IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN INSURANCE ASSOCIATION,<br>   2101 L Street NW<br>   Suite 400<br>   Washington, DC 20037,<br><br>and<br><br>NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,<br>   122 C Street NW<br>   Suite 450<br>   Washington, DC 20001,<br><br>      Plaintiffs,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br>   451 Seventh Street SW<br>   Washington, DC 20410,<br><br>and<br><br>SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development,<br>   Office of the Secretary<br>   451 Seventh Street SW<br>   Washington, DC 20410,<br><br>      Defendants. | Civil Action No. _____<br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     Plaintiffs American Insurance Association and National Association of Mutual Insurance Companies seek declaratory and injunctive relief against Defendants Department of Housing and Urban Development ("HUD") and Shaun Donovan, in his official capacity as Secretary of Housing and Urban Development ("Secretary"), for violations of the Administrative

Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA"), and the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA").

2. On February 15, 2013, HUD promulgated a final rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard," 78 Fed. Reg. 11,460 ("Disparate-Impact Rule" or "Rule").  In relevant part, the Disparate-Impact Rule purports to interpret the Fair Housing Act to prohibit housing-related activities that, although not motivated by intent to discriminate, result in a disparate impact on certain protected groups.  The Disparate-Impact Rule creates a three-part burden-shifting framework for assigning liability in private lawsuits and HUD enforcement actions premised on the existence of a disparate impact.

3. In the preamble to the Disparate-Impact Rule, HUD formally extended disparate-impact liability to the provision and pricing of homeowner's insurance for the first time.  78 Fed. Reg. 11,460, 11,475.

4. Defendants had no authority to promulgate the Disparate-Impact Rule.  The Fair Housing Act makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin," 42 U.S.C. §3604(a), or handicap, *id.* § 3604(f), or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin," *id.* § 3604(b), or handicap, *id.* § 3604(f).  By its plain terms, the statute prohibits only intentional discrimination.

5. Interpreting the Fair Housing Act to extend disparate-impact liability to the provision and pricing of homeowner's insurance requires insurers to consider characteristics

2

such as race and ethnicity and to disregard legitimate risk-related factors. This interpretation would require insurers to provide and price insurance in a manner that is wholly inconsistent with well-established principles of actuarial practice and applicable state insurance law. That is not only a perverse result, but it also flies in the face of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*, which entrusts insurance regulation to the States. During the rulemaking process, Plaintiffs pointed out the problems with extending disparate-impact liability to the provision of homeowner's insurance, but HUD promulgated the Disparate-Impact Rule in spite of them.

6. The Disparate-Impact Rule reaches beyond HUD's statutory authority under the Fair Housing Act. For the reasons set forth below, this Court should declare that the Disparate-Impact Rule is unlawful.

## PARTIES

7. The American Insurance Association ("AIA") is a non-profit trade organization with its headquarters in Washington, D.C. AIA's members sell homeowner's insurance, subject to state insurance regulations, in every State and territory of the United States. The Disparate-Impact Rule purports to regulate AIA's members. In bringing this lawsuit, AIA seeks to vindicate the interests of its members.

8. The National Association of Mutual Insurance Companies ("NAMIC") is a non-profit trade organization with its headquarters in Indianapolis, Indiana. NAMIC's members sell homeowner's insurance, subject to state insurance regulations, in every State and territory of the United States. The Disparate-Impact Rule purports to regulate NAMIC's members. In bringing this lawsuit, NAMIC seeks to vindicate the interests of its members.

9. Defendant HUD is an executive agency of the federal government, 5 U.S.C. §§ 101, 105, and is subject to the APA, 5 U.S.C. § 551(1). HUD was established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. §§ 3531 *et seq*. HUD is headquartered in Washington, D.C.

10. Defendant Shaun Donovan is the Secretary of Housing and Urban Development. His official address is in Washington, D.C. He is being sued in his official capacity. In that capacity, Secretary Donovan has responsibility for the operation and management of HUD. As such, Secretary Donovan is responsible for HUD's promulgation of the challenged regulation.

## JURISDICTION, VENUE, AND TIMELINESS

11. This action arises under the APA and the FHA. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and is authorized to review the final rule and grant relief pursuant to 5 U.S.C. §§ 702, 704, and 706.

12. Venue is proper in this district under 28 U.S.C. § 1391(b) and (e)(1) because Defendant HUD resides in this judicial district; Defendant Secretary Donovan performs his official duties in this judicial district; and a substantial part of the events giving rise to this action occurred in this judicial district.

13. This Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201 and 2202.

14. This Complaint is timely under 28 U.S.C. § 2401(a).

## BACKGROUND

### A. The Business of Insurance

15. Plaintiffs' members insure property, including private homes, against the risk of damage or loss. They sell their homeowner's insurance to private individuals.

16.     When providing insurance coverage, insurers make underwriting and rating decisions. They calculate the probability of a potential loss by considering aggregated loss data related to the characteristics of the insured property and the risk being assumed. They are required to consider all costs associated with the transfer of risk in developing their rating plans. For homeowner's coverage, relevant characteristics may include, for example, the age of the insured building, construction type, location of the property (such as in a region with a heightened risk of natural catastrophes), and the presence of smoke detectors.

17.     By properly classifying the risk associated with insured properties, insurers can then pool similar risks together to reduce the amount of variance in the insurer's expected losses. That process turns many individually risky transactions into a set that produces predictable outcomes. Insurers then establish rates, taking into account the expected loss, the magnitude of loss, and overhead costs.

18.     Insurance markets function efficiently and fairly when insurers underwrite according to actuarially significant risk factors and set rates that accurately reflect the risk of loss. If insurers are not able to do so, the system cannot operate efficiently. Some consumers would overpay, others underpay, and insurers would be unable to set premiums that accurately reflect the risks they assume.

19.     Differentiation among risks, then, is one of the foundational elements of insurance. A regime that does not allow an insurer to make risk-based distinctions would be antithetical to basic insurance practice. Fair and efficient risk allocation and pooling benefits insured and insurer alike.

20.     To promote fair and efficient risk allocation, every State has enacted laws that regulate the business of insurance. Those regulatory schemes typically cover virtually all aspects

of the business of insurance, including the licensing and operation of insurers in the State, and they are overseen by insurance administrators responsible for consistent, fair enforcement.

21. Among other things, state laws dictate that insurers' risk-classification standards may be based upon the "differences among risks that can be demonstrated to have a probable effect upon losses or expenses." W. Va. Code § 33-20-3; *see also* Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(c); Wis. Stat. Ann. § 626.12(2).

22. So, for example, risk classification may be "based upon size, expense, management, individual experience, purpose of insurance, location or dispersion of hazard, or any other reasonable considerations, provided such classifications and modifications apply to all risks under the same or substantially similar circumstances or conditions." Me. Rev. Stat. tit. 24-A, § 2303(2).

23. The differentiation among risks that present different probabilities of loss is permissible and appropriate under state laws. *See, e.g.*, Va. Code Ann. § 38.2-1904(A)(3) ("No rate shall be unfairly discriminatory if a different rate is charged for the same coverage and the rate differential (i) is based on sound actuarial principles or (ii) is related to actual or reasonably anticipated experience.").

24. By contrast, treating similar risks differently for reasons unrelated to actuarial justification is impermissible. Under state insurance codes, that principle is typically referred to as a prohibition against "unfair discrimination."

25. For example, insurers may not differentiate among "individuals or risks of the same class or of essentially the same hazard and expense element because of the race, color, religion, or national origin of such insurance risks or applicants." 215 Ill. Comp. Stat. 5/424(3); *see also* Alaska Stat. § 21.36.090; Tenn. Code Ann. § 56-5-303(a)(2)(d). Nor may risk

6

classifications "be based upon race, creed, national origin or the religion of the insured." Me. Rev. Stat. tit. 24-A, § 2303(1)(G).

26. Because state law prohibits considering characteristics such as the race and national origin of the insured in the risk-classification process, property insurers do not collect data regarding those characteristics.

27. In order to preserve the primacy of the States in regulating the business of insurance and protect these comprehensive and detailed state regulatory schemes from federal intrusion, Congress enacted the McCarran-Ferguson Act in 1945. *See* 15 U.S.C. §§ 1011-1015.

28. The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). A state law is "impaired" under the McCarran-Ferguson Act if application of the federal law in question would frustrate declared state policy or interfere with a State's administrative regime. *See Humana, Inc.* v. *Forsyth*, 525 U.S. 299 (1999).

29. The McCarran-Ferguson Act secured the supremacy of state law in the realm of insurance regulation, absent specific legislation from Congress to the contrary.

      **B.**    **HUD's Disparate-Impact Rule**

30. On November 7, 2011, the Supreme Court granted certiorari in *Magner* v. *Gallagher*, No. 10-1032, to decide whether disparate-impact claims are cognizable under the FHA and, if so, what approach courts should use to resolve them.

31. As of that time, HUD had not proposed any rule concerning disparate-impact liability under the FHA. HUD reportedly viewed the Supreme Court's grant of certiorari as "very problematic." Staff of H. Comm. on Oversight and Government Reform et al., 113th Cong., *DOJ's* Quid Pro Quo *with St. Paul: How Assistant Attorney General Thomas Perez*

*Manipulated Justice and Ignored the Rule of Law* 30 (Comm. Rep. 2013) (quoting HUD General Counsel Helen Kanovsky).

32.  Nine days after the Supreme Court granted certiorari in *Magner*, HUD proposed a regulation creating disparate-impact liability under the FHA.  76 Fed. Reg. 70,921 (Nov. 16, 2011).  That proposed regulation became the final rule at issue in this case.

33.  HUD did not formally consult with state insurance commissioners or the Federal Insurance Office before launching the rulemaking process.

34.  The City of St. Paul, Minnesota, which was the petitioner in *Magner*, voluntarily dismissed its case before the Supreme Court on February 14, 2012.  The Department of Justice's role in that dismissal was the subject of an ensuing congressional investigation.  *See* Staff of H. Comm. on Oversight and Government Reform et al., 113th Cong., *DOJ's* Quid Pro Quo *with St. Paul: How Assistant Attorney General Thomas Perez Manipulated Justice and Ignored the Rule of Law*.

35.  On February 15, 2013, after notice-and-comment rulemaking, HUD promulgated this final rule interpreting the FHA to prohibit practices that, although devoid of discriminatory intent, result in a disparate impact.  78 Fed. Reg. 11,460.

36.  The Disparate-Impact Rule, codified at 24 C.F.R. §§ 100.5 *et seq.*, provides as follows:  "Liability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent." *Id.* § 100.500.  "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."  *Id.* § 100.500(a).

8

37. Under the Disparate-Impact Rule, a practice that results in a discriminatory effect is permissible only if it is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests . . . [and] [t]hose interests could not be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(b)(1).

38. The Disparate-Impact Rule creates a burden-shifting framework for assessing disparate-impact liability under the FHA. It provides that the plaintiff or charging party has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). If the plaintiff or charging party meets that burden, "the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). If the defendant or respondent meets its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3).

39. In the preamble to the Disparate-Impact Rule, HUD formally extended disparate-impact liability to the provision and pricing of homeowner's insurance for the first time. 78 Fed. Reg. 11,460, 11,475.

40. Notwithstanding HUD's promulgation of the Disparate-Impact Rule, the Supreme Court has since granted review in another case presenting the same primary question as *Magner*. On June 17, 2013, the Court granted certiorari in *Township of Mt. Holly* v. *Mt. Holly Gardens Citizens in Action, Inc.*, No. 11-1507, to resolve the question whether disparate-impact claims are cognizable under the FHA.

9

### C. The Disparate-Impact Rule Is Contrary To Law

41. Congress enacted the FHA in 1968 "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

42. In furtherance of that purpose and as relevant here, the FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin," 42 U.S.C. § 3604(b), or handicap, *id.* § 3604(f)(2).

43. By its plain terms, Section 3604 prohibits only intentional discrimination, *i.e.*, discrimination "*because of*" race, color, religion, sex, familial status, national origin, or handicap.

44. The Supreme Court of the United States has interpreted analogous language under Title VII as prohibiting only intentional discrimination. *See Ricci* v. *DeStefano*, 557 U.S. 557 (2009).

45. Statutes that create disparate-impact liability use different language—such as language proscribing actions that "adversely affect" an individual because of his or her membership in a protected group—to focus on the effect of the action on the individual rather than on the motivation for the action. *See Smith* v. *City of Jackson*, 544 U.S. 228 (2004). Section 3604 does not include such language.

46. Unlike statutes that prohibit actions that "adversely affect" an individual, the text of the FHA does not prohibit practices that result in a disparate impact in the absence of discriminatory intent.

47. The FHA's applicability to insurers highlights the error of interpreting the FHA to create disparate-impact liability.

48. The FHA does not specifically indicate an intention to override the States' authority to regulate the business of insurance within the meaning of the McCarran-Ferguson Act.

49. Congress therefore did not intend that the FHA be construed in a way that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b).

50. Disparate-impact liability under the FHA would have precisely that effect. Among other things, the Disparate-Impact Rule would impair state laws that prohibit discrimination between risks of the same class or of essentially the same hazard, violating principles of sound actuarial practice. The Disparate-Impact Rule would also impair state laws that prohibit consideration of race in the underwriting or rating process. It would do so by giving rise to disparate treatment among risks of the same class or of essentially the same hazard in order to avoid a disparate impact on protected groups and by imposing on insurers a need to collect data about characteristics such as the race or national origin of the insured in order to avoid unintentionally perpetuating a disparate effect.

### D. Plaintiffs' Members Are Harmed by the Disparate-Impact Rule

51. Although the text of the Disparate-Impact Rule does not specifically address insurance, HUD's proposed rule cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." 76 Fed. Reg. 70,921, 70,924.

52. In response to the proposed rule, Plaintiffs filed comments that identified a variety of problems with the proposed rule and, in particular, explained why the FHA cannot be interpreted to include disparate-impact liability. Regarding insurers, Plaintiffs argued, *inter alia*, that:

      A.     Disparate-impact liability for insurance practices is inappropriate because insurance is risk-based and insurers rely on numerous legitimate factors when providing coverage;

      B.     Insurers would be forced to violate state laws that require insurance rates to accurately estimate risk and not be excessive, inadequate, or unfairly discriminatory under state law; and

      C.     Insurers would face special hardship on burden-of-proof issues because they do not collect race and ethnicity data. Indeed, considering race or ethnicity data in the course of searching for a less discriminatory alternative would be a violation of state laws prohibiting the consideration of those factors.

53.    Instead of directly addressing those arguments, HUD dodged them at every turn.

      A.     HUD responded to concerns about risk-based ratemaking and compliance with state law by suggesting that an insurer could always "defend the business justifications for its policies" if it showed that the premiums it charged were supported by "a legally sufficient justification." 78 Fed. Reg. 11,460, 11,475. It did not address the fact that the Disparate-Impact Rule would force insurers, in many cases, to violate state law; bear the costs and risks of proving the necessity of well-established ratemaking practices; and still face the prospect of liability if there were a less accurate alternative to risk-based rating practices that would allegedly result in less of a disparate impact. Nor did HUD identify any deficiency in state insurance law's provision for members of groups protected under the FHA.

      B.     HUD essentially ignored the burden-of-proof argument, merely stating that the burden of proof would be no more of an issue for insurers than it would be for plaintiffs. HUD did not address the burden that the Disparate-Impact Rule would impose on insurers,

which would have to create new data-collection processes specifically for the purpose of considering factors such as race, when they previously had not done so, in order to defend against disparate-impact claims.  Worse, HUD completely ignored the fact that, at least in ratemaking, insurers would have to violate state laws prohibiting the consideration of race or ethnicity or other protected characteristics in order to determine whether a less discriminatory alternative practice is available.

54. After giving those plainly inadequate responses that left Plaintiffs' concerns unaddressed, HUD promulgated the Disparate-Impact Rule.

55. As a result, Plaintiffs and their members have expended money and resources analyzing the applicability of the Disparate-Impact Rule to the business of insurance.

56. Plaintiffs have spent money and resources explaining the Disparate-Impact Rule to their members.

57. Plaintiffs have spent money and resources evaluating the effect of the Disparate-Impact Rule on their members and helping to ensure that their members are in a position to comply with the Disparate-Impact Rule.

58. In addition, the Disparate-Impact Rule will create, and has already created, significant burdens on Plaintiffs' members.

59. In order to comply with the Disparate-Impact Rule, Plaintiffs' members have spent and will continue to have to spend money on, and have devoted and will continue to have to devote resources to, re-examining and, if necessary, modifying their existing practices. Plaintiffs' members are and will be harmed by the Disparate-Impact Rule.

60. The Disparate-Impact Rule will inevitably have an ongoing effect on Plaintiffs and their members.

61. The Disparate-Impact Rule subjects Plaintiffs' members to different and conflicting obligations under state and federal law.

62. Plaintiffs' members also face a significant threat of continuous and recurring litigation and agency-enforcement actions under the Disparate-Impact Rule.

63. The Disparate-Impact Rule injures insurers, including Plaintiffs' members, by imposing significant costs related to identifying and remedying the disparate impact of various practices, which were acceptable until the rule was issued. A court decision invalidating the Disparate-Impact Rule would redress that injury.

64. Ultimately, the Disparate-Impact Rule harms the public, as consumers of insurance, because increased costs to the insurance industry will result in increased costs to insurance policyholders; because consideration of potential disparate impacts will make rating less efficient, causing some policyholders to overpay; and because the Rule, for the first time, makes the policyholder's protected personal characteristics such as race relevant to the insurance decision.

## CLAIM FOR RELIEF

**The Disparate-Impact Rule Is In Excess Of Defendants' Statutory Jurisdiction, Authority, Or Limitations Or Is Otherwise Not In Accordance With Law**

65. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

66. The FHA makes it unlawful to, among other things, "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin," 42 U.S.C. § 3604(b), or handicap, *id.* § 3604(f)(2).

67. By its terms, the FHA prohibits only intentional discrimination. It does not prohibit facially neutral practices that, although not motivated by discriminatory intent, result in a disparate impact.

68. Congress delegated to the Secretary of HUD the authority to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out" the FHA. 42 U.S.C. § 3614a.

69. The Disparate-Impact Rule constitutes final agency action.

70. An agency acts outside its delegated authority when it enacts a regulation contrary to the plain language of the delegating statute. It has no power to amend the statute as enacted by Congress or to create rights that Congress did not.

71. The Disparate-Impact Rule does not "carry out" the FHA and is not authorized under the FHA because the Rule prohibits a disparate impact, whereas the FHA prohibits only intentional discrimination.

72. Accordingly, Defendants did not have authority under the FHA to promulgate the Disparate-Impact Rule, and the Disparate-Impact Rule is not in accordance with the FHA.

73. By promulgating the Disparate-Impact Rule, Defendants acted in excess of their statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C), and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1. Declare that Defendants have violated the APA;

2. Declare that the Disparate-Impact Rule is not in accordance with the FHA and beyond Defendant's authority under the FHA;

3. Grant an order and judgment vacating the Disparate-Impact Rule as unlawful;

4. Grant an order and judgment enjoining HUD and its officers from carrying out any of the powers delegated to them by the Disparate-Impact Rule;

5. Award Plaintiffs their costs and reasonable attorneys' fees as appropriate; and

6. Grant any such other relief that this Court deems just and appropriate.

Respectfully submitted,

By: s/ Kannon K. Shanmugam
Kannon K. Shanmugam (#474304)
Allison B. Jones (#991503)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*Counsel for Plaintiffs*

Dated: June 26, 2013