**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

        Plaintiffs,

            v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and SHAUN DONOVAN, in his official
capacity as Secretary of Housing and Urban
Development,

        Defendants.

Civil Action No. 13-cv-966 (RJL)


**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**


Kannon K. Shanmugam (#474304)
Allison B. Jones (#991503)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

    A.    Statutory Background .........................................................................2

    B.    HUD's Disparate-Impact Rule.............................................................4

    C.    Procedural History ..............................................................................8

ARGUMENT ..................................................................................................8

HUD'S DISPARATE-IMPACT RULE IS INCONSISTENT WITH THE FHA AND
THEREFORE INVALID ......................................................................................9

    A.    The Text of the FHA Unambiguously Prohibits Only Intentional
        Discrimination.....................................................................................10

    B.    The FHA's History Confirms That It Does Not Permit Disparate-Impact
        Claims .................................................................................................20

    C.    Construing the FHA To Permit Disparate-Impact Liability Would Raise
        Serious Constitutional Questions.........................................................26

    D.    Construing The FHA To Permit Disparate-Impact Liability Would Be
        Inconsistent With The McCarran-Ferguson Act And Would Disrupt The
        Business Of Homeowner's Insurance ...................................................30

CONCLUSION ..................................................................................................38

# TABLE OF AUTHORITIES

## CASES

*2922 Sherman Avenue Tenants' Ass'n* v. *District of Columbia*, 444 F.3d 673
(D.C. Cir. 2006) ............................................................................................24

*Alexander* v. *Sandoval*, 532 U.S. 275 (2001) ............................................................13

*American Bankers Ass'n* v. *Nat'l Credit Union Admin.*, 271 F.3d 262 (D.C. Cir.
2001) .............................................................................................................9

*American Bar Ass'n* v. *FTC*, 430 F.3d 457 (D.C. Cir. 2005) ..................................10, 27

*Bell Atlantic Telephone Cos.* v. *FCC*, 131 F.3d 1044 (D.C. Cir. 1997) ......................10

*Board of Education of the City School District of the City of New York* v. *Harris*,
444 U.S. 130 (1979).............................................................................12, 19, 20

*Brown* v. *Artery Organization, Inc.*, 654 F. Supp. 1106 (D.D.C. 1987).........................4

*Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S.
164 (1994).......................................................................................................25

*Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837 (1984) ......... passim

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) ............................................................29

*City of Edmonds* v. *Oxford House, Inc.*, 514 U.S. 725 (1995) ....................................23

*City of Mobile* v. *Bolden*, 446 U.S. 55 (1980) ......................................................13, 17

*Dehoyos* v. *Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) .......................................35, 36

*Department of Treasury* v. *Fabe*, 508 U.S. 491 (1993).........................................31, 34

*Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction
Trades Council*, 485 U.S. 568 (1988) ..............................................................27

*FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)................10, 27, 30

*Fischer* v. *University of Texas at Austin*, 133 S. Ct. 2411 (2013) ..............................30

*Freeman* v. *Quicken Loans, Inc.*, 132 S. Ct. 2034 (2012) ......................................9, 14

*General Dynamics Land Systems, Inc.* v. *Cline*, 540 U.S. 581 (2004).........................10

*Greater New Orleans Fair Housing Action Ctr.* v. *HUD*, 639 F.3d 1078 (D.C. Cir.
2011) ...............................................................................................................4

Page

Cases—continued:

*Griggs* v. *Duke Power Company*, 401 U.S. 424 (1971) ................................................22

*Gross* v. *FBL Financial Services, Inc.*, 557 U.S. 167 (2009) ........................................18

*Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U.S. 205 (1979) ......................31

*Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N.A.*, 530 U.S. 1 (2000)......11

*Hazen Paper Co.* v. *Biggins*, 507 U.S. 604 (1993)........................................................11

*Hearth, Patio & Barbecue Ass'n* v. *Department of Energy*, 706 F.3d 499 (D.C.
    Cir. 2013) ...............................................................................................................9, 10

*Humana, Inc.* v. *Forsyth*, 525 U.S. 299 (1999) .............................................................34

*Insurance Commissioner* v. *Engelman*, 692 A.2d 474 (Md. 1997) ...............................33

*International Brotherhood of Teamsters* v. *United States*, 431 U.S. 324 (1977) ...................3, 11

*Jama* v. *ICE*, 543 U.S. 335 (2005)................................................................................24

*Kartman* v. *State Farm Mutual Automobile Insurance Co.*, 634 F.3d 883 (7th Cir.
    2011) ..........................................................................................................................31

*Life Insurance Ass'n* v. *Commissioner of Insurance*, 530 N.E.2d 168 (Mass. 1988)...................34

*Magner* v. *Gallagher*, 132 S. Ct. 548 (2011)........................................................1, 4, 5

*Massachusetts* v. *Department of Transportation*, 93 F.3d 890 (D.C. Cir. 1996) .........38

*MCI Telecommunications Corp.* v. *AT&T Co.*, 512 U.S. 218 (1994) ...........................27

*Meacham* v. *Knolls Atomic Power Laboratory*, 554 U.S. 84 (2008)............................30

*Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft
    Noise, Inc.*, 501 U.S. 252 (1991)...............................................................................28

*Miller* v. *Johnson*, 515 U.S. 900 (1995) ................................................26, 28, 29, 30

*NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287 (7th Cir. 1992)....................35

*NACS* v. *Board of Governors of Federal Reserve System*, No. 11-2075 (RJL),
    2013 WL 3943489 (D.D.C. July 31, 2013)....................................................8, 10, 38

Page

Cases—continued:

*National Community Reinvestment Coalition* v. *Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70 (D.D.C. 2008) ...................................................4

*Nationwide Mutual Insurance Co.* v. *Cisneros*, 52 F.3d 1351 (6th Cir. 1995).............................35

*Natural Resources Defense Council* v. *Reilly*, 983 F.2d 259 (D.C. Cir. 1993) ..........................27

*North Carolina Fisheries Ass'n* v. *Gutierrez*, 518 F. Supp. 2d 62 (D.D.C. 2007) .........................9

*Ojo* v. *Farmers Group Inc.*, 600 F.3d 1205 (9th Cir. 2010) (en banc) .........................................34

*Raytheon Co.* v. *Hernandez*, 540 U.S. 44 (2003) ..........................................3, 11, 12, 22

*Regents of University of California* v. *Bakke*, 438 U.S. 265 (1978)............................................28

*\*Ricci* v. *DeStefano*, 557 U.S. 557 (2009)......................................................................... passim

*Rust* v. *Sullivan*, 500 U.S. 173 (1991)..........................................................................................27

*Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961 (8th Cir. 2008)............................35, 36

*Schindler Elevator Corp.* v. *United States ex rel. Kirk*, 131 S. Ct. 1885 (2011).........................12

*Sebelius* v. *Cloer*, 133 S. Ct. 1886 (2013) ...............................................................................20

*Sierra Club* v. *EPA*, 292 F.3d 895 (D.C. Cir. 2002)........................................................................8

*\*Smith* v. *City of Jackson*, 544 U.S. 228 (2005) ..................................................................... passim

*Town of Huntington* v. *Huntington Branch, NAACP*, 488 U.S. 15 (1988)....................................25

*Township of Mount Holly* v. *Mt. Holly Gardens Citizens in Action, Inc.*, 133 S. Ct. 2824 (2013)............................................................................................................... passim

*United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U.S. 366 (1909)...........................................................................................................................27

*University of Texas Southwestern Medical Center* v. *Nassar*, 133 S. Ct. 2517 (2013)...........................................................................................................................24

*Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)....................................................................................................11, 29

Page

Cases—continued:

*Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642 (1989)............................................3

*Washington* v. *Davis*, 426 U.S. 229 (1976) ...................................................11, 29

## CONSTITUTION, STATUTES AND REGULATIONS

U.S. Const. Amend. XIV .............................................................................11, 29

U.S. Const. Art. VI, cl. 2 ....................................................................................34

5 U.S.C. § 706(2)(A)...........................................................................................8

5 U.S.C. § 706(2)(C)...........................................................................................8

*15 U.S.C. §§ 1011 *et seq.* .......................................................................... passim

15 U.S.C. § 1011 ...............................................................................................34

15 U.S.C. § 1012(b) ....................................................................................34, 35

20 U.S.C. §§ 1601 *et seq.*.................................................................................19

29 U.S.C. § 623(a) .............................................................................................14

29 U.S.C. § 623(a)(1)........................................................................................15

29 U.S.C. § 623(a)(2)...................................................................................15, 16

42 U.S.C. § 1973 ..........................................................................................13, 17

42 U.S.C. § 1973c(b) ........................................................................................17

42 U.S.C. § 2000d..............................................................................................13

42 U.S.C. § 2000e-2(a) .....................................................................................14

42 U.S.C. § 2000e-2(a)(1).................................................................................15

42 U.S.C. § 2000e-2(a)(2)...........................................................................15, 16

42 U.S.C. § 2000e-2(k)......................................................................................22

*42 U.S.C. §§ 3601 *et seq.*.......................................................................... passim

Page

Constitution, statutes and regulations—continued:

42 U.S.C. § 3601 .................................................................................2

42 U.S.C. § 3604(a) ..................................................................... passim

42 U.S.C. § 3604(b) ..................................................................... passim

42 U.S.C. § 3604(f)(1) .................................................................. passim

42 U.S.C. § 3604(f)(2) .................................................................. passim

42 U.S.C. § 3605 ......................................................................... passim

42 U.S.C. § 3605(a) .............................................................................22

42 U.S.C. § 3605(c) .............................................................................23

42 U.S.C. § 3606 ......................................................................... passim

42 U.S.C. § 3607(b)(1) ........................................................................23

42 U.S.C. § 3607(b)(4) ........................................................................23

42 U.S.C. § 12112(b) ...........................................................................22

24 C.F.R. §§ 100.5 *et seq.* ....................................................................6

24 C.F.R. § 100.500 ..............................................................................6

24 C.F.R. § 100.500(a) ..........................................................................6

24 C.F.R. § 100.500(c)(1) ......................................................................6

24 C.F.R. § 100.500(c)(2) ......................................................................6

24 C.F.R. § 100.500(c)(3) ......................................................................6

54 Fed. Reg. 3232 (Jan. 23, 1989) ......................................................25

76 Fed. Reg. 70,921 (Nov. 16, 2011) ....................................................4

78 Fed. Reg. 11,460 (Feb. 15, 2013) ............................................ passim

Alaska Stat. § 21.36.090 ......................................................................33

Alaska Stat. § 21.39.030 ......................................................................33

Page

Constitution, statutes and regulations—continued:

Colo. Rev. Stat. § 10-4-403 ....................................................................33

Colo. Rev. Stat. § 10-4-403(1) ................................................................33

Colo. Rev. Stat. § 10-4-403(1)(c) ...........................................................33

D.C. Code § 31-2231.11 ..........................................................................33

215 Ill. Comp. Stat. 5/424(3) ..................................................................33

Ky. Rev. Stat. Ann. § 304.12-085 ...........................................................33

Mass Gen. Laws Ann. Chapter 175 ........................................................33

Md. Code Ann. Ins. § 27-501(c)(1) ...................................................33, 36

Me. Rev. Stat. Title 24-A, § 2303(1)(G) .................................................33

Me. Rev. Stat. Title 24-A, § 2303(2) .......................................................33

Mo. Rev. Stat. § 379.318(2) .....................................................................36

N.Y. Ins. Law § 3201 ...............................................................................32

Okla. Stat. Ann. Title 36, § 985 ..............................................................33

S.C. Code Ann. § 38-75-1210(B)(1) ...................................................33, 36

Tenn. Code Ann. § 56-5-303(a)(2)(d) ..................................................33, 36

Tex. Ins. Code Ann. § 544.002 ...........................................................33, 36

Va. Code Ann. § 38.2-1904(A)(3) .............................................................34

W. Va. Code § 33-20-3 .............................................................................33

Wis. Stat. Ann. § 626.12(2) ......................................................................33

**MISCELLANEOUS**

114 Cong. Rec. 2283 (1968) .....................................................................21

114 Cong. Rec. 2530 (1968) .....................................................................21

114 Cong. Rec. 3129 (1968) .....................................................................21

vii

Page

Miscellaneous—continued:

114 Cong. Rec. 3252 (1968) ..................................................................21

114 Cong. Rec. 3421 (1968) ..................................................................21

114 Cong. Rec. 3422 (1968) ..................................................................21

114 Cong. Rec. 5643 (1968) ..................................................................21

Actuarial Standards Board, Task Force to Revise ASOP No. 12, *Actuarial Standard of Practice: Risk Classification (for All Practice Areas)* (Dec. 2005)....................32

American Academy of Actuaries, Committee on Risk Classification, *Risk Classification: Statement of Principles* (2013) ........................................32

*American Heritage Dictionary* (1969)............................................12, 13, 14

Casualty Actuarial Society, Board of Directors, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* (May 1988) ................32

H.R. Rep. No. 711, 100th Cong., 2d Sess. 89 (1988) ...............................26

Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403 (1985) ....................................................31

Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum (2009)....................................35

National Association of Insurance Commissioners, Property & Casualty Model Rating Law (Prior Approval Version), NAIC 1780 (2009)..........................32

Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140 (Sept. 13, 1988) ...........................................25

*Rigging Antidiscrimination Law*, Wall St. J., Nov. 19, 2013 .........................2

Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29 (2012)..........................................................................31

Staff of H. Comm. on Oversight and Gov't Reform et al., 113th Cong., *DOJ's "Quid Pro Quo" with St. Paul: How Assistant Attorney General Thomas Perez Manipulated Justice and Ignored the Rule of Law* (Comm. Rep. 2013)................1, 4, 5

1 Steven Plitt, et al., *Couch on Insurance* (3d rev. ed. 2009) .....................31

*Webster's Third New International Dictionary* (1971) ....................11, 12, 13, 14

viii

Plaintiffs American Insurance Association (AIA) and the National Association of Mutual Insurance Companies (NAMIC) respectfully submit this Memorandum in Support of their Motion for Summary Judgment.

## INTRODUCTION

On February 15, 2013, the United States Department of Housing and Urban Development (HUD) promulgated a final rule purporting to interpret the Fair Housing Act (FHA) to prohibit housing-related activities that, although not motivated by intent to discriminate, result in a disparate impact on certain protected groups. *See* Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (Disparate-Impact Rule), attached as Ex. A. Plaintiffs are two of the Nation's largest trade associations representing homeowner's insurers. On June 26, 2013, Plaintiffs filed this suit challenging the Disparate-Impact Rule and seeking declaratory and injunctive relief against HUD and its Secretary, Shaun Donovan. In their complaint, Plaintiffs raised a single claim: *viz.*, that Defendants violated the Administrative Procedure Act (APA) by promulgating the Disparate-Impact Rule, because the FHA unambiguously prohibits only intentional discrimination and not practices that result in a disparate impact.

Plaintiffs now move for summary judgment on their APA claim. At bottom, that claim presents a clean legal question: namely, whether disparate-impact claims are cognizable under the FHA. The Supreme Court has granted review twice to address that question, *see Township of Mount Holly* v. *Mt. Holly Gardens Citizens in Action, Inc.*, 133 S. Ct. 2824 (2013); *Magner* v. *Gallagher*, 132 S. Ct. 548 (2011), but in each instance the cases were derailed by parties that feared the challengers would prevail. *See* Staff of H. Comm. on Oversight and Gov't Reform et al., 113th Cong., *DOJ's "Quid Pro Quo" with St. Paul: How Assistant Attorney General Thomas*

*Perez Manipulated Justice and Ignored the Rule of Law* 64 (Comm. Rep. 2013) (Perez Report);

*Rigging Antidiscrimination Law*, Wall St. J., Nov. 19, 2013, at A16.

Because this case will potentially present the Supreme Court with an opportunity not only to address the question but to resolve it once and for all, and because the question has already been the subject of literally thousands of pages of briefing in the two prior Supreme Court cases (including two merits briefs from the Justice Department), Plaintiffs file this motion now in an effort to streamline proceedings before this Court and to expedite the ultimate resolution of this question—a question of exceptional importance not only to the insurance industry, but beyond. And Plaintiffs respectfully submit that the answer to the question is clear. Because the Disparate-Impact Rule is contrary to the unambiguously expressed intent of Congress in the text of the Fair Housing Act, HUD acted in excess of its statutory authority, and not in accordance with law, when it promulgated the rule. Plaintiffs' motion for summary judgment should therefore be granted.

## BACKGROUND

### A.    Statutory Background

Congress enacted the Fair Housing Act in 1968 to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. As originally enacted, Section 804(a) of the FHA made it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin." 42 U.S.C. § 3604(a). Section 804(b) of the FHA, in turn, made it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith because of" the same characteristics. 42 U.S.C. § 3604(b). Those provisions were subsequently amended to add sex, familial status, and handi-

cap to the list of protected characteristics. *See* 42 U.S.C. § 3604(a) and (b) (1974); 42 U.S.C. § 3604(a), (b), (f)(1), and (f)(2) (1988).[1]

In interpreting other federal statutes that prohibit discrimination on the basis of protected characteristics, the Supreme Court has drawn a distinction between those that prohibit only "disparate treatment" and those that prohibit practices with a "disparate impact." *Raytheon Co.* v. *Hernandez*, 540 U.S. 44, 52 (2003). "Disparate treatment" is intentional discrimination: it occurs when the defendant "has treated [a] particular person less favorably because of a protected trait." *Ricci* v. *DeStefano*, 557 U.S. 557, 577 (2009) (internal quotation marks and citation omitted). In order to show disparate treatment, the plaintiff must prove that the defendant acted with "discriminatory intent or motive." *Id.* (internal quotation marks and citation omitted). A claim for "disparate impact," by contrast, seeks to hold a defendant liable for adopting a "practice[] that [is] facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by business necessity." *Raytheon*, 540 U.S. at 52 (quoting *International Brotherhood of Teamsters* v. *United States*, 431 U.S. 324, 335 n.15 (1977)). As the name suggests, a disparate-impact claim may succeed "without evidence of the employer's subjective intent to discriminate." *Id.* at 52-53 (quoting *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 646 (1989)).

---

[1] Other sections of the FHA prohibit more specific conduct using similar statutory language. As amended, Section 805 makes it unlawful for "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction because of" the protected characteristics. 42 U.S.C. § 3605. Section 806 makes it unlawful "to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of" the protected characteristics. 42 U.S.C. § 3606.

3

The question presented in this case is whether disparate-impact claims are cognizable under the FHA.  While other courts of appeals have held that the FHA permits disparate-impact claims, the D.C. Circuit has not yet addressed the question, *see Greater New Orleans Fair Housing Action Ctr.* v. *HUD*, 639 F.3d 1078, 1085 (D.C. Cir. 2011) (assuming, without deciding, that disparate-impact liability is available), and judges in this district have reached differing results. *Compare National Community Reinvestment Coalition* v. *Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 77-79 (D.D.C. 2008) (Sullivan, J.) (holding that the FHA permits disparate-impact claims), *with Brown* v. *Artery Organization, Inc.*, 654 F. Supp. 1106, 1115-1116 (D.D.C. 1987) (Greene, J.) (holding that it does not, at least against private defendants).

### B.    HUD's Disparate-Impact Rule

On November 7, 2011, the Supreme Court granted certiorari in *Magner*, *supra*, which presented the question whether disparate-impact claims are cognizable under the FHA.  At the time, the General Counsel of HUD considered the grant of certiorari to be "very problematic." Perez Report 30 (quoting HUD General Counsel Helen Kanovsky).  Just nine days after the Court granted certiorari in *Magner*, HUD proposed a rule that would permit disparate-impact liability under the FHA.  *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011).  In the rule, HUD proposed to "prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate."  *Id.*

Of particular relevance to Plaintiffs here, the proposed rule specifically took aim at homeowner's insurers.  The rule identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act."  76 Fed. Reg. 70,924.  The rule marked the first time that HUD had formally taken the position that insurers were subject to

4

disparate-impact liability in connection with the provision and pricing of homeowner's insurance.

In response, both Plaintiffs submitted comments on behalf of their members, which the rule proposed to regulate. *See* Ex. B (AIA Comments, filed Jan. 17, 2012); Ex. C (NAMIC Comments, filed Jan. 17, 2012). First and foremost, Plaintiffs pointed out that the Supreme Court was expected soon to decide whether the FHA prohibits only intentional discrimination, Ex. B, at 3-4; Ex. C, at 3-4, and Plaintiff NAMIC specifically asserted that it would be inconsistent with the statutory language to prohibit practices that result in a disparate impact without any evidence of discriminatory intent, *id.* In addition, Plaintiffs argued that applying disparate-impact analysis to the insurance industry would contravene state law and thus violate the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*, which entrusts insurance regulation to the States. Ex. B, at 2-3; Ex. C, at 6-9. Plaintiff NAMIC further contended that disparate-impact liability would be fundamentally inconsistent with risk-based pricing, one of the cornerstones of the insurance business, Ex. C, at 4-6, and noted that insurers would have special difficulties with burdens of proof because "insurers do not collect data on race and ethnicity" and in some instances cannot do so because of state law, *id.* at 12.

As noted above, while HUD's proposed rule was pending, *Magner* settled; it later came to light that then-Assistant Attorney General for Civil Rights (now Secretary of Labor) Tom Perez had played a central role in the settlement effort. *See* Perez Report 64. Soon after, however, another challenge to disparate-impact liability was filed in the Supreme Court. *See Township of Mount Holly* v. *Mt. Holly Gardens Citizens in Action, Inc.*, No. 11-1507 (pet. for cert. filed June 11, 2012). On February 15, 2013, while the Court was awaiting a brief from the Solicitor Gen-

eral on whether to grant review in *Mount Holly*, HUD promulgated its final rule. *See* 78 Fed. Reg. 11,460.

The Disparate-Impact Rule, codified at 24 C.F.R. §§ 100.5 *et seq.*, provides that "[l]iability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent." 24 C.F.R. § 100.500. "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a). In addition, the Disparate-Impact Rule purported to establish a burden-shifting framework for disparate-impact claims. Under that framework, the plaintiff first must prove "that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). If the plaintiff meets that burden, the defendant must show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 24 C.F.R. § 100.500(c)(2). If the defendant makes that showing, the plaintiff "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3).

To justify its position that the FHA authorized disparate-impact liability, HUD relied on the FHA's prohibitions against "otherwise mak[ing] unavailable or deny[ing]" a dwelling, 42 U.S.C. § 3604(a) and (f)(1), and against "discriminat[ing]" in certain housing-related transactions, 42 U.S.C. §§ 3604(b) and (f)(2), 3605, 3606. *See* 78 Fed. Reg. 11,465-11,466. The former, HUD claimed, shows that disparate-impact liability is available because it "focuses on the effects of a challenged action rather than the motivation of the actor" and is "similar to the 'oth-

erwise adversely affect' formulation that the Supreme Court found to support disparate impact liability under Title VII and the ADEA." *Id.* at 11,466. HUD asserted that the prohibition against "discriminat[ing]" supported its interpretation because a discriminatory effect could be a form of discrimination and, in HUD's "experience," an expansive interpretation of the word is necessary to achieve the statute's purpose. *Id.*

HUD offered only cursory responses to Plaintiffs' insurance-related comments. Regarding the McCarran-Ferguson Act, HUD claimed that it was not bound by McCarran-Ferguson because that law merely "instructs courts on how to construe federal statutes." 78 Fed. Reg. 11,475. HUD dismissed Plaintiffs' concern that the business of insurance was incompatible with disparate-impact liability, claiming that, under its proposed framework, insurers had the opportunity to show that their premiums were supported by "legally sufficient justification." *Id.* And HUD summarily rejected Plaintiffs' concern about insurers' inability to collect the data necessary to defend themselves because of state insurance laws and industry practice, asserting that "[t]he burden of proof is not more difficult for insurers than for a charging party or plaintiff alleging that an insurance practice creates a discriminatory effect." *Id.*

The Disparate-Impact Rule took effect on March 18, 2013. On May 17, 2013—nearly seven months after the Supreme Court initially solicited his views—the Solicitor General filed a brief recommending that the Court deny certiorari in *Mount Holly* on the ground that "[n]o court of appeals has considered the final rule[] and it would be appropriate for this Court to allow courts to implement HUD's recent guidance." U.S. Br. at 6, *Mount Holly*, *supra*. Notwithstanding the Solicitor General's recommendation, the Supreme Court granted certiorari in *Mount Holly* on June 17, 2013.

### C.    Procedural History

On June 26, 2013, Plaintiffs filed this lawsuit, contending that the Disparate-Impact Rule was invalid because the FHA unambiguously prohibits only disparate treatment and not disparate impact.[2]  On August 15, 2013, Defendants filed a motion for a stay of proceedings, contending that "[i]t is apparent from the face of the Complaint that plaintiffs seek to litigate the same issue of statutory interpretation that the Supreme Court is set to decide in *Mount Holly*."  Defs.' Unopposed Mot. to Stay Proceedings, ECF No. 12, at 3.  Plaintiffs agreed not to oppose the stay motion but informed Defendants of Plaintiffs' desire to move expeditiously with a motion for summary judgment in the event of a settlement in *Mount Holly*.  On August 29, 2013, this Court granted a stay, asking the parties to advise the Court of the need for any further proceedings in this action within 30 days of the Supreme Court's disposition of *Mount Holly*.  *See* Minute Order.  On November 15, 2013, the Supreme Court dismissed *Mount Holly* pursuant to the parties' settlement.  The parties here filed a joint motion to lift the stay on December 16, 2013, and the Court granted that motion, lifting the stay, on December 20, 2013.  *See* Order, ECF No. 15.

### ARGUMENT

Under the APA, a court must set aside agency action that exceeds the agency's "statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).  The Disparate-Impact Rule fails at the first step of the familiar two-step framework for reviewing an agency's interpretation of a statute that it administers, because this is a case in which "Congress

---

[2] Because Plaintiffs' members are "object[s] of the action  .   .   .  at issue," it is "self-evident" that Plaintiffs have standing:  there is "little question that the action  .   .   .  has caused [Plaintiffs' members] injury[] and that a judgment preventing  .   .   .  the action will redress it."  *Sierra Club* v. *EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (internal quotation marks and citation omitted); *accord*, *e.g.*, *NACS* v. *Board of Governors of Federal Reserve System*, No. 11-2075 (RJL), 2013 WL 3943489, at *11 (D.D.C. July 31, 2013).

has directly spoken to the precise question at issue." *See Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837, 842-843 (1984).  The text and history of the FHA unambiguously indicate that the FHA prohibits only disparate treatment and not disparate impact. Where, as here, "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.*; *see also Freeman* v. *Quicken Loans, Inc.*, 132 S. Ct. 2034, 2040 (2012) (explaining that the Court "need not resolve" whether *Chevron* deference would apply because HUD's policy "goes beyond the meaning that the statute can bear" (internal quotation marks and citation omitted)). This Court should grant summary judgment on that basis alone.  *See, e.g., North Carolina Fisheries Ass'n* v. *Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007) (noting that, "[i]n a case like this one involving review of a final agency action under the APA," a motion for summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is  .  .  . consistent with the APA standard of review" (internal quotation marks and citation omitted)).[3]

## HUD'S DISPARATE-IMPACT RULE IS INCONSISTENT WITH THE FHA AND THEREFORE INVALID

Under the first step of *Chevron*, a court "examine[s] the statute *de novo*, employing traditional tools of statutory construction." *Hearth, Patio & Barbecue Ass'n* v. *Department of Energy*, 706 F.3d 499, 503 (D.C. Cir. 2013) (internal quotation marks and citation omitted).  "The Court is thus free to consider the text, structure, purpose, and history of an agency's authorizing statute to determine whether a statutory provision admits of congressional intent on the precise question at issue." *Id.* (internal quotation marks and citation omitted).  Even if the relevant statu-

---

[3] Where, as here, the party challenging a regulation is arguing that the regulation is inconsistent with the relevant statute, a court may resolve the challenge on a dispositive motion without awaiting the administrative record.  *See American Bankers Ass'n* v. *Nat'l Credit Union Admin.*, 271 F.3d 262, 266-267 (D.C. Cir. 2001).  The parties have agreed to waive the filing of the administrative record in this case.

tory text leaves room for ambiguity, the court's inquiry "does not end with the plain language." *Id.* at 504. "[T]he sort of ambiguity giving rise to *Chevron* deference is a creature not of definitional possibilities, but of statutory context." *American Bar Ass'n* v. *FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005) (internal quotation marks and citation omitted). Thus, in determining whether a statute is so ambiguous as to indicate an implicit delegation of authority to the agency, a court must "exhaust 'traditional tools of statutory construction,' including textual analysis, structural analysis, and (when appropriate) legislative history." *NACS* v. *Board of Governors of Federal Reserve System*, No. 11-2075 (RJL), 2013 WL 3943489, at *10 (D.D.C. July 31, 2013) (quoting *Chevron*, 467 U.S. at 843 n.9, and citing *Bell Atlantic Telephone Cos.* v. *FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997)). In addition, "the meaning of one statute may be affected by other Acts," such as the McCarran-Ferguson Act in this case, particularly when Congress has spoken "more specifically to the topic at hand." *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

In short, "under *Chevron*, deference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *General Dynamics Land Systems, Inc.* v. *Cline*, 540 U.S. 581, 600 (2004). Here, all of the tools of statutory construction—including the text of the statute, the statutory and legislative history, and other Acts of Congress—point to the same conclusion: *viz.*, that the FHA prohibits only intentional discrimination and not practices that result in a disparate impact.

### A.    The Text of the FHA Unambiguously Prohibits Only Intentional Discrimination

The plain language of the FHA does not permit disparate-impact claims. "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required

by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks and citation omitted).

1. An anti-discrimination statute ordinarily should be construed to prohibit only intentional discrimination. The Equal Protection Clause prohibits only intentional discrimination, and the Supreme Court has repeatedly rejected the "proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact." *Washington* v. *Davis*, 426 U.S. 229, 239 (1976); *accord Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977). Congress has extended that prohibition on disparate treatment to private conduct through various anti-discrimination statutes, such as Titles VI and VII of the Civil Rights Act of 1964 and the ADEA. When interpreting those statutes, the Supreme Court begins with the understanding that bans on discrimination "of course" encompass disparate treatment. *Hazen Paper Co.* v. *Biggins*, 507 U.S. 604, 609 (1993). That accords with the ordinary meaning and common understanding of discrimination. *See Raytheon*, 540 U.S. at 52 (noting that "'[d]isparate treatment . . . is the most easily understood type of discrimination'" (quoting *Teamsters*, 431 U.S. at 335 n.15)); *Webster's Third New International Dictionary* 648 (1971) (*Webster's Third*) (defining "discriminate" as "to make a difference in *treatment* or favor on a class or categorical basis in disregard of individual merit" (emphasis added)).

In contrast, the Supreme Court has determined that statutes prohibit practices resulting in a disparate impact, without discriminatory intent, only when affirmative language in the statute so indicates. *See, e.g.*, *Smith* v. *City of Jackson*, 544 U.S. 228, 235-236 (2005) (plurality opinion); *Board of Education of the City School District of the City of New York* v. *Harris*, 444 U.S.

130, 138-139 (1979); *Raytheon*, 540 U.S. at 53.  Thus, in order to construe a statute as reaching beyond disparate treatment to also prohibit practices resulting in a disparate impact, there must be some affirmative indication in the text of the statute to that effect.  Without such an affirmative indication, the statute should be construed to prohibit only disparate treatment.

2.      The relevant provisions of the FHA make it unlawful to "refuse to sell or rent"; to "refuse to negotiate"; "otherwise" to "make unavailable or deny" housing; or to "discriminate" "because of" or "on account of" a protected characteristic.  42 U.S.C. §§ 3604(a), (b), (f)(1), (f)(2), 3605, 3606.  All of those provisions require a discriminatory motive to accomplish the prohibited action.  Because the FHA "does not define" any of the operative words contained in those provisions, "we look first to the word's ordinary meaning."  *Schindler Elevator Corp.* v. *United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011).

a.      The first two clauses of Section 804(a) make it unlawful to "refuse" to sell, rent, or negotiate for housing "because of" a protected characteristic.  42 U.S.C. § 3604(a).  The ordinary meaning of "refuse" is "to show or express a positive unwillingness to do or comply with."  *Webster's Third* 1910; *see also American Heritage Dictionary* 1094 (1969) (*American Heritage*) ("[t]o indicate unwillingness to do").  Thus, a "refusal" is a willful act that requires a purpose.

In the first two clauses of Section 804(a), that purpose is supplied by the "because of" clause; the refusal must be "because of" the protected characteristic.  To be sure, it does not automatically follow from the mere inclusion of a "because of" clause, by itself, that disparate-impact liability is foreclosed.  But where, as here, a statute forbids someone from taking some action against an individual because of his race (rather than from acting in a manner that *affects* an individual because of his race), it is natural to construe the statute as prohibiting only intentional discrimination.

12

b.     The third clause of Section 804(a) (as well as Section 804(f)(1)) makes it unlawful "otherwise" to "make" housing unavailable or to "deny" it "because of" a protected characteristic.  42 U.S.C. § 3604(a), (f)(1).  Similarly, Section 806 makes it unlawful to "deny" access to, or membership in, real-estate brokerage services "on account of" a protected characteristic.  42 U.S.C. § 3606.  The ordinary meaning of "deny" is "to refuse to recognize or acknowledge." *Webster's Third* 603; *see American Heritage* 353 ("[t]o refuse to recognize or acknowledge"; "[t]o decline to grant or allow; refuse").  Thus, "deny," like "refuse," requires a purpose, which the "because of" (or, in the case of Section 806, "on account of") clause supplies.  Precedent confirms that plain meaning:  the Supreme Court has observed that it is "beyond dispute" that Section 601 of Title VI, 42 U.S.C. § 2000d, which makes it unlawful for any person to "be denied" federal financial assistance "on the ground of" race, "prohibits only intentional discrimination." *Alexander* v. *Sandoval*, 532 U.S. 275, 280 (2001).  Likewise, a plurality of the Court interpreted Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, which (until a later amendment) made it unlawful to "deny or abridge" voting rights "on account of" race, to prohibit only intentional discrimination.  *City of Mobile* v. *Bolden*, 446 U.S. 55, 60-64 (1980) (opinion of Stewart, J.).

The phrase "make unavailable" also requires intent.  The ordinary meaning of "make" is "to produce as a result of action, effort, or behavior" or "to cause to happen or to be experienced by someone." *Webster's Third* 1363; *see American Heritage* 788 ("[t]o cause to exist or happen; bring about; create").  Thus, when Congress declared it unlawful to "make" housing unavailable "because of" protected characteristics, it meant to reach all forms of intentional discrimination.  If there were any doubt on this score, moreover, the "commonsense canon of *noscitur a sociis*" dispels it.  *Freeman*, 132 S. Ct. at 2042 (internal quotation marks omitted).  "Make" is found in the same clause as "deny," a verb that indisputably requires a discriminatory purpose.  The other

13

verb found in Section 804(a), "refuse," also requires discriminatory purpose—and the clause containing "make unavailable" is expressly linked to the clauses containing "refuse" by the word "otherwise." Especially when the word "make" is given "more precise content by the neighboring words with which it is associated," *Freeman*, 132 S. Ct. at 2042, there can be no doubt that Congress intended to limit it to actions taken with a discriminatory motive.

      c.      Finally, Sections 804(b), 804(f)(1) and (f)(2), 805, and 806 make it unlawful to "discriminate" in various respects "because of" (or, in the case of Section 806, "on account of") a protected characteristic. 42 U.S.C. §§ 3604(b), (f)(1), (f)(2), 3605, 3606. The ordinary meaning of "discriminate" in that context is "to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit." *Webster's Third* 648; *see American Heritage* 376 ("[t]o act on the basis of prejudice"). There can thus be no doubt that, like the other verbs in the relevant provisions, "discriminate" requires intentional, purposeful action.

      2.      a.      Not only does the plain language of the FHA prohibit only disparate treatment, but that reading is confirmed when the FHA is juxtaposed with two other anti-discrimination statutes that Congress enacted just a few years earlier. Section 703(a) of Title VII of the Civil Rights Act of 1964 bans employment discrimination because of race and other protected characteristics. 42 U.S.C. § 2000e-2(a). Section 4(a) of the ADEA, enacted in 1967, prohibits employment discrimination because of age. 29 U.S.C. § 623(a). Each of those statutes is divided into two provisions, with "key textual differences" between them. *Smith*, 544 U.S. at 235 n.6 (2005) (plurality opinion).

      In materially identical language, the first of the two provisions in those statutes, Section 703(a)(1) of Title VII and Section 4(a)(1) of the ADEA, makes it unlawful "[t]o fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with re-

spect to his compensation, terms, conditions, or privileges of employment, because of such individual's" protected characteristics. 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1). The Supreme Court has construed that statutory language as prohibiting only intentional discrimination. *See Ricci*, 557 U.S. at 577 (Section 703(a)(1) of Title VII); *Smith*, 544 U.S. at 236 n.6 (plurality opinion) (Section 4(a)(1) of the ADEA); *id.* at 246 (Scalia, J., concurring) (same); *id.* at 249 (O'Connor, J., concurring in the judgment) (same). The relevant provisions of the FHA are closely analogous to those provisions. Like those provisions, the FHA uses the words "refuse" and "discriminate" and focuses on the defendant's discriminatory motivation for a particular action against an individual—a clear indication that the statute prohibits only intentional discrimination. *See Ricci*, 557 U.S. at 577; *Smith*, 544 U.S. at 236 (plurality opinion).

By contrast, the second of the two provisions in those statutes, Section 703(a)(2) of Title VII and Section 4(a)(2) of the ADEA, makes it unlawful for an employer "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's" protected characteristics. 42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2). By prohibiting an employer from acting in a manner that would "deprive or tend to deprive" or "otherwise adversely affect" an employee because of his protected characteristics, those provisions "focus[] on the effects of the action on the employee rather than the motivation for the action of the employer." *Smith*, 544 U.S. at 236 (plurality opinion). Such a focus on the effects of an action, in turn, can give rise to disparate-impact liability. *See id.* at 235-236.

The FHA, which Congress enacted shortly after Title VII and the ADEA, contains no such effects-focused language. The FHA prohibits taking various actions against an individual because of his race or other protected characteristic: "refus[ing] to sell or rent," "refus[ing] to

negotiate for the sale or rental," "otherwise mak[ing] unavailable or deny[ing] a dwelling," "discriminat[ing]" in "sale or rental" or "in the provision of services or facilities in connection" with the sale or rental of a dwelling, "discriminat[ing] . . . in making available" real-estate transactions or in the terms thereof, and "deny[ing] . . . access to or membership or participation in" brokerage services "because of" or "on account of" a protected characteristic. 42 U.S.C. §§ 3604(a), (b), (f)(1), (f)(2), 3605, 3606. As with the first of the two provisions in the relevant subsections of Title VII and the ADEA, the focus of the FHA is thus on the defendant's motivation for the conduct at issue, not on the effects of that conduct.

The FHA differs from the second of the two provisions in the relevant subsections of Title VII and the ADEA in another important respect. The latter provision is phrased so as to create "an incongruity between the employer's actions—which are focused on his employees generally—and the individual employee who adversely suffers because of those actions." *Smith*, 544 U.S. at 236 n.6 (plurality opinion). Specifically, that provision makes it unlawful to take an action affecting a group of employees—to "limit, segregate, or classify" them—if the action "adversely affect[s]" a particular employee because of a protected characteristic. 42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2). By contrast, the relevant provisions of the FHA cover actions purposefully directed at, and taken against, a particular individual: discriminating against an individual, refusing an individual housing, and so forth. In that respect as well, the FHA more closely resembles the first of the two provisions in the relevant subsections of Title VII and the ADEA—the provision that prohibits intentional discrimination.

b.     The absence of any effects-focused language in the FHA is especially glaring because Congress demonstrated in Title VII and the ADEA that it knows how to use such language to provide for disparate-impact liability when it so desires. Nor are those the only statutes that

16

contain such language:  another prominent example is the Voting Rights Act, which was also en-

acted shortly before the FHA.  Under Section 5 of the Voting Rights Act, certain jurisdictions

must obtain federal preclearance before adopting "[a]ny voting qualification  .  .  .  that has the

purpose of or will have the effect of diminishing the ability of any citizens of the United States

on account of race or color  .  .  .  to elect their preferred candidates of choice."  42 U.S.C.

§ 1973c(b).  That language expressly focuses on the effects of the conduct at issue.  By contrast,

Section 2 of the Voting Rights Act originally prohibited only intentional discrimination because

it prohibited imposing a voting qualification "to deny or abridge the right of any citizen" to vote

on account of race.  42 U.S.C. § 1973 (1980); *see City of Mobile*, 446 U.S. at 60-64 (plurality

opinion).  In response to the Supreme Court's decision in *City of Mobile*, Congress amended

Section 2 in 1982 to eliminate the intent requirement and expand the statute to prohibit practices

that "*result*[] in a denial or abridgement" of the right to vote.  42 U.S.C. § 1973 (emphasis add-

ed).

     In light of the language of those other statutes and the body of decisions interpreting

them, there can be no doubt that the FHA prohibits only intentional discrimination and not prac-

tices that result in a disparate impact.  Congress uses unambiguous effects-focused language

when it intends to impose liability for unintentional effects, and none of the phrases that signal

disparate-impact liability is used in the FHA.  Instead, the statute focuses exclusively on actions

taken with a discriminatory motivation—*i.e.*, intentional discrimination.

     3.     Not surprisingly, the concern that the text of the FHA does not permit disparate-

impact liability was raised by numerous parties in the rulemaking process, including Plaintiffs.

In response, HUD contended that the "otherwise make unavailable or deny" language in Section

804(a) and (f)(1) of the FHA was "similar to the 'otherwise adversely affect' formulation that the

17

Supreme Court found to support disparate impact liability under Title VII and the ADEA." 78 Fed. Reg. 11,466. As explained above, however, the "otherwise make unavailable or deny" language focuses on the defendant's motivation for the conduct at issue, not on the effects of that conduct. That is the hallmark of a disparate-treatment provision. *See Ricci*, 557 U.S. at 577; *Smith*, 544 U.S. at 236 n.6 (plurality opinion).

HUD also contended that its interpretation was supported by lower-court decisions that have "drawn the analogy between Title VII and the Fair Housing Act" in interpreting the FHA to prohibit practices that result in a disparate impact. 78 Fed. Reg. 11,466. But it is no answer to say that the FHA is "analogous" to Title VII: the real question is whether the FHA is more closely analogous to Section 703(a)(2) of Title VII, which permits disparate-impact claims, or to Section 703(a)(1), which does not. Every court of appeals that has held that the FHA permits disparate-impact liability did so before the Supreme Court's decision in *Smith*, in which a plurality of the Court highlighted the "key textual differences" between the two provisions of Title VII. 544 U.S. at 236 n.6 (plurality opinion). To the extent those courts of appeals relied on precedent interpreting Title VII without focusing on the textual differences between the relevant provisions of Title VII and the FHA, they ran afoul of the admonition "not to apply rules applicable under one statute to a different statute without careful and critical examination." *Gross* v. *FBL Financial Services, Inc.*, 557 U.S. 167, 174 (2009) (internal quotation marks and citation omitted).

Finally, HUD contended that, as used in the FHA, the word "discriminate" "may encompass actions that have a discriminatory effect but not a discriminatory intent." 78 Fed. Reg. 11,466. As demonstrated above, however, that contention is contrary to the plain meaning of "discriminate," as well as the Supreme Court's interpretation of that word in Section 703(a)(1) of

Title VII and Section 4(a)(1) of the ADEA, both of which the Court has construed to prohibit only intentional discrimination.  Aside from its own "experience in administering the [FHA]," the only authority HUD cited in support of its contention was the repealed Emergency School Aid Act.  78 Fed. Reg. 11,466.  But that statute used "discriminate" in a very different context. Under the Emergency School Aid Act, schools were ineligible for additional federal funds if they employed a practice "which results in the disproportionate demotion or dismissal of . . . personnel from minority groups" or "otherwise engage[d] in discrimination . . . in the hiring, promotion, or assignment of employees."  *Harris*, 444 U.S. at 138 (quoting Section 706(d)(1)(B) of the Emergency School Aid Act).  The Court concluded that the statute "suffer[ed] from imprecision of expression" because "[t]he first portion clearly speaks in terms of effect or impact," whereas "[t]he second portion[] arguably[] might be said to possess an overtone of intent."  *Id.* at 138-139.  Relying heavily on Congress's statements of purpose and policy and the legislative history, the Court concluded that an impact test should apply to both portions of Section 706(d)(1)(B).  *Id.* at 141.  Importantly, when analyzing the text, the Court relied on the fact that the "discrimination" clause was linked with the "results in the disproportionate demotion or dismissal" clause by the word "otherwise," which in the Court's view indicated that "a similar standard was to apply."  *Id.* at 143.

Given the obvious differences in the wording of the two statutes, the Emergency School Aid Act is of no help to HUD in interpreting the FHA.  As the Supreme Court acknowledged in construing the Emergency School Aid Act in *Harris*, "discriminate," standing alone, suggests intentional discrimination.  444 U.S. at 139.  And that is exactly how the Supreme Court interpreted the word "discriminate" in Title VII and the ADEA, where, as in the FHA, it is paired

with the word "refuse," and not with the phrase "results in." *See Ricci*, 557 U.S. at 577; *Smith*, 544 U.S. at 236 n.6 (plurality opinion).

*     *     *     *     *

In sum, the text of the FHA leaves no room for recognition of disparate-impact liability. And where, as here, the "statutory language is unambiguous and the statutory scheme is coherent and consistent," the analysis should come to an end. *Sebelius* v. *Cloer*, 133 S. Ct. 1886, 1895 (2013) (internal quotation marks and citation omitted).

**B.  The FHA's History Confirms That It Does Not Permit Disparate-Impact Claims**

To the extent that the Court believes it is necessary to consider the FHA's legislative history and subsequent amendments, those sources confirm that Congress intended to prohibit only intentional discrimination.

1.      The FHA was introduced as a floor amendment to the Civil Rights Act of 1968; although the FHA was subject to floor debates in the House and Senate, there are no committee reports associated with it.  The floor debates, however, amply demonstrate that members of Congress viewed intentional discrimination as the barrier to equality in the housing market and designed the FHA to combat that evil alone.  No member of Congress suggested that the Act could be used to require insurers or others to take into account the impacts on protected classes of otherwise neutral housing-related decisions.

As Senator Mondale, the FHA's principal sponsor, explained:  "The bill permits an owner to do  .  .  .  everything he could ever do with property, except refuse to sell it to a person solely on the basis of his color or his religion.  That is all it does.  It does not confer any right."  114 Cong. Rec. 5643 (1968).  Other legislators agreed.  According to Senator Brooke, "[a] person can sell his property to anyone he chooses, as long as it is by personal choice and not be-

20

cause of motivations of discrimination."  114 Cong. Rec. 2283.  Similarly, Senator Tydings stat-ed that the problem Congress intended to address was "the deliberate exclusion from residential neighborhoods on grounds of race."  114 Cong. Rec. 2530.

Members of Congress also clarified that the FHA did not have the broader purpose of guaranteeing the availability of housing to any particular individuals or demographic groups, in statements that would be difficult to square with a supposed purpose to prohibit practices that result in a disparate impact.  As Senator Mondale stated:  "[T]he basic purpose of this legislation is to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it.  It would not overcome the economic problem of those who could not afford to purchase the house of their choice."  114 Cong. Rec. 3421.  Other legislators made statements to the same effect.  *See*, *e.g.*, 114 Cong. Rec. 3129 (Sen. Hatfield) (stating that the FHA prohibits a person being "denied the right to buy a home within a community according to his economic ability  .  .  .  merely because his skin is of a different color"); 114 Cong. Rec. 3252 (Sen. Scott) (stating that the FHA would ensure that individuals "can rent or buy the dwelling of their choice, if they have the money or credit to qualify").

To be sure, as HUD noted in its rulemaking, *see* 78 Fed. Reg. 11,467, legislators ex-pressed hope that prohibiting intentional discrimination would encourage "truly integrated and balanced living patterns."  114 Cong. Rec. 3422 (Sen. Mondale).  Critically, however, no legisla-tor suggested that the FHA would require insurers or others to consider the demographic impact of every housing-related decision.

2.    a.    The 1988 amendments to the FHA reinforce the conclusion that the statute prohibits only intentional discrimination.  Most notably in those amendments, Congress left the operative language of Section 804(a) and (b) and Section 806 untouched.  Congress also added

Section 804(f)(1) and (2), which makes it unlawful "[t]o discriminate in the sale or rental, or oth-erwise make unavailable or deny, a dwelling . . . because of a handicap" or to "discriminate . . . in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap."  42 U.S.C. § 3604(f)(1), (2).  And while Congress modified the language of Section 805 in some respects, it left unaltered the core prohibition against "discriminat[ing] against any person" in the terms or availability of residential loans because of a protected characteristic.  42 U.S.C. § 3605(a).  Con-gress therefore retained—and, in the case of Section 804(f)(1) and (2), added—language focused on discriminatory intent.

Shortly after the 1988 amendments, moreover, Congress enacted two other statutes that authorize disparate-impact claims.  In 1990, Congress enacted Section 102 of the Americans with Disabilities Act, which uses the phrase "adversely affects" to permit disparate-impact claims by disabled employees.  42 U.S.C. § 12112(b); *see Raytheon*, 540 U.S. at 53.  In 1991, Congress added language to Title VII expressly to authorize claims based on "disparate impact," codifying the Supreme Court's earlier interpretation of Section 703(a)(2) in *Griggs* v. *Duke Power Company*, 401 U.S. 424 (1971).  42 U.S.C. § 2000e-2(k).  Congress's failure to include similar language when it amended the FHA is strong evidence that Congress did not intend to provide for disparate-impact liability.

b.    In its response to comments on the Disparate-Impact Rule, HUD contended that the 1988 amendments actually supported its interpretation of the FHA, for three reasons.

*First*, HUD cited three exemptions added to the FHA in 1988 that, in its view, "presup-pose that the Act encompasses an effects theory of liability."  78 Fed. Reg. 11,466.  The first ex-emption states that "[n]othing in [the FHA] prohibits" a real-estate appraiser from "tak[ing] into

consideration factors other than race, color, religion, national origin, sex, handicap, or familial status." 42 U.S.C. § 3605(c). The second provides that "[n]othing in [the FHA] limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). And the third states that "[n]othing in [the FHA] prohibits conduct against a person because such person has been convicted" of a drug offense. 42 U.S.C. § 3607(b)(4). HUD argued that those exemptions would be meaningless if the FHA prohibited only intentional discrimination, because the FHA does not directly bar consideration of any of the factors set out in the exemptions. 78 Fed. Reg. 11,466.

A fair reading of the exemptions does not support HUD's argument. As a preliminary matter, unlike similar exemptions in other statutes, those exemptions are not limited to providing a defense for conduct that is "otherwise prohibited" by the statute. *Cf. Smith*, 544 U.S. at 246 (Scalia, J., concurring in part, concurring in judgment) (interpreting the ADEA). Thus, the three exemptions are properly understood to be safe harbors, rather than as exceptions to liability that would otherwise exist. Indeed, by their terms, those provisions supply a "complete exemption from FHA scrutiny." *City of Edmonds* v. *Oxford House, Inc.*, 514 U.S. 725, 728 (1995).

In any event, all three exemptions do offer valuable defenses to claims of intentional discrimination—and would therefore still have meaning if the FHA is construed, consistent with its plain language, to permit only those claims. A disparate-treatment defendant can "escape liability if it [can] prove that it would have taken the same . . . action in the absence of all discriminatory animus." *University of Texas Southwestern Medical Center* v. *Nassar*, 133 S. Ct. 2517, 2526-2527 (2013). In many jurisdictions, including this circuit, courts apply a burden-shifting framework to disparate-treatment claims under the FHA, under which a defendant is required to show a legitimate basis for its action once presented with a *prima facie* case of discrimination.

*See, e.g., 2922 Sherman Avenue Tenants' Ass'n* v. *District of Columbia*, 444 F.3d 673, 682 (D.C. Cir. 2006).  By providing that a denial of housing based on a past drug offense or a maximum-occupancy requirement will not violate the FHA, Congress identified two non-discriminatory motives that constitute *per se* legitimate bases for denying housing, which, if proven by a disparate-treatment defendant, would allow the defendant to avoid liability on a disparate-treatment claim.  And the other exemption merely clarifies that appraisers may consider factors other than protected characteristics in their analysis.  The presence of those exemptions is therefore hardly the equivalent of language affirmatively authorizing disparate-impact claims—language that the FHA conspicuously does not contain.

*Second*, HUD contended that, even if the 1988 amendments did not affirmatively authorize disparate-impact claims, Congress implicitly permitted those claims by leaving the operative language of the FHA unchanged in the face of the decisions of numerous courts of appeals construing the FHA to provide for disparate-impact liability.  78 Fed. Reg. 11,467.  The high standard for drawing such an inference from congressional silence, however, is not met here.  In order to conclude that Congress implicitly ratified the view of the lower courts, "the supposed judicial consensus [must be] so broad and unquestioned that [a reviewing court] must presume Congress knew of and endorsed it."  *Jama* v. *ICE*, 543 U.S. 335, 349 (2005).  That is because "[w]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle."  *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994) (internal quotation marks and citation omitted).

At the time of the 1988 amendments, the supposed consensus was by no means "broad and unquestioned."  In fact, the Supreme Court refused to endorse the decisions of lower courts permitting disparate-impact liability when presented with the issue later that year.  *See Town of*

24

*Huntington* v. *Huntington Branch, NAACP*, 488 U.S. 15, 18 (1988) (per curiam).[4]  Notably, the Court did so after receiving a brief from the Solicitor General taking the position that "Congress intended to require a showing of intentional discrimination" in the FHA.  U.S. Br. at 16, *Town of Huntington*, *supra* (No. 87-1961).

In addition, President Reagan explicitly rejected the view of the lower courts in his signing statement for the 1988 amendments, declaring that "Title 8 speaks only to intentional discrimination."  Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988).  In no uncertain terms, the President stated that the amendments did "not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that [T]itle 8 violations may be established by a showing of disparate impact . . . without discriminatory intent."  *Id.*  Four months after the amendments were passed, moreover, HUD itself declined to take any position on "whether intent is or is not required to show a violation" of the FHA.  54 Fed. Reg. 3232, 3235 (Jan. 23, 1989).  Given the absence of "unquestioned" consensus on the issue at the time of the amendments, this is not the extraordinary case in which the doctrine of ratification can overcome the absence of any affirmative language in the FHA's text authorizing disparate-impact claims.

*Third*, HUD asserted that the House Judiciary Committee's rejection of a proposed amendment in 1988 demonstrates that the FHA permits disparate-impact claims.  78 Fed. Reg. 11,467.  HUD cited the views of a dissenting member of the Committee, stating that the Committee had rejected his proposed amendment that "a zoning decision is not a violation of the Fair Housing Act unless the decision was made with the intent to discriminate."  *Id.* (internal quota-

---

[4] *Cf. Central Bank*, 511 U.S. at 186 (citing the fact that the Supreme Court had reserved the issue in rejecting the argument that Congress had implicitly ratified the consensus view of eleven courts of appeals).

tion marks omitted).  The dissenting member, however, immediately clarified that his "amend-ment did not seek, implicitly or explicitly, to establish a standard of liability in any other context but zoning"; instead, it "left to caselaw and eventual Supreme Court resolution whether a dis-criminatory intent or discriminatory effects standard is appropriate for realtors, landlords, public housing authorities—all situations but zoning."  H.R. Rep. No. 711, 100th Cong., 2d Sess. 89 (1988) (dissenting views of Rep. Swindall).  To state the obvious, the views of that dissenting member are therefore a thin reed on which to rest such a dramatic expansion of the FHA's scope.

In sum, the 1988 amendments did not alter the FHA's core provisions, which uniformly focus on the defendant's motivation for the conduct at issue and therefore limit the statute to in-tentional discrimination.  Because the plain language of the FHA unambiguously prohibits only intentional discrimination, HUD's Disparate-Impact Rule is invalid.

### C.    Construing the FHA To Permit Disparate-Impact Liability Would Raise Se-rious Constitutional Questions

Not only is HUD's interpretation of the FHA foreclosed by the plain text of the statute, but the agency's interpretation would give rise to serious equal-protection problems.  As a result, the canon of constitutional avoidance, which takes precedence over any deference to which HUD could otherwise be entitled, strongly counsels against HUD's interpretation.

1.    As a rule, courts should "reject[] agency interpretations to which [they] would otherwise defer where they raise serious constitutional questions."  *Miller* v. *Johnson*, 515 U.S. 900, 923 (1995).  Under that "cardinal principle" of statutory construction, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."  *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988).  As the Supreme Court has explained, courts have

long followed that canon "out of respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust* v. *Sullivan*, 500 U.S. 173, 191 (1991). Indeed, that canon "has for so long been applied by [the Supreme Court] that it is beyond debate." *Edward J. DeBartolo Corp.*, 485 U.S. at 575; *see, e.g.*, *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909).

Adherence to the avoidance canon accords with the court's task at the first step of the *Chevron* analysis, which is to determine from the statute whether "Congress either explicitly or implicitly delegated authority to cure [a statutory] ambiguity" to the agency. *American Bar Ass'n*, 430 F.3d at 469. After all, "it is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*." *Natural Resources Defense Council* v. *Reilly*, 983 F.2d 259, 266 (D.C. Cir. 1993) (internal quotation marks and citation omitted). On questions of sufficient importance, courts presume that Congress has considered and answered the question itself in the statute and that, if it intended to delegate the question to the agency, it would have done so clearly. *See Brown & Williamson*, 529 U.S. at 160; *MCI Telecommunications Corp.* v. *AT&T Co.*, 512 U.S. 218, 231 (1994). Questions of statutory interpretation fraught with constitutional implications implicate that presumption. *See Edward J. DeBartolo Corp.*, 485 U.S. at 575.

2.    When, as here, an agency's interpretation of a federal statute "compels race-based [decisions], it by definition raises a serious constitutional question and should not receive deference." *Miller*, 515 U.S. at 923 (citing *Regents of University of California* v. *Bakke*, 438 U.S. 265, 291 (1978) (opinion of Powell, J.)). The Disparate-Impact Rule requires insurers and other regulated entities to assess the impact of their facially neutral practices upon particular racial groups and then to alter those practices if they determine that protected racial groups will be dis-

27

proportionately affected by them. Quite simply, the Disparate-Impact Rule compels insurers and others to make race-based decisions regarding insurance practices and other housing-related decisions. *See Ricci*, 557 U.S. at 594 (Scalia, J., concurring) (noting that disparate-impact statutes "affirmatively *require*[]" "race-based actions" when a disparate impact would otherwise result).

The Disparate-Impact Rule therefore raises serious constitutional concerns and is not entitled to any deference. "[I]f the Federal Government is prohibited from discriminating on the basis of race, then surely it is also prohibited from enacting laws mandating that third parties— . . . whether private, State, or municipal—discriminate on the basis of race." *Id.* For example, Congress could not require private employers, States, or funding recipients to segregate workplaces, low-income housing, or philanthropic institutions. *See Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 284 (1991). That same rule should apply if Congress attempts to use its lawmaking or spending authority to mandate that third parties violate the Constitution's equal-protection guarantee in other ways. Yet that is what interpreting the FHA to prohibit disparate impact would seemingly require.

Disparate-impact provisions such as HUD's Rule "place a racial thumb on the scales, often requiring [regulated entities] to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes." *Ricci*, 557 U.S. at 594 (Scalia, J., concurring). That type of racial decisionmaking is indisputably discriminatory, *see id.* at 579-580 (majority opinion), and the Supreme Court has expressly reserved the question whether such discriminatory treatment, even if motivated by "a legitimate fear of disparate impact," could survive constitutional scrutiny, *id.* at 584. More broadly, federal prohibitions on disparate impact arguably violate the command "[a]t the heart of the Constitution's guarantee of equal protection," that "the Government must treat citizens as individuals, not as simply components of a racial, reli-

gious, sexual or national class." *Miller*, 515 U.S. at 911 (internal quotation marks and citation omitted). By its terms, the Disparate-Impact Rule prohibits practices that are facially neutral in their treatment of different groups, but "actually or predictably" impact one group more than another and cannot be justified by business necessity. 78 Fed. Reg. 11,479. In other words, the Rule interprets the FHA to require insurers to treat insureds not as individuals but merely as members of racial (and other) groups. In so doing, it would seem "to demand the very racial stereotyping the Fourteenth Amendment forbids." *Miller*, 515 U.S. at 928.

The serious constitutional problems with interpreting the FHA to prohibit practices that result in a disparate impact cannot be avoided by recasting the Disparate-Impact Rule as enforcing the Constitution's ban on disparate treatment. The Supreme Court has "not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact." *Washington*, 426 U.S. at 239. Rather, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights*, 429 U.S. at 265. Disparate-impact liability deviates too far from the constitutional standard to be described as mere enforcement of the Fourteenth Amendment. *See City of Boerne* v. *Flores*, 521 U.S. 507, 519 (1997). And disparate-impact liability "sweeps too broadly to be fairly characterized" as simply an evidentiary tool to "smoke out" intentional discrimination because, *inter alia*, there is no affirmative defense to a disparate-impact claim for conduct that is not motivated by discriminatory intent. *Ricci*, 557 U.S. at 595 (Scalia, J., concurring). Indeed, as is the case with the Disparate-Impact Rule, the absence of discriminatory intent "is the very premise for disparate-impact liability in the first place, not negation of it or a defense to it." *Meacham* v. *Knolls Atomic Power Laboratory*, 554 U.S. 84, 96 (2008).

29

3.    Because HUD's interpretation of the FHA as authorizing disparate-impact claims triggers these equal-protection concerns, it "by definition raises a serious constitutional question and should not receive deference." *Miller*, 515 U.S. at 923. Racial classifications "are contrary to our traditions and hence constitutionally suspect." *Fischer* v. *University of Texas at Austin*, 133 S. Ct. 2411, 2418 (2013) (internal quotation marks and citation omitted). For this reason, laws making racial classifications must "be subjected to the most rigid scrutiny." *Id.* at 2419 (internal quotation marks and citation omitted). The Court should avoid confronting those serious constitutional concerns by interpreting the FHA as Congress wrote it: *viz.*, as protecting individuals against disparate treatment, not groups against disparate impact.[5]

### D.    Construing The FHA To Permit Disparate-Impact Liability Would Be Inconsistent With The McCarran-Ferguson Act And Would Disrupt The Business Of Homeowner's Insurance

To the extent that the Court believes it is necessary to look beyond the text of the FHA to confirm congressional intent, it can and should consider the interplay between the FHA and other federal statutes, such as the McCarran-Ferguson Act, at the first step of the *Chevron* analysis. *Cf. Brown & Williamson*, 529 U.S. at 137-139 (reasoning that the Food, Drug, and Cosmetic Act did not give the Food and Drug Administration jurisdiction over tobacco products, because a ban on tobacco would contradict congressional policy articulated in other legislation). The McCarran-Ferguson Act, and the disruptive effect that disparate-impact liability would have on the business of homeowner's insurance, provide yet another indication that Congress did not intend to create disparate-impact liability in the FHA. Put simply, the Disparate-Impact Rule would fundamentally alter the business of insurance, in conflict with sound actuarial principles and state

---

[5] The constitutional implications of the Disparate-Impact Rule are not limited to the context of race; by its terms, the Rule also implicates other constitutionally protected categories such as sex and religion.

law.  In light of the McCarran-Ferguson Act, Congress could not have intended to impose such a

severe disruption *sub silentio*—or to give HUD the power to do so through rulemaking in the ab-

sence of a clear statutory authorization.  *See Department of Treasury* v. *Fabe*, 508 U.S. 491, 507

(1993) (noting that McCarran-Ferguson "is, in effect, a clear-statement rule").

      1.     The principles that underlie the business of insurance are familiar ones.  At its

core, insurance is a means of sharing and distributing risk.  *See, e.g.*, *Group Life & Health Ins.*

*Co.* v. *Royal Drug Co.*, 440 U.S. 205, 211 (1979).  The insurer agrees to compensate the insured

for a large but uncertain future loss in exchange for a small but certain premium.  *See Kartman* v.

*State Farm Mutual Automobile Insurance Co.*, 634 F.3d 883, 890 (7th Cir. 2011); 1 Steven Plitt,

et al., *Couch on Insurance* § 1:9, at 1-23 (3d rev. ed. 2009).

      Risk classification and rate setting are at the heart of that bargain.  Kenneth S. Abraham,

*Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 403 (1985).  Risk

classification turns on "the notion of expected loss—the predicted probability that an insured will

suffer a loss multiplied by the predicted severity of the loss."  *Id.* at 408.  To determine expected

loss, insurers analyze data about the risks they intend to insure.  For homeowner's insurance, rel-

evant data might include the age, construction type, and location of homes that suffered loss,

how often such losses occurred, and how severe those losses were.  *See* Ronen Avraham, *The*

*Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 37-38 (2012).  After studying the

expected losses associated with salient risk characteristics, insurers sort similarly risky applicants

into pools based on the applicant's own traits.  *See* Actuarial Standards Board, Task Force to Re-

vise ASOP No. 12, *Actuarial Standard of Practice: Risk Classification (for All Practice Areas)*

§ 3.3, at 4 (Dec. 2005) (*Risk Classification*). Insurers then allocate the risk in each pool by charg-

ing rates.  Rates typically consist of an insurer's expected loss, plus the costs of doing business

and a reasonable profit.  Casualty Actuarial Society, Board of Directors, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* 2 (May 1988).  State law ordinarily requires that rates not be excessive, inadequate, or unfairly discriminatory, *see, e.g.*, National Association of Insurance Commissioners, Property & Casualty Model Rating Law (Prior Approval Version), NAIC 1780, § 4 (2009), meaning that "[d]ifferences in prices among classes should reflect differences in expected costs with no intended redistribution or subsidy among classes," American Academy of Actuaries, Committee on Risk Classification, *Risk Classification: Statement of Principles* 6 (2013).

The insurance system is therefore based on the premise that insurers differentiate among insureds based on factors that are legitimately related to risk.  By engaging in such differentiation, insurers are able to provide coverage at fair prices while remaining solvent.  If insurers are unable to engage in such differentiation, the rating and underwriting system will become less efficient; some consumers will overpay, others will underpay, and the industry generally will become less stable to the detriment of all.  *Risk Classification* 8.

2.      The business of insurance is pervasively regulated by state law.  Every State has an insurance code; those codes typically cover all aspects of the business of insurance, ranging from the licensing and operation of insurers, *see, e.g.*, N.Y. Ins. Law § 3201, to the prohibition of unfair and deceptive trade practices, *see, e.g.*, D.C. Code § 31-2231.11, to the regulation of rates in certain lines, including homeowner's insurance, *see, e.g.*, Colo. Rev. Stat. § 10-4-403(1).

Consistent with the actuarial principles discussed above, States forbid insurers from engaging in unfair discrimination: that is, from differentiating among insureds in the classification and rating process based on factors that are not legitimately related to the risks presented by their properties.  *See, e.g.*, *Insurance Commissioner* v. *Engelman*, 692 A.2d 474, 480 (Md. 1997);

32

Colo. Rev. Stat. § 10-4-403.  And States specifically prohibit insurers from differentiating among insureds based on the characteristics protected by the FHA:  *e.g.*, from differentiating among "individuals or risks of the same class or of essentially the same hazard and expense element because of the race, color, religion, or national origin of such insurance risks or applicants."  215 Ill. Comp. Stat. 5/424(3); *see also*, *e.g.*, Alaska Stat. § 21.36.090; Ky. Rev. Stat. Ann. § 304.12-085; Mass Gen. Laws Ann. ch. 175; Me. Rev. Stat. tit. 24-A, § 2303(1)(G); Okla. Stat. Ann. tit. 36, § 985; S.C. Code Ann. § 38-75-1210(B)(1); Tenn. Code Ann. § 56-5-303(a)(2)(d); Tex. Ins. Code Ann. § 544.002.  Indeed, one State affirmatively prohibits even the collection of data on such protected characteristics.  *See* Md. Code Ann. Ins. § 27-501(c)(1).

By contrast, States often expressly permit insurers to classify risks based on the "differences among risks that can be demonstrated to have a probable effect upon losses or expenses." W. Va. Code § 33-20-3; *see also*, *e.g.*, Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(c); Wis. Stat. Ann. § 626.12(2).  Thus, risk classification may be "based upon size, expense, management, individual experience, purpose of insurance, location or dispersion of hazard, or any other reasonable considerations, provided such classifications and modifications apply to all risks under the same or substantially similar circumstances or conditions."  Me. Rev. Stat. tit. 24-A, § 2303(2).  And a rate is not unfairly discriminatory when "a different rate is charged for the same coverage," as long as "the rate differential (i) is based on sound actuarial principles or (ii) is related to actual or reasonably anticipated experience."  Va. Code Ann. § 38.2-1904(A)(3).  Those state laws not only tolerate but affirmatively sanction "fair discrimination"—*viz.* grouping and rating practices that are based on shared, actuarially significant characteristics.  *See, e.g.*, *Life Insurance Ass'n* v. *Commissioner of Insurance*, 530 N.E.2d 168, 171-172 (Mass. 1988).

3.    Through the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*, federal law pre-serves the primacy of state law in regulating the business of insurance.  Enacted in 1945, the McCarran-Ferguson Act established a form of reverse preemption, authorizing state law to pre-vail over federal law despite the ordinary operation of the Supremacy Clause.  In relevant part, McCarran-Ferguson provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  McCarran-Ferguson further provides that "silence on the part of the Congress shall not be con-strued to impose any barrier to the regulation . . . of such business by the several states."  15 U.S.C. § 1011.  As noted above, McCarran-Ferguson "is, in effect, a clear-statement rule." *Fabe*, 508 U.S. at 507.  Unless Congress explicitly says so, application of a federal law may not frustrate declared state policy or interfere with a State's administrative regime.  *See Humana, Inc.* v. *Forsyth*, 525 U.S. 299, 310 (1999).

The FHA is a general federal law that triggers the reverse-preemption principle of the McCarran-Ferguson Act, because it does not specifically relate to the business of insurance and therefore does not evince an intention to override the States' authority to regulate insurance with-in the meaning of McCarran-Ferguson.  *See, e.g.*, *Ojo* v. *Farmers Group Inc.*, 600 F.3d 1205, 1209 (9th Cir. 2010) (en banc); *NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287, 295 (7th Cir. 1992).  Accordingly, Congress did not intend for the FHA to be construed in a way that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance."  15 U.S.C. § 1012(b).

4.    Interpreting the FHA to permit disparate-impact liability to be imposed on home-owner's insurers would contravene the McCarran-Ferguson Act by impairing state insurance

34

laws in numerous ways.  In addition, it would be antithetical to sound insurance practice and would upend fundamental tenets of the insurance business, which are founded on the ability to predict the risk of loss.  Assessing risk and making pricing decisions based on predictive risk factors is critical to the stability of the homeowner's insurance system and is mandatory under state law.  But it is in "inevitable and irreconcilable conflict" with disparate-impact liability.  Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 277 (2009).

In applying the reverse-preemption principle of the McCarran-Ferguson Act to the FHA, courts have recognized a significant distinction between claims for intentional discrimination, with respect to which state and federal law are in accord, and claims for disparate impact, which raise the prospect of federal impairment of state insurance regulation.  *See Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961, 967 (8th Cir. 2008); *Nationwide Mutual Insurance Co.* v. *Cisneros*, 52 F.3d 1351, 1361 (6th Cir. 1995); *NAACP*, 978 F.2d at 290-291; *see also Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 300 (5th Cir. 2003) (Jones, J., concurring in part and dissenting in part).  For example, in *Saunders*, the Eighth Circuit affirmed the dismissal of a claim alleging a disparate impact in the pricing of homeowner's insurance, holding that the claim was barred by McCarran-Ferguson because it would interfere with Missouri's comprehensive regulatory regime.  537 F.3d at 967-968.  The court noted that Missouri law required insurers to establish rates based on economic factors essential to insurer solvency, such as loss experience, and further permitted insurers to classify risks based on standards that "measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses."  *Id.* at 967 (quoting Mo. Rev. Stat. § 379.318(2)).  The court reasoned that allowing a federal court to "determine that the [i]nsurers' filed rates are unlawful using [the] different federal standard [of] dis-

parate racial impact" would improperly interfere with state law and, in particular, with the rate-making authority of the state insurance commissioner. *Id.* at 968.

The Eighth Circuit's reasoning applies with equal force here. Because of McCarran-Ferguson, the FHA cannot be read to displace state laws that permit risk classification based on factors legitimately related to the risk of loss, state laws that prohibit the consideration of characteristics such as race, or state laws that prohibit insurers even from collecting data concerning those characteristics. If the FHA were read to permit disparate-impact liability, however, insurers would be compelled to collect data on protected characteristics, *but see* Md. Code Ann. Ins. § 27-501(c)(1); to consider that data, *but see, e.g.*, S.C. Code Ann. § 38-75-1210(B)(1); Tex. Ins. Code Ann. § 544.002; and to make classification and rating decisions that take into account membership in protected groups, *but see, e.g.*, Tenn. Code Ann. § 56-5-303(a)(2)(d). With regard to those and other similar state laws, disparate-impact liability would contravene the reverse-preemption provision of the McCarran-Ferguson Act. *See, e.g.*, *Saunders*, 537 F.3d at 967-968. And disparate-impact liability would more broadly impair both States' ability to base insurance regulation solely on risk and state insurance commissioners' authority to determine the adequacy and appropriateness of rates, also in contravention of McCarran-Ferguson. *See* *Dehoyos*, 345 F.3d at 300 (Jones, J., concurring in part and dissenting in part). As the association of state insurance commissioners has warned, application of a disparate-impact theory would "make[] impossible the operation of state laws establishing insurers' right to use rationally based, neutral risk selection techniques." National Association of Insurance Commissioners Br. at 2, *Nationwide Mutual Insurance Co.* v. *Cisneros*, 516 U.S. 1140 (1996) (No. 95-714).

More broadly, disparate-impact liability would be incompatible with core insurance principles because it would strike at the heart of the concept of fair discrimination. Disparate-impact

36

liability would force insurers to take into account factors not correlated to risk in order to avoid causing or perpetuating a disparate impact on insureds who are members of protected classes. That, in turn, would cause rates to be based on factors other than an insured's risk profile. Not only would that outcome threaten the viability of the insurance system, but the resulting rates would also be unfairly discriminatory under established actuarial standards and state law. Disparate-impact liability would therefore place insurers in an impossible position. Any risk factor that happens to affect a protected group disproportionately could trigger a disparate-impact claim. At the same time, changing risk factors or rates because of the impact on protected groups could make the insurer's rates unfairly discriminatory, thereby violating sound insurance practice and state law, and undermining the insurer's ability to cover the risks being insured. Moreover, predicting a potential disproportionate effect across time, different geographic areas, and potentially hundreds of actuarially sound risk factors could prove difficult, if not impossible, exposing insurers to significant uncertainty and litigation risk.

The McCarran-Ferguson Act, and the disruptive effect that disparate-impact liability would have on the business of homeowner's insurance, simply underscore what the statutory text and history already make clear: namely, that Congress could not have intended to create disparate-impact liability in the FHA, or to give HUD the power to do so through rulemaking in the absence of a clear statutory authorization. Where, as here, "the agency has . . . exceeded the statute's clear boundaries then, as *Chevron* puts it, that is the end of the matter—the agency's interpretation is unlawful." *NACS*, 2013 WL 3943489, at *18 (internal quotation marks and citation omitted).[6] Because all of the tools of statutory construction unambiguously point to the con-

---

[6] Even if this Court were to conclude that the relevant provisions of the FHA were ambiguous, Plaintiffs would still be entitled to prevail on their APA claim because, in light of the McCarran-Ferguson Act and the effect of disparate-impact liability on the business of insurance,

clusion that the FHA prohibits only intentional discrimination and not practices that result in a disparate impact, HUD's Disparate-Impact Rule is inconsistent with the FHA and therefore invalid.  This Court should grant summary judgment in Plaintiffs' favor on their APA claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted and the Disparate-Impact Rule vacated.

Respectfully submitted,

By: /s/ Kannon K. Shanmugam
    Kannon K. Shanmugam (#474304)
    Allison B. Jones (#991503)
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, DC 20005
    Telephone:  (202) 434-5000
    Facsimile:  (202) 434-5029

    *Counsel for Plaintiffs*

December 20, 2013

---

HUD's interpretation of those provisions would be unreasonable (and would therefore fail the second step of the *Chevron* analysis).  *Cf. Massachusetts* v. *Department of Transportation*, 93 F.3d 890, 894 (D.C. Cir. 1996) (reasoning that the Department of Transportation's interpretation of the Hazardous Materials Transportation Act was not reasonable "in light of the text and structure of the [Act]  .   .   . *as well as* the traditional presumption against federal preemption of state rules in areas of traditional state regulation").  In response to Plaintiffs' comment that the Disparate-Impact Rule would be inconsistent with the McCarran-Ferguson Act, HUD claimed that McCarran-Ferguson merely "instructs courts on how to construe federal statutes."  78 Fed. Reg. 11,475.  That response borders on the frivolous:  McCarran-Ferguson is in no way limited to judicial construction of statutes, and HUD cited no authority to the contrary.  HUD therefore acted unreasonably by disregarding McCarran-Ferguson and promulgating a rule that would "sweepingly preclude state rules in many areas of [insurance] regulation."  *Massachusetts*, 93 F.3d at 896.