# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                            )
AMERICAN INSURANCE                          )
ASSOCIATION, *et al.*                       )
                                            )
        Plaintiffs,                         )
                                            )        No. 1:13-cv-00966 (RJL)
        v.                                  )
                                            )
UNITED STATES DEPARTMENT                    )
OF HOUSING AND URBAN                        )
DEVELOPMENT, *et al.*                       )
                                            )
        Defendants.                         )
_____)

## EXHIBIT A

## TO DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In The

# Supreme Court of the United States

OCTOBER TERM, 1995

NATIONWIDE MUTUAL INSURANCE COMPANY and
NATIONWIDE MUTUAL FIRE INSURANCE COMPANY,

*Petitioners,*

v.

HENRY CISNEROS, Secretary of the United States Department of Housing and Urban Development; JERALD L. STEED, Executive Director, Dayton Human Relations Council; CHARLES W. BROWN, Chairperson, Dayton Human Relations Council; and CITY OF DAYTON,

*Respondents.*

On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Sixth Circuit

MOTION FOR LEAVE TO FILE BRIEF AMICI CURIAE
AND BRIEF AMICI CURIAE FOR THE NATIONAL
ASSOCIATION OF MUTUAL INSURANCE COMPANIES
AND THE AMERICAN INSURANCE ASSOCIATION
IN SUPPORT OF THE PETITION

JOHN G. ROBERTS, JR.*
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5810

JOSEPH A. CANCILA, JR.
HEIDI DALENBERG
SONDRA A. HEMERYCK
SCHIFF HARDIN & WAITE
7200 Sears Tower
Chicago, Illinois 60606
(312) 876-1000
*Counsel for Amici Curiae*

* Counsel of Record

WILSON - EPES PRINTING CO., INC. - 789-0096 - WASHINGTON, D.C. 20001

In The

# Supreme Court of the United States

OCTOBER TERM, 1995

No. 95-714

NATIONWIDE MUTUAL INSURANCE COMPANY and
NATIONWIDE MUTUAL FIRE INSURANCE COMPANY,

*Petitioners,*

v.

HENRY CISNEROS, Secretary of the United States Depart-
ment of Housing and Urban Development; JERALD L.
STEED, Executive Director, Dayton Human Relations
Council; CHARLES W. BROWN, Chairperson, Dayton
Human Relations Council; and CITY OF DAYTON,

*Respondents.*

On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Sixth Circuit

## MOTION FOR LEAVE TO FILE BRIEF AMICI CURIAE

Pursuant to S. Ct. Rule 37.2, the National Association
of Mutual Insurance Companies ("NAMIC") and the
American Insurance Association ("AIA") move for leave
to file the attached brief amici curiae in support of the
petition. Petitioners and the Solicitor General, on behalf
of the federal respondent, have consented to the filing of
this brief. The Dayton respondents have not consented,
necessitating this motion.

NAMIC was founded in 1895 and currently has over
1200 member insurance companies underwriting all lines
of insurance, including homeowners' insurance. NAMIC's

membership represents the full spectrum of property and casualty insurance companies, from large insurers with a national presence, to regional and mid-sized companies, to farm mutuals and niche insurers. NAMIC's members account for nearly 30 percent of all direct written property and casualty insurance premiums in the United States. NAMIC's purposes are to promote a financially stable and competitive private insurance industry, and to benefit member companies through government relations, educational services, and insurance and employee benefit programs.

AIA is a national trade organization representing more than 260 companies writing property and casualty insurance in every state and jurisdiction of the United States. These companies provide 27 percent of all property and casualty insurance underwritten in the United States, and write more than 14 percent of the total homeowners' insurance premiums written nationwide. AIA companies are affiliated with independent insurance agents throughout the country. AIA's purposes are to promote the economic, legislative and public standing of its members and the insurance industry; to provide a forum for discussion of problems which are of common concern to its members; to keep members informed of regulatory and legislative developments; and to serve the public interest through appropriate activities including the promotion of safety and security of persons and property.

One way in which NAMIC and AIA promote the interests of their members is by participating as amicus curiae in cases where the outcome will have important and far-ranging consequences for the industry, far beyond the interests of any particular insurer.* This is such a case.

*See, e.g., *Pacific Mutual Life Ins. Co.* v. *Haslip*, 499 U.S. 1 (1991) (NAMIC amicus brief); *Browning-Ferris Indus.* v. *Kelco Disposal, Inc.*, 492 U.S. 257 (1989) (same); *Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries*, 114 S. Ct. 2251 (1994) (AIA amicus brief); *FTC* v. *Ticor Title Ins. Co.*, 504 U.S. 621 (1992) (same).

By siding with the Seventh Circuit's decision in *NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287 (7th Cir. 1992), *cert. denied*, 113 S. Ct. 2335 (1993), and expressly rejecting the Fourth Circuit's decision in *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419 (4th Cir. 1984), the majority below has exacerbated an existing conflict among the circuits over whether the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 et seq., applies to the business of insurance. This irreconcilable and deepening conflict confronts amici's members with extraordinary uncertainty over whether they are subject to the regulatory powers of the federal government under the FHA, whether the regulatory framework of the several states remains intact or instead has been altered by federal regulation under the Act, and what legal standards will be applied to determine an insurer's potential liability in connection with its homeowners' insurance products, prices, and practices.

Amici are uniquely situated to assess the practical implications of the Sixth Circuit's rulings in this case, and the need for resolution of the conflicts deepened by the decision below. In particular, amici can highlight for the Court the impact federal regulation of insurance under the standards of the FHA will have on the neutral underwriting and rating rules and standards that have been the hallmark of state regulation for many years. An appreciation of such consequences is critical to a proper determination of whether federal regulation will "invalidate, impair, or supersede" state regulation, and thus whether the McCarran-Ferguson Act precludes a construction of the FHA to cover the business of insurance. 15 U.S.C. § 1012(b).

Accordingly, NAMIC and AIA respectfully request that the Court grant this motion for leave to file the attached brief amici curiae.

Respectfully submitted,

JOHN G. ROBERTS, JR.*
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5810

JOSEPH A. CANCILA, JR.
HEIDI DALENBERG
SONDRA A. HEMERYCK
SCHIFF HARDIN & WAITE
7200 Sears Tower
Chicago, Illinois 60606
(312) 876-1000
*Counsel for Amici Curiae*

* Counsel of Record

## TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| STATEMENT OF INTEREST OF AMICI CURIAE | 1 |
| SUMMARY OF ARGUMENT | 4 |
| ARGUMENT | 6 |
| I. THIS COURT SHOULD GRANT CERTIORARI TO RESOLVE THE CONFLICT OVER WHETHER THE AVAILABILITY OF ADDITIONAL REMEDIES UNDER FEDERAL LAW OPERATES TO "INVALIDATE, IMPAIR, OR SUPERSEDE" STATE INSURANCE LAW | 6 |
| II. THIS COURT SHOULD GRANT CERTIORARI TO RESOLVE THE CONFLICT OVER WHETHER APPLYING LIABILITY STANDARDS UNDER THE FAIR HOUSING ACT TO THE BUSINESS OF INSURANCE WOULD "INVALIDATE, IMPAIR, OR SUPERSEDE" STATE INSURANCE LAW | 13 |
| III. THE QUESTIONS PRESENTED ARE IMPORTANT AND RECURRING, AND SHOULD BE RESOLVED BY THIS COURT | 17 |
| CONCLUSION | 19 |
| APPENDICES | |
| APPENDIX A: Excerpts from Consent Decree, *NAACP v. American Family Mutual Ins. Co,* Civ. Action No. 90-C-0759 (E.D. Wisc.) | 1a |
| APPENDIX B: Excerpts from Testimony of Richard C. Hsia, Deputy Superintendent of Insurance, New York State Insurance Department, before United States Department of Housing & Urban Development (Oct. 27, 1994) | 6a |

ii

## TABLE OF AUTHORITIES

| Cases | Page |
|---|---|
| Abbott Laboratories v. Gardner, 387 U.S. 136 (1967) | 15 |
| Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504 (1981) | 8 |
| Ambrose v. Blue Cross & Blue Shield of Virginia, Inc., 891 F. Supp. 1153 (E.D. Va. 1995) | 8,10,11 |
| Arthur v. City of Toledo, 782 F.2d 565 (6th Cir. 1986) | 14 |
| Asgrow Seed Co. v. Winterboer, 115 S. Ct. 788 (1995) | 9 |
| Attorney General v. Insurance Commissioner, 323 N.W.2d 645 (Mich. Ct. App. 1982) | 14 |
| Betsey v. Turtle Creek Assocs., 736 F.2d 983 (4th Cir. 1984) | 14 |
| Braxton v. United States, 500 U.S. 344 (1991) | 18 |
| Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992) | 7,8 |
| Everson v. Blue Cross & Blue Shield of Ohio, 898 F. Supp. 532 (N.D. Ohio 1994) | 11 |
| Farmers Ins. Exch. v. Superior Court, 2 Cal. 4th 377, 6 Cal. Rptr. 2d 487, 826 P.2d 730 (1992) | 14 |
| FDIC v. Meyer, 114 S. Ct. 996 (1994) | 9 |
| FMC Corp. v. Holliday, 498 U.S. 52 (1990) | 8 |
| Forsyth v. Humana, Inc., 827 F. Supp. 1498 (D. Nev. 1993) | 11 |
| Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205 (1979) | 7 |
| Hanson v. Veterans Admin., 800 F.2d 1381 (5th Cir. 1986) | 14 |
| Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926 (2d Cir.), review declined in relevant part, 488 U.S. 15 (1988) | 14 |
| Keith v. Volpe, 858 F.2d 467 (9th Cir. 1988), cert. denied, 493 U.S. 813 (1989) | 14 |
| Kenty v. Bank One, 67 F.3d 1257 (6th Cir. 1995), reh'g granted (Nov. 28, 1995) | 12 |
| LeDuc v. Kentucky Central Life Ins. Co., 814 F. Supp. 820 (N.D. Cal. 1992) | 11 |

iii

## TABLE OF AUTHORITIES—Continued

| | Page |
|---|---|
| Mackey v. Nationwide Ins. Co., 724 F.2d 419 (4th Cir. 1984) | 2,4,17,18 |
| Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., 50 F.3d 1486 (9th Cir.), cert. denied, 116 S. Ct. 418 (1995) | 14 |
| Metropolitan Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978) | 14 |
| Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724 (1985) | 12 |
| Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992) | 7-8 |
| Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development, 56 F.3d 1243 (10th Cir. 1995) | 11 |
| NAACP v. American Family Mutual Ins. Co., 978 F.2d 287 (7th Cir. 1992), cert. denied, 113 S. Ct. 2335 (1993) | passim |
| Pennsylvania Ins. Dept. v. Johnson, 238 A.2d 23 (Pa. Super. 1967), aff'd, 248 A.2d 308 (Pa. 1968), cert. denied, 394 U.S. 1003 (1969) | 14 |
| Resident Advisory Bd. v. Rizzo, 564 F.2d 126 (3d Cir. 1977), cert. denied, 435 U.S. 908 (1978) | 14 |
| SEC v. National Securities, Inc., 393 U.S. 453 (1969) | 8 |
| Senich v. Transamerica Premier Ins. Co., 766 F. Supp. 339 (W.D. Pa. 1990) | 11 |
| United States v. City of Black Jack, 508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975) | 14 |
| United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944) | 4 |
| United States v. Western Pac. R.R. Co., 352 U.S. 59 (1956) | 11 |
| United States Dept. of Treasury v. Fabe, 113 S. Ct. 2202 (1993) | 8 |
| Western & Southern Life Ins. Co. v. State Board of Equalization, 451 U.S. 648 (1981) | 8 |

TABLE OF AUTHORITIES—Continued

|  | Page |
|---|---|
| *Wesco, Inc.* v. *IMC, Inc.,* 820 F. Supp. 194 (M.D. Pa. 1993) | 11 |

*Statutory Provisions and Rules*

| | |
|---|---|
| 15 U.S.C. § 1012(b) | passim |
| 18 U.S.C. §§ 1961-68 | 11 |
| 42 U.S.C. §§ 3601 et seq. | 2 |
| Ohio Rev. Code § 3901.21 (M) | 15 |
| Ohio Rev. Code § 3935.03-.05 | 16 |
| S. Ct. Rule 10.1(a) | 18 |

*Other*

| | |
|---|---|
| 59 Fed. Reg. 40757 (Aug. 9, 1994) | 13 |
| Webster's Third New International Dictionary (1986) | 9 |

In The

# Supreme Court of the United States

October Term, 1995

No. 95-714

Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company,

*Petitioners,*

v.

Henry Cisneros, Secretary of the United States Department of Housing and Urban Development; Jerald L. Steed, Executive Director, Dayton Human Relations Council; Charles W. Brown, Chairperson, Dayton Human Relations Council; and City of Dayton,

*Respondents.*

On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Sixth Circuit

**BRIEF AMICI CURIAE FOR THE NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES AND THE AMERICAN INSURANCE ASSOCIATION IN SUPPORT OF THE PETITION**

## STATEMENT OF INTEREST OF AMICI CURIAE

Founded a century ago, the National Association of Mutual Insurance Companies ("NAMIC") has over 1200 member insurance companies underwriting all lines of insurance, including homeowners' insurance. NAMIC's membership represents the full spectrum of property and casualty insurance companies, from large insurers with a

national presence, to regional and mid-sized companies, to farm mutuals and niche insurers. NAMIC's members account for nearly 30 percent of all direct written property and casualty insurance premiums in the United States. NAMIC's purposes are to promote a financially stable and competitive private insurance industry, and to benefit member companies through government relations, educational services, and insurance and employee benefit programs.

AIA is a national trade organization representing more than 260 companies writing property and casualty insurance in every state and jurisdiction of the United States. These companies provide 27 percent of all property and casualty insurance underwritten in the United States, and write more than 14 percent of the total homeowners' insurance premiums written nationwide. AIA companies are affiliated with independent insurance agents throughout the country. AIA's purposes are to promote the economic, legislative and public standing of its members and the insurance industry; to provide a forum for discussion of problems which are of common concern to its members; to keep members informed of regulatory and legislative developments; and to serve the public interest through appropriate activities including the promotion of safety and security of persons and property.

By siding with the Seventh Circuit's decision in *NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287 (7th Cir. 1992), *cert. denied*, 113 S. Ct. 2335 (1993), and expressly rejecting the Fourth Circuit's decision in *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419 (4th Cir. 1984), the majority below has exacerbated an existing conflict among the circuits over whether the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*, applies to the business of insurance. This irreconcilable and deepening conflict confronts amici's members with extraordinary uncertainty over whether they are subject to the regulatory powers of the federal government under the FHA, whether

2

the regulatory framework of the several states remains intact or instead has been altered by federal regulation under the Act, and what legal standards will be applied to determine an insurer's potential liability in connection with its homeowners' insurance products, prices, and practices.

Amici and their member companies are firmly committed to the principle that homeowners' insurance should never be denied on the basis of race or any other unfairly discriminatory factor. This case, however, is not about the indisputable merit of that principle, but rather whether Congress intended that the FHA apply to the business of property insurance in the first instance, and whether such a construction of the Act invalidates, impairs, or supersedes state insurance law and is therefore prohibited by the McCarran-Ferguson Act, 15 U.S.C. § 1012(b) (the "McCarran Act").

In answering that latter question, the majority below exacerbated yet another conflict among the federal courts, one with ramifications beyond the confines of the FHA. Rather than construing the "invalidate, impair, or supersede" language of the McCarran Act according to its natural meaning, the majority below viewed the issue before it as one of "inverse preemption." Under that framework, the court asked not whether the application of federal law would "invalidate, impair, or supersede" state law, but whether federal law directly conflicted with state law. The majority below then concluded that the availability of additional and broader remedies under the FHA for racial discrimination did not conflict with the provisions of state insurance law that also prohibit such conduct, and that the McCarran Act therefore did not preclude applying the FHA to insurers. The question whether additional and broader remedies under federal law can operate to "invalidate, impair, or supersede" state law under the McCarran Act has generated confusion and uncertainty among the lower courts. Amici and their members have a keen interest in the resolution of this

3

4

## SUMMARY OF ARGUMENT

This case presents the Court with a unique opportunity to resolve existing conflicts and confusion in the interpretation and application of both the FHA and the McCarran Act, and in doing so to provide much needed certainty to insurers and state insurance regulators alike.

The McCarran Act, enacted by Congress in response to this Court's decision in *United States* v. *South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), established the primacy of the states in the regulation of the business of insurance. Section 2(b) of the Act provides, in relevant part: "No Act of Congress shall be construed to *invalidate, impair, or supersede* any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b) (emphasis added). The majority below committed two basic errors in deciding that the McCarran Act did not prevent it from construing the FHA to reach the business of insurance.[1]

*First*, the court below did not accord the language of the McCarran Act its natural meaning, or even begin its analysis with the language of the statute. Instead, following the lead of the Seventh Circuit in *American Family*, the majority below viewed the issue before it under the

[1] We will not repeat here the compelling arguments against applying the FHA to insurance in the first place, quite apart from any consideration of the McCarran Act. Those arguments are fully set forth in the petition (Pet. 6-13) and in Judge Haynesworth's opinion for the Fourth Circuit in *Mackey* v. *Nationwide Ins. Co.*, 724 F.2d at 423-425. Our focus is instead on whether such a construction is precluded by the McCarran Act because federal regulation of property insurers under the FHA would "invalidate, impair, or supersede" the extensive state regulation of such insurers.

5

McCarran Act as one of "inverse preemption." The court did not ask whether application of the broader remedies of the FHA would "invalidate, impair, or supersede" the Ohio regulatory regime, but instead whether the FHA directly conflicted with Ohio law. *See* Pet. App. 26-27.

This erroneous analytic approach led the majority below to the mistaken conclusion that the availability of additional, broader remedies under the FHA did not interfere with state insurance law in contravention of the McCarran Act. But in fact the different remedies available under the FHA will interfere with Ohio insurance law by encouraging Ohio citizens with complaints to bypass state administrative processes. This will have an adverse effect not only on those processes but also on the ability of state regulators to apply their experience and expertise to the insurance issues implicated by the complaints.

The consequences of the court's flawed approach, however, are not limited to the FHA. The question of the proper scope of the "invalidate, impair, or supersede" language of the McCarran Act arises repeatedly in a wide variety of settings, and there is a compelling need for a uniform understanding of how that language is to be applied. The lower courts, however, are divided on the question whether additional, broader remedies under federal law can "invalidate, impair, or supersede" state law under the McCarran Act. This Court should grant review to resolve this deepening split over a basic question in the interpretation of the McCarran Act.

*Second*, the majority below erred in assessing the extent to which application of liability standards under the FHA to insurers will interfere with Ohio's regulatory regime. The relief sought by federal enforcement agencies in FHA cases directly intrudes upon state regulation of insurance pricing, and the application of disparate impact analysis under the FHA to the business of insurance will undermine state regulatory guidelines grounded on the impor-

tance of neutral underwriting and rating principles. Basic uncertainty over whether federal or state standards apply, and how they are to be reconciled, is the practical consequence for insurers and regulators of the conflicts among the circuits exacerbated by the split decision below. This Court should grant the petition to resolve that uncertainty and confusion.

## ARGUMENT

I. **THIS COURT SHOULD GRANT CERTIORARI TO RESOLVE THE CONFLICT OVER WHETHER THE AVAILABILITY OF ADDITIONAL REMEDIES UNDER FEDERAL LAW OPERATES TO "INVALIDATE, IMPAIR, OR SUPERSEDE" STATE INSURANCE LAW.**

The court below erroneously concluded that the availability under the FHA of private civil actions—with access to jury trials, unlimited punitive damages, and attorneys fees—does not cause the Act to "invalidate, impair, or supersede" Ohio insurance law, which affords only administrative remedies. Pet. App. 26-27. The court arrived at this conclusion not by beginning its analysis with the language of the McCarran Act²—the proper

² The McCarran Act, as codified at Title 15 of the United States Code, provides in pertinent part:

Section 1011. The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

Section 1012. (a) State regulation. The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) Federal regulation. No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance.

6

starting point in a case of statutory interpretation, *see Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 210 (1979) ("the starting point in a case involving construction of the McCarran-Ferguson Act, like the starting point in any case involving the meaning of a statute, is the language of the statute itself")—but instead via a circuitous route: Relying on the Seventh Circuit's decision in *American Family,* the court below first analogized the effect of the McCarran Act on other federal statutes to the effect of federal law on state law under the Supremacy Clause. As the court saw it, "[t]he McCarran-Ferguson Act is a form of inverse preemption, so principles defining when state remedies conflict with (and so are preempted by) federal law are pertinent in deciding when federal rules "invalidate, impair, or supersede" state rules.'" Pet. App. 27 (quoting *American Family,* 978 F.2d at 296).³

The "inverse preemption" model announced by the Seventh Circuit in *American Family* and adopted by the majority below is fundamentally flawed. The question whether federal law preempts state law is asked against the background of a federal system in which the Federal Government is one of limited and defined powers and there is a "strong presumption" against preemption and in favor of the application of state law. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 523 (1992). *See, e.g., Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 740

³ In *American Family,* the Seventh Circuit—applying this "inverse preemption" model—reasoned that application of the FHA to Wisconsin property insurers was precluded by the McCarran Act only if the FHA "conflicts" with Wisconsin insurance law. 978 F.2d at 295. The court concluded that "state and federal rules that are substantively identical but differ in penalty do not conflict with or displace each other." *Id.* at 297. Concluding that both the FHA and Wisconsin insurance law prohibit disparate treatment and differ only in the remedies available for such conduct, the court found that application of the FHA to property insurers was not precluded by the McCarran Act.

7

8

(1985); *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 522 (1981). Against such a background, preemption is found only if Congress expressly provides that state law is displaced or if state law "actually conflicts with federal law." *Cipollone*, 505 U.S. at 516.

Viewing the question under the McCarran Act as one of "inverse" preemption improperly incorporates a similar presumption into the statutory analysis. There is, however, no presumption in favor of the application of generic federal law to the business of insurance. If anything, the presumption is against any such application of federal laws that do not specifically mention insurance. That is, after all, the fair and natural reading of the McCarran Act. *See Ambrose v. Blue Cross & Blue Shield of Virginia, Inc.*, 891 F.Supp. 1153, 1167 (E.D. Va. 1995) ("Forcing the McCarran-Ferguson Act analysis into the preemption model distorts the analysis required by the statutory test fixed by the McCarran-Ferguson Act").

As this Court recently emphasized, Congress' purpose in enacting the McCarran Act was "*broadly* to give support to the existing and future state systems for regulating and taxing the business of insurance," by removing obstructions to the states' exercise of power that "might be thought to flow from [Congress'] own power, whether dormant or exercised." *United States Dept. of Treasury v. Fabe*, 113 S. Ct. 2202, 2207 (1993) (emphasis added). The design was not, as is generally true in the federal system, one of parallel and overlapping regulation, but instead one in which Congress intended to enforce "the continued supremacy of the States" with respect to insurance regulation, *SEC v. National Securities, Inc.*, 393 U.S. 453, 459 (1969), and "to reserve to the States the regulation of the 'business of insurance.'" *FMC Corp. v. Holliday*, 498 U.S. 52, 63 (1990). *See generally Western & Southern Life Ins. Co. v. State Board of Equalization*, 451 U.S. 648, 652-655 (1981). The pre-

9

emption model on which both the Sixth and Seventh Circuits relied ignores the significantly broader deference to state regulation required under the McCarran Act, and is therefore inappropriate for McCarran Act analysis.

The "inverse preemption" model embraced by the Seventh Circuit in *American Family* and the court below led those courts to ask whether the FHA directly conflicted with state insurance law. The McCarran Act does not, by its terms, require such a direct "conflict" to preclude the application of federal law. Rather, it requires a determination whether the application of federal law will "invalidate, impair, or supersede" state insurance laws. The Act does not define the words "invalidate, impair, or supersede." "When terms used in a statute are undefined, we give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 115 S. Ct. 788, 793 (1995); *see FDIC v. Meyer*, 114 S. Ct. 996, 1001-02 (1994). The word "invalidate" means "to weaken or make valueless." Webster's Third New International Dictionary 1188 (1986). "Impair" is defined as "to make worse; diminish in quality, value, excellence, or strength; do harm to." *Id.* at 1131. And "supersede" means "to make obsolete, inferior, or outmoded, * * * to make void * * * to make superfluous or unnecessary." *Id.* at 2295. These words—particularly used in conjunction—make it clear that Congress did not require the sort of actual conflict necessary for a finding of preemption under the Supremacy Clause before a determination that the McCarran Act precludes the application to the business of insurance of a federal statute that does not specifically relate to that business.

The "inverse preemption" model led the majority below—following the Seventh Circuit in *American Family*—to conclude that the availability of additional and markedly stronger remedies under the FHA did not conflict with state insurance law, and that therefore the FHA could be construed to apply to the business of insurance. When the McCarran Act's broad prohibition on construc-

10

tions of federal law that "invalidate, impair, or supersede" state insurance law is read according to its natural meaning, however, rather than filtered through the "inverse preemption" test, it is clear that there can be no blanket rule that additional federal remedies can never satisfy the statutory language. *See Ambrose*, 891 F. Supp. at 1166. Rather, the language of the Act requires that a court consider the actual effect of the federal law on the state regulatory regime. *Id.*

Here the availability of additional and broader remedies under the FHA—private causes of action, jury trials, unlimited punitive damages, and attorneys fees—will "weaken," "do harm to," and "make superfluous or unnecessary" Ohio insurance law, which affords relief through administrative procedures designed to allow regulatory consideration of all pertinent factors, including state interests in insurer solvency and fair access to sound insurance products. *See* Pet. 20-21. The availability of additional different remedies under the FHA—through procedures that do not ensure consideration of state regulatory interests—will encourage Ohio citizens to bypass the administrative forum provided by Ohio law, thereby displacing expert and experienced state regulators and depriving both insurers and insureds of the technical expertise of the state officials and the flexibility afforded by the administrative process. As one court recently explained:

Virtually any state statute includes more than a simple proscription of conduct. It includes the appropriate penalty for that conduct and the appropriate mechanism for enforcing the proscription. A state law that prohibits an act, punishes it with a specific range of fines, makes it the subject of remedial action, and vests enforcement in a state quasi-judicial entity cannot be said to be consistent with a federal law that prohibits the same act, permits treble damages, fees, and costs, and expressly creates a personal cause of action. [*Ambrose v. Blue Cross & Blue Shield of Virginia, Inc.*, 891 F. Supp. at 1167.]

11

The notion that the availability of different remedies under federal law cannot "invalidate, impair, or supersede" state insurance law is untenable as a matter of logic. Assume both federal and state law make it illegal to operate a store after 9:00 p.m. The federal remedy is forfeiture of the business; the state remedy is a hearing before a state official who can issue a warning or a $100 fine. The federal remedy plainly "impair[s]" the state remedy, not only by imposing a greater penalty but by dispensing with the hearing at which the state official could, for example, decide only to issue a warning in light of the desirability of maintaining stores in a particular neighborhood. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 386 (1992) (finding "inconsisten[cy]" between state and federal law in part because state law "imposes greater liability").[4]

The question whether additional remedies under federal law can operate to "invalidate, impair, or supersede" state insurance law has significance far beyond the FHA context in which it arose in this case, and has generated a growing conflict among the lower courts. For example, numerous courts around the country have held that the McCarran Act precludes construing the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), to apply to the business of insurance.[6]

_____

[4] This Court has recognized in other contexts the desirability of having complex regulatory issues decided in the first instance by expert administrators operating pursuant to flexible procedures. *See, e.g., United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63-65 (1956) (discussing the desirable "uniformity and consistency in the regulation of business" that results from permitting a specialized agency to resolve issues within its "special competence").

[6] *See, e.g., Ambrose v. Blue Cross & Blue Shield of Virginia, Inc.*, 891 F. Supp. 1153 (E.D. Va. 1995); *Everson v. Blue Cross & Blue Shield of Ohio*, 898 F. Supp. 532, 544 (N.D. Ohio 1994); *Forsyth v. Humana, Inc.*, 827 F. Supp. 1498, 1621-22 (D. Nev. 1993); *Wexco, Inc. v. IMC, Inc.*, 820 F. Supp. 194, 204 (M.D. Pa. 1993); *LeDuc v. Kentucky Central Life Ins. Co.*, 814 F. Supp. 820, 829 (N.D. Cal. 1992); *Senich v. Transamerica Premier Ins. Co.*, 766 F. Supp. 339, 341 (W.D. Pa. 1990).

12

Those courts have reasoned—in conflict with the approach of the majority below—that the prospect of private causes of action for treble damages and attorneys' fees under RICO would "invalidate, impair, or supersede" state insurance law, even though both RICO and state insurance law prohibit the same conduct. Indeed, less than six months after issuing its opinion in this case, the Sixth Circuit reached the same result in *Kerry v. Bank One*, 67 F.3d 1257 (6th Cir. 1995), *reh'g granted* (Nov. 28, 1995), holding that application of RICO to alleged fraudulent conduct by an insurer would "invalidate, impair, or supersede" Ohio insurance law and is therefore precluded by the McCarran Act. *Id.* at 1264-67.[6]

*Kerry* and the numerous other decisions to like effect conflict with the recent decision of the Ninth Circuit in *Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co.*, 50 F.3d 1486 (9th Cir.), *cert. denied*, 116 S. Ct. 418 (1995). In that case, the insurer argued that the application of RICO to its alleged fraudulent conduct would invalidate, impair, or supersede state insurance regulations because "the private right of action for treble damages and mandatory attorneys fees allowed by RICO would upset the balance struck by California's insurance code, which, in general, allows only administrative enforcement and actual damages." *Id.* at 1491. The Ninth Circuit, relying heavily on the Seventh Circuit's "inverse preemption" analysis in *American Family*, rejected this argument and held "that the application of a federal statute prohibiting acts which are also prohibited under a state's insurance laws does not 'invalidate, impair, or supersede' the state's laws under § 2(b) of the McCarran-Ferguson Act." *Id.* at 1492. This Court should grant certiorari to resolve the growing conflict over whether additional and stronger remedies under federal law trigger

---

[6] The *Kerry* court has granted a petition for rehearing, but not on the McCarran Act issue. *See* Petition for Rehearing of Appellee-Petitioner Bank One, Columbus, N.A. (6th Cir. No. 93-4211, filed Nov. 8, 1995).

13

the McCarran Act because they operate to "invalidate, impair, or supersede" state insurance law.

## II. THIS COURT SHOULD GRANT CERTIORARI TO RESOLVE THE CONFLICT OVER WHETHER APPLYING LIABILITY STANDARDS UNDER THE FAIR HOUSING ACT TO THE BUSINESS OF INSURANCE WOULD "INVALIDATE, IMPAIR, OR SUPERSEDE" STATE INSURANCE LAW

The availability of different and broader remedies under the FHA—remedies divorced from the supervision and control of state regulatory officials—suffices to establish that application of the FHA to the business of insurance will operate to "invalidate, impair, or supersede" the state regulatory regime. Consideration of *how* the FHA will be applied to insurance practices simply confirms that conclusion.[7]

There is no question that application of the FHA to property insurance will impact state regulation of insurance pricing. Indeed, both the Sixth and Seventh Circuits have defined "redlining" to encompass the rates charged for insurance. *See* Pet. App. 3; *American Family*, 978 F.2d at 290. The widely-publicized consent decree entered in the *American Family* case has placed insurers on notice that federal enforcement agencies are seeking and obtaining relief in FHA cases that effectively sets homeowners' insurance premium rates and establishes basic underwriting standards without regard to active state supervision of insurance pricing and underwriting rules. *See* App., *infra*, at 1a-5a.[8] Direct federal regulation

---

[7] We believe that application of the FHA to insurance would intrude upon state regulation to such an extent as to constitute a direct conflict of the sort apparently required under the lower court's misguided "inverse preemption" test. The level of inevitable disruption certainly meets the "invalidate, impair, or supersede" test established by the McCarran Act itself.

[8] In addition, HUD has publicly solicited applications for funding for private fair housing enforcement projects based on comparisons of premiums charged and data indicating discriminatory impact of underwriting practices. *See* 59 Fed. Reg. 40757 (Aug. 9, 1994).

## 14

of insurance pricing openly intrudes upon the state insurance regulators' mission to ensure that rates are not excessive, inadequate, or unfairly discriminatory, matters which are quintessentially within the province of the states and properly confided to the insurance regulators' expertise.[9]

The FHA's interference with state regulation of insurance pricing and underwriting is especially pronounced under a disparate impact liability standard. The practical effect of the Sixth Circuit's decision is that property insurers will be forced to fend off FHA disparate impact challenges to underwriting and rating standards and rules sanctioned by state insurance regulators. HUD has actively advocated a disparate impact standard for FHA claims generally, and has issued a regulation providing that the FHA applies to property insurance.[10] These facts have al-

___

[9] See, e.g., Farmers Ins. Exch. v. Superior Court, 2 Cal. 4th 377, 398, 6 Cal. Rptr. 2d 487, 500-501, 826 P.2d 730, 742-743 (1992); Attorney General v. Insurance Commissioner, 323 N.W.2d 645, 649 (Mich. Ct. App. 1982) (insurance rate-making is "a technical and highly complex process requiring much expertise"); Pennsylvania Ins. Dept. v. Johnson, 238 A.2d 23, 25-26 (Pa. Super. 1967) (insurance ratemaking is a technical, complicated and involved procedure carried on by trained men.") (quotation omitted), cert. denied, 248 A.2d 308 (Pa. 1968), cert. denied, 394 U.S. 1003 (1969).

[10] See Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934 (2d Cir.), review declined in relevant part, 488 U.S. 18 (1988); Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 146-48 (3d Cir. 1977), cert. denied, 435 U.S. 908 (1978); Betsey v. Turtle Creek Assocs., 736 F.2d 983, 986-988 (4th Cir. 1984); Arthur v. City of Toledo, 782 F.2d 565, 574-575 (6th Cir. 1986); Hanson v. Veterans Admin., 800 F.2d 1381, 1386 (5th Cir. 1986); Metropolitan Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1289-90 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978); United States v. City of Black Jack, 508 F.2d 1179, 1184-85 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975); Keith v. Volpe,

## 15

ready precipitated and will inevitably continue to precipitate disparate impact challenges to property insurers' underwriting and rating standards.[11]

The imposition of a disparate impact standard upon property insurers under the FHA would directly conflict with the state insurance law principle requiring comparable treatment of like risks. Like many other states, Ohio prohibits insurers from engaging in unfair discrimination among like risks, but does not prohibit the use of facially neutral rates and underwriting standards that may have a disparate impact. Ohio Rev. Code § 3901.21(M) (prohibiting insurers from "making or permitting any unfair

___

858 F.2d 467, 482-484 (9th Cir. 1988), cert. denied, 493 U.S. 813 (1989); Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development, 56 F.3d 1243, 1250-51 (10th Cir. 1995).

[11] The Sixth Circuit declined to reach the disparate impact issue on the ground that it was not ripe for review. Nationwide has argued in its petition that the court's refusal to address the disparate impact issue conflicts with this Court's decision in Abbott Laboratories v. Gardner, 387 U.S. 136 (1967), and decisions from other circuits. See Pet. App. 16-19. Amici join those arguments, and emphasize the urgency to their members of having this unsettled issue resolved. For example, HUD has received and is investigating complaints against amici's members which include claims of disparate impact, and has given every indication of its intention to employ a disparate impact theory in enforcing the FHA against insurers. See Pet. App. 135-152. Some state insurance regulators have correctly ascertained that the "disparate impact test applied to insurance for urban dwellers seems to be a given—a foregone conclusion—to HUD." App., infra, at 7a (testimony of Richard C. Hsia, Deputy Superintendent of Insurance, New York State Insurance Department, before United States Department of Housing & Urban Development, at 7 (Oct. 27, 1994).

The certworthiness of this case does not depend, however, on whether the Court elects to reach and decide the ripeness issue. As explained in the petition and this brief, there are stark conflicts among the circuits on whether the FHA applies in any form to insurance, and on whether the availability of additional federal remedies triggers the McCarran Act. Those conflicts do not depend on whether a disparate impact standard is applied to insurance

16

discrimination between individuals of the same class and of essentially the same hazard in the amount of premium, policy fees, assessments, or rates charged for any policy or contract of insurance * * * or in underwriting standards and practices or eligibility requirements"). By no means does state law permit race to be used as a basis for these risk classifications. Rather, the classifications focus on the condition of the structure to be insured and rating territory, and must have a meaningful actuarial basis linked to loss experience or other legitimate basis. These standards and groupings are submitted to and subject to approval by state insurance regulators. See, e.g., §§ 3935.03–.05.

The FHA disparate impact standard and state law unfair discrimination standards serve different and not necessarily compatible or consistent ends. Underwriting standards and rates which are proper under the state unfair discrimination standard because they are actuarially sound, risk-related, and justified on the basis of loss experience—and in no way reflect an intent to discriminate on the basis of a prohibited factor—may nevertheless have a disparate impact and thus fail to pass muster under the FHA, absent a sufficient showing of business necessity. For example, higher rates for older homes or urban areas may be approved by a state insurance commissioner, based on the higher loss costs for such homes or areas. Nonetheless, there may be a disproportionate percentage of groups protected under the FHA living in those homes or areas. A lawsuit filed under the FHA alleging that this state-approved rating practice has a disparate impact on such protected groups would plainly interfere with the state insurance regulatory regime. Potential conflicts like these recently led one state regulator to counsel HUD that "[f]or insurance purposes * * * treating everyone the same would create widespread unfair discrimination." App., infra, at 9a (Testimony of Richard C. Hsia, supra).

The specter of disparate impact challenges would act as a perverse incentive to insurers to close their eyes to

17

actual loss experience and spread the risk of loss attributable to identifiable classes of housing stock across all insureds. As the Seventh Circuit acknowledged, "[p]utting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out." American Family, 978 F.2d at 290.

Finally, the threat of disparate impact liability would have a severe chilling effect upon underwriting judgments in other respects. The potential for disparate impact suits, where no proof of discriminatory intent is required and where inferences matter so significantly—not to mention the uncertainty of jury trials and unlimited punitive damage awards—would be sure to alter and discourage proper underwriting judgments and the application of neutral standards consistent with state unfair discrimination principles. The end result will be to "invalidate, impair, or supersede" state insurance law, in violation of the McCarran Act.

III. THE QUESTIONS PRESENTED ARE IMPORTANT AND RECURRING, AND SHOULD BE RESOLVED BY THIS COURT

There is a sharp conflict among the federal circuits over whether the FHA applies to the business of insurance. The Sixth Circuit's decision in this case and the Seventh Circuit's decision in American Family conflict with the Fourth Circuit's decision in Mackey. There can be no debate about the existence of that conflict; it has been expressly acknowledged by the courts themselves. See, e.g., American Family, 978 F.2d at 302 (recognizing that "this opinion * * * conflicts with * * * the Fourth Circuit's holding in Mackey"); Pet. App. 11-15 (Kennedy, J., dissenting and relying on Mackey). This conflict over the applicability of an important federal statute should be resolved by this Court. As this Court has explained, a

18

"principal purpose for which we use our certiorari jurisdiction * * * is to resolve conflicts among the United States courts of appeals." *Braxton v. United States*, 500 U.S. 344, 347 (1991). *See* S. Ct. Rule 10.1(a).

The issue is a legal one that does not depend upon the specific facts of any particular case. The FHA should have the same scope in the Sixth and Seventh Circuits as in the Fourth, particularly since many insurers operate throughout the country. The division among the circuits is sharply defined and the competing arguments have been fully aired and considered; there is no warrant for allowing the conflict and uncertainty to persist while other circuits weigh in on the question. The hope that Congress might address and resolve the conflict—which might well explain the decision not to grant review in *American Family*, despite the expressly acknowledged conflict with *Mackey*—has not come to fruition. Instead of being resolved, the conflict has now deepened. This Court should wait no longer to resolve it.

At the same time, there is a deepening conflict among the lower courts over the broader question whether the availability of additional federal remedies can operate to "invalidate, impair, or supersede" state insurance law under the McCarran Act. Until this confusion is resolved, the circuits will continue to reach disparate results as they apply the McCarran Act to particular federal statutes, as has already happened with respect to the FHA and RICO. This case affords the Court an opportunity to clarify these important and unsettled questions of federal law. It should grant certiorari to do so.

19

## CONCLUSION

For the foregoing reasons, and those in the petition, this Court should grant the petition and reverse the decision below.

Respectfully submitted,

JOHN G. ROBERTS, JR.*
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5810

JOSEPH A. CANCILA, JR.
HEIDI DALENBERG
SONDRA A. HEMERYCK
SCHIFF HARDIN & WAITE
7200 Sears Tower
Chicago, Illinois 60606
(312) 876-1000
*Counsel for Amici Curiae*

* Counsel of Record

**APPENDICES**

APPENDIX A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,

Defendant.

Civil Action No. 95-C-0327

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, [NAACP], et al.,

Plaintiffs,

v.

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,

Defendant.

Civil Action No. 90-C-0759

CONSENT DECREE

*   *   *

II.  AMERICAN FAMILY'S
HOMEOWNERS INSURANCE INITIATIVES

A.  Injunctive Relief

American Family, its officials, employees, sales agents,
and through them, their employees, and successors are

enjoined from engaging in any act or practice that un-lawfully discriminates by intent or effect on the basis of race or color in the provision of homeowners insurance, imposing on the basis of race different terms or conditions for the availability of homeowners insurance, or making any statement that indicates any preference, limitation, or discrimination based on race or color.

C. Marketing

\* \* \* \*

\* \* \* \*

3. *Policy offerings*

American Family will make the following policy offer-ings in Milwaukee County:

(a) American Family has introduced and will maintain a new homeowners insurance product known as a Custom Value replacement cost home-owners policy and will make modifications to the eligibility guidelines for several existing insurance products, as described below.

(b) American Family has decided to and will eliminate its requirement that the market value of a home must be eighty (80) percent or more of the estimated replacement cost to obtain a homeowners insurance policy which provides replacement cost coverage.

i. A homeowner can obtain a Custom Value replacement cost homeowners policy if the market value of the home is ten (10) per-cent or greater and less than eighty (80) percent of the replacement cost and the amount of insurance purchased is less than eighty (80) percent of the replacement cost of the dwelling. Under this policy Ameri-can Family will not prorate the payment of any claims up to the policy limits. These

2a

Custom Value policies will be identical to American Family's HO-1 and HO-3 policies in coverages, terms, and conditions, except as to the differences in coverage amounts described above.

ii. A homeowner can obtain a Custom Value homeowners insurance policy in any cov-erage amount from ten (10) to seventy-nine (79) percent of the home's estimated replacement cost if the market value of the home to be insured is between forty (40) and seventy-nine (79) percent of its esti-mated replacement cost. A homeowner can obtain a Custom Value policy in any cov-erage amount up to one and a half times the market value of the home if the market value of the home to be insured is less than forty percent of the home's estimated re-placement cost.

iii. A homeowner can obtain a standard re-placement Form 1, 2, or 3 homeowners pol-icy if the market value of the home is at least forty (40) percent of the replacement cost and the amount of insurance purchased is at least eighty (80) percent of the re-placement cost.

iv. A homeowner can obtain a Gold Star re-placement cost homeowners policy if the market value of the home is at least fifty (50) percent of the replacement cost and the amount of insurance purchased is at least one hundred (100) percent of the re-placement cost. American Family will also require that homes covered by a Gold Star policy meet those specified objective stand-ards directly related to a reduction in the risk of loss or damage to the home.

3a

4a

(c) American Family has decided to and will eliminate the requirement that a property must be of a certain minimum value and that a potential insured must purchase a minimum amount of homeowners insurance. A minimum basic premium of eighty-eight ($88.00) dollars for a home in the City of Milwaukee with masonry construction and ninety-five ($95.00) dollars for a home with frame construction will be charged to cover administrative, loss, and processing costs. For the year ending March 31, 1996, the minimum basic premium amount will provide a maximum of twenty thousand dollars ($20,000) of insurance coverage, with a two hundred and fifty dollar ($250.00) deductible. American Family may adjust the minimum premium by the same percentage as the percentage of adjustment approved by the Wisconsin Office of the Commissioner for Insurance for American Family Form 3 replacement cost homeowners insurance policy.

(d) American Family has decided that the premium for the Custom Value coverage will be calculated by multiplying a factor for the percentage the requested amount of coverage is of the home's estimated replacement cost by the premium American Family charges for Form 3 coverage at the full replacement cost. A minimum basic premium of eighty-eight ($88.00) dollars for a home in the City of Milwaukee with masonry construction and ninety-five ($95.00) dollars for a home with frame construction will be charged to cover administrative, loss, and processing costs. American Family may adjust the minimum premium by the same percentage as the percentage of adjustment approved by the Wisconsin Office of the Commissioner for Insurance for American Family Custom value Form 3 replacement cost homeowners insurance policy.

\* \* \*

D.  Underwriting

\* \* \*

4. American Family will disseminate these revised underwriting guidelines to its sales agents, underwriters, and other appropriate employees within ninety (90) days following the entry of this Order. The revised underwriting guidelines will provide that:

5a

(b) The decision on the eligibility of a home for insurance, and the decision as to the type of policy that will be issued, will be based on the individual characteristics of the home. American Family agrees not to take into consideration the condition or other characteristics of the homes in the surrounding neighborhood and may take into consideration the condition of an adjacent home only if it presents an identifiable risk to the home for which insurance is sought. For example, American Family agrees the mere fact that an adjacent home is not itself in insurable condition may not be a basis for declining insurance.

\* \* \*

APPENDIX B

NEW YORK STATE
INSURANCE DEPARTMENT

TESTIMONY

BY

RICHARD C. HSIA
DEPUTY SUPERINTENDENT OF INSURANCE

ON BEHALF OF

SALVATORE R. CURIALE
SUPERINTENDENT OF INSURANCE

ON

FAIR HOUSING & FAIR INSURANCE

SOUND HOUSING & SOUND INSURANCE

BEFORE

UNITED STATES DEPARTMENT
OF
HOUSING & URBAN DEVELOPMENT

HON. HENRY CISNEROS
HUD SECRETARY

HON. ROBERTA ACHTENBERG
HUD ASSISTANT SECRETARY
FOR
FAIR HOUSING & EQUAL OPPORTUNITY

FANEUIL HALL
BOSTON, MASSACHUSETTS
OCTOBER 27, 1994

*    *    *

---

FAIR HOUSING & FAIR INSURANCE

SOUND HOUSING & SOUND INSURANCE

*    *    *

H: Divergence (?) Between Unfair Discrimination & Disparate Impact.

The disparate impact test (DIT) applied to insurance for urban dwellers seems to be a given—a foregone conclusion—to HUD. No practical obstacle might be presented, if disparate impact under HUD's interpretation of the federal Fair Housing Act closely corresponds to what would constitute unfair discrimination under governing state insurance statutory and regulatory standards. How would DIT work, as applied to insurance? If applied to insurance, would DIT prove workable?

Problems surely arise in the event of divergence between these two concepts. Are they compatible or in conflict? Under disparate impact analysis, to what extent, if at all, would otherwise lawful insurer practices become unlawful? Suppose an underwriting guideline was, indisputably, both risk-related and causally-connected. Despite these qualities of sound underwriting, could it be nevertheless thrown into question or struck down due to disparate impact? Will disparate impact bar behavior that is not unfair discrimination?

At this stage, unsure of correct answers, we merely pose a series of pertinent questions:

*** Would DIT permit or promote sound underwriting?

*** Will DIT proscribe factors, even if risk-related?

*** Will DIT proscribe factors, even if causally-connected?

8a

*** Do loss probabilities or actuarial projections matter under DIT?

*** Does use of rating territories comport with DIT?

*** Do higher urban insurance rates fail DIT?

*** Do higher urban residual market proportions fail DIT?

*** Will DIT admit the need for special expertise in urban markets?

*** Will DIT rule out prudent underwriting practices?

*** Will DIT overrule prudent financial management?

*** Does DIT trigger due to disparities in agents per capita ratios?

*** Will DIT forbid regional, specialty or niche writers?

*** Would DIT have disparate impact on competition?

*** Does DIT preclude insurer diversification?

*** Will DIT recognize concentration of risk concerns?

*** Will DIT override capacity constraints & insurer compliance?

We look, and listen, to HUD for the answers to these questions. It will be of comfort to know that the answers to these questions are all no. In any event, we need to know if yes, or even maybe, is the answer to any of these questions. Some queries may not lend themselves to a yes or no response.

Still more questions should be asked and answered. Do business necessity under DIT and proper business purpose in insurance terms mean the same? Insofar as DIT con-

9a

templates shifting burdens of proof, how heavy are those burdens and how can they be lifted or carried? What if the practice in question has a disparate impact but also a reasonable economic basis?

If disparate impact in some ways amounts to a sterner test than unfair discrimination, will it yield better results? Will DIT impair or impinge upon state insurance regulation?

Most important, perhaps, will risk factors relevant to insurance be equalized or ignored under a disparate impact test? Most pointedly, will disparate impact, if and when applied to insurance in view of fair housing goals, fairly take disparate housing conditions into account?

Ultimately, how can disparate impact analyses work in the context of insurance, which, properly understood in nature and properly functioning, is all about differential treatment? For insurance purposes, it must be appreciated that treating everyone the same would create widespread unfair discrimination.

\* \* \*