# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

AMERICAN INSURANCE
ASSOCIATION, *et al.*

        Plaintiffs,

        v.

UNITED STATES DEPARTMENT
OF HOUSING AND URBAN
DEVELOPMENT, *et al.*

        Defendants.

_____

No. 1:13-cv-00966 (RJL)

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

STUART F. DELERY
Assistant Attorney General

JOCELYN SAMUELS
Acting Assistant Attorney General

DAMON Y. SMITH
Acting General Counsel
MICHELLE ARONOWITZ
Deputy General Counsel for
    Enforcement and Fair Housing
JEANINE M. WORDEN
Associate General Counsel for
    Fair Housing
KATHLEEN M. PENNINGTON
Assistant General Counsel
    for Fair Housing Enforcement
M. CASEY WEISSMAN-VERMEULEN
AYELET R. WEISS
Attorneys
*Of counsel*

RONALD C. MACHEN JR.
United States Attorney

MICHAEL SITCOV
KYLE R. FREENY (Cal. Bar No. 247857)
DANIEL P. MOSTELLER (DC Bar No. 980802)
Attorneys
U.S. Department of Justice
20 Massachusetts Ave., N.W.
Washington, DC  20001
Tel: (202) 514-5108/Fax: (202) 616-8470
Email:  Kyle.Freeny@usdoj.gov
*Counsel for Defendants*

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION .......................................................................................................1

STATUTORY AND REGULATORY BACKGROUND....................................................2

ARGUMENT .............................................................................................................7

I.    PLAINTIFFS' CLAIM SHOULD BE DISMISSED FOR LACK OF
      JURISDICTION .................................................................................................7

      A.    Plaintiffs Lack Standing to Challenge HUD's Rule ...............................7

            1.   Plaintiffs Have Failed to Demonstrate a Legally Sufficient
                 Injury-in-Fact .............................................................................8

            2.   Plaintiffs' Injuries Are Neither Fairly Traceable to the Rule
                 Nor Redressable by their Requested Relief ...............................11

      B.    Plaintiffs' Claim Is Not Ripe ...............................................................15

II.   HUD REASONABLY CONSTRUED THE FHA TO ENCOMPASS
      DISPARATE IMPACT CLAIMS ..........................................................................18

      A.    HUD's Interpretation Is Entitled to Deference .....................................18

      B.    The Secretary's Interpretation Is Supported by the Text
            of the Statute .......................................................................................21

      C.    HUD's Interpretation Is in Harmony with the Statutory Context.........28

      D.    The Legislative History Supports the Availability of Disparate
            Impact Claims Under the FHA ..............................................................32

      E.    The Canon of Constitutional Avoidance Is Inapplicable Here .............35

      F.    McCarran-Ferguson Act Does Not Foreclose HUD's Interpretation ...37

      G.    There Is No Basis to Find HUD's Construction Unreasonable ............43

CONCLUSION........................................................................................................45

## TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE(S)**

*2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia,*
    444 F.3d 673 (D.C. Cir. 2006) ...................................................................20, 26

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ...................................................................................15

*In re Aiken Cnty.,*
    645 F.3d 428 (D.C. Cir. 2011) ...................................................................15

*Allen v. Wright,*
    468 U.S. 737 (1984)...................................................................................11

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998)...................................................................................36

*Arthur v. City of Toledo,*
    782 F.2d 565 (6th Cir. 1986) ....................................................................20, 32

*Ass'n of American Physicians & Surgeons, Inc. v. Sebelius,*
    901 F. Supp. 2d 19 (D.D.C. 2012) ...........................................................13

*Atl. Urological Assocs. v. Leavitt,*
    549 F. Supp. 2d 20 (D.D.C. 2008) ...........................................................13

*Auer v. Robbins,*
    519 U.S. 452 (1997)...................................................................................19

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
    515 U.S. 687 (1995)...................................................................................19

*Barrett v. H&R Block, Inc.,*
    652 F. Supp. 2d 104 (D. Mass. 2009) .......................................................28

*Bd. of Education v. Harris,*
    444 U.S. 130 (1979)...................................................................................24, 27

*Boykin v. Gray,*
    895 F. Supp. 2d 199 (D.D.C. 2012) ..........................................................20

*Brown v. Artery Org., Inc.,*
    654 F. Supp. 1106 (D.D.C. 1987) .............................................................20

*Brown v. FBI,*
    793 F. Supp. 2d 368 (D.D.C. 2011) ...................................................................8

*Helvering v. Hallock,*
    309 U.S. 106 (1940).........................................................................................35

*Chamber of Commerce of U.S. v. EPA,*
    642 F.3d 192 (D.C. Cir. 2011) .......................................................................8

*\*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.,*
    467 U.S. 837 (1984).............................................................................. passim

*City of Edmonds v. Oxford House, Inc.,*
    514 U.S. 725 (1995).........................................................................................30

*Cnty. of L.A. v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999) ...................................................................31

*Davis Cnty. Solid Waste Mgmt. v. EPA,*
    101 F.3d 1395 (D.C. Cir. 1996) ...................................................................30

*Davis v. Mich. Dep't of Treasury,*
    489 U.S. 803 (1989).........................................................................................29

*Dehoyos v. Allstate Corp.,*
    345 F.3d 290 (5th Cir. 2003) ...................................................................39, 41

*Diamond Shamrock Corp. v. Costle,*
    580 F.2d 670 (D.C. Cir. 1978) .......................................................................17

*Dolan v. USPS,*
    546 U.S. 481 (2006).........................................................................................29

*Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.,*
    472 F. Supp. 1106 (S.D. Ohio 1979) ...........................................................6

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988).........................................................................................35

*ExxonMobil Gas Mktg. Co. v. FERC,*
    297 F.3d 1071 (D.C. Cir. 2002) ...................................................................34

*Fair Hous. Opportunities of Nw. Ohio v. Am. Family Mut. Ins. Co.,*
    684 F. Supp. 2d 964 (N.D. Ohio 2010).................................................10, 42

*Forest Grove Sch. Dist. v. T.A.,*
    557 U.S. 230 (2009) ........................................................................................33

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,*
    559 U.S. 280 (2010) ........................................................................................25

*Greater New Orleans Fair Hous. Action Ctr. v. HUD,*
    639 F.3d 1078 (D.C. Cir. 2011) .......................................................................20

*\*Griggs v. Duke Power Co.,*
    401 U.S. 424 (1971) .................................................................................. passim

*Groach Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n,*
    508 F.3d 366 (6th Cir. 2007) ...........................................................................28

*Haines v. Gen. Pension Plan of Int'l Union of Operating Eng'rs,*
    \_\_ F. Supp. 2d \_\_\_, 2013 WL 4736228 (D.D.C. Sept. 4, 2013) .......................10

*Halet v. Wend Inv. Co.,*
    672 F.2d 1305 (9th Cir. 1982) ....................................................................20, 32

*Hanson v. Veterans Admin.,*
    800 F.2d 1381 (5th Cir. 1986) ....................................................................20, 32

*Hargraves v. Capital City Mortg. Corp.,*
    140 F. Supp. 2d 7 (D.D.C. 2000) ....................................................................20

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ..........................................................................................2

*Hoffman v. Option One Mortg. Corp.,*
    589 F. Supp. 2d 1009 (N.D. Ill. 2008) .............................................................28

*\*Humana Inc. v. Forsyth,*
    525 U.S. 299 (1999) ....................................................................16, 38, 42, 43

*Huntington Branch, NAACP v. Town of Huntington,*
    844 F.2d 926 (2d Cir.), *aff'd in part*, 488 U.S. 15 (1988) ...................19, 32, 45

*Hutchins v. Dist. of Columbia,*
    188 F.3d 531 (D.C. Cir. 1999) (en banc) .........................................................43

*Ileto v. Glock, Inc.,*
    565 F.3d 1126 (9th Cir. 2009) .........................................................................36

*Jacobs v. Vrobel,*
    724 F.3d 217 (D.C. Cir. 2013) ...................................................................................9

*King v. St. Vincent's Hosp.,*
    502 U.S. 215 (1991).................................................................................................29

*La. Envtl. Action Network v. Browner,*
    87 F.3d 1379 (D.C. Cir. 1996) ..............................................................................17

*Langlois v. Abington Hous. Auth.,*
    207 F.3d 43 (1st Cir. 2000)....................................................................................19

*Lorillard v. Pons,*
    434 U.S. 575 (1978).................................................................................................33

*\*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).............................................................................................8, 9

*Lumpkin v. Farmers Group, Inc.,*
    2007 WL 6996777 (W.D. Tenn. July 6, 2007) ....................................................41

*Meacham v. Knolls Atomic Power Lab.,*
    554 U.S. 84 (2008).............................................................................................26, 30

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,*
    558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025 (1978)...........................20, 32

*Meyer v. Holley,*
    537 U.S. 280 (2003).................................................................................................18

*Mountain Side Mobile Estates v. HUD,*
    56 F.3d 1243 (10th Cir. 1995) .......................................................................3, 5, 20

*NAACP v. Ameriquest Mortg. Co.,*
    635 F. Supp. 2d 1096 (C.D. Cal. 2009) ................................................................28

*NACS v. Board of Governors of the Federal Reserve System,*
    ___ F. Supp. 2d ___, 2013 WL 3943489 (D.D.C. July 31, 2013) .....................15

*N.Y. City Transit Auth. v. Beazer,*
    440 U.S. 568 (1979).................................................................................................31

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers,*
    663 F.3d 470 (D.C. Cir. 2011) .........................................................................12, 13

*Nat'l Cmty. Reinv. Coal. v. Accredited Home Lenders Holding Co.,*
  573 F. Supp. 2d 70 (D.D.C. 2008) ............................................................20, 28

*Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.,*
  208 F. Supp. 2d 46 (D.D.C. 2002) ................................................6, 20, 21, 42

*Nat'l Mining Ass'n v. Kempthorne,*
  512 F.3d 702 (D.C. Cir. 2008) ..................................................................36

*Nat'l Multi Hous. Council v. Jackson,*
  539 F. Supp. 2d 425 (D.D.C. 2008) ..........................................................13

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
  538 U.S. 803 (2003).............................................................................15, 16

*Nat'l Rifle Ass'n of Am., Inc. v. Reno,*
  216 F.3d 122 (D.C. Cir. 2000) ..................................................................45

*Nat'l Taxpayers Union v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ....................................................................8

*\*Nationwide Mut. Ins. Co. v. Cisneros,*
  52 F.3d 1351 (6th Cir. 1995) ..................................................................6, 17

*Natural Res. Defense Council, Inc. v. EPA,*
  859 F.2d 156 (D.C. Cir. 1988) ..................................................................17

*Ober United Travel Agency v. U.S. Dep't of Labor,*
  135 F.3d 822 (D.C. Cir. 1998) ..................................................................27

*Ojo v. Farmers Grp. Inc.,*
  600 F.3d 1205 (9th Cir. 2010) (en banc) .....................................................6

*Owens v. Nationwide Mut. Ins. Co.,*
  2005 WL 1837959 (N.D. Tex. Aug. 2, 2005)............................................10, 42

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007)................................................................................37

*Pauley v. BethEnergy Mines, Inc.,*
  501 U.S. 680 (1991)............................................................................19, 26

*Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC,*
  962 F.2d 27 (D.C. Cir. 1992) ....................................................................11

*Ramirez v. GreenPoint Mortg. Funding, Inc.,*
    633 F. Supp. 2d 922 (N.D. Cal. 2008) ....................................................26, 28

*Regions Hosp. v. Shalala,*
    522 U.S. 448 (1998).............................................................................18, 29, 28

*Reinhart v. Lincoln Cnty.,*
    482 F.3d 1225 (10th Cir. 2007) ............................................................28

*Resident Advisory Bd. v. Rizzo,*
    564 F.2d 126 (3d Cir. 1977).................................................................20, 32

*Ricci v. DeStefano,*
    129 S. Ct. 2658 (2009) ..........................................................................36

*Rust v. Sullivan,*
    500 U.S. 173 (1991)...............................................................................43

*Samaritan Inns v. Dist. of. Columbia,*
    1995 WL 405710 (D.D.C. June 30, 1995),
    *aff'd in part and rev'd in part,* 114 F.3d 1227 (D.C. Cir. 1997) .....................20

*Salinas v. United States,*
    522 U.S. 52 (1997)................................................................................37

*Saunders v. Farmers Ins. Exch.,*
    440 F.3d 940 (8th Cir. 2006) ..............................................................39

*Saunders v. Farmers Ins. Exch.,*
    537 F.3d 961 (8th Cir. 2008) ..............................................................39, 40

*Smiley v. Citibank (S.D.),*
    517 U.S. 735 (1996).............................................................................21

*\*Smith v. City of Jackson,*
    544 U.S. 228 (2005)............................................................... passim

*Smith v. Town of Clarkton,*
    682 F.2d 1055 (4th Cir. 1982) ............................................................20

*Sprint Corp. v. FCC,*
    331 F.2d 952 (D.C. Cir. 2003) .............................................................16

*State Farm Mut. Auto. Ins. Co. v. Dole,*
    802 F.2d 474 (D.C. Cir. 1986) .............................................................17

*State Nat'l Bank of Big Spring v. Lew,*
    __ F. Supp. 2d ___, 2013 WL 3945027 (D.D.C. Aug. 1, 2013) ..........................................9

*Taylor v. Accredited Home Lenders, Inc.,*
    580 F. Supp. 2d 1062 (S.D. Cal. 2008) ..............................................................................28

*Texas v. United States,*
    523 U.S. 296 (1998) ............................................................................................................16

*Toilet Goods Ass'n v. Gardner,*
    387 U.S. 158 (1967) ......................................................................................................16, 17

*Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.,*
    704 N.E.2d 667 (Ohio Ct. Com. Pl. 1997) ...................................................................41, 42

*Trafficante v. Metro. Life Ins. Co.,*
    409 U.S. 205 (1972) ............................................................................................................45

*United States v. City of Black Jack,*
    508 F.2d 1179 (8th Cir. 1974) .....................................................................................2, 20, 32

*United States v. Giles,*
    300 U.S. 41 (1937) .......................................................................................................24, 25

*United States v. Haggar Apparel Co.,*
    526 U.S. 380 (1999) ............................................................................................................19

*United States v. Marengo Cnty. Comm'n,*
    731 F.2d 1546 (11th Cir. 1984) ....................................................................................20, 32

*Wai v. Allstate Ins. Co.,*
    75 F. Supp. 2d 1 (D.D.C. 1999) .........................................................................................6

*Watson v. Fort Worth Bank & Trust,*
    487 U.S. 977 (1988) ............................................................................................................22

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ............................................................................................................11

## STATUTES

15 U.S.C. §§ 1011-1015 .................................................................................................................7

29 U.S.C. § 623 ................................................................................................................... passim

42 U.S.C. § 2000e-2 ............................................................................................................ passim

42 U.S.C. § 3601 ...........................................................................................................2

42 U.S.C. § 3604 ................................................................................................. passim

42 U.S.C. § 3605 ..............................................................................................2, 24, 30

42 U.S.C. § 3606 ....................................................................................................2, 24

42 U.S.C. § 3607 ..............................................................................................29, 30, 31

42 U.S.C. § 3612 ...........................................................................................................3

42 U.S.C. § 3614a .........................................................................................................3

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 ..................................35

Emergency School Aid Act,
     Pub. L. No. 92-318, § 706(d)(1)(B), 86 Stat. 354, 358 (1972) ..........................24

Fair Housing Act, Pub. L. No. 90-284, 82 Stat. 81 (1968) ...........................................2

Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 .............3

**RULES AND REGULATIONS**

24 C.F.R. § 100.500 ............................................................................................ passim

24 C.F.R. § 180.675 .....................................................................................................3

54 Fed. Reg. 3232 (Jan. 23, 1989) ...............................................................................6

59 Fed. Reg. 18,266 (Apr. 15, 1994) ...........................................................................4

63 Fed. Reg. 70,256 (Dec. 18, 1998) .....................................................................4, 25

76 Fed. Reg. 70,921 (Nov. 16, 2011)......................................................................5, 7

78 Fed. Reg. 11,460 (Feb. 15, 2013) ................................................................. passim

**ADMINISTRATIVE PROCEEDINGS**

*HUD v. Carter,*
     No. 03-90-0058-1, 1992 WL 406520 (HUD ALJ May 1, 1992)..........................3

*HUD v. Mountain Side Mobile Estates P'ship,*
    Nos. 08-92-0010 and 08-92-0011, 1993 WL 307069,
    *aff'd in relevant part*, 56 F.3d 1243 (10th Cir. 1995) .........................................................3

*HUD v. Pfaff,*
    No. 10-93-0084-8, 1994 WL 592199 (HUD ALJ Oct. 27, 1994),
    *rev'd on other grounds*, 88 F.3d 739 (9th Cir. 1996) ..........................................................3

*HUD v. Ross,*
    No. 01-92-0466-8, 1994 WL 326437 (HUD ALJ July 7, 1994)........................................3

*HUD v. Twinbrook Vill. Apartments,*
    Nos. 02-00-0256-8, 02-00-0257-8, and 02-00-0258-8,
    2001 WL 1632533 (HUD ALJ Nov. 9, 2001) ...................................................................3

## LEGISLATIVE MATERIAL

114 Cong. Rec. 3422 (1968) ...................................................................................................34

126 Cong. Rec. 31,167 (1980) ...........................................................................................3, 32

134 Cong. Rec. 23,711 (1988) .........................................................................................33, 34

H.R. Rep. No. 100-711 (1988)................................................................................................40

*Fair Hous. Amendments Act of 1987: Hearings Before the Subcomm.*
    *on the Constitution of the S. Comm. on the Judiciary*, 100th Cong (1987) ......................33

*Homeowners Insurance Discrimination: Hearing Before the S. Comm. on Banking,*
    *Hous., and Urban Affairs*, 103rd Cong. (1994) ............................................................7, 41

## STATE CODES

Ark. Code Ann. § 23-66-206(14)...........................................................................................40

Colo. Rev. Stat. § 10-3-1104(1) ............................................................................................40

Conn. Agencies Regs. § 38a-824-3(a) ...................................................................................40

Del. Code Ann. tit. 18, § 4124(3) ..........................................................................................40

Fla. Stat. § 626.9541(1) .........................................................................................................40

Ga. Code Ann. § 33-6-4(b)(8)(A)(iii)....................................................................................40

Haw. Rev. Stat. § 431:13-103(a)(7).......................................................................................40

215 Ill. Comp. Stat. 5 / 143.21a(a)........................................................................40

215 Ill. Comp. Stat. 5 / 155.22.............................................................................40

Ind. Code §27-2-17-5(b).......................................................................................40

Kan. Admin. Regs. § 40-3-40(a)(4) .....................................................................40

Ky. Rev. Stat. Ann. § 304.20-340(3) ....................................................................40

La. Rev. Stat. Ann. § 22:1964(7)...........................................................................40

Me. Rev. Stat. tit. 24-A § 3051.............................................................................40

Md. Code Ann. Ins. § 11-205(f)(4) .......................................................................40

211 Mass. Code Regs. § 142.07............................................................................40

Mich. Comp. Laws § 500.2027.............................................................................40

Minn. Stat. § 72A.20(13) ......................................................................................40

Mo. Rev. Stat. §375.936(11).................................................................................40

Mont. Code Ann. § 33-18-210..............................................................................40

Neb. Rev. Stat. § 44-1525(7)................................................................................40

N.H. Rev. Stat. Ann. § 417:4(VIII).......................................................................40

N.Y. Ins. Law § 3429-a........................................................................................40

N.C. Gen. Stat. § 58-63-15(7)..............................................................................40

N.D. Cent. Code § 26.1-04-03(7)(d).....................................................................40

N.D. Cent. Code § 26.1-39-17(3) .........................................................................40

Okla. Stat. tit. 36, § 619.1 ....................................................................................40

Or. Rev. Stat. § 746.018(2)...................................................................................40

40 Pa. Cons. Stat. § 1171.5(a)(7)(iii) ...................................................................40

R.I. Gen. Laws § 27-29-4(7).................................................................................40

R.I. Gen. Laws § 27-29-4.1 .................................................................................40

S.D. Codified Laws § 58-11-55 ...........................................................................40

Tenn. Code Ann. § 56-8-104(7) ...........................................................................40

28 Tex. Admin. Code § 21.1006(b) ......................................................................40

Tex. Ins. Code § 544.002(a)(2) ...........................................................................40

Va. Code Ann. § 38.2-508 ...................................................................................40

W. Va. Code § 33-17A-6(c) .................................................................................40

Wis. Admin. Code Ins. § 6.68(3) .........................................................................40

44-33 Wyo. Code R. § 3 ......................................................................................40

**MISCELLANEOUS**

24 Weekly Comp. Pres. Doc. 1141 (Sept. 13, 1988) .......................................34

Black's Law Dictionary 1107 (rev. 4th ed. 1968) ...........................................25

Webster's Third New Int'l Dictionary 1364 (1966) .........................................25

## INTRODUCTION

Plaintiffs, two trade associations representing sellers of homeowner's insurance, seek to mount a facial, pre-enforcement attack on a February 2013 regulation ("Discriminatory Effects Rule" or "Rule") promulgated by the Department of Housing and Urban Development ("HUD") that confirmed its longstanding interpretation of the Fair Housing Act ("FHA" or "Act") to prohibit disparate impact discrimination in housing-related practices.  In doing so, plaintiffs seek to upend decades of settled case law and administrative practice – including administrative practice having nothing to do with plaintiffs – on the basis of statutory and policy arguments that have been rejected, time and again, by every court of appeals to have reached the issue.

As an initial matter, plaintiffs' claim is not properly before the Court because plaintiffs have failed to demonstrate that their members suffer any concrete and imminent injury as a result of the Rule.  Although plaintiffs suggest, in equivocal language, that their members may have to modify their conduct as a result of the Rule, they nowhere identify any such member or any insurance practice that was previously permissible but that would now subject them to liability under a disparate impact theory.  Moreover, because disparate impact claims have long been cognizable under the FHA, the injuries alleged by plaintiffs cannot be traced to the Rule or redressed by the relief they seek.  Plaintiffs' claim is unripe for similar reasons.

Plaintiffs' claim also fails on the merits.  Plaintiffs stake their entire case on their assertion that the FHA *unambiguously forecloses* disparate impact claims – despite the fact that all eleven courts of appeals to have addressed the issue have held, after applying traditional canons of statutory construction, that the FHA *affirmatively provides* for disparate impact claims. HUD's construction of the FHA not only comports with the uniform judicial consensus, but also follows directly from the statute's text, structure, and history.  It is therefore entitled to

controlling weight under the traditional *Chevron* framework.

## STATUTORY AND REGULATORY BACKGROUND

The Fair Housing Act, Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified as amended at 42 U.S.C. §§ 3601-3619), was enacted in 1968 in order "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (recognizing Congress's "broad remedial intent" in passing the Act). To that end, the FHA makes it unlawful, among other things:

> [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a); *see also id.* § 3604(f)(1) (prohibiting actions that "otherwise make unavailable or deny[] a dwelling . . . because of a handicap"). The FHA also makes it unlawful, "because of" a prohibited basis, to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" or "to discriminate against any person in making available . . . a [real estate-related] transaction, or in the terms or conditions of such a transaction." *Id.* §§ 3604(b), (f)(2), 3605; *see also id.* § 3606.

For 40 years, the FHA has been construed to provide for disparate impact liability. Shortly after a unanimous Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), recognized that Title VII of the Civil Rights Act of 1964 prohibits facially neutral practices that are "discriminatory in operation," *id.* at 431, the federal courts of appeals began, one by one, to find that a disparate impact theory of liability also applied to the FHA. The earliest of these decisions came from the Eighth Circuit in 1974, s*ee United States v. City of Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975), with ten other courts of

appeals joining the Eighth Circuit thereafter.  *See* Part II.A, *infra*.  HUD has also long been on record supporting the availability of disparate impact liability under the FHA, including in an October 1980 letter to Senator Charles Mathias entered into the congressional record, in which the Secretary of HUD expressed HUD's view that disparate impact liability is "imperative to the success of civil rights law enforcement."  126 Cong. Rec. 31,167 (1980).

Congress substantially amended the FHA in 1988, *see* Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619, among other things, granting HUD the authority to engage in formal adjudications of housing discrimination claims, *see* 42 U.S.C. § 3612, and to issue authoritative interpretations of the FHA, *see id.* § 3614a.  HUD's formal adjudications, pursuant to 42 U.S.C. § 3612(g)-(h) and 24 C.F.R. § 180.675, have repeatedly recognized the disparate impact theory of housing discrimination.[1]

Likewise, HUD has regularly issued guidance to its staff that recognizes the discriminatory effects theory of liability under the FHA.  The original HUD enforcement handbook, published in 1995, advised its enforcement staff that the FHA encompasses disparate impact claims.  *See* HUD, No. 8024.01, Title VIII Compl. Intake, Investigation & Conciliation Handbook, Pt. 7-12 (1995) (emphasizing that disparate impact is one of "the principal theories of discrimination" under the FHA and requiring HUD investigators to apply it when appropriate).  HUD's 2005 version of the Enforcement Handbook, which is currently in effect, also recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in

---

[1] *See, e.g.*, *HUD v. Twinbrook Vill. Apartments*, Nos. 02-00-0256-8, 02-00-0257-8, and 02-00-0258-8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *HUD v. Pfaff*, No. 10-93-0084-8, 1994 WL 592199, at *7-9 (HUD ALJ Oct. 27, 1994), *rev'd on other grounds*, 88 F.3d 739 (9th Cir. 1996); *HUD v. Mountain Side Mobile Estates P'ship*, Nos. 08-92-0010 and 08-92-0011, 1993 WL 307069, at *5 (HUD, Office of the Sec'y, July 19, 1993), *aff'd in relevant part*, 56 F.3d 1243 (10th Cir. 1995); *HUD v. Ross*, No. 01-92-0466-8, 1994 WL 326437, at *5, *7 (HUD ALJ July 7, 1994); *HUD v. Carter*, No. 03-90-0058-1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992).

appropriate cases nationwide.  *See* HUD, No. 8024.01, Title VIII Complaint Intake, Investigation & Conciliation Handbook at 2-27 (2005) ("[A] respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations.").  Even predating these handbooks, HUD had instructed its investigators on analyzing complaints under the disparate impact theory of liability.  *See* Mem. from the HUD Assistant Sec'y for Fair Hous. & Equal Opportunity, The Applicability of Disparate Impact Analysis to Fair Housing Cases (Dec. 17, 1993); Mem. from the HUD Deputy Assistant Sec'y for Enforcement and Investigations, Redelegation of Authority to Make Determinations under the Fair Housing Act (Oct. 7, 1994); U.S. Dep't of Hous. & Urban Dev., Title VIII Investigative Skills Training: Fair Housing Amendments Act of 1988 (Dec. 1988).

In 1998, at Congress's direction, HUD published in the Federal Register previously-internal guidance issued in 1991 by HUD's General Counsel Frank Keating explaining when occupancy limits may violate the FHA's prohibition of discrimination because of familial status, premised on the application of disparate impact liability.  *See* 63 Fed. Reg. 70,256 (Dec. 18, 1998).[2]  Additionally, HUD joined with other federal enforcement agencies in providing guidance concerning fair-lending standards under several statutes, including the FHA, and that guidance explicitly notes the availability of disparate impact liability.  *See* 59 Fed. Reg. 18,266, 18,269-70 (Apr. 15, 1994).  That view has also been expressed in appellate briefs filed on behalf

---

[2] *See also* Mem. from the HUD Gen. Counsel and the HUD Assistant Sec'y for Fair Hous. and Equal Opportunity, Occupancy Fees and Familial Status Discrimination under the Fair Housing Act 6-13 (Mar. 29, 1994) (explaining when additional occupancy fees would violate the discriminatory effect standard of the FHA and describing "at least five cases" in which HUD issued a charge that "a facially neutral occupancy fee discriminated because of its discriminatory effect on families with children" in violation of the FHA ).

of HUD.[3]  *See, e.g.*, Br.for HUD Secretary as respondent in *Pfaff*, 88 F.3d 739; Br. for HUD

Secretary as respondent in *Mountain Side Mobile Estates* 56 F.3d 1243.  And HUD recently

reiterated the availability of a disparate impact theory for sex-discrimination claims under the

FHA.  *See* HUD, Office of Fair Hous. & Equal Opportunity, Assessing Claims of Hous.

Discrimination Against Victims of Domestic Violence Under the Fair Hous. Act & the Violence

Against Women Act 5-6 (Feb. 9, 2011).

It is against this backdrop that HUD promulgated the regulation that plaintiffs challenge.

In its Notice of Proposed Rulemaking, HUD proposed "adding a new subpart . . . to its Fair

Housing Act regulations . . . [to] confirm that the Fair Housing Act may be violated by a housing

practice that has a discriminatory effect."  76 Fed. Reg. 70,921, 70,924 (Nov. 16, 2011).  HUD

adopted this proposal without substantive change in its Final Rule promulgated on February 15,

2013.  78 Fed. Reg. 11,460 (Feb. 15, 2013).

The Rule amends Part 100 of Title 24 of the Code of Federal Regulations to provide:

"Liability may be established under the Fair Housing Act based on a practice's discriminatory

effect . . . even if the practice was not motivated by a discriminatory intent."  *Id*. at 11,482; 24

C.F.R. § 100.500.  The regulation further states:

> A practice has a discriminatory effect where it actually or predictably results in a
> disparate impact on a group of persons or creates, increases, reinforces, or
> perpetuates segregated housing patterns because of race, color, religion, sex,
> handicap, familial status, or national origin.

---

[3] Plaintiffs observe that, in 1988, the government filed an amicus brief in the Supreme Court
arguing that the FHA proscribes only intentional discrimination.  *See* Pls.' Mem. at 25.  But that
brief was filed before the enactment of the 1988 statutory amendments giving HUD its full
authority to administer and enforce the Act, and thus before the agency's formal adjudications
and other administrative pronouncements endorsing the existence of a disparate impact theory of
discrimination under the statute.  The brief also predated the enactment of the statutory
exemptions that presuppose the viability of disparate impact claims (*see* Part II.C, *infra*).

24 C.F.R. § 100.500(a). But the Rule specifies that discriminatory effects liability does not apply to practices that are "supported by a legally sufficient justification," *id*. § 100.500, which exists when the practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent . . . .or defendant" and those "interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b). The Rule also sets out the burdens to prove discriminatory effect and legally sufficient justifications. *Id*. § 100.500(c).

HUD and courts have also long interpreted the FHA to cover discrimination in the provision of homeowner's insurance (hereinafter "insurance"). In 1978, HUD's General Counsel interpreted the FHA to cover insurance because the lack of insurance can "render[] dwellings 'unavailable.'" Mem. of Ruth T. Prokop, Gen. Counsel of HUD to Chester C. McGuire, Assistant Sec'y for Equal Opportunity (Aug. 25, 1978), *quoted in Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1354 (6th Cir. 1995), *cert. denied*, 516 U.S. 1140 (1996). In 1989, HUD issued a regulation formalizing its long-held interpretation of the FHA to prohibit insurance discrimination. *See* 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989) (codified at 24 C.F.R. § 100.70(d)(4)). This interpretation also finds widespread support among the courts, including courts in this District. *See, e.g., Nationwide*, 52 F.3d at 1354; *Ojo v. Farmers Grp. Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) (en banc); *Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 55-58 (D.D.C. 2002) (Sullivan, J.); *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1, 5-8 (D.D.C. 1999) (Kennedy, J.); *Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.*, 472 F. Supp. 1106, 1109 & n.7 (S.D. Ohio 1979). And in 1994, HUD's Assistant Secretary for Fair Housing and Equal Opportunity, in testimony to Congress, confirmed the applicability of disparate impact liability to insurance: "[insurance company] practices that are neutral on their face [and] have a disproportionate racial impact . . . may violate the [Act] where they cannot

-6-

meet the established test of business necessity and the showing that there is no less discriminatory alternative." *Homeowners Insurance Discrimination: Hearing Before the S. Comm. on Banking, Hous., and Urban Affairs*, 103rd Cong. 50 (1994) (hereinafter "1994 Hearing") (stmt. of Roberta Achtenberg, Ass't Sec'y for Fair Hous. and Equal Opportunity).

Consistent with this longstanding interpretation, HUD specifically acknowledged in the 2011 Notice of Proposed Rulemaking that the disparate impact rule would cover the insurance industry. 76 Fed. Reg. at 70,924. And in promulgating the Rule, HUD considered comments by entities representing the insurance industry, including plaintiffs, expressing the view that application of the Rule to the provision of insurance would violate the McCarran-Ferguson Act ("McCarran-Ferguson"), 15 U.S.C. §§ 1011-1015, or contravene actuarially sound estimates of risk. 78 Fed. Reg. at 11,474-75. HUD explained that these concerns were misplaced because an insurance practice with a discriminatory effect would not be *per se* illegal. *Id.* at 11,475. Rather, the Rule distinguishes between "unnecessary barriers proscribed by" the FHA and "valid policies and practices crafted to advance legitimate interests." *Id.* (internal quotation marks and citation omitted). Only the former are subject to liability. HUD also explained as part of the rulemaking that the Rule does not alter the effect of McCarran-Ferguson, which would continue to "depend[] on the facts at issue and the language of the relevant State law 'relat[ing] to the business of insurance.'" *Id.* (quoting 15 U.S.C. § 1012(b)).

## ARGUMENT

## I.    PLAINTIFFS' CLAIM SHOULD BE DISMISSED FOR LACK OF JURISDICTION

### A.    Plaintiffs Lack Standing to Challenge HUD's Rule

Plaintiffs' challenge to the Discriminatory Effects Rule is not properly before this Court, because plaintiffs fail to satisfy the elements of Article III standing, an essential aspect of the

case-or-controversy requirement.  To demonstrate standing under Article III, plaintiffs must demonstrate:  (1) that they suffer a concrete and particularized injury-in-fact that is either actual or imminent, rather than conjectural or hypothetical; (2) that there is a causal connection between the injury and defendants' challenged conduct; and (3) that there is a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Because plaintiffs here seek to proceed on behalf of their members under the doctrine of associational standing,[4] *see* Pls.' Mem. at 8 n.2, plaintiffs must specifically identify at least one member that can satisfy these three elements, *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199-200 (D.C. Cir. 2011).  Plaintiffs fall short of satisfying any of these requirements for Article III standing.  Plaintiffs complain of vague and speculative injuries that are not traceable to the challenged Rule and that would not be redressed by its vacatur.

### 1.  Plaintiffs Have Failed to Demonstrate a Legally Sufficient Injury-in-Fact

Plaintiffs have failed to identify a single member that is allegedly injured by the Rule. This alone is fatal to their claim.  "When a [plaintiff] claims associational standing, it is not enough to aver that unidentified members have been injured.  Rather, the [plaintiff] must specifically identify members who have suffered the requisite harm."  *Id.* at 199.

Moreover, plaintiffs' "nondescript and conclusory allegations of injury" are "insufficient to meet [their] burden of alleging an injury in fact that is concrete and particularized."  *Brown v.*

---

[4] Plaintiffs' summary judgment argument concerning standing is solely premised on the fact that "Plaintiffs' *members* are objects of the action at issue."  Pls.' Mem. at 8 n.2 (emphasis added) (internal quotation marks and alterations omitted).  Plaintiffs have presented no support for standing independent of their members.  Plaintiffs' standing cannot be based on the allegations that they, on their own behalf, have suffered harm by choosing to "analyze[] the applicability" of the rule to the insurance industry, choosing to "explain[]" the rule to their members, and choosing to "evaluat[e] the effect" of the rule on their members.  Compl. ¶¶ 55-57.  *See Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (holding than an association's "self-serving observation that it has expended resources to educate its members and others regarding [a challenged law] does not present an injury in fact").

*FBI*, 793 F. Supp. 2d 368, 374 (D.D.C. 2011) (internal quotation marks omitted).  The Complaint includes several baldly conclusory allegations, including that the "Rule will create, and has already created, significant burdens on Plaintiffs' members" and that the "Rule will inevitably have an ongoing effect on Plaintiffs and their members."  Compl. ¶¶ 58, 60.  These allegations are nothing more than recitations of legal conclusions and are insufficient to support an injury in fact, even at the pleading stage.  *See Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013).  Indeed, at the summary judgment stage, plaintiffs cannot "rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,'" to show that their members have suffered the requisite injury in fact.  *Lujan*, 504 U.S. at 561.

Plaintiffs do not set forth any specific facts demonstrating how, if at all, their members' business practices have been or imminently will be affected by the Rule.  To be sure, the Complaint alleges in conclusory terms that plaintiffs' members will have to "modify[] their existing practices" or "remedy[] the disparate impact of various practices" in response to the Rule.  Compl. ¶¶ 59, 63.  But plaintiffs do not identify *one single* practice that their members employed before the Rule took effect that must be modified or remedied, nor do they list *one single* way in which they would have to modify any practice in response to the Rule.  Without such detail, there is nothing concrete or actual about the claimed injuries.  Costs a "party incurs to determine *whether* it needs to satisfy a legal mandate" do not constitute an injury that gives rise to standing.  *State Nat'l Bank of Big Spring v. Lew*, __ F. Supp. 2d ___, No. 12-1032 (ESH), 2013 WL 3945027, at *20 (D.D.C. Aug. 1, 2013).

Indeed, plaintiffs explicitly condition the allegation that their members will need to modify existing practices by using the phrase "if necessary."  Compl. ¶ 59.  Similarly, plaintiffs' summary judgment arguments about the impact of the Rule are premised on a conditional

statement: various generic harms to the insurance industry will accrue "*[i]f* insurers are unable to engage in [risk] differentiation." Pls.' Mem. at 32 (emphasis added). But plaintiffs offer nothing other than conjecture and hypothesis about whether these alleged harms actually occur. Using such a qualification makes plaintiffs' allegation the very definition of a "conjectural or hypothetical" statement. *See Haines v. Gen. Pension Plan of Int'l Union of Operating Eng'rs*, __ F. Supp. 2d ___, No. 12-1870 (RMC), 2013 WL 4736228, at *5 (D.D.C. Sept. 4, 2013) ("The []claim alleges only a speculative injury, as revealed in the conditional language it uses.").

Nor can it simply be presumed that plaintiffs' members will inevitably have to modify current underwriting practices in order to avoid disparate impact liability under the FHA, pursuant to the Rule's burden-shifting standard. An insurance practice with a discriminatory effect is nevertheless "lawful if supported by a legally sufficient justification," 24 C.F.R. § 100.500, *i.e.*, when the practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and the "interests could not be served by another practice that has a less discriminatory effect." *Id.* § 100.500(b); *see also* 78 Fed. Reg. at 11,475. Therefore, if insurance companies are, as plaintiffs assert, considering only those factors that are "legitimately related to the risks presented by [insureds'] properties," Pls.' Mem. at 32-33, and consideration of these factors is "critical to the stability of the homeowner's insurance system," *id.* at 35, there is no reason to presume plaintiffs' members lack a legally sufficient justification to avoid liability under the Act. *See, e.g.*, *Fair Hous. Opportunities of Nw. Ohio v. Am. Family Mut. Ins. Co.*, 684 F. Supp. 2d 964, 970 (N.D. Ohio 2010) (recognizing an FHA disparate impact claim regarding insurance, but finding persuasive defendant insurers' business necessity defense); *Owens v. Nationwide Mut. Ins. Co.*, No. 03-1184, 2005 WL 1837959, at *14-15 (N.D. Tex. Aug. 2, 2005) (same).

-10-

Plaintiffs' allegation that their members face a threat of future litigation or agency enforcement actions as a result of the Rule, *see* Compl. ¶ 62, is similarly conjectural – especially in light of plaintiffs' inability to say that they actually engage in practices prohibited by the Rule. *See Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) ("Allegations of injury based on predictions regarding future legal proceedings are, however, too speculative to invoke the jurisdiction of an Article III Court." (internal quotation marks and brackets omitted)). The mere possibility that they might face suit or enforcement actions in the future is not sufficient to demonstrate an imminent injury. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (deeming "possible future injury" insufficient to show standing). Accordingly, plaintiffs have failed to show that the threat of litigation or enforcement action as a result of the Rule is "certainly impending." *Id.*

In their motion for summary judgment, plaintiffs contend that they may be presumed to have suffered an injury in fact because their "members are objects of the action at issue." Pls.' Mem. at 8 n.2 (internal quotation marks and alterations omitted). This contention is incorrect. As another court in this District recently held, "no case stands for the proposition that standing can be established merely by being subject to government regulatory authority in the absence of any agency action that causes injury." *Bank of Big Spring*, 2013 WL 3945027, at *19. Indeed, a plaintiff "errs to the extent that it suggests that it need only show that it is 'directly subject to the authority of the agency' without meeting the basic standing requirements of injury-in-fact, causation, and redressability." *Id.*

### 2. Plaintiffs' Injuries Are Neither Fairly Traceable to the Rule Nor Redressable by their Requested Relief

Plaintiffs also lack standing because any injuries they may suffer would not be "fairly traceable" to the Rule they challenge, nor redressable by the relief they seek (*i.e.*, vacatur of that

Rule).  *See Allen v. Wright*, 468 U.S. 737, 757 (1984).  Rather, any injuries alleged by plaintiffs

are the result of the longstanding availability of disparate impact liability under the FHA itself,

which, as described above, had been recognized by eleven courts of appeals and in formal

adjudications by HUD long before the Rule's promulgation.

　　　　The D.C. Circuit has made clear that plaintiffs, like those here, do not have standing to

challenge agency actions that are based on preexisting legal requirements.  For example, in

*National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 663 F.3d 470 (D.C. Cir.

2011), an organization representing home construction companies filed suit over an action of the

Corps of Engineers that required construction companies to comply with the Clean Water Act by

notifying the Corps before making discharges into certain "upland ditches."  *See id.* at 473.

　　　　The D.C. Circuit held the plaintiff lacked standing.  The plaintiff's injury was "not fairly

traceable" to the challenged action because the Corps's prior actions had already established that

the Corps asserted jurisdiction over certain upland ditches.  *See id.* at 474.  In other words, "[t]he

risk of sanctions attendant on filling upland ditches without Corps approval predates, and is in no

way aggravated by" the challenged action.  *Id.* (noting the challenged action "compel[ed] no

additional action (or inaction) by [the organization's] members to limit their exposure to

penalties for proceeding without Corps authorization").  In coming to that conclusion, the court

examined prior administrative publications in which the Corps had explained its treatment of

upland ditches, the position the United States had taken in prior litigation concerning upland

ditches, and homebuilders' prior understanding about the Corps's position.  *See id.*

　　　　The preexisting nature of the Corps's position in that case also meant that the plaintiff's

injury would not "be redressed by a favorable decision" because vacating the permit would not

diminish the harm homebuilders faced from the Corps's preexisting position concerning upland

ditches. *See id.* at 475. The plaintiff's standing was not saved by its request for declaratory

judgment – even "one that would simply declare upland ditches to be off limits altogether." *Id.*

Similarly, in *Ass'n of American Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d

19 (D.D.C. 2012), another court in this District held that, to determine whether a plaintiffs'

challenge to administrative action satisfied the redressability requirement, it was necessary to

"look[] to whether the[] [challenged] agency actions added any new requirements that were not

imposed by existing statutes, rules, and regulations." *Id.* at 42. The court held that the plaintiffs

in that case lacked standing for claims related to injuries "caused by statutes and regulations that

pre-date the agency actions plaintiffs challenge" because they "are not redressable by the relief

plaintiffs[] seek." *Id.*; *see also Atl. Urological Assocs. v. Leavitt*, 549 F. Supp. 2d 20, 28 (D.D.C.

2008) ("The [administrative agency's] Final Order did nothing to alter th[e] . . . landscape as it

affected [plaintiffs]. Since the Final Order did not change anything for these Plaintiffs,

invalidating it would not afford them any relief."); *Nat'l Multi Hous. Council v. Jackson*, 539 F.

Supp. 2d 425, 431 (D.D.C. 2008) (concluding that alleged injury was not traceable to HUD

guidance concerning disparate impact claims under Title VI where it was clear "that HUD and

Justice have adhered to a disparate impact theory of discrimination under Title VI and its

implementing regulations for over 35 years").

So too here. As previously explained, disparate impact liability under the FHA has been

recognized by eleven courts of appeals and has been applied repeatedly through agency

adjudications predating the Rule. This interpretation of the FHA has also been the position of

the United States in litigation, including in litigation against the insurance industry. *See United*

*States v. Nationwide Mut. Ins. Co.*, No. 97-291 (S.D. Ohio Mar. 10, 1997) (alleging in paragraph

12 of the Complaint that an insurer's policies "are not necessitated by considerations of risk,

profit, or any other legitimate race-neutral business consideration" and that "[a]lternative methods are available which would accomplish the business objectives forming the ostensible rationale for these practices without the substantial and disproportionate burden on residents of minority neighborhoods"). Therefore, plaintiffs' injuries, if they exist at all, are not traceable to the Rule and therefore cannot confer standing.

Were there any doubt that plaintiffs' claimed injuries in this litigation predate the challenged Rule, that doubt is resolved by the fact that the *very same* plaintiffs represented to the Supreme Court nearly two decades ago that HUD and the courts of appeal had already caused them these injuries by interpreting the FHA to make insurance companies liable under a disparate impact theory of liability. In January 1996, as *amici* supporting a petition for certiorari to review the Sixth Circuit's decision in *Nationwide Mutual Insurance Co. v. Cisneros*, AIA and NAMIC told the Supreme Court that as a result of HUD's interpretation of the FHA, as endorsed by the Sixth Circuit:

> [P]roperty insurers will be forced to fend off FHA disparate impact challenges to underwriting and rating standards and rules sanctioned by state insurance regulators. HUD has actively advocated a disparate impact standard for FHA claims generally, and has issued a regulation providing that the FHA applies to property insurance. . . . [T]he federal circuits . . . have held that, at least in some circumstances, a claim under the FHA can be established by proof of disparate impact alone. These facts have already precipitated and will inevitably continue to precipitate disparate impact challenges to property insurers' underwriting and rating standards.

Brief for Nat'l Ass'n of Mut. Ins. Cos. & Am. Ins. Ass'n as Amici Curiae in Support of the Petition at 14-15, *Nationwide Mut. Ins. Co. v. Cisneros*, 516 U.S. 1140 (1996) (footnotes omitted) (attached as Exhibit A); *see also id.* at 15 n.11 ("HUD has received and is investigating complaints against *amici*'s members which include claims of disparate impact, and has given every indication of its intention to employ a disparate impact theory in enforcing the FHA

against insurers."). Plaintiffs further elaborated on the injuries supposedly suffered by insurance companies due to HUD's interpretation. *See, e.g.*, *id.* at 5 ("[T]he application of disparate impact analysis under the FHA to the business of insurance will undermine state regulatory guidelines grounded on the importance of neutral underwriting and rating principles."). Such injuries are identical to those they complain about in this lawsuit – a clear indication that they are not traceable to the Rule, promulgated almost two decades later.[5]

**B. Plaintiffs' Claim Is Not Ripe**

Even if plaintiffs' claimed injuries satisfied the standing requirements of Article III, which they do not, this case is not ripe for adjudication. In determining whether a claim is ripe, courts look to two factors: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). The purpose of the ripeness doctrine "'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *In re Aiken Cnty.*, 645 F.3d 428, 433 (D.C. Cir. 2011) (quoting *Abbott Labs.*, 387 U.S. at 148-49).

---

[5] The fact that the administrative action in this case addresses legal obligations that existed prior to the Rule's promulgation makes it nothing like the administrative action – or the injuries faced by the organizational plaintiffs' members – at issue in the case cited in plaintiffs' summary judgment brief, *NACS v. Board of Governors of the Federal Reserve System*, ___ F. Supp. 2d ___, No. 11-2075 (RJL), 2013 WL 3943489 (D.D.C. July 31, 2013). The Federal Reserve's action at issue in *NACS* imposed government regulation on debit card fees and network structures that were unregulated prior to the promulgation of the challenged rule. *See id.* at *1-5.

As previously noted, plaintiffs' allegations of harm as a result of the Rule are abstract rather than concrete, offering mere speculation about the Rule's effect on the insurance industry in general.  Plaintiffs do not identify any concrete application of the Rule to their members.  Because plaintiffs have not identified any particular underwriting practice that they believe the Rule will prevent them from employing, their challenge presents merely an "abstract disagreement[] over administrative polic[y]."  *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807-08.  Moreover, plaintiffs' alleged injury rests on pure conjecture that their members' unspecified insurance underwriting practices would expose them to liability in a hypothetical future enforcement action applying the Rule.  As such, plaintiffs' "claim is not ripe for adjudication [because] it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted)).

Plaintiffs' contention that the Rule is precluded by McCarran-Ferguson, or is in tension with "core insurance principles," Pls.' Mem. at 36, highlights the prematurity of their claim.  As the Supreme Court made clear in *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), the effect of McCarran-Ferguson can only be ascertained in the context of a specific *application* of the federal law in question.  *See id.* at 307.  Consistent with this framework, and as discussed more fully in Part II.F, *infra*, application of McCarran-Ferguson's discriminatory effects standard to a particular insurance underwriting practice would involve a highly fact-specific assessment of the effects of and business justifications for the practice, as well as the language of any relevant state law relating to the business of insurance.  *See* 78 Fed. Reg. at 11,475.  Therefore, "judicial appraisal of these factors is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized

challenge made here." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967); *see also Sprint Corp. v. FCC*, 331 F.2d 952, 956 (D.C. Cir. 2003) ("[I]ssues . . . may not be fit for review where the agency retains considerable discretion to apply the new rule on a case-by-case basis, particularly where there is a complex statutory scheme or there are other difficult legal issues that are implicated by the agency action."). Thus, plaintiffs' abstract attack on the Rule presents "the classic institutional reason to postpone review," which is the "need to wait for 'a rule to be applied [to see] what its effect will be.'" *La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1385 (D.C. Cir. 1996) (quoting *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 674 (D.C. Cir. 1978)). Indeed, plaintiffs' abstract contention that FHA disparate impact liability *might* conflict with a state law is precisely the speculative claim rejected as unripe by the Sixth Circuit in *Nationwide*. *See* 52 F.3d at 1362-63.

Plaintiffs have also failed to establish that they would suffer hardship in the absence of judicial intervention, for substantially the same reason that they have failed to demonstrate injury in fact. Like the plaintiffs in *Toilet Goods*, plaintiffs here have not demonstrated that the "impact of the [Rule has been] felt *immediately* . . . in conducting their day-to-day affairs." 387 U.S. at 164 (emphasis added). To the contrary, plaintiffs allege only that their members may devote resources to modifying their business practices "if necessary." Compl. ¶ 59. Accordingly, they have failed to demonstrate the sort of hardship that would warrant review of their abstract claim. *See Natural Res. Defense Council, Inc. v. EPA*, 859 F.2d 156, 166 (D.C. Cir. 1988) ("A petitioner cannot show hardship by positing a speculative or hypothetical future harm."); *see also State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 480 (D.C. Cir. 1986) ("[A] party's allegation of hardship will be found wanting if there are too many 'ifs' in the asserted causal chain linking the agency's action to the alleged hardship. . . .").

-17-

In sum, plaintiffs have failed to demonstrate that they meet any of the three elements required to establish Article III standing.  In addition, this case is not presently ripe for review. Accordingly, this Court should dismiss plaintiffs' claim without reaching its merits.

## II.    HUD REASONABLY CONSTRUED THE FHA TO ENCOMPASS DISPARATE IMPACT CLAIMS

### A.    HUD's Interpretation Is Entitled to Deference

Even if plaintiffs' facial, pre-enforcement challenge to the Rule were properly before the Court, it would nevertheless fail as a matter of law.  Congress has charged HUD with administering the FHA, and HUD has construed the Act to encompass disparate impact liability. Because, as the judgment of eleven courts of appeals confirms, the FHA is best read to include – and certainly does not foreclose – disparate impact claims, HUD's interpretation is dispositive. *See Meyer v. Holley*, 537 U.S. 280, 287-88 (2003); *see also Smith v. City of Jackson*, 544 U.S. 228, 243-47 (2005) (Scalia, J., concurring in part and in the judgment) (deferring to an administrative interpretation that disparate impact claims are cognizable under another civil rights statute).

Review of the Secretary's interpretation is ordinarily a two-step process.  It begins with the familiar inquiry into whether "the intent of Congress is clear" as to the "precise question at issue."  *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  If, by "employing traditional tools of statutory construction," Congress's intent is clear and unambiguous, "that is the end of the matter."  *Id.* at 842-43 & n.9.  Where a statute is instead silent or ambiguous with respect to a particular issue, however, courts proceed to *Chevron*'s second step, where it is presumed that Congress implicitly or explicitly "left a gap for the agency to fill."  *Id.* at 843.  "If the agency's reading fills [this] gap or defines a term in a reasonable way in light of the Legislature's design, [a court will] give that reading controlling weight, even if it

is not the answer 'the court would have reached if the question initially had arisen in a judicial proceeding.'" *Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998) (quoting *Chevron*, 467 U.S. at 843 n.11). Ultimately, to uphold the agency's interpretation of the statute, this Court need not conclude that it is "the best interpretation of the statute," *United States v. Haggar Apparel Co.*, 526 U.S. 380, 394 (1999) (citation omitted), or that it is the "most natural one by grammatical or other standards," *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991). Rather, plaintiffs bear the difficult burden of demonstrating that Congress made a deliberate decision to "compel" the result they urge, *Auer v. Robbins*, 519 U.S. 452, 458 (1997), in terms so "unambiguously manifest," *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703 (1995), that theirs is "the only possible interpretation" of the statute, *Regions Hosp.*, 522 U.S. at 450. Plaintiffs fall far short of meeting this exacting standard.

Here, plaintiffs contend that the Court's inquiry ends at the first step of the *Chevron* analysis. They contend that the FHA cognizes only disparate treatment claims, and that HUD's interpretation of the statute to encompass disparate impact claims is therefore contrary to the unambiguous meaning of the statute. Apart from a single footnote, plaintiffs do not contend that HUD's interpretation of the FHA is an unreasonable resolution of any statutory ambiguity. Pls.' Mem. at 37 n.6. Accordingly, if HUD's construction survives the first step of the *Chevron* inquiry, summary judgment should be entered in favor of defendants.

"The language of the [FHA] is broad and inclusive," *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972), and does not admit to the kind of parsimonious and out-of-context reading urged by plaintiffs. As described more fully below, HUD's interpretation of the FHA to encompass disparate impact liability is not inconsistent with – and indeed, is strongly supported by – the text and structure of the statute and the relevant legislative history.

-19-

All eleven courts of appeals to have addressed the issue have found disparate impact claims to be cognizable under the FHA.  *See, e.g.*, *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49 (1st Cir. 2000); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935-36 (2d Cir.), *aff'd in part*, 488 U.S. 15 (1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146 (3d Cir. 1977), *cert. denied*, 435 U.S. 908 (1978); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur v. City of Toledo*, 782 F.2d 565, 574-75 (6th Cir. 1986); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025 (1978); *City of Black Jack*, 508 F.2d at 1184-85; *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311-12 (9th Cir. 1982); *Mountain Side Mobile Estates P'ship*, 56 F.3d at 1251; *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1559 n.20 (11th Cir.), *cert. denied*, 469 U.S. 976 (1984).  C*f. 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) (finding it "[s]ignificant[]" that "every one of the eleven circuits to have considered the issue has held that the FHA similarly prohibits not only intentional housing discrimination," but declining to reach the issue because only one side had briefed it).  Moreover, although the D.C. Circuit has not yet had been required to decide the issue, *see Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1085 (D.C. Cir. 2011), several courts in this District have concluded that disparate impact claims are readily cognizable under the FHA.  *See Boykin v. Gray*, 895 F. Supp. 2d 199, 211-14 (D.D.C. 2012) (Friedman, J.); *Nat'l Cmty. Reinv. Coal. v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 77-79 (D.D.C. 2008) (Sullivan, J.); *Nat'l Fair Hous. Alliance*, 208 F. Supp. 2d at 58-60; *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20-22 (D.D.C. 2000) (Green, J.); *Samaritan Inns v. Dist. of. Columbia*, No. 93-2600, 1995 WL 405710, at *26-28 (D.D.C. June 30, 1995) (Urbina, J.), *aff'd in part and rev'd in part*, 114 F.3d

1227 (D.C. Cir. 1997). *But cf. Brown v. Artery Org., Inc.*, 654 F. Supp. 1106, 1115-17 (D.D.C.

1987) (Greene, J.) (requiring no proof of intent for claims against government actors, but

adopting a sliding scale for claims against private defendants where less proof of discriminatory

intent is required, the greater the disparate impact demonstrated).[6]

    This staggering weight of authority in support of HUD's interpretation – much of which

was decided on *de novo* review without the benefit of any deference to HUD's considered views

– puts the lie to plaintiffs' bold assertion that "there can be no doubt that the FHA prohibits only

intentional discrimination."  Pls.' Mem. at 17.  In light of this precedent, "it would be difficult

indeed" to conclude that the text is "unambiguous" in compelling plaintiffs' contrary reading of

the statute.  *See Smiley v. Citibank (S.D.)*, 517 U.S. 735, 739 (1996) (finding ambiguity in part

from the conflict among lower courts).  On this basis alone, HUD's interpretation is entitled to

controlling weight.

## B.    The Secretary's Interpretation Is Supported by the Text of the Statute

    As numerous courts have already recognized, the text of the FHA readily accommodates

disparate impact liability.  The FHA makes it unlawful, *inter alia*, "[t]o refuse to sell or rent . . .

or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion,

sex, familial status, or national origin."  42 U.S.C. § 3604(a); *see also id.* § 3604(f)(1)

(prohibiting actions that "otherwise make unavailable or deny[] a dwelling. . . because of"

disability).  That language is best read to encompass disparate impact claims.  By banning

---

[6] Notably, Judge Greene's decision in *Brown* predated the 1988 Amendments to the FHA, which
not only demonstrated Congress's understanding that disparate impact claims are available under
the FHA, but also expressly delegated rulemaking authority to the Secretary of HUD to interpret
and enforce the Act.  Moreover, as Judge Sullivan has observed, *Brown* "did not hold . . . that
disparate impact claims were never available under the FHA," but rather "recognized that where
there is evidence of discriminatory effect, courts have required plaintiffs to demonstrate varying
degrees of discriminatory intent."  *Nat'l Fair Hous. Alliance*, 208 F. Supp. 2d at 59.

actions that "make unavailable or deny" housing on one of the specified bases, the FHA focuses on the *result* of challenged actions – the unavailability or denial of a dwelling – rather than exclusively on the intent of the actor.  Such a prohibition on specified outcomes that adversely affect an identifiable group is most naturally read to support a disparate impact claim.

The Supreme Court has drawn precisely that conclusion when construing other anti-discrimination statutes that similarly place principal focus on the discriminatory consequences of the challenged actions rather than the actor's motive.  In particular, both Section 703(a)(2) of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2(a)(2), and Section 4(a)(2) of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 623(a)(2), make it unlawful for an employer "to limit, segregate, or classify his employees in any way" that would "deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of " a specified protected characteristic.

In *Griggs*, the Court held that Section 703(a)(2) of Title VII prohibits employers from taking actions that have the effect of discriminating on the basis of race, regardless of whether the actions are motivated by discriminatory intent.  The Court explained that "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." *Griggs*, 401 U.S. at 432.  *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988) (noting that, if employer's practice "has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply"); *see also Smith*, 544 U.S. at 235 (plurality)

(recognizing that the Supreme Court's "holding [in *Griggs*] represented the better reading of the statutory text").[7]

The same is true of the parallel terms in Section 4(a)(2) of the ADEA, which the Supreme Court in *Smith* likewise held to encompass disparate impact claims. The Court explained that, in prohibiting actions that "deprive any individual of employment opportunities or otherwise adversely affect his [employment] status[] because of " his age, 29 U.S.C. § 623(a)(2), "the text" of the statute – like Section 703(a)(2) of Title VII – "focuses on the *effects* of the action on the employee rather than the motivation for the action of the employer." *Smith*, 544 U.S. at 235-36 (plurality); *see id.* at 243 (Scalia, J., concurring in part and in the judgment) ("agree[ing] with all of the Court's reasoning" as the basis "for deferral to the reasonable views" of the administrative agency that the statute provides for disparate impact liability). That focus, the Court explained, "strongly suggests that a disparate-impact theory should be cognizable." *Id.* at 236 (plurality).

The textual similarities between Section 3604(a) and the disparate impact provisions in Title VII and the ADEA fully justify HUD's conclusion that the text of the FHA authorizes disparate impact claims. Actions that "make unavailable or deny[] a dwelling to any person" – like actions that "deprive any individual of employment opportunities" – "focus[] on the *effects* of the [challenged] action . . . rather than the motivation for the action." *Id*. This focus on effects rather than motivations is the essence of a disparate impact prohibition. Accordingly, the text of Section 3604(a) not only permits, but also affirmatively supports, HUD's interpretation.

Other provisions in the FHA also accommodate disparate impact liability. For example, Congress made it unlawful to "discriminate against any person" because of specified

---

[7] In 1991, Congress amended Title VII to add a provision expressly recognizing the existence of "disparate impact cases" under the statute, 42 U.S.C. § 2000e-2(k), but Title VII contained no such provision when *Griggs* construed Section 703(a)(2) to encompass disparate impact liability.

characteristics with respect to certain housing-related transactions.  42 U.S.C. § 3604(b) (making it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin"); *id*. § 3605(a) ("It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin"); *id.* § 3606 (making it unlawful "to discriminate . . . in the terms or conditions of . . . access, membership, or participation" in brokerage services because of protected status).  Although the term "discriminate" need not always encompass a disparate impact theory of discrimination, it is certainly broad enough to include such claims.  Thus, in *Board of Education v. Harris*, 444 U.S. 130 (1979), the Supreme Court concluded that the term "discrimination," as used in the Emergency School Aid Act, Pub. L. No. 92-318, § 706(d)(1)(B), 86 Stat. 354, 358 (1972), was "ambiguous."  444 U.S. at 140; *see id.* at 138 (statute provided that a local educational agency was ineligible for certain federal funds if it "engage[d] in discrimination  . . .  in the hiring, promotion, or assignment of employees").

Plaintiffs' contrary parsing of the statutory text to reach an "unambiguous" result is unpersuasive.  Plaintiffs argue that the FHA's prohibition on "otherwise mak[ing] housing unavailable" encompasses only intentional discrimination.  Pls.' Mem. at 13.  That is incorrect. The plain meaning of the phrase "make unavailable" includes actions that have the result of making housing unavailable, regardless of whether the actions were intended to have that result. The Supreme Court explained long ago that "[t]he word 'make' has many meanings, among

them 'To cause to exist, appear or occur.'"  *United States v. Giles*, 300 U.S. 41, 48 (1937)

(quoting Webster's New Int'l Dictionary (2d ed. 1934)); *see* Webster's Third New Int'l

Dictionary 1364 (1966) (noting that "make" "can comprise any such action" that "cause[s]

something to come into being," "whether by an intelligence or blind agency"); Black's Law

Dictionary 1107 (rev. 4th ed. 1968) ("[to] cause to exist").  One may cause a result to "exist,

appear or occur," *Giles*, 300 U.S. at 48, without specifically intending to do so.  For example, a

landlord may make her housing unavailable to families with children by setting a one person per

bedroom limit.  *See* 63 Fed. Reg. at 70,256-57 (HUD's General Counsel Frank Keating's

guidance on when occupancy limits may violate the FHA's prohibition of familial status

discrimination based on the application of disparate impact liability).  Intent is not a prerequisite

to making housing unavailable.

   Plaintiffs also invoke the canon of *noscitur a sociis* in an effort to strip the phrase of its

effects-based character.  Pls.' Mem. at 13.  Plaintiffs would have this Court hold that, because

the phrase "otherwise make unavailable" appears in the same phrase as the word "deny" – a

word they believe to require discriminatory intent – that phrase must unambiguously connote

intentional discrimination as well.  This argument is unavailing.  As an initial matter, the word

"deny" does not inevitably connote intentional action.  And even if it did, its placement in the

text next to the phrase "otherwise make unavailable" is not sufficient to strip the latter phrase of

its clear effects-based character.  *See Graham Cnty. Soil & Water Conservation Dist. v. United

States ex rel. Wilson*, 559 U.S. 280, 288-89 (2010) ("That a word may be known by the company

it keeps is . . . not an invariable rule, for the word may have a character of its own not to be

submerged by its association.").  Accordingly, plaintiffs' contention that the FHA "contains no []

effects-focused language," Pls.' Mem. at 15 – a premise that underpins their entire argument about textual unambiguity – is plainly incorrect.

Plaintiffs also contend that Congress's inclusion of the phrase "because of" in the FHA unequivocally supplies an intent requirement. Pls.' Mem. at 12. But the disparate impact provisions of both Title VII and the ADEA also require that the prohibited discrimination arise "because of" a specific characteristic. 29 U.S.C. § 623(a)(2); 42 U.S.C. § 2000e-2(a)(2). *See Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 96 (2008) (explaining that, "in the typical disparate impact case" under the ADEA, "the employer's practice is 'without respect to age' and its adverse impact (*though 'because of age'*) is 'attributable to a nonage factor'" (emphasis added)); *see also 2922 Sherman Ave.*, 444 F.3d at 679 (observing that "the FHA's language prohibiting discrimination – 'because of . . . race . . . or national origin' – is identical to Title VII's"). The phrase "because of" cannot be read to unambiguously prohibit a disparate impact cause of action under the FHA when the same phrase embraces such a cause of action under Title VII and the ADEA. Even plaintiffs concede that the phrase does not "automatically" foreclose disparate impact liability, only that it is "natural" to construe the phrase as doing so in the present context. Pls.' Mem. at 12. This is insufficient to satisfy plaintiffs' heavy burden under *Chevron* Step One, as the agency is not compelled to adopt "the most natural" construction of the statute, only one that is not unambiguously foreclosed. *Pauley*, 501 U.S. at 702.

Plaintiffs also dismiss any analogy between the language in the FHA and the language found to accommodate disparate impact claims in *Smith*, on the ground that the language in the two statutes is not *identical*. Pls.' Mem. at 14-16. Indeed, plaintiffs go so far as to argue that disparate impact claims are unambiguously foreclosed under the FHA because the language of the Act is not identical to Section 4(a)(2) of the ADEA, which the Court in *Smith* found to

accommodate effects-based claims.  This argument rests on a faulty reading of *Smith*.  *Smith* did not suggest, let alone hold, that the specific language in Section 4(a)(2) was the *only* language that could be read to accommodate such claims.  The *Smith* Court only held that the language of Section 4(a)(2) of the ADEA was sufficient to embrace such claims.  *See Ramirez v. GreenPoint Mortg. Funding, Inc.*, 633 F. Supp. 2d 922, 927 (N.D. Cal. 2008) ("[T]he *Smith* decision does not reach so far as to prohibit disparate-impact claims under other statutes that do not contain this same language. . . .").

Plaintiffs also attempt to fashion a clear-statement rule that would make disparate impact claims presumptively unavailable: in their view, "[a]n anti-discrimination statute ordinarily should be construed to prohibit only intentional discrimination" and may be construed to authorize disparate impact claims "only when affirmative language in the statute so indicates." Pls.' Mem. at 11.  As explained above, the text of the FHA affirmatively supports the conclusion that Congress intended to recognize disparate impact claims under the FHA.  But no such affirmative indication is required.  Plaintiffs fail to cite a single case that imposes the kind of clear statement rule they advance, and indeed, one of their supporting citations directly refutes the existence of such a clear statement rule.  *See Harris*, 444 U.S. at 138-39 (looking to the overall structure, legislative history, and purpose of a textually ambiguous statute to determine whether intentional discrimination was required).  Moreover, this proposed rule of construction would preference one particular substantive outcome over another and would lead to the rejection of an agency's interpretation even where the text and overall structure of a statute might readily accommodate that interpretation.  As such, it is irreconcilable with *Chevron*.  *See Ober United Travel Agency v. U.S. Dep't of Labor*, 135 F.3d 822, 825 (D.C. Cir. 1998) ("In a post-

*Chevron* era such policy-oriented canons of statutory construction may not be used to evaluate agency interpretations of ambiguous statutes.").

Finally, plaintiffs fail to contend meaningfully with the great weight of authority directly contrary to their position in this litigation, including the uniform consensus among every court of appeals to have addressed the issue. Instead, they attempt to dismiss this precedent with the demonstrably false observation that "[e]very court of appeals that has held that the FHA permits disparate impact liability did so before the Supreme Court's decision in *Smith*." Pls.' Mem. at 18. *See, e.g., Groach Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 374-78 (6th Cir. 2007); *Reinhart v. Lincoln Cnty.*, 482 F.3d 1225, 1229 (10th Cir. 2007). Plaintiffs' faulty contention that *Smith* overruled, *sub silentio*, decades of precedent interpreting civil rights laws – mandating for the first time that Congress employ particular talismanic language in order to allow for disparate impact liability – has been explicitly and resoundingly rejected by numerous courts interpreting the FHA since *Smith*. *See, e.g., Nat'l Cmty. Reinv. Coal.*, 573 F. Supp. 2d at 78-79 ("[T]he Court finds that *Smith* does not preclude disparate impact claims pursuant to the FHA."); *NAACP v. Ameriquest Mortg. Co.*, 635 F. Supp. 2d 1096, 1104-05 (C.D. Cal. 2009) ("*Smith* does not address FHA . . . claims at all."); *Barrett v. H&R Block, Inc.*, 652 F. Supp. 2d 104, 108-09 (D. Mass. 2009); *Ramirez*, 633 F. Supp. 2d at 926-27; *Hoffman v. Option One Mortg. Corp.*, 589 F. Supp. 2d 1009, 1010-11 (N.D. Ill. 2008); *Taylor v. Accredited Home Lenders, Inc.*, 580 F. Supp. 2d 1062, 1066-67 (S.D. Cal. 2008).

### C.    HUD's Interpretation Is in Harmony with the Statutory Context

Because the text of the FHA readily accommodates disparate impact claims, HUD's interpretation is entitled to deference, irrespective of whether it is the interpretation this Court

would have adopted in the first instance. *See Regions Hosp.*, 522 U.S. at 457. But even if the text of the FHA were not so demonstrably supportive of HUD's interpretation – indeed, even if plaintiffs' textual arguments were credited – it would not follow that Congress *unambiguously* intended to foreclose disparate impact liability under the FHA, as plaintiffs are required to show at Step One of the *Chevron* analysis. That is because a close reading of the specific text in question is not the exclusive means of discerning congressional intent. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also Dolan v. USPS*, 546 U.S. 481, 486 (2006) ("The definition of words in isolation . . . is not necessarily controlling in statutory construction."); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("[T]he meaning of statutory language, plain or not, depends on context.").

Here, the statutory context strongly confirms HUD's interpretation of the statute. In particular, the FHA contains three exemptions from liability that presuppose the availability of disparate impact claims. Because each of these three provisions provides an exemption to liability that would only attach, if at all, under a disparate impact theory, they would be meaningless if the FHA were read to preclude disparate impact liability.

First, Congress specified that "[n]othing in [the FHA] prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance." 42 U.S.C. § 3607(b)(4). Because the Act contains no direct prohibition on discriminating against individuals with drug convictions, the inclusion of that exemption makes sense only if actions denying housing to individuals with such drug convictions would otherwise be subject to challenge on the ground that they have a

-29-

disparate impact based on a protected characteristic. That the exemption presupposes a disparate impact theory of discrimination is made all the more clear by a similar exemption in Title VII. *See* 42 U.S.C. § 2000e-2(k)(3). Congress enacted the Title VII exemption from liability for the exclusion of drug users as part of a provision expressly addressed to "disparate impact cases," *id*. § 2000e-2(k), and the language of the exemption specifies that it applies solely to disparate impact claims, *see id*. § 2000e-2(k)(3) (allowing employers to prohibit employment of individuals who use or possess drugs unless "such [a] rule is adopted or applied with an intent to discriminate because of race").

Second, Congress specified that "[n]othing in [the FHA] limits the applicability of any reasonable . . . [governmental] restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). Because the Act contains no direct bar against discrimination based on number of occupants, the purpose of the exemption necessarily was to preclude suits contending that otherwise reasonable occupancy limits have a disparate impact based on a protected characteristic such as familial status. *See City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 735 n.9 (1995).

Third and finally, the FHA includes a targeted exemption specifying that "[n]othing in [the Act] prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status." 42 U.S.C. § 3605(c). There would be no reason to enact an exemption for appraisers' actions based on factors other than protected characteristics unless the statute would otherwise bar such actions on a disparate impact theory. *See Meacham*, 554 U.S. at 96 ("action based on a 'factor other than age' is the very premise for disparate impact liability").

-30-

These statutory exemptions thus strongly support the conclusion that the FHA encompasses disparate impact claims.  To construe the Act to foreclose disparate impact liability would be to strip these three provisions of any meaning in the statutory scheme, in contravention of the "well-established maxim . . . that courts should avoid interpretations that render a statutory provision superfluous."  *Davis Cnty. Solid Waste Mgmt. v. EPA*, 101 F.3d 1395, 1404 (D.C. Cir. 1996).  Accordingly, even if the text of the FHA were thought to suggest the availability only of disparate treatment claims, as plaintiffs contend, that putative clarity would disappear when the FHA is read, as it must be, "in [] context and with a view to [its] place in the overall statutory scheme."  *See Davis*, 489 U.S. at 809; s*ee also Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1014-15 (D.C. Cir. 1999) (concluding that "any putative clarity that [a provision] might arguably have quickly recedes to ambiguity once again" upon consideration of the larger statutory structure).

Anticipating HUD's argument on this point, plaintiffs deny that the foregoing exemptions suggest anything about whether the FHA encompasses disparate impact claims, contending that "all three exemptions . . . offer valuable defenses to claims of intentional discrimination."  Pls.' Mem. at 23.  That is incorrect.  The classic defense to a disparate treatment claim is that the challenged action was undertaken for a nondiscriminatory reason.  *See. e.g.*, *2292 Sherman Ave.*, 444 F.3d at 682.  A showing that housing was denied based on (for example) a prospective buyer's drug offense would defeat disparate treatment liability whether or not Congress had enacted Section 3607(b)(1).  Congress thus had no reason to identify three particular exemptions if the FHA extends only to claims of disparate treatment.  In contrast, liability for disparate impact arises precisely when a facially neutral policy, such as one that excludes prior drug offenders, affects a protected class disproportionately.  Indeed, analogous claims had been litigated by the time Congress added that exemption in 1988.  *See, e.g.*, *N.Y. City Transit Auth. v.*

*Beazer*, 440 U.S. 568 (1979) (asserting disparate impact liability under Title VII based on an employer's refusal to hire methadone users).  That Congress chose to identify these three exemptions from liability makes sense only if Congress had disparate impact liability in mind.

The Supreme Court endorsed this very reasoning in *Smith* when considering the ADEA's "RFOA" defense, which allows an employer to escape liability if it relied on a "reasonable factor[] other than age."  544 U.S. at 238-39 (plurality); *id.* at 243 (Scalia, J., concurring in part and concurring in the judgment) (expressly agreeing with "all of the Court's reasoning" as the basis "for deferral to the reasonable views" of the administrative agency); *see* 29 U.S.C. § 623(f)(1).  The RFOA defense would be "unnecessary" if the ADEA prohibited only disparate treatment because "[i]n most disparate-treatment cases, if an employer in fact acted on a factor other than age, the action would not be prohibited under [the disparate-treatment provision] in the first place."  *Smith*, 544 U.S. at 238 (plurality).  Because the defense "plays its principal role by precluding liability if the adverse impact was attributable to a nonage factor that was 'reasonable,'" the availability of the defense "supports" the conclusion that the ADEA encompasses disparate impact claims.  *Id.* at 239 (plurality).  So too here.

>    **D.    The Legislative History Supports the Availability of Disparate Impact Claims Under the FHA.**

The legislative history, and in particular the history of the 1988 amendments to the FHA, confirms what the statute's text and structure demonstrate:  that Congress intended to permit disparate impact claims under the FHA.  The snippets of legislative history cited by plaintiff do not even come close to demonstrating that Congress unequivocally intended the contrary.

Between the enactment of the FHA in 1968 and its substantial amendment in 1988, nine courts of appeals considered whether the Act authorizes suits based on disparate impact claims,

and all nine concluded that it did.[8]  Congress was also on notice that HUD considered disparate

impact liability to be a vital aspect of the Act's remedial scheme.  *See* 126 Cong. Rec. 31,167

(1980) (entering into the record a letter from HUD's Secretary affirming the importance of

disparate impact liability under the Act).

Against that backdrop, Congress substantially amended the Act in 1988, adding new

provisions barring discrimination based on familial status and disability, establishing the three

statutory exemptions that presuppose the availability of disparate impact actions, *see* Part II.C,

*supra*, and enhancing HUD's authority to interpret and implement the Act.  Congress was aware

that the FHA had uniformly been interpreted to encompass disparate impact claims.  *See, e.g.*,

H.R. Rep. No. 100-711, at 21 (1988) (citing federal appellate court decisions when discussing

policy with potential "discriminatory effect"); 134 Cong. Rec. 23,711 (1988) (Sen. Kennedy)

(noting unanimity of federal appellate courts concerning disparate impact); *Fair Hous.*

*Amendments Act of 1987: Hearings Before the Subcomm. on the Constitution of the S. Comm. on*

*the Judiciary*, 100th Cong. 529-57 (statement of Robert Schwemm) (describing consensus

judicial view that the Act prohibited disparate impact discrimination).  In light of that awareness,

it is significant that Congress chose when amending the Act – including an amendment of

Section 804(a) to add familial status as a protected characteristic – to leave that provision's

operative language unchanged.[9]  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 244 n.11

---

[8] *See Huntington Branch*, 844 F.2d at 935-36; *Resident Advisory Bd.*, 564 F.2d at 146; *Smith*,
682 F.2d at 1065; *Hanson*, 800 F.2d at 1386; *Arthur*, 782 F.2d at 574-75; *Metro. Hous. Dev.*
*Corp.*, 558 F.2d at 1290; *City of Black Jack*, 508 F.2d at 1184-85; *Halet*, 672 F.2d at 1311;
*Marengo Cnty. Comm'n*, 731 F.2d at 1559 n.20.

[9] Plaintiffs would have the Court draw the opposite inference from Congress's decision to leave
the operative language intact, on the ground that Congress "retained. . . language focused on
discriminatory intent."  Pls.' Mem. at 22.  This argument rests entirely on plaintiffs' faulty

(2009) ("When Congress amended [the Act] without altering the text of [the relevant provision], it implicitly adopted [this Court's] construction" of that provision.); *cf. Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). Moreover, Congress specifically rejected an amendment that would have overturned precedent recognizing disparate impact challenges to zoning decisions. *See* H.R. Rep. No. 100-711 at 89-91 (dissenting views of Rep. Swindall); *see* 78 Fed. Reg. at 11,467 (noting five other occasions when Congress declined to impose an intent requirement).

Plaintiffs note that President Reagan, when signing the 1988 amendments, declared that the amendments did not "represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions," of a disparate impact theory under the FHA. Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1141 (Sept. 13, 1988). But that statement does not cast doubt on Congress's awareness of courts' unanimous construction of the FHA as encompassing disparate impact claims when it amended the FHA without changing the Act's operative language. *See* 134 Cong. Rec. 23,711 (Sen. Kennedy) (rejecting President Reagan's assertion as "flatly inconsistent with Congress's understanding of the law," and stating that "[a]s the principal Senate sponsor of the 1988 [Fair Housing Amendments] Act, I can state unequivocally that Congress contemplated no such intent requirement").

Plaintiffs also cite a handful of floor statements made by Senators during consideration of the original 1968 enactment, which plaintiffs claim support their reading of the statute. Pls.' Mem. at 20-21. But a handful of floor statements cannot supply the clear and unambiguous

---

textual argument, discussed in Part II.B, *supra*. It does no extra work when repackaged as a claim about the legislative history.

evidence of congressional intent that plaintiffs must demonstrate in order to prevail. *See ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1088 (D.C. Cir. 2002) ("[S]nippets of legislative history do not a law make."). Moreover, as plaintiffs themselves concede, there were other floor statements that demonstrated quite a different congressional understanding about the availability of disparate impact claims under the Act. Pls.' Mem. at 21. For example, Senator Mondale, the Act's lead sponsor, explained that the purpose of the Act was to replace segregated neighborhoods with "truly integrated and balanced living patterns." 114 Cong. Rec. 3422 (1968). In his view, the Act was intended to address the patterns of segregation that resulted not just from "overt racial discrimination" but also from "[o]ld habits" that became "frozen rules," such as the "refusal by suburbs and other communities to accept low-income housing," a facially-neutral practice with a discriminatory impact. *Id.* at 3421, 2277.

Finally, there is no merit to plaintiffs' contention that Congress's failure to amend the FHA when it amended Title VII in 1991 to codify the Supreme Court's earlier interpretation in *Griggs* provides "strong evidence" that Congress did not intend to provide for disparate impact liability under the FHA. Pls.' Mem. at 22. Those 1991 amendments contained no provisions concerning the FHA. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. Congress's intent when it enacted the FHA in 1968, or amended it in 1988, is not informed by a later decision to amend a separate law. *Cf. Helvering v. Hallock*, 309 U.S. 106, 120 (1940) ("To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities.").

### E.    The Canon of Constitutional Avoidance Is Inapplicable Here

In an effort to sidestep the deference owed to HUD's resolution of statutory ambiguity, plaintiffs invoke the canon of constitutional avoidance, arguing that the Court must reject the

agency's interpretation – even if it comports with the language and structure of the Act – in order to avoid supposed constitutional difficulties associated with the disparate impact liability. Plaintiffs' resort to the canon of constitutional avoidance is entirely misplaced.

The canon of constitutional avoidance provides that, when one plausible interpretation of an ambiguous statute would cause "serious constitutional concerns," courts should construe the statute to avoid those problems by adopting another plausible interpretation, if one is available. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 577 (1988). Although plaintiffs are correct that, in this Circuit, the canon of constitutional avoidance, when it applies, will trump *Chevron* deference, courts "do not abandon *Chevron* deference at the mere mention of a possible constitutional problem." *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 238-39 (1998) (noting that "the 'constitutional doubt' doctrine does not apply mechanically whenever there arises a significant constitutional question the answer to which is not obvious"). Rather, to displace the ordinary principles of *Chevron* deference, there must be "grave doubts" about the constitutionality of an agency's interpretation. *See Almendarez-Torres*, 523 U.S. at 237-38.

HUD's construction of the FHA – which comports with the interpretation adopted by eleven courts of appeals – raises no colorable constitutional concern, let alone the kind of "grave doubts" necessary to reject the agency's considered views. To conclude otherwise would be to suppose that the Supreme Court construed Title VII, the ADEA, and other federal statutes to effect an unconstitutional outcome. Constitutional equal-protection principles do not prevent Congress or HUD from requiring insurers (and others) to consider the effects of their policies to ensure that they do not unnecessarily burden one racial group. In an analogous context, the

Supreme Court recently explained that Title VII's prohibition on disparate treatment "does not prohibit an employer from considering, before administering a test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of their race." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009).[10]  As Justice Kennedy has explained, when a government "considers the impact a given approach might have on [individuals] of different races," it does not run afoul of the Constitution – instead, it acts in service of its duty "to preserve and expand the promise of liberty and equality on which [the Nation] was founded." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 787, 789 (2007) (Kennedy, J., concurring).  Tellingly, plaintiffs fail to cite a single case in which a court has found the existence of disparate impact liability to violate the Constitution.  Moreover, the fact that plaintiffs' supposed constitutional concerns are based on pure conjecture about the effect of the Rule on their members, *see* Part I.A, *supra*, makes resort to the canon of constitutional avoidance all the more inappropriate here.  *Cf. Salinas v. United States*, 522 U.S. 52, 60 (1997) (rejecting avoidance canon where there was "no serious doubt about the constitutionality of [of a challenge law] *as applied to the facts of [the] case*." (emphasis added)).

### F.    McCarran-Ferguson Act Does Not Foreclose HUD's Interpretation

As demonstrated by the foregoing, HUD's interpretation of the FHA to encompass disparate impact claims is an entirely permissible reading of the Act's text, structure, and legislative history.  The McCarran-Ferguson Act does not compel a different result.

---

[10] Plaintiffs stake their claims of constitutional doubt on Justice Scalia's concurrence in *Ricci*, which pondered whether, and to what extent, disparate impact liability is consistent with the Equal Protection Clause.  Pls.' Mem. at 28-29 (citing 557 U.S. at 594-95 (Scalia, J., concurring)). The reflections of a single Justice are plainly insufficient to trigger application of the canon of constitutional avoidance.  *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1144 (9th Cir. 2009) ("The doctrine of constitutional avoidance requires 'grave doubts,' not occasional statements by a justice or two.").

Based on nothing more than the allegations of their Complaint, plaintiffs argue that the availability of disparate impact liability under the FHA would "broadly impair" state regulation of the insurance industry, including the ability of states to "base insurance regulation solely on risk," in contravention of McCarran-Ferguson. Pls.' Mem. at 36. Plaintiffs cite this alleged conflict in support of their argument at *Chevron* Step One that HUD's construction of the FHA is unambiguously foreclosed. Pls.' Mem. at 30-38. This argument is fatally flawed for multiple reasons. First, it improperly treats the laws of 50 different states as though they were a single monolith. It is also premised on the unwarranted assumption that disparate impact liability would attach to any underwriting practice that results in a discriminatory effect, even where the practice is supported by a legally sufficient justification. And most critically, it advances a type of wholesale, facial preemption inconsistent with the as-applied framework for analyzing McCarran-Ferguson challenges articulated by the Supreme Court.

McCarran-Ferguson "precludes application of a federal statute in face of state law 'enacted . . . for the purpose of regulating the business of insurance,' if the federal measure does not 'specifically relate[] to the business of insurance,' and would 'invalidate, impair, or supersede' the State's law." *Humana*, 525 U.S. at 307 (quoting 15 U.S.C. § 1012(b)). In *Humana*, the Supreme Court set forth the appropriate framework for determining whether application of any given federal law (not specifically related to the business of insurance) would "invalidate, impair, or supersede" a state law. The petitioner in that case, an insurance company, argued that McCarran-Ferguson barred a claim brought against it under the Racketeer Influenced and Corrupt Organizations Act (RICO) by insurance beneficiaries who alleged that the company fraudulently inflated their insurance deductible. *Id.* at 302-04. The Supreme Court rejected the notion that preemption could be triggered by the mere existence of a comprehensive state

regulatory scheme, or the fact that federal law provided additional remedies unavailable under state law. *Id.* at 309-10. Instead, the Court looked to the specific contours of the pending RICO claim and to the relevant Nevada law, concluding that adjudication of the RICO claim would not impair state law, and thus was not barred by McCarran-Ferguson. *Id.* at 314.

In light of *Humana*, it is clear that the question of impairment of state law is one that cannot be answered in the abstract, unmoored to a specific application of the federal and state laws in question. *See id.* at 307 ("This case . . . turns on the question: Would RICO's application to the employee beneficiaries' claims at issue 'invalidate, impair, or supersede' Nevada's laws regulating insurance?"). Courts that have addressed the interplay between McCarran-Ferguson and the FHA have noted that a "fact-intensive" inquiry is required in order "to decide the . . . impairment issue" – one that would consider "the nature of" the FHA claim asserted, the "specific relief" being sought, and the specific state law purportedly implicated. *Saunders v. Farmers Ins. Exch.*, 440 F.3d 940, 945-46 (8th Cir. 2006); *see also Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 967 (8th Cir. 2008) ("[F]ederal civil rights statutes [like the FHA] are drafted broadly, so a statute might 'impair' state insurance laws when applied in some ways, but not in others"); *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 298 (5th Cir. 2003) (rejecting argument that McCarran-Ferguson foreclosed an FHA claim when defendants "declin[ed] to direct the Court to a *particular* law or declared regulatory policy" (emphasis added)). The contours of this "fact-intensive" inquiry only become clear in the context of a specific action to enforce the FHA – a fact that HUD recognized in its rulemaking. *See* 78 Fed. Reg. at 11,475.

Plaintiffs' use of McCarran-Ferguson to attack the Rule on a wholesale, pre-enforcement basis is thus misplaced. Even if plaintiffs were able to identify some imagined application of the Rule that would impair an identified state law – a claim that would be manifestly unripe at this

stage, *see* Part I.B, *supra* – that would not affect the availability of disparate impact liability in other states or under other circumstances.  Thus, for instance, when the Eighth Circuit found that Missouri law preempted a particular FHA claim against an insurance provider, the court took pains to limit its holding to the facts before it, observing that the "McCarran-Ferguson Act's application might well be different if other disparate impact claims were asserted" or if other state laws were in play.[11]  *Saunders*, 537 F.3d at 968 & n.7.

Prohibitions on insurance redlining comprise one area for which there is significant if not total overlap between the FHA and state insurance laws.  Missouri is one of thirty-five states that restrict, to varying degrees, insurers from basing insurance decisions on geographic location,[12] and one of twenty-two states that restrict insurance decisions based on the age of the property.[13]

---

[11] The United States filed an amicus brief in *Saunders*, arguing that Missouri civil rights law permits private actions against insurers for rate discrimination notwithstanding the state insurance code provisions that defendants cited.  *See id.* at 968-69.  The Court of Appeals declined to reach the United States' argument because the plaintiff in that case had failed to preserve it.  *Id.*

[12] *See* Ark. Code Ann. § 23-66-206(14)(C); Colo. Rev. Stat. § 10-3-1104(1)(f)(XIV); Conn. Agencies Regs. § 38a-824-3(a)(1); Del. Code Ann. tit. 18, § 4124(3); Fla. Stat. § 626.9541(1)(x)(2); Ga. Code Ann. § 33-6-4(b)(8)(A)(iii); Haw. Rev. Stat. § 431:13-103(a)(7)(C); 215 Ill. Comp. Stat. 5 / 143.21a(a), 155.22; Ind. Code § 27-2-17-5(b); Kan. Admin. Regs. § 40-3-40(a)(4); Ky. Rev. Stat. Ann. § 304.20-340(3); La. Rev. Stat. Ann. § 22:1964(7)(d); Me. Rev. Stat. tit. 24-A § 3051; Md. Code Ann. Ins. § 11-205(f)(4); 211 Mass. Code Regs. § 142.07; Mich. Comp. Laws § 500.2027(a)(iii), (c); Minn. Stat. § 72A.20(13)(a); Mo. Rev. Stat. § 375.936(11)(c); Mont. Code Ann. § 33-18-210(5); Neb. Rev. Stat. § 44-1525(7)(c); N.H. Rev. Stat. Ann. § 417:4(VIII)(e); N.Y. Ins. Law § 3429-a; N.C. Gen. Stat. § 58-63-15(7)(c); N.D. Cent. Code §§ 26.1-04-03(7)(d), 26.1-39-17(3); Okla. Stat. tit. 36, § 619.1; Or. Rev. Stat. § 746.018(2); 40 Pa. Cons. Stat. § 1171.5(a)(7)(iii); R.I. Gen. Laws §§ 27-29-4(7)(iii), 27-29-4.1; S.D. Codified Laws § 58-11-55; Tenn. Code Ann. § 56-8-104(7)(D); Tex. Ins. Code § 544.002(a)(2); Va. Code Ann. § 38.2-508(4); W. Va. Code § 33-17A-6(c); Wis. Admin. Code Ins. § 6.68(3)(a); 44-33 Wyo. Code R. § 3(a).

[13] *See* Ark. Code Ann. § 23-66-206(14)(D); Colo. Rev. Stat. § 10-3-1104(1)(f)(XV); Conn. Agencies Regs. § 38a-824-3(a)(5); Del. Code Ann. tit. 18, § 4124(3); Ga. Code Ann. § 33-6-4(b)(8)(A)(iii); Haw. Rev. Stat. § 431:13-103(a)(7)(D); 215 Ill. Comp. Stat. 5 / 143.21a(a); Ky. Rev. Stat. Ann. § 304.20-340(3); La. Rev. Stat. Ann. § 22:1964(7)(e); Minn. Stat.

HUD has similarly expressed longstanding concern about insurance decisions based on geographic location and property age.  The Assistant Secretary, for example, in explaining why property insurance is essential for the revitalization of the Nation's cities, identified a number of "seemingly neutral policies" that may violate the Act when not tied to the risk of loss, such as redlining of minority or low income areas, or minimum value or age requirements for the property.  *See* 1994 Hearings at 49, 51.  Not surprisingly, then, rather than applying reverse-preemption as a matter of course, several courts have found harmony between state insurance laws and disparate impact liability under the FHA.  *See Dehoyos*, 345 F.3d at 298-99 (finding federal and state policy goals aligned in limiting credit-scoring for homeowners insurance); *Lumpkin v. Farmers Group, Inc.*, No. 05-2868, 2007 WL  6996777 at *6-7 (W.D. Tenn. July 6, 2007) (highlighting the congruity between state and federal law where both provide disparate impact liability in homeowners insurance and concluding that "Tennessee code does not permit credit scoring [for homeowners insurance] with disparate impact"); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 704 N.E.2d 667, 670 (Ohio Ct. Com. Pl. 1997) (recognizing disparate impact liability in insurance under Ohio fair housing law).

     Because McCarran-Ferguson does not contemplate facial preemption of the kind urged by plaintiffs – a principle that is underscored by the existence of established applications of the disparate impact standard in harmony with state law – there is no sense in which HUD's construction of the FHA can be said to be "in contravention of McCarran-Ferguson."  Pls.' Mem. at 36.

---

§ 72A.20(13)(b); Mo. Rev. Stat. § 375.936(11)(d); Mont. Code Ann. § 33-18-210(6); Neb. Rev. Stat. § 44-1525(7)(d); N.C. Gen. Stat. § 58-63-15(7)(d); N.D. Cent. Code § 26.1-39-17(3); R.I. Gen. Laws § 27-29-4(7)(iv); Tenn. Code Ann. § 56-8-104(7)(E); 28 Tex. Admin. Code § 21.1006(b); Va. Code Ann. § 38.2-508(5); W. Va. Code § 33-17A-6(c); Wis. Admin. Code Ins. § 6.68(3)(b); 44-33 Wyo. Code R. § 3(b).

Even setting aside plaintiffs' improper resort to a facial attack, there remain serious flaws in plaintiffs' claim to the existence of an "irreconcilable conflict" between disparate impact liability recognized by the Rule and "States' ability to base insurance regulation solely on risk." Pls.' Mem. at 35-36. This supposed conflict is a product of plaintiffs' failure to account for the ability of insurers to avoid liability under the challenged Rule so long as they have a "legally sufficient justification" for a challenged practice. 24 C.F.R. § 100.500(b); *see Nat'l Fair Hous. Alliance*, 208 F. Supp. 2d at 60 (finding similar argument, based on the "purportedly unique nature of the insurance industry, which must 'discriminate' based on an assessment of risk" to be "unavailing in light of the availability of the 'business justification' defense"); *Toledo Fair Hous. Ctr.*, 704 N.E.2d at 670-71 (citing availability of business justification defense to conclude that disparate impact liability would not "unduly undermine the business of selling insurance").

For the reasons previously discussed, it is simply not the case, as plaintiffs imply, that every underwriting practice that results in a differential effect on some protected class is *per se* illegal if the Rule is applied. If plaintiffs are correct that their members' underwriting practices are both "legitimately related to the risk of loss" and "critical to the stability of the homeowner's insurance system," Pls.' Mem. at 35, there is no reason to presume that plaintiffs' members would be subject to liability, notwithstanding any differential effect. *See, e.g.*, *Fair Hous. Opportunities*, 684 F. Supp. 2d at 970 (finding that a defendant's use of credit in underwriting insurance was correlated with legitimate risk considerations and an interest in maintaining market competitiveness that could not be achieved in a less discriminatory fashion); *Owens*, 2005 WL 1837959, at *14-15.

Finally, even if plaintiffs were able to demonstrate that McCarran-Ferguson preempts *all* applications of disparate impact liability to the insurance industry – a premise that cannot be

-42-

squared with *Humana* or with the actual operation of the Rule – the remedy they posit is fundamentally inappropriate.  Plaintiffs are not asking the Court to find the FHA, as construed by HUD, preempted as it applies to the insurance industry and where it impairs state law.  Rather, they ask the Court to use McCarran-Ferguson to narrow the scope of the FHA as applied in any and all contexts.  Pls.' Mem. at 31, 37.  This, too, is inconsistent with the operation of McCarran-Ferguson, which, when it applies, preempts particular *applications* of federal law without changing the meaning of the federal law itself.  *Humana*, 525 U.S. at 307.  Plaintiffs have pointed to *no* case in which a court has construed McCarran-Ferguson to effect a substantive, across-the-board change in the meaning of another federal statute.  Because the Rule covers a wide range of entities involved in housing, from landlords to municipalities, it has a wide range of applications that are indisputably unaffected by McCarran-Ferguson.  The possibility that HUD's regulation might be invalid or preempted "under some conceivable set of circumstances is insufficient to render [it] wholly invalid." *Rust v. Sullivan*, 500 U.S. 173, 183 (1991).  Accordingly, plaintiffs' facial, pre-enforcement challenge to the Rule based on McCarran-Ferguson must fail.  *Id.*

### G.    There Is No Basis to Find HUD's Construction Unreasonable

Plaintiffs' have staked their entire claim on their ability to prevail at Step One of the *Chevron* analysis, *see* Compl. ¶¶ 65-73, and, for all the foregoing reasons, they have failed to demonstrate that their reading of the statute is unambiguously compelled by the traditional canons of statutory construction.  Accordingly, to the extent that the Court reaches the merits of plaintiffs' claim, defendants are entitled to summary judgment.  Although plaintiffs suggest, in cursory fashion, that HUD's construction of the statute would not pass muster at Step Two of the *Chevron* analysis because it is not a reasonable resolution of any statutory ambiguity, Pls. Mem.

at 38 n.6, the Court need not reach this issue.  This argument was relegated to a footnote in

plaintiffs' brief and thus may be considered waived.  *See Hutchins v. Dist. of Columbia*, 188 F.3d

531, 539 n.3 (D.C. Cir. 1999) (en banc) (noting that courts "need not consider cursory arguments

made only in a footnote").

Even were this Court to consider the argument, it would provide no basis for questioning

the validity of a Rule that adopts the consensus view of eleven courts of appeals and comports

with decades of agency interpretation.  Plaintiffs contend, in a footnote, that HUD "unreasonably

. . . disregard[ed] McCarran-Ferguson" and adopted an interpretation inconsistent with state

regulation of the insurance industry.  Pls.' Mem. at 37 n.6.  This conclusory argument is

presumably based on the same faulty understanding of McCarran-Ferguson discussed above.

Because the effect of McCarran-Ferguson will depend on the practice at issue and any asserted

justification, as well as the language of any relevant state law, HUD reasonably left that inquiry

where it belongs – in the context of actions to enforce the FHA.  *See* 78 Fed. Reg. at 11,475.

Moreover, as previously demonstrated, it is legally inaccurate to claim, as plaintiffs do, that

HUD's construction of the FHA would subject all risk-based underwriting to liability under the

Act.  Stripped of these inaccurate characterizations, plaintiffs' claim of incompatibility between

disparate impact liability and the interests of the insurance industry amounts to a policy

disagreement with HUD's longstanding view on the issue.  As such, this claim must fail.

*Chevron*, 467 U.S. at 866 ("When a challenge to an agency construction of a statutory provision,

fairly conceptualized, really centers on the wisdom of the agency's policy . . . the challenge must

fail.").

Construing the FHA to encompass a disparate impact cause of action was a reasonable

implementation of the Act's broad anti-discrimination purpose.  Individual motives are difficult

to prove directly and Congress has frequently required proof of only discriminatory effect as a means of overcoming discriminatory practices – including in Title VII, enacted only four years before the FHA. As the Supreme Court explained in *Griggs*, Congress's objective in enacting Title VII, including its disparate impact prohibition, "was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." 401 U.S. at 429-30. "Under the Act," the Court explained, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 430. When enacting the FHA, Congress similarly sought to overcome entrenched barriers to equal opportunity in housing by prohibiting acts that have the effect of denying such opportunities on a specified basis. *See Huntington Branch*, 844 F.2d at 935 (observing that Title VII and the FHA "are part of a coordinated scheme of federal civil rights laws enacted to end discrimination [and] the Supreme Court has held that both statutes must be construed expansively to implement that goal" (citing *Trafficante*, 409 U.S. at 211-12; *Griggs*, 401 U.S. at 429-36)).

For the reasons articulated previously, HUD's construction of the FHA comports with the statutory text, brings coherency to the statute as a whole, is consistent with the legislative history, and serves the purpose of the Act. As such, it easily meets the "highly deferential standard" for reasonableness under the *Chevron* framework. *See Nat'l Rifle Ass'n of Am., Inc. v. Reno*, 216 F.3d 122, 137 (D.C. Cir. 2000).

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiffs' Complaint or, in the alternative, grant summary judgment in favor of defendants.

Dated: February 3, 2014

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

JOCELYN SAMUELS
Acting Assistant Attorney General

DAMON Y. SMITH
Acting General Counsel
MICHELLE ARONOWITZ
Deputy General Counsel for
   Enforcement and Fair Housing
JEANINE M. WORDEN
Associate General Counsel
   for Fair Housing
KATHLEEN M. PENNINGTON
Assistant General Counsel
   for Fair Housing Enforcement
M. CASEY WEISSMAN-VERMEULEN
AYELET R. WEISS
Attorneys
*Of counsel*

RONALD C. MACHEN JR.
United States Attorney

 */s/ Kyle R. Freeny*_____
MICHAEL SITCOV
KYLE R. FREENY (Cal. Bar No. 247857)
DANIEL P. MOSTELLER (DC Bar No. 980802)
Attorneys
U.S. Department of Justice
20 Massachusetts Ave., N.W.
Washington, DC  20001
Tel: (202) 514-5108/Fax: (202) 616-8470
Email:  Kyle.Freeny@usdoj.gov
*Counsel for Defendants*

-46-