**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN INSURANCE ASSOCIATION,

   et al.,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,

   et al.,

      Defendants.

Case No. 1:13-cv-00966

---

**BRIEF OF *AMICI CURIAE*
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED BY THE
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

---

NATIONAL FAIR HOUSING ALLIANCE

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

NATIONAL LOW INCOME HOUSING COALITION

POVERTY & RACE RESEARCH ACTION COUNCIL

NATIONAL HOUSING LAW PROJECT

LATINOJUSTICE PRLDEF

Stephen M. Dane
Glenn Schlactus
RELMAN, DANE & COLFAX PLLC
1225 Nineteenth Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

Joseph D. Rich
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1401 New York Avenue, N.W., Suite 400
Washington, D.C. 20005
(202) 662-8600
(202) 783-3113 (fax)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... i-v

I.    INTRODUCTION AND INTERESTS OF AMICI ........................................................ 2

II.   THIS CASE LACKS THE NECESSARY RIPENESS REQUIRED FOR
      REVIEW OF HUD'S DISPARATE IMPACT REGULATION, ESPECIALLY
      IN LIGHT OF THE McCARRAN-FERGUSON ACT ................................................. 5

      A. The Attack on the Disparate Impact Regulation Is Not Fit for
         Judicial Decision ......................................................................................... 6

      B. Withholding Consideration of This Case Will Not Cause Hardship
         to Plaintiffs .................................................................................................. 9

III.  HUD'S DISPARATE IMPACT RULE IS NOT A SUBSTANTIVE
      PROHIBITION OF ANY SPECIFIC INSURANCE CONDUCT, BUT
      IS MERELY A METHOD OF PROVING A DISPARATE IMPACT
      CLAIM.  ACCORDINGLY, IT DOES NOT CONSTITUTE "FINAL
      AGENCY ACTION" WITHIN THE MEANING OF THE APA ............................... 10

IV.   BECAUSE THE McCARRAN-FERGUSON ACT APPLIES ONLY
      IN SPECIAL CIRCUMSTANCES, THE COMPLAINT DOES NOT
      ALLEGE FACTS SUFFICIENT TO COMPLY
      WITH FED. R. CIV. P. 8(a) ......................................................................... 12

V.    THE McCARRAN-FERGUSON ACT IS NOT AN AUTOMATIC
      BAR TO APPLICATION OF DISPARATE IMPACT TO INSURERS .................... 15

      A. The Fair Housing Act Has Been Enforced Against Homeowner's
         Insurers for Decades ................................................................................ 15

      B. The McCarran-Ferguson Act Is Not An Automatic Bar to Disparate
         Impact Fair Housing Act Enforcement Against Insurers ........................... 18

      C. Insurance "Risk Analysis" Is Not Inconsistent With HUD's Disparate
         Impact Rule.  HUD Has Applied Disparate Impact to Insurers for Decades,
         and All Federal Administrative Agencies With FHA Enforcement Authority
         Have Adopted and Applied Disparate Impact Principles to Risk Analysis ................ 21

VI.   CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)................................................5, 9

*Arthur v. City of Toledo, Ohio*, 782 F.2d 565 (6th Cir. 1986) ........................................5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................13, 15

*Atl. States Legal Found. v. E.P.A.*, 325 F.3d 281 (D.C. Cir. 2003) .............................10

*Barnett Bank of Marion Cnty. v. Nelson*, 517 U.S. 25 (1996) .....................................20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................13

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................10

*Breen v. Peters*, 474 F. Supp. 2d 1 (D.D.C. 2007) .....................................................11

*Connecticut v. Teal*, 457 U.S. 440 (1982) (Powell, J., dissenting) ...............................11

*DeHoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) ..................................... *passim*

*Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421 (D.C. Cir. 2007) ...................7, 10

*Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.*, 472 F. Supp.
     1106 (S.D. Ohio 1979)........................................................................................16

*Graoch Assoc. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations
     Comm'n*, 508 F.3d 366 (6th Cir. 2007)..............................................................20

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) .......................................................11

*Halet v. Wend Inv. Co.*, 672 F.2d 1305 (9th Cir. 1982)................................................5

*Hallmark Developers, Inc. v. Fulton Cnty.*, 466 F.3d 1276 (11th Cir. 2006)................6

*Hanson v. Veterans Admin.*, 800 F.2d 1381 (5th Cir. 1986)..........................................5

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................3

*Humana Inc. v. Forsyth*, 525 U.S. 299 (1999)........................................................9, 20

*Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926
     (2d Cir. 1988), *aff'd in part*, 488 U.S. 15 (1988)..................................................4

**Cases**

*In Re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213 (D.C. Cir. 2010) ..................................13

*Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531 (11th Cir. 1994) ....................................................5

*Langlois v. Abington Hous. Auth.*, 207 F.3d 43 (1st Cir. 2000) .....................................................4

*Lindsey v. Allstate Ins. Co.*, 34 F. Supp. 2d 636 (W.D. Tenn. 1999)....................................... 15-17

*Lumpkin v. Farmers Grp., Inc.*, No. 05-2868 Ma/V., 2007 WL 6996777
    (W.D. Tenn. July 6. 2007) ....................................................................................15, 19

*Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419 (4th Cir. 1984).....................................................18

*McDiarmid v. Econ. Fire & Cas. Co.*, 604 F. Supp. 105 (S.D. Ohio 1984).................................16

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283 (7th Cir. 1977) .................5

*Metro. Life Ins. Co. v. Ward*, 470 U.S. 869 (1985)........................................................................20

*Meyer v. Holley*, 537 U.S. 280 (2003) ...........................................................................................22

*Moore v. Hughes Helicopters, Inc., a Div. of Summa Corp.*,
    708 F.2d 475 (9th Cir. 1983) ............................................................................................11

*Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001) ....................................14, 18

*Mount Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
    658 F.3d 375 (3d Cir. 2011), *cert. dismissed*, 134 S. Ct. 636 (2013) .................................6

*Mountain Side Mobile Estates P'ship v. Sec'y of HUD*,
    56 F.3d 1243 (10th Cir. 1995) ............................................................................................5

*NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) ........................... *passim*

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005)........................................................................................10

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    440 F.3d 459 (D.C. Cir. 2006)............................................................................................5

*Nat'l Fair Hous. Alliance v. Allstate Ins. Co.*,
    Case No. 03-94-0529-8 (HUD)...........................................................................................4

**Cases**

*Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.*,
    208 F. Supp. 2d 46 (D.D.C. 2002) ............................................................. *passim*

*Nat'l Fair Hous. Alliance v. State Farm Ins. Cos.*,
    Case No. 05-94-1351-8 (HUD) ........................................................................4

*Nat'l Fair Hous. Alliance et al. v. Travelers Ins. Co.*, No. 1:00-cv-1506
    (D.D.C. filed June 26, 2000) ............................................................................4

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003).........................5

*Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995) ...............................8

*Nevels v. W. World Ins. Co.*, 359 F. Supp. 2d 1110 (W.D. Wash. 2004) .............. *passim*

*Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421 (Tex. 2011)...............................................19

*Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205 (9th Cir. 2010) .................................. *passim*

*Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397 (D.C. Cir. 2012)..........................13

*Peoples Nat'l Bank v. Office of the Comptroller of the Currency of
    the U.S.*, 362 F.3d 333 (5th Cir. 2004)...........................................................11

*Putnam Family Partnership v. City of Yucaipa, Cal.*,
    673 F.3d 920 (9th Cir. 2012) .........................................................................23

*Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977)..........................................4

*Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008) ................................9, 19

*Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055 (4th Cir. 1982) ...............................4-5

*Strange v. Nationwide Mut. Ins. Co.*, 867 F. Supp. 1209 (E.D. Pa. 1994) ...................16

*Texas v. United States,* 523 U.S. 296 (1998) ...............................................................10

*Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158 (1967). ................................. *passim*

*Toledo Fair Hous. Ctr. et al. v. Nationwide Ins. Co.
    et al.*, 704 N.E.2d 667 (Ohio Com. Pl. 1997) ............................................2, 19

*United Farm Bureau Mut. Ins. Co. v. Metro. Human Relations
    Comm'n*, 24 F.3d 1008 (7th Cir. 1994).................................................. *passim*

## Cases

*United States v. Am. Family Mut. Ins. Co.* and *NAACP v. Am. Family Mut. Ins. Co.* (Dep't of Justice July 13, 1995) (consent decree) (online at http://www.justice.gov/crt/about/hce/documents/amfamsettle.php) ...................................2

*United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974)................................................5

*United States v. Nationwide Mut. Ins. Co. et al.*, No. C2-97-291 (Dep't of Justice Mar. 10, 1997) (consent decree) (online at http://www.justice.gov/crt/about/hce/documents/nationsettle.php)...................................2

*Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737 (7th Cir. 2006) ................................11

## Regulations

12 C.F.R. § 202.6 ............................................................................................................................24

24 C.F.R. § 100.70 ..........................................................................................................................17

24 C.F.R. § 100.500 ...................................................................................................................12, 20

76 Fed. Reg. 70,921 (Nov. 16, 2011)..............................................................................................23

78 Fed. Reg. 11,460 (Feb. 15, 2013) ...................................................................................... *passim*

42 U.S.C. § 3604..............................................................................................................................16

42 U.S.C. § 3614..............................................................................................................................22

Fed. R. Civ. P. 8...............................................................................................................................12

## Other Authorities

Arwine, Barbara, *Comments of Lawyers' Committee for Civil Rights Under Law Regarding Docket No. FR-5508-P-01, Implementation of the Fair Housing Act's Discriminatory Effect Standard* (2012), http://www.regulations.gov/#!documentDetail;D=HUD-2011-0138-0075.....................22

FEDERAL HOUSING ADMINISTRATION, THE, http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/fhahistory (last visited Feb. 10, 2014)....................................................................................................24

**Other Authorities**

Greenspan, Alan, *Economic Challenges in the New Century*, Remarks
    Before the Annual Conference of the National Community Reinvestment
    Coalition (Mar. 22, 2000) (online at
    http://www.federalreserve.gov/boarddocs/speeches/2000/20000322.htm) .................. 24-5

Heimer, Carol, *The Racial and Organizational Origins of Insurance Redlining*,
    10 J. INTERGROUP RELATIONS 42 (1982) ........................................................................3

*Interagency Fair Lending Examination Procedures*, at Appendix 26-28 (online at
    http://www.federalreserve.gov/boarddocs/caletters/2009/0906/09-06_attachment.pdf)...23

Interagency Task Force on Fair Lending, *Policy Statement on Discrimination
    in Lending,* 59 Fed. Reg. 18,266 (Apr. 15, 1994) (online at
    www.occ.treas.gov/news-issuances/federal-register/94fr9214.pdf) .................................23

Kaersvang, Dana, *The Fair Housing Act and Disparate Impact in Homeowners
    Insurance*, 104 MICH. L. REV. 1993 (2006) ......................................................................3

Smith, Shanna, *Comments of National Fair Housing Alliance and Other Civil Rights
    Organizations Regarding Docket No. FR-5508-P-01, Implementation
    of the Fair Housing Act's Discriminatory Effect Standard* (2012),
    http://www.regulations.gov/#!documentDetail;D=HUD-2011-0138-0076......................22

Smith, Shanna & Cathy Cloud, *Documenting Discrimination by Homeowners
    Insurance Companies Through Testing, in* INSURANCE REDLINING:
    DISINVESTMENT, REINVESTMENT, AND THE EVOLVING ROLE OF FINANCIAL
    INSTITUTIONS (Gregory Squires ed., Urban Institute Press 1997) ........................................3

Squires, Gregory, *Racial Profiling, Insurance Style: Insurance Redlining and
    the Uneven Development of Metropolitan Areas*, 25 J. URBAN
    AFFAIRS 4 (2003) ..............................................................................................................3

I.    **INTRODUCTION AND INTERESTS OF AMICI**[1]

Over the past two decades the homeowner's insurance industry has been the subject of significant private and public enforcement actions under the Fair Housing Act ("FHA"). Virtually all of the major carriers, and several smaller ones, have been the subject of fair housing enforcement actions based on claims of race discrimination in the underwriting, marketing, advertising, and sale of their products.

The results have been dramatic.  Many historical homeowner's insurance underwriting and pricing policies have been successfully challenged under the Fair Housing Act on disparate impact grounds, including age of the dwelling, minimum dwelling value, the ratio of a dwelling's market value to its replacement cost, and credit scoring.[2]  As a result, the largest homeowner's insurers no longer use dwelling age or minimum market value as part of their underwriting processes.  Many have also eliminated restrictions on the availability of full and guaranteed replacement cost policies, with companies finally making such policies available in

---

[1]    Full Statements of Interest for each of the Amici are set forth in the Unopposed Motion for Leave to File a Brief *Amicus Curiae*.

[2]    *See, e.g.*, *United States v. Nationwide Mut. Ins. Co. et al.*, No. C2-97-291 (Dep't of Justice Mar. 10, 1997) (consent decree) (online at http://www.justice.gov/crt/about/hce/documents/nationsettle.php) (Department of Justice ("DOJ") DOJ settlement with Nationwide Insurance under the Fair Housing Act eliminating age of dwelling as an underwriting criterion); *United States v. Am. Family Mut. Ins. Co.* and *NAACP v. Am. Family Mut. Ins. Co.* (Dep't of Justice July 13, 1995) (consent decree) (online at http://www.justice.gov/crt/about/hce/documents/amfamsettle.php) (DOJ settlement with American Family Mutual Insurance Company under the Fair Housing Act eliminating age of dwelling as an underwriting criterion); *Toledo Fair Hous. Ctr. et al. v. Nationwide Ins. Co. et al.*, 704 N.E.2d 667, 674-76 (Ohio Com. Pl. 1997) (plaintiffs survived summary judgment because Nationwide did not provide sufficient business justification in response to the racially disparate impact of age of dwelling standard demonstrated by plaintiffs' statistical expert; minimum dwelling value, ratio of dwelling market value to replacement cost); *DeHoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) (credit scoring); *Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46 (D.D.C. 2002) (market value of home, ratio between replacement cost and market value, credit scoring).

African-American and minority neighborhoods. Insurers have abandoned explicitly race-based and geographically-based marketing plans.[3]

These challenges to traditional underwriting and marketing practices have been supported both by testing of agents conducted by fair housing organizations[4] and by statistical analyses demonstrating the racial impact of certain facially neutral criteria. Many of the challenged underwriting criteria were not supported by any company or industry empirical loss or claims data, so could not be justified by business necessity.

*Amici* are committed to making sure that insurance markets operate correctly and fairly in under-served communities and neighborhoods that have historically experienced redlining practices. For example, identifying and eliminating discrimination in the availability and marketing of homeowner's insurance has been one of the National Fair Housing Alliance's ("NFHA") highest priorities for almost two decades. NFHA has dedicated significant resources to the study of the homeowner's insurance market and has received grants and contracts with the U.S. Department of Housing and Development ("HUD") to investigate homeowner's insurers. NFHA has also been a complainant or a plaintiff in many cases involving racial discrimination in

---

[3]    For a historical discussion of the intersection between race discrimination and homeowner's insurance, *see* Carol Heimer, *The Racial and Organizational Origins of Insurance Redlining*, 10 J. INTERGROUP RELATIONS 42 (1982), and Gregory Squires, *Racial Profiling, Insurance Style: Insurance Redlining and the Uneven Development of Metropolitan Areas*, 25 J. URBAN AFFAIRS 4, 391-410 (2003). For a broader discussion of the many issues surrounding race discrimination and disparate impact claims brought under the Fair Housing Act against insurers, *see* Dana Kaersvang, *The Fair Housing Act and Disparate Impact in Homeowners Insurance*, 104 MICH. L. REV. 1993 (2006).

[4]    "Testers" are individuals who, without an intent to purchase homeowner's insurance, pose as potential purchasers for the purpose of collecting evidence of unlawful discrimination. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982). *See generally* Shanna Smith & Cathy Cloud, *Documenting Discrimination by Homeowners Insurance Companies Through Testing*, *in* INSURANCE REDLINING: DISINVESTMENT, REINVESTMENT, AND THE EVOLVING ROLE OF FINANCIAL INSTITUTIONS (Gregory Squires ed., Urban Institute Press 1997).

the availability and marketing of homeowner's insurance.  For example, NFHA was the plaintiff in *Prudential*, 208 F. Supp. 2d, and in *National Fair Housing Alliance et al. v. Travelers Insurance Company*, No. 1:00-cv-1506 (D.D.C. filed June 26, 2000).  NFHA was the lead complainant in *National Fair Housing Alliance v. State Farm Insurance Companies*, Case No. 05-94-1351-8 (HUD), and *National Fair Housing Alliance v. Allstate Insurance Company*, Case No. 03-94-0529-8 (HUD).  NFHA has filed amicus briefs in several insurance discrimination cases, including *United Farm Bureau Mutual Insurance Company v. Metropolitan Human Relations Comm'n*, 24 F.3d 1008 (7th Cir. 1994), and *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010).

At the same time, *amici* have actively used disparate impact analysis in fair housing enforcement in all aspects of the housing market.  In the 45 years since the Fair Housing Act was passed, and especially after the Fair Housing Act Amendments of 1988, the federal courts, the federal government, and fair housing plaintiffs have successfully enforced the Fair Housing Act on the basis of disparate impact principles.  Long before HUD formally promulgated its Disparate Impact regulation in 2013 – the subject of this Administrative Procedure Act ("APA") challenge – courts struck down facially neutral housing practices because they were based on no legitimate business justification, yet operated to deprive minorities, persons with disabilities, families with children, and other protected classes of the full range of housing products and services available to others.  *Amici* have participated extensively in these enforcement efforts through disparate impact claims and for forty years, every court of appeals to examine such claims has found them cognizable under the Fair Housing Act.[5]

---

[5]  *See Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49 (1st Cir. 2000); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934-35 (2d Cir. 1988), *aff'd in part*, 488 U.S. 15 (1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146-47 (3d Cir. 1977); *Smith v. Town of*

*Amici* respectfully submit that their unique experiences at the intersection of the homeowner's insurance industry and fair housing compliance based on disparate impact principles make their views particularly valuable to this Court. They file this brief in support of the Defendants' Motion to Dismiss or, In the Alternative, For Summary Judgment.

## II.    THIS CASE LACKS THE NECESSARY RIPENESS REQUIRED FOR REVIEW OF HUD'S DISPARATE IMPACT REGULATION, ESPECIALLY IN LIGHT OF THE McCARRAN-FERGUSON ACT.

The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" like the one at issue here. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967)) (evaluating pre-enforcement ripeness based on "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."). *See also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 463 (D.C. Cir. 2006) (applying same two part test).

Plaintiffs attempt to characterize their challenge to HUD's disparate impact regulation as a pure legal issue: whether disparate impact claims are cognizable under the Fair Housing Act. While "courts have occasionally dealt [with such situations] without requiring a specific attempt at enforcement or exhaustion of administrative remedies," such an approach may be "outweighed by other considerations" and not be ripe for review. *Toilet Goods Ass'n, Inc. v. Gardner*, 387

---

*Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 575 (6th Cir. 1986); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1288-89 (7th Cir. 1977); *United States v. City of Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir. 1974); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982); *Mountain Side Mobile Estates P'ship v. Sec'y of HUD*, 56 F.3d 1243, 1250-51 (10th Cir. 1995); *Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1543 (11th Cir. 1994).

U.S. 158, 162 (1967).  That is the situation here, and the complaint in this case should be dismissed because it is not ripe for resolution.

### A.  The Attack on the Disparate Impact Regulation Is Not Fit for Judicial Decision

The Complaint by the American Insurance Association ("AIA") and the National Association of Mutual Insurance Companies ("NAMIC") contains none of the necessary elements to put their claim in the factual context required for a broad declaratory judgment or injunction.  And factual context is key here, because no one can predict how the Disparate Impact Rule will be applied in the abstract. It is merely a method of proof, the application of which requires concrete facts.  Those facts are lacking here.  The Complaint alleges no factual circumstance in which the Disparate Impact Rule is alleged to be causing injury or threat of injury to Plaintiffs or their members.  There is no allegation that HUD is currently applying the Rule to any insurance company.  There is no allegation that HUD has initiated any enforcement action against any insurer based on the Disparate Impact Rule.  There is no allegation of what business practice is at risk of being subject to disparate impact analysis.  There is no allegation of which state's law is being impaired or violated by application of the Disparate Impact Rule.

HUD's Final Rule is consistent with the courts' refusal to dictate any exclusive test for establishing a discriminatory effect.[6]  HUD declined to codify "how data and statistics" should be used in the application of the disparate impact standard, because "[g]iven the numerous and varied practices and wide variety of private and governmental entities covered by the Act, it

---

[6]     *See, e.g.*, *Mount Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011), *cert. dismissed*, 134 S. Ct. 636 (2013) ("'[N]o single test controls in measuring disparate impact.'" (quoting *Hallmark Developers, Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006))).

would be impossible to specify in the rule the showing that would be required to demonstrate a discriminatory effect in each of these contexts."[7]

Moreover, Plaintiffs ignore the actual operation of the standard, which always allows a defendant an opportunity to prove that any discriminatory effect is justified by legitimate, non-discriminatory objectives, so long as there are no effective alternative practices that have less of a disparate impact. In rejecting a proposal that insurance practices be completely exempted, HUD explained that such an argument "[p]resumes that once a discriminatory effect is shown, the policy at issue is per se illegal. This is incorrect."[8] Precisely because the establishment of a prima facie case of disparate impact, by itself, is not enough to establish liability under the FHA, but instead simply triggers a more searching inquiry into a specific business practice, disparate impact liability cannot be determined in the abstract. More concrete facts are required than presented here.

Plaintiffs' claim here rests on the possibility that some state laws *might* conflict with the HUD rule and some of Plaintiffs' members *might* have to alter their practices. R.1, Complaint ("Compl.") ¶¶ 52, 59. Such a speculative claim, without any concrete action for a court to consider, is not fit for review. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. at 164 (holding a trade association's challenge on behalf of all its members was not ripe despite final agency action because "judicial appraisal . . . is likely to stand on much surer footing in the context of a specific application of this regulation."); *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421,

---

[7]    78 Fed. Reg. 11,460, 11,468 (Feb. 15, 2013).

[8]    *Id.* at 11,475; *see also id.* at 11,476 (disparate impact liability does not preclude a defendant from denying credit or any other housing-related product or service to unqualified individuals); *id.* at 11,478 (emphasizing that a showing of adverse impact in the lending context is only the beginning of a disparate impact analysis).

424 (D.C. Cir. 2007) (finding that the case was not ripe because it was unclear whether and when regulatory power would be used).

This is the exact problem the plaintiff insurer faced in *Nationwide Mutual Insurance Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995). Like the plaintiffs here,[9]  Nationwide challenged HUD's application of the disparate impact theory of liability to its underwriting and pricing practices.  But HUD argued that "any application of the disparate impact analysis would depend on the practices alleged to violate the Act and the business necessity put forth to justify them." *Id.* at 1362-63.  The court agreed with HUD and held that the challenge to HUD's application of disparate impact analysis to insurers was not ripe for adjudication.  *Id.*

The importance of a concrete factual context for examining HUD's Disparate Impact Rule is especially apparent in Plaintiffs' repeated assertion here that the Rule "flies in the face of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*,"  Compl. ¶ 5, and that "Congress . . . did not intend that the FHA be construed in a way that would invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance. 15 U.S.C. § 1012(b)."  Compl. ¶ 49 (internal quotation marks omitted).  Plaintiffs devote an entire section of their Motion for Summary Judgment to the argument that the McCarran-Ferguson Act protects insurers from disparate impact analysis.  R. 16-1, Plaintiffs' Motion for Summary Judgment ("MSJ") at 30-38.  But in light of the limited applicability of McCarran-Ferguson's special pre-emption provisions, which only concern insurance, Plaintiffs, who represent only the interests of insurance companies, cannot present the necessary "ripeness" for federal court review of HUD's Disparate Impact Rule.

---

[9]    Nationwide Mutual Insurance Company is a member of Plaintiff National Association of Mutual Insurance Companies.

The insurance pre-emption constraints of the McCarran-Ferguson Act are triggered only when a federal law is construed in a way that would "invalidate, impair, or supersede" a *specific state law* regulating the business of insurance.  *See Humana Inc. v. Forsyth*, 525 U.S. 299, 308-09 (1999) (rejecting a field pre-emption reading of the McCarran-Ferguson Act in favor of a detailed analysis of whether federal law conflicts directly or frustrates the purpose of a specific state law); *see also Dehoyos*, 345 F.3d at 294-95  (Fair Housing Act claim, noting that the *Humana* court's test requires analysis of "a *particular state law*" that regulates insurance) (emphasis added).  Such an analysis can only be conducted on a state-by-state basis, with a particular business practice identified, and a specific state law examined.  *See, e.g.*, *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 968 n.7 (8th Cir. 2008) (McCarran-Ferguson barred disparate impact challenge to specific insurance pricing practices under Missouri law, but did not necessarily bar other disparate impact claims under Missouri law); *Ojo*, 600 F.3d at 1204-05 (whether McCarran-Ferguson preempted insurance scoring discrimination claim could only be determined after Texas interpreted its own state law; question therefore certified to Texas Supreme Court). HUD's Disparate Impact Rule cannot be challenged, in the abstract, for all 50 states and all possible insurance company practices, as Plaintiffs would have the court do here, because there is not the necessary concreteness required for judicial review.

### B.   Withholding Consideration of This Case Will Not Cause Hardship to Plaintiffs

Plaintiffs also cannot meet the hardship prong of the ripeness doctrine in the circumstances of this case.  This is not a case like *Abbott Laboratories*, where the regulation at issue had a "direct effect on the day-to-day business" of the plaintiffs and drug manufacturers were facing immediate, uncontroverted, and costly criminal and civil penalties from a regulation. 387 U.S. at 152-53.  Moreover, Plaintiffs are not "required to engage in, or to refrain from, any

conduct," *Atl. States Legal Found. v. E.P.A.*, 325 F.3d 281, 285 (D.C. Cir. 2003) (quoting *Texas v. United States,* 523 U.S. 296, 300 (1998)), nor do they allege that they would suffer any hardship were the court to hold its petition in abeyance.  *Devia*, 492 F.3d at 427.

Rather, this is a situation in which (1) HUD has interpreted the Fair Housing Act as prohibiting discriminatory practices relating to property and hazard insurance for 35 years *prior to* promulgating of the Disparate Impact Rule, and (2) eleven circuit courts of appeals have unanimously recognized  disparate impact claims in Fair Housing Act cases over the course of 40 years. *See* discussion *infra* at 23-24.  There is no imminent threat of "hardship" when HUD has merely adopted a method of proof for disparate impact claims to which insurers have already been subject for decades.  Given this background, "no irremediable adverse consequences flow from requiring a later challenge to this regulation."  *Toilet Goods Ass'n, Inc.*, 387 U.S. at 164.

III.    **HUD'S DISPARATE IMPACT RULE IS NOT A SUBSTANTIVE PROHIBITION OF ANY SPECIFIC INSURANCE CONDUCT, BUT IS MERELY A METHOD OF PROVING A DISPARATE IMPACT CLAIM. ACCORDINGLY, IT DOES NOT CONSTITUTE "FINAL AGENCY ACTION" WITHIN THE MEANING OF THE APA.**

Before agency action will be considered "final" for purposes of judicial review, the action must be one by which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  A substantive rule – *i.e.*, a rule that creates legal obligations – constitutes final agency action. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1285-86 (D.C. Cir. 2005).

But HUD's Disparate Impact Rule is not final agency action under the APA because it does not determine rights or obligations and no "legal consequences" flow from it.  It does not regulate any specific conduct.  It does not compel an insurer or housing provider to adopt any specific rule, practice, or procedure.  It does not prohibit an insurer or housing provider from

10

adopting any specific rule, practice, or procedure. *See Peoples Nat'l Bank v. Office of the*

*Comptroller of the Currency of the U.S.*, 362 F.3d 333, 337 (5th Cir. 2004) ("[A] non-final

agency order is one that does not of itself adversely affect complainant but only affects his rights

adversely on the contingency of future administrative action.") (internal quotation marks

omitted).

       Instead, the Disparate Impact Rule articulates a method of proving a disparate impact

claim by which liability under the Fair Housing Act may be established – depending on the facts.

Federal courts have consistently regarded disparate impact analysis as merely one of several

possible methods by which discrimination may be proved.  The precedent on disparate impact as

a method of proof comes from a range of civil rights laws including Title VII of the Civil Rights

Act of 1964, the Americans with Disabilities Act ("ADA"), and the Age Discrimination in

Employment Act ("ADEA").  *See, e.g.*, *Connecticut v. Teal*, 457 U.S. 440, 458-59 (1982)

(Powell, J., dissenting) ("Title VII jurisprudence has recognized two distinct methods of proof.");

*Moore v. Hughes Helicopters, Inc., a Div. of Summa Corp.*, 708 F.2d 475, 482 (9th Cir. 1983)

(analyzing Title VII claim "under the disparate impact method of proof"); *Wis. Cmty. Servs., Inc.*

*v. City of Milwaukee*, 465 F.3d 737, 753 n.14 (7th Cir. 2006) ("We understand the City to be

using 'disparate impact' to signify the method of proof under [ADA] anti-discrimination laws.");

*Breen v. Peters*, 474 F. Supp. 2d 1, 4 (D.D.C. 2007) ("Plaintiffs plead both disparate treatment

and disparate impact as alternative methods to prove their age discrimination claim.").  In these

cases, disparate impact is seen as a separate path by which to prove discrimination against

protected classes and to "remove barriers" that prevent equal opportunity.  *See Griggs v. Duke*

*Power Co.*, 401 U.S. 424, 430-31 (1971) (employing disparate impact theory to Title VII).

11

HUD regards disparate impact in the same manner here. It unambiguously regards its Disparate Impact Rule as a method of proving a disparate impact violation of the FHA. *See* 24 C.F.R. § 100.500 ("*Liability may be established* under the Fair Housing Act based on a practice's discriminatory effect . . . .") (emphasis added). The Executive Summary accompanying the rule makes this clear: "This rule . . . establish[es] a consistent *standard for assessing claims* that a facially neutral practice violates the Fair Housing Act . . . ." 78 Fed. Reg. 11,460 (Feb. 15, 2013) (emphasis added). *See also id.* ("This rule formally establishes the *three-part burden-shifting test* for determining when a practice . . . violates the Fair Housing Act.") (emphasis added).

Because the Disparate Impact Rule is nothing more than a procedural method for assessing liability under the Act, there has been no final agency action for purposes of judicial review under the APA. The relief Plaintiffs seek – a declaratory judgment and an injunction – will not affect Plaintiffs or their members or the way they conduct business. Plaintiffs are really asking for an advisory opinion as to how HUD may weigh or assess evidence during an administrative investigation. This is not sufficient to invoke the Court's jurisdiction for judicial review.

## IV.    BECAUSE THE McCARRAN-FERGUSON ACT APPLIES ONLY IN SPECIAL CIRCUMSTANCES, THE COMPLAINT DOES NOT ALLEGE FACTS SUFFICIENT TO COMPLY WITH FED. R. CIV. P. 8(a).

The Complaint contains many dire assertions about how the Disparate Impact Rule will "impair state laws that prohibit discrimination," will "violat[e] principles of sound actuarial practice," and will "create . . . significant burdens" on its members who will have to comply with it. Compl. ¶¶ 50-64.

These allegations do not contain the necessary factual concreteness to satisfy the requirements of Rule 8(a). They are merely speculations and are not "provable" in the abstract, without some concrete factual context in which the Disparate Impact Rule is being applied.

To adequately state a claim for relief, a complaint "requires more than labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Factual allegations must be substantial enough to raise a right to relief above the speculative level, *id.*, and Rule 8 requires a complaint with enough factual matter (taken as true) to suggest that a violation of law has occurred, or is about to occur. *Id.*; *see also Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012) (dismissing complaint as "much too vague" on who was harmed and how to suggest a plausible scenario for relief). It is not enough that a plaintiff might later establish some "set of [undisclosed] facts" to support its claim. *Twombly*, 550 U.S. at 561.

"Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. *See In Re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 221 (D.C. Cir. 2010) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.") (quoting *Iqbal*, 556 U.S. at 678). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

Courts have rejected assertions made by other insurers that are similar to the allegations in this complaint as overly "sweeping," *Prudential*, 208 F. Supp. 2d at 60, and even "fanciful." *Dehoyos*, 345 F.3d at 297 n.5.

> Essentially, [Prudential's] argument turns on the purportedly unique nature of the
> insurance industry, which must "discriminate" based on an assessment of risk.

> However, this argument is unavailing in light of the availability of the "business justification" defense. Plaintiffs do not challenge Prudential's right to evaluate homeowners' insurance risks fairly and objectively. Rather, plaintiffs allege that the underwriting policies and practices employed by Prudential are *not* purely risk-based. Furthermore, defendants cannot point to anything in the FHA itself that would justify this Court in carving out an exception for a particular type of organization.

*Prudential*, 208 F. Supp. 2d at 60.  The Fifth Circuit similarly observed that the insurance industry's "ominous" description of how disparate impact will force federal courts to act as "super actuaries" by substituting their judgment for the judgment of each of the 50 states "although colorful, is incorrect."  *DeHoyos*, 345 F.3d at 297 n.5.  This is because courts are regularly called upon to evaluate whether a practice with a disparate impact is nevertheless justified by a business necessity.  "[Allstate's] attempt to distinguish the business of insurance from other businesses is unpersuasive."  *Id.*  Moreover, supposed conflicts between disparate impact theory and state insurance laws "are entirely conjectural."  *Id*. at 299, n.7.[10]

The Seventh Circuit made the same observations in *NAACP v. American Family*. Insurers are no different from lenders when it comes to risk assessment.  Like insurers, lenders must evaluate risks, such as whether to extend credit in the first instance, and if so at what rate of interest.  *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992).  The Fair Housing Act indisputably applies to lenders, so "it is difficult to see risk classification as a principled ground to exclude insurers" from disparate impact analysis.  *Id.* [11]

---

[10]     *See also Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1220-23 (11th Cir. 2001) ("Liberty National argues that racial discrimination is acceptable in the Alabama . . . insurance context so long as those racial distinctions have an actuarial basis . . . .  Absent more convincing evidence that racial discrimination in the insurance context is an integral part of Alabama's regulatory scheme, Liberty National's argument must fail.").

[11]     American Family Mutual Insurance Company is also a member of Plaintiff National Association of Mutual Insurance Companies. *See supra* n.7.

Plaintiffs' allegations about the ominous ramifications of HUD's Disparate Impact Rule do not contain the factual concreteness necessary to satisfy the requirements of Rule 8, in light of *Iqbal* and *Twombly* and McCarran-Ferguson.  On this ground alone, then, the Complaint must be dismissed for failure to state a claim.

## V.    THE McCARRAN-FERGUSON ACT IS NOT AN AUTOMATIC BAR TO APPLICATION OF DISPARATE IMPACT TO INSURERS.

As noted previously, in order to be ripe for review, a complaint raising the limited application of the McCarran-Ferguson Act, and its special reverse-preemption provisions for the business of insurance, requires a certain level of specificity and concreteness that is lacking in this complaint filed by insurance trade industry representatives.  Nevertheless, Plaintiffs argue that the McCarran-Ferguson Act presents an absolute bar to *any* disparate impact enforcement against insurers, under *any* circumstances.  MSJ at 30-38; Compl. at ¶¶ 65-73.

This argument must fail, as it has failed in the past.

### A.  The Fair Housing Act Has Been Enforced Against Homeowner's Insurers for Decades.

Since the Fair Housing Act was amended in 1988, every court to consider the issue has held that the Fair Housing Act prohibits acts of discrimination by homeowner's insurers. *See, e.g.*, *Ojo*, 600 F.3d at 1208 (9th Cir. 2010); *Nationwide*, 52 F.3d at 1360; *United Farm Bureau*, 24 F.3d at 1016; *American Family*, 978 F.2d at 301; *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868 Ma/V., 2007 WL 6996777, at *2 (W.D. Tenn. July 6. 2007);  *Nevels v. W. World Ins. Co.*, 359 F. Supp. 2d 1110, 1117-1122 (W.D. Wash. 2004); *Prudential*, 208 F. Supp. 2d at 55-59; *Lindsey v.*

*Allstate Ins. Co.*, 34 F. Supp. 2d 636, 641-43 (W.D. Tenn. 1999);  *Strange v. Nationwide Mut. Ins. Co.*, 867 F. Supp. 1209, 1212, 1213-15 (E.D. Pa. 1994).[12]

Most of these decisions have gone no further than the language of section 3604(a), which makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a dwelling to any person because of race. . . ."  42 U.S.C. § 3604(a) (emphasis added).  This is due, in part, to the link between the ability to obtain insurance and the ability to obtain housing – adequate insurance is necessary to the ownership or rental of housing.  *Nationwide*, 52 F.3d at 1360 ("[T]he availability of property insurance has a direct and immediate effect on a person's ability to obtain housing.");  *Nevels*, 359 F. Supp. 2d at 1119 ("Plaintiffs . . . , without liability insurance, face significant financial risk, and their ability to provide housing for disabled individuals is threatened.").[13]

Section 3604(b) has also been interpreted to prohibit homeowner's insurance discrimination.  This provision makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, *or in the provision of services or facilities in connection therewith,* because of race . . . ."  42 U.S.C. § 3604(b) (emphasis added).

---

[12]    Even before the Fair Housing Amendments Act of 1988, federal district courts had so held.  *See, e.g.*, *McDiarmid v. Econ. Fire & Cas. Co.*, 604 F. Supp. 105, 107 (S.D. Ohio 1984); *Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.*, 472 F. Supp. 1106, 1109 (S.D. Ohio 1979).

[13]    *See also American Family*, 978 F.2d at 297-98, 300 ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable.");  *United Farm Bureau*, 24 F.3d at 1014 n.8 ("This undoubtedly could make owning and retaining real property unavailable . . . .");  *Lindsey*, 34 F. Supp. 2d at 641-43 (FHA prohibits discriminatory refusal to underwrite homeowner's insurance); *United States v. Mass. Indus. Fin. Agency*, 910 F. Supp. 21, 27 (D. Mass. 1996) ("Few, if any, banks make home loans to uninsured borrowers.  Thus, property insurers in effect have the power to make housing unavailable to potential buyers.");  *Strange*, 867 F. Supp. at 1214.

As the 1989 HUD regulations state, this provision makes illegal the act of "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such services or insurance differently because of race. . . ." 24 C.F.R. § 100.70(d)(4). The Sixth, Seventh, and Ninth Circuits and several lower courts have all determined that homeowner's insurance is clearly and simply a "service" rendered "in connection" with the sale or rental of a dwelling. *See, e.g.*, *Ojo*, 600 F.3d at 1208; *American Family*, 978 F.2d at 298; *Lindsey*, 34 F. Supp. 2d at 642-43 (claims of discrimination by insurers in setting premiums and failing to renew policies are also covered by the Fair Housing Act, even though they do not directly affect the "availability" of housing).

The 1988 amendments to the Act also substantially rewrote 42 U.S.C. § 3605 so that it, too, includes homeowner's insurance transactions. Prior to 1988, § 3605 prohibited discrimination in mortgage "loan transactions," even those engaged in by insurers. When Congress passed the Fair Housing Amendments Act of 1988, it completely rewrote § 3605 so that it is no longer limited only to loan transactions. That section now makes it unlawful to make unavailable, or to discriminate in the terms or conditions of, a "*residential real estate-related transaction*," which includes "the making or purchasing of loans or *providing other financial assistance for . . . purchasing, constructing, improving, repairing, or maintaining a dwelling*." *Id*. (emphasis added). The new definition[14] makes clear that Congress intended to prohibit discrimination in transactions, like insurance, that provide financial assistance for "repairing" or "maintaining" a dwelling. Under the plain language of the current version of § 3605,

---

[14]     Under the new § 3605, it is unlawful for a defendant to not "mak[e] available" a residential real estate related transaction because of race or any other prohibited basis. 42 U.S.C. § 3605(a). There is no implication of intent or motive in this phrase. A housing transaction can be "made unavailable" to an individual by operation of facially neutral rules just as much as by operation of rules that express their discriminatory intent. Clearly the language Congress used in the new § 3605 could encompass practices with a disparate impact.

homeowner's insurance constitutes "financial assistance" for one or more of the purposes listed in the statute.  Accordingly, several courts have held that homeowner's insurance falls within the scope of § 3605's protections because it "provides the financial assistance necessary" to maintain, repair, or construct a dwelling.  *Prudential,* 208 F. Supp. 2d at 58; *Nevels*, 359 F. Supp. 2d at 1121-22.  As this court noted in *Prudential*:

> It is undisputed that individuals are often unable to purchase or to maintain financing for homes without homeowners insurance. Without property insurance, most homeowners are unable to repair their homes when and if disaster should strike. For these reasons, insurance provides the financial assistance necessary to maintain a dwelling. As such, it is reasonable to conclude the Congress intended that homeowners insurance fall within the scope of section 3605's protections.

208 F. Supp. 2d at 58.  This is also HUD's view of § 3605.[15]

## B. The McCarran-Ferguson Act Is Not An Automatic Bar to Disparate Impact Fair Housing Act Enforcement Against Insurers.

Most courts have concluded that the McCarran-Ferguson Act does *not* preclude Fair Housing Act claims from going forward against insurers on the ground that no state insurance law would have been "invalidated, impaired, or superseded" by a finding of liability under the Fair Housing Act.  *Nationwide,* 52 F.3d at 1363 (Ohio); *United Farm Bureau,* 24 F.3d at 1016 (Indiana); *American Family*, 978 F.2d at 296 (Wisconsin); *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 421 (4th Cir. 1984) (North Carolina).  *Accord*, *Moore,* 267 F.3d at 1220-23 (Alabama insurance law would not be impaired if insurance discrimination claims under § 1981 and § 1982 were successful).  This is so even if the claims against an insurance company are based on a

---

[15]    *See* Letter from Elizabeth K. Julian, HUD Acting Ass't Secretary for Policy and Initiatives, to Richard D. Rogers, Deputy Director, Illinois Dep't of Insurance (Jan. 26, 1996) ("Julian 1/26/96 Letter") (attached hereto as Exh. A).

disparate impact theory of liability.  *Dehoyos*, 345 F.3d at 298-99  (Florida and Texas);

*Prudential*, 208 F. Supp. 2d (Ohio); *Lumpkin* 2007 WL 6996777, at *2 (Tennessee).[16]

These decisions collectively stand for the proposition that McCarran-Ferguson is not, as Plaintiffs allege, an automatic and nationwide bar to disparate impact Fair Housing Act enforcement.  If McCarran-Ferguson does not prohibit the courts from enforcing the Fair Housing Act in these litigation settings, then neither does it prohibit HUD from using the Disparate Impact Rule method of proof in the administrative setting.

McCarran-Ferguson may occasionally reverse preempt fair housing claims, but only in those situations where the specific insurance practice being challenged is permitted by state law. *See, e.g.*, *Ojo v. Farmers Grp., Inc*., 356 S.W.3d 421, 434 (Tex. 2011) (Texas law permits race-neutral credit scoring that has a racially disparate impact, and permitting a challenge to such a practice "would frustrate the regulatory policy of Texas."); *Saunders*, 537 F.3d at 968 (Missouri's law would be "frustrated and interfered with" if a plaintiff could challenge insurance prices under the FHA).

Moreover, Plaintiffs undercut their own argument by alleging (Compl. ¶¶ 24-26) that state laws and codes often do in fact prohibit insurers from "treating similar risks differently" and from differentiating among individuals or risks "because of . . . race, color, religion, or national origin."  Such prohibitions are entirely consistent with the Fair Housing Act, and so would not be "invalidated, impaired or superseded" by HUD's enforcement of the Act in states with such prohibitions.  McCarran-Ferguson would not be triggered in those states.

---

[16]    According to at least one state court, "the disparate-impact approach does not unduly undermine the business of selling insurance [and] does not conflict with Ohio insurance law." *Toledo Fair Hous. Ctr.*, 704 N.E.2d at 670-71.  Similar holdings in other states would also bar this court from issuing the relief Plaintiffs seek here.

In short, in the absence of knowing what specific underwriting practice is being challenged, and, without knowing which state law might preempt application of disparate impact analysis, it is impossible to grant the relief Plaintiffs seek.

The Supreme Court has repeatedly interpreted the McCarran-Ferguson Act in the context of an act of Congress being applied *in a specific state* and in relation to *a specific insurance business practice. See e.g.*, *Humana*, 525 U.S. at 303 (considering federal RICO charges in light of Nevada state policy on insurance fraud); *Barnett Bank of Marion Cnty. v. Nelson*, 517 U.S. 25 (1996) (interpreting federal statute on national bank's sale of insurance in the context of Florida state law prohibiting banks from selling most types of insurance); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880-81 (1985) (examining whether McCarran-Ferguson protected Alabama preferential insurance tax statute).  We have not located any Supreme Court decision, or that of any other federal court, interpreting the McCarran-Ferguson Act to invalidate a federal act or administrative rule in all 50 states.  Yet that is what Plaintiffs seek in this action for declaratory and injunctive relief.

Finally, Plaintiffs completely overlook a key component of the disparate impact analysis – the "business justification" component – which HUD has embraced in its Disparate Impact Rule.  Specifically, a business practice that has a disparate impact on a protected group is nevertheless legal under the FHA if it "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  24 C.F.R. § 100.500(b).  "Not every housing practice that has a disparate impact is illegal. We use [the disparate impact framework] to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests."  *Graoch Assoc. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 374-5 (6th Cir. 2007).

HUD has stated that "nothing in the [FHA] requires or encourages any practice that is inconsistent with sound actuarial and underwriting principles . . . ." Julian 1/26/96 Letter, *supra*, n.15. But "when distinctions are drawn on the basis of subjective perception, inaccurate stereotypes, or overt prejudice then such practices do violate the Act." *Id. See also Prudential*, 208 F. Supp. 2d at 60 (insurers' ability to assess risk on legitimate grounds is preserved in light of the "business justification" element of disparate impact analysis) (internal quotation marks omitted).

Disparate impact is not a "gotcha" standard of liability intended to trap unwitting defendants; nor does it require quotas or set-asides. When a defendant, using evidence that is neither hypothetical nor speculative, can establish a legitimate, non-discriminatory justification for a practice that may have a discriminatory effect, that defendant can prevail unless the plaintiff then demonstrates the existence of a less discriminatory alternative practice that achieves the same objective. If, as Plaintiffs contend, any of their challenged insurance practices are based on legitimate risk-based underwriting or pricing, then they will suffer no liability under the FHA.

### C. Insurance "Risk Analysis" Is Not Inconsistent With HUD's Disparate Impact Rule. HUD Has Applied Disparate Impact to Insurers for Decades, and All Federal Administrative Agencies With FHA Enforcement Authority Have Adopted and Applied Disparate Impact Principles to Risk Analysis.

Plaintiffs contend that when HUD promulgated its Disparate Impact Rule after the required notice and comment period, it "offered only cursory responses" to Plaintiffs' objections to the draft rule, MSJ at 7, and ignored Plaintiffs' ardent contention that disparate impact analysis is "fundamentally inconsistent" with risk-based analysis, the cornerstone of insurance. MSJ at 5.

Contrary to Plaintiffs' suggestion, HUD considered many competing views in the notice-and-comment process, making changes to the November 16, 2011 proposed rule in response to

many comments.[17]  The resulting Rule represents the agency's carefully considered and

authoritative interpretation of the scope of the statute it is charged with enforcing, and it

establishes a practical analytical framework for evaluating disparate impact claims.

Moreover, HUD has significant prior experience in applying the Fair Housing Act to a

wide range of housing contexts, including insurance.  As the Court noted in *Nationwide,* 52 F.3d

at 1354: HUD "has interpreted the Fair Housing Act as prohibiting discriminatory practices

relating to property and hazard insurance . . . since at least 1978."  Furthermore, in 1988, the Fair

Housing Act was amended to authorize HUD to issue rules to implement the Act.  42 U.S.C. §

3614a.  At that time, HUD issued a regulation reflecting its interpretation of the Act and its

application to insurance companies.[18]  This informal agency interpretation, even if not

formalized into a statutorily authorized regulation, is entitled to substantial deference by the

courts.  *See Meyer v. Holley*, 537 U.S. 280, 287 (2003) (HUD is "the federal agency primarily

---

[17]     *See* 78 Fed. Reg. 11,460, at 11,460 ("This final rule follows a November 16, 2011, proposed rule and takes into consideration comments received on that proposed rule."); *id.* at 11,463 (summarizing changes from the proposed rule); *id.* at 11,475 (addressing why policies with a disparate impact are legal if supported by a legally sufficient business justification, and why an exemption for insurance practices would be contrary to Congressional intent).  Indeed, many commenters took positions opposite to Plaintiffs, and specifically addressed how the proposed Disparate Impact Rule should apply in cases against insurance companies.  *See, e.g.*, Shanna Smith, *Comments of National Fair Housing Alliance and Other Civil Rights Organizations Regarding Docket No. FR-5508-P-01, Implementation of the Fair Housing Act's Discriminatory Effect Standard* (2012), http://www.regulations.gov/#!documentDetail;D=HUD-2011-0138-0076 (discussing less discriminatory alternative in the context of insurance litigation); Barbara Arwine, *Comments of Lawyers' Committee for Civil Rights Under Law Regarding Docket No. FR-5508-P-01, Implementation of the Fair Housing Act's Discriminatory Effect Standard* (2012), http://www.regulations.gov/#!documentDetail;D=HUD-2011-0138-0075 (highlighting usefulness of disparate impact analysis in "a wide variety of homeowners insurance cases" and citing specific examples of objectionable insurance practices).

[18]     *See also* Julian 1/26/96 Letter (attached hereto as Exh. A); Letter from Henry Cisneros, HUD Secretary, to Sen. Christopher S. Bond, U.S. Senate (June 27, 1996) (attached hereto as Exh. B).

charged with the implementation and administration of the [Fair Housing Act]" and the Court "ordinarily defer[s] to an administrating agency's reasonable interpretation of a statute."); *Putnam Family Partnership v. City of Yucaipa, Cal.*, 673 F.3d 920, 928 (9th Cir. 2012) ("We routinely defer to HUD's reasonable interpretation of the FHA.") (internal quotation marks omitted).

Furthermore, when HUD proposed the Disparate Impact Rule, it explicitly found that the disparate impact standard of proof was already "well established," noting that starting almost forty years ago, all eleven courts of appeals that have addressed the issue have adopted the standard, 76 Fed. Reg. 70,921, 70,923, n.16 (Nov. 16, 2011), and that the standard had been applied uniformly by HUD in its administrative enforcement of the Fair Housing Amendments Act of 1988 starting over twenty years ago. *Id.* at 70,922, n.11. Thus, HUD's Disparate Impact Rule is merely a formal adoption of the courts' and HUD's own long-held interpretation of the Fair Housing Act.

HUD is not the only federal regulatory agency to adopt and apply the disparate impact standard of liability to financial institutions that regularly assess financial risk. Other federal agencies charged with implementing and administering the FHA have embraced the use of disparate impact analysis. Since at least 1994, all five federal financial regulatory agencies have used disparate impact analysis to assess liability under the various federal anti-discrimination laws they enforce, including the Fair Housing Act. *See, e.g.*, Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending,* 59 Fed. Reg. 18,266 (Apr. 15, 1994) (online at www.occ.treas.gov/news-issuances/federal-register/94fr9214.pdf). *See also Interagency Fair Lending Examination Procedures*, at Appendix 26-28 (online at http://www.federalreserve.gov/boarddocs/caletters/2009/0906/09-06_attachment.pdf).

Indeed, the disparate impact doctrine has been an integral part of Regulation B, which prohibits discrimination in underwriting and pricing in *lending* transactions, since it was promulgated in 1985.  12 C.F.R. § 202.6, n.2.  Plaintiffs' assertion that application of disparate impact to insurance risk assessment would require an insurer to "disregard legitimate risk-related factors" and would be "wholly inconsistent with well-established principles of actuarial practice" (Compl. ¶ 5) is therefore patently false.

HUD itself runs an extensive insurance program.  The National Housing Act of 1934 created the Federal Housing Administration to provide mortgage insurance on loans made by Federal Housing Administration-approved lenders throughout the United States and its territories.  The Federal Housing Administration insures mortgages on single family and multifamily homes including manufactured homes and hospitals.  It is the largest insurer of mortgages in the world, insuring over 34 million properties since its inception in 1934.[19]  To suggest that HUD does not understand principles of insurance, or the analysis of insurance risk, is utterly disingenuous.

As a matter of public policy, open markets that are free of discrimination are critical to maintaining a healthy, robust real estate industry.  Conversely, markets tainted by discrimination are inefficient and adversely affect all market participants.  For more than 50 years, economists have studied the negative impacts of discrimination on free markets.  Alan Greenspan, while Chairman of the Federal Reserve, observed that discrimination is bad for business:

> Discrimination is against the interests of business — yet business people too often practice it.  To the extent that market participants discriminate, they erect barriers to the free flow of capital and labor to their most profitable employment, and the distribution of output is distorted.  In the end, costs are higher, less real output is

---

[19]    THE FEDERAL HOUSING ADMINISTRATION, http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/fhahistory (last visited Feb. 10, 2014).

produced, and national wealth accumulation is slowed.  By removing the non-economic distortions that arise as a result of discrimination, we can generate higher returns to both human and physical capital.

Alan Greenspan, Economic Challenges in the New Century, Remarks Before the Annual Conference of the National Community Reinvestment Coalition (Mar. 22, 2000) (online at http://www.federalreserve.gov/boarddocs/speeches/2000/20000322.htm).

Plaintiffs' members have been operating profitably for decades in a world where every circuit court that has addressed the issue, as well as HUD, has found that disparate impact liability exists under the FHA – without the calamitous results predicted by Plaintiffs.  The McCarran-Ferguson Act, therefore, is not an automatic bar to application of disparate impact to homeowner's insurers.

## VI.    CONCLUSION

For the above reasons, the Court should grant the government's motion and dismiss Plaintiffs' complaint in its entirety.

Respectfully Submitted,


*/s/ Stephen M. Dane*
Stephen M. Dane
Glenn Schlactus
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
Telephone: (202) 728-1888
Fax: (202) 728-0848

*/s/ Joseph D. Rich*
Joseph D. Rich
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1401 New York Avenue, N.W., Suite 400
Washington, D.C. 20005
Telephone: (202) 662-8600
Fax: (202) 783-5113

Attorneys for *Amici Curiae*
The National Fair Housing Alliance,
Lawyers' Committee for Civil Rights Under Law
National Low Income Housing Coalition
Poverty & Race Research Action Council
National Housing Law Project
LatinoJustice PRLDEF