# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN INSURANCE ASSOCIATION and NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,<br><br>　　　Plaintiffs,<br><br>　　　　　v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development,<br><br>　　　Defendants. | Civil Action No. 13-cv-966 (RJL) |

---

### *AMICUS CURIAE* BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| Rachel L. Brand<br>Tyler R. Green<br>NATIONAL CHAMBER LITIGATION CENTER<br>1615 H Street, N.W.<br>Washington, D.C. 20062<br>(202) 463-5337 | Carter G. Phillips (D.C. Bar No. 26176)<br>Brian P. Morrissey (D.C. Bar No. 989371)<br>Jeremy M. Bylund (D.C. Bar No. 1015198)<br>SIDLEY AUSTIN LLP<br>1501 K Street, N.W.<br>Washington, D.C. 20005<br>Telephone: 202-736-8000<br>Facsimile: 202-736-8711 |
| Dated: February 24, 2014 | *Counsel for Amicus Curiae Chamber of Commerce of the United States* |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTEREST OF *AMICUS CURIAE* .......................................................................................1

STATUTORY AND REGULATORY BACKGROUND ............................................................2

SUMMARY OF ARGUMENT ................................................................................................2

ARGUMENT .............................................................................................................................4

I.      THE FHA DOES NOT PERMIT DISPARATE-IMPACT CLAIMS ................................5

        A.      The FHA's Text, Structure, And History Demonstrate That It Prohibits Only
                Purposeful Discrimination ...........................................................................5

        B.      The FHA Does Not Impose Disparate Impact Liability .........................................6

II.     HUD'S DISPARATE-IMPACT RULE CONFLICTS WITH FEDERAL LENDING
        STANDARDS................................................................................................................10

III.    HUD'S DISPARATE-IMPACT RULE ADOPTS A BURDEN-SHIFTING TEST THAT
        CONFLICTS WITH SUPREME COURT PRECEDENT AND EXPOSES LENDERS
        TO UNDUE LITIGATION RISKS ...............................................................................16

CONCLUSION.........................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*2922 Sherman Ave. Tenants Ass'n v. Dist. of Columbia,*
  444 F.3d 673 (D.C. Cir. 2006) ...................................................................................10

*Freeman v. Quicken Loans, Inc.,*
  132 S. Ct. 2034 (2012) ..........................................................................................6, 8

*Gaona v. Town & Country Credit,*
  324 F.3d 1050 (8th Cir. 2003) ....................................................................................7

*Gallagher v. Magner,*
  619 F.3d 823 (8th Cir. 2010), *petition dismissed*, 80 U.S.L.W. 3465 (U.S. Feb. 14,
  2012) (No. 10-1032) ................................................................................................13

*Garcia v. Johanns,*
  444 F.3d 625 (D.C. Cir. 2006) ....................................................................................8

*Gen. Dynamics Land Sys., Inc. v. Cline,*
  540 U.S. 581 (2004).....................................................................................................6

*Hazelwood Sch. Dist. v. United States,*
  433 U.S. 299 (1977)...................................................................................................17

*Jackson v. Birmingham Bd. of Educ.,*
  544 U.S. 167 (2005).....................................................................................................9

*Lindh v. Murphy,*
  521 U.S. 320 (1997)...................................................................................................10

*Mackey v. Nationwide Ins. Cos.,*
  724 F.2d 419 (4th Cir. 1984) ......................................................................................7

*Meacham* v. *Knolls Atomic Power Lab.,*
  554 U.S. 84 (2008).....................................................................................................19

*Mount Holly Gardens Citizens In Action v. Twp. of Mount Holly,*
  658 F.3d 375 (3d Cir. 2011), *petition dismissed*, 82 U.S.L.W. 3287 (U.S. Nov. 15,
  2013) (No. 11-1507) ................................................................................................13

*Nationwide Mut. Ins. Co. v. Cisneros,*
  52 F.3d 1351 (6th Cir. 1995) ......................................................................................7

*Authorities chiefly relied upon are marked with asterisks

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
132 S. Ct. 2065 (2012) ......................................................................................7

*Ricci v. DeStefano*,
557 U.S. 557 (2009) ...............................................................................16, 20

*Smith v. City of Jackson*,
544 U.S. 228 (2005) ...........................................................................4, 6, 9, 18

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
133 S. Ct. 2517 (2013) ....................................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ....................................................................................16

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e-
2(k), *as recognized in Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.
2541 (2011) ............................................................................4, 17, 18, 19, 20, 21

*Watson v. Fort Worth Bank & Trust*,
487 U.S. 977 (1988) ........................................................................................16

## STATUTES AND REGULATIONS

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 ...................................18

5 U.S.C. § 706(2) .........................................................................................................2

15 U.S.C. §1607(a)(6) ................................................................................................12

15 U.S.C. § 1639b .....................................................................................................12

15 U.S.C. § 1639c ..................................................................................................3, 11

15 U.S.C. § 1640(a) ..................................................................................................12

*15 U.S.C. § 1691 et seq.* ...........................................................................................7

15 U.S.C. § 1691(a) ....................................................................................................7

29 U.S.C. § 623(a) ..........................................................................................2, 6, 9, 10

42 U.S.C. § 2000e-2(a) ...................................................................................6, 9, 10

42 U.S.C. § 3601 *et seq.* ...........................................................................................1

*42 U.S.C. § 3604(a) .................................................................................5, 6, 7, 8, 9

iii

42 U.S.C. § 3604(c)-(e) .................................................................................................5

*42 U.S.C. § 3605 .............................................................................................3, 5, 6, 8

42 U.S.C. 3606 ...............................................................................................................5

*12 C.F.R. § 1026.43 ....................................................................................................12

*24 C.F.R. § 100.500 .....................................................................................13, 19, 20

38 C.F.R. § 36.4340 .....................................................................................................11

*Ability-to-Repy and Qualified Mortgage Standards under the Truth in Lending Act
    (Regulation Z), 78 Fed. Reg. 6408 (Jan. 30, 2013) ......................................3, 11, 12

*Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed.
    Reg. 11,460 (Feb. 15, 2013) ..............................................2, 7, 9, 15, 16, 18, 20

FHA Risk Management Initiatives: New Manual Underwriting Requirements, 78 Fed.
    Reg. 75,238 (Dec. 11, 2013) ...........................................................................11

OTHER AUTHORITIES

Ltr. from Am. Banker's Ass'n et al. to Hon. Shaun Donovan, Secretary, HUD et al.,
    Request for Guidance and Clarity on Disparate Impact and Dodd-Frank Mortgage
    Standards (June 4, 2013), http://fsroundtable.org/joint-letter-hud-requesting-
    guidance-clarity-disparate-impact-dodd-frank-mortgage-standards/. ....................................14

Press Release, CFPB, CFPB Bulletin 2012-04, Lending Discrimination (Apr. 18, 2012),
    http://files.consumerfinance.gov/f/201404_cfpb_bulletin_lending_discrimination.pdf. ....8, 15

Press Release, Fed. Hous. Fin. Agency, FHFA Limiting Fannie Mae and Freddie Mac
    Loan Purchases to "Qualified Mortgages" (May 6, 2013),
    http://www.fhfa.gov/webfiles/25163/QMFINALrelease050613.pdf. ..............................11, 14

Press Release, U.S. Dep't of Hous. & Urban Dev., HUD to Investigate Allegations that
    22 Banks and Mortgage Lenders Discriminate against African American and Latino
    Loan Seekers (Dec. 8, 2010),
    http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/20
    10/HUDNo.10-266 ......................................................................................................15

Webster's Second New International Dictionary (1959) ................................................9

Webster's Third New International Dictionary (1963) ..................................................9

## INTEREST OF *AMICUS CURIAE*

This case presents questions of exceptional importance to businesses in financial-services industries that will significantly affect numerous members of the Chamber of Commerce of the United States of America (the "Chamber"). The Chamber is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases that raise issues of concern to the nation's business community.

The Chamber, on behalf of its members, has a substantial interest in the outcome of this case.[1] The Chamber and its members are strongly committed to the eradication of discrimination from the marketplace, and to ensuring that financial services are provided to all consumers in a fair and even-handed manner. Despite this, the Chamber's members in financial-services industries are concerned about potential liability for disparate-impact claims under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and other similar statutory and regulatory regimes. These disparate-impact claims frequently challenge legitimate, neutral standards—that are applied uniformly to all consumers and are a critical component of responsible business decisions—on the theory that they result in a disparate impact on certain demographic groups, even though the standards themselves raise no inference of purposeful discrimination.

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, and counsel, made any monetary contribution intended to fund the preparation and submission of this brief.

This Court's ruling on whether the FHA authorizes disparate-impact claims, as the United States Department of Housing and Urban Development ("HUD") contends, will provide important guidance to the Chamber and its members. Clarification of this question will reduce the uncertainty that presently exists in this area of the law and will promote compliance, to the benefit of financial institutions, other businesses, and the public.

## STATUTORY AND REGULATORY BACKGROUND

The Chamber endorses Plaintiffs' Statement of Facts describing the FHA's statutory background and the promulgation of HUD's Disparate-Impact Rule, Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.5 *et seq.*). *See* Mem. in. Support of Plaintiffs' Mot. for Summary Judgment 4–8 (Dec. 20, 2013) (Dkt. No. 16-1) ("Plaintiffs' Mem.").

## SUMMARY OF ARGUMENT

I.  The FHA exclusively prohibits purposeful discrimination. Accordingly, HUD's Rule, which attempts to empower private plaintiffs and the Agency to pursue FHA claims on a disparate-impact theory, exceeds HUD's statutory authority and violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C). Traditional tools of statutory construction squarely foreclose HUD's contention that the FHA permits disparate-impact claims. Each verb Congress used in the FHA's anti-discrimination provisions focuses exclusively on the defendant's motives and actions, not their consequences. *Infra* at 5. And the FHA's anti-discrimination provisions bear no resemblance to the sections in Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA") that authorize disparate-impact liability. *Infra* at 5–6 (citing 42 U.S.C. § 2000e-2(a)(2) (Title VII); 29 U.S.C. § 623(a)(2) (ADEA)).

This conclusion is most readily apparent when Section 805, the FHA provision specifically applicable to housing lenders, is considered. Section 805 makes it unlawful to "*discriminate*" in the "making or purchasing of loans." 42 U.S.C. § 3605 (emphasis added). Dictionary definitions and Supreme Court precedent demonstrate that the word "discriminate" ordinarily is understood to require intent, and Section 805's text provides no basis to depart from that ordinary understanding. *See infra* at 9–10. Congress did not provide HUD authority to subject lenders to disparate-impact claims.

II.  If HUD's Rule stands, it will trap lenders between two seemingly irreconcilable federal regulatory standards. In the wake of the recent recession, Congress has required housing lenders to tighten underwriting standards, and to determine and verify that a borrower has a "reasonable ability to repay" a loan before it is provided. 15 U.S.C. § 1639c. A Consumer Financial Protection Bureau ("CFPB") regulation implementing this directive—known as the Ability to Repay Rule or "ATR"—became effective just last month. *See* CFPB, Final Rule, *Ability-to-Repay and Qualified Mortgage Standards under the Truth in Lending Act (Regulation Z)*, 78 Fed. Reg. 6408, 6408 (Jan. 30, 2013) (codified at 12 C.F.R. § 1026.43(c)). Private plaintiffs and government regulators may well argue that, due to statistical variations in the average financial profiles of particular demographic groups, a lender's uniform and even-handed application of ATR requirements affects the availability and terms of credit for some demographic groups more significantly than others. *Infra* at 13–16.

HUD's Rule, on its face, appears to subject lenders to disparate-impact liability if such a consequence results from their adherence to federal law. *Id*. The Rule thus would present lenders with an impossible Catch-22, in which compliance with one federal law would trigger the violation of another.

3

Adhering instead to the FHA's plain meaning avoids any such regulatory collision. Properly interpreted, the Act simply does not permit disparate-impact claims. The conflict HUD's Rule creates with the ATR further confirms that HUD has departed from the FHA's statutory mandate.

III.   HUD exceeds the limits of its authority once again by abandoning the burden-shifting framework the Supreme Court developed in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), to resolve disparate-impact claims. This framework "remains applicable" to any anti-discrimination statute that authorizes disparate-impact liability, unless Congress specifically provides otherwise. *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005). Congress has made no exception to *Wards Cove* in the FHA. Thus, even if the FHA allows disparate-impact claims—which it does not—*Wards Cove* is the test HUD's Rule must follow.

Yet HUD discards *Wards Cove*, and the bright lines that case established to simplify disparate-impact litigation, in favor of a subjective standard that threatens lenders with undue litigation costs and reputational harm, and injects unnecessary uncertainty into this area of the law. HUD had no statutory basis to take such a step. Its Rule should be vacated.

## ARGUMENT

In recent years, private plaintiffs and government regulators—including the United States Department of Justice ("DOJ"), the CFPB, and HUD—have moved aggressively to target financial service providers in an increasing number of disparate-impact suits under the FHA and similar statutory and regulatory regimes. These suits commonly allege that a business's use of neutral standards to assess a consumer's ability to repay a loan or other form of credit affects some demographic groups differently than others, and therefore constitutes illegal discrimination.

HUD's attempt to import disparate-impact liability into the FHA will directly affect industries beyond the insurers who are represented by Plaintiffs here, including mortgage lenders and other housing-finance providers.  This brief focuses principally on such businesses as a result.  Yet due to textual similarities between the FHA and other anti-discrimination statutes, this Court's decision whether HUD's Rule exceeds the Agency's statutory authority could significantly affect the availability of disparate-impact claims against a host of other financial services providers, including credit card issuers, student loan providers, and auto lenders, to name just a few.  As the statutory language plainly indicates, Congress never intended disparate-impact liability to be used as a tool to regulate so many different sectors of the national economy.

## I.    THE FHA DOES NOT PERMIT DISPARATE-IMPACT CLAIMS.

### A.    The FHA's Text, Structure, And History Demonstrate That It Prohibits Only Purposeful Discrimination.

Plaintiffs have thoroughly demonstrated that none of the FHA's anti-discrimination provisions authorize disparate-impact claims.  Plaintiffs' Mem. at 8–26.  Indeed, to resolve this case, the Court need not look beyond the language Congress purposefully chose in defining liability.  In making it unlawful to "*refuse*" to rent, sell or negotiate for housing, to "*make* unavailable or *deny*" housing, or to "*discriminate*" in providing lending services, 42 U.S.C. §§ 3604(a), 3605 (emphases added),[2] the FHA proscribes actions that require a discriminatory purpose to achieve, *see* Plaintiffs' Mem. at 12–16 (citing dictionary definitions and Supreme Court precedents interpreting these terms).

If there were any doubt on that score, statutory context resolves it.  The FHA adopts the language and structure of the Title VII and ADEA provisions that prohibit only discriminatory

---

[2] As Plaintiffs note, the Act contains additional sections that prohibit more specific conduct using similar statutory language. *See* 42 U.S.C. §§ 3604(c)-(e), 3606; Plaintiffs' Mem. at 3 n.1.

treatment, while abandoning the "key" phrases that other sections of those statutes use to signal disparate-impact liability. *See City of Jackson*, 544 U.S. at 236 n.6 (plurality); *compare* 42 U.S.C. §§ 3604(a), 3605, *with* 42 U.S.C. § 2000e-2(a)(1) (Title VII discriminatory-treatment provision) (making it unlawful to "*refuse* to hire or to *discharge* any individual or otherwise to *discriminate against any individual*" (emphases added)); 29 U.S.C. § 623(a)(1) (ADEA discriminatory-treatment provision) (same), *and with* 42 U.S.C. § 2000e-2(a)(2) (Title VII disparate-impact provision) (making it unlawful to "limit, segregate, or classify . . . employees . . . in any way which would deprive or *tend to deprive* any individual of employment opportunities or otherwise *adversely affect* his status" (emphases added)); 29 U.S.C. § 623(a)(2) (ADEA disparate-impact provision) (same). This confirms what the FHA's text already makes clear: the Act targets intentional discrimination alone. Plaintiffs' Mem. at 14–17.

The contrary interpretation HUD puts forth in its Rule is not entitled to deference because Congress has left no ambiguity for HUD to resolve. "[U]nder *Chevron*, deference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004); *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2040 (2012) (refusing to defer to HUD's interpretation of a statute that "'goes beyond the meaning that the statute can bear'").

### B. The FHA Does Not Impose Disparate Impact Liability.

HUD's Rule is particularly unreasonable in purporting to engraft a disparate-impact standard onto Section 805 of the FHA, which makes it unlawful for any mortgage lender or other housing-finance provider to "discriminate" in the making or purchasing of loans. 42 U.S.C.

§ 3605. While *none* of the FHA's provisions authorizes disparate-impact claims, Section 805 is the least susceptible to such a reading.

   ***HUD's Attempt to Authorize Disparate-Impact Claims Under Section 805 Has Far-Reaching Consequences.*** It is important to clarify that Section 805 forecloses disparate-impact claims for two reasons. First, Section 805 is the only FHA section under which a lender should be susceptible to suit. Section 804(a) of the FHA establishes a general ban on discrimination in "sell[ing]," "rent[ing]," "negotiat[ing] for the sale or rental," and "mak[ing] unavailable or deny[ing] a dwelling." 42 U.S.C. § 3604(a). It is followed by a series of additional provisions banning more specific activities, including Section 805's specific ban on discriminatory lending. Therefore, under the well-established canon that "the specific governs the general," allegations of discriminatory lending must be brought under Section 805 alone, and not under Section 804(a)'s more general prohibition. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (The "canon" has "full application . . . to statutes . . . in which a general [prohibition] and a more limited, specific [prohibition] exist side-by-side.").[3]

   Second, the text of Section 805 is nearly identical to the anti-discrimination provision in the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, which similarly makes it unlawful to "discriminate" on the basis of protected factors, *id.* § 1691(a). This ECOA provision is the principal source from which the DOJ and the CFPB purport to derive their authority to

---

[3] HUD disagrees and seeks to assert claims against lenders under both Sections, 78 Fed. Reg. at 11,464 n.41, although the weight of judicial authority undermines HUD's view, *see, e.g.*, *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 423 (4th Cir. 1984) (only Section 805 applies to lending); *Gaona v. Town & Country Credit*, 324 F.3d 1050, 1056 n.7 (8th Cir. 2003) (same). *But see Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1357 (6th Cir. 1995) (finding that Sections 804 and 805 overlap). The Court should reject HUD's dubious assertion that Section 804(a)'s general standard necessarily applies to allegations of discrimination controlled by the FHA's more specific prohibitions.

enforce the "disparate impact doctrine" in the wide range of industries governed by that statute.[4] The D.C. Circuit has refused to express any "opinion about whether a disparate impact claim can be pursued under ECOA," *Garcia v. Johanns*, 444 F.3d 625, 633 n.9 (D.C. Cir. 2006), and this Court should reject HUD's attempt to import such a theory of liability into Section 805's analogous text.

**Section 805's Text Squarely Forecloses Disparate-Impact Claims.**  Section 805 makes it unlawful to "*discriminate*" against any person in the "making or purchasing of loans or providing other financial assistance" for purchasing or improving a home. 42 U.S.C. § 3605(b)(a)-(b) (emphasis added).  HUD identifies no textual evidence that Section 805 or any other FHA provision expressly permits disparate-impact claims.  Instead, HUD principally argues that the Act is ambiguous enough to "accommodate" a disparate-impact reading. Mot. to Dismiss or, in the Alternative, for Summary Judgment 21–27 (Feb. 3, 2013) (Dkt. No. 20) ("HUD Mem.").  In doing so, HUD zeroes in on the phrase "make unavailable"—which appears only in Section 804(a)—as the source of that purported ambiguity.  *Id.* at 23–24.

As Plaintiffs' thoroughly demonstrate, "make unavailable" cannot bear the weight HUD places on that phrase.  Plaintiffs' Mem. at 13–14.  Although "make" can have more than one meaning, it is given more precise content by the neighboring verbs in Section 804(a)—"refuse" and "deny"—both of which require purposeful action.  Plaintiffs' Mem. at 12–13; *Freeman*, 132 S. Ct. at 2042 (applying *noscitur a sociis* cannon to resolve definitional ambiguity).  In addition, Section 804(a) borrows the text and structure of Title VII and the ADEA's discriminatory treatment provisions: it uses verbs that require a discriminatory purpose to achieve, and it prohibits actions taken directly against an individual.  *Compare* 42 U.S.C. § 3604(a) (making it

---

[4] *See*, *e.g.*, CFPB, *CFPB Bulletin 2012-04, Lending Discrimination* (Apr. 18, 2012), http://files.consumerfinance.gov/f/201404_cfpb_bulletin_lending_discrimination.pdf.

unlawful to "*refuse*" to sell or rent, "*refuse*" to negotiate for housing, or "*make unavailable or deny*" housing "to any *person*" (emphases added)), *with id.* § 2000e-2(a)(1) (Title VII) (making it unlawful to "*refuse* to hire or to *discharge* any *individual*, or otherwise to *discriminate* against any *individual*" (emphases added)), *and* 29 U.S.C. § 623(a)(1) (ADEA) (same).  By contrast, Section 804(a) declines to use either of the two "key" phrases—"adversely affect" or "tend to deprive"—that other Title VII and ADEA sections use to signal disparate-impact liability, and it fails to adopt the "incongru[ous]" structure of those sections, which ban neutral practices applied to groups if they impact protected classes in an adverse way.  *City of Jackson*, 544 U.S. at 236 n.6 (plurality); *compare* 42 U.S.C. § 3604(a), *with id.* § 2000e-2(a)(2), *and* 29 U.S.C. § 623(a)(2).  HUD fails in its attempt to find ambiguity in Section 804(a).

HUD's interpretation of Section 805 is even more unworkable.  Section 805 does not contain the phrase "make unavailable" at all.  Nonetheless, HUD insists that Section 805 authorizes disparate-impact claims because the word "discriminate" in Section 805 can be read to "encompass actions that have a discriminatory effect but not a discriminatory intent."  78 Fed. Reg. at 11,466.

This argument is squarely foreclosed by the ordinary meaning of the word and by Supreme Court precedent.  "[D]iscriminate" ordinarily is understood to mean a "difference in *treatment* or favor on a class or categorical basis in disregard of individual merit."  *Webster's Third New International Dictionary* 648 (1963) (emphasis added).  *See also Webster's Second New International Dictionary* 745 (1959) ("To make a difference in treatment or favor (of one as compared with others); as . . . to discriminate against a special class").  For this reason, the Supreme Court has had little difficulty in concluding that "the 'normal definition of discrimination' is 'differential treatment.'"  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167,

174 (2005). Indeed, the word's focus on "treatment" necessarily presumes intentional action. "Nothing . . . but a different intent explains the different treatment." *Lindh v. Murphy*, 521 U.S. 320, 329 (1997); *see 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 682 (D.C. Cir. 2006) ("[P]laintiffs alleging disparate *treatment* must establish . . . that the defendant *intentionally* discriminated against them") (emphases added).

Statutory context confirms this reading. Title VII and ADEA's discriminatory-treatment provisions both include the word "discriminate." *See* 42 U.S.C. § 2000e-2(a)(1) (Title VII) (making it unlawful "to *discriminate* against any individual . . . because of [a protected trait]" (emphasis added)); 29 U.S.C. § 623(a) (ADEA) (same). By contrast, that word is noticeably absent from Title VII and the ADEA's disparate-impact provisions.

Section 805's language is unambiguous. HUD's attempt to insert a disparate-impact standard into this particular provision presents the clearest example of HUD's departure from the statutory limits on its rulemaking authority.

## II. HUD'S DISPARATE-IMPACT RULE CONFLICTS WITH FEDERAL LENDING STANDARDS.

HUD's Rule threatens to penalize lenders for following established underwriting standards that are now required by federal law. Congress could not have intended this result, which further confirms that HUD's Rule exceeds the Agency's statutory authority.

***The Federal Ability-to-Repay Rule Requires Lenders To Tighten Credit Standards.*** As Plaintiffs show, HUD's Disparate-Impact Rule is "fundamentally inconsistent with risk-based pricing," a cornerstone of both the insurance and housing-finance industry. Plaintiffs' Mem. at 5. Like insurers, lenders engage in risk differentiation to ensure that they can "provide [financial products] at fair prices while remaining solvent." *Id.* at 31–32.

Prudent lenders in the housing-finance sector analyze risk by examining various aspects of a borrower's credit profile, including income, job status, credit score, and available funds for a down payment. Federal regulators consistently have recognized that these criteria are highly predictive of borrowers' ability to repay debt.[5] Moreover, government-sponsored enterprises Fannie Mae and Freddie Mac will only purchase loans issued to borrowers with certain credit qualifications.[6] Federal agencies, such as the Fair Housing Administration and the Department of Veterans Affairs, impose similar conditions on the mortgage guarantees and insurance they provide.[7]

New federal standards adopted in the wake of the financial crisis now require lenders to rigorously examine the credit profiles of prospective borrowers and extend credit more sparingly than in the past. In the Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress directed mortgage lenders to determine and verify that a borrower has a "reasonable ability to repay the loan" before extending the borrower credit. 15 U.S.C. § 1639c. Effective January 10, 2014, the CFPB has implemented that congressional mandate through a new rule—the ATR—which requires the lenders of most residential mortgage loans to examine and verify eight factors—including the borrower's income, monthly debt-to-income ratio, employment status,

---

[5] *See*, *e.g.*, ATR, 78 Fed. Reg. at 6526–27 (noting that a borrower's "debt-to-income ratio . . . correlates with loan performance . . . in any credit cycle"); *id.* at 6470 (noting that credit scores established by independent business are predictive of a borrower's ability to repay).

[6] *See*, *e.g.*, Press Release, Federal Housing Finance Agency ("FHFA"), *FHFA Limiting Fannie Mae and Freddie Mac Loan Purchases to "Qualified Mortgages"* (May 6, 2013) ("FHFA Press Release"), *available at* http://www.fhfa.gov/webfiles/25163/QMFINALrelease050613.pdf.

[7] *See*, *e.g.*, 38 C.F.R. § 36.4340 (establishing credit standards, relating to a borrower's "income and expenses, and credit history," necessary to qualify for a mortgage guarantee from the Department of Veterans Affairs); *FHA Risk Management Initiatives: New Manual Underwriting Requirements*, 78 Fed. Reg. 75,238 (Dec. 11, 2013) (establishing credit standards for manually-underwritten FHA loans).

and credit history—before deciding that a borrower has a "reasonable" ability to repay the loan.[8] 12 C.F.R. § 1026.43(c). Violations of the ATR are enforceable by the CFPB or by aggrieved borrowers, 15 U.S.C. §§1607(a)(6), 1640(a), and expose lenders to penalties, including the greater of the borrower's "actual damages" or the treble the lender's "compensation or gain," plus costs and attorney's fees, *id.* § 1639b(d)(2).

For lenders who wish to ensure compliance, the ATR defines certain loans as "Qualified Mortgages ("QMs"), which presumptively satisfy Dodd-Frank's requirements. 12 C.F.R. §1026.43(e).[9] To qualify for a QM, the loan must meet certain underwriting requirements, fee limitations, and other terms. *Id.* Most notably, the borrower may not have a debt-to-income ratio higher than 43%. *See Id.* § 1026.43(e)(2)(vi).

These new requirements reflect Congress's and the CFPB's conclusion that "[l]oose underwriting practices . . . contributed to [the] mortgage crisis," and that "too many mortgages were made to consumers without regard to the consumer's ability to repay." ATR, 78 Fed. Reg. at 6408. The purpose and design of the ATR therefore is to cause fewer loans to be made to borrowers with comparatively weak credit profiles, and to increase the costs of those loans when made. Put simply, the ATR likely will reduce the number of consumers who can afford to enter the residential mortgage market.

---

[8] The ATR applies to "any consumer credit transaction that is secured by a dwelling," subject to certain exceptions, including home equity loans and reverse mortgages. 12 C.F.R. § 1026.43(a). Unless certain exceptions apply, the lender must consider the borrower's (1) "current or reasonably expected income or assets," excluding "the value of the dwelling"; (2) "current employment status"; (3) monthly mortgage payment; (4) monthly debt payments for other loans; (5) monthly payment for "mortgage-related obligations"; (6) "current debt obligations, alimony, and child support"; (7) "debt-to-income ratio"; and (8) credit history. *Id.* § 1026.43(c)(2).

[9] For prime loans that meet the qualifications, the presumption is a conclusive "safe harbor." 12 C.F.R. § 1026.43(e)(1)(i); 78 Fed. Reg. at 6408-09. For subprime loans that meet the standard, the presumption is "rebuttable." 12 C.F.R. § 1026.43(e)(1)(ii).

***HUD's Rule Would Impose Liability On Lenders For Efforts To Meet Or Exceed Federal Ability-To-Repay Requirements.***  On its face, HUD's Disparate-Impact Rule appears to expose lenders to the risk of private lawsuits and government enforcement actions for the consequences of their adherence to underwriting standards that federal law now demands.  *See* 24 C.F.R. § 100.500 ("Liability may be established . . . based on a practice's discriminatory effect, . . . even if the practice was not motivated by a discriminatory intent.").   HUD's Disparate-Impact Rule could hold a lender liable for applying the ATR or other credit standards uniformly and evenhandedly to all *individuals* it dealt with—as Dodd-Frank requires—if doing so resulted in statistical disparities among groups.  Indeed, in both cases in which the Supreme Court recently granted certiorari to decide whether the FHA authorizes disparate impact claims (both cases settled before decision), the plaintiffs established *prima facie* disparate-impact cases against neutral municipal policies likely to increase housing costs by pointing to statistical differences in the average household incomes of particular demographic groups within the municipalities and arguing that, on average, different groups would have different abilities to afford the new costs.  *See Mount Holly Gardens Citizens In Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (municipal plan to redevelop residential neighborhood), *petition dismissed*, 82 U.S.L.W. 3287 (U.S. Nov. 15, 2013) (No. 11-1507); *Gallagher v. Magner*, 619 F.3d 823, 830, 834-37 (8th Cir. 2010) (municipal plan to increase housing code enforcement at rental properties), *petition dismissed*, 80 U.S.L.W. 3465 (U.S. Feb. 14, 2012) (No. 10-1032). In the same fashion, plaintiffs or regulators could invoke HUD's Rule to force lenders into court for applying neutral credit standards evenly to all borrowers, so long as they identify some statistical difference in the average finances of the numerous demographic groups with which lenders do business.

13

Even if lenders successfully establish during litigation that compliance with the ATR is a "business necessity" that should shield them from disparate-impact liability, *see infra* at 19–20, HUD has declined to provide lenders a safe harbor that protects them from the costs and reputational damage associated with defending against FHA suits brought on such a theory.

In addition, it is far less certain that lenders will be able to defeat disparate-impact challenges to their voluntary efforts to exceed ATR requirements in an effort to steer comfortably clear of ATR liability. For example, in the new regulatory environment, some lenders inevitably will decide that it is in their best interests to issue only those loans that meet the CFPB's higher QM standard. Indeed, FHFA recently directed Fannie and Freddie to "limit their future mortgage acquisitions" accordingly. *See* FHFA Press Release, *supra* n.6. Yet some could argue that a lender's companywide decision to offer only QM loans should give rise to disparate-impact liability under HUD's Rule. For example, a plaintiff or regulator could argue that such a practice is not technically "necessary" to avoid liability under the ATR, and thus is actionable if it results in discriminatory effects. *Infra* at 19–21.

Despite the clear Catch-22 this imposes on lenders, HUD has declined to provide assurances that disparate-impact claims will not be brought based on a lender's reasonable efforts to meet ATR requirements or its decision to limit its portfolio to loans that meet the QM standard.[10]

Although HUD attempts to downplay this regulatory conflict, *see* 78 Fed. Reg. at 11,476, the risk that private plaintiffs or government agencies will target a lender's credit standards as the basis for disparate-impact challenges is by no means hypothetical. For example, HUD

---

[10] *See* Ltr. from Am. Banker's Ass'n et al. *to* Hon. Shaun Donovan, Secretary, HUD and Hon. Richard Cordray, Director, CFPB, *Request for Guidance and Clarity on Disparate Impact and Dodd-Frank Mortgage Standards* (June 4, 2013), http://fsroundtable.org/joint-letter-hud-requesting-guidance-clarity-disparate-impact-dodd-frank-mortgage-standards/.

initiated an investigation of 22 lenders in 2010 to examine whether their policies of requiring a credit score above the FHA minimum disparately impacted racial minorities and thereby violated the FHA.[11]

In addition, HUD has alleged that disparate-impact claims can be used to challenge practices in which lenders provide employees or agents a measure of "discretion" in establishing loan terms without any evidence of discriminatory intent. *See* 78 Fed. Reg. at 11,468. The Department of Justice has already moved aggressively to assert disparate-impact claims under the ECOA against mortgage lenders for permitting loan originators discretion to reduce the price of a loan to match or beat the offer of another lender, a common practice in the industry.[12] The CFPB similarly has targeted common discretionary practices in the auto lending industry. Just two months ago, the CFPB announced a $98 million settlement, in which it alleged that an auto lender's practice of allowing dealers discretion to negotiate with borrowers over the "dealer markup"—*i.e.*, the difference between the "sticker" rate and the auto lender's base rate—without any evidence that either the lender or dealers acted with discriminatory intent.[13]

The Agency and private plaintiffs could argue that HUD's Rule enables them to pursue similar claims against lenders for allowing their employees some decisionmaking responsibility in the lending process. Importantly, any attempt to subject a lender to disparate-impact liability

---

[11] *See* Press Release, U.S. Dep't of Hous. & Urban Dev., *HUD to Investigate Allegations that 22 Banks and Mortgage Lenders Discriminate Against African American and Latino Loan Seekers* (Dec. 8, 2010), http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2010/HUDNo. 10-266.

[12] *See, e.g.*, Complaint ¶¶ 17–41, *United States v. SunTrust Mortg., Inc.*, No. 3:12-cv-00397-REP (E.D. Va. May 31, 2012).

[13] Press Release, CFPB, *CFPB and DOJ Order Ally To Pay $80 Million to Consumers Harmed By Discriminatory Auto Loan Pricing: Ally to Pay Additional $18 Million In Civil Penalties* (Dec. 20, 2013), *available at* http://www.consumerfinance.gov/newsroom/cfpb-and-doj-order-ally-to-pay-80-million-to-consumers-harmed-by-discriminatory-auto-loan-pricing/.

for such a collection of discretionary decisions by individual employees is foreclosed by the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011) (holding that disparate impacts caused by a collection of discretionary determinations made by individual employees "'raise no inference of discriminatory conduct'"). Yet HUD will "not agree that the Supreme Court's decision in *Wal-Mart* means that policies permitting discretion may not give rise to discriminatory effects liability under the [FHA]." 78 Fed. Reg. at 11,468.

When disparate-impact challenges are aimed at lenders' neutral application of uniform credit standards, they could potentially pressure some lenders to consider the possibility of using inappropriate "prophylactic measures" to balance the outcomes of their lending practices. Such measures might include the express consideration of race in credit decisions—precisely the result the FHA's text unambiguously prohibits. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 992–93 (1988) (plurality); *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009). *See also Ricci*, 557 U.S. at 594 (Scalia, J., concurring) (noting that disparate-impact statutes "affirmatively *require*[]" defendants to undertake "race-based actions" to avoid liability). Such measures will not advance the neutral treatment of all consumers and may lead to unforeseen consequences, to the detriment of all participants in the housing-finance markets. Congress provided no textual basis for a disparate-impact rule in the FHA, and the troubling consequences disparate-impact challenges would impose on the lending industry confirm that HUD exceeded its statutory authority in attempting to impose such a standard.

## III.    HUD'S DISPARATE-IMPACT RULE ADOPTS A BURDEN-SHIFTING TEST THAT CONFLICTS WITH SUPREME COURT PRECEDENT AND EXPOSES LENDERS TO UNDUE LITIGATION RISKS.

HUD also exceeds the limits of its statutory mandate by establishing a burden-shifting test for resolving disparate-impact claims that lacks support in the FHA's text and departs from

Supreme Court precedent in critical ways.  HUD insists that the Rule easily will allow lenders and other FHA defendants to defeat meritless disparate-impact suits by demonstrating that they have a "legitimate" basis for undertaking the challenged action.  HUD Mem. at 10.  To the contrary, the Rule makes the litigation of disparate-impact claims anything but simple, for the parties or the courts.

Supreme Court precedent makes clear the path HUD should have followed.  In *Wards Cove*, the Supreme Court developed a three-part burden-shifting test to govern disparate-impact claims:

*First*, the plaintiff must make a *prima facie* showing that the defendant's challenged practice caused a "significantly disparate impact" on members of a protected class.  490 U.S. at 658.  Importantly, only a disparate impact on persons *similarly situated* to those who benefitted from the practice is cognizable.  When "special qualifications"—such as borrower's attainment of a certain credit standard in a lending case—are required to benefit from the practice, "comparisons" between those who have benefitted and "the general population" of the protected class have "little probative value."  *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.13 (1977).  The disparate-impact analysis must focus solely on "the smaller group of individuals who possess the necessary qualifications."  *Id.*

*Second*, if the plaintiff establishes a *prima facie* case, the defendant must demonstrate that the "challenged practice serves, in a significant way, [its] legitimate . . . goals."  *Wards Cove*, 490 U.S. at 659.  Although the defendant has the burden to produce evidence at this step, "[t]he burden of persuasion . . . remains with the disparate-impact plaintiff" to demonstrate affirmatively that the defendant's practice did not "significantly" serve a legitimate business goal.  *Id.*

17

*Third*, if the defendant succeeds at the second step, the plaintiff may prevail at the final step of the analysis only if it can prove that the defendant refused to adopt alternative practices that would have been "'equally as effective as the challenged practice'" in serving the defendant's legitimate business goal. *Id*. at 660–61.

To the extent that the FHA permits disparate-impact claims—which it does not—there is no reason to believe that Congress would have intended courts to use any analytical framework besides the *Wards Cove* test. In *Wards Cove*, the Supreme Court applied the test to a disparate-impact claim asserted under Title VII, as it then existed. *Id*. at 645–46. Congress subsequently amended Title VII to modify the burden-shifting test in cases brought under that statute, *see* Civil Rights Act of 1991, Pub. L. No. 102-166, § 105, 105 Stat. 1071, 1074–75 (codified at 42 U.S.C. § 2000e-2(k)), but Congress noticeably has declined to make similar amendments to other anti-discrimination statutes, including the FHA. Accordingly, the Supreme Court has held that *Wards Cove* "*remains applicable*" to other anti-discrimination statutes that authorize disparate-impact claims. *City of Jackson*, 544 U.S. at 240 (emphasis added) (interpreting the ADEA).

Despite this, HUD discards the *Wards Cove* test, stating simply that the Agency's "experience" suggests that its own alternative creation would "effectuate[] the broad, remedial goal of the Act" more effectively than the Supreme Court's standard. 78 Fed. Reg. 11,471. In place of *Wards Cove*, HUD's Rule substantially relaxes the evidentiary burden on plaintiffs, making it exceedingly difficult for lenders and others to defend against disparate-impact claims, and for courts to screen out meritless allegations.

1. At the first step, HUD's Rule fails expressly to require the plaintiff to demonstrate disparate impacts on *similarly situated* individuals as an element of the *prima facie* case. *Wards Cove*, 490 U.S. at 651. Under the Rule, a neutral practice is actionable so long as it "actually or

predictably results in a disparate impact on a group of persons."  24 C.F.R. § 100.500(a).  This

omission is significant.  *Wards Cove*'s limitation of the analysis to similarly situated individuals

is essential to ensure that defendants are not held "potentially liable for 'the myriad of innocent

causes that may lead to statistical imbalances,'" *Meacham v. Knolls Atomic Power Lab.*, 554

U.S. 84, 100 (2008), and to enable courts to "dismiss dubious claims at the summary judgment

stage," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2531–32 (2013).  In the lending

context, *Wards Cove* limits the relevant comparison to borrowers with similar credit profiles who

have applied for similar products.  No disparate impact occurs if a lender treats *individuals* with

similar credit profile uniformly, even if the average credit profiles of demographic groups vary

nationwide.  490 U.S. at 651.  HUD's Rule fails to indicate that this important limitation applies

to disparate-impact claims.

2.    At the second step, HUD's Rule imposes a greater burden on the defendant than

*Wards Cove* allows.  Under *Wards Cove*, the defendant must establish that its challenged practice

serves "legitimate" goals in a "significant way."  *Id.* at 659.  HUD's Rule, by contrast, requires

the defendant to prove that the practice is "*necessary*" to achieve that legitimate business goal.

24 C.F.R. § 100.500(b)(1)(i) (emphasis added).  This flatly contradicts *Wards Cove*'s directive

that a "business necessity" standard requiring the defendant's practice to be "essential" or

"indispensable" to a legitimate business goal "would be almost impossible for most [defendants]

to meet," and inevitably "would result in a host of evils," including the use of quotas to balance

outcomes among racial and other groups.  *Wards Cove*, 490 U.S. at 659–60.  For that reason, the

Supreme Court has held unequivocally that "the business necessity test should have no place in

ADEA disparate-impact cases."  *Meacham*, 554 U.S. at 97.  Just like the ADEA, Congress has

not modified the FHA to bypass *Wards Cove*.  Here too, the "business necessity" test should therefore be foreclosed.

    3.  HUD's Rule departs from *Wards Cove* at the third step of the burden-shifting framework as well.  Under *Wards Cove*, a plaintiff can prevail only by establishing that the defendant refused to adopt a less discriminatory practice that would have been "'*equally as effective*'" in achieving its goals.  490 U.S. at 659–60 (emphasis added).[14]  HUD's Rule, by contrast, allows a plaintiff to prevail simply by showing that another practice would have had "a less discriminatory effect."  24 C.F.R. § 100.500(c)(3).  The plaintiff need not demonstrate that the alternative practice would have been "equally as effective" in serving the defendant's legitimate business needs.

    HUD's removal of this element dramatically reshapes the burden-shifting framework.  Indeed, the "equally as effective" requirement is critical to lenders facing claims that their neutral application of uniform credit standards disparately impacts certain demographic groups.  Prudent lenders measure a borrower's likely ability to repay a loan by examining an array of factors—some mandated by federal law, others adopted as a matter of their own business judgment.  Lenders' individual sensitivities to risk influence the underwriting factors they deem most relevant, and the degree to which they are able to do business with borrowers with particular credit profiles.  It is entirely impractical—indeed impossible—for a lender to test the entire universe of underwriting formulae in advance of implementation to determine which one

---

[14] In addition, the alternative practice must be known to and rejected by the defendant; it cannot be a post-hoc creation of the plaintiff.  *Id.*; *Ricci*, 557 U.S. at 590.  HUD's Rule fails to implement this requirement expressly, although HUD appears to concede it in the preamble.  78 Fed. Reg. at 11,473 ("[A] less discriminatory alternative . . . must be supported by evidence, and may not be hypothetical or speculative").

will result in the lowest statistical disparities among demographic groups while still preserving "necessary" business needs. HUD's Rule purports to require just that.

HUD's Rule muddies the clear lines *Wards Cove* established in favor of a far less precise standard. The questions whether it is "necessary" for a lender to tighten credit requirements to achieve a particular return on investment, whether that return on investment is "necessary" in the first place, and whether different—though less "effective"—measures should have been adopted are inherently subjective. This invites protracted litigation in which plaintiffs and regulators will attempt to recalibrate the complex underwriting practices of financial institutions in the "'[c]ourts,'" which are "'generally less competent than [businesses] to restructure business practices,'" *Wards Cove*, 490 U.S. at 661 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978)).

In addition, HUD's new burden-shifting framework injects uncertainty into this area of the law, and therefore is very likely to increase the number of disparate-impact claims that are filed and that survive past the summary-judgment stage. This inevitably will force lenders to incur the financial and reputational costs of defending against disparate-impact suits that would be meritless under *Wards Cove*, and that have no textual support in the FHA to begin with. This imposes undue costs on all lenders, but the toll will be most severe for community banks and locally-owned mortgage companies that simply lack the reserves necessary to endure prolonged battles in the federal courts over the effects of practices adopted without discriminatory intent.

Finally, the imprecise nature of HUD's burden-shifting framework makes it virtually impossible for lenders—large or small—to establish compliance programs that ensure adherence to the law and minimize the risk of suit. HUD's Rule leaves lenders uncertain as to whether and how their neutral application of uniform credit standards will be attacked under the disparate-

impact standard, and HUD's fuzzy-burden shifting framework provides lenders little ability to predict which defenses will be deemed adequate.  This makes it exceedingly difficult for lenders to organize their affairs in a way they can be confident will avoid disparate-impact liability.

The FHA's text provides no indication that Congress intended HUD to regulate even-handed lending practices in such a manner.  The costs of HUD's overreach will impact lenders most directly, but will also necessarily impair the availability and affordability of credit in the housing markets.  HUD had no statutory authority to promulgate this Rule.  The Rule should be vacated.

## CONCLUSION

For the foregoing reasons, this Court should **GRANT** Plaintiffs' Motion for Summary Judgment, deny Defendants' Motion to Dismiss and Motion for Summary Judgment, and vacate HUD's Disparate-Impact Rule.

Respectfully submitted,

                                                    __/s/ Carter G. Phillips_____

Rachel L. Brand                          Carter G. Phillips (D.C. Bar No. 26176)
Tyler R. Green                             Brian P. Morrissey (D.C. Bar No. 989371)
NATIONAL CHAMBER LITIGATION CENTER     Jeremy M. Bylund (D.C. Bar No. 1015198)
1615 H Street, N.W.                       SIDLEY AUSTIN LLP
Washington, D.C. 20062               1501 K Street, N.W.
(202) 463-5848                            Washington, D.C. 20005
                                                    Telephone: 202-736-8000
                                                    Facsimile: 202-736-8711

Dated: February 24, 2014          *Counsel for Amicus Curiae Chamber of Commerce of the United States*

22