# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN INSURANCE ASSOCIATION and NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, <br><br> Defendants. | Civil Action No. 13-cv-966 (RJL) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Kannon K. Shanmugam (#474304)
Allison B. Jones (#991503)
A. Joshua Podoll (#1011743)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.    THIS COURT HAS JURISDICTION TO REVIEW PLAINTIFFS'
      CHALLENGE TO HUD'S DISPARATE-IMPACT RULE ...............................................2

      A.    Plaintiffs Have Standing On Behalf Of Their Members................................2

            1.    Plaintiffs' Standing Is Self-Evident Because Their Members Are
                  Objects Of The Disparate-Impact Rule................................................2

            2.    Affidavits From Plaintiffs' Members Confirm That Plaintiffs Have
                  Standing ...............................................................................................5

      B.    Plaintiffs' Challenge To The Disparate-Impact Rule Is Ripe For Review ...........18

II.   HUD'S DISPARATE-IMPACT RULE IS INCONSISTENT WITH THE FHA
      AND THEREFORE INVALID ..................................................................................21

      A.    The Text Of The FHA Unambiguously Prohibits Only Intentional
            Discrimination.............................................................................................22

      B.    The FHA's History Confirms That It Does Not Permit Disparate-Impact
            Claims .........................................................................................................30

      C.    Construing The FHA To Permit Disparate-Impact Liability Would Raise
            Serious Constitutional Questions..................................................................36

      D.    Construing The FHA To Permit Disparate-Impact Liability Would Be
            Inconsistent With The McCarran-Ferguson Act And Would Disrupt The
            Business Of Homeowner's Insurance ...........................................................37

      E.    The Disparate-Impact Rule Is Not A Reasonable Interpretation Of The
            FHA.............................................................................................................39

CONCLUSION ...................................................................................................................41

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories* v. *Gardner*, 387 U.S. 136 (1967) ...................................................19

*Action for Children's Television* v. *FCC*, 59 F.3d 1249 (D.C. Cir. 1995)....................................19

*Affum* v. *United States*, 566 F.3d 1150 (D.C. Cir. 2009).........................................................3

*Alexander* v. *Sandoval*, 532 U.S. 275 (2001) ................................................................24, 30, 34

*Alliance for Natural Health U.S.* v. *Sebelius*, 775 F. Supp. 2d 112 (D.D.C. 2011) ...............10, 11

*American Petroleum Institute* v. *Johnson*, 541 F. Supp. 2d 165 (D.D.C. 2008) .................3, 10, 19

*Association of American Physicians & Surgeons, Inc.* v. *Sebelius*,
  901 F. Supp. 2d 19 (D.D.C. 2012) ...........................................................................17

*Association of Private Sector Colleges & Universities* v. *Duncan*,
  681 F.3d 427 (D.C. Cir. 2012) .............................................................................10, 11

*Atlantic Urological Associates, P.A.* v. *Leavitt*, 549 F. Supp. 2d 20 (D.D.C. 2008)....................17

*Babbitt* v. *United Farm Workers National Union*, 442 U.S. 289 (1979)......................................10

*Banner Health* v. *Sebelius*, 797 F. Supp. 2d 97 (D.D.C. 2011).........................................................3

*Barnhart* v. *Sigmon Coal Co.,* 534 U.S. 438 (2002)........................................................................33

*Bell Atlantic Telephone Cos.* v. *FCC*, 131 F.3d 1044 (D.C. Cir. 1997) ......................................21

*Board of Education* v. *Harris*, 444 U.S. 130 (1979)........................................................................25

*Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994)..............................................................................................32, 34

*Chamber of Commerce* v. *Federal Election Commission*,
  69 F.3d 600 (D.C. Cir. 1995) .........................................................................................6

*Chamber of Commerce* v. *Reich*, 57 F.3d 1099 (D.C. Cir. 1995)...........................................19

*Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837 (1984) ........18, 21, 23

*Chlorine Chemistry Council* v. *EPA*, 206 F.3d 1286 (D.C. Cir. 2000) .......................................10

*Chrysler Corp.* v. *Brown*, 441 U.S. 281 (1979)...............................................................................33

Page

Cases—continued:

*City of Mobile* v. *Bolden*, 446 U.S. 55 (1980) ...................................................24

*City of Waukesha* v. *EPA*, 320 F.3d 228 (D.C. Cir. 2003) ...........................7

*Cohen* v. *United States*, 650 F.3d 717 (D.C. Cir. 2011) ...........................19

*Connecticut National Bank* v. *Germain*, 503 U.S. 249 (1992).................30

*Deal* v. *United States*, 508 U.S. 129 (1993)..............................................29

*Department of Treasury* v. *Fabe*, 508 U.S. 491 (1993).............................38

*Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U.S. 546 (2005)..........33

*Florida Bankers Association* v. *U.S. Department of Treasury*,
  ___ F. Supp. 2d ___, Civ. No. 13-529 (JEB), 2014 WL 114519
  (D.D.C. Jan. 13, 2014) ............................................................................3

*Freeman* v. *Quicken Loans, Inc.*, 132 S. Ct. 2034 (2012) ........................24

*Friends of the Earth, Inc.* v. *Laidlaw Environmental Services, Inc.*,
  528 U.S. 167 (2000)..................................................................................7

*Full Value Advisors, LLC* v. *SEC*, 633 F.3d 1101 (D.C. Cir. 2011)..........20

*Fund for Animals, Inc.* v. *Norton*, 322 F.3d 728 (D.C. Cir. 2003) .............3

*Gallagher* v. *Magner*, 636 F.3d 380 (8th Cir. 2010) ...............................29

*Halverson* v. *Slater*, 129 F.3d 180 (D.C. Cir. 1997)..................................21

*Hettinga* v. *United States*, 770 F. Supp. 2d 51 (D.D.C. 2011),
  *aff'd per curiam*, 677 F.3d 471 (D.C. Cir. 2012)...................................14

*Hoffman* v. *Blaski*, 363 U.S. 335 (1960)....................................................29

*Hunt* v. *Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) .........................2

*International Fabricare Institute* v. *EPA*, 972 F.2d 384 (D.C. Cir. 1992) .....................3

*Investment Company Institute* v. *Commodity Futures Trading Commission*,
  891 F. Supp. 2d 162 (D.D.C. 2012)..................................................10, 11

*Jama* v. *Immigration & Customs Enforcement*, 543 U.S. 335 (2005)..........34

*\*Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992) ...................2, 3, 5, 7

Page

Cases—continued:

*Mackey* v. *Nationwide Insurance Cos.*, 724 F.2d 419 (4th Cir. 1984) .........................................15

*Magner* v. *Gallagher*, 132 S. Ct. 548 (2011)...........................................................................18

*Massachusetts* v. *U.S. Dep't of Transportation*, 93 F.3d 890 (D.C. Cir. 1996) .....................39, 40

*MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118 (2007) .........................................................19

*Miller* v. *Johnson*, 515 U.S. 900 (1995) .....................................................................................36

*NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287 (7th Cir. 1992)...............15, 38

*\*NACS* v. *Board of Governors of Federal Reserve System*, ___ F. Supp. 2d ___,
   Civ. No. 11-02075 (RJL), 2013 WL 3943489 (D.D.C. July 31, 2013) .....................3, 4, 5, 21

*National Association of Clean Water Agencies* v. *EPA*,
   734 F.3d 1115 (D.C. Cir. 2013)...........................................................................................21

*National Association of Home Builders* v. *U.S. Army Corps of Engineers*,
   440 F.3d 459 (D.C. Cir. 2006)...........................................................................................20

*National Association of Home Builders* v. *U.S. Army Corps of Engineers*,
   663 F.3d 470 (D.C. Cir. 2011)...........................................................................................17

*National Association of Manufacturers* v. *Taylor*,
   549 F. Supp. 2d 33 (D.D.C. 2008).......................................................................................3

*National Latino Media Coalition* v. *FCC*, 816 F.2d 785 (D.C. Cir. 1987) .................................16

*National Lime Association* v. *EPA*, 233 F.3d 625 (D.C. Cir. 2000)............................................14

*National Mining Association* v. *Kempthorne*, 512 F.3d 702 (D.C. Cir. 2008)............................36

*National Mining Association* v. *U.S. Department of Interior*,
   70 F.3d 1345 (D.C. Cir. 1995)............................................................................................9

*National Multi Housing Council* v. *Jackson*, 539 F. Supp. 2d 425 (D.D.C. 2008) ..........17, 18, 20

*National Park Hospitality Association* v. *Department of the Interior*,
   538 U.S. 803 (2003)...........................................................................................................18

*Nationwide Mutual Insurance Co.* v. *Cisneros*, 52 F.3d 1351 (6th Cir. 1995)......................15, 38

*Nationwide Mutual Insurance Co.* v. *Cisneros*, 516 U.S. 1140 (1996).......................................15

*Natural Resources Defense Council, Inc.* v. *Daley*, 209 F.3d 747 (D.C. Cir. 2000)...................40

Page

Cases—continued:

*Neighborhood Assistance Corp.* v. *Consumer Financial Protection Bureau*,
    907 F. Supp. 2d 112 (D.D.C. 2012)........................................................16

*Parents Involved in Community Schools* v. *Seattle School District No. 1*,
    551 U.S. 701 (2007).............................................................................37

*Pauley* v. *BethEnergy Mines, Inc.*, 501 U.S. 680 (1991)................................23

*Rainbow/PUSH Coalition* v. *FCC*, 396 F.3d 1235 (D.C. Cir. 2005)................5

*Regents of University of California* v. *Bakke*, 438 U.S. 265 (1978)................36

*Reno* v. *Koray*, 515 U.S. 50 (1995)...............................................................29

*\*Ricci* v. *DeStefano*, 557 U.S. 557 (2009)...........................................25, 37

*Russell-Murray Hospice* v. *Sebelius*, 724 F. Supp. 2d 43 (D.D.C. 2010) .......3

*Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961 (8th Cir. 2008)........15, 38

*Schindler Elevator Corp.* v. *United States ex rel. Kirk*, 131 S. Ct. 1885 (2011).........22

*Sierra Club* v. *EPA*, 292 F.3d 895 (D.C. Cir. 2002)...................................3, 5

*\*Smith* v. *City of Jackson*, 544 U.S. 228 (2005)..............................25, 28, 29

*South Coast Air Quality Management District* v. *EPA*,
    472 F.3d 882 (D.C. Cir. 2006).............................................................3

*South Dakota* v. *Yankton Sioux Tribe*, 522 U.S. 329 (1998).........................32

*State Farm F.S.B.* v. *District of Columbia*, 640 F. Supp. 2d 17 (D.D.C. 2009).........10

*State National Bank of Big Spring* v. *Lew*, Civ. No. 12-1032 (ESH),
    2013 WL 3945027 (D.D.C. Aug. 1, 2013) .......................................4, 5, 11

*Steel Co.* v. *Citizens for a Better Environment*, 523 U.S. 83 (1998) ...............13

*Toilet Goods Association* v. *Gardner*, 387 U.S. 158 (1967)...........................18

*Town of Huntington* v. *Huntington Branch, NAACP*, 488 U.S. 15 (1988)........33

*United States* v. *Estate of Romani*, 523 U.S. 517 (1998).............................34

*United States* v. *Jin Fuey Moy*, 241 U.S. 394 (1916) ....................................37

Page

Cases—continued:

*United States* v. *Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989) ...............................................30

*United States* v. *Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973)...........................................................................................................8

*Valley Forge Christian College* v. *American United for Separation of Church &*
    *State, Inc.*, 454 U.S. 464 (1982)......................................................................................12

*Virginia* v. *American Booksellers Association*, 484 U.S. 383 (1988)...........................................10

*Washington Legal Clinic for the Homeless* v. *Barry*, 107 F.3d 32 (D.C. Cir. 1997) ...................39

*Whitman* v. *American Trucking Associations*, 531 U.S. 457 (2001) ...........................................18

## CONSTITUTION, STATUTES AND REGULATIONS

U.S. Const. Art. III............................................................................................... *passim*

U.S. Const. Amend. XIV .................................................................................................36

15 U.S.C. § 1011 .................................................................................................. *passim*

15 U.S.C. § 1012(b) ........................................................................................................38

29 U.S.C. § 623(a) ............................................................................................... *passim*

29 U.S.C. § 623(a)(1) ......................................................................................................25

29 U.S.C. § 623(a)(2) .................................................................................................27, 28

29 U.S.C. § 623(f)(1) ......................................................................................................35

42 U.S.C. § 1973 .............................................................................................................24

42 U.S.C. § 1973(a) ........................................................................................................28

42 U.S.C. § 1973c(b) ......................................................................................................28

42 U.S.C. § 2000d .....................................................................................................24, 29

42 U.S.C. § 2000e-2(a)(1)...............................................................................................25

42 U.S.C. § 2000e-2(a)(2)..................................................................................... *passim*

*42 U.S.C. §§ 3601 *et seq.*...................................................................................... *passim*

Page

Statutes and regulations—continued:

42 U.S.C. § 3604 ...................................................................................22, 27

42 U.S.C. § 3604(a) ..............................................................................22, 23

42 U.S.C. § 3604(b) ..............................................................................22, 23

42 U.S.C. § 3604(f) ....................................................................22, 23, 24, 32

42 U.S.C. § 3605 ...................................................................................22, 23

42 U.S.C. § 3606 ...................................................................................22, 23

42 U.S.C. § 3610(a)(1)(B)(iv) .......................................................................6

42 U.S.C. § 3610(a)(1)(C) .............................................................................6

42 U.S.C. § 3610(g)(1) .................................................................................6

Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 ....................35, 36

24 C.F.R. § 100.500(b) ................................................................................12

24 C.F.R. § 100.500(b)(1)(i) ..........................................................................9

24 C.F.R. § 100.500(c)(3) ....................................................................9, 12, 39

Md. Code Ann., Ins. § 27-501(c)(1) ................................................................8

## MISCELLANEOUS

*American Heritage Dictionary* (1969) ............................................................25

114 Cong. Rec. 2277 (1968) ........................................................................31

114 Cong. Rec. 2283 (1968) ........................................................................31

114 Cong. Rec. 2530 (1968) ........................................................................30

114 Cong. Rec. 3421 (1968) ................................................................30, 31, 32

114 Cong. Rec. 3422 (1968) ........................................................................31

114 Cong. Rec. 5643 (1968) ........................................................................31

Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) ..........................................4, 12, 16

Page

Miscellaneous—continued:

Proposed Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 70,921 (Nov. 16, 2011)............................................................3, 13, 16

*Webster's Third New International Dictionary* (1971) ..................................................................25

*Webster's Third New International Dictionary* (1966) ..................................................................24

## INTRODUCTION

Having engaged in unprecedented efforts to prevent the Supreme Court from reaching the merits of the question whether disparate-impact liability is available under the Fair Housing Act, the government now raises jurisdictional objections in an apparent effort to prevent this Court from doing the same. Those objections, however, are plainly meritless. As to standing, the government's objection fails for the simple reason that the Disparate-Impact Rule explicitly and directly regulates Plaintiffs' members. And even if that were insufficient, Plaintiffs' members are injured because they are facing enforcement actions under the Rule; in fact, at least one member is already the object of multiple disparate-impact complaints, including one directly initiated by HUD itself. Indeed, in light of those pending complaints—of which the government was presumably aware when it represented to this Court that the threat of agency enforcement action was merely "conjectural"—it is remarkable that the government decided to raise a standing objection in the first place. As to ripeness, the government's objection fails because it rests on a misapprehension of Plaintiffs' claim, which presents a purely legal question of statutory interpretation that is presumptively fit for judicial review.

The government fares no better when it finally turns to the merits. The government struggles to characterize the FHA as prohibiting disparate effects on groups as well as discriminatory actions against individuals—or, at a minimum, to inject some ambiguity into the statute in an effort to claim the mantle of *Chevron* deference. The FHA's plain text, however, unambiguously prohibits only actions taken with discriminatory intent, as demonstrated by the ordinary meanings of the relevant statutory terms and the Supreme Court's interpretation of strikingly similar statutes. Because the Disparate-Impact Rule is contrary to the intent of Congress, as expressed in the FHA's text and history, HUD acted in excess of its statutory authority, and not in

accordance with law, when it promulgated the Rule. Plaintiffs' motion for summary judgment should therefore be granted.

**ARGUMENT**

I.    **THIS COURT HAS JURISDICTION TO REVIEW PLAINTIFFS' CHALLENGE TO HUD'S DISPARATE-IMPACT RULE**

A.    **Plaintiffs Have Standing On Behalf Of Their Members**

The Disparate-Impact Rule explicitly regulates Plaintiffs' members. As a result, Plaintiffs' members have incurred, and will continue to incur, new and substantial costs in their efforts to comply with the Rule. And one of Plaintiffs' members has already been served with complaints premised on the Rule's disparate-impact theory of liability. Under those circumstances, Plaintiffs' standing to challenge the Disparate-Impact Rule is beyond question.

To reiterate the familiar principles governing the standing analysis: a plaintiff establishes Article III standing by showing that it has suffered an injury in fact, traceable to the defendant's actions, that a favorable judgment would redress. *See, e.g.*, *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). As trade associations proceeding on their members' behalf, Plaintiffs have standing as long as one of their members has standing, the suit is germane to Plaintiffs' purpose, and the suit does not require the participation of Plaintiffs' individual members. *See, e.g.*, *Hunt* v. *Washington State Apple Advertising Commission*, 432 U.S. 333, 344 (1977). The government does not dispute that Plaintiffs satisfy the second and third criteria; it argues only that none of Plaintiffs' members would have Article III standing to challenge the Disparate-Impact Rule in their own right. That argument is wholly unfounded.

1.    *Plaintiffs' Standing Is Self-Evident Because Their Members Are Objects Of The Disparate-Impact Rule*

As the D.C. Circuit has explained, when "the complainant is 'an object of the [agency] action . . . at issue,'" such as a rulemaking, the complainant's "standing to seek review of

2

administrative action is self-evident." *Sierra Club* v. *EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561-562). In such a case, there "should be 'little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it.'" *Id.* at 900 (quoting *Lujan*, 504 U.S. at 561-562).

Time and again, the D.C. Circuit and this Court have reaffirmed that principle in holding that regulated entities have standing to challenge agency action, whether it takes the form of rulemaking or adjudication. *See, e.g., Affum* v. *United States*, 566 F.3d 1150, 1158 (D.C. Cir. 2009); *South Coast Air Quality Management District* v. *EPA*, 472 F.3d 882, 895-896 (D.C. Cir. 2006); *Fund for Animals, Inc.* v. *Norton*, 322 F.3d 728, 733-734 (D.C. Cir. 2003); *International Fabricare Institute* v. *EPA*, 972 F.2d 384, 390 (D.C. Cir. 1992); *Florida Bankers Association* v. *U.S. Department of Treasury*, ___ F. Supp. 2d ___, Civ. No. 13-529 (JEB), 2014 WL 114519, at *5-*6 (D.D.C. Jan. 13, 2014); *NACS* v. *Board of Governors of Federal Reserve System*, ___ F. Supp. 2d ___, Civ. No. 11-02075 (RJL), 2013 WL 3943489, at *11 (D.D.C. July 31, 2013); *Banner Health* v. *Sebelius*, 797 F. Supp. 2d 97, 107-109 (D.D.C. 2011); *Russell-Murray Hospice* v. *Sebelius*, 724 F. Supp. 2d 43, 53 (D.D.C. 2010); *American Petroleum Institute* v. *Johnson*, 541 F. Supp. 2d 165, 176-177 (D.D.C. 2008); *National Association of Manufacturers* v. *Taylor*, 549 F. Supp. 2d 33, 48 n.8 (D.D.C. 2008).

The Disparate-Impact Rule indisputably regulates Plaintiffs' members. Indeed, as initially proposed, the Rule expressly targeted homeowner's insurers, listing "the provision and pricing of homeowner's insurance" as one example of "a housing policy or practice that may have a disparate impact" under the Rule. Proposed Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 70,921, 70,924 (Nov. 16, 2011). In response, Plaintiffs submitted comments asking HUD to remove the reference to homeowner's insurers on the

ground that disparate-impact liability would be fundamentally inconsistent with the business of insurance and suggesting that HUD create a safe harbor for certain insurance practices. *See* Pls.' Mot. for Summ. J., ECF No. 16-2, Ex. B (AIA Comments, filed Jan. 17, 2012); *id.* at Ex. C (NAMIC Comments, filed Jan. 17, 2012). Plaintiffs specifically asserted that insurers would suffer substantial harm from the Disparate-Impact Rule. *See, e.g., id.*, Ex. C, at 4-7. But HUD rejected those arguments and, in the final rule, reiterated that insurers are subject to the Disparate-Impact Rule's prohibition on practices that result in a disparate impact on protected groups. *See* Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460, 11,475 (Feb. 15, 2013) (refusing to provide "exemptions or safe harbors related to insurance"). By its terms, therefore, the Disparate-Impact Rule explicitly and directly regulates Plaintiffs' members, and Plaintiffs' standing to challenge the Rule is self-evident. *See, e.g., NACS*, 2013 WL 3943489, at *11 (holding that standing is self-evident where the rulemaking at issue "recognizes that . . . [plaintiffs' members are] directly affected by the . . . Final Rule regulating [their businesses]").

The government's only response to this argument is the artfully worded point that "merely . . . being subject to governmental regulatory authority" does not establish standing. Defs.' Mem. 11. That is true enough, as far as it goes. But Plaintiffs are not seeking review of the mere fact that their members are subject to HUD's authority; they are seeking review of a particular agency rulemaking of which their members are stated objects. The sole case on which the government relies—*State National Bank of Big Spring* v. *Lew*, Civ. No. 12-1032 (ESH), 2013 WL 3945027 (D.D.C. Aug. 1, 2013)—underscores that distinction. In the relevant count of the complaint, the plaintiff was challenging the *creation* of the Consumer Financial Protection Bureau. *Id.* at *19. In holding that the plaintiff lacked standing, the court observed that merely being

"subject to the authority of [an] agency" does not confer standing if the plaintiff is not "the object" of any particular agency action. *Id.* at \*19 & n.18 (internal quotation marks and citation omitted). In so doing, the court acknowledged that a plaintiff who was the object of an agency ruling or enforcement action would have standing to challenge that action. *Id.* That is precisely the case here. Because the Disparate-Impact Rule expressly targets homeowner's insurers, there is "little question" that the Rule has caused injury to Plaintiffs' members and that a judgment vacating the Rule will redress that injury. *Sierra Club*, 292 F.3d at 900 (quoting *Lujan*, 504 U.S. at 560-561). As a result, Plaintiffs' members, and thus Plaintiffs, have standing to challenge the Disparate-Impact Rule.

### 2. *Affidavits From Plaintiffs' Members Confirm That Plaintiffs Have Standing*

Where, as here, it is "self-evident" that a plaintiff has standing because the plaintiff or its members are the objects of the challenged agency action, the plaintiff need not submit any additional materials to defeat a standing objection. *Sierra Club*, 292 F.3d at 900. Only if standing is not self-evident must a plaintiff come forward with additional evidence to establish standing. *Id.* That evidence may take the form of affidavits submitted in response to a motion to dismiss. *See*, *e.g.*, *Rainbow/PUSH Coalition* v. *FCC*, 396 F.3d 1235, 1239 (D.C. Cir. 2005); *NACS*, 2013 WL 3943489, at \*11.

Although Plaintiffs' standing in this case is self-evident, Plaintiffs, acting out of an abundance of caution, are providing six affidavits from their members together with this brief. Those affidavits demonstrate that at least one of Plaintiffs' members is already the object of multiple disparate-impact complaints, including one directly initiated by HUD itself, and that other members have spent, or imminently will spend, significant resources in an effort to assess and ensure their compliance with the Rule. Those injuries, moreover, are traceable to the Disparate-Impact

Rule and would be redressed by a favorable judgment in this case. In short, the attached affidavits confirm beyond any shadow of a doubt that Plaintiffs' members, and therefore Plaintiffs, have standing. This Court should therefore reject the government's standing objection.

> a.    *Plaintiffs' Members Are Injured Because At Least One Member Is Currently The Target Of Complaints Pursuant To The Disparate-Impact Rule*

As the attached declaration of Peter Schwartz explains in greater detail, the insurer identified therein, which is a member of Plaintiff American Insurance Association, has been the object of three disparate-impact complaints filed with HUD since the promulgation of the Disparate-Impact Rule, including one directly initiated by HUD itself. *See* Decl. of Peter Schwartz ¶¶ 4-12. HUD has asserted that the insurer may be liable under a disparate-impact theory, implicating the Disparate-Impact Rule it promulgated in February 2013. *See id.* ¶ 7. HUD is still in the process of investigating those complaints. *See id.* ¶ 10 & Ex. C; 42 U.S.C. § 3610(a)(1)(B)(iv), (a)(1)(C), (g)(1). The same insurer has also been the subject of a related disparate-impact complaint filed in federal court after the promulgation of the Rule. *See* Schwartz Decl. ¶ 15 & Ex. D. In light of those pending complaints against one of Plaintiffs' members, and efforts to drum up additional complaints, *see id.* ¶ 14, it cannot seriously be disputed that other members face a significant threat of litigation and agency enforcement actions themselves. *See* Compl. ¶ 62.

To state the obvious, the existence of an actual or imminent agency enforcement action or private lawsuit gives rise to a cognizable injury for standing purposes. *See, e.g., Chamber of Commerce* v. *Federal Election Commission*, 69 F.3d 600, 603 (D.C. Cir. 1995) (holding that plaintiffs had standing where they were "subject to litigation challenging the legality of their actions"); *City of Waukesha* v. *EPA*, 320 F.3d 228, 236 (D.C. Cir. 2003) (holding that a trade association had standing based on the "substantial probability" of one of its members' incurring costs associated with agency enforcement action). That is simply an application of the broader princi-

ple that a cognizable "injury in fact" must be "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 180 (2000). And it is beyond question that the insurer against which complaints have been filed has expended, and will continue to expend, resources to defend itself against HUD's investigation and the related litigation. *See* Schwartz Decl. ¶¶ 10, 16, 18.

Remarkably, in its brief raising the standing objection, the government devotes an entire paragraph to the representation that the threat of litigation or agency enforcement action is "conjectural" and a "mere possibility." Defs.' Mem. 11. In light of the pendency of the complaints against one of Plaintiffs' members, that representation is simply false. Indeed, one wonders how the government could possibly have made that representation—and, for that matter, raised a standing objection at all—if the lawyers who prepared the government's brief were aware of the pending complaints (as they either were or should have been).[1] If there were any doubt that Plaintiffs' members have suffered an injury in fact—even leaving aside the fact that the Disparate-Impact Rule explicitly and directly regulates them—the actual initiation of complaints against at least one member under the Rule, and the ensuing HUD investigation, put the matter beyond reasonable dispute. *See Lujan*, 504 U.S. at 561.

       b.     *Plaintiffs' Members Are Injured Because They Must Incur Costs To Comply With The Disparate-Impact Rule*

As if the foregoing were not sufficient to establish Plaintiffs' standing, Plaintiffs' members have suffered injury because they have incurred, and will continue to incur, new and substantial costs in their efforts to assess and attempt to ensure their compliance with the Disparate-Impact Rule. *See* Compl. ¶¶ 55, 58-60, 63. Although an injury does not have to be significant in

---

[1] While the government's lawyers may not have been aware of the pending disparate-impact lawsuit against one of Plaintiffs' members, the government's amici evidently were, because they cited the court's opinion denying a stay in that case. *See* NAACP Br. 7 n.3.

order to establish standing, *see*, *e.g.*, *United States* v. *Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973) (noting that an "identifiable trifle" is sufficient (citation omitted)), affidavits from Plaintiffs' members demonstrate that the costs that the Rule has imposed, and will continue to impose, are in fact substantial.

To begin with, Plaintiffs' members do not currently collect data regarding the protected characteristics of their insureds like race, color, and national origin; indeed, one State, Maryland, affirmatively prohibits the collection of such data. *See* Compl. ¶ 26; Aff. of Bill Essman ¶ 4; Aff. of Kathleen Rudolph ¶¶ 9, 13; Aff. of Kevin J. Christy ¶ 5; Aff. of Martin M. Doto ¶ 5; Aff. of Victoria L. McCarthy ¶ 6; Md. Code Ann., Ins. § 27-501(c)(1). Without such data, Plaintiffs' members cannot assess the impact of particular insurance practices on protected groups and thus cannot determine whether those practices result in a disparate impact. It necessarily follows that Plaintiffs' members cannot identify and correct any impermissible results being caused by their insurance practices. *See* Rudolph Aff. ¶ 10. In order to ensure compliance with the Disparate-Impact Rule—that is, in order to ensure that their practices do not result in prohibited disparate results without appropriate justification—Plaintiffs' members would need to collect and analyze data about the protected characteristics of their insureds. *See* Rudolph Aff. ¶¶ 12-15; Christy Aff. ¶ 6. As explained at greater length in Plaintiffs' opening brief, however, state law forbids the consideration—and, in one State, the collection—of such data. *See* Pls.' Mem. 33. In a very real sense, therefore, compliance with the Disparate-Impact Rule would require Plaintiffs' members to violate state law. *See* Rudolph Aff. ¶¶ 11, 13-16. The resulting Catch-22 inflicts a cognizable injury on Plaintiffs' members, because they are "caught in the regulatory crossfire between state and federal authorities" and thus "are . . . subject to costly uncertainty as to which

[regulator's] standards must be met." *National Mining Association* v. *U.S. Department of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995); *see* Compl. ¶ 61.[2]

Even if Plaintiffs' members could collect and analyze the data they would need to assess and ensure their compliance with the Disparate-Impact Rule, doing so would be a costly endeavor that would require fundamentally altering their businesses. As the affidavits from Plaintiffs' members set out in more detail, changing their underwriting systems to collect, store, protect, and process data about the protected characteristics of their insureds would require thousands of hours of employee labor and millions of dollars. *See* Essman Aff. ¶¶ 5-9; Doto Aff. ¶¶ 8-16. Even collecting that data will cost thousands of dollars and hundreds of hours of employee time. *See* Christy Aff. ¶¶ 7-11. Ensuring continued compliance will require hiring new staff, also at significant cost. *See* Doto Aff. ¶ 14. Instituting those changes and incorporating protected characteristics into their rating and underwriting analysis would fundamentally transform Plaintiffs' members' businesses. *See* Rudolph Aff. ¶¶ 9-10, 15; Doto Aff. ¶ 10.

The foregoing effects readily satisfy the injury-in-fact requirement for Article III standing. Reconfiguring a business or business process in order to comply with a statute or regulation gives rise to a cognizable injury. *See*, *e.g.*, *Virginia* v. *American Booksellers Association*, 484 U.S. 383, 389, 392 (1988). Likewise, spending money to address non-compliant practices, *see*, *e.g.*, *Chlorine Chemistry Council* v. *EPA*, 206 F.3d 1286, 1290 (D.C. Cir. 2000); incurring costs

---

[2] It is no answer to say, as the government does, that even if a particular practice has a disparate impact, it may survive under the Rule's burden-shifting framework if an insurer can show that it is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 24 C.F.R. § 100.500(b)(1)(i). For present purposes, the point is not that the Rule directly *requires* an insurer to collect data regarding protected characteristics; rather, it is that an insurer would be exposed to liability under the Rule whenever it engages in a practice with an allegedly disparate impact that it was unable to discover and remedy because it did not collect such data. And even if an insurer could identify a substantial nondiscriminatory interest that justified the challenged practice, the charging party could still prevail by proving that the insurer's interest could be served by a practice with a *less* discriminatory effect. *See* 24 C.F.R. § 100.500(c)(3).

to implement new compliance processes, *see*, *e.g.*, *Association of Private Sector Colleges & Universities* v. *Duncan*, 681 F.3d 427, 457-458 (D.C. Cir. 2012); and undergoing the "relative increased regulatory burden" imposed by new agency rules, *see*, *e.g.*, *Investment Company Institute* v. *Commodity Futures Trading Commission*, 891 F. Supp. 2d 162, 185 (D.D.C. 2012); *State Farm F.S.B.* v. *District of Columbia*, 640 F. Supp. 2d 17, 22 (D.D.C. 2009), all suffice to establish an injury. Other cognizable compliance costs include paying compliance employees, holding meetings about compliance programs, implementing testing procedures, and conducting internal auditing. *See*, *e.g.*, *Alliance for Natural Health U.S.* v. *Sebelius*, 775 F. Supp. 2d 114, 120 (D.D.C. 2011).

Critically, a plaintiff need not have completed the process of complying with a burdensome regulation in order to establish an Article III injury. *See generally Babbitt* v. *United Farm Workers National Union*, 442 U.S. 289, 298 (1979) (noting that "one does not have to await the consummation of threatened injury to obtain preventive relief" (internal quotation marks and citation omitted)). Instead, "[r]egulatory influences on a firm's business decisions may confer standing when, as here, they give rise to cognizable economic injuries or even a sufficient likelihood of such injuries." *American Petroleum*, 541 F. Supp. 2d at 176-177 (internal quotation marks and citation omitted). Here, Plaintiffs' members have begun the process of assessing and ensuring their compliance with the Disparate-Impact Rule, and that is all that is required for Article III standing. Plaintiffs' members already have expended time and devoted personnel resources, at a cost of thousands of dollars, for the purpose of analyzing their obligations under the Rule and determining how to comply. *See* McCarthy Aff. ¶ 7; Doto Aff. ¶¶ 6-7.

In the face of Plaintiffs' allegations that their members have incurred and will continue to incur costs of complying with the Disparate-Impact Rule, *see* Compl. ¶¶ 58-61, 63, the govern-

ment offers two primary responses, neither of which is availing. *First*, the government asserts that costs incurred "to determine *whether* [a party] needs to satisfy a legal mandate" do not constitute an injury that gives rise to standing. Defs.' Mem. 9 (quoting *Bank of Big Spring*, 2013 WL 3945027, at *20). That is true enough, but it is beside the point. There is no dispute here as to whether Plaintiffs' members need to comply with the Disparate-Impact Rule; they clearly do. And expenses incurred in determining *how* to come into compliance (and in actually doing so) plainly give rise to a cognizable injury for purposes of Article III standing. *See, e.g.*, *Duncan*, 681 F.3d at 457-458; *Investment Company Institute*, 891 F. Supp. 2d at 185; *Alliance for Natural Health*, 775 F. Supp. 2d at 120. In *Bank of Big Spring*, the costs at issue consisted of "learning about the [agency's] regulatory and enforcement activities" to "keep abreast of developments in the law." 2013 WL 3945027, at *20. Unsurprisingly, the court determined that those costs were insufficient. *Id.* But at the same time, the court acknowledged that, if the plaintiff at issue had claimed costs "incurred to come into compliance with the law," it would have made out a valid Article III injury. *Id.* Those are precisely the types of costs that Plaintiffs' members have incurred and will continue to incur.

*Second*, the government argues that Plaintiffs' members will not inevitably have to modify their practices because they would have an opportunity to justify their practices in litigation through the Disparate-Impact Rule's burden-shifting framework. Defs.' Mem. 10; *see* p. 9 n.2, *supra*. That argument does not withstand scrutiny. As a factual matter, Plaintiffs' members have already spent, and imminently will have to spend, substantial amounts assessing and modifying their underwriting practices in order to comply with the Disparate-Impact Rule. *See* McCarthy Aff. ¶ 7; Doto Aff. ¶¶ 6-17; Christy Aff. ¶¶ 6-11; Essman Aff. ¶¶ 6, 9. And in any event, even to support an argument that a particular challenged practice is necessary to achieve a substantial

nondiscriminatory interest, *see* 24 C.F.R. § 100.500(b), Plaintiffs' members must implement new systems to collect data that they have not collected before, *see* Rudolph Aff. ¶¶ 10, 12; Christy Aff. ¶¶ 5-6; Essman Aff. ¶¶ 4-5, or at a minimum spend hundreds of thousands of dollars to engage an expert, *see* McCarthy Aff. ¶¶ 8, 14-15.  Moreover, regardless of whether Plaintiffs' members would ultimately prevail in litigation concerning a particular practice, the very burden of litigating against a *prima facie* case of disparate impact inflicts an injury—and, as discussed above, such litigation is not just imminent, but actual.  *See* Schwartz Decl. ¶¶ 10, 16, 18; McCarthy Aff. ¶¶ 8, 14-15; pp. 6-7, *supra*.  And under the Disparate-Impact Rule, even a practice that is necessary to achieve a substantial nondiscriminatory interest must be changed if the charging party proves that the insurer's interest could be served by a practice with a less discriminatory effect—apparently even if the alternative practice is less effective.  24 C.F.R. § 100.500(c)(3); *see* 78 Fed. Reg. at 11,473.[3]

In sum, Plaintiffs' members have amply demonstrated that they have suffered an injury in fact because they are the express objects of the Disparate-Impact Rule; they are already facing enforcement actions under the Rule; and they have incurred and will continue to incur substantial costs in order to comply with the Rule.  Those injuries are more than sufficient to ensure that review is being sought in this case by "those who have a direct stake in the outcome" and not merely "concerned bystanders."  *Valley Forge Christian College* v. *American United for Separa-*

---

[3] The government faults Plaintiffs for not identifying particular member practices that result in a disparate impact and will have to be changed.  *See* Defs.' Mem. 9.  But Plaintiffs are hardly required to draft HUD's next complaint in order to establish standing to challenge the Rule.  And the complaint pending against one of Plaintiffs' members specifically asks that court to require that insurer to change its practices.  *See* Schwartz Decl., Ex. D, at VII.  In any event, as discussed above, Plaintiffs need not show that any of their members' practices must change; it is sufficient that they must expend resources to determine whether their practices comply with the Rule and must implement systems to ensure compliance.  *See* pp. 9, 10-11, *supra*.

*tion of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (internal quotation marks and citations omitted).

### c.    *Plaintiffs Have Established Causation And Redressability*

The government's arguments regarding the other two requirements for Article III standing—causation and redressability—are no stronger than its argument regarding injury in fact. Because the availability of disparate-impact liability against homeowner's insurers was far from settled until promulgation of the Disparate-Impact Rule, Plaintiffs' members' injuries are "fairly traceable" to the Rule and "likel[y]" to be redressed by the relief sought here (*i.e.*, vacatur of the Rule). *Steel Co.* v. *Citizens for a Better Environment*, 523 U.S. 83, 103 (1998). The government's arguments should therefore be rejected.

To begin with, Plaintiffs' members' litigation and compliance injuries are fairly traceable to the Disparate-Impact Rule. The disparate-impact complaints against one of Plaintiffs' members, including the complaint initiated by HUD itself, were filed only after HUD had issued the Disparate-Impact Rule specifically identifying the provision and pricing of homeowners' insurance as a practice subject to disparate-impact liability. *See* Schwartz Decl. ¶¶ 5, 7, 11, 12, 15; 76 Fed. Reg. at 70,924. HUD's discovery requests pursuant to its complaint indicate that its investigation extends beyond the particular property at issue in that matter. *See* Schwartz Decl. ¶ 9 & Ex. B. In addition, but for the Rule, Plaintiffs' members would not incur the identified costs of fundamentally altering their systems to ensure nationwide compliance with the Rule, across all jurisdictions and all practices, or be forced to confront the conflict with state regulations that such compliance entails. *See* Christy Aff. ¶ 12; Doto Aff. ¶ 18.

Likewise, Plaintiffs' members' injuries would be redressed by a favorable outcome in this litigation. Plaintiffs have asked this Court, *inter alia*, to vacate the Disparate-Impact Rule, enjoin its enforcement, and "[d]eclare that [it] is not in accordance with the FHA and beyond De-

fendant's authority under the FHA." Compl., Prayer for Relief ¶¶ 2, 3, 4. If the Court were to vacate the Disparate-Impact Rule and enjoin its enforcement as inconsistent with the FHA, HUD could no longer pursue enforcement actions against homeowner's insurers, including Plaintiffs' members, based on a disparate-impact theory, nor could private litigants file disparate-impact complaints against Plaintiffs' members. Vacatur of the Rule would also relieve Plaintiffs' members of the costs and burdens of complying with the Rule. *See* Christy Aff. ¶ 12; Doto Aff. ¶ 18. In other words, if victorious, Plaintiffs' members would be spared the very costs the Disparate-Impact Rule is forcing them to incur. *See, e.g., National Lime Association* v. *EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000) (holding that the standing of a trade association was established by a member's affidavit showing that monitoring and compliance costs would be avoided by a favorable decision).

The government contends that Plaintiffs cannot establish traceability or redressability because, in its view, the Disparate-Impact Rule did nothing more than confirm a preexisting legal requirement. *See* Defs.' Mem. 12. That is incorrect. As a preliminary matter, even if the government's characterization of the Rule were accurate, this Court has rejected the argument that overlapping legal obligations imposing the same requirements deprive a plaintiff that is the direct object of government action of standing to challenge the action. *See Hettinga* v. *United States*, 770 F. Supp. 2d 51, 56-57 (D.D.C. 2011) (Leon, J.) (holding that the plaintiffs had standing to challenge a milk-production cap in a statute, despite a preexisting USDA rule imposing the same cap, because the plaintiffs were direct objects of the government action at issue), *aff'd per curiam*, 677 F.3d 471 (D.C. Cir. 2012). The government's argument therefore fails even on its own terms.

In any event, the government's characterization of the effect of the Disparate-Impact Rule is inaccurate. Even if the law on the availability of disparate-impact liability more generally had been uniform nationwide at the time the Rule was promulgated—and, at least in this circuit, the law was unsettled, *see* Pls.' Mem. 4 (citing cases)—no statute, formal rule, or Supreme Court decision had ever applied disparate-impact liability *to homeowner's insurers*. To the contrary, the question whether disparate-impact liability was available in an action against an insurer was unsettled. *See Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961, 964 (8th Cir. 2008) (stating that "we have recognized a disparate impact Fair Housing Act claim against *private* actors in another context," but acknowledging that, "at least with respect to insurers, the question is not free from doubt"); *id.* at 964 n.3 (noting that "HUD has never applied a disparate impact analysis to insurers" (quoting *Nationwide Mutual Insurance Co.* v. *Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995))); *NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287, 290-291 (7th Cir. 1992) (discussing the important distinction between disparate-treatment and disparate-impact theories under the FHA with respect to insurance, and "mak[ing] clear" that the court was not deciding the availability of the latter theory); *Mackey* v. *Nationwide Insurance Cos.*, 724 F.2d 419, 423-425 (4th Cir. 1984) (holding that the FHA does not apply to insurance). Plaintiffs' amicus brief in support of the petition for certiorari in *Nationwide Mutual Insurance Co.* v. *Cisneros*, *cert. denied*, 516 U.S. 1140 (1996), is not to the contrary. *See* Defs.' Mem. 14-15. That brief simply indicated that, in 1996, disparate-impact liability posed many of the same dangers for insurers that it poses today. But long after 1996, ambiguity remained regarding whether disparate-impact liability was available against insurers under the FHA. *See*, *e.g.*, *Saunders*, 537 F.3d at 964.

15

The Disparate-Impact Rule resolved the uncertainty in the law by expressly making disparate-impact liability available against insurers under the FHA.  And to the extent that it is valid, the Rule "is binding upon all persons, and on the courts, to the same extent as a congressional statute."  *National Latino Media Coalition* v. *FCC*, 816 F.2d 785, 788 (D.C. Cir. 1987).  At a minimum, the Disparate-Impact Rule has created an altogether new form of liability against insurers in some jurisdictions and has imposed uniformity in other respects where there was previously ambiguity.[4]  As a result, insurers must now ensure that none of their practices anywhere in the Nation leads to an unnecessary disparate impact under the uniform standard set out in the Rule.

Those changes in the law are sufficient to satisfy the traceability and redressability elements of the standing inquiry.  *See, e.g.*, *Neighborhood Assistance Corp.* v. *Consumer Financial Protection Bureau*, 907 F. Supp. 2d 112, 122 (D.D.C. 2012) (holding that traceability and redressability were established where the plaintiffs "identified jurisdictions where the Final Rule . . . is the cause of their injury").  The injuries of Plaintiffs' members are traceable to the Disparate-Impact Rule and its authorization of disparate-impact liability against insurers nationwide.  And if Plaintiffs were ultimately to obtain the relief they are seeking, their members would no longer be subject to disparate-impact enforcement actions by HUD or complaints by private litigants.

The cases the government cites in support of its causation and redressability arguments, *see* Defs.' Mem. 12-13, are inapposite.  Those cases stand only for the proposition that, when a

---

[4] In the Disparate-Impact Rule, beyond simply providing that disparate-impact liability was available, HUD acknowledged that there was variation in the tests courts had used for determining disparate-impact liability, and it sought to eliminate that variation by "formally establish[ing] a three-part burden-shifting test."  78 Fed. Reg. at 11,460; *see also* 76 Fed. Reg. at 70,923 (noting, in proposed rule, variations in the application of disparate-impact standards).

government action does *not* change the law, it ordinarily does not cause the plaintiff harm and thus cannot be redressed by a favorable decision. *See National Association of Home Builders* v. *U.S. Army Corps of Engineers*, 663 F.3d 470, 474-475 (D.C. Cir. 2011) (holding that there was no causation or redressability where the government action at issue did "nothing to worsen" the plaintiff's legal position); *Association of American Physicians & Surgeons, Inc.* v. *Sebelius*, 901 F. Supp. 2d 19, 42-43 (D.D.C. 2012) (holding that there was no causation or redressability where the plaintiff would inevitably have to take the challenged action under preexisting regulations); *Atlantic Urological Associates, P.A.* v. *Leavitt*, 549 F. Supp. 2d 20, 28 (D.D.C. 2008) (holding that there was no causation or redressability where an agency order did not alter the plaintiff's legal obligations); *National Multi Housing Council* v. *Jackson*, 539 F. Supp. 2d 425, 430-431 (D.D.C. 2008) (holding that there was no redressability where the challenged policy statement simply reiterated existing regulations, with the result that voiding the policy statement would have no effect on the plaintiffs' legal rights). As previously discussed, the Disparate-Impact Rule did change the legal landscape: to the detriment of Plaintiffs' members, it resolved uncertainty regarding whether disparate-impact liability was available against homeowner's insurers, and it imposed a duty to ensure that insurance practices in every corner of the Nation do not result in unnecessary disparate impacts. A decision in Plaintiffs' favor would eliminate the Rule and would unambiguously provide that disparate-impact liability is unavailable against insurers under the FHA.[5]

Ultimately, the government's arguments concerning causation and redressability ring hollow for a fundamental reason. If it were really true that the law were so clear that it did not

---

[5] Under the government's reasoning, an agency could seemingly avoid facial review of any new final rule simply by announcing its position beforehand in an informal guidance document or agency manual. That cannot be the law.

change at all after promulgation of the Disparate-Impact Rule, there would have been no need for the Rule in the first place. HUD announced it was promulgating the rule just days after the Supreme Court granted review in *Magner* v. *Gallagher*, 132 S. Ct. 548 (2011), and it did so for obvious reasons: namely, to try to take advantage of any deference under *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837 (1984), on the availability of disparate-impact liability more generally, and to make clear that disparate-impact liability was available against insurers specifically. HUD's decision to issue the Disparate-Impact Rule cannot be squared with its argument that the Rule was unnecessary. Even assuming, *arguendo*, that Plaintiffs could not establish standing simply by showing that their members are direct objects of the Rule, Plaintiffs have demonstrated causation and redressability, as well as injury in fact, on behalf of their members, and they therefore have standing to pursue this suit.

### B.    Plaintiffs' Challenge To The Disparate-Impact Rule Is Ripe For Review

To determine whether an agency action is ripe for review, a court considers "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *National Park Hospitality Association* v. *Department of the Interior*, 538 U.S. 803, 808 (2003). Notably, "[p]urely legal questions are presumptively fit for judicial review." *Chamber of Commerce* v. *Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (per curiam) (internal quotation marks and citation omitted). Where, as here, a plaintiff claims that "[a] regulation is totally beyond the agency's power under the statute," the plaintiff raises precisely the type of purely legal challenge that is ripe even in the absence of a specific attempt at enforcement. *Jackson*, 539 F. Supp. 2d at 428 (quoting *Toilet Goods Association* v. *Gardner*, 387 U.S. 158, 163 (1967)); *see, e.g.*, *Whitman* v. *American Trucking Associations*, 531 U.S. 457, 479 (2001) (holding that whether a regulation exceeds an agency's statutory authority is "purely [a question] of

statutory interpretation that would not benefit from further factual development of the issues presented" (internal quotation marks and citation omitted)).[6]

In an APA challenge, "[o]nce [the court] ha[s] determined that an issue is clearly fit for review, there is no need to consider the hardship to the parties of withholding court consideration." *Cohen* v. *United States*, 650 F.3d 717, 735 (D.C. Cir. 2011) (en banc) (quoting *Action for Children's Television* v. *FCC*, 59 F.3d 1249, 1258 (D.C. Cir. 1995)).  But even if the Court were to consider the hardship prong here, it is satisfied.  Plaintiffs' members face the choice of "tak[ing] immediate action [to comply with the Rule] to their detriment and risking substantial future [liability] for non-compliance"; as the D.C. Circuit has explained, that is "a paradigm case of 'hardship' under the second prong of [the ripeness inquiry]."  *Chamber of Commerce*, 57 F.3d at 1101; *see also American Petroleum*, 541 F. Supp. 2d at 178 (holding that hardship was established when plaintiffs faced a choice "between spending money to develop what they regard as unnecessary [compliance] plans or face possible sanctions"); Essman Aff. ¶¶ 5-9 (identifying compliance costs); Christy Aff. ¶¶ 6-12 (same); Doto Aff. ¶¶ 8-17 (same).  The threat of agency enforcement against Plaintiffs' members also independently satisfies the hardship prong.  *See MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 128-129 (2007) (noting that, "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat"); Schwartz Decl. ¶¶ 5-12 (discussing ongoing HUD investigation).

---

[6] In addressing the fitness prong of the ripeness inquiry, courts sometimes consider whether the agency action was final. *See Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 149 (1967).  Although the government's amici attempt to raise an issue concerning the finality of the Disparate-Impact Rule, *see* NFHA Br. 10-12, the government itself has not disputed the Rule's finality, and for good reason:  a regulation "promulgated in a formal manner after announcement in the Federal Register and consideration of comments by interested parties is quite clearly definitive." *Abbott Laboratories*, 387 U.S. at 151.

In raising a ripeness objection, the government fundamentally misapprehends the single claim that Plaintiffs are making in this case. Plaintiffs have claimed only that the Disparate-Impact Rule is beyond HUD's power under the FHA because the statute prohibits only intentional discrimination. *See* Compl. ¶¶ 65-73. That is a facial challenge to the agency's authority to promulgate the Rule; because it turns on a purely legal question of statutory interpretation and does not depend on application of the Rule to any particular facts, resolution of that challenge would not be enhanced by consideration in an as-applied setting. *See Jackson*, 539 F. Supp. 2d at 428 (noting that a question about the availability of disparate-impact liability under Title VI "involves the application of no facts," and concluding that "neither accuracy in adjudication nor flexibility in policy-making will be affected by delaying the issue any longer"). Put another way, nothing that could occur in a particular disparate-impact lawsuit or enforcement proceeding would inform the Court's decision on the question whether the text of the FHA authorizes disparate-impact liability. To the extent that Plaintiffs argue that the McCarran-Ferguson Act "provide[s] yet another indication that Congress did not intend to create disparate-impact liability in the FHA," Pls.' Mem. 30, that argument merely supports Plaintiffs' interpretation of the FHA. Contrary to the government's contention, Plaintiffs are not asking this Court to grant relief independently based on the McCarran-Ferguson Act, nor are they asking this Court to referee any conflict between the Disparate-Impact Rule and the McCarran-Ferguson Act as applied to particular insurance practices. *See* Defs.' Mem. 16-17.

Finally, the government has failed to identify any "significant agency or judicial interests militating in favor of delay." *National Association of Home Builders* v. *U.S. Army Corps of Engineers*, 440 F.3d 459, 465 (D.C. Cir. 2006) (internal quotation marks and citation omitted); *see also Full Value Advisors, LLC* v. *SEC*, 633 F.3d 1101, 1106 (D.C. Cir. 2011) (noting that, "[i]n

evaluating hardship, [courts] do not consider direct hardship, but rather whether *postponing* judicial review would impose an undue burden on the parties or would benefit the court" (internal quotation marks and citation omitted)).  That is unsurprising, because the question whether disparate-impact claims are cognizable under the FHA is not just ripe but long overdue for judicial review.  Because this case presents the sort of purely legal question of statutory interpretation that is presumptively fit for judicial review, this Court should reject the government's ripeness objection.

## II.    HUD'S DISPARATE-IMPACT RULE IS INCONSISTENT WITH THE FHA AND THEREFORE INVALID

Under the first step of *Chevron*, an agency is entitled to no deference.  "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.  If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."  *Chevron*, 467 U.S. at 843 n.9 (citations omitted).  Thus, a court "must first exhaust the traditional tools of statutory construction," *Halverson* v. *Slater*, 129 F.3d 180, 184 (D.C. Cir. 1997) (internal quotation marks and citation omitted), to determine "whether a congressional act admits of plain meaning," *National Association of Clean Water Agencies* v. *EPA*, 734 F.3d 1115, 1126 (D.C. Cir. 2013).  If those tools—including "textual analysis, structural analysis, and (when appropriate) legislative history," *NACS*, 2013 WL 3943489, at *10—resolve any apparent ambiguity in the statute, then "Congress has expressed its intention as to the question, and deference is not appropriate."  *Bell Atlantic Telephone Cos.* v. *FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997); *see also National Association of Clean Water Agencies*, 734 F.3d at 1126.

In light of those fundamental principles, the government's repeated efforts to smuggle the deference due only at the second step of *Chevron* into the first step are unavailing.  *See*, *e.g.*, Defs.' Mem. 18-19, 26, 27-28, 28-29, 36.  And without any deference, the government's meager statutory analysis cannot carry the day.  Here, the tools of statutory construction—including the text of the statute, the statutory and legislative history, and other Acts of Congress—uniformly point to the conclusion that the FHA prohibits only intentional discrimination, and not practices that result in a disparate impact.

A.    **The Text Of The FHA Unambiguously Prohibits Only Intentional Discrimination**

The relevant provisions of the FHA make it unlawful to "refuse to sell or rent"; to "refuse to negotiate"; "otherwise" to "make unavailable or deny" housing; or to "discriminate against" any person "because of" or "on account of" a protected characteristic.  42 U.S.C. §§ 3604(a), (b), (f)(1), (f)(2), 3605, 3606.  As Plaintiffs have explained, all of those provisions require a discriminatory motive to accomplish the prohibited action.  *See* Pls.' Mem. 11-17.  When confronted with the plain text of those provisions, the government has little to say.

1.    The government entirely ignores the fundamental principle of statutory construction that, when analyzing the meaning of a word in a statute, a court should "look first to the word's ordinary meaning."  *Schindler Elevator Corp.* v. *United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011).  The ordinary meanings of the operative terms in the FHA indicate that the statute prohibits only intentional discrimination.

a.    To begin with, each verb in the relevant provisions of Sections 804, 805, and 806 of the FHA is accompanied by a clause identifying the actor's motivation:  the statute prohibits "refus[ing]" to sell or rent, "mak[ing] unavailable or deny[ing]" housing or access, and "discriminat[ing]" "because of" (or, in Section 806, "on account of") an individual's protected

characteristic. 42 U.S.C. §§ 3604(a), (b), (f)(1), (f)(2), 3605, 3606. By the statute's plain terms, a person is forbidden from taking the specified actions only when he does so "because of" a person's protected characteristic: that is, when he is motivated by discriminatory intent.

The government cannot, and does not, dispute that linguistic point. Instead, it argues that an individual may also be disparately affected because of his membership in a protected group and that, in such circumstances, the impact is felt "because of" the protected characteristic. *See* Defs.' Mem. 26. But the FHA does not forbid an individual being "affected because of" a protected characteristic; it forbids *taking certain actions against an individual*—refusing, making unavailable or denying, and discriminating—because of that individual's protected characteristic. Where a statute forbids someone from taking some action against an individual "because of" his protected characteristic (rather than from acting in a manner that *affects* an individual because of that characteristic), it is natural to construe the statute as prohibiting only intentional discrimination.[7]

b.    The government does not dispute that the word "refuse," as used in Section 804(a), connotes an intentional act that requires a purpose, which is supplied by the statute's "because of" clause. *See* Pls.' Mem. 12. In fact, the government does not address the presence of the word "refuse" in the statute at all, even though it is expressly linked to the phrase "make unavailable or deny" by the words "or otherwise" and therefore forms an important part of the statutory context for interpreting that phrase.

Instead, the government focuses on "make unavailable or deny" in isolation. But the government cannot dispute that, according to its ordinary meaning, the word "deny," like "re-

---

[7] Contrary to the government's contention, a natural and grammatical reading of the statute is quite relevant at the first step of *Chevron*; only *after* a court finds a statute to be ambiguous is the agency entitled to adopt an interpretation that is not "the best or most natural one." *See* Defs.' Mem. 19, 26 (quoting *Pauley* v. *BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991)).

fuse," indicates an intentional act that requires a purpose.  *See* Pls.' Mem. 13.  Dictionaries and Supreme Court opinions confirm that meaning.  *See id.*; *Alexander* v. *Sandoval*, 532 U.S. 275, 280 (2001) (concluding that it is "beyond dispute" that Section 601 of Title VI, 42 U.S.C. § 2000d, which makes it unlawful for any person to "be denied" federal financial assistance "on the ground of" race, "prohibits only intentional discrimination"); *City of Mobile* v. *Bolden*, 446 U.S. 55, 60-64 (1980) (opinion of Stewart, J.) (interpreting Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, which made it unlawful to "deny or abridge" voting rights "on account of" race, to prohibit only intentional discrimination).  Although the government halfheartedly suggests that the word "deny" does not "inevitably connote intentional action," it provides no support for that assertion.  Defs.' Mem. 25.

Further stripping the word "make" of any context, the government contends that the phrase "make [housing] unavailable" could include causing unavailability "to exist, appear, or occur .  .  .without specifically intending to do so." Defs.' Mem. 25.[8]  Even assuming, *arguendo*, that the word "make" were susceptible to that interpretation in isolation, the context here makes clear that Congress intended to prohibit only intentional discrimination.  "Make unavailable" is in the same clause as "deny," and that clause is expressly linked to the other verb in Section 804(a), "refuse," by the word "otherwise."  Both "deny" and "refuse" indisputably require a discriminatory purpose, and the word "make" is not of such a fixed character as to defy being colored by its context.  When "make" is given "more precise content by [those] neighboring words," in accordance with traditional statutory construction, *Freeman* v. *Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042 (2012) (internal quotation marks and citation omitted), there can be no

---

[8]  Curiously, the government purports to define the word "make" not by reference to any of the word's 36 definitions, but instead by quoting from a dictionary's explanation of the word's *synonyms*.  *See* Defs.' Mem. 25 (quoting *Webster's Third New International Dictionary* 1364 (1966).

doubt that Congress intended to limit it to actions taken with the discriminatory motive described in Section 804(a).

c.    In a desperate effort to inject ambiguity into the statute, the government argues that the word "discriminate" in Section 804(b) and (f) could "accommodate" disparate-impact liability.  Defs.' Mem. 23, 24.[9]  But the government does not dispute that the *ordinary* meaning of "discriminate" in this context is "to make a difference in *treatment* or favor on a class or categorical basis in disregard of individual merit."  *Webster's Third New International Dictionary* 648 (1971) (emphasis added); *see American Heritage Dictionary* 376 (1969) (defining "discriminate" as "[t]o act on the basis of prejudice").  That ordinary meaning is confirmed by the Supreme Court's interpretation of Section 703(a)(1) of Title VII and Section 4(a)(1) of the ADEA—each of which makes it unlawful "*to discriminate* against any individual  .  .  .  because of such individual's" protected characteristics, 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1) (emphasis added)—to prohibit only intentional discrimination.  *See Ricci* v. *DeStefano*, 557 U.S. 557, 577 (2009) (Section 703(a)(1) of Title VII); *Smith* v. *City of Jackson*, 544 U.S. 228, 236 n.6 (2005) (plurality opinion) (Section 4(a)(1) of the ADEA); *id.* at 246 (Scalia, J., concurring) (same); *id.* at 249 (O'Connor, J., concurring in the judgment) (same).  Here, there is simply no reason to think that Congress intended to deviate from that ordinary meaning, particularly given the other terms that Congress actually used.

For precisely that reason, the Emergency School Aid Act offers no aid to the government. *See* Defs.' Mem. 24.  In construing that statute, the Supreme Court acknowledged that the word "discriminate," standing alone, would suggest intentional discrimination.  *See Board of Educa-*

---

[9] Despite suggesting that the word "discriminate" is ambiguous, the government appears to rely solely on the phrase "make unavailable" to import disparate-impact analysis into the FHA. *See* Defs.' Mem. 21-22.

*tion* v. *Harris*, 444 U.S. 130, 138-139 (1979). But the Court ultimately ruled that, because "discriminate" was paired in the statute at issue with the phrase "results in the disproportionate demotion or dismissal of . . . personnel from minority groups," an impact test could apply. *Id.* at 138. The text of the FHA is nothing like that of the Emergency School Aid Act, because the FHA links the word "discriminate" with terms that unambiguously proscribe only intentional discrimination.

2.    a.    As noted above, the foregoing reading of the FHA is confirmed when that statute is juxtaposed with Section 703(a) of Title VII of the Civil Rights Act of 1964 and Section 4(a) of the ADEA, two other anti-discrimination statutes that Congress enacted just a few years earlier. Each of those statutes has two relevant provisions—one prohibiting only intentional discrimination and the other prohibiting conduct resulting in a disparate impact.

Remarkably, the government wholly ignores the intentional-discrimination provisions of Title VII and the ADEA; they are not so much as cited in the government's brief, despite the government's copious attention to the accompanying disparate-impact provisions. As the below chart illustrates, however, the FHA is much more closely analogous to the intentional-discrimination provisions than to the disparate-impact provisions of those statutes:

**Anti-Discrimination Provisions in Title VII, ADEA, and FHA**

|  | **Section 703(a) of Title VII; Section 4(a) of the ADEA** | **Section 804 of the FHA** |
|---|---|---|
| **Intentional Discrimination** | (a)   It shall be an unlawful employment practice for an employer—<br><br>(1)   to fail or *refuse to hire* or to *discharge* any individual, or otherwise to *discriminate against* any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's [protected characteristic]. | It shall be unlawful—<br><br>(a)   To *refuse to sell or rent* after the making of a bona fide offer, or to *refuse to negotiate* for the sale or rental of, or otherwise *make unavailable or deny*, a dwelling to any person because of [a protected characteristic].<br><br>(b)   To *discriminate against* any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of [a protected characteristic]. |
| **Disparate Impact** | (a)   It shall be an unlawful employment practice for an employer—<br><br>(2)   to *limit, segregate, or classify* his employees [or, under Title VII, applicants for employment] in any way which would deprive or *tend to deprive* any individual of employment opportunities or otherwise *adversely affect* his status as an employee, because of such individual's [protected characteristic]. |  |

Like Section 703(a)(1) of Title VII and Section 4(a)(1) of the ADEA, the FHA prohibits "refus[ing]" and "discriminat[ing] against" and focuses on the defendant's discriminatory motivation for a particular action against an individual.  As noted above, the Supreme Court has interpreted that statutory language as prohibiting only intentional discrimination, *see* pp. 25-26, *supra*, and the same analysis applies to the FHA.

The government errs when it tries to draw a parallel instead between the FHA and the disparate-impact provisions of Title VII and the ADEA. *See* Defs.' Mem. 23. The Supreme Court interpreted those provisions to give rise to disparate-impact liability precisely because their text prohibits actions that "*adversely affect*" an individual. *Smith*, 544 U.S. at 235 (quoting Section 703(a)(2) of Title VII) (emphasis in original). The text of the FHA, by contrast, simply does not "focus[] on the *effects* of the action on the [individual]." *Id.* at 236. The FHA contains no reference to conduct that "affects" an individual in a particular way. Nor does it refer to conduct that "will have the effect of" causing certain outcomes, like Section 5 of the Voting Rights Act does. 42 U.S.C. § 1973c(b). Also unlike the disparate-impact provisions of Title VII and the ADEA, the FHA does not refer to conduct that would "tend to deprive" an individual of certain benefits. *See* 29 U.S.C. § 623(a)(2); 42 U.S.C. § 2000e-2(a)(2). Nor does the FHA contain any reference to practices that "result[] in" prohibited outcomes, like Section 2 of the Voting Rights Act, which Congress amended for the specific purpose of eliminating a judicially imposed intent requirement. 42 U.S.C. § 1973(a); *see* Pls.' Mem. 17.

Congress's decision not to use effects-focused language in the FHA, despite using it in other contemporaneous statutes, demonstrates that Congress did not intend to create disparate-impact liability under the FHA. By prohibiting "refus[ing]" or "otherwise mak[ing] unavailable or deny[ing] a dwelling to any person," the FHA does not contain any effects-focused language that signals disparate-impact liability.

b.      Like the government, those courts of appeals that have found disparate-impact claims cognizable under the FHA have ignored the "key textual differences" between the disparate-impact and intentional-discrimination provisions of Title VII and the ADEA. *Smith*, 544 U.S. at 236 n.6. In fact, every court of appeals to have reached that conclusion did so for the first

time before the Supreme Court elucidated those key textual differences in *Smith*.  *See* Pls.' Mem. 18; *cf.* Defs.' Mem. 28 (incorrectly claiming otherwise).  The government's own case citations demonstrate that every court of appeals to have decided the question did so before 2005, *see* Defs.' Mem. 20; while some courts have reapplied circuit precedent since then, none has reconsidered the question in light of *Smith*.  As one judge has observed, "there has been  .  .  .  virtually no discussion of the matter [of the textual basis for disparate-impact liability under the FHA] by any court of appeals since the Court in *Smith* explained how the text of Title VII justified the decision in *Griggs*."  *Gallagher* v. *Magner*, 636 F.3d 380, 383 (8th Cir. 2010) (Colloton, J., dissenting from denial of rehearing en banc).[10]

More broadly, the fact that some courts of appeals have construed the FHA to permit disparate-impact claims does not determine whether the statutory text clearly expresses Congress's intent to prohibit only intentional discrimination.  As the Supreme Court has explained, "judges cannot cause a clear text to become ambiguous by ignoring it."  *Deal* v. *United States*, 508 U.S. 129, 136 (1993); *see also Reno* v. *Koray*, 515 U.S. 50, 64-65 (1995) (noting that "[a] statute is not 'ambiguous'  .  .  .  merely because there is a division of judicial authority over its proper construction" (internal quotation marks and citation omitted)).  Indeed, the Supreme Court has repeatedly found statutes to be unambiguous despite "a long line of  .  .  .  lower-court decisions" adopting a contrary interpretation.  *Deal*, 508 U.S. at 142 n.6 (Stevens, J., dissenting); *see also*, *e.g.*, *Hoffman* v. *Blaski*, 363 U.S. 335, 343 (1960) (agreeing that the statute at issue was "unambiguous, direct and clear" (internal quotation marks and citation omitted)); *id.* at 358 (Frankfurter, J., dissenting) (noting that the Court's interpretation was "contrary to the rulings of

_____

[10] The fact that district courts in those circuits continue to consider themselves bound by circuit precedent regarding the FHA even after *Smith*, of course, signifies nothing.  It certainly does not constitute a "resounding[] reject[ion]" of Plaintiffs' interpretation, as the government contends.  Defs.' Mem. 28.

every Court of Appeals but one which has considered the problem, and [wa]s contrary to the view of more than half the District Courts as well").  For example, the Court found the text of Title VI to be "clear" in not creating a private right of action to enforce disparate-impact regulations, *Alexander* v. *Sandoval*, 532 U.S. 275, 285, 288, 293 (2001), even though "[j]ust about every Court of Appeals ha[d] either explicitly or implicitly held that a private right of action exists to enforce [such] regulations" and "[n]o Court of Appeals ha[d] ever reached a contrary conclusion," *id.* at 295 n.1 (Stevens, J., dissenting).

So too here.  Regardless of the views of other courts, which have not revisited their holdings since the most pertinent Supreme Court decision was issued, the text of the FHA leaves no room for recognition of disparate-impact liability.  Because "the statute's language is plain," the Court's inquiry "should end" with "the language of the statute itself."  *United States* v. *Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989).

### B.    The FHA's History Confirms That It Does Not Permit Disparate-Impact Claims

The Court need not search outside the text of the FHA for the meaning of the statute. The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Connecticut National Bank* v. *Germain*, 503 U.S. 249, 253-254 (1992).  Thus, when a statute is unambiguous, the "legislative history," much less subsequent legislative history, need not be consulted.  *Id.*  To the extent that the Court nevertheless believes it is necessary to consider the legislative history and subsequent amendments to other sections of the FHA, those sources confirm that Congress intended to prohibit only intentional discrimination.

1.    As Plaintiffs have explained, *see* Pls.' Mem. 20-21, the legislative history of the FHA is replete with evidence that Congress intended to forbid only "the deliberate exclusion

from residential neighborhoods on grounds of race," 114 Cong. Rec. 2530 (1968) (Sen. Tydings), and similar forms of "overt racial discrimination," 114 Cong. Rec. 3421 (1968) (Sen. Mondale); *see also* 114 Cong. Rec. 2283 (1968) (Sen. Brooke) ("A person can sell his property to anyone he chooses, as long as it is by personal choice and not because of motivations of discrimination."); 114 Cong. Rec. 5643 (1968) (Sen. Mondale) ("The bill permits an owner to do .  .  . everything he could ever do with property, except refuse to sell it to a person solely on the basis of his color or his religion.").  The government cannot seriously dispute that the scourge of intentional discrimination is the consistent theme of the legislative history; perhaps for that reason, the government devotes only a few sentences to the legislative history of the FHA as originally enacted.  *See* Defs.' Mem. 34-35.

In those few sentences, the government picks out passing references to "integrated" living patterns and "low-income housing" in an effort to suggest that members of Congress were concerned with eliminating disparate impacts that were not caused by discriminatory intent.  But when those references are considered in context, they plainly cannot bear the weight that the government would place on them.  *See* 114 Cong. Rec. 3421 (1968) (Sen. Mondale) (noting that "frozen rules" of property ownership have permitted whites to determine where blacks may live, and reiterating that "[t]his bill .  .  . removes from an economic transaction an irrelevant test based on color"); 114 Cong. Rec. 2277 (1968) (Sen. Mondale) (quoting report about various reasons individuals cannot escape ghettos in order to demonstrate that non-whites who "had the financial ability to buy decent housing in all-white neighborhoods" were being denied housing when it "was absolutely obvious" that "race [was the] reason"); 114 Cong. Rec. 3422 (1968) (Sen. Mondale) (expressing the hope that, after the bill prohibited housing discrimination "caused by .  .  . bigotry," the "laws of supply and demand" would eventually result in "truly

31

integrated and balanced living patterns").[11]  Those references thus lend no support to the government's interpretation.  And even if they did, they are woefully insufficient to overcome the textual evidence that Congress intended to prohibit only intentional discrimination.

2.     Rather than addressing the legislative history of the FHA as originally enacted, the government focuses primarily on the 1988 amendments to the FHA, which did not reenact the statute as a whole or alter the operative language of the statute in any relevant respect.  If anything, the 1988 amendments added *more* intent-focused language to the statute, by making it unlawful "[t]o discriminate  .  .  .  because of a handicap."  42 U.S.C. § 3604(f)(1), (2).

The government's reliance on the intent of the Congress that enacted the 1988 Fair Housing Amendments, twenty years after the FHA was passed, is misplaced.  It is a familiar principle that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," *South Dakota* v. *Yankton Sioux Tribe*, 522 U.S. 329, 355 (1998) (citation omitted), and the Supreme Court "h[as] observed on more than one occasion that the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute," *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 185 (1994) (internal quotation marks and citation omitted).  The 1988 amendments and their legislative history thus provide no basis to doubt that the FHA, as originally enacted, prohibits only intentional discrimination.

a.     The government attempts to make the intent of the 1988 Congress relevant by suggesting that Congress was aware of, and implicitly ratified, a supposed judicial and administrative consensus that disparate-impact claims were cognizable under the FHA.  *See* Defs.' Mem.

---

[11] *See also* 114 Cong. Rec. 3421 (1968) (Sen. Mondale) (emphasizing that "the basic purpose of this legislation is to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it," and adding that "[i]t would not overcome the economic problem of those who could not afford to purchase the house of their choice").

32-34.  That suggestion can be rejected out of hand.  *First*, at the time of the 1988 amendments, the government actually interpreted the FHA *not* to prohibit practices resulting in a disparate impact without discriminatory intent.  Just three months before Congress passed the amendments, the Solicitor General told the Supreme Court in unconditional terms that "Congress intended to require a showing of intentional discrimination" in the FHA.  U.S. Br. at 16, *Town of Huntington* v. *Huntington Branch, NAACP*, 488 U.S. 15 (1988) (No. 87-1961).  In the face of that statement, it is remarkable that the government relies on a letter from eight years *earlier* as evidence that HUD took the position that disparate-impact claims were cognizable.  *See* Defs.' Mem. 33.

*Second*, the three snippets of legislative history on which the government relies to show Congress's supposed awareness of various courts of appeals decisions do nothing of the sort.  The government cites a report from the House Judiciary Committee citing, in a footnote, two courts of appeals decisions; passing testimony from a professor before a subcommittee of the Senate Judiciary Committee; and a reference to that testimony by Senator Kennedy *after* the Fair Housing Amendments had already been signed into law.  *See* Defs.' Mem. 33.  That evidence falls woefully short of demonstrating that Congress *as a whole* was aware of, much less endorsed, any consensus among the courts of appeals on the subject of disparate impact.  Indeed, the Supreme Court has repeatedly criticized reliance on "legislative materials like committee reports," *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005), and the remarks of "a single legislator, even the sponsor," *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 311 (1979)—to say nothing of the remarks of a single legislator who comments on a bill *after* Congress has already passed it, *see Barnhart* v. *Sigmon Coal Co.,* 534 U.S. 438, 457 n.15 (2002).

Given the paucity of affirmative evidence it adduces, the government cannot meet the high bar for inferring ratification of a judicial interpretation from subsequent congressional ac-

tion.  To begin with, Congress did not review and reenact the entire Fair Housing Act, or even the operative provisions at issue here, when it passed the 1988 amendments; as a result, the threshold requirement for inferring ratification has not been satisfied.  *See Jama* v. *Immigration & Customs Enforcement*, 543 U.S. 335, 349 (2005); *Central Bank of Denver*, 511 U.S. at 185. The Supreme Court has "bluntly" rejected such an inference when "Congress has not comprehensively revised a statutory scheme but has made only isolated amendments," as it did in the 1988 Fair Housing Amendments.  *Alexander*, 532 U.S. at 292.  In such circumstances, "[i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the Court's statutory interpretation."  *Id.* (internal quotation marks and citation omitted).  "Congressional inaction cannot amend a duly enacted statute." *Central Bank*, 511 U.S. at 186 (internal quotation marks and citation omitted).

For similar reasons, the House Judiciary Committee's rejection of a proposed amendment in 1988 provides no basis for inferring that Congress ratified the view that the FHA permits disparate-impact claims.  *See* Pls.' Mem. 25-26.  As the Supreme Court has explained, "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute."  *Central Bank*, 511 U.S. at 187 (internal quotation marks and citation omitted).  And to state the obvious, the views of individual members of a later Congress provide little insight into the intent of the earlier Congress that enacted the relevant statutory language.  *See*, *e.g.*, *United States* v. *Estate of Romani*, 523 U.S. 517, 536 (1998) (Scalia, J., concurring) ("[T]he will of a later Congress that a law enacted by an earlier Congress should bear a particular meaning is of no effect whatever.  The Constitution puts Congress in the business of writing new laws, not interpreting old ones.").

b.    The government contends that three provisions Congress added to the FHA as part of the 1988 amendments show that the 1988 Congress presumed the existence of disparate-impact claims.  *See* Defs.' Mem. 28-32.  As Plaintiffs have already explained, however, that contention fails because those provisions, which state only that "[n]othing in [the FHA]" prohibits certain conduct, merely provide clarity and safe harbors.  *See* Pls.' Mem. 22-24.  The government offers no response to Plaintiffs' textual analysis of those provisions.[12]  Those provisions contrast sharply with the "reasonable factor other than age" exception in the ADEA, which affirmatively authorizes employers to take actions that would be "otherwise prohibited" under the statute.  29 U.S.C. § 623(f)(1); *see* Defs.' Mem. 32.  Unlike the ADEA exception, none of the FHA provisions permits actions that would be "otherwise prohibited" under the statute, nor does any of them authorize conduct "notwithstanding" other restrictions of the statute.  Instead, those provisions simply clarify that certain conduct is permitted under the FHA.

Congress's decision to provide such safe harbors makes sense, especially in light of the addition of two new protected categories and the inclusion of appraisals in the 1988 amendments.  Thus, when Congress added the protected category of "familial status" to the FHA, it simultaneously clarified that "[n]othing in [the statute]" limited the applicability of maximum occupancy restrictions.  Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, § 6(b), (d), 102 Stat. 1619, 1621-1623.  Similarly, when Congress added the protected category of "handicap," excluding from the term "current" drug use, it simultaneously clarified that "[n]othing in [the statute]" prohibited conduct against a person because of a conviction for a pri-

---

[12] The government's reliance on a differently worded drug-related exception in Title VII has no bearing on the proper analysis of the text of the FHA.  *See* Defs.' Mem. 29-30.  If anything, the absence of a similar express reference to "disparate impact cases" in the FHA confirms that such claims are not cognizable under the statute, because Congress speaks clearly when it intends to prohibit conduct resulting in a disparate impact without discriminatory intent.  *See* Pls.' Mem. 11-12.

or drug offense. *Id.* § 5(b), § 6(a), (d), 102 Stat. at 1619, 1621. And when Congress brought the "appraising of residential real property" within the FHA, it simultaneously clarified that "[n]othing in [the statute]" prevented appraisers from considering factors other than protected characteristics in their analysis. *Id.* § 6(c), 102 Stat. at 1620. As Plaintiffs have explained, these provisions offer valuable defenses to claims of intentional discrimination by making clear that conduct motivated by a factor that could otherwise arguably be considered related to a protected characteristic is not prohibited by the FHA. *See* Pls.' Mem. 23-24. This Court should reject the government's strained attempt to read into those amendments an affirmative congressional intent to authorize disparate-impact claims, despite the conspicuous absence from the FHA and its amendments of any language affirmatively authorizing such claims.

### C.    Construing The FHA To Permit Disparate-Impact Liability Would Raise Serious Constitutional Questions

The government concedes that, even if the FHA were ambiguous regarding disparate-impact liability, its interpretation would not be entitled to any deference if it "raise[s] [a] serious constitutional question[]." *Miller* v. *Johnson*, 515 U.S. 900, 923 (1995); *see also National Mining Association* v. *Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008) (noting that "[t]his canon of constitutional avoidance trumps *Chevron* deference" if the constitutional "argument [is] serious"). *See* Defs.' Mem. 36. And where, as here, an agency's interpretation of a federal statute "compels race-based [decisions], it by definition raises a serious constitutional question and should not receive deference." *Miller*, 515 U.S. at 923 (citing *Regents of University of California* v. *Bakke*, 438 U.S. 265, 291 (1978) (opinion of Powell, J.)). By imposing liability when an insurer's (or other regulated entity's) practice results in a disparate impact on a racial group, the Disparate-Impact Rule requires insurers and other regulated entities to evaluate the racial outcomes of their policies and to make race-based decisions regarding insurance and other housing

practices in order to avoid those outcomes.  That kind of racial decisionmaking is intentionally discriminatory.  *See Ricci*, 557 U.S. at 579-580.

The canon of constitutional avoidance requires the Court to construe a statute not only to avoid the conclusion that it is unconstitutional, but also to avoid serious doubts about its constitutionality.  *See United States* v. *Jin Fuey Moy*, 241 U.S. 394, 401 (1916).  It therefore does not matter that the Supreme Court has not resolved whether the Equal Protection Clause prohibits the government from requiring discriminatory treatment of individuals based on race in order to avoid causing a disparate impact on a racial group.  *See* Defs.' Mem. 36-37.  The Court has acknowledged the seriousness of the problem and has expressly reserved the question whether such discriminatory treatment, even if motivated by "a legitimate fear of disparate impact," could survive constitutional scrutiny.  *Ricci*, 557 U.S. at 584; *see also id.* at 594 (Scalia, J., concurring) (contending that, "if the Federal Government is prohibited from discriminating on the basis of race, then surely it is also prohibited from enacting laws mandating that third parties  .  .  .  discriminate on the basis of race"); *see Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring) (acknowledging that "mechanisms [that] lead to different treatment based on a [racial] classification  .  .  .  would demand strict scrutiny to be found permissible").  The Court should avoid confronting the serious constitutional questions raised by the Disparate-Impact Rule by interpreting the FHA, as its text demands, to prohibit only intentional discrimination.

**D.      Construing The FHA To Permit Disparate-Impact Liability Would Be Inconsistent With The McCarran-Ferguson Act And Would Disrupt The Business Of Homeowner's Insurance**

To the extent that the Court looks beyond the text of the FHA to confirm congressional intent, the McCarran-Ferguson Act, and the disruptive effect that disparate-impact liability would have on the business of homeowner's insurance, provide further evidence that Congress

did not intend to create disparate-impact liability in the FHA. Plaintiffs' argument is simple. Compliance with the Disparate-Impact Rule would fundamentally alter the business of insurance, in conflict with sound actuarial principles and basic widespread principles of state insurance law. *See* Pls.' Mem. 31-37. The government does not dispute that the McCarran-Ferguson Act prohibits any act of Congress from being "construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). In light of McCarran-Ferguson, therefore, Congress could not have intended in the FHA to impose such a severe disruption on the business of insurance *sub silentio*, or to give HUD the power to do so through rulemaking in the absence of a clear statutory authorization. *See Department of Treasury* v. *Fabe*, 508 U.S. 491, 507 (1993) (noting that McCarran-Ferguson "is, in effect, a clear-statement rule").

In response to this argument, the government simply engages in misdirection, treating Plaintiffs' McCarran-Ferguson argument as if it were a freestanding facial challenge to the Disparate-Impact Rule, rather than an argument in support of Plaintiffs' interpretation of the FHA. *See* Defs.' Mem. 38-43. But contrary to the government's assertions, this Court need not determine that the McCarran-Ferguson Act preempts every application of disparate-impact theory in order to agree with Plaintiffs that disparate-impact liability, unlike liability for intentional discrimination, raises a serious prospect of federal impairment of state insurance regulation and of incompatibility with actuarial principles central to the business of insurance. *See* Pls.' Mem. 35-37. Several courts have acknowledged precisely that concern. *See, e.g., Saunders*, 537 F.3d at 967; *Nationwide Mutual Insurance Co.*, 52 F.3d at 1361; *NAACP*, 978 F.2d at 290-291. The disruption to the business of insurance that compliance with the Disparate-Impact Rule would require, especially in light of the principles of McCarran-Ferguson, constitutes strong evidence that

Congress did not intend to impose disparate-impact liability under the FHA—or to give HUD the power to do so under the guise of rulemaking.

The government also errs in asserting that the conflicts Plaintiffs identify may be dismissed because insurers can "avoid liability" simply by voicing a "legally sufficient justification" for a challenged practice. Defs.' Mem. 42. Even if an insurer could identify a nondiscriminatory interest that justified the challenged practice, the charging party could still prevail by proving that the insurer's interest could be served by a practice with a *less* discriminatory effect. *See* 24 C.F.R. § 100.500(c)(3). The Rule's burden-shifting framework therefore is not the panacea that HUD represents it to be.[13]

### E.    The Disparate-Impact Rule Is Not A Reasonable Interpretation Of The FHA

Finally, even if the FHA were ambiguous and left any gap for HUD to fill, the Disparate-Impact Rule would fail because it is not a reasonable interpretation of the statute.[14] Under the second step of *Chevron*, "a court must determine whether the agency's interpretation is a reasonable resolution of whatever ambiguity precluded a clear declaration of congressional intent in the first step." *Massachusetts* v. *U.S. Dep't of Transportation*, 93 F.3d 890, 893 (D.C. Cir. 1996). "This second inquiry is thus not independent of the first: what a court may consider a reasonable interpretation largely depends on the nature and extent of the ambiguity already identified in

---

[13] The government's amici contend that Plaintiffs' allegations regarding the McCarran-Ferguson Act fail to state a claim. *See* NFHA Br. 12-15. That contention—which the government itself does not make—fails for the obvious reason that Plaintiffs do not seek to state a free-standing claim under the McCarran-Ferguson Act.

[14] The government's suggestion that the Court should treat this argument as forfeited, *see* Defs.' Mem. 44, borders on the disingenuous. Plaintiffs raised the argument in their opening brief, *see* Pls.' Mem. 37 n.6, and the government has now joined issue. *Cf. Washington Legal Clinic for the Homeless* v. *Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997) (noting that a court normally will not address a claim if one party raised it in "cursory fashion" and the other party did "not address the merits of the claim at all" (internal quotation marks and citation omitted)).

*Chevron*'s first step." *Id.*  Furthermore, "traditional presumptions about the parties or the topic in dispute may limit the breadth of ambiguity and thus affect both the first and second steps of *Chevron*." *Id.*

The D.C. Circuit's decision in *Massachusetts*, *supra*, is elucidating.  In that case, the court held that, although the Department of Transportation's interpretation of the Hazardous Materials Transportation Act was "perhaps not conclusively forbidden by the statute itself," it "could not be deemed reasonable in light of the text and structure of [the Act] *as well as* the traditional presumption against the federal preemption of state rules in areas of traditional state regulation." 93 F.3d at 894.  The presumption against preemption "constrain[ed] the possible number of *reasonable* ways to read an ambiguity in [the] statute." *Id.* at 893.  And in light of the presumption, the court could not "credit an interpretation . . . [that] may sweepingly preclude state rules in many areas of hazardous-waste regulation within that state." *Id.* at 896.

So too here, a background rule of construction—the McCarran-Ferguson Act's reverse-preemption principle—along with the text and history of the FHA, set the bounds of HUD's discretion.  Instead of accounting for the McCarran-Ferguson Act in its interpretation of the FHA, as it was required to do, HUD unreasonably disregarded the statute and promulgated a rule that would "sweepingly preclude state rules in many areas of [insurance] regulation." *Massachusetts*, 93 F.3d at 896.  And all of Plaintiffs' arguments, set out above, under the first step of *Chevron* apply with full force under the second step as well.  Those arguments demonstrate that HUD's interpretation of the FHA, especially in light of the McCarran-Ferguson Act and the effect of disparate-impact liability on the business of insurance, was not a reasonable one.  *See id.* at 893; *Natural Resources Defense Council, Inc.* v. *Daley*, 209 F.3d 747, 753-754 (D.C. Cir. 2000) (con-

cluding that the agency's position failed under the second step of *Chevron* in light of the plaintiff's argument under the first step).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted and the Disparate-Impact Rule vacated.

Respectfully submitted,

By:  /s/Kannon K. Shanmugam
Kannon K. Shanmugam (#474304)
Allison B. Jones (#991503)
A. Joshua Podoll (#1011743)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

*Counsel for Plaintiffs*

February 24, 2014