IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN INSURANCE ASSOCIATION and NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development,<br><br>Defendants. | Civil Action No. 13-cv-966 (RJL) |

**AFFIDAVIT OF KATHLEEN RUDOLPH IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

I, Kathleen Rudolph, declare as follows:

1.  I am over eighteen years of age and am not suffering under any legal or physical disability.

2.  I submit this affidavit in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. I am testifying to the statements below based on my personal knowledge.

3.  I am Vice President – Business Compliance at The Hartford Financial Services Group, Inc. ("Hartford"). Hartford is a member of Plaintiff American Insurance Association. My duties at Hartford include managing and optimizing the ongoing work to ensure that Hartford's writing companies are in compliance with State and federal law in the provision of homeowners' insurance.

7820906_1

1

4. The American insurance industry is highly regulated, primarily through the regulatory arm of each State. An insurer's compliance with insurance rules and regulations in a jurisdiction is generally a prerequisite to doing business there. The consequences of lapsing out of compliance with a State's regulatory strictures can be catastrophic, including the loss of the right to conduct business as an insurer in that State.

5. The Hartford writing companies insure over a million homeowners in the 50 States and the District of Columbia against the risk of loss to their homes and belongings. Through its compliance and government affairs functions, Hartford maintains ongoing monitoring and outreach efforts to ensure it is operating in full accord with the regulatory strictures of each of the States.

6. Hartford designs and sells its homeowners' insurance products based on long-standing principles of risk assessment and differentiation. In short, in the underwriting process Hartford identifies risk factors based on data pertinent to a given property. Those may include dwelling-specific factors such as property age, type of construction, and broader factors such as the catastrophe history of the region. From there, Hartford can pool risks, thereby creating a basis for predictability that allows the company to establish rates. The accurate ongoing evaluation and differentiation of risk drives the underwriting and rating models.

7. Hartford provides the consumer with the characteristics that we use to rate their policy. Hartford does so as well to State regulators, in the form of rate filings that are submitted as a precondition of doing business there, which govern the price Hartford can charge for insurance premiums in that State.

8. The regulations that govern Hartford and its peers in the business of insurance are fully consistent with the idea that risk assessment and differentiation should be the primary engine in underwriting, rating and pricing homeowners' insurance. For example, regulations in Alaska, Colorado, West Virginia and Wisconsin affirmatively permit risk differentiation to account for probable impacts on losses or expenses. Similarly, Maine's statute enumerates permissible factors for risk classification, so long as the classifications apply equally to all insureds with the same circumstances or conditions.

9. State regulations also make clear that certain factors extraneous to risk assessment and differentiation should not be considered in insurers' actuarial and rating work. By way of example, Alaska, Illinois and Tennessee each forbid risk differentiation in insurance based on race, color, religion, or national origin. Maryland law forbids even the collection of data regarding those characteristics of insureds. In that spirit, Hartford does not collect or take any account of these criteria in underwriting and rating homeowners' insurance, and these factors have no relevance to actuarial risk assessment and differentiation in the process of insuring homeowners.

10. As a stakeholder in Hartford's compliance group, I have been closely monitoring the recent consideration and adoption by the federal Department of Housing and Urban Development (HUD) of a rule which, on its face, extends that entity's reach into the field of homeowners' insurance. The new HUD rule has already provided much cause for concern and internal discussion at Hartford about what steps, if any, Hartford can take in response without creating other, greater problems. The threshold problem is that Hartford cannot determine its current compliance or ability to comply with the HUD rule without

taking new steps that would undermine its current business practices discussed above and its ongoing obligations to comply with State rules and regulations.

11. The HUD rule creates immediate tension with respect to State regulatory obligations, as they essentially forbid consideration of protected characteristics that the HUD rule would newly require us to value in the underwriting and rating process. I am aware of no current efforts by State regulators to give insurers relief from the existing State regulatory regimes to facilitate compliance with the HUD rule.

12. Hartford would have to undertake three steps to assure effective compliance with the HUD rule, and each of those steps would mark departures from Hartford's current business practices. The three-step process would comprise: (1) collecting data on characteristics of Hartford's insureds of interest to HUD (including race, religion, gender and national origin); (2) cross-referencing this newly-collected data against the pricing determined by the current risk assessment and differentiation model described above; and (3) making corrective underwriting, rating and pricing adjustments to recalibrate away from risk and towards parity of "impact." Each of these steps would create fundamental conflicts with Hartford's existing State regulatory obligations.

13. First, Hartford does not currently collect or use data regarding race, religion, or nationality in issuing homeowners' insurance policies. This data in no way informs the process Hartford employs to assess risk or to rate and price insurance. Given the State regulations that affirmatively forbid the use of such data by insurers, it would be a compliance risk under the existing State regulatory regime even to possess such data. Hartford would need some State regulators' approval to modify its processes to collect this data, and the inconsistency of this modification with most existing State regulatory obligations (start-

iv

ing with Maryland's, which prohibits the collection of such data) would certainly create friction, or even active conflict, with State regulators.

14. Second, using the currently-uncollected data as a benchmark against our current underwriting and rating structure is foreign to Hartford's current actuarial process and would require the incorporation of additional analytics that, for obvious reasons, do not exist in the current system. Again, the actuarial use of this data itself would likely be regarded as violative of existing State norms that prohibit attempts to differentiate amongst insureds by means of these characteristics.

15. Third, taking the analysis to its logical conclusion, in order to ensure compliance with the HUD rule, Hartford would have to use the newly-acquired data to adjust outcomes for individual insureds based solely on this data – *i.e.* adjusting (upward or downward) the premium charged to achieve parity of "impact." Again, this would require additional analytical effort and diversion of resources, all in the cause of a process that would run directly afoul of most State regulatory regimes, and operate inconsistently with others. That practice would risk Hartford's ability to do business as an insurer in those States under current regulations. It would also subvert Hartford's risk differentiation model that has governed its business practices, and the operation of the American insurance business more generally, for decades.

\\\
\\\
\\\

16. Hartford's compliance organization prides itself on being proactive and maintaining adaptability to change. We keep close watch on proposed State rules and regulations and foster strong working relationships with State regulators to ensure that Hartford remains on the leading edge of the compliance curve. Good-faith efforts to assure compliance with the HUD rule would force Hartford out of compliance with many States, thereby jeopardizing its ongoing ability to do business.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 21, 2014 in Hartford, Connecticut.

*Kathleen Rudolph*
Kathleen Rudolph