**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

      Plaintiffs,

        vs.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and SHAUN DONOVAN, in his official
capacity as Secretary of Housing and Urban
Development,

      Defendants.

Civil Action No. 13-cv-966 (RJL)

**AFFIDAVIT OF VICTORIA L. MCCARTHY IN SUPPORT OF PLAINTIFFS'**
**OPPOSTION TO DEFENDANTS' MOTION TO DISMISS**

I, Victoria L. McCarthy, declare as follows:

1.    I am over eighteen years of age and am not suffering under any legal or physical disability.

2.    I submit this declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss.  I am testifying to the statements below based on my personal knowledge.

3.    I am the Head of State and Federal Regulatory Affairs at Farmers Group, Inc. (FGI).  My duties include leading the team that manages state and federal regulatory issues.

4.    FGI is a wholly owned subsidiary of Zurich Insurance Group, Ltd. and is a member of the American Insurance Association. FGI is not an insurance carrier, but does provide certain insurance-related administrative services.

5.   On November 16, 2011 the Department of Housing and Urban Development published its proposed rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard. HUD issued its final rule on February 15, 2013, providing that the Federal Housing Act, 42 U.S.C. 3604 ("FHA") precludes "disparate impact" discrimination (the "Disparate-Impact Rule"). The Disparate-Impact Rule establishes a burden–shifting framework for disparate-impact claims. Under this framework, the plaintiff initially has the burden of showing that a challenged practice caused or predictably will cause a discriminatory effect. If that burden is met, the defendant must show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." If the defendant meets that burden, the plaintiff may still prevail if it can show that such interests supporting the challenged practice could be served by another practice that has a less discriminatory effect

6.   Many states prohibit property and casualty insurance carriers from collecting data regarding the race, color, religion, national origin, sex, familial status, or disability of their policyholders, or prohibit insurance carriers from using such data in underwriting decisions. FGI, in accordance with state regulations, does **not** collect such data.

7.   Since the Disparate Impact Rule was proposed, FGI has expended time and personnel resources to analyze the rule and the compliance issues it creates for insurance carriers subject to different and conflicting obligations under state and federal law. In the course of my duties, my colleagues and I have spent approximately 104 hours evaluating the proposed rule and the final rule, and discussing with individuals within the organization the potential impact of the different and conflicting obligations under state and federal law. In total, to date it has cost FGI approximately $ 26,000 and approximately 104 of

hours in employee time to evaluate the potential impact and compliance issues arising from the Disparate-Impact Rule. These costs are independent from, and not associated with, the instant litigation. But for the Disparate Impact Rule, FGI would not have incurred these costs.

8.    Moreover, the Disparate-Impact Rule imposes an undue burden and cost on insurers. Any allegation of disparate impact liability made against an insurer (whether by the Department, or by a private party plaintiff) may necessitate a complicated and expensive analysis by the insurer, an analysis which it could only do with the assistance of outside experts.

9.    First, an insurer may need to analyze whether its actions do or do not have a "discriminatory effect" (a "Disparate-Impact Analysis"). Additionally, the insurer may need to analyze if the challenged practice is necessary to achieve one or more substantial, legitimate nondiscriminatory interests, and may need to analyze and preclude any argument by a plaintiff that there may be other practices with a less discriminatory effect (an "Actuarial Analysis"). Each analysis imposes a substantial cost and burden on an insurer.

10.    Again, as an initial matter, in many states an insurance carrier may not collect information regarding the race, ethnicity, sex, or other classification characteristics of its insureds, or use such data in underwriting decisions. Thus, an insurer will not be able to specifically identify the race, ethnicity or other classification characteristics of any of its insureds.

11.    To perform a Disparate-Impact Analysis, an insurer may need to engage the services of an expert, and may need to gather voluminous records to provide to that expert. For example, the insurer may need to gather and provide information regarding policyholders

and policies for a multi-year period, including information relating to the creation, modification and termination of the policy, address, age of home, number of units, construction material, replacement cost, roof type and roof age, as well as zip, county and territory codes. The insurer may also need to gather and provide information relating to the types and amounts of coverage included in each policy, the deductible amount and various classes of discounts and surcharges, the premium charged for the policy, and all losses claimed. Finally, the insurer may need to provide any specific information relating to the action being challenged as having a disparate impact.

12.    Because the insurer's records would not have information regarding race, ethnicity or other classification characteristic, the expert may need to find a method to determine and assign such demographic classifications to the insureds' data. One such process is "geocoding", in which the expert may have to attempt to determine the racial and ethnic characteristics of a carrier's policyholders by analyzing census data of the geographic areas containing the policyholders' addresses.

13.    After the results of the geocoding are obtained, the expert may then need to design and perform a complicated, multi variant regression type of analysis to attempt to determine whether the challenged practice did, in fact, result in any disparate impact as concerns a particular classification characteristic.

14.    The cost of performing both the geocoding analysis and then the overall Disparate-Impact Analysis may vary based on the size and scope of the analysis to be done (that is, the cost may depend on the amount of data and records analyzed, as well as the number of different geographic areas encompassed by such an analysis)—but in all cases the cost will be very large. The cost of such an analysis may routinely run from at least a few hundred

thousand dollars to multiple millions of dollars. This cost is for the analysis alone, and would not include the cost of an expert report, or the cost of the expert's time in testifying or reviewing any other material such as another expert's report.

15.    In addition to a Disparate-Impact Analysis, an insurer may also need to conduct expert analysis of the actuarial soundness of the challenged practice - the Actuarial Analysis. For this, the insurer may need to engage experts to design, run and analyze an actuarial analysis specifically tailored to the allegations at issue. Such an Actuarial Analysis is also extremely expensive, and would cost in the hundreds of thousands to the millions of dollars.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2014.


Victoria L. McCarthy

v