# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION,

   et al.,

      Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,

   et al.,

      Defendants.

Case No. 1:13-cv-00966-RJL

---

**BRIEF OF THE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., THE
AMERICAN CIVIL LIBERTIES UNION, THE NATIONAL CONSUMER LAW
CENTER, AND THE NATIONAL COMMUNITY REINVESTMENT COALITION
AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Sherrilyn Ifill
  Director-Counsel
Christina A. Swarns
Ryan P. Haygood (Bar. No. 53135)
Ria Tabacco Mar
NAACP Legal Defense &
  Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Dennis D. Parker
Laurence M. Schwartztol
Rachel E. Goodman
Peter W. Beauchamp
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500

Joshua Civin (Bar No. 494496)
NAACP Legal Defense &
  Educational Fund, Inc.
1444 I St., NW, 10th Floor
Washington, DC 20005
(202) 682-1300

Alys I. Cohen (Bar No. 452411)
National Consumer Law Center
1001 Connecticut Avenue, NW,
  Suite 510
Washington, DC 20036
(202) 452-6252

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

INTERESTS OF AMICI........................................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

   I.    DISPARATE IMPACT ENFORCEMENT IS VITAL IN LIGHT OF HISTORICAL
         AND CONTINUING DISCRIMINATION IN HOMEOWNER'S INSURANCE ........... 4

      A.   Prior intentional discrimination set the stage for the unjustified impediments that
           continue to limit equal access to homeowner's insurance............................................. 4

      B.   Insurers continue to employ policies that result in adverse racial impacts but cannot
           be justified by actuarial risk.................................................................................... 7

         1.   *Maximum-age and Minimum-value Requirements* ..................................... 9

         2.   *Credit Scoring* ............................................................................................ 10

   II.   PLAINTIFFS' MISAPPLICATION OF CONSTITUTIONAL AVOIDANCE
         CONFIRMS THAT THEIR CLAIM IS NOT RIPE ...................................................... 13

      A.   Plaintiffs' characterization of the operation of HUD's Discriminatory Effects Rule is
           flawed and highlights the unripeness of their claim ................................................... 14

      B.   Case-specific application of strict scrutiny is fully adequate to address any
           constitutional concerns raised by disparate impact in particular circumstances ........ 20

      C.   Disparate impact remedies further compelling interests............................................. 21

         1.   *Evidentiary dragnet to root out subtle or covert discrimination* ........................... 21

         2.   *Eliminating unnecessary barriers to equal housing opportunity* ......................... 23

      D.   Narrow tailoring provides a framework for addressing any constitutional tensions
           based on the facts of a particular case ...................................................................... 26

CONCLUSION...................................................................................................................... 27

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)............................................................ 20

*Albemarle Paper Company v. Moody*, 422 U.S. 405 (1975) .................................................... 17, 22

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) ........................................................ 13

*Aman v. Cort Furniture Rental Corporation*, 85 F.3d 1074 (3d Cir. 1996) ................................ 21

*Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001) ...................... 14, 25

*Burrell v. State Farm & Casualty Company*, 226 F. Supp. 2d 427 (S.D.N.Y. 2002)................... 6

*Bush v. Vera*, 517 U.S. 952 (1996) ......................................................................................... 17

*City of Richmond v. J.A. Croson Company*, 488 U.S. 469 (1989)................................... 17, 25, 26

*Clark v. Martinez*, 543 U.S. 371 (2005) ................................................................................ 13

*Connecticut v. Teal*, 457 U.S. 440 (1982).............................................................................. 17

*Dehoyos v. Allstate Corporation*, 240 F.R.D. 269 (W.D. Tex. 2007) ......................................... 12

*Dehoyos v. Allstate Corporation*, No. CIV.ASA01CA1010FB, 2002 WL 1491650
    (W.D. Tex. Apr. 5, 2002)....................................................................................................... 12

*Dunn v. Midwestern Indemnity Mid-American Fire & Casualty Company*, 472 F. Supp. 1106
    (S.D. Ohio 1979)..................................................................................................................... 5

*Fisher v. University of Texas at Austin*, 133 S. Ct. 2411 (2013) ................................................ 18

*Fuller v. Teachers Insurance Company*, No. 06-cv-00438, 2007 WL 2746861
    (E.D.N.C. Sept. 19, 2007)...................................................................................................... 7

*Graoch Assocs. # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*,
    508 F.3d 366 (6th Cir. 2007) ................................................................................................. 2

*Griggs v. Duke Power Company*, 401 U.S. 424 (1971)...................................................... passim

*Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d. Cir. 1988).......... 3, 18, 24

*In re Employment Discrimination Litigation Against Alabama*, 198 F.3d 1305
    (11th Cir. 1999) ................................................................................ 22, 23

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) ........................ 22

*Jaimes v. Lucas Metropolitan Housing Authority*, 833 F.2d 1203 (6th Cir. 1987) ..................... 26

*Jones v. Travelers Casualty Insurance Company of America*, No. 13-CV-02390, 2013 WL
    4511648 (N.D. Cal. Aug. 22, 2013) ................................................................ 7

*Lewis v. City of Chicago*, 560 U.S. 205 (2010) ...................................................... 3, 21

*Lumpkin v. Farmers Group, Inc.*, No. 05-2868 Ma/V, 2007 WL 6996584
    (W.D. Tenn. Apr. 26, 2007) .......................................................................... 11

*Metropolitan Housing Development Corporation v. Village of Arlington Heights*, 558 F.2d 1283
    (7th Cir. 1977) ........................................................................................... 21

*Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991) .................................................................................. 21

*NAACP v. American Family Mutual Insurance Company*, 978 F.2d 287 (7th Cir. 1992) ............ 6

*National Fair Housing Alliance, Inc. v. Prudential Insurance Company of America*,
    208 F. Supp. 2d 46 (D.D.C. 2002) ............................................................... 12

*Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003) ................................. 24

*Nevels v. Western World Insurance Company, Inc.*, 359 F. Supp. 2d 1110
    (W.D. Wash. 2004) ..................................................................................... 6

*Ojo v. Farmers Group, Inc.*, No. CV 05-5818-JFW, 2006 WL 4552707
    (C.D. Cal. Mar. 7, 2006) ............................................................................ 10

*Parents Involved in Community Schools v. Seattle School District No. 1*,
    551 U.S. 701 (2007) .................................................................................. 16

*Raso v. Lago*, 135 F.3d 11 (1st Cir. 1998) ............................................................... 15

*Resident Advisory Board. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977) ..................................... 16

*Ricci v. DeStefano*, 557 U.S. 557 (2009) .................................................... 17, 24, 25

*Rust v. Sullivan*, 500 U.S. 173 (1991) ............................................................... 13, 20

iii

*Salinas v. United States*, 522 U.S. 52 (1997) ............................................................................. 13

*Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984) ......................................................................... 22

*Shaw v. Hunt*, 517 U.S. 899 (1996) ............................................................................................. 17

*Tennessee v. Lane*, 541 U.S. 509 (2004) ..................................................................................... 23

*Texas v. United States*, 523 U.S. 296 (1998) .............................................................................. 13

*Thompson v. Metropolitan Life Insurance Company*, 149 F. Supp. 2d 38 (S.D.N.Y. 2001) ......... 4

*Toledo Fair Housing Center v. Nationwide Mutual Insurance Company*, 704 N.E.2d 667
    (Ohio Ct. Com. Pl. 1997) ....................................................................................................... 9

*Toledo Fair Housing Center v. Nationwide Mutual Insurance Company*, 705 N.E.2d 1
    (Ohio Ct. Com. Pl. 1998) ..................................................................................................... 10

*Trafficante v. Metropolitan Life Insurance Company*, 409 U.S. 205 (1972) .......................... 6, 21

*United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974) ............................................. 1

*United States v. Mortgage Guaranty Insurance Corporation*, Civ.A. No. 2:11-00882-RCM,
    2012 WL 1606235 (W.D. Pa. Apr. 30, 2012) ...................................................................... 4

*United States v. Paradise*, 480 U.S. 149 (1987) ........................................................................ 26

*United States v. Starrett City Associates*, 840 F.2d 1096 (2d Cir. 1988) .................................... 26

*United States v. Yonkers Board of Education*, 837 F.2d 1181 (2d Cir. 1987) ............................. 16

*Wai v. Allstate Insurance Company*, 75 F. Supp. 2d 1 (D.D.C. 1999) ......................................... 6

*Washington v. Davis*, 426 U.S. 229 (1976) ................................................................................. 22

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) ................................................... 21, 24

## COURT FILINGS AND DOCKETED CASES

Conciliation Agreement, *HUD v. Allstate Insurance Company*, No. 03-94-0529-8
    (Feb. 1997) ........................................................................................................................ 19

Conciliation Agreement, *HUD v. State Farm Fire & Casualty Company*, Nos. 05-94-1351-8, 05-94-1352-8 (July 1996) ............................................................................................... 19

Consent Decree, *United States v. American Family Mutual Insurance* and *NAACP v. American Family Mutual Insurance Company* (Dep't of Justice July 13, 1995), *available at* http://www.justice.gov/crt/about/hce/documents/amfamsettle.php ................................... 10, 19

Consent Decree, *United States v. City of Pooler*, No. 4:01-263 (S.D. Ga. June 16, 2003) .......... 18

Consent Decree, *United States v. Erie Insurance Company of New York*, No. 08-0945 (W.D.N.Y. Dec. 23, 2008) ...................................................................................................... 19

Consent Decree, *United States v. Jacksonville Housing Authority*, No. 3:00-1165-J-25A (M.D. Fla. Oct. 18, 2000) ................................................................................................... 18

Consent Decree, *United States v. Nationwide Mutual Insurance Company*, No. C2-97-291 (S.D. Ohio Mar. 10, 1997) .............................................................................................. 19

## STATUTES AND CONGRESSIONAL MATERIALS

42 U.S.C. § 3604 ........................................................................................................................ 14

90 Cong. Rec. 3422 (1968) ........................................................................................................ 21

Fair Housing Act of 1968 (FHA), Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified as amended at 42 U.S.C. §§ 3601-3631) .................................................................. 1

## FEDERAL RULES AND REGULATIONS

24 C.F.R. § 100.500(b) .............................................................................................................. 12

24 C.F.R. § 100.500(c) ............................................................................................................ 2, 3, 8

54 Fed. Reg. 3232 (Jan. 23, 1989) (codified at 24 C.F.R. § 100.70(d)(4)) .................................... 7

HUD, Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) .............................................................................. 1, 2, 8

## OTHER AUTHORITIES

Tom Baker & Karen McElrath, *Whose Safety Net? Home Insurance and Inequality*, 21 Law & Soc. Inquiry 229 (1996) ................................................................................................ 9

Birny Birnbaum, Insurers' Use of Credit Scoring for Homeowners Insurance In Ohio: A Report to the Ohio Civil Rights Commission (Jan. 2003) .................................................... 11

Civil Rights Division, U.S. Department of Justice, *Title VI Legal Manual* (2001) ...................... 3

Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Regulation 21 (2006) .................................. 10

Carol A. Heimer, *The Racial And Organizational Origins Of Insurance Redlining*, X:3 J. Intergroup Relations (Autumn 1982) ........................................................................................ 5

Brent Kabler, State of Missouri Department of Insurance, Insurance-Based Credit Scores: Impact on Minority and Low Income Populations in Missouri (Jan. 2004) ...................... 11, 12

Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners Insurance Markets*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions (Gregory D. Squires ed., 1997) ............................................................... 8

Douglas S. Massey & Nancy A. Denton, *American Apartheid: Segregation and the Making of the Underclass* (1993) ........................................................................................................ 25

N.J. Citizen Action et al., Insurance Redlining: Is It Happening in Your Neighborhood? (Feb. 2004), *available at* www.njcitizenaction.org/craredlining.html ........................................ 8

National Consumer Law Center & Center for Economic Justice, Credit Scoring and Insurance: Costing Consumers Billions and Perpetuating the Economic Racial Divide (June 2007) ....... 11

D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions (Gregory D. Squires ed., 1997) .................................................................................... 9, 10, 11

President's National Advisory Panel on Insurance in Riot Affected Areas, Meeting the Insurance Crisis of Our Cities (U.S. Government Printing Office 1968) .................................................... 6

Patrick Sharkey, *Stuck in Place: Urban Neighborhoods and the End of Progress Toward Racial Equality* (2012) ................................................................................................................. 25

Gregory D. Squires & Jan Chadwick, *Linguistic Profiling: A Continuing Tradition of Discrimination in the Home Insurance Industry?*, 41 Urb. Aff. Rev. 400 (2006) ...................... 6

Gregory D. Squires, *Race, Politics, and the Law: Recurring Themes in the Insurance Redlining Debate*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions (Gregory D. Squires ed., 1997) ............................................................... 5

U.S. Bureau of the Census, American Housing Survey for the United States: 2011 Table C-01-OO (2013), *available at* http://www.census.gov/programs-surveys/ahs/data/2011/h150-11.html ................................................................................................................................. 9

U.S. Bureau of the Census, American Housing Survey for the United States: 2011 Table C-13-OO (2013), *available at* http://www.census.gov/programs-surveys/ahs/data/2011/h150-11.html ............................................................................................................................... 10

Barbara Van Kerkhove, The Homeowners Insurance Gap: How Race and Neighborhood Composition Explain Cost and Access Disparities in Rochester and Monroe County, NY (May 2005) ..................................................................................................................... 8

Women's Law Project & Pennsylvania Coalition Against Domestic Violence, Insurance Discrimination Against Victims of Domestic Violence (1998) ............................................... 7

## INTERESTS OF AMICI

Amici are the NAACP Legal Defense & Educational Fund, Inc. (LDF), the American Civil Liberties Union (ACLU), the National Consumer Law Center (NCLC), and the National Community Reinvestment Coalition (NCRC).  Each is a non-profit organization that has long sought to eliminate the vestiges of our nation's history of housing segregation and promote equal housing opportunity for all.  Each organization also has experience utilizing the disparate impact framework to combat discrimination in housing and other contexts.  More detailed statements of interest are contained in the accompanying unopposed motion seeking the Court's leave to file this amicus brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When Congress enacted the Fair Housing Act of 1968 (FHA), Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified as amended at 42 U.S.C. §§ 3601-3631), in the immediate aftermath of Martin Luther King Jr.'s tragic assassination, it intended to combat not only overt prejudice but also those housing policies that impose unnecessary and unjustified burdens based on race and other FHA-protected categories and, thus, are as "disastrous and unfair to private rights and the public interest as the perversity of a willful scheme."  *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir. 1974) (internal quotation marks omitted).  The FHA's prohibition against such forms of disparate impact discrimination has been consistently acknowledged by federal courts and by the U.S. Department of Housing and Urban Development (HUD), which codified its long-standing interpretation in a final rule promulgated last year.  *See* HUD, Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) [hereinafter "Discriminatory Effects Rule" or "Rule"].

1

Plaintiff homeowner's insurance associations seek to invalidate the Rule, but their real goal is to eviscerate a key tool in our nation's ongoing fight to promote a more just and inclusive society. This Court need not grapple with the sweeping nature of Plaintiffs' claim, however. Amici agree with HUD, as well as other amici who filed in support of HUD's position, that significant jurisdictional defects warrant dismissal of this case without reaching the merits of Plaintiffs' challenge to the Rule. *See* HUD Br. 7-18 (ECF No. 20); Amicus Brief of National Fair Housing Alliance et al. 5-25 (ECF No. 23) [hereinafter "NFHA Br."].

Amici write separately to emphasize two key points. *First*, FHA disparate impact enforcement does not disrupt homeowner's insurance markets. *Cf.* Pls.' Br. 30 (ECF No. 16-1). To the contrary, it is vital to ensuring fairness in such markets by combating a variety of policies and practices that unnecessarily limit many Americans' ability to become and remain homeowners. Under the three-part burden-shifting framework endorsed in HUD's Rule, defendants may rebut a prima facie case of adverse impact by demonstrating that the challenged practice is justified by an interest that is "substantial" (*i.e.*, "a core interest of the organization that has a direct relationship to the function of that organization"), "legitimate" (*i.e.*, "genuine and not false"), and itself "nondiscriminatory." 78 Fed. Reg. at 11,470; 24 C.F.R. § 100.500(c)(2); *see Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 374-75 (6th Cir. 2007) ("Of course, not every housing practice that has a disparate impact is illegal. We use the burden-shifting framework described above . . . to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests."). If the defendant

2

succeeds at this second stage, plaintiffs prevail only if they demonstrate that those interests "could be served by another practice that has a less discriminatory effect."  24 C.F.R. § 100.500(c)(3).  The feasibility of this burden-shifting framework for redressing the unjustified denial of housing opportunities, while protecting policies and practices that are necessary to achieve legitimate, non-discriminatory objectives, is illustrated not only by its long-standing application in fair housing cases, *see, e.g.*, *Huntington Branch*, *NAACP v. Town of Huntington*, 844 F.2d 926, 939 (2d. Cir. 1988), *aff'd*, *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) (per curiam), but also in equal employment litigation, *see, e.g.*, *Lewis v. City of Chicago*, 560 U.S. 205 (2010); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and other contexts, *see, e.g.*, Civil Rights Division, U.S. Dep't of Justice, *Title VI Legal Manual* 47-53 (2001).

*Second*, the canon of constitutional avoidance does not preclude FHA disparate impact enforcement.  Plaintiffs claim that disparate impact is constitutionally suspect because it necessarily compels race-based decisionmaking and racial classifications, *see* Pls.' Br. 28-30, but this is incorrect.  Most FHA remedies are facially race-neutral.  To the extent that relief is allocated based on individual racial classifications in particular circumstances, that does not provide a basis for eliminating the disparate impact standard entirely; rather, courts are well-equipped to apply the appropriate level of constitutional review on a case-by-case basis.  The appropriateness of case-specific review as a means to resolve any constitutional concerns further supports HUD's contention that this broad pre-enforcement challenge should be dismissed on jurisdictional grounds without reaching the merits.  *See* HUD Br. 7-18; NFHA Br. 5-25.

I.    **DISPARATE IMPACT ENFORCEMENT IS VITAL IN LIGHT OF HISTORICAL AND CONTINUING DISCRIMINATION IN HOMEOWNER'S INSURANCE**.

Plaintiffs' challenge to HUD's Rule could upset decades of well-settled civil rights law in an array of contexts relating to housing, yet they claim a narrow focus. Challenging the supposed consequences of applying disparate impact enforcement to insurance providers, Plaintiffs make the dramatic claim that "[i]nterpreting the FHA to permit disparate-impact liability to be imposed on homeowner's insurers . . . would be antithetical to sound insurance practice and would upend fundamental tenets of the insurance business." Pls.' Br. 34-35. This is a curious allegation in light of the FHA's long-standing application to homeowner's insurance. *See* HUD Br. 6-7. More fundamentally, Plaintiffs elide the history and persistence of discrimination in homeowner's insurance, as well as the actual operation of disparate impact enforcement.

A.    **Prior intentional discrimination set the stage for the unjustified impediments that continue to limit equal access to homeowner's insurance**.

For decades before and after the FHA's enactment in 1968, insurers unabashedly treated homeowners seeking insurance differently based on their race or the racial composition of the neighborhoods in which they lived.[1] The term "redlining" originally referred to the practice of color-coding neighborhoods, typically defined by their racial or ethnic composition, to describe where financial services would be limited or denied. *See,*

---

[1] Homeowner's insurance is but one area in which insurers have engaged in intentional discrimination. *See, e.g.*, *United States v. Mort. Guar. Ins. Corp.*, Civ.A. No. 2:11-00882-RCM, 2012 WL 1606235 (W.D. Pa. Apr. 30, 2012) (consent order settling challenge to practice of denying mortgage insurance to applicants on maternity leave, resulting in differential treatment on the basis of sex and familial status); *Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 42 (S.D.N.Y. 2001) (challenging policies steering African Americans to substandard and "significantly more expensive" life insurance).

4

*e.g.*, Carol A. Heimer, *The Racial And Organizational Origins Of Insurance Redlining*, X:3 J. Intergroup Relations 49 (Autumn 1982).  As late as the 1960s, homeowner's insurance underwriting guidelines utilized such maps to indicate where agents should avoid writing policies or should issue them only after special review or with different terms.  *Id.*

Even though courts found such disparate treatment unlawful under the FHA as early as 1979, *see Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.*, 472 F. Supp. 1106 (S.D. Ohio 1979), it persisted long afterward.  A treatise on insurance redlining recounts stark examples of explicitly discriminatory practices in the 1970s-1980s:

> In 1977 the chief actuary of the New York Department of Insurance stated:  "Take Harlem, for example.  They don't need any insurance because they don't have anything of value to insure."  In 1988 some American Family Mutual Insurance Company agents were instructed in writing to "*quit writing* all those *blacks*." . . .  In 1994 the Texas commissioner told the U.S. Senate Committee on Banking, Housing, and Urban Affairs that "we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk."

Gregory D. Squires, *Race, Politics, and the Law: Recurring Themes in the Insurance Redlining Debate*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions 6-7 (Gregory D. Squires ed., 1997) (internal citations omitted) [hereinafter "Insurance Redlining"].

During the 1990s, discriminatory treatment was revealed by a study in which an African-American tester with an address in an African-American neighborhood was paired with a white tester with an address in a white neighborhood to contact homeowner's insurance companies in nine different cities.  Gregory D. Squires & Jan Chadwick, *Linguistic Profiling: A Continuing Tradition of Discrimination in the Home*

5

*Insurance Industry?*, 41 Urb. Aff. Rev. 400, 404, 407 (2006).  In 221 tests, the white

caller received more favorable treatment nearly twice as often as the African-American

caller did.  *Id.* at 405.[2]

Such discriminatory insurance practices create or entrench precisely the kind of

segregated living patterns that the FHA was designed to dismantle.  *See Trafficante v.*

*Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (noting Congress's purpose in enacting the

FHA "to replace the ghettos by truly integrated and balanced living patterns" (internal

quotation marks omitted)).  As observed by a presidential commission the year the FHA

was passed, "[i]nsurance is essential to revitalize our cities. . . .  Without insurance,

buildings are left to deteriorate; services, goods and jobs diminish.  Efforts to rebuild our

nation's inner cities cannot move forward.  Communities without insurance are

communities without hope."  President's National Advisory Panel on Insurance in Riot

Affected Areas, Meeting the Insurance Crisis of Our Cities 1 (U.S. Government Printing

Office 1968).

In recognizing that the FHA reaches discrimination related to homeowner's

insurance, the Seventh Circuit put it succinctly:  "No insurance, no loan; no loan, no

house; lack of insurance thus makes housing unavailable."  *NAACP v. Am. Family Mut.*

*Ins. Co.*, 978 F.2d 287, 296 (7th Cir. 1992); *see also Burrell v. State Farm & Cas. Co.*,

226 F. Supp. 2d 427, 441 (S.D.N.Y. 2002) (noting that "property insurance is often a

---

[2] Although this brief focuses on race, insurers also have engaged, and continue to engage, in disparate treatment based on other FHA-protected categories.  *See, e.g.*, *Nevels v. W. World Ins. Co., Inc.*, 359 F. Supp. 2d 1110, 1118 (W.D. Wash. 2004) (finding plaintiffs stated FHA claim against defendant where defendant did "not deny that Plaintiffs' [property] insurance policies were cancelled because Plaintiffs cared for individuals with mental disabilities"); *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1 (D.D.C. 1999) (insurer refused coverage for homeowners who operated group homes for adults, resulting in differential treatment on the basis of disability).

condition for obtaining housing or rentals, such that redlining practices can effectively prevent equal opportunities to housing or rental resources").  The FHA's application to homeowner's insurance also has been confirmed by long-standing HUD regulations.  *See* 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989) (codified at 24 C.F.R. § 100.70(d)(4)).

      **B.**      **Insurers continue to employ policies that result in adverse racial impacts but cannot be justified by actuarial risk**.

Due in large part to enforcement of the FHA and other anti-discrimination statutes, insurance practices that overtly discriminate on the basis of race have become significantly less common, but insurance underwriting is still tainted by "practices that are fair in form, but discriminatory in operation."  *Griggs*, 401 U.S. at 431 (1971).[3]  For instance, some neutral underwriting policies cause minority homeowners, and homeowners who live in heavily minority neighborhoods, to have their applications rejected more frequently and, where they do secure insurance, to pay higher premiums. A comprehensive study of the availability and price of homeowner's insurance in thirty-three metropolitan neighborhoods, conducted by the National Association of Insurance Commissioners (NAIC) in the mid-1990s, found that the racial composition of a neighborhood had a statistically significant relationship to the number and cost of insurance policies that could not be adequately justified based on actuarial risk factors.

---

[3] Disparate impact is equally vital to eliminate unjustified discriminatory effects of insurance practices on other protected groups. *See, e.g.*, *Jones v. Travelers Cas. Ins. Co. of Am*., No. 13-CV-02390, 2013 WL 4511648 (N.D. Cal. Aug. 22, 2013) (insurer ended coverage for rental property upon discovering it housed Section 8 tenants, resulting in alleged disparate impact on the basis of race, sex, age, and familial status); *Fuller v. Teachers Ins. Co*., No. 06-cv-00438, 2007 WL 2746861 (E.D.N.C. Sept. 19, 2007) (denying motion to dismiss disparate impact claims based on insurer's cancellation of coverage for group home for people recovering from drug and alcohol addiction because of the unjustified adverse impact on individuals with mental and physical disabilities); Women's Law Project & Pennsylvania Coalition Against Domestic Violence, Insurance Discrimination Against Victims of Domestic Violence 4-7 (1998) (detailing property and casualty insurance policies that had disparate adverse impact on the basis of sex by precluding coverage for domestic violence victims).

Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners Insurance Markets*, *in* Insurance Redlining 44-45.  Regression analysis showed that none of the potentially legitimate business explanations for those disparities, including loss costs, demographic variables, and housing characteristics, could account for the disparate racial impact.  *See generally id.* at 43-78.[4]

When such policies with disparate effects cannot be justified by actuarial principles, the FHA requires the insurer to search for less-discriminatory alternatives.  Yet it is misleading to assert, as Plaintiffs do, that "[d]isparate-impact liability would force insurers to take into account factors not correlated to risk in order to avoid causing or perpetuating a disparate impact on insureds who are members of protected classes."  Pls.' Br. 36-37.  An insurer's consideration of factors resulting in adverse effects will not give rise to disparate impact liability if those factors actually correlate to actuarial risk and there is no less-discriminatory means of achieving that goal.  *See* 24 C.F.R. § 100.500(c); 78 Fed. Reg. at 11,475.  It is therefore hard to fathom how HUD's Rule compels Plaintiffs to set pricing or availability based on "factors not correlated to risk."  For similar reasons, it is simply false that "[a]ny risk factor that happens to affect a protected group disproportionately could trigger a disparate-impact claim."  Pls.' Br. 37.  A disproportionate effect, disconnected from the rest of the disparate impact analysis, is

---

[4] Findings at the local level echo NAIC's national research.  One study found that homeowners in the most heavily minority areas of Rochester, New York received premiums nearly three times higher than in the surrounding towns, which were overwhelmingly white.  Barbara Van Kerkhove, The Homeowners Insurance Gap: How Race and Neighborhood Composition Explain Cost and Access Disparities in Rochester and Monroe County, NY 3 (May 2005).  After testing variables that might legitimately explain these differences, the report concluded that almost all of those variables had no correlation, or were negatively correlated, to racial disparities in premiums.  *Id* at 5; *see also* N.J. Citizen Action et al., Insurance Redlining: Is It Happening in Your Neighborhood? (Feb. 2004) (analysis of four New Jersey cities finding: (a) significantly higher costs of homeowner's insurance for Hispanic customers; and (b) no significant variations in house price or unit size that accounted for this disparity).

*per se* insufficient to establish FHA liability.

### 1.    *Maximum-age and Minimum-value Requirements*

Several specific underwriting practices have been found to foster unjustified disparate impacts based on race.[5]  For example, underwriting guidelines sometimes include a requirement that the insured dwelling not exceed a certain age.  As a result of residential segregation, however, such "maximum age" policies tend to disproportionately exclude homeowners in heavily minority neighborhoods.  As of 2011, 29.6% of owner-occupied homes nationwide had been built prior to 1960, compared to 35.6% of African-American owner-occupied homes.  *See* U.S. Bureau of the Census, American Housing Survey for the United States: 2011 Table C-01-OO (2013) [hereinafter "American Housing"]; *see also Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 704 N.E.2d 667, 674 (Ohio Ct. Com. Pl. 1997) (discussing expert report showing maximum-dwelling-age guideline effectively excluded 92.6% of homes in African-American neighborhoods, but only 61.3% of homes in white neighborhoods); *see also* D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*, *in* Insurance Redlining at 126 (noting that age-of-home underwriting guidelines "represent[] one of the greatest barriers to homeowner's insurance for members of protected classes who are disproportionately located in older, inner-city neighborhoods and unable to afford the required improvements.").

Underwriting guidelines also may include a "minimum value" requirement — *i.e.*,

---

[5] This brief aims only to provide a general overview of some areas where FHA disparate impact enforcement is important in combating persistent discrimination, not to comprehensively detail the historic or continuing forms of discrimination in this sector.  For example, evidence suggests serious problems with discrimination not just in the availability of insurance or differences in premiums, but also in practices relating to the payment of claims, *see, e.g.*, Tom Baker & Karen McElrath, *Whose Safety Net? Home Insurance and Inequality*, 21 Law & Soc. Inquiry 229, 237 (1996), and other aspects of insurance policies.

homes must have a market value above a certain threshold in order to be eligible for homeowner's insurance. These policies also tend to have an adverse effect on racial minorities. In 2011, for example, 26.3% of all owner-occupied homes nationwide were valued at less than $100,000, but 40.7% of homes owned by African-Americans, and 35.7% of those owned by Latinos, fell below this threshold. *See* American Housing at Table C-13-OO; *see also* Powers, *in* Insurance Redlining at 126.

Fair housing enforcement at the state and federal level has led to a dramatic shift: most insurers no longer use maximum-age or minimum-value requirements in underwriting. *See, e.g.*, Consent Decree, *United States v. Am. Family Mut. Ins.* and *NAACP v. Am. Family Mut. Ins.*, (Dep't of Justice July 13, 1995), *available at* http://www.justice.gov/crt/about/hce/documents/amfamsettle.php; *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 705 N.E.2d 1 (Ohio Ct. Com. Pl. 1998); Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Regulation 21, 21-22 (2006). Plaintiffs have certainly not explained how these reforms, enacted at least in part due to disparate impact principles, have "upend[ed] fundamental tenets of the insurance business," Pls.' Br. 35.

### 2.    *Credit Scoring*

In recent years, homeowner's insurance companies have shifted toward relying on specialized insurance credit scores as part of the underwriting process. *See Ojo v. Farmers Grp., Inc.*, No. CV 05-5818-JFW, 2006 WL 4552707, at *2 (C.D. Cal. Mar. 7, 2006), *rev'd and remanded*, 565 F.3d 1175 (9th Cir. 2009). Credit scoring is a blunt instrument, and its proponents within the insurance industry have had difficulty articulating why a homeowner with a lower credit score is more likely to cause a higher

loss to her insurer.  *See* National Consumer Law Center & Center for Economic Justice,

Credit Scoring and Insurance: Costing Consumers Billions and Perpetuating the

Economic Racial Divide 4 (June 2007) [hereinafter "Credit Scoring Report"];  Powers, *in*

Insurance Redlining at 137 ("The use of credit history as an underwriting guideline offers

an excellent example of how even the largest insurers use underwriting guidelines with

little or no justification."); Birny Birnbaum, Insurers' Use of Credit Scoring for

Homeowners Insurance In Ohio: A Report to the Ohio Civil Rights Commission 16-19

(Jan. 2003) [hereinafter "Insurers' Use"].

      While justifications for credit scoring remain elusive, its adverse impact is clear:

credit scoring has an enormously disproportionate impact on racial minorities.  *See*

Insurers' Use at 19-21; Credit Scoring Report at 12-13 (collecting studies demonstrating

racial disparity in credit scores); *see also Lumpkin v. Farmers Grp., Inc.*, No. 05-2868

Ma/V, 2007 WL 6996584, at *4 (W.D. Tenn. Apr. 26, 2007) (finding plaintiff made out

prima facie case by alleging that racial minorities as a group have lower credit scores

than whites, and racial minorities are therefore charged higher prices for identical

policies).  For example, the Missouri Department of Insurance has found that, even when

controlling for factors legitimately linked to actuarial risk, "race/ethnicity proved to be

the most robust single predictor of credit scores; in most instances it had a significantly

greater impact than education, marital status, income and housing values."  Brent Kabler,

State of Missouri Department of Insurance, Insurance-Based Credit Scores: Impact on

Minority and Low Income Populations in Missouri 11 (Jan. 2004).  The same report

concluded, based on statistical modeling, that "African-American and Hispanic insureds

had scores in the worst credit score group at a rate of about 30 percentage points higher

than did other individuals." *Id.* at 12.

Assessing and remedying the disparate impact of any particular credit scoring policy requires focus on the specific factual circumstances at issue. In *Dehoyos v. Allstate Corp.*, for example, a nationwide class of African Americans and Latinos alleged that Allstate improperly factored credit information into a "secretive credit scoring formula" that caused non-white customers to be charged higher rates than their white counterparts. No. CIV.ASA01CA1010FB, 2002 WL 1491650, at *1 (W.D. Tex. Apr. 5, 2002), *aff'd*, 345 F.3d 290 (5th Cir. 2003). As part of a court-approved settlement agreement, Allstate was not required to abandon its credit-scoring formula entirely; rather it agreed to adopt a new policy that had been extensively tested by plaintiffs' experts and did not result in the same disparate impact. *Dehoyos v. Allstate Corp.*, 240 F.R.D. 269, 276 (W.D. Tex. 2007). While there are serious concerns about the use of insurance credit scores apart from their disparate impact, this remedy demonstrates the central fallacy in Plaintiffs' characterization of the interaction between disparate impact enforcement and actuarial underwriting: Disparate impact does not always foreclose the use of a desired underwriting tool. Indeed, in specific cases, it may yield alternative methods of using that tool without generating unjustified racial disparities. This is the careful balance struck through the burden-shifting framework that HUD's Rule endorses. *See* 24 C.F.R. § 100.500(b); *see also Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 60 (D.D.C. 2002) (rejecting argument that disparate impact and risk-based pricing are incompatible, because disparate impact challenge alleges that insurer's underwriting policies "are *not* purely risk-based").

* * *

12

As the examples above illustrate, there is no conflict between the legitimate purposes of insurance underwriting, on the one hand, and disparate impact enforcement under the FHA, on the other. Instead, disparate impact reinforces the value of sound actuarial practices while protecting homeowners against invidious discrimination — a necessary safeguard in light of the stubborn persistence of insurance redlining.

## II.    PLAINTIFFS' MISAPPLICATION OF CONSTITUTIONAL AVOIDANCE CONFIRMS THAT THEIR CLAIM IS NOT RIPE.

As HUD explains, the FHA's text, structure, and legislative history clearly authorize disparate impact claims. *See* HUD Br. 21-35. Thus, notwithstanding Plaintiffs' claim to the contrary, *see* Pls.' Br. 26-28, the canon of constitutional avoidance is inoperable, *see Salinas v. United States*, 522 U.S. 52, 60 (1997). This canon is "a means of giving effect to congressional intent, not subverting it." *Clark v. Martinez*, 543 U.S. 371, 382 (2005). Even if the Court finds that the FHA is ambiguous, constitutional avoidance should not displace ordinary principles of *Chevron* deference. This canon is not applicable "whenever there arises a significant constitutional question the answer to which is not obvious." *Almendarez-Torres v. United States*, 523 U.S. 224, 239 (1998). Instead, only especially "grave" constitutional concerns warrant its invocation. *Rust v. Sullivan*, 500 U.S. 173, 191 (1991). Here, there exist no such grave constitutional concerns that could trump the long-standing determination of courts and federal agencies that the disparate impact framework advances the FHA's core purposes.

The flaws in Plaintiffs' constitutional avoidance arguments are symptomatic of the basic unripeness of their claim. For Plaintiffs' claim to be ripe for adjudication, it cannot "rest[ ] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal

13

quotation marks omitted).  But it is exactly such speculations and contingencies that form the basis of Plaintiffs' constitutional avoidance arguments.

> **A.    Plaintiffs' characterization of the operation of HUD's Discriminatory Effects Rule is flawed and highlights the unripeness of their claim**.

Plaintiffs' invocation of the canon of constitutional avoidance is premised on the notion that the FHA's disparate impact framework is "indisputably discriminatory," Pls.' Br. 28, because it "*requires* insurers and other regulated entities to assess the impact of their facially neutral practices upon particular racial groups and then to alter those practices if they determine that protected racial groups will be disproportionately affected by them," *id*. at 27-28 (emphasis added).  This premise is deeply flawed.  Focusing on the actual operation of disparate impact enforcement under the FHA, in contrast to Plaintiffs' parody of it, reinforces the lack of ripeness of their constitutional arguments.

First, as a threshold matter, Plaintiffs effectively concede that any purported constitutional concerns are not raised by the FHA's application to certain other protected categories, such as sex or religion, in the same way as they might be in the context of race.  Pls.' Br. 30 n.5.  But they consign this point to a one-sentence footnote and do not engage in the distinct constitutional analysis dictated by those contexts.  Moreover, they entirely ignore that the FHA also applies to discrimination based on familial status and disability, 42 U.S.C. § 3604, which do not trigger strict constitutional scrutiny.  *See Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365-67 (2001).  This selective argumentation highlights the problems created by bringing suit in such a factually unspecific posture, which the ripeness doctrine seeks to avoid.

Second, notwithstanding Plaintiffs' claim to the contrary, disparate impact does not "compel[ ]" insurers to alter their practices simply because they have adverse effects.

14

*Cf.* Pls.' Br. 27-28.  The FHA's disparate impact provision does not dictate a particular racial outcome or impose *any limit* on the substantive objectives a governmental or private housing provider may choose to pursue.  Insurers remain free to continue a practice with discriminatory impact so long as it serves a legitimate business interest and there are no less-discriminatory alternatives available.  In other words, the nuanced burden-shifting approach to establishing disparate impact liability contradicts the basic premise of Plaintiffs' constitutional-avoidance argument.

Third, Plaintiffs' premise that the Rule is "indisputably discriminatory," *id.*, is unsupported by the actual approach to devising remedies for disparate impact discrimination in the housing context.  Neither the Supreme Court nor any other court has held that a government actor — much less a private entity — violates the Equal Protection Clause simply because it seeks to remedy the unjustified adverse impacts of its policies or practices in the housing realm or any other context.  *Cf.* Pls.' Br. 28.  There are many options for avoiding or redressing unjustified racially adverse effects — and, thus, promoting the integrative aims of the FHA — that do not even trigger heightened constitutional scrutiny.  *Cf. Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998) ("Every antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect a concern with race.  That does not make such enactments or actions unlawful or automatically 'suspect' under the Equal Protection Clause.").

As Justice Kennedy recognized in his pivotal *Parents Involved* concurrence, when government officials utilize "mechanisms [that] are race conscious but do not lead to different treatment based on a classification that tells each [individual] he or she is to be

15

defined by race, . . . it is unlikely any of [these mechanisms] would demand strict scrutiny to be found permissible." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring in part and concurring in the judgment). In the school context, these mechanisms might include "strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race." *Id.*

Justice Kennedy explicitly assured government officials of the presumptive validity of such facially race-neutral efforts to consider racially adverse impacts:

> Executive and legislative branches, which for generations now have considered these types of policies and procedures, should be permitted to employ them with candor and with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races.

*Id.* Similarly, providers of housing services should be able to consider the demographics of specific neighborhoods, in an effort to avoid creating or perpetuating unequal housing opportunities, without triggering strict scrutiny. *Cf. United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1184, 1236 (2d Cir. 1987) (upholding order to build 200 public housing units in areas that were predominantly non-minority to further racial integration); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 153 (3d Cir. 1977) (affirming order requiring construction of a low-income housing project in a predominantly white neighborhood to redress disparate impact and intentional violations).

Echoing his concurrence in *Parents Involved*, Justice Kennedy's opinion for the Court in *Ricci* drew a similar distinction (under Title VII) between "race-based"

invalidation of employment test results and "considering, before administering a test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of their race." *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009).[6] This reasoning builds upon prior precedent. For example, although a majority of the Supreme Court applied strict scrutiny and struck down a race-conscious minority contracting program in *City of Richmond v. J.A. Croson Company*, all nine Justices agreed that a government actor does not trigger heightened constitutional scrutiny when it takes action to "increase the opportunities available to minority business without classifying individuals on the basis of race" — including efforts to eliminate "barriers" that "may be the product of bureaucratic inertia more than actual necessity, and may have a disproportionate effect on the opportunities open to new minority firms." 488 U.S. 469, 510 (1989) (plurality opinion); *see id.* at 551-53 (Marshall, J., dissenting). In his concurrence, Justice Scalia emphasized the same point:

> A State can, of course, act "to undo the effects of past discrimination" in many permissible ways that do not involve classification by race. In the particular field of state contracting, for example, it may adopt a preference for small businesses, or even for new businesses — which would make it easier for those previously excluded by discrimination to enter the field.

*Id.* at 526 (Scalia, J., concurring).[7]

---

[6] So, too, in the drawing of electoral districts, "[s]trict scrutiny does not apply merely because redistricting is performed with consciousness of race." *Bush v. Vera*, 517 U.S. 952, 958 (1996) (plurality opinion); *see also Shaw v. Hunt*, 517 U.S. 899, 905 (1996).

[7] In contrast to the careful, context-specific approach reflected in Justice Kennedy's opinions in *Ricci* and *Parents Involved*, Plaintiffs advocate a radical view: the logic of their constitutional-avoidance argument, taken to its conclusion, would create a presumption against the constitutional validity of any anti-discrimination statute that encompasses disparate impact liability. This position flies in the face of decades of settled doctrine, particularly in the employment context. *See, e.g., Connecticut v. Teal*, 457 U.S. 440, 449 (1982); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975); *Griggs*, 401 U.S. at 429-30. In support of this sweeping reconfiguration of civil rights law, Plaintiffs rely primarily on Justice Scalia's short concurrence in *Ricci*. *See* Pls.' Br. 28-29. Justice Scalia's concurrence, however, is not a proper

Indeed, if such facially race-neutral mechanisms trigger rigorous constitutional review simply because they are adopted in pursuit of a race-conscious goal, strict scrutiny would be internally inconsistent and impossible to satisfy. As part of the narrow-tailoring prong of strict scrutiny, government actors must consider facially race-neutral alternatives before adopting measures that allocate benefits or burdens based on individualized racial classifications. *See Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2420 (2013). The very act of giving consideration to facially race-neutral alternatives requires decisionmakers to evaluate their racial impact to determine whether those alternatives effectively achieve the intended race-conscious goal.

Finally, it is simply incorrect that complying with the FHA's disparate impact requirements will inevitably compel a provider of housing services to undertake "racial classifications," as Plaintiffs claim, Pls.' Br. 30. In the context of court-approved settlements and court-ordered remedies for FHA disparate impact claims, the typical relief is facially race-neutral insofar as it benefits all individuals, and not just the racial group disproportionately impacted by the challenged policy.[8] This is especially true of FHA remedies in disparate impact cases alleging discrimination by homeowner's insurance companies. Eliminating the challenged underwriting criteria to the extent that they are not correlated to actuarial risk benefits homeowners of all races who would have

---

basis for departing from an authoritative agency interpretation. No other Justice joined it, and if such solo separate writings sufficed to trigger the canon of constitutional avoidance, many more statutes would require narrow construction. *See* HUD Br. 37 n.10. Plaintiffs also fail to reconcile Justice Scalia's writing in *Ricci* with his *Croson* concurrence quoted above.

[8] *See, e.g.*, *Huntington Branch*, 844 F.2d at 941-42 (ordering defendants to eliminate a zoning ordinance that restricted multi-family housing in an already segregated "urban renewal zone"); Consent Decree, *United States v. City of Pooler*, No. 4:01-263 (S.D. Ga. June 16, 2003) (requiring city to construct 68 low-income units and to advertise and fill them on a non-discriminatory basis); Consent Decree, *United States v. Jacksonville Hous. Auth.*, No. 3:00-1165-J-25A (M.D. Fla. Oct. 18, 2000) (requiring a city to replace demolished public housing with new buildings restricted to certain census tracts and accessible via public transportation, and to develop a Section 8 mobility counseling program).

been screened out or charged a higher premium under the old underwriting standards.[9]

Requirements that insurers make all types of insurance policies widely available across

census tracts are similarly facially race-neutral because they increase access for all

consumers to desirable forms of insurance, such as replacement cost policies.[10]

Likewise, settlement provisions requiring insurers to notify homeowners of the reasons

for denial, cancellation, or nonrenewal of insurance policies increase transparency for all

homeowners and afford them the opportunity to seek reconsideration of the insurer's

decision.[11]  Other remedies in the homeowner's insurance context focus on increasing the

accessibility and availability of insurance in targeted urban areas, but they are focused on

improving the vitality and stability of the neighborhood as a whole, not simply the lot of

its minority residents.[12]

---

[9] *See, e.g.*, Conciliation Agmt. at ¶ 8(A)-(C), *HUD v. Allstate Ins. Co.*, No. 03-94-0529-8 (Feb. 1997) (eliminating maximum-age and minimum-value requirements, limiting use of credit scoring, and agreeing to adopt objective property-inspection criteria); Conciliation Agmt. at ¶ 11(a)-(f), *HUD v. State Farm Fire & Cas. Co.*, Nos. 05-94-1351-8, 05-94-1352-8 (July 1996) (modifying underwriting criteria to, *inter alia*, eliminate maximum-age and minimum-value requirements, limit use of credit reports, and reduce subjective criteria, and agreeing not to decline coverage solely because another insurer did so); Consent Decree at § III.A, *United States v. Nationwide Mut. Ins. Co.*, No. C2-97-291 (S.D. Ohio Mar. 10, 1997).

[10] *See, e.g.*, Consent Decree at ¶ 19, *United States v. Erie Ins. Co. of N.Y.*, No. 08-0945 (W.D.N.Y. Dec. 23, 2008); Consent Decree at §§ II.c.3, III, *NAACP v. Am. Family Mut. Ins. Co* (increasing access to replacement cost policies by, *inter alia*, eliminating requirement that home must have a market value of 80% or more of the estimated replacement cost); Conciliation Agmt. at ¶ 11(h), *State Farm Fire & Cas. Co.* (agreeing to encourage customers to insure to full replacement cost).

[11] *See, e.g.*, Conciliation Agmt. at ¶ 8(D), *Allstate Ins. Co.*; Consent Decree at § III.7, *Nationwide Mut. Ins. Co*.

[12] *See, e.g.*, Conciliation Agmt. at ¶ 6, *Allstate Ins. Co.* (expanding comprehensive neighborhood partnership program and adding sales and service centers in targeted urban areas); Conciliation Agmt. at ¶ 13(h), *State Farm Fire & Cas. Co.* (adding sales and service centers in targeted urban neighborhoods with a substantial minority population and agreeing to make $1 million in loans available for mortgage financing in neighborhoods with substantial African-American populations); Consent Decree at § III.A.3-III.A.4, *Nationwide Mut. Ins. Co.* (agreeing to affirmative efforts to increase company's presence in predominantly minority neighborhoods, including community outreach); *id.* at § VI (providing $2.2 million per year in financial assistance for homebuyers in certain predominantly minority neighborhoods); Consent Decree at § VI , *NAACP v. Am. Family Mut. Ins. Co.* (providing $9.5 million in community-based programs including interest rate subsidies for home mortgage and repair loans to encourage the purchase and rehabilitation of dilapidated homes in predominantly African-American communities).

Given the broad array of remedies that do not "compel[ ] insurers and others to make race-based decisions," Plaintiffs' argument is entirely speculative.  Pls.' Br. 28. This is reason enough to decline to rule on the broad constitutional assertions in this pre-enforcement challenge.

> **B.**    **Case-specific application of strict scrutiny is fully adequate to address any constitutional concerns raised by disparate impact in particular circumstances**.

As previously discussed, it is relatively uncommon for a disparate impact remedy under the FHA to allocate significant benefits or burdens based on individuals' race, and that mere possibility of a racial classification should not automatically trigger any "grave" constitutional concerns with the overall disparate impact framework.  *Rust*, 500 U.S. at 191.  With respect to government actors, as illustrated below, the strict scrutiny standard of review does not invalidate all racial classifications; rather, it provides a well-established framework for evaluating — on a case-by-case, context-specific basis — whether racial classifications are "narrowly tailored" to achieve a "compelling governmental interest."  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

By contrast, with respect to private actors, such as Plaintiffs and their members, it is difficult to conceive how such heightened scrutiny could be applicable.  Amici are not aware of any precedent for applying strict scrutiny to — much less invalidating — a federal anti-discrimination requirement that a private entity carefully consider whether its actions unnecessarily perpetuate barriers to equal opportunity, especially if less-

20

discriminatory alternatives are available.[13]  In any event, even if strict scrutiny applies in

this context, for the reasons outlined below, Plaintiffs have still failed to identify a

constitutional defect with the Rule.

      **C.**     **Disparate impact remedies further compelling interests**.

      A remedy for FHA disparate impact discrimination that requires a racial

classification should not face serious difficulty satisfying the "compelling interest" prong

of strict scrutiny.  In the employment context, the Supreme Court has repeatedly endorsed

disparate impact analysis, without ever questioning its constitutionality.  *See*, *e.g.*, *Lewis*,

560 U.S. at 211-13; *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986-87 (1988);

*Griggs*, 401 U.S. at 431.

      In the FHA context, there are at least two ways in which disparate impact

advances Congress's constitutionally compelling goal of "replac[ing] segregated

neighborhoods with 'truly integrated and balanced living patterns.'"  90 Cong. Rec. 3422

(1968) (Sen. Mondale); *Trafficante*, 409 U.S. at 211.

      **1.**     ***Evidentiary dragnet to root out subtle or covert discrimination***

      First, disparate impact helps to root out the subtle and sophisticated types of

discrimination that are often more commonplace in today's society — but also more

difficult to detect and prove — than instances of overt racial animus.  *See Metro. Hous.*

*Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *see also*

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081-1082 (3d Cir. 1996) ("[W]hile

---

[13] Plaintiffs' citation, Pls.' Br. 28, to *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 284 (1991), a separation of powers case, provides no support for the notion that the specter of disparate impact liability against private entities could give rise to constitutional concerns.  The pinpoint citation is to the dissenting opinion, not the opinion of the Court, and merely recites the principle that a grant of federal funds cannot be conditioned on discriminatory state action.  *See id.*

discriminatory conduct persists, violators have learned not to leave the proverbial 'smoking gun' behind."); *Segar v. Smith*, 738 F.2d 1249, 1271 n.18 (D.C. Cir. 1984) ("[D]isparate impact . . . speeds the day when we will have rid ourselves of discrimination in its subtle as well as its crass aspect.").

Through the three-part burden-shifting framework discussed above, disparate impact provides a powerful evidentiary tool for evaluating, in an orderly and sensible fashion, whether housing policies that have a demonstrably adverse impact are, in effect, pretexts for subtle or covert intentional discrimination. *Cf. Albemarle Paper*, 422 U.S. at 422, 425-36  (explaining disparate impact in Title VII context); *In re Emp't Discrimination Litig. Against Ala.*, 198 F.3d 1305, 1321 (11th Cir. 1999) (same).  Even "[t]hough the plaintiff is never explicitly required to demonstrate discriminatory motive, a genuine finding of disparate impact can be highly probative of the [defendant]'s motive since a racial 'imbalance is often a telltale sign of purposeful discrimination.'"  *Id.* (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339-40 n.20 (1977)); *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened.").

Because the reasonable operation of the burden-shifting framework provides ample opportunity for housing service providers to justify, and consider alternatives to, policies or practices that cause an adverse impact, it renders "an affirmative defense for good-faith" unnecessary to assuage any constitutional concerns raised by disparate impact enforcement.  *Cf.* Pls.' Br. 29 (citing *Ricci*, 557 U.S. at 595 (Scalia, J., concurring)).  Rebuffing a constitutional challenge to Title VII's prohibition against

disparate impact discrimination in the workplace, the Eleventh Circuit reasoned: "If, after a *prima facie* demonstration of discriminatory impact, the employer cannot demonstrate that the challenged practice is a job related business necessity, what explanation can there be for the employer's continued use of the discriminatory practice other than that some invidious practice is probably at work?" *In re Emp't Discrimination Litig. Against Ala.*, 198 F.3d at 1321-22. Evidence offered at the third stage of the burden-shifting framework may also be probative of discriminatory intent: "In the context of the plaintiff's further option of demonstrating an alternative employment practice that has less discriminatory impact, the Supreme Court has been even more unambiguous in characterizing an employer's refusal to adopt the alternative practice as 'evidence that the employer was using its tests merely as a "pretext" for discrimination.'" *Id.* at 1322 (quoting *Albemarle Paper*, 422 U.S. at 425). Accordingly, a finding of disparate impact discrimination may be tantamount to evidence of clandestine intentional discrimination.

### 2.    *Eliminating unnecessary barriers to equal housing opportunity*

Of course, not every practice with an unlawful disparate impact is actually motivated by intentional discrimination; Plaintiffs therefore are correct that disparate impact is not "simply an evidentiary tool to 'smoke out' intentional discrimination." Pls.' Br. 29. Yet disparate impact's broader sweep is not fatal to its constitutionality. The Supreme Court has endorsed "prophylactic legislation" prohibiting disparate impact discrimination in order to fully enforce the Fourteenth Amendment's equal protection guarantee. *Tennessee v. Lane*, 541 U.S. 509, 520 (2004) ("When Congress seeks to remedy or prevent unconstitutional discrimination, § 5 [of the Fourteenth Amendment]

authorizes it to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause."); *see also Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 737-38 (2003).

This brings us to the second and equally compelling interest advanced by the FHA disparate impact framework:  It eliminates — through the same burden-shifting framework — practices that may be neutral on their face, but nevertheless impose unnecessary barriers to fulfillment of the FHA's promise of equal housing opportunity for all.  *See Watson*, 487 U.S. at 987 ("[T]he necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination."); *Huntington Branch,* 844 F.2d at 935 ("Often [facially race-neutral] rules bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied.").

Disparate impact prompts a "hard look," *Ricci*, 557 U.S. at 587, at the fit between the means and ends of the policy in question.  Assuring that policies actually benefit the interests they purport to serve benefits not only those individuals who identify as part of a group that was unnecessarily excluded (*e.g.*, racial minorities disparately impacted by minimum age of residence requirements), but others as well (*e.g.*, non-minorities who live in older homes).  By encouraging consideration of alternatives, disparate impact makes it less likely that prior acts of intentional exclusion are thoughtlessly repeated or unduly exacerbated by unexamined assumptions or unconscious prejudices.  *See Watson,* 487 U.S. at 990 ("[E]ven if one assumed that [intentional] discrimination can be adequately policed through disparate treatment analysis, the problem of subconscious

stereotypes and prejudices would remain."); *Garrett*, 531 U.S. at 374-75 (Kennedy, J.,

concurring) (recognizing that prejudice "may result . . . from insensitivity caused by

simple want of careful, rational reflection").  Disparate impact also can reduce racial

tensions by engaging stakeholders and consumers in the search for fair housing policies.

*Cf. Ricci*, 557 U.S. at 585 ("[W]hen, during the test-design stage, an employer invites

comments to ensure the test is fair, that process can provide a common ground for open

discussions toward that end.").

Moreover, disparate impact enforcement is entirely consistent with the well-

established principle that government officials have both the constitutional authority and

the responsibility to ensure that the vestiges of prior intentionally discriminatory practices

are not maintained where not necessary.  *Cf. Croson*, 488 U.S. at 492 (plurality opinion)

("It is beyond dispute that any public entity, state or federal, has a compelling interest in

assuring that public dollars, drawn from the tax contributions of all citizens, do not serve

to finance the evils of private prejudice.").  The FHA's prohibition against disparate

treatment discrimination, alone, would be insufficient to challenge housing policies and

practices that have the effect, if not the intent, of "freez[ing]" the status quo of prior

discriminat[ion]."  *Griggs*, 401 U.S. at 430.  Key features of the housing "status quo"

continue to be shaped by prior purposeful discrimination, including the homeowner's

insurance policies discussed in Section I.A, *supra*.  *See generally* Patrick Sharkey, *Stuck

in Place: Urban Neighborhoods and the End of Progress Toward Racial Equality* (2012);

Douglas S. Massey & Nancy A. Denton, *American Apartheid: Segregation and the

Making of the Underclass* (1993).  The FHA's critical role in advancing the government's

compelling interest in removing such unjustifiable obstacles to equal housing opportunity

belies Plaintiffs' contention that disparate impact enforcement "deviates too far" from the proper bounds of the federal government's authority under the Fourteenth Amendment. *See* Pls.' Br. 29.

> **D.    Narrow tailoring provides a framework for addressing any constitutional tensions based on the facts of a particular case**.

Because disparate impact satisfies the "compelling interest" prong of strict scrutiny, any lingering concerns about the constitutionality of a specific race-conscious remedy or voluntary compliance effort should be addressed as a matter of narrow tailoring in the particular circumstances of any such governmental action — and, to the extent that standard also applies to private entities, in those distinct contexts as well. Plaintiffs focus on Justice Scalia's concurrence in *Ricci*, where he speculated about potential tension between disparate impact and disparate treatment.  Pls.' Br. 28-29 (quoting *Ricci*, 557 U.S. at 594 (Scalia, J., concurring)).  Yet the narrow-tailoring prong of strict scrutiny already builds in a framework that fully and adequately addresses any possible tension based on the specific facts of a case.  *See Croson*, 488 U.S. at 500; *United States v. Paradise*, 480 U.S. 149, 171 (1987).

Courts have adeptly applied narrow tailoring in those instances where racial classifications by government actors in the housing context have been challenged. *Compare United States v. Starrett City Assocs.*, 840 F.2d 1096, 1103 (2d Cir. 1988) (striking down tenant selection procedure that utilized "rigid racial quotas of indefinite duration to maintain a fixed level of integration"), *with Jaimes v. Lucas Metro. Hous. Auth.*, 833 F.2d 1203, 1206-07 (6th Cir. 1987) (upholding a tenant selection plan for a municipal housing complex, which classified applicants by race).  One important factor in such analysis is that even remedies for FHA disparate impact violations that arguably

allocate benefits on the basis of race, such as monetary relief for individuals who are disparately and unnecessary affected by a policy, rarely, if ever, cause cognizable — much less significant — harm to others outside of the protected class at issue.

Thus, as a general matter, FHA disparate impact enforcement presents no significant constitutional concerns, and any specific remedies that involve racial classifications can be addressed through well-established mechanisms of judicial review.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' complaint in its entirety or, alternatively, grant summary judgment to HUD.

Respectfully submitted,

*s/ Ryan P. Haygood*
Sherrilyn Ifill
   Director-Counsel
Christina A. Swarns
Ryan P. Haygood (Bar. No. 53135)
Ria Tabacco Mar
NAACP Legal Defense &
   Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Joshua Civin (Bar No. 494496)
NAACP Legal Defense &
   Educational Fund, Inc.
1444 I St., NW, 10th Floor
Washington, DC 20005
(202) 682-1300

Dennis D. Parker
Laurence M. Schwartztol
Rachel E. Goodman
Peter W. Beauchamp
American Civil Liberties Union
   Foundation
125 Broad St., 18th Floor

27

New York, NY 10004
(212) 549-2500

Alys I. Cohen (Bar No. 452411)
National Consumer Law Center
1001 Connecticut Avenue, NW,
  Suite 510
Washington, DC 20036
(202) 452-6252

Dated: February 20, 2014