**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————
                                                )
AMERICAN INSURANCE                              )
ASSOCIATION, *et al.*                           )
                                                )
            Plaintiffs,                         )
                                                )       No. 1:13-cv-00966 (RJL)
        v.                                      )
                                                )
UNITED STATES DEPARTMENT                        )
OF HOUSING AND URBAN                            )
DEVELOPMENT, *et al.*                           )
                                                )
            Defendants.                         )
———————————————————)


**DEFENDANTS' REPLY MEMORANDUM
IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

                                        STUART F. DELERY
                                        Assistant Attorney General

                                        JOCELYN SAMUELS
                                        Acting Assistant Attorney General

DAMON Y. SMITH
Acting General Counsel
MICHELLE ARONOWITZ                      RONALD C. MACHEN JR.
Deputy General Counsel for             United States Attorney
    Enforcement and Fair Housing
JEANINE M. WORDEN                       MICHAEL SITCOV
Associate General Counsel for          KYLE R. FREENY (Cal. Bar No. 247857)
    Fair Housing                       DANIEL P. MOSTELLER (DC Bar No. 980802)
KATHLEEN M. PENNINGTON                  Attorneys
Assistant General Counsel              U.S. Department of Justice
    for Fair Housing Enforcement       20 Massachusetts Ave., N.W.
M. CASEY WEISSMAN-VERMEULEN             Washington, DC  20001
AYELET R. WEISS                        Tel: (202) 514-5108/Fax: (202) 616-8470
Attorneys                              Email:  Kyle.Freeny@usdoj.gov
*Of counsel*                           *Counsel for Defendants*

# TABLE OF CONTENTS

**PAGE**

I.   PLAINTIFFS' CLAIM IS NOT PROPERLY BEFORE THE COURT ...........................1

    A.   Plaintiffs Have Not Satisfied the Traceability and Redressability Requirements for Standing...................................................................................................................1

    B.   Plaintiffs' Claim Is Not Ripe .................................................................................6

II.  PLAINTIFFS FAIL TO DEMONSTRATE THAT THE FHA UNAMBIGUOUSLY COMPELS THEIR PREFERRED READING .............................7

    A.   Plaintiffs' Reading of the FHA Is Contrary to the Great Weight of Authority .......7

    B.   The Plain Text Supports HUD's Recognition of Disparate Impact Claims ..........10

    C.   The FHA's Anti-Discrimination Prohibitions Must Be Read Together with Other Provisions of the FHA that Clearly Contemplate Disparate Impact Liability .....................................................................................14

    D.   The History of the 1988 Amendments to the FHA Supports HUD's Reading......17

    E.   The Canon of Constitutional Avoidance Does Not Apply ....................................18

    F.   The McCarran-Ferguson Act Cannot Be Used to Drive a Wholesale Reinterpretation of the FHA ................................................................................20

III. HUD'S CONSTRUCTION OF THE FHA IS REASONABLE UNDER *CHEVRON*'S DEFERENTIAL STEP TWO ....................................................................22

CONCLUSION..............................................................................................................25

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Adirondack Med. Ctr. v. Sebelius,*
    740 F.3d 692 (D.C. Cir. 2014) ........................................................................14

*Ahmetovic v. INS,*
    62 F.3d 48 (2d Cir. 1995) ...............................................................................23

*Aliotta v. Bair,*
    614 F.3d 556 (D.C. Cir. 2010) ..........................................................................4

*Allen v. Wright,*
    468 U.S. 737 (1984) ....................................................................................2, 3

*Alleyne v. United States,*
    133 S. Ct. 2151 (2013) ...................................................................................19

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ......................................................................................14

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998) ......................................................................................20

*Ass'n of Flight Attendants v. U.S. Dep't of Transp.,*
    564 F.3d 462 (D.C. Cir. 2009) ..........................................................................6

*Atl. States Legal Found., Inc. v. EPA,*
    325 F.3d 281 (D.C. Cir. 2003) ..........................................................................7

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
    515 U.S. 687 (1995) ......................................................................................24

*Bd. of Education v. Harris,*
    444 U.S. 130 (1979) .................................................................................13, 18

*\*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ............................................................................... passim

*Clark v. Martinez,*
    543 U.S. 371 (2005) ......................................................................................19

*Davis v. Mich. Dep't of Treasury,*
    489 U.S. 803 (1989) ......................................................................................10

*de Csepel v. Hungary*,
  808 F. Supp. 2d 113 (D.D.C. 2011),
  *aff'd in part and rev'd in part*, 714 F.3d 591 (D.C. Cir. 2013) ........................................22

*Dehoyos v. Allstate Corp.*,
  345 F.3d 290 (5th Cir. 2003) ........................................................................................5

*DePierre v. United States*,
  131 S. Ct. 2225 (2011) ................................................................................................11

*FAA v. Cooper*,
  132 S. Ct. 1441 (2012) ................................................................................................11

*Garcia v. United States*,
  469 U.S. 70 (1984) ......................................................................................................12

*Good Samaritan Hosp. v Shalala*,
  508 U.S. 402 (1993) ....................................................................................................25

*\*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971) ..............................................................................................11, 18

*Grocery Mfrs. Ass'n v. EPA*,
  693 F.3d 169 (D.C. Cir. 2012) ......................................................................................9

*Guardsmark, LLC v. NLRB*,
  475 F.3d 369 (D.C. Cir. 2007) ....................................................................................12

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ....................................................................................................24

*Halet v. Wend Inv. Co.*,
  672 F.2d 1305 (9th Cir. 1982) ......................................................................................4

*Harris v. United States*,
  536 U.S. 545 (2002) ....................................................................................................19

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ....................................................................................................21

*Hettinga v. United States*,
  770 F. Supp. 2d 51 (D.D.C. 2011) ................................................................................3

*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012) (per curiam) ................................................................3

*Hous. Auth. of Kaw Tribe of Indians v. Ponca City,*
  952 F.2d 1183 (10th Cir. 1991) ....................................................................17

*Humana Inc. v. Forsyth,*
  525 U.S. 299 (1999).............................................................................7, 21

*In re Navy Chaplaincy,*
  534 F.3d 756 (D.C. Cir. 2008) .....................................................................3

*K Mart Corp. v. Cartier, Inc.,*
  486 U.S. 281 (1988)...................................................................................14

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992).....................................................................................2

*Lynch v. Donnelly,*
  465 U.S. 668 (1984)...................................................................................12

*Massachusetts v. U.S. Dep't of Transp.,*
  93 F.3d 890 (D.C. Cir. 1996) ........................................................8, 23, 24

*Merck & Co. v. Reynolds,*
  559 U.S. 633 (2010)...................................................................................18

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
  663 F.3d 470 (D.C. Cir. 2011) ................................................................2, 3

*Nat'l Ass'n of Mfrs. v. SEC,*
  956 F. Supp. 2d 43 (D.D.C. 2013) ............................................................13

*Nat'l Auto Dealers Ass'n v. FTC,*
  864 F. Supp. 2d 65 (D.D.C. 2012) ............................................................25

*Nat'l Cmty. Reinv. Coal. v. Accredited Home Lenders Holding Co.,*
  573 F. Supp. 2d 70 (D.D.C. 2008) ..............................................................9

*Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.,*
  208 F. Supp. 2d 46 (D.D.C. 2002) ..............................................................5

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
  538 U.S. 803 (2003).....................................................................................7

*NRA v. Reno,*
  216 F.3d 122 (D.C. Cir. 2000) ..................................................................23

*Neal v. Bd. of Trs. of Cal. State Univs.,*
    198 F.3d 763 (9th Cir. 1999) ...................................................................8

*Ojo v. Farmers Grp. Inc.,*
    600 F.3d 1205 (9th Cir. 2010) (en banc) ...............................................4, 5

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007)...............................................................................20

*Pharm. Research & Mfrs. of Am. v. Thompson,*
    251 F.3d 219 (D.C. Cir. 2001) ...............................................................17

*Regents of Univ. of Cal. v. Bakke,*
    438 U.S. 265 (1978)...............................................................................14

*Ricci v. DeStefano,*
    557 U.S. 557 (2009)...............................................................................14

*Saunders v. Farmers Ins. Exch.,*
    537 F.3d 961 (8th Cir. 2008) ..............................................................5, 21

*Schnitzer v. Harvey,*
    389 F.3d 200 (D.C. Cir. 2004) .................................................................8

*Smith v. Bennett,*
    365 U.S. 708 (1961)...............................................................................12

*\*Smith v. City of Jackson,*
    544 U.S. 228 (2005)........................................................................ <u>passim</u>

*Trafficante v. Metro. Life Ins. Co.,*
    409 U.S. 205 (1972)..................................................................................8

*Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,*
    52 F.3d 127 (6th Cir. 1995) ......................................................................9

*United States v. Tinkleberg,*
    131 S. Ct. 2007 (2011).............................................................................8

*Washington v. Davis,*
    426 U.S. 229 (1976)...............................................................................19

*W. Fuels-Utah, Inc. v. Lujan,*
    895 F.2d 780 (D.C. Cir. 1990) ..........................................................15, 18

*W. Va. Univ. Hosps. v. Casey,*
  499 U.S. 83 (1991) ..................................................................................17

## STATUTES

29 U.S.C. § 623 ........................................................................................10

42 U.S.C. § 2000e-2 ..................................................................................11

42 U.S.C. § 3601 ................................................................................19, 23

42 U.S.C. § 3604 ........................................................................11, 13, 17

42 U.S.C. § 3605 ..............................................................13, 16, 17, 25

42 U.S.C. § 3606 ......................................................................................13

Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 ..................... 16-18

## RULES AND REGULATIONS

54 Fed. Reg. 3232 (1989) .............................................................................3

78 Fed. Reg. 11,460 (Feb. 15, 2013) ................................................. *passim*

## MISCELLANEOUS

Webster's Third New Int'l Dictionary (1966) ...........................................12

Plaintiffs ask this Court to hold that the Fair Housing Act ("FHA" or "Act"), 42 U.S.C. §§ 3601-3619, unambiguously forecloses disparate impact discrimination claims, even though all eleven courts of appeals that have addressed the issue found the Act best interpreted to provide for such claims. Although Plaintiffs portray their position as a mechanical application of traditional tools of construction, a closer examination of their arguments demonstrates that their success in this litigation would depend, at every turn, on departing from standard principles of statutory construction and on accepting arguments rejected by all other courts to have considered them. A straightforward reading of the FHA as a whole confirms that it not only accommodates, but indeed embraces, a theory of disparate impact liability. Accordingly, the Department of Housing and Urban Development's ("HUD's") February 2013 regulation ("Discriminatory Effects Rule" or "Rule"), 78 Fed. Reg. 11,460 (Feb. 15, 2013), which confirmed the agency's longstanding interpretation of the FHA to encompass disparate impact claims, is lawful.

In any event, the Court need not reach this issue, because Plaintiffs have still failed to demonstrate that they suffer any concrete harm traceable to the Rule, rather than to the longstanding availability of disparate impact liability under the FHA itself, as recognized in established case law and formal adjudications by HUD long before the Rule's promulgation.

## I.     PLAINTIFFS' CLAIM IS NOT PROPERLY BEFORE THE COURT

### A.     Plaintiffs Have Not Satisfied the Traceability and Redressability Requirements for Standing

In their opening brief, Defendants explained that Plaintiffs lack Article III standing, having failed to demonstrate that one of their members suffered a concrete injury that is fairly traceable to the Rule and redressable by the relief sought. In their Opposition, Plaintiffs attempt to correct this deficiency by filing several affidavits, which allege for the first time that Plaintiffs' members face some injury-in-fact as a result of the availability of disparate impact

liability under the FHA.  Even taken as true, however, the harms identified in these affidavits are not traceable to the Rule, but to pre-existing legal obligations.[1]  As Defendants explained at length in their opening brief, the Rule did not change "the longstanding availability of disparate impact liability under the FHA itself."  Defs.' Mem. at 12; *see also id.* at 2-7.  Because Plaintiffs have failed to satisfy the independent requirement that they demonstrate traceability and redressability, *see Allen v. Wright*, 468 U.S. 737, 754 n.19, 757 (1984), their claim should be dismissed for lack of standing.

Initially, Plaintiffs dispute that they even need to demonstrate traceability, returning to the unremarkable proposition that "there is *ordinarily* little question that the action or inaction has caused . . . injury" when "the plaintiff is himself an object of the action (or forgone action) at issue."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (emphasis added); *see* Pls.' Opp. at 2-5.  But, by its own terms, this general rule has exceptions.  One such exception arises when a party challenges a regulation to which it is subject that duplicates preexisting legal duties. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 663 F.3d 470, 473-74 (D.C. Cir. 2011).

Without citing any authority, Plaintiffs seek to thwart application of this exception here by arguing that the preexisting legal duty must be imposed by a "statute, formal rule, or Supreme Court decision."  Pls.' Opp. at 15.  Plaintiffs' assertion is contrary to *National Ass'n of Home Builders*, in which the D.C. Circuit held that a membership organization lacked standing based

---

[1] Plaintiffs observe in a footnote that the Rule "formally establish[ed] a three-part burden-shifting test" to eliminate "variation[s] in the tests courts had used for determining disparate-impact liability."  Pls.' Opp. at 16 n.4.  But neither Plaintiffs' Opposition nor their affidavits explain how alterations in the burden shifting test harm any of their members.  As HUD explained, "the rule serves to reduce regulatory burden for all entities . . . by establishing certainty and clarity with respect to how a determination of unjustified discriminatory effect is to be made."  78 Fed. Reg. at 11,479.  Moreover, Plaintiffs do not challenge the merits of the burden-shifting test adopted by HUD.

on preexisting legal duties that were contained in the agency's prior administrative publications,
the United States' position in prior litigation, and the plaintiff's prior understanding about the
agency's position. 663 F.3d at 474. Defendants' opening brief cited exactly the forms of
preexisting interpretation relied upon in *National Ass'n of Home Builders*, as well as the uniform
judicial consensus across eleven circuits, which collectively demonstrate that the insurance
industry and other entities were subject to liability on a disparate impact theory long before
promulgation of the Rule. *See* Defs.' Mem. at 3-7, 13-15, 40 n.11. Plaintiffs attempt to
overcome the holding in *National Ass'n of Home Builders* by citing to a decision of this Court in
*Hettinga v. United States*, 770 F. Supp. 2d 51, 56-57 (D.D.C. 2011). *See* Pls.' Opp. at 14. But
that case predates the D.C. Circuit's decision in *National Ass'n of Home Builders*.[2]

As explained in Defendants' opening brief, any injuries Plaintiffs may suffer as a result
of the availability of disparate impact liability under the FHA would predate HUD's
promulgation of the Rule and therefore would not be "fairly traceable" to it.[3] *See Allen*, 468
U.S. at 757. The newly filed affidavits do not cure this defect. Plaintiffs note, *inter alia*, that
one of their members is the subject of an investigation initiated by HUD that seeks, in part, to
determine whether there is evidence of discrimination under a disparate impact theory of liability
– a fact that Defendants inadvertently and regrettably failed to identify when they filed their

---

[2] Because this Court's decision was affirmed without addressing standing, *Hettinga v. United States*, 677 F.3d 471 (D.C. Cir. 2012) (per curiam), the D.C. Circuit's *Hettinga* opinion has no implication for the standing analysis in this case. *See In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008) ("It is a well-established rule that cases in which jurisdiction is assumed *sub silentio* are not binding authority for the proposition that jurisdiction exists." (internal quotation marks omitted)).

[3] HUD's fair housing regulations have, since 1989, identified homeowner's insurance as but one of many examples of covered housing practices. *See* 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989) (codified at 24 CFR 100.70(d)(4))). The Rule no more "targets" homeowner's insurance, Pls.' Opp. at 5, than any other covered practices.

opening brief.  *See* Pls.' Opp. at 6-7 (citing Schwartz Decl. ¶¶ 7, 15).  Though this fact may suffice to show that one of Plaintiffs' members faces a threat of liability under a disparate impact theory, it does not discharge Plaintiffs' burden of showing that one of its members is injured *as a result of* the challenged Rule.  Plaintiffs merely assume that because the investigation was initiated "since the promulgation of the Disparate-Impact Rule," it would not have occurred *but for* the Rule.  Pls.' Opp. at 6.  But this *temporal* argument does not provide the necessary evidence of a *causal* link between the Rule and the investigation – or any costs incurred by Plaintiffs' member to respond to the requests of HUD's investigator.[4]  Instead, these costs are traceable to the fact that disparate impact liability under the FHA has long been established under the relevant circuit's case law.  *See Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311-12 (9th Cir. 1982); *see also Ojo v. Farmers Grp. Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) (en banc) (recognizing the viability of a FHA disparate impact claim against an insurer).

Plaintiffs can hardly now contend that investigations or complaints would not have occurred but for the Rule, having represented to the Supreme Court back in 1996 that "HUD has received and is investigating complaints against [their] members which include claims of disparate impact, and has given every indication of its intention to employ a disparate impact theory in enforcing the FHA against insurers."  Br. for Nat'l Ass'n of Mut. Ins. Cos. & Am. Ins. Ass'n as Amici Curiae in Supp. of the Pet. at 15 n.11, *Nationwide Mut. Ins. Co. v. Cisneros*, 516 U.S. 1140 (1996) (No. 95-714).  Moreover, Plaintiffs have failed to demonstrate that HUD's investigation would proceed in a different manner if HUD were permitted to investigate only allegations of intentional discrimination.  *See Aliotta v. Bair*, 614 F.3d 556, 562 (D.C. Cir. 2010)

---

[4] Indeed, one of the documents attached to the declaration submitted by Plaintiffs shows on its face that the form data request sent by HUD had been in use since October 2002 – more than 10 years before the Rule was finalized – to investigate allegations against insurers.  *See* Schwartz Decl. Ex. A at 3 (stating revision date of October 3, 2002).

(noting "[s]tatistical evidence may suffice to establish a prima facie case" of disparate treatment under an antidiscrimination statute); *see also* HUD, No. 8024.01, Title VIII Complaint Intake, Investigation & Conciliation Handbook at 2-44 (2005) (directing HUD investigators to "always be alert to the possibility that a case which … look[s] like a discriminatory impact case [may] later be shown to be a disparate treatment case" and instructing them that "evidence of the respondent's intentional discrimination … include[es] … awareness by the respondent that his policy would have the effect of excluding a large portion of the complainant's protected class").

Plaintiffs' reliance on the filing of private litigation against one of their members is even less availing. *See* Pls.' Opp. at 6-7. Not only does this fail to demonstrate any causal connection to the Rule, but it is also not remediable by any relief that this Court has authority to grant. Private litigants have pursued claims against insurance providers based on a disparate impact theory since long before the Rule was adopted.[5] *See, e.g., Ojo*, 600 F.3d at 1207; *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 964 (8th Cir. 2008); *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 293 (5th Cir. 2003); *Nat'l Fair Hous. Alliance v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 50 (D.D.C. 2002). Simply put, Plaintiffs give no indication of how vacating the Rule would prevent private litigants – who are not defendants in this lawsuit – from "fil[ing] disparate-impact complaints against Plaintiffs' members." Pls.' Opp. at 14.

To the extent that Plaintiffs' affidavits also purport to address the costs that would be incurred to avoid liability under the Rule, they fail to demonstrate causation for similar reasons. The affidavits provide no explanation for how these costs are attributable to the Rule, notwithstanding the fact that Plaintiffs' members have for decades been required by the prevailing legal and administrative precedent to avoid practices that result in an unjustified

---

[5] This includes Plaintiffs' own members. *See* McCarthy Aff. ¶ 4 (identifying Farmers Group, Inc., the defendant in *Ojo*, as a member of AIA).

disparate impact.[6]  *See* 78 Fed. Reg. at 11,479 ("[F]or the minority of entities that have, in the

over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid

engaging in illegal housing discrimination and plan to come into compliance as a result of this

rulemaking, the costs will simply be the costs of compliance with a preexisting statute,

administrative practice and case law.").  Instead, several of the affidavits contain baldly

conclusory statements of causation.[7]  *See* Christy Aff. ¶ 12 ("But for the Disparate Impact Rule,

Western National would not incur these costs."); Doto Aff. ¶ 18 ("But for the Disparate Impact

Rule, Preferred Mutual would not incur the costs described above.").  This sort of "conclusory

statement" that merely "assert[s] . . . causation" does not satisfy Plaintiffs' burden at the

summary judgment stage to demonstrate standing with admissible evidence.  *Ass'n of Flight

Attendants v. U.S. Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009).  Accordingly, Plaintiffs'

claim should be dismissed for lack of standing.

### B.    Plaintiffs' Claim Is Not Ripe

Plaintiffs' pre-enforcement challenge to the Rule is also unripe for the reasons noted in

Defendants' opening brief.  Plaintiffs respond by contending that their claim "is ripe even in the

absence of a specific attempt at enforcement" because it presents a "purely legal challenge."

Pls.' Opp. at 18.  However, even where "the question presented . . . is a purely legal one and . . .

constitutes final agency action," the issue is unripe for review if "further factual development

---

[6]  Plaintiffs represent that their members seek to comply with federal law.  *See* Rudolph Aff. ¶ 3
("My duties at Hartford include . . . ensur[ing] that Harford's writing companies are in
compliance with State and federal law in the provision of homeowners' insurance.").  This effort
presumably includes *all* obligations imposed by federal law, including obligations imposed by
the FHA under prevailing law prior to the Rule's promulgation.

[7]  One affidavit omits even a conclusory claim of causation, merely stating that the affiant
"understand[s] that [HUD] has issued a final rule purporting to interpret the Fair Housing Act to
prohibit practices . . . that result in a disparate impact."  Essman Aff. ¶ 3.

would significantly advance [the court's] ability to deal with the legal issues presented." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 811-12 (2003) (citations and internal quotation marks omitted); *see also Atl. States Legal Found., Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) ("Claims that an agency's action is . . . contrary to law present purely legal issues.  But even purely legal issues may be unfit for review." (citations omitted)).

Plaintiffs err in claiming that "nothing that could occur in a particular disparate-impact lawsuit or enforcement proceeding would inform the Court's decision."  Pls.' Opp. at 20. Plaintiffs' supposedly textual challenge to the Rule is, in fact, predicated on factual suppositions about how the Rule will affect the industry in practice, *see, e.g.*, Pls' Opp. at 38 (urging the Court to reject HUD's interpretation because it will supposedly cause "severe disruption on the business of insurance").  And notwithstanding Plaintiffs' statement that they are "not asking this Court to grant relief independently based on the McCarran-Ferguson Act," Pls.' Opp. at 39 n.13, Plaintiffs continue to argue that the McCarran-Ferguson Act compels their preferred reading of the statute.  *See id.* at 37-39.  In doing so, Plaintiffs entirely fail to address the Supreme Court's clear instruction that the effect of McCarran-Ferguson can only be ascertained in the context of a specific application of the federal law in question.  *See Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999).  Plaintiffs' challenge should await consideration until this issue is presented in the proper factual context, namely in a formal adjudication or private litigation under the FHA.

## II.    PLAINTIFFS FAIL TO DEMONSTRATE THAT THE FHA UNAMBIGUOUSLY COMPELS THEIR PREFERRED READING

### A.    Plaintiffs' Reading of the FHA Is Contrary to the Great Weight of Authority

Plaintiffs continue to claim that "the text of the FHA leaves no room for recognition of disparate impact liability," Pls.' Opp. at 30, as they must to succeed on their claim that HUD's interpretation of the FHA is entitled to no deference under *Chevron U.S.A., Inc. v. Nat'l*

*Resources Def. Council*, 467 U.S. 837 (1984).  But their claim that the statute unambiguously forecloses HUD's reading – a claim that rests solely on the first step of the *Chevron* inquiry – cannot be reconciled with the "broad and inclusive" language of the Act, *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972), and with the widespread judicial consensus that such claims are readily cognizable under the Act.

As Defendants explained in their opening brief, HUD's construction of the FHA to encompass disparate impact liability comports with the construction adopted by all eleven courts of appeals to have reached the issue, and with the prevailing view among the courts in this District.  *See* Defs.' Mem. at 20-21.  In their Opposition, Plaintiffs grudgingly acknowledge "that *some* courts of appeals have construed the FHA to permit disparate-impact claims," Pls.' Opp. at 29 (emphasis added) – a substantial understatement given the overwhelming weight of authority. But Plaintiffs invite the Court to ignore that authority simply because it is not binding.  *Id.*

Plaintiffs are plainly wrong to discount the import of the uniform judicial consensus here. The "uniformity of precedent among the other circuits" is "significant," even if it is not strictly binding.  *Schnitzer v. Harvey*, 389 F.3d 200, 203 (D.C. Cir. 2004); *see also United States v. Tinkleberg*, 131 S. Ct. 2007, 2014 (2011) (finding "unanimity among the lower courts about the meaning of" the Speedy Trial Act to be "entitled to strong consideration, particularly when those courts have maintained that interpretation consistently over a long period of time").   Indeed, the fact that eleven circuits have concurred with HUD's construction of the FHA is reason enough to find that the construction is not unambiguously foreclosed.  *See Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 895-96 (D.C. Cir. 1996) (citing "the fact that a number of circuits" have interpreted a statute in a manner somewhat similar to the agency's interpretation as reason to find the statute ambiguous at *Chevron* Step One); *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d

763, 771 (9th Cir. 1999) ("Appellees' interpretation of [the statute's] text has been rejected explicitly by the Seventh Circuit, as well as the [agency], and implicitly rejected by [three] other circuits . . . .  Under such circumstances, it is clear that [the agency]'s interpretation of [the statute's] provisions merits deference under . . . *Chevron*."  (citation omitted)).

In an effort to justify the disconnect between their interpretive position and the view adopted by eleven courts of appeals, Plaintiffs suggest that the Supreme Court in *Smith v. City of Jackson*, 544 U.S. 228 (2005), overruled, *sub silentio*, decades of circuit precedent construing the FHA.  As an initial matter, Supreme Court decisions generally do not overrule circuit court decisions on issues not before the Court.  *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 180 (D.C. Cir. 2012) (Tatel, J., concurring) (noting circuit precedents remain good law even after Supreme Court decisions criticizing similar methods of reasoning "no matter how much we may think those decisions are wrong or that the Supreme Court may be preparing to hold otherwise"); *Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 52 F.3d 127, 130 (6th Cir. 1995) (rejecting that Supreme Court *sub silentio* overruled eight circuits' interpretations of one provision in the Bankruptcy Code through its interpretation of another bankruptcy provision).  Indeed, Plaintiffs' argument that *Smith* overrules prevailing law on the proper construction of the FHA has been expressly rejected by a number of courts, including in this District.  *See Nat'l Cmty. Reinv. Coal. v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 78-79 (D.D.C. 2008) (collecting cases).

More importantly, Plaintiffs' reading of *Smith* is simply incorrect.  As explained in Defendants' opening brief, *Smith* strongly supports Defendants' reading of the FHA.  Defs.' Mem. at 23, 32.  Plaintiffs' contrary reading is based on an observation the plurality made in a single footnote, comparing the disparate impact and disparate treatment provisions of the Age

Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 623(a); *see* Pls.' Opp. at 28-29 (citing *Smith*, 544 U.S. at 236 n.6). That footnote observed that a provision of the ADEA, which makes it unlawful "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual . . . because of such individual's age," 29 U.S.C. § 623(a)(1), prohibits only intentional discrimination. *See Smith*, 544 U.S. at 236 n.6 (plurality). Based on this observation, Plaintiffs purport to discern a much larger principle: that the words "refuse," "discriminate," and "because of" necessarily connote only intentional discrimination, and that because those words also appear in the FHA – though undeniably employed in a different linguistic formulation than they are in the ADEA, and with additional effects-focused language – the Act unambiguously forecloses disparate impact liability. *See* Pls.' Opp. at 25, 28-29.

Plaintiffs' suggestion that the Supreme Court intended, in a single footnote, to impart unambiguous, stand-alone meaning to particular words in isolation is entirely without merit. Nothing in *Smith* suggests that the Court was departing from the well-established principle that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Indeed, the plurality in *Smith* gave content to the text at issue only after evaluating the entire statutory context, *see* 544 U.S. at 238-39, and its textual analysis must be understood in light of that context. For the reasons discussed in Defendants' opening brief and below, the text of the FHA, when considered as a whole rather than in the piecemeal fashion advanced by Plaintiffs, easily embraces HUD's construction – a view that accords with uniform judicial consensus.

### B.    The Plain Text Supports HUD's Recognition of Disparate Impact Claims

A straightforward reading of the text of the FHA demonstrates that it readily accommodates liability based on a disparate impact standard. By prohibiting actions that "make

unavailable or deny" housing on the basis of a protected characteristic, 42 U.S.C. § 3604(a), (f)(1), the FHA focuses on the "consequences of . . . practices," *i.e.*, the unavailability of housing on the basis of race or other protected characteristic, and "not simply [their] motivation." *See Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971).  It was on this same basis that the Supreme Court found disparate impact claims cognizable under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2(a)(2), in *Griggs*, 401 U.S. at 432, and under the ADEA in *Smith*, 544 U.S. at 234-35 (plurality).

Plaintiffs resist the analogy to *Griggs* and *Smith*, suggesting that because the FHA does not contain the *exact* language contained in Title VII and the ADEA, it cannot possibly be read to encompass disparate impact liability.  *See, e.g.*, Pls.' Opp. at 28.  This highly formalistic argument is without merit.  The fact that Congress used a particular formulation to allow for disparate impact claims in one statute does not mean that Congress must use an identical formulation in every other statute in order to allow for a similar result.  *See DePierre v. United States*, 131 S. Ct. 2225, 2234 (2011) ("[B]ecause Congress sometimes uses slightly different language to convey the same message, we must be careful not to place too much emphasis on the marginal semantic divergence . . . ."  (internal quotation marks and citation omitted)); *cf. FAA v. Cooper*, 132 S. Ct. 1441, 1448 (2012) (holding that "magic words" are not necessary to demonstrate even "unmistakable" congressional intent).

Although Plaintiffs attack Defendants' opening brief for "entirely ignor[ing]" the ordinary meaning of the words in the Act, Pls.' Opp. at 22 – an attack that cannot be squared with Defendants' extensive discussion of the words of the text, *see* Defs.' Mem. at 21-24 – it is in fact Plaintiffs who ignore the ordinary meaning of the phrase "make unavailable."  Plaintiffs simply dismiss the significance of the dictionary definition of the word "make," and claim

without support that the phrase, along with all the other verbs in the statute, "identif[ies] the actor's motivation."  Pls.' Opp. at 22.  This assertion is contrary to the ordinary meaning of the word "make," which need not connote intentional action.  *See* Defs.' Mem. at 24-25.[8]  Thus, in common parlance, someone can "make" a result happen without intending the result.  *See Smith v. Bennett*, 365 U.S. 708, 713-14 (1961) (positing that a statute "inadvertently[] made" certain procedural protections unavailable); *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (discussing "government practice[s]" that "intentionally or unintentionally . . . make religion relevant").

Unable to rely on the ordinary meaning of the phrase "make unavailable," Plaintiffs resort to the canon of *noscitur a sociis* to contend that the phrase's effects-focused connotation should be read out of the statute because it appears together with the words "refuse," "deny," and "otherwise."  Pls.' Opp. at 24-25.  Not only are Plaintiffs are incorrect that these three words inevitably require an intentional act, but application of the canon is inappropriate here in any case given the clear import of the phrase "make unavailable" and the fact that it appears in the *disjunctive* with the other words.  *See Garcia v. United States*, 469 U.S. 70, 73 (1984) ("Canons of construction indicate that terms connected in the disjunctive . . . be given separate meanings."); *Guardsmark, LLC v. NLRB*, 475 F.3d 369, 378 (D.C. Cir. 2007) (noting the canon of *noscitur a sociis* may run up against the "equally applicable canon of construction . . . that all words in a text must be given independent meaning").  And even if the canon were applicable, it

---

[8] Defendants' opening brief cited two dictionary definitions that support HUD's reading of the phrase "make unavailable."  Defs.' Mem. at 24-25.  Plaintiffs complain that one of the two citations was to language that appears in an "explanation of the word's *synonyms*" rather than its definition.  Pls.' Opp. at 24 n.8.  But the quoted language was part of an explanation *distinguishing* the word "make" from its synonyms.  Webster's Third New Int'l Dictionary 1364 (1966).  As such, it serves as an especially strong indication that Congress's choice of the word "make," as opposed to another similar word, connotes both intentional *and* unintentional action.  This quoted language is also consistent with the enumerated definitions.  *See id.* at 1363 ("[T]o give rise to: favor the growth or occurrence of").

could not support the weight of Plaintiffs' entire argument, especially where, as here, other canons of construction strongly support HUD's reading of the statute, *see* Part II.C, *infra*. *See Nat'l Ass'n of Mfrs. v. SEC*, 956 F. Supp. 2d 43, 70 (D.D.C. 2013) ("The fact that both sides credibly wield competing canons of statutory interpretation suggests that Congress did not plainly answer this particular question . . . .").

Plaintiffs mischaracterize Defendants' position – as well as the relevant question under *Chevron* – when they suggest that the government "appears to rely solely on the phrase 'make unavailable' to import disparate-impact analysis into the FHA." Pls.' Opp. at 25 n.9. Although the phrase "make unavailable" affirmatively favors HUD's construction of the statute, Defendants need not demonstrate that a particular phrase definitively "imports" disparate impact analysis, but only that the language of the FHA does not foreclose it. As set forth in Defendants' opening brief, there are many indications in the words Congress used in the FHA that it left the ultimate interpretive choice to the agency. *See* Defs.' Mem. at 21-26. These indications include Congress's choice to prohibit "discriminat[ion]," *see* 42 U.S.C. §§ 3604(b), 3605, 3606, a word that the Supreme Court has found to be susceptible to multiple interpretations. *See Bd. of Educ. v. Harris*, 444 U.S. 130, 140 (1979) (finding the prohibition on "discrimination" in the "assignment of employees" to be "ambiguous").[9] Plaintiffs fail to cite any precedent suggesting

_____

[9] Plaintiffs attempt to distinguish *Harris* by noting that the statute under review had two anti-discrimination provisions, one of which spoke clearly in terms of effect and the other of which generically prohibited "discrimination" in the "assignment of employees." *See* Pls.' Opp. at 26; *Harris*, 444 U.S. at 140. Plaintiffs suggest that the Court found the second provision to be ambiguous only in light of the first provision. *See* Pls.' Opp. at 26. But, in fact, the Court relied on the inherent ambiguity of the term "discrimination" – together with an analysis of the statute's context and history – to reject an inference that Congress's inclusion of effects-based language in the first provision but exclusion in the second provision was "purposeful[]." *Harris*, 444 U.S. at 140. Plaintiffs also err in claiming that the FHA, unlike the statute in *Harris*, "links the word 'discriminate' with terms that unambiguously proscribe only intentional discrimination." Pls.'

that the term "discriminate" is of sufficiently concrete and self-evident meaning that, standing

alone, it unambiguously compels rejection of the agency's construction.[10]  Indeed, the simple

fact that practices resulting in an unlawful disparate impact are referred to, in common parlance,

as "disparate-impact *discrimination*," *e.g., Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)

(emphasis added), confirms that a prohibition on "discriminat[ion]" is by its plain terms capable

of encompassing disparate impact liability.

> ### C.    The FHA's Anti-Discrimination Prohibitions Must Be Read Together with Other Provisions of the FHA that Clearly Contemplate Disparate Impact Liability

The unsoundness of Plaintiffs' textual analysis is further underscored by its failure to

account for the significance of three other provisions in the FHA that provide exemptions to

liability that would only logically apply to a disparate impact theory.  *See* Defs.' Mem. at 29-31.

Because these exemptions presuppose the availability of disparate impact claims, they strongly

confirm HUD's construction of the statute.

Ordinary principles of statutory construction demand that courts look not only to "the

particular statutory language at issue," but also to "the language and design of the statute as a

whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *Adirondack Med. Ctr. v.

Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014) ("[W]hen one possible interpretation of a statutory

---

Opp. at 26.  In Section 3604(b), the term is "linked" to no other verbs, and in Sections 3604(f) and 3605, it is "linked" with the effects-focused phrase "make unavailable."

[10] Plaintiffs' reliance on *Alexander v. Sandoval*, 532 U.S. 275 (2001), to support their position that a prohibition on "discrimination" conclusively refers only to disparate treatment, s*ee* Pls.' Opp. at 30, is misplaced.  In *Sandoval*, the Court noted that it was "beyond dispute" that language in Title VI of the Civil Rights Act of 1964 prohibits only intentional discrimination, when *no party disputed the fact* and the Court had previously construed the provision as so limited.  532 U.S. at 280-81 (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)). Moreover, Justice Powell's controlling opinion in *Bakke* observed that "[t]he concept of 'discrimination' . . . is susceptible of varying interpretations" and looked to other clues in the statute, including its legislative history, to conclude that Congress intended the scope of the Spending Clause provision to be coextensive with the Equal Protection Clause.  438 U.S. at 284.

provision has the potential to render another provision inert, we cannot simply say. . . that we are reviewing the former in isolation.").  This review requires consideration of the "statute as a whole" in its current form, including provisions added to the statute since its original enactment. *See W. Fuels-Utah, Inc. v. Lujan*, 895 F.2d 780, 785 n.6 (D.C. Cir. 1990) (considering the plain meaning of a statutory provision in light of entire statutory context, including later-enacted amendment); *cf. W. Va. Univ. Hosps. v. Casey*, 499 U.S. 83, 100 (1991) (noting that courts must consider whether a construction fits "logically and comfortably into the body of both previously and subsequently enacted law").

Accordingly, the FHA's anti-discrimination provisions must be read in light of the three exemptions in the FHA that presuppose disparate impact liability.  Plaintiffs' failure to discuss these exemptions in their analysis of the text of the statute, instead relegating them to the section of their Opposition concerning legislative history, *see* Pls.' Opp. at 35, further discredits their already flawed textual analysis.

Plaintiffs also disregard the common sense understanding of these provisions as discrete exemptions to disparate impact liability, claiming that they are instead merely "safe harbors" that "clarify that certain conduct is permitted under the FHA."  Pls.' Opp. at 35.  This claim assumes, counterfactually, that it would not otherwise be clear that such conduct is permitted.  If the only conduct that is prohibited under the FHA is conduct intentionally directed at individuals because of a protected characteristic – rather than facially-neutral conduct that *results* in an unjustified disparate effect because of a protected characteristic – there would be no need to "clarify" that facially-neutral practices are exempt from liability.  As such, the exemptions confirm the availability of disparate impact claims.  The Court endorsed this same reasoning in *Smith* with

-15-

respect to a similar provision in the ADEA.[11]  544 U.S. at 238-39 (plurality) (rejecting the dissent's efforts to characterize the ADEA's "RFOA" defense as merely a "'safe harbor from liability'"); *id.* at 243 (Scalia, J., concurring in part and concurring in the judgment).

Plaintiffs further posit that the exemptions have significance even under a disparate treatment regime by "making clear that conduct motivated by a factor that could otherwise arguably be considered related to a protected characteristic is not prohibited by the FHA."  Pls.' Opp. at 36.  An examination of the "appraisal exemption" demonstrates why this argument lacks merit.  This exemption provides that: "Nothing in this subchapter prohibits a person engaged in the business of furnishing appraisals of real property from considering factors other than race, color, religion, national origin, sex, handicap, or familial statute."  42 U.S.C. § 3605(c).  If the Act prohibited only intentional discrimination, it would not be unlawful to "consider[] factors other than race, color, religion, national origin, sex, handicap, or familial status," and Congress would have had no need to create that exemption.  Put differently, the only way that facially-neutral practices could "otherwise . . . be considered related to a protected characteristic," Pls.' Opp. at 36, is under a theory of disparate impact liability.  To construe the FHA to preclude disparate impact liability would not only render the appraisal exemption superfluous, but would also fail to respect Congress's choice *not* to add a similar exemption for other types of housing-related activities when it comprehensively revised the FHA in 1988 through the Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 ("1988 Amendments").

---

[11] Plaintiffs attempt to distinguish *Smith* on the ground that the relevant provision in the ADEA refers to conduct that is "otherwise prohibited" by the statute, whereas the FHA exemptions do not.  Pls.' Opp. at 35.  Because the three FHA exemptions would be unnecessary unless the conduct *was* otherwise prohibited, this linguistic hair-splitting gains them no traction.

**D.      The History of the 1988 Amendments to the FHA Supports HUD's Reading**

Plaintiffs renew their effort to marshal sources of legislative history in support of their position by pulling out isolated statements of individual legislators from the 1968 floor debates. *See* Pls.' Opp. at 30-31.  This argument repeats the failings noted in Defendants' opening brief. *See* Defs.' Mem. at 34-35.  Plaintiffs also argue that the legislative history "need not be consulted" in resolving the present interpretive inquiry.  Pls.' Opp. at 30.  To the extent Plaintiffs advance this as a sweeping principle of statutory interpretation, they are plainly incorrect.  *See Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001) (employing all "traditional tools of statutory interpretation," including the "text, structure, purpose, and legislative history," to ascertain Congress's intent at *Chevron* Step One).  Although the text of the FHA, standing alone, readily accommodates HUD's construction, the legislative history, in particular the history of the 1988 Amendments, further confirms that Congress understood disparate impact claims to be cognizable under the Act for the reasons explained in Defendants' opening brief.  *See* Defs.' Mem. at 32-35.

Plaintiffs discount this legislative history by arguing that Congress cannot be understood to have ratified an existing interpretation of language in a statute when it enacts "isolated amendments," rather than a "comprehensive[]" revision of the statute.  *See* Pls.' Opp. at 34 (quoting *Sandoval*, 532 U.S. at 292).  But this argument rests on Plaintiffs' mischaracterization of the 1988 Amendments as "isolated amendments."  In reality, the 1988 Amendments effected sweeping changes to the FHA – including to Sections 3604 and 3605 – while leaving intact language that nine courts of appeals had already construed to encompass disparate impact liability.  *See* Defs.' Mem. at 3, 33; *Hous. Auth. of Kaw Tribe of Indians v. Ponca City*, 952 F.2d 1183, 1195 n.16 (10th Cir. 1991) (discussing "the broad sweep" of the 1988 Amendments).

-17-

Congress also repeated or substantially duplicated the existing language in new provisions added as part of the 1988 Amendments.  *See* 1988 Amendments § 6(a) (codified at 42 U.S.C. § 3604(f)); *id.* § 6(c) (codified at 42 U.S.C. § 3605).  Such actions are evidence that Congress intended the text of the FHA to continue to encompass disparate impact liability, consistent with the uniform construction of appellate courts.

Although Plaintiffs complain that the government's "evidence falls woefully short of demonstrating that Congress as a whole was aware of" the prevailing judicial construction in 1988, Pls.' Opp. at 33 (emphasis omitted), courts "normally *assume* that, when Congress enacts statutes, it is aware of relevant judicial precedent," *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (emphasis added).  Because Congress is assumed to be aware of such precedent, Plaintiffs err in insisting that Defendants demonstrate congressional awareness with concrete evidence – let alone, stronger evidence than a Committee Report citing the relevant case law, *see* Defs.' Mem. at 33.[12]

### E.    The Canon of Constitutional Avoidance Does Not Apply

Plaintiffs urge this Court to employ the canon of constitutional avoidance to override the agency's reasonable interpretation of the FHA, even though the Supreme Court has on numerous occasions construed other statutes to prohibit disparate impact discrimination without invoking the canon to discern congressional intent.  *See, e.g.*, *Griggs*, 401 U.S. at 432; *Harris*, 444 U.S. at 140; *Smith*, 544 U.S. at 235 (plurality).

---

[12] Plaintiffs also retort that "the views of individual members of a later Congress provide little insight into the intent of the earlier Congress that enacted the relevant statutory language."  Pls.' Opp. at 34.  But that misses the point.  The 1988 Amendments reflect not just the views of individual legislators, but the enactments of Congress as a whole.  *See W.Fuels-Utah*, 895 F.2d at 785 n.6 ("[T]here is an important distinction between subsequent *legislation* and less formal types of subsequent legislative history.").

The canon of constitutional avoidance is not a principle of constitutional adjudication but a principle of statutory construction, which is served only to the extent that it sheds light on congressional intent. *See Clark v. Martinez*, 543 U.S. 371, 381-82 (2005) (noting that the canon is a "means of giving effect to congressional intent, not of subverting it" and "is not a method of adjudicating constitutional questions by other means"). Yet Plaintiffs' discussion of the canon is wholly devoid of any consideration of Congress's intent. Applying the avoidance canon in this case would acutely contravene Congress's directive that the FHA's scope broadly extend to its "constitutional limitations." 42 U.S.C. § 3601.

At the time the FHA was enacted in 1968 (and at the time the FHA was comprehensively amended in 1988), Congress had no reason to doubt the constitutionality of outlawing disparate impact discrimination. It was not until 1976 that the Supreme Court resolved whether the Equal Protection Clause *directly prohibited* disparate impact discrimination by government actors, and although the Court determined that it did not, it invited Congress to impose disparate impact liability by "legislative prescription." *Washington v. Davis*, 426 U.S. 229, 248 (1976). It would not serve the basic interpretative aims of the canon to construe the Act to foreclose disparate impact liability on the basis of purported constitutional doubt that Congress could not plausibly have had in mind at the time. *See Harris v. United States*, 536 U.S. 545, 556 (2002) (refusing to use constitutional avoidance canon because relevant statute was passed at a time when "Congress would have had no reason to believe that it was approaching the constitutional line" and rejecting a "dynamic view of statutory interpretation, under which the text might mean one thing when enacted yet another if the prevailing view of the Constitution later changed"), *overruled on other grounds by Alleyne v. United States*, 133 S. Ct. 2151 (2013).

Moreover, Plaintiffs' suggestion of current constitutional doubt is based on speculation about the effect of the Rule rather than on any real application that would warrant a heightened equal protection analysis, let alone demonstrate serious constitutional doubt. *See* Br. of NAACP Legal Def. at 14-21 (Doc. No. 29). To begin with, the case law questioning the constitutionality of race-based decision-making typically involves the intentional distribution of a limited set of benefits that, if allocated on a preferential basis to members of one race, could not then be allocated to members of another race. *See, e.g.*, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 711-12, 718-19 (2007). Plaintiffs have failed to explain how that concern is presented here.

Even if Plaintiffs were correct that some hypothetical application of the Rule would "require[] [their members] . . . to make race-based decisions" in a manner that would trigger heightened scrutiny, Pls.' Opp. at 36, Plaintiffs make an unwarranted leap in equating this heightened scrutiny with serious constitutional doubt. Plaintiffs elide any discussion of this necessary next step in the constitutional analysis. Plaintiffs thus cannot claim to have demonstrated genuine constitutional doubt about the availability of disparate impact liability under the FHA, let alone the kind of "grave" doubt necessary to warrant application of the canon. *See Alamendarez-Torres v. United States*, 523 U.S. 224, 238-39 (1998).

### F. The McCarran-Ferguson Act Cannot Be Used to Drive a Wholesale Reinterpretation of the FHA

Plaintiffs' invocation of the McCarran-Ferguson Act does not overcome their failure to demonstrate that Congress unambiguously intended to compel their preferred reading of the FHA. For the reasons set forth in Defendants' opening brief, Plaintiffs' attempt to portray the Rule as facially inconsistent with McCarran-Ferguson is contrary to the legal framework

governing McCarran-Ferguson, as articulated by the Supreme Court in *Humana*.  *See* Defs.'
Mem. at 37-43.

Instead of meeting Defendants' arguments head-on, Plaintiffs summarily dismiss them as
"misdirection,"  Pls.' Opp. at 38, and then continue to advance a construction of McCarran-
Ferguson that is inconsistent with *Humana*.  Plaintiffs insist that HUD's construction of the FHA
must be rejected – even if it is otherwise supported by the statutory text – because it raises a
"serious prospect" of impairment of unspecified state laws in unspecified contexts. Pls.' Opp. at
38.  But by disclaiming any attempt to demonstrate a "conflict between the Disparate-Impact
Rule and the McCarran-Ferguson Act as applied to particular insurance practices," Pls.' Opp. at
20, Plaintiffs effectively concede that the interplay between McCarran-Ferguson and the FHA is
not properly presented in this litigation.  *See Saunders*, 537 F.3d at 967 (noting that interplay
between FHA and McCarran-Ferguson requires "a fact-intensive," as-applied inquiry).[13]

Plaintiffs' reliance on a faulty understanding of the operation of McCarran-Ferguson is
not the only problem with Plaintiffs' arguments.  The connection that Plaintiffs try to draw
between congressional intent in enacting the FHA – a statute with broad application beyond the
insurance industry – and McCarran-Ferguson defies common sense and sound principles of
statutory interpretation.  McCarran-Ferguson, by its operation, already ensures that federal law
will not impair state regulation of the insurance industry.  There is no reason to think that
Congress's "broad remedial intent" in enacting the FHA, *Havens Realty Corp. v. Coleman*, 455

---

[13] Plaintiffs contend that *Saunders* "acknowledg[es]" the prospect of wholesale incompatibility
between disparate impact claims and McCarran-Ferguson. Pls.' Opp. at 38.  Quite to the
contrary, *Saunders* recognized that, although the disparate impact claim before it was reverse-
preempted by Missouri law, "other disparate impact claims" might well go forward if they
involved different facts or different state laws.  537 F.3d at 968 & n.7.

U.S. 363, 380 (1982), was meant to be tempered by considerations that are applicable solely to the insurance industry and that are already fully accommodated by a separate statute.

## III.    HUD'S CONSTRUCTION OF THE FHA IS REASONABLE UNDER *CHEVRON*'S DEFERENTIAL STEP TWO

For the reasons set forth above and in Defendants' opening brief, Plaintiffs have failed to demonstrate that HUD's construction of the FHA is foreclosed by the plain language of the statute, relying on traditional tools of statutory construction.  Accordingly, Plaintiffs have not demonstrated that HUD "acted in excess of its statutory authority" – the gravamen of their challenge to the Rule.  *See* Pls.' Opp. at 1.

Plaintiffs attempt to breathe life into their challenge by expounding on an alternative argument that was relegated to a footnote in their opening brief.  Plaintiffs argue that "even if the FHA were ambiguous and left any gap for HUD to fill," HUD's resolution of that ambiguity in adopting one of the two available interpretations is unreasonable at *Chevron*'s second step.  Pls.' Opp. at 39.  Plaintiffs' effort to expand their attack on the Rule in this manner runs contrary to their own styling of their claim*, see* Pls. Mem. at 1 ("Plaintiffs raise[] a single claim: *viz.*, that Defendants violated the Administrative Procedure Act (APA) by promulgating the Disparate-Impact Rule, because the FHA unambiguously prohibits only intentional discrimination . . . ."), as well as the general disfavor accorded to arguments spun out of a footnote in an opening brief, *see de Csepel v. Hungary*, 808 F. Supp. 2d 113, 143 (D.D.C. 2011), *aff'd in part and rev'd in part*, 714 F.3d 591 (D.C. Cir. 2013).  Plaintiffs' effort to shore up their attack on the Rule with this previously-waived argument also fails on its merits.

HUD's interpretation is entitled to controlling weight at *Chevron* Step Two so long it is reasonable, a standard that is "highly deferential" to the views of the agency.  *NRA v. Reno*, 216 F.3d 122, 137 (D.C. Cir. 2000).  Where, as here, there is "room for differing interpretations of

the statutory language," and the interpretation adopted by the agency is supported by "the

unanimity of the other circuits [and] the seeming intent of Congress as reflected in the legislative

history," there is no basis to conclude that the agency's interpretation is unreasonable – even if it

is not the one a court would choose if it were reviewing the statute in the first instance.

*Ahmetovic v. INS*, 62 F.3d 48, 53 (2d Cir. 1995).  Plaintiffs have entirely failed to discharge their

heavy burden at *Chevron* Step Two to demonstrate the contrary.

 The cramped textual arguments that Plaintiffs employ at *Chevron* Step One are no more

effective when framed as an attack on the Rule's reasonableness.  Indeed, the fact of overlap

between the two steps of the *Chevron* analysis undermines, rather than supports, Plaintiffs'

attack on the Rule.  Because there are only two possible ways in which HUD could have

resolved the particular statutory ambiguity at issue in this case, it is difficult to imagine how the

agency's selection of one of those two choices is outside the bounds of Congress's delegation.

*See Massachusetts*, 93 F.3d at 893 (noting that the "range of permissible interpretations of a

statute" is shaped by the ambiguity identified).

 Plaintiffs err to suggest that *Massachusetts* dictates a finding of unreasonableness here.

*See* Pls.' Opp. at 40.  In *Massachusetts*, the D.C. Circuit found that an agency's construction of

an express preemption statute was unreasonable in light of the "presumption against extending a

preemption statute to matters not clearly addressed in the statute in areas of traditional state

control." *Id.* at 896.  This presumption against preemption is wholly inapplicable here.  The

Court is not being asked to review the agency's interpretation of a statute that preempts state law,

but rather its interpretation of a substantive civil rights statute intended "to provide, within

constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601.

Thus, far from violating any common law presumptions, HUD's construction of the FHA to prohibit disparate impact discrimination respects and advances that intent.

In an effort to sustain the inapt analogy to *Massachusetts*, Plaintiffs claim that the Rule would "preclude state rules in many areas of [insurance]." Pls.' Opp. at 40 (alteration in Plaintiffs' brief) (quoting *Massachusetts*, 93 F.3d at 896). This is flatly incorrect. The Rule, by recognizing that McCarran-Ferguson can provide a defense to specific applications of the Rule, would not, and does not purport to, preclude or override conflicting state regulation of the business of insurance. *See* 78 Fed. Reg. at 11,475.

Moreover, the outcome in *Massachusetts* was founded equally on the fact that the agency's interpretation of the statute at issue "necessarily conflicts with other . . . provisions" in that same statute. 93 F.3d at 896-97. Here, the opposite is true: it is Plaintiffs' interpretation that would be in tension with several provisions in the FHA that presume the availability of disparate impact claims, and that would render those provisions meaningless. *See* Part II.C, *supra*. The Rule thus sensibly "avoid[s] a reading which [would] render[] some words [in the statute] altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995); *see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 698 (1995) ("A reluctance to treat statutory terms as surplusage supports the reasonableness of the Secretary's interpretation.").

Plaintiffs' effort to portray the Rule as unreasonable in light of McCarran-Ferguson is also without merit. *See* Pls.' Opp. at 40. That McCarran-Ferguson might reverse-preempt some hypothetical applications of the Rule does not make HUD's interpretation unreasonable, especially because the interpretive question called for HUD to choose a construction that would apply across all housing transactions covered by the FHA, the overwhelming majority of which are unaffected by McCarran-Ferguson.

Finally, the manifest reasonableness of HUD's interpretation is unaffected by Plaintiffs'

supposition about the "effect of disparate-impact liability on the business of insurance."  Pls.'

Opp. at 40.  This supposition, which entails a significant factual leap outside the scope of

Plaintiffs' "purely legal" claim,  Pls.' Opp. at 1, is insufficient as a matter of law to cast doubt on

the reasonableness of HUD's considered judgment in interpreting the FHA.  *See Nat'l Auto*

*Dealers Ass'n v. FTC*, 864 F. Supp. 2d 65, 79 (D.D.C. 2012) ("Even if compliance with the

[agency's interpretation] would create 'awkward and burdensome' situations, as plaintiff

suggests . . . that does not render it unreasonable.").  Moreover, Congress demonstrated that it

knows how to create an exemption to disparate impact liability when it wants to do so.  *See, e.g.*,

42 U.S.C. § 3605(c) ("Appraisal exemption").  And yet Congress failed to exempt homeowner's

insurance.  HUD's decision not to read such an atextual exemption into the statute reasonably

respects Congress's decision.  *See Good Samaritan Hosp. v Shalala*, 508 U.S. 402, 417-18

(1993) (noting that courts are "especially reluctant" to reject an agency view when it "fits the

design of the statute as a whole" (internal quotation mark omitted)).

## CONCLUSION

For all these reasons and the reasons set forth in Defendants' opening brief, their Motion

to Dismiss, or for Summary Judgment, should be granted.

Dated: March 18, 2014                      Respectfully submitted,

                                           STUART F. DELERY
                                           Assistant Attorney General

                                           JOCELYN SAMUELS
                                           Acting Assistant Attorney General

DAMON Y. SMITH
Acting General Counsel
MICHELLE ARONOWITZ
Deputy General Counsel for
   Enforcement and Fair Housing
JEANINE M. WORDEN
Associate General Counsel
   for Fair Housing
KATHLEEN M. PENNINGTON
Assistant General Counsel
   for Fair Housing Enforcement
M. CASEY WEISSMAN-VERMEULEN
AYELET R. WEISS
Attorneys
*Of counsel*

RONALD C. MACHEN JR.
United States Attorney

 /s/ *Kyle R. Freeny*               
MICHAEL SITCOV
KYLE R. FREENY (Cal. Bar No. 247857)
DANIEL P. MOSTELLER (DC Bar No. 980802)
Attorneys
U.S. Department of Justice
20 Massachusetts Ave., N.W.
Washington, DC  20001
Tel: (202) 514-5108/Fax: (202) 616-8470
Email:  Kyle.Freeny@usdoj.gov
*Counsel for Defendants*