# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

      Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and SHAUN DONOVAN, in his official
capacity as Secretary of Housing and Urban
Development,

      Defendants.

Civil Action No. 13-cv-966 (RJL)

---

## *AMICI CURIAE* BRIEF OF THE AMERICAN FINANCIAL SERVICES ASSOCIATION, THE CONSUMER MORTGAGE COALITION, THE INDEPENDENT COMMUNITY BANKERS OF AMERICA®, AND THE MORTGAGE BANKERS ASSOCIATION IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Paul F. Hancock (D.C. Bar No. 159327)
K&L GATES LLP
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
(305) 539-3300
paul.hancock@klgates.com

John Longstreth (D.C. Bar No.367047)
K&L GATES LLP
1601 K Street NW
Washington, D.C. 20006
(202) 778-9000
john.longstreth@klgates.com

*Counsel for Amici Curiae*

The American Financial Services Association ("AFSA"), the Consumer Mortgage
Coalition ("CMC"), the Independent Community Bankers of America® ("ICBA"), and the
Mortgage Bankers Association ("MBA") (collectively, *amici*) respectfully submit this brief as
*amici curiae* in support of plaintiffs' motion for summary judgment.[1]

- AFSA is a national trade association for providers of financial services to
  consumers, including residential mortgage loans.  AFSA seeks to promote
  responsible, ethical lending to informed borrowers and to improve and protect
  consumers' access to credit.

- CMC is a national trade association comprised of residential mortgage lenders,
  servicers, and service providers.  CMC was formed in 1995 to pursue reform of
  the mortgage origination process, and its members participate in every stage of
  the home financing process.

- The ICBA, a national trade association, is the nation's voice for nearly 7,000
  community banks of all sizes and charter types.  ICBA member community banks
  seek to improve cities and towns by using local dollars to help families purchase
  homes and are actively engaged in the business of residential mortgage lending in
  the communities that they serve.

- The MBA is the national association representing the real estate finance industry,
  an industry that employs more than 280,000 people in virtually every community
  in the country.  Headquartered in Washington, D.C., the association works to
  ensure the continued strength of the nation's residential and commercial real
  estate markets, to expand homeownership, and to extend access to affordable
  housing to all Americans.  Its membership of over 2,200 companies includes all
  elements of real estate finance, including mortgage companies, mortgage brokers,
  commercial banks, thrifts, Wall Street conduits, and life insurance companies.

A*mici* believe that  in considering plaintiffs' motion for summary judgment, the Court

would find it of valuable assistance to review the analysis that *amici* presented in a brief that they

recently submitted to the United States Supreme Court in the matter styled *Township of Mount*

*Holly v. Mt. Holly Gardens Citizens in Action, Inc.*, No. 11-1507.  Notwithstanding the fact that

---

[1]     No counsel for any party authored this brief in whole or in part, and no counsel for any
party made a monetary contribution intended to fund the preparation or submission of this brief.
No person or entity other than *amici curiae*, their respective members, and their counsel made a
monetary contribution intended to fund the preparation or submission of this brief.

the Supreme Court had granted certiorari in *Mount Holly* and in a similar case raising the same issue the term before, the cases were settled before the Supreme Court could rule on them. Nonetheless, the points raised in the amici's *Mount Holly* brief are highly relevant to the instant case and highly important to the *amici* and their members.

*Amici*'s members are subject to Section 805 of the Fair Housing Act (the "Act"), which prohibits discrimination in residential real estate-related transactions. 42 U.S.C. § 3605. *Amici* and their members vigorously support the Act and strongly oppose discrimination "because of race, color, religion, sex, handicap, familial status, or national origin" in any aspect of mortgage lending. *Id.* At the same time, *amici* have serious concerns that recognition of a disparate-impact theory of liability under the Fair Housing Act, as asserted by the United States Department of Housing and Urban Development ("HUD") in the Rule at issue, would allow challenges to legitimate business practices that themselves raise no inference of unlawful discrimination. *See* 24 C.F.R. §100.500. As Congress intended, the focus of the Act is to ensure the fairness of the processes governed by the Act rather than the outcomes of otherwise fair and non-discriminatory processes. *Amici* and their members have an interest in the disposition of this case, as plaintiffs' challenge to the HUD's Rule raises many issues that *amici*'s members face with respect to compliance with the Fair Housing Act and HUD's Rule implementing it.

For the reasons plaintiffs set forth in their memorandum in support of the motion for summary judgment (Dkt. No. 16-1), *amici* agree that Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a), does not authorize a disparate-impact theory of liability and that the statute requires proof of discriminatory intent. That conclusion applies with even more force to Section 805, and *amici* emphasize that the use of the disparate-impact theory has particularly deleterious effects on the residential mortgage lending industry. Sensible, risk-based credit standards – from

basic minimum down payment and credit score requirements to more complex interactive risk attributes – are highly predictive of applicants' ability to repay debt. They may also yield lending outcomes across racial and ethnic groups that are disproportionate to their share of the population. These differential outcomes may form the basis for disparate-impact claims, even when all applicants were treated fairly and uniformly, and without any consideration of racial or other protected characteristics.

National data reveal that virtually any lender could face disparate-impact claims simply for implementing sensible, risk-based lending decisions. Indeed, mortgage lenders have already faced an onslaught of claims with no assertion that any consumer was treated differently *because of* race or ethnicity. These claims include challenges to basic underwriting criteria and to the standard business practice of allowing employees the discretion in pricing a loan to match a competitor's offer to a consumer. Newly-imposed restrictions on the lending industry as a result of the financial crisis only exacerbate the problems of the disparate-impact theory of liability. As a result of the government directives, credit standards have tightened, with clear racial and ethnic consequences, increasing the risk of disparate-impact challenges arising from complying with the new standards or from not offering products with less stringent requirements. Under a disparate-impact theory, lenders would face the double bind of incurring increased litigation risk simply by complying with government regulations and sensible lending standards. Recognition of the disparate-impact legal theory embodied in HUD's Rule does not advance *fair* housing or lending and may place lenders in an impossible situation where there is no choice that would avoid legal challenges.

For the reasons stated above, *amici* believe that in considering plaintiffs' motion for summary judgment, the Court would find it of valuable assistance to review the analysis that *amici* presented to the United States Supreme Court in *Township of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.*, No. 11-1507, which brief *amici* incorporate by reference herein and attach for the Court's convenience as Appendix A hereto.[2]

Respectfully submitted,

*/s/ John Longstreth*

Paul F. Hancock (D.C. Bar No. 159327)
K&L GATES LLP
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
(305) 539-3300
paul.hancock@klgates.com

John Longstreth (D.C. Bar No.367047)
K&L GATES LLP
1601 K Street NW
Washington, D.C. 20006
(202) 778-9000
john.longstreth@klgates.com

*Counsel for Amici Curiae*

Dated: March 18, 2014

---

[2]    The brief is also available at http://sblog.s3.amazonaws.com/wp-content/uploads/2013/09/BOS-3356187-v1-Mt__Holly__AS_FILED_Merits_Amicus_Brief_of_AFSA__CMC__ICBA__and_MBA.pdf.

# APPENDIX A

No. 11-1507

IN THE

## Supreme Court of the United States

TOWNSHIP OF MOUNT HOLLY, TOWNSHIP
COUNCIL OF TOWNSHIP OF MOUNT HOLLY,
KATHLEEN HOFFMAN, as Township Manager of the
Township of Mount Holly, JULES THIESSEN, as Mayor of
the Township of Mount Holly,

*Petitioners,*

*v.*

MT. HOLLY GARDENS CITIZENS IN
ACTION, INC., *et al.,*

*Respondents.*

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT
OF APPEALS FOR THE THIRD CIRCUIT

**BRIEF FOR THE AMERICAN FINANCIAL
SERVICES ASSOCIATION, THE CONSUMER
MORTGAGE COALITION, THE INDEPENDENT
COMMUNITY BANKERS OF AMERICA, AND THE
MORTGAGE BANKERS ASSOCIATION AS *AMICI
CURIAE* IN SUPPORT OF PETITIONERS**

ANDREW C. GLASS
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
(617) 261-3100

PAUL F. HANCOCK
*Counsel of Record*
K&L GATES LLP
Southeast Financial Center,
Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131
paul.hancock@klgates.com
(305) 539-3300

*Counsel for Amici Curiae*

248959

*i*

## TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . iv

STATEMENT OF INTEREST OF *AMICI CURIAE* . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.   THE RECENT FINANCIAL CRISIS
     HAS CONFIRMED THE IMPORTANCE
     OF USING SENSIBLE, RISK-BASED
     LENDING STANDARDS THAT ARE
     APPLIED FAIRLY EVEN THOUGH
     THEY MAY NOT RESULT IN
     OUTCOMES BY GROUP THAT ARE
     PROPORTIONAL TO THE GROUP'S
     SHARE OF THE POPULATION . . . . . . . . . . . 5

     A.   The Provision of Residential Mortgage
          Loan Products to Consumers . . . . . . . . . . . 6

     B.   Differences in Economic and
          Credit Characteristics among
          Racial or Ethnic Groups . . . . . . . . . . . . . . . 9

*ii*

*Table of Contents*

Page

II. UNDER A DISPARATE-IMPACT THEORY, NON-DISCRIMINATORY APPLICATION OF SENSIBLE LENDING STANDARDS SUBJECTS RESIDENTIAL LENDERS TO A DOUBLE BIND RESULTING IN COSTLY, NON-MERITORIOUS CLAIMS ..................11

A. A Disparate-Impact Theory Requires No Assertion That Any Consumer Is Treated Differently for Impermissible Reasons ................12

B. Disparate-Impact Claims Present Intractable Issues for Lenders ..........14

C. The Congressional Response to the Financial Crisis Enhances the Risk of Disparate-Impact Claims...............17

D. The Disparate-Impact Theory Pushes Businesses toward Consideration of Factors, Which Are Themselves Unlawful, and Reduces Access to Credit...............19

*iii*

### Table of Contents

*Page*

III. NEITHER THE COURTS OF APPEALS DECISIONS REVIEWING THE FAIR HOUSING ACT, THE ARGUMENTS PRESENTED BY THE SOLICITOR GENERAL, NOR THE ADMINISTRATIVE ENFORCEMENT HISTORY OF THE ACT PROVIDE ANY BASIS FOR RECOGNIZING A DISPARATE-IMPACT THEORY ..................... .20

    A.   The Courts of Appeals Have Given Limited, Cursory Consideration to the Standard of Proof Required by the Fair Housing Act .............. .21

    B.   No Court of Appeals Decision Has Adopted the Legal Bases Offered by the Solicitor General ........ .26

    C.   HUD Declined to Adopt a Disparate-Impact Theory at the Time of the 1988 Amendments to the Fair Housing Act and for 24 Years Thereafter, with Both Congress's Actions and the Courts of Appeals' Decisions before It ... .28

CONCLUSION ............................... .33

*iv*

## TABLE OF CITED AUTHORITIES

*Page*

**CASES**

*2922 Sherman Avenue Tenants' Ass'n v.*
   *District of Columbia,*
   444 F.3d 673 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . .25

*Arthur v. City of Toledo, Ohio,*
   782 F.2d 565 (6th Cir. 1986). . . . . . . . . . . . . . . . . . . .25

*Dolan v. U.S. Postal Service,*
   546 U.S. 481 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . .28

*Griggs v. Duke Power Co.,*
   401 U.S. 424 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Halet v. Wend Investment Co.,*
   672 F.2d 1305 (9th Cir. 1982). . . . . . . . . . . . . . . . . . .25

*Huntington Branch, NAACP v.*
   *Town of Huntington,*
   844 F.2d 926 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . .25

*In re Countrywide Financial Mortgage Lending*
   *Practices Litigation,*
   708 F.3d 704 (6th Cir. 2013). . . . . . . . . . . . . . . . . . . .15

*Langlois v. Abington Housing Authority,*
   207 F.3d 43 (1st Cir. 2000). . . . . . . . . . . . . . . . . . . . .25

*Lindsay v. Yates,*
   578 F.3d 407 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . .24

*v*

*Cited Authorities*

Page

*Metropolitan Housing Development Corp. v.*
*Village of Arlington Heights,*
558 F.2d 1283 (7th Cir. 1977) . . . . . . . . 22, 23, 24, 27

*Mountain Side Mobile Estates Partnership v.*
*Secretary of HUD,*
56 F.3d 1243 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . .25

*Resident Advisory Board v. Rizzo,*
564 F.2d 126 (3d Cir. 1977) . . . . . . . . . . . . . 23, 24, 27

*Ricci v. DeStefano,*
557 U.S. 557 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Rodriguez v. National City Bank,*
--- F.3d ---, 2013 WL 4046385
(3d Cir. Aug. 12, 2013) . . . . . . . . . . . . . . . . . . . . . . . .15

*Rogers v. Lodge,*
458 U.S. 613 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . .24

*Smith v. City of Jackson, Mississippi,*
544 U.S. 228 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Smith v. Town of Clarkton, North Carolina,*
682 F.2d 1055 (4th Cir. 1982). . . . . . . . . . . . . . . . . . .25

*Town of Huntington, New York v.*
*Huntington Branch, NAACP,*
488 U.S. 15 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*vi*

*Cited Authorities*

*Page*

*United States v. City of Black Jack, Missouri,*
    508 F.2d 1179 (8th Cir. 1974)................21, 22

*United States v.*
    *Marengo Community Commission,*
    731 F.2d 1546 (11th Cir. 1984)..................25

*United States v. Mitchell,*
    580 F.2d 789 (5th Cir. 1978)....................25

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. ---, 131 S. Ct. 2541 (2011)...........13, 15

*Wards Cove Packing Co. v. Atonio,*
    490 U.S. 642 (1989)............................13

*Washington v. Davis,*
    426 U.S. 229 (1976)............................24

*Watson v. Fort Worth Bank & Trust,*
    487 U.S. 977 (1988)............................20

## STATUTES AND REGULATIONS

12 U.S.C. § 2801................................11

12 U.S.C. § 2803................................11

15 U.S.C. § 1639c(a)(3).........................17

15 U.S.C. § 1639c(b)...........................18

*vii*

*Cited Authorities*

                                                          *Page*

15 U.S.C. § 1681 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

29 U.S.C. § 623(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

42 U.S.C. § 3604(a). . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 3605. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 3

42 U.S.C. § 3608(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

12 C.F.R. § 1003.4 . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 13

12 C.F.R. § 1026.43 . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

24 C.F.R. § 100.500(c) . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Dodd-Frank Wall Street Reform and Consumer
    Protection Act, Pub. L. No. 111-203,
    124 Stat. 1376 (2010). . . . . . . . . . . . . . . . . . . . . . . . .17

## OTHER AUTHORITIES

Ability-to-Repay and Qualified Mortgage Standards
    under the Truth in Lending Act (Regulation
    Z), 78 Fed. Reg. 6408 (Jan. 30, 2013) . . . . . . . . *passim*

About myFICO – Consumer Credit Score
    and Credit Report Provider, http://www.
    myfico.com/Company/AboutUs.aspx
    (last visited Aug. 29, 2013). . . . . . . . . . . . . . . . . . . . . .8

*viii*

*Cited Authorities*

Page

Assistant Attorney General for the Civil Rights
Division Thomas E. Perez, Remarks at the
National Community Reinvestment Coalition
Annual Conference Luncheon (Apr. 15, 2011) . . . . .32

Assistant Attorney General for the Civil Rights
Division Thomas E. Perez, Remarks at the 15th
Annual Community Reinvestment Act and Fair
Lending Colloquium (Nov. 7, 2011) . . . . . . . . . . . .32

Robert B. Avery, *et al.*, Division of Research
& Statistics, *The Mortgage Market in
2010: Highlights from the Data Reported
under the Home Mortgage Disclosure
Act*, 97 Federal Reserve Bulletin
(Sept. 22, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Board of Governors of Federal Reserve System,
*Report to the Congress on Credit Scoring and
Its Effects on the Availability and Affordability
of Credit* (Aug. 2007) . . . . . . . . . . . . . . . . . . . . .9, 10, 11

Jesse Bricker, *et al.*, Division of Research &
Statistics, *Changes in U.S. Family Finances
from 2007 to 2010: Evidence from the
Survey of Consumer Finances*, 98 Federal
Reserve Bulletin (June 11, 2012) . . . . . . . . . . . . . . .10

Brief for United States as *Amicus Curiae, Town
of Huntington, N.Y. v. Huntington Branch,
NAACP*, 488 U.S. 15 (1988) (No. 87-1961) . . . . . . . .28

*ix*

*Cited Authorities*

*Page*

Brief for United States as *Amicus Curiae,*
    *Township of Mount Holly, New Jersey, et al. v.*
    *Mt. Holly Gardens Citizens in Action, Inc.,*
    *et al.* (May 17, 2013) (U.S. No. 11-1507)...21, 26, 28, 31

Complaint, *United States v.*
    *SunTrust Mortgage, Inc.,*
    No. 3:12-cv-00397-REP (E.D. Va.
    May 31, 2012) ...........................15, 16

Complaint, *United States v.*
    *Wells Fargo Bank, N.A.,*
    No. 1:12-cv-01150 (D.D.C. July 12, 2012)..........16

HMDA National Aggregate Report Table 4-2:
    Conventional Purchases by Race (2011) ..........11

H.R. Rep. No. 108-396 (2003)......................8

Implementation of Fair Housing Act's
    Discriminatory Effects Standard: Final Rule,
    78 Fed. Reg. 11,460 (Feb. 15, 2013) ......... *passim*

Implementation of Fair Housing Amendments Act
    of 1988, 54 Fed. Reg. 3232 (Jan. 23, 1989) ..27, 29, 31

Policy Statement on Discrimination in Lending,
    59 Fed. Reg. 18,266 (Apr. 15, 1994) ...........29-30

Press Release, Federal Housing Finance Agency,
    FHFA Limiting Fannie Mae and Freddie
    Mac Loan Purchases to "Qualified
    Mortgages" (May 6, 2013)....................6, 18

*x*

*Cited Authorities*

*Page*

Press Release, United States Department of Housing & Urban Development, HUD to Investigate Allegations that 22 Banks and Mortgage Lenders Discriminate against African American and Latino Loan Seekers (Dec. 8, 2010) . . . . . . . . . .14

Press Release, United States Department of Justice, Justice Department Reaches $335 Million Settlement to Resolve Allegations of Lending Discrimination by Countrywide Financial Corporation (Dec. 21, 2011) . . . . . . . . . .32

"Remarks on Signing the Fair Housing Amendments Act of 1988," Public Papers of President Ronald W. Reagan, (Sept. 13, 1988) . . . . .29

Margery A. Turner, *et al.*, for United States Department of Housing & Urban Development, *Discrimination in Metropolitan Housing Markets: National Results from Phase 1 of HDS2000, Executive Summary* (Nov. 2002) . . . . . .30

United States Census Bureau, Table 1. Median Value of Assets for Households, by Type of Asset Owned and Selected Characteristics: 2011 . . . . . . . .9

United States Census Bureau, Table H-17. Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2011 . . . . .10

1

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

The American Financial Services Association ("AFSA"), the Consumer Mortgage Coalition ("CMC"), the Independent Community Bankers of America ("ICBA"), and the Mortgage Bankers Association ("MBA") (collectively, *"amici"*) respectfully submit this brief as *amici curiae* in support of the petitioners.

- AFSA is a national trade association for providers of financial services to consumers, including residential mortgage loans. AFSA seeks to promote responsible, ethical lending to informed borrowers and to improve and protect consumers' access to credit.

- CMC is a national trade association comprised of residential mortgage lenders, servicers, and service providers. CMC was formed in 1995 to pursue reform of the mortgage origination process, and its members participate in every stage of the home financing process.

- ICBA is a national trade association that represents nearly 5,000 community banks of all sizes and charter types. ICBA member community banks seek to improve cities and towns by using local dollars to help families purchase homes and are

---

1. No counsel for any party authored this brief in whole or in part, and no counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. No person or entity other than *amici curiae*, their respective members, and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. The parties have filed blanket consents.

2

actively engaged in the business of residential mortgage lending in the communities that they serve.

- The MBA is the national association representing the real estate finance industry, an industry that employs more than 280,000 people in virtually every community in the country. Headquartered in Washington, D.C., the association works to ensure the continued strength of the nation's residential and commercial real estate markets, to expand homeownership, and to extend access to affordable housing to all Americans. Its membership of over 2,200 companies includes all elements of real estate finance, including mortgage companies, mortgage brokers, commercial banks, thrifts, Wall Street conduits, and life insurance companies.

*Amici*'s members are subject to Section 805 of the Fair Housing Act (the "Act"), which prohibits discrimination in residential real estate-related transactions. 42 U.S.C. § 3605.[2] *Amici* and their members vigorously support the Act and strongly oppose discrimination "because of race, color, religion, sex, handicap, familial status, or national origin"[3] in any aspect of mortgage lending. *Id.* At the

---

2.  A residential real estate-related transaction "means any of the following: (1) The making or purchasing of loans or providing other financial assistance—(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or (B) secured by residential real estate. (2) The selling, brokering, or appraising of residential real property." 42 U.S.C. § 3605(b).

3.  In this brief, *amici* will frequently reference discrimination on the basis of race, ethnicity, or national origin. These categories

3

same time, *amici* have serious concerns that the Court's recognition of a disparate-impact theory of liability under Section 804(a) of the Act, 42 U.S.C. § 3604(a), would allow challenges to legitimate business practices that themselves raise no inference of unlawful discrimination. As Congress intended, the focus of the Act is to ensure the fairness of the process rather than the outcomes of an otherwise fair and non-discriminatory process.

## SUMMARY OF THE ARGUMENT

I. For the reasons the petitioners set forth in their brief, *amici* agree that Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a), does not authorize a disparate-impact theory of liability and that the statute requires proof of discriminatory intent. That conclusion applies with even more force to Section 805, and *amici* emphasize that the use of the disparate-impact theory has particularly deleterious effects on the residential mortgage lending industry. Sensible, risk-based credit standards – from basic minimum down-payment and credit-score requirements to more complex interactive risk attributes – are highly predictive of applicants' ability to repay debt. They also yield lending outcomes across racial and ethnic groups that are disproportionate to their share of the population. These differential outcomes form the basis for disparate-impact claims, even when all applicants were treated fairly and uniformly.

---

are the most frequent subject of government and private legal claims brought under the Act against *amici's* members. The arguments presented herein, however, are equally applicable to the other prohibited bases of discrimination.

4

II. National data reveal that virtually any lender could face disparate-impact claims simply for implementing sensible, risk-based lending decisions. Indeed, mortgage lenders have already faced an onslaught of claims with no assertion that any consumer was treated differently *because of* race or ethnicity. These claims include challenges to basic underwriting criteria and to the standard business practice of allowing employees the discretion in pricing a loan to match a competitor's offer to a consumer. Newly-imposed restrictions on the lending industry as a result of the financial crisis only exacerbate the problems of the disparate-impact theory of liability. At the government's directive, credit standards have tightened, with clear racial and ethnic consequences, increasing the risk of disparate-impact challenges arising from complying with the new standards or from not offering products with less stringent requirements. Under a disparate-impact theory, lenders would face the double bind of incurring increased litigation risk simply by complying with government directives and sensible lending standards.

An unwarranted focus on *outcomes* has a foreseeable consequence. Disparate-impact claims cannot be avoided by the use of accepted methods of ensuring fair and non-discriminatory *treatment* of all consumers. The only way to avoid an impact claim in the first place is to ensure that a lender's end numbers do not show disparities in racial and ethnic *outcomes*. This, of course, pushes toward the consideration of unlawful factors. Recognition of such a legal theory with such a foreseeable consequence does not advance *fair* housing or lending and may place lenders in an impossible situation where there is no choice that would avoid legal challenges.

5

III. The courts of appeals have given scant analysis to the legal issue now before the Court, and the United States Solicitor General ("Solicitor General") does not rely on the reasoning of any lower court decision in arguing that the Fair Housing Act recognizes a disparate-impact theory of liability. The government's assertion that the United States Department of Housing and Urban Development ("HUD") has "long interpreted" the Fair Housing Act as recognizing such a theory is contradicted by the actual enforcement and rule-making history, as well as by recent concessions of government officials that the theory had been dormant for years and that the types of claims now being presented had never been presented before.

## ARGUMENT

**I. THE RECENT FINANCIAL CRISIS HAS CONFIRMED THE IMPORTANCE OF USING SENSIBLE, RISK-BASED LENDING STANDARDS THAT ARE APPLIED FAIRLY EVEN THOUGH THEY MAY NOT RESULT IN OUTCOMES BY GROUP THAT ARE PROPORTIONAL TO THE GROUP'S SHARE OF THE POPULATION**

A brief description of the residential mortgage financing process assists with understanding the context in which disparate-impact claims may arise under the Fair Housing Act and the unwarranted adverse effects those claims may have on the residential mortgage lending industry.

6

### A. The Provision of Residential Mortgage Loan Products to Consumers

There are two common methods for offering residential mortgage loans to consumers, retail lending and wholesale lending. In retail lending, lenders offer loans directly to consumers through their own loan originators. In wholesale lending, independent third-party mortgage brokers offer loans and present loan applications to one or more residential mortgage lenders on behalf of the brokers' customers. Some lenders have both retail and wholesale components to their residential mortgage lending operations.

To maintain the necessary liquidity to fund loans, both categories of lenders sell the great majority of loans that they originate to secondary-market investors, including private investors and the government-sponsored enterprises ("GSEs") Fannie Mae and Freddie Mac. These investors establish guidelines to which lenders must underwrite loans to make them eligible for purchase.[4] Various federal government agencies, including the Federal Housing Administration and the Department of Veterans Affairs, also promulgate standards that lenders must follow to make loans eligible for government insurance or guarantee.

---

4. The Federal Housing Finance Agency ("FHFA"), which oversees Fannie Mae and Freddie Mac, provides directives to those entities about the attributes of loans that they may purchase in the secondary market. *See, e.g.,* Press Release, FHFA, FHFA Limiting Fannie Mae and Freddie Mac Loan Purchases to "Qualified Mortgages" (May 6, 2013) (hereinafter "FHFA QM Release"), *available at* http://www.fhfa.gov/webfiles/25163/QMFINALrelease050613.pdf.

7

In general, lenders and investors must evaluate available information relative to both the *ability* of a consumer to repay a loan and the apparent *willingness* of the consumer to repay debts. Today, this evaluation is mainly performed using automated systems that consider multiple factors. Fannie Mae and Freddie Mac require the submission of loan applications by means of proprietary automated underwriting systems. Underwriting systems are complex and consider the relationship among many factors; lenders using the systems generally are not privy to the algorithms by which the systems analyze applicant data and render decisions. There are, however, certain basic factors relevant to all residential mortgage loan applications, three of which are highlighted here.

Down-payment or loan-to-value (LTV) requirements. The amount that a consumer pays out of pocket (or the amount of equity that a consumer has in his or her home) is an important factor in evaluating the likelihood that the consumer will repay the loan. Consumers who make smaller down payments relative to the price of their house are more likely to default.[5] On the other hand, requiring consumers to make larger down payments increases the number of consumers who cannot afford to enter the housing market.

Debt-to-income (DTI) requirements. The ratio of an applicant's debt to his or her income is highly predictive

---

5.  *See* Ability-to-Repay and Qualified Mortgage Standards under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 6408, 6412 (Jan. 30, 2013) (hereinafter, "ATR Rule") ("[m]ortgage loan terms and credit standards have tightened most for consumers … with less money available for a down payment").

8

of the applicant's ability to repay the loan.[6] According to
the Consumer Financial Protection Bureau, "[a]t a basic
level, the lower the debt-to-income ratio, the greater
the consumer's ability to pay back a mortgage loan
would be under existing conditions as well as changed
circumstances, such as an increase in an adjustable rate,
a drop in future income, or unanticipated expenses or new
debts."[7] Recent data indicate that a DTI ratio "correlates
with loan performance, as measured by delinquency rate
... in *any* credit cycle."[8]

    <u>Credit-score requirements</u>. Consumer credit scores
are used by mortgage lenders to evaluate the history
of an applicant's repayment of debt which is predictive
of the likelihood the applicant will repay debt in the
future.[9] These scores, such as the commonly-used FICO
scores,[10] are developed by independent third-party
businesses and are regularly incorporated into the
automated underwriting systems used to evaluate an

---

6. *See id.* at 6526.

7. *Id.* at 6526-27.

8. *Id.* at 6527 (emphasis added).

9. *See id.* at 6470. Congress has endorsed the use of a uniform,
objective credit reporting system. *See* H.R. Rep. No. 108-396, at
65 (2003) (Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*,
was designed to create a "national credit reporting system" that
"permits consumers to transport their credit with them wherever
they go").

10. The FICO scoring system was developed by an entity
originally known as Fair, Isaac & Company. *See* About myFICO—
Consumer Credit Score and Credit Report Provider, http://www.
myfico.com/Company/AboutUs.aspx (last visited Aug. 29, 2013).

9

application for mortgage credit.[11] The scores may take into account aspects of the applicant's credit history such as the number and age of the applicant's credit lines, the applicant's payment history, and judgments, collections, or bankruptcies involving the applicant.[12]

### B. Differences in Economic and Credit Characteristics among Racial or Ethnic Groups

National data indicate that on average, racial and ethnic groups have differences in economic and credit characteristics. United States Census Bureau data reveal significant differences in wealth, a primary source for a down payment, between white households on the one hand and African-American and Hispanic households on the other. The Census Bureau most recently reported that the median wealth of white households was approximately 17.5 times that of African-American households and 14 times that of Hispanic households.[13] Government data also

---

11. *See* Board of Governors of Fed. Reserve Sys., *Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit*, at 11, 22-23 (Aug. 2007) (hereinafter, "FRB Study") ("Fair Isaac ... estimates that FICO scores are involved in more than 75 percent of all mortgage originations"), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf.

12. *See* ATR Rule, 78 Fed. Reg. at 6470.

13. U.S. Census Bureau, Table 1. Median Value of Assets for Households, by Type of Asset Owned and Selected Characteristics: 2011 (median net worth for white households—$110,500, African-American households—$6,314, and Hispanic households—$7,683), *available at* http://www.census.gov/people/wealth/files/Wealth_Tables_2011.xlsx.

10

indicate that the ratio of debt to assets differs significantly between racial and ethnic groups. For instance, in 2010, the leverage ratio (that is, the ratio of the sum of all debt to the sum of all assets) for white families was less than one-half than that for nonwhite or Hispanic families.[14] And the median income of white households is greater than that of African-American and Hispanic households.[15]

Similarly, the Federal Reserve Board ("FRB") has recognized that standardized credit scores, such as those FICO generates, "are predictive of credit risk for the population as a whole and for all major demographic groups."[16] Nonetheless, the FRB found that the "[d]ifferences in credit scores among racial or ethnic groups ... are particularly large," with 52.6% of African-Americans and 30.1% of Hispanics in the sample appearing

---

14. Jesse Bricker, *et al.*, Div. of Research & Statistics, *Changes in U.S. Family Finances from 2007 to 2010: Evidence from the Survey of Consumer Finances*, 98 Federal Reserve Bulletin, at 55-56 (June 11, 2012), *available at* http://www.federalreserve.gov/pubs/bulletin/2012/pdf/scf12.pdf.

15. U.S. Census Bureau, Table H-17. Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2011 (median income for white households—$55,412, African-American households—$32,229, and Hispanic households—$38,624), *available at* http://www.census.gov/hhes/www/income/data/historical/household/2011/H17_2011.xls.

16. FRB Study at S-1, O-13. The FRB noted that while it did not have access to the proprietary model on which industry-generated credit scores are based, it developed a model that "reflects closely the methodologies used by the credit-scoring industry in constructing generic credit history scoring models," and that its model displays predictiveness "that is in line with other generic credit-scoring models that use the same measure of performance for estimation." *Id.* at O-10, 77-78.

11

in the lowest two score deciles, as compared to 16.3% of non-Hispanic whites.[17]

## II. UNDER A DISPARATE-IMPACT THEORY, NON-DISCRIMINATORY APPLICATION OF SENSIBLE LENDING STANDARDS SUBJECTS RESIDENTIAL LENDERS TO A DOUBLE BIND RESULTING IN COSTLY, NON-MERITORIOUS CLAIMS

The sensible, risk-based criteria used to evaluate a consumer's qualifications for residential mortgage credit do so by assessing the economic and credit characteristics of the *individual* consumer and are applied fairly and uniformly to all consumers. Yet, differences in the economic and credit characteristics across race and ethnicity can lead to differences in the availability or terms of credit when those groups are viewed as a whole.[18] Even though government agencies

---

17. *See id.* at 80.

18. For instance, data reported pursuant to the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801, *et seq.*, for the year 2011 (the most recent year for which data are available) reflect that African-American applicants for conventional home-purchase loans were rejected at a rate more than twice the rate at which white applicants were rejected (36.88% versus 15.27%). *See* HMDA National Aggregate Report Table 4-2: Conventional Purchases by Race (2011), *available at* http://www.ffiec.gov/hmdaadwebreport/NatAggWelcome.aspx. Hispanic applicants were rejected at a rate more than 1.6 times the rate at which white applicants were rejected (24.41% versus 15.27%). *See id.* Under HMDA, approximately 8,000 lenders—ranging from national enterprises to local operations—are required to report information regarding their residential mortgage lending activities. 12 U.S.C. § 2803; *see* 12 C.F.R. § 1003.4.

12

recognize the foreseeable consequences of the fair and non-discriminatory application of credit standards, HUD has asserted that such outcomes can provide the basis for a legal challenge pursuant to a disparate-impact theory. For instance, HUD's newly-implemented rule, to which the Solicitor General urges the Court defer, asserts that "HUD and courts have recognized that analysis of loan level data identified through HMDA may indicate a disparate impact."[19] This is the problem with the theory, not a justification for it.

## A. A Disparate-Impact Theory Requires No Assertion That Any Consumer Is Treated Differently for Impermissible Reasons

Under the disparate-impact theory, it is not necessary for a plaintiff to assert that a lender *treated* any applicant differently because of race, national origin, or any other impermissible factor. Rather than examining the fairness of a business's operations, a disparate-impact claim focuses solely on the *outcome* of those operations. Of course, a lender might ultimately prevail in litigation, and HUD asserts that a lender facing a disparate-impact challenge "would have the opportunity to refute the existence of the alleged impact and establish a substantial, legitimate, non-discriminatory interest for the challenged practice."[20] What this ignores, however, is that virtually every lender in the United States could be sued for using non-discriminatory credit standards simply because

---

19. Implementation of Fair Housing Act's Discriminatory Effects Standard: Final Rule, 78 Fed. Reg. 11,460, 11,478 (Feb. 15, 2013) (hereinafter, "HUD's 2013 Interpretive Rule").

20. *Id.*

13

variations in economic and credit characteristics produce different credit outcomes among racial and ethnic groups. And even though the starting point of a disparate-impact claim raises no inference of unlawful discrimination taken because of a prohibited factor,[21] lenders may face a heavy burden of proof,[22] expend substantial amounts of money, and suffer the reputational consequences of a discrimination charge. Most lenders implement policies designed to avoid facing legal challenges, and that is virtually impossible to achieve if the outcomes of the fair and non-discriminatory application of credit standards can provide the basis for a legal claim.

---

21. The FRB has stated that "although the HMDA data include some detailed information about each mortgage transaction, many key factors that are considered by lenders in credit underwriting and pricing are not included. Accordingly, it is not possible to determine from HMDA data alone whether racial and ethnic pricing disparities reflect illegal discrimination." Robert B. Avery, *et al.*, Div. of Research & Statistics, *The Mortgage Market in 2010: Highlights from the Data Reported under the Home Mortgage Disclosure Act*, 97 Federal Reserve Bulletin, at 50 (Sept. 22, 2011), *available at* http://www.federalreserve.gov/pubs/bulletin/2011/pdf/2010_HMDA_final.pdf. Information regarding the disposition of loan applications is reported, but consumers' credit scores, income and assets, cash reserves, DTI ratios, and LTV ratios are *not* required to be reported. 12 C.F.R. § 1003.4.

22. HUD's 2013 Interpretive Rule, which shifts the burden of proof to defendants, *see* 78 Fed. Reg. at 11,482 (codifying 24 C.F.R. § 100.500(c)), is contrary to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). *See* 490 U.S. at 656-61; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ---, 131 S. Ct. 2541, 2554-55 (2011).

14

## B.  Disparate-Impact Claims Present Intractable Issues for Lenders

The disparate-impact theory has given rise to numerous types of challenges against lenders, all of which create the same type of intractable issues. For instance, credit-score thresholds have been a target of Fair Housing Act disparate-impact claims. In 2010, the National Community Reinvestment Coalition filed administrative complaints with HUD against 22 lenders alleging that their policies of requiring a credit score above the Federal Housing Administration minimum had a disparate impact on minorities in violation of the Fair Housing Act.[23] None of the complaints alleged that the lenders' credit-score threshold was established "because of" race or national origin. Rather, the claim was that the uniform application of objective credit-score thresholds disproportionately impacted minority applicants.

Defending against these types of claims raises significant challenges. A lender may argue that a certain credit-score threshold is necessary to maintain a certain level of loan performance, in recognition of the fact that a lower cutoff would result in increased defaults and a decline in revenue. Return on investment is a legitimate business interest, yet under the disparate-impact theory as articulated in HUD's 2013 Interpretive Rule, a business may be required to justify the necessity of a certain level

---

23. *See* Press Release, U.S. Dep't of Hous. & Urban Dev., HUD to Investigate Allegations that 22 Banks and Mortgage Lenders Discriminate against African American and Latino Loan Seekers (Dec. 8, 2010), *available at* http://portal.hud.gov/hudportal/ HUD?src=/press/press_releases_media_advisories/2010/ HUDNo.10-266.

15

of return given the racial or ethnic impact that results from the use of credit-score thresholds.[24]

The disparate-impact theory of liability has also been used by government enforcement agencies to challenge the standard business practice of permitting loan originators an amount of discretion to compete in the marketplace, for example, by reducing the price of a loan to match or beat the offer of another lender.[25] The claims are devoid of any allegation that the persons exercising the discretion to adjust loan price *treated* consumers differently because of race or ethnicity. Instead, the claims are based solely on the notion that a non-discriminatory practice – reducing the loan price in response to a competing offer *obtained by the consumer* – nevertheless caused different *outcomes* for different racial and ethnic groups.

---

24. *See* 78 Fed. Reg. at 11,479-80.

25. *See, e.g.*, Complaint ¶¶ 17-41, *United States v. SunTrust Mortgage, Inc.*, No. 3:12-cv-00397-REP (E.D. Va. May 31, 2012) (hereinafter, "SunTrust Complaint"). Of course, in *Wal-Mart*, the Court noted that granting employees discretion is "a very common and presumptively reasonable way of doing business—one that we have said should itself raise no inference of discriminatory conduct." 131 S. Ct. at 2554 (quotations omitted). Since the *Wal-Mart* decision, federal courts have not allowed private civil claims of this nature to proceed as a class action. *See, e.g.*, *In re Countrywide Fin. Mortgage Lending Practices Litig.*, 708 F.3d 704, 709-10 (6th Cir. 2013); *Rodriguez v. National City Bank*, --- F.3d ---, 2013 WL 4046385, at *9-11 (3d Cir. Aug. 12, 2013). Yet HUD states that it "does not agree that the Supreme Court's decision in *Wal-Mart* means that policies permitting discretion may not give rise to discriminatory effects liability under the Fair Housing Act." HUD's 2013 Interpretive Rule, 78 Fed. Reg. at 11,468.

16

The enforcement agencies have also attempted to use the disparate-impact theory to hold wholesale mortgage lenders responsible for fees charged by *independent* third-party mortgage brokers. The government asserts that the lenders' practice of allowing independent brokers to set their own fees purportedly results in consumers in some racial or ethnic groups paying, on average, higher fees.[26] No broker is alleged to charge different fees to different racial or ethnic groups, let alone *because of* their race or ethnicity, nor are the members of a particular group alleged to have paid higher fees to any particular broker. And, of course, the lender is not alleged to have set any of the fees at issue.

Again, these types of actions raise intractable issues for defendants. A lender may demonstrate that it has strong policies against unlawful discrimination and that all employees have been trained to treat consumers without any regard to impermissible factors, but these efforts aimed at fair, non-discriminatory treatment are largely for naught if the lender may still be subject to litigation regarding outcomes even when there is no discriminatory treatment. The net result is that under the federal government's current approach to enforcing the Act, lenders must bear significant litigation costs and reputational damage from lawsuits that have no basis under the Act.

---

26. *See, e.g., SunTrust* Complaint ¶¶ 42-70; Complaint ¶¶ 51-78, *United States v. Wells Fargo Bank*, N.A., No. 1:12-cv-01150 (D.D.C. July 12, 2012).

17

C.  **The Congressional Response to the Financial
    Crisis Enhances the Risk of Disparate-Impact
    Claims**

The foregoing are examples of the issues encountered
to date, but the risks appear even greater for the future.
The congressional and regulatory response to the
recent financial crisis exacerbates lenders' risk of facing
disparate-impact lawsuits under the Fair Housing Act.
For instance, the Dodd-Frank Wall Street Reform and
Consumer Protection Act, Pub. L. No. 111-203, 124 Stat.
1376 (2010) ("Dodd-Frank Act"), and Ability-to-Repay
and Qualified Mortgage Standards under the Truth in
Lending Act (Regulation Z), 78 Fed. Reg. 6408 (Jan. 30,
2013) (to be codified at 12 C.F.R. § 1026.43, effective Jan.
10, 2014) ("ATR Rule"), require that residential mortgage
lenders ensure that consumers can repay their mortgages
based on an evaluation of several factors, including the
consumer's income and assets, monthly debt obligations,
and credit history.[27] Loans that satisfy certain detailed
criteria, including strict underwriting requirements,
fee limitations, and restrictions on certain terms and
conditions, qualify as Qualified Mortgages ("QMs") and
are presumed to comply with the Dodd-Frank Act's

---

27. In particular, the ATR Rule will expressly require
residential mortgage lenders to consider an applicant's "credit
history, current income, expected income the consumer is
reasonably assured of receiving, current obligations, debt-to-
income ratio or the residual income the consumer will have after
paying non-mortgage debt and mortgage-related obligations,
employment status, and other financial resources other than the
consumer's equity in the dwelling or real property that secures
repayment of the loan." 15 U.S.C. § 1639c(a)(3); *see also* ATR Rule,
78 Fed. Reg. at 6585 (to be codified at 12 C.F.R. § 1026.43(c)).

18

ability-to-repay requirements.[28] Because failure to comply
with the ability-to-repay requirements can result in
substantial penalties, the number of lenders willing to
make, and investors willing to purchase, non-QM loans
is expected to be limited for quite some time.[29]

Whether a particular loan qualifies as a QM loan
necessarily depends on the DTI ratio and other factors
comprising the risk profile of both the consumer and the
loan. Consumers with greater income, lower debt, and
other positive credit factors are more likely to be eligible
for loans because they are more likely to meet the QM
qualifications. Individuals with less income or wealth are
more likely to be declined for QM loans. Even though the
limited secondary market for non-QM loans will make
it difficult, and for some lenders impossible, to make
loans that do not qualify as QMs, complying with the QM
standards may thus give rise to disparate-impact claims.
And a lender's decision to originate *only* loans that satisfy

---

28. *See* 15 U.S.C. § 1639c(b); ATR Rule, 78 Fed. Reg. at 6586-
87 (to be codified at 12 C.F.R. § 1026.43(e)). Standard QMs, for
example, (1) require that the consumer have a DTI ratio no higher
than 43%, a characteristic unlikely to be distributed evenly across
all demographic groups, or (2) must be eligible for purchase or
guarantee by GSEs such as Fannie Mae or Freddie Mac, or for
insurance or guarantee by federal agencies such as the Federal
Housing Administration or Department of Veterans Affairs, which
eligibility may also produce results susceptible to disparate-impact
challenge. *See* ATR Rule, 78 Fed. Reg. at 6587 (to be codified at
12 C.F.R. § 1026.43(e)(2)(vi)).

29. Indeed, FHFA recently directed Fannie Mae and Freddie
Mac to "limit their future mortgage acquisitions to loans that meet
the requirements for a qualified mortgage, including those that
meet the special or temporary qualified mortgage definition, and
loans that are exempt from the 'ability to repay' requirements
under ... Dodd-Frank." FHFA QM Release, *supra* note 4.

19

the QM strictures might also face a challenge alleging that the disparate-impact theory of liability requires the lender to offer other, riskier loan products aimed at those who might not satisfy the QM requirements.

### D. The Disparate-Impact Theory Pushes Businesses toward Consideration of Factors, Which Are Themselves Unlawful, and Reduces Access to Credit

The disparate-impact theory of liability does not advance the congressional objective to ensure that factors such as race and national origin play no role in a credit decision. In fact, with the focus solely on the racial and ethnic *outcomes* of a process that may otherwise be fair and non-discriminatory, the theory has the potential to push businesses to consider the very factors which the Fair Housing Act prohibits. For instance, if disparate-impact claims can be based simply on outcomes of fair practices, such as the non-discriminatory exercise of discretion, some might strive for a racial balance in outcomes, which requires the affirmative consideration of race in lending decisions. But such conduct would likely constitute intentional discrimination that itself violates the Fair Housing Act. *See, e.g., Ricci v. DeStefano*, 557 U.S. 557, 585 (2009) (under Title VII, "before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action").[30]

---

30. The Court has cautioned against this result even as it has permitted the use of a disparate-impact theory of liability based

20

Of course, the industry can defend disparate-impact claims. But the burden and standard of proof HUD's 2013 Interpretive Rule imposes, and the novel manner in which government agencies seek to enforce disparate-impact liability, have created an unprecedented threat of legal challenges. Defending against that threat necessitates substantial monetary expenditures and exposure to unwarranted reputational harm that also has financial consequences. These costs would logically have to be built into the price of loan products and thus, would ultimately be borne by consumers seeking credit. Alternatively, if lenders cannot recover a sufficient amount of these costs to sustain necessary revenue levels, they may cease lending altogether, thus reducing competition and further driving up costs for consumers.

**III. NEITHER THE COURTS OF APPEALS DECISIONS REVIEWING THE FAIR HOUSING ACT, THE ARGUMENTS PRESENTED BY THE SOLICITOR GENERAL, NOR THE ADMINISTRATIVE ENFORCEMENT HISTORY OF THE ACT PROVIDE ANY BASIS FOR RECOGNIZING A DISPARATE-IMPACT THEORY**

The Solicitor General asserts that "[e]leven courts of appeals – every court of appeals to consider the question – have held that the [Fair Housing Act] authorizes

---

on language in other federal anti-discrimination statutes. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 992-93 (1988) (in Title VII context, noting that "the inevitable focus on statistics in disparate-impact cases could put undue pressure on employers to adopt inappropriate prophylactic measures").

21

disparate-impact suits."[31] Yet, in support of its contention
that the Act authorizes a disparate-impact theory of
liability, the government does not rely upon – or even
describe – the legal reasoning of a single one of the courts
of appeals' decisions. To the contrary, the government
offers arguments that have not been recognized by any
court of appeals to have addressed the issue. The Solicitor
General also asserts that the federal government "has
long interpreted Section 804(a) [of the Fair Housing Act]
to support disparate-impact liability,"[32] but that contention
is belied by the government's actual enforcement history.

A.  **The Courts of Appeals Have Given Limited,
    Cursory Consideration to the Standard of
    Proof Required by the Fair Housing Act**

It is understandable that the Solicitor General does
not rely on the reasoning of the courts of appeals to
support his position because the courts have applied, at
best, a cursory analysis of the issue and appear to have
misread this Court's decision in *Griggs v. Duke Power
Co.*, 401 U.S. 424 (1971).

The first court of appeals to consider the issue, and
to find that the Fair Housing Act recognized a disparate-
impact theory, was the Eighth Circuit in *United States
v. City of Black Jack, Missouri*, 508 F.2d 1179 (8th Cir.
1974). That court provided no description of any statutory

---

31. Brief for United States as *Amicus Curiae, Township of
Mount Holly, New Jersey, et al. v. Mt. Holly Gardens Citizens
in Action, Inc., et al.*, at 15 (May 17, 2013) (U.S. No. 11-1507)
(hereinafter, "S.G. Brief").

32. *Id.* at 7.

22

language of the Act that would authorize a disparate-impact theory of liability, but merely stated that the Act "is designed to prohibit all forms of discrimination, sophisticated as well as simple-minded."[33] Nor did the court consider the meaning of the statutory language that limits unlawful conduct to that taken "because of" certain characteristics.[34]

The Seventh Circuit considered whether the Fair Housing Act authorized a disparate-impact theory of liability in *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977). That court was the first court of appeals to recognize that "[t]he major obstacle to concluding that action taken without discriminatory intent can violate [S]ection 3604(a) is the phrase 'because of race' contained in the statutory provision" and noted that the language might suggest that a party cannot "commit[ ] an act 'because of race' unless he intends to discriminate between races."[35] Nonetheless, the court decided to adopt a "broad[er]" approach under which conduct is prohibited where "the natural and foreseeable consequence of that act is to discriminate between races, regardless of ... intent."[36]

The Seventh Circuit also stated that "[t]he important point to be derived from *Griggs* is that the Court did not find the 'because of race' language to be an obstacle to its ultimate holding that intent was not required under

---

33. 508 F.2d at 1184 (internal quotations omitted).

34. *See id.* at 1184-85.

35. 558 F.2d at 1288.

36. *Id.*

23

Title VII."[37] This Court's decision in *Smith v. City of Jackson, Mississippi*, 544 U.S. 228 (2005), makes clear that the Seventh Circuit misread *Griggs* in this respect. In *Smith*, the Court was unanimous in the conclusion that the "because of" language in Section 4(a)(1) of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a)(1), "does not encompass disparate impact liability," but rather contemplates only intentional discrimination. *See* 544 U.S. at 236 n.6 (plurality op.) (Section 4(a)(1) of ADEA makes it unlawful for an employer "to fail or refuse to hire ... any individual ... *because of* such individual's age," and "[t]he focus of the paragraph is on the employer's actions with respect to the targeted individual") (emphasis added); *id.* at 246 (Scalia, J., concurring) ("the only provision of the ADEA that could conceivably be interpreted to effect [a disparate-impact] prohibition is § 4(a)(2)"); *id.* at 249 (O'Connor, J., concurring in judgment) ("[n]either petitioners nor the plurality contend that the first paragraph, § 4(a)(1), authorizes disparate impact claims, and I think it obvious that it does not. That provision plainly requires discriminatory intent").[38] And, like the Eighth Circuit, the Seventh Circuit pointed to no provision of the Fair Housing Act comparable to the language of Title VII that would authorize a disparate-impact theory of liability.

Shortly after *Arlington Heights*, the Third Circuit addressed the availability of disparate impact under the Fair Housing Act in *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977). That court also recognized that "the 'because of race' language might seem to

---

37. *Id.* at 1288-90 & n.6.

38. *See also* Pet'rs' Br. at 17-25.

24

suggest that a plaintiff must show some measure of discriminatory intent."[39] The Third Circuit concluded, however, that "[t]he Seventh Circuit has persuasively put to rest the assumption that the 'because of race' language in Section 804(a) requires proof of *Washington v. Davis* intent in Title VIII cases."[40] The court thus repeated the Seventh Circuit's error in misreading *Griggs* to the extent the Third Circuit concluded that the "because of race" language authorized a disparate-impact theory of liability under the Fair Housing Act.[41]

None of the remaining circuit decisions cited by the Solicitor General add to the legal analysis. Each of the decisions simply adopts the disparate-impact theory of liability because it had been approved in *City of Black*

---

39. 564 F.2d at 146.

40. *Id.* at 147.

41. *See id.* at 146-48. Both the Seventh and Third Circuits addressed this issue shortly after this Court's decision in *Washington v. Davis*, 426 U.S. 229 (1976), which held that discriminatory intent is required to establish an Equal Protection Clause violation. The Seventh Circuit, for example, expressed concerns that "a requirement that the plaintiff prove discriminatory intent before relief can be granted under the statute is often a burden that is impossible to satisfy" and that "[a] strict focus on intent permits racial discrimination to go unpunished in the absence of overt bigotry." *Arlington Heights*, 558 F.2d at 1290. These concerns proved unwarranted in light of this Court's subsequent decisions recognizing that intentional discrimination is not limited to instances of "overt bigotry." *See, e.g., Rogers v. Lodge*, 458 U.S. 613, 618 (1982) ("invidious discriminatory purpose may ... be inferred from the totality of the relevant facts"); *accord Lindsay v. Yates*, 578 F.3d 407, 415-18 (6th Cir. 2009) (Fair Housing Act disparate-treatment claim may be shown through "existence of circumstantial evidence which creates an inference of discrimination").

25

*Jack, Arlington Heights,* or *Rizzo,* with no additional analysis of how the statutory language of the Fair Housing Act would authorize such liability. *See, e.g., United States v. Mitchell,* 580 F.2d 789, 791 (5th Cir. 1978) (citing *Arlington Heights* without analyzing statutory language); *Halet v. Wend Inv. Co.,* 672 F.2d 1305, 1311 (9th Cir. 1982) (relying upon *Arlington Heights* and *Rizzo* without examination of statute); *Smith v. Town of Clarkton, N.C.,* 682 F.2d 1055, 1065 (4th Cir. 1982) (agreeing with *Arlington Heights, Rizzo,* and *City of Black Jack* without considering statutory language); *Arthur v. City of Toledo, Ohio,* 782 F.2d 565, 574-75 (6th Cir. 1986) (same); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934-35 (2d Cir. 1988) (same); *Mountain Side Mobile Estates P'ship v. Secretary of HUD,* 56 F.3d 1243, 1250-51 (10th Cir. 1995) (applying disparate impact without analyzing statutory language); *Langlois v. Abington Hous. Auth.,* 207 F.3d 43, 49 (1st Cir. 2000) (agreeing with *Arlington Heights* and *Rizzo*).[42] And while this Court affirmed the decision of the Second Circuit in *Town of Huntington,* in doing so it specifically stated that "we do not reach the question whether that test [i.e., disparate impact] is the appropriate one."[43]

---

42. The District of Columbia Circuit has yet to decide the question whether disparate impact applies under the Fair Housing Act, although it assumed so in *2922 Sherman Avenue Tenants' Ass'n v. District of Columbia,* 444 F.3d 673, 679 (D.C. Cir. 2006). And, the Eleventh Circuit noted, without holding, that the Fair Housing Act "prohibits conduct having a significant discriminatory effect, without proof of discriminatory intent" in *United States v. Marengo Community Commission,* 731 F.2d 1546, 1559 n.20 (11th Cir. 1984).

43. *Town of Huntington, N.Y. v. Huntington Branch, NAACP,* 488 U.S. 15, 18 (1988) (per curiam).

26

### B. No Court of Appeals Decision Has Adopted the Legal Bases Offered by the Solicitor General

The Solicitor General asserts that "[t]he existence of disparate-impact liability under Section 804(a) of the FHA is reinforced by the Act's structure, in that it contains three exemptions from liability that presuppose the availability of a disparate impact claim."[44] None of the decisions on which the government otherwise relies, however, have embraced this novel argument that these statutory exemptions provide a basis for disparate-impact liability under the Act.

The Solicitor General also argues that the provisions of the Act, which makes it unlawful "[t]o refuse to sell or rent ... or *otherwise make unavailable or deny*, a dwelling to any person because of race," indicate a congressional design to apply a disparate-impact theory of liability.[45] But again, none of the courts on which the government otherwise relies have cited this provision as a basis for concluding that a disparate-impact theory is authorized.[46] To the contrary, the courts of appeals have applied the "otherwise make unavailable" language in an entirely different context unrelated to the standard of proof required by the law. For instance, both the Seventh Circuit in *Arlington Heights* and the Third Circuit in *Rizzo* isolate the "make unavailable" language of the Fair

---

44 S.G. Br. at 12.

45. *Id.* at 10-12 (citing 42 U.S.C. § 3604(a)) (emphasis added).

46. *Amici* agree with the arguments presented in the Petitioners' Opening Brief describing why the Solicitor General's arguments do not indicate a congressional design to allow legal claims based solely on impact. *See* Pet'rs' Br. at 26-36.

27

Housing Act in describing the claims presented.[47] But that is appropriate because the claims presented there, like the claims in this action, involved challenges to local government land-use or zoning decisions. The terms of the statute prohibiting discrimination in the sale or rental of housing did not fit the circumstances of those cases, but the claim could be presented on the basis that the governmental actions made housing unavailable. HUD itself recognized this point in promulgating its 1989 rule, where it declared that land-use violations are covered by the "otherwise make unavailable" language of the Act while at the same time declining to answer the question "whether intent is or is not required to show a violation" of the Act.[48]

The citation to the type of claim presented was separate and distinct from the standard of proof necessary to establish liability. After noting the contention that the governmental action made housing unavailable, each circuit considered whether the language "because of race" required a showing that the governmental bodies acted with a discriminatory intent.[49] Just as the term "refusal to sell or rent" does not address the standard of proof necessary to establish a violation, the other portion of the same phrase – namely "otherwise make unavailable

---

47. *See Arlington Heights*, 558 F.2d at 1287; *Rizzo*, 564 F.2d at 146.

48. *Compare* Implementation of Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3240 (Jan. 23, 1989) (hereinafter, "HUD's 1989 Interpretive Rule"), *with id.* at 3234-35.

49. *See Arlington Heights*, 558 F.2d at 1288; *Rizzo*, 564 F.2d at 146.

28

or deny" – is also irrelevant to the issue now before the Court.[50]

### C. HUD Declined to Adopt a Disparate-Impact Theory at the Time of the 1988 Amendments to the Fair Housing Act and for 24 Years Thereafter, with Both Congress's Actions and the Courts of Appeals' Decisions before It

The Solicitor General notes that at the time of the 1988 amendments to the Fair Housing Act, nine courts of appeals had recognized a disparate-impact theory of liability, and thus posits that the 1988 amendments must be considered a ratification of that theory.[51] At the time, however, neither the Administration nor the chief enforcement agency, HUD, concluded that the court decisions or the congressional action supported a disparate-impact theory.

In 1987, shortly before the congressional action, the Solicitor General told the Court that a plaintiff must prove *intentional* discrimination to establish a violation of the Fair Housing Act. *See* Brief for United States as *Amicus Curiae, Town of Huntington, N.Y. v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) (No. 87-1961)

---

50. Under the precepts of statutory construction, the meaning of the language "otherwise make unavailable or deny" is derived from the more specific items appearing earlier in the list, all of which describe intentional acts. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (a general item within a list of more specific items must be construed as having a meaning similar to the specific items).

51. *See* S.G. Br. at 13.

29

("[n]ot only do the statute's language and legislative history show that a violation of [the Fair Housing Act] requires intentional discrimination, substantial practical problems result if this requirement is discarded"), *available at* http://www.justice.gov/osg/briefs/1987/sg870004.txt. And the President, in signing the Fair Housing Amendments Act, reiterated this position, stating that the amended Act "does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that ... violations [of the Act] may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent.... [The Act] speaks only to intentional discrimination."[52]

The 1988 amendments provided notice-and-comment rulemaking authority to HUD. In adopting a rule construing and implementing the amended Act in 1989, HUD did not determine that either the then-existing courts of appeals decisions or the recent congressional action provided a basis for concluding that the disparate-impact theory of liability was authorized by the law. Rather, HUD declared that its "regulations are *not* designed to answer the question of whether intent is or is not required to show a violation" of the Act.[53] This remained HUD's official position for 24 years.[54] HUD did

---

52. "Remarks on Signing the Fair Housing Amendments Act of 1988," Public Papers of President Ronald W. Reagan, (Sept. 13, 1988), *available at* http://www.reagan.utexas.edu/archives/speeches/1988/091388a.htm.

53. HUD's 1989 Interpretive Rule, 54 Fed. Reg. at 3234-35 (emphasis added).

54. Although HUD later joined an interagency "Policy Statement on Discrimination in Lending," which opined that a

30

not alter the position articulated in its 1989 rule until 2013.[55]

Further, prior to its 2013 rule, HUD regularly defined the "nature" of discrimination addressed by the Act as disparate treatment. The Act requires HUD to "make studies with respect to the *nature* ... of discriminatory housing practices in representative communities ... throughout the United States."[56] HUD conducted such studies in 1977, 1989, and 2000.[57] Each of these studies focuses exclusively on the extent to which certain racial and ethnic groups, among others, may have been subjected to disparate treatment in their search for housing – that is, whether they encountered discrimination *because of* their race or ethnicity. For instance, in connection with its 2000 Housing Discrimination Study, the agency stated:

> HUD's goals for the study include rigorous measures of change in *adverse treatment* against blacks and Hispanics nationwide, site-specific estimates of *adverse treatment* for

---

violation of the Fair Housing Act could be established under a disparate-impact theory, 59 Fed. Reg. 18,266, 18,269 (Apr. 15, 1994), that policy statement was not subject to official notice and comment, and HUD did not seek to amend its 1989 rule that articulated a contrary agency position.

55. HUD's 2013 Interpretive Rule, 78 Fed. Reg. at 11,482.

56. 42 U.S.C. § 3608(e) (emphasis added).

57. *See* Margery A. Turner, *et al.*, for U.S. Dep't of Hous. & Urban Dev., *Discrimination in Metropolitan Housing Markets: National Results from Phase 1 of HDS2000*, Executive Summary, at i (Nov. 2002) (noting prior studies), *available at* http://www.huduser.org/portal/publications/pdf/Phase1_Report.pdf.

31

> major metropolitan areas, estimates of *adverse
> treatment* for smaller metropolitan areas and
> adjoining rural communities, and new measures
> of *adverse treatment* against Asians and Native
> Americans.[68]

Thus, in responding to the congressional requirement that HUD define the "nature" of housing discrimination, HUD always defined it to be disparate "treatment," consistent with the language of and policy behind the statute. If HUD thought that disparate impact was at issue, it might study the extent to which rent levels, or housing prices, disproportionately impact different racial groups, or the extent to which the construction of small apartments disproportionately impact families with children. It did not do so.[59]

This history contradicts the assertions in the Solicitor General's brief, as well as in the preamble to HUD's 2013 Interpretive Rule, that HUD has had a "longstanding" view that the Act recognizes a disparate-impact theory of liability.[60] The current Administration has conceded as much in publicly stating that its use of disparate impact

---

58. *Id.* (emphasis added).

59. Indeed, in promulgating its 1989 rule, HUD took the express position that "a private developer's market-based decision to include only efficiency apartments in a new development would *not* violate the Fair Housing Act" even though such a decision might impact families with children. HUD's 1989 Interpretive Rule, 54 Fed. Reg. at 3239 (emphasis added). HUD's position appears to disavow the disparate-impact theory entirely.

60. *See* S.G. Br. at 2; HUD's 2013 Interpretive Rule, 78 Fed. Reg. at 11,460.

32

reflects a decision to employ enforcement strategies "that were dormant for years."[61] Indeed, in discussing matters involving disparate-impact claims, the then-Assistant Attorney General for Civil Rights recently remarked that "case[s] of this nature would not have been brought in the previous Administration, because disparate impact claims *were not allowed,*"[62] and that "[t]he political leadership in the prior administration sent an unmistakable message that it would be *next to impossible* to bring a fair lending lawsuit using *disparate impact* theory."[63]

Thus, at best, the current Administration's only claim is that while it believes the Fair Housing Act authorizes a disparate-impact theory of liability, other Administrations did not.

---

61. *See* Press Release, U.S. Dep't of Justice, Justice Department Reaches $335 Million Settlement to Resolve Allegations of Lending Discrimination by Countrywide Financial Corporation (Dec. 21, 2011), *available at* http://www.justice.gov/opa/pr/2011/December/11-ag-1694.html.

62. Assistant Attorney General for the Civil Rights Division Thomas E. Perez, Remarks at the National Community Reinvestment Coalition Annual Conference Luncheon (Apr. 15, 2011) (emphasis added), *available at* http://www.justice.gov/crt/opa/pr/speeches/2011/crt-speech-110415.html.

63. Assistant Attorney General for the Civil Rights Division Thomas E. Perez, Remarks at the 15th Annual Community Reinvestment Act and Fair Lending Colloquium (Nov. 7, 2011) (emphasis added), *available at* http://www.justice.gov/crt/opa/pr/speeches/2011/crt-speech-111107.html.

33

## CONCLUSION

The proper focus of the Fair Housing Act is on the elimination of disparate treatment of consumers on bases that Congress has prohibited. That is the national issue that HUD has addressed each time it has studied the nature of housing discrimination in the United States. A switch to a demand for equal outcomes as the necessary basis to avoid legal claims is unwarranted under the terms of the statute, is contrary to sound public policy, and leads to the type of deleterious results described above. The decision of the Third Circuit should be reversed.

Respectfully submitted,

ANDREW C. GLASS                    PAUL F. HANCOCK
K&L GATES LLP                      *Counsel of Record*
State Street Financial Center      K&L GATES LLP
One Lincoln Street                 Southeast Financial Center,
Boston, Massachusetts 02111        Suite 3900
(617) 261-3100                     200 South Biscayne Boulevard
                                   Miami, Florida 33131
                                   paul.hancock@klgates.com
                                   (305) 539-3300

*Counsel for Amici Curiae*