# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

     Plaintiffs,

         v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and SHAUN DONOVAN, in his official
capacity as Secretary of Housing and Urban
Development,

     Defendants.

Civil Action No. 13-cv-966 (RJL)

# JOINT APPENDIX
## OF ADMINISTRATIVE RECORD MATERIALS

Kannon K. Shanmugam (#474304)
Allison B. Jones (#991503)
A. Joshua Podoll (#1011743)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

Administrative
<u>Record Page</u>

Implementation of the Fair Housing Act's Discriminatory Effects Standard –
Proposed Rule, 76 Fed. Reg. 70,921 (November 16, 2011) ..........................................................1

Comments from the National Association of Mutual Insurance Companies
on the Proposed Rule (January 17, 2012) ...................................................................................372

Comments from the American Insurance Association on the Proposed Rule
(January 17, 2012) .......................................................................................................................455

Implementation of the Fair Housing Act's Discriminatory Effects Standard –
Final Rule, 78 Fed. Reg. 11,460 (February 15, 2013) ...............................................................611

HUD, Title VIII Investigative Skills Training: Fair Housing Amendments
Act of 1988 (December 1988) ..................................................................................................1,007

Memorandum from HUD Assistant Secretary for Fair Housing & Equal
Opportunity, The Applicability of Disparate Impact Analysis to Fair Housing Cases
(December 17, 1993) .................................................................................................................1,114

Excerpts from Memorandum from HUD General Counsel and Assistant Secretary
for Fair Housing & Equal Opportunity, Occupancy Fees and Familial Status
Discrimination Under the Fair Housing Act (March 29, 1994) ................................................1,141

Memorandum from HUD Deputy Assistant Secretary for Enforcement and
Investigations, Office of Fair Housing & Equal Opportunity, Redelegation of
Authority to Make Determinations Under the Fair Housing Act (October 7, 1994) ..............1,171

Excerpts from HUD, No. 8024.01, Title VIII Complaint Intake, Investigation,
and Conciliation Handbook, Sections 3.5A and 7-12 (September 1995) .................................1,269

Excerpts from HUD, No. 8024.01, Title VIII Complaint Intake, Investigation,
and Conciliation Handbook, REV-2, Section 2-4 (May 2005)..................................................1,406

Excerpts from Memorandum from HUD Deputy Assistant Secretary for
Enforcement and Programs, Office of Fair Housing & Equal Opportunity,
Assessing Claims of Housing Discrimination Under the Fair Housing Act
& the Violence Against Women Act (February 9, 2011) ..........................................................1,668

Persons interested in being placed on a mailing list for future NPRM's should contact the FAA's Office of Rulemaking, (202) 267–9677, for a copy of Advisory Circular No. 11–2A, Notice of Proposed Rulemaking Distribution System, which describes the application procedure.

**The Proposal**

The FAA is proposing an amendment to Title 14 Code of Federal Regulations (14 CFR) part 71 by amending Class E airspace designated as an extension to Class C airspace area for City of Colorado Springs Municipal Airport, Colorado Springs, CO. Airspace reconfiguration is necessary due to the decommissioning of the Black Forest TACAN. Also, the geographic coordinates of the airport would be updated to coincide with the FAA's aeronautical database. Controlled airspace is necessary for the safety and management of IFR operations at the Airport.

Class E airspace designations are published in paragraph 6003, of FAA Order 7400.9V, dated August 9, 2011, and effective September 15, 2011, which is incorporated by reference in 14 CFR 71.1. The Class E airspace designation listed in this document will be published subsequently in this Order.

The FAA has determined this proposed regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. Therefore, this proposed regulation; (1) is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a regulatory evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified this proposed rule, when promulgated, would not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the U.S. Code. Subtitle 1, section 106, describes the authority for the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in subtitle VII, part A, subpart I, section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it would amend controlled airspace at City of Colorado Springs Municipal Airport, Colorado Springs, CO.

**List of Subjects in 14 CFR Part 71**

Airspace, Incorporation by reference, Navigation (air).

**The Proposed Amendment**

Accordingly, pursuant to the authority delegated to me, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

**PART 71—DESIGNATION OF CLASS A, B, C, D AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS**

1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

**§ 71.1   [Amended]**

2. The incorporation by reference in 14 CFR 71.1 of the Federal Aviation Administration Order 7400.9V, Airspace Designations and Reporting Points, dated August 9, 2011, and effective September 15, 2011 is amended as follows:

*Paragraph 6003   Class E airspace designated as an extension to Class C surface areas.*

\*     \*     \*     \*     \*

**ANM CO E3   Colorado Springs, CO [Amended]**

City of Colorado Springs Municipal Airport, CO

(Lat. 38°48′21″ N., long. 104°42′03″ W.)

That airspace extending upward from the surface within 2.4 miles northwest and 1.2 miles southeast of the City of Colorado Springs Municipal Airport 025° bearing extending from the 5-mile radius of the airport to 8.9 miles northeast and within 1.4 miles each side of the airport 360° bearing extending from the 5-mile radius of the airport to 7.7 miles north of the airport.

Issued in Seattle, Washington, on November 8, 2011.

**William Buck,**

*Acting Manager, Operations Support Group, Western Service Center.*

[FR Doc. 2011–29635 Filed 11–15–11; 8:45 am]

**BILLING CODE 4910–13–P**

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**24 CFR Part 100**

**[Docket No. FR–5508–P–01]**

**RIN 2529–AA96**

**Implementation of the Fair Housing Act's Discriminatory Effects Standard**

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Proposed rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] HUD, to which Congress gave the authority and responsibility for administering the Fair Housing Act and the power to make rules implementing the Act, has long interpreted the Act to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate.

The reasonableness of HUD's interpretation is confirmed by eleven United States Courts of Appeals, which agree that the Fair Housing Act imposes liability based on discriminatory effects. By the time the Fair Housing Amendments Act became effective in 1989, nine of the thirteen United States Courts of Appeals had determined that the Act prohibits housing practices with a discriminatory effect even absent an intent to discriminate. Two other United States Courts of Appeals have since reached the same conclusion, while another has assumed the same but did not need to reach the issue for purposes of deciding the case before it.

Although there has been some variation in the application of the discriminatory effects standard, neither HUD nor any Federal court has ever determined that liability under the Act requires a finding of discriminatory intent. The purpose of this proposed rule, therefore, is to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.

**DATES:** *Comment due date:* January 17, 2012.

**ADDRESSES:** Interested persons are invited to submit written comments regarding this proposed rule to the

---

[1] This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap."

**70922** **Federal Register**/Vol. 76, No. 221/Wednesday, November 16, 2011/Proposed Rules

Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410. All communications should refer to the above docket number and title. There are two methods for submitting public comments.

1. *Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *http://www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *http://www.regulations.gov* Web site can be viewed by other commenters and interested members of the public. Commenters should follow the instructions provided on that site to submit comments electronically.

2. *Submission of Comments by Mail.* Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410–0500.

**Note:** To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule.

*No Facsimile Comments.* Facsimile (FAX) comments are not acceptable.

*Public Inspection of Public Comments.* All properly submitted comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an appointment to review the public comments must be scheduled in advance by calling the Regulations Division at (202) 708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at (800) 877–8339. Copies of all comments submitted are available for inspection and downloading at *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–

0500, telephone number (202) 402–5188. Persons with hearing and speech impairments may contact this phone number via TTY by calling the Federal Information Relay Service at (800) 877–8399.

**SUPPLEMENTARY INFORMATION:**

# I. Background

## A. History of Discriminatory Effects Liability Under the Fair Housing Act

The Fair Housing Act declares it to be "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [2] Congress considered the realization of this policy "to be of the highest priority." [3] The language of the Fair Housing Act prohibiting discrimination in housing is "broad and inclusive";[4] the purpose of its reach is to replace segregated neighborhoods with "truly integrated and balanced living patterns." [5] In commemorating the 40th anniversary of the Fair Housing Act and the 20th anniversary of the Fair Housing Amendments Act, the House of Representatives recognized that "the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States." [6]

In keeping with the "broad remedial intent" of Congress in passing the Fair Housing Act,[7] and consequently the Act's entitlement to a "generous construction," [8] HUD, to which Congress gave the authority and responsibility for administering the Fair Housing Act and the power to make rules to carry out the Act,[9] has repeatedly determined that the Fair Housing Act is directed to the consequences of housing practices, not simply their purpose. Under the Act, housing practices—regardless of any discriminatory motive or intent—cannot be maintained if they operate to deny protected groups equal housing opportunity or they create, perpetuate, or increase segregation without a legally sufficient justification.

Accordingly, HUD has concluded that the Act provides for liability based on

discriminatory effects without the need for a finding of intentional discrimination. For example, HUD's Title VIII Complaint Intake, Investigation and Conciliation Handbook (Handbook), which sets forth HUD's guidelines for investigating and resolving Fair Housing Act complaints, recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in appropriate cases.[10] In adjudicating charges of discrimination filed by HUD under the Fair Housing Act, HUD administrative law judges have held that the Act is violated by facially neutral practices that have a disparate impact on protected classes.[11] HUD's regulations interpreting the Fair Housing Act prohibit practices that create, perpetuate, or increase segregated housing patterns.[12] HUD also joined with the Department of Justice and nine other Federal enforcement agencies to recognize that disparate impact is among the "methods of proof of lending discrimination under the * * * Act" and provide guidance on how to prove a disparate impact fair lending claim.[13]

In addition, in regulations implementing the Federal Housing Enterprises Financial Safety and Soundness Act, HUD prohibited mortgage purchase activities that have a discriminatory effect. In enacting these regulations,[14] which prescribe the fair lending responsibilities of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), HUD noted that "the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law" and concluded that disparate impact law "is applicable to all

---

[2] *See* 42 U.S.C. 3601.

[3] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 211 (1972) (internal citation omitted).

[4] *Id.* at 209.

[5] *Id.* at 211.

[6] H. Res. 1095, 110th Cong., 2d Sess., 154 Cong. Rec. H2280–01 (April 15, 2008) (2008 WL 1733432).

[7] *Havens Realty Corp.* v. *Coleman,* 455 U.S. 363, 380 (1982).

[8] *City of Edmonds* v. *Oxford House, Inc.,* 514 U.S. 725, 731–732 (1995).

[9] *See* 42 U.S.C. 3608(a) and 42 U.S.C. 3614a.

[10] *See, e.g.,* Handbook at 3–25 (the Act is violated by an "action or policy [that] has a disproportionately negative effect upon persons of a particular race, color, religion, sex, familial status, national origin or handicap status"); *id.* at 2–27 ("a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations"); *id.* at 2–27 to 2–45 (HUD guidelines for investigating a disparate impact claim and establishing its elements).

[11] *See e.g., HUD* v. *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Ross,* 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter,* 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[12] *See* 24 CFR 100.70.

[13] *Policy Statement on Discrimination in Lending,* 59 FR 18,266, 18,268 (Apr. 15, 1994).

[14] *See* 24 CFR 81.42.

segments of the housing marketplace, including the GSEs.'' [15]

Moreover, all Federal courts of appeals to have addressed the question have held that liability under the Act may be established based on a showing that a neutral policy or practice either has a disparate impact on a protected group [16] or creates, perpetuates, or increases segregation,[17] even if such a policy or practice was not adopted for a discriminatory purpose.

The Fair Housing Act's discriminatory effects standard is analogous to the discriminatory effects standard under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e), which prohibits discriminatory employment practices. The U.S. Supreme Court held that Title VII reaches beyond intentional discrimination to include employment practices that have a discriminatory effect.[18] The Supreme Court explained that Title VII ''proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.'' [19]

It is thus well established that liability under the Fair Housing Act can arise where a housing practice is intentionally discriminatory or where it has a discriminatory effect.[20] A

### B. Application of the Discriminatory Effects Standard Under the Fair Housing Act

While the discriminatory effects theory of liability under the Fair Housing Act is well established, there is minor variation in how HUD and the courts have applied that theory. For example, HUD has always used a three-step burden-shifting approach,[22] as do many Federal courts of appeals.[23] But some courts apply a multi-factor balancing test,[24] other courts apply a hybrid between the two,[25] and one court

discriminatory effect may be found where a housing practice has a disparate impact on a group of persons protected by the Act, or where a housing practice has the effect of creating, perpetuating, or increasing segregated housing patterns on a protected basis.[21]

applies a different test for public and private defendants.[26]

Another source of variation is in the application of the burden-shifting test. Under the burden-shifting approach, the plaintiff (or, in administrative proceedings, the complainant) must make a prima facie showing of either disparate impact or perpetuation of segregation. If the discriminatory effect is shown, the burden of proof shifts to the defendant (or respondent) to justify its actions. If the defendant or respondent satisfies its burden, courts and HUD administrative law judges have differed as to which party bears the burden of proving whether a less discriminatory alternative to the challenged practice exists. The majority of Federal courts of appeals that use a burden-shifting approach place this burden on the plaintiff,[27] analogizing to Title VII's burden-shifting framework.[28] Other Federal courts of appeals have kept the burden with the defendant.[29] HUD has, at times, placed this burden of proving a less discriminatory alternative on the respondent and, at other times, on the complainant.[30]

### C. Scope of the Proposed Rule

This proposed rule establishes a uniform standard of liability for facially neutral housing practices that have a discriminatory effect. Under this rule, liability is determined by a burden-shifting approach. The plaintiff or complainant first must bear the burden

---

[15] The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR. 61,846, 61,867 (Dec. 1, 1995).

[16] *See, e.g., Graoch Assocs. #33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 374 (6th Cir. 2007); *Reinhart* v. *Lincoln County,* 482 F.3d 1225, 1229 (10th Cir. 2007); *Charleston Housing Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Simms* v. *First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996); *Jackson* v. *Okaloosa County, Fla.,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 938 (2d Cir. 1988), judgment aff'd, 488 U.S. 15 (1988); *Resident Advisory Board* v. *Rizzo,* 564 F.2d 126, 149–50 (3d Cir. 1977); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 988–89 (4th Cir. 1984); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977).

[17] *See, e.g., Graoch Associates #33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007); *Hallmark Developers, Inc.* v. *Fulton County, Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937 (2d Cir. 1988), *aff'd,* 488 U.S. 15 (1988) (per curiam); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987 n.3 (4th Cir. 1984); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290–1291 (7th Cir. 1977); *United States.* v. *City of Black Jack, Missouri,* 508 F.2d 1179, 1184–86 (8th Cir. 1974); *see also Trafficante,* 409 U.S. at 209–210.

[18] *See Griggs* v. *Duke Power Co.,* 401 U.S. 424, 433–34 (1971).

[19] Id. at 431.

[20] *See, e.g.,* 42 U.S.C. 3604(a), (b), (f)(1), (f)(2); 42 U.S.C. 3605; 42 U.S.C. 3606. Liability under the Fair Housing Act can also arise in other ways, for

example, where a reasonable person would find a notice, statement, advertisement, or representation to be discriminatory, see 42 U.S.C. 3604(c), or where a reasonable accommodation is refused, see 42 U.S.C. 3604(f)(3). The Act also imposes an affirmative obligation on HUD and other executive departments and agencies to administer their programs and activities related to housing and urban development in a manner affirmatively to further the purposes of the Fair Housing Act. See 42 U.S.C. 3608(d); *see also* 3608(e)(5).

[21] A ''discriminatory effect'' prohibited by the Act refers to either a ''disparate impact'' or the ''perpetuation of segregation.'' *See, e.g. Graoch Associates #33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007) (there are ''two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.'').

[22] See, e.g., *HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994); *HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *see also Policy Statement on Discrimination in Lending, 59 FR. 18,266, 18,269 (Apr. 15, 1994)* (applying three-step test without specifying where the burden lies at each step).

[23] See, e.g., *Oti Kaga, Inc.* v. *S. Dakota Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003); *Lapid –Laurel, L.L.C.* v. *Zoning Bd. of Adjustment of Twp. of Scotch Plains,* 284 F.3d 442, 466–67 (3d Cir. 2002); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Huntington Branch NAACP* v. *Town of Huntington, N.Y.,* 844 F.2d 926, 939 (2d Cir. 1988).

[24] See, e.g., *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977) (four-factor balancing test).

[25] See, e.g., *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1252, 1254 (10th Cir. 1995) (three-factor balancing test incorporated into burden shifting framework to weigh defendant's justification); *Graoch Associates #33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 373 (6th Cir. 2007) (balancing test incorporated as elements of proof after second step of burden shifting framework).

[26] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. *See e.g., Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 989 n.5 (4th Cir. 1984).

[27] *See, e.g., Gallagher* v. *Magner,* 619 F.3d 823, 834 (8th Cir. 2010); *Graoch Associates # 33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 373–74 (6th Cir. 2007); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1254 (10th Cir. 1995).

[28] *See, e.g. Graoch,* 508 F.3d at 373 (6th Cir. 2007) (''claims under Title VII and the [Fair Housing Act] generally should receive similar treatment''); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1254 (10th Cir. 1995) (explaining that in interpreting Title VII, ''the Supreme Court has repeatedly stated that the ultimate burden of proving that discrimination against a protected group has been caused by a specific * * * practice remains with the plaintiff at all times'') (internal citation omitted).

[29] *See, e.g., Huntington Branch NAACP* v. *Town of Huntington, N.Y.,* 844 F.2d 926, 939 (2d Cir. 1988); *Resident Advisory Board* v. *Rizzo,* 564 F.2d 126, 146–48 (3d Cir. 1977).

[30] *Compare, e.g., HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992) (respondent bears the burden of showing that no less discriminatory alternative exists), *and Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) (same), *with HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993) (complainant bears the burden of showing that a less discriminatory alternative exists), *and HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) (same).

of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice has a necessary and manifest relationship to one or more of the defendant's or respondent's legitimate, nondiscriminatory interests. If the defendant or respondent satisfies its burden, the plaintiff or complainant may still establish liability by demonstrating that these legitimate nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect.[31]

HUD proposes this standard for several reasons. First, Title VII, enacted four years before the Fair Housing Act, has often been looked to for guidance in interpreting analogous provisions of the Fair Housing Act.[32] HUD's proposal is consistent with the discriminatory effects standard confirmed by Congress in the 1991 amendments to Title VII.[33] Second, HUD's proposal is consistent with the discriminatory effects standard applied under the Equal Credit Opportunities Act (ECOA),[34] which borrows from Title VII's burden-shifting framework.[35] There is significant overlap in coverage between ECOA, which prohibits discrimination in credit, and the Fair Housing Act, which

---

[31] *See Graoch Associates #33, L.P.* v. *Louisville/ Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 373–74 (6th Cir. 2007); *Oti Kaga, Inc.* v. *S. Dakota Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1254 (10th Cir. 1995).

[32] *See, e.g., Trafficante,* 409 U.S. at 205; The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR 61,846, 61,868 (Dec. 1, 1995). Short form cite in n. 15.

[33] *See* 42 U.S.C. 2000e–2(k).

[34] ECOA prohibits discrimination in credit on the basis of race and other enumerated criteria. *See* 15 U.S.C. 1691.

[35] *See* S. Rep. 94–589, 94th Cong., 2d Sess. (1976) ("judicial constructions of antidiscrimination legislation in the employment field, in cases such as *Griggs* v. *Duke Power Company,* 401 U.S. 424 (1971), *and Albemarle Paper Co.* v. *Moody* (U.S. Supreme Court, June 25, 1975) [422 U.S. 405], are intended to serve as guides in the application of [ECOA], especially with respect to the allocations of burdens of proof."); 12 CFR 202.6(a), n. 2 (1997) ("The legislative history of [ECOA] indicates that the Congress intended an "effects test" concept, as outlined in the employment field, by the Supreme Court in the cases of *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971) and *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness."); 12 CFR part 202, Supp. I, Official Staff Commentary, Comment 6(a)–2 ("Effects test. The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e– 2).").

prohibits discrimination in residential real estate-related transactions.[36] The interagency *Policy Statement on Discrimination in Lending* analyzed the standard for proving disparate impact discrimination in lending under the Fair Housing Act and under ECOA without differentiation.[37] Under HUD's proposed framework, parties litigating a claim brought under both the Fair Housing Act and ECOA will not face the burden of applying inconsistent methods of proof to factually indistinguishable claims. Third, by placing the burden of proving a necessary and manifest relationship to a legitimate, nondiscriminatory interest on the defendant or respondent and the burden of proving a less discriminatory alternative on the plaintiff or complainant, "neither party is saddled with having to prove a negative." [38]

## II. This Proposed Rule

### A. Subpart G—Discriminatory Effect

#### 1. Discriminatory Effect Prohibited (§ 100.500)

HUD proposes adding a new subpart G, entitled "Prohibiting Discriminatory Effects," to its Fair Housing Act regulations in 24 CFR part 100. Subpart G would confirm that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, as defined in § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose. The housing practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The respective burdens of proof for establishing or refuting an effects claim are set forth in § 100.500(c). Subsection 100.500(d) clarifies that a legally sufficient justification does not defeat liability for a discriminatory intent claim once the intent to discriminate has been established.[39]

This proposed rule would apply to both public and private entities because the definition of "discriminatory housing practice" under the Act makes no distinction between the two.[40]

---

[36] *See* 59 FR 18,266.

[37] *See* 59 FR 18,266, 18,269 (Apr. 15, 1994).

[38] *Hispanics United of DuPage Cnty.* v. *Vill. of Addison, Ill.,* 988 F.Supp. 1130, 1162 (N.D. Ill. 1997).

[39] It is possible to bring a claim alleging both discriminatory effect and discriminatory intent as alternative theories of liability. In addition, the discriminatory effect of a challenged practice may provide evidence of the discriminatory intent behind the practice. *See, e.g., Vill. of Arlington Heights* v. *Metro. Housing Dev. Corp.,* 429 U.S. 252, 266 (1977). But proof of intent to discriminate is not necessary to prevail on a discriminatory effects claim. *See, e.g., Black Jack,* 508 F.2d at 1184–85.

[40] *See* 42 U.S.C. 3602(f) (defining "discriminatory housing practice" as "an act that is unlawful under

#### 2. Discriminatory Effect Defined (§ 100.500(a))

Under the Fair Housing Act and this proposed rule, a "discriminatory effect" occurs where a facially neutral housing practice actually or predictably results in a discriminatory effect on a group of persons (that is, a disparate impact), or on the community as a whole (perpetuation of segregation).[41] Any facially neutral action, *e.g.* laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule.

*Disparate Impact.* Examples of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act include a zoning ordinance restricting private construction of multifamily housing to a largely minority area (*see Huntington Branch,* 844 F.2d at 937); the provision and pricing of homeowner's insurance (*see Ojo* v. *Farmers Group, Inc.,* 600 F.3d 1205, 1207–8 (9th Cir. 2010) (en banc)); mortgage pricing policies that give lenders or brokers discretion to impose additional charges or higher interest rates unrelated to a borrower's creditworthiness (*see Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251, 253 (D. Mass. 2008)); credit scoring overrides provided by a purchaser of loans (*see Beaulialice* v. *Federal Home Loan Mortg. Corp.,* 2007 WL 744646, *4 (M.D. Fla. Mar. 6, 2007)); and credit offered on predatory terms, (*see Hargraves* v. *Capitol City Mortgage,* 140 F. Supp. 2d 7, 20–21 (D.D.C. 2000)). Further examples of such claims can be found in the following court cases: *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988), where the city's land-use decisions that prevented the construction of two housing developments for city residents displaced by a freeway had a greater adverse impact on minorities than on whites because two-thirds of the persons who would have benefited from the housing were minorities; (*Langlois,* 207 F.3d at 50, where public housing authorities' use of local residency preferences to award Section 8 Housing

---

Section 804, 805, 806, or 818," none of which distinguish between public and private entities); *see also Nat'l Fair Housing Alliance, Inc.* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 59–60 & n.7 (D.D.C. 2002) (applying the same impact analysis to a private entity as to public entities, noting that a "distinction between governmental and non-governmental bodies finds no support in the language of the [Act] or in [its] legislative history").

[41] *See, e.g., Graoch Associates # 33, L.P.,* 508 F.3d at 378.

Choice Vouchers likely would result in an adverse impact based on race; *United States* v. *Incorporated Village of Island Park,* 888 F. Supp. 419, 447 (E.D.N.Y. 1995), where a housing program's preference for residents of the Village, most of whom were white, had a disparate impact on African-Americans; *Charleston Housing Auth.,* 419 F.3d at 741–42, where the housing authority's plan to demolish 50 low-income public housing units—46 of which were occupied by African Americans—would disproportionately impact African Americans based on an analysis of the housing authority's waiting list population, the population of individuals income-eligible for public housing, or the current tenant population; and *Smith* v. *Town of Clarkton, N.C.,* 682 F.2d 1055, 1065–66 (4th Cir. 1982), where the town's withdrawal from a multi-municipality housing authority effectively blocked construction of 50 units of public housing, adversely affecting African American residents of the county, who were those most in need of new construction to replace substandard dwellings).

*Perpetuation of Segregation.* A person or entity may be liable for a housing policy or practice that has a discriminatory effect on the community because the practice has the effect of creating, perpetuating, or increasing housing patterns that segregate by race, color, religion, sex, familial status, national origin, or disability. Examples of such claims can be found in the following court cases: *Huntington Branch,* 844 F.2d at 934, 937, where the town's zoning ordinance, which limited private construction of multifamily housing to a largely minority neighborhood, had the effect of perpetuating segregation "by restricting low-income housing needed by minorities to an area already 52% minority"; *Dews* v. *Town of Sunnyvale, Tex.,* 109 F. Supp. 2d 526, 567 (N.D. Tex. 2000), where the town's zoning ordinance that banned multifamily housing and required single-family lots of at least one acre had the effect of perpetuating segregation by keeping minorities out of a town that was 94 percent white; *Black Jack,* 508 F.2d at 1186, where a city ordinance preventing the construction of low-income multifamily housing "would contribute to the perpetuation of segregation in a community which was 99% white"; and *Inclusive Communities Projects, Inc.* v. *Texas Dep't of Housing & Community Affairs,* 749 F. Supp. 2d 486, 500 (N.D. Tex. 2010), where the state's disproportionate denial of tax credits for

nonelderly housing in predominately white neighborhoods had a segregative impact on the community.

### 3. Legally Sufficient Justification (§ 100.500(b))

A housing practice or policy found to have a discriminatory effect may still be lawful if it has a "legally sufficient justification." A "legally sufficient justification" exists where the housing practice or policy: (1) Has a necessary and manifest relationship to the defendant's or respondent's legitimate, nondiscriminatory interests;[42] and (2) those interests cannot be served by another practice that has a less discriminatory effect.[43] A legally sufficient justification may not be hypothetical or speculative. In addition, a legally sufficient justification does not defeat liability for a discriminatory *intent* claim once the intent to discriminate has been established.

### 4. Burdens of Proof (§ 100.500(c))

The burden-shifting framework set forth in the proposed rule for discriminatory effect claims finds support in judicial interpretations of the Act, and is also consistent with the burdens of proof Congress assigned in disparate impact employment discrimination cases. *See* 42 U.S.C. § 2000e-2(k). In the proposed rule, the complainant or plaintiff first bears the burden of proving its prima facie case, that is, that a housing practice caused, causes, or will cause a discriminatory effect on a group of persons or a community on the basis of race, color, religion, sex, disability, familial status, or national origin.

Once the complainant or plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of the housing provider's legitimate, nondiscriminatory interests.

If the respondent or defendant satisfies this burden, the complainant or plaintiff may still establish liability by demonstrating that these legitimate, nondiscriminatory interests could be

---

[42] *See, e.g., Charleston Housing Auth.,* 419 F.3d at 741 ("[u]nder the second step of the disparate impact burden shifting analysis, the [defendant] must demonstrate that the proposed action has a manifest relationship to the legitimate non-discriminatory policy objectives" and "is necessary to the attainment of these objectives") (internal quotation marks omitted); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 988–89 (4th Cir. 1984); 24 CFR 100.125(c); 59 FR 18,266, 18,269; *see also* 60 FR at 61,868.

[43] *See, e.g., Oti Kaga, Inc.* v. *South Dakota Housing Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003).

served by a policy or decision that produces a less discriminatory effect.

### B. Examples of Housing Practices With Discriminatory Effects

Violations of various provisions of the Act may be established by proof of discriminatory effects. For example, under 42 U.S.C. subsections 3604(a) and 3604(f)(1), discriminatory effects claims may be brought under the Act's provisions that make it unlawful to "otherwise make unavailable or deny [ ] a dwelling" because of a protected characteristic. Discriminatory effects claims may be brought pursuant to subsections 3604(b) and 3604(f)(2) of the Act prohibiting discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" a protected characteristic. For residential real estate-related transactions, discriminatory effects claims may be brought under section 3605, which bars "discrimination against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of" a protected characteristic. Discriminatory effects claims may also be brought under section 3606, prohibiting discrimination in the provision of brokerage services.

HUD's existing Fair Housing Act regulations provide examples of housing practices that may violate the Act, based on an intent theory, an effects theory, or both. The proposed rule adds examples of discriminatory housing practices that may violate the new subsection G because they have a discriminatory effect. The cases cited in Section II.A.2 of this preamble identify housing practices found by courts to create discriminatory effects that violate or may violate the Act. These cases are provided as examples only and should not be viewed as the only ways to establish a violation of the Act based on a discriminatory effects theory.

### III. Solicitation of Comments

The Department welcomes comments on the standards proposed in this rule, including whether a burden-shifting approach should be used to determine when a housing practice with a discriminatory effect violates the Fair Housing Act and, where proof is required of the existence or nonexistence of a less discriminatory alternative to the challenged practice, which party should bear that burden. These comments will help the Department in its effort to craft final regulations that best serve the broad, remedial goals of the Fair Housing Act.

## IV. Findings and Certifications

*Executive Order 12866, Regulatory Planning and Review*

The Office of Management and Budget (OMB) reviewed this proposed rule under Executive Order 12866 (entitled ''Regulatory Planning and Review''). The proposed rule has been determined to be a ''significant regulatory action,'' as defined in section 3(f) of the Order, but not economically significant under section 3(f)(1) of the Order. The docket file is available for public inspection in the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at (202) 402–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at (800) 877–8339.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule proposes to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.

Discriminatory effects liability is consistent with the position of other Executive Branch agencies and has been applied by every Federal court of appeals to have reached the question. Given the variation in how the courts have applied that standard, HUD's objective in this proposed rule is to achieve consistency and uniformity in this area, and therefore reduce burden for all who may be involved in a challenged practice. Accordingly, the undersigned certifies that the proposed rule will not have a significant economic impact on a substantial number of small entities.

*Environmental Impact*

This proposed rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled ''Federalism'') prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This proposed rule would not have federalism implications and would not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531– 1538) (UMRA) establishes requirements for Federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This proposed rule would not impose any Federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

## List of Subjects in 24 CFR Part 100

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD proposes to amend 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

1. The authority for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

2. In § 100.65, a new paragraph (b)(6) is added to as follows:

**§ 100.65    Discrimination in terms, conditions and privileges and in services and facilities.**

\*    \*    \*    \*    \*

(b) \* \* \*

(6) Providing different, limited, or no governmental services such as water, sewer, or garbage collection in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin.

3. In § 100.70, add a new paragraph (d)(5) to read as follows:

**§ 100.70    Other prohibited conduct.**

\*    \*    \*    \*    \*

(d) \* \* \*

(5) Implementing land-use rules, policies, or procedures that restrict or deny housing opportunities in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin.

4. In § 100.120, amend paragraph (b) to read as follows:

**§ 100.120    Discrimination in the making of loans and in the provision of other financial assistance.**

\*    \*    \*    \*    \*

(b) Prohibited practices under this section include, but are not limited to:

(1) Failing or refusing to provide to any person, in connection with a residential real estate-related transaction, information regarding the availability of loans or other financial assistance, application requirements, procedures, or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Providing loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin.

5. In part 100, add a subpart G as follows:

## Subpart G—Discriminatory Effect

**§ 100.500    Discriminatory Effect Prohibited**

Liability may be established under this subpart based on a housing practice's *discriminatory effect,* as defined in § 100.500(a), even if the housing practice is not motivated by a prohibited intent. The housing practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The burdens of proof for establishing a violation under this subpart are set forth in § 100.500(c).

(a) *Discriminatory effect defined.* A housing practice has a *discriminatory effect* where it actually or predictably:

(1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or

(2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* A *legally sufficient justification* exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3610, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and (2) those interests cannot be served by another practice that has a less discriminatory effect. The burdens of proof for establishing each of the two elements of a *legally sufficient justification* are set forth in § 100.500(c)(2)–(c)(3).

(c) *Burdens of proof in discriminatory effects cases.*

(1) A complainant, with respect to claims brought under 42 U.S.C. 3610, or a plaintiff, with respect to claims brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice causes a *discriminatory effect.*

(2) Once a complainant or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the complainant or plaintiff may still prevail upon demonstrating that the legitimate, nondiscriminatory interests supporting the challenged practice can be served by another practice that has a less *discriminatory effect.*

(d) *Relationship to discriminatory intent.* A demonstration that a housing practice is supported by a *legally sufficient justification,* as defined in § 100.500(b), may not be used as a defense against a claim of intentional discrimination.

Dated: October 4, 2011.

**John Trasviña,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2011–29515 Filed 11–15–11; 8:45 am]

**BILLING CODE 4210–67–P**

---

# DEPARTMENT OF DEFENSE

## Department of the Army, Corps of Engineers

### 33 CFR Chapter II

### USACE's Plan for Retrospective Review Under E.O. 13563

**AGENCY:** U.S. Army Corps of Engineers, DoD.

**ACTION:** Notice of intent and request for comments.

**SUMMARY:** The U.S. Army Corps of Engineers (USACE) is seeking public input on its plan to retrospectively review its Regulations implementing the USACE Regulatory Program at 33 CFR parts 320–332 and 334. Executive Order 13563, "Improving Regulation and Regulatory Review" (E.O.), issued on January 18, 2011, directs Federal agencies to review existing significant regulations and identify those that can be made more effective or less burdensome in achieving regulatory objectives. The Regulations are essential for implementation of the Regulatory mission; thus, USACE believes they are a significant rule warranting review pursuant to E.O. 13563. The E.O. further directs each agency to periodically review its existing significant regulations to determine whether any such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives. Section 404(e) of the Clean Water Act authorizes USACE to development general permits, including nationwide permits (NWPs), for minor activities in waters of the U.S. for a period of five years. Accordingly, every five years, USACE undergoes a reauthorization process for the NWP program and includes public notice and provides an opportunity for public hearing. Comments for the NWP program are submitted during the reauthorization process. Therefore, USACE is currently complying with the E.O. 13563 direction to periodically review its existing significant regulations. Other regulations will be reviewed on an as-needed basis in accordance with new laws, court cases, etc.

**DATES:** Written comments must be submitted on or before January 17, 2012.

**ADDRESSES:** You may submit comments, identified by docket number COE–2011–0028, by any of the following methods:

*Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

*Email: regulatory.review@usace.army.mil* Include the docket number, COE–2011–0028, in the subject line of the message.

*Mail:* U.S. Army Corps of Engineers, ATTN: CECW–CO–R (Ms. Amy S. Klein), 441 G Street NW., Washington, DC 20314–1000.

*Hand Delivery/Courier:* Due to security requirements, we cannot receive comments by hand delivery or courier.

*Instructions:* Direct your comments to docket number COE–2011–0028. All comments received will be included in the public docket without change and may be made available on-line at *http://www.regulations.gov,* including any personal information provided, unless the commenter indicates that the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI, or otherwise protected, through regulations.gov or email. The regulations.gov Web site is an anonymous access system, which means we will not know your identity or contact information unless you provide it in the body of your comment. If you send an email directly to the Corps without going through regulations.gov, your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, we recommend that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If we cannot read your comment because of technical difficulties and cannot contact you for clarification, we may not be able to consider your comment. Electronic comments should avoid the use of any special characters, any form of encryption, and be free of any defects or viruses.

*Docket:* For access to the docket to read background documents or comments received, go to *http:// www.regulations.gov.* All documents in the docket are listed. Although listed in the index, some information is not publicly available, such as CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form.





NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410–0500.

Re:  Docket No. FR–5508–P–01; RIN 2529–AA96
     Implementation of the Fair Housing Act's Discriminatory Effects Standard

Dear Sir/Madam:

      The National Association of Mutual Insurance Companies ("NAMIC") appreciates the opportunity to comment on the Department of Housing and Urban Development's ("HUD") proposed implementation of the Fair Housing Act's ("FHA") Discriminatory Effects Standard ("Proposed Rule").

      NAMIC is the largest and most diverse property/casualty trade association in the country, with 1,400 regional and local mutual insurance member companies on main streets across America joining many of the country's largest national insurers who also call NAMIC their home.  Member companies serve more than 135 million auto, home and business policyholders, writing in excess of $196 billion in annual premiums that account for 50 percent of the automobile/ homeowners market and 31 percent of the business insurance market.  More than 200,000 people are employed by NAMIC member companies.

**Background**

      The Fair Housing Act prohibits discrimination against any person in "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or

facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."[1]

HUD on November 16, 2011 proposed significant changes in the implementation of the Discriminatory Effects Standard.[2]  The proposed rule purportedly would harmonize existing standards for determining when a housing practice with a discriminatory effect violates the FHA. The proposed rule also discusses liability standards where a facially neutral housing practice has a discriminatory effect.

In its proposal, HUD asserts that it has long interpreted the FHA to permit disparate-impact claims, meaning claims of discrimination even where there has been no intent to discriminate and no claim that any person was subject to discriminatory treatment, and has held that the Act is violated by facially neutral practices that have a disparate impact on protected classes.[3] According to HUD, violations of various provisions of the FHA may be established by proof of discriminatory effects, and discriminatory effects claims may be brought pursuant to the FHA under subsections (b) and (f)(2) of 42 U.S.C. § 3604 ("Section 3604"), which prohibit discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" a protected characteristic.

The recently proposed rule would solidify HUD's position on disparate-impact liability and prescribe standards for addressing disparate-impact claims. HUD proposes to add a new Subpart G, Prohibiting Discriminatory Effect, which would confirm that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, as defined in 24 C.F.R. § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose and regardless of whether any individual person was subjected to discriminatory treatment.

As examples of practices that may have a disparate impact on a class of persons, HUD cites the provision and pricing of homeowner's insurance.  For support, HUD cites *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1207-8 (9th Cir. 2010) (*en banc*). However, as discussed further below, the *Ojo* case clearly reveals that the application of the disparate impact test for FHA liability is inappropriate in the context of insurance.

### *Magner v. Gallagher*

The proposed rule is being advanced by HUD even as the U.S. Supreme Court is currently considering the question of whether disparate impact claims are cognizable

---

[1] 42 U.S.C. § 3604(b).

[2] 76 Fed. Reg. at 70,921.

[3] *See, e.g., Mountain Side Mobile Estates P'ship v. HUD*, 56 F.3d 1243, 1251 (10th Cir. 1995).

under Section 3604.[4]  Oral argument is scheduled for February 27, 2012. In light of the direct bearing the decision of the court will have on the issues at hand, we respectfully request that HUD defer action on the proposed rule until the Supreme Court renders its decision in the case.

The Solicitor General on behalf of the United States filed an amicus brief in the case asking the Court to grant *Chevron* deference to the proposed rule.  We believe that this position is misguided and that rather HUD should withdraw the proposed rule pending consideration of the context and limitations of the Supreme Court's decision. Although HUD asserts that the proposed rule reflects long-standing department policy, *Chevron* deference should not be accorded to a proposed rule.  We believe the interests of the American public would be better served by awaiting the decision of the Supreme Court and drafting proposed regulations consistent with that decision. Specifically, the Court in *Magner* is asked to determine whether disparate impact claims are cognizable under the Fair Housing Act and, if such claims are cognizable, whether they should they be analyzed under the burden shifting approach used by three circuits, under the balancing test used by four circuits, under a hybrid approach used by two circuits, or by some other test.  The questions before the Court lie at the heart of the issues addressed in the proposed regulation and action on the proposed regulation is premature in light of the pending Supreme Court decision.

**Statutory Construction**

As a threshold matter, NAMIC disputes that the disparate impact standard is properly applicable under Section 3404 in any context.  Section 3604 prohibits only *intentional* discrimination against individual persons. Section 3604 specifically proscribes conduct relating to the sale or rental of dwellings that is undertaken against an individual "because of" that person's membership in a class protected under the statute. Section 3604 makes it unlawful to "refuse to sell or rent" or "otherwise make unavailable or deny" housing to a person "because of" a protected characteristic, including race.  HUD places the emphasis on the effect (deny or make unavailable), rather than on the "because of" standard.  Such a reading fails to acknowledge the "because of" standard serves as a threshold test.  The statutory language does not refer to conduct that "adversely affects" or "tends to deprive" members of a protected class - language that would substantiate the basis for disparate-impact causes of action - but enumerates actions that may not be taken "because of" the individual's protected class.[5]

---

[4] *Magner v. Gallagher*, 619 F.3d 823 (8th Cir. 2010), *cert. granted*, No. 10-1032 (Docket) (U.S. Nov. 7, 2011).

[5] *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988) (plurality opinion) (construing Title VII Section 703(a)(2)); *see also* Smith v. City of Jackson, 544 U.S. 228, 236 (2005) (plurality opinion) (construing ADEA Section 4(a)(2)).

In contrast, Section 3604(a) is textually distinct from other statutory provisions that
permit claims for disparate impact, such as Section 703(a)(2) of Title VII, 42 U.S.C. §
2000e-2(a)(2), Section 4(a)(2) of the ADEA, 29 U.S.C. § 623(a)(2), and Section 102 of
the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(b). Each of these
provisions prohibit conduct that "adversely affects" a protected class, using language
the Court has recognized as authorizing claims of disparate impact.[6]  Section 3604
therefore does not provide a cause of action for disparate-impact discrimination and
recovery is limited to claims of disparate treatment.  As such, we believe the proposed
rule exceeds HUD's statutory authority, including in the application of the disparate
impact test to insurance, as discussed below.

## Disparate Impact and Insurance

Disparate impact in the context of the proposed rule would be presumed to exist
when a standard or practice has the effect of disproportionately harming members of a
group defined by race, ethnicity, or sex – regardless of whether the challenged practice
makes reference to these characteristics, or whether the resulting adverse group impact
was intended.  While the concept of disparate impact is problematic in the best of
circumstances, its application in the context of insurance would be particularly difficult.
While in 1992 the Seventh Circuit applied the FHA to insurance, the Court noted a
distinction between "disparate treatment" (i.e., intentional unfair discrimination) and
"disparate impact."  The Court further noted that "risk discrimination is not race
discrimination."[7]

The FHA has been applied to insurance through § 3604 and the existing HUD
regulation – both of which use terminology indicating that discrimination consists of
disparate *treatment* where there is *intentional* discrimination rather than merely
discriminatory *effects*.[8]  HUD asserts that the Department has long interpreted the FHA
to permit disparate-impact claims.  However, the Department fails to acknowledge that
in 1988 the United States Solicitor General submitted an amicus brief before the
Supreme Court arguing that a FHA violation requires proof of intentional discrimination.
The parties in the case agreed to litigate under the disparate impact approach and while
the Court did not disturb the theory, it specifically noted that "[W]e do not reach the
question whether that test is the appropriate one."[9]  The same year, President Ronald

---

[6] See *Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 429–31.

[7] *NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287, 290 (7th Cir. 1992).

[8] *Id.* The Seventh Circuit applied the FHA and the 1989 HUD rules to insurance based on the conclusion
that "Section 3604 is sufficiently pliable that its text can bear [HUD's] construction.

[9] *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15, 18 (1988).

Reagan, upon signing the Fair Housing Amendments Act of 1988, issued a statement expressing the view that the FHA requires proof of intentional discrimination to establish a violation.[10] In implementing the new legislative amendments in 1989, the Department adopted expansive rules related to the standards for proving a violation, yet it specifically declined to opine whether the FHA allows a disparate impact approach or required proof of intentional discrimination.[11]  Under the Clinton Administration in 1994, several federal agencies issued a "Policy Statement on Discrimination in Lending" sanctioning the disparate impact approach, but acknowledged that the law on disparate impact was under development.[12]  Thus, while the Department asserts that its "administrative law judges have held that the Act is violated by facially neutral practices that have a disparate impact on protected classes," the proposed regulation would be the first formal regulatory promulgation to that effect.

The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly.  Race or other protected class characteristics are not part of the risk assessment process.  In addition, state insurance laws proscribe the use of prohibited factors in rating and underwriting practices of insurers, and states prohibit unfair discrimination in insurance.  In the context of insurance, unfair discrimination includes treating similar risks in a dissimilar manner.  Insurance regulation focuses on facially neutral underwriting or rating factors that reflect insurance risk.  Accordingly, state insurance laws largely reflect the principles underpinning property/casualty insurance pricing.

To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly.  This practice is the very essence of risk-based pricing. Common homeowners insurance factors include claim history of applicant, construction material (s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system. Under HUD's  proposed rule, however, these and other common underwriting factors could be jeopardized, even though they

---

[10] President Ronald Reagan, *Remarks on Signing the Fair Housing Amendments Act of 1988* (Sept. 13, 1988) ("I want to emphasize that this bill does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that Title 8 violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent. Title 8 speaks only to intentional discrimination.").

[11] 54 Fed. Reg. 3235 (Jan. 23, 1989)

[12] Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending*, 59 Fed. Reg. 18266 (April 15, 1994).

do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected. To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk- based variables would have to be eliminated from the underwriting process. In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

State insurance laws prohibit insurance rates from being "excessive, inadequate, unreasonable or unfairly discriminatory." Classifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance. "Unfair discrimination," on the other hand, has specific meaning in the insurance context. The concept of unfairly discriminatory insurance rates has historically been a cost-based concept. Principal 4 of Casualty Actuarial Society Statement of Ratemaking Principles, formally adopted in 1988, provides that "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer." [13]  Under model legislation developed by the National Association of Insurance Commissioners, an insurer could be guilty of unfair discrimination by making underwriting and rating distinctions "between individuals or risks of the same class and essentially the same hazard" or when underwriting and rating decisions are unsupported by "the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience."[14]

Given the differences, it is the exception rather than the rule where the "unfairly discriminatory" standard and the concept of disparate impact could be applied simultaneously to a risk classification plan without conflict. The proposed rule's standard for disparate impact would at a minimum be inconsistent with the risk-based insurance "unfair discrimination" standard. At worst, by requiring an insurer to disregard the predictive value of a valid factor, HUD would be placing insurers in the untenable position of risking violation of state prohibitions against "unfairly discriminatory" insurance rates. If a state regulator has found that a rate, rating factor, or territory does not unfairly discriminate (as well as not making the rate excessive or inadequate),

---

[13] Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988. <http://www.casact.org/standards/princip/sppcrate.pdf>

[14] "Unfair Discrimination," Sec. G (3), Unfair Trade Practices Act, NAIC Model Regulation Service, January 1993, pp. 880-884.

HUD's intervention via a finding of disparate impact or "discriminatory effect" could reverse the state regulator ruling and even make the resulting application unfairly discriminatory under state law.  As such, the proposed rule would serve to undercut and even contradict the unfair discrimination standard in state law.  If the standard of disparate impact prevails over the historical standard that mandates unfairly discriminatory rates, accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer.  Perversely, application of the proposed rule could in fact harm all insurance consumers, including the very groups it purports to protect.

In addition to the "unfairly discriminatory" standard, pricing for property/casualty insurance falls squarely within the "filed rate doctrine."  The filed rate doctrine, which has a long history of common-law development, imposes a limitation on private claims for damages based on challenges to filed rates.  State regulated insurers generally are required to file rates with state regulators.  The application of the filed rate doctrine to property/casualty prices properly balances the interests in ensuring nondiscriminatory treatment of rate-payers.  The filed rate doctrine "recognizes that (1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack competence to set . . . rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." [15]  Imposing disparate impact analysis in the context of property/casualty pricing would similarly undermine the state-based regulatory regime.  Indeed, a number of courts have recently found the disparate impact test may not be applied to insurance practices for precisely this reason, when addressing discrimination claims in the context of the McCarran-Ferguson Act.

### *McCarran-Ferguson*

The McCarran-Ferguson Act of 1945 [16] confirms the states' authority to regulate the "business of insurance," unless federal law specifically provides otherwise.  State law governs the business of insurance and no act of Congress may interfere with state insurance law unless the federal act specifically relates to insurance.  All states regulate the business of insurance within their borders, including the underwriting and rating practices of insurers.  Although the courts have held that federal laws may *duplicate*

---

[15] *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 489 (2d Cir. 1998) (internal quotation marks omitted; alteration in original).

[16] 15 U.S.C.A. § 1011 *et seq.*

state laws,[17] McCarran-Ferguson bars any application of federal law that would invalidate, impair or supersede state laws regulating the business of insurance.[18]

One of the cases HUD cites as purported support for its proposed rule, *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1207–8 (9th Cir. 2010) (en banc), plainly illustrates how the Department's overreach in applying disparate impact standards would undermine the states' regulation of insurance. In *Ojo*, the plaintiffs claimed that the use of credit-based insurance scoring had a disparate effect on minorities in violation of the FHA. The Ninth Circuit determined that the FHA does not specifically relate to insurance and that the relevant Texas law was enacted for the purpose of regulating insurance, and thus faced the question whether a ruling for the plaintiffs under the FHA might "invalidate, impair, or supersede" Texas law. The Ninth Circuit certified that question to the Texas Supreme Court. The Texas Supreme Court held: "In light of the fact that Texas only prohibits the use of credit score factors or rates *based on* race, or rates that differ *because of* race, we answer that application of the FHA to permit a cause of action for disparate impact resulting from the use of credit scoring in the field of insurance certainly might invalidate, impair, or supersede Texas law."[19] The court concluded that "[a]llowing a claim against Texas insurers for using completely race-neutral factors in credit scoring would frustrate the regulatory policy of Texas."[20]

The Eighth Circuit made a similar ruling in Saunders v. Farmers Insurance Exchange.[21] In that case, the court upheld the dismissal of class action disparate impact claims, citing the reverse-preemption impact of the McCarran-Ferguson Act, as well as the filed rate doctrine, which says that an insurer charging a rate that has been approved by the regulator cannot be sued for using that rate.[22] The court recognized that "a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime."

Other courts are in accord. A Nebraska federal court concluded that "it is difficult to envision how allowing [the plaintiff] to proceed" with a disparate-impact claim under

---

[17] *See American Family*, 978 F.2d 287.

[18] *See Saunders v. Farmers Ins. Exchange*, 537 F.3d 961 (8th Cir 2008).

[19] *Ojo v. Farmers Grp., Inc.*, _ S.W.3d _, No. 10-0245, 2011 WL 2112778, at *2 (Tex. May 27, 2011).

[20] *Id.* at *11.

[21] 537 F.3d 961 (8th Cir. 2008).

[22] *See Mackey v. Nationwide Ins. Co.*, 724 F.2d 419 (4th Cir. 1984); *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003); *Nationwide Mutual Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 19950; *NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287 (7th Cir. 1992); *Moore v. Liberty National Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001).

the FHA challenging the use of credit scores would not frustrate and/or interfere with Nebraska's administrative regime.[23]   Likewise, a Mississippi federal court held that it was "clear" that a disparate-impact claim under the FHA would impair a state regulation that allowed the use of insurance scores not "based in whole or in part on race" where the regulation "makes no reference to disparate impact."[24]

As these court decisions demonstrate, the disparate-impact analysis is inappropriate in the context of insurance.  NAMIC therefore urges HUD to exempt property/casualty coverage from the application of the newly proposed Subpart G, Prohibiting Discriminatory Effect standards.  Specifically, HUD should:

- exempt insurance pricing from the discriminatory effects standards.  The application of the FHA to insurance has been limited to the Act's prohibition on "denying or making unavailable" dwellings by making homeowners insurance unavailable.  The decision to not write insurance is an underwriting decision based on a number of factors related to the anticipated risk of loss.  Pricing is a separate issue and would be subject to the filed rate doctrine.

If the Department insists on the inclusion of property/casualty insurance, NAMIC strongly urges the Department to:

- provide regulatory safe harbors for long-recognized risk-related factors, such as use of prior insurance claims, age and condition of property, and distance from fire station. Failure to provide safe harbor protection for the use of factors historically allowed by state insurance regulators would subject insurers to baseless litigation and threaten the sound actuarial standards underpinning the insurance market; and

- exempt Fair Access to Insurance Requirements ("FAIR") Plans.  State FAIR plans provide insurance to individuals or cover risks that would otherwise be denied insurance due to a related high-risk problem. FAIR plans generally utilize market survey data to determine rates and spread the cost of coverage through assessments on participating insurance companies or through assignment to risks to participating insurance companies.  Insurance companies participating in FAIR plans should be exempt from the discriminatory effects standards.  The state action doctrine would clearly apply since the operation of the FAIR plans facilitate private conduct that otherwise would not have occurred.

---

[23] *Taylor v. Am. Family Ins. Grp.*, No. 8:07CV493, 2008 WL 3539267, at *3 (D. Neb. Aug. 11, 2008).

[24] *McKenzie v. S. Farm Bureau Casualty Ins. Co.*, No. 3:06CV013, 2007 WL 2012214, at *3 (N.D. Miss., July 6, 2007).

**Burden of Proof**

The proposed rule outlines a "three-step burden-shifting" approach to determining which party bears the burden of proof at each step of the process.

1. The plaintiff must first prove a prima facie case that the "practice caused, causes, or will cause a discriminatory effect on" a protected group.
2. Once the complainant or plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of the housing provider's legitimate, nondiscriminatory interests.
3. If the respondent or defendant satisfies its burden, the complainant or plaintiff may still establish liability by demonstrating that these legitimate, nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect. (76 FR 70925, 70927).

The Supreme Court in *Wards Cove Packing Co. v. Atonio*[25] set forth a burden-shifting framework governing disparate-impact claims under non-Title VII statutes such as the FHA.[26]  The *Wards Cove* burden-shifting framework involves a similar three-step process, but differs in significant respects. Under *Wards Cove*, the plaintiff must first make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class.[27] Second, the *Wards Cove* standard provides that if the plaintiff makes the prima facie showing, the defendant must come forward with evidence that the "challenged practice serves, in a significant way, [its] legitimate . . . goals."[28]  Third, under *Wards Cove,* the plaintiff must then prove that the defendant refused to adopt an alternative practice that would have served its goals equally as effectively without causing the disparate impact.[29]

Although most lower courts have applied a burden- shifting approach in the FHA context, they generally have failed to adhere to the instruction of *Wards Cove*.  The most common deviation is mistakenly shifting the burden of persuasion, as opposed to the burden of production, to the defendant at the second step in the analysis.  The proposed rule replicates this error.

---

[25] 490 U.S. 642 (1989).

[26] *See Smith*, 544 U.S. at 240.

[27] *Wards* Cove, 490 U.S. at 658.

[28] *Id*. at 659.

[29] *Id*. at 660–61.

The proposed rule differs from the *Wards Cove* standard in several fundamental ways.  In the first step, the proposed rule significantly lowers the standard for demonstrating a "discriminatory effect."  In the second step, the proposed rule profoundly narrows the standard for allowing the defendant to rebut the presumption of unlawful discrimination that results from the plaintiff's showing of a discriminatory effect, by requiring the defendant to show that the challenged practice has "a necessary and manifest relationship" to one or more "legitimate, nondiscriminatory interest[s]," instead of adopting a "legitimate goal" standard.  In the third and final step, the proposed rule merely provides that the plaintiff may demonstrate that legitimate, nondiscriminatory interests "could be served by a policy that produces a less discriminatory effect."  Unlike the Wards Cove standard, the third step in the Department's proposed rule gives no consideration to whether the preferred alternative practice is "equally as effective" as the challenged practice.

Moreover, the process of determining whether there exists an alternative practice that produces a "less discriminatory effect" would require an insurer to explicitly take race and ethnicity into account in its analysis.  This would directly violate state insurance laws prohibiting "unfair discrimination," which proscribe the use of race and ethnicity and instead require insurers to rely solely on risk in developing underwriting and rating practices.

NAMIC urges HUD to follow the *Wards Cove* standards.  Specifically, in step two the defendant must able to rebut the plaintiff's prima facie showing of unlawful discrimination by showing only that the challenged practice is significantly related to the achievement of its legitimate business goals.  In step three, the plaintiff must bear the burden to identify an alternative "equally as effective as the challenged practice in serving the [defendant's] legitimate business goals" and "reduce[s] the . . . disparate impact of practices currently being used."  This alternative must also be as effective in meeting the business reason as the challenged practice.  In the case of an insurer's use of a predictive model, the plaintiff should bear the burden of proving that the alternative is as predictive.  Similarly the plaintiff must bear the burden of proving that the alternative is not subject to patent or is otherwise proprietary, that it is not more expensive even if it is as effective, and that it is not more difficult to implement than the challenged practice.  When the statutory text is silent on allocation of the burden of persuasion, the ordinary default rule is that the plaintiff bears the risk of proving their claims.[30]  The FHA is silent on burden-shifting allocations and HUD should not attempt to use the regulatory process to shift the burden of persuasion to the defendant.

---

[30] *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009),*quoting Schaffer v. Weast*, 546 U.S. 49, 56 (2005); *see Smith*, 544 U.S. at 240.

Comments of the National Association of Mutual Insurance Companies                  Page 12
Re: Docket No. FR–5508–P–01; RIN 2529–AA96
January 17, 2012

The burden of proof issues are particularly difficult for insurers. Unlike banks, real estate settlement practices or rental real estate practices, insurers do not collect data on race and ethnicity. Without collecting such data indicative of protected class, insurers could not assess whether its facially neutral risk-related underwriting and rating factors have a disparate impact or discriminatory effect on protected classes. State insurance laws prohibit the use or consideration of prohibited factors like race and ethnicity and insurers should not be required to collect that data to protect themselves from disparate impact or discriminatory effects claims.

NAMIC urges HUD to conform the burden of proof standards in Subpart G(4) ((§ 100.500(c)) to the *Wards Cove* standards.

## Conclusion

NAMIC believes it is premature in light of Supreme Court's pending consideration of *Magner v. Gallagher* for HUD to move forward with the proposed rule. NAMIC urges the Department to withdraw the proposed rule, pending the Supreme Court decision. Alternatively, HUD should suspend activity regarding the rule until the Supreme Court has ruled. NAMIC does not believe that Section 3604 supports inclusion of the disparate impact standards. At a minimum, NAMIC believes that pricing decisions and operations of FAIR plans should be excluded from the reach of the rule and regulatory safe harbors should be provided for recognized underwriting risk factors. NAMIC further believes that the McCarran-Ferguson Act precludes federal acts that would impair or supersede state laws and that application of the disparate impact standards would impair state unfair discrimination standards.

Sincerely,

Robert Detlefsen, Ph.D.
Vice President, Public Policy
National Association of Mutual Insurance Companies
122 C Street, NW, Suite 450
Washington, D.C. 20001
202-628-1558
www.namic.org





**American Insurance Association**

2101 L Street NW

Suite 400

Washington, DC 20037

202-828-7100

Fax 202-293-1219

www.aiadc.org

January 17, 2011

**VIA FEDERAL eRULEMAKING PORTAL**

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW
Room 10276
Washington, DC  20410

> **Re:  24 CFR Part 100 [Docket No. FR-5508-P-01] RIN 2529-AA96,**
> **Department of Housing and Urban Development Proposed Rule Implementing the Fair**
> **Housing Act's Discriminatory Effects Standard**

Ladies and Gentlemen:

The American Insurance Association (AIA) appreciates the opportunity to submit comments on the Department of Housing and Urban Development's (HUD) notice published in the November 16, 2011, Federal Register, seeking public comment on a proposed rule regarding "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("Proposed Rule").[1] AIA represents approximately 300 major U.S. insurance companies that provide all lines of property-casualty insurance to U.S. consumers and businesses, writing more than $117 billion annually in premiums.  Our members are subject to comprehensive regulation by the states, and they therefore have a substantial interest in any proposal that would seek to add

---

[1] 76 Fed. Reg. 70921 - 70927 (November 16, 2011).

regulation or enforcement at the federal level. More specifically, as many AIA members write homeowners' insurance, they have an important interest in any regulation pertaining to the Fair Housing Act (FHA). Consistent with those interests, AIA respectfully submits the following comments on the proposed rule.

## REFERENCES TO INSURANCE AND THE "*OJO V. FARMERS*" LITIGATION SHOULD BE DELETED FROM THE PREDICATE TO THE PROPOSED RULE.

The predicate to the Proposed Rule, describing the proposal's scope, includes in its list of examples of potential "Disparate Impact" discrimination, the following statement: "the provision and pricing of homeowner's insurance (see *Ojo v. Farmers Group, Inc.*, 600 F.3[rd] 1205, 1207-8 (9th Cir. 2010))."[2] As discussed more fully below, the inclusion of the homeowner's insurance example is inappropriate as it fails to describe the principles announced in the *Ojo* decision, ignoring the decision's discussion of the impact of state law pursuant to the McCarran-Ferguson Act. Under the McCarran Act's "reverse pre-emption" principle, state insurance law trumps the application of any federal law to state regulated insurance, except under very narrow circumstances, which are not met here.

In the *Ojo* litigation, the U.S. Circuit Court of Appeals for the Ninth Circuit (en banc) sought the opinion of the Texas Supreme Court on whether Texas insurance law prohibited disparate impact discrimination.[3] The case arose in relation to the use of credit scoring by the insurer in setting homeowner's insurance rates and premiums. The Ninth Circuit quoted the applicable McCarran-Ferguson Act language, as follows:

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."[4]

The appeals court then set forth the decision-making standard:

> "If Texas law permits insurance companies to use credit scores even if the factors used to compute scores may have a racially disparate impact that could violate the FHA, then allowing Ojo to sue Defendants under FHA for this practice would

---

[2] *Id.* at 70924.
[3] *Ojo v. Farmers Group Inc*, 600 F.3d 1201(April 9, 2010).
[4] *Id.* at 1203.

2

impair Texas law… The outcome of this (case) turns on the extent to which Texas law permits insurance companies to use credit-score factors that may have a racially disparate impact that would constitute a FHA violation… *We agree to abide by the Supreme Court of Texas's decision in issuing our subsequent opinion in Ojo v. Farmers Group Inc.*[5]

Upon receiving the Ninth Circuit's certification of the state regulation question, the Texas Supreme Court determined that "the language of the [Texas] Insurance Code is inconsistent with a disparate impact theory of liability," holding that "Texas law does not prohibit an insurer from using race-neutral factors in credit-scoring to price insurance, even if doing so creates a racially disparate effect."[6]

Thus, since the *Ojo* litigation stands for the proposition that Texas insurance law reverse-pre-empts the FHA pursuant to the McCarran Ferguson Act, it is inappropriate for the HUD Proposed Rule to proceed as if that principle does not exist. As a result, we would strongly urge HUD to delete the insurance example from the rule's predicate.

## THE PROPOSED RULE INAPPROPRIATELY AND PREMATURELY ASSUMES THAT FHA COVERS DISPARATE IMPACT DISCRIMINATION CLAIMS.

The Proposed Rule assumes that the FHA covers disparate impact discrimination. This assumption, however, may be wrong. Indeed, it may well be that the FHA's jurisdiction is limited to deliberate discriminatory practices. As HUD knows, this question is currently before the U.S. Supreme Court in the *Magner* case.[7] In light of the currency of this issue, it obviously would have been better, procedurally and substantively, for HUD to have delayed its Proposed Rule until the Court had decided whether the FHA does, in fact, incorporate disparate impact discrimination situations and, if so, the proper analytical framework for deciding those cases.

However, since HUD has decided to publish its proposal during the pendency of the *Magner* litigation, we respectfully suggest that HUD promptly publish a supplemental Federal Register notice stating that the promulgation of any final regulation will be deferred until the Supreme Court's *Magner* decision is handed down. This approach would make certain that HUD is not regulating based on a hypothetical construction of the law. It would also spare HUD the

---

[5] *Id.* at 1204-05.
[6] *Ojo, et. al. v. Farmers Group Inc., et. al*, 54 Tex. Sup. Ct. J. 1068 (May 27, 2011).
[7] *Magner v. Gallagher*, 619 F.3d 823 (8th Cir. 2010), cert. granted, No. 10-1032 (Docket) (U.S. Nov. 7, 2011).

3

potential embarrassment of needing to amend its final regulation if the Supreme Court's decision is at variance with it.

## THE PROPOSAL'S ANALYTICAL FRAMEWORK FOR DETERMINING THE EXISTENCE OF ACTIONABLE DISPARATE IMPACT DISCRIMINATION IS CONFUSING AND INCONSISTENT WITH BOTH STATUTORY AND SUPREME COURT LAW.

The analytical framework that HUD proposes to use to determine whether there has been actionable disparate impact discrimination in individual cases is very difficult to understand and appears to be at variance with both the standard established for Title VII employment discrimination cases under the Civil Rights Act of 1991 and the alternative *Wards Cove*[8] analysis that has provided the basis for disparate impact analysis in non-Title VII employment related cases.[9]

We believe that the *Wards Cove* analysis provides the proper approach for FHA cases, and that the Title VII approach should be limited to employment cases arising under that title. Under the *Wards Cove* approach, the plaintiff in any FHA disparate impact case has the burden of persuasion *throughout* the entire process.[10] The plaintiff must prove that the challenged practice furthered no legitimate business goal identified by the defendant or that the plaintiff's proposed alternative business practice that would avoid the disparate impact would be "equally as effective as the challenged practice in serving the (defendant's) legitimate business needs." The proposed regulation, however, requires that a "necessary and manifest" business need be established.[11] This not only goes beyond *Wards Cove*, but also introduces a new and additional standard that is both "manifestly unfair" to the defendant and "manifestly unclear" in application. Under this analytical approach, it would not be enough to establish that the practice is "necessary" to the business; the defendant would be required to demonstrate that it was "manifestly" necessary. We do not believe that this is consistent with either Supreme Court or statutory law.

We believe that the Proposed Rule even goes beyond the 1991 Civil Rights Act. As we have stated, we believe that the disparate impact language in the Civil Rights Act of 1991 is limited to

---

[8] *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642 (1989)
[9] The Civil Rights Act of 1991 was enacted to, among other things, reverse the U.S. Supreme Court's decision in *Wards Cove*, as it applied to employment discrimination cases. Subsequent to the 1991 law, the *Wards Cove* analytical framework has been followed in non-Title VII disparate impact cases. *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (plurality opinion)
[10] *See Wards Cove* at 659-60.
[11] 76 *Fed. Reg.* at 70927.

4

Title VII employment discrimination cases, and should not be exported to the FHA. But, even if that language were to be so exported, we believe that HUD's proposed regulatory language goes beyond it, as well. The Civil Rights Act also uses the term "business necessity."[12] It does not add the "manifest" concept.

## CONCLUSION

In light of the Supreme Court's consideration of the *Magner* case, AIA strongly urges HUD, when finalizing any eventual regulation, to eliminate the references to homeowner's insurance in light of the principles enunciated in *Ojo*. We would also urge HUD to publish a supplemental notice in the Federal Register that it will delay any action on its proposal until the Supreme Court has ruled on *Magner* and then proceed in a manner consistent with that decision.

Respectfully submitted,

J. Stephen ("Stef") Zielezienski
Sr. Vice President & General Counsel
American Insurance Association

David F. Snyder
Vice President & Associate General Counsel, Public Policy
American Insurance Association

---

[12] 42 U.S.C. § 2000e-2(k)(1)(A): "An unlawful employment practice based on disparate impact is established under this subchapter only if—(1) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact... and the respondent fails to demonstrate that the challenged practice is... consistent with business necessity."

5



# FEDERAL REGISTER

| | |
|---|---|
| Vol. 78 | Friday, |
| No. 32 | February 15, 2013 |

Part IV

## Department of Housing and Urban Development

24 CFR Part 100
Implementation of the Fair Housing Act's Discriminatory Effects Standard; Final Rule

**11460**    **Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

**[Docket No. FR–5508–F–02]**

**RIN 2529–AA96**

## Implementation of the Fair Housing Act's Discriminatory Effects Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] HUD, which is statutorily charged with the authority and responsibility for interpreting and enforcing the Fair Housing Act and with the power to make rules implementing the Act, has long interpreted the Act to prohibit practices with an unjustified discriminatory effect, regardless of whether there was an intent to discriminate. The eleven federal courts of appeals that have ruled on this issue agree with this interpretation. While HUD and every federal appellate court to have ruled on the issue have determined that liability under the Act may be established through proof of discriminatory effects, the statute itself does not specify a standard for proving a discriminatory effects violation. As a result, although HUD and courts are in agreement that practices with discriminatory effects may violate the Fair Housing Act, there has been some minor variation in the application of the discriminatory effects standard.

Through this final rule, HUD formalizes its long-held recognition of discriminatory effects liability under the Act and, for purposes of providing consistency nationwide, formalizes a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act. This final rule also adds to, and revises, illustrations of discriminatory housing practices found in HUD's Fair Housing Act regulations. This final rule follows a November 16, 2011, proposed rule and takes into consideration comments received on that proposed rule.

**DATES:** *Effective Date:* March 18, 2013.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–0500, telephone number 202–402–5188. Persons who are deaf, are hard of hearing, or have speech impairments may contact this phone number via TTY by calling the Federal Relay Service at 800–877–8399.

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### A. Purpose of Regulatory Action

*Need for the Regulation.* This regulation is needed to formalize HUD's long-held interpretation of the availability of "discriminatory effects" liability under the Fair Housing Act, 42 U.S.C. 3601 *et seq.*, and to provide nationwide consistency in the application of that form of liability. HUD, through its longstanding interpretation of the Act, and the eleven federal courts of appeals that have addressed the issue agree that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect. The twelfth court of appeals has assumed that the Fair Housing Act includes discriminatory effects liability, but has not decided the issue. Through four decades of case-by-case application of the Fair Housing Act's discriminatory effects standard by HUD and the courts, a small degree of variation has developed in the methodology of proving a claim of discriminatory effects liability. This inconsistency threatens to create uncertainty as to how parties' conduct will be evaluated. This rule formally establishes a three-part burden-shifting test currently used by HUD and most federal courts, thereby providing greater clarity and predictability for all parties engaged in housing transactions as to how the discriminatory effects standard applies.

*How the Rule Meets the Need.* This rule serves the need described above by establishing a consistent standard for assessing claims that a facially neutral practice violates the Fair Housing Act and by incorporating that standard in HUD's existing Fair Housing Act regulations at 24 CFR 100.500. By formalizing the three-part burden-shifting test for proving such liability under the Fair Housing Act, the rule provides for consistent and predictable application of the test on a national basis. It also offers clarity to persons seeking housing and persons engaged in housing transactions as to how to assess

potential claims involving discriminatory effects.

*Legal Authority for the Regulation.* The legal authority for the regulation is found in the Fair Housing Act. Specifically, section 808(a) of the Act gives the Secretary of HUD the "authority and responsibility for administering this Act." (42 U.S.C. 3608(a)). In addition, section 815 of the Act provides that "[t]he Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this title. The Secretary shall give public notice and opportunity for comment with respect to all rules made under this section." (42 U.S.C. 3614a.) HUD also has general rulemaking authority, under the Department of Housing and Urban Development Act, to make such rules and regulations as may be necessary to carry out its functions, powers, and duties. (See 42 U.S.C. 3535(d).)

### B. Summary of the Major Provisions

This rule formally establishes the three-part burden-shifting test for determining when a practice with a discriminatory effect violates the Fair Housing Act. Under this test, the charging party or plaintiff first bears the burden of proving its prima facie case that a practice results in, or would predictably result in, a discriminatory effect on the basis of a protected characteristic. If the charging party or plaintiff proves a prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, then the charging party or plaintiff may still establish liability by proving that the substantial, legitimate, nondiscriminatory interest could be served by a practice that has a less discriminatory effect.

This rule also adds and revises illustrations of practices that violate the Act through intentional discrimination or through a discriminatory effect under the standards outlined in § 100.500.

### C. Costs and Benefits

Because the rule does not change decades-old substantive law articulated by HUD and the courts, but rather formalizes a clear, consistent, nationwide standard for litigating discriminatory effects cases under the Fair Housing Act,[2] it adds no additional costs to housing providers and others engaged in housing transactions. Rather,

---

[1] This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap." Both terms have the same legal meaning. *See Bragdon* v. *Abbott,* 524 U.S. 624, 631 (1998).

[2] *See* nn. 12, 28, *supra,* discussing HUD administrative decisions and federal court rulings.

the rule will simplify compliance with the Fair Housing Act's discriminatory effects standard and decrease litigation associated with such claims by clearly allocating the burdens of proof and how such burdens are to be met.

## II. Background

The Fair Housing Act was enacted in 1968 (Pub. L. 90–284, codified at 42 U.S.C. 3601–3619, 3631) to combat and prevent segregation and discrimination in housing, including in the sale or rental of housing and the provision of advertising, lending, and brokerage services related to housing. The Fair Housing Act's "Declaration of Policy" specifies that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [3] Congress considered the realization of this policy "to be of the highest priority." [4] The Fair Housing Act's language prohibiting discrimination in housing is "broad and inclusive;" [5] the purpose of its reach is to replace segregated neighborhoods with "truly integrated and balanced living patterns." [6] In commemorating the 40th anniversary of the Fair Housing Act and the 20th anniversary of the Fair Housing Amendments Act, the House of Representatives reiterated that "the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States." [7] (See the preamble to the November 16, 2011, proposed rule at 76 FR 70922.)

The Fair Housing Act gives HUD the authority and responsibility for administering and enforcing the Act,[8] including the authority to conduct formal adjudications of Fair Housing Act complaints [9] and the power to promulgate rules to interpret and carry out the Act.[10] In keeping with the Act's "broad remedial intent," [11] HUD, as the following discussion reflects, has long interpreted the Act to prohibit practices that have an unjustified discriminatory effect, regardless of intent. (See also the

preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.)

In formal adjudications of charges of discrimination under the Fair Housing Act over the past 20 years, HUD has consistently concluded that the Act is violated by facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent.[12] In one such formal adjudication, the Secretary of HUD reviewed the initial decision of a HUD administrative law judge and issued a final order stating that practices with an unjustified discriminatory effect violate the Act. In that case, the Secretary found that a mobile home community's occupancy limit of three persons per dwelling had a discriminatory effect on families with children.[13] When the housing provider appealed the Secretary's order to the United States Court of Appeals for the Tenth Circuit, the Secretary of HUD defended his order, arguing that statistics showed that the housing policy, while neutral on its face, had a discriminatory effect on families with children because it served to exclude them at more than four times the rate of families without children.[14] Similarly, on appeal of another final agency decision holding that a housing policy had a disparate impact on families with children,[15] the Secretary of HUD, in his brief defending the decision before the United States Court of Appeals for the Ninth Circuit, discussed in detail the text and legislative history of the Act, as well as prior pronouncements by HUD that proof of a discriminatory intent is not

required to establish liability under the Act.[16]

HUD has interpreted the Act to include discriminatory effects liability not only in formal adjudications, but through various other means as well. In 1980, for example, Senator Charles Mathias read into the Congressional Record a letter that the Senator had received from the HUD Secretary describing discriminatory effects liability under the Act and explaining that such liability is "imperative to the success of civil rights law enforcement." [17] In 1994, HUD joined with the Department of Justice and nine other federal regulatory and enforcement agencies in approving and adopting a policy statement that, among other things, recognized that disparate impact is among the "methods of proof of lending discrimination under the * * * [Fair Housing] Act." [18] In this Policy Statement on Discrimination in Lending (Joint Policy Statement), HUD and the other regulatory and enforcement agencies recognized that "[p]olicies and practices that are neutral on their face and that are applied equally may still, on a prohibited basis, disproportionately and adversely affect a person's access to credit," and provided guidance on how to prove a disparate impact fair lending claim.[19]

Additionally, HUD's interpretation of the Act is further confirmed by regulations implementing the Federal Housing Enterprises Financial Safety and Soundness Act (FHEFSSA), in which HUD prohibited Fannie Mae and Freddie Mac from engaging in mortgage purchase activities that have a discriminatory effect in violation of FHEFSSA.[20] In addressing a concern for how the impact theory might operate under FHEFFSA, HUD explained that "the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law" and concluded that this Fair Housing Act disparate impact law "is applicable to all segments of the housing marketplace, including the GSEs" (government-sponsored enterprises).[21] In

---

[3] 42 U.S.C. 3601.

[4] *Trafficante* v. *Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (internal citation omitted).

[5] Id. at 209.

[6] Id. at 211.

[7] H. Res. 1095, 110th Cong., 2d Sess., 154 Cong. Rec. H2280–01 (April 15, 2008) (2008 WL 1733432).

[8] *See* 42 U.S.C. 3608(a).

[9] *See* 42 U.S.C. 3610, 3612.

[10] *See* 42 U.S.C. 3614a.

[11] *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 380 (1982).

[12] *See, e.g.*, *HUD* v. *Twinbrook Village Apts.*, No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Carlson*, No. 08–91–0077–1, 1995 WL 365009 (HUD ALJ June 12, 1995) ("A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a prima facie case that the policy or practice has a disparate impact on members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity."); *HUD* v. *Ross*, No. 01–92–0466–18, 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter*, No. 03–90–0058–1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[13] *HUD* v. *Mountain Side Mobile Estates P'ship*, No. 08–92–0010–1, 1993 WL 307069 (HUD Sec'y July 19, 1993), aff'd in relevant part, 56 F.3d 1243 (10th Cir. 1995).

[14] Brief for HUD Secretary as Respondent, *Mountain Side Mobile Estates P'ship* v. *HUD*, No. 94–9509 (10th Cir. 1994).

[15] *HUD* v. *Pfaff*, No. 10–93–0084–8, 1994 WL 592199, at *17 (HUD ALJ Oct. 27, 1994), rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996).

[16] Brief for HUD Secretary as Respondent, *Pfaff* v. *HUD*, No. 94–70898 (9th Cir. 1996).

[17] 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias reading into the record letter of HUD Secretary).

[18] Policy Statement on Discrimination in Lending, 59 FR 18266, 18269 (Apr. 15, 1994) ("Joint Policy Statement").

[19] *Id.*

[20] *See* 24 CFR 81.42 (2012).

[21] The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR 61846, 61867 (Dec. 1, 1995).

**11462**    **Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

promulgating this regulation, HUD also emphasized the importance of the Joint Policy Statement, explaining that "[a]ll the Federal financial regulatory and enforcement agencies recognize the role that disparate impact analysis plays in scrutiny of mortgage lending" and have "jointly recognized the disparate impact standard as a means of proving lending discrimination under the Fair Housing Act." [22]

Consistent with its longstanding interpretation of the Act, over the past two decades, HUD has regularly issued guidance to its staff that recognizes the discriminatory effects theory of liability under the Act. For instance, HUD's Assistant Secretary for Fair Housing and Equal Opportunity (FHEO) issued a memorandum in 1993 instructing HUD investigators to be sure to analyze complaints under the disparate impact theory of liability.[23] HUD's 1995 Title VIII Complaint Intake, Investigation and Conciliation Handbook (Enforcement Handbook), which set forth guidelines for investigating and resolving Fair Housing Act complaints, emphasized to HUD's enforcement staff that disparate impact is one of "the principal theories of discrimination" under the Fair Housing Act and required HUD investigators to apply it when appropriate.[24] HUD's 1998 version of the Enforcement Handbook, which is currently in effect, also recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in appropriate cases nationwide.[25]

In 1998, at Congress's direction, HUD published in the **Federal Register** previously-internal guidance from 1991 explaining when occupancy limits may violate the Act's prohibition of discrimination because of familial status, premised on the application of disparate impact liability.[26] More recently, HUD posted on its Web site guidance to its staff and others discussing how facially neutral housing policies addressing domestic violence can have a disparate impact on women in violation of the Act.[27]

Although several of the HUD administrative decisions, federal court holdings, and HUD and other federal agency public pronouncements on the discriminatory effects standard just noted were discussed in the preamble to HUD's November 16, 2011, proposed rule, HUD has described these events in the preamble to this final rule to underscore that this rule is not establishing new substantive law. Rather, this final rule embodies law that has been in place for almost four decades and that has consistently been applied, with minor variations, by HUD, the Justice Department and nine other federal agencies, and federal courts. In this regard, HUD emphasizes that the title of this rulemaking, "Implementation of the Fair Housing Act's Discriminatory Effects Standard," indicates that HUD is not proposing new law in this area.

As discussed in the preamble to the proposed rule (76 FR 70921, 70923), all federal courts of appeals to have addressed the question agree that liability under the Act may be established based on a showing that a neutral policy or practice has a discriminatory effect even if such a policy or practice was not adopted for a discriminatory purpose.[28] There is minor variation, however, in how evidence has been analyzed pursuant to this theory. For example, in adjudications, HUD has always used a three-step burden-shifting approach,[29] as do many federal courts of appeals.[30] One federal court of appeals applies a multi-factor balancing test,[31] other courts of appeals apply a hybrid between the two,[32] and one court of appeals applies a different test for public and private defendants.[33]

Another source of variation in existing law is in the application of the burden-shifting test. Under the three-step burden-shifting approach applied by HUD and the courts, the plaintiff (or, in administrative adjudications, the charging party) first must make a prima facie showing of either a disparate impact or a segregative effect. If the discriminatory effect is shown, the burden of proof shifts to the defendant (or respondent) to justify its actions. If the defendant (or respondent) satisfies its burden, the third step comes into play. There has been a difference of approach among the various appellate courts and HUD adjudicators as to which party bears the burden of proof at this third step, which requires proof as to whether or not a less discriminatory alternative to the challenged practice exists. All but one of the federal courts of appeals that use a burden-shifting approach place the ultimate burden of proving that a less discriminatory alternative exists on the plaintiff,[34] with some courts analogizing to the burden-shifting framework established for Title VII of the Civil Rights Act of 1964 (Title VII), which addresses employment discrimination.[35] The remaining court of appeals places the burden on the

---

[22] *Id.*

[23] Memorandum from the HUD Assistant Secretary for Fair Housing & Equal Opportunity, The Applicability of Disparate Impact Analysis to Fair Housing Cases (Dec. 17, 1993).

[24] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 7–12 (1995).

[25] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 2–27 (1998) ("a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations"); *id.* at 2–27 to 2–45 (HUD guidelines for investigating a disparate impact claim and establishing its elements).

[26] *See* 63 FR 70256 (Dec. 18, 1998) (publishing "Keating Memo" regarding reasonable occupancy standards); Quality Housing and Work Responsibility Act of 1998, Public Law 105–276, 112 Stat. 2461, § 589 (Oct. 21, 1998) (requiring publication of Keating Memo).

[27] Memorandum from HUD Office of Fair Housing & Equal Opportunity, Assessing Claims of Housing Discrimination Under the Fair Housing Act & the Violence Against Women Act 5–6 (Feb. 9, 2011). *http://www.hud.gov/offices/fheo/library/11-domestic-violence-memo-with-attachment.pdf.*

[28] *See, e.g. Graoch Assocs. #33, L.P.* v. *Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 374–78 (6th Cir. 2007); *Reinhart* v. *Lincoln Cnty.*, 482 F.3d 1225, 1229 (10th Cir. 2007); *Hallmark Developers, Inc.* v. *Fulton County, Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006); *Charleston Hous. Auth.* v. *U.S. Dep't of Agric.*, 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.*, 207 F.3d 43, 49–50 (1st Cir. 2000); *Simms* v. *First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Jackson* v. *Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith* v. *Volpe*, 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP* v. *Town of Huntington*, 844 F.2d 926, 937–38 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curiam); *Resident Advisory Bd.* v. *Rizzo*, 564 F.2d 126, 148 (3d Cir. 1977); *Betsey* v. *Turtle Creek Assocs.*, 736 F.2d 983, 987–89 & n.3 (4th Cir. 1984); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights*, 558 F.2d 1283, 1290–91 (7th Cir. 1977); *United States.* v. *City of Black Jack*, 508 F.2d 1179, 1184–86 (8th Cir. 1974).

[29] *See, e.g. HUD* v. *Twinbrook Village Apts.*, No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *HUD* v. *Pfaff*, 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996); *HUD* v.

*Mountain Side Mobile Estates P'ship*, 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter*, 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *see also* Joint Policy Statement, 59 FR 18269.

[30] *See, e.g. Charleston*, 419 F.3d at 740–42; *Langlois*, 207 F.3d at 49–50; *Huntington Branch*, 844 F.2d at 939.

[31] *See, e.g. Metro. Hous. Dev. Corp.*, 558 F.2d at 1290 (applying a four-factor balancing test).

[32] *See, e.g. Graoch*, 508 F.3d at 373 (balancing test incorporated as elements of proof after second step of burden-shifting framework); *Mountain Side Mobile Estates v. Sec'y HUD*, 56 F.3d 1243, 1252, 1254 (10th Cir. 1995) (incorporating a three-factor balancing test into the burden-shifting framework to weigh defendant's justification);.

[33] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. *See, e.g., Betsey* v. *Turtle Creek Assocs.*, 736 F.2d 983, 989 n.5 (4th Cir. 1984).

[34] *Compare Mt. Holly Gardens Citizens in Action, Inc.* v. *Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (burden of proving less discriminatory alternative ultimately on plaintiff), *and Gallagher* v. *Magner*, 619 F.3d 823, 834 (8th Cir. 2010) (same), *and Graoch*, 508 F.3d at 373–74 (same), *and Mountain Side Mobile Estates*, 56 F.3d at 1254 (same), *with Huntington Branch*, 844 F.2d at 939 (burden of proving no less discriminatory alternative exists on defendant).

[35] *See, e.g., Graoch*, 508 F.3d at 373 ("[C]laims under Title VII and the [Fair Housing Act] generally should receive similar treatment").

defendant to show that no less discriminatory alternative to the challenged practice exists.[36] HUD's administrative law judges have, at times, placed this burden of proof concerning a less discriminatory alternative on the respondent and, at other times, on the charging party.[37]

Through this rulemaking and interpretative authority under the Act, HUD formalizes its longstanding view that discriminatory effects liability is available under the Act and establishes uniform standards for determining when a practice with a discriminatory effect violates the Fair Housing Act.

## III. The November 16, 2011, Proposed Rule

On November 16, 2011, HUD published a proposed rule in the **Federal Register** (76 FR 70921) addressing the discriminatory effects theory of liability under the Act. Specifically, HUD proposed adding a new subpart G to 24 CFR part 100, which would formalize the longstanding position held by HUD and the federal courts that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, regardless of whether the practice was adopted for a discriminatory purpose, and would establish uniform standards for determining when such a practice violates the Act.

In the proposed rule, HUD defined a housing practice with a "discriminatory effect" as one that "actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

A housing practice with a discriminatory effect would still be lawful if supported by a "legally sufficient justification." HUD proposed that a "legally sufficient justification" exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent or defendant; and (2)

those interests cannot be served by another practice that has a less discriminatory effect.

Consistent with its own past practice and that of many federal courts, HUD proposed a burden-shifting framework for determining whether liability exists under a discriminatory effects theory. Under the proposed burden-shifting approach, the charging party or plaintiff in an adjudication first bears the burden of proving that a challenged practice causes a discriminatory effect. If the charging party or plaintiff meets this burden, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of its legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that the legitimate, nondiscriminatory interest can be served by another practice that has a less discriminatory effect.

In the proposed rule, HUD explained that violations of various provisions of the Act may be established by proof of discriminatory effects, including 42 U.S.C. 3604(a), 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606 (see 76 FR 70923 n.20), and that discriminatory effects liability applies to both public and private entities (see 76 FR 70924 n.40).

HUD also proposed to revise 24 CFR part 100 to add examples of practices that may violate the Act under the discriminatory effects theory.

## IV. Changes Made at the Final Rule Stage

In response to public comment, a discussion of which is presented in the following section, and in further consideration of issues addressed at the proposed rule stage, HUD is making the following changes at this final rule stage:

### A. Changes to Subpart G

The final rule makes several minor revisions to subpart G in the proposed rule for clarity. The final rule changes "housing practice" to "practice" throughout proposed subpart G to make clear that the standards set forth in subpart G are not limited to the practices addressed in subpart B, which is titled "Discriminatory Housing Practices." The final rule replaces "under this subpart" with "under the Fair Housing Act" because subpart G outlines evidentiary standards for proving liability under the Fair Housing Act. The final rule also replaces the general phrase "prohibited intent" with

the more specific "discriminatory intent."

The final rule slightly revises the definition of discriminatory effect found in proposed § 100.500(a), without changing its meaning, to condense the definition and make it more consistent with terminology used in case law. Proposed § 100.500(a) provided that "[a] housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin." Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."

To clarify "legally sufficient justification" and in particular, what HUD meant in the proposed rule by "a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests," HUD is revising the definition found in proposed § 100.500(b) to read as follows: "(1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and (ii) Those interests could not be served by another practice that has a less discriminatory effect. (2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative * * *." This revision to the definition of "legally sufficient justification" includes changing "cannot be served," the phrasing used in the proposed rule, to "could not be served."

This revised definition of "legally sufficient justification" also appears in § 100.500(c)(2) and, in essentially the same form, in § 100.500(c)(3). The final rule also replaces the word "demonstrating" with "proving" in § 100.500(c)(3) in order to make clear that the burden found in that section is one of proof, not production.

In addition to these changes, the final rule makes several minor corrections to § 100.500. The final rule substitutes "42

---

[36] *Huntington Branch,* 844 F.2d at 939.

[37] *Compare, e.g., HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992) (respondent bears the burden of showing that no less discriminatory alternative exists), *and HUD* v. *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) (same), *with HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (charging party bears the burden of showing that a less discriminatory alternative exists), *and HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) (same).

**11464**     **Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

U.S.C. 3610'' with ''42 U.S.C. 3612'' in § 100.500(c)(1) because the procedures for a formal adjudication under the Act are found in 42 U.S.C. 3612. Also in § 100.500(c)(1), the final rule changes ''proving that a challenged practice causes a discriminatory effect'' to ''proving that a challenged practice caused or predictably will cause a discriminatory effect.'' This edit is required for consistency with the Fair Housing Act and § 100.500(a), which prohibit actions that predictably result in discrimination.

The final rule further corrects proposed § 100.500(c)(1) and (2) to replace ''complainant'' with ''charging party'' because in cases tried before HUD administrative law judges, the charging party—and not the complainant—has the same burden of proof as a plaintiff in court. Under the provisions of the Act governing adjudication of administrative complaints, an aggrieved person may file a complaint with the Secretary alleging a discriminatory housing practice, or the Secretary may file such a complaint,[38] but it is the Secretary who issues the charge of discrimination and prosecutes the case before the Administrative Law Judge, on behalf of the aggrieved person.[39] Any aggrieved person may intervene as a party in the proceeding,[40] in which case the intervener would bear the same burden of proof as the charging party or a plaintiff in a judicial action.

*B. Changes to Illustrations*

The illustrations added in this rule, as well as the existing illustrations in part 100, represent HUD's interpretation of conduct that is illegal housing discrimination under the Fair Housing Act. Liability can be established for the conduct illustrated in part 100 through evidence of intentional discrimination, or based on discriminatory effects pursuant to the standards set forth in subpart G, depending on the nature of the potential violation.

In order to make clear that the Fair Housing Act violations illustrated in part 100 may be proven through evidence of intentional discrimination or discriminatory effects, as the evidence permits, and that any potential discriminatory effects violation must be assessed pursuant to the standards set forth in § 100.500, the final rule amends paragraph (b) of § 100.5 to add at the end the following sentence: ''The illustrations of unlawful housing discrimination in this part may be

established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500.''

The final rule revises the illustrations of discriminatory housing practices in the proposed rule, rephrasing them in more general terms. The language of the added illustrations, which in the proposed rule included paraphrasing the definition of discriminatory effect from subpart G, is revised to eliminate the paraphrasing, which is unnecessary after the addition to paragraph (b) of § 100.5. This revision is also intended to eliminate any potential negative implication from the proposed rule that the existing illustrations in part 100 could not be proven through an effects theory. In addition to this general streamlining of the illustrations in the proposed rule, the final rule makes the following specific revisions to the illustrations.

In order to avoid redundancy in HUD's Fair Housing Act regulations, this final rule eliminates proposed § 100.65(b)(6). The substance of proposed § 100.65(b)(6), which covers ''Providing different, limited, or no governmental services such as water, sewer, or garbage collection'' is already captured by existing § 100.65(b)(4), which prohibits ''Limiting the use of privileges, services, or facilities associated with a dwelling,'' and existing § 100.70(d)(4), which prohibits ''Refusing to provide municipal services * * * for dwellings or providing such services differently.''

In response to public comment, the final rule adds ''enacting'' and ''ordinance'' to § 100.70(d)(5). These changes confirm that an ordinance is one type of land-use decision that is covered by the Act, under a theory of intentional discrimination or discriminatory effect, and that land-use decisions may discriminate from the moment of enactment. This final rule therefore revises proposed § 100.70(d)(5) to give the following as an illustration of a prohibited practice: ''Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.'' The final rule removes ''cost'' and ''terms or conditions'' from proposed § 100.120(b)(2) and adds them to § 100.130. This revision is not intended to make any substantive changes to HUD's interpretation of the Act's coverage, but rather is for organizational purposes only: § 100.120 addresses

discrimination in the making and provision of loans and other financial assistance, while § 100.130 addresses discriminatory terms or conditions. Other minor streamlining changes are made to existing § 100.120(b). Accordingly, this final rule revises § 100.120(b) to read as set forth in the regulatory text of the rule.

The final rule amends existing § 100.130(b)(2) to add ''or conditions'' and the term ''cost'' to the list of potentially discriminatory terms or conditions of loans or other financial assistance. It also adds new § 100.130(b)(3), which, in response to a public comment, illustrates that servicing is a condition of loans or other financial assistance covered by section 805.[41] Because, as noted above, at the final rule stage ''terms and conditions'' is removed from proposed § 100.120(b)(2), new § 100.130(b)(3) also addresses the provision of loans or other financial assistance with terms or conditions that have a discriminatory intent or effect. As a result of these changes, new § 100.130(b)(3) reads as follows: ''Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin.''

**V. The Public Comments**

The public comment period for the November 16, 2011, proposed rule closed on January 17, 2012. Ninety-six public comments were received in response to the proposed rule. Comments were submitted by a wide variety of interested entities, including individuals, fair housing and legal aid organizations, state and local fair housing agencies, Attorneys General from several States, state housing finance agencies, public housing agencies, public housing trade associations, insurance companies, mortgage lenders, credit unions, banking trade associations, real estate agents, and law firms.[42] This section of the preamble, which addresses significant issues raised in the public

---

[38] 42 U.S.C. 3610(a)(1)(A).

[39] 42 U.S.C. 3610(g)(2)(A), 3612.

[40] 42 U.S.C. 3612(c).

[41] 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate section 804 of the Act, 42 U.S.C. 3604.

[42] All public comments on this rule can be found at *www.regulations.gov*, specifically at *http://www.regulations.gov/#!searchResults;rpp=50;po=0;dktid=HUD-2011-0138*.

comments, organizes the comments by subject category, with a brief description of the issue (or set of related issues) followed by HUD's response.

Many comments were received in support of the rule generally and in support of the proposed discriminatory effects standard in particular. This summary does not provide a response to comments that expressed support for the proposed rule. Supportive comments included statements asserting that the rule: advances the goals of the Fair Housing Act; offers a well-reasoned standard for analyzing discriminatory effects claims; provides a national standard for courts, housing providers, municipalities and the financial and insurance industries; provides clarity to housing providers, housing seekers, and others; will decrease litigation by clarifying the burdens of proof; and will help address a lack of adequate housing for older persons even though age is not a protected characteristic under the Act because older persons may be affected by practices with a discriminatory effect based on disability. Commenters stated that the rule is particularly necessary to maintain protections against discriminatory and abusive practices in the mortgage industry, as the Fair Housing Act covers activities in residential real estate-related transactions that may not be covered by the Equal Credit Opportunity Act (ECOA).[43] A commenter stated that the rule's flexible standard is appropriate, as no rigid formula fits the variety of practices that exist in a rapidly evolving housing market.

Several commenters supported discriminatory effects liability under the Act in general, stating that it is widely agreed that discriminatory effects analysis is critically important to vigorous enforcement of the Fair Housing Act, and that the rule is consistent with HUD's longstanding interpretation and the interpretation of the federal courts of appeals. Commenters in support of the importance of the effects test proffered the following: if the effects approach were no longer available, "the proverbial door to equal housing opportunity will be slammed in the face of many victims"; the effects analysis is particularly important with respect to

the protection of persons with disabilities and in familial status cases; municipal land use decisions are more likely to have a discriminatory effect on minorities when they unreasonably attempt to restrict affordable housing; the effects analysis is important to environmental justice investigations; the discriminatory effects standard encourages housing providers to develop creative ways to achieve their economic objectives while promoting diversity; the effects standard gives HUD and fair housing advocates the tools to reveal the effects of racism, poverty, disability discrimination, and adverse environmental conditions on the health and well-being of individuals protected by the law; the rule provides practical administrative guidance for HUD attorneys and administrative law judges, as well as for the state and local fair housing agencies that share responsibility with HUD for adjudicating fair housing complaints; and the disparate impact standard is important in addressing discrimination in lending and denial of access to credit, which are often the results of neutral policies that have a disparate impact on protected groups.

Some commenters supported the proposed rule's allocation of the burden of proof, stating that the rule is practical and supported by longstanding precedent, and that it provides clear guidance to housing providers and government agencies in adopting rules and policies and an objective method for courts to evaluate discriminatory effect claims. A commenter stated that the perpetuation of segregation theory of effects liability is supported by the legislative history of Title VIII and the obligation to affirmatively further fair housing found in 42 U.S.C. 3608(d).

Following are the remaining issues raised by the public comments and HUD's responses.

### A. Validity of Discriminatory Effects Liability Under the Act

*Issue:* Some commenters opposed the rule because, in their view, the Act's text cannot be interpreted to include liability under a discriminatory effects theory. Commenters stated that the Fair Housing Act does not include an effects standard because it does not use the phrase "adversely affect," as in Title VII, the Age Discrimination in Employment Act (ADEA), or the Americans with Disabilities Act. One of these commenters stated that the Fair Housing Act does not include any of the words in other statutes that have been interpreted as giving rise to disparate impact claims, such as "affect" and "tend to." A commenter found the

"otherwise make unavailable or deny" language in the Fair Housing Act unpersuasive evidence that Congress intended the Act to include an effects test because it is a catchall phrase at the end of a list of prohibited conduct, and it must be read as having a similar meaning as the specific items on the list.

Some commenters stated that the Act's prohibition of certain practices "because of," "on account of," or "based on" a protected classification necessitates a showing of discriminatory intent. A commenter stated that "because of" and "on account of," as used in every provision of the Act, require evidence of intent because the same phrases are used in two provisions of the Act that cannot plausibly be interpreted to employ discriminatory effects liability. In this regard, this commenter pointed to 42 U.S.C. 3631, which uses the phrase "because of" to create criminal liability for specific fair housing violations, and 42 U.S.C. 3617, which uses the phrase "on account of" to ban coercion and intimidation of those exercising fair-housing rights.

Other commenters expressed support for a rule setting out the discriminatory effects theory of liability. Some of these commenters stated that Congress intended that such liability exist and that the text of the Act readily supports this position. Commenters stated that discriminatory effects liability best effectuates Congress's broad, remedial intent in passing the Fair Housing Act and the Act's stated purpose of providing for fair housing, within constitutional limitations, throughout the country. Commenters pointed out, through examples of neutral practices with discriminatory results that they have encountered, that an effects theory of liability continues to be vital in achieving the Act's broad goal. Commenters stated that, consistent with HUD's interpretation of the Act, federal courts have unanimously held that liability may be established by proof of discriminatory effects.

*HUD Response:* As the preamble to the proposed rule and this final rule make clear, both HUD and the federal courts have long interpreted the Fair Housing Act to prohibit actions that have an unjustified discriminatory effect, regardless of whether the action was motivated by a discriminatory intent. Section 804(a) of the Act makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex,

---

[43] ECOA prohibits any creditor from discriminating in credit transactions on the basis of race, color, national origin, religion, age, sex, marital status, or public assistance program participation. *See* 15 U.S.C. 1691(a). By comparison, Section 805 of the Fair Housing Act prohibits any person whose business includes engaging in residential-related transactions from discriminating in such transactions on the basis of race, color, religion, sex, disability, familial status, or national origin. *See* 42 U.S.C. 3605.

familial status, or national origin.'' [44] Similarly, section 804(f)(1) makes it unlawful ''[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap.'' [45] This ''otherwise make unavailable or deny'' formulation in the text of the Act focuses on the effects of a challenged action rather than the motivation of the actor. In this way, the provisions are similar to the ''otherwise adversely affect'' formulation that the Supreme Court found to support disparate impact liability under Title VII and the ADEA.[46] And, indeed, the federal courts have drawn the analogy between Title VII and the Fair Housing Act in interpreting the Act to prohibit actions that have an unjustified discriminatory effect, regardless of intent.[47]

In addition, many of the Fair Housing Act's provisions make it unlawful ''to discriminate'' in certain housing-related transactions based on a protected characteristic.[48] ''Discriminate'' is a term that may encompass actions that have a discriminatory effect but not a discriminatory intent.[49] HUD's extensive experience in administering the Fair Housing Act and in investigating and adjudicating claims arising under the Act, which is discussed in this preamble and that of the proposed rule,[50] informs its conclusion that not only can the term ''discriminate'' be interpreted to encompass discriminatory effects liability, but it must be so interpreted in order to achieve the Act's stated purpose to provide for fair housing to the extent the Constitution allows.[51] Indeed, as far back as 1980, the HUD Secretary explained to Congress why discriminatory effects liability under the Fair Housing Act is ''imperative to the success of civil rights enforcement.'' [52] Only by eliminating practices with an unnecessary disparate impact or that unnecessarily create, perpetuate, increase, or reinforce segregated housing patterns, can the Act's intended goal to advance equal housing opportunity and achieve integration be realized.[53] In keeping with the broad remedial goals of the Fair Housing Act,[54] HUD interprets the term ''discriminate,'' as well as the language in sections 804(a) and 804(f)(1) of the Act, to encompass liability based on the results of a practice, as well as any intended effect.

The ''because of'' phrase found in sections 804 and 805 of the Act [55] and similar language such as ''on account of'' or ''based on'' does not signal that Congress intended to limit the Act's coverage to intentional discrimination. Both section 703(a)(2) of Title VII [56] and section 4(a)(2) of the ADEA [57] prohibit certain actions ''because of'' a protected characteristic, yet neither provision requires a finding of discriminatory intent.[58] Moreover, the fact that the phrases ''on account of'' and ''because of'' appear in sections 817 and 831 of the Fair Housing Act [59] does not preclude finding discriminatory effects liability under the Act's other substantive provisions using the same language because, as discussed above, HUD bases its interpretation of those other provisions on other language not found in sections 817 and 831, such as the phrase ''otherwise make unavailable or deny a dwelling'' and the term ''discriminate.''

HUD's interpretation is confirmed by the fact that the Act's text contains three exemptions that presuppose that the Act encompasses an effects theory of liability. For one, section 805(c) of the Act allows ''a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.'' [60] If the Act prohibited only intentional discrimination, it would not be unlawful to ''take into consideration factors other than'' protected characteristics in the first instance, and this exemption would be superfluous. Second, section 807(b)(1) of the Act states that ''[n]othing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.'' [61] Since ''the number of occupants permitted to occupy a dwelling'' is not a protected classification under the Act, this provision makes sense only as authorizing occupancy limits that would otherwise violate the Act based on an effects theory.[62] Indeed, in 1991, HUD issued a memorandum to its staff explaining when occupancy limits would violate the Act based on disparate impact liability, and Congress later directed HUD to publish these guidelines in the **Federal Register**.[63] Third, section 807(b)(4) of the Act states that ''[n]othing in this title prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance.'' [64] As with the two exemptions discussed above, this provision would be wholly unnecessary if the Act prohibited only intentional discrimination.

---

[44] 42 U.S.C. 3604(a).

[45] 42 U.S.C. 3604(f)(1).

[46] *See Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431 (1971) (holding that Title VII includes a disparate impact standard); *Smith* v. *City of Jackson, Miss.,* 544 U.S. 228, 235 (2005) (affirming that the holding in *Griggs* represented the best reading of Title VII's text); *id.* at 240 (holding that section 4(a)(2) of the ADEA includes a disparate impact standard); *see also Nat'l Cmty. Reinvestment Coalition* v. *Accredited Home Lenders Holding Co.,* 573 F. Supp. 2d 70, 78 (D.DC 2008) (holding that the Fair Housing Act encompasses disparate impact liability because, among other reasons, language in the Act is analogous to language in the ADEA found by the Supreme Court to include disparate impact).

[47] *See Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 146 (3d Cir. 1977) (''[I]n Title VIII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response.''); *Graoch,* 508 F.3d at 374 (quoting *Griggs,* 401 U.S. at 431) (''The Supreme Court held that Title VII, which uses similar language [to Title VIII], 'proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.' The same analysis justifies the existence of disparate-impact liability under the FHA.'').

[48] *See* 42 U.S.C. 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606.

[49] *See, e.g., Alexander* v. *Choate,* 469 U.S. 287, 299 (1985) (assuming without deciding that section 504 of the Rehabilitation Act of 1973, which prohibits ''subject[ing] to discrimination'' otherwise qualified handicapped individuals, ''reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped''); *Board. of Ed.* v. *Harris,* 444 U.S. 130, 140–41 (1979) (concluding that the term ''discrimination,'' as used in the 1972 Emergency School Aid Act, was ambiguous and proscribed actions that had a disparate impact).

[50] *See supra* nn. 12–27; preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.

[51] In enacting the Fair Housing Act, Congress expressed its desire to provide, within constitutional limitations, for fair housing throughout the United States. *See* 42 U.S.C. 3601.

[52] *See* 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias) (reading into the record letter of HUD Secretary).

[53] *See supra* nn. 3–7; *infra* nn. 65–69.

[54] *See supra* note 11.

[55] 42 U.S.C. 3604 and 3605.

[56] 42 U.S.C. 2000e–2(a)(2).

[57] 29 U.S.C. 623(a)(2).

[58] *See Meacham* v. *Knolls Atomic Power Lab.,* 554 U.S. 84, 96 (2008) (explaining that, ''in the typical disparate-impact case'' under the ADEA, ''the employer's practice is 'without respect to age' and its adverse impact (though 'because of age') is 'attributable to a nonage factor' ''); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 147 (3d Cir. 1977) (''[T]he 'because of race' language is not unique to § 3604(a): that same language appears in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), yet a prima facie case of Title VII liability is made out when a showing of discriminatory effect (as distinct from intent) is established.'').

[59] 42 U.S.C. 3617 and 3631.

[60] 42 U.S.C. 3605(c).

[61] 42 U.S.C. 3607(b)(1).

[62] *See City of Jackson,* 544 U.S. at 238–39 (explaining that the ADEA's provision that allows an employer ''to take any action otherwise prohibited * * * where the differentiation is based on reasonable factors other than age'' would be ''simply unnecessary'' if the ADEA prohibited only intentional discrimination).

[63] *See supra* note 26.

[64] 42 U.S.C. 3607(b)(4).

The legislative history of the Act informs HUD's interpretation. The Fair Housing Act was enacted after a report by the National Advisory Commission on Civil Disorders, which President Johnson had convened in response to major riots taking place throughout the country, warned that "[o]ur Nation is moving toward two societies, one black, one white—separate and unequal." [65] The Act's lead sponsor, Senator Walter Mondale, explained in the Senate debates that the broad purpose of the Act was to replace segregated neighborhoods with "truly integrated and balanced living patterns." [66] Senator Mondale recognized that segregation was caused not only by "overt racial discrimination" but also by "[o]ld habits" which became "frozen rules," [67] and he pointed to one such facially neutral practice—the "refusal by suburbs and other communities to accept low-income housing." [68] He further explained some of the ways in which federal, state, and local policies had formerly operated to require segregation and argued that "Congress should now pass a fair housing act to undo the effects of these past" discriminatory actions. [69]

Moreover, in the approximately 20 years between the Act's enactment in 1968 and its amendment in 1988, the nine federal courts of appeals to address the issue held that the Act prohibited actions with a discriminatory effect. [70] Congress was aware of this widespread judicial agreement when it significantly amended the Act in 1988. [71] At that time, the House Committee on the Judiciary specifically rejected an amendment that would have provided that "a zoning decision is not a violation of the Fair Housing Act unless the decision was made with the intent to discriminate." [72] Instead of adding this intent requirement to the Act, Congress chose to maintain the Act's operative text barring discrimination and making unavailable or denying housing, to extend those prohibitions to disability and familial status, and to establish the exemptions discussed above that presuppose the availability of a discriminatory effects theory of liability. [73] The failed attempt in 1988 to impose an intent requirement on the Act followed five other failed attempts, in 1980, [74] 1981, [75] 1983, [76] 1985, [77] and 1987. [78]

*Issue:* Two commenters stated that, when promulgating regulations implementing the Fair Housing Amendments Act of 1988, HUD stated in the preamble that the "regulations are not designed to resolve the question of whether intent is or is not required to show a violation" of the Act. [79] A commenter faulted HUD for failing to explain what the commenter perceived as a change in its official interpretation of the Act, and urged HUD to eliminate disparate impact liability from the rule. Some commenters stated that President Reagan, when signing the Fair Housing Amendments Act of 1988, expressed his opinion that the amendment "does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that [Fair Housing Act] violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent." [80] Some commenters also stated that, in 1988, the United States Solicitor General submitted an amicus brief to the U.S.

Supreme Court in *Huntington Branch, NAACP* v. *Town of Huntington* asserting that a violation of the Fair Housing Act requires a finding of intentional discrimination. [81]

*HUD Response:* While HUD chose not to use the regulations implementing the Fair Housing Amendments Act of 1988 to opine formally on whether a violation under the Act may be established absent discriminatory intent, it has never taken the position that the Act requires a finding of intentional discrimination. On the contrary, through formal adjudications and various other means, including other regulations, interpretive guidance, and statements to Congress, HUD has consistently construed the Act as encompassing discriminatory effects liability. [82] HUD's prior interpretations of the Act regarding the discriminatory effects standard are entitled to judicial deference. [83] Neither President Reagan's signing statement nor the Solicitor General's amicus brief in *Huntington Branch* affects or overrides the longstanding, consistent construction of the Act by HUD, the agency with delegated authority to administer the Act and to promulgate rules interpreting it. Moreover, the Department of Justice both before and after *Huntington Branch* has taken the position that the Fair Housing Act includes discriminatory effects liability. [84]

### B. Definition of Discriminatory Effect, § 100.500(a)

In order to make it more concise and more consistent with terminology used in case law without changing its substance, this final rule slightly revises the definition of "discriminatory effect."

Proposed § 100.500(a) provided that "A housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of

---

[65] Report of the National Advisory Commission on Civil Disorders 1 (1968).

[66] 90 Cong. Rec. 3422 (1968).

[67] 114 Cong. Rec. 3421 (1968).

[68] *Id.* at 2277.

[69] *Id.* at 2669.

[70] *See, e.g., Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 935–36 (2d Cir.), aff'd, 488 U.S. 15 (1988); *Hanson* v. *Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur* v. *City of Toledo,* 782 F.2d 565, 574–75 (6th Cir. 1986); *United States* v. *Marengo Cnty. Comm'n,* 731 F.2d 1546, 1559 n.20 (11th Cir. 1984); *Smith* v. *Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982); *Halet* v. *Wend Inv. Co.,* 672 F.2d 1305, 1311 (9th Cir. 1982); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 146 (3d Cir. 1977); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978); *United States* v. *City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir. 1974).

[71] *See, e.g.,* H.R. Rep. No. 100–711, at 2182 (1988) (citing courts of appeals decisions in discussing a policy that could have a "discriminatory effect" on minority households ("[b]ecause minority households tend to be larger"); 134 Cong. Rec. 23711–12 (1988) (Statement of Sen. Kennedy) (noting unanimity of courts of appeals as to the disparate impact test); Fair Housing Amendments Act of 1987: Hearings Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary, 100th Cong., 1st Sess. 529–557 (1987) (testimony of Prof. Robert Schwemm, Univ. of Ky. Law Sch.) (discussing "strong consensus" in federal courts of

appeals that the Fair Housing Act prohibited disparate impact discrimination).

[72] *See* H.R. Rep. No. 100–711, at 89–91 (1988) (dissenting views of Rep. Swindall).

[73] *See* Fair Housing Amendments Act of 1988, Pub. L. 100–430, 102 Stat. 1619 (1988).

[74] H.R. Rep. No. 96–865, at 2 (1980) (The Act "effectively proscribed housing practices with the intent or effect of discriminating on account of race, color, national origin, or religion."); 126 Cong. Rec. 31,164 (1980) (explaining that the addition of an intent requirement "would make a radical change in the standard of proof in title VIII cases") (statement of Sen. Bayh).

[75] 127 Cong. Rec. 22,156 (1981).

[76] 129 Cong. Rec. 808 (1983).

[77] S. 139, 99th Cong. § 6(e) (1985).

[78] 133 Cong. Rec. 7180 (1987).

[79] 54 FR 3232, 3235 (Jan. 23, 1989).

[80] Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988).

[81] *See* Brief for United States as Amicus Curiae, *Town of Huntington* v. *Huntington Branch, NAACP,* 488 U.S. 15 (1988) (No. 97–1961).

[82] *See, e.g.,* nn. 12–27, *supra.*

[83] *See, e.g., United States* v. *Mead Corp.,* 533 U.S. 218, 230 & n.12 (2001) (*Chevron* deference is warranted for formal adjudications).

[84] *See United States.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974); *see also* Brief for the United States as Amicus Curiae, *Magner* v. *Gallagher,* 132 S. Ct. 1306 (2012) (No. 10–1032).

persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.''

Commenters raised a number of issues with respect to the definition of ''discriminatory effect.''

*Issue:* Two commenters requested that HUD expand the definition of ''housing practice'' to include the language from the preamble to the proposed rule that provided examples of facially neutral actions that may result in a discriminatory effect, ''e.g. laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria,'' to make clear that the Act does not apply only to housing ''practices.''

*HUD Response:* The Act and HUD regulations define ''discriminatory housing practice'' broadly as ''an act that is unlawful under section 804, 805, 806, or 818.'' [85] As HUD explained in the preamble to the proposed rule, any facially neutral actions, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act. Given the breadth of the definition of ''discriminatory housing practice,'' and the examples provided in the preamble to the proposed rule, HUD does not agree that it is necessary to provide those examples in the text of the regulation. The final rule does, however, replace ''housing practice'' with ''practice'' in order to make clear it applies to the full range of actions that may violate the Fair Housing Act under an effects theory.

*Issue:* A commenter stated that, in light of the Supreme Court's decision in *Wal-Mart Stores, Inc.* v. *Dukes,* [86] HUD should ''remove those aspects of the proposed rule that would give rise to disparate impact liability based on the exercise of discretion.''

*HUD Response:* HUD does not agree that the Supreme Court's decision in *Wal-Mart* means that policies permitting discretion may not give rise to discriminatory effects liability under the Fair Housing Act. The opinion in *Wal-Mart* did not address the substantive standards under the Fair Housing Act but instead addressed the issue of class certification under Title VII. Moreover, even in that context, the opinion in *Wal-Mart* does not shield policies that allow for discretion from liability under Title

VII. On the contrary, the Supreme Court confirmed that an employer who permits his managers to exercise discretion may be liable under Title VII pursuant to a disparate impact theory, ''since an employer's undisciplined system of subjective decision-making can have precisely the same effects as a system pervaded by impermissible intentional discrimination.'' [87]

*Issue:* Some commenters asked HUD to remove the word ''predictably'' from the proposed definition. One commenter made this request out of concern that such a definition would make good faith compliance with the Act difficult, and another because claims based on a predictable impact are too speculative. Another commenter expressed support for the inclusion of ''predictably'' in the definition because discrimination cases often involve members of a protected class who predictably would be impacted by the challenged practice. As an example, the commenter stated that a challenge to a zoning or land use ordinance might focus on persons who would be excluded from residency by application of the ordinance.

*HUD Response:* HUD agrees with the latter commenter that the Act is best interpreted as prohibiting actions that predictably result in an unjustified discriminatory effect. HUD's interpretation is supported by the plain language of the Fair Housing Act, which defines ''aggrieved person'' as any person who ''believes that such person will be injured by a discriminatory housing practice that is about to occur,'' [88] and which specifically authorizes HUD to take enforcement action and ALJs and courts to order relief with respect to discrimination that ''is about to occur.'' [89] Moreover, courts interpreting the Fair Housing Act have agreed that predictable discriminatory effects may violate the Act. [90]

*Issue:* A commenter requested that the preamble or the text of the final rule make clear that reasonable data, such as data from the U.S. Census Bureau, data required by the Home Mortgage Disclosure Act (HMDA), and HUD data

on the occupancy of subsidized housing units, can be used to demonstrate that a practice predictably results in a discriminatory effect.

*HUD Response:* The purpose of the rule, as identified in the November 16, 2011, proposed rule, is to formalize a long-recognized legal interpretation and establish a uniform legal standard, rather than to describe how data and statistics may be used in the application of the standard. The appropriate use of such data is discussed in other federal sources, including the Joint Policy Statement.

*Issue:* Several commenters expressed concern that the proposed rule did not explain the degree to which a practice must disproportionately impact one group over another. A few commenters expressed the opinion that, in order for a practice to violate the Act, the practice must result in a significant or non-trivial discriminatory effect. A commenter wrote that members of a protected class must be impacted in a manner that is ''meaningfully different'' from any impact on other individuals. Another commenter suggested defining a disparate impact as a 20 percent difference between the relevant groups. Another stated that the impact should be ''qualitatively different.'' A commenter wrote that, in the lending context, a disparate impact should not exist where statistics only show that a protected class, on an aggregate basis, has not received as many loans as the general population. Another commenter stated concern that the rule would allow small statistical differences in the pricing of loans to be actionable.

*HUD Response:* As stated in the response to the preceding issue, this rule concerns the formalization of a long-recognized legal interpretation and burden-shifting framework, rather than a codification of how data and statistics may be used in the application of the standard. To establish a prima facie case of discriminatory effects liability under the rule, the charging party or plaintiff must show that members of a protected class are disproportionately burdened by the challenged action, or that the practice has a segregative effect. Whether a particular practice results in a discriminatory effect is a fact-specific inquiry. Given the numerous and varied practices and wide variety of private and governmental entities covered by the Act, it would be impossible to specify in the rule the showing that would be required to demonstrate a discriminatory effect in each of these contexts. HUD's decision not to codify a significance requirement for pleading purposes is consistent with the Joint

---

[85] 42 U.S.C. 3602(f); 24 CFR 100.20.
[86] 131 S. Ct. 2541 (2011).

[87] Id. at 2554 (internal brackets and quotation omitted).

[88] 42 U.S.C. 3602(i).

[89] *See* 42 U.S.C. 3610(g)(2)(A); 3612(g)(3); 3613(c)(1); 3614(d)(1)(A).

[90] *See, e.g., Pfaff* v. *HUD,* 88 F.3d at 745 ('''Discriminatory effect' describes conduct that actually or predictably resulted in discrimination.''); *United States.* v. *City of Black Jack,* 508 F.2d at 1184 (''To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect.'').

Policy Statement,[91] the statutory codification of the disparate impact standard under Title VII,[92] and the Consumer Financial Protection Bureau's interpretation of the disparate impact standard under ECOA.[93]

*Issue:* Two commenters stated that, in order to establish a prima facie case of discriminatory effect liability, a charging party or plaintiff should have to identify a specific practice and show that the alleged discriminatory effect is caused by that specific practice, with a commenter referring to *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989), in support of this position.

*HUD Response:* HUD addressed this issue at the proposed rule stage, and its analysis is not changed in this final rule. Under this rule, the charging party or plaintiff has the burden of proving that a challenged practice causes a discriminatory effect.[94] In HUD's experience, identifying the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis. Moreover, as recognized in the employment context under Title VII, the elements of a decision-making process may not be capable of separation for analysis,[95] in which case it may be appropriate to challenge the decision-making process as a whole. For example, in a reverse redlining case, there may be multiple acts or policies which together result in a discriminatory effect.[96]

*Issue:* Commenters expressed concern with the definition of "discriminatory

effect" because it included a practice that has "the effect of creating, perpetuating, or increasing segregated housing patterns" based on protected class. A commenter asked that "segregation" be removed from the proposed definition. Another commenter expressed concern that this portion of the definition would extend liability beyond the factual circumstances of the cases HUD cited as examples in the proposed rule's preamble because, according to the commenter, most of those cases raised at least a suggestion of intentional discrimination. A commenter stated that "perpetuating" should be more clearly defined so that the rule states, for example, whether the term requires an attempt to segregate further, or merely a practice that continues existing patterns of segregation. Another commenter expressed the related opinion that "not explicitly fostering integration" should never form the basis for liability under the Act.

*HUD Response:* As discussed in the preambles to both the proposed rule and this final rule, the elimination of segregation is central to why the Fair Housing Act was enacted.[97] HUD therefore declines to remove from the rule's definition of "discriminatory effects" "creating, perpetuating, or increasing segregated housing patterns." [98] The Fair Housing Act was enacted to replace segregated neighborhoods with "truly integrated and balanced living patterns." [99] It was structured to address discriminatory housing practices that affect "the whole community" as well as particular segments of the community,[100] with the goal of advancing equal opportunity in housing and also to "achieve racial integration for the benefit of all people in the United States." [101] Accordingly, the Act prohibits two kinds of unjustified discriminatory effects: (1) harm to a particular group of persons by a disparate impact; and (2) harm to the community generally by creating, increasing, reinforcing, or perpetuating

segregated housing patterns.[102] Recognizing liability for actions that impermissibly create, increase, reinforce, or perpetuate segregated housing patterns directly addresses the purpose of the Act to replace segregated neighborhoods with "truly integrated and balanced living patterns." For example, the perpetuation of segregation theory of liability has been utilized by private developers and others to challenge practices that frustrated affordable housing development in nearly all-white communities and thus has aided attempts to promote integration.[103]

Moreover, every federal court of appeals to have addressed the issue has agreed with HUD's interpretation that the Act prohibits practices with the unjustified effect of perpetuating segregation.[104] In one such case, for example, the court of appeals held that a zoning ordinance that prevents the construction of multifamily housing in areas that are primarily white may violate the Act by "reinforcing racial

---

[91] *See* Joint Policy Statement, 59 FR 18,266, 18,269 (Apr. 15, 1994) (defining "disparate impact" as "a disproportionate adverse impact" on applicants from a protected group).

[92] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i) (complaining party must demonstrate "that a respondent uses a particular employment practice that causes a disparate impact").

[93] *See* 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)-2 (discriminatory effect may exist when a creditor practice "has a disproportionately negative impact on a prohibited basis").

[94] *See* 24 CFR 100.500(c); *see also* 76 FR 70925.

[95] *See* 42 U.S.C. 2000e–2(k)(1)(B)(i) ("[T]he complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice").

[96] *See, e.g., Hargraves* v. *Capital City Mortg. Corp,* 140 F. Supp. 2d 7, 20–22 (D.D.C. 2000) (finding that "predatory lending" in African American neighborhoods, which included exorbitant interest rates, lending based on the value of the asset rather than a borrower's ability to repay, profiting by acquiring the property through default, repeated foreclosures, and loan servicing procedures with excessive fees, could disparately impact African Americans).

[97] *See* nn. 6–7, 65–69 and accompanying text, *supra;* 76 FR 70922.

[98] As discussed in the "Definition of Discriminatory Effect" section, the final rule amends the definition of "discriminatory effect" to make it more concise and more consistent with terminology used in case law, but its substance is unchanged.

[99] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 3422 (Feb. 20, 1968) (statement of Senator Mondale)).

[100] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 2706 (1968) (Statement of Senator Javits)).

[101] H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280–01 (April 15, 2008).

[102] *See, e.g., Graoch,* 508 F.3d at 378 (there are "two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups."); *Huntington Branch,* 844 F.2d at 937 ("the discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation * * * recognizing this second form of effect advances the principal purpose of Title VIII to promote, open, integrated residential housing patterns.") (internal citations and quotation marks omitted); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d at 1290 ("There are two kinds of racially discriminatory effects which a facially neutral decision about housing can produce. The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted); *Hallmark Developers, Inc.* v. *Fulton County,* 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005) ("Of course there are two kinds of racially discriminatory effect which can be produced by a facially neutral decision. If the decision or action perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted).

[103] *See, e.g., Huntington Branch,* 844 F.2d at 937; *Arlington Heights,* 558 F.2d at 1291; *Black Jack,* 508 F.2d at 1184–86; *Summerchase Ltd. Pshp. I, et al.* v. *City of Gonzales, et al.,* 970 F. Supp. 522, 527–28 (M.D. La. 1997); *Dews,* 109 F. Supp. 2d at 567–68.

[104] *See supra* note 28.

segregation in housing.'' [105] For consistency with the terminology used in this case law, the final rule adds the term ''reinforces'' to the definition of ''discriminatory effect.''

In response to the comment regarding the facts of the cases HUD cited as examples in the proposed rule's preamble, HUD notes that those cases [106] are not exhaustive and therefore should not be viewed as the only ways that a violation of the Act may be established based on a discriminatory effects theory. Moreover, even if the facts of a particular case suggest intentional discrimination, in many instances both an intent to discriminate and a discriminatory effect may exist, and a charging party or plaintiff may bring a claim alleging either or both intent and effect as alternative theories of liability. Regardless, as explained throughout this preamble, and in case law, discriminatory intent is not required for a violation of the Act under an effects theory.

### C. Legally Sufficient Justification, § 100.500(b)(1)

In response to comments, this final rule slightly revises the first prong of ''legally sufficient justification,'' as provided in the November 16, 2011, proposed rule, which is required to sustain a practice with a discriminatory effect under the Act.

Proposed § 100.500(b)(1) provided: ''A legally sufficient justification exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent * * * or defendant.''

Final § 100.500(b)(1) provides: ''A legally sufficient justification exists where the challenged practice: (1) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent * * * or defendant * * * A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative.''

Comments were received with respect to proposed § 100.500(b)(1), some agreeing with the standard as stated; some recommending that § 100.500(b)(1) set either a higher or lower standard of proof for defendants and respondents; and some suggesting that HUD provide definitions for certain terms or use slightly different terms to make the regulatory provision easier to understand and apply.

### 1. Substantial, Legitimate, Nondiscriminatory Interests, § 100.500(b)(1)

*Issue:* Although some commenters supported the use of the phrase ''legitimate, nondiscriminatory interest,'' a commenter asked that the final rule provide a definition of the phrase to ensure that the standard is applied uniformly. Commenters stated that the word ''substantial'' or ''clearly'' should modify the phrase ''nondiscriminatory interests,'' reasoning that justifying discrimination with an interest that may be of little or no importance to the defendant or respondent would run contrary to Congress's goal of providing for fair housing within constitutional limitations.

*HUD Response:* HUD agrees that, in order to effectuate the Fair Housing Act's broad, remedial goal, practices with discriminatory effects cannot be justified based on interests of an insubstantial nature. Accordingly, HUD is making clear in this final rule that any interest justifying a practice with a discriminatory effect must be ''substantial.'' A ''substantial'' interest is a core interest of the organization that has a direct relationship to the function of that organization. The requirement that an entity's interest be substantial is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related.[107] HUD uses the more general standard of substantiality because there is no single objective, such as job-relatedness, against which every practice covered by the Fair Housing Act could be measured. The determination of whether goals, objectives, and activities are of substantial interest to a respondent or defendant such that they can justify actions with a discriminatory effect requires a case-specific, fact-based inquiry.

The word ''legitimate,'' used in its ordinary meaning, is intended to ensure that a justification is genuine and not false,[108] while the word ''nondiscriminatory'' is intended to ensure that the justification for a challenged practice does not itself discriminate based on a protected characteristic. HUD and federal courts interpreting the Fair Housing Act have

been applying these concepts without incident.[109]

*Issue:* Commenters requested that ''legitimate, nondiscriminatory interests'' be replaced or equated with ''business necessity.'' This would, in their view, be consistent with judicial interpretations of the Fair Housing Act, with HUD's regulations governing Fannie Mae and Freddie Mac, and with the Joint Policy Statement. Commenters stated that the Joint Policy Statement is well established and provides a clear, predictable standard to covered entities. Several commenters expressed concern that the proposed standard requiring a ''legitimate'' justification was weaker than, and would be interpreted as requiring less than, the ''business necessity'' standard.

*HUD Response:* In its adjudications under the Fair Housing Act, HUD has required respondents to prove that their challenged practices are justified by business necessity.[110] The other federal regulatory and enforcement agencies involved in the investigation of lending discrimination have taken the same approach.[111] The ''substantial, legitimate, nondiscriminatory interest'' standard found in § 100.500(b)(1) is equivalent to the ''business necessity'' standard found in the Joint Policy Statement. The standard set forth in this rule is not to be interpreted as a more lenient standard than ''business necessity.'' HUD chooses not to use the phrase ''business necessity'' in the rule because the phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities. Using the phrase ''business necessity'' might confuse litigating parties and the courts as to how the term might apply, for example, to a nonprofit organization that provides housing or housing-related services, or to a branch of state or local government carrying out its functions. The standards in § 100.500 apply equally to individuals, public entities, and for-

---

[105] *Huntington Branch,* 844 F.2d at 937–38.
[106] *See* 76 FR 70925.

[107] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i).
[108] *See, e.g.,* Legitimate Definition, Merriam-Webster's Dictionary, *http://www.merriam-webster.com/dictionary/necessary* (last visited Mar. 15, 2012) (defining ''legitimate'' as ''neither spurious nor false'').

[109] *See, e.g., Darst-Webbe Tenant Ass'n Bd.* v. *St. Louis Hous. Auth.,* 417 F.3d 898, 902 (8th Cir. 2005) (defendant must prove that challenged action is necessary to achieve ''legitimate, non-discriminatory policy objectives''); *Charleston Hous. Auth.* v. *U.S. Dept. of Agric.* 419 F.3d 729 (same).
[110] *See, e.g.,* 1998 Enforcement Handbook at 2–30 (instructing HUD investigators that a respondent's policy must be justified by a ''business necessity''); *HUD* v. *Carlson,* 1995 WL 365009, at *14 (HUD ALJ June 12, 1995) (''The Respondent has the burden to overcome the prima facie case by establishing a business necessity for the policy.''); Joint Policy Statement, 59 FR at 18269 (requiring a challenged policy or practice to be ''justified by 'business necessity' '').
[111] *See* Joint Policy Statement, 59 FR at 18269.

profit and nonprofit private entities because, as discussed below, neither the text of the Act nor its legislative history supports drawing a distinction among them. Accordingly, HUD has chosen terminology that, while equivalent to its previous guidance in the Joint Policy Statement, applies readily to all covered entities and all covered activities.

*Issue:* Some commenters expressed concern that the term "legitimate" allows for subjective review of a proffered justification.

*HUD Response:* HUD and courts have reviewed justifications proffered by covered entities for many years. While the review is very fact intensive, it is not subjective. Whether an interest is "legitimate" is judged on the basis of objective facts establishing that the proffered justification is genuine, and not fabricated or pretextual.[112] HUD and courts have engaged in this inquiry for decades without encountering issues related to the subjectivity of the inquiry. HUD therefore believes that concerns about subjective reviews of proffered justifications are not warranted.

*Issue:* A commenter requested that the final rule expressly state that increasing profits, minimizing costs, and increasing market share qualify as legitimate, nondiscriminatory interests. Similarly, another commenter asked that the final rule codify examples of tenant screening criteria such as rental history, credit checks, income verification, and court records that would be presumed to qualify as legally sufficient justifications.

*HUD Response:* HUD is not adopting these suggestions because the Fair Housing Act covers many different types of entities and practices, and a determination of what qualifies as a substantial, legitimate, nondiscriminatory interest for a given entity is fact-specific and must be determined on a case-by-case basis. Accordingly, the final rule does not provide examples of interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every respondent or defendant in any context.

2. Relationship Between Challenged Practice and Asserted Interest, § 100.500(b)(1)

*Issue:* Several commenters expressed concern with HUD's use of the term "manifest" in the proposed requirement that the challenged practice have a "necessary and manifest relationship" to one or more legitimate, nondiscriminatory interests of the respondent or defendant. Commenters

expressed uncertainty about what the term was intended to mean and how it would be interpreted by HUD or by federal courts. Two commenters expressed concern that the term "manifest" may involve a subjective evaluation and others did not understand the evidentiary concept embodied in the term. A commenter urged HUD to make clear in the language of the final rule, in addition to the preamble, that a justification may not be hypothetical or speculative.

*HUD Response:* In the proposed rule, the term "manifest" was used to convey defendants' and respondents' obligation to provide evidence of the actual need for the challenged practices, instead of relying on speculation, hypothesis, generalization, stereotype, or fear. HUD recognizes that some commenters were confused by the term "manifest." In response to these concerns, HUD is replacing the term "manifest" in the final rule with the requirement, added in § 100.500(b)(2), that "a legally sufficient justification must be supported by evidence and may not be hypothetical or speculative." This language is intended to convey that defendants and respondents, relying on a defense under § 100.500(b)(1), must be able to prove with evidence the substantial, legitimate, nondiscriminatory interest supporting the challenged practice and the necessity of the challenged practice to achieve that interest. This language is consistent with HUD's longstanding application of effects liability under the Fair Housing Act, is easy to understand, can be uniformly applied by federal and state courts and administrative agencies, and is unlikely to cause confusion or unnecessary litigation about its meaning. HUD notes that this language is also consistent with the application of the standard by other federal regulatory and enforcement agencies under both the Fair Housing Act and ECOA,[113] with the approach taken under Title VII,[114] and with the approach taken by a number of federal courts interpreting the Fair Housing Act.[115]

[113] *See* Joint Policy Statement, 59 FR at 18269 ("The justification must be manifest and may not be hypothetical or speculative.")

[114] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) (the respondent must "*demonstrate* that the challenged practice is job related for the position in question and consistent with business necessity") (emphasis added).

[115] *See, e.g., Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 741 (8th Cir. 2005) (the challenged housing practice must have a "manifest relationship" to the defendant's objectives); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d at 149 ("a justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant") (emphasis added); *Huntington Branch,*

*Issue:* A commenter suggested that the phrase "necessary and manifest" should be defined.

*HUD Response:* As discussed above, HUD has removed the word "manifest" in the final rule in order to avoid any potential confusion. Thus, § 100.500(b)(1) is slightly revised at this final rule stage to state that a respondent or defendant seeking to defend a challenged practice with a discriminatory effect must prove that the practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the respondent or defendant. In the proposed rule, as well as this final rule, HUD uses "necessary" in its ordinary, most commonly used sense.

*Issue:* Some commenters suggested that HUD remove the word "necessary" to make the standard found in § 100.500(b)(1) consistent with the Title VII standard set out in the Supreme Court's opinion in *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989). Commenters suggested various standards without the word "necessary," including requiring that the challenged practice have "a legitimate business purpose," that the challenged practice have "a legitimate nondiscriminatory purpose," or that the challenged practice be "rationally related to a legitimate, nondiscriminatory goal."

*HUD Response:* HUD declines to adopt the commenters' suggestion to remove "necessary" from the rule. HUD's substantial experience in administering the Fair Housing Act confirms that requiring a challenged practice with a discriminatory effect to be necessary best effectuates the broad, remedial goal of the Act. Indeed, in 1994 HUD and ten other federal agencies notified lenders of the requirement to justify the discriminatory effect of a challenged lending practice under the Fair Housing Act and ECOA by showing that the practice is necessary to their business.[116] Moreover, in 1997, HUD

*NAACP* v. *Town of Huntington,* 844 F.2d at 938, aff'd, 488 U.S. 15 (1988) (per curiam) (same).

[116] *See* Joint Policy Statement, 59 FR 18,269 (the second step of a disparate impact analysis under the Fair Housing Act and ECOA is to "determine whether the policy or practice is justified by 'business necessity.'") *Id.* (giving an example of a policy that may violate the Fair Housing Act and ECOA since "the lender is unlikely to be able to show that the policy is compelled by business necessity"); *see also* Office of the Comptroller of the Currency, Federal Depository Insurance Corporation, Federal Reserve Board, Office of Thrift Supervision, National Credit Union Administration, The Interagency Fair Lending Examination Procedures app. at 28, August 2009, available at *http://www.ffiec.gov/pdf/fairappx.pdf.*

[112] *See* note 109, *supra.*

promulgated a regulation recognizing that section 805 of the Act [117] does not prevent consideration, in the purchasing of loans, of factors that are necessary to a business. [118] In addition, in 1988 the House Committee on the Judiciary, in advancing a bill amending the Fair Housing Act, recognized that liability should not attach when a justification is necessary to the covered entity's business. [119] HUD's view is also consistent with Congress's 1991 enactment of legislation codifying that, in the employment context, a practice that has a disparate impact must be consistent with "business necessity" and must also be "job related." [120] HUD also notes that a similar necessity requirement is found in ECOA, which requires that a challenged practice "meets a legitimate business need." [121] HUD's final rule therefore uses language that is consistent with its longstanding interpretation of the Fair Housing Act, comparable to the protections afforded under Title VII and ECOA, and fairly balances the interests of all parties.

*Issue:* A commenter expressed concern that requiring a "necessary" relationship may interfere with loss mitigation efforts, including those under the Home Affordable Modification Program (HAMP) and Home Affordable Refinance Program (HARP)—federal programs that encourage mortgage servicers to offer modifications of loans or refinances—because such efforts are voluntary and participation in them may not be perceived as "necessary."

*HUD Response:* Since at least the date of issuance of the Joint Policy Statement in 1994, lenders have been on notice that they must prove the necessity of a challenged practice to their business under both the Fair Housing Act and ECOA. This requirement has not prevented lenders or servicers from engaging in effective loss mitigation efforts. The mere fact that a policy is voluntarily adopted does not preclude it from being necessary to achieve a substantial, legitimate, nondiscriminatory interest. By formalizing the process of proving

business necessity in a rule that clearly allocates the burdens of proof among the parties, HUD is not changing substantive law, but merely clarifying the contours of an available defense so that lenders may rely upon it with greater clarity as to how it applies.

*Issue:* A commenter expressed the concern that requiring a respondent or defendant to prove necessity would subject the respondent or defendant to unnecessary and possibly frivolous investigations and litigation. Another commenter took the opposite position, stating that the rule would not create excessive litigation exposure for respondents or defendants because numerous procedural mechanisms exist to dispose of meritless cases. A commenter stated that, at the second stage of the burden-shifting analysis, a defendant should have the opportunity to demonstrate not only a legally sufficient justification, but also that the charging party or plaintiff did not satisfy its prima facie case because the challenged practice did not result in a discriminatory effect.

*HUD Response:* Given how the discriminatory effects framework has been applied to date by HUD and by the courts, HUD does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants. As discussed above, since at least 1994, when the Joint Policy Statement was issued, lenders have known that they must prove the necessity of a challenged practice to their business. Moreover, HUD believes that promulgation of this rule—with its clear allocation of burdens and clarification of the showings each party must make—has the potential to decrease or simplify this type of litigation. For example, with a clear, uniform standard, covered entities can conduct consistent self-testing and compliance reviews, document their substantial, legitimate nondiscriminatory interests, and resolve potential issues so as to prevent future litigation. A uniform standard is also a benefit to entities operating in multiple jurisdictions. To the extent that the rule results in more plaintiffs being aware of potential effects liability under the Fair Housing Act, it should have the same impact on covered entities, resulting in greater awareness and compliance with the Fair Housing Act. Additionally, as a commenter noted, the Federal Rules of Civil Procedure provide various means to dispose of meritless claims, including Rules 11, 12, and 56. Moreover, a respondent or defendant may avoid liability by rebutting the charging party's or plaintiff's proof of

discriminatory effect. [122] If the fact-finder decides that the charging party or plaintiff has not proven that the challenged practice resulted in a discriminatory effect, liability will not attach.

*Issue:* A commenter expressed concern that, under the proposed rule, a legally sufficient justification under § 100.500(b)(1) may not be hypothetical or speculative but a discriminatory effect under § 100.500(a) may be, creating an imbalance in the burden of proof in favor of the charging party or plaintiff.

*HUD Response:* This comment indicates a misunderstanding of what § 100.500 requires. Requiring the respondent or defendant to introduce evidence (instead of speculation) proving that a challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests in order to benefit from the defense to liability is not different in kind from requiring the charging party or plaintiff to introduce evidence (not speculation) proving that a challenged practice caused or will predictably cause a discriminatory effect. As discussed in this preamble, the language of the Act makes clear that it is intended to address discrimination that has occurred or is about to occur, and not hypothetical or speculative discrimination.

### D. Less Discriminatory Alternative, § 100.500(b)(2)

Some comments were received with respect to § 100.500(b)(2) of the proposed rule. With that provision, HUD proposed that a practice with a discriminatory effect may be justified only if the respondent's or defendant's interests cannot be served by another practice with a less discriminatory effect. In response to these comments, the final rule makes one slight revision to the proposed provision by substituting "could not be served" for "cannot be served."

*Issue:* A commenter requested that HUD replace "cannot be served" with "would not be served" because, under the Supreme Court's analysis in *Wards Cove,* a plaintiff cannot prevail by showing that a less discriminatory alternative could in theory serve the defendant's business interest. This commenter also stated that, in order for liability to attach, a less discriminatory alternative must have been known to and rejected by the respondent or

---

[117] 42 U.S.C. 3605.

[118] *See* 24 CFR 100.125(c); *cf. Darst-Webbe Tenant Ass'n Bd.* v. *St. Louis Hous. Auth.,* 417 F.3d, at 902 (the challenged practice must be "necessary to the attainment of" the defendant's objectives) (internal citation omitted); *see also Affordable Hous. Dev. Corp.* v. *City of Fresno,* 433 F.3d 1182, 1195 (9th Cir. 2006) (describing the Eighth Circuit's approach as "sound").

[119] H.R. Rep. No. 100–711, at 2191 (1988) ("The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity.").

[120] *See* 42 U.S.C. 2000e–2(k)(1)(A).

[121] 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)(2).

[122] *See, e.g., Dothard* v. *Rawlinson,* 433 U.S. 321, 331 (1977) (Title VII case explaining that a defendant is "free to adduce countervailing evidence of his own" in order to discredit a plaintiff's evidence of disparate impact).

defendant. Other commenters stated that, in order for liability to attach, the alternative practice must be equally effective as the challenged practice, or at least as effective as the challenged practice, with some of these commenters pointing to *Wards Cove* in support of this position. A number of other commenters, on the other hand, cited to Fair Housing Act case law for the proposition that liability should attach unless the less discriminatory alternative would impose an undue hardship on the respondent or defendant under the circumstances of the particular case.

*HUD Response:* HUD agrees that a less discriminatory alternative must serve the respondent's or defendant's substantial, legitimate nondiscriminatory interests, must be supported by evidence, and may not be hypothetical or speculative. For greater consistency with the terminology used in HUD's (and other federal regulatory agencies') previous guidance in the Joint Policy Statement,[123] the final rule replaces "cannot be served" with "could not be served." A corresponding change of "can" to "could" is also made in § 100.500(c)(3) of the final rule. HUD does not believe the rule's language needs to be further revised to state that the less discriminatory alternative must be "equally effective," or "at least as effective," in serving the respondent's or defendant's interests; the current language already states that the less discriminatory alternative must serve the respondent's or defendant's interests, and the current language is consistent with the Joint Policy Statement, with Congress's codification of the disparate impact standard in the employment context,[124] and with judicial interpretations of the Fair Housing Act.[125] The additional modifier

"equally effective," borrowed from the superseded *Wards Cove* case, is even less appropriate in the housing context than in the employment area in light of the wider range and variety of practices covered by the Act that are not readily quantifiable. For a similar reason, HUD does not adopt the suggestion that the less discriminatory alternative proffered by the charging party or plaintiff must be accepted unless it creates an "undue hardship" on the respondent or defendant. The "undue hardship" standard, which is borrowed from the reasonable accommodation doctrine in disability law, would place too heavy a burden on the respondent or defendant.

In addition, HUD does not agree with the commenter who stated that *Wards Cove* requires the charging party or plaintiff to show that, prior to litigation, a respondent or defendant knew of and rejected a less discriminatory alternative,[126] or that *Wards Cove* even governs Fair Housing Act claims. HUD believes that adopting this requirement in the housing context would be unjustified because it would create an incentive not to consider possible ways to produce a less discriminatory result. Encouraging covered entities not to consider alternatives would be inconsistent with Congress's goal of providing for fair housing throughout the country.

*Issue:* Two commenters expressed concern that, under the proposed rule's language, the discriminatory effect of an alternative would be considered but a lender's concerns such as credit risk would be irrelevant.

*HUD Response:* HUD believes these commenters' concerns will not be realized in practice because a less discriminatory alternative need not be adopted unless it could serve the substantial, legitimate, nondiscriminatory interest at issue. The final rule specifically provides that the interests supporting a challenged practice are relevant to the consideration of whether a less discriminatory alternative exists. As stated in § 100.500(c)(3), the charging party or plaintiff must show that the less discriminatory alternative could serve the "interests supporting the challenged practice." Thus, if the lender's interest in imposing the challenged practice relates to credit risk, the alternative would also need to effectively address the lender's concerns about credit risk.

### E. Allocations of Burdens of Proof in § 100.500(c)

In the proposed rule, HUD set forth a burden-shifting framework in which the plaintiff or charging party would bear the burden of proving a prima facie case of discriminatory effect, the defendant or respondent would bear the burden of proving a legitimate, nondiscriminatory interest for the challenged practice, and the plaintiff or charging party would bear the burden of proving that a less discriminatory alternative exists.

*Issue:* Some commenters stated that the plaintiff or charging party should bear the burden of proof at all stages of the proceedings, either citing *Wards Cove* in support of this position or reasoning that, in our legal system, the plaintiff normally carries the burden of proving each element of his claim. Other commenters asked HUD to modify § 100.500(c)(3) in order to place the burden of proving no less discriminatory alternative on the defendant or respondent. Those recommending that the burden allocation be modified in this way reasoned that the respondent or defendant is in a better position to bear this burden because of greater knowledge of, and access to, information concerning the respondent's or defendant's interests and whether a less discriminatory alternative could serve them. Several commenters stated that this is particularly true in the context of government decisions, as complainants and plaintiffs will generally be outside the political decision-making process, and in the context of insurance and lending decisions, where proprietary information and formulas used in the decision making process may be vigorously protected.

Commenters stated that complainants and plaintiffs may not have the capacity to evaluate possible less discriminatory alternatives. Some commenters also pointed out that assigning this burden to the respondent or defendant may avoid intrusive and expensive discovery into a respondent's or defendant's decision-making process, and would incentivize entities subject to the Act to consider less discriminatory options when making decisions. Commenters also stated that courts have placed this burden of proof on the defendant, others have placed it on the party for whom proof is easiest, and reliance on Title VII is inappropriate because of the unique nature of less discriminatory alternatives in Fair Housing Act cases.

*HUD Response:* HUD believes that the burden of proof allocation in § 100.500(c) is the fairest and most

---

[123] *See* Joint Policy Statement, 59 FR at 18269 ("Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be discriminatory if an alternative policy or practice could serve the same purpose with less discriminatory effect.")

[124] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) ("the concept of 'alternative employment practice'" under Title VII "shall be in accordance with the law as it existed on June 4, 1989"); *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 425 (1975) ("[I]t remains open to the complaining party to show that other tests or selection devises, without a similarly undesirable racial effect, would also serve the employer's legitimate interest.").

[125] *See, e.g., Darst-Webbe,* 417 F.3d at 906 ("plaintiffs must offer a viable alternative that satisfies the Housing Authority's legitimate policy objectives while reducing the [challenged practice's] discriminatory impact"); *Huntington,* 844 F.2d at 939 (analyzing whether the "[t]own's goal * * * can be achieved by less discriminatory means"); *Rizzo,* 564 F.2d at 159 (it must be analyzed whether an alternative "could be adopted

that would enable [the defendant's] interest to be served with less discriminatory impact.").

[126] *See Wards Cove Packing Co., Inc.* v. *Atonio,* 490 U.S. 642, 660–61 (1989).

reasonable approach to resolving the claims. As the proposed rule stated, this framework makes the most sense because it does not require either party to prove a negative. Moreover, this approach will ensure consistency in applying the discriminatory effects standard while creating the least disruption because, as discussed earlier in this preamble, HUD and most courts utilize a burden-shifting framework,[127] and most federal courts using a burden-shifting framework allocate the burdens of proof in this way.[128] In addition, HUD notes that this burden-shifting scheme is consistent with the Title VII discriminatory effects standard codified by Congress in 1991.[129] It is also consistent with the discriminatory effects standard under ECOA,[130] which borrows from Title VII's burden-shifting framework.[131] There is significant overlap in coverage between ECOA, which prohibits discrimination in credit, and the Fair Housing Act, which prohibits discrimination in residential real estate-related transactions.[132] Thus, under the rule's framework, in litigation involving claims brought under both the Fair Housing Act and ECOA, the parties and the court will not face the burden of applying inconsistent methods of proof to factually indistinguishable claims. Having the same allocation of burdens under the Fair Housing Act and ECOA will also provide for less

confusion and more consistent decision making by the fact finder in jury trials.

With respect to expressed concerns about the ability of plaintiffs or complainants to demonstrate a less discriminatory alternative, plaintiffs in litigation in federal courts may rely on Rule 26(b)(1) of the Federal Rules of Civil Procedure for the discovery of information "that is relevant to any party's claim or defense," [133] and parties in an administrative proceeding may rely on Rule 26(b)(1) and a similar provision in HUD's regulations.[134] The application of those standards would plainly provide for the discovery of information regarding the alternatives that exist to achieve an asserted interest, the extent to which such alternatives were considered, the reasons why such alternatives were rejected, and the data that a plaintiff or plaintiff's expert could use to show that the defendant did not select the least discriminatory alternative. An appropriately tailored protective order can be issued by the court to provide access to proprietary information in the context of cases involving confidential business information, such as those involving insurance or lending, while providing to respondents and defendants adequate protection from disclosure of this information. Moreover, as noted above, in administrative adjudications, it is the charging party, not non-intervening complainants, who bear this burden of proof.

### F. Application of Discriminatory Effects Liability

Comments were received with respect to how the discriminatory effects standard would be applied and how it might impact covered entities. These comments expressed varying concerns, including the retroactivity of the rule, its application to the insurance and lending industries, and its impact on developing affordable housing.

*Issue:* A commenter stated that each of the cases listed in the proposed rule as examples of practices with a segregative effect involved a government actor, while another commenter asked HUD to clarify whether liability may attach to private parties.

*HUD Response:* Liability for a practice that has an unjustified discriminatory effect may attach to either public or private parties according to the standards in § 100.500, because there is nothing in the text of the Act or its legislative history to indicate that

Congress intended to distinguish the manner in which the Act applies to public versus private entities.[135]

*Issue:* A commenter expressed the opinion that the Fair Housing Act does not grant HUD the power to promulgate retroactive rules, and therefore HUD should make clear that the final rule applies prospectively only.

*HUD Response:* This final rule embodying HUD's and the federal courts' longstanding interpretation of the Act to include a discriminatory effects standard will apply to pending and future cases. HUD has long recognized, as have the courts, that the Act supports an effects theory of liability. This rule is not a change in HUD's position but rather a formal interpretation of the Act that clarifies the appropriate standards for proving a violation under an effects theory. As such, it "is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." [136]

*Issue:* A commenter stated that the most appropriate remedy for a violation of the Act under an effects theory is declaratory or injunctive relief. This commenter expressed the opinion that the use of penalties or punitive damages generally does not serve the underlying purpose of the Fair Housing Act to remedy housing discrimination.

*HUD Response:* HUD disagrees with the commenter. The Fair Housing Act specifically provides for the award of damages—both actual and punitive—and penalties.[137]

*Issue:* Commenters from the insurance industry expressed a number of concerns about the application of the proposed rule to insurance practices. Some commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act (15 U.S.C. 1011–1015) or the common law "filed rate doctrine." Some commenters stated that HUD's use of *Ojo v. Farmers Group, Inc.,* 600 F.3d 1205 (9th Cir. 2010), in the preamble of the proposed rule was not appropriate.

---

[127] *See supra* notes 29–33.

[128] *See supra* notes 34, 35.

[129] *See* 42 U.S.C. 2000e–2(k).

[130] ECOA prohibits discrimination in credit on the basis of race and other enumerated criteria. *See* 15 U.S.C. 1691.

[131] *See* S. Rep. No. 94–589, at 4–5 (1976) ("[J]udicial constructions of antidiscrimination legislation in the employment field, in cases such as *Griggs v. Duke Power Company,* 401 U.S. 424 (1971), and *Albemarle Paper Co.* v. *Mood,* [422 U.S. 405 (1975)], are intended to serve as guides in the application of [ECOA], especially with respect to the allocations of burdens of proof."); 12 CFR 1002.6(a) ("The legislative history of [ECOA] indicates that the Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971) and *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness."); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ("Effects test. The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e– 2).").

[132] *See* Joint Policy Statement, 59 FR 18266. Indeed, the Joint Policy Statement analyzed the standard for proving disparate impact discrimination in lending under the Fair Housing Act and under ECOA without any differentiation. *See* 59 FR 18269.

[133] Fed. R. Civ. P. 26(b)(1).

[134] *See* 24 CFR 180.500(b) ("parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the proceeding").

[135] *See* 42 U.S.C. 3602(f) (defining "discriminatory housing practice" as "an act that is unlawful under section 804, 805, 806, or 818," none of which distinguish between public and private entities); *see also Nat'l Fair Hous. Alliance, Inc.* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 59– 60 & n.7 (D.D.C. 2002) (applying the same impact analysis to a private entity as to public entities, and noting that a "distinction between governmental and non-governmental bodies finds no support in the language of the [Act] or in [its] legislative history").

[136] *Pope* v. *Shalala,* 998 F.2d 473, 483 (7th Cir. 1993) (quoting *Manhattan General Equip. Co.* v. *Comm'r,* 297 U.S. 129, 135 (1936)).

[137] *See* 42 U.S.C. 3612–14.

*HUD Response:* HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance,[138] and courts have agreed with HUD, including in *Ojo* v. *Farmers Group*.[139] Moreover, as discussed above, HUD has consistently interpreted the Act to permit violations to be established by proof of discriminatory effect. By formalizing the discriminatory effects standard, the rule will not, as one commenter suggested, "undermine the states' regulation of insurance." The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance." McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo* v. *Farmers Group*, it will not interfere with any State regulation of the insurance industry.

*Issue:* Some commenters stated that liability for insurance practices based on a disparate impact standard of proof is inappropriate because insurance is risk-based and often based on a multivariate analysis. A commenter wrote that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk," or might be forced to violate state laws that require insurance rates to be actuarially sound estimates of the expected value of all future costs associated with an individual risk transfer.

*HUD Response:* HUD believes that these concerns are misplaced. First, they presume that once a discriminatory effect is shown, the policy at issue is *per se* illegal. This is incorrect. Rather, as § 100.500 makes clear, the respondent or defendant has a full opportunity to defend the business justifications for its policies. This "burden-shifting framework" distinguishes "unnecessary barriers proscribed by the [Act] from valid policies and practices crafted to advance legitimate interests."[140] Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.

*Issue:* Some commenters asked HUD to exempt insurance pricing from the rule, exempt Fair Access to Insurance Requirements ("FAIR") plans, or establish safe harbors for certain risk-related factors.

*HUD Response:* Creating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act. Moreover, creating exemptions beyond those found in the Act would run contrary to Congressional intent.[141]

*Issue:* Another commenter stated that the "burden of proof issues" are difficult for insurers because they do not collect data on race and ethnicity and state insurance laws may prohibit the collection of such data.

*HUD Response:* The burden of proof is not more difficult for insurers than for a charging party or plaintiff alleging that an insurance practice creates a discriminatory effect. The charging party or plaintiff must initially show the discriminatory effect of the challenged practice using appropriate evidence that demonstrates the effect. If the charging party or plaintiff makes that showing, the burden shifts to the insurer to show that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests.

*Issue:* A commenter expressed concern that the rule may create strict liability for entities complying with contractual obligations set by third parties, including the federal government.

*HUD Response:* The commenter misconstrues the discriminatory effects standard, which permits a defendant or respondent to defend against a claim of discriminatory effect by establishing a legally sufficient justification, as specified in § 100.500.

*Issue:* Another commenter expressed concern that the citation to *Miller* v. *Countrywide Bank, N.A.*, 571 F. Supp. 2d 251 (D. Mass. 2008), in the preamble to the proposed rule suggested that liability could exist under the Act for the neutral actions of third parties and that such liability would be inconsistent with the Supreme Court's decision in *Meyer* v. *Holley*, 537 U.S. 280 (2003). This commenter requested that HUD revise the proposed rule to articulate the standard set forth in *Meyer*.

*HUD Response:* HUD does not agree with the commenter's suggestion. HUD recognizes that pursuant to *Meyer*, liability under the Act for corporate officers is determined by agency law. The proposed rule cited *Miller* as an example of how a lender's facially neutral policy allowing employees and mortgage brokers the discretion to price loans may be actionable under the Fair Housing Act. The decision in *Miller* is not inconsistent with the Supreme Court's ruling on agency in *Meyer*, and therefore HUD does not believe that the final rule needs to be revised in response to this comment.

*Issue:* Several commenters expressed concern that adoption of the proposed discriminatory effects standard would lead to lawsuits challenging lenders' use of credit scores, other credit assessment standards, or automated underwriting. A commenter stated that a lender's consideration of credit score or other credit assessment standards such as a borrower's debt-to-income ratio may have a disparate impact because of demographic differences. This commenter cited studies which indicate that borrowers who live in zip codes with a higher concentration of minorities are more likely to have lower credit scores and fewer savings. A commenter stated that credit scores are often used as the determining factor in a lender's origination practices and that certain underwriting software and investor securitization standards require a minimum credit score. The commenter further stated that HUD's Federal Housing Administration (FHA) program has recognized the value of credit scores in setting underwriting standards for FHA insured loans. According to the commenter, lenders have little ability or desire to override credit score standards, because manual underwriting is time consuming and staff-intensive. Another commenter expressed concern that, even if a lender was successful in defending its credit risk assessment practices under the burden-shifting approach, the lender would have to defend an expensive lawsuit and suffer harm to its reputation.

---

[138] *See, e.g.,* 24 CFR 100.70(d)(4) (Mar. 15, 1989) (defining "other prohibited sale and rental conduct" to include "refusing to provide * * * property or hazard insurance for dwellings or providing such * * * insurance differently" because of a protected class); 53 FR 44,992, 44,997 (Nov. 7, 1988) (preamble to proposed regulations stating that "discriminatory refusals to provide * * * adequate property or hazard insurance * * * has been interpreted by the Department and by courts to render dwellings unavailable").

[139] *See Ojo* v. *Farmers Group, Inc.,* 600 F.3d at 1208; *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, 297–301 (7th Cir. 1993); *Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351, 1355–1360 (6th Cir. 1995). *But see Mackey* v. *Nationwide Ins. Cos.,* 724 F.2d 419, 423–25 (4th Cir. 1984) (pre-Fair Housing Amendments Act and regulations pursuant thereto holding that Act does not cover insurance).

[140] *Graoch,* 508 F.3d at 374–75.

[141] *See Graoch,* 508 F.3d at 375 ("we cannot create categorical exemptions from [the Act] without a statutory basis" and "[n]othing in the text of the FHA instructs us to create practice-specific exceptions").

Commenters from the lending industry also stated that the rule may have a chilling effect on lending in lower income communities. A commenter stated that the rule will create uncertainty in a skittish market, so lenders will be cautious about lending in lower income communities for fear of a legal challenge. Some of these commenters reasoned that underwriting requirements and risk requirements pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act (Pub. L. 111–203, approved July 21, 2010)), such as ability to repay, down payment requirements, and qualified residential mortgages, may result in a disparate impact because of demographic differences. Another commenter explained that the rule would eliminate in-portfolio mortgage loans at community banks, which provide mortgage credit to borrowers who may not qualify for a secondary market transaction.

*HUD Response:* HUD does not believe that the rule will have a chilling effect on lending in lower income communities or that it will encourage lawsuits challenging credit scores, other credit assessment standards, or the requirements of the Dodd-Frank Act. As discussed above, the rule does not change the substantive law; eleven federal courts of appeals have recognized discriminatory effects liability under the Act and over the years courts have evaluated both meritorious and non-meritorious discriminatory effects claims challenging lending practices.[142] As HUD has reiterated, the rule formalizes a substantive legal standard that is well recognized by both courts and participants in the lending industry for assessing claims of discriminatory effects. Indeed, in the lending context, at least since the issuance of the Joint

Policy Statement nearly 18 years ago, non-depository lenders, banks, thrifts, and credit unions have been on notice that federal regulatory and enforcement agencies, including HUD and the Department of Justice, may apply a disparate impact analysis in their examinations and investigations under both the Fair Housing Act and ECOA. The regulations and Staff Commentary implementing ECOA also explicitly prohibit unjustified discriminatory effects.[143] Thus, neither a chilling effect nor a wealth of new lawsuits can be expected as a result of this rule. Rather, HUD anticipates that this rule will encourage the many lenders and other entities that already conduct internal discriminatory effects analyses of their policies to review those analyses in light of the now uniform standard for a legally sufficient justification found in § 100.500. Indeed, lender compliance should become somewhat easier due to the rule's clear and nationally uniform allocation of burdens and clarification of the showings each party must make.

*Issue:* Some commenters expressed concern that faced with the threat of disparate impact liability, lenders might extend credit to members of minority groups who do not qualify for the credit.

*HUD Response:* The Fair Housing Act does not require lenders to extend credit to persons not otherwise qualified for a loan. As discussed previously, the final rule formalizes a standard of liability under the Act that has been in effect for decades. HUD is unaware of any lender found liable under the discriminatory effects standard for failing to make a loan to a member of a minority group who did not meet legitimate nondiscriminatory credit qualifications.

*Issue:* Several other commenters expressed a concern that discriminatory effects liability might have a chilling effect on efforts designed to preserve or develop affordable housing, including pursuant to HUD's own programs, because much of the existing affordable housing stock is located in areas of minority concentration. A commenter stated that resources designed to support the development of affordable housing will be "deflect[ed]" away so as to respond to claims of disparate impact discrimination. Another commenter requested that HUD issue guidance to the affordable housing industry as they administer HUD programs.

Other commenters expressed concern about potential liability for administrators of the federal Low Income Housing Tax Credit (LIHTC) program. These commenters reasoned that the concentration of affordable housing stock in low-income areas, combined with federal requirements and incentives which encourage the deployment of tax credits in low-income communities, may result in discriminatory effects liability for agencies administering the LIHTC program. Several commenters asked HUD to specify in the final rule that the mere approval of LIHTC projects in minority areas alone does not establish a prima facie case of disparate impact under the Act or that locating LIHTC projects in low-income areas is a legally sufficient justification to claims of disparate impact discrimination. A commenter requested that HUD provide guidance to such agencies.

*HUD Response:* HUD does not expect the final rule to have a chilling effect on the development and preservation of affordable housing because, as discussed above, the rule does not establish a new form of liability, but instead serves to formalize by regulation a standard that has been applied by HUD and the courts for decades, while providing nationwide uniformity of application. The rule does not mandate that affordable housing be located in neighborhoods with any particular characteristic, but requires, as the Fair Housing Act already does, only that housing development activities not have an unjustified discriminatory effect.

Concerns of a chilling effect on affordable housing activities are belied by the prevalence of cases where the discriminatory effects method of proof has been used by plaintiffs seeking to develop such housing [144] and even by the less frequent instances where

---

[142] *Compare Ramirez* v. *GreenPoint Mortg. Funding, Inc.,* 633 F. Supp. 2d 922, 927–28 (N.D. Cal. 2008) (holding that the Act permits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy that had a disparate impact on members of a protected class); *Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251, 258 (D. Mass. 2008) (denying defendants motion to dismiss and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation); and *Hoffman* v. *Option One Mortg. Corp.,* 589 F. Supp. 2d 1009, 1011–12 (N.D. Ill. 2008) (holding that the Act permits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation), *with Ng* v. *HSBC Mortgage Corp.,* No. 07–CV–5434, 2010 WL 889256, *12 (E.D.N.Y. Mar. 10, 2010) (dismissing plaintiff's claim of disparate impact discrimination and finding that the claim was "alleged with little more than buzzwords and conclusory labels").

[143] *See* 12 CFR 1002.6(a); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ; *see also* Consumer Financial Protection Bureau Bulletin 2012–04 (Apr. 18, 2012) ("CFPB reaffirms that the legal doctrine of disparate impact remains applicable as the Bureau exercises its supervision and enforcement authority to enforce compliance with the ECOA.").

[144] *See, e.g., Huntington Branch,* 844 F.2d at 926 (reversing district court and finding Fair Housing Act violations based on discriminatory effect of town's refusal to rezone site for affordable housing); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Parish,* 648 F. Supp. 2d 805 (E.D. La. 2009) (finding parish's subversion of attempts to develop affordable housing had a discriminatory effect in violation of the Fair Housing Act); *Dews* v. *Town of Sunnyvale,* 109 F. Supp. 2d 526 (N.D. Tex. 2000) (finding that developer established Fair Housing Act violation based on Town's rejection of development application under discriminatory effects method); *Sunrise Dev.* v. *Town of Huntington,* 62 F. Supp. 2d 762 (E.D.N.Y. 1999) (finding the plaintiff had established prima facie case of discriminatory effect and granting preliminary injunction requiring town to consider plaintiff's zoning application); *Summerchase Ltd. Pshp. I* v. *City of Gonzales,* 970 F. Supp. 522 (M.D. La. 1997) (denying defendant's motion for summary judgment on developer's claim that parish's denial of building permits for affordable housing development had a discriminatory effect in violation of the Fair Housing Act).

agencies administering affordable housing programs have been defendants.[145] Rather than indicating a chilling effect, existing case law shows that use of the discriminatory effects framework has promoted the development of affordable housing, while allowing due consideration for substantial, legitimate, nondiscriminatory interests involved in providing such housing. Moreover, recipients of HUD funds already must comply with a variety of civil rights requirements. This includes the obligation under Title VI of the Civil Rights Act of 1964 and its applicable regulations to refrain from discrimination, either by intent or effect, on the basis of race, color, or national origin; the obligation under the Fair Housing Act to affirmatively further fair housing in carrying out HUD programs; and HUD program rules designed to foster compliance with the Fair Housing Act and other civil rights laws. As discussed throughout this preamble, allegations of discriminatory effects discrimination must be analyzed on a case-by-case basis using the standards set out in § 100.500. HUD will issue guidance addressing the application of the discriminatory effects standard with respect to HUD programs.

*Issue:* Like commenters who requested "safe harbors" or exemptions for the insurance and lending industries, some commenters requested that the proposed rule be revised to provide "safe harbors" or exemptions from liability for programs designed to preserve affordable housing or revitalize existing communities. A commenter requested that the final rule provide safe harbors for state and local programs that have legitimate policy and safety goals such as protecting water resources, promoting transit orientated development, and revitalizing communities. Other commenters requested safe harbors or exemptions for entities that are meeting requirements or standards established by federal or state law or regulation, such as the Federal Credit Union Act, the Dodd-Frank Act, HAMP and HARP, or by government-sponsored enterprises or investors.

*HUD Response:* HUD does not believe that the suggested safe harbors or exemptions from discriminatory effects liability are appropriate or necessary. HUD notes that, in seeking these exemptions, the commenters appear to misconstrue the discriminatory effects

standard, which permits practices with discriminatory effects if they are supported by a legally sufficient justification. The standard thus recognizes that a practice may be lawful even if it has a discriminatory effect. HUD notes further that Congress created various exemptions from liability in the text of the Act,[146] and that in light of this and the Act's important remedial purposes, additional exemptions would be contrary to Congressional intent.

*Issue:* Several commenters expressed concern that in complying with new Dodd-Frank Act mortgage reforms, including in determining that consumers have an ability to repay, a lender necessarily "will face liability under the Proposed Rule."

*HUD Response:* HUD reiterates that the lender is free to defend any allegations of illegal discriminatory effects by meeting its burden of proof at § 100.500. Moreover, if instances were to arise in which a lender's efforts to comply with the Dodd-Frank Act were challenged under the Fair Housing Act's discriminatory effects standard of liability, those same activities most likely would be subject to a similar challenge under ECOA and Regulation B, which also prohibit lending practices that have a discriminatory effect based on numerous protected characteristics.[147] The Dodd-Frank Act created the Consumer Financial Protection Bureau to combat both unfair and deceptive practices and discriminatory practices in the consumer financial industry, and it gave the Consumer Financial Protection Bureau authority to enforce ECOA.[148] *See* Dodd-Frank Act sections 1402–1403 (enacting section 129B of the Truth in Lending Act "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive," and, as part of that section, requiring the Consumer Financial Protection Bureau to create regulations that prohibit "abusive or unfair lending practices that promote disparities among consumers of equal credit worthiness but of different race, ethnicity, gender, or age"); *see also* Dodd-Frank Act section 1013(c) (establishing the Consumer Financial Protection Bureau's Office of Fair Lending and Equal Opportunity to provide enforcement of fair lending laws, including ECOA, and coordinate

fair lending efforts within the Bureau and with other federal and state agencies); *id.* section 1085 (transferring regulatory authority for ECOA to the Consumer Financial Protection Bureau).

*G. Illustrations of Practices With Discriminatory Effects*

Consistent with HUD's existing Fair Housing Act regulations, which contain illustrations of practices that violate the Act, the proposed rule specified additional illustrations of such practices. The November 16, 2011, rule proposed to add illustrations to 24 CFR 100.65, 100.70 and 100.120. The final rule revises these illustrations in the manner described below.

Because the illustrations in HUD's existing regulations include practices that may violate the Act based on an intent or effects theory, and proposed § 100.65(b)(6) describes conduct that is already prohibited in § 100.65(b)(4)—the provision of housing-related services—and § 100.70(d)(4)—the provision of municipal services—this final rule eliminates proposed § 100.65(b)(6). This will avoid redundancy in HUD's Fair Housing Act regulations, and its elimination from the proposed rule is not intended as a substantive change.

Commenters raised the following issues with respect to the proposed rule's illustrations of discriminatory practices.

*Issue:* A commenter stated that the examples specified by the proposed rule describe the types of actions that the commenter's "clients encounter regularly." Examples of potentially discriminatory laws or ordinances cited by commenters include ordinances in largely white communities that establish local residency requirements, limit the use of vouchers under HUD's Housing Choice Voucher program, or set large-lot density requirements. Commenters suggested that language should be added to proposed § 100.70(d)(5), which provides, as an example, "[i]mplementing land-use rules, policies or procedures that restrict or deny housing opportunities in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" based on a protected class. Commenters stated that this example should include not just the word "implementing," but also the words "enacting" "maintaining," and/or "applying" because the discriminatory effect of a land-use decision may occur from the moment of enactment. A commenter suggested that the word "ordinances" should be added to the example to make clear that the Act applies to all types of exclusionary land-use actions.

---

[145] *Compare, e.g., In re Adoption of 2003 Low Income Housing Tax Credit Qualified Allocation Plan,* 369 N.J. Super. 2 (N.J. Sup. Ct. App. Div. 2004) *with Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs,* 749 F. Supp. 2d 48 (N.D. Tex. 2010).

[146] *See, e.g.,* 42 U.S.C. 3603(b)(1) (exempting from most of section 804 of the Act an owner's sale or rental of his single-family house if certain conditions are met).

[147] *See* 15 U.S.C. 1691 *et seq;* 12 CFR part 1002.

[148] *See* 12 U.S.C. 5491 *et seq.*

*HUD Response:* HUD reiterates that the illustrations contained in HUD's regulations are merely examples. The scope and variety of practices that may violate the Act make it impossible to list all examples in a rule. Nevertheless, HUD finds it appropriate to revise proposed § 100.70(d)(5) in this final rule in order to confirm that a land-use ordinance may be discriminatory from the moment of enactment. The final rule therefore changes "[i]mplementing land-use rules, policies, or procedures * * * " to "[e]nacting or implementing land-use rules, ordinances, policies, or procedures * * * ." It is not necessary to add "maintaining" or "applying" to § 100.70(d)(5) because the meaning of these words in this context is indistinguishable from the meaning of "implementing."

Because the illustrated conduct may violate the Act under either an intent theory, an effects theory, or both, HUD also finds it appropriate to replace "in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" because of a protected characteristic with "otherwise make unavailable or deny dwellings because of" a protected characteristic. As discussed in the "Validity of Discriminatory Effects Liability under the Act" section above, the phrase "otherwise make unavailable or deny" encompasses discriminatory effects liability. This revised language, therefore, is broader because it describes land-use decisions that violate the Act because of either a prohibited intent or an unjustified discriminatory effect. The final rule makes a similar revision to each of the illustrations so they may cover violations based on intentional discrimination or discriminatory effects.

*Issue:* A commenter requested that HUD add as an example the practice of prohibiting from housing individuals with records of arrests or convictions. This commenter reasoned that such blanket prohibitions have a discriminatory effect because of the disproportionate numbers of minorities with such records. The commenter stated further that HUD should issue guidance on this topic similar to guidance issued by the Equal Employment Opportunity Commission. Another commenter expressed concern that the rule would restrict housing providers from screening tenants based on criminal arrest and conviction records. This commenter also asked HUD to issue guidance to housing providers on appropriate background screening.

*HUD Response:* Whether any discriminatory effect resulting from a housing provider's or operator's use of criminal arrest or conviction records to exclude persons from housing is supported by a legally sufficient justification depends on the facts of the situation. HUD believes it may be appropriate to explore the issue more fully and will consider issuing guidance for housing providers and operators.

*Issue:* Several commenters suggested revisions to proposed § 100.120(b)(2), which specifies as an example "[p]roviding loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin." These commenters stated that proposed § 100.120(b)(2) does not contain language concerning the second type of discriminatory effect, i.e., creating, perpetuating or increasing segregation. They urged HUD to add language making clear that the provision of loans or other financial assistance may result in either type of discriminatory effect.

In addition, several commenters asked HUD to clarify that mortgage servicing with a discriminatory effect based on a protected characteristic may violate the Act.

*HUD Response:* As discussed above, proposed § 100.120(b)(2) is revised in the final rule to cover both intentional discrimination and discriminatory effects. HUD also agrees that residential mortgage servicing is covered by the Act. It is a term or condition of a loan or other financial assistance, covered by section 805 of the Act.[149] Accordingly, the final rule adds a § 100.130(b)(3), which provides an illustration of discrimination in the terms or conditions for making available loans or financial assistance, in order to show that discriminatory loan servicing (and other discriminatory terms or conditions of loans and other financial assistance) violate the Act's proscription on "discriminat[ing] * * * in the terms or conditions of [a residential real estate-related transaction]."

*Issue:* A commenter expressed concern that the language in proposed § 100.120(b)(2) would allow for lawsuits based only on statistical data produced under HMDA.

*HUD Response:* HUD and courts have recognized that analysis of loan level data identified though HMDA may indicate a disparate impact.[150] Such a showing, however, does not end the inquiry. The lender would have the opportunity to refute the existence of the alleged impact and establish a substantial, legitimate, nondiscriminatory interest for the challenged practice, and the charging party or plaintiff would have the opportunity to demonstrate that a less discriminatory alternative is available to the lender.

*Issue:* A commenter stated that HUD should not add any of the new examples unless the final rule makes clear that the specified practices are not *per se* violations of the Act, but rather must be assessed pursuant to the standards set forth in § 100.500. According to the commenter, the new examples may be misconstrued because they state only the initial finding described in § 100.500.

*HUD Response:* HUD agrees that, when a practice is challenged under a discriminatory effects theory, the practice must be reviewed under the standards specified in § 100.500. The final rule therefore adds a sentence to the end of § 100.5(b), which makes clear that discriminatory effects claims are assessed pursuant to the standards stated in § 100.500.

### H. Other Issues

*Issue:* A commenter requested that HUD examine the overall compliance burden of the regulation on small businesses, noting that Executive Order 13563 requires a cost-benefit analysis.

*HUD Response:* In examining the compliance burden on small institutions, the governing authority is the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*, which provides, among other things, that the requirements to do an initial and final regulatory flexibility analysis "shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." Thus, the focus is on whether the rule—and not the underlying statute or preexisting administrative practice and case law— will have a significant economic impact. For this rule, the impact primarily arises from the Fair Housing Act itself, not only as interpreted by HUD, but also as interpreted by federal courts. Because this final rule provides a uniform burden-shifting test for determining

---

[149] 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate § 804 of the Act. 42 U.S.C. 3604.

[150] *See City of Memphis and Shelby Cnty.* v. *Wells Fargo, N.A.,* No. 09–2857–STA, 2011 U.S. Dist.

LEXIS 48522 at *45 (W.D. Tenn. May 4, 2011); *Mayor and City Council of Baltimore* v. *Wells Fargo Bank, N.A.,* No. JFM–08–62, 2011 U.S. Dist. LEXIS 44013 (D. Md. April 22, 2011); *Steele* v. *GE Money Bank,* No. 08–C–1880, 2009 U.S. Dist. LEXIS 11536 (N.D. Ill. Feb. 17, 2009); *Taylor* v. *Accredited Home Lenders, Inc.,* 580 F. Supp. 2d 1062 (S.D. Cal. 2008).

whether a given action or policy has an unjustified discriminatory effect, the rule serves to reduce regulatory burden for all entities, large or small, by establishing certainty and clarity with respect to how a determination of unjustified discriminatory effect is to be made.

The requirement under the Fair Housing Act not to discriminate in the provision of housing and related services is the law of the nation. We presume that the vast majority of entities both large and small are in compliance with the Fair Housing Act. Furthermore, for the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute, administrative practice, and case law. Compliance with the Fair Housing Act has for almost 40 years included the requirement to refrain from undertaking actions that have an unjustified discriminatory effect. The rule does not change that substantive obligation; it merely formalizes it in regulation, along with the applicable burden-shifting framework.

Variations in the well-established discriminatory effects theory of liability under the Fair Housing Act, discussed earlier in the preamble, are minor and making them uniform will not have a significant economic impact. The allocation of the burdens of proof among the parties, described in the rule, are methods of proof that only come into play if a complaint has been filed with HUD, a state or local agency or a federal or state court; that is, once an entity has been charged with discriminating under the Fair Housing Act. The only economic impact discernible from this rule is the cost of the difference, if any, between defense of litigation under the burden-shifting test on the one hand, and defense of litigation under the balancing or hybrid test on the other. In all the tests, the elements of proof are similar. Likewise, the costs to develop and defend such proof under either the burden-shifting or balancing tests are similar. The only difference is at which stage of the test particular evidence must be produced. There would not, however, be a significant economic impact on a substantial number of small entities as a result of this rule.

Executive Order 13563 (Improving Regulations and Regulatory Review) reaffirms Executive Order 12866, which requires that agencies conduct a benefit/cost assessment for rules that "have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities." As stated in Section VII of this preamble below, this rule is not "economically significant" within the meaning in Executive Order 12866, and therefore a full benefit/cost assessment is not required. This final rule does not alter the established law that facially neutral actions that have an unjustified discriminatory effect are violations of the Fair Housing Act. What this rule does is formalize that well-settled interpretation of the Act and provide consistency in how such discriminatory effects claims are to be analyzed.

## VI. This Final Rule

For the reasons presented in this preamble, this final rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability and establishes a uniform standard of liability for facially neutral practices that have a discriminatory effect. Under this rule, liability is determined by a burden-shifting approach. The charging party or plaintiff in an adjudication first must bear the burden of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice is necessary to achieve one or more of the defendant's or respondent's substantial, legitimate, nondiscriminatory interests. If the defendant or respondent satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that these substantial, legitimate, nondiscriminatory interests could be served by a practice that has a less discriminatory effect.

### A. Discriminatory Effect—Subpart G

#### 1. Scope

This final rule adds a new sentence to the end of paragraph (b) in § 100.5, which states: "The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500."

#### 2. Discriminatory Effect Prohibited (§ 100.500)

Consistent with HUD's November 16, 2011, proposed rule, this final rule adds a new subpart G, entitled "Discriminatory Effect," to its Fair Housing Act regulations in 24 CFR part 100. Section 100.500 provides that the Fair Housing Act may be violated by a practice that has a discriminatory effect, as defined in § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose. The practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The respective burdens of proof for establishing or refuting an effects claim are set forth in § 100.500(c). Section 100.500(d) clarifies that a legally sufficient justification may not be used as a defense against a claim of intentional discrimination. It should be noted that it is possible to bring a claim alleging both discriminatory effect and discriminatory intent as alternative theories of liability. In addition, the discriminatory effect of a challenged practice may provide evidence of the discriminatory intent behind the practice. This final rule applies to both public and private entities because the definition of "discriminatory housing practice" under the Act makes no distinction between the two.

#### 3. Discriminatory Effect Defined (§ 100.500(a))

Section 100.500(a) provides that a "discriminatory effect" occurs where a facially neutral practice actually or predictably results in a discriminatory effect on a group of persons protected by the Act (that is, has a disparate impact), or on the community as a whole on the basis of a protected characteristic (perpetuation of segregation). Any facially neutral action, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule. For examples of court decisions regarding policies or practices that may have a discriminatory effect, please see the preamble to the proposed rule at 76 FR 70924–25.

#### 4. Legally Sufficient Justification (§ 100.500(b))

Section 100.500(b), as set forth in the regulatory text of this final rule, provides that a practice or policy found to have a discriminatory effect may still be lawful if it has a "legally sufficient justification."

#### 5. Burden of Proof (§ 100.500(c))

Under § 100.500(c), the charging party or plaintiff first bears the burden of proving its prima facie case: that is, that a practice caused, causes, or predictably will cause a discriminatory effect on a

group of persons or a community on the basis of race, color, religion, sex, disability, familial status, or national origin. Once the charging party or the plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant. If the respondent or defendant satisfies its burden, the charging party or plaintiff may still establish liability by proving that these substantial, legitimate, nondiscriminatory interests could be served by another practice that has a less discriminatory effect.

### B. Illustrations of Practices With Discriminatory Effects

This final rule adds or revises the following illustrations of discriminatory housing practices:

The final rule adds to § 100.70 new paragraph (d)(5), which provides as an illustration of other prohibited conduct "[e]nacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings because of race, color, religion, sex, handicap, familial status, or national origin."

Section 100.120, which gives illustrations of discrimination in the making of loans and in the provision of other financial assistance, is streamlined, and paragraph (b)(2) now reads as set forth in the regulatory text of this final rule

In § 100.130, the final rule also amends paragraph (b)(2) and adds new paragraph (b)(3). The words "or conditions" is added after "terms," and "cost" is added to the list of terms or conditions in existing paragraph (b)(2). New paragraph (b)(3) includes servicing as an illustration of terms or conditions of loans or other financial assistance covered by section 805 of the Act: "Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin."

### VII. Findings and Certifications

### Regulatory Review—Executive Orders 13563 and 12866

Executive Order 13563 ("Improving Regulation and Regulatory Review")

directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 ("Regulatory Planning and Review"), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (OMB) in accordance with the requirements of the order. This rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

This rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability, and establishes uniform, clear standards for determining whether a practice that has a discriminatory effect is in violation of the Fair Housing Act, regardless of whether the practice was adopted with intent to discriminate. As stated in the Executive Summary, the need for this rule arises because, although all federal courts of appeals that have considered the issue agree that Fair Housing Act liability may be based solely on discriminatory effects, there is a small degree of variation in the methodology of proof for a claim of effects liability. As has been discussed in the preamble to this rule, in establishing such standards HUD is exercising its rulemaking authority to bring uniformity, clarity, and certainty to an area of the law that has been approached by HUD and federal courts across the nation in generally the same way, but with minor variations in the allocation of the burdens of proof.[151] A uniform rule would simplify compliance with the Fair Housing Act's discriminatory effects standard, and decrease litigation associated with such claims. By providing certainty in this area to housing providers, lenders, municipalities, realtors, individuals engaged in housing transactions, and courts, this rule would reduce the burden associated with litigating discriminatory effect cases under the Fair Housing Act by clearly establishing which party has the burden of proof, and how such burdens are to be met. Additionally, HUD believes the rule

may even help to minimize litigation in this area by establishing uniform standards. With a uniform standard, entities are more likely to conduct self-testing and check that their practices comply with the Fair Housing Act, thus reducing their liability and the risk of litigation. A uniform standard is also a benefit for entities operating in multiple jurisdictions. Also, legal and regulatory clarity generally serves to reduce litigation because it is clearer what each party's rights and responsibilities are, whereas lack of consistency and clarity generally serves to increase litigation. For example, once disputes around the court-defined standards are eliminated by this rule, non-meritorious cases that cannot meet the burden under § 100.500(c)(1) are likely not to be brought in the first place, and a respondent or defendant that cannot meet the burden under § 100.500(c)(2) may be more inclined to settle at the pre-litigation stage.

Accordingly, while this rule is a significant regulatory action under Executive Order 12866 in that it establishes, for the first time in regulation, uniform standards for determining whether a housing action or policy has a discriminatory effect on a protected group, it is not an economically significant regulatory action. The burden reduction that HUD believes will be achieved through uniform standards will not reach an annual impact on the economy of $100 million or more, because HUD's approach is not a significant departure from HUD's interpretation to date or that of the majority of federal courts. Although the burden reduction provided by this rule will not result in economically significant impact on the economy, it nevertheless provides some burden reduction through the uniformity and clarity presented by HUD's standards promulgated through this final rule and is therefore consistent with Executive Order 13563.

The docket file is available for public inspection in the Regulations Division, Office of the General Counsel, Room 10276, 451 7th Street SW., Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339.

### Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires

---

[151] *See, e.g.,* the extensive discussion of the various options in *Graoch,* 508 F.3d at 371–375.

an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. For the reasons stated earlier in this preamble in response to public comment on the issue of undue burden on small entities, and discussed here, HUD certifies that this rule will not have significant economic impact on a substantial number of small entities.

It has long been the position of HUD, confirmed by federal courts, that practices with discriminatory effects may violate the Fair Housing Act. As noted in the preamble to the proposed rule (76 FR 70921) and this preamble to the final rule, this long-standing interpretation has been supported by HUD policy documents issued over the last decades, is consistent with the position of other Executive Branch agencies, and has been adopted and applied by every federal court of appeals to have reached the question. Given, however, the variation in how the courts and even HUD's own ALJs have applied that standard, this final rule provides for consistency and uniformity in this area, and hence predictability, and will therefore reduce the burden for all seeking to comply with the Fair Housing Act. Furthermore, HUD presumes that given the over 40-year history of the Fair Housing Act, the majority of entities, large or small, currently comply and will remain in compliance with the Fair Housing Act. For the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute. The rule does not change that substantive obligation; it merely sets it forth in a regulation. While this rule provides uniformity as to specifics such as burden of proof, HUD's rule does not alter the substantive prohibitions against discrimination in fair housing law, which were established by statute and developed over time by administrative and federal court case law. Any burden on small entities is simply incidental to the pre-existing requirements to comply with this body of law. Accordingly, the undersigned certifies that this final rule will not have a significant economic impact on a substantial number of small entities.

### Environmental Impact

This final rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

### Executive Order 13132, Federalism

Executive Order 13132 (entitled ''Federalism'') prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This final rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

### Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This final rule does not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

### List of Subjects in 24 CFR Part 100

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD amends 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority citation for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

### Subpart A—General

■ 2. In § 100.5, add the following sentence at the end of paragraph (b):

### § 100.5   Scope.

*    *    *    *    *

(b) * * * The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent,

consistent with the standards outlined in § 100.500.

*    *    *    *    *

### Subpart B—Discriminatory Housing Practices

■ 3. In § 100.70, add new paragraph (d)(5) to read as follows:

### § 100.70   Other prohibited conduct.

*    *    *    *    *

(d) * * *

(5) Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

### Subpart C—Discrimination in Residential Real Estate-Related Transactions

■ 4. In § 100.120, revise paragraph (b) to read as follows:

### § 100.120   Discrimination in the making of loans and in the provision of other financial assistance.

*    *    *    *    *

(b) Practices prohibited under this section in connection with a residential real estate-related transaction include, but are not limited to:

(1) Failing or refusing to provide to any person information regarding the availability of loans or other financial assistance, application requirements, procedures or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Providing, failing to provide, or discouraging the receipt of loans or other financial assistance in a manner that discriminates in their denial rate or otherwise discriminates in their availability because of race, color, religion, sex, handicap, familial status, or national origin.

■ 5. In § 100.130, revise paragraph (b)(2) and add new paragraph (b)(3) to read as follows:

### § 100.130   Discrimination in the terms and conditions for making available loans or other financial assistance.

*    *    *    *    *

(b) * * *

(2) Determining the type of loan or other financial assistance to be provided with respect to a dwelling, or fixing the amount, interest rate, cost, duration or other terms or conditions for a loan or

other financial assistance for a dwelling or which is secured by residential real estate, because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin.

■ 6. In part 100, add a new subpart G to read as follows:

### Subpart G—Discriminatory Effect

§ 100.500   Discriminatory effect prohibited.

Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

(a) *Discriminatory effect.* A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* (1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

(ii) Those interests could not be served by another practice that has a less discriminatory effect.

(2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (c)(3) of this section.

(c) *Burdens of proof in discriminatory effects cases.* (1) The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

(d) *Relationship to discriminatory intent.* A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

Dated: February 8, 2013.

**John Trasviña,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2013–03375 Filed 2–14–13; 8:45 am]

**BILLING CODE 4210–67–P**

# Title VIII Investigative Skills Training

## Fair Housing Amendments Act of 1988



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## Office of
## Fair Housing and Equal Opportunity



EQUAL HOUSING
OPPORTUNITY

FAIR HOUSING AMENDMENTS ACT OF 1988 TRAINING
TITLE VIII INVESTIGATIVE SKILLS
AGENDA
QUALITY HOTEL
Arlington, Virginia
December 12 - 16, 1988

## DAY 1

| Time | Topic | Presenter |
|---|---|---|
| 9:00-10:00 | General Overview of Course/Administrative Details/PreTest | Dana Jackson/ Peggy Swift |
| 10:00-10:15 | Break | |
| 10:15-11:00 | Overview of the new Statute | Larry Pearl |
| 11:00-12:00 | Overview of Implementing Procedures | Sam Hutchinson |
| 12:00-1:00 | Lunch | |
| 1:00-1:15 | Office of General Counsel's Reasonable Cause Process | Kathy Coughlin |
| 1:15-2:30 | Requirements of Legal Sufficiency<br>- Jurisdiction and Standing<br>- Documentary Evidence<br>- Admissible v. Inadmissible Evidence | Kathy Coughlin<br><br>Jackie Ringhausen |
| 2:30-2:45 | Break | |
| 2:45-3:15 | - Disparate Treatment Analysis<br>- Pattern and Practice Cases | Kathy Coughlin |
| 3:15-4:00 | Subpoenas, Interrogatories, Penalties for Document Tampering | Jackie Ringhausen |
| 4:00-4:10 | Closing Remarks | Judith Brachman |
| 4:10-4:30 | Discussion of Evening Assignment | Dana Jackson |

2

Day 2

| 9:00-9:30 | New Role of Investigators | Joe Rich, DOJ |
| 9:30-10:30 | Case Management Concepts | Joe Rich |
| 10:30-10:45 | Break | |
| 10:45-11:15 | Complaint Intake | Jackie Ringhausen |
| 11:15-12:00 | Planning and Implementation of Investigation | Joe Rich Paul Hancock |
| 12:00-1:00 | Lunch | |
| 1:00-2:00 | Planning and Implementation of Investigation (Cont) | |
| 2:00-2:45 | Organization of FIR | Kathy Coughlin Jackie Ringhausen |
| 2:45-3:30 | File Organization and Maintenance | Joe Rich Paul Hancock |
| 3:30-4:30 | Investigative Role verses Conciliation Role | Joe Rich Paul Hancock |
| 4:30-5:00 | Department of Justice's Responsibilities Under the Act | Joe Rich Paul Hancock |
| 5:00-5:15 | Assignment of Evening Exercises | Dana Jackson |

Day 3

| 9:00-10:00 | Plenary Session – Discussion of Evening Exercises & Film | Dana Jackson |

3

| | | |
|---|---|---|
| 10:00-12:00 | Conciliation/Negotiation Process | Harold Davis, Federal Mediation & Conciliation Service |
| 12:00-1:00 | Lunch | |
| 1:00-4:00 | Conciliation/Negotiation Process (Cont.) | Harold Davis |
| 4:00-4:45 | Assignment of Evening Exercise | |

Day 4

| | | |
|---|---|---|
| 9:00-10:30 | Plenary Session - Discussion of Evening Exercise | |
| 10:30-10:45 | Break | |
| 10:45-12:00 | Administrative Law Judge's Hearing Process | Alan Heifetz, Chief ALJ Marshall Lippman, Attorney-at-Law |
| 12:00-1:00 | Lunch | |
| 1:00- 3:00 | Administrative Hearing (Cont.) | |
| 3:00-3:45 | Title VIII Contract Investigations | Wagner Jackson |
| 3:45-4:30 | Monitoring of Cases Referred to State/Local Agencies | Sue Ireland |
| 4:30-5:30 | Regional Meetings | |

Day 5

| | | |
|---|---|---|
| 9:00-10:15 | Plenary Session - Feedback from Regional Meetings | |
| 10:15-10:30 | Break | |
| 10:30-11:05 | Relationship of CDBG Regulations to Title VIII Amendments | Brenda Cleaver |
| 11:05-11:15 | Wrap Up - "This is a New Beginning" | William Wynn |
| 11:15-12:00 | Post Test/Course Evaluation | Dana Jackson |

Establishing Discriminatory Housing Practices under Title
VIII of the Civil Rights Act of 1968

THE EFFECTS TEST

While the Supreme Court has often considered the bases for
establishing the occurrence of discriminatory employment
practices, it has not decided any Fair Housing Act case which
discusses or describes the basis for finding a discriminatory
housing practice under Title VIII of the Civil Rights Act of
1968.

EFFECTS TEST 1

Court of Appeals decisions in Fair Housing Act cases involving standards of proof do not disclose any patterns or general rules for establishing discriminatory housing practices. However, no circuit court has explicitly rejected the effects test as a standard.

EFFECTS TEST 2

BUT WHAT IS THE EFFECTS TEST?

EFFECTS TEST 3

DOES IT MEAN

That any act which has the effect of denying or otherwise making unavailable a dwelling is a violation of Title VIII

OR

That it is not necessary to establish a purpose or an intention to discriminate in order to establish a violation of Title VIII

OR

That any act which has a significant adverse affect on persons of a particular race, color, religion, sex or national origin in unlawful.

EFFECTS TEST  4

In Metropolitan Housing Development Corp. v Village of Arlington Heights the Seventh Circuit Court of Appeals taking into account the similarity between Title VIII and Title VII set forth four critical factors for determining "under what circumstances conduct that produces a discriminatory impact but which was taken without discriminatory intent will violate [Title VIII]"

(1) The strength of plaintiff's showing of discriminatory effect

(2) Evidence of intent, though not enough to satisfy the constitutional standard

(3) Defendant's interest in taking the action complained of

(4) Whether the remedy is to compel provision of housing or merely to restrain defendant from interfering with owners who wish to provide housing

Metropolitan Development Corp. v Village of Arlington Heights 558 F2d 1283 (7th Cir. 1977)

EFFECTS TEST  p. 5

In Resident Advisory Board v Rizzo decided shortly after
Arlington Heights in 1977 the Third Circuit joined the Seventh
Circuit in concluding that "in Title VIII cases, unrebutted
proof of discriminatory effect alone ..." may constitute viola-
tion of Title VIII


Resident Advisory Bd. v Rizzo
564 F2d 126 (3rd Cir. 1977)




EFFECTS TEST  p. 6

Recognizing vast differences between employment and housing discrimination cases the Court in Rizzo indicated that Title VIII rebuttal criteria must evolve on a case-by-case basis.  However, the Court did state the following guidance:

> "a justification must serve in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show no alternative course of action would enable that interest to be served with less discriminatory impact."

In the event the prima facie case is not rebutted, a violation of Title VIII is established.

Resident Advisory Bd. v Rizzo

EFFECTS TEST p. 7

Another Title VIII decision dealing with standards for establishing a violation is U.S. v City of Black Jack.  In an opinion of the Eighth Circuit Court of Appeals the Court held that in order to establish "a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination.

The Court thus held that in responding to the prima facie case the burden shifted to the city to demonstrate "that a compelling government interest was furthered by that ordinance."

U.S. v City of Black Jack
508 F2d (8th Cir, 1974), cert. denied,
422 U.S. 1042, (1975)

N.B. The Third Circuit in Rizzo expressly declined to apply the Black Jack "compelling interest" analysis noting that it was not part of the Title VIII doctrine and that such a heavy burden should be reserved not for Title VIII defendants, but for those who seek to justify denials of equal protection.

EFFECTS TEST  p. 8

Several Title VIII "effects test" cases have involved clearly intentional practices.

US v Youritan Construction Co
Credit checks for blacks but not for whites

US v Mitchell
Steering of black to housing in only one
   section of complex

Smith v Anchor Bldg. Corp
Telling blacks that dwellings were not available
   while housing whites

Because of this fact the analysis of a prima facie case
and the rebuttals provided are not developed in the decision -
If an act is discriminatory what type of rebuttal would make it
nondiscriminatory

EFFECTS TEST  p. 9

In Robinson v 12 Lofts Realty the second Circuit employed the Title VII disparate treatment analysis of McDonnell Douglas in reviewing a case of refusal by a cooperative to accept a contract for the sale of a dwelling.  A similar analysis was used in subsequent district court case Dreher v Rana Management, Inc.  It should be noted, however, that the Second Circuit decision in Boyd v the Lefrak Organization has been read to indicate that the Second Circuit has not adopted a pure effects test approach in Title VIII cases.  In that case the court held that plaintiff although establishing a disparate impact had not established racial motivation.  A similar analysis has been used in the Sixth Circuit.  (See McHaney v Spears, 526 F. Supp. 566 (W.D. Tenn. 1981.)

EFFECTS TEST  p. 10

More recently the Fourth Circuit has adopted the position
that intentional discriminatory conduct is not essential to
establishing a violation of Title VIII.  However, the Court of
Appeals while determining that the Griggs disparate impact
rationale should be applied to Fair Housing Act cases adopted
the Arlington Heights four critical factor analysis.  See also
Atkins v Robinson, 545 F. Supp. 852 (E.D. Va. 1982).

EFFECTS TEST  p. 11

Although no Court has rejected the effects test, the Sixth
Circuit has indicated in Skillken v City of Toledo that intent
to discriminate must be shown to invalidate a zoning ordinance

Courts of Appeal in the Second, Third, Fourth, Fifth,
Seventh, Eighth and Ninth Circuit have adopted the principle
that intentional conduct is not needed to establish a violation
of Title VIII

EFFECTS TEST  p. 12

While Courts of Appeal in 7 circuits have held Title VIII analogous to Title VII with respect to the burden of proof and production the three leading Title VIII effects test cases Black Jack, Resident Advisory Board and Arlington Heights, all involve governmental actions and provide for different analyses.

In another circuit the court has adopted Title VII Disparate Impact but employed a different analysis than that used in Title VII cases.

In two other circuits there is an effects test in place but no direction on the analysis to be provided.

The remaining circuit courts have adopted the McDonnell Douglas analysis.

EFFECTS TEST   p. 13



FILE COPY

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-2000

December 17, 1993

OFFICE OF THE ASSISTANT SECRETARY
FOR FAIR HOUSING AND EQUAL OPPORTUNITY

MEMORANDUM FOR:  All Regional Directors, Office of Fair Housing
and Equal Opportunity

FROM:  Roberta Achtenberg, Assistant Secretary for Fair Housing
and Equal Opportunity, E

SUBJECT:  Applicability of Disparate Impact Analysis to Fair
Housing Cases

Cases which have been brought under the Fair Housing Act
should now be analyzed using a disparate impact analysis, to the
extent that this theory is applicable to a particular case.

Under a disparate impact analysis, a policy, standard,
practice or procedure which, in operation, disproportionately
adversely affects persons protected by the Fair Housing Act
coverages may violate the Act.

According to a Secretarial decision in <u>Secretary v. Mountain
Side Mobile Estates</u>, dated July 19, 1993, a <u>prima facie</u> case of
disparate impact may be established by statistical evidence,
including national statistics where there is no evidence of a
large variation from local statistics, establishing that a
facially neutral policy has a disparate impact on persons who are
protected against discrimination.  This theory only applies where
there is a policy which is, on its face, neutral, but which
operates to disproportionately disadvantage persons because of
race, color, national origin, religion, handicap, sex or familial
status.  Other theories will be applicable where the policy is
unequally applied or where it is discriminatory on its face.

For purposes of investigation, this suggests that a position
that a <u>prima facie</u> case has been established should be buttressed
by an analysis of the evidence supporting the belief that a
particular policy, practice, standard or procedure disadvantages
a group or a portion of a group protected against discrimination.
In some instances, this will be by analysis of waiting lists,
applicant flow or occupancy data.  In other cases, this will be
done by an analysis of the effect of a policy on potential
applicants or the population of a community in a particular
income bracket.

In a second Secretarial decision in the same case, dated October 20, 1993, the Secretary confirmed that a respondent may rebut a _prima facie_ case by evidence that the policy is justified by a business necessity which is sufficiently compelling to overcome the discriminatory effect. The business necessity justification may not be hypothetical or speculative.

For purposes of investigation, all of the respondent's justifications for its policy should be requested, with any supporting documentation. Each should be investigated to determine if there are genuine business reasons for the policy. The respondent should also be queried as to whether or not the respondent considered any alternatives to the particular policy and what the reasons for rejecting the alternatives, if any, were. Even if the respondent did not consider discriminatory alternatives, the investigation should consider whether there are any less discriminatory ways in which the respondent's business justifications may be addressed. These steps are important because if there is a less discriminatory way by which genuine business necessities may be addressed, it may be argued that the respondent should have adopted the less discriminatory alternative.

The disparate impact analysis may be applicable in a variety of situations, ranging from cases in which a local residency preference disproportionately excludes minorities from housing residency, to policies refusing to count alimony as income for purposes of housing eligibility, to occupancy cases in which a facially neutral policy disproportionately excludes or disadvantages families with children.[1]

Copies of the two Secretarial decisions are attached for your consideration.

Further examples and additional guidance will follow this memo. If you have any questions, please contact Sara Pratt, Director, Office of Investigations at (202) 708-0836.

---

[1] Because the Frank Keating memorandum of March 21, 1991 addressing occupancy restrictions has not been withdrawn, occupancy cases involving a disparate impact aspect should also be analyzed using the memorandum as a guide.

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN AND DEVELOPMENT
OFFICE OF THE SECRETARY

The Secretary, United States
Department of Housing and Urban
Development, on behalf of
Jacqueline, Jaime, Michael,
and Shea VanLoozenoord,

        Charging Party,

    v.

Mountain Side Mobile Estates
Partnership, and Mr. and Mrs.
R. D. Dalke,

       Respondents.

      AND

                         HUDALJ 08-92-0010-1
                         HUDALJ 08-92-0011-1

The Secretary, United States
Department of Housing and Urban
Development, on behalf of
Michael Brace,

        Charging Party,

    v.

Mountain Side Mobile Estates
Partnership, and Mr. and Mrs.
R. D. Dalke,

       Respondents.

Dorothy Crow-Willard, Esq.
Sara K. Pratt, Esq.
Harry L. Carey, Esq.
Carole W. Wilson, Esq.
    For the Charging Party

Stephen E. Kapnik, Esq.                                    2
    For the Respondents

Before:    Henry G. Cisneros
           Secretary of Housing and Urban Development

## DECISION AND ORDER

### Statement of the Case

Mountain Side Mobile Estates ("the Park") is a trailer park located at 17190 Mt. Vernon Road, Golden, Colorado, in unincorporated Jefferson County. It was developed in the 1960's. It has 229 lots for mobile homes, with an average of 10 lots per acre. The Park has limited recreational facilities and narrow streets compared to trailer parks built in the 1970's and later, and small "single-wide" mobile homes. The Park has a total of 458 bedrooms. Nevertheless, the Park has a population of approximately 320 persons, with approximately 30 families with children under 18 years of age. Approximately 76% of the homes in the Park are two bedroom, 13% are three bedroom, and 11% are one bedroom homes. The Park sits on a flood plain.

Prior to the effective date of the Fair Housing Amendments Act of 1988, the Park was an "adults only" Park. Respondents determined that it would not be feasible to qualify for the "55 and older" statutory exemption. See 42 U.S.C. § 3607(b)(2). However, fearing an unlimited expansion of the Park's population, they instituted a three person per unit occupancy limit on March 8, 1989. The Fair Housing Amendments of 1988 became effective on March 12, 1989.

This case arose as a result of complaints filed by Jacqueline VanLoozenoord, her three minor children, and Michael Brace ("Complainants"), alleging discrimination based on familial status in violation of the Fair Housing Act, as amended, 42 U.S.C. 3601, et seq. ("the Act"). On July 24, 1992, following an investigation and a determination that reasonable cause existed to believe that discrimination had occurred, the Department of Housing and Urban Development ("the Charging Party") issued a charge against Mountain Side Mobile Estates Partnership, Robert Dalke, and Marilyn Dalke ("Respondents"), alleging that they had engaged in discriminatory practices in violation of 42 U.S.C. 3604 because they had imposed an occupancy limitation of three persons per mobile home (unit). Respondents had attempted to evict Complainants because they were in violation of the unit occupancy limitation.

A hearing was held and Administrative Law Judge William C. Cregar issued an Initial Decision and Order on March 22, 1993, finding that the Charging Party failed to prove that Respondents had violated the Act and dismissing the charge of discrimination.

3

On April 21, 1993, the Secretary of Housing and Urban Development remanded the Initial Decision and Order in the above-captioned case to permit consideration of the Charging Party's April 13, 1993, Motion for Partial Reconsideration and any opposition thereto. *See* 24 C.F.R. § 104.930(a) and (d). ALJ Cregar issued an Order for the submission of briefs in support of the Charging Party's Motion, and in opposition. Both parties timely filed briefs.

The Charging Party moved for reconsideration of that portion of ALJ Cregar's Initial Decision and Order that found no violation of 42 U.S.C. § 3604(a) and (b) and requested the assessment of damages against Respondents for those alleged violations. Respondents argued that the Initial Decision contained no clear error, and accordingly, the determination should not be modified. In his Initial Decision on Remand and Order, dated June 18, 1993, ALJ Cregar again found that Respondents did not violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601, et seq. ("the Act"), and he again denied the Charging Party's request for relief.

On July 7, 1993, the Charging Party filed a Motion to Set Aside Initial Decisions and Enter a Final Decision Granting Relief, and also filed a Memorandum in Support of Motion to Set Aside Initial Decision on Remand and Order and Issue a Final Decision Granting Relief ("Memorandum"). On July 14, 1993, Respondents timely filed an Opposition to HUD's Motion to Set Aside Initial Decision. On July 19, 1993, the Secretary again remanded the case to the ALJ. The ALJ had held that Charging Party had not proven a prima facie case and further held that, even if a prima facie disparate impact case had been shown, Respondents had carried their burden of rebuttal by demonstrating that their three person per unit occupancy restriction served their legitimate goals and was not a mere unsubstantial justification. The Secretary reversed the ALJ. He held that the Charging Party had established a prima facie case based upon the disparate impact theory. He further held that the ALJ had improperly relied upon the analysis of business necessity as set forth in Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642 (1989). The Secretary then directed a remand for the ALJ to consider the Respondents' business necessity defenses in light of the standard set forth in Betsy v. Turtle Creek Associates, 736 F.2d 983 (4th Cir. 1984).

On September 20, 1993, Judge Cregar issued a Second Initial Decision on Remand and Order in which he held that the Respondents had met the business necessity test under Betsy and that the Charging Party had failed to demonstrate that a less discriminatory alternative to the three person per unit occupancy policy existed. Charging Party filed a Motion to Set Aside the Second Initial Decision and Order on October 5, 1993. The NAACP

4

Legal Defense and Educational Fund, Inc. filed an _amicus curiae_ brief on October 5, 1993.

Summary of Second Initial Decision on Remand and Order

The ALJ determined that both economic viability and concern for the safety and health of tenants are legitimate business concerns. He held as follows:

> Drawing an analogy from the Title VII job relatedness tests, I conclude that the "business necessity" test as applied to Title VIII has two components. First, the challenged practice must bear a demonstrable relationship to a housing provider's legitimate business interests; and second, objective evidence must establish that the means selected to serve those interests must be reasonably likely to effectuate those interests and not otherwise be unlawful.

Second Initial Decision at 5. It was his view that economic viability was the _sine qua non_ of a business, including a housing provider. He then cited 42 U.S.C. §1437 for the proposition that "it is the policy of the United States to promote the general welfare of the Nation by employing its funds and credit ... to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income." Based on this provision, he held that the business necessity standard under Title VIII included consideration of health and safety concerns.

Using these twin business concerns he ruled that the three person per unit policy constituted business necessity for several reasons. Second Initial Decision at 5-7. First, the policy prevented overcrowding. Overcrowding, according to the ALJ, "could put the health of [Mountain Side Mobile Estates] Park population at risk by overwhelming the sewer system." In support of the health risk, he noted that the record demonstrated that overcrowding would result if the number of occupants of the Park exceeded 916. Second, overcrowding could affect the Park's economic viability because "it could result in an exodus of tenants seeking to avoid these conditions. The same unsanitary conditions causing the exodus could discourage or prevent new tenants from moving into the Park." The ALJ held that the three person per unit occupancy limit was not otherwise illegal and would stem the risk of overcrowding.

The ALJ also ruled that objective evidence established that the occupancy limit was "reasonably likely to maintain a healthy and economically viable park." He noted that although the

occupancy limit would establish a Park population lower than the capacity of the Park's sewer system, the lower limit would allow for seasonal visitors and would allow the smaller population to live in greater comfort. He cited as objective evidence the QCI Report that establishes that more than four persons per unit could lead to unsanitary conditions and testimony that there were seasonal visitors.

The ALJ then discussed and dismissed each of a number of suggested alternatives presented by the Charging Party. The alternatives to the three person per unit occupancy limit were: (1) adoption of an alternate occupancy limit, (2) physical alterations to the Park and (3) the imposition of restrictions on the terms and conditions of residence. The ALJ rejected all three as unacceptable because they would discriminate or be impractical or prohibitively expensive.

The ALJ rejected the Charging Party's suggestion that Respondents impose an overall maximum population ceiling on the Park regardless of the number of occupants. He held that this alternative was economically impractical because total Park population could be reached before Respondents are able to rent all of their lots. He noted that the Respondents might be compelled to prohibit the sale of units and rental spaces once the limit was reached. He also noted that once the limit was reached, Respondent's refusal to rent a unit could subject them to disparate treatment charges.

The ALJ rejected the Charging Party's suggestion that Respondents impose an occupancy limit based on the number of occupants per bedroom. He noted that because of the number of bedrooms, that a potential for overcrowding existed because of the sewer system limitations.[1]

Charging Party also suggested physical alterations to the Park, such as replacement of a section of sewer pipe that could prevent sewer blockages. The ALJ ruled that, although the solution would not be expensive, it involved major impediments,

---

[1] Charging Party also suggested the adoption of a minimum square footage requirement for each occupant's sleeping area. The ALJ ruled, however, that this suggestion would not necessarily prevent overcrowding. He also ruled that the record failed to demonstrate that adoption of a square footage requirement for sleeping areas or for whole units would not result in a less discriminatory impact on families with children. Charging Party further suggested that sewer overload could be prevented by limiting the number of toilets per unit or instituting water conservation and demand control. The ALJ, however, ruled that Park residents could then be faced with too few toilets and an intrusive police enforcement mechanism.

6

such as obtaining a permit from FEMA and possibly removing the Park from the flood plain on which it rests.  He further ruled that there was credible testimony that replacing the section of pipe might not cure the sewerage problems.

### Motion to Set Aside Second Initial Decision and Enter a Final Decision Granting Relief

In its Motion to Set Aside Second Initial Decision and Enter a Final Decision Granting Relief, Charging Party argues that the ALJ misinterpreted the standard required for a respondent to establish that a discriminatory housing practice is justified by business necessity, improperly required the Charging Party to bear the burden of proving that there were less discriminatory alternatives to the challenged three person per unit occupancy restriction and, regardless of which party bears the burden of production, incorrectly found that there were no less discriminatory alternatives which would meet the respondents' claimed business concerns.

The Charging Party argues that the ALJ improperly substituted the concept of "legitimacy" for the requirement that a policy be a "necessity."  Charging Party argues that, under Betsy and other cases, a business necessity must be compelling, not just legitimate.  Charging party further argues that the necessity must be manifest or apparent rather than speculative. In addition, Charging Party urges that even if Respondents' interests are substantial, they cannot automatically outweigh significant disparate effects and must be weighed against and shown to outweigh the showing of discriminatory effect.

Charging Party further argues that the record does not support a conclusion that the three person per unit occupancy policy was justified by business necessity.  First, Charging Party notes that the Respondents presented no evidence that overcrowding would actually or predictably occur, citing that only 341 persons resided in the Park in the months preceding Complainants' purchase of their unit and that this number was barely more than one third of the alleged maximum number allowable because of the sewer capacity of the Park.

Second, Charging Party points to the lack of any meaningful study of the Park or its sewer system at the time the Respondents imposed the three person per unit limitation.  For example, Charging Party points to the testimony of the manager of the Park who admitted that the Respondents had no objective evidence in March 1989 on which to base their restriction, notes that an alleged population study conducted in 1988 was not raised as a defense during the investigation of the charge, and that the QCI engineering report never mentioned the population study.

7

Charging Party also faults the ALJ for relying on the QCI Report, which was not conducted until 1991. Charging Party strongly urges that the QCI Report only concluded that overall occupancy not routinely exceed the limit of 916 persons (two persons per bedroom) and provided no evidence that occupancy lower than 916 would create health or sanitation problems for the Park. Third, Charging party argues that the issue of seasonal visitors was a bald assertion, not supported by any evidence and unaccompanied by testimony as to the extent to which residents of the Park took vacations or had visitors.[2]

In the remainder of its Motion, Charging Party argues that various alternative proposals would have accomplished the Respondents' goals with less adverse impact and asks for judgment and damages against the Respondents. Charging Party states that there was no necessity for any occupancy restriction based upon the current population of the Park, that the two persons per bedroom alternative was within the parameters of the QCI Report or that an overall Park maximum occupancy could have been instituted. Charging Party seeks $1250.05 in economic damages and $50,000 in emotional distress damages for Complainants Michael Brace and Jacqueline VanLoozenoord and $500 for Jaime VanLoozenoord.

On October 14, 1993, Respondents filed an Objection to Staff's Third Attempt to Negate ALJ Decision (hereafter "Objection") and filed a Motion to Strike NAACP's Second Amicus Curiae Letter.[3] Respondents' Objection complains about the conduct of Departmental employees during the course of the investigation and hearing on the charge in this case, alleges that the Department should have engaged in rulemaking, rather

_____

[2] Charging Party also argues that the ALJ failed to weigh the substance of the Respondents' justifications against the severity of the policy itself. The Charging Party states that since the Secretary has previously held that the three person per unit policy had a severe impact on a family with more than one child, such severe impact far outweighs the alleged potential overcrowding, was based on guesswork or speculation. In its Motion, Charging Party takes the position that the Respondents bear the burden of demonstrating that no less discriminatory alternative exist. Charging party suggests that ALJ Cregar's decision is in conflict with ALJ Streb's decision in HUD v. Carter, HUDALJ 03-90-0058-1 (1992), in which the burden to demonstrate a less discriminatory course of action was placed on respondent.


[3] The NAACP Legal Defense and Education Fund, Inc. (the "Fund") as amicus curiae filed a letter on October 5, 1993. The Fund's letter was not considered in this Secretarial review.

than attempt to establish new case law on a case by case basis, and argues that the Secretary will subvert the administrative process if he reverses the ALJ again.

8

DISCUSSION

I. Business Necessity in General

In remanding this case to the ALJ on July 19, 1993, the Secretarial Decision and Order directed the application of a business necessity rebuttal standard after finding that the Charging Party had demonstrated a prima facie case of disparate impact discrimination regarding the three person per unit occupancy policy. It cited the <u>Betsy</u> decision as authority for the application of the business necessity standard. <u>Id</u>. at 9. Unfortunately, the business necessity standard was not correctly set forth by the ALJ in this case.

The business necessity standard in Title VIII cases is imported from employment discrimination case law under Title VII. Business necessity in the employment discrimination arena requires that the alleged discriminatory practice "have a <u>manifest</u> relationship to the employment in question." <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 432 (1971) (emphasis added). A discriminatory employment practice must be shown to be "<u>necessary</u> to safe and efficient job performance to survive a Title VII challenge." <u>Dothard v. Rawlinson</u>, 433 U.S. 321, 331, n.14 (1977) (emphasis added). The Eleventh Circuit has emphasized the word "necessity" and has properly dismissed the standard embodied in the phrase "legitimate employment goals":

Prior to 1989, the "business necessity" showing was an affirmative defense for which the defendant bore the burden of proof and the risk of nonpersuasion. [Citations omitted.] In 1989, the Supreme Court in <u>Wards Cove</u>, changed the law, holding that the defendant bore only the burden of coming forward with an alleged business-related justification for the challenged practice, which the plaintiff would then have to disprove in order to prevail. <u>Wards Cove</u> at 659.... The court also broadened the scope of the necessity defense by holding that practices causing a disparate

9

impact were permissible even if they could not be shown to be absolutely necessary, so long as they served in a significant way the legitimate employment goals of the employer. Id. at 659.... These changes were statutorily reversed by 1991 Civil Rights Act of 1991, Pub. L. No. 102-166, §105(a)....

Patrick v. City of Atlanta, LEXIS #24682 at 16 (11th Cir., Sept. 27, 1993). Accordingly, under Title VII law, the business necessity test means that the policy or practice at issue must serve a necessary relationship to the employer's needs, not merely serve the employer's legitimate goals.

As with current Title VII law, under Title VIII law, the need for a true necessity is also required. In Betsy, the court held that when confronted with a showing of discriminatory impact, "defendants must prove a business necessity sufficiently compelling to justify the challenged practice." Id. at 988 (emphasis added). In United States v. City of Black Jack, Mo., 508 F.2d 1179, 1186 (8th Cir. 1974), the court held that after the finding of a prima facie case, the defendant was required to "demonstrate a compelling . . . .interest." (Emphasis added.) Clearly, the word "compelling" correlates to the word "necessary."

Further, under Title VII, only objective evidence, as opposed to the employer's mere speculation or subjective opinion, that a practice addresses an employer's job relatedness concerns can establish a legal rebuttal. See Dothard; Albemarle Paper Co. v. Moody, 422 U.S. 405,428, n.23 (1975) ("Job relatedness[4] cannot be proved through vague and unsubstantiated hearsay.") The same rule applies under Title VIII law. See, e.g., Keith v. Volpe, 858 F.2d 467 (9th Cir. 1988). Additionally, post hoc rationalizations are accorded little weight by courts, Huntington Branch, NAACP v. Town of Huntington, NY, 844 F.2d 926 (2d Cir. 1988), and will be accorded little weight by this agency.

---

[4] Griggs and its progeny use the terms "business necessity" and "job relatedness" interchangeably. Also, the most recent amendment to Title VII, the Civil Rights Act of 1991, upon which the Secretary relied in rejecting the Wards Cove standard, considers "job relatedness" to be consistent with "business necessity." See 42 U.S.C. §2000e-2(k)(1)(A)(i) and 137 Cong. Rec. S15276 (daily ed. October 25, 1991)(Interpretive Memorandum) reprinted in 1991 Code Cong. and Admin. News, 102d Cong., 1st Sess. at 767.

10

## 2. Business Necessity as Applied to This Case

The evidence in this case fails to demonstrate that the three person per unit occupancy policy meets the business necessity standard.  The existing evidence consists of speculation, post hoc rationalizations and vague hearsay. Accordingly, this decision finds that the Respondents have not met the business necessity test.

The ALJ erroneously set forth a test that would require significantly less than a "business necessity" when he ruled that the "challenged practice must bear a demonstrable relationship to a housing provider's legitimate business interests."  As was noted above, the standard for a business necessity can only be met by establishing compelling need or necessity.  The evidence in this case does not support a compelling need or necessity for the three person per unit policy.  At the time the policy was implemented, the Park only had a population of 320 people. Second Initial Decision at 3.[5]  The QCI Report concluded that the sewer system could support 916 residents.  Thus, during the period in question, between 1988 and 1991, there existed no compelling need or necessity for an occupancy limit of three persons per unit.  In fact, based on that report, the Park could have tripled in size without having caused sewer problems.

Furthermore, the figure of 916 was not absolute. Mr. Walker, who prepared the QCI Report, testified that assuming the Park reached 916 residents, and assuming that everyone were at home on a hot afternoon, and assuming that guests were visiting, there might potentially be a problem with the sewer system.  Tr. III at 146-147.  He did not state that 916 or even 925 was an absolute maximum.  Rather, he testified that "We're into probability and we're into statistics."  Ibid.  Thus, the Report itself, assuming it is given full weight, does not establish business necessity.  See HUD v. Carter, 2 Fair Housing-Fair Lending ¶25,029 at 25,318 (HUDALJ May 1, 1992); HUD v. Denton, 2 Fair Housing-Fair Lending  ¶25,014 at 25,204 (HUDALJ November 12, 1991).

In addition, the QCI Report was not completed until three years after the imposition of the occupancy limitation.  This

---

[5] The Charging Party used the figure of 341 Park residents as of a few months prior to the purchase of the mobile home unit by Complainants, that is in August 1991.  Memorandum in Support of Motion to Set Aside at 3, 12.  Since the ALJ's figure was based on the date the three person per unit policy was implemented in 1988, only 21 additional people became residents in three years.  At this rate, the Park would not reach a resident population of 687 (the three person per unit limit) until 2039.

11

report constitutes a post hoc rationalization for the occupancy limitation.  As such, it will be accorded little weight. Huntington, supra.

The ALJ also rested his decision on the fact that there would be visitors to the Park who, if the Park ever reached its maximum of 916 residents, would overly stress the sewer system and cause unsanitary conditions as well as result in a flight of residents to avoid such consequences.  The question of visitors, however, was never an issue raised by Respondents until well into discovery and trial.  Mr. Edward Brooks, a son of one of the owners and President of Prime Management, which manages the Park, mentioned seasonal visitors only one time.  Tr. III at 236.  The reference to seasonal visitors is vague and unsubstantiated; no specific numbers of visitors were cited and the testimony is speculative.  Further, it is a post hoc rationalization. Additionally, the argument of overcrowding on the basis of seasonal visitors, at a period of time when the population of the Park was one-third the 916 suggested by the QCI Report, is sheer speculation by the ALJ.  Speculation is not objective evidence, and theoretical problems do not a business necessity make.

In summary, the use of the three person per unit occupancy limit was not necessary or based upon a compelling need to control the population of the Park.  Nor was the occupancy limit imposed based upon objective evidence known to Respondents at the time the occupancy limit was adopted.  The QCI Report was conducted after the fact and provides a post hoc rationalization. Nor does the ALJ's reliance on seasonal visitors pass muster. The evidence is vague, speculative and a post hoc rationalization.

## 3. Respondents' Claims Are Misplaced

In their Objections, as noted above, Respondents raised three issues concerning the alleged abuse of the administrative process by the Department and its employees.  First, the Respondents allege that Departmental employees engaged in questionable conduct during the course of the investigation and hearing of this case.  These matters are best dealt with by the ALJ in the course of officiating over the case.  In this case, however, the ALJ made no mention of any such alleged improprieties in the course of his 13 page decision dated October 1, 1993.  Since there were no findings of fact relating to improprieties, there is no basis on the record as it now exists for any action by the Secretary in response to these vague allegations.

Second, the Respondents allege that the Department should have engaged in rulemaking, rather than attempt to establish new law on a case by case basis. Respondents cite no authority for their position. Nor is this argument persuasive. A criminal prosecutor enjoys the advantages of great latitude in enforcement, <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 364 (1978), and civil enforcers enjoy even greater latitude, since the principle that ambiguities in criminal statutes must be resolved in favor of lenity does not apply to the civil enforcement context. <u>United States v. Batchelder</u>, 442 U.S. 114, 121 (1979); <u>see</u> <u>also</u> <u>United States v. Goodwin</u>, 457 U.S. 368 (1982). The Department has no duty under the law to warn landlords by regulation that their conduct violates the Fair Housing Act. Further, the enforcement of a statutory scheme is best left to the responsible agency, since it alone is "empowered to develop that enforcement best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and econom- ically." <u>Moog v. FTC</u>, 355 U.S. 411, 413 (1958). Accordingly, Respondents' second argument in their Objections is unpersuasive.

Third, Respondents argue that a Secretarial reversal of the ALJ would negate a year of litigation, undermine Federal law and the integrity of the administrative law system, and politicize the administrative process. This review does not negate a year of litigation or subvert the administrative process. Under 42 U.S.C. §3612(h), the Secretary may review any finding, conclusion or order. There is no limitation on this review authority. In this case, the ALJ did not properly set forth the standard for business necessity. Correcting that error falls within the purview of §3612(h) and in no way undermines the integrity of the administrative law process. Assuring that this Nation's fair housing laws are enforced uniformly and in concert with precedent is not a politicization of the administrative process.

Accordingly, this decision and order finds that the Respondents have failed to establish the business necessity of their three person per unit occupancy policy. Based upon this finding and the earlier finding by this Office on July 19, 1993, that the Charging Party had demonstrated a prima facie case, judgment must be, and hereby is, entered against Respondents. The case is remanded to the ALJ to determine the amount of damages to be assessed in this case.

13

## ORDER

Upon consideration of the Motion to Set Aside the Second Initial Decision and Enter a Final Decision Granting Relief in the above captioned case, and pursuant to 42 U.S.C. 3612(h)(1) and 24 CFR 104.930(a) and (d), the Secretary hereby enters judgment for the Charging Party in the above captioned case and remands it for 60 days so that the Administrative Law Judge may take further action consistent with the above Decision.

10/20/93
Date

BRUCE KATZ
Chief of Staff
Office of the Secretary

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN AND DEVELOPMENT
OFFICE OF THE SECRETARY

The Secretary, United States
Department of Housing and Urban
Development, on behalf of
Jacqueline, Jaime, Michael,
and Shea VanLoozenoord,

   Charging Party,

  v.

Mountain Side Mobile Estates
Partnership, and Mr. and Mrs.
R. D. Dalke,

   Respondents.

   AND

The Secretary, United States
Department of Housing and Urban
Development, on behalf of
Michael Brace,

   Charging Party,

  v.

Mountain Side Mobile Estates
Partnership, and Mr. and Mrs.
R. D. Dalke,

   Respondents.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

HUDALJ 08-92-0010-1
HUDALJ 08-92-0011-1

Dorothy Crow-Willard, Esq.
Jane S. O'Leary, Esq.
Sara K. Pratt, Esq.
Harry L. Carey, Esq.
Carole W. Wilson, Esq.
 For the Charging Party

Stephen E. Kapnik, Esq.
        For the Respondents

Before:    Henry G. Cisneros
           Secretary of Housing and Urban Development

### DECISION AND ORDER

#### Statement of the Case

This matter arose as a result of complaints filed by Jacqueline VanLoozenoord, her three minor children, and Michael Brace ("Complainants"), alleging discrimination based on familial status in violation of the Fair Housing Act, as amended, 42 U.S.C. 3601, et seq. ("the Act").  On July 24, 1992, following an investigation and a determination that reasonable cause existed to believe that discrimination had occurred, the Department of Housing and Urban Development ("the Charging Party") issued a charge against Mountain Side Mobile Estates Partnership, Robert Dalke, and Marilyn Dalke ("Respondents"), alleging that they had engaged in discriminatory practices in violation of 42 U.S.C. 3604.

A hearing was held and, as discussed more fully below, Administrative Law Judge William C. Cregar issued an Initial Decision and Order on March 22, 1993, finding that the Charging Party failed to prove that Respondents had violated the Act and dismissing the charge of discrimination.

On April 21, 1993, the Secretary of Housing and Urban Development remanded the Initial Decision and Order in the above-captioned case to permit consideration of the Charging Party's April 13, 1993, Motion for Partial Reconsideration and any opposition thereto.  *See* 24 C.F.R. § 104.930(a) and (d).  ALJ Cregar issued an Order for the submission of briefs in support of the Charging Party's Motion, and in opposition.  Both parties timely filed briefs.

The Charging Party moved for reconsideration of that portion of ALJ Cregar's Initial Decision and Order that found no violation of 42 U.S.C. § 3604(a) and (b) and requested the assessment of damages against Respondents for those alleged violations.  Respondents argued that the Initial Decision contained no clear error, and accordingly, the determination should not be modified.  In his Initial Decision on Remand and Order, dated June 18, 1993, ALJ Cregar again found that Respondents did not violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601, et seq. ("the Act"), and he again denied the Charging Party's request for relief.

On July 7, 1993, the Charging Party filed a Motion to Set Aside Initial Decisions and Enter a Final Decision Granting

2

In a second Secretarial decision in the same case, dated October 20, 1993, the Secretary confirmed that a respondent may rebut a <u>prima facie</u> case by evidence that the policy is justified by a business necessity which is sufficiently compelling to overcome the discriminatory effect.  The business necessity justification may not be hypothetical or speculative.

For purposes of investigation, all of the respondent's justifications for its policy should be requested, with any supporting documentation.  Each should be investigated to determine if there are genuine business reasons for the policy. The respondent should also be queried as to whether or not the respondent considered any alternatives to the particular policy, and what the reasons for rejecting the alternatives, if any, were.  Even if the respondent did not consider discriminatory alternatives, the investigation should consider whether there are any less discriminatory ways in which the respondent's business justifications may be addressed.  These steps are important because if there is a less discriminatory way by which genuine business necessities may be addressed, it may be argued that the respondent should have adopted the less discriminatory alternative.

The disparate impact analysis may be applicable in a variety of situations, ranging from cases in which a local residency preference disproportionately excludes minorities from housing residency, to policies refusing to count alimony as income for purposes of housing eligibility, to occupancy cases in which a facially neutral policy disproportionately excludes or disadvantages families with children.[1]

Copies of the two Secretarial decisions are attached for your consideration.

Further examples and additional guidance will follow this memo.  If you have any questions, please contact Sara Pratt, Director, Office of Investigations, at (202) 708-0836.

Attachments

---

[1] Because the Frank Keating memorandum of March 21, 1991 addressing occupancy restrictions has not been withdrawn, occupancy cases involving families with children with a disparate impact aspect should also be analyzed using the memorandum as a guide.

3

Relief, and also filed a Memorandum in Support of Motion to Set Aside Initial Decision on Remand and Order and Issue a Final Decision Granting Relief ("Memorandum"). On July 14, 1993, Respondents timely filed an Opposition to HUD's Motion to Set Aside Initial Decision.

## Summary of Initial Decision and Order

Mountain Side Mobile Estates ("the Park") is a trailer park located at 17190 Mt. Vernon Road, Golden, Colorado, in unincorporated Jefferson County. It was developed in the 1960's. It has 229 lots for mobile homes, with an average of 10 lots per acre. The Park has limited recreational facilities and narrow streets compared to trailer parks built in the 1970's and later, and small "single-wide" mobile homes, typically with two bedrooms. The Park has a population of approximately 320 person, with approximately 30 families with children under 18 years of age. Because the Park is located in a flood plain, significant modifications of the Park's infrastructure would require compliance with regulations of, and approval by, the Federal Emergency Management Agency, and could involve expenditures in the hundreds of thousands of dollars.

Prior to the effective date of the Fair Housing Amendments Act of 1988, the Park was an "adults only" Park. Respondents determined that it would not be feasible to qualify for the "55 and older" statutory exemption. *See* 42 U.S.C. § 3607(b)(2). However, fearing an unlimited expansion of the Park's population, they considered instituting occupancy limits. Having undertaken a Park population study and expressing a concern that overcrowding would place a burden on the water and sewer capacity and result in a decline in the quality of life, Respondents imposed a three persons per unit occupancy limit. Following the conciliation of a housing discrimination complaint, Respondents retained QCI Development Services Group, Inc. ("QCI") to conduct an independent assessment of the Park's facilities and to assist in evaluating Respondents' occupancy standard. As a result of its assessment of the sewer system and the Park's physical limitations, in May 1991, QCI recommended a two persons per bedroom standard with a maximum limit of 916 Park residents. Respondents elected to maintain their existing limit of three persons per unit, thus restricting the total Park occupancy to 687 residents, well within the cap recommended by QCI.

Complainants are an unmarried couple, Jacqueline VanLoozenoord and Michael Brace, and Ms. VanLoozenoord's three minor children. After Complainants purchased a mobile home without informing the Park managers, Respondents brought eviction proceedings against them because the number of occupants in their dwelling exceeded three persons. The Jefferson County court granted judgment for Respondents, but HUD's conciliation efforts

4

resulted in a stay of the eviction pending the outcome of this proceeding.

HUD presented statistical evidence concerning household composition through documents and the testimony of James Coil, a HUD economist. Mr. Coil testified that as of March 1991, at least 71.2% of all U.S. households with four or more persons contained one or more children under 18 years of age.

The Charging Party attempted to prove that Respondents' institution of the three-person occupancy limit was discriminatory against Complainants based on their familial status on both disparate treatment and disparate impact theories. The ALJ held that the Charging Party had failed to meet its burden under either theory. First, he found that the record did not establish direct evidence of disparate treatment. Regarding indirect evidence of disparate treatment, he determined that the Charging Party had made out a prima facie case. However, he determined that the QCI study established that the sewerage system and Park's physical limitations warranted some action to limit the population of the Park, and that the Charging Party had failed to demonstrate that Respondents' choice of a limit of three persons per unit was pretextual. The ALJ held that he did not need to decide whether the Act contemplates a disparate impact analysis, because the Charging Party's statistics failed to support a prima facie case of disparate impact. The ALJ also concluded that even were a prima facie case of disparate impact established, the Respondents had produced evidence of a business justification and the Charging Party had failed to demonstrate the existence of practical or affordable alternatives.

Initial Decision on Remand and Order

In his Initial Decision on Remand and Order, the ALJ rejected a contention by the Charging Party that the second prong of the shifting burdens analysis of McDonnell Douglas v. Green, 411 U.S. 792 (1973), was inapplicable to the case because Respondents were claiming an exemption under the Act, i.e., the provision in 42 U.S.C. 3607(b)(1) that "[n]othing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." The Charging Party asserted that the assertion of this affirmative defense superseded the McDonnell Douglas scheme and shifted the burden to Respondents to prove the reasonableness of the exemption. The ALJ rejected the Charging Party's contentions because, inter alia, the arguments had not been raised earlier, and the statutory provision applies

5

only to local, State and Federal occupancy restrictions.[1]

With regard to disparate impact analysis, the Initial Decision on Remand also rejected the Charging Party's assertion that, contrary to the March 22 Initial Decision, nationwide statistics regarding the composition of households, along with the testimony of HUD economist James Coil, were inadequate to demonstrate a prima facie case of disparate impact on families with children.  The ALJ also held on remand that even if he were to conclude that a disparate impact analysis should apply in this case and that a prima facie case was established thereunder,[2] Respondents had demonstrated that their three persons per unit occupancy restriction served their legitimate business goals and was not a mere insubstantial justification.  Citing Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642 (1989), the ALJ held that the practice at issue need not be essential or indispensable.  Finally, he held that the Charging Party, rather than Respondents, had the burden of persuasion to demonstrate the existence of alternative methods that would satisfy Respondents' legitimate business interests while lessening the impact on families with children, and that the Charging Party had yet to demonstrate the existence of any such alternatives.

The ALJ also rejected arguments by the Charging Party that it had shown the existence of pretext with regard to Respondents' three person per unit occupancy restriction.

### Motion to Set Aside Initial Decision on Remand and Opposition Thereto

In its Memorandum in support of its Motion to Set Aside, the Charging Party for the most part reiterates the arguments that it raised in its previous memorandum in support of Motion for Partial Reconsideration.  In its current Memorandum, the Charging Party abandoned the earlier claim that a statutory exemption for occupancy limits is at issue.  However, the Charging Party reasserts that in lieu of the usual burden on Respondents of articulating a legitimate, nondiscriminatory reason for their action, once a prima facie case of disparate treatment has been established, under the shifting burdens analysis of McDonnell Douglas, supra, the assertion by Respondents of a nongovernmental

---

[1]  In its Memorandum in Support of Motion to Set Aside, the Charging Party has abandoned its argument that a statutory exemption is at issue.

[2]  The ALJ's March 22, 1993 Initial Decision held that he did not need to determine whether a discriminatory effect is, by itself, sufficient to establish a violation of the Act since he found that the Charging Party had failed to establish a prima facie case of disparate impact.

6

occupancy restriction requires "heightened scrutiny", and that the ALJ had failed to "carefully examine" the occupancy restriction, as required by the Preamble to 24 CFR Part 104 (24 CFR Ch. I, subch. A, App. I, p. 879 (1982)). The Charging Party reasserted its other arguments, including those regarding the adequacy of its statistical showing as a prima facie case of disparate impact; its argument that, following establishment of a prima facie case, Respondents have a burden of demonstrating something akin to business necessity, rather than merely a legitimate nondiscriminatory reason, for the policy in question; and the assignment to Respondents rather than the Charging Party of the burden of showing less discriminatory alternatives.

In its memorandum in opposition to the Motion to Set Aside, Respondents assert, inter alia, that the Secretary can reverse findings by a HUD ALJ only for clear abuse of discretion, which has not been alleged; that Respondents are by corporate policy opposed to discrimination; that limitations on total occupancy in the Park were necessary because of the Park's limitations and functional obsolescence, and there are no reasonable alternatives; that the Park has limited ability to control utilization of space in an individual home; and that some of the complainants' bedrooms do not meet the applicable building code. Respondents also oppose the Charging Party's arguments that any occupancy policy that provides for two persons per bedroom should be "presumptively unreasonable" and that nongovernmental occupancy policies should be presumed to be unfair.

DISCUSSION

1.   Preliminary matters

The Respondents assert in their opposition to the Motion to Set Aside that the Secretary can reverse findings by a HUD ALJ only for a "clear abuse of discretion", citing HUD v. Holiday Manor Estates Club, Inc., Fair Housing-Fair Lending (P-H) ¶35,024 (1992).  I find that the authority of the Secretary is not so limited.  The Secretarial decision in Holiday Manor merely indicated that with respect to the particular issue of the appropriate amount of compensatory pain and suffering damages, the Secretary found that it would be "inappropriate" to substitute his judgment for that of the ALJ in the absence of a clear abuse of discretion, since, among other things, the ALJ had observed the witness's credibility.  The decision does not suggest a lack of authority on the Secretary's part to reverse in the absence of an abuse of discretion, but merely a judgment that in the circumstances of that case it would have been inappropriate to reverse on that particular issue.  In any event, Title VIII and HUD's procedural Title VIII regulations do not limit the Secretary's authority to reverse.  Section 104.930(a) of HUD's Title VIII regulations state in relevant part that:

001135

7

[t]he Secretary of HUD may review any finding of fact, conclusion of law, or order contained in the initial decision of the administrative law judge and issue a final decision in the proceedings. The Secretary may affirm, modify or set aside, in whole or in part, the initial decision or remand the initial decision for further proceedings. [24 CFR 104.930(a)]

Neither Title VIII nor the cited regulation imposes the limitation urged by Respondents. Accordingly, I need not find a "clear abuse of discretion" in order to reverse an initial decision by an ALJ or to remand for further proceedings.

2. Disparate impact

As outlined above, the ALJ did not decide whether disparate impact (discriminatory impact) alone is sufficient to establish a violation of the Act, since he concluded that the Charging Party failed to establish a prima facie case of disparate impact. I find that the Charging Party did establish a prima facie case of disparate impact and that a disparate impact, if proven, would establish a violation of the Act.

First, in declining to consider discriminatory effect as sufficient to establish a violation of the Act, the ALJ found merely that this question is "not completely settled". The ALJ concluded not that such a rule would conflict with the law of the Tenth Circuit, but rather that the Tenth Circuit has not yet ruled whether facially neutral policies which have a disparate impact on a protected class violate the Act. Initial Decision (March 22) at 25. The ALJ conceded that most of the United States circuit courts of appeal have held that evidence of discriminatory effect is sufficient to establish a prima facie case. Id. The authority and responsibility for administering the Act is in the Secretary of Housing and Urban Development. 42 U.S.C. 3608(a). In view of the judicial authority for applying the discriminatory effects test, I find that this test should have been applied in this case.

The ALJ concluded that on the facts of this case, nationwide statistics are inadequate to demonstrate a prima facie case of disparate impact on families with children. Initial Decision on Remand at 6; Initial Decision (March 22) at 26. The Charging Party relied upon statistics and the testimony of HUD economist James Coil which the ALJ found establish that at least 71.2% of all U.S. households with four or more persons contain at least one child under the age of 18; that at least 50.5% of U.S. families with minor children have four or more individuals; and that at most, 11.7% of households without minor children have four or more persons. The ALJ found no evidence that statistics which establish the percentage of families with minor children nationwide are the same in Jefferson County or the Denver

metropolitan area. He stated that Mr. Coil tried to address this deficiency by pointing out that the percentage of households with four or more individuals that are families in Jefferson County (for which statistics are available) is almost identical to the nationwide percentage. However, the ALJ stated that he was unwilling to speculate that the same correlation exists as to the percentage of households with minor children. Initial Decision (March 22) at 25. On remand, the ALJ stated that:

> [r]ather than there being "no reason to suppose" that the area around Golden, Colorado, does not statistically differ in the proportion of families with children under 18 from the rest of the United States, I see no reason to suppose that it would be the same. For example, it may well be that, due to depressed economic circumstances, in some areas a higher percentage of adult children live with their parents than are reflected in the nationwide statistics . . . [while] in communities with large populations of university students or young working adults, there may be a higher incidence of congregate housing arrangements. Mr. Coil assumes that because the nationwide and local percentage of family households with four or more persons is similar, the same relationship exists between the nationwide and local percentage of households with minor children. Based on this record, such an assumption is unsupported and speculative. [Initial Decision on Remand at 6]

The ALJ distinguished the Supreme Court's approval, in Dothard v. Rawlinson, 433 U.S. 321, 330 (1977), of reliance on nationwide statistics where there is "no reason to suppose" that regional statistics do not differ markedly from the national statistics. That Title VII case concerned reliance on general population data regarding physical height and weight characteristics, where there was "no reason to suppose" that such data for the Alabama population differed markedly from such data for the national population.

It is possible that there may be greater variation among local populations with respect to percentage of households with children (even where the local and national percentage of households with four or more individuals that are families are virtually identical) than there is among local populations with respect to height and weight characteristics. However, in the absence of any showing of a large variation from the national statistics in the case of the locality in question, and where the economist discussing the statistics testified that the likelihood of finding a family household in the four-or-more-person household category in Jefferson County is apparently virtually identical to the national average, I believe that the possibility of such a significant variation is more speculative and

unsupported than a supposition of its absence.  As the Charging Party argues, if a party "discerns fallacies or deficiencies in the data offered by the plaintiff, [the party] is free to adduce countervailing evidence of his own." Dothard, supra, 433 U.S. at 331.  In these circumstances, then, I conclude that the Charging Party established a prima facie case of disparate impact.

The ALJ went on to conclude that, even if a prima facie disparate impact case is made, as I now conclude, Respondents have carried their burden of rebuttal by demonstrating that their three persons per unit occupancy restriction serves their legitimate goals and is not a mere unsubstantial justification; in this regard, the ALJ held, the practice need not be essential or indispensable.  The ALJ cited Wards Cove, supra, 490 U.S. 642 at 658-59 as authority for this formulation of the burden of rebuttal.  The ALJ notes in his Initial Decision of March 22 that Wards Cove is an employment discrimination case under Title VII of the Civil Rights Act of 1964 and that Congress subsequently eliminated the Wards Cove analysis for purposes of Title VII in the Civil Rights Act of 1991, Pub. L. 102-166.  The ALJ concluded, however, that since the Civil Rights Act of 1991 did not amend Title VIII, the Wards Cove analytical framework would continue to apply to cases arising under Title VIII.  Initial Decision (March 22), p. 25, n. 24.

I reach the opposite conclusion, however.  Regardless of what impact Wards Cove might eventually have had on Title VIII case law that had previously applied a higher test to Respondents' burden of rebuttal, I do not believe that Wards Cove, having been overruled by Congress to the extent that it did not require consistency with business necessity in its own sphere of Title VII cases, could nevertheless stand as authority for this lesser burden in Title VIII cases.  While Title VII case law may often serve as the genesis of Title VIII case law on analogous issues, I find no basis for following a Title VII decision in an area in which it has been specifically overruled by Congress.  I do not find Congress's failure to amend Title VIII to be persuasive, since Congress was not faced with a comparable authoritative judicial decision by the nation's highest court establishing a less-than-business-necessity standard under Title VIII.  To the contrary, there is authority for the application of a standard of business necessity in Title VIII cases.  See, e.g., Betsey v. Turtle Creek Associates, 736 F.2d 983 (4th Cir. 1984).  I conclude that the business necessity standard is the appropriate rebuttal standard for the respondents to meet in this case.  Accordingly, I remand this case for a determination by the ALJ as to whether Respondents have met their burden under the business necessity standard, in justification of their three person per unit occupancy policy.  Depending on whether the Respondents have met their burden, further review of the existence of alternatives to the three persons per unit policy may or may not be warranted.

10

## ORDER

Upon consideration of the Motion to Set Aside Initial Decisions and Enter a Final Decision Granting Relief in the above captioned case and Respondents' Opposition thereto, and pursuant to 42 U.S.C. 3612(h)(1) and 24 CFR 104.930(a) and (d), the Secretary hereby remands the above captioned case for 60 days so that the Administrative Law Judge may take further action consistent with the above Decision.

7/19/93
_____
Date

_____
BRUCE KATZ
Chief of Staff
Office of the Secretary

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-0000

MAR 29 1994

MEMORANDUM FOR:   All Regional Counsel

                  All Regional Directors of Fair Housing and
                  Equal Opportunity

FROM:    Nelson A. Díaz, General Counsel, G

         Roberta Achtenberg, Assistant Secretary for
         Fair Housing and Equal Opportunity, E

SUBJECT:    Occupancy Fees and Familial Status Discrimination
            under the Fair Housing Act


        This memorandum is designed to facilitate your review of
complaints under the Fair Housing Act (the Act).  The Department
has received a number of complaints involving allegations that
housing providers who impose additional fees on households based
on the number of occupants in the dwelling discriminate because
of familial status.  This memorandum outlines the principles
applicable to analyzing such complaints and discusses the
experiences of the Office of General Counsel's Fair Housing
Division with such cases.

        The complaints that the Fair Housing Division has reviewed
involving occupancy fees have thus far arisen in the rental
context.  However, the principles for analyzing complaints
involving occupancy based fees are equally applicable whether
housing is rented, sold, or made available through other means.
For example, if a condominium or home owners association were to
assess fees based on the number of occupants in a dwelling, such
a policy would be analyzed in the same manner as where landlords
impose additional fees based on the number of occupants in a
unit.

        In some cases in which housing providers charge occupancy
fees, the fees are only imposed on households in which children
under the age of 18 are present.  It has been the experience of
the Fair Housing Division, however, that more often the fees are
imposed on any households which contain more than a specified
number of occupants, regardless of familial status.  This
memorandum discusses the discriminatory nature of each type of
occupancy fee structure.



Where there is evidence that an additional occupancy fee was
implemented with a discriminatory intent, e.g., with the intent
to discourage occupancy by families with children through an
unfavorable rent structure, the fees violate the Act. Such fees
violate the Act for much the same reasons as would fees imposed
by rule or practice only upon families with children, as
discussed, supra. Absent evidence of discriminatory intent,
whether or not the occupancy fees violate the Act depends on the
effect of the policy.

A.    Discriminatory Effect Standard

Where the fee policy has an adverse discriminatory effect on
families with children, the fee policy violates the Act unless
there is a compelling business necessity for the fee policy and
less discriminatory alternatives that would meet the housing
provider's business necessity are not available.

1.    Demonstrating Discriminatory Effect

Census statistics demonstrate what common sense suggests --
that generally, households with more members are more likely than
households with fewer members to contain one or more children
under age 18. The Appendix to this memorandum summarizes
pertinent national census bureau statistics and provides relevant
definitions. The Bureau of the Census does not maintain
statistics that directly address the precise question applicable
to determining if a disparate impact exists under the Act, i.e.,
what percentage of dwelling units of various numbers of occupants
contain families with children. The Bureau does, however,
provide data that are extremely helpful to estimating this
answer. The Bureau provides data on the percentage of "families"
of varying sizes in which children are domiciled with a parent,
custodian, or designee.

The data show that families with three or more members are
more likely to contain one or more children, as compared to two
member families; families with four or five members are even more
likely than three member families to contain children. Whereas
only about 11 percent of two person families contain children,
about 63 percent of three person families contain children, about
84 percent of four person families contain children, and about 88
percent of five person families contain children. Moreover, a
policy that imposes additional charges only on families with 3 or
more persons, will have no adverse consequences for about 73
percent of those families without children, whereas it will
adversely affect about 91 percent of families with children,
meaning that most families with children will be negatively
affected, whereas most families without children will not be
negatively affected. Even an occupancy fee policy that only
imposes a surcharge on families with 5 or more people, which
would only adversely affect about 24 percent of families with

children, will still have a disproportionate adverse effect on families with children.  While 76 percent of families with children would suffer no negative consequences under such a policy, about 96 percent of families without children will suffer no adverse effect.

Thus, a policy of imposing occupancy fees based on the number of occupants in the unit would be expected to have a disproportionate adverse impact upon families with children.  The discrepancy between the adverse effect on families with children and families without children would be expected to be most significant when the occupancy fee is one that imposes an additional surcharge for households with 3 or more, 4 or more, or 5 or more occupants.  In contrast, if the occupancy fee only applies when households contain 6 or more persons or seven or more persons, relatively few families with or without children would be adversely affected, so the policy would have minimal adverse impact.

The statistics summarized in the Appendix that are available from the Bureau are nationwide statistics.  Breakdowns for specific locales, states, or regions are not maintained or available from the Bureau.  While it is possible that in any given locale large households may be disproportionately composed of unrelated adults (which the Bureau does not categorize as "families"), rather than families with children, national statistics may be used to prove disparate impact.  National statistics are used to prove discriminatory impact in employment discrimination cases.  E.g., Dothard v. Rawlinson, 433 U.S. 321, 339 (1977).  The Secretary's July 19, 1993 Decision and Order in HUD v. Mountain Side Mobile Estates, 2 Fair Housing-Fair Lending (P-H), ¶ 25,053 (HUD Secretary 7-19-93), is strong precedent for applying national statistics to prove discriminatory impact in fair housing cases.

HUD v. Mountain Side Mobile Estates involved the legality of an occupancy limit, an issue closely related to the legality of occupancy fees.  As the Secretary's decision held:

It is possible that there may be greater variation among local populations with respect to percentage of households with children (even where the local and national percentage of households with four or more individuals that are families are virtually identical) than there is among local populations with respect to height and weight characteristics.  However, in the absence of any showing of a large variation from the national statistics in the case of the locality in question, and where the economist discussing the statistics testified that the likelihood of finding a family household in the four-or-more-person household category in Jefferson County is apparently virtually

identical to the national average, I believe that the
possibility of such a significant variation is more
speculative and unsupported than a supposition of its
absence.  As the Charging Party argues, if a party
"discerns fallacies or deficiencies in the data offered
by the plaintiff, [the party] is free to adduce
countervailing evidence of his own."  Dothard, supra,
433 U.S. at 331.  In these circumstances, then, I
conclude that the Charging Party established a prima
facie case of disparate impact.

HUD v. Mountain Side Mobile Estates, supra, ¶ 25,053 at 25,493.

Therefore, national statistics may be used to determine if a
disparate impact exists, when making a determination of
reasonable cause.  Such statistics, however, should be considered
in the context of other evidence which may have been provided by
the respondent or uncovered by the investigator during the course
of the investigation that would bear on whether household
composition in the locale reflects the national statistics for
families.

     2.    Demonstrating Business Necessity and Lack of Less
        Discriminatory Alternatives

Once it is determined that an occupancy fee policy creates a
discriminatory adverse impact for families with children,
consideration should then turn to whether the need for the
occupancy fee policy is compelled by business necessity.
The Secretary's October 20, 1993 Decision and Order in HUD v.
Mountain Side Mobile Estates, reflects that establishing a
business necessity is a rigorous standard.  It is not sufficient
that a challenged practice bears a demonstrable relationship to a
housing provider's legitimate business interests.  HUD v.
Mountain Side Mobile Estates, HUDALJs 08-92-0010-1 and 08-92-
0011-1 (HUD Secretary 10-20-93), slip op. at 10.  Rather, "[T]he
standard for a business necessity can only be met by establishing
compelling need or necessity."  Id.  As the Secretary's decision
held:

    As with current Title VII law, under Title VIII
    law, the need for a true necessity is also required.
    In Betsy [v. Turtle Creek Associates, 736 F.2d 983 (4th
    Cir. 1984)], the court held that when confronted with a
    showing of discriminatory impact, "defendants must
    prove a business necessity sufficiently compelling to
    justify the challenged practice."  Id. at 988 (emphasis
    added).  In United States v. City of Black Jack, Mo.,
    508 F.2d 1179, 1186 (8th Cir. 1974), the court held
    that after the finding of a prima facie case, the
    defendant was required to "demonstrate a compelling ...

9

interest."  (Emphasis added.)  Clearly, the word
"compelling" correlates to the word "necessary."

HUD v. Mountain Side Mobile Estates, supra, slip op. at 9.

    As the Secretary also held, under Title VIII, as under Title
VII, only objective evidence, as opposed to mere speculation or
subjective opinion, can establish a legal rebuttal demonstrating
that a practice is compelled by business necessity.  HUD v.
Mountain Side Mobile Estates, supra, slip op. at 9 and 11 (citing
Albemarle Paper Co. v. Moody, 422 U.S. 405, 428 n.23 (1975) and
Keith v. Volpe, 858 F.2d 467 (9th Cir. 1988)).  In addition, post
hoc rationalizations for a practice are to be accorded little
weight.  HUD v. Mountain Side Mobile Estates, supra, slip op. at
9 and 11 (citing Huntington Branch, NAACP v. Town of Huntington,
NY, 844 F.2d 926 (2d Cir. 1988)).

    The type of information that housing providers most commonly
provide to attempt to justify their occupancy fees is information
on the housing facility's variable costs.  For example, housing
providers may attempt to demonstrate that the amount of the fee
is based on the amount that charges or taxes for water, sewage,
or garbage collection increase for each additional occupant who
is added to a unit.  Whatever information the housing provider
provides should be analyzed to determine if the increased costs
are truly variable costs or are in actuality fixed costs that the
housing provider would incur regardless of the number of
residents in a unit.  The figures provided should also be
scrutinized to assess whether the occupancy fee charge is limited
to the amount which variable costs increase based on the number
of occupants in a unit, or whether the fee exceeds that amount,
even factoring in a reasonable profit margin.

    Housing providers may also assert that the occupancy fee is
justified by the increased wear and tear on a unit from each
additional occupant.  As with claims concerning increased
variable costs, housing providers should be asked for information
demonstrating the link between costs such as repairs to units or
replacement of parts per unit and the number of occupants in the
dwelling, rather than mere speculation.

    Even if an occupancy fee policy were determined to be
compelled by business necessity, consideration must also be given
to whether less discriminatory alternatives exist which would
meet the respondents' business necessity with less discriminatory
impact.  HUD v. Carter, 2 Fair Housing-Fair Lending (P-H), ¶
25,029 at 25,317 (HUD Office of Admin. Law Judges 5-1-92) (citing
Resident Advisory Board v. Rizzo, 564 F.2d 126, 146-49 (3d Cir.
1977), cert. denied, 435 U.S. 908 (1978)).  As part of the
investigation of such complaints, the respondents should be asked
to explain whether alternatives were considered, and, if so, why
such alternatives would not meet their business necessity.

For example, housing providers could raise the base rent for all units rather than imposing additional fees based on the number of occupants. Housing providers could meter utilities and bill each dwelling unit based on actual usage of utilities, rather than charging households based on speculative concepts of how usage may vary depending on the number of occupants. Housing providers could recoup the costs of repairs and replacements based on actual wear and tear on a unit caused by the unit's occupants through neutrally imposed and enforced maintenance surcharges assessed per call or through security deposits (as is more common). Where respondents assert that alternatives are not feasible, they should be asked for credible and objective evidence to support their position. Exploring the availability of alternatives with respondents is not only relevant to determining whether an occupancy fee policy is compelled by business necessity, but may also be useful in facilitating conciliation.

B.   Case Studies

The Fair Housing Division has issued charges in at least five cases which contained an allegation that a facially neutral occupancy fee discriminated because of its discriminatory effect on families with children. In one case, the Department litigated the issue and lost that claim before an administrative law judge ("ALJ"). In another, the Department entered into a Consent Order resolving the matter. In the other three, an election was made to have the claims adjudicated in Federal district court. In one of these cases, Justice litigated the issue and won an injunction against the practice. In the other two, Justice entered into Consent Orders resolving the matters. These cases are summarized below:

1.   HUD v. Murphy, HUDALJs 02-89-0202-1, 0203-1, 0204-1, 0205-1, 0206-1, 0209-1, 0212-1, 0213-1, 0243-1, Determination of Reasonable Cause and Charge of Discrimination (Nov. 15, 1989). In this case, the Department alleged that the respondents had discriminated against families with children through a variety of policies and practices. Among the policies which the Department alleged were discriminatory was a policy of charging $5 per person for each occupant in excess of one person (if a single person) or in excess of two persons (if a married couple). The complainants included households which in addition to base rents of approximately $200 per month were also charged either $5 or $10 per month in additional occupancy fees depending on the number of occupants in the unit.

While the main focus of the case was the respondent's failure to qualify its mobile home park as housing for older persons age 55 or older, the ALJ decision briefly addressed the Department's allegation that the $5 fee discriminated. The ALJ ruled that while the respondent had discriminated in a number of

other respects, the Department had failed to demonstrate that this particular policy was discriminatory. Rather, the ALJ indicated that the rule served legitimate purposes, such as maintaining the condition of existing facilities. HUD v. Murphy, 2 Fair Housing-Fair Lending (P-H), ¶ 25,002 at 25,020 and 25,053 (HUD Office of Admin. Law Judges 7-13-90).

This allegation, however, was not central to the Department's case and the issue was not fully litigated. The Department did not make a disparate impact argument against the policy. Thus, the challenge to the practice proceeded solely on the disparate treatment theory. The decision did not address directly whether such a policy could violate the Act due to its disparate impact and should not be taken as precluding this type of claim in other cases.

2.   HUD v. Reyes, HUDALJ 09-91-1699-1, Determination of Reasonable Cause and Charge of Discrimination (Aug. 3, 1992).  In this case, the Department alleged that the respondent discriminated because of familial status by imposing an occupancy fee of $100 per person for each person in excess of two persons in a two bedroom apartment.  The complainant was a single woman who sought to rent a two bedroom apartment for herself, her live in companion, one child, and an additional child who would reside part time in the unit.  Both children were under age 18.

The Department entered into a Consent Order that required the respondent to pay the complainant $1,500 and imposed a variety of record keeping and reporting requirements.  In addition, the Consent Order required the respondent to reduce the occupancy fee for families with children from $100 per person to $15 per person.  While the justification for the $15 per person occupancy fee is not stated in the Consent Order, the basis for the fee was supported by evidence that this portion of the fee was related to variable costs (for water usage and garbage collection) that increased on average approximately $15 for each occupant over two.  The Consent Order did not, however, require the respondents to abandon the occupancy fee entirely and adopt less discriminatory alternatives, such as recouping these costs by raising the basic apartment rent for all units.  HUD v. Reyes, HUDALJ 09-91-1699-1 (HUD Office of Admin. Law Judges 4-30-93) (Initial Decision and Consent Order).

3.   HUD v. Dickinson, HUDALJ 10-89-0402-1, Determination of Reasonable Cause and Charge of Discrimination (Dec. 5, 1990).  In this case, the Department alleged that the respondents discriminated because of familial status through a policy of charging an occupancy fee of $85 for each person in excess of two persons for the rental of a townhouse.  The complainant was a woman who sought to rent a unit for herself, her husband, and a minor child.

An election was made in this case to have the claims adjudicated in Federal district court.  Justice filed suit in Federal district court.  Prior to trial, the respondents made a motion for summary judgment.  Justice responded to the summary judgment motion by arguing that the case involved disparate treatment, without making a disparate impact argument.  The judge denied summary judgment on the ground that there was a genuine issue of fact as to whether the defendants intended to discriminate and whether the fee was reasonable.  Justice proceeded to litigate the case on the disparate treatment theory before a jury.  The jury returned a verdict in favor of the complainant, but awarded only $5 in damages.  After the jury verdict, the judge ordered "that the defendants shall discontinue imposing and shall not impose on families with children any per-person rental or other per-person charge connected with the rental of an apartment ... in excess of the basic rental rate for an apartment."  <u>United States v. Dickinson</u>, No. C91-73Z (W.D. Wash. 1992), <u>slip op.</u> at 2 (Order).

4.    <u>HUD v. McMahan</u>, HUDALJ 05-91-0430-1, Determination of Reasonable Cause and Charge of Discrimination (Aug. 3, 1992).  In this case, the Department alleged that the respondents discriminated because of familial status through a policy of imposing an additional $15 per month fee for each occupant in excess of two persons per mobile home lot.  The complainant was a woman who rented a lot in which she, her husband, and four minor children resided.  They were charged occupancy fees of $60 per month in addition to a basic lot rent which varied from $105 to $115 per month over the course of their residency.  The evidence submitted by the respondents to support its necessity for an occupancy fee arguably supported a claim that variable costs for items such as water and sewage increased $8 to $9 for each additional occupant added to a unit, but did not support the $15 fee charged, nor did the respondents explain why alternative methods of increasing revenues, such as raising the basic lot rent for all units, or installing water saving devices or water meters to charge units based on actual usage were not available alternatives that would have a less discriminatory effect.

An election was made in this case to have the claims adjudicated in Federal district court.  Justice entered into a Consent Order which ordered the respondents to compensate the complainant $1,605.  The Consent Order also enjoined the respondents from discriminating because of familial status in any aspect of the ownership or management of the mobile home park, but did not specifically state that respondents were enjoined from charging an occupancy fee.  The Consent Order did make clear, however, that the allegation in the case was that the additional occupancy fee policy discriminated because of familial status.  <u>United States v. McMahan</u>, No. C-3-92-389 (S.D. Ohio 1993) (Consent Order).

5.  <u>HUD v. Colonial Inn Mobile Home Park and Guccini</u>, HUDALJ 08-89-0146-1, Determination of Reasonable Cause and Charge of Discrimination (Nov. 2, 1990).  In this case, the Department alleged that the respondents discriminated because of familial status through a variety of policies, including charging a $50 per month occupancy fee for each occupant in excess of two persons per mobile home lot, in addition to a basic lot rent of $215 per month.

An election was made in this case to have the claims adjudicated in Federal district court.  Justice entered into a Consent Order which ordered the respondents to compensate the complainant $10,000 and imposed a variety of reporting and record keeping requirements.  In addition, the Consent Order required the respondents to change their rules in order to ensure that all spaces would be available on a nondiscriminatory basis.  The required rules deleted reference to a charge of any additional occupancy fees.  <u>United States v. Guccini d/b/a Colonial Inn Mobile Home Park</u>, No. 90 N 2278 (D. Colo. 1991) (Consent Order).

III.  <u>Conclusion</u>

While this memorandum focuses on the experience of the Fair Housing Division, Regional Counsels and Regional Directors of Fair Housing and Equal Opportunity (FHEO) no doubt have additional valuable experiences handling occupancy fee cases.  Sharing this information with headquarters and the regions would benefit all involved.  Therefore, the regions are encouraged to contact the Fair Housing Division to share their insights and experiences in investigating, reviewing, and litigating these cases and to provide their reaction to the framework set forth in this memorandum.  Supplementary guidance may be provided based on the comments received from the regions.

If you wish to comment on this memorandum, relate your experiences or insights, or pose questions directly related that you believe could be addressed in supplementary guidance, please write or call the Fair Housing Division or headquarters FHEO within 30 days of the date of this memorandum.  The contact person in the Fair Housing Division is Richard Bennett, Attorney, tel. (202) 708-0340.  The contact person in FHEO is Waite H. Madison, III, Deputy Director of Investigations, tel. (202) 708-4211.

Attachment (Appendix)

**U. S. Department of Housing and Urban Development**
Washington, D.C. 20410-2000

October 7, 1994



OFFICE OF THE ASSISTANT SECRETARY
FOR FAIR HOUSING AND EQUAL OPPORTUNITY

MEMORANDUM FOR:    Fair Housing and Equal Opportunity Enforcement
                   Directors
                   Field Enforcement Staff
                   Staff, Office of Investigations

FROM:    Susan Forward, Deputy Assistant Secretary for Enforcement
         and Investigations, EE

SUBJECT:    Redelegation of Authority to Make Determinations under
            the Fair Housing Act

As you know, as of October 1, 1994, the authority for making determinations under the Fair Housing Act has been assigned to the Assistant Secretary for Fair Housing and Equal Opportunity, with the concurrence of counsel. A final rule was published in the Federal Register on August 6, 1994, and a revised final rule was published on September 12, 1994, changing the authority. Revised delegations of authority, which delegate the authority to issue cause determinations to the Assistant Secretary with the concurrence of counsel will be issued shortly. That authority will be delegated concurrently to the Enforcement Directors with the concurrence of the Assistant General Counsels. Copies of the delegations will be provided to you following publication. This is preliminary guidance on internal processing procedures to be followed in investigating cases, analyzing investigative information and making determinations of cause and no cause under the Act.

## NEW PROCEDURES

**Determinations:**

Under the revised system, FHEO will make all determinations of cause and no cause, with close coordination with field counsel or the Office of General Counsel Fair Housing Enforcement Division. All cases except cases involving novel issues of law or complex facts will be enforced by field counsel, with the Fair Housing Enforcement Division enforcing the novel and complex cases.

All determinations of cause and no cause under the Act will be jointly delegated to the Assistant Secretary (and the Deputy Assistant Secretary for Enforcement and Investigations) and to the Directors of the Enforcement Centers.  The Enforcement Center staff will prepare determinations, which will be reviewed and approved by Headquarters before issuance.  The Assistant General Counsel will concur (or non-concur) on cases which originate in the field office and OGC-Fair Housing Enforcement Division will concur (or non-concur) on cases investigated by the Office of Investigations, including all Secretary-initiated complaints.

**Office of Counsel Involvement:**

Field counsel and OGC's Fair Housing Enforcement Division will work closely with FHEO staff to provide informal guidance as needed by FHEO at any stage of case processing.  The mechanisms for developing a coordinated system to identify legal issues early in the process and legal input into the conduct of the investigation will be left to the respective offices to develop.  We encourage staff meetings between FHEO and counsel to review all cases before preparation of a determination with one or more fair housing lawyers to ensure that all legal perspectives are considered before a determination is made.  (This would systematize a process which now seems to work informally in several regions, where there is close interaction between one or more regional counsel on questions arising during the intake/investigation process and joint sessions to review cases before FHEO forwards the case to Headquarters).

**Format for Determinations:**

Determinations (which will resemble the current case summary used in no cause cases, see attached Exhibit 1 for format) in both cause and no cause cases will be prepared by the Enforcement Centers and sent to the Office of Investigations, with a case analysis summary package, which will highlight any factual or legal issues and summarize the evidence.  The case analysis summary package will consist of one or more completed Case Analysis Worksheets (attached as Exhibit 2), a memorandum from counsel either concurring or non-concurring on the determination, any recommendation which counsel or FHEO wishes to make regarding whether the case should be handled as a novel or complex case, and the Final Investigative Report.  A cover "Record of Clearances" (Form HUD-1047 (4/91)) will be attached, which will contain the record of concurrences initiated with the investigator, including the supervisor, the Enforcement Director and counsel.  The form will be used to record further clearances at Headquarters as necessary.

3.

Only in cases involving discrimination in mortgage lending, appraisals, insurance or any other allegation of a violation of Section 805 of the Act should a copy of the case file be forwarded to the Office of Investigations.

## Office of Investigations Review Process:

All determinations will be reviewed by the Office of Investigations and will be approved by the Assistant Secretary or the Deputy Assistant Secretary for Enforcement and Investigations. Informal consultation by telephone on any questionable determination will be the preferred mechanism for resolution of concerns by the Office of Investigations. In some instances, where there may be questions regarding the proposed determination, the Office of Investigations may request the entire case file or portions of the file. After a brief Headquarters review, no cause determinations will be approved and returned to the Enforcement Centers to be issued by the Enforcement Director.

## Resolution of Disputes:

Any disagreement between field FHEO and counsel regarding a proposed determination will be resolved as follows: If the Office of Investigations agrees with counsel, it will modify the determination accordingly or return the determination for revision by the field. If the Office of Investigations agrees with the Enforcement Center, the issue will be addressed at the staff level between the Office of Investigations and OGC-Fair Housing, and, if necessary, by the Assistant Secretary and the General Counsel, or ultimately by the Secretary.

## Cause Cases:

After approval by the Assistant Secretary or her designee, cause cases will be sent to OGC's Fair Housing Division if they are novel or complex, or if they are Headquarters initiated. Otherwise they will be returned to field counsel for preparation and issuance of a charge. In cause cases, the determination will be served with the charge. In no cause cases, the determination will be provided to the parties, as the case summary is currently provided. Any enforcement action before ALJs will be taken by the assigned office.

## Prompt Judicial Relief:

Pursuant to a delegation of authority published on March 8, 1994, requests for temporary restraining orders generally are referred by Assistant General Counsels to the Department of

Justice.   FHEO staff should ensure that adequate information is gathered to support such a referral, including preparation of written summaries of all available facts, a HUD 903 form, and information which indicates that the circumstances indicate that irreparable harm may occur if prompt judicial action is not taken.   The Fair Housing Division will handle any TRO matters occurring while cases are being reviewed in the Office of Investigations, as well as any cases involving Systemic or Secretary-initiated complaints.

**Criminal referrals, Zoning Cases, Pattern and Practice Referrals:**

Criminal referrals to DOJ, pattern and practice referrals to DOJ and zoning cases will continue to be referred to the Office of Investigations, which will refer them to the Department of Justice.

**Breach of Conciliation Agreements:**

Cases involving allegations that a conciliation agreement has been breached may be referred directly to the Department of Justice by the Enforcement Director.   The referral must include a copy of the agreement sought to be enforced.   Please ensure that the agreement was still in effect as of the date of the alleged breach.   Additionally, the referral should include information gathered through investigation which documents the breach, including such items as statements by the complainant, results of tests conducted to check compliance with the agreement, or statements of appropriate level staff which indicate a failure to provide timely or complete reports.   In all cases, documentation of efforts to achieve compliance with the agreement should be included, including at least one written communication with the respondent advising of non-compliance and seeking compliance.   A transmittal memo should be prepared from the Enforcement Director, to the Chief of the Housing and Civil Enforcement Branch, U.S. Department of Justice, describing the areas of the breach and efforts to achieve compliance.   Copies of the referral packet should be sent to the Director, Office of Investigations, so that monitoring and follow up may occur.

**Subpoena Issuance and Enforcement:**

Subpoena issuance and enforcement procedures will remain unchanged.

5

**Requests for Reconsideration:**

Requests for reconsideration should be reviewed in the Enforcement Center and then forwarded to the Office of Investigations with a recommendation as to whether the reconsideration should be approved and the reasons for the recommendation.

CURRENT CASE INVENTORY

As of October 1, 1994, all cases in our inventory will be handled as follows:

1. Cases in field FHEO will be handled under the new procedures, i.e., a determination, a completed case analysis worksheet, a record of concurrences and the FIR will be prepared in FHEO, reviewed by counsel with concurrence or a non-concurrence memo and sent to Headquarters for approval.

2. Cases in the Office of Investigations will have worksheets and determinations prepared in the Office of Investigations. For cause cases, if the case is novel or complex, it will be sent to OGC-Fair Housing Enforcement Division for preparation and issuance of a charge. If the case is not novel or complex, it will be sent to field counsel for preparation and issuance of a charge. The counsel's office which receives the determination may concur or non-concur on the determination, since counsel would not have previously reviewed the case. If counsel non-concurs, that office should address its non-concurrence to the Office of Investigations, which will respond to the non-concurrence.

Determinations of cause in such cases will be signed by the Enforcement Director or the Assistant Secretary, as appropriate. In no cause cases, the determination will be prepared in the Office of Investigations and issued from Headquarters.

If, in the opinion of the Office of Investigations, further investigation is necessary before a determination can be made, the case may be discussed by telephone with appropriate field staff or remanded to the field. If a case is remanded, the field will complete the investigation and make a determination based on the further investigation. The Office of Investigations will monitor remanded cases to ensure that the investigation is adequate.

3. Cases with field counsel and OGC-Fair Housing Enforcement Division will, on a time frame to be established based on case load, prepare draft determinations, using the FHEO model, which will be reviewed and signed by the appropriate FHEO authority (Enforcement Directors in the field, the Assistant Secretary or

6

will be reviewed and signed by the appropriate FHEO authority (Enforcement Directors in the field, the Assistant Secretary or the Deputy Assistant Secretary for Enforcement and Investigations at Headquarters).  A charge will be drafted by counsel as well. When the determination is signed by FHEO the charge will be signed and issued by counsel, with the determination served simultaneously with the charge.

COOPERATIVE RELATIONSHIP WITH COUNSEL

For cases which are currently being filed as complaints or being investigated, FHEO and field counsel should develop procedures which will facilitate an on-going cooperative interchange on cases.  In this process, in essence, FHEO is the client consulting with counsel to strengthen FHEO's analysis of the case, allow FHEO to identify early in the process legal issues relating to the case (on which counsel will provide assistance in resolving), in the context of an exchange of ideas on how the investigation can effectively gather relevant information.  It is not designed to be a "second-guessing" of FHEO directions, but a supportive and mutually assistive process. Discussions could include anything from questions arising during the intake process involving jurisdiction or First Amendment concerns, to effective data gathering techniques in a particularly difficult case, to development of new strategies for gathering information when direct investigation is not identifying reliable information.  By the end of the investigation, there should generally have been several opportunities to discuss each cases.

FURTHER INFORMATION

Guidance which will address more detailed procedures and time frames for FHEO and OGC actions under the new procedures will be communicated shortly.  In the meantime, for further information contact Sara K. Pratt, Director, Office of Investigations, at (202) 708-0836, ext. 221.

Attachments

Exhibit #1

## Outline of information to be contained in a Determination

The outlined format should be used for all determinations, cause and no cause. It thus replaces existing formats for the "case summary" currently used in no cause cases. A determination will be prepared in all cases, except those closed by administrative closure. In some situations it is appropriate to prepare one determination which involves more than one complaint, where the facts of separate complaints are closely interrelated.

## DETERMINATION

I. Case name(s), identifying all parties
   Case number(s)

II. Jurisdiction: A paragraph which states the facts found in the investigation which support a conclusion that the complaint is jurisdictional. It will include a one or two sentence summary of the complaint, which will demonstrate subject matter jurisdiction and basis of the complaint and refer to information relating to standing and statute of limitations. This information will be similar to that provided in the case analysis worksheet. In non-jurisdictional complaints, this information will be substantial, and completion of this section will also be the conclusion of the determination.

III. Complainant's Allegations: A short paragraph which describes the specific factual allegations of the complainant(s).

IV. Respondent's Defenses: A short paragraph which briefly summarizes each of the defendant(s) responses to the allegations, beginning with words such as "The respondent denies discrimination and states that...." (if in fact the respondent denies discrimination.

V. Findings: A more lengthy paragraph or series of paragraphs which normally would start with words such as "The investigation revealed...." Each of the claims made by the complainant and each of the responses made by the respondent should be covered in this section, with particular reference to the evidence which supports or refutes each claim or response.

VI. Conclusion: A short summary and conclusion paragraph which may be as simple as "Based upon the information set forth above, there is reasonable cause to believe that the Fair Housing Act was violated, as alleged.

VII. The final paragraph should indicate the source for a copy of a final investigative report.

VIII. Signature of Enforcement Director

Exhibit #2

<u>DELIBERATIVE DOCUMENT-ADMINISTRATIVELY CONFIDENTIAL</u>

<u>CASE ANALYSIS WORKSHEET</u>

FHEO Enforcement Center _____

FHAP Agency _____

Reviewer _____

Investigator _____

CASE NAME _____

NUMBER _____

BASIS: _____

ISSUE: _____

I. JURISDICTION:

   Standing _____

   _____

   _____

   _____

   _____

   _____

   _____

Statute of Limitations (indicate the last date on which unlawful discrimination occurred.  If still continuing, indicate)

_____

_____

_____

_____

_____

Respondent jurisdiction _____

_____

_____

_____

_____

Subject matter jurisdiction _____

_____

_____

_____

Any remaining jurisdiction issues? _____

_____

_____

If there are any persons who are aggrieved persons, but not complainants, identify and briefly describe the reason(s) they are not complainants.

_____

## II. PROOF FORMULA:

OVERT _____

UNEQUAL TREATMENT _____

DISPARATE IMPACT _____


PRIMA FACIE CASE

_____

_____

_____

_____

_____

_____


RESPONDENT DEFENSES

A. _____

_____

_____

_____

_____

AFFIRM

_____

_____

_____

_____

_____

_____

REFUTE

_____

_____

_____

_____

_____

_____

**B.** _____

_____

_____

AFFIRM

_____

_____

_____

_____

REFUTE

C.

AFFIRM

REFUTE

D. _____

_____

_____

_____

_____

AFFIRM

_____

_____

_____

_____

REFUTE

_____

_____

_____

IS ANY FURTHER INVESTIGATION NECESSARY? WHY? _____

_____

_____

_____

_____

_____

_____

_____

III. CONCILIATION EFFORTS:(Describe as to all issues and all parties) _____

_____

_____

_____

_____

_____

IV. CONCLUSION

CAUSE _____(Describe as to all issues and parties)_____

_____

_____

_____

_____

_____

_____

NO CAUSE ____ (Describe as to all issues and all parties) _____

_____

_____

_____

_____

_____

COMMENTS:

Exhibit #3

## CASE ANALYSIS WORKSHEET INSTRUCTIONS

A case analysis worksheet should be completed on each case, whether the case is cause or no cause.  In some situations, one worksheet may be used for several proof formulas.  Each worksheet should include the name of the case, the case number, the name of the investigator and the region.  The space called "reviewer" is for use of Headquarters.  If more than one worksheet is used, the first one should include information regarding jurisdictional points for all parties.  For each factual assertion made on the worksheet, the Tab where the underlying information is included should be listed after the assertion. Any relevant legal opinion should be included in the file and referenced as necessary on the worksheet.

If the complaint is clearly non-jurisdictional, the remainder of the worksheet need not be completed, other than the recommendation section.

The Worksheet is a deliberative document and therefore is not subject to public disclosure requirements.  It is not for public release; it describes the factual information gathered in the case and the analytical process by which an investigator determines which information is relevant and what the information means to the case.  An investigator may complete a deliberative memorandum if desired, but it is not necessary.

JURISDICTION:

Standing-the information provided should briefly indicate the factual basis for a conclusion that the complainant(s) have standing.  In many cases, that information will be extremely brief, i.e. the complainant is African-American. (Tab C-5)  In other cases, it may be more detailed.  E.g., "the complainant, a private fair housing group, has as its mission fair housing counseling of applicants for housing throughout the community and, specifically, the referral of disabled applicants to accessible housing. The Complainant cannot refer disabled applicants to respondents' housing because of respondents' practices excluding persons with disabilities. (Interview with C, Tab C-10)".

Statute of Limitations-the information provided should describe what the investigation found to be the last discriminatory incident, its date and the date on which the complaint was filed. E.g., "the complainant's application was rejected by the respondent by letter sent on March 27, 1994 and received on April 1, 1994.  The complaint was filed on June 15, 1994. (Tab C-21, Tab C-12, Tab C-2)".

2

Respondent Jurisdiction-In most cases, the facts provided will be brief. E.g., "the respondents are the owners (Property tax records, Tab C-12), district manager and property manager (Tab C-10) of Seven Oaks Apartments, a 63 unit rental complex". In some cases, this area will need a large amount of factual specificity, especially where the issue is whether the respondent is exempt from the Act, or from certain of its provisions. For example, when the complaint alleges discrimination based on familial status and the investigation has addressed the respondent's claim that it is exempt as housing for older persons, the information contained in this section will, in summary fashion, describe the facts found through investigation of each element of the possible exemption.

Subject Matter Jurisdiction-In virtually all cases, this will contain a brief statement, such as "the respondent engages in the provision of housing" or "the respondent engages in the provision of homeowners insurance". In some cases, where subject matter jurisdiction may be in question, more detail may be necessary.

PROOF FORMULAS:

SPECIFIC INFORMATION COVERING EACH OF THESE ELEMENTS MUST BE INCLUDED ON THE CASE ANALYSIS WORKSHEET FOR EACH APPLICABLE PROOF FORMULA:

Overt Discrimination:

1. Prima facie case: Evidence found through investigation (NOT the allegations in the complaint) indicating that the complainant has been subjected to some form of overt discrimination. E.g., "Advertisement placed by respondent in the Gatlinburg, TN Hornet states 'no children', or "Complainant's witness, her real estate agent, states that respondent said to the agent that she should not have shown the house to complainant because the respondent would never sell her house to Hispanics."

2. Respondent's defense: The respondents defense(s) should be detailed. Sources for this information are typically the respondents' answer and the interview(s) of the respondents. For each defense, state the investigative information which either affirms (supports) the defense or refutes (contradicts) the defense.

If, for example, the respondent defends by stating that the advertisement was run by mistake, that is the defense. The investigative facts affirming or refuting the defense would discuss what the investigation found about why and by whom the advertisement was placed.

3

If the respondent denies making the overt statement, the investigative facts would identify the information available which would support the respondents' defense (for example, "R owner denies making the discriminatory statement" under Affirm and under refute might be stated that "Witness real estate agent states that at two points in her conversation with the respondent following the showing of the house, respondent owner made statements such as "I wish you had talked to me before you showed the house to the complainant because I never would have let you show the house to Hispanics.  Agent made detailed notes of the conversation. (Tab C-11).  Agent terminated relationship with owner describing substance of the conversation by letter dated two days after the conversation.  (Tab C-8)."

In some cases, the result of the review of investigative evidence may not result in a final conclusion of the investigation.  For example, the complainant may allege that a discriminatory statement was made and respondent may deny making the statement, and no other witnesses exist to support either version of the story, resulting in a "swearing contest."  In such cases, the case should also be investigated and analyzed under a disparate treatment analysis.

If the speech of the respondent is protected by the First Amendment, the rationale/legal opinion/other information indicating the protected nature of the speech should be included here.

Unequal Treatment:

1. Prima facie case:  Describe the facts found in the investigation for each element of the relevant prima facie case.  For example, in a failure to rent case, the prima facie case section might contain the following kind of information: "Complainant is an African-American male.  He completed an application for an apartment on March 15, 1994. (Tab C-22).  His income of $23,450 qualified him for the $650 monthly rent. (Tab C-14, C-15).  He was told by telephone by R. Smith on March 25 that his application was rejected.  (Tab C-11, C-14).  The apartment in question was rented to a white female who applied on March 16, 1994 and who had an income of $25,000."

2. Respondents' defense(s):  List each of the defenses, express or implied, which the investigative evidence indicates.  For each defense, indicate the evidence which supports the defense under "Affirm" and the evidence which does not support or contradicts the defense under "Refutes".  For example, the respondent defenses might be that the complainant has poor credit and that the complainant made insufficient income to afford the apartment.  (Note that the latter defense amounts to a rejection

4

of the element of the prima facie case regarding income eligibility.  This may occur in some situations.  The prima facie case element is designed to address whether an applicant superficially is qualified, not to anticipate a respondent defense to the specific complainant).

Under each defense, the investigative facts should be listed which either support or reject the defense.  For example, for the poor credit defense, under "affirm" would be the indication that the complainant's credit report (Tab C-15) indicates that the complainant has two accounts which were turned over for collection two years earlier.  Under affirm might also be included the fact that respondents' written tenanting policies state 'any applicant with one or more accounts turned over for collection within the preceding four years will be rejected."  Under "Refutes" might be included evidence which indicates that the white female applicant did not have a credit report run by the respondents, that a review of 23 files indicates that credit reports were run on all black applicants and only on one white applicants.  All comparative data and all information indicating that a respondent's defense is or is not pretextual should be included under the "Affirm" or "Refute" categories.

Disparate Impact:

1. Prima facie case:  The evidence should be summarized which indicates:

a. the policy, practice or standard which is identified as possibly having a disparate impact.

b. The evidence which shows that the policy disparately affects a group on line covered by the Act, including identification of the group which is being analyzed.

c. Information which shows that the effect is adverse in some fashion.

For example, a factual summary under disparate impact might read as follows: "Respondent has a policy, which was put into effect in June, 1994, of refusing to accept applicants who hold Section 8 certificates or vouchers.  Prior to that date, respondent accepted certificates and vouchers.  In addition, respondent is seeking to evict all certificate/voucher holders.  This policy has a disparate impact on African-Americans because the Section 8 waiting list in this community is 60% African-American (Tab C-13), while the general population in the community residing in rental housing is 15% African-American. (Tab C-11).  When the respondent began participating in the program in 1980, the Section 8 list was approximately 10% African-American. (Tab D-11).  Furthermore, of respondent's 500

5

units, 100 are occupied by African-Americans. (Tab C-18). Of that number, 90 are Section 8 certificate or voucher holders. (Tab C-15). Of the remaining 400 units, 95% are occupied by white families. (Tab C-15). Therefore, 90% of the tenants who will be evicted will be African-American. Only 10% will be white.

2. Respondent Defense(s):

Each of respondents' business necessity justifications should be summarized as individual defenses, and the factual evidence which either supports or contradicts a conclusion that the policy, practice or standard is a business necessity should be summarized. Respondents' consideration (or lack of consideration of) less discriminatory alternatives should be summarized under the defense as well. If there is other evidence which supports a conclusion that less discriminatory alternative ways of meeting business needs were or were not available, it should also be summarized under either 'affirms" or "refutes".

For example, if the respondent justifies its restrictive occupancy standard by a concern for excessive costs associated with higher water usage, the "affirm" column might indicate "Since respondent instituted its policy, water usage costs have dropped by 10%. (Tab D-11). There is no individual metering system per unit to allow allocation of costs based on use per unit. (Tab C-9)." Under the "refutes" column, there might be information such as "the difference in water cost attributable to additional occupants amounts to $500 per year, (based on comparative data from the year preceding institution of the policy and the year following its implementation) in a complex which has a total gross profit of $100,000 dollars and a net profit of $20,000. (Tab C-10, D-12). The cost of installing water saving devices in units occupied by more than four occupant would amount to approximately $400, based on current occupancy."

The "Conciliation Efforts" section should include a brief summary of all efforts of conciliation, ensuring that efforts have been made, where feasible, as to all parties, and on all issues or claims, especially where new issues or claims were identified and added to the complaint during the course of the investigation. A summary of offers and counter offers should be included.

"Cause" or "no cause" recommendations should be entered for each issue analyzed. If there are several bases alleged or several portions of the Act alleged to have been violated, indicate "cause" or "no cause" as to each. The "Comments" section may include any additional analysis or assessment of the case, or additional items for investigation or discovery following issuance of a charge.



**Handbook 8024.01**

U.S. Department of Housing and Urban Development
Office of Fair Housing and Equal Opportunity

---

Departmental
Staff

---

September 1995

# Title VIII Complaint Intake, Investigation, and Conciliation Handbook

: **Distribution:** W-3-1, R-3-1 (FHEO), RC

8024.01

systemic complaint.  The difference arises when the
evidence shows that the alleged discriminatory practice
encompasses more than an isolated, accidental or peculiar
event, and the alleged violation happened as a regular
procedure.

The investigator should determine as soon as possible if
other complaints against the same respondent have been
referred to the Attorney General, and the bases, issues
and status of the existing complaints.  The investigator
should then discuss the complaint with his or her
supervisor.  Field Office management will decide whether
the complaint should be transmitted to Headquarters for
referral to the Department of Justice  (See Chapter 5,
Special Intake processing.)

B.  **Additional Guidance On Identifying Pattern Or Practice
Complaints**

Reserved

## 7-12 EVALUATING THE APPROPRIATE THEORY OF DISCRIMINATION TO APPLY IN A GIVEN CASE

Following is a brief summary of the principal theories of
discrimination -- overt discrimination, disparate treatment,
and disparate impact--and the analytical framework these
theories provide for an investigation of a Fair Housing Act
violation.  After receiving evidence from the complainant,
respondent, and witnesses, the investigator should re-assess
whether the correct theory of discrimination is being
applied.  The theories of discrimination are addressed
below; however, for a more thorough discussion of the
subject, see Chapter 2, Theories of Discrimination.

A.  **Overt Discrimination**

A complainant may present or report overt evidence of a
prohibited preference or limitation as part of their
allegation.  A landlord might be alleged to have told an
applicant, "We don't rent to families with children," or
a former employee might report that her boss told her to
"get rid of some of the Latinos."

The investigation of an overt evidence case will typically
focus upon establishing the complainant's relative

001272

credibility and the respondent's lack of credibility, as well as looking for supporting evidence through the respondent's records of dealings with persons of the complainant's class. Merely establishing that a respondent housing provider made a discriminatory comment during the course of a real estate transaction, will suffice for a showing that the Act's prohibitions against discriminatory advertising found at 804(c) have been violated. The investigator should not, however, stop there. In order to establish that the negative actions taken by the respondent towards the complainant were motivated, in whole or part, by the discriminatory preference, the investigation should proceed along the lines of other disparate treatment cases, with the collection and analysis of comparative and supporting evidence.

**B.    Disparate Treatment**

Disparate treatment discrimination occurs when a housing provider treats an individual differently because of race, sex, religion, color, national origin, familial status, or disability. Frequently, disparate treatment cases also involve a showing that the respondent has failed to follow his or her own established policies along lines prohibited by the law.

In many cases, however, respondents do not verbalize or otherwise express their discriminatory intent. To investigate these cases, the investigator must inquire: "Has the respondent treated any contrasting class persons more favorably?" If neither the complainant nor the investigator has identified any contrasting class comparators at the early stage in the case, the investigator should ask: "Has the respondent taken any unusual action against the complainant?" or "Does it appear that the respondent has taken an action <u>not</u> in accordance with his or her own procedures?" Alternatively the investigator may ask: "Is the reason advanced by the respondent for his or her actions true?" The following are two examples of claims of disparate treatment cases.

**Example One:  A complainant states that her neighbor, who is non-minority, was reported to the local police for creating excessive noise on three different occasions and yet was not evicted. The minority**

8024.01

complainant was evicted after her daughter had a single noisy party.

Example Two: A complainant states that she had been negotiating to buy a house for several weeks. The complainant and respondent had agreed upon a purchase price but were still negotiating over who would bear the cost of replacing the roof. The complainant's agent mentioned that the respondent's agent had asked her if it was true that her client had two adopted children with mental disabilities. The respondent then demanded a higher price for the house and specified that the house was offered "as is." Neither the complainant nor the complainant's agent could understand the sudden step backwards in negotiations on the part of the respondent.

C.   Disparate Impact

Disparate impact discrimination occurs when a housing provider implements an apparently <u>neutral</u> policy, practice, or procedure that can be shown to have a disproportionately negative effect upon a class of people. In proving that disparate impact discrimination has occurred, the investigator does not have to establish that the respondent <u>intended</u> to discriminate against a particular class of persons. Also, disparate impact occurs when everyone is treated in more or less the same manner, but the effects of this treatment are measurably more detrimental to a specific group of persons.

Disparate impact cases are often built upon statistical proof that demonstrates the negative effect of the subject policy upon persons of the complainant's class.

Disparate impact cases may be recognized on receipt of the respondent's statement of defense. When the respondent acknowledges the alleged discriminatory policy, but emphasizes that this policy is even-handedly enforced, the investigator should begin to consider the case as a possible example of disparate impact discrimination.

Example: New owners of a three- building, high-rise apartment complex placed into effect a change in the rental policy from renting to families with children to an all-adult rental policy. Pursuant to that policy change the owners issued eviction notices to all of the

8024.01

families with children in one of the buildings. At the time the eviction notices were issued, most of the families with children in that building were minority. Of the total number of people living in that building, approximately 75% of the minority tenants received termination notices as opposed to approximately only 25% of the White tenants. An action was brought against the owners for violation of the Fair Housing Act alleging that the all-adult policy was part of a broad scheme to alter the racial composition of the complex. The court held that a prima facie showing for a discriminatory impact case required proof that a particular policy had a disproportionate effect on the minorities in the total group on which the policy was applied. The fact the evictions had a substantially greater effect on the minority tenants in the building was sufficient to establish a prima facie showing of a discriminatory impact.

In the example above, the respondent applied the challenged policy across the board to all families with children in the building. It could not be demonstrated that the respondent evidenced an intent to prevent minorities from living in the building. However, the facts illustrate how a prima facie case under the theory of disparate impact can be used to show that the restrictive policy had a substantially greater impact on minorities than on non-minorities. (Note that in this example the respondent's policy discriminated on its face against families with children. A familial status complaint under these facts would be a disparate treatment case.)

D.  **Recognizing the Need to Shift Between Theories of Discrimination During the Investigation**

As outlined in Chapter 2, Theories of Discrimination, the requirements for proving a case of disparate treatment may differ significantly from the requirements for proving a case of disparate impact. On occasion, an investigator may find it impossible to accurately determine the difference between disparate treatment versus disparate impact cases, that is, whether a respondent treated a complainant differently because of his or her class, or,

8024.01

whether <u>a uniformly applied, apparently neutral policy that had a discriminatory effect upon persons of the complainant's class detrimentally affected the complainant</u>.

For example, a respondent may state that he rejected a complainant's application for an apartment because the applicant did not meet the income eligibility requirements. The investigation must, first determine the precise details of the respondent's income eligibility requirements and how the respondent believes that the complainant did not meet the standards. Then the investigation must determine whether the respondent applied those income requirements to all applicants. Only if the answer to that question is "yes" should the investigator examine, after consultation with the supervisor, whether the income requirement had a disparate impact on members of the complainant's protected class. Where this is the case, the investigator should create an investigative plan that allows for the possibility of either a disparate treatment case or a disparate impact case.

## 7-13  DETERMINING THE SCOPE OF THE INVESTIGATION

One of the most important decisions an investigator makes in planning an investigation is determining the scope of the investigation. For example, the investigator must decide for what time period to seek evidence (the temporal scope), and what buildings, facilities, or institutions to examine (the geographic scope). Additionally, the investigator must determine the extent to which the circumstances of other potentially aggrieved persons merit examination and whether to treat the allegations as systemic or "pattern or practice" complaints.

The investigator must make these decisions on a case-by-case basis. Additionally, as the investigation progresses, the initial decisions about the scope of the investigation and necessary adjustments must be re-evaluated.

**U.S. Department of Housing and Urban Development**

---

Special Attention of:
All FHEO Region Directors
All Associate General Counsel
All FHEO Staff

**Transmittal** for Handbook No.: 8024.01, REV-2

Issued: May 11, 2005

---

1. This Transmits

one new chapter and four revised chapters of the Title VIII Complaint Intake, Investigation, and Conciliation Handbook, 8024.01. The original handbook was published in 1995, and included six chapters: Jurisdiction, Complaint Intake, Special Intake, Conciliation, Planning and Conducting the Investigation, and Administrative Closures. Two chapters were added in 1998; Theories of Discrimination and Analysis of Specific Cases.

One new chapter, Chapter 10, Preparation of the Case File has been added, and four chapters: Chapter 4, Complaint Intake; Chapter 7, Planning and Conducting the Investigation; Chapter 9, Administrative Closures; and Chapter 11, Conciliation, have been revised and updated to reflect current FHEO guidance.

Chapter 10: Preparation of the Case File, provides guidance to FHEO staff on the organization and placement of evidence in the investigative case file, including privileged and confidential information.

Chapter 4: Complaint Intake, combines and revises Chapters 4 and 5 from the 1995 edition of the Handbook, and provides updated and revised guidance for complaint intake activities and special intake issues, previously contained in Chapter 4 (Complaint Intake) and Chapter 5 (Special Intake).

Chapter 7: Planning and Conducting the Investigation, Chapter 9, Administrative Closures, and Chapter 11, Conciliation, have been updated to include current FHEO policies and practices.

Remove Chapters 4,5, 7, 9 and 11 and insert Handbook 8024.01, REV-2, Chapters 4, 7, 9, 10 and 11, with Appendices.

Assistant Secretary
 for Fair Housing and Equal Opportunity

Distribution: W-3-1,

the family for this offense regardless of
considerations of familial status was believed.

Another basis for judging how seriously the respondent
felt about his proffered reason is to examine when in
the overall application process this matter was first
raised by the respondent.  If, for example, a
respondent claims that a minority applicant's poor
credit history would alone have resulted in her
rejection, then the respondent would ordinarily be
expected to have made all the necessary inquiries into
this issue early enough in the application process to
be able to act on the information elicited.

Finally, because mixed-motive and single-motive cases
generally focus on the same issues, it follows that all
of the other types of circumstantial evidence discussed
in Section 2-2 would also be relevant in mixed-motive
cases.  Particularly important among these other topics
would be the consistency with which the respondent has
articulated and maintained his claimed legitimate
excuse for not dealing with the complainant, and the
demographics of those tenants or other homeseekers whom
the respondent has dealt with, broken down by whether
or not these other persons are members of the
complainant's protected class.

## 2-4  DISCRIMINATORY IMPACT CASES

### A.  Introduction

Under certain circumstances, a respondent may be held
liable for violating the Fair Housing Act even if his
action against the complainant was not even partly
motivated by illegal considerations.  This could occur
if the respondent has rejected the complainant on the
basis of a policy, practice, or standard that
disproportionately excludes or otherwise harms a class
of persons protected by the Act and for which the
respondent cannot supply a substantial justification.

An example of this type of complaint might involve a
landlord who declined to accept child support income in

8024.01, CHG-1

respondent, the complainant, or some other source), whether the respondent has ever considered any of these alternatives, and why he believes they are not as satisfactory a way to deal with the problem as his adopted policy. Finally, the respondent should also be asked whether he knew or suspected that his adopted policy would have a discriminatory impact on the complainant's protected class, and whether he considered this at all -- as a negative, a positive, or not at all -- in his decision to adopt this policy.

**E.**  **Review: The Keys to Investigating a Discriminatory Impact Case**

Every case in which a complainant alleges that he or she has been rejected because of the application of an apparently consistent policy or rule is potentially a discriminatory impact case.  The first item that should be explored in such a case is whether the case is really better analyzed as one involving discriminatory intent.  If, for example, the respondent's rule is discriminatory "on its face" against a protected group or, if the contested rule has been applied selectively so as to discriminate against such a group, the case may be appropriately analyzed under the theory of disparate treatment, with the element of intent to be demonstrated.  There may be other evidence of the respondent's intentional discrimination in such cases, including direct evidence in the form of statements by the respondent indicating an intent to discriminate and/or awareness by the respondent that his policy would have the effect of excluding a large portion of the complainant's protected class.  The investigator should always be alert to the possibility that a case which begins life looking like a discriminatory impact case later be shown to be a disparate treatment case, or may, indeed, involve actions that violate the Act under *both* theories.

As for the applicability of the discriminatory impact theory itself, the investigation must produce a proper statistical basis for the fact-finder to conclude that a given policy, practice or standard produces a

11/98

2-44



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-2000

OFFICE OF FAIR HOUSING
AND EQUAL OPPORTUNITY

February 9, 2011

MEMORANDUM FOR:     FHEO Office Directors
                    FHEO Regional Directors

FROM:               Sara K. Pratt, Deputy Assistant Secretary for Enforcement and
                    Programs

SUBJECT:            Assessing Claims of Housing Discrimination against Victims of
                    Domestic Violence under the Fair Housing Act (FHAct) and the
                    Violence Against Women Act (VAWA)

---

I.     Purpose

This memorandum provides guidance to FHEO headquarters and field staff on assessing claims by domestic violence victims of housing discrimination under the Fair Housing Act (FHAct). Such claims are generally based on sex, but may also involve other protected classes, in particular race or national origin. This memorandum discusses the legal theories behind such claims and provides examples of recent cases involving allegations of housing discrimination against domestic violence victims. This memorandum also explains how the Violence Against Women Act (VAWA)[1] protects some domestic violence victims from eviction, denial of housing, or termination of assistance on the basis of the violence perpetrated by their abusers.

II.    Background

Survivors of domestic violence often face housing discrimination because of their history or the acts of their abusers. Congress has acknowledged that "[w]omen and families across the country are being discriminated against, denied access to, and even evicted from public and subsidized housing because of their status as victims of domestic violence."[2] Housing authorities and landlords evict victims under zero-tolerance crime policies, citing the violence of a household member, guest, or other person under the victim's "control."[3] Victims are often evicted after repeated calls to the police for domestic violence incidents because of allegations of disturbance to other tenants. Victims are also evicted because of property damage caused by their abusers. In

---

[1] This guidance refers to the Violence Against Women and Department of Justice Reauthorization Act of 2005 (VAWA 2005), which included provisions in Title VI ("Housing Opportunities and Safety for Battered Women and Children") that are applicable to HUD programs. The original version of VAWA, enacted in 1994, did not apply to HUD programs. Note also that HUD recently published its VAWA Final Rule. *See* HUD Programs: Violence Against Women Act Conforming Amendments; Final Rule, 75 Fed. Reg. 66246 (October 27, 2010).

[2] 42 U.S.C. § 14043e(3) (findings published in the Violence Against Women Act). Note that VAWA also protects male victims of domestic violence. *See* HUD Programs: Violence Against Women Act Conforming Amendments; Final Rule, 75 Fed. Reg. 66246, 66251 ("VAWA 2005 does protect men. Although the name of the statute references only women, the substance of the statute makes it clear that its protections are not exclusively applicable to women.").

[3] *See* 24 CFR § 5.100.

investigating each reason to determine whether the evidence supports or refutes each reason. If a nondiscriminatory reason(s) is articulated, the investigation shifts again to examining the evidence to determine whether or not the reason(s) given is supported by the evidence or is a pretext for discrimination.[25]

*Disparate impact.* In some cases, there is no direct evidence of unequal treatment, but a facially neutral housing policy, procedure, or practice disproportionately affects domestic violence victims. In these cases, a disparate impact analysis is appropriate. Disparate impact cases often arise in the context of "zero-tolerance" policies, under which the entire household is evicted for the criminal activity of one household member. The theory is that, even when consistently applied, women may be disproportionately affected by these policies because, as the overwhelming majority of domestic violence victims, women are often evicted as a result of the violence of their abusers.

There are four steps to a disparate impact analysis. First, the investigator must identify the specific policy, procedure, or practice of the landlord's that is allegedly discriminatory. This process means both the identification of the policy, procedure, or practice and the examination of what types of crimes trigger the application of the policy. Second, the investigator must determine whether or not that policy, procedure, or practice was consistently applied. This step is important because it reveals the correct framework for the investigation. If the policy is applied unequally, then the proper analysis is unequal treatment, not disparate impact. If, however, the policy was applied consistently to all tenants, then a disparate impact analysis applies, and the investigation proceeds to the next step.

Third, the investigation must determine whether or not the particular policy, procedure, or practice has a significant adverse impact on domestic violence victims and if so, how many of those victims were women (or members of a certain race or national origin). Statistical evidence is generally used to identify the scope of the impact on a group protected against discrimination. These statistics should be as particularized as possible; they could demonstrate the impact of the policy as to applicants for a specific building or property, or the impact on applicants or residents for all of the landlord's operations. For example, in a sex discrimination case, the investigation may uncover evidence that women in one apartment complex were evicted more often than men under a zero-tolerance crime policy. It would not matter that the landlord did not intend to discriminate against women, or that the policy was applied consistently. Proof of disparate impact claims is not an exact science. Courts have not agreed on any precise percentage or ratio that conclusively establishes a prima facie case. Rather, what constitutes a sufficiently disparate impact will depend on the particular facts and circumstances of each case.

If the investigation reveals a disparate impact based on sex, race, or national origin, the investigation then shifts to eliciting the respondent's reasons for enforcing the policy. It is critical to thoroughly investigate these reasons. Why was the policy enacted? What specific outcome was it meant to achieve or prevent? Were there any triggering events? Were any alternatives considered, and if so, why were they rejected? Is there any evidence that the policy has been effective? What constitutes a sufficient justification will vary according to the circumstances. In general, the investigation will examine whether or not the offered justification is real and supported by a substantial business justification. For the purposes of this memorandum, it is important to

---

[25] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for an explanation of the burden-shifting formula.

5

understand that an investigation must identify and evaluate the evidence supporting and refuting the justification.

Even if there is sufficient justification for the policy, there may be a less discriminatory alternative available to the respondent. A disparate impact investigation must consider possible alternative policies and analyze whether each policy would achieve the same objective with less discriminatory impact. For example, in a case of discriminatory eviction under a zero-tolerance policy, a landlord could adopt a policy of evicting only the wrongdoer and not innocent victims. This policy would protect tenants without unfairly penalizing victims of violence.

In summary, an investigation of a disparate impact case must seek evidence that a specific policy of the landlord's caused a substantial, disproportionate, adverse impact on a protected class of persons. Proving a disparate impact claim will generally depend on statistical data demonstrating the disparity and a causal link between the policy and the disparity; discriminatory intent is irrelevant.

V.    Fair Housing Cases Involving Domestic Violence

*Eviction Cases*. Victims are often served with eviction notices following domestic violence incidents. Landlords cite the danger posed to other tenants by the abuser, property damage caused by the abuser, or other reasons for eviction. Several cases have challenged these evictions as violations of VAWA or the Fair Housing Act.

*Alvera v. CBM Group*, Case No. 01-857 (D. Or. 2001).[26] The victim was assaulted by her husband in their apartment. She obtained a restraining order against her husband, and he was subsequently arrested and jailed for the assault. She provided a copy of the restraining order to the property manager. The property manager then served her with a 24-hour eviction notice based on the incident of domestic violence. The notice specified: "You, someone in your control, or your pet, has seriously threatened to immediately inflict personal injury, or has inflicted personal injury upon the landlord or other tenants." The victim then submitted an application for a one-bedroom apartment in the same building. Management denied the application and refused to accept her rent. After a second application, management finally approved her for a one-bedroom apartment, but warned her that "any type of recurrence" of domestic violence would lead to her eviction.

The victim filed a complaint with HUD, which investigated her case and issued a charge of discrimination against the apartment management group. She elected to pursue the case in federal court. The parties later agreed to settle the lawsuit. The consent decree, approved by the Oregon district court in 2001, requires that the management group agree not to "evict, or otherwise discriminate against tenants because they have been victims of violence, including domestic violence" and change its policies accordingly. Employees of the management group must participate in education about discrimination and fair housing law. The management group also agreed to pay compensatory damages to the victim.

*Warren v. Ypsilanti Housing Authority*, Case No. 4:02-cv-40034 (E.D. Mich. 2003). The victim's ex-boyfriend broke into her house and physically abused her. She called the police to

---

[26] A copy of the determination is attached to this memo.