IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN INSURANCE ASSOCIATION and NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,<br><br>    Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development,<br><br>    Defendants. | Civil Action No. 13-cv-966 (RJL) |

**PLAINTIFFS' SUPPLEMENTAL BRIEF**

At the Court's invitation, Plaintiffs American Insurance Association and National Association of Mutual Insurance Companies submit this supplemental brief to address topics that arose during the motions hearing in support of their Motion for Summary Judgment and in opposition to Defendants' Motion to Dismiss or for Summary Judgment.

1.  As Plaintiffs explained at the hearing, the government's efforts to prevent this Court from reaching the merits of the question whether disparate-impact liability is available under the Fair Housing Act (FHA) are meritless. The Disparate-Impact Rule expressly and directly targets Plaintiffs' members. Transcript of 7/22/14 Hearing ("Tr.") 20; *see* Proposed Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 70,921, 70,924 (Nov. 16, 2011). For that reason alone, Plaintiffs' standing to challenge the rule is "self-evident." *Sierra Club* v. *EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). But even if there were any question about whether Plaintiffs' members' injuries—the existence of which the government no longer contests—are traceable to the Disparate-Impact Rule, it cannot seriously be de-

bated that the Rule altered the preexisting legal landscape as to homeowner's insurers. Tr. 46. At the time HUD promulgated the Rule, the question whether disparate-impact liability was available in an action against an insurer was unsettled. *See Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961, 964 (8th Cir. 2008); *NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287, 290-291 (7th Cir. 1992). And in this circuit, the availability of disparate-impact liability more generally was an open question. *Compare National Community Reinvestment Coalition* v. *Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 77-79 (D.D.C. 2008) (Sullivan, J.), *with Brown* v. *Artery Organization, Inc.*, 654 F. Supp. 1106, 1115-1116 (D.D.C. 1987) (Greene, J.). The Disparate-Impact Rule resolved the uncertainty in the law by expressly making disparate-impact liability under the FHA uniformly available against insurers throughout the Nation, including in jurisdictions where such liability did not previously exist. That change in the law is sufficient to satisfy the traceability element of the standing inquiry. Tr. 44; *see Neighborhood Assistance Corp.* v. *Consumer Financial Protection Bureau*, 907 F. Supp. 2d 112, 122 (D.D.C. 2012) (Wilkins, J.).

    2.    As to the merits, the plain language of the FHA, both as it was originally enacted and as it remains today, unambiguously prohibits only actions taken with discriminatory intent and not practices that result in a disparate impact without intent. Tr. 4. The legislative history of the FHA confirms what the text makes clear, and Congress has never amended the statute to authorize disparate-impact liability. In the face of the statutory language and the explicit disagreement between the political branches at the time of the 1988 amendments about whether the statute permitted disparate-impact liability, the government's effort to attach significance to the silence of that later Congress is wholly unconvincing. Tr. 12-13.

    Indeed, the Solicitor General's 1988 brief to the Supreme Court in *Town of Huntington* v. *Huntington Branch, NAACP*, No. 87-1961, fully supports Plaintiffs' interpretation of the statuto-

ry text and legislative history of the FHA. Because that brief was the subject of much discussion at the motions hearing, *see, e.g.*, Tr. 5, 13-14, 29-30, 47, Plaintiffs attach a copy here for the Court's convenience. In that brief, the government argued that "the court below, and the other courts of appeals that have addressed the issue, have erred in holding that a showing of discriminatory effect will suffice" to prove a violation of the FHA. U.S. Br. at 10, *Town of Huntington*, *supra*; *see id.* at 12 n.15 (listing cases). According to the government, "[t]he words 'because of' plainly connote a causal connection between the housing-related action and the person's race," which "strongly suggests a requirement of discriminatory motivation." *Id.* at 14. And looking to the legislative history, the government argued that the legislative history "reinforces the understanding that Congress intended to require a showing of intentional discrimination," and that statements expressing the FHA's "ambitious goals" could not "surmount[] the obstacles posed by the statute's plain language and legislative history." *Id.* at 16, 18 n.21. The government was correct in *Town of Huntington* for all the reasons that it is incorrect here. And at a minimum, the government's position in *Town of Huntington* utterly refutes the government's contention here that there was a "broad and unquestioned" consensus in 1988 that the FHA permitted disparate-impact liability. Tr. 13.

*   *   *   *   *

For the foregoing reasons and the reasons set out in Plaintiffs' previous briefs and at oral argument, Plaintiffs' motion for summary judgment should be granted and the Disparate-Impact Rule vacated. In light of the urgent need for definitive resolution of the applicability of the Disparate-Impact Rule and the availability of disparate-impact liability against Plaintiffs' members, Plaintiffs urge the Court to resolve this case expeditiously so as to facilitate further review.

/s/Kannon K. Shanmugam
Kannon K. Shanmugam (#474304)
Allison B. Jones (#991503)
A. Joshua Podoll (#1011743)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

August 5, 2014                              *Counsel for Plaintiffs*

DISTRIBUTED
JUN 30 1988
FILE COPY
Supreme Court, U.S.
FILED
JUN 24 1988
JOSEPH F. SPANIOL, JR.

No. 87-1961

# In the Supreme Court of the United States

OCTOBER TERM, 1987

---

TOWN OF HUNTINGTON, NEW YORK, ET AL., APPELLANTS

*v.*

HUNTINGTON BRANCH, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.

---

*ON APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

---

> CHARLES FRIED
>   *Solicitor General*
> WM. BRADFORD REYNOLDS
>   *Assistant Attorney General*
> MARK R. DISLER
> ROGER CLEGG
>   *Deputy Assistant Attorneys General*
> MICHAEL R. LAZERWITZ
>   *Assistant to the Solicitor General*
> DAVID K. FLYNN
> WILLIAM R. YEOMANS
>   *Attorneys*
>
>   *Department of Justice*
>   *Washington, D.C. 20530*
>   *(202) 633-2217*

## QUESTION PRESENTED

Whether the Town of Huntington's zoning ordinance, which on its face prevented private construction of multi-family low-income housing outside an urban renewal area, and the Town's refusal to rezone a specific site to permit such construction violated Title VIII of the Civil Rights Act of 1968 (Fair Housing Act), 42 U.S.C. 3601 *et seq.,* on the basis of findings that the Town's actions had a discriminatory effect on minority residents and lacked sufficiently legitimate justifications.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Interest of the United States | 1 |
| Statement | 1 |
| Discussion | 9 |
| Conclusion | 19 |

## TABLE OF AUTHORITIES

Cases:

| | |
|---|---|
| *Arthur* v. *City of Toledo*, 782 F.2d 565 (6th Cir. 1986) | 12 |
| *City of Mobile* v. *Bolden*, 446 U.S. 55 (1980) | 15 |
| *Davis* v. *Scherer*, 468 U.S. 183 (1984) | 11, 19 |
| *Fornaris* v. *Ridge Tool Co.*, 400 U.S. 41 (1970) | 11 |
| *General Electric Co.* v. *Gilbert*, 429 U.S. 125 (1976) | 15 |
| *Gonzales* v. *Automatic Employees Credit Union*, 419 U.S. 90 (1974) | 11 |
| *Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971) | 15 |
| *Guardians Ass'n* v. *Civil Service Comm'n*, 463 U.S. 582 (1983) | 15 |
| *Hanson* v. *Veterans Admin.*, 800 F.2d 1381 (5th Cir. 1986) | 12, 13 |
| *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973) | 6 |
| *Metropolitan Hous. Dev. Corp.* v. *Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978) | 6, 13, 15-16, 17 |
| *Nashville Gas Co.* v. *Satty*, 434 U.S. 136 (1977) | 15 |
| *Personnel Administrator* v. *Feeney*, 442 U.S. 256 (1979) | 14-15, 16 |
| *Resident Advisory Bd.* v. *Rizzo*, 564 F.2d 126 (3d Cir. 1977), cert. denied, 435 U.S. 908 (1978) | 12-13, 15, 17 |
| *Smith* v. *Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982) | 12 |
| *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972) | 18 |
| *United States* v. *City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975) | 13 |
| *United States* v. *Fruehauf*, 365 U.S. 146 (1961) | 12 |

IV

Cases—Continued:

| | Page |
|---|---|
| *Village of Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*, 429 U.S. 252 (1977) | 13 |
| *Village of Belle Terre* v. *Boraas*, 416 U.S. 1 (1974) | 18 |

Constitution, statutes and regulation:

| | |
|---|---|
| U.S. Const. Amend. XIV (Equal Protection Clause) | 5, 13 |
| Civil Rights Act of 1964, 42 U.S.C. 2000a *et seq.*: | |
| Tit. VI, 42 U.S.C. 2000d *et seq.* | 15 |
| Tit. VII: | |
| 42 U.S.C. 2000e-2(a)(1) | 15 |
| 42 U.S.C. 2000e-2(a)(2) | 15 |
| Civil Rights Act of 1968, Tit. VIII, 42 U.S.C. 3601 *et seq.* | *passim* |
| 42 U.S.C. 3601 | 17 |
| 42 U.S.C. 3604(a) (§ 804(a)) | 14 |
| 42 U.S.C. 3604(b) | 14 |
| 42 U.S.C. 3604(c) | 14 |
| 42 U.S.C. 3604(d) | 14 |
| 42 U.S.C. 3604(e) | 14 |
| 42 U.S.C. 3605 | 14 |
| 42 U.S.C. 3606 | 14 |
| 42 U.S.C. 3610 | 1 |
| 42 U.S.C. 3613 | 1 |
| Housing Act of 1949, Tit. I, 42 U.S.C. (& Supp. III) 1450 *et seq.* | 2 |
| Housing and Community Development Act of 1974, 42 U.S.C. (& Supp. III) 5301 *et seq.* | 2, 3 |
| Voting Rights Act of 1965, 42 U.S.C. (& Supp. III) 1971 *et seq.*: | |
| § 2, 42 U.S.C. 1973 | 15 |
| § 5, 42 U.S.C. 1973c | 15 |
| 28 U.S.C. 1254(2) | 9, 10 |
| 42 U.S.C. (& Supp. III) 1437f | 4 |
| 42 U.S.C. (& Supp. III) 1439(a)(1) | 4 |
| 42 U.S.C. 1982 | 5 |
| 42 U.S.C. 1983 | 5 |
| Huntington, N.Y., Town Code § 198-20 | 2, 3, 11, 19 |

V

Miscellaneous:

| | Page |
|---|---|
| 114 Cong. Rec. (1968): | |
| p. 2277 | 17 |
| p. 3422 | 17 |
| p. 4974 | 18 |
| p. 4976 | 17 |
| p. 5643 | 17 |
| *Fair Housing Act of 1967: Hearings Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. (1967) | 17 |
| H.R. Rep. 100-711, 100th Cong., 2d Sess. (1988) | 16 |
| C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* (1988) | 18 |
| | 11 |

# In the Supreme Court of the United States

October Term, 1987

No. 87-1961

Town of Huntington, New York, et al., Appellants

v.

Huntington Branch, National Association for the Advancement of Colored People, et al.

ON APPEAL FROM THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

## INTEREST OF THE UNITED STATES

This cases involves an application of Title VIII of the Civil Rights Act of 1968 (Fair Housing Act), 42 U.S.C. 3601 *et seq.*, as a restriction on local governmental zoning practices. The United States Department of Housing and Urban Development (HUD) has responsibility under the Fair Housing Act to receive, investigate, and attempt to resolve complaints of discrimination through "conference, conciliation, and persuasion" (42 U.S.C. 3610). The United States Department of Justice is further responsible under the statute for redressing by judicial action patterns and practices of discriminatory conduct. See 42 U.S.C. 3613.

## STATEMENT

1. Appellant, the Town of Huntington, New York, according to 1980 census figures, had approximately 200,000

2

people, 95% of whom were white and 3.35% of whom were black. Roughly 70% of the Town's black residents lived within six census tracts located in the Huntington Station and South Greenlawn sections, which were also part of the Town's urban renewal area. J.S. App. 5a.[1] "Outside these two neighborhoods, the Town's population was overwhelmingly white" (*ibid.*). The Town had a shortage of rental housing for low and moderate-income households. This shortage disproportionately affected black residents: 7% of all of the Town's families needed subsidized housing, but 24% of the Town's black families required such assistance. *Ibid.*

As part of its efforts under the urban renewal program, the Town created a zoning classification known as the "R-3M Garden Apartment District" (J.S. App. 42a), and permitted multi-family housing to be built in areas so designated. The relevant zoning ordinance, Section 198-20 of the Code of the Town of Huntington,[2] restricted private construction of such multi-family housing to the urban renewal area; the ordinance allowed the Huntington

---

[1] During the 1960s, the Town participated in the federal urban renewal program. See Housing Act of 1949, Tit. I, 42 U.S.C. (& Supp. III) 1450 *et seq.* The state legislature created the Huntington Urban Renewal Agency, which in turn supervised the Town's urban renewal plan. One aspect of the plan was the designation of that area of the Town which needed housing development. J.S. App. 40a-41a. The "urban renewal area" became the sections of the Town in and surrounding Huntington Station, which contained "[t]he greatest concentration of [the Town's] substandard dwelling units" (*id.* at 40a). Congress terminated urban renewal programs in 1974 and enacted the Community Development Block Grant Program as part of the Housing and Community Development Act of 1974, 42 U.S.C. (& Supp. III) 5301 *et seq.*

[2] Section 198-20, by reference to other zoning regulations, included restrictions related to such things as off-street parking and loading, height, area, and bulk, and site plan development.

3

Housing Authority (HHA) to build such housing "townwide" (J.S. App. 7a). HHA's only multi-family housing project was in the urban renewal area (*ibid.*). Following enactment of the Housing and Community Development Act of 1974, 42 U.S.C. (& Supp. III) 5301 *et seq.*, the Town designated certain areas as community development areas (J.S. App. 40a), created the Huntington Community Development Agency (CDA), and considered applications for block grants for construction within the community development areas (*id.* at 43a). Evidence in the record suggests that, following these developments, the Town neither read nor applied Section 198-20 as prohibiting private construction of multi-family housing outside the urban renewal area, but, instead, treated the ordinance as permitting such development within the much larger "community development areas" (J.S. App. 40a; see *id.* at 7a n.4, 32a n.12, 57a; R. E-14, E-175, E-264 to E-265).[3]

Beginning in 1978, Housing Help, Inc. (HHI), a nonprofit housing civil rights organization headquartered in Huntington, launched its efforts to build a subsidized, low-income housing project for the Town. Although HHI found an available site within the urban renewal area, HHI decided not to build on that site. The organization wished to sponsor an integrative housing project and the "[urban renewal] area already had a substantial minority population" (J.S. App. 77a-78a; see *id.* at 8a). On January 23, 1980, HHI obtained an option to purchase a vacant

---

[3] The Town continues to maintain, as it has throughout this litigation, that Housing Help, Inc. (HHI), never properly applied for rezoning of its Matinecock Court project, and simply bypassed the Town's zoning procedures. See J.S. 4, 12-13, 15, 28; J.S. App. 79a-80a; Mar. 3, 1988 Tr. of Oral Arg. 30-31, 36-37; R. A-39. The court of appeals, however, overturned the district court's finding that HHI had not effectively applied for rezoning (J.S. App. 13a-14a).

4

14.8-acre site located in an area that was 98% white. The site was zoned "R-40" for single family homes on lots of at least one acre. *Id.* at 9a, 78a. HHI intended to obtain a rezoning from the Town for its planned 162-unit Matinecock Court project. On February 26, 1980, a director of HHI addressed the Town Board at a public meeting and "filed a document * * * request[ing] 'a commitment by the Town to amend the zoning ordinance to allow multi-family rental construction by a private developer'" (*id.* at 78a; see *id.* at 10a).

On August 28, 1980, HHI filed with the United States Department of Housing and Urban Development (HUD) its application for "Section 8" funding for the Matinecock Court project.[4] On October 9, 1980, the director of the CDA reviewed HHI's application for federal funding. The CDA disapproved of the project on a number of grounds, including the project's conflict with the Town's Housing Assistance Plan's goals of no new construction, the site's existing R-40 zoning restriction, the project's poor parking plans, the project's "inadequate" recreation facilities and unit size, and the site's traffic difficulties. On October 14, 1980, a letter was sent expressing the views of the "Town's professional staff in the Planning, Legal and Community Development Departments," recommending that HUD disapprove the proposal. J.S. App. 10a-11a, 44a-45a & n.1.[5]

---

[4] "Section 8" refers to a federal program that provided subsidies for newly built and substantially rehabilitated housing. See 42 U.S.C. (& Supp. III) 1437f.

[5] Under 42 U.S.C. (& Supp. III) 1439(a)(1), HUD must refer a Section 8 application for funding to the town having a Housing Assistance Plan previously approved by HUD; the statute gives the town an opportunity to comment on the application's compatibility with the existing Plan. See J.S. App. 10a, 46a.

5

HHI's proposed project also met substantial opposition when it became public. Town residents formed the Concerned Citizens Association and submitted to the Town Board a petition containing 4,100 signatures against the project. Ultimately, on January 6, 1981, the Town Board rejected HHI's

> propos[al] * * * that Huntington's zoning code be changed in order to build [the Matinecock Court project] * * * find[ing] that * * * the location [of the project] is not an appropriate location due to lack of transportation, traffic hazard and disruption of the existing residential patterns in the * * * area.

J.S. App. 12a-13a.

2. On February 23, 1981, HHI, the Huntington Branch of the NAACP, and several black, low-income residents of Huntington filed a complaint against the Town and members of the Town Board in the United States District Court for the Eastern District of New York. The complaint alleged, among other claims,[6] that the Town had violated Title VIII of the Civil Rights Act of 1968 (Fair Housing Act), 42 U.S.C. 3601 *et seq.*, by restricting private construction of multi-family housing to the urban renewal area and by refusing to rezone the site of HHI's proposed project. J.S. App. 38a-39a.[7] Following

---

[6] Plaintifs also alleged claims under the Equal Protection Clause, 42 U.S.C. 1982 and 1983, and New York state law (J.S. App. 38a-39a). These claims are no longer at issue. See *id.* at 3a n.1.

[7] The complaint also named as defendants HUD and its Secretary. The district court initially dismissed the complaint, holding that plaintiffs lacked standing (530 F. Supp. 838 (1981)). The court of appeals reversed and remanded (689 F.2d 391 (1982), cert. denied, 460 U.S. 1069 (1983)). Plaintiffs did not appeal the dismissal with respect to the federal defendants, and thus the case proceeded against only the Town.

On November 7, 1983, the district court certified the case as a class action and defined the class as roughly "[a]ll black, Hispanic and lower

6

a bench trial, the district court, on three alternative grounds, held that plaintiffs failed to prove that the Town had violated the Fair Housing Act (*id.* at 78a-86a).[8]

First, the court reviewed plaintiffs' claims under the four-part order of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The court found that plaintiffs never formally applied for rezoning of the site and thus concluded that their claim failed for that reason alone because "the second *McDonnell Douglas* element [was] missing" (J.S. App. 81a), namely, that plaintiffs applied for and qualified to build the housing sought (*id.* at 79a-81a).

Second, the court considered plaintiffs' claims under the four-part test of *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) (*Arlington Heights II*), cert. denied, 434 U.S. 1025 (1978). The court found that the Town's actions had only a slight "discriminatory effect" (J.S. App. 82a), the evidence "did not give rise to an aura of discriminatory intent" (*id.* at 83a), and the Town's actions "with respect to the zoning process and housing in general were supported by [the] rational and legitimate concerns" the Town had submitted to HUD in its October 14, 1980, letter (*ibid.*). The court thus concluded that, even assuming plaintiffs had applied for rezoning, the evidence was insufficient to establish a prima facie case of discrimination under the Fair Housing Act (*id.* at 83a-84a).

---

income persons in need of lower cost housing opportunities in Huntington and surrounding areas" (J.S. App. 39a).

[8] As a threshold matter, the court concluded that "[i]t [was] not necessary for plaintiffs to prove discriminatory intent before they may succeed on a claim under section 3604(a) [pertaining to discriminatory sale or rental decisions]" (J.S. App. 75a).

7

Third, the court concluded that, assuming plaintiffs had established a prima facie case under the balancing test of *Arlington Heights II*, the Town adequately rebutted the allegations by "legitimate, nondiscriminatory reasons for its conduct, and those reasons [had] not been exposed as pretextual" (J.S. App. 84a).

3. The court of appeals reversed (J.S. App. 1a-35a), holding that the Town had violated the Fair Housing Act by refusing to permit private construction of multi-family housing outside the urban renewal area and by refusing to rezone plaintiffs' site (*id.* at 32a). The court ordered "site-specific" relief, directing the Town to rezone plaintiffs' site, and also ordered the Town "to strike from [the] zoning ordinance that portion which limits private multi-family housing projects to the urban renewal area" (*id.* at 35a).

After reviewing relevant case law, legislative history, and the parallel to Title VII, the court concluded that the plaintiff need only show "discriminatory impact" (J.S. App. 18a), and that "a Title VIII violation can be established without proof of discriminatory intent" (*id.* at 17a-20a). Turning to the proper standard to evaluate the defendant's conduct and justifications once the plaintiff established a prima facie case, the court concluded that the "defendant must present bona fide and legitimate justifications for its actions with no less discriminatory alternatives available" (*id.* at 27a).[9]

---

[9] The court rejected the district court's apparent requirement that the plaintiff prove that the defendant's justifications were pretextual because "an intent-based standard for disparate treatment cases [was] inapposite to the disparate impact claim asserted" (J.S. App. 28a). The court similarly criticized the district court's application of the *McDonnell Douglas* test and overturned the finding that plaintiffs had

8

The court noted that the Town's zoning ordinance "impedes integration by restricting low-income housing needed by minorities to [the urban renewal] area already 52% minority" and found that the Town's refusal to amend that "restrictive zoning ordinance to permit privately-built multi-family housing outside the urban renewal area significantly perpetuated segregation in the Town" (J.S. App. 25a (footnote omitted)).[10] Similarly, given the greater percentage of minority residents needing

---

not applied for rezoning. According to the court of appeals (id. at 14a), the record showed that the

> parties thus clearly understood that an application for a zoning change had been made * * * [and] the Town's refusal to amend the zoning code rendered meaningless a request to change the zoning on the [proposed project site], as R-3M classifications were reserved for property within the urban renewal area, and there were no other multi-family housing designations.

In light of the court of appeals' conclusion that plaintiffs need not present proof of discriminatory intent, the court did not review the district court's findings regarding the Town's intent to discriminate (J.S. App. 24a n.7).

[10] The court of appeals was unmoved by the argument of the Town that

> R-3M zoning is available to any private developer * * * in any of the areas designated as community development areas * * * [and] that there would be absolutely no objection on the Town's part * * * to amend the ordinance so as to be consistent with [the Town's asserted policy of] allowing private developers, wherever they are, in these community development areas.

Mar. 3, 1988 Tr. of Oral Arg. 27, 30. See p. 3, *supra*.

The court concluded that "[a]ppellees cannot argue, as they do now, that the zoning ordinance does not now limit private builders to the urban renewal area when the Town Board in its January 6, 1981, resolution refused to amend the ordinance to delete the restriction of such housing to the urban renewal area, and appellees throughout this litigation have defended that decision" (J.S. App. 35a).

9

subsidized housing, the Town's refusal to rezone plaintiffs' site "had a substantial adverse impact on minorities" (*id.* at 27a (footnote omitted)). The court thus concluded (*ibid.*) that

> the disproportionate harm to blacks and the segregative impact on the entire community resulting from the refusal to rezone create a strong prima facie showing of discriminatory effect * * *.

Reviewing the Town's asserted justifications for its actions, the court concluded that the reasons outlined in the Town's October 14, 1980, letter to HUD were "entirely insubstantial," "weak and inadequate," and not supported by the record (J.S. App. 31a). In holding that the Town's actions violated the Fair Housing Act, the court stated that "the strong showing of discriminatory effect resulting from the Town's adherence to its * * * zoning [ordinance] and its refusal to rezone the Matinecock Court site far outweigh the Town's weak justifications" (*id.* at 32a).

### DISCUSSION

1. This case comes before the Court as an appeal pursuant to 28 U.S.C. 1254(2). Because the court of appeals struck down a portion of the Town's ordinance, and because the Town's jurisdictional statement is fairly understood to challenge that action,[11] we believe that this Court's appellate jurisdiction has been properly invoked. The case is appropriately treated as an appeal because the

---

[11] J.S. 29. The Town appears to be concerned primarily with the court of appeals' order of site-specific relief, rather than with the court's striking down of the ordinance. Each of the five questions presented in the jurisdictional statement appears to have as its central focus the court of appeals' action in overriding the Town's refusal to rezone appellees' site for multi-family housing.

Town is "relying on a State statute held by a court of appeals to be invalid as repugnant to the * * * laws of the United States" (28 U.S.C. 1254(2)).

In contesting the court of appeals' invalidation of the ordinance (as distinct from its order directing rezoning), however, the Town raises no issue meriting this Court's plenary consideration. The Town conceded below that a discriminatory impact or effects test governs the Title VIII challenge to the ordinance. See Defendants' Trial Mem. 48; Appellees' C.A. Br. 27-29, 37; J.S. App. 16a-17a, 62a-63a. And we do not read the Town even now as arguing to the contrary. It rather appears to pursue the argument, initiated below, that the properly applicable effects test has been misapplied. See J.S. 21-28.

We believe that there is a substantial question, meriting this Court's attention, as to whether an intent test or an effects test governs under Title VIII. Indeed, we believe that the court below, and the other courts of appeals which have addressed the issue, have erred in holding that a showing of discriminatory effect will suffice. Since the court below decided that discriminatory intent is not an essential element of a Title VIII violation, that issue can be reviewed by this Court. At the same time, if the Court were disposed, contrary to our recommendation, to exercise its discretion to decline to hear the remainder of the case on the merits,[12] see p. 11, *infra*, it would be proper to affirm summarily the court of appeals' partial invalidation of

---

[12] If the Court determines, as we recommend, to consider the rezoning issue on the merits, and thus to review in that context the issue of an intent versus an effects test under Title VIII, we urge the Court simply to note probable jurisdiction, and defer judgment on any aspect of the merits until after briefing and argument.

Section 198-20 of the Code of the Town of Huntington. We believe that such an action would be appropriate, however, only to the extent that it made clear that no determination of the proper burden of proof under Title VIII was thereby implied.

2. Such a disposition of the issue on which appellate jurisdiction is predicated would not dispose of the Town's challenge to the court of appeals' order that it rezone the land in issue for multi-family housing. Indeed, the Town primarily emphasizes the rezoning issue in its jurisdictional statement. See J.S. 1-5, 28-30. While this Court need not review the rezoning issue simply because the Court's appellate jurisdiction has been invoked with regard to the accompanying issue of the invalidation of the ordinance, the Court may appropriately exercise its discretion to reach and decide the remaining issue in the case. See *Davis* v. *Scherer*, 468 U.S. 183, 189-190 & n.7 (1984); C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 4037, at 62-64 (1988).[13] We believe that the Court should do so here.

The exercise of discretion in the immediate context operates in the same manner that is appropriate for determining whether to grant certiorari. Factors weighing against such an exercise of this Court's discretion are readily identifiable.

First, while the Town has technically preserved the position that an intent test should be applied with regard to the rezoning decision, it appears that the argument for that position has been pressed in an ambiguous and internally

---

[13] There is an "overriding policy, historically encouraged by Congress, of minimizing the mandatory docket of this Court in the interests of sound judicial administration." *Gonzales* v. *Automatic Employees Credit Union*, 419 U.S. 90, 98 (1974) (footnote omitted). See *Fornaris* v. *Ridge Tool Co.*, 400 U.S. 41, 42 n.1 (1970) (referring to Court's practice of strictly construing statutes authorizing appeals).

12

inconsistent manner. The Town defended its refusal to rezone principally on the ground that plaintiffs had not properly applied for rezoning. See J.S. 4, 12-13, 15, 28; J.S. App. 79a-80a; Mar. 3, 1988 Tr. of Oral Arg. 30-31, 36-37; R. A-39. Its repeated reference to the *McDonnell-Douglas* test was directed primarily to the point that plaintiffs had failed to satisfy a critical element of the prima facie case—the requirement of application. Further, the Town conceded below that a discriminatory effect standard applied to plaintiffs' challenge to the zoning ordinance and argued only that the *McDonnell Douglas* test governed plaintiffs' rezoning claim. See Appellees' C.A. Br. 26-47; J.S. App. 16a-17a, 62a-63a. More to the point, the Town's apparent assertion of two distinct standards under the Fair Housing Act leaves substantial uncertainty about whether and on what basis it is claiming that one must ever prove intentional discrimination. The Town's jurisdictional statement itself contains little reference to that point. Compare J.S. at i with J.S. 20-28.[14]

Further, this is not a case presenting a sharp conflict in the circuits. The courts of appeals have consistently held that the Fair Housing Act does not require proof of intentional discrimination.[15] And, while there are some

---

[14] In analogous circumstances, this Court has declined to review cases where the

> issues * * * remain unfocused because they [were] not pressed * * * with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation * * *.

*United States* v. *Fruehauf*, 365 U.S. 146, 157 (1961).

[15] E.g., *Hanson* v. *Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur* v. *City of Toledo*, 782 F.2d 565, 575 (6th Cir. 1986); *Smith* v. *Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Resident Advisory Bd.* v. *Rizzo*, 564 F.2d 126, 146-149 (3d Cir. 1977),

13

troublesome discrepancies among the courts regarding the appropriate standard for evaluating the defendant's justifications, these differences do not constitute a clear conflict.[16]

Notwithstanding these considerations, we urge the Court to exercise its discretion to review the court of

---

cert. denied, 435 U.S. 908 (1978); *Metropolitan Hous. Dev. Corp.* v. *Village of Arlington Heights*, 558 F.2d 1283, 1289-1290 (7th Cir. 1977) (*Arlington Heights II*), cert. denied, 434 U.S. 1025 (1978); *United States* v. *City of Black Jack*, 508 F.2d 1179, 1184-1187 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975).

This Court has not decided what proof the plaintiff must present to establish unlawful discrimination under Title VIII. Cf. *Village of Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*, 429 U.S. 252 (1977) (holding that a municipality's refusal to rezone a parcel of land violated the Equal Protection Clause only upon a showing of purposeful discrimination; remanding the case for consideration of whether the village had violated Title VIII).

[16] In *Arlington Heights II*, 558 F.2d at 1290, the Seventh Circuit cautioned courts to exercise discretion when considering Title VIII actions premised only on discriminatory effect and instructed courts to evaluate the strength of the defendant's "interest" in taking the challenged action. The Third Circuit, in *Resident Advisory Bd.* v. *Rizzo*, 564 F.2d at 149, agreed that courts must use their discretion when deciding such lawsuits. Moreover, the *Rizzo* court fleshed out the standard for evaluating the defendant's proffered justification for the challenged action (*ibid.* (footnote omitted)):

> a justification must serve * * * a legitimate, bona fide interest of the * * * defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact.

The Eighth Circuit, although using the phrase "compelling governmental interest" in *United States* v. *City of Black Jack*, 508 F.2d at 1185, to describe the defendant's burden, actually adopted a standard substantially similar to that later adopted by the Third Circuit in *Rizzo*. See *id.* at 1186-1187; see also *Hanson* v. *Veterans Admin.*, 800 F.2d at 1386 ("showing of a significant discriminatory effect" establishes violation of Title VIII).

appeals' rezoning decision holding that an effects rather than an intent test is applicable under Title VIII. We reach that conclusion based on the importance of the issue and the incorrectness of the decision below.

The principal operative provision of Title VIII (§ 804(a), 42 U.S.C. 3604(a)), makes it unlawful

> [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

Although proscribing a broad range of conduct, Congress limited that proscription to action taken "because of race."[17] The words "because of" plainly connote a causal connection between the housing-related action and the person's race or color. The proscribed action must have been caused, at least in part, by the individual's race, which strongly suggests a requirement of discriminatory motivation.[18] See *Personnel Administrator* v. *Feeney*, 442

---

[17] Three of the other prohibitions set forth in the Fair Housing Act also pertain to actions taken "because of" race or color. See 42 U.S.C. 3604(b) (terms or conditions of sale or rental), 42 U.S.C. 3604(d) (representation of unavailability of property for sale or rental), and 42 U.S.C. 3605 (denial of financial assistance). One section, pertaining to real estate advertising, bars any indication of "preference, limitation, or discrimination based on race, color * * *" (42 U.S.C. 3604(c)), and another, relating to participation in multiple listing services, prohibits discrimination "on account of" race or color (42 U.S.C. 3606). A final section makes it illegal to attempt to induce any person to sell or rent "by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race [or] color" (42 U.S.C. 3604(e)).

[18] Interpretation of similar or related language in various civil rights statutes does not resolve the meaning of Title VIII's "because of"

---

U.S. 256, 279 (1979). An action taken because of some factor other than race, *i.e.,* financial means, even if it causes a discriminatory effect, is not an example of the intentional discrimination outlawed by the statute.[19]

---

phrasing. On the one hand, Congress has demonstrated its ability unambiguously to adopt an effects test when it wishes to do so. In Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c, for example, Congress required covered jurisdictions to seek preclearance of any voting change and to show that such a change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color * * *."

In holding that Section 2 of the Voting Rights Act of 1965, 42 U.S.C. 1973, before its amendment in 1982, required a showing of purposeful discrimination, the Court did not discuss that provision's requirement that discriminatory action be taken "on account of race." See *City of Mobile* v. *Bolden,* 446 U.S. 55, 60-65 (1980); see also *Guardians Ass'n* v. *Civil Service Comm'n,* 463 U.S. 582 (1983) (Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*, which prohibits exclusion from participation in federal programs "on the ground of race," requires proof of discriminatory intent).

At the same time, in *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971), the Court construed the "because of" language in 42 U.S.C. 2000e-2(a)(2) as prohibiting employment practices that had discriminatory effects and rejected the contention that the language barred only intentional discriminatory practices. See 401 U.S. at 432. The Court has twice reserved the question whether 42 U.S.C. 2000e-2(a)(1), which contains "because of" phrasing, requires a showing of discriminatory intent. See *General Electric Co.* v. *Gilbert,* 429 U.S. 125, 137 (1976); *Nashville Gas Co.* v. *Satty,* 434 U.S. 136, 144 (1977).

[19] The courts of appeals have not presented a plausible alternative reading of the statutory language. In *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d at 146, for example, the court acknowledged that the "'because of race' language might seem to suggest that a plaintiff must show some measure of discriminatory intent," but rejected this logical consequence in part because such a requirement would unduly burden Title VIII plaintiffs. See *id.* at 146-147. Similarly, in *Arlington Heights II,* 558 F.2d at 1288, the court noted that "[t]he major

The legislative history reinforces the understanding that Congress intended to require a showing of intentional discrimination.[20] Neither supporters nor opponents suggested that the legislation would ban local zoning regulations merely because they had a racial effect, without any showing that the local government intended to discriminate. Rather, the legislative history shows that Congress sought to eliminate intentional refusals to sell or rent housing because of the race of the renter or buyer and believed that financial ability should remain the most important factor in property transactions. Members of Congress emphasized that the bill was designed to make financial ability, rather than race, the principal qualification for purchasing or renting housing. See, *e.g.*, 114 Cong. Rec. 2277 (1968) (Sen. Mondale).

Senator Mondale, a leading sponsor of the legislation, stated: "The bill simply reaches the point where there is an offering to the public and the prospective seller refuses to sell to someone solely on the basis of race." (114 Cong. Rec. 4974 (1968)). Senator Hart echoed these sentiments (see *id.* at 4976). Senator Mondale also emphasized the limits of the bill's prohibitions (*id.* at 5643):

> The bill permits an owner to do everything that he could do anyhow with his property * * *, except refuse to sell it to a person solely on the basis of his color or his religion. That is all it does. It does not confer any right. It simply removes the opportunity to insult and discriminate against a fellow American because of his color, and that is all * * *.

Not only do the statute's language and legislative history show that a violation of Title VIII requires intentional discrimination, substantial practical problems result if this requirement is discarded. In particular, the courts have acknowledged the difficulties in placing meaningful limits on the discriminatory effect standard of liability. See, *e.g.*, *Resident Advisory Bd.* v. *Rizzo*, 564 F.2d at 148-149; J.S. App. 23a. While proponents of such a standard have turned to Title VII as a model, "in Title VIII cases there is no single objective like job performance to which the legitimacy of the facially neutral rule may be related" (J.S. App. 23a).[21] The hundreds of zoning decisions made by

---

obstacle to concluding that action taken without discriminatory intent can violate [Title VIII] is the phrase 'because of race' * * *." The court, however, proceeded to embrace "[t]he broad view * * * that a party commits an act 'because of race' whenever the natural and foreseeable consequence of that act is to discriminate between races, regardless of his intent" (*ibid.*). This reasoning is directly at odds with *Personnel Administrator* v. *Feeney*, 442 U.S. 256 (1979), where this Court, in defining "discriminatory purpose," stated (*id.* at 279 (citation and footnotes omitted)) that the phrase

> implies more than intent as volition or intent as awareness of consequences * * *. It implies that the decisionmaker * * * selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

[20] Because Title VIII, as enacted, was offered as a floor amendment, there are no committee reports. The legislative history consists primarily of statements by representatives and senators on their respective floors. Congress also held hearings, the record of which further supports reading Title VIII as requiring intentional discrimination. See *Fair Housing Act of 1967: Hearings Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. 22-23 (1967) (remarks of Sen. Mondale) (bill is "designed to deal exclusively with the refusal to sell or rent for racial reasons, and it does not apply to the existence of other reasons or [sic] does not apply to zoning requirements, ordinances, and the rest").

[21] Courts which adopt the discriminatory effect standard have relied on two aspects of the legislative record. See, *e.g.*, *Arlington Heights II*, 558 F.2d at 1289-1290. The first is the language of 42 U.S.C. 3601, stating that the purpose of Title VIII is "to provide,

localities every year inevitably involve a mix of factors, some objective, such as traffic or sewage concerns, and some aesthetic, such as density and recreation concerns. Indeed, intangible factors that contribute to the quality of life in a community are legitimate subjects of zoning regulations entitled to judicial deference. See *Village of Belle Terre* v. *Boraas,* 416 U.S. 1 (1974). The importance of permitting individuals to shape the communities in which they live advises against invalidating zoning decisions enacted without discriminatory intent. And the subjective nature of many of the goals served by zoning renders judicial review of such zoning decisions particularly difficult. The drifting away from the statute's language requiring intentional discrimination has only exacerbated the inherent difficulties of this judicial function.

---

within constitutional limitations, for fair housing throughout the United States." The second is Senator Mondale's statement that Congress designed the Act to create "truly integrated and balanced living patterns." 114 Cong. Rec. 3422 (1968); see *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U.S. 205, 211 (1972). The first statement appears to offer little but a truism and the second, although stating an admirable goal, does not address the means of achieving it. The argument that the ambitious goals of Title VIII require an expansive reading of the statute to include a discriminatory effect standard hardly surmounts the obstacles posed by the statute's plain language and legislative history.

Congress is currently considering legislation designed to strengthen enforcement of the Fair Housing Act by permitting persons aggrieved by housing discrimination to file administrative claims subject to judicial review. The proposed legislation would also broaden the enforcement authority of the Attorney General and HUD. See H.R. Rep. 100-711, 100th Cong., 2d Sess. (1988).

## CONCLUSION

We urge the Court to note probable jurisdiction. However, should the court be disinclined as a matter of its discretionary jurisdiction to reach the rezoning issue, it should summarily affirm the invalidation of Section 198-20 of the Code of the Town of Huntington (on which the effects versus intent test issue has not been preserved), making clear at that time that it is declining to reach the other issues presented in the case. See *Davis* v. *Scherer,* 468 U.S. at 190 n.7.

Respectfully submitted.

CHARLES FRIED
*Solicitor General*
WM. BRADFORD REYNOLDS
*Assistant Attorney General*
MARK R. DISLER
ROGER CLEGG
*Deputy Assistant Attorneys General*
MICHAEL R. LAZERWITZ
*Assistant to the Solicitor General*
DAVID K. FLYNN
WILLIAM R. YEOMANS
*Attorneys*

JUNE 1988