UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
AMERICAN INSURANCE                      )
ASSOCIATION, *et al.*                   )
                                        )
         Plaintiffs,                    )
                                        )   No. 1:13-cv-00966 (RJL)
    v.                                  )
                                        )
UNITED STATES DEPARTMENT                )
OF HOUSING AND URBAN                    )
DEVELOPMENT, *et al.*                   )
                                        )
         Defendants.                    )
_____)

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

|  |  |
|---|---|
|  | STUART F. DELERY |
|  | Assistant Attorney General |
|  |  |
|  | MOLLY J. MORAN |
|  | Acting Assistant Attorney General |
|  |  |
|  | RONALD C. MACHEN JR. |
|  | United States Attorney |
| HELEN R. KANOVSKY |  |
| General Counsel | RACHEL J. HINES |
| MICHELLE ARONOWITZ | Assistant Branch Director |
| Deputy General Counsel for | Federal Programs Branch |
|   Enforcement and Fair Housing |  |
| JEANINE M. WORDEN | KYLE R. FREENY (Cal. Bar No. 247857) |
| Associate General Counsel | DANIEL P. MOSTELLER (DC Bar No. 980802) |
|   for Fair Housing | Attorneys |
| KATHLEEN M. PENNINGTON | U.S. Department of Justice |
| Assistant General Counsel | 20 Massachusetts Ave., N.W. |
|   for Fair Housing Enforcement | Washington, DC 20001 |
| M. CASEY WEISSMAN-VERMEULEN | Tel: (202) 514-5108/Fax: (202) 616-8470 |
| AYELET R. WEISS | Email: Kyle.Freeny@usdoj.gov |
| Attorneys |  |
| *Of counsel* | *Counsel for Defendants* |

**INTRODUCTION**

At oral argument, Plaintiffs recognized that they can prevail in their challenge to HUD's Discriminatory Effects Rule, 78 Fed. Reg. 11,460 (Feb. 15, 2013), if, and only if, they establish that the Fair Housing Act ("FHA" or "Act") "unambiguously forecloses" disparate impact claims. Plaintiffs have failed to make this showing. The text of the Act can easily be read to encompass disparate impact discrimination, and the legislative history of the 1988 amendments to the FHA demonstrates that Congress understood that the Act could permit such claims. Plaintiffs' contention that the FHA can only be interpreted to provide for disparate treatment, and not disparate impact, claims is further belied by decades of uniform circuit precedent and administrative practice interpreting the FHA to permit disparate impact claims. Nothing in the Supreme Court's decision in *Smith v. City of Jackson*, 544 U.S. 228 (2005), calls into question this precedent, or permits this Court to ignore the clear indications that Congress contemplated disparate impact liability under the FHA. Accordingly, even if Plaintiffs are correct that there are also indications that would support a contrary reading of the Act, that would at most allow for a conclusion that the FHA is ambiguous on the question of disparate impact. And because Congress has delegated to HUD the task of resolving any ambiguity in the statute, this Court must defer to HUD's construction of the FHA, in accordance with *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

**ARGUMENT**

At the invitation of the Court, Defendants take this opportunity to respond to a few specific issues that arose during oral argument, while respectfully referring the Court to Defendants' memoranda supporting their Motion to Dismiss and/or for Summary Judgment.

## I. The Language of the FHA Does Not Support Plaintiffs' Claim That Congress <u>Unambiguously</u> Intended to Preclude Disparate Impact Liability

At oral argument, Plaintiffs broadly mischaracterized the nature of Defendants' position in this case, claiming that Defendants' "primary argument" is that Congress "acquiesced in lower court decisions permitting disparate impact liability when it amended the FHA." Tr. of Oral Arg. (July 22, 2014) ("Tr.") at 5:1-4. This is simply not so. Although the fact of Congress's acquiescence to the unanimous judicial consensus is significant, *see* Part II, *infra*, Defendants' primary argument is that the language of the FHA readily accommodates HUD's interpretation, and certainly does not *unambiguously compel* a contrary interpretation. *See* Defs.' Mem. at 4, 21-24; Defs.' Reply Mem. at 10-17. As such, HUD's interpretation is entitled to *Chevron* deference. *See* 467 U.S. at 844. The relevant statutory language for purposes of this Court's analysis includes not only the operative anti-discrimination provisions but also other provisions in the FHA that Plaintiffs' reading of the Act would render meaningless.

As demonstrated in Defendants' briefing, the FHA's prohibition on practices that "make [housing] unavailable," like the provisions in Title VII and the ADEA that undisputedly encompass disparate impact liability, focuses on the "*consequences* [of the practice, and] not simply the motivation." *See Smith v. City of Jackson*, 544 U.S. 228, 243 (2005) (plurality) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)). A party need not have a malevolent intent in order to make housing unavailable to a particular protected class of individuals on a disproportionate basis.[1] *See* Webster's Third New Int'l Dictionary 1364 (1966) (noting that "make" "can comprise any such action" that "cause[s] something to come into

---

[1] To be sure, Defendants do not deny that entities subject to liability for making housing unavailable must intend to act. *See* Tr. 7:21-23 (implication by Plaintiffs that it is disputed that the statute "requires intentional action"). But under the disparate impact theory of liability, an entity need not intend to bring about the discriminatory consequences of an action.

being," "whether by an intelligent or blind agency"); *see also United States v. Parma*, 494 F. Supp. 1049, 1054-55 (N.D. Ohio 1980) ("There is nothing in the language of Section 804(a), which prohibits any practice that makes unavailable or denies a dwelling to any person because of race, that requires proof of intent."), *aff'd* 661 F.2d 562 (6th Cir. 1981).

The prohibition in other provisions of the FHA on practices that "discriminate" similarly accommodates a focus on discriminatory effects, and not just discriminatory motive. Plaintiffs were flatly incorrect when they claimed at oral argument that "[t]he Government doesn't dispute that the ordinary meaning of the term 'discriminate,' standing alone, would be to reach only practices [resulting from] . . . disparate treatment." Tr. 8:24-9:1. As Defendants have repeatedly explained, the word "discriminate," standing alone, does not have an unambiguous or plain meaning – a view that has been confirmed by the Supreme Court. *See Bd. of Educ. v. Harris*, 444 U.S. 130, 139-40 (1979) (concluding that the term "discriminate" was "ambiguous"); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 284 (1978) (Powell, J.) ("The concept of 'discrimination' . . . is susceptible of varying interpretations"). Plaintiffs point to nothing that suggests that *Harris* has been overruled.[2] Indeed, the Supreme Court routinely employs the term "discrimination" when referring to disparate impact claims. *See*, *e.g.*, *Griggs*, 401 U.S. at 430 (recognizing that a practice can be "fair in form, but discriminatory in operation"); *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (discussing "disparate-impact *discrimination*") (emphasis added). Plaintiffs offer nothing to suggest that Congress would have understood the term "discriminate" to exclude disparate impact discrimination when it enacted the legislation in 1968 or amended it in 1988. *See generally* Part II, *infra*. By using a term that is susceptible to multiple meanings and then delegating to HUD rulemaking authority under the statute, Congress

---

[2] Plaintiffs' effort at oral argument to distinguish *Harris* fails for the reason articulated in Defendants' Reply Memorandum. *See* Defs.' Reply Mem. at 13 n.9.

authorized HUD to resolve the ambiguity, and HUD's resolution is entitled to deference even if it is not the one this Court would itself have reached in the first instance.[3] *See Chevron*, 467 U.S. at 842-43 & n.11.

Plaintiffs' contention at oral argument that the phrase "because of" supplies the missing requirement of discriminatory motive or intent, Tr. 7:21-23, cannot be reconciled with controlling Supreme Court authority. Both Section 703(a)(2) of Title VII and Section 4(a)(2) of the ADEA contain the same phrase, and the Supreme Court held those provisions to encompass disparate impact liability. *See Smith*, 544 U.S. at 235 (plurality) (quoting 29 U.S.C. § 623(a)(2)); *id.* at 243 (Scalia, J., concurring in judgment); *Griggs*, 401 U.S. at 425 n.1 (quoting 42 U.S.C. § 2000e-2(a)(2)).

Plaintiffs also incorrectly contended at oral argument that the operative language of the FHA "more closely resemble[s]" language in the provisions of Title VII and the ADEA that do not encompass disparate impact liability, rather than the provisions that do. Tr. 6:20-22. But the D.C. Circuit, though declining to reach the ultimate interpretive question, has twice advanced a contrary characterization of the language of the FHA, observing that it "is parallel to that of Title VII . . . under which a plaintiff can prevail by showing either disparate impact or disparate treatment." *See Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1085 (D.C. Cir. 2011); *see also 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) ("Significantly . . . the FHA's language prohibiting discrimination –

---

[3] Ordinarily, review of an agency interpretation under the familiar *Chevron* framework would involve the additional step of determining whether the agency's resolution of statutory ambiguity is reasonable. *See* 467 U.S. at 843. Here, that step is unnecessary, because Plaintiffs stake their entire case on their contention that the statute unambiguously forecloses HUD's interpretation at the first step of the *Chevron* analysis. But even if they had not, HUD's interpretation is a reasonable one. *See* Defs' Mem. at 43-45; Defs.' Reply Mem. at 22-25.

'because of . . . race . . . or national origin' – is identical to" the language in Title VII that *Griggs* construed to encompass disparate impact liability).

Moreover, Plaintiffs' interpretive theory fails to account for crucial language in other provisions of the FHA – Sections 3505(c), 3607(b)(1), and 3607(b)(4) – that demonstrate that Congress did not intend to limit the coverage of the Act to disparate treatment claims. *Cf. U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("[W]e must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law.") (citation omitted). As explained in Defendants' earlier briefs, these three provisions provide targeted exemptions from liability for certain facially neutral conduct that might otherwise be subject to liability under the statute. For example, Congress exempted appraisers from liability for taking into consideration factors *other than* race or other protected characteristics when they make appraisals. 42 U.S.C. § 3605(c). That Congress found it necessary to create this exemption demonstrates that Congress understood that the statute's prohibition on discrimination would otherwise make unlawful an appraiser's reliance on such neutral factors when that reliance results in a disparate impact under the Act. In other words, these exemptions are clear textual indications that Congress contemplated the possibility of disparate impact liability. *See Smith*, 544 U.S. at 239 (plurality) (adopting a similar argument with respect to the ADEA's defense for consideration of "reasonable factors other than age"); *id.* at 245-46 (Scalia, J., concurring in judgment); *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 96 (2008) (noting that "action based on a factor other than [a protected characteristic] is the very premise for disparate impact liability").

In order to reconcile these exemptions with their claim that the statute encompasses only disparate treatment liability, Plaintiffs endeavor to explain away these exemptions as a

redundancy, precluding liability for conduct that would not be subject to disparate treatment liability in the first place. *See* Tr. 15:3-5 (claiming that the provisions merely "codify[]" the fact that if a defendant can demonstrate that its actions were not based on a protected factor, "the defendant avoids liability" for disparate treatment). Five justices rejected a similar argument in *Smith*. *See* 544 U.S. at 238-39 (plurality) (rejecting reading of ADEA to encompass only disparate treatment liability, because it would render RFOA provision "simply unnecessary"); *id.* at 243 (Scalia J., concurring in judgment).[4] Plaintiffs' flawed reading of these exemptions also rests on their claim that they extend to all conduct newly covered by the 1988 amendments, *see* Tr. at 15:6-16, which they manifestly do not.

The existence of these exemptions demonstrates that Congress knows how to preclude disparate impact liability when it wants to. And Congress did so only with respect to three discrete areas: appraisal decisions, reasonable government occupancy restrictions, and actions taken on the basis of an individual's drug conviction. HUD's construction of the statute respects Congress's decision not to do so more broadly.

Given the concrete textual indicia that Congress contemplated the availability of disparate impact claims under the FHA, Plaintiffs' purported evidence to the contrary cannot discharge their burden to show unambiguous congressional intent to compel their reading of the Act. In the *Chevron* Step One analysis, "[t]he fact that both sides credibly wield competing canons of statutory interpretation suggests that Congress did not plainly answer this particular question." *Nat'l Ass'n of Mfrs. v. SEC*, 956 F. Supp. 2d 43, 70 (D.D.C. 2013), *aff'd in relevant*

---

[4] Plaintiffs also suggested for the first time at oral argument that the exemptions are necessary because the text of the FHA does not specify a burden-shifting scheme for proving disparate treatment claims. *See* Tr. 14:18-24. But this argument would apply equally to the ADEA, *see Smith*, 544 U.S. at 252 (O'Connor, dissenting), and thus is not a tenable basis for saving Plaintiffs' strained construction of the exemptions, *see id.* at 238-39 (plurality) (rejecting dissent's reading of the RFOA defense), *id.* at 243 (Scalia, J., concurring in judgment).

*part* 748 F.3d 359 (D.C. Cir. 2014). Because Congress has delegated to HUD the task of resolving any statutory ambiguity, it is not for this Court to weigh statutory interpretations and decide which it finds to be more convincing. Instead, it must defer to HUD's resolution of ambiguity.

## II. The Legislative History of the 1998 Amendments to the FHA Confirms That Deference Should Be Accorded to HUD's Interpretation

Plaintiffs also suggest that if Congress had intended the FHA to give rise to disparate impact claims, it would have added express language authorizing such claims when it amended the statute in 1988. *See* Tr. 5:10-12; 12:11-12. This argument is without merit, especially in light of Plaintiffs' burden to demonstrate that the statute *unambiguously* compels their preferred interpretation.

At the time Congress amended the statute in 1988, *see* Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619, Congress would have had no reason to believe that it needed to alter the existing language in order allow the statute to be read to extend to disparate impact discrimination. Every single court of appeals to have construed the existing language at that time – nine in total – had concluded that the language not only *could* be read to prohibit disparate impact discrimination but was *best* read in this fashion. Plaintiffs question the methods of statutory construction employed in those early circuit decisions, but that criticism is irrelevant to an understanding of congressional intent in 1988. What matters is that the uniform judicial consensus in 1988 gave Congress no reason to doubt that the statute could be read to accommodate disparate impact liability. The fact that Congress left intact language that nine courts of appeals had found to accommodate disparate impact liability undermines, rather than

-7-

supports, Plaintiffs' position in this case.[5]  *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.").[6]  Moreover, it is clear that Congress knew how to preclude disparate impact claims, having rejected no fewer than six efforts to amend the statute to do so.  *See* 78 Fed. Reg. at 11,467 (noting six occasions when Congress declined to impose an intent requirement); *see also Smith*, 544 U.S. at 239, n.11 (plurality) ("We note that if Congress intended to prohibit all disparate-impact claims, it certainly could have done so.").  And yet it did not do so.

At oral argument, Plaintiffs proffered, as evidence that Congress actually meant to preclude disparate impact claims, the fact that "Congress added 804(f) . . . to reach . . . handicap without any way suggesting that disparate impact liability was available." Tr. 11:15-20.  This contention is incorrect on several scores.  First, the simple fact that Congress employed the same language in § 3604(f) that had already been construed by nine courts of appeals to encompass disparate impact liability refutes this inference.  In addition, the House Report affirmatively demonstrates Congress's understanding that the prohibition on "discrimination" set forth in § 3604(f)(1)-(2) extended to practices that have a discriminatory effect regardless of intent.  *See*

---

[5] When Defendants' counsel indicated at oral argument that no legislative history supported a particular argument being advanced by Defendants, *see* Tr. 36:17-19, that response was limited to legislative history pertaining to the three exemptions added in 1988.  As discussed herein, there is ample support in the legislative history for HUD's position more broadly.  And although, at the time, Defendants' counsel was not aware that there was any legislative history on the three exemptions, there is some limited mention of the exemptions in the House Report that does not expressly discuss disparate impact liability.  *See* H.R. Rep. No. 100-711, at 30 n.80 (1988).  The language of the exemptions themselves, however, demonstrates congressional intent to allow disparate impact claims.

[6] The House Report confirms that Congress was, in fact, aware of the judicial construction employed by the courts.  *See* H.R. Rep. No. 100-711, at 21 (citing federal appellate court decisions when discussing policy with potential "discriminatory effect").  And the House floor debates confirm that Congress understood that the 1988 amendments would leave intact existing judicial interpretations of the phrase "make unavailable."  *See* 134 Cong. Rec. H4603, H4607 (daily ed. June 22, 1988) (stmts. of Reps. Gonzales, Edwards, Sensenbrenner) (confirming understanding that amendments "preserved the status quo with regard to the case law, the interpretation and the enforcement of the language that makes it unlawful to 'otherwise make unavailable or deny a dwelling to any person' who is in a protected class").

H.R. Rep. No. 100-711, at 23-24 (contemplating that subsections (f)(1) and (f)(2) would extend to practices that "have the *effect* of discriminating against persons with disabilities") (emphasis added).[7]

The fact that the Solicitor General had filed a brief in *Town of Huntington Branch v. Huntington Branch, NAACP*, 488 U.S. 15 (1988), in which he urged the Supreme Court to find that the better of reading of the statute was to provide only for disparate treatment claims, does not override these indications of congressional intent that favor HUD's interpretation. At most, the Solicitor General's submission suggests that Congress would have had reason to know that the language of the FHA was potentially susceptible to two different interpretations – the interpretation that governed in at least nine circuits, according to which disparate impact claims were cognizable; and the interpretation advanced by the Solicitor General in 1988 that such claims were not.[8] And against this backdrop, Congress comprehensively amended the statute without adding language that *either* expressly required recognition of *or* expressly precluded disparate impact claims (while also adding three provisions that operate as exemptions to certain disparate impact claims). Congress simultaneously delegated to HUD the authority to interpret the statute, and thus to resolve any ambiguity in the statute that Congress itself did not resolve.

---

[7] *See also* H.R. Rep. No. 100-711, at 24 ("Another method of making housing unavailable to people with disabilities has been the application or enforcement of otherwise neutral rules and regulations on health, safety and land-use in a manner which discriminates against people with disabilities."); *id.* ("This provision is intended to prohibit special restrictive covenants or other terms or conditions, or denials of service because of an individual's handicap and which have the *effect* of excluding" persons with disabilities.) (emphasis added). Notably, the House Report's effects-focused discussion was directed toward the prohibition on discrimination in subsections (1) and (2), independent of the reasonable accommodation and accessibility requirements in subsection (f)(3), which are "specific requirements [that] *augment* the general prohibitions under (f)(1) and (2)." *See id.* (emphasis added).

[8] Congress was also on notice that HUD had previously found disparate impact claims not only to be cognizable under the Act, but to be vital to its success. *See* 126 Cong. Rec. 31,167 (1980) (entering into the record a letter from HUD's Secretary affirming the importance of disparate impact liability under the Act). Conversely, President Reagan's signing statement concerning the 1988 Amendments could not have informed congressional intent, as it came only after Congress passed the legislation.

*See* 42 U.S.C. § 3614a.  Accordingly, respect for congressional intent and for the legislative process that resulted in the current statutory formulation requires deference to the Secretary's interpretation.  *Cf. Smith*, 544 U.S. at 243 (Scalia, J., concurring in judgment) (deferring to the agency's interpretation of the ADEA).

### III.  *Smith v. City of Jackson* Supports, Rather Than Undermines, HUD's Interpretation of the Statute

At oral argument, Plaintiffs repeated the view that *Smith* radically altered the manner in which anti-discrimination statutes are to be interpreted, thereby overruling, *sub silentio*, the uniform judicial consensus that the FHA is best read to provide for disparate impact claims.  But while *Smith* certainly contains a more explicit analysis of the statutory text than earlier decisions like *Griggs*, *Smith* is an application of, rather than a departure from, traditional modes of statutory interpretation.  And it is entirely consistent with, and indeed supportive of, Defendants' position in this litigation.

Plaintiffs argued that the views of eleven courts of appeals, holding that the FHA authorized disparate impact claims, are without value because "those courts only really had the benefit of the Supreme Court's opinion in *Griggs*."[9]  Tr. 10:1-2.  In making this claim, Plaintiffs erroneously imply either that *Griggs* is no longer good law in light of *Smith*, or that its value has otherwise been cast into doubt.  Quite to the contrary, *Smith* confirmed the continued value of *Griggs*, describing it as a "precedent of compelling importance."  544 U.S. at 234 (plurality).

Plaintiffs mischaracterize *Smith* as holding that a statute *must* speak in terms of "adverse effects" in order to authorize disparate impact claims.  Plaintiffs have identified no language in the plurality or concurring opinions that even remotely supports such a broad new principle.

---

[9] Plaintiffs completely ignore that decisions in no fewer than ten federal judicial districts have explicitly rejected the argument that *Smith* undermined precedents construing the FHA to provide for disparate impact liability.  Defendants are not aware of any court to have accepted this argument.

Indeed, that conclusion would be contrary to other Supreme Court authority, which *Smith* did not purport to overrule. *See*, *e.g.*, *Harris*, 444 U.S. at 13-40 (finding that prohibition on "discrimination" included disparate impact discrimination). Plaintiffs instead claim to discern such a broad new principle from the plurality's discussion of the specific provisions of the ADEA. In essence, Plaintiffs ask this Court to infer, from the plurality's conclusion that a statute containing the word "effects" *does* provide for disparate impact liability, that a different statute without that word does not. This line of reasoning rests on a logical fallacy "known as denying the antecedent[]: the incorrect assumption that if P implies Q, then not-P implies not-Q." *NLRB v. Canning*, 134 S. Ct. 2550, 2603 (2014) (Scalia, J., concurring in judgment); *see also New Eng. Power Generators Ass'n v. FERC*, 707 F.3d 364, 370 (D.C. Cir. 2013). The fact that language expressly directed toward the "effects" of an action is *sufficient* to authorize disparate impact liability does not, as a matter of basic logic, mean that it is *necessary*. *See Alleyne v. Flagstar Bank*, No. 07-12128, 2008 WL 8901271, at *3 (D. Mass. Sept. 12, 2008) ("Nowhere in [the *Smith*] opinion does the Court require adverse effects language as a necessary prerequisite to allowing disparate impact liability.").

Nor are Plaintiffs correct when they argue that the outcome in *Smith* was based solely on a close reading of the individual words in the operative anti-discrimination provision. *Smith* also looked to the language of the statute as a whole (including the RFOA defense), 544 U.S. at 238-30 (plurality), "the history of the enactment," *id.* at 238, and the "congressional goals" of the enactment, *id.* at 235 n.5. *See also Alleyne*, 2008 WL 8901271, at *3 ("*Smith* was decided on the basis of a number of canons of statutory interpretation and does not define a unique textual interpretation standard sufficient to invalidate First Circuit precedent on the FHA . . . .").

A similar analysis of the FHA demonstrates that its prohibition on discrimination is, at a minimum, consistent with disparate impact liability.  As noted above, the FHA, like the ADEA, contains textual indications that Congress intended to prohibit disparate impact discrimination, including the existence of provisions that only make sense if disparate impact claims are cognizable.  The legislative history of the FHA also supports HUD's interpretation, for the reasons discussed above.  Finally, the purpose of the FHA, as articulated by the Supreme Court itself, includes a uniquely effects-oriented goal:  not just to root out bad actors but to promote "truly integrated and balanced living patterns."  *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211-12 (1972).

## IV. Plaintiffs' Claims about the Effect of Disparate Impact Liability on the Insurance Industry Are Counterfactual and Irrelevant to the Interpretative Question

The remainder of Plaintiffs' case – based on their supposition that the Rule would be "disruptive" to the insurance industry or would "fundamentally alter the way that insurers do business," Tr. 16:10-12 – prioritizes, without basis, the interest of one industry over the broad scope of the Act, and as such, is a policy-driven argument not germane to Plaintiffs' plain language argument.  Moreover, Plaintiffs' predictions of harm from the Rule are belied by the history of disparate impact claims under the FHA.

Significantly, Plaintiffs' dire predictions about the effect of the Rule are nearly identical to the predictions they made in an *amicus* brief submitted to the Supreme Court in 1996, in response to the judicial and administrative recognition of disparate impact claims at that time.  There, Plaintiffs predicted that the threat of disparate impact liability to which their members were already exposed "would have a severe chilling effect upon underwriting judgments," and would "be sure to alter and discourage proper underwriting judgments and the application of neutral standards consistent with state unfair discrimination principles."  Br. for NAMIC & AIA

as Amici Curiae in Support of the Petition at 14-15, 17, *Nationwide Mut. Ins. Co. v. Cisneros*, 516 U.S. 1140 (1996) (No. 95-714).  Tellingly, Plaintiffs do not now contend that their members actually suffered any of those predicted consequences in the nearly two decades since, even though they have been subject to the risk of disparate impact claims.  Rather, insurers have been operating without disruption under a legal regime that has recognized the availability of disparate impact claims for years.

Tellingly, when the Court asked Plaintiffs' counsel whether Plaintiffs' members already conducted their operations – prior to the Rule – with an understanding that they could be subject to disparate impact liability, Plaintiffs' counsel failed to respond directly.  Instead, Plaintiffs' counsel merely contended that there "were jurisdictions where the law was uncertain."  Tr. 43:19-25.  Plaintiffs have entirely failed to explain why the risks associated with disparate impact liability that were present at least as early as 1996 are now suddenly traceable to the 2013 Rule.[10]  Accordingly, Plaintiffs have failed to demonstrate that they were independently harmed by the Rule, and so have failed to establish Article III standing in this case.[11]

---

[10] While the Rule did not create disparate impact liability, which was already widely recognized, it did have significant practical effects in other ways that may benefit the insurance industry.  It resolved questions about the proper burden-shifting standard to be applied to such claims.  *Cf. Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 281-81 (5th Cir. 2014) (discussing pre-Rule discrepancies among circuits and adopting standard set forth in Rule), *petition for cert. filed*, 82 U.S.L.W. 3686 (U.S. May 13, 2014) (No. 13-1371).  Notably, as applied in at least one circuit, the Rule shifts the burden of proof regarding less discriminatory alternatives from the defendant to the plaintiff.  *See* 78 Fed. Reg. at 11473-74.  This aspect of the Rule is not subject to challenge in this litigation.

[11] At oral argument, Plaintiffs endeavored to defeat Defendants' standing challenge with a straw man argument: "[I]f it were really true that a party would be somehow foreclosed from bringing a facial challenge under [these] circumstances, all the Government would need to do is to issue some sort of informal notice of its position before going through rulemaking, and then facial challenges would essentially be pretermitted."  Tr. 20:7-11.  It cannot seriously be contended that, prior to the Rule, HUD's consistent interpretation of the FHA to include disparate impact liability was limited to an "informal notice of its position."  As detailed in Defendants' opening brief, HUD consistently employed this interpretation for decades, including in formal adjudications by the Secretary that would themselves be entitled to *Chevron* deference.  *See* Defs.' Mem. at 2-5; *see also United States v. Mead Corp.*, 533 U.S. 218, 230 & n.12 (2001).

Moreover, even if Plaintiffs' predictions about the disruptive effect of the Rule had some grounding in fact, which they do not, they would still not supply a reasoned basis for this Court to find that the language of the statute unambiguously compels Plaintiffs' preferred reading. Plaintiffs' supposition that Congress would not have wanted to impose the putative burdens of disparate impact liability on the insurance industry is really an attack on the "wisdom of the . . . policy" of subjecting insurers to such liability, and as such, is outside the scope of this Court's purview. *See Chevron*, 467 U.S. at 866.

Plaintiffs' insurance-specific argument fares no better when framed in terms of the McCarran-Ferguson Act ("McCarran-Ferguson"), 15 U.S.C. §§ 1011-1015. At oral argument, Plaintiffs backed away from the claim in their brief that the Rule "contravene[s] the McCarran-Ferguson Act," Pls.' Mem. at 34. *See* Tr. 18:9. Plaintiffs also do not claim that the Rule would implicate McCarran-Ferguson in all applications, but instead "only in some subset" of them. Tr. 18:13-19. To construe the FHA to unambiguously foreclose disparate impact liability because of the possibility that *some* applications of disparate impact liability may be preempted by McCarran-Ferguson would be to provide the insurance industry greater insulation from federal regulation than McCarran-Ferguson itself contemplates. And inasmuch as McCarran-Ferguson represents the balance Congress struck between general federal regulation and the preservation of state regulation of insurance, such an outcome would be directly contrary to congressional intent. *See Humana Inc. v. Forsyth*, 525 U.S. 299 (1999) (rejecting argument that Congress intended to broadly preclude application of general federal laws to insurance in the abstract).

Finally, there is simply no logic to Plaintiffs' claim that Congress intended the entire scope of the FHA to be dictated by the interests of a single industry, especially when those interests are already accommodated by a separate statute. As the Supreme Court has twice

confirmed, the FHA is a "broad and inclusive" statute that covers a range of conduct and that merits a "generous construction." *See City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) (quoting *Trafficante*, 409 U.S. at 209). Plaintiffs are thus flatly wrong to serve up their own interests as evidence that Congress intended a narrow construction of the FHA's anti-discrimination provisions.

## CONCLUSION

For the reasons stated above and in the earlier memoranda submitted in support of Defendants' Motion to Dismiss and/or for Summary Judgment, Defendants' Motion should be granted and Plaintiffs' Motion for Summary Judgment should be denied.

Dated:  August 5, 2014                         Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

MOLLY J. MORAN
Acting Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

| | |
|---|---|
| HELEN R. KANOVSKY | RACHEL J. HINES |
| General Counsel | Assistant Branch Director |
| MICHELLE ARONOWITZ | Federal Programs Branch |
| Deputy General Counsel for | |
|   Enforcement and Fair Housing |  */s/ Kyle R. Freeny* |
| JEANINE M. WORDEN | KYLE R. FREENY (Cal. Bar No. 247857) |
| Associate General Counsel | DANIEL P. MOSTELLER (DC Bar No. 980802) |
|   for Fair Housing | Attorneys |
| KATHLEEN M. PENNINGTON | U.S. Department of Justice |
| Assistant General Counsel | 20 Massachusetts Ave., N.W. |
|   for Fair Housing Enforcement | Washington, DC 20001 |
| M. CASEY WEISSMAN-VERMEULEN | Tel: (202) 514-5108/Fax: (202) 616-8470 |
| AYELET R. WEISS | Email:  Kyle.Freeny@usdoj.gov |
| Attorneys | |
| *Of counsel* | *Counsel for Defendants* |