Persons interested in being placed on a mailing list for future NPRM's should contact the FAA's Office of Rulemaking, (202) 267–9677, for a copy of Advisory Circular No. 11–2A, Notice of Proposed Rulemaking Distribution System, which describes the application procedure.

**The Proposal**

The FAA is proposing an amendment to Title 14 Code of Federal Regulations (14 CFR) part 71 by amending Class E airspace designated as an extension to Class C airspace area for City of Colorado Springs Municipal Airport, Colorado Springs, CO. Airspace reconfiguration is necessary due to the decommissioning of the Black Forest TACAN. Also, the geographic coordinates of the airport would be updated to coincide with the FAA's aeronautical database. Controlled airspace is necessary for the safety and management of IFR operations at the Airport.

Class E airspace designations are published in paragraph 6003, of FAA Order 7400.9V, dated August 9, 2011, and effective September 15, 2011, which is incorporated by reference in 14 CFR 71.1. The Class E airspace designation listed in this document will be published subsequently in this Order.

The FAA has determined this proposed regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. Therefore, this proposed regulation; (1) is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a regulatory evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified this proposed rule, when promulgated, would not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the U.S. Code. Subtitle 1, section 106, describes the authority for the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in subtitle VII, part A, subpart I, section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it would amend controlled airspace at City of Colorado Springs Municipal Airport, Colorado Springs, CO.

**List of Subjects in 14 CFR Part 71**

Airspace, Incorporation by reference, Navigation (air).

**The Proposed Amendment**

Accordingly, pursuant to the authority delegated to me, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

**PART 71—DESIGNATION OF CLASS A, B, C, D AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS**

1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

**§ 71.1 [Amended]**

2. The incorporation by reference in 14 CFR 71.1 of the Federal Aviation Administration Order 7400.9V, Airspace Designations and Reporting Points, dated August 9, 2011, and effective September 15, 2011 is amended as follows:

*Paragraph 6003    Class E airspace designated as an extension to Class C surface areas.*

\*    \*    \*    \*    \*

**ANM CO E3    Colorado Springs, CO [Amended]**

City of Colorado Springs Municipal Airport, CO

(Lat. 38°48′21″ N., long. 104°42′03″ W.)

That airspace extending upward from the surface within 2.4 miles northwest and 1.2 miles southeast of the City of Colorado Springs Municipal Airport 025° bearing extending from the 5-mile radius of the airport to 8.9 miles northeast and within 1.4 miles each side of the airport 360° bearing extending from the 5-mile radius of the airport to 7.7 miles north of the airport.

Issued in Seattle, Washington, on November 8, 2011.

**William Buck,**

*Acting Manager, Operations Support Group, Western Service Center.*

[FR Doc. 2011–29635 Filed 11–15–11; 8:45 am]

**BILLING CODE 4910–13–P**

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**24 CFR Part 100**

**[Docket No. FR–5508–P–01]**

**RIN 2529–AA96**

**Implementation of the Fair Housing Act's Discriminatory Effects Standard**

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Proposed rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] HUD, to which Congress gave the authority and responsibility for administering the Fair Housing Act and the power to make rules implementing the Act, has long interpreted the Act to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate.

The reasonableness of HUD's interpretation is confirmed by eleven United States Courts of Appeals, which agree that the Fair Housing Act imposes liability based on discriminatory effects. By the time the Fair Housing Amendments Act became effective in 1989, nine of the thirteen United States Courts of Appeals had determined that the Act prohibits housing practices with a discriminatory effect even absent an intent to discriminate. Two other United States Courts of Appeals have since reached the same conclusion, while another has assumed the same but did not need to reach the issue for purposes of deciding the case before it.

Although there has been some variation in the application of the discriminatory effects standard, neither HUD nor any Federal court has ever determined that liability under the Act requires a finding of discriminatory intent. The purpose of this proposed rule, therefore, is to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.

**DATES:** *Comment due date:* January 17, 2012.

**ADDRESSES:** Interested persons are invited to submit written comments regarding this proposed rule to the

---

[1] This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap."

Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410. All communications should refer to the above docket number and title. There are two methods for submitting public comments.

1. *Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *http://www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *http://www.regulations.gov* Web site can be viewed by other commenters and interested members of the public. Commenters should follow the instructions provided on that site to submit comments electronically.

2. *Submission of Comments by Mail.* Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410–0500.

Note: To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule.

*No Facsimile Comments.* Facsimile (FAX) comments are not acceptable.

*Public Inspection of Public Comments.* All properly submitted comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an appointment to review the public comments must be scheduled in advance by calling the Regulations Division at (202) 708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at (800) 877–8339. Copies of all comments submitted are available for inspection and downloading at *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:**
Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–

0500, telephone number (202) 402–5188. Persons with hearing and speech impairments may contact this phone number via TTY by calling the Federal Information Relay Service at (800) 877–8399.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. History of Discriminatory Effects Liability Under the Fair Housing Act*

The Fair Housing Act declares it to be "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [2] Congress considered the realization of this policy "to be of the highest priority." [3] The language of the Fair Housing Act prohibiting discrimination in housing is "broad and inclusive";[4] the purpose of its reach is to replace segregated neighborhoods with "truly integrated and balanced living patterns." [5] In commemorating the 40th anniversary of the Fair Housing Act and the 20th anniversary of the Fair Housing Amendments Act, the House of Representatives recognized that "the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States." [6]

In keeping with the "broad remedial intent" of Congress in passing the Fair Housing Act,[7] and consequently the Act's entitlement to a "generous construction," [8] HUD, to which Congress gave the authority and responsibility for administering the Fair Housing Act and the power to make rules to carry out the Act,[9] has repeatedly determined that the Fair Housing Act is directed to the consequences of housing practices, not simply their purpose. Under the Act, housing practices—regardless of any discriminatory motive or intent—cannot be maintained if they operate to deny protected groups equal housing opportunity or they create, perpetuate, or increase segregation without a legally sufficient justification.

Accordingly, HUD has concluded that the Act provides for liability based on

discriminatory effects without the need for a finding of intentional discrimination. For example, HUD's Title VIII Complaint Intake, Investigation and Conciliation Handbook (Handbook), which sets forth HUD's guidelines for investigating and resolving Fair Housing Act complaints, recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in appropriate cases.[10] In adjudicating charges of discrimination filed by HUD under the Fair Housing Act, HUD administrative law judges have held that the Act is violated by facially neutral practices that have a disparate impact on protected classes.[11] HUD's regulations interpreting the Fair Housing Act prohibit practices that create, perpetuate, or increase segregated housing patterns.[12] HUD also joined with the Department of Justice and nine other Federal enforcement agencies to recognize that disparate impact is among the "methods of proof of lending discrimination under the * * * Act" and provide guidance on how to prove a disparate impact fair lending claim.[13]

In addition, in regulations implementing the Federal Housing Enterprises Financial Safety and Soundness Act, HUD prohibited mortgage purchase activities that have a discriminatory effect. In enacting these regulations,[14] which prescribe the fair lending responsibilities of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), HUD noted that "the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law" and concluded that disparate impact law "is applicable to all

---

[2] *See* 42 U.S.C. 3601.

[3] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 211 (1972) (internal citation omitted).

[4] *Id.* at 209.

[5] *Id.* at 211.

[6] H. Res. 1095, 110th Cong., 2d Sess., 154 Cong. Rec. H2280–01 (April 15, 2008) (2008 WL 1733432).

[7] *Havens Realty Corp.* v. *Coleman,* 455 U.S. 363, 380 (1982).

[8] *City of Edmonds* v. *Oxford House, Inc.,* 514 U.S. 725, 731–732 (1995).

[9] *See* 42 U.S.C. 3608(a) and 42 U.S.C. 3614a.

[10] *See, e.g.,* Handbook at 3–25 (the Act is violated by an "action or policy [that] has a disproportionately negative effect upon persons of a particular race, color, religion, sex, familial status, national origin or handicap status"); *id.* at 2–27 ("a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations"); *id.* at 2–27 to 2–45 (HUD guidelines for investigating a disparate impact claim and establishing its elements).

[11] *See e.g., HUD* v. *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Ross,* 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter,* 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[12] *See* 24 CFR 100.70.

[13] *Policy Statement on Discrimination in Lending,* 59 FR 18,266, 18,268 (Apr. 15, 1994).

[14] *See* 24 CFR 81.42.

segments of the housing marketplace, including the GSEs.'' [15]

Moreover, all Federal courts of appeals to have addressed the question have held that liability under the Act may be established based on a showing that a neutral policy or practice either has a disparate impact on a protected group [16] or creates, perpetuates, or increases segregation,[17] even if such a policy or practice was not adopted for a discriminatory purpose.

The Fair Housing Act's discriminatory effects standard is analogous to the discriminatory effects standard under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e), which prohibits discriminatory employment practices. The U.S. Supreme Court held that Title VII reaches beyond intentional discrimination to include employment practices that have a discriminatory effect.[18] The Supreme Court explained that Title VII ''proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.'' [19]

It is thus well established that liability under the Fair Housing Act can arise where a housing practice is intentionally discriminatory or where it has a discriminatory effect.[20] A

discriminatory effect may be found where a housing practice has a disparate impact on a group of persons protected by the Act, or where a housing practice has the effect of creating, perpetuating, or increasing segregated housing patterns on a protected basis.[21]

### B. Application of the Discriminatory Effects Standard Under the Fair Housing Act

While the discriminatory effects theory of liability under the Fair Housing Act is well established, there is minor variation in how HUD and the courts have applied that theory. For example, HUD has always used a three-step burden-shifting approach,[22] as do many Federal courts of appeals.[23] But some courts apply a multi-factor balancing test,[24] other courts apply a hybrid between the two,[25] and one court

applies a different test for public and private defendants.[26]

Another source of variation is in the application of the burden-shifting test. Under the burden-shifting approach, the plaintiff (or, in administrative proceedings, the complainant) must make a prima facie showing of either disparate impact or perpetuation of segregation. If the discriminatory effect is shown, the burden of proof shifts to the defendant (or respondent) to justify its actions. If the defendant or respondent satisfies its burden, courts and HUD administrative law judges have differed as to which party bears the burden of proving whether a less discriminatory alternative to the challenged practice exists. The majority of Federal courts of appeals that use a burden-shifting approach place this burden on the plaintiff,[27] analogizing to Title VII's burden-shifting framework.[28] Other Federal courts of appeals have kept the burden with the defendant.[29] HUD has, at times, placed this burden of proving a less discriminatory alternative on the respondent and, at other times, on the complainant.[30]

### C. Scope of the Proposed Rule

This proposed rule establishes a uniform standard of liability for facially neutral housing practices that have a discriminatory effect. Under this rule, liability is determined by a burden-shifting approach. The plaintiff or complainant first must bear the burden

---

[15] The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR. 61,846, 61,867 (Dec. 1, 1995).

[16] *See, e.g., Graoch Assocs. #33, L.P.* v. *Louisville/ Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 374 (6th Cir. 2007); *Reinhart* v. *Lincoln County,* 482 F.3d 1225, 1229 (10th Cir. 2007); *Charleston Housing Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49– 50 (1st Cir. 2000); *Simms* v. *First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996); *Jackson* v. *Okaloosa County, Fla.,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 938 (2d Cir. 1988), judgment aff'd, 488 U.S. 15 (1988); *Resident Advisory Board* v. *Rizzo,* 564 F.2d 126, 149–50 (3d Cir. 1977); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 988–89 (4th Cir. 1984); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977).

[17] *See, e.g., Graoch Associates #33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007); *Hallmark Developers, Inc.* v. *Fulton County, Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937 (2d Cir. 1988), *aff'd,* 488 U.S. 15 (1988) (per curiam); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987 n.3 (4th Cir. 1984); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290–1291 (7th Cir. 1977); *United States.* v. *City of Black Jack, Missouri,* 508 F.2d 1179, 1184– 86 (8th Cir. 1974); *see also Trafficante,* 409 U.S. at 209–210.

[18] *See Griggs* v. *Duke Power Co.,* 401 U.S. 424, 433–34 (1971).

[19] Id. at 431.

[20] *See, e.g.,* 42 U.S.C. 3604(a), (b), (f)(1), (f)(2); 42 U.S.C. 3605; 42 U.S.C. 3606. Liability under the Fair Housing Act can also arise in other ways, for

example, where a reasonable person would find a notice, statement, advertisement, or representation to be discriminatory, see 42 U.S.C. 3604(c), or where a reasonable accommodation is refused, see 42 U.S.C. 3604(f)(3). The Act also imposes an affirmative obligation on HUD and other executive departments and agencies to administer their programs and activities related to housing and urban development in a manner affirmatively to further the purposes of the Fair Housing Act. See 42 U.S.C. 3608(d); *see also* 3608(e)(5).

[21] A ''discriminatory effect'' prohibited by the Act refers to either a ''disparate impact'' or the ''perpetuation of segregation.'' *See, e.g. Graoch Associates #33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007) (there are ''two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.'').

[22] See, e.g., *HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994); *HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *see also Policy Statement on Discrimination in Lending, 59 FR. 18,266, 18,269 (Apr. 15, 1994)* (applying three-step test without specifying where the burden lies at each step).

[23] *See, e.g., Oti Kaga, Inc.* v. *S. Dakota Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003); *Lapid –Laurel, L.L.C.* v. *Zoning Bd. of Adjustment of Twp. of Scotch Plains,* 284 F.3d 442, 466–67 (3d Cir. 2002); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Huntington Branch NAACP* v. *Town of Huntington, N.Y.,* 844 F.2d 926, 939 (2d Cir. 1988).

[24] *See, e.g., Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977) (four-factor balancing test).

[25] *See, e.g., Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1252, 1254 (10th Cir. 1995) (three-factor balancing test incorporated into burden shifting framework to weigh defendant's justification); *Graoch Associates #33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 373 (6th Cir. 2007) (balancing test incorporated as elements of proof after second step of burden shifting framework).

[26] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. *See e.g., Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 989 n.5 (4th Cir. 1984).

[27] *See, e.g., Gallagher* v. *Magner,* 619 F.3d 823, 834 (8th Cir. 2010); *Graoch Associates # 33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 373–74 (6th Cir. 2007); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1254 (10th Cir. 1995).

[28] *See, e.g. Graoch,* 508 F.3d at 373 (6th Cir. 2007) (''claims under Title VII and the [Fair Housing Act] generally should receive similar treatment''); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1254 (10th Cir. 1995) (explaining that in interpreting Title VII, ''the Supreme Court has repeatedly stated that the ultimate burden of proving that discrimination against a protected group has been caused by a specific * * * practice remains with the plaintiff at all times'') (internal citation omitted).

[29] *See, e.g., Huntington Branch NAACP* v. *Town of Huntington, N.Y.,* 844 F.2d 926, 939 (2d Cir. 1988); *Resident Advisory Board* v. *Rizzo,* 564 F.2d 126, 146–48 (3d Cir. 1977).

[30] *Compare, e.g., HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992) (respondent bears the burden of showing that no less discriminatory alternative exists), *and Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) (same), *with HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993) (complainant bears the burden of showing that a less discriminatory alternative exists), *and HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) (same).

of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice has a necessary and manifest relationship to one or more of the defendant's or respondent's legitimate, nondiscriminatory interests. If the defendant or respondent satisfies its burden, the plaintiff or complainant may still establish liability by demonstrating that these legitimate nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect.[31]

HUD proposes this standard for several reasons. First, Title VII, enacted four years before the Fair Housing Act, has often been looked to for guidance in interpreting analogous provisions of the Fair Housing Act.[32] HUD's proposal is consistent with the discriminatory effects standard confirmed by Congress in the 1991 amendments to Title VII.[33] Second, HUD's proposal is consistent with the discriminatory effects standard applied under the Equal Credit Opportunities Act (ECOA),[34] which borrows from Title VII's burden-shifting framework.[35] There is significant overlap in coverage between ECOA, which prohibits discrimination in credit, and the Fair Housing Act, which

prohibits discrimination in residential real estate-related transactions.[36] The interagency *Policy Statement on Discrimination in Lending* analyzed the standard for proving disparate impact discrimination in lending under the Fair Housing Act and under ECOA without differentiation.[37] Under HUD's proposed framework, parties litigating a claim brought under both the Fair Housing Act and ECOA will not face the burden of applying inconsistent methods of proof to factually indistinguishable claims. Third, by placing the burden of proving a necessary and manifest relationship to a legitimate, nondiscriminatory interest on the defendant or respondent and the burden of proving a less discriminatory alternative on the plaintiff or complainant, "neither party is saddled with having to prove a negative." [38]

## II. This Proposed Rule

### A. Subpart G—Discriminatory Effect

#### 1. Discriminatory Effect Prohibited (§ 100.500)

HUD proposes adding a new subpart G, entitled "Prohibiting Discriminatory Effects," to its Fair Housing Act regulations in 24 CFR part 100. Subpart G would confirm that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, as defined in § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose. The housing practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The respective burdens of proof for establishing or refuting an effects claim are set forth in § 100.500(c). Subsection 100.500(d) clarifies that a legally sufficient justification does not defeat liability for a discriminatory intent claim once the intent to discriminate has been established.[39]

This proposed rule would apply to both public and private entities because the definition of "discriminatory housing practice" under the Act makes no distinction between the two.[40]

#### 2. Discriminatory Effect Defined (§ 100.500(a))

Under the Fair Housing Act and this proposed rule, a "discriminatory effect" occurs where a facially neutral housing practice actually or predictably results in a discriminatory effect on a group of persons (that is, a disparate impact), or on the community as a whole (perpetuation of segregation).[41] Any facially neutral action, *e.g.* laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule.

*Disparate Impact.* Examples of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act include a zoning ordinance restricting private construction of multifamily housing to a largely minority area (*see Huntington Branch,* 844 F.2d at 937); the provision and pricing of homeowner's insurance (*see Ojo* v. *Farmers Group, Inc.,* 600 F.3d 1205, 1207–8 (9th Cir. 2010) (en banc)); mortgage pricing policies that give lenders or brokers discretion to impose additional charges or higher interest rates unrelated to a borrower's creditworthiness (*see Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251, 253 (D. Mass. 2008)); credit scoring overrides provided by a purchaser of loans (*see Beaulialice* v. *Federal Home Loan Mortg. Corp.,* 2007 WL 744646, *4 (M.D. Fla. Mar. 6, 2007)); and credit offered on predatory terms, (*see Hargraves* v. *Capitol City Mortgage,* 140 F. Supp. 2d 7, 20–21 (D.D.C. 2000)). Further examples of such claims can be found in the following court cases: *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988), where the city's land-use decisions that prevented the construction of two housing developments for city residents displaced by a freeway had a greater adverse impact on minorities than on whites because two-thirds of the persons who would have benefited from the housing were minorities; (*Langlois,* 207 F.3d at 50, where public housing authorities' use of local residency preferences to award Section 8 Housing

---

[31] *See Graoch Associates #33, L.P.* v. *Louisville/ Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 373–74 (6th Cir. 2007); *Oti Kaga, Inc.* v. *S. Dakota Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1254 (10th Cir. 1995).

[32] *See, e.g., Trafficante,* 409 U.S. at 205; The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR 61,846, 61,868 (Dec. 1, 1995). Short form cite n. 15.

[33] *See* 42 U.S.C. 2000e–2(k).

[34] ECOA prohibits discrimination in credit on the basis of race and other enumerated criteria. *See* 15 U.S.C. 1691.

[35] *See* S. Rep. 94–589, 94th Cong., 2d Sess. (1976) ("judicial constructions of antidiscrimination legislation in the employment field, in cases such as *Griggs* v. *Duke Power Company,* 401 U.S. 424 (1971), *and Albemarle Paper Co.* v. *Moody* (U.S. Supreme Court, June 25, 1975) [422 U.S. 405], are intended to serve as guides in the application of [ECOA], especially with respect to the allocations of burdens of proof."); 12 CFR 202.6(a), n. 2 (1997) ("The legislative history of [ECOA] indicates that the Congress intended an "effects test" concept, as outlined in the employment field, by the Supreme Court in the cases of *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971) and *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness."); 12 CFR part 202, Supp. I, Official Staff Commentary, Comment 6(a)–2 ("Effects test. The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e– 2).").

[36] *See* 59 FR 18,266.

[37] *See* 59 FR 18,266, 18,269 (Apr. 15, 1994).

[38] *Hispanics United of DuPage Cnty.* v. *Vill. of Addison, Ill.,* 988 F.Supp. 1130, 1162 (N.D. Ill. 1997).

[39] It is possible to bring a claim alleging both discriminatory effect and discriminatory intent as alternative theories of liability. In addition, the discriminatory effect of a challenged practice may provide evidence of the discriminatory intent behind the practice. *See, e.g., Vill. of Arlington Heights* v. *Metro. Housing Dev. Corp.,* 429 U.S. 252, 266 (1977). But proof of intent to discriminate is not necessary to prevail on a discriminatory effects claim. *See, e.g., Black Jack,* 508 F.2d at 1184–85.

[40] *See* 42 U.S.C. 3602(f) (defining "discriminatory housing practice" as "an act that is unlawful under

Section 804, 805, 806, or 818," none of which distinguish between public and private entities); *see also Nat'l Fair Housing Alliance, Inc.* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 59–60 & n.7 (D.D.C. 2002) (applying the same impact analysis to a private entity as to public entities, noting that a "distinction between governmental and non- governmental bodies finds no support in the language of the [Act] or in [its] legislative history").

[41] *See, e.g., Graoch Associates # 33, L.P.,* 508 F.3d at 378.

Choice Vouchers likely would result in an adverse impact based on race; *United States* v. *Incorporated Village of Island Park,* 888 F. Supp. 419, 447 (E.D.N.Y. 1995), where a housing program's preference for residents of the Village, most of whom were white, had a disparate impact on African-Americans; *Charleston Housing Auth.,* 419 F.3d at 741–42, where the housing authority's plan to demolish 50 low-income public housing units—46 of which were occupied by African Americans—would disproportionately impact African Americans based on an analysis of the housing authority's waiting list population, the population of individuals income-eligible for public housing, or the current tenant population; and *Smith* v. *Town of Clarkton, N.C.,* 682 F.2d 1055, 1065–66 (4th Cir. 1982), where the town's withdrawal from a multi-municipality housing authority effectively blocked construction of 50 units of public housing, adversely affecting African American residents of the county, who were those most in need of new construction to replace substandard dwellings).

*Perpetuation of Segregation.* A person or entity may be liable for a housing policy or practice that has a discriminatory effect on the community because the practice has the effect of creating, perpetuating, or increasing housing patterns that segregate by race, color, religion, sex, familial status, national origin, or disability. Examples of such claims can be found in the following court cases: *Huntington Branch,* 844 F.2d at 934, 937, where the town's zoning ordinance, which limited private construction of multifamily housing to a largely minority neighborhood, had the effect of perpetuating segregation "by restricting low-income housing needed by minorities to an area already 52% minority"; *Dews* v. *Town of Sunnyvale, Tex.,* 109 F. Supp. 2d 526, 567 (N.D. Tex. 2000), where the town's zoning ordinance that banned multifamily housing and required single-family lots of at least one acre had the effect of perpetuating segregation by keeping minorities out of a town that was 94 percent white; *Black Jack,* 508 F.2d at 1186, where a city ordinance preventing the construction of low-income multifamily housing "would contribute to the perpetuation of segregation in a community which was 99% white"; and *Inclusive Communities Projects, Inc.* v. *Texas Dep't of Housing & Community Affairs,* 749 F. Supp. 2d 486, 500 (N.D. Tex. 2010), where the state's disproportionate denial of tax credits for nonelderly housing in predominately white neighborhoods had a segregative impact on the community.

### 3. Legally Sufficient Justification (§ 100.500(b))

A housing practice or policy found to have a discriminatory effect may still be lawful if it has a "legally sufficient justification." A "legally sufficient justification" exists where the housing practice or policy: (1) Has a necessary and manifest relationship to the defendant's or respondent's legitimate, nondiscriminatory interests;[42] and (2) those interests cannot be served by another practice that has a less discriminatory effect.[43] A legally sufficient justification may not be hypothetical or speculative. In addition, a legally sufficient justification does not defeat liability for a discriminatory *intent* claim once the intent to discriminate has been established.

### 4. Burdens of Proof (§ 100.500(c))

The burden-shifting framework set forth in the proposed rule for discriminatory effect claims finds support in judicial interpretations of the Act, and is also consistent with the burdens of proof Congress assigned in disparate impact employment discrimination cases. *See* 42 U.S.C. § 2000e-2(k). In the proposed rule, the complainant or plaintiff first bears the burden of proving its prima facie case, that is, that a housing practice caused, causes, or will cause a discriminatory effect on a group of persons or a community on the basis of race, color, religion, sex, disability, familial status, or national origin.

Once the complainant or plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of the housing provider's legitimate, nondiscriminatory interests.

If the respondent or defendant satisfies this burden, the complainant or plaintiff may still establish liability by demonstrating that these legitimate, nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect.

### B. Examples of Housing Practices With Discriminatory Effects

Violations of various provisions of the Act may be established by proof of discriminatory effects. For example, under 42 U.S.C. subsections 3604(a) and 3604(f)(1), discriminatory effects claims may be brought under the Act's provisions that make it unlawful to "otherwise make unavailable or deny [ ] a dwelling" because of a protected characteristic. Discriminatory effects claims may be brought pursuant to subsections 3604(b) and 3604(f)(2) of the Act prohibiting discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" a protected characteristic. For residential real estate-related transactions, discriminatory effects claims may be brought under section 3605, which bars "discrimination against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of" a protected characteristic. Discriminatory effects claims may also be brought under section 3606, prohibiting discrimination in the provision of brokerage services.

HUD's existing Fair Housing Act regulations provide examples of housing practices that may violate the Act, based on an intent theory, an effects theory, or both. The proposed rule adds examples of discriminatory housing practices that may violate the new subsection G because they have a discriminatory effect. The cases cited in Section II.A.2 of this preamble identify housing practices found by courts to create discriminatory effects that violate or may violate the Act. These cases are provided as examples only and should not be viewed as the only ways to establish a violation of the Act based on a discriminatory effects theory.

### III. Solicitation of Comments

The Department welcomes comments on the standards proposed in this rule, including whether a burden-shifting approach should be used to determine when a housing practice with a discriminatory effect violates the Fair Housing Act and, where proof is required of the existence or nonexistence of a less discriminatory alternative to the challenged practice, which party should bear that burden. These comments will help the Department in its effort to craft final regulations that best serve the broad, remedial goals of the Fair Housing Act.

---

[42] *See, e.g., Charleston Housing Auth.,* 419 F.3d at 741 ("[u]nder the second step of the disparate impact burden shifting analysis, the [defendant] must demonstrate that the proposed action has a manifest relationship to the legitimate non-discriminatory policy objectives" and "is necessary to the attainment of these objectives") (internal quotation marks omitted); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 988–89 (4th Cir. 1984); 24 CFR 100.125(c); 59 FR 18,266, 18,269; *see also* 60 FR at 61,868.

[43] *See, e.g., Oti Kaga, Inc.* v. *South Dakota Housing Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003).

## IV. Findings and Certifications

*Executive Order 12866, Regulatory Planning and Review*

The Office of Management and Budget (OMB) reviewed this proposed rule under Executive Order 12866 (entitled "Regulatory Planning and Review"). The proposed rule has been determined to be a "significant regulatory action," as defined in section 3(f) of the Order, but not economically significant under section 3(f)(1) of the Order. The docket file is available for public inspection in the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at (202) 402–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at (800) 877–8339.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule proposes to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.

Discriminatory effects liability is consistent with the position of other Executive Branch agencies and has been applied by every Federal court of appeals to have reached the question. Given the variation in how the courts have applied that standard, HUD's objective in this proposed rule is to achieve consistency and uniformity in this area, and therefore reduce burden for all who may be involved in a challenged practice. Accordingly, the undersigned certifies that the proposed rule will not have a significant economic impact on a substantial number of small entities.

*Environmental Impact*

This proposed rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This proposed rule would not have federalism implications and would not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for Federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This proposed rule would not impose any Federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

**List of Subjects in 24 CFR Part 100**

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD proposes to amend 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

1. The authority for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

2. In § 100.65, a new paragraph (b)(6) is added to as follows:

**§ 100.65   Discrimination in terms, conditions and privileges and in services and facilities.**

\*      \*      \*      \*      \*

(b) \* \* \*

(6) Providing different, limited, or no governmental services such as water, sewer, or garbage collection in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin.

3. In § 100.70, add a new paragraph (d)(5) to read as follows:

**§ 100.70   Other prohibited conduct.**

\*      \*      \*      \*      \*

(d) \* \* \*

(5) Implementing land-use rules, policies, or procedures that restrict or deny housing opportunities in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin.

4. In § 100.120, amend paragraph (b) to read as follows:

**§ 100.120   Discrimination in the making of loans and in the provision of other financial assistance.**

\*      \*      \*      \*      \*

(b) Prohibited practices under this section include, but are not limited to:

(1) Failing or refusing to provide to any person, in connection with a residential real estate-related transaction, information regarding the availability of loans or other financial assistance, application requirements, procedures, or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Providing loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin.

5. In part 100, add a subpart G as follows:

## Subpart G—Discriminatory Effect

**§ 100.500   Discriminatory Effect Prohibited**

Liability may be established under this subpart based on a housing practice's *discriminatory effect,* as defined in § 100.500(a), even if the housing practice is not motivated by a prohibited intent. The housing practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The burdens of proof for establishing a violation under this subpart are set forth in § 100.500(c).

(a) *Discriminatory effect defined.* A housing practice has a *discriminatory effect* where it actually or predictably:

(1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or

(2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* A *legally sufficient justification* exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3610, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and (2) those interests cannot be served by another practice that has a less discriminatory effect. The burdens of proof for establishing each of the two elements of a *legally sufficient justification* are set forth in § 100.500(c)(2)–(c)(3).

(c) *Burdens of proof in discriminatory effects cases.*

(1) A complainant, with respect to claims brought under 42 U.S.C. 3610, or a plaintiff, with respect to claims brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice causes a *discriminatory effect.*

(2) Once a complainant or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the complainant or plaintiff may still prevail upon demonstrating that the legitimate, nondiscriminatory interests supporting the challenged practice can be served by another practice that has a less *discriminatory effect.*

(d) *Relationship to discriminatory intent.* A demonstration that a housing practice is supported by a *legally sufficient justification,* as defined in § 100.500(b), may not be used as a defense against a claim of intentional discrimination.

Dated: October 4, 2011.

**John Trasviña,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2011–29515 Filed 11–15–11; 8:45 am]

**BILLING CODE 4210–67–P**

# DEPARTMENT OF DEFENSE

## Department of the Army, Corps of Engineers

### 33 CFR Chapter II

### USACE's Plan for Retrospective Review Under E.O. 13563

**AGENCY:** U.S. Army Corps of Engineers, DoD.

**ACTION:** Notice of intent and request for comments.

**SUMMARY:** The U.S. Army Corps of Engineers (USACE) is seeking public input on its plan to retrospectively review its Regulations implementing the USACE Regulatory Program at 33 CFR parts 320–332 and 334. Executive Order 13563, "Improving Regulation and Regulatory Review" (E.O.), issued on January 18, 2011, directs Federal agencies to review existing significant regulations and identify those that can be made more effective or less burdensome in achieving regulatory objectives. The Regulations are essential for implementation of the Regulatory mission; thus, USACE believes they are a significant rule warranting review pursuant to E.O. 13563. The E.O. further directs each agency to periodically review its existing significant regulations to determine whether any such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives. Section 404(e) of the Clean Water Act authorizes USACE to development general permits, including nationwide permits (NWPs), for minor activities in waters of the U.S. for a period of five years. Accordingly, every five years, USACE undergoes a reauthorization process for the NWP program and includes public notice and provides an opportunity for public hearing. Comments for the NWP program are submitted during the reauthorization process. Therefore, USACE is currently complying with the E.O. 13563 direction to periodically review its existing significant regulations. Other regulations will be reviewed on an as-needed basis in accordance with new laws, court cases, etc.

**DATES:** Written comments must be submitted on or before January 17, 2012.

**ADDRESSES:** You may submit comments, identified by docket number COE–2011–0028, by any of the following methods:

*Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*Email: regulatory.review@usace.army.mil* Include the docket number, COE–2011–0028, in the subject line of the message.

*Mail:* U.S. Army Corps of Engineers, ATTN: CECW–CO–R (Ms. Amy S. Klein), 441 G Street NW., Washington, DC 20314–1000.

*Hand Delivery/Courier:* Due to security requirements, we cannot receive comments by hand delivery or courier.

*Instructions:* Direct your comments to docket number COE–2011–0028. All comments received will be included in the public docket without change and may be made available on-line at *http://www.regulations.gov,* including any personal information provided, unless the commenter indicates that the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI, or otherwise protected, through regulations.gov or email. The regulations.gov Web site is an anonymous access system, which means we will not know your identity or contact information unless you provide it in the body of your comment. If you send an email directly to the Corps without going through regulations.gov, your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, we recommend that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If we cannot read your comment because of technical difficulties and cannot contact you for clarification, we may not be able to consider your comment. Electronic comments should avoid the use of any special characters, any form of encryption, and be free of any defects or viruses.

*Docket:* For access to the docket to read background documents or comments received, go to *http://www.regulations.gov.* All documents in the docket are listed. Although listed in the index, some information is not publicly available, such as CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form.

Document Details                                    SHARE

Comment Submitted by Roger Clegg

**Document ID:** HUD-2011-0138-0002    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:** 

Show Details

For the reasons given in the column that is the "Appendix" to this congressional testimony, we oppose any FHA regulations using the disparate-impact approach: http://www.ceousa.org/content/view/771/119/ The citation to the column is Roger Clegg, "Home Improvement," Legal Times, Oct. 7, 2002.

# PUBLIC SUBMISSION

As of: 1/18/12 9:39 AM
Tracking No. 80f6dbd6
Comments Due: January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0002
Comment Submitted by Roger Clegg

## Submitter Information

## General Comment

For the reasons given in the column that is the "Appendix" to this congressional testimony, we oppose any FHA regulations using the disparate-impact approach: http://www.ceousa.org/content/view/771/119/ The citation to the column is Roger Clegg, "Home Improvement," Legal Times, Oct. 7, 2002.



Document Details

⊙ SHARE

Comment Submitted by Theresa Sparks, San Francisco Human Rights Commission

**Document ID:** HUD-2011-0138-0003    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

| – Comment Submitted by Theresa Sparks, San Francisco Human Rights Commission ... | View Attachment: |
|---|---|

Title:
Comment Submitted by Theresa Sparks, San Francisco Human Rights Commission (Attachment)

# City and County of San Francisco



Edwin M. Lee
Mayor

# Human Rights Commission

Contract Compliance
Dispute Resolution/Fair Housing
Minority/Women/Local Business Enterprise
Lesbian Gay Bisexual Transgender & HIV Discrimination

**Theresa Sparks**
Executive Director

November 21, 2011

John D. Trasviña
Assistant Secretary of Fair Housing and Equal Opportunity
U.S. Department of Housing and Urban Development
451 7th Street S.W.,
Washington, DC 20410

**Re:  24 CFR Part 100 Implementation of the Fair Housing Act's Discriminatory Effects Standard**

Dear Assistant Secretary Trasviña,

I am writing to provide comment on the Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard. As you may know, the San Francisco Human Rights Commission (HRC) enforces the City's anti-discrimination ordinances, including the prohibitions on discrimination against certain protected categories of race, gender, sexual orientation, HIV/AIDS status, source of income and familial status. In addition, the Commission works to identify other community groups that are vulnerable to discrimination. Currently, the San Francisco Human Rights Commission (HRC) is advocating a proposal to reduce barriers for persons with prior arrest and conviction records. Based on our research, including studies of model legislation from other jurisdictions as well as local testimony and reports documenting the obstacles and discrimination faced by persons with criminal records, persons with arrest and conviction records should be protected under the proposed rule.

## Disproportionate Impact

Through prohibiting blanket bans on ex-offenders, the US Department of Housing and Urban Development (H.U.D.) could make a meaningful difference for many Americans. In California, one in four adults (almost 7 million Californians) has a misdemeanor or felony arrest or conviction record.  When those adults seek housing, they often face blanket denials.  Further, the disproportionate representation of African Americans and Latinos in the criminal justice system has concentrated the social and economic disadvantages of such discrimination in communities of color.

The use of criminal background checks can help ensure public safety; however, too often, criminal background checks are used indiscriminately and overbroadly.  These practices create lifelong barriers for people with arrest and conviction records who are seeking housing and other opportunities.  Moreover, overboard exclusion of people based on arrest or conviction record actually compromises public safety.



25 Van Ness Avenue, Suite 800, San Francisco CA 94102-6033
Tel (415) 252-2500 ● Fax (415) 431-5764 ● TTY/TDD (415) 252-2550 ● http://www.ci.sf.ca.us/sfhumanrights
The office location is accessible to and accommodates people with disabilities.



**Discriminatory Effect**

In the proposed rule, H.U.D. cites several examples of neutral policies or practices that have a disparate impact on a protected group or creates, perpetuates or increases segregation. These practices include a zoning ordinance restricting private construction of multifamily housing to a largely minority area and mortgage pricing policies that give lenders or brokers discretion to impose additional charges or higher interest rates unrelated to a borrower's creditworthiness, credit scoring overrides provided by a purchaser of loans, and credit offered on predatory terms, In our view, a blanket ban on persons with arrest and conviction records is seemingly neutral policy that has a disparate impact on African American and Latinos. In addition, it increases segregation by designating all persons with arrest and conviction records, irrespective of how long ago the conviction occurred, the number of arrests or convictions, or the type of conviction they had, as a class of persons unfit to buy or rent property. It is our position that this policy can only increase segregation and decrease public safety.

As you may know, the U.S. Equal Employment Opportunity Commission (E.E.O.C.) has issued guidance on the consideration of arrest and conviction records in employment decisions. According to the E.E.O.C., using these records as an absolute measure to prevent an individual from being hired has a discriminatory effect on African Americans and Latinos, who are arrested and convicted disproportionately to their representation in the population. We believe that H.U.D.'s mission to create strong, sustainable, inclusive communities and quality affordable homes for all would best be served by issuing similar guidance.

Instead of blanket denials of persons with arrest and conviction records, the HRC encourages property owners who conduct background checks, to refrain requesting information about persons with a criminal history until they have determined that the applicant is otherwise qualified for the property. In our view, this enables property owners to select the best candidates. We encourage H.U.D. to issue similar guidance to staff, rental property managers and other housing decision makers.

**Conclusion**

I hope that these recommendations will assist you in your revision of the proposed rule. If I or my staff can be of any assistance to you in this process or the implementation of the rule, please do not hesitate to contact me.

Kind Regards,

Theresa Sparks
Executive Director

CC: Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street S.W., Room 10276
Washington, DC 20410-0500

Minutes of the Lesbian Gay Bisexual Transgender Advisory Committee Meeting
Page 2 of 2
August 16, 2011



## Document Details

**Comment Submitted by Joshua Brewster**

**Document ID:** HUD-2011-0138-0004   **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

Disparate impact analysis is essential in the 21st century fight against housing segregation and perpetuation of discrimination on the basis of race, disability, sex, national origin and familial status.

# PUBLIC SUBMISSION

**As of:** 1/18/12 11:00 AM
**Tracking No.** 80f75e1f
**Comments Due:** January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0004
Comment Submitted by Joshua Brewster

---

## Submitter Information

---

## General Comment

Disparate impact analysis is essential in the 21st century fight against housing segregation and perpetuation of discrimination on the basis of race, disability, sex, national origin and familial status.

000015

## Document Details

### Comment Submitted by Jean Public

**Document ID:** HUD-2011-0138-0005    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

#### Show Details

to effect liability even when there is no intent to discriminate shows a govt agency going much beyond what congress authorized. it is wrong to go beyond what is authorized. I do not believe hud should make this rule. I believe the courts have spoken and their decisions speak for themselves and are more worthy of being the law. they are well reasoned decisions rather than what hud is proposing. I do not believe hud is correctly interpreting either congress or the courts intentions honestly or adequately. I also believe the budget of this agency needs to be cut by 25%. it is an expensive, free spending agency that needs to help american taxpayers from going into economic deficit. there is too much out of control spending going on at hud. title vii is not title viii and should not be interpreted as if it is title viii. hud is reading title vii as title viii when it clearly is NOT. this agency appears to be making its own laws which are not congress or the courts rules. IIA - I do not agree that hud should make its own law. jhud is only there to interpret congress law. hud is way out of line.

# PUBLIC SUBMISSION

As of: 1/18/12 10:59 AM
Tracking No. 80f77812
Comments Due: January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0005
Comment Submitted by Jean Public

## Submitter Information

## General Comment

to effect liability even when there is no intent to discriminate shows a govt agency going much beyond what congress authorized. it is wrong to go beyond what is authorized. i do not believe hud should make this rule. i believe the courts have spoken and their decisions speak for themselves and are more worthy of being the law. they are well reasoned decisions rather than what hud is proposing. i do not believe hud is correctly interpreting either congress or the courts intentions honestly or adequately. i also believe the budget of this agency needs to be cut by 25%. it is an expensive, free spending agency that needs to help american taxpayers from going into economic deficit. there is too much out of control spending going on at hud. title vii is not title viii and shoudl not be interpreted as if it is title viii. hud is reading title vii as title viii when it clearly is NOT. this agency appears to be making its own laws which are not congress or the courts rules. IIA - i do not agree that hud should make its own law.jhud is only there to interpret congress law. hud is way out of line.

## Document Details

SHARE

**Comment Submitted by Cierra Jordan**

**Document ID:** HUD-2011-0138-0006   **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

### Show Details

I support the proposed rule to establish uniformed standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The current standards provide liability of discriminatory effects but do not require there to be evidence of intentional discrimination. I think it is important to put standards in place that require evidence of discrimination or discriminatory effect. These standards will protect against false claims of discrimination and require proof it being intentional. I think that these uniformed standards will also facilitate fair housing practices from entities who sale, rent or finance housing. I support this proposed rule.

Page 1 of 1

2

# PUBLIC SUBMISSION

**As of:** 1/18/12 3:01 PM
**Tracking No.** 80f7ca3e
**Comments Due:** January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0006
Comment Submitted by Cierra Jordan

## Submitter Information

## General Comment

I support the proposed rule to establish uniformed standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The current standards provide liability of discriminatory effects but do not require there to be evidence of intentional discrimination. I think it is important to put standards in place that require evidence of discrimination or discriminatory effect. These standards will protect against false claims of discrimination and require proof it being intentional. I think that these uniformed standards will also facilitate fair housing practices from entities who sale, rent or finance housing. I support this proposed rule.



## Document Details

SHARE

### Comment Submitted by Mary Prem, Housing Equality Law Project (HELP)

**Document ID:** HUD-2011-0138-0007    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:** HTML

Show Details

See attached file(s)

Attachments:

─ Comment Submitted by Mary Prem, Housing Equality Law Project (HELP)- Attach...    View Attachment: HTML PDF

**Title:**
Comment Submitted by Mary Prem, Housing Equality Law Project (HELP)- Attachment



**HOUSING EQUALITY LAW PROJECT**

December 28th, 2011

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

Re: Docket No. FR-5508-P-01; *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

As an advocate for equal opportunity in housing, I am writing in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. Housing Equality Law Project (HELP), a non-profit civil rights agency was founded in 2009 to promote the rights of all individuals in housing, employment, education, lending, public accommodations, and the provision of services. HELP is headquartered in San Francisco and directs its services to areas deemed "unserved or underserved" in the State of California. As part of its fair housing program, HELP provides counseling, investigation of housing discrimination complaints, enforcement of fair housing violations, and education and outreach.

HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status. In our work, we have encountered many examples of housing practices that are neutral on the surface, but destructive to the mission of fostering equal opportunity.

One such example is zoning and land-use restrictions containing limitations based on the household composition. Such zoning restrictions may prevent people with disabilities or handicaps from living together in financially viable and therapeutic group settings. This effect, even if not intended by the municipal agency, runs counter to the goals of the Fair Housing Act.

HUD's proposed regulation provides clarity to housing providers, housing seekers, municipalities, and courts who may confront such policies in many different ways. The regulation not only clarifies the burden of proof in the context of litigation to the benefit of courts and litigants. It also will help to prevent litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of our agency.

We applaud HUD's efforts to provide guidance on the important issue of disparate effects under the Fair Housing Act and urge HUD to issue the final rule as soon as possible.

Very truly yours,

Mary Prem
Executive Director

3 Embarcadero Center, Suite 420, San Francisco, CA 94111 | T: 415.434.9400 | F: 415.434.9010 | www.housingequality.org

## Document Details

### Comment Submitted by Nancy Kenyon, Fair Housing of Marin

**Document ID:** HUD-2011-0138-0008   **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

As an advocate for equal opportunity in housing, I am writing in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. Fair Housing of Marin is a civil rights nonprofit founded in 1982 that serves the county of Marin in California. We counsel victims of discrimination, provide legal seminar to Landlords, counsel individuals on forclosure, advocate for affordable housing and fun human rights programs in the area schools. We believe that People Learn to Live Together by Living Together and work to make sure every individual protected by the federal and state fair housing laws live in the housing of their choice. HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status. In our work, we have encountered many examples of housing practices that are neutral on the surface, but destructive to the mission of fostering equal opportunity. One such example is numerical occupancy limitations. When such limitations are imposed by housing providers, they may have the effect of excluding families with minor children from housing. This effect, even if not intended by the housing provider, runs counter to the goals of the Fair Housing Act. Another is zoning and land-use restrictions containing limitations based on the household composition. Such zoning restrictions may prevent people with disabilities or handicaps from living together in financially viable and therapeutic group settings. This effect, even if not intended by the municipal agency, runs counter to the goals of the Fair Housing Act. Finally, Marin County is 84% Caucasian. When affordable housing projects are built, many cities decided to give preference to current residents, which meant that non-Whites were virtually eliminated. Our agency met with these cities and persuaded them that their policy was in violation of fair housing laws by disparate impac

# PUBLIC SUBMISSION

As of: 1/18/12 10:24 AM
Tracking No. 80f8ae81
Comments Due: January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0008
Comment Submitted by Nancy Kenyon, Fair Housing of Marin

---

## Submitter Information

---

## General Comment

As an advocate for equal opportunity in housing, I am writing in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. Fair Housing of Marin is a civil rights nonprofit founded in 1982 that serves the county of Marin in Clifornia. We counsel victims of discrimination, provide legal seminar to Landlords, counsel individuals on forclosure, advocate for affordable housing and fun human rights programs in the area schools. We believe that People Learn to Live Together by Living Together and work to make sure every individual protected by the federal and state fair housing laws live in the housing of their choice.

HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status. In our work, we have encountered many examples of housing practices that are neutral on the surface, but destructive to the mission of fostering equal opportunity.

One such example is numerical occupancy limitations. When such limitations are imposed by housing providers, they may have the effect of excluding families with minor children from housing. This effect, even if not intended by the housing provider, runs counter to the goals of the Fair Housing Act.

Another is zoning and land-use restrictions containing limitations based on the household composition. Such zoning restrictions may prevent people with disabilities or handicaps from living together in financially viable and therapeutic group settings. This effect, even if not intended by the municipal agency, runs counter to the goals of the Fair Housing Act.

Finally, Marin County is 84% Caucasian. When affordable housing projects are built, many cities decided to give preference to current residents, which meant that non-Whites were virtually eliminated. Our agency met with these cities and persuaded them that their policy was in violation of fair housing laws by disparate impac

## Document Details

SHARE

### Comment Submitted by Sheryl Henderson

**Document ID:** HUD-2011-0138-0009    **Document Type:** Public Submission
This is comment on    **Proposed Rule:** FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

#### Show Details

After waiting for 2 years I finally got my section 8 voucher...I was told my life was going to improve greatly and it did until the last 3 years.I am a single white woman who has been disabled for ten year and I just turned 65! I survive on Medicare and without any increase for cost of living my rent has nearly doubled!!! At my last exam I turned my 20% out-of-pocket expenses and they were not allowed by DHA. I was also informed that if I were to fall and break my hip those out of pocket expenses would not be covered either! WHY???? I was told because they wouldn't be on going???? I currently live in a 2 bedroom house with a 2 bedroom voucher my zip code is 75228. Last year the fair market rental was $810 yet this year it has dropped to $700.00 I am one of only a few Caucasians in this area...It is mostly Hispanic! I have a wonderful landlady but if I am forced to move,she will no longer participate...ever! She has seen the problems I have encountered and can't stand the thought of my having to leave my home! This zip code is noting but bull!!!!!! Go to craigslist Dallas and check the rental amounts! Thank you for hearing me!!!

Page 1 of 1

# PUBLIC SUBMISSION

As of: 1/18/12 11:03 AM
Tracking No. 80f900ef
Comments Due: January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0009
Comment Submitted by Sheryl Henderson

## Submitter Information

## General Comment

After waiting for 2 years I finally got my section 8 voucher...I was told my life was going to improve greatly and it did until the last 3 years.I am a single white woman who has been disabled for ten year and I just turned 65!

I survive on Medicare and without any increase for cost of living my rent has nearly doubled!!! At my last exam I turned my 20% out-of-pocket expenses and they were not allowed by DHA. I was also informed that if I were to fall and break my hip those out of pocket expenses would not be covered either! WHY????? I was told because they wouldn't be on going?????

I currently live in a 2 bedroom house with a 2 bedroom voucher my zip code is 75228. Last year the fair market rental was $810 yet this year it has dropped to $700.00 I am one of only a few Caucasians in this area...it is mostly Hispanic!

I have a wonderful landlady but if I am forced to move,she will no longer participate..ever! She has seen the problems I have encountered and can't stand the thought of my having to leave my home! This zip code is noting but bull!!!!!! Go to craigslist Dallas and check the rental amounts!

Thank you for hearing me!!!



## Comment Submitted by Tamara Parker, Legal Aid Society of Columb

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: <u>FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard</u>

For related information, <u>Open Docket Folder</u>

**Comment Period Closed**
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0010
**Tracking Number:** 80f934d

### Comment

Discrimination in housing continues to be a problem yet many persons affected do not take any action to address the individual discriminatory acts. Thus it is important to have an avenue to address the systemic discriminatory impact from policies that limit housing choice for persons who are members of protected groups. Not only are the defendants in housing discrimination cases better situated to proffer alternatives, knowing that the burden will be on them in the event of litigation should serve as motivation to consider less discriminatory means when making decisions that could have a discriminatory impact.

## Document Informatio

**Date Posted:**
Jan 12, 2012

Show More Details





Miami Valley Fair Housing Center, Inc.

21-23 East Babbitt Street

Dayton, OH 45405

937-223-6035 • Fax 937-223-6279

Jim McCarthy, President/CEO

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:     Docket No. FR-5508-P-01
        Implementation of the Fair Housing Act's Discriminatory Effect Standard
        Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Miami Valley Fair Housing Center, Inc. supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

The Miami Valley Fair Housing Center is a private non-profit corporation, organized under Ohio law, and incorporated in 1993. Under the direction of a volunteer board of trustees and with a professional staff, the Center's mission is to eliminate housing discrimination and ensure equal housing opportunity for all people in our region. Since 2001, the Fair Housing Center has been implementing the Predatory Lending Solutions (PLS) project in Montgomery County; providing education and outreach, victim intervention services, local community impact research, and legislative support on the issue of predatory mortgage lending.

**The Miami Valley Fair Housing Center, Inc. is in full support of the National Fair Housing Alliance's comment letter.**

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact Jim McCarthy *at* (937) 223-6035 or jim.mccarthy@mvfairhousing.com with any questions.

Sincerely,

Jim McCarthy
President/CEO

jlm

EQUAL OPPORTUNITY SPECIALISTS
NATIONAL FAIR HOUSING ALLIANCE OPERATING MEMBER



Document Details

Comment Submitted by Gregory Squires, George Washington University

**Document ID:** HUD-2011-0138-0012    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

Comment Submitted by Gregory Squires, George Washington University (Attachm...    View Attachment:

Title:
Comment Submitted by Gregory Squires, George Washington University (Attachment)



THE GEORGE
WASHINGTON
UNIVERSITY
W A S H I N G T O N   D C

DEPARTMENT OF SOCIOLOGY

January 11, 2011


Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410


Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

I want to commend the Department for releasing a proposed regulation clarifying the disparate impact standard under the Fair Housing Act. This has been a long time in coming. I remember working on a draft disparate impact regulation when I was at HUD in 1994 and 1995! But it is essential that such a regulation be promulgated now.

As you know, the disparate impact standard is critical if the Act is to realize its primary objectives of eradicating both discrimination and segregation. If explicit, overt, and blatant prejudicial practices are less common today (though they certainly have not disappeared) more subtle but equally "effective" institutional barriers remain that can only be eliminated by dismantling those policies that have an adverse disparate impact on protected groups while serving no legitimate business purpose. In my own direct experience, as an expert witness in a number of insurance redlining cases, the disparate impact theory was critical in obtaining favorable outcomes for the plaintiffs. If this option is no longer available, the proverbial door to equal housing opportunity will be slammed in the face of many victims.

Timing is critical. The Supreme Court's decision to grant certiorari in the case of *Magner v. Gallagher* means that the disparate impact rule must be final before that decision is handed down, given the Court's deference to agency interpretation of statutory language in regulations. Failure to do so may well result in the fair housing community losing one of its most effective tools.

3

It is not an exaggeration to say that effective fair housing enforcement going forward may well depend on retaining the disparate impact standard under the Fair Housing Act. This is an important matter that demands careful scrutiny. At the same time, it is important to act expeditiously. I am ready to provide any assistance I can as are your many friends in the fair housing community.

Thank you for taking this important step forward.

Sincerely,

Gregory D. Squires
Professor of Sociology and Public Policy and Public Administration
George Washington University





8134 VAN NUYS BOULEVARD, SUITE 206
PANORAMA CITY, CALIFORNIA 91402
TELEPHONE: (818) 373-1185
FAX : (818) 373-1193

**FAIR HOUSING COUNCIL**
of the
San Fernando Valley

*BOARD OF DIRECTORS'*

RAFER JOHNSON
*Board President*

LORETTA KELLY
*1st Vice President*

WINNIE DAVIS
*Recording Secretary*

BETSY JOHNSON
*Recording Secretary*

DONALD BAGWELL, JR.
*Treasurer*

DIANA C. BRUNO
*Executive Director*

JUANITA BANKHEAD

WADE RICE

MILDRED STEWART

*ADVISORY BOARD*

WENDY FURTH

DEBRA LEVY

TRUDY SIBLEY

DR. ROBERT WAKAMATSU

ROBERT WINN

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal rulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Fair Housing Council of the San Fernando Valley, California, supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

The Fair Housing Council of the San Fernando Valley, founded in 1959, is a comprehensive housing services organization for the San Fernando Valley region. The Council provides advocacy, counseling, education and investigative services (and sometimes makes direct interventions on behalf of vulnerable parties) for rental, sales, lending (including predatory lending) insurance redlining and appraisal discrimination. Discrimination in housing for minorities or people with disabilities also is a major focus of the Council's work. We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact Diana Bruno at 818-373-1185 with any questions.

Sincerely,

Diana C Bruno,
Executive Director









**Public Housing Authorities Directors Association**
511 Capitol Court, NE, Washington, DC 20002-4937
phone: 202-546-5445   fax: 202-546-2280   www.phada.org

Regulations Division
Office of General Counsel
Department of Housing and
          Urban Development
451 7th Street, SW
Room 10276
Washington, DC 20410

January 11, 2012

Re:    Docket No. FR–5508–P–01
       Implementation of the Fair Housing Act's Discriminatory Effects
       Standard

Gentlepeople:

The Public Housing Authorities Directors Association represents approximately
1,900 housing authority chief executives. The association wishes to submit the
following comments concerning HUD's published proposed rule implementing
aspects of the Fair Housing Act referenced above.

The proposed rule was published by the department on November 16, 2011.
PHADA appreciates the opportunity to comment and wishes to raise the
following issues: 1) the timing of the publication, 2) the broadness of language
used in the definition of discriminatory effect, and 3) examples of disparate
impact and discriminatory effect included in the proposed rule.

          Timing of Publication

Although the department claims that the use of disparate impact and
discriminatory effect in establishing a prima facie case of housing
discrimination has been a long standing policy, it was not until 1993 that then
Assistant Secretary for Fair Housing and Equal Opportunity Roberta
Achtenberg published a memorandum instructing administrative law judges
(ALJs) to use disparate impact in their assessments of fair housing complaints.
As a basis for her instruction, Achtenberg cited 1993 memoranda from then
Chief of Staff Bruce Katz in which he announced that the Secretary had
overruled an ALJ twice in a single housing discrimination complaint. From
1968 until 1993, it appears that the use of disparate impact and

*3*

discriminatory effect was not a common practice in connection with adjudication of fair housing complaints.

In that regard, while the department is correct in pointing out that most Federal Circuit Courts of Appeal have found that disparate impact and discriminatory effect can form the basis for a successful fair housing complaint, not all courts have ruled on the matter. As the department also pointed out, Federal Circuit Courts of Appeal, along with HUD's ALJs, have applied several different tests in connection with such complaints. Partly in order to address these issues, on November 7th, 9 days before HUD published its proposed rule, the United States Supreme Court announced that it had granted a writ of certiorari in Magner v. Gallagher, a case arising from a fair housing complaint that presented two questions:

1.    Are disparate impact claims cognizable under the Fair Housing Act?

2.    If such claims are cognizable, should they be analyzed under the burden shifting approach used by three circuits, under the balancing test used by four circuits, under a hybrid approach used by two circuits, or by some other test?

These are exactly the issues HUD announced it was endeavoring to address in its proposed rule.

The timing of the court's announcement and HUD's rule publication may have been serendipitous. However, since the court will consider whether or how disparate impact claims may form a basis for fair housing complaints and if so, what sort of analysis should be used in assessing those claims, PHADA suggests that HUD pursue a prudent course of action and forego further action on this proposed rule until after the court announces how it intends to resolve these 2 issues.

### Discriminatory Effect Defined

In the proposed Sec. 100.500, the department proposes to include in its definition of a housing practice with discriminatory effect one which could even, "predictably," have a disparate impact on a protected class or create, perpetuate or increase housing segregated by a protected class. Thus the rule would support a complaint where no disparate impact has actually occurred, but where a hypothetical impact might occur. PHADA urges HUD to reconsider inclusion in this definition impacts which have not yet occurred but which could conceivably occur at some undefined moment in the future. Such a standard is much too broad and makes good faith compliance very complicated if not impossible. An innocent, neutral policy today could conceivably have a discriminatory effect sometime in the future, although it may never actually ever have that effect, and the practice could still constitute a violation of the rule's standards.

A second concern with language in the proposed definition of discriminatory effect involves language in Sec. 100.500(a)(2) which includes as illegitimate practices those which, "perpetuate," segregated housing. A practice may perpetuate segregated housing in 2 ways. First, it may actively and affirmatively discourage the integration of housing in a community where housing occupied by members of protected classes is segregated. Second, a neutral practice might perpetuate segregated housing simply because it doesn't explicitly foster the integration of housing somehow. PHADA believes that the second instance includes otherwise neutral housing practices too broadly and should not be the basis for successful fair housing complaints. The department may add language to the rule that distinguishes between these active or neutral roles of housing practices in "perpetuating" segregated housing and make clear that the rule only encompasses practices that actively perpetuate segregated housing and does not encompass otherwise neutral policies simply because they fail to foster integrated housing.

### Discriminatory Effect Examples

The proposed rule includes new examples of discriminatory effect in Sec. 100.65(b), Sec. 100.70(d) and Sec. 100.120(b) that are very broadly stated. For example, Sec. 100.65(b)(5) could hold a community liable if it provided levels of service different from neighboring communities and those differential levels of service could be construed to have discriminatory effects. Sec. 100.70(d)(5) appears to define local government land use practices as violations that the United States Supreme Court has already found to be constitutional (e.g. Arlington Heights v. Metropolitan Housing Corp.). PHADA believes that HUD can offer examples of discriminatory effects that are more circumspect than the examples it has elected to include in this proposed rule.

Thank you for the opportunity to submit these comments. We trust that the department will act judiciously, delay action on this proposed rule until the United States Supreme Court acts, constrains language in its definition of discriminatory effect, and constrains the scope of its examples of proscribed discriminatory practices.

Sincerely,

Timothy G. Kaiser
Executive Director



**Calvin Bradford & Associates, Ltd.**
530 Thomas Bransby - Williamsburg, Virginia 23185

January 10, 2011

**Via Electronic Submission**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01;** *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

As a person who has engaged in policy evaluation and research on housing, lending, and insurance discrimination – and who has served as an expert in housing discrimination cases for more than thirty years, I fully endorse HUD's action in proposing regulations to codify and make uniform the standards for the application of discriminatory effects under the Fair Housing Act.

In the many cases I have worked on, I have found the courts agreeing in principle that respondents are liable for activities that have a disparate impact on a protected class members or communities with significant protected class populations, though the standards for defining the process and the methods of proof have varied from one court to another. Moreover, in addition to direct actions related to making housing available, some of the most important cases relate to the disparate impacts of facially neutral "laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria" by both governments and private sector actors that impinge on the terms and conditions under which housing is made available or maintained.

Actions that have a disparate impact have become particularly important with the addition of persons with disabilities and familial status to the protected classes under the Act. Examples include various occupancy numeric and other standards that affect persons with disabilities or households with children. Zoning and housing codes and zoning and code enforcement activities, while important for many legitimate purposes, may have notable disparate impacts which cannot withstand a reasonable test of their legitimacy. Even legitimate practices, such as the need to provide sound evaluations of a borrower's ability and willingness to repay a loan, may have disparate impacts (such as in the use of credit scores) which can be served with less discriminatory alternatives (such as requirements for credit and loan counseling).

1



In the residential lending area, these regulations are particularly necessary as they will cover activities in real estate-related transactions that some courts may not recognize as covered by the disparate impact standards of ECOA because the respondents are not defined as providers of credit. For example, the actions of many participants in the secondary (mortgage securitization) market or in the servicing of mortgage loans may not be seen by some courts as covered by ECOA. Additionally, the actions of local, state, Federal government agencies, or private third parties related to the maintenance, disposition, and other treatment of foreclosed and abandoned properties may not be seen as covered by ECOA. All of these actions have profound implications and impacts on communities of color that are protected by the provisions of the Fair Housing Act.

With consideration for the caveats and comments below, I fully recommend that HUD move as quickly as possible to implement its final set of regulations for disparate impact standards.

Throughout the proposed regulations, HUD refers to "practices" that have a disparate impact. Under the Supplemental Information section of the proposed rule [Part II. This Proposed Rule - A. Subpart G — Discriminatory Effect. - 1. Discriminatory Effect Prohibited (§100.500)], HUD elaborates that "any facially neutral action, e.g. laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule." This is a clear statement of the kinds of "practices" that HUD intends to cover under the rule. Under the actual proposed language for the rule, however, this elaboration is missing. In as much as this elaboration does not exist in the current regulations, it should be inserted into the rule itself in order to make clear the scope of the rule and HUD's position on the range of "practices" actionable under the law.

HUD provides the following description of the application of the discriminatory effects standard under the Fair Housing Act. "The plaintiff or complainant first must bear the burden of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice has a necessary and manifest relationship to one or more of the defendant's or respondent's legitimate, nondiscriminatory interests. If the defendant or respondent satisfies its burden, the plaintiff or complainant may still establish liability by demonstrating that these legitimate nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect."

The language under §100.500(b)(1) defining a "legally sufficient justification" (i.e., that the practice has a "manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent") appears all too likely by itself to be interpreted so liberally that any claim of increased profitability resulting from the discriminatory impact or other claims of normal business procedures or governmental operations could be put forward by the respondent in a case. Notwithstanding §100.500(b)(2), which conditions the defense on there being a no less discriminatory practice, it is the standard for recognizing the legitimacy for the practice against its discriminatory impact that is at issue at this stage in the case and not whether that practice, once recognized as legitimate, could be served in some other less discriminatory way. Finding a less discriminatory alternative to a practice that has a questionable business or public policy purpose does not affirmatively further the Act. The regulation would at least be improved if it included the language similar to that cited in footnote #42 of the

2

proposed regulation in the case of *Charleston Housing Auth. v. U.S. Dep't of Agric.*, (419 F.3d 729, 741) that the defendant needs to establish that the policy has not only a manifest relationship to a legitimate interest, but that it is "necessary to the attainment of" <u>clearly</u> legitimate nondiscriminatory goals.

Section 100.500(c)(3) requires the complainant to define the possibility of a less discriminatory alternative. While HUD claims that this creates a balance in burdens, the practical reality is that offering some allegedly nondiscriminatory business or policy justification is far less burdensome than investigating all possible alternative practices once a practice is deemed justifiable. This is particularly the case where the practice involves complex systems (e.g., credit scoring, credit-based insurance scores, automated loan underwriting, or software that reviews loans for purchase or rating in the secondary market). In such cases, the burden placed on the complainant would often be unreasonable because of both the lack of access to the internal workings of these systems and because of the lack of resources necessary to evaluate these systems and the alternatives to these systems - even if one had access to the basic systems and their uses. Outside of cases where the complainant is represented by the full battery of the resources of the Federal government, only the respondents are likely to have either access to, or the resources for, evaluating whether alternatives can be developed. Therefore, without some provision requiring access to these systems and the allocation of resources to evaluate these systems and alternatives, the burdens of proof placed on the complainants are enormous and unreasonable when compared to those placed on the respondent.

One option that would place at least a more balanced burden on the respondent in a disparate impact case is to require the respondent to provide access to all persons and documents that indicate if the respondent was ever aware of any possible disparate impact for the practice and whether the respondent has ever explored any less discriminatory alternative. HUD should make a clear statement in the comments published with the final rule, if not in the rule itself, that evidence of the awareness of the disparate impact should take account of willful ignorance on the part of the respondent. The complainant could then have a right to challenge the respondent's awareness of the disparate impact as well as the respondent's response as evidence of disparate treatment (intent). That is, HUD should make clear its understanding that the failure to take reasonable action in the face of a disparate impact that was known or that should have been known may be taken as evidence of discriminatory intent.

In §100.500(a) the language states that a practice has a discriminatory effect if it "actually or predictably" results in a disparate impact or creates, perpetuates, or increases segregation. In my experience, using the term "predictably" is extremely important as so many disparate impact cases (zoning, or occupancy rules, for example) relate to questions of which protected class group would be impacted rather than a claim that a specific named complaint or population (such as those on the waiting list for public housing) is directly impacted. In the cases of familial status, for example, even though only a particular complainant or one or more testers may be immediately impacted by a numeric occupancy standard, all households with children that do not conform to the standard are impacted in that the choice for housing for that population is limited by the policy.

Still, the question of what constitutes an acceptable demonstration of a population that "predictably" would be impacted is critically important. What is most important is to indicate that reasonable data on current or recent patterns of relevant protected and control populations that are taken

3

5

from one or more areas served by or comparable to the subject property should be considered as having what the banking regulatory agencies have labeled as a "refutable assumption" of legitimacy in establishing the prima facie case of a disparate impact. This would provide for the use of such commonly accepted sets of data as reports from the Census Bureau, while still providing the respondent with an opportunity to make a case that such data do not reasonably apply to the facts of the complaint. Moreover, lacking evidence of a change in patterns of occupancy, such data should be considered acceptable for cases where the impacted population does not presently exist, such as in a challenge to a zoning code or the case of the rejection of a request for a zoning change to build housing on a particular site.

If it is not possible or practical to include interpretations of proof or examples of data presumed to be acceptable as a demonstration of a prima facie case of a disparate impact in the regulation itself under the burden of proof language in §100.500(c), I would suggest that HUD place such interpretations in the preamble or introductory statement when it publishes the final rule – as I find commonly done by the banking regulatory agencies and as HUD has done in this announcement in terms of examples of prohibited practices and in the current regulations (especially in the sections dealing with handicapped issues and age restricted housing). While such introductory comments may not have the same force of law as the regulations themselves, they provide a clear support as to how the regulations are interpreted by the agency charged with drafting the regulations and charged with the lead in enforcement, including enforcement through its own Administrative procedures. Such language about the forms of evidence needs to state that the use of patterns from such sources as census data, the Home Mortgage Disclosure Act data, or HUD's data on the occupancy of subsidized housing units, for example, representing markets reasonably served by the respondent in the case can be used to demonstrate a "predictable" disparate impact.

Very truly yours,

Calvin Bradford, President
Calvin Bradford & Associates, Ltd.

4

Comment Submitted by John Ward, Inland Fair Housing and Mediation Board
Case 1:13-cv-00966 Document 40-1 Filed 08/08/14 Page 43 of 209
Page 1 of 1



**Document Details**

**Comment Submitted by John Ward, Inland Fair Housing and Mediation Board**

Document ID: HUD-2011-0138-0016    Document Type: Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

See attached file(s)

Attachments:

| Comment Submitted by John Ward, Inland Fair Housing and Mediation Board (At... | View Attachment: |
|---|---|

Title:
Comment Submitted by John Ward, Inland Fair Housing and Mediation Board (Attachment)



# Inland Fair Housing
# and Mediation Board

January 3, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01;** *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

Inland Fair Housing and Mediation Board (IFHMB) is writing to support HUD's proposed "Subpart G" regulation implementing the Fair Housing Act's discriminatory effects standard.

IFHMB is a non-profit fair housing agency that has served many communities in the Inland Empire area of Southern California—San Bernardino, Riverside, Imperial, and eastern Los Angeles counties--since 1980. We also provide home mortgage counseling, landlord tenant mediation, and other services for home owners, renters, and other consumers.

HUD's proposed regulation is necessary to ensure that housing opportunities are open to all. Our area's population has experienced incredible growth, both in numbers and diversity, over the last 30 years, and with that growth has come new challenges and concerns. We have encountered many examples of housing practices that may appear to be neutral or benign, but operate to limit the availability of housing to vulnerable classes of Americans.

For example, many of our cities have a shortage of rental housing units, so landlord occupancy limits have the effect of excluding families from living in communities of their choosing. Government policies have also limited housing opportunities. Zoning and household definitions can prevent people with disabilities from living in group home settings, which are often more therapeutic and less expensive than hospital and nursing care facilities. Lending and insurance underwriting guidelines may appear to be neutral but may be incorporating the effects of past redlining and other discriminatory practices.

The discriminatory effects standard encourages housing providers to develop objective and creative ways to achieve their economic objectives while promoting diversity. These providers, and government agencies, find that reasonable regulations are more effective at promoting healthy and diverse communities than over broad restrictions. In addition, the discriminatory effects standard benefits the democratic process by encouraging these local

City Center Building 10681 Foothill Blvd., Ste. 101 • Rancho Cucamonga, CA 91730
*Administration Suite 297*
(909) 984-2254 • (800) 321-0911 • Fax (909) 460-0274
www.inmedbd.com

governments to seek input from a variety of sources and formulate regulations in a thoughtful and deliberative manner.

We also want to express support for the burden-shifting approach to proving liability. This standard provides clear guidance to housing providers and government agencies in adopting rules and policies, and an objective method for courts to evaluate discriminatory effect claims.

We appreciate HUD's efforts to clarify this issue, and support the prompt adoption of Subpart G.

Very truly yours,

Lynne Anderson
Executive Director

2



# Comment Submitted by Denise McGranahan, Legal Aid Foundation of Los Angeles

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder** 

Comment Period Close
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0017

**Tracking Number:** 80f9508

## Comment

See attached file(s)

Document Informatio

**Date Posted:**
Jan 13, 2012

**Show More Details**

## Attachments (1)

Comment Submitted by Denise McGranahan, Legal Aid Foundation of Los Angeles (Attachment)

**View Attachment:** `PDF`



# Legal Aid Foundation of Los Angeles

**Santa Monica Office**
1640 5th Street, Suite 124
Santa Monica, CA 90401
Phone: (310) 899-6200
Fax: (310) 899-6208
www.lafla.org

**Other Office Locations:**
**Central Office,** 1550 W. 8th Street, Los Angeles, CA 90017  T: (213) 640-3881
**East Los Angeles Office,** 5228 Whittier Boulevard, Los Angeles, CA 90022  T: (213) 640-3883
**Long Beach Office,** 601 Pacific Avenue, Long Beach, CA 90802  T: (562) 435-3501
**South Los Angeles Office,** 7000 S. Broadway, Los Angeles, CA  90003  T: (213) 640-3988
**West Office,** 1102 Crenshaw Boulevard, Los Angeles, CA 90019  T: (323) 801-7989

Writer's Direct Line

Our File Number

January 12, 2012

Via Electronic Submission & Mail

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov
Re:  Docket No. FR-5508-P-01; Implementation of the Fair Housing Act's
Discriminatory Effects Standard

Dear Rules Docket Clerk:

I am writing on behalf of The Legal Aid Foundation of Los Angeles to express our strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard.

The Legal Aid Foundation of Los Angeles (LAFLA) is California's oldest and largest legal services program, with over 60 lawyers and approximately 100 additional staff members.  LAFLA is the largest law firm for poor and low-income individuals and families in California, providing free civil legal services for over 80 years to the Los Angeles metropolitan area, presently a community of over two million eligible clients.  LAFLA's mission is to achieve equal justice for poor and low-income people in greater Los Angeles. We change lives through direct representation, systems change and community education.  LAFLA provides a range of legal assistance to thousands of vulnerable tenants each year, including representation in cases such as unlawful detainers and affirmative actions for wrongful eviction, housing discrimination and uninhabitable conditions.  Most of our clients are members of classes protected under the Federal Fair Housing Amendments Act:  Minorities, families with children, and the disabled.

HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status.  In our work, we have encountered many examples of housing practices that are neutral on the surface, but destructive to the mission of fostering equal opportunity.

One such example is numerical occupancy limitations.  When such limitations are imposed by housing providers, they may have the effect of excluding families with minor children from housing.  This effect, even if not intended by the housing provider, runs counter to the goals of the Fair Housing Act.

*Working for Justice in Our Communities Since 1929*

LSC

Our clients are also adversely impacted by residency requirements, blocking of the construction of affordable housing, surcharges based on number of occupants, source of income restrictions, minimum income requirements, credit scoring, limitations on section 8, and other laws and policies.

HUD's proposed regulation provides clarity to housing providers, housing seekers, municipalities, and courts who may confront such policies in many different ways. The regulation not only clarifies the burden of proof in the context of litigation to the benefit of courts and litigants. It also will help to prevent litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of our agency.

We applaud HUD's efforts to provide guidance on the important issue of disparate effects under the Fair Housing Act and urge HUD to issue the final rule as soon as possible.

Very truly yours,

Denise McGranahan
Senior Attorney
Santa Monica Office

*Working for Justice in Our Communities Since 1929*

LSC



Document Details

Comment Submitted by Cory Kallheim, LeadingAge

**Document ID:** HUD-2011-0138-0018    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

— Comment Submitted by Cory Kallheim, LeadingAge (Attachment)    View Attachment:

Title:
Comment Submitted by Cory Kallheim, LeadingAge (Attachment)



January 13, 2012                                        **Submitted electronically**

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW, Room 10276
Washington, DC 20410

**Re: Docket No. FR 5508-P-01:** Implementation of the Fair Housing Act's Discriminatory
 Effects Standard

To Whom It May Concern:

LeadingAge (formerly the American Association of Homes and Services for the Aging-AAHSA)
appreciates the opportunity to comment on this proposed regulation.  The members of
LeadingAge (www.LeadingAge.org) serve as many as two million people every day through
mission-driven, not-for-profit organizations dedicated to expanding the world of possibilities for
aging.  Our 5,700 members, many of which have served their communities for generations, offer
the continuum of aging services: adult day services, home health, community services, senior
housing, assisted living residences, continuing care retirement communities and nursing homes.
Together, we advance policies, promote practices and conduct research that supports, enables
and empowers people to live fully as they age.  LeadingAge's commitment is to create the future
of aging services through quality people can trust.

We believe that HUD should withdraw the proposed rule on Implementation of the Fair Housing
Act's Discriminatory Effects Standard (Proposed Rule) pending the resolution of the *Magner v.
Gallagher* fair housing case currently before the United State Supreme Court.  *Gallagher v.
Magner*, 619 F.3rd 832 (8th Cir. 2010); Supreme Court Docket No. 10-1032.

On November 7, 2011, the United States Supreme Court agreed to hear the *Magner v. Gallagher*
case, which presents the question of whether disparate impact claims are cognizable under the
Fair Housing Act and, if so, what standard should be used to analyze such claims.  Oral argument
on the *Magner v. Gallagher* case is scheduled for February 29, 2012.

The Proposed Rule, published in the Federal Register on November 16, 2011, purports to
"establish uniform standards for determining when a housing practice with a discriminatory
effect violates the Fair Housing Act."  Citing differences between HUD's three-step burden-
shifting approach and various Federal courts of appeals standards (three-step test, multi-factor

2519 Connecticut Ave., NW | Washington, DC 20008-1520
P  202.783.2242  |  F  202.783.2255  |  LeadingAge.org

*Expanding the world of possibilities for aging.*



Regulations Division
Office of General Counsel, HUD
January 13, 2012
Page 2

balancing test, and different tests for private and public defendants) HUD proposes a burden-shifting approach as the uniform standard to establish liability for facially neutral housing practices that have a discriminatory effect. HUD solicits comments on its proposed three-step burden approach.

HUD's Proposed Rule, published shortly after the Supreme Court decision to hear the *Magner v. Gallagher* case, is at best premature. This is the first time HUD has issued a proposed rule on this issue despite having years to do so. Publishing a proposed rule and soliciting public comment on it while an action is pending before the Supreme Court is a waste of time and resources for the agency and stakeholders because the Supreme Court will ultimately decide whether the Fair Housing Act allows claims for disparate impact and what standard should be applied. The Solicitor General has filed a brief as *amicus curiae* in the *Magner v. Gallagher* case and that is the appropriate forum for HUD to express its views, rather than publish a proposed rule. Any final rule HUD adopts would be subject to legal challenge if it violates the law. Therefore, HUD should withdraw the Proposed Rule until the Supreme Court decides the *Magner v. Gallagher* case.

The merits of the Proposed Rule do not warrant comment until the Supreme Court issues its decision in *Magner v. Gallagher*. If HUD wishes to republish a rule at that time, LeadingAge would be happy to submit comments on it.

LeadingAge appreciates the opportunity to comment on this proposed rule. We hope our comments will be helpful to you.

Please do not hesitate to contact us if you have any questions.

Sincerely,


Cory Kallheim                          Colleen Bloom
Director, Legal Affairs                Associate Director for Housing Operations
LeadingAge                             LeadingAge
ckallheim@leadingage.org               cbloom@leadingage.org

## Document Details

SHARE

### Comment Submitted by Bill Hirsh, AIDS Legal Referral Panel

**Document ID:** HUD-2011-0138-0019    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

As an advocate for equal opportunity in housing, I am writing in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. ALRP provides legal services to people living with HIV/AIDS. Housing is the biggest issue our clients face. HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status. In our work, we have encountered many examples of housing practices that are neutral on the surface, but destructive to the mission of fostering equal opportunity. A classic example is a rule that does not allow for tenants to have a companion animal. HUD's proposed regulation provides clarity to housing providers, housing seekers, municipalities, and courts who may confront such policies in many different ways. The regulation not only clarifies the burden of proof in the context of litigation to the benefit of courts and litigants. It also will help to prevent litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of our agency. We applaud HUD's efforts to provide guidance on the important issue of disparate effects under the Fair Housing Act and urge HUD to issue the final rule as soon as possible.

# PUBLIC SUBMISSION

**As of:** 1/18/12 2:48 PM
**Tracking No.** 80f94ec0
**Comments Due:** January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0019
Comment Submitted by Bill Hirsh, AIDS Legal Referral Panel

---

## Submitter Information

---

## General Comment

As an advocate for equal opportunity in housing, I am writing in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. ALRP provides legal services to people living with HIV/AIDS. Housing is the biggest issue our clients face.

HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status. In our work, we have encountered many examples of housing practices that are neutral on the surface, but destructive to the mission of fostering equal opportunity. A classic example is a rule that does not allow for tenants to have a companion animal.

HUD's proposed regulation provides clarity to housing providers, housing seekers, municipalities, and courts who may confront such policies in many different ways. The regulation not only clarifies the burden of proof in the context of litigation to the benefit of courts and litigants. It also will help to prevent litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of our agency.

We applaud HUD's efforts to provide guidance on the important issue of disparate effects under the Fair Housing Act and urge HUD to issue the final rule as soon as possible.



January 13, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

    **Re: Docket No. FR-5508-P-01;** *Implementation of the Fair Housing Act's*
    *Discriminatory Effects Standard*

Dear Rules Docket Clerk:

On behalf of the Technical Assistance Collaborative (TAC), we write in strong support of
HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects
standard. TAC is a national non-profit organization that advances proven solutions to the
housing and community support needs of vulnerable low-income people with significant and
long-term disabilities. HUD's proposed regulation is an important and necessary step in ensuring
that the nation's housing is available to all, regardless of protected class status.

The breadth of complaints filed with HUD's Office of Fair Housing and Equal Opportunity and
litigation relying on disparate impact claims bought by private enforcers of the Act illustrates the
importance of such claims to achieving the "policy of the United States to provide within
constitutional limitations, for fair housing throughout the United States." 42 U.S.C. 3601.
Examples are numerous and far-reaching and include the following rules, policies, and actions
that contribute to discrimination on the basis of disability.

- Apparently neutral rules that unintentionally result in less favorable treatment of one
  individual or a group because of disability, or because of a particular type of disability, or
  because of severity of disability. Examples include "capable of independent living"
  admission criteria that are so subjective that they are applied inconsistently by different
  staff in the same organization and result in both illegal denials of housing and charges of
  discrimination against housing providers.

- Apparently neutral rules that are not based on disability but that nonetheless result in
  disparate, adverse outcomes for individuals with disabilities. For example, a housing
  provider who refuses to process rental applications without drivers' licenses is making
  housing unavailable to individuals with visual disabilities and others whose disabilities
  prevent them from acquiring drivers' licenses. Similar policies requiring that rental
  applicants earn 3x the rent, refuse to process applications from applicants with co-signors
  or from applicants who are not employed all result in disparate, adverse outcomes for
  individuals with disabilities.

1

- Zoning ordinances that permit only households whose members are related by blood or marriage to occupy homes in single family neighborhoods but not individuals with mental and physical disabilities who choose to share a home and create a household.

- Criminal arrest and eviction records that have a disparate impact on African Americans, Hispanics and homeless individuals, with and without disabilities, that are used to deny housing to otherwise eligible and qualified applicants;

- Zoning and land-use policies and decisions which restrict construction of multifamily housing to a largely minority area or block or limit development of affordable housing in communities of opportunity, resulting in both discriminatory denial of housing to minorities, the continued institutionalization of individuals with disabilities who are ready to move back to their communities, and the perpetuation and/or exacerbation of residential segregation;

- Residency requirements and other admissions procedures imposed by public housing agencies or housing management firms in predominantly white and high opportunity communities which discriminate against minority persons, with and without disabilities who are not living in such communities including, individuals with disabilities living unnecessarily and at great cost to the State, in institutions, nursing homes, and other congregate

- Policies requiring that tenants walk unassisted or hear or speak or speak English or be United States citizens.

In each of these contexts, the discriminatory effects standard has proven to be a valuable tool in assessing when policies have an adverse impact on members of a protected class, and whether these policies are necessary to achieve a legitimate goal that cannot be achieved through less discriminatory means. This type of assessment is an essential part of our fair housing enforcement system, and the proposed rule will ensure that the standard continues to be applied consistently across the country.

An often overlooked benefit of the disparate effects test is its ability to give HUD and private Fair Housing advocates the tools to reveal the effects of racism, poverty, disability discrimination, and adverse environmental conditions on the health and well-being of individuals protected by the law. The disparate impact analysis is critical to environmental justice investigations and it has led to corrective action through education as well as litigation.

As the Surgeon General reported,

> Ethnic and racial minorities in the United States face a social and economic environment of inequality that includes greater exposure to racism, discrimination, violence, and poverty. Living in poverty has the most measurable effect on the rates of mental illness. People in the lowest strata of income, education, and occupation (known as socioeconomic status) are about two to three times more likely than those in the highest strata to have a mental disorder.

2

4

*Mental Health: Culture, Race, and Ethnicity:A Supplement to Mental Health: A Report of the Surgeon General*
        http://www.surgeongeneral.gov/library/mentalhealth/cre/execsummary-6.html.

While no government agency would purposely place any residents in danger, competing interests sometimes lead to harmful and discriminatory results that both result in injuries, disabilities and the exacerbation of the symptoms of illnesses and disabilities.  The disparate impact rule will continue to be an important tool for both avoiding and correcting such outcomes.

We applaud HUD's proposal to provide a long needed regulation on the propriety of disparate impact claims under the Fair Housing Act and to clarify the burden of proof under this standard. This regulation will foster the goals of the Fair Housing Act and benefit people with disabilities. It provides a national standard for courts, housing providers, municipalities and the financial and insurance industries.  These issues are now being considered by the Supreme Court and we urge HUD to issue the final rule as soon as possible to provide the Court definitive agency interpretation concerning these issues.


Very truly yours,

Technical Assistance Collaborative

3

Comment Submitted by Erin Kemple, Connecticut Fair Housing Center          Page 1 of 1



**Document Details**

SHARE

**Comment Submitted by Erin Kemple, Connecticut Fair Housing Center**

Document ID: HUD-2011-0138-0021    Document Type: Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

See attached file(s)

**Attachments:**

— Comment Submitted by Erin Kemple, Connecticut Fair Housing Center (Attachme...        View Attachment:

Title:
Comment Submitted by Erin Kemple, Connecticut Fair Housing Center (Attachment)



**Connecticut**
**Fair Housing Center**

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Connecticut Fair Housing Center (hereinafter "the Center") supports the Department's
efforts to establish standards for determining when a housing practice with a discriminatory
effect violates the Fair Housing Act. The Department has requested comments on the issue of
which party bears the burden of proof to establish a less discriminatory alternative. For the
reasons set out below, we respectfully suggest that the burden of proof as set out in the proposed
regulation be assigned to the defendant or respondent to show that it has "a legitimate, bona fide
. . . interest and that no alternative would serve that interest with less discriminatory effect."
*Gashi et al. v. Grubb & Ellis, et al.,* (Connecticut Federal District Court, Case 3:09-cv-01037-
JCH)(June 23, 2011) (hereinafter *"Gashi"* or *"the Gashi case"*).

The Connecticut Fair Housing Center is a statewide non-profit organization dedicated to
ensuring that individual choice, and not discrimination, determines where people live in
Connecticut. Because housing discrimination has a disproportionate effect on people with low
incomes, we place a particular focus on the intersection of poverty and discrimination. To
accomplish this, the Center takes complaints from people who believe they have been the victim
of housing discrimination, conducts investigations into individual complaints as well as to assess
whether there is discrimination in the housing market, represents the victims of housing
discrimination in filing complaints, provides education on the fair housing laws to both housing
providers and those who may be searching for housing, and works with state and local policy
makers to promote housing integration.

Each year, the Center receives more than 40 complaints from families with children searching
for appropriate housing. Often these families are looking for housing in safe neighborhoods with
high performing schools. Unfortunately, the housing in such neighborhoods is expensive and a
housing provider's occupancy restrictions often prevent the family from moving into an

221 Main Street, 4th Floor • Hartford, CT • 06106
860-247-4400 (Hartford) • 888-247-4401 (Toll Free)
860-247-4236 (fax)
www.ctfairhousing.org

affordable unit. In one such case, *Gashi v. Ellis*, our clients, Drita and Florim Gashi, lived in a one-bedroom condominium they owned in Stamford, CT. After having their first child, the couple received a letter from the condominium association informing them they were in violation of the two-person per bedroom occupancy requirement and that if they did not vacate the premises, they would be fined $500 per month. As a result, the Gashis sold their condominium at a loss. Since the housing market in Stamford was very expensive, the couple's new home cost significantly more than the condominium they sold.

The Center brought a fair housing lawsuit on behalf of the Gashis alleging that the two-person per bedroom rule had a disparate impact on families with children. In June 2011, the Connecticut Federal District Court issued a decision granting the Gashi's motion for summary judgment. In that decision, the Court held that to prevail on a disparate impact claim under the FHA, plaintiffs must first show that the challenged policy has a discriminatory effect, in that it actually or predictably results in discrimination. Once the discriminatory impact is shown by the plaintiffs, the Court held that the burden then shifts to the defendant to

> prove that its actions furthered "a legitimate, bona fide . . . interest and that no alternative would serve that interest with less discriminatory effect." *Huntington Branch NAACP v. Huntington*, 844 F.2d 926 at 936 (2nd Cir. 1988). The court generally views "subjective rationales" skeptically; however, if the defendant presents objective evidence to support his assertions, the court is less wary of subjective explanations. See *Soules v. HUD*, 967 F.2d 817, 822 (2d Cir. 1992). After the defendant presents a legitimate justification, the court must weigh the defendant's justification against the degree of adverse effect shown by the plaintiff. See *Huntington Branch*, 844 F.2d at 937. *Gashi* at 4.

We urge HUD to adopt the "legitimate bona fide" business standard set out by the Second Circuit in *Gashi* and the cases cited therein. The defendants in *Gashi* attempted to set out such a reason by arguing that the Stamford Fire Code required such a standard. However, the Court held that this assertion was not supported by the Fire Code and that mere assertions without more did not meet the defendants' burden of proof. Adopting the standard in the proposed regulation may have permitted the defendants in the *Gashi* case to meet its burden of proof and thus defeat the Gashi's fair housing claims. Instead, the parties have reached an agreement that includes the condominium association dropping its restrictive occupancy standards thus opening 150 units of housing to families with children.

In addition, the Center wishes to reiterate that we are in full support of the National Fair Housing Alliance's comment letter.

2

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact Erin Kemple at (860)247-4400, ext. 0723 or at erin@ctfairhousing.org with any questions.

Very truly yours,

Erin Kemple
Executive Director

3



## Comment Submitted by Marlene Zarfes, Westchester Residential Opportunities, Inc.

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: <u>FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard</u>

For related information, <u>Open Docket Folder</u> 

**Comment Period Closed**
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0022
**Tracking Number:** 80f9625

### Comment

See attached file(s)

## Document Information

**Date Posted:**
Jan 13, 2012

**Show More Details** ⊡

### Attachments (2)

Comment Submitted by Marlene Zarfes, Westchester Residential Opportunities, Inc. (Attachment 1)

**View Attachment:** [PDF]

Comment Submitted by Marlene Zarfes, Westchester Residential Opportunities, Inc. (Attachment 2)

**View Attachment:**  



**Westchester Residential Opportunities, Inc.**

470 Mamaroneck Avenue • Suite 410
White Plains, New York 10605
www.wroinc.org

(914) 428-4507 P
(914) 428-9455 F
housinghelp@wroinc.org

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

Westchester Residential Opportunities, Inc. supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

Westchester Residential Opportunities, Inc. (WRO) is a 43 year old non-profit organization whose mission is to promote equal, affordable and accessible housing opportunities for all residents of our region. WRO has championed the expansion of non-discriminatory housing opportunities in the Westchester region for low- and moderate-income households, minorities, senior citizens and persons with disabilities, including the psychiatrically disabled. WRO is a HUD-certified Housing Counseling Agency, a licensed real estate broker and a United Way

• Fair Housing
• Homebuying
• Senior Housing
• Rental Opportunities
• Homelessness Prevention
• Independent Living and Shelter Plus Care

National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 2

agency. All of our housing services for consumers are free, and are funded by government
grants, private contributions and corporate support.

We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair
Housing Act's discriminatory effect standard.  We again commend the Department for
promulgating the proposed regulations implementing the discriminatory effect standard under the
Fair Housing Act.  Please contact Marlene Zarfes, Fair Housing Director, at (914) 428-4507
x306 or mzarfes@wroinc.org with any questions.

Sincerely,



*TO BE SUBMITTED ON NFHA LETTERHEAD*

January 13, 2012

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

      The National Fair Housing Alliance ("NFHA"), its members and the other organizations
signed below commend the Department for its publication of a proposed regulation
implementing the discriminatory effect standard under the Fair Housing Act ("FHA"), and
submit the following comments and recommendations regarding that regulation.

      Founded in 1988, NFHA is a consortium of more than 220 private, non-profit
organizations, state and local civil rights agencies and individuals from throughout the United
States.  Headquartered in Washington D.C., NFHA, through comprehensive education,
advocacy, and enforcement programs, provides equal access to apartments, houses, mortgage
loans and insurance policies for all residents of the nation.

      We supports the Department's efforts to establish standards for determining when a
housing practice with a discriminatory effect violates the FHA.  The proposed rule effectuates
the broad remedial effect intended by Congress and furthers the statutory goal of providing,
"within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. §
3601; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (noting the "broad remedial
intent of Congress embodied in the Act").  For many years, we have encouraged the Department
to adopt regulations implementing the discriminatory effect standard and requests that the
Department act promptly to enact the regulations.

      In the more than forty years since the FHA was passed, a strong consensus has developed
among the courts that the FHA includes a disparate impact standard. *See, e.g., Mt. Holly
Gardens Citizens in Action v. Township of Mount Holly*, 658 F.3d 375, 384 (3d Cir. 2011) ("All
of the courts of appeal that have considered the matter . . . have concluded that plaintiffs can
show the FHA has been violated through policies that have a disparate impact. . . ."). As federal
courts have consistently held, "[i]n disparate impact cases, [e]ffect, not motivation, is the
touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful
scheme." *Id*. at 385 (quoting *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976).

National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 2

The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921, 70925 (proposed Nov. 16, 2011) (to be codified 24 C.F.R. § 100.500(c)(3)). Where the burden is apportioned is often a critical issue that has the potential to affect the outcome of fair housing cases and overall enforcement of the FHA and state and local fair housing laws. The dispute in disparate impact cases under the FHA often focuses on the determination of whether a less discriminatory alternative exists. *See, e.g.,* *Mt. Holly,* 658 F.3d at 385 (indicating that this step in the analysis determines "whether a person is being deprived of his lawful rights because of his race").

We must observe that the proposed rule places the burden of proof upon the plaintiff or complainant to demonstrate a less discriminatory alternative. Proposed § 100.500(c)(3) states that "[i]f the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the complainant or plaintiff may still prevail upon demonstrating that the legitimate, nondiscriminatory interests supporting the challenged practice can be served by another practice that has a less discriminatory effect." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. at 70927.

We respectfully suggest that the burden of proof should be assigned to the defendant or respondent to show that there is no less discriminatory alternative. The proposed rule observes that judicial interpretations of the FHA and the burden of proof Congress assigned to disparate impact employment discrimination cases support assigning the burden of proof to plaintiffs or complainants. *Id.* at 70925. In fact, federal courts are split on the issue of which party bears the burden of proof to demonstrate a less discriminatory alternative and reliance on Title VII standards is inappropriate because of the unique nature of less discriminatory alternatives in FHA cases. Furthermore, a defendant/respondent is in a far superior position to bear the burden of proof on this issue.

First, there is no unanimity among the courts that have addressed the question of which party should have the burden of proof regarding less discriminatory alternatives. Many federal courts have held that the defendant/respondent has the burden of proof to demonstrate that there is no less discriminatory alternative. *See e.g. Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 939 (2d Cir. 1988) (a defendant must show that there are no less discriminatory alternatives available); *Mt. Holly,* 658 F.3d at 385 (holding that defendants have the burden of showing that there is no less discriminatory alternative and that "[o]nly when the defendants make this showing does the burden shift back to the plaintiffs—where it ultimately remains—to provide evidence of such an alternative"); *Langlois v. Abington Hous. Auth.,* 207 F.3d 43, 50 (1st Cir. 2000) (affirming the district court's decision holding that the defendant failed to show a less discriminatory alternative); *Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs,* 749 F. Supp. 2d 486, 503 (N.D. Tex. 2010); *Dews v. Town of Sunnyvale,* 109 F. Supp. 2d 526, 565 (N.D. Tex. 2000).

Second, courts have rejected the lockstep importation of Title VII principles into the determination of which party bears the burden of establishing a less discriminatory alternative. As the Third Circuit explained in *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 148 (3d Cir.

National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 3

1977), "[l]ooking to Title VII for the correct standard for rebuttal of a prima facie case, we note that the 'business necessity' test employed in Title VII job discrimination cases, *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), is of somewhat uncertain application in Title VIII cases." *Id.* The Third Circuit explained that less discriminatory alternatives are far easier to identify and quantify in a Title VII case, noting that "the job-related qualities which might legitimately bar a Title VII-protected employee from employment will be much more susceptible to definition and quantification than any attempted justification of discriminatory housing practices under Title VIII." *Id.; see also, Huntington*, 844 F.2d at 937-38 (stating that "in Title VIII cases there is no single objective like job performance to which the legitimacy of the facially neutral rule may be related" and that a defendant's justifications are "normally based on a variety of circumstances" in zoning cases under the FHA); *Langlois*, 207 F.3d at 51 (noting that "a single criterion-like the relationship of the test to job performance used under Title VII-is hardly possible" under the FHA). Thus, both the qualitative and quantitative nature of less discriminatory alternatives in FHA cases supports assigning the burden of proof to the defendant or respondent.

Finally, the burden of proof to establish a less discriminatory alternative in a FHA case should be assigned to the defendant/respondent for a more practical reason – that party almost always has superior knowledge of the less discriminatory alternatives available and whether the alternatives meet its business objectives. The test to determine a less discriminatory alternative asks whether an alternative imposes "an undue hardship under the circumstances of the specific case" on the defendant or respondent. *Mt. Holly*, 658 F.3d at 386. The test is similar to the rebuttal burden imposed on a defendant or respondent in a reasonable accommodation case. *Id.*

In assessing who should have the burden in FHA cases, courts have permitted shifting the burden to the party for whom the proof was the easiest. *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1291, 1295 n. 16 (7th Cir. 1977) (holding that the burden to identify parcels of land that were appropriate for the development of multi-family housing was on the defendant municipality because "[i]t is far easier for defendant to show that a single parcel of land which is suitable does exist than for plaintiffs to show that no suitable land exists" and that allocating the burdens any other way "would compel plaintiffs to attempt the impossible task of proving a negative"). The defendant/respondent generally has far superior knowledge of the alternative practices available to meet its legitimate objectives and is in a far better position to assess whether an alternative imposes an undue hardship upon it in the particular circumstances of the case and is consistent with its goals.

For example, in cases challenging zoning policies or practices as having a disparate impact on people of color, the municipal defendant will unquestionably have superior knowledge about the existence and feasibility of alternative approaches that might achieve its permissible objectives with less discriminatory impact on protected classes. Plaintiffs will rarely be in a position to conduct such an assessment because they will lack information and be outside the political decision-making process. In such a case, logic would dictate imposing the burden on local government to identify such alternatives and to articulate why they would not achieve its objectives.

7

National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 4

      In litigation involving insurance or lending—where private companies scrupulously protect proprietary information such as credit scores, actuarial data and risk assessment—there is an even stronger rationale for imposing the burden on the defendant, whose knowledge will be vastly superior to that of a plaintiff and who will uniquely possess information with respect to less discriminatory alternatives.

      Beyond the litigation context, the policy embedded in the HUD final rule should incentivize and encourage insurers and lenders who build and use statistical models to look at alternative models and variables to make certain that they adopt the most predictive models that have the least discriminatory impact (and thus avoid litigation altogether). Placing the burden on these private parties will have salutary business and public policy effects as well: By requiring them to actually look at such alternatives, they may find and implement less discriminatory approaches that are equally (or even more) predictive of business risk that they would not otherwise have explored.

      For the reasons outlined above, we urge the Department to revise the proposed rule to impose the burden on the defendant/respondent in the final step of the disparate impact analysis.

      Thank you for the opportunity to comment on the proposed regulation implementing the FHA's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the FHA. Please contact Lisa Rice at 202.898.1661 or lrice@nationalfairhousing.org with any questions.

Sincerely,

National Fair Housing Alliance





January 13, 2012

**VIA ONLINE SUBMISSION**

Regulations Division, Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW Room 10276
Washington, DC 20410

Re:     Docket No. FR-5508-P-01, 24 CFR Part 100, *Proposed Rule Regarding Fair Housing
          Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

The Apartment Association of South Central Wisconsin ("AASCW") is writing to comment on the
proposed rule establishing uniform standards for determining when a housing practice has a
discriminatory effect or results in a disparate impact which violates the Fair Housing Act.
AASCW is an organization comprised of rental property owners, property managers, industry
providers, housing related non-profit organizations, officials and government agencies involved
in the rental housing industry.  AASCW members are committed to providing and maintaining
rental housing providing residents with health and life safety, with the human values of pride,
dignity and security. AASCW has a particular interest in ensuring the proposed rule includes a
provision protecting tenant screening tools utilized by property owners and managers to ensure
affordable and safe housing.

HUD has proposed adding a new subpart G to its Fair Housing Act regulations in 24 CFR part
100, entitled "Prohibiting Discriminatory Effects". It is our understanding the new subpart
codifies the three step burden-shifting approach used by many Federal courts for determining
liability under the Fair Housing Act for practices which have a discriminatory effect (or result in a
disparate impact).  Under the proposed rule, a plaintiff must establish a *prima facie* case of
discriminatory effect, then the burden shifts to the defendant to prove the challenged practice
has a necessary and manifest relationship to one or more legitimate, nondiscriminatory
interests.   The burden then shifts back to the plaintiff to demonstrate the legitimate,
nondiscriminatory interests could be served by a different policy or practice which would
produce a less discriminatory effect.   AASCW supports implementation of uniform standards
and consistent application of those standards.

AASCW would like to see protections added to the rule for tenant screening criteria within the
proposed codification of the standard for showing a challenged practice has a "necessary and
manifest relationship to one or more legitimate, nondiscriminatory interests" under new Sec.
100.500(b).  AASCW advises its property owners and managers on the use of effective tenant
screening criteria, including review of prior rental history, credit checks, income verification, and
court records.  These screening criteria promote safe housing and help control housing costs,
allowing housing providers to evaluate tenants and applicants in a way that effectively identifies
individuals who do not pose a threat to others in the immediate community and with a
demonstrated ability to meet their rent obligations.  High levels of rent delinquency create higher
housing costs for all tenants.   Providing safe and affordable rental housing are legitimate,
nondiscriminatory interests that promote strong families and communities.  Screening tenants is
a narrowly tailored tool allowing rental property owners and managers to promote those
interests. *See, e.g., Sutton v. Freedom Square Limited*, 2008 U.S. Dist. LEXIS 81600 (E.D.
Mich. Oct 15, 2008); *aff'd, Sutton v. Piper*, 2009 U.S. App. LEXIS 17201 (6th Cir. Mich. 2009).

AASCW requests HUD include a provision in the proposed new Sec. 100.500(b) codifying examples of tenant screening criteria presumed to be "Legally Sufficient Justifications," unless a plaintiff can show the screening practices are merely a pretext for discrimination. These examples should include requests for and/or review of the following information from current or prospective tenants: rental history, credit checks, income verification, and court records. Codification of these legitimate screening criteria will provide clear guidance to residential rental property providers, as well as to courts and administrative agencies, and create consistent expectations. AASCW seeks to promote safe and sustainable housing for families and communities. AASCW hopes the information and recommendations above will assist HUD in its evaluation and creation of the new proposed rule, including a provision that protects landlords and property managers screening tools used to promote safe and affordable housing. We are happy to provide any further assistance or information that might be helpful to HUD's creation and implementation of the new proposed rule.

Sincerely,

**Apartment Association of South Central Wisconsin**



Document Details

Comment Submitted by Robert Hatch, Financial Services Roundtable

Document ID: HUD-2011-0138-0024    Document Type: Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

Please see the attached comment letter

Attachments:

Comment Submitted by Robert Hatch, Financial Services Roundtable (Attachmen...    View Attachment:

Title:
Comment Submitted by Robert Hatch, Financial Services Roundtable (Attachment)

# THE FINANCIAL SERVICES ROUNDTABLE

*Financing America's Economy*





**HPC**
HOUSING
POLICY
COUNCIL

January 13, 2012

Submitted via http://www.regulations.gov

Regulations Division, Office of General Counsel
Department of Housing and Urban Development
451 Seventh Street SW
Room 10276
Washington, DC  20410

**Re: Docket No. FR-5508-P-01, Implementation of the Fair Housing Act's Discriminatory Effects Standard**

Dear Madam / Sir:

The Financial Services Roundtable[1] (the "Roundtable") and its Housing Policy Council[2] ("HPC") welcome the opportunity to comment on the Department of Housing and Urban Development's ("HUD") proposed amendment (the "Proposal") to its regulation implementing Title VIII of the Civil Rights Act of 1968, as amended (the "Fair Housing Act").[3]

HUD has proposed to amend several provisions of its existing regulation, which is found at 24 CFR Part 100, and to add a new Subpart G to that regulation, which would prohibit housing practices that have discriminatory effects.

---

[1] The Financial Services Roundtable represents 100 of the largest integrated financial services companies providing banking, insurance, and investment products and services to the American consumer. Member companies participate through the Chief Executive Officer and other senior executives nominated by the CEO. Roundtable member companies account directly for $92.7 trillion in managed assets, $1.1 trillion in revenue, and 2.3 million jobs.
[2] The Housing Policy Council is made up of thirty-two companies that are among the nation's leaders in mortgage finance and originate seventy-five percent of the mortgages for American home buyers.  HPC members participate in the Council through the company's senior mortgage executive.
[3] 76 Fed. Reg. 70921.

3

Financial Services Roundtable / Housing Policy Council
Docket No. FR-5508-P-01
Page 2 of 3

**I.  We urge HUD to extend the comment period on the Proposal until after the Supreme Court renders its decision in *Magner v. Gallagher* to prevent unnecessary confusion and cost for all parties.**

The Roundtable, HPC and our members have supported the objectives of the Fair Housing Act since its enactment and strongly oppose discrimination based on race, color, religion, sex, disability, or familial status.  As you know, the Supreme Court currently is reviewing the precise scope of the Fair Housing Act and many of the same issues that are found in the Proposal. *Magner v. Gallagher* is scheduled for argument on February 29, 2012, and we respectfully request that HUD act immediately to extend the comment period on the Proposal until the Supreme Court renders its decision in that case.

Finalizing the Proposal before the Supreme Court issues its opinion will create legal and business uncertainty and require financial services companies subject to the Proposal to undertake a costly and time-intensive review of their policies and procedures.  When the Supreme Court issues its opinion, it is likely that the rulemaking process and the compliance process will have to be repeated.  Extending the comment period on the Proposal until after the Supreme Court acts will avoid unnecessary expense and burden for those protected by the Fair Housing Act and those subject to the Act's requirements.

Should the Supreme Court decide that a disparate impact review is required under the Fair Housing Act, we would welcome the opportunity to work with HUD to develop clear and unambiguous guidance for lenders so consumers may obtain the maximum possible access to housing credit.

**II.  Fair Housing Act guidance must be clear and unambiguous.**

We believe that clear and unambiguous guidance will promote understanding of and compliance with the Fair Housing Act. Lack of clarity or uncertainty in the standards will create needless confusion, false expectations, and costly and unnecessary litigation.

Should a disparate impact review be required, we believe that a three-step burden shifting approach has merit, especially one that can be clearly understood and faithfully followed in the context of a lender's ongoing business and not merely after the fact.

Step one should require the complaining party to establish that the lender's conduct caused a substantial adverse impact on a protected class. This step should not be satisfied simply by presenting statistics that show that a protected class, on an aggregate basis, has not received as many loans as the general population.  The comparison should be between the composition of the population of recipients of home-secured loans and the composition of the qualified population of applicants for home-secured loans in the relevant market. The complainant should be responsible for identifying a specific practice of the lender and showing that any disparity is statistically significant and the result of that specific practice.

2

4

Financial Services Roundtable / Housing Policy Council
Docket No. FR-5508-P-01
Page 3 of 3

In addition, step one should require the complaining party to show that he or she fits within the affected set of borrowers, and that the lender's specific practice resulted in damage specific to the complainant.

In step two, the lender should have the opportunity to show that the challenged practice did not cause a significantly disparate impact or that the practice in question is demonstrably and statistically related to a legitimate non-discriminatory purpose. The test should be whether the practice has a legitimate business purpose, not that the practice is necessary and manifestly related to one or more legitimate business purposes. While the lender bears the burden of showing the business reason why the practice was used, the complainant should carry the burden of persuasion to show that the challenged practice did not significantly serve the lender's legitimate goals.

In step three, the complainant should have an opportunity to show that the lender could have used an alternative, equally effective practice, to meet its legitimate business objectives, which would not have caused a significantly adverse impact.

### III.  Conclusion

Since the Supreme Court's opinion in the *Magner* case is likely to provide guidance on these matters, we again encourage HUD to delay any further action on the Proposal until the Supreme Court renders its decision in that case.

Thank you again for the opportunity to comment on this important matter.  If you have questions regarding our comments, please contact Anne Wallace, anne@fsround.org, 202.589.1936; or Richard Foster, Richard.foster@fsround.org, 202.589.2424.


Steve Bartlett
President & CEO
The Financial Services Roundtable

John H. Dalton
President
Housing Policy Council

3





**EAST BAY**
**COMMUNITY**
**LAW CENTER**

January 13, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

> Re:   Docket No. FR-5508-P-01; *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

I write on behalf of the East Bay Community Law Center to express our strong support for HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard.   The East Bay Community Law Center is committed to eliminating housing discrimination through the work of its housing practice.

Contemporary housing discrimination can take many forms, elusive and sinister: historically obvious, embedded in our unconscious, by proxy, or in effect only.   This latter type of "racism without racists" is especially important to combat if we are to further the broad societal goals of eliminating housing discrimination as described in Title VIII of the Civil Rights Act of 1968, the Fair Housing Act.   In situations when actors lack discriminatory intent yet their actions produce discriminatory effects, holding those actors accountable not only best serves these goals but provides a critical voice for the unheard who must suffer the consequences of these actions.

The complex nature of our legal system limits access to justice, especially for people in poverty and those faced with language and cultural barriers.   The disparate impact cause of action gives a voice to this integral part of our community and provides a necessary tool for translating their needs into progressive social change.

HUD should continue to follow established caselaw in both the housing and employment contexts as well as its own standards and implement its Fair Housing Act's discriminatory effects standard as proposed. HUD's proposed regulation provides clarity to housing providers, housing seekers, municipalities, and courts who may confront such policies in many different ways.   The regulation clarifies the burden of proof in the context of litigation to the benefit of courts and litigants. It will also help to prevent

2921 Adeline Street, Berkeley, CA 94703
/510.548.4040   /510.548.2566   www.ebclc.org



**EAST BAY COMMUNITY LAW CENTER**

litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of EBCLC.

We are encouraged by HUD's efforts to provide guidance on this important issue of disparate effects under the Fair Housing Act and urge HUD to issue the final rule as proposed, with no major changes. HUD possesses a unique capacity for leadership in this area and it is inspiring to see proposed regulations that simultaneously mirror established caselaw and expectations, advance the broader goals of the Fair Housing Act, and parallel EBCLC's mission of providing equal access to justice.

Sincerely,

Noah Frigault
Fair Housing Fellow

Laura Lane
Housing Clinic Director

2921 Adeline Street, Berkeley, CA 94703
/510.548.4040  /510.548.2566  www.ebclc.org



The Regulations.gov hosting facility will undergo scheduled maintenance and as a result Regulations.gov will be unavailable Monday, August 5 beginning at 6pm lasting until Tuesday morning at 8am (ET).



## Comment Submitted by Glen Corso, Managing Director, Community Mortgage Banking Project

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: <u>FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard</u>

For related information, **Open Docket Folder**

Comment Period Closed
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0026
**Tracking Number:** 80f9637

### Comment

Attached please find comments submitted by the Community Mortgage Banking Project in response to HUD Docket # FR-5508-P-01.

Document Information

**Date Posted:**
Jan 16, 2012

Show More Details

### Attachments (1)

CMBP comment letter to HUD -- final with attachments

**View Attachment:**  PDF

# Community Mortgage Banking Project

January 13, 2012

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 7th Street S.W., Room 10276
Washington, DC 20410

      **RE:**    **Proposed Rule Regarding Implementation of the Fair Housing Act's
               Discriminatory Effects Standard (Docket No. FR-5508-P-01)**

To whom it may concern:

      The Community Mortgage Banking Project ("CMBP")[1] appreciates the opportunity to submit
comments in connection with the Department of Housing and Urban Development's ("HUD")
proposed rule regarding the implementation of a disparate impact standard under the Fair Housing Act
("FHA").

      We believe HUD's proposed rule is contrary to the FHA and fundamentally inconsistent with
controlling case law, and therefore should not be adopted. Recent Supreme Court precedent has
clarified that the FHA does not permit disparate impact claims. But even if the FHA permitted
disparate impact claims, the burden shifting standard articulated in the proposed rule is inconsistent
with controlling U.S. Supreme Court precedent.

      In addition to these substantive reasons why the proposed rule should not be adopted, the
proposed rule should not be adopted at this time because both of these issues—whether the FHA
permits disparate impact claims and, if so, what the appropriate standard for analyzing such cases
should be—are currently being considered by the Supreme Court. The Court agreed to hear this case
before HUD issued its proposed rule. HUD's proposed rule is based on selective precedents from
lower federal courts. It would be inappropriate for HUD to issue a rule based on lower court precedent
when these issues are currently pending before the Supreme Court.

      Finally, if HUD decides to move ahead with this proposed rule despite the significant issues
raised herein, the standard articulated in the proposed rule is in substantial need of clarification.

## I.     Disparate Impact Claims Are Not Cognizable Under the FHA.

      Although the Supreme Court has not yet directly held whether disparate impact claims are
cognizable under the FHA, recent Supreme Court decisions interpreting other anti-discrimination
statutes have undermined the lower court decisions on which HUD relies in its proposed rule. For
example, in *Smith v. City of Jackson*[2] the Supreme Court clarified its Title VII jurisprudence and

---

[1]     The Community Mortgage Banking Project is a public policy organization representing the business interests of
nearly 45 independent, community-based mortgage banking companies engaged in the origination, sale and servicing of
residential mortgages.

[2]     544 U.S. 228 (2005).

*108 North Payne Street, Alexandria VA 22314*

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Page 2

explained that disparate impact claims are firmly rooted in the text of Title VII. In clarifying the statutory basis of disparate impact claims under Title VII, the Supreme Court explained that the "effects" language of Title VII and other anti-discrimination statutes is the basis for disparate impact claims—not merely the broader purpose of the statute. Importantly, the FHA does not have the "effects" language that the Supreme Court has explained is the basis for disparate impact claims under other statutes. These Supreme Court cases make clear that the FHA lacks the language that makes disparate impact claims cognizable under other anti-discrimination statutes.[3]

HUD's reliance on pre-*City of Jackson* court of appeals decisions is misplaced. These decisions were based on a misunderstanding of the Supreme Court's Title VII precedent. Indeed, one of these decisions expressly acknowledged that the "plain language" of the FHA would not permit disparate impact claims. Despite the "major obstacle" of the "plain language" of the statute, the court concluded the "broad purposes" of the FHA permitted disparate impact claims.[4]

In *City of Jackson*, the Supreme Court clarified that its Title VII disparate impact precedent was based not simply on the purpose of Title VII, but on the text of the statute itself.[5] The Court explained that the "effects" language of Title VII is the language that permits disparate impact claims under Title VII.[6] At the same time, the Court explained that the "discriminate against . . . because of language" "does not encompass disparate impact liability" and requires a showing of intent.[7] The FHA lacks the "effects" language that the Supreme Court held is the textual basis for disparate impact claims—and contains only the "discriminate against . . . because of" language that the Court held requires a showing of intent.[8] *City of Jackson* thus undermines the rationale of the lower court decisions on which HUD relies.

---

[3]    The Supreme Court's decision in *Smith v. City of Jackson* and its implications for the FHA is discussed in detail in Kirk D. Jensen & Jeffrey P. Naimon, *The Fair Housing Act, Disparate Impact Claims, and Magner v. Gallagher: An Opportunity to Return to the Primacy of the Statutory Text*, 129 BANKING L.J. 99 (forthcoming Feb. 2012). A copy of this article is attached hereto as Attachment A.

[4]    *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1288-90 (7th Cir. 1977); *see also* Jensen & Naimon, *supra*, at 126-28.

[5]    *City of Jackson*, 544 U.S. at 234 (explaining that while previous Supreme Court precedent had relied in part on the purpose of the statute, the Court "has subsequently clarified" that its Title VII disparate impact jurisprudence "represented the better reading of the statutory text").

[6]    *Id.* at 235-38.

[7]    *Id.* at 236-38; *accord id.* at 249 (O'Connor, J., dissenting) ("Neither petitioners nor the plurality contend that the ['discriminate against . . . because of' language] authorizes disparate impact claims, and I think it obvious that it does not. That provision plainly requires discriminatory intent . . . .").

[8]    42 U.S.C. §§ 3604-3605. The absence of "effects" language from the FHA is consistent with the legislative history of the FHA, which shows that Congress intended only to prohibit intentional discrimination. *See* Jensen & Naimon, *supra*, at 113-25.

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Page 3

    While no federal court of appeals has yet considered whether the FHA permits disparate impact claims after *Smith v. City of Jackson*,[9] one federal court of appeal has signaled that similar language in the Equal Credit Opportunity Act does not permit disparate impact claims after *City of Jackson*: "The Supreme Court has held that this ['effects'] language gives rise to a cause of action for disparate impact discrimination under Title VII and the ADEA. ECOA contains no such language."[10]

    Because disparate impact claims are not cognizable under the FHA, the proposed rule is fundamentally inconsistent with the FHA and should not be adopted.

## II.    The Proposed Rule Would Implement Standards That Are Inconsistent With the Standards Mandated by the Supreme Court.

    Even if disparate impact claims were cognizable under the FHA, the standard articulated in the proposed rule is fundamentally inconsistent with controlling Supreme Court precedent regarding such claims. The proposed rule would provide that a "legally sufficient justification" exists only "where the challenged housing practice: (1) [h]as a *necessary and manifest relationship* to one or more legitimate, nondiscriminatory interests of the [respondent or defendant] . . . and (2) those interests *cannot be served* by another practice that has a less discriminatory effect."[11] HUD makes clear that this standard is based on HUD's reading of various lower court opinions.[12] This standard and these cases, however, cannot be reconciled with controlling Supreme Court precedent.

    In *Wards Cove Packing Co., Inc. v. Atonio*,[13] the Supreme Court articulated the burden-shifting framework that applies to disparate impact claims brought under federal anti-discrimination laws. In *Wards Cove*, the Supreme Court explained that if a claimant establishes a prima facie case of disparate impact, "the case will shift to any business justification [companies] offer for use of these practices."[14] The Court further explained that "the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate [business] goals of the [company]."[15] The Court also clarified that there is no requirement that the practice be necessary or essential to the company's business to satisfy this standard, because "this degree of scrutiny would be almost impossible for most [companies] to meet."[16] The proposed rule is squarely at odds with the standard established by the Supreme Court.

---

[9]    *See, e.g., Gallagher v. Magner*, 636 F.3d 380, 383 (8th Cir. 2010) (Colloton, J., dissenting) (noting that there has been "virtually no discussion of the matter [of whether the FHA permits disparate impact claims] by any court of appeals since the Court in *Smith [v. City of Jackson]* explained how the text of Title VII justified the decision in *Griggs*.").

[10]    *Garcia v. Johanns*, 444 F.3d 625, 633 n.9 (D.C. Cir. 2006) (citations omitted).

[11]    Proposed 24 C.F.R. § 100.500(b) (emphasis added).

[12]    76 Fed. Reg. 70921, 70925 (Nov. 16, 2011).

[13]    490 U.S. 642 (1989).

[14]    *Id.* at 658.

[15]    *Id.* at 659.

[16]    *Id.*

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Page 4

Once a company shows a legitimate business justification for the challenged practices, the Court explained that the claimant must persuade the finder of fact that other practices that reduce the disparate impact of the current practices also serve the company's legitimate business interests.[17]  The Court clarified that the standard is not merely whether the company's legitimate interests "can be served" by an alternative practice.  Instead, the Court clarified that any alternative practices which a claimant may put forward "must be equally effective" as the company's chosen practices in achieving the company's legitimate business goals.[18]  The Court further clarified that "'[f]actors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the [company's] legitimate business goals.'"[19]

Although the Civil Rights Act of 1991 amended Title VII to change the standard established by the Supreme Court in *Wards Cove* for purposes of employment discrimination,[20] the Act did not amend the FHA or other federal anti-discrimination laws.  Thus, even if the FHA could be interpreted to permit disparate impact claims, the *Wards Cove* standard remains the controlling standard for such claims under the FHA, as well as for other anti-discrimination laws that were not amended by the Civil Rights Act of 1991.  Indeed, the Supreme Court has clarified that notwithstanding the 1991 amendments to Title VII, the *Wards Cove* standard continues to apply to disparate impact claims brought under the Age Discrimination in Employment Act ("ADEA").  In *City of Jackson*, the Supreme Court explained that "[w]hile the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination.  Hence, *Wards Cove*'s pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA."[21]  Similarly, because the Civil Rights Act of 1991 did not amend the FHA, the *Wards Cove* standard is the standard that would apply to disparate impact claims under the FHA if such claims can be brought at all.

The standard articulated in the proposed rule cannot be reconciled with the controlling precedent of *Wards Cove*.  As noted above, we believe that the proposed rule should not be adopted at all.  However, if HUD decides to adopt a final rule, the standard articulated in the rule should be revised to be consistent with the standard established in *Wards Cove* and reaffirmed in *City of Jackson* as the appropriate standard for anti-discrimination laws not amended by the Civil Rights Act of 1991.

---

[17]     *Id.* at 660.

[18]     *Id.* at 661.

[19]     *Id.* (quoting *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 998 (1988)).

[20]     Pub. L. 102-166, 105 Stat. 1071 (1991).  Section 105 of The Civil Rights Act of 1991 amended Title VII to require that a defendant show a "business necessity."  42 U.S.C. § 2000e-2(k).

[21]     *City of Jackson*, 544 U.S. at 240.

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Page 5

### III.   HUD Should Delay Consideration of Its Proposed Rule Until the Supreme Court Issues Its Opinion in *Magner v. Gallagher*.

Throughout its proposed rule, HUD relies on the opinion of lower courts interpreting the FHA. To date, the Supreme Court has not directly addressed whether the FHA permits disparate impact claims and, if so, which standard applies.

The Court recently granted certiorari in a case that will allow it for the first time to address both issues. In the pending case of *Magner v. Gallagher*, the Supreme Court is considering the following questions:

> 1. Are disparate-impact claims cognizable under the Fair Housing Act?
>
> 2. If such claims are cognizable, should they be analyzed under the burden-shifting approach used by three circuits, under the balancing test used by four circuits, under a hybrid approach used by two circuits, or by some other test?[22]

The Court granted certiorari in *Magner* on November 7, 2011—prior to HUD issuing the proposed rule. The *Magner* case is currently being briefed by the parties and is scheduled for oral argument on February 29, 2012.[23]

HUD's stated reason for considering the proposed rule is "to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act."[24] The Supreme Court's decision in *Magner* will establish first, whether disparate impact claims are cognizable under the FHA and, if so, it will create such a uniform standard. However, if HUD adopts the proposed rule or something like it before the Court decides *Magner*, HUD's proposed rule may impede, rather than establish, uniformity. Because HUD's proposed rule is based in large part on HUD's interpretation of lower court opinions—and because recent Supreme Court opinions indicate there is a significant possibility that the Supreme Court will reach a holding fundamentally different than the past holdings of those lower courts—the Supreme Court's holding in *Magner* may differ in important ways from HUD's proposed rule. A final rule that is inconsistent with the Supreme Court's holding in *Magner* will sow confusion rather than enhance certainty.

HUD will best achieve its goal of a uniform standard by allowing the Supreme Court to issue its opinion before HUD takes further action on the proposed rule. Even if HUD disagrees with the above analysis—and concludes (1) that disparate impact claims are cognizable under the FHA

---

[22]    *Magner v. Gallagher*, No. 10-1032.

[23]    *Magner v. Gallagher* Docket, *available at* http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/10-1032.htm. We have attached as Attachments B, C, and D the Petitioner's brief as well as the briefs of the American Bankers Association, et al., and of the Independent Community Bankers of America, et al. as *amici curiae*. These briefs further spell out the support for the positions in sections I and II of this letter.

[24]    76 Fed. Reg. 70921, 70921 (Nov. 16, 2011).

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Page 6

notwithstanding the language of the statute and the Supreme Court's holding in *City of Jackson*; and (2) that the standard articulated in the proposed rule is an appropriate standard notwithstanding the Supreme Court's holdings in *Wards Cove* and *City of Jackson*—HUD should delay further consideration of the proposed rule until the Supreme Court issues its opinion in *Magner*.

## IV.    The Proposed Rule Needs Further Clarification.

If HUD decides to continue consideration of its proposed rule notwithstanding the above, the CMBP respectfully requests that HUD provide additional guidance regarding the meaning of many of the terms in the proposed rule. Specifically, we request that HUD clarify the following:

- *The meaning of "burden of proof"* – We request that HUD clarify, consistent with controlling Supreme Court precedent,[25] that the burden of proving discrimination rests at all times on the claimant. While the burden of production of evidence may shift in the burden-shifting framework, the burden of proof must rest at all times on the claimant.

- *The meaning of "necessary"* – While "necessary" can mean "essential" or "indispensible," the Supreme Court has opined that it "would be almost impossible" for a company to show that a practice is "essential" or "indispensible" to a legitimate, nondiscriminatory business interest.[26] Because the burden of proving discrimination always rests on the claimant,[27] it would be inconsistent with existing Supreme Court precedent for HUD to adopt a standard that effectively makes a defense to a claim of discrimination impossible. We request that HUD clarify the meaning of "necessary" consistent with controlling Supreme Court precedent.

- *The meaning of "manifest"* – We request that HUD clarify that "manifest" means that the practice has a demonstrable relationship to the legitimate, nondiscriminatory business interest.[28]

- *The meaning of "cannot be served"* – We request that HUD clarify that an alternative practice that reduces the disparate impact of the current practice serves a company's legitimate business interests only if the alternative practice is *equally effective* in achieving the company's legitimate business goals as is the challenged practice.[29] Such a clarification would be consistent with HUD's recent assertion that the alternative practice must "achieve"—not

---

[25]    *See, e.g., Wards Cove*, 490 U.S. at 659-60; *Watson*, 487 U.S. at 997.

[26]    *Wards Cove*, 490 U.S. at 659.

[27]    *See, e.g., id.* at 659-60; *Watson*, 487 U.S. at 997.

[28]    *See, e.g., Griggs v. Duke Power*, 401 U.S. 424, 432 (1971); *Mountain Side Mobile Estates Partnership v. Secretary of HUD*, 56 F.3d 1243, 1254-55 (10th Cir. 1995).

[29]    *See Wards Cove*, 490 U.S. at 661.

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Page 7

merely advance—a company's legitimate objectives.[30]  Otherwise, a claimant might be able to force companies to adopt practices that undermine or weaken a company's legitimate, nondiscriminatory business goals—a result that is not required by the FHA.

- *The meaning of "legitimate business goals"* – We request that HUD clarify that "legitimate business goals" include a company's goals regarding increasing profits, minimizing costs, increasing market share, and other nondiscriminatory goals.[31]

*     *     *

For the reasons set forth above, we urge HUD not to adopt its proposed rule.  The proposed rule is contrary to the FHA and fundamentally inconsistent with controlling Supreme Court precedent.  We also urge HUD to delay further consideration of its proposed rule until the Supreme Court issues its opinion in *Magner v. Gallagher*, which is currently pending before the Court.  But if HUD decides to move forward nevertheless, we request that HUD clarify key terms in its rule to ensure that it is consistent with controlling law.

Very truly yours,

Glen Corso
Managing Director,
Community Mortgage Banking Project

---

[30]    Brief of the United States as Amicus Curiae, Magner v. Gallagher, No. 10-1032, at 26 (filed Dec. 29, 2011) ("And it is fair to assign to plaintiffs the burden of demonstrating the existence of alternative means that would have a less discriminatory effect on them and that would achieve the defendant's legitimate objectives.")

[31]    *See, e.g., id*; *Watson*, 487 U.S. at 998.

# ATTACHMENT A

# THE BANKING LAW
# JOURNAL

| VOLUME 129 | NUMBER 2 | FEBRUARY 2012 |
| --- | --- | --- |

HEADNOTE: ARTICLES
Steven A. Meyerowitz                                                            97

**THE FAIR HOUSING ACT, DISPARATE IMPACT CLAIMS, AND**
***MAGNER v. GALLAGHER*: AN OPPORTUNITY TO RETURN TO**
**THE PRIMACY OF THE STATUTORY TEXT**
Kirk D. Jensen and Jeffrey P. Naimon                                           **99**

SAVINGS AND LOAN HOLDING COMPANIES AFTER THE
DODD-FRANK ACT: AN ENDANGERED SPECIES? – PART I
Paul L. Lee                                                                    147

*RIVER ROAD*: THE RIGHT ROAD FOR SELLING A SECURED
LENDER'S COLLATERAL UNDER A CHAPTER 11 PLAN OF
REORGANIZATION
Erik W. Chalut and Blair R. Zanzig                                             173

# THE FAIR HOUSING ACT, DISPARATE IMPACT CLAIMS, AND *MAGNER V. GALLAGHER*: AN OPPORTUNITY TO RETURN TO THE PRIMACY OF THE STATUTORY TEXT

KIRK D. JENSEN AND JEFFREY P. NAIMON

*The authors discuss the text of the Fair Housing Act, its legislative history, and the past federal appellate court decisions holding that the FHA permits disparate impact claims. They argue that recent Supreme Court decisions cast doubt on the past federal appellate court decisions, and show that the statutory text of the FHA, unlike the text of some other civil rights laws, does not permit disparate impact claims. They also discuss the case currently pending before the Court in which the Court may address for the first time whether the FHA permits disparate impact claims.*

This term, the Supreme Court will hear an appeal involving the question of whether the Fair Housing Act ("FHA") permits claims based on a disparate impact theory of liability.[1] Eleven of the 12 federal courts of appeal and a number of federal district courts have assumed that it does, notwithstanding the fact that there is no support for this position in the text of the statute.[2] Ignoring the text of the FHA—which many of these courts acknowledge is troublesome for their conclusion—these courts

Kirk D. Jensen and Jeffrey P. Naimon, partners in the Washington, D.C., office of BuckleySandler LLP, can be reached at KJensen@BuckleySandler.com and JNaimon@BuckleySandler.com, respectively. The authors are indebted to their friend Peter Cubita, whose article with his colleague Michelle Hartmann, *The ECOA Discrimination Proscription and Disparate Impact—Interpreting the Meaning of the Words That Actually Are There*, 61 Bus. Lawyer 829 (2006), provided significant inspiration for this article.

99

Published by A.S. Pratt in the February 2012 issue of *The Banking Law Journal*.
Copyright © 2012 THOMPSON MEDIA GROUP LLC. 1-800-572-2797.

analogize to Title VII jurisprudence, relying on what they characterized as the broad purpose of the FHA to find a disparate impact right of action.[3] This nebulous purpose led these courts to find a disparate impact right of action while expressly acknowledging that such a right of action conflicts with the plain language of the statute.[4] Too often, the statutory text was considered to be of secondary importance. This expanded view of the type of behavior that the FHA was designed to punish, however, is unjustified. Indeed, what evidence is available from the legislative history of the FHA makes plain that the drafters never intended—indeed, attempted to avoid—allowing for disparate impact claims under the FHA.

The Supreme Court has never decided whether the FHA permits plaintiffs to bring claims under a disparate impact theory. However, in recent years the Supreme Court has reconfirmed the primacy of the statutory text in anti-discrimination statutes. For example, in *Smith v. City of Jackson*[5] the Supreme Court clarified its Title VII jurisprudence and explained that disparate impact claims are firmly rooted in the text of Title VII. In clarifying the statutory basis of disparate impact claims under Title VII, the Supreme Court undermined the foundations of those decisions that permitted disparate impact claims under the FHA through analogy to Title VII. *City of Jackson* makes clear that the anti-discrimination provisions of the FHA do not permit disparate impact claims. No federal court of appeal has yet addressed whether the FHA permits disparate impact claims after *City of Jackson*.[6]

On November 7, 2011, the Supreme Court granted a petition for a writ of certiorari in *Magner v. Gallagher*,[7] which poses the question of whether disparate impact claims are cognizable under the FHA. In *Magner*, the City of St. Paul, Minnesota has asked the Supreme Court to consider whether the FHA permits disparate impact claims.[8] Private landlords, seeking to limit the City's "aggressive" enforcement of its housing code, have sued the City for violating the FHA.[9] The landlords argue that the City's attempt to close housing that violates its housing code reduces the amount of affordable housing available to minority renters.[10] The landlords claim that as a result, the City's enforcement efforts have a disparate impact on minority renters in violation of the FHA.[11] Although the District Court ruled for the City,[12] the Eighth Circuit reversed, holding that the landlords had stated a cognizable claim under the FHA.[13] The City petitioned the Eighth Circuit for rehearing en banc, but the court denied the petition.[14]

100

The result of the *Magner* appeal before the Supreme Court will have profound impact both in private litigation and government enforcement actions. Both the Department of Housing and Urban Development ("HUD") and the Department of Justice ("DOJ") have increasingly relied on disparate impact claims to further their policy goals without properly, much less formally, interpreting the text of FHA. Shortly after the Supreme Court agreed to hear the *Magner* appeal, HUD issued for the first time a proposed rule claiming to establish standards for applying its purported longstanding interpretation that the FHA allows claims under the disparate impact standard.[15] Even if HUD were to institute a formal rule following notice and comment, such an interpretation would not be entitled to deference because, as argued below, the statute is unambiguous. The DOJ—which does not have interpretive authority under the FHA—has made the disparate impact theory an important tool in its efforts to achieve settlements with lenders without needing to prove discriminatory intent.[16] Indeed, a plain reading of the statutory text makes clear that disparate impact claims are not allowed under the FHA.

This article will demonstrate that the text of the FHA and its legislative history show that Congress did not intend the FHA to permit disparate impact claims. Instead, the statute was purposely designed to combat intentional discrimination, not to create liability for facially neutral activities that may result in unequal effects.

## THE TEXT OF THE FHA DOES NOT PERMIT DISPARATE IMPACT CLAIMS

### The "Effects" Language: The Basis of Disparate Impact Claims

The Supreme Court's opinion in *City of Jackson* shows that the text of an anti-discrimination statute, not merely a broad interpretation of the statute's purpose, determines whether the statute permits disparate impact claims. The question before the Court in *City of Jackson* was whether the Age Discrimination in Employment Act ("ADEA") permits disparate impact claims. Noting the similarity between the ADEA and Title VII, the Court reviewed its Title VII jurisprudence for guidance—and, in the process, clarified and emphasized that its Title VII disparate impact jurisprudence is firmly rooted in the statutory text.

101

Justice Stevens' plurality opinion in *City of Jackson* clarifies that the Court's holding in *Griggs v. Duke Power Co.*,[17] was based on the "interpretation of § 703(a)(2) of Title VII."[18] Indeed, in *Griggs* the Court began its analysis by quoting only one of the two anti-discrimination provisions in § 703(a) of Title VII. This section provides:

> (a) It shall be an unlawful employment practice for an employer -
>
> > (1) to fail or refuse to hire or to discharge any individual, or otherwise to *discriminate against* any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin; or
> >
> > (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's race, color, religion, sex, or national origin.[19]

The *Griggs* Court quoted only subsection (a)(2)—the subsection with the "effects" language—omitting subsection (a)(1).[20]

In discussing *Griggs*, Justice Stevens noted that the *Griggs* Court "explained that Congress had 'directed the thrust of the Act [Title VII] to the *consequences* of employment practices, not simply the motivation.'"[21] The *Griggs* Court "thus squarely held that § 703(a)(2) of Title VII did not require a showing of discriminatory intent." While Justice Stevens acknowledged that *Griggs* relied in part on the purposes of Title VII, he noted that the Court has "subsequently clarified" that its Title VII disparate impact jurisprudence "represented the better reading of the statutory text."[22] Indeed, in the two cases cited by Justice Stevens, the Court had cited only § 703(a)(2) in discussing disparate impact under Title VII.[23]

Justice Stevens explained that § 703(a)(2) permits disparate impact claims because of the "effects" language in the provision:

> Neither § 703(a)(2) [of Title VII] nor the comparable language in the ADEA simply prohibits actions that "limit, segregate, or classify" per-

102

THE FAIR HOUSING ACT, DISPARATE IMPACT CLAIMS, AND *MAGNER v. GALLAGHER*

sons; rather the language prohibits such actions that "deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's" race or age. *Ibid.* (explaining that in disparate-impact cases, "the employer's practices may be said to 'adversely affect [an individual's status] as an employee'" (alteration in original) (quoting U.S.C. § 2000e-2(a)(2))). Thus, the text focuses on the *effects* of the action on the employee rather than the motivation for the action of the employer.[24]

Because ADEA § 4(a)(2) contains the same "effects" language as Title VII § 703(a)(2), the Court held that the ADEA permits disparate impact claims.[25] By showing that the original disparate impact holding in *Griggs v. Duke Power Co.* was rooted in specific language in the text of Title VII rather than being implied by the overall purposes of the statute—and by basing its disparate impact analysis under the ADEA on the text of the statute—the Supreme Court's decision in *City of Jackson* reaffirms the primacy of the statutory text in construing anti-discrimination statutes.

The Supreme Court's textual analysis in *City of Jackson* also makes clear that the "discriminate against...because of" formulation in § 703(a)(1) of Title VII—the same formulation in the FHA—permits only disparate treatment claims and requires a showing of intent. The Court noted that there are "key textual differences" between subsections (a)(1) and (a)(2) of both Title VII § 703 and ADEA § 4.[26] Whereas subsection (a)(2) permits disparate impact claims, the Court emphasized that subsection (a)(1) encompasses disparate treatment, but "*does not encompass disparate-impact liability*," and requires a showing of intent.[27] This is because "the focus of the paragraph is on the employer's actions with respect to the targeted individual."[28] Similarly, Justice O'Connor, with whom Justices Kennedy and Thomas joined in dissent, emphasized that subsection (a)(1) does not permit disparate impact claims: "Neither petitioners nor the plurality contend that the first paragraph, § 4(a)(1), authorizes disparate impact claims, and *I think it obvious that it does not. That provision plainly requires discriminatory intent....*"[29] Thus, while the Court was divided as to whether subsection (a)(2) of ADEA § 4 permits disparate impact claims, the Court was unanimous that subsection (a)(1)—the section containing the "discriminate against...because of" formulation—does not.[30]

103

THE BANKING LAW JOURNAL

This analysis is consistent with the Supreme Court's approach to other anti-discrimination statutes. When the statutory text creates a cause of action based on the "effects" or "results" of actions, the Court has held that the statute permits disparate impact claims as is demonstrated in the following chart:

| Statute | Text of Statute Permitting Disparate Impact Claims | Cases Finding Disparate Impact Claims Permitted |
| --- | --- | --- |
| Title VII | "It shall be an unlawful employment practice for an employer:… (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities **or otherwise adversely affect** his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2) (emphasis added). | *Griggs*, 401 U.S. at 429-31. |
| ADEA | "It shall be unlawful for an employer:… (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities **or otherwise adversely affect** his status as an employee, because of such individual's age…." 29 U.S.C. § 623 (emphasis added). | *City of Jackson*, 544 U.S. at 232-35. |

104

THE FAIR HOUSING ACT, DISPARATE IMPACT CLAIMS, AND *MAGNER v. GALLAGHER*

| | | |
|---|---|---|
| Americans with Disabilities Act ("ADA") | "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).<br><br>"As used in subsection (a) of this section, the term 'discriminate' includes: (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee; (2) participating in a[n]… arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited in this subchapter; (3) utilizing standards, criteria, or methods of administration: (A) ***that have the effect of discrimination*** on the basis of disability; or (B) that perpetuate the discrimination of others who are subject to common administrative control…." 42 U.S.C. § 12112(b) (emphasis added). | *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). |

105

THE BANKING LAW JOURNAL

| | | |
|---|---|---|
| Rehabilitation Act | "The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990...." 29 U.S.C. § 791(g). | *Alexander v. Choate*, 469 U.S. 287, 299 (1985). |
| Voting Rights Act | "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by a State or political subdivision in a manner which *results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C. § 1973(a) (emphasis added). | *Chisom v. Roemer*, 501 U.S. 380, 404 (1991) |

In contrast, when the statutory text does not contain a provision creating a cause of action based on "effects" of actions, the Court has held that the statute does not permit disparate impact claims as is demonstrated in the following chart:

| Statute | Text of Statute Permitting Disparate Impact Claims | Cases Finding Disparate Impact Claims Permitted |
|---|---|---|
| Title IX | "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program | *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005). |

106

|  |  |  |
|---|---|---|
|  | or activity receiving Federal financial assistance…." 20 U.S.C. § 1681. |  |
| Title VI | "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000-d. | *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). |
| Equal Education Opportunities Act | "No State shall deny equal educational opportunity to any individual on account of his or her race, color, sex or national origin…." 20 U.S.C. § 1703. | *Castenada v. Pickard*, 648 F.2d 989, 1001 (5th Cir. 1981). |
| Title II | "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a. | *Robinson v. Paragon Foods, Inc.*, 2006 WL 2661110, at *6 (N.D. Ga. Sept. 15, 2006) (Title II). |

    Thus, when a statute contains language addressing the "effects" or "results" of an action, disparate impact claims under the statute are permitted. When the statute lacks such "effects" language, disparate impact claims under the statute are prohibited.[31]

107

THE BANKING LAW JOURNAL

## The Text of the FHA: Disparate Treatment Only

The anti-discrimination provisions of the FHA do not contain "effects" language analogous to Title VII or the ADEA; rather, the provisions contain the "discriminate against…because of" formulation that the Supreme Court unanimously held permits only disparate treatment—and not disparate impact—claims. The following table compares the provisions of Title VII § 703(a), ADEA § 4(a), and FHA § 805 (the provision applicable to mortgage lending), and shows that the FHA's anti-discrimination provision mirrors the disparate-treatment-only provisions of Title VII and the ADEA and that the FHA has no provision analogous to the disparate impact provisions of Title VII and the ADEA:

|  | Title VII | ADEA | FHA |
|---|---|---|---|
| Disparate Treatment Language | (a) It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to *discriminate against any individual* with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's* race, color, religion, sex, or national origin; | (a) It shall be unlawful for an employer: (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; | (a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to *discriminate against any person* in making available such a transaction, or in the terms or conditions of such a transaction, *because of* race, color, religion, sex, handicap, familial status, or national origin. |

108

| | | | |
|---|---|---|---|
| Disparate Impact Language | (a) It shall be an unlawful employment practice for an employer – (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's race, color, religion, sex, or national origin. | "It shall be unlawful for an employer:... (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's age.... | None. |

These similarities and differences between the text of the FHA and the text of Title VII and the ADEA are dispositive of Congress's intent in enacting the FHA. The Supreme Court has explained that "when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."[32] Indeed, this was the basis for the Court concluding in *City of Jackson* that an "effects" provision in the ADEA comparable to Title VII's "effects" provision meant Congress intended to permit disparate impact claims.[33] In accordance with this rule of statutory construction, the "discriminate against...because of" language in the FHA must have the same meaning as that same language does

109

in Title VII and the ADEA. The Court was unanimous in *City of Jackson* that this language permits only disparate treatment claims, not disparate impact claims.[34]

Just as similar language in similar statutes must be interpreted to have the same meaning, different language in similar statutes must be interpreted as having different meanings. Then-Judge John Roberts has explained that "[t]his use of different language in two statutes so analogous in their form and content, enacted so closely in time, suggests that the statutes differ in their meaning...."[35] In contrast to Title VII and the ADEA which contain two different anti-discrimination provisions—a "discriminate against...because of" provision prohibiting disparate treatment only and an "effects" provision prohibiting disparate impact—the FHA lacks an "effects" provision comparable to Title VII § 703(a)(2) and ADEA § 4(a)(2). Because the FHA was enacted only four years after Title VII and only one year after the ADEA,[36] the omission of "effects" language from the FHA must be viewed as intentional—and shows conclusively that the FHA does not permit disparate impact claims.

## The Meaning of "Discriminate"

This view is also consistent with the ordinary meaning of the term "discriminate" used in the FHA. It is well established that when terms are not defined in a statute, those terms are given their ordinary meaning.[37] In ordinary usage, "discriminate" refers to the *intentional* treatment of one person differently than another.[38] In contrast, several commentators have noted that disparate impact causes of action do not, in fact, punish actions motivated by an intent to treat one person different than another but rather further notions of distributive justice.[39] In addressing what he referred to as the "nondiscrimination principle" in the context of voting rights legislation, Professor Blumstein has explained:

> [T]he substantive concept of "discriminatory effect" stemming from neutral legislation is not only anomalous but also analytically bankrupt. Legitimate and neutral legislation can have consequences that disadvantage a group with disproportional racial composition. Nevertheless, such legislation does not necessarily "discriminate" on the basis of race. The norm of nondiscrimination is at bottom one of procedural regularity.

110

It requires that decisionmaking occur on the basis of relevant criteria, and simultaneously renders race irrelevant in almost all circumstances. Therefore, discrimination occurs only when decisions are impermissibly based on racial criteria.  To determine whether a facially neutral law is discriminatory, one must focus on the legitimacy and plausibility of the asserted neutral rationale.  In addition, one must look at the decision-maker's good faith and the integrity of the decisionmaking process to determine whether either is infected with racial bias.

Because only purposefully discriminatory conduct can violate the principle of nondiscrimination, disproportional racial impact by itself merely highlights the existence of racial disadvantage.  If society considers such disadvantage undesirable because of independent principles of distributive justice, it can use the evidence of disproportional impact as a basis of relief.  Such relief furthers the independent, affirmative value of improving the political influence of blacks and necessarily encompasses some notion of race-based entitlements to political influence or representation; such relief does not, however, rest on the nondiscrimination norm embodied in the fourteenth and fifteenth amendments.

Despite this clear conceptual distinction, prohibiting discrimination and overcoming disadvantage are often lumped together in debates over civil rights legislation and enforcement policies....  The desire to remedy a racially disproportional impact is animated by policy objectives quite different from those behind the principle of racial nondiscrimination and is supported by an underlying, often unarticulated notion of race-based entitlements.[40]

Indeed, one prominent member of the plaintiffs' bar has noted that even actions intended to *prevent* discrimination can lead to disparate impact liability: "A defendant with the best of intentions—indeed, *even a defendant who undertakes a particular policy in the express hope of eliminating any possible discrimination*—can still be held liable if a plaintiff pursues a disparate impact claim."[41]  Such an interpretation cannot be reconciled with the ordinary meaning of "discriminate"—and it is inconceivable that Congress could have intended "discriminate" to reach so far.  Whether legislation should target only actions motivated by discrimination, or whether the legislation should

111

seek to further notions of distributive justice (as Title VII and the ADEA arguably do) is a decision that must be left to Congress.[42] In the case of the FHA, Congress chose to do only the former.

## The Purpose of the FHA Is Codified in the Text of the Statute

Proponents of a disparate impact right of action under the FHA no doubt will argue that the purpose of the FHA supports the view that disparate impact claims are cognizable. However, such an argument begs the question of what Congress intended to prohibit. The Supreme Court has explained that "the purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone. The best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President."[43] As discussed above, the plain language of the FHA prohibits only "discriminat[ion]"—not the disparate "effects" of facially neutral actions—and this shows that Congress intended the FHA to prohibit only actions motivated by discriminatory animus. The presence of language supporting only disparate treatment—and not disparate impact—shows that Congress did not intend either the FHA or ECOA to permit disparate impact claims.

Section 801 of the FHA, which provides Congress's statement of policy in passing the FHA, is consistent with this view. Section 801 provides that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."[44] While Section 801 has been cited to justify giving the FHA a "generous construction" to the FHA's provisions,[45] it cannot support an interpretation of the FHA that goes beyond the text of the statute. Indeed, the legislative history shows that the words "within constitutional limitations" were intended to restrict the application of the statute, not expand it beyond the text of the statute itself. Because the fair housing legislation would affect individuals' basic property rights, including placing restrictions on the ability to buy, sell, rent, or encumber real property, many were concerned that the legislation exceeded Congress's authority under the Constitution.[46] The reference to constitutional limits was added to make clear that the FHA was not intended to exceed Congress's constitutional authority.

The reference to "constitutional limits" was added by an amendment offered by Mr. Miller of Iowa who explained that it was intended to make

112

"clear that the provision for fair housing must be within constitutional limitations upon Congress in so providing." Senator Hart of Michigan, floor manager on the bill, accepted the Iowa Senator's amendment on the basis of this explanation and so long as it was clearly understood that it was not an "acknowledgement that we consciously intend to legislate beyond the reach of the Constitution…"[47]

Even if the language of Section 801 was intended more broadly, a "generous construction" cannot add provisions to a statute that were not added by Congress. The Supreme Court has explained

That principle [of liberal construction] may be invoked, in case of ambiguity, to find present rather than absent elements that are essential to operation of a legislative scheme; but it does not add features that will achieve the statutory "purposes" more effectively. Every statute proposes, not only to achieve certain ends, but also to achieve them by particular means—and there is often a considerable legislative battle over what those means ought to be.[48]

Judge Easterbrook has similarly explained that "the essential question is not which way the statute points but how far it directs one to go" and that "[n]o principle of statutory construction says that after identifying the statute's accommodation of competing interests, the court should give the favored party a little extra."[49] Thus, an interpretation of the FHA that goes beyond the text of the statute does not simply further the purposes of the statute, it changes the statute. Indeed, Senator Mondale, a principal sponsor of the FHA in the Senate, explained that the language of Section 801 "is to be read in context with the entire bill"—in other words, the text of the FHA determines its scope.[50]

## THE LEGISLATIVE HISTORY FURTHER SHOWS THAT THE FHA DOES NOT PERMIT DISPARATE IMPACT CLAIMS

Where, as here, the language of the FHA is plain, the analysis of the FHA must begin *and end* with the statutory text.[51] Nevertheless, the legislative history of the FHA further shows that the FHA does not—and was not

113

intended to—permit disparate impact claims. Indeed, in a brief filed before the U.S. Supreme Court, Solicitor General Fried explained that "[t]he legislative history reinforces the understanding that Congress intended to require a showing of intentional discrimination."[52]

While there are no conference reports, committee reports, etc. from the Congress that passed the FHA, there is significant legislative history in the form of (1) the larger body of anti-discrimination laws, and (2) the evolution of fair housing legislation that ultimately resulted in the FHA.

## The FHA Within the Larger Body of Anti-Discrimination Law

The FHA was not the first federal anti-discrimination statute—and the differences between the FHA and previous anti-discrimination statutes are important to understanding Congress's intent in formulating the language of the FHA.[53] When the FHA is compared to the previous anti-discrimination statutes, it becomes evident that Congress did not intend the FHA to permit disparate impact claims.

When Congress enacted Title VII in 1964—four years before the enactment of the FHA—it crafted two different anti-discrimination provisions: one (§ 703(a)(1)) that makes it unlawful for an employer to "discriminate against" an individual "because of" the individual's membership in a protected class, and another (§ 703(a)(2)) that prohibits employers from taking actions that "adversely affect" an individual's employment status.[54]

When Congress enacted the ADEA in 1967—the year before it enacted the FHA—Congress similarly crafted two anti-discrimination provisions: one (§ 4(a)(1)) that makes it unlawful for an employer to "discriminate against" an individual "because of" the individual's membership in a protected class, and another (§ 4(a)(2)) that prohibits employers from taking actions that "adversely affect" an individual's employment status.[55]

In contrast, when Congress enacted the FHA in 1968, Congress crafted the FHA's anti-discrimination provisions using only the "discriminate against …because of" formulation found in subsection (a)(1) of both Title VII § 703 and ADEA § 4.[56] Congress did not enact "effects" language comparable to subsection (a)(2) of Title VII § 703 and ADEA § 4. The FHA does not contain a provision with the "adversely affect" formulation that the Supreme

114

Court in *City of Jackson* found to be the basis for disparate impact claims under Title VII and the ADEA. When anti-discrimination statutes enacted closely in time contain similar language, "it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."[57] However, when such statutes have significant differences in language, it must be presumed that Congress intended the provisions to have different meanings.[58] If Congress had intended the FHA to permit disparate impact claims as it did with Title VII and the ADEA, then Congress would have incorporated into the FHA the "adversely affects" language it used in Title VII and the ADEA. It did not, and this is dispositive of congressional intent.

## The Evolution of Fair Housing Legislation

The FHA did not simply spring into existence in 1968; rather, it was the culmination of a three-year legislative effort. This effort began in 1966 with the introduction, at the behest of President Johnson,[59] of Title IV of the Civil Rights Act of 1966.[60] Among its various provisions, Title IV contained a provision for a Fair Housing Board that could hear and adjudicate complaints of violations of the Act.[61] This provision created intense opposition because of fear that it would have permitted a prima facie case of housing discrimination to be made based solely on results, without a showing of discriminatory intent. For example, early in the House debates Congressman Whitener expressed his concern that Title IV would allow claims to be brought based solely on results:

> Title IV, as had been said, leaves more questions unanswered than it answers.
>
> A provision was added in the committee about a fair housing board. At the time that seemed rather innocuous. As we look at it a little further it becomes objectionable. For example, it provides that we will use the NLRB procedure.
>
> We know that under the NLRB if a man is fired from a job and he was engaged in union activity, proof of these two facts establishes a prima facie case, and thereby shifts to the employer the burden of showing that the employer was not engaged in unfair labor practice.

115

I assume, if that is the procedure followed, this new fair housing board, as it is called, if a house were up for sale and a member of a minority group sought to purchase that house and that effort to buy the house was fruitless, then a prima facie case would be established and the burden would shift to the owner to show that he had not discriminated.

In the testimony before the Senate committee the Attorney General of the United States agreed that that would be the situation under the statement of facts I have just mentioned.[62]

The concern that the Fair Housing Board provision would permit a prima facie case to be made on results alone also featured prominently in the Senate debates. For example, Senator Long, a key member in the opposition to Title IV, presented four arguments against its passage. The fourth reason was the possibility that the Fair Housing Board provision would permit a plaintiff to make a prima facie case without a showing of discriminatory intent:

A fourth reason for opposing the open housing section of the bill is that it would very likely result in the imposition of an unreasonable practical burden upon property owners—over and above the deprivation of basic property rights.

Prof. Sylvestor Petro of the New York University School of Law, who testified before the Senate Subcommittee on Constitutional Rights, made some very interesting and appropriate comments on this aspect of the Senate bill. I should like to quote some of his remarks:

\* \* \*

[Petro] As we shall see, it is likely that the burden of proof will come to rest swiftly upon the homeowner, rather than, as is traditional, at least in due process countries, upon the complaining party.

\* \* \*

And what will happen at trial? The law is vague, and forbids refusing to sell to any person because race, color, religion, or national origin. How much proof is required? On whom will the burden of proof come ultimately to rest?

116

We have considerable experience with a similarly vague law. An analogous provision in the National Labor Relations Act prohibits discrimination by employers which tends to discourage union membership. The National Labor Relations Board considers itself as having a prima facie case of discrimination when a union man is discharged by an employer who has betrayed an antiunion sentiment. At that point the burden of proof shifts to the employer. He must show there was some good reason for the discharge.

\* \* \*

The burden of proving lack of discrimination will fall upon the homeowner....

\* \* \*

[Senator Long] Mr. President, I feel that Mr. Petro's logic is unimpeachable. He has made it plain that this bill would impose a very serious and unwarranted burden upon those to whom its provisions would apply. The imposition of this burden is indeed a compelling argument for rejecting so-called fair housing.[63]

Similarly, Senator Dirksen expressed concern about how discrimination could be proven under Title IV. After endorsing Professor Petro's views, he stated

Mr. President, this is a brilliant treatise.

\* \* \*

What Dr. Sylvester Petro of New York University Law School says is that this is the greatest assault upon the due process clause of the Constitution that anybody has ever undertaken....[64]

Similar concerns were expressed by several other opponents of the bill.[65] After cloture was defeated twice, the leadership voted to lay the bill aside.[66]

There can be no doubt that concern over the burden of proof—the ability of plaintiffs to establish a prima facie case based solely on results and without alleging discriminatory intent—played an important role in the defeat of Title IV.[67] Indeed, Senator Javits, a proponent of the bill, stated that Senator Dirksen's support was indispensible if cloture were to be invoked and the act

117

passed—and stated further that Dirksen's support was not forthcoming "be-cause Title IV was included in the bill."[68]

The Senate hearings the following year further confirm that the provision of Title IV permitting claims without allegations of discriminatory intent was a central reason for the bill's failure. After Title IV had been defeated, another bill (S. 1358) was introduced by Senator Mondale in 1967. S. 1358 removed the Fair Housing Board provision and replaced it with a provision that vested enforcement with the Secretary of Housing and Urban Development.[69] This provision raised the same concerns: that a prima facie case of violation might be established solely by results and without a showing of discriminatory in-tent. For example, during the hearings on S. 1358, a spokesman for the National Association of Real Estate Boards testified that the burden of proof issue—the ability of a complainant to establish a prima facie case based solely on results—was a principal reason for Title IV's failure, and that S. 1358 presented similar problems:

> It [Title IV] proposed an elaborate, complicated method of enforcement deplored by opponents as well as proponents of the bill.
>
> It was subsequently revised in the House with a radical method of en-forcement involving a Federal regulatory body with powers comparable to that of the National Labor Relations Board. Of course, this delighted the proponents but its oppressive terms were so manifest as to challenge the most objective analysis of the bill.
>
> Now in S. 1358, we have a third method of enforcement…which vests in the Secretary of Housing and Urban Development the power to issue complaints…to investigate with full subpoena power, to make findings of facts to render judgment, and to enforce judgment….
>
> All this to ascertain the subjective reasoning behind a property owner's decision not to rent a room in his home, or to sell his home to a certain individual. Due process dictates that he who alleges a fact has the burden of proving the fact.
>
> One would be most naive to believe that the Secretary or one of the thou-sands of employees who would be visited upon the public to enforce this law would accept as less than conclusive the mere denial of sale or rental as a fact of discrimination.[70]

118

The committee took no official action to report out the bill.[71]

## The Enactment of the FHA

Similarly, the bill that eventually became the FHA stalled in the Senate until the provisions that would allow plaintiffs to establish a prima facie case based solely on results and without alleging discriminatory intent were removed. In 1968, Senators Mondale and Brooke presented an amendment to a fair housing bill, H.R. 2516, which was substantively similar to S. 1358 that had failed the previous year.[72] With Senator Dirksen again opposing cloture, the Senate rejected cloture on the bill.[73] And, before the Dirksen compromise was reached, cloture was rejected a second time.[74]

To gain Senator Dirksen's support, the proponents of the fair housing title of the bill reached a compromise with him on the burden of proof.[75] Among other changes to his fair housing amendment, Senator Mondale described the Dirksen compromise:

> Last week's parliamentary tactics require us to put in a new version of the fair housing amendment today. With the exception of a few procedural changes, the new amendment is the same as the one voted on last week.
>
> * * *
>
> The changes that have been made in this amendment…are as follows:
>
> We have included a provision to make clear that the burden of proof with respect to allegations of discrimination rests on the complainant.[76]

In other words, the Dirksen compromise clarification that the prima facie case must be based on allegations of "discrimination," not on results alone. This can also be seen in the question and answer proponents of the bill prepared. One of these addressed this very issue:

> 15. Will a person against whom a complaint of discrimination is issued have to prove that he did not discriminate?
>
> No. The burden of proof rests on the Department of Housing and Urban Development, or the complaining person, to prove that the defend-

119

THE BANKING LAW JOURNAL

ing person *did* discriminate on the basis of race, color, religion, or national origin.[77]

Additionally, an exchange between Senators Jordan and Ervin—both opponents of the bill—shows that they understood that the Dirksen compromise would require a showing of intent and would not permit a prima facie case be made solely on results:

> Mr. JORDAN of North Carolina. I commend my colleague [Sen. Ervin] for the fine explanation he has made of this Dirksen amendment, and the bill that it seeks to amend.
>
> Because my colleague is an able lawyer and a good judge,...I ask him this question. I know of a case of a family which inherited some property. One sister inherited a specific piece of land, and it belonged to her by inheritance. Some people wanted to buy a lot, and she said, "No, I am not going to sell you that lot, because I want my brother to have it."
>
> Under the Dirksen proposal, she would be violating the law in that case, would she not?
>
> Mr. ERVIN. No, I do not believe she would, if she wanted to sell it to her brother. This is true because she would have a motive other than a racial motive.
>
> But if she said, "I want to sell that lot, but I prefer to sell it to a person of his and my race because persons of our race inhabit this neighborhood," she would be violating the law.[78]

Thus, both proponents and opponents of the bill understood that, after the Dirksen compromise, a person could be held liable under the FHA only upon a showing of discriminatory intent.

Additionally, statements by the bill's two principal proponents—Senators Mondale and Brooke—confirm that the FHA was intended to reach only intentional discrimination, not disparate impact. For example, Senator Brooke explained that "[a] person can sell his property to anyone he chooses as long as it is by personal choice and not because of *motivation of discrimination*."[79] Similarly, Senator Mondale explained that "[t]he bill permits an owner to do

120

everything that he could do anyhow with his property…except to refuse to sell it to a person *solely on the basis of his color. That is all it does.*"[80] Similarly, the proponents of the legislation in the House emphasized that claims require a showing of discriminatory intent. Congressman Steiger stated that "under the provisions of this legislation the burden of proof rests with the person alleging discrimination, who must in any court case which arises under this law, prove discrimination."[81] 114 Cong. Rec. 9573 (1968) (Rep. Steiger).

The Senate's rejection of the so-called "Baker Amendment" is another aspect of the legislative history of the FHA commonly used to support the argument that the FHA does not require a showing of intent to discriminate.[82] The context of the Baker Amendment, however, undermines the argument. As noted above, to garner Senator Dirksen's support, on February 26, 1968, Senators Mondale and Brooke and others presented an amendment to the fair housing title of the bill "to make clear that the burden of proof with respect to the allegations of discrimination rests on the complainant."[83] A subsequent vote on cloture, however, failed.[84] Two days later, on the motion of Senators Mondale and Brook, the Senate tabled the amendment to the fair housing title of the bill and Senator Dirksen introduced a substitute amendment with the support of Senators Mondale and Brook.[85] The key difference between the Dirksen substitute and the tabled fair housing amendment was who the bill would cover.[86] The Dirksen substitute contained an exemption for:

> any single-family house sold or rented by an owner residing in such house at the time of such sale or rental….: *Provided*, That after December 31, 1969, the sale or rental of any such single-family house shall be excepted from the application of this title only if such house is sold or rented (A) without the use in any manner of the sales or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings, or of any employee or agent of any such broker, agent, salesman, or person, and (B) without the publication, posting or mailing, after notice, of any advertisement or written notice in violation of section 204(c) of this Title….[87]

In other words, the Dirksen substitute carved out owner-occupied single family housing from the bill's coverage except when the seller (i) used a real estate

121

agent or (ii) published advertisements to sell the home that indicated a racial preference or limitation. In the latter two cases, the seller would still be covered under the anti-discrimination provisions of the bill. The Senate rejected the first cloture motion on the Dirksen substitute, but agreed to the second cloture motion.[88]

The following day, Senator Howard Baker proposed an amendment that would have extended the owner-occupied single family home exemption to owners who used a real estate agent.[89] Under the Baker Amendment, however, an owner of a single-family owner-occupied home would lose the exemption if he "indicat[ed] any preference, limitation, or discrimination based on race, color, religion, or national origin" to the real estate agent.[90] In other words, under the Baker Amendment, all single-family owner-occupied homes would be exempt from the bill, regardless of whether the owners used real estate agents or not, *unless* the owners instructed their real estate agents to discriminate.[91]

Senator Charles Percy and others opposed the Baker Amendment because they believed that, as a practical matter, it would have exempted from the bill all sellers of owner-occupied single-family homes who used real estate agents—even those who in fact instructed their real estate agents to discriminate.[92] According to Senator Percy, it would be "impossible" for a plaintiff to produce evidence that a seller instructed his real estate agent to discriminate.[93] The Senate rejected the Baker Amendment the same day it was introduced.[94] The Senate debates strongly suggest that Senator Percy and others primarily opposed the Baker Amendment not because of the difficulty of proving an instruction to discriminate, but because the Baker Amendment would have exempted all sellers of single-family owner-occupied homes who used real estate agents—a group that was covered under the Dirksen substitute.[95] The debates do not, however, support the conclusion that certain senators opposed the Baker Amendment because it would have introduced an intent requirement.[96] Indeed, the intent requirement was already in the bill by the time the Baker Amendment was introduced.

### Subsequent Legislative History

The relevant portion of the FHA's anti-discrimination provision has remained unchanged since the FHA's 1968 enactment. In 1988, 20 years after the

122

FHA's enactment, Congress amended the FHA to apply the Act's prohibitions against discrimination to the additional categories of familial status and disability.[97] This legislation did not add "effects" language to the statute. Instead, Congress left the relevant language of the anti-discrimination unchanged.[98]

Although Congress did not change the relevant language, at least one court has relied in part on select portions of the legislative history from 1988 amendments to the FHA—20 years after the FHA's enactment—in holding that the FHA permits disparate impact claims.[99] Indeed, certain individual legislators asserted during the legislative process that the amendments permit disparate impact claims even though the relevant statutory language remained unchanged. For example, the House Committee Report relied on two court opinions to assert that the unchanged language permitted disparate impact claims.[100] Additionally, the day following the enactment of the 1988 amendments, Senator Kennedy stated that "Congress accepted th[e] consistent interpretation" of the federal courts of appeal and that the FHA "prohibit[s] acts that have discriminatory effects, and that there is no need to prove discriminatory intent."[101]

The legislative history to the 1988 amendments illustrates the problems with relying on legislative history to include concepts into a statute that do not exist in the text itself.[102] First, the statements mentioned above substantially overstate the "consistent" interpretation of the FHA by the court to that date. For example, the inconsistency in the case law at the time of the 1988 amendments—both with respect to whether the FHA permitted disparate impact claims and the types of effects that must be shown—was discussed in a 1987 opinion by Judge Greene of the United District Court for the District of Columbia:

> Several of the decisions are inconsistent with each other; others are incomplete in significant respects; and still others do not distinguish between the various relevant concepts. While, to be sure, proof of discriminatory intent by the landlord seems everywhere to be regarded as establishing a violation of the statute, there is a variety of opinion, usually not reconciled in any systematic fashion, whether a violation may also be predicated solely upon proof that the landlord's actions had a discriminatory effect, that is, a disproportionate effect on minorities.[103]

123

Thus, the case law at the time of the 1988 amendments was far from consistent with respect to whether the FHA permitted disparate impact claims.

Additionally, the statements discussed above fail to disclose that the United States—just three months before the 1988 amendments were enacted—filed an amicus brief before the Supreme Court arguing that the FHA did not permit disparate impact claims. In the United States' brief, the Solicitor General argued that the FHA did not permit disparate impact claims:

> Although proscribing a broad range of conduct, Congress limited that proscription to action taken "because of race." The words "because of" plainly connote a causal connection between the housing-related action and the person's race or color. The proscribed action must have been caused, at least in part, by the individual's race, which strongly suggests a requirement of discriminatory motivation. An action taken because of some factor other than race, i.e., financial means, even if it causes a discriminatory effect, is not an example of the intentional discrimination outlawed by the statute. [104]

The United States' brief further argues that the FHA's legislative history supports this reading of the statute. Indeed, the Solicitor General noted that "substantial practical problems result if this requirement is disregarded."[105]

Furthermore, the statements discussed above did not reflect the views of all those involved in the enactment of the 1988 amendments. For example, President Reagan made the following clarification when signing the 1988 amendments:

> I want to emphasize that this bill does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that title 8 [FHA] violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent. Title 8 speaks only to intentional discrimination.[106]

Because the 1988 amendments did not change the relevant language of the FHA's anti-discrimination provision—language that prohibits only discrimi-

124

nating against individuals "because of" certain characteristics, but does not address the "effects" of any particular action—the 1988 amendments would be relevant to interpreting the FHA only under the "reenactment doctrine." Under the reenactment doctrine, Congress is presumed to adopt prior interpretation of a statute when it "re-enacts a statute without change."[107] The doctrine applies, however, only if the interpretation is "well established."[108] As the discussion above shows, courts and government officials disagreed about whether the FHA permitted disparate impact claims. The reenactment doctrine cannot appropriately apply to the 1988 amendments.[109]

## THE CASE LAW MISCONSTRUES *CITY OF JACKSON* AND THE FHA

The notion that the FHA permits disparate impact claims originated in a trio of poorly-reasoned decisions in the 1970s that have since been eviscerated by subsequent Supreme Court decisions, including *City of Jackson*. Despite the plain import of *City of Jackson*, the lower courts that have continued to find disparate impact theory available under the FHA. To borrow from Hans Christian Andersen's classic tale, the child has declared that the emperor has no clothes, but the general populace still refuses to recognize the truth.

### Pre-*City of Jackson* Case Law Rested on a Questionable Foundation

The first court to hold that the FHA permits disparate impact claims drew on equal protection jurisprudence and ignored entirely the text of the FHA. In *United States v. City of Black Jack*,[110] the Eighth Circuit concluded that to establish a *prima facie* case of discrimination under the FHA, a plaintiff "need make no showing whatsoever that the [challenged] action resulting in racial discrimination in housing was racially motivated."[111] The court did not analyze the FHA or Title VII or even rely on case law concerning those statutes. Instead, the court cited a series of constitutional equal protection cases[112] without providing any rationale for why equal protection case law ought to apply to the FHA. Less than two years later, the Supreme Court overruled the series of equal protection cases relied upon in *Black Jack*[113] and

125

held that equal protection violations require a showing of discriminatory intent.[114] *Black Jack*'s flawed foundation was thus undermined and the opinion "must be regarded as having no vitality."[115]

Soon after *Black Jack*, the Seventh Circuit in *Metropolitan Housing Development Corp. v. Village of Arlington Heights (Arlington Heights II)*[116] similarly concluded that the FHA permits disparate impact claims. Before discussing the opinion, a brief review of the procedural history is relevant. The complaint at issue in the *Arlington Heights* decisions alleged both constitutional equal protection and FHA claims. In *Metropolitan Housing Development Corp. v. Village of Arlington Heights (Arlington Heights I)*,[117] the Seventh Circuit held that a "racially discriminatory effect" was sufficient to support an equal protection claim but did not consider the FHA issue.[118] The Supreme Court reversed based on its decision in *Washington v. Davis* that equal protection violations require intent to discriminate and not merely a disparate impact.[119] The Court remanded for consideration of the FHA claim because the appellate court, "proceeding in a somewhat unorthodox fashion, did not decide the statutory question."[120]

On remand, the Seventh Circuit began with the observation that the "because of race" language contained in the FHA presented a "major obstacle" to applying disparate impact theory under the FHA.[121] The court acknowledged that a "narrow view of the phrase"—in other words, a plain interpretation of the text—"is that a party cannot commit an act 'because of race' unless he intends to discriminate between races."[122] The court observed, however, that *Griggs* permitted Title VII disparate impact claims based on "the broad purposes" of Title VII despite that statute's inclusion of the "because of race" language.[123] Thus, reasoned the *Arlington Heights II* court, the same phrase in the FHA should not be an impediment to disparate impact claims under the FHA. According to the court,

> The important point to be derived from *Griggs* is that the Court did not find the "because of race" language to be an obstacle to its ultimate holding that intent was not required under Title VII. It looked to the broad purposes underlying the Act rather than attempting to discern the meaning of this provision from its plain language.[124]

126

In *Griggs v. Duke Power Co.*,[125] a key decision in the *Arlington Heights II* opinion, the Supreme Court held that Title VII authorizes disparate impact claims. The appellate court in *Griggs* held that a plaintiff must show that a "racial purpose or invidious intent" motivated the challenged employment practice to prevail on a Title VII claim.[126] The Supreme Court reversed, setting forth its entire reasoning in the brief paragraph quoted below. Importantly, the Court did not analyze the text of Title VII in reaching its conclusion, but rather relied exclusively on what it characterized as the "objective of Congress" in enacting Title VII.

> The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.[127]

Based on *Griggs* and despite the plain language of the FHA, the Seventh Circuit in *Arlington Heights II* held that "at least under some circumstances a violation of [the FHA] can be established by a showing of discriminatory effect without a showing of discriminatory intent."[128] As additional support for its conclusion, the court cited *Black Jack* and *Rizzo*.[129] The Seventh Circuit then identified four factors relevant to determining whether conduct lacking a discriminatory intent but which has a disparate impact would be considered a violation of the FHA.[130]

The Supreme Court in *City of Jackson* rejected the same interpretation of *Griggs* that the *Arlington Heights II* court relied on, thereby undermining the decision and subsequent cases relying upon it.[131] *City of Jackson* made clear that Title VII permits disparate impact claims only because of the language in section 703(a)(2) regarding conduct that "otherwise adversely affect[s]" an employee's status because of a protected class, language which is absent from the FHA, and not because of the broad purposes of Title VII. It follows that had Title VII included only the "discriminate...because of race" language, it would not permit disparate impact claims. Thus, *City of Jackson* directly

127

contradicts the *Arlington Heights II* court's conclusion that the broad purpose of Title VII permits disparate impact claims and that the "because of race" language in Title VII presents no obstacle to disparate impact claims. This conclusion was critical to the *Arlington Heights II* holding.

The third of the original FHA disparate impact cases, the Third Circuit's decision in *Resident Advisory Board v. Rizzo*,[132] relied on three flawed or subsequently discredited arguments. First, the Third Circuit put significant stock in the Supreme Court's remand in *Arlington Heights*. According to the Third Circuit, the Supreme Court would not have remanded for consideration of the FHA claim on facts demonstrating only disparate impact and not intent unless the Court believed that the FHA permitted disparate impact claims. On the contrary, the Supreme Court's remand was entirely consistent with its duty to address only issues properly before it and is irrelevant to an issue neither briefed nor properly before the Court.[133] Second, the Third Circuit relied on case law permitting disparate impact claims under Title VII, reasoning that the broad purpose of the FHA supported disparate impact theory just as the purpose of Title VII had supposedly permitted disparate impact claims in *Griggs*.[134] The court also asserted that the "because of race" language in Title VII did not require discriminatory intent and thus similar language in the FHA did not require discriminatory intent either.[135] Finally, the Third Circuit cited cases from other circuits, primarily *Arlington Heights II* and *Black Jack*.[136] As explained previously, *City of Jackson* completely discredited the second and third arguments.

After *Black Jack, Arlington Heights II,* and *Rizzo*, other circuits and district courts reached the same conclusion, relying on that trio of cases and the analysis advanced therein. The Fourth Circuit's decision in *Smith v. Town of Clarkton, NC,* is typical of these subsequent cases.[137] The court performed no additional analysis and cited only *Black Jack, Arlington Heights II, Rizzo,* and *Griggs* as support. Its statement that "some courts have reasoned that since the anti-discrimination objectives of Title VIII [the FHA] are parallel to the goals of Title VII, the *Griggs* rationale must be applied in Fair Housing Act cases," has been rejected by *City of Jackson*. Parallel text—not objectives—are what matter post- *City of Jackson*, and the FHA and Title VII do not have parallel language. A second example of post- *City of Jackson* case law, the Ninth Circuit's decision in *Keith v. Volpe,* relied on *Black Jack, Arlington Heights II,*

128

*Rizzo*, and *Town of Clarkton* to support its conclusion that the FHA permits disparate impact claims.[138]  Other decisions followed the same pattern.[139]

## Post-*City of Jackson* Case Law Fails to Recognize the Implications of *City of Jackson*

After the Supreme Court's 2005 decision in *City of Jackson*, courts continue to follow the pre-*City of Jackson* line of cases.  For example, in *National Community Reinvestment Coalition v. Accredited Home Lenders*, the D.C. district court held that "*City of Jackson* does not preclude disparate impact claims pursuant to the FHA."[140]  The court relied on several grounds, each of which has been discredited in this article, including (i) the legislative history of the FHA; (ii) agency interpretations of the FHA; (iii) *Arlington Heights II*, *Rizzo*, and other circuit cases that "are 'grounded on Supreme Court rules of FHA construction, legislative history, purpose, analogy to Title VII, issues of proof, and the Act's text'"; and (iv) several post-*City of Jackson* district court decisions.[141]  The court's reasoning is typical of the post-*City of Jackson* district court cases, which generally assert that although the FHA's text does not support disparate impact theory, other factors justify perpetuating pre-*City of Jackson* precedent.

In *Guerra v. GMAC LLC*, the Eastern District of Pennsylvania also held that the FHA permits disparate impact claims even after *City of Jackson*, relying on a distorted view of the *City of Jackson* decision.[142]  The court stated that "the *City of Jackson* decision was not based merely on the text of the ADEA, but also on the governing regulations, the purposes of the act, and the uniform interpretation of the appellate courts."[143]  Justice Steven's plurality opinion in *City of Jackson*, however, is inconsistent with the district court's statement.  The plurality opinion "beg[a]n with the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."[144]  In other words, two statutes must have *both* the same text and similar purposes for the presumption that they also have the same meaning to attach.  Different language in similar statutes enacted closely in time, as is true of Title VII and the FHA, in fact suggests different meanings.[145]  Furthermore, if purpose

129

alone sufficed, then any statute prohibiting discrimination would authorize disparate impact claims, which is clearly not the case.[146]

The *Guerra* court's reliance on governing regulations and general consensus among lower courts is also incorrect. Although the *City of Jackson* plurality opinion also cited governing regulations as additional support for its position, the core rationale of *City of Jackson* was the text of the ADEA. Absent a firm textual foundation, it is highly unlikely that the other factors alone would have supported the Court's conclusion. Indeed, as demonstrated in this article, other factors such as legislative history and agency interpretations do not support the notion that the FHA permits disparate impact claims. Nor does the widespread consensus of lower courts lend legitimacy to the notion. The *City of Jackson* plurality opinion's reference to the uniform interpretation of appellate courts that the ADEA permitted disparate impact theory was merely an observation that the appellate courts' interpretation was correct, not a justification for the Court's opinion.[147] In any event, the Court has rejected the uniform interpretations of the appellate courts in the past when it disagreed[148] and, on the question of whether *City of Jackson* negates the availability of disparate impact theory under the FHA, no circuit court has squarely addressed the issue and thus no consensus on the issue exists among the appellate courts.

In *Beaulialice v. Federal Home Loan Mortgage Corp.*, another post-*City of Jackson* opinion addressing disparate impact under the FHA, the Middle District of Florida decided that the statute continues to permit disparate impact claims in conclusory fashion without any analysis.[149] The court first cited the pre-*City of Jackson* decision in *Jackson v. Okaloosa County*[150] to support the proposition that the FHA permits disparate impact claims. Its discussion of *City of Jackson* was confined to one sentence noting only that *City of Jackson* did not "prohibit disparate impact claims under [the ADEA]."[151] It then concluded that, "in light of this precedent," the "Plaintiff may bring a disparate impact claim under the FHA." The decision is devoid of any discussion of the rationale underlying *City of Jackson* or analysis of the text of the FHA.

Other district courts have also held that *City of Jackson* does not preclude disparate impact claims under the FHA but have made no additional arguments not previously addressed in this article.[152] Several other post-*City of Jackson* district court decisions assert that the FHA permits disparate impact

130

claims but do not discuss *City of Jackson*.[153] Ironically, several of these district court cases cite to *City of Jackson* for the substantive disparate impact standard without recognizing that the same case precludes disparate impact claims under the FHA.[154]

After the Supreme Court issued its decision in *City of Jackson*, no circuit court—including the Eighth Circuit in *Magner*—has analyzed the decision to preclude disparate impact claims under the FHA. Although several circuit courts in post-*City of Jackson* decisions have asserted that the FHA permits disparate impact claims, they have done so without analysis or acknowledgement of *City of Jackson* and in reliance on pre-*City of Jackson* precedent that has since been discredited.[155] In the Eighth Circuit *Magner* decision, however, five judges dissented from the full court's denial of rehearing en banc, stating that "recent developments in the law," primarily *City of Jackson*, "suggest that the issue is appropriate for careful review by the en banc court."[156] The D.C. Circuit has also called into doubt whether disparate impact claims are viable under the Equal Credit Opportunity Act—and by implication under the FHA—after *City of Jackson*, but did not resolve the issue.[157] The D.C. Circuit's comment is equally applicable to the FHA, which also lacks the "otherwise adversely affect" language the Supreme Court has stated gives rise to disparate impact claims under Title VII and the ADEA.

## HUD AND DOJ INTERPRETATIONS ARE NEITHER REASONABLE NOR ENTITLED TO DEFERENCE

Recently, both HUD—the executive agency charged with administering, interpreting and enforcing the FHA[158]—and the Department of Justice ("DOJ") have taken the position that the FHA provides for liability under the disparate impact standard. Curiously, soon after the Supreme Court granted the cert. petition in *Magner*, HUD for the first time issued a proposed rule ostensibly to establish standards for determining whether an action or policy has a disparate impact violative of the FHA.[159] In issuing the proposed rule, however, HUD puts the cart before the horse because it has never formally interpreted the FHA to allow for claims under the disparate impact theory.[160] Nonetheless, according to HUD, it "has repeatedly determined that the [FHA] is directed to the consequences of housing practices, not simply their purpose."[161]

131

In support of its contention that it recognizes a disparate impact claim under the FHA, HUD lists a number of occasions on which it "has concluded that the [FHA] provides for liability based on discriminatory effects without the need for a finding of intentional discrimination," including (i) its "Title VIII Complaint Intake, Investigation and Conciliation Handbook" (the "Handbook"), (ii) the holdings of (non-Article III) HUD administrative law judges, (iii) its regulations interpreting the FHA, and (iv) its joining "with the [DOJ] and nine other Federal enforcement agencies to recognize that disparate impact is among the 'methods of proof of lending discrimination under the [FHA]' and provide guidance on how to prove a disparate impact fair lending claim.[162] HUD also refers to regulations it has issued implementing statutes other than the FHA, as if these have any bearing on an appropriate interpretation of the FHA.[163] None of these instances, however, provides HUD with the justification to declare that application of the disparate impact test itself is a reasonable interpretation of the FHA. Indeed, the only formal regulation applicable to the FHA cited by HUD—24 C.F.R. § 100.70—does not stand for the proposition claimed by HUD, instead simply mirroring the broad remedial language of Section 3604 itself.[164]

Lacking a formal interpretation supporting its current position on the disparate impact test, HUD relies on the fact that "all Federal courts of appeals to have addressed the question have held that liability under the Act may be established based on a showing that a neutral policy or practice either has a disparate impact on a protected group...even if such a policy or practice was not adopted for a discriminatory purpose."[165] Of course, HUD's reliance on case law for its position is not entitled to deference.[166] Parroting the erroneous conclusions of these courts—as demonstrated above—HUD concludes that "[t]he [FHA's] discriminatory effects standard is analogous to the discriminatory effects standard under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e), which prohibits discriminatory employment practices.

HUD's new proposed rule is entitled to no more deference than its previous interpretations of case law. The language of Section 3604 is unambiguous. Accordingly, HUD's interpretation of Section 3604 is not entitled to deference.[167] A regulatory agency is not authorized to attempt to effectuate an interpretation of a statute by prohibiting conduct the statute permits. As Justice O'Connor has explained: "an agency's legislative regulations will be upheld

132

if they are 'reasonably related' to the purposes of the enabling statute,... [W]e would expand considerably the discretion and power of agencies were we to interpret 'reasonably related' to permit agencies to proscribe conduct Congress did not intend to prohibit."[168] "'[R]egulations that would proscribe conduct by the recipient having only a discriminatory *effect*...do not simply "further" the purpose of the [statute]; they go well *beyond* that purpose.'"[169]

DOJ's position regarding disparate impact claims under the FHA is even less justified. Since its creation in early 2010, DOJ's Fair Lending Unit of the Housing and Civil Enforcement Section has relied on the disparate impact theory in charging lenders with lending discrimination in violation of the FHA based on statistical analysis rather than proof of discriminatory intent.[170] Of course, DOJ has no rulemaking or interpretive authority under the FHA.[171] As a result, DOJ's interpretation, which is being carried out through its enforcement function, is not entitled to deference.[172]

## CONCLUSION

In *Magner*, the Supreme Court has an opportunity to reign in the unjustifiably expansive and unjustified interpretation of the FHA by lower courts and regulators that permits disparate impact claims. As demonstrated above, such claims were neither provided for in the FHA nor anticipated by the lawmakers who enacted the Act. A plain reading of the statutory text makes clear that disparate impact claims are not allowed under the FHA. Such a decision would not only correct decades of misinterpretation and misapplication of the FHA, but also would provide a powerful signal to courts interpreting other antidiscrimination laws, like the Equal Credit Opportunity Act, that similarly lack statutory language providing for claims based on "effects" rather than intentional discrimination.

## NOTES

[1] *See* http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/10-1032.htm (*Magner v. Gallagher*, No. 10-1032 (U.S.) docket). The disparate impact theory of discrimination allows a plaintiff to establish "discrimination" based solely on the results of a neutral policy, without having to show any actual intent to discriminate.

133

THE BANKING LAW JOURNAL

*See, e.g., Graoch Assocs. #33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 378 (6th Cir. 2007).

[2]  *Graoch Assocs.*, 508 F.3d at 374; *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007); *Charleston Housing Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49–50 (1st Cir. 2000); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith v. Volpe*, 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir. 1988), *judgment aff'd*, 488 U.S. 15 (1988); *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 149–50 (3d Cir. 1977); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988–89 (4th Cir. 1984); *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights (Arlington Heights II)*, 558 F.2d 1283, 1290 (7th Cir. 1977).

[3]  *See, e.g., Arlington Heights II*, 558 F.2d at 1289.

[4]  *See, e.g., id.* at 1288.

[5]  544 U.S. 228 (2005).

[6]  *See, e.g., Gallagher v. Magner*, 636 F.3d 380, 383 (8th Cir. 2010) (Colloton, J., dissenting) (noting that there has been "virtually no discussion of the matter [of whether the FHA permits disparate impact claims] by any court of appeals since the Court in *Smith [v. City of Jackson]* explained how the text of Title VII justified the decision in *Griggs*.")

One federal court of appeal suggested, in dicta, that a similar statute—the Equal Credit Opportunity Act—does not permit disparate impact claims after *City of Jackson*. *See Garcia v. Johanns*, 444 F.3d 625, 633 n.9 (D.C. Cir. 2006) ("The Supreme Court has held that this ['effects'] language gives rise to a cause of action for disparate impact discrimination under Title VII and the ADEA. ECOA contains no such language." (citations omitted)).

[7]  No. 10-1032.

[8]  Petition for Writ of Certiorari, 2011 WL 549171, *i (Feb. 14, 2011).

[9]  *Gallagher v. Magner*, 619 F.3d 823, 830 (8th Cir. 2010).

[10]  *Id.* at 834.

[11]  *Id.*

[12]  *See Steinhauser v. City of St. Paul*, 595 F. Supp. 2d 987 (D. Minn. 2008).

[13]  *Gallagher v. Magner*, 619 F.3d at 838.

[14]  *Gallagher v. Magner*, 636 F.3d 380, 381 (8th Cir. 2010).

[15]  Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921 (proposed Nov. 16, 2011) (to be codified at 24 CFR Part 100).

[16]  *See, e.g.,* Thomas E. Perez, Speech to 15th Annual Community Reinvestment Act and Fair Lending Colloquium (Nov. 7, 2011), *available at* http://www.justice.gov/crt/opa/pr/speeches/2011/crt-speech-111107.html.  Critics of this approach

134

THE FAIR HOUSING ACT, DISPARATE IMPACT CLAIMS, AND *MAGNER v. GALLAGHER*

have argued that DOJ has used the disparate impact theory to "intimidat[e] banks into lending to minority borrowers at below-market rates in the name of combating discrimination." *Mary Kissel,* "Justice's New War Against Lenders," WALL ST. J. Aug. 31, 2011.

[17] 401 U.S. 424 (1971).

[18] *City of Jackson,* 544 U.S. at 234.

[19] Title VII § 703(a), 42 U.S.C. § 2000e-2(a) (emphasis added).

[20] *Griggs,* 401 U.S. at 426 (quoting Section 703(a)(2), but omitting quotation of Section 703(a)(1)).

[21] *City of Jackson,* 544 U.S. at 234 (quoting *Griggs,* 401 U.S. at 432 (emphasis in original)).

[22] *Id.*

[23] *See Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 991 (1988) (quoting only Section 703(a)(2) in discussing disparate impact); *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 655 n.9 (1989) (same).

[24] *City of Jackson,* 544 U.S. at 235-36 (emphasis in original).

[25] *Id.* at 235-38.

[26] *Id.* at 236 n.6.

[27] *Id.* at 236-38 (emphasis added).

[28] *Id.* at 236 n.6. Justice Scalia concurred in judgment and explained that he agreed with the plurality's analysis. *See id.* at 243 (Scalia, J., concurring) ("I agree with all of the Court's reasoning....").

[29] *Id.* at 249 (O'Connor, J., dissenting) (emphasis added).

[30] The *City of Jackson* Court's limited foray into the purpose of the statute was to address the dissent's view that the "because of" language in section (a)(2) also required a showing of intent. The Court reasoned that the "because of" language could plausibly be interpreted as referring to the "motive of the employer's action" rather than the "cause of the adverse effect." *See, e.g., City of Jackson,* 544 U.S. at 249 (O'Connor, J., dissenting). A broad reading of the purpose of the statute was the basis for holding that "because of" did not refer to the employer's intent. *City of Jackson* makes clear, however, that disparate impact claims are rooted in the "effects" language of the statute and not the broad purpose.

[31] *See, e.g., Garcia v. Johanns,* 444 F.3d 625, 633 n.9 (D.C. Cir. 2006) ("The Supreme Court has held that this ['effects'] language gives rise to a cause of action for disparate impact discrimination under Title VII and the ADEA. ECOA contains no such language." (citations omitted)).

[32] *City of Jackson,* 544 U.S. at 233-34.

[33] *Id.* at 235-38.

[34] *See id.* at 236 n.6; *id.* at 243 (Scalia, J., concurring); *id.* at 249 (O'Connor, J.,

135

dissenting).

[35] *Acree v. Republic of Iraq*, 370 F.3d 41, 61 (D.C. Cir. 2004) (Roberts, J., concurring).

[36] Pub. L. 90-284, April 11, 1968, 82 Stat. 73 (FHA); Pub. L. 88-352, July 2, 1964, 78 Stat. 241 (Title VII); Pub. L. 90-202, Dec. 15, 1967, 81 Stat. 602 (ADEA).

[37] *See, e.g., Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995).

[38] *See, e.g., Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("'Discrimination' is a term that covers a wide range of *intentional* unequal treatment." (emphasis added)). It should be noted, however, that in the aftermath of the creation of disparate impact causes of action the term "discrimination" is occasionally used generically, and imprecisely, to refer to any conduct prohibited by antidiscrimination laws—even if that conduct is unrelated to "discrimination" per se. *See, e.g.,* James F. Blumstein, *Defining and Proving Race Discrimination: Perspectives on the Purpose vs. Results Approach from the Voting Rights Act*, 69 VA. L. REV. 633, 635 (1983) (noting that, despite the "clear conceptual distinction" between intentional discrimination and neutral conduct that results in disparate impacts, the two concepts "are often lumped together in debates over civil rights legislation and enforcement policies.") Nevertheless, in its ordinary usage "discriminate" refers to the intentional treatment of one person differently than another—not to whether the consequences of a particular action affect all persons the same. *See, e.g.,* RANDOM HOUSE UNABRIDGED DICTIONARY, "Discriminate" (2006).

[39] *See, e.g.,* Blumstein, *supra* note 38, at 633-36; Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*, 117 HARV. L. REV. 493, 524-25 (2003) (noting that, under this view, disparate impact is "a cousin of affirmative action"); David A. Strauss, *The Myth of Color Blindness*, 1986 SUP. CT. REV. 99 (arguing that affirmative action and disparate impact doctrine lie on the same conceptual continuum); D. Marvin Jones, *Plessy's Ghost: Grutter, Seattle and the Quiet Reversal of Brown*, 35 PEPP. L. REV. 583, 592 & n.59 (2008) ("Most people think of racism as something that involves decisions.").

We note that an alternative view of the goal of disparate impact claims is as a proxy for disparate treatment claims where intent may be difficult to prove. *See, e.g.,* Primus, *supra*, at 523-24. However, courts have generally allowed the use of statistical evidence to show intent to discriminate. *See, e.g., Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 715 (7th Cir. 1998). Consequently, disparate impact claims cannot be justified as a proxy for disparate treatment claims.

[40] Blumstein, *supra* note 38, at 634-46; *see also id.* at 643-44 ("Because the nondiscrimination notion is a procedural concept assuring evenhanded treatment of similarly situated individuals, it is breached when similarly situated people are treated differently because of their race. Such differential treatment has an essential ingredient of volition, and a finding of unconstitutional discrimination therefore

136

THE FAIR HOUSING ACT, DISPARATE IMPACT CLAIMS, AND *MAGNER v. GALLAGHER*

rests on a finding of intent.").

[41] 1 JOHN P. RELMAN, HOUSING DISCRIMINATION PRACTICE MANUAL § 2:24 (2005) (emphasis added).

[42] *See, e.g.*, *Washington v. Davis*, 426 U.S. 229, 248 (1976) (explaining that any "extension of [disparate impact] beyond those areas where it is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription").

[43] *W.Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98-99 (1991); *see also Neal v. Honeywell Inc.*, 33 F.3d 860, 862-63 (7th Cir. 1994) ("[A]ll laws...are compromises among competing interests.... [W]hether one of these interests triumphs over the other, or whether instead they coexist uneasily, is determined not by natural justice but by the political process, which created a text."); Laurence H. Tribe, *Comment, in* ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 74-75 (1997) (emphasis added) (explaining that "[t]he text of the law is not just evidence about how much one interest...should be preferred over another...; the text is the *decision* about what to do" regarding the accommodation of competing interests—"a decision approved by the Constitution's own means, bicameral approval and presidential signature.").

[44] FHA § 801, 42 U.S.C. § 3601.

[45] *See, e.g.*, *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972).

[46] *See, e.g.*, *Hearings Before the Subcommittee on Housing and Urban Affairs of the Committee on Banking and Currency on S. 1358, S. 2114, and S. 2280, Relating to Civil Rights and Housing*, at 338-42 (1967) (testimony of Alan L. Emlen, National Association of Real Estate Boards) (testifying that fair housing legislation is unconstitutional); *see also* Jean Eberhart Dubofsky, *Fair Housing: A Legislative History and a Perspective*, 8 WASHBURN L.J. 149, 152-53 (1969) (explaining that opponents of fair housing legislation "argued the...familiar constitutional grounds of states' rights and the right of the individual to control the disposal of his property").

[47] Raymond J. Celeda, *The Civil Rights Act of 1968: Background and Title-by-Title Analysis*, at LRS-40 (Congressional Research Service 1968) (quoting 114 Cong. Rec. S 2061 (daily ed. March 4, 1968)).

[48] *Director v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135-36 (1995); *see also id.* at 135 (referring to "the proposition that the statute at hand should be liberally construed to achieve its purposes" as "the last redoubt of losing causes"); *MCI Telecomms. Corp. v. American Tel. & Tel. Co.*, 512 U.S. 218, 230-32 (1994) (noting that even when the Court itself in other contexts has determined an alternative policy may better serve the legislative purpose, the statutory text controls).

[49] *Neal*, 33 F.3d at 862.

[50] 114 Cong. Rec. 4975 (1968).

137

THE BANKING LAW JOURNAL

[51] *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 288 (2001); *see also id.* ("We have never accorded dispositive weight to context shorn of text...in interpreting statutes generally...legal context matters only to the extent it clarifies text.").

[52] Brief of United States as Amicus Curiae, *Town of Huntington v. Huntington Branch, NAACP*, No. 87-1961 (U.S. filed June 1988) (emphasis added and citations omitted) (hereinafter "SG Brief"), *available at* http://www.usdoj.gov/osg/briefs/1987/sg870004.txt.

[53] *See, e.g., W.Va. Univ. Hosps.*, 499 U.S. at 100 (explaining that where the language of a statute is ambiguous, courts must "construe it to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law").

[54] Pub. L. 88-352, § 703(a), 78 Stat. 241 (1964).

[55] Pub. L. 90-202, § 4(a), 81 Stat. 602 (1967).

[56] Pub. L. 90-284, § 805, 82 Stat. 73 (1968).

[57] *City of Jackson*, 544 U.S. at 233-34.

[58] *See, e.g., Acree v. Republic of Iraq*, 370 F.3d 41, 61 (D.C. Cir. 2004) (Roberts, J., concurring).

[59] *See* 112 Cong. Rec. 9390-91 (Apr. 28, 1966).

[60] *See* H.R. 14765 (1966); S. 3296 (1966). For a detailed discussion of the evolution of the legislation that became the Fair Housing Act, see Marshall D. Stein, *The Fair Housing Act of 1968 and the Civil Rights Act of 1866: The Test for Liability in Housing Discrimination Cases, in* 1 Issues in Housing Discrimination: A Consultation/Hearing, at 94 (U.S. Comm'n on Civil Rights, 1985).

[61] *See* H.R. 14765, § 408; S. 3296, § 408 (1966).

[62] 112 Cong. Rec. 17196 (1966) (Rep. Whitener).

[63] *Id.* at 22313-14 (Sen. Long).

[64] 112 Cong. Rec. 22618 (1966) (Sen. Dirksen).

[65] *See, e.g., id.* at 22625 (Sen. Sparkman) ("Title IV is premised on the mistaken belief that any rejection of an offer to buy or rent from a member of a racial minority is necessarily an act of racial discrimination.... Even though race might not be the reason a home owner decides to sell, he could, under this bill, become involved in expensive and lengthy litigation trying to prove that his refusal to sell was not because of race." (citation omitted)); *id.* at 23023 (Sen. Ervin) ("A prima facie case could be made in every case in which two people of different race, color, religion, or national origin are parties to an unsuccessful real estate transaction.").

Additionally, while much of the discussion focused on the impact the bill would have on individual homeowners and landlords, the Senate also focused on the similar effect the bill's provisions allowing claims to be brought without alleging discriminatory intent would have on governmental entities. *See, e.g., id.* at 22300-01,

138

THE FAIR HOUSING ACT, DISPARATE IMPACT CLAIMS, AND *MAGNER v. GALLAGHER*

22304-05 (Sen. Stennis) ("Thus, in conducting investigations and filing complaints under the open housing provisions of Title IV, as well as in approving grants under Federal aid programs….the Secretary will be in a position to force the balancing of the races in every neighborhood throughout the land, on whatever basis he may have in his mind at that particular time.").

[66] *See* 112 Cong. Rec. 22670 (1966) (1st cloture defeated); *id.* at 23042-43 (2d cloture defeated); *id.* at 23046-47 (laid aside consideration for 1966).

[67] *See* Stein, *supra note* 60, at 97.

[68] *See* 112 Cong. Rec. 23013-14 (1966) (Sen. Javits). Stein notes that "[t]his assessment from a fellow Republican Senator seems unassailable, and Javits' acumen was verified when in 1968 Dirksen supported the amended fair housing provision; cloture was invoked, and the Civil Rights Act was passed." Stein, *supra note* 60, at 97 n.15. Additionally, Jean Eberhart Dubofsky, Senator Mondale's legislative assistant at the time, has recounted Senator Dirksen's central role in changing the momentum toward passage of the FHA. *See* Dubofsky, *supra note* 46, at 155-58.

[69] *See* S. 1358, 90th Cong., 1st Sess. §§ 11-12, 14 (1967).

[70] *Hearings Before the Subcommittee on Housing and Urban Affairs of the Committee on Banking and Currency on S. 1358, S. 2114, and S. 2280, Relating to Civil Rights and Housing,* at 344 (Aug. 23, 1967) (hereinafter "Senate Subcommittee Hearings"), at 171 (Sen. Muskie); *id.* at 389 (Sen. Proxmire); *id.* at 418 (Sens. Meany and Proxmire).

[71] *See* Dubofsky, *supra note* 46, at 149-50.

[72] 114 Cong. Rec. S980-83, S1876 (1968); *see also* Dubofsky, *supra note* 46, at 152 ("The amendment was S. 1358 with the addition of the 'Mrs. Murphy exemption'….").

[73] *See* 114 Cong. Rec. S1454 (Sen. Dirksen); *id.* S1458 (1st failed cloture vote); *see also* Dubofsky, *supra note* 46, at 155 (recounting the Sen. Dirksen's role in opposing cloture and the vote against cloture).

[74] *See* 114 Cong. Rec. S1729.

[75] *See* 114 Cong. Rec. S4049 (1968) (Sen. Javitz) (expressing hope that Sen. Dirksen's support would result in passage of the act); *see also* Dubofsky, *supra note* 46, at 156-58 (describing process of reaching compromise with Sen. Dirksen).

[76] 114 Cong. Rec. S4060-61 (1968) (Sen. Mondale).

[77] 114 Cong. Rec. 2273 (1968).

[78] *Id.* at 4689-90.

[79] *Id.* at 3427 (emphasis added).

[80] *Id.* at 5643 (emphasis added). While Senators Brooke and Mondale clarified that the bill that became the FHA was intended to reach only intentional discrimination, some broader statements regarding the bill have caused some confusion. For example, the Supreme Court in *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S.

139

THE BANKING LAW JOURNAL

205 (1972), noted that Sen. Mondale had stated that "the reach of the proposed law was to replace the ghettos 'by truly integrated and balanced living patterns.'" *Id.* at 211 (quoting 114 Cong. Rec. 3422 (Sen. Mondale)). Solicitor General Fried rightly noted that such statements, "although stating an admirable goal, do[] not address the means of achieving it. The argument that the ambitious goals of Title VIII require an expansive reading of the statute to include a discriminatory effect standard hardly surmounts the obstacles posed by the statute's plain language and legislative history." SG Brief, *supra* note 52, at n.21. And, in any event, the statements by Sens. Brooke and Mondale cited above interpret the actual provisions of the legislation—and therefore must be accorded greater weight than general statements. *See, e.g., Regan v. Wald,* 468 U.S. 222, 237 (1984) ("Oral testimony of witnesses and individual Congressmen, unless very precisely directed to the intended meaning of particular words in a statute, can seldom be expected to be as precise as the enacted language itself. To permit what we regard as clear statutory language to be materially altered by such colloquies, which often take place before the bill has achieved its final form, would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President.")

[81] *Id.* at 9573 (Rep. Steiger).

[82] *See, e.g., Resident Advisory Board v. Rizzo,* 564 F.2d 126, 147 (3d Cir. 1977).

[83] *See* 114 Cong. Rec. 4060-61 (Feb. 26, 1968).

[84] *Id.* at 4064-65.

[85] *See* 114 Cong. Rec. 4568, 4570 (Feb. 28, 1968).

[86] *Id.* at 4568.

[87] *Id.* at 4571.

[88] 114 Cong. Rec. 4845 (Mar. 1, 1968) (Senate rejected first cloture motion on Dirksen substitute); 114 Cong. Rec. 4960 (Mar. 4, 1968) (Senate agreed to second cloture motion on Dirksen substitute).

[89] 114 Cong. Rec. 5214 (Mar. 5, 1968); *see also id.* at 5218 (Senator Baker stating, "The purpose of this amendment, once again, is simply to remove the burden of forfeiting your exemption under the act because of the mere fact of hiring a real estate agency.").

[90] *Id.* at 5214-15.

[91] The Dirksen substitute also contained another exception to the exemption for owners of single-family owner-occupied homes who published advertisements indicating a racial preference or limitation. The Baker Amendment did not involve that exception.

[92] *Id.* at 5216.

[93] *Id.*

[94] *Id.* at 5221-22.

140

[95] *Id.* at 5217 (Senator Percy opposing the Baker Amendment, stating, "I would like to go further than the compromise bill [Dirksen substitute] goes…. Now I have withheld any amendment to further strengthen the bill, in the spirit of the compromise, I still do not intend to offer such amendments. By no implication do I wish to detract from [the Dirksen substitute]."); *id.* at 5217-5218 (Senator Brooke opposing the Baker Amendment, stating, "Under the [Baker Amendment], the same homes that would be covered under the Dirksen substitute would be exempt from fair housing legislation, is that not true?…. The Senator [Baker] knows that one of the purposes of the proponents of this legislation was to cover as much of the housing in the country as possible, and to make fair housing legislation applicable to as many dwelling units in the country as possible.").

[96] Other commentators agree that the rejection of the Baker Amendment was irrelevant to whether the bill required an intent to discriminate. *See* Stein, *supra note* 60, at 101 (describing Baker Amendment as "one last attempt to address the kind of proof necessary to prove discrimination, but this one focused on the issue of what kind of evidence could be employed to demonstrate an intent to discriminate, rather than whether a violation could be established by proof of results alone"); Note, 46 Geo. Wash. L. Rev. 615, 630 (1978) ("The Senate rejected the [Baker] amendment because it believed a plaintiff would encounter great difficulty proving the existence of discriminatory instructions, not because it believed plaintiff should not have to establish defendant's racial motivation.").

[97] Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988).

[98] *Id.* § 6(a)-(b).

[99] *Nat'l Community Reinvestment Coalition v. Accredited Home Lenders, Inc.*, 573 F. Supp. 2d 70, 77-78 (D.D.C. 2008).

[100] H.R.Rep. 100-711, at 21 (1988).

[101] 134 Cong. Rec. 23711-12 (1988).

[102] The Supreme Court's reluctance to rely on the statements of individual legislators during the legislative process is well founded. Such statements lend themselves "to a kind of ventriloquism" pursuant to which "[t]he Congressional Record or committee reports are used to make words appear from Congress's mouth which were spoken or written by others (individual Members of Congress, congressional aides, or even enterprising lobbyists)." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50-73-74 (Scalia, J., dissenting); *see also* W. David Lawson, *Legislative History and the Need to Bring Statutory Interpretation Under the Rule of Law*, 44 STAN. L. REV. 383, 383-84 (1992) ("Members of Congress can make law by 'manufacturing' legislative history, thereby evading the Constitutional requirements for legislating that assure that laws receive the appropriate representative consent.").

141

THE BANKING LAW JOURNAL

[103] *Brown v. Artery Org., Inc.*, 654 F. Supp. 1106, 1114-15 (D.D.C. 1987) (citation omitted). Judge Greene ultimately held that disparate impact claims cannot be brought against private individuals.

[104] SG Brief, *supra* note 52 (citations and footnotes omitted).

[105] *Id.*

[106] President Ronald W. Reagan, *Remarks on Signing the Fair Housing Amendments of 1988* (Sept. 13, 1988), *available at* http://www.reagan.utexas.edu/archives/speeches/1988/091388a.htm.

[107] *See, e.g., Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

[108] *See, e.g., id.*

[109] Because the reenactment doctrine does not apply, the statements by legislators during the process of passing and enacting the 1988 amendments have little relevance in interpreting the language of the statute. *See, e.g., United States v. X-Citement Video, Inc.*, 513 U.S. 64, 77 n.6 (1994) ("[T]he views of one Congress as to the meaning of an Act passed by an earlier Congress are not ordinarily of great weight, and the views of the committee of one House of another Congress are of even less weight." (citations omitted)); *Weinberger v. Rossi*, 456 U.S. 25, 35 (1982) ("Such *post hoc* statements of a congressional Committee are not entitled to much weight.").

[110] 508 F.2d 1179 (8th Cir. 1974).

[111] *Id.* at 1185 (footnote and citations omitted).

[112] *Id.*

[113] *Washington v. Davis*, 426 U.S. 229, 238-39, 244 n.12 (1976); *see also* Peter E. Mahoney, *The End(s) of Disparate Impact: Doctrinal Reconstruction, Fair Housing and Lending Law, and the Antidiscrimination Principle*, 47 Emory L.J. 409, 429-30 (1998) (noting that the Supreme Court's decision in *Washington v. Davis*, 426 U.S. 229 (1976), expressly overruled three non-employment equal protection cases relied upon in *Black Jack* and overruled the other cases by implication).

[114] *Washington*, 426 U.S. at 265.

[115] *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 360-61 (1984).

[116] 558 F.2d 1283 (7th Cir. 1977).

[117] 517 F.2d 409 (7th Cir. 1975).

[118] *Id.* at 412.

[119] *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 268-70 (1977).

[120] *Id.* at 271.

[121] *Id.* at 1288.

[122] *Id.* at 1288.

[123] *Id.* at 1289.

[124] *Id.* at 1289 n.6.

142

[125] 401 U.S. 424 (1971).

[126] *Id.* at 429.

[127] *Id.* at 429-30.

[128] *Arlington Heights II*, 558 F.2d at 1290.

[129] *Id.*

[130] *Id.* at 1290-94.

[131] *City of Jackson*, 544 U.S. at 235-37.

[132] 564 F.2d 126 (3d Cir. 1977).

[133] *See, e.g., Taylor v. Freeland & Kronz*, 503 U.S. 638, 645-46 (1992); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 815-16 (1985).

[134] *Rizzo*, 564 F.2d at 147.

[135] *Id.*

[136] *Id.* at 148 n.31.

[137] 682 F.2d 1055, 1065 (4th Cir. 1982).

[138] 858 F.2d 467, 482-83 (9th Cir. 1988).

[139] *See Arthur v. City of Toledo*, 782 F.2d 1055, 1065 (6th Cir. 1986) (relying on *Black Jack, Arlington Heights II, Rizzo*, and *Town of Clarkton*); *United States v. Starrett City Assoc.*, 840 F.2d 1096, 1100 (2d Cir. 1988) (relying on *Town of Clarkton, Arthur*, and *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1036-37 (2d Cir. 1979), which in turn relied on *Black Jack, Arlington Heights II*, and *Rizzo*); *Casa Marie, Inc. v. Super. Ct. of P.R.*, 988 F.2d 252, 269 n.20 (1st Cir. 1993) (relying on *Black Jack, Arlington Heights II, City of Clarkton, Starrett City*, and *Robinson*); *Jackson v. Okaloosa County*, 21 F.3d 1531, 1543 (11th Cir. 1994) (relying on *City of Clarkton, United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir. 1978) (which in turn relies on *Arlington Heights II*), and *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1558, n. 20 (11th Cir. 1984) (which in turn relies on *Black Jack, Arlington Heights II, Rizzo, City of Clarkton, Mitchell*, and *Griggs*)); *Mountain Side Mobile Home Estates Partnership v. HUD*, 56 F.3d 1243, 1250-51 (10th Cir. 1995) (relying on *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995) (which in turn relies on *Black Jack, Arlington Heights II*, and *Rizzo*)); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996) (relying on *Hanson v. Veterans Administration*, 800 F.2d 1381, 1386 (5th Cir. 1986) (which in turn relies on *Mitchell*)).

[140] 573 F. Supp. 2d 70, 77-79 (D.D.C. 2008).

[141] *Id.* at 78 (quoting plaintiff's memorandum in opposition at 37).

[142] 2009 WL 449153, at *3 (E.D. Pa. Feb. 20, 2009).

[143] *Id.* (citing *City of Jackson*, 544 U.S. at 233-40).

[144] *City of Jackson*, 544 U.S. at 233.

[145] *See Acree v. Republic of Iraq*, 370 F.3d 41, 61 (D.C. Cir. 2004) (Roberts J., concurring) ("This use of different language in two statutes so analogous in their

143

form and content, enacted so closely in time, suggests that the statutes differ in their meaning….").

[146] *See supra* note 31 and accompanying text (table summarizing anti-discrimination statutes that do not authorize disparate impact claims).

[147] *City of Jackson*, 544 U.S. at 1542-43.

[148] *See, e.g., Centr. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) (reversing the interpretation of the Securities Exchange Act previously adopted by 11 circuits and approved in dicta by the twelfth).

[149] 2007 WL 744646, at *4 (M.D. Fla. 2007).

[150] 21 F.3d 1531, 1543 (11th Cir. 1994).

[151] *Beaulialice*, 2007 WL 744646, at *4.

[152] *See Ramirez v. GreenPoint Mortg. Funding, Inc.*, 633 F. Supp. 2d 922, 926-27 (N.D. Cal. 2008); *Zamudio v. HSBC N. Am. Holdings Inc.*, 2008 WL 517138, at *2 (N.D. Ill. Feb. 20, 2008); *Payares v. JP Morgan Chase & Co. et al.*, 2008 WL 2485592, at *1 (C.D. Cal. June 17, 2008); *Taylor v. Accredited Home Lenders, Inc.*, 580 F. Supp. 2d 1062, 1066-67 (S.D. Cal. 2008); *Hoffman v. Option One Mortg. Corp.*, 589 F. Supp. 2d 1009, 1010-11 (N.D. Ill. 2008); *Barrett v. H & R Block, Inc.*, 652 F. Supp. 2d 104, 108-09 (D. Mass. 2009); *NAACP v. Ameriquest Mortg. Co.*, 635 F. Supp. 2d 1096, 1104-05 (C.D. Cal. 2009); *Garcia v. Countrywide Fin'l Corp.*, 2008 WL 7842104, at *3-*4 (C.D. Cal. Jan. 17, 2008).

[153] *HDC, LLC v. City of Ann Arbor*, 2010 WL 2232220, at *5 (E.D. Mich. 2010); *Rodriguez v. Bear Stearns Cos., Inc.* 2009 WL 5184702, at *6 (D. Conn. 2009); *Steele v. GE Money Bank*, 2009 WL 393860, at *3 (N.D. Ill. 2009); *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251, 255 (D. Mass. 2008).

[154] *HDC, LLC v. City of Ann Arbor*, 2010 WL 2232220, at *5 (E.D. Mich. 2010); *Rodriguez v. Bear Stearns Cos., Inc.* 2009 WL 5184702, at *6 (D. Conn. 2009); *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251, 255 (D. Mass. 2008).

[155] *Cox v. City of Dallas, Tex.*, 430 F.3d 734, 746 (5th Cir. 2005); *Gallagher v. Magner*, 619 F.3d 823, 833-34 (8th Cir. 2010); *Charleston Hous. Auth. v. U.S. Dept. of Agric.*, 419 F.3d 729, 740 -741 (8th Cir. 2005) (stating that the FHA permits disparate impact claims and citing *Black Jack*); *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 902 (8th Cir. 2005); *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194 (9th Cir. 2006); *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007); *Hallmark Developers, Inc. v. Fulton County*, 466 F.3d 1276, 1286 (11th Cir. 2006); *Graoch Assocs. # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 371 (6th Cir. 2007).

[156] *Gallagher v. Magner*, 636 F.3d 380, 383 (8th Cir. 2010).

[157] 444 F.3d 625, 633 n.9 (D.C. Cir. 2006).

[158] *See* 42 U.S.C. §§3608(a), 3614a.

144

[159] Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921 (proposed Nov. 16, 2011) (to be codified at 24 CFR Part 100) (the "HUD Proposed Rule").

[160] *See, e.g.,* 1 RELMAN, *supra* note 41, § 2:24 ("HUD has not issued regulations addressing the use of disparate impact theory under the Fair Housing Act. . . .").

[161] 76 Fed. Reg. 70921, 70922.

[162] *Id.* (referring to Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18,266, 18,268 (Apr. 15, 1994)).

[163] *Id.* (referring to "regulations implementing the Federal Housing Enterprises Financial Safety and Soundness Act [that] prohibit[] mortgage purchase activities [by the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation] that have a discriminatory effect."

[164] *See* 24 C.F.R. § 100.70(b); *see also* 24 C.F.R. § 100.50(b).

[165] 76 Fed. Reg. at 70923.

[166] *See, e.g., TEVA Pharms. USA, Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006) (explaining that an agency's reliance on discredited case law "renders its decision arbitrary and capricious" and noting that "[a]n [agency] order may not stand if the agency has misconceived the law"); *PDK Labs. Inc. v. U.S. Drug Enforcement Agency*, 362 F.3d 786, 795-798 (D.C. Cir. 2004) (explaining that an agency's reliance on case law is not entitled to deference, and that deference is appropriate only where the agency "bring[s] its experience to bear in light of competing interests at stake"). HUD's reliance on its *Title VIII Complaint Intake, Investigation & Conciliation Handbook* and the 1994 Policy Statement on Discrimination in Lending is particularly unconvincing, considering that both materials rely solely on court decisions rather than on any agency's independent interpretation of the FHA. *HUD Title VIII Complaint Intake, Investigation and Conciliation Handbook*, No. 8024.1, at 2-2 (REV-2, 2005) ("[T]he lower courts have generally held that these precedents from the employment discrimination field should be followed in interpreting the Fair Housing Act."), *available at* http://www.hudclips.org/sub_nonhud/cgi/selecthbk.cgi (select "search" and 8024.1); *id.* at 2-3 ("This chapter discusses the analytical structure and the proof necessary to establish and rebut three types of claims—single-motive, mixed-motive, and discriminatory impact—*that have been recognized* under the Fair Housing Act." (emphasis added)); *Policy Statement on Discrimination in Lending*, 59 Fed. Reg. 18266, 18268 (Apr. 15, 1994) ("The courts have recognized three methods of proof of lending discrimination under the ECOA and FH Act:...."); *id.* at 18629 ("Although the precise contours of the law on disparate impact as it applies to lending discrimination are under development....").

[167] *Presley v. Etowah County Com'n*, 502 U.S. 491, 509-10, 112 S. Ct. 820 (U.S. 1992) (refusing to defer to an administrative interpretation of a statute except where

145

there is ambiguity and only if the administrative interpretation is reasonable).

[168] *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 614 (1983) (O' Connor, J., concurring); *see also id.* at 613 ("'Reasonably related to' simply cannot mean 'inconsistent with.'"); *American Federation of Gov't Employees, AFL-CIO v. Gates*, 486 F.3d 1316, 1321-22 (D.C. Cir. 2007) ("If the relevant statutory language is plain but is inconsistent with the [agency's] regulations, we must hold the regulations invalid.").

[169] *Alexander v. Sandoval*, 532 U.S. 275, 286 n.6 (2001) (quoting with approval *Guardians*, 463 U.S. at 613 (O'Connor, J., concurring) (emphasis in original)).

[170] Assistant Attorney General Thomas E. Perez Speaks at the 15th Annual Community Reinvestment Act and Fair Lending Colloquium, Baltimore (Nov. 7, 2011) http://www.justice.gov/crt/opa/pr/speeches/2011/crt-speech-111107.html ("Many of our pricing cases relied, in part, on disparate impact theory to show a violation of the law. The Civil Rights Division will make use of all the tools in our arsenal to root out discrimination, including disparate impact theory if the facts support its application.").

[171] *See* 42 U.S.C. § 3614a.

[172] *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984) (giving deference to an agency's reasonable interpretation of a statute *it is charged with administering*).

146

# ATTACHMENT B

No. 10-1032

## In the
## Supreme Court of the United States

STEVE MAGNER, ET AL.,

*Petitioners,*

v.

THOMAS J. GALLAGHER, ET AL.,

*Respondents.*

*On Writ of Certiorari to the United
States Court of Appeals for the Eighth Circuit*

## BRIEF FOR THE PETITIONERS

SARA R. GREWING
  City Attorney
LOUISE TOSCANO SEEBA
  Assistant City Attorney
  *Counsel of Record*
GERALD T. HENDRICKSON
PORTIA HAMPTON-FLOWERS
  Deputy City Attorneys
K. MEGHAN KISCH
  Assistant City Attorney
750 City Hall and Court House
15 West Kellogg Boulevard
Saint Paul, Minnesota 55102
(651) 266-8770
Louise.Seeba@ci.stpaul.mn.us

*Counsel for Petitioners*      December 22, 2011

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

i

## QUESTIONS PRESENTED

The Fair Housing Act makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Respondents are owners of rental properties who argue that Petitioners violated the Fair Housing Act by "aggressively" enforcing the City of Saint Paul's housing code. According to Respondents, because a disproportionate number of renters are African-American, and Respondents rent to many African-Americans, requiring them to meet the housing code will increase their costs and decrease the number of units they make available to rent to African-American tenants. Reversing the district court's grant of summary judgment for Petitioners, the Eighth Circuit held that Respondents should be allowed to proceed to trial because they presented sufficient evidence of a "disparate impact" on African-Americans.

The following are the questions presented:

1. Are disparate-impact claims cognizable under the Fair Housing Act?

2. If such claims are cognizable, should they be analyzed under the burden-shifting approach used by three circuits, under the balancing test used by four circuits, under a hybrid approach used by two circuits, or by some other test?

ii

## LIST OF PARTIES AND CORPORATIONS

RANDY KELLY, individually and as Mayor of the City of St. Paul, ANDY DAWKINS, individually and as Director of the City of St. Paul's Department of Neighborhood Housing and Property Improvement, LISA MARTIN, individually and as a code enforcement officer of the City of St. Paul's Department of Neighborhood Housing and Property Improvement, STEVE MAGNER, individually and as a supervisor of the City of St. Paul's Department of Neighborhood Housing and Property Improvement, DEAN KOEHNEN, individually and as a law enforcement officer of the City of St. Paul, JOHN DOE and JANE DOE, individually and in their official capacities as code enforcement officers of the City of St. Paul's Department of Neighborhood Housing and Property Improvement, LAW ENFORCEMENT OFFICERS OR OTHER OFFICIALS OR EMPLOYEES of the City of St. Paul, individually, jointly and severally, and the CITY OF ST. PAUL, a municipal corporation, Petitioners.

FRANK J. STEINHAUSER, III, MARK E. MEYSEMBOURG, KELLY G. BRISSON, Respondents.

———————————————————

STEVE MAGNER, individually and as a supervisor of the City of St. Paul's Department of Neighborhood Housing and Property Improvement, MICHAEL KALIS, DICK LIPPERT, KELLY BOOKER, JACK REARDON, PAULA SEELEY, LISA MARTIN, individually and as code enforcement officers of the City of St. Paul, DEAN KOEHNEN, individually and as a law enforcement officer of the City of St. Paul,

iii

ANDY DAWKINS, individually and as Director of the
City of St. Paul's Department of Neighborhood
Housing and Property Improvement, RANDY KELLY,
individually and as Mayor of the City of St. Paul,
JOHN DOE and JANE DOE, individually and in their
official capacities as code enforcement officers of the
City of St. Paul's Department of Neighborhood
Housing and Property Improvement, LAW
ENFORCEMENT OFFICERS OR OTHER
OFFICIALS OR EMPLOYEES of the City of St. Paul,
individually, jointly and severally, and the CITY OF
ST. PAUL, a municipal corporation, Petitioners.

SANDRA HARRILAL, BEE VUE, LAMENA VUE,
STEVEN R. JOHNSON, d/b/a Market Group and
Properties, Respondents.

_____

STEVE MAGNER, individually and as a supervisor of
the City of St. Paul's Department of Neighborhood
Housing and Property Improvement, MICHAEL
CASSIDY, JOEL ESSLING, STEVE SCHILLER, JOE
YANNARELLY, DENNIS SENTY, RICH
SINGERHOUSE, KELLY BOOKER, individually and
as code enforcement officers of the City of St. Paul,
MICHAEL URMANN, individually and as a fire
inspector of the City of St. Paul, ANDY DAWKINS,
individually and as Director of the City of St. Paul's
Department of Neighborhood Housing and Property
Improvement, RANDY KELLY, individually and as
Mayor of the City of St. Paul, JOHN DOE and JANE
DOE, individually and in their official capacities as
code enforcement officers of the City of St. Paul's
Department of Neighborhood Housing and Property
Improvement, LAW ENFORCEMENT OFFICERS OR
OTHER OFFICIALS OR EMPLOYEES of the City of

iv

St. Paul, individually, jointly and severally, and the
CITY OF ST. PAUL, Petitioners.

THOMAS J. GALLAGHER, JOSEPH J. COLLINS,
SR., DADDER'S PROPERTIES, LLC, DADDER'S
ESTATES, LLC, DADDER'S ENTERPRISES, LLC,
DADDER'S HOLDINGS, LLC, TROY ALLISON, JEFF
KUBITSCHEK  and  SARA  KUBITSCHEK,
Respondents.

v

# TABLE OF CONTENTS

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . .  i

LIST OF PARTIES AND CORPORATIONS . . . . .  ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . .  v

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . viii

OPINIONS BELOW . . . . . . . . . . . . . . . . . . . . . . .  1

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATUTE INVOLVED . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE . . . . . . . . . . . . . . .  2

I.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . .  2

    A. Housing Codes . . . . . . . . . . . . . . . . . . . . . . .  2

    B. City Of Saint Paul Housing Code . . . . . . . .  3

    C. Landlords . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    D. City Of Saint Paul Census Data . . . . . . . . .  7

    E. Condition Of Rental Units . . . . . . . . . . . . . .  7

II. PROCEEDINGS BELOW . . . . . . . . . . . . . . . . . . . .  9

    A. Summary Judgment In The District Court .  9

    B. Court Of Appeals' Decision . . . . . . . . . . . .  11

vi

C. Denial Of Rehearing En Banc With Five
   Judges Dissenting  . . . . . . . . . . . . . . . . . . .   14

D. Issuance Of Writ Of Certiorari  . . . . . . . . .   15

SUMMARY OF THE ARGUMENT  . . . . . . . . . . .   15

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

I.  DISPARATE-IMPACT  CLAIMS  ARE  NOT
    COGNIZABLE UNDER THE FAIR HOUSING ACT  .   20

   A. The Text Of The Fair Housing Act Does Not
      Support Disparate-Impact Liability  . . . . .   20

   B. The Legislative History Of The Fair Housing
      Act  Does  Not  Establish  That  Congress
      Intended  To  Impose  Disparate-Impact
      Liability . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

   C. Deference To HUD's Proposed Regulation Is
      Not Required . . . . . . . . . . . . . . . . . . . . . . .   36

II. ENFORCEMENT OF SAINT PAUL'S HOUSING CODE
    DOES  NOT  VIOLATE  THE  FAIR  HOUSING  ACT
    EVEN  IF  THE  ACT  IMPOSES  DISPARATE-IMPACT
    LIABILITY  . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

   A. If Disparate-Impact Claims Are Cognizable,
      The *Wards Cove* Test Should Apply  . . . . .   38

      1. *Wards Cove* is the correct test  . . . . . . .   38

      2. The  circuit  courts'  analyses  are
         incorrect . . . . . . . . . . . . . . . . . . . . . . . .   41

vii

B. The City Was Entitled To Summary
   Judgment Under The *Wards Cove* Test . . .  44

   1. Respondents failed to make out a
      prima facie case of disparate impact  . .  44

   2. Petitioners have a legitimate business
      justification  . . . . . . . . . . . . . . . . . . . . .  50

   3. Respondents lack evidence of an
      equally      effective      alternative
      practice  . . . . . . . . . . . . . . . . . . . . . . . .  51

C. Even If The Court Does Not Adopt The
   *Wards Cove* Test, Respondents' Claims
   Should Still Fail  . . . . . . . . . . . . . . . . . . . .  53

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . .  57

viii

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) . . . . . . . . . . . . . . . . .  25, 26

*Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) . . . . . . . . . . . . . . . . .  33

*Arthur v. City of Toledo, Ohio,*
    782 F.2d 565 (6th Cir. 1986) . . . . . . . . . . . . .  43

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) . . . . . . . . . . . . . . . . . .  37

*Cent. Bank of Denver v. First Interstate Bank of Denver,*
    511 U.S. 164 (1994) . . . . . . . . . . . . . . . . .  32, 33

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984) . . . . . . . . . . . . . .  17, 36, 37

*Christensen v. Harris Cnty.,*
    529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . .  37

*City of Mobile v. Bolden,*
    446 U.S. 55 (1980) . . . . . . . . . . . . . . . . . .  25

*Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.,*
    417 F.3d 898 (8th Cir. 2005) . . . . . . . . . . . . .  42

*Griggs v. Duke Power Co.,*
    401 U.S. 424 (1971) . . . . . . . . . . . . . . . . .  23, 30

ix

*Gross v. FBL Fin. Servs., Inc.,*
    129 S. Ct. 2343 (2009) . . . . . . . . . . 16, 22, 27, 42

*Huntington Branch, NAACP v. Town of Huntington, N.Y.,*
    844 F.2d 926 (2d Cir. 1988) . . . . . . . . 30, 33, 41

*Jama v. ICE,*
    543 U.S. 335 (2005) . . . . . . . . . . . . . . . . . . . . 32

*Landgraf v. USI Film Prod.,*
    511 U.S. 244 (1994) . . . . . . . . . . . . . . . . . . . . 37

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,*
    558 F.2d 1283 (7th Cir. 1977) . . . . . . . . . 26, 43

*Reno v. Bossier Parish Sch. Bd.,*
    520 U.S. 471 (1997) . . . . . . . . . . . . . . . . . . . . 25

*Resident Advisory Bd. v. Rizzo,*
    564 F.2d 126 (3d Cir. 1977) . . . . . . . 26, 29, 30, 42

*Ricci v. DeStefano,*
    129 S. Ct. 2658 (2009) . . . . . . . . . . 20, 21, 55, 56

*Schaffer v. Weast,*
    546 U.S. 49 (2005) . . . . . . . . . . . . . . . . . . . . . 42

*Smith v. City of Jackson, Miss.,*
    544 U.S. 228 (2005) . . . . . . . . . . . . . . . . . *passim*

*Smith v. Town of Clarkton, N.C.,*
    682 F.2d 1055 (4th Cir. 1982) . . . . . . . . . . . . 43

x

*Town of Huntington, N.Y. v. Huntington Branch, NAACP,*
   488 U.S. 15 (1988) (per curiam)  . . . . .  14, 16, 33

*Trafficante v. Metro. Life Ins. Co.,*
   409 U.S. 205 (1972)  . . . . . . . . . . . . . . . . . . . .  29

*United States v. Mead Corp.,*
   533 U.S. 218 (2001)  . . . . . . . . . . . . . . . . . . . .  37

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011)  . . . . . . . . . . . . . . . . .  41

*Wards Cove Packing Co. v. Antonio,*
   490 U.S. 642 (1989)  . . . . . . . . . . . . . . . . . *passim*

*Washington v. Davis,*
   426 U.S. 229 (1976)  . . . . . . . . . . . . . . . . . . . .  54

*Watson v. Fort Worth Bank & Trust,*
   487 U.S. 977 (1988)  . . . . . . . . . . . . .  38, 39, 40, 55

**Statutes**

28 U.S.C. § 1254(1)  . . . . . . . . . . . . . . . . . . . . . . . .  1
29 U.S.C. § 623(a)(1)  . . . . . . . . . . . . . . . . . . . .  21, 28
29 U.S.C. § 623(a)(2)  . . . . . . . . . . . . . . . . . . . .  23, 28
42 U.S.C. § 1973 (1980)  . . . . . . . . . . . . . . . . . . .  25
42 U.S.C. § 1973c(b)  . . . . . . . . . . . . . . . . . . . .  24, 25
42 U.S.C. § 1983  . . . . . . . . . . . . . . . . . . . . . . . . . .  9
42 U.S.C. § 2000d  . . . . . . . . . . . . . . . . . . . . . . . .  26
42 U.S.C. § 2000e-2(a)(1)  . . . . . . . . . . . . . . .  21, 28
42 U.S.C. § 2000e-2(a)(2)  . . . . . . . . . . . .  15, 23, 28
42 U.S.C. § 2000e-2(k)  . . . . . . . . . . . . . . . . . . . .  41
42 U.S.C. § 3601  . . . . . . . . . . . . . . . . . . . . . . . . .  54
42 U.S.C. § 3603(b)  . . . . . . . . . . . . . . . . . . . . . . .  31

xi

42 U.S.C. § 3604(2) . . . . . . . . . . . . . . . . . . . . . . .   54
42 U.S.C. § 3604(a) . . . . . . . . . . . . . . . .   2, 16, 20, 26
42 U.S.C. § 3614A . . . . . . . . . . . . . . . . . . . . . . .   37
42 U.S.C. § 1441 . . . . . . . . . . . . . . . . . . . . . . . . .   3
St. Paul, Minn., Legislative Code § 34.02. . . . . . . .   4
St. Paul, Minn., Legislative Code § 34.01(1) . . . . .   4
St. Paul, Minn., Ordinance 4028 (Mar. 28, 1918) .   3

## Regulations

*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 70,921 (Nov. 16, 2011) . . . . . . . . . . . . . . . .   36, 37

## Legislative

114 Cong. Rec. 2270 (1968) . . . . . . . . . . . . . . . . .   31
114 Cong. Rec. 2270-74 (1968) . . . . . . . . . . . . . .   29
114 Cong. Rec. 4974 (1968) . . . . . . . . . . . . . . . . .   30
114 Cong. Rec. 4975 . . . . . . . . . . . . . . . . . . . . . .   31
114 Cong. Rec. 5214 . . . . . . . . . . . . . . . . . . . . . .   31
114 Cong. Rec. 5214-22 . . . . . . . . . . . . . . . . . . . .   31
114 Cong. Rec. 5216 (1968) . . . . . . . . . . . . . . . . .   32
114 Cong. Rec. 5216-17 . . . . . . . . . . . . . . . . . . . .   32
126 Cong. Rec. 15,192 (1980) . . . . . . . . . . . . . . .   35
133 Cong. Rec. S4088 (daily ed. Mar. 27, 1987) . .   35

## Other Authorities

Abbott, Samuel B., *Housing Policy, Housing Codes and Tenant Remedies: An Integration*, 56 B.U. L. Rev. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . .   2, 3

Am. Pub. Health Ass'n, 41 Am. J. of Pub. Health 577 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

xii

City of St. Paul, Comprehensive Plan: Housing 3 (2010), *available at* http://www.stpaul.gov/ DocumentView.aspx?DID=11879 . . . . . . . . . . 7

*Healthy Housing Reference Manual* (rev. 2006) . . 3

Int'l Code Council, *Int'l Code Adoptions*, http://www.iccsafe.org/gr/pages/adoptions.aspx (last visited Dec. 20, 2011) . . . . . . . . . . . . . . . 2

Presidential Statement on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1141 (Sept. 13, 1988) . . . . . 34

Rabin, Edward H., *The Revolution in Residential Landlord-Tenant Law: Causes and Consequences*, 69 Cornell L. Rev. 517 (1984) . . 2

*Tax & Prop. Info.*, Ramsey Cnty., http://www.co.ramsey.mn.us/prr (last visited Dec. 20, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 7

Webster's Third New International Dictionary 194 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1

## OPINIONS BELOW

The district court's December 18, 2008, decision is reported at 595 F. Supp. 2d 987 (D. Minn. 2008) and is set forth at pages 48a through 115a of the Petition Appendix. The panel decision of the Eighth Circuit Court of Appeals is reported at 619 F.3d 823 (8th Cir. 2010) and is set forth at pages 1a through 42a of the Petition Appendix. The Eighth Circuit Court of Appeals' decision denying rehearing en banc, with five judges dissenting, is reported at 636 F.3d 380 (8th Cir. 2010), and is set forth at pages 116a through 125a of the Petition Appendix.

## JURISDICTION

The Eighth Circuit Court of Appeals issued its decision on September 1, 2010. The circuit court denied a timely petition for rehearing en banc on November 15, 2010. The Petition for Writ of Certiorari was filed on February 14, 2011. The Court granted certiorari on November 7, 2011. The jurisdiction of the Court rests on 28 U.S.C. § 1254(1).

## STATUTE INVOLVED

The Fair Housing Act (hereinafter FHA) provides in relevant part:

[I]t shall be unlawful --

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person

2

because of race, color, religion, sex, familial
status, or national origin.

42 U.S.C. § 3604(a).

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND.

#### A. Housing Codes.

The first modern housing code in America was
adopted in New York City during the late 19th
century. *See* Samuel B. Abbott, *Housing Policy,
Housing Codes and Tenant Remedies: An Integration*,
56 B.U. L. Rev. 1, 41-42 (1976). Prompted by an
outbreak of cholera and at the behest of the New York
Metropolitan Board of Health, the state legislature
adopted the Tenement Housing Act of 1867, which
mandated, among other requirements, that dwellings
contain fire escapes, bathroom facilities, and water-
tight roofs. *Id.*

By 1920, twelve states and forty municipalities had
enacted housing codes to protect the health, safety,
and welfare of their inhabitants. *Id.* at 42. By 1968,
that number had grown to nearly 5,000 American
municipalities. *See* Edward H. Rabin, *The Revolution
in Residential Landlord-Tenant Law: Causes and
Consequences*, 69 Cornell L. Rev. 517, 551 (1984).
Today, housing codes are ubiquitous, having been
enacted in every state at either a state-wide or local
level. *See* Int'l Code Council, *Int'l Code Adoptions*,
http://www.iccsafe.org/gr/pages/adoptions.aspx (last
visited Dec. 20, 2011).

3

The federal government has long had a policy of supporting housing codes. The Housing Act of 1949, for instance, declared that "the general welfare and security of the Nation and the health and living standards of its people require . . . a decent home and suitable environment for every American family." 42 U.S.C. § 1441. Similarly, the Housing Act of 1954 required, as a condition of receiving federal housing funds, that the municipality enforce a "workable program for community improvement," such as a housing code. Abbott, *supra*, at 43.

Organizations such as the American Public Health Association Committee on the Hygiene of Housing, often in conjunction with federal government agencies like the Center for Disease Control, have published model ordinances recommending minimum housing standards. *See, e.g.*, Am. Pub. Health Ass'n, 41 Am. J. of Pub. Health 577, 578 (1951). The Center for Disease Control and the U.S. Department of Housing and Urban Development (HUD) published the Healthy Housing Reference Manual, a document that advises communities on the adoption of housing codes for the purpose of eliminating substandard conditions. *See Healthy Housing Reference Manual* (rev. 2006). The Manual recognizes that housing code standards are important to protect the health and well-being of inhabitants. *Id.* at 2-1.

## B. City Of Saint Paul Housing Code.

The City of Saint Paul has a long history dating back to at least 1918 of enforcing housing codes and general sanitary laws designed to keep dwellings healthy and safe. St. Paul, Minn., Ordinance 4028 (Mar. 28, 1918). In 1993, the City adopted a new

4

housing code, which remains in effect today. Pet. App. 6a. The City adopted this housing code based on determinations by the Saint Paul City Council that "[t]here exist in the city structures which are now or which may in the future become substandard with respect to structure, equipment, maintenance or energy efficiency" and that "these conditions, together with inadequate provision of light and air, insufficient protection against fire hazards, lack of proper heating, unsanitary conditions and overcrowding, constitute a menace to public health, safety and welfare." St. Paul, Minn., Legislative Code § 34.02.

To address these problems, the City Council established "minimum maintenance standards for all structures and premises for basic equipment and facilities for light, ventilation, heating and sanitation; for safety from fire; for crime prevention; for space, use and location; and for safe and sanitary maintenance of all structures and premises." St. Paul, Minn., Legislative Code § 34.01(1).

From approximately 2002 to 2008, the City's Department of Neighborhood Housing and Property Improvement (NHPI) was charged with the administration and enforcement of Saint Paul's housing code. Pet. App. 6a. NHPI was authorized to inspect all one- and two-family homes and impose civil and criminal penalties, in coordination with local law enforcement and the City Attorney. *Id.* at 6a-7a. NHPI's mission was "to keep the city clean, keep its housing habitable, and make neighborhoods the safest and most livable anywhere in Minnesota." *Id.* at 52a-53a. To achieve this goal, the agency responded to citizen complaints about problem properties and

5

conducted "proactive 'sweeps' to detect Housing Code violations." *Id.* at 6a.

Prior to the creation of NHPI, the City instituted a limited-scale housing code enforcement program called Problem Properties 2000 (PP2000). Pet. App. 24a-25a. The program, which began in late 1999 and ended in 2001, targeted for inspection properties with a history of unresolved or repeated housing code violations. Defs.' Ex. 9, Doc. 201-10, at 212; Pls.' Ex. 113, Doc. 247-4, at 3-4.[1] Approximately fifteen property owners participated in PP2000. Defs.' Ex. 9, Doc. 201-10, at 214. Collectively, they owned and rented only a fraction of the City's 115,713 total housing units. Pls.' Ex. 263, Doc. 254-30, at 8. Under the program, compliance with the housing code remained mandatory, but each property owner was monitored by one of two inspectors in the hope that working with a dedicated inspector would result in prompt compliance with the housing code, albeit at the same cost that any non-PP2000 participant would incur.

## C. Landlords.

Respondents are current or former owners of residential rental property in the City. These sixteen landlords, who collectively own approximately 120 rental property units, brought three separate lawsuits against Petitioners alleging FHA violations based on the City's consistent and race-neutral housing code enforcement. Respondents admit many of the code

---

[1] Citations to the record are to the U.S. District Court District of Minnesota Civil Docket for Case # 0:04-cv-02632, *Steinhauser, et al. v. City of St. Paul, et al.*

6

violations were valid.[2]   Respondents also at times
blame their tenants for the damage and claim that
their tenants should be held responsible for bringing
the properties up to code.[3]   Respondents admit that
their complaints regarding illegal code enforcement
apply to only a portion of their collective 120
properties.[4]   They admit that some of their properties
with African-American tenants were not subject to
what they considered illegal code enforcement, and
that some of their properties which were subject to
code enforcement were either vacant or occupied by
white tenants.[5]

———————————

[2] Defs.' Ex. 19, Doc. 201-24, at 186-88, 206-212; Defs.' Ex. 19, Doc.
201-25, at 45, 67, 69, 149-52, 237-38; Defs.' Ex. 22, Doc. 201-27, at
123-29, 156-58; Defs.' Ex. 23, Doc. 201-28, at 75-81, 94-95, 101,
119-125; Defs.' Ex. 24, Doc. 201-29, at 26; Defs.' Ex. 25, Doc. 201-
33, at 123-127; Defs.' Ex. 27, Doc. 201-38, at 40, 121-122; Defs.'
Ex. 34, Doc. 201-45, at 104-106.

[3] Defs.' Ex. 19, Doc. 201-24, at 186-88, 206-212; Defs.' Ex. 19, Doc.
201-25, at 45-48, 149-52; Defs.' Ex. 23, Doc. 201-28, at 112-16;
Defs.' Ex. 25, Doc. 201-33, at 125-27; Defs.' Ex. 30, Doc. 201-41, at
188-192; 2d Am. Compl., Case No. 05-1348, Doc. 59, at 25 ¶ 103.

[4] Defs.' Ex. 19, Doc. 201-24, at 112-13, 157; Defs.' Ex. 22, Doc. 201-
27, at 53, 62-84; Defs.' Ex. 25, Doc. 201-32, at 32-26, 130-32, 197-
98; Defs.' Ex. 27, Doc. 201-38, at 32-37, 119, 125, 130-139, 225-
226; Defs.' Ex. 28, Doc. 201-39, at 1-3; Defs.' Ex. 31, Doc. 201-42;
Defs.' Ex. 32, Doc. 201-43, at 17, 24, 134-38, 166-67; Defs. Ex. 33,
Doc. 201-44; Defs.' Ex. 34, Doc. 201-45, at 108-09, 127.

[5] Defs.' Ex. 19, Doc. 201-24, at 112-13, 157; Defs.' Ex. 22, Doc. 201-
72, at 62-84; Defs.' Ex. 25, Doc. 201-33, at 44-47; Defs.' Ex. 30,
Doc. 201-41, at 81-84; Defs.' Ex. 31, Doc. 201-42; Defs.' Ex. 32,
Doc. 201-43, at 24; Defs.' Ex. 34, Doc. 201-45, at 89-92, 108-09,
127.

7

## D. City Of Saint Paul Census Data.

Saint Paul, while predominantly white, is a city of diverse races and national origins. The most recent census data available at the time these lawsuits were filed, reported that the City had 287,151 residents of which 67% identified as white, 17.4% identified as a minority group other than black or African-American, 11.7% identified as black or African-American, and 3.9% identified as a member of two or more races. Pls.' Ex. 263, Doc. 254-30, at 8-9. All parties concede that African-Americans make up a disproportionate percentage of low-income tenants. Pet. App. 63a n.7. The 2000 census data reported that there were 50,645 renter-occupied housing units in the City making up 33.8% of the total housing units. Pls.' Ex. 263, Doc. 254-30, at 8-9. Respondents' properties amount to merely 0.24% of the renter-occupied housing units in the City.

## E. Condition Of Rental Units.

The public health, safety, and welfare in Saint Paul depend on effective enforcement of its health and safety ordinances. Enforcement is especially crucial because in Saint Paul single-family and duplex rental stock is predominately pre-WWI housing that requires consistent and proactive maintenance to keep the properties safe and habitable. Compl. Nos. 04-2632, 05-461, 05-1348 (see *Tax & Prop. Info.*, Ramsey Cnty., *available at* http://www.co.ramsey.mn.us/prr (last visited Dec. 20, 2011), to determine years Respondents' houses were built); City of St. Paul, Comprehensive Plan: Housing 3 (2010), *available at* http://www.stpaul.gov/DocumentView.aspx? DID=11879 (last visited Dec. 21, 2011).

8

Between 2002 and 2005, Respondents received many enforcement orders from NHPI based on code violations found at their properties. The NHPI inspectors regularly found these units to be in serious disrepair or to pose significant health risks to their inhabitants, in violation of the housing code. Respondents "received code enforcement orders that, in many cases, cited between ten and twenty-five violations per property for conditions including rodent infestation, missing dead-bolt locks, inadequate sanitation facilities, inadequate heat, inoperable smoke detectors, broken or missing doors and screens, and broken or missing guardrails or handrails." Pet. App. 8a. "In some cases [Respondents'] properties were condemned as unfit for habitation." *Id.* at 50a. One of Respondents' properties "lacked adequate heat and did not have a door between the apartment and a common hallway. The stove and refrigerator did not work. There were holes in the wall, and [the witness] saw two mice while she was present." *Id.* at 79a n.13. One landlord admitted a stove was leaking gas but denied it was his responsibility to fix the leak. Defs.' Ex. 19, Doc. 201-24, at 206, 207.

At yet another property, a duplex owned by Respondent Steinhauser, one of the tenants called the police to report that Steinhauser, using racial- and gender-motivated epithets, threatened her for calling code enforcement. Defs.' Ex. 40, Doc. 201-52, at 1-2. When police responded, they reported that the downstairs unit had no heat, no smoke detector, rotting floors, continuous running water in the bathroom, water damage, and holes in the walls throughout the house where rats were accessing the interior. *Id.* The tenant who lived upstairs also reported that a space heater was the only available

9

heat source for her unit. *Id.* at 2. Most disturbing, the same tenant reported to police that just that morning, she found a rat on the bed where her two-month-old baby was sleeping. *Id.*

Caty Royce is the head of the Community Stabilization Project, a local non-profit organization that assists low-income residents in securing livable housing. She identified Respondent Steinhauser's properties as properties that tenants would come to her organization complaining about the conditions. Pls.' Ex. 128, Doc. 247-28, at 20. Royce testified that if there was not code enforcement that required landlords to maintain their properties to minimal health and safety standards, families who lived in these homes would be at great risk. *Id.* at 20-21.

## II. PROCEEDINGS BELOW.

### A. Summary Judgment In The District Court.

In 2004 and 2005, Respondents filed three related suits, subsequently consolidated, against Petitioners in the District of Minnesota. The suits pled a wide variety of claims, including violations of the FHA under disparate-treatment, disparate-impact, and retaliation theories. Pet. App. 51a. Respondents also asserted equal protection and substantive due process claims under 42 U.S.C. § 1983, and claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), federal antitrust laws, and Minnesota state law. *Id.* These claims were based on NHPI's inspections of Respondents' units beginning in 2002.

After extensive discovery, the district court granted the City's motion for summary judgment on all claims.

10

*Id.* Many of Respondents' claims were based on their allegations that the City intentionally discriminated against them by enforcing the City's housing code at their properties. According to Respondents, the City's actions were based on discriminatory motives because Respondents' tenants were predominately African-American. *Id.* at 59a. The district court granted summary judgment for the City on these claims because Respondents lacked sufficient evidence to prove that the City engaged in racial discrimination. *Id.* at 67a-82a.

With respect to the claim of disparate impact under the FHA, Respondents did not need to show a discriminatory motive, but they did need to identify a facially neutral practice or policy that caused a disparate impact on a protected class. *Id.* at 61a. Respondents failed to identify the facially neutral policy at issue in their summary judgment briefs. When pressed by the district court at oral argument, Respondents pointed to the "enforcement of the City's housing code instead of the federal [Housing Quality Standards]." *Id.* at 61a-62a.[6]

The district court granted summary judgment on Respondents' disparate-impact claim because they failed to present evidence that the enforcement of the City's housing code resulted in a disparate impact to members of a protected class. *Id.* at 62a-63a. For example, no evidence demonstrated that enforcement of the housing code, which was arguably stricter in

---

[6] The federal Housing Quality Standards (HQS) is the housing code applicable to properties that house participants in the federal Section 8/Housing Choice Voucher program.

11

substance than the federal HQS, would increase the cost of low-income housing disproportionately rented by African-Americans. *Id.*

The district court also held that, even if Respondents could make out a prima facie case of disparate impact, their claims would still fail because they had not identified a viable alternative that would achieve the City's legitimate objectives. No party disputed that the City's enforcement of the housing code furthered the legitimate objectives of providing minimum property maintenance standards, keeping the City clean and its housing habitable. The district court rejected Respondents' argument that the enforcement of the HQS was a viable, non-discriminatory alternative to the housing code because the content of the two standards differed materially and there was no evidence that the adoption of the HQS would decrease rents. *Id.* at 66a.

The district court also rejected the contention that PP2000 was a viable alternative to city-wide code enforcement. *Id.* at 67a n.9. The court held that Respondents abandoned this position at oral argument by relying only on the federal HQS as a possible alternative. *Id.* In addition, even if Respondents had not abandoned this argument, Respondents "offered no evidence showing that the PP2000 program would achieve the [NHPI's] objectives without discriminatory effect." *Id.*

**B. Court Of Appeals' Decision.**

Respondents appealed the district court's ruling to the Eighth Circuit Court of Appeals. The circuit court agreed that Respondents failed to present sufficient

12

evidence that the City had acted with discriminatory intent. Pet. App. 10a-16a. The circuit court thus affirmed the summary judgment decision on all claims except for the disparate-impact claim under the FHA. *Id.* at 5a-6a.

On the disparate-impact claim, the circuit court did not discuss whether Respondents had presented sufficient evidence to show that enforcement of the City's housing code instead of the federal HQS resulted in a disparate impact on a protected class. *Id.* at 16a. Instead, the Eighth Circuit deemed "aggressive enforcement of the Housing Code" to be the relevant facially neutral policy. *Id.*

Having framed the challenged practice in this manner, the Eighth Circuit applied a three-step burden-shifting analysis to Respondents' claim. *Id.* at 17a-26a. At the first step, the circuit court acknowledged "there is not a single document that connects the dots of [Respondents'] disparate-impact claim." *Id.* at 20a. The court nevertheless concluded that Respondents had carried their burden at this first step because they had offered evidence supporting four conclusions: (1) "The City experienced a shortage of affordable housing."; (2) "Racial minorities, especially African-Americans, made up a disproportionate percentage of lower-income households in the City that rely on low-income housing."; (3) "The City's aggressive enforcement practices increased costs for property owners that rent to low-income tenants."; and (4) "The increased burden on rental-property owners from aggressive code enforcement resulted in less affordable housing in the City." *Id.* at 17a-19a.

13

According to the Eighth Circuit, "[t]hese premises, together, reasonably demonstrate that the City's aggressive enforcement of the housing code resulted in a disproportionate adverse effect on racial minorities, particularly African-Americans." *Id.* at 19a. As applied to Respondents, the evidence showed that "the City's Housing Code enforcement, temporarily, if not permanently, burdened [Respondents'] rental business, which indirectly burdened their tenants," who were predominantly African-American, by decreasing the availability of affordable housing. *Id.* at 20a.

Turning to the second step of the analysis, the Eighth Circuit agreed that the enforcement of the housing code was manifestly related to the legitimate non-discriminatory objectives of providing minimum property maintenance standards, keeping the City clean and its housing habitable, and making the City's neighborhoods safe and livable. *Id.* at 24a. As a result, the circuit court shifted the burden back to Respondents to identify a viable alternative to the City's "aggressive" enforcement of the housing code. *Id.*

Although the district court held that Respondents abandoned the position that PP2000 was a viable alternative to city-wide housing code enforcement, the Eighth Circuit revived this argument and determined that PP2000 could accomplish the objectives of housing code enforcement without discriminatory effect. *Id.* at 24a-26a.   The Eighth Circuit reasoned that the program's cooperative approach would achieve greater rates of compliance at lower cost, thereby "significantly reduc[ing] the impact on protected class members." *Id.* at 26a.

14

Based on this analysis, the Eighth Circuit reversed the district court's grant of summary judgment on the disparate-impact claim.

## C. Denial Of Rehearing En Banc With Five Judges Dissenting.

The City petitioned for rehearing en banc. Although the circuit court denied the petition, five judges dissented from the denial. The dissent noted that the case raises "important questions concerning whether 'aggressive' enforcement of a housing code is the sort of facially neutral policy that can trigger disparate-impact analysis under the FHA." Pet. App. 118a. In the dissent's view, the panel relied on an "expansive rationale [that] raises significant threshold issues concerning the application of disparate-impact analysis." *Id.* at 119a.

The dissent first questioned whether longstanding circuit precedent recognizing disparate-impact claims under the FHA remains viable. Although the Court declined to resolve the issue in *Town of Huntington, N.Y. v. Huntington Branch, NAACP*, 488 U.S. 15, 18 (1988) (per curiam), the Court's more recent decisions construing analogous statutes—in particular, *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233-36 (2005)—suggest that the FHA's text should not be interpreted to impose disparate-impact liability. Pet. App. 120a-122a.

The dissent also questioned whether disparate-impact analysis of "aggressive" enforcement of a housing code is consistent with the purpose of the FHA, assuming such a claim is cognizable. *Id.* at 124a. Although the Eighth Circuit has applied disparate-

15

impact analysis in various cases arising under the FHA, "whether the panel's application of disparate-impact analysis to a city's aggressive housing code enforcement is dictated by the purpose of the FHA is an important question of first impression." *Id.* at 125a.

### D. Issuance Of Writ Of Certiorari.

On November 7, 2011, the Court granted the Petition for Writ of Certiorari. *Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010), *cert. granted*, 79 U.S.L.W. 3494 (U.S. Nov. 7, 2011) (No. 10-1032).

## SUMMARY OF THE ARGUMENT

The FHA imposes liability for disparate treatment, not disparate impact. Under a disparate-impact theory, a defendant can be held liable if its actions disproportionately affect members of a protected class. Under this theory, whether a defendant acted entirely in good faith and without any discriminatory motive is irrelevant. This theory finds no support in the text of the FHA, which prohibits certain conduct taken "because of" a protected trait such a race.

In interpreting other anti-discrimination provisions, the Court has relied on the statutory text to distinguish between provisions that impose disparate-impact liability and those that do not. The Court has concluded that disparate-impact claims are cognizable when the statutory provision imposes liability on conduct that "adversely affect[s]" a member of a protected class. *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 235 (2005) (quoting 42 U.S.C. § 2000e-2(a)(2)).

16

In contrast, the Court has concluded that anti-discrimination provisions like the FHA's do not impose disparate-impact liability. The FHA prohibits a defendant from making housing "unavailable . . . to any person *because of* race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (emphasis added). This provision does not address the effect of the conduct on the plaintiff, but instead focuses on the defendant's motivation for the challenged conduct. *See Smith*, 544 U.S. at 235-36 & n.6; *see also Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009) (based on the plain meaning of "because of," challenged conduct must be taken "by reason of" or "on account of" the protected trait). Because the FHA imposes liability only when a defendant has acted "because of" a person's race or other protected trait, an FHA violation cannot be established without evidence of a discriminatory motive. A showing of disparate impact alone will not suffice.

The legislative history does not support imposing disparate-impact liability under the FHA. When the statute was enacted in 1968, no member of Congress expressed the view that disparate-impact claims were cognizable under the statute. Some Senators suggested that the FHA required proof of discriminatory motive. Nor does the legislative history of the Fair Housing Amendments Act of 1988 establish that Congress intended for the FHA to impose disparate-impact liability. This legislative history demonstrates that there was no consensus as to whether disparate-impact claims were cognizable under the FHA. Not only did the Court leave open that question in *Town of Huntington, N.Y. v. Huntington Branch, NAACP*, 488 U.S. at 18 (per

17

curiam), but the United States filed a brief in that case urging the Court to hold that disparate-impact claims are not cognizable.

HUD has proposed regulations that would interpret the FHA to permit disparate-impact claims, but those proposed regulations do not affect the outcome of this case. Because the proposed regulations have not been finalized, they lack the force of law. Moreover, the regulations are contrary to the plain language of the statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 841 (1984).

Even if the FHA permits disparate-impact claims, Respondents' claims still fail as a matter of law. The courts that have recognized disparate-impact claims under the FHA have analogized the FHA to Title VII. If the FHA's provisions are interpreted based on Title VII, then disparate-impact claims under the FHA should be governed by *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642 (1989), which sets forth the test for proving a disparate-impact claim under Title VII. The Court followed this approach in *Smith*, in which it held that disparate-impact claims under the Age Discrimination in Employment Act (ADEA) were governed by *Wards Cove*.

Respondents' claims fail under this test. Under *Wards Cove*, Respondents must first make out a prima facie case of disparate impact by identifying a specific practice that allegedly caused a disparate impact on a protected group. *See* 490 U.S. at 656-57. Respondents failed to present sufficient evidence to make this showing.

18

Respondents did not establish that a *specific* practice had a disparate impact. Instead, Respondents raised numerous objections to the City's enforcement of its housing code. Rather than analyzing whether any of the specific practices at issue had a disparate impact, the court of appeals combined the different practices and characterized them as "aggressive" enforcement practices.

Respondents also failed to present statistical evidence showing that the City's "aggressive" enforcement of the housing code caused a disparate impact on a protected class. The court of appeals relied on evidence showing that, as a general matter, racial minorities disproportionately rely on low-income housing. But there is no allegation—much less evidence—that all owners of low-income housing were subject to "aggressive" enforcement of the housing code. To the contrary, Respondents presented evidence that only a very small percentage of low-income housing was subject to "aggressive" enforcement.

Respondents failed to present evidence that "aggressive" enforcement resulted in less affordable housing—a critical link in the chain of inferences on which the court of appeals relied. The court concluded that a jury could infer that "aggressive" enforcement resulted in a decrease in affordable housing based on the Vacant Buildings Report and on three affidavits describing hardships suffered by Respondents' tenants. This evidence is insufficient. The Vacant Buildings Report showed an increase in vacant buildings between 2003 and 2007, but it did not attribute the increase to enforcement of the City's housing code.

19

Even if Respondents could make out a prima facie case, their claims would still fail because they have not identified an equally effective alternative practice that would serve the City's legitimate interests with less racial impact. *See Wards Cove*, 490 U.S. at 656-57. The court of appeals concluded that Respondents presented sufficient evidence that PP2000 was a viable alternative, but the court erred in reaching this result. Respondents presented no evidence regarding the cost of PP2000—a relevant factor in considering whether PP2000 would be equally effective. Given that PP2000 was a limited program in which two inspectors worked with approximately fifteen landlords, that program is not a viable alternative for enforcement of the housing code at more than 115,713 properties.

Finally, regardless of the governing standard for disparate-impact claims, Respondents' claims of "aggressive" enforcement of the City's housing code—without evidence that the City's actions were motivated at all by race—does not satisfy the standard. If the City's race-neutral enforcement of its housing code could subject it to FHA liability under a disparate-impact theory, it would be forced to take race into consideration in deciding whether to enforce its code. Such a result would raise serious concerns under the Equal Protection Clause and would be contrary to the purpose of the FHA, which was intended to remove race as a consideration in housing decisions.

20

## ARGUMENT

### I. DISPARATE-IMPACT CLAIMS ARE NOT COGNIZABLE UNDER THE FAIR HOUSING ACT.

#### A. The Text Of The Fair Housing Act Does Not Support Disparate-Impact Liability.

Under section 804(a) of the FHA, it is unlawful to make housing "unavailable" if the defendant's actions were taken "because of" a protected trait, such as race. 42 U.S.C. § 3604(a). The Eighth Circuit held that Respondents could prove that the City acted "because of" race without offering any evidence that the City's actions were motivated by race. This ruling, which relied on a disparate-impact theory of liability, cannot be squared with the FHA's requirement that the challenged actions were "because of" race.

In interpreting anti-discrimination statutes, the Court distinguishes between practices involving "disparate treatment" and those that result in a "disparate impact." "Disparate-treatment cases present the most easily understood type of discrimination, and occur where an employer has treated [a] particular person less favorably than others because of a protected trait." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672 (2009) (internal quotation marks and citations omitted). To prove a disparate-treatment claim, a plaintiff must "establish that the defendant had a discriminatory intent or motive." *Id.* (internal quotation marks and citation omitted). In contrast, a disparate-impact claim does not require any proof of discriminatory intent. *Id.* Instead, disparate-impact liability may arise from "practices that are not

21

intended to discriminate but in fact have a disproportionately adverse effect on minorities." *Id.*

The Court looks to the statutory text of an anti-discrimination provision to determine whether it imposes liability only for disparate treatment or whether it also permits a disparate-impact claim. *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233-36 (2005). The Court's interpretations of Title VII and the ADEA are instructive because these statutes contain some provisions that impose liability only for disparate treatment and other provisions that impose disparate-impact liability. *Id.*

Section 703(a)(1) of Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court has made clear that this provision holds "employers liable only for disparate treatment." *Ricci*, 129 S. Ct. at 2672.

Section 4(a)(1) of the ADEA contains the same language, except that it prohibits discrimination "because of . . . age." 29 U.S.C. § 623(a)(1). In *Smith*, the eight Justices who took part in the decision unanimously concluded that this provision does not impose disparate-impact liability. *See* 544 U.S. at 236 n.6 (plurality opinion of four justices); *id.* at 246 (Scalia, J., concurring in part); *id.* at 249 (O'Connor, J., concurring with three other justices). Justice O'Connor, in her concurrence, noted:

22

Neither petitioners nor the plurality contend that the first paragraph, § 4(a)(1), authorizes disparate impact claims, and I think it obvious that it does not. That provision plainly requires discriminatory intent, for to take an action against an individual *"because of such individual's age"* is to do so "by reason of" or "on account of" her age.

*Id.* at 249 (quoting Webster's Third New International Dictionary 194 (1961)).

As the Court recently explained in *Gross v. FBL Financial Services, Inc.*, "[t]he words 'because of' mean 'by reason of: on account of.'" 129 S. Ct. 2343, 2350 (2009) (quoting Webster's Third New International Dictionary 194 (1966)). Based on the ordinary meaning of "because of," the Court interpreted the ADEA to require a plaintiff to "prove that age was the 'but-for' cause of the employer's adverse decision." *Id.* Although the dissenting Justices disagreed with interpreting "because of" to require "but for" causation, they would have required a causal link between the challenged action and the protected trait. *Id.* at 2353 (Stevens, J., dissenting). Under the dissent's view, "the most natural reading of this statutory text prohibits adverse employment actions motivated in whole or in part by the age of the employee." *Id.* Thus, even under the dissent's approach, the "because of" language forecloses disparate-impact liability, which extends to actions that are not motivated at all by a protected trait.

Title VII and the ADEA also contain provisions that the Court has interpreted as imposing disparate-impact liability. *See Smith*, 544 U.S. at 236-40

23

(plurality opinion). Section 703(a)(2) of Title VII makes it unlawful for an employer "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities *or otherwise adversely affect* his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2) (emphasis added). Section 4(a)(2) of the ADEA contains the same language, except that it prohibits conduct that affects an individual "because of such individual's age." 29 U.S.C. § 623(a)(2). These provisions differ from section 703(a)(1) of Title VII and section 4(a)(1) of the ADEA because they address not only the employer's actions but also the effects that those actions have on employees.

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971), the Court held that an employee could establish a violation of Title VII without any evidence that the employer acted with discriminatory intent. The Court explained that "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." *Id.* As a result, an employee could prevail on a Title VII claim under a disparate-impact theory even when the evidence established the employer's "good intent or absence of discriminatory intent." *Id.*

Although *Griggs* focused on the purpose of Title VII in interpreting the statute to impose disparate-impact liability, the Court has "subsequently noted that [its] holding represented the better reading of the statutory text as well." *Smith*, 544 U.S. at 235 (plurality opinion). The text of section 703(a)(2) of Title VII supports a disparate-impact claim because it "focuses on the *effects* on the employee rather than the

24

motivation for the action of the employer." *Id.* at 236. The statutory text is directed at the discriminatory effects because it does not "simply prohibit[] actions that 'limit, segregate, or classify' persons; rather the language prohibits such actions that 'deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's' race or age." *Id.* at 235.

The *Smith* plurality also identified another "key textual difference[]" between section 4(a)(1) and section 4(a)(2) of the ADEA. 544 U.S. at 236 n.6. Section 4(a)(1) focuses "on the employer's actions with respect to the targeted individual." *Id.* In contrast, under section 4(a)(2), there is "an incongruity between the employer's actions—which are focused on his employees generally—and the individual employee who adversely suffers because of those actions." *Id.* As the plurality explained, "an employer who classifies his employees without respect to age may still be liable under the terms of this paragraph if such classification adversely affects the employee because of that employee's age—the very definition of disparate impact." *Id.*

Other anti-discrimination provisions, in addition to Title VII and the ADEA, reinforce the dividing line between the disparate-treatment and disparate-impact standards. Section 5 of the Voting Rights Act, which was enacted three years before the FHA, expressly focused on the effects of discrimination. 42 U.S.C. § 1973c(b). Under this provision, certain political subdivisions must obtain preclearance before changing their voting systems in order to prevent them from adopting "[a]ny voting qualification . . . that has the purpose of *or will have the effect of* diminishing the

25

ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice." *Id.* (emphasis added).

In contrast, section 2 of the Voting Rights Act originally lacked any reference to the "effect" of discrimination.    Section 2 provided: "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color. . . ." 42 U.S.C. § 1973 (1980). In *City of Mobile v. Bolden*, the Court interpreted this provision to require proof that the state action was motivated by a discriminatory purpose. 446 U.S. 55, 60-64 (1980) (plurality opinion); *id.* at 80 (Blackmun, J., concurring); *id.* at 85-86 (Stevens, J., concurring); *id.* at 94-95 (White, J., dissenting).

In response to the Court's decision in *City of Mobile*, Congress amended section 2 to provide that it did not require proof of discriminatory intent. *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 482 (1997) ("When Congress amended § 2 in 1982, it clearly expressed its desire that § 2 *not* have an intent component . . . ." (citation omitted)). As amended, "§ 2 bars *all* States and their political subdivisions from maintaining any voting 'standard, practice, or procedure' that 'results in a denial or abridgement of the right . . . to vote on account of race or color.'" *Id.* at 479.

Likewise, the Court has interpreted Title VI to prohibit only disparate treatment. *See Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). In contrast to section 703(a)(2) of Title VII and section 4(a)(2) of the

26

ADEA, section 601 of Title VI does not proscribe activities that would "adversely affect" a person because of a protected trait. Instead, it provides only that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In *Alexander*, the Court stated that it is "beyond dispute—and no party disagrees—that § 601 prohibits only intentional discrimination." 532 U.S. at 280.

In light of this body of case law, the language of the FHA does not impose disparate-impact liability. Section 804(a) of the FHA provides that "it shall be unlawful . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The language of the FHA thus requires a plaintiff to show that the challenged conduct was taken "because of" a protected trait. *Id.* Such a showing requires evidence of discriminatory intent.

Circuit courts have held that disparate-impact claims are cognizable under the FHA by analogizing the FHA to Title VII. *See, e.g., Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 147 (3d Cir. 1977); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1288-89 (7th Cir. 1977). This approach, however, begs the question of whether the FHA is analogous to section 4(a)(2) of Title VII, which permits disparate-impact claims, or to section 4(a)(1), which does not.

27

*See supra* pp. 21-24. By relying on the Court's Title VII precedent without addressing that question, the circuit courts have violated the Court's admonition "not to apply rules applicable under one statute to a different statute without careful and critical examination." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2349 (2009) (internal quotation marks omitted).

Based on its text, section 803(a) of the FHA should be interpreted in the same way the Court has interpreted section 703(a)(1) of Title VII and section 4(a)(1) of the ADEA. The Court has interpreted other anti-discrimination provisions as imposing disparate-impact liability when Congress has expressly prohibited actions that "adversely affect" an individual, and where the statute text exhibits an "incongruity" between the challenged action—which targets a group of employees—and the effect that the action has on an individual employee. *See Smith*, 544 U.S. at 235-36 & n.6. Section 804(a) of the FHA cannot be interpreted to impose disparate-impact liability because it lacks both of these textual features.

In opposing certiorari, Respondents argued that section 804(a) should be interpreted to impose disparate-impact liability because the provision is structured like section 703(a)(2) of Title VII. Resp'ts' Br. in Opp'n 14. Respondents base this argument on the fact that section 804(a) of the FHA includes a "catch-all[]" provision that prohibits actions that "otherwise make unavailable or deny" housing because of a protected trait. *Id.* In Respondents' view, this catch-all provision serves the same function as section 703(a)(2)'s catch-all provision, which addresses actions that "otherwise adversely affect" an employee. *Id.*

28

Respondents' argument lacks merit. The Court did not interpret section 703(a)(2) of Title VII to impose disparate-impact liability simply because it includes a catch-all provision.    In fact, all of the relevant provisions in both Title VII and the ADEA have catch-all provisions.[7] The significance of section 703(a)(2)'s catch-all provision is that it shifts the focus from the defendant's actions to the effect that those actions have on the employee.    Thus, this provision is considerably different than the catch-all provision in section 703(a)(1)—which makes it unlawful for an employer "otherwise to discriminate"—because that phrase simply broadens the scope of the proscribed actions, rather than shifting the focus to the effect on the employee. The catch-all provision in section 804(a) of the FHA serves the same purpose of the catch-all in section 703(a)(1) of Title VII: it makes clear that the

---

[7] *See* 29 U.S.C. § 623(a)(1) (making it unlawful for an employer "to fail or refuse to hire or to discharge any individual, *or otherwise to discriminate* against any individual . . . because of such individual's age") (emphasis added); *id.* § 623(a)(2) (making it unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities *or otherwise adversely affect* his status as an employee, because of such individual's age") (emphasis added); 42 U.S.C. § 2000e-2(a)(1) (making it unlawful for an employer "to fail or refuse to hire or to discharge any individual, *or otherwise to discriminate* against any individual . . . because of such individual's race, color, religion, sex, or national origin") (emphasis added); *id.* § 2000e-2(a)(2) (making it unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities *or otherwise adversely affect* his status as an employee, because of such individual's race, color, religion, sex, or national origin") (emphasis added).

29

provision prohibits all actions that make housing unavailable, not just those actions that are expressly prohibited. Unlike section 703(a)(2) of Title VII, nothing in the FHA's catch-all phrase shifts the focus to the effects that the defendant's actions have on the plaintiff.

Although the Court has said that the FHA should be interpreted broadly, *see Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 212 (1972), nothing in *Trafficante*—or any other decision of the Court— justifies giving the FHA a broader interpretation than the text of the statute can support. Under a disparate-impact theory, a defendant may be held liable for conduct that is not motivated at all by race so long as it has a disparate effect on a protected class of individuals. The FHA cannot be read to impose liability under this theory because it is contrary to the statutory requirement that the plaintiff prove that the defendant's actions were "because of" a prohibited factor such as race.

**B. The Legislative History Of The Fair Housing Act Does Not Establish That Congress Intended To Impose Disparate-Impact Liability.**

The legislative history of the FHA provides limited insight into whether Congress intended to impose disparate-impact liability. The FHA was introduced as a floor amendment to the Civil Rights Act. *See* 114 Cong. Rec. 2270-74 (1968). As a result, there are no committee reports discussing what Congress intended. *See, e.g., Trafficante*, 409 U.S. at 210 ("The legislative history of the Act is not too helpful."); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 147 & n.29 (3d

30

Cir. 1977) (characterizing the FHA's legislative history as "somewhat sketchy" because "committee reports and other documents usually accompanying congressional enactments are missing here").

To the extent that the floor statements are relevant, no member of Congress explicitly stated that the FHA imposed disparate-impact liability. To the contrary, members of Congress made statements suggesting that the FHA required proof of discriminatory motive. For example, when asked whether FHA plaintiffs "would have to prove discrimination," Senator Mondale, the FHA's principal sponsor, answered: "Yes, and the burden is on the complainant." 114 Cong. Rec. 4974 (1968). Senator Mondale also stated that the FHA would simply allow an owner "to do everything that he could do anyhow with his property . . . except refuse to sell it to a person solely on the basis of his color. . . . That is all it does." *Id.* at 5643; *see also id.* at 2283 (Sen. Brooke) ("A person can sell his property to anyone he chooses as long as it is by personal choice and not because of motivations of discrimination."). Nor is there a basis for inferring that Congress intended to impose disparate-impact liability by analogy to Title VII, because Congress enacted the FHA three years *before* the Court held in *Griggs* that Title VII provides for disparate-impact liability.

Some courts have inferred that Congress intended for the FHA to allow disparate-impact claims based on the Senate's rejection of the "Baker amendment." *See, e.g., Rizzo*, 564 F.2d at 147-48; *Huntington Branch, NAACP v. Town of Huntington, N.Y.*, 844 F.2d 926, 934-35 (2d Cir. 1988). That inference is unwarranted.

31

Under Senator Mondale's original proposal, the FHA would have applied to all homeowners. *See* 114 Cong. Rec. 2270 (1968). When this provision met opposition, Senator Dirksen proposed a substitute that would exempt single-family houses that were being sold or rented by their owners so long as the owners (1) sell or rent their houses without using a real estate agent, and (2) do not advertise their intent to give racial preference or to discriminate. *Id.* at 4975. During the debate on the Dirksen substitute, Senator Baker offered an amendment to Dirksen's proposal. *Id.* at 5214-22. Under the Baker amendment, a homeowner could use a real estate agent and still be exempt from the FHA's requirements so long as the homeowner did not either instruct the real estate agent to discriminate against potential buyers or otherwise express to the agent his or her intent to discriminate. *Id.* at 5214. The Baker amendment was rejected, and Congress enacted the Dirksen substitute, which remains part of the FHA today. *See* 42 U.S.C. § 3603(b).

The Senate's rejection of the Baker amendment does not support the inference that Congress intended the FHA to impose disparate-impact liability because the debate over that amendment had nothing to do with disparate-impact liability. The debate centered on the circumstances in which an owner of a single family home could act with a discriminatory motive without violating the FHA. Indeed, it is unclear whether it would even be possible to prove disparate impact based on the sale of a single home.

The statements by Senator Percy, the most outspoken opponent of the Baker amendment, do not suggest that he was concerned about imposing liability

32

on homeowners who acted in good faith but whose actions nevertheless had a disparate impact on protected classes. Instead, Senator Percy's statements made clear that he understood the Dirksen substitute to have the effect of allowing homeowners to engage in intentional discrimination based on race so long as they did so without using a real estate agent. 114 Cong. Rec. 5216 (1968). Although Senator Percy would have liked for the FHA to go further in eliminating discrimination, he viewed the Dirksen substitute as a "reasonable compromise," and opposed the Baker amendment's attempt to expand the scope of the exemption. *Id.* at 5216-17.

In opposing certiorari, Respondents argued that Congress's enactment of the Fair Housing Amendments Act of 1988 (FHAA) demonstrates that Congress intended for the FHA to impose disparate-impact liability. Resp'ts' Br. in Opp. 15-16. That argument fails.

Contrary to Respondents' assertion, the Court should not presume that Congress, in enacting the FHAA, implicitly ratified the courts of appeals' interpretations of the FHA. For such a presumption to apply, "the supposed judicial consensus [must be] so broad and unquestioned that [the Court] must presume Congress knew of and endorsed it." *Jama v. ICE*, 543 U.S. 335, 349 (2005). That standard is not met here.

The Court has declined to presume that Congress intended to adopt the circuit courts' interpretation of a statute even when eleven circuits had all interpreted a statute in the same way. *See Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 186

Case 1:13-cv-00966-RJL    Document 40-1    Filed 08/08/14    Page 183 of 209

(1994); *id.* at 192 (Stevens, J. dissenting). Despite the unanimity in the circuits that had considered the question at issue, the judicial consensus was not sufficiently broad and unquestioned because the Court had previously reserved ruling on the question at issue. *Id.* at 186.

Here, as in *Central Bank of Denver*, the Court has explicitly left open the question of whether a plaintiff can establish a violation of the FHA based solely on a showing of discriminatory effect. *See Town of Huntington, N.Y. v. Huntington Branch, NAACP*, 488 U.S. 15, 18 (1988) (per curiam) ("Since appellants conceded the applicability of the disparate-impact test for evaluating the zoning ordinance under Title VIII, we do not reach the question whether that test is the appropriate one."); *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270-71 (1977) (remanding the case to allow the circuit court to decide whether FHA imposed disparate-impact liability).

The views of the Executive Branch during 1988—the year that the FHAA was enacted—reinforce the lack of a broad and unquestioned consensus on the issue. In *Town of Huntington*, the United States filed a brief noting that the Court had not decided whether a plaintiff must prove discriminatory intent under the FHA and urging the Court to hold that the FHA does *not* impose disparate-impact liability. Brief for United States as Amicus Curiae Supporting Appellants at 12 n.15, Town of Huntington, N.Y. v. Huntington Branch, NAACP, 488 U.S. 15 (1988) (No. 87-1961). The Solicitor General explained:

Although proscribing a broad range of conduct, Congress limited [§ 804(a)] to action taken

34

"because of race." The words "because of"
plainly connote a causal connection between the
housing-related action and the person's race or
color. The proscribed action must have been
caused, at least in part, by the individual's race,
which strongly suggests a requirement of
discriminatory motivation. An action taken
because of some factor other than race, i.e.,
financial means, even if it causes a
discriminatory effect, is not an example of the
intentional discrimination outlawed by the
statute.

*Id.* at 14-15 (citation omitted).

In addition to making this textual argument, the
Solicitor General argued that "[t]he legislative history
reinforces the understanding that Congress intended
to require a showing of intentional discrimination." *Id.*
at 16 & n.20. According to the Solicitor General,
"[n]either supporters nor opponents suggested that the
legislation would ban local zoning regulations merely
because they had a racial effect, without any showing
that the local government intended to discriminate."
*Id.* at 16-17.

In signing the FHAA, President Reagan expressed
the same view. He explicitly stated that "this bill does
not represent any congressional or executive branch
endorsement of the notion, expressed in some judicial
opinions, that Title 8 violations may be established by
a showing of disparate impact or discriminatory effects
of a practice that is taken without discriminatory
intent. Title 8 speaks only to intentional
discrimination." Presidential Statement on Signing

35

the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1141 (Sept. 13, 1988).

Nor would it be appropriate to presume that Congress viewed the issue of whether the FHA imposed disparate-impact liability to be settled when the legislative history demonstrates that no such consensus existed. For example, Senator Hatch repeatedly expressed his view that the FHA requires proof of discriminatory intent. *See, e.g.*, 133 Cong. Rec. S4088 (daily ed. Mar. 27, 1987) (statement of Sen. Hatch) (arguing in support of a bill "that would clarify that the standard of proof in identifying discrimination under Title VIII is an intent standard" and that "the present language of [Title VIII], as well as its legislative history, indicate clearly that this is already the appropriate standard"). Senator Hatch also stated: "According to my Webster's dictionary, the phrase 'because of' means 'by reason of' or 'on account of.' There is, in other words, a nexus or a relationship between the activity and the proscribed motivation." 126 Cong. Rec. 15,192 (1980).

In short, the legislative history demonstrates that neither the members of Congress who enacted the FHA in 1968 nor those who amended it in 1988 shared a common view as to whether the statute imposed disparate-impact liability. Moreover, the text that Congress enacted establishes that a violation of the FHA cannot be proven without evidence of discriminatory intent. *See supra* Part I.A.

36

## C. Deference To HUD's Proposed Regulation Is Not Required.

Nine days after the Court granted certiorari in this case, HUD issued a notice of proposed rulemaking to "establish uniform standards for determining when a housing practice with a discriminatory effect violates" the FHA. *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 70,921 (Nov. 16, 2011). The proposed rule would interpret the FHA as permitting disparate-impact claims, and would establish a burden-shifting approach to resolving those claims. *Id.* at 70,924-25. The agency set a deadline of January 17, 2012, for comments on the proposed regulations. *Id.* at 70,921.

HUD's proposed regulations do not affect this case because they have not been adopted, and therefore do not have the force of law. Moreover, even if HUD were to issue final regulations before the Court decides this case, those regulations would not affect the Court's decision for at least two reasons.

First, the regulations, if adopted, would not be entitled to deference because they are contrary to the plain language of the statute. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 841 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). As discussed above, the

37

statutory text cannot be interpreted to permit disparate-impact claims. *See supra* Part I.A.[8]

Second, HUD's proposed regulations do not affect this case because they do not apply retroactively. The regulations do not rebut the "deeply rooted" presumption against retroactivity. *See, e.g., Landgraf v. USI Film Prod.*, 511 U.S. 244, 265-66 (1994) (concluding that provisions of the Civil Rights Act of 1991 do not retroactively apply to actions pending when the legislation was enacted). An agency may engage in retroactive rulemaking only if Congress has clearly authorized it to do so. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Nothing in the FHA provides HUD with retroactive rulemaking authority. *See* 42 U.S.C. § 3614A. As a result, HUD's regulations would affect only future cases. The claims in this case must be resolved based solely on the statutory text.

---

[8] In its notice of proposed rulemaking, HUD asserts that it has had a longstanding policy of interpreting the FHA as permitting disparate impact claims. 76 Fed. Reg. at 70,922. HUD does not assert that any of these prior statements is entitled to deference from the Court. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (*Chevron* deference is reserved for administrative action "carrying the force of law," such as notice-and-comment rulemaking); *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.").

38

## II. ENFORCEMENT OF SAINT PAUL'S HOUSING CODE DOES NOT VIOLATE THE FAIR HOUSING ACT EVEN IF THE ACT IMPOSES DISPARATE-IMPACT LIABILITY.

### A. If Disparate-Impact Claims Are Cognizable, The *Wards Cove* Test Should Apply.

#### 1. *Wards Cove* is the correct test.

The Court in *Smith* applied the test in *Wards Cove* when it analyzed disparate impact under the ADEA. The *Smith* Court reasoned that the Civil Rights Act of 1991, which modified the *Wards Cove* analysis, applied expressly and only to Title VII. Hence it did not apply to the ADEA. The same reasoning applies to the FHA and the same test should be applied here.

In *Wards Cove*, the Court laid out a three phase analysis for disparate-impact claims. 490 U.S. at 656-58. Under *Wards Cove*, "'the ultimate burden of proving that discrimination against a protected group has been caused by a specific . . . practice remains with the plaintiff *at all times*.'" *Id.* at 659 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 997 (1988) (plurality opinion)). In phase one, the plaintiff must first make out a prima facie case of disparate impact by identifying the specific practice that caused the alleged disparate impact on a protected group. *See id.* at 657; *see also Watson*, 487 U.S. at 994.

Once the plaintiff has established its prima facie case, the defendant must produce evidence of a "business justification" for the challenged employment practice. *Wards Cove*, 490 U.S. at 659. Phase two of

39

the inquiry has two steps: (1) defendant must produce evidence of a business justification; and (2) plaintiff must persuade the factfinder that this justification is not legitimate. *Id.* at 658-60. Although the defendant has the burden of production with regard to its reasons for adopting the challenged practice, "the burden of persuasion . . . remains with the disparate-impact plaintiff." *Id.* at 659. "A mere insubstantial justification in this regard will not suffice . . . . At the same time, though, there is no requirement that the challenged practice be 'essential' or 'indispensible' to the employer's business for it to pass muster . . . ." *Id.*

Once the defendant has discharged its burden of production, the plaintiff must at phase three "persuade the factfinder that 'other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate . . . interests'; by so demonstrating, [the plaintiff] would prove that '[the defendant was] using [its] tests merely as a "pretext" for discrimination.'" *Id.* at 660 (citing, inter alia, *Watson*, 487 U.S. at 998 (plurality opinion) & 1005-06 (concurrence)). Any alternative practices, though, must be "equally effective." *Id.* at 661 (noting factors such as cost and other burdens are relevant considerations).

In light of *Wards Cove*'s reliance on *Watson*'s plurality opinion in laying out its disparate-impact standard, it is important to consider *Watson* as well. *Watson*'s majority wrote that "the necessary premise of the disparate impact approach is that some . . . practices, adopted without a deliberately discriminatory motive, may in operation be *functionally equivalent* to intentional discrimination." 487 U.S. at 987 (emphasis added). The Court

40

explained that, as between disparate treatment and disparate impact, the "ultimate legal issue" was the same—i.e., discrimination "because of" a protected trait—and thus it was wholly inappropriate "to hold a defendant liable for unintentional discrimination on the basis of *less evidence* than is required to prove intentional discrimination." *Id.* (emphasis added).

The Court in *Wards Cove* gave three additional reasons for the approach that it adopted. First, liberal civil discovery rules aid all plaintiffs in "meet[ing] their burden of showing a causal link between challenged . . . practices" and disparate impacts. 490 U.S. at 657-58. Second, making the plaintiff carry the burden of persuasion at each phase "conforms with the usual method for allocating persuasion and production burdens in the federal courts, . . . and more specifically, it conforms to the rule in disparate-treatment cases." *Id.* at 659-60. Lastly, regarding the last phase, the Court noted that "[c]ourts are generally less competent than employers to restructure business practices," and that "consequently, the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's alternative . . . practice." *Id.* at 661 (internal quotation marks omitted).

These points are each applicable and relevant in the FHA context, including this case: Respondents had the benefit of liberal discovery; Respondents brought (and lost) a disparate-treatment claim and therein had to carry the burden of persuasion all the way through, just as in any other claim; and Petitioners, *not* the district court or the Eighth Circuit, were more competent and in the best position to decide how to effectively enforce Saint Paul's housing code. *Wards Cove* is clearly the best standard to apply in

41

this case and to disparate-impact claims under the FHA as a whole.

Parts of *Wards Cove* were superseded by the Civil Rights Act of 1991. *See* 42 U.S.C. § 2000e-2(k); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2555 (2011) (noting this fact, but then citing *Wards Cove* for a non-superseded proposition). This superseding legislation, however, is only relevant in the Title VII context, not the Title VIII context. In *Smith*, the Court thought it significant that Congress had not similarly amended the ADEA. 544 U.S. at 240. The Court concluded that, because the Civil Rights Act of 1991 did not amend the burden of proof applicable to claims under the ADEA, *Wards Cove's* pre-1991 interpretation of Title VII remained applicable to disparate-impact claims brought under the ADEA. *Id.* Likewise, Congress has not amended the burden of proof for FHA claims, and thus the *Wards Cove* test should be given deference and should be applied in this case.

## 2. The circuit courts' analyses are incorrect.

Rather than applying *Wards Cove*, circuit courts of appeals have generally applied either a burden-shifting test or a balancing test. The Court should not adopt either approach.[9]

---

[9] Other circuit courts have adopted aspects of both the burden-shifting test and the balancing test. *See, e.g., Huntington Branch, NAACP v. Town of Huntington, N.Y.*, 844 F.2d 926, 934-35 (2d Cir. 1988). This approach should be rejected both because it is unsupported by the statutory text and the Court's precedents and

42

First, the circuit courts that use a burden-shifting test typically consider factors similar to those applied in *Wards Cove. See, e.g., Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148-49 (3d Cir. 1977). Unlike in *Wards Cove*, however, these courts shift the burden of persuasion to the defendants to justify the necessity of the challenged practice. *See, e.g., id.* If the defendant successfully shows that the practice is necessary, some courts shift the burden of persuasion back to the plaintiff to show the availability of equally effective alternatives, while other courts assign the burden of persuasion to the defendants. *Compare Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 902-03 (8th Cir. 2005) (shifting the burden back to the plaintiff to show that a viable alternative practice is available that would achieve the defendant's policy objectives without discriminatory effects), *with Rizzo*, 564 F.2d at 149 (requiring a Title VIII defendant to show that no equally effective but less discriminatory alternative practice could have been adopted).

The burden-shifting approach is contrary to the general presumption that a plaintiff must prove each element of his or her claim. The Court has made clear that "[w]here the statutory text is 'silent on the allocation of the burden of persuasion,' [it] 'begin[s] with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims.'" *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009) (quoting, *Schaffer v. Weast*, 546 U.S. 49, 56 (2005)). The text of the FHA provides no basis for shifting the burden of

---

because it raises the same concerns that result from applying either test individually.

43

persuasion to the defendant for any part of the plaintiff's claim.

Second, other courts of appeals have adopted multifactor balancing tests to decide disparate-impact claims under the FHA. *See, e.g., Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 574-75 (6th Cir. 1986); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290-92 (7th Cir. 1977). This approach finds no support in either the text of the FHA or in the Court's decisions. Nor does the balancing approach further the purposes of the FHA. In *Wards Cove*, the Court required a plaintiff to make out a prima facie case of disparate impact before it would consider the defendant's justifications for the challenged practice because "[c]ourts are generally less competent than employers to restructure business practices," 490 U.S. at 661 (internal quotation marks omitted), and to avoid holding employers liable for "the myriad of innocent causes that may lead to statistical imbalances in the composition of workforces." *Id.* at 657 (internal quotation marks omitted).

The Court's reasoning is equally applicable in this case. Before a court second guesses a city's method for enforcing its housing code, it should ensure that the plaintiff has made out a prima facie case of disparate impact. Yet, under a balancing test, a court must consider all factors in each case, and thus must pass judgment on the city's decisions even when evidence of disparate impact is lacking. In short, if the Court concludes that disparate-impact claims are cognizable under the FHA, then it should apply the disparate-impact test in *Wards Cove* that it has previously

44

applied to Title VII and the ADEA. *See Wards Cove*, 490 U.S. at 656-60; *Smith*, 544 U.S. at 240.

## B. The City Was Entitled To Summary Judgment Under The *Wards Cove* Test.

Applying *Wards Cove*, Respondents are first required to make out a prima facie case of disparate impact. 490 U.S. at 656-58. Respondents would then need to persuade the factfinder that either the City lacked a legitimate reason for enforcing its housing code, or that the City could have adopted a different policy that would have been equally effective in achieving the City's objectives while having less impact on a protected class of tenants. *Id.* at 658-61. Respondents' claims fail as a matter of law at each phase of such an analysis.

### 1. Respondents failed to make out a prima facie case of disparate impact.

The Eighth Circuit held that Respondents presented sufficient evidence to make out a prima facie case based on the theory that the City's "aggressive" enforcement of its housing code had a disparate impact on Respondents' minority tenants. Pet. App. 16a-26a. Although it acknowledged that Respondents lacked any evidence that "connect[ed] the dots" of their claim, the court of appeals concluded that a jury could connect the dots based on the following chain of inferences: (1) "aggressive" enforcement of the housing code increased costs for landlords; (2) the increased costs for landlords resulted in less affordable housing; and (3) the reduction in affordable housing disproportionately affected racial minorities because the City had a shortage of affordable housing and

45

racial minorities made up a disproportionate percentage of low-income residents. *Id.* at 17a-19a.

Respondents' evidence is insufficient to survive summary judgment under *Wards Cove*. To make out a prima facie case of disparate impact, it is not enough for plaintiffs to establish that a racial imbalance exists. *Wards Cove*, 490 U.S. at 657. Instead, plaintiffs must meet a "specific causation requirement," by identifying the *specific* practice that he or she is challenging and demonstrating that this practice "has created the disparate impact under attack." *Id.* Respondents failed to present sufficient evidence to meet this standard.

The circuit court erred by not addressing whether any specific practice identified by Respondents resulted in a disparate impact on a protected class. *See id.* Respondents challenged the City's enforcement of its housing code on many distinct grounds, including "that the City issued false Housing Code violations and punished property owners without prior notification, invitations to cooperate with [NHPI], or adequate time to remedy Housing Code violations." Pet. App. 17a. Rather than addressing whether any of these specific practices resulted in a disparate impact, the circuit court broadly characterized them all as "aggressive" enforcement practices, and considered only whether "aggressive" enforcement caused a disparate impact. *Id.*

This approach cannot be squared with *Wards Cove*. There, plaintiffs also challenged "several" of the defendant's practices. 490 U.S. at 657. The Court made clear that plaintiffs could not make out a prima facie case by showing that the employers' practices,

46

considered as a whole, disparately impacted members of a protected class. *Id.* Instead, the plaintiffs were required "to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites." *Id.*

Respondents should have been required to make the same showing here. Rather than grouping all of the challenged actions together and calling them "aggressive" enforcement practices, the circuit court should have considered whether Respondents had any evidence to link a specific practice to a disparate impact on a protected class. This is especially true given the broad range of allegations that have been subsumed in "aggressive" enforcement. For example, allegations that the City issued false code violations are considerably different from allegations that the city issued valid violations without first extending an "invitation[] to cooperate with [NHPI]," and thus acted too aggressively. Pet. App. 17a.

The circuit court erred in holding that Respondents made out a prima facie case of disparate impact based on statistics showing that, as a general matter, racial minorities in Saint Paul disproportionately rely on low-income housing. *Id.* at 20a-24a. In *Wards Cove*, the Court made clear that the statistics used to show a racial disparity must permit an inference that the challenged practice led to that disparity. *See* 490 U.S. 650-52. Thus, in *Wards Cove*, it was insufficient for the plaintiffs to show that a disproportionately large number of minorities were employed as cannery workers as compared to non-cannery workers, because

47

that comparison did not suggest that the employers' hiring practices for either type of worker caused a disparate impact. *Id.* at 651-55. Instead, plaintiffs needed to show, for example, a disparity between the applicant pool for non-cannery jobs and those hired for the jobs because that statistic would permit an inference related to the effect of the employer's hiring practices. *Id.*

The circuit court erred in relying on general statistics related to the percentage of minorities in low-income housing as compared to the percentage of minorities in Saint Paul as a whole. These general statistics cannot be used to make out a prima facie case because they fail to isolate the alleged effects of the challenged actions. *See id.* at 655. Respondents do not allege—much less present sufficient evidence to survive summary judgment—that the City engaged in "aggressive" enforcement with respect to all low-income housing. To the contrary, Respondents based their disparate *treatment* claims on allegations that their properties were targeted for "aggressive" enforcement, while other landlords who owned low-income housing were not subject to "aggressive" enforcement. Both lower courts concluded that Respondents lacked evidence to support this allegation. Pet. App. 10a-16a, 67a-81a.

Respondents presented no evidence that the alleged "aggressive" enforcement impacted any properties within the City other than their own. Even with respect to their own properties, Respondents do not allege that the City practiced "aggressive" enforcement at all of their properties. Moreover, some of Respondents' allegations of "aggressive" enforcement relate to properties that were rented by non-protected

48

tenants or were vacant at the time of enforcement. *See, e.g.*, Defs.' Ex. 30, Doc. 201-41, at 147. Thus, Respondents' evidence, at best, showed that the City aggressively enforced its housing code at less than 120 of the City's more than 100,000 properties, including properties that were not inhabited by members of a protected class.

Under *Wards Cove*, Respondents were required to present evidence that could isolate the effect of "aggressive" enforcement on those tenants who were subject to "aggressive" enforcement. Without such evidence, there is no way to determine whether any observed statistical disparity is causally linked to the challenged actions. Because Respondents presented evidence of "aggressive" enforcement at only a tiny fraction of the housing units in Saint Paul, the circuit court erred in concluding that a jury could draw inferences regarding the effect of "aggressive" enforcement on these few tenants based on statistics involving all of Saint Paul.

The circuit court also erred in holding that a jury could infer that the City's enforcement of its housing code resulted in less affordable housing in the City. Pet. App. 19a. The court based this conclusion on (1) the City's Vacant Buildings Report, which showed an increase in vacant homes from 367 in March 2003, to 1,466 in November 2007; and (2) affidavits from three tenants who alleged that their homes were condemned for minimal or false housing code violations. *Id.* This evidence does not support an inference that "aggressive" enforcement disproportionately harmed minority tenants by reducing the amount of affordable housing.

49

First, although the Vacant Buildings Report shows an increase in vacant homes, it does not support the inference that this increase was caused by "aggressive" enforcement of the housing code. *See Wards Cove*, 490 U.S. at 656 (discussing causation). To the contrary, as the district court explained, the report attributes the increase to mortgage foreclosures, and it "identifies equity stripping, predatory lending practices, sub-prime lending, unforeseen life events such as loss of income and health issues, increasing interest rates, and unemployment levels as causes of foreclosures." Pet. App. 65a. As the district court explained, "[t]he Vacant Buildings report does not identify enforcement of the City's housing code as a cause of increased vacancies or foreclosures." *Id.* Thus, the circuit court erred in holding that a jury could infer that "aggressive" enforcement caused an increase in vacant housing when the evidence does not support that causal link.[10]

Second, affidavits from three tenants cannot establish that "aggressive" enforcement resulted in a disparate impact on members of a protected class. To show that members of a protected class were disproportionately affected by "aggressive" enforcement of the housing code, Respondents would need to quantify the total number of tenants who were

---

[10] The vacant building statistics are also insufficient because they are not limited to vacancies in low-income housing, much less to vacancies in properties that were allegedly subject to aggressive enforcement. Instead, the statistics include all vacant homes throughout the City. Pls.' Ex. 253, Doc. 254-23, at 1-43; Pls.' Ex. 246, Doc. 254-15, at 1-10; Doc. 254-16, at 1-7; Doc. 254-17, at 1-11; Doc. 254-18, at 1-12; Doc. 254-19, at 1-11; and Doc. 254-20, at 1-11.

50

harmed by "aggressive" enforcement. *See Wards Cove*, 490 U.S. at 653-54 (discussing the need to identify an appropriate comparator group for purposes of determining disparate impact). If the majority of those individuals are not members of a protected class, then the evidence would fail to show a disparate impact.

Affidavits from three individuals are also insufficient because they do not establish that "aggressive" enforcement of the housing code generally had a negative effect on members of a protected class. There is no evidence that tenants had their rent increased as a result of their landlord's need to spend money to bring their residence up to code. To the contrary, "aggressive" enforcement benefited all of the tenants whose residences were repaired rather than condemned. Those tenants may greatly outnumber the tenants whose residences were condemned.

In short, the City was entitled to summary judgment because Respondents failed to present evidence of a *specific* practice that resulted in a disparate impact on a protected class. The circuit court's attempt to create a chain of inferences to support Respondents' claims fails under the *Wards Cove* test.

## 2. Petitioners have a legitimate business justification.

If Respondents could make out a prima facie case of disparate impact, the inquiry would shift to (1) the City's justifications for the challenged practice, and (2) the availability of equally effective alternative practices that serve the City's legitimate interests with less disparate impact. *Wards Cove*, 490 U.S. at 658-60.

51

Because Respondents failed to create a genuine issue of material fact on these issues, Respondents' claims fail even if they had sufficient evidence that "aggressive" code enforcement caused a disparate impact.

There is no dispute that Respondents cannot prevail on the first phase of the inquiry. At this phase, the focus is on the City's justification for the challenged practice, and the dispositive issue is whether the practice serves the City's legitimate interests. *See id.* at 659. The City's efforts to enforce its housing code clearly serve the legitimate goal of ensuring that all City residents have housing that is habitable and safe. Neither the circuit court nor Respondents dispute this point. Pet. App. 24a.

### 3. Respondents lack evidence of an equally effective alternative practice.

Because Respondents have not challenged the legitimacy of the City's enforcement of its housing code, they can prevail only if they prove that a viable alternative practice exists. The circuit court held that the case could go to trial on the theory that the City's PP2000 program is a viable alternative to the City's alleged "aggressive" enforcement of its housing code. Pet. App. 25a-26a. The evidence regarding PP2000 was insufficient as a matter of law.

Under *Wards Cove*, Respondents are required to identify an "equally effective" alternative practice that serves the City's legitimate interests without the alleged undesirable racial effect before they can succeed on their disparate-impact claim. 490 U.S. at 660. To determine whether a proposed alternative is

52

"equally effective," a court must consider "factors such as the cost or other burdens of [the] proposed alternative." *Id*. at 661 (internal quotation omitted).

Respondents failed to present evidence that PP2000 satisfies this standard. PP2000 was a program that started in 1999 and ended in 2001 before Petitioner Dawkins was chosen as the Director of NHPI. Defs.' Ex. 9, Doc. 201-10, at 212. As part of this program, the City identified approximately fifteen landlords whose properties had a history of unresolved or repeat housing code violations. Defs.' Ex. 9, Doc. 201-10, at 214. While PP2000 was in effect, two City inspectors worked with the landlords to find ways to improve their compliance with the housing code. Pls.' Ex 113, Doc 247-4, at 4; Defs.' Ex 9, Doc. 201-10, at 211-12; Pet. App. 66a n.9. At all times during the program, the landlords bore the costs of improving their properties; the City did not subsidize any of the remedial costs. PP2000 was successful in improving living conditions at most, but not all, properties involved in the program. As City inspector Hawkins acknowledged, PP2000 was successful with regard to approximately 70% of the program's landlords. Pls.' Ex. 113, Doc. 247-4, at 9.

Contrary to the circuit court's ruling, the success of this limited program fails to create a genuine issue as to whether it would be as "equally effective" as the challenged practice. The Court's decision in *Wards Cove* makes clear that costs or other burdens imposed by the proposed alternative must be considered in determining whether the alternative is "equally effective." 490 U.S. at 661. Respondents presented no evidence to show that PP2000 could be implemented city-wide without imposing prohibitive costs on the

53

City. Nor could they. PP2000 operated with a ratio of roughly one inspector for every seven landlords. The City would need to hire hundreds, if not thousands, of inspectors to expand the program to include the landlords or owners for all 115,713 housing units in the City.[11]

Had the Eighth Circuit properly applied the *Wards Cove* test, it would have affirmed the district court's ruling that Respondents lacked sufficient evidence to show that PP2000 is a viable alternative to the challenged practice. Because the Court of Appeals applied the wrong test and reached the wrong result, its decision should be reversed.

## C. Even If The Court Does Not Adopt The *Wards Cove* Test, Respondents' Claims Should Still Fail.

Respondents' claims should fail regardless of the test adopted by the Court. As discussed above, the summary judgment record lacks sufficient evidence to show that the alleged "aggressive" enforcement of the

---

[11] The district court concluded that Respondents had abandoned PP2000 as a viable alternative, and that, in any event, they had offered "no evidence" to establish that PP2000 was a viable alternative. Pet. App. 66a n.9. On appeal, Respondents did not argue that PP2000 would be equally (or less) costly than "aggressive" enforcement, and thus the City had no reason to argue to the contrary. The Eighth Circuit stated that the *City* had not argued that PP2000 would be more costly. Pet. App. 26a. Under *Wards Cove*, however, Respondents have the burden of showing that expanding PP2000 city-wide would not be so costly as to prevent the program from being "equally effective." Since Respondents made no attempt to satisfy this burden, summary judgment should have been affirmed.

54

housing code caused a disparate impact on a protected class. *See supra* Part II.B.1. That alone should be sufficient to warrant summary judgment for the City under any test that the Court would adopt.

Regardless of the governing standard, plaintiffs should not be able to challenge a city's enforcement of its housing code where they cannot show that the city's actions were motivated by race or any other protected trait. Allowing such claims to proceed would be contrary to the FHA's purpose and would raise equal protection concerns.

Congress enacted the FHA to provide for fair housing throughout the United States. 42 U.S.C. § 3601. Congress sought to achieve this goal by prohibiting housing decisions that are based on factors such as race. *See* 42 U.S.C. § 3604(2). Yet, if a city is subject to disparate-impact claims for enforcing its housing code, it will be required to consider race as a factor in its enforcement decisions. For example, if a city discovers that a building has such serious structural problems that it should be condemned, the city will need to consider whether the occupants who would be displaced are disproportionately from protected classes. If they are, the city will face a Hobson's choice. If it condemns the building, it could be sued under the FHA on a disparate-impact theory. If the city decides not to enforce the housing code and this decision is made based on the race of the building's occupants, it could also be sued under the FHA on a disparate-treatment theory. Its decision would also potentially violate the Equal Protection Clause. *See Washington v. Davis*, 426 U.S. 229, 242 (1976).

55

The Court has recognized that the disparate-impact theory, if misapplied, could result in the unintended consequence of requiring race-based decision making. For example, in *Watson*, the plurality opinion noted:

> [E]xtending disparate impact analysis to subjective employment practices [under Title VII] has the potential to create a Hobson's choice for employers and thus to lead in practice to perverse results. If quotas and preferential treatment become the only cost-effective means of avoiding expensive litigation and potentially catastrophic liability, such measures will be widely adopted. . . . Allowing the evolution of disparate impact analysis to lead to this result would be contrary to Congress' clearly expressed intent, and it should not be the effect of our decision today.

487 U.S. at 993.

If a city must enforce its housing code selectively to avoid disparately impacting minorities under the FHA, it will be required to consider the racial significance of its facially neutral policy and to make decisions based on race. Yet selectively enforcing its laws based on race raises significant equal protection concerns. *See Ricci*, 129 S. Ct. at 2673-74. In *Ricci*, the Court addressed only whether the city's race-based preferential treatment of certain employees was justified under Title VII by its avoidance of a disparate-impact suit by different employees, leaving for another day whether this action is permitted by the Equal Protection Clause of the Fourteenth Amendment. *See id.* at 2676. Nonetheless, as a concurring opinion noted, resolving the case solely on

56

statutory grounds "merely postpones the evil day on which the Court will have to confront the question: Whether, or to what extent, are the disparate-impact provisions of Title VII . . . consistent with the Constitution's guarantee of equal protection?" *Id.* at 2682 (Scalia, J., concurring).

In short, regardless of which test is adopted for disparate-impact claims, the Court should hold that the test is not satisfied by allegations involving a city's enforcement of its housing code without evidence of a discriminatory motive, because allowing such claims would frustrate the FHA's objectives and would raise serious constitutional concerns.

57

## CONCLUSION

The judgment of the Eighth Circuit Court of Appeals should be reversed.

Respectfully submitted,

SARA R. GREWING
  City Attorney
LOUISE TOSCANO SEEBA
  Assistant City Attorney
    *Counsel of Record*
GERALD T. HENDRICKSON
PORTIA HAMPTON-FLOWERS
  Deputy City Attorneys
K. MEGHAN KISCH
  Assistant City Attorney
750 City Hall and Court House
15 West Kellogg Boulevard
Saint Paul, Minnesota 55102
(651) 266-8770
Louise.Seeba@ci.stpaul.mn.us

*Counsel for Petitioners*

# ATTACHMENT C

No. 10-1032

In The

# Supreme Court of the United States

---

Steve Magner, et al.,
*Petitioners,*

v.

Thomas J. Gallagher, et al.,
*Respondents.*

---

**On Writ of Certiorari to the
United States Court of Appeals
for the Eighth Circuit**

---

**BRIEF OF *AMICI CURIAE*
AMERICAN BANKERS ASSOCIATION,
CONSUMER BANKERS ASSOCIATION,
FINANCIAL SERVICES ROUNDTABLE,
AND HOUSING POLICY COUNCIL
SUGGESTING REVERSAL**

**[Additional *amici* listed on inside cover]**

---

Lisa S. Blatt
  *Counsel of Record*
Nancy L. Perkins
Isaac B. Rosenberg
Colin Holmes
Arnold & Porter LLP
555 12th Street, N.W.
Washington, DC 20004
(202) 942-5000
Lisa.Blatt@aporter.com

*Counsel for Amici Curiae
American Bankers Association, et al.*

---

Wilson-Epes Printing Co., Inc. – (202) 789-0096 – Washington, D. C. 20002