## Additional *Amici Curiae*

Alabama Bankers Association, Alaska Bankers Association, Arizona Bankers Association, Arkansas Bankers Association, California Bankers Association, Colorado Bankers Association, Connecticut Bankers Association, Delaware Bankers Association, Florida Bankers Association, Georgia Bankers Association, Hawaii Bankers Association, Heartland Community Bankers Association, Idaho Bankers Association, Illinois Bankers Association, Illinois League of Financial Institutions, Indiana Bankers Association, Iowa Bankers Association, Kansas Bankers Association, Kentucky Bankers Association, Louisiana Bankers Association, Maine Bankers Association, Maryland Bankers Association, Massachusetts Bankers Association, Michigan Bankers Association, Minnesota Bankers Association, Mississippi Bankers Association, Missouri Bankers Association, Montana Bankers Association, Nebraska Bankers Association, Nevada Bankers Association, New Hampshire Bankers Association, New Jersey Bankers Association, New Mexico Bankers Association, New York Bankers Association, North Carolina Bankers Association, North Dakota Bankers Association, Ohio Bankers League, Oklahoma Bankers Association, Oregon Bankers Association, Pennsylvania Bankers Association, Puerto Rico Bankers Association, Rhode Island Bankers Association, South Carolina Bankers Association, South Dakota Bankers Association, Tennessee Bankers Association, Texas Bankers Association, Utah Bankers Association, Vermont Bankers Association, Virginia Bankers Association, Washington Bankers Association, Washington Financial League, West Virginia Bankers Association, Wisconsin Bankers Association, and Wyoming Bankers Association.

TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| INTEREST OF *AMICI CURIAE* | 1 |
| SUMMARY OF ARGUMENT | 3 |
| ARGUMENT | 5 |
| I. THE FAIR HOUSING ACT DOES NOT PERMIT DISPARATE-IMPACT CLAIMS | 5 |
| A. The Text of 42 U.S.C. § 3604 Provides No Basis for Claims of Disparate Impact | 5 |
| B. Lenders Are Not Subject to Disparate-Impact Claims Under the FHA | 9 |
| II. IF DISPARATE-IMPACT CLAIMS ARE DEEMED COGNIZABLE UNDER THE FHA, THE *WARDS COVE* ANALYTICAL FRAMEWORK SHOULD APPLY | 13 |
| A. Most Circuits Have Applied a Burden-Shifting Approach in FHA Cases but Have Failed To Do So Properly | 13 |
| B. The *Wards Cove* Framework Provides the Applicable Burden-Shifting Standards | 16 |
| C. The Other Approaches Applied by Lower Courts Are Unsound and Inappropriate for Private Defendants | 20 |
| CONCLUSION | 23 |
| APPENDIX: Chart of Relevant Provisions of Title VII, the ADEA, and the FHA | 1a |

TABLE OF AUTHORITIES

CASES Page(s)

*Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182 (9th Cir. 2006) ......... 13, 18

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) ...................................... 20

*Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir. 1986) ........................ 21

*Betsey v. Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984) ...................14, 18, 22

*Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102 (1944) ...................................... 11

*Colby v. J.C. Penney Co.*, 811 F.2d 1119 (7th Cir. 1987) ...................... 8

*D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204 (1932) ...................................... 11

*Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898 (8th Cir. 2005)... 20

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) ................. 20

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ........................................ 9

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978) ...................................... 14

*Gaona v. Town & Country Credit*, 324 F.3d 1050 (8th Cir. 2003) ...................... 10, 11

*Graoch Assocs. #33, L.P. v. Louisville / Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366 (6th Cir. 2007)......... 21, 22

TABLE OF AUTHORITIES—Continued

Page(s)

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) .................................... 7, 17

*Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343 (2009) ................................ 12, 15

*Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582 (1983) ............................ 15

*Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999) ..................... 19

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) .................................... 17

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) .................................... 5

*Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988) ........................................14, 22, 23

*Langlois v. Abington Hous. Auth.*, 207 F.3d 43 (1st Cir. 2000)...............13, 19, 20, 22

*Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442 (3d Cir. 2002)......................... 13

*Laufman v. Oakley Bldg. & Loan Co.*, 408 F. Supp. 489 (S.D. Ohio 1976).............. 10

*Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419 (4th Cir. 1984) ....................... 10, 11

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .................................... 9

*Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84 (2008) ...................................8, 16, 18

TABLE OF AUTHORITIES—Continued

Page(s)

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) .......... 13, 21

*Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243 (10th Cir. 1995) .......... 22, 23

*Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427 (1973) (per curiam) .......... 7

*Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871 (8th Cir. 2003) .......... 13, 14, 19

*Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) .......... 8

*Reinhart v. Lincoln Cnty.*, 482 F.3d 1225 (10th Cir. 2007) .......... 22

*Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977) .......... 19

*Ricci v. DeStefano*, 129 S. Ct. 2658 (2009) .......... 6, 14, 20

*Salute v. Stratford Greens Garden Apts.*, 136 F.3d 293 (2d Cir. 1998) .......... 14, 18

*Schaffer v. Weast*, 546 U.S. 49 (2005) .......... 15

*Simms v. First Gibraltar Bank*, 83 F.3d 1546 (5th Cir. 1996) .......... 10, 11, 18

*Smith v. City of Jackson*, 544 U.S. 228 (2005) .......... *passim*

*Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982) .......... 21

TABLE OF AUTHORITIES—Continued

Page(s)

*Tsombanidis v. W. Haven Fire Dep't*,
352 F.3d 565 (2d Cir. 2003)........................ 18, 19

*United States v. Jicarilla Apache Nation*,
131 S. Ct. 2313 (2011)................................ 11

*United States v. Price*,
361 U.S. 304 (1960).................................... 9

*Villas W. II of Willowridge Homeowners Ass'n v. McGlothin*,
885 N.E.2d 1274 (Ind. 2008)........................ 20, 22

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989)..................................*passim*

*Watson v. Fort Worth Bank & Trust*,
487 U.S. 977 (1988)..................................*passim*

STATUTES AND REGULATORY PROVISIONS

29 U.S.C. § 623(a)(1)................................3, 6, 8, 12

29 U.S.C. § 623(a)(2)...................................... 3, 7, 8

42 U.S.C. § 2000e-2(a)(1)................................ 3, 6, 8

42 U.S.C. § 2000e-2(a)(2).............................3, 7, 8, 9

42 U.S.C. § 2000e-2(k)(1)(A)(i)........................ 15

42 U.S.C. § 3604............................................*passim*

42 U.S.C. § 3604(a)......................................*passim*

42 U.S.C. § 3604(b)........................................ 10

42 U.S.C. § 3604(f)........................................ 10, 11

42 U.S.C. § 3605............................................*passim*

42 U.S.C. § 3605(a)........................................ 10, 12

TABLE OF AUTHORITIES—Continued

Page(s)

42 U.S.C. § 3605(b)(1) .................................... 10

42 U.S.C. § 12112(b) ...................................... 7, 8

42 U.S.C. § 12112(b)(1) .................................. 7

42 U.S.C. § 12112(b)(3)(A) .............................. 7

42 U.S.C. § 12112(b)(6) .................................. 8

Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 73 .................................................. 12

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 .................................... 16

Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 ........... 12

Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70,921 (Nov. 16, 2011) (to be codified at 24 C.F.R. pt. 100) .................................... 14, 15

## INTEREST OF *AMICI CURIAE*[1]

The American Bankers Association ("ABA"), headquartered in Washington, D.C., is the principal national trade association of the financial services industry. The ABA's members, located in each of the 50 states, the District of Columbia, and Puerto Rico, include financial institutions of all sizes. ABA members hold a majority of the domestic assets of the banking industry in the United States. The ABA frequently submits *amicus curiae* briefs in state and federal courts in matters that significantly affect its members and the business of banking.

The Consumer Bankers Association ("CBA") is the only national financial trade group focused exclusively on retail banking and personal financial services—banking services geared toward consumers and small businesses. As the recognized voice on retail banking issues, the CBA provides leadership, education, research, and federal representation on retail banking issues. CBA members include most of the nation's largest bank holding companies, as well as regional and super-community banks that collectively hold two-thirds of the industry's total assets.

The Financial Services Roundtable ("Roundtable") represents 100 of the largest integrated financial companies providing banking, insurance, and invest-

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No one other than *amici curiae*, their members, or *amici*'s counsel made a monetary contribution to the preparation or submission of this brief. Letters from the parties consenting to the filing of *amicus* briefs have been filed with the Clerk of the Court.

ment products and services to American consumers. Roundtable members finance the majority of single and multifamily housing in the United States.

The Housing Policy Council is made up of 32 companies that are among the nation's leaders in mortgage finance and that originate an estimated 75 percent of mortgages for American home buyers.

Also appearing as *amici* are 54 bankers associations from each of the 50 states and Puerto Rico. These associations represent the interests of their members (which include state and federally chartered banks, as well as savings and loan associations) at the state and local level. They provide a voice for the industry in state legislatures across the nation, as well as support their members with research and information, public relations, continuing professional education, and educational materials.

*Amici*, on behalf of their members, have a substantial interest in the outcome of this case. *Amici*'s members are strongly committed to providing lending and financial services in a nondiscriminatory manner. Clarification of the Fair Housing Act ("FHA") issues in this case will benefit both consumers and financial institutions by reducing ambiguity and promoting compliance.

The questions presented—(1) whether the FHA supports claims against a city based on an alleged "disparate impact" of the city's housing improvement efforts on FHA-protected classes, and (2) if so, what framework applies to the analysis of such claims—could affect whether and how *amici*'s members are subject to FHA disparate-impact claims. Plaintiffs in other cases have brought disparate-impact claims against lenders under both the "sale or rental" FHA

provision at issue here, 42 U.S.C. § 3604, as well as the separate FHA section applicable to lending, 42 U.S.C. § 3605.

## SUMMARY OF ARGUMENT

I. When Congress intends to prohibit facially neutral conduct that has a disparate impact on members of a protected class, Congress uses specific language directed to the "effects" of that conduct. But when Congress speaks only to discriminatory acts committed "because of" a person's protected status, it prohibits only intentional discrimination, *i.e.*, disparate treatment. Congress used only disparate-treatment language in the FHA.

The FHA provision at issue here, 42 U.S.C. § 3604 ("Section 3604")—like Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and Section 4(a)(1) of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1)—prohibits only intentional discrimination. Section 3604 proscribes conduct relating to the sale or rental of dwellings that is undertaken against an individual "because of" that person's membership in a class protected under the statute. Section 3604 does not refer to conduct that "adversely affects" or "tends to deprive" members of a protected class—language that substantiates the basis for disparate-impact causes of action. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988) (plurality opinion) (construing Title VII Section 703(a)(2)); *see also Smith v. City of Jackson*, 544 U.S. 228, 236 (2005) (plurality opinion) (construing ADEA Section 4(a)(2)). Section 3604 therefore does not provide a cause of action for disparate-impact discrimination.

Section 3604's construction affects *amici* because plaintiffs bring disparate-impact claims against lenders under Section 3604. Plaintiffs bring such claims despite the fact that a separate section of the FHA, 42 U.S.C. § 3605 ("Section 3605"), which contains no language whatsoever supporting a disparate-impact theory of liability, constitutes the statute's sole prohibition on discriminatory lending. If the Court holds that Section 3604 permits disparate-impact claims, the Court should make clear that its holding does not apply to lender liability.

II. Should the Court conclude that disparate-impact claims are cognizable under Section 3604, it also should confirm that the three-step analytical framework specified in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), applies to such claims. *See Smith*, 544 U.S. at 240. Applying the *Wards Cove* analysis, the plaintiff in any FHA disparate-impact case bears the burden of persuasion throughout each of three analytical steps. *See Wards Cove*, 659–60. Ultimately, the plaintiff can prevail only by proving either that the challenged practice served no legitimate goal identified by the defendant or that an alternative practice that avoids the disparate impact is "'equally as effective as the challenged practice in serving the [defendant's] legitimate business goals.'" *Id.* at 660, 661 (quoting *Watson*, 487 U.S. at 998).

## ARGUMENT

### I. THE FAIR HOUSING ACT DOES NOT PERMIT DISPARATE-IMPACT CLAIMS

#### A. The Text of 42 U.S.C. § 3604 Provides No Basis for Claims of Disparate Impact

The starting point in any question of statutory construction is, of course, the text. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).

As the plurality explained in *Smith v. City of Jackson*, 544 U.S. 228 (2005), the critical textual question for determining if a statute supports a disparate-impact claim is whether the statute "focuses on the *effects* of the action on the [protected individual] rather than the motivation for the action of the [defendant]." *Id.* at 236 (emphasis in original); *see Watson*, 487 U.S. at 991 (concluding that Title VII "may be analyzed under the disparate impact approach" because the statute prohibits employer practices that "adversely affect" an employee's status). When Congress chooses statutory language to target the *effects* of facially neutral conduct, the statute prohibits disparate-impact discrimination. Conversely, a statute that proscribes only discrimination based on protected status, but does not address the effects of facially neutral conduct, supports only claims of disparate treatment.

Section 3604(a) prohibits specific conduct without consideration of the effects of that conduct. Under Section 3604(a), it is unlawful to refuse to sell, rent, or negotiate for, or otherwise make unavailable or deny, a dwelling based on a person's protected status. The statute does not include the word "affect" or otherwise refer to the effects of facially neutral conduct. By focusing on the prohibited acts, and not on the effect of those acts, Congress limited recovery under Section 3604(a) to claims of disparate treatment.

In this regard, the text of Section 3604(a) parallels the text of other statutory provisions that do not permit disparate-impact claims. Section 703(a)(1) of Title VII and Section 4(a)(1) of the ADEA prohibit specific discriminatory conduct, but those provisions do not focus on the "effects" of the prohibited conduct.[2] *See Ricci v. DeStefano*, 129 S. Ct. 2658, 2672–73 (2009) (construing Title VII § 703(a)(1) as a disparate-treatment provision); *Smith*, 544 U.S. at 236 n.6, 249 (finding no disparate-impact liability under ADEA § 4(a)(1)). "The similarity of language in [these provisions] is . . . a strong indication

---

[2] Section 703(a)(1) of Title VII provides that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Section 4(a)(1) of the ADEA similarly provides that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

that [they] should be interpreted *pari passu*." *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427, 428 (1973) (per curiam).

In contrast, Section 3604(a) is textually distinct from other statutory provisions that permit claims for disparate impact, such as Section 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), Section 4(a)(2) of the ADEA, 29 U.S.C. § 623(a)(2), and Section 102 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(b). Each of those other provisions prohibits conduct that "adversely affects" a protected class, using language the Court has recognized as authorizing claims of disparate impact.[3] *See Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 429–31

---

[3] Section 703(a)(2) of Title VII provides that it shall be an unlawful employment practice for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise ***adversely affect*** his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2) (emphasis added).

Section 4(a)(2) of the ADEA provides that it shall be unlawful for an employer "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise ***adversely affect*** his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2) (emphasis added).

Section 102 of the ADA defines "discrimination" to include "limiting, segregating, or classifying a job applicant or employee in a way that ***adversely affects*** the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C. § 12112(b)(1) (emphasis added). *See also id.* § 12112(b)(3)(A) (discrimination includes "utilizing standards, criteria, or methods of administration . . . that ***have the effect*** of discrimination on the basis of disability" (emphasis added)).

(1971) (Section 703(a)(2) of Title VII permits disparate-impact claims); *Smith*, 544 U.S. at 235–36 (Section 4(a)(2) of the ADEA permits disparate-impact claims); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (Section 102(b) of the ADA permits disparate-impact claims).

Statutes that authorize claims for disparate-impact discrimination also prohibit practices that "tend to" interfere with rights of protected classes. *See* 42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2); 42 U.S.C. § 12112(b)(6). The Court in *Meacham v. Knolls Atomic Power Laboratory*, 554 U.S. 84 (2008), observed that the ADEA's "tend to deprive" language supports a disparate-impact construction of ADEA Section 4(a)(2). *Id.* at 96 n.13; *see also Hernandez*, 540 U.S. at 53 (similar recognition under ADA). The Seventh Circuit also has recognized that this language "seems designed to expand the reach of [the ADEA beyond disparate treatment liability] by forbidding practices having a *tendency* to harm members of the favored groups, i.e., disparate impact." *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1127 (7th Cir. 1987) (emphasis in original). By contrast, Section 3604(a) does not contain language directed at the harmful "tendencies" of facially neutral conduct.

Respondents argue (Cert. Opp. 14) that the phrase "or otherwise" in Section 3604 is a talismanic indicator of a disparate-impact statute. But such "or otherwise" language appears in both Section 4(a)(1) of the ADEA and Section 703(a)(1) of Title VII. *See supra* note 2. As discussed, those provisions do not provide for disparate-impact claims. A majority of the Court in *Smith* agreed that Section 4(a)(1) of the ADEA, which prohibits employers from "otherwise discriminat[ing] against any individual," does not

authorize disparate-impact claims. *Smith*, 544 U.S. at 236 n.6 (plurality opinion); *id.* at 249 (O'Connor, J., concurring).[4]

Because Section 3604(a) lacks any textual indicia of a disparate-impact provision, the statute prohibits only intentional discrimination. Where the statutory text is clear, the court's analysis ends with the text. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003).[5]

### B. Lenders Are Not Subject to Disparate-Impact Claims Under the FHA

Plaintiffs may not, in any event, pursue disparate-impact claims against housing *lenders* under Section 3604(a). Section 3605, not Section 3604, addresses discriminatory lending practices, and Section 3605 too prohibits only disparate treatment. Clarity on this point would help guide the lower courts in properly dismissing disparate-impact claims against lenders brought under Section 3604(a).

---

[4] A chart containing the relevant provisions of Title VII, the ADEA, and the FHA is set forth in an Appendix.

[5] In any event, *amici* agree with Petitioners that Congress did not "implicitly ratif[y]" in 1988 the views of some lower courts that the FHA supported disparate-impact liability. Pet. Br. 32. "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313 (1960); *see Massachusetts v. EPA*, 549 U.S. 497, 530 n.27 (2007) ("[P]ost-enactment legislative history is not only oxymoronic but inherently entitled to little weight." (internal quotation marks omitted)). Congress presumptively knew the importance of "effects" language to a disparate-impact construction when it passed the Fair Housing Amendments Act in August 1988 because of this Court's reading of Title VII Section 703(a)(2) in *Watson* months earlier. *See Watson*, 487 U.S. at 990–91.

1. The circuit courts to have considered the issue broadly agree that Section 3604 does not apply to lenders. *See, e.g.*, *Gaona v. Town & Country Credit*, 324 F.3d 1050, 1056 n.7 (8th Cir. 2003); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1554 n.27 (5th Cir. 1996); *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 423 (4th Cir. 1984). *But see Laufman v. Oakley Bldg. & Loan Co.*, 408 F. Supp. 489, 493 (S.D. Ohio 1976).

Section 3605 specifically addresses lending practices. Section 3605 makes it unlawful for "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). Section 3605 defines a "residential real estate-related transaction" to include "[t]he making or purchasing of *loans* or providing other financial assistance . . . for purchasing, constructing, improving, repairing, or maintaining a dwelling[,] or secured by residential real estate." *Id.* § 3605(b)(1)(A)–(B) (emphasis added). Section 3605 thus expressly and specifically applies to lending.

Section 3604, by contrast, simply establishes general categories of prohibited conduct and identifies protected classes. *See* 42 U.S.C. § 3604(a), (b), (f). The conduct prohibited under Section 3604 includes discriminatory "sell[ing]," "rent[ing]," "negotiat[ing] for the sale or rental," and "mak[ing] unavailable or deny[ing] a dwelling." 42 U.S.C. § 3604(a); *see id.* § 3604(b) (referring to "discriminat[ion] . . . in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

in connection therewith"); *id.* § 3604(f) (referring to "the sale or rental" and the "mak[ing] unavailable or deny[ing] a dwelling"). Section 3604 is silent both as to lending and as to borrowers.

Section 3604 cannot be read to pertain to lenders when Section 3605 specifically enumerates prohibited lending conduct. "However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment. . . . Specific terms prevail over the general in the same or another statute which otherwise might be controlling.'" *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107 (1944) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)); *see also United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2330 (2011) (similar).

Thus, the Eighth Circuit has correctly determined that Section 3604 "bars discrimination in sales and rentals, rather than loans." *Gaona*, 324 F.3d at 1056 n.7. The Fourth Circuit similarly reasoned that, "[i]f [Section 3604] was designed to reach every discriminatory act that might conceivably affect the availability of housing, [Section 3605's] specific prohibition of discrimination in the provision of financing would have been superfluous." *Mackey*, 724 F.2d at 423. And the Fifth Circuit has observed that "the plain language of [Sections 3604 and 3605] seems to indicate that § 3605 is the vehicle for discrimination claims involving the financing of residential housing." *Simms*, 83 F.3d at 1554 n.27.

2. Like Section 3604(a), Section 3605 does not permit disparate-impact claims. Section 3605 does not contain language about the "effects" of facially neutral classifications. As originally enacted in 1968,

and as amended in 1988, Section 3605 prohibits "discriminat[ion] . . . *because of*" an individual's protected status. 42 U.S.C. § 3605(a) (emphasis added); *see* Civil Rights Act of 1968, Pub. L. No. 90-284, § 805, 82 Stat. 73, 83 (original); Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, § 6(c), 102 Stat. 1619, 1622 (amended). Thus, Section 3605 prohibits only disparate *treatment*. *See Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009) (reasoning that the words "because of" in ADEA Section 4(a)(1) indicate Congress's intent to prohibit disparate treatment). By retaining Section 3605's exclusive use of disparate-treatment language when amending the provision in 1988, Congress reaffirmed its intent to permit only disparate-treatment claims against lenders.

Based on Respondents' interpretation of the FHA, Section 3605 is even less susceptible to a disparate-impact construction than Section 3604. Respondents have argued that Section 3604(a) permits disparate-impact claims because it contains the phrase "or otherwise." *See* Cert. Opp. 14. Section 3605, however, does not contain, and has never contained, the phrase "or otherwise." Even if such language could suggest an authorization for disparate-impact claims (*but see supra* Part I.A), its omission from Section 3605 underscores Congress's intent not to subject lenders to such claims under the FHA. The FHA prohibits discrimination in lending only to the extent a lender's conduct was based on discriminatory animus—*i.e.*, disparate treatment.

Thus, if the Court ultimately rules in Respondents' favor that Section 3604 permits disparate-impact claims, the Court should state explicitly that its holding does not extend to lender liability.

## II. IF DISPARATE-IMPACT CLAIMS ARE DEEMED COGNIZABLE UNDER THE FHA, THE *WARDS COVE* ANALYTICAL FRAMEWORK SHOULD APPLY

If this Court concludes that disparate-impact claims are viable under the FHA, it should hold that the analytical framework set forth in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), governs those claims. The Court in *Wards Cove* set forth a particular burden-shifting framework that governs disparate-impact claims under non-Title VII statutes such as the FHA. *See Smith*, 544 U.S. at 240.

### A. Most Circuits Have Applied a Burden-Shifting Approach in FHA Cases but Have Failed To Do So Properly

Lower courts have adopted various approaches for assessing disparate-impact claims under the FHA. A majority of the circuits follow some form of burden-shifting framework, generally involving three steps, under which the plaintiff and the defendant alternately bear the burden to establish relevant facts. *See, e.g.*, *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194–95 (9th Cir. 2006); *Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 883 (8th Cir. 2003); *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 466–67 (3d Cir. 2002); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 51 (1st Cir. 2000).

As an alternative to the burden-shifting approach, some courts apply a balancing approach, which involves weighing the parties' respective interests along with considerations of the relief requested and any evidence of discriminatory intent. *See Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558

F.2d 1283, 1290 (7th Cir. 1977). Other courts apply a hybrid approach, using a burden-shifting framework but incorporating "balancing" factors. *See Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 936, 939–40 (2d Cir. 1988). Two circuits that initially adopted a balancing or hybrid approach have since replaced it with a burden-shifting analysis in certain circumstances. *See Salute v. Stratford Greens Garden Apts.*, 136 F.3d 293, 302 (2d Cir. 1998); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 & n.5 (4th Cir. 1984).

In the Title VII context, the Court has identified at least two advantages to a burden-shifting approach. First, it offers "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Second, burden shifting is the best available "safeguard[] against the danger" that public and private entities fearing legal liability will resort to "inappropriate prophylactic measures," *Watson*, 487 U.S. at 992–93, such as *de facto* quota systems favoring minorities, *Ricci*, 129 S. Ct. at 2675. These advantages are equally applicable in the context of housing discrimination.

Although most lower courts have applied a burden-shifting approach in the FHA context, they generally have failed to adhere to the instruction of *Wards Cove*—most notably by mistakenly shifting the burden of *persuasion*, as opposed to the burden of *production*, to the defendant at the second step in the analysis. *See, e.g.*, *Oti Kaga*, 342 F.3d at 883. The Department of Housing and Urban Development ("HUD"), in a recently proposed rule under the FHA, has made the same error. *See* Implementation of the

Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70,921, 70,923–24 (Nov. 16, 2011) (to be codified at 24 C.F.R. pt. 100).[6]

"Where the statutory text is 'silent on the allocation of the burden of persuasion,' [the Court] 'begin[s] with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims.'" *Gross*, 129 S. Ct. at 2351 (quoting *Schaffer v. Weast*, 546 U.S. 49, 56 (2005)); *see Smith*, 544 U.S. at 240. The FHA is silent on this burden, and thus a plaintiff invoking the statute bears the burden of persuasion at all stages of the case.

The lower courts that have placed the burden of persuasion on the defendant during the burden-shifting analysis have relied incorrectly on Title VII, which expressly provides that the defendant bears the burden of persuasion after the plaintiff presents a *prima facie* case of a disparate impact. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i). HUD, in its proposed rule, likewise wrongly relies on Title VII's unique burden-shifting provision. *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76

---

[6] *Amici* agree that HUD's proposed rule is not entitled to deference. *See* Pet. Br. 36–37. HUD does not meaningfully interpret any part of the FHA's statutory text or distinguish between Sections 3604 and 3605. *See generally* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. at 70,922–25. If adopted, HUD's proposed rule would not, as HUD suggests, "simply 'further' the purpose of [the FHA]; [it would] go well *beyond* that purpose." *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 613 (1983) (O'Connor, J., concurring) (construing regulations under Title VI). Nor does HUD analyze the policy benefits and disadvantages of recognizing disparate-impact liability under the FHA. *See* Implementation of the Fair Housing Act's Discriminatory Effect's Standard, 76 Fed. Reg. at 70,923 & nn.16–17.

Fed. Reg. at 70,924 & n.33. But the FHA contains no similar burden-allocating provision. Thus, the default rule that the plaintiff always bears the burden of persuasion applies under the FHA.

### B. The *Wards Cove* Framework Provides the Applicable Burden-Shifting Standards

In *Wards Cove*, the Court articulated the elements of the burden-shifting framework for disparate-impact claims under Title VII as it then existed. 490 U.S. at 658–61. Congress subsequently altered the Title VII burden-shifting framework in the Civil Rights Act of 1991, Pub. L. No. 102-166, § 105, 105 Stat. 1071, 1074–75 (codified at 42 U.S.C. § 2000e-2(k)), including with respect to the burden of persuasion. However, that modification affected Title VII cases only.

In *Smith*, this Court recognized that the burden-shifting framework outlined in *Wards Cove* remains viable to the extent non-Title VII statutes borrow from the pre-1991 Title VII tradition. 544 U.S. at 240; *see Meacham*, 554 U.S. at 97–101. Specifically, in addressing the ADEA claims in *Smith*, the Court held that, "[w]hile the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA . . . . Hence, *Wards Cove's* pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA." 544 U.S. at 240.

As explained above, the language of the FHA significantly differs from that of Title VII. *See supra* Part I.A. However, to the extent that the FHA permits disparate-impact claims, there is no reason to believe that Congress would have intended courts

to use any analytical framework other than the traditional *Wards Cove* burden-shifting approach.

The *Wards Cove* burden-shifting framework involves three steps. First, the plaintiff must make a *prima facie* showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class. *Wards Cove*, 490 U.S. at 658. Second, if the plaintiff makes this showing, the defendant must come forward with evidence that the "challenged practice serves, in a significant way, [its] legitimate . . . goals." *Id.* at 659. Third, the plaintiff must then prove that the defendant refused to adopt an alternative practice that would have served its goals equally as effectively without causing the disparate impact. *Id.* at 660–61.

This Court should clarify the specific considerations applicable at each step in this process for any disparate-impact claims cognizable under the FHA. If the elements of the burden-shifting analysis are imprecise, courts and litigants will be embroiled in unnecessary, prolonged litigation, with potentially inconsistent and unfair results.

1. A plaintiff's *prima facie* case typically begins with a statistical showing that the defendant's conduct causes a substantial adverse impact on a protected class. *See Watson*, 487 U.S. at 987. This showing must consist of properly circumscribed comparisons. For example, in the context of FHA claims against lenders, the relevant statistical comparison is between the composition of home loan recipients and the composition of the *qualified* population of home loan applicants in the relevant market. *See Wards Cove*, 490 U.S. at 650–53; *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977); *Griggs*, 401 U.S. at 431–35.

But the plaintiff cannot simply recite statistics. *Watson*, 487 U.S. at 994–95. Rather, the plaintiff is responsible for isolating and identifying a specific practice of the defendant and demonstrating that the disparity at issue is *statistically significant* and the result of that *specific practice*. *Id.* at 994; *Wards Cove*, 490 U.S. at 657.

If the plaintiff succeeds in making the initial, two-part showing, the case proceeds to a probing analysis of the defendant's conduct. *See Wards Cove*, 490 U.S. at 658. The plaintiff's initial, *prima facie* requirement under the burden-shifting framework must therefore be sufficiently stringent to guard against the unwarranted expense, time, and diversion of party and judicial resources entailed in litigating meritless claims. *See Meacham*, 554 U.S. at 100; *see also Simms*, 83 F.3d at 1555.

2. The lower courts also have diverged with respect to the nature of the defendant's burden at the second step of the burden-shifting analysis. Some lower courts require private defendants to show a "business necessity sufficiently compelling to justify the challenged practice." *Betsey*, 736 F.2d at 988. Other courts require defendants to demonstrate a "legitimate, bona fide . . . interest." *Salute*, 136 F.3d at 302 (internal quotation marks omitted). Similarly distinct standards have emerged in cases involving public defendants. *Compare City of Fresno*, 433 F.3d at 1195, *with Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003).

*Wards Cove* requires the defendant to offer evidence that the challenged practice did not cause a significantly disparate impact or that the "challenged practice serves, in a significant way, the [defendant's] legitimate . . . goals." 490 U.S. at 659. This does not

mean that the defendant must show "that the challenged practice [is] 'essential' or 'indispensable' to the [defendant's] business," as such a "degree of scrutiny would be almost impossible . . . to meet and would result in a host of evils," such as quotas. *Id.* And, as explained above, although the defendant has the burden to produce evidence, "[t]he burden of persuasion . . . remains with the disparate-impact plaintiff" at all times. *Id.*; *accord Watson*, 487 U.S. at 997. At step two, the plaintiff carries the burden of persuasion to demonstrate affirmatively that the challenged practice did not significantly serve the defendant's legitimate business goals.

3. At the third step, the plaintiff must affirmatively show that the defendant could have undertaken viable measures as an alternative to the challenged practice without causing a significantly disparate impact. *Wards Cove*, 490 U.S. at 660.

The circuits also are divided on the standards applicable at this step. A majority of the circuits properly place the step-three burden on the plaintiff. *See, e.g.*, *Oti Kaga*, 342 F.3d at 883; *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999). But at least one circuit has placed this burden on the defendant, *see Tsombanidis*, 352 F.3d at 575, and other courts do not clearly allocate the burden, *see Langlois*, 207 F.3d at 51; *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 149 & n.37 (3d Cir. 1977).

To resolve the circuit conflict, the Court should confirm that the plaintiff bears the burden to identify an alternative that is "'equally as effective as the challenged practice in serving the [defendant's] legitimate business goals'" and "reduce[s] the . . . disparate impact of practices currently being used." *Wards Cove*, 490 U.S. at 661 (quoting *Watson*, 487 U.S. at

998). This standard conforms to the Court's instruction that the burden of persuasion "remains with the disparate-impact plaintiff" at all times. *Id.* at 659. Moreover, "[r]equiring the plaintiff to identify a specific less restrictive alternative is more efficient and fair than requiring the defendant to guess at and eliminate all possible alternatives." *Villas W. II of Willowridge Homeowners Ass'n v. McGlothin*, 885 N.E.2d 1274, 1283 (Ind. 2008) (internal quotation marks omitted).

Further, the viability of an alternative practice identified by the plaintiff must be evaluated in light of factors the defendant itself would consider. *See Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 906 (8th Cir. 2005); *Langlois*, 207 F.3d at 50 & n.6; *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 289–90 (W.D. Tex. 2007). Any proffered alternative to a challenged practice must have been available and knowable to the defendant at the time the challenged practice created a disparate impact. *See Ricci*, 129 S. Ct. at 2680; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975). The plaintiff may prevail only by pointing to options that the defendant reasonably could have known were viable.

The foregoing *Wards Cove* standards should be extended to any FHA disparate-impact claims.

### C. The Other Approaches Applied by Lower Courts Are Unsound and Inappropriate for Private Defendants

In contrast to the familiar burden-shifting approach, several circuits apply either a balancing approach or a hybrid approach (which merges the balancing and burden-shifting approaches) to evaluate disparate-

impact claims under the FHA. These alternative approaches introduce improper considerations and unnecessary complexity into a court's analysis of disparate-impact claims.

The balancing approach considers three factors: (1) the strength of the plaintiff's showing of discriminatory impact; (2) the defendant's interest in taking the challenged action; and (3) the nature of the relief requested, *i.e.*, whether the plaintiff seeks to compel the defendant to take affirmative steps to provide housing or merely to remove obstacles to such housing. *See Arthur v. City of Toledo*, 782 F.2d 565, 575 (6th Cir. 1986); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Arlington Heights*, 558 F.2d at 1290. Some courts also consider whether the plaintiff has offered any evidence of discriminatory intent. *See Town of Clarkton*, 682 F.2d at 1065; *Arlington Heights*, 558 F.2d at 1290.

These amorphous and subjective factors make the balancing test generally unworkable and pose particular problems for private defendants. One court applying the balancing test has stated that courts should take care not to be "overly solicitous" to a defendant "seeking to protect private rights." *Arlington Heights*, 558 F.2d at 1293. But private rights are obviously important, and a burden-shifting approach properly accommodates competing interests.

Specifically, the final factor in the balancing approach—the nature of the housing-related relief the plaintiff seeks—has questionable application to claims against private defendants, who, unlike public defendants, "lack the authority to control third-party behavior." *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 373 (6th Cir. 2007). Recognizing this

limitation, two circuits that previously adopted the balancing approach have subsequently rejected its application to claims against private defendants. *Id.*; *Betsey*, 736 F.2d at 988 n.5.

Over the past two decades, the balancing approach has become increasingly disfavored. "[R]ecently, most federal circuits have abandoned the *Arlington Heights* . . . factors altogether." *McGlothin*, 885 N.E.2d at 1281. The widespread abandonment of this approach—a framework that provides courts with little guidance as to how to evaluate the interests presented in a given case—is understandable. *See Langlois*, 207 F.3d at 51. This Court should confirm that the balancing approach is inappropriate, at least with respect to claims against private defendants.

The hybrid approach also is inferior to the traditional burden-shifting approach. Some courts incorporate "balancing" factors into the burden-shifting framework. *See Graoch Assocs.*, 508 F.3d at 373; *Reinhart v. Lincoln Cnty.*, 482 F.3d 1225, 1229 (10th Cir. 2007); *Huntington Branch*, 844 F.2d at 936. This hybrid approach suffers from the same deficiencies (especially with respect to private defendants) as the balancing approach.

Furthermore, "mixing the [balancing] factors with the burden-shifting framework produces an unnecessarily complex process." *McGlothin*, 885 N.E.2d at 1282. The disagreement among circuits over the specific factors to be balanced has led to variance in the elements considered in the hybrid approach as well. *Compare Graoch Assocs.*, 508 F.3d at 373–74, *with Huntington Branch*, 844 F.2d at 936–37. Even within a single circuit, the opinions have not identified those factors consistently. *Compare Reinhart*, 482 F.3d at 1229, *with Mountain Side Mobile Estates*

*P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243, 1252 (10th Cir. 1995). This complexity reduces efficiency and predictability, and results in a lengthy, laborious decision-making process for courts. *See, e.g.*, *Mountain Side*, 56 F.3d at 1253–57; *Huntington Branch*, 844 F.2d at 937–41. The hybrid approach, like the balancing approach, should be rejected.

## CONCLUSION

The Court should reverse the decision below and hold that disparate-impact claims are not cognizable under the FHA. If the Court holds otherwise, it should endorse the *Wards Cove* burden-shifting analysis for such claims.

Respectfully submitted,

LISA S. BLATT
*Counsel of Record*
NANCY L. PERKINS
ISAAC B. ROSENBERG
COLIN HOLMES
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, DC 20004
(202) 942-5000
Lisa.Blatt@aporter.com

*Counsel for Amici Curiae*
*American Bankers Association, et al.*

December 29, 2011

**APPENDIX**

| | No "effects" language | "Effects" language |
|---|---|---|
| **Title VII, Sec. 703(a)** | It shall be an unlawful employment practice for an employer— (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.] | It shall be an unlawful employment practice for an employer— (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. |
| **ADEA, Sec. 4(a)** | It shall be unlawful for an employer— (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.] | It shall be unlawful for an employer— (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age[.] |
| **FHA, 42 U.S.C. Sec. 3604(a)** | [I]t shall be unlawful—[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin. | None. |

# ATTACHMENT D

No. 10-1032

IN THE

# Supreme Court of the United States

STEVE MAGNER, *et al.*,

*Petitioners,*

*v.*

THOMAS J. GALLAGHER, *et al.*,

*Respondents.*

ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

## BRIEF FOR THE INDEPENDENT COMMUNITY BANKERS OF AMERICA, THE CONSUMER MORTGAGE COALITION, AND THE AMERICAN FINANCIAL SERVICES ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS

ANDREW C. GLASS
K&L GATES LLP
State Street
Financial Center
One Lincoln Street
Boston, MA 02111
(617) 261-3100

PAUL F. HANCOCK
*Counsel of Record*
K&L GATES LLP
Southeast Financial Center,
Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
(305) 539-3300
paul.hancock@klgates.com

*Counsel for Amici Curiae*

239749

COUNSEL PRESS
(800) 274-3321 • (800) 359-6859

## TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS ...................... i

TABLE OF CITED AUTHORITIES ........... iv

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................ 1

SUMMARY OF THE ARGUMENT ............ 4

ARGUMENT ............................... 7

I. THE PLAIN LANGUAGE OF THE FAIR HOUSING ACT, PROHIBITING THE DISPARATE TREATMENT OF INDIVIDUALS, ADVANCES THE NATIONAL OBJECTIVE OF PREVENTING DISCRIMINATION IN HOUSING ............................ 7

A. The Statutory Language Provides a Cause of Action for Disparate Treatment, Not Disparate Impact .... 8

B. HUD's National Studies of the Nature of Housing Discrimination Confirm the Congressional Design is Aimed at Intentional Discrimination........... 11

*Table of Contents*

*Page*

II. LOWER COURTS HAVE CONSTRUED THE FAIR HOUSING ACT IN A WAY THAT CONFLICTS WITH THIS COURT'S DISPARATE-IMPACT JURISPRUDENCE, WHILE EXECUTIVE AGENCIES HAVE OFFERED INCONSISTENT GUIDANCE. . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. The Courts of Appeals Have Misapplied this Court's Title VII Jurisprudence . . . . . . . . . . . . . . . . . . . . . 13

B. The Executive Branch Has Offered Conflicting Opinions as to the Availability of a Disparate-Impact Approach in the Fair Housing Act . . . . . . . . . . . . . . . 15

C. Federal Enforcement Agencies Have Not Followed the Court's Precedent in Applying a Disparate-Impact Approach. . . . . . . . . . . . . . . . . . . 18

1. The controlling disparate-impact standard . . . . . . . . . . . . . . . . . . . . . . 18

2. Agency positions regarding disparate-impact liability in lending contradict the Court's jurisprudence . . . . . . . . . . . . . . . . . . 21

*Table of Contents*

*Page*

III. THE THREAT OF LIABILITY UNDER A DISPARATE-IMPACT APPROACH WOULD FORCE LENDERS TO CONSIDER PROPHYLACTIC MEASURES, WHICH THEMSELVES PRESENT LEGAL RISKS AND DRAW RESOURCES AWAY FROM EFFORTS TO PREVENT DISPARATE TREATMENT ........................ 22

A. Disparate Impact as a Cause of Action Creates Dilemmas When the Uniform Application of Sound, Neutral Financial Standards Has Different Demographic Results ............... 23

B. Lenders Face Disparate-Impact Challenges Now.................... 26

C. Tight Credit Markets and Governmental Responses Increase the Threat of Disparate-Impact Claims............ 29

CONCLUSION ............................. 32

## TABLE OF CITED AUTHORITIES

*Page*

**CASES**

*2922 Sherman Avenue Tenants' Ass'n v. District of Columbia*, 444 F.3d 673 (D.C. Cir. 2006) .................. 13

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) .......................... 19

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) .......................... 26

*Dothard v. Rawlinson*, 433 U.S. 321 (1977) .......................... 20

*Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007) .................. 13

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ..................... 4, 9-10, 14

*Gross v. FBL Financial Services*, 557 U.S. 167, 129 S. Ct. 2343 (2009) .......... 10, 15

*In re Countrywide Financial Mortgage Lending Practices Litigation*, No. 08-MD-1974, 2011 WL 4862174 (W.D. Ky. Oct. 13, 2011) ..................... 27

*Cited Authorities*

*Page*

*In re Wells Fargo Residential Mortgage Lending Discrimination Litigation*, No. 3:08-md-01930-MMC, slip op. (N.D. Cal. Sept. 6, 2011) . . . . . . . . . . . . . . . . . . . . . 27

*Langlois v. Abington Housing Authority*, 207 F.3d 43 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . 14

*Latimore v. Citibank Federal Savings Bank*, 151 F.3d 712 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . 14

*Pfaff v. U.S. Department of Housing & Urban Development*, 88 F.3d 739 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . 14

*Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977). . . . . . . . . . . . . . . . . . . 14

*Ricci v. DeStefano*, 129 S. Ct. 2658 (2009) . . . . . . . . . . . . . . . . . . . . . *passim*

*Rodriguez v. National City Bank*, --- F.R.D. ----, 2011 WL 4018028 (E.D. Pa. Sept. 8, 2011). . . . . . . . . . . . . . . . . . . . . . 27

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Smith v. City of Jackson, Mississippi*, 544 U.S. 228 (2005) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Page*

*Town of Huntington, New York v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) .......................... 16

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ----, 131 S. Ct. 2541 (2011)..... 18, 20, 21, 27

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) ....................... *passim*

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) ....................... *passim*

**STATUTES AND REGULATIONS**

12 U.S.C. § 2801............................ 27

12 U.S.C. § 2803............................ 27

15 U.S.C. § 78o-11 .......................... 31

15 U.S.C. § 1639c ........................... 30

29 U.S.C. § 623(a)(1) ......................... 8

29 U.S.C. § 623(a)(2) ......................... 9, 10

42 U.S.C. § 2000e-2(a)(1)...................... 9

42 U.S.C. § 2000e-2(a)(2)...................... 10

42 U.S.C. §§ 2000e-2(k)(1) ..................... 19

*Page*

42 U.S.C. § 3601 . . . . . . . . . . 7

42 U.S.C. § 3604 . . . . . . . . . . 7, 10

42 U.S.C. § 3605 . . . . . . . . . . 1, 7, 8, 10

42 U.S.C. § 3608(e) . . . . . . . . . . 5, 11

42 U.S.C. § 3614a . . . . . . . . . . 17

12 C.F.R. § 203.4 . . . . . . . . . . 27, 28

24 C.F.R. § 100.500 . . . . . . . . . . 6

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) . . . . . . . . . . 6, 29, 30, 31

Fair Housing Act, Pub. L. No. 90-284, Title VIII, 82 Stat. 73 (1968) . . . . . . . . . . *passim*

Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988) . . . . . . . . . . 7, 16, 17

**OTHER AUTHORITIES**

Board of Governors of Federal Reserve System, *Report to the Congress on Credit Scoring and its Effects on the Availability and Affordability of Credit* (Aug. 2007) . . . . . . . . . . 24, 29

*Page*

Brief for United States as *Amicus Curiae*, *Town of Huntington, N.Y. v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) (No. 87-1961), *available at* http://www.justice.gov/osg/briefs/1987/sg870004.txt . . . . . . . . . . 16

Credit Risk Retention, 76 Fed. Reg. 24,090 (Apr. 29, 2011) . . . . . . . . . . 30, 31

Credit Risk Retention, 76 Fed. Reg. 34,010 (June 10, 2011) . . . . . . . . . . 30

Implementation of Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232 (Jan. 23, 1989). . . 17

Implementation of Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70,921 (Nov. 16, 2011). . . . . . . . . . 6, 17, 18, 22

Margery A. Turner, *et al.*, for U.S. Department of Housing & Urban Development, *Discrimination in Metropolitan Housing Markets: National Results from Phase 1 of HDS2000*, Executive Summary (Nov. 2002), *available at* http://www.huduser.org/portal/publications/pdf/Phase1_Report.pdf . . . . . . . . . . 11, 12

*Page*

National Community Reinvestment Coalition, *Working-Class Families Arbitrarily Blocked from Accessing Credit: NCRC's Fair Lending Investigation of Credit Score Restrictions by Federal Housing Administration-Approved Lenders*, Mortgage Lending Disparities Series Paper (Dec. 2010), *available at* http://www.ncrc.org/images/stories/mediaCenter_reports/fha%20white%20paper-120810-final.pdf ....... 24

Pew Research Center, *Twenty-to-One: Wealth Gaps Rise to Record Highs Between Whites, Blacks and Hispanics* (July 2011) *available at* http://www.pewsocialtrends.org/files/2011/07/SDT-Wealth-Report_7-26-11_FINAL.pdf...... 24

Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18,266 (Apr. 15, 1994)........... 17, 21

Press Release, U.S. Department of Housing & Urban Development, HUD to Investigate Allegations that 22 Banks and Mortgage Lenders Discriminate against African American and Latino Seekers (Dec. 8, 2010), *available at* http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2010/HUDNo.10-266 .......................... 28-29

*Page*

Regulation Z, Truth in Lending, 76 Fed. Reg. 27,390 (May 11, 2011) . . . . . . . . . . . . . . . . . . . . . . . 30

"Remarks on Signing the Fair Housing Amendments Act of 1988," Public Papers of President Ronald W. Reagan, Ronald Reagan Presidential Library (Sept. 13, 1988), *available at* http://www.reagan.utexas.edu/archives/speeches/1988/091388a.htm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Robert B. Avery, *et al.*, Division of Research & Statistics, *The Mortgage Market in 2010: Highlights from the Data Reported under the Home Mortgage Disclosure Act*, 97 Federal Reserve Bulletin (Sept. 22, 2011), *available at* http://www.federalreserve.gov/pubs/bulletin/2011/pdf/2010_HMDA.pdf. . . . . . . 28

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

The Independent Community Bankers of America ("ICBA"), the Consumer Mortgage Coalition ("CMC"), and the American Financial Services Association ("AFSA") (collectively, "*amici*") respectfully submit this brief as *amici curiae* in support of petitioners. ICBA is a trade association that represents nearly 5000 community banks of all sizes and charter types nationwide. ICBA member community banks seek to improve cities and towns by using local dollars to help families purchase homes. ICBA member community banks are actively engaged in the business of residential mortgage lending in the communities that they serve. CMC is a trade association comprised of national residential mortgage lenders, servicers, and service providers. CMC was formed in 1995 to pursue reform of the mortgage origination process. CMC members participate in every stage of the home financing process. AFSA is a national trade association for providers of financial services to consumers, including residential mortgage loans. AFSA seeks to promote responsible, ethical lending to informed borrowers and to improve and protect consumers' access to credit.

The Fair Housing Act prohibits discrimination in "residential real estate-related transactions." *See* 42 U.S.C. § 3605. *Amici*'s members are subject to the Fair

1. No counsel for any party authored this brief in whole or in part, and no counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. No person or entity other than *amici*, their respective members, and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. Letters from the parties consenting to the filing of *amicus* briefs have been filed with the Clerk of the Court.

Housing Act and related laws that prohibit discrimination in lending. *Amici* support the Fair Housing Act, and they and their members devote substantial resources to the advancement of fair lending. *Amici* oppose the disparate treatment of individuals. The threshold issue before the Court, though, is whether the Fair Housing Act goes beyond prohibiting disparate treatment and creates a cause of action for disparate impact.[2]

Lending standards, by their very nature, have differential impacts that could be correlated with factors, such as race, that are listed in the Fair Housing Act as prohibited bases of discrimination. Lenders base credit decisions on multiple standards such as an applicant's credit score, the ability to provide a down payment, and the relationship between an applicant's debt and income. Although these standards, whether considered in isolation or combination, often impact groups of borrowers differently, they have been proven to be predictive of the likelihood of repayment.

The residential mortgage lenders represented by *amici* seek to ensure that their credit decisions are not made "because of" any factor prohibited by the Fair Housing Act. *Amici* wholeheartedly endorse this legal obligation. But if the legal focus is on the "impact" of a

2. "Disparate impact" is a phrase used to describe the differential results that arise from "practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 239 (2005) (plurality op.). "Disparate treatment" is a phrase used to describe an intentional act of discrimination against an individual "*because of* their protected characteristic." *Id.* at 249 (O'Connor, J., concurring) (emphasis in original) (internal punctuation omitted).

lender's neutral policy on applicants of different races or national origins, rather than the reasons for particular actions, the industry faces far more complex risks. Such risks arise simply because the demographic results of a lender's sound, neutral financial standards might show disparate statistical "impacts," or as this Court has termed it, might not satisfy "the laws of chance." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 992 (1988).

The disparate-impact approach, of course, can allow a lender to prevail at the "justification" stage, but the alleged "impact" itself can promote protracted litigation causing reputational damage, serious business disruption, and extraordinary financial expense, even when there is no reasonable inference that the disparities reflect discrimination "because of" a prohibited factor. Also, the procedures at the "justification" stage – such as the nature of the burden allocation and the standard of proof – if improperly applied, can further exacerbate the legal risks that lenders face.

The threat of a disparate-impact challenge may prompt efforts by businesses to bring end results more in line with demographics. Such efforts, though intended to avoid disparate-impact liability, raise other legal risks, as the Court has confirmed. *Ricci v. DeStefano*, 129 S. Ct. 2658, 2676 (2009); *id.* at 2682 (Scalia, J., concurring); *id.* at 2701 (Ginsburg, J., dissenting).

A disparate-impact standard under the Fair Housing Act, therefore, creates a "Catch-22" for the members of *amici*. Lenders are required by federal law to employ conservative lending standards. They must not make loans to applicants who cannot afford them. Yet, to try to minimize the threat of disparate-impact liability,

they would have to structure their lending operations to manage end numbers so as to avoid statistically-significant differences in outcomes across borrower groups, taking into consideration the factors that the Fair Housing Act bans.

The threat of litigation is not hypothetical. *See* Section III.B, *infra*. To stop this spiral of claims and claim avoidance, which is deleterious to borrowers as well as lenders, *amici* file this brief in support of petitioners. The intent standard that *amici* endorse advances the goal of the Fair Housing Act, fosters compliance programs long supported by *amici*, which are designed to prevent decision-making "because of" a prohibited factor, and makes unnecessary any well-intentioned but precarious efforts to compensate for the demographic consequences of sound, neutral financial standards.

## SUMMARY OF THE ARGUMENT

1. The Fair Housing Act requires proof of intentional discrimination and does not envision a legal violation founded solely upon disparate impact. The Court has interpreted employment discrimination statutes that prohibit discrimination "because of" certain factors, as the Fair Housing Act does, as reflecting a congressional intent to address intentional discrimination only. *See Ricci v. DeStefano*, 129 S. Ct. 2658, 2672 (2009); *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 236 n.6 (2005) (plurality op.). In contrast, the Court has found that a disparate-impact cause of action arises from the phrase "otherwise adversely affect," which phrase is not found in the Fair Housing Act. *See Ricci*, 129 S. Ct. at 2672-73; *Smith*, 544 U.S. at 235-36 (plurality op.); *Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 429-30 (1971).

2. In conducting studies mandated by Congress under the Fair Housing Act, *see* 42 U.S.C. § 3608(e), the United States Department of Housing and Urban Development ("HUD") has defined the "nature" of housing discrimination addressed by the Act as "disparate treatment." A focus on "disparate impact" would differ markedly and might consider issues such as the justification for rent prices that could have differential impacts on certain groups. At no point, however, have HUD's studies sought to evaluate the impact of neutral policies on such groups.

3. Although the courts of appeals have found disparate-impact claims are cognizable under the Fair Housing Act, their holdings are premised on an incorrect analogy to this Court's Title VII jurisprudence. The decisions of the courts of appeals do not reflect key textual distinctions between Title VII and the Fair Housing Act. Moreover, the federal enforcement agencies have provided conflicting guidance on whether disparate impact is recognized under the Fair Housing Act. Some administrations have contended that proof of discriminatory intent is necessary to establish a violation of the Act, while others have opined that a violation can be established under the disparate-impact approach. In issuing notice and comment regulations in 1989, HUD declined to address the required standard of proof.

4. Administrations that have recognized the disparate-impact approach have not followed the Court's precedent regarding proper application of the theory. *Amici* view the controlling standard for a disparate-impact-type claim as set forth in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) ("*Wards Cove*"), a Title VII employment matter. Under *Wards Cove*, a defendant

may justify the challenged policy through articulating how it serves a legitimate business goal, and the ultimate burden of proof remains with the plaintiff. 490 U.S. at 659. Yet, in the lending context, enforcement agencies have sometimes articulated a contrary disparate-impact approach. HUD's recent proposed amendment to its rules implementing the Fair Housing Act, for example, would require a defendant to articulate a business necessity for the challenged policy and would shift the burden of proof to the defendant. Implementation of Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70,921, 70,925 (Nov. 16, 2011) (proposed to be codified at 24 C.F.R. § 100.500).

5. Applying a disparate-impact approach to residential mortgage lending has unintended consequences. While the disparate-treatment approach is well suited to rooting out discrimination in lending, the many neutral standards that are relevant to credit decisions may have differential impacts correlated with race, national origin, or other prohibited bases of discrimination under the Fair Housing Act. For instance, the application of neutral credit assessment policies, such as requiring a minimum credit score, can result in applicants of one racial group being rejected for financing at a greater rate than applicants of another racial group. If the differences in the rejection rates cannot be attributed to mere chance, the lender faces the prospect of a disparate-impact lawsuit. Lenders already face frequent disparate-impact suits based on superficial or inapposite data. Under the Dodd-Frank Wall Street Reform and Consumer Protection Act, lenders must employ even more conservative underwriting standards, which may lead to further differentials between various groups and an increased threat of disparate-impact suits. Though lenders may defend such suits on the basis that

their practices are undertaken in accordance with federal law, lenders will still face substantial defense costs and administrative burdens, and the outcome in any case is uncertain. Moreover, the failure of results to satisfy the laws of chance causes lenders to consider prophylactic measures to minimize risk, measures about which the Court has consistently expressed concern. *See Ricci*, 129 S. Ct. at 2675 (concern over use of "de facto quota system"). These measures are themselves undesirable and, perversely, can operate to the detriment of both lenders and borrowers. The Fair Housing Act should not be construed to force lenders to choose between two such untenable outcomes.

## ARGUMENT

### I. THE PLAIN LANGUAGE OF THE FAIR HOUSING ACT, PROHIBITING THE DISPARATE TREATMENT OF INDIVIDUALS, ADVANCES THE NATIONAL OBJECTIVE OF PREVENTING DISCRIMINATION IN HOUSING

The purpose of the Fair Housing Act is "to provide, within constitutional limitations, for fair housing throughout the United States."[3] 42 U.S.C. § 3601. To that end, the statute prohibits discrimination "because of race, color, religion, sex, handicap, familial status, or national origin," *id.* §§ 3604, 3605, in connection with, among other

3. Congress enacted the Fair Housing Act in 1968. Pub. L. No. 90-284, Title VIII, 82 Stat. 73, 81-89 (1968) (codified at 42 U.S.C. §§ 3601, *et seq.*). In 1988, Congress amended the Fair Housing Act to address, in part, discrimination in residential real-estate-related transactions. Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988).

things, "residential real estate-related transactions,"[4] *id.* § 3605.

### A. The Statutory Language Provides a Cause of Action for Disparate Treatment, Not Disparate Impact

The plain language of the Fair Housing Act requires proof of intentional discrimination and does not envision a violation founded on disparate impact. The Court has held that language prohibiting discrimination "because of" certain factors reflects a congressional intent to address intentional discrimination only. *See generally Ricci v. DeStefano*, 129 S. Ct. 2658 (2009); *Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005). In *Smith*, the Court was unanimous in the conclusion that the "because of" language in section 4(a)(1) of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a)(1), "does not encompass disparate impact liability," but rather contemplates only intentional discrimination. *Compare Smith*, 544 U.S. at 236 n.6 (plurality op.) (section (a)(1) of ADEA makes it unlawful for an employer "to fail or refuse to hire ... any individual ... *because of* such individual's age," and "[t]he focus of the paragraph is on the employer's actions with respect to the targeted individual") (emphasis added); *with id.* at 246 (Scalia, J., concurring) ("the only provision of the ADEA that could conceivably be interpreted to effect [a disparate-impact]

4. A residential real-estate related transaction "means any of the following: (1) The making or purchasing of loans or providing other financial assistance – (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or (B) secured by residential real estate. (2) The selling, brokering, or appraising of residential real property." 42 U.S.C. § 3605(b).

prohibition is § 4(a)(2)"); *and with id.* at 249 (O'Connor, J., dissenting) ("[n]either petitioners nor the plurality contend that the first paragraph, § 4(a)(1), authorizes disparate impact claims, and I think it obvious that it does not. That provision plainly requires discriminatory intent").

In *Ricci*, the Court reached a similar conclusion with regard to the "because of" language contained in section 703(a)(1) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1). 129 S. Ct. at 2672-73. The Court reasoned:

> As enacted in 1964, Title VII's principal nondiscrimination provision held employers liable only for disparate treatment. That section retains its original wording today. It makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin."

*Id.* at 2672 (citing 42 U.S.C. § 2000e–2(a)(1)) (emphasis added).

By contrast, the Court has held that disparate-impact claims were cognizable under certain other provisions of the ADEA and Title VII because those statutes contain additional language, not found in the Fair Housing Act, directed to the effects of discrimination. *See Smith*, 544 U.S. at 235 (plurality op.); *Ricci*, 129 S. Ct. at 2672-73; *Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 429-30

(1971). In *Smith*, the Court held that disparate-impact claims are available under the ADEA because, like Title VII, the ADEA prohibits actions by employers that "deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's age." 544 U.S. at 235 (plurality op.) (emphasis in original) (comparing ADEA, 29 U.S.C. § 623(a)(2), with Title VII, 42 U.S.C. § 2000e-2(a)(2)). Congress intended the phrase "otherwise adversely affect" contained in both the ADEA and section 703(a)(2) of Title VII to address "the *consequences* of employment practices, not simply the motivation." *Smith*, 544 U.S. at 234-35 (plurality op.) (emphasis in original).

The Fair Housing Act proscribes only conduct undertaken "because of" certain factors, and in the context of the precedent discussed above, the Court has held that this language addresses only intentional conduct. Unlike certain employment discrimination statutes, the Fair Housing Act does not contain a provision proscribing lending practices that "otherwise adversely affect" protected classes, and thus, disparate-impact claims are not cognizable under the Act. *See* 42 U.S.C. §§ 3604, 3605; *see also Gross v. FBL Fin. Servs.*, 557 U.S. 167, 129 S. Ct. 2343, 2349 (2009) (Congress is presumed to act intentionally where it does not add language to one statute that it has included in another statute); *cf. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 168 n.16 (1993) ("we may not add terms or provisions where [C]ongress has omitted them").

### B. HUD's National Studies of the Nature of Housing Discrimination Confirm the Congressional Design Is Aimed at Intentional Discrimination

The United States Department of Housing and Urban Development ("HUD"), the federal agency with primary authority for enforcing the Fair Housing Act, has defined the "nature" of discrimination addressed by the Act as disparate treatment. The Fair Housing Act requires HUD to "make studies with respect to the *nature* ... of discriminatory housing practices in representative communities ... throughout the United States." 42 U.S.C. § 3608(e) (emphasis added). HUD conducted such studies in 1977, 1989, and 2000.[5] Each of these studies focuses exclusively on the extent to which racial minorities, among other groups, have been subjected to disparate treatment in their search for housing, namely, whether they encountered discrimination *because of* their race. For instance, in connection with its 2000 Housing Discrimination Study, the agency stated:

> HUD's goals for the study include rigorous measures of change in *adverse treatment* against blacks and Hispanics nationwide, site-specific estimates of *adverse treatment* for major metropolitan areas, estimates of *adverse*

5. *See* Margery A. Turner, et al., for U.S. Dep't of Hous. & Urban Dev., *Discrimination in Metropolitan Housing Markets: National Results from Phase 1 of HDS2000*, Executive Summary, at i (Nov. 2002), *available at* http://www.huduser.org/portal/publications/pdf/Phase1_Report.pdf (referencing HUD's *1977 Housing Market Practices Study*, *1989 Housing Discrimination Study*, and *2000 Housing Discrimination Study*).

> *treatment* for smaller metropolitan areas and adjoining rural communities, and new measures of *adverse treatment* against Asians and Native Americans.

Margery A. Turner, et al., for U.S. Dep't of Hous. & Urban Dev., *Discrimination in Metropolitan Housing Markets: National Results from Phase 1 of HDS2000)*, Executive Summary, at i (Nov. 2002) (emphasis added), *available at* http://www.huduser.org/portal/publications/pdf/Phase1_Report.pdf ("HDS2000 Executive Summary"). Thus, in responding to the congressional requirement that HUD define the "nature" of housing discrimination, HUD always defined it to be "disparate treatment," consistent with the language of the statute.

A study of the "nature" of housing discrimination based on the impact of neutral policies on certain groups would differ markedly from HUD's studies focusing on the disparate treatment of individuals. While the treatment approach considers whether applicants of different races are provided, for example, with different information about the availability of a rental apartment, an impact approach might consider whether the rent charged disproportionately excludes minority applicants.[6] At no

6. If an assertion of disparate impact of this type were presented in a lawsuit, a business might be required to justify the challenged rent level. The allocation of the burden of proof and the standard for a business justification would be important to the outcome. The decision to charge a certain amount of rent, for example, might be related to a legitimate business interest, such as maintaining a certain profit margin, but it may be more difficult to establish such a legitimate interest constitutes a "business necessity."

point, however, have HUD's studies sought to evaluate the *impact* of neutral policies or practices that might impede achievement of the congressional design.

## II. LOWER COURTS HAVE CONSTRUED THE FAIR HOUSING ACT IN A WAY THAT CONFLICTS WITH THIS COURT'S DISPARATE-IMPACT JURISPRUDENCE, WHILE EXECUTIVE AGENCIES HAVE OFFERED INCONSISTENT GUIDANCE

### A. The Courts of Appeals Have Misapplied this Court's Title VII Jurisprudence

The courts of appeals have approved the application of the disparate-impact approach under the Fair Housing Act at least in certain circumstances.[7] Yet, their holdings are often incorrectly premised on the Court's Title VII jurisprudence, which recognizes the availability of a disparate-impact approach in Title VII based on language *not* found in the Fair Housing Act.[8] In particular, the

7. The majority of these decisions address section 804 of the Fair Housing Act governing housing and not section 805 of the Act governing residential real-estate related transactions. Of the ninety-six federal courts of appeals decisions, available through a Westlaw search, addressing disparate impact under either or both sections, ninety-one decisions discuss section 804, whereas only thirteen discuss section 805.

8. *See, e.g., Graoch Assocs. # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 372 (6th Cir. 2007) ("[r]elying on the analogy between Title VII and the FHA, several other circuits have applied essentially this approach to disparate-impact claims under the FHA"); *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) (noting that the Fair Housing Act's "language prohibiting

lower courts' decisions are wrong to the extent that they conclude *Griggs* held that the language "because of" reveals a congressional intent to allow a disparate-impact approach. As made clear by this Court's decisions in *Smith* and *Ricci*, this is not the proper lesson of *Griggs*. Rather, *Smith* and *Ricci* each confirm that the language "because of," including the provision in Title VII, does not permit a disparate-impact approach. *Smith*, 544 U.S. at 236 n.6 (plurality op.); *Ricci*, 129 S. Ct. at 2672-73.

Notably, neither in 1968, when it enacted the Fair Housing Act, nor in 1988, when it amended the Fair Housing Act, nor in 1991, when it amended Title VII to better articulate the disparate-impact theory available

---

discrimination – 'because of ... race ... or national origin' – is identical to Title VII's, and since *Griggs*, every one of the eleven circuits to have considered the issue has held that the FHA similarly prohibits not only intentional housing discrimination, but also housing actions having a disparate impact"); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 51 (1st Cir. 2000) (noting that "[i]n light of *Griggs* and the similarity of the statutes, it is a fair reading of the Fair Housing Act's 'because of race' prohibition to ask that a demonstrated disparate impact in housing be justified by a legitimate and substantial goal of the measure in question"); *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 & n.1 (9th Cir. 1996) ("look[ing] for guidance to employment discrimination cases" in finding that FHA provides for disparate impact); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146 (3d Cir. 1977) ("in [Fair Housing Act] cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response"). *But see Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 714 (7th Cir. 1998) (cautioning against the "wholesale transposition" of discrimination theories and standards of proof from the Title VII context to the unique area of "credit discrimination").

under that statute, did Congress choose to incorporate language into the Fair Housing Act analogous to that language under Title VII which the Court has interpreted as providing for a disparate-impact cause of action. As the Court has stated, "[w]e cannot ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to [other anti-discrimination statutes]. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally." *Gross*, 129 S. Ct. at 2349. Moreover, Title VII and the Fair Housing Act are separate laws, passed by different acts of Congress in different years. Title VII is a part of the Civil Rights Act of 1964, while the Fair Housing Act is Title VIII of the Civil Rights Act of 1968. That both laws were designed to eliminate discrimination, one in employment and the other in housing, does not warrant identical construction, particularly in light of the Court's aforementioned observation in *Smith*. 544 U.S. at 236 n.6 (plurality op.).

### B. The Executive Branch Has Offered Conflicting Opinions as to the Availability of a Disparate-Impact Approach in the Fair Housing Act

The seeming unanimity of the courts of appeals has not been convincing to all federal administrations that have shared responsibility for effectuating the congressional design encompassed in the Fair Housing Act. In some years, the executive branch has opined that the Fair Housing Act requires a showing of intentional discrimination to establish a violation, while in other years the executive branch has opined that a violation can be established under the disparate-impact approach without proof of intentional discrimination.

For instance, in 1988, the United States Solicitor General submitted an *amicus* brief to the Court asserting that a plaintiff must prove *intentional* discrimination to establish a violation of the Fair Housing Act. The government specifically stated that "[n]ot only do the statute's language and legislative history show that a violation of Title VIII [(i.e., the Fair Housing Act)] requires intentional discrimination, substantial practical problems result if this requirement is discarded," such as "the difficulties in placing meaningful limits on the discriminatory effect standard of liability." *See* Brief for United States as *Amicus Curiae, Town of Huntington, N.Y. v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) (No. 87-1961), *available at* http://www.justice.gov/osg/briefs/1987/sg870004.txt. For these reasons, the Solicitor General urged the Court to find that a showing of discriminatory effect does not suffice to state a claim under the Act. That same year, in signing the Fair Housing Amendments Act, the President issued a statement saying that the amended Act "does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that Title 8 violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent.... Title 8 speaks only to intentional discrimination." "Remarks on Signing the Fair Housing Amendments Act of 1988," Public Papers of President Ronald W. Reagan, Ronald Reagan Presidential Library (Sept. 13, 1988), *available at* http://www.reagan.utexas.edu/archives/speeches/1988/091388a.htm.

HUD itself considered the issue in implementing the Fair Housing Amendments Act of 1988. The 1988 amendment provided that "[t]he Secretary [of HUD] may

make rules ... to carry out this title" and in so doing, required that the Secretary "shall give public notice and opportunity for comment to all rules." *See* Pub. L. No. 100-430, § 8(2), 102 Stat. 1619 (codified at 42 U.S.C. § 3614a). In 1989, HUD issued a notice and comment rule (the "1989 Rule") but consciously determined not to resolve the issue of whether it is necessary to establish discriminatory intent to show a violation of the Fair Housing Act. In the section of the 1989 Rule describing the "Standard for Proving a Violation" under the Act, HUD states that the "regulations are *not* designed to answer the question of whether intent is or is not required to show a violation." Implementation of Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3234-35 (Jan. 23, 1989) (emphasis added). By contrast, in 1994, HUD and other federal agencies issued a joint "Policy Statement on Discrimination in Lending" ("1994 Policy Statement"), not subject to the notice and comment rulemaking process, which opined that a violation of the Fair Housing Act can be established under a disparate-impact approach. 59 Fed. Reg. 18,266, 18,269 (Apr. 15, 1994). Even still, the 1994 Policy Statement noted that "the precise contours of the law on disparate impact as it applies to lending discrimination are under development." *Id.*

Most recently, after the Court granted *certiorari* in this case, HUD issued for comment a proposed amendment to the 1989 Rule to resolve the issue on which the agency had previously punted. The proposed rule would provide that a violation of the Fair Housing Act can be established through a disparate-impact approach. Implementation of Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70,921, 70,921 (Nov. 16, 2011). Despite its history of wavering on this very issue,

HUD claims in the summary of its proposed rule that it "has long interpreted the Act to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.*

In sum, there is no consistent executive-branch interpretation as to whether the Fair Housing Act encompasses a disparate-impact approach.

### C. Federal Enforcement Agencies Have Not Followed the Court's Precedent in Applying a Disparate-Impact Approach

In the event the Court concludes that a violation of the Fair Housing Act can be established under a disparate-impact approach, an equally important issue is the proper standard for effectuating the approach. *Amici* believe that the Court articulated the controlling standard in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) ("*Wards Cove*"), and more recently in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ----, 131 S. Ct. 2541 (2011) ("*Wal-Mart*"), but federal agencies suggest a different approach.

#### 1. The controlling disparate-impact standard

In *Wards Cove*, the Court articulated the necessary elements for stating a prima facie case for disparate impact in the Title VII employment context, namely that a plaintiff must (1) identify a specific policy or practice, (2) demonstrate an impact unfavorable to minorities, and (3) establish that the challenged policy or practice *caused* the impact. *See* 490 U.S. at 656 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)). If the plaintiff makes a prima facie showing, the defendant can justify the challenged policy by articulating a

legitimate business goal that the policy serves. *Wards Cove*, 490 U.S. at 658-59 ("at the justification stage of ... a disparate-impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer"). The Court expressly disclaimed any requirement that the defendant establish that its policy was "essential" or "indispensable." *Id.* at 659. Having articulated a legitimate business goal, the defendant should prevail unless the plaintiff can demonstrate "that 'other tests or selection devices, without a similarly undesirable racial effect, would also serve the ... legitimate [business] interest[s]'" in an equally effective manner. *Id.* at 660 (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)).[9] "[T]he ultimate burden of proving that discrimination against a protected group has been caused by a specific ... practice remains with the plaintiff *at all times*." *Wards Cove*, 490 U.S. at 659 (emphasis in original).

9. In response to *Wards Cove*, Congress altered the standard for future Title VII litigation with the passage of the Civil Rights Act of 1991. Specifically, Congress amended Title VII to allow plaintiffs to challenge a group of employment practices without having to identify a specific practice as being the cause of their alleged harm, as well as to require that the burden of persuasion shift to the defendant to articulate a "business necessity" for the challenged practices. *See* 42 U.S.C. §§ 2000e-2(k)(1)(A)-(B). Congress has never made any such amendments to the Fair Housing Act, and accordingly, if the Act recognizes a disparate-impact theory, it is the view of *amici* that the burdens and standards of proof articulated in *Wards Cove* would remain applicable to such claims under the Act. *See Smith*, 544 U.S. at 240 ("[w]hile the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination. Hence, *Wards Cove*'s pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA").

In *Wal-Mart*, the Court narrowed the application of the disparate-impact theory in cases where discretion in decision-making is challenged.[10] In particular, *Wal-Mart* rejected the application of the disparate-impact theory to a company-wide policy of discretion. 131 S. Ct. at 2554-55. Where hundreds or thousands of persons independently exercise discretion in carrying out their job duties, that is "just the opposite of a uniform ... practice" which is normally the subject of a disparate-impact approach – such as the height and weight requirement applied uniformly to all prison guard applicants in *Dothard v. Rawlinson*, 433 U.S. 321, 323-24 (1977). *Wal-Mart*, 131 S. Ct. at 2554. Rather, the Court found the challenged conduct to be "a policy against having uniform employment practices." *Id.* In its reasoning, the Court opined, "[w]ithout some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored." *Id.* at 2552.[11]

10. The Court first recognized disparate-impact challenges to subjective policies, such as discretion in decision-making, in *Watson*. 487 U.S. at 989-91 (applying the disparate-impact approach to subjective decision-making regarding promotions, to address the "functional equivalent" of intentional discrimination). *Wal-Mart*, however, operates to limit the application of *Watson* in certain factual circumstances.

11. The Court further reasoned that granting employees discretion "is also a very common and presumptively reasonable way of doing business – one that we have said should itself raise no inference of discriminatory conduct." *Wal-Mart*, 131 S. Ct. at 2554 (quotations omitted).

### 2. Agency positions regarding disparate-impact liability in lending contradict the Court's jurisprudence

Where federal agencies have addressed disparate-impact liability for lending transactions under the Fair Housing Act, the agencies have, at least in some instances, articulated positions that are contrary to the controlling authority set forth in *Wards Cove* and *Wal-Mart*. For instance, the interagency 1994 Policy Statement states that once an agency finds that a lender's policy has a disparate impact, then the "lender will be required to justify the 'business necessity' for the policy," and the "justification must be manifest." 59 Fed. Reg. at 18,269.[12] Yet, in *Wards Cove*, the Court required that the burden remain with the plaintiff at all stages of the disparate-impact proceeding and ruled that a defendant prevails if "the challenged practice serves, in a significant way, the legitimate [business] goals of the [defendant]." 490 U.S. at 659. The agency standard, at least as articulated in the 1994 Policy Statement, can lead to different outcomes than the application of the *Wards Cove* standard.

HUD's recently proposed rule under the Fair Housing Act is also at odds with the Court's controlling jurisprudence regarding the standard and burden of proof under a disparate-impact theory, particularly at the justification stage. Similar to the 1994 Policy Statement's "business necessity" language, HUD's proposed rule

---

12. It is possible that the issuing agencies borrowed the concept of "business necessity" from the language of Title VII as amended in 1991, but the Fair Housing Act contains no such language.

would require a defendant to articulate that its policy "has a necessary and manifest relationship to one or more of the housing provider's legitimate, nondiscriminatory interests." 76 Fed. Reg. at 70,925. HUD's proposal would also place the burden of proof on the defendant. *See id.* (noting that "the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to the legitimate business interest").[13]

## III. THE THREAT OF LIABILITY UNDER A DISPARATE-IMPACT APPROACH WOULD FORCE LENDERS TO CONSIDER PROPHYLACTIC MEASURES, WHICH THEMSELVES PRESENT LEGAL RISKS AND DRAW RESOURCES AWAY FROM EFFORTS TO PREVENT DISPARATE TREATMENT

The disparate-impact approach originally was designed to challenge "practices, adopted without a deliberately discriminatory motive, [that] may in operation be functionally equivalent to intentional discrimination." *Watson*, 487 U.S. at 987. Were it recognized, however, as applying to the residential mortgage lending industry, the approach would have unintended consequences. The disparate-treatment approach is well suited to rooting out discrimination in lending, but the threat of a disparate-impact challenge inevitably causes lenders to consider prophylactic measures to minimize risk. These measures

13. The HUD proposal adopts the approach established by Congress in amending Title VII with the Civil Rights Act of 1991. It required an act of Congress to establish such a standard under Title VII. Congress has never made a comparable amendment to the Fair Housing Act.

are themselves undesirable and, perversely, can enhance rather than minimize legal risk to the detriment of lenders, hindering their efforts to serve borrowers.

### A. Disparate Impact As a Cause of Action Creates Dilemmas When the Uniform Application of Sound, Neutral Financial Standards Has Different Demographic Results

The threat of disparate-impact liability arises when the end results of a lender's operations have different demographic results, despite the uniform application of sound, neutral financial standards. For instance, notwithstanding a lender's neutral credit assessment policies, applicants belonging to one racial group may be rejected for financing at a greater rate than applicants from another racial group. If the differences in the rejection rates are deemed statistically significant (that is, the results can not be attributed to mere chance), the lender faces the prospect of a disparate-impact lawsuit. The risk can arise regardless of the racial group impacted or whether men or women experience differential results.

In lending, generally-accepted credit assessment standards, which themselves raise no inference of discrimination, may produce differential results that can be correlated with factors such as race or national origin. For example, it is commonplace and accepted for lenders to consider applicants' credit scores as an important indicator of credit risk, because such a score is highly predictive of risk and costs relatively little to obtain. At the same time, the Federal Reserve Board has found that the "[d]ifferences in credit scores among racial or ethnic groups ... are particularly large," with 52.6% of African-Americans in the sample appearing in the lowest two

score deciles, as compared to 16.3% of non-Hispanic whites. *See* Board of Governors of Fed. Reserve Sys., *Report to the Congress on Credit Scoring and its Effects on the Availability and Affordability of Credit*, at 80 (Aug. 2007) ("FRB Study"), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf. Similarly, the National Community Reinvestment Coalition ("NCRC") has stated that "our analysis finds that zip codes with concentrations of minorities contain a disproportionate percentage of consumers with [low] FICO scores between 580 and 620." Nat'l Cmty. Reinvestment Coal., *Working-Class Families Arbitrarily Blocked from Accessing Credit: NCRC's Fair Lending Investigation of Credit Score Restrictions by Federal Housing Administration-Approved Lenders*, Mortgage Lending Disparities Series Paper, at 15 (Dec. 2010), *available at* http://www.ncrc.org/images/stories/mediaCenter_reports/fha%20white%20paper-120810-final.pdf.

Down-payment requirements also impact various racial and ethnic groups differently. This result is reflected in examining census data on household wealth, because wealth (versus income) is the primary source for a down payment. In 2009, the median wealth of white households was 20 times that of African-American households and 18 times that of Hispanic households. *See* Pew Research Center, *Twenty-to-One: Wealth Gaps Rise to Record Highs Between Whites, Blacks and Hispanics*, at 1 (July 2011) (analyzing 2009 U.S. Census Bureau data and finding that average African-American and Hispanic households had $5,677 and $6,325 in wealth, respectively, while the average white household had $113,149 in wealth), *available at* http://www.pewsocialtrends.org/files/2011/07/SDT-Wealth-Report_7-26-11_FINAL.pdf. Debt-to-income

and loan-to-value requirements can also have a differential impact among various racial and ethnic groups.

These are simple examples of basic elements of assessing credit risk, and yet differences in their impacts could be expected to trigger at least the initial stages of a legal claim under a disparate-impact approach. In reality, the issues faced by lenders are far more complex in that the many elements related to credit risk assessment are usually layered in complex models or algorithms often developed by third parties. For example, the government-sponsored enterprises Fannie Mae and Freddie Mac require lenders to evaluate credit risk pursuant to automated underwriting systems containing models proprietary to those entities. The sum total of the elements in the model might have the same differential impact as the application of single assessment elements such as credit score and ability to make a down payment, yet lenders are not in a position to "justify" each element of the model much less the relationships among all the variables.

*Amici* recognize that liability under a disparate-impact approach would not attach unless the challenged policy or practice lacked a non-pretextual business justification. But the primary objective of most lenders, as with most businesses, is to minimize the risk of ever facing such a challenge. A lawsuit alleging lending discrimination on the basis of race or national origin is a very serious charge and can occasion an immediate reputational injury and business disruption. The allegation of a statistical impact is still newsworthy even if there is no reasonable inference that it is caused by an impermissible differential treatment. Moreover, defending allegations of disparate impact is typically very expensive.

In these circumstances, it is not unexpected that businesses would seek to manage the end numbers so as to avoid legal risk. The Court has recognized this result as it has allowed the expansion of the use of a disparate-impact approach in the employment discrimination field. *See Watson*, 487 U.S. at 992-93 (noting that "the inevitable focus on statistics in disparate-impact cases could put undue pressure on employers to adopt inappropriate prophylactic measures"). The Court has expressed concerns that a lender's efforts to avoid a disparate-impact legal challenge may themselves constitute intentional unlawful discrimination. *See, e.g., Ricci*, 129 S. Ct. at 2664 ("[w]e conclude that race-based action like the City's in this case is impermissible under Title VII unless the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute"); *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 499-500 (1989) (rejecting a set-aside program for minority contractors, since "an amorphous claim that there has been past discrimination ... cannot justify the use of an unyielding racial quota"). And the Court has cautioned that "[a]llowing employers to violate the disparate-treatment prohibition based on a mere good-faith fear of disparate-impact liability would encourage race-based action at the slightest hint of disparate impact. ... That would amount to a de facto quota system." *Ricci*, 129 S. Ct. at 2675.

### B. Lenders Face Disparate-Impact Challenges Now

It is not a merely hypothetical risk that lenders would face lawsuits, and the substantial reputational and monetary costs associated with being sued, based

on end results that go beyond the laws of chance. In the past several years, lenders have faced frequent disparate-impact suits[14] based largely on the public loan data reported by financial institutions under the federal Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. § 2801, *et seq.*[15] These lawsuits contend that the neutral

14. *See, e.g., In re Countrywide Fin. Mortgage Lending Practices Litig.*, No. 08-MD-1974, 2011 WL 4862174, at *3-4 (W.D. Ky. Oct. 13, 2011) (denying motion to certify disparate-impact class; under *Wal-Mart*, "statistical evidence of average disparities does not suffice to" establish commonality); *Rodriguez v. National City Bank*, --- F.R.D. ----, 2011 WL 4018028, at *5-7 (E.D. Pa. Sept. 8, 2011) (declining to certify class for settlement of disparate-impact claims because discretion provided to defendants' various loan officers precluded finding of commonality in light of *Wal-Mart*); *In re Wells Fargo Residential Mortgage Lending Discrimination Litig.*, No. 3:08-md-01930-MMC, slip op. at 5-8 (N.D. Cal. Sept. 6, 2011) (denying class certification on Fair Housing Act claim because, in part, claim relied upon discretion of individual brokers or branches).

15. HMDA itself is a disclosure law. It establishes neither unlawful lending terms nor a cause of action. HMDA requires most mortgage lenders to report information about their home-lending activities. 12 U.S.C. § 2803. Federal Reserve Board Regulation C implements HMDA and describes the information to be submitted to federal agencies, which subsequently is made public by the Federal Financial Institutions Examination Council ("FFIEC"). *See* www.ffiec.gov. Information regarding the disposition of all loan applications (that is, whether they were accepted or declined) is reported, but only limited information about loan pricing is reported. For example, at the time relevant to the lawsuits in note 14, *supra*, Regulation C required reporting as to the spread between certain higher-priced mortgage loans' annual percentage rate ("APR") and the yield on comparable Treasury obligations but not the actual APR, much less requiring that such spread be reported for all loans. 12 C.F.R. § 203.4(a)(12) (2008). In addition,

credit assessment policies of the defendants caused higher loan prices for minority borrowers. Yet, the HMDA data, which forms the sole basis for these lawsuits, do not even include the most relevant credit standards that lenders use in assessing risk. Indeed, the Federal Reserve Board has stated that "although the HMDA data include some detailed information about each mortgage transaction, many key factors that are considered by lenders in credit underwriting and pricing are not included. Accordingly, it is not possible to determine from HMDA data alone whether racial and ethnic pricing disparities reflect illegal discrimination." Robert B. Avery, et al., Div. of Research & Statistics, *The Mortgage Market in 2010: Highlights from the Data Reported under the Home Mortgage Disclosure Act*, 97 Federal Reserve Bulletin, at 39 (Sept. 22, 2011), *available at* http://www.federalreserve.gov/pubs/bulletin/2011/pdf/2010_HMDA.pdf. Despite the inconclusive nature of the data on which they are based, such lawsuits nevertheless put the defendants in a position of having to "explain[] the myriad of innocent causes that may lead to statistical imbalances," which burden the Court has expressly disavowed in the employment context. *Watson*, 487 U.S. at 992-93.

As another example, the NCRC filed Fair Housing Act complaints with HUD against twenty-two lenders alleging that the lenders' residential mortgage lending policies requiring a credit score above the Federal Housing Authority minimum have had a disparate impact on minorities. *See* Press Release, U.S. Dep't of Hous. &

---

borrowers' credit scores, income and assets, and cash reserves, the debt-to-income ratio, and the loan-to-value ratio are not among the currently reported data. 12 C.F.R. § 203.4 (2011).

Urban Dev., HUD to Investigate Allegations that 22 Banks and Mortgage Lenders Discriminate against African American and Latino Seekers (Dec. 8, 2010), *available at* http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2010/HUDNo.10-266. There is no allegation that the lenders' credit score threshold was established "because of" race or national origin, and there can be little question that credit score is a valid predictor of credit risk. *See* FRB Study, *supra*, at 87 ("[r]egardless of the specific performance measure considered, each of the three credit scores used in this study predicts future loan performance"). But under the disparate-impact approach, and HUD's interpretation of the standard, a significant burden can be placed on the lender in avoiding liability.

### C. Tight Credit Markets and Governmental Responses Increase the Threat of Disparate-Impact Claims

In the context of the recent financial crisis, Congress and other policy makers have created incentives and requirements for the lending industry to employ conservative underwriting standards. For instance, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act"), and certain of its proposed implementing regulations, create two separate categories of residential mortgage loans – Qualified Mortgages ("QMs") and Qualified Residential Mortgages ("QRMs").[16]

16. The regulations that would establish QMs and QRMs have not yet been finalized. The Board of Governors of the Federal Reserve System issued proposed QM rules on May 11, 2011. *See*

The proposed QM rules would impose, among other things, liability for loans that do not meet the ability-to-repay requirements of the Dodd-Frank Act, while establishing a certain level of protection from scrutiny for conservatively underwritten QM loans. *See* Dodd-Frank Act § 1412 (amending section 129C of the Truth in Lending Act, 15 U.S.C. § 1639c). To be sure, assessment of a borrower's repayment ability is a routine part of underwriting, but to avoid the threat of liability under the ability-to-repay requirements, a lender's response will be to proceed very cautiously. More cautious underwriting may restrict the availability of loans to groups with less wealth and income and, correspondingly, to minority groups. Such differentials may prompt disparate-impact lawsuits. Even though lenders can defend such suits on the basis that their practices are undertaken in accordance with federal regulation, lenders will still face the reputational and monetary costs incurred in doing so.

The proposed QRM lending standards also may be characterized as quite conservative. In particular, to qualify for such a loan, a borrower would be subject to "maximum front-end and back-end debt-to-income ratios of 28 percent and 36 percent, respectively; a maximum loan-to-value (LTV) ratio of 80 percent in the case of a purchase transaction...; a 20 percent down payment

Regulation Z, Truth in Lending, 76 Fed. Reg. 27,390, 27,396 (May 11, 2011). The comment period for the proposed rules closed on July 22, 2011. *See id.* at 27,390. The final QM rules will be issued by the newly-formed Consumer Financial Protection Bureau. Several agencies jointly proposed the rules to establish QRMs on April 29, 2011. *See generally* Credit Risk Retention, 76 Fed. Reg. 24,090 (Apr. 29, 2011). The extended comment period for the proposed rules closed on August 1, 2011. *See* Credit Risk Retention, 76 Fed. Reg. 34,010, 34,010 (June 10, 2011).

requirement in the case of a purchase transaction; and credit history restrictions." *See* Credit Risk Retention, 76 Fed. Reg. 24,090, 24,150 (Apr. 29, 2011). The incentive for lenders to make QRM loans would be to assure that their loans do not require "risk-retention" (which requirement would make non-QRM loans less marketable as securitizers will be forced to retain 5% of the economic credit risk for such loans under the Dodd-Frank Act). *See* Dodd-Frank Act § 941 (adding section 15G of the Securities Exchange Act of 1934, 15 U.S.C. § 78o-11) ("[t]he regulations prescribed under subsection (b) shall... (B) require a securitizer to retain – (i) not less than 5 percent of the credit risk for any asset – (I) that is not a qualified residential mortgage that is transferred, sold, or conveyed through the issuance of an asset-backed security by the securitizer"). There is no requirement for a lender to make any non-QRM loans, but if a lender were to underwrite only to meet the proposed QRM standards, the practice would likely restrict the availability of loans to less wealthy groups and those not in the top credit tiers, which would likely have a differential impact on minorities, increasing the risk of disparate-impact liability.

Moreover, in making QRM loans, HUD's proposed standard of proof under a disparate-impact approach would significantly augment the risk of liability to lenders. While a lender could certainly offer a legitimate business reason for making only QRM loans, namely, the ability to avoid the risk-retention requirement, it may be more difficult to establish that this constitutes a business necessity.

Thus, recognizing a disparate-impact approach under the Fair Housing Act may place lenders in the predicament of facing suit where they are attempting to comply with

law, no matter what they do. No matter how frivolous such suits may be, the threat of such suits may cause lenders to manage their end numbers, which creates another kind of risk, and the defense of such lawsuits would inevitability draw resources away from lenders' efforts to ensure the fair treatment of individual loan applicants and from lenders' ability to fund loans.

## CONCLUSION

*Amici* read the Fair Housing Act as prohibiting intentional discrimination but not authorizing claims based on disparate impact. This interpretation is consistent with the intent of Congress as expressed in the Act and comports with HUD's studies of the nature of housing discrimination. The result of the Court's determination of the issue is of grave importance to the lending industry, and a finding that the Fair Housing Act does not encompass disparate impact would allow a proper focus on ensuring that employees treat all credit applicants on the basis of their qualifications and not on an impermissible basis as described in the Act. If the Court holds that the Fair Housing Act does encompass disparate impact, *amici* submit that *Wards Cove* establishes the proper standard for that type of claim.

Dated: December 29, 2011

Respectfully submitted,

PAUL F. HANCOCK
*Counsel of Record*
K&L GATES LLP
Southeast Financial Center,
Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
(305) 539-3300
paul.hancock@klgates.com

ANDREW C. GLASS
K&L GATES LLP
State Street
Financial Center
One Lincoln Street
Boston, MA 02111
(617) 261-3100

*Counsel for Amici Curiae*

Document Details

SHARE

Comment Submitted by James Berry, Executive Director, Fair Housing Council of Suburban Philadelphia

**Document ID:** HUD-2011-0138-0027 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

- Comments Disparate Impact Regulations - individual organization

View Attachment:

**Title:**
Comments Disparate Impact Regulations - individual organization

2

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effect Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Fair Housing Council of Suburban Philadelphia (FHCSP) supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

FHCSP promotes expanded housing choice for members of the Fair Housing Act's protected classes by testing and investigating rental, sales, mortgage lending, and homeowners insurance practices to determine compliance with the Fair Housing Act; adjudicating lawsuits and administrative complaints based on methodical investigations; providing consumers and members of the real estate, lending and insurance industries with accurate, current and understandable information concerning their rights and responsibilities under the Fair Housing Act; and collaborating with an extensive variety of social service organizations and government agencies. Through FHCSP's enforcement efforts 46,765 units of housing in the Philadelphia region have been opened to members of the protected classes and $1,514,366 has been recovered for victims of housing discrimination.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact me at 267-419-8918 ext 4 with any questions.

Sincerely,

James Berry
Executive Director

## Document Details

Comment Submitted by Patricia Kidd, Executive Director, Fair Housing Resource Center, Inc.

**Document ID:** HUD-2011-0138-0028 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

Regarding which party bears the burden of proof to establish a less discriminatory alternative? The burden of proof should be assigned to the defendant or respondent.

Attachments:

- NFHA Letter View Attachment:

**Title:**
NFHA Letter

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Fair Housing Resource Center, Inc. supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing and requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative.  We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

Our agency is a non-profit organization with a mission to promote equal housing opportunities for all persons and to advocate for fair housing and diversity in Lake County Ohio and surrounding counties through the education, involvement of the public, the governments, and the business.

We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard.  We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act.  Please contact Patricia Kidd, at Patriciakidd@msn.com or via the telephone number listed above with any questions.

Sincerely,


Patricia Kidd, Esq.
Executive Director

3

National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 2

000292

1

Document Details

Comment Submitted by Rob Breymaier, Chicago Area Fair Housing Alliance

**Document ID:** HUD-2011-0138-0029 **Document Type:** Public Submission
This is comment on Proposed Rule: FR 5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

- CAFHA support of NFHA disparate impact comment View Attachment:

**Title:**
CAFHA support of NFHA disparate impact comment

2

CHICAGO AREA
FAIR HOUSING
ALLIANCE
A VOICE FOR EQUAL ACCESS AND OPPORTUNITY

**CAFHA Members**
Access Living

Chicago Lawyers' Committee for Civil Rights Under Law, Inc.

Cook County Commission on Human Rights

Community and Economic Development Corporation (CEDA)

Diversity, Inc.

Fair Housing Center of Lake County

HOPE Fair Housing Center

Illinois Department of Human Rights

Interfaith Housing Center of the Northern Suburbs

Interfaith Open Communities

The John Marshall Law School Fair Housing Legal Support Center

Lawyers' Committee for Better Housing

Oak Park Regional Housing Center

Sargent Shriver National Center on Poverty Law

South Suburban Housing Center

Village of Park Forest

Village of Streamwood

Woodstock Institute

**Associate Members**

Baird & Warner

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effect Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Chicago Area Fair Housing Alliance (CAFHA) supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

CAFHA is a consortium of fair housing and advocacy organizations, government agencies, and municipalities committed to the value of fair housing, diversity, and integration.

We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please feel free to contact me with any questions or for further information on CAFHA's support of this regulation.

Sincerely,

Rob Breymaier
CAFHA President
(708) 848-7150 x123
rbreymaier@oprhc.org



Document Details

Comment Submitted by Dennis Nixon, President, International Bancshares Corporation

**Document ID:** HUD-2011-0138-0030 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

- 20120113171822503 View Attachment:

**Title:**
20120113171822503



2

International Bancshares Corporation

January 13, 2012

***Via E-Rulemaking Portal: http://www.regulations.gov***

Regulations Division, Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410-0500

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effects Standard

Dear Sirs:

The following comments are submitted on behalf of International Bancshares Corporation ("IBC"), a multi-bank financial holding company headquartered in Laredo, Texas. IBC maintains 218 facilities and 375 ATMs, which serve 88 communities in Texas and Oklahoma. IBC is the largest Hispanic-owned financial holding company in the continental United States with over $11.6 billion in assets. IBC is a publicly-traded holding company. We appreciate the opportunity to comment on this matter. We are strongly committed to a robust fair lending program and are committed to the principles behind the Fair Housing Act. However, IBC strongly believes that this proposal is premature based on pending litigation. More significantly, we also believe that the "disparate impact" analysis engrafted onto the Fair Housing Act by the proposed rule will have the unintended consequence of actually reducing credit availability for many low to moderate income home buyers.

*Proposal*

On November 16, 2011, the above referenced docket was filed in the Federal Register. This proposal would amend the Fair Housing Act (FHA) regulations by amending section 100.120 relating to the making of loans by adding a new subparagraph (2) that prohibits "providing loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin." A new Subpart G—Discriminatory Effect would also be added to the rules.

P.O. DRAWER 1359, LAREDO, TEXAS 78042-1359 (956) 722-7611

This new subpart would prohibit practices that have a "discriminatory effect," which is defined through disparate impact. The statistical analysis identifying a disparate impact could be refuted by establishing a "necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent." However, there cannot be another practice that arguably has a less discriminatory effect. Finally, subpart G provides a shifting burden of proof. The complainant or plaintiff has the burden of proving that the challenged practice has a "discriminatory effect." Then the respondent or defendant has the burden of proving a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests. This may then be countered by the complainant or plaintiff by showing that the challenged practice can be served by another practice that a "less discriminatory effect."

*Recent Court Developments*

On November 7, 2011, the United States Supreme Court granted certiorari in the case of *Magner v. Gallagher* to determine whether disparate impact is a valid theory of liability under the FHA, and, if so, what standard should be applied.

The Background section of the proposal discusses the history of the discriminatory effects test under the FHA. It notes that courts of appeal have supported this test. The grant of certiorari occurred after the proposal was crafted but before the Federal Register publication. Any adoption of a rule relating to the disparate impact test will likely be subject to revision following a decision by the Supreme Court, which could uphold the test, strike it totally, or subject it to limitations. In any event, action on this proposal is premature at this time. We strongly urge HUD to withdraw this proposal pending final court action.

Further, we believe that the Courts of Appeals cited for approval of the application of disparate impact to the Fair Housing Act have incorrectly premised their decisions on the Equal Employment Opportunity Act jurisprudence. In addition, the proposed expansive definition of disparate impact in the rule is inconsistent with prior Supreme Court case law on disparate impact. In *Wards Cove Packing Co. v. Atonio* (490 US 642, 1989), which set forth the contours for a disparate impact claim under Title VII, the United States Supreme Court required a plaintiff to identify a specific policy or practice, demonstrate an impact unfavorable to minorities, and show causation. These proposed rules declare a practice as unlawful if it "actually or predictably results in a discriminatory effect." Predictability is a far cry from the standard of *Wards Cove*.

4

*Lack of Statutory Support for Proposal*

In the event the proposal is not withdrawn, we would make the following comments regarding the legal support for the rule and the industry impact of the rule as drafted.

First, the disparate impact analysis is taken from employment law and has no statutory basis in the FHA. By contrast, the Equal Employment Opportunity Act has an explicit statutory framework for disparate impact. See 42 USC §2000e-2(k). Clearly Congress knows how to describe the framework for disparate impact cases and has done so in the employment discrimination context. Arguably, the fact that Congress has not amended the FHA in the last four decades to incorporate a disparate impact theory of recovery indicates indirectly that it has no intent to apply that concept to fair lending laws specifically or to fair housing more generally. As noted in *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 2009, Congress is presumed to act intentionally where it does not add language to one statute that it has included in another statute. In short, this proposal exceeds the agency's authority.

Next it is critical to note that the FHA only proscribes conduct that is undertaken "because of" certain factors. In other words, the organic law requires intentional conduct. It does not prohibit behaviors that are nondiscriminatory but that might have some discriminatory effect when evaluated through the lens of an obscure statistical analysis.

*Section 100.120*

The proposal adds a new subparagraph (b)(2) that would affect the pricing and underwriting of mortgage loans if a practice would have the "effect" of denying or discouraging such loans on a prohibited basis. Although the regulation is silent as to the manner of determining the "effects" test, in practice banking regulators have used a statistical analysis to establish that a facially neutral policy or practice has a discriminatory effect.

Expanding that concept more broadly to cost, rate of denial, terms and conditions creates a level of uncertainty for lenders that ultimately leads to either cookie cutter loans with rigid criteria or an exit from the credit product due to the regulatory compliance cost and enforcement/litigation cost arising from the uncertainties created by an ambiguous rule. This is especially true when the analysis used to determine the adverse "effect" is based on unspecified, ill-conceived statistical analyses.

5

This is particularly problematic as to pricing of loans. The unintended consequences of this proposal would be the constriction of credit availability generally and the reduction of product offerings. The ambiguities in this rule are such that lenders must provide only the simplest product.

*Subpart G—Discriminatory Effect*

In addition to the concerns expressed above, IBC believes that the new sections dealing with legally sufficient justification and with burden of proof create new, expanded impediments to lending and will over time reduce mortgage credit availability. Here are our more specific concerns.

First, a lender must identify not only an appropriate business justification for a particular practice, but that rationale must establish a "necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent..." [emphasis added] The underscored terms inject potential subjective review of the countervailing business support for a practice.

The burden of proof provisions also present concerns. After a lender demonstrates a business justification for a policy, the complainant or plaintiff can allege that there is another practice that has a less discriminatory effect. In fact, there are likely to be an array of practices that are possible in a loan program. The ultimate structure of a mortgage lending product will take into consideration credit risk, reputation risk, repayment risk, legal risk, and a variety of other applicable risks. Subpart G does not require an alternative policy to consider any issue other than "less" discriminatory effect. Every other concern is irrelevant (apparently) under the Subpart G burden of proof analysis. In addition, the lender's justification for their business practice—unlike the claim of discriminatory effect—may not be "hypothetical or speculative." This creates a dangerous double standard: an innocuous practice that has the "effect" of discrimination cannot be rebutted by a business justification that a regulator determines is hypothetical or speculative. Regrettably, this means that an examiner can apply a subjective standard to find a potential violation but the lender can defend itself only with an objectively provable business reason for the practice.

6

*Conclusion*

IBC respectfully suggests that this proposal should be withdrawn pending final action by the United States Supreme Court. If the proposal is not withdrawn, we would suggest that the provisions relating to a legal justification be made less subjective, taking into consideration as well the need for a multiplicity of factors in a lending environment. Any use of statistical analyses to determine disparate impact must be subject to further clarification in the rule and rigorous validation. Lenders should not be subjected to punitive action based on regulations that do not provide clear standards for behavior. Finally, the burden of proof should not be shifted a second time merely through a showing of a possible alternative. Rather, that less discriminatory option must also be rationally available and not excessively burdensome for lenders.

Thank you for this opportunity to comment.

Respectfully,

Dennis E. Nixon
President and CEO

# Document Details

Comment Submitted by Katherine Knister, Executive Director, Silver State Fair Housing Council

**Document ID:** HUD-2011-0138-0031 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

- SSFHC Disparate Impact Comments January 2012 View Attachment:

**Title:**
SSFHC Disparate Impact Comments January 2012



2

January 13, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01; *Implementation of the Fair Housing Act's Discriminatory Effects Standard***

Dear Rules Docket Clerk:

As an advocate for equal opportunity in housing, I am writing in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. Silver State Fair Housing Council (SSFHC) is a private nonprofit agency with the mission to ensure equal housing opportunity in Nevada. SSFHC advocates for fair housing through a comprehensive program of education, outreach, and enforcement activities. Much of our funding comes from HUD's Fair Housing Initiatives Program (FHIP). SSFHC is currently funded under the Private Enforcement Initiative Performance-Based Component and the Fair Housing Organizations Initiative. As a private agency in a state that is not substantially equivalent, SSFHC works particularly closely with our HUD partners to provide fair housing services and justice for those who experience illegal housing discrimination.

HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status. In our work, we have encountered many examples of housing practices that are neutral on the surface, but destructive to the mission of fostering equal opportunity.

One such example is numerical occupancy limitations. When such limitations are imposed by housing providers, they may have the effect of excluding families with minor children from housing. This effect, even if not intended by the housing provider, runs counter to the goals of the Fair Housing Act.

HUD's proposed regulation provides clarity to housing providers, housing seekers, municipalities, and courts who may confront such policies in many different ways. The regulation not only clarifies the burden of proof in the context of litigation to the benefit of courts and litigants. It also will help to

P.O. Box 3935, Reno, NV 89505
(775) 324-0990 • fax: (775) 324-7507 • toll free: (888) 585-8634 • Relay Nevada 711
email: fairhousing@gbis.com • silverstatefairhousing.org

prevent litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of our agency.

We applaud HUD's efforts to provide guidance on the important issue of disparate effects under the Fair Housing Act and urge HUD to issue the final rule as soon as possible.

Very truly yours,

Katherine E. Knister
Executive Director

Document Details

Comment Submitted by Ellen Johnson, President, Housing Land Advocates

**Document ID:** HUD-2011-0138-0032 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

DI comments View Attachment:

**Title:**
DI comments

Housing Land Advocates

January 17, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01;** "RIN 2529–AA96" ***Implementation of the Fair Housing Act's Discriminatory Effects Standard***

Dear Rules Docket Clerk:

The Housing Land Advocates ("HLA") is an advocacy organization dedicated to using land use planning and the law to address affordable housing conditions in Oregon. We respectfully submit the following comments on the Department of Housing and Urban Development's ("HUD") proposed rule for implementation of the Fair Housing Act's Discriminatory Effects Standard ("Rule").

The Rule embodies a longstanding[1] agency interpretation of the Fair Housing Act ("FHA") that allows plaintiffs the opportunity to state a claim under the FHA by providing evidence that land use or zoning practices have significantly adverse effects on a protected class. This interpretation, sometimes referred to as the disparate impact ("DI") standard of liability, provides a means to redress systemic discrimination and perpetuation of segregation, in the absence of overt intentional discrimination. The Rule's burden-shifting approach to FHA litigation is analogous to the Supreme Court's interpretation of Title VII of the Civil Rights Act of 1964, which prohibits discriminatory employment practices, whether or not intentionally so.

HLA vigorously applauds HUD's past and present commitment to a DI standard for liability under the Fair Housing Act, because of the importance of DI as a tool for local communities, developers, and advocacy groups to enforce the Fair Housing Act in the land use and zoning context. To abandon DI liability for a stricter standard that requires direct evidence of intentional discrimination to state a claim under the FHA would set aside decades of agency

[1]The longevity of this interpretation is evidenced by written guidance and handbooks from HUD; see *Title VIII Complaint, Intake, Investigation and Conciliation Handbook* 8024.01. Chapter 2 Theories of Discrimination, specifically Section 2-1, *Occupancy Requirements of Subsidized Multifamily Housing Programs Handbook* 4350.3 Rev1 Chapter 2 Civil Rights and Non-Discrimination Requirements, specifically Section 2-18 C and 1993 Memorandum from Roberta Achtenberg, HUD Assist. Sec. for Fair Housing and Equal Opportunity entitled "*Applicability of Disparate Impact Analysis to Fair Housing Cases*".



Housing Land Advocates

guidance and federal court interpretations of the Fair Housing Act. Imposing an intentional discrimination standard for FHA claims would also run counter to Congress's goals of redressing the discriminatory consequences of municipal land use and zoning policies, and the stemming the perpetuation of segregation within both regional and subregional housing markets.

To underscore the importance of the availability of the DI standard, we offer a case study of regional discriminatory effects and perpetuation of racial segregation wrought by a local jurisdiction's land use policies. Side by side near the urban center of Portland, two jurisdictions. The City of Tigard and Lake Oswego, have developed different housing markets and demographics despite statewide land use laws which ordinarily would have resulted in an equitable distribution of housing opportunities across the region. Tigard has a higher Latino population than the regional average, while Lake Oswego, has a much lower than expected Latino population. To understand this asymmetry, we look at history of these two cities' land use policies.

In the late 1970s Lake Oswego, a suburb of Portland, adopted a policy to limit population growth within its urban service boundary ("USB") to 49,000 through the year 2000. The City's 1979 comprehensive plan projected a population of 54,000 by the year 2000; in 1984, the City's comprehensive plan projected that 50,000 people would be living within the USB by that date. In reality, there were an estimated 43,412 people living within Lake Oswego's USB in 2008. The City currently permits a maximum density of 5.5 dwelling units per net buildable acre within their USB, which is far below the statewide standard of 10 dwelling units. While maintaining a low growth rate, regulatory barriers to housing choice like this one have kept housing prices high with the effect of excluding a disproportionate number of minorities. Thus Lake Oswego's land use/zoning policies act as discriminatory regulatory barriers to the development of housing opportunities to our current Latino population, which in general are poorer than the average household in Oregon and therefore have greater difficulty obtaining housing they can afford.

Like Lake Oswego, Tigard is an inner suburb of Portland with transit access to major employment centers. Concerned about the regional effects of its neighbor's growth policy, Tigard penned a letter to Lake Oswego in 1978, warning that the policy would effectively force Tigard to absorb more than its fair share of the region's growth. Oregon's statewide land use planning law, as interpreted by Oregon courts in the 1981 case 1000 Friends of Oregon v. Lake Oswego, requires each metropolitan city to accept its regional fair share of housing and population growth.

Despite this warning and the requirements of Oregon law, Lake Oswego did not amend their restrictive growth policy. As a result, Tigard's rate of population growth exceeded Lake Oswego's by 2.1% between 1990 and 2000, and by 1.1% between 2000 and 2010. And the differences between the two cities are far more dramatic when rates of growth are disaggregated by race. For example, Tigard's Latino population grew at a rate of 12.7% in 2010 compared with Lake Oswego's 3.7% Latino population growth rate. Meanwhile, the Latino population in the nearby urban center of Portland grew at a rate of 9.4%.

Lake Oswego's facially neutral policy does not deny any specific household a housing opportunity within its jurisdiction. Still, it could be challenged under the Fair Housing Act based upon its effect, which is to deny housing opportunities to Latino households that can not currently locate within the city. The proposed Rule ensures that the Fair Housing Act can continue to be used in this way. Without a DI standard of liability, facially neutral land use and zoning policies that have a significant adverse impact on housing availability would be beyond the reach of the fair housing laws. Consequently, housing segregation in Oregon, which harms us all, would exist without a remedy; the sole means of redress under the FHA would require evidence of intentional discrimination.

Evidence of intentional discrimination, even when it exists, is notoriously hard to find. Thus, for Oregonians and for potential FHA plaintiffs across the country, there is no practically feasible remedy for municipal discriminatory land use and zoning policies without disparate impact liability under the FHA. We strongly encourage HUD to adopt the proposed Rule for implementation of the Fair Housing Act's discriminatory effects standard.

Sincerely,

Ellen Johnson
President, Housing Land Advocates

# Document Details

SHARE

## Comment Submitted by Karen Culbertson

**Document ID:** HUD-2011-0138-0033 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

if I understand t his correctly, I would had to rent my next door unit ( duplex, I live on one side) to the man convicted of assaulting a woman and a child - who is required to be at his home on his rental property i.e. when not at work,AND any other hours from 8-4 during week. There is a yard. I run a daycare in my home from 715 - 5, and have for 12 yrs., children under 3 yrs old. Who is going ot protect them? Who would even bring their child to my business, with him there before and after his work shift? And WHO is goin g to protect me the rest of the time?????. Whta if convicted of drug dealing? Sorry not in my unit. This is ridiculous.

# PUBLIC SUBMISSION

**As of:** 1/18/12 2:47 PM
**Tracking No.** 80f9841e
**Comments Due:** January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0033
Comment Submitted by Karen Culbertson

## Submitter Information

## General Comment

if I understand t his correctly, I would had to rent my next
door unit ( duplex, I live on one side) to the man convicted of assaulting a woman and a child - who is required to be at his home on his rental property i.e. when not at work,AND any other hours from 8-4 during week. There is a yard.
i run a daycare in my home from 715 - 5, and have for 12 yrs., children under 3 yrs old.

Who is going ot protect them? Who would even bring their child to my business, with him there before and after his work shift?
And WHO is goin g to protect me the rest of the time?????.

Whta if convicted of drug dealing? Sorry not in my unit.

This is ridiculous.



# Comment Submitted by David Levin, Bay Area Legal Aid

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder**

Comment Period Closed
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0034
**Tracking Number:** 80f976f

## Comment

See attached file(s)

## Attachments (1)

BayLegal Comment Letter 1-16-12

**View Attachment:** PDF

## Document Information

**Date Posted:**
Jan 16, 2012

**Show More Details**

# PUBLIC SUBMISSION

**As of:** 1/18/12 10:01 AM
**Tracking No.** 80f976f8
**Comments Due:** January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0034
Comment Submitted by David Levin, Bay Area Legal Aid

---

## Submitter Information

---

## General Comment

See attached file(s)

---

## Attachments

BayLegal Comment Letter 1-16-12



January 16, 2012

**Via Electronic Submission**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01;** ***Implementation of the Fair Housing Act's Discriminatory Effects Standard***

Dear Rules Docket Clerk:

We are writing on behalf of Bay Area Legal Aid, a Legal Services Corporation-funded legal service provider in the San Francisco Bay Area, in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. Thank you for requesting and reviewing comments on this important proposed regulation.

Bay Area Legal Aid is the largest provider of civil legal services to low-income individuals in the San Francisco Bay Area. Our housing practice includes full representation of tenants in eviction proceedings, enforcement of our clients' rights to fair housing, representing Housing Choice Voucher participants at grievance hearings, and affirmative litigation. Bay Area Legal Aid's fair housing work is funded in part by HUD under a FHIP grant. This work includes requesting reasonable accommodations from both private landlords and Public Housing Authorities for clients with disabilities, investigating claims of discrimination, filing administrative complaints with HUD, conciliating disputes, and affirmatively pursuing litigation to enforce fair housing rights. Our clients are all indigent, representing a multitude of racial and ethnic backgrounds, and many of our clients have limited English proficiency.

On behalf of our clients, we are very pleased to support HUD's proposed regulation as an important and necessary step forward in helping to ensure that the nation's housing is available to all. On a daily basis, we see many clients facing housing practices that may appear neutral on their surface, but which threaten our mission of fostering equal opportunity and access to housing.

One such example is the loss of subsidized or affordable housing. We have frequently witnessed such housing convert to market-rate units with devastating effects on our elderly, disabled, and

4

low-income clients. We have taken legal action to prevent the disparate impact on these groups who would otherwise improperly face eviction when available options can protect their valuable and longstanding ties to the community. The proposed regulations will help continue to provide this vital protection of housing for elderly, disabled, and other vulnerable groups from loss and other disparate impacts that violate the Fair Housing Act.

Another important example of how these proposed regulations will assist housing providers and others concerns the potential harassment of certain protected groups related to housing. For example, in one local city we brought legal action to prevent targeting Housing Choice Voucher participants when law enforcement activities resulted in a disparate impact on African American families. The new proposed regulations will assist fair housing advocates and others in evaluating and preventing actions that inflict a disparate impact on protected groups.

HUD's proposed regulation will assist housing providers, housing seekers, municipalities, and courts to have a clearer and improved understanding of the disparate impact standard. The proposed regulation not only clarifies the burden of proof in the context of litigation, but will also help to prevent litigation by providing housing providers, and jurisdictions, with the guidance and tools they need to evaluate all alternatives and make well-considered decisions. Further, this new regulation will protect indigent individuals in protected groups, such as many of our clients, who are often acutely impacted by improper housing policies. This guidance will help foster the goals of the Fair Housing Act, and move our county toward the dream envisioned by Dr. Martin Luther King that originally inspired the first version of this law in 1968.

We applaud HUD's efforts to provide new guidance on the important issue of disparate effects under the Fair Housing Act, and we urge HUD to issue the final rule as soon as possible.

Very truly yours,

Nadia Aziz and David Levin

Staff Attorneys

BAY AREA LEGAL AID
1025 Macdonald Avenue
Richmond, CA 94801
Phone: 510-233-9954
Fax: 510-236-6848



# Document Details

Comment Submitted by Tim Ballering, Apartment Association of Southeastern WI, Inc.

**Document ID:** HUD-2011-0138-0035 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

See attached file(s)

Attachments:

- 2012_01_16_08_45_33 View Attachment:

**Title:**
2012_01_16_08_45_33



Apartment Association of Southeastern Wisconsin
PO Box 26516,
Wauwatosa, Wisconsin 53226
414•276•7378
Tim@ApartmentAssoc.org
www.ApartmentAssoc.org

1/16/2012

The Apartment Association of Southeastern WI, Inc. is a trade association representing approximately 575 owners and managers of rental housing in the Metro Milwaukee area.

Our organization supports Fair Housing as well as community efforts to reduce the effects of crime within the neighborhoods that our members own and manage rental housing.

We are concerned that this proposed rule will restrict the legitimate and necessary use of criminal arrest and conviction records in screening tenants to exclude those who will cause disruption and harm to other occupants, the neighborhoods those properties are located in, and to our properties.

Many communities in southeastern Wisconsin have "Nuisance Property Ordinances" that hold owners' accountable for the misdeeds of their tenants. For example Milwaukee's Nuisance Ordinance does not require the conviction, nor the arrest of the tenant or their invitees, rather simply repeat law enforcement activity will trigger the enforcement provisions of that ordinance.

As part of your proposed rule property owners need "bright line" guidance, establishing what background screening criteria and methods will remain acceptable under this proposed rule as well as protections from potentially conflicting local requirements.

It would be inequitable, causing unnecessary costs and harm to property owners if such guidance is not provided in advance of the implementation and enforcement of this proposed rule.

Sincerely

Tim Ballering
Executive Committee
Apartment Association of Southeastern WI, Inc.

Case 1:13-cv-00966-RJL Document 40-2 Filed 08/08/14 Page 107 of 169

# Document Details

## Comment Submitted by Lorae Ponder, Housing Opportunities Made Equal of Virginia, Inc.

**Document ID:** HUD-2011-0138-0036 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

Housing Opportunities Made Equal of Virginia, Inc. ("HOME") supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative. HOME was founded in 1971 to fight housing discrimination in Virginia. Through housing counseling, policy leadership, and enforcement of the fair housing laws, HOME vigorously pursues its mission of ensuring equal access to housing for all people. We are in full support of the National Fair Housing Alliance's comment letter. Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact Lorae Ponder, Acting President, at 804-354-0641 with any questions.

Attachments:

- HOME of VA Comments on Implementation of FHA's Discriminatory Effect Standa... View Attachment:

**Title:**
HOME of VA Comments on Implementation of FHA's Discriminatory Effect Standard



2

HOME
Housing Opportunities Made Equal
years
Unlocking doors and minds

*"Ensuring equal access to housing for all people"*

626 E. Broad St., Suite 400
Richmond, Virginia 23219

804.354.0641
Fax: 804.354.0690
VA Relay: 711

help@phoneHOME.org

www.phoneHOME.org

OFFICERS
Edward B. Freeman III
*Chair*

Joe Casey
*First Vice Chair*

Victor K. Branch
*Second Vice Chair*

Donita Harper
*Treasurer*

Velma J. Ballard
*Secretary*

Stephen A. Northup, Esq.
*Immediate Past Chair*

BOARD OF DIRECTORS
Carla P. Childs
Thomas J. Gallagher
David C. Gould
S. Corey Humphrey
The Honorable Tim Kaine
The Rev. Canon J. Fletcher Lowe, Jr.
Walter J. O'Brien, Jr.
Nealie V. Pitts
Agustin E. Rodriguez, Esq.
James A. Rothrock
Millard J. Stith, Jr.
Tiffany Taylor-Minor

PRESIDENT AND CEO
Constance K. Chamberlin

January 14, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh Street SW, Room 10276
Washington D.C. 20410

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's
Discriminatory Effect Standard
***Submitted through Federal eRulemaking Portal at***
***www.regulations.gov***

To Whom It May Concern:

Housing Opportunities Made Equal of Virginia, Inc. ("HOME") supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

HOME was founded in 1971 to fight housing discrimination in Virginia. HOME vigorously pursues its mission of ensuring equal access to housing for all people through counseling and education, fair housing enforcement and leadership in public policy. We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the

3

Housing Opportunities Made Equal of Virginia, Inc.
Comments to Proposed Discriminatory Effect Regulations
Page 2

Fair Housing Act. Please feel free to contact me at 804-354-0641 with any questions.

Sincerely,

Lorae D Ponder

Lorae Ponder
Acting President & CEO

000318

SHARE

## Document Details

Comment Submitted by Chris Bettis

**Document ID:** HUD-2011-0138-0037 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

I respectfully argue that the effects standard is illogical, unfair, and should not be put into this practice. Discrimination by definition requires intent. Additionally, the burden of proof is placed upon the defendant - not judicious (in my humble opinion).



# PUBLIC SUBMISSION

**As of:** 1/18/12 10:38 AM
**Tracking No.** 80f985f7
**Comments Due:** January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0037
Comment Submitted by Chris Bettis

## Submitter Information

## General Comment

I respectfully argue that the effects standard is illogical, unfair, and should not be put into this practice. Discrimination by definition requires intent. Additionally, the burden of proof is placed upon the defendant - not judicious (in my humble opinion).

The Regulations.gov hosting facility will undergo scheduled maintenance and as a result Regulations.gov will be unavailable Monday, August 5 beginning at 6pm lasting until Tuesday morning at 8am (ET).

# Comment Submitted by Fred Underwood, National Associati Realtors

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder**

Comment Period Close
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0038

**Tracking Number:** 80f9897

## Document Informatio

**Date Posted:**
Jan 17, 2012

**Show More Details**

## Comment

See attached file(s)

## Attachments (1)

Comment Submitted by Fred Underwood, National Association of Realtors (Attachment)

**View Attachment:**



2

NATIONAL ASSOCIATION of REALTORS®

Maurice "Moe" Veissi
2012 President

Dale A. Stinton
Chief Executive Officer

GOVERNMENT AFFAIRS DIVISION
Jerry Giovaniello, Senior Vice President
Gary Weaver, Vice President
Joe Ventrone, Vice President
Jamie Gregory, Deputy Chief Lobbyist

500 New Jersey Ave., NW
Washington, DC 20001-2020
Ph. 202-383-1194 Fax 202-3837580
www.REALTOR.org

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW, room 10276
Washington, DC 20410

Docket No: FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effects Standard

Dear Sir or Madame:

I am writing on behalf of the 1.1 million members of the National Association of REALTORS® (NAR)[1] and its affiliate, the Institute of Real Estate Management, to urge the Department to delay rulemaking in this matter until after the U.S. Supreme Court rules in the matter of *Gallagher v. Magner*, 619 F3d 823 (8th Cir. 2010).

The Supreme Court recently granted a petition for writ of certiorari in the *Gallagher* case, which poses the following two questions to the Court: 1) are disparate impact claims cognizable under the Fair Housing Act; and 2) if such claims are cognizable, should they be analyzed under the burden shifting approach used by three circuits, under the balancing test used by four circuits, under a hybrid approach used by two circuits, or by some other test?

The Department's proposed rule addresses the same issues facing the Court in *Gallagher*. Given the implications of the Court's ruling on the future rulemaking, NAR urges the Department to delay rulemaking until the Supreme Court has ruled in the *Gallagher* case.

NAR is proud of its history of support for fair housing laws and its collaboration with the Department to promote fair housing. A housing market free from discrimination is of critical importance to NAR and its members. The creation of clear and easily understandable laws is essential to providing fair housing opportunities. Once the Supreme Court has ruled in the *Gallagher* case, NAR would welcome the opportunity to work with the Department to develop a final rule that incorporates the Supreme Court's guidance on these issues and promotes our mutual objective of providing fair housing opportunities.

Sincerely,

Maurice "Moe" Veissi
2012 President, National Association of REALTORS®

REALTOR® is a registered collective membership mark which may be used only by real estate professionals who are members of the NATIONAL ASSOCIATION OF REALTORS® and subscribe to its strict Code of Ethics

[1] The National Association of REALTORS® is America's largest trade association, including NAR's eight affiliated institutes, societies and councils. REALTORS® are involved in all aspects of the residential and commercial real estate industries and belong to one or more of some 1,400 local associations or boards, and 54 state and territory associations of REALTORS®.



Document Details

Comment Submitted by Liz Murray, National People's Action

**Document ID:** HUD-2011-0138-0039 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attachment

Attachments:

- Comment Submitted by Liz Murray, National People's Action (Attachment) View Attachment:

**Title:**
Comment Submitted by Liz Murray, National People's Action (Attachment)

2

# NATIONAL PEOPLE'S ACTION

January 17, 2012

**Via Electronic Submission**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01; *Implementation of the Fair Housing Act's Discriminatory Effects Standard***

Dear Rules Docket Clerk:

As an organization that represent the interests of consumers, communities, and persons protected by the provisions of civil rights laws, we support HUD's proposed Fair Housing Act regulations specifically memorializing and clarifying the use of the disparate impact theory to establish liability under the Fair Housing Act. We have long relied on the Fair Housing Act's prohibitions against discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin – both to protect individuals and communities of color. We agree with HUD's introductory statement to the proposed regulations that "all federal courts of appeals to have addressed the question have held that liability under the Act may be established based on a showing that a neutral policy or practice either has a disparate impact on a protected group or creates, perpetuates, or increases segregation, even if such a policy or practice was not adopted for a discriminatory purpose". We also agree with HUD that there is a need to codify this in the regulations and to clarify inconsistencies in the application of the theory in different jurisdictions.

Codification and clarification of the disparate impact theory is particularly important to those of us working on discriminatory and abusive practices in the mortgage industries. In prohibiting discriminatory practices in residential real estate-related transactions, the Fair Housing Act provides protections for some classes not covered by the Equal Credit Opportunity Act (ECOA). Equally important, the Act protects persons and communities from actions that are not covered by ECOA because those involved in these actions are not considered credit providers.

For example, the actions of secondary market agents are specifically covered by the Fair Housing Act – and the fair housing compliance responsibilities of the GSEs are specifically covered in other statutes such as the Federal Housing Enterprises Financial Safety and Soundness Act. Aside from the many aspects of the securitization of mortgages, loan servicing actions may also have a discriminatory effect, but may not be seen by some courts as covered by ECOA. Additionally, the actions of local, state, Federal government agencies, or private third parties related to the maintenance, disposition, and other treatment of foreclosed and abandoned properties may not be seen as covered by ECOA. All of these actions have profound implications and impacts on communities of color that are protected by the provisions of the Fair Housing Act.

Therefore, with the following comments, we strongly endorse the proposed regulations and ask HUD to move to the final implementation of these regulations with the utmost urgency:

Throughout the proposed regulations, HUD refers to "practices" that have a disparate impact. Under the Supplemental Information section of the proposed rule [Part II. This Proposed Rule -
A. Subpart G — Discriminatory Effect. - 1. Discriminatory Effect Prohibited (§ 100.500)], HUD elaborates that "any facially neutral action, e.g. laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule." This is a clear statement of the kinds of "practices" that HUD intends to cover under the rule. Under the actual proposed language for the rule, however, this elaboration is missing. In as much as this elaboration does not exist in the current regulations, it should be inserted into the rule itself in order to make clear the scope of the rule and HUD's position on the range of "practices" actionable under the law.

HUD provides the following description of the application of the discriminatory effects standard under the Fair Housing Act. "The plaintiff or complainant first must bear the burden of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice has a necessary and manifest relationship to one or more of the defendant's or respondent's legitimate, nondiscriminatory interests. If the defendant or respondent satisfies its burden, the plaintiff or complainant may still establish liability by demonstrating that these legitimate nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect."

National People's Action • 810 N. Milwaukee • Chicago, IL 60642 • (312) 243-3035 • (312) 243-7044 fax • www.npa-us.org

4

The language under §100.500(b)(1) defining a "legally sufficient justification" (i.e., that the practice has a "manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent") appears all too likely by itself to be interpreted so liberally that any claim of increased profitability resulting from the discriminatory impact or other claims of normal business procedures or governmental operations could be put forward by the respondent in a case. Notwithstanding §100.500(b)(2), which conditions the defense on there being a no less discriminatory practice, it is the standard for recognizing the legitimacy for the practice against its discriminatory impact that is at issue at this stage in the case and not whether that practice, once recognized as legitimate, could be served in some other less discriminatory way. Finding a less discriminatory alternative to a practice that has a questionable business or public policy purpose does not affirmatively further the Act. The regulation would at least be improved if it included the language similar to that cited in footnote #42 of the proposed regulation in the case of *Charleston Housing Auth. v. U.S. Dep't of Agric.*, (419 F.3d 729, 741) that the defendant needs to establish that the policy has not only a manifest relationship to a legitimate interest, but that it is "necessary to the attainment of" clearly legitimate nondiscriminatory goals.

Section 100.500(c)(3) requires the complainant to define the possibility of a less discriminatory alternative. While HUD claims that this creates a balance in burdens, the practical reality is that offering some allegedly nondiscriminatory business or policy justification is far less burdensome than investigating all possible alternative practices once a practice is deemed justifiable. This is particularly the case where the practice involves complex systems (e.g., credit scoring, credit-based insurance scores, automated loan underwriting, or software that reviews loans for purchase or rating in the secondary market). In such cases, the burden placed on the complainant would often be unreasonable because of both the lack of access to the internal workings of these systems and because of the lack of resources necessary to evaluate these systems and the alternatives to these systems - even if one had access to the basic systems and their uses. Outside of cases where the complainant is represented by the full battery of the resources of the Federal government, only the respondents are likely to have either access to, or the resources for, evaluating whether alternatives can be developed. Therefore, without some provision requiring access to these systems and the allocation of resources to evaluate these systems and alternatives, the burdens of proof placed on the complainants are enormous and unreasonable when compared to those placed on the respondent.

One option that would place at least a more balanced burden on the respondent in a disparate impact case is to require the respondent to provide access to all persons and documents that indicate if the respondent was ever aware of any

5

possible disparate impact for the practice and whether the respondent has ever explored any less discriminatory alternative. HUD should make a clear statement in the comments published with the final rule, if not in the rule itself, that evidence of the awareness of the disparate impact should take account of willful ignorance on the part of the respondent. The complainant could then have a right to challenge the respondent's awareness of the disparate impact as well as the respondent's response as evidence of disparate treatment (intent). That is, HUD should make clear its understanding that the failure to take reasonable action in the face of a disparate impact that was known or that should have been known may be taken as evidence of discriminatory intent.

Respectfully submitted,

Liz Ryan Murray
Policy Director

Comment Submitted by Kristina Del Vecchio, Credit Union National Association, Inc. Page 1 of 1

SHARE

## Document Details

Comment Submitted by Kristina Del Vecchio, Credit Union National Association, Inc.

**Document ID:** HUD-2011-0138-0040 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

See attached file(s)

Attachments:

- Comment Submitted by Kristina Del Vecchio, Credit Union National Associatio... **View Attachment:**

**Title:**
Comment Submitted by Kristina Del Vecchio, Credit Union National Association, Inc. (Attachment)

http://www.regulations.gov/ 000328 1/18/2012



CUNA
Credit Union National Association
601 Pennsylvania Ave., NW | South Building, Suite 600 | Washington, DC 20004-2601 | PHONE: 202-638-5777 | FAX: 202-638-7734
cuna.org

January 17, 2012

Regulations Division, Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW
Room 10276
Washington, DC 20410-0500

Re: Docket No. FR-5508-P-01
Comments regarding the proposed rule implementing a Discriminatory Effects Standard into the Fair Housing Act

Dear Sir or Madam:

The Credit Union National Association (CUNA) appreciates the opportunity to comment on the Department of Housing and Urban Development's (HUD) proposed rule implementing a Discriminatory Effects Standard into the Fair Housing Act. By way of background, CUNA is the nation's largest credit union trade organization, representing approximately 90 percent of our nation's 7,300 state and federal credit unions, which serve approximately 93 million members.

CUNA believes that incorporating a discriminatory effects standard into the Fair Housing Act is premature at this point. HUD should not consider implementing a discriminatory effects standard until after the U.S. Supreme Court has reached a decision in *Magner v. Gallagher*, No. 10-1032.[1] The U.S. Supreme Court granted certiorari in this case on November 7, 2011 and oral argument is scheduled for February 29, 2012.

In *Magner v. Gallagher*, the U.S. Supreme Court will review the precise issues that HUD's proposed rule addresses. The questions presented in the case are (1) whether a lawsuit can be brought for a violation of the Fair Housing Act based on a practice that does not have a discriminatory intent but instead has a discriminatory effect, and (2) if so, what test should be used to determine whether a practice has a discriminatory effect and therefore violates the Fair Housing Act?

CUNA is concerned that implementing a uniform discriminatory effects standard before *Magner v. Gallagher* is decided could cause unnecessary confusion for both lenders and borrowers regarding the proper interpretation of the Fair Housing Act.

[1] *Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010), *certiorari granted.*

AMERICA'S
CREDIT UNIONS

OFFICES: | WASHINGTON, D.C. | MADISON, WISCONSIN

Because the U.S. Supreme Court will soon address *all* of the issues presented by HUD in its proposed rule, CUNA urges HUD to wait until after the U.S. Supreme Court has reached a decision in *Magner v. Gallagher* to propose any rule relating to integrating a discriminatory effects standard into the Fair Housing Act. To avoid future confusion and potential legal challenges to the proposed rule, HUD should ensure that any proposed rule is consistent with the U.S. Supreme Court's anticipated interpretation of the Fair Housing Act.

Thank you for the opportunity to comment on HUD's proposed rule to implement a Discriminatory Effects Standard into the Fair Housing Act. If you have any questions concerning our letter, please feel free to contact CUNA's Senior Vice President and Deputy General Counsel Mary Dunn or me at (202) 508-6776.

Sincerely,

Kristina A. Del Vecchio
Counsel for Special Projects



SHARE

Document Details

Comment Submitted by Harry Kelly, Nixon Peabody, LLP

**Document ID:** HUD-2011-0138-0041 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:** HTML

Show Details

See attached file(s)

Attachments:

- Comment Submitted by Harry Kelly, Nixon Peabody, LLP (Attachment) View Attachment: PDF

**Title:**
Comment Submitted by Harry Kelly, Nixon Peabody, LLP (Attachment)



401 9th Street N.W.
Suite 900
Washington, D.C. 20004-2128
(202) 585-8000
Fax: (202) 585-8080
Direct Dial: (202) 585-8712
E-Mail: hkelly@nixonpeabody.com

January 17, 2012

***VIA ELECTRONIC MAIL DELIVERY***

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street, S.W.
Washington, D.C. 20410

RE: Comments on Proposed Regulations Titled:
"Implementation of the Fair Housing Act's Discriminatory Effects Standard"
Docket No. FR 5508-P-01 (76 Fed. Reg. 70922 (November 16, 2011)

Dear Sir or Madam:

These comments are submitted to the U.S. Department of Housing and Urban Development ("HUD") on behalf of the Council for Affordable Rural Housing ("CARH"), the National Apartment Association ("NAA"), the National Leased Housing Association ("NLHA") and the National Multi Housing Council ("NMHC") (jointly, CARH, NAA, NLHA, and NMHC are referred to as the "Commenters"). CARH represents the owners of affordable housing properties that receive mortgage insurance and/or rental assistance from the U.S. Department of Agriculture's Rural Development office. NLHA represents owners of properties that participate in the Section 8 rental assistance program. NMHC represents the principal officers of the multifamily housing industry's largest and most prominent firms. NAA is the largest national federation of state and local apartment associations with 170 state and local affiliates comprised of more than 50,000 members. Together, the Commenters speak on behalf of the owners of tens of thousands of multifamily housing units across the United States, all of whom deal with issues relating to the Fair Housing Act (the "FHAct") on a daily basis, including the FHAct's disparate effect standard, which is the subject of the above-referenced proposed rule (the "Rule"), published at 76 Fed. Reg. 70921 on November 16, 2011 (the "Notice").

As explained below, the Commenters believe that HUD should not move forward with further action on the Rule at the present time, in light of the pending action of the U.S. Supreme Court in connection with *Magner v. Gallagher*, No. 10-1032. As explained in more detail below, that case raises a number of important issues relating to the FHAct generally and disparate effect claims in particular, and HUD should delay action on the Rule until the Supreme Court issues its

13750897.1

3

decision in that case. Further, regardless of the additional guidance that the Supreme Court may provide, the Rule should be revised to eliminate onerous interpretations or misunderstandings that may result from the pending proposal. Claims arising from alleged disparate effect discrimination are particularly difficult to resolve because, almost by definition, they often arise from conflicts between well-intentioned policies and practices designed to achieve important management and operational goals. Any effort to clarify HUD's views on the subject and to standardize the elements of and procedures to establish disparate effects claims therefore should be taken with great care to ensure fairness to all parties.

1. **HUD Should Take No Further Action On The Rule Until the Supreme Court Issues Its Decision in *Magner v. Gallagher.***

Shortly before HUD issued the Rule, the U.S. Supreme Court announced that it had accepted the petition for certiorari filed by the petitioner in *Magner v. Gallagher*. The issues raised by the *Magner* case address a number of important matters relating to the FHAct and, in particular, the extent of non-intentional claims of discrimination. Specifically, the petitioner has asked the Supreme Court to determine whether "disparate impact" claims are recognized by the FHAct and, if so, whether they should be analyzed using a burden-shifting approach or some other approach. *See* Petitioner's Initial Brief ("Petitioner's Brief"), 2011 U.S. S. Ct. Briefs LEXIS 2812 *i, No. 10-1032 (U.S. Supreme Court Dec. 22, 2011). Of course, it is not clear which issues the Supreme Court will address or how it will rule on the substantive questions raised by the petitioners. Nevertheless, HUD should take no further action on the Rule until the Supreme Court rules in the *Magner* case, for several reasons.

First, the *Magner* case raises serious questions about whether the FHAct actually recognizes disparate impact claims. Certainly, the text of the FHAct does not, on its face, manifest a clear design to address nonintentional practices that have a more harmful effect on a class of persons protected under the FHAct. As Petitioner's Brief explains (at 20 – 30), disparate impact theory was imported into the FHAct from employment and other areas of the law, but it is far from clear that Congress intended the same disparate impact theories should apply in the housing context and, if they do, what the specific elements are and who bears the burden of proving them. Given the potential sweep of the Supreme Court's decision in *Magner*, HUD should not presume to codify rules that may change dramatically in a matter of months'

Second, even if the Supreme Court takes a narrower view of the issues in *Magner*, HUD should not act until the Supreme Court provides rules. The Supreme Court rarely addresses the FHAct. Whatever issues it finally does address, the Supreme Court's *Magner* decision undoubtedly will provide important guidance relating to the disparate impact standard under the FHAct, which could have a direct impact on the Rule. For example, to the extent that the Supreme Court attempts to clarify the elements of a disparate impact claim, and who bears the burden with respect to proving each element of such a claim, its actions would likely require HUD to revise the Rule to reflect the Supreme Court's action.

4

Finally, premature action on the Rule engenders a number of troubling issues of administrative law. Rushing to finalize the Rule prior to the Supreme Court's decision in *Magner* would raise unsettling questions concerning to what extent, if at all, the Supreme Court should defer to hastily-adopted HUD regulations on related topics. Assuming the Court does clarify substantive areas of disparate impact law, HUD would be compelled to reissue its regulations, or find them subject to attack in administrative and judicial proceeding to the extent they differ from the holding in *Magner*. Finally, the FHAct was adopted in 1968 and HUD has waited more than 40 years to propose regulations codifying disparate effect standards. Prudence dictates, therefore, that HUD wait a little longer and take no further action on the Rule until the Supreme Court issues its decision in *Magner*. Of course, the Commenters expect that, pursuant to proper administrative procedure generally and HUD's existing regulations (24 CFR §10.1), HUD will engage in additional notice-and-comment rulemaking with respect to any modifications to the Rule that are made as a result of the *Magner* decision.

2. **Regardless of the Outcome of the *Magner* Decision, Additional Revisions To the Proposed Rules Are Necessary.**

Commenters believe that, regardless of the potential changes that may be compelled by the outcome of the *Magner* decision, the proposed Rule must be modified substantially. Commenters begin with the premise that a case involving a facially-neutral act or practice, in which there is no evidence of intentional discrimination, must be viewed differently from those cases in which intent is evident. In those instances in which facially neutral acts or policies are alleged to have a discriminatory effect on classes of persons protected by the FHAct in the absence of an actual intent, HUD and the courts should be reluctant to find a violation of the FHAct unless there is (a) clear evidence of a significant adverse impact on the protected population; (b) no showing that the challenged act or practice is rationally related to a legitimate, nondiscriminatory goal; and (c) clear evidence that a less discriminatory, but equally effective, alternative exists. At all times, the burden should be on the complainant/plaintiff to show the required elements of the case; in other words, the complainant (or plaintiff) should not be able to make a "prima facie" case solely by proving that a challenged act or practice had a marginally adverse impact on a protected class. For these reasons, Commenters believe that the Rule should be revised to provide better guidance to all parties and to assure that policies and practices adopted to accomplish legitimate, nondiscriminatory practices do not result in liability.

**a. Any regulations codifying disparate effect standards should place the ultimate burden of proof on the party asserting a claim of discrimination**. In the Notice, HUD specifically requests comments concerning "whether a burden-shifting approach should be used to determine when a housing practice with a discriminatory effect" violates the FHAct. Notice at 70925. In some cases, Federal courts examining liability for nonintentional forms of discrimination have utilized **some** form of burden-shifting, requiring the complainant or plaintiff to make out a "prima facie" case of disparate impact, and then shifting the burden to the respondent/defendant to show a legitimate purpose. In our legal system, the plaintiff normally carries the burden of making out the individual elements of its claim, and Commenters believe that the same rules should apply in the context of disparate impact claims under the FHAct. That

13745324.2

is, the complainant/plaintiff should have the burden of proving that it suffered a disparate impact (subject to the comments made below) and that there was no legitimate, nondiscriminatory purpose for the challenged practice. Again, where liability is premised on facially neutral policies that do not demonstrate actual intent to discriminate, it is inequitable and logically flawed to ask the respondent/defendant to prove their acts or practices were nondiscriminatory. The burden at all times should be on the party claiming injury to prove the elements of those claims. If HUD decides to adopt a burden-shifting approach, however, it should require that the complainant/plaintiff prove that it suffered a significant adverse impact and that there were other less discriminatory but equally effective alternatives, as described in more detail below, to prevent "false positive" findings of discrimination.

**b. HUD should define when particular practices have a "disparate impact" (proposed § 100.500(a)(1)).** The Rule defines "disparate effect" cases as involving both practices that have a "disparate impact" (that is, a practice that has a disparate impact on a protected class) and those that have the effect of perpetuating segregated housing patterns. *See* proposed Rule, 24 CFR §100.500(a)(1) and (2).

At the same time, however, any such rule must recognize that there is a fundamental difference between policies that are intended to discriminate against persons in protected classes, and policies that only incidentally have a harsher impact on protected classes. Specifically, the Commenters believe that an owner or government agency should not face liability for adopting a policy or practice that on its face is neutral to protected classes, unless it can be shown that the policy or practice has an impact on a protected class that is, quantitatively and qualitatively, significantly different from the impact on other persons who are not in a protected class.

A serious problem with current case law is the absence of a standard to determine how much of a disparate impact is necessary to establish a violation of the FHAct. Is any disparate impact sufficient to violate the FHAct, or should there be some evidence that the impact must be non-trivial before liability may arise? As the Notice explains, there are some cases in which the local population demographics mean that a facially neutral policy will have a manifest impact on housing opportunities for protected classes. *See, e.g., Dews v. Town of Sunnyvale, Tex.*, 109 F.Supp. 2d 526 (N.D. Tex. 2000) (local zoning rules restricted minority housing opportunities in a city that was 94 percent white) and *United States v. City of Blackjack, Mo.*, 508 F.2d 1179 (8th Cir. 1974) (ordinance preventing construction of multifamily housing perpetuates segregation in city that was 99 percent white). In such cases, the disparate impact on protected classes is profound and obvious.

But there are other instances where a neutral policy may have a different, but much less extensive, impact on a protected class than on non-protected classes. Imagine a workforce housing proposal – that is, a proposal to provide housing to employees of public institutions, such as police, firefighters, teachers and others – in a city with a diverse ethnic population. For many reasons – level of education, employment experience, etc. – the demographics of the workforce may differ from the demographics of the market area generally. But unless the workforce demographics exactly coincide with the demographics of the market population generally, such a preference would likely expand housing opportunities for some groups – including some protected classes – while reducing opportunities for others. In such cases,

6

where there is at least some negative impact on a protected class, does the workforce preference violate the FHAct, or should there be some leeway allowed before a violation arises? In other words, is any disparate impact, no matter how small or trivial, sufficient to permit a complainant to establish the requisite impact? HUD should make clear that an impact is not disparate unless it has a non-trivial impact on a protected class.

In defining a disparate impact, the kind of impact also should be relevant in determining liability. If two persons, one in a protected class and one not in a protected class, experience exactly the same impact as a result of a facially neutral policy, it is difficult to argue that the person in the protected class has a discrimination claim, solely because he or she is in that protected class. In other words, in the absence of intent, something more than a mere numerical impact on a protected class should be required to prove a violation occurred. A person claiming a non-intentional violation of the FHAct should show, as part of any prima facie case, that the challenged policy or practice had a qualitatively different impact on him or her, as a member of that protected class, than it had on persons outside that class. For example, a mere economic impact should not, by itself, trigger liability if others outside the protected class experience the same sort of impact. In such a case, persons seeking to assert a disparate impact claim should be required to prove, as part of their prima facie case, that the challenged policy or practice not only affected them more harshly than others, but affected them more harshly ***because*** of their participation in that class.

HUD should use the opportunity of issuing regulations dealing with disparate effect cases to clarify that persons alleging disparate impact claims should show they have experienced an impact that is, quantitatively or qualitatively, meaningfully different than from persons in a non-protected class. In order to do this, HUD should incorporate a definition of "disparate impact" in §100.500(a) that explains that a practice has a disparate impact only if:

i. With respect to those persons who are affected by the challenged practice, there is material difference – we suggest at least a 20 % difference – between the number of persons in the protected class who are affected by the challenged practice compared to the number of persons in the population generally who are impacted by the challenged practice; and

ii. Persons in the protected class are adversely impacted by the challenged practice in a manner that is different than persons who are not in a protected class.

Without such criteria, policies and practices that will have a beneficial impact on housing generally may be discouraged or prevented, for fear that someone in a protected class may assert an FHAct claim, even though the adverse impact on the protected class is not, qualitatively or quantitatively, significantly different from the impact on persons outside that class. In the long-run, adopting regulations that discourage reasonable policies and practices will diminish housing opportunities for all persons.

**c. HUD should clarify when a practice "predictably" has a disparate effect (proposed §100.500(a).** In identifying practices that have a "disparate effect," the Rule mentions practices that "actually or predictably" result in a disparate impact or perpetuating

7

segregation. Presumably, an "actual" practice is one that has occurred and can be measured factually; such practices present serious, but manageable, issues of proof.

Determining when a practice "predictably" has a disparate impact is much more difficult: In such cases, a practice by definition has not in fact yet caused discrimination and is being challenged without actual evidence that it has in fact caused a disparate impact.[1] Such impacts are far too speculative to support a bona fide claim for liability under the FHAct. The Rule, therefore, should be revised to exclude liability for impacts that may occur in the future. To the extent that HUD decides to address liability with respect to possible future impacts, HUD needs to specify what sort of evidence would be necessary to establish a violation of the FHAct.

**d. HUD should disaggregate the concepts of a "legally sufficient justification" in connection with the burden-shifting mechanism contained in the Rule (proposed §100.500(b) and (c)).** According to the burden-shifting mechanism proposed in the Rule, after the complainant makes out a prima facie disparate effects case, the parties divide the responsibility of showing whether there is a "legally sufficient justification" for the challenged practice. While it is conceptually correct to say that a disparate effects claim cannot prevail where there is a "legally sufficient justification" for the challenged practice, the approach taken by the Rule imposes awkward duties on the adversaries to establish different elements of the same concept. As noted above, all the elements of proving a disparate impact case should be carried by the complainant/plaintiff. To the extent HUD adopts a formal burden-shifting approach, however, it would be preferable to define separate evidentiary showings that each party must meet to carry their respective burden, rather than define a single standard ("legally sufficient justification") for which both parties share a burden of proof. Specifically, the elements that the parties must show should be clarified as follows:

i. **A policy or practice should be deemed to satisfy the "legally sufficient justification" standard if it is rationally related to a legitimate, nondiscriminatory interest.** Assuming a burden-shifting approach is allowed, HUD suggests that the respondent must show that there is a "necessary and manifest relationship" between the challenged practice and "one or more legitimate, nondiscriminatory interests." *See* Rule, proposed §100.500(c)(2). The proposed "necessary and manifest" standard is vague and is likely to lead to unnecessary confusion and litigation. It suggests that the respondent must show that the challenged practice is the only policy that could possibly be adopted, which in the absence of evidence of intent is far too strict. In the absence of an actual intent to discriminate, HUD should allow some leeway for owners and government agencies to adopt measures that are designed to accomplish legitimate, nondiscriminatory goals. If in fact the policy is nondiscriminatory on its face, the complainant should be

---

[1] Of course, if HUD adopts a more precise definition of "disparate impact," as discussed in section 2(b) above, at least some of the uncertainty will be eliminated, because predictions about future impacts will be more reliable where they can be shown to have a quantitatively and qualitatively harsher impact on protected classes than on nonprotected classes.

8

required to prove that the challenged policy or practice is not rationally related to the claimed interest.

ii. **<u>The complainant should be deemed to satisfy its burden if it can show that (1) there is a less discriminatory alternative to the challenged practice and (2) the alternative is at least as effective as the challenged practice to satisfy the legitimate, nondiscriminatory interest.</u>** Assuming a burden-shifting approach is allowed, the Rule proposes that a complainant can prevail if it can show that there is an alternative that has a less discriminatory effect. *See* Rule, proposed §100.500(c)(3). Proving that a less discriminatory alternative exists is necessary, but not sufficient. In order to carry its final burden, the complainant must show not only that there is a less discriminatory alternative, but that the alternative is at least as likely as the challenged practice to accomplish its legitimate, nondiscriminatory goal. This should not be controversial – an alternative is not, in fact, an "alternative" if it is not likely to accomplish the same legitimate, nondiscriminatory goals as the challenged practice. HUD should revise the Rule to indicate that, in order to meet its final burden, the complainant must show that, if a less discriminatory "alternative" in fact exists, it is likely to produce the same beneficial result as the challenged practice.

**<u>e. The Rule should not incorporate examples of alleged "disparate effects" cases (proposed §§100.65(b)(6), .70(d)(5), and .120(d)(5)&(6)).</u>** HUD proposes to adopt a series of additional provisions describing specific types of conduct that it considers to demonstrate "discriminatory effects" to be inserted at §§100.65(b)(6), .70(d)(5), and .120(d)(5)&(6)). But as HUD acknowledges, these are at best "examples of housing practices with discriminatory effects" (76 FR at 70925) and are not themselves sufficient to constitute actual violations of the FHAct. If retained in the Rule, these examples in fact are likely to create significant confusion, because, as written here, the "examples" are stated as *per se* violations of the FHAct.[2] As drafted, the examples suggest that there is a violation of the FHAct whenever the described conduct occurs. Specifically, HUD fails to signal how the complicated burden-shifting analysis described in §100.500 would apply here. There is nothing on the face of these examples that make them examples of "discriminatory effect" type violations.

Without some attempt to describe the relation between the standards of liability and burden-shifting contained in §100.500, these examples suggest that the listed practices violate the FHAct without need to engage in the burden-shifting analysis set out in §100.500. Certainly, HUD would assert that the failure to list a challenged act or practice in Part 100 does not mean that the challenged act or practice should be presumed to be lawful. Conversely, HUD should not expand the list of prohibited acts in §§100.65, .70 and .120 unless it makes clear that the additional practices are not in fact *per se* violations of the FHAct, but require proof pursuant to the standards of proof set forth in §100.500. The Commenters believe that it is unwise to insert such "examples" into HUD regulations generally without making clear that, before a violation

---

[2] Indeed, as drafted by HUD, many of the forms of conduct listed in proposed §§100.65, .70 and .120 could reflect intentional discrimination, rather than nonintentional discriminatory effect.

9

can be found, the fact-finder must analyze them pursuant to whatever disparate impact procedures are finally adopted. Accordingly, HUD should delete these examples entirely from the Rule, or, if it decides to retain them, substantially alter them to describe the specific elements that must establish to satisfy the requirements of §100.500.

**Conclusions**

It is important that any regulation add definitiveness to the implementation of the FHAct, as there has been much vagueness and confusion in addressing alleged acts of nonintentional discrimination. For the reasons stated above, the Commenters urge HUD to refrain from taking any further action with respect to the Rule until after the Supreme Court rules in the *Magner* case, because that case is likely to provide important guidance relating to the issues addressed by the Rule, and HUD's rule may be obsolete in part shortly after issuance. To the extent that HUD moves forward to finalize the Rule at any point, it should revise the Rule to reflect the comments above, to assure, on the one hand, that persons in protected classes who are in fact adversely impacted by nonintentional discriminatory acts are protected, while, on the other hand, assuring that owners, government agencies, and other persons are able to pursue legitimate, nondiscriminatory goals in housing without placing themselves in jeopardy of inadvertently violating the FHAct.

Please feel free to contact me if you have any questions.

Very truly yours,

Harry J. Kelly

13745324.2



# Comment Submitted by Tracey McCartney, Tennessee Fair Housing Council

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder**

Comment Period Close
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0042

**Tracking Number:** 80f98ae

## Comment

See attached letter.

## Attachments (1)

Comment Submitted by Tracey McCartney, Tennessee Fair Housing Council (Attachment)

**View Attachment:**  PDF

## Document Informatio

**Date Posted:**
Jan 17, 2012

**Show More Details**

2

**TENNESSEE FAIR HOUSING COUNCIL**
107 MUSIC CITY CIRCLE, SUITE 318
NASHVILLE, TN 37214
(615) 874-2344
FAX: (615) 874-1636

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Tennessee Fair Housing Council supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

The Tennessee Fair Housing Council is a private, non-profit organization in Nashville, Tenn., whose mission is to eradicate housing discrimination in Tennessee. The organization was incorporated in 1995 and has operated under several HUD Fair Housing Initiatives Program grants over the years.

We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact me at 615-874-2344 with any questions.

Sincerely,

Tracey McCartney, Attorney at Law
Executive Director



# Document Details

Comment Submitted by Katherine Walz, Sargent Shriver National Center on Poverty Law

**Document ID:** HUD-2011-0138-0043 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

See attached file(s)

Attachments:

- Comment Submitted by Katherine Walz, Sargent Shriver National Center on Pov... View Attachment:

**Title:**
Comment Submitted by Katherine Walz, Sargent Shriver National Center on Poverty Law (Attachment)



SHRIVER
CENTER

advancing justice and opportunity

Sargent Shriver National Center on Poverty Law

January 17, 2012

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St. SW, Room 10276
Washington, D.C. 20410

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effect Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Sargent Shriver National Center on Poverty Law strongly supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.

The Shriver Center provides national leadership in advancing laws and policies that improve the lives of low-income people. The Center engages in direct advocacy campaigns in Illinois and around the country to improve policies and programs on specific issues, and also engages in broader advocacy on general issues of justice and opportunity. The Center's Housing Justice Unit advocates to preserve affordable housing, advance fair housing, and protect residents of public and subsidized housing throughout Illinois and nationally. In recent years the Center's housing attorneys have: defended against efforts by local governments to reduce the supply of low-income rental housing primarily occupied by minority households through exercise of their condemnation powers, advocated to ensure the adequate replacement of public housing units lost to demolition in communities of opportunity and to incorporate fair housing considerations into the demolition application process, promoted the fair housing rights of persons with criminal backgrounds, and promoted the fair housing rights of women who are survivors of domestic violence, dating violence, sexual assault, or stalking.

We are in full support of the comment letter of the Lawyers' Committee for Civil Rights Under Law explaining the critical importance of a disparate impact analysis to effective fair housing enforcement. In our work, we have encountered numerous examples of practices that may be neutral on the surface but are extremely destructive to the mission of fostering equal housing opportunity.

The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative. We are in full support of the comment letters of the National Fair Housing Alliance and the

50 E. Washington Street, Suite 500, Chicago, Illinois 60602 Phone: 312.263.3830 Fax: 312.263.3846 www.povertylaw.org

5

Housing Justice Network in this regard. We are also in full support of the other comments offered by the letter of the Housing Justice Network for how the Department should improve upon the proposed regulation in order to ensure a robust discriminatory effects standard.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact Katherine Walz at 312-368-2679 or katewalz@povertylaw.org with any questions.

Sincerely,

Katherine E. Walz
Director, Housing Justice

Emily Werth
Staff Attorney/Skadden Fellow

SHARE

## Document Details

Comment Submitted by Keenya Robertson, Housing Oppourtunties Project for Excellence, Inc. (HOPE, Inc.)

**Document ID:** HUD-2011-0138-0044 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

- Comment Submitted by Keenya Robertson, Housing Oppourtunties Project for Ex... View Attachment:

**Title:**
Comment Submitted by Keenya Robertson, Housing Oppourtunties Project for Excellence, Inc. (HOPE, Inc.)- Attachment



2

Housing Opportunities Project for Excellence, Inc.
*Ensuring fair and equal housing opportunities for all people.*

January 17, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effect Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

Housing Opportunities Project for Excellence, Inc. (HOPE) supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. The purpose of these comments is to respectfully request that the Department (1) follow the many federal courts that have held that the burden of proof is on the defendant/respondent; and (2) follow its previous guidance and adopt a "business necessity" defense for private entities in disparate impact cases under the Fair Housing Act.

**(1) The burden of proof should be upon the defendant/respondent**

We respectfully suggest that the burden of proof should be assigned to the defendant or respondent to show that there is no less discriminatory alternative. The proposed rule observes that judicial interpretations of the FHA and the burden of proof Congress assigned to disparate impact employment discrimination cases support assigning the burden of proof to plaintiffs or complainants. *Id.* at 70925. In fact, federal courts are split on the issue of which party bears the burden of proof to demonstrate a less discriminatory alternative and reliance on Title VII standards is inappropriate because of the unique nature of less discriminatory alternatives in FHA cases. Furthermore, a defendant/respondent is in a far superior position to bear the burden of proof on this issue.

There is no unanimity among the courts that have addressed the question of which party should have the burden of proof regarding less discriminatory alternatives. Many federal courts have held that the defendant/respondent has the burden of proof to demonstrate that there is no less discriminatory alternative. *See e.g. Huntington Branch, NAACP v. Town of Huntington*, 844

The Bill Thompson Building
11501 NW 2nd Avenue, Miami, FL 33168
Tel:305-651-HOPE [4673] Fax: 305-759-2440 TDD 1-800-955-8771
Email: hopefhc@bellsouth.net Webpage: www.hopefhc.com

F.2d 926, 939 (2d Cir. 1988) (a defendant must show that there are no less discriminatory alternatives available); *Mt. Holly*, 658 F.3d at 385 (holding that defendants have the burden of showing that there is no less discriminatory alternative and that "[o]nly when the defendants make this showing does the burden shift back to the plaintiffs—where it ultimately remains—to provide evidence of such an alternative"); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000) (affirming the district court's decision holding that the defendant failed to show a less discriminatory alternative); *Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 503 (N.D. Tex. 2010); *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 565 (N.D. Tex. 2000).

Courts have rejected the lockstep importation of Title VII principles into the determination of which party bears the burden of establishing a less discriminatory alternative. As the Third Circuit explained in *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148 (3d Cir. 1977), "[l]ooking to Title VII for the correct standard for rebuttal of a prima facie case, we note that the 'business necessity' test employed in Title VII job discrimination cases, *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), is of somewhat uncertain application in Title VIII cases." *Id.* The Third Circuit explained that less discriminatory alternatives are far easier to identify and quantify in a Title VII case, noting that "the job-related qualities which might legitimately bar a Title VII-protected employee from employment will be much more susceptible to definition and quantification than any attempted justification of discriminatory housing practices under Title VIII." *Id.*; *see also*, *Huntington*, 844 F.2d at 937-38 (stating that "in Title VIII cases there is no single objective like job performance to which the legitimacy of the facially neutral rule may be related" and that a defendant's justifications are "normally based on a variety of circumstances" in zoning cases under the FHA); *Langlois*, 207 F.3d at 51 (noting that "a single criterion-like the relationship of the test to job performance used under Title VII-is hardly possible" under the FHA). Thus, both the qualitative and quantitative nature of less discriminatory alternatives in FHA cases supports assigning the burden of proof to the defendant or respondent.

The burden of proof to establish a less discriminatory alternative in a FHA case should be assigned to the defendant/respondent for a more practical reason – that party almost always has superior knowledge of the less discriminatory alternatives available and whether the alternatives meet its business objectives. The test to determine a less discriminatory alternative asks whether an alternative imposes "an undue hardship under the circumstances of the specific case" on the defendant or respondent. *Mt. Holly*, 658 F.3d at 386. The test is similar to the rebuttal burden imposed on a defendant or respondent in a reasonable accommodation case. *Id.*

In assessing who should have the burden in FHA cases, courts have permitted shifting the burden to the party for whom the proof was the easiest. *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1291, 1295 n. 16 (7th Cir. 1977) (holding that the burden to identify parcels of land that were appropriate for the development of multi-family housing was on the defendant municipality because "[i]t is far easier for defendant to show that a single parcel of land which is suitable does exist than for plaintiffs to show that no suitable land exists" and that allocating the burdens any other way "would compel plaintiffs to attempt the impossible task of proving a negative"). The defendant/respondent generally has far superior knowledge of the alternative practices available to meet its legitimate objectives and is in a far better position to

assess whether an alternative imposes an undue hardship upon it in the particular circumstances of the case and is consistent with its goals.

**(2) The Department should follow its previous guidance and adopt a "business necessity" defense for private entities in disparate impact cases under the Fair Housing Act**

HOPE respectfully suggests that "business necessity" is "the appropriate standard for private entities' defense against disparate-claims made under the FHA." *See Graoch Assoc. #33 LP v. Louisville/Jefferson County*, 508 F.3d 366, 387 (6th Cir. 2007) (Moore, J., concurring in part, dissenting in part). "Business necessity" more accurately defines the standard that respondents/defendants must meet in rebutting a complainant/plaintiff's showing of discriminatory effect and is consistent with the standard previously adopted by the Department, other federal regulators and federal courts.

First, "business necessity" holds respondents/defendants to a higher standard than the more lenient term "legally sufficient justification" proposed in the regulation. *See id.* (comparing the business necessity standard to the business justifications test). "Necessity" connotes "an imperative requirement or need for something." *Id.* at 388 (quoting *Random House Dictionary* 1284 (Stuart Berg Flexner ed., 2d ed. 1993). By contrast, "justification" means "a lawful or sufficient reason for one's acts or omissions." *Black's Law Dictionary* 870 (7th ed. 1999). Based on the plain meaning of the terms, "business necessity" more accurately describes the correct standard for a respondent/defendant's rebuttal burden.

Second, the "legally sufficient justification" standard departs from the well established business necessity standard adopted by the Department and other federal regulators in determining whether a lender has employed practices having a discriminatory effect in violation of the Fair Housing Act. In the Secretary's regulations of Fannie Mae and Freddy Mac, the Department interpreted the Fair Housing Act and its regulations to adopt a business necessity defense. The Department stated that "[t]he Fair Housing Act and its implementing regulations, ,which were promulgated in 1989, . . . set forth the *business necessity* defense to a disparate impact claim involving the purchasing of loans." The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Association (Freddie Mac), 60 Fed. Reg. 61866, 61867 (Dec. 1, 1995) (codified at 24 C.F.R. Part 81) (emphasis added).

Similarly, the Department, as well as other federal regulators (including the Department of Justice, the Office of the Controller of the Currency, the Office of Thrift Supervision, the Board of Governors of the Federal Reserve and the FDIC), adopted a business necessity standard in their *Policy Statement on Discrimination in Lending.* Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18266, 18269 (Apr. 15, 1994). The Department and the regulators stated

that "[w]hen an agency finds that a lender's policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by '*business necessity.*'" *Id.* (emphasis added). Thus, the rebuttal standard in the proposed regulation conflicts with the established "business necessity" standard previously adopted by the Department and other federal regulators.

The ramifications of adopting a different rebuttal standard could be severe. By adopting a standard that departs from the previously established business necessity standard, the Department risks making "inconsistent and misleading representations to those those regulated by the FHA" such as lenders, insurers and other private entities. *See Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 748 (9th Cir. 1996). Adopting a different rebuttal standard may also endanger the deference usually afforded to enacted regulations by the courts. *Id.* As the Ninth Circuit has recognized, when the Department departs from previous interpretations of the Fair Housing Act and entities regulated under the Fair Housing Act relied on the previous interpretations, courts are not bound to afford the usual deference to the Department's interpretations of the law. *Id.* (refusing to afford deference to compelling business necessity standard applied by a HUD administrative law in an occupancy limits case because HUD departed from the previous interpretations of the law and the public relied substantially and in good faith on the previous interpretation).

Third, the Department's proposed rebuttal standard is at odds with federal court decisions that have adopted a business necessity standard in disparate impact cases under the Fair Housing Act involving private entity defendants. *See e.g., Betsey v. Turtle Creek Assoc.*, 736 F.2d 983, 988 (4th Cir. 1984) ("[W]hen confronted with a showing of disparate impact, defendants must prove a business necessity sufficiently compelling to justify the challenged practice."); *United States v. Weiss*, 847 F. Supp. 829, 831 (D. Nev. 1994); *Ramirez v. Greenpoint Mortgage Funding, Inc.*, 268 F.R.D. 627, 631 (N.D. Cal. 2009).

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please feel free to contact me at (305) 651-HOPE [4673] or keenya@hopefhc.com should you have any questions.

Respectfully Submitted,

Keenya J. Robertson,
President & CEO



# Comment Submitted by Nancy Haynes, Fair Housing Center of West Michigan

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder**

Comment Period Close(
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0045

**Tracking Number:** 80f98b2

## Comment

See attached file(s)

## Document Informatio(

**Date Posted:**
Jan 17, 2012

**Show More Details**

## Attachments (1)

Comment Submitted by Nancy Haynes, Fair Housing Center of West Michigan (Attachment)

**View Attachment:**

2

January 17, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effect Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Fair Housing Center of West Michigan (FHCWM) supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

The Fair Housing Center of West Michigan notes that the proposed regulation uses the term "legally sufficient justification" in defining a respondent/defendant's rebuttal burden once a complainant/plaintiff has established that a challenged housing practice has a discriminatory effect. Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921, 70926 (proposed Nov. 16, 2011) (to be codified 24 C.F.R. § 100.500)).

The FHCWM respectfully suggests that "business necessity" is "the appropriate standard for private entities' defense against disparate-claims made under the FHA." *See Graoch Assoc. #33 LP v. Louisville/Jefferson County*, 508 F.3d 366, 387 (6th Cir. 2007) (Moore, J., concurring in part, dissenting in part). "Business necessity" more accurately defines the standard that respondents/defendants must meet in rebutting a complainant/plaintiff's showing of discriminatory effect and is consistent with the standard previously adopted by the Department, other federal regulators and federal courts.

First, "business necessity" holds respondents/defendants to a higher standard than the more lenient term "legally sufficient justification" proposed in the regulation. *See id.* (comparing the business necessity standard to the business justifications test). "Necessity" connotes "an imperative requirement or need for

something." *Id.* at 388 (quoting *Random House Dictionary* 1284 (Stuart Berg Flexner ed., 2d ed. 1993). By contrast, "justification" means "a lawful or sufficient reason for one's acts or omissions." *Black's Law Dictionary* 870 (7th ed. 1999). Based on the plain meaning of the terms, "business necessity" more accurately describes the correct standard for a respondent/defendant's rebuttal burden.

Second, the "legally sufficient justification" standard departs from the well-established business necessity standard adopted by the Department and other federal regulators in determining whether a lender has employed practices having a discriminatory effect in violation of the Fair Housing Act. In the Secretary's regulations of Fannie Mae and Freddy Mac, the Department interpreted the Fair Housing Act and its regulations to adopt a business necessity defense. The Department stated that "[t]he Fair Housing Act and its implementing regulations, which were promulgated in 1989, . . . set forth the *business necessity* defense to a disparate impact claim involving the purchasing of loans." The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Association (Freddie Mac), 60 Fed. Reg. 61866, 61867 (Dec. 1, 1995) (codified at 24 C.F.R. Part 81) (emphasis added).

Similarly, the Department, as well as other federal regulators (including the Department of Justice, the Office of the Controller of the Currency, the Office of Thrift Supervision, the Board of Governors of the Federal Reserve and the FDIC), adopted a business necessity standard in their *Policy Statement on Discrimination in Lending*. Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18266, 18269 (Apr. 15, 1994). The Department and the regulators stated that "[w]hen an agency finds that a lender's policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by '*business necessity*.'" *Id.* (emphasis added). Thus, the rebuttal standard in the proposed regulation conflicts with the established "business necessity" standard previously adopted by the Department and other federal regulators.

The ramifications of adopting a different rebuttal standard could be severe. By adopting a standard that departs from the previously established business necessity standard, the Department risks making "inconsistent and misleading representations to those regulated by the FHA" such as lenders, insurers and other private entities. *See Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 748 (9th Cir. 1996). Adopting a different rebuttal standard may also endanger the deference usually afforded to enacted regulations by the courts. *Id.* As the Ninth Circuit has recognized, when the Department departs from previous interpretations of the Fair Housing Act and entities regulated under the Fair Housing Act relied on the previous interpretations, courts are not bound to afford the usual deference to the Department's interpretations of the law. *Id.* (refusing to afford deference to compelling business necessity standard applied by a HUD

administrative law in an occupancy limits case because HUD departed from the previous interpretations of the law and the public relied substantially and in good faith on the previous interpretation).

Third, the Department's proposed rebuttal standard is at odds with federal court decisions that have adopted a business necessity standard in disparate impact cases under the Fair Housing Act involving private entity defendants. *See e.g., Betsey v. Turtle Creek Assoc.*, 736 F.2d 983, 988 (4th Cir. 1984) ("[W]hen confronted with a showing of disparate impact, defendants must prove a business necessity sufficiently compelling to justify the challenged practice."); *United States v. Weiss*, 847 F. Supp. 829, 831 (D. Nev. 1994); *Ramirez v. Greenpoint Mortgage Funding, Inc.*, 268 F.R.D. 627, 631 (N.D. Cal. 2009).

The FHCWM therefore requests that the Department follow its previous guidance and adopt a "business necessity" defense for private entities in disparate impact cases under the Fair Housing Act. **In addition, the FHCWM is in full support of the National Fair Housing Alliance's comment letter.**

The FHCWM is a private, non-profit organization established in 1980; it addresses housing discrimination through a variety of education and outreach efforts and well as assisting with enforcement of federal, state and local fair housing laws. The mission of the FHCWM is to eliminate practices of housing discrimination and promote diverse, open communities through education and advocacy.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact me at (616) 451-2980 or nhaynes@fhcwm.org with any questions.

Sincerely,

Nancy Haynes
Executive Director

The Regulations.gov hosting facility will undergo scheduled maintenance and as a result Regulations.gov will be unavailable Monday, August 5 beginning at 6pm lasting until Tuesday morning at 8am (ET).

# Comment Submitted by Amy Nelson, Fair Housing Center of Central Indiana

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

For related information, Open Docket Folder

## Comment

Please see attached.

## Attachments (1)

Comment Submitted by Amy Nelson, Fair Housing Center of Central Indiana (Attachment)

**View Attachment:** 

Comment Period Close
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0046

**Tracking Number:** 80f98b2

## Document Informatio

**Date Posted:**
Jan 17, 2012

**Show More Details**





**FAIR HOUSING CENTER OF CENTRAL INDIANA, INC.**

615 North Alabama Street, Suite 426, Indianapolis, IN 46204
Phone: 317-644-0673 Toll-Free: 855-270-7280
Fax: 317-245-0322
Web: www.fhcci.org Email: info@fhcci.org

January 17, 2012

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effect Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Fair Housing Center of Central Indiana (FHCCI) supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

The mission of the Fair Housing Center of Central Indiana (FHCCI) is to eliminate housing discrimination, to ensure equal housing opportunity and promote neighborhood choice for all people, regardless of race, color, religion, sex, national origin, disability, familial status or other characteristic protected under state or local law, primarily in Central Indiana and other areas in the region as needed, through leadership, education, outreach, advocacy and enforcement.

We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact me at 317-644-0673 or at anelson@fhcci.org with any questions.

Sincerely,

Amy Nelson
Executive Director

The Regulations.gov hosting facility will undergo scheduled maintenance and as a result Regulations.gov will be unavailable Monday, August 5 beginning at 6pm lasting until Tuesday morning at 8am (ET).

# Comment Submitted by John Kozlowski, Ohio Credit Union League

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder**

Comment Period Closed
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0047
**Tracking Number:** 80f98f7

## Comment

See attached file(s)

## Attachments (1)

Comment Submitted by John Kozlowski, Ohio Credit Union League (Attachment)

**View Attachment:** PDF

## Document Information

**Date Posted:**
Jan 17, 2012

**Show More Details**





OHIO CREDIT
UNION LEAGUE

January 17, 2012

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 7th Street N.W., Room 1276
Washington, D.C. 20410-0500

RE: **Docket No. FR-5508-P-01**
**Implementation of the Fair Housing Act's Discriminatory Effects Standard**

Dear Sir/Madam:

The Ohio Credit Union League (OCUL) appreciates the opportunity to comment on the Department of Housing and Urban Development's Proposed Rule regarding Implementation of the Fair Housing Act's Discriminatory Effects Standard.

The comments reflected in this letter represent the recommendations of the Ohio Credit Union League. The Ohio Credit Union League (OCUL) is the trade association for credit unions in Ohio and advocates on behalf of 379 credit unions, serving their 2.7 million members. We appreciate the opportunity to provide suggestions and feedback to the Department of Housing and Urban Development (HUD) prior to adoption of any rules as proposed.

**Background**

Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin. HUD is charged with enforcement of these provisions, and has long interpreted the Fair Housing Act (Act) to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate.

Eleven of the twelve U.S. Courts of Appeals have confirmed HUD's interpretation that the Act imposes liability based on discriminatory effects. There has been some variation among the courts regarding the test to be used to determine discriminatory effect, and the proposed rule seeks to reconcile these variations in order to apply a uniform standard of liability for all facially neutral housing practices that have a discriminatory effect.

The Proposed Rule implements a burden-shifting approach to determining liability. The complainant must first bear the burden of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the respondent to prove that the challenged practice has a necessary and manifest relationship to one or more of respondent's legitimate, nondiscriminatory interests. If the respondent satisfies its burden, the complainant may still establish liability by demonstrating that these legitimate nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect.

AMERICA'S
CREDIT
UNIONS

10 W. Broad St., Suite 1100, Columbus, Ohio 43215
614-336-2894 ■ 800-486-2917 ■ fax 614-336-2895 ■ www.OhioCreditUnions.org

**The Proposed Rule Is Premature Due to Pending Litigation**

The U.S. Supreme Court has agreed to decide whether "disparate impact" discrimination claims are cognizable under the Act, and, if so, how such claims should be analyzed, in the pending case of *Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010). In this case, owners of rental properties have challenged the imposition of liability for discriminatory effect under the Act and further challenge the three-part burden-shifting test used in the Eighth Circuit of the U.S. Court of Appeals. The burden-shifting test is the same test being proposed under this Proposed Rule.

This pending litigation may potentially either eliminate liability for discriminatory effect under the Act, set a uniform standard for the determination of liability in such cases, or reach a different decision. Therefore, OCUL respectfully urges HUD to withdraw the proposed rule until the judicial process has run its course or alternatively postpone the comment period until a final decision is rendered by the Court.

**Conclusion**

OCUL applauds the efforts of the Department of Housing and Urban Development to set uniform standards for determining discrimination under the Fair Housing Act in order to assure consistent treatment of all such claims. However, in the case of the standards in this Proposed Rule, the case pending in the U.S. Supreme Court should determine whether a determination of "disparate impact" is proper under the Act, and, if so, what the analysis for determining a "disparate impact" should be. Any determination of such standards by HUD is premature, and the Proposed Rule should be withdrawn or at the very least postponed indefinitely or until the decision is handed down.

Thank you for your consideration of the comments presented. If you have any questions, please contact me at (614)923-9766 or jkozlowski@ohiocul.org.

Respectfully submitted,

John F. Kozlowski
General Counsel

David J. Shoup
Director, Compliance & Information

Carole McCallister,
Manager, Shared Compliance Services

cc: Mary Dunn, Credit Union National Association General Counsel
Tim Boellner, OCUL Chair
Paul Mercer, OCUL President
Jennifer Ferguson, Government Affairs Committee Chair

SHARE

# Document Details

Comment Submitted by Sheila Crowley, National Low Income Housing Coalition

**Document ID:** HUD-2011-0138-0048 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:** HTML

Show Details

The National Low Income Housing Coalition is submitting a Word document with comments in support of Docket FR-5508-P-01, but with additional suggestions for improvement. See the attached letter.

Attachments:

– Comment Submitted by Sheila Crowley, National Low Income Housing Coalition ... View Attachment: DOC PDF

**Title:**
Comment Submitted by Sheila Crowley, National Low Income Housing Coalition (Attachment)



NATIONAL LOW INCOME
HOUSING COALITION

*Sheila Crowley, President*

*Board of Directors*

*George Moses, Chair, Pittsburgh, PA*
*Mark Allison, Albuquerque, NM*
*William C. Apgar, Cambridge, MA*
*David Bowers, Washington, DC*
*Mary Brooks, Frazier Park, CA*
*Maria Cabildo, Los Angeles, CA*
*Delorise Calhoun, Cincinnati, OH*
*Donald Chamberlain, Seattle, WA*
*Brenda J. Clement, Pawtucket, RI*
*Marcie Cohen, Washington, DC*
*Lot Diaz, Washington, DC*
*Charles Elsesser, Jr., Miami, FL*
*Chris Estes, Raleigh, NC*
*Bill Faith (Honorary), Columbus, OH*
*Daisy Franklin, Norwalk, CT*
*Matt Gerard, Minneapolis, MN*
*Lisa Hasegawa, Washington, DC*
*Linda Leaks, Washington, DC*
*Moises Loza (Honorary), Washington, DC*
*Reymundo Ocañas, Houston, TX*
*Greg Payne, Portland, ME*
*Tara Rollins, Salt Lake City, UT*
*Martha Weatherspoon, Clarksville, TN*
*Paul Weech, Washington, DC*
*Leonard Williams, Buffalo, NY*

*Founded in 1974 by Cushing N. Dolbeare*

January 17, 2011

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effect Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov

Rules Docket Clerk:

The National Low Income Housing Coalition (NLIHC) is an organization whose members include state and local housing coalitions, residents of public and assisted housing, nonprofit housing providers, homeless service providers, fair housing organizations, researchers, public housing agencies, private developers and property owners, local and state government agencies, faith-based organizations, and concerned citizens. While our members include the spectrum of housing interests, we do not represent any segment of the housing industry. Rather, we focus on what is in the best interests of people who receive and those who are in need of federal housing assistance, especially extremely low income people.

NLIHC supports HUD's proposed rule implementing the Fair Housing Act's discriminatory effects standard. The proposed regulation formalizes HUD's long and consistent interpretation of the Fair Housing Act. This interpretation is consonant with the uniform interpretation of the Act by the federal courts of appeals, which for more than forty years have held that liability under Title VIII may be established by showing that a neutral policy or practice either has a disparate impact on a protected group, or creates, perpetuates, or increases segregation.

NLIHC also endorses the improvements to the regulations presented in the formal comments submitted by the Housing Justice Network and the National Fair Housing Alliance.

NLIHC commends HUD for defining and applying a definition of discriminatory effect that specifically incorporates the two distinct forms of discriminatory

*Dedicated solely to achieving socially just public policy that assures people with the lowest incomes in the United States have affordable and decent homes.*

727 15th Street NW, 6th Floor, Washington, D.C. 20005 | tel: 202.662.1530 | fax: 202.393.1973 | info@nlihc.org | www.nlihc.org

000360

effect that have long been recognized by the courts. NLIHC urges HUD to keep this clear distinction between an adverse "disparate impact" upon a protected class and the separate claims for cases involving "segregative effect." However, as the Housing Justice Network (HJN) letter notes, in one portion of the proposed regulations the language supporting claims based on segregative effect is omitted. NLIHC urges HUD to add to proposed Section 100.120, the same language used in Sections 100.65(b)(6), and in Section 100.70 (d)(5).

Regarding Section 100.70, Other Prohibited Conduct, NLIHC welcomes HUD's proposed addition of discriminatory land use laws, policies and practices to the category of prohibited conduct. The final rule, however, should make clear that enactment and *maintenance* of discriminatory land use practices are included in the proscription against discriminatory implementation.

Regarding Section 100.500(b), Legally Sufficient Justification, NLIHC agrees with HJN's suggestion for strengthening (b)(1) to require the definition of "legally sufficient justification" to be a **substantial**, legitimate, nondiscriminatory interest for the defendant, **including a business necessity as defined in the 1994 *Interagency Policy Statement on Discriminatory Lending*."**

Regarding Section 100.500(c), Burden of Proof, NLIHC concurs with the comments of the National Fair Housing Alliance. Specifically, that the burden of proof should be assigned to the defendant to show that there is no less discriminatory alternative. The defendant will have greater access to information than the plaintiff regarding available alternatives and the advantages and disadvantages of those alternatives.

Finally, NLIHC urges HUD to publish a final rule as quickly as possible.

Sincerely,

Sheila Crowley

Sheila Crowley
President

SHARE
Document Details
Comment Submitted by Fred Freiberg, Fair Housing Justice Center
Document ID: HUD-2011-0138-0049 Document Type: Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:
Show Details
See attached file(s)
Attachments:
Comment Submitted by Fred Freiberg, Fair Housing Justice Center (Attachment...
View Attachment:
Title:
Comment Submitted by Fred Freiberg, Fair Housing Justice Center (Attachment)

January 17, 2012

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re: Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effect Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Fair Housing Justice Center (FHJC) respectfully submits to the U.S. Department of Housing and Urban Development (HUD) the following comments about the proposed regulation implementing the discriminatory effect standard under the Fair Housing Act ("FHA"). FHJC commends HUD for codifying the well-established legal precedent of disparate impact under the FHA. However, we suggest adoption of a burden shifting standard that places the burden of proof on defendants or respondents to show there is no less discriminatory alternative.

The FHJC is a 501(c)(3) nonprofit organized under the laws of the State of New York and funded, in part, by HUD. FHJC is dedicated to ensuring all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities.

As a part of its work in eliminating housing discrimination, FHJC provides information to the public and other nonprofit organizations in the New York City regional area about fair housing laws, provides intake counseling to individuals and organizations who allege they are victims of housing discrimination, conducts testing and other investigations into housing discrimination, makes referrals to cooperating attorneys, assists with the preparation and filing of administrative housing discrimination complaints, and provides post referral litigation support services. FHJC provides these services free of charge.

FHJC supports HUD's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the FHA. The proposed rule is in keeping with the intention of Congress and furthers the statutory goal of providing, "within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (noting the "broad remedial intent of Congress embodied in the Act").

Fair Housing Justice Center, Inc. - 5 Hanover Square, 17th Floor, New York, NY 10004
(212) 400-8201 - Fax: (212) 400-8203 - Website: www.fairhousingjustice.org



In the more than forty years since the FHA was passed, a strong consensus has developed among the courts that the FHA includes a disparate impact standard. *See, e.g., Mt. Holly Gardens Citizens in Action v. Township of Mount Holly*, 658 F.3d 375, 384 (3d Cir. 2011) ("All of the courts of appeal that have considered the matter . . . have concluded that plaintiffs can show the FHA has been violated through policies that have a disparate impact. . . ."). As federal courts have consistently held, "[i]n disparate impact cases, [e]ffect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme." *Id.* at 385 (quoting *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976).

HUD has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative in cases alleging a neutral policy has has a disparate impact. Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921, 70925 (proposed Nov. 16, 2011) (to be codified 24 C.F.R. § 100.500(c)(3)). How the burden of proof is apportioned is often a critical issue that has the potential to affect the outcome of fair housing cases and overall enforcement of the FHA. One issue in disparate impact cases under the FHA focuses on the determination of whether a less discriminatory alternative exists. *See, e.g., Mt. Holly*, 658 F.3d at 385 (indicating that this step in the analysis determines "whether a person is being deprived of his lawful rights because of his race").

We observe that the proposed rule places the burden of proof upon the plaintiff or complainant to demonstrate a less discriminatory alternative. Proposed § 100.500(c)(3) states that "[i]f the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the complainant or plaintiff may still prevail upon demonstrating that the legitimate, nondiscriminatory interests supporting the challenged practice can be served by another practice that has a less discriminatory effect." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. at 70927.

FHJC respectfully suggests the burden of showing there is no less discriminatory alternative to the conduct in question should be assigned to the defendant or respondent. In the Second Circuit, it is well established jurisprudence that the burden of proving there is no less discriminatory alternative resides with the defendant. *See e.g. Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir. 1988). Placing this burden upon the defendant/respondents is the best way to ensure vigorous enforcement of fair housing rights as was intended by Congress in its passage of the Fair Housing Act.

4

Furthermore, there are strong practical reasons why a defendant/respondent is in a superior position to bear the burden of proof on this issue. The defendant/respondent almost always has superior knowledge of the less discriminatory alternatives available and how the alternatives may meet its legitimate business objectives. The test to determine a less discriminatory alternative asks whether an alternative imposes "an undue hardship under the circumstances of the specific case" on the defendant or respondent. *Mt. Holly*, 658 F.3d at 386.

For example, in a recently settled case, FHJC challenged the practice of a virtually all-white Bronx housing cooperative that required prospective buyers to secure three references from shareholders currently residing in the cooperative. FHJC argued, in part, that the three reference rule had a disparate impact on African Americans. While African Americans own 35% of the housing cooperatives in the Bronx, less then 1% of the units in the defendant's co-op are owned by African Americans. In this case, the defendant unquestionably had superior knowledge about the existence and feasibility of alternative approaches that might achieve its permissible objectives with a less discriminatory impact on African Americans. Thus, the burden to show an alternative approach rightly resided with the defendant. For example, the co-op may have used other neutral screening devices in the past that did not adversely impact African American buyers and found that these devices did not provide as reliable a source of relevant information as the three shareholder reference rule. In a case like this, logic would dictate, and the Second Circuit requires, imposing the burden on the defendants to identify such alternatives and to articulate why less discriminatory alternatives would not achieve their legitimate objectives.

For the reasons outlined above, we urge the Department to revise the proposed rule to impose the burden on the defendant/respondent in the final step of the disparate impact analysis.

Thank you for the opportunity to comment on the proposed regulation implementing the FHA's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations. Please contact me at 212-400-8231 or ffreiberg@fairhousingjustice.org with any questions.

Sincerely,

Fred Freiberg
Executive Director



Document Details

Comment Submitted by Christopher Whitcomb, National Association of Home Builders

**Document ID:** HUD-2011-0138-0050 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

See attached file(s)

Attachments:

- Comment Submitted by Christopher Whitcomb, National Association of Home Bui... View Attachment:

**Title:**
Comment Submitted by Christopher Whitcomb, National Association of Home Builders (Attachment)





January 17, 2012

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street SW, Room 10276
Washington, DC 20410

RE: Proposed Implementation of the Fair Housing Act's Discriminatory Effects Standard Rule, Docket No. FR-5508-P-01

The National Association of Home Builders ("NAHB") appreciates this opportunity to provide comments on the *Proposed Implementation of the Fair Housing Act's Discriminatory Effects Standard*. NAHB is a trade association representing more than 160,000 members involved in home building, remodeling, multifamily construction, property management, subcontracting, design, housing finance, building product manufacturing and other aspects of residential and light commercial construction. Known as "the voice of the housing industry," NAHB is affiliated with 800 state and local home builders associations around the country. NAHB's builder members will construct about 80 percent of the new housing units projected for 2010.

NAHB supports the prevention of discrimination in the sale, rental, or financing of housing and acknowledges the need to prevent housing practices that have a discriminatory effect under the Fair Housing Act (FHA). However, because the Supreme Court of the United States will soon address this very issue, NAHB suggests that HUD should wait to finalize the proposed regulation until the Court has had an opportunity to address the issue. Additionally, because our members also provide affordable housing, NAHB is concerned about the possibility that the regulation will increase the potential for unwarranted liability in the context of state and local implementation of the Low-Income Housing Tax Credit program.

## Legal Comments

### A. The Final Regulation Should Be Held in Abeyance Until the Supreme Court Issues Its Decision in *Magner v. Gallagher*.

This proposed regulation dovetails with a review of the viability and extent of discriminatory effect claims under the FHA by the Supreme Court of the United States in

*Magner v. Gallagher,* No. 10-1032. *Magner* will address two issues that directly impact the proposed regulation. First, the Court will determine the threshold question of whether discriminatory effect claims are cognizable under the FHA. Second, the Court will analyze the use of burden shifting to show disparate impact under the FHA. Thus, the Court's decision will determine the basis for, and content of, any final discriminatory effects regulation.

For the purpose of the proposed regulation, it is particularly important that the Supreme Court may further analyze and refine the burden shifting framework. This analysis should be incorporated into the final regulation for the same reason the proposed regulation analyzed discriminatory effect opinions from lower courts—it serves to better inform HUD of the current state of the law. It is also possible that HUD will be required to give the Court's ultimate decision in *Magner* even greater weight in the wake of yet another case that is before the Supreme Court this term.

The Court may also decide whether—and to what degree—agency regulations can run counter to its own precedent.[1] The Court has previously ruled that judicial deference is due to rulemakings that conflict with lower court decisions when there is ambiguity in the statute.[2] The Court, however, has never definitively applied this same standard to its own precedent. Because the Court may ultimately hold that agency regulations cannot conflict with its own precedent, it is appropriate that HUD delay implementation of the final regulation here.

**B. NAHB Supports The Availability of Disparate Impact Claims Under the FHA**

NAHB acknowledges that discriminatory effects claims based on facially neutral housing policies have long been recognized by federal courts.[3] In fact, NAHB members have been affected by housing policies that have an unlawful discriminatory effect under the FHA. These policies pose the greatest concern to NAHB members in the context of land use policies that have a disparate impact on minorities. Such "exclusionary zoning" frequently affects the availability of affordable housing in minority communities. Indeed, the proposed regulation points to examples such as land use decisions and ordinances that have a greater adverse impact on minorities. The proposed regulation is correct to note that municipal land use decisions are more likely to have a disparate impact on minorities when they unreasonably attempt to restrict affordable housing.

This type of exclusionary zoning continues to occur in communities across the nation. For example, a federal district court recently determined that a Louisiana county's subdivision approval ordinance had a disparate impact on minorities in violation of the FHA.[4] In this vein,

---

[1] *See United States v. Home Concrete & Supply LLC, et al.,* No. 11-139.
[2] *Nat'l Cable and Telecomm. Ass'n v. Brand X Internet Serv.,* 545 U.S. 967 (2005).
[3] *See, e.g., Metro. Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1287-90 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025 (1978); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 935 (2d Cir. 1988), *aff'd per curiam,* 488 U.S. 15 (1988).
[4] *See Greater New Orleans Fair Housing Action Center, et al. v. St. Bernard Parish,* 648 F. Supp.2d 805, 809 (E.D. La. 2009).

7

NAHB has voiced its support for eliminating land use ordinances and decisions that have a discriminatory effect on minorities and other protected classes under the FHA.

While the burden-shifting approach embraced by the proposed regulation has also been widely recognized by federal courts, HUD's use of "necessary and manifest relationship" is a problematic measure for a legitimate, non-discriminatory alternative. Specifically, lower court decisions have provided a poor explanation as to what constitutes a necessary and manifest relationship.[5] HUD should take this opportunity to more explicitly define the term in order to make the burden-shifting approach more transparent.

HUD should also clarify the applicability of "perpetuation of segregation" to private parties. In the proposed regulation, HUD points to cases where zoning and land use patterns have had the effect of perpetuating segregation by keeping minorities out of a municipality. In NAHB's experience, it is municipal land use decisions, rather than actions by private developers, that result in the perpetuation of segregation.

Further, the final regulations should clearly articulate the scope of liability when a facially neutral housing policy is determined to have a disparate impact. In particular, NAHB would urge HUD to explain that the most appropriate remedy in the context of disparate impact cases is declaratory or injunctive relief. The use of penalties or punitive liability generally does not serve the underlying purpose of the FHA—to remedy housing discrimination.

### C. The Regulation Should Account For the Structure of the Low-Income Housing Tax Credit Program

NAHB is particularly concerned with the impact that the proposed regulation may have on the effective and reasonable implementation of the Low-Income Housing Tax Credit (LIHTC)program.[6] Under the LIHTC program, the Internal Revenue Service allocates housing tax credits to designated state housing finance agencies, which then award the credits to developers of qualified projects or credit syndicators who then sell the credits to developers.

Under the LIHTC program, credits are frequently allocated to a Qualified Census Tract (QCT). In fact, because QCT's have low median incomes relative to surrounding areas, they are awarded greater incentives under the LIHTC program.[7] Because low-income areas often include a disproportionate number of minority residents, this process often result in affordable housing development in minority areas under the normal operation of the LIHTC program. When this occurs, it raises the issue of whether the allocation of tax credits has a discriminatory effect or perpetuated segregation.

---

[5] While federal circuit courts have imposed the "manifest relationship" test in the burden shifting framework, they have, thus far, failed to articulate the level of proof required to show that relationship. *See, e.g., Mountain Side Mobile Estates v. HUD,* 56 F.3d 1243, 1254-55 (10th Cir. 1995) (respondent must demonstrate a housing policy's "manifest relationship" to the housing in question).

[6] *See* 28 U.S.C. § 42.

[7] *See* 42 U.S.C. § 42 (d)(4)(C)(i).

However, it is important to note that allocations by state housing agencies are generally limited and not solely targeted to low-income or minority neighborhoods. While such targeting may be unlawful, NAHB is concerned that HUD's regulation may result in frivolous attempts to hold housing finance agencies and developers liable for reasonable and lawful attempts to encourage development in low-income areas.[8] This concern directly relates to the effect of discriminatory land use controls on affordable housing. There is a risk that HUD's final regulation creates and unwarranted presumption that land use approvals for affordable development in minority areas violate the FHA.

Therefore, the final regulation should acknowledge that allocation of credits and approval of development projects in minority neighborhoods may be part of the normal operation of the LIHTC program. For this reason, the final regulation should state that the mere approval of LIHTC projects in minority areas alone does not result in *prima facie* showing of disparate impact under the FHA. To establish a *prima facie* case of disparate impact discrimination, a litigant must show that the policy resulted, or predictably will result, in discrimination.

Thank you for the opportunity for NAHB to review and provide comments on the *Proposed Implementation of the Fair Housing Act's Discriminatory Effects Standard.* We hope these comments will be helpful to you in your review and in your future considerations. Please let us know if you have any further questions or comments regarding NAHB's review. Christopher Whitcomb can be reached at cwhitcomb@nahb.org or 202-266-8329.

Sincerely,

Christopher Whitcomb
Senior Counsel, Legal Advocacy

[8] Plaintiffs groups have successfully challenged the allocation process of state housing finance agencies. *See Inclusive Communities Project, Inc. v. Texas Dept. Of Housing and Community Affairs,* 749 F. Supp.2d 486 (N.D. Texas, 2010).

SHARE

## Document Details

Comment Submitted by Julie Gackenbach, Confrere Strategies, on behalf of National Association of Mutual Insurance Companies

**Document ID:** HUD-2011-0138-0051 **Document Type:** Public Submission
This is comment on Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

Attached are the comments of the National Association of Mutual Insurance Companies ("NAMIC") regarding implementation of the Fair Housing Act's discriminatory effects standard. (Docket No. FR-5508-P-01; RIN 2529-AA96) NAMIC believes it is premature in light of Supreme Court's pending consideration of Magner v. Gallagher for HUD to move forward with the proposed rule. NAMIC urges the Department to withdraw the proposed rule, pending the Supreme Court decision. Alternatively, HUD should suspend activity regarding the rule until the Supreme Court has ruled. NAMIC does not believe that Section 3604 supports inclusion of the disparate impact standards. At a minimum, NAMIC believes that pricing decisions and operations of FAIR plans should be excluded from the reach of the rule and regulatory safe harbors should be provided for recognized underwriting risk factors. NAMIC further believes that the McCarran-Ferguson Act precludes federal acts that would impair or supersede state laws and that application of the disparate impact standards would impair state unfair discrimination standards.

Attachments:

- Comment Submitted by Julie Gackenbach, Confrere Strategies, on behalf of Na... View Attachment:

**Title:**
Comment Submitted by Julie Gackenbach, Confrere Strategies, on behalf of National Association of Mutual Insurance Companies (Attachment)





NAMIC®
NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410–0500.

Re: Docket No. FR–5508–P–01; RIN 2529–AA96
Implementation of the Fair Housing Act's Discriminatory Effects Standard

Dear Sir/Madam:

The National Association of Mutual Insurance Companies ("NAMIC") appreciates the opportunity to comment on the Department of Housing and Urban Development's ("HUD") proposed implementation of the Fair Housing Act's ("FHA") Discriminatory Effects Standard ("Proposed Rule").

NAMIC is the largest and most diverse property/casualty trade association in the country, with 1,400 regional and local mutual insurance member companies on main streets across America joining many of the country's largest national insurers who also call NAMIC their home. Member companies serve more than 135 million auto, home and business policyholders, writing in excess of $196 billion in annual premiums that account for 50 percent of the automobile/ homeowners market and 31 percent of the business insurance market. More than 200,000 people are employed by NAMIC member companies.

**Background**

The Fair Housing Act prohibits discrimination against any person in "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or

3

facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."[1]

HUD on November 16, 2011 proposed significant changes in the implementation of the Discriminatory Effects Standard.[2] The proposed rule purportedly would harmonize existing standards for determining when a housing practice with a discriminatory effect violates the FHA. The proposed rule also discusses liability standards where a facially neutral housing practice has a discriminatory effect.

In its proposal, HUD asserts that it has long interpreted the FHA to permit disparate-impact claims, meaning claims of discrimination even where there has been no intent to discriminate and no claim that any person was subject to discriminatory treatment, and has held that the Act is violated by facially neutral practices that have a disparate impact on protected classes.[3] According to HUD, violations of various provisions of the FHA may be established by proof of discriminatory effects, and discriminatory effects claims may be brought pursuant to the FHA under subsections (b) and (f)(2) of 42 U.S.C. § 3604 ("Section 3604"), which prohibit discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" a protected characteristic.

The recently proposed rule would solidify HUD's position on disparate-impact liability and prescribe standards for addressing disparate-impact claims. HUD proposes to add a new Subpart G, Prohibiting Discriminatory Effect, which would confirm that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, as defined in 24 C.F.R. § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose and regardless of whether any individual person was subjected to discriminatory treatment.

As examples of practices that may have a disparate impact on a class of persons, HUD cites the provision and pricing of homeowner's insurance. For support, HUD cites *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1207-8 (9th Cir. 2010) (*en banc*). However, as discussed further below, the *Ojo* case clearly reveals that the application of the disparate impact test for FHA liability is inappropriate in the context of insurance.

***Magner v. Gallagher***

The proposed rule is being advanced by HUD even as the U.S. Supreme Court is currently considering the question of whether disparate impact claims are cognizable

---

[1] 42 U.S.C. § 3604(b).

[2] 76 Fed. Reg. at 70,921.

[3] *See, e.g.*, *Mountain Side Mobile Estates P'ship v. HUD*, 56 F.3d 1243, 1251 (10th Cir. 1995).

7

under Section 3604.[4] Oral argument is scheduled for February 27, 2012. In light of the direct bearing the decision of the court will have on the issues at hand, we respectfully request that HUD defer action on the proposed rule until the Supreme Court renders its decision in the case.

The Solicitor General on behalf of the United States filed an amicus brief in the case asking the Court to grant *Chevron* deference to the proposed rule. We believe that this position is misguided and that rather HUD should withdraw the proposed rule pending consideration of the context and limitations of the Supreme Court's decision. Although HUD asserts that the proposed rule reflects long-standing department policy, *Chevron* deference should not be accorded to a proposed rule. We believe the interests of the American public would be better served by awaiting the decision of the Supreme Court and drafting proposed regulations consistent with that decision. Specifically, the Court in *Magner* is asked to determine whether disparate impact claims are cognizable under the Fair Housing Act and, if such claims are cognizable, whether they should they be analyzed under the burden shifting approach used by three circuits, under the balancing test used by four circuits, under a hybrid approach used by two circuits, or by some other test. The questions before the Court lie at the heart of the issues addressed in the proposed regulation and action on the proposed regulation is premature in light of the pending Supreme Court decision.

**Statutory Construction**

As a threshold matter, NAMIC disputes that the disparate impact standard is properly applicable under Section 3404 in any context. Section 3604 prohibits only *intentional* discrimination against individual persons. Section 3604 specifically proscribes conduct relating to the sale or rental of dwellings that is undertaken against an individual "because of" that person's membership in a class protected under the statute. Section 3604 makes it unlawful to "refuse to sell or rent" or "otherwise make unavailable or deny" housing to a person "because of" a protected characteristic, including race. HUD places the emphasis on the effect (deny or make unavailable), rather than on the "because of" standard. Such a reading fails to acknowledge the "because of" standard serves as a threshold test. The statutory language does not refer to conduct that "adversely affects" or "tends to deprive" members of a protected class - language that would substantiate the basis for disparate-impact causes of action - but enumerates actions that may not be taken "because of" the individual's protected class.[5]

---

[4] *Magner v. Gallagher*, 619 F.3d 823 (8th Cir. 2010), *cert. granted*, No. 10-1032 (Docket) (U.S. Nov. 7, 2011).

[5] *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988) (plurality opinion) (construing Title VII Section 703(a)(2)); *see also* Smith v. City of Jackson, 544 U.S. 228, 236 (2005) (plurality opinion) (construing ADEA Section 4(a)(2)).

In contrast, Section 3604(a) is textually distinct from other statutory provisions that permit claims for disparate impact, such as Section 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), Section 4(a)(2) of the ADEA, 29 U.S.C. § 623(a)(2), and Section 102 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(b). Each of these provisions prohibit conduct that "adversely affects" a protected class, using language the Court has recognized as authorizing claims of disparate impact.[6] Section 3604 therefore does not provide a cause of action for disparate-impact discrimination and recovery is limited to claims of disparate treatment. As such, we believe the proposed rule exceeds HUD's statutory authority, including in the application of the disparate impact test to insurance, as discussed below.

**Disparate Impact and Insurance**

Disparate impact in the context of the proposed rule would be presumed to exist when a standard or practice has the effect of disproportionately harming members of a group defined by race, ethnicity, or sex – regardless of whether the challenged practice makes reference to these characteristics, or whether the resulting adverse group impact was intended. While the concept of disparate impact is problematic in the best of circumstances, its application in the context of insurance would be particularly difficult. While in 1992 the Seventh Circuit applied the FHA to insurance, the Court noted a distinction between "disparate treatment" (i.e., intentional unfair discrimination) and "disparate impact." The Court further noted that "risk discrimination is not race discrimination."[7]

The FHA has been applied to insurance through § 3604 and the existing HUD regulation – both of which use terminology indicating that discrimination consists of disparate *treatment* where there is *intentional* discrimination rather than merely discriminatory *effects*.[8] HUD asserts that the Department has long interpreted the FHA to permit disparate-impact claims. However, the Department fails to acknowledge that in 1988 the United States Solicitor General submitted an amicus brief before the Supreme Court arguing that a FHA violation requires proof of intentional discrimination. The parties in the case agreed to litigate under the disparate impact approach and while the Court did not disturb the theory, it specifically noted that "[W]e do not reach the question whether that test is the appropriate one." [9] The same year, President Ronald

[6] *See Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 429–31.

[7] *NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287, 290 (7th Cir. 1992).

[8] *Id.* The Seventh Circuit applied the FHA and the 1989 HUD rules to insurance based on the conclusion that "Section 3604 is sufficiently pliable that its text can bear [HUD's] construction.

[9] *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15, 18 (1988).

Reagan, upon signing the Fair Housing Amendments Act of 1988, issued a statement expressing the view that the FHA requires proof of intentional discrimination to establish a violation.[10] In implementing the new legislative amendments in 1989, the Department adopted expansive rules related to the standards for proving a violation, yet it specifically declined to opine whether the FHA allows a disparate impact approach or required proof of intentional discrimination.[11]  Under the Clinton Administration in 1994, several federal agencies issued a "Policy Statement on Discrimination in Lending" sanctioning the disparate impact approach, but acknowledged that the law on disparate impact was under development.[12]  Thus, while the Department asserts that its "administrative law judges have held that the Act is violated by facially neutral practices that have a disparate impact on protected classes," the proposed regulation would be the first formal regulatory promulgation to that effect.

The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly.  Race or other protected class characteristics are not part of the risk assessment process.  In addition, state insurance laws proscribe the use of prohibited factors in rating and underwriting practices of insurers, and states prohibit unfair discrimination in insurance.  In the context of insurance, unfair discrimination includes treating similar risks in a dissimilar manner.  Insurance regulation focuses on facially neutral underwriting or rating factors that reflect insurance risk.  Accordingly, state insurance laws largely reflect the principles underpinning property/casualty insurance pricing.

To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly.  This practice is the very essence of risk-based pricing. Common homeowners insurance factors include claim history of applicant, construction material (s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system. Under HUD's  proposed rule, however, these and other common underwriting factors could be jeopardized, even though they

---

[10] President Ronald Reagan, *Remarks on Signing the Fair Housing Amendments Act of 1988* (Sept. 13, 1988) ("I want to emphasize that this bill does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that Title 8 violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent. Title 8 speaks only to intentional discrimination.").

[11] 54 Fed. Reg. 3235 (Jan. 23, 1989)

[12] Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending*, 59 Fed. Reg. 18266 (April 15, 1994).

do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected. To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk- based variables would have to be eliminated from the underwriting process. In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

State insurance laws prohibit insurance rates from being "excessive, inadequate, unreasonable or unfairly discriminatory." Classifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance. "Unfair discrimination," on the other hand, has specific meaning in the insurance context. The concept of unfairly discriminatory insurance rates has historically been a cost-based concept. Principal 4 of Casualty Actuarial Society Statement of Ratemaking Principles, formally adopted in 1988, provides that "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer." [13] Under model legislation developed by the National Association of Insurance Commissioners, an insurer could be guilty of unfair discrimination by making underwriting and rating distinctions "between individuals or risks of the same class and essentially the same hazard" or when underwriting and rating decisions are unsupported by "the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience."[14]

Given the differences, it is the exception rather than the rule where the "unfairly discriminatory" standard and the concept of disparate impact could be applied simultaneously to a risk classification plan without conflict. The proposed rule's standard for disparate impact would at a minimum be inconsistent with the risk-based insurance "unfair discrimination" standard. At worst, by requiring an insurer to disregard the predictive value of a valid factor, HUD would be placing insurers in the untenable position of risking violation of state prohibitions against "unfairly discriminatory" insurance rates. If a state regulator has found that a rate, rating factor, or territory does not unfairly discriminate (as well as not making the rate excessive or inadequate),

---

[13] Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988. <http://www.casact.org/standards/princip/sppcrate.pdf>

[14] "Unfair Discrimination," Sec. G (3), Unfair Trade Practices Act, NAIC Model Regulation Service, January 1993, pp. 880-884.

HUD's intervention via a finding of disparate impact or "discriminatory effect" could reverse the state regulator ruling and even make the resulting application unfairly discriminatory under state law. As such, the proposed rule would serve to undercut and even contradict the unfair discrimination standard in state law. If the standard of disparate impact prevails over the historical standard that mandates unfairly discriminatory rates, accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer. Perversely, application of the proposed rule could in fact harm all insurance consumers, including the very groups it purports to protect.

In addition to the "unfairly discriminatory" standard, pricing for property/casualty insurance falls squarely within the "filed rate doctrine." The filed rate doctrine, which has a long history of common-law development, imposes a limitation on private claims for damages based on challenges to filed rates. State regulated insurers generally are required to file rates with state regulators. The application of the filed rate doctrine to property/casualty prices properly balances the interests in ensuring nondiscriminatory treatment of rate-payers. The filed rate doctrine "recognizes that (1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack competence to set . . . rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." [15] Imposing disparate impact analysis in the context of property/casualty pricing would similarly undermine the state-based regulatory regime. Indeed, a number of courts have recently found the disparate impact test may not be applied to insurance practices for precisely this reason, when addressing discrimination claims in the context of the McCarran-Ferguson Act.

***McCarran-Ferguson***

The McCarran-Ferguson Act of 1945 [16] confirms the states' authority to regulate the "business of insurance," unless federal law specifically provides otherwise. State law governs the business of insurance and no act of Congress may interfere with state insurance law unless the federal act specifically relates to insurance. All states regulate the business of insurance within their borders, including the underwriting and rating practices of insurers. Although the courts have held that federal laws may *duplicate*

---

[15] *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 489 (2d Cir. 1998) (internal quotation marks omitted; alteration in original).

[16] 15 U.S.C.A. § 1011 *et seq.*