state laws,[17] McCarran-Ferguson bars any application of federal law that would invalidate, impair or supersede state laws regulating the business of insurance.[18]

One of the cases HUD cites as purported support for its proposed rule, *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1207–8 (9th Cir. 2010) (en banc), plainly illustrates how the Department's overreach in applying disparate impact standards would undermine the states' regulation of insurance. In *Ojo*, the plaintiffs claimed that the use of credit-based insurance scoring had a disparate effect on minorities in violation of the FHA. The Ninth Circuit determined that the FHA does not specifically relate to insurance and that the relevant Texas law was enacted for the purpose of regulating insurance, and thus faced the question whether a ruling for the plaintiffs under the FHA might "invalidate, impair, or supersede" Texas law. The Ninth Circuit certified that question to the Texas Supreme Court. The Texas Supreme Court held: "In light of the fact that Texas only prohibits the use of credit score factors or rates *based on* race, or rates that differ *because of* race, we answer that application of the FHA to permit a cause of action for disparate impact resulting from the use of credit scoring in the field of insurance certainly might invalidate, impair, or supersede Texas law."[19] The court concluded that "[a]llowing a claim against Texas insurers for using completely race-neutral factors in credit scoring would frustrate the regulatory policy of Texas."[20]

The Eighth Circuit made a similar ruling in Saunders v. Farmers Insurance Exchange.[21] In that case, the court upheld the dismissal of class action disparate impact claims, citing the reverse-preemption impact of the McCarran-Ferguson Act, as well as the filed rate doctrine, which says that an insurer charging a rate that has been approved by the regulator cannot be sued for using that rate.[22] The court recognized that "a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime."

Other courts are in accord. A Nebraska federal court concluded that "it is difficult to envision how allowing [the plaintiff] to proceed" with a disparate-impact claim under

---

[17] *See American Family*, 978 F.2d 287.

[18] *See Saunders v. Farmers Ins. Exchange*, 537 F.3d 961 (8th Cir 2008).

[19] *Ojo v. Farmers Grp., Inc.*, _ S.W.3d _, No. 10-0245, 2011 WL 2112778, at *2 (Tex. May 27, 2011).

[20] *Id.* at *11.

[21] 537 F.3d 961 (8th Cir. 2008)

[22] *See Mackey v. Nationwide Ins. Co.*, 724 F.2d 419 (4th Cir. 1984); *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003); *Nationwide Mutual Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 19950; *NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287 (7th Cir. 1992); *Moore v. Liberty National Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001).

the FHA challenging the use of credit scores would not frustrate and/or interfere with Nebraska's administrative regime.[23]  Likewise, a Mississippi federal court held that it was "clear" that a disparate-impact claim under the FHA would impair a state regulation that allowed the use of insurance scores not "based in whole or in part on race" where the regulation "makes no reference to disparate impact."[24]

As these court decisions demonstrate, the disparate-impact analysis is inappropriate in the context of insurance.  NAMIC therefore urges HUD to exempt property/casualty coverage from the application of the newly proposed Subpart G, Prohibiting Discriminatory Effect standards.  Specifically, HUD should:

• exempt insurance pricing from the discriminatory effects standards.  The application of the FHA to insurance has been limited to the Act's prohibition on "denying or making unavailable" dwellings by making homeowners insurance unavailable.  The decision to not write insurance is an underwriting decision based on a number of factors related to the anticipated risk of loss.  Pricing is a separate issue and would be subject to the filed rate doctrine.

If the Department insists on the inclusion of property/casualty insurance, NAMIC strongly urges the Department to:

• provide regulatory safe harbors for long-recognized risk-related factors, such as use of prior insurance claims, age and condition of property, and distance from fire station.  Failure to provide safe harbor protection for the use of factors historically allowed by state insurance regulators would subject insurers to baseless litigation and threaten the sound actuarial standards underpinning the insurance market; and

• exempt Fair Access to Insurance Requirements ("FAIR") Plans.  State FAIR plans provide insurance to individuals or cover risks that would otherwise be denied insurance due to a related high-risk problem. FAIR plans generally utilize market survey data to determine rates and spread the cost of coverage through assessments on participating insurance companies or through assignment to risks to participating insurance companies.  Insurance companies participating in FAIR plans should be exempt from the discriminatory effects standards.  The state action doctrine would clearly apply since the operation of the FAIR plans facilitate private conduct that otherwise would not have occurred.

---

[23] *Taylor v. Am. Family Ins. Grp.*, No. 8:07CV493, 2008 WL 3539267, at *3 (D. Neb. Aug. 11, 2008).

[24] *McKenzie v. S. Farm Bureau Casualty Ins. Co.*, No. 3:06CV013, 2007 WL 2012214, at *3 (N.D. Miss., July 6, 2007).

**Burden of Proof**

The proposed rule outlines a "three-step burden-shifting" approach to determining which party bears the burden of proof at each step of the process.

1. The plaintiff must first prove a prima facie case that the "practice caused, causes, or will cause a discriminatory effect on" a protected group.
2. Once the complainant or plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of the housing provider's legitimate, nondiscriminatory interests.
3. If the respondent or defendant satisfies its burden, the complainant or plaintiff may still establish liability by demonstrating that these legitimate, nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect. (76 FR 70925, 70927).

The Supreme Court in *Wards Cove Packing Co. v. Atonio*[25] set forth a burden-shifting framework governing disparate-impact claims under non-Title VII statutes such as the FHA.[26]  The *Wards Cove* burden-shifting framework involves a similar three-step process, but differs in significant respects. Under *Wards Cove*, the plaintiff must first make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class.[27] Second, the *Wards Cove* standard provides that if the plaintiff makes the prima facie showing, the defendant must come forward with evidence that the "challenged practice serves, in a significant way, [its] legitimate . . . goals."[28]  Third, under *Wards Cove,* the plaintiff must then prove that the defendant refused to adopt an alternative practice that would have served its goals equally as effectively without causing the disparate impact.[29]

Although most lower courts have applied a burden-shifting approach in the FHA context, they generally have failed to adhere to the instruction of *Wards Cove*.  The most common deviation is mistakenly shifting the burden of persuasion, as opposed to the burden of production, to the defendant at the second step in the analysis.  The proposed rule replicates this error.

---

[25] 490 U.S. 642 (1989).

[26] *See Smith*, 544 U.S. at 240.

[27] *Wards* Cove, 490 U.S. at 658.

[28] *Id*. at 659.

[29] *Id*. at 660–61.

The proposed rule differs from the *Wards Cove* standard in several fundamental ways. In the first step, the proposed rule significantly lowers the standard for demonstrating a "discriminatory effect." In the second step, the proposed rule profoundly narrows the standard for allowing the defendant to rebut the presumption of unlawful discrimination that results from the plaintiff's showing of a discriminatory effect, by requiring the defendant to show that the challenged practice has "a necessary and manifest relationship" to one or more "legitimate, nondiscriminatory interest[s]," instead of adopting a "legitimate goal" standard. In the third and final step, the proposed rule merely provides that the plaintiff may demonstrate that legitimate, nondiscriminatory interests "could be served by a policy that produces a less discriminatory effect." Unlike the Wards Cove standard, the third step in the Department's proposed rule gives no consideration to whether the preferred alternative practice is "equally as effective" as the challenged practice.

Moreover, the process of determining whether there exists an alternative practice that produces a "less discriminatory effect" would require an insurer to explicitly take race and ethnicity into account in its analysis. This would directly violate state insurance laws prohibiting "unfair discrimination," which proscribe the use of race and ethnicity and instead require insurers to rely solely on risk in developing underwriting and rating practices.

NAMIC urges HUD to follow the *Wards Cove* standards. Specifically, in step two the defendant must able to rebut the plaintiff's prima facie showing of unlawful discrimination by showing only that the challenged practice is significantly related to the achievement of its legitimate business goals. In step three, the plaintiff must bear the burden to identify an alternative "equally as effective as the challenged practice in serving the [defendant's] legitimate business goals" and "reduce[s] the . . . disparate impact of practices currently being used." This alternative must also be as effective in meeting the business reason as the challenged practice. In the case of an insurer's use of a predictive model, the plaintiff should bear the burden of proving that the alternative is as predictive. Similarly the plaintiff must bear the burden of proving that the alternative is not subject to patent or is otherwise proprietary, that it is not more expensive even if it is as effective, and that it is not more difficult to implement than the challenged practice. When the statutory text is silent on allocation of the burden of persuasion, the ordinary default rule is that the plaintiff bears the risk of proving their claims.[30] The FHA is silent on burden-shifting allocations and HUD should not attempt to use the regulatory process to shift the burden of persuasion to the defendant.

---

[30] *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009),*quoting Schaffer v. Weast*, 546 U.S. 49, 56 (2005); *see Smith*, 544 U.S. at 240.

The burden of proof issues are particularly difficult for insurers.  Unlike banks, real estate settlement practices or rental real estate practices, insurers do not collect data on race and ethnicity.  Without collecting such data indicative of protected class, insurers could not assess whether its facially neutral risk-related underwriting and rating factors have a disparate impact or discriminatory effect on protected classes.  State insurance laws prohibit the use or consideration of prohibited factors like race and ethnicity and insurers should not be required to collect that data to protect themselves from disparate impact or discriminatory effects claims.

NAMIC urges HUD to conform the burden of proof standards in Subpart G(4) ((§ 100.500(c)) to the *Wards Cove* standards.

**Conclusion**

NAMIC believes it is premature in light of Supreme Court's pending consideration of *Magner v. Gallagher* for HUD to move forward with the proposed rule.  NAMIC urges the Department to withdraw the proposed rule, pending the Supreme Court decision. Alternatively, HUD should suspend activity regarding the rule until the Supreme Court has ruled.  NAMIC does not believe that Section 3604 supports inclusion of the disparate impact standards.  At a minimum, NAMIC believes that pricing decisions and operations of FAIR plans should be excluded from the reach of the rule and regulatory safe harbors should be provided for recognized underwriting risk factors.  NAMIC further believes that the McCarran-Ferguson Act precludes federal acts that would impair or supersede state laws and that application of the disparate impact standards would impair state unfair discrimination standards.

Sincerely,

*Robert Detlefsen*

Robert Detlefsen, Ph.D.
Vice President, Public Policy
National Association of Mutual Insurance Companies
122 C Street, NW, Suite 450
Washington, D.C. 20001
202-628-1558
www.namic.org



# Comment Submitted by Maeve Brown, Housing and Economic Rights Advocates

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder**

Comment Period Closed
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0052
**Tracking Number:** 80f98fd

### Comment

See attached file(s)

Document Information

**Date Posted:**
Jan 17, 2012

**Show More Details**

### Attachments (1)

Comment Submitted by Maeve Brown, Housing and Economic Rights Advocates (Attachment)

**View Attachment:** 



housing and
economic
rights advocates

January 17, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

    Re:  Docket No. FR-5508-P-01; *Implementation of the Fair Housing Act's
    Discriminatory Effects Standard*

Dear Rules Docket Clerk:

As advocates for equal opportunity in housing, we are writing in strong support of HUD's
proposed regulation implementing the Fair Housing Act's discriminatory effects standard.

**Housing and Economic Rights Advocates (HERA)** is a California statewide, not-for-profit
legal service and advocacy organization, founded in 2005. HERA's mission is to ensure that all
people are protected from discrimination and economic abuses, especially in the realm of
housing. We focus particularly on the needs of those who are most vulnerable, which includes
lower-income people, the elderly, immigrants, people of color and people with disabilities.
HERA's core practice areas are foreclosure prevention advocacy, as well as advocacy to combat
predatory/unfair mortgage lending, abusive mortgage servicing practices, rescue scams, and
wrongful collections problems.  Our direct legal representation services are available primarily in
Northern California, while our technical assistance, training and capacity building services are
available statewide.  HERA's activities include direct service for individuals (including counsel
and advice, litigation and administrative complaints), community workshops, trainings to
increase the number of professionals available to serve the public and some policy work.  Since
2005, we have provide legal assistance to over 7000 Californians dealing with foreclosure and/or
predatory lending problems.  We have an excellent track record of success in helping the
homeowners whom we work with in-depth to keep their home, and an excellent reputation for
highly professional, knowledgeable staff.

HUD's proposed regulation is an important and necessary step in ensuring that the nation's
housing is available to all, regardless of protected class status.  In our work, we have encountered
many examples of housing practices that are neutral on the surface, but destructive to the mission
of fostering equal opportunity.  One example is mortgage loan servicing practices, which appear
to be neutral on the surface but are having a disparate impact on people of color, seniors, women,
immigrants and people with disabilities, who are all over-represented amongst the ranks of those

phone    510.271.8443
fax      510.868.4521

HERACA.ORG

1814 franklin st., ste. 1040, oakland ca 94612

in need of modification assistance) (unsurprising since most were targeted for higher-cost, more onerous loans in the first place). The horrendous mortgage servicing practices delivered by some of the largest servicers in the country are having, de facto, a particularly untoward effect on these protected classifications despite being, as far as we know so far, facially neutral or generally applicable.

HUD's proposed regulation provides clarity to housing providers, housing seekers, municipalities, and courts who may confront such policies in many different ways. The regulation not only clarifies the burden of proof in the context of litigation to the benefit of courts and litigants. It also will help to prevent litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of our agency.

We applaud HUD's efforts to provide guidance on the important issue of disparate effects under the Fair Housing Act and urge HUD to issue the final rule as soon as possible.

Sincerely,

Maeve Elise Brown
Executive Director

phone   510.271.8443
fax     510.868.4521

HERACA.ORG

1814 franklin st., ste. 1040, oakland ca 94612



**Document Details**

SHARE

Comment Submitted by Rebecca Peace, Pennsylvania Housing Finance Agency

**Document ID:** HUD-2011-0138-0053   **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01-Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

Please accept the attached document as the Pennsylvania Housing Finance Agency's comment to FR-5508-P-01-Implementation of the Fair Housing Acts Discriminatory Effects Standard.

Attachments:

— Comment Submitted by Rebecca Peace, Pennsylvania Housing Finance Agency (At...        View Attachment:

Title:
Comment Submitted by Rebecca Peace, Pennsylvania Housing Finance Agency (Attachment)





January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW
Room 10276
Washington, DC 20410

Re:    Proposed Rule
       Implementation of the Fair Housing Act's Discriminatory Effects Standard
       Docket No- FR - 5508-P-01

Submitted via http://www.regulations.gov

To Whom It May Concern:

        Thank you for this opportunity to comment on the proposed rule (the "Proposed Rule") published in the November 16, 2011 Federal Register. I am writing on behalf of a state housing finance agency, ("PennHFA"), a public corporation and government instrumentality of Pennsylvania, which administers numerous housing, community development and economic stimulus programs and funds for low and moderate income households. These programs touch all aspects of housing development and operation, from finance and support programs for homebuyers and homeowners to renovation, production and administration of affordable rental housing.

        At the onset, we suggest you wait to enact any changes to the Fair Housing Act (the "Act"). This area of law has become increasingly confusing. The United States Supreme Court will hear arguments surrounding disparate impact and the Act at the end of February, 2012. The pending discussions in Magner v. Gallagher, 80 U.S.L.W. 3280 (U.S. Nov. 7, 2011) (No. 10-1030) should help to inform any final regulations from HUD pertaining to the Act. Final rulemaking and an appropriate comment period should be set forth only after guidance from the Supreme Court.

Comments on the Proposed Rule follow:

- 1.) The Proposed Rule raises the real possibility of challenges to numerous practices in the mortgage lending industry and affordable housing programs, which, though clearly nondiscriminatory in intent, may have an inadvertent discriminatory "effect".
- 2.) If adopted as proposed, these new standards should be phased in after clear and consistent guidance is provided by HUD to the affordable housing industry.
- 3.) The burden shifting set forth in the Proposed Rule is overly broad.
- 4.) Changes proposed in the new Proposed Rule threaten funding for affordable housing, not only by deflecting resources to defend challenges, but also by creating uncertainty.

Discussion

        1.) The Proposed Rule raises the real possibility of challenges to numerous practices in the mortgage lending industry and affordable housing programs, which, though clearly nondiscriminatory in intent, may have an inadvertent discriminatory "effect".

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
January 17, 2012
Page 2 of 5

As one example, the Proposed Rule specifically challenges the use of "credit score".  The Proposed Rule suggests that use of credit scoring may be indicative of a discriminatory effect, which will establish a *prima facie* case of discrimination.

Credit score alone is often used as a determining factor in lenders' origination practices.  Certain underwriting software packages and investor securitization standards (including those developed for government sponsored entity loans) have minimum credit scores.  Failure to achieve these credit scores may automatically disqualify the buyer.  HUD itself has even recognized that the credit score is a critical component of prudent underwriting, and as such, the FHA requires buyers with scores between 500 and 579 to make a greater down-payment, and buyers with scores below 500 are disqualified altogether.  HUD has set its thresholds below those typically provided by private sector investors.

HUD has conceded that there is indeed a direct link between credit score and loan performance.  In its final rule implementing the credit score threshold (see Docket No. FR–5404–N–02), HUD states, "Borrowers with low credit scores present higher risk of default and mortgage insurance claim." HUD goes on to explain that the scores were selected after careful analysis that balances the risk to FHA's insurance fund with HUD's social purpose, while also protecting consumers from taking on mortgage loans with excessive financial risks.  "Given FHA's mission, allowing the continuation of practices that result in such a high proportion of families losing their homes represents a disservice to American families and communities." (July 15, 2010 proposed rule, Docket No. FR–5404–N–01.)

The private sector accepts particular levels of risk by imposing higher prices to the consumer to compensate for that risk (something which FHA has also implemented as part of its efforts to replenish the insurance fund).  Lenders do not have much ability or incentive to override credit score.  Performing manual underwriting is time consuming and staff intensive.  It also requires subjective analysis—something lenders have attempted to remove from the process to the extent possible to avoid certain risks (ironically, one of which is the potential for inconsistent underwriting standards and thereby possible Fair Housing violations—such as the evaluation of compensating factors).  Furthermore, in its July 15, 2010 proposed rule, FHA states that it "will tighten underwriting standards for mortgage loan transactions that are manually underwritten.  These transactions have resulted in high mortgage insurance claim rates and present an unacceptable risk of loss."

While PennHFA does not currently impose a minimum credit score for our homeownership program (through which we purchase mortgage loans originated by an approved network of lenders), we do adopt the benchmark established by insurers and/or guarantors.  However, because we also service all of the loans we fund (currently, approximately 60,000 for a total of over $4 billion), we, like HUD, have direct knowledge of the correlation between credit score and loan performance as evidenced by our own portfolio.  PennHFA closely monitors the performance of our loans and would like to retain the ability to tighten or loosen our criteria accordingly, just as FHA has done in response to current market conditions to replenish its insurance fund.

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
January 17, 2012
Page 3 of 5

Interestingly, the Proposed Rule in fact may create conflict with the recently enacted changes in mortgage originations mandated by the Dodd-Frank bill. Newly proposed Dodd-Frank rules require lenders to determine that consumers have an "ability to repay", that loans meet certain down-payment requirements and that there be certain related credit standards. The implementation of these new Dodd-Frank standards may have an unintended impact on lower income households and restrict their access to credit. Economic standards meant to improve consumer loan performance may have a disparate "effect" on households with less wealth.

The potential for challenge under the Proposed Rule may further discourage lending and credit markets serving lower income households.

**2.) If adopted as proposed, these new standards should be phased in after clear and consistent guidance is provided by HUD to the affordable housing industry.**

In addition to consumer mortgage lenders, other affordable housing programs may be faced with uncertainty and inevitable challenge because of unintended effects of long standing program rules.

One good example involves rental housing preservation funding programs designed to preserve limited housing stock and improve living conditions of households in existing affordable housing. These older properties may be located in census tracts of concentrated poverty. HUD's own public housing developments, and the recent capital improvement programs which have assisted in modernization efforts of these properties, are often in census tracts of concentrated poverty.

Ironically, as federal funds dwindle, HUD has been encouraging its public housing properties - and other existing subsidized properties - to seek funding through the Low Income Housing Tax Credit Program (LIHTC). The 25 year old LIHTC Program, administered by state housing finance agencies, is one of the most successful rental housing programs in affordable housing history. Yet, this program appears to be targeted for challenges under the Proposed Rule if LIHTC funding is deployed to assist existing projects located in areas of concentrated poverty. The catch is that HUD is encouraging more rehabilitation and public housing modernization efforts to be funded with LIHTCs. Unfortunately, the existing stock of affordable housing units cannot be moved into an areas of greater opportunity. The same HUD, through the Proposed Rule, seems to be raising questions about the appropriateness of LIHTC funding into these census tracts.

The LIHTC program is administered with public participation through allocation plans adopted annually by administering agencies. These plans must adhere to federal requirements of the Treasury (which is the administering agency for the program). The federal rules mandate consideration of funding for very low income, favor sponsorship by nonprofit corporations, and provide incentive for funding properties in qualified census tracts (which are low income communities). The Proposed Rule suggests that the administration of the LIHTC program may be subject to challenge as to the "effects" that these federally mandated allocation criteria have had.

At a minimum, such a shift in evaluating the program should be phased in, after clear and consistent guidance is provided to the administering agencies.

Furthermore, if HUD proceeds with the Proposed Rule as written, HUD will need to be forthright in guidance to project owners, managers and funders to protect them from Fair Housing charges in the day to day administration of housing programs and properties designed for a particular population.

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
January 17, 2012
Page 4 of 5

Questions arise for instance, regarding projects which target program support specifically to a particular tenant population with a specific type of disability. Arguably, these are per se "discriminatory" practices, since people with one type of disability are "favored" over persons with any other disability. Additionally, many of these programs targeting specific populations intentionally "discriminate" - often to provide services specifically to one group at the expense of another.

### 3.) The burden shifting set forth in the Proposed Rule is overly broad.

The burden shifting steps set forth in the Proposed Rule are overly broad. Consistent with the jurisprudence articulated by numerous courts, we urge HUD to leave the burden on the plaintiff, permitting the defendant to prevail if the challenged practice serves legitimate business goals and is not discriminatory in intent.

### 4.) Changes proposed in the new Proposed Rule threaten funding for affordable housing, not only by deflecting resources to defend challenges, but also by creating uncertainty.

Interest rates in the consumer mortgage industry are at all time lows, but consumer lending is not robust. The Proposed Rule, by its pronounced challenges to existing practices like "use of credit scoring", raises the level of uncertainty in a skittish market. One of the unintended consequences of the Proposed Rule is that lenders may be especially cautious about lending in lower income populations, for fear of the challenge brought about by use of economic benchmarks discussed earlier. Some financial institutions may find it easier to avoid making any consumer loans than to face challenges of a Fair Housing Act violation.

In addition, challenges to public agency programs and inadvertent "effects" which are clearly unintentional will only deflect resources otherwise available to support development of affordable housing programs. Resources are declining. Legal costs to defend against the challenges possible under the Proposed Rule will have to be borne by already strapped budgets.

### Conclusion

We are deeply committed to administering programs and allocating resources in a nondiscriminatory manner to create greater housing choice and opportunity. We welcome opportunities to work together with HUD, DOJ, local communities and Fair Housing advocates to secure additional funds, to administer programs to break down barriers to fair housing and to create new opportunities for households to have meaningful choices for safe homes, near work and transit, and with quality schools. Resources should be targeted to collaborative efforts among HUD and lenders to create greater access to affordable credit and to educate consumers about how to borrow wisely.

An increasing number of households face severe housing challenges. Resources to address these challenges are dwindling. The Proposed Rule raises uncertainty and confusion about numerous housing programs and lending practices. Deciding what standard applies and who determines costs and burdens of rectifying inadvertent disparate "effects" under the Proposed Rule will frustrate the overall goals of the affordable housing community. Markets and consumers already suffering from the economic downturn will be negatively impacted by the real threat of legal challenges.

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
January 17, 2012
Page 5 of 5

In conclusion, we urge HUD to postpone action on the Proposed Rule to allow the Supreme Court to articulate standards, to confirm that disparate impact claims are appropriate under the Act, to establish how the burdens should be borne and to provide guidance in a complex area of the law.

Thank you for the opportunity to comment on the Proposed Rule.

Sincerely,

Rebecca L. Peace
Chief Counsel



Document Details

Comment Submitted by Jeffrey Taren, South Suburban Housing Center and Interfaith Housing Center of the Northern Suburbs

Document ID: HUD-2011-0138-0054    Document Type: Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

See attached file(s)

Attachments:

— Comment Submitted by Jeffrey Taren, South Suburban Housing Center and Inter...    View Attachment:

Title:
Comment Submitted by Jeffrey Taren, South Suburban Housing Center and Interfaith Housing Center of the Northern Suburbs (Attachment)



# KINOY, TAREN & GERAGHTY, P.C.
### ATTORNEYS AT LAW
224 SOUTH MICHIGAN AVENUE, SUITE 300
CHICAGO, ILLINOIS 60604-2536
(312) 663-5210
FAX (312) 663-6663
e-mail: ktgp224@aol.com

JOANNE KINOY
JEFFREY L. TAREN
MIRIAM N. GERAGHTY

Se habla espanol

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and
Urban Development
451 7th Street SW.
Room 10276
Washington, DC 20410


Comments submitted on behalf of:

    South Suburban Housing Center ("SSHC")
    Interfaith Housing Center of the Northern Suburbs ("Interfaith")

Re:  Proposed Regulations
24 CFR Part 100
[Docket No. FR–5508–P–01]
RIN 2529–AA96
Implementation of the Fair Housing
Act's Discriminatory Effects Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov


**Summary:**    South Suburban Housing Center ("SSHR") and Interfaith Housing Center of the Northern Suburbs strongly support the proposed regulation entitled "Discriminatory Effect Prohibited" as critical to the effective enforcement of fair housing policy in the Chicago Metropolitan Area.

**Statement of Interest:**  South Suburban Housing Center is an Illinois Not-For-Profit Corporation with its principal place of business located at 18220 Harwood, Homewood, Illinois 60430.  South Suburban's primary purpose is to promote equal opportunity in housing in the southern areas of Chicago and in Northern Indiana.  One of its major goals is the elimination of unlawful discriminatory housing practices.  Serving over 50 municipalities in south and southwest Cook County Illinois, and 19 municipalities in Lake County Indiana, with an aggregate population of 1.5 million people, South Suburban engages in activities to identify barriers to fair housing, to counteract and eliminate discriminatory housing practices, and to protect the rights of its clients and potential clients to enjoy the benefits of living in an integrated

*3*

Comments of South Suburban Housing Center
And Interfaith Housing Center of the Northern Suburbs
January 17, 2012
Page 2 of 3

community. In addition, South Suburban engages in housing counseling and referral services for its clients.

SSHC has been involved in numerous matters over the years attempting to eliminate practices that have the effect of discriminating on the basis of a protected characteristic. For example, in 2003, SSHC filed suit against a large apartment complex in Northern Indiana which restricted tenancy in two-bedroom apartments to only three people. *Tukes and SSHC et al. v. Tanglewood Limited Partnership of Indiana,* 03-CV-20 RL (N.D. In 2003). This policy all but prohibited families with two children from living in the apartment complex.

Interfaith Housing ("Interfaith") is an Illinois Not-For-Profit Corporation with its principal place of business located in Winnetka, Illinois. Interfaith, founded in 1972, is dedicated to housing justice by advancing open, inclusive, and diverse communities throughout Chicago's northern suburbs. Interfaith covers 16 suburbs spanning northern Cook and southern Lake Counties, encompassing about 430,000 people. As the area's premier voice for fair and affordable housing, Interfaith educates, advocates, and organizes to uphold these values.

Many of the fair housing enforcement matters that Interfaith has pursued have been based upon ordinances, policies or practices that had a disparate impact upon a protected class. Recently, Interfaith has been engaged litigation seeking to prohibit housing providers from restricting tenancies to college students only thereby depriving families with children of much needed housing. *Interfaith Housing Center v. Bernsen,* 11-cv-1146 (N.D. IL 2011)

In 2007, the Village of Skokie, Illinois adopted an amendment to its zoning ordinance that removed a one-cab-per-block exemption to its commercial vehicle parking ban. This would have had the effect of forcing taxicab drivers who live in Skokie to move because most only have the one cab as their everyday vehicle and do not have a garage. Virtually 100% of the residents affected were of Pakistani or Indian national origin. Using disparate impact theory, Interfaith successfully convinced the Village to amend its ordinance so that these residents could remain in the Village. In 2003, the Village of Highwood, Illinois used its Rental Property Safety Ordinance as the basis for condemning properties housing the bulk of the Hispanic residents of the Village - under the guise of redevelopment. More recently, the Villages of Glenview and Northbrook attempted to adopt "guiding principles" for developers that would have made it difficult to construct housing for families as opposed to empty nesters. In each of these instances, Interfaith was able to show that the policies adopted would adversely affect a group based upon a protected characteristic and was able to convince the municipalities to ameliorate the discriminatory effects of the ordinance or policy.

**Comments:**    SSHC and Interfaith strongly support the proposed regulation entitled "Discriminatory Effect Prohibited" as critical to the effective enforcement of fair housing policy in the Chicago Metropolitan Area. Many of the discriminatory practices which our clients encounter on a daily basis result from seemingly neutral policies that adversely affect minorities, families with children or persons with disabilities. It is safe to say that in the suburbs of Chicago,



Document Details

SHARE

Comment Submitted by John Greiner, Maryland Department of Housing and Community Development

**Document ID:** HUD-2011-0138-0055   **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

— Comment Submitted by John Greiner, Maryland Department of Housing and Commu...   View Attachment:

Title:
Comment Submitted by John Greiner, Maryland Department of Housing and Community Development (Attachment)



MARTIN O'MALLEY
*Governor*
ANTHONY G. BROWN
*Lt. Governor*
RAYMOND A. SKINNER
*Secretary*
CLARENCE J. SNUGGS
*Deputy Secretary*

January 17, 2012

Regulations Division
Office of General Counsel
U.S. Department of Housing and
    Urban Development
451 7th Street, S.W. Room 10276
Washington, D.C. 20410-0500

RE: Docket No. FR-5508-P-01
    RIN 2529-AA95
    Implementation of the Fair Housing Act's Discriminatory Effects Standard

Dear Sir/Madam:

The Maryland Department of Housing and Community Development (DHCD) has reviewed the proposed rule regarding Implementation of the Fair Housing Act's Discriminatory Effects Standard. The DHCD's comments on the proposed rule follow.

DHCD operates numerous programs that finance housing and community development activities across the State, including HUD's HOME Investment Partnerships Program (HOME), Community Development Block Grant (CDBG), Emergency Solutions Grant (ESG), and Housing Opportunities for Persons with AIDS (HOPWA) programs. DHCD is also a public housing agency as designated by HUD, operating the Section 8 Voucher program and as a Section 8 Project Based Contract Administrator. DHCD also is the State's Housing Finance Agency (HFA) and administers both the Federal Low-Income Housing Tax Credit (LIHTC) and Mortgage Revenue Bond Programs in accordance with the Internal Revenue Code. The Department also administers numerous State programs that provide housing and community development resources, including the Rental Housing Production Program, Elderly Rental Housing Program, Maryland Affordable Housing Trust, Community Legacy Program, Smart Sites, Sustainable Communities, and Neighborhood BusinessWorks among many others. DHCD is also one of the two lead agencies, along with the Maryland Department of Planning, in implementing Maryland's nationally recognized "Smart Growth" policies.

Based on extensive experience in the field, DHCD is concerned that HUD's proposed rule, as currently drafted, would have a chilling effect on federal, state and local housing and community development efforts designed to preserve affordable housing and revitalize existing communities. In our view, HUD should delay adopting a rule on this topic pending the U.S. Supreme Court's decision in Magner v Gallagher, S. Ct. Case No. 10-1032 (2011) a case that will directly address the same issues to be covered in the proposed rule.

OFFICE OF THE SECRETARY
100 Community Place ▪ Crownsville, MD 21032 ▪ www.mdhousing.org
410-514-7005 ▪ 1-800-756-0119 ▪ FAX 410-987-4070 ▪ TTY/RELAY 711 or 1-800-735-2258

000397



Additionally, DHCD strongly recommends that HUD fully consider the impact the proposed rule may have on HUD's own housing practices and priorities, including its Rental Assistance Demonstration (RAD), as well as HOPE VI, Choice Neighborhood, and project-based section 8 preservation strategies. HUD has reached out to state housing finance agencies and others to partner in the recapitalization and preservation of HUD's affordable housing stock. Much of this stock is located in areas of minority and/or low income concentration. It is possible that someone could interpret the preservation of this housing as "perpetuating segregated housing patterns" putting agencies that help to finance these properties at risk of litigation under the proposed rule.

Should HUD decide to move forward with the proposed rule, DHCD recommends that the rule be amended to include safe harbors for specified housing practices. Safe harbor examples should include at least the following:

1. **Affordable Housing Preservation**. HUD has a major affordable housing preservation program for project based section 8 projects. If an HFA or State or local government were to finance preservation and/or rehabilitation of these housing units using LIHTC or other resources in a minority and or low-income area, it should be clear that preservation of affordable housing is a legally sufficient justification for carrying out this activity without fear of legal action.

2. **Qualified Census Tracts**. Congress has legislatively mandated that the LIHTC program give preference to projects located in Qualified Census Tracts (QCTs), which are areas that contain high numbers of/concentrations of low-income persons who are often minority. In fact, Congress has legislatively mandated that LIHTC projects get a "basis boost" to encourage developers to develop housing in these areas. Congress' justification is to promote affordable housing where needed and to help revitalize communities. HUD should recognize Congress' specific legislative language that requires HFAs to give preference to projects located in QCTS and it should be made clear in the rule that locating and giving preference to LIHTC projects located in QCTs is a legally sufficient justification for carry out these activities without fear of legal action.

3. **Smart Growth and designated Community Revitalization Efforts.** HUD rules should explicitly recognize that efforts to target growth and revitalize communities provides a sufficient justification that would exempt States and localities from unintentional violations of fair housing rules. HUD's own Sustainable Communities and Choice Neighborhood Initiatives recognize revitalization efforts, and State and local programs and policies should also be recognized as part of safe harbor limits to allow and encourage such efforts to go forward. In addition to recognizing Smart Growth efforts, HUD should also specifically recognize that other policies and programs that have legitimate policy and safety goals, such as protection of water resources and watersheds, promoting and giving preference to Transit Oriented Development, and revitalizing urban cities, towns and municipalities instead of promoting sprawl, are legally sufficient safe harbor policies that protect States, cities, towns and municipalities from legal action.

4. **Policies that Promote Additional Resources for Affordable Housing.** HUD requires that applicants for many of its programs, including both formula grant programs such as HOME and ESG, and competitive programs such as the Section 811 (disabled housing) and Section 202 (elderly housing), Section 8 Mod Rehab, Lead Hazard Control, competitive HOPWA funding – among many other HUD programs - provide matching funds or contributions as a threshold requirement for receiving funding. HUD should recognize in safe harbor limits that State and local programs that have similar requirements, such as requiring local funding contributions (as with HOME) or matching requirements are legally sufficient safe harbors because they result in additional resources for affordable housing which greatly expands the supply while making the housing more affordable.



Page 2 of 3

5. **Housing Rehabilitation and Energy Retrofit Activities.**   HUD should recognize  housing rehabilitation and energy retrofit activities, including rehabilitation and retrofit of affordable rental housing with or without HUD subsidies, as a safe harbor that improves the quality of housing rather than increasing or perpetuating segregation.

Finally, DHCD notes that HUD has requested comments on the burden shifting approach proposed in the rule. As stated above, DHCD would prefer that HUD wait to adopt any rule on this topic until after the Supreme Court issues its decision.  However, should HUD decide to proceed, DHCD believes that the burden shifting approach in the proposed rule is reasonable provided the rule includes clear safe harbors as discussed above.  Such safe harbors will reduce the risk of spurious complaints that divert limited government resources from legitimate and appropriate functions.

Thank you for giving us the opportunity to comment on HUD's proposed Rule.  We look forward to working with HUD in the future.

Sincerely,

Raymond A. Skinner
Secretary

Page **3** of **3**



**Via Electronic Submission**

January 17, 2012

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

   Re:  **Docket No. FR-5508-P-01;**
   *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

These comments are submitted by a coalition of legal services and housing advocates who are committed to protecting affordable housing and housing rights for low-income families and individuals nationwide. We write in strong support of HUD's proposed rule implementing the Fair Housing Act's discriminatory effects standard. Members of our coalition have used discriminatory effects theory in a variety of cases to preserve access to housing for people of color, people with disabilities, and families with children. HUD's proposed rule will help ensure that families and individuals are not unjustly denied housing opportunities as a result of practices that have a discriminatory effect.

In addition to expressing our support for the proposed rule, we write to suggest some ways in which the proposed rule could be strengthened. Our comments focus on these areas: (1) segregative effect and disparate impact; (2) discriminatory land use laws and practices; (3) defendant's burden of demonstrating a legally sufficient justification; and (4) burden of proof to establish a less discriminatory alternative.

  1. Segregative Effect  and Disparate Impact

In supporting HUD's proposed regulation, we are pleased to note that throughout the proposed regulations HUD has defined and applied a definition of discriminatory effect that specifically incorporates the two distinct forms of discriminatory effect that have long been recognized by the courts. We urge you to retain in the final regulation this clear distinction between an adverse "disparate impact" upon a protected class and the separate claims for cases involving "segregative effect."

As noted in HUD's commentary on page 70,924, col. 3, and in footnote 21 to the proposed regulations, these two distinct claims are founded in separate types of harm. "Disparate impact" is based upon a disproportionate harm to the protected class while the independent "perpetuation of segregation" or "segregative effect" claim is based upon harm to the entire community, primarily through the loss of interracial association.

The Supreme Court has given close scrutiny in recent years to the question of whether the text

1

and goals of a civil rights statute include the express language hallmarks of Title VII which led the Court to adopt the discriminatory effects test in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). In *Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005), reviewing the availability of an effects test under the Age Discrimination in Employment Act, the Court voiced an apparent intent to severely limit the applicability of the *Griggs'* determination based upon variations from the statutory language of Title VII and whether the law was intended to protect groups or simply individuals. In doing so the Court acknowledged that a civil rights law must be read in conjunction with the law's overriding goals and purposes.

A well-reasoned textual interpretation by HUD that the language in Title VIII was intended 1) to protect classes of persons, and 2) to prevent the creation and perpetuation of patterns of residential segregation may be critical to establishing a basis for the Court to confirm the viability of an effects test. The proposed regulation, by clearly framing the separate harms of "disparate impact" and "segregative effect" provides such an interpretation. At a minimum, framing the regulation to separately address the "segregative effect" claims as HUD has done provides an additional basis for preserving an effects test regarding those claims. This should be bolstered by reference to 42 U.S.C. § 3608(d)(5) which obligates the Secretary and the federal government as a whole to affirmatively further fair housing, a legislative direction to go beyond ending overt and intentional discrimination.

To the extent that there may be concerns about differences between the express texts of Titles VII and VIII, Title VIII's specific legislative history concerning the need to address patterns of residential segregation provides authority apart from the Title VII language analogies for applying an effects test. For example, Senator Mondale who authored much of the Act pointed out that the proposed law was designed to replace the ghettos "by truly integrated and balanced living patterns." 114 Cong. Rec. 3422. Further, in an analysis regarding the separate question of the appropriate burden of proof related to a segregative effect claim, Prof. Robert G. Schwemm in his treatise, "Housing Discrimination Law and Litigation," specifically noted the distinction that segregative effect claims do not derive from Title VII law, but arise from this "unique legislative history" of the Fair Housing Act. (Schwemm, §10:7). As such, *segregative* effects claims have independent legislative authorization.

We do note, however, that in one portion of the proposed regulations the language supporting claims based on segregative effect was omitted. We urge you to add to proposed § 100.120 ("Discrimination in the making of loans and in the provision of financial assistance"), the same language used in § 100.65(b)(6), and in § 100.70 (d)(5), so that § 100.120(b)(2) would specifically prohibit: "Providing loans or other financial assistance in a manner that results in disparities in their cost, rate of denial or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin, or has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

2. Other Prohibited Conduct—Discriminatory Land Use Laws & Practices (§ 100.70(d)(5))

We welcome HUD's proposed addition of discriminatory land use laws, policies and practices to the category of prohibited conduct. As highlighted in parts of the proposed rule, the courts have long recognized that local land use rules, procedures and development decisions can have a disparate impact on a protected group or the effect of creating, perpetuating or increasing

2

segregation. See, e.g., *United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1184-85 (8th Cir. 1974); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *Keith v. Volpe*, 858 F.2d 467, 482-84 (9th Cir. 2008); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir. 1988); *Charleston Housing Authority v. U.S. Dept. of Agriculture*, 419 F.3d 729, 740-42 (4th Cir. 2005). Clarifying the coverage of this significant area is very important. Exclusionary zoning and land use practices facilitated much of the entrenched segregation in this country and continue to provide formidable barriers to integration.

The proposed language for §100.70 addresses this area of discriminatory effect directly by identifying as prohibited conduct the implementation of land-use rules, policies, or procedures in a manner that has a discriminatory effect. Proposed Rule at page 70,926. The final rule, however, should make clear that enactment and maintenance of discriminatory land use practices are included in the proscription against discriminatory implementation. Enactment alone, of course, can have an illegally discriminatory effect if it effectively prohibits or discourages affordable housing development or limits affordable housing development to already segregated areas. *See, e.g., Huntington Branch, NAACP*, 844 F.2d at 937, described on page 70,924 of the proposed rule (local land use policies restricting multifamily housing development to segregated areas have a discriminatory effect).

The current language does not quite capture all the facets of this concept. We acknowledge that, given the case law, the drafted language may presume that enactment or maintenance of discriminatory land use policies are simply different aspects of implementation discriminatory policies. But, a clearer articulation would avoid confusion and future disagreement.

3. Defendant's Burden of Demonstrating a Legally Sufficient Justification (§ 100.500(b))

We understand that defining a legally sufficient justification that would support a housing practice that has an adverse disparate impact is challenging, and courts have developed various descriptions of required justification. Section 100.500(b) of the proposed rule successfully addresses some, but not all of these challenges.

If a plaintiff meets the burden of demonstrating that a housing practice has a discriminatory effect, as defined in proposed § 100.500(a), the housing practice may still be lawful if defendant meets its burden of demonstrating that there is a "legally sufficient justification" for the housing practice. We applaud the *first part* of proposed § 100.500(b) and (b)(1) (in italics here) which states: "A legally sufficient justification exists where the challenged housing practice: (1) *has a necessary and manifest relationship* to one or more legitimate, nondiscriminatory interests of the respondent …." We understand this standard to be the same as the "business necessity" standard set forth in the 1994 *Interagency Policy Statement on Discrimination in Lending*, which indicates that the challenged practice must be important and necessary to the respondent's interest and cannot be merely incidental, hypothetical or speculative. See 59 Fed. Reg. at 18,269.

We suggest two changes to § 100.500(b)(1) of the proposed rule. First, the legitimate and nondiscriminatory interest must be "substantial." Second, HUD should explicitly include reference to the "business necessity" standard established in the 1994 *Interagency Policy Statement on Discrimination in Lending* so that there is no confusion that this standard is unchanged.

3

### a. *Substantial Legitimate Nondiscriminatory Interest*

HUD's proposed language in the second part of (b)(1) requiring only a *"legitimate and nondiscriminatory interest"* to justify a practice that has adversely impacted protected groups sets the bar too low and should be strengthened to further the purposes of the Fair Housing Act. It is too easy for a respondent to claim that it has a "legitimate and nondiscriminatory" interest in an activity which would, in this proposed regulation, then place the burden on the complainant to articulate a less discriminatory alternative. All the respondent need show is that the activity is "legitimate" (and a respondent would hardly be defending an illegitimate practice) and not meant to discriminate. This is insufficient.

Although we suggest a stronger standard, we do not propose the most stringent, such as the "compelling business necessity" justification required in *Pfaff v. HUD*, 88 F.3d 739, 747 (9th Cir. 1996) ("appropriate standard of rebuttal in disparate impact cases normally requires a compelling business necessity") and *Graoch Associates # 33 v. Louisville/Jefferson County*, 508 F.3d 366, 387) (6th Cir. 2007). We suggest that HUD define what comprises a "legally sufficient justification" that falls between the proposed and weak "legitimate and nondiscriminatory interest" standard and the higher "compelling interest" standard. We recommend that a sufficient definition of business necessity is one where the challenged practice achieves goals that are "substantial." *Langlois v. Abington Housing Authority*, 207 F.3d 43, 51 (1st Cir. 2000) ("a demonstrated disparate impact in housing [must] be justified by a legitimate and substantial goal of the measure in question").

### b. *Business Necessity*

We support HUD's proposed language in (b)(1) that creates a single standard for both public and private actors. But in doing so, the language fails to include the "business necessity" standard articulated in the 1994 *Interagency Policy Statement on Discrimination in Lending.* This policy was signed by 10 government agencies, including HUD, and reads:

> When a lender's policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by *"business necessity*." The *justification must be manifest* and may not be hypothetical or speculative. Factors that may be relevant to the justification include cost and profitability. 59 Fed. Reg. at 18,269 (emphasis added).

The Interagency Policy Statement standard is well-established, especially in fair lending matters, and we would urge including it in the regulation so that there is no confusion over, or dilution of, that standard because the proposed regulation does not include the "business necessity" language from the 1994 policy.

### c. *Proposed Language*

We urge HUD to amend proposed § 100.500(b)(1) to read: "(1) Has a necessary and manifest relationship to one or more **substantial** legitimate, nondiscriminatory interests of the respondent, including a **business necessity** as defined in the 1994 *Interagency Policy Statement on Discrimination in Lending.*"

4



4. <u>Burden of Proof to Establish a Less Discriminatory Alternative (§ 100.500(c)(3))</u>

We echo and support the comments submitted by the National Fair Housing Alliance (NFHA) regarding the issue of which party should bear the burden of proof to establish a less discriminatory alternative. As stated by NFHA, the burden of proof should be assigned to the defendant to show that there is no less discriminatory alternative available. In the majority of cases, the defendant will have greater access to information than the plaintiff regarding what alternatives are available, and the advantages and disadvantages of those alternatives. It is therefore more efficient to place the burden on the defendant to use the information that is readily available to it to articulate why the alternatives would not achieve its objectives.

<u>Conclusion</u>

The undersigned organizations support HUD's efforts to establish a uniform discriminatory effects standard and urge HUD to issue a final rule as quickly as possible. Thank you for your attention to our suggestions for ways in which the rule could be strengthened.

Respectfully submitted,

Ilene Jacobs, Director of Litigation, Advocacy & Training, California Rural Legal Assistance
Merf Ehman, Staff Attorney, Columbia Legal Services
Michael L. Hanley, Senior Attorney, Empire Justice Center, Rochester, NY
Fair Share Housing Center, Cherry Hill, NJ
Legal Aid of North Carolina, Inc.
Legal Assistance Foundation of Metropolitan Chicago
Mona Tawatao, Regional Counsel, Legal Services of Northern California
Judith Liben, Senior Housing Attorney, Massachusetts Law Reform Institute
Cathy Haukedahl, Executive Director, Mid Minnesota Legal Assistance, Inc.
National Low Income Housing Coalition
North Carolina Justice Center
Linda Merola, Senior Staff Attorney, Public Health Law & Policy
Mike Rawson, Co-Director, The Public Interest Law Project, Oakland, CA
Katherine E. Walz, Director, Housing Justice, Sargent Shriver National Center on Poverty Law
Jonathan Grant, Executive Director, Tenants Union of Washington
Vermont Legal Aid

5



Document Details

Comment Submitted by Bryan Anderson, Michigan State University College of Law Housing Clinic

Document ID:  HUD-2011-0138-0057   Document Type:  Public Submission
This is comment on   Proposed Rule: FR-5508-P 01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID:  HUD-2011-0138
View Document:

Show Details

See attached file(s)

Attachments:

— Comment Submitted by Bryan Anderson, Michigan State University College of L...        View Attachment:

Title:
Comment Submitted by Bryan Anderson, Michigan State University College of Law Housing Clinic (Attachment)



# MICHIGAN STATE
# U N I V E R S I T Y
## C O L L E G E   O F   L A W

Michigan State University College of Law – Housing Clinic
Professor Brian Gilmore
January 15, 2012

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St. SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

### Comments On HUD's Proposed Amendments

**Legal Clinic**

610 Abbot Road
East Lansing, MI 48823

517-336-8088
Fax 517-336-8089
www.law.msu.edu/clinics

The Housing Law Clinic at the Michigan State University College of Law is a full service law clinic providing free legal assistance, representation, and systemic advocacy, to and on behalf of the citizens of the state of Michigan. The clinic, founded in 1999, through a cooperative agreement between the College of Law, the city of East Lansing, and Ingham County, first and foremost, seeks to aid the consumers of Michigan with their housing problems but also looks to better the housing outcomes overall, for any and all consumers in the U.S. Currently, along with landlord-tenant, foreclosures, and consumer housing issues, housing discrimination is one of our priority areas for advocacy on behalf of consumers. In the Fall 2011, the Housing Law Clinic introduced its "Fair Housing Project," an initiative that seeks to focus the clinic's educational components and legal advocacy in the area of housing discrimination, and in particular, the Fair Housing

MSU College of Law is an affirmative-action, equal opportunity institution.

Act of 1968 and its amendments. For these reasons, the proposed rule currently presented by HUD is of great interest to our clinic, and we provide our comments with great enthusiasm.

**Placement of the Burden**

In order to succeed on their disparate impact claim, the proposed rule places the burden of proof upon the plaintiff to establish that there is a less discriminatory means to carry out the defendant's legitimate purpose. The placement of this burden is an important issue which often affects the outcome of Fair Housing Cases. Where to place this burden has been an unsettled debate between most circuits; however, some courts have determined the placement of the burden based upon an interpretation of Title VII job discrimination standards. Title VII places the burden on the plaintiff or moving party to establish that there is a less discriminatory alternative to achieve the defendant's business necessity. Applying this same burden shift to fair housing cases creates a disadvantage for the plaintiff, "the job-related qualities which might legitimately bar a Title VII-protected employee from employment will be much more susceptible to definition and quantification than any attempted justification of discriminatory housing practices under Title VIII." Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971). A strong example of the confusion between courts in regard to the application of the burden shift used in Title VII cases to Fair housing cases is Graoch Associates #3, L.P. v. Louisville/Jefferson County Metro Human Relations Comm, 508 F.3d 366 (2007), where the court describes the myriad of approaches among the circuits when analyzing a disparate impact claim. The miss application of Title VII's burden shift to Fair Housing cases is only one reason for why the burden should be placed on the defendant; there is a

more obvious reason given the general nature of disparate impact claims under the Fair Housing Act.

Most plaintiffs who sue for relief due to a *discriminatory effect* caused by the actions of the defendant will not have the education or means to "demonstrate that the legitimate, nondiscriminatory interests supporting the challenged practice can be served by another practice that has a less discriminatory effect." Therefore, the burden to prove that the challenged practice can be served by another practice that has a less discriminatory effect should be on the defendant rather then the plaintiff. Further, putting the burden on the plaintiff does not logically flow from the circumstances of the cause of action; the plaintiff has already proven that the defendant's actions have a discriminatory effect; therefore, but for the defendants actions, the plaintiff would have not had to file suit and go through the trouble of seeking a remedy for the activity or actions. Since the plaintiff has already been adversely affected by the defendant's discriminatory action, they should not also have to meet the burden of showing that the defendant can accomplish their legitimate interest in a less discriminatory manner.

The reason offered for where the burdens lye, "that neither party will be forced to prove a negative," is weak. If the defendant truly does have a legitimate nondiscriminatory interest he should carry it out in a nondiscriminatory manner. Putting this burden on the plaintiffs will create an incentive to pursue discriminatory actions in the guise of a legitimate nondiscriminatory interest, because under the new proposed standard discriminatory actions will go on unfettered if those being discriminated against are unable to show there is a less discriminatory action. If the defendants carried the burden then they will have the incentive to make the action as nondiscriminatory as

possible so as to ensure they would survive the burden shift if they were sued for a discriminatory effect. This will be especially difficult if the parties are impoverished or low income and lack the necessary resources to demonstrate the necessary proof. Further, the burden should be higher then simply demonstrating that the legitimate nondiscriminatory interest supporting the challenged practice can be served by another practice that has a less discriminatory effect." The burden should be that it can be carried about by another practice that has no discriminatory effect.

### Terms in the Proposed Rule

With respect to the term "perpetuating," as stated at the proposed rule section entitled "Perpetuation of Segregation," it should be more clearly defined. While there is a court case located here that describes the meaning of the term, a definition of the term might be more accurate for purposes of this rule.   For example, in a recent lawsuit filed by historically African-American colleges in the state of Maryland, the core accusation is that under funding their universities perpetuates segregation. In this instance, the allegations do not necessarily attempt to segregate further but continue existing segregation patterns already in place. This example is presented to stress the need to be certain this term is adequately defined in the final rule. The term "necessary and manifest relationship" should be defined further to ensure this standard would be applied in a uniform manner and that defendants will not attempt to carry out discriminatory actions that they are able to camouflage has a "legitimate nondiscriminatory interest." Further, the term "legitimate nondiscriminatory interest" should be defined further to ensure this standard would be applied in a uniform manner.

For the reasons outlined above, we urge the Department to revise the proposed rule to impose the burden on the defendant/respondent in the final step of the disparate impact analysis. Thank you for the opportunity to comment on the proposed amendments. Please contact the Michigan State University Housing Clinic for any questions 1-517-336-8088.

Sincerely,

Michigan State University Housing Clinic



## Document Details

**Comment Submitted by Chris Williston, Independent Bankers Association of Texas**

**Document ID:** HUD-2011-0138-0058    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

### Show Details

See attached file(s)

## Attachments:

| — Comment Submitted by Chris Williston, Independent Bankers Association of Te... | View Attachment: |
|---|---|

**Title:**
Comment Submitted by Chris Williston, Independent Bankers Association of Texas (Attachment)



**January 17, 2012**

INDEPENDENT BANKERS
ASSOCIATION OF TEXAS

1700 RIO GRANDE STREET
SUITE 100
AUSTIN, TEXAS 78701
P: 512.474.6889
F: 512.322.9004
WWW.IBAT.ORG

SCOTT HEITKAMP
IBAT CHAIRMAN
SCOTTH@VBTEX.COM
VALUEBANK TEXAS,
CORPUS CHRISTI

TROY M. ROBINSON
IBAT CHAIRMAN-ELECT
TROBINSON@BANKTEXAS.ORG
BANKTEXAS, QUITMAN

JAY M. GOBER
IBAT VICE CHAIRMAN
JGOBER@FSBGRAHAM.COM
FIRST STATE BANK, GRAHAM

JOHN W. JAY
IBAT SECRETARY-TREASURER
JWJAY@ROSCOESTATEBANK.COM
ROSCOE STATE BANK, ROSCOE

ANGIE BROWN
LEADERSHIP DIVISION
PRESIDENT
ABROWN@FNBGIDDINGS.COM
FIRST NATIONAL BANK, GIDDINGS

WILLARD J. STILL
IBAT EDUCATION FOUNDATION
CHAIRMAN
WSTILL@AMBANKWACO.COM
AMERICAN BANK, N.A., WACO

J. DAVID WILLIAMS
IMMEDIATE PAST CHAIRMAN
JD.WILLIAMS@HCSB.COM
HCSB, A STATE BANKING
ASSOCIATION, KERRVILLE

CHRISTOPHER L. WILLISTON, CAE
PRESIDENT AND CEO
CWILLISTON@IBAT.ORG

STEPHEN Y. SCURLOCK
EXECUTIVE VICE PRESIDENT
SSCURLOCK@IBAT.ORG

JANE HOLSTIEN
SENIOR VICE PRESIDENT
JHOLSTIEN@IBAT.ORG

URSULA L. JIMENEZ, CAE
SENIOR VICE PRESIDENT
UJIMENEZ@IBAT.ORG

RAMONA JONES
IBAT SERVICES VICE CHAIR
RJONES@IBAT.ORG

CURT NELSON
IBAT SERVICES PRESIDENT
CNELSON@IBAT.ORG

MARY E. LANGE, CAE
IBAT EDUCATION FOUNDATION
PRESIDENT
MLANGE@IBAT.ORG

JULIE COURTNEY, CAE, CMP
IBAT EDUCATION FOUNDATION
SENIOR VICE PRESIDENT
JCOURTNEY@IBAT.ORG

*Via E-Rulemaking Portal: http://www.regulations.gov*

Regulations Division, Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW, Room 10276
Washington, DC 20410-0500

Re:   Docket No. FR-5508-P-01
      Implementation of the Fair Housing Act's
      Discriminatory Effects Standard

Dear Sirs:

The following comments are submitted on behalf of the Independent Bankers Association of Texas (IBAT). IBAT is a trade association representing approximately 500 independent, community banks domiciled in Texas. Virtually all of its members make home loans and will be affected by this proposal. We appreciate the opportunity to comment. IBAT and its members are strongly committed to fair lending principles. However, IBAT believes that this proposal is premature based on pending litigation. More significantly, we also believe that the "disparate impact" analysis engrafted onto the Fair Housing Act by regulatory fiat will have the unintended consequence of actually reducing credit availability for many low to moderate income home buyers including many in protected classes.

*Proposal*

On November 16, 2011, the above referenced docket was filed in the Federal Register. This proposal would amend the Fair Housing Act (FHA) regulations by amending section 100.120 relating to the making of loans by adding a new subparagraph (2) that prohibits "providing loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin." A new Subpart G—Discriminatory Effect would also be added to the rules. This new subpart would prohibit practices that have a "discriminatory effect," which is defined through disparate impact. The statistical analysis identifying a disparate impact could be refuted by establishing a "necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent." However, there cannot be another practice that arguably has a less discriminatory effect. Finally, subpart G provides a shifting burden of proof. The complainant or plaintiff has the burden of proving that the challenged practice has a "discriminatory effect." Then the respondent or

Department of Housing and Urban Development
January 17, 2012
Page 2

defendant has the burden of proving a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests. This may then be countered by the complainant or plaintiff by showing that the challenged practice can be served by another practice that has a "less discriminatory effect." These provisions relating to disparate impact are taken from employment law.

*Recent Court Developments*

On November 7, 2011, the United States Supreme Court granted certiorari in the case of *Magner v. Gallagher* to determine whether disparate impact is a valid theory of liability under the FHA, and, if so, what standard should be applied. Independent Community Bankers of America, the national organization that exclusively represents community banks, has filed an amicus curiae brief in that matter, which we would suggest appropriately demonstrates the lack of statutory support for disparate impact as a theory of discrimination under the FHA. The grant of certiorari occurred after the proposal was crafted but before the Federal Register publication. The Supreme Court could uphold the test, strike it totally, or subject it to limitations. In any event, action on this proposal is premature at this time. We strongly urge HUD to withdraw this proposal pending final court action.

*Lack of Statutory Support for Proposal*

In the event the proposal is not withdrawn, we would make the following comments regarding the legal support for the rule and the industry impact of the rule as drafted.

First, the disparate impact analysis is taken from Title VII of the Equal Employment Opportunity Act and has no statutory basis in the FHA. Title VII has an explicit statutory framework for disparate impact. See 42 USC §2000e-2(k). Congress could have amended the FHA at any time during the last four decades to mirror Title VII and has not done so. That indicates that Congress has no intent to apply that "disparate impact" concept to the FHA. In short, this proposal exceeds the agency's authority.

*Section 100.120*

The proposal adds a new subparagraph (b)(2) that would affect the pricing and underwriting of mortgage loans if a practice would have the "effect" of denying or discouraging such loans on a prohibited basis. Although the regulation is silent as to the manner of determining the "effects" test, in practice banking regulators (in the absence of regulatory constructs) have used a statistical analysis to establish that a facially neutral policy or practice has the effect of impermissibly discriminating. IBAT members have reported to the organization that these statistical analyses have found, for example, that pricing on loans can be statistically significant, resulting in a finding of a fair lending violation, when rates to minorities or women were higher than rates to non-protected classes by as little as 0.125%. In addition, the statistical analyses are a blunt instrument. They do not take into consideration all of the nuances in a credit relationship. However, the result of such a test is devastating. If an examiner concludes that there is a "pattern or practice" of discriminatory pricing, the bank is referred to Department of Justice (DOJ) for further action. The bank's Community Reinvestment Act rating is reduced to no better than unsatisfactory. This means that the institution cannot branch, expand its activities, hold state public funds, or qualify for long term FHLB advances. All of that occurs without the right of appeal, pending the DOJ action. IBAT is extremely concerned with any effort to belatedly

Department of Housing and Urban Development
January 17, 2012
Page 3

create a regulatory framework that, after the fact, validates the analytical approach used to bash community banks.

Applying the disparate impact test broadly to cost, rate of denial, and terms and conditions of credit creates a level of uncertainty for lenders that ultimately leads to either cookie cutter loans with rigid criteria or an exit from certain credit products due to the regulatory compliance cost and enforcement/litigation cost arising from the uncertainties created by an ambiguous rule. This is especially true when the analysis used to determine the adverse "effect" is based on unspecified, ill-conceived statistical analyses. This is particularly problematic as to pricing of loans. To avoid any problem, a bank with branches in a variety of very different areas must ignore the differences in competition and the marketplace and simply price every loan exactly the same. While such a "loan in the box" approach may work for loans to be sold in the secondary market, it is totally inappropriate for loans that don't qualify for secondary market criteria but which a community bank is willing to make and keep in its own portfolio. The losers in this scenario are the consumers who can't get traditional mortgage loans but who could qualify for an in-portfolio loan made by the local branch. The loan officers, who may know the prospective borrower's capacity and desire to repay based on prior transactions, will not be able to use that to benefit the applicant. In short, community banks will have to abandon community banking principles in order to achieve a safe level of compliance with a disparate impact test as contemplated by this rule.

*Subpart G—Discriminatory Effect*

In addition to the concerns expressed above, IBAT believes that the new sections dealing with legally sufficient justification and with burden of proof create new, expanded impediments to lending and will over time reduce credit availability as to mortgage loans. Here are our more specific concerns.

First, a lender must identify not only an appropriate business justification for a particular practice, but that rationale must establish a "necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent..." [emphasis added] The underscored terms inject potential subjective review of the countervailing business support for a practice. We fear that a differential in interest rates for in-portfolio loans (even though such loans have a higher risk of repayment than loans that are to be sold) could be struck if an examiner (or court) substituted its judgment for the lender and concluded that although the differential might be a logical business action, it was not manifestly necessary. The ultimate effect could be the elimination of in-portfolio mortgage loans at many community banks. These loans fill an important niche in providing more tailored loans to customers who may not qualify for a secondary market transaction. The losers in that event are the consumers who can't find any source of mortgage credit, the builders who can't sell their homes, and the community which loses the expanded property tax base.

The burden of proof provisions also present concerns. After a lender demonstrates a business justification for a policy, the complainant or plaintiff can simply allege that there is another practice that has a less discriminatory effect. This ignores the fact that there are likely to be an array of practices that are possible in a loan program. The ultimate structure of a mortgage lending product will take into consideration interest rate risk, credit risk, reputation risk, repayment risk, legal risk, and a variety of other applicable factors. Subpart G does not require an alternative policy to evaluate any

Department of Housing and Urban Development
January 17, 2012
Page 4

factor other than whether or not it is "less" discriminatory.    Every other concern is irrelevant (apparently) under the Subpart G burden of proof analysis.

*Conclusion*

IBAT urges that this proposal be withdrawn pending final action by the United States Supreme Court. If that court should conclude that the plain language of the FHA can be ignored and a new standard involving "disparate impact" is permissible, we urge the agency to go back to the drawing board. The final standards should be objective rather than subjective. Once a bank establishes a clear business justification for a policy or practice, the inquiry should stop. Most significantly, there should be clear intent on the part of the lender rather than a mere statistical analysis that arguably shows different treatment. Further, if that point is ignored, we strongly urge the agency to establish rational, supportable standards for analysis.

Thank you for this opportunity to comment.

Sincerely,

Christopher L. Williston, CAE
President and CEO



## Document Details

SHARE

**Comment Submitted by JoAnn Edwards, Pennsylvania Human Relations Commission**

Document ID: HUD-2011-0138-0059   Document Type: Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

See attached file(s)

Attachments:

| – Comment Submitted by JoAnn Edwards, Pennsylvania Human Relations Commission... | View Attachment: |
|---|---|

Title:
Comment Submitted by JoAnn Edwards, Pennsylvania Human Relations Commission (Attachment)

Chairman
GERALD S. ROBINSON
Vice Chair
DR. RAQUEL O. YIENGST
Secretary
DANIEL D. YUN
Assistant Secretary
REV. DR. JAMES EARL GARMON, SR.
Executive Director
JOANN L. EDWARDS

Commissioners
ISMAEL ARCELAY
M. JOEL BOLSTEIN
STEPHEN A. GLASSMAN
J. WHYATT MONDESIRE
S. KWEILIN NASSAR
SYLVIA A. WATERS
DANIEL L. WOODALL, JR.



**COMMONWEALTH OF PENNSYLVANIA**
**Human Relations Commission**
301 Chestnut Street, Suite 300
Harrisburg, PA 17101-2702
(717) 787-4410 voice
(717) 787-4087 TTY
www.phrc.state.pa.us

January 17, 2012

**Via Federal eRulemaking Portal at www.regulations.gov**
Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street N.W., Room 10276
Washington, D.C. 20410

Re:   FR Docket No. FR-5508-P-01—Implementation of the Fair Housing
      Act's Discriminatory Effects Standard

To Whom It May Concern:

I write, on behalf of the Pennsylvania Human Relations Commission ("PHRC"), in strong support of HUD's Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard. The PHRC is an administrative agency of the Commonwealth of Pennsylvania, duly authorized by the Pennsylvania Human Relations Act[1] (the "PHRA" or "Act") to enforce the anti-discrimination provisions of the PHRA pursuant to the Act and the regulations promulgated thereunder.[2] HUD has certified that the PHRC provides procedures that are "substantially equivalent" to the FHA and certified as such in accord with the FHA. The Commission has both a significant interest in, and experience regarding, the issue of disparate impact claims under the fair housing laws. For decades, the Commission has enforced the PHRA's fair housing and fair lending provisions, and relied upon disparate impact analysis in combating housing discrimination and residential segregation.

This Proposed Rule provides needed clarity on both the importance of, and the standard for, the Fair Housing Act's prohibition against housing practices that have a discriminatory effect, even in the absence of discriminatory intent. The PHRC has examined HUD's proposed standard for disparate impact claims and believes that it presents a well-reasoned standard for analyzing such claims that reflects the consistent interpretation of the courts of the appeals that that violations of the Fair Housing Act may be proved through a disparate impact analysis.

---

[1] Act of 1955, P.L. 744, *as amended*, 43 P.S. §§ 951963.
[2] 16 Pa. Code §§ 41 *et seq.*

Despite the unanimous consensus that the Fair Housing Act includes a disparate impact standard by all federal courts of appeals to address the issue, some clarity has been lacking concerning the proper approach to such claims.[3] As a result, this proposed standard provides much-needed and timely guidance regarding this critical tool in civil rights enforcement. The guidance is particularly desirable in light of some of the confusion demonstrated by housing discrimination defendants as to the scope of disparate impact analysis under the Fair Housing Act following the United States Supreme Court's decision in *Smith v. City of Jackson*.[4] This Proposed Regulation provides a uniform standard for disparate impact claims and thus promotes compliance with, and advancement of, the laudable goals of the Fair Housing Act.

Having reviewed the Proposed Regulation, the PHRC agrees with the position taken by HUD with respect to all aspects of the proposed disparate impact standard. The PHRC believes that the burden-shifting scheme that HUD proposes to adopt sets forth an appropriate standard for evaluating disparate impact and perpetuation of segregation claims. The PHRC supports this standard and applauds HUD's Proposed Regulation.

Indeed, the PHRC particularly applauds HUD's proposed regulation because it clarifies the long established and widely agreed upon position that disparate impact analysis is critically important to vigorous enforcement of the Fair Housing Act. The Fair Housing Act's central purpose is "to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States."[5] The Act's "broad remedial intent" can only be truly achieved through strong enforcement that recognizes the history of residential segregation in this country.[6] As Congress recognized in 1988, "[a]cts that have the effect of causing discrimination can be just as devastating as intentional discrimination." Disparate impact claims are an invaluable tool in combating housing discrimination and residential segregation.

---

[3] The unanimity of the federal courts of appeals aside, the question of whether disparate impact analysis is available is currently pending before the United States Supreme Court. *See, Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010), *cert. granted*, 79 U.S.L.W. 3653 (U.S. Nov. 7, 2011) (No. 10-1032). While the Commission's position is that the federal Fair Housing Act embraces a disparate impact standard, the Commission notes that, should the Supreme Court find otherwise or limit the disparate impact standard when it decides *Magner*, such a result will not affect the availability of disparate impact analysis in Pennsylvania, under the PHRA. The Pennsylvania Supreme Court has long-since recognized the availability of disparate impact analysis under the PHRA. *Gen. Elec. Corp. v. Pa. Human Relations Comm'n*, 365 A.2d 649 (1976). Moreover, unlike its federal counterparts, the PHRA encompasses all forms of discrimination—housing, employment, public accommodations, disability—in one statute. This makes clear, as a matter of common sense and under basic principles of statutory construction, that the Pennsylvania Legislature intended uniform treatment of discrimination claims by the courts. As a consequence, disparate impact analysis is available in all contexts—housing, employment, public accommodations, disability— under the PHRA.

[4] 544 U.S. 228 (2005).

[5] H. Res. 1095, 110th Cong., 2d Sess., 154 Cong. Rec. H2280-01 (Apr. 15, 2008) (2008 WL 1733432).'

[6] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982).

2

In 1976, the Pennsylvania Supreme Court, relying on the example set by the U.S. Supreme Court in *Griggs v. Duke Power Company*, first recognized the applicability and importance of the disparate impact standard.[7] Since that time, the PHRC has investigated and prosecuted numerous cases wherein a housing policy had a disparate impact on members of protected classes. *See i.e., McGlawn v. Pennsylvania Human Relations Com'n*, 891 A.2d 757 (Pa. Cmwlth. 2006). Such cases highlight the need for disparate impact analysis in our efforts as a society to promote on non-discrimination and integration.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effects standard. I also thank HUD for its efforts in crafting this Proposed Regulation, and for the important guidance it provides all of us who work to enforce the aims of the Fair Housing Act.

Respectfully,

JoAnn L. Edwards, MA, SPHR
Executive Director

---

[7] *Gen. Elec. Corp. v. Pa. Human Relations Comm'n*, 365 A.2d 649 (1976); *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 431-32 (1971) (holding that Title VII "proscribes not only overt discrimination but also practices that are fair in form but discriminatory in operation. . . . If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited. . . . Congress directed the thrust of the Act to the *consequences* of employment practice, not simply the motivation.").

3



## Comment Submitted by Cindy Turner, Georgia Credit Union Affiliates

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder** →

**Comment**

See attached file(s)

**Attachments (1)**

Comment Submitted by Cindy Turner, Georgia Credit Union Affiliates (Attachment)

**View Attachment:**  

Comment Period Closed
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0060
**Tracking Number:** 80f98c3

Document Information

**Date Posted:**
Jan 18, 2012

**Show More Details** ▢



6705 Sugarloaf Parkway, Suite 200
Duluth, GA 30097
(770) 476-9625 • (800) 768-1282 • (770) 497-9534 (fax)



AMERICA'S
CREDIT UNIONS

January 17, 2012


Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410

**RE: Docket No. FR–5508–P–01   RIN 2529–AA96**
**Implementation of the Fair Housing Act's Discriminatory Effects Standard**


To Whom It May Concern:


The Georgia Credit Union League (GCUL) appreciates the opportunity to comment on the Department of Housing and Urban Development discriminatory effects proposal. As a matter of background, GCUL is the state trade association and one member of the network of state leagues that make up the Credit Union National Association (CUNA). GCUL serves approximately 149 credit unions that have nearly 1.9 million members. This letter reflects the views of our Regulatory Response Committee, which has been appointed by the GCUL Board to provide input into proposed regulations such as this.

GCUL commends the Agency's efforts to create uniform standards regarding discriminatory effects. The rule is intended to make clear that the standard to be used in implementing the Fair Housing Act's prohibition on housing discrimination on the basis of race, color, religion, sex, disability, familial status, or national origin includes discrimination with or without discriminatory intent. While clarification is welcome we believe that the pending court case of *Magner v. Gallagher* being heard before the Supreme Court soon could complicate matters where lenders may be faced with instituting a set of rules that have a chance of being changed during the course of implementation.

We would like to urge HUD to hold off on further rule making until the Supreme Court ruling has been established. This may help avoid any confusion regarding interpretation of the Fair Housing Act.


We understand and support your effort to standardize the test that would be applied to all cases brought under the act. Without implementing a uniform standard under the Act, courts and HUD will continue to use different standards depending on the venue in which the case is brought and the type of claim.

GCUA appreciates the opportunity to present comments on behalf of Georgia's credit unions. Thank you for your consideration. If you have questions about our comments, please contact me at (770) 476-9625.


Respectfully submitted,

*Cindy Turner*

Cindy Turner
Vice President/Compliance Services



## Document Details

**Comment Submitted by Sharon Kinlaw, Fair Housing Council of the San Fernando Valley**

Document ID: HUD-2011-0138-0061   Document Type: Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

See attached file(s)

Attachments:

— Comment Submitted by Sharon Kinlaw, Fair Housing Council of the San Fernand...   View Attachment:

Title:
Comment Submitted by Sharon Kinlaw, Fair Housing Council of the San Fernando Valley (Attachment)



8134 VAN NUYS BOULEVARD, SUITE 206
PANORAMA CITY, CALIFORNIA 91402
TELEPHONE: (818) 373-1185
FAX : (818) 373-1193

January 17, 2012

**BOARD OF DIRECTORS'**

RAFER JOHNSON
*Board President*

LORETTA KELLY
*1st Vice President*

WINNIE DAVIS
*Recording Secretary*

BETSY JOHNSON
*Recording Secretary*

DONALD BAGWELL, JR.
*Treasurer*

DIANA C. BRUNO
*Executive Director*

JUANITA BANKHEAD

WADE RICE

MILDRED STEWART

**ADVISORY BOARD**

WENDY FURTH

DEBRA LEVY

TRUDY SIBLEY

DR. ROBERT WAKAMATSU

ROBERT WINN

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

    Re:  Docket No. FR-5508-P-01; *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

I am writing in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. Our organization, The Fair Housing Council of the San Fernando Valley, founded in 1959, is a comprehensive housing services organization for the San Fernando Valley region of Los Angeles. Our agency is constantly evolving to meet the changing needs of tenants, owners, and others concerned with receiving or advancing equal opportunity in housing. The Council provides advocacy, counseling, education and investigative services (and provides direct intervention on behalf of vulnerable parties) for rental, sales, lending (including predatory lending) insurance redlining and appraisal discrimination.

The Council takes the view that housing links to education, transportation, health care and other major quality-of-life aspects of the community, and it serves in an advocacy role throughout the State of California on this topic. We have a vast service area in Los Angeles County which encompasses almost 2 million people and we take pride in providing a full-service comprehensive fair housing and fair lending program that since 2003 has provided education to approximately 1,500,470 individuals, distributed approximately 908,514 pieces of educational fair housing and fair lending materials and actively participated in over 1,862 community events. In 2010, we assisted approximately 406 individuals with complaints of housing discrimination.

HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status. In our work, we have encountered many examples of housing practices that are neutral on the surface, but destructive to the mission of fostering equal opportunity.



*One such example is numerical occupancy limitations. When such limitations are imposed by housing providers, they may have the effect of excluding families with minor children from housing. This effect, even if not intended by the housing provider, runs counter to the goals of the Fair Housing Act.*

*Another example is of a complaint recently received in our office from a group of tenants, all of whom were seniors and/or disabled. The housing provider in an effort to "go green" imposed a new policy and notified tenants that all rents would have to be paid online. The seniors most in their eighties complained to the manager that they did not own or know how to operate a computer. They were advised by the Management Company that if they did not own a computer, they could pay their rent online at the local Internet Café or library. Our agency began an investigation the complaint and found that the nearest library was about 3 miles away and the Internet Café locations provided to the tenants by the manager charged a fee of $5 to use the computers.*

*Some of these seniors no longer drive due to age and/or disability and all live on extremely limited incomes of social security and/or disability and could not afford to pay an additional $5 (or more) a month. No longer being able to pay the rent directly to the onsite manager was more then a mere inconvenience to these seniors, it caused stressed and created an unnecessary hardship. The hardship for the elderly and disabled residents of this apartment complex included trying to find transportation to the library (sometimes at a cost) or having to stretch an already too thin budget The housing provider's intention was to "go green," not to negatively impact the lives of the tenants with a neutral policy, but the effect of this new rule significantly impacted the lives of these octogenarians, which runs counter to the goals of the Fair Housing Act.*

HUD's proposed regulation provides clarity to housing providers, housing seekers, municipalities, and courts who may confront such policies in many different ways. The regulation not only clarifies the burden of proof in the context of litigation to the benefit of courts and litigants. It also will help to prevent litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of our agency.

We applaud HUD's efforts to provide guidance on the important issue of disparate effects under the Fair Housing Act and urge HUD to issue the final rule as soon as possible.

Respectfully,

*Sharon Kinlaw*
Sharon Kinlaw
Assistant Director

Comment Submitted by Ilene J. Jacobs, California Rural Legal Assistance, Inc.

Case 1:13-cv-00966-RJL    Document 40-3    Filed 08/08/14    Page 49 of 138





# CALIFORNIA RURAL LEGAL ASSISTANCE, Inc.



**MARYSVILLE OFFICE**

**511 D Street**
**Post Office Box 2600**
**Marysville, CA 95901**
**Telephone 530.742.7235**
**Fax 530.741.0854**
ijacobs@crla.org

**Ilene J. Jacobs**
*Director of Litigation,*
*Advocacy & Training*
*Also admitted in District of Columbia*
*and Maryland*

**CENTRAL OFFICE**
631 Howard Street, Suite 300
San Francisco, CA 94105-3907
(415) 777-2752

**José R. Padilla**
*Executive Director*

**Ralph Santiago Abascal**
*General Counsel*
*(1934-1997)*

*Directors of Litigation,*
*Advocacy and Training*
**Michael Meuter**
*in Salinas*
**William G. Hoerger**
**Ilene J. Jacobs**
*in Marysville*
**Cynthia Rice**

**OTHER REGIONAL OFFICES**
*Coachella*
*Delano*
*El Centro*
*Fresno*
*Gilroy*
*Madera*
*Modesto*
*Monterey*
*Oceanside*
*Oxnard*
*Paso Robles*
*Salinas*
*San Luis Obispo*
*Santa Barbara*
*Santa Cruz*
*Santa Maria*
*Santa Rosa*
*Stockton*
*Watsonville*

January 17, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:     Docket No. FR-5508-P-01
        Implementation of the Fair Housing Act's Discriminatory Effect
        Standard Submitted through Federal eRulemaking Portal at
        www.regulations.gov

To Whom It May Concern:

California Rural Legal Assistance, Inc. (CRLA) recognizes the importance of
the Department's efforts to establish standards for determining when a
housing practice with a discriminatory effect violates the Fair Housing Act.

CRLA legal services are shaped by the needs of our diverse client community.
Through a state-wide network of 21 offices, our staff conducts litigation,
outreach and legal education on the most pressing issues facing low-income
communities: housing; employment; education; workplace safety;
discrimination; income maintenance and healthcare access. CRLA provides
legal services in conjunction with a series of innovative programs and special
initiatives. Strategically designed programs and initiatives allow CRLA to
address recurring, wide-spread problems that we have identified through
emergent patterns in our individual client cases, for example, enforcing fair
housing and land use rights, protecting individuals from predatory lending,
fighting for communities that lack basic infrastructure, supporting victims of
domestic violence.

We are in full support of the National Fair Housing Alliance's comment letter
and the Housing Justice Network's comment letter.

Regulations Counsel
Office of General Counsel
January 17, 2012
Page 2


Thank you for the opportunity to comment on the proposed regulations implementing the Fair Housing Act's discriminatory effect standard.  We commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act.  Please contact me with any questions.


Sincerely,

Ilene J. Jacobs

Ilene J. Jacobs
CRLA Director of Litigation, Advocacy & Training







South
Brooklyn
Legal
Services

Legal
Services NYC

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW, Room 10276
Washington, D.C.  20410-0500

      **Re: Docket No. FR-5508-P-01, Proposed Rule for Implementation of the Fair
      Housing Act's Discriminatory Effects Standard**

To Whom It May Concern:

South Brooklyn Legal Services is pleased to submit comments to the Department of Housing and
Urban Development regarding its proposed rule for implementation of the Fair Housing Act's
discriminatory effects standard.  We thank the Department of Housing and Urban Development
for the opportunity to comment on these critical regulations.

South Brooklyn Legal Services provides legal assistance to low-income individuals in a variety
of areas, including robust practices in tenants' rights, disability rights, and foreclosure
prevention.  Our assistance includes legal advice and referral, as well as representation in state
and federal court and before administrative agencies.  In our practice, we frequently assert our
clients' rights under the Fair Housing Act.  We see disparate impact fair housing/fair lending
violations of all varieties. Some common fact patterns our clients encounter include the
following:

- An African-American or Latina homeowner's origination papers show that she was
  brokered a high-cost refinance or home purchase loan packed with excessive fees and a
  high "yield spread" premium; these charges were all discretionary, not based on any
  objective measure of credit-worthiness, and studies have shown bank practices allowing
  these types of charges have a disparate impact on minority borrowers.

**South Brooklyn Legal Services**
105 Court Street, 3rd Floor Brooklyn, NY 11201
Phone: 718-237-5500  Fax: 718-855-0733  www.sbls.org
**John C. Gray**, Project Director

**Towards justice and dignity for all – Por la Justicia y Dignidad de Todos**

LSC

- An African-American or Latino homeowner faces egregious servicing abuses which appear to have been the results of servicer policies and practices that have a disparate impact on minority borrowers. Such abuses may include:
  - The homeowner's payments, although made correctly and on-time, are repeatedly misapplied, driving him into foreclosure.
  - The homeowner finds that an exorbitant "forced-placed" insurance policy was improperly placed on his home and the excess payments drive him into foreclosure.
  - The servicer has failed to properly consider the homeowner for a Home Affordable Modification Program ("HAMP"), an FHA-HAMP, or a non-HAMP loan modification, either failing to process the modification in the proper time periods, incorrectly finding the homeowner ineligible for the program, or offering the homeowner improper terms outside of the parameters of the program.

- A disabled homeowner's servicer improperly requests documentation of her disability upon learning that the homeowner's income includes income from the Social Security Disability program.

- An African-American or Latino tenant's landlord makes repairs only for new, higher-paying tenants; the new tenants are all white, and the older tenants are African American and Latino.

We welcome the Department of Housing and Urban Development's step in promulgating this proposed rule for comment. These regulations will be of tremendous importance to our clients, as they endeavor to protect their rights under the Fair Housing Act. The regulations are clear and concise. They lay out the burden-shifting test in a manner that is clear, coherent, and easy for courts and other arbitrators to apply. The examples provided in proposed sections 100.65, 100.70, and 100.120 of the regulations of actions and activities that violate the Fair Housing Act are ones that our clients encounter regularly, and their inclusion as proscribed behavior will be of great benefit to tenants and homeowners. The proposed changes are essential for remediating abuses in the housing and lending markets and ensuring access to fair and affordable housing for all.

Although the proposed regulations are overall quite clear and robust, we believe that the proposal could be strengthened in a few discrete ways to provide additional clarity to courts as well as to housing and other service providers, and to potential victims of discrimination. We encourage the Department of Housing and Urban Development to make the following changes to the proposed regulations: (1) add language referring to mortgage servicing abuses to proposed 24 C.F.R. § 100.120 and (2) clarify that a "legally specific justification" may not be hypothetical or speculative under 24 C.F.R. § 100.500(b).

**Improvements to the Proposed Regulations**

- Proposed 24 C.F.R. § 100.120 regarding "Discrimination in the making of loans and in the provision of other financial assistance"

  Proposed 24 C.F.R. § 100.120(b) revises an existing section describing a list of practices

that are prohibited under Section 3605 of the Fair Housing Act. Section 3605 has been held to apply to discriminatory treatment of protected groups by mortgage loan servicers. *See, e.g., Rodriguez v. Bear Stearns Cos.*, 2009 WL 995865 (D. Conn. April 14, 2009); *Stanfield v. CitiMortgage*, 2010 WL 3257721, *4 (D.S.C. July 16, 2010). This holding is clearly indicated by the language of the statute. Mortgage servicers should be explicitly included in the language of the regulation, particularly as we see a high level of discriminatory activity by these entities. We propose that the language of the section 100.120(b)(2) be modified to read: "Providing or servicing loans or providing other financial assistance in a manner that results in disparities in their cost…"

- Proposed 24 C.F.R. § 100.500(b)

  Proposed 24 C.F.R § 100.500 lays out the definitions and mechanics at the heart of the burden-shifting disparate impact test already adopted by the Department of Housing and Urban Development, as well as by numerous courts of appeals. Although the rule clearly establishes the burdens of the parties in challenging and defending, respectively, a housing practice, the section would be strengthened by a clarification that any "legally sufficient justification" provided under section 100.500(c)(2), and defined in section 100.500(b), must be actual and may not be hypothetical or speculative. We therefore propose that the language of section 100.500(b) be modified to include the following sentence: "A legally sufficient justification may not be hypothetical or speculative."

**Conclusion**

Thank you for your leadership in proposing these additions and changes to the regulations implementing the Fair Housing Act. If you have any questions, please do not hesitate to contact me regarding these comments.

Sincerely,

Rachel Geballe
Staff Attorney



## Comment Submitted by Hilary King, Housing Research & Advocacy Center

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder** →

**Comment Period Closed**
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0064
**Tracking Number:** 80f98c6

### Comment

See attached file(s)

### Document Information

**Date Posted:**
Jan 18, 2012

Show More Details ⌕

### Attachments (1)

Comment Submitted by Hilary King, Housing Research & Advocacy Center (Attachment)

**View Attachment:**  PDF

The Housing
Research & Advocacy
Center

3631 Perkins Ave., #3A-2
Cleveland, OH 44114
Phone: (216) 361-9240
Fax: (216) 426-1290

January 17, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Housing Research & Advocacy Center supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

The Housing Research & Advocacy Center is a fair housing agency that works to ensure fair housing rights through research, education and advocacy. The Housing Center conducts research on housing and lending patterns in Northeast Ohio and throughout the State. In addition to our annual *State of Fair Housing in Northeast Ohio* report, we produce a variety of reports, maps, and other publications examining fair housing and fair lending issues in the region, as well as foreclosure trends, subprime lending and related matters. Over the past two years, the Housing Center has trained nearly 1,000 residents and real estate professionals on fair housing laws.

Agency advocacy takes many forms including testimony before the Federal Reserve Board on Home Mortgage Disclosure Act (HMDA) data and in front of the Ohio House on predatory lending practices. Dedicated staff work to advocate on behalf of victims of housing discrimination by assisting in the administrative complaint process. Through all of these efforts, the Housing Center works to further fair housing for the residents of Northeast Ohio.

We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact me at (216) 361-9240/hking@thehousingcenter.org with any questions.

Sincerely,

Hilary Mason King
Executive Director

www.thehousingcenter.org

000435



SHARE

## Document Details

Comment Submitted by Molly Dunham, American Planning Association

Document ID: HUD-2011-0138-0065    Document Type: Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

See attached file(s)

Attachments:

— Comment Submitted by Molly Dunham, American Planning Association (Attachmen...    View Attachment:

Title:
Comment Submitted by Molly Dunham, American Planning Association (Attachment)



**American Planning Association**

*Making Great Communities Happen*

January 17, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01; "RIN 2529–AA96"** *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

The American Planning Association respectfully submits its comments supporting HUD's proposed formalization of the Fair Housing Act's discriminatory effects standard and urging the agency to further formalize a holistic test for that standard. Our comments largely echo those submitted by the National Lawyers' Committee for Civil Rights Under Law, with two exceptions: APA takes no position with respect to the precise burden-shifting framework to be imposed as part of the test determining whether a discriminatory effect violates the Fair Housing Act, and we further encourage HUD to take a broad view of the impacts of any particular policy or practice in applying whichever test is ultimately adopted.

**Support for the Discriminatory Effects Standard**

We write in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status.

The proposed regulation formalizes the long and consistent interpretation of the Fair Housing Act by HUD, which has repeatedly determined that the anti-discrimination provisions of the Act are directed to the consequences of housing policies and practices, not simply their purpose.

Please reply to
**Chicago office**
205 N. Michigan Avenue
Suite 1200
Chicago, IL 60601-5927
p 312.431.9100

planning.org

**National Headquarters**
1030 15th Street, NW
Suite 750 West
Washington, DC 20005-1503
p 202.872.0611

W. Paul Farmer, FAICP
*Chief Executive*

Mitchell J. Silver, AICP
*President*

This interpretation is consistent with the uniform interpretation of the Act by the federal courts of appeals, which have consistently held, for over forty years, that liability under Title VIII may be established based on a showing that a neutral policy or practice either has a disparate impact on a protected group or creates, perpetuates, or increases segregation. As the Supreme Court recently noted in another context, "[t]his unanimity among the lower courts about the meaning of a statute of great practical administrative importance in the daily working lives of busy trial judges is itself entitled to strong consideration, particularly when those courts have maintained that interpretation consistently over a long a period of time." *United States v. Tinklenberg*, 131 S. Ct. 2007, 2014 (2011). With this proposed regulation, HUD is providing this same type of "practical administrative" guidance for HUD investigators and administrative law judges, as well as for the state and local fair housing agencies that share responsibility with HUD for the investigation of fair housing complaints.

The importance of the disparate impact standard to effective and vigorous fair housing enforcement cannot be overstated. This is evident in the variety of cases listed in the proposed regulation where disparate impact analysis has been applied (76 Fed. Reg. 70924-25). Without the ability to prove violations through a disparate impact analysis, there would be major obstacles to attacking subtle but pernicious housing-related discrimination. Moreover, without a disparate impact standard, the Fair Housing Act would not address many of the implicit, structural and institutional biases operating in today's housing market.

The breadth of cases relying on disparate impact claims brought by private enforcers of the Act illustrates the importance of such claims to achieving the "policy of the United States to provide within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. 3601. Examples are numerous and far-reaching and include the following:

- Cases attacking zoning and land-use policies and decisions which restrict private construction of multifamily housing to a largely minority area or block or limit development of affordable housing in communities of opportunity, resulting in both discriminatory denial of housing to minorities and the perpetuation and/or exacerbation of residential segregation;

- A wide variety of fair lending cases attacking policies of financial institutions with a discriminatory impact on protected groups, including (1) underwriting polices; (2) pricing and fee policies (which were a central factor in the ongoing foreclosure crisis); (3) discriminatory application of credit score criteria in determining home mortgage interest rates; (4) minimum loan amount policies which disproportionately exclude potential minority applicants from consideration because of their income levels or the value of the houses in the areas in which they live; and (5) residential mortgage lending policies requiring a credit score above the Federal Housing Authority minimum;

- A wide variety of homeowners' insurance cases attacking insurance company policies that (1) deny insurance based on the age of the home; (2) do not provide replacement value insurance policies based on the age or location of the home; (3) do not insure for replacement value if that value is greater than the market value of the house, based on a moral hazard rationale; and (4) discriminate in the pricing of homeowners' insurance policies;

- Residency requirements and other admissions procedures imposed by public housing agencies or housing management firms in predominantly white communities which discriminate against minority persons not living in such communities;

- Cases challenging governmental redevelopment or demolition plans or policies which disproportionately displace minorities by eliminating lower income housing;

- A variety of cases involving group homes for disabled persons. For example, there have been many cases brought by groups of unrelated persons seeking to live together in financially viable and therapeutic group settings, such as persons recovering from alcohol or drug addiction, who seek to occupy a home located in a single-family neighborhood but are denied because the zoning ordinances only permit families related by blood or marriage to occupy homes in this neighborhood. Other cases attack municipal ordinances requiring that all group homes be located more than one mile from any other group home;

- Cases attacking unreasonably restrictive occupancy standards adopted by landlords which result in excluding or limiting families with children from the housing;

- Cases attacking policies which have a disparate impact because of the sex of tenants, e.g. a policy which refuses to consider alimony payments in determining eligibility; a policy or practice of evicting tenants who receive welfare; a policy or practice of evicting victims of domestic violence; and

- Cases attacking policies requiring that tenants speak English or be United States citizens.

In each of these contexts, the discriminatory effects standard has proven to be a valuable tool in assessing when policies have an adverse impact on members of a protected class, and whether these policies are necessary to achieve a legitimate goal that cannot be achieved through less discriminatory means. This type of assessment is an essential part of our fair housing enforcement system, and the proposed rule will ensure that the standard continues to be applied consistently across the country.

**Support for a Holistic View of Discriminatory Effects**

The discriminatory effects standard is essential in addressing housing discrimination, and the burden-shifting framework proposed by HUD represents an attempt to distinguish between those policies and practices that incidentally and unavoidably give rise to disparate impacts and those that lead to unnecessary and unfair housing discrimination. Though we take no position on the precise framework of the test to be adopted, we urge HUD to incorporate a holistic and long-term view in evaluating potential disparate impacts under the Fair Housing Act.

The ongoing matter of *Magner v. Gallagher* currently before the U.S. Supreme Court provides an illustration of our concerns. On the facts of *Magner*, in which landlords protest aggressive enforcement of housing codes targeted toward rental housing, a holistic inquiry would broadly consider all impacts on the protected class before reaching a conclusion as to whether the practice has a discriminatory effect. While it may be possible to identify a negative impact on landlord expenses, which basic economic theory implies will translate to some degree of negative impact on the availability of affordable housing, it is essential that HUD take the wider view and long-term perspective typically adopted by local, regional, and state governments in setting policy related to housing.

The *Magner* facts, for example, require consideration of whether increased housing code enforcement might lead to a very large increase in affordable, code-compliant housing at minimal additional cost, providing a net benefit to the protected class. The same inquiry should further consider whether the additional costs imposed might be largely capital costs whose initial impacts may greatly overstate the long-term costs to landlords and their tenants. It is the responsibility of agencies at all levels of government to holistically plan and regulate for the long-term benefit of the citizens of their jurisdictions, and their practices should be evaluated in that light. Costs imposed on a protected class, though constituting a negative "disparate impact," may in fact be nominal in comparison with the overall impacts of any particular policy or practice.

Though it is not possible to predict all the questions an agency should consider in determining whether a practice or policy has a disparate impact on a protected class, the facts of *Magner* illustrate the necessity of a full and holistic inquiry in reaching such a determination.

Very truly yours,

American Planning Association
Washington, DC

Case 1:13-cv-00966-RJL    Document 40-3    Filed 08/08/14    Page 63 of 138





**T A A H P**
TEXAS AFFILIATION OF AFFORDABLE HOUSING PROVIDERS | 221 E. 9th street, ste. 408 | Austin, TX 78701
tel 512.476.9901  fax 512.476.9903  taahp.org  texashousingconference.org

January 17, 2012

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street SW, Room 10276
Washington, DC 20410

RE:  *Proposed Implementation of the Fair Housing Act's Discriminatory Effects Standard Rule, Docket No. FR-5508-P-01*

Please accept these comments by the Texas Affiliation of Affordable Housing Providers (TAAHP) on the proposed "Implementation of the Fair Housing Act's Discriminatory Effects Standard."

TAAHP is the leading association of affordable housing professionals representing the affordable housing industry in Texas. TAAHP represents a nationwide coalition of dedicated housing professionals who have helped produce tens of thousands of affordable and award- winning multifamily, assisted living, and residential communities with state-of-the-art design, amenities, and resident services across Texas. TAAHP's goal is to ensure that affordable housing is developed at the highest quality level for low-income and special needs individuals and families across the State of Texas.

The proposed revisions to 24 CFR Part 100 appropriately clarify that a violation of the Fair Housing Act does not require a finding of discriminatory intent. The proposed provision prohibiting land use rules, policies, or procedures with a disparate impact will help to address impediments to fair housing and obstacles to generating affordable housing in Texas.

In contrast, however, the proposed rule inappropriately includes segregation as a category of discriminatory effect violation under the Fair Housing Act, which sets the stage for a constitutional challenge to the proposed regulations. Segregation is more appropriately addressed through revisions to HUD's site and neighborhood standards in separate notice-and-comment rulemaking. Furthermore, the proposed segregation provisions make no distinction between public entities such as cities and private entities such as affordable housing developers.

Finally, the disparate impact test regulations may need to be revised based on the Supreme Court's decision in *Magner v. Gallagher*.

<u>The Regulations Appropriately Prohibit Housing Practices With Discriminatory Effect</u>

The proposed regulation interprets the Fair Housing Act as prohibiting housing practices with discriminatory effect even if not motivated by a prohibited intent. This interpretation is consistent with statutory text, legislative history, and the case law. The clarification of fair housing regulations in this regard is appropriate and consistent with HUD's duty to affirmatively further fair housing.

president
ANTOINETTE M.
"TONI" JACKSON
Coats | Rose

immediate past
president
DAN MARKSON
The NRP Group

president-elect
BARRY KAHN
Heitig-Kahn

vice president
NICOLE FLORES
City Real Estate Advisors

vice president
GEORGE LITTLEJOHN
Novogradac & Co. LLP

treasurer
MAHESH AIYER
Sterling Bank

secretary
JUSTIN MACDONALD
MacDonald & Associates

DIRECTORS

SARAH ANDERSON
S. Anderson Consulting

TERRI ANDERSON
Anderson Capital, LLC

BOBBY BOWLING
Tropicana Building Corp.

DENNIS HOOVER
Hamilton Valley
Management, Inc.

JOY HORAK-BROWN
New Hope Housing, Inc.

DARRELL G. JACK
Apartment Market
Data, LLC

DAVID MARK KOOGLER
Mark Dana Corporation

MARK MAYFIELD
Texas Housing Foundation

JEFFREY SPICER
State Street
Housing Advisors, L.P.

JERRY WRIGHT
Dougherty & Company, LLC

executive director
JIM T. BROWN





**TAAHP** TEXAS AFFILIATION OF AFFORDABLE HOUSING PROVIDERS | 221 E. 9th street, ste. 408 | Austin, TX 78701
tel 512.476.9901 fax 512.476.9903 taahp.org texashousingconference.org

### Proposed Section 100.70(d)(5): Add "Ordinances" to List of Impediment to Fair Housing

The proposed regulation prohibiting "land use rules, policies, or procedures" with a discriminatory effect will address exclusionary zoning, a major impediment to fair housing. In response to not-in-my-backyard (NIMBY) political pressure, which is often exacerbated by state qualified allocation plans that require neighborhood support, city governments have adopted exclusionary land use policies with discriminatory effects. The proposed regulation will provide HUD and the courts with clarification of their legal authority to prevent these governmental impediments to fair housing. To strengthen this provision, the term "ordinance" should be added to "rules, policies, or procedures" so that the regulation prohibits "land use rules, policies, ordinances or procedures" with a discriminatory effect.

### Proposed Section 100.500(a): Distinguish between Public versus Private Entities

Segregated housing patterns have, unfortunately, existed for many years in a large number of cities and towns. Most of the housing segregation case law focuses on HUD programs, especially public housing. *Gautreaux v. Romney*, 448 F. 2d 731 (7th Cir. 1971), *Clients Council v. Pierce*, 711 F.2d 1406 (8th Cir. 1983), *Young v. Pierce*, 822 F.2d 1376 (5th Cir. 1987), *Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086 (6th Cir. 1985), and *Walker v. City of Dallas*, 858 F.2d 1071 (5th Cir. 1988). In these cases, the defendants were governmental entities that either knew or should have known that their site selection decisions would have the effect of segregating minorities in racially concentrated neighborhoods.

One of the cases cited in HUD's rulemaking notice is *Inclusive Communities Project, Inc. v. Texas Dep't of Housing and Community Affairs*, 749 F. Supp. 486 (N.D. Tex. 2010). While TAAHP takes no position on the merits of that pending lawsuit, we note that the defendant in that case is a governmental agency, and that a final decision on the merits is pending in federal district court after trial last summer. The proposed regulation extends beyond the legal authority in any appellate decision and even beyond this reported summary judgment ruling in a district court.

This proposed rule makes no distinction between governmental defendants and private defendants. The regulation could, for example, be interpreted as prohibiting construction by a private developer of a low-income housing tax credit development in any census tract with more than 50% minority population. We are not aware of any case law that interprets the Fair Housing Act so broadly.

We recommend clarifying 100.500(a) to be limited to "a housing practice by a governmental entity. . . ."

### Proposed Section 100.500(a)(1): Remove Segregation from the Definition Of Discriminatory Effect

The proposed regulation prohibits any housing practice that has the effect of creating, perpetuating, or increasing segregated housing patterns. The term "housing practice" does not distinguish between exclusionary zoning and approval for construction of a new development.

Fair housing segregation claims and desegregation remedies raise equal protection constitutional issues. For example, if HUD interprets the Fair Housing Act as preventing construction of low-income housing tax credit apartments because of the neighborhood's racial composition, this race-based governmental decision is subject to strict scrutiny and must be narrowly tailored to a compelling governmental interest. The only compelling interest likely to survive a judicial challenge is remedying past discrimination, which may require a showing of at least past discriminatory intent.





**TAAHP**

TEXAS AFFILIATION OF AFFORDABLE HOUSING PROVIDERS | 221 E. 9th street, ste. 408 | Austin, TX 78701
tel 512.476.9901 fax 512.476.9903 taahp.org texashousingconference.org

The proposed regulation extending the Fair Housing Act's reach to any housing practice, whether by a private or public entity, that increases segregation is not supported by constitutional law or fair housing act case law. The references to segregation should be deleted from the final rule. Failure to do so could discourage entities from developing new housing stock or rehabilitating older housing stock in areas in need of revitalization.

<u>To Address Segregation, HUD Site and Neighborhood Standards Should Be Revised</u>

Federal development funding such as the HOME program triggers HUD site and neighborhood standards review, 24 CFR 983.6. The purpose of these regulations is to comply with HUD's affirmative duty to further fair housing and prevent further segregation. *Shannon v. HUD*, 436 F.2d 809 (3rd Cir. 1970), *Alshuler v. HUD*, 686 F.2d 472 (7th Cir. 1982), and *Gaurteaux v. Pierce*, 690 F.2d 616, 637 (7th Cir. 1982).

The site and neighborhood standards should be revised. Terms such as "area of minority concentration" and "racially mixed area" are not defined even though race-based laws are subject to strict scrutiny. HUD field offices interpret these standards as prohibiting new construction of affordable housing in census tracts with more than 50% minority population, essentially redlining major swaths of Texas. The term "minority" is not defined, treating Latino neighborhoods along the Mexico border the same as predominantly African-American neighborhood in Houston and Dallas, even though discrimination may not be the cause of housing patterns along an international border.

HUD should address segregation by revising its site and neighborhood standards in separate notice-and-comment rulemaking. Terms subject to strict scrutiny should be defined clearly.

<u>Disparate Impact Rulemaking Should Follow The Magner v. Gallagher Decision</u>

The Supreme Court has granted *certiorari* of a fair housing case involving disparate impact. HUD's proposed regulations may need to be revised based on that decision.

Thank you for offering an opportunity to provide these comments on the proposed Fair Housing Act discriminatory effect regulations.

Respectfully Submitted,

Jim T. Brown
Executive Director





NATIONAL
COMMUNITY
REINVESTMENT
COALITION

John E. Taylor
*President & CEO*
Rachel Maleh
*Chief of Staff & Membership Matters*

**Board of Directors**

Ed Wiznski, *Chairperson*
Local Economic & Employment
Development Council

Bethany Sanchez *Vice Chairperson*
Metro Milwaukee Fair Housing Council

Gail Burks, *Vice Chairperson*
Nevada Fair Housing Center, Inc.

Ernest (Gene) E. Ortega, *Treasurer*
Rural Housing, Inc.

Lee Beaulac, *Past Chairperson*
PathStone

Stella J. Adams
North Carolina Branch of NAACP

Maria Smith Battle-Bey
Vermont Slauson Economic
Development Corporation

Nadine Cohen, *Esq.*
Greater Boston Legal Services

Robert Dickerson, Jr.
Birmingham Business Resources Center

Ron Fisher
California Reinvestment Coalition

Pete Garcia
The Victoria Foundation

Charles Harris, *Secretary*
Housing Education & Economic
Development

Charles Helms
Consumer Counseling Northwest

Irvin Henderson
National Trust for Historic Preservation

Jim Hunt
Sunnyside Up CNRC

Jean Ishmon
Northwest Indiana Reinvestment Alliance

Ethert Jones
Escambia County Housing
Finance Authority

Matthew Lee
Inner City Press/
Fair Finance Watch

Maryellen Lewis
Michigan CRA Coalition

Dean Lovelace
Dayton Community Reinvestment Institute

Moises Loza
Housing Assistance Council

Dory Rand
Woodstock Institute

Rashmi Rangan, *Esq.*
Delaware Community Reinvestment
Action Council

Shelley Sheehy
River Cities Development Services

Hubert Van Tol
PathStone

Marva Williams, *Board Member Emeritus*
Hamilton County Community
Reinvestment Group

727 15th Street, NW Suite 900
Washington, DC 20005-6027
Phone  202-628-8866
Fax  202-628-9800
Website  www.ncrc.org

January 16, 2012

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01;** *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

The National Community Reinvestment Coalition (NCRC) respectfully submits this comment letter for your consideration on behalf of our over 600 member organizations. NCRC and its members work in partnership with the U.S. Department of Housing and Urban Development (HUD) to ensure equal housing opportunity and open housing in the United States.

NCRC's mission is to increase fair and equal access to credit, capital, and banking services and products for low- and moderate-income communities, and to actively assist in efforts to eliminate discrimination that is detrimental to the economic growth of those traditionally underserved communities.

NCRC strongly supports HUD's proposed disparate impact regulation, and we urge you to adopt the strongest possible regulation to allow utilization of this theory in enforcement of the nation's fair housing and fair lending laws. Disparate impact theory is a powerful tool for combating housing discrimination.

The Fair Housing Act (Title VIII of the Civil Rights Act of 1968, as amended) prohibits discrimination in the sale, rental, or financing of dwellings and in other housing related actions based on their race, color, national origin, religion, sex, disability or familial status (which are "protected classes" under the Act).

The "Disparate Impact" theory is of paramount importance in combating discrimination under the Fair Housing Act and NCRC members and supporters urge HUD to adopt the strongest possible regulation to utilize this theory in enforcing the nation's fair housing and fair lending laws.



The disparate impact theory allows HUD, as well as organizations that have standing under the Act, to challenge policies and practices applied to everyone but that have the effect of treating a protected class differently. This follows an analysis in which the impact of a policy or practice is found to be disproportionate on protected classes.

In fact, HUD has long held that the Fair Housing Act imposes liability based on discriminatory effects. This approach has been confirmed by 11 United States Courts of Appeal. Courts and HUD administrative law judges have ruled that the Fair Housing Act is violated even by practices that on their face appear neutral, but nonetheless have a disparate impact on protected classes. (See e.g., *HUD v. Twinbrook Village Apts., 2001 WL1632533, at *17 (HUD ALJ)).* All Federal courts of appeals that have considered the issue have ruled that liability under the Fair Housing Act may be established based on a demonstration that a neutral policy or practice either has a disparate impact on a protected class, or creates, perpetuates or increases segregation, even if such policy or practice was not adopted for a discriminatory purpose (Federal Register Vol.76, No.221/November 16, 2011/proposed Rules p. 70923.)

Pursuant to this proposed new rule, HUD is seeking to add "subpart G, 'Prohibiting Discriminatory Effects,'" to the existing Fair Housing Act regulations in 24 CFR part 100, confirming that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect. This is a necessary and important clarification that is supported by the fair housing community.

The proposed rule establishes a consistent standard of liability for practices that while on their face appear neutral, nonetheless have a discriminatory effect. The rule mandates that the complainant/plaintiff must initially meet the burden of showing that either the practice in question has a disparate impact, or that it perpetuates segregation. If this burden is met, the responsibility shifts to the respondent/defendant to prove that the questioned practice or policy has a business necessity in furtherance of the challenged party's nondiscriminatory objectives. Finally, even if the respondent/defendant can demonstrate a business purpose, the complainant has the opportunity to show that an alternative, non-discriminatory means exists to reach that purpose.

Some fair housing advocates have suggested that as part of the burden shifting approach the standard should require the respondent/defendant to establish that there is no better way to achieve their legitimate business interests without a discriminatory effect. The rationale is that the respondent generally has within their possession the information and data that can demonstrate whether a less onerous and less discriminatory alternative to their current practices exists, and therefore should have to demonstrate that they have sought to achieve their business interests without discriminatory effects. While NCRC supports this rationale, we believe that the complainant can also effectively meet its burden of proof if the respondent is compelled to provide information in its possession that will allow the complainant to demonstrate that the respondent



had less discriminatory methods of achieving its legitimate business interests. While improvements can be made to this process, the current burden shifting approach has been effective.

For several decades fair housing organizations, municipalities and other plaintiffs have relied upon the disparate impact theory in fair lending, exclusionary zoning, and in challenging discriminatory policies and practices such as redlining and residential segregation. Fair housing enforcement actions brought forth under the disparate impact theory has helped fulfill Congress' mandate to interpret the Fair Housing Act in as broad a manner as possible.

NCRC's National Neighbors initiative has successfully used disparate impact theory in numerous civil and administrative complaints over the past decade to challenge minimum loan amounts, declining markets policies, discriminatory credit overlays on FHA loans, and redlining and reverse redlining. These policies had a disparate impact on African-American and Latino communities.

A few significant examples of NCRC's cases involving disparate impact include:

- NCRC v. SouthStar Funding LLC, stemming from NCRC's determination that SouthStar would not make mortgage loans for row homes in Baltimore. This case was resolved with a conciliation that changed SoutStar's discriminatory policy of refusing to lend for row homes.

- NCRC v. NovaStar Financial Inc. et. al. NCRC's investigation revealed NovaStar's underwriting guidelines relating to "properties located on Indian reservations" and a policy regarding "Properties for Adult Foster Care" were both violations of the Fair Housing Act by virtue of the disparate impact these policies had on borrowers in protected classes. As a result, these policies were changed.

- NCRC has utilized the disparate impact theory to challenge the impact of the proposed Qualified Residential Mortgage (QRM) definition, under the Equal Credit Opportunity Act and the Fair Housing Act, a policy that produces a disparate impact by race, ethnicity, and gender and therefore needs to be justified by business necessity or it constitutes a violation.

- NCRC has filed complaints with the U.S. Department of Housing and Urban Development, against lenders who have policies that are not in compliance with the Federal Housing Administration's (FHA) policies. Because they place credit overlays on top of the FHA's qualification standards, these lenders' policies have a disproportionate, adverse and disparate impact on African Americans and Latinos in violation of the Act. NCRC's research, testing and complaints filed in 2010 have led to 18 FHA lenders revising their policies and



practices to remove discriminatory overlays and accept credit scores to the FHA-required minimum of 580.

NCRC and other local and national fair housing organizations will continue to investigate lenders policies and file complaints when evidence indicates that their policies have discriminatory impact and effects on individuals or communities protected under the act. The disparate impact theory of discrimination is an important legal argument used by fair housing organizations to enforce the letter and the spirit of the Fair Housing Act and any attempt to prevent its use in Fair Housing cases will hamper fair housing organizations' ability to ensure equal housing opportunity for their communities.

Not surprisingly, there are those that do not support this proposed regulation, among them some members of the financial services industry and other housing providers. If successful, their opposition to the regulation would roll back the clock on fair housing and prevent the full enforcement of the Fair Housing Act as intended by Congress.

HUD's proposed regulation provides clarity to housing providers, housing seekers, lenders, loan seekers, municipalities and courts. The regulation not only clarifies the burden of proof in the context of litigation, it also will help to prevent unnecessary litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of our agencies and the communities that we serve.

NCRC and the community leaders we represent support HUD's proposed rule implementing the Fair Housing Act's disparate impact standard. We applaud HUD's efforts to provide guidance on this important issue and urge HUD to issue the final rule as soon as possible.

Sincerely,

John Taylor
President & CEO

SHARE

## Document Details

### Comment Submitted by James Casey, Akron Metropolitan Housing Authority

**Document ID:** HUD-2011-0138-0068    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

#### Show Details

In a letter dated January 11, 2012, the Public Housing Directors Association (PHADA) submitted comments on behalf of the 1,900 PHA Executive Directors it represents. As an attorney for one of those PHAs, I want to voice my strong support for the reasoned analysis PHADA presented. It seems obviously prudent for HUD to await the U.S. Supreme Court's review of the case titled Magner v. Gallagher which involves a fair housing complaint and presents the very legal questions which HUD is deciding in its proposed rule namely, whether the disparate impact claim is appropriate under the Fair Housing Act and, if so, how they should be analyzed. There has been a split among the federal circuit courts and the U.S. Supreme Court, not HUD, is the appropriate body to decide among the conflicting circuit court decisions and establish the standard of review.

# PUBLIC SUBMISSION

As of: 1/19/12 5:20 PM
Tracking No. 80f98c83
Comments Due: January 17, 2012

**Docket:** HUD-2011-0138
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Comment On:** HUD-2011-0138-0001
FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard

**Document:** HUD-2011-0138-0068
Comment Submitted by James Casey, Akron Metropolitan Housing Authority

## Submitter Information

## General Comment

In a letter dated January 11, 2012, the Public Housing Directors Association (PHADA) submitted comments on behalf of the 1,900 PHA Executive Directors it represents. As an attorney for one of those PHAs, I want to voice my strong support for the reasoned analysis PHADA presented.

It seems obviously prudent for HUD to await the U.S. Supreme Court's review of the case titled Magner v. Gallagher which involves a fair housing complaint and presents the very legal questions which HUD is deciding in its proposed rule namely, whether the disparate impact claim is appropriate under the Fair Housing Act and, if so, how they should be analyzed. There has been a split among the federal circuit courts and the U.S. Supreme Court, not HUD, is the appropriate body to decice among the conflicting circuit court decisions and establish the standard of review.



## Comment Submitted by Anne Houghtaling, HOPE Fair Housing Cent

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: <u>**FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**</u>

For related information, **Open Docket Folder**

**Comment Period Close**
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0069

**Tracking Number:** 80f990d

### Comment

See attached file(s)

### Document Information

**Date Posted:**
Jan 18, 2012

Show More Details

### Attachments (1)

Comment Submitted by Anne Houghtaling, HOPE Fair Housing Center (Attachment)

**View Attachment:** PDF





Alton J. Mitchell
*President*

**Anne V. Houghtaling**
*Executive Director*

2100 Manchester Road . Bldg. C . Suite 1620 . Wheaton, Illinois  60187

| **Phone:** | 630-690-6500 |
| **Fax:** | 630-690-6586 |
| **TTY:** | 630-690-6553 |

January 17, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

HOPE Fair Housing Center, Wheaton, Illinois, supports the Department's efforts to establish standards
for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.  The
Department has requested comments on the issue of which party bears the burden of proof to establish a
less discriminatory alternative.  We respectfully suggest that the burden of proof be assigned to the
defendant or respondent to show that there is no less discriminatory alternative.

HOPE, established in 1968, is the oldest fair housing center in Illinois.  HOPE Fair Housing Center seeks
to end the hurt and devastation of housing discrimination and segregation because of race, color, religion,
national origin, sex, disability, familial status, or any other characteristics protected under state or local
laws.  HOPE accomplishes this by promoting equal housing, lending and home insurance opportunities
for all people, through education, research, outreach, enforcement, training and advocacy.
We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing
Act's discriminatory effect standard.  We again commend the Department for promulgating the proposed
regulations implementing the discriminatory effect standard under the Fair Housing Act.  Please contact
Anne V. Houghtaling, Executive Director, at 630-690-6500, Ext. 114, or anne.houghtaling@hopefair.org
with any questions.

Sincerely,

*Anne V. Houghtaling*

Anne V. Houghtaling
Executive Director

**Be sure to check HOPE's website, www.hopefair.org**
*Creating greater housing opportunities and choice for all people since 1968*

Comment Submitted by Stef Zielezienski, American Insurance Association

SHARE

## Document Details

Comment Submitted by Stef Zielezienski, American Insurance Association

**Document ID:** HUD-2011-0138-0070   **Document Type:** Public Submission
**This is comment on** Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

Attached please find in PDF format comments of the American Insurance Association in response to a proposed rule issued by the
Department of Housing and Urban Development implementing the Fair Housing Act's discriminatory effects standard.

Attachments:

| — Comment Submitted by Stef Zielezienski, American Insurance Association (Att... | View Attachment: PDF |
|---|---|
| **Title:** | |
| Comment Submitted by Stef Zielezienski, American Insurance Association (Attachment) | |



**American Insurance Association**

2101 L Street, NW

Suite 400

Washington, DC 20037

202-828-7100

Fax 202-293-1219

www.aiadc.org

January 17, 2011

**VIA FEDERAL eRULEMAKING PORTAL**

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW
Room 10276
Washington, DC 20410

Re:  24 CFR Part 100 [Docket No. FR-5508-P-01] RIN 2529-AA96,
Department of Housing and Urban Development Proposed Rule Implementing the Fair
Housing Act's Discriminatory Effects Standard

Ladies and Gentlemen:

The American Insurance Association (AIA) appreciates the opportunity to submit comments on the Department of Housing and Urban Development's (HUD) notice published in the November 16, 2011, Federal Register, seeking public comment on a proposed rule regarding "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("Proposed Rule").[1] AIA represents approximately 300 major U.S. insurance companies that provide all lines of property-casualty insurance to U.S. consumers and businesses, writing more than $117 billion annually in premiums.  Our members are subject to comprehensive regulation by the states, and they therefore have a substantial interest in any proposal that would seek to add

---

[1] 76 Fed. Reg. 70921 - 70927 (November 16, 2011).

regulation or enforcement at the federal level. More specifically, as many AIA members write homeowners' insurance, they have an important interest in any regulation pertaining to the Fair Housing Act (FHA). Consistent with those interests, AIA respectfully submits the following comments on the proposed rule.

## REFERENCES TO INSURANCE AND THE *"OJO V. FARMERS"* LITIGATION SHOULD BE DELETED FROM THE PREDICATE TO THE PROPOSED RULE.

The predicate to the Proposed Rule, describing the proposal's scope, includes in its list of examples of potential "Disparate Impact" discrimination, the following statement: "the provision and pricing of homeowner's insurance (see *Ojo v. Farmers Group, Inc.*, 600 F.3rd 1205, 1207-8 (9th Cir. 2010))."[2] As discussed more fully below, the inclusion of the homeowner's insurance example is inappropriate as it fails to describe the principles announced in the *Ojo* decision, ignoring the decision's discussion of the impact of state law pursuant to the McCarran-Ferguson Act. Under the McCarran Act's "reverse pre-emption" principle, state insurance law trumps the application of any federal law to state regulated insurance, except under very narrow circumstances, which are not met here.

In the *Ojo* litigation, the U.S. Circuit Court of Appeals for the Ninth Circuit (en banc) sought the opinion of the Texas Supreme Court on whether Texas insurance law prohibited disparate impact discrimination.[3] The case arose in relation to the use of credit scoring by the insurer in setting homeowner's insurance rates and premiums. The Ninth Circuit quoted the applicable McCarran-Ferguson Act language, as follows:

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."[4]

The appeals court then set forth the decision-making standard:

> "If Texas law permits insurance companies to use credit scores even if the factors used to compute scores may have a racially disparate impact that could violate the FHA, then allowing Ojo to sue Defendants under FHA for this practice would

---

[2] *Id.* at 70924.
[3] *Ojo v. Farmers Group Inc*, 600 F.3d 1201(April 9, 2010).
[4] *Id.* at 1203.

000456

impair Texas law... The outcome of this (case) turns on the extent to which Texas law permits insurance companies to use credit-score factors that may have a racially disparate impact that would constitute a FHA violation... *We agree to abide by the Supreme Court of Texas's decision in issuing our subsequent opinion in Ojo v. Farmers Group Inc.*[5]

Upon receiving the Ninth Circuit's certification of the state regulation question, the Texas Supreme Court determined that "the language of the [Texas] Insurance Code is inconsistent with a disparate impact theory of liability," holding that "Texas law does not prohibit an insurer from using race-neutral factors in credit-scoring to price insurance, even if doing so creates a racially disparate effect."[6]

Thus, since the *Ojo* litigation stands for the proposition that Texas insurance law reverse-pre-empts the FHA pursuant to the McCarran Ferguson Act, it is inappropriate for the HUD Proposed Rule to proceed as if that principle does not exist. As a result, we would strongly urge HUD to delete the insurance example from the rule's predicate.

## THE PROPOSED RULE INAPPROPRIATELY AND PREMATURELY ASSUMES THAT FHA COVERS DISPARATE IMPACT DISCRIMINATION CLAIMS.

The Proposed Rule assumes that the FHA covers disparate impact discrimination. This assumption, however, may be wrong. Indeed, it may well be that the FHA's jurisdiction is limited to deliberate discriminatory practices. As HUD knows, this question is currently before the U.S. Supreme Court in the *Magner* case.[7] In light of the currency of this issue, it obviously would have been better, procedurally and substantively, for HUD to have delayed its Proposed Rule until the Court had decided whether the FHA does, in fact, incorporate disparate impact discrimination situations and, if so, the proper analytical framework for deciding those cases.

However, since HUD has decided to publish its proposal during the pendency of the *Magner* litigation, we respectfully suggest that HUD promptly publish a supplemental Federal Register notice stating that the promulgation of any final regulation will be deferred until the Supreme Court's *Magner* decision is handed down. This approach would make certain that HUD is not regulating based on a hypothetical construction of the law. It would also spare HUD the

---

[5] *Id.* at 1204-05.
[6] *Ojo, et. al. v. Farmers Group Inc., et. al*, 54 Tex. Sup. Ct. J. 1068 (May 27, 2011).
[7] *Magner v. Gallagher*, 619 F.3d 823 (8th Cir. 2010), cert. granted, No. 10-1032 (Docket) (U.S. Nov. 7, 2011).

3

potential embarrassment of needing to amend its final regulation if the Supreme Court's decision is at variance with it.

## THE PROPOSAL'S ANALYTICAL FRAMEWORK FOR DETERMINING THE EXISTENCE OF ACTIONABLE DISPARATE IMPACT DISCRIMINATION IS CONFUSING AND INCONSISTENT WITH BOTH STATUTORY AND SUPREME COURT LAW.

The analytical framework that HUD proposes to use to determine whether there has been actionable disparate impact discrimination in individual cases is very difficult to understand and appears to be at variance with both the standard established for Title VII employment discrimination cases under the Civil Rights Act of 1991 and the alternative *Wards Cove*[8] analysis that has provided the basis for disparate impact analysis in non-Title VII employment related cases.[9]

We believe that the *Wards Cove* analysis provides the proper approach for FHA cases, and that the Title VII approach should be limited to employment cases arising under that title. Under the *Wards Cove* approach, the plaintiff in any FHA disparate impact case has the burden of persuasion *throughout* the entire process.[10] The plaintiff must prove that the challenged practice furthered no legitimate business goal identified by the defendant or that the plaintiff's proposed alternative business practice that would avoid the disparate impact would be "equally as effective as the challenged practice in serving the (defendant's) legitimate business needs." The proposed regulation, however, requires that a "necessary and manifest" business need be established.[11] This not only goes beyond *Wards Cove*, but also introduces a new and additional standard that is both "manifestly unfair" to the defendant and "manifestly unclear" in application. Under this analytical approach, it would not be enough to establish that the practice is "necessary" to the business; the defendant would be required to demonstrate that it was "manifestly" necessary. We do not believe that this is consistent with either Supreme Court or statutory law.

We believe that the Proposed Rule even goes beyond the 1991 Civil Rights Act. As we have stated, we believe that the disparate impact language in the Civil Rights Act of 1991 is limited to

---

[8] *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642 (1989)
[9] The Civil Rights Act of 1991 was enacted to, among other things, reverse the U.S. Supreme Court's decision in *Wards Cove*, as it applied to employment discrimination cases. Subsequent to the 1991 law, the *Wards Cove* analytical framework has been followed in non-Title VII disparate impact cases. *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (plurality opinion)
[10] *See Wards Cove* at 659-60.
[11] 76 *Fed. Reg.* at 70927.

4

Title VII employment discrimination cases, and should not be exported to the FHA. But, even if that language were to be so exported, we believe that HUD's proposed regulatory language goes beyond it, as well. The Civil Rights Act also uses the term "business necessity."[12] It does not add the "manifest" concept.

## CONCLUSION

In light of the Supreme Court's consideration of the *Magner* case, AIA strongly urges HUD, when finalizing any eventual regulation, to eliminate the references to homeowner's insurance in light of the principles enunciated in *Ojo*. We would also urge HUD to publish a supplemental notice in the Federal Register that it will delay any action on its proposal until the Supreme Court has ruled on *Magner* and then proceed in a manner consistent with that decision.

Respectfully submitted,

J. Stephen ("Stef") Zielezienski
Sr. Vice President & General Counsel
American Insurance Association

David F. Snyder
Vice President & Associate General Counsel, Public Policy
American Insurance Association

---

[12] 42 U.S.C. § 2000e-2(k)(1)(A): "An unlawful employment practice based on disparate impact is established under this subchapter only if—(1) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact... and the respondent fails to demonstrate that the challenged practice is... consistent with business necessity."

5

◆ SHARE

## Document Details

Comment Submitted by Craig Gurian, Anti-Discrimination Center

**Document ID:** HUD-2011-0138-0071    **Document Type:** Public Submission
**This is comment on** Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

| | |
|---|---|
| − Comment Submitted by Craig Gurian, Anti-Discrimination Center (Attachment) | View Attachment: |

**Title:**
Comment Submitted by Craig Gurian, Anti-Discrimination Center (Attachment)



# ANTI-DISCRIMINATION CENTER, INC.

"ONE COMMUNITY, NO EXCLUSION "

Jan. 17, 2012

Via Electronic Submission: www.regulations.gov/#!submitComment;D=HUD-2011-0138-0001

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500

Re: Docket No. FR-5508-P-0
Implementation of Fair Housing Act's Discriminatory Effects Standard

Dear Rules Docket Clerk:

As the Lawyers Committee for Civil Rights Under Law points out in separate comments, the importance of the disparate impact standard to effective and vigorous fair housing enforcement cannot be overstated. Anti-Discrimination Center (ADC) writes separately to highlight several concerns with the proposed rule as drafted.

Land-use rules, policies, or procedures

Proposed section 100.70(d)(5) deals with a crucial structural means by which segregation and other exclusionary conduct (including disadvantaging people with disabilities) is maintained, and includes as prohibited conduct:

> *Implementing* land-use rules, policies, or procedures that restrict or deny housing opportunities in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin (emphasis added).

The operative word is "implementing." Exclusionary land-use rules, policies, and procedures, of course, are classic examples of practices that have a discriminatory impact from the moment of enactment (when they begin to deter development with desegregation potential), continuing throughout the time that the rules, policy, and procedures are maintained, and causing harm whenever ultimately applied — however long after first enactment.

54 WEST 21ST STREET, SUITE 707, NEW YORK, NEW YORK 10010
212-346-7600 (V)   212-242-6126 (F)   WWW.ANTIBIASLAW.COM   CENTER@ANTIBIASLAW.COM

000461

To be certain to avoid the perverse result that the most effectively exclusionary rules, policies, and procedures do not become immune to challenge either because of a lack of an individual plaintiff or through the passage of time, we urge the Department to replace the word "implementing" with the phrase "enacting, maintaining, implementing, or applying."

It may be that the Department intended for the one word to encompass all elements of our proposed phrase, and, indeed, those words are reasonably construed to be elements of "implemented," especially in the context of the broad construction consistent with the remedial purposes of the Fair Housing Act.

Nevertheless, knowing that there will undoubtedly be those who will pursue a cramped interpretation in order to undermine the effectiveness of the regulations, a more explicit and detailed recitation is desirable. We applaud similar comments being made by the Housing Justice Network.


Less discriminatory alternative

HUD's proposal — to place on the plaintiff the burden of persuasion that there is a less discriminatory alternative to a defendant's practice that has a disparate impact — is unfortunate, and its rationale is unpersuasive.

It is true that the Fair Housing Act has oftentimes been analogized to Title VII. But the purposes of the Fair Housing Act are broader, as are, *inter alia,* the scope of persons liable, the scope of vicarious liability, the compensatory damages available, and the punitive damages available.

As such, it is much more sensible to view Title VII as a floor below which the Fair Housing Act should not fall, not a ceiling beyond which it cannot go.

For those premises subject to the law, Congress did not intend to "balance" the interests of discriminators against the interests of those discriminated against. The test in implementing the Fair Housing Act, therefore, should be consistent with deterring evasion of the law, searching vigorously for the truth, and recognizing that it is the defendant that has greatest knowledge of its purported needs and of the claimed consequences (the National Fair Housing Alliance makes a similar point).

HUD's argument that its rule avoids saddling either party "with having to prove a negative" ignores several practical considerations. First, despite HUD's suggestion that its resolution leaves the parties equivalently situated, this is functionally not true. It is the plaintiff who remains the party that has less access to information about the allegedly negative consequences that would befall a business or government entity if the less discriminatory alternative were adopted. Second, there is no unfairness to a defendant of having to show that a less discriminatory alternative does not serve its interests as well. If a defendant can't get a jury to accept its explanation as more likely than not, then it is hardly likely that the less discriminatory alternative will actually prove materially less efficacious for the defendant.

Third, again as a practical matter, it is not as though the defendant will be sorting through a variety of theoretical possibilities. If the plaintiff puts on no evidence having to do with less discriminatory alternative, a defendant's case on this point will require little more than, "There is no suggestion that there is a less discriminatory alternative." Once a plaintiff does specify an alternative or alternatives, then a defendant should easily be able to carry a burden of persuasion (if, in fact, the alternatives do not serve defendant's interests as well).

The New York City Human Rights Law's disparate impact provision makes this practical process explicit. New York City Admin. Code § 8-107(17(a)(2), available at http://antibiaslaw.com/nyc-human-rights-law/text, provides that, even where a defendant has prevailed at "Stage 2," the policies or practices with disparate impact shall still be illegal where the plaintiff "produces substantial evidence that an alternative policy or practice with less disparate impact is available to the covered entity and the covered entity fails to prove that such alternative policy or practice would not serve the covered entity as well."

Finally, HUD's argument that the FHA rule should conform with the ECOA rule to avoid the "burdens of applying inconsistent methods of proof to factually indistinguishable claims" ignores two facts: first, the primary obligation of the Department is to have an FHA "less discriminatory alternative rule" that is most true to the purpose and intent of the FHA; second, there are many contexts in which juries are given special interrogatories to enable them to parse out claims with differing evidentiary burdens.

In this context, for example, it would not be difficult to have an interrogatory as to whether the plaintiff had met a specified burden of production as to less discriminatory alternatives. Only if the answer were "yes," would the ultimate interrogatory be posed: has the defendant met its burden of persuasion that the less discriminatory alternatives would not serve its interests as well.

Why permit a defense where the defendant's interests are insubstantial?

The proposed rule appears to permit a policy or practice that has a disparate impact — even policies or practices that have the most severe disparate impacts — where the defendant shows that the policy or practice has a manifest and necessary relationship to one or more "legitimate, nondiscriminatory interests" of the defendant.

That rule — which could be read to permit a policy that has a severe disparate impact even where the defendant's interest, though legitimate, is insubstantial — needs to be strengthened, as our colleagues at the Housing Justice Network have suggested. An interest should have to be legitimate *and* "substantial" — if not "compelling" — to justify the continuation of a practice or policy with disparate impact.[1] .

---

[1] The NYC Human Rights Law codification on this point specifies the need for a "significant relationship to a significant" defendant interest. NYC Admin. Code § 8-107(17)(a)(2). The same section, it should be pointed out, makes clear that a plaintiff who shows that a group of

"Legitimate" appears to do little to modify the need for the interest to be "nondiscriminatory," although the Department may mean more by "legitimate" than "genuine" or "not pretextual." Strikingly, the materials accompanying the proposed rule offer no substantive reason why a defendant's interests that are less than compelling or even substantial should entitle that defendant to continue a practice with demonstrated disparate impact.

* * *

If you have any questions, please do not hesitate to contact us.

Respectfully submitted,

ANTI-DISCRIMINATION CENTER

**Craig Gurian**

Digitally signed by Craig Gurian
DN: cn=Craig Gurian, o=Anti-
Discrimination Center, ou,
email=center@antibiaslaw.com, c=US
Date: 2012.01.17 15:41:22 -05'00'

By: _____
        Craig Gurian, Executive Director

---

policies or practices has a disparate impact "shall not be required to demonstrate which specific policies or practices within the group results in such disparate impact," and that it is the burden of the defendant to show that each such policy or practice does *not* contribute to the disparate impact (rejecting *Wards Cove*).

⊙ SHARE

## Document Details

### Comment Submitted by Michael Seng, The John Marshall Law School

**Document ID:** HUD-2011-0138-0072   **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

Our comments are attached.

## Attachments:

— Comment Submitted by Michael Seng, The John Marshall Law School (Attachment...    View Attachment:

**Title:**
Comment Submitted by Michael Seng, The John Marshall Law School (Attachment)

Department of Housing and Urban Development

Proposed Rule Title:  Implementation of the Fair Housing Act's Discriminatory Effects Standard

Docket No. FR-5508-P-01

The undersigned attorneys at The John Marshall Law School Fair Housing Legal Support Center and Clinic in Chicago, Illinois support the proposed rule to implement the Fair Housing Act's Discriminatory Effects Standard for the following reasons:

1. While every federal court of appeals that has considered this issue has determined that the Fair Housing Act prohibits housing practices that have a discriminatory effect even absent a discriminatory intent and while this standard is consistent with Title VII and other comparable civil rights statutes, the proposed rule will be useful to ensure future uniformity and to inform and instruct housing providers of their obligations under the Fair Housing Act.  The undersigned therefore support this rule.

2. While the undersigned practice law in the Seventh Judicial Circuit and are familiar with the balancing approach used in perpetuation of discrimination cases in that Circuit, we do not think that the ultimate outcome in many cases is likely to differ greatly whether the burden-shifting approach or the balancing approach in both disparate impact and perpetuation of discrimination cases is adopted. *Metropolitan Housing Development Corporation v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977).  We recognize that even under the balancing test, questions arise regarding burdens and standards of proof.  See *Hispanics United v. Village of Addison*, 988 F. Supp. 1130, 1152 (N.D. Ill. 2997). Nonetheless, we would prefer that on the burden of proof issue, the Department assign to the defendant or to the respondent the burden of showing that there is no less discriminatory alternative.  The defendant or the respondent is generally in a much better position to come forward with evidence on this issue.

The undersigned attorneys commend the Department for drafting this rule.

F. Willis Caruso

Michael P. Seng

Allison Bethel

The John Marshall Law School
Fair Housing Legal Support Center and Clinic
315 South Plymouth Court
Chicago, Illinois 60604
312-987-2397

Comment Submitted by Susan Dewey    Page 1 of 1



## Document Details

### Comment Submitted by Susan Dewey

**Document ID:** HUD-2011-0118-0073    **Document Type:** Public Submission
**This is comment on**    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0118
**View Document:**

Show Details

Please see attached comment letter dated January 17, 2012.

## Attachments:

– Comment Submitted by Susan Dewey (Attachment)                 View Attachment:

**Title:**
Comment Submitted by Susan Dewey (Attachment)



January 17, 2012

VIA ELECTRONIC SUBMISSION

Department of Housing and Urban Development
Office of General Counsel, Regulations Division
451 7th Street, SW, Room 10276
Washington, DC 20410-0500

Re:     Implementation of the Fair Housing Act's Discriminatory Effects Standard
        Docket No. FR-5508-P-01

Dear Sir/Madam:

The Virginia Housing Development Authority (VHDA) hereby provides the
following comments on Docket No. FR-5508-P-01.

**1. VHDA Supports the Fair Housing Act and Its Prohibition of Intentional
Discrimination in Lending.** VHDA supports the Fair Housing Act and related laws that
prohibit discrimination in lending. VHDA supports the position that the Fair Housing
Act requires proof of intentional discrimination, and does not envision a legal violation
founded solely upon disparate impact, as the proposed HUD rule would do.

**2. Disparate Impact Approach Under the Fair Housing Act Opens Up
Lenders to Expensive Lawsuits and Undermines the Uniform Application of
Generally Accepted, Neutral Credit Underwriting Standards.** By no longer
requiring proof of intentional discrimination, the disparate impact approach under the
Fair Housing Act would open up lenders to a whole new class of expensive lawsuits.
Lenders would face increased liability even where they have uniformly applied generally
accepted, neutral credit underwriting standards. This is because the threat of a disparate
impact claim increases where the end results of a lender's operations have different
demographic results. Many generally accepted, neutral credit underwriting standards
(e.g. credit scores, down payment requirements, debt-to-income ratios, and loan-to-value
ratios), which themselves raise no inference of discrimination, may produce differential
results that can be correlated with factors such as race or national origin. Any resulting
statistical differences could be used trigger a disparate impact claim. Even though a
lender may be successful in defending its credit risk assessment business practices under
the proposed burden-shifting approach, a lawsuit alleging lending discrimination on the
basis of race or national origin would be extremely expensive to defend and result in
immediate reputational damage. In order to decrease the risks of a disparate impact
lawsuit, lenders may seek to manage the end numbers. Any attempt to do so would
undermine the uniform application of generally accepted, neutral credit underwriting
standards and could also subject lenders to liability for intentional unlawful
discrimination.

VIRGINIA HOUSING DEVELOPMENT AUTHORITY
601 SOUTH BELVIDERE STREET | RICHMOND, VIRGINIA 23220 | PHONE: 877/VHDA123 | TDD: 804/783-6705 | WWW.VHDA.COM

000468

**3. Disparate Impact Approach Coupled with Proposed Ability to Repay (QM) and Risk Retention (QRM) Regulations Places Lenders in the Predicament of Facing Lawsuits No Matter What They Do to Comply with the Law.** The proposed QM rules would impose liability for loans that do not meet the ability to repay requirements of the Dodd-Frank Act. The more cautious underwriting required by the QM rules may restrict the availability of loans to groups with less wealth and income and, correspondingly, to minority groups. Likewise, the QRM lending standards are quite conservative, and incentivize lenders to make QRM loans that do not require risk retention. Complying with such standards would also likely restrict the availability of loans to less wealthy groups and those not in the top credit score tiers, which would likely have a differential impact on minorities. Such statistical differences cold prompt disparate impact lawsuits. Even though lenders can defend such suits on the basis that their practices are undertaken in accordance with federal regulation, lenders will still face the expense of defending such suits and the reputational damage that accompanies them. Thus, a disparate impact approach may place lenders in the predicament of facing lawsuits no matter what they do to comply with law. The disparate impact approach would make it extremely difficult for lenders to thread the needle between QM/QRM compliance and Fair Housing Act compliance.

If you have any questions or need any additional information concerning our comments, please feel free to contact VHDA.

Sincerely,

Susan F. Dewey
Executive Director

SHARE

## Document Details

### Comment Submitted by Kris Miller, Fair Housing Center of Southwest Michigan

**Document ID:** HUD-2011-0138-0074    **Document Type:** Public Submission
This is comment on   Proposed Rule: FR 5508-P 01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

#### Show Details

I, respectfully, suggest that the burden of proof should be assigned to the defendant or respondent to show that there is no less discriminatory alternative. The proposed rule observes that judicial interpretations of the FHA and the burden of proof Congress assigned to disparate impact employment discrimination cases support assigning the burden of proof to plaintiffs or complainants. Id. at 70925. In fact, federal courts are split on the issue of which party bears the burden of proof to demonstrate a less discriminatory alternative and reliance on Title VII standards is inappropriate because of the unique nature of less discriminatory alternatives in FHA cases. Furthermore, a defendant/respondent is in a far superior position to bear the burden of proof on this issue.

## Attachments:

| — Comment Submitted by Kris Miller, Fair Housing Center of Southwest Michigan... | View Attachment: |
|---|---|

**Title:**
Comment Submitted by Kris Miller, Fair Housing Center of Southwest Michigan (Attachment)

January 17, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

Fair Housing Center of Southwest Michigan supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department requested comments on the issue of who bears the burden of proof to establish a less discriminatory alternative. As an organization, we respectfully suggest that the burden of proof be on the defendant/respondent to show no less discriminatory alternative.

The Fair Housing Center of Southwest Michigan is a private non-profit organization established in 1998 to ensure equal housing opportunities for everyone in Southwest Michigan regardless of race, color, national origin, gender, disability, familial status, religion, age, or marital status. The Center's mission is to eliminate all forms of housing discrimination in Southwest Michigan through education, enforcement, and advocacy of the fair housing laws. Here at this fair housing center, we recognize the importance of "home" as a component of the American dream and envision a country free of housing discrimination allowing every individual, group, and community enjoy equal housing opportunity and access in a bias-free and open housing market.

We are in full support of the National Fair Housing Alliance's comment letter.

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact Kris Miller at 269.276.9100 with any questions.

Sincerely,


Kris R. Miller, esq.
Director of Enforcement



## Document Details

**Comment Submitted by Barbara Arwine, Lawyers Committee for Civil Rights Under Law**

**Document ID:** HUD-2011-0138-0075   **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

| — Comment Submitted by Barbara Arwine, Lawyers Committee for Civil Rights Und... | View Attachment: |

**Title:**
Comment Submitted by Barbara Arwine, Lawyers Committee for Civil Rights Under Law (Attachment)

January 17, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

    **Re: Docket No. FR-5508-P-01;** "RIN 2529–AA96" *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

On behalf of the undersigned organizations, we write in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard.  HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status.

The proposed regulation formalizes the long and consistent interpretation of the Fair Housing Act by HUD which has repeatedly determined that the anti-discrimination provisions of the Act are directed to the consequences of housing policies and practices, not simply their purpose. This interpretation is consistent with the uniform interpretation of the Act by the federal courts of appeals, which have consistently held, for over forty years, that liability under Title VIII may be established based on a showing that a neutral policy or practice either has a disparate impact on a protected group or creates, perpetuates, or increases segregation.  As the Supreme Court recently noted, in another context, "[t]his unanimity among the lower courts about the meaning of a statute of great practical administrative importance in the daily working lives of busy trial judges is itself entitled to strong consideration, particularly when those courts have maintained that interpretation consistently over a long a period of time." *United States v. Tinklenberg,* 131 S. Ct. 2007, 2014 (2011).  With this proposed regulation, HUD is providing this same type of "practical administrative" guidance for HUD investigators and administrative law judges, as well as for the state and local fair housing agencies that share responsibility with HUD for the investigation of fair housing complaints.

The importance of the disparate impact standard to effective and vigorous fair housing enforcement cannot be overstated.  This is evident in the variety of cases listed in the proposed regulation where disparate impact analysis has been applied (76 Fed. Reg. 70924-25).  Without the ability to prove violations through a disparate impact analysis, there would be major obstacles to attacking subtle but pernicious housing-related discrimination.  Moreover, without a disparate impact standard, the Fair Housing Act would not address many of the implicit, structural and institutional biases operating in today's housing market.

Furthermore, the proposed standard codifies the burden-shifting standard that has long been used by HUD in its agency adjudications. In particular, we support placing the burden at the second stage on the defendant to show the challenged practice has a manifest relationship to one or more legitimate, nondiscriminatory interests. The burden is appropriately placed on defendant because they are best positioned to articulate the legitimate, nondiscriminatory interests served by the challenged practice. We further note the inapplicability to the Fair Housing Act of the Supreme Court's holding in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) that in Title VII disparate impact claims the defendant has the burden of production but not persuasion in the second stage. *See Meacham v. Knolls Atomic Power Lab*, 544 U.S. 84, 98 (2008).

The breadth of cases relying on disparate impact claims brought by private enforcers of the Act illustrates the importance of such claims to achieving the "policy of the United States to provide within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. 3601. Examples are numerous and far-reaching and include the following:

- Cases attacking zoning and land-use policies and decisions which restrict private construction of multifamily housing to a largely minority area or block or limit development of affordable housing in communities of opportunity, resulting in both discriminatory denial of housing to minorities and the perpetuation and/or exacerbation of residential segregation;

- A wide variety of fair lending cases attacking policies of financial institutions with a discriminatory impact on protected groups, including (1) underwriting polices; (2) pricing and fee policies (which were a central factor in the ongoing foreclosure crisis); (3) discriminatory application of credit score criteria in determining home mortgage interest rates; (4) minimum loan amount policies which disproportionately exclude potential minority applicants from consideration because of their income levels or the value of the houses in the areas in which they live; and (5) residential mortgage lending policies requiring a credit score above the Federal Housing Authority minimum;

- A wide variety of homeowners' insurance cases attacking insurance company policies that (1) deny insurance based on the age of the home; (2) do not provide replacement value insurance policies based on the age or location of the home; (3) do not insure for replacement value if that value is greater than the market value of the house, based on a moral hazard rationale; and (4) discriminate in the pricing of homeowners' insurance policies;

- Residency requirements and other admissions procedures imposed by public housing agencies or housing management firms in predominantly white communities which discriminate against minority persons not living in such communities;

- Cases challenging governmental redevelopment or demolition plans or policies which disproportionately displace minorities by eliminating lower income housing;

- A variety of cases involving group homes for disabled persons. For example, there have been many cases brought by groups of unrelated persons seeking to live together in

financially viable and therapeutic group settings, such as persons recovering from alcohol or drug addiction, who seek to occupy a home located in a single-family neighborhood but are denied because the zoning ordinances only permit families related by blood or marriage to occupy homes in this neighborhood. Other cases attack municipal ordinances requiring that all group homes be located more than one mile from any other group home;

- Cases attacking unreasonably restrictive occupancy standards adopted by landlords which result in excluding or limiting families with children from the housing;

- Cases attacking policies which have a disparate impact because of the sex of tenants, e.g. a policy which refuses to consider alimony payments in determining eligibility; a policy or practice of evicting tenants who receive welfare; a policy or practice of evicting victims of domestic violence; and

- Cases attacking policies requiring that tenants speak English or be United States citizens.

In each of these contexts, the discriminatory effects standard has proven to be a valuable tool in assessing when policies have an adverse impact on members of a protected class, and whether these policies are necessary to achieve a legitimate goal that cannot be achieved through less discriminatory means. This type of assessment is an essential part of our fair housing enforcement system, and the proposed rule will ensure that the standard continues to be applied consistently across the country.

We applaud HUD's proposal to provide a long needed regulation on the propriety of disparate impact claims under the Fair Housing Act and to clarify the burden of proof under this standard. This regulation will foster the goals of the Fair Housing Act and benefit the clients and constituents of our organizations. It provides a national standard for courts, housing providers, municipalities and the financial and insurance industries. These issues are now being considered by the Supreme Court and we urge HUD to issue the final rule as soon as possible to provide the Court definitive agency interpretation concerning these issues.

Very truly yours,

Barbara Arnwine
National Lawyers' Committee for Civil Rights Under Law
Washington, DC

Affiliates of the Lawyers Committee:

      Rod Boggs
      Washington Lawyers' Committee for Civil Rights and Urban Affairs
      Washington, DC

      Martha Bergmark
      Mississippi Center for Justice
      Jackson MS

      Hernan Vera
      Public Counsel
      Los Angeles, CA

      Oren Sellstrom
      Lawyers' Committee for Civil Rights of the San Francisco Bay Area
      San Francisco, CA

      Jennifer Clarke
      Public Interest Law Center of Philadelphia
      Philadelphia, PA

      Jay Readey
      Betsy Schuman-Moore
      Chicago Lawyers' Committee for Civil Rights Under Law
      Chicago, IL

ReNika Moore
NAACP Legal Defense and Education Fund
New York, NY

Marcia Rosen
National Housing Law Project
San Francisco, CA

Hilary O. Shelton
NAACP
Washington, DC

John Taylor
National Community Reinvestment Coalition
Washington, DC

Ricardo Byrd
National Association of Neighborhoods
Washington, DC

Philip Tegeler
Poverty & Race Research Action Council
Washington, DC

David Harris
Charles Hamilton Houston Institute for Race & Justice
Harvard Law School
Cambridge, MA

Alan Jenkins
The Opportunity Agenda
New York, NY

Sharon L. Davies
Kirwan Institute for the Study of Race and Ethnicity
The Ohio State University
Columbus, Ohio

Richard Marcantonio
Elisabeth Voight
Public Advocates, Inc.
San Francisco, CA

Eva Paterson
Equal Justice Society
San Francisco, CA

Juan Cartagena
LatinoJustice PRLDEF
New York, NY

Jacinta Ma
Asian American Justice Center,
Member of the Asian American Center for Advancing Justice
Washington, DC

Myron Orfield
Institute on Race and Poverty
Minneapolis, MN

Maya Roy
Asian Pacific American Legal Center
Los Angeles, CA

Donald L. Kahl
Equal Rights Center
Washington, DC

Michael L. Hanley
Empire Justice Center
Rochester, NY

Ellen Johnson
Oregon Law Center, Hillsboro Regional Center
Hillsboro, OR

## Document Details

### Comment Submitted by Shana Smith, National Fair Housing Alliance

Document ID: HUD-2011-0118-0076    Document Type: Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0118
View Document:

Show Details

Attached please find the comment letter submitted by the National Fair Housing Alliance and 85 other national and local organizations regarding Docket No. FR-5508-P-01, Implementation of the Fair Housing Act's Discriminatory Effect Standard. Please allow this to replace the letter submitted earlier today. Please contact Deidre Swesnik at 202-898-1661 with any questions.

### Attachments:

- Comment Submitted by Shana Smith, National Fair Housing Alliance (Attachmen...    View Attachment:

Title:
Comment Submitted by Shana Smith, National Fair Housing Alliance (Attachment)





# NFHA
National Fair Housing Alliance

1101 Vermont Avenue, NW, Suite 710, Washington, DC 20005 • (202) 898-1661 • Fax: (202) 371-9744 • www.nationalfairhousing.org

January 17, 2012

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The National Fair Housing Alliance ("NFHA"), its members and the other civil rights organizations signed below commend the Department for its publication of a proposed regulation implementing the discriminatory effect standard under the Fair Housing Act ("FHA"), and submit the following comments and recommendations regarding that regulation.

Founded in 1988, NFHA is a consortium of more than 220 private, non-profit organizations, state and local civil rights agencies and individuals from throughout the United States. Headquartered in Washington D.C., NFHA, through comprehensive education, advocacy, and enforcement programs, provides equal access to apartments, houses, mortgage loans and insurance policies for all residents of the nation.

We support the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the FHA. The proposed rule effectuates the broad remedial effect intended by Congress and furthers the statutory goal of providing, "within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (noting the "broad remedial intent of Congress embodied in the Act"). For many years, we have encouraged the Department to adopt regulations implementing the discriminatory effect standard and request that the Department act promptly to enact the regulations.

In the more than forty years since the FHA was passed, a strong consensus has developed among the courts that the FHA includes a disparate impact standard. *See, e.g., Mt. Holly Gardens Citizens in Action v. Township of Mount Holly*, 658 F.3d 375, 384 (3d Cir. 2011) ("All of the courts of appeal that have considered the matter . . . have concluded that plaintiffs can show the FHA has been violated through policies that have a disparate impact. . . ."). As federal courts have consistently held, "[i]n disparate impact cases, [e]ffect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme." *Id.* at 385 (quoting *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976).

---

The National Fair Housing Alliance (NFHA) is the voice of fair housing. NFHA works to eliminate housing discrimination and to ensure equal housing Opportunity for all people through leadership, education, outreach, membership services, public policy initiatives, advocacy and enforcement.



*National Fair Housing Alliance*
*Comments to Proposed Discriminatory Effect Regulations*
*Page 2*

The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921, 70925 (proposed Nov. 16, 2011) (to be codified 24 C.F.R. § 100.500(c)(3)). Where the burden is apportioned is often a critical issue that has the potential to affect the outcome of fair housing cases and overall enforcement of the FHA and state and local fair housing laws. The dispute in disparate impact cases under the FHA often focuses on the determination of whether a less discriminatory alternative exists. *See, e.g., Mt. Holly*, 658 F.3d at 385 (indicating that this step in the analysis determines "whether a person is being deprived of his lawful rights because of his race").

We must observe that the proposed rule places the burden of proof upon the plaintiff or complainant to demonstrate a less discriminatory alternative. Proposed § 100.500(c)(3) states that "[i]f the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the complainant or plaintiff may still prevail upon demonstrating that the legitimate, nondiscriminatory interests supporting the challenged practice can be served by another practice that has a less discriminatory effect." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. at 70927.

We respectfully suggest that the burden of proof should be assigned to the defendant or respondent to show that there is no less discriminatory alternative. The proposed rule observes that judicial interpretations of the FHA and the burden of proof Congress assigned to disparate impact employment discrimination cases support assigning the burden of proof to plaintiffs or complainants. *Id.* at 70925. In fact, federal courts are split on the issue of which party bears the burden of proof to demonstrate a less discriminatory alternative and reliance on Title VII standards is inappropriate because of the unique nature of less discriminatory alternatives in FHA cases. Furthermore, a defendant/respondent is in a far superior position to bear the burden of proof on this issue.

First, there is no unanimity among the courts that have addressed the question of which party should have the burden of proof regarding less discriminatory alternatives. Many federal courts have held that the defendant/respondent has the burden of proof to demonstrate that there is no less discriminatory alternative. *See e.g. Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir. 1988) (a defendant must show that there are no less discriminatory alternatives available); *Mt. Holly*, 658 F.3d at 385 (holding that defendants have the burden of showing that there is no less discriminatory alternative and that "[o]nly when the defendants make this showing does the burden shift back to the plaintiffs—where it ultimately remains—to provide evidence of such an alternative"); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000) (affirming the district court's decision holding that the defendant failed to show a less discriminatory alternative); *Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 503 (N.D. Tex. 2010); *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 565 (N.D. Tex. 2000).

Second, courts have rejected the lockstep importation of Title VII principles into the determination of which party bears the burden of establishing a less discriminatory alternative. As the Third Circuit explained in *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148 (3d Cir. 1977), "[l]ooking to Title VII for the correct standard for rebuttal of a prima facie case, we note that the 'business necessity' test employed in Title VII job discrimination cases, *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), is of somewhat uncertain application in Title VIII cases." *Id.* The Third Circuit explained that less discriminatory alternatives are far easier to identify and quantify in a Title VII case, noting that "the job-related qualities which might legitimately bar a Title VII-protected employee from employment will be much more susceptible to definition and quantification than any attempted justification of discriminatory housing practices under Title VIII." *Id.*; *see also, Huntington,* 844 F.2d at 937-38 (stating that "in Title VIII cases there is no single objective like job performance to which the legitimacy of the facially neutral rule may be related" and that a defendant's justifications are "normally based on a variety of circumstances" in zoning cases under the FHA); *Langlois,* 207 F.3d at 51 (noting that "a single criterion-like the relationship of the test to job performance used under Title VII-is hardly possible" under the FHA). Thus, both the qualitative and quantitative nature of less discriminatory alternatives in FHA cases supports assigning the burden of proof to the defendant or respondent.

Finally, the burden of proof to establish a less discriminatory alternative in a FHA case should be assigned to the defendant/respondent for a more practical reason – that party almost always has superior knowledge of the less discriminatory alternatives available and whether the alternatives meet its business objectives. The test to determine a less discriminatory alternative asks whether an alternative imposes "an undue hardship under the circumstances of the specific case" on the defendant or respondent. *Mt. Holly,* 658 F.3d at 386. The test is similar to the rebuttal burden imposed on a defendant or respondent in a reasonable accommodation case. *Id.*

In assessing who should have the burden in FHA cases, courts have permitted shifting the burden to the party for whom the proof was the easiest. *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283, 1291, 1295 n. 16 (7th Cir. 1977) (holding that the burden to identify parcels of land that were appropriate for the development of multi-family housing was on the defendant municipality because "[i]t is far easier for defendant to show that a single parcel of land which is suitable does exist than for plaintiffs to show that no suitable land exists" and that allocating the burdens any other way "would compel plaintiffs to attempt the impossible task of proving a negative"). The defendant/respondent generally has far superior knowledge of the alternative practices available to meet its legitimate objectives and is in a far better position to assess whether an alternative imposes an undue hardship upon it in the particular circumstances of the case and is consistent with its goals.

For example, in cases challenging zoning policies or practices as having a disparate impact on people of color, the municipal defendant will unquestionably have superior knowledge about the existence and feasibility of alternative approaches that might achieve its permissible objectives with less discriminatory impact on protected classes. Plaintiffs will rarely be in a

*National Fair Housing Alliance*
*Comments to Proposed Discriminatory Effect Regulations*
*Page 4*

position to conduct such an assessment because they will lack information and be outside the political decision-making process. In such a case, logic would dictate imposing the burden on local government to identify such alternatives and to articulate why they would not achieve its objectives.

In litigation involving insurance or lending—where private companies scrupulously protect proprietary information such as credit scores, actuarial data and risk assessment—there is an even stronger rationale for imposing the burden on the defendant, whose knowledge will be vastly superior to that of a plaintiff and who will uniquely possess information with respect to less discriminatory alternatives.

Beyond the litigation context, the policy embedded in the HUD final rule should incentivize and encourage insurers and lenders who build and use statistical models to look at alternative models and variables to make certain that they adopt the most predictive models that have the least discriminatory impact (and thus avoid litigation altogether). Placing the burden on these private parties will have salutary business and public policy effects as well: By requiring them to actually look at such alternatives, they may find and implement less discriminatory approaches that are equally (or even more) predictive of business risk that they would not otherwise have explored.

For the reasons outlined above, we urge the Department to revise the proposed rule to impose the burden on the defendant/respondent in the final step of the disparate impact analysis.

Thank you for the opportunity to comment on the proposed regulation implementing the FHA's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the FHA. Please contact Lisa Rice at 202.898.1661 or lrice@nationalfairhousing.org with any questions.

Sincerely,

Charles Hamilton Houston Institute for Race & Justice, Harvard Law School
NAACP
National Association of Consumer Advocates
National Coalition for Asian Pacific American Community Development
National Fair Housing Alliance
National Low Income Housing Coalition
Sargent Shriver National Center on Poverty Law

Michael T. Iglesias, Professor of Law, University of San Francisco School of Law
Gregory Squires, Professor of Sociology and Public Policy and Public Administration, George Washington University

*National Fair Housing Alliance*
*Comments to Proposed Discriminatory Effect Regulations*
*Page 5*

| Local Agency | City | State |
|---|---|---|
| Arizona Fair Housing Center | Phoenix | AZ |
| Austin Tenants' Council | Austin | TX |
| Baltimore Neighborhoods, Inc. | Baltimore | MD |
| California Rural Legal Assistance, Inc. | Marysville | CA |
| Center for Fair Housing Mobile, Inc. | Mobile | AL |
| Central Alabama Fair Housing Center | Montgomery | AL |
| Chicago Area Fair Housing Alliance | Chicago | IL |
| Community Legal Aid Society, Inc. | Wilmington | DE |
| Connecticut Fair Housing Center, Inc. | Hartford | CT |
| Eden Council for Hope and Opportunity | Hayward | CA |
| Fair Housing Advocates Association | Akron | OH |
| Fair Housing Center of Central Indiana | Indianapolis | IN |
| Fair Housing Center of Greater Boston | Boston | MA |
| Fair Housing Center of the Greater Palm Beaches, Inc. | Lantana | FL |
| Fair Housing Center of Metropolitan Detroit | Detroit | MI |
| Fair Housing Center of Nebraska and Iowa | Omaha | NE |
| Fair Housing Center of Northern Alabama | Birmingham | AL |
| Fair Housing Center of Southeastern Michigan | Ann Arbor | MI |
| Fair Housing Center of Southwest Michigan | Kalamazoo | MI |
| Fair Housing Center of Washington | Tacoma | WA |
| Fair Housing Center of West Michigan | Grand Rapids | MI |
| Fair Housing Contact Service, Inc. | Akron | OH |
| Fair Housing Continuum, Inc. | Melbourne | FL |
| Fair Housing Council of Central California | Fresno | CA |
| Fair Housing Council of Central New York, Inc. | Syracuse | NY |
| Fair Housing Council of Greater San Antonio | San Antonio | TX |
| Fair Housing Council of Northern New Jersey | Hackensack | NJ |
| Fair Housing Council of Orange County | Santa Ana | CA |
| Fair Housing Council of Oregon | Portland | OR |
| Fair Housing Council of Riverside, Inc. | Riverside | CA |
| Fair Housing Council of San Fernando Valley | Panorama City | CA |
| Fair Housing Council of Suburban Philadelphia | Swarthmore | PA |
| Fair Housing Foundation | Long Beach | CA |
| Fair Housing Justice Center | New York | NY |

*National Fair Housing Alliance*
*Comments to Proposed Discriminatory Effect Regulations*
*Page 6*

| | | |
|---|---|---|
| Fair Housing Napa Valley | Napa | CA |
| Fair Housing of Marin | San Rafael | CA |
| Fair Housing Law Clinic of Cleveland-Marshall School of Law, Cleveland State University | Cleveland | OH |
| Fair Housing Opportunities of Northwest Ohio, Inc. | Toledo | OH |
| Fair Housing Partnership of Greater Pittsburgh, Inc. | Pittsburgh | PA |
| Fair Housing Resource Center, Inc. | Painesville | OH |
| Fair Housing Rights Center in SE Pennsylvania | Glenside | PA |
| Greater Houston Fair Housing Center | Houston | TX |
| Greater New Orleans Fair Housing Action Center | New Orleans | LA |
| Gulf Coast Fair Housing Center | Waveland | MS |
| Heights Community Congress | Cleveland Heights | OH |
| HOPE Fair Housing Center | Wheaton | IL |
| The Housing Advocates, Inc. | Cleveland | OH |
| Housing Opportunities Made Equal of Virginia, Inc. | Richmond | VA |
| Housing Opportunities Made Equal, Inc., NY | Buffalo | NY |
| Housing Opportunities Made Equal, Inc., OH | Cincinnati | OH |
| Housing Opportunities Project for Excellence, Inc. | Miami | FL |
| Housing Research and Advocacy Center | Cleveland | OH |
| Housing Rights Center | Los Angeles | CA |
| Housing Rights, Inc. | Berkeley | CA |
| Inland Fair Housing and Mediation Board | Rancho Cucamonga | CA |
| Interfaith Housing Center of the Northern Suburbs | Winnetka | IL |
| Intermountain Fair Housing Council | Boise | ID |
| Lawyers' Committee for Better Housing | Chicago | IL |
| Legal Aid Society of Southwest Ohio | Cincinnati | OH |
| Lexington Fair Housing Council, Inc. | Lexington | KY |
| Long Island Housing Services, Inc. | Bohemia | NY |
| Massachusetts Fair Housing Center | Holyoke | MA |
| Metro Fair Housing Services, Inc. | Atlanta | GA |
| Metropolitan Fair Housing Council of Oklahoma, Inc. | Oklahoma City | OK |
| Metropolitan Milwaukee Fair Housing Council | Milwaukee | WI |
| Metropolitan St. Louis Equal Housing Opportunity Council | St. Louis | MO |
| Miami Valley Fair Housing Center, Inc. | Dayton | OH |
| Montana Fair Housing | Butte | MT |
| North Texas Fair Housing Center | Dallas | TX |
| Northwest Fair Housing Alliance | Spokane | WA |

*National Fair Housing Alliance*
*Comments to Proposed Discriminatory Effect Regulations*
*Page 7*

| | | |
|---|---|---|
| Oak Park Regional Housing Center | Oak Park | IL |
| Project Sentinel, Inc. | Redwood City | CA |
| Savannah-Chatham County Fair Housing Council | Savannah | GA |
| Silver State Fair Housing Council | Reno | NV |
| South Suburban Housing Center | Homewood | IL |
| Tennessee Fair Housing Council | Nashville | TN |
| Westchester Residential Opportunities, Inc. | White Plains | NY |

# regulations.gov

## Comment Submitted by Michael Beall, Missouri Credit Union Associa

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder**

**Comment Period Close**
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0077
**Tracking Number:** 80f9910

**Document Information**

**Date Posted:**
Jan 18, 2012

**Show More Details**

### Comment

January 17, 2012

Jeanine Worden, Associate General Counsel
Regulations Division, Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410
http://www.regulations.gov

RE: Michael V. Beall, Esq., - Docket No. FR-55080-P-01 RIN 2529-AA96,
Implementation of the Fair Housing Act's Discriminatory Effects Standards

Dear Ms. Worden:

On behalf of the 1.3 million credit union members, the Missouri Credit Union Association (MCUA) would like to take this opportunity to express our views on possible amendments to Title VII of the Civil Rights Act of 1968 (the "Fair Housing Act") which prohibits discrimination in the sale, rental, or financing of dwellings and in the other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin. MCUA supports the establishment of uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.

The precise tests used by courts and by the Department of Housing and Urban Development (HUD) to determine a violation based on discriminatory effects vary slightly depending on the specific court's preference, and depending on the type of case. MCUA strongly believes resolving these inconsistencies and standardizing the test will allow credit unions to better understand and comply with the Fair Housing Act. Therefore, we support the addition of a new subpart G to the Fair Housing Act which will confirm that the Act may be violated by a housing practice that has a discriminatory effect, as defined in 24 CFR part 100.500(a), regardless of whether the practice was adopted with a discriminatory intent.

As always, we appreciate the opportunity to respond to the proposed changes to the Fair Housing Act. We will be happy to respond to any questions regarding these comments.

Sincerely,

Michael V. Beall, Esq.
President/CEO

Attachments (1)

Comment Submitted by Michael Beall, Missouri
Credit Union Association (Attachment)

View Attachment: PDF



MISSOURI CREDIT UNION ASSOCIATION

January 17, 2012

Jeanine Worden, Associate General Counsel
Regulations Division, Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC  20410
http://www.regulations.gov

RE:  Michael V. Beall, Esq., - Docket No. FR-55080-P-01 RIN 2529-AA96,
Implementation of the Fair Housing Act's Discriminatory Effects Standards

Dear Ms. Worden:

On behalf of the 1.3 million credit union members, the Missouri Credit Union Association
(MCUA) would like to take this opportunity to express our views on possible amendments to
Title VII of the Civil Rights Act of 1968 (the "Fair Housing Act") which prohibits discrimination in
the sale, rental, or financing of dwellings and in the other housing-related activities on the basis
of race, color, religion, sex, disability, familial status, or national origin.  MCUA supports the
establishment of uniform standards for determining when a housing practice with a
discriminatory effect violates the Fair Housing Act.

The precise tests used by courts and by the Department of Housing and Urban Development
(HUD) to determine a violation based on discriminatory effects vary slightly depending on the
specific court's preference, and depending on the type of case.  MCUA strongly believes
resolving these inconsistencies and standardizing the test will allow credit unions to better
understand and comply with the Fair Housing Act. Therefore, we support the addition of a new
subpart G to the Fair Housing Act which will confirm that the Act may be violated by a housing
practice that has a discriminatory effect, as defined in 24 CFR part 100.500(a), regardless of
whether the practice was adopted with a discriminatory intent.

As always, we appreciate the opportunity to respond to the proposed changes to the Fair
Housing Act.  We will be happy to respond to any questions regarding these comments.

Sincerely,

Michael V. Beall, Esq.
President/CEO

*Your Best Resource*

2055 Craigshire Drive • St. Louis, Missouri 63146-4009 • T: 314-542-0555 • F: 314-542-1387
6220 Blue Ridge Cut-Off, Suite 300 • Kansas City, Missouri 64133-3730 • T: 816-313-0005 • F: 816-313-0011
1-800-392-3074 • www.mcua.org

SHARE

## Document Details

### Comment Submitted by Meris Bergquist, Massachusetts Fair Housing Center

**Document ID:** HUD-2011-0138-0078   **Document Type:** Public Submission
This is comment on   **Proposed Rule:** FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

## Attachments:

— Comment Submitted by Meris Bergquist, Massachusetts Fair Housing Center (At...   View Attachment:

**Title:**
Comment Submitted by Meris Bergquist, Massachusetts Fair Housing Center (Attachment)



 

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The Massachusetts Fair Housing Center supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

Since 1989 the Massachusetts Fair Housing Center, (formerly known as the Housing Discrimination Project, Inc.,) has been in the forefront of the effort to eliminate housing discrimination in Central and Western Massachusetts. HDP engages in extensive educational activities to inform community members about their right to equal housing opportunities. HDP also provides trainings to housing industry professionals to educate them about their responsibilities under the law. When an individual suspects housing discrimination, HDP will counsel the client, investigate the complaint and, in appropriate cases, provide free legal representation. HDP's legal advocacy helps to promote housing choice, preserve tenancies, avoid homelessness, create lead-safe housing for children, and provide disabled tenants with equal access to housing. HDP has maintained its office in Holyoke, Massachusetts for over 23 years and provides its services in English and Spanish.

We are in full support of the National Fair Housing Alliance's comment letter.

57 Suffolk Street
Holyoke, MA 01040

www.massfairhousing.org
info@massfairhousing.org

phone (413) 539-9796
fax (413) 533-9978

 

**Housing Discrimination Project**

Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact Meris Bergquist, at 413-539-9796 x 108 or merismfhc@gmail.com, with any questions.

Sincerely,

Meris Bergquist
Executive Director

57 Suffolk Street
Holyoke, MA 01040

www.massfairhousing.org
info@massfairhousing.org

phone (413) 539-9796
fax (413) 533-9978

000492

Comment Submitted by Jaycee Winn, Northwest Credit Union Association

SHARE

## Document Details

Comment Submitted by Jaycee Winn, Northwest Credit Union Association

Document ID: HUD-2011-0138-0079   Document Type: Public Submission
This is comment on   Proposed Rule: FR 5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

See attached file(s)

Attachments:

                                                                              View Attachment:

– Comment Submitted by Jaycee Winn, Northwest Credit Union Association (Attac...

Title:
Comment Submitted by Jaycee Winn, Northwest Credit Union Association (Attachment)



www.nwcua.org

January 17, 2012

*Delivered Electronically*

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW, Room 10276
Washington, DC 20410

Subject:  <u>Implementation of the Fair Housing Act's Discriminatory Effects Standards;
Docket No. FR-5508-P-01</u>

Dear Sir or Madam:

The Northwest Credit Union Association (Association)[1] welcomes the opportunity to comment on the proposal from the Department of Housing and Urban Development (HUD) to implement a Discriminatory Effects Standard into the Fair Housing Act. We understand the purpose of the proposal, to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act, but believe that HUD should put a hold on such rulemaking until a case dealing with this subject matter has been addressed by the Supreme Court.

The Supreme Court issued a writ of certiorari in the case of Magner v. Gallagher[2] on November 7, 2011. Oral arguments will begin February 29, 2012[3] and until a decision in this case has been made, implementing a new regulation would be premature.

The arguments brought by Magner v. Gallagher are (1) whether a lawsuit can be brought for a violation of the Fair Housing Act based on a practice that is not discriminatory on its own, but has a discriminatory effect; and, if so, (2) how should courts determine whether a practice has a discriminatory effect and violates the Act. The decision of the court will address the impetus behind the proposed rulemaking and could warrant the regulation, as proposed, inconsistent with this finding.

While we fully support the goal of consistent fair housing, continuing with the regulatory process at this point could cause confusion and unnecessary burden on credit unions and complying institutions.

Overwhelming regulatory burden continues to be of serious concern. In addressing this rulemaking and those in the pipeline we ask HUD to look at the overall compliance burden being placed on small institutions. Credit unions, as well as all financial institutions are currently struggling to meet the

---

[1] The Northwest Credit Union Association is a regional trade association representing the interests of more than 200 credit unions and their six million consumer-members; institutions that employ and engage more than 10,000 people and hold more than $50 billion in aggregate assets. The Association is a nonpartisan advocacy organization representing the interests of its member institutions on a variety of systemically important banking issues.

Credit unions affiliated with the Association are principally domiciled in the Northwest quadrant of the United States, but the Association also has members from the states of Alaska, Idaho, California and Hawaii. Learn more about the Association at www.nwcua.org.
[2] Magner v. Gallagher, 619 F.3d 823 (8th Cir. 2010)
[3] Docket No. 10-1032; http://www.scotusblog.com/case-files/cases/magner-v-gallagher/

Oregon Office
8205 SW Creekside Place, Suite 220
Beaverton, OR 97008

Washington Office
33301 9th Avenue S., Suite 200
Federal Way, WA 98003

Phone Numbers
+1 800 995 9064 toll free
+1 877 928 6397 fax

NWCUA Comment Re: HUD Discriminatory Effects; Docket No. FR-5508-P-01
January 17, 2012

compliance burden placed on them through individual rulemakings by numerous regulators as well as the implementation of Dodd-Frank.

Recognizing the need for regulatory relief, in Executive Order 13563, "Improving Regulation and Regulatory Review"[4] President Obama called for executive agencies to ensure that our regulatory system is effective and as accessible as possible, stating our regulatory system "must take into account benefits and costs, both quantitative and qualitative." This is an acknowledgement and a call for change from government's highest level that regulatory and compliance burden is reaching new heights.

Once again, we ask the HUD delay any further rulemaking on this issue until the Supreme Court has issued a ruling in the matter of Magner v. Gallagher.

Thank you for your consideration, we would be happy to answer any questions you may have.

Respectfully,


Jaycee Winn
Director of Regulatory Advocacy
Northwest Credit Union Association

---

[4] http://www.whitehouse.gov/the-press-office/2011/01/18/improving-regulation-and-regulatory-review-executive-order

2

Document Details

Comment Submitted by Michele Magar, Law Office of Michele Magar

**Document ID:** HUD-2011-0138-0080   **Document Type:** Public Submission
This is comment on   **Proposed Rule:** FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

please see attached uploaded comment letter

Attachments:

— Comment Submitted by Michele Magar, Law Office of Michele Magar (Attachment...   View Attachment:

**Title:**
Comment Submitted by Michele Magar, Law Office of Michele Magar (Attachment)

# Law Office of Michele Magar

Civil Rights Law & Consulting
415.793.4144
415.282.6995 fax
magar@sbcglobal.net

Mailing Address:
153 Ripley St.
San Francisco, CA 94110

Office:
1814 Franklin St., Ste. 210
Oakland, CA 94612

January 17, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

Re: Docket No. FR-5508-P-01; *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

As someone who has published more than 200 articles on fair housing, I write to applaud HUD's proposed regulations implementing the discriminatory effects standard under the Fair Housing Act, and to submit the following comments and recommendations in response.

## HUD's Proposed Regulations Are Crucial and Codify Well-Established Case Law

First, I note that the federal courts of appeal have consistently held for more than four decades that housing discrimination under the Act can be proved by showing that a neutral policy or practice has a disparate adverse impact on a protected class or creates, perpetuates, or increases segregation.

Second, as a fair housing attorney I've watched discrimination become more and more difficult to prove over the years, as housing providers have become more sophisticated in how they discriminate against protected classes. For example, I know that some landlords have used the pretext of providing "quiet enjoyment" of housing to evict women who call the police to seek protection from domestic violence. And I still see "capacity to live independently" used as a seemingly innocent criteria for housing applicants.

Rules Docket Clerk
Re: Docket No. FR-5508-P-01
January 17, 2012
Page 2 of 3

One of the most egregious examples of housing discrimination I've litigated involved a 350 home condominium development in California's ski country, where snow can reach shoulder height. The condo association plowed only a central parking lot and the streets where board members lived – everyone else was expected to walk from the plowed central lot to their home.

My client lived half a mile from the plowed central lot. She had a mobility impairment and a newborn son whose respiratory disability made it life-threatening for him to be exposed to the cold. She was unable to leave her home or take her child to medical appointments. Her husband was unable to get to work, and her older children could not reach the school bus.

By the time she sought my help, she and her family had already endured three winters trapped at home whenever the snow proved too deep to navigate by car. If I had had to prove discriminatory intent, we would have lost the case. Only disparate impact analysis revealed the discriminatory nature of the Homeowner Association's policy and persuaded the defendants to plow every resident's street.

## Suggested Change in Burden of Proof Language of Proposed §100.500(c)(3)

HUD's proposed regulations are nearly flawless. The one change I recommend is that the burden of proof at the end of the three-step prima facie case should be on the defendant to show that the legitimate and nondiscriminatory interests served by the challenged practice cannot be met by a less discriminatory practice.

All too often, the plaintiff/complainant lacks the knowledge or information to meet this burden.

Conversely, the defendant/respondent is in the best position to know not just whether less discriminatory alternatives exist, but also whether such alternatives serve the defendant's legitimate and nondiscriminatory purposes. Moreover, placing the burden of proof on the defendant/respondent will encourage housing and mortgage providers to avoid discrimination by routinely screening their policies for discriminatory impact and upon finding it, developing alternative policies and practices that advance legitimate business goals without discrimination.

If for some reason HUD opts not to adopt the proposed regulations at issue, only California's fair housing law would provide a safe refuge for people who wish to assert their housing rights: ours is the only state law with an explicit effects test.

Rules Docket Clerk
Re: Docket No. FR-5508-P-01
January 17, 2012
Page 3 of 3

### *Magner v. Gallagher:* HUD Must Produce a Final Rule Before June

Finally, I urge HUD to produce a final rule before June to provide guidance to the Supreme Court, which will hear oral argument on *Magner v. Gallagher* next month. Unless HUD acts quickly, a bad Supreme Court ruling would mean that only Californians would enjoy unfettered rights to fair housing, because California's Fair Employment and Housing Act is the only state law with an explicit effects test.

Thank you for this opportunity to provide comment to these long overdue proposed regulations. Fair housing advocates nationwide are united in hoping that HUD acts quickly to transform its nearly perfect proposed regulations into an even stronger and more effective final rule before June.

Sincerely,


Michele Magar

SHARE

## Document Details

### Comment Submitted by David Certner, AARP

**Document ID:** HUD-2011-0138-0081     **Document Type:** Public Submission
This is comment on     Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

Please see the attached document for AARP's comments.

### Attachments:

View Attachment:

- Comment Submitted by David Certner, AARP (Attachment)

**Title:**
Comment Submitted by David Certner, AARP (Attachment)



January 17, 2012

**Via Electronic Submission**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

RE:    **Docket No. FR-5508-P-01, RIN 2529–AA96; Implementation of the Fair
Housing Act's Discriminatory Effects Standard**

Dear Rules Docket Clerk:

AARP appreciates the opportunity to provide comments supporting HUD's proposed
rule to implement the Fair Housing Act's ("FHA"), discriminatory effects standard.  We
urge HUD to implement the proposed rule as quickly as possible to further fair and
equal housing opportunities.

AARP is a nonprofit, nonpartisan membership organization that helps people 50+ have
independence, choice, and control in ways that are beneficial and affordable to them
and society as a whole.  We produce AARP The Magazine, AARP Bulletin, AARP Viva,
NRTA Live and Learn, and provide information via our website, www.aarp.org.  AARP
publications reach more households than any other publication in the United States.
AARP advocates for policies that enhance and protect the economic security of
individuals.

**Obstacles to Aging in Place**

The vast majority of older people prefer to age in place, yet inadequate housing,
mobility options, and community supports can create serious obstacles to achievement
of this desire.  Without appropriate housing and transportation, older adults are at much
greater risk of institutionalization when they stop driving or acquire mobility impairments.
Keys to successful aging include access to affordable, accessible housing and
adequate mobility options that provide access to necessary supports and services,
received both in and out of the home.[1]

---

[1] AARP Public Policy Institute, Fact Sheet 172, *Housing Policy Solutions to Support Aging in Place* (March 2010).

1

While age is not itself a protected class, people in each of the protected classes eventually age. Moreover, a person's housing needs frequently change as they age. In particular, many older people eventually acquire a disability and become part of a protected class as a result.[2] When a person whose housing opportunities have been limited by discrimination because of race or national origin becomes disabled, their housing opportunities may be even further narrowed by discrimination because of their dual protected status.

## The Fair Housing Act Protects Against Discriminatory Effects

AARP supports adoption of the proposed rule, which reflects the long understood interpretation of HUD, the Department of Justice, and the courts that the FHA protects against policies and practices that have a discriminatory effect on a protected class.

The FHA's discriminatory effects standard addresses facially neutral policies and practices that make housing unavailable to a protected class, regardless of intent or equal treatment.[3] It has provided a means to combat "practices that are fair in form, but discriminatory in operation."[4] The disparate impact analysis "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for these disparities" because this mode of analysis exposes practices that, while "adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination."[5]

Importantly, although people are not protected from housing discrimination based upon their age, the FHA protects people as they age. For example, protection against discrimination because of disability helps protect the frail elderly and those with disabilities from being forced into institutions. The disparate impact analysis is essential to reach the discriminatory effects of a wide range of practices that make housing unavailable to people as they age.

---

[2] See National Council on Disability, *The State of Housing in the 21st Century: A Disability Perspective*, 27 (2010) ("Recent federal research estimates that 54.4 million people with disabilities live in the civilian population in the United States, representing approximately 19 percent of the noninstitutionalized population. At all ages, women (24%) have a higher prevalence of disability when compared with men (19%). For all, the prevalence of disability increases with age, from 11 percent for people 18 to 44 years of age to 52 percent for people 65 years and older.").

[3] *Mt. Holly Gardens Citizens in Action v. Township of Mount Holly*, 658 F.3d 375, 385 (3d Cir. 2011) (finding "[i]n disparate impact cases, [e]ffect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme.") (quoting *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976).

[4] *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

[5] *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988).

## Subprime Mortgage Lending Discrimination Has a Discriminatory Effect on African American and Hispanic Borrowers and Threatens Their Financial Security

The wealth created by homeownership is a primary resource for older people to support them in their retirement years.[6] Many African American and Hispanic borrowers have a markedly less secure financial future in comparison to other borrowers as a direct result of mortgage lending practices that have discriminatory effects.

The importance of the discriminatory effects standard in eliminating discrimination in mortgage lending cannot be overstated. According to a recent study of mortgage lending data, "even after years of public policy efforts, race and ethnicity remain an important determinant of the allocation of mortgage credit in both home purchase and home refinance markets."[7] The study concluded that racial disparities in rates of subprime lending could not be explained by factors related to credit-worthiness.

Disparate effects in lending also meant that "borrowers in minority groups were much more likely to receive loans with product features associated with higher rates of foreclosure," i.e., loans with higher interests rates or with risky terms, like ballooning interest rates.[8] These high disparities were "evident even within credit rates."[9] Older minority borrowers are frequently impacted by such discriminatory lending practices, which often result in foreclosure.[10]

A Discriminatory Effects Standard Is Necessary To Address Housing Discrimination against Persons with Disabilities That Interferes With Aging in Place

The vast majority of older people want to live out their lives in the home and community in which they currently live. Unfortunately, many will find it impossible to do so because their home will not match their changing physical, financial or cognitive needs, or their community lacks the home based services, supports, and features necessary to support aging in place.[11]

---

[6] William C. Apgar and Zhu Xiao Di, *Housing Wealth and Retirement Savings: Enhancing Financial Security for Older Americans*, (Sept. 2005).

[7] William Apgar et al., Dep't Housing & Urban Development, *Risk or Race: An Assessment of Subprime Lending Patterns in Nine Metropolitan Areas* 45 (2009).

[8] Bocian, et al., Center for Responsible Lending, *Lost Ground* 21 (2011).

[9] *Id.; see also* Apgar & Calder, at 111-15 (summarizing research of subprime lending designed to "control[] for neighborhood and borrower characteristics, including several measures of risk" and concluding that those studies "confirm[] that race remains a factor").

[10] *See* AARP Public Policy Institute, forthcoming foreclosure study, expected publication February 2012 (For African Americans age 50+, the foreclosure rate on subprime loans was 10.4 percent in 2010, and for Hispanics 50+ the foreclosure rate on subprime loans was 15.3 percent. For prime loans in 2010, the foreclosure rate was 3.0 percent for African Americans and 3.9 percent for Hispanics age 50+).

[11] *See* AARP Public Policy Institute, Fact Sheet 173, *Supportive Housing* (March 2010); National Conference of State Legislatures and AARP Public Policy Institute, In Brief 190, *Aging in Place: A State Survey of Livability Policies* (Dec. 2011).

3

Congress intended the FHA to eliminate the discriminatory effects of zoning and land use policies – such as family composition and "proper supervision" requirements -- that erect barriers to integration of people with disabilities in neighborhoods and communities.[12]

Congress recognized that discrimination against persons with disabilities exists as much because of "thoughtlessness" as intentional discrimination. The FHA thus protects against all forms of discrimination – intentional as well as benign – caused by the public's perception of what is "best" for persons with disabilities."[13] Although state and local governments have the authority to regulate land use, the FHA protections provide a remedy where "that authority has sometimes been used to restrict the ability of [persons with disabilities] to live in communities."[14]

Without the ability to challenge discrimination that results from discriminatory effects, it would be impossible to reach such practices even though they may dramatically limit housing choice or otherwise make housing unavailable. The FHA clearly contemplates protection against such injuries and the use of the discriminatory effects analysis to root them out.

In addition, the FHA reaches discriminatory effects of policies and practices of licensing agencies and housing providers that cater to serving the housing needs of older people. Discriminatory effects may result from decisions based either upon "thoughtlessness" or stereotypes and assumptions about people with disabilities.[15] Common obstacles that older people face obtaining housing and aging in place often result from neutral policies – such as prohibition of supportive services provided in the home or restrictions on the use of mobility aids – that have a discriminatory effect on older people with disabilities.

A common justification asserted for such policies is the safety of residents. Under a discriminatory effects analysis, courts have required that legitimate safety rules be construed narrowly, in accord with Congressional intent in amending the FHA to end discrimination based on disability.

## Race and National Origin Discrimination in Housing Interferes with Aging in Place

Housing options that support successful aging in place are disproportionately unavailable in racially concentrated segregated neighborhoods.[16] African American and

---

[12] *See* H.R. Rep. No. 100-711, 100th Cong., 2d Sess. 24 (1988) ("The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices."); Housing Policy Solutions, *supra* note 1 (discussing barriers to integration).

[13] *Cason v. Rochester Hous. Auth.*, 748 F. Supp. 1002, 1003 (W.D.N.Y. 1990).

[14] *See* H.R. Rep No. 100-711.

[15] *See Cason*, 748 F. Supp. at 1003.

[16] David Barton Smith, Zhanlian Feng, Mary L. Fennell, Jacqueline Zinn, Vincent Mor, *Racial Disparities in Access to Long-Term Care: The Illusive Pursuit of Equity*, Journal of Health Politics, Policy and Law, Vol. 33, No. 5 (Oct. 2008); Mary L. Fennell, Zhanlian Feng, Melissa A. Clark, and Vincent Mor, "Elderly Hispanics More Likely to Reside In Poor Quality Nursing Homes," Health Affairs, Vol. 29, Issue 1, pp. 65-73, 2010;  David Barton Smith, Zhanlian Feng, Mary L. Fennell, Jacqueline S. Zinn, and Vincent Mor,

4

Hispanic residents, many of whom live in highly racially or ethnically concentrated neighborhoods, tend to live in older housing stock, built well before accessibility guidelines provided a minimal level of accessible features necessary to permit them to age in place.[17]  They also lack the supportive services and transportation options that are necessary to support successful aging.  Unlike a person who lives in a community with more robust options and resources, people in protected classes who live in segregated communities may be forced as they age to make the Hobson's choice of foregoing suitable housing and services, or breaking the social ties necessary to maintain mental and physical health in order to access such supports and services, in either a residential or institutional setting.[18]

AARP applauds HUD for reaffirming through this rulemaking its longstanding interpretation of the FHA that where the adverse impact of a facially neutral zoning or land use policy falls more heavily on a protected class, such discriminatory effect violates the FHA.[19]  A discriminatory effects standard is essential to protect fair and equal housing opportunities throughout a person's lifespan.

**Standard of Proof**

AARP endorses evaluating discriminatory effects claims under a three-step burden shifting analysis.[20]  Such an approach is practical and supported by longstanding precedent in the evaluation of discriminatory effect claims under a variety of statutes, including Title VII, upon which the Fair Housing Act is modeled.

While AARP applauds HUD's efforts to standardize the analysis of discriminatory effects claims, we urge HUD to strengthen it in order to further the goals of the FHA.  In particular, while HUD proposes to assign to the plaintiff the burden in the third step of the analysis to produce evidence of a less discriminatory alternative, AARP urges HUD to recognize that the defendant in a Fair Housing Act discriminatory effects case appropriately bears the burden to show a less discriminatory alternative is not available. Placing the burden on the defendant is practical and not overly burdensome, as

---

"*Separate and Unequal: Racial Segregation and Disparities in Quality Across U.S. Nursing Homes*, Health Affairs, Vol. 26, Issue 5, pp. 1448-1458 (2007).

[17] MetLife, *Aging In Place 2.0, Rethinking Solutions to the Home Care Challenge*, 18-19 (Sept. 2010).
[18] Mia Oberlink, *Opportunities for Creating Livable Communities*, AARP Public Policy Institute (Ap. 2008).
[19] *See Mt. Holly Gardens Citizens in Action v. Township of Mount Holly*, 658 F.3d 375, 384 (3d Cir. 2011) ("All of the courts of appeal that have considered the matter . . . have concluded that plaintiffs can show the FHA has been violated through policies that have a disparate impact. . . ."). As federal courts have consistently held, "[i]n disparate impact cases, [e]ffect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme." *Id.* at 385 (quoting *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976).
[20] Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921, 70925 (proposed Nov. 16, 2011) (to be codified at 24 C.F.R. § 100.500(c)(3)).

5

demonstrated by the fact that many of the judicial circuits have long assigned defendants that burden.[21]

One reason HUD cites for proposing this rule is to eliminate the waste of time and resources spent litigating the availability and analysis of a discriminatory effects claim under the FHA. This motivation is eminently reasonable. By placing the burden on plaintiffs to prove a less discriminatory alternative, however, HUD has not eliminated time-wasting disputes. Placing the burden on the plaintiffs will only shift when those disputes occur because plaintiffs will be required to conduct extensive discovery to obtain from the defendants the information necessary to develop the less discriminatory alternative.

Undoubtedly, defendants will oppose providing such information based upon any number of common defenses to providing discovery in litigation. Even if defendants are compelled to provide the necessary information, in many cases, plaintiffs will not have the resources or expertise to propose effective alternatives. In the war of attrition, the defendants will have an overwhelming advantage that unnecessarily limits enforcement of FHA discriminatory effects claims. Such time-wasting discovery disputes will be avoided, however, if HUD places the burden on defendant's experts -- who were likely involved in developing the challenged plan -- to evaluate the alternatives.

Moreover, HUD misconstrues the nature of the burden on either party under such an analysis. HUD cites the virtue of relieving defendants of the necessity of proving a negative, but that is not what is required to evaluate a discriminatory effects claim. The FHA does not address the simple existence or non-existence of a binary fact. It addresses the permutations of highly complex decisions and actions of a housing provider or governmental agency with many competing priorities and obligations.[22] Thus, defendants are often in the best position to evaluate and chose between the alternatives to arrive at a less discriminatory outcome that also meets their competing goals. Moreover, assigning to defendants the burden to show no less discriminatory alternative is available gives government entities greater flexibility to determine how best to accomplish their myriad goals in light of limited public funds. Providers of assisted living and nursing facilities can determine how best to navigate overlapping regulatory requirements.

Assigning the burden in the third step to the defendant encourages housing providers to be more cognizant of and responsible for the impact of their practices on protected classes, which itself furthers the goals of the FHA. Although enforcement of the FHA is

---

[21] *See e.g. Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir. 1988) (a defendant must show that there are no less discriminatory alternatives available); *Mt. Holly*, 658 F.3d at 385 (holding that defendants have the burden of showing that there is no less discriminatory alternative); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000) (same); *Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 503 (N.D. Tex. 2010) (same); *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 565 (N.D. Tex. 2000) (same).

[22] *Huntington*, 844 F.2d at 937-38 (noting that in zoning cases under the FHA a defendant's justifications are "normally based on a variety of circumstances");

6

typically an adversarial process, its goals are best met when the parties work together to arrive at a mutually beneficial result. Placing the burden on the defendant provides an important incentive for housing providers to work cooperatively with protected classes to implement policies that do not have discriminatory effects adverse to a protected class.

## Conclusion

AARP appreciates the opportunity to comment on the proposed rule, as it is vital to ensure successful aging in one's home and community. If you have questions or need additional information, please contact Cristina Martin-Firvida at 202-434-6194.

Sincerely,

David Certner
Legislative Counsel and Legislative Policy Director

7

Comment Submitted by T.J. Sutcliffe, Consortium for Citizens with Disabilities Housing





**CONSORTIUM FOR CITIZENS
WITH DISABILITIES**

January 17, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development (HUD)
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

   Re: **Docket No. FR-5508-P-01;** *Implementation of the Fair Housing Act's
   Discriminatory Effects Standard*

Dear Rules Docket Clerk:

On behalf of the undersigned members of the Consortium for Citizens with Disabilities (CCD)
Housing Task Force, we write in strong support of the HUD's proposed regulation implementing
the Fair Housing Act's discriminatory effects standard. The CCD Housing Task Force is a
coalition of national organizations which advocates on behalf of the housing needs of people
with a variety of disabilities, including mental illness, sensory disabilities, physical disabilities,
developmental disabilities, cognitive disabilities, and intellectual disabilities. HUD's proposed
regulation is an important and necessary step in ensuring that the nation's housing is available to
all, regardless of protected class status.

The breadth of complaints filed with HUD's Office of Fair Housing and Equal Opportunity and
litigation relying on disparate impact claims bought by private enforcers of the Act illustrates the
importance of such claims to achieving the "policy of the United States to provide within
constitutional limitations, for fair housing throughout the United States." 42 U.S.C. 3601.
Examples are numerous and far-reaching and include the following rules, policies, and actions
that contribute to discrimination on the basis of disability:

- Apparently neutral rules that unintentionally result in less favorable treatment of one
  individual or a group because of disability, or because of a particular type of disability, or
  because of severity of disability. Examples include "capable of independent living"
  admission criteria that are so subjective that they are applied inconsistently by different
  staff in the same organization and result in both illegal denials of housing and charges of
  discrimination against housing providers.

1825 K Street, NW, Suite 1200 • Washington, DC  20006 • PH 202-783-2229 • FAX 202-783-8250 • Info@c-c-d.org • www.c-c-d.org

- Apparently neutral rules that are not based on disability but that nonetheless result in disparate, adverse outcomes for individuals with disabilities. For example, a housing provider who refuses to process rental applications without drivers' licenses is making housing unavailable to individuals with visual disabilities and others whose disabilities prevent them from acquiring drivers' licenses. Similar policies requiring that rental applicants earn three times the rent, refuse to process applications from applicants with co-signors, or from applicants who are not employed all result in disparate, adverse outcomes for individuals with disabilities. Another example are policies against assigning parking spaces to tenants, which place a particular hardship on tenants with disabilities who need to be able to count on an available accessible spot close to their unit;

- Zoning ordinances that permit only households whose members are related by blood or marriage to occupy homes in single family neighborhoods but not individuals with mental and physical disabilities who choose to share a home and create a household;

- Zoning and land-use policies and decisions which restrict construction of multifamily housing to a largely minority area or block or limit development of affordable housing in communities of opportunity, resulting in both discriminatory denial of housing to minorities, the continued institutionalization of individuals with disabilities who are ready to move back to their communities, and the perpetuation and/or exacerbation of residential segregation;

- Residency requirements and other admissions procedures imposed by public housing agencies or housing management firms in predominantly white and high opportunity communities which discriminate against minority persons, with and without disabilities who are not living in such communities including, individuals with disabilities living unnecessarily and at great cost to the State, in institutions, nursing homes, and other congregate; and

- Policies requiring that tenants walk unassisted or hear or speak or speak English or be United States citizens.

In each of these contexts, the discriminatory effects standard has proven to be a valuable tool in assessing when policies have an adverse impact on members of a protected class, and whether these policies are necessary to achieve a legitimate goal that cannot be achieved through less discriminatory means. This type of assessment is an essential part of our fair housing enforcement system, and the proposed rule will ensure that the standard continues to be applied consistently across the country.

An often overlooked benefit of the disparate effects test is its ability to give HUD and private Fair Housing advocates the tools to reveal the effects of racism, poverty, disability discrimination, and adverse environmental conditions on the health and well-being of individuals protected by the law. The disparate impact analysis is critical to environmental justice investigations and it has led to corrective action through education as well as litigation.

2

As the Surgeon General reported,

> Ethnic and racial minorities in the United States face a social and economic environment of inequality that includes greater exposure to racism, discrimination, violence, and poverty. Living in poverty has the most measurable effect on the rates of mental illness. People in the lowest strata of income, education, and occupation (known as socioeconomic status) are about two to three times more likely than those in the highest strata to have a mental disorder.
>
> *Mental Health: Culture, Race, and Ethnicity: A Supplement to Mental Health: A Report of the Surgeon General*
> http://www.surgeongeneral.gov/library/mentalhealth/cre/execsummary-6.html.

While no government agency would purposely place any residents in danger, competing interests sometimes lead to harmful and discriminatory results that both result in injuries, disabilities and the exacerbation of the symptoms of illnesses and disabilities. The disparate impact rule will continue to be an important tool for both avoiding and correcting such outcomes.

We applaud HUD's proposal to provide a long needed regulation on the propriety of disparate impact claims under the Fair Housing Act and to clarify the burden of proof under this standard. This regulation will foster the goals of the Fair Housing Act and benefit people with disabilities. It provides a national standard for courts, housing providers, municipalities and the financial and insurance industries. These issues are now being considered by the Supreme Court and we urge HUD to issue the final rule as soon as possible to provide the Court definitive agency interpretation concerning these issues.

Very truly yours,

The Arc of the United States
Bazelon Center for Mental Health Law
National Alliance on Mental Illness
National Association of Councils on Developmental Disabilities
National Disability Rights Network
Paralyzed Veterans of America
VetsFirst, a program of United Spinal Association

The CCD Housing Task Force is joined in these comments by:

National Low Income Housing Coalition

3



## Document Details

SHARE

**Comment Submitted by Paul Hancock**

**Document ID:** HUD-2011-0138-0083  **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

Please see attached comment letter

Attachments:

– Comment Submitted by Paul Hancock (Attachment)                          View Attachment:

**Title:**
Comment Submitted by Paul Hancock (Attachment)

# COMMENTS CONCERNING PROPOSED RULEMAKING ON THE "DISCRIMINATORY EFFECTS STANDARD" OF THE FAIR HOUSING ACT

*January 17, 2012*

Submitted to:

United States Department of Housing and Urban Development
Regulations Division
Office of the General Counsel

Docket No. FR-5508-P-01
RIN 2529-AA96

## SUBMITTED BY:

**American Bankers Association**

**American Financial Services Association**

**Consumer Bankers Association**

**Consumer Mortgage Coalition**

**Independent Community Bankers of America**

**Mortgage Bankers Association**

Counsel:
**K&L GATES LLP**
**Paul F. Hancock**
paul.hancock@klgates.com
200 South Biscayne Boulevard, 39th floor
Miami, Florida 33131
Telephone (305) 539-3300

**Andrew C. Glass**
andrew.glass@klgates.com
One Lincoln Street
Boston, Massachusetts 02111
Telephone (617) 261-3100

January 17, 2012


<u>**By Federal E-Rulemaking Portal**</u>

Regulations Division
Office of General Counsel
United States Department of Housing and Urban
    Development
451 7th Street SW, Room 10276
Washington, DC 20410

Re:    Implementation of the Fair Housing Act's Discriminatory Effects Standard
        Docket No. FR-5508-P-01
        RIN 2529-AA96

Ladies and Gentlemen:

This comment is submitted by the American Bankers Association, the American Financial Services Association, the Consumer Bankers Association, the Consumer Mortgage Coalition, the Independent Community Bankers of America, and the Mortgage Bankers Association, trade associations whose members are actively involved in the residential mortgage lending industry nationwide (collectively, the "Trade Associations").[1]  The Trade Associations submit the following comments concerning the proposed rulemaking (the "Proposed Rule") by the United States Department of Housing and Urban Development (the "Department" or "HUD") on the "discriminatory effects standard" of the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.* ("Fair Housing Act" or the "Act").

The Trade Associations appreciate the Department's efforts in promoting fair lending for all loan applicants, a goal which the Trade Associations strongly endorse, and the Department's efforts in promulgating the Proposed Rule.  The Department faces complex issues in effecting the anti-discrimination provisions of the Fair Housing Act.  The Trade Associations' comments are meant to assist the Department in determining the proper scope and standards for its enforcement efforts in promulgating rules under the Fair Housing Act. Application of an incorrect standard or improper enforcement of the Act would have serious negative implications for lenders and borrowers alike.  Thus, the issues that this letter addresses are of great import both to the members of the Trade Associations and to their customers.

---

[1] A brief description of each of the Trade Associations is attached hereto as Appendix A.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 2

## I.   Introduction and Summary of Comments

Congress enacted the Fair Housing Act in 1968.  Pub. L. No. 90-284, Title VIII, 82 Stat. 73, 81-89 (1968) (codified at 42 U.S.C. §§ 3601, *et seq.*).  In 1988, Congress amended the Act to address, in part, discrimination in residential real-estate-related transactions.  Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988).  The purpose of the Act is "to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601.  To that end, the statute prohibits discrimination "because of race, color, religion, sex, handicap, familial status, or national origin," *id.* §§ 3604, 3605, in connection with, among other things, "residential real estate-related transactions," *id.* § 3605.

The Trade Associations vigorously support the Fair Housing Act, and they and their members devote substantial resources on an ongoing basis to the advancement of fair lending.  The Trade Associations wholeheartedly oppose the disparate treatment of individuals.  "Disparate treatment" describes an intentional act of discrimination against individuals "because of" certain characteristics such as race or ethnicity.  *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 249 (2005) (O'Connor, J., concurring).  The residential mortgage lenders represented by the Trade Associations seek to ensure that their credit decisions are made without regard to any factor prohibited by the Act.

The Trade Associations do not believe, however, that the disparate-impact cause of action created by the Proposed Rule finds support in the Fair Housing Act.  "Disparate impact" describes the differential results that arise from "practices that are facially neutral in their treatment of different groups" but that may "fall more harshly on one group than another."  *Id.* at 239 (plurality op.).  Accordingly, and as discussed in detail below, the Trade Associations present the following comments for the Department's consideration:

　　　　1.　　The Department should postpone its rulemaking pending the United States Supreme Court's disposition of *Magner v. Gallagher*.  The Proposed Rule presents the same issues that the Supreme Court is currently reviewing in *Magner*, namely, whether the Fair Housing Act prohibits conduct that, although facially neutral, has a purported disparate impact and if so, which burden and standard of proof should apply to disparate-impact claims.  To take advantage of guidance from the Court on these issues, the Department should postpone its rulemaking until after the Court has rendered its opinion.

　　　　2.　　By creating liability for disparate impact, the Proposed Rule is inconsistent with the plain language of the Fair Housing Act.  Congress's use of language prohibiting discriminatory practices "because of" certain traits or characteristics, such as the language

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 3

found in the Fair Housing Act, only extends to disparate treatment.  The Department should revise the rule accordingly.

      3.    <u>Reliance on United States Courts of Appeals rulings is misplaced</u>.  Although many of the Courts of Appeals have held that disparate-impact claims may be brought under the Fair Housing Act, these courts' holdings are incorrectly premised on Supreme Court jurisprudence construing language that is found in other statutes but that is *not* found in the Fair Housing Act.  The Department cannot rely on those Courts of Appeal decisions in promulgating the Proposed Rule.

      4.    <u>The Proposed Rule exceeds the Department's authority</u>.  If the Department were to promulgate the Proposed Rule in its current form, the Department would surpass the scope of authority that Congress has delegated to it.  Moreover, the Department's failure to explain the departure from its prior, official, neutral position with respect to the availability of a disparate-impact cause of action under the Fair Housing Act suggests that the Department should revise the rule to eliminate the proposed cause of action.

      5.    <u>The burden and standard of proof in the Proposed Rule are inconsistent with Supreme Court jurisprudence</u>.  If the Department does not eliminate the disparate-impact cause of action from the final rule, the Department should revise the burden and standard of proof to comport with the Court's holding in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).

      6.    <u>The Proposed Rule may encourage discrimination</u>.  Although the Trade Associations and their members staunchly oppose disparate treatment, the Trade Associations are concerned that the threat of a disparate-impact challenge may encourage efforts by businesses to bring end results more in line with demographics.  Such efforts, while intended to avoid disparate-impact liability, may lead to the use of quotas and thus to disparate treatment, the very situation that the Fair Housing Act is intended to eliminate.

      7.    <u>The Department should provide an exemption from disparate-impact liability for compliance with government and government-sponsored programs or policies</u>.  If the Department does not eliminate the disparate-impact cause of action from the final rule, the Department should revise the rule to ensure that it does not create liability for businesses which are otherwise complying with or assisting in government efforts to rehabilitate the residential housing market.