**48040** Federal Register / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations

**Appendix C—Sample Notificaton Forms**

This appendix contains six sample notification forms. Forms C–1 through C–4 are intended for use in notifying an applicant that adverse action has been taken on an application or account under § 202.9 (a)(1) and (2)(i) of this regulation. Form C–5 is a notice of disclosure of the right to request specific reasons for adverse action under § 202.9 (a)(1) and (2)(ii). Form C–6 is designed for use in notifying an applicant, under § 202.9(c)(2), that an application is incomplete.

Form C–1 contains the Fair Credit Reporting Act disclosure as required by sections 615 (a) and (b) of that act. Forms C–2 through C–5 contain only the section 615(a) disclosure (that a creditor obtained information from a consumer reporting agency that played a part in the credit decision). A creditor must provide the section 615(b) disclosure (that a creditor obtained information from an outside source other than a consumer reporting agency that played

a part in the credit decision) where appropriate.

The sample forms are illustrative and may not be appropriate for all creditors. They were designed to include some of the factors that creditors most commonly consider. If a creditor chooses to use the checklist of reasons provided in one of the sample forms in this appendix and if reasons commonly used by the creditor are not provided on the form, the creditor should modify the checklist by substituting or adding other reasons. For example, if "inadequate down payment" or "no deposit relationship with us" are common reasons for taking adverse action on an application, the creditor ought to add or substitute such reasons for those presently contained on the sample forms.

If the reasons listed on the forms are not the factors actually used, a creditor will not satisfy the notice requirement by simply checking the closest identifiable factor listed. For example, some creditors consider only references from banks or other depository institutions and disregard finance company

references altogether; their statement of reasons should disclose "insufficient bank references," not "insufficient credit references." Similarly, a creditor that considers bank references and other credit references as distinct factors should treat the two factors separately and disclose them as appropriate. The creditor should either add such other factors to the form or check "other" and include the appropriate explanation. The creditor need not, however, describe how or why a factor adversely affected the application. For example, the notice may say "length of residence" rather than "too short a period of residence."

A creditor may design its own notification forms or use all or a portion of the forms contained in this appendix. Proper use of forms C–1 through C–4 will satisfy the requirement of § 202.9(a)(2)(i). Proper use of forms C–5 and C–6 constitutes full compliance with §§ 202.9(a)(2)(ii) and 202.9(c)(2), respectively.

BILLING CODE 6210-01-M

FORM C-1 -- SAMPLE NOTICE OF ACTION TAKEN AND STATEMENT OF REASONS

### Statement of Credit Denial, Termination, or Change

DATE _____

Applicant's Name: _____

Applicant's Address: _____

Description of Account, Transaction, or Requested Credit:

_____

Description of Action Taken:

_____

_____

PART I - PRINCIPAL REASONS(S) FOR CREDIT DENIAL, TERMINATION,
OR OTHER ACTION TAKEN CONCERNING CREDIT.
This section must be completed in all instances.

____Credit application incomplete                 ____Length of residence

____Insufficient number of credit                 ____Temporary residence
references provided
                                                   ____Unable to verify residence
____Unacceptable type of credit
references provided                                ____No credit file

____Unable to verify credit references            ____Limited credit experience

____Temporary or irregular employment             ____Poor credit performance with us

____Unable to verify employment                    ____Delinquent past or present credit
obligations with others
____Length of employment
                                                   ____Garnishment, attachment, foreclosure,
____Income insufficient for amount                 repossession, collection action, or
of credit requested                                judgment

____Excessive obligations in                       ____Bankruptcy
relation to income
                                                   ____Value or type of collateral
____Unable to verify income                        not sufficent

____Other, specify:_____

**48042**    Federal Register / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations

FORM C-1, page 2

PART II  - DISCLOSURE OF USE OF INFORMATION OBTAINED FROM AN OUTSIDE SOURCE.
           This section should be completed if the credit decision was based
           in whole or in part on information that has been obtained from an
           outside source.

____ Our credit decision was based in whole or in part on information obtained
     in a report from the consumer reporting agency listed below.  You have a
     right under the Fair Credit Reporting Act to know the information contained
     in your credit file at the consumer reporting agency.  The reporting agency
     played no part in our decision and is unable to supply specific reasons why
     we have denied credit to you.

     Name: _____

     _____

     Address: _____

     _____

     Telephone number: _____

____ Our credit decision was based in whole or in part on information obtained
     from an outside source other than a consumer reporting agency. Under the
     Fair Credit Reporting Act, you have the right to make a written request,
     no later than 60 days after you receive this notice, for disclosure of the
     nature of this information.

If you have any questions regarding this notice, you should contact:

     Creditor's name: _____
     Creditor's address: _____
     Creditor's telephone number: _____

                              NOTICE

The federal Equal Credit Opportunity Act prohibits creditors from discriminating
against credit applicants on the basis of race, color, religion, national origin,
sex, marital status, age (provided the applicant has the capacity to enter into
a binding contract); because all or part of the applicant's income derives from
any public assistance program; or because the applicant has in good faith
exercised any right under the Consumer Credit Protection Act.  The federal agency
that administers compliance with this law concerning this creditor is (name and
address as specified by the appropriate agency listed in Appendix A).

Federal Register / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations    48043

## FORM C-2 -- SAMPLE NOTICE OF ACTION TAKEN AND STATEMENT OF REASONS

Date

Dear Applicant:

Thank you for your recent application. Your request for [a loan/a credit card/ an increase in your credit limit] was carefully considered, and we regret that we are unable to approve your application at this time, for the following reason(s):

YOUR INCOME:
\_\_\_\_ is below our minimum requirement.
\_\_\_\_ is insufficient to sustain payments on the amount of credit requested.
\_\_\_\_ could not be verified.

YOUR EMPLOYMENT:
\_\_\_\_ is not of sufficient length to qualify.
\_\_\_\_ could not be verified.

YOUR CREDIT HISTORY:
\_\_\_\_ of making payments on time was not satisfactory.
\_\_\_\_ could not be verified.

YOUR APPLICATION:
\_\_\_\_ lacks a sufficient number of credit references.
\_\_\_\_ lacks acceptable types of credit references.
\_\_\_\_ reveals that current obligations are excessive in relation to income.

OTHER: _____

The consumer reporting agency contacted that provided information that influenced our decision in whole or in part was [name, address and telephone number of the reporting agency]. The reporting agency is unable to supply specific reasons why we have denied credit to you. You do, however, have a right under the Fair Credit Reporting Act to know the information contained in your credit file. Any questions regarding such information should be directed to [consumer reporting agency].

If you have any questions regarding this letter you should contact us at [creditor's name, address and telephone number].

NOTICE: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national orgin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is (name and address as specified by the appropriate agency listed in Appendix A).

**48044**    **Federal Register** / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations

FORM C-3 -- SAMPLE NOTICE OF ACTION TAKEN AND STATEMENT OF REASONS
            (CREDIT SCORING)

                                                        Date

Dear Applicant:

        Thank you for your recent application for _____.
We regret that we are unable to approve your request.

        Your application was processed by a credit scoring system that
assigns a numerical value to the various items of information we consider in
evaluating an application. These numerical values are based upon the results
of analyses of repayment histories of large numbers of customers.

        The information you provided in your application did not score a
sufficient number of points for approval of the application. The reasons why
you did not score well compared to other applicants were:

                        * Insufficient bank references
                        * Type of occupation
                        * Insufficient credit experience

        In evaluating your application the consumer reporting agency listed
below provided us with information that in whole or in part influenced our deci-
sion. The reporting agency played no part in our decision other than providing
us with credit information about you. Under the Fair Credit Reporting Act, you
have a right to know the information provided to us. It can be obtained by
contacting: [name, address, and telephone number of the consumer reporting
agency].

        If you have any questions regarding this letter, you should contact
us at

                Creditor's Name: _____

                Address: _____

                         _____

                Telephone: _____

Sincerely,


NOTICE: The federal Equal Credit Opportunity Act prohibits creditors from
discriminating against credit applicants on the basis of race, color, religion,
national origin, sex, marital status, age (with certain limited exceptions);
because all or part of the applicant's income derives from any public assistance
program; or because the applicant has in good faith exercised any right under
the Consumer Credit Protection Act. The federal agency that administers com-
pliance with this law concerning this creditor is (name and address as specified
by the appropriate agency listed in Appendix A).

Federal Register / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations    48045

FORM C-4 -- SAMPLE NOTICE OF ACTION TAKEN, STATEMENT OF REASONS AND COUNTEROFFER

                                                      Date

Dear Applicant:

        Thank you for your application for _____. We are unable
to offer you credit on the terms that you requested for the following reason(s):

_____

        We can, however, offer you credit on the following terms: _____

If this offer is acceptable to you, please notify us within [amount of time] at
the following address: _____

        Our credit decision on your application was based in whole or in part
on information obtained in a report from [name, address and telephone number of
the consumer reporting agency]. You have a right under the Fair Credit Reporting
Act to know the information contained in your credit file at the consumer reporting
agency.

        You should know that the federal Equal Credit Opportunity Act prohibits
creditors, such as ourselves, from discriminating against credit applicants on
the basis of their race, color, religion, national origin, sex, marital status,
age because they receive income from a public assistance program, or because
they may have exercised their rights under the Consumer Credit Protection Act.
If you believe there has been discrimination in handling your application you
should contact the [name and address of the appropriate federal enforcement
agency listed in Appendix A]

                        Sincerely,

FORM C-5 -- SAMPLE DISCLOSURE OF RIGHT TO REQUEST SPECIFIC REASONS FOR CREDIT DENIAL

Date

Dear Applicant:

Thank you for applying to us for _____.

After carefully reviewing your application, we are sorry to advise you that we cannot [open an account for you/grant a loan to you/increase your credit limit] at this time.

If you would like a statement of specific reasons why your application was denied, please contact [our credit service manager] shown below within 60 days of the date of this letter. We will provide you with the statement of reasons within 30 days after receving your request.

        Creditor's Name
        Address
        Telephone number

If we obtained information from a consumer reporting agency as part of our consideration of your application, its name, address, and telephone number is shown below. You can find out about the information contained in your file (if one was used) by contacting:

        Consumer reporting agency's name
        Address
        Telephone number

Sincerely,


                          NOTICE


The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is (name and address as specified by the appropriate agency listed in Appendix A).

Federal Register / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations    48047

FORM C-6 -- SAMPLE NOTICE OF INCOMPLETE APPLICATION AND REQUEST FOR
              ADDITIONAL INFORMATION

                              Creditor's name
                              Address
                              Telephone number


                                              Date


Dear Applicant:

        Thank you for your application for credit.  The following information
is needed to make a decision on your application:  _____

_____

We need to receive this information by __(date)__.  If we do not receive it
by that date, we will regrettably be unable to give further consideration to
your credit request.

                        Sincerely,

BILLING CODE 6210-01-C

**Appendix D—Issuance of Staff Interpretations**

*Official Staff Interpretations*

Officials in the Board's Division of Consumer and Community Affairs are authorized to issue official staff interpretations of this regulation. These interpretations provide the protection afforded under section 706(e) of the act. Except in unusual circumstances, such interpretations will not be issued separately but will be incorporated in an official commentary to the regulation, which will be amended periodically.

*Requests for Issuance of Official Staff Interpretations*

A request for an official staff interpretation should be in writing and addressed to the Director, Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, Washington, D.C. 20551. The request should contain a complete statement of all relevant facts concerning the issue, including copies of all pertinent documents.

*Scope of Interpretations*

No staff interpretations will be issued approving creditor's forms or statements. This restriction does not apply to forms or statements whose use is required or sanctioned by a government agency.

**Supplement I—Official Staff Interpretations**

[Reg. B; ECO–1]

Following is an official staff interpretation of Regulation B issued under authority delegated by the Federal Reserve Board to officials in the Division of Consumer and Community Affairs. References are to sections of the regulation or the Equal Credit Opportunity Act (15 U.S.C. 1601 et seq.).

**Introduction**

1. *Official status.* Section 706(e) of the Equal Credit Opportunity Act protects a creditor from civil liability for any act done or omitted in good faith in conformity with an interpretation issued by a duly authorized official of the Federal Reserve Board. This commentary is the means by which the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation B. Good-faith compliance with this commentary affords a creditor protection under section 706(e) of the act.

2. *Issuance of interpretations.* Under Appendix D to the regulation, any person may request an official staff interpretation. Interpretations will be issued at the discretion of designated officials and incorporated in this commentary following publication for comment in the **Federal Register**. Except in unusual circumstances, official staff interpretations will be issued only by means of this commentary.

3. *Status of previous interpretations.* Interpretations of Regulation B previously issued by the Federal Reserve Board and its staff have been incorporated into this commentary as appropriate. All other previous Board and staff interpretations, official and unofficial, are superseded by this commentary.

4. *Footnotes.* Footnotes in the regulation have the same legal effect as the text of the regulation, whether they are explanatory or illustrative in nature.

5. *Comment designations.* The comments are designated with as much specificity as possible according to the particular regulatory provision addressed. Each comment in the commentary is identified by a number and the regulatory section or paragraph that it interprets. For example, comments to section 202.2(c) are further divided by subparagraph, such as comment 2(c)(1)(ii)–1 and comment 2(c)(2)(ii)–1.

*Section 202.1—Authority, Scope, and Purpose*

1(a) *Authority and scope.*

1. *Scope.* The Equal Credit Opportunity Act and Regulation B apply to all credit—commercial as well as personal—without regard to the nature or type of the credit or the creditor. If a transaction provides for the deferral of the payment of a debt, it is credit covered by Regulation B even though it may not be a credit transaction covered by Regulation Z (Truth in Lending). Further, the definition of creditor is not restricted to the party or person to whom the obligation is initially payable, as is the case under Regulation Z. Moreover, the act and regulation apply to all methods of credit evaluation, whether performed judgmentally or by use of a credit scoring system.

2. *Foreign applicability.* Regulation B generally does not apply to lending activities that occur outside the United States. The regulation does apply to lending activities that take place within the United States (as well as the Commonwealth of Puerto Rico and any territory or possession of the United States), whether or not the applicant is a citizen.

*Section 202.2—Definitions*

2(c) *Adverse action.*

Paragraph 2(c)(1)(ii)

1. *Move from service area.* If a credit card issuer terminates the open-end account of a customer because the customer has moved out of the card issuer's service area, the termination is "adverse action" for purposes of the regulation unless termination on this ground was explicitly provided for in the credit agreement between the parties. In cases where termination is adverse action, notification is required under § 202.9.

2. *Termination based on credit limit.* If a creditor terminates credit accounts that have low credit limits (for example, under $400) but keeps open accounts with higher credit limits, the termination is adverse action and notification is required under § 202.9.

Paragraph 2(c)(2)(ii)

1. *Default—exercise of due-on-sale clause.* If a mortgagor sells or transfers mortgaged property without the consent of the mortgagee, and the mortgagee exercises its contractual right to accelerate the mortgage loan, the mortgagee may treat the mortgagor as being in default. An adverse action notice need not be given to the mortgagor or the transferee. (See comment 2(e)-1 for treatment of a purchaser who requests to assume the loan.)

Paragraph (2)(c)(2)(iii)

1. *Point-of-sale transactions.* Denial of credit at point of sale is not adverse action except under those circumstances specified in the regulation. For example, denial, at point of sale is not adverse action in the following situations:

• A credit cardholder presents an expired card or a card that has been reported to the card issuer as lost or stolen.

• The amount of a transaction exceeds a cash advance or credit limit.

• The circumstances (such as excessive use of a credit card in a short period of time) suggests that fraud is involved.

• The authorization facilities are not functioning.

• Billing statements have been returned to the creditor for lack of a forwarding address.

Paragraph 2(c)(2)(v)

1. *Terms of credit versus type of credit offered.* When an applicant applies for credit and the creditor does not offer the credit terms requested by the applicant (for example, the interest rate, length of maturity, collateral, or amount of downpayment), a denial of the application for that reason is adverse action (unless the creditor makes a counteroffer that is accepted by the applicant) and the applicant is entitled to notification under § 202.9.

2(e) *Applicant.*

1. *Request to assume loan.* If a mortgagor sells or transfers the mortgaged property and the buyer makes an application to the creditor to assume the mortgage loan, the mortgagee must treat the buyer as an applicant unless its policy is not to permit assumptions.

2(f) *Application.*

1. *General.* A creditor has the latitude under the regulation to establish its own application process and to decide the type and amount of information it will require from credit applicants.

2. *"Procedures established."* The term refers to the actual practices followed by a creditor for making credit decisions as well as its stated application procedures. For example, if a creditor's stated policy is to require all applications to be in writing on the creditor's application form, but the creditor also makes credit decision based on oral requests, the creditor's establish procedures are to accept both oral and written applications.

3. *When an inquiry becomes an application.* A creditor is encouraged to provide consumers with information about loan terms. However, if in giving information to the consumer the creditor also evaluates information about the appliant, decides to decline the request, and communicates this to the applicant, the creditor has treated the inquiry as an application and must then comply with the notification requirements under § 202.9. Whether the inquiry becomes an application depends on how the creditor responds to the applicant, not on what the applicant says or asks.

4. *Examples of inquiries that are not applications.* The following examples illustrate situations in which only an inquiry has taken place:

• When a consumer calls to asks about loan terms and an employee explains the creditor's basic loan terms, such as interest rates, loan to value ration, and debt to income ratio.

• When a consumer calls to ask about interest rates for car loans, and, in order to quote the appropriate rate, the loan officer asks for the make and sale price of the car and amount of the down-payment, then given the consumer the rate.

• When a consumer asks about terms for a loan to purchase home and tells the loan officer her income and intended down-payment, but the loan officer only explains the creditor's loan to value ratio policy and other basic lending policies, without telling the consumer whether she qualifies for the loan.

• When a consumer calls to ask about terms for a loan to purchase vacant land and states his income, the sale price of the property to be financed, and asks whether he qualifies for a loan, and the employee responds by describing the general lending policies, explaining that he would need to look at all of the applicant's qualifications before making a decision, and offering to send an application form to the consumer.

5. *Completed application—diligence requirement.* The regulation defines a complete application in terms that give a creditor the latitude to establish its own information requirements. Nevertheless, the creditor must act with reasonable diligence to collect information needed to complete the application. For example, the creditor should request information from third parties, such as a credit report, promptly after receiving the application. If additional information is needed from the applicant, such as an address or telephone number needed to verify employment, the creditor should contact the applicant promptly.

2(j) *Credit.*

1. *General.* Regulation B covers a wider range of credit transactions than Regulation Z (Truth in Lending). For purposes of Regulation B a transaction is credit if there is a right to defer payment of a debt—regardless of whether the credit is for personal or commercial purposes, the number of installments required for repayment, or whether the transaction is subject to a finance charge.

2(l) *Creditor.*

1. *Assignees.* The term "creditor" includes all persons participating in the credit decision. This may include an assignee or a potential purchaser of the obligation who influences the credit decision by indicating whether or not it will purchase the obligation if the transaction is consummated.

2. *Referrals to creditors.* For certain purposes, the term "creditor" includes persons such as real estate brokers who do not participate in credit decisions but who regularly refer applicants to creditors or who select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4, the general rule prohibiting discrimination, and with § 202.5(a), on discouraging applications.

2(p) *Empirically derived and other credit systems.*

1. *Purpose of definition.* The definition under § 202.2(p)(1) through (iv) sets the criteria that a credit system must meet in order for the system to use age as a predictive factor. Credit systems that do not meet these criteria are judgmental systems and may consider age only for the purpose of determining a "pertinent element of creditworthiness." (Both types of systems may favor an elderly applicant. See § 202.6(b)(2).)

2. *Periodic revalidation.* The regulation does not specify how often credit scoring systems must be revalidated. To meet the requirements for statistical soundness, the credit scoring system must be revalidated frequently enough to assure that it continues to meet recognized professional statistical standards.

2(w) *Open-end credit.*

1. *Open-end real estate mortgages.* The term "open-end credit" does not include negotiated advances under an open-end real estate mortgage or a letter of credit.

2(z) *Prohibited basis.*

1. *Persons associated with applicant.* "Prohibited basis" as used in this regulation refers to the race, color, religion, national origin, sex, marital status, or age of an applicant (or officers of an applicant in the case of a corporation). The term also refers to the characteristics of individuals with whom an applicant is affiliated or with whom the applicant associates. This means, for example, that under the general rule stated in § 202.4, a creditor may not discriminate against an applicant because of that person's personal or business dealings with members of a certain religion, because of the national origin of any persons associated with the extension of credit (such as the tenants in the apartment complex being financed), or because of the race of other residents in the neighborhood where the property offered as collateral is located.

2. *National origin.* A creditor may not refuse to grant credit because an applicant comes from a particular country but may take the applicant's immigration status into account. A creditor may also take into account any applicable law, regulation, or executive order restricting dealings with citizens (or the government) of a particular country or imposing limitations regarding credit extended for their use.

3. *Public assistance program.* Any federal, state, or local governmental assistance program that provides a continuing, periodic income supplement, whether premised on entitlement or need, is "public assistance" for purposes of the regulation. The term includes (but is not limited to) Aid to Families with Dependent Children, food stamps, rent and mortgage supplement or assistance programs, Social Security and Supplemental Security Income, and unemployment compensation. Only physicians, hospitals, and others to whom the benefits are payable need consider Medicare and Medicaid as public assistance.

*Section 202.3—Limited Exceptions for Certain Classes of Transactions*

1. *Scope.* This section relieves burdens with regard to certain types of credit for which full application of the procedural requirements of the regulation is not needed. All classes of transactions remain subject to the general rule given in § 202.4, barring discrimination on a prohibited basis, and to any other provision not specifically excepted.

3(a) *Public utilities credit.*

1. *Definition.* This definition applies only to credit for the purchase of a utility service, such as electricity, gas, or telephone service. Credit provided or offered by a public utility for some other purpose—such as for financing the purchase of a gas dryer, telephone equipment, or other durable goods, or for insulation or other home improvements—is not excepted.

2. *Security deposits.* A utility company is a creditor when it supplies utility service and bills the user after the service has been provided. Thus, any credit term (such as a requirement for a security deposit) is subject to the regulation.

3(c) *Incidental credit.*

1. *Examples.* If a service provider (such as a hospital, doctor, lawyer or retailer) allows the client or customer to defer the payment of a bill, this deferral of debt is credit for purposes of the regulation, even though there is no finance charge and no agreement for payment in installments. Because of the exceptions provided by this section, however, these particular credit extensions are excepted from compliance with certain procedural requirements as specified in the regulation.

3(d) *Business credit.*

1. *Definition.* The test for deciding whether a transaction qualifies as business credit is one of primary purpose. For example, an open-end credit account used for both personal and business purposes is not business credit unless the primary purpose of the account is business-related. A creditor may rely on an applicant's statement of the purpose for the credit requested.

Paragraph 3(d)(3)

1. *Notification.* A creditor is required in all cases to notify a business credit applicant of action taken on an application within a reasonable time of receiving a completed application. This notification may be written or oral.

3(e) *Government credit.*

1. *Credit to governments.* The exception relates to credit extended to (not by) governmental entities. For example, credit extended to a local government by a creditor in the private sector is covered by this exception, but credit extended to consumers by a federal or state housing agency does not qualify for special treatment under this category.

*Section 202.4—General Rule Prohibiting Discrimination*

1. *Scope of section.* The general rule stated in § 202.4 covers all dealings, without exception, between an applicant and a creditor, whether or not addressed by other provisions of the regulation. Other sections of the regulation identify specific practices that the Board has decided are impermissible because they could result in credit discrimination on a basis prohibited by the act. The general rule covers, for example, application procedures, criteria used to evaluate creditworthiness, administration of accounts, and treatment of delinquent or slow accounts. Thus, whether or not

**48050** Federal Register / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations

specifically prohibited elsewhere in the regulation, a credit practice that treats applicants differently on a prohibited basis violates the law because it violates the general rule.

*Section 202.5—Rules Concerning Taking of Applications*

5(a) *Discouraging applications.*

1. *Potential applicants.* Generally, the regulation's protections apply only to persons who have requested or received an extension of credit. In keeping with the purpose of the act—to promote the availability of credit on a nondiscriminatory basis § 202.5(a) covers acts or practices directed at potential applicants. Practices prohibited by this section include:

• A statement that the applicant should not bother to apply, after the applicant states that he is retired.

• Use of words, symbols, models or other forms of communication in advertising that express, imply or suggest a discriminatory preference or a policy of exclusion in violation of the act.

• Use of interview scripts that discourage applications on a prohibited basis.

2. *Affirmative advertising.* A creditor may affirmatively solicit or encourage members of traditionally disadvantaged groups to apply for credit, especially groups that might not normally seek credit from that creditor.

5(b) *General rules concerning requests for information.*

1. *Requests for information.* This section governs the types of information that a creditor may gather. Section 202.6 governs how information may be used.

5(d) *Other limitations on information requests.*

Paragraph 5(d)(1)

1. *Indirect disclosure of prohibited information.* The fact that certain credit-related information may indirectly disclose marital status does not bar a creditor from seeking such information. For example, the creditor may ask about:

• The applicant's obligation to pay alimony, child support, or separate maintenance.

• The source of income to be used as the basis for repaying the credit requested, which could disclose that it is the income of a spouse.

• Whether any obligation disclosed by the applicant has a co-obligor, which could disclose that the co-obligor is a spouse or former spouse.

• The ownership of assets, which could disclose the interest of a spouse.

Paragraph 5(d)(2)

1. *Disclosure about income.* The sample application forms in Appendix B to the regulation illustrate how a creditor may inform an applicant of the right not to disclose alimony, child support, or separate maintenance income.

2. *General inquiry about source of income.* Since a general inquiry about the source of income may lead an applicant to disclose alimony, child support, or separate maintenance, a creditor may not make such an inquiry on an application form without prefacing the request with the disclosure required by this paragraph.

3. *Specific inquiry about sources of income.* A creditor need not give the disclosure if the inquiry about income is specific and worded in a way that is unlikely to lead the applicant to disclose the fact that income is derived from alimony, child support or separate maintenance payments. For example, an application form that asks about specific types of income such as salary, wages, or investment income need not include the disclosure.

5(e) *Written applications.*

1. *Requirement for written applications.* The requirement of written applications for certain types of dwelling-related loans is intended to assist the federal supervisory agencies in monitoring compliance with the ECOA and the Fair Housing Act. Model application forms are provided in Appendix B to the regulation, although use of a printed form of any kind is not required. A creditor will satisfy the requirement by writing down the information that it normally considers in making a credit decision. The creditor may complete the application on behalf of an applicant and need not require the applicant to sign the application.

2. *Telephone applications.* A creditor that accepts applications by telephone for dwelling-related credit covered by section 202.13 can meet the requirements for written applications by writing down pertinent information that is provided by the applicant(s).

3. *Computerized entry.* Information entered directly into and retained by a computerized system qualifies as a written application under this paragraph. (See the commentary to § 202.13(b).)

*Section 202.6—Rules Concerning Evaluation of Applications*

6(a) *General rule concerning use of information.*

1. *General.* When evaluating an application for credit, a creditor generally may consider any information obtained. However, a creditor may not consider in its evaluation of creditworthiness any information that it is barred by § 202.5 from obtaining.

2. *Effects test.* The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*). Congressional intent that this doctrine apply to the credit area is documented in the Senate Report that accompanied H.R. 6516, No. 94–589, pp. 4–5; and in the House Report that accompanied H.R. 6516, No. 94–210, p. 5. The act and regulation may prohibit a creditor practice that is discriminatory in effect because it has a disproportionately negative impact on a prohibited basis, even though the creditor has no intent to discriminate and the practice appears neutral on its face, unless the creditor practice meets a legitimate business need that cannot reasonably be achieved as well by means that are less disparate in their impact. For example, requiring that applicants have incomes in excess of a certain amount to qualify for an overdraft line of credit could mean that women and minority applicants will be rejected at a higher rate than men and non-minority applicants. If there is a demonstrable

relationship between the income requirement and creditworthiness for the level of credit involved, however, use of the income standard would likely be permissible.

6(b) *Specific rules concerning use of information.*

Paragraph 6(b)(1)

1. *Prohibited basis—marital status.* A creditor may not use marital status as a basis for determining the applicant's creditworthiness. However, a creditor may consider an applicant's marital status for the purpose of ascertaining the creditor's rights and remedies applicable to the particular extension of credit. For example, in a secured transaction involving real property, a creditor could take into account whether state law gives the applicant's spouse an interest in the property being offered as collateral.

2. *Prohibited basis—special purpose credit.* In a special purpose credit program, a creditor may consider a prohibited basis to determine whether the applicant possesses a characteristic needed for eligibility. (See § 202.8.)

Paragraph 6(b)(2)

1. *Favoring the elderly.* Any system of evaluating creditworthiness may favor a credit applicant who is age 62 or older.

2. *Consideration of age in a credit scoring system.* Age may be taken directly into account in a credit scoring system that is "demonstrably and statistically sound," as defined in § 202.2(p), with one limitation: an applicant who is 62 years old or older must be treated at least as favorably as anyone who is under age 62.

3. *Consideration of age in a judgmental system.* In a judgmental system, defined in § 202.2(t), a creditor may not take age directly into account in any aspect of the credit transaction. For example, the creditor may not reject an application or terminate an account because the applicant is 60 years old. But a creditor that uses a judgmental system may relate the applicant's age to other information about the applicant that the creditor considers in evaluating creditworthiness. For example:

• A creditor may consider the applicant's occupation and length of time to retirement to ascertain whether the applicant's income (including retirement income) will support the extension of credit to its maturity.

• A creditor may consider the adequacy of any security offered when the term of the credit extension exceeds the life expectancy of the applicant and the cost of realizing on the collateral could exceed the applicant's equity. (An elderly applicant might not qualify for a 5 percent down, 30-year mortgage loan but might qualify with a larger downpayment or a shorter loan maturity.)

• A creditor may consider the applicant's age to assess the significance of the length of the applicant's employment (a young applicant may have just entered the job market) or length of time at an address (an elderly applicant may recently have retired and moved from a long-time residence).

4. *Consideration of age in a combined system.* A creditor using a credit scoring system that qualifies as "empirically derived" under § 202.2(p) may consider other factors (such as credit report or the applicant's cash

flow) on a judgmental basis. Doing so will not negate the classification of the credit scoring component of the combined system as "demonstrably and statistically sound." While age could be used in the credit scoring portion, however, in the judgmental portion age may not be considered directly. It may be used only for the purpose of determining a "pertinent element of creditworthiness." (See comment 6(b)(2)–3.)

5. *Consideration of public assistance.* When considering income derived from a public assistance program, a creditor may take into account, for example:

• The length of time an applicant will likely remain eligible to receive such income.

• Whether the applicant will continue to qualify for benefits based on the status of the applicant's dependents (such as Aid to Families with Dependent Children or Social Security payments to a minor).

• Whether the creditor can attach or garnish the income to assure payment of the debt in the event of default.

Paragraph 6(b)(5)

1. *Consideration of an individual applicant.* A creditor must evaluate income derived from part-time employment, alimony, child support, separate maintenance, retirement benefits, or public assistance (all referred to as "protected income") on an individual basis, not on the basis of aggregate statistics, and must assess its reliability or unreliability by analyzing the applicant's actual circumstances, not by analyzing statistical measures derived from a group.

2. *Payments consistently made.* In determining the likelihood of consistent payments of alimony, child support, or separate maintenance, a creditor may consider factors such as whether payments are received pursuant to a written agreement or court decree; the length of time that the payments have been received; whether the payments are regularly received by the applicant; the availability of court or other procedures to compel payment; and the creditworthiness of the payor, including the credit history of the payor when it is available to the creditor.

3. *Consideration of income.* A creditor need not consider income at all in evaluating creditworthiness. If a creditor does consider income, there are several acceptable methods, whether in a credit scoring or a judgmental system:

• A creditor may score or take into account the total sum of all income stated by the applicant without taking steps to evaluate the income.

• A creditor may evaluate each component of the applicant's income, and then score or take into account reliable income separately from income that is not reliable, or the creditor may disregard that portion of income that is not reliable before aggregating it with reliable income.

• A creditor that does not evaluate all income components for reliability must treat as reliable any component of protected income that is not evaluated.

In considering the separate components of an applicant's income, the creditor may not automatically discount or exclude from consideration any protected income. Any discounting or exclusion must be based on the applicant's actual circumstances.

4. *Part-time employment, sources of income.* A creditor may score or take into account the fact that an individual applicant has more than one source of earned income—a full-time and a part-time job or two part-time jobs. A creditor may also score or treat earned income from a secondary source differently than earned income from a primary source. However, the creditor may not score or otherwise take into account the number of sources for protected income—for example, retirement income, social security, alimony. Nor may the creditor treat negatively the fact that an applicant's only earned income is derived from a part-time job.

Paragraph 6(b)(6)

1. *Types of credit references.* A creditor may restrict the types of credit history and credit references that it will consider, provided that the restrictions are applied to all credit applicants without regard to sex, marital status, or any other prohibited basis. However, on the applicant's request, a creditor must consider credit information not reported through a credit bureau when the information relates to the same types of credit references and history that the creditor would consider if reported through a credit bureau.

Paragraph 6(b)(7)

1. *National origin—immigration status.* The applicant's immigration status and ties to the community (such as employment and continued residence in the area) could have a bearing on a creditor's ability to obtain repayment. Accordingly, the creditor may consider and differentiate, for example, between a noncitizen who is a long-time resident with permanent resident status and a noncitizen who is temporarily in this country on a student visa.

2. *National origin—citizenship.* Under the regulation a denial of credit on the ground that an applicant is not a United States citizen is nor per se discrimination based on national origin.

*Section 202.7—Rules Concerning Extensions of Credit*

7(a) *Individual accounts.*

1. *Open-end credit—authorized user.* A creditor may not require a creditworthy applicant seeking an individual credit account to provide additional signatures. However, the creditor may condition the designation of an authorized user by the account holder on the authorized user's becoming contractually liable for the account, as long as the creditor does not differentiate on any prohibited basis in imposing this requirement.

2. *Open-end credit—choice of authorized user.* A creditor that permits an account holder to designate an authorized user may not restrict this designation on a prohibited basis. For example, if the creditor allows the designation of spouses as authorized users, the creditor may not refuse to accept a non-spouse as an authorized user.

3. *Overdraft authority on transaction accounts.* If a transaction account (such as a checking account or NOW account) includes an overdraft line of credit, the creditor may require that all persons authorized to draw on the transaction account assume liability for any overdraft.

7(b) *Designation of name.*

1. *Single name on account.* A creditor may require that joint applicants on an account designate a single name for purposes of administering the account and that a single name be embossed on any credit card(s) issued on the account. But the creditor may not require that the name be the husband's name. (See § 202.10 for rule governing the furnishing of credit history on accounts held by spouses.)

7(c) *Action concerning existing open-end accounts.*

Paragraph 7(c)(1)

1. *Termination coincidental with marital status change.* When an account holder's marital status changes, a creditor generally may not terminate the account unless it has evidence that the account holder is unable or unwilling to repay. But the creditor may terminate an account on which both spouses are jointly liable, even if the action coincides with a change in marital status, when one or both spouses:

• Repudiate responsibility for future charges on the joint account.

• Request separate accounts in their own names.

• Request that the joint account be closed.

2. *Updating information.* A creditor may periodically request updated information from applicants but may not use events related to a prohibited basis—such as an applicant's retirement, reaching a particular age, or change in name or marital status—to trigger such a request.

Paragraph 7(c)(2)

1. *Procedure pending reapplication.* A creditor may require a reapplication from a contractually liable party, even when there is no evidence of unwillingness or inability to repay, if (1) the credit was based on the qualifications of a person who is no longer available to support the credit and (2) the creditor has information indicating that the account holder's income by itself may be insufficient to support the credit. While a reapplication is pending, the creditor must allow the account holder full access to the account under the existing contract terms. The creditor may specify a reasonable time period within which the account holder must submit the required information.

7(d) *Signature of spouse or other person.*

1. *Qualified applicant.* The signature rules assure that qualified applicants are able to obtain credit in their own names. Thus, when an applicant requests individual credit, a creditor generally may not require the signature of another person unless the creditor has first determined that the applicant alone does not qualify for the credit requested.

2. *Unqualified applicant.* When an applicant applies for individual credit but does not alone meet a creditor's standards, the creditor may require a cosigner, guarantor or the like—but cannot require that it be the spouse. (See commentary to § 202.7(d) (5) and (6).)

Paragraph 7(d)(1)

1. *Joint applicant.* The term "joint applicant" refers to someone who applies contemporaneously with the applicant for shared or joint credit. It does not refer to someone whose signature is required by the creditor as a condition for granting the credit requested.

Paragraph 7(d)(2)

1. *Jointly owned property.* In determining the value of the applicant's interest in jointly owned property, a creditor may consider factors such as the form of ownership and the property's susceptibility to attachment, execution, severance, or partition and the cost of such action. If the applicant's interest in the property does not support the amount and terms of credit sought, the creditor may give the applicant some other option of providing additional support for the extension of credit. For example:

• Requiring an additional party under § 202.7(d)(5).

• Offering to grant the applicant's request on a secured credit basis.

• Asking for the signature of the co-owner of the property on an instrument that assures access to the property but does not impose personal liability unless necessary under state law.

2. *Need for signature—reasonable belief.* A creditor's reasonable belief as to what instruments need to be signed by a person other than the applicant should be supported by a thorough review of pertinent statutory and decisional law or an opinion of the state attorney general.

Paragraph 7(d)(3)

1. *Residency.* In assessing the creditworthiness of a person who applies for credit in a community property state, a creditor may assume that the applicant is a resident of the state unless the applicant indicates otherwise.

Paragraph 7(d)(4)

1. *Creation of enforceable lien.* Some state laws require that both spouses join in executing any instrument by which real property is encumbered. If an applicant offers such property as security for credit, a creditor may require the applicant's spouse to sign the instruments necessary to create a valid security interest in the property. The creditor may not require the spouse to sign the note evidencing the credit obligation if signing only the mortgage or other security agreement is sufficient to make the property available to satisfy the debt in the event of default. However, if under state law both spouses must sign the note to create an enforceable lien, the creditor may require them to do so.

2. *Need for signature—reasonable belief.* Generally, a signature to make the secured property available will only be needed on a security agreement. A creditor's reasonable belief that, to assure access to the property, the spouse's signature is needed on an instrument that imposes personal liability should be supported by a thorough review of pertinent statutory and decisional law or an opinion of the state attorney general.

3. *Integrated instruments.* When a creditor uses an integrated instrument that combines the note and the security agreement, the spouse cannot be required to sign the integrated instrument if the signature is only needed to grant a security interest. But the spouse could be asked to sign an integrated instrument that makes clear—for example, by a legend placed next to the spouse's signature—that the spouse's signature is only to grant a security interest and that signing the instrument does not impose personal liability.

Paragraph 7(d)(5)

*Qualifications of additional parties.* In establishing guidelines for eligibility of guarantors, cosigners, or similar additional parties, a creditor may restrict the applicant's choice of additional parties but may not discriminate on the basis of sex, marital status or any other prohibited basis. For example, the creditor could require that the additional party live in the creditor's market area.

2. *Income of another person.* An applicant who requests individual credit relying on the income of another person (such as a spouse) may be required to provide the signature of the other person to make the income available to pay the debt. In community property states, the signature may be required if the applicant relies on the separate income of another person, i.e., income that as a matter of state law is not community property.

3. *Renewals.* If the borrower's creditworthiness is reevaluated when a credit obligation is renewed, the creditor must determine whether an additional party is still warranted and, if not, release the additional party.

Paragraph 7(d)(6)

1. *Guarantees.* A guarantee on an extension of credit is part of a credit transaction and therefore subject to the regulation. The rules in § 202.7(d) bar a creditor from requiring the signature of a *guarantor's spouse* just as they bar the creditor from requiring the signature of an *applicant's spouse.* For example, when all officers of a closely held corporation are required to personally guarantee a corporate loan, the creditor may not automatically require that spouses of married officers also sign. However, an evaluation of the financial circumstances of an officer may indicate that an additional signature is necessary, and this may be the signature of a spouse in appropriate circumstances.

7(e) *Insurance*

1. *Differences in terms.* Differences in the availability, rates, and other terms on which credit-related casualty insurance or credit life, health, accident, or disability insurance is offered or provided to an applicant does not violate Regulation B.

2. *Insurance information.* A creditor may obtain information about an applicant's age, sex, or marital status for insurance purposes. The information may only be used, however, for determining eligibility and premium rates for insurance, and not in making the credit decision.

*Section 202.8—Special Purpose Credit Programs*

8(a) *Standards for programs.*

1. *Determining qualified programs.* The Board does not determine whether individual programs qualify for special purpose credit status, or whether a particular program benefits an "economically disadvantaged class of persons." The agency or creditor administering or offering the loan program must make these decisions regarding the status of its program.

2. *Compliance with a program authorized by federal or state law.* A creditor does not violate Regulation B when it complies in good faith with a regulation promulgated by a government agency implementing a special purpose credit program under § 202.8(a)(1). It is the agency's responsibility to promulgate a regulation that is consistent with federal and state law.

3. *Expressly authorized.* Credit programs authorized by federal or state law include programs offered pursuant to federal, state or local statute, regulation or ordinance, or by judicial or administrative order.

4. *Creditor liability.* A refusal to grant credit to an applicant is not a violation of the act or regulation if the applicant does not meet the eligibility requirements under a special purpose credit program.

8(b) *Rules is other sections.*

1. *Applicability of rules.* A creditor that rejects an application because the applicant does not meet the eligibility requirements (common characteristic or financial need, for example) must nevertheless notify the applicant of action taker as required by 202.9.

8(c) *Special rule concerning requests and use of information.*

1. *Request of prohibited information.* This section permits a creditor to request and consider certain information that would otherwise be prohibited by §§ 202.5 and 202.6 to determine an applicant's eligibility for a particular program.

2. *Examples.* Examples of programs under which the creditor can ask for and consider information related to prohibited basis are:

• Energy conservation programs to assist the elderly, for which the creditor must consider the applicant's age.

• Programs under a Minority Enterprise Small Business Investment Corporation, for which a creditor must consider the applicant's minority status.

8(d) *Special rule in the case of financial need.*

1. *Request of prohibited information.* This section permits a creditor to request and consider certain information that would otherwise be prohibited by §§ 202.5 and 202.6, and to require signatures that would otherwise be prohibited by § 202.7(d).

2. *Examples.* Examples of programs in which financial need is a criterion are:

• Subsidized housing programs for low- to moderate-income households, for which a creditor may have to consider the applicant's receipt of alimony or child support, the spouse's or parents' income, etc.

• Student loan programs based on the family's financial need, for which a creditor may have to consider to spouse's or parents' financial resources.

3. *Student loans.* In a guaranteed student loan program, a creditor may obtain the signature of a parent as a guarantor when

required by federal or state law or agency regulation, or when the student does not meet the creditor's standards of creditworthiness. (See §§ 202.7(d)(1) and (5).) The creditor may not require an additional signature when a student has a work or credit history that satisfies the creditor's standards.

*Section 202.9—Notifications*

1. *Use of the term "adverse action."* The regulation does not require that a creditor use the term "adverse" in communicating to an applicant that a request for an extension of credit has not been approved. In notifying an applicant of adverse action as defined by § 202.2(c)(1), a creditor may use any words or phrases that describe the action taken on the application.

2. *Expressly withdrawn applications.* When an applicant expressly withdraws a credit application, the creditor is not required to comply with the notification requirements under § 202.9. (The creditor must, however, comply with the record retention requirements of the regulation. See § 202.12(b)(3).)

3. *When notification occurs.* Notification occurs when a creditor delivers or mails a notice to the applicant's last known address or, in the case of an oral notification, when the creditor communicates the credit decision to the applicant.

4. *Location of notice.* The notifications required under § 202.9 may appear on either or both sides of a form or letter.

9(a) *Notification of action taken, ECOA notice, and statement of specific reasons.*

*Paragraph 9(a)(1)*

1. *Timing of notice—when an application is complete.* Once a creditor has obtained all the information it normally considers in making a credit decision, the application is complete and the creditor has 30 days in which to notify the applicant of the credit decision. (See also comment 2(f)–5.)

2. *Notification of approval.* Notification of approval may be express or by implication. For example, the creditor will satisfy the notification requirement when it gives the applicant the credit card, money, property, or services requested.

3. *Incomplete application—denial for reasons other than incompleteness.* When an application is missing information but provides sufficient data for a credit decision, the creditor may evaluate the application and notify the applicant under this section as appropriate. If credit is denied, the applicant must be given the specific reasons for the credit denial (or notice of the right to receive the reasons); in this instance the incompleteness of the application cannot be given as the reason for the denial.

4. *Length of counteroffer.* Section 202.9(a)(1)(iv) does not require a creditor to hold a counteroffer open for 90 days or any other particular length of time.

5. *Counteroffer combined with adverse action notice.* A creditor that gives the applicant a combined counteroffer and adverse action notice that complies with § 202.9(a)(2) need not send a second adverse action notice if the applicant does not accept the counteroffer. A sample of a combined notice is contained in form C–4 of Appendix C to the regulation.

6. *Denial of a telephone application.* When an application is conveyed by means of telephone and adverse action is taken, the creditor must request the applicant's name and address in order to provide written notification under this section. If the applicant declines to provide that information, then the creditor has no further notification responsibility.

9(b) *Form of ECOA notice and statement of specific reasons.*

*Paragraph 9(b)(1)*

1. *Substantially similar notice.* The ECOA notice sent with a notification of a credit denial or other adverse action will comply with the regulation if it is "substantially similar" to the notice contained in § 202.9(b)(1). For example, a creditor may add a reference to the fact that the ECOA permits age to be considered in certain scoring systems, or add a reference to a similar state statute or regulation and to a state enforcement agency.

*Paragraph 9(b)(2)*

1. *Number of specific reasons.* A creditor must disclose the principal reasons for denying an application or taking other adverse action. The regulation does not mandate that a specific number of reasons be disclosed, but disclosure of more than four reasons is not likely to be helpful to the applicant.

2. *Source of specific reasons.* The specific reasons disclosed under § 202.9 (a)(2) and (b)(2) must relate to and accurately describe the factors actually considered or scored by a creditor.

3. *Description of reasons.* A creditor need not describe how or why a factor adversely affected an applicant. For example, the notice may say "length of residence" rather than "too short a period of residence."

4. *Credit scoring system.* If a creditor bases the denial or other adverse action on a credit scoring system, the reasons disclosed must relate only to those factors actually scored in the system. Moreover, no factor that was a principal reason for adverse action may be excluded from disclosure. The creditor must disclose the actual reasons for denial (for example, "age of automobile") even if the relationship of that factor to predicting creditworthiness may not be clear to the applicant.

5. *Credit scoring—method for selecting reasons.* The regulation does not require that any one method be used for selecting reasons for a credit denial or other adverse action that is based on a credit scoring system. Various methods will meet the requirements of the regulation. One method is to identify the factors for which the applicant's score fell furthest below the average score for each of those factors achieved by applicants whose total score was at or slightly above the minimum passing score. Another method is to identify the factors for which the applicant's score fell furthest below the average score for each of those factors achieved by all applicants. These average scores could be calculated during the development or use of the system. Any other method that produces results substantially similar to either of these methods is also acceptable under the regulation.

6. *Judgmental system.* If a creditor uses a judgmental system, the reasons for the denial or other adverse action must relate to those factors in the applicant's record actually reviewed by the person making the decision.

7. *Combined credit scoring and judgmental system.* If a creditor denies an application based on a credit evaluation system that employs both credit scoring and judgmental components, the reasons for the denial must come from the component of the system that the applicant failed. For example, if a creditor initially credit scores an application and denies the credit request as a result of that scoring, the reasons disclosed to the applicant must relate to the factors scored in the system. If the application passes the credit scoring stage but the creditor then denies the credit request based on a judgmental assessment of the applicant's record, the reasons disclosed must relate to the factors reviewed judgmentally, even if the factors were also considered in the credit scoring component.

8. *Automatic denial.* Some credit decision methods contain features that call for automatic denial because of one or more negative factors in the applicant's record (such as the applicant's previous bad credit history with that creditor, the applicant's declaration of bankruptcy, or the fact that the applicant is a minor). When a creditor denies the credit request because of an automatic-denial factor, the creditor must disclose that specific factor.

9. *Combined ECOA–FCRA disclosures.* The ECOA requires disclosure of the principal reasons for denying or taking other adverse action on an application for an extension of credit. The Fair Credit Reporting Act requires a creditor to disclose when it has based its decision in whole or in part on information from a source other than the applicant or from its own files. Disclosing that a credit report was obtained and used to deny the application, as the FCRA requires, does not satisfy the ECOA requirement to disclose specific reasons. For example, if the applicant's credit history reveals delinquent credit obligations and the application is denied for that reason, to satisfy § 202.9(b)(2) the creditor must disclose that the application was denied because of the applicant's delinquent credit obligations. To satisfy the FCRA requirement, the credit must also disclose that a credit report was obtained and used to deny credit. Sample forms C–1 through C–5 of Appendix C of the regulation provide for the two disclosures.

9(c) *Incomplete applications.*

*Paragraph 9(c)(2)*

1. *Reapplication.* If information requested by a creditor is submitted by an applicant after the expiration of the time period designated by the creditor, the creditor may require the applicant to make a new application.

*Paragraph 9(c)(3)*

1. *Oral inquiries for additional information.* If the applicant fails to provide the information in response to an oral request, a creditor must send a written notice to the applicant within the 30-day period specified in § 202.9 (c)(1) and (c)(2). If the applicant

**48054** **Federal Register** / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations

does provide the information, the creditor shall take action on the application and notify the applicant in accordance with § 202.9(a).

9(g) *Applications submitted through a third party.*

1. *Third parties.* The notification of adverse action may be given by one of the creditors to whom an application was submitted. Alternatively, the third party may be a noncreditor.

2. *Third-party notice—enforcement agency.* If a single adverse action notice is being provided to an applicant on behalf of several creditors and they are under the jurisdiction of different federal enforcement agencies, the notice need not name each agency; disclosure of any one of them will suffice.

3. *Third-party notice—liability.* When a notice is to be provided through a third party, a creditor is not liable for an act or omission of the third party that constitutes a violation of the regulation if the creditor accurately and in a timely manner provided the third party with the information necessary for the notification and maintains reasonable procedures adapted to prevent such violations.

*Section 202.10—Furnishing of Credit Information*

1. *Scope.* The requirements of § 202.10 for designating and reporting credit information apply only to creditors that furnish credit information to credit bureaus or to other creditors. There is no requirement that a creditor furnish credit information on its accounts.

2. *Reporting on all accounts.* The requirements of § 202.10 apply only to accounts held or used by spouses. However, a creditor has the option to designate all joint accounts (or all accounts with an authorized user) to reflect the participation of both parties, whether or not the accounts are held by persons married to each other.

3. *Designating accounts.* In designating accounts and reporting credit information, a creditor need not distinguish between accounts on which the spouse is an authorized user and accounts on which the spouse is a contractually liable party.

4. *File and index systems.* The regulation does not require the creation or maintenance of separate files in the name of each participant on a joint or user account, or require any other particular system of recordkeeping or indexing. It requires only that a creditor be able to report information in the name of each spouse on accounts covered by § 202.10. Thus, if a creditor receives a credit inquiry about the wife, it should be able to locate her credit file without asking the husband's name.

10(a) *Designation of accounts.*

1. *New parties.* When new parties who are spouses undertake a legal obligation on an account, as in the case of a mortgage loan assumption, the creditor should change the designation on the account to reflect the new parties and should furnish subsequent credit information on the account in the new names.

2. *Request to change designation of account.* A request to change the manner in which information concerning an account is furnished does not alter the legal liability of

either spouse upon the account and does not require a creditor to change the name in which the account is maintained.

*Section 202.12—Record Retention*

12(a) *Retention of prohibited information.*

1. *Receipt of prohibited information.* Unless the creditor specifically requested such information, a creditor does not violate this section when it receives prohibited information from a consumer reporting agency.

2. *Use of retained information.* Although a creditor may keep in its files prohibited information as provided in § 202.12(a), the creditor may use the information in evaluating credit applications only if permitted to do so by § 202.6.

12(b) *Preservation of records.*

1. *Copies.* A copy of the original record includes carbon copies, photocopies, microfilm or microfiche copies, or copies produced by any other accurate retrieval system, such as documents stored and reproduced by computer.

2. *Computerized decisions.* A creditor that enters information items from a written application into a computerized or mechanized system and makes the credit decision mechanically, based only on the items of information entered into the system, may comply with § 202.12(b) by retaining the information actually entered. It is not required to store the complete written application, nor is it required to enter the remaining items of information into the system. If the transaction is subject to § 202.13, however, the creditor is required to enter and retain the data on personal characteristics in order to comply with the requirements of that section.

Paragraph 12(b)(3)

1. *Withdrawn and brokered applications.* In most cases, the 25-month retention period for applications runs from the date a notification is sent to the applicant granting or denying the credit requested. In certain transactions, a creditor is not obligated to provide a notice of the action taken. (See, for example, comment 9–2.) In such cases, the 25-month requirement runs from the date of application, as when:

• An application is withdrawn by the applicant.

• An application is submitted to more than one creditor on behalf of the applicant, and the application is approved by one of the other creditors.

*Section 202.13—Information for Monitoring purposes*

13(a) *Information to be requested.*

1. *Natural person.* Section 202.13 applies only to applications from natural persons.

2. *Principal residence.* The requirements of § 202.13 apply only if an application relates to a dwelling that is or will be occupied by the applicant as the principal residence. A credit application related to a vacation home or a rental unit is not covered. In the case of a two- to four-unit dwelling, the application is covered if the applicant intends to occupy one of the units as a principal residence.

3. *Temporary financing.* An application for temporary financing to construct a dwelling is not subject to § 202.13. But an application

for both a temporary loan to finance construction of a dwelling and a permanent mortgage loan to take effect upon the completion of construction is subject to § 202.13.

4. *New principal residence.* A person can have only one principal residence at a time. However, if a person buys a new dwelling that will become that person's principal residence within a year or upon completion of construction, the new dwelling is considered the principal residence for purposes of § 202.13.

5. *Refinancings.* A creditor who receives an application to change the terms and conditions of an existing extension of credit made by that creditor for the purchase of the applicant's dwelling may request the monitoring information again, but is not required to do so if it was obtained in the earlier transaction.

13(b) *Obtaining of information.*

1. *Forms for collecting data.* A creditor may collect the information specified in § 202.13(a) either on an application form or on a separate form referring to the application.

2. *Written applications.* The regulation requires written applications for the types of credit covered by § 202.13. A creditor can satisfy this requirement by recording in writing or by means of computer the information that the applicant provides orally and that the creditor normally considers in a credit decision.

3. *Telephone, mail applications.* If an applicant does not apply in person for the credit requested, a creditor does not have to complete the monitoring information. For example:

• When a creditor accepts an application by telephone, it does not have to request the monitoring information.

• When a creditor accepts an application by mail, it does not have to make a special request to the applicant if the applicant fails to complete the monitoring information on the application form sent to the creditor.

If it is not evident on the face of the application that it was received by mail or telephone, the creditor should indicate on the form or other application record how the application was received.

4. *Applications through loan shopping services.* When a creditor accepts an application through an unaffiliated loan shopping service, it does not have to request the monitoring information.

5. *Inadvertent notation.* If a creditor inadvertently obtains the monitoring information in a dwelling related transaction not covered by § 202.13, the creditor may process and retain the application without violating the regulation.

13(c) *Disclosure to applicant(s).*

1. *Procedures for providing disclosures.* The disclosures to an applicant regarding the monitoring information may be provided in writing. Appendix B contains a sample disclosure. A creditor may devise its own disclosure so long as it is substantially similar. The creditor need not orally request the applicant to provide the monitoring information if it is requested in writing.

13(d) *Substitute monitoring program.*

1. *Substitute program.* An enforcement agency may adopt, under its established rulemaking or enforcement procedures, a program requiring creditors under its jurisdiction to collect information in addition to that required by this section.

*Section 202.14—Enforcement, penalties and liabilities*

14(c) *Failure of compliance.*

1. *Inadvertent errors.* Inadvertent errors include, but are not limited to, clerical mistake, calculation error, computer malfunction, and printing error. An error of legal judgment is not an inadvertent error under the regulation.

2. *Correction of error.* For inadvertent errors that occur under §§ 202.12 and 202.13, this section requires that they be corrected prospectively only.

**Appendix B—Model Application Forms**

1. *FHLMC/FNMA form—residential loan application.* The residential loan application form (FHLMC 65/FNMA 1003) and supplemental form (FHLMC 65A/FNMA 1003A) prepared by the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association comply with the requirements of this regulation.

2. *FHLMC/FNMA form—home improvement loan application.* The home improvement and energy loan application form (FHLMC Form 703/FNMA Form 1012) prepared by the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association comply with the requirements of this regulation.

By order of the Board of Governors of the Federal Reserve System, November 13, 1985.

**William W. Wiles,**

*Secretary of the Board.*

[FR Doc. 85–27459 Filed 11–19–85; 8:45 am]

**BILLING CODE 6210-01—M**

in court—not simply is day before a HUD administration law tribunal. In addition, he will be assured that, before he is labeled a civil rights violator, there will have been some evidence of a discriminatory intent on his part, not simply evidence that his apartment building or his subdivision lacked the right proportion of white, black, yellow, red, and brown faces.

The individual who is denied an apartment because of his skin color or a home because of his ethnic background will, in short, have more and stronger protections than he has ever had before. He will have access to the full resources of the Federal and State governments when he is treated, not as an individual, but as a member of some collective group, in his pursuit of a dwelling. At the same time, some of the so-called public interest groups, which have little to do beyond harassing small businessmen and communities, and some of the more creative and innovative minds in the bureaucracy who wish to remake America in their image, may have a more difficult time of it all. That is the way it ought to be, in my opinion.

I ask unanimous consent that the text of the proposed Equal Access to Housing Act be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

## S. 867

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SHORT TITLE

SECTION 1. This Act may be cited as the "Equal Access to Housing Act of 1987".

### SHORT TITLE FOR 1968 ACT

SEC. 2. The Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by inserting immediately after the comma at the end of the enacting clause, the following: "That this Act may be cited as the 'Civil Rights Act of 1968'.".

### SHORT TITLE FOR TITLE VIII

SEC. 3. Title VIII of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by inserting immediately after the title's catchline the following:

### "SHORT TITLE

"Sec. 800. This title may be cited as the 'Equal Access to Housing Act'.".

### AMENDMENTS TO POLICY SECTION

SEC. 4. (a) Section 801 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by striking out "for fair housing" and inserting in lieu thereof "for equal access to housing".

(b) Section 801 of such Act is amended by adding at the end thereof the following: "Such a policy means that individuals shall not be denied access to housing which they desire and can afford, because of race, color, religion, sex, handicap, or national origin.

### AMENDMENTS TO DEFINITIONS SECTION

SEC. 5. Section 802 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by—

(a) striking out subsection (a) and inserting in lieu thereof the following:

"(a) 'Attorney General' means the United States Attorney General."; and

(b) adding at the end the following:

"(h) 'Handicap' means, with respect to a person, a physical impairment which substantially limits the capacity to see, hear, or walk unaided or the capacity to live completely unattended. Such term does not include any alcohol, drug abuse, or any other impairment which would be a threat to the safety or the property of others.

"(i) 'Aggrieved person' includes any person whose bona fide attempt or bona fide offer to purchase, sell, lease, or rent, or whose bona fide attempt to obtain financing for a dwelling has been denied on the basis of race, color, religion, sex, handicap, or national origin, or made subject to terms of purchase, sale, lease, rental, or acquisition which discriminate on any such basis.".

### DISCRIMINATORY HOUSING PRACTICE AMENDMENTS

SEC. 6. (a) Section 804(e) of such Act is amended by striking out the words "For profit, to" and inserting in lieu thereof "To".

(b) Section 804 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284) is amended by adding at the end the following:

"(f)(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny a dwelling to any person because of such handicap of a prospective buyer or renter or of a person or persons to be occupying a dwelling with such buyer or renter unless such handicap would prevent a prospective dwelling occupant from conforming to such rules, policies, and practices as are permitted by paragraph (2) of this subsection.

"(2) To discriminate against any person in the terms or conditions of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of a handicap. For purposes of this subsection, (A) discrimination shall include: (i) refusal to permit reasonable modifications of premises occupied, or to be occupied by persons with a handicap where such modifications are necessary to afford such handicapped persons access to premises substantially equal to that of nonhandicapped persons: *Provided, however,* That with respect to such premises, such handicapped persons have agreed to return them to their original condition if requested to do so by the landlord; or (ii) refusal to make reasonable accommodations in existing policies, practices, services, or facilities when such accommodations are necessary to afford handicapped persons enjoyment of dwellings substantially equal to that of nonhandicapped persons; but (B) discrimination shall not include (i) refusal to make alterations in premises at the expense of sellers, landlords, owners,

brokers, building managers, or persons acting on their behalf; (ii) refusal to make modifications of existing policies, practices, services or facilities where such modifications would result in unreasonable inconvenience to other persons; or (iii) refusal to allow modifications of dwellings which would alter the marketability or appearance of a dwelling or the manner in which a dwelling or its environs has been, or is intended to be, used.".

(c) Subsections (c), (d), and (e) of section 804 and section 806 of such Act are each amended by inserting "handicap", immediately after "sex", each place it appears.

(d) Section 805 of such Act is amended by adding at the end thereof the following: "It shall also be unlawful for any person or other entity whose business includes the appraising of real property to discriminate in the estimation of the property value on the basis of race, color, religion, sex, handicap, or national origin. It shall not be unlawful for such a person or other entity to take into consideration or to report to the person for whom the appraisal is being done all factors relevant to the appraiser's estimate of the fair market value of the property: *Provided,* That such factors are not used by the appraiser for the purpose of discriminating or denying rights guaranteed by this title.".

### ROLE OF THE ATTORNEY GENERAL

SEC. 7. Section 808 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended—

(1) in subsection (a) by striking out "Secretary of Housing and Urban Development" and inserting in lieu thereof "Attorney General";

(2) by striking out subsection (b);

(3) by redesignating subsections (c), (d), and (e) as subsections (b), (c), and (d), respectively;

(4) in subsection (b) as redesignated by this section by striking out—

(A) "Secretary" each place it appears and inserting in lieu thereof "Attorney General";

(B) "Department of Housing and Urban Development" each place it appears and inserting in lieu thereof "Department of Justice";

(C) "sections 3105, 3344, 5362, and 7521 of title 5 of the United States Code" and inserting in lieu thereof "law"; and

(D) "5362" and inserting in lieu thereof "5372";

(5) in subsection (c) as redesignated by this section, by striking out "Secretary" and inserting in lieu thereof "Attorney General";

(6) in subsection (d) as redesignated by this section, by striking out "Secretary of Housing and Urban Development" and inserting in lieu thereof "Attorney General"; and

(7) by adding at the end the following:

"(e)(1) Simultaneously with the promulgation of any regulation or rule issued for the purpose of compliance with this title, the Attorney General shall transmit a copy thereof to the Committees on the Judiciary of the House of Representatives and the Senate. Such rule or regulation, other than an emergency rule, shall become effective at the end of the first period of sixty calendar days of continuous session of Congress, unless between the date of transmittal and the end of the sixty-day period, either House of Congress passes a resolution stat-

ing in substance that that House does not approve of the proposed rule or regulation.

"(2) Either House of Congress may adopt a resolution directing agency reconsideration of a rule other than an emergency rule. If such resolution is adopted within sixty calendar days of continuous session of Congress after the date the rule was transmitted to Congress, the rule shall not go into effect. The agency shall reconsider the rule and take such action as they deem appropriate.

### EDUCATION AND CONCILIATION

Sec. 8. Section 809 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90-284, approved April 11, 1968) is amended by—

(1) striking out "Secretary" each place it appears and inserting in lieu thereof "Attorney General";

(2) striking out "Secretary's" and inserting in lieu thereof "Attorney General's"; and

(3) adding at the end thereof the following sentence: "Nothing in this section shall authorize any payment of funds to any organization or entity formed by or pursuant to any agreements entered into under this section.".

### ENFORCEMENT CHANGES

Sec. 9. The Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90-284, approved April 11, 1968) is amended by—

(1) redesignating sections 815 through 819 as sections 816 through 820, respectively; and

(2) striking out sections 810 through 815 and inserting in lieu thereof the following:

### "PRELIMINARY MATTERS OF ENFORCEMENT

"Sec. 810. (a) Whenever an aggrieved person, or the United States Attorney General on the Attorney General's own initiative, files a charge alleging a discriminatory housing practice, the Attorney General shall serve a notice of the alleged discriminatory housing practice on the party charged (hereinafter in this title referred to as the 'respondent') within ten days after such filing, and shall make an investigation thereof. Upon receipt of such charge, the Attorney General shall serve notice upon the aggrieved person acknowledging receipt of the charge and advising the aggrieved person of the time limits and alternative means of enforcement provided under this title. Such charge shall be in writing, under oath or affirmation, and shall contain such information and be in such form as the Attorney General may require, including detailed information regarding: (1) specific discriminatory practices alleged; (2) the dates of such alleged practices; (3) the names of parties involved; and (4) other relevant facts. An aggrieved person shall file a charge under this section with the Attorney General not later than six months after the alleged discriminatory housing practice occurred or terminated.

"(b)(1) In connection with any investigation of such charge, the Attorney General shall, at reasonable times, have access to, and the right to copy, any information that is reasonably necessary for the furtherance of the investigation. The Attorney General may issue subpoenas to compel such access to or the production of such information, or the appearance of persons, and may issue interrogatories, to the same extent and subject to the same limitations as would apply if the subpoenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Attorney General may administer oaths.

"(2) Upon written application to the Attorney General, a respondent shall be entitled to the issuance of a reasonable number of subpoenas and interrogatories by and in the name of the Attorney General to the same extent and subject to the same limitations as subpoenas issued by the Attorney General under paragraph (1) of this subsection.

"(3) Witnesses summoned by subpoena of the Attorney General under this title shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts.

"(4) The Attorney General or other party at whose request a subpoena is issued under this title may enforce such subpoena in appropriate proceedings in the United States district court for the district in which the person to whom the subpoena was addressed resides, was served, or transacts business.

"(5) Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence in such person's power to do so, in obedience to the subpoena or lawful order of the Attorney General under this title, shall be fined not more than $1,000. Any person who, with intent thereby to mislead the Attorney General, shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document produced pursuant to the Attorney General's subpoena or other order, or shall willfully neglect or fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000.

### "STATE ENFORCEMENT

"Sec. 811. (a) Whenever a charge alleges a discriminatory housing practice within the jurisdiction of a State or local public agency certified by the Attorney General under this subsection, the Attorney General shall, within twenty days after receiving such charge and before taking any action with respect to such charge, refer such charge to such agency. The Attorney General shall notify all parties involved of the referral to such agency. The Attorney General shall, after that referral is made, take no further action with respect to such charge unless the Attorney General determines that such agency no longer qualifies for certification. Wherever a State or local law provides rights and remedies which are reasonably equivalent to the rights and remedies provided by this title, the Attorney General shall certify the appropriate State or local agency administering such law. Any State or local agency may submit a written request for certification to the Attorney General. Unless the Attorney General offers a written objection within ninety days after such submission, such State or local agency shall be deemed certified within the meaning of this title. If the Attorney General objects within the prescribed ninety-day period, he shall provide the State or local agency with an explanation for his decision and such decision shall be subject to review by the appropriate United States district court.

"(b) The Attorney General shall not require, as a condition of such certification, that the State or local law enforcement agency agree, to waive, its exclusive authority over charges alleging discriminatory housing practices.

### "CONCILIATION PROCESS

"Sec. 812. (a) If the Attorney General concludes, on the basis of a preliminary investigation of a charge, that prompt judicial action is necessary to carry out the purposes of this title, he may seek appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure.

"(b) At any time after the filing of a charge, the Attorney General shall endeavor to resolve such charge by conciliation. If the respondent refuses to participate in the conciliation process, the Attorney General may grant to the aggrieved person not more than $1,000 for legal fees and other expenses of initiating a civil action under this title against such respondent. Nothing said or done in the course of the conciliation process may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Attorney General who makes public any information in violation of the immediately preceding sentence shall be fined not more than $1,000. The conciliation process may result in a conciliation agreement. Such agreement may provide for binding arbitration of the dispute arising from the complaint or may award appropriate specific relief to the aggrieved person including damages of not more than $1,000. The Attorney General may issue such orders as are necessary to enforce any conciliation agreement, including, if the Attorney General has determined that there has been a breach of such agreement, an order that the breaching party pay to the other party not more than $1,000.

"(c)(1) If the Attorney General determines, after an investigation and after initiation of the conciliation process under this section, that reasonable cause exists to believe a charge is true, the Attorney General shall file an appropriate civil action under section 814(b) of this title. Such determination in the case of a charge filed by an aggrieved person may not be made later than six months after the date of the filing of such charge.

"(2) After each investigation under this section, the Attorney General shall provide to each party a copy of the report of such investigation.

"(d) The Attorney General shall not employ the services of any person or organization, or provide direct or indirect assistance to any person or organization, to make an offer to purchase, rent, or obtain financing for a dwelling that is not a bona fide offer, except where such action is undertaken for the purpose of verifying a violation of this title which the Attorney General has reason to believe has occurred.

### "PRIVATE ENFORCEMENT

"Sec. 813. (a)(1) An aggrieved person may commence a civil action in an appropriate United States district court or State court at any time not later than six months after the alleged discriminatory housing practice occurred or terminated.

"(2) The Attorney General may, upon timely application, intervene in such civil action, if he personally certifies that the case is of general public importance.

"(b) Any court, upon application by an aggrieved person or a respondent, may, in

such circumstances as it deems just, appoint an attorney for such party and may authorize the commencement or continuation of the action without the payment of fees, costs, or security.

"(c) The court may award such relief in any civil action under this section as is authorized in section 813(c) of this title in cases brought under that section.

"(d) The filing of a civil action pursuant to a charge filed by an aggrieved person under this title by the Attorney General or by any State or local agency shall preclude the filing of a civil action under this title growing out of the same discriminatory housing practice by such aggrieved person. The filing of a civil action under this title by an aggrieved person shall preclude the filing of a civil action under this title growing out of the same discriminatory housing practice by the Attorney General or by any State or local agency pursuant to a charge filed by such aggrieved person.

"(e) It is the sense of the Congress that, except in cases in which a municipality or State is involved, the use of United States magistrates should be encouraged to the maximum extent feasible in order to expedite litigation under this section."

"ANCILLARY AND PROCEDURAL MATTERS

"SEC. 815. (a) In any action or proceeding under this title, the court may allow a prevailing party (other than the United States with respect to attorney fees) reasonable attorney and expert witness fees as part of the costs. The United States shall be liable for such costs the same as a private person. Such costs may also be awarded upon the entry of any interlocutory order which determines substantial rights of the parties.

"(b) Any court in which a proceeding is instituted under this title shall assign the case for hearing at the earliest practicable date and cause the case in every way to be expedited.

"(c) Any sale, encumbrance, or lease executed before the issuance of any order under this title, and involving a bona fide purchase, encumbrancer, or tenant without actual notice of the existence of the filing of a charge or civil action under this title shall not be affected by such court order.

"(d) Any court having jurisdiction of an action brought under this title which enters a temporary restraining order or other order providing permanent or temporary relief sought by the Attorney General may, in such circumstances as it deems just, if a violation of this title is not ultimately found, enter an order providing reimbursement from the United States to the defendant for unavoidable economic losses incurred during the time that the temporary restraining order or preliminary or temporary relief was in effect which were a direct result of such temporary restraining order or preliminary or temporary relief.".

COOPERATION WITH STATE AND LOCAL AGENCIES

SEC. 10. Section 817 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes", the "Equal Access to Housing Act", as redesignated by section 9 of this Act is amended by striking out "Secretary" each place it appears and inserting in lieu thereof "Attorney General".

CLARIFYING PROVISION

SEC. 11. The Equal Access to Housing Act is amended by adding at the end thereof the following new section:

"CLARIFYING PROVISIONS

"SEC. 821. Nothing in this Act shall be construed to prohibit—

"(a) in the case of landlords, the establishment of any requirements for tenancy relating to age, income level or source, parental status, familial relationship, or maximum occupancy;

"(b) in the case of State, local, or other governmental jurisdictions, the establishment of zoning or land-use statutes, ordinances, administrative policies or regulations, including dwelling lot size requirements and multiple-family dwelling exclusions or limitations, which may result in increased housing costs or diminished housing availability; or

"(c) in the case of private agreements, contracts or covenants, the establishment of any rules or requirements, including those relating to dwelling lot size or multiple-family dwelling exclusions or limitations, which may result in increased housing costs or diminished housing availability;

*Provided,* however, that nothing in this section shall exempt from coverage of this Act, any action described herein taken for the purpose of discriminating on account of race, color, religion, sex, handicap, or national origin.".

CONFORMING AMENDMENT

SEC. 12. Section 901 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by inserting ", handicap (as defined in section 802 of this Act)," immediately after "sex" each place it appears.●

___

By Mr. FORD:

S. 868. A bill to require the Secretary of Agriculture and the Secretary of Commerce to conduct a joint study of commodities and products that may be produced and marketed in conjunction with the production of tobacco; to the Committee on Agriculture, Nutrition, and Forestry.

COMPLEMENTARY CROP LEGISLATION

● Mr. FORD. Mr. President, today I introduce a bill with implications for all of agriculture and, especially, for tobacco, the mainstay of thousands of small farmers in Kentucky and other States.

As we work on broad approaches to our farm problems, we must be aware that a few sweeping changes will not solve all our problems. We also must focus on agricultural specialties, finding a whole range of alternatives to allow farmers to choose what is right for their own farms.

My bill would apply this principle to our struggling tobacco farmers. I am calling upon the Secretaries of Agriculture and Commerce to carry out a joint study of the existing infrastructure of tobacco in order to identify other crops that might fit into and complement tobacco operations.

I am seeking the guidance of the USDA in our efforts to use tobacco labor and equipment in diversified farming operations. The Commerce Department is included to make sure that markets can be found for any new crop or livestock enterprises begun by our tobacco growers. I am convinced we can take advantage of the existing knowhow of our tobacco farmers to

grow and prosper, not only in tobacco but in other areas as well. In this way, perhaps we can begin to overcome at least a few of the expensive problems involved in our larger farm policy debates.

Tobacco remains the mainstay of Kentucky agriculture. It is the very nature of tobacco, yielding a gross return of $3,500 per acre, that has enabled Kentucky agriculture to be so diverse. Kentucky is the 13th largest producer of soybeans in the country, 14th for sorghum, and in the top 15 in cattle, dairy, and hog numbers.

The number of farms in Kentucky is 99,000, a decline of almost 2,000 farms since 1984. Despite the seeming diversity of Kentucky agriculture, it is tobacco that makes up 29 percent of the total farm receipts and over 41 percent of the crop receipts, all on less than 2 percent of the land. The average farm in Kentucky is just under 146 acres compared to the national average of over 455 acres. Kentucky farms are small, family operations. The average farm in Kentucky will raise a few head of cattle, some grain for feed, selling the rest. It is tobacco, however, on these small farms which pays the bills, allowing a Kentucky farmer to operate on a unit one-third the size of the national average.

I am bullish on tobacco. I know of no other commodity in which a 1-percent loss of output could mean 545 lost jobs, or $19.4 million in labor and capital intensive, yet requiring such a small amount of tillable soil, which can produce such great returns to Kentucky farmers.

Recently, two major cigarette manufacturers comprising better than a 70-percent market share announced they would virtually end importation of foreign grown burley and Flue-cured tobaccos. The announcements came as a result of major changes in the operation of the Tobacco Program enacted in Congress. I compliment these two fine companies—Philip Morris Co. and R.J. Reynolds Tobacco Co.

The announcement by these two companies only strengthens my belief that tobacco will be a major income producer for tobacco farmers for some time to come. I am convinced we must use the stability and future of tobacco to branch out into production of other crops to complement the strengths of tobacco production.

However, I am concerned for the crop. The overall condition of agriculture is such that extreme pressure is being placed on this commodity to shoulder the whole load of farm profitability. We have all, both here in this Chamber and at home, heard of the bad times in American agriculture. Cash prices for our grains are so low, payments cannot be met; cattle and pork prices, though better, are still strained. The average debt-to-asset

529

Senator SIMON. We thank you.

The final witness is Prof. Robert Schwemm of the University of Kentucky Law School. Happy to have you with us, Mr. Schwemm.

## STATEMENT OF ROBERT SCHWEMM

Mr. SCHWEMM. Thank you very much, Mr. Chairman. My name is Robert Schwemm, and I am a professor of law at the University of Kentucky. I have devoted almost my entire professional life to the subject of housing discrimination law, first as a trial lawyer in Chicago and more recently as a law professor doing research in this area. In the last year, I have been a member of my State's Human Rights Commission, which has some of the powers of enforcement that this bill is contemplating at the Federal level.

I have also prepared a paper for the committee on the subject of whether the 1968 Fair Housing Act includes a discriminatory effect standard as well as a discriminatory intent standard. That is a rather lengthy paper. It goes on to some 25 pages, and it is my hope that that could be included in the record. I might just summarize briefly the conclusions that I reached in that paper.

Most of the available sources of interpretation are at the lower court level. The 1968 statute does not define the proper standard. The Supreme Court has not reviewed the law with respect to this issue, and the legislative history, although supportive of a generous construction of title VIII, is not absolutely conclusive.

The decisions of the Federal Courts of Appeals on this subject are the principal source of authority. They reflect the strong consensus, now approaching unanimity, that title VIII should be construed to prohibit discriminatory effects, at least under some circumstances. By my count, of the 12 Federal Courts of Appeals, 9 have reviewed this issue, and they have all agreed with that proposition; three have not yet passed on it; and none at this moment objects to that interpretation.

It so happens that in the field of housing discrimination law, this particular issue has not been as important in terms of the number of cases affected as it has been, for example, in the employment field. But I think the issue is important for a couple of reasons that I would like to mention briefly.

In certain types of cases, the question of whether the law prohibits discriminatory effects can be very important. These tend to be the larger impact or communitywide cases. The other reason that I think it is important that the courts have endorsed the effects standard for this law is that, as we have said today, the 1968 law is not terribly strong. And it would be very unfortunate if the courts interpreted that law, already somewhat weak, in any way that would suggest it was weaker than the employment discrimination law of 1964, which has, as you know, been interpreted by the Supreme Court to prohibit discriminatory effects under certain circumstances.

I have a couple of other comments with respect to the bill that you are considering. First of all, I applaud the effort to strengthen the enforcement mechanism. The 1968 law made a promise to the Nation that, we were told, Congress considered of the highest priority—to achieve fair housing. The problem, as you well know, is that

---

## Section 504 Update

Each month, the National Center receives inquiries on the status and requirements of Section 504 of the Rehabilitation Act of 1973. Though many of the Reagan administration's questions about the regulations have yet to be resolved, some progress continues to be made.

Recently, the Small Business Administration (SBA) began providing reading and interpreting assistance to blind and deaf persons using agency programs. This change of policy came about as a result of a complaint to the Small Business Administration from the National Center for Law and the Deaf. Responding to a request for guidance, Assistant Attorney General William Bradford Reynolds told the SBA that in the absence of regulations establishing procedures for implementing coverage of federally conducted programs

under Section 504, SBA should use standards already established for federally assisted programs.

He further noted: "the Attorney General's regulations require agencies to mandate that recipients of federal assistance take appropriate steps to ensure that communications with their applicants, employees and beneficiaries are available to persons with impaired ... hearing 24CFR 41.51(e)." Other federal agencies, including the Internal Revenue Service, are developing policies on the provision of services for hearing-impaired clientele. The Assistant Attorney General's letter is providing guidance to these agencies.

Recently, the U.S. Department of Justice, Civil Rights Division published a current listing of agency regulations implementing Section 504 of the Rehabilitation Act. For the convenience of our readers, this list is reproduced below.

## Agency Regulations Implementing Section 504 of Rehabilitation Act

**Final Rules**

| | |
|---|---|
| ACTION | 45 C.F.R. Part 1232 (1982), 44 Fed. Reg. 31018 (1979) |
| Agency for International Development/IDCA | 22 C.F.R. Part 217 (1982); 45 Fed. Reg. 66415 (1980) |
| Department of Agriculture | 47 Fed. Reg. 25,458 (1982) (to be codified at 7 C.F.R. Part 15b) |
| Civil Aeronautics Board | 14 C.F.R. Part 382 (1982); 47 Fed. Reg. 25,936 (1982) (to be codified at 14 C.F.R. Part 382) |
| Department of Commerce | 47 Fed. Reg. 17,744 (1982) (to be codified at 15 C.F.R. Part 8b) |
| Department of Defense | 47 Fed. Reg. 15,122 (1982) (to be codified at 32 C.F.R. Part 56) |
| Department of Education | 34 C.F.R. Part 104 (1982); 45 Fed. Reg. 30,936 (1980) |
| Department of Energy | 10 C.F.R. Part 1040.71 (1982); 45 Fed. Reg. 40,515 (1980) |
| General Services Administration | 47 Fed. Reg. 25,337 (1982) (to be codified at 41 C.F.R. §§ 101-6.300-313) |
| Department of Health and Human Services | 45 C.F.R. Part 84 (1982); 42 Fed. Reg. 22,677 (1977) |
| Department of Housing and Urban Development | 48 Fed. Reg. 20,635 (1983), as amended by 48 Fed. Reg. 20,902 (1983) (to be codified at 24 C.F.R. Part 8) |
| Department of Interior | 47 Fed. Reg. 29,540 (1982) (to be codified at 43 C.F.R. §§ 17,200-259 |
| Department of Justice | 28 C.F.R. §§ 42.501-540 (1982); 45 Fed. Reg. 37,622 (1980) |
| Department of Labor | 29 C.F.R. Part 32 (1982); 45 Fed. Reg. 66,709 (1980) |
| National Aeronautics and Space Administration | 14 C.F.R. Part 1251 (1982); 44 Fed. Reg. 52,800 (1979) |
| National Endowment for the Arts | 45 C.F.R. Part 1151 (1982); 44 Fed. Reg. 22,734 (1979) |
| National Endowment for the Humanities | 45 C.F.R. Part 1170 (1982); 44 Fed. Reg. 58,804 (1981) |
| National Science Foundation | 10 C.F.R. §§ 4.101-233 (1982); 45 Fed. Reg. 14,335 (1980) |
| Office of Personnel Management | 47 Fed. Reg. 8570 (1982) (to be codified at 45 C.F.R. Part 600) |
| Small Business Administration | 5 C.F.R. §§ 900.701-710 (1982); 45 Fed. Reg. 75,368 (1980) |
| Department of State | 13 C.F.R. Part 113 (1982); 47 Fed. Reg. 6,680 (1982) |
| Tennessee Valley Authority | 22 C.F.R. Part 142 (1982); 45 Fed. Reg. 68,426 (1980) |
| Department of Transportation | 18 C.F.R. Part 1307 (1982); 44 Fed. Reg. 22,865 (1980) |
| | 49 C.F.R. Part 27 (1982); 44 Fed. Reg. 31,468 (1979), as amended by 45 Fed. Reg. 37,482 (1981) |
| Department of the Treasury | 31 C.F.R. Part 51.50 (1982); 47 Fed. Reg. 48,034 (1981) |
| Veterans Administration | 38 C.F.R. §§ 18.401-461 (1982); 47 Fed. Reg. 4,684 (1982) |

**Notices of Proposed Rulemaking**

| | |
|---|---|
| Equal Employment Opportunity Commission | 44 Fed. Reg. 68,482 (1979) |
| Environmental Protection Agency | 45 Fed. Reg. 2206 (1981) |

530

the enforcement mechanism of the bill did not carry out that promise or did not allow for the carrying out of that promise, primarily because it put almost the entire responsibility for enforcement on the shoulders of the victims of discrimination. The Federal Government was given a very, very small and relatively weak role. The bill that you are considering would address itself to increasing the effective role of the Federal Government in enforcing fair housing, particularly through the use of complaints to HUD followed up by hearings before administrative law judges.

I am in favor of that, and I am in favor of this bill. I have mentioned from time to time in discussions with staff that there are a few minor technical problems that I would like to work out with them, but the overall thrust of the bill is excellent and is very much needed.

I am concerned with the suggestion by some people that Senator Kennedy referred to earlier that an alternative to this system of administrative law judges might be mandatory arbitration. I do not know a great deal about mandatory arbitration, but I know enough about it to know that I have some real questions about how it would work in this area.

For example, I do not know who the arbitrators would be, whether they would be people who are knowledgeable and specialists in the area. I do not know the capacity of arbitrators to issue decisions that would include effective relief, particularly penalties if those are appropriate. I am aware of how difficult it is to get proper judicial review of the decisions of arbitrators, so I have some questions about that.

I have been asked also to touch on a subject that I know has been mentioned before the committee involving programs that are sometimes labeled "integration maintenance." Let me begin by saying that this is a very dangerous phrase, because many people use it without defining it. It can be used to talk about quotas; it can be used to talk about programs that have nothing to do with quotas. And I think the first thing we ought to do is understand what we are talking about

The other thing that I might mention with respect to this topic is that, as far as I am concerned, it is a very, very small topic in the overall field of fair housing law. As a matter of fact, I am not aware of a single case where a local government has adopted a quota that would limit minority housing opportunities in order to achieve integration.

I understand some people have suggested that this is somewhat widespread. I would like them to come forward with the evidence of that, because I am not aware of it.

It is true that a very small number of communities have made efforts, not of a quota nature, but of a pro-integration nature, to try to preserve stable, integrated communities. And let me point out briefly how important it is for those communities to be able to do those modest things, such as just advertising the fact that they are open to people of all races.

In this country, if a person wants to live in an all-white community, he has a great many places he can move and live in an all-white community. If a person wants to live in an all-black commu-

531

nity or predominantly black community, there are a great many places he can go to and live in such a community.

The problem in the country is that there are only a few situations for those people who might want to live in integrated communities. These situations are almost impossible to find. And often they do not last very long. In a few of these situations, communities that have decided that they would like to achieve the goal of the 1968 Fair Housing Act, which is open, integrated, and long-term stable communities, have made modest efforts to advertise that fact and to encourage people to treat their communities in such a way. If that is what integration maintenance is understood to be, I do not see that there is a great deal of problem with it.

So I would suggest, No. 1, this overall topic is something that we have to understand what we are talking about; and, No. 2 if we do understand what we are talking about, it is really not a major problem.

I know I have exceeded my time. Let me just conclude by saying that if there are any questions I would be happy to try to answer them.

[Submissions of Mr. Schwemm follow:]

STATEMENT OF ROBERT G. SCHWEMM
on the
FAIR HOUSING AMENDMENTS ACT OF 1987 (S. 558)
before the
SUBCOMMITTEE ON THE CONSTITUTION
of the
SENATE COMMITTEE ON THE JUDICIARY

April 9, 1987

My name is Robert G. Schwemm. I am a professor of law at the University of Kentucky, where I teach courses in constitutional law, civil procedure, and trial practice.

During the 1970s, I was Chief Trial Counsel for the Leadership Council for Metropolitan Open Communities, a fair housing organization in Chicago, Illinois. In connection with that work, I was the plaintiff's attorney in scores of federal fair housing cases. Many of these cases ultimately were decided by the 7th Circuit court of appeals, and two -- Village of Arlington Heights v. Metropolitan Housing Development Corp. and Gladstone, Realtors v. Village of Bellwood -- reached the Supreme Court. A partial list of my reported fair housing cases is included in the Appendix to my statement.

Since becoming a law professor, my research has been devoted to fair housing law. I have written numerous articles and two books on the subject. These writings are listed in the Appendix. I am the author of the paper submitted to this Committee on "Discriminatory Intent vs. Discriminatory Effect: The Proper Standard in Cases under the Fair Housing Act of 1968."

I also act as a consultant to practitioners and to various fair housing organizations, both private and governmental. I have spoken to lawyers' groups and others on fair housing law throughout the country.

I am currently serving as Vice Chairperson of the Kentucky Commission on Human Rights, which investigates, prosecutes, and decides cases under our state fair housing law, and I am the Vice Chairperson of the Kentucky Advisory Committee to the U.S. Commission on Civil Rights.

I appear today as a private citizen with a keen interest in fair housing law.

If the Committee has any questions on the "intent vs. effect" issue or on other matters relating to the Fair Housing Amendments Act of 1987, I would be happy to try to answer them.

535

DISCRIMINATORY INTENT VS. DISCRIMINATORY EFFECT:
THE PROPER STANDARD IN CASES UNDER THE FAIR HOUSING ACT OF 1968

(Paper prepared for Congressional hearings
on the Fair Housing Amendments Act of 1987)

—Robert G. Schwemm

College of Law
University of Kentucky
Lexington, Kentucky 40506
March 31, 1987

Introduction

This paper addresses the issue of whether the federal Fair Housing Act (Title VIII of the Civil Rights Act of 1968)[1] bans only intentional discrimination or whether its coverage extends as well to practices with discriminatory effects."

Title VIII prohibits, with certain limited exceptions, virtually every housing practice that discriminates on the basis of race, color, religion, sex, or national origin. A "discriminatory housing practice" under the statute is defined as any "act that is unlawful under section 3604, 3605, or 3606 of this title."[3] These substantive provisions are violated whenever a housing practice is undertaken "because of," "based on," or "on account of" race, color, religion, sex, or national origin." The question is: Do these phrases cover practices with discriminatory effects or do they apply only to intentional discrimination?

This question cannot be answered with absolute certainty. The statute, itself, does not define what these phrases mean. The relevant legislative history is sketchy and inconclusive . The Supreme Court, which has addressed the "intent vs. effect" issue in a number of other civil rights contexts, has thus far avoided doing so in a Title VIII case. Under these circumstances, the principal authority available on this point is the decisions of the federal courts of appeals, which have generally held that Title VIII does apply to discriminatory effect cases. These three subjects -- Title VIII's legislative history; analogous Supreme Court decisions; and

---

534

Appendix to the Statement of Robert G. Schwemm

I. REPORTED FAIR HOUSING CASES

Gladstone Realtors v. Village of Bellwood:
(1) 441 U.S. 91 (1979)
(2) 569 F.2d 1013 (7th Cir. 1978)

Metropolitan Housing Development Corp. v. Village of Arlington Heights:
(1) 517 F.2d 409 (7th Cir. 1975)
(2) 429 U.S. 252 (1977)
(3) 558 F.2d 1283 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978)
(4) 469 F. Supp. 836 (N.D. Ill. 1979), aff'd, 616 F.2d 1006 (7th Cir. 1980)

Crumble v. Blumthal, 549 F.2d 462 (7th Cir. 1977)

Moore v. Townsend:
(1) 525 F.2d 482 (7th Cir. 1975)
(2) 421 F. Supp. 378 (N.D. Ill. 1976), aff'd in part and rev'd in part, 577 F.2d 424 (7th Cir. 1978)

Hairston v. R & R Apartments, 510 F.2d 1090 (7th Cir. 1975)

Morris v. Cizek, 503 F.2d 1303 (7th Cir. 1974)

Jeanty v. McKey & Poague, Inc., 496 F.2d 1119 (7th Cir. 1974)

Seaton v. Sky Realty Company, Inc., 491 F.2d 634 (7th Cir. 1974)

Johnson v. Jerry Pals Real Estate, 485 F.2d 528 (7th Cir. 1973)

II. FAIR HOUSING PUBLICATIONS

Housing Discrimination Law - Supplement (BNA: 1986)

Housing Discrimination Law (BNA: 1983)

"Compensatory Damages in Federal Fair Housing Cases," 16 Harvard Civil Rights - Civil Liberties Law Review 83 (1981)

Guide to Practice Fair Housing Law (1980) (co-author with F. Willis Caruso)

"Standing to Sue in Fair Housing Cases," 41 Ohio State Law Journal 1 (1980)

"Discriminatory Effect and the Fair Housing Act," 54 Notre Dame Lawyer 199 (1978)

"Discriminatory Purpose in Equal Protection Litigation," 77 Illinois Law Forum 961 (1977)

Tenants' Rights (chapters on discrimination) (1975; revised: 1978 & 1985) -- Illinois Institute for Continuing Legal Education

536

lower court decisions involving Title VIII -- are discussed in the next three sections. A final section is then devoted to "Analysis and Conclusions."

## I. Legislative History and Congressional Intent

"[T]he starting point in every case involving construction of a statute is the language itself."[5] Title VIII, however, does not contain language that addresses the "intent vs. effect" issue. Therefore, it is necessary to resort to an examination of the congressional intent underlying the statute in an attempt to resolve this issue.

One source of evidence concerning congressional intent is legislative history. Unfortunately, the legislative history of Title VIII is not particularly helpful.[6] This is due in part to the fact that the statute was enacted after relatively short debates by the full House and Senate in the wake of the urban riots following the assassination of Martin Luther King, Jr. In addition, because Title VIII was first introduced as a floor amendment to a pending bill in the Senate, its legislative history does not include the committee reports and other documents that usually accompany major legislation.[7]

The specific issue of whether Title VIII was intended to bar practices with discriminatory effects as well as those based on intentional discrimination was not discussed by Congress. This is hardly surprising. Intentional discrimination was a way of life in the housing field, and eradicating it was obviously the key concern of the bill's sponsors. With the Supreme Court's decision in Griggs v. Duke Power Co.[8] still three years away, the "intent vs. effect" issue was simply not of commanding interest in 1968. As a result, there is no specific legislative history that can clearly resolve the question of whether Title VIII was meant to cover discriminatory effect cases.[9]

537

There is some evidence, however, concerning the broad impact that Title VIII was intended to have. Proponents of the statute in both the House and Senate spoke repeatedly of their desire to achieve the result of an integrated society through this legislation.[10] Title VIII begins with the sweeping declaration that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."[11] Clearly, it is "within constitutional limitations" to outlaw practices with discriminatory effects. Indeed, Senator Mondale, the principal sponsor of Title VIII, in commenting on the role that government had played in maintaining segregated housing conditions, concluded that "it thus seems only fair, and is constitutional, that Congress should now pass a fair housing act to undo the effects of these past State and Federal unconstitutionally discriminatory actions."[12]

The broad scope envisioned for Title VIII by its proponents has been recognized by the Supreme Court. In its first decision under the statute -- Trafficante v. Metropolitan Life Insurance Co. -- the Court held that Title VIII reflects "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution."[13] The Court's unanimous opinion commented that the language of the Fair Housing Act is "broad and inclusive," that the Act carries out a national "policy that Congress considered to be of the highest priority," and that vitality can be given to this policy "only by a generous construction" of the statute.[14] This mandate by a unanimous Supreme Court to construe Title VIII broadly has become the foundation for all subsequent judicial interpretations of the Fair Housing Act.

In conclusion, the legislative history of Title VIII does not conclusively establish whether the law was intended to prohibit practices with discriminatory effects. Nothing in that history directly conflicts with this interpretation, however, and such an interpretation would be consistent with the broad mandate that clearly was intended for the statute by its proponents.

78-076 O - 88 - 18

588

II. Supreme Court Decisions on the "Intent vs. Effect" Issue in Other Civil Rights Contexts

Although the Supreme Court has not yet decided whether Title VIII should be governed by an effect or an intent test, the Court has dealt with this issue in a number of cases involving other civil rights laws. This section describes some of these decisions and discusses how they might relate to a proper interpretation of Title VIII.

1) Griggs v. Duke Power Co., 401 U.S. 424 (1971).

In Griggs, the Supreme Court interpreted Title VII of the Civil Rights Act of 1964 to prohibit job requirements that produced racially discriminatory effects, as well as those that were prompted by a discriminatory intent. The Court unanimously held that Title VII bans employment practices that "operate to disqualify Negroes at a substantially higher rate than white applicants," unless the defendant can prove that such practices are "significantly related to successful job performance." 401 U.S. at 426. According to the Court, the statute was intended to proscribe "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Id. at 431.

The plaintiffs in Griggs based their claim on §703(a) of Title VII, which makes it unlawful for an employer to discriminate against any individual "because of such individual's race." The Supreme Court did not specifically discuss the meaning of this phrase nor its legislative history. Rather, the opinion focused on the broad purposes underlying Title VII, concluding that the statute was intended "to achieve equality of employment opportunities and remove barriers that have operated in the past" to hurt minority employees. Id. at 429-430.

Certainly, similar objectives could be said to underlie the Fair Housing Act. In addition, Griggs was an interpretation of a statute that was passed only four years before Title VIII and that used almost the identical "because of race" language as Title VIII. These facts make Griggs the most important precedent affecting the "intent vs. effect" issue under the Fair Housing Act.

589

2) Washington v. Davis, 426 U.S. 229 (1976).

Here, the Supreme Court held that the equal protection guarantee of the United States Constitution could be violated only by a showing of purposeful discrimination. Like Griggs, this case challenged an employment test that disproportionately excluded minority candidates, but the plaintiffs' claim was based on the equal protection component of the 5th Amendment, not on Title VII. This distinction was critical for the Court, which held that purposeful discrimination was required to make out an equal protection claim.

The opinion made clear that the Griggs-effect standard would continue to govern Title VII cases. This standard, however, was thought to be too rigorous for constitutional claims, because it might call into question "a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white." 426 U.S. at 249.

In areas like public employment and housing that are now covered by both a statute and the Constitution, the significance of Washington v. Davis is that the same practice may violate the statute even though it passes constitutional muster, because the statutory standard may involve "a more probing judicial review of, and less deference to" the defendant's conduct. Id. at 247.

3) Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977).

In Arlington Heights, the Supreme Court applied the principle of Washington v. Davis to a housing case, holding that an equal protection challenge to a municipality's exclusionary zoning decision would fail where only discriminatory effect was shown. The plaintiffs had sued under both Title VIII and the Equal Protection Clause, but only the constitutional claim was reviewed by the Supreme Court. The Court examined the evidence and concluded that the defendant's decision to block a subsidized housing development was not shown to have been motivated by a racial purpose. "This conclusion," wrote the Court, "ends the constitutional inquiry." The finding below that the defendant's action had a discriminatory effect "is without independent constitutional significance." 429 U.S. at 271.

540

Having disposed of the plaintiffs' constitutional claim, the Court then turned to the Title VIII claim. Noting that this claim had not been reviewed below, the Supreme Court remanded the case to the Seventh Circuit for consideration of the statutory claim. Ibid.

The Supreme Court's handling of the Title VIII claim in Arlington Heights suggests that the same dichotomy between constitutional and statutory standards that was recognized in Washington v. Davis for employment discrimination claims may also exist in the fair housing field. By remanding the Title VIII claim -- instead of simply dismissing it on the ground that it was controlled by the same standard as the equal protection claim -- the Court hinted that a standard other than purposeful discrimination would be appropriate in Title VIII cases. On remand, the Seventh Circuit took the hint and held that a violation of Title VIII "can be established by a showing of discriminatory effect without a showing of discriminatory intent."18

4) General Building Contractors Ass'n v. Inc. v. Pennsylvania, 458 U.S. 375 (1982).

This case holds that 42 U.S.C. §1981 can be violated only by purposeful discrimination. Section 1981 provides for equal rights in making contracts and has been used in recent years primarily in employment discrimination cases. Section 1981 and its companion statute (42 U.S.C. §1982, which guarantees equal rights in property matters) were enacted as part of §1 of the Civil Rights Act of 1866. In General Building, the Supreme Court reviewed the post-Civil War legislative history of §1981 and concluded that the statute, which was a "legislative cousin[] of the Fourteenth Amendment," was intended to be governed by the same purposeful discrimination standard as the Equal Protection Clause. 458 U.S. at 389-391.

The Civil Rights Act of 1866 is important in the housing field. In Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968), the Supreme Court interpreted §§1981-1982 to prohibit private, as well as public, racial discrimination in housing. Jones was decided within weeks of the enactment of Title VIII. Since 1969, therefore, both Title VIII and §§1981-1982 have been available to combat housing discrimination based on race.

541

In housing cases, the significance of General Building is that claims based on §1981 (and probably §1982*) now cannot be based on discriminatory effect. Title VIII claims, however, are not affected by General Building. It is well established that Title VIII and §§1981-1982 are independent of one another and that a limitation on one statute does not apply to the other.'17 It may well be, therefore, that the proper interpretation of Title VIII will include an effect test even though §§1981-1982 claims are now governed by General Building, just as the employment cases are subject to an effect test under Title VII and an intent test under §1981.

5) Guardians Association v. Civil Service Commission, N.Y.C., 463 U.S. 582 (1983).

In Guardians, the Justices produced no less than five separate opinions concerning the proper interpretation of Title VI of the Civil Rights Act of 1964. By various majority votes, the Court settled three issues having to do with the "intent vs. effect" question:

  (a) proof of discriminatory intent is required for a violation of Title VI, itself. See 463 U.S. at 608 n.1.

  (b) proof of discriminatory effect may be sufficient to establish a violation of the regulations promulgated pursuant to Title VI. See id. at 584 n.2.

  (c) when a private plaintiff's Title VI claim is based on discriminatory effect, he can only be awarded injunctive (nonmonetary) relief. See id. at 595-603; 610-611; and 612-615.

Because the Guardians decision was based on an assessment of the congressional intent underlying Title VI, it is not directly relevant to a proper interpretation of Title VIII. Guardians is worth noting, however, because it marks the first time that the Court has interpreted a modern civil rights statute to require a showing of purposeful discrimination. Thus, it can no longer be said that the Court will apply the intent standard only when the Equal Protection Clause or a post-Civil War statute from the Fourteenth Amendment era is involved. Guardians at least raises the possibility that the Court might conclude that Title VIII should be governed by the purposeful discrimination standard.

Guardians also teaches that a statute may be accorded one interpretation (intent) when sued on directly and another

## 542

interpretation (effect) when suit is based on the statute's regulations. If applied to Title VIII today, this possibility would essentially mean adoption of the intent standard, because very few substantive regulations have thus far been promulgated under Title VIII.

6) Alexander v. Choate, 469 U.S. 287 (1985).

This handicap discrimination case was brought under §504 of the Rehabilitation Act of 1973. The Supreme Court's unanimous opinion took a middle ground on the "intent vs. effect" issue. The Court made clear that §504 did not outlaw all practices that produced discriminatory effects, but it also rejected the defendant's argument that only purposeful discrimination could violate the statute. Section 504 was assumed to reach "at least some conduct that has an unjustifiable disparate impact on the handicapped." 469 U.S. at 299.

Like Guardians, the Alexander opinion is not directly relevant to Title VIII, because it is based on the unique legislative history of §504. Still, Alexander is worth noting, because it marks the second time in recent years (Guardians being the first) that the Supreme Court has given a mixed answer to the question of whether the discriminatory effect standard is appropriate for a modern civil rights statute. In other words, the Justices have now discovered that the answer need not be a clear "Yes" or "No," but that a third alternative -- "Under some circumstances" -- is available. The Alexander opinion explained the appeal of such a mixed answer by noting that it would accommodate "two powerful but countervailing considerations -- the need to give effect to the statutory objectives (which favored an 'effects' test) and the desire to keep §504 within manageable bounds (which counseled against an 'effects' test)." Id. at 299. As a result of Alexander and Guardians, the "under some circumstances" alternative must be considered at least a possibility when the Court reviews the "intent vs. effect" issue under Title VIII.

III. Decisions of the Federal Courts of Appeals on Discriminatory Effect in Title VIII Cases

This section reviews 16 major appellate court decisions on discriminatory effect under Title VIII. A brief description of each

## 548

case is given, starting with the oldest decision and progressing chronologically. An analysis of the entire group of cases is presented in Part IV. The principal conclusion of this analysis is that these decisions, though not in agreement on all points, do reflect a strong consensus that a Title VIII violation may be based on discriminatory effect as well as on discriminatory intent.

1) United States v. Pelzer Realty Company, Inc., 484 F.2d 438 (5th Cir. 1973), cert. denied, 416 U.S. 936 (1974). Here, the old Fifth Circuit upheld a "pattern or practice" suit by the Justice Department under §3604(a) and §3604(b). There was strong evidence of the defendant's intentional discrimination, but the opinion also stated that "it is not necessary to show that [defendant] intended to deprive [black homeseekers] of rights granted by the Act. A violation occurred because his words had that effect." 484 F.2d at 443.

2) United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, 493 F.2d 499 (5th Cir. 1974). In this exclusionary zoning suit based on §3604(a), §3604(b), §§1981-1982, and the Equal Protection Clause, the Fifth Circuit held that "the effect of [defendants'] refusal was racially discriminatory. To prove a prima facie case of racial discrimination, no more is required." 493 F.2d at 808. Subsequent Supreme Court decisions have discredited this holding insofar as it applies to §§1981-1982 and the Equal Protection Clause (see Part II supra, discussing General Contractors and Washington v. Davis). However, the United Farmworkers case must still be considered a precedent, albeit a somewhat tarnished one, on the proper meaning of Title VIII.

3) Williams v. Matthews Company, 499 F.2d 819 (8th Cir.), cert. denied, 419 U.S. 1021 (1974). This case was brought under §3604(b), and §1982, and again included substantial evidence of the defendant's intent to discriminate. In ruling for the plaintiff, the Eighth Circuit wrote that:

## 544

The courts will look beyond the form of a transaction to its substance and proscribe practices which actually or predictively result in racial discrimination, irrespective of defendant's motivation.

499 F.2d at 926.

4) Boyd v. Lefrak Organization, 509 F.2d 1110 (2d Cir.), cert. denied, 423 U.S. 896 (1975). Here, the Second Circuit in a 2-1 decision refused to apply Griggs to a Title VIII-§1982 case. The plaintiffs were a class of welfare recipients who could not meet the defendant's requirement that its tenants have a weekly income equal to at least 90% of their monthly rent. This requirement was not shown to have been racially motivated, and the minority population in the defendant's apartments (19.8%) was not far below what it was in the overall metropolitan area. The plaintiffs challenged the 90% rule on the grounds that it excluded most welfare recipients (at least 77% of whom were minorities) and that blacks were disqualified by the rule at a substantially higher rate than whites. In ruling for the defendant, the majority opinion held that this showing of disproportionate impact was not sufficient to shift a burden of justification to a private business defendant in fair housing cases. 509 F.2d at 1113. According to Boyd, the Griggs-Title VII approach was "inapposite" in such cases. Id. at 1114. At the same time, this decision seemed to be a fairly clear statement that Title VIII cases in the Second Circuit were not to be governed by a discriminatory effect standard, but five years later, the same court rejected this view of Boyd and endorsed the effect theory in Robinson v. 12 Lofts Realty, Inc. (see Case #11 infra).

5) United States v. City of Black Jack, 508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975). This exclusionary zoning suit was brought by the Justice Department under §3604(a) and §3617. With respect to the proper standard under Title VIII, the Eighth Circuit wrote:

To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect... The plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing was racially motivated.

## 545

508 F.2d at 1184-1185. Once a showing of discriminatory effect has been made by the plaintiff, Black Jack held that "the burden shifts to the government defendant to demonstrate that its conduct was necessary to promote a compelling governmental interest." Id. at 1185.

6) Smith v. Anchor Building Corp., 536 F.2d 231 (8th Cir. 1976), and
7) Wharton v. Knefel, 562 F.2d 550 (8th Cir. 1977).

Both of these cases were based on Title VIII and §1982, and both included substantial evidence of the defendant's racial motivation. Still, the Eighth Circuit felt compelled to state that effect, not motivation, was to be the "touchstone" in such cases. See Smith, 536 F.2d at 233, and Wharton, 562 F.2d at 555.

8) Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d 1283 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978). In this exclusionary zoning suit, the Supreme Court ruled that the plaintiffs' equal protection claim failed for lack of proof of purposeful discrimination and then remanded the case to the Seventh Circuit for consideration of the plaintiffs' Title VIII claims (see Part II supra for a discussion of the Supreme Court's decision). On remand, the court of appeals held that "at least under some circumstances a violation of §3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent." 558 F.2d at 1290. The Seventh Circuit cautioned, however, that not "every action which produces discriminatory effects is illegal." Ibid. The opinion went on to list four "critical factors" that a court should examine in determining whether a violation of §3604(a) has occurred:

(1) how strong is the plaintiff's showing of discriminatory effect;

(2) is there some evidence of discriminatory intent, even though it is not enough to make out an equal protection violation;

(3) what is the defendant's interest in taking the action complained of; and,

(4) does the plaintiff seek affirmative remedies or merely to restrain the defendant from interfering with individual property owners who wish to provide housing opportunities.

Ibid. The Seventh Circuit analyzed these factors and concluded that

546

this was a "close case" that required further fact-finding at the trial court level. Id. at 1893-1894. After the case was sent back to the district court, the parties reached a settlement.*

9) Joseph Skillken & Co. v. City of Toledo, 528 F.2d 867 (6th Cir. 1975), vacated and remanded to, 429 U.S. 1068, decision adhered to, 558 F.2d 350 (6th Cir.), cert. denied, 434 U.S. 985 (1977). This exclusionary zoning suit had a number of factual similarities to Arlington Heights, but the Sixth Circuit took a much different approach to the law. In its first decision, the court found no purposeful discrimination on the part of the defendants and ruled in their favor, not bothering to distinguish between the plaintiffs' Title VIII claim and their equal protection claim. While the plaintiffs were seeking certiorari, the Supreme Court decided Arlington Heights, which confirmed the Sixth Circuit's view that purposeful discrimination was required under the Equal Protection Clause but which left the Title VIII standard unresolved (see Part II, Case #3, supra). The Supreme Court then vacated the Sixth Circuit's decision in Skillken and remanded the case for reconsideration in light of Arlington Heights. The hint implicit in this remand -- that Title VIII might have a different standard from the Equal Protection Clause -- was lost on the Sixth Circuit. In a brief opinion, it simply adhered to its prior determination that the defendants should win, again failing to treat the Title VIII claim separately from the equal protection claim. For some years, this remand decision was read by some observers as a conscious rejection by the Sixth Circuit of the discriminatory effect theory under Title VIII. In subsequent opinions, however, this court has made clear that Skillken was not an authoritative interpretation of Title VIII (see United States v. City of Parma, Ohio (Case #12 infra)), and that in fact the Sixth Circuit does endorse the effect theory in Title VIII cases (see Arthur v. City of Toledo, Ohio (Case #16 infra)).

10) Resident Advisory Board v. Rizzo, 564 F.2d 126 (3d Cir. 1977), cert. denied, 435 U.S. 908 (1978). In this exclusionary land-use case, the Third Circuit examined Title VIII's legislative history in

547

some detail and held that §3604(a) could be violated by a showing that the defendant's action had a racially discriminatory effect. 564 F.2d at 146-148. The opinion then discussed the nature of the burden that would shift to the defendant once the plaintiff establishes a prima facie case based on discriminatory effect. According to Rizzo, a defendant in these circumstances must show a justification for his action that serves a legitimate, bona fide interest, and he must also show that "no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." Id. at 149. Because the defendants in Rizzo failed to satisfy this burden, the Third Circuit held that they had violated Title VIII.

11) Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032 (2d Cir. 1979). In this Title VIII-§1982 case, the Second Circuit found the evidence sufficient to establish the defendant's racial motive, but it also endorsed the discriminatory effect theory for purposes of §3604(a). The opinion is significant, because it explicitly holds that an earlier Second Circuit decision -- Boyd v. Lefrak Organization (Case #4 supra) -- is not inconsistent with this view. The Robinson opinion read Boyd as concluding only that the plaintiffs there had failed to show racial motivation, a conclusion that "does not imply that proof of motivation was required in order for the plaintiffs to establish a prima facie case." 610 F.2d at 1038 n.10.

NOTE: Subsequent district court opinions from the Second Circuit have cited Robinson for the proposition that a prima facie case under Title VIII may be established based on discriminatory effect. E.g., Parks v. Coleman, F-Hi Fair Housing--Fair Lending Rptr. ¶15,519, at p. 16,423 (D. Conn. 1985); United States v. Yonkers Board of Education, 624 F. Supp. 1276, 1292 n.11 (S.D.N.Y. 1985).

12) United States v. City of Parma, Ohio, 661 F.2d 562 (6th Cir. 1981), cert. denied, 456 U.S. 926 (1982). Here, the Sixth Circuit reviewed a trial court decision that had found violations of §3604(a) and §3617 based on actions by Parma that had both the purpose and effect of maintaining segregation in the city. The opinion below had specifically endorsed the discriminatory effect theory for such Title

## 548

VIII cases. See 494 F. Supp. 1047, 1054-1055 (N.D. Ohio 1980). On appeal, the defendants argued that this view was inconsistent with the Sixth Circuit's earlier decision in Shilliken (Case #9 supra). The Parma panel rejected this argument. It stated that Shilliken was not based "on a construction of Title VIII. In fact, the Fair Housing Act is not mentioned in any of the dispositive language of the opinion." 661 F.2d at 574. Having disposed of Shilliken, the Sixth Circuit in Parma went on to affirm the finding that the city had engaged in illegal discrimination and, with some modifications, also affirmed the broad remedial order entered by the district court. The Parma opinion does not contain a ringing endorsement of the effect theory, but it does serve to undercut whatever precedential value Shilliken may have had as a threat to that theory. It remained for a later case -- Arthur v. City of Toledo, Ohio (Case #16 infra) -- to establish the Sixth Circuit's clear acceptance of the discriminatory effect theory in Title VIII cases.

13) Halet v. Wend Investment Co., 672 F.2d 1305 (9th Cir. 1982). Here, the plaintiff challenged an apartment complex's "no children" policy on the ground that it would exclude a greater percentage of minority families than white families. The Ninth Circuit held that this claim stated a cause of action under §3604, concluding that: "Significant discriminatory effects flowing from rental decisions may be sufficient to demonstrate a violation of the Fair Housing Act." 672 F.2d at 1311. The case was remanded for a trial on the merits.

NOTE: For a post-Halet decision by a district court from the Ninth Circuit finding a Title VIII violation based on proof of discriminatory effect, see Keith v. Volpe, 618 F. Supp. 1132, 1147-1157 (C.D. Cal. 1985).

14) Smith v. Town of Clarkton, N.C., 682 F.2d 1055 (4th Cir. 1982). In this exclusionary land-use case, the Fourth Circuit held that practices with discriminatory effects could violate §3604. The opinion adopted the "four factor" approach to analyzing these cases developed by the Seventh Circuit in its remand decision in Arlington Heights (see Case #8 supra). The result of this analysis in Town of Clarkton led to a holding that the defendants had violated Title

## 549

VIII, although the Fourth Circuit noted that the evidence of the defendants' discriminatory intent was so strong that they would have been liable "under either the 'discriminatory effect' test or one requiring the showing of discriminatory intent." 682 F.2d at 1067.

15) Betsey v. Turtle Creek Associates, 736 F.2d 983 (4th Cir. 1984). Here, the Fourth Circuit held that a landlord's policy of evicting families with children had such a large disproportionate impact on black tenants that the policy would violate Title VIII, unless the defendant could justify it by a showing of "business necessity." Betsey was a "pure" discriminatory effect case. The trial court had found that the defendant's policy was not based on discriminatory intent, and the plaintiffs did not challenge this ruling in the court of appeals. The proof showed that the defendant's new "all-adult" policy resulted in 74.9% of the nonwhite tenants receiving eviction notices, while only 26.4% of the white tenants received such notices. The Fourth Circuit held that such statistics were sufficient to establish a prima facie case of discriminatory impact under Title VIII. 736 F.2d at 988.

Once such a showing is made, the court of appeals ruled that the burden shifts to the defendant to "prove a business necessity sufficiently compelling to justify the challenged practice [citing Griggs]." Ibid. According to Betsey, the proper analysis of this stage of an effect case under Title VIII varies depending on whether the defendant is a private entity or a public body. In private defendant cases, the Griggs "business necessity" test is appropriate, whereas cases against municipal defendants should employ the "four factor" analysis adopted in the Town of Clarkton case (see Case #14 supra). Id. at 988 n.5.

16) Arthur v. City of Toledo, Ohio, 782 F.2d 565 (6th Cir. 1986). Here, the Sixth Circuit endorsed the discriminatory effect theory in in a decision that rejected the plaintiffs' challenge to two referendum votes blocking low-income housing. The opinion agreed with the various other courts of appeals that have held that "at least under some circumstances a violation of [the Fair Housing Act]

551

Fourth (Cases #14 and #15) and the Ninth (#13) joined this group in the 1980s. The Second and the Sixth, after initial false starts (Cases #4 and #9), have now indicated their agreement (Cases #11, #12, and #16). The new Eleventh has no case of its own, but its announced policy of following the precedents of the old Fifth* puts it in the pro-effect group (Cases #1 and #2). Only the First, Tenth, and D.C. Circuits have not been heard from on this issue. Not a single court of appeals currently espouses the view that the effect theory is inappropriate for Title VIII cases.

Despite this consensus on the basic issue, there is a good deal of variety reflected in the court of appeals cases. First of all, many of the appellate decisions adopting the discriminatory effect theory involved defendants who were also shown to have engaged in intentional discrimination. Examples include Cases #1, #3, #6, #7, #11, and #14. Discriminatory effect and discriminatory intent are certainly not incompatible concepts, and a fair housing plaintiff may well pursue both theories in a single case. The endorsement of the discriminatory effect theory in these cases, however, may be viewed as having somewhat less precedential value than it would in cases where only proof of discriminatory effect was presented.

Second, it should be noted that there are in fact two different types of discriminatory effect cases under Title VIII. Historically, the more common type has involved exclusionary zoning or some other community-wide practice that is challenged on the ground that it perpetuates housing segregation in an entire area. No less than 8 of the decisions reviewed in Part III are of this variety (see Cases #2, #5, #8, #9, #10, #12, #14, #16). The other type of effect case challenges a housing practice because it has a greater adverse impact on minorities than on whites. This "disproportionate impact" type of discrimination effect case has been well known in the employment discrimination field ever since Griggs,** but it has been less common in Title VIII cases. An example of this type of effect case in the housing field is Case #15, Betsey v. Turtle Creek Associates.

---

550

can be established by a showing of discriminatory effect without a showing of discriminatory intent." 788 F.2d at 574. The approach to these cases adopted in Arthur was a modified version of the "four factor" analysis developed by the Seventh Circuit in its remand decision in Arlington Heights (see Case #8 supra). The Sixth Circuit decided to adopt three of these four factors, choosing not to consider Factor #2 (evidence of the defendant's intent). Id. at 575. Applying this version of the effect test to the case at hand, the court of appeals held that the challenged referenda did not have a sufficient racial impact to violate Title VIII. Id. at 575-577.

IV. Analysis and Conclusions

The issue of whether Title VIII bans practices with discriminatory effects as well as those based on discriminatory intent must still be considered unresolved. The language of the statute is silent on this matter. The legislative history, though supportive of a broad reading of the law, is not conclusive. The Supreme Court has shown a willingness to interpret Title VIII broadly, but has thus far denied all requests to review the effect theory under the statute. In other civil rights areas, the Court has often spoken on the "intent vs. effect" issue, but these decisions show too much variety to support a confident prediction as to the Court's eventual approach to Title VIII. The most persuasive of these precedents -- Griggs -- supports the effect theory, but more recent decisions suggest that the Court may now be favoring a more mixed ("under some circumstances") answer to the effect question.

Decisions of the federal courts of appeals are currently the principal source of authority on this issue. These decisions are reviewed in Part III. They reflect a strong consensus -- now approaching unanimity -- that Title VIII should be construed to prohibit discriminatory effects, at least "under some circumstances."

The Circuits that led the way in endorsing this view were the Third (see Part III, Case #10), the Fifth (Cases #1 and #2), the Seventh (Case #8), and the Eighth (Cases #3, #5, #6, and #7). The

552

Third, most of the lower court decisions that have applied the discriminatory effect theory in Title VIII cases have been based on only one provision of the statute: §3604(a). The rest have involved §3604(b). There is no case law on the effect issue in cases based exclusively on §3604(c), §3604(e), §3605, or §3606. The point is that each section of Title VIII may have to be examined on its own with respect to the "intent vs. effect" issue instead of reaching an overall conclusion for the statute as a whole.

Fourth, endorsement of the effect theory certainly does not mean that the defendant will always lose. Many of the lower courts have required the plaintiff to prove a "significant" discriminatory effect in order to benefit from this theory and have gone on to rule that the plaintiff's proof failed to meet this burden.[4] If the plaintiff does prove a large enough discriminatory effect, the result is not an automatic victory. Rather, such a showing merely shifts the burden of proof to the defendant to justify his challenged practice on some non-discriminatory ground. The proper standard for evaluating the defendant's justification has caused some disagreement among the circuits (compare Cases #5, #8, #10, and #15), but, whatever the standard, the key point is that a defendant with a substantial justification for his policy can win a Title VIII effect case.

A final point should be noted. Whether or not the effect theory is adopted for purposes of Title VIII has simply not been a major issue in the fair housing field, at least in terms of the number of cases affected by it. The vast majority of Title VIII cases have been based exclusively on proof of the defendant's discriminatory intent. No doubt, this will continue in the future. As to those relatively few cases where the effect theory has been discussed, most would have reached the same result with or without the effect theory (i.e., either the defendant won or, if the plaintiff won, he would have won anyway based on proof of discriminatory intent). Of the 16 cases reviewed in Part III, only two (#8 and #15) probably would have been decided differently in the absence of the discriminatory effect

553

theory. This is not to say that the "intent vs. effect" issue is a trivial one. In certain types of large cases, it can be very important. And the "symbolic" value of giving Title VIII at least as generous an interpretation as Title VII has been accorded should not be overlooked. The fact remains, however, that the decision in most fair housing cases will not be changed by the resolution of the issue discussed in this paper.

FOOTNOTES

1 42 U.S.C. §§3601 et seq.

2 I have previously addressed this issue in Schwemm, "Discriminatory Effect Under Title VIII: A New Approach," 54 Notre Dame Lawyer 199 (1978). Other relevant writings include: Comment, "A Last Stand on Arlington Heights: Title VIII and the Requirement of Discriminatory Intent," 53 N.Y.U. L. Rev. 150 (1978); Note, "Justifying a Discriminatory Effect Under the Fair Housing Act: A Search for the Proper Standard," 27 U.C.L.A. L. Rev. 398 (1979); and four papers prepared by, respectively, John D. Calmore, Marshall D. Stein, Otto J. Hetzel, and Douglas W. Kmiec for a Consultation/Hearing of the U.S. Commission on Civil Rights in 1985 (Issues in Housing Discrimination: A Consultation/Hearing, Vol. 1, 77-142 (U.S. Commission on Civil Rights, November 12-13, 1985)).

3 42 U.S.C. §3602(f).

4 The phrase "because of" is used in §3604(a), §3604(b), §3604(d), and §3605; §3604(c) is directed toward discrimination "based on" race and other prohibited grounds; and §3606 uses the words "on account of."

5 Greyhound Corp. v. Mt. Hood Stages, Inc., 437 U.S. 322, 330 (1978); quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756 (1975) (Powell, J., concurring).

6 The relevant legislative history of Title VIII is reviewed in Schwemm, "Discriminatory Effect and the Fair Housing Act," 54 Notre Dame Lawyer 199, 207-212 (1978).

7 The floor amendment that eventually became Title VIII was sponsored by Senators Mondale and Brooke. Hearings on a proposal similar to the Mondale-Brooke amendment had been held by the Housing and Urban Affairs Subcommittee of the Senate Banking and Currency Committee in August, 1967, but no bill had been reported as a result of these hearings.

8 401 U.S. 424 (1971). The Griggs decision is discussed in Part II (Case #1) of this paper.

555

Senator SIMON. Thank you. Professor Schwemm, I know that my staff has the book that you have authored here: "Housing Discrimination Law," along with "The Housing Discrimination Law Supplement."

You described the law as not a terribly strong one, and you say that it is now imbalanced against the victim. Is what we have proposed here a reasonably balanced law?

Mr. SCHWEMM. I think if you are talking about an individual lawsuit, sir, the current law is not unfair to the victim who can afford legal counsel, which quite often is terribly expensive, and who has the time to engage in litigation. And you have to understand that the moment of being discriminated against in housing is not the time most individuals want to stop their life and engage in Federal litigation.

What this bill does, I believe, is say that the Nation as a whole is no longer going to rely almost exclusively on those individuals to enforce fair housing. A number of them have done so, by the way. Their efforts have been somewhat successful on an individual basis, but nationwide the enforcement effort has been not strong.

What this bill does through the administrative law judge technique is to say that if you file a complaint, there will be Federal help for that. The complaint can be processed; the case can be prosecuted; the structure of the Federal Government is available to help you enforce your rights.

And I might say one additional thing as a result of my experience on the Kentucky Human Rights Commission. The importance of having that effective procedure in place is not only how it is going to deal with the cases that actually come to hearing, but it is also going to encourage respondents to obey the law and take that process seriously before the hearing. Many cases will be settled. In our own experience in Kentucky we find, since we do have substantial cease and desist power and other power with respect to remedies, that a large number of cases never get to the hearing process; that the respondents see what is coming and they agree to settle in an appropriate fashion. You do not have that now because the respondents will understand that the HUD procedures have no teeth in them whatsoever.

Senator SIMON. Ms. Milstein, we talk about 36 million Americans being handicapped, but many of them may, for example, walk with a limp but may not be dramatically affected by the discrimination in housing.

Could you make any kind of a guess as to what are the numbers of Americans who face discrimination in housing because of disabilities?

Ms. MILSTEIN. I am not prepared to give you those figures today, Senator.

I would say simply, though, that you prefaced your question with a reference to people who have visible physical disabilities, and I suspect that you are quite right, that the numbers of people who have such serious physical disabilities that they need the kinds of accommodations that an earlier witness referenced today is a much smaller number than 36 million people.

On the other hand, the Congress very wisely included in the definition, as you are including, those having a history of a handicap

554

* A paper by Marshall D. Stein published in 1985 by the U.S. Commission on Civil Rights argues, to the contrary, that the statute was intended to be... the legislative history of Title VIII demonstrates that the statute was intended to establish a disparate-treatment standard. See Stein, "The Fair Housing Act of 1968 and the Civil Right Act of 1866: The Test for Liability in Housing Discrimination Cases," Issues in Housing Discrimination: A Consultation/Hearing, Vol. 1, 94-114 (U.S. Commission on Civil Rights, November 12-13, 1985). This paper represents a minority view and is, on close analysis, not convincing. For an effective rebuttal of the Stein paper; see Hetzel, "A Perspective on Legal Issues in Housing Discrimination," Issues in Housing Discrimination: A Consultation/Hearing, Vol. 1, 116-180 (U.S. Commission on Civil Rights, November 12-13, 1985).

[9] See Schwemm, supra note 6, at 210-211.

[11] 42 U.S.C. §3601.

[12] 114 Cong. Rec. 2699 (1968).

[13] 409 U.S. 205, 209 (1972).

[14] Id. at 209, 211, 212.

[15] 558 F.2d 1283, 1290 (7th Cir. 1977); cert. denied, 434 U.S. 1025 (1978). This decision is discussed in Part III (Case #8) of this paper.

[16] Even though General Building dealt only with §1981, that statute and §1982 are generally construed in similar fashion. Gittin v. Robinson, 545 F. Supp. 852, 880 (E.D. Va. 1982), aff'd, 733 F.2d 318 (4th Cir. 1984). After General Building, most lower courts have taken the position that §1982 is also to be governed by the discriminatory-intent standard. See, e.g., Vasquez v. Ferre, 779 F.2d 383, 387 (7th Cir. 1985); Phillips v. Hunter Trails Community Ass'n, 685 F.2d 184, 187 (7th Cir. 1982); In re Malone, 592 F. Supp. 1135, 1158-1159 (E.D. Mo. 1984).

[17] E.g., DiFilippo v. Morizio, 759 F.2d 231, 233-234 n.1 (2d Cir. 1985); Marable v. Walker, 704 F.2d 1219, 1221 (11th Cir. 1983); Bills v. Hodges, 628 F.2d 844 (4th Cir. 1980); Resident Advisory Bd. v. Rizzo, 503 F.2d 1303 (3d Cir. 1977); see generally Jones v. Alfred H. Mayer Co., 392 U.S. 409, 416-417 (1968).

[18] See 469 F. Supp. 836 (N.D. Ill. 1979), aff'd, 616 F.2d 1006 (7th Cir. 1980).

[19] See Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[20] Griggs v. Duke Power Co., 401 U.S. 424 (1971). The Supreme Court's decision in Griggs is discussed in Part II (Case #1) of this paper.

[21] See, e.g., Southend Neighborhood Improvement v. County of St. Clair, 743 F.2d 1207, 1209 (7th Cir. 1984); In re Malone, 592 F. Supp. 1135, 1167 (E.D. Mo. 1984); Schmidt v. Boston Housing Authority, 505 F. Supp. 988, 994-996 (D. Mass. 1981).

556

or being regarded as having a handicap. That handicap is described as substantially impairing a major life function.

Thus, when a landlord or an employer or an educator knows an individual has tested positive for tuberculosis, and wrongly assumes that that person has active tuberculosis and, therefore, denies that person the house or the benefit of the education program or the job, then that person is being discriminated on the basis of a perceived disability.

That vastly expands the numbers about whom we are talking.

Senator SIMON. So that even though the number of people who may be discriminated against may not be 36 million, in fact we are really talking about millions of Americans.

Ms. MILSTEIN. That is right.

Senator SIMON. Millions of Americans face this problem, not just a handful.

Ms. MILSTEIN. That is right, Senator.

Senator SIMON. Senator Kennedy.

Senator KENNEDY. Let me ask Professor Schwemm: There are those who say we should not pass this needed legislation until we address the issue they call "integration maintenance." Based on your knowledge of the law of housing, how would you respond to this position?

Mr. SCHWEMM. Well, sir, if this entire hearing room were the problem of housing discrimination in this country, then my small pen here would be the problem of integration maintenance. I want you to address the problem of housing discrimination in this country, and keep your eye on the major problem and do not be deflected by what turns out to be a fairly minor, in terms of number of situations involved, problem that the courts under title VIII are perfectly capable of dealing with if we ever get to a situation where litigation is involved.

There are, frankly, sir, more Law Review articles on this subject and more speeches on this subject than there are cases. My knowledge of it is that there are less cases than there are fingers on one hand. And when the cases do come, the courts are perfectly capable of dealing with it.

I have heard it said that some people argue they cannot understand the law. They are caught between a rock and a hard place. It is just not so, sir. They can understand the law. They can follow the law, and the law makes perfectly good sense, I believe.

Senator KENNEDY. There are some that say that we should not pass legislation until we address the issue of whether an intent test or effects test should govern housing discrimination. You made some reference to that in your opening comment. Would you develop that? Describe for the committee the state of the law in this area.

Mr. SCHWEMM. Yes, sir. Again, I think this is an area where title VIII, as it is currently written, is evolving in a correct fashion and does not need to be addressed in the amendments bill. The amendments bill is addressing problems that need to be addressed. This is not a problem area, and it does not need to be addressed.

For the 19 or so years since the 1968 act, there have been a few cases that have presented this issue. They have worked their way up to the Court of Appeals level. The Court of Appeals of the

557

United States have worked on this issue with some variety and subtleties, but in general a unanimity of approach that I think has probably been the reason that the U.S. Supreme Court has decided to deny certiorari in all of these cases.

It seems to me if you want to reach any conclusion from a denial of certiorari—and that is, of course, dangerous to do—but it may be that the U.S. Supreme Court has decided this issue is not necessary to review, because the Courts of Appeals are solving it.

If I had longer, I would be happy to go into a lengthy description. I do some of this in the paper about how there are some subtle differences in the case law with respect to the individual circuits, but they are working that out in the normal process. I think we should let them continue to work that out.

Senator KENNEDY. Ms. Milstein, you have given us important testimony with regards to the provisions in the legislation dealing with the handicap. Is it your sense that a great many, I think, red herrings have been raised about this issue about whether we are going to require various landlords to take in drug addicts and alcoholics?

Your testimony, particularly the paragraph of your testimony, was quite clear on this issue. Would you just state it once more about how we are going to distinguish between what is impermissible discrimination on the basis of handicapped and how we are going to sift out those cases which obviously we intend to sift out?

What would be the test? How would you define it in terms of that particular provision of the legislation?

Ms. MILSTEIN. Well, Senator, in the context of housing, unlike other contexts, the test is created by the landlord himself in a rental agreement. Rental agreements traditionally call for certain types of behavior on behalf of tenants. One has to be able to pay the rent; one has to be able to keep the apartment in a decent, safe and sanitary manner; one has to be able to live in such a way as to not interfere with his or her neighbors' enjoyment of their property.

The definition of handicap that this bill would include—and, in fact, the intent to cover people with disabilities under the Fair Housing Act—simply says to landlords and to homeowners:

You may not discriminate against an applicant for housing or a renter because that person has a disability. You are a landlord. That person is a renter. Your relationship with him is guided by the contract that both of you signed, or that you might sign.

And that is it. Those are the issues that are involved.

If, for example, someone rents an apartment, after having looked for many months because there are so few rental apartments now available, and goes out to celebrate, goes to a bar, is drinking a beer, and the landlady who has just rented him an apartment sees him drinking assumes that he is an alcoholic and wants to break the contract, she would be discriminating against that person because of her perception that he was an alcoholic and not because of any objective data that would lead to a rational decision as to whether that person would be a good tenant or not.

The Fair Housing Act's coverage of people with disabilities is really a very straightforward restatement of what this Congress and the courts have already said for the past many years, which is

# FAIR HOUSING AMENDMENTS ACT OF 1987

---

## TUESDAY, JUNE 9, 1987

U.S. SENATE,
SUBCOMMITTEE ON THE CONSTITUTION,
COMMITTEE ON THE JUDICIARY,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:21 a.m., in room SD-226, Dirksen Senate Office Building, Hon. Paul Simon (chairman of the subcommittee) presiding.

Also present: Senators Thurmond, DeConcini, Kennedy, and Specter.

Staff present: Deborah Leavy, chief counsel; Jeffrey Robinson, minority chief counsel; Cheryl G. Matcho, chief clerk; Margaret Morton, legislative fellow.

## OPENING STATEMENT OF SENATOR PAUL SIMON

Senator SIMON. The subcommittee hearing will come to order.

First of all, my apologies to my colleagues, Senator Kennedy and Senator Thurmond, and to witnesses for getting here late.

There is no issue that is really more fundamental than the ability to fulfill the American dream by having that home. When that opportunity, for whatever reason, is denied to people, we are impinging on that American dream in ways that are contrary to the best interests and ideas of this country. What we want to do is to make sure that that American dream can be and is a reality for people. That is ultimately what this legislation is all about.

We appreciate the witnesses being here. We set this hearing specifically so that Brad Reynolds, the Assistant Attorney General, could be here. He is not able to be here. We will reschedule for him, but, frankly, we are not going to postpone action on this matter indefinitely as a result of delays from some witnesses. We want to move ahead and get action on this legislation.

Let me call on my colleagues for any opening statements they may have.

Senator Thurmond.

Senator THURMOND. Thank you, Mr. Chairman. Mr. Chairman, this morning the subcommittee—suppose you let DeConcini go next. Let me clear my throat.

Senator SIMON. All right.

Senator Kennedy.

(559)

---

that we will not countenance discrimination because discrimination is not the fault of the victim, because of the victim's color or the victim's disability; it is the fault of those who insist on operating on the basis of unfounded, irrational generalizations.

Thank you very much, Mr. Chairman.

Senator SIMON. I thank both of you, as well as the earlier witnesses, for their testimony and I want to thank Senator Kennedy again for coming in and pinch-hitting for me.

The hearing stands adjourned.

[Whereupon, at 11:15 a.m., the subcommittee was adjourned.]

558

U.S. Department of Housing and Urban Development 

# Fair Housing—
# The Law in Perspective



## Twentieth Anniversary

## April 11, 1968–1988

U.S. Department of Housing and Urban Development 

# Fair Housing—
# The Law in Perspective

## Twentieth Anniversary
## April 11, 1968–1988



**Samuel R. Pierce, Jr.**
Secretary

**Judith Y. Brachman**
Assistant Secretary for Fair Housing and Equal Opportunity

**Jayne Gallagher**
Director, Office of Public Affairs

**John H. Waller**
20th Anniversary National Project Director

★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★

# Table of Contents

Foreword

Samuel R. Pierce, Jr., Secretary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Judith Y. Brachman, Assistant Secretary . . . . . . . . . . . . . . . . . . . . . . . . v
for Fair Housing and
Equal Opportunity

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

I. Racial Discrimination in the . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
United States from the
Colonial Period through 1950

II. Actions Leading to Passage of . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
the Civil Rights Act of 1968

III. Title VIII of the Civil Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Act of 1968

IV. Federal Role in Enforcement of . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
the Fair Housing Laws

V. Role of State & Local Fair Housing . . . . . . . . . . . . . . . . . . . . . . . . . 27
Enforcement Agencies

VI. Role of Housing Industry Groups . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VII. Role of Private Fair Housing Groups . . . . . . . . . . . . . . . . . . . . . . . 33

VIII. Federal Court Decisions Interpreting . . . . . . . . . . . . . . . . . . . . . . 38
& Applying the Fair Housing Laws

IX. Problems & Issues for the Future . . . . . . . . . . . . . . . . . . . . . . . . . 51

Appendix A   The Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Appendix B   Discrimination Complaints
Instructions & Forms
English
Spanish . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-3



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
THE SECRETARY
WASHINGTON, D.C 20410-0001

Dear Friend of Fair Housing,

April 1988 marks the twentieth anniversary of the passage of Title VIII of the Civil Rights Act of 1968, popularly referred to as the "Fair Housing Law". The act makes it unlawful to discriminate in the sale, rental or financing of housing because of race, color, religion, sex or national origin.

As part of the twentieth anniversary celebration, the Department has issued this brochure entitled "Fair Housing – the Law in Perspective", which traces the history of housing discrimination in America, the struggle to enact legislation to combat that discrimination, the ways in which the fair housing laws have been enforced, by both public and private efforts, and the interpretation of these laws by the courts. The brochure also points out the weaknesses in the current Fair Housing Law and the need for its revision.

Shortly after my arrival at HUD in 1981, I realized that the Fair Housing Law needed stronger enforcement provisions in order to be fully effective. In 1983, 1985 and 1986, and again this year, the Administration has proposed legislation that would put "teeth" into the Fair Housing Law. I am hopeful that this twentieth anniversary celebration will provide added impetus for the enactment of that legislation.

This Administration is fully committed to the fight against discrimination in housing. As President Reagan said this past February, when he signed into law the Housing and Community Development Act of 1987, "Too often – one case is too many – families and individuals seeking to buy or rent homes still confront bigotry and discrimination . . . such racism will not be tolerated."

Accordingly, I urge your continued support of the efforts to strengthen the Fair Housing Law.

Very sincerely yours,

Samuel R. Pierce, Jr.



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410-2000

OFFICE OF THE ASSISTANT SECRETARY
FOR FAIR HOUSING AND EQUAL OPPORTUNITY

April 1988

Dear Supporter of Fair Housing:

   Fair Housing is the right of every citizen in the United
States, and the Federal Fair Housing Law enacted in 1968
guarantees that right.

   This historical perspective of fair housing illustrates the
important strides that have been made toward eradicating housing
discrimination.  It demonstrates as well that the challenge of
equal access to housing still remains before us.

   To reach our goal, we must move forward in concert. The roles
of the public and private sectors are complimentary and working
together we can assure that all individuals, regardless of race,
color, religion, sex or national origin, have the same opportunity
to exercise their housing choices.

   As we observe the Fair Housing Law's 20th Anniversary, we
solicit your support and participation.  Fair Housing is a right,
everyone's right.

                    Very sincerely yours,

                    Judith Y. Brachman

                    Judith Y. Brachman
                    Assistant Secretary

# Acknowledgments

The planning for commemoration of the twentieth anniversary required a concerted effort and demanded the resources of the various offices of the Department. Offices of the Under Secretary, the Deputy Under Secretary for Intergovernmental Relations, the Deputy Under Secretary for Field Coordination, the General Counsel, the Assistant Secretary for Legislation and Congressional Relations, the Assistant Secretary for Administration, the Inspector General, the Assistant Secretary for Legislation and Congressional Relations, the Assistant Secretary for Policy Development and Research, and the Assistant Secretary for Community Planning and Development provided immeasurable support.

The Office of General Counsel, specifically, Charles M. Farbstein, Harry L. Carey and William R. Granik served as the authors and coordinators of this document.

The Task Force, with the responsibility of developing the overall plans for the commemoration was from the Office of Fair Housing and Equal Opportunity. The Task Force was chaired by John Waller, and Edrena Alexander, Sonya Bell, Ronald Branch, John Brown, Humberto Caballero, Thelma Cockrell, John Delbruegge, Virginia Flannagan, Howard Tutman, Barbara Hill, Sue Ireland, Myra Kennedy, Oscar Mims and Marie Rosado served as members.

# Introduction

The promise of the Fair Housing Law—Title VIII of the Civil Rights Act of 1968—is a marketplace where all individuals with similar financial means have a similar range of choices in the purchase, rental, or financing of housing regardless of race, color, religion, sex, or national origin. The changes that we have witnessed in the housing market in the past 20 years are significant. The pervasive, blatant discriminatory practices that restricted minorities' rights to housing choices are less prevalent. Yet our efforts to meet the goal of equal housing opportunity are not complete. Now we contend with subtle—but equally repugnant-discriminatory practices.

The Housing and Community Development Act of 1987 included legislation long sought by the Secretary of Housing and Urban Development, Samuel R. Pierce, Jr. This is the Fair Housing Initiatives Program, which authorizes funding of public and private organizations dedicated to ending discriminatory housing practices because of race, color, religion, sex, or national origin. When President Ronald Reagan signed this Act into law on February 5, 1988, he stated:

I'm. . . gratified by [the] provision of this bill which authorizes HUD to fund local, private organizations that are working to end housing discrimination. Too often—one case is too many—families and individuals seeking to buy or rent homes still confront bigotry and discrimination. Well, the fair housing initiative program section of this bill will help ensure that such racism will not be tolerated. Special thanks to Sam Pierce for leading the three-year fight for this program. . . .

Racial discrimination in this nation has a long and sorry history, dating back to the beginning of slavery on these shores three and one-half centuries ago. This publication recounts many of the highlights of that history, including the nation's struggle to abolish not only slavery but all of its evil progeny. Much remains to be done before all the vestiges of "the peculiar institution" are wiped out, but much has already been accomplished.

One vestige of racial discrimination which was not the subject of specific legislation until 1968 was housing.

This was the last of the major areas of discriminatory conduct to be singled out for specific legislative proscription. Not until twenty years ago did Congress pass Title VIII of the Civil Rights Act of 1968, known as the Federal Fair Housing Law, prohibiting discrimination in the sale, rental or financing of housing because of race, color, religion, sex, or national origin. What follows documents both the major accomplishments along the path toward eliminating housing discrimination and the roadblocks that remain. Americans must work together to reaffirm our dedication as a nation to the principles of equal opportunity on which the Fair Housing Law is grounded.

000849

This volume commemorates the twenty-year milestone since the passage of the Act, as part of the observance of April 1988 as Fair Housing Month in accordance with the President's Proclamation and Senate Joint Resolution 143.

# Fair Housing—The Law in Perspective

In 1968, the Fair Housing Law passed after several earlier attempts failed. The assassination of Dr. Martin Luther King during the period that Congress was considering fair housing legislation played a major role in the passage of the Act.

Although discrimination in housing because of race, color, religion, sex, or national origin is against the law, it nonetheless persists throughout the United States. A nationwide study conducted in 1977 provided definitive evidence that Blacks were still being discriminated against in the sale and rental of housing, long after the passage of Title VIII of the Civil Rights Act of 1968. Looking at the key issue of the availability of housing, the Housing Market Practices Survey showed that Black homeseekers were discriminated against 27 percent of the time in the rental market and 15 percent of the time in the sale market. Moreover, this effect is cumulative. A Black person who visits four rental agents could expect to encounter at least one instance of discrimination 72 percent of the time, a Black person visiting four sales agents could expect one or more instances of discrimination 48 percent of the time. Although there has not been a more recent nationwide study, information from local testing projects and other sources, as well as a continuing substantial volume of complaints and lawsuits, indicates that housing discrimination has not abated.

How can this be happening twenty years after passage of the Federal Fair Housing Law? To understand this discrepancy between the requirements of the law and the reality of the marketplace, it is necessary to go back to the beginning of the Colonial Period in America and look at the institution of slavery.

## I. Historical Perspective—Racial Discrimination in the United States from the Colonial Period through 1950

Slavery began in the United States in 1619, when a Dutch warship landed twenty Blacks in Jamestown, Virginia, where they were sold into servitude. Further "importations" soon considerably increased that number. However, it was not until about 1660 that Blacks were generally referred to as "slaves." Thereafter, complete control was exercised by the colonists over the Blacks, and the term "slave" was substituted for "servant."

Prior to the beginning of the 19th century, the denial of civil rights was not based wholly upon race. In those days the civil rights of a free white person depended in part on his birth and the extent of his property holdings. At that time, most of the Blacks in the United States were slaves but not all; there were over a hundred thousand Blacks, a tenth of the Black population, who were free and who were recognized as having some of the rights of free men. As far as the letter of the law was concerned, there was not a single Southern colony in which a Black man, who owned the requisite amount of property, and complied with other conditions, did not at some period have the legal right to vote. In other matters besides voting, some civil rights of free Blacks, such as the right to travel and the right to enter into contracts, were recognized at that time and for some time after. Even slaves in this period had some recognized rights.

However, slaves were considered to be chattels under the law and, as such, could not claim the protection given to the individuals under the Bill of Rights, ratified in 1791. The Constitution itself acknowledged the existence of slavery in Article 1, Section 2, which originally quantified slaves as three-fifths of a person each, for the purpose of determining the number of Representatives in Congress. By 1800, the status of slave had been firmly established in the United States.

Between 1800 and 1850, there was a widespread and determined effort to make slavery and race synonymous. This was primarily because of the rise and importance of the new "Cotton Kingdom" and the need of Black labor as the foundation of its prosperity. As a result of this, disfranchising laws aimed against Blacks were passed in Southern States, as for example, South Carolina and Virginia, and in many Northern States, including Pennsylvania, where there had been movement toward emancipation and the recognition of the Black as a citizen. Even in the absence of laws, custom narrowed the rights of free Blacks as to domicile, status in court and admittance to public places and facilities. The movement against the Black as freeman increased toward 1850 in the South and approached a caste system based on race. There were some exceptions, as among the free Black land and slave owners in Louisiana and artisans in cities such as Charleston and Richmond.

Between 1850 and the Civil War, the caste status of Blacks was firmly and almost universally established in the South and was increasing in the North. As one writer put it, "it was safe to say that the law regards a Negro

slave, so far as his civil status is concerned, purely and absolutely property, to be bought and sold and passed and descended as a tract of land, a horse, or an ox." The free Black became in the South a person often with fewer rights than a slave. As if to illustrate the pervasiveness of this view, in 1857, in the **Dred Scott** case, 60 U.S. 393, Chief Justice Taney declared for the United States Supreme Court that Blacks "had no rights or privileges but such as those who held the power and the government might choose to grant them." This situation persisted through the end of the Civil War.

**Civil Rights—Post Civil War**—On December 18, 1865, however, three years after President Lincoln signed the Emancipation Proclamation, the 13th Amendment, the anti-slavery amendment, was declared ratified. The 14th Amendment, containing the due process clause and the equal protection of the laws clause, was declared ratified July 28, 1868. The Supreme Court of the United States has for many years interpreted the due process clause of the 14th Amendment to protect individuals against State action depriving them of many of the rights guaranteed by the first 10 amendments to the Federal Constitution. These rights are considered basic, and an abridgement of them by government is a denial of liberty and justice without due process of law. Similarly, in the area of racial discrimination, the due process clause of the 5th Amendment, in its application to the Federal Government, has been construed by the United States Supreme Court to be practically co-extensive with the equal protection clause of the 14th Amendment.

In the period following Lincoln's death, many Southern States passed laws, commonly known as Black Codes, that threatened the vitality of the 13th Amendment by the reimposition of harsh constraints on Blacks. Congress responded by passing numerous civil rights laws to give Blacks the protection of basic rights which were recognized in white persons. Among these was the Civil Rights Act of 1866, which contained a provision that gave all citizens the same rights as white citizens to inherit, purchase and sell real and personal property. This provision was reenacted in 1870 after ratification of the 14th Amendment to the Constitution of the United States. However, many other civil rights laws were either repealed or declared unconstitutional. In the **Civil Rights Cases**, the United States Supreme Court held that the 14th Amendment applied only to State action and did not cover private acts of discrimination.

**Separate but Equal**—Thirteen years after the **Civil Rights Cases** were decided, the United States Supreme Court, in the case of **Plessy v. Ferguson**, 163 U.S. 537 (1896), established the "separate but equal" doctrine holding that a Louisiana statute, requiring railroad companies carrying passengers in their coaches in that State to provide separate but equal accommodations for the white and colored races, was not in conflict with the 13th and 14th Amendments to the Constitution of the United States. Justice Harlan in his memorable dissent said, "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens."

For many decades following this decision of the Supreme Court, Blacks were plagued with separate, but not always equal, accommodations in hospitals, schools, parks, swimming pools and many other facilities. For many years the Federal Government supported the "separate but equal" doctrine in the program providing Federal financial assistance for low income housing.

**Racial Zoning and Restrictive Covenants**—At the turn of the century, many municipalities separated the races by zoning. Discriminatory zoning, however, was declared unconstitutional by the Supreme Court of the United States in the case of **Buchanan v. Warley,** 245 U.S. 60 (1917). (See discussion of this case in Part VIII, below.)

The restrictive covenant came into general usage after the zoning decision, to accomplish the same purpose as restrictive zoning, to prevent designated racial, ethnic and religious minorities from living in certain residential areas. These covenants were very effective in depriving Blacks of free choice in housing. In 1948, however, the Supreme Court of the United States decided that the 14th Amendment prohibited State courts from enforcing racially restrictive convenants in **Shelly v. Kraemer,** 334 U.S. 1. In a companion case, the Supreme Court held that the Federal courts were also prohibited from enforcing racially restrictive convenants, **Hurd v. Hodge,** 334 U.S. 24. In the latter case, the court cited the Civil Rights Act of 1886 but said that, even in the absence of the statute, "It is not consistent with the public policy of the United States to permit federal courts in the Nation's capital to exercise general equitable powers to compel action denied the state courts where such state action has been held to be violative of the guaranty of the equal protection of the laws." (See discussion of these cases in Part VIII, below.)

Prior to these decisions, the Federal Housing Administration, in the administration of its mortgage insurance programs, encouraged lending institutions, builders, and real estate brokers in maintaining segregated housing patterns. After the decisions on racial covenants, however, the Federal Housing Administration promulgated regulations prohibiting the insurance of mortgages on property encumbered by racially restrictive covenants after February 15, 1950. The Veterans Administration issued regulations, in its mortgage guarantee program, which produced virtually the same result.

## II. Actions Leading to the Passage of the Civil Rights Act of 1968

**Voluntary Home Mortgage Credit Program**—On January 25, 1954, President Eisenhower, in his message to Congress on "Housing Program," stated:

"It must be frankly and honestly acknowledged that many members of minority groups, regardless of their income or their economic status, have had the least opportunity of all our citizens to acquire good homes." Discussing the several steps the Government would take to

relieve this situation, the President said, "And we shall encourage adequate mortgage financing for the construction of new housing for such families on good, well-located sites."

The Congress in 1954 established the Voluntary Home Mortgage Credit Program as part of the Housing Act of 1954. Its primary function was to make FHA-insured and VA-guaranteed loans available to minority groups and to persons in remote areas and small communities.

The United States Commission on Civil Rights in 1961, in its report on Housing, stated:

> "The VHMCP...marked the first formal governmental recognition that minority citizens needed special assistance to equalize their opportunity to obtain home financing."

**Brown v. Board of Education—Effect on "separate but equal" doctrine**—The United States Supreme Court, in 1954, in the case of **Brown v. Board of Education,** 347 U.S. 483, outlawed the "separate but equal" doctrine as applied to public schools. This decision was followed by other rulings outlawing separation of the races on buses, beaches, and municipal golf courses, and in parks and other public facilities. Two Federal Courts of Appeals ruled that government enforced segregation in public housing was unconstitutional.

The decision of the United States Supreme Court in **Brown v. Board of Education, supra,** injected new life into the civil rights movement in the United States. When Governor Faubus, in September 1957, used the Arkansas National Guard to bar Black students from admission to public schools in Little Rock, President Eisenhower responded by ordering Federal troops to protect the students. In the same year, Congress enacted the Civil Rights Act of 1957, which created the United States Commission on Civil Rights to study civil rights problems and report to the President and the Congress.

The **Brown** case was the forerunner of many actions by States and each of the three branches of the Federal Government which led ultimately to the enactment of many State fair housing laws, the issuance of the Executive Order on Equal Opportunity in Housing, and the enactment of the Civil Rights Act of 1964 and the Civil Rights Act of 1968 containing a Federal Fair Housing Law.

**Early Action by States**—States generally took the lead in the enactment of civil rights legislation, and this was true of fair housing legislation. By 1961, 17 states had acted in this field. The United States Commission on Civil Rights, in its 1961 report to the President on housing, noted an evolutionary pattern in the enactment by States of anti-discrimination legislation. The States generally directed their legislative efforts at discrimination in public accommodations, then employment and finally housing. There has also been an evolutionary pattern in the development of State fair housing laws. Discrimination in publicly assisted housing was generally attacked before

discrimination in private housing. Most State fair housing laws went through a process of amendments of a broadening and strengthening character. No State statute, however, covered private housing prior to 1959.

**Executive Order 11063**—Executive Order 11063 on equal opportunity in housing was issued by President Kennedy on November 20, 1962. It represented a strong statement of national fair housing policy on the part of the Executive Branch of the Government. Prior to the issuance of the order, there had been some action by the Executive Branch to indicate support for fair housing. In 1948, President Truman issued an Executive Order directed at the elimination of discrimination in the armed services, including discrimination in housing. In 1954, as previously stated, Congress established the Voluntary Home Mortgage Credit Program, and in 1961, the Federal Home Loan Bank Board expressed its opposition to discrimination because of race, color, or creed by the institutions it supervised "as a matter of policy."

The issuance of an order was recommended to the President in 1961 by the United States Commission on Civil Rights, which had made an exhaustive study of housing discrimination in this country. The Commission had previously found that housing was "the one commodity in the American market. . .not freely available on equal terms to everyone who can afford to pay." The Commission recommended the issuance of an order which would cover all programs involving Federal financial assistance for housing and related facilities. It also recommended coverage, either by executive order or by Congressional enactment, of the agencies in the Federal Government which supervised the financial community, including the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Federal Home Loan Bank Board, the Federal Savings and Loan Insurance Corporation and the Comptroller of the Currency. The position of the Commission was strongly supported by the civil rights groups.

A basic issue involved in carrying out these recommendations was whether the President had legal authority to issue an order requiring Federal agencies, providing financial assistance for housing and other related facilities, to insist upon non-discriminatory conduct by the recipients of this assistance. The Executive Order responds to this in the preamble by stating that "the granting of Federal assistance for the provision, rehabilitation, or operation of housing and related facilities from which Americans are excluded because of their race, color, creed, or national origin is unfair, unjust, and inconsistent with the public policy of the United States as manifested in its Constitution and laws," and that "the executive branch of the Government, in faithfully executing the laws of the United States which authorize Federal financial assistance, directly or indirectly, for the provision, rehabilitation, and operation of housing and related facilities, is charged with an obligation and duty to assure that those laws are fairly administered and that benefits thereunder are made available to all Americans without regard to their race, color, creed, or national origin."

Another basic issue which had to be resolved before the issuance of the Executive Order was whether the President had authority to make the Executive Order retroactive in application. This legal issue was averted by the President directing the Housing and Home Finance Agency (the predecessor of the Department of Housing and Urban Development) and all other executive departments and agencies to use their "good offices" and to take other appropriate action permitted by law, including the institution of appropriate litigation, if required, to promote the abandonment of discriminatory practices with respect to residential property and related facilities provided with Federal assistance prior to the issuance of the order.

The Executive Order established the President's Committee on Equal Opportunity in Housing. The Committee consisted of the Secretaries of Treasury, Defense, and Agriculture, the Attorney General, the Housing and Home Finance Administrator, the Administrator of Veterans Affairs, the Chairman of the Federal Home Loan Bank Board, a member of the staff of the Executive Office of the President, who acted as Chairman, and members selected by the President from the general public. The basic function of the Committee was to recommend general policies and procedures to implement the order. It had no authority to issue rules and regulations which would be binding on Federal agencies. The Committee also had the responsibility to take appropriate steps to promote the coordination of the activities of departments and agencies under the order. (After the passage of the Federal Fair Housing Law in 1968, the Committee ceased to function. On July 1, 1968, the members of its staff were transferred to the Office of Equal Opportunity in the Department of Housing and Urban Development. The Executive Order, however, remained in effect).

The order directed all Federal departments and agencies to take appropriate action to prevent discrimination based on race, color, creed or national origin in the sale, rental or use of residential property and related facilities (including land to be developed for residential use) if:

(1) owned or operated by the Federal Government;
(2) thereafter provided through grants, loans or contributions by the Federal Government;
(3) provided by loans thereafter insured, guaranteed or otherwise secured by the credit of the Federal Government; or
(4) located in federally-assisted urban renewal areas, where the loan and grant contract was executed after the effective date of the order.

The order covered lending practices of lending institutions with respect to residential property and related facilities only insofar as such practices related to loans thereafter insured or guaranteed by the Federal Government.

The President determined not to cover the agencies supervising and regulating the banks and savings and loan associations. He also decided against retroactivity.

The failure to cover existing housing previously financed by the Federal Government was most significant in the low-rent public housing program, which at the time of the issuance of the order covered approximately one half million units, and in the FHA multi-family mortgage insurance programs covering hundreds of thousands of units.

The coverage of the Executive Order was relatively narrow, primarily because it did not include any housing which was conventionally financed. Furthermore, its mandatory provisions were limited to housing provided with Federal financial assistance subsequent to the issuance of the order; and the "good offices" provision, relating to housing provided with Federal financial assistance before the issuance of the order, was precatory in nature and therefore not calculated to produce significant results. The coverage of the Executive Order was further limited by administrative action. Both the Federal Housing Administration and the Veterans Administration, by regulation exempted from coverage one and two family owner-occupied houses.

The departments and agencies primarily affected by Executive Order 11063 were the Federal Housing Administration (FHA), in its mortgage insurance programs; the Veterans Administration, in its direct loan and mortgage guarantee programs; the Public Housing Administration, in its low rent public housing program; the Urban Renewal Administration, in its urban renewal and related programs; and the Farmers Home Administration, in its rural housing programs. The various Federal agencies implemented the order by the issuance of many regulations, directives and procedures, including complaint procedures.

One of the most significant actions taken by the Federal Government was to require local public agencies carrying out the federally-aided urban renewal programs to incorporate in deeds to developers a nondiscrimination covenant running with the land.

At the end of 1980, the Executive Order was amended by the addition of a prohibition against sex discrimination, and by the addition of the word "religion" to clarify the scope of the order with respect to "creed."

Shortly after the Executive Order was issued, pressures arose for its extension to cover existing housing previously financed by the Federal Government and loans, and housing provided by loans, from lending institutions supervised by the Federal agencies. The debate on expansion of coverage related to both policy and law. An argument was made in favor of an expansion of the order so that all builders would be treated equally and would be covered, whether the housing was conventionally financed or financed with Federal assistance. It was pointed out, in favor of expansion, that Congress had expressed its view in favor of Fair Housing in its policy statement in the Housing Act of 1949, in which it established as a national housing objective "...a decent home and a suitable living environment for every American family." In addition, proponents frequently cited 42 U.S.C. 1982, derived from the Civil Rights Act of 1866, referenced above, which provides: "All citizens of the United States shall have the same right,

in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." It was also pointed out that the United States Supreme Court had acted in outlawing discriminatory zoning and racial covenants and that Federal appellate courts had held that discrimination by local housing authorities in operating under the Federal low-rent public housing program violated the 14th Amendment to the United States Constitution.

The legal argument supporting an expanded order had many facets. As far as low-rent public housing was concerned, the constitutional argument was urged. In relation to FHA-insured multi-family housing, it was argued that FHA in its regulatory agreements retained considerable control over the operation and management of the projects as to rentals or sales, charges, capital structure, rate of return and methods of operation. Moreover, in one program, in which the owner-mortgagor was a corporation, FHA was the sole holder of preferred stock in order to effectuate these controls. It was contended that, since the statute gave FHA authority to regulate the "methods of operation," it certainly could prohibit discrimination in view of the public policy of the United States on this issue.

The debate over coverage of the financial supervisory agencies was centered on the Federal Deposit Insurance Corporation (FDIC) and the Federal Home Loan Bank Board (FHLBB). Most homes were being financed through conventional mortgages, primarily through commercial banks, mutual savings banks and savings and loan associations. Most of these institutions were supervised by one or more Federal agencies. The national banks were chartered and supervised by the Comptroller of the Currency and had their accounts insured by FDIC. FDIC also insured State chartered banks which were members of the Federal Reserve System. In addition, FDIC also insured some State banks which were not members of the Federal Reserve System. The percent of the Nation's commercial banks not FDIC-insured was inconsequential. Also, all Federal savings and loan associations which were chartered by the Federal Home Loan Bank Board were insured by the Federal Savings and Loan Insurance Corporation (a constituent agency of the FHLBB), and a substantial number of State-chartered savings and loan associations also had their accounts insured by that agency. Associations holding all but a small percentage of savings of loan resources had their accounts insured by the Federal Government.

Supporters of an extended Executive Order contended that FDIC and FHLBB were created with a principal purpose of facilitating community credit, of which housing credit is a major aspect. It was contended further that these agencies possessed ample regulatory and discretionary authority to prohibit discrimination, in furtherance of the national policy.

There was considerable doubt in legal circles as to whether the President had authority to direct FDIC and FHLBB to take these actions.

Some supporters of an expanded order urged the President to direct the Federal agencies supervising lending institutions to take action not only

to eliminate discriminatory lending practices but also to require the lending institutions in turn to require their borrowers to refrain from discriminatory practices in the sale and rental of housing. This raised additional legal issues.

**Forces for and Against Fair Housing**—Concomitant with the development of fair housing laws, particularly in the decade of the 60's, voluntary groups were organized in many States throughout the country in the form of fair housing committees. It was the prime objective of these committees to foster fair housing and to assist minority families in obtaining housing in areas which were formerly closed to them. Some were organized to find housing in the desirable price ranges for minority families, and others concentrated their efforts on obtaining fair housing pledges indicating that the pledgor would welcome minority families into his or her neighborhood. Other fair housing groups were active in neighborhood stabilization efforts to prevent integrated neighborhoods from becoming all Black. Fair housing groups took an active part in proposing and recommending fair housing legislation and monitoring the activities of the Federal and State governments to assure that fair housing legislation was properly administered and to assure that housing provided with governmental assistance for families of low- and moderate-income was made available to such families. Several thousand fair housing groups were organized in the United States. In recent years, some of these groups have been consolidated in metropolitan areas.

Churches and synagogues of all denominations and labor groups were very active in the 60's in support of fair housing. They were represented in practically all national civil rights groups and played a supportive role with the local fair housing committees. Many such groups also formed non-profit organizations to develop housing for low- and moderate-income families with Federal financial assistance.

For years fair housing was opposed by many segments of the population. For example, opposition to fair housing was evidenced in the State of California when a proposed amendment to the State Constitution was subjected to a referendum in the 1964 general election. The amendment, known as Proposition XIV, prohibited the State or any political subdivision or agency thereof from limiting or abridging, directly or indirectly, the right of any "person" to decline to sell or rent his property to any other person. The Supreme Court of California refused to issue a writ of mandamus to keep the referendum off the ballot. However, in its decision it expressed grave doubts as to constitutionality of the referendum proposition under the 14th Amendment to the Constitution of the United States. Proposition XIV was overwhelmingly approved in the referendum. The United States Supreme Court, in the case of **Reitman** v. **Mulkey**, 387 U.S. 369 (1967), affirmed a decision of the Supreme Court of California holding that Proposition XIV was unconstitutional.

In the middle 60's, referenda against local fair housing ordinances were successful in a number of cities. However, the Supreme Court, in a decision involving a referendum in Akron, Ohio, held that, where the reality of

the local action falls most heavily on minorities seeking their rights, a violation of the constitutional right to equal protection of the laws occurs. **Hunter** v. **Erickson**, 39 U.S. 385 (1969).

The contention of opponents to fair housing laws, that they violated basic property rights, was successfully refuted by the argument that the courts have repeatedly held that property rights are not absolute and have sustained laws restricting property rights, such as zoning laws, building codes and rent control.

**The Civil Rights Act of 1964**—Neither President Kennedy nor President Johnson expanded coverage of the Executive Order on Equal Opportunity in Housing. However, they recommended to the Congress broad civil rights legislation covering voting, public accommodations, education and Federal financial assistance programs. After bitter and prolonged debate in the House of Representatives and the United States Senate, the Civil Rights Act of 1964 was enacted by the Congress and approved by President Johnson on July 2, 1964. The peaceful march of several hundred thousand Americans on Washington in 1963 in the cause of civil rights spurred Congressional action.

Housing provided with Federal financial assistance after the effective date of regulations implementing Title VI, albeit with significant exceptions, is covered by this title of the 1964 Act. Section 601 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." This provision laid down a strong national policy against discrimination in any program or activity financed by the Federal Government and, as far as housing is concerned, supported the Executive Branch's pronouncement in President Kennedy's Executive Order.

Section 602 directs all Federal departments and agencies providing financial assistance to any program or activity by way of grant, loan, or contract, other than a contract of insurance or guaranty, to issue rules and regulations or orders of general applicability consistent with achievement of the objectives of the statutes authorizing the financial assistance. It provides that the rules, regulations and orders shall not be effective until approved by the President. It provides further that compliance with the requirements may be affected by the termination or refusal to grant or to continue assistance to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement. But such termination or refusal is limited to the particular political entity, or part thereof, or other recipient as to whom such finding has been made, and is limited in its effect to the particular program, or part thereof, in which such non-compliance has been found. Section 602 also provides that compliance may be effected by any other means authorized by law. No compliance action, however, can be taken unless the agency has notified the recipient of its non-compliance and has determined that compliance cannot be attained by voluntary means. In the case of a cut-off of

000861

funds, the Federal department or agency is required to file, with the committees of the House and Senate having legislative jurisdiction over the program or activity involved, a full written report of the circumstances and the grounds for such action. The action does not become effective until 30 days after the filing of the report.

Section 604 of Title VI covers employment practices where a primary objective of the Federal financial assistance is to provide employment. Title VI has also been construed to cover employment practices in carrying out a program or activity provided with Federal financial assistance if the practice tends to deprive intended beneficiaries of the program of participation in or the benefits of the program or activity.

Title VI prohibits discrimination on the basis of race, color, or national origin, but not on account of creed or religion. The legislative history of Title VI indicates that discrimination on the basis of creed or religion was not considered a serious problem.

The reach of Title VI was broad. It initially covered many programs administered by the Federal government involving billions of dollars. It covered programs of Federal financial assistance for schools, hospitals, housing, roads, transportation and many other facilities, as well as for welfare, agriculture and business.

The possible conflict between Title VI and the Executive Order on Equal Opportunity in Housing was fully considered by Congress. After lengthy debate, the Congress added a provision to Title VI stating: "Nothing in this title shall add to or detract from any existing authority with respect to any program or activity under which Federal financial assistance is extended by way of a contract of insurance or guaranty." Consequently it was made clear that, although the FHA mortgage insurance programs and the VA mortgage guarantee program were not generally covered by Title VI, coverage of these programs by Executive Order 11063 was not affected by the enactment of Title VI.

A number of mortgage insurance programs administered by the Federal Housing Administration, enacted after Title VI became law, are subject to Title VI because, in addition to mortgage insurance, they involve Federal assistance.

In many situations, federally assisted housing is covered by both the Executive Order and Title VI. In such instances, no funds may be cut off without following the procedures outlined in Title VI. However, to the extent that there is discrimination with respect to the program or activity involving a contract of insurance or guaranty, the Executive Order can be invoked to impose sanctions for the violation, such as debarment from participation in all Departmental programs.

The legislative history of Title VI clearly indicates that Congress did not intend to cover the programs administered by the FDIC and the FHLBB.

In addition to Federal-aid programs for the provision of housing, Title VI covers the community development grant programs administered by HUD,

including the Community Development Block Grant and Urban Development Action Grant Programs.

Title VI may be violated in many ways, as far as housing is concerned. It may be violated most directly by discrimination in the selection of tenants or purchasers for housing. However, there are many more subtle acts of discrimination in housing programs covered by Title VI, such as: in the selection of sites for housing; in various forms of segregation within the housing; in the eviction of tenants; in appraisals; in providing services with housing accommodations; in determining eligibility for housing or for services in connection with the housing; in making relocation plans and making relocation payments; and in selecting housing for demolition, as opposed to rehabilitation.

However, despite the increased number of tools available to erase housing discrimination, the bulk of housing in the United States was not affected by either the issuance of the Executive Order or the enactment of Title VI, as neither covered housing which was conventionally financed or housing which was federally financed prior to the issuance or the order and the enactment of Title VI, except in the case of public housing.

**Legislative History of Title VIII of the Civil Rights Act of 1968**—The enactment of the Civil Rights Act of 1964 was a giant step forward in Congressional action for the protection of civil rights. In addition to Title VI, the Act covered voting rights, discrimination in public accommodations, desegregation of public facilities and desegregation of public education, granted additional powers to the United States Commission on Civil Rights, it also provided for equal employment opportunity and established in the Department of Commerce a Community Relations Service (transferred to the Department of Justice in 1966) with the function of providing assistance to communities in resolving disputes relating to discriminatory practices.

The movement to bring racial and ethnic minorities into the mainstream of American life was gaining momentum. In 1965, Congress enacted the Voting Rights Act of 1965. In 1966, the White House conference "To Fulfill These Rights" was held, and many significant recommendations were made in its report, to enhance these rights.

Significant strides in attaining civil rights for minorities were made after the enactment of the Civil Rights Act of 1964 and the Voting Rights Act of 1965. Public accommodations were generally opened to minorities; the dual school systems were breaking down; fair employment practices were becoming a reality; and hundreds of thousands of Blacks were voting for the first time. Housing was the one commodity on the American market not freely available on equal terms to everyone who could afford to pay.

Housing discrimination led to confinement in the ghettos, with all of its deprivations. The time was approaching for the Federal Government to take a strong stand against discrimination in housing. The opposition was powerful and very well organized.

In 1966, President Lyndon B. Johnson sent a message to Congress on the elimination of racial discrimination, in which he said:

"The fruits of the Voting Rights Act and of the Civil Rights Act of 1964 are already impressively apparent."

The President, in discussing discrimination in housing, said:

"We must give the Negro the right to live in freedom among his fellow Americans.

"I ask Congress to enact the first effective Federal law against discrimination in the sale and rental of housing.

"The time has come for the Congress to declare resoundingly that discrimination in housing and all the evils it breeds are a denial of justice and a threat to the development of our growing urban areas.

"The time has come to combat unreasoning restrictions on any family's freedom to live in the home and the neighborhood of its choice."

To carry out the recommendation contained in the President's message, the Administration proposed the "Civil Rights Act of 1966." The proposals were incorporated in H.R. 14765, introduced by Congressman Emanuel Celler, and S. 3296, introduced by Senator Philip A. Hart and 19 other Senators, including members of both parties. The provisions relating to fair housing were incorporated in Title IV of these bills.

Title IV prohibited discrimination in all housing without exception. It also prohibited discriminatory lending practices and discriminatory membership practices in any multiple-listing service or other services or facilities related to the business of selling or renting dwellings. Those bills contained no provision for administrative enforcement but authorized individuals to seek judicial relief from discriminatory practices. They also authorized the Attorney General to bring a civil action in any appropriate United States District Court in any case where there was a pattern or practice of discrimination.

Lengthy hearings on these bills were conducted by the Judiciary Committees of the Senate and the House of Representatives. The Senate Committee failed to report the bill. The Judiciary Committee of the House, however, reported the bill after making some very substantial amendments in the provisions relating to Fair Housing. The House Judiciary Committee incorporated in the bill provisions for administrative enforcement by a Fair Housing Board which would have powers similar to the National Labor Relations Board. It restricted coverage, however, in several ways. First, coverage was limited to real estate brokers and salesmen and others engaged in the business of housing, and secondly, it exempted owner-occupied dwellings containing four or fewer units, as well as certain housing operated by religious institutions and fraternal organizations.

H.R. 14765 was amended on the floor of the House to provide that no real estate broker, agent, or salesman or any of their employees or agents would be prohibited from complying with the express written instruction of any person not in the business of building, developing, selling, renting, or leasing dwellings, or otherwise not subject to the prohibition relating to the sale or rental of housing.

H.R. 14765 was bitterly debated in the Senate for several months without any action by that body.

A filibuster was conducted by a number of Senators against the fair housing provision, and several motions to close debate on a motion to take up this bill were defeated. However, support for the fair housing provision was growing in the Senate, as 54 Senators voted for cloture. On February 16, 1967, President Johnson sent another message to the Congress on Civil Rights, after a number of large cities experienced racial riots.

In this message, President Johnson said, in part:

"Last year I proposed that legislation because it was right and just.

"The civil rights legislation of 1966 was passed by the House of Representatives, and brought to the floor of the Senate. Most of its features commanded a strong majority in both Houses. None of its features was defeated on the merits.

"Yet it did not become law. It could not be brought to a final vote in the Senate.

"Some observers felt that the riots which occured in several cities last summer prevented the passage of the bill.

"Public concern over the riots was great, as it should have been. Lawlessness cannot be tolerated in a nation whose very existence depends upon respect for law. It cannot be permitted because it injures every American and tears at the very fabric of our democracy.

"We want public order in America, and we shall have it. But a decent public order cannot be achieved solely at the end of a stick, nor by confining one race to self-perpetuating poverty.

"Let us create the conditions for a public order based upon equal justice."

The Administration's proposed Civil Rights Act of 1967 contained provisions relating to discrimination relating to discrimination in housing. In some respects the proposal was substantially different from that contained in the Administration's proposed Civil Rights Act of 1966. The new legislative recommendations provided for coverage by progressive stages. In the first year, it would cover housing accommodations previously covered by the Executive Order on Equal Opportunity in Housing. During 1968, the coverage was to be increased to include all dwellings no part of which was occupied by the owner and dwellings for five or more families. In 1969, it would have covered all housing, with limited exemptions. The proposed legislation also would have outlawed discriminatory practices in financing housing and in providing real estate brokers' services, as well as blockbusting. The Secretary of Housing and Urban Development would have been authorized to administer the law.

The proposed Civil Rights Act of 1967 (S. 1026) was introduced by Senator Philip A. Hart and 26 co-sponsors on February 20, 1967, and it was referred to the Committee on the Judiciary. On the same day, a companion bill (H.R.

5700) was introduced in the House of Representatives by Congressman Emanuel Celler, Chairman of the House Judiciary Committee.

The House Judiciary Committee did not act on H.R. 5700, but reported another bill, H.R. 2516, a bill to prescribe penalties for certain acts of violence or intimidation and for other purposes, but which contained no fair housing title. It was amended by the House and passed by a roll call vote of 326 yeas to 93 nays. H.R. 2516, as passed by the House, was referred to the Senate Committee on the Judiciary on August 25, 1967, which reported it with an amendment on November 2, 1967, but no further action was taken on it during the remainder of the first session on the 90th Congress. The reported bill contained no fair housing title.

On January 18, 1968, action on H.R. 2516 was resumed in the Senate. During the debate, Senators Walter Mondale and Edward W. Brooke jointly offered a fair housing amendment to the bill. After further debate, the Mondale-Brooke amendment was tabled as part of a compromise under which Senator Everett Dirksen offered a substitute fair housing amendment. On March 1, 1968, within days of the submission of the Dirksen amendment, the Report of the National Commission on Civil Disorder was published. That report, known as the "Kerner Commission Report," concluded that our country was "moving toward two societies, one black, one white—separate and unequal." One of the recommendations of the commission was the enactment of a federal open housing law. Shortly thereafter, a Senate filibuster was broken, the Dirksen amendment was agreed to, and finally, on March 11, 1968, by a roll call vote of 71 yeas to 20 nays, H.R. 2516 was passed by the Senate. The bill contained 10 titles, of which Title VIII related to fair housing.

A resolution (H. Res 1100) was then introduced in the House providing for agreement to the Senate amendments and was referred to the Committee on Rules. Action on this bill was hastened by the assassination of Martin Luther King, Jr., and the urban riots which followed in its wake. The committee on Rules reported the resolution on April 9, 1968, and the House agreed to it on the following day by a vote of 250 yeas to 171 nays. This action cleared H.R. 2516 for the President. The President approved the bill the next day, and it was designated as Public Law 90-284. Upon signing the bill, the President stated in part:

"In the Civil Rights Act of 1964, we affirmed through law that men equal under God are also equal when they seek a job, when they go to get a meal in a restaurant, or when they seek lodging for the night in any State in the Union.

"Now the Negro families no longer suffer the humiliation of being turned away because of their race.

"In the Civil Rights Act of 1965, we affirmed through law for every citizen in this land the most basic right of democracy—the right of a citizen to vote in an election in his country. In the five States where the act had its greater impact, Negro voter registration has already more than doubled.

"Now, with this bill, the voice of justice speaks again.

"It proclaims that fair housing for all—all human beings who live in this country—is now a part of the American way of life."

During the several years of debate in Congress, proposals for fair housing legislation always received bipartisan support. The debates, to a considerable extent, centered on constitutional issues and the relationship between human rights and property rights.

Shortly after the enactment of Title VIII, the National Association of Home Builders, the National Association of Real Estate Boards and the Council of Housing Producers, consisting of eleven of the largest home builders in North America, indicated their support for fair housing. The American Bankers Association also pledged its support.

## III. Title VIII of the Civil Rights Act of 1968—Summary and Explanation

Title VIII of the Civil Rights Act of 1968, popularly known as the Federal Fair Housing Law, is broad in its coverage of housing. The law became applicable in stages. On the date of enactment, it covered dwellings owned and operated by the Federal Government or receiving Federal financial assistance after November 20, 1962, under agreements that were outstanding at the time of the passage of Title VIII. In general, on the date of enactment it covered housing accommodations which were previously covered by Executive Order 11063. It was estimated that initial coverage amounted to approximately one million units. On January 1, 1969, coverage was increased to approximately 20 million units, as Title VIII then applied to all housing except that which was specifically excepted. The prime exception related to single family houses in situations where the owner owed not more than three single family houses. Another exemption related to housing units in dwellings containing four or fewer units, one of which was owner-occupied. Other exemptions related to housing owned or operated by religious organizations and fraternal organizations which was operated for other than a commercial purpose. On January 1, 1970, coverage was increased to approximately 54 million units, as on that date single family houses became subject to the law if the dwelling was either sold or rented by a broker or the owner advertised the proposed sale or rental in a discriminatory manner.

The prohibitions against discrimination in Title VIII are also very comprehensive. They not only relate to the sale, rental or occupancy of housing but also specifically prohibit discriminatory lending practices, discriminatory membership practices in real estate brokers' organizations and multiple listing services, and blockbusting. Discriminatory advertising is prohibited. The 4th Circuit Court of Appeals has held that the Constitution permits Title VIII to prohibit the publishing by newspapers of discriminatory ads. **United States** v. **Hunter**, 459 F. 2d 205 (4th Cir. 1972).

The Secretary of HUD is authorized to administer Title VIII. The Secretary has authority to receive, investigate and conciliate complaints and broad powers to investigate complaints, including access to premises, records,

documents and individuals. The Secretary has the authority to issue subpoenas for the appearance of persons and production of documents and to issue interrogatories to a respondent and to administer oaths. He or she has no power, however, to issue cease and desist orders.

The Secretary is directed to refer complaints to State and local agencies administering fair housing laws and ordinances if such laws provide rights and remedies for discriminatory housing practices which are substantially equivalent to those provided in Title VIII and the alleged discriminatory housing practice appears to violate the State or local law. The Secretary also has authority to recall complaints if the State or local agency proceedings on the complaint are not initiated within 30 days or the proceedings are not thereafter carried forward with reasonable promptness.

Any person aggrieved by a discriminatory housing practice may file a civil action within a specified time after filing an administrative complaint with the Secretary, if the Secretary has been unable to obtain voluntary compliance. An aggrieved person may also, without regard to the filing of an administrative complaint with the Secretary, file a civil action in any Federal district court or any appropriate State or local court of general jurisdiction within 180 days after the occurrence of the alleged discriminatory housing practice. The plaintiff may obtain injunctive relief and may be awarded actual damages and not more than $1,000 in punitive damages, together with court costs and reasonable attorney's fees in the case of a prevailing plaintiff if in the opinion of the court he or she is unable to assume payment of attorney's fees.

Title VIII also makes provision for enforcement by the Attorney General, who may file a civil action in an appropriate Federal district court if the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by Title VIII or that any group of persons has been denied rights granted by Title VIII and such denial raises an issue of general public importance. The Department of Housing and Urban Development frequently refers such cases to the Department of Justice for appropriate action. (See discussion in Part IV, below.)

Section 817 of Title VIII makes it unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of rights protected by that title. Section 817 may be enforced by appropriate civil action.

Title VIII directs the Secretary to administer all programs and activities relating to housing and urban development in a manner affirmatively to further the policies of that title. All executive departments and agencies of the Federal Government are required to do likewise and to cooperate with the Secretary to further such purposes.

In carrying out these affirmative responsibilities, the Department of Housing and Urban Development entered into an agreement with the General Services Administration to cooperate in the selection of sites of Federal installations to make certain that there would be an adequate supply of housing on a non-discriminatory basis for persons of low and moderate income

who would be employees of the installation. The Department of Housing and Urban Development also cooperated with the Federal agencies supervising lending institutions in the making of a survey of all such institutions carrying on residential lending practices to determine whether such practices were being carried out on a nondiscriminatory basis. Those agencies, including the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Comptroller of the Currency and the Federal Home Loan Bank Board, have taken various actions including the issuance of regulations to assure that the lending institutions they supervise will comply with the provisions of Title VIII.

The Secretary is also empowered to make studies as to the nature and extent of discriminatory housing practices; to publish and disseminate reports on such studies; and to cooperate with and render technical assistance to Federal, State, local and other public or private agencies and institutions which are carrying on programs to eliminate discriminatory housing practices. The Secretary is also authorized to cooperate with State and local agencies administering fair housing laws and with their consent to use their services and employees with appropriate reimbursement.

Title VIII made provision for the appointment by the President, subject to confirmation by the Senate, of an additional Assistant Secretary in the Department of Housing and Urban Development. In the fall of 1968, the President appointed an Assistant Secretary for Equal Opportunity (later changed to Assistant Secretary for Fair Housing and Equal Opportunity). Subsequently, the Secretary of the Department of Housing and Urban Development delegated the authority to administer Title VIII to the Assistant Secretary, who also has primary responsibility in the Department for administering all laws and executive orders relating to civil rights.

Title VIII specifically provides that it shall not be construed to invalidate or limit any law of a State or political subdivision of a State or of any other jurisdiction that grants, guarantees, or protects the same rights that are granted by Title VIII. However, any law that purports to require or permit any action that would be a discriminatory housing practice under Title VIII shall, to that extent, be invalid.

The Assistant Secretary was given the Secretary's statutory responsibility to try to resolve complaints by informal methods of conference, conciliation and persuasion. Written conciliation agreements signed by complainants and respondents and by the Assistant Secretary or other designated HUD official may provide relief for the complainant by the respondent agreeing to sell or rent a sought dwelling unit and to pay the complainant a cash award for actual damages and humiliation. Agreements generally provide that the respondent take affirmative action to eliminate discrimination in sales and rental practices. In signing the conciliation agreement, the respondent generally does not admit commission of the acts of discrimination alleged by the complainant, and the complainant usually agrees to waive all rights of action against the respondent for the alleged discriminatory conduct.

The Secretary of Housing and Urban Development, in January 1969, issued complaint procedures pursuant to Title VIII, and the Assistant Secretary subsequently issued a field operations handbook instructing central office and field officials on the procedures for receiving, investigating and conciliating complaints. The Assistant Secretary also issued regulations relating to the display of a fair housing poster (24 CFR Part 110) and guidelines relating to discriminatory advertising. These guidelines have since been codified at 24 CFR Part 109 as the Fair Housing Advertising Regulation. The standards contained in this regulation have been generally accepted and used by advertisers and the advertising media throughout the United States. HUD has also issued regulations relating to the recognition of State and local fair housing laws and ordinances which are substantially equivalent to those provided in Title VIII (24 CFR Part 115).

HUD's Affirmative Fair Housing Marketing Regulations, contained in Subpart M of 24 CFR Part 200, are applicable to all of the HUD housing programs, both subsidized and unsubsidized, administered by the Assistant Secretary for Housing—Federal Housing Commissioner. Developers of such housing are required to meet certain affirmative fair housing marketing requirements, including the submission of an affirmative fair housing marketing plan for compliance with the regulations, with respect to each project applied for. Affirmative fair housing marketing requirements are also contained in other Departmental program regulations, such as the Section 8 Housing Assistance Payments Program Regulations for New Construction and for Substantial Rehabilitation, 24 CFR Parts 880 and 881.

**Amendment to Prohibit Sex Discrimination**—In 1974, Congress amended Title VIII by adding the word "sex" to the previous prohibitions based on race, color, religion and national origin. The intent of Congress in adopting this amendment was to end discriminatory practices based on sexual stereotype, such as refusal to rent or to make a housing loan because of the sex of the applicant, total or partial failure to count a woman's income, and discriminatory terms and conditions for rental.

**Executive Order 12259**—On December 31, 1980, President Carter issued Executive Order 12259 to assure interagency coordination and effective implementation of the administrative responsibilities of Title VIII. Section 808(e)(5) requires the Secretary of HUD to administer the programs and activities relating to housing and urban development in a manner affirmatively to further fair housing. HUD has included such fair housing requirements in many of its program regulations. Other Executive agencies are required by section 808(d) to administer their programs relating to housing and urban development in a manner affirmatively to further fair housing and are directed to cooperate with the Secretary of HUD in furthering the goal of fair housing.

Executive Order 12259 re-emphasizes the mandate of Title VIII which provides the Secretary of Housing and Urban Development with the responsibility for the administration of Title VIII; stipulates the leadership and coordination role of the Department of Housing and Urban Development and states the responsibility of all other Executive agencies with respect to the

preparation and implementation of regulations and procedures which will further fair housing; requires all agencies to use informal and formal means to remedy violations of regulations or procedures adopted pursuant to the order; sets a timetable for implementation for the order by all Executive agencies; and directs HUD to submit an annual report to the President noting the progress made by the Federal government in furthering fair housing objectives.

## IV. Federal Role in Enforcement of the Fair Housing Laws

### Processing of Title VIII Complaints by HUD

**Regular Processing**—Any person or organization who alleges injury because of discrimination with respect to the sale, rental or financing of housing in violation of Title VIII may file a complaint with HUD within 180 days of the alleged discriminatory act. Regulations governing the processing of fair housing complaints are contained at 24 CFR Part 105. An aggrieved person may state a complaint in a letter or use a HUD complaint form so long as it meets the minimum requirements set forth in the regulation. Copies of the complaint forms (HUD-903 and HUD-903A) are included as appendices to this brochure and can be photocopied for individual use. The complaint should be notarized, if possible. HUD will also accept telephoned complaints when they are reduced to writing by a HUD employee, subject to later signature by the aggrieved person.

Title VIII complaints are processed in the Regional Offices of Fair Housing and Equal Opportunity (FHEO). After a complaint is received in a Regional FHEO office, a complaint intake analyst determines, from the information stated in the complaint, whether HUD has jurisdiction under Title VIII with respect to the act or acts complained of. If it is determined that there is jurisdiction, a HUD case number is assigned to the complaint.

If the alleged discriminatory act is covered by a State or local law which HUD had determined provides rights and remedies substantially equivalent to those provided by Title VIII, HUD must send the complaint to the appropriate State or local agency for processing (see discussion of State and local enforcement efforts in Part V, below). Once a State or local agency has been notified of the referral of a complaint to it, the State or local agency then has the responsibility of processing the complaint under its own law. When that agency has completed its processing of the complaint, it must send a summary report of its action on the complaint to the Regional FHEO office.

If the State or local agency to which a complaint has been referred fails to commence proceedings on the case within 30 days, or commences proceedings but fails to move ahead with reasonable promptness, the Regional FHEO office may recall the complaint and undertake the processing itself. A complaint can only be recalled if the Regional FHEO office certifies that such action is necessary in the interests of justice or for the protection of the rights of the parties.

000871

If the discriminatory act alleged in a complaint is not covered by a substantially equivalent State or local law, or if a complaint is recalled from a State or local agency, the Regional FHEO office will process the complaint.

The first step in HUD processing is to furnish a copy of the complaint to the person charged with the discriminatory act (the respondent). The respondent has an opportunity to file an answer within seven days after receiving the copy of the complaint. The answer must be in writing and must be signed by the respondent and notarized.

An Equal Opportunity (E.O.) Specialist in the Regional FHEO office develops an investigation plan that includes: a review of the alleged discriminatory act; the identification of persons with knowledge of matters related to the complaint, such as ownership, management, sales or rental agents, former employees, and knowledge of relevant policies of the respondent; a search for complaints against the same respondent filed by persons other than the complainant; a review of fair housing efforts by the respondent; and a review of documentation by the respondent of all phases of the rental/sale operation that would provide information relevant to the complaint.

The E.O. Specialist then conducts interviews with the complainant, respondent, witnesses, and any other persons, such as local officials or community leaders, who may provide additional information relevant to a determination whether or not to attempt resolution of the issues raised by the complaint. If the facts indicate that the complainant experienced unlawful discrimination in any aspect of the sale or rental of housing, the E.O. Specialist would recommend that the Secretary make a determination to attempt to resolve the complaint. If, on the other hand, the facts indicate that the Department has no jurisdiction over the alleged injury, or do not support the allegations, the E.O. Specialist would recommend a determination not to resolve the complaint.

On the basis of the facts then, the Regional Director of FHEO determines whether to try to resolve the issues raised in the complaint through the informal methods of conference, conciliation and persuasion. If resolution is attempted and is successful, the aggrieved person, the respondent, and HUD enter into a conciliation agreement, providing a remedy for the aggrieved person, usually either the obtaining of the dwelling unit sought or monetary damages or both. Generally, such an agreement will also provide for affirmative action by the respondent, to benefit the public interest. The Regional FHEO office monitors these conciliation agreements to assure compliance.

If there is a determination not to resolve a complaint, or if resolution is attempted and is unsuccessful, the parties are notified by the Regional FHEO office. This notification also advises the aggrieved person of the opportunity to initiate court action under Section 810 or Section 812 of Title VIII.

Under these sections, the aggrieved person may file a civil action in a Federal district court seeking injunctive relief, the dwelling originally sought,

actual damages and not more than $1,000 in punitive damages. Moreover, if the aggrieved person is a U.S. Citizen whose complaint alleges housing discrimination because of his or her race or ethnicity (being treated differently than a "white citizen"), he or she also may sue under Section 1 of the Civil Rights Act of 1866 (42 U.S.C. 1982) seeking injunctive relief, compensatory damages and punitive damages. Attorney's fees may also be awarded in suits brought under the 1866 Act.

**Systemic Processing**—Systemic complaint processing is designed to address pervasive or institutional discriminatory housing practices; this goes beyond the investigation of the individual complaint of an aggrieved person. Practices of financial redlining, racial steering, property insurance redlining and exclusionary zoning are appropriate for systemic investigation because of their pervasive impact on minorities and women. Similarly, where there are multiple complaints against a housing provider who controls many units, systemic processing may also be appropriate. Systemic processing provides HUD with the ability to achieve a greater remedial result or deterrent effect, in addition to the specific relief that can be obtained for the individual aggrieved person who files a complaint.

At the time that a Title VIII complaint is received, where filed directly with HUD or dual-filed (filed first with a substantially equivalent State or local fair housing agency and then with HUD), a complaint intake analyst at the Regional FHEO office analyzes the complaint to see whether systemic processing may be appropriate. If the complaint is approved for systemic processing in the Regional FHEO office, a waiver is requested from any State or local agency to which the complaint would otherwise be referred. A copy of the complaint is submitted to FHEO Headquarters, together with a systemic referral report stating the reasons why systemic processing is appropriate.

The Regional FHEO office prepares a systemic investigation plan which identifies witnesses, lists information to be obtained and states relevant legal issues. In general, a systemic investigation begins with an interview of the aggrieved person or persons who filed the complaint. Subsequent steps include the interviewing of the respondent and any witnesses to the discriminatory acts complained of, the gathering of relevant evidence and documentation and analysis of investigation data and evidence. The investigator confers with the Regional FHEO Director and the Headquarters Director of Fair Housing Enforcement for their recommendations. If they recommend proceeding with the processing, the investigator prepares a final investigation report.

When there is a determination to resolve the complaint, a conciliation conference is scheduled and a conciliation strategy is developed, in consultation with the Regional Counsel and Headquarters FHEO staff. If the conciliation conference results in an agreement, it is signed by the aggrieved person, the respondent and HUD.

HUD will conduct compliance reviews to determine whether the respondent is complying with the provisions of the conciliation agreement.

In the event that conciliation is unsuccessful, the systemic case is closed by the Regional FHEO office and sent to Headquarters FHEO for referral to the Department of Justice. The parties to the complaint are also notified, and the aggrieved person is advised of the opportunity to initiate court action under Sections 810 or 812 of Title VIII.

**Referral to the Department of Justice**—Section 813 of Title VIII gives the Attorney General authority to bring a civil action for injunctive relief when any person or group of persons is engaged in "a pattern or practice of resistance to the full enjoyment" of another's Title VIII rights or when a denial of Title VIII rights "raises an issue of general public importance". If the Assistant Secretary is unable to obtain voluntary compliance through conciliation in a case which meets the requirements for action by the Attorney General under Section 813, the Assistant Secretary can refer the case to the Attorney General with a recommendation for institution of a civil action. In addition, the Department of Justice may indicate its interest in a complaint while it is still under investigation by HUD, in which case an agreement is reached as to when HUD will share its information, to give HUD an opportunity to complete the administrative processing of the complaint before the Department of Justice becomes involved.

In June 1984, HUD and the Department of Justice entered into a Memorandum of Understanding setting forth the procedure under which the Assistant Secretary may refer cases to the Department of Justice for action under Section 813. Under the procedure, whenever a Regional FHEO office has closed a case after an unsuccessful conciliation attempt, Headquarters FHEO conducts a review to determine whether the Department of Justice may have an interest in the cases. HUD has referred 130 Title VIII case referred by HUD to the Department of Justice in Fiscal Years 1981 through 1987, the Department of Justice has brought 12 civil actions under Section 813.

The Memorandum of Understanding further provides that the Department of Justice may inspect and copy investigatory information and other case documentation at Regional FHEO offices. The Department of Justice may use this information for purposes of filing suit or, if HUD has not completed its processing, for developing a case for subsequent litigation.

**Arrangements for Publication of Fair Housing Reporter Service**—In 1971, Prentice-Hall, Inc., a publisher of legal reporter services, began publication of the **Equal Opportunity in Housing** service, for subscribers in both the private and public sectors. This loose-leaf reporter service provided, on a monthly basis, materials relating to fair housing, including Federal and State court decisions, statutes, regulations, and related background materials. New court decisions and statutory and regulatory changes were

summarized in a monthly report bulletin. For three years, subscriptions were provided to 2,000 subscribers designated by HUD.

As the number of Federal and State court decisions in the fair housing area grew, they were bound in permanent volumes. By 1983, there were three bound volumes of cases.

Prentice-Hall continued to provide the **Equal Opportunity in Housing** service until December 1983, when publication ceased, because the number of subscriptions was inadequate to support continuation of the service. With the cessation of this reporter service, practitioners in the fair housing area, and HUD staff, lost an invaluable comprehensive reference tool.

Consequently, in early 1984, HUD began communications with Prentice-Hall concerning resumption of the fair housing reporter service. Conversations involved officials and staff of HUD, State and Federal fair housing enforcement agencies, private fair housing groups, and persons engaged in the enforcement and administration of fair housing laws. These discussions resulted in Prentice-Hall's commitment to resume publication of the fair housing reporter service, if there were a sufficient number of subscriptions to justify the allocation of the firm's resources to produce the service. HUD agreed to provide an initial 1,000 subscriptions to the publication for private organizations and public officials involved in fair housing and has continued to do so at a reduced level of subscriptions as commercial sales increased.

In July of 1985, Prentice-Hall began publication of the **Fair Housing-Fair Lending** service, similar to the earlier service but with several improvements, including a revised index, report bulletin coverage of speeches and policy statements by Federal and other officials, and bibliography and selected texts of relevant articles and studies. The new service included a compilation of Federal and State court decisions in the fair housing and fair lending areas rendered in 1984 and 1985, during the time after publication of the previous service had ceased.

**Role of the Department of Justice**—Section 813 of Title VIII authorizes the Attorney General of the United States to file suit where there is a pattern or practice of discrimination or where a group of persons has been denied rights guaranteed by Title VIII.

The Department of Justice has filed more than 300 civil actions under the Fair Housing Act. The Justice Department has sought through these actions not only to protect individual rights but also to promote the achievement of the goal of fair housing throughout the marketplace.

Some of the Department of Justice civil actions have sought to establish the scope of discriminatory housing practices made unlawful by the Fair Housing Act. In this area, pattern and practice suits have been filed urging a broad interpretation of the "otherwise make unavailable" language of section 804(a) (**U.S.** v. **Parma,** 494 F. Supp. 1049 (N.D. Ohio 1980), and (**U.S.** v. **Youritan Construction Company,** 370 F.2d 623 (9th Cir. 1975)). Other suits have sought to reflect the expansive coverage under the Fair Housing Act

of racial steering (**U.S.** v. **Real Estate One,** 433 F. Supp. 1140 (E.D. Mich. 1977)), discriminatory appraisal practices **U.S.** v. **American Institute of Real Estate Appraisers,** 442 F. Supp. 1072 (N.D. Ill. 1977)), and discriminatory actions because of the race of a person's guests or associates (**U.S.** v. **Reddock,** 467 F.2d 897 (5th Cir. 1972); **U.S.** v. **L & H Land Corporation,** 407 F. Supp. 576 (S.D. Fla. 1976)).

In addition to the filing of these pattern and practice cases, the Department of Justice has sought to further the Government's interpretation of the Fair Housing Law through the Friend of the Court (**Amicus Curiae**) briefs filed in support of private litigation under the law.

In 1982, the Department of Justice, at HUD's urging, filed a brief in the Supreme Court in support of a private fair housing complaint urging the court to find that fair housing testers who have been denied information about the availability of housing are victims of a discriminatory housing practice. The Supreme Court decision in that case, **Havens Realty Corp.** v. **Coleman,** holding that testers denied information based on race have standing to sue under the Fair Housing Act, has been considered by many to be one of the most important interpretations of the Fair Housing Law. (See discussion of this case in Part VIII, below.)

Many cases result in the entry of consent decrees. Such decrees, which resolve lawsuits without the expense and delay of a trial, are tailored to the facts of each case. Unually, however, they provide for (1) an injunction against future discrimination; (2) an educational program designed to ensure that the defendant and its employees are fully aware of their obligations under the law and the consent order; (3) notice to the public that the defendant follows a policy of non-discrimination; (4) recordkeeping and periodic reporting to permit the Justice Department to monitor the defendant's activities; (5) equitable relief for individual victims; and (6) affirmative outreach and advertising requirements in appropriate cases.

With respect to relief for individual victims, the courts have ruled that the Justice Department cannot recover monetary damages for victims of unlawful discrimination. However, the Government is entitled to obtain "equitable relief" on their behalf, which can include monetary relief in the form of restitution. In cases where it is possible to identify the individuals who were denied housing because of the defendants' discriminatory conduct, the Justice Department will seek a requirement that such persons be offered the next available units or be given other appropriate relief, such as priority consideration based on the date of their applications for housing.

The 53 fair housing cases filed since late 1983 have involved a variety of issues and defendants. For example, the owners or managers of apartment buildings, including four public housing authorities, were defendants in twenty of the cases. Similar suits were filed against the owners or operators of mobile home parks and developers and marketers of time-share resorts. In addition, an apartment referral service was sued for acceding to the discriminatory policies of apartment owners to which they made tenant

referrals. These suits involved defendants operating more than 24,000 rental units and over 30,000 time-share units.

Another group of suits did not involve the actual denial of housing but challenged instead practices which inhibit the full exercise of fair housing rights. Thus, four suits were filed challenging the practice of recording restrictive covenants in official deed books, and the practice of neighborhood associations of requiring such discriminatory convenants. In three cases, voluntary agreements have resulted in actions to cease the practice and to cure the violations alleged.

Other major litigation activities pursued by the Justice Department have been suits against municipalities. Some of the more recent cases in this area have combined, for the first time, housing discrimination claims with claims of discrimination in employment or educational opportunities. The Justice Department also has brought suit against a municipality to enjoin enforcement of an ordinance which allowed fair housing testers to be prosecuted and required them to register before conducting any test, a requirement which totally eliminates the effectiveness of any testing. Fifteen other cities which had similar ordinances repealed their anti-testing ordinances when they were notified of the Government's position that such ordinances were inconsistent with the Federal law.

## V. Role of State and Local Fair Housing Enforcement Agencies

**Recognition of Jurisdictions with Substantially Equivalent Laws—** Section 810(c) of the Civil Rights Act of 1968 provides, in part:

"Whenever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in [Title VIII], the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law. . . "

Despite the statutory requirement and authority, there was a basic problem of inadequacy of resources at the State and local level to support State and local agencies in processing housing discrimination complaints referred from HUD. Thus, until there was a Federal financial assistance program for State and local fair housing agencies, there were only 23 recognized jurisdictions, and many of the recognized agencies did not bother to formalize complaint processing agreements with HUD.

HUD regulations at 24 CFR Part 115 provide a two-phased procedure for determining whether a particular State or local jurisdiction has a "substantially equivalent" fair housing law. The first phase involves a review as to "whether the State or local law, on its face, provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in the Act". Section 115.3 of the

regulations sets out specific criteria which must be met for the law or ordinance to be substantially equivalent "on its face":

1. It must provide for an administrative enforcement body to receive and process complaints;

2. It must delegate to the administrative enforcement body comprehensive authority to investigate the allegations of complaints and to conciliate complaint matters;

3. It must not place any excessive burdens on the complainant that might discourage the filing of complaints;

4. It must not contain exemptions that substantially reduce the coverage of housing accommodations, as compared to secton 803 of the Act; and

5. It must be sufficiently comprehensive in its prohibitions of discriminatory housing practices to carry out the purpose of Title VIII effectively, including, as a minimum, the prohibition of specified acts listed in the regulation.

The second phase of the determination procedure for a finding of substantial equivalency is an inquiry as to "whether the current practices and past performance of the appropriate State or local agency charged with administration and enforcement of such law demonstrates that, in operation, the State or local law in fact provides rights and remedies which are substantially equivalent to those provided in the Act". In short, the second test requires the State or local agency to show that it has created and continues to maintain an adequate administrative capacity to enforce its law effectively. Performance standards for this second test are set forth in §115.4.

The process of recognition of a fair housing law as substantially equivalent is initiated by the agency having principal responsibility for administration of the State or local fair housing law. The request for recognition, which is submitted to the Assistant Secretary for Fair Housing and Equal Opportunity, must be accompanied by the specific supporting materials and information listed in §115.5.

If the review of those materials results in a finding that the law, on its face, is substantially equivalent, a notice of that finding is published in the Federal Register, together with a request for public comments. Following the comment period, a performance review is made. If the results of that review (and an evaluation of the public comments) are positive, and the agency has entered into a memorandum of understanding with HUD providing for referral of complaints and for procedures adequate for the Department to monitor the continuing substantial equivalency of the agency, a notice of recognition is published in the Federal Register. The performance of the agency administering the law is reviewed at least annually.

In the case of a new agency found to have a law which is substantially equivalent on its face but which does not have a sufficient record of performance to qualify for recognition, §115.11 provides that the Assistant Secretary may enter into an agreement with the agency for interim referral of complaints.

In 1980, Congress appropriated funds for a Fair Housing Assistance Program, and there was an immediate surge in requests from State and local agencies for recognition. During 1980, an additional five States and ten localities secured recognition, and the numbers have increased each year since.

As of February 1, 1988, the fair housing laws of 36 states and 72 localities had been recognized by the Assistant Secretary as being substantially equivalent to Title VIII. In addition, agreements for interim referral of complaints were in effect with four localities.

**Fair Housing Assistance Program**—The Fair Housing Assistance Program is a national program of financial and technical assistance for processing complaints and conducting special projects by State and local government human rights agencies enforcing laws which have been recognized by HUD as "substantially equivalent" to Title VIII. The program was first authorized in Fiscal Year 1979 and has received an appropriation each year since Fiscal Year 1980. In the first year of funding, there were 32 agencies funded. That number has grown to a current total of 107 agencies funded in Fiscal Year 1987.

Since 1980, HUD has funded over 100 specialized and innovative projects. These projects included such activities as: fair housing testing, development of creative data management information systems, fair housing education and outreach, development of systemic procedures and manuals, establishment of regional fair housing consortiums, implementation of fair housing courses for secondary and post-secondary schools, legal assistance to investigative staff, technical assistance to the real estate industry concerning its fair housing responsibilities, and "how-to" manuals on subjects such as damages for embarrassment and humiliation and investigation and conciliation of fair housing complaints.

## VI. Role of Housing Industry Groups—Voluntary Affirmative Marketing Agreements and Community Housing Resource Boards

Among the provisions contained in Title VIII is one directing the Secretary of HUD to "work out programs of voluntary compliance and of enforcement" with "persons in the housing industry" (section 809 of the Fair Housing Law).

One means by which the Secretary has discharged this responsibility is by negotiating and executive voluntary affirmative marketing agreements with national associations representing major components of the housing industry, such as real estate brokers, homebuilders, rental property managers and real estate licensing commission. Each of these agreements, or "VAMAs", is designed to carry out a broad equal opportunity program including outreach advertising, affirmative action in employment, safeguards against racial steering, and other actions designed to ensure that housing will be marketed on an equal opportunity basis.

The national association party to an agreement recommends its adoption by member affiliates at the State or local level. Upon adoption of the agreement at the local level, HUD field offices provide technical assistance, monitor progress under the agreement, and organize a citizen participation component.

The voluntary compliance programs of the Department have a two-fold policy objective. The first objective is cooperation and assistance in aiding persons, firms, agencies, and municipalities to comply voluntarily with Title VIII and HUD equal opportunity requirements. The second is encouragement of these same parties to exceed the minimum level of legal requirements by working affirmatively to further fair housing objectives.

VAMAs are intended to promote institutional change on an area-wide basis. HUD's policy is predicated on the belief that complete equal housing opportunity cannot be achieved until the real estate and building industries, apartment housing association members, appraisal firms, financial institutions and local governments demonstrate their acceptance of minority applicants and affirmatively promote open communities. Industry group efforts play an important role in HUD's promotion of fair housing because they affect conventionally financed housing, representing approximately 90 percent of the total housing market, as well as housing assisted or insured under HUD programs. The institutionalization of fair housing policies and procedures throughout the housing industry would have a profound impact on the fair housing climate in this country.

The first national VAMA was adopted by the Board of Directors of the National Association of Realtors (NAR) on November 11, 1975, and it was signed by HUD and NAR on December 16, 1975. A Memorandum of Understanding, effective November 16, 1981, renewed the VAMA until September 20, 1986. The Memorandum of Understanding amended certain provisions of the 1975 VAMA and clarified the intent of other provisions. During 1986, HUD and NAR negotiated further changes and clarifications for inclusion in a new Memorandum of Understanding, which extended the effectiveness of the VAMA into 1987. On June 10, 1987, the original HUD/NAR VAMA was superseded by a revised agreement that will be effective through June 10, 1992.

The HUD/NAR VAMA is the most broadly subscribed and prominent of the national voluntary agreements. Member Boards of Realtors, State Associations and individual Realtors who subscribe to the VAMA on behalf of their firms are parties to State or local VAMAs with HUD. As of December 1987, the NAR VAMA had been adopted by more than 1,300 of the approximately 2,000 NAR Member Boards of Realtors across the country. In addition, 50 of the 51 State Associations of Realtors (including the District of Columbia) had adopted the VAMA.

A key element of the HUD/NAR VAMA is the provision for appointment by HUD of a Community Housing Resource Board (CHRB) with respect to each State and local VAMA, to assist the signatory Board of Realtors or State Association with any problems that may arise in the implementation of the

agreement and to participate with HUD in the annual evaluation of the effectiveness of the agreement. HUD appoints to the CHRB representatives of a broad spectrum of organizations throughout the community served by the signatory Board of Realtors that have a substantial interest in fair housing and equal opportunity.

The CHRB has two basic objectives. The first is to monitor effectively the implementation of the affirmative marketing provisions of the VAMA, to enhance the prospect that the commitments of the housing industry groups made in the VAMA will be met. Second, the CHRB is intended to maximize communication between the local housing industry and community groups which foster minority and women's rights. The first objective requires an influential community representation, including public officials or their representatives. The second objective requires broad minority and fair housing group representation on the CHRB.

HUD provides limited funding assistance to CHRBs pursuant to regulations in 24 CFR Part 120. As of December 1987, 601 CHRBs had been established under VAMAs adopted by NAR Member Boards of Realtors or other local industry group VAMAs. Of these, approximately 450 CHRBs are active.

Between 1982 and 1988 the Department has provided approximately 11.3 million dollars to CHRBs to assist with agreement implementation.

The following examples are among the many successful CHRB projects that have promoted the national goal of providing equal housing opportunities for all Americans through education, outreach, and affirmative marketing practices. CHRBs have:

■ Established and monitored telephone hotlines to provide information about fair housing laws.

■ Monitored real estate advertising for compliance with fair housing advertising guidelines.

■ Conducted seminars for Realtors to inform the participants of fair housing laws, landlord/tenant rights and responsibilities, affirmative marketing techniques, and the goals and objectives of the Voluntary Affirmative Marketing Agreement (VAMA).

■ Established contact with State Real Estate Commissions regarding required continuing education for real estate license holders.

■ Served as mediators in fair housing disputes.

■ Monitored compliance of lending institutions with the Community Reinvestment Act and the Home Mortgage Disclosure Act.

■ Produced radio and television public service announcements to inform the general public about the various types of illegal discrimination.

Another VAMA was entered into by HUD and the National Association of Real Estate Brokers (NAREB) on May 14, 1976. NAREB was formed in 1947 as an organization of Black licensed real estate practitioners who had been excluded from membership in the major national trade association. HUD undertook negotiation of a VAMA with NAREB in order to promote cooperation between NAR and NAREB and to expand and extend the range of minority sales experience and responsibility. A successor VAMA was