- 9 -

14, 1991, demanding that they vacate the Park by November 14, 1991 (Gov't Ex. 3).

### 4. Eviction Proceedings

Mountain Side tried to evict the VanLoozenoords and Brace pursuant to Colorado's Forcible Entry and Detainer ("FED") statute, Colo. Rev. Stat. § 13-40-101, et seq. (see Gov't Ex. 4; Gov't Ex. 6 at 3). A summons, dated November 8, 1991, was posted on the door of VanLoozenoord's and Brace's home ordering them to appear in the district court of Jefferson County, Colorado, to answer an eviction complaint filed by Mountain Side (Gov't Ex. 4; Tr. I at 166; Doc. 36 at 10).

The eviction hearing was held on January 16, 1992, before a Jefferson County District Court judge (Gov't Ex. 6). HUD did not attend the hearing and was not represented in the proceeding (see Gov't Ex. 6 at 1; Tr. I at 199). At the end of a brief hearing, the judge issued a writ of restitution in favor of Mountain Side solely on the ground that VanLoozenoord and Brace had failed to apply for residency in the Park (Gov't Ex. 6 at 49-50; Gov't Ex. 7). The court did not consider the validity of Mountain Side's three-person rule under the Fair Housing Act or any other statute (Gov't Ex. 6 at 48-49), and did not entertain claims for damages (id. at 53).

As a result of the district court's ruling, VanLoozenoord and Brace were served with a notice, dated February 3, 1992, ordering them to remove their mobile home from the Park within 48 hours (Gov't Ex. 6 at 52; Gov't Ex. 8). In March 1992, HUD

negotiated an interim agreement between the parties that permitted the VanLoozenoords and Brace to remain in the park while their administrative complaints were pending (Gov't Ex. 9; Tr. I at 84-85, 206).

   5.  <u>Conciliation Efforts</u>

   After VanLoozenoord and Brace filed their discrimination complaints, they contacted Jerry Ritchie, a private housing consultant who specialized in landlord-tenant disputes (Tr. I at 155-156, 194).  Ritchie was not employed by, or in any way affiliated with, HUD (Tr. I at 156-157; Tr. III at 36).  Ritchie advised VanLoozenoord and Brace not to appear at a conciliation meeting set up by HUD because, he said, evidence that was discussed at that meeting could not be introduced at an administrative hearing unless all parties consented (Tr. I at 92-93, 97; see Tr. I at 132, 140, 218-219).  Fearing that they would lose the right to introduce evidence crucial to their claim, they followed the consultant's advice and declined to attend the conciliation meeting (Tr. I at 93, 141-142; Tr. III at 216).  Had it not been for Ritchie's advice, VanLoozenoord and Brace would have attended the conciliation meeting (Tr. I at 93).  Despite their decision not to attend the HUD meeting, VanLoozenoord and Brace did try to settle the case (Tr. I at 213, 215-217).  For example, despite having been told that Mountain Side purchased trailers for less than they were worth (Tr. I at 209), complainants submitted an offer to Mountain Side to purchase their mobile home so that they could afford to buy comparable

housing elsewhere (Tr. I at 216-217; see also Tr. I at 100; Doc. 4 at 5). They also entered into the interim conciliation agreement negotiated by HUD that allowed them to stay in the Park pending disposition of their administrative complaints, in exchange for agreeing to pay back rent that Mountain Side had refused to accept and which VanLoozenoord and Brace believed Mountain Side was not necessarily entitled to (Gov't Ex. 9; Tr. I at 216).

C.   ALJ's and Secretary's Opinions

In his Initial Decision, the ALJ rejected Mountain Side's argument that the administrative action was barred by res judicata, but held that HUD had failed to prove that Mountain Side violated 42 U.S.C. 3604 or 3617 (Doc. 36 at 12-13, 28). The ALJ concluded that the evidence was insufficient to establish intentional discrimination, and also held that HUD had failed to prove that Mountain Side's three-person occupancy rule violated the Fair Housing Act under a disparate impact theory (id. at 25-26). In rejecting the disparate impact claim, the ALJ held that HUD failed to establish a prima facie case because it relied on nationwide population figures rather than local data (id. at 25). Next, the ALJ held that even if HUD had established a prima facie case, Mountain Side had rebutted it by "produc[ing] evidence of a business justification for the occupancy limitation" (id. at 26). The ALJ also concluded that HUD had failed to prove the existence of less discriminatory alternatives to the three-person rule that would serve Mountain Side's business needs (id. at 22).

After the Secretary's remand for reconsideration, the ALJ again rejected HUD's intentional discrimination and disparate impact claims (Doc. 43 at 6-7). He adhered to his position that the nationwide statistics were insufficient to establish disparate impact, and held that Mountain Side had demonstrated that its three-person rule "serves [its] legitimate business goals and is not a mere insubstantial justification" (id. at 7).

On review, the Secretary concluded, however, that HUD had established a prima facie case of discrimination and that the ALJ had applied the wrong legal standard in analyzing Mountain Side's rebuttal burden (Doc. 49 at 9). The Secretary found that HUD's nationwide population statistics were sufficient to establish disparate impact because there was no evidence in the record of any significant disparity between the nationwide statistics and the demographics of Jefferson County, Colorado, and because HUD had presented testimony of an economist showing that the percentage of four-or-more-person households that are families is virtually identical in Jefferson County and the nation as a whole (id. at 8). In addition, the Secretary concluded that the ALJ had applied the wrong legal standard in analyzing Mountain Side's rebuttal burden, and held that to overcome HUD's prima facie case, Mountain Side must prove that its three-person rule was required by "business necessity" (id. at 9). He remanded the case to the ALJ to determine whether Mountain Side met that burden (ibid.).

- 13 -

On remand, the ALJ held that Mountain Side had proved that its three-person limit was a "business necessity," concluding that the rule served Mountain Side's goals of preventing overcrowding and was "reasonably likely to effectuate" the goal of maintaining a healthy and economically viable park (Doc. 58 at 4-5).

The Secretary overturned the ALJ's decision, concluding that he had incorrectly articulated the business necessity standard (Doc. 62 at 8, 10). According to the Secretary, business necessity "means that the policy or practice at issue must serve a necessary relationship to the [housing provider's] needs, not merely serve [its] legitimate goals" (id. at 9). In other words, "business necessity can only be met by establishing compelling need or necessity" (id. at 10). Applying this standard, the Secretary found that petitioners had failed to demonstrate that the three-person limit was compelled by business necessity (id. at 12). He concluded that Mountain Side's proffered justifications for the policy consisted of speculation, subjective opinions, conclusory statements and post-hoc rationalizations, all of which were insufficient to sustain its burden (id. at 11).

First, the Secretary found no compelling need for any occupancy limit during the period in question because only 320 people lived at the Park when the policy was implemented, even though the QCI report concluded that the Park could support 916 residents (id. at 10). Moreover, he found that the Park had

- 14 -

experienced only a small increase in population between 1988 and 1991, belying Mountain Side's professed fears of a population explosion stemming from the admission of families with children after the 1988 amendments to the Act (id. at 10 n.5).  The Secretary noted that if that growth rate were to continue, the Park would not reach the population limit of 687 adopted by Mountain Side until well into the next century (ibid.).

The Secretary also found that the 916 figure was not "absolute" in the sense that the presence of additional persons in the Park would necessarily cause a failure of the sewer system.  He noted that Walker's testimony about failure of the sewer system when the 916 figure was reached was based on assumptions that a number of events would occur simultaneously that would place unusual demand on the system (id. at 10).  At any rate, the Secretary held that even if the QCI Report supported Mountain Side's position, it should be given little weight because it was not completed until two years after the institution of the three-person rule and thus was a post-hoc rationalization (id. at 10-11).

Next, the Secretary found that Mountain Side's concerns about an influx of seasonal visitors was a post-hoc rationalization and that assertions about such visitors were vague and unsubstantiated (id. at 11).  Moreover, the Secretary concluded that the fear of overcrowding due to visitors at a time when the Park's population was only about one-third of the 916 figure recommended by the QCI Report was nothing but speculation,

which could not establish business necessity (ibid.).  He
therefore ordered that judgment be entered in favor of the
VanLoozenoords and Brace, and remanded the case to the ALJ for
award of appropriate relief (id. at 12).

On remand, the ALJ awarded $9,178.05 in damages to the
complainants and entered an injunction that prohibited Mountain
Side from enforcing its three-person rule and which imposed
recordkeeping and reporting requirements (Doc. 63 at 12-14).  The
ALJ found that the complainants had sustained economic losses as
a result of the discrimination (id. at 8-9), and that the threat
of eviction -- coming as it did during the Thanksgiving and
Christmas holidays -- caused substantial emotional distress for
both the adults and children, and even prompted one of
VanLoozenoord's daughters to threaten to run away from home (id.
at 6-7, 10-11).  Despite this emotional distress, the ALJ refused
to award greater damages in part because of VanLoozenoord's and
Brace's failure to attend the conciliation meeting arranged by
HUD (id. at 10-11).

ARGUMENT

I

HUD PROVED A VIOLATION OF THE FAIR HOUSING ACT
UNDER THE DISPARATE IMPACT THEORY OF DISCRIMINATION

A.  Standards Of Review.

Congress has expressly delegated authority to the Secretary
to administer the Fair Housing Act and to issue regulations to
implement the statute.  42 U.S.C. 3608, 3614a.  In light of this
delegation of authority, this Court must uphold the Secretary's

interpretation of the Act as long as it is "reasonable" and "is not in conflict with the plain language of the statute." National R.R. Passenger Corp. v. Boston & Maine Corp., 112 S. Ct. 1394, 1401 (1992). Such deference is required even if the Secretary's reading of the statute is not the one the Court would have adopted if the question initially had arisen in a judicial proceeding. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n.11 (1984).[4/] This deferential standard of review applies to the following legal issues: (1) whether a violation of the Fair Housing Act by a private housing provider can be proved under a disparate impact theory without a showing of discriminatory intent; (2) whether nationwide, general population figures can form the proper statistical comparison to establish disparate impact under the Act; and (3) whether the Secretary properly defined the "business necessity" burden under the statute. In addition, the Secretary's factual findings of discrimination under these legal standards must be upheld if they are supported by substantial evidence in the record as a whole. Morgan v. HUD, 985 F.2d 1451, 1457 (10th Cir. 1993).

B.  The Disparate Impact Theory Applies To Fair Housing Act
    Claims Against Private Housing Providers

        Under the disparate impact theory of liability, a facially neutral rule that disproportionately excludes members of a

_____

[4/] The deferential standard of review is the same whether the agency interpretation is through rulemaking or, as here, through administrative adjudication. Arco Oil & Gas Co. v. EPA, 14 F.3d 1431, 1433 (10th Cir. 1993).

- 17 -

protected group can violate the Fair Housing Act even though the defendant was not motivated by discriminatory intent. See, e.g., Betsey v. Turtle Creek Assoc., 736 F.2d 983, 986-988 (4th Cir. 1984). The theory, which is also known as the discriminatory effects test, has been well-established in discrimination law since at least the early 1970s when the Supreme Court endorsed the disparate impact standard in Griggs v. Duke Power Co., 401 U.S. 424 (1971) (interpreting Title VII of the Civil Rights Act of 1964). Mountain Side argues (Br. 17-20), however, that the disparate impact theory of discrimination does not apply to Fair Housing Act claims against private housing providers. Contrary to Mountain Side's contentions, this Court must uphold the Secretary's adoption of the disparate impact standard because it is a reasonable construction of the Act that is supported by the statutory language, the overwhelming weight of the caselaw, the legislative history and public policy interests underlying the Act.

The disparate impact standard is consistent with the statutory language. Under the Act, it is unlawful to make a dwelling unavailable to any person "because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. 3604(a). See also 42 U.S.C. 3604(b). The Supreme Court has interpreted virtually identical language in Title VII as allowing proof of discrimination under a disparate impact standard without a showing of discriminatory intent. Griggs, 401 U.S. at 426-431, interpreting 42 U.S.C. 2000e-2(a)(2) (prohibiting certain actions

that deny employment opportunities to an employee or job applicant "because of such individual's race, color, religion, sex, or national origin").  The Supreme Court recognized that such an interpretation was necessary to achieve Congress' broad remedial goal of providing equal employment opportunities. Griggs, 401 U.S. at 429-431.  This logic applies with equal force under the Fair Housing Act.  The Supreme Court has held that the Act must be given a "generous construction" to fulfill the statute's broad remedial purpose of achieving "'truly integrated and balanced living patterns.'"  Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 211-212 (1972), quoting 114 Cong. Rec. 3422 (1968).  This ambitious remedial goal -- which is at least as broad as the purposes underlying Title VII -- could not be achieved if the Act were interpreted to require a showing of discriminatory intent.  Sophisticated defendants may erect barriers to open housing and yet conceal their discriminatory motives, thereby making it virtually impossible for plaintiffs to establish intentional discrimination.  Moreover, facially neutral practices can impede integration efforts and deny housing opportunities to minorities, families with children, and members of other protected groups even if defendants did not adopt such practices with discriminatory intent.  Thus, the same reasoning that led the Supreme Court to adopt a disparate impact standard under Title VII also requires use of that test under the Fair Housing Act.  Courts, including this Circuit, often use Title VII

- 19 -

caselaw as a model for interpreting the Fair Housing Act.  See,
e.g., Honce v. Vigil, 1 F.3d 1085, 1088 (10th Cir. 1993).[5/]

This Court has never decided whether the disparate impact
theory applies under the Fair Housing Act.[6/]  Every court of
appeals that has considered the issue, however, has held that a
violation of the Act can be established without proof of
discriminatory intent.  See Huntington Branch, NAACP v. Town of
Huntington, 844 F.2d 926, 934-935 (2d Cir.), aff'd, 488 U.S. 15
(1988); Doe v. City of Butler, 892 F.2d 315, 323 (3d Cir. 1989);
Edwards v. Johnston County Health Dep't, 885 F.2d 1215, 1223 (4th
Cir. 1989); Hanson v. Veterans Admin., 800 F.2d 1381, 1386 (5th
Cir. 1986); Arthur v. City of Toledo, 782 F.2d 565, 575 (6th Cir.
1986); Metropolitan Housing Dev. Corp. v. Village of Arlington
Heights, 558 F.2d 1283, 1288-1290 (7th Cir. 1977), cert. denied,
434 U.S. 1025 (1978); Keith v. Volpe, 858 F.2d 467, 482-484 (9th
Cir. 1988), cert. denied, 493 U.S. 813 (1989); Jackson v.
Okaloosa County, 21 F.3d 1531, 1543 (11th Cir. 1994).  See also
Casa Marie, Inc. v. Superior Court of Puerto Rico, 988 F.2d 252,
269 & n.20 (1st Cir. 1993) (dictum).  In addition, the Supreme

---

[5/] See also Trafficante v. Metropolitan Life Ins. Co., 409 U.S.
205, 209 (1972); Huntington Branch, NAACP v. Town of Huntington,
844 F.2d 926, 935 (2d Cir.), aff'd, 488 U.S. 15 (1988); Betsey,
736 F.2d at 987.

[6/] This Court has stated in dictum that "[i]n order to prevail
on a claim made under [the Fair Housing Act], plaintiff must
prove a discriminatory intent."  Asbury v. Brougham, 866 F.2d
1276, 1279 (10th Cir. 1989).  This statement does not represent a
rejection of the disparate impact theory because that theory was
not before the Court, which had no reason to reach the issue
since it upheld the jury's finding of intentional discrimination.

- 20 -

Court has assumed, without deciding, that the disparate impact theory of liability applies under the Act.  Town of Huntington v. Huntington Branch, NAACP, 488 U.S. 15, 18 (1988) (upholding decision endorsing the discriminatory effects theory).

Congress was aware of these established judicial interpretations of the Fair Housing Act.  By reenacting the statute without any relevant change to the statutory language, it has adopted these interpretations.  Keene Corp. v. United States, 113 S. Ct. 2035, 2043 (1993); Lorillard v. Pons, 434 U.S. 575, 580-581 (1978); Housing Auth. of Kaw Tribe of Indians of Oklahoma v. City of Ponca City, 952 F.2d 1183, 1195 n.16 (10th Cir. 1991), cert. denied, 112 S. Ct. 1945 (1992) (interpreting Fair Housing Act).  In 1988, Congress amended the Fair Housing Act to add familial status and handicap discrimination to the list of prohibited practices, to establish an administrative enforcement mechanism within HUD, and to give HUD power to issue regulations implementing the statute.  At that time, Congress was fully aware that every court of appeals that had addressed the issue had endorsed use of the discriminatory effects test under the Act, see 134 Cong. Rec. 23711-23712 (1988) (statement of Senator Kennedy), and yet Congress took no action to amend the statute to overturn these judicial decisions.  Indeed, Senator Kennedy, the principal Senate sponsor of the 1988 amendments, emphasized that "Congress accepted this consistent judicial interpretation" of the Act and did not intend the legislation to impose an intent requirement.  Id. at 23712.  As the principal sponsor of the

- 21 -

legislation in the Senate, Senator Kennedy's views provide "an authoritative guide to the statute's construction." <u>North Haven Bd. of Educ.</u> v. <u>Bell</u>, 456 U.S. 512, 527 (1982).

The House Report accompanying the 1988 amendments also demonstrates that Congress intended that the Act incorporate a disparate impact standard.  The House Judiciary Committee rejected, after debate, an amendment that would have required a showing of discriminatory intent to invalidate local zoning practices and decisions under the Act.  See H.R. Rep. No. 711, 100th Cong., 2d Sess. 89 (additional views of Rep. Swindall, <u>et al.</u>).  Representative Swindall and five other members of the House Judiciary Committee dissented from the Committee's favorable report of the bill, in part, because it would allow plaintiffs to prove a violation under a disparate impact theory. These members warned that under the 1988 amendments, munici-palities could be found liable for zoning decisions that had "a disproportionate impact on families with children." <u>Id.</u> at 90. Representative Swindall and his dissenting colleagues also viewed the Committee's rejection of the amendment as sanctioning the Second Circuit's endorsement of the discriminatory effects test in <u>Huntington Branch</u>.  See <u>id.</u> at 90-91.  Swindall noted that in opposing the amendment, some Committee members had argued that requiring proof of discriminatory intent would impose too heavy a burden on plaintiffs.  <u>Id.</u> at 91.

In addition, the House Committee Report expressly noted that two other courts of appeals had endorsed the disparate impact

- 22 -

theory: "Because minority households tend to be larger and exclusion of children often has a racially discriminatory effect, two federal courts of appeal have held that adults-only housing may state a claim of racial discrimination under Title VIII." H.R. Rep. No. 711 at 21, citing Betsey v. Turtle Creek Assoc., 736 F.2d 983 (4th Cir. 1984), and Halet v. Wend Inv. Co., 672 F.2d 1305 (9th Cir. 1982). The report also observed that housing discrimination against handicapped individuals "is not limited to blatant, intentional acts of discrimination," and emphasized that "[a]cts that have the effect of causing discrimination can be just as devastating as intentional discrimination." H.R. Rep. No. 711 at 25. This Committee report is an "authoritative source" for interpreting Congress' intent in enacting the 1988 amendments. See Garcia v. United States, 469 U.S. 70, 76 (1984).

Legislative history confirms that the Congress that originally enacted the Fair Housing Act in 1968 also intended it to reach practices that have discriminatory effects without proof of discriminatory purpose. Senator Mondale, the principal sponsor of the 1968 legislation, emphasized that it "seems only fair, and is constitutional, that Congress should now pass a fair housing act to undo the effects of these past State and Federal unconstitutionally discriminatory actions." 114 Cong. Rec. 2699 (1968) (emphasis added). In addition, the Senate rejected a proposed amendment that would have required proof of discriminatory intent in claims involving a single-family owner-occupied dwelling. 114 Cong. Rec. 5214-5222 (1968). See

Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 147 (3d Cir. 1977), cert. denied, 435 U.S. 908 (1978). Opponents of the proposed amendment argued that it would make proof of discrimination too difficult. See, e.g., 114 Cong. Rec. 5216 (Sen. Percy); id. at 5218 (Sen. Mondale).

Mountain Side nonetheless argues (Br. 19-20) that the amendment of Title VII -- but not the Fair Housing Act -- in 1991 indicates that Congress did not intend the disparate impact standard to apply to the Act. This is flawed reasoning. One purpose of the 1991 amendments was to overturn a portion of the Supreme Court's decision in Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989), which had weakened Title VII's well-established disparate impact standard developed through judicial interpretation. See Pub. L. No. 102-166, §§ 2(2), 3(2) & (3), 105 Stat. 1071 (1991); 137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991). Congress did not view the 1991 amendments as creating some new theory of liability that had never existed, but rather as a restoration of the standard that had been articulated by the Supreme Court in 1971 in Griggs. 105 Stat. 1071. There was no comparable reason to amend the Fair Housing Act in 1991 because Wards Cove did not purport to interpret that statute, and because neither the Supreme Court nor the courts of appeals had rendered a comparable restrictive interpretation of the Act.

Mountain Side also argues (Br. 17-20) that even if the Fair Housing Act encompasses a disparate impact standard, it should not apply against private housing providers. Mountain Side

- 24 -

suggests that it is inequitable to apply the disparate impact theory to such private defendants because doing so might hold them "responsible for consequences over which they have no control" (Br. 19), quoting Brown v. Artery Org., Inc., 654 F. Supp. 1106, 1116 (D.D.C.), motion granted in part, denied in part, 691 F. Supp. 1459 (D.D.C. 1987).[1/] This reasoning is foreclosed by Griggs, where the Supreme Court recognized that the disparate impact of a facially neutral standard might be explained by factors over which the private defendant had no direct control, such as societal or governmental discrimination. See 401 U.S. at 430 (adverse racial impact of tests and diploma requirement could be explained, at least in part, by the inferior education that blacks received during the days of de jure segregation of public schools). Although the private employer in Griggs was obviously not responsible for such segregation, it could be required to eliminate unnecessary employment require-ments whose disparate impact could be explained by such govern-

---

[1/] Three other cases cited by Mountain Side (Br. 17-19) provide no support for its argument. Arlington Heights simply recognizes that a plaintiff does not necessarily prevail merely by showing discriminatory impact. See 558 F.2d at 1290. If the justifica-tions for the facially neutral rule are strong enough, they can overcome the showing of disparate impact. Id. at 1290-1293. This is consistent with the standard applied by the Secretary. Nor does Mountain Side derive any support from Elliott v. City of Athens, 960 F.2d 975 (11th Cir.), cert. denied, 113 S. Ct. 376 (1992). Elliott interpreted an exemption to the statute -- not the standard of liability for proving a violation where, as here, no exemption applies -- and specifically emphasized that it was not addressing "issues of discriminatory effect." Id. at 978. Finally, Alexander v. Choate, 469 U.S. 287 (1985), is wholly inapposite because it interpreted Section 504 of the Rehabilitation Act of 1973, not the Fair Housing Act.

- 25 -

mental discrimination.  At any rate, contrary to Mountain Side's
assertion (Br. 17), several other circuits have applied the
discriminatory effects test in cases involving private housing
providers, including two cases that were specifically cited by
the House Report in 1988 as examples of judicial endorsement of
the disparate impact theory.  See <u>Betsey</u>, <u>supra</u> (private owners
and managers of apartment complex), and <u>Halet</u> (action against
both a private landlord and a municipality), cited in H.R. Rep.
No. 711, <u>supra</u>, at 21.  See also <u>Williams</u> v. <u>Matthews Co.</u>, 499
F.2d 819, 826-828 (8th Cir.), cert. denied, 419 U.S. 1021 (1974);
<u>Smith</u> v. <u>Anchor Building Corp.</u>, 536 F.2d 231, 233-236 (8th Cir.
1976); <u>United States</u> v. <u>Mitchell</u>, 580 F.2d 789, 791 (5th Cir.
1978).  Congress took no action in 1988 to override any of these
decisions.

C.  The Secretary's Finding That HUD Established A Prima Facie
    Case Of Discrimination Is In Accordance With Law And Is
    <u>Supported By Substantial Evidence In The Record</u>

    To establish a prima facie case under a disparate impact
theory, a plaintiff must show that a facially-neutral rule
disproportionately excludes members of a protected group.
<u>Dothard</u> v. <u>Rawlinson</u>, 433 U.S. 321, 329 (1977); <u>Albemarle Paper
Co.</u> v. <u>Moody</u>, 422 U.S. 405, 425 (1975).  HUD met this burden by
demonstrating that Mountain Side's three-person rule
disproportionately excludes families with minor children, a group
whose members are protected by the Fair Housing Act.  Census
figures show that Mountain Side's three-person rule would
exclude, at the very least, 50.5% of families in the United

- 26 -

States with minor children, but, at most, only 11.7% of
households in the United States with no children under 18.

Mountain Side challenges (Br. 20) the Secretary's reliance
on nationwide statistics in finding that the three-person rule
had disparate impact on families with children.  The Supreme
Court's decision in Dothard makes clear, however, that HUD's
statistics were sufficient to establish a prima facie case.  In
Dothard, the Supreme Court relied on national population
statistics to uphold a finding that Alabama's height and weight
requirements for prison guards had a disparate impact on women.
Id. at 329-330.  The Court rejected the State's argument that
plaintiffs were required to produce evidence about the local
population in Alabama, holding that "reliance on general
population demographic data was not misplaced where there was no
reason to suppose that physical height and weight characteristics
of Alabama men and women differ markedly from those of the
national population."  Id. at 330.[8]  Similarly, there is no
reason to suppose that the composition of households with four or
more persons in Jefferson County differs markedly from the makeup
of such households in the nation as a whole, nor has Mountain
Side produced any evidence showing such a difference.  If
Mountain Side "discern[ed] fallacies or deficiencies in the data

_____

[8]  No subsequent Supreme Court decision has called this aspect
of the Dothard decision into question.  See Wards Cove, 490 U.S.
at 651 & n.6 (citing Dothard favorably); EEOC v. St. Louis-San
Francisco Ry. Co., 743 F.2d 739, 742 (10th Cir. 1984) (relying on
Dothard); Bradley v. Pizzaco of Nebraska, Inc., 939 F.2d 610, 613
(8th Cir. 1991) (same), cert. denied, 112 S. Ct. 933 (1992).

offered by [HUD], [it was] free to adduce countervailing evidence of [its] own." Id. at 331.[2/]

Although it was not required to do so in light of Dothard, HUD bolstered its statistical evidence by showing that the percentage of four-or-more-person households that are families is virtually identical in Jefferson County and in the nation as a whole (Tr. II at 38). This comparison discounted the possibility that Jefferson County had an abnormally large percentage of four-or-more-person households that consisted entirely of unrelated persons, and thus further reduced the likelihood that the demographic makeup of the County would differ markedly from the national average.

Mountain Side argues (Br. 22-26) that HUD was required to produce evidence of the impact of the three-person rule on applicants for residency or on the pool of individuals who were

---

[2/] Mountain Side distorts the record by suggesting (Br. 21-22) that census data were available for Jefferson County that HUD should have used to measure the impact on families with children. In fact, HUD presented unrebutted testimony of James Coil, an experienced economist with special expertise in analyzing census data, that no such census figures were available for either Jefferson County or the Denver metropolitan area (Tr. II at 48-51). Although the census data showed how many "families" in the County contained three or fewer persons, that figure is meaningless for purposes of the disparate impact analysis because the data did not reflect how many of those families contained children under 18 (Tr. II at 46-47). The term "family," as defined by the U.S. Census Bureau, simply means a group containing two or more persons related by blood or marriage and thus may consist entirely of adults (Gov't Ex. 29 at B-2, B-9; Tr. II at 47). Moreover, Mountain Side's attack on Coil's expertise is unfounded. His job involved analysis of census data and he had received specialized training in that area (Tr. II at 26). That he gathered certain information at the request of HUD's attorneys does nothing to call into question his expertise or his knowledge about what data were available from the Census Bureau.

- 28 -

interested in living in the Park.  Neither showing is necessary.
Applicant flow data is not required, especially where, as here,
the three-person rule would deter otherwise qualified families
from seeking residency in Mountain Side's park.  See Dothard, 433
U.S. at 330; EEOC v. St. Louis-San Francisco Ry. Co., 743 F.2d
739, 742 (10th Cir. 1984).  Mountain Side's reliance (Br. 24) on
New York City Transit Auth. v. Beazer, 440 U.S. 568 (1979), is
misplaced.  Beazer, in fact, reaffirmed Dothard's holding that
applicant flow data is not required if no reason exists to
suspect that the general population figures might not accurately
reflect the pool of qualified persons.  Id. at 586 n.29.  In
Beazer, the Transit Authority refused to employ current users of
methadone, including those receiving methadone treatment for
curing heroin addiction.  Plaintiffs challenged the policy under
Title VII on grounds that it had a disparate impact on blacks and
Hispanics.  The Court found plaintiffs' analysis inadequate and
suggested that applicant flow data might be more useful because
the record showed that a large percentage of the methadone users
in the plaintiffs' statistical analysis were unqualified, indeed
unemployable, because of illegal narcotics use and other
problems, and because plaintiffs' figures were underinclusive
since they did not include persons who were in private methadone
treatment programs -- an omission that could drastically
overstate the disparate racial effect of the no-methadone rule.

- 29 -

_Id._ at 571-572, 576-577, 586-587 & n.30.  Mountain Side failed to

show any comparable flaws in HUD's statistical analysis.[10/]

D.   Mountain Side Failed To Rebut The Prima Facie Case Of
     Discrimination

   1.   The Secretary applied the correct definition of
        "business necessity"

Once HUD established a prima facie case of discrimination,

the burden shifted to Mountain Side to prove that its three-

person rule was required by "business necessity."  _Griggs_, 401

U.S. at 431; _Betsey_, 736 F.2d at 987 (adopting _Griggs_' standard

in Fair Housing Act cases).  The Secretary held that business

necessity "means that the policy or practice at issue must serve

a necessary relationship to the [housing provider's] needs, not

---

[10/]  Mountain Side argues (Br. 22-23) that HUD could have and
should have correlated family size and income level to try to
isolate the pool of individuals whose low economic status
supposedly would make them interested in mobile home living.
Although HUD's economist testified that he could correlate family
size with income level (Tr. II at 45), such an analysis would be
irrelevant because it would not identify how many families _with_
_minor_ _children_ there are among the low-income families that
contain four or more individuals (see Tr. II at 51-52).  Again,
Mountain Side is confusing the term "families" with "families
with minor children."  See footnote 9, _supra_.  In any event, even
if such statistics were available, HUD was under no obligation to
produce them.  The cases and legislative history cited by Moun-
tain Side make clear that a statistical comparison can properly
be based on generalized population figures where the jobs in
question do not require specialized skills.  See _Wards_ _Cove_, 490
U.S. at 651 & n.6; _Hazelwood_ _Sch._ _Dist._ v. _United_ _States_, 433
U.S. 299, 308 n.13 (1977); H.R. Rep. No. 102-40(I), 102d Cong.,
1st Sess. 33.  See also _International_ _Bhd._ _of_ _Teamsters_ v. _United_
_States_, 431 U.S. 324, 339-340 n.20 (1977).  In the fair housing
context, the low-to-moderate income housing at issue here is
analogous to jobs requiring no specialized skills, and thus
general population figures provide the appropriate statistical
comparison.  Although high-income families might choose not to
reside in mobile homes, clearly they are qualified by virtue of
their income to live there.

- 30 -

merely serve the [housing provider's] legitimate goals" (Doc. 62
at 9). In other words, Mountain Side must show "compelling need
or necessity" (id. at 10).

Although Mountain Side argues (Br. 27-30) that the Secretary
applied the wrong definition of "business necessity," his
formulation of the defendant's burden is consistent with Griggs
and its progeny. First, the "necessary relationship" requirement
adopted by the Secretary is inherent in a literal reading of the
term "business necessity," as the Supreme Court and this Court
have recognized. See Dothard, 433 U.S. at 331-332 n.14 (employer
must show practice is "necessary to safe and efficient job
performance") (emphasis added); Williams v. Colorado Springs
School Dist., 641 F.2d 835, 840-841 n.2 (10th Cir. 1981) (Griggs
"requires that hiring and promotion criteria be necessary to the
effective performance of a job") (emphasis added). Second, the
Secretary's use of the word "compelling" to describe the
necessity of the challenged practice mirrors the language used by
this Court in interpreting Griggs. See e.g., Thomas v.
Metroflight, Inc., 814 F.2d 1506, 1509 (10th Cir. 1987) ("'The
practice must be essential, the purpose compelling.'"), quoting
Williams, 641 F.2d at 842. This "compelling" standard also
applies in Fair Housing Act cases. Betsey, 736 F.2d at 988
("defendants must prove a business necessity sufficiently
compelling to justify the challenged practice") (emphasis added).
Other circuits have also required a showing of "compelling"
necessity. Bradley v. Pizzaco of Nebraska, Inc., 7 F.3d 795, 797

- 31 -

(8th Cir. 1993); <u>Gutierrez</u> v. <u>Municipal Court of Southeast</u>
<u>Judicial Dist.</u>, 838 F.2d 1031, 1042 (9th Cir. 1988), vacated as
moot, 490 U.S. 1016 (1989); <u>Rowe</u> v. <u>Cleveland Pneumatic Co.</u>, 690
F.2d 88, 93-94 (6th Cir. 1982); <u>Jackson</u> v. <u>Seaboard Coastline</u>
<u>R.R.</u>, 678 F.2d 992, 1016-1017 (11th Cir. 1982).

Mountain Side also contends (Br. 28) that the Secretary's
definition of "business necessity" is inconsistent with the
legislative history of the Civil Rights Act of 1991.  Reliance on
that legislative history is misplaced.  The excerpts of the
Committee Report cited by Mountain Side interpret a proposed
definition of "business necessity" that was never enacted into
law.  Compare H.R. Rep. No. 102-40(I), 102d Cong., 1st Sess. 34
(quoting Section 701(o) of H.R. 1) with Civil Rights Act of 1991,
Pub. L. No. 102-166, § 105(b), 105 Stat. 1075 (1991).  Moreover,
the Civil Rights Act of 1991 specifically provides that "[n]o
statements other than the interpretive memorandum appearing at
[137 Cong. Rec.] S15276 (daily ed. Oct. 25, 1991) shall be
considered legislative history of, or relied upon in any way as
legislative history in construing or applying" the business
necessity provisions of the statute.  Pub. L. No. 102-166, §
105(b), 105 Stat. 1075 (1991).  With regard to "business
necessity," that interpretive memorandum simply states that
"[t]he terms 'business necessity' and 'job related' are intended
to reflect the concepts enunciated by the Supreme Court in <u>Griggs</u>
v. <u>Duke Power Co.</u>, 401 U.S. 424 (1971), and in the other Supreme
Court decisions prior to <u>Wards Cove Packing Co.</u> v. <u>Atonio</u>, 490

- 32 -

U.S. 642 (1989)." 137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991). The Secretary's formulation, which mirrors this Court's interpretation of Griggs, is consistent with this authoritative legislative history.

Finally, Mountain Side's suggestion (Br. 27 n.14) that the Wards Cove standard governs this case has no merit in light of the Civil Rights Act of 1991, which overturned that portion of Wards Cove that defined the defendant's rebuttal burden in a disparate impact case, and which expressly reinstated the long-standing "business necessity" standard of Griggs. See Pub. L. No. 102-166, §§ 2(2), 3(2), 105(b), 105 Stat. 1071, 1075 (1991); 137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991). It makes no sense for this Court to follow a Title VII decision that Congress has specifically repudiated, especially since no federal court has ever adopted the Wards Cove business justification standard in a Fair Housing Act case and since Congress expressly acknowledged, but took no action to overturn, Betsey (which endorsed the Griggs standard under Title VIII) when it amended the Act in 1988. See H.R. Rep. No. 711, supra, at 21.

2.  The Secretary's finding that Mountain Side failed to prove business necessity is supported by substantial evidence in the record

As the Secretary recognized, Mountain Side's proffered justifications for its three-person rule consisted of nothing but speculation, conclusory assertions, subjective opinions and post-hoc rationalizations (Doc. 62 at 11). Such explanations certainly do not establish a "compelling need or necessity" for

- 33 -

the rule (id. at 10).[11/]  The Secretary found that Mountain Side had failed to prove that any occupancy limit, let alone its three-person rule, was needed to prevent overcrowding at the Park.  This finding is supported by substantial evidence in the record and should be upheld.

Mountain Side's professed concern about overcrowding has no factual basis.  Indeed, it is contrary to the evidence in the record.  As such, it is insufficient to establish business necessity.  Griggs, 401 U.S. at 431-432; Keith, 858 F.2d at 484.  At the time it adopted the three-person rule, the Park had only 320 residents -- only about a third of the 916 residents that the QCI Report recommended as a cap and less than half of the 687 limit advocated by Mountain Side itself.  By 1991, with all but three of its 229 lots occupied, the Park still only had 341 residents.  If the Park's growth rate were to continue as it had between 1988 and 1991, it would not reach the population limit of 687 advocated by Mountain Side until well into the next century.  The Park also has a low attrition rate (Doc. 33 at 10; see also Tr. I at 43 (counsel's argument)), and the engineer who prepared the QCI report predicted that the Park would continue to be

---

[11/]  These explanations would not even satisfy the more deferential Wards Cove standard because they represent "[a] mere insubstantial justification" which, if accepted, would "permit discrimination to be practiced through the use of spurious, seemingly neutral * * * practices."  Wards Cove, 490 U.S. at 659.  Although the discredited Wards Cove standard relaxed Griggs' business necessity test, it did not require a court to accept a defendant's proffered justification at face value.  Green v. USX Corp., 896 F.2d 801, 805 (3d Cir.), cert. denied, 498 U.S. 814 (1990); Newark Branch, NAACP v. Town of Harrison, 940 F.2d 792, 803 (3d Cir. 1991).

dominated by two-bedroom trailers because most lots cannot accommodate large mobile homes (D. Ex. 14 at 6, 11; Tr. III at 148). Indeed, Mountain Side's professed concerns about a population surge contradict the position it has taken throughout this litigation (see, e.g., Br. 10) that large families do not want to live in mobile homes.

Moreover, Mountain Side adopted the three-person rule in 1989 without any meaningful study of the situation, further undermining its overcrowding argument. See Griggs, 401 U.S. at 431 (requiring "meaningful study" to establish business necessity). Mountain Side's own witness admitted that, at the time they adopted the three-person limit, Park operators had no objective evidence on which to base the rule and had not explored alternative methods of avoiding overcrowding (Tr. III at 249-250). The only study Mountain Side did was to commission the QCI Report -- two years after it instituted the three-person rule -- but then Mountain Side refused to follow the Report's recommendations.

But even assuming overcrowding were a realistic concern, Mountain Side failed to establish a business necessity for adopting a three-person rule instead of a less discriminatory standard. Mountain Side ignored the recommendations of the QCI Report, which would have allowed two persons per bedroom until the Park reached 916 residents,[12] thus permitting the

---

[12] Even the 916 figure was not an absolute limit on the number of persons who could be in the Park at any one time. Contrary to
(continued...)

- 35 -

VanLoozenoords and Brace to remain in their home. Although
Mountain Side argued that it must cap the number of residents at
687 -- well below 916 -- to accommodate an influx of seasonal
visitors, the Secretary correctly found that this assertion was a
post-hoc rationalization and consisted of only vague and
unsubstantiated assertions (R. 62 at 11). This is insufficient
to establish business necessity. See <u>Dothard</u>, 433 U.S. at 331-
332; <u>Huntington Branch</u>, 844 F.2d at 940.

II

THE SECRETARY HAD PLENARY AUTHORITY
TO REVERSE THE ALJ'S DECISIONS

<u>Standard of Review</u>. The Secretary's interpretation of his
authority under the Act to review ALJ decisions must be upheld as
long as it is "reasonable" and "is not in conflict with the plain
language of the statute." See pp. 15-16, <u>supra</u>.

Mountain Side argues (Br. 40-42) that the Secretary was
required to uphold the ALJ's findings unless they constituted a
"clear abuse of discretion" or were not supported by substantial
evidence in the record. Contrary to Mountain Side's argument,
the Act imposes no such limit on the scope of the Secretary's
review. The Secretary's interpretation of the statute as giving
him plenary power of review is reasonable and must be upheld.

The Act gives the Secretary the power to "review any
finding, conclusion, or order" issued by an ALJ. 42 U.S.C.

---

[2/] (...continued)
Mountain Side's assertion (Br. 31), the Secretary accurately
characterized the engineer's testimony on this point (see Tr. III
at 147).

3612(h).  See also 24 C.F.R. 104.930(a) (the Secretary "may review any finding of fact, conclusion of law, or order"). Nothing in the statute or regulations limits the scope of this review authority.  To the contrary, Congress intended and HUD's regulations provide that ALJ proceedings shall be "conducted in accordance with the Administrative Procedure Act (5 U.S.C. 551-559)." 24 C.F.R. 104.710.  See H.R. Rep. No. 711, supra, at 36. The APA, in turn, authorizes the head of an agency who reviews an ALJ's decision to reweigh the evidence and to substitute his findings of fact for those of the ALJ, even on credibility determinations.  See 5 U.S.C. 557(b); K. Davis & R. Pierce, Jr., Administrative Law Treatise, § 11.2 at 178 (3d ed. 1994).  This is a well-established principle of administrative law.  United States v. Raddatz, 447 U.S. 667, 680 (1980); FCC v. Allentown Broadcasting Co., 349 U.S. 358, 364 (1955).

Contrary to Mountain Side's suggestion (Br. 41), the Secretary has not limited his own authority to review ALJ decisions.  The administrative decision cited by Mountain Side (Br. 41) merely illustrates that the Secretary can defer to the ALJ if he chooses, not that he must defer.  See HUD v. Holiday Manor Estates Club, Inc., 2 Fair Housing-Fair Lending (P-H) ¶ 25,027 at 25,295 (HUD Secretary 1992).  Indeed, although the Secretary in Holiday Manor deferred to the ALJ on the calculation of damages for pain and suffering, id. at 25,302, he substituted his own findings for those of the ALJ on the question whether certain individuals had been harassed.  See id. at 25,300.

- 37 -

This Court's duty is to review the Secretary's factual findings to determine if they are supported by substantial evidence in the record. If they are, those findings must be upheld, even if they contradict an ALJ's findings which also have substantial support in the record. <u>Fierro</u> v. <u>Bowen</u>, 798 F.2d 1351, 1355 (10th Cir. 1986), cert. denied, 480 U.S. 945 (1987); <u>Glaziers Local Union 558</u> v. <u>NLRB</u>, 787 F.2d 1406, 1411 (10th Cir. 1986).

### III

THE SECRETARY HAD JURISDICTION TO
ISSUE EACH OF HIS DECISIONS IN THIS MATTER

<u>Standard of Review</u>. Congress has expressly delegated to the Secretary the power to promulgate regulations implementing the Act. 42 U.S.C. 3614a. Consequently, HUD's regulation interpreting the Secretary's power of "review" under the Act must be upheld as long as it is "reasonable" and "is not in conflict with the plain language of the statute." <u>National R.R. Passenger Corp.</u>, 112 S. Ct. at 1401; <u>Chevron</u>, 467 U.S. at 843 & n.11; <u>Housing Auth. of Kaw Tribe</u>, 952 F.2d at 1194-1195 (deference to HUD's interpretation).

Mountain Side argues (Br. 33-36) that the Secretary had no jurisdiction to issue the orders of July 19, 1993, and October 20, 1993, which set aside portions of the ALJ's decisions. This argument is based on a fundamental misreading of the Fair Housing Act, which provides that

> The Secretary may review any finding, conclusion, or order issued under subsection (g) [decisions by ALJs]. Such review shall be completed not later than 30 days after the

finding, conclusion, or order is so issued; otherwise the
finding, conclusion or order becomes final.

42 U.S.C. 3612(h)(1).  HUD regulations interpret this provision
to permit the Secretary to "affirm, modify or set aside, in whole
or in part, the initial decision or remand the initial decision
for further proceedings."  24 C.F.R. 104.930(a).

Mountain Side does not dispute that the Secretary complied
with HUD's regulations, but argues that those regulations exceed
the authority granted by 42 U.S.C. 3612(h)(1).  Mountain Side
further suggests (Br. 35) that unless the Secretary -- within 30
days after the ALJ's decision -- renders a final determination on
the merits that definitively resolves the dispute at the
administrative level, he loses jurisdiction of the case and the
ALJ's decision automatically becomes the final decision of HUD.
This argument rests on the faulty premise that a remand for
further proceedings does not constitute "review" under the Act.

HUD's interpretation of the word "review" in 42 U.S.C.
3612(h)(1) to include a remand is a "permissible construction" of
the statute.  Chevron, 467 U.S. at 843.  In the federal court
system, review is commonly understood to include the power of
remand "for further proceedings without deciding the merits."
Ford Motor Co. v. NLRB, 305 U.S. 364, 373 (1939).  Indeed, courts
sometimes remand cases without expressing any views whatever on
any legal or factual issue.  See, e.g., Crosslin v. Mountain
States Tel. & Tel. Co., 400 U.S. 1004 (1971).

Moreover, the Act gives the Secretary broad authority to
prescribe by rule the "rights of appeal from the decisions of his

administrative law judges * * * to himself, as shall be appropriate and in accordance with law." 42 U.S.C. 3608(c). Congress thus recognized that the Secretary is in the best position to structure the administrative review process to promote efficient and sound decisionmaking within HUD.  See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543-544 (1978) (special deference owed to agencies' choice of procedural rules).  It is certainly within the Secretary's broad discretion to interpret his power of review to encompass remands, which serve important functions in the administrative process.  In the present case, HUD's motion for a remand (Doc. 37 at 6) brought to the Secretary's attention crucial caselaw on the disparate impact issue -- notably, the Supreme Court's decision in Dothard, supra -- that the ALJ had ignored in his Initial Decision (Doc. 36).  It was therefore proper for the Secretary to give the ALJ the opportunity in the first instance to apply Dothard and the other caselaw cited by HUD to the facts of this case.  Had the ALJ correctly applied the law on remand, the need for further Secretarial review could have been avoided.  At a minimum, a remand gave the Secretary the benefit of the ALJ's views on Dothard and the other cases, thereby helping to focus the issues in the case, which, in turn, promoted more efficient and informed decisionmaking at the Secretarial level.  In light of the policy interests furthered by such remands and the traditional deference owed to an agency's choice of procedural rules, the Secretary's interpretation of

- 40 -

"review" to include remands for further proceedings is a
reasonable construction of the Act that must be upheld by this
Court.

IV

COMPLAINANTS' DECISION NOT TO ATTEND A
CONCILIATION MEETING DOES NOT JUSTIFY DISMISSAL
OF THE CHARGES OR REVERSAL OF THE DAMAGE AWARD

Standards of Review.  Whether failure to attend a
conciliation meeting is a jurisdictional defect requiring
dismissal of the complaints is a legal issue subject to de novo
review.  FDIC v. Hulsey, 22 F.3d 1472, 1479 (10th Cir. 1994).
The ALJ's damage award will be upheld if supported by substantial
evidence in the record.  Morgan, 985 F.2d at 1458.

Mountain Side contends (Br. 39-40) that VanLoozenoord's and
Brace's failure to attend a conciliation meeting constitutes a
jurisdictional defect requiring dismissal of their administrative
complaints or, at a minimum, a reversal of their damage awards.
This argument has no merit because the Fair Housing Act imposes
no obligation on discrimination victims to engage in
conciliation.  By contrast, the Act requires the Secretary to
engage in conciliation "to the extent feasible."  42 U.S.C.
3610(b)(1).  Yet this Court has held that the Secretary's failure
to conciliate is not a jurisdictional bar.  Morgan, 985 F.2d at
1456.  A fortiori, the failure of the victims to engage in
conciliation certainly could not constitute a jurisdictional
defect under Morgan.

HUD met its obligations under the Act since it was prepared to conciliate if the victims had attended the meeting. HUD also engaged the parties in conciliation on another occasion and successfully negotiated an interim agreement. Moreover, as the ALJ found, HUD was not responsible for VanLoozenoord's and Brace's decision not to attend the conciliation meeting (Doc. 63 at 7 n.8). HUD therefore fulfilled its statutory obligation to engage in conciliation "to the extent feasible."

In addition, the failure of VanLoozenoord and Brace to attend the HUD conciliation meeting does not justify reversing their damage award, which is modest in light of the threats of eviction they faced. The ALJ already took their failure to attend the meeting into account in deciding to award VanLoozenoord and Brace only a small fraction of the damages requested by HUD ($9,178.05 of the $106,178.05 requested) (Doc. 63 at 8, 14). Further reduction of this award would be unjust. VanLoozenoord and Brace declined to attend the conciliation meeting only because the private housing consultant incorrectly informed them that if they attended they might lose the right to introduce crucial evidence at an administrative hearing.[13/] They tried to settle the case on other occasions, and entered

---

[13/]   The consultant apparently misinterpreted 42 U.S.C. 3610(d), which provides that "[n]othing said or done in the course of conciliation" under the Act may be made public or used in a subsequent proceeding under the Act "without the written consent of the persons concerned." This provision would not have prevented VanLoozenoord and Brace from using the evidence that they had obtained prior to conciliation, even if they had discussed such evidence during the conciliation meeting.

into the interim conciliation agreement negotiated by HUD, even though it required them to pay money to Mountain Side that they believed they might not owe.  Moreover, the record contains substantial evidence of economic losses and severe emotional distress that supports the ALJ's calculation of damages (Doc. 63 at 6-7, 10-11).  The award should stand.

V

## COMPLAINANTS ARE "AGGRIEVED PERSONS" WHO HAVE STANDING TO PURSUE FAIR HOUSING ACT CLAIMS

Standard of Review.  Standing is a legal question subject to de novo review.  Hackford v. Babbitt, 14 F.3d 1457, 1465 (10th Cir. 1994).

Mountain Side argues (Br. 36-39) that the complainants had no standing to bring a complaint under the Fair Housing Act. With regard to Brace, Mountain Side appears to contend that he has no standing because he is not legally married to VanLoozenoord and is not the legal custodian of her children. Mountain Side also argues that VanLoozenoord and her children have no standing because, as a result of Brace's presence in their home, their household included not one family, but two. These arguments are foreclosed by the plain language of the Fair Housing Act.

The Act prohibits discrimination in housing on the basis of familial status, 42 U.S.C. 3604, and defines "familial status" as

one or more individuals (who have not attained the age of 18 years) being domiciled with (1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such

custody, with the written permission of such parent or other person.

42 U.S.C. 3602(k). The VanLoozenoord-Brace household fell squarely within this definition because the household contained minor children who were domiciled with their mother.

Brace need not be the husband of VanLoozenoord or the father or legal custodian of her children to have standing under the Act. The Act provides that an "aggrieved person" may file a complaint, 42 U.S.C. 3610(a)(1)(A)(i), and defines "aggrieved person" to include "any person who * * * claims to have been injured by a discriminatory housing practice; or * * * believes that [he or she] will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. 3602(i). This broad definition confers standing on individuals who are injured by discrimination against others within a protected class even if they themselves are not in the protected class. See Trafficante, 409 U.S. at 208-212. Brace and the VanLoozenoords have standing because their eviction from the Park would cause them direct injury.[14]

---

[14] Even if Brace were not protected by the Act, his living in the same household as the VanLoozenoords would not destroy their standing under the Fair Housing Act. Mountain Side argues essentially that a family who would otherwise be covered by the Act loses that protection whenever any unrelated person moves into their household. Under Mountain Side's theory, a family who hired a live-in nurse to care for a sick child would no longer be protected by the familial status provisions of the Act. Congress could not having intended such a result. As long as the household contains a minor child who is domiciled with a parent or other person have legal custody or the equivalent, it is covered by the definition of "familial status."

- 44 -

VI

RES JUDICATA DID NOT BAR HUD'S CLAIMS

Standard of Review.  Whether res judicata bars HUD's Fair Housing Act claims is a legal question subject to de novo review. Satsky v. Paramount Communications, Inc., 7 F.3d 1464, 1467-1468 (10th Cir. 1993).

Mountain Side argues that HUD was precluded from bringing this action because VanLoozenoord and Brace did not raise their Fair Housing Act claims in a Forcible Entry and Detainer ("FED") action in a local Colorado court.  Res judicata does not apply here because VanLoozenoord and Brace did not have a full and fair opportunity to litigate their federal claims in the local court.

Under the "full faith and credit" mandate of 28 U.S.C. 1738, federal courts must first look to state law to determine the preclusive effects that a prior state proceeding may have on a subsequent federal action.  Marrese v. American Academy of Ortho. Surgeons, 470 U.S. 373, 380 (1985).  Under Colorado law, res judicata applies only if in both proceedings there are (1) "identity of subject matter"; (2) "identity of the cause of action"; (3) "identity of parties to the action"; and (4) "identity of capacity in the persons for which or against whom the claim is made."  State Engineer v. Smith Cattle, Inc., 780 P.2d 546, 549 (Colo. 1989) (citation omitted).  In addition, both federal and state law require that the party against whom res judicata is asserted must have had a "full and fair opportunity" to litigate its claims in the prior proceeding.  Scroggins v.

Kansas Dep't of Human Resources, 802 F.2d 1289, 1291 (10th Cir.
1986); Mason Jar Restaurant v. Industrial Claim Appeals Office of
Colo., 862 P.2d 1026 (Colo. App. 1993).

The ALJ correctly held that VanLoozenoord and Brace did not
have a "full and fair opportunity" to raise their Fair Housing
Act claims in the prior FED action (Doc. 36 at 13).  Under
Colorado law, an FED action is a narrow proceeding "limited to
the question of possession."  Aasgaard v. Spar Consolidated
Mining & Dev. Co., 522 P.2d 726, 727 (Colo. 1974) (FED judgment
not res judicata in subsequent action).  Colorado courts have
held that where service of the summons in an FED case is
accomplished by posting -- as it was here (Tr. I at 166) -- the
local court has no jurisdiction to entertain damage claims during
the possession hearing, and thus res judicata does not bar such
claims in subsequent proceedings.  Magliocco v. Olson, 762 P.2d
681, 684 (Colo. App. 1987); Aspen Plaza Co. v. Garcia, 691 P.2d
763, 764-765 (Colo. App. 1984).[15/]  The judge and the attorneys
in the FED hearing understood this limitation on the local
court's jurisdiction.  Mountain Side's counsel reiterated at the
end of the proceedings that "this was only a possession hearing"
(Gov't Ex. 6 at 53).  When he informed the court that Mountain

_____

[15/] The res judicata inquiry under Colorado law focuses on the
authority of the court that rendered judgment in the first
action, not on other courts that might have, but did not, adjudi-
cate the claims.  See Aspen Plaza, 691 P.2d at 765.  Thus, there
is no merit to Mountain Side's suggestion that VanLoozenoord and
Brace had an obligation to remove the eviction proceeding to
another court that had jurisdiction over all the Fair Housing Act
claims.

Side wanted to seek back rent from VanLoozenoord and Brace, the district judge advised him that such damages issues would have to be handled in a separate civil lawsuit (ibid.).  Moreover, the judge emphasized that the validity of the three-person rule -- the primary focus of the HUD administrative proceedings -- was not an issue to be resolved in the FED proceeding (id. at 48-50). Even if VanLoozenoord and Brace could have raised the Fair Housing Act as a defense to try to defeat Mountain Side's claim of possession, the local court's inability to completely adjudicate the federal law claims by awarding damages deprives the FED judgment of its res judicata effect.  See Marino v. Willoughby, 618 P.2d 728, 730-731 (Colo. App. 1980); Wilson v. Town of Avon, 749 P.2d 990, 992-993 (Colo. App. 1987).

Even if the local court had had jurisdiction to adjudicate all the Fair Housing Act issues, the summary nature of the FED proceedings deprived VanLoozenoord and Brace of a fair and full opportunity to litigate their claims.  Colorado's FED statute is designed to provide expedited hearings that allow landlords to gain possession of the premises quickly following a termination of tenancy or breach of lease.  Butler v. Farner, 704 P.2d 853, 856 (Colo. 1985).  See also Colo. Rev. Stat. § 13-40-114 (setting forth expedited deadlines).[16/]  The FED proceedings in this

---

[16/]  Forcing tenants to litigate all civil rights claims in FED eviction hearings would turn such proceedings into full-blown trials on the merits, which would require the local judge to resolve complex federal law issues and allow extensive presentation of evidence.  This would defeat the underlying purpose of the FED statute to provide an expeditious hearing to landlords,
(continued...)

case illustrate the expedited nature of the process.  The
proceedings were limited to half an hour (Gov't Ex. 6 at 4), the
judge emphasized to counsel that he was "not inclined to have
additional hearings on this kind of a case" (id. at 24), and he
ruled from the bench at the conclusion of the hearing (id. at 47-
50).  Where, as here, there are reasons to suspect the
thoroughness of the initial proceeding, this Court traditionally
errs on the side of caution by denying res judicata effect to the
first judgment.  See Housing Auth. of Kaw Tribe, 952 F.2d at
1196; Scroggins, 802 F.2d at 1292-1293.  This is especially true
where, as here, VanLoozenoord and Brace were involuntary
defendants in the eviction proceeding.  Thournir v. Meyer, 803
F.2d 1093, 1095 (10th Cir. 1986) (interpreting Colorado
law).[17]

Even if VanLoozenoord and Brace had had a "full and fair
opportunity" to litigate their Fair Housing Act claims in the
local court, res judicata would not bar this action because HUD

_____

[16] (...continued)
and provides added evidence that Colorado would not give preclu-
sive effect to the judgment in the eviction proceeding.

[17] Contrary to Mountain Side's assertions, VanLoozenoord's
counsel in the FED proceeding did not waive their Fair Housing
Act claims.  Rather, he merely stated that such claims were not
before the local court (Gov't Ex. 6 at 3), which was consistent
with the court's and opposing counsel's understanding of the
limited nature of the FED proceeding.  Mountain Side's reliance
on Magliocco is misplaced because the court there held that the
judgment for possession in the FED proceeding was not res
judicata.  762 P.2d at 684.  The waiver question in that case
went to different issue.  At any rate, unlike the attorney in
Magliocco, counsel for VanLoozenoord and Brace vigorously opposed
Mountain Side's claim of possession, and did not waive any right
they had to object to eviction in a subsequent proceeding.

was neither a party to nor "in privity with a party" to the FED proceeding.  State Engineer, 780 P.2d at 549.  The Secretary does not simply stand in the shoes of the complainants, but has an interest in this case independent of the private complainants' interests.  In amending the Fair Housing Act in 1988, Congress created an administrative mechanism for resolving federal housing discrimination claims, and granted authority to the Secretary to administer the Act.  42 U.S.C. 3608, 3612.  Recognizing the Secretary's unique responsibilities in enforcing the Act, Congress also authorized the Secretary to seek civil penalties "to vindicate the public interest" and injunctive relief against individuals who are found liable for violating the Act.  42 U.S.C. 3612(g).  The fact that HUD also sought relief on behalf of private individuals in this suit does not mean that it was merely acting as a "proxy for victims of discrimination."  General Tel. Co. v. EEOC, 446 U.S. 318, 326 (1980).  Accord EEOC v. United Parcel Serv., 860 F.2d 372, 376 (10th Cir. 1988). Thus, HUD's administrative action was not barred by res judicata.

## VII

### THE ALJ DID NOT ABUSE HIS DISCRETION IN AWARDING INJUNCTIVE RELIEF THAT INCLUDED RECORDKEEPING AND REPORTING REQUIREMENTS

Standard of Review.  This Court reviews an injunction for abuse of discretion.  Roberts v. Colorado State Bd. of Agriculture, 998 F.2d 824, 826 (10th Cir.), cert. denied, 114 S. Ct. 580 (1993).

- 49 -

Mountain Side argues (Br. 44) that the ALJ erred in awarding
injunctive relief that included recordkeeping and reporting
requirements.  To the contrary, the ALJ acted well within his
discretion.  An ALJ may award injunctive relief under the Act "to
deter possible future violations and to 'remov[e] any lingering
effects of past discrimination.'"  Morgan, 985 F.2d at 1460,
quoting Marable v. Walker, 704 F.2d 1219, 1221 (11th Cir. 1983).
See 42 U.S.C. 3612(g)(3).  The recordkeeping and reporting
requirements are needed to deter Mountain Side from continuing to
enforce -- either openly or surreptitiously -- occupancy limits
that discriminate against families with children.  Deterrence
will be effective only if HUD has some way of verifying that
Mountain Side has not reverted to its old ways.  The type of
recordkeeping and reporting requirements included in the ALJ's
injunction are widely recognized as appropriate remedies in Fair
Housing Act cases.  See Baumgardner v. HUD, 960 F.2d 572, 583-584
(6th Cir. 1992); United States v. West Peachtree Tenth Corp., 437
F.2d 221, 230-231 (5th Cir. 1971); Marable, 704 F.2d at 1221.

Contrary to Mountain Side's argument (Br. 44), Morgan
provides no support for vacating the injunction in this case.
The mobile home park operator in Morgan abandoned his
discriminatory ways quickly after he learned of the Act's
requirements, 985 F.2d at 1459, 1461, whereas Mountain Side has
known about the Act's familial status provisions since at least
1989 and yet still tried to evict VanLoozenoord and Brace from
their home in 1992 and is still vigorously opposing a change in

- 50 -

the discriminatory three-person rule. Moreover, the park operator in <u>Morgan</u> no longer owned the park where the discrimination took place. <u>Id.</u> at 1461. Mountain Side, by contrast, still owns and operates the Park at issue in this case (see Br. 8). Under such circumstances, the ALJ did not abuse his discretion in entering the injunction.

### CONCLUSION

This Court should affirm and enforce HUD's decision and order of December 17, 1993. 42 U.S.C. 3612(k).

Respectfully submitted,

DEVAL L. PATRICK
Assistant Attorney General

JESSICA DUNSAY SILVER
GREGORY B. FRIEL
Attorneys
Department of Justice
P.O. Box 66078
Washington, D.C.   20035-6078
(202) 514-3876

### STATEMENT REGARDING ORAL ARGUMENT

The Secretary believes oral argument would be helpful because this case involves an issue of first impression in this Circuit, <u>i.e.</u>, whether the disparate impact standard of liability applies under the Fair Housing Act.

7/13/95

No. 95-9509

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

MOUNTAIN SIDE MOBILE ESTATES PARTNERSHIP, et al.,

Petitioners

v.

SECRETARY, UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
on behalf of Jacqueline, Jaime,
Michael and Shena VanLoozenoord, and
on behalf of Michael Brace,

Respondent

JACQUELINE VANLOOZENOORD, JAIME VANLOOZENOORD,
MICHAEL VANLOOZENOORD, SHENA VANLOOZENOORD
and MICHAEL BRACE,

Intervenors

ON PETITION FOR REVIEW OF A DECISION OF THE
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SECRETARY'S PETITION FOR REHEARING

JESSICA DUNSAY SILVER
GREGORY B. FRIEL
  Attorneys
  Department of Justice
  P.O. Box 66078
  Washington, D.C.  20035-6078
  (202) 514-3876

## TABLE OF CONTENTS

PAGE

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . .   2

ARGUMENT:

    THE PANEL MAJORITY ERRED IN ORDERING THE
    DISMISSAL OF THE DISCRIMINATION CLAIMS WITHOUT
    GIVING THE SECRETARY THE OPPORTUNITY TO
    CONSIDER THE EXISTENCE OF LESS DISCRIMINATORY
    ALTERNATIVES . . . . . . . . . . . . . . . . . . . . . . .   6

    A.   Disparate Impact Claims Involve A
       Three-Step Analysis . . . . . . . . . . . . . . . . .   6

    B.   The Panel Failed To Complete The
       Three-Step Analysis . . . . . . . . . . . . . . . . .   8

    C.   The Record Contains Abundant Evidence
       Of Less Discriminatory, But Equally
       Effective, Alternatives . . . . . . . . . . . . . .  10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . .  13

## TABLE OF AUTHORITIES

CASES:                                                        PAGE

Albermarle Paper Co. v. Moody, 422 U.S. 405 (1975) . . . . 5, 7

Chrisner v. Complete Auto Trans., Inc., 645
    F.2d 1251 (6th Cir. 1981) . . . . . . . . . . . . . . . .   9

Department of Labor v. City of Sapulpa, 30 F.3d
    1285 (10th Cir. 1994) . . . . . . . . . . . . . . . . . .   9

Dothard v. Rawlinson, 433 U.S. 321 (1977) . . . . . . . . .   7

EEOC v. St. Louis-San Francisco Ry. Co., 743
    F.2d 739 (10th Cir. 1984) . . . . . . . . . . . . . . . .   7

Emanuel v. Marsh, 897 F.2d 1435 (8th Cir. 1990) . . . . . .   9

Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419
    (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . .   7

- i -

CASES (cont'd):                                                  PAGE

FCC v. Allentown Broadcasting Co., 349 U.S.
     358 (1955) . . . . . . . . . . . . . . . . . . . 10

Fierro v. Bowen, 798 F.2d 1351 (10th Cir. 1986),
     cert. denied, 480 U.S. 945 (1987) . . . . . . . . . . 10

Martin v. Occupational Safety & Health Review
     Comm'n, 499 U.S. 144 (1991) . . . . . . . . . . . . 9

Matter of Search of the Premises Known as 6455
     South Yosemite, 897 F.2d 1549 (10th Cir. 1990) . . . . . 9

McLane/Western, Inc. v. NLRB, 827 F.2d 1423 (10th
     Cir. 1987) . . . . . . . . . . . . . . . . . . . 9

Murphy v. Derwinski, 990 F.2d 540 (10th Cir. 1993) . . . . . 7

Ortega v. Safeway Stores, Inc., 943 F.2d 1230
     (10th Cir. 1991) . . . . . . . . . . . . . . . . 7

United States v. Badgett, 976 F.2d 1176 (8th
     Cir. 1992) . . . . . . . . . . . . . . . . . . . 13

United States v. Perez, 989 F.2d 1574 (10th
     Cir. 1993) (en banc) . . . . . . . . . . . . . . . 9

United States v. Raddatz, 447 U.S. 667 (1980) . . . . . . . 10

Watson v. Fort Worth Bank & Trust, 487 U.S.
     977 (1988) . . . . . . . . . . . . . . . . . . . 5

Williams v. Colorado Springs Sch. Dist. No. 11,
     641 F.2d 835 (10th Cir. 1981) . . . . . . . . . . . 7, 9

STATUTES:

Administrative Procedures Act, 5 U.S.C. 557(b) . . . . . . . 10

Civil Rights Act of 1964, Title VII,
     42 U.S.C. 2000e et seq. . . . . . . . . . . . . 4, 6, 7

Pub. L. No. 102-166, Section 105(a), 105
     Stat. 1074 (1991), codified at 42 U.S.C.
     2000e-2(k)(1) . . . . . . . . . . . . . . . . . . 7

- ii -

RULES AND REGULATIONS:                                    PAGE

Fed. R. App. P. 40 . . . . . . . . . . . . . . . . . . . . . .   1

10th Cir. Rule 40.1 . . . . . . . . . . . . . . . . . . . . .   8


MISCELLANEOUS:

K. Davis & R. Pierce, Jr., Administrative
    Law Treatise (3d ed. 1994) . . . . . . . . . . . . . . .  10

- iii -

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

No. 94-9509

MOUNTAIN SIDE MOBILE ESTATES PARTNERSHIP, et al.,

Petitioners

v.

SECRETARY, UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
on behalf of Jacqueline, Jaime,
Michael and Shena VanLoozenoord, and
on behalf of Michael Brace,

Respondent

JACQUELINE VANLOOZENOORD, JAIME VANLOOZENOORD,
MICHAEL VANLOOZENOORD, SHENA VANLOOZENOORD
and MICHAEL BRACE,

Intervenors

ON PETITION FOR REVIEW OF A DECISION OF THE
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SECRETARY'S PETITION FOR REHEARING

Pursuant to Fed. R. App. P. 40, the Secretary of the United
States Department of Housing and Urban Development (HUD) requests
rehearing of this Court's decision of May 30, 1995.

QUESTION PRESENTED

Whether the panel majority erred in ordering dismissal of
the discrimination claims in this case without giving the
Secretary the opportunity to decide whether there were any less
discriminatory alternatives to the three-person occupancy rule
that would serve petitioners' business needs.

- 2 -

## STATEMENT OF THE CASE

This case involves a challenge under the Fair Housing Act to a three-person-per-mobile-home rule adopted and enforced by the owner and managers of Mountain Side Mobile Estates (collectively "petitioners" or "Mountain Side"). Mountain Side sought to evict the complainants -- a five-person family with three minor children -- from their three-bedroom mobile home in the park because they exceeded the three-person limit (Op. 3-4).[1]

HUD challenged the three-person rule under the Fair Housing Act's disparate impact standard (among other theories). An Administrative Law Judge (ALJ) initially held that HUD had not established a prima facie case of discrimination (Op. 5; Doc. 36 at 25). The Secretary reversed, holding that HUD had made a prima facie showing under a disparate impact theory (Doc. 49 at 9). He remanded the case to the ALJ to determine whether Mountain Side could overcome the prima facie case by proving that its three-person rule was required by "business necessity" (ibid.). The Secretary also emphasized that, on remand, the ALJ might find it necessary to consider the existence of less discriminatory alternatives to the three-person rule, depending on which way he ruled on the business necessity question (ibid.).

---

[1] "Op. __" refers to the page number of the panel majority's opinion issued in this case on May 30, 1995. "Doc. __" refers to the document number on the List of Pleadings filed with the administrative record. "Tr. __ at __" refers to the volume and page number of the transcript of the hearing before the ALJ. "D. Ex." refers to Mountain Side's exhibits admitted at the hearing. "Br." refers to petitioners' opening brief.

- 3 -

On remand, HUD argued that Mountain Side had failed to establish a business necessity and, alternatively, that even if business necessity were proved, a number of less discriminatory alternatives existed that would have had a less disparate impact on families with minor children and yet would have effectively served Mountain Side's business needs (Doc. 57 at 12-16). Among the less discriminatory alternatives proposed by HUD were (1) using the two-person per bedroom limit recommended by Mountain Side's own expert; (2) setting an overall population limit for the park without imposing any occupancy restrictions on individual units; and (3) imposing restrictions on the number of vehicles per unit to address any concerns about parking and traffic (ibid.).

The ALJ rejected HUD's arguments. He held that Mountain Side had proved that the three-person limit was a "business necessity" (Doc. 58 at 4-5), and that HUD had failed "to demonstrate that a less discriminatory alternative exists that will accomplish the need addressed by the challenged practice" (id. at 4).

HUD again appealed to the Secretary, arguing that the ALJ had erred both on the business necessity holding and on the issue of less discriminatory alternatives (Doc. 60 at 24-29). The Secretary again overturned the ALJ's decision, finding that Mountain Side had failed to prove a business necessity for its occupancy standard (Doc. 62 at 10-12). The Secretary thus ordered that judgment be entered in favor of HUD (Doc. 62 at 12).

- 4 -

He did not address the issue of less discriminatory alternatives
to the three-person rule.  After the ALJ awarded relief to the
complainants on remand, Mountain Side petitioned for review of
the administrative decision.

On review, a divided panel of this Court reversed the
Secretary's decision and ordered that he dismiss the complaints
of discrimination (Op. at 28).  Judge Henry dissented.

At the outset, the majority agreed with the Secretary that a
plaintiff may prove a violation of the Fair Housing Act under a
disparate impact standard, and that no showing of discriminatory
intent is necessary to establish a violation under such a theory
(Op. 12-19).  The panel majority also agreed with the Secretary
that the disparate impact standard developed under Title VII of
the Civil Rights of 1964 (42 U.S.C. 2000e et seq.) provides the
proper model for analyzing disparate impact claims under the Fair
Housing Act (Op. 23-24).

The majority also recognized that the disparate impact test
involves a three-step analysis (Op. 22-23).  First, a plaintiff
must establish a prima facie case by showing that the challenged
rule or practice has a disparate impact on a protected class (Op.
22).  Second, once a prima facie showing is made, the burden
shifts to the defendant to prove "business necessity" by showing
that the challenged practice "has a manifest relationship to the
housing in question" (Op. 24).  Finally, if the defendant rebuts
the prima facie case by proving business necessity, the plaintiff
can still prevail by showing that other policies "without a

similarly undesirable * * * effect," would serve the defendant's business needs (Op. 23, citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 998 (1988), and Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975)).

The panel then proceeded to apply the first two steps of the three-part analysis. The majority first recognized that HUD could rely on a disparate impact theory to establish a prima facie case of familial status discrimination under the Fair Housing Act (Op. 17). Then, the majority concluded that Mountain Side had rebutted HUD's prima facie case by proving a "business necessity" for the three-person rule (Op. 22-28). But rather than proceeding to the third step of the disparate impact analysis -- i.e., the less discriminatory alternatives question -- the panel majority simply ordered that the claims of discrimination be dismissed (Op. 28).

Judge Henry dissented, concluding that there was substantial evidence to support the Secretary's finding that Mountain Side failed to prove business necessity (Dissent at 1, 4-5). He therefore would have affirmed the Secretary's finding of discrimination (Dissent at 6).

- 6 -

ARGUMENT

THE PANEL MAJORITY ERRED IN ORDERING THE
DISMISSAL OF THE DISCRIMINATION CLAIMS WITHOUT
GIVING THE SECRETARY THE OPPORTUNITY TO CONSIDER
THE EXISTENCE OF LESS DISCRIMINATORY ALTERNATIVES

The panel majority overlooked a crucial step in analyzing

this disparate impact case.  Having concluded that petitioners

established a business necessity for their three-person occupancy

limit, the majority stopped there and assumed that the case was

over.  This was error.  Even if a defendant demonstrates business

necessity, a plaintiff may nonetheless prevail by showing the

existence of an alternative practice with a less discriminatory

impact that would effectively serve the defendant's business

needs.  It was improper for the panel to order dismissal of the

discrimination claims, since neither the Secretary nor this Court

had addressed HUD's evidence of less discriminatory alternatives.

The proper procedure would have been to remand the case to the

Secretary with instructions to consider whether HUD proved the

existence of such alternatives.

A.   Disparate Impact Claims Involve A Three-Step Analysis

The panel majority recognized that Title VII provides the

model for analyzing disparate impact claims under the Fair

Housing Act (Op. 23-24).  Under Title VII, the courts have

developed, and Congress has ratified, a three-step process for

deciding whether plaintiffs have proved discrimination under a

disparate impact theory.  First, a plaintiff must establish a

prima facie case by showing that the challenged practice has a

disparate impact on members of a protected class.  Second, the

- 7 -

defendant can rebut the prima facie case by proving that the challenged practice is a business necessity. Third, if the defendant proves business necessity, the plaintiff can still prevail by showing that other practices "without a similar discriminatory effect" would also serve the defendant's business needs. Dothard v. Rawlinson, 433 U.S. 321, 329 (1977), citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975). Congress codified this three-step process when it amended Title VII in 1991. See Pub. L. No. 102-166, § 105(a), 105 Stat. 1074 (1991), codified at 42 U.S.C. 2000e-2(k)(1).

This Court has recognized the three-step test for disparate impact cases on several occasions, and has emphasized the importance of the less discriminatory alternatives inquiry. For example, this Court has upheld a finding of liability under Title VII on the ground that the plaintiff established the existence of an effective alternative to the defendant's policy that would have less of a disparate impact on women. Murphy v. Derwinski, 990 F.2d 540, 545-547 (10th Cir. 1993). See also Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1428-1430 (10th Cir. 1993) (recognizing three-step test that includes examination of less-discriminatory alternatives); Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1243-1244 (10th Cir. 1991) (same); EEOC v. St. Louis-San Francisco Ry. Co., 743 F.2d 739, 742-743 (10th Cir. 1984) (same); Williams v. Colorado Springs School Dist. No. 11, 641 F.2d 835, 841 & n.3 (10th Cir. 1981) (same).

B.   The Panel Failed To Complete The Three-Step Analysis

Although the panel majority acknowledged that the disparate impact analysis consists of three steps (Op. 23), it overlooked Step No. 3 when it applied the legal standard to the facts of the present case.   This oversight justifies rehearing, which is appropriate in this Circuit where the panel has "overlooked" a "significant issue" in the case.   10th Cir. R. 40.1.

HUD argued to both the ALJ and the Secretary that less discriminatory alternatives existed that would serve Mountain Side's needs equally as well as the three-person rule.   The ALJ ruled against HUD on this point.   HUD then preserved the issue by raising it in each of its administrative appeals to the Secretary (see Doc. 40 at 37; Doc. 44 at 47-48; Doc. 60 at 24-29).   The Secretary acknowledged that HUD had preserved the issue of less discriminatory alternatives (see Doc. 62 at 7 & n.2), but he never reached that issue because he found that Mountain Side had failed to prove business necessity and thus had not rebutted the prima facie showing of discrimination.   The Secretary had no need to decide the less discriminatory alternatives question because that issue does not come into play unless a defendant successfully rebuts the prima facie case.

Since the Secretary has not ruled on the question of less discriminatory alternatives, the case should be remanded to the Secretary to allow him to address the issue.   The question of less discriminatory alternatives is quintessentially a factual one, which should be addressed first by the Secretary rather than

by this Court.  See <u>Williams</u>, 641 F.2d at 841 & n.3, 842 (setting
forth evidence that might prove the existence of less
discriminatory alternatives, but remanding case to district court
rather than deciding issue on appeal); <u>Emanuel</u> v. <u>Marsh</u>, 897 F.2d
1435, 1444 (8th Cir. 1990) (remanding less discriminatory
alternatives question rather than deciding it at the appellate
level); <u>Chrisner</u> v. <u>Complete Auto Trans., Inc.</u>, 645 F.2d 1251,
1263 (6th Cir. 1981) (same).  This Court routinely remands cases
for further proceedings where the lower tribunal has not resolved
dispositive factual issues.  See <u>Department of Labor</u> v. <u>City of
Sapulpa</u>, 30 F.3d 1285, 1289-1290 (10th Cir. 1994) (factual
findings should be made in first instance by district court on
remand); <u>United States</u> v. <u>Perez</u>, 989 F.2d 1574, 1581-1582 (10th
Cir. 1993) (en banc) (recognizing that appellate court is not
proper forum for factfinding); <u>Matter of Search of the Premises
Known as 6455 South Yosemite</u>, 897 F.2d 1549, 1557 (10th Cir.
1990) (remanding case because unresolved issues should be
addressed by district court in first instance); <u>McLane/Western,
Inc.</u> v. <u>NLRB</u>, 827 F.2d 1423, 1425 n.4 (10th Cir. 1987) (court of
appeals should not make factual findings in the first instance).
See also <u>Martin</u> v. <u>Occupation Safety & Health Review Comm'n</u>, 499
U.S. 144, 159 (1991) (leaving issue for remand since lower court
had not addressed that question).

    In the present case, there has been no agency decision on
the less discriminatory alternatives issue.  Although the ALJ has
rejected HUD's proposed alternatives, the Secretary neither

accepted the ALJ's findings on this point nor decided the issue himself. The Secretary -- not the ALJ -- is HUD's ultimate factfinder.[2/] Consequently, the Secretary should have the opportunity to address the less discriminatory alternatives issue before it is considered by this Court.

C. The Record Contains Abundant Evidence Of Less Discriminatory, But Equally Effective, Alternatives

The record shows that there are less discriminatory, but equally effective, alternatives to Mountain Side's three-person-per-mobile-home rule. HUD proposed to the Secretary and to the ALJ a number of options, each of which would have had a less disparate impact on families with minor children, and yet, still would have been as effective as the three-person rule in accomplishing Mountain Side's goals.

For example, Mountain Side's expert concluded that the park's infrastructure, including its sewer system, could support 916 residents. Based on this conclusion, the expert recommended

---

[2/] Although the Secretary may, and often does, accept an ALJ's findings of fact, he is not compelled to do so. Under well-established principles of administrative law, the HUD Secretary has the authority to weigh the evidence himself and substitute his own findings of fact for those of the ALJ. See Administrative Procedures Act, 5 U.S.C. 557(b); United States v. Raddatz, 447 U.S. 667, 680 (1980); FCC v. Allentown Broadcasting Co., 349 U.S. 358, 364 (1955); K. Davis & R. Pierce, Jr., Administrative Law Treatise, § 11.2 at 178 (3d ed. 1994). The Court recognized this basic principle in Fierro v. Bowen, 798 F.2d 1351 (10th Cir. 1986), cert. denied, 480 U.S. 945 (1987). Fierro held that where the Secretary of an agency substitutes his or her own findings of fact for those of an ALJ, the Court's duty "is to review the decision of the Secretary, and not that of the ALJ" to determine whether it is supported by substantial evidence in the record. Id. at 1355. Thus, Fierro recognizes that the Secretary, not the ALJ, is the ultimate factfinder at the agency level.

that Mountain Side adopt a limit of two persons per bedroom in each mobile home and a population cap of 916 for the park as a whole (D. Ex. 14 at 11-12). Mountain Side could have used the occupancy limits recommended by its own expert: 2 persons per bedroom with an overall cap of 916 residents in the park. This less restrictive limit would have allowed the five-person family in this case to continue living in their 3-bedroom mobile home.

Such a restriction also would have effectively addressed any legitimate overcrowding concerns. The park's population likely would have stayed well below 916 if Mountain Side had replaced the 3-person-per-unit limit with the 2-person-per-bedroom rule. In 1988, the park contained only 318 residents -- nearly 600 below the capacity that the Park's expert recommended (Op. 25). At that time, 213 of the park's 229 lots were occupied by mobile homes (ibid.). By 1991, with all but three of its 229 lots occupied, the park still had only 341 residents (D. Ex. 14 at 2; Tr. III at 164). In other words, even though 13 more mobile homes at the park became occupied between 1988 and 1991, the park's population increased by only 28 persons (about 2 for each additional unit). Given the existence of only three vacant lots in the park in 1991 and the slow growth rate that had occurred over the preceding three-year period, the chance of the population surging anywhere near 916 is exceedingly remote. This is especially true in light of: (1) the park's low turnover rate (Doc. 33 at 10; see also Tr. I at 43 (counsel's argument)); (2) Mountain Side's own assertion that large families generally do

not want to live in mobile homes (Br. 10); and (3) the expert's

prediction that the park would continue to be dominated by two-

bedroom trailers because most lots cannot accommodate large

mobile homes (D. Ex. 14 at 6, 11; Tr. III at 148). Since most

homes in the park contain no more than two bedrooms, the 2-

person-per-bedroom rule likely would eliminate any risk of a

dramatic population surge that would push the number of residents

from 341 to the limit of 916.

Alternatively, Mountain Side could have adopted an overall

limit on the park's population without imposing restrictions on

the number of persons per unit. For example, Mountain Side could

cap the population at 687 residents -- the limit it advocated

during this litigation (see Op. 25). Even without any per-unit

restrictions, there is little likelihood that the park's

population would ever come close to 687. The number of residents

in the park (341 at last count) could more than double without

reaching the 687 limit, and such doubling is highly unlikely

given the factors we have already mentioned -- e.g., the tiny

number of vacancies, the infrequent turnover, and the small size

of the mobile homes (which naturally tends to hold down the

park's population even without any per-unit occupancy rules).

Of course, if the park's population unexpectedly increased

to a level relatively close to either the 916 or the 687 limit,

Mountain Side could at that time reevaluate its policies and then

impose other restrictions, perhaps even per-unit ones. Under

such an approach, Mountain Side would not have to wait until the

- 13 -

population reached the limit before taking action.  For example,
if the overall limit were set at 687 and the population surged
unexpectedly to 500 residents, Mountain Side might then be
justified in resorting to more restrictive occupancy rules to
slow the growth rate so that the number of persons did not
surpass the 687 level.

Moreover, if Mountain Side truly is concerned about parking
and traffic in the park, it could limit the number of automobiles
per unit, rather than the number of residents who may live in
each home.  This alternative would allow families with more than
three persons to continue living in the park and would offer
Mountain Side a more direct way to attack any perceived parking
or traffic problems.  Cf. United States v. Badgett, 976 F.2d
1176, 1180 (8th Cir. 1992) (rejecting argument that restrictive
occupancy rule was designed to address parking shortage).

The Secretary should be given an opportunity on remand to
consider these and the other alternatives proposed by HUD.  Until
such alternatives are addressed, the three-step disparate impact
analysis is incomplete.

                         CONCLUSION

The Court should rehear this case and should vacate that
portion of the panel decision that ordered the dismissal of the
discrimination claims.  The Court should then remand the case to

- 14 -

the Secretary for consideration of the less discriminatory
alternatives issue.

Respectfully submitted,

JESSICA DUNSAY SILVER
GREGORY B. FRIEL
  Attorneys
  Department of Justice
  P.O. Box 66078
  Washington, D.C.  20035-6078
  (202) 514-3876



# Handbook 8024.01

**U.S. Department of Housing and Urban Development**
Office of Fair Housing and Equal Opportunity

---

Departmental
Staff

---

**September 1995**

# Title VIII Complaint Intake, Investigation, and Conciliation Handbook

**: Distribution:** W-3-1, R-3-1 (FHEO), RC

8024.01

Despite the limited involvement of the real estate
agency, the homeowner's participation in the listing
service would destroy his right to claim the exemption.

3.  <u>Impact of Discriminatory Advertising upon the Claim to
    Single Family Home Exemption</u>.  Persons who would
    otherwise have the right to claim the exemption for the
    sale or rental of their own single family homes, lose
    that right if they publish or cause to be published any
    <u>written</u> notice which is discriminatory.  The Act
    explicitly includes posted notices and mailings under
    this prohibition.  This is one way in which the single
    family home exemption differs from the "Mrs. Murphy
    exemption," as illustrated by the examples below:

    **Example One:  A woman owns and resides in an inner-
    city townhouse with a rental unit in the basement.
    The woman publishes an advertisement specifying that
    the unit is available for rent to "A Childless
    Single or Couple."  The woman may be investigated
    and charged for a violation of Subsection 804(c),
    but continues to have the right to claim to the
    "Mrs. Murphy" exemption from the Act's prohibitions
    against refusal to rent and discriminatory terms and
    conditions.**

    **Example Two:  A man owns two houses, one of them a
    vacation cottage.  The man decides to handle renting
    the cottage himself and save money on commissions.
    He distributes flyers all over town which read
    "Adorable Vacation Cottage available for monthly
    lease to all-adult groups."  The owner in this
    instance would lose the right to claim the "single
    family home" exemption because of the discriminatory
    language in his advertisement.  This owner could be
    investigated and charged under Subsections 804(a),
    804(b), and 804(c).**

## 3-5  SUBJECT MATTER/ISSUE JURISDICTION

A.  **What Constitutes a Violation of the Act?**

In order for HUD to have jurisdiction over the subject
matter of a given complaint, the complainant must allege a
violation of the Act.  In the broadest possible terms, an
allegation will probably meet the test of involving a

001270

violation of the Act if the complainant provides information which indicates:

1. that the act, statement or decision was in some way related to the provision or enjoyment of housing, and

   a. that the motive for the action or decision was the race, color, religion, sex, national origin, familial status or handicap of the complainant; or the race, color, religion, sex, national origin or handicap of one or more persons associated with the complainant

      or,

   b. that the action or policy has a disproportionately negative effect upon persons of a particular race, color, religion, sex, familial status, national origin or handicap status.

The activities prohibited by the Act are described at Sections 804, 805, 806, 818, and 901. Each complaint must allege a violation of one or more of these provisions in order to be jurisdictional. A discussion of the intent and application of each of these sections is presented below.

**B.  Activities Prohibited under Section 804**

1. Part (a) of this Section of the Act makes it illegal to:

   **. . . refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise to make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.**

   This provision, particularly the phrase "or otherwise to make unavailable," has been interpreted to provide coverage for a multitude of actions which prevent, or greatly impede, an individual's efforts to secure housing.  For example, the provision speaks to situations in which a mortgage application is denied on a prohibited basis.  (The prohibitions found at Section 805 would also apply).  There are, however, other means people can use to render a desired dwelling unavailable.

8024.01

systemic complaint.  The difference arises when the
evidence shows that the alleged discriminatory practice
encompasses more than an isolated, accidental or peculiar
event, and the alleged violation happened as a regular
procedure.

The investigator should determine as soon as possible if
other complaints against the same respondent have been
referred to the Attorney General, and the bases, issues
and status of the existing complaints.  The investigator
should then discuss the complaint with his or her
supervisor.  Field Office management will decide whether
the complaint should be transmitted to Headquarters for
referral to the Department of Justice  (See Chapter 5,
Special Intake processing.)

B.  **Additional Guidance On Identifying Pattern Or Practice
Complaints**

Reserved

## 7-12  EVALUATING THE APPROPRIATE THEORY OF DISCRIMINATION TO APPLY IN A GIVEN CASE

Following is a brief summary of the principal theories of
discrimination -- overt discrimination, disparate treatment,
and disparate impact--and the analytical framework these
theories provide for an investigation of a Fair Housing Act
violation.  After receiving evidence from the complainant,
respondent, and witnesses, the investigator should re-assess
whether the correct theory of discrimination is being
applied.  The theories of discrimination are addressed
below; however, for a more thorough discussion of the
subject, see Chapter 2, Theories of Discrimination.

A.  **Overt Discrimination**

A complainant may present or report overt evidence of a
prohibited preference or limitation as part of their
allegation.  A landlord might be alleged to have told an
applicant, "We don't rent to families with children," or
a former employee might report that her boss told her to
"get rid of some of the Latinos."

The investigation of an overt evidence case will typically
focus upon establishing the complainant's relative

8024.01

credibility and the respondent's lack of credibility, as well as looking for supporting evidence through the respondent's records of dealings with persons of the complainant's class. Merely establishing that a respondent housing provider made a discriminatory comment during the course of a real estate transaction, will suffice for a showing that the Act's prohibitions against discriminatory advertising found at 804(c) have been violated. The investigator should not, however, stop there. In order to establish that the negative actions taken by the respondent towards the complainant were motivated, in whole or part, by the discriminatory preference, the investigation should proceed along the lines of other disparate treatment cases, with the collection and analysis of comparative and supporting evidence.

**B.   Disparate Treatment**

Disparate treatment discrimination occurs when a housing provider treats an individual differently because of race, sex, religion, color, national origin, familial status, or disability. Frequently, disparate treatment cases also involve a showing that the respondent has failed to follow his or her own established policies along lines prohibited by the law.

In many cases, however, respondents do not verbalize or otherwise express their discriminatory intent. To investigate these cases, the investigator must inquire: "Has the respondent treated any contrasting class persons more favorably?" If neither the complainant nor the investigator has identified any contrasting class comparators at the early stage in the case, the investigator should ask: "Has the respondent taken any unusual action against the complainant?" or "Does it appear that the respondent has taken an action <u>not</u> in accordance with his or her own procedures?" Alternatively the investigator may ask: "Is the reason advanced by the respondent for his or her actions true?" The following are two examples of claims of disparate treatment cases.

**Example One:  A complainant states that her neighbor, who is non-minority, was reported to the local police for creating excessive noise on three different occasions and yet was not evicted. The minority**

7-21

9/ 95

8024.01

complainant was evicted after her daughter had a single noisy party.

Example Two: A complainant states that she had been negotiating to buy a house for several weeks. The complainant and respondent had agreed upon a purchase price but were still negotiating over who would bear the cost of replacing the roof. The complainant's agent mentioned that the respondent's agent had asked her if it was true that her client had two adopted children with mental disabilities. The respondent then demanded a higher price for the house and specified that the house was offered "as is." Neither the complainant nor the complainant's agent could understand the sudden step backwards in negotiations on the part of the respondent.

## C. Disparate Impact

Disparate impact discrimination occurs when a housing provider implements an apparently _neutral_ policy, practice, or procedure that can be shown to have a disproportionately negative effect upon a class of people. In proving that disparate impact discrimination has occurred, the investigator does not have to establish that the respondent _intended_ to discriminate against a particular class of persons. Also, disparate impact occurs when everyone is treated in more or less the same manner, but the effects of this treatment are measurably more detrimental to a specific group of persons.

Disparate impact cases are often built upon statistical proof that demonstrates the negative effect of the subject policy upon persons of the complainant's class.

Disparate impact cases may be recognized on receipt of the respondent's statement of defense. When the respondent acknowledges the alleged discriminatory policy, but emphasizes that this policy is even-handedly enforced, the investigator should begin to consider the case as a possible example of disparate impact discrimination.

Example: New owners of a three- building, high-rise apartment complex placed into effect a change in the rental policy from renting to families with children to an all-adult rental policy. Pursuant to that policy change the owners issued eviction notices to all of the

8024.01

> families with children in one of the buildings.
> At the time the eviction notices were issued,
> most of the families with children in that
> building were minority. Of the total number of
> people living in that building, approximately
> 75% of the minority tenants received
> termination notices as opposed to approximately
> only 25% of the White tenants. An action was
> brought against the owners for violation of the
> Fair Housing Act alleging that the all-adult
> policy was part of a broad scheme to alter the
> racial composition of the complex. The court
> held that a prima facie showing for a
> discriminatory impact case required proof that
> a particular policy had a disproportionate
> effect on the minorities in the total group on
> which the policy was applied. The fact the
> evictions had a substantially greater effect on
> the minority tenants in the building was
> sufficient to establish a prima facie showing
> of a discriminatory impact.

In the example above, the respondent applied the
challenged policy across the board to all families with
children in the building. It could not be demonstrated
that the respondent evidenced an intent to prevent
minorities from living in the building. However, the
facts illustrate how a prima facie case under the theory
of disparate impact can be used to show that the
restrictive policy had a substantially greater impact on
minorities than on non-minorities. (Note that in this
example the respondent's policy discriminated on its face
against families with children. A familial status
complaint under these facts would be a disparate treatment
case.)

D. **Recognizing the Need to Shift Between Theories of
Discrimination During the Investigation**

As outlined in Chapter 2, Theories of Discrimination, the
requirements for proving a case of disparate treatment may
differ significantly from the requirements for proving a
case of disparate impact. On occasion, an investigator
may find it impossible to accurately determine the
difference between disparate treatment versus disparate
impact cases, that is, whether a respondent treated a
complainant differently because of his or her class, or,

8024.01

whether <u>a uniformly applied, apparently neutral policy that had a discriminatory effect upon persons of the complainant's class detrimentally affected the complainant</u>.

For example, a respondent may state that he rejected a complainant's application for an apartment because the applicant did not meet the income eligibility requirements.  The investigation must, first determine the precise details of the respondent's income eligibility requirements and how the respondent believes that the complainant did not meet the standards.  Then the investigation must determine whether the respondent applied those income requirements to all applicants.  Only if the answer to that question is "yes" should the investigator examine, after consultation with the supervisor, whether the income requirement had a disparate impact on members of the complainant's protected class.  Where this is the case, the investigator should create an investigative plan that allows for the possibility of either a disparate treatment case or a disparate impact case.

## 7-13 DETERMINING THE SCOPE OF THE INVESTIGATION

One of the most important decisions an investigator makes in planning an investigation is determining the scope of the investigation.  For example, the investigator must decide for what time period to seek evidence (the temporal scope), and what buildings, facilities, or institutions to examine (the geographic scope).  Additionally, the investigator must determine the extent to which the circumstances of other potentially aggrieved persons merit examination and whether to treat the allegations as systemic or "pattern or practice" complaints.

The investigator must make these decisions on a case-by-case basis.  Additionally, as the investigation progresses, the initial decisions about the scope of the investigation and necessary adjustments must be re-evaluated.

that the statute's prohibitions extend beyond intentional discrimination. The Senate Report states that Congress intended to proscribe ''policies and practices, including inappropriate underwriting guidelines, [which] may *unintentionally* yield discriminatory patterns in mortgage lending.''[47] The Senate Committee report cited testimony that ''. . .there are other business practices of the enterprises which have the *effect of discriminating* against minorities . . . .''[48] Examples cited by the Senate Report included differential pricing and fee structures for mortgage products which effectively discouraged lending in minority and low-income communities.[49]

However, HUD has taken into account the considerable comments it received from the GSEs and others, and has determined to track the statutory prohibition as enacted by Congress.

In response to the GSEs' comments regarding a lack of guidance, the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law. That law is applicable to all segments of the housing marketplace, including the GSEs. All of the circuit courts, except for the D.C. Circuit which has not considered the issue, have held that the Fair Housing Act includes claims based upon the disparate impact theory.[50]

All the Federal financial regulatory and enforcement agencies recognize the role that disparate impact analysis plays in scrutiny of mortgage lending. In the Interagency Policy Statement, the bank, thrift, and credit union regulators, the Justice Department, Treasury, OFHEO, Federal Trade Commission (FTC), and HUD jointly recognized the disparate impact standard as a means of proving lending discrimination under the Fair Housing Act and ECOA. The disparate results assessment requirement included in this final rule mirrors the statutory requirement and is consistent with the Interagency Policy Statement, which explicitly applies a similar ''disparate impact'' standard to proving violations of the Fair Housing Act and ECOA.[51]

Congress, in enacting FHEFSSA, expressly stated that it was concerned with the subtle, often ''*unintentional*'' forms of discrimination that are the

hallmark of present-day unlawful conduct, and that the law was enacted to ensure that the enterprises would in no way contribute to the continuance of such discrimination in mortgage lending.[52]

Prohibitions Against Discrimination

Freddie Mac objected to the use, in § 81.42(b)(1) of the proposed rule, of the term ''*based on* race, color . . .'' (etc.), suggesting that the statutory phrase ''because of'' be substituted. This final rule, which now mirrors the language of the statute, incorporates this suggestion. Section 81.43 of this final rule also follows the language of the statute in requiring assessments ''based on'' protected status. In the context of this rule, HUD considers the terms ''based on'' and ''because of'' to be synonymous.

Appraisals

Freddie Mac found the proposed rule's treatment of age and location troubling, even where the purpose of the rule was to set forth specific exemptions allowing consideration of such factors. Freddie Mac stated that the listed exemptions might be limiting and that the exemption as set out conflicted with the appraisal exemption in the Fair Housing Act. Freddie Mac also asked that the age/location-related exemption be removed from this final rule, asserting that the use of age or location in underwriting is appropriate so long as it is not used to discriminate.

In this final rule, § 81.42 parallels the language of the statute and no longer contains the list of examples of location factors which may properly be considered in an appraisal and in other aspects of the underwriting process. Section 805(c) of the Fair Housing Act, 42 U.S.C. 3605(c) addresses appraisals. The HUD regulation which implements this section provides that ''nothing in this section prohibits a person engaged in the business of making or furnishing appraisals of residential real property from taking into account factors other than race, color, religion, sex, handicap, familial status or national origin.'' 24 CFR 100.135. It is HUD's view that the Fair Housing Act and FHEFSSA allow the consideration of the age or location of a dwelling as long as that consideration is not used in a manner that discriminates unlawfully.

Assessment of Disparate Results

Both GSEs objected to conducting a disparate results assessment as part of the Annual Housing Activities Report (AHAR) required by FHEFSSA, a report

further discussed in § 81.63 of subpart E. Both GSEs objected to the manner in which the disparate results assessment would have been implemented by § 81.43 of the proposed rule, insofar as that section would have required the GSEs to set forth fully the basis for their conclusions that a business necessity exists for any policies and practices which yield disparate results. Freddie Mac contended that the Secretary has no authority to require the assessments. Freddie Mac also stated that the business practices assessment requirement would result in a massive diversion of resources from Freddie Mac's core business activities and detract from its abilities to fulfill its mission.

Fannie Mae stated that the proposed rule, as well as HUD administrative law decisions, suggest that Fannie Mae must accompany the demonstration of business necessity with a showing that no less discriminatory alternative exists for serving that business necessity, and that this would involve proving a negative assumption. Similar objections were stated with reference to the provisions requiring the GSEs to assess their underwriting and appraisal guidelines. Fannie Mae also claimed that the proposed rule provided no effective guidance to the GSEs concerning how to apply this test to their operating procedures and how to measure whether facially-neutral policies have a disparate impact on a protected class.

The GSEs further asserted that the business practices assessment and underwriting appraisal guidelines requirements place an excessive burden on the GSEs and that HUD underestimated this burden in its Regulatory Impact Analysis. Fannie Mae and Freddie Mac both objected to what they perceived as a shift in responsibility for analysis of data and enforcement from HUD to the GSEs.

MBA opposed the inclusion of the ''less discriminatory alternative'' prong of the disparate impact analysis set out in the rule, arguing that making it the GSE's burden to establish this prong would be unfair and inconsistent with case law on which the theory is based. Although opposing any requirements for GSEs to develop fair lending plans, and joining the objections to the disparate impact provisions, MBA nevertheless saw it as the proper function of the GSEs to develop a business practices assessment along the lines required by subpart D.

Finally, Freddie Mac claimed that the system of ''self-testing'' required by the business practices assessment conflicts with the clear trend set by the

---

[47] S. Rep. at 43 (emphasis added).

[48] Id. at 31 (emphasis added).

[49] *See id.*

[50] No courts have ever held in Fair Housing Act or ECOA cases that the disparate impact standard does not apply to lenders.

[51] Additionally, the Federal Reserve, in its Regulation B, recognizes the role of disparate impact analysis under ECOA. 12 CFR 202.6(a)(2); Federal Reserve System Handbook at 1–24.

[52] S. Rep. at 42–43.

# SYMPOSIUM: EMPLOYMENT DISCRIMINATION: SYMPOSIUM ARTICLE: THE BUSINESS NECESSITY DEFENSE IN DISPARATE IMPACT DISCRIMINA-TION CASES

Winter, 1996

**Reporter:** 30 Ga. L. Rev. 387

**Length:** 13095 words

**Author:** Susan S. Grover *

* Associate Professor of Law, College of William and Mary. Thanks to Robert Belton, Martha Chamallas, Marty Malen, and Michael Zimmer for their comments on earlier drafts of this Article.

---

| LexisNexis Summary |
| --- |

… When an employer's facially neutral practice disproportionately harms minority or women workers, the workers may sue for disparate impact discrimination under Title VII. … One rationale compares dispa-rate impact analysis with the disparate treatment analysis applicable to cases of intentional discrimina-tion. … The Supreme Court first recognized the disparate impact theory and its business necessity de-fense in Griggs v. Duke Power Co. … This Article examines the business necessity defense in order to aid the task of deriving such doctrine. … Unlike disparate impact discrimination, which may result inadver-tently from a seemingly benign practice, disparate treatment discrimination entails adverse employer deci-sionmaking actually motivated by an employee's membership in a Title VII-protected class. … Commen-tators have used the differences between impact and treatment analysis to support arguments that the stringent level of business need required to establish the BFOQ defense in disparate treatment cases is greater than the level of need required to establish the business necessity defense in impact cases. … Beginning early in the development of the disparate impact doctrine, and culminating in the Wards Cove case, some judges have analogized the business necessity defense not to the BFOQ, but to the legitimate, nondis-criminatory reason phase of treatment cases. … Balancing the Importance of An Employer's Goal Against the Efficacy of Its Practice. …

---

| Text |
| --- |

[*387]

I. Introduction

When an employer's facially neutral practice disproportionately harms minority or women workers, the workers may sue for disparate impact discrimination under Title VII. [1] An employer whose practice is found to have such an impact may avoid liability by proving that the challenged discriminatory practice is re-quired by "business necessity." [2] Long the subject of case-law colloquy, the business necessity defense se-cured a statutory foundation in the 1991 Civil Rights Act. [3] Although the new provision aspired to pro-

---

[1]    Civil Rights Act of 1964 tit. VII, 42 U.S.C. sections 2000e-2(k)(1)(A)-(B) (Supp. V 1993); see also Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971) (holding facially neutral practices having discriminatory effect violate Title VII).

[2]    42 U.S.C. sections 2000e-2(k)(1)(A)-(B); Griggs, 401 U.S. at 436. "Business necessity" is here used as an umbrella term for an affirmative defense encompassing the concepts of both business necessity and job relatedness. See infra notes 35-39 and accompanying text (discussing relationship between business necessity and job relatedness concepts).

[3]    42 U.S.C. sections 2000e-2(k)(1)(A)-(B).

vide statutory guidelines for the business necessity defense, [4] it ultimately left open precisely the questions that antecedent case law had failed to resolve. The overarching issue continues to be whether the term "necessity" in the business necessity defense literally requires that the discriminatory practice be essential to the continued viability of the business, or whether it requires something less. [5] This Article argues for the former interpretation.

Those who argue that the defense requires a demonstration of something less than true necessity generally rely on one of two rationales. One rationale compares disparate impact analysis with [*388] the disparate treatment analysis applicable to cases of intentional discrimination. [6] This argument focuses generally on perceived distinctions between the levels of culpability involved in the two types of cases and calls for a lighter defense burden in impact cases (where there is said to be less culpability) than the strict necessity usually required by the bona fide occupational qualification defense (BFOQ) available in treatment cases (where there is said to be greater culpability).

The other rationale relied on by those advocating a diminished showing of business necessity in impact cases focuses on the deliberative process. This argument contends that factfinders in impact cases should apply a balancing test in lieu of a strict necessity approach. Advocates of this methodology assert that balancing is the most effective way to safeguard the business-autonomy interests Congress recognized as important when it enacted Title VII. [7]

This Article explores the foundations of these two rationales. It challenges the distinctions that are assumed to exist between the level of culpability involved in impact cases and the level of culpability involved in treatment cases. It also questions the fairness of a balancing approach in lieu of a strict necessity requirement. The Article concludes that both rationales actually point more readily toward an absolute necessity requirement than toward a lighter defense burden. [*389]

II. The Business Necessity Defense

a. case law development of disparate impact analysis

The Supreme Court first recognized the disparate impact theory and its business necessity defense in Griggs v. Duke Power Co. [8] Prior to passage of the 1964 Civil Rights Act, the Duke Power Co. hired black workers in only one of its five departments--the "labor department." [9] After the 1964 Act forbade segregation in hiring, Duke Power adopted a facially neutral policy requiring applicants for work in the four "white" departments to have a high school diploma and satisfactory scores on both a standardized general intelligence test and an aptitude test. [10] These requirements excluded black workers from the four de-

---

[4]    Civil Rights Act of 1991, Pub. L. No. 102-166, section 3(2), 105 Stat. 1071, 1071 (1991).

[5]    I use "continued viability" to mean that relinquishing the discriminatory practice will compel the employer to cut back its business, resulting in employee layoffs.

[6]    Title VII has yielded two major theoretical frameworks for employment discrimination cases: disparate impact and disparate treatment. The Supreme Court has stated that these Title VII schemes, in addition to allocating burdens, "establish . . . an order for the presentation of proof" at trial. St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2746 (1993).

With respect to relative strengths of the BFOQ and business necessity defenses, the Supreme Court's pre-1991 Act decision in International Union, UAW v. Johnson Controls actually included dictum which expressly stated that business necessity is more lenient than the BFOQ defense. 115 S. Ct. 1196, 1203 (1993). Johnson Controls reflected the same Supreme Court view of business necessity that was advanced in Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989), and which was expressly legislatively overruled in the 1991 Civil Rights Act. See infra text accompanying note 22.

[7]    See, e.g., 110 Cong. Rec. 7246-47 (1964) (stressing important business-autonomy interests that Title VII should not infringe upon).

[8]    401 U.S. 424 (1971).

[9]    Id. at 427.

[10]    Id. at 427-28.

30 Ga. L. Rev. 387, *389

partments at a far greater rate than they excluded whites. [11] A unanimous Supreme Court held that fa-cially neutral practices with such disproportionate impacts on blacks violated Title VII unless justified. [12] To justify the practices, the Court required Duke Power to show both business necessity and job related-ness, apparently equating the two concepts: "The touchstone is business necessity. If an employment prac-tice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." [13]

Many of the lower court cases following Griggs required that the challenged practice be essential, not just efficacious, to the defen-    [*390]    dant's business. "The doctrine of business necessity 'connotes an ir-resistible demand.' The system in question must not only foster safety and efficiency, but must be essential to that goal." [14] Moreover, the Supreme Court's own decisions in Albemarle Paper Co. v. Moody [15] and Dothard v. Rawlinson [16] characterized the business necessity defense as a narrow one, requiring that the discriminatory practice be "necessary to safe and efficient job performance." [17] "The [concurrences and dissents in the] Albemar- le and Dothard decisions[, however,] showed the beginnings of a breakdown of the consensus regarding . . . [the business necessity standard]." [18]

The Court's full retreat from Griggs's strict business necessity    [*391]    standard finally materialized in Wards Cove Packing Co. v. Atonio. [19] In Wards Cove, the Court espoused in dictum a far lighter burden

---

[11]    Id. at 430. The high school diploma requirement, for example, would have excluded 88% of the state's black residents and only 66% of its white residents. The tests utilized by Duke Power had in another case been found to exclude blacks at a rate of 94% while whites were excluded at a rate of 42%. Id. at 430 n.6.

[12]    Id. at 430. The Court found the practices "froze the status quo of prior discriminatory practices." Id. Because the Griggs Court was looking at a perpetuation of pre-Act intentional discrimination, its language could be taken as indicative that impact analysis is appropriate only in cases involving otherwise unchallengeable intentional discrimination. In fact, Griggs has been taken more broadly to permit impact challenges where there is no hint of discriminatory motive. E.g., Connecticut v. Teal, 457 U.S. 440 (1982); New York Transit Auth. v. Beazer, 440 U.S. 568 (1979); Dothard v. Rawlinson, 433 U.S. 321 (1977).

[13]    Griggs, 401 U.S. at 431. In Griggs, the Court found no business necessity at Duke Power with regard to an acceptable pur-pose (such as predicting successful performance in the jobs to be filled) because no proof existed that the challenged educational criteria were effective predictors. Id. at 431, 432 n.7, 436.

[14]    Mark S. Brodin, Costs, Profits, and Equal Employment Opportunity, 62 Notre Dame L. Rev. 318, 343 (1987) (quoting United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 308 (8th Cir. 1972), cert. denied, 409 U.S. 1116 (1973)); see also Green v. Missouri Pac. R.R., 523 F.2d 1290, 1295-98 (8th Cir. 1975) (supporting narrowly construed business necessity defense); United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971) (same); Note, Business Necessity: Judicial Dualism and the Search for Adequate Standards, 15 Ga. L. Rev. 376, 387 n.47 (1981) [hereinafter Business Necessity] (citing cases constru-ing business necessity narrowly). But cf. Rosemary Alito, Disparate Impact Discrimination Under the 1991 Civil Rights Act, 45 Rut-gers L. Rev. 1011, 1031 (1993) (arguing Court's post-Griggs decision in Dothard, 433 U.S. at 321, "did not require that the cri-terion be necessary for the business to survive or for the job to be done at all but rather that it be 'necessary' for the job to be done well").

[15]    422 U.S. 405 (1975).

[16]    433 U.S. 321 (1977).

[17]    Id. at 331 n.14; see also Pamela L. Perry, Balancing Equal Employment Opportunities with Employers' Legitimate Discre-tion: The Business Necessity Response to Disparate Impact Discrimination Under Title VII, 12 Indus. Rel. L.J. 1, 11-17 (1990) (discussing Supreme Court development of business necessity doctrine).

[18]    Perry, supra note 17, at 15. This breakdown developed further in New York Transit Auth. v. Beazer, 440 U.S. 568 (1979). In Beazer, the Court found the plaintiff had failed to demonstrate a sufficient disparate impact in the employer's practice, but noted it would have allowed the business necessity defense if the employer showed merely that its "legitimate goals [would be] significantly served by[,] even if they do not require[,]" the practice. Id. at 587 n.31. Arguably, the lighter burden proposed by the Court was a function of the safety purpose underlying the drug abuse-related practice challenged in Beazer.

Ironically, while the Griggs Court stated of the defense that "the touchstone is business necessity," in a subsequent decision, the Court repeated the "touchstone" language but altered the standard to lessen the burden on defendants. In Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988), the Court stated that "the touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice." Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 659 (1989).

[19]    490 U.S. 662 (1989). The previous year, a plurality of the Court asserted the same position in Watson.

30 Ga. L. Rev. 387, *391

on the employer than it had applied in earlier impact cases. [20] Under Wards Cove, the challenged practice need not be ″ ʹessentialʹ or ʹindispensableʹ to the employerʹs business for it to pass muster.″ [21] This aspect of Wards Cove met with congres- sional disapproval. In the Civil Rights Act of 1991, Congress reinstated the stricter standard. [22]

b. statutory development of disparate impact analysis: the 1991 civil rights act

The Civil Rights Act of 1991 provided the first express legislative authority for disparate impact analysis and its business necessity defense. The 1991 Act imposes on defendants the burden of proving ″that the challenged practice is job related for the position in question and consistent with business necessity.″ [23] Even if the [*392] defendant succeeds in making this showing, the Act still imposes liability if the plaintiff dem- onstrates the availability of a less discriminatory alternative business practice which the defendant re- fuses to adopt. [24]

Although the 1991 Act purports not to alter the business necessity doctrine that pre-existed Wards Cove, the Actʹs language facially suggests three changes from earlier case law. First, Congressʹs conjoining of job relatedness and business necessity in the Act represents a departure from some earlier case law that al- lowed a defendant to prevail by showing either job relatedness or business necessity. [25] The language ″con- sistent with business necessity,″ on the other hand, could be interpreted as weaker than its precursors, re- quiring something less than absolute ″necessity.″ Finally, codification of the less-discriminatory alternative doctrine clarifies the allocation of proof burdens and suggests that necessary does indeed mean essential.

The only legislative history available to explain the meaning of the statutory terms is contained in an inter-

---

[20]    In the pre-Act case of International Union, U.A.W. v. Johnson Controls, this lighter standard was expressly described as ″more lenient for the employer than the statutory BFOQ defense.″ 111 S. Ct. 1196, 1203 (1991). On remand from the Supreme Courtʹs Wards Cove decision, the Ninth Circuit distinguished the pre- and post-Wards Cove standards as follows:

The district court on remand found again that the employerʹs interest in saving money justified its failure to winterize all of the bunkhouses. Although economizing in this way may have been unnecessary to the canneries′ success or survival, we cannot say that it fails to serve the legitimate goal of reducing operating costs.

Atonio v. Wards Cove Packing Co., 10 F.3d 1485, 1503 (9th Cir. 1993), cert. denied, 115 S. Ct. 57 (1994).

[21]    Wards Cove, 490 U.S. at 659. The Court stated that ″this degree of scrutiny would be almost impossible for most employers to meet, and would result in a host of evils.″ Id.

[22]    42 U.S.C. 2000e-2 (Supp. V 1993).

[23]    Id. section 2000e-2(k)(1)(A)(i) (emphasis added). The pertinent provisions of the 1991 Act provide:

An unlawful employment practice based on disparate impact is estab- lished under this title only if--

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consis- tent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

Id. section 2000e-2(k)(1)(A).

[24]    Id. section 2000e-2(k)(1)(A)(ii). ″The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of ʹalternative employment practice.ʹ ″ Id. section 2000e-2(k)(1)(C).

One commentator has observed that the Actʹs language providing for establishment of a less-discriminatory alternative may be read as a potential substitute for the plaintiffʹs initial establishment of a practiceʹs disparate impact. Alito, supra note 14, at 1016. While the language of the provision may be ambiguous, such a reading is illogical. It would not make sense for Congress to im- pose on courts the obligation of considering every less-discriminatory alternative without requiring the plaintiff to make some showing that the current practice has a discriminatory impact. But see id. at 1038 (stating such interpretation is consistent with logic and policy).

[25]    See Business Necessity, supra note 14, at 387 n.47 (providing relevant case law).

30 Ga. L. Rev. 387, *392

pretive memoran- dum.[26] That memorandum provides that "the terms 'business    [*393] necessity' and 'job relatedness' are intended to reflect the concepts enunciated by the Supreme Court in Griggs v. Duke Power Co. and in the other Supreme Court decisions prior to Wards Cove Packing Co. v. Atonio."[27] Because the Court's decisions preceding Wards Cove were not consistent among themselves,[28] however, definitions for these seemingly straightforward statutory terms must be derived from the theoretical and policy underpinnings of the business necessity defense.[29] The memorandum does nothing to explain how "necessary" the practice must be or how the less- discriminatory-alternative concept interplays with other compo- nents of the defense. This Article examines the business necessity defense in order to aid the task of deriving such doctrine.

### c. the elements of disparate impact analysis

A disparate impact case begins with the plaintiff's establishment    [*394] of a statistical prima facie case.[30] At this initial stage, the plain- tiff must prove that the challenged practice "selects applicants for hire or promotion in a . . . pattern significantly different from that of the pool of applicants."[31] Once the plain- tiff establishes a prima facie case, the employer either may disprove the existence of the alleged dispa-

---

[26]    Section 105(b) of the 1991 Act instructs courts to ignore any legislative history that purports to elucidate the business neces- sity defense, but permits reference to an accompany- ing "interpretive memorandum." Section 105 provides that

no statements other than the interpretive memorandum appearing at Vol. 137 Congressional Record S15276 (daily ed. Oct. 25, 1991) shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any provision of the Act that relates to Wards Cove Business necessity/culmulation/alternative business practice.

Pub. L. No. 102-166, section 105(b), 105 Stat. 1075 (1991). What, exactly, the Act intended to codify is especially unclear in light of the Court's plurality decision in  Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988). The Act purported to reinstate the law that existed prior to Wards Cove, but it may be "that Wards Cove simply created a clear majority for a position advocated by a plurality in Watson[;] [thus,] the question is whether the 1991 Act intended to overrule Watson as well as Wards Cove." Jerome M. Culp, Jr., Neutrality, the Race Question, and the 1991 Civil Rights Act: The "Impossibility" of Permanent Reform,  45 Rutgers L. Rev. 965, 969 n.16 (1993).

[27]    137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991). However, the Bush Administration took the position that "the bill embod- ies longstanding concepts of job-relatedness and business necessity and rejects proposed innovations. In short, it represents an affirmation of existing law, including Wards Cove." 137 Cong. Rec. S15474 (daily ed. Oct. 30, 1991).

The language of the 1991 Act mirrors that found in the Americans with Disabilities Act (ADA),  42 U.S.C. section 12112(b)(6) (Supp. V 1993). Nevertheless, Congress's official legislative history to the 1991 Act forbade reliance on ADA legislative history, de- spite statements in the unofficial legislative history of the 1991 Act drawing upon the ADA for meaning. Alito, supra note 14, at 1024 n.54; see also Robert Belton, The Unfinished Agenda of the Civil Rights Act of 1991,  45 Rutgers L. Rev. 921, 931 & n.48 (1993) (asserting Congress deliberately left open possibility that 1991 Act could be used to support same result achieved in Wards Cove).

[28]    Compare  New York City Transit Auth. v. Beazer, 440 U.S. 568 (1979) (allowing defendant to meet business necessity de- fense by showing its legitimate goals were significantly served by challenged practice) with  Dothard v. Rawlinson, 433 U.S. 321 (1977) (requiring discriminatory practice to be necessary to job performance).

[29]    But cf. Belton, supra note 27, at 930 (asserting plain meaning approach is supported by "built-in statutory legislative history" forbidding reliance on any legislative history other than interpretive memorandum).

[30]    In  Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988), Justice O'Connor, in a plurality opinion, stated that there is no hard and fast test for establishing the impact of a practice, but rather, courts must make this determination on a case-by-case basis. Id. at 995 n.3. Cf. EEOC v. Steamship Clerks Union, 48 F.3d 549, 604-06 (1st Cir. 1995).

[31]    Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975). In order to make this showing, the plaintiff must prove that (1) a dis- crete employer selection practice (or if no discrete practice is severable from the selection process, the process itself) (2) dispro- portion- ately excludes people of the plaintiff's class. Whether the degree of disproportion is adequate to constitute "impact" is de- termined on a case-by-case basis. Watson, 487 U.S. at 995 n.3. However, one type of practice that cannot be challenged based on its disproportionate impact is an employer's bona fide seniority system. See  International Bhd. of Teamsters v. United States, 431 U.S. 324, 349-50 (1977) (discussing Title VII's seniority-system exception). It is unclear whether an employee who is a mem- ber of the racial or gender (typically male) majority may utilize the disparate impact theory. Perry, supra note 17, at 10 n.33. But see  Craig v. Alabama State Univ., 804 F.2d 682, 688 (11th Cir. 1986) (recognizing impact claim for white male plaintiff); cf. Sims v. Montgomery County Comm'n, 890 F. Supp. 1530 (M.D. Ala. 1995) (apparently accepting that white males may mount disparate impact challenge).

30 Ga. L. Rev. 387, *394

rate impact by challenging the verity or significance of the plaintiff's statistics or may affirmatively prove that, despite the disparate impact, the practice is justified because it is "job related for the position in question and consistent with business necessity." [32] Should the defendant succeed by establishing the latter defense, the plaintiff may nevertheless prevail by introducing evidence that there is a less-discriminatory alternative which the defendant cannot successfully rebut but refuses to adopt. [33]

Application of these elements to particular facts requires clarification of three issues. One is the overarching degree of need [*395] issue that Part III of this Article addresses. The other two questions pertain to the relationship between business necessity and job-relatedness and the role of the less-discriminatory element of the defense.

1. Business Necessity and Job-Relatedness. The common and statutory law creating the business necessity defense has developed a two-part test, culminating in the language of the 1991 Act: "job related for the position in question and consistent with business necessity." [34] This duality raises the question of the relationship between business necessity and job relatedness. [35] The question consists of two sub-issues: first, whether employer practices can be defended as necessary to the business even though they are not job-related; and second, whether the business necessity defense can insulate practices that are job-related, even though the job itself is [*396] not shown to be essential to the business.

The language and purpose of the 1991 Act suggest that job-relatedness and business-necessity are both required and should be treated as two facets of the same requirement. Supreme Court and congressional choice of conjunctive language to join the two elements counsels in favor of requiring that both elements be met if the two can logically work together. The two can work together. In fact, the business necessity analysis actually lends itself more readily to a dual requirement than to an either-or approach.

---

[32]    42 U.S.C. section 2000e-2(k)(1)(A) (Supp. V 1993); see EEOC v. Steamship Clerks Union, 48 F.3d 549, 604 (1st Cir. 1995). In Watson, a plurality of the Court concluded the defendant's burden at this stage was one of production rather than persuasion. Although the Court espoused this view the following year in  Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989), Congress rejected it in the 1991 Act and established the defendant's burden as one of production and persuasion.  42 U.S.C. section 2000e(m).

[33]    42 U.S.C. section 2000e-2(k)(1)(A)(ii); see  Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1974). It is not clear whether a defendant can escape liability entirely by adopting such an alternative mid-way through the litigation. See Blumoff & Lewis, The Reagan Court and Title VII: A Common-Law Outlook on a Statutory Task,  69 N.C. L. Rev. 1, 43 (1990). Title VII provides additionally for other affirmative defenses not here relevant. See  42 U.S.C. sections 2000e-2(h), 2000e-11.

[34]    42 U.S.C. section 2000e-2(k)(1)(A)(i).

[35]    Belton, supra note 27, at 931-32 (positing Court has not definitively answered question of whether terms "job related" and "business necessity" are alternative characterizations of a same standard or are different standards); cf. Brodin, supra note 14, at 340 (noting in Griggs, "Court . . . left unexplained whether business necessity, described as the 'touchstone' of Title VII, is a separate form of justification, or merely another descriptive phrase for job relation" (citations omitted)). But see Alfred W. Blumrosen, Society in Transition III: Justice O'Connor and the Destabilization of the Griggs Principle of Employment Discrimination, 13 Women's Rts. L. Rep. 53, 56 n.25 (1991) (asserting business necessity standard requires "rigorous review of employer practices, protecting only those practices with disparate impact which are objectively important[,]" whereas job-relatedness standard "accepts the existing order"); Gary A. Moore & Michael K. Braswell, "Quotas" and the Codification of the Disparate Impact Theory: What did Griggs Really Say and Not Say?, 55 Alb. L. Rev. 459, 481 (1991) (suggesting job-relatedness and business necessity are necessarily contradictory standards); Philip S. Runkel, Note, The Civil Rights Act of 1991: A Continuation of the Wards Cove Standard of Business Necessity?,  35 Wm & Mary L. Rev. 1177, 1185 (1994) (suggesting Griggs standard treats job-relatedness and business necessity as independently sufficient alternatives); Michael C. Sloan, Comment, Disparate Impact in the Age Discrimination in Employment Act: Will the Supreme Court Permit It?,  1995 Wis. L. Rev. 507, 523 (arguing Griggs business necessity and job-relatedness language is contradictory).

An earlier version of the 1991 Act would have divided challenged practices into two categories: those pertaining to employee selection, which had to bear "a significant relationship to the successful performance of the job," and those not related to selection, which had to bear "a significant relationship to a manifest business objective of the employer." H.R. Conf. Rep. No. 856, 101st Cong., 2d Sess., 136 Cong. Rec. H9552 (daily ed. Oct. 12, 1990).

Although Professor Belton argues against a two-step business necessity analysis, the strict, BFOQ-type standard he advocates in fact lends itself to the two steps in question--looking at the relationship between the requirement and the task to be performed; and looking at the relationship between the task to be performed and the ultimate purpose or nature of the business. See Belton, supra note 27, at 937 (discussing analytical steps of BFOQ).

30 Ga. L. Rev. 387, *396

In order for the job-related requirement to constrain employers at all, it must incorporate a necessity requirement. Thus, the employer that demonstrates that a practice measures the ability to do particular tasks must also establish that the task in question is necessary to the ultimate business goal sought and that the ultimate goal is essential to the business. [36] If this interpretation were not imposed, employers would be able to prevail by submitting as evidence job definitions incorporating tasks for which the challenged practice accurately measured, even though performance of the tasks was not necessary to the business.

On the other hand, there cannot logically be a showing of business necessity without job-relatedness. In order to be "neces- sary," a practice must somehow measure the worker's ability to perform some function (broadly defined) that the employer wants done. Perhaps the employer defines the job to include the "task" or "function" of "contributing to the appearance of a well-educated work force." To create that appearance, then, is a "task" that the employer has assigned, just as much as a more mechanical function would be. In either case, the employer must demonstrate both that the practice accurately measures for the ability to create the desired appearance and that creation of that appearance is **[*397]** essential to the business. [37]

2. Less-Discriminatory Alternative. The statutorily created role for the less-discriminatory alternative provides important informa- tion about the contours of the defense. The codification of the less- discriminatory alternative element confirms that the "necessity" required by the Act to establish business necessity is true necessity, rather than mere efficacy. Under the terms of the 1991 Act, a practice cannot successfully be defended as "necessary" if a less-discrimina- tory alternative is available. Because the Act requires employers to adopt the least discriminatory alternative, the Act permits retention of only those practices that are essential to the busi- ness. [38]

In addition, the codification clarifies the order of proof that applies in impact cases. It suggests that the defendant's burden is not initially to prove absolute necessity, but something less. Because the 1991 Act refers only to those less-discriminatory alternatives which the plaintiff introduces, the Act stops short of imposing on the defendant the burden of showing initially that all conceivable less discriminatory alternatives are unworkable. [39] The defendant should be put to the task of showing that such alternatives are unworkable and thus that the challenged practice is essential only after the plaintiff has introduced evidence of less-discriminatory alternatives. At the outset, then, the defendant must show simply that the practice significantly and efficiently achieves an essential goal.

Some courts and commentators would absolve the defendant of having to adopt less-discriminatory alternatives that are deemed **[*398]** overly costly. [40] Although tenable at one time, this position currently

---

[36]    Cf. Belton, supra note 27, at 932 (positing "job-relatedness is simply one way an employer can prove business necessity"). But cf. Cynthia L. Alexander, Note, The Defeat of the Civil Rights Act of 1990: Wading Through the Rhetoric in Search of Com- promise, 44 Vand. L. Rev. 595, 599 (1991) (suggesting Supreme Court has equated business necessity with job-relatedness and job -relatedness is established by showing practice is necessary to business). Professor Belton further argues that the unified busi- ness necessity/job-relatedness test established in Griggs was unnecessarily bifurcated by the 1991 Act's language, compelling an initial inquiry into job-relatedness followed by an inquiry into the necessity of the practice. Belton, supra note 27, at 936.

[37]    Because any job may be defined in such a way that any desired employee ability or trait is incorporated into the job descrip- tion, the element of job-relatedness should form a part of every business necessity analysis.

[38]    The "less discriminatory alternative" language thus supports my contention that the business necessity defense requires the em- ployer to show its practice is essential, rather than merely effective. However, the language lends support only at the choice-of- practice level of the business necessity analysis, and not at the necessity-of-the-goal level, which is a far more difficult issue. See infra notes 36-45 and accompanying text (discussing levels of business necessity analysis).

[39]    See Steven R. Greenberger, A Productivity Approach to Disparate Impact and the Civil Rights Act of 1991, 72 Or. L. Rev. 253, 319 (1993) (discussing EEOC Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. section 1607 (1992) and ar- guing that requiring particularized validation studies from every employer as contemplated by Guidelines is counterproductive).

[40]    See, e.g., Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 998 (1988) (plurality opinion) (permitting consideration of costs and other burdens of proposed less-discriminatory alternative practices in deciding whether such alternatives are "equally effec- tive" as challenged practice in serving employer's legitimate business goals); Note, Business Necessity Under Title VII of the Civil Rights Act of 1964: A No-Alternative Approach, 84 Yale L.J. 98, 114-15 (1974) [hereinafter Note, A No-Alternative Approach] (ad-

30 Ga. L. Rev. 387, *398

poses problems. [41] As explained in the next section, parallels between business necessity analysis and disparate treatment analysis demonstrate that the defenses available under the two schemes should be treated comparably. The Supreme Court's decision in International Union, UAW v. Johnson Controls, Inc. suggested, in the context of disparate treatment and its BFOQ defense, that the expense of eliminating a discriminatory practice must be ignored with the possible exception of where the expense would threaten the very survival of the defendant's business. [42] If the BFOQ and business necessity defenses are comparable, then, at most only ruinous costs may be invoked in support of the business necessity defense as well. [43] **[*399]**

3. Summary of Business Necessity Analysis. The elements an employer must demonstrate to establish the business necessity defense are:

(1) the ultimate business goal which the employer seeks to achieve through the practice is essential to the business; [44]

(2) the tasks for which the practice measures ability are essential to achievement of that ultimate business goal;

(3) workers selected for the positions in question must be able to perform the tasks; and

(4) the practice selected is necessary to measure the ability to perform those tasks.

The analysis may be depicted as follows with each arrow indicating a point at which the employer must establish that the occurrence on the bottom is necessary to the occurrence immediate- ly above: **[*400]**

[SEE CHART IN ORIGINAL]

Thus, depending on the vagaries of the particular case, the employer must show that the practice measures ability to perform a task, which measurement assures that employees selected will be capable of performing the task, which ability to perform assures **[*401]** that the task will, indeed, be performed, and so on. These elements may be divided into two categories. At the top is the ultimate business goal asserted by the employer and the arrow connecting it with the business's survival. With respect to this element, this Article posits that achievement of the goal must be truly essential to the continued viability of the business rather than simply beneficial to the business. The second category of elements (represented by all other arrows in the chart) consists of all of the sub-elements pertaining to the challenged practice and

---

[41]     vocating "not insubstantial" test, requiring employers to adopt proposed alternative if cost difference between it and current discriminatory practice is "insubstantial"). But see Brodin, supra note 14, at 353-54 & n.203 (discussing cost-based defense when economic risks are at stake); Note, The Civil Rights Act of 1991 and Less Discriminatory Alternatives in Disparate Impact Litigation, 106 Harv. L. Rev. 1621, 1625-26 (1993) (contending that cost-based defenses should be rejected in disparate impact context).

[41]     It is frequently argued that employers will be caught in a quandary: facing liability for unlawful affirmative action if they adopt quotas, facing liability for unlawful impact discrimination if they do not. See, e.g., Moore & Braswell, supra note 35, at 470. Given Title VII's primary goal of ending discrimination against those who have historically been victims of discrimination, it is appropriate to construe the Act in a way that yields affirmative action liability, rather than impact liability if some type of liability cannot be avoided. See, e.g., Donald O. Johnson, The Civil Rights Act of 1991 and Disparate Impact: The Response to Factionalism, 47 U. Miami L. Rev. 469, 472-73 (1992) (discussing history of discrimination that Title VII was intended to end). The law should be interpreted in a way that will cause employers to err on the side of including traditionally excluded groups.

[42]     499 U.S. 187, 210-11 (1991); see also EEOC: Policy Guide on Supreme Court's Johnson Controls Decision, 8 Lab. Rel. Rep. (BNA) 405:6941, 6943 n.7 (June 28, 1991) (suggesting Johnson Controls decided costs could not support BFOQ defense). But see Michael J. Zimmer et al., Cases and Materials on Employment Discrimination 441-42 (3d ed. 1994) (noting Court in Johnson Controls reserved issue of whether "costs . . . so prohibitive as to threaten survival of the employer's business" might justify BFOQ).

[43]     See generally Zimmer et al., supra note 42, at 440-42 (discussing role of cost justification in employer defenses); Brodin, supra note 14 (same).

[44]     But cf. Marcus B. Chandler, Comment, The Business Necessity Defense to Disparate- Impact Liability Under Title VII, 46 U. Chi. L. Rev. 911, 934 (1979) (arguing employer's good faith belief in need for its goal should establish adequacy of goal and only relation of practice to achievement of stated goal should be assessed).

30 Ga. L. Rev. 387, *401

the traits it seeks to measure. With respect to such intermediate goals and the relationships between the practice and these goals, this Article similarly advocates a strict necessity showing, but suggests that the defendant's unrebutted demonstration that the practice significant- ly and efficiently achieves the ultimate goal may create a presump- tion that the practice is essential to the goal's achievement. Only when the plaintiff introduces evidence of the availability of less- discriminatory alternatives, as described in the 1991 Act, must the defendant demonstrate why retaining the more discriminatory alternative is essential to the business. [45] If the defendant adopts the practice identified by the plaintiff as a less-discriminatory alternative, the defendant may avert liability under the terms of the 1991 Act.

III. Why the Practice Must Be Crucial to the Employer's Business

As stated above, arguments opposed to a strict necessity requirement rely on two rationales. One is that distinctions between disparate treatment cases and disparate impact cases warrant a lighter defense burden in the latter. The other is that a balancing test comports with the goals of Title VII better than a strict necessity test does. The remainder of the Article examines the assumptions underlying these two positions. [*402]

a. impact and treatment--analogies and contrasts

1. Disparate Treatment Analysis. Unlike disparate impact discrimination, which may result inadvertently from a seemingly benign practice, disparate treatment discrimination entails adverse employer decisionmaking actually motivated by an employee's membership in a Title VII-protected class. [46] For this reason, disparate treatment is often called "intentional" discrimination. [47] There are three types of disparate treatment cases: (1) individual inferential proof cases, using the burden-shifting scheme adopted in McDonnell Douglas Corp. v. Green; [48] (2) group (or systemic) inferential proof cases, using statistics to establish that the employer engages in a system-wide "pattern and practice" of discrimination; [49] and (3) direct evidence cases, in which an individual or group plaintiff establishes discriminatory intent through direct evidence, either in the form of an overt (admitted) discriminatory practice or through direct evidence regarding the defendant's motives or state of mind. [50] [*403]

In a direct-evidence treatment case, the ultimate issue of discrimination turns simply on whether the plaintiff's direct evidence of discrimination is more persuasive than the defendant's countervailing evidence. In an individual inferential case, by contrast, the Court has developed a burden-shifting scheme to assist the

---

[45]    But see Greenberger, supra note 39, at 320 (arguing employers should be required to show affirmatively that they have conducted survey of alternatives as part of business necessity proof); George Rutherglen, Disparate Impact Under Title VII: An Objective Theory of Discrimination, 73 Va. L. Rev. 1297, 1327 (1987).

[46]    See International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977) (explaining differences between impact and treatment cases).

Title VII prohibits employers from discriminating based on "race, color, religion, sex, or national origin." 42 U.S.C. section 2000e-2 (1988 & Supp. V 1993). While the business necessity defense is available in impact cases involving any of the five prohibited categories of discrimination, the BFOQ defense is not available in treatment cases involving race or color. Id. section 2000e-2(e)(1).

[47]    See infra notes 60-70 and accompanying text (discussing meaning of intent and motive in Title VII context).

[48]    411 U.S. 792 (1973); see also infra note 52 (providing factors required to establish prima facie case).

[49]    E.g., International Bhd. of Teamsters v. United States, 431 U.S. 324 (1977). In explaining why it is permissible to infer discriminatory intent based on statistical disparities, the Teamsters Court stated, "Absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." Id. at 339-40 n.20. The disparity established by the plaintiff's statistics in a systemic treatment case is greater than that needed to establish discrimination in an impact case. Id. at 339 n.20.

[50]    E.g., Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); see infra notes 71-74 and accompanying text (discussing Court's treatment of employer's state-of-mind in St. Mary's Honor Ctr. v. Hicks). There is not a clear demarcation between direct evidence and "high quality circumstantial evidence." Deborah C. Malamud, The Last Minuet: Disparate Treatment After Hicks, 93 Mich. L. Rev. 2229, 2321 n.290 (1995); Charles Sullivan, Accounting for Price Waterhouse: Proving Disparate Treatment After Title VII, 56 Brook. L. Rev. 1107, 1118-19 (1991).

30 Ga. L. Rev. 387, *403

factfinder in resolving the ultimate issue of discrimina- tion. [51] In such cases, the McDonnell Douglas scheme requires the plaintiff to persuade the factfinder that four specific facts exist. Proof of these four facts creates a presumption of discrimination. [52] A burden of production then shifts to the defendant to of- fer a legitimate nondiscriminatory explanation for its decision. [53] If the defendant meets its burden of pro- duction, the plaintiff may then submit evidence that the defendant's proffered reason is pretextual. The factfinder considers all of this evidence in deciding whether the plaintiff in an individual inferential case has proven the ultimate fact of discrimination. If a pattern-and-practice plaintiff, by contrast, mounts an ad- equately strong statistical case that his [*404] group is underrepresented in the defendant's workplace, the defendant typically responds by challenging the statistics rather than by articulating a legitimate, nondiscriminatory reason. [54]

Whether the fact of disparate treatment discrimination is established with direct or inferential evidence, the defendant is liable for that discrimination unless the defendant proves, by a preponderance of the evi- dence, the existence of facts supporting an affirmative defense. [55] For purposes of the present discus- sion, the only relevant treatment-based affirmative defense is the bona fide occupational qualification (BFOQ). [56] The BFOQ defense succeeds [*405] only when the employer establishes that "the essence of the business operation would be undermined by [not hiring members outside of the plaintiff's protected

---

[51]    It is unrealistic . . . to require the victim of alleged discrimination to uncover the actual subjective intent of the decision- maker........" Washington v. Davis, 426 U.S. 229, 253 (1976) (Stevens, J., concurring) (discussing plaintiff's difficulty in proving em- ployer intent when challenging selection practice).

[52]    The four elements that comprise this "prima facie case" are as follows: (1) the plaintiff is a member of a Title VII-protected group; (2) the plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) despite the plaintiff's qualifications, she was rejected; and (4) after her rejection, the position remained open and the employer continued to seek applicants from persons with the plaintiff's qualifications. McDonnell Douglas, 411 U.S. at 802. Of course, the specific facts falling within each of the elements will vary, depending on the circumstances of the plaintiff's case. Id.

The Teamsters Court further elucidated the nature of the prima facie case, explaining:

The McDonnell Douglas formula does not require direct proof of discrimination, but it does demand that the alleged discrimina- tee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimi- nation of these reasons for the refusal to hire is sufficient, [absent other explanation, to create an inference that the decision was a dis- criminatory one.

Teamsters, 431 U.S. at 358 n.44.

[53]    By placing a burden of production on the defendant, the defendant is compelled to introduce evidence sufficient to permit an inference of the fact it is attempting to prove. This is a lesser burden than the burden of persuasion, which means that if the defendant fails to prove the existence of the fact at issue, the plaintiff immediately prevails.

[54]    See Teamsters, 431 U.S. at 342 n.24 (holding general statements that defendant hired best-qualified applicants insufficient to re- but prima facie case of systemic discrimination); cf. Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 309 (1977) (noting de- fendant may also respond by showing that racial disparities revealed in plaintiff's statistics are result of discrimination occur- ring prior to enactment of Title VII). But see EEOC v. Sears, Roebuck & Co., 839 F.2d 302 (7th Cir. 1988) (holding defendant's informal evidence that women were less interested than men in holding certain sales positions was sufficient to rebut Agency's sta- tistical prima facie case).

[55]    This aspect of disparate treatment presents an anomaly. When an employer implements an overtly discriminatory practice, such as the open exclusion of all women, a BFOQ defense is readily available as a defense. However, when the employer, perhaps inadvertently, treats an employee adversely because of her sex, the BFOQ defense--though theoretically available--is unlikely to help the employer. This renders overt discrimination more easily defensible than negligent discrimination. Of course, if the plaintiff establishes in the course of an inferential case that the employer indeed did exclude her based on her sex, the employer can, in theory, invoke the BFOQ to argue that women cannot do the job.

The Court's holding in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), suggested the availability of an additional affirmative defense. In Price Waterhouse, the Majority held that a defendant could avoid liability entirely by proving that legitimate reasons would have compelled the defendant to make the same adverse decision even in the absence of the discriminatory reason. Id. at 237. However, the 1991 Civil Rights Act eliminated the availability of this affirmative defense. Under the Act, the defendant's proof that it would have made the same decision absent its discrimination limits the remedies for which the defendant may be held liable, but does not serve as an absolute defense. 42 U.S.C. section 2000e- 2(m) (Supp. V 1993).

[56]    42 U.S.C. section 2000e-2(e)(1) (1988 & Supp. V 1993). In fact, in the context of race discrimination, the BFOQ defense is

30 Ga. L. Rev. 387, *405

group]." [57] To establish this defense, the employer might prove, for example, (1) that only men can perform the central tasks of the job and (2) that the perfor- mance of the tasks which require a male-only workforce are crucial to the essence of the employer's business. [58] The BFOQ defense, then, is available only where an employer's business could not operate at all if it were forced to include the plaintiff's protected group. [59] In the BFOQ context, "necessary" means "essential."

The following chart sets forth a simplified synopsis of the various types of analysis used in Title VII cases to facilitate comparisons between them:

[SEE TABLE IN ORIGINAL]
 [*406]    [*407]

2. The Discriminator's State of Mind in Impact and Treatment Cases: No Rewards for Benign Intent. Com- mentators have used the differences between impact and treatment analysis to support arguments that the stringent level of business need required to establish the BFOQ defense in disparate treatment cases is greater than the level of need required to establish the business necessity defense in impact cases. They argue that treatment defendants have discriminated "intentionally" and are therefore more culpable than impact de- fendants, who have merely employed facially neutral practices. [60] This distinction is not accurate. [61] Dis- parate treat- ment does not necessarily entail any greater culpable intent than the typical impact case. [62] If employer culpability is to be the measure, then the same strict necessity standard that controls in the

---

not even available. Interestingly, prior to the Court's decision in  International Union, UAW v. Johnson Controls, 499 U.S. 187 (1991), some lower courts had suggested that the business necessity defense applied to both disparate impact and disparate treat- ment cases. E.g.,  Hayes v. Shelby Mem. Hosp., 726 F.2d 1543 (11th Cir. 1984);  Wright v. Olin Corp., 697 F.2d 1172 (4th Cir. 1982).

Another affirmative defense to disparate treatment discrimination under Title VII is a bona fide affirmative action program. See United Steelworkers v. Weber, 443 U.S. 193 (1979) (holding affirmative action program did not violate Title VII). Because this defense applies only where the employer's action is predicated on an express policy recognizing the existence of discrimination, it has no analog in the disparate impact context.

[57]  Diaz v. Pan Am. World Airways, 442 F.2d 385, 388 (5th Cir.), cert. denied,  404 U.S. 950 (1971).

[58]  To show that only people of one sex can do the job, the employer may show that there is "reasonable cause to believe, that is, a factual basis for believing, that all or substantially all [members of the excluded sex] would be unable to perform safely and efficiently the duties of the job involved."  Weeks v. Southern Bell Tel. & Tel., 408 F.2d 228, 235 (5th Cir. 1969).

Wilson v. Southwest Airlines, 517 F. Supp. 292 (N.D. Tex. 1981), demonstrates the meaning of "essence of the business." The Wil- son court rejected a contention by the defendant airline that the essence of its business entailed using only female flight atten- dants who would appeal to male passengers, concluding instead that the essence of an airline's business is transporting passen- gers.  Id. at 302.

[59]  Johnson Controls, 499 U.S. at 210; see supra note 42. But see  id. at 216-17 (White, J., concurring) (proposing lighter em- ployer burden when asserting safety-based defense to treatment claim).

[60]  See, e.g., Perry, supra note 17, at 60-62 (noting disparate impact is viewed as less objectionable than disparate treatment; harm to employees resulting from impact is less wide spread than harm resulting from treatment; potential for harm to employers is greater if facially neutral policy is eliminated than if overtly discriminatory policy is eliminated; and for these reasons the BFOQ defense imposes stricter standard).

[61]  See Belton, supra note 27, at 938 (discussing close relationship between BFOQ and business necessity test and advocating that courts treat them similarly).

[62]  There are other problems with viewing discrimination liability from a culpability standpoint. There is a growing need to see em- ployment discrimination law less as a system for catching "bad" decisionmakers and more as a system for encouraging decision- makers, specifically those with the power to impose systemic changes, to think about how to create employment structures that will foster substantive equality. Martha Chamallas, Structuralist and Cultural Domination Theories Meet Title VII: Some Contem- porary Influences,  92 Mich. L. Rev. 2370, 2398 (1994) (stating that employer would be held liable if it failed to guard against ste- reotyping); cf. Perry, supra note 17, at 57-60 & n.294 (asserting impact- and treatment-based discrimination are essentially indis- tinguishable);  Goodman v. Lukens Steel Co., 482 U.S. 656, 669 (1987) (concluding discriminatory animus is unnecessary to establish liability in treatment-based claim). But see  Personnel Adm'r v. Feeney, 442 U.S. 256, 272 (1979) (holding Equal Protec- tion Clause of Constitution imposes no liability unless purpose of discrimination is to harm women). An impact case is as likely to entail "intent" to discriminate as a treatment case; even the Court has recognized that impact analysis is sometimes used to "get

30 Ga. L. Rev. 387, *407

BFOQ context should apply to the business necessity defense in impact cases as well. [63]    [*408]

Arguments to the contrary, predicated on the idea that the stricter standard is appropriate when a defendant is shown to have discriminated intentionally, misunderstand the concept of intent in Title VII doctrine. For purposes of Title VII, an employer inten- tionally discriminates when, for example, it treats a woman differently from how it would treat a similarly situated man. [64] "Intent to discriminate" will be found even if the employer is not aware that it is motivated by discrimination. The employer's discrimination (and perhaps some underlying prejudice against the protected group) may be entirely unconscious but is nevertheless deemed disparate treatment (that is, intentional) discrimination for Title VII purposes. [65] Title VII, then, requires neither that the employer intend to treat the employee differently because of her sex nor that the employer realize its decision was actually motivated by sex. [66]

In reality, the distinctions in culpability drawn between the impact and treatment analyses have more to do with imprecise [*409] language used in discussions of the treatment doctrine than with any true differences between the two approaches. [67] What courts actually require in Title VII disparate treatment cases is not properly denominated "intent" at all, but is instead "motive." "Motive," as Professor Don Welch explains, "is the underlying [possibly unconscious] cause or reason moving an agent to action . . ., whereas intent is the conscious purpose with which one acts to effect a desired goal or result." [68]

---

at" intentional discrimination that can not be effectively proved through treatment analysis. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 990 (1988).

[63]    See Brodin, supra note 14, at 358 (noting Griggs recognized "employers can do as much harm to minorities and women by un-intentional acts as they can by acts designed to discriminate .......... Given the equation of purposeful discrimination and practices which are its functional equivalent, the affirmative defenses in both types of lawsuits should be substantially similar."); Perry, supra note 17, at 56 (arguing same standards should apply in BFOQ and business necessity defenses). In fact, the EEOC and courts have stated that the BFOQ defense is available primarily in situations in which the defendant excludes a protected group because the defendant requires the physical or biological characteristics of the other group. See 29 C.F.R. section 1604 (1995) (outlining sex discrimination guidelines). Thus, for example, the BFOQ defense is available to an employer who excludes women if the employer's business is to maintain a sperm bank.

[64]    The standard in treatment cases is simply whether the plaintiff would have received the same treatment had she been of a different race or sex. Price Waterhouse v. Hopkins, 490 U.S. 228, 240 (1989); Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978); Alfred W. Blumrosen, Strangers in Paradise: Griggs v. Duke Power Co. and the Concept of Employment Discrimination, 71 Mich. L. Rev. 59, 67, 69 (1972). This concept of discrimina- tion, described as "equal protection" discrimination, permits the inference of an unlawful purpose or motive to be drawn from differential treatment. International Bhd. of Teamsters v. United States, 431 U.S. 324, 340 n.20 (1977).

[65]    As Professor Lawrence has noted:

Freudian theory states that the human mind defends itself against the discomfort of guilt by denying or refusing to recognize those ideas, wishes, and beliefs that conflict with what the individual has learned is good or right. While our historical experience has made racism an integral part of our culture, our society has more recently embraced an ideal that rejects racism as immoral. When an individual experiences conflict between racist ideas and the societal ethic that condemns those ideas, the mind excludes his racism from consciousness.

Charles R. Lawrence III, The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism, 39 Stan. L. Rev. 317, 322-23 (1987).

[66]    Lukens Steel, 482 U.S. at 669. But see Feeney, 442 U.S. at 278-79 (requiring initial finding of intent to harm protected group in order to establish equal protection violation).

[67]    Cf. Michael J. Zimmer, Teamsters: Redefinition and Retrenchment of Concepts of Discrimination, 30 N.Y.U. Conf. on Lab. 51 (1977) (asserting Title VII equal-treatment analysis does not involve question of intent).

[68]    D. Don Welch, Removing Discriminatory Barriers: Basing Disparate Treatment Analysis on Motive Rather than Intent, 60 S. Cal. L. Rev. 733, 738 (1987) (emphasis added). Professor Welch further notes:

Motive is a causal concept. It comes into play when a concern exists that decisions were made "because of" or "on the grounds of" certain factors. Motive addresses reasons for actions, realities that shape and influence actions, regardless of whether the actor is fully aware of these realities. Intent, on the other hand, is a state of awareness concept. An actor's intent speaks to the purpose that is being consciously pur- sued--the goals one has in mind as choices are being made.

Id. at 739.

30 Ga. L. Rev. 387, *409

Professor Welch demonstrates that courts and commentators have confused the concepts of intent and motive in the Title VII context. He confirms that the actual test applied in Title VII disparate treatment cases has been a test of motive, although it has been called one of intent. [69] Because the "intent" requirement in disparate treatment cases does not necessarily entail culpability at all, it does not serve as a means for distinguishing between treatment-based and impact-based discrimination. [70] [*410]

The Supreme Court's decision in St. Mary's Honor Center v. Hicks [71] potentially increases the amount of evidence a plaintiff must introduce on the question of motive, but does nothing to diminish the claim that treatment may be established without a showing of conscious intent. In Hicks, the Court rejected the view that a disparate treatment plaintiff who proves that the defendant's proffered reason is not the true reason for the defendant's action automatically prevails. [72] Thus, the Hicks decision permits, but does not require, the factfinder to conclude that the lying defendant has discriminated. [73] Although for some plaintiffs Hicks increases the difficulty of establishing motive, it does not alter, or in any way add to, the definition of discrimination. Discrimination continues to be defined as differential treatment based on membership in a protected class. [74] If employer consciousness of the reasons for its treatment was not a requirement before Hicks, neither is it a requirement afterwards.

3. Disparities in Remedies Available for Impact and Treatment Cases. Linda Hamilton Krieger carries Welch's intent/motive distinction one step further. [75] She suggests that, because the levels of culpability in impact and treatment cases are often indistinguishable, the remedies available in the two types of cases [*411] should be the same. [76]

Such a conflation of the two types of cases for remedial purposes would represent a change of direction from the 1991 Act, which added levels to the remedial hierarchy to include additional compensation for willful offenses. The current structure appears as follows:

---

[69]    Id. at 763-72. Welch furthers asserts that a test of motive, rather than one of intent, is appropriate in the Title VII context. Id. at 775-78. The 1991 Act has confirmed this view in the mixed-motives context, stating that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. section 2000e-2(m) (Supp. V 1993).

[70]    Both systemic disparate treatment and disparate impact are based on a statistical demonstration of discrimination. Arguably, though, courts require statistical significance to establish a prima facie case of systemic disparate treatment, but not establish a prima facie case of disparate impact. Compare International Bhd. of Teamsters v. United States, 431 U.S. 324, 339-40 n.20 (1977) (stressing, in systemic disparate treatment case, the importance of statistical analysis in Title VII cases) with Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995 n.3 (1988) (O'Connor, J., concurring) (stating, in disparate-impact case, that no particular test of statistical significance is required in Title VII cases). This difference may create the impression that treatment cases involve greater culpability, but this is not necessarily correct. Cf. Thomas v. Metroflight, 814 F.2d 1506, 1510-11 n.4 (10th Cir. 1987) (requiring plaintiff to show statistical significance in order to establish prima facie impact case). Even if the prima facie systemic-treatment case requires statistical significance and the prima facie impact case does not, the fact remains that any employer "intent" to discriminate that can be inferred from the plaintiff's systemic-treatment case may well be an intent unknown to the defendant, which is to say the defendant lacks motive.

[71]    113 S. Ct. 2742 (1993).

[72]    Id. at 2751 ("Nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.").

[73]    Deborah A. Calloway, St. Mary's Honor Center v. Hicks: Questioning the Basic Assumption, 26 Conn. L. Rev. 997, 998 (1994); Malamud, supra note 50, at 2254.

[74]    42 U.S.C. section 2000e-2(a) (1988); Goodman v. Lukens Steel Co., 482 U.S. 656, 669 (1987); see also Zimmer et al., supra note 42, at 110 (noting Court's decisions suggest it does not believe most discrimination is animus-based).

[75]    Linda H. Krieger, The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity, 47 Stan. L. Rev. 1161 (1995).

[76]    Id. at 1243. Krieger would bifurcate the remedy scheme at a different point than that chosen by Congress. Although Krieger argues that similarities in the level of culpability between impact and systemic-treatment cases call for a reduction of systemic-treatment remedies, it may be more logical to increase the remedies available to impact plaintiffs. See infra note 80 and accompanying text (explaining that given purposes of Title VII, defendant in impact case should not be faced with less-drastic remedies).

30 Ga. L. Rev. 387, *411

Disparate Impact: equitable relief, including non-compensa- tory monetary damages; [77]

Disparate Treatment (non-willful): equitable relief and compensatory damages;

Disparate Treatment (willful): equitable relief and compen- satory damages;

Disparate Treatment (malicious or reckless disregard of rights): equitable relief, compensatory damages, and punitive damages. [78]

Professor Robert Belton apparently would agree with Krieger. In response to the distinctions drawn by the 1991 Act, Professor Robert Belton has stated:

The exclusion of disparate impact . . . claims [from those for which compensatory and punitive damages are available] has the effect of creating first- and second-class cases of unlawful discrimination. Even

[*412]

though their exclusion was deemed necessary to reach a compromise bill, there is no principled basis on which to distinguish disparate impact . . . and disparate treatment cases when a plaintiff has proven that she has been the victim of unlawful discrimination ........................ The unfairness [of this distinc- tion] is underscored by the fact that Congress has not made the same distinction between disparate impact and disparate treatment in cases not involv- ing employment. [79]

Although both Krieger and Belton both suggest that similarities between treatment and impact warrant con- flation of the remedies for the two, Krieger's rationale could actually support the conclu- sion that the im- pact defendant should bear a lighter justification burden than the treatment defendant. Krieger advo- cates propor- tionality between the level of culpability and the scope of the remedy available in Title VII cases. If, as this Article contends, there should also be proportionality between the level of culpability and the degree of need required to justify the employer's action, then there must also be a correlation be- tween the scope of the remedy available under Title VII and the level of need required to justify the prac- tice. The gap which the 1991 Act created between remedies available in treatment and those available in im- pact cases could be argued to indicate congressional perception of differences in culpability levels between the two types of cases, which could then be argued to call for requiring different levels of justifi- cation in the two types of cases. In fact, however, the 1991 Act's bifurca- tion of remedies actually weighs in favor of strengthening the business necessity defense, bringing it more in line with the level of busi- ness exigency required by the BFOQ defense. In treatment cases, courts may rely on the specter of com- pensatory and punitive damages to assure that the defendants will be motivated to defend their actions. Be- cause a losing defendant in an impact case faces considerably less-drastic remedies than a comparable defendant in a treatment case, the proof structure itself must be relied upon more heavily to assure the de- fendant is forced to defend the [*413] practice. [80]

4. Confusion of Business Necessity with the Legitimate, Nondis- criminatory Reason in Treatment Cases. Just as some arguments for requiring a lighter demonstration of business necessity have rested on per-

---

[77]    Back pay, for example, is available in disparate impact cases. Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975); Green v. USX Corp., 843 F.2d 1511 (3d. Cir. 1988), cert. granted and judgment vacated, 109 S. Ct. 3151 (1989).

[78]    The 1991 Civil Rights Act adds compensatory and punitive damages to the equitable relief Title VII has always allowed. 42 U.S.C. section 1981a(b) (Supp. V 1993). Compensatory damages are available only in cases of intentional (that is, disparate treatment) discrimina- tion. Id. Moreover, punitive damages are restricted to disparate treatment cases in which the employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally pro-
tected rights of an aggrieved individual." Id.

[79]    Belton, supra note 27, at 948-49.

[80]    Such reliance is consistent with the twofold purpose of the Title VII remedial scheme: (1) "to serve as a 'spur or catalyst' to cause employers 'to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges' of discrimination"; and (2) compensation for injuries. McKennon v. Nashville Banner Publishing Co., 115 S. Ct. 879, 884 (1995) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 417-18 (1975)).

30 Ga. L. Rev. 387, *413

ceived differences between impact and treatment cases, other arguments have turned on perceived similarities between the two. Beginning early in the development of the disparate impact doctrine, and culminating in the Wards Cove case, some judges have analogized the business necessity defense not to the BFOQ, but to the legitimate, nondiscriminatory reason phase of treatment cases. [81] The confusion centered on two issues. The first issue was whether the defendant's burden in establishing business necessity was one of production comparable to the articulation or production of a legitimate, nondiscriminatory reason in the disparate treatment context. [82] This issue was resolved by the 1991 Act, which established that the employer's business- necessity burden is one of persuasion. [83] The second issue, not resolved by the 1991 Act, concerns whether any distinction exists between the content of a qualifying successful legitimate, nondis- criminatory reason and the content of a business necessity defense. [84] Purporting to apply the "business necessity" standard, [*414] some courts have accepted from impact defendants any "reason- able" business justification for practices, just as they would have from a treatment defendant, rather than requiring a showing of real need for the practice. [85]

Differences between the postures of the treatment defendant and the impact defendant render comparisons between legitimate nondiscriminatory reasons and business necessity inapposite. The legitimate nondiscriminatory reason requirement asks the defen- dant to state the reason why the defendant took the actions of which the plaintiffs complain. In the impact case, by contrast, by the time business necessity is at issue, everyone is already fully aware of the reason why the defendant took the actions of which plaintiffs complain. The defendant took those actions because of the facially neutral practice, a practice we may assume for present purposes entails no discriminatory motive and thus would easily qualify as a legitimate nondiscriminatory reason in a treatment case. What the defendant must show is need for the practice.

In looking at the issue of need for the practice, some courts--again--have sought a mere business justification for the practice, again frequently referring to the legitimate nondiscrimina- tory reason context. [86] Yet to permit the employer to prevail simply by proving that it had legitimate, nondiscriminatory reason for adopting the practice is to change impact analysis into a search for intent to discriminate. Again, impact analysis assumes the [*415] employer adopted the practice for legitimate nondiscriminatory business reason. The impact inquiry does not ask whether the employer had a legitimate reason for adopting the practice, but asks how dire the employer's need for the practice is.

---

[81]    See Wards Cove Packing Co. v. Atonio, 490 U.S. 662, 659 (1989) (employer carries burden of producing evidence of a business justification). Dothard v. Rawlinson, 433 U.S. 321, 339-40 (1977) (Rehnquist, J., concurring) (describing impact defendant's burden as one of production and citing McDonnell Douglas). But see Note, A No-Alternative Approach, supra note 40, at 109 (describing defendant's burden as one of persuasion).

[82]    See Malamud, supra note 73, at 2264-66 (discussing Court's efforts to prevent stricter business necessity defense from being incorporated into McDonnell Douglas concept of legitimate, nondiscriminatory reason).

[83]    42 U.S.C. section 2000e(m) (Supp. V 1993).

[84]    See, e.g., Furnco Constr. Corp. v. Waters, 438 U.S. 567, 570-71 (1978) (holding treatment analysis relied on necessity of defendant's practice of not hiring people who, like plaintiff, applied at work site); cf. Chandler, supra note 44, at 934 (asserting courts should accept any good-faith business justification employers offer); Johnson, supra note 41, at 495 (stating that effectiveness of placing burden of persuasion on defendant will turn on how "necessity" is defined, as the 1991 Act leaves this open).

[85]    See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 659 (1989) ("The touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice.").

[86]    EEOC v. Steamship Clerks Union, 48 F.3d 549, 607 (1st Cir. 1995); Graffam v. Scott Paper Co., 870 F. Supp. 389, 398 (D. Me. 1994), aff'd, 60 F.3d 809 (1st Cir. 1995). A recent example of an age discrimination impact court apparently applying the McDonnell Douglas legitimate nondiscriminatory reason standard to an impact case is Graffam, 870 F. Supp. at 389. In Graffam, the district court treated the impact inquiry as a search for intent to discriminate. 870 F. Supp. at 398. It thus permitted the defendant to justify, in part, by demonstrating that there were legitimate nondiscriminatory reasons for the decisions against the individual members of the group impacted. Id. at 400, 405. Although disparate impact analysis is often employed in ADEA cases, the 1991 Act's modifications of the doctrine apparently do not extend to ADEA cases. See Howard Eglit, The Age Discrimination in Employment Act, Title VII, and the Civil Rights Act of 1991: Three Acts and a Dog that Didn't Bark, 39 Wayne L. Rev. 1093, 1099, 1150 (1993); see also Michael C. Sloan, Comment, Disparate Impact in the Age Discrimination in Employment Act: Will the Supreme Court Permit It?, 1995 Wisc. L. Rev. 507.

30 Ga. L. Rev. 387, *415

Moreover, the 1991 Act's confirmation that the defendant in an impact case has a burden of persuasion rather than merely a burden of production further signifies that such a defendant should likewise be required to show that its practice is a true business necessity. Professor Hannah Furnish has explained the distinction in meaning between establishment of a prima facie case in each of the types of claims. [87] At this stage of a treatment case, the plaintiff has merely raised a presumption of discrimination, which the defendant may rebut by merely producing evidence of a legitimate, nondiscriminatory reason. [88] In contrast, once a prima facie case of impact is established, the existence of discrimination is considered proven and the defendant must therefore establish an affirmative defense to avoid liability. [89] Once discrimination has been established as a factual matter, the remedial purposes of Title VII demand that the defendant establish actual necessity, whether the context is treatment or impact. [90] The 1991 Act's confirmation that the impact defendant must bear a burden of persuasion, rather than production, supports the conclusion that the fact of discrimi- nation has at this juncture been established, calling for the defendant to establish true necessity to justify the practice. **[*416]**

b. the problems with balancing

1. The Types of Balancing. As an alternative to requiring employers to show absolute necessity for a challenged practice, some commentators have advocated a balancing approach to the business necessity defense. [91] Balancing approaches fall into two categories. In the first, a court assesses whether the gain the defendant derives from the discriminatory practice is sufficient to outweigh the loss of employment opportunity the practice inflicts on the plaintiff class. [92] Such a "sliding-scale" balancing approach enables "courts to correlate the likely harm to equal employment opportunities with the employer's justification burden on a case-by- case basis." [93]

For example, suppose a plaintiff has succeeded in establishing a prima facie case of impact discrimination. She has demonstrated that her employer's discriminatory practice excludes women at a rate significantly greater than the rate at which it excludes men; thus, she has met whatever impact test the court deems applica- ble. [94] At this juncture, advocates of interest balancing would require additional scrutiny of the plaintiff's case before any burden is imposed on the defendant. Such scrutiny might reveal, for example, that

---

[87]   Hannah A. Furnish, A Path Through the Maze: Disparate Impact and Disparate Treatment Under Title VII of the Civil Rights Act of 1964 After Beazer and Burdine, 23 B.C. L. Rev. 419, 440-44 (1982). Her position that the defendant's burden in establishing business necessity is one of persuasion became law in the 1991 Act.

[88]   In fact, the burden imposed on the defendant at this stage in a treatment case is so minimal that its reason need not even be lawful (as long as the statute violated is one other than that under which the claim was brought). Hazen Paper Co. v. Biggins, 113 S. Ct. 1701, 1707 (1993).

[89]   Griggs established that impact-based discrimination is no less discrimination than treatment-based discrimination. "[Title VII requires] the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classifications." Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971).

[90]   But see Brodin, supra note 14, at 343 n.138 (suggesting mere business reason defense would be more appropriate when defendant must negate discriminatory intent, rather than when issue is "whether the exclusionary effect of a practice can be tolerated because the practice produces a more productive workforce").

[91]   E.g., Moore & Braswell, supra note 35, at 492. Such commentators recognize that the present system does not involve balancing. E.g., id. Under current doctrine, a plaintiff's statistical showing either establishes or fails to establish a prima facie case of disparate impact. Once established, the burden falls on the defendant to demonstrate business necessity. At present, business necessity is a unitary standard and does not take into consideration the extent of the impact the plaintiff has established. Id.; see also infra notes 101-102 and accompanying text (discussing type-one balancing further).

[92]   See, e.g., Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir.) (holding business purpose must be sufficiently compelling to override any racial impact), cert. dismissed, 404 U.S. 1006 (1971); Neely v. Grenada, 438 F. Supp. 390, 407 (N.D. Miss. 1977) (same).

[93]   Moore & Braswell, supra note 35, at 492. But cf. Note, A No-Alternative Approach, supra note 40, at 116 (rejecting balancing approach as allowing employer increases in safety or efficiency to be "balanced away").

[94]   The EEOC Guidelines, for example, provide for a four-fifths rule to establish disparate impact. See 29 C.F.R. section 1607.4(D) (1995) (establishing minority-group selection rate less than four-fifths of selection rate for majority group is evidence of adverse impact).

30 Ga. L. Rev. 387, *416

the plaintiff's case is relatively weak in not identify- ing which part of the defendant's indivisible hiring pro- cess has caused the impact or in not demonstrating that the impact affects **[*417]** a large number of mi- nority or female workers. [95] Even though the law recognizes the practice as discriminatory enough to es- tablish the fact of discriminatory impact, the relative weakness of the plaintiff's case would, under a balancing approach, lessen the degree of business need the defendant must show for the practice.

The second type of balancing disregards the plaintiff's case entirely once it is made, looking instead at the relationship between the employer's practice and its ultimate goal. Under this approach, the greater the importance of the goal the employer seeks to achieve through use of the practice, the lower the level of cor- rela- tion required between the practice and the goal. [96] This type of balancing focuses on whether an em- ployer's strong demonstration of its ultimate goal offsets a weak demonstration of the practice's efficacy. [97]

The second type of balancing is exemplified by Spurlock v. United **[*418]** Airlines. [98] In Spurlock, an air- line imposed as minimum qualifica- tions for its flight officers 500 hours of flight time and a college degree. [99] A black applicant who had accumulated 204 hours of flight time and two years of college challenged the qualifications for their disparate impact on blacks. The court established a "sliding scale" of business necessity, imposing on the defendant a lighter burden to demonstrate business necessity when "the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great." [100] The court, in effect, permitted the importance of the employer's goal to compensate for weaknesses in the means used to achieve it.

2. Balancing Employee Harm Against Employer Harm

a. Theoretical Rationales for Imposing a Per Se Test. Several commentators have argued that courts should adopt a balancing test that would weigh the degree of impact on the protected group against the de-

---

[95]    Moore & Braswell, supra note 35, at 492. Note, however, that Title VII does not mandate the drawing of an adverse infer- ence from the plaintiff's failure to identify the specific impacting practice when the process cannot be subdivided. In fact, the 1991 Act specifically authorizes judicial analysis in this circumstance. 42 U.S.C. section 2000e-2(k)(1)(B)(i) (Supp. V 1993). There is dis- pute about whether Title VII rights should be deemed "group rights" or "individual rights." See, e.g., Pamela L. Perry, Two Faces of Disparate Impact Discrimination, 59 Fordham L. Rev. 523, 567 (1991) (advocating individual-rights approach); Julia Lam- ber, Discretionary Decisionmaking: The Application of Title VII's Disparate Impact Theory, 1985 U. Ill. L. Rev. 869, 900-09 (same); William B. Reynolds, An Equal Opportunity Scorecard, 21 Ga. L. Rev. 1007, 1030 (1987) (same); see also Martha Cha- mallas, Evolving Conceptions of Equality Under Title VII: Disparate Impact Theory and the Demise of the Bottom Line Prin- ciple, 31 UCLA L. Rev. 305, 310 n.22 (1983). Balancing is inconsistent with an individual-rights approach because balancing would permit employers to escape liability by showing that the number of women or minorities harmed by a practice is rela- tively low, regardless of the extent of harm inflicted on those persons. See Connecticut v. Teal, 457 U.S. 440, 452-56 (1982) (re- jecting notion that employer could insulate itself from Title VII liability by hiring enough minorities to reach non- discriminatory "bottom line"); cf. McKennon v. Nashville Banner Publishing Co., 115 S. Ct. 879, 885 (1995) (stating federal employment- discrimination policy objectives are "furthered when even a single employee establishes that an employer has dis- criminated against him or her").

[96]    See, e.g., Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1263 (6th Cir. 1981) (permitting lesser showing of mani- fest relationship between practice and goal because goal was one of safety); Spurlock v. United Airlines, 475 F.2d 216 (10th Cir. 1973) (holding employer's burden to demonstrate job-relatedness of employment criteria varies with skills required for job and consequences of hiring unqualified people).

[97]    See infra notes 137-138 and accompanying text (discussing this second type of balancing further).

[98]    475 F.2d 216 (10th Cir. 1973); see also New York City Transit Auth. v. Beazer, 440 U.S. 568, 587 n.31 (1979) (noting where ultimate goal was passenger safety, business necessity defense required that criterion significantly serve, though not necessarily be required by, that goal).

[99]    Spurlock, 475 F.2d at 219.

[100]    Id. As one study of employment discrimination law states:

The analysis in Spurlock could lead to the ironic situation that the higher the level of the job, the less the burden on the em- ployer to show that the qualifications are actually related to the ability to perform that job ......... [However,] the Spurlock ap- proach has been narrowly limited to jobs involving high risk to life and limb.

Charles A. Sullivan et al., Federal Statutory Law of Employment Discrimination 57 (1980).

30 Ga. L. Rev. 387, *418

gree of employer need for the practice. [101] Advo-  [*419] cates of such balancing suggest that this approach would success- fully account for Congress's concern with reconciling the employee's interest in equal opportunity and the employer's interest in preserving business autonomy. [102]

In the business necessity context, a hard and fast "rules" approach is preferable to such sliding scale balancing. [103] A rules or "classificatory" approach [104] inquires first whether the effect of the defendant's practice may properly be classified as "disparately impacting a protected group." If so, then a straightforward application of the rule requiring absolute business necessity resolves the case.

The rules approach does not ignore congressional concern for business autonomy. Rather, it is itself the product of a balance already struck by Congress. [105] The task of the courts is to apply the resulting rule. The preference for a per se rule in the business necessity context finds support in the reasoning that generally underlies choices between rules and balancing and specifically in [*420] the Title VII context. [106]

Most importantly, the employment discrimination arena is inappropriate for balancing because of the dan-

---

[101]    E.g., Moore & Braswell, supra note 35, at 491 (asserting where "degree of disparate impact is not devastating and precision of plaintiff's evidence is obscured by the inability to isolate the impact separately," employer's justification burden should be lighter); Mack A. Player, Is Griggs Dead? Reflecting (Fearfully) on Wards Cove Packing Co. v. Atonio: Burdens of Proof, Statistical Evidence, and Affirmative Action, 17 Fla. St. U. L. Rev. 1, 36- 44 (1989); Rutherglen, supra note 45, at 1327; Steven L. Willborn, The Disparate Impact Model of Discrimination: Theory and Limits, 34 Am. U. L. Rev. 799, 825 (1985).

Moore and Braswell posit the case in which an employer uses a subjective decisionmaking process with a discriminatory impact and in which the "degree of impact is not devastating" and the "precision of plaintiff's evidence is obscured by the inability to isolate the impact separately by practice." Moore & Braswell, supra note 35, at 491. In this case, they argue, the employer should have to show merely "the existence and consistent use of job-related [i.e., not absolutely necessary to the business] guidelines for its discretionary performance appraisals, and an overall relationship between the promotion system and legitimate employment goals. In each instance, the magnitude of the potentially troublesome 'business necessity' defense would vary with the size and demonstrability of the disparate impact." Id. at 492.

[102]    Moore & Braswell, supra note 35, at 485; cf. Chandler, supra note 44, at 922 (positing purpose of business necessity defense is to protect goals of economic efficiency and entrepreneurial freedom). But see Note, A No-Alternative Approach, supra note 40, at 116 (rejecting balancing approach as permitting employer increases in efficiency and safety to be offset by correspondingly larger impact on plaintiff group). Similarly, some who assert that impact analysis is in reality a way of redressing covert intentional discrimination likewise argue for a sliding scale of burden on the defendant. The greater the impact, the greater the likelihood that intent is at work; therefore, the burden should be greater on the defendant to show that its practice is effective in meeting its business goal. Perry, supra note 17, at 26 n.128.

[103]    Professor Sullivan has distinguished balancing tests from a rules-oriented or "categorization" approach. Balancing, she notes, "explicitly considers all relevant factors with an eye to the underlying purposes or background principles or policies at stake." Kathleen M. Sullivan, The Supreme Court, 1991 Term--Foreword: The Justices of Rules and Standards, 106 Harv. L. Rev. 24, 60 (1992). Professor Sullivan explains that a balancing test equates with the concept of standard-based decisionmaking, whereas a classificatory or "categorical" approach equates with a rules approach. Id. at 60.

[104]    The term "classificatory" derived from discussions of the rules-versus-balancing approach in the first amendment context. Note, Civil Disabilities and the First Amendment, 78 Yale L.J. 842, 844 (1969) [hereinafter Note, Civil Disabilities] (discussing Professor Emerson's description of "classificatory approach").

[105]    Chandler, supra note 44, at 922 (asserting the "degree of protection [the business necessity] defense provides depends on weight given to competing goals--a legislative value judgment").

[106]    Frederick Schauer, Playing by the Rules--A Philosophical Examination of Rule-Based Decision-Making in Law and in Life 151-52 (1991); Duncan M. Kennedy, Form and Substance in Private Law Adjudication, 89 Harv. L. Rev. 1685 (1976); Martha Minow, The Supreme Court, 1986 Term--Foreword: Justice Engendered, 101 Harv. L. Rev. 10, 26-30 (1987); Carol M. Rose, Crystals and Mud in Property Law, 40 Stan. L. Rev. 577 (1988); Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1179-80 (1989); Sullivan, supra note 103, at 60. But see Note, Civil Disabilities, supra note 104, at 846 n.16 (noting application of balancing in context of indirect speech regulation-based discrimination). In addition to the danger decisionmaker bias poses to application of a business necessity balancing test, theorists offer another rationale that tends to call for a per se rule in the business necessity determination. A per se rule better addresses the goal of instilling vigilance in potential parties to avoid precisely the problem that gave rise to the suit. See Rose, supra, at 591 (asserting use of rules in lieu of standards causes people to guard against problems sued upon by rendering actors extra vigilant). According to Professor Louis Kaplow, the advantage of rules in affecting parties' primary behavior (such as the behavior that ultimately results in the lawsuit) is that people who know what the law is will conform to it, and people are more likely to know what the law is when rules are applied because it is less expensive to learn the content of rules than of standards. Louis Kaplow, Rules Versus Standards: An Economic Analysis, 42 Duke L.J. 557, 564 (1992).

30 Ga. L. Rev. 387, *420

ger that decision- maker bias may affect the outcome. [107] Professor Frederick Schauer has explained how the potential for bias counsels against utilization of balancing tests:

We understand that any decision-making procedure will make errors. When rule-based decision-making is in place, the most noteworthy error is the failure on some number of occasions to make the best or optimal decision in the particular case. But when particularistic [e.g., balancing] decision-making prevails, the most noteworthy errors will be those in which misguided decision-makers--whether biased,

[*421]

ignorant, incompetent, or simply confused--will make decidedly non-optimal decisions. In attempting to design a decision-making procedure, we assess as best we can the expected frequency and consequences of these two types of errors. When the result of that assessment is a preference for rules, there is implicit in the preference a judgement that the errors that might be made by misguided decision-makers are more serious or more likely than the rule-based errors that come from a built-in failure to reach the very best decision in every case. [108]

Professor Sullivan has also identified the potential for bias as a reason for avoiding balancing tests: If "rules are fairer than standards because rules require decisionmakers to act consistent- ly, treating like cases alike, then rules reduce the danger of official arbitrariness or bias by preventing decisionmakers from fac- toring the parties' particular attractive or unattractive qualities into the decisionmaking calculus." [109]

Similarly, Professor Kennedy has identified the "social virtues of [rules in lieu of standards] to include the restraint on official arbitrariness." [110]  In describing what he calls "the social science [*422] ap- proach" to lawmakers' decisions to adopt rules in lieu of stan- dards, Kennedy explains that rules are cho- sen when there is concern that the person charged with implementing the rule will be unsympathetic to the policies underlying the rule. [111] If in Title VII cases there is an unusual danger that courts will place too much importance on the employer's profit motive and too little importance on the plaintiff's right to equal opportunity, then "formally realizable general rules . . . would function much better than standards to

---

[107]    See Maria L. Marcus, Wanted: A Federal Standard for Evaluating the Adequate State Forum,  50 Md. L. Rev. 131, 205 n.368 (1991) (noting tendency of courts applying balancing approach to assign heavy weight to whatever interest defendant proffers, thereby defeating plaintiff's claim); Scalia, supra note 106, at 1179-80 (arguing that rules approach more effective than balancing approach in providing "check upon arbitrary judges"); Sullivan, supra note 103, at 65 (describing Justice Scalia's arguments in favor of rules and noting "balancing tests permit the expression of 'political or policy preferences.' "). But see Note, Civil Disabilities, supra note 104, at 846 n.16 (noting courts' application of balancing where speech regulation discriminated indirectly, but not where regulation discriminated intentionally).

[108]    Schauer, supra note 106, at 154. Moreover, where there is reason to distrust a set of decisionmakers with certain kinds of de- cisions, "the problems of inflexibility that rules pose are less prevalent than problems that too much discretion will yield." Id. at 152. But cf. id. at 153 (explaining that "the choice of rule-based decision-making ordinarily entails disabling wise and sensitive de- cision-makers from making the best decisions in order to disable incompetent or simply wicked decision-makers from making wrong decisions").

[109]    Sullivan, supra note 103, at 62. Professor Tribe likewise notes that judicial decisions are a function of the characteristics of the people elevated to judgeships. Lawrence H. Tribe, Constitutional Calculus: Equal Justice or Economic Efficiency?,  98 Harv. L. Rev. 592, 598-99 n.37 (1985).

[110]    Kennedy, supra note 106, at 1688. Kennedy defines "official arbitrariness" as "the sub rosa use of criteria of decision that are inappropriate in view of the underlying purposes of the rule, . . . ranging from corruption to political bias." Id. He argues that a person's consideration of the desired outcome in choosing whether a rule or standard should govern a particular situation does not fully explain the selection of one over the other. Id. at 1710. Rather, such a choice additionally is founded on the view of the world held by the selector: generally, the altruist chooses principles and the individualist chooses rules. Id. Kennedy cautions, however, that adoption of rules rather than standards imposes a different sort of arbitrariness on judicial decisionmaking: over- and underinclusiveness at the margins or borders of the rules' coverage. Id. at 1689.

[111]    Id. at 1706. Kennedy draws a parallel between rules and individualism (Ralph Waldo Emerson's doctrine of self-reliance) and between standards and altruism. Id. at 1713-1778. Still, Kennedy notes that an altruistic judge may do well to apply a strict rule when doing so protects the most vulnerable classes of people from exploitation. Id. at 1777.

30 Ga. L. Rev. 387, *422

force the court to put the [legislator's] view of the issue into practice." [112]

Even if it is correct that balancing is inappropriate in situations posing an unusual danger of bias, what is it about employment discrimination that increases the likelihood of decisionmaker bias? Why is bias more likely to taint balancing in the employment discrimination context than it is in, say, torts suits? Ideally, judges who (at least at the federal level) are carefully screened by both the executive and the legislative branches [113] either are not prejudiced or can rise above their prejudices. [114] **[*423]**

Regardless of the caliber and good faith of decisionmakers, problems of bias are likely to occur whenever matters focus on race, sex, or other bases of discrimination. According to Professor Minow, the potential for bias in cases involving "difference," whether racial, sexual, or some other form of difference, heightens the significance of "tension between formal, predictable rules and individualized judgments under discretionary standards." [115]  Racial and sexual bias is too firmly rooted in both the conscious and subconscious mind of this country and its judiciary to permit a cavalier dismissal of the prospect that it plays a role in judicial decisionmaking in discrimination cases. [116]

Legal and social norms have eliminated the most visible manifes- tations of prejudice, creating the misleading appearance that we have cured ourselves of prejudice altogether. [117] In reality, preju- dice has merely "gone underground." We may or may not be conscious of it, but prejudice remains a strong, motivating force in the citizens and judiciary of this country. **[*424]**

That unconscious prejudice is rampant in this country is exemplified by the results of a 1994 housing seg- regation study reported in the American Sociological Review. [118] That study identified a gap between at- titude and behavior among whites in this country. [The study concluded that] most whites today endorse the

---

[112]    Id. at 1706. To advocate a per se business necessity rule in impact cases does not state any general position on the overall ef- ficacy of rules over standards. Professor Kennedy further notes:

In assessing a proposal to change a regime of rules to standards, or vice versa, we should ignore all claims about the intrinsic merits of formal positions and demand an accounting of effects. What is the substantive objective? How does the choice of form affect the likelihood of embodying the objective in law?

Id. at 1709. Professor Schauer notes that those favoring rules rather than more flexible decisionmaking tend to envision a deci- sion as being made in a vacuum. They "take the dampening of variance as a good to be pursued in its own right, and see rules as instruments of that dampening process. Schauer, supra note 106, at 155.

[113]    As a rule, juries are available in disparate treatment cases, but not disparate impact cases. See Civil Rights Act of 1991, Pub. L. No. 102-166, section 102, 105 Stat. 1071, 1072-73 (1991) (allowing juries in cases seeking compensatory and punitive damages but allowing such damages only in intentional cases). Although the facts in impact cases are determined by judges, not juries, the same confidence seemingly could be placed in jurors as well, given that voir dire should eliminate prospective jurors possessing bias against the group in question.

[114]    See Schauer, supra note 106, at 137 (noting that balancing yields more just decisions than strict rules when decisionmaker is just).

[115]    Minow, supra note 106, at 26. Thus, imposition of a strict rule rather than a balancing test addresses the perceived need to "ex- clude from the calculus of decision specific factors likely to be misapplied by some class of decision-makers, substituting cruder but less likely to be abused factors." Schauer, supra note 106, at 151-52.

[116]    See Elaine Golin, Solving the Problem of Gender and Racial Bias in Administrative Adjudication,  95 Colum. L. Rev. 1532, 1545  (1995) (discussing bias in courts); Lawrence, supra note 64, at 322-23 (discussing "ingrained" nature of racism in our cul- ture); Girardeau A. Spann, Simple Justice,  73 Geo. L.J. 1041, 1073-1080 (1985)  (same); cf. Mary E. Becker, From Muller v. Or- egon to Fetal Vulnerability Policies,  53 U. Chi. L. Rev. 1219, 1260 (1986)  (noting special judicial bias in gender cases); John D. Johnston, Jr. & Charles L. Knapp, Sex Discrimination by Law: A Study in Judicial Perspective, 46 N.Y.U. L. Rev. 675, 741 (1977)  (same).

Precisely because we so abhor our prejudice, we are likely to suppress our knowledge of it in order to avoid the pain of knowing about it. Gordon W. Allport, The Nature of Prejudice 357 (1958); Kenneth B. Clark, Prejudice and Your Child 78 (1963); Jo- seph Jastrow, Freud: His Dream and Sex Theories 12 (1948); see also Susan L. McCoin, Sex Discrimination in the Voir Dire Process: The Rights of Prospective Female Jurors,  58 S. Cal. L. Rev. 1225, 1251 (1985)  (discussing prejudice in jury selection).

[117]    See Donald C. Nugent, Judicial Bias,  42 Clev. St. L. Rev. 1, 45-48 (1994)  (explaining covert nature of bias in courts).

[118]    Reynolds Farley & William H. Frey, Changes in the Segregation of Whites from Blacks During the 1980s: Small Steps To- ward a More Integrated Society, 59 Am. Soc. Rev. 23 (Feb. 1994).

30 Ga. L. Rev. 387, *424

principle of equal opportu- nities for blacks in the housing market, but [the researchers'] analysis of 232 met-ropolitan areas "suggests that most whites are uncomfortable when numerous blacks enter their neighbor-hoods." [119]

Because we are not on guard against unacknowledged prejudice, it poses a far more ominous threat to fair decisionmaking than articulated, challengeable prejudice. Our prejudice is rendered more invidious by its subconsciousness. [120]

b. The General Rejection of Balancing in Title VII Adjudica-    [*425] tion. Consistent with the above ra-tionale, most Title VII decision- making has eschewed a balancing approach in favor of a rules ap-proach. For example, once the fact of disparate treatment is found and no defense can be established, li-ability is certain. No consideration is given to the strength of the plaintiff's established case in deciding whether the defendant has established its defense. No balancing of harms occurs. [121] Rather, Title VII di-rects courts, for the most part, to find facts to which law can then be applied. The suggestion, then, that busi-ness necessity should be the subject of balancing by the factfinder proposes an exception to Title VII's gen-eral mandate.

In the few Title VII cases where courts have purported to balance interests, such balancing essentially masked what turned out to be straightforward decisions for employers. Perhaps the best example is Title VII's requirement that an employer reasonably accommo- date practices required by a worker's sincerely held religious beliefs. [122] In Trans World Airlines v. Hardison, [123] the Supreme Court created a balanc-ing test for determining whether an employer had met its duty to accommodate its employee's religious prac-tices. The Court appears to have relied, at least in part, on the fact that religious practitioners are physi-cally capable of modifying their practices. [124] The Court concluded the employer had ade- quately accommodated Hardison's religious practices when adopting a more accommodating practice would have "assured Hardison . . . of getting the days off necessary for strict observance of his religion, but . . . only at the expense of others who had strong, but perhaps nonreligious, reasons for not working on week-

---

[119]    Ann Seng, Voice of the People: Little Progress in Race Relations, Chi. Trib., Dec. 8, 1995, at 28 (citations omitted); see also Clark, supra note 116, at 35 (noting people's behavior reflected more prejudice than their self-reports).

[120]    See Clark, supra note 116, at 70, 72 (positing that prejudiced individuals show less self-insight than non-prejudiced individu-als and that people with "acceptable" levels of prejudice, although outraged by open, bigoted behavior, usually respond pas-sively and silently in its face). It is argued that balancing "satisfies a civic republican commitment to 'resolving normative dis-putes by conversation, a communicative practice of open and intelligible reason-giving.' " Sullivan, supra note 103, at 68 (quoting Frank I. Michelman, The Supreme Court, 1985 Term--Foreword: Traces of Self-Government, 100 Harv. L. Rev. 4, 34 (1986)). Civic republicans argue that a balancing test

compels a judge to take full responsibility for his decisions, and promises a particularized, rational account of how he arrives at them --more particularized and more rational at least than the familiar parade of . . . absolutes ......... This approach should make it more difficult for judges to rest on their predispositions without ever subjecting them to the test of reason. It should make their accounts more rationally auditable.

Id. (quoting Wallace Mendelson, On the Meaning of the First Amendment: Absolutes in the Balance, 50 Cal. L. Rev. 821, 825-26 (1962)). To the extent balancing tests require decision- makers to reveal the ideas leading to their decisions, this is true. How-ever, when an unusually strong subconscious bias exists against the parties having the least power to begin with, full and open reason -giving is defeated. The bias is present, but surely not articulated.

[121]    Balancing of evidence occurs in the process of factfinding, which is different from determining the ultimate outcome of a case by balancing plaintiff's harm with defendant's harm. In the latter, the ultimate issue is not whether unlawful discrimination has occurred, but instead it is who would suffer the most from an adverse decision.

[122]    See 29 C.F.R. section 1605.2(C)(2)(ii) (1995) (providing employer must offer accommodation not causing undue hardship on employer that least disadvantages the worker); see also Sara L. Silbiger, Note, Heaven Can Wait: Judicial Interpretation of Title VII's Religious Accommodation Requirement Since Trans World Airlines v. Hardison, 53 Fordham L. Rev. 839, 857-861 (1985) (discussing Title VII's religion-accommodation requirements); Note, Accommodation of an Employee's Religious Practice Under Title VII, 1976 U. Ill. L. F. 867, 871 (suggesting duty to accommodate religious practice imposes balancing test).

[123]    432 U.S. 63 (1977).

[124]    Id. at 74.

30 Ga. L. Rev. 387, *425

ends." [125]    [*426]

Although Title VII's use of "reasonableness" language in the religious accommodation context supports a balancing test and although the accommodation test is often described as balanc- ing, [126] the Hardison Court in fact imposed a per se rule, albeit one so de minimis as to require almost no showing by the employer at all. [127] Once a worker has established that an employment practice interfered with his sincerely -held religious practices, the employer is required merely to show that any alternative practice accommodating the worker would have involved some cost to the employer. [128] Regardless of the extent of interference with the plaintiff's religious practices, the de minimis burden on the employer remains the same. [129] It is not a balancing test at all. [130] In effect, the decision to apply a balancing test in the Title VII context is akin to the decision to apply rational-basis scrutiny in the equal protection context: The case is decided in selection of the standard rather than in its application. It is a defendant- favoring mechanism.

If balancing is fraught with bias potential generally in Title VII cases, it is especially problematic in the business necessity context. In matters of business judgment, courts are likely to afford particular deference to the employer. [131] When the court assesses not the importance of the practice but the importance ascribed to it by the employer, the test becomes one of good faith--the same test rejected in Griggs. [132] Deference to employers' business [*427] judgment destroys the impact concept entirely, [133] for the idea of impact analysis is that good faith is no defense to a neutral practice with discriminatory impact. [134]

Balancing tests, moreover, invite deference to the party whose situation most closely approximates that of the judge. [135] Judges, who often share the perspective of the employer more than that of the employee, are likely to find the employer's actions acceptable as long as they are not too far removed from what the

---

125    Id. at 81 (emphasis added).

126    See supra note 122 (citing supporting sources).

127    The actual reason why the religion test must not heavily consider the worker's interest in her religious practice is to avoid judicial entanglement in religion. Silbiger, supra note 122, at 857 n.136.

128    Id. at 847.

129    Id. at 857 n.136.

130    Cf. Frederick M. Gedicks, Toward a Constitutional Jurisprudence of Religious Group Rights, 1989 Wis. L. Rev. 99, 145 (positing courts' attempts to balance extent of governmen- tal burden on religion cannot accurately quantify religious experience because such experience is not reducible to rational terms).

131    See Brodin, supra note 14, at 364-65 (arguing courts are ill-equipped to conduct cost- benefit analysis of business practices).

132    Courts' increased deference to an employer's judgment on business efficacy of a practice as the employer's business goal increases in importance is reminiscent of the mentality that, in times of crisis, human rights must give way when something else very important is at stake. See Elizabeth Bartholet, Application of Title VII to Jobs in High Places, 95 Harv. L. Rev. 945, 957 (1982) (noting at upper levels of employment, "where courts feel that the quality of performance really matters, they may be reluctant to interfere with traditional selection means").

133    See Bartholet, supra note 132, at 1026 ("Putting the stamp of judicial approval on racially exclusionary systems is seriously unjust if in fact the systems are not 'finding' that the systems are job related is based simply on judges' views that systems with which they are personally familiar make sense.").

134    Id. But cf. Rutherglen, supra note 45, at 1320 ("Taken together, the plaintiff's evidence of adverse impact and the defendant's evidence of business justification must reveal a significant risk that the disputed employment practice could be used as a pretext for discrimination.").

135    Cf. International Union, UAW v. Johnson Controls, 499 U.S. 187, 201 (1991) (noting in BFOQ context inappropriateness of accepting employer's decision of what makes candidates qualified).

judge himself would do in comparable circumstances. [136] Such deference verges on creating a standard of reasonableness or rationality. Yet, one cannot ask simply whether the employer was being rational; ongoing businesses do not stay profitable by making irrational decisions.

3. Balancing the Importance of An Employer's Goal Against the Efficacy of Its Practice. In the second type of balancing, courts impose on the employer a lesser burden because the employer's goal is deemed especially important. For example, courts are willing to assume the need for safety. [137] The fact that an employer's safety **[*428]** motif justifies deference to its need for the ultimate safety goal, however, does not justify deference to the means chosen by the employer to achieve safety when that means is discriminatory. [138] Courts do not owe employers deference on the choice of means, even if deference is owed on the choice of ends.

Moreover, the same reasons not to give deference to employer judgment generally, as described above, apply with equal force in the choice of means. The problem with deferring to an employer's business judgment about what practices it may utilize is that management decisions to employ particular hiring criteria are the products of a subconscious point of view that envisions a workplace full of people like the manager. [139] The manager may not deliber- ately choose a criterion excluding people dissimilar to himself, but when the manager envisions the type of worker the criterion aims to select, he imagines a person like himself. [140] Thus, the manag- er charged with assessing the efficacy of a practice may not adequately guard against his own subconscious expectations of the people to be selected and against the disparate impact the selecting **[*429]** criterion may yield. [141]

---

[136]    See Frances E. Olsen, The Family and the Market: A Study of Ideology and Legal Reform, 96 Harv. L. Rev. 1497, 1552 (1983) (stating antidiscrimination laws, by suggesting that instances of discrimination are irrational and capricious departures from normal objective operation of markets, disguise systemic nature of bias in favor of dominant [i.e., white male] workers); see also Barbara A. Hocking, Is the Reasonable Man the Right Man for the Job?, 17 Adel. L. Rev. 79, 86 (1995) (arguing "it is implicit within an organizational structure that like will recruit and promote like, that difference is disadvantage"); Margaret Thornton, Hegemonic Masculinity and the Academy, 17 Int'l J. Soc. L. 115, 122 (1989) (positing "homogeneity is a central value of any organizational culture since it is conducive to the maintenance of bureaucratic control and efficiency").

[137]    See generally Spurlock v. United Airlines, 475 F.2d 216 (10th Cir. 1973) (permitting business necessity defense where employer could not establish direct relationship between requirement of minimum flight time and training success).

Not all safety goals may be assumed to qualify as proper business purposes. In the disparate treatment context, for example, the Court held that the goal of protecting workers' fetuses was not within the essence of battery manufacturing and therefore was not a BFOQ. International Union, UAW v. Johnson Controls, 499 U.S. 187, 205-06 (1991).

[138]    See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1119 n.6 (11th Cir. 1993) (holding employer invoking safety defense must nevertheless establish necessity and does not receive absolute court deference); Jeffrey D. Kirtner, Note, English-Only Rules and the Role of Perspective in Title VII Claims, 73 Tex. L. Rev. 871, 913-14 (1995) (discussing limits on use of safety-based business necessity defense).

[139]    Barbara J. Flagg, "Was Blind But Now I See": White Race Consciousness and the Requirement of Discriminatory Intent, 91 Mich. L. Rev. 953, 970 (1993); see also Derrick Bell, And We Are Not Saved: The Elusive Quest for Racial Justice 140-61 (1987) (suggesting white-dominated workplace that admits minorities will halt such admission to maintain white dominance); Bartholet, supra note 132, at 1026 (asserting system has failed to consider alternative methods of selection due to tendency of those who are "in" to perpetuate systems that got them there); Minow, supra note 106, at 13 ("By granting discretion to . . . private decisionmakers, . . . judges . . . allow[] those decisionmakers to give significance to differences."). If courts "cede discretion to other decisionmakers[,] . . . [they allow] the decisionmaker with the discretion to take difference into account in an impermissible manner." Id. at 26. Professor Minow discussed the tension among the Supreme Court Justices during the 1986 Term, between those wanting to preserve the discretion of decisionmakers and those wanting to avoid the discrimination resulting when decisionmakers are given unchecked discretion. Id. passim.

[140]    Chamallas, supra note 62, at 2392.

[141]    Professor Chamallas explains that a "focus on the inadequacy of the excluded group" has created a tendency not to scrutinize the criteria that have excluded them. Id. at 2372. This focus on the victim's shortcomings rather than on the criteria that exclude the victims allows "existing organizations and professions" to continue to exclude such victims without challenge. Id. at 2374. "In this motivational account, responsibility lies with the individual worker; the employer is required only to measure or judge each worker evenhandedly using conventional standards." Id. at 2377.

30 Ga. L. Rev. 387, *429

In fact, cultural-domination theorists argue that as soon as women or minorities begin to satisfy a require-ment that had heretofore excluded them (for example, admission to law school), the organization subcon-sciously responds by adopting a different standard, precisely to keep the number of women or minorities at a level low enough to maintain white-male dominance within the organization. [142] Thus, deference to the defendant's business judgment in this context threatens the integrity of decisionmaking. Deferring to the defendant's business judgment "leaves intact the very managerial prerogative which has built the dis-criminatory base." [143]

IV. Conclusion

The 1991 Act's codification of the disparate impact doctrine has opened the door for long needed clarifi-cation and strengthening of the business necessity defense. That defense should require an employer to prove that its discriminatory practice is essential to its continued operation. Under the structure created by the 1991 Act, **[*430]** an employer must prove that the goal it seeks to achieve through the practice is cru-cial to its continued viability and, in turn, that the practice selected is crucial to the achievement of that goal. The employer may meet the second part of this test by producing evidence that the practice significantly and efficiently achieves the goal and by rebutting the plaintiff's evidence of the availability of a less-discriminatory alternative.

Moreover, requiring an employer to prove a strict level of need for its discriminatory practice comports with the proof structure in impact cases contemplated by the 1991 Civil Rights Act. Parallels between the analytical structure of disparate impact cases and disparate treatment cases demonstrate that the stringent BFOQ- defense standard applied in treatment cases is equally appropriate in impact cases. Alternatives to this standard thwart the objectives of Title VII by disproportionately favoring defendants.

Copyright (c) 1996 Georgia Law Review Association
Georgia Law Review

---

[142]    E.g., id. at 2387.

[143]    Hocking, supra note 136, at 83; see also Chandler, supra note 44, at 934 (arguing Griggs simply prevents employers from us-ing non-economic criteria--criteria unrelated to job performance--that decrease minority opportunities).

 Mountain Side Mobile Estates Partnership v. HUD, 56 F.3d 1243 (10th Cir. 1995), illustrates this point. In Mountain Side, a Title VIII case applying a business necessity test identical to that of Title VII, the defendant argued that inherent limitations on the park's sewer system required it to impose the three-person-per-unit policy challenged as discriminatory against families with chil-dren. Although a study commissioned by the defendant itself contradicted the sewer system-based argument, the Tenth Circuit ac-cepted the defendant's additional, unsupported arguments pertaining to "quality of life" and found that business necessity was es-tablished.  Id. at 1256. The holding seems particularly troubling because the defendant had adopted the policy at the exact time that the Fair Housing Act,  42 U.S.C. section 3601 (1988), rendered discrimination against families with young children unlawful.  Id. at 1246.

For Opinion See 88 F.3d 739

United States Court of Appeals,

Ninth Circuit.

Karl PFAFF and Elizabeth Pfaff, Petitioners,

v.

SECRETARY, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, on behalf
of Michael Nymoen, Beckie Nymoen, Lindsay Nymoen, John Nymoen and Katie Nymoen, Respondent.

No. 94-70898.

July 3, 1995.

On Petition for Review of A Decision of the United States Department of Housing and Urban Development

Brief for the Secretary as Respondent

Deval L. Patrick, Assistant Attorney General, Jessica Dunsay Silver, Gregory B. Friel, Attorneys, Department of
Justice, P.O. Box 66078, Washington, D.C. 20035-6078, (202) 514-3876.

TABLE OF CONTENTS

STATEMENT OF JURISDICTION ... 1

ISSUES PRESENTED ... 1

STANDARDS OF REVIEW ... 2

STATEMENT OF THE CASE ... 2

A. Procedural History ... 2

B. Facts ... 3

1. Discrimination ... 3

2. Pfaffs' Justifications For The Four-Person Rule ... 6

3. Effect Of The Discrimination On The Nymoens ... 6

C. ALJ's Opinion ... 7

SUMMARY OF ARGUMENT ... 10

ARGUMENT:

I. NO SHOWING OF DISCRIMINATORY INTENT IS REQUIRED TO ESTABLISH A PRIMA FACIE CASE

Case 1:13-cv-00966-RJL    Document 40-10    Filed 08/08/14    Page 100 of 154

OF FAMILIAL STATUS DISCRIMINATION UNDER THE FAIR HOUSING ACT ... 11

II. THE PFAFFS FAILED TO REBUT THE PRIMA FACIE SHOWING OF FAMILIAL STATUS DISCRIM-INATION ... 18

A. The ALJ Properly Required The Pfaffs To Prove A Compelling Business Necessity ... 18

B. The ALJ's Finding That The Pfaffs Failed To Prove Business Necessity Is Supported By Substantial Evidence In The Record ... 24

III. THE COMPENSATORY DAMAGES AWARD IS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD ... 28

IV. THE ALJ DID NOT ABUSE HIS DISCRETION IN AWARDING A CIVIL PENALTY AND AN INJUNC-TION ... 32

CONCLUSION ... 35

STATEMENT OF RELATED CASES ... 35

## TABLE OF AUTHORITIES

CASES:

*Arthur v. City of Toledo,* 782 F.2d 565 (6th Cir. 1986) ... 12

*Baumgardner v. HUD,* 960 F.2d 572 (6th Cir. 1992) ... 34

*Betsey v. Turtle Creek Assoc.,* 736 F.2d 983 (4th Cir. 1984) ... *passim*

*Blake v. City of Los Angeles,* 595 F.2d 1367 (9th Cir. 1979), cert. denied, 446 U.S. 928 (1980) ... 23, 24

*Block v. R.H. Macy & Co.,* 712 F.2d 1241 (8th Cir. 1983) ... 31

*Bradley v. Pizzaco of Nebraska, Inc.,* 7 F.3d 795 (8th Cir. 1993) ... 23, 24, 27

*Brown v. Artery Org., Inc.,* 654 F. Supp. 1106 (D.D.C. 1987) ... 17

*Carey v. Piphus,* 435 U.S. 247 (1978) ... 31

*Casa Marie, Inc. v. Superior Court of Puerto Rico,* 988 F.2d 252 (1st Cir. 1993) (dictum) ... 12

*Chambers v. Omaha Girls Club, Inc.,* 834 F.2d 697 (8th Cir. 1987) ... 24

*Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837 (1984) ... 17-18

*City of Edmonds v. Oxford House, Inc.,* 115 S. Ct. 1776 (1995) ... 15, 16

*Curtis v. Loether,* 415 U.S. 189 (1974) ... 31

*Doe v. City of Butler,* 892 F.2d 315 (3d Cir. 1989) ... 12

*Edwards v. Occidental Chem. Co.,* 892 F.2d 1442 (9th Cir. 1990) ... 31

*FTC v. American Nat'l Cellular, Inc.,* 810 F.2d 1511 (9th Cir. 1987) ... 32

*Federal Election Comm'n v. Furgatch,* 869 F.2d 1256 (9th Cir. 1989) ... 32

*Griggs v. Duke Power Co.,* 401 U.S. 424 (1971) ... *passim*

*Gutierrez v. Municipal Court of Southeast Judicial Dist.,* 838 F.2d 1031 (9th Cir. 1988), vacated as moot, 490 U.S. 1016 (1989) ... 23

*Halet v. Wend Inv. Co.,* 672 F.2d 1305 (9th Cir. 1982) ... 14-15

*Hanson v. Veterans Admin.,* 800 F.2d 1381 (5th Cir. 1986) ... 12

*Harriss v. Pan American World Airways, Inc.,* 649 F.2d 670 (9th Cir. 1980) ... 23

*Hawkins v. Anheuser-Busch, Inc.,* 697 F.2d 810 (8th Cir. 1983) ... 27

*HUD v. Blackwell,* 908 F.2d 864 (11th Cir. 1990) ... *passim*

*HUD v. Mountain Side Mobile Estates,* 2 Fair Housing-Fair Lending Rep. ¶ 25,053, (HUD Secretary July 19, 1993), rev'd 1995 WL 322627 (10th Cir. May 30, 1995) ... *passim*

*HUD v. Mountain Side Mobile Estates,* 2 Fair Housing-Fair Lending Rep. ¶ 25,064, (HUD Secretary October 20, 1993), rev'd 1995 WL 322627 (10th Cir. May 30, 1995) ... 8, 24

*Hung Ping Wang v. Hoffman,* 694 F.2d 1146 (9th Cir. 1981) ... 19

*Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926 (2d Cir.), aff'd, 488 U.S. 15 (1988) ... 12

*Image of Greater San Antonio v. Brown,* 570 F.2d 517 (5th Cir. 1978) ... 23

*Jackson v. Okaloosa County,* 21 F.3d 1531 (11th Cir. 1994) ... 12

*Johnson v. Hale,* 13 F.3d 1351 (9th Cir. 1994) ... 30, 32

*Keene Corp. v. United States,* 113 S. Ct. 2035 (1993) ... 14

*Keith v. Volpe,* 858 F.2d 467 (9th Cir. 1988), cert. denied, 493 U.S. 813 (1989) ... 12, 13, 27

*Lorillard v. Pons,* 434 U.S. 575 (1978) ... 14

*Lum v. City & County of Honolulu,* 963 F.2d 1167 (9th Cir.), cert. denied, 113 S. Ct. 659 (1992) ... 29

*Marable v. Walker,* 704 F.2d 1219 (11th Cir. 1983) ... 34

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ... 19

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Metropolitan Housing Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978) ... 12, 13

*Mountain Side Mobile Estates Partnership v. HUD,* 1995 WL 322627 (10th Cir. May 30, 1995) ... 12, 22, 24

*National R.R. Passenger Corp. v. Boston & Maine Corp.,* 112 S. Ct. 1394 (1992) ... 17

*Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir. 1974) ... 27

*Phiffer v. Proud Parrot Motor Hotel, Inc.,* 648 F.2d 548 (9th Cir. 1980) ... 30, 34

*Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88 (6th Cir. 1982) ... 23

*Smith v. Anchor Bldg. Corp.,* 536 F.2d 231 (8th Cir. 1976) ... 34

*Smith v. Wade,* 461 U.S. 30 (1983) ... 31

*Soules v. HUD,* 967 F.2d 817 (2d Cir. 1992) ... 19, 21

*Stamper v. Secretary of Agriculture,* 722 F.2d 1483 (9th Cir. 1984) ... 30

*Thomas v. Metroflight, Inc.,* 814 F.2d 1506 (10th Cir. 1987) ... 20

*Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205 (1972) ... 15

*Tull v. United States,* 481 U.S. 412 (1987) ... 32

*United States v. Badgett,* 976 F.2d 1176 (8th Cir. 1992) ... 19, 21

*United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1985) ... 12

*United States v. City of Hayward,* 36 F.3d 832 (9th Cir. 1994), petition for cert. filed, 63 U.S.L.W. 3874 (U.S. Apr. 24, 1995) ... 15, 31

*United States v. Presidio Invs., Ltd.,* 4 F.3d 805 (9th Cir. 1993) ... 18

*United States v. West Peachtree Tenth Corp.,* 437 F.2d 221 (5th Cir. 1971) ... 34-35

*Wambheim v. J.C. Penny Co.,* 705 F.2d 1492 (9th Cir. 1983), cert. denied, 467 U.S. 1255 (1984) ... 19

*Western Pioneer, Inc. v. United States,* 709 F.2d 1331 (9th Cir. 1983) ... 17

*Williams v. Colorado Springs School Dist. No. 11,* 641 F.2d 835 (10th Cir. 1981) ... 24

CONSTITUTION, STATUTES, AND REGULATIONS:

Constitution of the United States:

Equal Protection Clause ... 20

Fair Housing Act, 42 U.S.C. 3601 *et seq.* ... *passim*

42 U.S.C. 3602(k) ... 2

42 U.S.C. 3604(a) ... 7, 10, 12, 13, 28

42 U.S.C. 3604(c) ... 7

42 U.S.C. 3607(b)(1) ... 16, 21

42 U.S.C. 3608 ... 17

42 U.S.C. 3612(b)-(h) ... 1

42 U.S.C. 3612(g)(3) ... 32

42 U.S.C. 3612(g)(3) (A) ... 32

42 U.S.C. 3612(h)(1) ... 1

42 U.S.C. 3612(i) ... 1

42 U.S.C. 3614a ... 17

28 U.S.C. 2342(6) ... 1

24 C.F.R. Ch. 1, Subch. A, App. I (1994) ... 21

24 C.F.R. 104.30(a) ... 1

LEGISLATIVE HISTORY:

H.R. Rep. No. 711, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173 ... *passim*

134 Cong. Rec. 23711-23712 (1988) ... 13

MISCELLANEOUS:

R. Schwemm, Housing Discrimination, Law and Litigation § 25.3(2)(b) (1991) ... 32

## STATEMENT OF JURISDICTION

The Administrative Law Judge (ALJ) had subject matter jurisdiction under 42 U.S.C. 3612(b)-(h). He issued a decision and order on October 27, 1994 (ER 1-28), which became final on November 28, 1994. See 42 U.S.C. 3612(h)(1); 24 C.F.R. 104.30(a). On December 15, 1994, petitioners timely sought review in this Court, which has jurisdiction under 42 U.S.C. 3612(i) and 28 U.S.C. 2342(6).

## ISSUES PRESENTED

1. Whether a showing of discriminatory intent is necessary to prove familial status discrimination under the Fair Housing Act.

2. Whether petitioners rebutted the prima facie showing of familial status discrimination.

3. Whether the ALJ's award of compensatory damages is supported by substantial evidence in the record.

4. Whether the ALJ abused his discretion in assessing a civil penalty and imposing injunctive relief.

STANDARDS OF REVIEW

The applicable standards of review are discussed in each argument section. See pp. 17-19, 24, 28-29 & n.18, 32, *infra.*

STATEMENT OF THE CASE

A. *Procedural History*

In November 1992, Beckie and Michael Nymoen filed a complaint with the Department of Housing and Urban Development (HUD), alleging that Karl and Elizabeth Pfaff had engaged in discrimination on the basis of familial status in violation of the Fair Housing Act, 42 U.S.C. 3601 *et seq.* (ER 1-2).[FN1] Following an investigation, HUD issued a reasonable cause determination and a charge of discrimination against the Pfaffs, alleging that they had engaged in discriminatory practices on the basis of familial status (ER 2).[FN2]

> FN1. We use the following abbreviations in this brief: "ER" (petitioners' Excerpts of Record); "SER" (HUD's Supplemental Excerpts of Record); "RT" (administrative hearing transcript); "GX" (HUD's exhibits introduced at hearing); and "Br." (petitioner's opening brief).

> FN2. "Familial status" is defined at 42 U.S.C. 3602(k) (reproduced in the Addendum, *infra*).

After an evidentiary hearing, a HUD ALJ found that the Pfaffs had violated the Act, and awarded damages, injunctive relief, and a civil penalty (ER 1-28). The ALJ's decision became final without review by the Secretary, and the Pfaffs petitioned for review in this Court (CR 34).

B. *Facts*

1. *Discrimination*

Michael and Beckie Nymoen are a married couple with three minor children who were 5, 7 and 9 years old, respectively, in the spring of 1992 (ER 3). At that time, the Nymoens were renting a three-bedroom house in Bellingham, Washington. Their landlord informed them in May 1992 that he had sold the house and that they would have to move by June 1, 1992 (RT 18-19). They contacted Sun Mark Properties, Inc., a real estate and property management company, for assistance in finding another house to rent (RT 19-23; GX 3).

A Sun Mark agent showed Mrs. Nymoen and one of the Nymoen children a three-bedroom house owned by the Pfaffs (RT 23-25). The dwelling, which rented for $850 per month, had about 1,200 square feet of living space and contained 3 bedrooms (each with a closet), an eat-in kitchen, a living room, a dining room, 2 bath-rooms, a "nice-sized" deck and a 2-car garage (GX 8; RT 25, 391-393; SER 1). Mrs. Nymoen liked the house very much and told the real estate agent that she would take it. She filled out a rental application and left a deposit with Sun Mark (GX 2, 10; RT 25). Mrs. Nymoen later took the entire family to see the house; they all liked it and wanted to move there (RT 26).

After a background check showed that the Nymoens had a good credit history, the Sun Mark agent contacted

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. Pfaff to tell him that she had prospective tenants for his house (GX 10; RT 162-163, 400, 403). She told him about the Nymoens, their employment, their previous residences and other background information (GX 10; SER 61). During the conversation, Mr. Pfaff asked for and was told the ages of the Nymoen children (*ibid.*). He then advised the Sun Mark agent that he thought the house might be too small for the Nymoens, but that he would check with his wife and call her back (*ibid.*). The next day, Mr. Pfaff informed the Sun Mark agent that he would not rent the house to the Nymoens (*ibid.*). The Pfaffs contend that they have a four-person occupancy limit for the dwelling (RT 400).

The Sun Mark agent told Mr. Pfaff that she believed the family was very nice and would take care of the house (GX 10; SER 61). She suggested that Mr. Pfaff meet with the Nymoens, but he refused (*ibid.*). He also refused to allow the Nymoens to present their credit history or their record of good tenancy and proper maintenance of the houses they had rented in the past (RT 400-401; SER 51). The Nymoens had made improvements to one of the properties they had rented (RT 52-53; SER 8-9).

After refusing to rent to the Nymoens, Mr. Pfaff met with two Sun Mark representatives to discuss the continued listing of his house by the company (GX 10; RT 152-154, 403-404; SER 31-33, 53-54, 62). The Sun Mark agents advised Mr. Pfaff that he may have violated the Fair Housing Act by refusing to rent to the Nymoens and that his four-person occupancy limit for the property was possibly unlawful (RT 152-154, 404; GX 10, 11; SER 31-33, 54, 62). Mr. Pfaff responded that "[t]his is our own property and we decide who we take" as tenants (RT 404; SER 54). After one of the Sun Mark agents emphasized that her company could not discriminate on the basis of the number of persons in the household, Mr. Pfaff refused to deal further with the company and ripped up the listing contract and threw it in the trash (RT 154, 404; SER 54). He later rented the house to a family of four (RT 341-342).

Later, when HUD's investigator asked Mr. Pfaff to explain his reasons for not renting the house to the Nymoens, "he talked about the number of children in the family" (RT 198; SER 34). He told the HUD investigator that he thought each child was entitled to his or her own bedroom, and that the house was too small to accommodate the children in the family (*ibid.*). Moreover, in his answer to the Nymoens' complaint, Mr. Pfaff emphasized that he did not consider the Nymoens for residency because the house had no "den [or] any basement which could be used as a play area for 3 children" (GX 12 ¶ 2; SER 64). He further stated that he and his wife consider the maximum capacity of the house to be "2 adults plus 2 children" (*ibid.*).

The Pfaffs have been in the real estate business since 1970 (RT 323; SER 39). They own eight homes in the Bellingham area and two in Tennessee, and they have a net worth of over $1 million (RT 329-331, 395-396, 411; SER 40-42, 59). Despite his decades of experience in real estate, Mr. Pfaff insisted during the HUD investigation that the Fair Housing Act did not apply to him and his wife (RT 402; SER 52).

2. *Pfaffs' Justifications For The Four-Person Rule*

The Pfaffs argued below that the purpose of the four-person rule was to protect the value of their property (ER 14). Mr. Pfaff asserted that he and his wife based the rule on "common sense" and did not rely on any engineering study to determine whether the house could support five persons (RT 399; SER 49). Nor did they rely on any local laws in establishing the four-person rule. There are no state or local occupancy policies or laws limiting the number of people who can reside in a single-family dwelling (RT 229-230, 382-383; SER 37-38, 45-46).

3. *Effect Of The Discrimination On The Nymoens*

The Nymoens felt pressured after their rejection by the Pfaffs because they had only a short period of time to find alternative housing before the June 1, 1992, deadline for vacating their current residence (RT 40-41; SER 2-3). The family eventually found a three-bedroom house that rented for $975 a month ($125 more per month than the Pfaff house) (RT 16, 43; GX 4). Although the size of the dwelling was "fairly comparable" to the Pfaff house (RT 44), the Nymoens found it less desirable (RT 53, 87-88).

The Nymoens suffered significant emotional distress as a result of their rejection by the Pfaffs (ER 5). Mr. Nymoen construed the Pfaffs' refusal to rent the house to his family as the equivalent of telling him that he was "not entitled to have three children" (RT 111-112, 119; SER 20-21, 25). It made him feel as though he no longer had control over his own life (RT 110-111; SER 19-20). The incident triggered feelings of anger, frustration and disbelief in Mr. Nymoen, who, as a result, withdrew emotionally from his wife and children and spent less time with them than usual (RT 59-60, 91-92, 100-101, 109-112, 117; SER 10-11, 13-14, 16-21, 24). Mrs. Nymoen was also very angry and upset; she found the experience "degrading" and considered it a "rude awakening" since she had never previously been subjected to discrimination (RT 51-52, 59, 65; SER 7-8, 10, 12). She could barely stop thinking about the incident (RT 59; SER 10). The children were also adversely affected by the discrimination (RT 50; SER 6). In addition to experiencing a change in their father's behavior toward them, the Nymoen children were confused by the fact that they were not permitted to live in the Pfaff house (*ibid.*). The tensions created by the discrimination contributed to the Nymoens' eventual separation in July 1993 (RT 91-92, 117; SER 13-14, 24). Mrs. Nymoen testified that the discrimination caused stress in the marriage because her husband was unable to discuss the incident with her, whereas she thought about it constantly and needed to talk things out (ER 21; RT 59, 91-92, 115-117; SER 10, 13-14, 22-24).

### C. *ALJ's Opinion*

The ALJ found that the Pfaffs had violated 42 U.S.C. 3604(a) and 3604(c) (ER 10-16).[FN3] With regard to the Section 3604(a) claim, the ALJ found that HUD had established a prima facie violation by proving that the Pfaffs' four-person rule had a substantial disparate impact on families with minor children (ER 12-13). He recognized that no proof of discriminatory intent was necessary to establish a prima facie showing of familial status discrimination (ER 11). In reaching this conclusion, the ALJ relied (ER 12) on the Secretary's decision in *HUD v. Mountain Side Mobile Estates Partnership,* 2 Fair Housing-Fair Lending Rep. (P-H) ¶ 25,053, pp. 25,492-25,493 (HUD Secretary July 19, 1993), rev'd, 1995 WL 322627 (10th Cir. May 30, 1995). In that case, the Secretary interpreted the Fair Housing Act to allow plaintiffs who bring claims against private defendants to establish a prima facie case of familial status discrimination under a disparate impact theory -- in other words, without offering any proof of discriminatory intent.

> FN3. The full text of 42 U.S.C. 3604(a) and 3604(c) is reproduced in the Addendum, *infra.*

Next, the ALJ concluded that the Pfaffs had failed to rebut HUD's prima facie showing because they had not proved a "compelling business necessity" for their four-person rule (ER 11, 13-14). In requiring the showing of a compelling business necessity, the ALJ applied the standard adopted by the Secretary in *HUD v. Mountain Side Mobile Estates Partnership,* 2 Fair Housing-Fair Lending Rep. (P-H) ¶ 25,064 (HUD Secretary Oct. 20, 1993), rev'd, 1995 WL 322627 (10th Cir. May 30, 1995) (ER 12-13). The Secretary held in *Mountain Side* that a private housing provider must prove a "compelling need or necessity" for a challenged practice in order to rebut a prima facie showing in a disparate impact case. *Id.* at p. 25,620.

The ALJ concluded that the Pfaffs failed to demonstrate that their four-person rule was necessary to achieve

their purported goal of protecting the value of their property (ER 14). He found no evidence that the Nymoens, or any other five-person family, would have degraded the economic value of the house (ER 14). The ALJ emphasized that the Pfaffs had refused to look at the Nymoens' history as tenants, which would have shown that the family had taken good care of rental properties in the past and had even improved one of the houses in which they had lived (ER 14). He also found that the Pfaffs had failed to consider other options that would likely prove more effective than the four-person rule in protecting their property against damage -- for example, use of "detailed maintenance requirements, more frequent inspections, higher security deposits, or more careful tenant screening" (ER 14).

As relief, the ALJ awarded the Nymoens $24,212.61 in compensatory damages -- $4,212.61 for out-of-pocket expenses and inconvenience and $20,000 for emotional distress (ER 16-23, 27). He found that the Nymoens' testimony established that they and their children had suffered significant emotional distress as a result of the Pfaffs' discriminatory conduct (ER 18-23). The ALJ also ordered the Pfaffs to pay an $8,000 civil penalty to HUD (ER 23-25). In setting the amount of the penalty, the ALJ emphasized that: (1) the Pfaffs had committed a serious violation that had caused significant harm to the Nymoens, (2) the Pfaffs had refused to heed explicit warnings from real estate agents that their rejection of the Nymoens may have violated the Act, (3) the Pfaffs were highly sophisticated and experienced in the real estate business, (4) they had a net worth of over $1 million, and (5) there was a need for a penalty to deter future violations (ER 24-25; see also ER 21). Finally, the ALJ granted injunctive relief that prohibited discrimination or retaliation against the Nymoens (ER 26). The injunction also included recordkeeping and reporting provisions that required the Pfaffs to submit quarterly reports to HUD concerning their rental practices (ER 26-27).

SUMMARY OF ARGUMENT

The Pfaffs challenge the finding of liability under 42 U.S.C. 3604(a), as well as some of the relief ordered by the ALJ. Their arguments have no merit.

First, HUD need not prove discriminatory intent to establish a prima facie case of familial status discrimination. Ninth Circuit precedent, the language of the statute, the legislative history and the underlying policies of the Act all confirm that a rule that has a disparate impact on families with children can violate the Act even if it was not adopted for intentionally discriminatory purposes. Moreover, the HUD Secretary has interpreted the Fair Housing Act as allowing a plaintiff to use a disparate impact theory to establish a prima facie case of familial status discrimination. Because Congress has given the Secretary responsibility for interpreting and administering the Act, this Court must give special deference to his reading of the statute. The Secretary's interpretation is a reasonable construction of the Act and should be upheld.

Second, the ALJ properly required the Pfaffs to prove a compelling business necessity for their four-person rule in order to rebut HUD's prima facie showing. The HUD Secretary has interpreted the familial status provisions of the Act as imposing a "compelling business necessity" standard. This is a reasonable construction of the statute that is consistent with the precedent of this and other circuits. Moreover, the ALJ's finding that the Pfaffs failed to prove that their occupancy rule was necessary is supported by substantial evidence in the record and must be affirmed.

Finally, this Court should uphold the relief granted by the ALJ. The $20,000 emotional distress award is supported by substantial evidence in the record, and the ALJ did not abuse his discretion in imposing an $8,000 civil penalty and an injunction that included recordkeeping and reporting requirements.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ARGUMENT

I

NO SHOWING OF DISCRIMINATORY INTENT IS REQUIRED TO ESTABLISH A PRIMA FACIE CASE
OF FAMILIAL STATUS DISCRIMINATION UNDER THE FAIR HOUSING ACT

The ALJ found that the Pfaffs' four-person rule had a substantial disparate impact on families with minor children. The Pfaffs do not challenge that finding, but argue instead that a showing of disparate impact is insufficient to establish a prima facie case. They contend that proof of discriminatory intent is required for a prima facie showing of familial status discrimination under 42 U.S.C. 3604(a), at least in cases involving private housing providers (Br. 7-13). The ALJ correctly held that HUD need not prove discriminatory intent.[FN4]

> FN4. HUD also raised an intentional discrimination claim under 42 U.S.C. 3604(a) (CR 22 at 19-25). The ALJ had no reason to address that claim since he found a violation under the disparate impact theory.

This Court -- as well as every other circuit that has decided the issue -- has recognized that proof of discriminatory intent is unnecessary to establish a violation of the Fair Housing Act. *Keith v. Volpe,* 858 F.2d 467, 482-484 (9th Cir. 1988), cert. denied, 493 U.S. 813 (1989), aff'g, 618 F. Supp. 1132 (C.D. Cal. 1985).[FN5] In *Keith,* this Court affirmed a finding of racial discrimination under the Act where the defendant's conduct had a disparate impact on minorities (*id.* at 484) -- even though there was no proof of discriminatory intent. See *id.* at 483 (plaintiffs "fail[ed] to produce direct evidence of discriminatory intent"); 618 F. Supp. at 1152 ("plaintiffs' failure to prove discriminatory intent * * * does not preclude them from establishing a prima facie case").[FN6]

> FN5. Accord *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934-935 (2d Cir.), aff'd, 488 U.S. 15 (1988); *Doe v. City of Butler,* 892 F.2d 315, 323 (3d Cir. 1989); *Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 986-988 (4th Cir. 1984); *Hanson v. Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur v. City of Toledo,* 782 F.2d 565, 574-575 (6th Cir. 1986); *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1288-1290 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978); *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975); *Mountain Side Mobile Estates Partnership v. HUD,* No. 94-9509, 1995 WL 322627 at *6-8 (10th Cir. May 30, 1995); *Jackson v. Okaloosa County,* 21 F.3d 1531, 1543 (11th Cir. 1994). See also *Casa Marie, Inc. v. Superior Court of Puerto Rico,* 983 F.2d 252, 269 & n.20 (1st Cir. 1993) (dictum).

> FN6. The Pfaffs incorrectly suggest (Br. 8-9) that this Court has left open the question whether proof of intent is necessary under the Act. The issue left unresolved in *Keith* was whether to adopt the approach of the Third and Eighth Circuits (under which proof of disparate impact automatically establishes a prima facie showing) or the standard adopted by the Seventh Circuit (which applies a four-factor balancing test that considers evidence of intent, in addition to disparate impact, in determining whether a violation has been proved). 858 F.2d at 483. But even under the Seventh Circuit test that the Pfaffs advocate (Br. 8-9), a plaintiff may establish a violation of the Act without proving discriminatory intent. See *Arlington Heights,* 558 F.2d at 1287, 1290-1294. Moreover, although the Fourth Circuit applies the Seventh Circuit standard to governmental defendants, it refuses to consider discriminatory intent in deciding whether a plaintiff has established a prima facie showing against a *private* defendant. *Betsey,* 736 F.2d at 988 & n.5.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Although *Keith* involved racial discrimination, its reasoning also applies to familial status claims. The language of the Act draws no distinction between familial status and race in defining the acts that constitute unlawful discrimination. See 42 U.S.C. 3604(a) (quoted in the Addendum, *infra*). Moreover, when Congress amended the Act in 1988 to add "familial status" as a protected class, it was fully aware that every court of appeals that had addressed the issue had concluded that proof of discriminatory intent was unnecessary to establish a violation of the statute. See 134 Cong. Rec. 23711-23712 (1988) (statement of Sen. Kennedy). In the face of such caselaw, Congress neither changed the language of the statute to impose an intent requirement nor created a special definition of discrimination applicable only to familial status claims. By reenacting the statute without any relevant change to the definition of discrimination, Congress is presumed to have adopted the disparate impact standard for familial status claims, as well as for cases involving race and other protected categories. See *Keene Corp. v. United States,* 113 S. Ct. 2035, 2043 (1993); *Lorillard v. Pons,* 434 U.S. 575, 580-581 (1978).

The legislative history of the 1988 amendments further demonstrates that Congress intended the Act to incorporate a disparate impact standard for familial status claims. The House Judiciary Committee rejected, after debate, an amendment that would have required a showing of discriminatory intent to invalidate local zoning practices and decisions under the Act. See H.R. Rep. No. 711, 100th Cong., 2d Sess. 89 (1988) (additional views of Rep. Swindall, *et al.*). Six members of the Committee dissented from the favorable report of the bill, in part, because they believed that the legislation could be used to attack practices that have "a disproportionate impact on families with children." *Id.* at 90.

In addition, in discussing the familial status amendments to the Act, the House Judiciary Committee favorably noted that two courts of appeals, including this Circuit, had allowed plaintiffs to rely on a disparate impact theory to state a claim under the Fair Housing Act. H.R. Rep. No. 711, *supra,* at 21, citing *Betsey v. Turtle Creek Assoc.,* 736 F.2d 983 (4th Cir. 1984), and *Halet v. Wend Inv. Co.,* 672 F.2d 1305 (9th Cir. 1982).[FN7]

> FN7. In *Halet,* this Court emphasized that "[s]ignificant discriminatory effects flowing from rental decisions may be sufficient to demonstrate a violation of the Fair Housing Act." 672 F.2d at 1311.

Requiring proof of intentional discrimination in familial status cases would also conflict with Congress' broad remedial goals in enacting the 1988 amendments to the Act. As this Court has explained:
Congress found wide-spread discrimination against families with children and enacted the 1988 Amendments to protect this social institution from discriminatory housing practices. * * * The goal of the FHA was to make more housing opportunities available to families with children.

*United States v. City of Hayward,* 36 F.3d 832, 834 (9th Cir. 1994), pet. for cert. filed, 63 U.S.L.W. 3874 (U.S. April 24, 1995). A disparate impact standard is crucial in eliminating this wide-spread discrimination. Sophisticated defendants may erect barriers to open housing and yet conceal their discriminatory motives, thereby making it virtually impossible for plaintiffs to establish intentional discrimination. And facially neutral practices can deny housing opportunities to families with children even if defendants did not adopt such practices with discriminatory intent. As the Supreme Court has emphasized, courts must give the Fair Housing Act a "generous construction" in order to fulfill the statute's broad remedial purposes. *City of Edmonds v. Oxford House, Inc.,* 115 S. Ct. 1776, 1780, 1783 n.11 (1995), quoting *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 212 (1972). Use of the disparate impact standard is consistent with this principle of statutory construction.

The Pfaffs nonetheless suggest that the disparate impact standard conflicts with 42 U.S.C. 3607(b)(1), which exempts from the Fair Housing Act "any reasonable local, State, or Federal restrictions regarding the maximum

number of occupants permitted to occupy a dwelling." That exemption is, in fact, irrelevant to this case because it expressly applies only to "local, State, or Federal" restrictions. It provides no protection for privately adopted numerical limits, such as the Pfaffs', that are not mandated by governmental occupancy restrictions. See H.R. Rep. No. 711, *supra*, at 31 (exemption protects occupancy "limitations by *governments*") (emphasis added). Such privately-imposed rules are subject to the same disparate impact analysis as any other practice.[FN8]

> FN8. Contrary to the Pfaffs' suggestion (Br. 10-11), the disparate impact standard is fully consistent with HUD's discussion of privately-adopted occupancy rules in the preamble to its regulations. See pp. 21-22, *infra*.

Indeed, the addition of the exemption to the statute in 1988 confirms that Congress understood that the disparate impact standard could be used to prove familial status discrimination, except in those narrow circumstances where 42 U.S.C. 3607(b)(1) applied. Congress enacted the exemption primarily because of its fear that the new familial status provisions would be used to attack reasonable, government-imposed occupancy restrictions that were adopted for legitimate health and safety reasons, rather than for intentionally discriminatory purposes. See *Edmonds,* 115 S. Ct. at 1782 n.9 (citing legislative history); H.R. Rep. No. 711, *supra*, at 31. If proof of discriminatory intent were required to establish familial status discrimination, Congress would have had no reason to worry about plaintiffs using the familial status provisions to attack these neutral, governmental restrictions, and thus would have had little, if any, reason to enact the exemption.[FN9]

> FN9. The Pfaffs also argue that the disparate impact analysis should not be used in cases against *private* defendants because it would improperly hold them "'responsible for consequences over which they have no control'" (Br. 11), quoting *Brown v. Artery Org., Inc.,* 654 F. Supp. 1106, 1116 (D.D.C. 1987). This reasoning is foreclosed by *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971), the Supreme Court's seminal disparate impact case, which held that no showing of intent was required to prove discrimination by a private defendant. At any rate, the Pfaffs are not being held responsible for anything over which they have no control; they obviously have the authority to change their four-person rule.

Finally, this Court must give substantial deference to the Secretary's adoption of the disparate impact standard for familial status cases. Congress has expressly delegated authority to the Secretary to administer the Act and to issue regulations to implement the statute. 42 U.S.C. 3608, 3614a. Consequently, this Court must uphold the Secretary's interpretation as long as it is "reasonable" and "is not in conflict with the plain language of the statute." *National R.R. Passenger Corp. v. Boston & Maine Corp.,* 112 S. Ct. 1394, 1401 (1992). Such deference is required even if the Secretary's reading of the statute is not the one the Court would have adopted if the question initially had arisen in a judicial proceeding. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n.11 (1984). See also *United States v. Presidio Invs., Ltd.,* 4 F.3d 805, 809 (9th Cir. 1993).[FN10] The Secretary's interpretation of the familial status provisions is, at the very least, reasonable. As we have explained, his reading is supported by the overwhelming weight of the caselaw (including this Circuit's own precedent), the language and structure of the statute, the legislative history and the underlying purposes of the Act. It should be upheld.

> FN10. The deferential standard of review is the same whether the agency interpretation is adopted through rulemaking or, as here, through administrative adjudication. *Western Pioneer, Inc. v. United States,* 709 F.2d 1331, 1335 (9th Cir. 1983).

II

THE PFAFFS FAILED TO REBUT THE PRIMA FACIE SHOWING OF FAMILIAL STATUS DISCRIMINA-
TION

A. The ALJ Properly Required The Pfaffs To Prove A Compelling *Business Necessity*

The Pfaffs argue (Br. 13-17) that even if HUD established a prima facie case, the ALJ erred in requiring them to show a "compelling business necessity" in order to rebut the inference of discrimination. Again, the Pfaffs fail to acknowledge the deference owed to the Secretary on this point. The Secretary has interpreted the Act as re-quiring a private housing provider to prove compelling business necessity in order to rebut a prima facie case under a disparate impact theory (p. 8, *supra*). As we have explained, the Secretary's interpretations of the Act must be upheld as long as they are "reasonable" and are "not in conflict with the plain language of the statute" (pp. 16-17, *supra*). The Secretary's adoption of the "compelling business necessity" standard is a reasonable construction of the Act that mirrors the language used by this Court and several other circuits.

The Pfaffs initially assert that they need only show a "legitimate business reason" for their four-person limit to rebut the prima facie showing (Br. 13). This argument confuses the distinction between disparate impact and in-tentional discrimination claims. The standard they advocate is essentially the rebuttal burden for defendants in *intentional* discrimination cases, as set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). But this Court has emphasized that the *McDonnell Douglas* standard does not apply to disparate impact cases. *Wambheim v. J.C. Penney Co.,* 705 F.2d 1492, 1494-1495 n.2 (9th Cir. 1983), cert. denied, 467 U.S. 1255 (1984); *Hung Ping Wang v. Hoffman,* 694 F.2d 1146, 1148 (9th Cir. 1981).[FN11]  As the Fourth Circuit has ex-plained:

> FN11. The Pfaffs' misunderstanding of the distinction between the disparate impact and the intentional discrimination standards is illustrated by their reliance (Br. 13, 15) on *United States v. Badgett,* 976 F.2d 1176 (8th Cir. 1992), and *Soules v. HUD,* 967 F.2d 817 (2d Cir. 1992). Although the courts in *Badgett* and *Soules* acknowledged that a plaintiff could prove a violation of the Act under a discriminat-ory effects theory, both cases applied the *McDonnell Douglas* standard because they involved *intention-al* discrimination claims. See *Badgett,* 976 F.2d at 1178-1180; *Soules,* 967 F.2d at 822-823.

The burden confronting defendants faced with a *prima facie* showing of discriminatory impact is different and more difficult than what they face when confronted with a showing of discriminatory intent. Defendants may overcome a *prima facie* showing of discriminatory intent by articulating some "legitimate non-discriminatory reason for the challenged practice." *[McDonnell Douglas,* 411 U.S. at 802]. However, when confronted with a showing of discriminatory impact, defendants must prove a business necessity sufficiently compelling to justify the challenged practice. * * * *Griggs v. Duke Power Co.,* 401 U.S. 424, 431 * * * (1971).

*Betsey,* 736 F.2d at 988 (applying disparate impact standard to Fair Housing Act case).[FN12]

> FN12. The defendant's rebuttal burden is heavier in a disparate impact lawsuit because the requirements of a prima facie case are "more exacting" in a disparate impact case than in an intentional discrimina-tion claim. *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 482 (9th Cir. 1983); accord *Thomas v. Metroflight, Inc.,* 814 F.2d 1506, 1509 (10th Cir. 1987). In a disparate impact lawsuit, the plaintiff must actually prove adverse impact to establish a prima facie case. In an intentional discrimination case, however, the plaintiff need not prove discriminatory intent to establish a prima facie case, but must only raise an inference of such intent. *Moore,* 708 F.2d at 482; *Thomas,* 814 F.2d at 1509.

© 2012 Thomson Reuters. No claim to Orig. US Gov. Works.

The Pfaffs concede (Br. 14) that the "compelling business necessity" standard has been used in Title VII caselaw and that it may be the appropriate standard in race discrimination cases under the Fair Housing Act. They argue (Br. 14-15), however, that a lesser burden should apply in this case since, unlike race, familial status is "not a constitutionally suspect class."

Whether familial status is a suspect class for constitutional purposes is irrelevant, since this case involves the interpretation of the Fair Housing Act -- not the Equal Protection Clause. The language of the Act draws no distinction between familial status and race in defining the conduct that constitutes unlawful discrimination. And Congress plainly intended the 1988 amendments to the Act to "extend to families with children the same protections that the [statute] previously had afforded principally to minorities and members of religious groups." *Soules v. HUD,* 967 F.2d 817, 821 (2d Cir. 1992). See also 24 C.F.R. Ch. 1, Subch. A, App. I at 862-863 (1994) (preamble to HUD regulations) (families with children enjoy same protections under Act as other protected classes).

The Pfaffs also argue (Br. 13-14, 16) that the business necessity standard conflicts with the exemption in 42 U.S.C. 3607(b)(1). As we have explained, however, that exemption is irrelevant in this case because the Pfaffs' four-person rule is privately-imposed -- not governmentally-mandated. See p. 16, *supra.* The Pfaffs try to overcome this hurdle by citing HUD's discussion of privately-adopted occupancy standards in the preamble to its regulations (Br. 13). But that commentary is fully consistent with the business necessity standard. HUD emphasized in the preamble that although privately-imposed occupancy standards are not necessarily unlawful under the Act, the agency "will carefully examine any such nongovernmental restriction to determine whether it operates unreasonably to limit or exclude families with children." 24 C.F.R. Ch. 1, Subch. A, App. I at 865 (1994). As the Eighth Circuit has explained, the HUD preamble simply means that a court should "examine the totality of the circumstances" to determine whether a privately-imposed occupancy rule "results in discrimination against a protected class." *United States v. Badgett,* 976 F.2d 1176, 1179 (8th Cir. 1992). Use of a facially neutral rule that has disparate impact on a protected class is "discrimination" unless the defendant can prove that the restriction is a "business necessity." *Griggs,* 401 U.S. at 431. By applying the business necessity standard in this case, HUD has subjected a privately adopted occupancy standard to close scrutiny -- just as it pledged to do in the preamble.[FN13]

> FN13. The Pfaffs also assert (Br. 15-16) that even if the business necessity standard is appropriate for governmental entities, it should not be used in cases against private defendants. This argument is baseless, essentially for the reasons we discussed at note 9, *supra.* The Supreme Court's seminal disparate impact case applied the business necessity test to a private defendant, *Griggs,* 401 U.S. at 431, and that standard has been extended to private housing providers under the Fair Housing Act. *E.g., Betsey,* 736 F.2d at 988-989.

The Secretary has explained that in order to establish a business necessity, a housing provider must prove a "compelling need or necessity" for the challenged practice (p. 8, *supra*). This definition of business necessity is a permissible reading of the Act and therefore must be upheld by this Court.

We acknowledge that the Tenth Circuit recently rejected the Secretary's use of the term "compelling need or necessity" to describe the "business necessity" standard. See *Mountain Side Mobile Estates Partnership v. HUD,* 1995 WL 322627 at *10-11 (10th Cir. May 30, 1995). Although the Tenth Circuit concluded that a private landlord must prove a "business necessity" to justify an occupancy rule that has a disparate impact on families with children (ibid.), the court apparently disagreed with the Secretary's use of the word "compelling" in describing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

that standard.

The Tenth Circuit's rejection of the Secretary's standard was unjustified. The "compelling" language adopted by the Secretary mirrors the terminology used by this and several other courts in interpreting *Griggs'* "business necessity" standard. See, *e.g., Gutierrez v. Municipal Court of Southeast Judicial Dist.,* 838 F.2d 1031, 1041-1042 (9th Cir. 1988) ("In order to meet the business necessity exception the justification must be sufficiently *compelling* to override the discriminatory impact created by the challenged rule"; "'[t]he practice must be essential, the purpose *compelling*'") (emphasis added; citation omitted), vacated as moot, 490 U.S. 1016 (1989); *Harriss v. Pan American World Airways, Inc.,* 649 F.2d 670, 675 (9th Cir. 1980) (to meet the business necessity requirement "'the business purpose must be sufficiently *compelling* to override any [discriminatory] impact'") (emphasis added), quoting *Blake v. City of Los Angeles,* 595 F.2d 1367, 1376 (9th Cir. 1979), cert. denied, 446 U.S. 928 (1980).[FN14] The Fourth Circuit extended this "compelling" standard to Fair Housing Act cases in *Betsey,* 736 F.2d at 988 -- a decision that was cited favorably by the House Report that accompanied the 1988 amendments to the Act (p. 14, *supra*). In light of such caselaw and legislative history, the Secretary's adoption of the "compelling" necessity standard was, at the very least, a reasonable construction of the Act.[FN15]

> FN14. Accord *Bradley v. Pizzaco of Nebraska, Inc.,* 7 F.3d 795, 797 (8th Cir. 1993); *Thomas,* 814 F.2d at 1509; *Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88, 93 (6th Cir. 1982); *Image of Greater San Antonio v. Brown,* 570 F.2d 517, 520 (5th Cir. 1978).

> FN15. In the end, we believe there is little practical difference between the Tenth Circuit's and the Secretary's definitions of "business necessity." The Tenth Circuit emphasized that to prove "business necessity," the housing provider must demonstrate that the challenged rule bears a "manifest relationship" to the housing in question. *Mountain Side,* 1995 WL 322627 at *11, quoting *Griggs,* 401 U.S. at 432. The Secretary's decision also cited the "manifest relationship" language and seemed to consider that standard synonymous with "compelling" business necessity. See *Mountain Side,* 2 Fair Housing-Fair Lending Rep. at p. 25,615, 25,619. Numerous courts, including this Circuit, have treated the two terms as essentially synonymous. See, *e.g., Blake,* 595 F.2d at 1376; *Bradley,* 7 F.3d at 798; *Chambers v. Omaha Girls Club. Inc.,* 834 F.2d 697, 700-701 (8th Cir. 1987); *Williams v. Colorado Springs School Dist. No. 11,* 641 F.2d 835, 840-842 (10th Cir. 1981).

B. The ALJ's Finding That The Pfaffs Failed To Prove Business *Necessity Is Supported By Substantial Evidence In The Record*

The Pfaffs assert (Br. 6) that their goal in imposing the four-person limit was to preserve the value of their property. The ALJ found that the Pfaffs had failed to prove that the limit was necessary to achieve their goal. This finding must be upheld because it is supported by substantial evidence in the record. See H.R. Rep. No. 711, *supra,* at 38 (ALJ's factual findings subject to substantial evidence review); *HUD v. Blackwell,* 908 F.2d 864, 868, 870 & n.2 (11th Cir. 1990) (same).

As the ALJ found, the living space and amenities of the Pfaff house make it "more than adequate for a group of five persons" (ER 7). The dwelling has about 1,200 square feet of living space and contains three bedrooms (each with a closet), an eat-in kitchen, a living room, a dining room, two bathrooms, a deck and a two-car garage. The three bedrooms would provide plenty of sleeping space for two adults and three children. The Nymoens lived in three-bedroom homes both before and after their rejection by the Pfaffs and found those dwellings sufficiently large for their needs (RT 43-44, 50, 99; SER 4-6, 15). Moreover, the property manager who testified on

behalf of the Pfaffs agreed that two of the bedrooms in the Pfaff house could each appropriately accommodate two persons (RT 379; ER 52). Although he preferred that the third bedroom be used as a den, rather than as sleeping quarters, he based this recommendation on the location of the room near the front entrance of the house -- not on any assertion that it was too small to accommodate one person (RT 379, 381; ER 52; SER 44). The Pfaffs themselves, however, believed that that room could appropriately be used as a bedroom (Br. 3). They advertised the house as a three-bedroom dwelling (GX 17, RT 407-409; SER 55-57, 66), they clearly anticipated that each of those three rooms would be used as bedrooms (see RT 198; SER 34), and they subsequently rented to tenants who used the smallest bedroom for sleeping purposes (RT 203-204; SER 35-36). It is thus clear that the three bedrooms could easily accommodate the five Nymoens.

The Pfaffs have argued that the four-person rule protects against property damage. But, as the ALJ recognized, the Pfaffs' argument is undermined by their failure to consider other options that would accomplish their goal more directly, such as imposing maintenance requirements on tenants, making more frequent inspections of the property, charging higher security deposits, and screening tenants more carefully.[FN16] Compared to these options, a four-person rule would be far less effective in screening out destructive tenants. For example, four unruly college students might create much more damage to a house than would a five-person family that included well-behaved children.

> FN16. Contrary to the Pfaffs' argument (Br. 16), use of such alternatives would not constitute intentional discrimination as long as they did not hold families with minor children to higher standards than comparably-sized all-adult households.

The best way to determine whether the Nymoens were likely to damage the house was to conduct a thorough background check (including interviews with past landlords) and to meet with the family members to determine whether they were well-behaved. Mr. Pfaff acknowledged that such screenings and face-to-face meetings are crucial in finding good tenants (RT 356, 400-401; SER 50-51). But rather than considering the Nymoens' rental history or meeting with them, the Pfaffs merely assumed that the family would threaten the value of the property. Had the Pfaffs considered the family's rental history, they would have discovered that the Nymoens had maintained their residences in good condition and had actually improved one of the houses in which they lived. In short, they were precisely the type of tenants who would be likely to protect and even enhance the value of the rental property.

The Pfaffs have failed to produce hard evidence that the four-person rule is necessary to accomplish their asserted goal. Instead, they have relied on generalities, such as their assertion that they based the four-person rule on "their philosophy and experience in investing in rental properties" (Br. 17) and "on common sense" (RT 399). Business necessity may be established only by objective evidence -- not through the type of vague, conclusory, subjective and unsubstantiated assertions that the Pfaffs have made in this case. See *Bradley v. Pizzaco of Nebraska, Inc.,* 7 F.3d 795, 798 (8th Cir. 1993); *Hawkins v. Anheuser-Busch, Inc.,* 697 F.2d 810, 815 (8th Cir. 1983); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1195-1196 (5th Cir. 1978), cert. denied, 439 U.S. 1115 (1979). Cf. *Keith,* 858 F.2d at 483-484 (defendant failed to present studies or other specific evidence to justify decision). The Pfaffs produced no concrete examples of how their past experiences with tenants led them to conclude that a four-person rule was needed for this house. They also conceded that they conducted no engineering study of the house to determine whether it could accommodate five persons (RT 399; SER 49). In short, they failed to show that they made the type of "meaningful study" of the situation that is required to establish business necessity. See *Griggs,* 401 U.S. at 431.

Nor did the property manager's testimony establish a business necessity for the four-person rule. There is no evidence that the Pfaffs consulted the property manager before adopting the four-person rule (see RT 363, 389; SER 43, 48). He apparently had never visited the house in question until shortly before the administrative hearing in this case -- nearly two years after the Nymoens' rejection (RT 363; SER 43). At any rate, although he asserted that a four-person rule would reduce "wear and tear" on the house, that testimony was extremely vague and conclusory (see RT 379; ER 52) and thus failed to establish that the rule was necessary to accomplish the goal of preserving the value of the Pfaff property. Moreover, the property manager acknowledged that a security deposit could be used to help preserve the property's value (RT 383-384; SER 46-47). This concession bolstered the ALJ's conclusion that the Pfaffs had other means at their disposal to protect their property.[FN17]

> FN17. The property manager also asserted that a four-person rule "would lead to * * * a longer-term occupancy" (RT 379; ER 52). It is not clear why this should be the case. At any rate, the Pfaffs had more direct ways of promoting long-term tenancy, including use of multi-year leases. Mr. Pfaff testified, in fact, that he sometimes uses two- and three-year leases for his rental properties (RT 410-411; SER 58-59).

In sum, the ALJ's finding that the Pfaffs failed to prove a business necessity is supported by substantial evidence. The Pfaffs thus failed to rebut the prima facie case of discrimination under 42 U.S.C. 3604(a).

III

THE COMPENSATORY DAMAGES AWARD IS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD

The Pfaffs' attack on the $20,000 emotional distress award is baseless (see Br. 18-20). The award is supported by substantial evidence in the record and therefore must be upheld.[FN18]

> FN18. This Court treats compensatory damage awards as findings of fact. *Lum v. City & County of Honolulu,* 963 F.2d 1167, 1170 (9th Cir.), cert. denied, 113 S. Ct. 659 (1992). Thus, an ALJ's calculation of such damages will be upheld if supported by substantial evidence in the record. See H.R. Rep. No. 711, *supra,* at 38 (standard for ALJ's factual findings); *Blackwell,* 908 F.2d at 870, 872-873 (review of damage award).

The Nymoens gave extensive and detailed testimony that established that their family suffered significant emotional distress as a result of the Pfaffs' conduct. That testimony -- which is set forth in detail at pp. 6-7, *supra* -- specifically describes how the discrimination angered and upset the Nymoens, how it made Mr. Nymoen feel helpless, why he reacted so strongly, how the incident caused him to withdraw emotionally from his family, and why the differing reactions to the discrimination by Mr. and Mrs. Nymoen caused strains in their marriage. Contrary to the Pfaffs' suggestion (Br. 19), Mrs. Nymoen did testify that she attributed the couple's marital problems, at least in part, to the discrimination (RT 91; SER 13).[FN19] In addition, the testimony confirmed that the Nymoens felt pressured after their rejection by the Pfaffs due to the fact that they had only a short time to find alternative housing because the dwelling they were living in had been sold (RT 40-41; SER 2-3).

> FN19. The Pfaffs try to blame Mr. Nymoen's emotional withdrawal on his business trips to Hawaii (Br. 19). In fact, the business travel represented only a small portion of the 14-month period between the time of the discrimination and the Nymoens' separation. During most of that time, Mr. Nymoen was living full-time with his family (RT 123-127; SER 26-30).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:13-cv-00966-RJL    Document 40-10    Filed 08/08/14    Page 116 of 154

This detailed testimony was more than sufficient to support the damages award. In fair housing cases, "compensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms." *Johnson v. Hale,* 13 F.3d 1351, 1352 (9th Cir. 1994). When the discrimination victims provide "'detailed and substantial testimony to support their claims that they suffered emotional distress,'" and the defendants "'offer[] no evidence to rebut this testimony,'" compensatory damages should be awarded. *Id.* at 1353 (citation omitted). See also *Phiffer v. Proud Parrot Motor Hotel, Inc.,* 648 F.2d 548, 552-553 (9th Cir. 1980) (upholding award of compensatory damages where victim's wife presented "uncontroverted" testimony about her reaction to discrimination against her husband). Since the Pfaffs failed to present any evidence contradicting the Nymoens' testimony about their distress, the ALJ properly awarded compensatory damages.

Special deference is also owed to the ALJ's finding of emotional distress since it was based on live testimony from two of the victims. This allowed the ALJ to observe the Nymoens' demeanor and assess their credibility as they described their distress. This Court should not second-guess such credibility determinations. See *Stamper v. Secretary of Agriculture,* 722 F.2d 1483, 1486 (9th Cir. 1984) (deference to ALJ's factual findings greatest where they involve credibility determinations based on witness demeanor).

The Pfaffs also argue (Br. 17, 20) that their conduct was not egregious and thus does not justify a damage award. This argument reflects a misunderstanding of the purpose of compensatory damages. In contrast to punitive damage awards, the availability of *compensatory* damages does not depend on the egregiousness of the defendants' behavior. See *Smith v. Wade,* 461 U.S. 30, 51-52 (1983). Rather, once a violation of the Fair Housing Act is proven, an award of compensatory damages is "mandatory" if the victims establish that they suffered harm as a result. *Id.* at 52; accord *Curtis v. Loether,* 415 U.S. 189, 197 (1974); *Hayward,* 36 F.3d at 839-840.[FN20]

    FN20. We nonetheless take issue with the Pfaffs' attempt to minimize the seriousness of their violation. See p. 33, *infra.*

The ALJ did not abuse his discretion in setting the amount of the award at $20,000. Emotional distress is an intangible injury that by its nature is difficult or impossible to measure with precision. See *Carey v. Piphus,* 435 U.S. 247, 267 n.25 (1978); *Block v. R.H. Macy & Co.,* 712 F.2d 1241, 1245 (8th Cir. 1983). Because the amount of compensatory damages cannot be calculated with mathematical precision, the factfinder is afforded considerable discretion in arriving at the size of the award. See *Edwards v. Occidental Chem. Co.,* 892 F.2d 1442, 1448 (9th Cir. 1990). The substantial emotional distress suffered by the Nymoens justified a relatively large award. Moreover, the $20,000 -- which was designed to compensate the entire five-member family (ER 23 n.15) -- averages out to only $4,000 per person. Finally, the amount chosen by the ALJ was well within the range of compensatory damage awards in other fair housing cases. See *Johnson,* 13 F.3d at 1353 n.2, citing R. Schwemm, Housing Discrimination, Law and Litigation § 25.3(2)(b) at 25-21 n.101 (1991) (noting that awards up to $25,000 are "quite common"). The award should be upheld.

IV

THE ALJ DID NOT ABUSE HIS DISCRETION IN ASSESSING A CIVIL PENALTY AND IMPOSING AN INJUNCTION

The Pfaffs challenge both the civil penalty and the injunction awarded by the ALJ. The ALJ did not abuse his discretion in awarding either the penalty or the injunction, and thus both should be upheld. See *Federal Election Comm'n v. Furgatch,* 869 F.2d 1256, 1258 (9th Cir. 1989) (civil penalty reviewed for abuse of discretion); *FTC*

© 2012 Thomson Reuters. No claim to Orig. US Gov. Works.

*v. American Nat'l Cellular, Inc.,* 810 F.2d 1511, 1514 (9th Cir. 1987) (injunction).

The Fair Housing Act authorizes an ALJ to assess a civil penalty against a violator of the statute "to vindicate the public interest." 42 U.S.C. 3612(g)(3). The ALJ may award up to $10,000 against a party who "has not been adjudged to have committed any prior discriminatory housing practice." 42 U.S.C. 3612(g)(3)(A). Determining the appropriate amount of the penalty necessarily involves "highly discretionary calculations" by the ALJ. *Tull v. United States,* 481 U.S. 412, 427 (1987). In exercising that broad discretion, the ALJ should consider the nature and circumstances of the violation; the degree of culpability; any history of prior violations; the financial circumstances of the violator; and the need for deterrence. H.R. Rep. No. 711, *supra,* at 37. The ALJ carefully weighed these factors in setting the penalty at $8,000 (ER 23-25).

The need for a penalty is clear in view of the Pfaffs' obstinacy during this case. They refused to heed explicit warnings from real estate agents that their conduct may have violated the Act, they stubbornly insisted that they could rent their property to whomever they wanted, and they contended that the Fair Housing Act did not even apply to them (RT 402-404; GX 10, 11; SER 52-54, 61-62). Their assertion that they did not have to comply with the Act is especially troubling in light of their decades of experience in the real estate business and the ALJ's finding that they were sophisticated and knowledgeable individuals. Those engaged in the real estate business have a special obligation to familiarize themselves with the Fair Housing Act and its requirements. See *Blackwell,* 908 F.2d at 873 (approving a large civil penalty where experienced real estate broker should have known his actions were unlawful). In view of the Pfaffs' attitude, a civil penalty is needed to deter them from engaging in future violations and to impress upon them the seriousness of their obligations under the Act.

The Pfaffs argue (Br. 22) that the civil penalty will deplete their assets. But since they have a net worth in excess of $1 million, their prediction about the effect of an $8,000 penalty is farfetched, to say the least. The burden was on the Pfaffs to produce evidence that they could not afford the penalty. See *Blackwell,* 908 F.2d at 873. They failed to do so.

In addition, the Pfaffs argue (Br. 21) that a civil penalty is inappropriate because they have rented their dwellings to other families with children. But nondiscriminatory treatment of some members of a protected class cannot excuse a defendant's unlawful discrimination against others in that same class. *Phiffer,* 648 F.2d at 552. See also *Smith v. Anchor Bldg. Corp.,* 536 F.2d 231, 235 n.7 (8th Cir. 1979). Moreover, no showing of malice toward the Nymoens or children in general is required for an award of a civil penalty. Cf. *Phiffer,* 648 F.2d at 553 (no showing of actual malice necessary to justify award of punitive damages in discrimination case). The Pfaffs' stubborn disregard of their obligations under the Act is more than sufficient to support the $8,000 penalty.

Finally, the Pfaffs contend (Br. 22) that they lack the necessary skills and staff to handle the recordkeeping and reporting requirements included in the injunction. Since they produce no evidence to back up this claim, the Court should disregard this argument. At any rate, the recordkeeping and reporting obligations are necessary to allow HUD to monitor the Pfaffs' compliance with the Act and the ALJ's order, and those requirements are comparable in scope to injunctive relief imposed in other fair housing cases, including those involving private landlords. See, *e.g., Baumgardner v. HUD,* 960 F.2d 572, 583-584 (6th Cir. 1992); *Marable v. Walker,* 704 F.2d 1219, 1221 (11th Cir. 1983); *United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 229-231 (5th Cir. 1971). The ALJ did not abuse his discretion in ordering such relief in this case.

CONCLUSION

The ALJ's decision should be affirmed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATEMENT OF RELATED CASES

The appeal in *United States v. Hover,* No. 95-15717 (9th Cir.), may raise legal issues similar to those presented in this case. The United States is unaware of any other related cases.

Appendix not available.

Karl PFAFF and Elizabeth Pfaff, Petitioners, v. SECRETARY, UNITED STATES DEPARTMENT OF HOUS-ING AND URBAN DEVELOPMENT, on behalf of Michael Nymoen, Beckie Nymoen, Lindsay Nymoen, John Nymoen and Katie Nymoen, Respondent.
1995 WL 17017239 (C.A.9 ) (Appellate Brief )

END OF DOCUMENT

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–4405–N–01]

### Fair Housing Enforcement—Occupancy Standards Notice of Statement of Policy

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Notice of statement of policy.

**SUMMARY:** This statement of policy advises the public of the factors that HUD will consider when evaluating a housing provider's occupancy policies to determine whether actions under the provider's policies may constitute discriminatory conduct under the Fair Housing Act on the basis of familial status (the presence of children in a family). Publication of this notice meets the requirements of the Quality Housing and Work Responsibility Act of 1998.

**DATES:** Effective date: December 18, 1998.

**FOR FURTHER INFORMATION CONTACT:** Sara Pratt, Director, Office of Investigations, Office of Fair Housing and Equal Opportunity, Room 5204, 451 Seventh Street, SW, Washington, DC 20410, telephone (202) 708–2290 (not a toll-free number). For hearing- and speech-impaired persons, this telephone number may be accessed via TTY (text telephone) by calling the Federal Information Relay Service at 1–800–877–8339 (toll-free).

**SUPPLEMENTARY INFORMATION:**

### Statutory and Regulatory Background

Section 589 of the Quality Housing and Work Responsibility Act of 1998 (Pub. L. 105–276, 112 Stat. 2461, approved October 21, 1998, "QHWRA") requires HUD to publish a notice in the **Federal Register** that advises the public of the occupancy standards that HUD uses for enforcement purposes under the Fair Housing Act (42 U.S.C. 3601–3619). Section 589 requires HUD to publish this notice within 60 days of enactment of the QHWRA, and states that the notice will be effective upon publication. Specifically, section 589 states, in relevant part, that:

[T]he specific and unmodified standards provided in the March 20, 1991, Memorandum from the General Counsel of [HUD] to all Regional Counsel shall be the policy of [HUD] with respect to complaints of discrimination under the Fair Housing Act . . . on the basis of familial status which involve an occupancy standard established by a housing provider.

The Fair Housing Act prohibits discrimination in any aspect of the sale, rental, financing or advertising of dwellings on the basis of race, color, religion, national origin, sex or familial status (the presence of children in the family). The Fair Housing Act also provides that nothing in the Act "limits the applicability of any reasonable local, State or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." The Fair Housing Act gave HUD responsibility for implementation and enforcement of the Act's requirements. The Fair Housing Act authorizes HUD to receive complaints alleging discrimination in violation of the Act, to investigate these complaints, and to engage in efforts to resolve informally matters raised in the complaint. In cases where the complaint is not resolved, the Fair Housing Act authorizes HUD to make a determination of whether or not there is reasonable cause to believe that discrimination has occurred. HUD's regulations, implementing the Fair Housing Act (42 U.S.C. 3614) are found in 24 CFR part 100.

In 1991, HUD's General Counsel, Frank Keating, determined that some confusion existed because of the absence of more detailed guidance regarding what occupancy restrictions are reasonable under the Act. To address this confusion, General Counsel Keating issued internal guidance to HUD Regional Counsel on factors that they should consider when examining complaints filed with HUD under the Fair Housing Act, to determine whether or not there is reasonable cause to believe discrimination has occurred.

### This Notice

Through this notice HUD implements section 589 of the QHWRA by adopting as its policy on occupancy standards, for purposes of enforcement actions under the Fair Housing Act, the standards provided in the Memorandum of General Counsel Frank Keating to Regional Counsel dated March 20, 1991, attached as Appendix A.

**Authority:** 42 U.S.C. 3535(d), 112 Stat. 2461.

Dated: December 14, 1998.

**Eva M. Plaza,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

### Appendix A.

March 20, 1991.

MEMORANDUM FOR: All Regional Counsel
FROM: Frank Keating, G
SUBJECT: Fair Housing Enforcement Policy: Occupancy Cases

On February 21, 1991, I issued a memorandum designed to facilitate your review of cases involving occupancy policies under the Fair Housing Act. The memorandum was based on my review of a significant number of such cases and was intended to constitute internal guidance to be used by Regional Counsel in reviewing cases involving occupancy restrictions. It was not intended to create a definitive test for whether a landlord or manager would be liable in a particular case, nor was it intended to establish occupancy policies or requirements for any particular type of housing.

However, in discussions within the Department, and with the Department of Justice and the public, it is clear that the February 21 memorandum has resulted in a significant misunderstanding of the Department's position on the question of occupancy policies which would be reasonable under the Fair Housing Act. In this respect, many people mistakenly viewed the February 21 memorandum as indicating that the Department was establishing an occupancy policy which it would consider reasonable in any fair housing case, rather than providing guidance to Regional Counsel on the evaluation of evidence in familial status cases which involve the use of an occupancy policy adopted by a housing provider.

For example, there is a HUD Handbook provision regarding the size of the unit needed for public housing tenants. *See* Handbook 7465.1 REV–2, Public Housing Occupancy Handbook: Admission, revised section 5–1 (issued February 12, 1991). While that Handbook provision states that HUD does not specify the number of persons who may live in public housing units of various sizes, it provides guidance about the factors public housing agencies may consider in establishing reasonable occupancy policies. Neither this memorandum nor the memorandum of February 21, 1991 overrides the guidance that Handbook provides about program requirements.

As you know, assuring Fair Housing for all is one of Secretary Kemp's top priorities. Prompt and vigorous enforcement of all the provisions of the Fair Housing Act, including the protections in the Act for families with children, is a critical responsibility of mine and every person in the Office of General Counsel. I expect Headquarters and Regional Office staff to continue their vigilant efforts to proceed to formal enforcement in all cases in which there is reasonable cause to believe that a discriminatory housing practice under the Act has occurred or is about to occur. This is particularly important in cases where occupancy restrictions are used to exclude families with children or to unreasonably limit the ability of families with children to obtain housing.

In order to assure that the Department's position in the area of occupancy policies is fully understood, I believe that it is imperative to articulate more fully the Department's position on reasonable occupancy policies and to describe the approach that the Department takes in its review of occupancy cases.

Specifically, the Department believes that an occupancy policy of two persons in a bedroom, as a general rule, is reasonable under the Fair Housing Act. The Department of Justice has advised us that this is the

general policy it has incorporated in consent decrees and proposed orders, and such a general policy also is consistent with the guidance provided to housing providers in the HUD handbook referenced above. However, the reasonableness of any occupancy policy is rebuttable, and neither the February 21 memorandum nor this memorandum implies that the Department will determine compliance with the Fair Housing Act based *solely* on the number of people permitted in each bedroom. Indeed, as we stated in the final rule implementing the Fair Housing Amendments Act of 1988, the Department's position is as follows:

[T]here is nothing in the legislative history which indicates any intent on the part of Congress to provide for the development of a national occupancy code. * * *

On the other hand, there is no basis to conclude that Congress intended that an owner or manager of dwellings would be unable to restrict the number of occupants who could reside in a dwelling. Thus, the Department believes that in appropriate circumstances, owners and managers may develop and implement reasonable occupancy requirements based on factors such as the number and size of sleeping areas or bedrooms and the overall size of the dwelling unit. In this regard, it must be noted that, in connection with a complaint alleging discrimination on the basis of familial status, the Department will carefully examine any such nongovernmental restriction to determine whether it operates unreasonably to limit or exclude families with children.

24 C.F.R. Chapter I, Subchapter A. Appendix I at 566–67 (1990).

Thus, in reviewing occupancy cases, HUD will consider the size and number of bedrooms and other special circumstances. The following principles and hypothetical examples should assist you in determining whether the size of the bedrooms or special circumstances would make an occupancy policy unreasonable.

*Size of bedrooms and unit*

Consider two theoretical situations in which a housing provider refused to permit a family of five to rent a two-bedroom dwelling based on a "two people per bedroom" policy. In the first, the complainants are a family of five who applied to rent an apartment with two large bedrooms and spacious living areas. In the second, the complainants are a family of five who applied to rent a mobile home space on

which they planned to live in a small two-bedroom mobile home. Depending on the other facts, issuance of a charge might be warranted in the first situation, but not in the second.

The size of the bedrooms also can be a factor suggesting that a determination of no reasonable cause is appropriate. For example, if a mobile home is advertised as a "two-bedroom" home, but one bedroom is extremely small, depending on all the facts, it could be reasonable for the park manager to limit occupancy of the home of two people.

*Age of children*

The following hypotheticals involving two housing providers who refused to permit three people to share a bedroom illustrate this principle. In the first, the complainants are two adult parents who applied to rent a one-bedroom apartment with their infant child, and both the bedroom and the apartment were large. In the second, the complainants are a family of two adult parents and one teenager who applied to rent a one-bedroom apartment. Depending on the other facts, issuance of a charge might be warranted in the first hypothetical, but not in the second.

*Configuration of unit*

The following imaginary situations illustrate special circumstances involving unit configuration. Two condominium associations each reject a purchase by a family of two adults and three children based on a rule limiting sales to buyers who satisfy a "two people per bedroom" occupancy policy. The first association manages a building in which the family of the five sought to purchase a unit consisting of two bedrooms plus a den or study. The second manages a building in which the family of five sought to purchase a two-bedroom unit which did not have a study or den. Depending on the other facts, a charge might be warranted in the first situation, but not in the second.

*Other physical limitations of housing*

In addition to physical considerations such as the size of each bedroom and the overall size and configuration of the dwelling, the Department will consider limiting factors identified by housing providers, such as the capacity of the septic, sewer, or other building systems.

*State and local law*

If a dwelling is governed by State or local governmental occupancy requirements, and the housing provider's occupancy policies reflect those requirements, HUD would consider the governmental requirements as a special circumstance tending to indicate that the housing provider's occupancy policies are reasonable.

*Other relevant factors*

Other relevant factors supporting a reasonable cause recommendation based on the conclusion that the occupancy policies are pretextual would include evidence that the housing provider has: (1) made discriminatory statements; (2) adopted discriminatory rules governing the use of common facilities; (3) taken other steps to discourage families with children from living in its housing; or (4) enforced its occupancy policies only against families with children. For example, the fact that a development was previously marketed as an "adults only" development would militate in favor of issuing a charge. This is an especially strong factor if there is other evidence suggesting that the occupancy policies are a pretext for excluding families with children.

An occupancy policy which limits the number of *children* per unit is less likely to be reasonable than one which limits the number of *people* per unit.

Special circumstances also may be found where the housing provider limits the total number of dwellings he or she is willing to rent to families with children. For example, assume a landlord owns a building of two-bedroom units, in which a policy of four people per unit is reasonable. If the landlord adopts a four person per unit policy, but refuses to rent to a family of two adults and two children because twenty of the thirty units already are occupied by families with children, a reasonable cause recommendation would be warranted.

If your review of the evidence indicates that these or other special circumstances are present, making application of a "two people per bedroom" policy unreasonably restrictive, you should prepare a reasonable cause determination. The Executive Summary should explain the special circumstances which support your recommendation.

[FR Doc. 98–33568 Filed 12–17–98; 8:45 am]

**BILLING CODE 4210–28–M**

# ARTICLE: THE END(S) OF DISPARATE IMPACT: DOCTRINAL RECONSTRUCTION, FAIR HOUSING AND LENDING LAW, AND THE ANTIDISCRIMINATION PRINCIPLE

Spring, 1998

**Reporter:** 47 Emory L.J. 409

**Length:** 39611 words

**Author:** Peter E. Mahoney *

* B.A. with high distinction, 1981, and J.D., 1985, University of Virginia; Associate General Counsel, Federal Home Loan Mortgage Corporation, McLean, Virginia; and Chair, Committee on Federally Regulated Financial Institutions, Section of Real Property, Probate and Trust Law, American Bar Association. The views expressed herein are solely those of the author and do not reflect the views of the Federal Home Loan Mortgage Corporation or the American Bar Association. Thanks go to George Rutherglen for thoughtful comments on an earlier draft of this article, Maud Mater, Allan Ratner, and Jo Anne Friedenthal of Freddie Mac for their support of this project, and my colleague, Shelly Pine, for his assistance and collaboration in formulating the broader themes presented here.

---

**LexisNexis Summary**

---

… Introduction: The Crisis of Disparate Impact Theory and the Muddle of Fair Housing and Lending Law … These early FHA cases do, however, provide an essential link in our understanding of how the Washington v. Davis intent requirement can be reconciled with the disparate impact standard used in Title VII employment discrimination and Title VIII fair housing/lending cases. … Similarly, equal protection doctrine requires plaintiffs to prove discriminatory intent, whereas Title VII merely requires a statistical showing of disparate impact in order to shift the burden to defendants to provide an explanation of the business necessity justifying the challenged practice. … B. The Disparate Impact Standard Under the Fair Housing Act: Equal Protection and Title VII Roots … While this language appears to say that, once a prima facie case is shown, the defendant must prove that there is no less discriminatory alternative, the court went on to explain its formulation of the test in a manner suggesting that the standard, three-part burden-shifting test used in employment discrimination cases should apply and that the defendant was only required to produce evidence regarding the absence of alternatives, not to carry the burden of proof on the issue. … Professor Ortiz's insightful analysis helps to illuminate the contradiction inherent in contemporary disparate impact doctrine. …

---

**Text**

---

[*411]

Introduction: The Crisis of Disparate Impact Theory and the Muddle of Fair Housing and Lending Law

The standards applied to determine liability under the substantive antidiscrimination provisions of the Fair Housing Act of 1968 [1] and the Equal Credit Opportunity Act of 1974 (ECOA) [2] remain inchoate. Decades after statutory enactment, courts, federal agencies charged with enforcing the Fair Housing Act and the ECOA, and commentators have failed to produce a reliable rule for determining liability under a standard known variously as "the effects test," "discriminatory effects," or (most commonly), "disparate im-

---

[1]   Title VIII of the Civil Rights Act of 1968, as amended,  42 U.S.C. 3601-31 (1994).

[2]    15 U.S.C. 1691 (1994).

47 Emory L.J. 409, *413

pact."[3] Notwithstanding the large number of cases decided employing these doctrinal labels, the standard in the fair housing/fair lending arena continues to be sketchy and haphazard.

The need for a consistent standard for determining the potential disparate impact liability of private party defendants in the fair housing/fair lending arena is a matter of growing urgency. The federal agencies charged with enforcing the Fair Housing Act (FHA) and the ECOA[4] have adopted an aggressive approach [*412] to enforcement of the fair housing and fair lending laws in the last four years.[5] In particular, the Department of Justice (DOJ) and the Department of Housing and Urban Development (HUD) have suggested interpretations of the case law that would impose a more rigorous standard of disparate impact liability on private party defendants such as lenders, insurers and landlords.[6] However, these Fed-

---

[3]    The terms are used interchangeably in this Article, but I will use "disparate impact" - the most commonly-used term - unless the specific statute or case under discussion suggests otherwise.

[4]    Congress has delegated primary responsibility for enforcement of the Fair Housing Act (FHA) to the Department of Housing and Urban Development (HUD) and the Department of Justice (DOJ). See Fair Housing Act of 1968 810-812, 42 U.S.C. 3610-3612, providing for an administrative enforcement process by the Secretary of HUD, either on behalf of an individual aggrieved person or on the basis of the Secretary's own investigation, and 814, 42 U.S.C. 3614, providing for enforcement by the Attorney General in cases where the Attorney General has reasonable cause to believe that a person is engaged in a "pattern or practice" of discrimination or upon referral from the Secretary of HUD. In addition, private persons may bring suit under 813 of the FHA, 42 U.S.C. 3613. HUD is responsible for issuing regulations implementing the FHA. See 24 C.F.R. 100.1 (1997).

Under the ECOA, primary responsibility for enforcement is delegated to a host of specific federal agencies based on the type of creditor subject to the ECOA. Regulations and interpretive official staff commentary are promulgated by the Board of Governors of the Federal Reserve System. 12 C.F.R. 202.1 (1997) (commonly referred to as "Regulation B"). The definition of "creditor," as set forth in Regulation B, "means a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit. The term includes a creditor's assignee, transferee, or subrogee who so participates." 12 C.F.R. 202.2(l) (1997). Insured depository institutions are regulated under the ECOA by their examining agency (i.e., the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, or the Federal Reserve Board). The "default" enforcement agency with authority over "finance companies" and other creditors that the statute does not specify as regulated by another agency is the Federal Trade Commission. "Finance companies" include mortgage banks and other financial institutions subject to the FHA that do not hold "needs and convenience" charters subjecting them to the authority of one of the four federal financial institution regulatory agencies. One might legitimately ask whether HUD might be the more appropriate regulating agency for these entities - because its Fair Housing Act jurisdiction is coextensive with the ECOA; but neither the statute nor regulations identify HUD as an enforcement agency for any creditor under the ECOA.

This patchwork of Federal enforcement and regulatory authority over substantive antidiscrimination provisions that are largely overlapping is probably one source of the notable lack of Federal guidance on the issues involved in the area of disparate impact liability. Commentators also have remarked upon the lack of any enforcement of the substantive antidiscrimination provisions of the ECOA in consumer lending areas unrelated to residential mortgage loans. See, e.g., Ian Ayres, Fair Driving: Gender and Race Discrimination in Retail Car Negotiations, 104 Harv. L. Rev. 817 (1991). The Department of Justice subsequently has initiated an investigation of practices in the automobile finance industry. See Lending Probe of Auto Industry Opens New Front in Bias Fight, Am. Banker, March 23, 1995, at 2.

[5]    See Policy Statement on Discrimination in Lending (the "Joint Policy Statement"), 59 Fed. Reg. 18,267-274 (April 15, 1994); Robert J. Sullivan & Andrew L. Sandler, Property Insurance Discrimination, the Next Federal Civil Rights Enforcement Frontier, 13 J. Ins. Reg. 478 (1995). The Joint Policy Statement appears to have been developed in response to an executive order and accompanying memorandum of President Clinton, issued in 1994 on the birthday of Rev. Martin Luther King, Jr., which ordered Federal agencies, under the leadership of the Secretary of HUD, to engage in a host of coordinated activities relating to discrimination, including discrimination in mortgage lending, secondary mortgage marketing, and property insurance practices. See "Leadership and Coordination of Fair Housing in Federal Programs: Affirmatively Furthering Fair Housing," Executive Order 12892 of January 17, 1994, 59 Fed. Reg. 2939 (Jan. 20, 1994), and "Federal Leadership of Fair Housing," Memorandum for the Heads of Executive Departments and Agencies, January 17, 1994, 59 Fed. Reg. 8,513-15 (Feb. 22, 1994). While the Executive Order requires the Secretary of HUD to issue "regulations describing the nature and scope of coverage and the conduct prohibited, including mortgage lending discrimination and property insurance discrimination," Exec. Order 12892, Sec. 4-404, 59 Fed. Reg. at 2941, to date, the Joint Policy Statement is the sole regulatory guidance produced by HUD or the Interagency Task Force on the subject.

[6]    Joint Policy Statement, 59 Fed. Reg. at 18,269. See also Justice Department Expected to Increase Attack on Loan Bias, Am. Banker, April 1, 1997, at 4; Albert R. Karr, Angry Lenders: Federal Drive to Curb Mortgage-Loan Bias Stirs Strong Backlash, Wall St. J., Feb. 7, 1995, at A1; U.S. Tightens Lending-Bias Definition, Atl. J. and Const., Mar. 9, 1994, at B1.

47 Emory L.J. 409, *412

eral agency interpretations have failed to provide a coherent and consistent reading of prior case law [7] and have not been accepted by courts. [8]

Viewed in context, the muddled state of fair housing/fair lending disparate impact doctrine is symptomatic of the broader doctrinal confusion over the meaning and enforcement of constitutional and statutory protections against [*413] discrimination and the obligation of government to engage actively in efforts to promote opportunities for members of protected classes. Developments such as recent court decisions striking down employment [9] and educational programs [10] that use diversity as a specific component of evaluation, and voter approval of the Proposition 209 referendum in California, [11] demonstrate that whatever fragile political consensus once existed on the meaning of the antidiscrimination principle has all but crumbled. [12]

As articulated in the case law, modern antidiscrimination principles rest upon two separate standards that appear to be fundamentally in conflict. More than twenty-five years ago, in Griggs v. Duke Power Co., [13] a unanimous Supreme Court created a standard under Title VII of the Civil Rights Act of 1964 [14] permitting a finding of liability in employment discrimination suits upon a showing of disparate impact alone. Five years later, in Washington v. Davis, [15] the Court determined that, in order to sustain a constitutional challenge under the Equal Protection Clause, [16] a plaintiff must prove that the conduct in question was motivated by discriminatory purpose. The Davis court expressly overruled a host of lower court decisions [17] that had permitted an equal protection claim to go forward solely on the basis of a showing of disparate impact, but it left the statutory standard in Griggs undisturbed. As George Rutherglen has observed, [*414] while the Court offered a number of justifications for its establishment of an intent requirement in the constitutional realm, [18] "what the Court failed to do was to offer any reason why these same ar-

---

[7]    See Fair Lending: Federal Oversight and Enforcement Improved but Some Challenges Remain, GAO Report GAO/GGD-96-145 (August 1996); Regulators Asked to Spell Out Liability in the Event of Bias Violations by Mortgage Brokers, Am. Banker, July 11, 1996, at 3; Statement on Lending Bias Leaves Key Issues Unresolved, Am. Banker, June 22, 1994, at 21.

[8]    See, e.g., Mountain Side Mobile Estates v. Secretary of HUD, 56 F.3d 1243, 1254 (10th Cir. 1995), discussed infra at notes 147-52 and accompanying text.

[9]    Taxman v. Board of Educ., 91 F.3d 1547 (3d. Cir. 1996) (en banc), cert. granted sub nom. Piscataway Tp. Bd. of Educ. v. Taxman, 117 S. Ct. 2506 and cert. dismissed, 118 S. Ct. 595 (1997).

[10]    Hopwood v. Texas, 78 F.3d 932 (5th Cir.), cert. denied sub nom., Thurgood Marshall Legal Soc'y v. Hopwood, 116 S. Ct. 2580  (1996).

[11]    Proposition 209 would amend the State of California's constitution to read: "Neither the state of California nor any of its political subdivisions shall use race, sex, color, ethnicity, or national origin as a criterion for discriminating against, or granting preferential treatment to, any individual or group in the operation of the state's system of public employment, public education or public contracting." For an account of pending legal issues, see Daniel B. Wood, Affirmative-Action Rollback Sifts Through a Legal Sieve, Christian Science Monitor, Nov. 12, 1996, at 3. While a U.S. District Court initially enjoined enforcement of Proposition 209, the Supreme Court's recent denial of certiorari leaves standing a Ninth Circuit decision upholding its constitutionality on equal protection grounds and removes the final barrier to its enforcement. See Nancy Montwieler & Bernard Mower, Justices Deny Review of California Measure, Allowing Implementation of Proposition 209, BNA U.S. Law Week, Daily Ed., Nov. 6, 1997, at 4.

[12]    This Article will discuss legal commentary on the antidiscrimination principle at some length but will not provide much discussion on the role of benign racial preferences, in the form of affirmative action policies, within equal protection principles. Commentary on this central question has been voluminous. For example, a collection of recent articles on the judiciary's influence on these matters can be found in Conference: Race, Law and Justice: The Rehnquist Court and the American Dilemma, 45 Am. U. L. Rev. 567 (1996).

[13]    401 U.S. 424 (1970).

[14]    42 U.S.C. 2000e-1 to 2000e-17, as amended (1996).

[15]    426 U.S. 229 (1976).

[16]    U.S. Const. amend. XIV.

[17]    See infra notes 55-57 and accompanying text.

[18]    See Daniel R. Ortiz, The Myth of Intent in Equal Protection, 41 Stan. L. Rev. 1105, 1134-42 (1989).

47 Emory L.J. 409, *414

guments should not apply to statutory law." [19]

Over the past twenty years, the result has been a jurisprudence of discrimination that continues to be fundamentally discordant in theory and practice. The standard established in Washington v. Davis has met one of its intended goals - preventing the judiciary from invalidating a broad range of legislative measures [20] - and provided courts with a durable and relatively straightforward test for evaluating equal protection claims. [21] But the intent requirement has proved deeply unpopular with substantial segments of society [22] and has provided a seemingly inexhaustible supply of grist for the mill of legal scholars. [23] On the **[*415]** other hand, the disparate impact standard announced in Griggs potentially embraces a far-reaching statutory prohibition of any employment practice that creates, contributes to, or perpetuates unequal outcomes among different racial groups. [24] The need to develop the meaning of Griggs has spawned a vast amount of litigation, one result of which has been to entangle many district judges in administer-

---

[19]     George Rutherglen, Discrimination and Its Discontents, 81 Va. L. Rev. 117, 124 (1995). I am indebted to this article and Professor Rutherglen's earlier work on Title VII disparate impact theory, George Rutherglen, Disparate Impact Under Title VII: An Objective Theory of Discrimination, 73 Va. L. Rev. 1297 (1987), which together stimulated much of my thinking on the larger themes in this Article.

[20]     Justice White, writing for the majority in Washington v. Davis, stated:

A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white.

426 U.S. at 248.

[21]     Michael Klarman has remarked upon "the rigor with which [the Supreme Court] has applied the Washington v. Davis rule," finding only one subsequent decision in which the Court appeared to have relaxed its application of the purpose test. See Michael Klarman, An Interpretive History of Modern Equal Protection, 90 Mich. L. Rev. 213, 298 (1991). See also Barbara J. Flagg, "Was Blind, But Now I See": White Race Consciousness and the Requirement of Discriminatory Intent, 91 Mich. L. Rev. 953, 967 (1993) ("Nevertheless, the discriminatory intent requirement has been remarkably stable, surviving unchanged for more than fifteen years."). But see Ortiz, supra note 18, arguing that the Supreme Court's supposed adherence to the intent requirement masks a standard that, in fact, entails a shifting requirement that varies with, and depends upon, the desired substantive outcome.

[22]     As Professor Randall Kennedy recently observed, "the discriminatory purpose boundary line has been roundly attacked by the leading lights of legal academia." Randall Kennedy, A Response to Professor Cole's "Paradox of Race and Crime," 83 Geo. L.J. 2573, 2576 (1995).

[23]     The benchmark against which all other treatments of the intent requirement continue to be measured is Paul Brest, The Supreme Court, 1975 Term - Foreword: In Defense of the Antidiscrimination Principle, 90 Harv. L. Rev. 1 (1976). Professor Brest's articulation of the "antidiscrimination principle," which he defines as "the general principle disfavoring classifications and other decisions and practices that depend on the race (or ethnic origin) of the parties affected," id. at 1, has served as an organizing thesis for much of the scholarship that has followed. Many of the questions posed by Professor Brest - particularly the question of whether the antidiscrimination principle can accommodate a broader standard of prohibition than intentional racial classification - remain unresolved to this day, although modern legal scholarship continues to wrestle with them. For a thoughtful synopsis of the important scholarly debate on the intent requirement, see generally Rutherglen, supra note 19, at 124-132. Another important treatment of these issues, in the very different context of institutional segregation, is Paul Gewirtz, Choice in the Transition: School Desegregation and the Corrective Ideal, 86 Colum. L. Rev. 728 (1986). One recent critique that has garnered significant attention is Charles R. Lawrence III, The Id, the Ego and Equal Protection: Reckoning with Unconscious Racism, 39 Stan. L. Rev. 317 (1987), discussed infra at notes 353-55 and accompanying text. For a collection of other recent work critical of the intent requirement, see Flagg, supra note 21, at 967 n.66.

[24]     Of the scholarship supporting such a theoretical construction of the disparate impact standard, Owen Fiss's "group disadvantaging principle" was the earliest and probably the most influential. See Owen M. Fiss, Groups and the Equal Protection Clause, 5 J. Phil & Pub. Aff. 107, 147 (1976). Paul Brest characterizes the "group distributive justice" theory as holding that "it is at least prima facie unjust for one racial or ethnic group to be substantially worse off than others." Brest, supra note 23, at 48-49. See also Gewirtz, supra note 23, at 731 ("The distributive conception rejects both the centrality of the antidiscrimination principle and the backward looking, remedial focus of the corrective view. Instead, racial justice under the Constitution is understood as a specific racial distribution - for example, a representation of the races in various institutions in proportion to their representation in the population. Other distributions are prohibited, whether or not they are caused by "wrongful' actions such as violations of the antidiscrimination principle.").

47 Emory L.J. 409, *415

ing complex remedial schemes over the course of decades. [25] The practical problems and costs of this development have caused the federal judiciary, led by the Supreme Court, to respond by gradually but inexorably narrowing the disparate impact standard in a series of Title VII decisions culminating in Wards Cove Packing Co. v. Atonio. [26] The Wards Cove decision triggered an epic legislative battle over Title VII, resulting in the Civil Rights Act of 1991 (the 1991 Act), [27] which codified the existence of a disparate impact standard under Title VII but settled few of the fundamental questions concerning judicial interpretation and implementation of that standard. [28]

The constitutional guarantee of equal protection and Title VII's prohibition of discrimination in employment are two of the most vital areas within the broad context of federal law applying the antidiscrimination principle. Each has benefited from extensive scholarly examination and judicial refinement. However, as doctrinal development in these two subject matter areas diverged, so did [*416] scholarship on the issue, such that employment discrimination and equal protection concepts now are treated separately by most scholars. A third significant area of antidiscrimination law in which the doctrine of disparate impact has been applied - that of fair housing and fair lending - remains largely and, somewhat inexplicably, unexplored. [29] The failure of both courts and commentators to understand and explicate the workings of the antidiscrimination principle in the fair housing/fair lending domain has obscured the fact that the disparate impact standard under the FHA and the ECOA [30] has developed from two entirely distinct and not always consistent sources: constitutional equal protection principles and analogies from the statutory employment discrimination cases.

The tangling of these two distinct lines of precedent has created a proverbial Gordian Knot in the current fair housing and lending jurisprudence. One of the primary tasks of this Article is to unravel these housing and lending cases so that courts and scholars can recognize and understand the manifestations of these competing and sometimes conflicting doctrinal foundations. This is a necessary first step in reconstruct-

---

[25]    A good example is Ensley Branch, NAACP v. Seibels, 31 F.3d 1548 (11th Cir. 1994), which chronicles a twenty-five-year litigation saga with more than ten separate district court opinions or consent decrees. The Ensley opinion also identifies a number of other sprawling disparate impact litigation contests. Id. at 1573.

[26]    490 U.S. 642 (1989).

[27]    42 U.S.C. 2000e-1 to 2000e-17. The 1991 Act is discussed in some detail infra at notes 178-94 and accompanying text.

[28]    See infra note 189 and accompanying text.

[29]    The disparate impact standard under the FHA or the ECOA has been treated nearly exclusively in treatises designed for practitioners. The most recent of these is Thomas P. Vartanian et al., The Fair Lending Guide (Glasser LegalWorks 1995), organizing FHA and ECOA cases by Federal circuit courts of appeal, with an exclusive focus on guidance for lending practitioners. Brief interpretations of the disparate impact standard are found in Professor Robert Schwemm's indispensable treatise on the FHA, Robert G. Schwemm, Housing Discrimination, Law and Litigation (1991). Professor Schwemm was plaintiffs' counsel in several of the landmark "government defendant" cases discussed in this article. The "effects test" under the ECOA is also briefly described in Ralph C. Clontz, Jr., Equal Credit Opportunity Manual (4th ed. 1988). A number of early law review articles and notes developed the arguments for a disparate impact standard under the FHA, namely, Robert G. Schwemm, Discriminatory Effect and the Fair Housing Act, 54 Notre Dame L. Rev. 199 (1978); Comment, A Last Stand on Arlington Heights: Title VIII and the Requirement of Discriminatory Intent, 53 N.Y.U. L. Rev. 150 (1978); Elliot M. Mincberg, Note, Applying the Title VII Prima Facie Case to Title VIII Litigation, 11 Harv. C.R.-C.L. L. Rev. 128 (1976); and John Stick, Note, Justifying a Discriminatory Effect under the Fair Housing Act: A Search for the Proper Standard, 27 U.C.L.A. L. Rev. 398 (1979). Only one early student note has ever directly addressed the use of the effects test under the ECOA. See Note, Credit Scoring and the ECOA: Applying the Effects Test, 88 Yale L.J. 1450 (1979).

Remarkably, these are virtually the only articles providing a sustained discussion of disparate impact doctrine in the specific context of the fair housing/fair lending laws. One result, as discussed below, is that none of the recent decisions involving the disparate impact standard under the FHA or the ECOA reflects an adequate understanding of the equal protection and Title VII foundations of disparate impact doctrine.

[30]    The FHA and the ECOA usually are linked only in cases against lenders or other creditors involving residential real estate, usually mortgages. Where lenders are the named defendants, it is nearly always the case that the complaint alleges liability under both laws. It is important to note that the two distinct strands of precedent from which the disparate impact standard has developed are not divided between FHA-only and FHA/ECOA cases. Many more cases have been decided under the FHA alone, and, within the body of these cases, the same confusion over the origin and principles of the disparate impact standard exists.

47 Emory L.J. 409, *416

ing a disparate impact standard for fair housing and fair lending that is both coherent and workable. For it is only by understanding how [*417] the doctrine of disparate impact came to be in these housing cases that we can understand what the doctrine means today. [31] And only by understanding what disparate impact doctrine means today can courts and scholars engage in informed debate over what it ought to mean in the future.

Thus, this Article comprises: (i) an exercise in deconstruction that explains the current predicament of disparate impact theory in the specific realm of fair housing law; (ii) an exercise in reconstruction of disparate impact standards for fair housing and fair lending law by way of a comparative study of Title VII standards; and (iii) a preface to further inquiry designed to clarify, and perhaps begin to reconcile, the various applications of the antidiscrimination principle across constitutional and several distinct statutory domains.

Part I of this Article is an exercise in deconstruction. It analyzes the case law and regulations to which reference should be made in considering disparate impact liability, primarily by identifying and analyzing the distinct lines of cases that courts have used in developing the doctrine. The Article begins with a brief review of the familiar standards of disparate impact liability under Title VII. Part I then traces the simultaneous development of FHA cases against governmental defendants, in which courts employed a "quasiconstitutional" analysis dependent almost wholly on equal protection standards developed prior to Washington v. Davis. Next, the Article examines recent FHA/ECOA case law involving private defendants. This review demonstrates the confusion and inconsistency resulting from the intermingling of Title VII and "quasi-constitutional" analysis in the fair housing and lending area.

Part I concludes that, in light of relevant statutory and regulatory language, the only disparate impact test appropriately applied to private defendants must be drawn from the principles of Title VII employment law. Injecting principles from FHA cases involving government defendants - something a number of recent decisions have attempted - is simply not a sound idea because the quasi-constitutional "balancing" tests developed and applied in these cases function [*418] adequately only when used to analyze decisions made by governmental actors. These early FHA cases do, however, provide an essential link in our understanding of how the Washington v. Davis intent requirement can be reconciled with the disparate impact standard used in Title VII employment discrimination and Title VIII fair housing/lending cases.

Untangling the first strand of cases - the quasi-constitutional cases involving governmental defendants - only leaves another thorny problem, namely, that the remaining disparate impact case law under the FHA and the ECOA provides scarce guidance in terms of meaningful liability standards for private defendants. If the disparate impact doctrine is to be applied to the often complex decisions of market actors such as lenders and landlords in a sustainable way, it is necessary to translate the standards used in Title VII disparate impact cases into a workable test that can be used in the context of both the FHA and the ECOA. Moreover, because courts currently are engaged in a fundamental reshaping of Title VII doctrine, the challenge is to translate a body of precedent that simultaneously is undergoing rapid evolution.

Thus, Part II is a work of reconstruction. It provides a comparative study of each of the three prongs of the Title VII disparate impact test, providing for each prong an analysis of both the employment discrimination cases and the cases under the FHA and the ECOA. This comparative analysis illustrates how a disparate impact liability standard might work for private defendants such as lenders, insurers, and landlords. To accomplish this, it is necessary to revisit the issues that provoked great controversy in Congress during the consideration of the Civil Rights Act of 1991 and to review the cases decided following the enact-

---

[31]    Cf. Oliver Wendell Holmes, Jr., The Common Law 1, 37 (1923):

The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. In order to know what it is, we must know what it has been, and what it tends to become… However much we may codify the law into a series of seemingly self-sufficient propositions, those propositions will be but a phase in a continuous growth. To understand their scope fully, to know how they will be dealt with by judges trained in the past which the law embodies, we must ourselves know something of that past. The history of what the law has been is necessary to the knowledge of what the law is.

47 Emory L.J. 409, *418

ment of that Act. These cases are beginning to provide answers to many of the questions that remained following the 1991 Act's passage. Only after exploring the labyrinth of Title VII disparate impact principles is it possible to suggest an appropriate standard for use in the arena of fair housing and fair lending. This somewhat detailed analysis of the 1991 Act, the post-1991 Title VII cases, and the fair housing/ lending cases form the basis for a demonstrably viable disparate impact doctrine for private defendants under the FHA and the ECOA. [32]

[*419]  This detailed reconstruction of statutory disparate impact standards also serves a larger purpose: it is a necessary preface to further efforts to unify constitutional and statutory theories implementing the antidiscrimination principle. Because the fair housing/lending decisions employ both quasi-constitutional and statutory theories, consideration of these decisions can illuminate the broader analysis. In fact, the confusion and inconsistency that pervade these cases also exemplify the general paradoxes operating in antidiscrimination law. Part I demonstrates that the quasi-constitutional disparate impact test applied to governmental defendants appears to entail a much lighter burden of justification for defendants than the Title VII standard applied to private defendants. Similarly, equal protection doctrine requires plaintiffs to prove discriminatory intent, whereas Title VII merely requires a statistical showing of disparate impact in order to shift the burden to defendants to provide an explanation of the business necessity justifying the challenged practice.

These paradoxes help to explain the unmistakable trend in recent cases applying the statutory disparate impact standard. Part II shows that post-1991 Title VII case law reflects a palpable judicial effort to retard the development of expansive versions of disparate impact theory. The FHA cases using the Title VII analogies are also inexorably following this trend. Notwithstanding the codification of disparate impact liability in the 1991 Act, it is hard to avoid the conclusion that the judiciary remains averse to unilateral creation of an expansive disparate impact theory. The judicial tendency to construe disparate impact liability narrowly seems to have at least two sources. First, the judiciary is having difficulty reconciling the constitutional requirement of intentional discrimination with statutory disparate impact theory and its outcome orientation. Second, there is no obvious limiting principle constraining the scope of disparate impact liability when conceived expansively. For example, in the employment area, the application of broad disparate impact principles has resulted in costly judicial adjudication in a large number of cases, many of which have been ongoing for decades. The fear of such outcomes is precisely the impulse underlying the Supreme Court's decision to limit equal protection relief to claims involving governmental actions motivated by racial animus.

[*420]  But a more modest version of Title VII disparate impact theory - which the federal courts appear to be pursuing in the wake of the 1991 Act - raises the fundamental question of whether the effects actually means what it says, that is, whether the standard of liability called "disparate impact" or "discriminatory effect" is a standard entirely divorced from any finding of intent to discriminate. The accumulated Title VII case law - particularly the more recent case law - suggests that many courts, while not requiring an overt finding of intent to discriminate, implicitly incorporate such a requirement or its functional equivalent in their application of the disparate impact standard.

Disparate impact theory is reaching a crossroads. It either must undergo substantial theoretical reformulation, or it inevitably will be applied with standards of proof sufficiently rigorous to ensure that any defendant found liable is likely to have engaged in practices that are functionally equivalent to intentional discrimination.

---

[32]    The comparative study in Part II is supplemented with two appendices. The first appendix provides a detailed discussion of the evidentiary standards that courts have required employer-defendants to meet in providing a legitimate business justification for employee selection or promotion procedures shown to have a statistically significant disparate impact. These standards often have required employers to complete "validation studies" in accordance with guidelines created by federal enforcement agencies that provide statistical evidence that a challenged procedure is "job-related." The appendix discusses how such complex requirements might translate from the Title VII/employment context into the fair housing/fair lending arena.

The second appendix consists of a proposed disparate impact test for use in FHA cases against private defendants. The test synthesizes the standards emerging from the comparative case review set forth in Part II.

47 Emory L.J. 409, *420

One conclusion reached here is that the increasing remoteness of dominant legal scholarship from the theoretical and practical problems confronting the courts is hindering a better understanding of disparate impact doctrine. This dialogic failure has limited courts' and commentators' ability to synthesize the fair housing/fair lending cases in a way that permits them to understand their larger implication for the antidiscrimination principle. By demonstrating the manner in which courts are shrinking from the broader implications of disparate impact doctrine, this article hopes to stimulate debate about whether an expansive version of judicially enforced disparate impact liability is a viable or, indeed, desirable mechanism for altering the operation of credit and housing markets. The arduous legislative and judicial course of the doctrine in the other areas studied suggests that determining the place of the disparate impact standard of liability under the FHA and the ECOA is an issue that deserves serious scholarly and public discussion.

[*421]

I. Deconstructing the Disparate Impact Standard in Fair Housing Law: An Archaeological Study

A. The Disparate Impact Standard in Employment Discrimination Cases Under Title VII

The roots of the disparate impact standard lie in Griggs v. Duke Power Co. [33] In Griggs, the Court interpreted language of Title VII prohibiting employers from adversely affecting employment status "because of" race, color, religion, sex, or national origin [34] to mean that "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze' the status quo of prior discriminatory employment practices." [35] The Court went on to strike down the respondent power company's use of two generic aptitude tests and a high school degree requirement. [36] The critical language for future disparate impact case law was contained in the Court's statement:

The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited… Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question. [37]

[*422]    The phrases "business necessity," "job related," and "manifest relation-ship" have echoed through Title VII court opinions for more than twenty-five years. Griggs has spawned a daunting body of Title

---

[33]    401 U.S. 424 (1970).

[34]    Section 703(a)(2) of Title VII provides:

(a) It shall be unlawful employment practice for an employer

…

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, or national origin.

 42 U.S.C. 2000e-2 (1994).

[35]    Griggs, 401 U.S. at 430.

[36]    The Court noted that the company added the testing requirements on July 2, 1965, the date on which Title VII became effective.  Id. at 427. While the Court did not dispute the lower courts' findings that the power company's requirements failed to evidence intentional discrimination, the Court's acknowledgment of the coincidence of dates suggests that it believed that the company not only had followed a previous policy of overt discrimination but that it continued to operate with some degree of racial animus.

[37]    Id. at 431-32.

47 Emory L.J. 409, *422

VII case law, referred to generally as cases decided in reliance on the doctrine of "disparate impact." [38] The standard first enunciated in Griggs has been refined by courts over many years and is best summarized by Justice O'Connor as follows:

In certain cases, facially neutral employment practices that have significant adverse effects on protected groups have been held to violate the Act without proof that the employer adopted those practices with a discriminatory intent. [39]

1. Elements of the Title VII Employment Discrimination Case

The three elements of the disparate impact standard of liability are most clearly developed in the area of employment discrimination law. [40] It is settled **[*423]** that the plaintiff must carry the burden of pleading and proving the first prong of the three-part test, the prima facie case. The prima facie case has been described as consisting of three elements: identification, impact, and causation. [41] "The plaintiff must begin by identifying the specific employment practice that is challenged." [42] The plaintiff's obligation to identify and isolate a specific employer practice is referred to as the "particularity" requirement, which Congress codified in the Civil Rights Act of 1991. [43] The second component of the plaintiff's prima facie showing consists of identifying a disproportionate impact on a specific class of persons protected by the employment discrimination law. The primary dispute relating to this issue is whether the plaintiff used an appropriate comparative population against which to measure the discriminatory effects of a challenged prac-

---

38      In employment discrimination cases, as in the lesser developed FHA/ECOA cases, the term "disparate impact" typically is contrasted with the term "disparate treatment." Disparate treatment stands for a doctrine developed under employment discrimination law in which a finding of intentional discrimination may be predicated upon circumstantial, indirect evidence. See  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993);  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981);  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). For a discussion of disparate treatment standards under the FHA and the ECOA, see generally Clontz, supra note 29; Schwemm, supra note 29; Vartanian et al., supra note 29.

39      Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986-87 (1988) (plurality opinion). While the portion of Watson discussed here constitutes a plurality opinion (only three other justices joined this portion of Justice O'Connor's opinion), Watson has been cited more than 400 times, nearly always with approval and quite frequently for the analysis contained in the plurality portion of the opinion. See, e.g.,  Garcia v. Woman's Hosp., 97 F.3d 810 (5th Cir. 1996);  NAACP, Inc. v. East Haven, 70 F.3d 219, 225 (2d Cir. 1995);  Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1314 (11th Cir. 1994);  Csicseri v. Bowsher, 862 F. Supp. 547, 574 (D.D.C. 1994) ("The Supreme Court, in Watson… articulated the elements, as well as the proper analysis of these claims."). Of particular importance in the fair housing area is the reliance placed on Watson by the Tenth Circuit Court of Appeals in the recently decided  Mountain Side Mobile Estates Partnership v. Secretary of HUD, 56 F.3d 1243, 1254 (10th Cir. 1995), discussed, infra, at notes 147-52 and accompanying text, which cites Justice O'Connor's analysis with approval for use in FHAcases.

40      Analyzing the vast body of disparate impact cases in the employment discrimination area is well beyond the scope of this Article. Rather, the exposition of the basics of the employment discrimination case law serves the limited purpose of permitting analysis of the FHA/ECOA cases. Similarly, the subsequent discussion of employment law precedent shall be used to specify explicit standards for use in fair housing and lending cases and to draw some more general conclusions. The voluminous Title VII case law has been refined and recast by Congress's passage of the Civil Rights Act of 1991, which settled some open issues, especially in relation to the required elements of the prima facie case. My approach, therefore, is to focus on the post-1991 federal court decisions along with earlier Supreme Court decisions that those cases continue to cite as binding precedent.

For a good introduction to basic employment discrimination law, see 2 Lex K. Larson & Arthur Larson, Employment Discrimination (2d ed. Supp. 1996) and, as to disparate impact, id. 20-33. See also Charles A. Sullivan et al., Employment Discrimination (2d ed. 1988 & Supp. 1992). Concerning the Civil Rights Act of 1991 (amending Title VII of the Civil Rights Act of 1964), see infra notes 176-98 and accompanying text.

41      See  EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 601(1st Cir. 1995) ("In the disparate impact milieu, the prima facie case consists of three elements: identification, impact and causation."). The description here owes much to Judge Selya's lucid explication of how courts apply the burdens of proof and production in disparate impact cases.

42      Watson, 487 U.S. at 995. See also Steamship Clerks, 48 F.3d at 601 (citing  Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989)) ("First, the plaintiff must identify the challenged employment practice or policy, and pinpoint the defendant's use of it."). The decision in the Wards Cove case prompted Congress to adopt the disparate impact language contained in the Civil Rights Act of 1991, relating to the proper burdens of proof. See discussion infra at notes 169-75 and accompanying text.

43      See infra notes 201-02 and accompanying text.

47 Emory L.J. 409, *423

tice or policy. [44] Finally, the plaintiff must show that the identified practice actually caused the alleged disparate impact. As a threshold matter, federal courts generally have required a plaintiff to show that a particular employment practice or policy causes a "substantial" or "significant" disparate impact upon a class of persons protected under the Act. [45] In employment discrimination cases, plaintiffs typically make this showing by use of statistical analyses. [46]

[*424] Once the plaintiff makes a prima facie showing, the defendant bears the burden of rebutting the plaintiff's case. While defendants are entitled merely to rebut a plaintiff's prima facie evidence, for reasons discussed in Part II of this Article, they rarely rest their defense exclusively on such grounds. [47] Defendants typically also attempt to show that the challenged practice is job-related and consistent with business necessity. [48] The defendant's additional burden under the disparate impact theory - embodied in the concept of "business necessity" - is one that has absorbed the attention of hundreds of scholarly articles and case decisions. Much of Part II will focus on the impact of the Civil Rights Act of 1991 upon the business necessity defense.

Once a defendant has demonstrated a business necessity, that is, a legitimate business justification for a challenged practice or action, the defendant has carried its burden under Title VII. However, the defendant will prevail only if "the plaintiff fails to show the availability of [a] less discriminatory alternative practice or action that would provide a comparably effective means of meeting that goal." [49] Prior to 1989, a number of courts of appeals had determined that the "business necessity" defense was an extremely rigorous standard, requiring defendants to show not only a "compelling need" for the challenged practice but also the absence of any less discriminatory alternatives. [50] However, the Supreme Court confirmed in Watson and Wards Cove that the plaintiff must sustain the twin burdens of production and persuasion on the question of less discriminatory alternatives, a position Congress codified in the Civil Rights Act of 1991. While the post-1991 cases suggest that the plaintiff's burden under Title VII is firmly settled, [51] questions remain about the extent to which a plaintiff must demonstrate that an alternative is "equally effective" in meeting the defendant's goals. [52]

[*425]

B. The Disparate Impact Standard Under the Fair Housing Act: Equal Protection and Title VII Roots

---

[44] See infra notes 207-14 and accompanying text. Plaintiffs must select a pool comprised of qualified persons in the relevant market who either applied for the job in question or who would have applied but for the discriminatory practice. See New York City Transit Auth. v. Beazer, 440 U.S. 586, 586-87 n.29 (1979) (quoting Teamsters v. United States, 431 U.S. 324, 340 n.20 (1977) ) (""evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants' undermines the significance of such figures.").

[45] Watson, 487 U.S. at 995 (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975)) (Plaintiffs in Title VII cases must show "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." See also Connecticut v. Teal, 457 U.S. 440, 446 (1982); Beazer, 440 U.S. at 584; Dothard v. Rawlinson, 433 U.S. 321, 329 (1977); Washington v. Davis, 426 U.S. 229, 246-47 (1976).

[46] See Watson, 487 U.S. at 994 ("Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.").

[47] See discussion infra at notes 242-46 and accompanying text.

[48] See discussion infra at notes 248-62 and accompanying text. See also 72 U.S.C. 2000e-2(k)(1)(A)(i); Steamship Clerks, 48 F.3d at 602 (citing Griggs, 401 U.S. at 431; Albemarle Paper, 422 U.S. at 425).

[49] Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1118-19 (11th Cir. 1993). See also Albemarle Paper, 422 U.S. at 425 (once the defendant shows that an employment requirement has a "manifest relationship" to a legitimate employer goal, the burden shifts back to the plaintiff to prove the existence of a less discriminatory alternative in order to prove that the defendant's showing of job-relatedness was a pretext for discrimination).

[50] See infra note 288 and accompanying text.

[51] See infra note 291 and accompanying text.

[52] See infra notes 298-305 and accompanying text.

47 Emory L.J. 409, *425

The commonly articulated explanation of the disparate impact standard under the FHA and the ECOA is that the test was "borrowed" from federal precedent reading a "disparate impact" liability standard into Title VII. The received explanation indisputably explains how the concept of nonintentional liability was introduced under the ECOA, since the legislative history of the ECOA explicitly refers to the Title VII cases; [53] but the Title VII explanation of the disparate impact standard does not fully unravel the reasons for its use in the FHA area or the tangled state of the standard in FHA/ECOA jurisprudence.

Simultaneously with the early development of what became a vast corpus of Title VII disparate impact jurisprudence, an entirely distinct line of cases provided an alternative basis for the disparate impact standard under the Fair Housing Act. [54] In the years after enactment of the FHA in 1968, federal courts [*426] were engaged in aggressively expanding the scope and application of equal protection analysis to a host of local governmental activities. [55] What impelled the federal courts to engage in this new analysis was the difficulty of proving an overt intent to discriminate on the part of recalcitrant local government bodies promoting or abetting racial discrimination. Courts in these cases began to draw an inference of actual intent to discriminate from evidence of disproportionate impact. [56] Within this body of precedent are a number of decisions linking an expansive reading of equal protection doctrine with provisions of the FHA. Such cases typically involved a claim by a plaintiff housing provider (or the United States, on behalf of

---

[53]    See discussion infra at notes 156-59 and accompanying text.

[54]    This article expressly leaves to one side the question of whether any disparate impact standard is appropriately applied under the FHA. The U.S. Supreme Court has never decided whether a case can be made under the FHA based solely on disparate impact theory. In  Huntington v. Huntington Branch, NAACP, 488 U.S. 15, 18 (1989),  the Court, in denying a petition for writ of certiorari from a decision of the Court of Appeals for the Second Circuit based on a disparate impact theory, took the unusual step of publishing a per curiam opinion stating: "Since appellants conceded the applicability of the disparate-impact test for evaluating the zoning ordinance under Title VIII, we do not reach the question whether that test is the appropriate one."  Id. at 18.  Thus, the Court has expressed its view that the question of whether disparate impact liability lies under the FHA is unresolved.

United States federal courts of appeals are divided on the issue of whether a showing of discriminatory effect is always enough for the plaintiff to make its prima facie case. Most circuits have accepted some variant of the theory, but some circuits have yet to reach the issue; and a number of district and circuit courts have questioned whether the theory alone is adequate. See, e.g.,  Brown v. Artery Org., Inc., 654 F. Supp. 1106, 1115 (D.D.C. 1987)  ("If the defendant is not a governmental body, the plaintiff-tenants will be deemed not to have proved a violation of the Fair Housing Act if they demonstrate no more than that the defendant's actions have had or will have a discriminatory effect or impact: some proof of discriminatory intent... is necessary."). See also  NAACP v. American Family Mut. Ins. Co., 978 F.2d 287 (7th Cir. 1992)  (questioning whether defendants should have conceded that disparate impact applies to Title VIII cases). Every case in which the federal circuits have recognized a disparate impact test under the FHA has involved residential rental housing claims. No lending cases have been decided on a disparate impact theory. For a summary of the application of the disparate impact test by United States appellate circuits, see Vartanian et al., supra note 29 4.02, 4.03.

The statute itself is totally silent as to whether a claim based solely on disparate impact can be made, as is the legislative history of the law as originally enacted. Further, the legislative and administrative history of the 1988 amendments to the law are mixed. Compare Statement of Sen. Kennedy, 134 Cong. Rec. S12,449 (daily ed. Sept. 7, 1988) ("All of the Federal courts of appeals that have considered the question have concluded that Title VIII should be construed, at least in some instances, to prohibit acts that have discriminatory effects ...... ") with President Reagan's statement in 24 Weekly Comp. Pres. Doc. 1141 (Sept. 13, 1988) ("I want to emphasize that this bill does not represent any congressional or executive branch endorsement... that Title 8 violations may be established by a showing of... discriminatory effects... without discriminatory intent. Title 8 speaks only to intentional discrimination.").

[55]    For a general discussion of this topic, see Lawrence H. Tribe, American Constitutional Law 1436-1672 (2d ed. 1988); Michael Klarman, An Interpretive History of Modern Equal Protection,  90 Mich. L. Rev. 213 (1991).

[56]    See, e.g.,  Hobson v. Hansen, 269 F. Supp. 401, 497 (D.D.C. 1967)  (Wright, J.), aff'd sub nom.  Smuck v. Hobson, 408 F.2d 175 (D.C. Cir. 1969)  ("Whatever the law was once, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.") (internal citations omitted). See also  United Farmworkers of Fla. Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799, 808 (5th Cir. 1974);  Hawkins v. Shaw, 461 F.2d 1171, 1175 (5th Cir. 1972)  (per curiam) (en banc) ("In our judgment the facts before us squarely and certainly support the reasonable and logical inference that there was here neglect involving clear overtones of racial discrimination in the administration of governmental affairs of the town of Shaw resulting in the same evils which characterize an intentional and purposeful disregard of the principle of equal protection of the laws.");  Dailey v. City of Lawton, Okla., 425 F.2d 1037, 1039 (10th Cir. 1970) ("In our opinion, it is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals.");  Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2d Cir. 1968).

47 Emory L.J. 409, *426

such provider) against a local government, based on the locality's active use of zoning laws to block housing development or its refusal to provide municipal services to effectuate a plan of low-income housing development. In each of these cases, the court - either expressly or implicitly - drew an inference of intentional discrimination from evidence of discriminatory effect.[57]

[*427]

1. Black Jack and Arlington Heights II: The Narrow Escape from Equal Protection

In 1974, two cases in the Eighth Circuit Court of Appeals attenuated the link between the equal protection basis of this strand of disparate impact analysis and FHA liability. In Williams v. Matthews Co.,[58] the Eighth Circuit considered a case brought under both the Civil Rights Acts of 1870 and 1866[59] and the FHA, alleging that a land developer discriminated by refusing to sell house lots except through a group of approved home builders, all of whom were white. The court's opinion is of interest because it relied primarily on reasoning drawn from the employment area without relying on the equal protection cases to any meaningful degree. While the court's holding against the defendant was based squarely on a finding of intentional discrimination,[60] the court's opinion veered, in dictum, toward a disparate impact analysis:

The undisputed facts show that under the circumstances the alleged procedure of selling lots only to builders carried racial overtones, and such a policy, even though neutral on its face, cannot stand if it in its operation serves to discriminate on the basis of race.[61]

The court did not refer to equal protection doctrine because the defendant in the case was a private party; because equal protection analysis was unavailable in the absence of a state actor, the dictum in Williams simply borrowed from a Title VII case analogy. Such reasoning - that a procedure with racial overtones which operates to discriminate cannot stand - seems a far cry from later disparate impact cases.

This reading of the Williams dictum draws support from an opinion rendered by the same court only six months later - the seminal opinion in the line of FHA cases drawn from equal protection. In United States v. City of Black Jack,[62] the Eighth Circuit invalidated a zoning ordinance adopted by the City of Black Jack, Missouri, proscribing construction of multifamily residential housing. While the facts of the case strongly leaned toward the conclusion that racial bias animated the enactment of the ordinance,[63] the court nonetheless grasped the opportunity [*428] to announce its view that a showing of discriminatory ef-

---

[57]    See Kennedy Park Homes Ass'n. v. Lackawanna, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010 (1971), a case combining equal protection and FHA complaints. Justice Tom Clark (Retired), sitting by designation, after reviewing the "long, sad" history of the City of Lackawanna's perpetuation of segregation, held that "the effect of Lackawanna's action was inescapably adverse to the enjoyment of this right. In such circumstances the City must show a compelling governmental interest in order to overcome a finding of unconstitutionality... Even were we to accept the City's allegation that any discrimination here resulted from thoughtlessness rather than a purposeful scheme, the City may not escape responsibility for placing its black citizens under a severe disadvantage which it cannot justify." Id. at 114. See also Metropolitan Housing Dev. Corp. v. Arlington Heights, 517 F.2d 409 (7th Cir. 1975), rev'd sub nom., Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252 (1977); Southern Alameda Spanish Speaking Org. v. Union City, 424 F. 2d 291 (9th Cir. 1970).

[58]    499 F.2d 819 (8th Cir.), cert. denied, 419 U.S. 1027 (1974).

[59]    42 U.S.C. 1981-1982 (West 1995).

[60]    The court's holding was explicitly based on an intentional discrimination analysis drawn from McDonnell Douglas Corp. v. Green, discussed supra note 38. Williams, 499 F.2d at 826.

[61]    Id. at 828 (citing Griggs v. Duke Power Co., 401 U.S. 424 (1971)).

[62]    508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975).

[63]    The City of Black Jack, in fact, had been incorporated immediately prior to the commencement of the suit by residents of St. Louis County, whose actions in incorporating the area as a municipality and in enacting the zoning ordinance appear to have been intended exclusively to block the planned construction of low-income housing by an interfaith church group attempting to broaden housing opportunities for inner-city residents. Id. at 1182-83.

47 Emory L.J. 409, *428

fect alone sufficed to establish a prima facie case under the FHA. [64] In contrast to the recent and factually similar Williams case, in which the Eighth Circuit found intentional discrimination using analogies from employment cases, the court in Black Jack relied exclusively on equal protection cases [65] to support its holding that liability could be imposed under the FHA based solely on disparate impact. Indeed, Black Jack lacks any substantive analysis of the language of the FHA or of the employment law disparate impact cases, [66] focusing instead on a balancing test derived wholly from the constitutional cases. Thus, the Black Jack court held, once the prima facie case had been established, "the burden shifts to the governmental defendant to demonstrate that its conduct was necessary to [*429] promote a compelling governmental interest." [67] This language is taken directly from the equal protection strict scrutiny/suspect classification framework. [68] The Court acknowledged that the compelling governmental interest standard is "most often expressed in cases involving equal protection challenges to statutes… creating suspect classifications" but concluded without further explanation that "even though this case is based on a federal statute, rather than on the Fourteenth Amendment, we believe that, once the United States established a prima facie case of racial discrimination, it became proper to apply the compelling governmental interest requirement of the equal protection cases." [69] In short, the Black Jack Court simply concluded that the rigor of the equal protection strict scrutiny standard was appropriate in determining liability under the FHA. Since such scrutiny is almost invariably "strict in theory, fatal in fact," [70] it almost goes without saying that the City of Black Jack was unable to carry its burden and lost the case.

Black Jack is a remarkable decision in many respects. It was not only the first FHA case finding liability solely on the basis of disparate impact, but it also was decided almost exclusively on the basis of equal pro-

---

[64]    The Black Jack court held:

The burden of proof in Title VIII cases is governed by the concept of the "prima facie case.' To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect. The plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing was racially motivated. Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations, but more importantly, because… whatever our law was once,… we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.

Id. at 1184-85 (citations omitted). To ensure that there could be no misunderstanding of the basis of its holding, the court explicitly stated that, despite some evidence in the record of intentional discrimination, "we do not base our conclusion that the Black Jack ordinance violates Title VIII on a finding that there was an improper purpose." Id. at 1185 n.3.

[65]    In addition to Williams, 499 F.2d 819, the court cited the following cases: United Farmworkers, 493 F.2d at 808; Hawkins v. Town of Shaw, Miss., 461 F.2d 1171, 1172 (5th Cir. 1972); Kennedy Park, 436 F.2d at 114; Dailey, 425 F.2d at 1039; Norwalk CORE, 395 F.2d at 931; Citizens Committee for Faraday Wood v. Lindsay, 362 F. Supp. 651, 658 (S.D.N.Y. 1973); Banks v. Perk, 341 F. Supp. 1175, 1180 (6th Cir. 1973). The court also noted that "this holding is consistent with cases involving racial discrimination in other areas," citing Wright v. Council of City of Emporia, 407 U.S. 451, 462 (1972) (schools); Griggs, 401 U.S. at 432 (employment); Burton v. Wilmington Parking Authority, 365 U.S. 715, 725 (1961) (restaurant); Hawkins, 461 F.2d at 1174 (Wisdom, J., concurring) (municipal services). Black Jack, 508 F.2d at 1184-85 n.2. The Wright, Burton and Hawkins cases are equal protection cases; Griggs, of course, is not.

[66]    The court adverted to Title VII only in the string cite to Griggs and in making a sweeping policy statement prior to announcing its substantive holdings in the case:

Title VIII is designed to prohibit all forms of discrimination, sophisticated as well as simple-minded. Just as Congress requires… the removal of artificial, arbitrary and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification, such barriers must also give way in the field of housing.

Black Jack, 508 F.2d at 1184 (internal citations omitted).

[67]    Id. at 1185 (emphasis added).

[68]    Cf. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224-25 (1995) (under strict scrutiny analysis, court determines whether racial classification serves a compelling governmental interest).

[69]    Black Jack, 508 F.2d at 1185 n.4.

[70]    Cf. Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 361-62 (1978) ("Thus, our review under the Fourteenth Amendment should be strict - not strict in theory and fatal in fact.") (internal citations omitted).

47 Emory L.J. 409, *429

tection precedent. [71] Less than two years after the Eighth Circuit's decision, however, the Supreme Court expressly overruled the entire line of equal protection cases relied upon in Black Jack.

In Washington v. Davis, [72] the Supreme Court reversed an appeals court decision finding that the District of Columbia's police department entrance examination violated the equal protection rights of minority job applicants based on its racially adverse impact. [73] The Court was obligated to explain carefully a number of its own decisions [74] relied upon in various court of appeals decisions [*430] (including Black Jack) and reached out to overrule the line of lower court equal protection decisions. [75] Of the seven non-employment cases expressly overruled by the Davis Court, [76] Black Jack directly relied upon three; [77] the other equal protection cases cited in Black Jack were overruled by implication. The Supreme Court reinforced its holding in Washington v. Davis a year later in the fair housing context. In Village of Arlington Heights v. Metropolitan Housing Development Corp., [78] the Supreme Court reaffirmed its holding that "proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." [79]

The Supreme Court's unmistakable rejection of the disparate impact theory of equal protection liability cut Black Jack from its constitutional moorings, apparently rendering its holding, within eighteen months,

---

[71]    The cases were not referred to by analogy. The Court based its holding squarely upon them, without any attempt to explain the leap from constitutional to statutory bases.

[72]    426 U.S. 229 (1976).

[73]    Id. at 247-48.

[74]    Specifically, Palmer v. Thompson, 403 U.S. 217 (1971) and Wright v. Council of City of Emporia, 407 U.S. 451 (1972). The Court stated that "neither Palmer nor Wright was understood to have changed the prevailing rule" that a showing of intent is necessary; and "to the extent that Palmer suggests a generally applicable proposition that legislative purpose is irrelevant in constitutional adjudication, our prior cases as indicated in the text are to the contrary." Davis, 426 U.S. at 243-44, n.11. The Wright case was relied upon by the Black Jack Court. See supra note 74. But note that Justice Stevens demurred from the Davis Court's recharacterization of Palmer and Wright in his separate concurrence. Davis, 426 U.S. at 254 (Stevens, J., concurring).

[75]    The Court held:

Both before and after Palmer v. Thompson, however, various Courts of Appeals have held in several contexts, including public employment, that the substantially disproportionate racial impact of a statute or official practice standing alone and without regard to discriminatory purpose, suffices to prove racial discrimination violating the Equal Protection Clause absent some justification going substantially beyond what would be necessary to validate most other legislative classifications. The cases impressively demonstrate that there is another side to the issue; but, with all due respect, to the extent that those cases rested on or expressed the view that proof of discriminatory racial purpose is unnecessary in making out an equal protection violation, we are in disagreement.

Davis, 426 U.S. at 244-45 (footnote omitted).

[76]    In the footnote setting out the overruled lower court cases, the Court first cites a line of employment cases in which equal protection claims were upheld on a disparate impact theory, then states:

In other contexts there are Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (CA2 1968) (urban renewal); Kennedy Park Homes Assn. v. City of Lackawanna, 436 F.2d 108, 114 (CA2 1970), cert. denied, 401 U.S. 1010 (1971) (zoning); Southern Alameda Spanish Speaking Organization v. Union City, 424 F.2d 291 (CA9 1970) (dictum) (zoning); Metropolitan H. D. Corp. v. Village of Arlington Heights, 517 F.2d 409 (CA7), cert. granted, 423 U.S. 1030 (1975) (zoning); Gautreaux v. Romney, 448 F.2d 731, 738 (CA7 1971) (dictum) (public housing); Crow v. Brown, 332 F. Supp. 382, 391 (N.D. Ga. 1971), aff'd, 457 F.2d 788 (CA5 1972) (public housing); Hawkins v. Town of Shaw, 437 F.2d 1286 (CA5 1971), aff'd on rehearing en banc, 461 F.2d 1171 (1972) (municipal services).

Id. at 244 n.12.

[77]    The three cases were Hawkins, 461 F.2d 1171; Kennedy Park, 436 F.2d 108, and Norwalk CORE, 395 F.2d 920.

[78]    429 U.S. 252 (1977).

[79]    Id. at 265.

47 Emory L.J. 409, *430

a "derelict on the waters of the law." [80] But the factual and procedural peculiarities of Davis and [*431] Arlington Heights allowed the Supreme Court to reject decisively disparate impact theory as a basis for Equal Protection Clause liability while leaving open the potential of disparate impact to serve as a theory of liability in the context of various antidiscrimination statutes.

In Washington v. Davis, the Supreme Court reviewed a claim involving an employment test used by a defendant not then subject to Title VII. [81] The Court of Appeals had decided that the Title VII/Griggs standards would govern anyway, despite the fact that plaintiffs sued under the Equal Protection Clause. [82] The essence of the Supreme Court's decision in Davis was that Title VII disparate impact standards were not to be extended without Congress's mandate:

Under Title VII, Congress provided that when hiring and promotion practices disqualifying substantially disproportionate numbers of blacks are challenged, discriminatory purpose need not be proved… We are not disposed to adopt this more rigorous standard for the purpose of applying the Fifth and the Fourteenth Amendments in cases such as this… In our view, extension of the rule beyond those areas where it is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription. [83]

Two points are noteworthy in this passage. First, the Supreme Court, bolstering its earlier Griggs holding, assumed without discussion that Congress intended for a disparate impact standard to apply under Title VII. Second, the Court stated a willingness to apply disparate impact liability solely in those areas where "it is already applicable by reason of statute." [84] Of course, this begs the question whether and how disparate impact liability exists under any particular statutes, such as the FHA and the ECOA.

[*432] In Arlington Heights, the unusual procedural posture in which the case came to the Supreme Court for review had a decisive effect on future FHA jurisprudence. The original claim in the case was brought under both the Equal Protection Clause and the FHA, but the Seventh Circuit Court of Appeals decided only the constitutional claim. Thus, after overturning the decision of the court of appeals the Supreme Court remanded for consideration of the FHA claim, writing that the Court of Appeals had proceeded, "in a somewhat unorthodox fashion." [85] Otherwise, the Court said nothing about the statutory claim, and, except for an ambiguous footnote criticizing an earlier case, did not disapprove a disparate impact standard under the Fair Housing Act. [86]

Because of this inverted procedural status - in which the court of appeals reached a constitutional claim without resolving the statutory issues - the Seventh Circuit plaintiffs lived to fight another day in Arlington Heights. In Metropolitan Housing Development Corp. v. Village of Arlington Heights, [87] the Seventh Circuit accepted a disparate impact theory of liability under the FHA. The court's reasoning was as follows: First, the statute should be read broadly to effectuate congressional intent; second, "conduct that

---

[80]   Alabama Pub. Serv. Comm'n v. Southern Ry. Co. 341 U.S. 341, 356 (1951) (Frankfurter, J., concurring). Notably, contemporaneous analysis of Black Jack supports this view. Brest, supra note 23, at 23-24, used the Black Jack case as his chief example of the type of disparate impact analysis that was overruled in Washington v. Davis.

[81]   At the time the Court considered the case, Title VII was inapplicable to the federal government; and the District of Columbia Police Department was then regarded legally as a part of the federal government. See Davis, 426 U.S. at 237-37 n.6.

[82]   Id. at 236.

[83]   Id. at 246-48.

[84]   Id. at 248.

[85]   Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 271 (1977).

[86]   In a footnote, the Court referred to the decision in  Kennedy Park Homes, 436 F.2d 108, stating: "To the extent that the decision in Kennedy Park Homes rested solely on a finding of discriminatory impact, we have indicated our disagreement." Id. at 267 n.16. Kennedy Park Homes involved both an Equal Protection Clause and FHA claim. It is not clear from this passage whether the Court's indication of disapproval applies to the entire disparate impact analysis or only to its constitutional application.

[87]   558 F.2d 1283 (7th Cir. 1977) ), cert. denied,  434 U.S. 1025 (1978) ("Arlington Heights II").

47 Emory L.J. 409, *432

has the necessary and foreseeable consequence of perpetuating segregation can be as deleterious as purposefully discriminatory conduct in frustrating the national commitment "to replace the ghettos by truly integrated and balanced living patterns'"; [88] third, "[a] strict focus on intent permits racial discrimination to go unpunished"; [89] and, therefore, a violation of the FHA can be shown in some circumstances without proving discriminatory intent. [90]

[*433] Of interest is the fact that the Arlington II court placed primary reliance in its analysis on equal protection cases [91] and then buttressed its statutory disparate impact holding by stating, "[a] number of courts have agreed." [92] But of the four "agreeing" cases cited by the court of appeals, two were premised entirely on equal protection analysis - Black Jack and Kennedy Park Homes (which had been specifically disapproved by the Supreme Court in the earlier decision in the same case). The third, Smith v. Anchor Building Corp., was an intentional discrimination decision that quoted, in dictum, the disparate impact language from Black Jack but rested its holding exclusively on findings of purposeful discrimination. [93] The fourth, Resident Advisory Board v. Rizzo, [94] was a district court decision that also relied almost entirely on equal protection analysis derived from Black Jack. [95] The Seventh Circuit thus can be said to have based nearly its entire disparate impact analysis in Arlington Heights II on cases that the Supreme Court either had overruled or seriously called into question. [96]

[*434] However, given the Supreme Court's earlier holding, the Arlington Heights II court trod cautiously. It fashioned a four-part inquiry to be used in determining disparate impact liability under the FHA.

---

[88]     Arlington Heights II, 558 F.2d at 1289-90 (quoting Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 211 (1972)) (internal quotations omitted).

[89]     The Court stated:

Moreover, a requirement that the plaintiff prove discriminatory intent before relief can be granted under the statute is often a burden that is impossible to satisfy. "Intent, motive, and purpose are elusive subjective concepts,"… Hawkins v. Town of Shaw, 461 F.2d 1171, 1172 (5th Cir. 1972) (en banc) (per curiam), and attempts to discern the intent of an entity such as a municipality are at best problematic. See Hart v. Community School Board of Education, 512 F.2d 37, 50 (2d Cir. 1975); Note, Reading the Mind of the School Board: Segregative Intent and the DeFacto/DeJure Distinction, 86 Yale L.J. 317, 322-26 (1976). A strict focus on intent permits racial discrimination to go unpunished in the absence of evidence of overt bigotry. As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find. But this does not mean that racial discrimination has disappeared. We cannot agree that Congress in enacting the Fair Housing Act intended to permit municipalities to systematically deprive minorities of housing opportunities simply because those municipalities act discreetly. We therefore hold that at least under some circumstances a violation of section 3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent.

Id. at 1290 (some citations omitted).

[90]     Id.

[91]     Id. at 1289-90 (relying on Hawkins and Hart, both constitutional cases). The Court did make brief reference to Griggs, 401 U.S. 424 as analogous support for its broad reading of the FHA. Arlington Heights II, 558 F.2d at 1289 n.6 ("The important point to be derived from Griggs is that the Court did not find the "because of race' language to be an obstacle to its ultimate holding that intent was not required under Title VII. It looked to the broad purposes underlying the Act rather than attempting to discern the meaning of this provision from its plain language.").

[92]     Id. at 1290, citing Smith v. Anchor Bldg. Corp., 536 F.2d 231 (8th Cir. 1976); Black Jack, 508 F.2d at 1183; Kennedy Park Homes, 436 F.2d at 114; Resident Advisory Bd. v. Rizzo, 425 F. Supp. 987, 1021-24 (E.D. Pa. 1976).

[93]     While the Smith opinion twice cited Black Jack, the court applied the McDonnell Douglas analysis of the prima facie case and made several evidentiary findings demonstrating that the court was focused on intentional discrimination. Indeed, the case revolved around the fact that the defendant apartment owners offered apartments to non-minority testers from a fair housing organization numerous times while rejecting the black plaintiff's application over fifteen times. See Smith, 536 F.2d at 234-35 ("The irresistible inference from plaintiff's uncontroverted evidence is that she was denied an apartment on the basis of race… It stretches credulity to believe, as the defendant argues and the district court found, that no suitable apartment was available for the plaintiff before June 28."). Notwithstanding the court's confusing citations to Black Jack, Smith is a disparate treatment case.

[94]     425 F. Supp. 987 (E.D. Pa. 1976).

[95]     Id. at 1022, 1026-28.

[96]     Interestingly, though, the Supreme Court denied the Village's petition for writ of certiorari. 434 U.S. 1025 (1978).

47 Emory L.J. 409, *434

The court began by stating: "We refuse to conclude that every action which produces discriminatory effects is illegal. Such a per se rule would go beyond the intent of Congress and would lead courts into untenable results in specific cases." [97] Instead the court articulated a test that would examine four specific questions: (i) How strong is plaintiff's showing of discriminatory effect? (ii) Is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of Washington v. Davis? (iii) What is the defendant's interest in taking the action complained of? (iv) Does the plaintiff seek to compel the defendant affirmatively to provide housing for a protected class, or merely to remove obstacles to private provision of such housing? [98]

The Arlington Heights II test is notable in at least two respects. First, the court did not stray far from equal protection analysis in articulating the new test. The four-part inquiry closely resembles the type of "balancing" test familiar in equal protection claims against governmental actors. And, probably impelled at least in some measure by a desire to avoid another Supreme Court reversal, the Arlington Heights II test included discriminatory intent as one of the four elements of the inquiry. The court stated that, in each of the previous FHA cases on which it relied, there had existed at least "some evidence of discriminatory intent." The court observed:

It is evident that the equitable argument for relief is stronger when there is some direct evidence that the defendant purposefully discriminated against members of minority groups because that evidence supports the inference that the defendant is a wrongdoer. Thus, the absence of any such evidence in this case is a factor buttressing the Village's contention that relief should be denied. [99]

But the court went on to state: "We conclude, however, that this criterion is the least important of the four factors that we are examining." [100] The court justified its derogation of the importance of intent to the overall inquiry by emphasizing the difficulty of proving intent to discriminate in the first place.

[*435] Thus, the court's holding essentially rested on its conclusion that a disparate impact inquiry was necessary to effectuate the broad remedial purposes of the statute: "We cannot agree that Congress in enacting the Fair Housing Act intended to permit municipalities to systematically deprive minorities of housing opportunities simply because those municipalities act discreetly." [101] The Court in Arlington Heights II, recognizing that equal protection analysis no longer provided an effective basis for checking local governments, built upon the presumably discredited analysis of Black Jack to read a disparate impact standard into the FHA.

2. Breaking Away from Equal Protection: Rizzo and Betsey

Later in the same year that the Seventh Circuit handed down Arlington Heights II, the Third Circuit Court of Appeals cogently analyzed the history of the FHA disparate impact standard in Resident Advisory Board v. Rizzo. [102] In considering the claim of low-income persons against the City of Philadelphia for failing to complete a low-income housing project, Judge Garth of the Third Circuit [103] identified the pragmatic basis behind the Arlington Heights II decision:

Until relatively recently, federal courts were not often called upon to adjudicate Title VIII claims. We attribute this circumstance to our impression that, at least with respect to alleged discrimination in housing

---

[97]    Arlington Heights II, 558 F.2d at 1290.

[98]    Id.

[99]    Id. at 1292.

[100]    Id.

[101]    Id. at 1290.

[102]    564 F.2d 126, 149 (3d Cir. 1977).

[103]    Associate Justice Tom C. Clark (Retired), sitting by designation, also was on the Rizzo panel. Recall that Justice Clark had written the opinion in Kennedy Park Homes, 436 F.2d 108 (discussed supra at note 57), the case that arguably initiated the disparate impact test under the FHA and that was expressly overruled by the Supreme Court in Arlington Heights I.

47 Emory L.J. 409, *435

by governmental agencies, the inquiry into claimed equal protection violations has made unnecessary a separate consideration of the "coextensive" rights and remedies afforded by Title VIII. However, given the increased burden of proof which Washington v. Davis and Arlington Heights now place upon equal protection claimants, we suspect that Title VIII will undoubtedly appear as a more attractive route to nondiscriminatory housing, as litigants become increasingly aware that Title VIII rights may be enforced even without direct evidence of discriminatory intent. We conclude that, in Title VIII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response. [104]

[*436] The court of appeals accurately concluded that Title VIII disparate impact theory was largely a response to the fact that the Supreme Court had stripped lower courts of the ability to use disparate impact as a basis for constitutional relief. Moreover, the Rizzo court, for the first time, placed primary analytic reliance upon analogy to Title VII cases, rather than on equal protection analogies.

The court of appeals next considered whether the Arlington Heights II disparate impact theory of liability was appropriate and concluded that it was but for somewhat different reasons. The Rizzo court's basis for reading disparate impact into the FHA consisted of three major points. First, the court made much of the Supreme Court's remand to the Seventh Circuit in Arlington Heights I. The Rizzo court concluded that, "in remanding, rather than directing the dismissal of the Arlington Heights litigation, the Court at least implied that considerations other than those necessary for proof of equal protection violations must govern Title VIII claims." [105] Next, the court dismissed the notion that the language of the FHA, which proscribes discrimination "because of race," [106] would foreclose disparate impact liability, persuasively pointing out that the Supreme Court already had concluded that a Title VII case could lie based on the same statutory formulation in the language of Title VII. [107] After adverting to the legislative history of Title VIII, which it deemed "somewhat sketchy," [108] the court finally buttressed its holding with the belief that it was joining a number of other circuit courts of appeal in holding that the disparate impact standard was viable under the FHA. [109] In sum, it may [*437] fairly be said that the most persuasive basis for the Rizzo court holding was the fact that the "because of race" language from Title VIII (the FHA) was identical to language in Title VII (the Civil Rights Act of 1964).

Having found that a prima facie case could lie, the court turned to determining the circumstances under which a Title VIII defendant could justify the discriminatory effect caused by the challenged action or prac-

---

104    Rizzo, 564 F.2d at 146.

105    Id. at 147. The court reasoned: "If the same "impact-plus' test governed Title VIII actions, consideration on remand of the [FHA] claim would have been unnecessary and a waste of valuable judicial resources, factors which could not have been lost upon the Supreme Court." Id. This reasoning overlooks the fact that the Supreme Court takes seriously its duty to consider only the cases properly before it and issues previously reviewed by a court of appeals. Indeed, the opinion in Arlington Heights I specifically remarked that the court was procedurally bound to remand the statutory question. Arlington Heights I, 429 U.S. at 271.
The Rizzo court stretched by reading Arlington Heights I as conveying the high court's view that different considerations must (rather than could) govern the Title VIII claims.

106    42 U.S.C. 3604(a) (1994).

107    Rizzo, 564 F.2d at 147 ("The "because of race" language is not unique to 3604(a): that same language appears in Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2(h), yet a prima facie case of Title VII liability is made out when a showing of discriminatory effect (as distinct from intent) is established.").

108    Id. at 147. Because there is so little use in the legislative history, courts hardly ever advert to it in construing the FHA. The FHA disparate impact standard resembles a Federal "common law" doctrine operating within a statutory framework. See Rutherglen, Disparate Impact Under Title VII, supra note 19, at 1297 (making a similar argument about Title VII).

109    Rizzo, 564 F.2d at 148 n.31 (citing Arlington Heights II, 558 F.2d 1283 (7th Cir. 1977); Smith, 536 F.2d 231 (8th Cir. 1977); Black Jack, 508 F.2d 1179 (8th Cir. 1974); Kennedy Park Homes, 436 F.2d 108 (2d Cir. 1970)).

At this point, the reader may begin to notice the circularity of the citations: Arlington Heights II had cited the district court case in the Rizzo litigation; the Smith case is mere dictum, quoting from Black Jack, which itself relies on overruled equal protection cases; Kennedy Park Homes was expressly overruled by the Supreme Court. In fact, it could be argued that not a single case in the list is free from the criticism of relying upon cases that were criticized or overruled by the Supreme Court.

tice. Again, the court accurately traced the equal protection foundations for the earlier appellate decisions (which had been relied upon by the district court below), stating:

The district court, adopting the approach taken by the Eighth Circuit in United States v. Village of Black Jack, held that once the plaintiffs' prima facie Title VIII case had been made out, presumably under 3608(d)(5) [of the Act], the burden shifted to the defendant to justify its actions by proving a "compelling" interest. We believe that in placing this burden upon Title VIII defendants, the district court erred, and this without regard to the particular provision of Title VIII which was violated. "Compelling interest" analysis is not a part of Title VII doctrine, and we conclude that this heavy burden should be reserved not for Title VIII defendants, but for those who seek to justify denials of equal protection by purposeful discrimination. [110]

The court refused to apply in the FHA context the most rigorous equal protection burden reserved for those defending statutes that are suspect by virtue of explicit racial or other protected classifications - the burden applied in Black Jack. Instead, the court stated that Title VIII standards must emerge on a case-by-case basis, but could

be guided at the least by the following rough measures: a justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact. [111]

While this language appears to say that, once a prima facie case is shown, the defendant must prove that there is no less discriminatory alternative, the court went on to explain its formulation of the test in a manner suggesting that **[*438]** the standard, three-part burden-shifting test used in employment discrimination cases should apply and that the defendant was only required to produce evidence regarding the absence of alternatives, not to carry the burden of proof on the issue. [112]

Resident Advisory Board v. Rizzo was one of two significant early cases to analyze coherently the competing lines of disparate impact precedent - the equal protection line and the Title VII line - and to choose Title VII as the proper basis for going forward. The other important case is Betsey v. Turtle Creek Associates. [113] In Betsey, the Fourth Circuit, abandoning the line of equal protection cases, explicitly recognized the difference between the appropriate test for government and private defendants. [114] Instead, the court of appeals, citing to the then-most-current Supreme Court and Fourth Circuit Title VII cases, held that the private defendant in the case at bar needed to "prove a business necessity sufficiently compelling to jus-

---

[110]   Rizzo, 564 F.2d at 148 (citing Davis & Arlington Heights) (emphasis in original) (footnote omitted).

[111]   Id. at 149 (footnote omitted).

[112]   See Rizzo, 564 F.2d at 149 n.37 ("If the defendant does introduce evidence that no such alternative course of action can be adopted, the burden will once again shift to the plaintiff to demonstrate that other practices are available."). The Rizzo court appeared to have concluded that the defendant's business necessity burden included some obligation at least to offer some evidence of a good faith search for alternatives having lesser disproportionate effect. However, once some evidence is offered, the burden shifts to the plaintiff to prove that less discriminatory alternatives exist. In this reading of the disparate impact test - which in some sense conflates the business necessity and less discriminatory alternative prongs of the test - the Rizzo court's 1977 holding was similar to contemporary readings of the disparate impact test in the employment discrimination context. However, as discussed infra at notes 287-91 and accompanying text, these employment cases have long since been overturned or made moot by subsequent congressional actions.

[113]    736 F.2d 983 (4th Cir. 1984).

[114]   Id. at 988. The opinion discusses  Smith v. Town of Clarkton, 682 F.2d 1055 (4th Cir. 1982), in which the Fourth Circuit applied the four-part test from Arlington Heights II and distinguished the case before it, holding:

As... this analysis suggests, the Clarkton test has been applied only in situations where a public body is the defendant. Where, as here, a private entity is involved the analysis is more straightforward. The inquiry is whether either discriminatory intent or impact can be proved and, if either or both is proved, whether there is a legitimate non-discriminatory reason sufficient to overcome the showing of intent, or whether a compelling business necessity exists, sufficient to overcome the showing of disparate im-

47 Emory L.J. 409, *438

tify the challenged practice." [115]    **[*439]**  As discussed in Part II of this article, [116] the Title VII cases re-lied upon in Betsey applied a very rigorous "compelling business necessity" standard. While the Betsey court's reliance on the cited Title VII cases may have been appropriate in 1984, the standards articulated in those cases have long since been rejected or modified, both by Supreme Court opinions as well as by the Civil Rights Act of 1991. Nonetheless, Betsey remains significant because of its direct reliance on Title VII case law and its explicit recognition of the distinction between the tests applicable to private and government defendants.

### 3. 1.86 - 1992: Inconsistent Application of the Disparate Impact Models

The meaningful distinctions made by each court of appeals in the Rizzo and Betsey cases between the equal protection-based "government" disparate impact standard and the Title VII-based disparate impact standard failed to hold in the following years. Instead, new versions of disparate impact theory based on the equal protection line, the Title VII line, or combinations of both, proliferated. The result has been an increasingly incoherent body of case law.

The Sixth Circuit, in Arthur v. City of Toledo, [117] departed from the test for government defendants used in Arlington Heights, by de-emphasizing the intent component of the four-part disparate impact test. [118] Two years later, the Second Circuit Court of Appeals thoroughly revised the test in Huntington Branch, N.A.A.C.P. v. Town of Huntington. [119] In essence, the Huntington court **[*440]** attempted to create a new standard for disparate impact liability, while purporting to rely on both the legislative history of the FHA and Title VII case law. [120] The court employed a balancing test characteristic of constitutional adju-

---

pact. Obviously, a business necessity test is inapplicable in situations where the defendant is a public entity. The Clarkton formulation similarly has no application to private defendants.

Betsey, 736 F. 2d at 988.

[115]    Id. (citing Griggs, 401 U.S. at 431, and  Williams v. Colorado Springs Sch. Dist. #11, 641 F.2d 835 (10th Cir. 1981)). Of course, the Griggs case never used the term "compelling business necessity." The court also cited  Wright v. Olin Corp., 697 F.2d 1172, 1188 (4th Cir. 1982) and  Robinson v. Lorillard, 444 F.2d 791, 798 (4th Cir. 1971) two Title VII cases applying the "compelling business necessity" formulation that have since been expressly overruled by the Fourth Circuit. See discussion infra at notes 287-91 and accompanying text.

[116]    See infra notes 241-62 and accompanying text.

[117]     782 F.2d 565 (6th Cir. 1986).

[118]    In Arthur, the Sixth Circuit considered constitutional and Fair Housing Act challenges to the City of Toledo's rejection of con-tracts for low-income housing when a city-wide referendum repealed sewer extension ordinances necessary to build the housing. In holding that the racially discriminatory effect of the referendum did not violate the FHA, the court adopted a new analytic test in which it applied three of the four factors pronounced in Arlington II, dropping consideration of whether plaintiffs introduced any evidence of discriminatory intent. The court adopted this test not to diminish the importance of a finding of intent but be-cause, in its words, "plaintiffs-appellants should not receive 'half-credit' for discriminatory intent under their Fair Housing Act claim."  Id. at 575. Indeed, the court held that "absent highly unusual circumstances, the discriminatory effect of a referendum can-not establish a violation of the Fair Housing Act," because such a result would go "far beyond the intent of Congress and could lead courts into untenable results." Id. Thus, the Arthur decision really represented an attempt by the Sixth Circuit to avoid apply-ing disparate impact analysis as rigorously as the court did in Arlington Heights II, but courts citing Arthur have cited it as a ba-sis for broadening the application of the test. See, e.g.,  Mountain Side Mobile Estates Partnership v. HUD, 56 F.3d 1243, 1252  (10th Cir. 1995).

[119]     844 F.2d 926 (2d Cir. 1988). In so doing, the court also rewrote the law it had previously applied. In  Boyd v. Lefrak Orga-nization, 509 F.2d 1110 (2d Cir. 1975), cert. denied,  423 U.S. 896 (1975), the Second Circuit had held that a claim against a private defendant under the FHA could not be made merely on a showing of discriminatory effect and expressly rejected an analogy to Griggs. The court in Huntington stated that the continued validity of the Boyd holding was "a matter of considerable uncertainty." 844 F.2d at 934.

[120]    The court stated: "The disparate impact approach of Title VII cases is fully applicable to this Title VIII case brought against a public defendant" but proceeded to announce a whole new set of standards for determining liability and barely referred to Title VII case law except at the outset. Huntington, 844 F.2d at 934-36. The court first rejected any consideration of intent, drawn either from the Arlington Heights II test or Title VII case law. The court, quoting Black Jack, stated that "clever men may eas-ily conceal their motivations," and reasoned that the lower court's focus on determining whether the defendants' proffered justi-fications were "pretextual" "vividly demonstrates the extent to which an intent-based standard can infect an analysis and draw it away

dication [121] to strike down the zoning ordinance, a result that it appears to have concluded was necessary to achieve overarching public policy objectives. [122]

Variations of either the Arlington Heights II or Huntington government defendant disparate impact test have proved to be a fairly durable standard for courts reviewing challenges to zoning ordinances. These tests are frequently cited, albeit in a variety of versions, in the rash of cases under the Fair Housing Amendments Act of 1988 generated by operators of group homes for mentally disabled persons claiming status as protected class members by virtue of "handicap." [123]

[*441] While courts in cases involving government defendants can be said to have settled upon some variant of the Arlington Heights II test, perhaps as recrafted by Huntington, decisions applying a disparate impact test under the FHA or the ECOA to claims against private defendants demonstrated much less certainty about proper standards. Some of the relatively few cases involving private defendants decided in this period merely applied Arlington Heights II without giving any indication that the court was aware of or considered the government/private defendant distinction developed in Rizzo and Betsey. [124] Other courts relied more upon Title VII standards, either because the claim involved the ECOA effects test standards [125] or because the circuit in which the case was decided previously had rejected the Arlington Heights II standard. [126]

During this period, however, several important decisions questioned the application of disparate impact

---

from its proper focus." Id. at 935. The court ruled that requiring plaintiffs to meet the Arlington Heights II test to make their prima facie case "places too onerous a burden" on plaintiffs because "Congress intended that broad application of the antidiscrimination provisions [of Title VIII] would ultimately result in residential integration." Id. at 936.

[121]    The court's balancing test required it "to assess whatever justifications the [defendant] advances and weigh them carefully against the degree of adverse effect the plaintiff has shown," measured by the impact on a particular minority group and the "harm to the community generally by the perpetuation of segregation." Id. at 937.

[122]    The court rejected any close adherence to Title VII analysis and read the Rizzo case as requiring the defendants to sustain a burden of proof - not merely production - regarding the absence of less discriminatory alternatives. Id. at 939. (I have already suggested that this interpretation of Rizzo, which other courts have followed, is wrong. See supra note 103.) The court then held that justifications advanced by the defendant - first identified after the litigation began - were "post hoc rationalizations" that should be accorded little deference by courts because such a justification "could hardly have been significant if [the defendants] only thought of it after the litigation began." Id. at 940. As noted previously, the Supreme Court affirmed Huntington in a per curiam opinion that left open the question of the propriety of applying disparate impact analysis under the FHA. See supra, discussion at note 54.

[123]    See, e.g., Casa Marie, Inc. v. Superior Court of Puerto Rico, 988 F.2d 252, 269 n.20 (1st Cir. 1993) (adopting a mixed version of the Huntington test but also citing Arlington Heights II and Betsey); Potomac Group Home Corp. v. Montgomery County, 823 F. Supp. 1285, 1295 (D.Md. 1993) (citing Smith v. Clarkton); Oxford House, Inc. v. Town of Babylon, 819 F. Supp. 1179, 1182 (E.D.N.Y. 1993) (citing Huntington); Cason v. Rochester Hous. Auth., 748 F. Supp. 1002, 1007 (W.D.N.Y. 1990) (citing Huntington); Association of Relatives and Friends of AIDS Patients v. Regulations & Permits Admin., 740 F. Supp. 95, 106 (D.P.R. 1990) (citing Arlington Heights II test). Note that the use of the currently disfavored term "handicap" is statutory. 42 U.S.C. 3602(h) (1994).

[124]    See, e.g., Old West End Ass'n v. Buckeye Fed. Sav. & Loan, 675 F. Supp. 1100, 1105 (N.D. Ohio 1987), in which the court, in dismissing a motion for summary judgment, applied the Arlington Heights II standard to a claim of redlining in mortgage underwriting. The district court held that the plaintiff could withstand a motion to dismiss by presenting statistical evidence in support of its claim. See also United States v. Badgett, 976 F.2d 1176 (8th Cir. 1992) (applying Arlington Heights II test to private defendant).

[125]    See, e.g., Thomas v. First Fed. Sav. Bank, 653 F. Supp. 1330 (N.D. Ind. 1987), and other ECOA-based cases discussed infra at note 281 and accompanying text.

[126]    Bronson v. Crestwood Lake Section 1 Holding Corp., 724 F. Supp. 148 (S.D.N.Y. 1989), is probably the most well-reasoned. There, the court, in a rental discrimination case, cited Huntington but rested its holding that disparate impact applied to the private defendants "principally upon the long recognized parallel between Title VIII and Title VII jurisprudence." Id. at 154 (citing Griggs, 401 U.S. at 429-36). The court held "once the plaintiffs have succeeded in making a prima facie showing of discriminatory effect, the burden shifts to the defendants to present bona fide and legitimate justifications for their policies." Bronson, 724 F. Supp. at 154. See also discussion infra at note 384 and accompanying text.

47 Emory L.J. 409, *441

analysis to private defendants in FHA cases. In Brown v. Artery Organization, Inc. [127] Judge Harold Greene held that, in private defendant cases, proof of discriminatory effect alone is not enough to establish a violation of the FHA, and that some proof of discriminatory intent is necessary for a plaintiff to make a prima facie case. [128] In Village of Bellwood v. [*442] Dwivedi, [129] Judge Posner stated that the Arlington Heights II holding that proof of discriminatory effect alone establishes a prima facie case is "correct in the sense that effect is probative of intent" and that

it is one thing to require a municipal government to consider the impact of its zoning decisions on the racial composition of the municipality, another to require an individual broker to consider and take steps to prevent the aggregate impact of many brokers' efforts to give individual customers what those customers want individually, though not collectively. [130]

The court remanded, instructing the lower court that liability was permissible only upon a finding of an intent to discriminate. [131]

In sum, the government defendant disparate impact standard, rooted in equal protection doctrine, had been refined into a number of similar applications. However, it had proven to be an inappropriate standard for use in cases involving behavior by private defendants that, while potentially adverse to members of a protected class, did not appear to be motivated by discriminatory animus.

4. HUD's Attempt to Reformulate the Standard: Mountain Side and Its Progeny

In 1993, in a series of decisions and orders in a single case decided under the administrative adjudicative apparatus established under the Fair Housing Amendments Act of 1988, [132] the Secretary of HUD articulated a reformulated disparate impact test. In three separate orders, the Secretary used his administrative appellate authority to reverse an administrative law judge's [*443] decision to dismiss a disparate impact case and to mandate issuance of an order assigning liability to the respondents. [133]

The Mountain Side case involved a challenge to the eviction from a mobile home park of a family with children, based upon the park owners' rule limiting occupancy of individual units to no more than three per-

---

[127] 654 F. Supp. 1106 (D.D.C. 1987).

[128] Id. at 1115. Judge Greene concluded that permitting the plaintiffs to make a prima facie case solely on the basis of disparate impact was a bad idea for two reasons:

There is no indication that the Congress had in mind the far-reaching consequences of the application of such a rule on private landlords or developers. A rule which imposed the burden of responsibility on such individuals or entities for the racial effects of their housing conversions irrespective of their purpose or intent would not only render them responsible for consequences over which they have no control (e.g., the racial mix in the community as a whole),… it would also be likely to halt in their tracks most, if not all, private efforts to upgrade deteriorated housing stock in many of the large cities of this nation.

Id. at 1115-16 (emphasis in original). While the Brown opinion discussed the various tests applied by the courts in some detail, including the Betsey decision, it did not advert to Title VII case law at all. It is not clear whether the court believed that Title VII analogies were inappropriate or unnecessary based on the facts of the case. In any event, too much should not be made of Brown, which in essence simply rejects the Arthur v. City of Toledo refinement of the Arlington Heights II standard and states that a plaintiff must always present at least some evidence of intent before a case can be made.

[129] 895 F.2d 1521 (7th Cir. 1990).

[130] Id. at 1533.

[131] Id. at 1534.

[132] The 1988 amendments to the FHA added an administrative adjudicatory process under the administration of HUD. Fair Housing Act 810-812, 42 U.S.C. 3610-3612 (1994), providing for an administrative enforcement process by the Secretary of HUD, either on behalf of an individual aggrieved person or on the basis of the Secretary's own investigation. For a good introduction to these administrative procedures, see Leland B. Ware, New Weapons for an Old Battle: The Enforcement Provisions of the 1988 Amendments to the Fair Housing Act, 7 Admin. L.J. 59 (1993). See also, John M. Payne, Fair Housing for the 1990s: The Fair Housing Amendments Act and the Wards Cove Case, 18 Real Estate L.J. 307 (1990).

[133] Under the FHA, the Secretary "may review any finding, conclusion or order issued" by an administrative law judge (called "an initial decision") under the act's administrative process. 42 U.S.C. 3612(h)(1) (1994). HUD has issued regulations interpreting this section to permit the Secretary to "affirm, modify or set aside, in whole or in part, the initial decision or remand the ini-

47 Emory L.J. 409, *443

sons. HUD, on behalf of the evicted family, brought an administrative disparate impact charge alleging a violation of the FHA's prohibition against "familial status" discrimination. After a hearing, the administrative law judge (ALJ) dismissed the complaint based upon his finding that HUD, the charging party, had failed to establish a prima facie case of disparate impact. HUD failed, the ALJ held, because it relied exclusively on national census statistics to make its case. Even were a prima facie case to lie, the respondent park owners had established a legitimate business justification for the occupancy limitation. [134] On appeal, the Secretary reversed the ALJ on both bases. [135] First, the Secretary found that a prima facie case had been made by HUD, stating that the use of the national census statistics on family size was sufficient, and that, in the event the Respondent believed that the statistics were unreliable, he was "free to adduce countervailing evidence of his own." [136] Next, the Secretary found that the ALJ's analysis of the defendant's burden was erroneous, stating that there was "authority for the application of a standard of business necessity in Title VIII cases." [137]

On remand, the ALJ again found that defendants had adequately met their burden, applying a carefully reasoned disparate impact test based upon prevailing Title VII standards. [138] Again, the Secretary reversed the ALJ's [*444] decision, holding that the burden of proving "business necessity" required respondents to meet a much higher standard of proof than the ALJ's test required. [139] The Secretary first analyzed Title VII law, concluding: "Accordingly, under Title VII law, the business necessity test means that the policy or practice at issue must serve a necessary relationship to the employer's needs, not merely serve the employer's legitimate goals." [140] Next, the Secretary articulated his version of the "business necessity" showing required of a defendant in an FHA case. First, relying on Betsey v. Turtle Creek Associates, the Secretary held that defendants "must prove a business necessity sufficiently compelling to justify the challenged practice." [141] Second, the Secretary cited with approval language from Title VII cases to the effect that "only objective evidence, as opposed to the employer's mere speculation or subjective opinion, that a practice addresses an employer's job relatedness concerns can establish a legal rebuttal." [142] Third, the Secretary held that "post hoc rationalizations are accorded little weight by courts … and will be accorded little weight by this agency." [143]

---

tial decision for further proceedings." 24 C.F.R. 180.675(a) (1997). While this expansive interpretation has been upheld, see Mountain Side, 56 F.3d at 1248, it has also recently been questioned. See discussion of Pfaff case supra at notes 268-74 and accompanying text.

[134]    HUD v. Mountain Side Mobile Estates, (HUD Office of Admin. Law Judges 3-22-93), Fair Housing-Fair Lending (Prentice Hall) P25,043, at 25,441.

[135]    HUD v. Mountain Side Mobile Estates, (HUD Secretary 7-19-93), Fair Housing-Fair Lending (Prentice Hall) P25,053 ("Mountain Side I").

[136]    Id. at 25,493, quoting Dothard v. Rawlinson, 433 U.S. 321, 331 (1977). The Mountain Side I decision regarding use of national statistics was followed by a U.S. District Court in Fair Housing Council v. Ayres, 855 F. Supp. 315, 318 n.3 (C.D. Cal. 1994) ("plaintiffs support their showing with U.S. Census family statistics").

[137]    Mountain Side I, at 25,493 (citing Betsey, 736 F.2d 983).

[138]    HUD v. Mountain Side Mobile Estates, (HUD Office of Admin. Law Judges 9-20-93), Fair Housing-Fair Lending (Prentice Hall) P25,057, at 25,557. The ALJ, after reviewing the Civil Rights Act of 1991, stated a test for use in "landlord" cases: "First, the challenged practice must bear a demonstrable relationship to a housing provider's legitimate business interests; and second, objective evidence must establish that the means selected to serve those interests must be reasonably likely to effectuate those interests and not otherwise be unlawful." Id.

[139]    HUD v. Mountain Side Mobile Estates, (HUD Secretary 10-20-93), Fair Housing-Fair Lending (Prentice Hall) P25,064 at 25,619 ("Mountain Side II").

[140]    Mountain Side II, at 25,619, citing Fitzpatrick, 2 F.3d at 1112 (which the Secretary cited as "Patrick"). It is worth noting that this is not quite what the Eleventh Circuit said in Fitzpatrick: "The defendant is entitled to prevail if… the defendant shows that the practice or action is necessary to meeting a goal that, as a matter of law, qualifies as an important business goal." Fitzpatrick, 2 F.3d at 1118.

[141]    Mountain Side II, at 25,619 (emphasis in original) (citing Betsey, 736 F.2d at 988).

[142]    Id. (citing Albemarle Paper, 422 U.S. at 428, n.23).

[143]    Id., at 25,620 (citations omitted) (citing Huntington, 844 F.2d 926).

47 Emory L.J. 409, *444

HUD's Mountain Side decisions were important for at least two reasons. First, they signaled an intent by HUD, the agency charged with issuing regulations implementing the FHA, to read a disparate impact test into the Act that arguably was more rigorous than the Title VII standard from which it was drawn. Second, because of the general confusion surrounding application of the disparate impact standard under the FHA, and particularly the absence of general regulatory guidance, the Mountain Side decisions were widely viewed as providing a road map for courts and litigants to follow. [144] And, indeed, a number of district court decisions decided in the aftermath purport to follow the Secretary's opinions. [145] However, if the Mountain Side opinions were intended to dispel [*445] confusion regarding the appropriate test to be applied to private defendants under the FHA, they must be said to have failed. Post-Mountain Side cases continue to evince significant confusion in the application of the disparate impact standard to private defendants. [146]

In any event, two recent appeals court decisions decisively repudiate the Secretary of HUD's new business necessity test. In Mountain Side Mobile Estates Partnership v. Secretary of HUD, [147] the Tenth Circuit rejected the "compelling business necessity" standard advocated by HUD. Based upon its finding that the defendants' two reasons for the challenged three-person occupancy limit - sewer capacity limitations and concern for the quality of park life - demonstrated that the limit had a "manifest relationship" to housing in the defendants' mobile home park, the court held that the defendants had overcome the prima facie case "by evidence of legitimate, non-pretextual justifications." [148] In so holding, the court stated that "the Secretary went beyond the business necessity test that the Supreme Court has enunciated in Title VII cases and incorrectly required that Mountain Side demonstrate a 'compelling need or necessity.'" [149]

The court's Mountain Side analysis reflects the difficulties courts have in separating the government defendant fair housing precedent from the Title VII line. The court prefaced analysis of the merits by announcing that it would apply the modified Arlington Heights II test used by the Sixth Circuit in Arthur [*446] v. City of Toledo. [150] However, after discussing the three "government defendant" criteria in only the most general terms, [151] and failing to make any meaningful holdings under the criteria, the court abruptly switched to a discussion of the business necessity test, as applied in HUD's Mountain Side II decision and in Title VII. In short, the court's confusing hodgepodge of government defendant and Title VII

---

144    See Jaret Seiberg, A Trailer Park Case Worries Bank Lawyers, Am. Banker, Mar. 29, 1995, at 4.

145    In  United States v. Weiss, 847 F. Supp. 819 (D. Nev. 1994), the court dismissed a plaintiff's claim of disparate impact after nonetheless citing the Mountain Side II "compelling" business necessity formulation with approval. 847 F. Supp. at 830 n.29. The court in  Ayres, 855 F. Supp. at 315, characterized the Secretary's holding as applying "a standard akin to constitutional strict scrutiny: defendant must show use of the least restrictive means to achieve a compelling business standard." 855 F. Supp. at 318 (citing pages 8 through 12 of the Mountain Side II decision slip opinion). The Court stated that the decision was entitled to great weight because "HUD is the federal agency charged by Congress with interpreting and enforcing the Act, and it has special expertise in housing discrimination." Id. However, the Ayres court read Mountain Side II as holding that defendants bear the burden of demonstrating that there were no less discriminatory alternatives available, and, indeed, the defendant's failure to "deal with a number of less restrictive alternatives suggested by plaintiffs" was the basis on which the court found failure to meet the business necessity standard and granted plaintiffs' motion for summary judgment. Id. at 319. While HUD, during the course of the litigation and in its capacity as "charging party" argued that the respondent park owners bore the burden of showing less discriminatory alternatives, see Mountain Side I, supra, at 25, 491, such a holding was never made by the Secretary in any of his orders.

146    See  Congdon v. Strine, 854 F. Supp. 355 (E.D. Pa. 1994) (court analyzed a disparate impact claim against a private defendant using a combination of the two government defendant test variants). See also  United States v. Tropic Seas, Inc., 887 F. Supp. 1347 (D. Haw. 1995) (garbling prior precedent on the effects test under both Title VII and VIII);  Ayres, 855 F. Supp. at 315 (citing elements of government defendant cases and mis-stating the holdings in a HUD administrative law decision).

147     56 F.3d 1243 (10th Cir. 1995).

148     Id. at 1257.

149     Id. at 1254.

150    Discussed supra at note 118 and accompanying text.

151    See Mountain Side, 56 F.3d at 1252:

The three factors we will consider … are (1) the strength of the plaintiff's showing of discriminatory effect; (2) the defendant's interest in taking the action complained of; and (3) whether the plaintiff seeks to compel the defendant affirmatively to provide hous-

47 Emory L.J. 409, *446

analysis notwithstanding, its holding is based entirely on modern Title VII cases. [152]

The Ninth Circuit Court of Appeals also rejected the Secretary's approach in Pfaff v. HUD. [153] While the court rejected HUD's interpretations of the "compelling business necessity" standard, its holding is limited in scope to a rejection of HUD's formulation as applied to particular occupancy standards that might disproportionately affect families with children. The decision sidesteps the issue of whether a "compelling business necessity" standard could ever be applied in a FHA disparate impact case, referring to a number of decisions that apply such a standard, including Betsey and a number of the Title VII cases on which Betsey relied. On the other hand, in its holding the Court notes with favor the petitioner's reasons for the occupancy limitations as advancing a "legitimate business purpose." The Pfaff case really turned upon the court's finding that HUD had enforced its new, rigorous reading of the defendants' burden of persuasion in disparate impact claims in a manner that was arbitrary, capricious, and plainly unfair. [154] The ALJ in the Pfaff case had relied on Mountain Side II nearly exclusively in rendering its decision in the administrative portion of the case.

[*447]

C. Conclusion of Part One: Title VII Disparate Impact Theory Is the Proper Basis for Disparate Impact Liability for Private Defendants Under the FHA and the ECOA

The development of Fair Housing Act disparate impact precedent demonstrates the confusion surrounding the workings of the test in claims against private defendants. When confronted with a disparate impact claim against, say, a lender or property owner, courts seem to be attempting to fit a square peg into a round hole - applying the quasi-equal protection analysis that courts have read into the FHA to cases that lack one of the necessary elements of such an analysis, namely, a government actor. There are a host of other reasons, based both on plain statutory meaning and sound public policy, for determining that the government defendant line of FHA cases should be given no role in adjudicating a disparate impact case against a private defendant.

1. Reconciling the FHA Disparate Impact Standard with the ECOA

Many private defendant FHA cases involve claims under two statutes. FHA claims routinely are joined with claims under the ECOA in any case involving a "creditor" as the term is broadly defined in the ECOA. [155] The legislative history of the ECOA expressly instructs courts to use employment discrimination cases in construing the ECOA "effects test." [156] The language of Regulation B, by which the Federal Reserve Board has implemented the ECOA, echoes this explicit legislative citation of Title VII case law precedent as guidance in connection with disparate impact standards. [157] ECOA cases have followed the three

---

ing for members of a protected class or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

[152]    For example, the Court's articulation of the defendant's burden in defending a practice shown to have a disparate impact is taken word-for-word (although, extraordinarily, without quotation or citation) from the Supreme Court's decision in Ward's Cove. For a direct comparison of the two opinions see infra notes 266-67 and accompanying text.

[153]    88 F.3d 739 (9th Cir. 1996).

[154]    See discussion infra at notes 268-74 and accompanying text.

[155]    15 U.S.C. 1691a-(e) (1994). See discussion, supra notes 4 and 30.

[156]    See S. Rep. 94-589, 94th Cong., 2d Sess. (1976) ("Thus, judicial constructions of antidiscrimination legislation in the employment field, in cases such as Griggs v. Duke Power Company, 401 U.S. 424 (1971), and Albemarle Paper Company v. Moody (U.S. Supreme Court, June 25, 1975) [422 U.S. 405], are intended to serve as guides in the application of this Act, especially with respect to the allocations of burdens of proof.")

[157]    See 12 C.F.R. 202.6(a), n. 2 (1997) ("The legislative history of the Act indicates that the Congress intended an "effects test" concept, as outlined in the employment field by the Supreme Court in the cases of Griggs v. Duke Power Co., 401 U.S. 424 (1971) and Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness.")

47 Emory L.J. 409, *447

-prong private defendant test established under Title VII law. [158] At least as    [*448]  applies to creditors (which, under the broad ECOA definition, includes lenders and, some could argue, property insurers and property owners evaluating potential lessees using financial information), any effects test claim brought under the ECOA must be evaluated by resort to Title VII law. In the event a FHA claim were joined to the ECOA claim, it would be extraordinarily difficult and needlessly confusing to apply some version of the government defendant test to the very same claim. In such cases, courts almost always apply a disparate impact standard derived from Title VII. The fact that the government defendant test has been mistakenly applied by a number of courts to cases that did not involve the ECOA (primarily cases against private property owners) has obscured the fundamental analytic flaw in transferring the government defendant analysis to the private arena.

2. Federal Recognition of the Title VII Analogy

Congress and the Federal agencies responsible for interpreting and enforcing the FHA have recognized that the appropriate disparate impact test for application, at least to private defendants, derives from analogies to Title VII. For example, in the legislative history accompanying the most recent amendments to the FHA, Congress used language recognizing the "business necessity" defense. [159] Both the briefs filed by the Department of Justice on HUD's behalf in the Mountain Side case and more recent HUD regulatory statements adopt an analysis drawn from a pure Title VII model. [160] Moreover, a "policy statement" issued by a multi-agency Federal task force in 1994 [161] also employs the Title VII framework in describing how the disparate impact standard would be applied to FHA and ECOA mortgage lending cases.

 [*449]

3. Disparate Impact Doctrine Founded on Equal Protection Concepts Cannot Sensibly Be Applied to Private Defendants

In the final analysis, however, the best reason for applying the Title VII model, as opposed to the government defendant model, to private defendants is because it makes sense. In the government defendant model, as exemplified by Black Jack, Arlington Heights II, and Huntington, the court reviews a government action or measure, and essentially inquires whether a government policy that perpetuates segregation should be allowed to stand when reviewed under a standard akin to strict scrutiny. These are "equal protection" cases in the guise of statutory interpretation. The language of the cases suggests that the courts are seeking to use the law to intervene in local government decisionmaking where it inhibits integration. While the cases often pay lip service to Title VII cases as a basis for action under the FHA, they in fact are employing a "balancing" model drawn from equal protection. For instance, Huntington, which is the best example of this type of decision, relied to a significant degree on a law review comment call-

In June 1995, the Federal Reserve Board staff amended its Regulation B Commentary, adding the following (new language italicized): "Effects test. The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964  (42 U.S.C. 2000e et seq.), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991  (42 U.S.C. 2000e-2)." 12 C.F.R. Part 202, Supp. I, Official Staff Commentary, Comment 6(a)-2 (emphasis added).

[158]    See, e.g.,  Thomas v. First Fed. Sav. Bank, 653 F. Supp. 1330 (N.D. Ind. 1987), discussed infra at note 281;  Cherry v. Amoco Oil Co., 490 F. Supp. 1026 (N.D. Ga. 1980).

[159]    The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity… which relate to the financial security of the transaction or the protection against default or diminution in value of the security." H.R. Rep. 100-711, 100th Cong., 2d Sess. (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2191.

[160]    For a discussion of the DOJ brief, see infra note 310 and accompanying text. For HUD's analysis, see infra note 312 and accompanying text. While the Federal agencies are on the right track in using Title VII analogies, some federal agency interpretations of Title VII and its judicial construction are flawed. See infra notes 292-97 and 362-64 and accompanying text.

[161]    Joint Policy Statement, supra  note 5, at 18,269. The Joint Policy Statement's discussion of disparate impact doctrine, while notoriously obscure, clearly relies entirely on Title VII principles.

47 Emory L.J. 409, *449

ing for a balancing approach. [162]

The various tests announced in these cases seek to determine whether the government made reasonable efforts to tailor the zoning or other policy; thus the cases require the government to have engaged in a prescriptive search for less discriminatory alternatives. Judge Harold Greene's analysis in Brown v. Artery Organization, which never considers the analogy to Title VII, provides one of the few thoughtful responses to how a government defendant standard could work in a private context, and concludes that, absent some showing of discriminatory intent, it would not work at all. This is because, according to Judge Greene, the overarching impulse behind this line of cases is to "charge a governmental entity with violations of the statute if its actions - by way of regulations, ordinances, zoning decisions, or the like - have the effect of fostering or perpetuating racial segregation." [163] Judge Greene argues that holding private defendants to such a standard would go beyond Congress's intent and would hold private actors "responsible for consequences over which they have no control (e.g., the racial mix in the community as a whole)." [164]

 [*450]  The Tenth Circuit's decision in Mountain Side demonstrates the futility of attempting to apply the government defendant test to private actions, resulting in an incoherent analytic structure that ultimately "defaults" to the Title VII framework. There, the court began with a pronouncement that it intended to apply a variant of the government defendant approach. However, after ostensibly applying the test the court veers into an analysis of the business necessity defense, relying entirely on Title VII cases. While the court ended up applying the precedent in a manner consistent with recent Title VII decisions, the court's apparent lack of awareness of the substantive differences between the two standards it was applying means that the decision probably will foster further confusion about the proper disparate impact test in private defendant cases. Eventually, it is to be hoped, courts will begin to untangle these strands and analyze claims against private parties in a manner that does not make property owners liable for failing to effectuate Federal policies and social objectives over which they have no control.

II. Reconstructing the Disparate Impact Standard in Fair Housing and Lending Law: A Comparative Study

The review undertaken thus far only takes us part of the way. It provides a basis to conclude that the government defendant line of cases is not helpful in formulating a FHA/ECOA disparate impact standard for private defendants and that resort to analogies from Title VII cases provides better guidance.

However, this conclusion does not complete the task at hand. Surprisingly, given the public importance of the issues and the number of scholars engaged in the area, to date no meaningful attempt has been made to understand the evolution of Title VII disparate impact precedent and to assess the meaning of this evolution for the fair housing and lending area. The consistent failure of Federal regulatory and enforcement agencies to articulate meaningful guidance under the FHA or the ECOA is well documented. [165] More curious, perhaps, is the lack of [*451]  any serious attempt by the private bar or academics to engage

---

[162]    The article, Comment, Justifying a Discriminatory Effect Under the Fair Housing Act: A Search for the Proper Standard, 27 U.C.L.A. L. Rev. 398 (1979), is cited by the court several times. See Huntington, 844 F.2d at 934-35.

[163]    Brown, 654 F. Supp. at 1115.

[164]    Id. at 1116.

[165]    The Joint Policy Statement, supra note 5, is quite ambiguous relating to the parameters of the disparate impact standard: "The precise contours of the law on disparate impact as it applies to lending discrimination are under development ........ " 59 Fed. Reg. at 18, 269. And a recent GAO Report states: "Because no case involving the disparate impact test within the context of lending discrimination has been decided by a court, considerable controversy exists as to how the test should or will be applied in certain lending scenarios." Fair Lending-Federal Oversight and Enforcement Improved but Some Challenges Remain, GAO Report GAO/GGD -96-145, 69 (August 1996) ("GAO Report").

The GAO report attributes much of the uncertainty surrounding Federal standards under the FHA and the ECOA to the tendency of the Department of Justice to seek consent decrees from lenders subject to fair lending investigations:

To date, all but one of the cases brought by DOJ under the ECOA and FHA have been settled by consent agreements wherein the defendants have not admitted any wrongdoing. While these agreements serve a public purpose by speedily bringing cases to clo-

47 Emory L.J. 409, *451

in such analysis. [166]

In fact, fairly clear Title VII disparate impact liability standards are emerging in cases decided since the passage of the Civil Rights Act of 1991. Developing Title VII-based standards for use in disparate impact challenges under the FHA and the ECOA requires a specific review of the changed landscape since 1991, the major issues the 1991 Act left unresolved and, especially, the major post-1991 Act disparate impact cases.

A. The Civil Rights Act of 1991: Supreme Court Decisions and a Clean Slate

The importance of the Civil Rights Act of 1991 - of what was both determined and not determined therein - has been much discussed [167] but often misunderstood. The saga of the bill's tortured passage through Congress began **[*452]** in 1989, with the Supreme Court's controversial decision in Wards Cove Packing Co. v. Atonio. [168] In that case, the Court overturned a lower court ruling against a salmon cannery, setting forth a number of holdings that, depending on one's reading of Title VII, represented either a refinement of disparate impact standards or a wholesale reversal of the line of cases begun with Griggs v. Duke Power Co.

The Court in Wards Cove held that, as to the prima facie case, the plaintiffs had failed to identify an appropriate pool against which to measure the allegedly disparate impact, because they did not draw a comparison between the racial composition of those performing the jobs in question and the racial composition of a larger group of applicants or members of the relevant labor market qualified to perform those jobs. [169] In addition, the Court ruled that the plaintiffs, to make their case, must "demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." [170]

The most controversial holding in the case, though, involved the defendant's burden in rebutting a prima facie case of disparate impact. The Court held that the employer only needed to "produce evidence of a business justification for his employment practice" and that the plaintiff bore the burden of persuasion under all three prongs of the disparate impact test, including the "business necessity" prong. [171] The Court, perhaps consciously echoing the language of the Griggs decision, stated: "The touchstone of this inquiry is

---

sure, remedying the alleged wrongs, and highlighting the government's commitment to enforce the fair lending laws, they leave some complex legal issues unanswered."

GAO Report, at 67.

[166]     For example, a recent article discussing developments in fair lending law concludes, in comparing disparate impact standards as they existed prior to passage of the Civil Rights Act of 1991, that "it is less clear what standard will emerge under the 1991 Act." David E. Teitelbaum & Clarke D. Camper, Developments in Fair Lending, 51 Bus. Law. 843, 848 (1996). For further discussion of this curious lacuna, see discussion infra at notes 351-59 and accompanying text.

[167]     See generally articles collected in David A. Cathcart et al., The Civil Rights Act of 1991 (1993), and Lex K. Larson, Civil Rights Act of 1991 (1992). There are numerous interesting treatments of the passage of the Civil Rights Act of 1991, many of which attempt to influence future judicial interpretation by construing the voluminous legislative history, most of which the Act itself prohibits from being used to interpret its meaning. See, e.g., Rosemary Alito, Disparate Impact Discrimination Under the 1991 Civil Rights Act, 45 Rutgers L. Rev. 1011 (1993); Robert Belton, The Unfinished Agenda of the Civil Rights Act of 1991, 45 Rutgers L. Rev. 921 (1993); Jerome McCrystal Culp, Jr., Neutrality, the Race Question, and the 1991 Civil Rights Act: The "Impossibility" of Permanent Reform, 45 Rutgers L. Rev. 965 (1993); C. Boyden Gray, Disparate Impact: History and Consequences, 54 La. L. Rev. 1487 (1994); Steven R. Greenberger, A Productivity Approach to Disparate Impact and the Civil Rights Act of 1991, 72 Or. L. Rev. 253 (1993); Peter M. Leibold et al., Civil Rights Act of 1991: Race to the Finish - Civil Rights, Quotas, and Disparate Impact in 1991, 45 Rutgers L. Rev. 1043 (1993); Note, The Civil Rights Act of 1991: The Business Necessity Standard, 106 Harv. L. Rev. 896 (1993) ("Harvard Note"); Phillip S. Runkel, Note, The Civil Rights Act of 1991: A Continuation of the Wards Cove Standard of Business Necessity? 35 Wm. & Mary L. Rev. 1177 (1994).

[168]     490 U.S. 642 (1989).

[169]     Id. at 650.

[170]     Id. at 657.

[171]     Id. at 659-60.

47 Emory L.J. 409, *452

a reasoned review of the employer's justification for his use of the challenged practice." [172] Moving to the third prong of the test, the Court stated that the plaintiff would have the burden of persuading the factfinder that less discriminatory alternative practices existed. Such a demonstration would "prove that petitioners were using their tests merely as a "pretext' for discrimination," [173] and that,

if respondents, having established a prima facie case, come forward with alternatives to petitioners' hiring practices that reduce the racially disparate impact of practices currently being used, and petitioners re-fuse to adopt these alternatives, such a refusal would [*453] belie a claim by petitioners that their incumbent practices are being employed for nondiscriminatory reasons. [174]

Congressional reaction to Wards Cove, and to a number of other cases decided in the 1988 term that also were perceived as "rolling back" legal protections against employment discrimination, [175] was swift. The Senate and House of Representatives passed legislation known as the Civil Rights Act of 1990 [176] that expressly overruled Wards Cove and provided strong support for a broad reading of the disparate impact standard, but President Bush vetoed the measure, characterizing it as a "quota bill." [177] This set the stage for an epic struggle in the first session of the 102d Congress, in which the first bill introduced on January 3, 1991 was H.R. 1, the Civil Rights Bill of 1991. President Bush finally signed the Senate's version of the legislation into law on November 21 of that year. [178]

The battle over the bill focused primarily on the effect it would have upon the holding in the Wards Cove case. Consensus was achieved on language relating to the "particularity" requirement: the 1991 Act codified the requirement established in Wards Cove and other Supreme Court cases that the plaintiff must "demonstrate that each particular challenged employment practice causes a disparate impact." [179] This is an absolute requirement of the prima facie case, unless the plaintiff "can demonstrate ... that the elements of [defendant's] decisionmaking process are not capable of separation for analysis," in which case, "the decisionmaking process may be analyzed as one employment practice." [180] Similarly, the legislation adopted something very like the Wards [*454] Cove Court's version of the standard for less discriminatory alternatives, requiring that plaintiffs demonstrate the existence of alternative employment practices, with the additional requirement that plaintiffs cannot prevail unless they show that the employer "refuses to adopt such

---

[172]   Id. at 659. Compare with Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971) ("The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.")

[173]   Id. at 660 (quoting Albermarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975)).

[174]   Id. at 660-61.

[175]   For a discussion of the cases see Runkel, supra note 167, at 1177.

[176]   S. 2104, approved by the Senate on October 16, 1990, 136 Cong. Rec. S15396 (daily ed. Oct. 16, 1990) and the House on October 17, 1990, id. at H9994-95 (daily ed. Oct. 17, 1990).

[177]   See Statement on the Civil Rights Act of 1990, 26 Weekly Comp. Pres. Doc. 1031 (Oct. 20, 1990) ("As I have said before, in its current form, this bill is a quota bill."). See also Veto-S. 2104: Message from the President of the United States, S. Doc. No. 35, 101st Cong., 2d Sess. 2 (1990), 26 Weekly Comp. Pres. Doc. 1632 (Oct. 22, 1990).

[178]   One commentator states: "As a result of the controversy, the Civil Rights Act of 1991 endured a two-year odyssey that involved twenty-two days of hearings, introduction of at least ten major alternative bills, dozens of versions of these bills, a veto, a failed veto override, scores of hours of debate on the floors of the House and Senate, and hundreds of hours of meetings." Harvard Note, supra note 167, at 900-01 (citations omitted).

[179]   42 U.S.C. 2000e-2(k)(1)(B)(i) (1994). "The Act comes close to codifying the particularity requirement set forth in Wards Cove." Cathcart et al., supra note 167, at 23.

[180]   42 U.S.C. 2000e-2(k)(1)(B)(i) (1994). The official interpretive memorandum adopted as the sole legislative history of the Act states: "When a decision-making process includes particular, functionally-integrated practices which are components of the same criterion, standard, method of administration, or test,... the particular, functionally-integrated practices may be analyzed as one employment practice." 137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991) (interpretive memorandum). This exception to the particularity requirement is called "cumulation" and is discussed infra at notes 202-05 and accompanying text.

47 Emory L.J. 409, *454

alternative employment practice." [181] However, while the formulation is similar to Wards Cove, the Act specifically reverted to pre-Wards Cove law "with respect to the concept of "alternative employment practices.'" [182]

The heated Congressional debate over the Civil Rights Act of 1991 largely focused on settling the question of the precise burden that should fall upon the party defending against a prima facie disparate impact case. In other words, Congress was locked in a struggle to determine both the meaning of the totemic phrase "business necessity" - first used in Griggs and later glossed to mean "legitimate business justification" in Wards Cove - and the evidentiary standard to which the defendant's proffered justification would be held.

Congress resolved the latter question rather easily, codifying the requirement that once a plaintiff makes a prima facie showing, the plaintiff will prevail if "the respondent fails to demonstrate [183] that the challenged practice is job-related for the position in question and consistent with business necessity." [184] However, the congressional negotiators were unable to develop a definition of "business necessity," or of the entire surrounding phrase, that adequately captured the defendant's burden. As pointed out in a section-by-section analysis of the final bill entered into the record by Senator Dole, [185] during the course of the legislative process nine different definitions of "business necessity" were offered in one form or another and ultimately discarded. [186]

In the end, the legislative attempt to provide a clear standard for the business necessity test appears to have failed: neither "job related" nor "consistent with business necessity" was defined anywhere in the final legislation. The only in [*455] terpretive guidance on which Congressional negotiators could agree was that the intent of the law was for the term "business necessity" to have the meaning developed in Supreme Court decisions prior to Wards Cove. The interpretive memorandum that Congress declared to be the exclusive legislative history of the law [187] states: "The terms 'business necessity' and 'job-related' are intended to reflect the concepts enunciated by the Supreme Court in Griggs v. Duke Power Co… and in the other Supreme Court decisions prior to Wards Cove Packing Co. v. Atonio." [188]

Many parties and observers have read this language to mean that the only decisive effect of the Civil Rights Act of 1991 in the area of business necessity was to reverse legislatively the change that Wards Cove wrought in disparate impact procedure - the burden of proof - while leaving to the courts the knottier question of what the defendant would actually be required to prove to escape liability. [189] However, Congress clearly decided something about the substance of the defendant's burden. The interpretive

---

[181]    42 U.S.C. 2000e-2(k)(1)(A)(ii) (1994).

[182]    42 U.S.C. 2000e-2(k)(1)(C) (1994).

[183]    The term "demonstrate" is used throughout the sections of the Civil Rights Act of 1991 dealing with disparate impact and was defined in the Act to mean "meets the burdens of production and persuasion." 42 U.S.C. 2000e-2(m).

[184]    See Civil Rights Act of 1991, 42 U.S.C. 2000e-2(k)(1)(B)(ii).

[185]    The section-by-section analysis represented the views of a host of Republican senators and was later declared by the President to represent the authoritative interpretation for purposes of the executive branch. See 137 Cong. Rec. S15472-S15477 (daily ed. Oct. 30, 1991) ("Dole Floor Analysis").

[186]    Dole Floor Analysis, 137 Cong. Rec. at S15474.

[187]    So hotly contested was the issue of the meaning of business necessity that Congress took the extraordinary and dubious step of amending the final bill to provide that "no statements other than the interpretive memorandum shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any provision of this Act that relates to Wards Cove-Business necessity/cumulation/alternative business practice." Civil Rights Act of 1991, Pub. L. No. 101-166, 105(b) Stat. 1071 (1991).

[188]    See 137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991).

[189]    See the statement of Senator Nancy Kassebaum, a moderate Republican senator who, along with Senator John Danforth and other moderate Republicans, was essential in brokering the compromise on business necessity that left the main question unanswered: "Having been the subject of so much legal wrangling, the definition of business necessity is now left undefined. Instead of creating new legal terms in anticipation of every possible future circumstance, we have left the interpretation to the courts.

47 Emory L.J. 409, *455

memorandum clearly confines the source that courts could look to in determining the meaning of the sub-ject phrases to previous decisions of the Supreme Court. There are two important, if subtle, points that need to be understood about this agreed-upon language in the interpretive memorandum. First, the lan-guage strongly suggests that the thousands of lower court cases interpreting "business necessity" decided prior to [*456] Wards Cove no longer serve as operative Title VII precedent. [190] Second, the lan-guage appears to have been carefully crafted to permit the courts to rely upon the plurality portion of Jus-tice O'Connor's opinion in Watson v. Forth Worth Bank and Trust. [191] The federal courts appear to agree with this reading of the interpretive memorandum, since they have continued to cite the Watson plu-rality with great frequency. [192]

The difficulty, of course, is that the Supreme Court's decisions preceding Wards Cove were not entirely uni-form but rather developed over time. Thus, while some commentators believed that Congress simply had "reversed" Wards Cove and reinstated the Griggs standard, it appears that the courts have concluded that something very different happened. The interpretive memorandum in essence brings courts not all the way back to Griggs, but instead to the entirety of Supreme Court decisions prior to Wards Cove, the most re-cent of which happens to be Watson. While some scholars expected the older, more rigorous business ne-cessity standard to be "reinstated," it is clear that something more closely approximating the "legitimate business justification" standard set forth in Wards Cove is emerging. [193] Indeed, one of the chief points of debate immediately prior to and following passage of the bill was whether the [*457] business neces-sity formulation articulated in Wards Cove had been overruled at all. [194]

---

While not ideal, this represents a significant improvement over earlier versions of the legislation." 137 Cong. Rec. S15463 (daily ed. Oct. 30, 1991). See also Cathcart et al., supra note 167, at 27 ("Congress imposed on employers, the bar, and the courts the bur-den of determining both the degree of necessity and the extent of job relatedness required for a showing of business necessity in a disparate impact analysis"); Belton, supra note 167, at 925 ("As a result, the 1991 Act contains numerous ambiguities and unre-solved issues"); Culp, supra note 167, at 969 ("Despite the enactment of the most detailed Civil Rights statute ever, the 1991 Civil Rights Act leaves a great deal of unchecked discretion in the hands of federal judges and juries."); Greenberger, supra note 167, at 292 ("On the whole, it is fair to say that, to a significant degree, the Act leaves disparate impact law in the state of confusion in which it has existed since its inception."); Harvard Note, supra note 167, at 896 ("The Act is poorly written and delegates a great deal of responsibility for the development of doctrine to the courts.").

[190]    See Charles A. Sullivan et al., Employment Discrimination 4.1A, at 64 (1992 Supp.) ("Because of the plain meaning of [the 1991 Act] and the focus of the Interpretative Memorandum on Supreme Court decisions only, these lower court decisions have lost their authority both as to what the terms mean and whether both are necessary elements to the employer's defense.").

[191]    487 U.S. 977 (1988). Support for both of these points is found in Senator Hatch's discussion of the language. See 137 Cong. Rec. S15317 (daily ed. Oct. 29, 1991) (remarks of Sen. Hatch):

It is important to note that this formulation [of the stated purposes of the Act] refers to Supreme Court decisions, not to narrower notions of Supreme Court holdings. The choice of the broader reference to decisions was a deliberate one. Nor are lower court decisions to be the Supreme Court's future guide.

The remarks of Senator Hatch following this passage, which dwell extensively on the Watson plurality opinion, make clear that he regarded Congress to have understood the term "decisions" as having a meaning inclusive of plurality opinions.

[192]    See supra note 39.

[193]    See Runkel, supra note 167, at 1207 (citations omitted), which presciently states:

What is truly startling about the Civil Rights Act of 1991 is that so many observers confidently state that the Act overturns Wards Cove, even while noting the Act's ambiguity. These observers see litigation of the business necessity standard as inevi-table but also see a return to Griggs, or to some standard very similar to Griggs, as equally inevitable. Regardless of the desirability of such an outcome, is such a conclusion really that obvious? A more extensive look at this issue reveals that the Bush Administration may have been right after all: the Wards Cove standard of business necessity is here to stay.

[194]    The Republicans argued that it had not been overruled, because it was basically similar to the Supreme Court decisions prior to Wards Cove. The Dole Floor Analysis stated:

The bill is no longer designed to overrule the meaning of business necessity in Wards Cove… Instead, the bill seeks to codify the meaning of "business necessity' in Griggs and other pre-Wards Cove cases - a meaning which is fully consistent with the use of the concept in Wards Cove.

Dole Floor Analysis, 137 Cong. Rec. at S15475 (daily ed. Oct. 30, 1991). The Dole Floor Analysis received executive approval in the President's Signing Statement accompanying the Civil Rights Act of 1991. President Bush, in this statement, instructed that the Dole Floor Analysis was to serve as the "authoritative interpretive guidance by all officials in the executive branch with re-

47 Emory L.J. 409, *457

The emerging answer is that, by and large, federal courts continue to view Wards Cove as good law, except for its holding allocating the burden of persuasion on business necessity to the plaintiff. [195] While a number of federal cases decided in the immediate aftermath of the bill's passage characterized the Act as having "questioned" or "overruled" Wards Cove generally [196] and numerous commentators announced the same opinion, [197] the vast majority of [*458] federal decisions confirm that the basic statements of law set forth in the decision - but for the burden of persuasion - remain viable. [198]

B. Applying the Emerging Standards of Employment Discrimination Law to Cases Under the FHA and the ECOA

With this background, it is possible to delineate the outlines of a disparate impact standard for private defendants, particularly lenders and other creditors, under the FHA and the ECOA. The analytic approach here will follow the three-prong disparate impact test. First, we set out the standards emerging in employment discrimination cases - standards derived primarily from federal cases decided after the Civil Rights Act of 1991 or from Supreme Court cases decided prior to Wards Cove. We resort exclusively to these sources when reviewing the issue of how courts are interpreting the defendant's burden in disparate impact cases ("job related" and "consistent with business necessity") because, in accordance with the Civil Rights Act of 1991, these are the two bodies of case law that can be properly considered binding precedent regarding this issue. Next, for each of the three "prongs," we provide a corresponding analysis of relevant authority under FHA or ECOA cases, regulations or legislative history, consciously excising all reliance on the "government defendant" line of cases, which we have previously argued are neither germane nor helpful in re-

---

spect to the law of disparate impact as well as the other matters covered in the documents." President's Statement on Signing the Civil Rights Act of 1991, 27 Wkly. Comp. Pres. Doc. 1701, 1702 (Nov. 21, 1991). For an interesting discussion of the development of these attempts to create "executive legislative history," see Runkel, supra note 167, at 1204 n.180 and articles cited therein.

195    See, e.g., Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1118 n.5 (11th Cir. 1993) (changes in the burden of proof standard relating to the business necessity defense "were statutorily reversed by the Civil Rights Act of 1991.") But see Barnett v. Technology International, Inc., 1998 U.S. Dist. LEXIS 4828 (E.D. Va. Apr. 8, 1998), in which the court, in dismissing a disparate impact claim under Title VII, recited the three-prong test and stated that the defendant's burden was to "produce evidence that its policy is job-related, that is, the 'challenged practice serves, in a significant way, the legitimate business goals of the employer,'" and that the plaintiff "of course, has the ultimate burden of persuasion." 1998 U.S. Dist. LEXIS 4828 at *21 (citing Wards Cove and Watson). The court here is in plain error: The Civil Rights Act of 1991 clearly reversed this aspect of Wards Cove and assigned to the defendant the obligation to "demonstrate" (that is, carry the burden or production and persuasion) business necessity. See supra note 183 and accompanying text.

196    See, for example, Cook v. Billington, 59 Federal Employment Cases 1010 (D.D.C. 1992), in which the court refused to apply the Civil Rights Act of 1991 retroactively and held that a Title VII disparate impact claim had been established under the standards of Wards Cove. In discussing whether the Act would apply, the court stated that, in the Act, "Congress questioned the Wards Cove analysis and established a more lenient legal standard for disparate impact claims." Id. at 1011. This dictum, however, merely adverts to the law's effect without indicating the extent to which the court believed Wards Cove had been overruled.

197    See the commentary made in the weeks immediately following the bill's enactment, cited in Runkel, supra note 167, at 1207-08 n.196. However, it should be noted that many of the cases relied on in the cited footnote do not entirely stand for the proposition for which they are cited. For example, the quotation from Cova v. Tucson Police Dep't, 783 F. Supp. 458, 472 (D. Ariz. 1992) is somewhat misleading; the full passage cited states only that the 1991 Act overruled Wards Cove on the issue of the burden of persuasion, not that the Griggs standard applies entirely.

198    See EEOC v. Steamship Clerks, 48 F.3d 594, 601 n.6 (1st Cir. 1995) (citations omitted) ("While Congress passed the 1991 Act partly in an effort to nullify certain aspects of the Court's opinion in Wards Cove, our reliance on Wards Cove is limited to portions of the opinion not affected by this legislative backlash."); Hiatt v. Burlington N. R.R., 859 F. Supp. 1416, 1431 n.13 (D. Wyo. 1994) ("While portions of the Wards Cove Packing decision dealing with the burdens of proof in a disparate impact case were expressly overturned by Congress in the 1991 Amendments... that case is still valid authority for its recitation of the elements of a disparate impact claim.") (deciding a case under the Age Discrimination in Employment Act (ADEA)). See also, Edwards v. Wallace Community College, 49 F.3d 1517, 1520 (11th Cir. 1995); Appleton v. Deloitte & Touche, LLP, 168 F.R.D. 221 (M.D. Tenn. 1996); Diehl v. Xerox Corp., 933 F. Supp. 1157 (W.D.N.Y. 1996); Donnelly v. Rhode Island Bd. of Governors for Higher Educ., 929 F. Supp. 583 (D.R.I. 1996), aff'd, 110 F.3d 2 (1st Cir. 1997); Fickling v. New York State Dept. of Civil Serv., 909 F. Supp. 185 (S.D.N.Y. 1995); Nash v. Consolidated City of Jacksonville, 895 F. Supp. 1536 (M.D. Fla. 1995), aff'd, 85 F.3d 643 (11th Cir. 1996); Rudder v. District of Columbia, 890 F. Supp. at 23 (D.D.C. 1995), aff'd, 1996 U.S. App. LEXIS 30527 (D.C. Cir. 1996); Pelli v. Stone Savannah River Pulp and Paper Corp., 878 F. Supp. 1559, 1566 (S.D. Ga. 1995); Stutts v. Sears, Roebuck & Co., 855 F. Supp. 1574, 1580 (N.D. Ala. 1994).