solving claims against private defendants. [199]

**[*459]**

1. The Prima Facie Case Under Title VII

There are three primary elements in assessing whether a plaintiff has made a prima facie case under Title VII disparate impact standards, as modified and interpreted in the 1991 Civil Rights Act.

a.

Particularity.

First, "the plaintiff must begin by identifying the specific employment practice that is challenged." [200] The plaintiff's obligation to isolate a specific employer practice is referred to as the "particularity" requirement, which was codified in the Civil Rights Act of 1991. [201] The law specifies that this requirement applies in every case with an important caveat: "except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." [202] Thus, a plaintiff seeking to avoid the particularity requirement would have to "demonstrate" (that is, carry the burden of proof and persuasion) that the employer's procedures could not be analyzed separately.

This exception to the particularity requirement was one of the only subjects addressed in the "official" interpretive memorandum that serves as the exclusive legislative history of the statute. The memorandum states:

When a decision-making process includes particular, functionally-integrated practices which are components of the same criterion, standard, method of administration, or test, such as the height and weight requirements designed to measure strength in *Dothard v. Rawlinson, 433 U.S. 321 (1977),* the particular, functionally-integrated practices may be analyzed as one employment practice. [203]

Additional glosses were added to the legislative record as well. Of particular interest are statements added to the record reflecting the views of Senator Danforth and his original co-sponsors. [204] Their statement appears intended to dis **[*460]** courage employers from consciously failing to maintain records of employment decisions and practices or from adopting selection practices that are entirely subjective, based on the sensible conclusion that a defendant might use either of these tactics to inhibit a plaintiff's ability to iden-

---

199 Two appendices provide additional materials that will prove useful to courts and practitioners. Appendix A discusses the standards that courts and federal agencies use to assess statistical "validation" studies that employers offer as evidence that a challenged selection or promotion procedure is "job-related" under Title VII standards. Further, Appendix A shows how such standards could translate to the fair housing/lending arena. Appendix B provides a proposed disparate impact test for fair housing/ lending claims, using what we learn in the comparative study.

200 Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988). See also Steamship Clerks, 48 F.3d at 601 ("First the plaintiff must identify the challenged employment practice or policy, and pinpoint the defendant's use of it.").

201 42 U.S.C. 2000e-2(k)(1)(A)(i) (1998).

202 42 U.S.C. 2000e-2(k)(1)(B)(i) (1998).

203 137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991).

204 See 137 Cong. Rec. S15484 (daily ed. October 30, 1991) (Statement of Sen. Danforth) (citations omitted):

For example, if employment decision-makers cannot reconstruct the basis for their employment decisions, because uncontrolled discretion is given to a respondent's employment decision-makers, then the decision-making process may be treated as one employment practice and need not be identified by the complaining party as discrete practices. Similarly, if a complaining party proves to a judge that it is impossible for whatever reason to reconstruct how practices were used in a decision-making process, then the decision-making process is incapable of separation for analysis and may be treated as one employment practice and challenged and defended as such.

tify a "particular" practice causing disparate impact. [205] Courts interpreting Title VII in the years following passage of the Civil Rights Act of 1991 have faithfully adhered to the particularity requirement, and it is often the basis for dismissal of an employee's claim. [206]

b.

Identifying Disparate Impact Against the Proper Pool of Protected Persons.

The second component of the plaintiff's initial prima facie showing consists of identifying or demonstrating an adverse impact on a specific class of **[*461]** persons protected by the employment discrimination law. There are two components of this showing. First, an adverse impact against protected persons must be demonstrated. Then, the plaintiff "must show that the unfavorable consequences are borne disproportionately by the members of the class in comparison to non-members who are similarly situated." [207] In demonstrating the impact, one of the primary challenges for a plaintiff is to show that she has used a proper pool of persons against which to measure the alleged discriminatory effects of a challenged practice or policy. The Supreme Court's general guidance in this area is that, "while a statistical showing of disproportionate impact [need not] always be based on an analysis of the characteristics of actual applicants," [208] "statistics based on an applicant pool containing individuals lacking minimal qualifications for the job would be of little probative value" [209] and ""evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants' undermines the significance of such figures." [210]

Both Watson and Wards Cove cite Hazelwood School District v. United States, [211] in which the Supreme Court held that the proper comparison of pools of persons for measuring disparate impact was "between the racial composition of [the defendant's] teaching staff and the racial composition of the quali-

---

205 See infra notes 227-32 and accompanying text, discussing courts' treatment of subjective practices in class actions. On the other hand, Senator Dole's statement emphasized that the plaintiff must prove that the elements of the employer's practices cannot be separated for analysis: "Finally, the phrase "not capable of separation for analysis' means precisely that. It does not apply when the process of separation is merely difficult or may entail some expense - for example, where a multiple regression analysis might be necessary in order to separate the elements." Dole Floor Analysis, 137 Cong. Rec. at S15474.

206 See, e.g., Johnson v. Uncle Ben's, Inc. 965 F.2d 1363, 1372 (5th Cir. 1992) (holding that "the Civil Rights Act of 1991… did not alter the "particularity' aspect of Wards Cove as applied in this case," and dismissing the case because plaintiffs "failed to show the specific effects" of the challenged practices); accord, Appleton v. Deloitte, Touche LLP, 168 F.R.D. 221 (M.D. Tenn. 1996) (refusing certification of a class). See also Anderson v. Douglas & Lomason, Co., 26 F.3d 1277 (5th Cir. 1994), in which the Fifth Circuit affirmed the lower court's refusal to apply the disparate impact analysis because

> the plaintiffs identified no specific policy that allegedly caused a race-based imbalance in the number of persons who received promotions. Instead the plaintiff merely launched a wide-ranging attack on the cumulative effects of [defendants'] employment practices. The disparate impact model is not the appropriate vehicle from which to launch such an attack.

26 F.2d at 1284. See also Csicseri v. Bowsher, 862 F. Supp. 547, 574 (D.D.C. 1994), citing Watson: "Plaintiffs must begin by identifying the specific employment practices they wish to challenge. Moreover, they are charged with isolating the specific employment practices allegedly responsible for any statistical disparities." In Csicseri, Judge Gasch held that the plaintiffs had not sustained their burden in a disparate impact case against the General Accounting Office: "Plaintiffs have failed to isolate and identify any specific GAO practices which they feel cause discriminatory impact. Granted, they ran statistical analyses of every stage of the [promotion] selection process, but they do not identify any stage as being in and of itself discriminatory." Id. See also Vitug v. Multistate Tax Comm'n, 88 F.3d 506 (7th Cir. 1996); Graffam v. Scott Paper Co., 1995 U.S. App. LEXIS 17120 (1st Cir. July 14, 1995); Edwards, 49 F.3d at 1520; Steamship Clerks, 48 F.3d at 601; Donnelly, 929 F. Supp. 583; Sims v. Montgomery County Comm'n, 890 F. Supp. 1520, 1530 (M.D. Ala. 1995). For a case in which the plaintiffs met the "particularity" requirement see Jones v. Pepsi-Cola Metropolitan Bottling Co., 871 F. Supp. 305, 310 (E.D. Mich. 1994) (decided under pre-Civil Rights Act of 1991 standards).

207 Donnelly, 929 F. Supp. at 590 (citing Steamship Clerks, 48 F.3d at 601).

208 Dothard v. Rawlinson, 433 U.S. 321, 330 (1977).

209 Watson, 487 U.S. at 997.

210 New York City Transit Auth. v. Beazer, 440 U.S. 586, 587 n.29 (1979) (quoting Teamsters v. United States, 431 U.S. 324, 340 n.20 (1977)).

211 433 U.S. 299 (1977).

fied public school teacher population in the relevant labor market." [212] The Court's recitation of the "appropriate pool" requirement in the Wards Cove case is similar to Hazelwood [213] and has been relied upon in numerous decisions applying the Civil Rights Act of 1991. [214]

**[*462]**

c.

Causation.

Finally, the plaintiff must show that the identified practice actually caused the disparate impact in question. As a threshhold matter, for such a case to lie prior Supreme Court decisions have generally required a plaintiff to show that the particular employment practice or policy has a disparate impact upon the identified pool of persons protected under the Act that is "significant" or "substantial" enough to raise an inference of causation. [215] In employment discrimination cases, plaintiffs typically make this showing by the use of statistical analyses, [216] but the Supreme Court has steadfastly declined to adopt or endorse a particular statistical standard that could apply to show "significance" in every case. Indeed, the Supreme Court has taken pains to point out that, with respect to the types of statistical evidence that would be adequate to establish a prima facie case of disparate impact, the only "standard" to be used is a "case-by-case approach." [217] As a result, lower courts have adopted varying methods of determining statistical significance or testing whether statistical evidence is sufficiently probative to permit the finder of fact to conclude that the impact is not "the product of chance." [218] In rare cases, non-**[*463]** statistical evidence can be used to make the case, but usually only where the pool of protected class members is small because the employers never hired members of the class in the first place, an indication of "residues of past dis-

---

212 Id. at 308.

213 The Court stated:

It is such a comparison - between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs - that generally forms the proper basis for the initial inquiry in a disparate impact case. Alternatively, in cases where such labor market statistics will be difficult if not impossible to ascertain, we have recognized that certain other statistics - such as measures indicating the racial composition of "otherwise-qualified applicants for at-issue jobs" - are equally probative for this purpose.

490 U.S. at 650-51.

214 See, e.g., Donnelly, 929 F. Supp. at 590 ("Care must be taken to be sure that the comparison is one between "apples and apples' rather than one between "apples and oranges.'"). See also Vitug, 88 F.3d 506; Steamship Clerks, 48 F.3d at 601; Harding v. City of Houma, 1998 U.S. Dist. LEXIS 5208 (E.D. La. April 9, 1998) (citing Wards Cove and holding plaintiff "artificially diminished the qualified population of applicants"); Diehl, 933 F. Supp. 1157; Nash, 895 F. Supp. at 1542; Pelli, 878 F. Supp. at 1566.

215 See Watson, 487 U.S. at 995 (Plaintiffs in Title VII cases must show that "the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants"). See also Connecticut v. Teal, 457 U.S. 440, 446 (1982); Beazer, 440 U.S. at 584; Dothard, 433 U.S. at 329; Washington v. Davis, 426 U.S. 229, 246-47 (1976).

216 See Watson, 487 U.S. at 994 ("Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."). See also Donnelly, 929 F. Supp. at 592 ("Establishing such a causal relationship requires a showing that "it is the application of a specific or particular employment practice that has created the disparate impact under attack.' Wards Cove, 490 U.S. at 658.").

217 Again, Watson usefully summarized the position the Supreme Court and almost all lower courts have adopted when it stated: "At least at this stage of the law's development, we believe that such a case-by-case approach properly reflects our recognition that statistics "come in infinite variety and … their usefulness depends on all of the surrounding facts and circumstances.'" Watson, 487 U.S. at 996 n.3 (quoting Teamsters v. United States, 431 U.S. 324, 340 (1977)).

218 Graffam v. Scott Paper Co., 870 F. Supp. 389, 397 (D. Me. 1994), aff'd, 1995 U.S. App. LEXIS 17120 (1995). One court summarized the varying tests as follows:

There is no set mathematical threshold that must be met in order to show significant disparate impact. The Equal Employment Opportunity Commission (EEOC) generally regards a selection rate that is less than 4/5, or 80%, of the rate for the group with the highest rate as an indication of significant adverse impact. Other courts have stated that, if the difference between the expected

crimination" [219] or ongoing discriminatory behavior by the defendants. [220]

In sum, the prima facie case under Title VII allows a court only to eliminate random chance as the explanation for an adverse impact on a properly identified pool of borrowers and to leave the finder of fact with the open question of whether the impact is impermissible or is the result of legitimate business practices. Put plainly, the plaintiff has accomplished her initial task, and the defendant must now advance evidence regarding the legitimacy of the challenged practice. [221]

2. The Prima Facie Case Under the FHA and the ECOA

The cases against private defendants under the FHA and the ECOA that have discussed standards for the prima facie disparate impact case, and that do not employ the government defendant line of reasoning, are sparse relative to employment discrimination cases. However, they are generally supportive of the Title VII line of cases, particularly those decided in the last few years.

**[*464]**

a. Particularity.

The vast majority of cases alleging disparate impact under the FHA or the ECOA make no mention of the particularity requirement. In most cases, this is because any particularity requirement is met by the very nature of the case. The facts of the plaintiff's claim often make it clear that a single practice is being challenged, such as an occupancy restriction [222] or an eviction. [223] However, a number of courts in FHA or ECOA cases have held that "to establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific policy caused a significant disparate effect on a protected group." [224] In a recent

---

value and the observed number is greater than two or three standard deviations, then adverse impact has been shown. And one commentator has proposed that, in cases involving challenges to employment tests, courts should use the "test for difference between independent proportions.'

Richardson v. Lamar County Bd. of Educ., 729 F. Supp. 806, 816 (M.D. Ala. 1989) (citations omitted). In addition, another court's frequently cited measure of statistical significance is stated as follows:

Although the law has not set any precise level at which statistical significance can be said to be sufficient to permit an inference of discrimination, social scientists usually accept a study that achieves statistical significance at the .05 level… In other words, a study is found significant - and the hypothesis of chance is rejected - when there exists at most a one in 20 possibility that the observed result could have occurred by chance.

Segar v. Smith, 738 F.2d 1249, 1282 (D.C. Cir. 1984).

219 Nash, 895 F. Supp. at 1543.

220 See Steamship Clerks, in which the First Circuit, after first noting that the labor union defendants had failed to hire a single minority group member for many years, stated: "Given the unique factual mosaic from which the statistical scaffolding hangs, and the logical force of the conclusion that the numbers suggest, it would blink reality to conclude that a serious "sample size' problem lurks here." 48 F.3d at 605.

221 As one court neatly summarized:

When a plaintiff's statistics indicate a disproportionate [impact] for a protected group, there are three possible explanations for the discrepancy. First the disparity may be the result of unlawful discriminatory bias. Second, the disparity may have a legitimate and nondiscriminatory cause. Third, the disparity may be the product of chance. When a plaintiff demonstrates a significant statistical disparity in the [challenged practice], he or she has provided strong evidence that chance alone is not the cause of the [disparity]… What the standard deviation statistics do not determine is whether the more likely cause is a bias in the selection process or legitimate selection criteria.

Graffam, 870 F. Supp. at 397 (citations omitted).

222 Pfaff v. HUD, 88 F.3d 739 (9th Cir. 1996); United States v. Weiss, 847 F. Supp. 819 (D. Nev. 1994).

223 Betsey v. Turtle Creek Assocs., 736 F.2d 983 (4th Cir. 1984).

224 Mountain Side Mobile Estates v. HUD, 56 F.3d 1243, 1251 (10th Cir. 1995) (citing Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1242 (10th Cir. 1991)).

case,[225] the Fifth Circuit held that a plaintiff failed to establish a discriminatory effects claim because he did not specifically identify a policy, procedure, or practice of the defendant that had a disparate impact.[226]

As with the statutory exception in the Civil Rights Act of 1991,[227] there is some indication that courts in FHA cases will permit an exception to the particularity requirement in cases in which plaintiffs allege that the "practice" causing disparate impact consists of a defendant's delegation to its employees of subjective decision-making authority. In Buycks-Robertson v. Citibank Federal Savings Bank,[228] a district court judge certified a class in an action against a lender alleging redlining and discrimination in connection with the lender's home loan application approval process. The defendant lender had argued that its "lending decisions were, and are, the result of a highly individualized case-by-case underwriting process," and that the plaintiffs did not "challenge any particular underwriting criteria that applies [sic] generally to any class."[229] The court referred to Title VII cases in holding that a class action certification was warranted in cases where "the discrimination manifested itself… through entirely subjective decisionmaking processes."[230] While the court in the Buycks-Robertson decision never explicitly referred to the "cumulation" exception to the particularity requirement established in the 1991 Act, it relied **[*465]** on Title VII cases applying the exception to precisely the types of cases anticipated in the Act's legislative history - cases in which employers are suspected of facilitating discriminatory behavior by adopting highly discretionary practices that are "incapable of separation for analysis."[231]

But since certification permits a class action to move into full-blown discovery, this type of holding would incline potential defendants to disfavor granting significant discretion to individual employees or offices, in favor of more statistically based criteria that are applied in accordance with established parameters. Using the example of Buycks-Robertson, had Citibank established and enforced specific credit, collateral and other loan underwriting criteria that were supported with statistical analyses, each of these criteria presumably could have been separated for analysis and would have provided Citibank with a basis for challenging a plaintiff's general claim of discrimination on the basis of a failure to plead with particularity.[232]

b.

---

225 Simms v. First Gibraltar Bank, 83 F.3d 1546 (5th Cir. 1996).

226 Id. at 1555 ("The relevant question in a discriminatory effects claim against a private defendant … is whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a protected class.").

227 See supra notes 203-05 and accompanying text for a discussion of "cumulation."

228 162 F.R.D. 322 (N.D. Ill. 1995).

229 Id. at 329-30 & n.9.

230 Id. at 332 (quoting General Tel. Co. v. Falcon, 457 U.S. 147, 159 n.15 (1982)).

231 42 U.S.C. 2000e-2(k)(1)(B)(i). See, e.g., Hartman v. Duffy, 19 F.2d 1459, 1472 (D.C. Cir. 1994) (cited in Buycks-Robertson, 162 F.R.D. at 331). It is important to note that, procedurally, the court in Buycks-Robertson was not holding that the plaintiff class had made its prima facie case but only that the plaintiff had demonstrated adequate "commonality" among class members to warrant certification by alleging that Citibank's subjective decision-making process was the policy causing discrimination in the case of each class member. This dilemma, in which the court's holdings relating to certification may be premised on facts that might not be sufficient to make a prima facie case, but that nonetheless obligate the defendant to engage in discovery and defend a potentially broad class action, is a function of the procedures established for class actions under Rule 23 of the Federal Rules of Civil Procedure.

232 The court's analysis in Buycks-Robertson could be criticized fairly for failing to appropriately distinguish between the facts before it and the facts of the employment cases relied on by the court. While it is true that Citibank conferred some subjective discretion on its individual loan officers, it is almost certain that, in the case before the court, numerous specific rules were the operative reason for individual loan decisions in the plaintiff class. Such rules were in fact offered by defendants in response to the motion for certification, indicating that the plaintiffs in the case could separate these specific, published underwriting standards for analysis. The court's opinion suggests that the parties did not fully brief the court on the specific standards established in the Civil Rights Act of 1991 relating to particularity and cumulation.

Identifying Disparate Impact Against the Proper Pool of Protected Persons.

In the leading case of Betsey v. Turtle Creek Associates, [233] the Fourth Circuit held that a plaintiff had made a prima facie case by showing that a landlord's conversion of an apartment complex resulted in 54.3 percent of non-white tenants in the building receiving eviction notices, while only 14.1 percent of white tenants received notices. The court stated that the "statistical significance of these figures easily meets the standards employed by the Supreme Court" in two cases decided under Title VII of the Civil Rights Act of **[*466]** 1964. [234] Other courts have generally supported the notion that "statistical significance" is a required showing in these cases. [235] However, even more than **[*467]** in the Title VII area, there is a paucity of guidance on the measures of statistical significance courts should use in FHA and ECOA cases. [236]

---

233 736 F.2d 983 (4th Cir. 1984).

234 Id. at 988 n.4.

235 Williams v. 5300 Columbia Pike Corp., 891 F. Supp. 1169, 1178 (E.D. Va. 1995). In the Williams case, the court took pains to carefully examine statistical evidence regarding the effect of a challenged condominium conversion plan on protected class residents of the subject building. Two of the eight African-American residents were non-participants in the conversion plan, as compared to three out of ninety-two white residents. The court stated:

Disparities of this magnitude are inconclusive. They neither prove nor disprove discrimination. It seems likely that the statistical evidence presented here, without more, would not alone create a triable issue of fact on the ultimate question of whether there was discrimination. Yet, the numbers involved do cross, if only barely, the level required to establish a prima facie case and therefore avoid threshold dismissal of plaintiff's claim. There is a distinction noticeable among the various groups' participation rates that a reasonable observer might conclude was not due to mere chance.

Id. at 1180. The court granted summary judgment to the defendants on September 15, 1995. Williams v. 5300 Columbia Pike Corp., Civ. Action No. 95-225-A (Order, September 15, 1995). The Fourth Circuit, in affirming the district court's grant of summary judgment, held that the plaintiffs had no FHA claim as a matter of law, and in dicta questioned whether any disparate impact claim could be made under the FHA with such minimal statistical evidence. Williams v. 5300 Columbia Pike Corp., 1996 U.S. App. LEXIS 31004,*12 n.5 (4th Cir. December 3, 1996) (per curiam) ("Given our holding that the Fair Housing Act does not apply to this case, we have no occasion to pass upon the district court's holding that a prima facie case of disparate impact discrimination can be established where only two members from each class protected by the Fair Housing Act were detrimentally affected (two black units and two disabled units).").

A number of earlier ECOA cases also stand for the proposition that a statistical showing under the effects test must be "significant" to give rise to a prima facie case. See, e.g., Sayers v. General Motors Acceptance Corp., 522 F. Supp. 835, 839 (W.D. Mo. 1981); Cherry v. Amoco Oil Co., 490 F. Supp. 1026, 1030 (N.D. Ga. 1980) ("The conventional statistical methodology for showing disparate effect of a facially neutral test or practice is to compare representation of the protected class in the applicant pool with representation in the group actually accepted from the pool. If the statistical disparity is significant, then plaintiff is deemed to have made out a prima facie case"); Carroll v. Exxon Co., U.S.A., 434 F. Supp. 557 (E.D. La. 1977) (prima facie case requires showing that the creditor's practices "result in a selection of credit card holders in a pattern significantly different from that of the pool of applicants.").

The Sayers case was followed in Saldana v. Citibank Federal Savings Bank, 1996 U.S. Dist. LEXIS 8327 (N.D. Ill. June 12, 1996), in which the court, inter alia, held:

The prima facie case is conventionally proved by a statistical comparison of the representation of the protected class in the applicant pool with representation in the group actually accepted from the pool… [Plaintiff Saldana] claims Citibank's loan approvals in the [subject] neighborhood fell from 27 to 2 in the years 1990 to 1992. Saldana identifies the allegedly discriminatory policy, but fails to allege that the policy had a significantly greater impact on members of the protected class. Crucial to establishing her prima facie case is … evidence that loan approval rates dropped in [her neighborhood] while staying high in other neighborhoods. Without this type of evidence, Saldana is unable to establish a prima facie case.

Id. at *12-13. See also Simms v. First Gibraltar Bank, 83 F.3d 1546, 1555 (5th Cir. 1996) (plaintiff fails to make a prima facie case where he fails to "provide evidence, statistical or otherwise, that such policy, procedure, or practice had a significantly greater impact on members of a protected class.").

236 For example, Mountain Side, one of the leading recent cases, contains a fairly confused discussion of the requirement of statistical significance. Quoting Wards Cove, the court found that, "although discriminatory effect is generally shown by statistical evidence, any statistical analysis must involve the appropriate comparables." 56 F.3d at 1253. Holding that the appropriate comparables in the instant case involved the local housing market and local family statistics, the court held that the national level evidence offered by HUD to prove familial status disparate impact "is so far removed from the local arena that it is of little weight in our analysis." Id. In other words, the court allowed HUD to offer its evidence and basically assumed that a case had been made,

As to the issue of the proper pool of persons against which the plaintiff must measure disparate impact, the few FHA or ECOA cases that have addressed the issue suggest that, in these cases, the proper pool is the group of protected class members who were actually adversely affected by the challenged policy. [237] Recent lending discrimination cases support the view that the proper pool of applicants for measurement of statistical disparities is the group of financially qualified protected class members that actually applied for financing and were rejected. [238]

**[*468]**

c. Causation.

Similar to cases decided under Title VII, recent FHA or ECOA cases, though small in number, support the notion that "to support a prima facie case of disparate impact discrimination, plaintiffs must show that a specific policy caused a significant disparate effect on a protected class." [239] Given the general availability of data under the Home Mortgage Disclosure Act that could be used to demonstrate statistical dis-

---

but assigned its evidence very little weight. Part of the Tenth Circuit's confusion doubtless stems from the fact that it was applying Title VII-Wards Cove analysis to a disparate impact test that it believed was adopted from the government defendant model. See supra notes 150-52 and accompanying text. This confusion has been perpetuated in a recent case following Mountain Side's "hybrid" analysis, Snyder v. Barry Realty, Inc., 953 F. Supp. 217 (N.D. Ill. 1996). See also the court's discussion of statistical tests set forth in Williams, 891 F. Supp. at 1179-80 & n.21-23, and the Fourth Circuit's language criticizing the lower court, 1996 U.S. App. LEXIS 31004, *12 n.5.

237 For example, in the lending context, this group would be comprised of applicants for credit who, but for the challenged practice, were otherwise financially qualified for the credit in question. This reading of the cases is fairly consistent, beginning with Betsey v. Turtle Creek Associates, where the Fourth Circuit, in considering the case of tenants being evicted from a single building in a multi-building apartment complex, held: "The correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied… This simple verity renders consideration of the rest of the "local community', the rest of the [tenants in the other buildings in the complex], or even prospective applicants for space in Building Three irrelevant." 736 F.2d at 987.

238 In Cartwright v. American Saving & Loan Assoc., 880 F.2d 912 (7th Cir. 1989), the plaintiff sued a bank for failing to provide a rehabilitation mortgage loan in the amount sought, an amount that the bank deemed to be too high since the rehabilitations proposed by the plaintiff would make the property overvalued in comparison to other properties in the neighborhood. The plaintiff alleged that the bank's decision constituted "redlining" with a disparate impact on residents in the neighborhood. In support of the redlining claim, the plaintiff offered evidence that the bank had approved only two loans in the census tract in which the plaintiff's property was located. The Seventh Circuit rejected the plaintiff's claim, stating:

The obvious flaw in the appellants' "disparity" argument is their failure to identify any relevant statistical evidence of the number of residential loan applications American Savings received from financially qualified borrowers in any particular census tract or geographical area, and how many of those applications it rejected. Such proof lies at the very heart of any redlining allegation, as it is absurd to allege a discriminatory refusal to approve loan applications in a particular area without proof that qualified borrowers actually applied and were rejected.

Id. at 922. The Cartwright case was followed by the Court in Buycks-Robertson v. Citibank Federal Savings Bank, in which the court granted certification of the class action but then noted the distinction between the class certification burdens and the plaintiff class's much greater burden of moving forward:

On a motion for class certification we can assume that the allegations related to the class representatives' financial [qualifications] are true. On summary judgment, that assumption evaporates, and the class representatives must produce enough evidence to support a judgment in their favor. For instance, to survive summary judgment on allegations that Citibank was redlining, Plaintiffs will need to produce evidence challenging Citibank's assertion that the loans were denied to African-American applicants who lived in predominantly African-American communities due to inadequate financial qualifications. Without such evidence neither the Court nor a jury could infer - on the basis of statistics alone - that Citibank engaged in discriminatory redlining. Therefore, financial qualifications, at least for the class representatives, are a prerequisite for injunctive relief.

162 F.R.D. at 336 (citing Cartwright, 880 F.2d at 922). See also Mountain Side, 56 F.3d at 1253 (quoting Hazelwood School Dist. v. United States, 433 U.S. 299, 308 (1977)) ("[A] proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teachers population in the relevant labor market.").

239 Mountain Side, 56 F.3d at 1251 (citing Ortega, 943 F.2d at 1242). Perhaps the best illustration of this required element is found in the recent case of Saldana v. Citibank Federal Savings Bank. In that case, the court found that plaintiff had presented evidence of statistical disparities in the defendant lender's loan rejection rates between African-American and white loan applicants, as compared to the population differences in the Chicago area and that the average refinancing loan size was much smaller within the area in which the plaintiff alleged the lender to have engaged in redlining. The court concluded, however:

parities in the approval and rejection rates between different groups of loan applicants, the requirement of causation plays a critical role in ensuring that the prima facie disparate impact case **[*469]** will consist of more than a mere showing of statistical imbalances in population samples. [240]

3. The Business Necessity Standard Under Title VII

In the area of employment discrimination, as one court summarized, "When the plaintiff rests, declaring herself satisfied that she has established a prima facie case of disparate impact discrimination, the ball bounces into the defendant's court." [241] In other words, once a plaintiff makes a prima facie showing, a defendant bears the burden of rebutting the plaintiff's case. Actually, a defendant can meet its burden in one of two ways. First, the defendant "may attack the plaintiff's proof head-on, debunking its sufficiency or attempting to rebut it by adducing countervailing evidence." [242] While this is a defensive posture typical **[*470]** of most civil proceedings, it is unusual for Title VII disparate impact defendants to use it exclusively, as the defendant's failure to adequately impugn the case would entitle - though not require [243]

---

Here, [plaintiff] is successful in presenting some evidence in a statistical comparison between communities. However, these statistics are of a very general nature and do not relate specifically to the policy identified as having a discriminatory impact. Thus, [plaintiff] has failed to establish her claim under a disparate impact analysis.

Saldana, 1996 U.S. Dist. LEXIS 8327, at *13; quoted with approval and followed, A.B.&S. Auto Service, Inc. v. South Shore Bank of Chicago, 962 F. Supp. 1056, 1061 (N.D. Ill. 1997). See also Thomas v. First Fed. Sav. Bank of Indiana, 653 F. Supp. 1330, 1340 (N.D. Ind. 1987) ("The court holds that plaintiffs' statistical evidence is not sufficient as a matter of law to establish a violation of [the FHA or the ECOA]. Plaintiffs' attorneys offered no explanation of the meaning of these figures, they made no attempt to present evidence which would allow the court to draw any inferences from them.").

240 The question of whether statistics alone can be used to prove the existence of discriminatory bias in mortgage lending practices is the subject of a lively academic debate that legal scholars and commentators have largely ignored. See, e.g., Stephen M. Dane, Eliminating the Labyrinth: A Proposal to Simplify Federal Mortgage Lending Discrimination Laws, 26 U. Mich J.L. Reform 527, 530 (1993) (citing studies showing disparities in denial rates as proof that "race still plays the most significant role in determining who receives conventional mortgage financing"). An exception to the general failure to review the economic literature is found in Peter P. Swire, The Persistent Problem of Lending Discrimination: A Law and Economics Analysis, 73 Tex. L. Rev. 787 (1995), which provides a partial review of the economic literature, weighted towards those studies supportive of the thesis that discrimination is provable from empirical research. Courts and commentators seeking a more complete understanding of published research could start with: Brent W. Ambrose et al., Policy Issues Concerning Racial and Ethnic Differences in Home Loan Rejection Rates, 6 J. Housing Res. 115 (1995); James A. Berkovec et al., Race, Redlining and Residential Mortgage Loan Performance, 9 J. Real Estate Fin. & Econ. 263 (1994); Glenn B. Canner et al., Race, Default Risk and Mortgage Lending: A Study of the FHA and Conventional Loan Markets, 58 S. Econ. J. 249 (1991); James H. Carr & Isaac F. Megbolugbe, The Federal Reserve Bank of Boston Study on Mortgage Lending Revisited, 4 J. Housing Res. 277 (1993); George C. Galster, The Facts of Lending Discrimination Cannot Be Argued Away by Examining Default Rates, 4 Housing Pol'y Debate 141 (1993); David K. Horne, Evaluating the Role of Race in Mortgage Lending, FDIC Banking Review (Spring/Summer 1994); Alicia H. Munnell et al, Mortgage Lending in Boston: Interpreting HMDA Data, 86 Am. Econ. Rev. 25 (March 1996) (reissuing an earlier study published as Federal Reserve Bank of Boston, Working Paper No. 92-7 1992); Mitchell B. Rachlis & Anthony M.J. Yezer, Serious Flaws in Statistical Tests for Discrimination in Mortgage Markets, 4 J. Housing Res. 315 (1993); Michael H. Schill & Susan M. Wachter, Borrower and Neighborhood Racial and Income Characteristics and Financial Institution Mortgage Application Screening, 9 J. Real Estate Fin. & Econ. 223 (1994); Anthony M.J. Yezer et al., Bias in Estimates of Discrimination and Default in Mortgage Lending: The Effects of Simultaneity and Self-Selection, 9 J. Real Estate Fin. & Econ. 197 (1994); Gary S. Becker, The Evidence Against Banks Doesn't Prove Bias, Bus. Wk. (April 19, 1993). A raft of additional research papers can be found in Fair Lending Analysis, A Compendium of Essays on the Use of Statistics (Anthony M.J. Yezer ed., American Bankers Association 1995) and Mortgage Lending, Racial Discrimination, and Federal Policy (J. Goering & R. Wienk eds., Urban Institute Press 1996). For an account of the sometimes fractious debate over the meaning of statistical analyses of mortgage data, see Race, Mortgages and Statistics: The Unending Debate over a Study of Lending Bias, N.Y. Times May 10, 1996, at D1.

241 EEOC v. Steamship Clerks, 48 F.3d 594, 601-02 (1st Cir. 1995).

242 Id. at 602 (citing Dothard v. Rawlinson, 433 U.S. 321, 331 (1977)). See 42 U.S.C. 2000e-2k(1)(B)(ii) ("If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.").

243 See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). In St. Mary's, the Supreme Court held that, for purposes of disparate treatment cases, in order to prevail, a plaintiff must do more than put on a prima facie case and then disprove a defendant's proffered legitimate business rationale for a challenged practice. Rather, the plaintiff must prove that the defendant engaged in intentional discrimination. Id. at 518-19. "It is not enough, in other words, to disbelieve the employer; the factfinder must

- the factfinder to enter judgment for the plaintiff. [244] It is also unusual because the courts have proved somewhat liberal in judging the admissibility and probative value of statistical evidence introduced by plaintiffs in the absence of responsive statistical evidence from defendants. [245]

**[*471]** Thus, defendants typically resort to preparing their own responsive statistical analyses, which may be used to rebut the plaintiff's case but also almost always attempt to provide evidence for the second basis for refuting the plaintiff's case, under which, as one court has characterized it, "the defendant may confess and avoid, acknowledging the legal sufficiency of the prima facie case but endeavoring to show… that the challenged practice is job-related and consistent with business necessity." [246] It is this latter defensive pleading as to which defendants bear the burden of proof and persuasion and as to which there has been significant disagreement among commentators.

As noted, there are two sources of precedent to which courts should properly resort in determining the meaning of the statutory phrase "consistent with business necessity": Supreme Court decisions prior to Wards Cove and cases decided after the passage of the Civil Rights Act of 1991 which apply its standards. [247] Thus, a useful starting point for "picking up the trail" marked by the Civil Rights Act of 1991 is the most recent case prior to the Wards Cove decision in which a Supreme Court majority articulated a standard for

---

believe the plaintiff's explanation of intentional discrimination." Id. at 519 (emphasis added). Many commentators have viewed St. Mary's as yet another Supreme Court retrenchment on the scope of Title VII. See, e.g., Deborah C. Malmud, The Last Minuet: Disparate Treatment After Hicks, 93 Mich. L. Rev. 2229 (1995); Michael Selmi, Proving Intentional Discrimination: The Reality of Supreme Court Rhetoric, 86 Geo. L.J. 279 (1997), discussed, infra, at note 335.

[244] Steamship Clerks, 48 F.3d at 602.

[245] See, e.g., Bazemore v. Friday, 478 U.S. 385 (1986) (per curiam), in which the Court reversed a lower court decision dismissing a claim based on a multiple regression analysis of wage disparities between black and white employees of various state agricultural extension services. The lower courts had held that plaintiffs' regression analyses, which employed only four variables, were ""unacceptable as evidence of discrimination,' because they did not include "all measurable variables thought to have an effect on salary level.'" 478 U.S. at 400 (Brennan, J., concurring) (All members of the Court joined this portion of the per curiam opinion; the other concurrence and a dissent by Justice Brennan centered on a Fourteenth Amendment issue irrelevant to our analysis.). In reversing the appellate court's decision, the Supreme Court's basic conclusion was that, while the regression analyses might be weak, such a conclusion would only go to the probative value of the study and not to its admissibility as evidence of discrimination. In other words, if a defendant fails to answer evidence presented in a regression analysis (even a weak one) - either by pointing out significant flaws in the analysis or by presenting its own statistical analyses that disprove the plaintiffs' evidence - then the plaintiff's unanswered statistical analysis could be expected to be accepted as credible. The Court stated:

The Court of Appeals erred in stating that petitioners' regression analyses were "unacceptable as evidence of discrimination," because they did not include "all measurable variables thought to have an effect on salary level." The court's view of the evidentiary value of the regression analyses was plainly incorrect. While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors "must be considered unacceptable as evidence of discrimination." Ibid. Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.

Importantly, it is clear that a regression analysis that includes less than "all measurable variables" may serve to prove a plaintiff's case. A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252 (1981). Whether, in fact, such a regression analysis does carry the plaintiffs' ultimate burden will depend in a given case on the factual context of each case in light of all the evidence presented by both the plaintiff and the defendant. However, as long as the court may fairly conclude, in light of all the evidence, that it is more likely than not that impermissible discrimination exists, the plaintiff is entitled to prevail.

Id at 400-01. See also Diehl, 933 F. Supp. at 1157, in which the court, in the course of dismissing the plaintiffs' claims, criticized the plaintiffs' expert witness for failing to undertake a multiple regression analysis, even though the expert determined that it would not be "helpful." The Court stated, "Dr. Honig's categorical refusal to test the reliability of the skills and performance data undermines her conclusions and renders them inadequate as a matter of law." Id. at 1169. In other words, the Diehl case illustrates the flip-side of the court's desire to review statistical evidence; if the plaintiff fails to offer a statistical analysis, the court may hold against it.

[246] Steamship Clerks, 48 F.3d at 602.

[247] See supra notes 190-91 and accompanying text. Post-1991 cases also must confront the issue of whether particular provisions of the 1991 Act apply retroactively to cases involving actions occurring before the effective date of the law. See Langdraf v. USI Firm Prods., 511 U.S. 244 (1994); Association of American-Mexican Educators v. California, 937 F. Supp. 1397 (N.D. Cal. 1996).

the Title VII business justification defense. In New York City Transit Authority v. Beazer, [248] the Court considered a challenge to the New York City Transit Authority's policy of refusing to hire methadone users. In dismissing the disparate impact claim, the Court held that the Authority's "legitimate employment goals of safety and efficiency… are significantly served by - even if they do not require - [the Authority's] rule as it applies to all methadone users." [249] In other **[*472]** words, the Court upheld the policy because it significantly served a legitimate goal of the defendant.

The question is whether courts will interpret the Civil Rights Act of 1991 as a repudiation of the Beazer standard, which is arguably less rigorous than the "business necessity" standard articulated in earlier Supreme Court cases such as Dothard or Griggs. This position has been advocated by a number of commentators on the business necessity standard. [250] However, the trend of lower federal court decisions in the years following passage of the Civil Rights Act of 1991 strongly supports the continuing vitality of the Beazer precedent. [251]

While Beazer probably remains the soundest source for the "business necessity" standard under the Civil Rights Act of 1991, lower federal courts also are articulating post-1991 Act interpretations of the critical phrase "job related and consistent with business necessity." Perhaps the most thoughtful recent analysis of the post-Civil Rights Act business necessity standard is found in Donnelly v. Rhode Island Board of Governors for Higher Education, [252] in which the Court considered a claim that the University of Rhode Island's method for fixing minimum salaries had a disparate impact on women. Following a bench trial, Judge Torres dismissed the claim on the basis of the plaintiffs' failure to meet the requirements for the prima facie case but also provided a nuanced reading of the issues relating to the defendant's burden under the 1991 Act. The court first observed:

**[*473]**

The terms "consistent with" and "necessity" connote two different notions. Two things are consistent with one another if they are in harmony as opposed to being in conflict. On the other hand, something is a necessity if it is required or compelled. Since [the 1991 Act] uses these terms conjunctively, it is not clear whether Congress intended the standard to be that adherence to the challenged practice is required to conduct the employer's business; that the practice is closely related to a legitimate business purpose; or something in between. [253]

---

248 440 U.S. 568 (1979).

249 Id. at 587 n.31.

250 See, e.g., Susan S. Grover, The Business Necessity Defense in Disparate Impact Discrimination Cases, 30 Ga. L. Rev. 387 (1996); Harvard Note, supra note 167.

251 For example, the district court in Stender v. Lucky Stores, Inc., 803 F. Supp. 259 (N.D. Cal. 1992), followed the Beazer Court's formulation of business necessity: "In order to prove business necessity, an employer must show that its selection criteria bear a manifest relationship to the employment in question… [and] that the employment practice significantly serves legitimate employment goals." Id. at 321-22 (omitting quotes and citations). A similar articulation of this business justification standard in a post -Civil Rights Act of 1991 case is found in Fitzpatrick v. City of Atlanta, 2 F.3d 1112 (11th Cir. 1993). There the court recognized the effect of the Civil Rights Act of 1991 in terms of definitively shifting the burden of persuasion onto the defendant but defined business necessity as follows: "Where a Title VII disparate impact challenge is mounted against a practice or action which admittedly causes a disparate impact, the defendant is entitled to prevail… if the defendant shows that the practice or action is necessary to meeting a goal that, as a matter of law, qualifies as an important business goal." Id. at 1118. See also Nash v. Consolidated City of Jacksonville, 895 F. Supp. 1536, 1542 (M.D. Fla. 1995), aff'd, 85 F.3d 643 (11th Cir. 1996) (citing Beazer); Graffam v. Scott Paper Co., 870 F. Supp. 389, 400 n.19 (D. Me. 1994), aff'd, 1995 U.S. LEXIS 17120 (1st Cir. July 14, 1995) (summarizing Beazer in an ADEA case: "With this decision, the Court seemed to equate the necessary or "manifest relationship' requirement with a standard that required that the policy or practice having a disparate impact "significantly serve' the employer's goals.").

252 929 F. Supp. 583 (D.R.I. 1996), aff'd 110 F.3d 2 (1st Cir. 1997).

253 Id. at 593 (citations omitted).

After reviewing Congress's intent in the Civil Rights Act of 1991, he concluded: "The result was a compromise manifested by the introduction of "a new, seemingly watered-down version' of the previous business necessity doctrine that is represented by the language "consistent with business necessity' now incorporated into [the 1991 Act]." [254]

The court pointed to two additional facts supporting this reading of the Civil Rights Act of 1991. The court first observed that earlier drafts of the legislation had required defendants to show that a challenged practice was "required by business necessity" [255] and that "the later substitution of the word "consistent' strongly suggests that Congress meant to require something less than a showing of indispensability." [256] Second, the court noted that the Civil Rights Act of 1991 permits an employee to overcome a showing of business necessity by demonstrating the existence of a nondiscriminatory alternative practice, and concluded: "If the business necessity defense required a showing that the employer had no choice except to adhere to the challenged practice, no alternative practice could exist and [the alternatives provision] would be meaningless." [257] The court then summarized "business necessity" under the 1991 Act as follows: "What it appears to require is proof that the challenged practice is reasonably necessary to achieve an important business objective." [258] This careful analysis of the Civil Rights Act of 1991 thus yields a business necessity standard similar to the standard articulated in Beazer. Lower court decisions are generally consistent with this analysis. [259]

---

[254] Id. This analysis is quoted with approval and followed in Bramble v. American Postal Workers Union, 963 F. Supp. 90 (D.R.I. 1997).

[255] See Dole Floor Analysis, supra note 185, listing versions of the legislation including the phrase "required by business necessity."

[256] Donnelly, 929 F. Supp. at 593.

[257] Id.

[258] Id.

[259] In Steamship Clerks, 48 F.3d at 602, Judge Selya stated that a defendant "stalemates the prima facie case by elucidating a legitimate, nondiscriminatory rationale for utilizing the challenged practice." Defendants lost the case because their sole business necessity defense for barring minorities from membership in the union was "because it [the union selection practice] represents an important vehicle for continuing family traditions." Id. at 607. The court concluded that such a feeble offer "falls hopelessly short of limning a business necessity." Id. See also Diehl, 933 F. Supp. at 1164 ("Legitimate nondiscriminatory business justifications, therefore, may exist to account for disparities in the workplace.").

Compare this with Nash, in which the court stated that "Section 105 of the Civil Rights Act of 1991 reversed Wards Cove… restoring pre-Wards Cove law in which… "business necessity' really means "necessity,'" and recited standards from numerous lower federal court decisions decided prior to the Civil Rights Act of 1991's effective date. The court concluded: "The business necessity doctrine is very narrow. An employer does not meet its burden of establishing the job relatedness of a test by merely showing a rational basis for the test. It must be validated by a demonstration that the examination is appropriate for the selection of qualified applicants for the job in question." 895 F. Supp. at 1545 (citations omitted).

The analysis by the court in Nash can be fairly criticized for ignoring the specific statement in the Civil Rights Act of 1991 that the phrase "job related and consistent with business necessity" is to be construed against Supreme Court decisions prior to Wards Cove; thus, the thousands of lower court disparate impact cases, which created the muddy waters that the Supreme Court in Wards Cove so thoroughly roiled, should not be relied upon as they were in Nash. In any event, the court's stern recitation of the business necessity defense did not deter it from rather summarily dispatching the claims in the case before it. The court, after reviewing a complex set of statistical analyses of the defendant's promotional examinations for the fire department, dismissed plaintiff's arguments by concluding: "The court finds that the selection process utilized by the City… was a business necessity because it was an objective way for the City to obtain top-notch captains." Id. at 1552. Thus, in terms of its results, if not its tone and reliance on now-discredited law, the Nash case adhered to the standard set forth in Beazer.

In addition, a number of courts construing the Americans with Disabilities Act (ADA), 42 U.S.C. 12101-12213 (1996), and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621-634 (1997), have interpreted the Civil Rights Act of 1991 in determining disparate impact standards for application under those statutes. It is particularly noteworthy that the ADA regulations provide that it is a defense to a discrimination charge that a challenged standard is "job-related and consistent with business necessity." 29 C.F.R. 1630.15(c) (1996). In Milton v. Scrivner, Inc., 53 F.3d 1118 (10th Cir. 1995), the court considered an ADA claim in which the defendant employer established new production standards which required plaintiffs to accomplish their jobs in a shorter amount of time. When the plaintiffs were discharged for failing to meet these standards, they sued under the ADA, claiming that their terminations constituted discrimination under the ADA, based upon their various disabilities. In dismissing the claims, the court interpreted the phrase "job-related and consistent with business necessity" as follows:

**[*474]** **[*475]** A defendant in a disparate impact case is not required to furnish any particular type of evidence in order to carry its burden of demonstrating a legitimate business justification for a challenged practice. The Supreme Court made this clear in Watson v. Fort Worth Bank & Trust, where it stated that "employers are not required, even when defending standardized or objective tests, to introduce formal validation studies showing that particular criteria predict actual on-the-job performance." [260] However, in a large number of cases, particularly those involving tests administered by employers for the purpose of hiring or promotion, courts have very nearly required defendants to provide statistical proof that the tests are, in the words of Griggs, "demonstrably a measure of job performance." [261] Thus, in cases that involve employer-administered tests, "the business justification that the employer must show is that the test is job-related." [262]

**[*476]**

4. The Legitimate Business Justification Standard Under the FHA and the ECOA

The number of cases involving a defendant's burden in a disparate impact case under the FHA or the ECOA comes nowhere near the vast corpus of decisions under Title VII. However, a number of recent cases involving private defendants have begun to signal that courts are endorsing the post-1991 Act version of

---

There is evidence in the record that the new production standards were implemented to improve [Defendant's] competitiveness in the marketplace. The changes were aimed at increasing efficiency and productivity and have done so. Performing [the plaintiffs' jobs] with speed and quality was viewed by [defendant's] management as essential and the policy was applied to all [employees]. Contrary to plaintiff's implication, the fact that defendant made changes to its business in order to increase profit is not an impermissible action under the ADA.

Id. at 1124 (omitting citations to the record). In short, in a reading of business necessity similar to "reasonably necessary to meet a legitimate business goal," the Tenth Circuit stated that "this inquiry is not intended to second guess the employer or to require him or her to lower company standards." Id.

In Graffam the district court, in deciding an ADEA claim, determined that the defendant's method of evaluating employees during a reduction in force in which the plaintiffs were terminated was job-related and consistent with business necessity. The court analyzed the business necessity standard under the Civil Rights Act of 1991 and articulated its version of the test as follows: "Business necessity inquires whether the job criteria arise out of a manifest, business need and the job related standard inquires whether there is a correlation between the criteria used and successful job performance." 870 F. Supp. at 400. The First Circuit, in affirming the district court, discussed the plaintiffs' contention that, because the employer "applied the same common criteria in equal weights to every job group assessed, the selection procedures could not possibly measure job skills significantly correlated with successful performance of any specific job." Graffam, 1995 U.S. App. LEXIS 17120, at *11 (1st Cir. July, 14 1995). The court held: "We are not convinced: The fact that the skills identified by the common criteria were important in many managerial and technical mill jobs simply does not compel a finding that the skills were unrelated to the particular jobs at issue… Moreover, we seriously doubt that [the employer] would have previously committed money and resources to developing the skills measured by the common criteria if they were not directly related to successful job performance." Id. at *12-13.

[260] 487 U.S. 977, 998 (1988), followed in Graffam, 1995 U.S. App. LEXIS 1712, at *13 n.3; Rudder v. District of Columbia, 890 F. Supp. 23, 45 n.14 (D.D.C. 1995). Earlier decisions under Title VII sometimes had held that validation tests were required to make the requisite showing of job relatedness. See, for example, Contreras v. City of Los Angeles, 656 F.2d 1267 (9th Cir. 1981), in which the Ninth Circuit criticized the lower court's holdings that "the defendants may demonstrate that a test is job related by any competent evidence" and "there is no magic in any validating procedure," stating: "these conclusions would be error if they implied that the evidence need not show that the screening device was validated "by professionally acceptable methods' to be "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.'" Id. at 1280. These earlier cases, though, are now overruled by later Supreme Court decisions, which are the only permissible precedent to which resort can be made under the Civil Rights Act of 1991 for determining the defendant's burden. As noted earlier, at least one recent decision is at least suggestive of a failure to recognize the effect of the 1991 Act on prior case law. The court in Nash makes the ambiguous statement that an employer's test "must be validated by a demonstration that the examination is "appropriate for the selection of qualified applications for the job in question.'" 895 F. Supp. at 1545 (quoting Washington v. Davis, 426 U.S. at 247). If by "validation," the court means "justified" or "proven to work for the employer's legitimate purpose," then the citation to the Washington case is appropriate. If the court intended to state that the employer must adhere to a specific validation practice, the court is wrong. See also Albemarle Paper Co. v. Moody, 422 U.S. 405, 449 (1975) (Blackmun, J., concurring in the judgment), quoted infra at note 366.

[261] 401 U.S. at 436.

[262] Rudder, 890 F. Supp. at 40. For a discussion of the standards used by courts and federal agencies to assess evidence of "job-relatedness," see Appendix A.

"business necessity" evolving under Title VII case law. These cases are consistent with earlier decisions under the ECOA, which articulated a standard of "legitimate business justification" as embodying the defendant's burden in rebutting a prima facie case under the effects test. Moreover, the legislative history of both the FHA, albeit limited, and the ECOA support the view that the business necessity standard is meant to permit a defendant to use a challenged policy where the policy significantly serves a legitimate goal of the defendant.

Just as in the Title VII context, there are relatively few FHA or ECOA cases in which a defendant has relied solely on a defense of rebutting the plaintiff's evidence head-on. [263] In most cases, defendants attempt both to refute a plaintiff's prima facie case and to demonstrate a legitimate business justification for the challenged practice. As noted, the most important recent case on the business necessity defense under the FHA is Mountain Side Mobile Estates v. HUD. [264] As discussed, the analysis in Mountain Side is not a model of clarity, veering from Title VII cases to government defendant FHA cases and then back to Title VII. Nonetheless, the holding of the Tenth Circuit is quite clear: it entirely rejects the "compelling business necessity" standard advocated by HUD. Based upon its finding that the defendants' two reasons for the challenged three-person occupancy limit - sewer capacity limitations and concern for the quality of park life - demonstrated that the occupancy limit had a "manifest relationship" to housing in the defendants' mobile home park, the court held that the defendants had overcome the prima facie case "by evidence of legitimate, non-pretextual justifications." [265]

**[*477]** What is perhaps most noteworthy about Mountain Side is its signal reliance on the opinion of the Supreme Court in Wards Cove. Indeed, since the court in Mountain Side never cites the Wards Cove opinion as the source of its analysis, it could fairly be accused of "plagiarism." Here are the two relevant passages from the cases, side by side:

We hold that for the purposes of Title VIII FHA housing discrimination cases, the defendant must demonstrate that the discriminatory practice has a manifest relationship to the housing in question. A mere insubstantial justification in this regard will not suffice, because such a low standard would permit discrimination to be practiced through the use of spurious, seemingly neutral practices. At the same time, there is no requirement that the defendant establish a "compelling need or necessity" for the challenged practice to pass muster since this degree of scrutiny would be almost impossible to satisfy. (Mountain Side) [266]

The touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice. A mere insubstantial justification in this regard will not suffice, because such a low standard of review would permit discrimination to be practiced through the use of spurious, seemingly neutral employment practices. At the same time, though, there is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet, and would result in a host of evils we have identified above. (Wards Cove) [267]

The court's failure to cite Wards Cove, which may (or may not) have been premised on a belief that the Civil Rights Act of 1991 prevents courts from citing the case as binding, merely underscores the weaknesses in the court's presentation of its analysis. A more meticulous opinion would have distinguished the government defendant cases and cited previous Supreme Court decisions on Title VII to produce the re-

---

263 One noteworthy case is Hanson v. Veterans Administration, 800 F.2d 1381 (5th Cir. 1986), where the Fifth Circuit dismissed a disparate impact claim alleging that the appraisal practices of the Veterans Administration resulted in a racially based negative impact on home values in a Houston neighborhood. The defendant's case was premised on a point-by-point expert refutation of the statistical case mounted by the plaintiff, which case the district court concluded was insufficient as a matter of law to show discriminatory intent or effect. Id. at 1388-90.

264 56 F.3d 1243 (10th Cir. 1995).

265 Id. at 1257.

266 Id. at 1254-55.

267 490 U.S. at 659.

sult in Mountain Side - rejection of the compelling business necessity standard - that the court concluded was required. As it stands, the Mountain Side decision provides strong support for a Title VII-based reading of the FHA disparate impact standard for private defendants and a clear indication that the "compelling business necessity" standard advocated by HUD is legally incorrect. According to the Tenth Circuit, legitimate, non-pretextual justifications should permit defendants to rebut a prima facie case.

**[*478]** Another important appeals court case treating the defendant's burden which was briefly discussed in Part I, is Pfaff v. HUD. [268] There, the Ninth Circuit also rejected HUD's recent interpretations of the "compelling business necessity" standard. However, the decision is limited in scope to particular occupancy standards that might disproportionately affect families with children. The court stated: "Even if the appropriate standard of rebuttal in disparate impact cases normally requires a compelling business necessity, the record in this case leads us to the conclusion that it would be fundamentally unfair to hold the Pfaffs to this standard given HUD's truly appalling conduct in this matter." [269]

The Pfaff case turned upon the court's finding that HUD had enforced its newly rigorous reading of the defendants' burden in disparate impact cases in a manner that was arbitrary, capricious, and plainly unfair. [270] The court pointed out that HUD previously had established occupancy restriction standards suggesting "that a facially neutral, numerical occupancy restriction may permissibly be based on a house's size and the number of bedrooms it **[*479]** contains." [271] The court then held that the previous "reasonableness" standards were

a far cry from requiring landlords to produce a compelling business necessity to justify any numerical occupancy limit. We conclude that Mountain Side's "compelling business necessity" rule departs abruptly from HUD's preexisting "reasonableness" standard. Radically inconsistent interpretations of a statute by an agency, relied upon in good faith by the public, do not command the usual measure of deference to agency action. [272]

---

[268] 88 F.3d 739 (9th Cir. 1996).

[269] Id. at 747. The court cited a number of older cases as examples of cases where a showing of a "compelling business necessity" was required. Id. at 747 n.3 (citing Rose v. Wells Fargo & Co., 902 F.2d 1417, 1424 (9th Cir. 1990) (ADEA); Gutierrez v. Municipal Court of S.E. Judicial Dist., 838 F.2d 1031, 1041-42 (9th Cir. 1988) (Title VII); Betsey, 736 F.2d at 988 (FHA); Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971); Williams v. Colorado Springs, Colo. Sch. Dist., 641 F.2d 835, 842 (10th Cir. 1981)). Thus, the only FHA case cited by the court is Betsey v. Turtle Creek Associates. But, as Part I showed, Betsey's "compelling business necessity" standard was derived entirely from Title VII cases like Lorillard and Williams, the analysis in which has been discredited and overruled by subsequent Title VII Supreme Court decisions and likely overruled as well by the Civil Rights Act of 1991. The court's point was to observe that, even if the "compelling business necessity" might be applied in some cases, the court was not even willing to consider applying the standard, given HUD's previous regulatory pronouncements. While the court did not need to consider whether "compelling business necessity" was appropriate for application in any other case, the court's reference and footnote are likely to prompt confusion.

[270] The court noted that, in many instances, it is appropriate for courts to give deference to the statutory interpretations of an agency charged with regulating and enforcing the subject statute, but went on to state:

Justice dictates, however, that our general rule of deference to announcements of law by adjudication have [sic] its exceptions. As the Supreme Court has cautioned, "there may be situations where the [agency's] reliance on adjudication would amount to an abuse of discretion.... " Such a situation may present itself where the new standard, adopted by adjudication, departs radically from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application… Most egregiously, HUD has made inconsistent and misleading representations to those regulated by the FHA and, in so doing, has led them down the garden path.

Id. at 748 (citations omitted).

[271] Id. The court reviewed HUD's original interpretation, published in 1989 as part of the preamble to FHA regulations, of the appropriate standard to be applied in delineating the right of private owners of housing to determine occupancy standards and the new prohibitions against familial status discrimination. The language quoted by the court refers to the right of owners and managers of dwellings to develop and implement "reasonable occupancy standards." See Preamble to Final Rule Implementing Fair Housing Amendments Act of 1988 (Published January 23, 1989), reprinted as Appendix I, 24 C.F.R. Ch. I, Subtitle A (Fair Housing) (1997).

[272] Pfaff, 88 F.3d at 748 (citation omitted).

The court then applied "HUD's original "reasonableness' standard" and found that the defendants had carried their burden of proof under the disparate impact standard. The court stated:

It is certainly reasonable to seek to preserve the value of one's property, as the Pfaffs sought to do, and a numerical limitation on occupancy here advances this legitimate business purpose… In our view, the Pfaffs' facially neutral, numerical occupancy restriction was hardly an unreasonable means under existing law to prevent the dilapidation of their little house. [273]

In sum, the Pfaff decision provides limited, but important, support for the position that courts are likely to reject the "compelling business necessity" standard as an unreasonably rigorous burden for disparate impact defendants. The court's articulation of the test suggests that a defendant's offer of a "legitimate business purpose" would be adequate to meet the law's standard. The Pfaff case also indicates that, in the event that the agencies charged with interpreting and enforcing the FHA and the ECOA believe that the burden on defendants should consist of a showing of a "compelling business necessity," these agencies must establish this standard through notice-and-comment rulemaking, rather than case-by-case adjudication. [274]

**[*480]** The other recent "landlord" case that squarely addresses the issue of the disparate impact defendant's burden of proof is Williams v. 5300 Columbia Pike Corp. [275] In that case, a group of plaintiffs challenged a condominium conversion plan by the owner of a rental apartment building. The court, in considering defendants' summary judgment motion, found that the plaintiffs had barely made a prima facie case under the FHA [276] and, in an extended footnote, discussed the arguments used by the defendants in their attempt to obtain summary judgment on plaintiffs' case.

The gist of defendants' argument was that any disparate impact observed in this case was attributable to the fact that minorities "continue to suffer a general economic disadvantage in American society." [277] The court concluded that the arguments relating to economic disadvantages, while not of relevance in deter-

---

273 Id. at 749.

274 The Ninth Circuit in Pfaff, after its holding on the merits of the case, discussed the efficacy and fairness of the ALJ adjudicatory process as a basis for making law. The discussion bears full recital:

The disadvantage to adjudicative procedures is the lack of notice they provide to those subject to the agency's authority. While some measure of retroactivity is inherent in any case-by-case development of the law, and is not inequitable per se, this problem grows more acute the further the new rule deviates from the one before it. Adjudication is best suited to incremental developments to the law, rather than great leaps forward. The APA contains numerous mechanisms, such as the notice and comment rulemaking procedure, by which the public is given notice of proposed changes before they occur. See generally APA 552, 553, 557. For this reason, the Supreme Court has concluded that "rulemaking is generally a better, fairer, and more effective method" of announcing a new rule than ad hoc adjudication. Community Television of S. Cal. v. Gottfried, 459 U.S. 498, 511, 103 S. Ct. 885, 74 L. Ed. 2d 705 (1983).

Id. at n.4.

We are most troubled that in this especially complex area of the law, in which private individuals may be subject to heavy-handed enforcement proceedings, the Secretary has done so little to enlighten the public as to what she expects of them… It is one of HUD's functions to develop expertise on the problem of housing discrimination, 42 U.S.C. 3608(e) (duty to study and report), and, on the basis of this expertise, to exercise its broad powers of enforcement and regulation. 42 U.S.C. 3608(a), (b) (HUD's authority to administer the FHA); 3614a (rulemaking authority). If HUD finds the line-drawing question difficult, imagine the position of Karl and Elizabeth Pfaff.

HUD's actions here fall well outside the limits of good - or acceptable - government, and so we grant the petitioners the relief they seek. We also express our hope that HUD will avoid such incidents in the future by providing the public with guidance adequate to enable honest people to comply with the 1988 Fair Housing Amendments Act.

Id. at 749-50 (citations omitted). But see Snyder, 953 F. Supp. at 217, in which the court cites both the Mountain Side and Pfaff courts of appeal decisions, and HUD's Mountain Side Administrative law opinions, with approval. Id. at 220-22.

275 891 F. Supp. 1169 (E.D. Va. 1995), aff'd, Williams v. 5300 Columbia Pike Corp., No. 95-2964, No. 95-3091, 1996 U.S. App. LEXIS 31004 (4th Cir. Dec. 3, 1996).

276 See discussion at supra note 235.

277 891 F. Supp. at 1180, n.23.

mining whether the plaintiffs had made out a prima facie case, were relevant to the defendant's "legitimate business justification" defense. The court stated that, once the defendant had shown a legitimate business **[*481]** justification, "defendant must prevail if it appears that the disparity was attributable to economic inequality rather than impermissible discrimination." [278]

These recent "pure" FHA cases (involving landlord defendants) are supported by a line of cases decided under both the FHA and the ECOA in which lenders or other creditors have been sued under a disparate impact theory. Perhaps the most important of these cases is Cartwright v. American Savings & Loan Ass'n, [279] in which the Seventh Circuit Court of Appeals affirmed a lower court's dismissal of a plaintiff's discrimination and redlining claim against a lender for denying a mortgage loan application. The court found that the lender's explanation for its decision to decline a rehabilitation loan for $ 90,000 in a neighborhood in which most homes were assessed at a value of $ 60,000 or less was adequate to meet the lender's burden. The court stated: "The Fair Housing Act's prohibition against denying a loan based upon the location of the dwelling does not require that a lender disregard its legitimate business interests or make an investment that is not economically sound." [280] Other mixed FHA **[*482]** and ECOA cases, or ECOA -only cases generally adopt this approach and adhere to a "legitimate justification" standard. [281]

---

278 Id. This is what the court later held. Williams v. 5300 Columbia Pike Corp., Civ. Action No. 95-225-A (Order, September 15, 1995). The district court granted summary judgment to the defendants on September 15, 1995. The court held that "defendants had shown a legitimate, non-discriminatory business purpose for their actions, which purpose plaintiffs had not shown to be pretextual... More precisely, plaintiffs failed to show that any triable issue of fact existed with respect to the existence of a non -pretextual business purpose for the condominium conversion plan at issue." Williams v. 5300 Columbia Pike Corp., 901 F. Supp. 208, 210 (E.D. Va. 1995) (citing Williams, Civ. Action No. 95-225-A). Thus, similarly to Mountain Side, the court in Columbia Pike established the defendants' burden as showing "legitimate business justification" for a challenged policy.

On appeal, the Fourth Circuit decided the case on different grounds, holding that the burden never shifted to the defendants because the plaintiffs had failed to make out a prima facie case. Williams v. 5300 Columbia Pike Corp., No. 95-2964, No. 95-3091, 1996 U.S. App. LEXIS 31004 (4th Cir. Dec. 3, 1996). In a per curiam opinion, the Fourth Circuit held that the FHA did not apply to the case as a matter of law, because, "although it is no doubt true that the "neutral criterion' of price may disparately impact blacks and the handicapped, because they may, on average, be poorer than whites or nondisabled persons, this type of injury extends beyond the reach of the Fair Housing Act." Id. at *11.

279 880 F.2d 912 (7th Cir. 1989).

280 Id. at 923. The court went on to state:

It seems obvious that a lender must be concerned, for example, about financing a new, $ 90,000 home in a residential area comprised of homes valued at $ 60,000 or less. If the borrower defaults on the loan, the lender must foreclose and may be unable to recoup its investment, as potential buyers might be reluctant to pay $ 90,000 for the home (and other lenders may be unwilling to finance the purchase) in light of the surrounding property values. The regulations implementing the Fair Housing Act address this type of concern, stating lenders may legitimately consider "the present market value of the property offered as security... and the likelihood that the property will retain an adequate value over the term of the loan." 12 C.F.R. 31.8(c)(7).

Id.

281 The best recent case illustrating this trend is A.B.&S. Auto Service, 962 F. Supp. at 1056, in which a plaintiff alleged that the lender's consideration of an applicant's criminal record in the approval process for a small business loan program had a disparate impact on African-American applicants. The court stated that, upon a plaintiff's successful showing of prima facie disparate impact, "the defendant-lender must demonstrate that any policy, procedure, or practice has a manifest relationship to the creditworthiness of the applicant... In other words, the onus is on the defendant to show that the particular practice makes the defendant's credit evaluation system more predictive than it would be otherwise." Id. at 1061 (citation omitted). The court then held that, assuming a prima facie case arguendo, the bank's consideration of applicant criminal records was permissible for two reasons: first, "because the bank's practice of considering criminal record information is required by the [Small Business Administration] to participate in the SBA loan guarantee program;" and, second, "because an applicant's judgment and character may legitimately be considered in making commercial lending decisions." Id. at 1064.

See also Thomas v. First Federal Savings Bank of Indiana, 653 F. Supp. 1330 (N.D. Ind. 1987), a mixed FHA/ECOA case in 1987, in which the district court found that "there is nothing ... which mandates [a lender] to make a bad loan as long as the criteria they use for making the loan are legitimate business criteria." Id. at 1340 (quoting Laufman v. Oakley Bldg. & Loan Co., 408 F. Supp. 489, 501 (S.D. Ohio 1976)). See also, Cherry v. Amoco Oil Co., 490 F. Supp. 1026, 1031 (N.D. Ga. 1980) (after plaintiff establishes a prima facie case, "it becomes Defendant's burden to show the [practice in question] makes Amoco's credit evaluation system more predictive than it would be otherwise"); Carroll v. Exxon Co., U.S.A., 434 F. Supp. 557, 563 (E.D. La. 1977) (after plaintiff establishes a prima facie case, defendant "must meet the burden of showing that any given requirement has a manifest relationship to the creditworthiness of the applicant").

In relation to cases involving lenders or other financial creditors, it is important to note that there is significant legislative and regulatory history supporting the use of the legitimate business justification standard adopted by these cases. For example, in the legislative history accompanying the 1988 amendments to the FHA, Congress deemed legitimate business considerations applicable to mortgage lending transactions: "The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity… which relate to the financial security of the transaction or the protection against default or diminution in value of the security." [282] FHA regulations promulgated by HUD echo this language. [283]

Similarly, Regulation B under the ECOA explicitly cites case law precedent under Title VII as guidance in connection with disparate impact standards, explaining that "Congress intended an "effects test' concept… to be applicable to a creditor's determination of creditworthiness." [284] The Federal Reserve Board **[*483]** staff Commentary accompanying Regulation B interprets this intent to mean that "the act and regulation may prohibit a creditor practice that is discriminatory in effect… unless the creditor practice meets a legitimate business need that cannot reasonably be achieved as well by means that are less disparate in their impact." [285] Other recent statements by federal regulatory and enforcement agencies support this interpretation. [286]

5. Less Discriminatory Alternatives Under Title VII

Under Title VII, once a defendant has presented evidence of a legitimate business justification for a challenged practice or action there is yet another prong of the test to be considered. When the defendant has carried its burden under this second prong of the test, the plaintiff is provided "another bite at the apple." The defendant will prevail only if "the plaintiff fails to show the availability of less discriminatory alternative practice or action that would provide a comparably effective means of meeting that goal." [287]

a. Burden of proof to show less discriminatory alternatives.

Following the Griggs decision, a number of courts of appeals had determined that the test of "business necessity" encompassed an extremely rigorous standard, including an obligation for the defendant to show the absence of less discriminatory alternatives. [288] Since those lower court cases, however, **[*484]** the Supreme Court, in a number of decisions, made clear that the plaintiff bears the burdens both of produc-

---

282 H.R. Rep. No. 100-711, 100th Cong., 2d Sess. (1988), reprinted in 1988 U.S.C.C.A.N 2173, 2191 ("House Report").

283 24 C.F.R. 100.125(c) (1997).

284 12 C.F.R. 202.6(a) n.2 (1997) ("Regulation B") ("The legislative history of the Act indicates that the Congress intended an "effects test" concept, as outlined in the employment field by the Supreme Court in the cases of Griggs v. Duke Power Co., 401 U.S. 424 (1971), and Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness.").

285 Official Commentary, 12 C.F.R. Part 202, Supp. I, Comment 202(6)(a)-2.

286 The Joint Policy Statement, supra, note 5, also recognized that factors such as "cost and profitability" may be relevant to business necessity justification in the context of lending. 59 Fed. Reg. 18,265, 18,269 (April 15, 1994).

287 Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1118-19 (11th Cir. 1993). See also Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975) (once the defendant shows that an employment requirement has a "manifest relationship" to a legitimate employer goal, the burden shifts back to the plaintiff to prove the existence of a less discriminatory alternative - as evidence that the defendant's showing of job-relatedness was a pretext for discrimination).

288 The leading case in this line is probably Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971), in which the court held:

The business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact.

tion and persuasion on the question of less discriminatory alternatives. [289] This determination was codified in the Civil Rights Act of 1991, requiring that the plaintiff must demonstrate the existence of alternative employment practices, with the additional requirement that a plaintiff cannot prevail unless the employer "refuses to adopt such alternative employment practice." [290] As evidenced by cases decided since 1991, the plaintiff's burden under Title VII is firmly settled. [291]

**[*485]** One lingering uncertainty on this issue relates to the effect that the 1991 Act may have upon the continued vitality of the Uniform Guidelines on Employment Selection Procedures [292] published by the Equal Employment Opportunity Commission (EEOC) and other Federal agencies. The Uniform Guidelines state that employers, in completing validation studies of tests or other devices used to hire or promote candidates, should engage in a reasonable "investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as pos-

---

Id. at 798, cited with approval in Williams v. Colorado Springs, Colo. Sch. Dist., 641 F.2d 835, 841 (10th Cir. 1981). Note that the cases holding that the burden is upon the defendant almost always adopt a restrictive "compelling business necessity" standard on the second prong of the test.

289 The Court in Albermarle Paper made clear that the plaintiff bore the burden:

If an employer does then meet the burden of proving that its tests are "job related," it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in "efficient and trustworthy workmanship."

422 U.S. at 425 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973)). Both the Watson and Wards Cove decisions specifically stated that the plaintiffs bear the burden of proving the existence of less discriminatory alternatives. See Wards Cove, 490 U.S. at 660 (citing Watson, 487 U.S. at 998).

The Fourth Circuit itself has long since repudiated its own formulation in Lorillard. In Wright v. Olin Corp., 697 F.2d 1172 (4th Cir. 1982), the court stated:

This court's formulation of the "business necessity" defense in Lorillard clearly contemplated that proof of "no acceptable alternatives" should be part of the defendant employer's burden in establishing the defense. While the Supreme Court has never expressly repudiated this aspect of Lorillard, its subsequent decisions in Beazer, Dothard and Albemarle Paper have so clearly indicated that proof of "acceptable alternatives" is claimant's burden in "rebuttal," that we must consider Lorillard's formulation to that extent no longer authoritative.

Id. at 1191 n.29 (citation omitted).

290 42 U.S.C. 2000e-2(k)(1)(A)(ii).

291 See, e.g., Steamship Clerks, 48 F.3d at 601; Graffam, 1995 U.S. App. LEXIS 17120, at *9; Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1428 (10th Cir. 1993); Fitzpatrick, 2 F.3d at 1117; MacPherson v. Univ. of Montevallo, 922 F.2d 766, 771 (11th Cir. 1991); Donnelly v. Rhode Island Board of Governors, 929 F. Supp. 583 (D.R.I. 1996); Allen v. District of Columbia, 812 F. Supp. 1239, 1245 (D.D.C. 1996) (applying Wards Cove standards); Nash, 895 F. Supp. at 1541; Rudder, 890 F. Supp. at 38; Stutts v. Sears, Roebuck & Co., 855 F. Supp 1574, 1580 (D. Ala. 1994). But see Davey v City of Omaha, 107 F.3d 587, 591 (8th Cir. 1997); Bradley v. Pizzaco of Nebraska, Inc., 7 F.3d 795, 797 (8th Cir. 1993). In these two cases the Eighth Circuit inexplicably states in dictum that Congress intended the 1991 Civil Rights Act to codify Griggs and that the standard in Griggs places the burden of proof as to less discriminatory alternatives on the private defendant. However, in each case, the court was disposing of a case that had been before it on multiple appeals, and it appears that its dictum relied on old case law on less discriminatory alternatives that may have applied in the Eighth Circuit prior to Congress's statement of the law in the Civil Rights Act of 1991. The dictum should not be accorded any weight. No case decided under Title VII outside of the Eighth Circuit has followed the Bradley and Davey courts in construing Title VII's requirements in this fashion. But see Jenkins v. Wal-Mart Stores, Inc., 910 F. Supp. 1399, 1424 (N.D. Iowa 1995) (quoting favorably in dictum the language from the Bradley case in finding that a plaintiff raised material questions of fact on the existence of a prima facie disparate impact case). The only conclusion can be that the court did not review the actual language of the Civil Rights Act of 1991, because the court states: "The 1991 Act reinstated the Griggs analysis, under which the burden is on the defendant employer to prove both a "compelling need' for the challenged policy, and the lack of an effective alternative policy that would not produce a similar disparate impact." Id. This reading of the 1991 Act is flatly inconsistent with the law itself, which expressly requires the plaintiff to demonstrate the existence of alternative employment practices. As such, Jenkins is not likely to be accorded significant precedential value, and the Eighth Circuit will need to find an opportunity to recast its recitation of the applicable legal standards.

292 29 C.F.R. Part 1607 (1978 version) (1997) ("the Uniform Guidelines"). A more extensive discussion of the Uniform Guidelines in the context of evidence of "job-relatedness" in the context of the business necessity defense is found infra in Appendix A.

sible." [293] This suggests, as one commentator states, that the Uniform Guidelines "appear to impose an obligation on the part of a user of a selection procedure, to investigate alternatives and to utilize the procedure that has the lesser impact." [294] Indeed, a number of decisions - applying the pre-1991 Act law - have adopted this line of reasoning. [295] But courts are far from unanimous in reading the Uniform Guidelines as imposing - or having the capacity to impose - such a burden or obligation, [296] and such an interpretation has been **[*486]** criticized by a leading commentator, particularly in light of the intervening Supreme Court decisions and the 1991 Act. [297] The better conclusion is that the 1991 Act means what it says, and imposes the burden of proving the existence of less discriminatory alternatives upon the plaintiff.

b.

"Equal effectiveness" and cost considerations

Determining that the burden of proof on the issue of less discriminatory alternatives remains with the plaintiff only begins to answer the questions raised in the 1991 Act. While Congress adopted something very like the Wards Cove version of the standard for less discriminatory alternatives, the 1991 Act also expressly provided that governing standards "with respect to the concept of "alternative employment practice'" were to revert to pre-Wards Cove precedent. [298] Thus, as with the business necessity question, Congress has provided clear instructions regarding the ordering of procedure and proof, but little guidance on what the law "prior to Wards Cove" is supposed to mean.

---

293 29 C.F.R. 1607.3B (1997).

294 Lex K. Larson, Employment Discrimination, 24.02, 24-7 (2d ed. 1997).

295 See Officers for Justice v. Civil Serv. Comm'n, 979 F.2d 721, 728 (9th Cir. 1992) ("Before utilizing a procedure that has an adverse impact on minorities, the City has an obligation pursuant to the Uniform Guidelines to explore alternative procedures and to implement them if they have less adverse impact and are substantially equally valid to rank ordering.") (emphasis in original); quoted with approval in Brunet v. City of Columbus, 1 F.3d 390, 412 (6th Cir. 1993). Both of these decisions involved a determination by the court that the decision by the defendant at one point in the tortuous cycle of litigation to employ a strict "rank -ordering" system, in the face of plaintiffs' contention that a "banding" system would be equally effective and less discriminatory, could not be sustained without a showing by the defendant that it had considered a banding system. These cases need to be treated with caution, because the courts deciding the cases had presided over years and years of litigation and, in essence, had become expensive referees of microscopic questions of fact. See Officers for Justice, 979 F.2d at 728 ("We do not overlook the fact that this resolution is the culmination of years of trial and error by the City and careful oversight by the district court.") Curiously, the Brunet decision also contains the statement that, "once the City has shown that the challenged test is job related, as the City has in this case, the burden shifts to the challengers to prove that the City was using the validated tests as a pretext for discrimination by demonstrating that other tests, without the adverse effects, would also serve the City's legitimate hiring interests." Brunet, 1 F.3d at 411. Note, too, that on remand the district court in Brunet found that there was sufficient evidence in the record to support the defendant's job analysis and to reject the less discriminatory alternative offered by plaintiffs. This decision was upheld on appeal. Brunet v. City of Columbus, 58 F.3d 251 (6th Cir. 1995), reh'g denied (Aug. 11, 1995).

296 Compare the cases cited supra at note 295 with Hamer v. City of Atlanta, 872 F.2d 1521, 1533 (11th Cir. 1989), which applies the Guidelines to validation studies prior to the 1991 Act, but holds that the plaintiff bears the burden of proving less discriminatory alternatives: "The appellants also allege that the district court erred in not requiring the City of Atlanta to review supplemental or alternative measures to lessen the adverse racial impact of the examination… We cannot fault the district court for not requiring such a showing by the City." See also Jones v. Pepsi-Cola Metro. Bottling Co., 871 F. Supp. 305, 312 (E.D. Mich. 1994) (holding that the burden of proof is on the plaintiff to show alternative methods that are less discriminatory); I.M.A.G.E. v. Bailar, 518 F. Supp. 800, 812 (N.D. Cal. 1981) (same).

297 See Larson, supra note 294, at 24.02, 24-7 (footnote omitted):

Here the Guidelines depart in a major way from [the 1991 Act] as well as from the Supreme Court guidance described above, which merely create an opportunity for a plaintiff in litigation [to show alternatives], and nowhere places an obligation upon the employer. True, it may be prudent for an employer to conduct such an investigation, in order to stave off a future successful showing of an alternative by a plaintiff, but to say that the employer must do so is another matter… These Guidelines were drafted many years ago, before the legislative codification and before more recent Supreme Court statements on this topic. A revamping of them is well overdue.

298 42 U.S.C. 2000e-2(k)(1)(C). Note that this provides a different legislative instruction to courts than Congress provided in connection with the defendants' burden. As to the latter, courts are limited to "Supreme Court decisions" prior to Wards Cove; alternative selection practices, on the other hand, are to be construed "in accordance with the law as it existed on June 4, 1989." Id. (Wards Cove was decided the next day.) This means that pre-Wards Cove lower court decisions are binding precedent for LDAs but not for business necessity. This is a rather odd outcome, but is nonetheless the one dictated by Congress.

The two most important issues relating to a plaintiff's proffered alternative are whether the plaintiff must show first that the alternative is equally effective and second, that it has less of a disparate impact than the challenged practice. These two requirements stem from the Supreme Court's language in Albemarle Paper Co. v. Moody, where the Court stated that "it remains open to the com **[*487]** plaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in "efficient and trustworthy workmanship.'" [299]

Recent decisions in Title VII disparate impact cases strongly affirm that, where a defendant has carried its burden of proving a legitimate business justification for a challenged practice, a plaintiff, in order to carry its burden of proving that a less discriminatory alternative exists, must prove that the alternative practice can be statistically proven to be equally effective in achieving the business objectives underlying the challenged practice and would have a less disproportionate effect. [300] A recent case directly on point is York v. AT&T, [301] in which the Tenth Circuit Court of Appeals upheld a district court's ruling rejecting the plaintiff's offered jury instruction on the issue of less discriminatory alternatives. [302]

**[*488]** Moreover, plaintiffs must do more than allege that a proffered alternative would meet the two requirements of equal effectiveness and less adverse impact; rather, the plaintiff carries the burden of demonstrating these points. As one court stated: "A mere statement that an alternate practice would work, particularly in the absence of any specific information concerning the mechanics of the plan to show its feasibility, is insufficient to demonstrate that the proposed alternative would have been equally effective." [303] The principle underlying the requirement that the plaintiff demonstrate the equal effectiveness and lesser impact of a proposed alternative is that, "because the courts are "generally less competent than employers to restructure business practice,' the courts should be cautious in requiring that an employer

---

299 422 U.S. 405, 425 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803 (1973)).

300 The standard is well-described in a 1991 case that has been cited favorably by other courts:

If an employer successfully establishes that the challenged business practice significantly serves the employer's legitimate employment goals, a plaintiff may still be able to prevail if he can persuade the factfinder than an alternative practice exists which would meet the employer's legitimate goals without producing an adverse effect on the protected group… But, the Supreme Court has indicated that just suggesting an alternative practice is insufficient to meet the plaintiff's burden: the alternative practice "must be equally effective as [the employer's chosen practice] in achieving [its] legitimate employment goals."

MacPherson v. University of Montevallo, 922 F.2d 766, 771 (11th Cir. 1991) (quoting Wards Cove, 490 U.S. at 611) (brackets in original), quoted with approval in Nash, 895 F. Supp. at 1552. See also Steamship Clerks, 48 F.3d at 601 cited with approval in Graffam, 1995 U.S. App. LEXIS 17120, *9 ("If the employer attempts to justify its actions, the plaintiff may seek to cast doubt on the justification by showing, inter alia, an alternate practice exists that equally protects the employer's putative interest but does not disproportionately burden employees in the protected class."); Brunet v. City of Columbus, 1 F.3d at 411; EEOC v. Joe's Stone Crab, Inc., 969 F. Supp. 727, 740 (S.D. Fla. 1997) (plaintiff must establish that "alternative practice is available which would achieve the same business end without the undesirable effect on minorities."); Rudder, 890 F. Supp. at 46 (articulating the same test for less discriminatory alternatives); Jones, 871 F. Supp. at 313; Allen, 812 F. Supp. at 1245.

301 95 F.3d 948 (10th Cir. 1996).

302 The Court held:

[Plaintiff] requested the court to instruct the jury that she would be entitled to prevail even if the defendants could establish the business necessity of the two-year experience requirement, provided that she could present alternative selection criteria "that would also have served AT&T's legitimate needs but without the same disproportionate impact on women." The district court rejected this request and instead instructed the jury that, to prevail on this issue, [Plaintiff] had to show that any alternative selection criteria would be "equally as effective as Defendant AT&T's experience requirement in achieving Defendant AT&T's legitimate employment goals." The district court's instructions correctly stated the plaintiff's burden in disparate impact cases; as this court had held, a plaintiff's alternative selection criteria must be equally effective in meeting the employer's legitimate employment goals.

Id. at 955 (citing Murphy v. Derwinski, 990 F.2d 540, 544 (10th Cir. 1993)).

303 Stutts v. Sears, Roebuck & Co., 855 F. Supp. 1574, 1581 (N.D. Ala. 1994). In the Stutts decision, plaintiffs challenged Sears, Roebuck's policy of reducing costs through a termination program that provided for voluntary and involuntary severance packages. The plaintiffs challenged the policy as having a disparate impact under the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621 et seq. (1994), and the court assumed arguendo that the alleged disparate impact should be analyzed under Title VII standards. Id. at 1580. The court, after finding that Sears had advanced a legitimate business justification for its compensation practices, held:

adopt practices recommended by the plaintiff in such a context." [304]

An integral part of the plaintiff's burden of proving the existence of an equally effective, less discriminatory alternative practice is a requirement to show that such alternative practice would be equally effective at a cost to the defendant that does not significantly exceed the cost of the challenged practice. The Title VII case law now strongly supports the view that a plaintiff's suggested alternative practice will not be deemed to be "equally effective" absent a **[*489]** showing that the cost to the defendant of maintaining such policy would not be significantly in excess of the cost to the defendant of maintaining the challenged policy. [305]

c. Requirement for the plaintiff to show the defendant's refusal to adopt the alternative practice.

The Civil Rights Act of 1991 states that a plaintiff is entitled to prevail in a disparate impact case if "the complaining party makes the demonstration [required] with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice." [306] This suggests that the plaintiff bears an additional burden of proving that the defendant has refused to adopt its proffered less discriminatory alternative before liability can attach under the third prong. [307] In a number of cases decided both before and after the Civil Rights Act of 1991, this has been an explicit part of the court's holding. [308]

---

In response to defendants' asserted need to cut personnel costs, plaintiff contends that Sears… could have "accomplished savings, similar to those resulting from the severance package… by having been more competitive on pricing of items which would have maintained customer loyalty, increased sales volume, with resulting increased profits." Plaintiff offers no supporting evidence for his contention that a different pricing strategy would have been effective in the context of Sears' overall financial structure, including the wage structure… Plaintiff has not carried [its] burden.

Id at 1581 (quoting Stutts Affidavit P 7). See also Fitzpatrick, 2 F.3d at 1122; Clady v. County of Los Angeles, 770 F.2d 1421, 1432-33 (9th Cir. 1985), cert. denied, 475 U.S. 1109 (1986); Donnelly v. R.I. Bd. of Governors for Higher Educ., 929 F. Supp. 583 (D.R.I. 1996) (plaintiffs' presentation of "brief testimony" regarding less discriminatory alternative inadequate in absence of "specifics regarding their plans"); Allen, 812 F. Supp. at 1245; H.R. Rep. No. 102-40(I) (1991), reprinted in 1991 U.S.C.C.A.N. 581 (plaintiff may prevail if it shows an LDA that has less of a disparate impact and would serve the employer "as well").

304 Stutts, 855 F. Supp. at 1580, (quoting Wards Cove, 490 U.S. at 659; Furnco Construction Corp. v. Waters, 438 U.S. 567, 578 (1978)).

305 See Rudder, 890 F. Supp. at 46 (quoting Wards Cove, 490 U.S. at 661 (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 998 (1988))) ("Factors such as the cost or other burdens of proposed alternatives are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals."); accord Joe's Stone Crab, 969 F. Supp. at 740 ("Increased cost and other burdens imposed by an alternative practice must be considered in making this determination"); Stutts, 855 F. Supp. at 1580. In Nash v. City of Jacksonville, the court cited Watson and quoted MacPherson v. University of Montevallo, 922 F.2d at 771, for the proposition that "The burdens imposed on the employer - including cost - by the alternative practices are "relevant in determining whether they would be equally effective as the challenged practice in serving the employer's legitimate business goals.'" Id. The court then held: "Plaintiff has not shown an alternative selection device which has equal validity and less adverse impact and does not have a burden upon the City in terms of greatly increased costs. Accordingly, the Court finds that Plaintiff cannot prevail under a disparate impact theory." Nash, 895 F. Supp. at 1553.

See also Clady, 770 F.2d at 1432 (rejecting a proffered less discriminatory alternative and stating that "financial concerns are legitimate needs of the employer"); Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1263 (6th Cir. 1981) ("the marginal cost of another hiring policy [is a]… factor[] which should not be omitted from [a less discriminatory alternative] consideration"); Allen, 812 F. Supp. at 1245 (less discriminatory alternative is insufficient "absent any showing that an alternative method was both possible and practical." (emphasis added)).

306 42 U.S.C. 2000e-2(k)(1)(A)(ii) (emphasis added).

307 For an interesting discussion of the practical problems associated with this new provision, see Larson, supra note 294, at 24.01.

308 In the Stutts case, the court held: "In addition, plaintiff has presented no evidence to show that he or anyone else presented the proposed alternative to Sears and Sears refused to adopt it. The Supreme Court has stated that once plaintiff has established a prima facie case, the refusal to adopt an alternative "would belie a claim by [an employer] that their incumbent practices are being employed for nondiscriminatory reasons.'" Stutts, 855 F. Supp. at 1581 (quoting Wards Cove, 490 U.S. at 661). In the Donnelly case, the court rejected the plaintiffs' offered alternative salary structure, not only because plaintiffs provided no specifics regarding their plan, but also because "there is no evidence that the plaintiffs proposed any of those plans to [the defendants] let

**[*490]**

6. Less Discriminatory Alternatives Under the FHA and the ECOA

Courts applying the disparate impact standard under the FHA or the ECOA rarely have discussed, much less reached, the "third prong" of less discriminatory alternatives analysis. However, the accumulated wisdom from federal regulatory and enforcement agencies, court decisions involving private defendants, and the legislative history provides support for the reading of the less discriminatory alternatives standard that is emerging in post-1991 Act Title VII case decisions.

a. Burden of proof to show less discriminatory alternatives

The Federal regulatory and enforcement agencies offer strong support for the identity of the burden of proof standards in private defendant FHA and ECOA cases and the 1991 Act. In 1995, both the Department of Justice and HUD endorsed the Title VII burden of proof standards as the appropriate standards in FHA cases. The Department of Justice, in petitioning the Tenth Circuit Court of Appeals for an en banc rehearing of the panel's decision in Mountain Side Mobile Estates Partnership v. Secretary of HUD, [309] explicitly endorsed the Title VII burden of proof standards, including plaintiff's burden to demonstrate less discriminatory alternatives. [310] For its part, HUD also has stated, in the preamble to 1995 regulations interpreting affordable housing and fair lending standards applicable to federally chartered housing enterprises, [311] that, "when taken together, the FHA regulations and case law, the Civil Rights Act of 1991, **[*491]** and the Interagency Policy Statement provide sufficient guidance concerning" interpretation of fair lending standards. [312] In earlier public statements, HUD had strongly implied that it believed the burden

---

alone that [defendants] refused to adopt them." 929 F. Supp. at 594. Accord, Bramble v. American Postal Workers Union, AFLCIO, 963 F. Supp. 90, 100 (D.R.I. 1997) (ADEA).

309 56 F.3d 1243 (10th Cir. 1995). The petition for rehearing en banc was denied, and the time period for petition for writ of certiorari to the United States Supreme Court has run without any filing.

310 See Docket No. 94-9509, Tenth Circuit Court of Appeals, Secretary's Petition for Rehearing (July 14, 1995) ("Justice Brief"), in which the Department of Justice's memorandum of law on behalf of the Secretary of HUD stated:

The panel majority also agreed with the Secretary [i.e., the Department's position] that the disparate impact standard developed under Title VII of the Civil Rights Act of 1964 … provides the proper model for analyzing disparate impact claims under the Fair Housing Act… The majority also recognized that the disparate impact test involves a three-step analysis… If the defendant rebuts the prima facie case by proving business necessity, the plaintiff can still prevail by showing that other policies "without a similarly undesirable … effect," would serve the defendant's business needs.

Justice Brief, at 4 (citations omitted). The Justice Brief also cites earlier Title VII cases in which the burden is allotted to the plaintiff. Justice Brief, at 7 (citing Albemarle Paper, 422 U.S. at 425); Murphy v. Derwinski, 990 F.2d 540, 545-47 (10th Cir. 1993); Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1428-30 (10th Cir. 1993).

311 Department of Housing and Urban Development, Office of the Secretary, 24 C.F.R. Part 81, The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac); Final Rule, 60 Fed. Reg. 61846 (1995).

312 60 Fed. Reg. at 61,868. As explained by HUD earlier in the preamble, its statement clearly relates to concerns raised over the burden of proof on less discriminatory alternatives:

Fannie Mae stated that the proposed rule, as well as HUD administrative law decisions, suggest that Fannie Mae must accompany the demonstration of business necessity with a showing that no less discriminatory alternative exists for serving that business necessity… Fannie Mae also claimed that the proposed rule provided no effective guidance to the GSEs concerning how to apply this test to their operating procedures… MBA opposed the inclusion of the "less discriminatory alternative" prong of the disparate impact analysis set out in the rule, arguing that making it the GSE's burden to establish this prong would be unfair and inconsistent with case law on which the theory is based.

Id. at 61,867. HUD withdrew the language in the regulations to which the commenters objected, explaining:

The Fair Housing Act and its implementing regulations, which were promulgated in 1989, apply to the GSEs and include a detailed prohibition against discrimination in the purchasing of loans and set forth the business necessity defense to a disparate impact claim involving the purchasing of loans. Thus, when taken together, the Fair Housing Act regulations and case law, the Civil Rights Act of 1991, and the Interagency Policy Statement provide sufficient guidance concerning the application of the statutorily required assessment of disparate results.

of proof on less discriminatory alternatives should be placed upon the defendants. [313] HUD's 1995 regulatory statement that the standards derive from the FHA and the Civil Rights Act of 1991 indicates that it now understands that the burden of proof on the third prong properly belongs with the plaintiff.

Similarly, definitive regulatory language adopted in 1995 by the Federal Reserve Board provides that the burdens of proof under the ECOA are to follow the Title VII standard as codified in the Civil Rights Act of 1991. In 1995, the Federal Reserve Board amended the Commentary to Regulation B [314] to incorporate a reference to the burdens of proof under the Civil Rights Act of 1991. [315] **[*492]** The initial version of the Commentary proposed by the Federal Reserve Board had left open (probably unwittingly) the question of where the burden on less discriminatory alternatives would properly rest. [316] The final version to the Commentary, however, with its explicit reference to the burdens of proof under the Civil Rights Act of 1991, provides strong support for the view that the burden remains with the plaintiff.

The sparse FHA case law continues to be confused on the issue of burdens of proof. As discussed, the courts continue to struggle with the precise nature of disparate impact liability in general, [317] and this uncertainty has led to application of the ″government defendant″ model in cases where a ″private defendant″ model would appear to be more appropriate. [318] However, some recent decisions involving private de-

---

Id. at 61,868 (footnote omitted).

[313] See, e.g., ″Unified Agenda of Federal Regulations, U.S. Department of Housing and Urban Development, Proposed Rules, Disparate Impact Rule, (FR-3534),″ 59 Fed. Reg. 57,087, 57,102 (1994) (HUD intends to propose a disparate impact rule that will ″describe the standards required to demonstrate business necessity and the absence of alternatives with a less discriminatory impact.″). HUD later withdrew the rule from its list of regulatory priorities. See also HUD v. Mountain Side Mobile Estates, Fair Housing-Fair Lending (Prentice Hall) P 25,053, at 25,491 (1993) (stating that HUD, as charging party in a disparate impact administrative law action, argued that the respondents in the case, rather than HUD as the charging party, bore the ″burden of showing less discriminatory alternatives.″).

[314] 12 C.F.R. Part 202 (1997). The Commentary appears in Supplement I to the regulation itself.

[315] The Commentary now states:

The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e-2). Congressional intent that this doctrine apply to the credit area is documented in the Senate Report that accompanied H.R. 6516, No. 94-589, pp. 4-5; and in the House Report that accompanied H.R. 6516, No. 94-210, p. 5.

Id., Supp. I, Comment to 200.6(a)-2 (emphasis added).

[316] See the proposed comments, 59 Fed. Reg. 67,235, 67,237 (1994), which proposed to add commentary stating: ″In addition, credit scoring systems that employ neutral factors could violate the act or regulation if there is a disparate impact on a prohibited basis, unless the practice is justified by business necessity with no less discriminatory alternative available.″

[317] See, e.g., supra note 146 and accompanying text.

[318] See, e.g., Davis v. New York City Housing Authority, 90 Civ. 628, 1997 U.S. Dist. LEXIS 10451 (S.D.N.Y. July 18, 1997). This latest decision in a litigation stretching back more than seven years involved a disparate impact challenge to the New York City Housing Authority's tenant selection and assignment plan (TSAP). After applying the Huntington version of the government defendant test to the case and finding that the plaintiffs had made out a case of prima facie disparate impact, the court enjoined application of the TSAP. The injunction came despite the court's holding that the defendant had demonstrated that the TSAP furthered the legitimate governmental interests of promoting income integration in public housing and increasing the number of working families in public housing - interests that the court noted were required by federal legislation and regulations and the legitimacy of which were expressly conceded by the plaintiffs. The court, however, following the interpretation first announced in Huntington (discussed supra at notes 119-22 and accompanying text), held that the defendant had ″failed to carry its burden of demonstrating that a less-discriminatory alternative would not advance its claimed interests.″ Id. at *44-45. The court noted that the plaintiffs proposed an alternative method of reconfiguring the immensely complex TSAP to increase upper income family distribution. Despite the fact that the authority argued without contradiction that the alternative would diminish the proportion of working families in its public housing, the court found that the plaintiff's proposed alternative was ″plausible″ and ″seem likely″ to have a somewhat less statistical impact on minority housing applicants and, therefore, held that the defendant had failed to carry its burden of demonstrating the negative ″that a less-discriminatory alternative would not advance its claimed interest.″ Id.

fendants - as opposed to governmental or **[*493]** "public" defendants [319] - have articulated a version of the test that allocates to the plaintiff the burden of proof on less discriminatory alternatives. Most prominently, the Tenth Circuit, in Mountain Side, strongly endorsed the pre-Wards Cove reading of the third prong adopted by the Supreme Court. [320]

**[*494]**

b.

"Equal effectiveness" and cost considerations

Again, comparatively little guidance exists in the case law regarding the showing required under the less discriminatory alternative prong. However, presuming that the private defendant, three-part liability test applies under Title VIII and the ECOA, it is fair to conclude that, in order to carry its burden, a plaintiff must prove that a less discriminatory alternative would be "equally effective" in meeting the defendant's legiti-

---

Pity the New York City Housing Authority, caught between the Scylla and Charybdis of required federal legislative and regulatory policies and a court willing to enjoin a plan scrupulously faithful both to the federal policies and the need to consider minute statistical impacts upon a wide variety of protected class interests that any plan necessarily must have.

319 In FHA cases against governmental entities, particularly where a plaintiff challenges a zoning or other land-use regulation, courts continue to apply a distinct test based on a quasi-constitutional, "least restrictive means" standard. See, e.g., Oxford House v. Town of Babylon, 819 F. Supp. 1179, 1182 (E.D.N.Y. 1993); Potomac Group Home Corp. v. Montgomery County, 823 F. Supp. 1285, 1296 (D. Md. 1993).

320 See, e.g., Mountain Side, 56 F.3d at 1254 (quoting Watson, 487 U.S. at 998). See also Burnett v. Venturi, 903 F. Supp. 304, 311 (N.D.N.Y. 1995) ("If the defendant does in fact come forward with evidence in his defense, the Court will allow a plaintiff to demonstrate, if possible, that the defendant's stated reason for denying the plaintiff's application for housing was pretextual.")

There are a number of recent cases that also seem to suggest that part of the burden lies with the defendant, but that, in the final analysis, actually put the burden on the plaintiff. See Wilson v. Glenwood Intermountain Properties, Inc., 876 F. Supp. 1231 (D. Utah 1995), in which the court stated that the defendant must show that "the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential impact." Id. at 1242 (quoting Williams v. Colorado Springs, 641 F.2d 835, 841 (10th Cir. 1981) (Title VII)). However, in making its holding the court stated that the defendant showed a ""manifest need' to stay in business," and that "moreover, the Plaintiffs have presented to the court no evidence that other acceptable alternative policies exist which would accomplish the Defendant Landlords' business practice equally as well as the current practice." Id. See also Snyder, 953 F. Supp. at 221, in which the district court, in dismissing summary judgment claims of both parties in a familial status disparate impace claim, characterizes the holding in Mountain Side as requiring "landlords to use the least restrictive practice to accomplish their non-discriminatory goals. If they do not do so, the Mountain Side standard deems the explanation pretextual." However, the court dismissed the plaintiff's summary judgment motion, stating that plaintiffs had failed to "unecquivocally demonstrate that [defendant's] non-discriminatory reason is more restrictive than necessary." Id. at 222. The Snyder case appears to badly misread the holding in Mountain Side and further demonstrates the doctrinal difficulties associated with the hybrid government defendant/Title VII FHA analysis.

See also 5300 Columbia Pike, in which the court, in dictum, stated: "Assuming defendants succeed in establishing a legitimate business purpose, and showing that no less discriminatory alternative was available to accomplish that purpose, the burden will shift to plaintiffs to present evidence showing that defendants' explanations are merely pretextual and that impermissible discrimination was in fact involved." 891 F. Supp. at 1181 (citing Betsey, 736 F.2d at 988). The court's reliance on Betsey for the notion that the less discriminatory alternative burden is on defendants is in error. Moreover, in other parts of the decision, the court appears to require the finder of fact to make an inference of intent before liability can attach, stating that, once defendant has shown a legitimate business justification, "the burden shifts finally back to the plaintiff to prove that there was discrimination by showing that the proffered justification is pretextual. At that point, defendant must prevail if it appears that the disparity was attributable to economic inequality rather than impermissible discrimination." Id.

The Fourth Circuit Court of Appeals, in affirming the grant of summary judgment in Williams, strongly implied in dictum that it believed the district court's initial recitation which suggested that the alternatives burden might be on the defendant to be erroneous. The court stated: "We have no opportunity to determine whether, after a prima facie case of disparate impact has been established, a party's rebuttal burden includes a showing that there is no less discriminatory alternative to the challenged practice, as the district court held. Compare Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 936 (2d Cir. 1988) (articulating this standard), aff'd, 488 U.S. 15 (1988), with Mountain Side Mobile Estates v. HUD, 56 F.3d 1243, 1255 (10th Cir. 1995) (rejecting this standard)." Williams v. 5300 Columbia Pike, Nos. 95-2964, 95-3091 1996 U.S. App. LEXIS 31004, *12, n.5 (4th Cir. Dec. 3, 1996).

mate business objectives. One recent FHA case held that the plaintiffs' cause of action failed upon the defendants' requisite showing of business justification, because ″the Plaintiffs have presented to the court no evidence that other acceptable alternative policies exist which would accomplish the Defendant Landlords' business practice equally as well as the current practice.″ [321] Moreover, the Department of Justice, in the memorandum supporting its motion for rehearing en banc of the Tenth Circuit's Mountain Side decision, endorses the use of the ″equally effective″ standard derived from Title VII cases. [322] There is virtually no case law in the ECOA arena. However, the Commentary to Regulation B supports the view that an alternative must be equally effective in order to sustain the plaintiff's burden. [323]

The best available ECOA guidance is drawn from the Regulation B standards for determining whether a credit scoring system is a ″qualified credit scoring system.″ Those standards state that such systems must be ″developed for the purpose of evaluating the creditworthiness of applicants with respect to **[*495]** the legitimate business interests of the creditor utilizing the system (including, but not limited to, minimizing bad debt losses and operating expenses in accordance with the creditor's business judgment).″ [324] Again, this language relates more to the defendant's business justification but strongly implies that, for an offered substitute to be considered a true ″alternative,″ it must achieve economic results that are at least roughly equal to the results obtained by using the challenged practice.

c. Requirement of plaintiff to show defendant's refusal to adopt the alternative practice.

There is no case law or guidance on this issue. Where, upon discovery, it can be shown that a defendant knew or should have known of the existence of an equally effective, less discriminatory alternative practice that did not impose significant costs upon the defendants, there is no statutory or case precedent beyond the Title VII analogy suggesting that a plaintiff's failure to ″prove″ that the defendant ″refused to adopt″ this alternative would bar relief.

III. The Antidiscrimination Principle at Twenty Years: Toward a Unified Theory of Discrimination

If courts continue to follow the unmistakable trend in employment discrimination law, they will adopt a quite narrow disparate impact test for use in FHA/ECOA cases. The logical end-point of the law's development is found in the rule proposed in the Watson v. Fort Worth Bank & Trust plurality, in which Justice O'Connor suggested that a finding of unlawful disparate impact should be the ″functional equivalent″ of a finding of intentional discrimination. [325] While the 1991 Act codified the Title VII disparate impact standard, it has not slowed the seemingly inexorable movement of the federal courts toward an ever narrower scope of disparate impact liability. The recent FHA cases from the courts of appeals are follow-

---

321 Wilson, 876 F. Supp. at 1242.

322 Justice Brief, supra, note 310, at 10: ″The record shows that there are less discriminatory, but equally effective, alternatives to Mountain Side's three-person-per-mobile-home rule. HUD proposed to the Secretary and to the ALJ a number of options, each of which would have had a less disparate impact on families with minor children, and yet, still would have been as effective as the three-person rule in accomplishing Mountain Side's goals.″

323 See 12 C.F.R. 202.6(a), Supplement I to Part 202, Comment 6(a)-2 (1994) (disparate impact will result in liability ″unless the creditor practice meets a legitimate business need that cannot reasonably be achieved as well by means that are less disparate in their impact″) (emphasis added).

As to whether the cost of a proffered alternative is a necessary, or appropriate, part of considering whether it is ″equally effective,″ again, there is little help in case law. However, there is some support for inclusion of cost considerations that strengthens the Title VII considerations suggesting that defendants' costs are relevant. Congress, in the 1988 amendments to the FHA, recognized that the consideration of a lender's costs is relevant, stating that parties subject to the FHA are not precluded from ″taking into consideration factors… which relate to the financial security of the transaction or the protection against default or diminution in value of the security.″ H.R. Rep. 100-711, supra note 282, reprinted in 1988 U.S.C.C.A.N. at 2191. While this language does not relate strictly to costs of alternatives, it shows that costs are an integral part of the lender's consideration of business justification. In addition, the Joint Policy Statement, supra note 5, approves lenders' consideration of factors such as ″cost and profitability.″ 59 Fed. Reg. at 18,269.

324 12 C.F.R. 202.2(p)(1)(ii) (1997).

325 Watson v. Fort Worth Bank & Trust Co., 487 U.S. 977, 998 (1988) (plurality opinion).

ing this trend as well. Indeed, as discussed in comparing the Title VII and Title VIII cases closely, the Mountain Side decision - clearly the most important recent FHA decision addressing disparate impact - goes so far as to appropriate, verbatim, the Supreme Court's formulation of the test from the Wards Cove decision, a formulation thought by many to have been discredited by the 1991 Act.

**[*496]** Perhaps the clearest example of this narrowing trend is found in the tendency of recent cases to refer to the third prong of the disparate impact test - the plaintiff's burden of showing less discriminatory alternatives - solely as a means for the plaintiff to demonstrate that the defendant's legitimate business justification is pretextual, or, in other words, is merely an after-the-fact rationalization of a policy that either directed or, at the least, tolerated in a consciously indifferent manner, the operation of discriminatory behaviors. [326] This interpretation of the third prong of the disparate impact standard has been adopted in a number of recent FHA decisions as well. [327] Courts have found support for this reading in the provision of the 1991 Act that requires the plaintiff to demonstrate not only that an alternative employment practice is equally effective and less discriminatory, but also that the defendant "refuses to adopt such alternative employment practice." [328] Evidence that a defendant has refused to do something is probative of knowledge of the alternative(s), that is, the defendant's state of mind and intent, consisting of a volitional failure to **[*497]** adopt a less discriminatory alternative. [329] All of this tends to suggest that the disparate impact test - although codified in Title VII - might be construed as merely an evidentiary variant of the disparate treatment doctrine, using modified McDonnell Douglas standards to permit purely statistical evidence to be used in a manner that is probative of intent. [330] Indeed, one recent Title VII case goes so far as to an-

---

326 The "pretext" reading of the less discriminatory alternative prong of the disparate impact doctrine derives from Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975), where the Supreme Court, citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973), stated that a showing of the existence of a less discriminatory alternative "would be evidence that the employer was using its tests merely as a "pretext' for discrimination." This formulation of the plaintiff's ultimate opportunity to prevail is used in Connecticut v. Teal, 457 U.S. 440, 447 (1982) and New York Transit Authority v. Beazer, 440 U.S. 568, 587 (1979); was approved in Watson, 487 U.S. at 998 (evidence of less discriminatory alternatives "would... be relevant in determining whether the challenged practice has operated as the functional equivalent of a pretext for discriminatory treatment."); and was cited by the court in Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 660 (1989). Numerous decisions since the passage of the Civil Rights Act of 1991 continue to rely on this "pretext" interpretation of the third prong of the test. See, e.g., EEOC v. Steamship Clerks, 48 F.3d 594, 602 (1st Cir. 1995) (citing Wards Cove and Albemarle Paper Co.). See also Barbara J. Flagg, Fashioning a Title VII Remedy for Transparently White Subjective Decisionmaking, 104 Yale L.J. 2009, 2024 (1995) ("Flagg, Fashioning a Title VII Remedy") ("The implication, of course, is that the plaintiff's ultimate objective in a disparate impact claim is to demonstrate that the defendant intentionally employed a facially neutral criterion of decision because of its discriminatory effects.").

327 See, e.g., Mountain Side Mobile Estates v. Secretary of HUD, 56 F.3d 1243, 1257 (10th Cir. 1995) (holding that defendant had carried its burden by presenting "legitimate, non-pretextual justifications for its occupancy limitations"); Burnett v. Venturi, 903 F. Supp. 304, 311 (N.D.N.Y. 1995) ("If the defendant does in fact come forward with evidence in his defense, the Court will allow a plaintiff to demonstrate, if possible, that the defendants stated reason for denying the plaintiff's application for housing was pretextual."); Williams v. 5300 Columbia Pike Corp., 891 F. Supp. at 1180, aff'd on other grounds 1996 U.S. App. LEXIS 31004 (4th Cir. Dec. 3, 1996) ("If the defendant succeeds [in carrying its legitimate business justification burden], the burden shifts finally back to the plaintiff to prove that there was discrimination by showing that the proffered justification is pretextual.").

328 42 U.S.C. 2000e-2(1)(A)(ii). And, as noted earlier, courts have based holdings for defendants on the grounds that a plaintiff has failed to demonstrate that it made such an offer or that such offer was refused. See supra note 308 and accompanying text.

329 One commentator, in considering the 1991 Act's language, has stated, "It remains to be seen whether "refusing' to adopt an alternative criterion means only a failure to use it, or requires knowledge of its existence as well." Flagg, supra note 326, at 2023 (citing Charles A. Sullivan et al., Employment Discrimination 4.3.3 n.11 (2d ed. 1988 & Supp. 1992)). (What Sullivan et al., actually state is: ""Refuse' seems to mean more than mere failure to be using the alternative practice. Proof of knowledge of the existence of the alternative coupled with the failure to start using it would probably suffice.") Professor Flagg's agnosticism regarding the meaning of the statutory language appears to overlook the plain meaning of the word "refuses," but courts have not yet authoritatively construed this provision of the 1991 Act.

330 The judicial and legislative developments described here that reflect this interpretation were prefigured in George Rutherglen's insightful 1987 analysis of disparate impact principles, which has significantly influenced my thinking on the subject. See George Rutherglen, Disparate Impact Under Title VII: An Objective Theory of Discrimination, 73 Va. L. Rev. 1297 (1987). Professor Rutherglen argues that prevention of pretextual discrimination is the overarching purpose of Title VII and that a rigorously defined disparate impact standard - one that imposes a less onerous "business necessity" burden on the defendant - is the best means of effectuating Title VII's central purpose:

nounce explicitly that disparate impact liability requires a finding of intent. [331] Courts are also grappling with whether the disparate impact doctrine **[*498]** has any place at all in closely related statutes such as Section 504 of the Rehabilitation Act of 1973 [332] and the ADEA. [333]

Why have courts come full circle concerning the meaning of the disparate impact test? This article has attempted to clear the brush obscuring both the FHA cases and the recent Title VII cases - to clarify what the law is today - in a way that will permit more informed discussion of what the law ought to be. What leaps

---

The most compelling purpose of the theory of disparate impact - to prevent pretextual discrimination - is better served by placing a moderate burden upon defendants, rather than a heavy burden that would, in effect, prevent hidden discrimination only by requiring reverse discrimination. A heavy burden serves the more controversial purpose of promoting equal opportunity directly by discouraging employment practices with adverse impact, but only at the risk of contradicting the prohibition against required preferences in [Title VII]… The theory of disparate impact represents an uneasy compromise between the abstract and ambiguous ideal of economic equality and the means that Congress thought sufficient to achieve it. The theory resists neat formulation because it embodies sometimes contradictory purposes, particularly on the issue of business justification. This tension between the different purposes of the theory of disparate impact can be alleviated, if not eliminated entirely, by subordinating the goal of racial and sexual balance to the dominant purpose of preventing pretextual discrimination. The only effective means of doing so is by moderating the burden of business justification placed upon defendants, particularly by the Uniform Guidelines on Employee Selection Procedures.

Id. at 1315-16 (footnote omitted). The case law development in the nine years since the publication of Rutherglen's thesis demonstrates the cogency of his analysis, as courts have groped their way down the path he demarcated over a decade ago. Curiously, however, only one unrelated federal case and a few commentators have recognized the prescience with which he analyzed how courts would begin to interpret the theory of disparate impact liability.

331 The district court in United States v. North Carolina, 914 F. Supp. 1257 (E.D.N.C. 1996), reached this extraordinary conclusion by reasoning that the disparate impact theory under Title VII itself, as embodied by Griggs v. Duke Power Co., has been overruled sub silentio by the Supreme Court. The court vacated the proposed settlement of the EEOC's race and gender disparate impact claims against the North Carolina Department of Corrections, holding that it lacked subject matter jurisdiction over the parties because the United States had failed adequately to state a case or controversy within the meaning of Article III of the Constitution. At the heart of the court's extraordinary opinion is its holding that: "Disparate impact analysis begins with the identification of an intentionally discriminatory practice that is demonstrably the cause of the complained impact." North Carolina, 914 F. Supp. at 1264. Addressing the obviously contrary Supreme Court precedent, the court stated:

The Supreme Court has overruled Griggs sub silentio. The concept of "unintentional discrimination" is logically impossible. Title VII was never intended to require employers to hire by racial, sexual, or other quota applicants who failed to qualify for a job because they could not meet some objective requirement.

Id. at 1265. The court reviewed the language from the Watson plurality that a finding of disparate impact means that the employer's practice is in operation "functionally equivalent" to discrimination, and placed great significance on Justice O'Connor's further statement that "in Griggs, the employer had a history of overt intentional discrimination." Id. at 1266. From this, the court concluded: "Thus, the ingredient necessary to transform a neutral practice into the "functional equivalent' of a Title VII violation is prior history of overt discrimination. The intent to discriminate may have been demonstrated at some point in the past, but it is nevertheless a required element of all Title VII complaints." Id. (citation omitted).

Since the United States voluntarily dismissed its appeal, see United States v. North Carolina (No. 96-1509, 4th Cir., motion to dismiss granted May 30, 1996), United States v. North Carolina presumably stands as precedent, although it is by no means clear that a holding that disparate impact theory no longer provides an independent basis for liability under Title VII absent a showing of past or present intentional discrimination will wield much influence in the near term.

332 87 Stat. 394, codified as amended, 29 U.S.C. 794. See Alexander v. Choate, 469 U.S. 287, 292-99 (1985), in which Justice Marshall, writing for a unanimous Court discussed - but ultimately declined to determine - whether disparate impact liability would ever be appropriate under 504.

333 Three members of the Supreme Court have opined that "there are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA." Hazen Paper Co. v. Biggins, 507 U.S. 604, 618 (1993) (Kennedy, J., concurring). While Hazen was a disparate treatment case, and thus the Kennedy concurrence merely dictum, some courts have relied upon it as a basis for applying a very rigorous disparate impact test under the ADEA. See EEOC v. Francis W. Parker Sch., 41 F.3d 1073 (7th Cir. 1994), a case under the ADEA applying a disparate impact theory. There, the court held: "Ultimately, the EEOC must show that [the defendant's] rationale is… predicated on some stereotype, conscious or unconscious. Otherwise, summary judgment in favor of [the defendant] is proper." Id. at 1078 (citation omitted). See also Ellis v. United Airlines, Inc., 73 F.3d 999, 1007-10 & n.12 (10th Cir. 1995) (holding disparate impact theory not cognizable under ADEA); DiBiase v. Smith Kline Beecham Corp., 48 F.3d 719 (3d Cir. 1995). But see Smith v. City of Des Moines, 99 F.3d 1466 (8th Cir. 1996) (holding disparate impact is cognizable under the ADEA), reh'g denied 1997 U.S. App. LEXIS 48 (8th Cir. Jan. 2, 1997); accord Mangold v. California Pub. Util. Comm'n, 67 F.3d 1470 (9th Cir. 1995); Houghton v. SIPCO, Inc., 38 F.3d 953, 958 (8th Cir. 1994).

out from a detailed review of these cases is the striking similarity between the judicial concerns animating the recent Title VII and Title VIII cases **[*499]** and those underlying the Supreme Court's landmark decision in Washington v. Davis. [334] These concerns are focused less on vindication of substantive principles and more on questions of practicability and judicial-institutional competence. The Davis decision and the more recent jurisprudence moving toward a "functional equivalent of intent" interpretation of disparate impact under statutory law reflect common concerns. Above all, one detects a significant judicial antipathy toward doctrines that appear unconstrained by meaningful limiting rules or standards. The judiciary seems to have concluded, in both constitutional and statutory settings, that, absent a principle based on intent or "the functional equivalent" thereof, disparate impact doctrine appears to have a limitless reach. Absent such a limiting principle, the judicial role would threaten to usurp those of market actors and political institutions; the crux of the matter is that no one has yet been able to offer a limiting principle that effectively replaces the factfinder's inference of motive.

The observation that the judiciary is reluctant to displace decentralized market decisionmaking or to become entangled in administering large segments of private and governmental institutions is hardly novel. Indeed, many of the seminal legal analyses of Washington v. Davis emphasize the impact of these practical and institutional considerations on the willingness of the Supreme Court to extend the reach of constitutional remedies. [335] The Supreme Court has **[*500]** not addressed this point directly in its recent Title VII decisions, [336] but has not been as reticent in discussing these institutional concerns in other statutory settings. Indeed, Justice Marshall, writing for a unanimous Court in Alexander v. Choate, squarely rejected "the boundless notion that all disparate-impact showings constitute prima facie cases under 504"

---

[334] 426 U.S. 229 (1976).

[335] Professor Laurence Tribe's analysis of the Supreme Court's intent requirement in equal protection claims provides perhaps the best summary:

In those cases where the Court has invoked the discriminatory intent requirement, the remedies sought often posed the risk that the federal courts would become deeply enmeshed in the machinery of state and local government, reviewing equal protection challenges to seemingly neutral government choices about the allocation of public funds, the zoning of land in residential neighborhoods, the elimination of traffic problems, and the very structure of local government. The Supreme Court may be forgiven for being taken aback by this prospect; the institutional concerns about such a role for the judiciary are serious and legitimate.

Lawrence H. Tribe, American Constitutional Law 16-20, 1511-12 (2d ed. 1988) (citations omitted). See also Brest, supra note 23, at 26 ("Davis reflects both the centrality of race-dependence to the Equal Protection Clause and the judicial unmanageability of a general rule requiring an extraordinary justification for practices that produce racially disproportionate effects"); Flagg, supra note 21, at 1014 (describing Justice White's "parade of horribles" as "the most persuasive argument articulated in Washington v. Davis"); Lawrence, supra note 23, at 320, n.10 (citing cases supportive of the judicial economy argument); Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 Harv. L. Rev. 407, 472 (1989) (the Court's intent requirement "is best understood at least partly as an outgrowth of institutional concerns. If courts held that a disproportionate effect sufficed to raise constitutional doubts, a wide variety of governmental policies would be seriously questioned - an extremely intrusive outcome that might be inappropriate in light of the properly limited role of the judiciary in American government.").

This is not to say that Professor Tribe supports the Supreme Court's intent requirement under the Equal Protection Clause. Professor Tribe would prefer the Court to announce that equal protection encompasses practices with unjustifiably disparate impact, but that the Court's remedial and institutional concerns prevent the violation from being remedied through judicial decree. "A right to equal protection of the laws, even if not perfectly enforceable in court, remains a right legally valid to its full conceptual limits; federal judicial decisions which stop short of those limits merely indicate the boundaries of the federal courts' role in vindicating those rights." Tribe, supra at 1512-13 (citations omitted). One dissenter from this widely held view is Professor Michael Selmi, who argues that what he describes as the "institutional concern" theory cannot explain the Supreme Court's determination to adopt an intent requirement in equal protection cases. Rather, he argues that the Court's decisions in discrimination cases, both constitutional and statutory, are explained nearly entirely by the "vituperatively conservative" and "overtly political" normative vision of the Court over the past thirty years. Selmi, Proving Intentional Discrimination, supra note 243, at 348. Professor Selmi argues that the lack of availability of a disparate impact standard in equal protection doctrine is irrelevant, since the "normative judgments and vision the Court brings to its discrimination cases would limit the force of an impact theory in the same fashion that it limits the Court's intentional discrimination doctrine." 86 Geo. L.J. at 285.

[336] The closest statement that the Supreme Court has made is found in the Watson plurality, which refers more to judicial self-restraint than illimitable principles and unmanageable remedies in stating that "courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it." Watson, 487 U.S. at 999 (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 578 (1978)).

[337] of the Rehabilitation Act of 1973. Justice Marshall provided a cogent summary of the core problems of disparate impact doctrine that reaches beyond the specific context of the Rehabilitation Act:

The position urged by respondents - that we interpret 504 to reach all action disparately affecting the handicapped - is also troubling. Because the handicapped typically are not similarly situated to the nonhandicapped, respondents' position would in essence require each recipient of federal funds first to evaluate the effect on the handicapped of every proposed action that might touch the interests of the handicapped, and then to consider alternatives for achieving the same objectives with less severe disadvantage to the handicapped. The formalization and policing of this process could lead to a wholly unwieldy administrative and adjudicative burden. [338]

**[*501]** The judiciary's fundamental uneasiness with the consequences of a broad reading of the disparate impact standard has played a significant role in the incremental narrowing of the statutory doctrine's scope. And this lack of theoretic comfort surely has been compounded by judges' day-to-day experiences with the hundreds of cases that have involved them in administering remedial decrees imposed on employers (particularly public employers), sometimes over the course of decades. [339]

However, grasping the practical and theoretical issues driving the case law development does not preclude a theoretical basis for using disparate impact evidence beyond the narrow confines of intentional discrimination - in the realms of employment discrimination, fair housing and lending, and, indeed, of equal protection doctrine generally. Even within the Watson opinion, an unresolved question looms large: What did the plurality mean by its suggested formulation that disparate impact liability represents a finding of the "functional equivalent" of intentional discrimination? One hint is found in the actual holding in the case. The holding - which commanded a seven-Justice majority - was that subjective decision-making processes can be scrutinized under a disparate impact theory in the same manner as objective tests or requirements. [340] As noted earlier, [341] there is ample basis to hold that both Title VII and Title VIII embrace liability for "merely" consciously maintaining **[*502]** practices that are entirely subjective or undocumented and that result in a discriminatory impact.

---

337 Alexander, 469 U.S. at 299.

338 Id. at 298. The Court in Alexander v. Choate did not reject disparate impact analysis, but instead assumed without deciding that "504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped." Id. at 299. This assumption permitted the Court to analyze the claim on its merits without endorsing the theory, since it determined that, even if disparate impact theory were to apply, it would not have invalidated the State of Tennessee's actions challenged in the claim before the Court. Id. at 309. This determination allowed Justice Marshall to maintain, if but shakily, his goal to "be responsive to two powerful but countervailing considerations - the need to give effect to the statutory objectives and the desire to keep 504 within manageable bounds." Id. at 299. And, as Justice Marshall's review of the legislative history of 504 demonstrates, the statutory objectives tended toward a disparate impact analysis much more strongly than the legislative history of either Title VII (even prior to the 1991 Act) or Title VIII. Justice Marshall stated that Congress had concluded that "discrimination against the handicapped was… most often the product, not of invidious animus, but rather of thoughtlessness and indifference - of benign neglect." Id. at 295 (footnote omitted). In other words, despite Congress' explicit finding that most harms to the handicapped were caused by unintended behaviors, the Court remained unwilling to recognize a boundless theory of disparate impact under the statute because of the problems of institutional competence that it identified.

339 See, e.g., Brunet v. City of Columbus, 1 F.3d 390 (6th Cir. 1993), an opinion of the Sixth Circuit Court of Appeals resolving claims stemming from firefighter examinations administered in 1980 and 1984, the results of which were used to rank candidates in accordance with procedures ordered by a district court in a remedial decree in Dozier v. Chupka, 395 F. Supp. 836 (S.D. Ohio 1975). A review of the opinion indicates that there were no fewer than twenty separate district court actions, numerous appeals and cross-appeals.

340 See Watson, 487 U.S. at 999-1000.

341 See the discussion of the exceptions to the particularity requirement for challenges to inextricably interwoven practices and decisionmaking and the corresponding development of a rule disfavoring subjective practices in the fair lending cases, at supra notes 200-06 and accompanying text and notes 227-32 and accompanying text, respectively. See also Gaines v. Boston Herald, Inc., 1998 U.S. Dist. LEXIS 5257 (D. Mass. Mar. 30, 1998), holding that a violation of Title VII can be made out when "there is evidence that the subjective decision-making process coincides with a significant disparity in the representation of a particular group.'" 1998 U.S. Dist. LEXIS 5257, *39 (quoting Mohammed v. Calloway, 698 F.2d 395, 401 (10th Cir. 1983)).

This measured broadening of the antidiscrimination principle resonates in the constitutional cases as well, hearkening back to the earliest equal protection cases employing disparate impact theory. Courts often held, in the words of Judge Skelly Wright, that "the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." [342] In his landmark article, Paul Brest characterized proof of "racially selective indifference" as a basis for constitutional relief when it can be shown to be "a causal factor in the adoption or retention of practices that are not overtly race-dependent" but that have a disproportionate impact. [343] But, at least in the constitutional realm, even this incremental extension would appear to be proscribed under current doctrine, since the Court has held that the requirement of discriminatory purpose "implies that the decisionmaker,… selected or reaffirmed a particular course of action at least in part "because of,' not merely "in spite of,' its adverse effects upon an identifiable group." [344]

Professor Daniel Ortiz has suggested that the Supreme Court's supposed rigid adherence to the "intent" requirement in equal protection cases actually wavers in cases that do not involve housing or employment. [345] Professor Ortiz analyzes housing, employment, voting rights, jury selection and education (school desegregation) equal protection cases and concludes:

In the housing and employment cases, the plaintiff must show current, actual discriminatory motivation; in the others, current disparate effects plus some other showing - at most of motivation in the past or in decisions unrelated to the one under consideration -**[*503]** suffice. Not only is it much more difficult to prove intent in the housing and employment cases, but, more interestingly, they involve a completely different kind of inquiry. [346]

According to Ortiz, the Court's emphasis on intent in equal protection housing and employment cases reflects a conscious, though obscured, substantive decision to refrain from intervening in "market" controlled areas. He argues that the Court's relative willingness to dispense with an intent requirement in voting rights, jury selection and education cases reflects its substantive view that judicial reordering of allocational interests is much more appropriate in such cases. [347]

---

342 Hobson v. Hansen, 269 F. Supp. 401, 497 (D.D.C. 1967) (Wright, J.), aff'd sub nom. Smuck v. Hobson, 408 F.2d 175 (D.C. Cir. 1969) (quoting Baker v. Carr, 369 U.S. 186, 226 (1962) ("discrimination-in-fact is bad when it "reflects no policy, but simply arbitrary and capricious action.'")). The court in Black Jack quoted this statement in explaining its decision to read a disparate impact standard into the FHA. See United States v. City of Black Jack, 508 F.2d at 1185.

343 Brest, supra note 23, at 14.

344 Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) (footnotes omitted) (sustaining Massachusetts' veterans' preference statute against an equal protection challenge based on gender discrimination). Because of Feeney, writes Professor Sunstein, the intent test "disregards the phenomenon of selective racial care and indifference." Cass R. Sunstein, Lochner's Legacy, 87 Colum. L. Rev. 873, 897 n.119 (1987) ("Lochner's Legacy"). Professor Sunstein implies that consideration of selective indifference would be appropriate, writing: "The equality decision should be whether the actor would have made the decision regardless of which group was helped and which hurt. Such an inquiry would also turn on intent, but it would call into question a larger number of government decisions." Id.

345 See Ortiz, supra note 18, at 1140.

346 Id. at 1137.

347 Professor Ortiz writes:

Seeing intent in this way helps explain both the gap between the housing and employment cases and the others, and the rest of the hierarchy of value that the intent doctrine reflects. In those areas traditionally relegated primarily to market control, like housing and employment, the intent doctrine requires actual motivation. This not only makes judicial supervision of government participation in and regulation of these markets difficult, but it also places beyond constitutional question differences, like those in education or wealth, upon which market rewards at least in part depend. Intent thus protects not only the government's decision to participate, intervene, or not intervene in traditional markets, but also the criteria, like wealth endowments, through which we structure society in these areas.

In other contexts, such as voting, jury selection, and school desegregation, the Court does not protect these cohort classifications. In fact, in these areas, the Court has independently condemned discrimination on the basis of those classifications, like wealth, on which the market operates.

Professor Ortiz's insightful analysis helps to illuminate the contradiction inherent in contemporary disparate impact doctrine. The Supreme Court apparently has concluded that housing and employment markets are areas in which only very limited judicial intervention is appropriate and thus has established a strong constitutional doctrine of intent. But the courts have not failed to recognize that these are precisely the same areas which the political branches have decided are to be governed by the disparate impact doctrine. Expansive interpretations of disparate impact doctrine would force the courts to regulate a wide range of private activities within these markets. The effect of **[*504]** the Court's rejection of disparate impact analysis in the constitutional realm and the statutory application of the doctrine in employment and housing is that private, "market" actors are potentially liable under theories that could not be applied to the government itself. For example, the Court in Feeney refused to strike down a statute explicitly favoring veterans for employment and promotion in state jobs, despite the fact that the statute resulted from a "volitional" choice by the Massachusetts Legislature that would have a "foreseeable" adverse impact on women because it was enacted only "in spite of," rather than "because of," its adverse impact. [348] In contrast, courts have upheld Title VII disparate impact claims in cases where private employers have adopted nearly identical preferences for veterans. [349]

Of course, there are good reasons for courts to refuse to intervene in a case on constitutional grounds while upholding a claim on a statutory basis. The Federal courts are the final arbiter of constitutional matters; when the Supreme Court speaks on a constitutional matter, the matter is decided absent constitutional amendment or doctrinal reverse (at no little cost to the principle of stare decisis) within the Court itself. Cases decided by reading meaning into ambiguous statutory formulations are reversible within the legislative branch of government. Thus, a court may be relatively more willing to engage in what it might regard as a less certain doctrinal formulation or remedy, because the legislative process can serve as a backstop to interpretive errors having political or redistributive implications.

The preceding indicates that courts are increasingly reluctant to operate with such latitude in the realm of statutory disparate impact. Courts appear to be concluding that legislative guidance on standards of liability is so wanting that bold judicial extension of disparate impact doctrine is unwarranted. Viewed from this perspective, the 1991 Act signifies less the ratification of a broad dis **[*505]** parate impact doctrine than a congressional abnegation of responsibility to set forth substantive criteria to determine the meaning of key elements of the doctrine. Given the potentially large political and redistributive consequences of disparate impact theory, the lower Federal courts appear unwilling to take on the role of attempting to fill the large void in public and political consensus left by the 1991 Act by furnishing "common law" standards that would stretch the doctrine beyond the narrow confines explicitly recognized in recent Supreme Court decisions. [350]

---

Id. at 1140 (footnotes omitted). Professor Ortiz's interpretation of the equal protection cases draws upon Professor Sunstein's argument that the Court continues to use principles of judicial neutrality that are fundamentally similar to the substantive due process analysis employed in Lochner v. New York, 198 U.S. 45 (1905). See Sunstein, Lochner's Legacy, supra note 344. Professor Sunstein argues that Lochner-like principles permeate the Court's modern jurisprudence and that the intent requirement exemplifies this trend: "For the Lochner Court, neutrality, understood in a particular way, was a constitutional requirement… [The intent requirement] also depends on a Lochner-like premise that discriminatory effects are simply "there,' so that the course of neutrality lies in indifference to race (what appears and is treated as inaction)." Id. at 874, 897.

348 Feeney, 442 U.S. at 278-79.

349 See Bailey v. Southeastern Area Joint Apprenticeship Comm'n, 561 F. Supp. 895, 912 (N.D. W. Va. 1983); Woody v. City of West Miami, 477 F. Supp. 1073, 1078 (S.D. Fla. 1979); Krenzer v. Ford, 429 F. Supp. 499, 502 (D.D.C. 1977). Remarkably, Title VII itself insulates legislative actors from any challenge based upon the disparate impact of a veterans' preference. See 42 U.S.C. 2000e-11 (1994) ("Nothing contained in this subchapter shall be construed to repeal or modify any Federal, State, territorial, or local law creating special rights or preference for veterans."). However, this exemption has been held applicable only to veterans' preferences in laws, and not to private employer preferences, even where such preferences were adopted at the urging of the Federal government as a means of providing opportunities to veterans. See Brown v. Puget Sound Elec. Apprenticeship and Training Trust, 732 F.2d 726 (9th Cir. 1984). Thus, the plaintiff in Feeney could not successfully sue the State of Massachusetts - a public employer - but could have successfully sued a private employer granting the exact same preference.

350 Professor Randall Kennedy has made a strongly analogous argument in discussing the propriety of constitutional and statutory protections for alleged racially disproportionate enforcement of criminal laws. See Randall Kennedy, The State, Criminal

If the progressive narrowing of statutory disparate impact standards is to be checked, those who support such a result must offer interpretive formulations that permit courts to distinguish cases in a consistent and readily explainable manner. At a minimum, these arguments must begin from a location within the existing body of precedent and must permit courts to characterize them as an extension or refinement, not a renunciation, of existing Supreme Court precedent.

Here is where the experience of courts and scholars in the related area of constitutional equal protection can be instructive. The equal protection literature, like much recent legal scholarship, evidences a decreasing concern with assisting the judiciary's development of law by case decision, [351] and a **[*506]** proclivity for proposing changes in constitutional standards that might result in systemic and/or large-scale wealth-redistributive changes. For example, contrast one of the first important critiques of Washington v. Davis with an important recent work on the subject. Paul Brest's 1977 article, In Defense of the Antidiscrimination Principle, continues to have direct relevance to the practical problems that courts face in considering evidence of disproportionate impact. The article identifies and discusses a number of incrementally more expansive doctrinal standards that would rely upon evidence of discriminatory effect as the primary basis for liability. [352] Brest offers his views on each in **[*507]** terms directly relevant to two overriding concerns of the law: first, whether the benefits to society of imposing remedies under each of the identified ratio-

---

Law, and Racial Discrimination: A Comment, 107 Harv. L. Rev. 1255 (1994). Professor Kennedy, discussing what he terms the "argument propounding the institutional superiority of legislatures over courts for purposes of redistribution," writes:

One significant aspect of the argument is the belief that, absent legislative guidance, courts will have no secure baseline by which to make the determination that the disproportionate adverse impact that a government policy has upon a given racial group is sufficient to outweigh the interests served by this policy.

Kennedy, supra, at 1276 n.89. Professor Kennedy concludes that, viewed from this perspective, the discriminatory purpose requirement is "attractively prudent." Id. at 1277. These same concerns are applicable in the Title VII and Title VIII area, where legislative guidance appears to be insufficient to provide courts with a "secure baseline" for deciding all but the easiest cases.

351 Many observers have remarked this fact. Judge Harry T. Edwards of the U.S. Court of Appeals for the District of Columbia Circuit succinctly summarizes the point:

Because too few law professors are producing articles or treatises that have direct utility for judges, administrators, legislators, and practitioners, too many important social issues are resolved without the needed input from academic lawyers. The problem is not simply the number of "practical" scholars, but their waning prestige within the academy.

Henry T. Edwards, The Growing Disjunction Between Legal Education and the Legal Profession, 91 Mich. L. Rev. 34, 36 (1992). But see Paul Brest, Plus ca Change, 91 Mich. L. Rev. 1945, 1949 (1993), in which Dean Brest gently demurs from Judge Edwards' opinion that legal scholarship has grown dangerously disjointed from practical application: "Judge Edwards focuses on doctrinal-policy scholarship - the grist for the machinery of appellate courts. The proportion of this sort of work, though perhaps not its absolute quantity, has declined under competition from other genres. Nonetheless, plenty of excellent doctrinal-policy articles continue to be written."

These views are perhaps reconcilable by arguing that, while doctrinal scholarship continues to be produced, it holds relatively less importance than it once did, both from the judicial and academic point of view. Another well-known Federal court of appeals judge believes this problem afflicts constitutional scholarship particularly:

Constitutional law remains the most prestigious field in the legal academy. It draws many of the ablest doctrinalists. But they have lost, for the time being anyway, their principal audience. They now write for each other. Doctrinalists who do not share the basic political premises of the judges whose work they analyze do not produce a scholarship that those judges, or the lawyers who are trying to move those judges by their advocacy, find useful, either in a critical or in a constructive sense. Nondoctrinalists, with some exceptions, especially among economic analysts of law and legal feminists, do not produce scholarship of even potential interest to practitioners or judges, but that is not a critical problem for nondoctrinalists because they identify with the university anyway rather than with the legal profession. It is the doctrinalists who have a sense of exile.

Richard A. Posner, Legal Scholarship and Disciplinary Politics: Legal Scholarship Today, 45 Stan. L. Rev. 1647, 1652-53 (1993). Judge Posner's views (not surprisingly) have empirical support. See William M. Landes & Richard A. Posner, The Influence of Economics on Law: A Quantitative Study, 36 J.L. & Econ. 385 (1993); Louis J. Sirico, Jr. & Jeffrey B. Margulies, The Citing of Law Reviews by the Supreme Court: An Empirical Study, 34 UCLA L. Rev. 131 (1986).

352 Brest discusses "five possible rationales for the disproportionate impact doctrine." Brest, supra note 23, at 26. The first, "suspected race-dependency," is fairly characterized as using evidence of disproportionate impact as proof of intentional discrimination, and Brest endorses the use of such evidence if used to create rebuttable presumptions of discriminatory intent, a position consistent with what has since evolved into present day Title VII and Title VIII disparate treatment doctrine. Id. at 29. The second use is to ameliorate the effects of past and remote discrimination. Id. at 31. While Brest believes the antidiscrimination principle

nales outweigh the costs; and, second, whether the judiciary, as opposed to a "plenary policymaking authority" is legally empowered to impose remedies, regardless of their theoretic benefit to society.

Contrast equal protection scholarship that has obtained recent currency. For example, Professor Charles R. Lawrence III's insightful and wide-ranging indictment of what he calls the requirement of "conscious intent" [353] proposes changes to judicial doctrine that almost certainly would never be applied by courts. Professor Lawrence's proposed remedies largely abstract from both the theoretic problems created by illimitable doctrines of racial justice, and the practical problems created by limitations on the judiciary's power and prestige as well as its limited capacity to impose and administer far-flung remedial decrees. [354] My point is not to derogate Professor Lawrence's work - it is a **[*508]** powerful, indeed, moving indictment of the social evils that current, intent-based equal protection doctrine leaves unremedied. [355] Rather, my point is that Professor Lawrence's advertent decision to advance an important critique of equal protection doctrine that is linked to a reform proposal that is utterly unworkable as an evidentiary standard and in-

---

may support this use of the disparate impact standard in some instances, he devotes considerable attention to the remedial issues inherent in its use. This standard may result in remedies that are overbroad because they "cannot be tailored narrowly to compensate all those and only those whose present situation is the result of past discrimination." Id. at 36. Indeed, Brest here first identifies the basic problem implicit in a broad reading of disparate impact theory, a problem with which courts have grappled since the Griggs decision: "As claims to compensation based on the past injustices of human institutions become attenuated, they begin to compete with claims based on the vagaries of fate, and thus become indistinguishable from demands for greater distributive justice among all individuals." The third conceptual rationale uses disparate impact to prevent future discrimination, limited to cases involving the specific "judicial concern to protect the political power of minorities," usually voting rights or other "political process" cases. Id. at 43-44 (prefiguring John Ely Hart's arguments in Democracy and Distrust. See John Ely Hart, Democracy & Distrust (1980)). The fourth rationale Brest identifies is using evidence of disparate impact to justify remedying "race-specific harms" that are not caused by past or present discriminatory behavior. Brest's view is that, while "an institution enjoying more or less plenary policymaking authority may remedy race-specific harms that are not traceable to violations of the antidiscrimination principle," courts are not policymakers and cannot invalidate otherwise permissible policies merely because they produce a harm for a group. Brest, supra note 23, at 47-48. Finally, Brest considers and dismisses the use of disparate impact disconnected from any theory of discrimination and used solely to redistribute wealth and welfare among groups. Id. at 48-52.

353 See Charles R. Lawrence III, The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism, 39 Stan. L. Rev. 317 (1987).

354 Professor Lawrence proposes a standard by which constitutional equal protection remedies would be available for claimants showing the existence of disproportionate impact in cases where the government's conduct "conveys a symbolic message to which the culture attaches racial significance." Lawrence, supra note 353, at 324. In order to make findings regarding the existence or non-existence of a challenged action's "cultural meaning," courts would evaluate a seemingly limitless body of evidence. For example, in bringing an exclusionary zoning case, "plaintiffs could present evidence of the historical and contemporaneous meaning of residential segregation in the culture as a whole" to support the court's obligation to find "cultural meaning" in the zoning order, and, thus, impermissible discrimination. Id. at 366. But in the final analysis, the standard on which Professor Lawrence places primary reliance is on the collective intuition of the judiciary about whether an act exhibits "unconscious racism" that warrants constitutional remedy. In discussing how his evidentiary standard would function in a case such as Washington v. Davis, he writes:

We have seen that human behavior must be examined in context, as it may well derive its meaning from the specific historical and cultural milieu in which it takes place. Despite the race-neutral origins of civil service exams as a generic entity, one has an intuitive sense that their use in this case has racial connotations - that this case is more like the Memphis wall than it is like an increased bus fare or a regressive tax. It is important to pay heed to one's intuitions at this juncture. One individual's gut feeling is hardly conclusive evidence of cultural meaning, but such feelings often derive from feelings that are more widely shared, and they may well indicate that more substantial testimony is available.

Id. at 369-70. In hard cases, the proposed test would appear to turn on whether a court "had a feeling" that a defendant's use of a neutral practice unknowingly implied some disfavored message or meaning about a racial group. Put another way, the proposal would replace the standard that permits a finder of fact to infer intent from unexplained evidence of disproportionate impact with a standard that permits a finder of fact to infer liability from evidence that a neutral practice is situated in a context that the court deems meaningful to the general condition of a racial group.

355 In fact, Professor Lawrence might reply that my observation that his proposal is unworkable is inapposite to his purpose, since, in his conclusion, he states:

I do not anticipate that either the Supreme Court or the academic establishment will rush to embrace and incorporate the approach this article proposes. It has not been my purpose to advance an analysis that is attractive for its ease of application or for its failure to challenge accepted and comfortable ways of thinking about equal protection and race.

Id. at 387.

appropriate to the judicial function leaves us more enlightened, but no better armed as lawyers to remedy the doctrinal difficulties. Notwithstanding the power of Professor Lawrence's critique, it offers practitioners, legislators and courts no practicable, alternative standard. [356] Legal scholars, it appears to me, have wandered in the wilderness **[*509]** for, lo, these many years, in search of an open-ended theoretical construct for expanding constitutional equal protection beyond the confines of the intent rule that the Supreme Court announced in Washington v. Davis. However, scholarship must focus at least equal attention upon the reasons for the steady adherence of both the Supreme Court and the lower federal courts to this doctrine. [357] Judges like rules; [358] and while scholars may prefer concepts, it is the judges who make the law. [359]

---

[356] Professor Lawrence is not alone in presenting criticisms of the intent requirement along with unmanageable proposals for reforming equal protection doctrine. One remarkable recent example is Professor Barbara Flagg's proposal for reforming the Equal Protection Clause. See Flagg, supra note 21. Professor Flagg begins from the premise that the law should impose a "radical skepticism regarding facially race-neutral criteria of decision," requiring courts to adopt "a presumption against the neutrality in fact of any facially neutral criterion of decision employed by a white decisionmaker." Id. at 960. She proposes an equal protection test that would appropriate the outlines of the Title VII disparate impact test while abandoning all aspects of the test that might favor the defendant, with the additional rule that a disparate impact equal protection claim would be available for the exclusive benefit of nonwhites. In her conception, a prima facie equal protection claim could be made by a mere comparison of racial group statistics versus general population statistics in relation to a government action, without regard to concepts of identification or causation. See id. at 995-97. On this showing alone, the government defendant then would be obligated to articulate a legitimate reason for the challenged policy or action. Professor Flagg proposes that courts be obligated to evaluate the legitimacy of the reason "in a manner that would not advantage whites." Id. at 998. For example, a justification that employees were required to "effectively communicate" could not be read as requiring proper use of the English language, written or spoken, since that would mean "effective communication with whites." Id. This might, in turn, disadvantage someone who was "monolingual in some "nonstandard' dialect of English, such as Black English." Id. at 1003 n.177. Even where the government could sustain such a burden, a plaintiff would have the presumptive right to cause the government to change its practice or policy in the event it offered an equally effective alternative: "The proposed rule also means to effect a modest transfer of power to nonwhites. When they, but not white people, recognize another way of doing things, the proposed rule requires that government implement the alternatives nonwhite challengers submit." Id. at 1005 n.180.

Professor Flagg acknowledges, in what appears to be unintended understatement, "I don't mean to imply that I think the Supreme Court likely would move from the Washington v. Davis rule to this proposed rule at once," id. at 992 n.137, but unlike Professor Lawrence she argues that her proposal, which advocates reading into the Constitution an explicitly discriminatory presumption against a person based solely on his or her race, "is adoptable, in the sense that it is consistent with Fourteenth Amendment principles." Id. Professor Flagg has proposed a similar type of reformation of Title VII standards, again arguing that the current legal framework accommodates her self-described radical vision. See Flagg, Fashioning a Title VII Remedy, supra note 326. Again, the point here is not that I disagree with Professor Flagg's proposals (I do), but that, interesting as her proposals may be, there is virtually no chance that they would be adopted in, or even have a meaningful influence on, a federal court decision. Compare Professor Flagg's proposals to the "wholly unwieldy administrative and adjudicative burden" foreseen by Justice Marshall in Alexander, 469 U.S. at 298. The fact that Professor Flagg's theories have been provided prestigious publication venues and are frequently cited by other academic scholars speaks volumes about the current distance between much recent legal scholarship and judicial developments.

[357] Professor Kennedy makes this point strikingly in his reply to Professor David Cole's critique of Kennedy's earlier defense of the discriminatory purpose equal protection standard. See David Cole, The Paradox of Race and Crime: A Comment on Randall Kennedy's "Politics of Distinction," 83 Geo. L.J. 2547 (1995); Randall Kennedy, A Response to Professor Cole's "Paradox of Race and Crime," 83 Geo. L.J. 2573 (1995). Professor Kennedy writes:

Professor Cole seems to want the judiciary to withdraw certain policies… from the political arena and stigmatize them as racially oppressive. The problem is that he wants this action to be taken without a clear, stable basis for doing so. I, too, believe that racially oppressive policies should be off-limits and withdrawn, if necessary judicially, from the political arena. The difficulty is identifying a racially oppressive policy or institution when it is, in form, silent as to race. Looking to racial disparities alone is inadequate… Given that the discriminatory purpose boundary line has been roundly attacked by the leading lights of legal academia - "the status quo" in the professional world that Professor Cole and I inhabit - I thought (and still do) that my refurbishing of it might be of interest and use. I am still waiting for Professor Cole's better idea.

Kennedy, supra, at 2575-76 (footnotes omitted).

[358] See generally Kathleen M. Sullivan, The Supreme Court 1991 Term: Foreword: The Justices of Rules and Standards, 106 Harv. L. Rev. 22 (1992).

[359] Of course, there is important, recent scholarship on the Equal Protection Clause that fully considers the practical problems that judges face. See, e.g., Rutherglen, supra note 19; Ortiz, supra note 18. Such work, however, receives far less relative attention (and hence, status) than does advertently abstract and non-doctrinal criticism. For example, a Shepherd's search completed

**[*510]** Challenges of statutory construction, doctrinal consistency and clarity, institutional capacity and appropriateness, and judicial manageability persist in conceiving the workings of an incrementally expansionist disparate impact doctrine.[360] Articulation of a more expansive theory of disparate impact within **[*511]** the generally understood antidiscrimination principle also will need to account for the fact that the courts increasingly are concluding that broad applications of constitutional or statutory theories which im-

---

in May, 1998, shows that Professor Ortiz's article, discussed supra at notes 345 through 347 and accompanying text, which represents an impressive attempt to deconstruct, reinterpret and synthesize the intent standard in a broad spectrum of Supreme Court equal protection cases, has been cited in other scholarship a mere thirty-five times since publication, and never in a federal court decision. The same search for Professor Lawrence's article lists 370 citations, including six federal court citations. However, the judicial citations to Professor Lawrence's article follow a striking pattern: All pertain to Professor Lawrence's findings that unconscious racism pervades American institutions and practices. None address Professor Lawrence's proposed standards or prescriptions for dealing with unconscious racism. But see Harris v. International Paper Co., 765 F. Supp. 1509, 1515-16 (D. Me. 1991) (using Professor Lawrence's empathetic analysis of racism to derive a ″reasonable black person″ standard in a hostile environment racial harassment case).

This indicates that not only has the academy's focus shifted to a broader critique of social norms, but that courts and practitioners appear largely to have written off legal scholarship as being of a piece and as unhelpful in deciding cases, while some members of the academy dismiss the courts as immoral and results-oriented because they have failed to date to implement their favored social policies and legal remedies. See, e.g., Selmi, Proving Intentional Discrimination, supra note 243, at 350 (″Unfortunately, it may be too late to expect the court to change… The court gave up without even trying.″). These conclusions are unwise. Justice Ruth Bader Ginsburg, in a recent address, reminded us of the academy's importance to the work of judging by quoting two other eminent jurists: ″Judge Learned Hand long ago said what I believe remains true today of law teacher and judge: ″Each is necessary to the other, each must understand, respect and regard the other, or both will fail.'″ Ruth Bader Ginsburg, Communicating and Commenting on the Court's Work, 83 Geo. L.J. 2119, 2127 (1995) (alteration in original) (quoting Learned Hand, Have the Bench and Bar Anything to Contribute to the Teaching of Law, 24 Mich. L. Rev. 466, 480 (1926)). Additionally, ″New York's current Chief Judge, Judith Kaye, more recently and cheerfully said: ″Parties do not necessarily have in mind the sensible, incremental development of [the law]… Academic writers therefore become genuine partners in the courts' search for wisdom.'″ Ginsburg, supra, at 2126-27 (alteration in original) (quoting Judith S. Kaye, One Judge's View of Academic Law Review Writing, 39 J. Legal Educ. 313, 319 (1989).

360 As noted, Dean Brest's ″selective indifference″ concept may be the most fruitful area for further work, but other theories abound. For example, one recent article posits that discrimination law, namely Title VII, already incorporates negligence concepts that only require judicial recognition to result in a reconfigured standard of liability. See David Benjamin Oppenheimer, Negligent Discrimination, 141 U. Pa. L. Rev. 899 (1993). Oppenheimer's thesis, while provocative, is flawed by a fundamental misreading of the Civil Rights Act of 1991. Oppenheimer argues that the Wards Cove decision had entirely rewritten the third prong of the disparate impact test relating to less discriminatory alternatives, and that the 1991 Act reversed Wards Cove in this respect. He argues, in the point central to his entire thesis:

Following the passage of the new Act and the reinstitution of the Griggs test, the employer must establish both business necessity and the absence of a less discriminatory alternative. Even if the selection device meets the business necessity test, if the employer knew or should have known of a less discriminatory device that met its legitimate needs, it should have avoided the harm caused to women and minorities by using the less discriminatory device. By acting carelessly or unreasonably in choosing the less discriminatory device [he means more discriminatory device], the employer has harmed the women and minority applicants, as well as the society as a whole. An intent to cause the harm may not have been present, but in passing Title VII the Congress was concerned with the consequences of discrimination, not simply the motivation.

Oppenheimer, supra, at 935.

There are a number of problems with this argument, but the most important from a doctrinal standpoint is that it completely ignores the text of the 1991 Act, which expressly assigned the burden of proving less discriminatory alternatives in Title VII cases to the plaintiff and which added, for the first time, language requiring the plaintiff to prove that the defendant ″refuses to adopt such alternative employment practice.″ Oppenheimer's inexplicable failure to address these two points undermines both the power, and, indeed, the credibility of his argument. The larger problem is that the article does not offer any standards for a duty of care against which employers would be measured for reasonableness. He argues, for example,

When a woman or minority job applicant is rejected, the rejection should act as a triggering device, requiring the decision maker to instantly stop and examine his or her own motives… If a prohibited basis for decision making played a role in the decision, consciously or unconsciously, Title VII liability should be imposed.

Id. at 970 (footnotes omitted). The problem, of course, is that, where a prohibited basis is consciously used to make a decision, Title VII liability is already available; where the basis is ″unconscious,″ it is difficult to conceive of an evidentiary standard that could determine whether the decision maker adequately ″examined his or her own motives.″ Oppenheimer depends upon an inference of ″unconscious motive″ to assign liability, and this runs into problems of application analogous to those observed in expansive equal protection theories.

plicate an explicitly race-conscious remedy [361] and public policy [362] issues. For any **[*512]** disparate impact theory to be sustainable over the long-term, its proponents will need to come to grips with these broader issues and the direction in which courts and Congress already are moving in attempting to cope with them.

**[*513]**

APPENDIX A:

Evidentiary Standards for Statistical Defenses and the Uniform Guidelines on Employment Selection Procedures

1. Employment Discrimination Law. In assessing a defendant's proffer of a study that demonstrates or "validates" the predictive power of a particular examination that is shown to have a disparate impact, many courts have made resort to the Uniform Guidelines on Employment Selection Procedures [363] published by the EEOC and other Federal agencies. The Uniform Guidelines contain specific standards for validation studies in the employment context. They are an important point of [364] but also because the Uniform Guidelines are the only well-developed regulatory expression under any Federal statute of the standards for validation that a Federal agency would use in the context of a disparate impact challenge. Thus, to provide any complete analogy from Title VII to FHA cases and ECOA cases, it helps to have a rudimentary understanding of what the Uniform Guidelines expect employers to do in validating employment tests.

---

Moreover, it is difficult to determine how this rule could apply in settings beyond the employer/employee relationship. Certainly, creditors do not appear to owe a "duty" to potential loan applicants under the FHA or the ECOA, other than to refrain from discriminating against them because of a prohibited characteristic. A better approach may be to work within the "functional equivalent of intent" concept articulated in Watson, which suggests that a court may entertain evidence that a defendant was sufficiently reckless in adopting business practices causing a disparate impact that the finder of fact could infer intent, or the functional equivalent thereof, from such evidence.

361 At the end of the day, the increasing hostility of the federal courts to any sort of plan or remedy that expressly uses race as a m eans of judging or separating persons may make moot many of the more expansive theories that legal scholars have suggested, or at least would require them to be addressed in the legislative branch. See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995); Shaw v. Reno, 504 U.S. 630 (1993); City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989); Wygant v. Jackson Bd. of Educ., 476 U.S. 267 (1986) (plurality opinion); Maryland Troopers Ass'n, Inc. v. Evans, 993 F.2d 1072, 1076 (4th Cir. 1993) ("While the inequities and indignities visited by past discrimination are undeniable, the use of race as a reparational device risks perpetuating the very race-consciousness such a remedy purports to overcome… It thus remains our constitutional premise that race is an impermissible arbiter of human fortunes.").

362 One of many critical public policy questions facing courts and scholars is whether race-conscious judicial remedies are suited for use in an era of proliferating racial diversity and identity. As one commentator has observed:

The changing demographics of our population is causing the current race-conscious remedial system to implode. Undoubtedly, public and political support will erode as increasing numbers of people of color magnify the exclusionary effects of race-based programs on nonminority groups. Not only will friction increase between minority and nonminority constituencies, but conflicts will also arise between minority groups themselves until we learn to balance their conflicting claims. Finally, as multiracial individuals increase in number and demand recognition, our existing race-conscious framework must consider the viability of a multiracial category, as well as the consequences of allowing a person to self define race.

Deborah Ramirez, Multicultural Empowerment: It's Not Just Black and White Anymore, 47 Stan. L. Rev. 957, 974 (1995). Professor Ramirez's provocative article (advocating a host of fundamental - some might argue, constitutional - changes to "empower" multicultural groups) is part of an excellent symposium, Race and Remedy in a Multicultural Society, also including Paul Brest & Miranda Oshige, Affirmative Action for Whom?, 47 Stan. L. Rev. 855 (1995); Alexandra Natapoff, Trouble in Paradise: Equal Protection and the Dilemma of Interminority Group Conflict, 47 Stan. L. Rev. 1059 (1995); and J. Harvie Wilkinson III, The Law of Civil Rights and the Dangers of Separatism in Multicultural America, 47 Stan. L. Rev. 993 (1995). See also Lawrence Wright, One Drop of Blood, New Yorker July 25, 1994, at 46, an influential article describing the pernicious and tragic manipulations of race-based classifications in the United States, particularly as relates to the perpetuation of the enslavement and segregation of African -Americans.

363 See 29 C.F.R. pt. 1607 (1997) ("Uniform Guidelines").

364 See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 433-34 (1971); Phillips v. Martin Marietta Corp., 400 U.S. 542, 545 (1971) (Marshall, J., concurring); Brunet v. City of Columbus, 1 F.3d 390 (6th Cir. 1993); Officers for Justice v. Civil Serv. Comm'n, 979 F.2d 721 (9th Cir. 1992); Bridgeport Guardians, Inc. v. City of Bridgeport, 933 F.2d 1140 (2d Cir. 1991); Hamer v. City of Atlanta, 872 F.2d 1521 (11th Cir. 1989).

That said, it is important to understand the important limits that apply to the Uniform Guidelines. [365] While many courts have paid deference to the Uniform Guidelines as reflective of the administrative expertise of the agency charged with enforcing Title VII, in recent years the Supreme Court has made clear that it does not accord the Uniform Guidelines any particular pride of place [366] and **[*514]** many lower courts have followed this trend. [367] In addition, few of the cases decided since enactment of the 1991 Act cite the Uniform Guidelines, so it is difficult to determine what effect the legislation might have upon courts' views of the Uniform Guidelines' relevance. [368]

Although the Uniform Guidelines define three types of validation studies that are acceptable for purpose of satisfying the "job-related" standard, [369] the **[*515]** Supreme Court has since held that tests can be vali-

---

365 As the Supreme Court has noted, "the EEOC Guidelines are not administrative "regulations' promulgated pursuant to formal procedures established by the Congress," Albemarle Paper Co. v. Moody, 422 U.S. 405, 431 (1975), and therefore lack the force of law. See Espinoza v. Farah Mfg. Co., 414 U.S. 86, 94 (1973) (quoting Red Lion Broad. Co. v. FCC, 395 U.S. 367, 381 (1969) ("Courts need not defer to [the Uniform Guidelines'] administrative construction of a statute where there are "compelling indications that it is wrong.'")). See also Zuber v. Allen, 396 U.S. 168, 193 (1969); Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272 (1968).

366 See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995 n.3 (1988), where the Court summarized lower court treatment of the Uniform Guidelines and stated that the Guidelines have been "criticized on technical grounds." The prescient advice of Justice Blackmun perhaps best articulates why courts have increasingly taken a dim view of the Guidelines, and the EEOC's stringent interpretation of validation standards in the context of disparate impact:

I cannot join, however, in the Court's apparent view that absolute compliance with the EEOC Guidelines is a sine qua non of pre-employment test validation. The Guidelines, of course, deserve that deference normally due agency statements based on agency experience and expertise. Nevertheless, the Guidelines in question have never been subjected to the test of adversary comment. Nor are the theories on which the Guidelines are based beyond dispute. The simple truth is that pre-employment tests, like most attempts to predict the future, will never be completely accurate. We should bear in mind that pre-employment testing, so long as it is fairly related to the job skills or work characteristics desired, possesses the potential of being an effective weapon in protecting equal employment opportunity because it has a unique capacity to measure all applicants objectively on a standardized basis. I fear that a too-rigid application of the EEOC Guidelines will leave the employer little choice, save an impossibly expensive and complex validation study, but to engage in a subjective quota system of employment selection. This, of course, is far from the intent of Title VII.

Albemarle Paper Co., 422 U.S. at 449 (Blackmun, J., concurring in judgment) (emphasis added).

367 See, e.g., Garcia v. Spun Steak Co., 998 F.2d 1480, 1489 (9th Cir. 1993) (expressly rejecting the Uniform Guidelines' per se rule against "English-only" workplace rules). Accord Long v. First Union Corp., 894 F. Supp. 933 (E.D. Va. 1995). A useful statement on the proper role of the Guidelines is found in Guardians Ass'n of New York City v. Civil Service Commission, 630 F.2d 79 (2d Cir. 1980), where the court stated:

The [Supreme] Court appears to have applied the Guidelines only to the extent that they are useful, in the particular setting of the case under consideration, for advancing the basic purposes of Title VII. To the extent that the Guidelines reflect expert, but non-judicial opinion, they must be applied by courts with the same combination of deference and wariness that characterizes the proper use of expert opinion in general. Thus, the Guidelines should always be considered, but they should not be regarded as conclusive unless reason and statutory interpretation support their conclusions. As this Court has previously stated: "If the EEOC's interpretations go beyond congressional intent, the Guidelines must give way."

Id. at 91 (quoting Guardians Ass'n v. Civil Serv. Comm'n, 490 F.2d 400, 403 n.1 (2d Cir. 1973)).

368 Thus, this section of our Title VII analysis relies in great measure on cases decided prior to the enactment of the 1991 Act. The analysis is intended to serve as a basis for sketching out basic standards for use of statistical tests in the context of the FHA and the ECOA.

369 The three types of studies are "criterion-related validity" studies, "content validity" studies, and "construct validity" studies. They are defined in the Uniform Guidelines, 29 C.F.R. 1607.16 (1997), and discussed elsewhere therein at some length, but the easiest way to distinguish among them is as follows: The "content" validity study is used to validate tests that directly measure a required element of job performance. The best example is a typing test for a typist. Other tests that are frequently validated through "content" studies would include strength tests for firefighters. (Tests used to qualify applicants or promote persons in police and fire departments have spawned a truly staggering amount of disparate impact litigation. See, e.g., Dothard v. Rawlinson, 433 U.S. 321 (1977); Officers for Justice, 979 F.2d 721; Guardians Ass'n, 630 F.2d 79 (2d Cir. 1980); Brown v. City of Chicago, 917 F. Supp. 577 (N.D. Ill. 1996); Allen v. District of Columbia, 812 F. Supp. 1239 (D.D.C. 1993).)

The other two permitted types of validation studies are really subsets of one type of study. The definition of the "criterion-related validity" study is the more comprehensible: "demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and the criteria so identified." Hamer, 872 F.2d at 1525 ("At the heart of criterion-related validity is the sta-

dated in any number of ways. [370] Regardless of the type of test used, the Uniform Guidelines stress the importance of completing a "review of job information to determine measures of work behavior(s) or performance that are relevant to the job or group of jobs in question." [371] In other words, to validate a practice as job-related, an employer must create or define the actual measures of job performance, which, in many instances could be extremely subjective, before a study can be completed. [372] The Uniform Guidelines state that the "possibility of bias" in developing criteria must be considered in developing the job analysis; [373] this has been the source of considerable litigation. [374]

For each of the tests, the Uniform Guidelines require elaborate documentation of the statistical and empirical data developed in the course of the validation studies. [375] However, courts, in construing the Uniform Guidelines, have generally limited the extent to which the test must measure every aspect of job performance. As one oft-cited opinion states: "Thus, it is reasonable to insist that the test measure important aspects of the job, at least those for which appropriate measurement is feasible, but not that it measure all aspects, regardless of significance, in their exact proportions." [376]

**[*516]** Courts, the Uniform Guidelines, and Congress also have provided guidance relating to the use of test results. First, the Uniform Guidelines suggest that, even where a test is validated, disparate impact could be alleged if the employer uses an arbitrary cutoff score that results in a disproportionate number of protected class "test takers" failing the test. [377] Courts, again following the lead of the Uniform Guidelines, also have considered the issue of whether a test that is valid enough to serve as a "pass/fail" for applicants also can be used appropriately to specifically rank all applicants. [378]

---

tistical correlation between performance on the test and objective measures or "criterions' of performance on the job."). This type of test looks at objective statistical criteria to predict performance. The "construct validity" test is "demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance." Id. Apparently, this is meant to distinguish less specific skills such as "leadership" or "motivation." The distinction between the construct validity test and the criterion-related test is somewhat obscure, but it is not worth pursuing, because the Guidelines express serious doubts about the utility of the construct validity test and, in any event, require that any construct validity test can only satisfy the Guidelines if it is accompanied by a criterion-related study that also satisfies the Guidelines. See 29 C.F.R. 1607.14D(4) (1997).

370 See Washington v. Davis, 426 U.S. 229, 247 n.13 (1976).

371 See 29 C.F.R. 1607.14B(2)-(3) (1997).

372 Id.

373 Id.

374 See Larson & Larson, supra note 40, at 27.05[2] and cases cited therein.

375 See 29 C.F.R. 1607.5B (1997).

376 Guardians Ass'n, 630 F.2d at 99, cited in Police Officers for Equal Rights v. City of Columbus, 916 F.2d 1092, 1100 (6th Cir. 1990). This limited requirement is sometimes referred to as the principle of "representativeness." See also Gillespie v. Wisconsin, 771 F.2d 1035, 1044 (7th Cir. 1985) ("an employment test must neither (1) focus exclusively on a minor aspect of the position; nor (2) fail to test a significant skill required by the position."); Adams v. City of Chicago, No. 94 C 5727, 1996 U.S. Dist. LEXIS 3567, at *60 (N.D. Ill. Mar. 25, 1996).

377 29 C.F.R. 1607.5H ("Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force."). See also Richardson v. Lamar County Bd. of Educ., 729 F. Supp. 806 (M.D. Ala. 1989), aff'd sub nom. Richardson v. Alabama State Bd. of Educ., 935 F.2d 1240 (11th Cir. 1991); Chisholm v. United States Postal Serv., 516 F. Supp. 810 (W.D.N.C. 1980), aff'd , 665 F. 2d 482 (4th Cir. 1981).

One court of appeals has established a practical standard for assessing the efficacy of cutoff scores: they must be reliable - that is, replicable by more than one person - and the employer must have a "justifiable reason" for adopting the score. Such justification must be established "at the very least by analyzing the test results to locate a logical "breakpoint' in the distribution of scores." Gillespie, 771 F.2d at 1045 (quoting Guardians Ass'n, 630 F.2d at 105), summarized in Larson & Larson, supra note 40, at 27.12[1].

378 29 C.F.R. 1607.5G (1997) ("Evidence which may be sufficient to support the use of a selection procedure on a pass/fail (screening) basis may be insufficient to support the use of the same procedure on a ranking basis under these guidelines."). This is typically an issue in tests used to rank candidates for promotions in police or fire departments. In some cases, courts have found that a test was too crude to be used to rank examinees for promotion based on one or two point scrutiny differentials. See Guard-

**[*517]** Finally, the Uniform Guidelines require two different types of analysis and documentation in addition to the documentation of "statistical significance" described above, which would be required for each of (i) a test itself, (ii) its cutoff scores, and (iii) its use as a ranking tool. The first requires a study of "unfairness" as part of the criterion-related validity study. [379] The "fairness" concept is best described as requiring that a test having a disparate impact must predict job performance in a manner that is roughly the same for applicants from protected and non-protected groups. [380]

The second significant, additional documentation requirement set forth in the Uniform Guidelines relates to the "consideration of suitable alternative selection procedures." [381] The Uniform Guidelines require that each validation study include "an investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible, to determine the appropriateness of using or validating them in accord with these guidelines." [382] The Uniform Guidelines **[*518]** continue, stating: "If a user has made a reasonable effort to become aware of such al-

---

ians Ass'n, 630 F.2d at 100. Other courts, however, have determined that, where higher test scores can be demonstrated to correlate with better job performance in a statistically reliable way, rank-ordering is permissible. See Police Officers for Equal Rights, 916 F.2d at 1101-03; Adams, 1996 U.S. Dist. LEXIS 3567, *69; Nash v. Consolidated City of Jacksonville, 895 F. Supp. 1536, 1549-52 (M.D. Fla. 1995); Cuesta v. New York Office of Court Admin., 708 F. Supp. 583, 586 (S.D.N.Y. 1989). See also 29 C.F.R. 1607.14B(6) (1997) ("The greater the magnitude of the relationship (e.g., correlation coefficient) between performance on a selection procedure and one or more criteria of performance on the job… the more likely it is that the procedure will be appropriate for use."); 29 C.F.R. 1607.14(C)(9) (1997); EEOC Questions and Answers, 44 Fed. Reg. 11,996, 12,005 (1979) (Question 62) (ranking is acceptable "if there is evidence from job analysis or other empirical data that what is measured by the selection procedure is associated with differences in levels of job performance.").

In a number of cases, courts either upheld or, in some cases, required the replacement of a rank-ordering system with a practice called "banding," which one court has defined as "a technique that takes a range of scores whose differences are not statistically significant and, within that band range, provides for promotions of candidates on the basis of considerations such as race or ethnicity, gender, work experience, past job dependability, and other factors that the hiring authorities deem pertinent." Bridgeport Guardians, Inc. v. City of Bridgeport, 933 F. 2d 1140, 1144 (2d Cir. 1991). See also Officers for Justice, 979 F.2d at 728 ("today we hold that the banding process is valid as a matter of constitutional and federal law."). This technique, along with other mechanisms for adjusting score results for the benefit of minority employees or applicants, has been rendered suspect under a provision of the Civil Rights Act of 1991. Section 106 of the 1991 Act states:

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

42 U.S.C. 2000(e)-2(l) (1994). At least one commentary has questioned whether this section makes such "banding" and other score adjustment techniques illegal. See Larson & Larson, supra note 40, at 27.12[3]. Larson also points out that "elsewhere, the [1991] Act states that nothing contained therein "shall be construed to affect court-ordered remedies, affirmative action, or conciliation agreements, that are in accordance with the law.'" Id. (quoting Section 116 of the 1991 Act at Pub. L. No. 102-166, 116 (1991)). Larson believes that this utterly tautological statement is intended to "grandfather" existing court-sanctioned plans. See id.

379 The Guidelines describe "unfairness" as follows:

Unfairness defined. When members of one race, sex, or ethnic group characteristically obtain lower scores on a selection procedure than members of another group, and the differences in scores are not reflected in differences in a measure of job performance, use of the selection procedure may unfairly deny opportunities to members of the group that obtains the lower scores.

29 C.F.R. 1607.14B(8)(a) (1997).

380 See Hamer, 872 F.2d at 1530. Hamer is the only Federal court case on record that actually interprets this portion of the Guidelines. In Hamer, the defendant's expert witness described the fairness test as follows:

Q. Dr. Palmer, did you perform any analyses on whether the examination was fair to black applicants in this case?

A. Yes, I did. I should perhaps begin by explaining what "fairness" means in this context. The accepted definition of "fairness" in a criterion context like this is not whether groups differ in their test scores or not but whether, for example, if you have a black with a score of 75 and a white with a score of 75 you would expect them to be equally good officers; that is, are the predictions roughly the same for blacks and whites.

Id.

381 29 C.F.R. 1607.3B (1997).

382 Id..

ternative procedures and validity has been demonstrated in accord with these guidelines, the use of the test or other selection procedure may continue until such time as it should reasonably be reviewed for currency." [383] This final requirement has already been addressed in the context of the review of the third prong of the disparate impact test relating to less discriminatory alternatives set forth in the body of the article. [384]

2. Statistical Tests, "Validation," and "Housing or Credit-Related" Issues Under the FHA and the ECOA. It is in the comparison of cases and literature relating to statistically based techniques for "validating" a test or other screening mechanism that the gap in the development of Title VII and FHA/ECOA standards becomes most obvious. There is simply no meaningful precedent decided under the latter statutes on which a potential defendant can rely in implementing a selection practice used to evaluate applicants for an apartment, for insurance, or for a loan. Very few cases have addressed the statistical adequacy of a defendant's proffered legitimate business justification, and those doing so are sketchy. [385] In connection with creditors' use of selection devices, such as "credit scorecards" or other statistically based or automated systems, the Federal Reserve Board's Regulation B, [386] implementing the ECOA, and the accompanying Official Staff Commentary of the Federal Reserve Board (Commentary), provide limited guidance regarding the duty to engage in ongoing validation and monitoring of scorecards. However, the guidance, including the elaborate definition of a "qualified credit scoring system," [387] in Regulation B is entirely inapposite to the **[*519]** standards of liability applicable under the ECOA (or, for that matter, the FHA). [388] While there may be some useful general guidance in the Regulation B language, [389] it cannot be relied upon as establishing a regulatory standard similar to the Uniform Guidelines, for example, in terms of validating a testing mechanism under the Fair Housing Act or the ECOA.

---

383 Id.

384 See supra notes 287-308 and accompanying text.

385 In Bronson v. Crestwood Lake Section I Holding Corp., 724 F. Supp. 148 (S.D.N.Y. 1989), the court, in a rental discrimination case, after holding that the disparate impact standard applied to the private defendants, held that "once plaintiffs have succeeded in making a prima facie showing of discriminatory effect, the burden shifts to the defendants to present bona fide and legitimate justifications for their policies." Id. at 154. The court then held that the defendant's offered justifications were insubstantial, because they were composed of "general conclusory assertions" and they did not offer "any evidence to show that the challenged policies are reasonably necessary to insure payment of rent or that Crestwood has, in past experience, encountered losses or defaults as a result of accepting Section 8 tenants or tenants who fail to meet the triple income test" which defendants used as a screening device for potential defendants. Id. at 156.

386 See 12 C.F.R. 202 (1997).

387 See 12 C.F.R. 202.2(p)(1) (1997), which includes the definition of "empirically derived, demonstrably and statistically sound, credit scoring systems." 12 C.F.R. 202.2(p)(1) (1997) (emphasis omitted). Such systems are permitted in accordance with the terms of Section 701(b)(3) of the ECOA, 15 U.S.C. 1691(b)(3), which specifically states that it shall not constitute prohibited discrimination under the law for a creditor

> to use any empirically derived credit system which considers age if such system is demonstrably and statistically sound in accordance with regulations of the Board [of Governors of the Federal Reserve], except that in the operation of such system the age of an elderly applicant may not be assigned a negative factor or value.

15 U.S.C. 1691(b)(3) (1997). In other words, the provisions of Regulation B applicable to scorecards, including qualified cards, have nothing to do with fair lending legal liability. The only use of the "qualified card" label under Regulation B and the ECOA today is to state that "in an empirically derived, demonstrably and statistically sound, credit scoring system, a creditor may use an applicant's age as a predictive variable, provided that the age of an elderly applicant is not assigned a negative factor or value." 12 C.F.R. 202.6(b)(2)(ii) (1997). Any credit scorecard or system that is not a "qualified credit scoring system" is lumped into the definition encompassing all other types of credit underwriting, labeled "Judgmental system of evaluating applicants." See id. at 202.2(p), (t).

388 Moreover, one of the problems with the Regulation B definition is that there are no standards that tell us whether a scorecard has been, to use the definition's language, "developed and validated using accepted statistical principles and methodology." Id. at 202.2(p)(iii). There is simply no law in the area to give us guidance.

389 The most recent example of this quite general advice appears in revisions to the Commentary, published as a supplement to Regulation B. See 12 C.F.R. 202, Supp. I (1997). The Board's published revisions to the Commentary provide the following interpretive guidance relating to a lender's duties in using a credit scoring system:

However, by necessity, some type of testing standards will emerge. Lenders, financial institutions, and insurers increasingly are turning to complex statistical models to increase the accuracy of their financing underwriting decisions, **[*520]** thereby increasing their profits (which is a permissible "business justification" for use of a selection practice or device [390] ). Their goals are to reduce costs associated with defaults or other financial losses, [391] and to increase the volume of their business. [392] Faced with concerns over whether use of these complex models meets the "business necessity" standard, these enterprises will search in vain for appropriate FHA, ECOA judicial or regulatory guidance, and thus must turn to validation standards as they have been developed under Title VII.

In at least one important respect, developing a validation study for a selection device used in making credit decisions will prove considerably easier than developing such studies for employment tests. The threshold challenge for employers in "validating" their selection devices is to analyze "the measures of work behavior that are relevant to job performance." As discussed earlier, this means that to validate a practice as job-related, an employer must create or define the actual measures of job performance, which in many instances could be extremely subjective. Because of this subjectivity, the Uniform Guidelines require that a validation study, in developing its job performance analysis, must consider the "possibility of bias" in the existing job criteria used to measure performance. Explained another way, for any job in which measurement of performance is more complex than answering the question, "How many widgets did the employee put in the box in an hour?" an employer would need to develop subjective "criteria" before a validation study on selection procedures could go forward. Thus, the Title VII study must concern itself with the validity of the subjective job criteria as well as the performance thereunder.

**[*521]** These concerns probably will not prove material in validating selection devices under the FHA or the ECOA. Creditors and insurers rely upon much more objective factors in constructing and applying their selection criteria. In most cases, "performance" is measured by a stark, objective and singular statistical result: Was a loan or other obligation paid as agreed? The scoring tests used in credit and other financial markets are constructed almost exclusively to measure this or other statistical outcomes. This suggests that the "performance criteria" used in most selection devices that may be tested under the FHA or the

---

To ensure that predictive ability is being maintained, creditors must periodically review the performance of the system. This could be done, for example, by analyzing the loan portfolio to determine the delinquency rate for each score interval, or by analyzing population stability over time to detect deviations of recent applications from the applicant population used to validate the system. If this analysis indicates that the system no longer predicts risk with statistical soundness, the system must be adjusted as necessary to reestablish its predictive ability. A creditor is responsible for ensuring its system is validated and revalidated based on the creditor's own data when it becomes available.

Official Staff Interpretation, 12 C.F.R. Part 202, Supp. I, Comment 202.2(p)(2), 61 Fed. Reg. 50,948, 50,950 (Sept. 30, 1996).

This interpretive guidance probably raises more questions than it answers. As a threshold matter, it is unclear whether this commentary, couched in the form of requirements, applies only to "qualified credit scoring systems" using age as a variable (see supra note 387), or is intended to apply to all credit scoring systems. Second, the Commentary provides no meaningful basis for assessing the statistical parameters of critical, qualitatively described standards, such as how an applicant population "deviates" from a validation sample; when a system no longer predicts risk with "statistical soundness;" or how a creditor is supposed to determine when its own data has "become available."

390 See Joint Policy Statement, supra note 5, at 18,269 (factors such as "cost and profitability" may be relevant to business necessity justification in the context of lending). See also Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir. 1995) ("Contrary to plaintiffs' implication, the fact that defendant made changes to its business in order to increase profit is not an impermissible action under the ADA.").

391 See House Report, supra note 282, at 2191, stating that parties subject to the FHA may take into "consideration factors justified by business necessity… which relate to the financial security of the transaction or the protection against default or diminution in value of the security."

392 See Consumer Debt: Hearing Before the House Comm. on Banking and Financial Services, 102d Cong. (Sept. 12, 1996) (testimony of Lawrence B. Lindsey, Member, Board of Governors of the Federal Reserve System), reprinted in Federal News Service (September 12, 1996):

Credit scoring and computer-based statistical evaluation have sharply lowered the cost of making a decision to extend credit. This has greatly facilitated the mass marketing of credit to individuals who are not bank customers and who live outside banks' traditional service areas… In turn, this has changed the cost structure of the industry to favor an expansion of volume in order to exploit scale economies.

ECOA will prove much more amenable to cogent validation than the selection devices used in the employment area.

Beyond this threshold distinction, the standards that courts have articulated under Title VII [393] probably will provide at least a rough measure for institutions to use in determining whether they have appropriately validated a selection device or scoring system. For example, it is reasonable to assume that any study purporting to serve as proof of the legitimacy of a selection device would demonstrate the selection mechanism does not "(1) focus exclusively on a minor aspect of the [applicant's qualifications]; nor (2) fail to test a significant [attribute of creditworthiness or loan default risk]." [394] A validation study also presumably would provide evidence that any cutoff scores used in connection with the selection device are reliable - that is, replicable by more than one person - and that the use of the cutoff scores is supported by a "justifiable reason" established, "at the very least, by analyzing the test results to locate a logical "breakpoint' in the distribution of scores." [395] It also would appear fair to require - where a creditor or insurer is using a selection device to establish a detailed "rank ordering" of applicants (that is, a low-to-high distribution, or each applicant by her or his score) - that the validation study demonstrate that the selection device is sufficiently precise to support its use in that manner. [396]

**[*522]** Finally, it would be appropriate for courts to insist that, in instances where a selection device is shown to have a statistically significant disparate impact on a protected class of otherwise qualified applicants, any validation study offered by defendants would provide an analysis similar to the "fairness" test contemplated in the Uniform Guidelines. Such a test would demonstrate that a selection device having a disparate impact predicts the objective function of the selection device (such as loan repayment performance) in a manner that is roughly the same for applicants from protected and non-protected groups. The device need not be held to a standard that requires complete statistical equality in the effectiveness of the test among different groups (as a statistical matter, such an outcome is almost always impossible to achieve). Rather, the test should be that the effectiveness is sufficiently comparable to warrant the conclusion that the defendant exercised care in developing and using the selection device.

**[*523]**

APPENDIX B:

A Disparate Impact Test Under the FHA and the ECOA, Applying Current Title VII Standards

This appendix strives to synthesize the comparative analysis contained in Part II of this Article into a framework that a court could use in determining the burdens and levels of proof required in a disparate im-

393 See supra notes 377-84 and accompanying text.

394 Adapting the representativeness text set forth in Gillespie v. Wisconsin, 771 F.2d at 1044.

395 Gillespie, 771 F.2d at 1045 (quoting Guardians Ass'n, 630 F.3d at 105). See Larson & Larson, supra note 40, at 27.12[1].

396 See 29 C.F.R. 1607.14B(6) (1997) ("The greater the magnitude of the relationship (e.g., correlation coefficient) between performance on a selection procedure and one or more criteria of performance on the job… the more likely it is that the procedure will be appropriate for use."); 29 C.F.R. 1607.14(C)(9) (1997); EEOC Questions and Answers, 44 Fed. Reg. 11,996, 12,005 (1979) (Question 62) (ranking is acceptable "if there is evidence from job analysis or other empirical data that what is measured by the selection procedure is associated with differences in levels of job performance.").

Here, though, it is important to distinguish between the use of selection devices in the area of employment and in other contexts. In the employment area, rank-ordering with precise use of testing scores may prove inherently more suspect, since the consequences of such rank-ordering - getting or failing to get a job or promotion - are so profound. At least in connection with creditors or insurers, such concerns are not immediately apparent. The practice of most credit-granting institutions is to approve anyone passing the threshold qualifying criteria - the cutoff score, perhaps - under the rationale that more approvals mean more profit opportunities for the institution. Given the highly competitive and increasingly liquid nature of credit markets, there is no practical need to be concerned about the rationing of a scarce resource (a job, or a loan) that perhaps renders suspect the use of rank -ordering in the employment arena. That said, the validity of a rank-ordering system may not prove totally irrelevant under the FHA or the ECOA, since creditors may choose to use such rank-ordering not as a basis for approving or denying a request for credit or some other service, but as a means to price such commodity. To the extent that applicant-by-applicant "risk-based pricing" takes hold in the credit markets and is based upon credit scoring systems, courts may resort to analogies from the "rankordering" and "banding" cases to test the validity of challenged systems.

pact claim under the FHA and/or the ECOA. True to the thesis of the Article, the test relies on Title VII Supreme Court decisions and court decisions following the 1991 Act as well as on FHA and ECOA cases applying the Title VII standards of disparate impact doctrine. [397]

I. Prima Facie Case:

A. The plaintiff must plead with particularity, that is, identify the specific practice of the defendant challenged in the claim. An exception will exist for those cases in which the plaintiff can show that the defendant uses a collection of practices that are so interrelated, subjective, or undocumented that the plaintiff cannot fairly be required to separate them for analysis. The burden of proving this ″cumulation″ exception, however, is not light: merely a difficult analysis (such as one requiring a multiple regression analysis) should not operate to permit a plaintiff to avoid identifying a specific policy.

B. The plaintiff must demonstrate that the challenged practice actually caused an adverse impact upon a qualified pool of protected class members. This demonstration typically would be made through statistical evidence demonstrating that the adverse impact actually caused by the challenged practice could not have occurred by chance. The plaintiff should provide evidence demonstrating that the impact falls more heavily on qualified members of protected classes than it does on other qualified persons in the appropriate pool for measurement. However, the pool of qualified applicants can **[*524]** include persons who would have qualified ″but for″ the use of the challenged practice.

II. Legitimate Business Justification:

A. Once the plaintiff makes a prima facie showing, the defendant may attempt to rebut the plaintiff's case by presenting statistical evidence that refutes that offered by the plaintiff. If the defendant acknowledges the existence of the disparate impact, the defendant must provide evidence showing the legitimate business justifications for the challenged practice. The defendant's burden is met if it produces evidence demonstrating that the challenged practice significantly serves a legitimate goal of the defendant (the Beazer standard) or is reasonably necessary to achieve an important business objective (the Donnelly standard).

B. In the event that the challenged practice involves a ″selection device,″ including tests or screening mechanisms (such as credit scoring systems or other tests used to determine eligibility), defendants should be prepared to offer evidence regarding the predictiveness of the selection device in accordance with the use that defendant makes of it.

1. While the defendant should not be required to produce a ″validation study″ meeting the requirements of the Uniform Guidelines, the adequacy of its evidence will need to be commensurate with the significance of the adverse impact demonstrated by the plaintiff. In particular, defendants will want to ensure that they can demonstrate the selection device's ″fairness″ by showing that the performance of protected and non-protected class members is roughly comparable at a given score level.

2. In addition, to the extent a defendant is using a selection device to set prices or otherwise to distinguish on a rank-ordering (as opposed to a pass/fail) basis, the defendant will wish to provide evidence that this use of the selection device is supported by objective evidence.

**[*525]** III. Less discriminatory alternatives

A. Finally, once a defendant provides evidence of a legitimate business justification, a plaintiff should have an opportunity to demonstrate that the defendant's explanations are merely a pretext for its encouragement or tolerance of discriminatory behavior. The best method for plaintiffs to make this showing will be to demonstrate that an alternative practice that is equally effective would have less of a disparate impact. In considering such evidence of ″equal effectiveness,″ courts must take into consideration the cost to

---

[397] Readers who have ″cut to the chase″ will need to labor through all of Part II of this Article to understand fully the basis for the test summarized here.

a defendant of adopting and maintaining such a practice or policy as an alternative to the challenged practice. In addition, a court wishing to apply an order of proof and procedure that is totally faithful to Title VII law would require that the plaintiff must also prove that the defendant refused to implement the less discriminatory alternative.

Copyright (c) 1998 Emory University School of Law
Emory Law Journal

**U.S. Department of Housing and Urban Development**

Special Attention of:
All FHEO Region Directors
All Associate General Counsel
All FHEO Staff

# Transmittal for Handbook No.: 8024.01, REV-2

Issued: May 11, 2005

1. This Transmits

one new chapter and four revised chapters of the Title VIII Complaint Intake, Investigation, and Conciliation Handbook, 8024.01. The original handbook was published in 1995, and included six chapters: Jurisdiction, Complaint Intake, Special Intake, Conciliation, Planning and Conducting the Investigation, and Administrative Closures. Two chapters were added in 1998; Theories of Discrimination and Analysis of Specific Cases.

One new chapter, Chapter 10, Preparation of the Case File has been added, and four chapters: Chapter 4, Complaint Intake; Chapter 7, Planning and Conducting the Investigation; Chapter 9, Administrative Closures; and Chapter 11, Conciliation, have been revised and updated to reflect current FHEO guidance.

Chapter 10: Preparation of the Case File, provides guidance to FHEO staff on the organization and placement of evidence in the investigative case file, including privileged and confidential information.

Chapter 4: Complaint Intake, combines and revises Chapters 4 and 5 from the 1995 edition of the Handbook, and provides updated and revised guidance for complaint intake activities and special intake issues, previously contained in Chapter 4 (Complaint Intake) and Chapter 5 (Special Intake).

Chapter 7: Planning and Conducting the Investigation, Chapter 9, Administrative Closures, and Chapter 11, Conciliation, have been updated to include current FHEO policies and practices.

Remove Chapters 4,5, 7, 9 and 11 and insert Handbook 8024.01, REV-2, Chapters 4, 7, 9, 10 and 11, with Appendices.

Assistant Secretary
for Fair Housing and Equal Opportunity

Distribution: W-3-1,

# CHAPTER 2. THEORIES OF DISCRIMINATION

## 2-1 INTRODUCTION

In order for a particular fact pattern to be covered by the Fair Housing Act, three elements must be present: (1) a covered property; (2) a covered transaction; and (3) a covered basis of discrimination. Covered properties are generally dwellings that are not subject to any of the Act's exemptions. Covered transactions, also referred to as subject matter jurisdiction (e.g., a refusal to rent), are set forth in Sections 804-806 and 818 of the Act. There are seven covered bases of discrimination: race; color; religion; sex; disability; familial status; and national origin. See a discussion of these subjects in Chapter 3, Jurisdiction.

Only behavior that involves one or more of these seven covered bases of discrimination is illegal under the Fair Housing Act. Thus, for example, a landlord who refuses to rent an apartment to a prospective tenant has not thereby violated the Act -- even though a covered practice and a covered property may be involved -- unless it can also be shown that the landlord's action was based on race, color, religion, sex, disability, familial status, or national origin. If the landlord's action was based on any other factor (e.g., the prospect's bad credit), no violation of the Act has occurred.

This chapter deals with how it may be shown that one of the seven covered bases of discrimination was involved in a housing practice, thereby rendering that practice illegal under the Fair Housing Act. The starting point in analyzing this issue is the language used in the key substantive provisions of the Act. This language prohibits various housing practices (e.g., refusals to rent, sell, and negotiate and the imposition of discriminatory terms or conditions) "because of," "based on," or "on account of" any one of the seven prohibited bases of discrimination.

What do these phrases mean? Clearly, a phrase like "because of" would apply when the sole reason for a respondent's action is the race, color, religion, sex, disability, familial status, or national origin of the person with whom he is dealing. A more difficult issue is presented when a respondent's behavior is prompted by a number of reasons, only one of which is prohibited by the statute. And what of a respondent who acts without any illegal motive, but who employs a policy that disproportionately excludes racial minorities or other groups protected by the Act?

The Supreme Court has not yet decided a Fair Housing Act case dealing with these matters. The Court has, however, issued numerous opinions on the standards for proving a violation under the federal employment discrimination law (Title VII of the Civil Rights Act of 1964), and the lower courts have generally held that these precedents from the employment discrimination field should be followed in interpreting the Fair Housing Act.

Under Title VII, a plaintiff may pursue a claim under either a disparate treatment theory (discriminatory intent) or a discriminatory impact theory (discriminatory effect). The Supreme Court has explained the difference between these two theories as follows:

> "Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical. . . .
>
> Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in the treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory. . . . Either theory may, of course, be applied to a particular set of facts.

Within the disparate treatment (discriminatory intent) category, two types of cases have been recognized: (1) cases in which the respondent's decision was motivated by a single consideration, and the problem is to determine whether that consideration was a legitimate one or one condemned by the statute; and (2) "mixed-motive" cases in which both legitimate and illegitimate considerations played a part in the respondent's decision. The first of these two categories has accounted for the vast majority of fair housing claims, although some "mixed-motive" cases have also been presented. And on occasion, both theories may be used in the same case, although it is important in this situation to keep in mind the distinctions between how these two approaches are used to analyze the respondent's motivation.

This chapter discusses the analytical structure and the proof necessary to establish and rebut the three types of claims -- single-motive, mixed-motive, and discriminatory impact -- that have been recognized under the Fair Housing Act. Single-motive claims are dealt with in Section 2-2, which includes a discussion of the types of direct and circumstantial evidence that are most often used to prove this type of case. Mixed-motive claims are analyzed in Section 2-3. Section 2-4 is devoted to claims based on the discriminatory impact theory.

Throughout this chapter, it is assumed that the standards for proving a violation are the same regardless of whether a case involves discrimination on the basis of race, color, religion, sex, disability, familial status, or national origin. This assumption is supported by the fact that the language of the Fair Housing Act generally does not distinguish between these types of discrimination.[1] Thus, when an example given in this chapter deals with a particular basis of discrimination (e.g., race or familial

[1] In cases involving discrimination based on disability, there are additional forbidden practices, such as a refusal to make reasonable accommodations. These special disability provisions are discussed in Chapter 8.

status), the text should be understood to apply to all of the seven bases of illegal discrimination under the Act.

## 2-2 SINGLE-MOTIVE INTENT CASES

### A. Introduction

The Fair Housing Act prohibits intentional discrimination in a covered housing practice on the basis of race, color, religion, sex, disability, familial status, or national origin. The command of the law is that these seven bases for distinguishing among homeseekers must be irrelevant to a housing decision. A respondent who consciously relies on any one of these illegal factors in discriminating with respect to a covered housing practice violates the Act. And this is so regardless of whether the respondent bears any ill will or hostility towards whatever protected group is involved in the case; proof of the respondent's personal prejudices is not required to establish a violation of the Act.

Cases alleging intentional discrimination account for most of the litigation under the Fair Housing Act. The key in virtually all of these cases is determining whether the respondent did in fact act on the basis of the alleged illegal motive or rather acted on the basis of some other, non-prohibited consideration.

A typical case might involve a landlord's refusal to rent an apartment to a black homeseeker, who then alleges that the reason for the landlord's refusal was racial discrimination. The landlord usually responds by claiming that his reason for not dealing with the complainant was some legitimate concern, such as the desire to rent the apartment to a better qualified tenant.

The resolution of such a case will turn on the determination of what the landlord's real motivation was. Housing providers have a right to turn down applicants on any honest basis unrelated to the seven protected factors banned by the Fair Housing Act. On the other hand, if the evidence shows that the landlord did not actually rely on the claimed legitimate reason

(e.g., because the white applicant who was eventually accepted for the unit was actually less qualified than the complainant), then this reason will appear to be simply a "pretext" for the landlord's unlawful motivation in refusing to deal with the minority complainant.

**B. Direct and Indirect Evidence of Unlawful Motive**

Evidence of the respondent's discriminatory motive may be either direct or indirect. Direct evidence is defined as evidence that "proves [the] existence of [the] fact in issue without inference or presumption." Such evidence in fair housing cases usually takes the form of a verbal statement, written policy, or advertisement by the respondent showing either hostility toward the particular protected group involved in the case (e.g., racial minorities or children) or a specific intent to limit housing opportunities based on a prohibited ground.

For example, a landlord's statement that he would prefer not to rent to families with children would be an example of direct evidence of familial status discrimination. Such a statement might be made either to the complainant or to some third party, such as another applicant, a current tenant, or a HUD investigator.

Notice that the statement need not show any ill will or hostility to the protected group. For example, a landlord who says that "I would not rent an upper-floor unit to a family with children because, as a parent myself, I would be too concerned for the children's safety in those units" has provided direct evidence of his illegal motive just as surely as if he'd said that his refusal to rent to families was because of his dislike of children.

If a case includes such a statement or other direct evidence of illegal motivation, very little else is required to prove a violation. Basically, if the direct evidence is believed -- that is, the fact finder

concludes that its existence is established by a preponderance of all the evidence in the case -- then discrimination may be found.

Because direct evidence is so powerful and because it is so often based simply on an oral exchange between the two parties, a dispute as to what was actually said by the respondent often occurs. The investigator's task in this situation is to identify as many facts as possible to help the fact finder sort out whose version of the conversation is more likely to be the credible one. Find out precisely what each person thinks was said and how strongly each claims his/her recollection of the conversation. Also, focus on why each person's recollection of the exact words used might be considered trustworthy or not. For example, was there something peculiar about this particular conversation from the participant's point of view that made it noteworthy, or was it just another conversation among the many had that day? It is also important to determine whether other persons were present during the conversation, what they heard, how precisely they remember the words that were said, and whether they have any reason to be interested or biased in the case.

Finally, every effort should be made to find out if the respondent has provided housing to other members of the complainant's protected class; although this is indirect evidence with respect to the respondent's motive in the present case, it may be highly probative of whether the alleged direct evidence statement was actually made. For example, it will be difficult for a fact finder to conclude that a respondent said he would never rent to blacks if his apartment complex includes a substantial number of African-American tenants.

It should be noted that, in cases where the respondent has explicitly communicated an intent to discriminate against a protected class, this is not only direct evidence of an illegal motive, but may also be, by itself, a violation of Section 804(c) of the Act. This section prohibits any notice, statement, or advertisement that indicates a preference, limitation, or discrimination based on any one of the seven illegal factors, and it is often cited -- along with the Act's other substantive provisions dealing with refusals to

deal and discriminatory terms and conditions -- as a basis for the respondent's liability in cases where direct evidence of discrimination is present.

Although explicit statements of racial or national origin preferences may occur less often today than they did in the years immediately following enactment of the 1968 Fair Housing Act, such direct evidence does still present itself from time to time. And discriminatory statements, policies, and advertisements directed against the more recently protected groups -- families with children and disabled persons -- are still quite common.

As more and more time passes, however, it seems likely that the number of cases in which a respondent's unlawful motive may be established by direct evidence will diminish. A large proportion of modern fair housing cases, therefore, will have to rely heavily, if not exclusively, on indirect evidence (sometimes called "circumstantial" evidence) for proof of the respondent's discriminatory motive. In cases based on indirect evidence, the absence of a "smoking gun" statement, ad, or policy means that the respondent's illegal motive will have to be inferred from other facts, such as the difference in how he treated the complainant compared to how he treated other homeseekers.

## C. Indirect Evidence and the "Prima Facie Case" Concept

### 1. Burdens of Proof under the Prima Facie Case Approach

In evaluating fair housing cases based on indirect evidence, judges have often employed the "prima facie case" concept that the Supreme Court has developed in disparate treatment cases under the federal employment discrimination laws. The Court's principal decisions concerning this concept have established the necessary elements of proof and the parties' respective burdens of proof

in such cases, and these principles have been applied to fair housing cases by the lower courts.

A common description of how the "prima facie case" concept works, which was first articulated by some lower courts and later adopted in a number of decisions by the HUD administrative law judges, is:

First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. Third, if the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance of evidence that the legitimate reasons asserted by the defendant are in fact mere pretext.

As indicated by this description, the first stage is that the complainant has the burden of proving a "prima facie case" of unlawful discrimination. This may be done by establishing four basic points. The specifics of these four points will vary somewhat depending on the type of unlawful practice claimed. Once these four points are shown, a prima facie case is established, and an inference of unlawful motive is created.

In a refusal-to-rent case, for example, a prima facie case would be established by proof that:

(1) the complainant is a member of a group protected by the Fair Housing Act;

(2) the complainant applied to the respondent for a unit and met the minimum qualifications for rental;

(3) the respondent, knowing that the complainant was a member of a protected class, rejected or passed over the complainant; and,

(4) the unit remained available thereafter to similarly situated persons who are not members of the complainant's protected class.

The above elements will have to be adjusted somewhat to fit the particular circumstances of the case. For example, the fourth point listed in the text would be changed to "the unit was rented to a person who is not a member of the complainant's protected class" in a case where the respondent rented the unit to someone else contemporaneously with rejecting the complainant. The key point in either situation is the complainant was not the successful applicant.

In cases involving other types of unlawful practices, the elements needed to establish a prima facie case would also have to be adjusted somewhat. Thus, for example, in a case alleging unlawful discrimination in connection with an eviction, the four elements would be that:

(1) the complainant is a member of a group protected by the Fair Housing Act;

(2) the complainant met the minimum standards to live in the respondent's housing;

(3) the respondent, knowing that the complainant was a member of a protected class, evicted or initiated eviction proceedings against the complainant; and,

(4) similarly situated tenants who are not members of the complainant's protected class were not subjected to such eviction proceedings.

In a discriminatory-terms-or-conditions rental case, the four points would be that;

(1) the complainant is a member of a group protected by the Fair Housing Act;

(2) the complainant applied to the respondent for a unit and met the minimum qualifications for rental;

(3) the respondent, knowing that the complainant was a member of a protected class, offered to rent the unit to the complainant on certain terms and conditions; and,

(4) the respondent offered more favorable terms or conditions for rental of the same or a similar unit to other persons who are not members of the complainant's protected class.

In a refusal-to-sell case, the four points would be:

(1) the complainant is a member of a group protected by the Fair Housing Act;

(2) the complainant applied to the respondent for and met the minimum qualifications to purchase the property at issue;

(3) the respondent, knowing that the complainant was a member of a protected class, rejected or passed over the complainant; and,

(4) the property remained available thereafter to similarly situated persons who are not members of the complainant's protected class.

For the elements needed to prove a prima facie case in discriminatory lending cases see Chapter 8.

Once a prima facie case is established, the burden shifts to the respondent to articulate some legitimate, nondiscriminatory reason for the complainant's rejection. At this point and throughout the litigation, the ultimate burden of persuasion on the discriminatory motive issue remains with the complainant. The respondent's evidentiary obligation is merely a burden of production. To satisfy this burden, the

respondent need only produce admissible evidence that would allow the fact finder rationally to conclude that the respondent's decision had not been motivated by illegal discrimination.

If the respondent fails to meet this burden, then the complainant will prevail. If the respondent does meet this burden by articulating some clear and reasonably specific legitimate reason, then the complainant is given an opportunity to show that the legitimate reason offered by the respondent was not its true reason, but was merely a "pretext" for discrimination.

For example, in a number of refusal-to-rent cases, a minority complainant has easily established a prima facie case by showing that she is a member of a racial minority, that she inquired about a unit at the respondent's apartment complex, that she was told nothing was available, and that the respondent thereafter continued to show the unit or indeed rented it to a white applicant. The defense in many of these cases has been that no units were available at the time of the complainant's inquiry because, for example, the respondent had just rented or promised the last unit to another applicant. The case then turns on whether this defense can be rebutted. If, for example, the evidence shows that no such rental or promise was in fact made to another applicant and the unit was indeed available when the complainant inquired, then the respondent's articulated reason for not dealing with the complainant will be seen as not credible, and the inference of intentional discrimination created by the complainant's prima facie case will be controlling. On the other hand, if the facts bear out the respondent's story, the inference of illegal motive has been effectively rebutted, and the respondent will prevail.

2. <u>The Initial Elements of a Prima Facie Case</u>

The investigator must pay close attention to the need for proof of each of the four elements of the prima facie case. Some of these elements, of course, will not be difficult to prove. This should certainly true of the complainant's status as a member of a protected class. Even with respect to this element, however, there may be cases where attention to some details is required. For example, in a disability case, it is important to check the Act's definition of "disability" and make sure the complainant satisfies all of the elements of this definition. And some race-color cases may arise either where the complainant's status is not entirely obvious or where the complainant is white and her protected-class status derives from the race-color of her spouse or children.

The complainant's membership in a protected class must also have been known by the respondent at the time that the respondent took the housing action that resulted in the filing of a complaint. Again, this element will usually be easy to prove by, for example, showing that the respondent met the complainant and was able to observe her protected-class status. This would be true in many race, color, sex, disability, and national origin cases. As noted above, however, a complainant's status (or "membership in a protected class") may not be obvious in a particular case, and facts beyond merely the respondent's observation of the complainant may be needed to establish the necessary element of the respondent's awareness.

Such additional facts may also be required in some cases involving familial status and religion, where the protected-class status of the complainant may not be readily apparent to a housing provider. For example, it may be necessary to prove that the complainant told the respondent, before the housing denial occurred, that the complainant was seeking an apartment for herself and her child.

Certainly where the complainant and respondent did not actually meet but only, say, talked on the phone, some additional evidence will be needed to establish the respondent's awareness of the complainant's status. The most helpful evidence in this situation would be a direct statement by the complainant about her race or other protected-class status. In the absence of such a direct statement, some cases have attempted to rely on the complainant's manner of speaking or her having given her current address in a particular neighborhood as providing the respondent with enough information to make him aware of her racial or national origin status. The law is that the respondent need only have suspected that the complainant was a member of a protected class. Still, when the evidence of the respondent's knowledge on this point is weak, a number of cases have resulted in decisions holding that the prima facie case has not been established.

A point should be made here about the need to identify who in the respondent's organization exercised the responsibility for denying housing to the complainant. In the simplest of cases, only one person will be involved; that person will have met the complainant and also rejected her. On the other hand, if there are two or more persons involved -- such as an intake person who met and obtained information from the complainant and a decision maker who acted on this information after receiving it from the intake person -- then establishing the respondent's awareness of the complainant's protected-class status may be more difficult. In this situation, the decision maker must be shown to have had this awareness, either through communications with the intake person or otherwise.[2] The point in all of these situations

[2] This multi-person-processing situation should not be confused with the situation where a single person (e.g., a rental agent) both meets and rejects the complainant and another person

is that the person accused of deciding to deny a housing opportunity to the complainant must be shown to have been aware of the complainant's protected-class status.

The second element of a prima facie case -- that the complainant applied and met the minimum qualifications for the housing unit involved -- is usually easy to establish. "Applied" here means only that the complainant did whatever was necessary from the respondent's point of view to seek out the unit. Filling out a formal application may or may not have been required; often, all that a housing provider requires is that the applicant inspect the unit, express an interest in it, and orally give some basic information about herself. Even this may not be required if the respondent announces upon seeing the complainant that no units are available, for then -- just by showing up -- the complainant has done all that was required to show an interest in the unit before the respondent ended the process.

On a few occasions, courts have excused the requirement of an application where the evidence showed that applying would have been a "futile gesture" because the respondent had already indicated it intended to discriminate against the complainant's class. For example, there is no need for a black applicant to apply if the respondent has already made clear that it will not accept African-Americans. The same would be true for a family with children if the respondent had announced a policy against renting to such families.

It should be noted, however, that the willingness of courts to excuse the application requirement based on this "futile gesture" theory is limited

(e.g., the rental agent's employer) may also be liable for that action under the doctrine of respondeat superior. In this latter situation, the employer has taken no role in dealing with or evaluating the complainant; his liability is based solely on a rule of law that holds that he, too, should be liable for his employee-agent's discrimination.

to those situations where the respondent's prior statements or other actions make it clear that applying would indeed be futile. Thus, if the complainant is relying on this theory to justify her not having applied, the investigator will have to explore in some detail the basis for her belief that the respondent has indeed established a firm policy against dealing with members of her protected class.

Few cases are brought unless the complainant can meet the minimum financial qualifications of the housing involved, but this issue, too, must be explored. Again, it is important to note at what point in the process the respondent rejected the complainant. If, for example, this occurred immediately upon seeing the complainant (e.g., allegedly because no units were available), then the complainant's qualifications for the unit were clearly not of concern to the respondent, and little investigation into this issue is called for. On the other hand, if the respondent generally makes an effort to "screen" applicants based on some minimal financial requirements (e.g., current employment or the payment of an application fee), then it will be necessary to show that the complainant was able to meet these requirements at the time she approached the respondent.

The fourth element of the prima facie case -- the respondent's continued efforts to rent or sell the unit after the complainant has been passed over -- may require some investigative work. Sometimes, this element is established by the experience of "testers," who have tried to deal with the respondent at the request of the complainant or a local fair housing group. Obtaining the identity of these testers and an account of their experiences (including whatever written reports and/or tape recorded evidence may have resulted therefrom) will be a crucial part of the investigation.

In addition to testing, other evidence tending to establish the respondent's continued efforts to sell or rent the unit involved might include advertising done by the respondent, the respondent's rental or other business records, and the observations of neighbors, employees, and/or other tenants.

An absolutely crucial fact to discover is the current status of the unit sought by the complainant. Is it still on the market? Was it withdrawn from the market during a certain period of time? If it was eventually rented or sold by the respondent, the identity of the person(s) who ultimately secured it must be obtained, and their membership or nonmembership in the complainant's protected class,must be noted.

In a familial status case, for example, it will be very difficult to establish the respondent's discriminatory motive if the unit denied to the complainant's family is ultimately rented to another family with children. On the other hand, if the unit is rented to an all-adult household, the fourth element of the prima facie case has been established.

3. The Respondent's Rebuttal and the Complainant's Response

In most fair housing cases, all four elements of the prima facie case are fairly easy to prove. Thus, the key issue in most of these cases will be whether the respondent can rebut the prima facie case by coming forward with evidence of some legitimate, nondiscriminatory reason for not dealing with the complainant, and if so, whether the complainant can then show that this reason is merely a pretext for unlawful discrimination.

There are any number of legitimate reasons that a respondent might advance for not wanting to deal with a particular complainant. Examples from reported cases of the justifications offered by housing providers for their rejection of minority

homeseekers include the marital status or age of the minority applicants, their status as students, pet-owners, or enlisted personnel in the military, their poor credit history or other financial problems, their misrepresentations or other questionable behavior when applying, and simply their failure to meet the landlord's subjective feelings about what a good tenant should be like.

The respondent's nondiscriminatory reason for refusing to deal with the complaint must be clear and reasonably specific and must be supported by admissible evidence. It must also have existed and been known to the respondent at the time of the complainant's rejection (e.g., finding out that the complainant has bad credit after deciding to reject her will not suffice). Purely subjective reasons (e.g., the respondent didn't like the complainant) are the most difficult to defend. Yet even these and other seemingly unwarranted excuses may allow the respondent to prevail as long as these reasons have been applied in a nondiscriminatory manner. Since the burden of persuasion on the discriminatory motive issue remains with the complainant, any proven non-prohibited excuse would tend to show that the respondent's decision to reject the complainant was not merely a pretext for discrimination.

Because respondents almost always succeed in identifying some legitimate reason for their behavior, the key to resolving most cases based on indirect evidence lies in determining whether this claimed legitimate reason was in fact what motivated the respondent. This determination, in turn, usually turns on an analysis of four points.

The first of these is whether the respondent has been consistent in maintaining its position in this particular case; that is, has the respondent identified some basic reason for not dealing with the complainant and stuck with that defense, or has he articulated a series of excuses over time,

with each one giving way to another as the factual basis for the former begins to erode? A respondent's credibility will be seriously undercut if he starts out with one excuse (e.g., the lack of available units), then adopts another after the first is shown to be untenable (e.g., by citing the complainant's poor credit after learning that a tester was shown an available unit shortly after the complainant was rejected), and so on.

The important lesson here for the investigator is to determine from the respondent <u>as early as possible</u> in the investigation what <u>all</u> of the respondent's reasons for his behavior toward the complainant are claimed to be. If one reason is cited, make sure to ask if that is the only one. If another is then mentioned, continue to ask if this covers everything until the respondent agrees that no other excuses exist. And do this without confronting the respondent with other evidence you may know about that tends to rebut these excuses. Your role is not to argue with the respondent, but to nail down early on what his side of the story is and to do so as thoroughly as possible. Keep in mind that dates and times are important; it is not only important to know what the respondent's defenses are, but also when those defenses were first articulated and when the facts on which the respondent allegedly based those defenses became known to him.

A second point that may be relevant in evaluating whether the respondent's claimed reason for passing over the complainant is pretextual is whether the respondent attempted to make follow-up contacts with the complainant after their initial encounter. If, for example, the respondent's position is that no units were available when the complainant applied, the question might well be asked why the respondent did not take the necessary steps to pursue the complainant as a prospect for future availabilities, at least if the number of units under the respondent's control is large enough to suggest that some vacancies will occur shortly. Did the respondent take the

complainant's phone number? Did he promise to call back when other vacancies occurred? If not, why not? There may be good answers to these questions (e.g., the complainant said she needed an apartment that very week, and the respondent's next vacancy would not arise until the following month), but unless they can be articulated, the respondent's lack of interest in the complainant may be seen as inconsistent with normal business behavior and therefore suggestive of an illegal motive.

The third and perhaps most important type of evidence that is relevant to determining whether the respondent's excuse is legitimate or just a pretext for discrimination concerns the matter of how the respondent has treated other homeseekers. The key here is to find out whether the respondent has applied its claimed legitimate reason to applicants who are not members of the complainant's protected class in the same way that this reason was applied to the complainant. For example, in a refusal-to-rent case where the respondent claims that a minority complainant was rejected because of bad credit, this reason may be shown to be a pretext even if the complainant's credit is somewhat flawed if white applicants with similar credit problems have been accepted. The need for this type of comparative evidence means that the investigator should attempt to find out how all other similarly situated applicants have been dealt with (e.g., whether their credit was also checked and whether, on similar bad credit, the respondent accepted or rejected them).

In many fair housing cases, this type of proof is supplied by testers dealing with the respondent. The persuasiveness of comparative evidence is generally not reduced by the fact that the non-protected class applicant is a tester rather than an actual homeseeker. Either will do. And if neither a tester nor an actual homeseeker can be identified for personal testimony, it may still be

possible to generate this crucial comparative evidence by reviewing the respondent's own sales or rental records to see how he has dealt with persons with qualifications similar to the complainant's.

Whether testers or bona fide applicants are involved, the persuasiveness of this evidence will turn on how similar these other homeseekers are to the complainant in terms of meeting the criteria that the respondent claims to have applied in rejecting the complainant. The phrase "similarly situated" is often used to capture the spirit of this type of comparative evidence.

For example, if the respondent's excuse for rejecting a minority complainant is her inadequate income, it does little good to show that the respondent has accepted white applicants whose income is higher than the complainant's. On the other hand, if the respondent's claim is that the complainant was rejected not for inadequate income but for having a large dog, the search will have to be for other tenants with large dogs, with their incomes being irrelevant in this case.

These examples show that finding "similarly situated" homeseekers requires knowing the respondent's claimed excuse for rejecting the complainant. The need for this information in order to be able to produce useful evidence of the respondent's treatment of comparable homeseekers reinforces the point made earlier that the respondent's excuse must be identified as early in the investigation as possible.

The fourth type of evidence that is often important in evaluating the veracity of the respondent's claimed legitimate reason is the extent to which the respondent has rented or sold to other members of the complainant's protected class. It should be remembered that in the final analysis, the concept of the prima facie case is simply a technique to help the fact finder decide whether an illegal motive prompted the respondent to reject the complainant. The existence of such

a motive will be a good deal harder to establish if the respondent has often dealt with other members of the protected class involved in this particular case. On the other hand, if no or only a few other protected-class members have been accommodated by a respondent who has a substantial number of units under his control, then a suspicion of illegal of discriminatory behavior may be warranted.

For example, a fact finder attempting to determine whether the respondent has intentionally discriminated against a black complainant will likely be influenced by the fact that the respondent has a demonstrated record of renting to other African-Americans. This fact seems to be inconsistent with the notion that the respondent's reason for rejecting the complainant was race. Indeed, a large proportion of the HUD cases won by respondents have included evidence of their having dealt with other protected-class members.

In some cases, the significance of this evidence has been discounted by other circumstances, such as the fact that these other protected-class members were not accepted by the respondent until after the complaint in the present case was filed or the fact that the proportion of protected-class members in the respondent's housing is much smaller than it is in the local area's overall population. Nevertheless, obtaining demographic information about the people who have obtained housing from the respondent and relating this information to the complainant's protected class should be a basic part of the investigation of any fair housing claim that must be proved by indirect evidence.

## 2-3 MIXED-MOTIVE INTENT CASES

### A. Comparison to Single-Motive Cases

The previous section dealt with cases in which the

respondent's action was motivated by one consideration, and the dispute was over whether that consideration was one prohibited by the Fair Housing Act or was based on some other, non-illegal factor. This section deals with cases in which the fact finder determines that both lawful and unlawful considerations motivated the respondent. For example, the evidence may show that a landlord rejected a black applicant both because the landlord did not want to rent to blacks and because he legitimately questioned the applicant's ability to pay the rent.

In these so-called "mixed-motive" cases, the legal analysis with respect to the parties' burdens of proof is somewhat different from the analysis that governs single-motive cases under the "prima facie case" approach discussed in Section 2-2, but most of the elements of a good investigation will be the same. For both single-motive and mixed-motive cases, the basic focus of inquiry will be the respondent's intent; more specifically, the key for both will be trying to determine what role race or some other illegal consideration played in the respondent's decision to limit or deny a housing opportunity to the complainant.

The legal issue in mixed-motive cases is whether the Fair Housing Act prohibits housing decisions that are based only in part on a prohibited motive. The Act's applicability in these cases depends on whether it is interpreted to apply only when a prohibited consideration is shown to be the sole or decisive reason that the respondent rejected the complainant or whether liability may be established if the unlawful consideration was only one factor motivating the decision.

This problem is almost as old as the Fair Housing Act itself. In an influential decision on this issue in 1970, a federal court of appeals ruled against a defendant who had a valid, nondiscriminatory excuse for rejecting the minority plaintiff, but who also "did not want to rent to her because she was colored." In an oft-quoted passage, the court held that:

> [R]ace is an impermissible factor in an apartment rental decision and it cannot be brushed aside

> because it was neither the sole reason for discrimination nor the total factor of discrimination. We find no acceptable place in the law for partial racial discrimination.

This view was adopted by many of the lower courts in the 1970s and 1980s. Indeed, during this time, no case ever rejected a claim where it was established that race or some other prohibited basis was at least a partial reason for the denial of housing.

However, the modern view of this issue must take into account the Supreme Court's 1989 decision in Price Waterhouse v. Hopkins (see Exhibit 2-1), which dealt with the proper standard for mixed-motive cases under the federal employment discrimination law. Both this law and the Fair Housing Act ban practices undertaken "because of" certain types of discrimination, and the Court's interpretation of this phrase in Price Waterhouse has been applied in subsequent fair housing cases by lower courts and the HUD administrative law judges.

The Supreme Court in Price Waterhouse took a position somewhere in between the "any part" test advocated by the plaintiff in that case and the "decisive consideration" test advocated by the defendant. The principal opinion determined that the statute's "because of" language was meant "to condemn even those decisions based on a mixture of legitimate and illegitimate considerations." Therefore, according to this opinion, the plaintiff's burden of proof is satisfied if it is shown by a preponderance of the evidence that the employer relied in any way on an unlawful consideration in making its decision.

However, the Court went on to hold that the employer should not be liable if it can prove that it would have made the same decision in the absence of any illegal considerations. This "same decision" defense asks the fact finder to ponder and evaluate a hypothetical situation that never occurred (i.e., what would the defendant have done if it had not considered the

plaintiff's protected-class status). In order for the defendant to prevail in a mixed-motive case, the fact finder must be convinced by a preponderance of the evidence that the defendant would have taken the same action even if it had not been motivated in any way by an unlawful basis of discrimination.

This shifting of the burden of persuasion to the defendant is the key distinction between these mixed-motive cases and the "pretext" cases discussed in Section 2-2, where the burden of persuasion always remains with the plaintiff. A total of six Justices in Price Waterhouse agreed that the defendant should bear this burden in mixed-motive cases. Under this view, once a plaintiff shows that a defendant's decision was motivated in part by an unlawful consideration, the defendant may avoid a finding of liability only by proving that it would have made the same decision in the absence of that consideration.

**B. Fair Housing Cases Involving the Mixed-Motive Analysis**

Applying Price Waterhouse to fair housing cases would mean that a complainant in a mixed-motive case will be able to shift the burden of persuasion to the respondent by showing that the challenged housing practice was motivated at least in part by an unlawful consideration. The respondent will then be liable unless it proves by a preponderance of the evidence that it would have taken the same action even in the absence of this unlawful consideration. If the respondent does satisfy this burden, there is no liability under the Fair Housing Act. Thus, for example, if the evidence establishes that a complainant who was rejected because of inadequate financial resources and because she is black would have been rejected on the basis of inadequate financial resources alone, the Act has not been violated.

Perhaps the best known of all the fair housing decisions that have employed this mixed-motive analysis is that of HUD Chief Administrative Law Judge Alan Heifetz in a case called HUD v. Denton (See Exhibit 2-2). In this case, the evidence showed that the respondent-landlord evicted a family in part because of the number of children in the family (an illegal

consideration) and in part because of numerous instances of misconduct by the family (a legitimate consideration). Following Price Waterhouse, Judge Heifetz then found that the respondent was sufficiently troubled by the misconduct that he would have evicted the family even in the absence of any illegal motive. Thus, the respondent succeeded in defeating the charge of discriminatory eviction. (Note: A further charge of violating Section 804(c) by including in the eviction notice a statement indicating discrimination based on familial status was sustained, but Judge Heifetz awarded no relief for this violation, finding that none of the complainants' claimed injuries resulted from this statement but rather from the eviction itself.)

**C. Investigating Mixed-Motive Cases**

How does the fact that a case might involve a mixed-motive analysis change the way it should be investigated? The answer is, "Very little." Remember that in both single-motive and mixed-motive cases, the basic allegation is the same (i.e., that the respondent engaged in intentional discrimination), and much of the proof will be the same (e.g., evidence directed toward supporting or refuting the respondent's claim that he relied on legitimate considerations rather than an illegal motive). Indeed, the decision whether to analyze a particular case as a single-motive or a mixed-motive case will ordinarily not be made until after the HUD investigation is completed.

Just as in the cases discussed in Section 2-2, the investigator in a mixed-motive case must first search for direct evidence of discrimination. In addition, the investigator must identify the respondent's claimed legitimate reason or reasons for denying a housing opportunity to the complainant and then work to assemble facts that will form the basis for a judgment as to whether this reason actually prompted the respondent's action.

Eventually, the claimed legitimate reason will either be determined to be the sole reason for the

respondent's behavior (in which case he should prevail); or just a made-up reason for illegal discrimination (in which case he should lose); or was relied on in part along with an unlawful consideration (in which case the respondent will prevail only if he shows that he would have acted in the same way absent this unlawful motivation). In all of these situations, the key will be to determine how valid the respondent actually considered his claimed legitimate reason to be. The outcome will usually turn on whether the respondent has consistently acted on the basis of this criteria by applying it to all of the other applicants and/or tenants he has dealt with, and not just members of the complainant's protected class.

This means that generally the key to resolving mixed-motive cases will be the same type of comparative evidence that is often the key in analyzing single-motive cases under the "prima facie case" approach. Thus, if the respondent in a mixed-motive case has regularly been guided by his claimed legitimate reason in dealing with people who are not in the complainant's protected class, then it may well be believed that he would have treated the complainant in the same way he did even in the absence of her protected-class status. On the other hand, if the claimed excuse has been ignored for other persons, the respondent will be hard pressed to show that he would have relied on it alone to reject the complainant.

In some cases, the legitimate reason cited by the respondent will not have been used often, so there is no record of comparable treatment available. In these situations, other types of evidence will have to be obtained in order to decide how the respondent would have treated a non-protected class applicant in circumstances similar to the complainant's situation.

One basis for making this judgment will be the inherent validity of the reason offered by the respondent. This occurred in the Denton case, where the key instance of the complainant family's misconduct was setting a fire in the basement of the apartment house. Judge Heifetz felt that this was so serious an offense that, even though the respondent had never dealt with anything like it before, his claim that he would have evicted

the family for this offense regardless of considerations of familial status was believed.

Another basis for judging how seriously the respondent felt about his proffered reason is to examine when in the overall application process this matter was first raised by the respondent. If, for example, a respondent claims that a minority applicant's poor credit history would alone have resulted in her rejection, then the respondent would ordinarily be expected to have made all the necessary inquiries into this issue early enough in the application process to be able to act on the information elicited.

Finally, because mixed-motive and single-motive cases generally focus on the same issues, it follows that all of the other types of circumstantial evidence discussed in Section 2-2 would also be relevant in mixed-motive cases. Particularly important among these other topics would be the consistency with which the respondent has articulated and maintained his claimed legitimate excuse for not dealing with the complainant, and the demographics of those tenants or other homeseekers whom the respondent has dealt with, broken down by whether or not these other persons are members of the complainant's protected class.

## 2-4 DISCRIMINATORY IMPACT CASES

### A. Introduction

Under certain circumstances, a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations. This could occur if the respondent has rejected the complainant on the basis of a policy, practice, or standard that disproportionately excludes or otherwise harms a class of persons protected by the Act and for which the respondent cannot supply a substantial justification.

An example of this type of complaint might involve a landlord who declined to accept child support income in

determining financial eligibility. Such a policy might have a significant exclusionary impact on both female headed-households and on families with children, even though it was not adopted with the intent to discriminate. Such a policy might violate the Act unless the respondent proves that the policy was needed to accomplish some substantial business goal. Other examples might include facially neutral policies of refusing to permit low income housing within the city limits of a white community where such decisions would disproportionately exclude African-Americans, Asians, Latinos or other groups protected against discrimination. Similarly, a local residency preference, although not intended to discriminate, may disproportionately exclude groups along lines prohibited by the Act.

These cases are sometimes called "discriminatory impact" or "discriminatory effect" cases, because their principal focus is on the impact or effect of the respondent's policy rather than on his intent. Note, however, that in some cases, evidence of a discriminatory effect may be coupled with evidence of discriminatory intent, as, for example, where a respondent's policy has a large exclusionary impact on a protected class and the evidence shows that he adopted this policy to achieve that very goal. In other words, a single case may produce evidence of the respondent's violation of the Act under both a discriminatory impact theory and a discriminatory intent theory. But even in cases where there is absolutely no evidence of discriminatory intent, a discriminatory impact claim may result in a finding of liability.

Experience with the discriminatory impact theory in fair housing cases is somewhat limited. Perhaps one reason for this is that most housing decisions are based on an individual evaluation of the applicant rather than on a general policy. This distinction is crucial. If the complaint against a housing provider is that it <u>claimed</u> to have a general policy, but in fact applied this policy in a discriminatory way against the complainant, then the case is based on discriminatory intent, not discriminatory impact. Indeed, the basic allegation in such a case is that the

respondent did not have a general policy applicable to all homeseekers. Thus, there would be no need to evaluate whether or not this phony "policy" would have a discriminatory impact on the complainant's protected class.

For example, let's say that a landlord has a rule that all applicants must demonstrate that their monthly income is at least 3 times the monthly rental payment. Suppose further that the landlord has a rule that alimony payments cannot be counted as "income" in satisfaction of this requirement. A Hispanic woman receiving alimony payments who was rejected because of the "alimony doesn't count" rule might file a fair housing complaint alleging discrimination on the basis of sex. Suppose, for example, that evidence revealed that the landlord had rented to several White non-Hispanic women who relied on alimony payments. The facts would begin to point to a case of intentional discrimination based on ethnicity rather than sex. The claimed policy would have been shown to have been not a real policy at all, but just a pretext for intentional discrimination. There would be no occasion to apply the discriminatory impact theory to this case.

The discriminatory impact theory applies only in situations where the accusation against the respondent is that he has in fact employed a generally applicable policy or standard. Furthermore, this standard must not "on its face" discriminate against a class of persons protected by the Fair Housing Act. If it does (e.g., a landlord's policy against renting to families with children), such a policy amounts to direct evidence of discrimination reflecting a clear discriminatory intent, and may be successfully challenged without resorting to the discriminatory impact theory.

On the other hand, a landlord's "alimony-isn't-income" would not on its face discriminate against any group protected by the Act. If the rule were in fact applied to everyone in a nondiscriminatory way, then it could be used to reject a woman relying on alimony without

violating the Act's prohibition against intentional discrimination. In these circumstances, the only way to challenge the complainant's rejection under the Act would be to use the discriminatory impact theory.

**B. Elements of a Discriminatory Impact Claim**

In order to establish a violation of the Fair Housing Act based on the discriminatory impact theory, the complainant has the burden of proving that the respondent's policy disproportionately excludes or otherwise harms the housing opportunities of a class of persons protected by the Act. Think again, for example, of the landlord previously described, who required applicants to show a certain level of income in order to qualify for tenancy but refused to consider alimony payments in satisfaction of this requirement. If the landlord's policy were challenged by a female applicant as being discriminatory (on the basis of sex) under the discriminatory impact theory, the complainant would have to prove that a significantly higher proportion of alimony recipients were females and that more females than males would be disadvantaged by this policy. If the evidence *did not* support this proposition, the key element of the discriminatory impact theory would be absent, and the respondent would prevail.

If evidence *did* establish a that the landlord's policy disqualified significantly more women than men, the burden would shift to the respondent to justify the policy by showing that it served to accomplish a business necessity. If the respondent was unable to satisfy this burden, the complainant would prevail. On the other hand, if the respondent succeeded in satisfying this "business necessity" burden, evidence would need to be collected and evaluated to determine whether alternative policies might have been used to accomplish the goal with less or no discriminatory impact.

Again, using the "alimony-isn't-income" policy as an example, a respondent might argue persuasively that knowing whether an applicant will be able to pay the rent is a legitimate business necessity. He might argue that a steady source of income is critical to a tenant's ability to pay the rent consistently and that,

based upon statistics or other documentation, alimony payments are usually not delivered in a steady, reliable fashion. The landlord's argument that it is necessary for him to be able to predict an applicant's ability to pay the rent, might be accepted by the court. If so, the "alimony-isn't-income" policy could be defended if the landlord could demonstrate that the policy was manifestly related--or critical--to his need to evaluate an applicants' ability to pay. If he could prove that the policy was critical to satisfying his business needs, the landlord would prevail unless a less discriminatory alternative was available that would equally well advance the goal. See Betsey v. Turtle Creek Associates, 736 F.2d 983 (4th Cir. 1984), Exhibit 2-3.

**C. Proving the Necessary Discriminatory Impact**

1. The Basic Approach

A prima facie case of discriminatory impact requires proof that the respondent's policy has a significantly greater adverse impact on the complainant's protected class than it does on nonmembers of this class. The key to proving this necessary discriminatory impact is statistical evidence.

A preliminary step in conducting the investigation of a possible discriminatory impact case is to identify the particular policy, standard, or practice of the respondent that is being challenged and to make sure that this policy, standard, or practice is neutral on its face and is not being administered in a discriminatory manner. If the policy is facially discriminatory or is not being uniformly applied, then the case is likely to be based on the respondent's intentional discrimination, and the investigator should employ techniques appropriate to investigating a case of intentional discrimination. (Remember: It is possible that a given case may be analyzed under both the

discriminatory impact theory and the disparate treatment theory.)

Once the respondent's particular policy, standard, or practice is identified, the search for appropriate statistical evidence may begin. In order to focus this search on data that will be relevant to the charge at hand, the investigator must take note of the particular basis of discrimination alleged in the complaint. The relevant statistics for evaluating the possible discriminatory impact of a no-pet policy, for example, will be quite different in a disability discrimination case (where the focus would be the policy's relative impact on disabled versus non-disabled persons) than they would be, say, in a sex or race discrimination case (where the focus would be on male-female or black-white statistics).

The proper focus of the statistical inquiry requires not only attention to the nature of the discrimination alleged, but also a determination of the overall group of persons who are affected by the respondent's policy. In other words, the appropriate "population" must be identified. This may be a very large group (e.g., the population of an entire metropolitan area) or a fairly small group (the residents of a single apartment building), depending on what type of practice is being engaged in by the respondent.

For example, if a respondent adopts an admissions policy that is applied to all potential applicants in an area, then statistics for the entire local area may be the best source of information on the group affected by this policy. On the other hand, if a landlord applies a new policy to his current tenants -- allowing those who meet the policy's standards to stay and evicting the others -- then the proper focus may be limited to that group of tenants.

Once the appropriate population of affected people is identified, then that overall group is divided into two sub-groups: (1) those who are in the

complainant's protected class; and (2) those who are not. Then, the percentage of each of these sub-groups that is affected by the respondent's policy is determined. Finally, these percentages are compared to see if the protected-class sub-group is more harmed by the respondent's policy than the non-protected class sub-group. If it is, then a prima facie case of discriminatory impact may be established.

2. Applying the Basic Approach: A Lender's Minimum Loan Policy

Scenario:

Suppose that the ABC Mortgage Company has a policy of not making loans under $30,000 to anyone because it determined that loans under $30,000 were not profitable. This policy on its face is neutral because it applies to all persons equally.

Also, suppose that a person tried to apply for a mortgage for $25,000 from the ABC Mortgage Company. He was told that the lender does not make loans below $30,000 and that his application would not be processed. The person filed a complaint with HUD alleging a violation of the Fair Housing Act.

The complainant's particulars are as follows: he is Black and tried to file an application with the ABC Mortgage Company on June 1, 1996 to obtain a Federal Housing Administration (FHA)-insured loan to purchase a home in which he intended to reside in the Baltimore metropolitan statistical area (MSA).

Finally, suppose that the ABC Mortgage Company received 459 applications from Black and White applicants during 1996 for FHA-insured loans to purchase homes in which the applicants intended to live in the Baltimore MSA. Of the 459 applications, 135 were from Black applicants and

324 were from White applicants. Of these, as can be seen in the table below, 27.4 percent of the Black applications and 16.4 percent of the White applications were for loan amounts under $30,000.

| Loan Amount | Blacks | | Whites | |
|---|---|---|---|---|
| | # | % | # | % |
| Below $30,000 | 37 | 27.4% | 53 | 16.4% |
| Above $30,000 | 98 | 72.6% | 271 | 83.6% |
| Total | 135 | 100.0% | 324 | 100.0% |

Initial Analysis

The analytical approach to establish a prima facie case of discriminatory impact in this complaint is as follows:

1. Identify the policy, procedure, or practice that is facially neutral, but allegedly has a discriminatory impact on Blacks.

   The ABC Mortgage Company's $30,000 minimum loan policy.

2. Demonstrate that the minimum loan policy has a discriminatory impact on Black applicants.

   a. Identify the relevant "population" of persons to be compared.

      All persons who applied to the ABC Mortgage Company (i.e., "who") for an FHA-insured loan to buy a home in which they intended to reside (i.e., "what") during 1996 (i.e., "when") in the Baltimore MSA (i.e., "where").[3]

[3] In an individual complaint, try to make the "population" as

b. Divide the relevant "population" into those in the complainant's protected class and those not in that class.

Black applicants (complainant's group) versus White applicants (comparison group).

c. Determine the measuring tool.

Within each group - Black and White applicants - determine the percentage of applications for loan amounts below $30,000.

d. Calculate the measurements.

% of Black applications[4] below $30,000
37 / 135 * 100 = 27.4%

% of White applications below $30,000
53 / 324 * 100 = 16.4%

e. Determine whether the difference in the two measurements merits a finding of discriminatory impact. (This topic will

---

narrow as possible conforming to the complainant's characteristics. In this case, the complainant applied for an FHA loan (versus a conventional, Veterans Administration-guaranteed, or Farmers Home Administration-insured loan) to purchase a home (versus to refinance an existing loan or to improve his home) in which he intended to reside (versus to use as a rental property) in the Baltimore MSA during 1996.

[4] In addition to using applications, an investigator also should conduct the same analysis using originations, denials, and withdrawals, which is simply done using the Mortgage Lending Information System.

be covered in a separate chapter of this manual.[5])

If the difference is insufficient to establish a prima facie case of discriminatory impact, then the case is closed as "no reasonable cause." However, if the difference is sufficient to establish a prima facie case of discriminatory impact, the respondent has the opportunity to claim and demonstrate a business necessity for the policy. It must then be determined whether another business approach would be as effective but less discriminatory.

Alternate Analysis

What happens, however, if the ABC Mortgage Company had no applications from the "population" for loans less than $30,000 or had too few applications to conduct a meaningful comparison? In this situation, other comparisons are possible.

First, the "population" parameters could be expanded as long as the new parameters are relevant to the case. For example, expand the loan type parameter to include conventional, Veterans Administration-guaranteed, and Farmers Home Administration-insured loans, and/or expand the loan purpose parameter to include refinances. These additions are relevant because a lender's minimum loan policy usually pertains to all loan types and most loan purposes.

However, it would be improper to expand the loan purpose parameter to include home improvement loans. The reason is that these loans are normally for lesser amounts than home purchase

[5] The Office of Fair Housing and Equal Opportunity and the Office of General Counsel are conducting legal research into the quantitative and statistical methods acceptable to courts to show a significant enough difference between two groups to merit a finding of discriminatory impact. After the research is completed, a separate chapter for the manual will be written addressing this topic.

loans or loan refinances, and, if included in the analysis, could skew the results. Therefore, they are not relevant.

It is possible that even this expanded definition of the "population" would yield no or few applications for loans under $30,000. In this situation, the investigator would not know if there was no market (or demand) for loans that small or if ABC Mortgage Company's staff successfully dissuaded potential applicants from filing a formal application.

Another approach to expand the definition of the "population" is to examine the loan activity of all lenders combined in the Baltimore MSA. Using the complainant's characteristics,[6] the investigator could compare the percentages of applications from Blacks and Whites for under $30,000 that were originated by all lenders combined. This "population" is still relevant to the complaint because the number of loans made by other lenders for under $30,000 shows (1) a market for such loans, and (2) that other lenders determined the profit from these loans to be satisfactory, which could be used to counter ABC Mortgage Company's business necessity argument if a disparate impact is established.

If the percentage of loans made to Blacks by all lenders combined that were under $30,000 (29.5% in the example below) is disproportionately larger than the percentage of loans made to Whites that were under that amount (17.5% in the example below), then a prima facie case of discriminatory impact is established against the ABC Mortgage Company. The reason is that a disproportionate number of applicants who received a loan for under $30,000 from other lenders and who would have been

[6] In this example, the complainant's characteristics are that a Black applied for an FHA-insured loan to purchase a home in which he intended to reside in the Baltimore MSA during 1996.

turned away by the ABC Mortgage Company were Black. On the other hand, if the percentage of such loans to Blacks is not disproportionately larger than the percentage to Whites, then a prima facie case is not established.

| Loan Amount | Blacks | | Whites | |
|---|---|---|---|---|
| | # | % | # | % |
| Below $30,000 | 303 | 29.5% | 813 | 17.5% |
| Above $30,000 | 724 | 70.5% | 3,832 | 82.5% |
| Total | 1,027 | 100.0% | 4,645 | 100.0% |

3. A Note on Local vs. National Statistics

In searching for the proper data, it may turn out that the relevant statistics concerning a particular policy's relative impact on protected and non-protected classes are not available for the city, county, or other local population unit. There is a strong preference for local, as opposed to national, statistics in discriminatory impact cases, but if no local figures are available, then national figures (e.g., from U.S. census data) may have to be used.

In these circumstances, it will be important for the investigator to make a record of what attempts were made to find local statistics and why these efforts failed, and also to try to establish some basis for the fact finder to conclude that the demographic characteristics of the local area are similar to those of the nation as a whole with respect to the discriminatory factor being examined in this case. For example, in a familial status case, the use of relevant U.S. census data may not be allowed if the local population is believed to be different from the overall United States population in terms of the number of

households with children (e.g., because the local area is primarily made up of retirement communities).

Indeed, one case held that the national statistics offered there were so far removed from the local arena that they were to be given little weight in assessing the possible discriminatory impact of the respondent's policies on families with children. While not all courts have reached this same conclusion, investigators should be aware that a certain degree of judicial skepticism does exist about national statistics. It might be possible to overcome this skepticism by demonstrating that the local situation is likely to reflect the demographics revealed by the national figures.

4. Other Cases with Less than Ideal Statistics

A number of cases have held that a sufficient showing of discriminatory impact has been made to shift the burden to the respondent based on less precise statistical evidence than the discussion in the previous sections would indicate is necessary. For example, one decision by a HUD administrative law judge found that a respondent's policy against renting to persons on welfare had a discriminatory impact on women based on the fact that female-headed households accounted for an overwhelming proportion (about 95%) of the families that received welfare in the local area. (See HUD v. Ross, Fair Housing--Fair Lending Reporter, ¶25, 075(HUD ALJ 1994).)

It should be noted that, in many impact cases, there is additional evidence presented, such as more pointed statistical evidence or direct evidence of the respondent's discriminatory intent. It may be that this additional evidence will carry the case or will make a judge feel that a sufficient discriminatory impact is shown by the fact that the adversely affected group is

overwhelmingly made up of members of the complainant's protected class. While this may not be true in all cases, some judges have indeed based a finding of liability on statistics like those in the example discussed in the preceding paragraph.

Another example of the willingness of judges to rely on less than ideal statistical evidence to find discriminatory impact occurs regularly in the area of group home litigation (i.e., cases challenging zoning and other land-use restrictions on group homes for disabled persons). A typical example of such a case has involved a group of unrelated persons who are recovering from alcohol or drug addiction and who seek to occupy a home located in a single-family neighborhood. This group may be blocked by the local municipality's reliance on its zoning ordinance, which only permits, for example, families related by blood or marriage to occupy homes in this neighborhood. This restriction is then challenged for illegally discriminating against disabled persons, and one of the theories supporting this challenge is that the single-family restriction has a discriminatory impact on the disabled group involved.

The analysis of the discriminatory impact claim in this type of case is often fairly simplistic. The court simply observes that the zoning ordinance divides all people into a favored group of family-related persons and a disfavored group of unrelated persons, and then goes on to note that recovering alcohol and drug addicts tend much more often than other types of persons to live in unrelated-group settings. Often, no statistical evidence at all is cited in support of these propositions; rather, the court simply takes judicial notice of these facts, or perhaps cites a group home "expert" whose testimony has included these general observations.

The point of this section is simply to make the observation that some cases have succeeded in convincing the fact finder of the discriminatory impact of a challenged policy, practice, or

standard, where "common sense" seems to support
this conclusion even though the statistical
evidence is not strong.  This observation should
not be taken as an excuse for producing weak
statistical evidence in a discriminatory impact
case.  It may, however, be used to justify
reliance on the "next best" evidence if the data
that might be hoped for in a perfect case simply
cannot be produced even by a thorough
investigation.

## D.    The Rebuttal of a Discriminatory Impact Case

### 1.    The Legal Standard

When the evidence is sufficient to make out a
prima facie case of discriminatory impact, then
the burden shifts to the respondent to come
forward with a justification for its challenged
policy, practice, or standard.  The exact nature
of the respondent's burden of justification has
been phrased in different ways by the courts, but
the basic idea of this burden is captured in the
phrase "business necessity."  Thus, a number of
courts and HUD administrative law judges have held
that, in order to rebut the inference of
discrimination created by a showing of
discriminatory impact, the respondent must prove
"a business necessity sufficiently compelling to
justify the challenged practice."

This means that the respondent must do more than
simply articulate some legitimate,
nondiscriminatory reason for its challenged
policy, practice, or standard.  Rather, the
respondent must show that its selection technique
has a manifest relationship to the housing in
question.  The justification must be substantial.

Essentially, the respondent must accomplish two
things in order to satisfy its burden of
justification.  First, it must identify a
legitimate and substantial reason underlying its

challenged policy. Second, it must show by objective evidence -- not merely its own subjective opinion -- that its policy has a strong relationship to the legitimate and substantial goal that has been identified. Another way of saying this is that the policy must be shown to be "closely tailored" to serve the identified goal.

If the respondent fails to offer any evidence in support of the "business necessity" of its challenged policy, then the inference of discrimination created by the discriminatory impact showing is unrebutted, and the complainant will prevail. In most cases, however, the respondent will at least be able to articulate some legitimate goal that the policy is allegedly designed to serve, and the key will then be trying to determine whether this policy is needed to achieve this goal.

2. Examples of Evaluating the Respondent's Rebuttal

In assessing the "business necessity" defense, the fact finder is likely to be influenced by three or four key types of evidence. One is whether the respondent can show that the identified problem has in fact occurred in the past, as opposed to simply being a prospective "worry" of the respondent. Another, and somewhat related, point is whether the respondent has demonstrated the seriousness of his concern over this problem by consulting an "expert" about it, or whether the respondent has simply relied on his own "gut reaction" in addressing the problem. If an expert was consulted, when did this occur; specifically, did it occur before the respondent instituted his challenged policy -- indeed, did the expert recommend adoption of this policy -- or was the expert consulted only after the respondent established the policy and/or was sued for unlawful discrimination?

A final, and often decisive, element in assessing the "business necessity" defense is related to whether the respondent (and/or his expert if one was consulted) considered any other alternatives

for dealing with the identified problem and, if so, why these alternatives were not adopted instead of the challenged policy.  For example, in one case where the "business necessity" defense failed, the court was influenced by the fact that, although the respondent sought to justify an occupancy standard as a means of avoiding excessive wear and tear on his units, he admittedly had not considered any of the various alternatives for achieving this goal that the plaintiff suggested (e.g., detailed maintenance requirements, more frequent inspections, higher security deposits, and more careful tenancy screening).  On the other hand, in a case where the "business necessity" defense succeeded, the landlord produced an expert who confirmed that the apartment complex's hot water heating system could not accommodate more than a certain number of tenants and that the principal alternative to an occupancy standard under these circumstances -- installing a new heating system -- would cost over $1.6 million.  During investigation, the availability of less discriminatory alternatives should be examined with the respondent, the complainant, and, if necessary, through independent investigative sources.

Reflecting these areas of judicial concern, the investigation of the "business necessity" defense in a discriminatory impact case should include the following elements: (1) the precise nature of the problem that the respondent is trying to solve by employing the challenged policy, practice, or standard; (2) any evidence showing that this problem has, in fact, occurred in the past or is about to occur now; (3) the basis for the respondent's belief that his policy will, in fact, help solve this problem (including any reports or other advice given to him by experts or other disinterested persons), and when and how the basis for this belief was formed; and (4) what other alternatives for solving this problem may be available (which might be identified by the

respondent, the complainant, or some other source), whether the respondent has ever considered any of these alternatives, and why he believes they are not as satisfactory a way to deal with the problem as his adopted policy. Finally, the respondent should also be asked whether he knew or suspected that his adopted policy would have a discriminatory impact on the complainant's protected class, and whether he considered this at all -- as a negative, a positive, or not at all -- in his decision to adopt this policy.

**E. Review: The Keys to Investigating a Discriminatory Impact Case**

Every case in which a complainant alleges that he or she has been rejected because of the application of an apparently consistent policy or rule is potentially a discriminatory impact case. The first item that should be explored in such a case is whether the case is really better analyzed as one involving discriminatory intent. If, for example, the respondent's rule is discriminatory "on its face" against a protected group or, if the contested rule has been applied selectively so as to discriminate against such a group, the case may be appropriately analyzed under the theory of disparate treatment, with the element of intent to be demonstrated. There may be other evidence of the respondent's intentional discrimination in such cases, including direct evidence in the form of statements by the respondent indicating an intent to discriminate and/or awareness by the respondent that his policy would have the effect of excluding a large portion of the complainant's protected class. The investigator should always be alert to the possibility that a case which begins life looking like a discriminatory impact case later be shown to be a disparate treatment case, or may, indeed, involve actions that violate the Act under *both* theories.

As for the applicability of the discriminatory impact theory itself, the investigation must produce a proper statistical basis for the fact-finder to conclude that a given policy, practice or standard produces a

sufficiently large disparate impact to present a prima facie case. This will require that the respondent's challenged policy, practice, or standard be identified with particularity; that the complainant's protected class be noted; that the "population" affected by this policy be identified; and that statistics be assembled that show what percentage of the protected class and what percentage of the non-protected class within this population is selected and/or rejected by the challenged policy.

If the only statistics that are available to show this are national figures (e.g., U.S. census data), the investigation should not only obtain these figures, but also include an explanation of what efforts were made to obtain local statistics, why these efforts were unsuccessful, and why a fact finder would be justified in concluding that the local situation -- vis-a-vis the challenged policy's discriminatory impact on the protected class -- is likely to be reflected in the national statistics.

The investigation of a discriminatory impact case must also anticipate the need to evaluate a possible "business necessity" defense by the respondent. This will require the investigator to develop evidence that is relevant to at least the following three areas: (1) the precise nature of the problem that the respondent is trying to solve by employing his challenged policy, practice, or standard, and the degree to which this problem has manifested itself in the past; (2) the basis for the respondent's belief that his policy will, in fact, help solve this problem, and when and how this basis was formed; and (3) what other alternatives for solving this problem may be available, whether the respondent ever considered any of these alternatives, and why he believes they would not solve the problem as well as his adopted policy.

The victims' right movement has come a long way. The days when a victim was just a mere witness in the courthouse are not far gone.

While we are always sure to safeguard the rights of defendants, our justice system must also safeguard the rights of victims of crime.

The victims' rights movement dates all the way back to 1965 when the first crime victim compensation program was started in the State of California. Five States enacted similar legislation by 1970, and then we saw that organization, what we call the MADD mothers, Mothers Against Drunk Driving, come into being to advocate on behalf of victims of crime who had been hurt by those people who drink and drive.

In 1975, activists across the country united and formed the National Organization for Victim Assistance to expand victim services and promote the rights of victims.

In 1978, three more important organizations started: the National Coalition Against Sexual Assault, the National Coalition Against Domestic Violence, and a group of somber individuals called Parents of Murdered Children, all of them advocating on behalf of crime victims.

President Reagan in 1981 proclaimed the first National Victims' Rights Week in April, and that was also the year that 6-year-old Adam Walsh was abducted from a department store and later murdered, prompting a national campaign to educate the public on missing children and to pass better legislation—Federal legislation, to protect our greatest natural resource, the young that live among us.

In 1982, the Federal Government created the Office for Victims of Crime, or OVC, within the Department of Justice, a tremendous organization that sees after the victims of crime in our country.

Then, in 1984, the Congress passed the Victims of Crime Act, what we call VOCA, one of the most novel concepts that Congress has ever adopted. What it does is require that people convicted in Federal courts, those defendants, once they are convicted, they pay moneys into a fund, and that fund is used to help crime victims throughout the United States. It is a tremendous idea, making defendants pay for the system they have created, pay the rent on a courthouse as I like to call it. And today, Madam Speaker, that fund is over $1.7 billion, contributed not by taxpayers but by offenders, that goes for the specific purpose of helping victims, helping victims' organizations like rape centers, domestic violence shelters, and victim advocates that help victims throughout the turmoil of being a crime victim.

In 2005, my first year in Congress, I was honored to form the Victims' Rights Caucus with the gentleman from California (Mr. COSTA), who was a long-time victims' advocate in the State of California before he ever came to Congress. And this bipartisan, but yet nonpartisan, caucus now has 44 members, and we do everything we can to raise the awareness of crime victims here in the Federal Government.

In 2006, 25 years after Adam Walsh's murder that I just mentioned earlier, President Bush signed the Adam Walsh Child Protection and Safety Act, which requires sex offenders and child molesters, once they leave the Federal penitentiary or State penitentiaries, to register on the national database so that we keep up with those people who wish to prey on our communities.

Madam Speaker, crime victims don't have a lobbyist up here in Washington. They don't have some high-dollar lobbyist to work for them and advocate on their behalf. But we are their lobbyists. We advocate on behalf of all crime victims because that's what we do here in Congress, to take and protect the best that we have among us, and that's crime victims.

I urge community leaders and organizations to celebrate how far the victims' rights movement has come but also to continue to recognize the importance of crime victims that live among us because, Madam Speaker, justice is the one thing we should always find, and hopefully crime victims can find justice at the courthouse in our day and time.

And that's just the way it is.

Ms. ZOE LOFGREN of California. Madam Speaker, I wonder if the gentleman from Ohio has additional speakers.

Mr. CHABOT. We have no additional speakers, and we would be happy to yield back our time.

Ms. ZOE LOFGREN of California. Madam Speaker, I would urge my colleagues to support this resolution. It's bipartisan. It's important.

I just recalled, as I was listening to both Mr. POE and Mr. COSTA taking the lead and I thank them both for that, my more than 10 years on the Victim Witness Assistance Board, when I was in local government, and the tremendous need there is for people who have been victims and then who are also witnesses to receive the assistance from society that they need so much.

So I appreciate the efforts of both gentlemen and our colleagues who are in this caucus and urge support.

Madam Speaker, I yield back the balance of my time.

The SPEAKER pro tempore. The question is on the motion offered by the gentlewoman from California (Ms. ZOE LOFGREN) that the House suspend the rules and agree to the resolution, H. Res. 1053.

The question was taken; and (two-thirds being in the affirmative) the rules were suspended and the resolution was agreed to.

A motion to reconsider was laid on the table.

## COMMEMORATING THE ANNIVERSARY OF THE FAIR HOUSING ACT

Mr. CONYERS. Madam Speaker, I move to suspend the rules and agree to the resolution (H. Res. 1095) recognizing and honoring the 40th anniversary of congressional passage of title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) and the 20th anniversary of the Fair Housing Amendments Act of 1988.

The Clerk read the title of the resolution.

The text of the resolution is as follows:

H. RES. 1095

Whereas April 11, 2008, marks the 40th anniversary of congressional passage of the Fair Housing Act;

Whereas September 13, 2008, marks the 20th anniversary of congressional passage of the Fair Housing Amendments Act of 1988;

Whereas the Chicago Freedom Movement, led by the Reverend Doctor Martin Luther King, Jr., expanded the fight for civil rights from the South to the North, raised the national consciousness about housing discrimination, and shaped the debate that led to the landmark fair housing legislation, the Fair Housing Act;

Whereas the National Advisory Commission on Civil Disorders, appointed by President Lyndon B. Johnson and commonly known as the Kerner Commission, found in 1968 that "[o]ur nation is moving toward two societies, one black and one white—separate and unequal";

Whereas Congress passed the Fair Housing Act as part of the Civil Rights Act of 1968, and President Lyndon B. Johnson signed the Act into law on April 11, 1968, one week after the assassination of the Reverend Doctor Martin Luther King, Jr.;

Whereas the Fair Housing Act prohibits discrimination in housing and housing-related transactions on the basis of race, color, national origin, and religion;

Whereas in section 808 of the Housing and Community Development Act of 1974, Congress amended the Fair Housing Act to include protection on the basis of sex;

Whereas the Fair Housing Amendments Act of 1988, passed by overwhelming margins in Congress, included protection on the basis of familial status and disability, created an important enforcement mechanism, and expanded the definition of "discriminatory housing practices" to include interference and intimidation, requiring the Department of Housing and Urban Development to issue regulations to implement and interpret the Fair Housing Act and report annually to Congress on the nature and extent of housing discrimination;

Whereas the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States;

Whereas housing integration affects educational attainment, employment opportunities, access to health care, and home equity;

Whereas the majority of Americans support neighborhood integration, and numerous studies have shown the universal benefits of residential integration;

Whereas more than 4,000,000 violations of fair housing laws still occur each year against people of all protected classes, and testing of the enforcement of fair housing laws continues to uncover a high rate of discrimination in the rental, sales, mortgage lending, and insurance markets;

Whereas less than 1 percent of violations of fair housing laws are reported each year;

Whereas fair housing centers funded by Fair Housing Initiatives Program (FHIP) are the frontline in the effort to resolve housing discrimination;

HeinOnline -- 154 Cong. Rec. H2280 2008

Whereas in 2006, approximately 27,000 housing discrimination complaints were filed, of which 18,000 complaints were resolved by fair housing centers;

Whereas the Fair Housing Assistance Program (FHAP) funds fair housing grants annually on a non-competitive basis to State and local fair housing enforcement agencies which are used for complaint processing, administrative costs, special enforcement efforts, training and other projects designed to enhance the agency's administration and enforcement of its fair housing law;

Whereas fair housing education and enforcement play a pivotal role in increasing housing choice and minority homeownership and combating predatory lending; and

Whereas the Fair Housing Act is an essential component of our Nation's civil rights legislation: Now, therefore, be it

*Resolved*, That the House of Representatives—

(1) recognizes and honors the 40th anniversary of the enactment of the Fair Housing Act (42 U.S.C. 3601 et seq.) and the 20th anniversary of the enactment of the Fair Housing Amendments Act of 1988 (Public Law 100–430; 102 Stat. 1619);

(2) supports activities to recognize and celebrate the important historical milestones represented by the anniversaries of the enactment of the Fair Housing Act and the enactment of the Fair Housing Amendments Act of 1988; and

(3) encourages all people and levels of government to rededicate themselves to the enforcement and the ideals of fair housing laws.

The SPEAKER pro tempore. Pursuant to the rule, the gentleman from Michigan (Mr. CONYERS) and the gentleman from Ohio (Mr. CHABOT) each will control 20 minutes.

The Chair recognizes the gentleman from Michigan.

GENERAL LEAVE

Mr. CONYERS. Madam Speaker, I ask unanimous consent that all Members have 5 legislative days to revise and extend their remarks and include extraneous material on the resolution under consideration.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. CONYERS. Madam Speaker, I yield myself such time as I may consume.

House Resolution 1095 recognizes the 40th anniversary of the Fair Housing Act, enacted as Title VIII of the Civil Rights Act of 1968.

On April 11, 1968, days after the assassination of Dr. Martin Luther King, Jr., President Lyndon Johnson signed into law the Fair Housing Act, which prohibits discrimination in housing based on race, color, religion or national origin. Twenty years later today, the law was expanded by the Fair Housing Amendments Act to include protections against discrimination based also on sexual orientation, familial status, and disability.

Many may not recall Dr. King's advocacy for fair housing, but he recognized the tremendous costs our society pays if patterns of segregated living continues, as it has.

While there is no question that the Fair Housing Act has become a powerful tool for advancing civil rights, there is much more to be done. For instance, most Americans still live in communities largely divided by race, according to the National Fair Housing Alliance.

An estimated 3.7 million people are discriminated against in housing transactions every single year. This number doesn't even include instances of discrimination against persons with disabilities, nor does it reflect discriminatory lending in insurance practices, planning and zoning, or other forms of profiling. We have so much more to do.

Enforcement is a key area where we need further improvement. For example, while 27,000 complaints of housing discrimination were filed with the Federal Government last year, Housing and Urban Development issued 31 charges, and the Justice Department filed 35 cases.

Landlords, real estate agents, lenders, insurance agents, and others know they face limited risk of prosecution for discrimination. Even those who are prosecuted often pay such a minor penalty that discrimination today becomes just another cost of doing business. It's no surprise that housing providers continue to discriminate and communities across our Nation sadly remain highly segregated.

The most recent manifestation of discrimination in housing is the current sub-prime foreclosure crisis, which presents some of the greatest fair housing and civil rights issues facing our Nation today. Fueled by reverse red-lining practices, the sub-prime foreclosure crisis is now causing extreme havoc for minority owners who were targeted for predatory home loans that stripped away their home equity and put their houses at risk of foreclosure. It's also affected financing markets all over the world.

If left unchecked, the foreclosure crisis threatens to wipe out many of the advances the country has made in the 40 years since the passage of the Fair Housing Act.

To be an effective tool in our fight against discrimination, the Fair Housing Act must be enforced, and we need to augment it with tough anti-predatory lending legislation, which is what I intend to do.

We should also enact legislation permitting bankruptcy judges to restructure home mortgages so deserving families can save their homes from foreclosure and, thereby, stem falling housing prices in communities all across our Nation.

After centuries of discrimination and denied opportunities, enactment of the Fair Housing Act 40 years ago marked a milestone in our Nation's efforts to achieve equal housing opportunities.

And so today, we celebrate the Fair Housing Act's 40th anniversary with, I hope, a renewed commitment to achieving and furthering its goals by supporting this resolution.

Madam Speaker, I reserve the balance of my time.

Mr. CHABOT. Madam Speaker, I rise in strong support of H. Res. 1095, a resolution commemorating the 40th anniversary of the passage of the Fair Housing Act.

On April 4, 2008, just 11 days ago, this Nation joined together to pay tribute to the 40th anniversary of the assassination of Dr. Martin Luther King, Jr., and recognize his contributions to this Nation.

□ 1300

Thus, it's only fitting that we recognize one aspect of Dr. King's legacy, passage of the Fair Housing Act, which was signed into law by President Lyndon Johnson on April 11, 1968, just one week after Dr. King's tragic assassination.

The act, which prohibits discrimination in the sale, rental and financing of housing based on race, religion, national origin, sex, and later handicap and family status, was another tool to give meaning to the rights and protections afforded to all citizens by the Constitution.

Passage of the Fair Housing Act was a fitting memorial to Dr. King, as his name was closely associated with fair housing legislation since the 1966 "open housing" marches in Chicago.

At the same time, Senator Edward Brooke, the first African American ever to be elected to the Senate by popular vote, helped facilitate this Act's passage by describing his difficulties finding housing for his new family following his service in World War II.

The first official appointed to administer the act was former Governor George Romney. Secretary Romney assumed his position of Secretary of Housing and Urban Development after serving as Governor of Michigan, where he successfully campaigned for the ratification of a State constitutional amendment that prohibited discrimination in housing.

Since its enactment, the Fair Housing Act has prevented both countless instances of specific discrimination as well as broader patterns or practices of discrimination in housing programs. In addition, the act serves to punish those who attempt to disguise their discriminatory motives by giving false information to potential homebuyers, or by manipulating zoning codes. It prohibits sexual harassment in housing, and enables the disabled to more easily assimilate into our communities.

Madam Speaker, I would be remiss if I didn't also commend and recognize the chairman of the Judiciary, Mr. CONYERS, both for his remarks, and also working with myself in a bipartisan manner on the issue that he raised about those that find themselves at risk of having their homes foreclosed upon. And I agree with him that we ought to give the bankruptcy judges additional powers to modify those particular agreements so that they can have a better chance of retaining their homes. That certainly would move forward those that find themselves at risk

HeinOnline -- 154 Cong. Rec. H2281 2008

**INTERAGENCY FAIR LENDING EXAMINATION PROCEDURES**

# APPENDIX

August 2009

# APPENDIX

## TABLE OF CONTENTS

Introduction 1

Compliance Management Analysis Checklist 2
- A. Preventive Measures
- B. Corrective Measures

Considering Automated Underwriting and Credit Scoring 8
- A. Structure and Organization of the Scoring System
- B. Adverse Action Disclosure Notices
- C. Disparate Treatment in the Application of Credit Scoring Programs
- D. Disparate Impact and Credit Scoring Algorithms
- E. Credit Scoring Systems That Include Age
- F. Examination for Empirical Derivation and Statistical Soundness

Evaluating Responses to Evidence of Disparate Treatment 12
- A. Responses to Comparative Evidence of Disparate Treatment
- B. Responses to Overt Evidence of Disparate Treatment

Fair Lending Sample Size Tables 19
- Table A: Underwriting (Accept/Deny) Comparisons
- Table B: Terms and Conditions Comparisons

Identifying Marginal Transactions 20
- A. Marginal Denials
- B. Marginal Approvals

Potential Scoping Information 22
- A. Internal Agency Documents and Records
- B. Information from the Institution

Special Analyses 26
- A. Disproportionate Adverse Impact Violations
- B. Discriminatory Pre-Application Screening
- C. Possible Discriminatory Marketing

Using Self-Tests and Self-Evaluations to Streamline the Examination 31

# Introduction

This Appendix offers a full range of information that might conceivably be brought to bear in an examination.  In that sense, it is a "menu" of resources to be considered and selected from, depending on the nature and scope of the examination being conducted.

# Compliance Management Analysis Checklist

This checklist is for use in conjunction with Part II of these procedures as a device for examiners to evaluate the strength of an institution's compliance program in terms of its capacity to prevent, and to identify and self-correct fair lending violations in connection with the products or issues selected for analysis. The checklist is not intended to be an absolute test of an institution's compliance management program. Programs containing all or most of the features described in the list may nonetheless be flawed for other reasons; conversely, a compliance program that encompasses only a portion of the factors listed below may nonetheless adequately support a strong program under appropriate circumstances. In short, the examiner must exercise his or her best judgment in utilizing this list and in assessing the overall quality of an institution's efforts to ensure fair lending compliance.

If the transactions within the proposed scope are covered by a listed preventive measure, and the answer is "Yes", check the box in the first column. You may then reduce the intensity (mainly the sample size) of the planned comparative file review to the degree that the preventive measures cover transactions within the proposed scope. Document your findings in sufficient detail to justify any resulting reduction in the intensity of the examination.

You are not required to learn whether preventive measures apply to specific products outside the proposed scope. However, if the information you have obtained shows that the measure is a general practice of the institution, and thus applies to all loan products, check the box in the second column in order to assist future examination planning.

## A. Preventive Measures

Determine whether policies and procedures exist that tend to prevent illegal disparate treatment in the transactions you plan to examine. There is no legal or agency requirement for institutions to conduct these activities. The absence of any of these policies and practices is never, by itself, a violation.

### 1. Lending Practices and Standards:

a. Principal Policy Issues

- ☐ ☐ Are underwriting practices clear, objective, and generally consistent with industry standards?
- ☐ ☐ Is pricing within reasonably confined ranges with guidance linking variations to risk and/or cost factors?
- ☐ ☐ Does management monitor the nature and frequency of exceptions to its standards?
- ☐ ☐ Are denial reasons accurately and promptly communicated to unsuccessful applicants?
- ☐ ☐ Are there clear and objective standards for referring applicants to (i)

subsidiaries, affiliates, or other lending channels within the institution, (ii) classifying applicants as "prime" or sub-prime" borrowers, or (iii) deciding what kinds of alternative loan products should be offered or recommended to applicants?

☐     ☐     Are loan officers required to document any deviation from the rate sheet?

☐     ☐     Does management monitor consumer complaints alleging discrimination in loan pricing or underwriting?

b.     Do training, application-processing aids, and other guidance correctly and adequately describe:

☐     ☐     Prohibited bases under ECOA, Regulation B, and the Fair Housing Act?

☐     ☐     Other substantive credit access requirements of Regulation B (e.g. spousal signatures, improper inquiries, protected income)?

c.     Is it specifically communicated to employees that they must not, on a prohibited basis:

☐     ☐     Refuse to deal with individuals inquiring about credit?

☐     ☐     Discourage inquiries or applicants by delays, discourtesy, or other means?

☐     ☐     Provide different, incomplete, or misleading information about the availability of loans, application requirements, and processing and approval standards or procedures (including selectively informing applicants about certain loan products while failing to inform them of alternatives)?

☐     ☐     Encourage or more vigorously assist only certain inquirers or applicants?

☐     ☐     Refer credit seekers to other institutions, more costly loan products, or potentially onerous features?

☐     ☐     Refer credit seekers to nontraditional products (i.e., negative amortization, "interest only," "payment option" adjustable rate mortgages) when they could have qualified for traditional mortgages?

☐     ☐     Waive or grant exceptions to application procedures or credit standards?

☐     ☐     State a willingness to negotiate?

☐     ☐     Use different procedures or standards to evaluate applications?

☐     ☐     Use different procedures to obtain and evaluate appraisals?

☐     ☐     Provide certain applicants opportunities to correct or explain adverse or inadequate information, or to provide additional information?

☐     ☐     Accept alternative proofs of creditworthiness?

☐     ☐     Require co-signers?

☐     ☐     Offer or authorize loan modifications?

☐     ☐     Suggest or permit loan assumptions?

☐     ☐     Impose late charges, reinstatement fees, etc.?

☐    ☐    Initiate collection or foreclosure?

d.    Has the institution taken specific initiatives to prevent the following practices:

☐    ☐    Basing credit decisions on assumptions derived from racial, gender, and other stereotypes, rather than facts?

☐    ☐    Seeking consumers from a particular racial, ethnic, or religious group, or of a particular gender, to the exclusion of other types of consumers, on the basis of how "comfortable" the employee may feel in dealing with those different from him/her?

☐    ☐    Limiting the exchange of credit-related information or the institution's efforts to qualify an applicant from a prohibited basis group.

☐    ☐    Drawing the institution's CRA assessment area by unreasonably excluding minority areas?

☐    ☐    Targeting certain borrowers or areas with less advantageous products?

e.    Does the institution have procedures to ensure that it does not:

☐    ☐    State racial or ethnic limitations in advertisements?

☐    ☐    Employ code words or use photos in advertisements that convey racial or ethnic limitations or preferences?

☐    ☐    Place advertisement that a reasonable person would regard as indicating minority consumers are less desirable?

☐    ☐    Advertise only in media serving predominantly minority or non-minority areas of the market?

☐    ☐    Conduct other forms of marketing differentially in minority or non-minority areas of the market?

☐    ☐    Market only through brokers known to serve only one racial or ethnic group in the market?

☐    ☐    Use a prohibited basis in any pre-screened solicitation?

☐    ☐    Provide financial incentives for loan officers to place applicants in nontraditional products or higher-risk products?

**2.    Compliance Audit Function: Does the Institution Attempt to Detect Prohibited Disparate Treatment by Self-Test or Self-Evaluation?**

**NOTE**: A self-test is any program, practice or study that is designed and specifically used to assess the institution's compliance with the ECOA and the Fair Housing Act.  It creates data or factual information that is not otherwise available and cannot be derived from loan, application or other records related to credit transactions (12 CFR 202.15(b)(1) and 24 CFR 100.141).  The report, results, and many other records associated with a self-test are privileged unless an institution voluntarily discloses the report or results or otherwise forfeits the privilege.  See 12 CFR 202.15(b)(2) and 24 CFR 100.142(a) for a complete listing of the types of information covered by the privilege.  A self-evaluation, while generally having the same purpose as a self-test, does not create any new data or factual information, but uses data readily available in loan or application files and

other records used in credit transactions and, therefore, does not meet the self-test definition.  See *Using Self-Tests and Self-Evaluations to Streamline the Examination* in this Appendix for more information about self-tests and self-evaluations.

While you may request the results of self-evaluations, you should not request the results of self-tests or any of the information listed in 12 CFR 202.15(b)(2) and 24 CFR 100.142(a).  If an institution discloses the self-test report or results to its regulator, it will lose the privilege.  The following items are intended to obtain information about the institution's approach to self-testing and self-evaluation, not the findings.  Complete the checklist below for each self-evaluation and each self-test, where the institution voluntarily discloses the report or results.  Evaluating the results of self-evaluations and voluntarily disclosed self-tests is described in *Using Self-tests and Self-Evaluations to Streamline the Examination* in this Appendix.

a.   Are the transactions reviewed by an independent analyst who:

☐   ☐   Is directed to report objective results?
☐   ☐   Has an adequate level of expertise?
☐   ☐   Produces written conclusions?

b.   Does the institution's approach for self-testing or self-evaluation call for:

☐   ☐   Attempting to explain major patterns shown in the HMDA or other loan data?
☐   ☐   Determining whether actual practices and standards differ from stated ones and basing the evaluation on the actual practices?
☐   ☐   Evaluating whether the reasons cited for denial are supported by facts relied on by the decision maker at the time of the decision?
☐   ☐   Comparing the treatment of prohibited basis group applicants to control group applicants?
☐   ☐   Obtaining explanations from decision makers for any unfavorable treatment of the prohibited basis group that departed from policy or customary practice?
☐   ☐   Covering significant decision points in the loan process where disparate treatment or discouragement might occur, including:
☐   ☐       The approve/deny decision?
☐   ☐       Pricing?
☐   ☐       Other terms and conditions?
☐   ☐   Covering at least as many transactions as examiners would independently, if using the Fair Lending Sample Size Tables for a product with the application volumes of the product to be evaluated?
☐   ☐   Maintaining information concerning personal characteristics collected as part of a self-test separately from application or loan files?

☐    ☐    Timely analysis of the data?
☐    ☐    Taking appropriate and timely corrective action?

c.    In the institution's plan for comparing the treatment of prohibited basis group applicants with that of control group applicants:

☐    ☐    Are control and prohibited basis groups based on a prohibited basis found in ECOA or the FHAct and defined clearly to isolate that prohibited basis for analysis?

☐    ☐    Are appropriate data to be obtained to document treatment of applicants and the relative qualifications vis-à-vis the requirement in question?

☐    ☐    Will the data to be obtained reflect the data on which decisions were based?

☐    ☐    Does the plan call for comparing the denied applicants' qualifications related to the stated reason for denial with the corresponding qualifications for approved applicants?

☐    ☐    Are comparisons designed to identify instances in which prohibited basis group applicants were treated less favorably than control group applicants who were no better qualified?

☐    ☐    Is the evaluation designed to determine whether control and prohibited basis group applicants were treated differently in the processes by which the institution helped applicants overcome obstacles and by which their qualifications were enhanced?

☐    ☐    Are responses and explanations to be obtained for any apparent disparate treatment on a prohibited basis or other apparent violations of credit rights?

☐    ☐    Are reasons cited by credit decision makers to justify or explain instances of apparent disparate treatment to be verified?

d.    For self-tests under ECOA that involved the collection of applicant personal characteristics, did the institution:

1. develop a written plan that describes or identifies the:

☐    ☐    specific purpose of the self-test?
☐    ☐    methodology to be used?
☐    ☐    geographic area(s) to be covered?
☐    ☐    type(s) of credit transactions to be reviewed?
☐    ☐    entity that will conduct the test and analyze the data?
☐    ☐    timing of the test, including start and end dates or the duration of the self-test?
☐    ☐    other related self-test data that is not privileged?

2. disclose at the time applicant characteristic information is requested, that:

☐    ☐    the applicant will not be required to provide the information?

☐    ☐    the creditor is requesting the information to monitor its compliance with ECOA?

☐    ☐    federal law prohibits the creditor from discriminating on the basis of this information or on the basis of an applicant's decision not to furnish the information?

☐    ☐    if applicable, certain information will be collected based on visual observation or surname if not provided by the applicant?

**B.    Corrective Measures**

a.    Determine whether the institution has provisions to take appropriate corrective action and provide adequate relief to victims for any violations in the transactions you plan to review.  Who is to receive the results of a self-evaluation or voluntarily disclosed self-test?  What decision process is supposed to follow delivery of the information?  Is feedback to be given to staff whose actions are reviewed?  What types of corrective action may occur?  Are consumers to be:

☐    ☐    Offered credit if they were improperly denied?
☐    ☐    Compensated for any damages, both out of pocket and compensatory?
☐    ☐    Notified of their legal rights?

b.    Other corrective action:

☐    ☐    Are institutional policies or procedures that may have contributed to the discrimination to be corrected?

☐    ☐    Are employees involved to be trained and/or disciplined?

☐    ☐    Is the need for community outreach programs and/or changes in marketing strategy or loan products to better serve minority segments of the institution's market to be considered?

☐    ☐    Are audit and oversight systems to be improved in order to ensure there is not recurrence of any identified discrimination?

# Considering Automated Underwriting and Credit Scoring

These procedures are designed to help an examiner draw and support fair lending conclusions in situations involving automated underwriting or credit scoring.

## A. Structure and Organization of the Scoring System

Determine the utilization of credit scoring at the institution including

1. For each customized credit scoring model or scorecard for any product, or for any credit scoring model used in connection with a product held in portfolio, identify and obtain:

    a. the number and inter-relationship of each model or scorecard applied to a particular product;
    b. the purposes for which each scorecard is employed (e.g., approval decision, set credit limits, set pricing, determine processing requirements, etc.);
    c. the developer of each scorecard used (e.g., in-house department, affiliate, independent vendor name) and describe the development population utilized:
    d. the types of monitoring reports generated (including front-end, back-end, account management and any disparate impact analyses), the frequency of generation and recent copies of each;
    e. all policies applicable to the use of credit scoring;
    f. training materials and programs on credit scoring for employees, agents and brokers involved in any aspect of retail lending;
    g. any action taken to revalidate or re-calibrate any model or scorecard used during the exam period and the reason(s) why;
    h. the number of all high-side and low-side overrides for each type of override occurring during the exam period and any guidance given to employees on their ability to override;
    i. all cutoffs used for each scorecard throughout the examination period and the reasons for the cutoffs and any change made during the exam period;
    j. all variables scored by each product's scorecard(s) and the values that each variable may take; and
    k. the method used to select for disclosure those adverse action reasons arising from application of the model or scorecard.

2. For each judgmental underwriting system that includes as an underwriting criterion a standard credit bureau or secondary market credit score, identify:

    a. the vendor of each credit score and any vendor recommendation or guidance on the usage of the score relied upon by the institution;

b. the institution's basis for using the particular bureau or secondary market score and the cutoff standards for each product's underwriting system and the reasons for the cutoffs and any changes to the same during the exam period;

c. the number of exceptions or overrides made to the credit score component of the underwriting criteria and the basis for those exceptions or overrides, including any guidance given to employees on their ability to depart from credit score underwriting standards; and

d. types of monitoring reports generated on the judgmental system or its credit scoring component (including front-end, back-end, differential processing and disparate impact analysis), the frequency of generation and recent copies of each.

**B. Adverse Action Disclosure Notices**

Determine the methodology used to select the reasons why adverse action was taken on a credit application denied on the basis of the applicant's credit score. Compare the methodology used to the examples recited in the Commentary to Regulation B and decide acceptability against that standard. Identify any consumer requests for reconsideration of credit score denial reasons and review the action taken by management for consistency across applicant groups.

Where a credit score is used to differentiate application processing, and an applicant is denied for failure to attain a judgmental underwriting standard that would not be applied if the applicant had received a better credit score (thereby being considered in a different—presumably less stringent--application processing group), ensure that the adverse action notice also discloses the bases on which the applicant failed to attain the credit score required for consideration in the less stringent processing group.

**C. Disparate Treatment in the Application of Credit Scoring Programs**

1. Determine what controls and policies management has implemented to ensure that the institution's credit scoring models or credit score criteria are not applied in a discriminatory manner, in particular:

a. Examine institution guidance on using the credit scoring system, on handling overrides and on processing applicants and how well that guidance is understood and observed by the targeted employees and monitored for compliance by management; and

b. Examine institution policies that permit overrides or that provide for different processing or underwriting requirements based on geographic identifiers or borrower score ranges to assure that they do not treat protected group applicants differently than other similarly situated applicants.

2. Evaluate whether any of the bases for granting credit to control group applicants who are low-side overrides are applicable to any prohibited basis denials whose credit score was equal to or greater than the lowest score among the low-side

overrides. If such cases are identified, obtain and evaluate management's reason for why such different treatment is not a fair lending violation.

3. Evaluate whether any of the bases for denying credit to any prohibited basis applicants who are high-side overrides are applicable to any control group approvals whose credit score was equal to or less than the highest score among the prohibited basis high-side overrides. If such cases are identified, obtain and evaluate management's reason for why such different treatment is not a fair lending violation.

4. If credit scores are used to segment applicants into groups that receive different processing or are required to meet additional underwriting requirements (e.g., "tiered risk underwriting"), perform a comparative file review, or confirm the results and adequacy of management's comparative file review, that evaluates whether all applicants within each group are treated equally.

**D. Disparate Impact and Credit Scoring Algorithms**

Consult with agency supervisory staff to assess potential disparate treatment issues relating to the credit scoring algorithm.

**E. Credit Scoring Systems that Include Age**

Regulation B expressly requires the initial validation and periodic revalidation of a credit scoring system that considers age. There are two ways a credit scoring system can consider age: 1) the system can be split into different scorecards depending on the age of the applicant; and 2) age may be directly scored as a variable. Both features may be present in some systems. Regulation B requires that all credit scoring systems that consider age in either of these ways must be validated (in the language of the regulation, empirically derived, demonstrably and statistically sound (EDDSS)).

1. Age-Split Scorecards: If a system is split into only two cards and one card covers a wide age range that encompasses elderly applicants (applicants 62 or older), the system is treated as considering, but not scoring, age. Typically, the younger scorecard in an age-split system is used for applicants under a specific age between 25 and 30. It de-emphasizes factors such as the number of trade lines and the length of employment, and increases the negative weight of any derogatory information on the credit report. Systems such as these do not raise the issue of assigning a negative factor or value to the age of an elderly applicant. However, if age is directly scored as a variable (whether or not the system is age-split), or if elderly applicants are included in a card with a narrow age range in an age-split system, the system is treated as scoring age.

2. Scorecards that Score Age: If a scorecard scores age directly, in addition to meeting the EDDSS requirement, the creditor must ensure that the age of an elderly applicant is not assigned a negative factor or value. (See the staff commentary at 12 CFR 202.2(p) and 202.6(b)(2)). A negative factor or value means utilizing a factor, value, or weight that is less favorable than the creditor's experience warrants <u>or</u> is less favorable than the

factor, value, or weight assigned to the most favored age group below the age of 62 (12 CFR 202.2(v)).

**F. Examination for Empirical Derivation and Statistical Soundness**

Regulation B requires credit scoring systems that use age to be empirically derived, and demonstrably and statistically sound. This means that they must fulfill the requirements of 12 CFR 202.2(p)(1)(i) - (iv). Obtain documentation provided by the developer of the system and consult the agency's most recent guidance for making that determination.

# Evaluating Responses to Evidence of Disparate Treatment

## A. Responses to Comparative Evidence of Disparate Treatment

The following are responses that an institution may offer -- separately or in combination -- to attempt to explain that the appearance of illegal disparate treatment is misleading, and that no violation has in fact occurred. The responses, if true, may rebut the appearance of disparate treatment. The examiners must evaluate the validity and credibility of the responses.

1. The institution's personnel were unaware of the prohibited basis identity of the applicant(s)

If the institution claims to have been unaware of the prohibited basis identity (race, etc.) of an applicant or neighborhood, ask it to show that the application in question was processed in such a way that the institution's staff that made the decisions could not have learned the prohibited basis identity of the applicant.

If the product is one for which the institution maintains prohibited basis monitoring information, assume that all employees could have taken those facts into account. Assume the same when there was face-to-face contact between any employee and the consumer.

If there are other facts about the application from which an ordinary person would have recognized the applicant's prohibited basis identity (for example, the surname is an easily recognizable Hispanic one), assume that the institution's staff drew the same conclusions. If the racial character of a community is in question, ask the institution to provide persuasive evidence why its staff would **not** know the racial character of any community in its service area.

2. The difference in treatment was justified by differences in the applicants (applicants not "similarly situated")

Ask the institution to account for the difference in treatment by pointing out a specific difference between the applicants' qualifications, or some factor not captured in the application but that legitimately makes one applicant more or less attractive to the institution, or some non-prohibited factor related to the processing of their applications. The difference identified by the institution must be one that is important enough to justify the difference in treatment in question, not a meaningless difference.

The factors commonly cited to show that applicants are not similarly situated fall into two groups: those that can be evaluated by how consistently they are handled in other transactions, and those that cannot be evaluated in that way.

a. Verifying "not similarly situated" explanations by consistency

The appearance of disparate treatment remains if a factor cited by the institution to justify favorable treatment for a control group applicant also exists for an otherwise similar prohibited basis applicant who was treated unfavorably.  Similarly, the appearance of disparate treatment remains if a factor cited by the institution to justify unfavorable treatment for a prohibited basis applicant also exists for a control group applicant that got favorable treatment.  If this is not so, ask the institution to document that the factor cited in its explanation was used consistently for control group and prohibited basis applicants.

Among the responses that should be evaluated this way are:

- **Customer relationship.**  Ask the institution to document that a customer relationship was also sometimes considered to the benefit of prohibited basis applicants and/or that its absence worked against control group customers.
- **"Loan not saleable or insurable."**  If file review is still in progress, be alert for loans approved despite the claimed fatal problem.  At a minimum, ask the institution to be able to produce the text of the secondary market or insurer's requirement in question.
- **Difference in standards or procedures between branches or underwriters.**  Ask the institution to provide transactions documenting that each of the two branches or underwriters applied its standards or procedures consistently to both prohibited basis and control group applications it processed, and that each served similar proportions of the prohibited basis group.
- **Difference in applying the same standard (difference in "strictness") between underwriter, branches, etc.**  Ask the institution to provide transactions documenting that the stricter employee, branch, etc., was strict for both prohibited basis and control group applicants and that the other was lenient for both, and that each served similar proportions of the prohibited basis group.  The best evidence of this would be prohibited basis applicants who received favorable treatment from the lenient branch and control group applicants who received less favorable treatment from the "strict" branch.
- **Standards or procedures changed during period reviewed.**  Ask the institution to provide transactions documenting that during each period the standards were applied consistently to both prohibited basis and control group applicants.
- **Employee misunderstood standard or procedure.**  Ask the institution to provide transactions documenting that the misunderstanding influenced both prohibited basis and control group applications.  If that is not available, find no violation if the misunderstanding is a reasonable mistake.

b. Evaluating "not similarly situated" explanations by other means.

If consistency cannot be evaluated, consider an explanation favorably even without examples of its consistent use if:

- the factor is documented to exist in (or be absent from) the transactions, as claimed by the institution;
- the factor is one a prudent institution would consider and is consistent with the institution's policies and procedures;
- file review found no evidence that the factor is applied selectively on a prohibited basis (in other words, the institution's explanation is "not inconsistent with available information"); and
- the institution's description of the transaction is generally consistent and reasonable.

Some factors that may be impossible to compare for consistency are:

- **Unusual underwriting standard.**  Ask the institution to show that the standard is prudent.  If the standard is prudent and not inconsistent with other information, accept this explanation even though there is no documentation that it is used consistently.
- **"Close calls."**  The institution may claim that underwriters' opposite decisions on similar applicants reflects legitimate discretion that the examiners should not second guess.  That is not an acceptable explanation for identical applicants with different results, but is acceptable when the applicants have differing strengths and weaknesses that different underwriters might reasonably weigh differently.  However, do not accept the explanation if other files reveal that these "strengths" or "weaknesses" are counted or ignored selectively on a prohibited basis.
- **"Character loan."**  Expect the institution to identify a specific history or specific facts that make the applicant treated favorably a better risk than those treated less favorably.
- **"Accommodation loan."**  There are many legitimate reasons that may make a transaction appealing to an institution apart from the familiar qualifications demanded by the secondary market and insurers.  For example, a consumer may be related to or referred by an important customer, be a political or entertainment figure who would bring prestige to the institution, be an employee of an important business customer, etc.  It is not illegal discrimination to make a loan to an otherwise unqualified control group applicant who has such attributes while denying a loan to an otherwise similar prohibited basis applicant without them.  However, be skeptical when the institution cites reasons for "accommodations" that an ordinary prudent institution would not value.
- **"Gut feeling."**  Be skeptical when institutions justify an approval or denial by a general perception or reaction to the consumer.  Such a perception or reaction may be linked to a racial or other stereotype that legally must not influence credit decisions.  Ask whether any specific event or fact generated the reaction.  Often, the institution can cite something specific that made him or her confident or uncomfortable about the consumer.  There is no discrimination if it is credible that the institution indeed considered such a factor and did not apply it selectively on a prohibited basis.

c. Follow up customer contacts

If the institution's explanation of the handling of a particular transaction is based on consumer traits, actions, or desires not evident from the file, consider obtaining agency authorization to contact the consumer to verify the institution's description. Such contacts need not be limited to possible victims of discrimination, but can include control group applicants or other witnesses.

3. The different results stemmed from an inadvertent error

If the institution claims an identified error such as miscalculation or misunderstanding caused the favorable or unfavorable result in question, evaluate whether the facts support the assertion that such an event occurred.

If the institution claims an unidentified error caused the favorable or unfavorable result in question, expect the institution to provide evidence that discrimination is inconsistent with its demonstrated conduct, and therefore that discrimination is the less logical interpretation of the situation. Consider the context (as described below).

4. The apparent disparate treatment on a prohibited basis is a misleading portion of a larger pattern of random inconsistencies

Ask the institution to provide evidence that the unfavorable treatment is not limited to the prohibited basis group and that the favorable treatment is not limited to the control group. Without such examples, do not accept an institution's unsupported claim that otherwise inexplicable differences in treatment are distributed randomly.

If the institution can document that similarly situated prohibited basis group applicants received the favorable treatment in question approximately as frequently and in comparable degree as the control group applicants, conclude there is no violation.

**NOTE:** Transactions are relevant to "random inconsistency" only if they are "similarly situated" to those apparently treated unequally.

5. Loan terms and conditions

The same analyses described in the preceding sections with regard to decisions to approve or deny loans also apply to pricing differences. Risks and costs are legitimate considerations in setting prices and other terms and conditions of loan products. However, generalized reference by the institution to "cost factors" is insufficient to explain pricing differences.

If the institution claims that specific borrowers received different terms or conditions because of cost or risk considerations, ask the institution to be able to identify specific risk or cost differences between them.

If the institution claims that specific borrowers received different terms or conditions because they were not similarly situated as negotiators, consider whether application records might provide relevant evidence. If the records are not helpful, consider seeking authorization to contact consumers to learn whether the institution in fact behaved comparably toward prohibited basis and control group consumers. The contacts would be to learn such information as the institution's opening quote of terms to the consumer and the progress of the negotiations.

If the institution responds that an average price difference between the control and prohibited basis groups is based on cost or risk factors, ask it to identify specific risk or cost differences between individual control group applicants with the lowest rates and prohibited basis group applicants with the highest rates that are significant enough to justify the pricing differences between them. If the distinguishing factors cited by the institution are legitimate and verifiable as described in the sections above, remove those applications from the average price calculation. If the average prices for the remaining control group and prohibited basis group members still differ more than minimally, consult agency supervisory staff about further analysis. Findings or violations based on disparate treatment or disparate impact regarding cost or risk factors should be discussed with agency supervisory staff.

**B. Responses to Overt Evidence of Disparate Treatment**

1. Descriptive references vs. lending considerations

A reference to race, gender, etc., does not constitute a violation if it is merely descriptive -- for example, "the applicant was young." In contrast, when the reference reveals that the prohibited factor influenced the institution's decisions and/or consumer behavior, treat the situation as an apparent violation to which the institution must respond.

2. Personal opinions vs. lending considerations

If an employee involved with credit availability states unfavorable views regarding a racial group, gender, etc., but does not explicitly relate those views to credit decisions, review that employee's credit decisions for possible disparate treatment of the prohibited basis group described unfavorably. If there are no instances of apparent disparate treatment, treat the employee's views as permissible private opinions. Inform the institution that such views create a risk of future violations.

3. Stereotypes related to credit decisions

There is an apparent violation when a prohibited factor influences a credit decision through a stereotype related to creditworthiness -- for example, a loan denial because "a single woman could not maintain a large house." If the stereotyped beliefs are offered as "explanations" for unfavorable treatment, regard such unfavorable treatment as apparent illegal disparate treatment. If the stereotype is only a general observation unrelated to particular transactions, review that employee's credit decisions for possible disparate

treatment of the prohibited basis group in question. Inform the institution that such views create a risk of future violations.

4. Indirect reference to a prohibited factor

If negative views related to creditworthiness are described in non-prohibited terms, consider whether the terms would commonly be understood as surrogates for prohibited terms. If so, treat the situation as if explicit prohibited basis terms were used. For example, an institution's statement that "It's too risky to lend north of 110th Street" might be reasonably interpreted as a refusal to lend because of race if that portion of the institution's lending area north of 110th Street were predominantly black and the area south, white.

5. Lawful use of a prohibited factor

a. Special Purpose Credit Program (SPCP)

If an institution claims that its use of a prohibited factor is lawful because it is operating an SPCP, ask the institution to document that its program conforms to the requirements of Regulation B. An SPCP must be defined in a written plan that existed before the institution made any decisions on loan applications under the program. The written plan must:

- demonstrate that the program will benefit persons who would otherwise be denied credit or receive credit on less favorable terms; and
- state the time period the program will be in effect or when it will be re-evaluated.

No provision of an SPCP should deprive people who are not part of the target group of rights or opportunities they otherwise would have. Qualified programs operating on an otherwise-prohibited basis will not be cited as a violation.

**NOTE:** Advise the institution that an agency finding that a program is a lawful SPCP is not absolute security against legal challenge by private parties. Suggest that an institution concerned about legal challenge from other quarters use exclusions or limitations that are not prohibited by ECOA or the FHAct, such as "first-time home buyer."

b. Second review program

Such programs are permissible if they do no more than ensure that lending standards are applied fairly and uniformly to all applicants. For example, it is permissible to review the proposed denial of applicants who are members of a prohibited basis group by comparing their applications to the approved applications of similarly qualified individuals who are in the control group to determine if the applications were evaluated consistently.

Ask the institution to demonstrate that the program is a safety net that merely attempts to prevent discrimination, and does not involve underwriting terms or practices that are preferential on a prohibited basis.

Statements indicating that the mission of the program is to apply different standards or efforts on behalf of a particular racial or other group constitute overt evidence of disparate treatment. Similarly, there is an apparent violation if comparative analysis of applicants who are processed through the second review and those who are not discloses dual standards related to the prohibited basis.

c. Affirmative marketing/advertising program:

Affirmative advertising and marketing efforts that do not involve application of different lending standards are permissible under both the ECOA and the FHAct. For example, special outreach to a minority community would be permissible.

# Fair Lending Sample Size Tables

## Table A
*Underwriting (Accept/Deny) Comparisons*

| | Sample 1 Prohibited Basis Denials | | | | Sample 2 Control Group Approvals | | |
|---|---|---|---|---|---|---|---|
| Number of Denials or Approvals | 5 - 50 | 51 - 150 | > 150 | | 20 - 50 | 51 – 250 | > 250 |
| Minimum to review: | All | 51 | 75 | | 20 | 51 | 100 |
| Maximum to review: | 50 | 100 | 150 | | 5x prohibited basis sample (up to 50) | 5x prohibited basis sample (up to 125) | 5x prohibited basis sample (up to 300) |

## Table B
*Terms and Conditions Comparisons*

| | Sample 1 Prohibited Basis Approvals | | | | Sample 2 Control Group Approvals | | |
|---|---|---|---|---|---|---|---|
| Number of Approvals | 5-25 | 26 - 100 | > 100 | | 20 -50 | 51 – 250 | > 250 |
| Minimum to review: | All | 26 | 50 | | 20 | 40 | 60 |
| Maximum to review: | 25 | 50 | 75 | | 5x prohibited basis sample (up to 50) | 5x prohibited basis sample (up to 75) | 5x prohibited basis sample (up to 100) |

**Explanatory Notes to Sample Size Tables**

**1** Examiners should not follow Table B when conducting a pricing review that involves a regression analysis. Consult with agency supervisory staff for specific protocol in these cases.

**2** When performing both underwriting and terms and conditions comparisons, use the same control group approval sample for both tasks.

**3** If there are fewer than 5 prohibited basis denials or 20 control group approvals, refer to "Sample Size" instructions in the procedures.

**4** "Minimum" and "maximum" sample sizes: select a sample size between the minimum and maximum numbers identified above. Examiners should base the size of their review on the level of risk identified during the preplanning and scoping procedures. Once the sample size has been determined, select individual transactions judgmentally. Refer to procedures.

**5** If two prohibited basis groups (e.g., black and Hispanic) are being compared against one control group, select a control group that is 5 times greater than the larger prohibited basis group sample, up to the maximum.

**6** Where the institution's discrimination risk profile identifies significant discrepancies in withdrawal/incomplete activity between control and prohibited basis groups, or where the number of marginal prohibited basis group files available for sampling is small, an examiner may consider supplementing samples by applying the following rules:

- If prohibited basis group withdrawals/incompletes occur after the applicant has received an offer of credit that includes pricing terms, this is a reporting error under Regulation C (the institution should have reported the application as approved but not accepted) and therefore these applications should be included as prohibited basis group approvals in a terms and conditions comparative file analysis.
- If prohibited basis group incompletes occur due to lack of an applicant response with respect to an item that would give rise to a denial reason, then include them as denials for that reason when conducting an underwriting comparative file analysis.

# Identifying Marginal Transactions

These procedures are intended to assist an examiner in identifying denied and approved applications that were not either clearly qualified or unqualified, i.e., marginal transactions.

**A. Marginal Denials**

Denied applications with any or all the following characteristics are "marginal." Such denials are compared to marginal approved applications. Marginal denied applications include those that:

- Were close to satisfying the requirement that the adverse action notice said was the reason for denial;
- Were denied by the institution's rigid interpretation of inconsequential processing requirements;
- Were denied quickly for a reason that normally would take a longer time for an underwriter to evaluate;
- Involved an unfavorable subjective evaluation of facts that another person might reasonably have interpreted more favorably (for example, whether late payments actually showed a "pattern," or whether an explanation for a break in employment was "credible");
- Resulted from the institution's failure to take reasonable steps to obtain necessary information;
- Received unfavorable treatment as the result of a departure from customary practices or stated policies. For example, if it is the institution's stated policy to request an explanation of derogatory credit information, a failure to do so for a prohibited basis applicant would be a departure from customary practices or stated policies even if the derogatory information seems to be egregious;
- Were similar to an approved control group applicant who received unusual consideration or service, but were not provided such consideration or service;
- Received unfavorable treatment (for example, were denied or given various conditions or more processing obstacles) but appeared fully to meet the institution's stated requirements for favorable treatment (for example, approval on the terms sought);
- Received unfavorable treatment related to a policy or practice that was vague, and/or the file lacked documentation on the applicant's qualifications related to the reason for denial or other factor;
- Met common secondary market or industry standards even though failing to meet the institution's more rigid standards;
- Had a strength that a prudent institution might believe outweighed the weaknesses cited as the basis for denial;
- Had a history of previously meeting a monthly housing obligation equivalent to or higher than the proposed debt; and/or

- Were denied for an apparently "serious" deficiency that might easily have been overcome. For example, an applicant's total debt ratio of 50 percent might appear grossly to exceed the institutions guideline of 36 percent, but this may in fact be easily corrected if the application lists assets to pay off sufficient nonhousing debts to reduce the ratio to the guideline, or if the institution were to count excluded part-time earnings described in the application.

**B. Marginal Approvals**

Approved applications with any or all of the following characteristics are "marginal." Such approvals are compared to marginal denied applications. Marginal approvals include those:

- Whose qualifications satisfied the institution's stated standard, but very narrowly;
- That bypassed stated processing requirements (such as verifications or deadlines);
- For which stated creditworthiness requirements were relaxed or waived;
- That, if the institution's own standards are not clear, fell short of common secondary market or industry lending standards;
- That a prudent conservative institution might have denied;
- Whose qualifications were raised to a qualifying level by assistance, proposals, counteroffers, favorable characterizations or questionable qualifications, etc.; and/or
- That in any way received unusual service or consideration that facilitated obtaining the credit.

# Potential Scoping Information

As part of the scoping process described in Part I of the procedures, examiners will need to gather documents and information to sufficiently identify their focal points for review. Below is a list of suggested information that examiners may wish to gather internally, as well as from the institution itself.

**A. Internal Agency Documents and Records**

1. Previous examination reports and related work papers for the most recent Compliance / CRA and Safety and Soundness Examinations.

2. Complaint information.

3. Demographic data for the institution's community**.**

   Comment: The examiner should obtain the most recent agency demographic data, for information on the characteristics of the institution's assessment/market areas.

**B. Information from the institution**

Comment: Prior to beginning a compliance examination, the examiner should request the institution to provide the information outlined below. This request should be made far enough in advance of the on-site phase of the examination to facilitate compliance by the institution. In some institutions, the examiner may not be able to review certain of this information until the on-site examination. The examiner should generally request only those items that correspond to the time period(s) being examined.

**1. Institution's Compliance Program (**For examinations that will include analysis of the institution's compliance program.)

a. Organization charts identifying those individuals who have lending responsibilities or compliance, HMDA or CRA responsibilities, together with job descriptions for each such position.

b. Lists of any pending litigation or administrative proceedings concerning fair lending matters.

c. Results of self-evaluations or self-tests (where the institution chooses to share self-test results), copies of audit or compliance reviews of the institution's program for compliance with fair lending laws and regulations, including both internal and independent audits.

**NOTE:** The request should advise the institution that it is not required to disclose the report or results of any self-tests of the type protected under amendments to ECOA and the FHAct programs.

d. Complaint file.

e. Any written or printed statements describing the institution's fair lending policies and/or procedures.

f. Training materials related to fair lending issues including records of attendance.

g. Records detailing policy exceptions or overrides, exception reporting and monitoring processes.

**2. Lending Policies / Loan Volume**

a. Internal underwriting guidelines and lending policies for all consumer and commercial loan products.

Comment: If guidelines or policies differ by branch or other geographic location, request copies of each variation.

b. A description of any credit scoring system(s) in use now or during the exam period.

Comment: Inquire as to whether a vendor or in-house system is used; the date of the last verification; the factors relied on to construct any in-house system and, if applicable, any judgmental criteria used in conjunction with the scoring system.

c. Pricing policies for each loan product, and for both direct and indirect loans.

Comment: The institution should be specifically asked whether its pricing policies for any loan products include the use of **"**overages**"**. The request should also ask whether the institution offers any **"**sub-prime**"** loan products or otherwise uses any form of risk-based pricing. A similar inquiry should be made regarding the use of any cost-based pricing. If any of these three forms are or have been in use since the last exam, the institution should provide pricing policy and practice details for each affected product, including the institution's criteria for differentiating between each risk or cost level and any policies regarding overages. Regarding indirect lending, the institution should be asked to provide any forms of agreement (including compensation) with brokers/dealers, together with a description of the roles that

both the institution and the dealer/broker play in each stage of the lending process.

d. A description of each form of compensation plan for all lending personnel and managers.

e. Advertising copy for all loan products.

f. The most recent HMDA / LAR, including unreported data if available.

Comment: The integrity of the institution's HMDA-LAR data should be verified prior to the pre-examination analysis.

g. Any existing loan registers for each non-HMDA loan product.

Comment: Loan registers for the 3 month period preceding the date of the examination, together with any available lists of declined loan applicants for the same period should be requested. Registers / lists should contain, to the extent available, the complete name and address of loan applicants and applicable loan terms, including loan amount, interest rate, fees, repayment schedule and collateral codes.

h. A description of any application or loan-level data bases maintained, including a description of all data fields within the database or that can be linked at the loan-level.

i. Forms used in the application and credit evaluation process for each loan product.

Comment: At a minimum, this request should include all types of credit applications, forms requesting financial information, underwriter worksheets, any form used for the collection of monitoring information, and any quality control or second review forms or worksheets.

j. Lists of service providers.

Comment: Service providers may include: brokers, realtors, real estate developers, appraisers, underwriters, home improvement contractors and private mortgage insurance companies. Request the full name and address and geographic area served by each provider. Also request documentation as to any fair lending requirements imposed on, or commitments required of, any of the institution's service providers.

k. Addresses of any Internet Site(s)

Comment: Internet "Home Pages" or similar sites that an institution may have on the Internet may provide information concerning the availability of credit, or means for obtaining it.  All such information must comply with the nondiscrimination requirements of the fair lending laws.  In view of the increasing capability to conduct transactions on the Internet, it is extremely important for examiners to review an institution's Internet sites to ensure that all of the information or procedures set forth therein are in compliance with any applicable provisions of the fair lending statutes and regulations.

**3.  Community Information**

a. Demographic information prepared or used by the institution.

b. Any fair lending complaints received and institution responses thereto.

# Special Analyses

These procedures are intended to assist examiners who encounter disproportionate adverse impact violations, discriminatory pre-application screening and possible discriminatory marketing.

### A. Disproportionate Adverse Impact Violations

When all five conditions below exist, consult within your agency to determine whether to present the situation to the institution and solicit the institution's response. Note that condition 5 can be satisfied by either of two alternatives.

The contacts between examiners and institutions described in this section are information-gathering contacts within the context of the examination and are not intended to serve as the formal notices and opportunities for response that an agency's enforcement process might provide. Also, the five conditions are not intended as authoritative statements of the legal elements of a disproportionate adverse impact proof of discrimination; they are paraphrases intended to give examiners practical guidance on situations that call for more scrutiny and on what additional information is relevant.

> **NOTE**: Even if it appears likely that a policy or criterion causes a disproportionate adverse impact on a prohibited basis (condition 3), consult agency supervisory staff if the policy or criterion is obviously related to predicting creditworthiness and is used in a way that is commensurate with its relationship to creditworthiness, or is obviously related to some other basic aspect of prudent lending, and there appears to be no equally effective alternative for it. Examples are reliance on credit reports or use of debt-to-income ratio in a way that appears consistent with industry standards and with a prudent evaluation of credit risk.

### Conditions

1. A specific policy or criterion is involved.

The policy or criterion suspected of producing a disproportionate adverse impact on a prohibited basis should be clear enough that the nature of action to correct the situation can be determined.

> **NOTE**: Gross HMDA denial or approval rate disparities are not appropriate for disproportionate adverse impact analysis because they typically cannot be attributed to a specific policy or criterion.

2. The policy or criterion on its stated terms is neutral for prohibited bases.

3. The policy or criterion falls disproportionately on applicants or borrowers in a prohibited basis group.

The difference between the rate at which prohibited basis group members are harmed or excluded by the policy or criterion and the rate for control group members must be large enough that it is unlikely that it could have occurred by chance. If there is reason to suspect a significant disproportionate adverse impact may exist, consult with agency supervisory staff as appropriate.

4. There is a causal relationship between the policy or criterion and the adverse result.

The link between the policy or criterion and the harmful or exclusionary effect must not be speculative. It must be clear that changing or terminating the policy or criterion would reduce the disproportion in the adverse result.

5. Either a or b:

a. The policy or criterion has no clear rationale, or appears to exist merely for convenience or to avoid a minimal expense, or is far removed from common sense or standard industry underwriting considerations or lending practices.

The legal doctrine of disproportionate adverse impact provides that the policy or criterion that causes the impact must be justified by "business necessity" if the institution is to avoid a violation. There is very little authoritative legal interpretation of that term with regard to lending, but that should not stop examiners from making the preliminary inquiries called for in these procedures. For example, the rationale is generally not clear for basing credit decisions on factors such as location of residence, income level (*per se* rather than relative to debt), and accounts with a finance company. If prohibited basis group applicants were denied loans more frequently than control group applicants because they failed an institution's minimum income requirement, it would appear that the first four conditions plus 5a existed; therefore, the examiners should consult within their agency about obtaining the institution's response, as described in the next section below.

b. Alternatively, even if there is a sound justification for the policy, it appears that there may be an equally effective alternative for accomplishing the same objective with a smaller disproportionate adverse impact.

The law does not require an institution to abandon a policy or criterion that is clearly the most effective method of accomplishing a legitimate business objective. However, if an alternative that is approximately equally effective is available that would cause a less severe adverse impact, the policy or criterion in question may constitute be a violation.

At any stage of the analysis of possible disproportionate adverse impact, if there appears to be such an alternative, and the first four conditions exist, consult within the agency how to evaluate whether the alternative would be equally effective and would cause a

less-severe impact.   If the conclusion is that it would, solicit a response from the institution, as described in the next section below.

**Obtaining the institution's response**

If the first four conditions plus either 5a or 5b appear to exist, consult with agency supervisory staff about whether and how to inform the institution of the situation and solicit the institution's response.  The communication with the institution may include the following:

- The specific neutral policy or criterion that appears to cause a disproportionate adverse impact.
- How the examiners learned about the policy.
- How widely the examiners understand it to be implemented.
- How strictly they understand it to be applied.
- The prohibited basis on which the impact occurs.
- The magnitude of the impact.
- The nature of the injury to individuals.
- The data from which the impact was computed.

The communication should request that the institution provide any information supporting the business justification for the policy and request that the institution describe any alternatives it considered before adopting the policy or criterion at issue.

**Evaluating and following up on the response**

The analyses of "business necessity" and "less discriminatory alternative" tend to converge because of the close relationship of the questions of what purpose the policy or criterion serves and whether it is the most effective means to accomplish that purpose.

Evaluate whether the institution's response persuasively contradicts the existence of the significant disparity or establishes a business justification.  Consult with agency supervisory staff, as appropriate.

**B.  Discriminatory Pre-Application Screening**

Obtain an explanation for any:

- Withdrawals by applicants in prohibited basis groups without documentation of consumer intent to withdraw;
- Denials of applicants in prohibited basis groups without any documentation of applicant qualifications; or
- On a prohibited basis, selectively quoting unfavorable terms (for example, high fees or down payment requirements) to prospective applicants, or quoting unfavorable terms to all prospective applicants but waiving such terms for control group applicants.  (Evidence of this might be found in withdrawn or incomplete files.)

- Obtain explanations for any delays between application and action dates on a prohibited basis

If the institution cannot explain the situations, examiners should consider obtaining authorization from their agency to contact the consumers to verify the institution's description of the transactions. Information from the consumer may help determine whether a violation occurred.

In some instances, such as possible "prescreening" of applicants by institution personnel, the results of the procedures discussed so far, including interviews with consumers, may be inconclusive in determining whether a violation has occurred. In those cases, examiners should, if authorized by their agency, consult with agency supervisory staff regarding the possible use of "testers" who would pose as apparently similarly situated applicants, differing only as to race or other applicable prohibited basis characteristic, to determine and compare how the institution treats them in the application process.

**C. Possible Discriminatory Marketing**

1. Obtain full documentation of the nature and extent, together with management's explanation, of any:

- Prohibited basis limitations stated in advertisements;
- Code words in advertisements that convey prohibited limitations; or
- Advertising patterns or practices that a reasonable person would believe indicate prohibited basis consumers are less desirable or are only eligible for certain products.

2. Obtain full documentation as to the nature and extent, together with management's explanation, for any situation in which the institution, despite the availability of other options in the market:

- Advertises only in media serving either minority or non-minority areas of the market;
- Markets through brokers or other agents that the institution knows, or could reasonably be expected to know, to serve only one racial or ethnic group in the market; or
- Utilizes mailing or other distribution lists or other marketing techniques for pre-screened or other offerings of residential loan products***** that:
  - Explicitly exclude groups of prospective borrowers on a prohibited basis; or
  - Exclude geographies (e.g., census tracts, ZIP codes, etc.) within the institution's marketing area that have demonstrably higher percentages of minority group residents than does the remainder of the marketing area, but which have income and other credit-related characteristics similar to the geographies that were targeted for marketing; or
  - Offer different products to such geographies, especially if sub-prime products are primarily marketed to racial or ethnic minorities.

*** NOTE:** Pre-screened solicitation of potential applicants on a prohibited basis does not violate ECOA. Such solicitations are, however, covered by the FHAct. Consequently, analyses of this form of potential marketing discrimination should be limited to residential loan products.

3. Evaluate management's response particularly with regard to the credibility of any nondiscriminatory reasons offered as explanations for any of the foregoing practices. Refer to *Evaluating Responses to Evidence of Disparate Treatment* elsewhere in this Appendix for guidance.

# Using Self-Tests and Self-Evaluations to Streamline the Examination

Institutions may find it advantageous to conduct self-tests or self-evaluations to measure or monitor their compliance with ECOA and Regulation B. A self-test is a program, practice or study that is designed and specifically used to assess the institution's compliance with fair lending laws that creates data not available or derived from loan, application or other records related to credit transactions (12 CFR 202.15(b)(1) and 24 CFR 100.140-100.148). For example, using testers to determine whether there is disparate treatment in the pre-application stage of credit shopping may constitute a self-test. The information set forth in 12 CFR 202.15(b)(2) and 24 CFR 100.142(a) is privileged unless an institution voluntarily discloses the report or results or otherwise forfeits the privilege. A self-evaluation, while generally having the same purpose as a self-test, does not create any new data or factual information, but uses data readily available in loan or application files and other records used in credit transactions and, therefore, does not meet the self-test definition.

Examiners should not request any information privileged under 12 CFR 202.15(b)(2) and 24 CFR 100.142(a), related to self-tests. If the institution discloses the results of any self-tests, or has performed any self-evaluations, and examiners can confirm the reliability and appropriateness of the self-tests or self-evaluations (or even parts of them), they need not repeat those tasks.

**NOTE: When the term self-evaluation is used below, it is meant to include self-tests where the institution has voluntarily disclosed the report or results.**

If the institution has performed a self-evaluation of any of the product(s) selected for examination, obtain a copy thereof and proceed through the remaining steps of this section on Streamlining the Examination.

Determine whether the research and analysis of the planned examination would duplicate the institution's own efforts. If the answers to Questions A and B below are both Yes, each successive Yes answer to Questions C through L indicates that the institution's work up to that point can serve as a basis for eliminating examination steps.

If the answer to either Question A or B is No, the self-evaluation cannot serve as a basis for eliminating examination steps. However, examiners should still consider the self-evaluation to the degree possible in light of the remaining questions and communicate the findings to the institution so that it can improve its self-evaluation process.

A.    Did the transactions covered by the self-evaluation occur not longer ago than two years prior to the examination? If the self-evaluation covered more than two years prior to the examination incorporate only results from transactions in the most recent two years.

B. Did it cover the same product, prohibited basis, decision center, and stage of the lending process (for example, underwriting, setting of loan terms) as the planned examination?

C. Did the self-evaluation include comparative file review?

**NOTE**: One type of "comparative file review" is statistical modeling to determine whether similar control group and prohibited basis group applicants were treated similarly. If an institution offers self-evaluation results based on a statistical model, consult appropriately within your agency.

D. Were control and prohibited basis groups defined accurately and consistently with ECOA and/or the FHAct?

E. Were the transactions selected for the self-evaluation chosen so as to focus on marginal applicants or, in the alternative, selected randomly?

F. Were the data analyzed (whether abstracted from files or obtained from electronic databases) accurate? Were those data actually relied on by the credit decision makers at the time of the decisions?

To answer these two questions and Question G below, for the institution's control group sample and each of its prohibited basis group samples, request to review 10% (but not more than 50 for each group) of the transactions covered by the self-evaluation. For example, if the institution's self-evaluation reviewed 250 control group and 75 prohibited basis group transactions, plan to verify the data for 25 control group and seven prohibited basis group transactions.

G. Did the 10% sample reviewed for Question F also show that customer assistance and institution judgment that assisted or enabled applicants to qualify were recorded systematically and accurately and were compared for differences on any prohibited bases?

H. Were prohibited basis group applicants' qualifications related to the underwriting factor in question compared to corresponding qualifications of control group approvals? Specifically, for self-evaluations of approve/deny decisions, were the denied applicants' qualifications related to the stated reason for denial compared to the corresponding qualifications for approved applicants?

I. Did the self-evaluation sample cover at least as many transactions at the initial stage of review as examiners would initially have reviewed using the sampling guidance in these procedures?

If the institution's samples are significantly smaller than those in the sampling guidance but its methodology otherwise is sound, review additional transactions until the numbers of reviewed control group and prohibited basis group transactions equal the minimums for the initial stage of review in the sampling guidance.

J. Did the self-evaluation identify instances in which prohibited basis group applicants were treated less favorably than control group applicants who were no better qualified?

K. Were explanations solicited for such instances from the persons responsible for the decisions?

L. Were the reasons cited by credit decision makers to justify or explain instances of apparent disparate treatment supported by legitimate, persuasive facts or reasoning?

If the questions above are answered “Yes”, incorporate the findings of the self-evaluation (whether supporting compliance or violations) into the examination findings. Indicate that those findings are based on verified data from the institution’s self-evaluation. In addition, consult appropriately within the agency regarding whether or not to conduct corroborative file analyses in addition to those performed by the institution.

If not all of the questions in the section above are answered “Yes”, resume the examination procedures at the point where the institution’s reliable work would not be duplicated. In other words, use the reliable portion of the self-evaluation and correspondingly reduce independent comparative file review by examiners. For example, if the institution conducted a comparative file review that compared applicants’ qualifications without taking account of the reasons they were denied, the examiners could use the qualification data abstracted by the institution (if accurate) but would have to construct independent comparisons structured around the reasons for denial.



# Disparate Impact under the Fair Housing Act: A Proposed Approach

COMMISSIONED BY THE NATIONAL FAIR HOUSING ALLIANCE
December 1, 2009

# Disparate Impact under the Fair Housing Act: A Proposed Approach

Prepared by Robert G. Schwemm and Sara K. Pratt***

Contents:

I. Background
- A. Need for Action; Overview of this Commentary
- B. Principal Circuit Court Decisions Endorsing Impact Standard in FHA Cases

II. Justification for Concluding that the FHA Includes an Impact Standard
- A. Overview; Basic Conclusion
- B. The FHA"s Text Supports an Impact Standard
- C. The FHA"s Legislative History Shows that Impact Claims Are Cognizable
- D. Congress Endorsed the Application of the FHA to Impact Claims in the Fair Housing Amendments Act of 1988
- E. Administrative Implementation of the FHA Supports an Impact Standard
- F. Summary

III. Scope of HUD"s Proposed Impact Approach
- A. Impact Evidence Relevant to Both Impact and Intent Claims
- B. "Perpetuation of Segregation" Claims
- C. Same Standards Apply to Private and Public Defendants in Impact Cases
- D. Impact Standard is Presumed to Govern All FHA"s Substantive Provisions

IV. Plaintiff"s Initial Burden
- A. Prima Facie Case and Proper Statistical Focus
- B. Causation; Need to Focus on Particular Practices
- C. Need to Show "Substantial" Disparate Impact
- D. Summary

V. Defendant"s Burden of Justification; Less Discriminatory Alternatives
- A. Background; Different Articulations of the Proper Standard
- B. HUD"s Position
- C. Less Discriminatory Alternatives

Appendix 1: Possible Regulatory Language: Impact Claims under the Fair Housing Act

Appendix 2: Examples of Impact-Producing Practices that Might Violate the FHA

***
Robert G. Schwemm is the Ashland-Spears Professor at the University of Kentucky College of Law. Sara Pratt is former Director of Enforcement at HUD"s Office of Fair Housing and Equal Opportunity and a consultant on fair housing issues.

NOTE: Because this paper deals primarily with court cases rather than administrative proceedings, the terms "plaintiff(s)" and "defendant(s)" are generally used, but these terms should be understood to refer to, respectively, "complainant(s)" and "respondent(s)" when administrative proceedings are involved.

# I. Background

## A. Need for Action; Overview of this Commentary

Ever since the early years of litigation under the 1968 Fair Housing Act ("FHA" or "Act"), courts have been called upon to determine whether the FHA"s prohibitions are limited to practices prompted by discriminatory intent or also cover those that produce a discriminatory effect (impact). *See, e.g.*, *United Farm Workers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 808-11 & n.12 (5th Cir. 1974) (holding, in case brought under both the FHA and the 14th Amendment, that the defendants bear a heavy burden of justification once the plaintiffs prove the existence of a racially discriminatory effect, but determining that, because defendants" conduct here violated the 14th Amendment, "we do not reach the question of whether the . . . conduct also constituted a violation of the Fair Housing Act"). In 1974, the Eighth Circuit became the first federal appellate court to find a FHA violation based on the discriminatory effect of the defendant"s actions. *See United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1184-85, 1188 (8th Cir. 1974) (holding, in exclusionary land-use case brought by the Justice Department, that the defendant-municipality violated the FHA"s § 3604(a) and § 3617 and commenting that in order "[t]o establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect. . . . Effect, and not motivation, is the touchstone . . . .").

Four decades of such litigation has produced a strong consensus that the Act does include an impact standard. *See 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) (noting that "every one of the eleven circuits to have considered the issue has held that the FHA . . . prohibits not only intentional housing discrimination, but also housing actions having a disparate impact" and "assum[ing] without deciding that [plaintiffs] may bring a disparate impact claim under the FHA").[1] Many of the early cases that established this consensus followed the lead of the Supreme Court"s first FHA decision, *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972), in relying on precedents under Title VII of the 1964 Civil Rights Act to interpret the FHA and the Court"s unanimous decision a year earlier in *Griggs v. Duke Power Co.*, 401 U.S. 424, 431-32 (1971), which held that Title VII

> proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. . . . If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited. . . .

[1] Part I-B contains a list of many of these appellate decisions, organized by circuit.

Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation.

However, the Supreme Court has never directly ruled on the issue of whether the FHA includes an impact standard. *See City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188, 199-200 (2003) (avoiding this issue); *Town of Huntington, N.Y. v. Huntington Branch, NAACP*, 488 U.S. 15, 18 (1988) (same). Furthermore, the Court has, in recent years, issued opinions dealing with impact claims under other civil rights statutes indicating that each statute‟s coverage of such claims must be determined on the basis of that statute‟s particular text and purposes. *See, e.g.*, *Smith v. City of Jackson*, 544 U.S. 228, 233-40 (2005) (ADEA); *see also Ricci v. DeStefano*, 129 S.Ct. 2658, 2672-73 (2009) (Title VII).

The result has been that, despite the overwhelming consensus among lower courts that the FHA includes an impact standard, defendants/respondents continue to contest this issue, and courts and administrative law judges continue to have to issue decisions dealing with it. *See, e.g.*, *Guerra v. GMAC LLC*, 2009 WL 449153, at *3 (E.D. Pa. Feb. 20, 2009) (rejecting, in mortgage discrimination case, defendants‟ argument that the FHA lacks an impact standard and citing eight other district court decisions in similar cases in the past two years that reached the same conclusion). In addition, to the extent that lack of HUD regulatory guidance has allowed unnecessary uncertainties to continue, the effort to obtain voluntary compliance with the Act without the need for expensive and time-consuming litigation is undermined.

The Supreme Court has often relied on interpretive regulations of the agency charged with enforcing particular civil rights statutes in deciding whether those statutes include an impact standard. *See, e.g.*, *Smith v. City of Jackson*, 544 U.S. at 239-40; *id*. at 243-47 (Scalia, J., concurring); *Griggs*, 401 U.S. at 433-34. Furthermore, the Court has held that HUD‟s regulations interpreting the FHA are entitled to substantial deference in determining the meaning of the FHA. *See Meyer v. Holley*, 537 U.S. 280, 287-88 (2003); *see also Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 210 (1972) (determining that HUD‟s internal interpretation of the FHA is "entitled to great weight"). *See generally Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

For many years, HUD has expressed its view that the FHA includes an impact standard. In 1994, HUD joined the Department of Justice and eight other federal regulatory agencies in publishing an *Interagency Policy Statement on Discrimination in Lending*, which recognized the disparate impact standard as one way of proving lending discrimination under the FHA and spelled out how such an impact-based case should be analyzed. *See* 59 Fed. Reg. 18266, 18269-70 (Apr. 15, 1994).[2] In 1995, in its final rule on *The Secretary of HUD's Regulation of the*

[2] This *Interagency Policy Statement* stated that it was being issued for several reasons, including to "provide guidance about what the agencies consider in determining if lending discrimination exists" and to "provide a foundation for future interpretations and rulemakings by

*Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac)*, HUD concluded that "the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law" and, on this basis, determined to prohibit these GSEs from discriminating "in a manner that has a discriminatory effect." *See* 60 Fed. Reg. 61846, 61867 (Dec. 1, 1995); 24 C.F.R. § 81.41. In the 1990s, a number of HUD administrative decisions under the FHA endorsed the impact standard, including one in which the HUD Secretary ruled "that a disparate impact, if proven, would establish a violation of the Act. . . . [and] that this [discriminatory effects] test should have been applied in this case." *HUD v. Mountain Side Mobile Estates*, Fair Hous.-Fair Lend. Rptr. ¶ 25,053, at p. 25,492, 1993 WL 307069, at *5 (HUD Sec'y 1993).[3] In 1994, HUD"s Assistant Secretary for Fair Housing and Equal Opportunity told Congress: "The standards to determine discrimination [in home insurance under the FHA] – as in all other covered areas – will be based on the principles of overt discrimination, disparate treatment, and disparate impact." *Hearings on Homeowners Ins. Discrimination Before the Sen. Comm. on Banking, Housing, & Urban Affairs* 52, 103rd Cong. (1994). Since the mid-1990s, HUD"s handbook for its FHA enforcement staff has endorsed the impact theory. *See HUD, No. 8024.01, Title VIII Complaint Intake, Investigation & Conciliation Handbook*, Part 3-5-A-1, at 3-25 (1995), *available at* http://www.hud.gov/offices/adm/hudclips/handbooks/fheh/80241 (instructing that a housing policy violates the FHA if it has a discriminatory motive or "a disproportionately negative effect upon [protected] persons"); *id*. Part 2-4, at 2-27 to 2-45 (discussing "discriminatory impact cases"); *id*. Part 7-12, at 7-20 to 7-23 (identifying "disparate impact" as one type of illegal discrimination under the FHA); *id*. Part 5-10-A-4, at 5-57 (noting that facially neutral land-use ordinances may violate the FHA if they have a "disparate impact").

These HUD endorsements of an impact standard under the FHA have been clear and consistent, but they have not yet taken the form of a regulation applicable to the entire statute. *See, e.g.*, 60 Fed. Reg. at 61866 (noting, in 1995, that the GSEs "urged HUD to postpone application of the disparate impact standard in this rule until the issue is addressed in the HUD"s broader Fair Housing Act regulations"). Therefore, in order to bring additional clarity to this issue and to help inform judicial and administrative decisions, HUD should consider adoption of a clear language that authorizes an impact standard.

---

the Agencies." 59 Fed. Reg. at 18267.

[3] In a subsequent decision in this case, the Tenth Circuit reversed a HUD ALJ"s decision on remand from the Secretary"s decision, but endorsed the view that the FHA includes an impact standard. *See Mountain Side Mobile Estates Partnership v. HUD*, 56 F.3d 1243, 1051-52 (10th Cir. 1995).Other decisions by HUD administrative law judges endorsing this view include *HUD v. Pfaff*, Fair Hous.-Fair Lend. Rptr. ¶ 25,085, at pp. 25,781-83 (HUD ALJ 1994), *rev'd on other grounds*, 88 F.3d 739 (9th Cir. 1996); *HUD v. Ross*, Fair Hous.-Fair Lend. Rptr. ¶ 25,075, at pp. 25,699-700 (HUD ALJ 1994); *HUD v. Carter*, Fair Hous.-Fair Lend. Rptr. ¶ 25,029, at pp. 25,317-18 (HUD ALJ 1992).

The basic rationale for this determination is set forth in Part II. Part III discusses the scope and limits of the approach being proposed here. The particular circumstances that are deemed appropriate for impact-based claims are described in Parts IV and V. The Appendix provides examples of impact-producing practices that might violate the FHA.

B. Principal Circuit Court Decisions Endorsing Impact Standard in FHA Cases

1st Circuit:
*Principal Case*: Langlois v. Abington Housing Authority, 207 F.3d 43, 49 (1st Cir. 2000).
*Others*: Macone v. Town of Wakefield, 277 F.3d 1, 5, 7-8 (1st Cir. 2002).

2nd Circuit:
*Principal Case*: Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934-35 (2d Cir.), aff'd per curiam, 488 U.S. 15 (1988).
*Others*: Tsombanidis v. West Haven Fire Dept., 352 F.3d 565, 574-78 (2d. Cir. 2003); Fair Housing in Huntington Committee, Inc. v. Town of Huntington, N.Y., 316 F.3d 357, 366 (2d. Cir. 2003); Regional Economic Community Action Program, Inc. v. City of Middletown, 294 F.3d 35, 52-53 (2d. Cir. 2002); Hack v. President and Fellows of Yale College, 237 F.3d 81, 90-91, 93-102 (2d. Cir. 2000); Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 302 (2d. Cir. 1998); Orange Lake Associates, Inc. v. Kirkpatrick, 21 F.3d 1214, 1227-28 (2d. Cir. 1994); Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1036-37 (2d. Cir. 1979).

3rd Circuit:
*Principal Case*: Resident Advisory Board v. Rizzo, 564 F.2d 126, 146-48 (3d Cir. 1977).
*Others*: Lapid-Laurel, LLC v. Zoning Bd. of Adjustment of Tp. of Scotch Plains, 284 F.3d 442, 466-68 (3d Cir. 2002); Doe v. City of Butler, Pa., 892 F.2d 315, 323 (3d Cir. 1989).

4th Circuit:
*Principal Cases*: Betsey v. Turtle Creek Associates, 736 F.2d 983, 986 (4th Cir. 1984); Smith v. Town of Clarkton, N.C., 682 F.2d 1055, 1065 (4th Cir. 1982).
*Others*: Edwards v. Johnston County Health Department, 885 F. 2d 1215, 1223 (4th Cir. 1989); Charleston Housing Authority v. U.S. Dept. of Agriculture, 419 F.3d 729, 740-42 (4th Cir.2005).

5th Circuit:
*Principal Case*: Hanson v. Veterans Administration, 800 F.2d 1381, 1386 (5th Cir. 1986).
*Others*: Cox v. City of Dallas, Tex., 430 F.3d 734, 746 (5th Cir. 2005); Simms v. First Gibralter Bank, 83 F.3d 1546, 1555 (5th Cir. 1996).

6th Circuit:
*Principal Case*: Arthur v. City of Toledo, Ohio, 782 F.2d 565, 574-75 (6th Cir. 1986).
*Others*: Graoch Associates # 33 v. Louisville/Jefferson County 508 F.3d 366, 371-74 (6th Cir.

2007); Larkin v. State of Mich. Dept. of Social Services, 89 F.3d 285, 289 (6th Cir. 1996).

7th Circuit:
*Principal Case*: Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1290 (7th Cir. 1977).

8th Circuit:
*Principal Case*: United States v. City of Black Jack, 508 F.2d 1179, 1184-85 (8th Cir. 1974).
*Others*: Oti Kaga, Inc. v. South Dakota Housing Development Authority, 342 F.3d 871, 883-84 (8th Cir. 2003); Darst-Webb Tenant Ass'n v. St. Louis Housing Authority, 339 F.3d 702, 712 (8th Cir. 2003); Williams v. Matthews Co., 499 F.2d 819, 826 (8th Cir. 1974).

9th Circuit:
*Principal Cases*: Pfaff v. HUD, 88 F.3d 739, 745-46 (9th Cir. 1996); Keith v. Volpe, 858 F.2d 467, 482-84 (9th Cir. 1988).
*Others*: Budnick v. Town of Carefree, 518 F.3d 1109, 1114, 1118-19 (9th Cir. 2008); Affordable Housing Development Corp. v. City of Fresno, 433 F.3d 1182, 1194-96 (9th Cir. 2006); Gilligan v. Jamco Development Corp., 108 F.3d 246, 250-51 (9th Cir. 1997); Gamble v. City of Escondido, 104 F.3d 300, 304-06 (9th Cir. 1997); Halet v. Wend Investment Co., 672 F.2d 1305, 1311 (9th Cir. 1982).

10th Circuit:
*Principal Case*: Mountain Side Mobile Estates Partnership v. HUD, 56 F.3d 1243, 1250-51 (10th Cir. 1995).
*Others*: Reinhart v. Lincoln County, 482 F.3d 1225, 1229 (10th Cir. 2007); Bangerter v. Orem City Corp., 46 F.3d 1491, 1501 (10th Cir. 1995).

11th Circuit:
*Principal Case*: Jackson v. Okaloosa County, 21 F.3d 1531, 1543 (11th Cir. 1994).
*Others*: Schwartz v. City of Treasure Island, 544 F.3d 1201, 1217-18 (11th Cir. 2008); Hallmark Developers, Inc. v. Fulton County, Ga., 466 F.3d 1276, 1286 (11th Cir. 2006).

D.C. Circuit:
*Principal Case*: 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia, 444 F.3d 673, 679 (D.C. Cir. 2006) ("assum[ing] without deciding that [plaintiffs] may bring a disparate impact claim under the FHA").[4]

---

[4] District courts in the D.C. Circuit have recognized that the FHA includes an impact standard. *E.g.*, *National Community Reinvestment Coalition v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 77-79 (D. D.C. 2008), *leave to appeal denied*, 597 F. Supp. 2d 120 (D. D.C. 2009); *National Fair Housing Alliance, Inc. v. Prudential Ins. Co. of America*., 208 F. Supp. 2d 46, 58-60 (D. D.C. 2002); *see also Brown v. Artery Organization, Inc.*, 654 F. Supp. 1106, 1114-

II. Justification for Concluding that the FHA Includes an Impact Standard

A. Overview; Basic Conclusion

The factors that the Supreme Court considers in determining whether a particular civil rights statute includes an impact standard support the conclusion that the FHA has such a standard. These factors, which are individually reviewed in Sections B-E of this Part, include: statutory text; legislative history and purpose; subsequent Congressional action; and administrative construction. *See e.g.*, *Griggs*, 401 U.S. at 429-36; *Smith v. City of Jackson*, 544 U.S. at 233-40.

HUD‟s basic conclusion should be that the FHA should be interpreted as the Supreme Court interpreted Title VII in *Griggs*, because the two statutes share similar language and goals and were enacted in close proximity to one another.[5] "[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. at 233 (plurality opinion, citing *per curiam* opinion in *Northcross v. Board of Ed. of Memphis City Schools*, 412 U.S. 427, 428 (1973)).[6]

Furthermore, the Supreme Court has instructed that the FHA be given a "generous construction" in light of its "broad and inclusive" "language." *Trafficante*, 409 U.S. at 209, 212; *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (noting "the broad remedial intent of Congress embodied

---

16 (D. D.C. 1987) (endorsing impact theory for public defendants).

[5] As noted in Part I-A, the Supreme Court‟s first FHA decision in 1972 relied on Title VII precedent to interpret the FHA. *See Trafficante*, 409 U.S. at 208-09; *cf. General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389-90 (1982) (holding that the 14th Amendment's discriminatory purpose standard controls claims under the 1866 Civil Rights Act, because these laws are "legislative cousins" and it would be "incongruous to construe" them in a "markedly different" manner).

[6] The FHA and Title VII share the common purpose of ending invidious discrimination in their respective fields of housing and employment. A number of appellate decisions holding that the FHA has an impact standard have noted the common purposes of these two statutes. *See, e.g.*, *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir.), aff'd per curiam, 488 U.S. 15 (1988) (citing numerous cases and other authorities noting "the parallel between Title VII and Title VIII [FHA]"); *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 987 (4th Cir. 1984) (noting the "parallel" objectives of Title VII and the FHA); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982) ("the anti-discrimination objectives of [the FHA] are parallel to the goals of Title VII"); *see also* note 10 and accompanying text.

in the Act"). This requirement supports the recognition of an impact standard under the FHA, as various appellate decisions have noted.[7]

B. The FHA"s Text Supports an Impact Standard

The text of the FHA"s substantive provisions (§§ 3604-3606 and 3617) does not explicitly state whether impact claims are or are not cognizable. This was also true with respect to the Title VII provisions that *Griggs* held included an impact standard.[8] Therefore, as the Supreme Court did in *Griggs* for Title VII, HUD may properly interpret the text of the FHA"s substantive provisions as including an impact standard.

Indeed, the Supreme Court has made clear from the beginning that it is appropriate to rely on Title VII precedents to interpret the FHA when the FHA"s text is similar to that used in Title VII.[9] Following the Court"s lead, a number of appellate courts have relied on *Griggs* and other Title VII precedents in concluding that the FHA includes an impact standard.[10]

In addition to relying on Title VII precedents, the view that impact claims are proper under the FHA is supported by the FHA"s first provision (§ 3601), which states: "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." Section 3601 counsels that, as between two reasonable and constitutional interpretations of the FHA, the one that provides a broader application of the Act is correct. The interpretive rule reflected in § 3601 is why the Supreme Court has held that only constitutional, and not also prudential, limits on standing apply under the FHA. *See, e.g., Havens*, 455 U.S. at 372.

Here, § 3601 encourages the FHA's application to impact claims, because this construction is permitted by the statute"s language and, in light of the Supreme Court's approval of impact claims under Title VII more than thirty-eight years ago in *Griggs*, is plainly constitutional. Thus, a number of appellate courts have relied on § 3601 in determining that the

---

[7] *See, e.g.*, *Huntington Branch*, 844 F.2d at 935; *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1289-90 (7th Cir. 1977).

[8] As Justice O"Connor noted in 2005, "the decision in *Griggs* was not based on any analysis of Title VII"s actual language. Rather, the *ratio decidendi* was the statute"s perceived *purpose* . . . ." *Smith v. City of Jackson*, 544 U.S. 228, 261-62 (2005) (O"Connor, J., concurring, joined by Kennedy and Thomas, JJ.).

[9] *See supra* Part I-A and note 5 (describing *Trafficante*, 409 U.S. at 208-09, as interpreting the FHA based on Title VII precedent).

[10] *See, e.g.*, *Town of Clarkton*, 682 F.2d at 1065; *Huntington Branch*, 844 F.2d at 934-36; *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 146 (3d Cir. 1977); *Mountain Side Mobile Estates Partnership v. HUD*, 56 F.3d 1243, 1250-51 & n.7 (10th Cir. 1995).

FHA includes an impact standard.[11]

The Supreme Court‟s decision in *Smith v. City of Jackson*, 544 U.S. 228 (2005) is not to the contrary. *Smith* held that the Age Discrimination in Employment Act ("ADEA") includes an impact standard, although one somewhat more restrictive that Title VII‟s. 544 U.S. at 433-41. There are key textual differences between the FHA‟s substantive provisions and the ADEA provisions considered in *Smith*, which indicate that *Smith's* understanding of the ADEA is consistent with concluding that the FHA has a Title VII-like impact standard. For example, in the FHA‟s substantive prohibitions, the phrases "any person," "because of," and "based on" fit with an impact standard, because they do not focus on a particular individual as certain ADEA provisions do. The plurality opinion in *Smith* explained that the ADEA‟s explicit focus on a "targeted individual" is the reason why one part of the ADEA, 29 U.S.C. § 623(a)(1), is inconsistent with an impact standard. *See* 544 U.S. at 236 n.6. The key words in the ADEA emphasized by this opinion, *see* 544 U.S. at 236 n.6 (emphasizing § 623(a)(1)‟s focus on "*any individual*" and "because of *such individual's*"), are not found in the FHA. Indeed, the FHA has no parallel to the ADEA's "such individual's" phrase. Rather, the FHA uses "any person" and defines "person" to include, *inter alia*, "one or more individuals." 42 U.S.C. § 3602(d). The FHA's use of the plural makes it more akin to the ADEA‟s provision that *Smith* held does allow impact claims, 29 U.S.C. § 623(a)(2), which uses the plural term "employees." Because the FHA‟s text reflects a general concern with protecting all people, not just a particular individual as the ADEA‟s text sometimes does,[12] interpreting the FHA to provide for impact claims is reasonable and consistent with the *Smith* opinions.[13]

C. The FHA‟s Legislative History Shows that Impact Claims Are Cognizable

---

[11] *See Huntington*, 844 F.2d at 928, 934; *Arlington Heights*, 558 F.2d at 1289-90; *City of Black Jack*, 508 F.2d at 1184; *see also Town of Clarkton*, 682 F.2d at 1068 (relying on § 3601 to reject defendant's objection to the scope of the trial court's remedial order in impact-based case).

[12] Furthermore, the FHA‟s statement of policy in § 3601 has no parallel in the ADEA. *See* 29 U.S.C. § 621(b) (providing the ADEA‟s more narrow statement of policy).

[13] Justice O‟Connor‟s concurring opinion in *Smith* (joined by Justices Kennedy and Thomas) disagreed with the Court‟s decision to find an impact standard in the ADEA, primarily because "there are significant textual differences between Title VII and the ADEA that indicate differences in congressional intent." 544 U.S. at 261. This opinion did recognize, however, that "if *Griggs* had been decided *before* the ADEA was enacted . . . , we could safely assume that Congress had notice (and therefore intended) that the language at issue here would be read to authorized disparate impact claims." *Id*. at 260.Before the FHA was amended in 1988, eight federal appellate courts had held that the FHA includes a *Griggs*-type impact standard. *See infra* Part II-D. Because the 1988 amendments maintained the operative language of the FHA‟s substantive provisions and even extended it to handicap and familial status, Justice O'Connor's analysis supports crediting Congress with the intention that the consistent judicial construction of the FHA would continue to govern.

Congress adopted the Fair Housing Act in the wake of the report of the National Advisory Commission on Civil Disorders, which warned that the "Nation is moving toward two societies, one black, one white – separate and unequal." *See Report of the National Advisory Commission on Civil Disorders* 1 (1968). Proponents of the FHA emphasized that the facially neutral practices of private and public actors were a principal cause of residential segregation, which the Act aimed to eliminate.[14] One of the Act's leading supporters, Senator Brooke, noted that African Americans could not move to better neighborhoods because they were "surrounded by a pattern of discrimination based on individual prejudice, often *institutionalized* by business and industry, and Government *practices*." 114 Cong. Rec. 2526 (1968) (emphases added). Senator Mondale, the Act's principal sponsor, explained that after the Supreme Court had prohibited explicitly racial zoning laws in 1917, "[l]ocal ordinances *with the same effect*, although operating more deviously in an attempt to avoid the Court's prohibition, were still being enacted." *Id*. at 2669 (emphasis added).

Proponents of the FHA plainly intended to eliminate these causes of residential segregation. Senator Mondale stated that it "seems only fair, and is constitutional, that Congress should now pass a fair housing act *to undo the effects*" of past discriminatory governmental actions. *Id*. (emphasis added)[15] Because Congress was undoubtedly empowered to proscribe intentional governmental discrimination, Senator Mondale would have had no reason to comment on the Act's constitutionality unless it also aimed at the discriminatory effects of facially neutral laws and practices.

The FHA's legislative history also demonstrates that Congress was aware of the difficulty of proving discriminatory intent and, because of this difficulty, allowed other forms of proof. Senator Baker introduced a floor amendment that would have exempted from liability any homeowner who engaged a real estate agent "without indicating any preference, limitation or discrimination based on race . . . , or an intention to make any such preference, limitation or discrimination." 114 Cong. Rec. 5214. The Baker amendment would have made such homeowners liable only if they intentionally discriminated. A number of the bill's supporters objected that the amendment would undermine Congress's purpose by making proof of discrimination difficult in all but the most blatant cases.[16] The Baker amendment was defeated.

[14] In marking the FHA"s 40th anniversary in 2008, the House of Representatives confirmed that the Act aimed "to advance equal opportunity in housing and achieve racial integration . . . ." H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280-01 (2008), *available at* 2008 WL 1733432 (Apr. 15, 2008).

[15] Senator Mondale"s statement here focused on public actors, but there is no indication in the FHA's text or legislative history that Congress intended to treat private and public acts differently. *See infra* Part III-C.

[16] For example, Senator Dominick argued that the amendment would "increase[] the opportunity for discrimination," *id*. at 5220, and Senator Percy stated that the amendment "would

*Id*. at 5221-22.

In short, the FHA's sponsors recognized that residential segregation stemmed in part from ostensibly neutral private and public practices, and they sought to undo the effects of those practices. This, along with the recognition that intentional discrimination would often be difficult to prove, confirms Congress"s goal of outlawing housing practices that disproportionately harm minorities without a legitimate justification. A contrary interpretation of the FHA would condemn Congress as having adopted a measure incapable of achieving its intended goals.

D. Congress Endorsed the Application of the FHA to Impact Claims in the Fair Housing Amendments Act of 1988

When it passed the Fair Housing Amendments Act of 1988 ("FHAA"), Congress used the same language the FHA already applied to race, color, religion, sex, and national origin to add new prohibitions against familial status discrimination. *See* Pub. L. No. 100-430, at § 6(a), (b) (1988); amended §§ 3604(a)-(e), 3605, 3606, 3617. Prior to the FHAA, all eight of the federal Courts of Appeals to address the issue had concluded that the FHA includes an impact standard. Congress is presumed to "adopt[s prior judicial] interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (citations omitted). In addition to this presumption, the FHAA"s legislative history in both the House and the Senate shows that the 1988 Congress agreed with these Circuit Court decisions.

The House Judiciary Committee"s *Report* on the FHAA explicitly relied on two of these decisions (*Betsey* from the Fourth Circuit and *Halet* from the Ninth Circuit) in noting: "Because minority households tend to be larger and exclusion of children often *has a racially discriminatory effect*, two federal courts of appeal have held that adults-only housing may state a claim of racial discrimination under title VIII." H.R. Rep. No. 100-711, at 21 (1988) (emphasis added). The *Report* also discussed the Second Circuit's *Huntington* decision permitting disparate impact claims. *See id*. at 90.

The Senate was also made aware of the Circuit Court decisions. *See Fair Housing Amendments Act of 1987: Hearings on S. 558 Before the Subcomm. on the Constitution of the Sen. Comm. on the Judiciary* 529-557 (1987) (testimony and statement of Robert Schwemm) (discussing "strong consensus" in Circuit Courts). The FHAA"s principal sponsor in the Senate, Senator Kennedy, stated that "Congress accepted th[e] consistent judicial interpretation . . . of the [] Federal courts of appeals that the FHA prohibits[s] acts that have discriminatory effects, and that there is no need to prove discriminatory intent." 134 Cong. Rec. 23711-12 (1988).

---

require proof that the single homeowner had specified racial preference. I maintain that proof would be impossible to produce." *Id*. at 5216; *see also id*. at 5218, 5220-21 (remarks of Senators Mondale and Hart regarding the difficulty of proving discriminatory intent).

Congressional approval of these decisions is further demonstrated by the House's rejection of an amendment mandating that "a zoning decision is not a violation of the Fair Housing Act unless the decision was made with the intent to discriminate on the basis of race or other prohibited criteria under the Act." H.R. Rep. No. 100-711, at 89 (emphasis added). The explicit purpose of this amendment was to eliminate the impact standard approved by the federal appellate courts in favor of an intent requirement. *See id*. 89-93. The House Judiciary Committee rejected this amendment. *Id*. at 89.

The House likewise made clear that it intended impact analysis to apply to the new protected class of handicap:

> The Committee understands that housing discrimination against handicapped persons is not limited to blatant, intentional acts of discrimination. *Acts that have the effect of causing discrimination can be just as devastating as intentional discrimination.* A person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying "No Handicapped People Allowed."

*Id*. at 25 (1988) (emphasis added). By using the FHA's original language to accomplish its goal of reaching acts with a discriminatory effect based on handicap,[17] Congress showed that it agreed with the Circuit Courts' holdings that the FHA‟s original language includes an impact standard.

E. Administrative Implementation of the FHA Supports an Impact Standard

Part I-A, above, describes numerous examples of HUD‟s determination over the years that the FHA includes an impact standard. Because HUD‟s consistent and long-standing view of the FHA reflected in these pronouncements is firmly rooted in the statute‟s text, purpose, and legislative history, it is entitled to substantial deference, e.g., at least *Skidmore* deference based on HUD's "specialized experience" and "the value of uniformity." *See United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139, 140 (1944)) (internal quotation marks omitted).

Other agencies have also interpreted the FHA to permit a disparate impact cause of action. The Department of Justice ("DOJ"), which has enforcement responsibilities under the Act, *see, e.g.*, 42 U.S.C. §§ 3610(g)(2)(C), 3614, has successfully urged the courts to adopt an impact standard, both on behalf of HUD, *see Mountain Side Mobile Estates Partnership v. HUD*, 56 F.3d 1243, 1250-51 (10th Cir. 1995) and *Pfaff v. HUD*, 88 F.3d 739, 745-46 (9th Cir. 1996), and on behalf of the United States. *See, e.g., United States v. City of Black Jack*, 508 F.2d 1179,

[17] The FHA‟s prohibitions in § 3604(a) and § 3604(b) were adopted almost verbatim in, respectively, § 3604(f)(1) and § 3604(f)(2), which outlaw handicap discrimination. In the FHA‟s other substantive provisions (§§ 3604(c)-(e), 3605, 3606, and 3617), "handicap" was simply added to the statute.

1184-85 (8th Cir. 1974); *United States v. Housing Authority of the City of Chickasaw*, 504 F. Supp. 716, 727, 729-33 (S.D. Ala. 1980). In 1994, DOJ joined HUD and eight other federal agencies that regulate financial institutions in adopting a joint *Interagency Policy Statement on Discrimination in Lending*, which recognized that proof of disparate impact may establish a violation of the FHA. *See* 59 Fed. Reg. 18266, 18269-70 (Apr. 15, 1994). The views of these other agencies are also entitled to *Skidmore* deference and confirm the propriety of HUD's determination that an impact standard exists under the FHA.

F. Summary

The unanimous conclusion of the First through Eleventh Circuits that the FHA includes an impact standard are firmly grounded on Supreme Court rules of FHA construction, the Act‟s text, legislative history and purpose, and other relevant guides to the proper interpretation of the FHA. These appellate decisions form an overwhelming body of judicial precedent supporting HUD‟s conclusion that an impact standard along the lines of the Supreme Court‟s interpretation of Title VII in *Griggs* is appropriate under the FHA.

III. Scope of an Impact Approach

A. Impact Evidence Relevant to Both Impact and Intent Claims

In those circumstances in which the FHA outlaws an impact-producing practice, such a practice may be challenged in a particular case *either* on the basis that it produces an illegal impact *or* that it was undertaken based on discriminatory intent *or both*. *See, e.g.*, *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d at 678-85. Furthermore, claims that are based entirely on intentional discriminations may rely on evidence that the challenged practice produces a discriminatory impact as proof of the defendant‟s intent, as has always been appropriate. *See, e.g.*, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977) (noting that the impact of the defendant‟s action – "whether it „bears more heavily on one race than another‟ – may provide an important starting point" in determining whether "invidious discriminatory purpose was a motivating factor") (citation omitted).

B. "Perpetuation of Segregation" Claims

Many of the early appellate cases adopting the view that the FHA bars practices with discriminatory effects involved challenges to municipal zoning and other land-use restrictions that blocked proposals for integrated housing developments in predominantly white communities. In these cases, the courts often commented that, regardless of the defendants‟ motivation, the FHA could be violated by actions that had the effect of "perpetuating segregation" in an area. *See, e.g.*, *Huntington Branch*, 844 F.2d at 937; *Keith v. Volpe*, 858 F.2d 467, 482-84 (9th Cir. 1988); *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 574-75 (6th Cir.

1986); *Rizzo*, 564 F.2d at 146-49; *Arlington Heights*, 558 F.2d at 1290; *Black Jack*, 508 F.2d at 1184-85.

Unlike the disparate impact theory, the "perpetuating of segregation" theory does not have a ready analogy in Title VII precedents such as *Griggs*. Rather, it is based primarily on the FHA‟s legislative history, which shows the statute‟s purposes included replacing ghettos with integrated housing patterns.[18]

HUD‟s determination here to recognize an impact standard under the FHA is not intended to address the additional theory that a practice may violate the FHA because it perpetuates segregation. A zoning ordinance or other practice may, of course, both perpetuate segregation and have a disparate impact based on a prohibited criteria. *See, e.g.*, *Huntington Branch*, 844 F.2d at 937; *Arlington Heights*, 558 F.2d at 1290. In this situation, the approach suggested here would support liability based on a disparate impact theory and leave the courts free to determine on their own whether liability is also appropriate under the "perpetuation of segregation" theory.

C. Same Standards Apply to Private and Public Defendants in Impact Cases

Another comment is prompted by the fact that so many of the early appellate decisions endorsing a discriminatory effect standard under the FHA involved municipalities and other governmental defendants. At the time of *Griggs*, Title VII litigation focused primarily on private employers, with the result that *Griggs* and its progeny often spoke of "business" purposes in considering whether an impact-producing practice could be sufficiently justified so as not to violate the statute. *See, e.g.*, *Griggs*, 401 U.S. at 432 (noting that the defendant‟s burden of justification in an impact case is to produce evidence of a "genuine business need" for the challenged practice). In contrast, the early FHA impact cases involving governmental defendants often used different language to describe the appropriate analysis, in particular that dealing with the defendant‟s burden of justification. *See, e.g.*, *Huntington Branch*, 844 F.2d at 936 (requiring the defendant to prove that its actions furthered "a legitimate bona fide governmental interest"); *Black Jack*, 508 F.2d at 1188 n. 4 (requiring the defendant "to demonstrate that its conduct was necessary to promote a compelling governmental interest").

This situation led one district court in 1987 to opine that "liability under the Fair Housing

---

[18] *See, e.g.*, *Huntington Branch*, 844 F.2d at 937; *see also Barrick Realty, Inc. v. City of Gary, Indiana*, 491 F.2d 161, 164 (7th Cir. 1974) ("the goal of our national housing policy is to „replace the ghettos‟ with „truly integrated and balanced living patterns‟ for persons of all races [citing *Trafficante*, 409 U.S. at 211]); *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1134 (2d Cir. 1973) (concluding that the FHA was intended to promote "open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat").

Act appears to depend upon whether the defendant is a governmental body or a private entity, suggesting that proof of discriminatory effect alone (without proof of discriminatory intent) is enough only when the defendant is a governmental body." *Brown v. Artery Organization, Inc.*, 654 F. Supp. 1106, 1115 (D. D.C. 1987). This court went on to announce that it would decide non-intent FHA claims based on the following rules: "If the defendant is a governmental body, proof of discriminatory impact of its actions on the community for which it serves suffices to establish a *prima facie* case of violation of the Fair Housing Act. . . . If the defendant is not a governmental body, the plaintiff-tenants will be deemed not to have proved a violation of the Fair Housing Act if they demonstrate no more than that the defendant's actions have had or will have a discriminatory effect or impact: some proof of discriminatory intent . . . is necessary." *Id.*

HUD should not adopt this approach. It has not been followed by other courts.[19] More importantly, there is no indication in the FHA's text or legislative history that Congress intended to impose different liability standards on public and private actors. Therefore, HUD believes that, to the extent a defendant"s practice has a disparate impact on a protected class that is not sufficiently justified by the defendant, that practice violates the FHA, regardless of whether the defendant is public or private.

Determining that the FHA includes one standard for both public and private defendants in disparate impact cases means, however, that the relevant standard should be phrased in a way that does not include language appropriate only for private defendants (e.g., by using references to "business" justifications).[20] HUD"s proposed approach therefore, should use more generic language, requiring, for example, that the defendant at the justification stage show that its challenged practice is justified by one or more legally sufficient legitimate purposes.[21]

---

[19] *See, e.g.*, *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 302 (2d. Cir. 1998) (transposing a formula derived from FHA cases against governmental defendants to one involving a private defendant by merely omitting the word "governmental" (i.e., concluding that a private defendant must "prove that its actions furthered, in theory and in practice a legitimate bona fide . . . interest" [quoting *Rizzo*, 564 F.2d at 148-49])); *National Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 59-60 (D. D.C. 2002) (rejecting the *Brown* approach in favor of applying an impact standard for FHA claims against both public and private defendants); *cf. Graoch Associates # 33 v. Louisville/Jefferson County*, 508 F.3d 366, 382-90 (6th Cir. 2007) (Nelson, J., concurring, suggesting that, while FHA impact cases may be brought against both public and private defendants, some parts of the analysis should differ depending on which type of defendant is involved); *Betsey*, 736 F.2d at 988 n.5 (quoted in next note).

[20] *See, e.g.*, *Betsey*, 736 F. 2d at 988 n.5 ("Obviously, a business necessity test is inapplicable in situations where the defendant is a public body. The *Clarkton* formulation [dealing with public defendants] similarly has no application to private defendants.").

[21] Note, however, that, despite Title VII"s applicability to certain governmental defendants, Congress"s 1991 amendments to that statute articulated the burden placed on defendants to rebut impact cases as having to demonstrate "that the challenged practice is job

D. Impact Standard is Presumed to Govern All FHA"s Substantive Provisions

Certain substantive provisions of the FHA have been involved in impact-based claims more than others. For example, many of the early challenges to exclusionary zoning relied on § 3604(a)"s prohibition on practices that make housing "otherwise unavailable," sometimes along with § 3617"s ban on interference with fair housing rights. *See, e.g.*, *Arlington Heights*, 558 F.2d at 1290 (§ 3604(a) along with § 3617); *Black Jack*, 508 F.2d at 1184-85 (§ 3604(a) along with § 3617); *Doe v. City of Butler, Pa.*, 892 F.2d 315, 323-24 (3d Cir. 1989) (§ 3604(a) alone); *Rizzo*, 564 F.2d at 146 (§ 3604(a) alone). Other FHA provisions, such as § 3604(b) and § 3605, have also regularly been the basis for impact-based claims. *See, e.g.*, *Oti Kaga, Inc. v. South Dakota Housing Development Authority*, 342 F.3d 871, 887, 883-84 (8th Cir. 2003) (§ 3605 along with § 3604); *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 87, 90-91 (2d. Cir. 2000) (§ 3604(b) along with § 3604(a)); *Simms v. First Gibralter Bank*, 83 F.3d 1546, 1554-55 (5th Cir. 1996) (§ 3604(b) and § 3605); *Betsey*, 736 F.2d at 986-87 (§ 3604(b)).

On the other hand, some of the FHA"s substantive provisions have rarely been cited in impact-based claims. These include § 3604(c)"s prohibition of discriminatory advertisements, notices, and statements; § 3604(d)"s prohibition of misrepresentations of availability; § 3604(e)"s prohibition of "blockbusting"; and § 3606's prohibition of discriminatory brokerage services. In addition, the Seventh Circuit, which endorsed the impact theory in 1977 in the *Arlington Heights* case, has since opined that some types of practices condemned by § 3604(a) and § 3604(b), such as racial steering, may be challenged only based on evidence of discriminatory intent. *See Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1533 (7th Cir. 1990) (opining that some of the "variety of practices" covered by § 3604 "lend themselves to the disparate impact methods, other not" and holding that plaintiffs here were not entitled to challenge defendants" alleged racial steering based on an "innocent in intent, discriminatory in impact" theory); *see also NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287, 292-93 (7th Cir. 1992) (suggesting that defendant"s concession that a FHA claim of insurance redlining may "be subject to proof under a disparate impact formula . . . may have been imprudent [citing *Bellwood*]").

HUD"s view should be that, unless the text indicates otherwise, all of the FHA"s substantive prohibitions – and all practices outlawed by these prohibitions – include an impact standard.[22] This is consistent with the broad remedial purposes of the FHA, with the fact that

---

related for the position in question and consistent with *business* necessity." *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i) (emphasis added).

[22] One possible text-based exception is § 3604(f)(3), whose three subparts (A), (B), and (C) deal only with handicap discrimination and outlaw, respectively, refusals to permit reasonable modifications, refusals to make reasonable accommodations, and failures to include accessibility features in certain multifamily housing. Establishing a violation of these provisions often involves evidence that is different from that required in intent-based or impact-based

these purposes are similar to those underlying Title VII as set forth in *Griggs*, and with the fact that the FHA"s text generally identifies prohibited practices without providing different liability standards for the practices outlawed. With respect to the Seventh Circuit decisions noted in the previous paragraph, HUD believes that, while the claims in *Bellwood* and *American Family* may have been properly analyzed under only an intent-based approach, other FHA claims challenging racial steering and insurance redlining might well be based on an impact approach. Indeed, in Appendix 2 below, specific examples of impact-based claims involving steering and insurance, as well as those involving practices outlawed by § 3604(c) and § 3606 are provided.

In short, HUD should conclude that, to the extent an impact standard is appropriate under the FHA, that standard should be available under all of the FHA"s substantive provisions (with the possible exception discussed in note 22). HUD could, however, invite comments about this issue, and, specifically, whether commentators believe certain practices outlawed by these substantive prohibitions should not be subject to an impact standard, and if so, why these particular practices and/or prohibitions should be exempted and how HUD"s proposed approach might be drafted to reflect such exemptions.[23]

IV. Plaintiff"s Initial Burden

A. Prima Facie Case and Proper Statistical Focus[24]

The first step in determining whether a housing practice is outlawed by the FHA based on disparate impact is for the complaining party to make out a prima facie case. This requires a showing that the particular practice being challenged results in a substantial adverse impact on a class of persons protected by the FHA compared to its impact on other persons.

The existence of a disparate impact is generally established through review of how a particular practice operates with respect to those who are affected by it. Frequently, this is done through a quantitative or statistical analysis. Sometimes the operation of the practice is reviewed

---

claims, *see, e.g.*, *Wisconsin Community Services, Inc. v. City of Milwaukee*, 485 F.3d 737, 753 (7th Cir. 2006) (en banc), although in certain circumstances, a defendant"s practice of not accommodating individuals with disabilities could trigger both an impact claim and a § 3604(f)(3)(B) claim. *See, e.g.*, *Lapid-Laurel, LLC v. Zoning Board of Adjustment of Township of Scotch Plains*, 284 F.3d 442, 459-68 (3d Cir. 2002).The handicap-only provisions in § 3604(f)(1) and § 3604(f)(2), being virtually identical to those prohibitions in § 3604(a) and § 3604(b), do include an impact standard. *See, e.g.*, *Lapid-Laurel*, 284 F.3d at 446, 466-68.

[23] Three possible approaches to regulatory language are included in Appendix 1.

[24] This section relies on – and often uses phrases similar to those contained in – the *Interagency Policy Statement* (described in Part I-A) and the Supreme Court"s opinion in *Wards Cove Packing Co., Inc. v. Antonio*, 490 U.S. 642 (1989) (a Title VII decision described in Part V-A).

by analyzing its effect on an applicant pool; sometimes it consists of an analysis of the practice's effect on possible applicants, or on the population in general. Not every member of the group must be adversely affected for the practice to have a disparate impact. Evidence of discriminatory intent is not necessary to establish that a policy or practice that has a disparate impact in violation of the FHA.[25]

In a race case, for example, the proper comparison is between the racial composition of the at-issue housing opportunities and the racial composition of the qualified population in the relevant housing market. This comparison generally forms the proper basis for the initial inquiry in an impact case. Alternatively, in cases where such housing market statistics will be difficult or impossible to ascertain, certain other statistics – such as measures indicating the racial composition of "otherwise-qualified applicants" for the at-issue housing opportunities – are equally probative for this purpose. In fact, where figures for the general population might accurately reflect the pool of qualified housing applicants, a prima facie case may be established based on such statistics as well.

B. Causation; Need to Focus on Particular Practices[26]

The complaining party must also establish causation in an impact-based case. The plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the housing opportunities provided by the defendant. The plaintiff must begin by identifying the specific housing practice that is challenged. Especially in cases where a provider of housing opportunities combines subjective criteria with the use of more rigid standardized rules or standards, the plaintiff is responsible for isolating and identifying the specific housing practices that are allegedly responsible for any observed statistical disparities.

The complaining party is not permitted to make out its case by offering only one set of cumulative comparative statistics as evidence of the disparate impact of each and all of the defendant"s housing practices. As is true under Title VII, FHA disparate-impact cases focus on the impact of *particular* practices on opportunities for protected-class members. As in Title VII, a FHA plaintiff does not make out an impact case simply by showing that, "at the bottom line," there is racial *imbalance* in the housing opportunities provided by the defendant. As a general

[25] As the Eighth Circuit wrote in one of the earliest appellate decisions to endorse an impact standard under the FHA: "Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations, but more importantly, because . . . „we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme."" *United States v. City of Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir. 1974).

[26] This section relies on – and often uses phrases similar to those contained in – the Supreme Court"s Title VII decision in *Wards Cove* (1989) and the amendments to Title VII enacted after *Wards Cove* in 1991.

matter, a plaintiff must demonstrate that it is the application of a specific or particular practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case in an impact-based claim under the FHA.

Consider, for example, a case where a plaintiff alleges that one or more "objective" practices, as well as the use of "subjective decision-making" in the defendant"s selection process, have had a disparate impact on nonwhites, and the plaintiff bases this claim on statistics showing a disproportionately low percentage of nonwhites in the at-issue housing opportunities. Even if plaintiff can show that nonwhites are underrepresented in these housing opportunities in a manner that is acceptable under the standards set forth above, this alone will not suffice to make out a prima facie case of disparate impact. Plaintiff will also have to demonstrate that the disparity complained of is the result of one or more of the practices that are attacked, specifically showing that each challenged practice has a significantly disparate impact on housing opportunities for whites and nonwhites. Providers of housing opportunities are not liable for the various innocent causes that may lead to statistical imbalances in the racial composition of the opportunities they provide.

Therefore, with respect to demonstrating that a particular practice causes a disparate impact as described herein, the complaining party must demonstrate that each particular challenged practice causes a disparate impact. However, if the complaining party can demonstrate that the elements of a defendant's decision-making process are not capable of separation for analysis, the decision-making process may be analyzed as one practice.

C. Need to Show "Substantial" Disparate Impact

Many courts have held that, in order to violate the FHA, a defendant"s practice must produce a "substantial" disparate impact. *See, e.g.*, *Schwartz v. City of Treasure Island*, 544 F.3d 1201, 1217 (11th Cir. 2008); *Budnick v. Town of Carefree*, 518 F.3d 1109, 1118-19 (9th Cir. 2008) (same, citing *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997)); *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007). The proposed approach reflects this view.

In determining whether the proven impact is substantial enough, no single test controls. *Cf. Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 995-96 n. 3 (1988) (Title VII case). A pertinent benchmark in the employment context is the EEOC"s four-fifths rule, *see* 29 C.F.R. § 1607.4(D), which some FHA decisions have considered. *See, e.g.*, *Langlois v. Abington Housing Authority*, 207 F.3d 43, 50 (1st Cir. 2000). This four-fifths formula – like statistical formulas in general – becomes less reliable when the numbers are small, although even in small-number situations, this formula may provide some guidance. *See id*. The issue of whether a proven disparate impact is significant enough is fact-bound. Nothing in HUD"s proposed approach is intended to limit the evidence that may be considered in making this determination. The determination should be made based on evidence that has been considered persuasive in analogous FHA cases and in the employment discrimination context.

D. Summary

Identifying the existence of a disparate impact is only the first step in proving unlawful discrimination. When a defendant‟s policy or practice has a disparate impact, the next step is to determine whether it is sufficiently justified by legitimate reasons and whether less discriminatory alternative exist. This step is discussed in Part V.

V. Defendant‟s Burden of Justification; Less Discriminatory Alternatives

A. Background; Different Articulations of the Proper Standard

Determining what the defendant‟s burden of justification should be in a FHA impact case is difficult. Part of this difficulty derives from the fact that the courts in FHA impact cases have tended to follow Title VII law, whose post-*Griggs* evolution has included a number of changes concerning the defendant‟s burden of justification.[27] The result is that only a few appellate decisions have carefully examined the burden of justification in a FHA impact case, and these decisions reflect, accurately, that some issues have not been authoritatively resolved.

Some of the early FHA decisions required a defendant to justify an impact-producing practice by showing a "business necessity." *See, e.g.*, *Betsey*, 736 F. 2d at 988 (calling for "a business necessity that is sufficiently compelling to justify the challenged practice"). Other appellate decisions articulated the proper standard of justification in different ways. *See, e.g.*, *Huntington Branch*, 844 F.2d at 936 (requiring the defendant to "prove that its actions furthered, in theory and in practice, a legitimate bona fide governmental interest"); *Rizzo*, 564 F.2d at 149

[27] A thoughtful analysis of the difficulties in FHA cases is contained in Judge Moran‟s opinion in *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 87, 91-101 (2d. Cir. 2000) (Moran, J., dissenting in part), which noted that "although there is now consensus that Title VII standards govern claims under [the FHA], it has not always been easy to translate principles designed to regulate employment relations into the realm of public and private housing. For instance, "job performance" may be more closely related to employment qualifications than "tenant performance" is to rental criteria. . . . There are analogous, but not identical concerns at issue; just as there are analogous, but not identical provisions in the antidiscrimination statutes. The toughest challenge is "to translate a body of precedent that simultaneously is undergoing rapid evolution." . . . Because the nature of cases under the Fair Housing Act varies dramatically – from landlord/tenant disputes to Section 8 housing participation, from lending practices to urban zoning conflicts – this translation is best accomplished piece by piece, but with an eye toward the development of a coherent methodology. *Id*. at 96 (citations and footnotes omitted). *See also Resident Advisory Board v. Rizzo*, 564 F.2d 126, 148-49 (3d Cir. 1977) (discussing the difference between the defendant‟s burden of justification in employment-impact cases under Title VII and housing-impact cases under the FHA).

(holding that defendant‟s rebuttal case is established if its practice is shown to "serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant"); *Black Jack*, 508 F.2d at 1188 n. 4 (calling for the defendant "to demonstrate that its conduct was necessary to promote a compelling governmental interest"). Whatever the standard, the courts were generally in agreement that the defendant had the burden of proof on this issue. *See, e.g.*, *Betsey*, 736 F.2d at 988; *Rizzo*, 564 F.2d at 149. As noted above in Part II-D, this was the state of FHA impact law when Congress adopted the 1988 Fair Housing Amendments Act, which re-enacted the basic prohibitive language of the 1968 FHA.

In 1989 in *Wards Cove Packing Co., Inc. v. Antonio*, 490 U.S. 642 (1989), the Supreme Court decided, by a 5-4 vote, a number of issues dealing with the burden of justification in a Title VII impact case. First, *Wards Cove* held that "the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Id*. at 659. This meant that there is "no requirement that the challenged practice be „essential‟ or „indispensable‟ to the employer‟s business for it to pass muster." *Id*. Second, *Wards Cove* held that, with respect to this issue, the defendant has only "the burden of producing evidence of a business justification for his employment practice," while the "burden of persuasion . . . remains with the disparate-impact plaintiff." *Id*. Finally, on the issue of less discriminatory alternatives, *Wards Cove* held that, if the plaintiff loses on the justification issue, he may still prevail if he can prove that "other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer‟s legitimate [hiring] interests." *Id*. at 660.[28]

In 1991, Congress overturned this part of *Wards Cove* in the Civil Rights Act of 1991. This law amended Title VII to explicitly recognize an impact standard and, for such cases, to place the full burden of proof (both production and persuasion) on the defendant to rebut a showing of disparate impact by demonstrating "that the challenged practice is job related for the position in question and consistent with business necessity." *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i). Furthermore, even if the defendant satisfied this burden, the 1991 amendments provided that a Title VII plaintiff could prevail if the plaintiff showed that the defendant refused to adopt an alternative employment practice "in accordance with the law as it existed on June 4, 1989 [the day before *Wards Cove* was decided], with respect to the concept of „alternative employment practice.‟" *Id*. § 2000e-2(k)(1)(C).

The question of how, if at all, *Wards Cove* and the 1991 amendments to Title VII affect FHA impact law is a genuinely difficult one, as subsequent court decisions attest. One

---

[28] Further commenting on this point, the *Wards Cove* opinion noted that "any alternative practices which [plaintiffs] offer up in this respect must be equally effective as [defendants‟] chosen hiring procedures in achieving [defendants‟] legitimate employment goals. Moreover, „[f]actors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer‟s legitimate business goals.‟" *Id*. at 660 (quoting *Watson*, 487 U.S. at 998).

possibility is that the Title VII standards established by the 1991 amendments should govern, but this is problematic because those amendments by their terms apply only to Title VII and not also to other civil rights laws. Another possibility is that the *Wards Cove* standards, though "overruled" for purposes of Title VII by the 1991 amendments, should govern,[29] but this too seems problematic given Congress‟s subsequent view that *Wards Cove* did not best reflect what was appropriate for Title VII. A third possibility is that the FHA standards are not governed by either of these sources and must be found elsewhere.

This third approach has generally been adopted by the post-1991 appellate decisions dealing with FHA impact cases. Among the more focused of these decisions (listed here in chronological order) are:

*Mountain Side Mobile Estates v. HUD*, 56 F.3d 1243, 1254 (10th Cir.1995) (rejecting the view that a defendant in a FHA impact case must show a "compelling need or necessity" and instead holding that, in accordance with *Griggs*, such a defendant "must demonstrate that the discriminatory practice has a manifest relationship to the housing in question" (citing *Grigg's* "manifest relationship to the employment in question" standard, *see* 401 U.S. at 432));

*Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 302 (2d. Cir. 1998) (concluding that a defendant must "prove that its actions furthered, in theory and in practice, a legitimate, bona fide . . . interest" (quoting *Huntington Branch*, 844 F.2d at 936));

*Hack v. President and Fellows of Yale College*, 237 F.3d 81, 100-01 (2d. Cir. 2000) (Moran, J., dissenting in part) (advocating a "reasonably necessary to achieve an important business objective" standard);

*Langlois v. Abington Housing Authority*, 207 F.3d 43, 51 (1st Cir. 2000) ("a demonstrated disparate impact in housing [must] be justified by a legitimate and substantial goal of the measure in question");

*Graoch Associates # 33 v. Louisville/Jefferson County*, 508 F.3d 366, 374 (6th Cir. 2007) ("the defendant must offer a „legitimate business reason‟ for the challenged practice");

*Graoch, supra*, 508 F.3d at 387 (Nelson, J., concurring) (concluding that "a consensus exists that business necessity is the appropriate test" and that this "business necessity" standard holds defendants to a higher standard than the more lenient "business justifications" test set forth in *Wards Cove*).

---

[29] *Cf. Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (noting that "*Wards Cove*‟s pre-1991 interpretation of Title VII‟s identical language remains applicable to the ADEA").

B. HUD"s Position

HUD should adopt this third approach. While Title VII standards may be helpful as a starting point, the variety of cases covered by the FHA"s substantive provisions and the special context of housing make a lock-step importation of Title VII standards inappropriate and inadequate.[30] This position is consistent with earlier views expressed by HUD, particularly two from the mid-1990s.

One of these is the 1994 *Interagency Policy Statement on Discrimination in Lending* (described in Part I-A), where HUD, along with the Justice Department and the eight other agencies, stated that when:

> a lender"s policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by "business necessity." The justification must be manifest and may not be hypothetical or speculative. Factors that may be relevant to the justification include cost and profitability.

59 Fed. Reg. at 18269. Although this *Statement* here and elsewhere used the Title VII-like phrase "business necessity" to describe the defendant"s burden of justification, *see id*. at 18268-69, it did so by often putting this phrase in quotation marks and in the context of providing guidance to private businesses while recognizing that "the precise contours of the law on disparate impact as it applies to lending discrimination are under development." *Id*. at 18269.

A second revealing indication of HUD"s position occurred in 1995, when HUD, represented by the Justice Department, took the position before the Tenth Circuit in the *Mountain Side* case that the respondent there had "failed to rebut the prima facie case of disparate impact on the grounds of business necessity." 56 F.3d at 1254. The Tenth Circuit"s opinion noted that "HUD argues that the Secretary applied the correct definition of business necessity when Mountain Side was required to show „compelling need or necessity" not merely „demonstrable relationship to . . . legitimate business interest." *Id*. In response to this argument, the Tenth Circuit held that HUD "correctly determined that the business necessity standard in Title VIII [FHA] cases is imported from employment discrimination case law under Title VII," but ruled that HUD went beyond the appropriate "business necessity" test and "incorrectly required that Mountain Side to demonstrate a „compelling need or necessity."" *Id*. Rather, the proper standard, according to the Tenth Circuit, was that in "FHA housing discrimination cases, the defendant must demonstrate that the discriminatory practice has a manifest relationship to the housing in question." *Id*. HUD should accept this ruling and adopt it.

---

[30] *See* note 26. It is also noteworthy that Title VII"s text reflects a special concern against quota-like hiring that led the Supreme Court in *Wards Cove* to interpret that statute in a way that would not encourage such hiring. *See Wards Cove*, 490 U.S. at 652 (citing 42 U.S.C. § 2000e-2(j)). The FHA has no comparable provision, and, indeed, examples of pro-minority affirmative housing programs have been virtually non-existent throughout the FHA"s history.

The defendant‟s justification must be stronger than the legitimate non-discriminatory reason that must be articulated under an unequal treatment analysis. *See, e.g.*, *Huntington Branch*, 844 F.2d at 936; *Betsey*, 736 F.2d at 988; *Rizzo*, 564 F.2d at 148-49. Specifically, the justification in a FHA impact case must:

> be substantial and not frivolous, *Mountain Side*, 56 F.3d at 1254 ("mere insubstantial justification . . . will not suffice"); 1994 *Interagency Policy Statement*, 59 Fed. Reg. at 18269 (the justification "may not be hypothetical or speculative"), compare *Huntington Branch NAACP v. Town of Huntington, New York*, 844 F.2d 926 (2nd Cir. 1988), concern may be non-frivolous, but may not be sufficient because it is not reflected in the record; must be legally sufficient and non-discriminatory, *Budnick v. Town of Carefree*, 518 F.3d 1109 (9th Cir. 2008) (citing *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194 (9th Cir. 2006) (quoting *Pfaff*, 88 F.3d at 746-47)); have "a manifest relationship to the housing in question," *Mountain Side*, 56 F.3d at 1254; *see also Oti Kaga, Inc. v. South Dakota Housing Development Authority*, 342 F.3d 871, 883 (8th Cir. 2003) ("manifest relationship"); 1994 *Interagency Policy Statement*, 59 Fed. Reg. at 18269 (the justification "must be manifest"); must bear a significant relationship to the housing, lending, or insurance opportunity, *Dehoyosv. Allstate Ins. Co.*, 2007 U.S. Dist. LEXIS 12366 (N.D.TX 2007); "serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant;" opportunity, *Rizzo*, 564 F. 2d at 149; *accord Lapid-Laurel, LLC v. Zoning Board of Adjustment of Township of Scotch Plains*, 284 F.3d 442, 468 (3d Cir. 2002); and, advance a "legitimate and substantial goal of the measure in question." *Langlois*, 207 F.3d at 51.

Furthermore, HUD should take the position that the defendant should bear the full burden of proof (both of production and of persuasion) on this issue. This is consistent with FHA decisions both before and after *Wards Cove* and the 1991 amendments to Title VII. *See, e.g.*, *Betsey*, 736 F.2d at 988 ("when confronted with a showing of discriminatory impact, defendants must prove a business necessity sufficiently compelling to justify the challenged practice"); *Mountain Side*, 56 F.3d at 1254 ("the defendant must demonstrate that the discriminatory practice has a manifest relationship to the housing in question"). It also reflects the fact that a FHA defendant is generally in a far superior position than the plaintiff to demonstrate what the defendant‟s legitimate purposes underlying its practices are and why these purposes justify the practice being challenged.

C. Less Discriminatory Alternatives

There is general agreement about this element in a FHA impact case. *See, e.g.*, *Huntington Branch*, 844 F.2d at 936 ("the defendant must prove . . . that no alternative would serve that interest with less discriminatory effect"); *Rizzo*, 564 F.2d at 149 ("the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact"). This is consistent with HUD‟s position in the 1994

*Interagency Policy Statement*, which provides:

> Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be discriminatory if an alternative policy or practice could serve the same purpose with less discriminatory effect.
> 59 Fed. Reg. at 18269.

The most difficult issue concerning this "less discriminatory alternative" element is determining which party should bear the burden of proof. As noted above in Part V-A, *Wards Cove* put this burden on the plaintiff, but Congress changed this to being "in accordance with the law as it existed" prior to *Wards Cove* (without specifying what this was). The FHA cases before *Wards Cove* tended to put this burden on the defendant. *See, e.g.*, *Huntington Branch*, 844 F.2d at 936; *Rizzo*, 564 F.2d at 149. Post-1991 FHA cases have generally continued to take this position. *See, e.g.*, *Salute*, 136 F.3d at 302 (burden on the defendant); *Langlois*, 207 F.3d at 50 (same); *see also Graoch*, 508 F.3d at 388 (Nelson, J. concurring: "The consensus across the circuits . . . is that in the housing context defendants have the burden of proving the absence of a less discriminatory alternative."); see also *United States v. Village of Island Park*, 888 F. Supp. 419 (E.D. N.Y. 1995), *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526 (N.D. TX 2000). *But see Graoch*, 508 F.3d at 374 (majority opinion, putting this burden on the plaintiff).

For reasons similar to those given in connection with the burden relating to the justification issue, HUD should take the position that the defendant should have both the burden of production and the burden of persuasion on the issue of whether a less discriminatory alternative exists. Court decisions both before 1991 and after 1991 have taken this position, and Congress explicitly overruled the Supreme Court"s contrary interpretation in the Title VII context.

In addition, a defendant will generally be in a far better position than a plaintiff to know what alternative practices are available, as well as the business advantages and disadvantages of these alternatives. A defendant is by definition in an industry where it will have greater access to alternative techniques that will meet its business needs and in general is better placed to explain its consideration of those alternatives in defending its conclusion about which approach it has taken. In addition, it seems fair to ask that a defendant who has chosen, among alternative practices, one that results in a substantial disparate impact be able to show why it chose that practice over less discriminatory alternatives. On this point, if HUD engaged in rule making, HUD could invite comments on which party should bear the burden of proof on the issue of whether there is a less discriminatory alternative, and why.[31]

---

[31] One possible variation on the approach advocated in the text would be to put the burden of production on the plaintiff (i.e., the plaintiff would have to produce evidence showing the existence of one or more specific alternatives and the fact that such alternative(s) would result in less discrimination), but leave the ultimate burden of persuasion on this issue on the

# APPENDIX

defendant. *Cf. Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002) (imposing, in "reasonable accommodation" case under the FHA"s § 3604(f)(3)(B), only an initial burden on the plaintiff, after which the burden is placed "on the defendant to show that the accommodation is unreasonable"); 42 U.S.C. § 2000e-2(k)(1)(A)(iii), (C) (Congress"s 1991 amendment regarding impact claims under Title VII, which provides that the "complaining party makes the demonstration . . .in accordance with" pre- *Wards Cove* law).

**Appendix 1: Possible Regulatory Language: Impact Claims under the Fair Housing Act**

I. Overview

There are a variety of ways to articulate an impact regulation and also different ways to place such a regulation in HUD"s current fair housing regulations. Part II contains our suggestion for how to articulate a new impact regulation. Part III identifies some of the ways that this new regulation might be placed in HUD"s current regulations.

II. Proposed Impact Regulation

*Unjustified discriminatory impact*: Prohibited actions for purposes of this subsection include

employing any practice that has an adverse impact based on race, color, religion, sex, familial status, national origin, or handicap unless that practice is shown by the party employing it to have a legally sufficient justification.

*For purposes of this subsection*:

– "practice" includes any practice, policy, procedure, process, standard, elements of practices, policies, procedures, processes, or standards that are not capable of being separated for analysis, and any other action that is intended to evaluate or affect a group of persons.

– "adverse impact" means a substantially different rate of selection which works to the disadvantage of members of a race, sex, ethnic group, religion, [etc.]. The term "substantially" means the same as it has been interpreted in prior judicial and HUD administrative decisions under this Act and in prior judicial decisions and administrative regulations under Title VII.[32]

– a "legally sufficient justification" is one that (1) furthers one or more of the user"s legitimate, non-discriminatory interests; and (2) cannot be served by an alternative practice with a less discriminatory impact. A "legally sufficient justification" must:

bear a manifest relationship to the practice that is challenged;
have a significant correlation with important elements of the operation of the housing opportunity or business;
involve a matter of substantial concern to the operation of the housing opportunity or business; and,
be more effective in accomplishing its purpose than a less discriminatory alternative.

[32] This paragraph is based in part on the EEOC"s 29 C.F.R. § 1607.16(B) and the 1991 amendments to Title VII of the Civil Rights Act of 1964.

A "legal sufficient justification" may not:
be hypothetical, speculative, or insubstantial; or
be facially discriminatory or otherwise reflect an intent to discriminate on a prohibited basis.

III. Placement of a new regulation in HUD‟s Current Fair Housing Regulations

Placement of this new regulatory language in HUD‟s current fair housing regulations (24 C.F.R. Part 100) could be accomplished in any one of a variety of ways, including by placing it:

(1) once in the "Scope" section of the regulations (at *24 C.F.R. § 100.5*, as a new subpart (d)).[33]

(2) once in the "Definitions" section of the regulations (at *24 C.F.R. § 100.20*, as an additional part of the definition of "*Discriminatory housing practice*").

(3) once in the "Definitions" section of the regulations (at *24 C.F.R. § 100.20*, as a new definition of "*Because of race"/"based on race*").

(4) in those parts of the regulations providing overall coverage of the FHA‟s substantive prohibitions, as follows:

*– As an amendment to 24 C.F.R. § 100.50* [applies to § 804 and § 806] *, add the following subsection "(d)":*

*– As an amendment to 24 C.F.R. § 100.110* [applies to § 805] *, add the following subsection "(c)"*:

*– As an amendment to 24 C.F.R. § 100.400(c)* [applies to § 818] *, add the following subsection "(6)" or an a new subsection (d)*:[34]

(5) in every part of the regulations dealing with the FHA‟s various substantive prohibitions, as follows:

*– As an amendment to 24 C.F.R. § 100.60* [applies to § 804(a) and § 804(f)(1)] *, add the following subsection "(d)(6)" or as a new subsection "(c)":*

*– As an amendment to 24 C.F.R. § 100.65* [applies to § 804(b) and § 804(f)(2)] *, add the following subsection "(b)(6)" or as a new subsection "(c)":*

*– As an amendment to 24 C.F.R. § 100.70* [applies to § 804(a)-(b) and § 804(f)(1)-(2)] *, add the following subsections "(c)(5)" and "(d)(5)" or as a new subsection "(e)":*

---

[33] This is our preferred alternative.

[34] This addition might be unnecessary to the extent that claims under § 818 are automatically included as a result of covering §§ 804-806 claims, but explicitly covering § 818 claims would eliminate any uncertainty on this matter and therefore seems the wiser technique.

    *– As an amendment to 24 C.F.R. § 100.75* [applies to § 804(c)] *, add the following subsection "(c)(5)" or as a new subsection "(e)":*

*– As an amendment to 24 C.F.R. § 100.80* [applies to § 804(d)] *, add the following subsection "(b)(6)" or as a new subsection "(c)":*

*– As an amendment to 24 C.F.R. § 100.85* [applies to § 804(e)] *, add the following subsection "(c)(3)" or as a new subsection "(d)":*

*– As an amendment to 24 C.F.R. § 100.90* [applies to § 806] *, add the following subsection "(b)(5)" or as a new subsection "(c)":*

*– As an amendment to 24 C.F.R. § 100.110* [applies to § 805] *, add the following subsection "(c)"*:

*– As an amendment to 24 C.F.R. § 100.202* [applies to § 804(f)(3)] *, add the following as a new subsection "(e)":*

*– As an amendment to 24 C.F.R. § 100.400(c)* [applies to § 818] *, add the following subsection "(6)" or as a new subsection (d)*:

Determining which is the best placement technique is a matter on which HUD presumably has expertise and will want to exercise its discretion.

**Appendix 2: Examples of Impact-Producing Practices that Might Violate the FHA**

List of Example Topics:

Residency requirement by public housing authority in predominantly white city

Residency requirement by all-white town for Sec. 8 vouchers

Rental Example #1 (Sex discrimination = refusal to consider alimony payments)

Rental Example #2 (Sex discrimination = eviction of tenants who receive welfare)

Rental - Occupancy standards (families with children)

Rental-No Section 8 policy

Rental payment due dates and penalties (disability discrimination, beyond refusal to make reasonable accommodations)

Rental - Landlord requires English speaker

Rental - Landlord requires U.S. citizenship

Rental- Landlord evicts victims of violence

Sales - Computer program generates listings based on prospect"s current neighborhood

Group home (disability) barred by zoning allowing only blood-and-marriage families

Group-home restriction (disability discrimination)

Group-home restriction (disability discrimination, beyond refusal to permit reasonable modifications)

Advertising (familial status discrimination)

Advertising (disability discrimination)

Advertising (perfect for single or couple)

Lender Example #1-A (no home loans under $100,000)

Lender Example #1-B (same: national origin discrimination)

Lender Example #2

Home-loan Pricing Example #1

Home-loan Pricing Example #2

Homeowners insurance – age-of-house denials

Homeowners insurance – rating territories

Homeowners insurance – replacement-coverage differentials

Homeowners insurance – marketing of products

*Residency requirement by public housing authority in predominantly white city*
– based on *United States v. Housing Authority of City of Chickasaw*, 504 F. Supp. 716 (D. Ala. 1980).A public housing authority ("PHA") in a predominantly white city has a rule that only local resident are eligible for housing in its units. The overall metropolitan area in which the PHA is local has a substantial minority population, many of whom would qualify for the PHA"s units but for its local residency requirement. Even if this requirement were not adopted for discriminatory reasons, it is likely to violate the FHA based on its disparate impact in excluding minorities. The only way such a requirement could not violate the FHA under these circumstances would be for the PHA to show that the requirement is justified by a legitimate purpose and that this purpose could not be served by a less discriminatory alternative.

*Residency requirement by all-white town for Sec. 8 vouchers*
– based on *Langlois* + other cases
The Section 8 program for rental assistance is a federally funded and supervised rent subsidy program for low-income tenants, but it is administered primarily through local units called public housing authorities ("PHAs"), each of which is generally coextensive with a local town or city. A main form of assistance is the voucher, which a PHA may issue to certain low-income families. The voucher program requires a PHA to pay to the family's landlord the difference between the gross rent (or a "payment standard" adopted by the PHA) and a lesser amount paid by the family. Because of an excess of demand, PHAs often maintain a waiting list for applicants who will receive vouchers if and when existing vouchers are surrendered or appropriations increase.

Vouchers are awarded by local PHAs, but applicants need not be local residents when they apply, and they may apply for vouchers from any PHA in the state. A portability provision

permits the user to move after twelve months while retaining the voucher to any area in which a Section 8 program is administered. There is thus an incentive for persons to apply to one or more (sometimes many) PHAs outside communities where they live or work.

Assume that a PHA in a suburban town whose residents are predominantly white determines that its present waiting list will soon be exhausted. This PHA decides to hold a lottery to rank new applicants in which it proposes to give preference to local residents (defined as those currently living or working in the PHA‟s town), so that so that local residents would be listed ahead of those applicants currently residing outside of the PHA‟s town. Local preferences in the awarding of Section 8 vouchers do not explicitly violate any provision in the governing statute.

The PHA‟s local-residency-preference element is challenged by a Latino individual who has a low income, intends to apply to the PHA for a voucher, and does not reside or work in the PHA‟s town. The claim is that the PHA‟s local residency preference violates the FHA.

The key to determining whether the PHA‟s local residency preference violates the FHA would be, first, to determine the relative impact of this preference on Latinos versus non-Latinos in the ~~local~~ housing market (probably the greater metropolitan area). If a disparate impact is established, the next steps would be to determine whether a legitimate reason exists for the PHA‟s local residency preference and, if so, whether this reason could be advanced equally well with a less discriminatory alternative.

*Rental Example #1 (Sex discrimination = refusal to consider alimony payments)*

A landlord requires applicant to show a certain level of income in order to qualify for tenancy, but refuses to consider alimony payments in satisfaction of this requirement. A female applicant who is rejected as a result of this policy may challenge the landlord‟s action as being a discriminatory refusal to rent because of sex, assuming that a significantly higher proportion of alimony recipients are females and that more females than males would be disadvantaged by this policy.

If the evidence does establish that the landlord‟s policy disqualifies significantly more women than men, then the burden would shift to the landlord to justify its policy by a significant justification for the policy. If the landlord is unable to satisfy this burden, it would lose. If the landlord does satisfy this burden (say, by showing that a steadier source of income than alimony is critical to a tenant‟s ability to pay the rent consistently), the landlord would prevail unless a less discriminatory alternative is available that would equally well advance this goal.

*Rental Example #2 (Sex discrimination = eviction of tenants who receive welfare benefits) [from HUD Title VIII Manual]*

Assume that a landlord with a 100-unit building decides to evict all of its tenants who are receiving welfare benefits. A particular female who is about to be evicted under this policy files a claim based on the theory that this policy has a disparate impact against women and therefore violates the Fair Housing Act's prohibition against sex discrimination. Assume that the group to which the policy applies -- that is, the 100 tenants in the building -- is made up of 40 women (the protected class in this case) and 60 men (the nonprotected class). Within these two groups, there are ten women and three men who receive welfare benefits and are therefore faced with eviction under this policy. These statistics would establish a large enough disparate impact to shift the burden of justification for this policy to the landlord.

In *HUD v. Ross*, Fair Hous.-Fair Lend. Rptr. ¶ 25,075, at pp. 25,699-700 (HUD ALJ 1994), a HUD ALJ held that such a policy had an unlawful discriminatory impact on women, based on the fact that female-headed households accounted for an overwhelming proportion (about 95%) of the families that received welfare in the local area.

*Rental - Occupancy Standard [from HUD Title VIII Manual]*
A landlord adopts an occupancy restriction of two persons per bedroom (e.g., no more than two people are allowed in a one-bedroom apartment) and, pursuant to this policy, seeks to evict a couple who has just had a baby from a one-bedroom apartment. Assuming that the relevant statistics show that this occupancy policy has a significant disparate impact on families with children, it might violate the Fair Housing Act even if it was not adopted with the intent of discriminating against such families, unless the landlord shows that the policy is needed to achieve some substantial business goal.

*Landlord establishes a no Section 8 policy (race discrimination)*
A landlord with a 100 unit apartment complex, establishes a policy of not accepting any applicant, and of not retaining any resident, whose rent is paid through the Section 8 Housing Choice voucher program. Such a policy, when applied to current residents, will result in the eviction of 25 residents, 20 (or 80%) of whom are African American. Such a policy when applied to the recent applicants for units at the property, will result in disqualification of 100 applicants, 75% of whom are black. The policy has a disparate impact based on race.

---Based on holding in *Graoch v. Louis./Jeff Co. Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007).

*Rental payment due dates and penalties (disability discrimination, beyond refusal to make reasonable accommodations)*

A landlord whose residents are mostly young adults with physical and mental disabilities requires that rental payments be made by the 5th of each month and imposes a $50 late fee for payment after that date. The U.S. Social Security Administration‟s policy it to send SS disability checks on the day of the month corresponding to the recipient‟s date of birth, meaning that

recipients of such checks may routinely receive checks well after the due date for rental payments. Each disabled tenant may request a reasonable accommodation from the landlord‟s policy. In addition, that policy may have a disparate impact based on disability on the residents of its property.

*Rental - Landlord requires English speaker (national origin discrimination)*
– based on *Veles v. Lindow*, 2000 WL 1807851 (9th Cir. Nov. 1, 2000)

A landlord has a policy of renting only to tenant groups in which at least one adult member speaks fluent English, which results in rejection of a Latino family. Assuming that this policy was not adopted for discriminatory reason, it may still be challenged as violating the FHA if plaintiffs can show that it disproportionately excludes tenants on the basis of national origin. If such a showing is made, the landlord would have to provide a nondiscriminatory justification for this policy. The landlord might be able to do this by showing that its policy was necessary so that the landlord could communicate effectively with tenants in an emergency.

*Rental - Landlord requires U.S. citizenship (national origin discrimination)*
– based on *Martinez v. Partch*, 2008 WL 113907 (D.Colo. Jan. 9, 2008; *Corwin v. B'Nai B'Rith Senior Citizens Housing, Inc.*, 489 F. Supp. 2d 405 (D. Del. 2007); *United States v. Dittmar Co.*, 1 EOHC ¶ 13,730 (E.D. Va. Oct. 2, 1975).

A landlord has a policy of renting only to U.S. citizens. Discrimination on the basis of citizenship is not explicitly outlawed by the FHA, although proof that this policy were adopted for discriminatory reasons or applied in a discriminatory way might establish an intent-based violation of the FHA. In addition, the landlord‟s policy might be challenged as violating the FHA if the evidence shows it disproportionately excludes tenants on the basis of national origin. If such a showing is made, the landlord would have to provide a nondiscriminatory justification for this policy that could not be achieved by a less discriminatory alternative.

*Rental--Landlord evicts victims of violence*

A landlord has a uniform policy of evicting all residents of a unit when there is a violent incident at the unit. Such a policy at a property, when 75% of such incidents involve domestic violence directed at an innocent female resident of the unit, has a disparate impact based on gender. Even when the property presents a substantial justification for its policy--the protection of the safety of residents, there is a less discriminatory alternative of evicting only the perpetrator of the violence.

---based on charge issued by the Department of Housing and Urban Development in Secretary v. CBM Group, et al. Case No. 10-99-0538-8, available on line at http://www.aclu.org/images/asset_upload_file37_33994.pdf and other cases.

*Sales - Computer program generates listings based on prospect's current neighborhood*
A real estate broker operates a website that offers to help homeseekers find listings of homes by entering certain information about the homeseeker. The computer program that drives this system uses characteristics of the homeseeker‟s current neighborhood to find "matching" neighborhoods in the metropolitan area that the homeseeker now seeks to move to. This program may include some race-based elements (e.g., the racial demographics of neighborhoods) or some other elements that correlate with race (e.g., local schools‟ ratings or test scores). Even if the broker is not aware of this (i.e., has no intent to discriminate), the result of using this system is that homeseekers who currently live in predominantly white or predominantly black neighborhoods will be given listings in different neighborhoods that correspond racially to the homeseekers‟ current neighborhoods. Thus, the broker‟s system results in racial steering that would violate the FHA, unless the broker can provide a legally sufficient justification for using this system and there is no less discriminatory alternative.

*Group home (disability) barred by zoning allowing only blood-and-marriage families*
*[from HUD Title VIII Manual]*
Disparate impact has regularly occurred in the area of group home litigation (i.e., cases challenging zoning and other land-use restrictions on group homes for persons with disabilities). A typical example has involved a group of unrelated persons who are recovering from alcohol or drug addiction and who seek to occupy a home located in a single-family neighborhood. This group is blocked by the local municipality's zoning ordinance, which only permits, for example, families related by blood or marriage to occupy homes in this neighborhood. If this restriction is challenged for illegally discriminating against persons with disabilities, one of the theories supporting this challenge could be that the restriction has a disparate impact on the disabled group involved. (The restriction may also be challenged on other grounds under the FHA, such as the statute‟s prohibition against refusals to reasonably accommodate housing opportunities for persons with disabilities.)

*Group-home restriction (disability discrimination)*
A municipality adopts an ordinance requiring that all group homes be located more than one mile from any other group home. In this ordinance, "group homes" include communal housing for people with disabilities, transitional housing for parolees, housing for sexual offenders, and nursing homes. If the ordinance has a significant disproportionate effect on housing for people with disabilities (not including the housing for parolees and sexual offenders who are not persons with disabilities), it may have a disparate impact based on disability. In addition, if the ordinance defines group homes as exclusively housing serving people with disabilities, the ordinance on its face discriminates based on disability, and a disparate impact analysis need not be applied.

*Group-home restriction (disability discrimination, beyond refusal to permit reasonable modifications)*
The homeowners‟ association of a large condominium community has a policy of refusing

permission for any structural modifications to the entrance of individual units. As to a disabled individual who wishes to install a ramp to provide an accessible entrance and who makes a request for a reasonable modification, that person may request a reasonable modification pursuant to 42 U.S.C. § 3604(f)(1) of the Act. In addition, the policy of refusing to permit any structural modifications, in a condominium community [area/housing market] that has a significant population of physically disabled individuals, may also have a disparate impact based on disability.

*Advertising (familial status discrimination)*
A large landlord places a series of advertisements in local newspapers and the internet, advertising “Senior Discount.” Discrimination based on age is not prohibited by the Fair Housing Act, and the advertisements do not convey to a reasonable person a preference or limitation based on any protected class status (which would violate the FHA‟s § 804(c)) . However, the evidence reveals that the “Senior Discount” policy has a disparate impact based on familial status and is not supported by a legitimate business justification. Therefore, the advertisement of the policy constitutes a separate violation of the Act‟s prohibition in § 804(c) against making a statement or advertisement that indicates a limitation or preference based on familial status.

Advertising (familial status discrimination)
A landlord places advertisements routinely in a local newspaper advertising that her one bedroom apartments are “perfect for a single or couple.” A reasonable person reading this advertisement understands that the statement conveys to the reader a practice that limits occupancy to households without children (which would violate the FHA‟s § 804(c)). Even if a reasonable reader would not understand the advertisements to convey such a discriminatory limitation, a policy of limiting occupancy in one bedroom units may, in specific circumstances, have a disparate impact based on familial status, and violate the Act‟s prohibition against discrimination based on familial status. Similarly, a statement that a three bedroom apartment was “too small” for a family of five may be evidence of a policy that has a disparate impact based on familial status.

--- Based on *Guider v. Bauer,* 865 F. Supp. 492 (N.D. Il 1994), *United States v. Badgett*, 976 F.2d 1176 (8th Cir. 1992) and the facts in the *Secretary v. Pfaff*, HUDALJ 10- 93-0084- 8 (October 27, 1994).

*Advertising (disability discrimination)*
A large retirement community that qualified for the FHA‟s “housing for older persons” exemption advertises itself as being for “Active Seniors.” The advertisements may convey to a reasonable person a preference or limitation based on disability (which would violate the FHA‟s § 804(c)). Even if they do not, however, the evidence may reveal that the community uses its preference for “Active Seniors” as a policy that has a disparate impact based on disability and is not supported by a legitimate business justification. Therefore, the advertisement of the policy constitutes a separate violation of the Act‟s prohibition in § 804(c) against making a statement or

advertisement that indicates a limitation or preference based on disability.
**[See** Schwemm, Robert and Allen, Michael, "For the Rest of Their Lives: Seniors and the Fair Housing Act," http://www.bazelon.org/issues/housing/articles/11-04iowalawreview.pdf, cases at footnote 237. The footnotes lay out the various authorities that suggest that use of "active adult," together with other limiting actions, can be a §3604(c) violation on the basis of disability.

*Lender Example #1-A [from 1994 FFIEC Joint Statement]*

A mortgage lender's policy is not to extend loans for single family residences for less than $100,000. This policy has been in effect for ten years. This minimum loan amount policy is shown to disproportionately exclude potential minority applicants from consideration because of their income levels or the value of the houses in the areas in which they live. The lender will be required to establish the business justification for the policy.

*Lender Example #1-B [from HUD Training Manual]*

A mortgage company has a policy of not making loans under $100,000 to anyone, because it has determined that loans under this amount are not profitable. Based on this policy, the company refuses to deal with a Latino family who wants to apply for a home loan for less than this amount (e.g., $70,000). Depending on the area"s demographics regarding Latinos vs. non-Latinos who might seek mortgages under $100,000, this policy could be challenged as being discriminatory on the basis of national origin in violation of the Fair Housing Act.

*Lender Example #2 [from 1994 FFIEC Joint Statement]*

A mortgage lender decides to switch its practice of primarily considering net income in making underwriting decisions to primarily considering gross income. However, in calculating gross income, the lender does not distinguish between taxable and nontaxable income even though nontaxable income is of more value than the equivalent amount of taxable income. The lender's policy may have a disparate impact on individuals with disabilities, who are more likely than the general applicant pool to receive substantial nontaxable income. The lender's policy is likely to be proven discriminatory. First, the lender is unlikely to be able to show that the policy is justified by a significant business reason or reasons. Second, even if the lender could show a significant business justification, the lender could achieve the same purpose with less discriminatory effect by "grossing up" nontaxable income (i.e., making it equivalent to gross taxable income by using formulas related to the applicant's tax bracket).

*Home-loan pricing* #1

– based on *Garcia v. Country Wide Financial Corp.*, 2008 U.S. Dist. LEXIS 106675 (C.D. Cal. Jan. 17, 2008) + other cases
A mortgage lender permits its loan officers to include non-risk based fees and higher rates in home purchase loans, which, although not violate of other federal laws, have a significant disparate impact on blacks and Latinos receiving loans from the lender. The result is that minorities receive higher priced loans, including loans with higher interest rates and higher costs.

The lender‟s policy of permitting subjective assessment of rates and fees that result in higher priced loans has a disparate impact based on race and national origin. The lender may defend its policy based on market and competition justifications, but the policy must be directly related to achieving those justifications and there must not be a less discriminatory way to accomplish these justifications.

*Home-loan pricing* #2
– based on *Hoffman v. Option One Mortgage Corp*., 589 F. Supp. 2d 1009 (N.D. Ill. 2008) + other cases
A mortgage lender provides several home-loan products with different interest rates based on the credit scores of borrowers. However, the lender leaves to the discretion of its loan officers how this credit score system should be applied in particular situations. Even if the policy of using credit scores to establish differing interest rates is justified by a proven relationship between risk and credit score, the lender‟s practice of permitting loan officers to provide borrowers with different interest rates based on subjective, non-risk-based factors may have a disparate impact based on race or national origin where statistical evidence establishes that the policy results in higher priced loans for minority borrowers.

*Homeowners insurance-- age-of--house denials*
– based on *Toledo Fair Housing Center v. Nationwide*, 704 N.E.2d 667 (Ohio Comm. Pleas 1999)

A home insurer refuses to provide insurance on any home build before 1950 in an area where 50% of African-American homeowners compared to 25% of white homeowners live in such dwellings. Because this policy has a disparate impact on African-Americans, it would violate the FHA unless the insurer can provide a legally sufficient justification. The insurer claims that, because losses are higher and there is a greater risk in older houses, it cannot afford to insure these dwellings.

It is unlikely that the insurer‟s claimed justification will be sufficient. First, the insurer must produce empirical evidence to support the contention that losses are higher on older dwellings. Even if such evidence establishes this legitimate justification, there are likely to be less discriminatory alternatives that would serve the same business objective of the insurer (e.g., conducting an on-site inspection of the house or charging higher premiums to cover the added costs).

*Homeowners insurance – rating territories*
A regional home insurer divides a large metropolitan area into two rating territories, one consisting of the central city where the population is 30% African American and the second consisting of the suburban ring which is 5% African American. Frequency and severity of losses for insureds in the central city are approximately 10% higher than for those in the suburbs.

Consequently, the insurer charges residents in the central city 10% more than it charges suburban residents for the same policy.

The evidence shows that if the insurer had divided the metropolitan area in half by drawing a north-south line that created territories consisting of the east side and west side, losses on the east side would have been found to be approximately 10% higher than losses on the west side. A similar pattern would be found by drawing an east-west line that divided the metropolitan area into north-side and south-side rating territories, with losses in the north side 10% higher than in the south side. In these two alternative configurations (which the insurer never considered), the racial composition in both territories would be roughly equal, with African Americans accounting for 15% of each territory. Had the insurer drawn its boundaries in either of these two ways, therefore, African Americans would have accounted for just 15% of those residing in the area paying the higher premium instead of 30% as they are in the company's current configuration.

Under these circumstances, the insurer‟s current territorial rating classification has a disparate impact on minority communities and despite, evidence showing that this classification system serves a legitimate business purpose, less discriminatory alternatives are available that would serve this purpose and the current system would violate the FHA.

*Homeowners insurance – replacement-coverage differentials*
A large nationwide insurer refuses to provide full replacement cost coverage on homes that are older than 50 years of age in a community where 40% of residents in predominantly Hispanic neighborhoods compared to 15% of residents in predominantly white neighborhoods reside in homes older than50 years. Consequently, this policy has a disparate impact based on the national origin of the affected neighborhoods, which prompts a FHA complaint by a resident of the predominantly Hispanic neighborhood.

By way of justification, the insurer presents evidence showing that average losses are higher in older homes than in newer homes. Plaintiff responds by contending that age of housing is in fact a poor predictor of losses and argues that a more appropriate underwriting guideline would utilize age of the major systems of the house (e.g., electric, heating, plumbing, roof), which would result in excluding fewer people and, in the particular metropolitan area from where the complaint is filed, a relatively smaller percentage of Hispanic residents. The insurer responds that it does obtain such information on its applications, but that it has not felt the need to incur the expense of analyzing the effects of the age of each system since age of the home generally has produced adequate results for its purposes.

Because this is a large nationwide insurer that provides insurance for homes of any age (though not replacement cost on homes over 50 years of age), it is reasonable to expect that the insurer could provide more detailed information on factors associated with loss than just the age of the home. In these circumstances, the insurer‟s practice of refusing to provide full replacement cost

policies on homes over 50 years of age would violate the FHA, because, even if the justification offered is legitimate, a less discriminatory alternative that serves the same business objective is available.

*Homeowners insurance – marketing of products*
– based on *Toledo Fair Housing Center v. Nationwide*, 704 N.E.2d 667 (Ohio Comm. Pleas 1999)
A regional home insurer decides where to market its products based on an area map that ranks certain zip codes by their desirability. Assume that this marketing technique has a disparate impact based on the racial make-up of the neighborhoods in the area; that is, the insurer does not make its products available in predominantly black neighborhoods with homes and risk factors similar to predominantly white neighborhoods where the insurer does make its products available. Even if the evidence fails to show that the insurer‟s marketing technique involves disparate treatment in violation of the FHA, it may still violate the FHA based on its disparate impact, unless the insurer can justify it based on legitimate business considerations and no less discriminatory alternatives exists.



**U.S. Department of Justice**

Civil Rights Division

*Appellate Section*
*Ben Franklin Station*
*P.O. Box 14403*
*Washington, DC 20044-4403*

January 29, 2010

Ms. Molly C. Dwyer
Clerk, United States Court of Appeals
for the Ninth Circuit
James R. Browning Courthouse
P.O. Box 193939
San Francisco, CA 94119-3939

Re: *Ojo* v. *Farmers Group, Inc., et al.*, No. 06-55522 (en banc)

Dear Ms. Dwyer:

This letter brief is submitted by the United States as amicus curiae in response to the Court's Orders of November 16, 2009, and November 18, 2009, and pursuant to Rule 29(a), Federal Rules of Appellate Procedure.

**INTEREST OF THE UNITED STATES**

The United States has substantial responsibility for the enforcement of the Fair Housing Act, 42 U.S.C. 3601 *et seq.* The Attorney General is responsible for all federal court enforcement of the Act by the United States. 42 U.S.C. 3614. The Secretary of the Department of Housing and Urban Development (HUD) is charged with administration and enforcement of the Act in administrative proceedings, as well as the promulgation of regulations to implement the Act. See

42 U.S.C. 3608-3612, 3614a. The Secretary's implementing regulations state that the Fair Housing Act prohibits discrimination in the provision of property or hazard insurance for dwellings. The resolution of this case will affect the enforcement programs of both the Secretary and the Attorney General.

## QUESTIONS PRESENTED

This Court has ordered the parties to address the following questions:

1. Whether the ban on racial discrimination in the Fair Housing Act, 42 U.S.C. 3604, applies to homeowner's insurance.

2. Whether the McCarran-Ferguson Act, 15 U.S.C. 1012(b), deprives federal courts of subject-matter jurisdiction to hear claims brought under federal statutes, or merely instructs courts how to construe federal statutes.

## STATEMENT

1. Plaintiff filed a class action complaint on August 10, 2005, asserting claims under the Fair Housing Act, 42 U.S.C. 3601 *et seq*., and California state law. E.R. 1-14.[1] Plaintiff alleged that in January 2004, defendants increased the premiums for his homeowner's and casualty insurance policy, based upon unfavorable credit information, and that defendants' use of an automated credit

[1] Citations to "E.R. __" refer to pages in the Appellant's Excerpts of Record. Citations to "Slip Op. __" refer to pages in the panel opinion in this appeal.

scoring system in underwriting and pricing of homeowner's insurance policies has a disparate impact on minorities, in violation of the Fair Housing Act. E.R. 2-5, 8-9, 11-12.

Defendants moved to dismiss the plaintiff's complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. E.R. 15-17. The district court ruled that plaintiff's Fair Housing Act claim was barred by the McCarran-Ferguson Act, 15 U.S.C. 1012(b), and granted defendants' motion.[2] E.R. 93-138. The court did not specify whether it was granting the motion under Rule 12(b)(1), for lack of jurisdiction, or under Rule 12(b)(6), for failure to state a claim, but it appeared to rule that the complaint should be dismissed for lack of jurisdiction. See E.R. 106 (summarizing defendants' "three arguments as to why the court lacks subject matter jurisdiction to hear this case"); E.R. 135-138 (ruling that the court lacked jurisdiction over plaintiff's state law claims).

---

[2] The McCarran-Ferguson Act provides, in pertinent part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance.

15 U.S.C. 1012(b).

A divided panel of this Court reversed. The panel majority ruled that the district court erred, first, by interpreting plaintiff's complaint to challenge the practice of credit scoring *per se*, and second, by ruling that the Texas Insurance code "permit[s] disparate impact race discrimination that results from credit scoring, thereby triggering McCarran-Ferguson reverse-preemption." Slip Op. 5702. The majority concluded that a Texas statute permitting insurers to use credit scores prohibits disparate impact as well as disparate treatment discrimination, and thus is in harmony with the Fair Housing Act. Slip Op. 5712-5722.

The dissent disagreed, stating that the Texas Insurance Code permits the use of credit scoring even where it results in a "disparate impact on racial minorities, so long as race is not used as a criteria in computing the credit scores." Slip Op. 5723. Because plaintiff had not alleged that race was a factor in defendant's credit scoring, according to the dissent, he had not asserted a disparate treatment claim, and could not establish a violation of Texas law. Slip Op. 5723. Thus, the dissent concluded, the application of the Fair Housing Act to plaintiff's claims "would invalidate, impair, or supersede Texas law," and the district court correctly ruled "that Texas law reverse preempts the claims Ojo makes under federal law, and was correct in dismissing the case for lack of federal jurisdiction." Slip Op. 5723.

Both the panel majority and the dissent understood the district court to have dismissed the complaint for lack of subject matter jurisdiction. See Slip Op. 5702 n.3, 5723.

2. Sections 3604(a) and (b) of the Fair Housing Act declare it unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
>
> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, *or in the provision of services or facilities in connection therewith*, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C.A. 3604(a) & (b) (emphasis added).

Since at least 1978, the Department of Housing and Urban Development (HUD) has interpreted Section 3604 to prohibit discriminatory practices in connection with homeowner's insurance. In a memorandum to the Assistant Secretary for Equal Opportunity, HUD's General Counsel advised that insurance redlining violates Section 3604(a) by making housing unavailable:

> Adequate insurance coverage is often a prerequisite to obtaining financing. Insurance redlining, by denying or impeding coverage makes mortgage money unavailable, rendering dwellings "unavailable" as effectively as the denial of financial assistance on other grounds.

Aug. 25, 1978, Memorandum from Ruth T. Prokop to Chester C. McGuire at 2 (copy attached).

In 1988, the Fair Housing Act was amended to give HUD significant new authority to enforce the Act administratively. Under the Fair Housing Act as enacted in 1968, the Secretary's enforcement authority was limited to receiving, investigating, and seeking to conciliate complaints of discrimination from aggrieved persons. 42 U.S.C. 3610, 3611 (1976). Under the 1988 Amendments, if HUD determines that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the agency is required to issue a charge on behalf of the aggrieved person. 42 U.S.C. 3610(g). The matter is then referred to an administrative law judge for a hearing and resolution (42 U.S.C. 3612(b)-(g)), or, if either the complainant or the respondent elects, to the Department of Justice for litigation in federal district court (42 U.S.C. 3612(o)). Decisions by administrative law judges are subject to review by the Secretary before becoming final. 42 U.S.C. 3612(h). Review and enforcement of final orders may be obtained in the courts of appeals. 42 U.S.C. 3612(i)-(n).

In accordance with HUD's new adjudicative responsibilities, the 1988 Amendments authorized HUD to issue implementing regulations. 42 U.S.C.

3614a.[3] HUD promulgated its implementing regulations in January 1989, after publication and opportunity for comment. 53 Fed. Reg. 44,992 (Nov. 7, 1988) (Proposed Rule); 54 Fed. Reg. 3232 (Jan. 23, 1989) (Final Rule). Subpart B of the regulations, promulgated in 1989, sets forth "the Department's interpretation of conduct that is unlawful housing discrimination under section [3604] and section [3606] of the Fair Housing Act." 24 C.F.R. 100.50(a). Section 100.70(d)(4) of the regulations defines "other prohibited sale and rental conduct" to include:

> Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin.

See also 53 Fed. Reg. 44,997 (Nov. 7, 1988) (preamble to proposed regulations stating that "discriminatory refusals to provide municipal services or adequate property or hazard insurance as well as discriminatory appraisal and financing practices, has been interpreted by the Department and by courts to render dwellings unavailable").

---

[3] Section 815 of the Fair Housing Act, 42 U.S.C. 3614a, provides:

> The Secretary may make rules * * * to carry out this title. The Secretary shall give public notice and opportunity for comment with respect to all rules made under this section.

The Fair Housing Act also directs the Secretary to certify state and local agencies authorized to enforce state or local fair housing laws that are "substantially equivalent" to the Fair Housing Act as to the substantive rights protected, procedures followed, remedies provided, and judicial review available. 42 U.S.C. 3610(f)(3)(A); 24 C.F.R. Pt. 115. Once a state or local agency is certified as substantially equivalent, HUD refers complaints within the jurisdiction to the agency for investigation and processing, including litigation, on HUD's behalf, and HUD pays the agency for these services. 42 U.S.C. 3610(f)(1); 24 C.F.R. 115.300.

The Texas Fair Housing Act was enacted to "provide rights and remedies substantially equivalent to those granted under federal law." Tex. Prop. Code 301.002(3). HUD has certified the Texas Workforce Commission Civil Rights Division, which enforces the Texas Fair Housing Act, as a "substantially equivalent" agency. 57 Fed. Reg. 48,803-02 (Oct. 28, 1992) and 58 Fed. Reg. 39,561-01 (July 23, 1993); see Tex. Prop. Code 301.0015. Like HUD's regulations, the regulations implementing the Texas Fair Housing Act expressly define discrimination to include "refusing to provide * * * property or hazard insurance for dwellings or providing such services or insurance differently based on" a prohibited basis. 40 Tex. Admin. Code 819.124(b)(4). If the Texas

legislature amends or otherwise changes the fair housing law, or a state court interprets the law, the Commission is obligated to notify HUD of such change within 60 days. 24 C.F.R. 115.211(a)(1). This obligation extends to any "amendment, adoption, or interpretation of any related law that bears on any aspect of the effectiveness of the agency's fair housing law." 24 C.F.R. 115.211(a)(2). These notifications help inform HUD as to whether or not an agency's continued certification is warranted. The Texas Workforce Commission has not informed HUD of any limitation on the enforcement of the Texas Fair Housing Act in light of the credit scoring provision contained in the Texas insurance code.[4]

## ARGUMENT

## I

## THE FAIR HOUSING ACT PROHIBITS DISCRIMINATION IN THE PROVISION OF PROPERTY OR HAZARD INSURANCE FOR DWELLINGS

1. As set forth above, the Fair Housing Act declares it unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin," and "[t]o discriminate against any person * * *

[4] Information provided by Kenneth J. Carroll, Director of HUD's Fair Housing Assistance Program Division.

in the provision of services or facilities in connection" with the sale or rental of a dwelling. 42 U.S.C. 3604(a), (b). HUD's regulations declare that the conduct prohibited by these provisions includes discrimination in the provision of property or hazard insurance for dwellings. 24 C.F.R. 100.70(d)(4).

Relying in part on HUD's regulation, both the Sixth and the Seventh Circuits have ruled that the Fair Housing Act prohibits discriminatory practices relating to the provision of property or hazard insurance for dwellings. *NAACP* v. *American Family Mutual Ins. Co.*, 978 F.2d 287, 297-301, cert. denied, 508 U.S. 907 (1993); *Nationwide Mutual Ins. Co.* v. *Cisneros*, 52 F.3d 1351, 1355-1360 (6th Cir. 1995), cert. denied, 516 U.S. 1140 (1996). In *Mackey* v. *Nationwide Ins. Cos*, 724 F.2d 419, 423-425 (4th Cir. 1984), however, the Fourth Circuit ruled that the Fair Housing Act does not cover insurance.

Notably, *Mackey* was decided before the Fair Housing Act was amended and HUD's implementing regulations were promulgated. Indeed, at least one district court has held that, in light of the regulations' explicit coverage of insurance, *Mackey* is no longer binding precedent, even within the Fourth Circuit. *Fuller* v. *Teachers Insur Co.*, No. 5:06-CV-00438-F, 2007 WL 2746861, at *3-7 (E.D.N.C. Sept. 19, 2007).

2. The Supreme Court set forth the steps to be taken by a court in evaluating "an agency's construction of the statute which it administers" in *Chevron U.S.A., Inc*. v. *Natural Resources Defense Council, Inc*., 467 U.S. 837, 842-843 (1984) (footnotes omitted). When "Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 842-843 (footnotes omitted). In these circumstances, "Congress entrusts to the [agency], rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the [agency] adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner." *Batterton* v. *Francis*, 432 U.S. 416, 425 (1977); see also *Rust* v. *Sullivan*, 500 U.S. 173, 184 (1991) (regulation should be upheld "if it reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent"); *Pauley* v. *BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991) (citation omitted) ("When Congress, through express delegation

or the introduction of an interpretive gap in the statutory structure, has delegated policy-making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited."); *American Family*, 978 F.2d at 300 ("Courts should respect a plausible construction by an agency to which Congress has delegated the power to make substantive rules."); see *Cisneros*, 52 F.3d at 1359-1360.

*Chevron* analysis is fully applicable even where a court has reached a different conclusion about the interpretation of a statute prior to the agency's pronouncement. "Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *National Cable & Telecomm. Ass'n* v. *Brand X Internet Serv.*, 545 U.S. 967, 982-983 (2005). Of course, *Mackey* is not binding on this Court. But even its persuasive authority is limited in light of Congress's delegation to HUD of the authority to issue implementing regulations and the agency's promulgation of regulations expressly applying the Act to discriminatory insurance practices. While *Mackey* concluded that the Fair Housing Act does not apply to insurance discrimination, it did not hold that the language of the statute "unambiguously forecloses" a contrary conclusion. *Brand X*, 545 U.S. at 983; see *Fuller*, 2007 WL 2746861, at *6.

Rather, as *Fuller* explained, *Mackey* "used the tools available to the court in 1984 to interpret the silence in the [Fair Housing Act] on the issue of insurance practices [and] could not anticipate that in 1988 Congress would allocate to HUD the authority to fill the gaps created by its legislative silence" in the Act. *Fuller*, 2007 WL 2746861, at *6. As the Seventh Circuit correctly concluded, "[e]vents have bypassed *Mackey*." *American Family*, 978 F.2d at 301; see *Fuller*, 2007 WL 2746861, at *4-7.

"Congress has not directly addressed the precise question" (*Chevron*, 467 U.S. at 843) whether the Fair Housing Act prohibits discriminatory insurance practices. See *American Family*, 978 F.2d at 298; *Cisneros*, 52 F.3d at 1356-1357. When it directed HUD to issue regulations to implement the Fair Housing Act, Congress authorized the agency to define the types of conduct prohibited by the Act, including the broad "otherwise make unavailable or deny" language of Section 3604(a), and the term "services * * * in connection" with the sale or rental of a dwelling in Section 3604(b). Therefore, the proper inquiry is whether HUD's regulation is "based on a permissible construction" of the Fair Housing Act. *Chevron*, 467 U.S. at 843; *American Family*, 978 F.2d at 301 ("[T]he question today is whether the Secretary's regulations are tenable.").

3. HUD's interpretation of the Act is both "permissible" (*Chevron*, 467 U.S. at 843), and "reasonable" (*id*. at 844-845; see *American Family*, 978 F.2d at 298, 300-301; *Cisneros*, 52 F.3d at 1359-1360). As HUD's General Counsel concluded in 1978, obtaining homeowner's insurance is an integral part of the process of buying and owning a home. Denial of such insurance "make[s] [housing] unavailable" in a quite direct way. Mortgage lenders require prospective borrowers to obtain insurance on their property, and to maintain it through the life of the loan. Thus, obtaining and maintaining such insurance is an essential prerequisite to obtaining a mortgage to purchase a dwelling and to complying with the terms of the mortgage throughout its life. Where an insurance company cancels or refuses to sell insurance policies to minority homebuyers, or cancels or refuses to sell policies in predominantly minority areas, it makes housing unavailable on the basis of race and/or national origin, in violation of Section 3604(a). See *Dunn* v. *Midwestern Indem., Mid-American Fire & Cas. Co.*, 472 F. Supp. 1106, 1109 (S.D. Ohio 1979). Similarly, charging minority homeowners higher rates may make owning a home so expensive as to make housing unavailable.

This Court and others have interpreted the term "otherwise make unavailable or deny" in Section 3604(a) to cover a variety of discriminatory

practices that are not expressly mentioned in the statute. As the Seventh Circuit explained, "Courts have applied this subsection to actions having a direct impact on the ability of potential homebuyers or renters to locate in a particular area, and to indirectly related actions arising from efforts to secure housing." *Southend Neighborhood Improvement Ass'n* v. *County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1984); see, *e.g*., *Keith* v. *Volpe*, 858 F.2d 467, 482-484 (9th Cir. 1988) (municipal refusal to permit construction of low income housing), cert. denied, 493 U.S. 813 (1989); *Metropolitan Hous. Dev. Corp*. v. *Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) (municipal refusal to rezone land to permit construction of low-income housing), cert. denied, 434 U.S. 1025 (1978); *United States* v. *City of Parma*, 661 F.2d 562 (6th Cir. 1981) (imposition of building height limitations to exclude housing project for racial reasons), cert. denied, 456 U.S. 926 (1982); *Kennedy Park Homes Ass'n, Inc*. v. *City of Lackawanna*, 436 F.2d 108 (2d Cir. 1970) (refusal to permit sewer hookup), cert. denied, 401 U.S. 1010 (1971); *United States* v. *American Inst. of Real Estate Appraisers*, 442 F. Supp. 1072, 1079 (N.D. Ill. 1977) (discrimination by real estate appraisers), appeal dismissed, 590 F.2d 242 (7th Cir. 1978); *Heights Cmty. Congress* v. *Hilltop Realty, Inc*., 774 F.2d 135, 140 (6th Cir. 1985) (real estate steering), cert. denied, 475 U.S. 1019 (1986).

What these apparently diverse actions have in common is that all interfere with the process of providing or acquiring residential property. The term "otherwise make unavailable or deny" is broad enough to encompass all such actions, including discriminatory insurance practices. As the Sixth Circuit wrote, "[t]he purpose of the Fair Housing Act as a whole is 'to eliminate the discriminatory business practices which might prevent a person economically able to do so from purchasing a house regardless of his race.'" *Cisneros*, 52 F.3d at 1359 (quoting *Dunn*, 472 F. Supp. at 1109). Thus, "HUD's interpretation of the Fair Housing Act is reasonable in light of the direct connection of availability of property insurance and ability to purchase a home." *Ibid.*

Similarly, because the acquisition and maintenance of insurance coverage is so closely connected to home ownership, discrimination in the terms and conditions of property insurance constitutes discrimination "*in the provision of services* * * * *in connection*" with the sale of a dwelling, in violation of Section 3604(b). *American Family*, 978 F.2d at 297, 300-301. This is so whether the discrimination occurs at the time of purchase or during the course of ownership of the dwelling. Cf. *Committee Concerning Cmty. Improvement* v. *City of Modesto*, 583 F.3d 690, 711-715 (9th Cir. 2009) (Fair Housing Act applies to post-acquisition conduct) (petition for rehearing pending); *Bloch* v. *Frischholz*, 587

F.3d 771, 779-781 (7th Cir. 2009) (en banc) (Section 3604(b) applies to certain post-acquisition conduct relating to the initial terms of sale).

*Mackey*'s reasons for its conclusion that the Fair Housing Act does not reach discriminatory insurance practices are unpersuasive, particularly in light of HUD's regulation. First, according to *Mackey*, construing Section 3604 to encompass actions such as discriminatory insurance practices would render superfluous Section 3605 of the Act, which explicitly addresses discrimination in actions relating to the financing of housing, but does not expressly prohibit discriminatory insurance practices.[5] The language and construction of the Act

---

[5] At the time of the decision in *Mackey*, Section 3605 prohibited "[d]iscrimination in the financing of housing," and declared it unlawful:

> for any bank, building and loan association, insurance company or other corporation, association, firm or enterprise whose business consists in whole or in part in the making of commercial real estate loans, to deny a loan or other financial assistance to a person applying therefore for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of [race].

42 U.S.C. 3605 (1982). As amended in 1988, Section 3605 declares it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction." 42 U.S.C.

(continued...)

disproves this contention; Sections 3604(a) and 3605 are overlapping in their coverage. See *American Family*, 978 F.2d at 298.

Section 3605 is both more specific and broader in its application than the "otherwise make unavailable or deny" language of Section 3604(a). As it existed at the time of the decision in *Mackey*, Section 3605 applied only to certain types of transactions, and only to commercial entities. At the same time, it prohibited discrimination, not only in making loans, but also in the terms and conditions of such transactions. The "otherwise make unavailable" clause of Section 3604(a), on the other hand, applies to any person not otherwise exempt from the Act, and governs a broad range of activities. It prohibits only such discrimination,

---

[5](...continued)
3605(a). Section 3605(b) defines the term "residential real estate transaction" to mean:

> (1) The making or purchasing of loans, or providing other financial assistance –
>
> (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or
>
> (B) secured by residential real estate.
>
> (2) The selling, brokering, or appraising of residential real property.

42 U.S.C. 3605(b).

however, that makes housing unavailable. The overlap in coverage by Section 3604(a) and Section 3605 is even clearer under the current version of Section 3605, which applies to those engaged in "in residential real estate-related transactions" and prohibits activities that also are expressly prohibited by Section 3604(a), such as discrimination in the sale of a dwelling. See note 5, *supra*.[6]

*Mackey* also found it significant that Congress had rejected efforts to amend the Fair Housing Act to explicitly cover insurance. 724 F.2d at 424. But, as the Seventh Circuit recognized, these failed efforts did not mean that Congress disagreed with the merits of the legislation. *American Family*, 978 F.2d at 299. "Proposed legislation can fail for many reasons." *Ibid.* Thus, "the Supreme Court repeatedly reminds us that unsuccessful proposals to amend a law, in the years following its passage, carry no significance." *Ibid.* It is more telling that Congress did amend the Act in 1988 to give HUD the authority to issue

---

[6] Indeed, many provisions of the Act are overlapping in their coverage. In a real estate steering case, for example, the same conduct may violate Sections 3604(a), (b), and (d), and 3605. When a real estate agent informs white, but not African-American homeseekers about houses for sale in certain areas, he makes those dwellings unavailable to the African Americans in violation of Section 3604(a), discriminates in the provision of his services in violation of Section 3604(b), and misrepresents the availability of housing in violation of Section 3604(d). See *Village of Bellwood* v. *Dwivedi*, 895 F.2d 1521, 1529 (7th Cir. 1990). His actions would also constitute discrimination in the "selling [or] brokering * * * of residential real property" in violation of Section 3605.

implementing regulations, knowing that, since 1978, HUD had interpreted the Act to apply to homeowner's insurance. *Id.* at 300.

Next, *Mackey* suggested that Congress might have omitted insurance from coverage under the Fair Housing Act because "[t]he insurance industry has traditionally classified risks. If insurance premiums are to remain at reasonable levels for most householders, some insurers must be permitted to reject risks which are perceived to be excessively high, while charging higher premiums on some risks than upon others." 724 F.2d at 423. The element of risk, however, cannot justify disparate treatment on the basis of race where Congress has prohibited it. *American Family*, 978 F.3d at 298 ("Nothing in the nature of insurance implies that hazard insurers need to engage in disparate treatment, to draw lines on the basis of race rather than risk."); cf. *City of Los Angeles* v. *Manhart*, 435 U.S. 702, 709 (1978) ("Congress has decided that classifications based on sex, like those based on national origin or race, are unlawful. Actuarial studies could unquestionably identify differences in life expectancy based on race or national origin, as well as sex. But a statute that was designed to make race irrelevant in the employment market could not reasonably be construed to permit a take-home-pay differential based on a racial classification.") (citation and footnote omitted). Nor does *Mackey*'s reasoning preclude the application of disparate

impact analysis to claims of insurance discrimination. For even in a disparate impact case such as this one, where plaintiff challenges defendants' use of credit scores, the insurer will have a full opportunity to defend the business justifications for its policies. See *Affordable Hous. Dev. Corp*. v. *City of Fresno*, 433 F.3d 1182, 1194 (9th Cir. 2006) ("[A] defendant may rebut a plaintiff's showing of disparate impact by supplying a legally sufficient, nondiscriminatory reason") (internal citation and quotation marks omitted); cf. *Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 298 n.5 (5th Cir. 2003) ("In engaging in the unremarkable task of determining whether specific conduct falls within the ambit of federal civil rights law, a court would no more become a 'super actuary' than the court becomes a 'super entrepreneur' each time the court must determine whether a discriminatory practice constitutes a business necessity."), cert. denied, 541 U.S. 1010 (2004); but see *American Family*, 978 F.3d at 291, 298-299 (questioning whether disparate impact analysis would apply to claim of insurance discrimination under the Fair Housing Act).

This Court, therefore, should hold that the Fair Housing Act prohibits discriminatory practices in the provision of property or hazard insurance for dwellings. See 24 C.F.R. 100.70(d)(4).

## II

## McCARRAN-FERGUSON REVERSE PREEMPTION DOES NOT DEPRIVE COURTS OF JURISDICTION OVER THE FEDERAL CLAIM

The district court erred when it assumed that the McCarran-Ferguson Act deprived it of jurisdiction to hear this case. In making this assumption, the district court improperly conflated the question whether a complaint states a claim with whether the court had subject matter jurisdiction to adjudicate the claim.

The general federal question jurisdiction statute, 28 U.S.C. 1331, provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."[7] "A plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States." *Arbaugh* v. *Y & H Corp*. 546 U.S. 500, 513 (2006) (citing *Bell* v. *Hood*, 327 U.S. 678, 681-685 (1946)). Plaintiff here has pled a colorable claim arising under the Fair Housing Act. Therefore, the district court had and this Court has subject matter jurisdiction over that claim, whether or not the claim is barred by McCarran-Ferguson.

This Court previously has recognized that McCarran-Ferguson reverse preemption does not deprive federal courts of subject matter jurisdiction. *United*

[7] Plaintiff in this case asserted jurisdiction under 28 U.S.C. 1331, 28 U.S.C. 1343(a)(4), or 42 U.S.C. 3613(a). See E.R. 2.

*States* v. *Robertson*, 158 F.3d 1370, 1371 (9th Cir. 1998). The Second, Fifth, and Eighth Circuits have agreed. *Dexter* v. *Equitable Life Assur. Soc. of United States*, 527 F.2d 233, 236-237 (2d Cir. 1975); *United States* v. *Cavin*, 39 F.3d 1299, 1305 (5th Cir. 1994); *United States* v. *Blumeyer*, 114 F.3d 758, 768 (8th Cir. 1997).

In *Gilchrist* v. *State Farm Mutual Automobile Insurance Co.*, 390 F.3d 1327, 1329 -1330 (11th Cir. 2004), the Eleventh Circuit treated McCarran-Ferguson preemption as jurisdictional. Much like the district court in this case, however, it did so without any analysis. *Gilchrist*, then, is the sort of "unrefined disposition[]" that the Supreme Court has characterized as a "'drive-by jurisdictional ruling[]' that should be accorded 'no precedential effect' on the question whether the federal court had authority to adjudicate the claim in suit." *Arbaugh*, 546 U.S. at 511 (quoting *Steel Co.* v. *Citizens for Better Env't*, 523 U.S. 83, 91 (1998)).

There is no doubt that plaintiff's claim in this case "aris[es] under" the Fair Housing Act. Section 3613(a) expressly authorizes civil actions by individuals alleging violations of the Act. 42 U.S.C. 3613(a). And plaintiff's claim, however the McCarran-Ferguson issue is resolved, asserts a colorable claim under the Act. His claim therefore meets the plain jurisdictional requirements of Section 1331.

Moreover, nothing in the McCarran-Ferguson Act indicates any intention to deprive district courts of jurisdiction even where it operates to preempt the application of another federal statute. To the contrary, McCarran-Ferguson provides that "[n]o Act of Congress shall be *construed* to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. 1012(b) (emphasis added). By its terms, the McCarran-Ferguson Act governs the construction of other federal statutes, not the jurisdiction of federal courts to adjudicate colorable claims arising under those statutes.

## CONCLUSION

This Court should rule that the ban on discrimination in the Fair Housing Act, 42 U.S.C. 3604, applies to homeowner's insurance; and that the McCarran-Ferguson Act does not deprive federal courts of subject-matter jurisdiction to hear claims brought under federal statutes, but rather merely instructs courts how to construe federal statutes.

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General

/s/ Linda F. Thome

JESSICA DUNSAY SILVER
LINDA F. THOME
Department of Justice
Civil Rights Division
Appellate Section
P.O. Box 14403
Ben Franklin Station
Washington, D.C. 20044-4403
Telephone: (202) 514-4706
Fascimile: (202) 514-8490
linda.thome@usdoj.gov
Attorneys for the United States

# Addendum

GEE-10240
-1.440

25 AUG 1978

MEMORANDUM TO: Chester C. McGuire
Assistant Secretary for
Equal Opportunity, E

SUBJECT: Title VIII of the Civil Rights Act of 1968

In connection with Departmental consideration of the issuance of substantive regulations interpreting Title VIII you have requested our views on the applicability of the Federal Fair Housing Act or property insurance activities.

Specifically, you asked for advice on whether a failure or refusal to provide property insurance on dwellings based upon race, color, sex, religion or national origin violates Title VIII.

Section 804(a) of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. Section 3604(a), makes it unlawful to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex or national origin.

The question whether insurance redlining is covered by Section 804(a) has not been addressed by the courts. The provisions of the Fair Housing Act of 1968 have, however, been construed broadly by the courts. The Act has been described as a "detailed housing law, applicable to a broad range of discriminatory practices," Jones v. Mayer Co., 392 U.S. 490, 417 (1968), and is to be accorded a "generous" construction so that it can accomplish the "enormous" task which Congress contemplated for it. Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 211-212 (1972).

Further, coverage under the Fair Housing Act is not limited to those who sell, rent, or finance real estate. "The Act has been applied not only to persons selling or renting dwellings, but also to newspapers carrying advertisements, to registrars or deeds containing racially restrictive covenants, and to municipalities engaging in zoning or discriminatory land use practices." United States v. Hughes Memorial Home, 396 F. Supp 544 (W.D. Va. 1975) (citations omitted).

| CORRE-SPON-DENCE CODE | ORIGINATOR | CONCURRENCE | CONCURRENCE | CONCURRENCE | CONCURRENCE | CONCURRENCE |
|---|---|---|---|---|---|---|
| Name | | | | | | |
| Date | | | | | | |

Section 804(a) has also been construed expansively:

> "Section 804(a) not only makes it unlawful to 'refuse to sell or rent...' a dwelling for racial reasons, but also makes it unlawful to 'otherwise make unavailable or deny a dwelling to any person because of race, color, religion, [sex] or national origin.' (Emphasis in decision.) This catch-all phraseology may not be easily discounted or de-emphasized. Indeed it 'appears to be as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful." United States v. Youritan Constr. Co., 370 F. Supp. 643. (United States v. City of Parma, P.H.E.O.H. Reptr. para 13,616, at p. 14015 (Ohio 1973))

Indeed, Section 804(a) has been construed to prohibit conduct much broader than that constituting a refusal to sell or rent. The statutory language proscribing conduct that "otherwise make[s] [dwellings] unavailable" has been applied to a variety of discriminatory conduct distinguishable from refusals to sell or rent, including refusal to make a mortgage loan because of the race of persons living in the area where the home was located, Laufman v. Oakley Bldg. and Loan Co., supra, Harrison v. Heinzeroth, 414 F. Supp 67 (N.D. Ohio 1976), racial steering by real estate agents, Zuch v. Hussy, 366 F. Sup 553 (E.D. Mich 1976); adoption of exclusionary ordinances by a municipality, United States v. Parma, supra; and discriminatory rejection by an orphanage of minority orphans, United States v. Hughes Memorial Home, 396 F. Supp. 544 (W.D. Va. 1975).

The rationale of these decisions indicates that any discriminatory action which, as a practical matter, makes a dwelling "unavailable," is violative of Section 3604(a). This rationale was best articulated by the Laufman court in the context of lender redlining:

> The cost of housing being what it is today, a denial of financial assistance in connection with a sale of a home would effectively "make unavailable or deny" a dwelling. When such denial occurs as a result of racial considerations, Section 3604(a) is transgressed. Laufman v. Oakley Building & Loan Co., 408 F. Supp. 489 (S.D. Ohio 1976).

Adequate insurance coverage is often a prerequisite to obtaining financing. Insurance redlining, by denying or impeding coverage makes mortgage money unavailable, rendering dwellings "unavailable" as effectively as the denial of financial assistance on other grounds:

> "Insurance is essential to revitalize our cities. It is a cornerstone of credit. Without insurance, banks and other financial institutions will not - and cannot - make loans."

(Report by the President's National Advisory Panel on Insurance, Meeting the Insurance Crisis of Our Cities 1 (1968).)

In instances where maintenance of appropriate hazard or property insurance on the premises is required as a condition of financing for the purchase of the dwelling refusal to issue insurance policies or imposition of provisions which make it more difficult to obtain such insurance, when based on the racial, religious, sex or ethnic origin of the applicant or similar concerns about a community, which would result in the denial of the mortgage makes the dwelling "unavailable" within the meaning of Section 804(a). Since this type of insurance redlining is within the parameters of Title VIII we are also of the opinion that issuance of Title VIII regulations is appropriate.

In the McCarran-Ferguson Act, 15 U.S.C. Section 1011-1012, the Congress declared:

> "that the continued regulation and taxation by the several States of the business of insurance is in the public interest and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

Further, the Act provides that no act of Congress "shall be construed to invalidate, impair or supersede any law enacted by any state regulating the business of insurance." (15 U.S.C. 1012(b)).

While the McCarran Act has been held to exempt the business of insurance from Federal antitrust Acts if such is regulated by the State where the alleged actions occurred, Commander Leasing Co. v. Transamerica Title Ins. Co., 447 F. 2d 77, 83 (10th Cir. 1973), the Supreme Court has indicated that "[i]nsurance companies may do many things which are subject to paramount federal regulations..." SEC v. National Securities, Inc., 393 U.S. 453 89 S. Ct., 564 21 L. Ed Fd 668 (1969).

It may be argued that this Congressional mandate exempts insurance activities from Federal legislation in the area of Civil Rights including the Fair Housing Act. However, although there is no legislative history under Title VIII in this area and there have been no judicial decisions we are of the opinion statutes such as Title VIII which are designed to protect constitutional rights are not limited by the McCarran-Ferguson Act.

In the only case which has addressed this issue, the McCarran-Ferguson Act was held not to bar suit against insurance companies for alleged violations of the Civil Rights Act of 1866 (42 U.S.C. Section 1982). Ben v. General Motors Acceptance Corp., 374 F. Supp. 1199 (D. Colo. 1974). The Ben court stated that:

> "There is no indication in the background and history of the McCarran Act or its application that the McCarran Act was intended to deprive a citizen of access to the Federal Courts to obtain redress for violations of his civil rights and require him to report to the state courts as the sole forum for redress. If such were the intent of Congress, it is highly questionable that Congress had the power under the Constitution to do so."

Based upon the above we are of the opinion that the McCarran-Ferguson Act does not exempt insurance companies from the coverage of the Federal Housing Act.

Ruth T. Prokop

Ruth T. Prokop

cc: GEE, RF & Chron 10240
Carey
Farbstein
GCI Kennedy 10278
Sauerbrunn
G Prokop 10214
GD Norton

GEE:BClarkedss:8/15/78

G-30942

| CORRESPONDENCE CODE | ORIGINATOR | CONCURRENCE | CONCURRENCE | CONCURRENCE | CONCURRENCE | CONCURRENCE |
|---|---|---|---|---|---|---|
| | | | GCI | | GD | |
| Name | B Clarke | RCF CMF | W Kennedy | Sauerbrunn | Norton | |
| Date | 8/15/78 | 8/16/78 | 8/17/78 | 8/17 | 8/21/78 | |

previous edition U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT OFFICIAL RECORD COPY HUD-713 (7-78)

U.S. GOVERNMENT PRINTING OFFICE: 1977-240-309

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation imposed by Fed. R. App. P. 32(a)(7)(B). The brief was prepared using WordPerfect X4 and contains 5,219 words of proportionally spaced text. The type face is Times New Roman, 14-point font.

/s/ Linda F. Thome
LINDA F. THOME
Attorney

Date: January 29, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by regular, first class mail, to the following non-CM/ECF participant:

James A. Francis
FRANCIS & MAILMAN
Land Title Bldg.
100 S. Broad St., 19th Floor
Philadelphia, PA 19110

/s/ Linda F. Thome
LINDA F. THOME
Attorney

# Housing Discrimination

## Law and Litigation

by Robert G. Schwemm

WEST®

A Thomson Reuters business

*For Customer Assistance Call 1-800-328-4880*

© 2012 Thomson Reuters/West, 6/2012

Mat #40928335

© 2012 Thomson Reuters/West

This publication was created to provide you with accurate and authoritative information concerning the subject matter covered; however, this publication was not necessarily prepared by persons licensed to practice law in a particular jurisdiction. The publisher is not engaged in rendering legal or other professional advice and this publication is not a substitute for the advice of an attorney. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

was the 'but-for' cause of the employer's adverse action."[35] Thus, in contrast to a Title VII case, the burden of persuasion in an ADEA disparate-treatment case "does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision."[36] The problem now for housing discrimination law will be to determine how, if at all, the *Gross* analysis impacts mixed-motive cases under the Fair Housing Act.[37]

### § 10:4 Discriminatory effect cases: Violations without a prohibited intent—Does the Fair Housing Act include a discriminatory effect standard?

The remaining question about the proper legal standards governing Fair Housing Act claims is whether the statute's substantive prohibitions extend beyond practices undertaken with at least some discriminatory intent to cover those that simply produce a discriminatory effect. Despite the absence of an authoritative Supreme Court ruling,[1] this issue has essentially been resolved as a result of a strong consensus among the lower courts that the Fair Housing Act does

---

[35] 129 S. Ct. at 2350–51. Justice Stevens' dissent for four members of the Court argued that the *Price Waterhouse* standards should control ADEA mixed-motive cases. *See* 129 S. Ct. at 2353–57.

[36] 129 S. Ct. at 2352.

[37] *Cf. Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961–64, 22 A.D. Cas. (BNA) 1379 (7th Cir. 2010) (holding, in ADA case, that *Gross* means that all civil rights statutes other than Title VII now require "but-for" causation and thus mixed-motive claims are not viable under such statutes).

**[Section 10:4]**

[1] *See* note 6. The issue has been addressed in a number of articles. *E.g.*, Peter E. Mahoney, *The Ends of Disparate Impact: Doctrinal Reconstruction, Fair Housing and Lending Law, and the Antidiscrimination Principle*, 47 Emory L. Rev. 409 (1998); Robert G. Schwemm, *Discriminatory Effect and the Fair Housing Act*, 54 Notre Dame Law. 199 (1978); Frederic S. Schwartz, *The Fair Housing Act and "Discriminatory Effect": A New Perspective*, 11 Nova L. Rev. 71 (1987); four papers prepared by, respectively, John O. Calmore, Marshall D. Stein, Otto J. Hetzel, and Douglas W. Kmiec for a consultation-hearing of the U.S. Commission on Civil Rights in 1985 entitled Issues in Housing Discrimination: A Consultation/Hearing, Vol. 1, at 77–142 (U.S. Commission on Civil Rights, November 12–13, 1985).

include a discriminatory effect standard.[2]

The language used in the Fair Housing Act does not resolve the problem. The statute's key substantive provisions prohibit housing practices that discriminate "because of" race, color, religion, sex, handicap, familial status, or national origin.[3] The Act does not specify whether these phrases were meant to cover only intentional discrimination or whether they also apply to discriminatory effect claims. In 1971, the Supreme Court interpreted similar language in Title VII to include a discriminatory effect standard in *Griggs v. Duke Power Co.*,[4] but the Court has also made clear that this interpretation is not necessarily appropriate for all civil rights claims.[5] Thus far, the Court has avoided issuing a de-

---

[2]*See* cases cited in notes 18–35 and 41.

[3]*See* 42 U.S.C.A. § 3604(a), § 3604(b), § 3604(d), § 3604(f)(1), § 3604(f)(2), and § 3605. Some of the statute's other substantive provisions are phrased differently and have been accorded their own special standards of proof. *See* § 10:1 notes 3–6 and accompanying text.

[4]*Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158, 3 Fair Empl. Prac. Cas. (BNA) 175, 3 Empl. Prac. Dec. (CCH) P 8137, 88 Pub. Util. Rep. 3d (PUR) 90 (1971).

[5]*E.g.*, *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233–42, 125 S. Ct. 1536, 1545, 161 L. Ed. 2d 410, 95 Fair Empl. Prac. Cas. (BNA) 641, 86 Empl. Prac. Dec. (CCH) P 41882 (2005) (Age Discrimination in Employment Act has a disparate impact standard, but not the same one as Title VII's); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–71, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) (equal protection claim requires proof of discriminatory intent); *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 382–91, 102 S. Ct. 3141, 73 L. Ed. 2d 835, 29 Fair Empl. Prac. Cas. (BNA) 139, 29 Empl. Prac. Dec. (CCH) P 32855 (1982) (§ 1981 claim requires proof of discriminatory intent); *Guardians Ass'n v. Civil Service Com'n of City of New York*, 463 U.S. 582, 584 n.2, 103 S. Ct. 3221, 77 L. Ed. 2d 866, 32 Fair Empl. Prac. Cas. (BNA) 250, 32 Empl. Prac. Dec. (CCH) P 33695 (1983) (Title VI claim requires proof of discriminatory intent, but claim under regulations promulgated pursuant to Title VI may be based on proof of discriminatory impact); *Alexander v. Choate*, 469 U.S. 287, 292–99, 105 S. Ct. 712, 83 L. Ed. 2d 661, 8 Soc. Sec. Rep. Serv. 6, 1 A.D.D. 204 (1985) (§ 504 of the 1973 Rehabilitation Act covers some, but not all, practices that have an unjustifiable disparate impact on disabled persons). Housing discrimination claims based on the equal protection clause are discussed in Ch 28; those based on §§ 1981 to 1982 are discussed in Ch 27; those based on Title VI are discussed in § 29:2; and those based on § 504 are discussed in § 29:3.

finitive ruling in a Fair Housing Act case.[6]

Although *Griggs* is not controlling, it is a powerful precedent in favor of a discriminatory effect standard for the Fair Housing Act. The decision unanimously interpreted a civil rights statute that was passed only four years before the Fair Housing Act and that used almost the identical "because of race" language as the Fair Housing Act.[7] The Supreme Court in *Griggs* did not specifically discuss the meaning of this phrase nor its legislative history. Rather, the opinion

---

[6]On two occasions, the Supreme Court has declined to decide whether the Fair Housing Act includes a discriminatory effect standard in cases that initially seemed to provide an opportunity for a ruling on this issue. In 1988 in *Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988), the Court issued a brief per curiam opinion affirming a Second Circuit decision that had endorsed the discriminatory effect standard for Fair Housing Act cases involving exclusionary zoning. The *Huntington* opinion, however, did not amount to a full-fledged endorsement of the discriminatory effect test for the Fair Housing Act, because the defendant town had conceded the applicability of this test, and the Court therefore explicitly declined to "reach the question whether that test is the appropriate one." 488 U.S. at 18. In 2003, the Court again avoided this issue in *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 123 S. Ct. 1389, 155 L. Ed. 2d 349 (2003). *Cuyahoga Falls* was also an exclusionary zoning case, where the plaintiffs challenged a city's delay in approving their low-income housing development on three separate theories: (1) intentional racial discrimination in violation of the equal protection clause; (2) arbitrary deprivation of their property rights in violation of the due process clause; and (3) discrimination against racial minorities and families with children in violation of the Fair Housing Act based on a disparate impact claim. After the Sixth Circuit held that the plaintiffs' evidence was sufficient to withstand the city's summary judgment motion with respect to all three of these theories, the Supreme Court granted the city's petition for certiorari. The Court ruled against the plaintiffs on their equal protection and due process claims, holding that there was insufficient evidence to justify proceeding to trial on these claims. 538 U.S. at 194–99. *See generally* § 28:2 (equal protection) and § 28:3 (due process). With respect to the Fair Housing Act, the plaintiffs abandoned their disparate impact claim in the Supreme Court, leading the Court to vacate the Sixth Circuit's approval of this claim and order its dismissal. 538 U.S. at 199–200. Thus, although *Cuyahoga Falls* resulted in a total defeat for the plaintiffs in that particular case, the Court once again did not produce an opinion that dealt with the merits of the question whether the Fair Housing Act includes a discriminatory effect theory.

[7]The *Griggs* plaintiffs based their claim in part on § 703(a)(2) of Title VII, *see* 401 U.S. at 426 n.1, which makes it unlawful for an employer to discriminate against any individual "because of such individual's race." 42 U.S.C.A. § 2000e-2(a)(2).

focused on the broad purposes underlying Title VII, concluding that the statute was intended "to achieve equality of employment opportunities and remove barriers that have operated in the past" to hurt minority employees.[8]

The same type of broad remedial objectives that were held to justify an effect standard for Title VII in *Griggs* also prompted the passage of the Fair Housing Act.[9] Although the Fair Housing Act's legislative history does not contain any specific discussion of the "intent vs. effect" issue,[10] proponents of the statute in both the House and Senate did speak repeatedly of their desire to achieve the *result* of an integrated society through this legislation.[11] The Fair Housing Act begins with the sweeping declaration that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."[12] Certainly, it is "within constitutional limitations" to outlaw practices with discriminatory effects. Indeed, Senator Mondale, the principal sponsor of the Fair Housing Act, in commenting on the role that government had played in maintaining segregated housing conditions, concluded that: "It thus seems only fair, and is constitutional, that Congress should now pass a fair housing act to undo the effects of these past State and Federal unconstitutionally discriminatory actions."[13] The Senate also rejected a floor amendment that would have required proof of an intention to discriminate in certain limited circumstances.[14] This legislative history has been cited by some of the appellate courts that have applied a discriminatory effect standard to the Fair Housing

[8]401 U.S. at 429–30.

[9]*See generally* § 7:2.

[10]This is not particularly surprising. Intentional discrimination was a way of life in the housing field when the Fair Housing Act was being considered, and eradicating it was obviously the key concern of the bill's sponsors. With the Supreme Court's decision in *Griggs* still three years away, the "intent vs. effect" issue was simply not of commanding interest in 1968.

[11]*See* Schwemm, note 1, at 210–11. For a discussion of the Fair Housing Act's legislative history concerning the goal of integration, see § 2:3.

[12]42 U.S.C.A. § 3601.

[13]114 Cong. Rec. 2699 (1968); *see also* 114 Cong. Rec. at 2281, 2526, 2988 to 2989 (remarks of Senator Brooke); 114 Cong. Rec. at 2277 to 2278, 3421 (remarks of Senator Mondale).

[14]*See* 114 Cong. Rec. 5214 to 5222 (1968).

Act,[15] although it is certainly not strong enough to be considered conclusive on this issue.[16]

In the absence of any direct guidance from the statutory language, the legislative history, or the Supreme Court on this point, the lower courts have generally held a Fair Housing Act violation may be based on the discriminatory effect standard.[17] These decisions have relied primarily on the Supreme Court's holding in *Griggs* and on their own determination that a similar standard should govern Fair Housing Act claims.

In the first decade of Fair Housing Act litigation, the appellate courts that led the way in adopting the discriminatory effect theory for the Fair Housing Act were the Eighth Circuit in *United States v. City of Black Jack*,[18] the Fifth Circuit in a series of opinions,[19] the Third Circuit in *Resident Advisory Board v. Rizzo*,[20] and the Seventh Circuit in the *Arlington Heights* case.[21] On the other hand, the Sixth Circuit in the *Skillken* case seemed to equate the proper Fair Housing Act standard with the purposeful discrimina-

---

[15] *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 147 (3d Cir. 1977); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1289–90 (7th Cir. 1977).

[16] *See* Schwemm, note 1, at 209–12.

[17] *See* cases cited in notes 18–35 and 41 and accompanying texts.

[18] *U.S. v. City of Black Jack, Missouri*, 508 F.2d 1179, 1184–85 (8th Cir. 1974).

[19] *E.g., U.S. v. Mitchell*, 580 F.2d 789, 791–92 (5th Cir. 1978); *U.S. v. Pelzer Realty Co., Inc.*, 484 F.2d 438, 443 (5th Cir. 1973); *see also Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Woods-Drake v. Lundy*, 667 F.2d 1198, 1202 (5th Cir. 1982).

[20] *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146–49 (3d Cir. 1977).

[21] *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977). This decision in the *Arlington Heights* case followed the Supreme Court's holding that the plaintiffs' showing of discriminatory effect was inadequate to establish an equal protection claim. 429 U.S. 252 (1977). The Court then remanded the case for a determination of whether a more lenient standard should apply to the Fair Housing Act. 429 U.S. at 271. On remand, the Seventh Circuit decided that "a violation of § 3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent." 558 F.2d at 1290. Subsequent Seventh Circuit decisions, while accepting this holding, have expressed some doubt as to whether the discriminatory effect standard is applicable to all types of Fair Housing Act claims. *See* cases cited in note 35.

© 2010 Thomson Reuters/West, 6/2010

tion standard that governs equal protection claims.[22] The Second Circuit produced mixed results, holding in *Boyd v. Lefrak Organization*[23] that the *Griggs* standard was "inapposite" in Fair Housing Act cases and then indicating in *Robinson v. 12 Lofts Realty, Inc.*[24] that it did subscribe to the discriminatory effect theory.

During the 1980s, the number of circuits favoring the discriminatory effect standard grew steadily. The Fourth Circuit in *Smith v. Town of Clarkton, N.C.*,[25] and *Betsey v. Turtle Creek Associates*[26] and the Ninth Circuit in *Keith v. Volpe*[27] aligned themselves with this view. The new Eleventh Circuit announced a policy of following the precedents of the old Fifth Circuit,[28] thereby putting itself in the pro-effect group. In addition, the two circuits that had shown some reluctance about the effect theory during the 1970s moved toward adopting this approach. The Sixth Circuit in *United States v. City of Parma, Ohio*[29] announced that *Skillken* had not been a dispositive interpretation of the Fair Housing Act and then embraced the discriminatory effect theory in *Arthur v. City of Toledo, Ohio*.[30] The Second Circuit stated in *United States v. Starrett City Associates*[31] that the Fair Housing Act's coverage extends to practices that "disproportionately affect minorities," and then in *Huntington Branch, NAACP*

---

[22]*Joseph Skillken & Co. v. City of Toledo*, 528 F.2d 867, 21 Fed. R. Serv. 2d 573 (6th Cir. 1975), judgment vacated on other grounds, 429 U.S. 1068, 97 S. Ct. 800, 50 L. Ed. 2d 786 (1977).

[23]*Boyd v. Lefrak Organization*, 509 F.2d 1110, 1114 (2d Cir. 1975).

[24]*Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1036–37 (2d Cir. 1979).

[25]*Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055, 1065, 11 Fed. R. Evid. Serv. 359, 34 Fed. R. Serv. 2d 1098 (4th Cir. 1982).

[26]*Betsey v. Turtle Creek Associates*, 736 F.2d 983, 986–88 (4th Cir. 1984); *see also Edwards v. Johnston County Health Dept.*, 885 F.2d 1215, 1223 (4th Cir. 1989).

[27]*Keith v. Volpe*, 858 F.2d 467, 482–84, 26 Fed. R. Evid. Serv. 1249, 12 Fed. R. Serv. 3d 323 (9th Cir. 1988); *see also Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982).

[28]*See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[29]*U.S. v. City of Parma, Ohio*, 661 F.2d 562, 574 (6th Cir. 1981).

[30]*Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 574–75 (6th Cir. 1986).

[31]*U.S. v. Starrett City Associates*, 840 F.2d 1096, 1100 (2d Cir. 1988).

*v. Town of Huntington*,[32] the same court produced a powerful endorsement of the effect theory for cases against public defendants, concluding that *Boyd's* precedential value was "a matter of considerable uncertainty."[33]

By 1988, therefore, a strong consensus had developed among the circuits that the proper meaning of the Fair Housing Act included a discriminatory effect standard. Only the First, Tenth, and D.C. Circuits had not been heard from on this issue.[34] Not a single court of appeals currently espouses the view that the effect theory is inappropriate for Fair Housing Act cases.[35]

It was against this background that Congress considered

---

[32] *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988). The Supreme Court's decision in the *Huntington* case is described in note 6.

[33] *See also U.S. v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217, 44 Ed. Law Rep. 44 (2d Cir. 1987).

[34] In 1995, the Tenth Circuit issued two opinions that endorsed the discriminatory effect theory. *Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243, 1250–51 (10th Cir. 1995); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501, 8 A.D.D. 1097 (10th Cir. 1995) (dicta); *accord Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007). Two years earlier, the First Circuit had done the same. *Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo*, 988 F.2d 252, 269 n.20, 1 A.D.D. 710 (1st Cir. 1993); *accord Macone v. Town of Wakefield*, 277 F.3d 1, 5, (1st Cir. 2002); *Langlois v. Abington Housing Authority*, 207 F.3d 43, 49 (1st Cir. 2000). The District of Columbia Circuit has assumed without deciding that plaintiffs may pursue a disparate impact claim under the Fair Housing Act, *see 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006), and D.C. district courts have endorsed this theory. *See National Community Reinvestment Coalition v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 77–79 (D.D.C. 2008), leave to appeal denied, 597 F. Supp. 2d 120 (D.D.C. 2009); *National Fair Housing Alliance, Inc. v. Prudential Ins. Co. of America*, 208 F. Supp. 2d 46, 58–60 (D.D.C. 2002); *Brown v. Artery Organization, Inc.*, 654 F. Supp. 1106, 1114–16, 100 A.L.R. Fed. 71 (D.D.C. 1987) (endorsement limited to certain types of defendants).

[35] *Cf. Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529–34 (7th Cir. 1990) (while the discriminatory effect theory is appropriate for some Fair Housing Act claims, racial steering claims require proof of discriminatory intent); *N.A.A.C.P. v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290–93, 24 Fed. R. Serv. 3d 278 (7th Cir. 1992) (noting that "the Supreme Court has yet to decide whether practices with disparate impact violate Title VIII [the Fair Housing Act]" and suggesting that, in this insurance redlining case, the defendant's concession that the plaintiffs' Fair Housing

© 2010 Thomson Reuters/West, 6/2010

and passed the 1988 Fair Housing Amendments Act.[36] The 1988 Act did not change the operative language of the Fair Housing Act's substantive provisions concerning what is required to prove a violation, although some members of Congress had argued that an intent requirement should be added.[37] This congressional decision to maintain the existing Fair Housing Act standards was made with a full understanding of the numerous court decisions that had endorsed the discriminatory effect theory.[38] According to Senator Kennedy, the principal Senate sponsor of the 1988 Act, "Congress accepted this consistent judicial interpretation."[39] The result is that future judicial efforts to divine the proper standard under the Fair Housing Act may rely not only on evidence of the intent of the 1968 Congress but also on the decision of the 1988 Congress to accept the current state of the law.[40]

---

Act claim was "subject to proof under a disparate impact formula . . . may have been imprudent [citing *Village of Bellwood*]").

[36]Pub. L. 100-430, 102 Stat. 1619 (1988).

[37]*See, e.g.*, U.S. House of Representatives, Committee on the Judiciary, Report 100-711: the Fair Housing Amendments Act of 1988 89–93, 100th Cong., 2nd Sess. (1988), *reprinted in* 1988 U.S.Code Congressional and Administrative News 2173 to 2230 (1988) (hereinafter *House Report*) (additional views of Congressman Swindall *et al.* concerning a proposed amendment to the 1988 Act that would have required a showing of discriminatory intent to invalidate zoning laws under the Fair Housing Act).

[38]*See, e.g.*, 134 Cong. Rec. 23711 (1988) (remarks of Senator Kennedy referring to the testimony of Professor Robert Schwemm, which appears at Hearings on the Fair Housing Amendments Act of 1987 before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 100th Cong., 1st Sess. 529–57 (1987)).

[39]134 Cong. Rec. 23712 (1988).

[40]"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S. Ct. 866, 55 L. Ed. 2d 40, 16 Fair Empl. Prac. Cas. (BNA) 885, 16 Empl. Prac. Dec. (CCH) P 8134, 24 Fed. R. Serv. 2d 1005 (1978) (employment discrimination case). Other Supreme Court decisions in civil rights cases that have discussed the weight to be accorded to congressional inaction vis-a-vis prior judicial interpretations of a statute include *Forest Grove School Dist. v. T.A.*, 129 S. Ct. 2484, 2491–92, 174 L. Ed. 2d 168, 245 Ed. Law Rep. 551 (2009); *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1, 109 S. Ct. 2363, 105 L. Ed. 2d 132, 49 Fair Empl. Prac. Cas. (BNA) 1814, 50 Empl. Prac. Dec. (CCH) P 39066 (1989); *Johnson v. Transportation Agency, Santa Clara County, Cal.*, 480 U.S. 616, 629–30

Court cases decided after the 1988 Amendments Act have generally continued to recognize that the Fair Housing Act may be violated without a showing of discriminatory intent.[41] In addition, a number of HUD administrative decisions have

---

n.7, 107 S. Ct. 1442, 94 L. Ed. 2d 615, 43 Fair Empl. Prac. Cas. (BNA) 411, 42 Empl. Prac. Dec. (CCH) P 36831 (1987).

Another potential source of guidance from the 1988 Act has turned out to be unhelpful. HUD's interpretive regulations issued pursuant to the 1988 Act specifically avoiding "resolv[ing] the question of whether intent is or is not required to show a violation" of the Fair Housing Act. *See* 54 Fed. Reg. 3235 (Jan 23, 1989). *But see* notes 43–44 and accompanying text.

[41]*E.g., Artisan/American Corp. v. City of Alvin, Tex.*, 588 F.3d 291, 295 (5th Cir. 2009); *Bloch v. Frischholz*, 587 F.3d 771, 784 (7th Cir. 2009); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1217–18 (11th Cir. 2008); *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007); *Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006); *Affordable Housing Development Corp. v. City of Fresno*, 433 F.3d 1182, 1194–96 (9th Cir. 2006); *Cox v. City of Dallas, Tex.*, 430 F.3d 734, 746, 35 Envtl. L. Rep. 20228 (5th Cir. 2005); *Charleston Housing Authority v. U.S. Dept. of Agriculture*, 419 F.3d 729, 740–42 (8th Cir. 2005); *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 574–78, 15 A.D. Cas. (BNA) 32 (2d Cir. 2003); *Oti Kaga, Inc. v. South Dakota Housing Development Authority*, 342 F.3d 871, 883–84, 92 A.F.T.R.2d 2003-6103 (8th Cir. 2003); *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Authority*, 339 F.3d 702, 712 (8th Cir. 2003); *Fair Housing in Huntington Committee Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 366 (2d Cir. 2003); *Macone v. Town of Wakefield*, 277 F.3d 1, 5, (1st Cir. 2002); *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 90–91, 150 Ed. Law Rep. 347, 2001-1, 2001-1 Trade Cas. (CCH) ¶ 73127 (2d Cir. 2000), and *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 93–102, 150 Ed. Law Rep. 347, 2001-1, 2001-1 Trade Cas. (CCH) ¶ 73127 (2d Cir. 2000) (Moran, J., dissenting in part); *Langlois v. Abington Housing Authority*, 207 F.3d 43, 49 (1st Cir. 2000); *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 250–51, 36 Fed. R. Serv. 3d 1244 (9th Cir. 1997); *Larkin v. State of Mich. Dept. of Social Services*, 89 F.3d 285, 289, 17 A.D.D. 867, 1996 FED App. 0211P (6th Cir. 1996); *Pfaff v. U.S. Dept. of Housing and Urban Development*, 88 F.3d 739, 745–46 (9th Cir. 1996); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243, 1250–51 (10th Cir. 1995); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501, 8 A.D.D. 1097 (10th Cir. 1995); *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1543 (11th Cir. 1994); *Orange Lake Associates, Inc. v. Kirkpatrick*, 21 F.3d 1214, 1227–28 (2d Cir. 1994); *Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo*, 988 F.2d 252, 269 n.20, 1 A.D.D. 710 (1st Cir. 1993); *Doe v. City of Butler, Pa.*, 892 F.2d 315, 323 (3d Cir. 1989); *Edwards v. Johnston County Health Dept.*, 885 F.2d 1215, 1223 (4th Cir. 1989); cases cited in note 21 of § 11D:5; *see also 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) (assuming without deciding that plaintiffs may bring a

held that the discriminatory effect standard should be applied in HUD proceedings brought under the Fair Housing Act.[42] Also, in 1993, HUD's Assistant Secretary for Fair Housing and Equal Opportunity announced that HUD would soon promulgate a regulation stating that the discriminatory effect standard was applicable in Fair Housing Act cases,[43] and other federal agencies with Fair Housing Act enforcement responsibilities have since endorsed this theory as well.[44]

## § 10:5 Discriminatory effect cases: Violations without a prohibited intent—Burdens of proof and the *Wards Cove* case

The lower courts have actually recognized two different types of discriminatory effect claims under the Fair Housing Act.[1] Historically, the more common type has involved exclusionary zoning or some other municipal regulation that

---

disparate impact claim under the Fair Housing Act). *But see* cases cited in note 35.

[42]*See, e.g., Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243, 1250–57 (10th Cir. 1995); *Pfaff v. U.S. Dept. of Housing and Urban Development*, 88 F.3d 739 (9th Cir. 1996); *HUD v. Ross*, 1994 WL 326437, Fair Housing—Fair Lending Rptr. ¶ 25,075, at pp. 25,699–700 (HUD ALJ 1994); *HUD v. Carter*, 1992 WL 406520, Fair Housing—Fair Lending Rptr. ¶ 25,029, at pp. 25,317–18 (HUD ALJ 1992).

[43]*See* Fair Housing—Fair Lending Rptr. ¶ 3.5 (Sept. 1, 1993) (reporting on remarks of HUD Assistant Secretary Roberta Achtenberg that one of her first orders of business after assuming office would be the promulgation of a discriminatory effect regulation). To date, however, such a regulation has not yet been issued.

[44]*See, e.g.,* Statement of Attorney General Janet Reno (Jan. 21, 1994) announcing that the Justice Department would use the disparate impact theory in fair housing cases, reported in Fair Housing-Fair Lending Reporter, Rep. Bull. ¶ 9.1 (Mar. 1, 1994); 59 Fed. Reg. 18266 to 18274 (Apr. 15, 1994), where HUD, Justice, and a number of other federal agencies that regulate financial institutions joined together in a project called the Interagency Task Force on Fair Lending to produce a "Policy Statement on Discrimination in Lending" that, *inter alia,* recognized that proof of disparate impact might be sufficient to establish a violation of the Fair Housing Act.

**[Section 10:5]**

[1]*See, e.g., Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006); *Edwards v. Johnston County Health Dept.*, 885 F.2d 1215, 1223 (4th Cir. 1989); *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir. 1988), judgment aff'd in

is challenged on the ground that it perpetuates housing segregation in an entire area.[2] These perpetuation-of-segregation claims are dealt with in § 10:7. The other type of effect case challenges a housing practice because it has a greater adverse impact on protected class members than on others. This "disparate impact" type of discriminatory effect case has been well known in the employment discrimination field ever since *Griggs*,[3] but it is less common in Fair Housing Act cases. These disparate impact claims are discussed in § 10:6. A fair housing plaintiff may present evidence supporting both types of claims in a single case.[4]

In both types of claims, the plaintiff has the initial burden

---

part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988); *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 987 n.3 (4th Cir. 1984); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 565–68 (N.D. Tex. 2000); *Hispanics United of DuPage County v. Village of Addison, Ill.*, 988 F. Supp. 1130, 1154 (N.D. Ill. 1997); *Summerchase Ltd. Partnership I v. City of Gonzales*, 970 F. Supp. 522, 527–28 (M.D. La. 1997); *Old West End Ass'n v. Buckeye Federal Sav. & Loan*, 675 F. Supp. 1100, 1105 (N.D. Ohio 1987); *Keith v. Volpe*, 618 F. Supp. 1132, 1150–51 (C.D. Cal. 1985); *In re Malone*, 592 F. Supp. 1135, 1166 (E.D. Mo. 1984), judgment aff'd, 794 F.2d 680 (8th Cir. 1986); *Atkins v. Robinson*, 545 F. Supp. 852, 867 (E.D. Va. 1982), judgment aff'd, 733 F.2d 318 (4th Cir. 1984).

[2]Many of the early appellate decisions discussed in the previous section were of this variety. *See* cases cited in § 10:4 notes 18–21, 25, 27, 29–30, and 32.

[3]*Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158, 3 Fair Empl. Prac. Cas. (BNA) 175, 3 Empl. Prac. Dec. (CCH) P 8137, 88 Pub. Util. Rep. 3d (PUR) 90 (1971). A number of employment discrimination claims based on the *Griggs* "disparate impact" theory have reached the Supreme Court. *See, e.g., Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S. Ct. 2115, 104 L. Ed. 2d 733, 49 Fair Empl. Prac. Cas. (BNA) 1519, 50 Empl. Prac. Dec. (CCH) P 39021 (1989) (and cases cited 490 U.S. at 650–51, 659).

[4]*E.g., Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 937–38 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988); *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 565–68 (N.D. Tex. 2000); *Hispanics United of DuPage County v. Village of Addison, Ill.*, 988 F. Supp. 1130, 1154–55 (N.D. Ill. 1997); *Summerchase Ltd. Partnership I v. City of Gonzales*, 970 F. Supp. 522, 528–31 (M.D. La. 1997); *Oxford House-Evergreen v. City of Plainfield*, 769 F. Supp. 1329, 1344 (D.N.J. 1991); *Keith v. Volpe*, 618 F. Supp. 1132, 1150–51 (C.D. Cal. 1985); *In re Malone*, 592 F. Supp. 1135, 1166–68 (E.D. Mo. 1984), judgment aff'd, 794 F.2d 680 (8th Cir. 1986); *Atkins v. Robinson*, 545 F. Supp. 852, 866–70 (E.D. Va. 1982), judgment aff'd, 733 F.2d 318 (4th Cir. 1984).

of establishing a prima facie case of discriminatory effect, after which the burden shifts to the defendant to justify its challenged action.[5] Less clear, however, is the exact nature of the parties' respective burdens of proof, and the courts in Fair Housing Act cases have articulated the applicable standards—particularly those dealing with the defendant's burden of justification—in somewhat different ways.[6]

In 1989 in *Wards Cove Packing Co., Inc. v. Atonio*,[7] the Supreme Court addressed these issues in a Title VII case based on the disparate impact theory. In a 5-4 decision, the Court established a number of important principles for evaluating these claims. First, the plaintiff has the burden of proving—through statistics comparing the racial composition of qualified persons in the labor market with the racial composition of persons actually hired by the defendant—that a particular practice of the defendant caused a significant disparate impact on minorities.[8] Such a showing will shift to the defendant the burden of justifying its challenged practice. At this justification stage, the dispositive issue is whether the defendant's practice "serves, in a significant way, the legitimate employment goals of the employer."[9] The defendant's burden here is simply a burden of production, not persuasion; that is, the employer can satisfy its burden

The same case may also include claims based on discriminatory intent. *E.g.*, *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038–39 (2d Cir. 1979); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 140–45 (3d Cir. 1977); *U.S. v. City of Black Jack, Missouri*, 508 F.2d 1179, 1185 n.3 (8th Cir. 1974); *Oxford House—Evergreen v. City of Plainfield, 769 F. Supp. at 1343–45*; *cf. International Broth. of Teamsters v. U.S.*, 431 U.S. 324, 335–36 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396, 14 Fair Empl. Prac. Cas. (BNA) 1514, 14 Empl. Prac. Dec. (CCH) P 7579 (1977) (Title VII case).

[5] *See* § 10:6 notes 1–5, 15–20, and § 10:7 notes 17–26 and accompanying texts; *cf. Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656–58, 109 S. Ct. 2115, 104 L. Ed. 2d 733, 49 Fair Empl. Prac. Cas. (BNA) 1519, 50 Empl. Prac. Dec. (CCH) P 39021 (1989) (Title VII case).

[6] *See* § 10:6 notes 15–17 and accompanying text and § 10:7 notes 17–18 and accompanying text.

[7] *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S. Ct. 2115, 104 L. Ed. 2d 733, 49 Fair Empl. Prac. Cas. (BNA) 1519, 50 Empl. Prac. Dec. (CCH) P 39021 (1989).

[8] 490 U.S. at 650–58.

[9] 490 U.S. at 659. The dissent argued that the defendant should have to justify its practice by the higher standard of "business necessity," which would require that the practice be shown to be "essential to effective job performance." 490 U.S. at 671.

of justification simply by "producing evidence of a business justification for his employment practice."[10] If the defendant satisfies this burden of production, the plaintiff can still prevail by proving that the defendant's legitimate interests could be served equally well by using alternative selection devices that would not produce such a heavy racial impact.[11] On this issue, as on all others throughout the case, the ultimate burden of persuasion remains with the plaintiff.[12]

It is not clear whether *Wards Cove* controls discriminatory effect claims under the Fair Housing Act. The principal reason for this uncertainty is that much of the *Wards Cove* analysis was "overruled" for purposes of Title VII claims by the 1991 Civil Rights Act.[13] Under the 1991 Act, once an employment practice is shown to have a disparate impact on minorities, the burden of persuasion shifts to the defendant to show that the challenged practice "is job related for the position in question and consistent with business necessity."[14] The 1991 Act, however, provided this standard only for Title VII claims and not also for the Fair Housing Act. Prior to passage of the 1991 Act, some courts had relied on *Wards Cove* in analyzing Fair Housing Act cases based on the discriminatory effect theory,[15] and it may be that the *Wards Cove* approach is still viable in Fair Housing Act cases despite being

---

[10]490 U.S. at 659. The dissent disagreed on this point as well, arguing that the defendant's burden of justification should be "proof of an affirmative defense." 490 U.S. at 668.

[11]490 U.S. at 660–61. The *Wards Cove* opinion strongly suggested that the plaintiff's likelihood of success at this "alternative practice" stage is slim, noting that "the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's alternative selection or hiring practice in response to a Title VII suit." 490 U.S. at 661.

[12]490 U.S. at 660.

[13]Pub. L. No. 102-166, 105 Stat. 1071 (1991).

[14]Pub. L. No. 102-166, 105 Stat. 1071 (1991) at § 105(a), adding subsection (k)(1)(A)(i) to 42 U.S.C.A. § 2000e-2. A plaintiff may also prevail on a disparate impact claim if the defendant refuses to adopt a less discriminatory alternative employment practice, with the respective burdens of proof on this "alternative employment practice" issue being governed by the law as it existed prior to the *Wards Cove* decision. Pub. L. No. 102-166, 105 Stat. 1071 (1991) at § 105(a), adding subsections (k)(1)(A)(ii) and (k)(1)(C) to 42 U.S.C.A. § 2000e-2.

[15]*E.g., Edwards v. Johnston County Health Dept.*, 885 F.2d 1215, 1223 (4th Cir. 1989); *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 154 n.7, (S.D. N.Y. 1989). For a discussion of the

largely overruled for purposes of Title VII.[16]

If the *Wards Cove* analysis has indeed survived for purposes of fair housing cases, it would seem to be particularly relevant to the proper handling of Fair Housing Act claims based on the disparate impact theory, which can be directly traced to the *Griggs*-Title VII model. Perpetuation-of-segregation claims, on the other hand, do not have a clear analogy in Title VII law, so the applicability of *Wards Cove* to these claims is less certain.[17] Still, to the extent that adoption of the discriminatory effect theory under the Fair Housing Act has been based on following *Griggs* and Title VII law, the Supreme Court's interpretation of that law can be expected to influence all types of Fair Housing Act claims based on discriminatory effect.

## § 10:6 Discriminatory effect cases: Violations without a prohibited intent—Disparate impact claims

In a disparate impact claim, "[t]he relevant question . . .

---

propriety of applying Title VII precedents to Fair Housing Act cases, see § 7:4.

[16]*See, e.g., Langlois v. Abington Housing Authority*, 207 F.3d 43, 50 (1st Cir. 2000); *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251, 259 n.16 (D. Mass. 2008); *cf.* cases cited in note 28 in § 10:3; *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 125 S. Ct. 1536, 1545, 161 L. Ed. 2d 410, 95 Fair Empl. Prac. Cas. (BNA) 641, 86 Empl. Prac. Dec. (CCH) P 41882 (2005) (holding that *Wards Cove* controls the defendant's rebuttal burden in an impact case under the 1967 Age Discrimination in Employment Act, because "[w]hile the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination. Hence, *Wards Cove*'s pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA."). *But see Hack v. President and Fellows of Yale College*, 237 F.3d 81, 93–102, 150 Ed. Law Rep. 347, 2001-1, 2001-1 Trade Cas. (CCH) ¶ 73127 (2d Cir. 2000) (Moran, J., dissenting in part) (applying standard from 1991 Act instead of from *Wards Cove*); *Hispanics United of DuPage County v. Village of Addison, Ill.*, 988 F. Supp. 1130, 1160–62 (N.D. Ill. 1997) (same); *Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243 (10th Cir. 1995) (*Wards Cove*, having been overruled by Congress in its own sphere of Title VII cases, cannot stand as authority for Fair Housing Act cases). *See generally Northwest Austin Mun. Utility Dist. No. One v. Holder*, 129 S. Ct. 2504, 2515–16, 174 L. Ed. 2d 140 (2009) (concluding that Supreme Court decision's rationale underlying its interpretation of the original Voting Rights Act, having been repudiated by Congress in subsequent amendments, is no longer applicable in interpreting the amended version of that statute).

[17]*See* text accompanying notes 27–30 in § 10:7.

is whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a protected class."[1] This theory is not appropriate for claims that are based on a single act or decision of the defendant that is alleged to be discriminatory.[2] Rather, disparate impact analysis is limited to those cases where a defendant's generally applicable policy or practice is being challenged. Furthermore, the challenged policy or practice must be neither discriminatory on its face nor applied in a discriminatory manner, for these situations would

---

**[Section 10:6]**

[1] *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *accord 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 680–81 (D.C. Cir. 2006); *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 574–75, 15 A.D. Cas. (BNA) 32 (2d Cir. 2003); *Oti Kaga, Inc. v. South Dakota Housing Development Authority*, 342 F.3d 871, 883, 92 A.F.T.R.2d 2003-6103 (8th Cir. 2003); *Fair Housing in Huntington Committee Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 366 (2d Cir. 2003); *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 90–91, 150 Ed. Law Rep. 347, 2001-1, 2001-1 Trade Cas. (CCH) ¶ 73127 (2d Cir. 2000); *Pfaff v. U.S. Dept. of Housing and Urban Development*, 88 F.3d 739, 745 (9th Cir. 1996).

[2] *E.g.*, *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 53 (2d Cir. 2002); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Ventura Village, Inc. v. City of Minneapolis*, 318 F. Supp. 2d 822, 827–28 (D. Minn. 2004), aff'd, 419 F.3d 725 (8th Cir. 2005); *Marbly v. Home Properties of New York*, 205 F. Supp. 2d 736, 743–44 (E.D. Mich. 2002). *But see Charleston Housing Authority v. U.S. Dept. of Agriculture*, 419 F.3d 729, 740–42 (8th Cir. 2005) (impact theory prevails in challenge to defendant's decision to empty and demolish single apartment complex).

For this reason, it would generally not be appropriate to apply disparate impact analysis to a perpetuation-of-segregation claim that challenges only a single governmental act or decision. Still, a number of individual exclusionary zoning cases have involved both disparate impact and perpetuation-of-segregation claims. *See, e.g.*, cases cited in notes 18–21, 25, 27, 29–30, and 32 in § 10:4; *see also Affordable Housing Development Corp. v. City of Fresno*, 433 F.3d 1182, 1194–96 (9th Cir. 2006) (ruling that plaintiffs' proof failed in disparate impact claim challenging defendant's rejection of a single housing proposal); *Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1286–88 (11th Cir. 2006) (same); *Fair Housing in Huntington Committee Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 368 n.8 (2d Cir. 2003) (avoiding review of "the question of whether plaintiffs have identified a cognizable policy or practice subject to disparate impact analysis" in the course of affirming denial of plaintiffs' preliminary injunction motion in a perpetuation-of-segregation claim). Perpetuation-of-segregation claims are discussed in § 10:7.

present claims of intentional discrimination.[3]

If a facially neutral policy or practice results in denial of a housing opportunity to a minority plaintiff, then a disparate impact claim may arise. The key questions in such a case will then be whether the impact of the defendant's policy or practice is significantly greater on a class of persons protected by the Fair Housing Act than it is on nonprotected class members, and if so, whether the defendant has provided a sufficiently strong justification for using this policy or practice to overcome the prima facie case that the plaintiff's showing of disparate impact has created.

One of the earliest examples of a disparate impact claim in a Fair Housing Act case occurred in 1984 in *Betsey v. Turtle Creek Associates*.[4] In *Betsey*, the Fourth Circuit held that a landlord's policy of evicting families with children from one of its buildings had "a substantially greater adverse impact on minority tenants" in that building and would therefore violate the Fair Housing Act unless the defendant

---

[3]*See, e.g., Larkin v. State of Mich. Dept. of Social Services*, 89 F.3d 285, 289–90, 17 A.D.D. 867, 1996 FED App. 0211P (6th Cir. 1996); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500–01, 8 A.D.D. 1097 (10th Cir. 1995); *U.S. v. Salvation Army*, 1999 WL 756199 (S.D. N.Y. 1999); *Oconomowoc Residential Programs, Inc. v. City of Greenfield*, 23 F. Supp. 2d 941, 955 (E.D. Wis. 1998); *see also Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 52–53 (2d Cir. 2002); *Pfaff v. U.S. Dept. of Housing and Urban Development*, 88 F.3d 739, 745 (9th Cir. 1996).

This is not to say that it would be inappropriate for a plaintiff to pursue both disparate impact and intentional discrimination ("disparate treatment") claims in the same case, but only that the court in such a case should deal with each of these claims according to its own proper analytical framework. According to the *Bangerter* opinion: "A disparate impact analysis examines a facially-neutral policy or practice, such as a hiring test or zoning law, for its differential impact or effect on a particular group. Disparate treatment analysis, on the other hand, involves differential treatment of similarly situated persons or groups." 46 F.3d at 1501 (quoting *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988)).

[4]*Betsey v. Turtle Creek Associates*, 736 F.2d 983 (4th Cir. 1984). Other examples include *Edwards v. Johnston County Health Dept.*, 885 F.2d 1215, 1223–24 (4th Cir. 1989); *U.S. v. Incorporated Village of Island Park*, 888 F. Supp. 419, 445–48 (E.D. N.Y. 1995); *Fair Housing Council of Orange County, Inc. v. Ayres*, 855 F. Supp. 315 (C.D. Cal. 1994); *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 154–58 (S.D. N.Y. 1989); cases cited in § 10:4 note 42.

could justify it by a showing of "business necessity."[5]

The key to proving a disparate impact claim is statistical evidence showing that the defendant's policy or practice has a greater impact on protected class members than on others.[6] This statistical evidence should generally focus on the relative impact of the defendant's policy or practice on the local population, but nationwide statistics may also be used in exceptional cases.[7] Determining which segment of the local population to focus on depends on the nature of the particular policy or practice that is being challenged; in an eviction case like *Betsey*, for example, the affected group would be the current tenants in the defendant's building, whereas in an admissions case, the affected group might be the entire local housing market.

In *Betsey*, the proof showed that at the time the defendant began to implement its new all-adult policy, 68.3% of the families with children in the building were black or other minority. Even more striking, according to the Fourth Circuit, was the policy's effect on the total number of individuals in the building: 74.9% of the non-whites were given eviction notices, while only 26.4% of the whites

[5]736 F.2d at 988. The *Betsey* case arose before the Fair Housing Act was amended to forbid discrimination against families with children by the 1988 Fair Housing Amendments Act.

[6]Besides *Betsey*, *see Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1217–18 (11th Cir. 2008); *McDonald v. Coldwell Banker*, 543 F.3d 498, 505 n.7 (9th Cir. 2008); *Khalil v. Farash Corp.*, 277 Fed. Appx. 81, 84 (2d Cir. 2008); *Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006); *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 680–81 (D.C. Cir. 2006); *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 575–78, 15 A.D. Cas. (BNA) 32 (2d Cir. 2003); *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 90–91, 150 Ed. Law Rep. 347, 2001-1, 2001-1 Trade Cas. (CCH) ¶ 73127 (2d Cir. 2000); *Langlois v. Abington Housing Authority*, 207 F.3d 43, 49–51 (1st Cir. 2000); *Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243, 1253 (10th Cir. 1995); *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 565–67 (N.D. Tex. 2000); *Hispanics United of DuPage County v. Village of Addison, Ill.*, 988 F. Supp. 1130, 1154–57 (N.D. Ill. 1997); *Summerchase Ltd. Partnership I v. City of Gonzales*, 970 F. Supp. 522, 528–30 (M.D. La. 1997); *U.S. v. Hillhaven Corp.*, 960 F. Supp. 259, 262–63, 22 A.D.D. 980 (D. Utah 1997); *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 154–55 (S.D. N.Y. 1989); *see also Pfaff v. U.S. Dept. of Housing and Urban Development*, 88 F.3d 739, 746 (9th Cir. 1996).

[7]*Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243, 1251–53 (10th Cir. 1995).

received such notices. "Under these circumstances," the Fourth Circuit concluded, "we believe a disparate impact is self-evident."[8]

Not every housing policy or practice that has a discriminatory impact on a group protected by the Fair Housing Act is unlawful.[9] How heavily a challenged practice impacts on

---

[8]736 F.2d at 988. Despite this discriminatory impact, the district court in *Betsey* had ruled for the defendant. It discounted the plaintiffs' proof on the grounds that the defendant's new all-adult policy would not have a *continuing* disproportionate impact on blacks, that the percentage of blacks in the defendant's overall complex of buildings would remain high, and that other blacks in the local community would not be significantly affected by the policy. The Fourth Circuit disagreed, holding that each of these factors was irrelevant to a showing of racially discriminatory impact. Rather, the minority plaintiffs were only required to prove

> that a given policy had a discriminatory impact on them as *individuals* . . . . [P]laintiffs are not required to show a discriminatory impact on anyone but the existing minority residents of Building Three. This simple verity renders consideration of the rest of the "local community," the rest of [the complex], or even prospective applicants for space in Building Three irrelevant.

736 F.2d at 987. Because the defendant had directed its policy only against the residents of Building Three, the racial impact of that policy was to be judged on the basis of statistics from that building alone, and not from the complex as a whole. 736 F.2d at 987–88.

[9]In addition to the "substantial" impact requirement discussed in the remainder of this paragraph, certain policies or practices may simply not be appropriate for a discriminatory impact challenge under the Fair Housing Act. *See, e.g., Knapp v. Eagle Property Management Corp.*, 54 F.3d 1272, 1280 (7th Cir. 1995) (opining that landlords' policy of refusing to accept Section 8 tenants cannot be the basis for holding "them liable for . . . discrimination under the disparate impact theory"); *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529–34 (7th Cir. 1990) (suggesting that racial steering claims under the Fair Housing Act may always require proof of discriminatory intent); *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 575 (6th Cir. 1986) ("absent highly unusual circumstances, the discriminatory effect of a referendum cannot establish a violation of the Fair Housing Act"); *see also Williams v. 5300 Columbia Pike Corp.*, 103 F.3d 122 (4th Cir. 1996) (unpublished opinion holding that "when the alleged injury to a claimant is solely the product of a facially neutral price (e.g., a price that does not vary depending on one's race, handicap or other status protected by the Fair Housing Act), no claim based on disparate impact can be brought under the Fair Housing Act").

With respect to the Fourth Circuit's opinion in *Williams* purporting to protect ability-to-pay requirements from disparate impact challenges, it should be noted that such protection would not extend to a landlord's practice of refusing to rent to applicants who receive public assistance or whose source of income is otherwise not acceptable to the landlord. Indeed, a number of cases have upheld disparate impact challenges to such

minorities compared to how it impacts on others is relevant in determining whether the plaintiff has established a prima facie case.[10] The courts have made clear that the Fair Housing Act prohibits only practices with "significant" discriminatory effects.[11] As noted above, the impact of the defendant's policy in *Betsey* was seen as "substantially greater" on minority tenants than on whites.[12] On the other hand, a number of

---

antiwelfare requirements. *See, e.g., Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 250–51, 36 Fed. R. Serv. 3d 1244 (9th Cir. 1997); *Ryan v. Ramsey*, 936 F. Supp. 417, 426–27, 18 A.D.D. 348 (S.D. Tex. 1996); *HUD v. Ross*, 1994 WL 326437, Fair Housing-Fair Lending Rptr. ¶ 25,075, at p. 25,700 (HUD ALJ 1994).

[10]In making this comparison, courts should focus on the relative *percentages* of protected class members versus nonprotected class members affected by the defendant's policy or practice, as opposed to the *absolute numbers* of these groups who are affected. *See, e.g., Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988) (criticizing the district court for focusing on absolute numbers instead of percentages in evaluating a disparate impact claim). *But see In re Malone*, 592 F. Supp. 1135, 1160–61, (E.D. Mo. 1984), judgment aff'd, 794 F.2d 680 (8th Cir. 1986) (finding insufficient disparate impact despite a greater percentage impact on blacks than whites, because in terms of absolute numbers, more whites than blacks were harmed by the defendant's action); *Summerchase Ltd. Partnership I v. City of Gonzales*, 970 F. Supp. 522, 528–30 (M.D. La. 1997) (same).

[11]*E.g., Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1217 (11th Cir. 2008); *Budnick v. Town of Carefree*, 518 F.3d 1109, 1118–19 (9th Cir. 2008); *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007); *Pfaff v. U.S. Dept. of Housing and Urban Development*, 88 F.3d 739, 745 (9th Cir. 1996); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Southend Neighborhood Imp. Ass'n v. St. Clair County*, 743 F.2d 1207, 1209 (7th Cir. 1984); cases cited in notes 12 and 13.

[12]736 F.2d at 988. *See also Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988) (statistics showing that 28 percent of the minorities and 11 percent of the whites in the area were eligible for the housing blocked by the defendant established that defendant's action "had a substantial adverse impact on minorities"); *Keith v. Volpe*, 858 F.2d 467, 484, 26 Fed. R. Evid. Serv. 1249, 12 Fed. R. Serv. 3d 323 (9th Cir. 1988) (defendant's action had "twice the adverse impact on minorities as it had on whites," because two-thirds of the group eligible for the housing project blocked by the defendant were minorities); *Parks v. Coleman*, Fair Housing—Fair Lending Rptr. ¶ 15,519, at p. 431 (D. Conn. 1984) (defendant's policies directed against public housing residents, 90 percent of whom were black, had an "unmistakably" disproportionate impact on blacks); *Atkins v. Robinson*, 545 F. Supp. 852, 867–68 (E.D. Va. 1982), judgment aff'd, 733 F.2d 318 (4th Cir. 1984)

© 2010 Thomson Reuters/West, 6/2010

cases have concluded that the evidence did not show a large enough discriminatory impact to satisfy the plaintiff's burden of proof.[13] The fair housing decisions as a group have not produced any precise mathematical formula for making this determination.[14]

Once the plaintiff has established a prima facie case of disparate impact, the burden shifts to the defendant to justify the challenged practice. The nature of the defendant's burden of justification has been phrased in different ways by the courts of appeals. The Second Circuit in the *Huntington* case stated that the defendant "must present bona fide and legitimate justifications for its action with no less discriminatory alternatives available."[15] In other cases involving public

---

(blacks comprised over 80 percent of the families needing the kind of housing assistance blocked by the defendant).

[13]*E.g., Khalil v. Farash Corp.*, 277 Fed. Appx. 81, 84 (2d Cir. 2008); *Bonvillian v. Lawler-Wood Housing, LLC*, 242 Fed. Appx. 159, 160 (5th Cir. 2007); *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 575–78, 15 A.D. Cas. (BNA) 32 (2d Cir. 2003); *Gamble v. City of Escondido*, 104 F.3d 300, 306–07, 19 A.D.D. 740 (9th Cir. 1997); *Edwards v. Johnston County Health Dept.*, 885 F.2d 1215, 1223–24 (4th Cir. 1989); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1388–89 (5th Cir. 1986); *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 576 (6th Cir. 1986); *U.S. v. Hillhaven Corp.*, 960 F. Supp. 259, 263, 22 A.D.D. 980 (D. Utah 1997); *Strykers Bay Neighborhood Council, Inc. v. City of New York*, 695 F. Supp. 1531, 1542–43 (S.D. N.Y. 1988); *Almonte v. Pierce*, 666 F. Supp. 517, 528 (S.D. N.Y. 1987); *In re Malone*, 592 F. Supp. 1135, 1160–61, (E.D. Mo. 1984), judgment aff'd, 794 F.2d 680 (8th Cir. 1986); *see also Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1286–88 (11th Cir. 2006) (rejecting plaintiffs' disparate impact claim on the ground that their statistical evidence was not persuasive); *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 90–91, 150 Ed. Law Rep. 347, 2001-1, 2001-1 Trade Cas. (CCH) ¶ 73127 (2d Cir. 2000) (ordering dismissal of plaintiffs' disparate impact claim on the ground that they failed to allege that defendant's policy "has resulted in or predictably will result in under-representation" of plaintiff's religious group).

[14]One rule-of-thumb in Title VII employment discrimination cases is that the selection rate for the protected-class group (e.g., blacks) must be shown to be less than four-fifths (80 percent) of the selection rate for the nonprotected class group (e.g., whites). *See, e.g.*, 29 C.F.R. § 1607.4(D) (EEOC's "Uniform Guidelines on Employee Selection Procedures"). This standard has been considered in some fair housing cases. *See, e.g., Langlois v. Abington Housing Authority*, 207 F.3d 43, 50 (1st Cir. 2000).

[15]*Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988); *accord Affordable Housing Development Corp. v. City of Fresno*, 433 F.3d 1182, 1195 (9th Cir. 2006); *Tsombanidis v. West*

defendants, some circuits have adopted a multifactor approach to determining liability.[16] In *Betsey*, the Fourth Circuit held that this multifactor approach was not appropriate for private defendants, who should be required to "prove a business necessity sufficiently compelling to justify the challenged practice."[17] This "business necessity" test was also adopted in 1995 by the Tenth Circuit in *Mountain Side Mobile Estates v. HUD*[18] and in 1996 by the Ninth Circuit—at

---

*Haven Fire Dept.*, 352 F.3d 565, 575, 15 A.D. Cas. (BNA) 32 (2d Cir. 2003). A similar formulation was adopted by the First Circuit in *Langlois v. Abington Housing Authority*, 207 F.3d 43, 51 (1st Cir. 2000) (defendant must justify a policy with a demonstrated disparate impact "by a legitimate and substantial goal of the measure in question") and by the Third Circuit in a perpetuation-of-segregation claim in *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 149 (3d Cir. 1977) (the defendant's justification "must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII [Fair Housing Act] defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact"). *See also Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Authority*, 417 F.3d 898, 902 (8th Cir. 2005) (describing the defendant's burden as having to "demonstrate that the proposed action has a 'manifest relationship' to the legitimate, non-discriminatory policy objectives and 'is justifiable on the ground it is necessary to' the attainment of these objectives" (quoting *Oti Kaga, Inc. v. South Dakota Housing Development Authority*, 342 F.3d 871, 883, 92 A.F.T.R.2d 2003-6103 (8th Cir. 2003)).

[16]*E.g., Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055, 1065, 11 Fed. R. Evid. Serv. 359, 34 Fed. R. Serv. 2d 1098 (4th Cir. 1982); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *see also Keith v. Volpe*, 858 F.2d 467, 483, 26 Fed. R. Evid. Serv. 1249, 12 Fed. R. Serv. 3d 323 (9th Cir. 1988); *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 575 (6th Cir. 1986). This approach, which was originated by the Seventh Circuit in the *Arlington Heights* case, focuses on a balancing of four factors. These factors are set forth in § 10:7 note 18.

[17]736 F.2d at 988. "The inquiry [when a private defendant is involved] is whether . . . a compelling business necessity exists, sufficient to overcome the showing of disparate impact." 736 F.2d at 988 n.5.

[18]*Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243, 1254 (10th Cir. 1995). In the *Mountain Side* case, HUD's Secretary adopted "business necessity" as the proper test for evaluating a respondent's rebuttal in a disparate impact case, a decision that was endorsed by the Tenth Circuit on appeal. 56 F.3d at 1254. However, in applying this test, the Secretary required the respondent to demonstrate a "compelling need or necessity," a standard that the Tenth Circuit did not approve of. 56 F.3d at 1254–55. In a 2-1 decision, the court of appeals held that a respondent attempting to satisfy the "business necessity" test must demonstarate only that its challenged practice has a "manifest relationship to the housing in question." 56 F.3d

least for all cases other than those involving challenges to a landlord's occupany restrictions—in *Pfaff v. HUD.*[19]

It seems unlikely that these differences in terminology will produce substantially different results in actual cases. Many impact cases under the Fair Housing Act have held that the defendant failed to satisfy its burden of justification,[20] although defendants have prevailed in some cases, particularly those involving challenges to landlords' occupancy restrictions brought on behalf of families with

---

at 1254. While this goes beyond a "mere insubstantial justification," it does not rise to the level of a "compelling need or necessity." 56 F.3d at 1254–55. The majority in *Mountain Side* then went on to hold that the respondent had met this standard by showing that its occupancy restriction, which had been challenged because of its disproportionate impact on families with children, was justified by sewer capacity limitations and concern over quality of life in the respondent's mobile home park. 56 F.3d at 1255–57.

[19]*Pfaff v. U.S. Dept. of Housing and Urban Development*, 88 F.3d 739, 747 (9th Cir. 1996). *But see Affordable Housing Development Corp. v. City of Fresno*, 433 F.3d 1182, 1195 (9th Cir. 2006) (concluding that the "business necessity" standard recognized in *Pfaff* "does not transpose cleanly into the circumstances present here" and holding instead that a municipality may rebut a showing of disparate impact in this type of Fair Housing Act case by showing that "it had a nondiscriminatory, 'legitimate bona fide governmental interest' ") (quoting *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 936 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988)). According to *Pfaff*, "[e]ven if the appropriate standard of rebuttal in disparate impact cases normally requires a compelling business necessity," a less rigorous "reasonableness" standard is appropriate in cases involving impact-based challenges to numerical occupancy restrictions based on the fact that HUD's regulation interpreting this defense requires only that such restrictions be "reasonable." 88 F.3d at 747–49. For a further discussion of *Pfaff* and the "reasonable occupancy standard" defense, see § 9:6 and § 11E:3.

[20]*E.g., Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 939–40 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988); *Keith v. Volpe*, 858 F.2d 467, 484, 26 Fed. R. Evid. Serv. 1249, 12 Fed. R. Serv. 3d 323 (9th Cir. 1988); *Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055, 1065, 11 Fed. R. Evid. Serv. 359, 34 Fed. R. Serv. 2d 1098 (4th Cir. 1982); *Fair Housing Council of Orange County, Inc. v. Ayres*, 855 F. Supp. 315, 318–19 (C.D. Cal. 1994); *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 155–58 (S.D. N.Y. 1989); *Parks v. Coleman*, Fair Housing—Fair Lending Rptr. ¶ 15,519, at pp. 432–33 (D. Conn. 1984); *Atkins v. Robinson*, 545 F. Supp. 852, 879–80 (E.D. Va. 1982), judgment aff'd, 733 F.2d 318 (4th Cir. 1984).

children.[21]

Some of these decisions predated the Supreme Court's holding in *Wards Cove* that a defendant in a disparate impact case under Title VII need only produce a justification that serves its legitimate goals in a significant way.[22] This formulation is more generous to defendants than the lower courts had thought appropriate for Fair Housing Act cases.[23] There may be good reasons why the *Wards Cove* approach should not be applied to the Fair Housing Act.[24] If it is, however, the number of situations in which Fair Housing Act defendants may be expected to prevail in justifying ac-

---

[21]The principal cases involving occupancy restrictions are *Pfaff v. U.S. Dept. of Housing and Urban Development*, 88 F.3d 739, 747–50 (9th Cir. 1996) (described in note 19); *Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243, 1254–57 (10th Cir. 1995) (described in note 18). Other cases in which defendants have successfully justified practices that were being challenged based on their disparate impact include *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Authority*, 417 F.3d 898, 902–06 (8th Cir. 2005); *Oti Kaga, Inc. v. South Dakota Housing Development Authority*, 342 F.3d 871, 883–84, 92 A.F.T.R.2d 2003-6103 (8th Cir. 2003); *U.S. v. Hillhaven Corp.*, 960 F. Supp. 259, 263, 22 A.D.D. 980 (D. Utah 1997); *U.S. v. Weiss*, 847 F. Supp. 819, 830–31 (D. Nev. 1994); *Strykers Bay Neighborhood Council, Inc. v. City of New York*, 695 F. Supp. 1531, 1543 (S.D. N.Y. 1988).

[22]*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 658–61, 109 S. Ct. 2115, 104 L. Ed. 2d 733, 49 Fair Empl. Prac. Cas. (BNA) 1519, 50 Empl. Prac. Dec. (CCH) P 39021 (1989).

[23]The *Wards Cove* approach to the defendant's burden of justification is described in the text accompanying notes 9–12 in § 10:5. *Compare* the Fair Housing Act formulations in notes 15–17 and accompanying text.

[24]*See, e.g., Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148–49 (3d Cir. 1977); Note, Business Necessity in Title VIII: Importing an Employment Discrimination Doctrine into the Fair Housing Act, 54 Fordham L. Rev. 563 (1986). For example, according to this Note:

> The employer has broad areas of legitimate concern; a decision to hire creates a relationship in which highly diverse considerations of safety, efficiency and the worker's skill can be important. In contrast, the variety of situations in the housing context is more limited and relationships are correspondingly more stereotyped. The lessor or seller is principally interested in the applicant's ability to pay. Although a lease creates a relationship, fine points of skill, education and the like are not critical, if important at all.

54 Fordham L. Rev. at 566–67 (footnotes omitted). *See also Hack v. President and Fellows of Yale College*, 237 F.3d 81, 96, 150 Ed. Law Rep. 347, 2001-1, 2001-1 Trade Cas. (CCH) ¶ 73127 (2d Cir. 2000) (Moran, J., dissenting in part) (noting the differences between the employment and housing contexts in connection with determining whether the Title VII standards should govern Fair Housing impact cases).

tions that have a disparate impact on protected-class members may grow.

### § 10:7 Discriminatory effect cases: Violations without a prohibited intent—Perpetuation-of-segregation claims

In addition to disparate impact claims, the Fair Housing Act has also been held to prohibit certain actions that have the effect of perpetuating housing segregation in a community.[1] These claims have generally been made against municipal defendants who are accused of using their zoning or other land-use powers to block construction of integrated housing developments in predominantly white areas. Unlike disparate impact claims,[2] perpetuation-of-segregation claims may be prompted by a particular action or decision of the defendant as well as an across-the-board policy or practice.

Two of the most important appellate cases holding that the Fair Housing Act may be violated when such a fact pattern is presented are the Seventh Circuit's 1977 decision in *Metropolitan Housing Development Corp. v. Village of Arlington Heights*[3] and the Second Circuit's 1988 decision in *Huntington Branch, NAACP v. Town of Huntington*.[4] Both cases specifically recognized that the perpetuation-of-segregation theory is an independent way of establishing a

**[Section 10:7]**

[1] *See, e.g., Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988); *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 987 n.3 (4th Cir. 1984); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d 710, 722 (N.D. Ill. 2003), on reconsideration in part on other grounds, 321 F. Supp. 2d 968 (N.D. Ill. 2004); *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 567–68 (N.D. Tex. 2000); *Keith v. Volpe*, 618 F. Supp. 1132, 1150–51 (C.D. Cal. 1985); *In re Malone*, 592 F. Supp. 1135, 1166 (E.D. Mo. 1984), judgment aff'd, 794 F.2d 680 (8th Cir. 1986); *Summerchase Ltd. Partnership I v. City of Gonzales*, 970 F. Supp. 522, 530–31 (M.D. La. 1997); cases cited in note 15.

[2] *See* note 2 and accompanying text in § 10:6.

[3] *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977).

[4] *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988).

Fair Housing Act violation. According to the *Arlington Heights* opinion, a defendant's housing decision can produce a discriminatory effect "on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups."[5] The *Huntington* opinion agreed, noting that the courts should consider the "segregative effect" of a zoning ordinance that restricts multifamily housing to minority areas and concluding that "recognizing this second form of effect advances the principal purpose of Title VIII [the Fair Housing Act] to promote 'open, integrated residential housing patterns.' "[6]

The legislative history of the 1968 Fair Housing Act supports this view. Proponents of this law were concerned not only with expanding minority housing opportunities, but also with fostering residential integration.[7] The statute's principal sponsor, Senator Mondale, stated that the Fair Housing Act was intended to undo the effects of past governmental discrimination,[8] and he specifically noted how the exclusionary attitude of some municipalities toward subsidized housing had contributed to the segregated housing patterns that the law was designed to eliminate.[9]

The Fair Housing Act's coverage of perpetuation-of-segregation claims is also supported by the legislative history of the 1988 Fair Housing Amendments Act. As noted in § 10:4,[10] the Congress that passed the 1988 Act was aware of the many court decisions endorsing this type of claim and chose not to change the statute's substantive coverage. Indeed, a proposal to overturn some of these decisions by

---

[5]558 F.2d at 1290.

[6]844 F.2d at 937 (quoting *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1134 (2d Cir. 1973)).

[7]*See* § 2:3 and § 7:3 for a discussion of this legislative history.

[8]*See* 114 Cong. Rec. 2698 to 2703 (1968).

[9]According to Senator Mondale:

> Negroes who live in slum ghettos, however, have been unable to move to suburban communities and other exclusively White areas. In part, this inability stems from a refusal by suburbs and other communities to accept low-income housing . . . . An important factor contributing to exclusion of Negroes from such areas, moreover, has been the policies and practices of agencies of government at all levels.

114 Cong. Rec. 2277 (1968).

[10]*See* notes 36–40 and accompanying text in § 10:4.

© 2010 Thomson Reuters/West, 6/2010