adding an intent requirement for claims against local zoning laws was defeated in the House.[11] Furthermore, Congress clearly intended that the 1988 Act's new prohibition against handicap discrimination would allow challenges to municipal actions that "restrict the ability of individuals with handicaps to live in communities,"[12] and it believed this could be accomplished simply by adding "handicap" to the existing substantive provisions of the law.

The Supreme Court has not yet fully endorsed this perpetuation-of-segregation theory, although it did affirm the Second Circuit's decision in the *Huntington* case in a brief per curiam order.[13] Most of the courts of appeals have now decided at least one case involving this type of claim. Their opinions vary somewhat,[14] but all of the circuits that have considered the matter now agree that the Fair Housing Act may be violated by an action that has the effect of perpetuating segregation in a community.[15]

The factual setting of *Arlington Heights*, *Huntington*, and most of the other cases dealing with this type of claim is basically the same (i.e., a zoning decision or other governmental action has prevented the development of housing that would help to integrate a predominantly white area).[16] The starting point for proving this type of claim is statistical evidence

[11]*See* § 10:4 note 37 and accompanying text.

[12]House Report, note 37 in § 10:4, at 24.

[13]*Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988). *See* § 10:4 note 6 and the text accompanying note 26 for descriptions of the Court's opinion in *Huntington*.

[14]*See* notes 16–17 and accompanying text.

[15]In addition to the Seventh Circuit's decision in *Arlington Heights* and the Second Circuit's decisions in *Huntington* (*see* notes 3–6 and accompanying text), *see Keith v. Volpe*, 858 F.2d 467, 482–84, 26 Fed. R. Evid. Serv. 1249, 12 Fed. R. Serv. 3d 323 (9th Cir. 1988); *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 574–75 (6th Cir. 1986); *Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055, 1065, 11 Fed. R. Evid. Serv. 359, 34 Fed. R. Serv. 2d 1098 (4th Cir. 1982); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146–49 (3d Cir. 1977); *U.S. v. City of Black Jack, Missouri*, 508 F.2d 1179, 1184–85 (8th Cir. 1974); *see also U.S. v. City of Parma, Ohio*, 661 F.2d 562, 576 (6th Cir. 1981) (noting that "zoning decisions which have a racially discriminatory effect have been held to violate the Fair Housing Act").

[16]Not all perpetuation-of-segregation claims fit this pattern. For example, it is possible to assert such a claim against a private defendant. *See, e.g., Metropolitan Housing Development Corp. v. Village of Arlington*

10-54

concerning the degree of residential segregation in the area and the likely racial makeup of the proposed development. The other principal element in the case will be an evaluation of the defendant's reasons for opposing development of the integrative housing.

Some courts, like the Second Circuit in *Huntington*, use a two-step approach in analyzing these cases, first considering the effect of the defendant's action on maintaining segregated housing patterns and then, if this effect is large enough, shifting the burden to the defendant to justify its action.[17] Other courts, following the lead of the Seventh Circuit in the *Arlington Heights* case, consider these two matters as part of a four-factor balancing approach to determining liability that does not formally shift the burden of proof.[18]

It is unlikely that these two methods of analysis will produce substantially different results.[19] Both are concerned primarily with the size of the segregative effect caused by the

---

*Heights*, 558 F.2d 1283, 1293 (7th Cir. 1977) (citing *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231 (8th Cir. 1976)).

[17]*Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 937–41 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146–49 (3d Cir. 1977); *U.S. v. City of Black Jack, Missouri*, 508 F.2d 1179, 1184–85 (8th Cir. 1974); *In re Malone*, 592 F. Supp. 1135, 1166 n.21 (E.D. Mo. 1984), judgment aff'd, 794 F.2d 680 (8th Cir. 1986).

[18]The four factors are: (1) the strength of the plaintiff's showing of discriminatory effect; (2) evidence of the defendant's discriminatory intent (though this be insufficient to make out an intentional violation); (3) the defendant's interest in taking the challenged action; and (4) whether the plaintiff seeks to compel the defendant affirmatively to provide housing or merely to refrain from interfering with others who wish to provide housing. *See Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977). Other courts that have employed this analysis include *Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055, 1065, 11 Fed. R. Evid. Serv. 359, 34 Fed. R. Serv. 2d 1098 (4th Cir. 1982); *Atkins v. Robinson*, 545 F. Supp. 852, 866–67 (E.D. Va. 1982), judgment aff'd, 733 F.2d 318 (4th Cir. 1984); *see also Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 575 (6th Cir. 1986) (agreeing with three of the four factors listed in *Arlington Heights* (factors (1), (3), and (4))). Although this approach does not involve a formal shifting of the burden of proof, it does imply in factor (3) that the defendant will have to convince the court of the legitimacy of its interest in opposing integrated housing. *See, e.g., Keith v. Volpe*, 858 F.2d 467, 484, 26 Fed. R. Evid. Serv. 1249, 12 Fed. R. Serv. 3d 323 (9th Cir. 1988).

[19]*See, e.g., Keith v. Volpe*, 858 F.2d 467, 483–84, 26 Fed. R. Evid. Serv. 1249, 12 Fed. R. Serv. 3d 323 (9th Cir. 1988) (affirming district

defendant's action and the legitimacy of the defendant's justifications for that action. If the proof shows only a small segregative effect, then the plaintiff will almost surely lose,[20] regardless of whether the court, as in *Huntington*, treats this matter as a necessary element in the plaintiff's prima facie case or whether the court, as in *Arlington Heights*, treats it as the first of four factors to be considered. On the other hand, in those cases where the defendant's action is shown to have had a substantial segregative effect on the community, the courts have usually found a violation of the Fair Housing Act unless the defendant's justification is extremely strong.

In *Arlington Heights*, for example, the size of the segregative effect was the crucial factor. The defendant, a virtually all-white suburb of Chicago, had refused to approve the necessary zoning for construction of the plaintiff's proposed integrated apartment complex. The Seventh Circuit held that the plaintiff should prevail if the defendant's zoning decision had the effect of totally blocking construction of this housing project in the Village.[21] If such blockage were shown because no other suitable land was available, then two of the four factors relevant to liability would favor the plaintiff. Although this would make for a close case, the court held that close cases under the Fair Housing Act should be decided "in

court's determination that, under both approaches, the defendant-city violated the Fair Housing Act); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148 n.32 (3d Cir. 1977) (decision would be the same using the *Arlington Heights* four-factor approach); *In re Malone*, 592 F. Supp. 1135, 1166 n.21 (E.D. Mo. 1984), judgment aff'd, 794 F.2d 680 (8th Cir. 1986) (the difference between the two approaches "is primarily procedural"); *see also Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 940 (2d Cir. 1988), judgment aff'd in part, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988) (agreeing with *Arlington Heights'* fourth factor that plaintiffs are more likely to prevail when they seek "only to enjoin a municipal defendant from interfering with [their] own plans rather than attempting to compel the defendant itself to build housing").

[20]Perpetuation-of-segregation claims in which the proof failed to show a substantial segregative effect and the court went on to rule against the plaintiff include *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 576–77 (6th Cir. 1986); *In re Malone*, 592 F. Supp. 1135, 1166–68 (E.D. Mo. 1984), judgment aff'd, 794 F.2d 680 (8th Cir. 1986); *Strykers Bay Neighborhood Council, Inc. v. City of New York*, 695 F. Supp. 1531, 1542–43 (S.D. N.Y. 1988).

[21]*Arlington Heights, 558 F.2d at 1294*.

10-56

favor of integrated housing."[22]

The *Huntington* case provides a good example of how courts go about evaluating a defendant's proffered justifications in a perpetuation-of-segregation claim. According to the Second Circuit, once the plaintiff establishes a prima facie case by showing a significant discriminatory effect in such a case, the defendant can prevail only if it "present[s] bona fide and legitimate justifications for its action with no less discriminatory alternatives available."[23] In *Huntington*, the defendant claimed a variety of traffic, safety, and other justifications for its restrictive zoning actions, all of which were held to be inadequate under this standard.[24] In particular, the town's rationale for refusing to allow multifamily housing outside of a predominantly black urban renewal area—that this policy would encourage developers to invest in this depressed area—was held to be inadequate, because the court felt that the restriction was more likely to cause developers to invest elsewhere and because alternative means, such as tax incentives, would be a more effective and less discriminatory way to achieve this goal.[25] On appeal, the Supreme Court avoided the question of whether to endorse this precise analysis, but the Court did agree that the defendant's proffered rationale was inadequate on the record presented.[26]

*Huntington*'s two-step, burden-shifting approach to perpetuation-of-segregation claims follows the analysis used for disparate impact claims discussed in the previous section.[27] If this is appropriate, then the Supreme Court's decision in *Wards Cove* concerning the nature of the defendant's burden in a Title VII disparate impact case may be relevant to perpetuation-of-segregation claims as well as to disparate

---

[22]*Arlington Heights*, 558 F.2d at 1294.

[23]*Huntington*, 844 F.2d at 939.

[24]844 F.2d at 939–41.

[25]844 F.2d at 939.

[26]*Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15, 18, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988).

[27]*See* § 10:6 notes 1–5 and accompanying text and notes 15–20 and accompanying text. *Huntington*, itself, involved both perpetuation-of-segregation and disparate impact claims, and the Second Circuit used the same approach concerning the defendant's burden of proof for both claims. *See Huntington*, 844 F.2d at 939–41.

© 2010 Thomson Reuters/West, 6/2010

impact claims under the Fair Housing Act.[28] However, the arguments against following the *Wards Cove* approach in Fair Housing Act discriminatory effect cases are even stronger in perpetuation-of-segregation claims than in disparate impact claims.[29] This is because the judicial decisions applying the disparate impact theory to the Fair Housing Act have clearly been based on the *Griggs*-Title VII model, whereas the perpetuation-of-segregation theory does not derive from Title VII law. Rather, it is based on the unique legislative history of the Fair Housing Act.[30] This legislative history is not analogous to anything in the legislative history of Title VII and may mean that the defendant's burden in perpetuation-of-segregation claims should not be governed by *Wards Cove*. If *Wards Cove* does control, however, then defendants will have an easier burden of justification in perpetuation-of-segregation claims than they did in the pre-*Wards Cove* era.

---

[28]The *Wards Cove* approach to the defendant's burden of justification is described in the text accompanying notes 9–12 in § 10:5.

[29]*See* note 24 in § 10:6 for authorities that question whether the *Wards Cove* standards concerning the defendant's burden of proof in disparate impact cases should be applied to Fair Housing Act disparate impact claims. *See also* note 16 in § 10:5.

[30]*See* notes 7–12 and accompanying text.

10-58

# Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act

*Robert G. Schwemm and Jeffrey L. Taren\**

ABSTRACT

*For generations, mortgage lending has always been the gateway to the American dream of homeownership, and, historically, has also been characterized by widespread discrimination against racial and ethnic minorities and their communities. Mortgage discrimination in the modern era has often been accomplished through a technique known as discretionary pricing, in which lenders allow their loan officers and brokers to increase borrowers' costs from an objectively determined base rate. In the past decade alone, discretionary pricing has cost minority homeowners billions of dollars in extra payments, which, in turn, has led these minorities to suffer higher foreclosure rates than whites and has reversed recent gains in their homeownership rates.*

*This Article explores the civil rights implications of discretionary pricing, which is currently being challenged in a series of nationwide class-action lawsuits based primarily on the federal Fair Housing Act. We begin with some background on the mortgage industry's performance in recent years and a survey of the evidence of the discrimination that has existed within this industry. We then review current legal responses to this discrimination, with a particular focus on the series of FHA-based class actions that have focused on the racial impact of discretionary pricing. We conclude with a discussion of non-litigation reforms that are also needed to ensure that the home-finance industry provides a less discriminatory marketplace in the future.*

## I. INTRODUCTION

The American home mortgage market's performance in recent years has been a story of heady successes followed by spectacular failures. This article focuses on a widespread practice within the mortgage industry—discretionary pricing—in which lenders allow their loan officers and brokers to increase borrowers' costs above an objectively determined "par" rate. Specifically, we consider whether this practice has a racially discriminatory impact that violates the federal Fair Housing Act ("FHA")[1] or other civil rights laws.

* Robert G. Schwemm is the Ashland-Spears Professor at the University of Kentucky College of Law. Jeffrey L. Taren is an attorney who has served as General Counsel for various Chicago-area fair housing organizations over the past twenty-five years and has litigated some of the leading housing discrimination cases in the Midwest; he is currently plaintiffs' counsel in many of the cases discussed in this Article, including those cited *infra* notes 161, 162, and 164. We thank Sarah Welling for her helpful comments on an earlier draft of this Article and Paul Hancock for his willingness to share the insights and point of view of a defendant's attorney in many of the mortgage pricing cases we discuss.

[1] Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 73 (1968). The FHA, as amended, is codified at 42 U.S.C. §§ 3601–3619 (2006).

The importance of this issue can hardly be overstated.  Apart from the
role that discretionary pricing may have played in exacerbating the collapse
of the country's home-finance system,[2] this practice has resulted in wide-
spread discrimination against African American and Latino borrowers.[3]
These minorities have often been charged substantially higher interest rates
and closing costs than comparable white borrowers, resulting in blacks and
Latinos incurring billions of dollars in extra payments for their mortgages;
this, in turn, has caused them to suffer higher foreclosure rates than whites
and has reversed recent gains in their homeownership rates, thereby substan-
tially reducing minorities' overall wealth.[4]

Discretionary pricing is now being challenged in a series of class-action
lawsuits that are pending in various federal courts throughout the country.[5]
The ultimate resolution of these cases —and particularly how they interpret
the FHA—will establish the regulatory framework for fair lending in the
mortgage industry for years to come.  Whether as a result of these cases or
otherwise, new ways must be found to eliminate the cancer of racial discrim-
ination in the home-finance system.[6]  Our purpose here is to find these new
approaches through detailed examination of the litigation and regulatory re-
sponses to discretionary mortgage pricing, with the ultimate goal of securing
the right of Americans of all racial and ethnic backgrounds to pursue the
dream of homeownership through fair and non-discriminatory financing
techniques.

We begin with some background in Part II, first on the mortgage indus-
try's evolution and performance in recent years and then with a review of the
evidence of discrimination that has existed within this industry.  Part III
deals with the modern legal response to this discrimination, with a particular
focus on the series of FHA-based class actions that are now challenging the

---

[2] These failures, in turn, led to a recession of epic proportions, perhaps the worst since the
Great Depression of the 1930s.  *See infra* Part II.B.

[3] We follow the federal government's nomenclature regarding racial and ethnic groups by
referring to "black" as equivalent to "African American"; "Hispanic" as equivalent to "La-
tino"; and "white" as equivalent to "non-Hispanic white."  *See, e.g.*, U.S. CENSUS BUREAU,
OVERVIEW OF RACE AND HISPANIC ORIGIN (2001); R.B. Avery et al., *New Information Re-
ported under HMDA and Its Application in Fair Lending Enforcement*, 91 FED. RES. BULL.
344, 351–52 (2005) [hereinafter *Fed's New HMDA Report*].

Other racial groups may also be affected by discretionary mortgage pricing.  As a general
matter, Asians seem to be treated similarly as whites, but two other groups—American Indian/
Alaska Native and Native Hawaiian/Other Pacific Islander—do suffer some discrimination,
albeit not to the same degree as blacks and Hispanics.  *See, e.g.*, Federal Reserve reports cited
*infra* note 134.  Reflecting such research, and the FHA litigation that has challenged discre-
tionary pricing, this Article focuses primarily on mortgage discrimination against blacks and
Hispanics.

[4] *See infra* notes 42–47 and accompanying text.  The importance of the issue of mortgage
discrimination is also highlighted by the fact that "the minority share of households [in the
United States] is projected to increase from 29 percent in 2005 to 35 percent in 2020."  *See*
JOINT CTR. FOR HOUS. STUDIES OF HARVARD UNIV., THE STATE OF THE NATION'S HOUSING:
2009, at 5 (2009) [hereinafter 2009 HOUSING].

[5] *See* cases cited *infra* notes 159–166.

[6] For a discussion of some non-litigation ideas on this point, see *infra* Part IV.

racial impact of discretionary pricing policies used by many large mortgage lenders. Part IV discusses non-litigation reforms that will be needed—regardless of how these class action cases are resolved—to ensure that the home-finance industry provides a less discriminatory marketplace in the future.

## II. Discrimination and Other Problems in the Home Mortgage Market

### A. This Decade's Boom-and-Bust Housing Market

Over the past decade, America's housing market has gone from boom to bust. Until 2000, average prices for single-family homes rose in line with median household incomes and general price inflation.[7] Then, in the boom period of 2000–2005, house-price appreciation shot ahead of these benchmarks, outstripping income growth more than six-fold.[8] The national homeownership rate, which fell in the 1980s and early 1990s, rose 4.6 percentage points in the ten-year period ending in 2005[9] to an all-time high of 69.2%.[10] Rates for minorities, which have always been substantially below those for whites,[11] did particularly well during this boom period.[12]

In 2005, U.S. housing prices were rising at their fastest pace since 1978,[13] but then began to stagnate or decline in much of the country.[14] From October of 2005 to January of 2009, the median price of a home fell by 29.8%,[15] and the declines continued in the first half of 2009.[16] Meanwhile, the homeownership rate lost almost two percentage points from its 2005

---

[7] *See* Joint Ctr. for Hous. Studies of Harvard Univ., The State of the Nation's Housing: 2006, at 7 (2006) [hereinafter 2006 Housing].

[8] *Id.*

[9] *See* 2009 Housing, *supra* note 4, at 13.

[10] *See* Press Release, U.S. Department of Commerce, U.S. Census Bureau News: Census Bureau Reports on Residential Vacancies and Homeownership 4 (Feb. 2, 2010) [hereinafter Census-Homeownership], *available at* http://www.census.gov/hhes/www/housing/hvs/hvs.html.

[11] *See infra* note 43 and accompanying text.

[12] *See, e.g.*, Rakesh Kochhar et al., Through Boom and Bust: Minorities, Immigrants and Homeownership i (2009) (reporting that "[f]rom 1995 through the middle of this decade, homeownership rates rose more rapidly among all minorities than among whites"), *available at* http://pewhispanic.org/files/reports/109.pdf.

[13] 2006 Housing, *supra* note 7, at 7. In 2005, inflation-adjusted house prices were up 9.4%, the largest gain in over forty years. *Id.* at 7-8.

[14] U.S. Gov't Accountability Office, Home Mortgage Defaults and Foreclosures: Recent Trends and Associated Economic and Market Developments 32 (2007) [hereinafter GAO Mortgage Report].

[15] 2009 Housing, *supra* note 4, at 8.

[16] *See, e.g.*, Jack Healy, *Declines in Home Prices Are Slowing*, N.Y. Times, Jul. 1, 2009, at B3 (reporting that in April 2009, "home prices in 20 major metropolitan areas fell 18.1 percent from a year ago"). Prices rose later in 2009, but were still well below those of a year earlier. *See, e.g.*, Press Release, S&P Indices, Home Prices Show Sustained Improvement through the Third Quarter of 2009 According to the S&P/Case-Shiller Home Price Indices (Nov. 24, 2009), *available at* http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indi-

peak and fell to 67.3% in the first quarter of 2009, erasing all of the gains since 2000.[17]

The boom's latter phase was fueled by an easing of traditional credit standards.[18] For example, in the two-year period ending in 2005, interest-only home-loans (i.e., loans in which principal payments are deferred for a set number of years) went from being virtually nonexistent to an estimated 20% of the dollar value of all loans and 37% of adjustable rate mortgages.[19] Furthermore, payment-option loans (i.e., loans in which borrowers make minimum payments that are even lower than the interest due and roll the balance into the overall amount owed) accounted for nearly 10% of loan originations in 2005.[20] Lenders also required less documentation of borrowers' income and assets.[21]

The first half of this decade also saw a dramatic increase in "subprime lending." Subprime loans generally refer to first-lien home-loans that have an annual percentage rate ("APR") of at least three percentage points above the rate on U.S. Treasury securities of comparable maturity.[22] Subprime loans, which had accounted for less than 5% of all home-loan originations in 1994, made up 23% of the total mortgage market in 2006.[23] During the 2001–2006 period, subprime mortgage originations grew from $210 billion to $640 billion, with the comparable figure being only $35 billion in 1994.[24]

---

ces/en/us/?indexId=spusa-cashpidff—p-us—— (reporting a 3.1% rise in the recent third quarter and "an 8.9% decline in the third quarter of 2009 versus the third quarter of 2008").

[17] 2009 HOUSING, *supra* note 4, at 16.

[18] *See, e.g.*, GAO MORTGAGE REPORT, *supra* note 14, at 41–42, 44.

[19] 2006 HOUSING, *supra* note 7, at 1, 17. Adjustable rate loans accounted for one-third of home mortgages in 2004. 2009 HOUSING, *supra* note 4, at 19.

[20] 2006 HOUSING, *supra* note 7, at 1–2.

[21] *See, e.g.*, 2006 HOUSING, *supra* note 7, at 17; GAO MORTGAGE REPORT, *supra* note 14, at 41–42, 44. Among the new loan products that mortgage lenders introduced during the boom years were the "stated income" (or "low-doc") loan and the no-document (or "no-doc") loan. These loans charged a premium to borrowers to dispense with traditional creditworthiness verifications (e.g., a pay stub or a tax return). Stated-income loans generally required only that borrowers verbally verified their employment status and income, while no-document loans, as their title suggests, dispensed with virtually all verification of income and assets.

[22] *See infra* notes 130–132 and accompanying text; KOCHHAR ET AL., *supra* note 12, at 13 n.2.

[23] *Fed's New HMDA Report*, *supra* note 3, at 349 (reporting the 1994 figure); Brian M. McCall, *Learning from Our History: Evaluating the Modern Housing Finance Market in Light of Ancient Principles of Justice*, 60 S.C. L. REV. 707, 710 (2009) (reporting the 2006 figure); *see also* AMAAD RIVERA ET AL., FORECLOSED: STATE OF THE DREAM 2008 4–5 (2008) ("Starting in the early 1990s as a small niche market, by 2006 the subprime mortgage industry rose to 20.1% of the market, growing from a $35 billion to a $665 billion-a-year-business."). For more on the history of subprime mortgage lending, see KENNETH TEMKIN ET AL., SUBPRIME MARKETS, THE ROLE OF GSES, AND RISK-BASED PRICING 7–12 (2002).

[24] *See* KEITH ERNST ET AL., STEERED WRONG: BROKERS, BORROWERS, AND SUBPRIME LOANS 6 (2008) (providing the 2006 figure); 2006 HOUSING, *supra* note 7, at 18 (providing the 2001-2005 figures); McCall, *supra* note 23, at 710 (providing the 1994 figure); *see also Examining the Making Home Affordable Program: Hearings Before the Subcomm. on Housing and Community Opportunity of the H. Comm. on Financial Servs.*, 111th Cong. 4 (2009) (testimony of Ellen Harnick, Senior Policy Counsel at the Center for Responsible Lending) (subprime and other nonprime lending "constituted 33.6% of all mortgage production" at its high point in 2006), *available at* http://financialservices.house.gov/hearings_all.shtml. GAO MORT-

Some of these subprime loans included such egregious terms that they were virtually impossible for the borrowers to repay and became known as "predatory" loans.[25] Why would a mortgage lender make loans that borrowers could not repay? Two reasons suggest themselves. First, as long as the value of the underlying homes was appreciating, borrowers could be counted on to re-finance their loans later (with the lender receiving additional fees in connection with the second loan) or, if foreclosure did result, the lender would take possession of properties that might well exceed the amount of the original loans.[26] Second, lenders could sell many of their loans to financial institutions in the secondary market, thereby passing on to others the risk of non-payment by the borrowers.[27]

Use of this latter technique—in which subprime loans were pooled by large secondary buyers for ultimate re-sale to investors as residential mortgage-backed securities ("RMBS") —became known as "securitization."[28] The securitization system allowed for virtually any mortgage to be sold by the originating lender in the secondary market. Government-backed purchasers played a large role in this process,[29] but private investors' market share grew rapidly during the boom years, ultimately surpassing that of the

---

GAGE REPORT, *supra* note 14, at 18 (reporting that, in the 2003–2006 period, subprime loans grew in dollar terms from about 9% to 24% of mortgage originations).

[25] A precise definition of a "predatory" loan is somewhat elusive, but it generally involves one or more highly egregious terms. *See, e.g.*, Kathleen C. Engel & Patricia A. McCoy, *A Tale of Three Markets: The Law and Economics of Predatory Lending*, 80 TEX. L. REV. 1255, 1260 (2002) (describing predatory lending as "a catalogue of onerous lending practices, which are often targeted at vulnerable populations" and listing five practices and terms that, either alone or in combination, mark a loan as predatory). Predatory lending occurs most frequently, but not exclusively, in subprime loans. *Id.* at 1261.

[26] *See, e.g.*, U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., FAIR-LENDING ENFORCEMENT PROGRAM (2001), http://www.usdoj.gov/crt/housing/bll_01.php [hereinafter JUSTICE ENFORCEMENT] ("Some lenders . . . make loans to borrowers whose income level is insufficient to meet the new debt obligations; these loans will inevitably lead to foreclosure or another refinancing transaction that takes even more equity."); Kristen David Adams, *Homeownership: American Dream or Illusion of Empowerment?*, 60 S.C. L. REV. 573, 606 (2009) ("Lenders knew that most of these [subprime adjustable-rate mortgages originated in 2006] were unsustainable at the reset rate and never intended them to perform at that rate; instead, lenders approved the loans with the expectation that they would be refinanced prior to the time of reset.").

[27] *See, e.g.*, GAO MORTGAGE REPORT, *supra* note 14, at 52-53 ("Until the 1990s, lenders held most loans on their balance sheets, so the same entity that originated the loan and created the risk bore the risk[, but in] recent years, lenders and mortgage brokers originated loans that were quickly sold down a chain of aggregators and investors.").

[28] For descriptions of how the modern mortgage securitization system worked, see Engel & McCoy, *supra* note 25, at 1273-74; Kathleen C. Engel & Patricia A. McCoy, *Turning a Blind Eye: Wall Street Finance of Predatory Lending*, 75 FORDHAM L. REV. 2039, 2045-48 (2007).

[29] *See, e.g.*, GAO MORTGAGE REPORT, *supra* note 14, at 19, 49. The government-backed purchasers operating in the secondary mortgage market were the Government National Mortgage Association (a government agency commonly known as "Ginnie Mae") and two government-sponsored enterprises ("GSEs"), the Federal National Mortgage Association (commonly known as "Fannie Mae") and the Federal Home Loan Mortgage Corporation (commonly known as "Freddie Mac"). *See id.* at 3.

governmental entities by 2005.[30] Less-than-prime loans accounted for much of this growth in private securitization; for example, from 2002 to 2006, "the share of private label RMBS comprised of subprime and Alt-A loans increased from 43 percent to 71 percent by dollar volume."[31]

Also during the boom, the role of independent mortgage brokers grew. By one estimate, the number of such brokerage firms rose in the 2000–2004 period from about 30,000 to 53,000, up from only about 7,000 in 1987.[32] In 2005, brokers accounted for about 60% of originations in the subprime market and about 25% in the prime market.[33] Unlike mortgage lenders, mortgage brokers "do not fund loans; they simply identify potential customers, process the paperwork, and submit the loan application to a wholesale lender, which underwrites and funds the mortgage."[34] Also unlike mortgage lenders, brokers are generally not subject to federal regulation.[35]

---

[30] *See id.* at 49; *see also id.* at 38 (noting that "private label securitized mortgages [represented] about 56 percent of RMBS issuances in 2006").

[31] *Id.* at 48. "Alt-A" refers to a middle category of loans between prime and subprime. *Id.* For 2006, one estimate put the amount of subprime mortgage debt held in securities at $825 billion, with an additional $722 billion held in securities backed by Alt-A mortgages. *See* ERIC S. BELSKY & REN S. ESSENE, HARVARD UNIV. JOINT CTR. FOR HOUS. STUDIES, CONSUMER AND MORTGAGE CREDIT AT A CROSSROADS: PRESERVING EXPANDED ACCESS WHILE INFORMING CHOICES AND PROTECTING CONSUMERS 21 (2008), *available at* http://www.jchs.harvard.edu/publications/finance/understanding_consumer_credit/papers/ucc08-1_belsky_essene.pdf.

[32] *See* GAO MORTGAGE REPORT, *supra* note 14, at 53 (giving the figures for the 2000–2004 period); William C. Apgar & Allegra Calder, *The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending*, *in* THE GEOGRAPHY OF OPPORTUNITY: RACE AND HOUSING CHOICE IN METROPOLITAN AMERICA 105 (Xavier de Souza Briggs ed., 2005) (giving the figures of 44,000 for 2002 and 7000 for 1987). The number of mortgage brokers fell dramatically once the housing bubble burst. *See, e.g.*, MORTGAGE BANKERS ASSOC., MORTGAGE BANKERS AND MORTGAGE BROKERS: DISTINCT DIFFERENCES WARRANTING DISTINCT REGULATION 10 (2008), *available at* http://www.nga.org/Files/pdf/0805FORECLOSUREBANKER.pdf [hereinafter MORTGAGE BANKERS/BROKERS] (noting that the figure for 2007 was about 25,000).

[33] GAO MORTGAGE REPORT, *supra* note 14, at 53. Increasingly during this period, subprime lenders came to rely on brokers for mortgage originations. *See, e.g.*, KEITH ERNST ET AL., *supra* note 24, at 6 (reporting that the portion of subprime loans originated by brokers grew from 48% in 2003 to 63%–81% in 2006); MORTGAGE BANKERS/BROKERS, *supra* note 32, at 10 (noting that, at the height of the housing boom, "70 to 80 percent of nonprime loans are estimated to have been mortgage broker originations"). By 2007, one commentator remarked, "Mortgage brokers have become the face of the mortgage lending industry and are often the only person a borrower will ever actually meet in the lifetime of a loan." Christopher L. Peterson, *Predatory Structured Finance*, 28 CARDOZO L. REV. 2185, 2281 (2007).

[34] Apgar & Calder, *supra* note 32, at 105. For a further description of the differences between mortgage brokers and lenders, see MORTGAGE BANKERS/BROKERS, *supra* note 32, at 12–23.

[35] *See, e.g.*, U.S. GOV'T ACCOUNTABILITY OFFICE, FAIR LENDING: DATA LIMITATIONS AND THE FRAGMENTED U.S. FINANCIAL REGULATORY STRUCTURE CHALLENGE FEDERAL OVERSIGHT AND ENFORCEMENT EFFORTS 28–30, 34–35, 63 (2009) [hereinafter GAO FAIR LENDING REPORT]. States may regulate mortgage brokers, but state regulatory and licensing requirements vary substantially. *See, e.g.*, BELSKY & ESSENE, *supra* note 31, at 40 (noting "the lack of serious licensing standards for loan brokers in many states"); ERNST ET AL., *supra* note 24, at 8 (describing a typical state licensing regime for mortgage brokers and concluding that, while all states license brokers, "the breadth and depth of state broker regulation varies considerably"); MORTGAGE BANKERS/BROKERS, *supra* note 32, at 7, 24–25 (describing state licensing laws of

When the housing bubble burst, a huge rise in defaulted mortgages and foreclosures occurred. For example, in 2005, there were some 847,000 fore-closures;[36] in 2009, the number reached 2,400,000, and worse times were predicted to follow.[37] In 2007, the overall default rate grew to "almost a 28-year high."[38] It was worse in 2008, with a 3.3% of all first-lien loans in foreclosure, an increase of 62% in one year.[39] The increase in defaults and foreclosures "has been concentrated among subprime loans."[40] Apart from the devastating human cost represented by these statistics, the financial cost to American households was staggering, as real home equity fell by $2.5 trillion in both 2007 and 2008.[41]

The reversals have been particularly hard on African American and La-tino families and their communities.[42] In 2009, minority homeownership rates fell for blacks to 46.0% (from a peak of 48.6% in 2005) and for His-panics to 48.1% (from a peak of 50.1% in 2007).[43] Moreover, subprime

---

mortgage brokers as "diverse" and "uneven"); Peterson, *supra* note 33, at 2219 n.191 (describing recent research on states' regulation of mortgage brokers).

[36] *See, e.g.*, ELLEN SCHLOEMER ET AL., CTR. FOR RESPONSIBLE LENDING, LOSING GROUND: FORECLOSURES IN THE SUBPRIME MARKET AND THEIR COST TO HOMEOWNERS 7 (2006), *availa-ble at* http://www.responsiblelending.org/mortgage-lending; *see also* GAO MORTGAGE RE-PORT, *supra* note 14, at 21 (providing charts showing default and foreclosure levels from 1979 through 2007).

[37] *See* CTR. FOR RESPONSIBLE LENDING, SOARING SPILLOVER: ACCELERATING FORECLO-SURES TO COST NEIGHBORS $502 BILLION IN 2009 ALONE 1 (2009), *available at* http://www.responsiblelending.org/mortgage-lending (providing the figure for 2009 and projecting that 9 million foreclosures will occur during the 2009–2012 period); *see also* Press Release, Mort-gage Bankers Association, Delinquencies Continue to Climb in Latest MBA National Delin-quency Survey (Nov. 19, 2009) (on file with author) (reporting that, during the third quarter of 2009, more than 14% of borrowers, or about 7.4 million households, were either delinquent on their mortgage (9.6%) or somewhere in the foreclosure process (4.5%), the highest level re-corded since this survey began in 1972, and predicting that the foreclosure and delinquency rates would worsen through early 2010).

[38] GAO MORTGAGE REPORT, *supra* note 14, at 4.

[39] 2009 HOUSING, *supra* note 4 at 19; *see also* KOCHHAR ET AL., *supra* note 12 at v (noting that the "national foreclosure rate tripled from 2006 to 2008, increasing from 0.6% to 1.8%").

[40] GAO MORTGAGE REPORT, *supra* note 14, at 48; *see also id.* at 24 (reporting that, from the second quarter of 2005 through the second quarter of 2007, "subprime loans accounted for 15 percent of loans serviced, but about two-thirds of the overall increase in defaults and fore-closures"); 2009 HOUSING, *supra* note 4, at 1–2 (reporting that "the share of subprime loans entering foreclosure soared to 4.1 percent in 2008 – shattering the 2.3 percent record set in 2001 when the subprime market share was much smaller").

Even before the housing bust, it was well-known that defaults and foreclosures occurred at a disproportionately high rate in subprime loans. *See, e.g.*, JUSTICE ENFORCEMENT, *supra* note 26, at 8 (reporting on two 2000 HUD studies showing a surge in mortgage foreclosures that occurred disproportionately in subprime loans); SCHLOEMER ET AL., *supra* note 36, at 3-4 (summarizing evidence of high and accelerating foreclosure rates in subprime loans issued between 1998 and 2006).

[41] 2009 HOUSING, *supra* note 4, at 13; *see also* Janet L. Yellen, President and CEO, Fed. Reserve Bank of San Francisco, Presentation to Forecasters Club of New York: The Uncertain Economic Outlook and the Policy Responses (Mar. 25, 2009) (noting that families' household wealth had fallen "by $13 trillion – or nearly 25 percent – since the peak in mid-2007"), *avaialable at* http://www.frbsf.org/news/speeches/2009/0325.html.

[42] *See generally* KOCHHAR ET AL., *supra* note 12.

[43] *See* Census-Homeownership, *supra* note 10, at 8. The white homeownership rate in 2009 fell to 74.5% from its high of 76.0% in the 2005–2008 period. *Id.*

home loans, and thus foreclosures, "are heavily concentrated in low-income minority neighborhoods."[44] To make matters worse, the poverty and unemployment rates of minorities are continuously higher than those of whites,[45] and home equity accounts for a disproportionately high portion of the overall wealth of minority families.[46] A 2008 report concluded that "subprime borrowers of color will lose between $164 billion and $213 billion for loans taken during the past eight years," and that this represents "the greatest loss of wealth for people of color in modern US history."[47]

---

[44] 2009 HOUSING, *supra* note 4, at 29. Additionally, "HUD estimates indicate that the median share of high-cost loans issued between 2004 and 2006 in low-income minority census tracts was nearly one-half, while the median share in low-income white neighborhoods was one-third." *Id.*; *see also* GAO MORTGAGE REPORT, *supra* note 14, at 18 (reporting that, in the 2003–2006 period, "the subprime share of the market for home purchase mortgages grew most rapidly in census tracts with lower median incomes and higher concentrations of minorities"); G. THOMAS KINGSLEY ET AL., THE IMPACTS OF FORECLOSURES ON FAMILIES AND COMMUNITIES 13–15 (2009), *available at* http://www.urban.org/UploadedPDF/411909_impact_of_foreclosures.pdf [hereinafter FORECLOSURE IMPACTS] (providing measures showing that the density of subprime lending in predominantly black and Hispanic neighborhoods was much higher than in predominantly white neighborhoods in 2004–2006); RIVERA ET AL., *supra* note 23, at vii ("people of color are more than three times more likely to have subprime loans: high-cost loans account for 55% of loans to Blacks, but only 17% of loans to Whites"); Chris Mayer & Karen Pence, *Subprime Mortgages: What, Where, and to Whom?* 3 (Fed. Reserve Bd. Staff, Working Paper No. 2008-29, 2008), *available at* http://www.federalreserve.gov/pubs/feds/2008/200829/200829pap.pdf (finding that subprime mortgages in 2005 were "concentrated in locations with high proportions of black and Hispanic residents, even controlling for the income and credit scores of these Zip codes"); JUSTICE ENFORCEMENT, *supra* note 26, at 7 (reporting on studies conducted by HUD, Fannie Mae, Freddie Mac, and others showing that: (1) subprime loans are five times more likely in African American neighborhoods than in white neighborhoods; (2) in 1998, subprime loans accounted for 51% of home loans in predominantly African American neighborhoods compared with only 9% in predominantly white areas; and (3) these differences hold regardless of income level (citing, inter alia, U.S. DEP'T OF HOUS. & URBAN DEV., UNEQUAL BURDEN: INCOME AND RACIAL DISPARITIES IN SUBPRIME LENDING IN AMERICA (2000), *available at* http://archives.hud.gov/reports/subprime/subprime. cfm (reporting that, in low-income neighborhoods, 54% of African American borrowers, but only 18% of white borrowers, obtained subprime loans; in moderate-income neighborhoods, the figures were 44% for African Americans and 10% for whites; and in upper-income neighborhoods, the figures were 39% for African Americans and 6% for whites))).

[45] *See, e.g.*, 2009 HOUSING, *supra* note 4, at 19–20. For example, in November 2009, the unemployment rates were 9.3% for whites, 15.6 % for blacks, and 12.7% for Hispanics. *See* News Release, U.S. Dep't of Labor, Bureau of Labor Statistics, Unemployment in November 2009 (Dec. 4, 2009), *available at* http://stats.bls.gov/opub/ted/.

[46] *See, e.g.*, George Lipsitz & Melvin L. Oliver, *Integration, Segregation, and the Racial Wealth Gap*, *in* THE INTEGRATION DEBATE: COMPETING FUTURES FOR AMERICAN CITIES 153 (Chester Hartman & Gregory D. Squires eds., 2009) (noting that home equity accounts for 63% of the total average net worth of black households compared with 38.5% for whites and that blacks "possess just 7 cents for every dollar of net worth that whites possess"); Alan M. White, *Borrowing While Black: Applying Fair Lending Laws to Risk-Based Mortgage Pricing*, 60 S.C. L. REV. 677, 679–80 (2009) (noting the substantial gap in net worth between black and Hispanic households compared to whites and the fact that the "smaller wealth endowment of minority families is also much more concentrated in home values and equity"). In other words, because African Americans and Latinos rely on home equity for their net worth to a far greater extent than whites who have more diverse sources, even an across-the-board loss in home equity has far more devastating consequences for minorities.

[47] RIVERA ET AL., *supra* note 23, at vii, 17.

## B.  The Resulting National Recession and Tightening Credit Markets

The bursting of the housing bubble had a devastating impact on home-lending institutions and, ultimately, the entire national economy.  In 2007, credit rating agencies changed their evaluation methodologies to reflect the worsening performance of subprime loans, which introduced uncertainty about the credit quality of subprime RMBS.[48]  By 2009, investors, "[s]tung by the horrible performance of subprime mortgage pools, . . . essentially stopped buying any mortgage-backed securities that [were] not guaranteed by Fannie Mae, Freddie Mac, or Ginnie Mae."[49]

In 2007, home-loan applications fell 22% and loans fell 25%,[50] while an unprecedented number of mortgage originators "ceased operations because of a bankruptcy or other adverse business event."[51]  The next year was even worse, as loan applications and originations fell sharply from their 2007 levels.[52]  In 2008, subprime loan originations fell to $23 billion, down 88% from the 2007 amount.[53]

---

[48] GAO MORTGAGE REPORT, *supra* note 14, at 50-51.

[49] 2009 HOUSING, *supra* note 4, at 17; *see also id.* (reporting that "[b]etween 2006 and 2008, the Fannie and Freddie share of new mortgage-backed security issuances soared from 40 percent to 74 percent, while the Ginnie Mae share jumped from 4 to 22 percent" and concluding that these three organizations, along with the Federal Housing Administration, "now dominate the market"); Robert B. Avery et al., *The 2008 HMDA Data: The Mortgage Market during a Turbulent Year*, 95 FED. RES. BULL. 7 (2009), *available at* http://www.federalreserve. gov/pubs/bulletin [hereinafter *Fed 2008 HMDA Report*] (reporting that subprime loans sold through the private securitization process fell "from about 10 percent of sold loans in 2006 to less than 1 percent in 2008").

[50] Robert B. Avery et al., *The 2007 HMDA Data*, 94 FED. RES. BULL. 3 (2008), *available at* http://www.federalreserve.gov/pubs/bulletin/2008/articles/hmda [hereinafter *Fed 2007 HMDA Report*].

[51] *Id.* at 2; *see also supra* note 32 and accompanying text; CALIFORNIA REINVESTMENT COALITION ET AL., PAYING MORE FOR THE AMERICAN DREAM: THE SUBPRIME SHAKEOUT AND ITS IMPACT ON LOWER-INCOME AND MINORITY COMMUNITIES 3 (2008), *available at* http:// www.calreinvest.org/system/assets/125.pdf [hereinafter PAYING MORE] (reporting that, from late 2006 through early 2008, 228 mortgage lenders that had made over a million loans nationally "imploded" (i.e., closed, went bankrupt, or were sold)).  In early 2008, the Federal Trade Commission "went so far as to develop a consumer fact sheet called, 'How to Manage Your Mortgage If Your Lender Closes or Files for Bankruptcy.'" *Id.*  For examples of specific mortgage companies that suffered major financial difficulties during the housing bust, see *infra* notes 54-56, 159, 163.

[52] *Fed 2008 HMDA Report*, *supra* note 49, at 2.  The decline in loan originations continued into 2010.  *See, e.g.*, David Streitfeld & Javier C. Hernandez, *New-Home Sales Plunged to Record Low in January*, N.Y. TIMES, Feb. 25, 2010, at B8 (reporting that applications for home-purchase loans dropped in February of 2010 "to the lowest level in 13 years").

[53] *Fed 2008 HMDA Report*, *supra* note 49, at 3; *see also id.* at 30 (describing data "reflecting the collapse of the subprime market" between 2006 and 2008, including the fact that the percentage of borrowers with higher priced loans fell from 20.3 to 3.3 in this two-year period); *Mortgage Lending Reform: A Comprehensive Review of the American Mortgage System: Hearings Before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. on Financial Servs.*, 111th Cong. 3 (2009) (statement of Julia Gordon, Senior Policy Counsel, Center for Responsible Lending) (testifying in early 2009 that "the subprime mortgage market . . . has virtually disappeared" and that all forms of nonprime lending had fallen to only 2.8% of all mortgage production by the fourth quarter of 2008), *available at* http:// www.house.gov/apps/list/hearing/financialsvcs_dem/gordon_testimony_3-11-09_final.pdf.

Losses on subprime loans and other debt-related investments pushed several large financial institutions into bankruptcy, including Lehman Brothers and Countrywide (at one time, the nation's largest originator of subprime home-loans).[54] Without the unprecedented infusion of federal funds that occurred, more surely would have gone under.[55] The federal government took Fannie Mae and Freddie Mac into conservatorship.[56]

Problems emanating from the housing market forced financial institutions to take massive write-downs on their mortgage portfolios, igniting a broader credit crisis.[57] The results for the overall national economy were devastating.[58]

---

[54] As for Lehman, see, e.g., Andrew Ross Sorkin, *Lehman Files for Bankruptcy; Merrill Is Sold*, N.Y. Times, Sept. 14, 2008, at A1. As for Countrywide, after a decade of stunning growth peppered by numerous lawsuits around the country, it imploded in 2007 as many of its mortgage loans went into default, and it was acquired a year later by Bank of America. *See* Ctr. for Responsible Lending, Unfair and Unsafe: How Countrywide's Irresponsible Practices Have Harmed Borrowers and Shareholders 1 (2008), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/unfair-and-unsafe-countrywide-white-paper.pdf. Bank of America soon thereafter accepted some $45 billion in federal bailout funds. *See, e.g.*, Louise Story, *Bank of America Ready to Refund Federal Bailout*, N.Y. Times, Dec. 3, 2009, at B1. Also filing for bankruptcy in 2007 was the nation's second largest subprime lender, New Century Financial Corporation. *See, e.g.*, Zachery Kouwe, *Civil Suit Says Lender Ignored Own Warnings*, N.Y. Times, Dec. 8, 2009, at B1. Among the financial institutions that ceased operations in 2008 were three banks and twelve independent mortgage companies that had accounted in 2007, in the aggregate, for about 5% of all conventional first-line home loans. *See Fed 2008 HMDA Report*, *supra* note 49, at 5.

[55] 2009 Housing, *supra* note 4, at 9. *See generally* U.S. Gov't Accountability Office, Troubled Asset Relief Program: Status of Government Assistance to AIG, GAO-09-975 (2009), *available at* http://www.gao.gov/products/GAO-09-975 (noting that, to address the risks of the failure of American International Group ("AIG"), "the Federal Reserve and Treasury made over $182 billion available to assist AIG between September 2008 and April 2009"); Nick Buckley, *Treasury to Give $3.8 Billion More to GMAC in a Third Taxpayer Bailout*, N.Y. Times, Dec. 31, 2009, at B3 (describing GMAC's latest infusion of federal funds, which totaled over $16 billion); Eric Dash, *Squinting Citigroup Tries to See a Profit*, N.Y. Times, Oct. 16, 2009, at B7 (recounting Citigroup's difficulties in repaying the $45 billion in federal bail-out funds it received in late 2008 and 2009); Eric Dash & Andrew Martin, *Wells Fargo to Repay U.S., a Coda to the Bailout Era*, N.Y. Times, Dec. 15, 2009, at B1 (describing Wells Fargo's announcement that it would repay "the $25 billion it was given to weather the worse financial storm since the Depression").

[56] 2009 Housing, *supra* note 4, at 10. The financial difficulties of Fannie Mae and Freddie Mac continued throughout 2009. *See, e.g.*, Mary Williams Walsh, *Burdens by the Billions*, N.Y. Times, Dec. 17, 2009, at B1.

[57] *See, e.g.*, 2009 Housing, *supra* note 4, at 2.

[58] Entire books have been written about the economic crisis of 2008–2009. *See, e.g.*, Daniel Gross, Dumb Money (2009); Gillian Tett, Fool's Gold (2009); David Wessel, In Fed We Trust: Ben Bernanke's War on the Great Panic (2009). More are sure to come. The depth of this crisis is illustrated by following facts:
- The year 2008 saw a $5.3 trillion plunge in the real value of stocks and mutual funds held by households. *See* 2009 Housing, *supra* note 4, at 13.
- "[P]ersonal bankruptcies nearly doubled from 600,000 in 2006 to 1.1 million in 2008." 2009 Housing, *supra* note 4, at 3.
- In 2009, iconic American companies Chrysler and General Motors were reorganized in bankruptcy proceedings, *see, e.g.*, U.S. Gov't Accountability Office, Troubled Asset Relief Program: Continued Stewardship Needed as Treasury Develops Strategies for Monitoring and Divesting Financial Interest in Chrysler and GM, GAO-10-151 (2009), *available at* http://www.gao.gov/products/GAO-10-151, while numerous state

The economic crisis also resulted in an extreme tightening of available credit for housing. After years of record-breaking home-loan originations, proliferation of new products, and tolerance of low underwriting standards, mortgage lending did an about-face beginning in 2007. In 2008, home-loan originations fell by 33% in real terms and by 62% from their 2003 level.[59] By 2009, most of the subprime market had dried up,[60] and new tight mortgage rules excluded even many potential homebuyers who would have been considered good credit risks by traditional standards a decade ago.[61]

### C.   Discrimination in the Home Mortgage Market

### 1.   Background:  Home-Loan Discrimination in the 20th Century

Racial discrimination has been pervasive within the home-finance industry for much of the twentieth century.[62] In the 1930s, the federal government adopted policies that discouraged Savings and Loan Associations ("S&Ls") from lending in minority neighborhoods.[63] For decades thereafter, S&Ls and other lending institutions refused to provide home loans in these areas or provided them only on the most egregious terms.[64] In addition, appraisal standards explicitly required that the presence of minorities in

---

and local governments flirted with it (the most dramatic example being California, which resorted in mid-2009 to issuing "IOUs" to pay its suppliers and employees), *see* Jesse McKinley, *Budget Deal Ending Need for I.O.U.'s in California*, N.Y. TIMES, Aug. 14, 2009, at A10.

• By 2009, the recession turned back the clock on Americans' personal wealth to 2004 and wiped out a staggering $1.3 trillion as home values shrank and investments withered, with net worth declining by 2.6% in the first three months of the year. ASSOCIATED PRESS (June 12, 2009) (re: Federal Reserve announcement on 6-11-09).

• By October of 2009, the overall unemployment rate had risen to 10.2%, the highest since the early 1980s, with the unemployment-plus-underemployment rate of 17.5% being the highest since the Great Depression of the 1930s, see David Leonhardt, *Jobless Rate Hits 10.2%, With More Underemployed*, N.Y. TIMES, Nov. 7, 2009, at A1, making this "the only recession since the Great Depression to wipe out all jobs growth from the previous business cycle," Peter S. Goodman, *Joblessness Hits 9.5%, Deflating Recovery Hopes*, N.Y. TIMES, July 3, 2009, at A1.

[59] 2009 HOUSING, *supra* note 4, at 17; *see also id.* at 9 (reporting that the shutdown of private mortgage lending was so complete "that 73 percent of the loans originated in 2008 . . . were bought, insured, or guaranteed by a federal agency or by Fannie Mae and Freddie Mac").

[60] *See supra* note 53 and accompanying text.

[61] *See, e.g.*, David Streitfeld, *Tight Mortgage Rules Exclude Even Good Risks*, N.Y. TIMES, July 11, 2009, at A1.

[62] GREGORY D. SQUIRES, CAPITAL AND COMMUNITIES IN BLACK AND WHITE: THE INTERSECTIONS OF RACE, CLASS, AND UNEVEN DEVELOPMENT 67 (1994).

[63] *See, e.g.*, DOUGLAS S. MASSEY & NANCY A. DENTON, AMERICAN APARTHEID: SEGREGATION AND THE MAKING OF THE UNDERCLASS 51-54 (1993).

[64] *See, e.g.*, *id.* at 50–52, 54–55, 105; JOHN YINGER, CLOSED DOORS, OPPORTUNITIES LOST: THE CONTINUING COSTS OF HOUSING DISCRIMINATION 63-85 (1995). For a more recent review of the research on historical redlining, see Amy E. Hiller, *Spacial Analysis of Historical Redlining: A Methodological Exploration*, 14 J. HOUSING RES. 137, 142–44 (2003).

a neighborhood be viewed as a negative factor in evaluating homes for pur-
poses of securing mortgage loans.[65]

The 1968 FHA and then also the 1974 Equal Credit Opportunity Act
("ECOA")[66] banned home-loan discrimination based on race, national ori-
gin, and certain other factors.[67] Passage of these laws, however, did not end
such discrimination. For example, the American Institute of Real Estate Ap-
praisers continued to promulgate race-based appraisal standards until the De-
partment of Justice ("Justice Department") challenged this practice in a
FHA suit concluded in 1977.[68]

The Justice Department did not file any mortgage discrimination cases
in the 1970s and 1980s, and few private cases were brought during this
time.[69] Proof of illegal mortgage discrimination was difficult to obtain. Un-
like FHA rental and sales cases where "testers" could be used to demon-
strate discriminatory behavior by landlords and sales agents,[70] testing in
lending cases is severely limited by the fact that federal law prohibits mis-
representing information on a mortgage application.[71] Thus, unless there

---

[65] See infra note 68 and accompanying text.

[66] 15 U.S.C. §§ 1691-1691f (2006).

[67] 42 U.S.C. § 3605 (2006) specifically outlaws home-loan discrimination, and its other
provisions bar making housing unavailable and discriminatory terms and conditions. 42
U.S.C. §§ 3604(a) and 3604(b) may also be violated by discrimination in mortgage lending.
See, e.g., Beard v. Worldwide Mortgage Corp., 354 F. Supp. 2d 789, 808–09 (W.D. Tenn.
2005) (violation of § 3604(b)); Hargraves v. Capital City Mortgage Corp., 140 F. Supp. 2d 7,
20–22 (D.D.C. 2000) (violation of § 3604(a)). The 1968 FHA outlawed discrimination based
on race, color, national origin, and religion, and the statute was later amended to add sex,
handicap, and familial status to the types of discrimination outlawed. See ROBERT G.
SCHWEMM, HOUSING DISCRIMINATION: LAW AND LITIGATION §§ 11C:1 n.3 (2009) (sex); id.
§ 11D:1 n.1 (handicap); id. § 11E:1 n.1 (familial status).

The ECOA outlaws discrimination in all aspects of credit transactions. See 15 U.S.C.
§ 1691(a) (2006) (includes home loans). See, e.g., Cartwright v. Am. Sav. & Loans Ass'n, 880
F.2d 912, 925–27 (7th Cir. 1989); Markham v. Colonial Mortgage Serv. Co., Assoc., 605 F.2d
566 (D.D.C. 1979). The ECOA bans discrimination based on race, color, religion, national
origin, sex, marital status, age, or the fact that the credit applicant derives income from
any public assistance program or has exercised consumer protection rights. See 15 U.S.C.
§ 1691(a).

[68] See United States v. Am. Inst. of Real Estate Appraisers, 442 F. Supp. 1072, 1076 (N.D.
Ill. 1977), appeal dismissed, 590 F.2d 242 (7th Cir. 1978).

[69] See SCHWEMM, supra note 67, § 18:1 nn.6-10 and accompanying text.

[70] See generally SCHWEMM, supra note 67, § 32:2. Testers are "individuals who, without
an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose
of collecting evidence of unlawful . . . practices." Havens Realty Corp. v. Coleman, 455 U.S.
363, 373 (1982). Apart from their use in FHA litigation, testers have been the basis for three
national studies conducted by HUD to measure the degree of rental and sales discrimination in
the United States. See MARGERY AUSTIN TURNER ET AL., DISCRIMINATION IN METROPOLITAN
HOUSING MARKETS: NATIONAL RESULTS FROM PHASE I HDS 2000 i-ii (2002), available at
http://www.huduser.org/Publications/pdf/Phase1_Report.pdf (describing the HUD studies of
1977, 1989, and 2000).

[71] See Steve Tomkowiak, Using Testing Evidence in Mortgage Lending Discrimination
Cases, 41 URB. LAW. 319, 335–36, 335 n.59 (2009) (referring to the general anti-fraud crimi-
nal statute, 18 U.S.C. § 1001 (2006)).

Unlike HUD's regular use of testing to measure rental and sales discrimination, see supra
note 70, the only example of HUD's relying on testing for mortgage discrimination is a 2002
"pilot" study dealing with the pre-application stage that involved 250 paired tests in Chicago

was direct evidence of discrimination (e.g., a loan officer's race-based comments), a minority plaintiff could only prove discrimination by showing that a lender treated bona fide white applicants better, a daunting task given that the information necessary to make such a showing was usually not readily available to such a plaintiff.

Even if a FHA plaintiff managed to obtain sufficient information to file a complaint and proceed to discovery, there was no guarantee that evidence could be obtained from the defendant-lender's files or other sources to show that the defendant had made loans to comparable white applicants. In the absence of such evidence, courts generally ruled against such a plaintiff's discrimination claim. A classic example was *Simms v. First Gibralter Bank*,[72] where the Fifth Circuit held that a rejected mortgage applicant's proof failed to show intentional discrimination because, although the defendant-bank had clearly treated the plaintiff poorly, there was no "evidence that similar 'non-protected' applications [had] received dissimilar treatment."[73] Put another way, a lending institution's bad treatment of racial minorities does not violate the FHA, absent proof that it approved loans for similarly situated whites while rejecting the plaintiff.[74]

For its part, the Justice Department, prompted by a series of newspaper articles,[75] finally filed its first mortgage discrimination case against Atlanta's Decatur Federal Savings & Loan Association in 1991.[76] Thereafter, the Justice Department's activity in this area accelerated, as it brought sixteen "pattern or practice" cases involving race or national origin discrimination

---

and Los Angeles and found that "African American and Hispanic homebuyers face a significant risk of receiving less favorable treatment than comparable whites when they visit mortgage lending institutions to inquire about financing options." MARGERY AUSTIN TURNER ET AL., OTHER THINGS BEING EQUAL: A PAIRED TESTING STUDY OF MORTGAGE LENDING INSTITUTIONS iii (2002), *available at* http://www.huduser.org/Publications/PDF/aotbe.pdf; *see also* Tomkowiak, *supra* note 71, at 333–35 (describing private testing of mortgage brokers conducted from 2004 to 2006).

[72] 83 F.3d 1546 (5th Cir. 1996).

[73] *Id.* at 1559.

[74] *See, e.g., id.* at 1558 (holding that the plaintiff's evidence of the bank's "arbitrary and unreasonable" conduct toward him was insufficient to create an inference of intentional discrimination, because "he presented absolutely no evidence that other, 'non-protected' applicants or applications were treated any differently around the time of Simms' rejection"). Post-*Simms* cases have followed this same general approach. *See infra* note 244.

For a recent critique of how such "comparable" evidence has been used in intent-based employment discrimination cases, see Charles A. Sullivan, *The Phoenix from the Ash: Proving Discrimination by Comparators*, 60 ALA. L. REV. 191 (2009).

[75] *See* YINGER, *supra* note 64, at 64 (describing Bill Dedman, *The Color of Money*, ATLANTA J.-CONSTITUTION, May 1-5, 1988).

[76] *See* United States v. Decatur Fed. Sav. & Loan Assoc., Case No. 1 92-CV-2198-CAM (N.D. Ga. 1992), *described in* JUSTICE ENFORCEMENT, *supra* note 26, at 3 (noting that this case involved "[d]iscrimination in underwriting—the process of evaluating the qualifications of credit applicants" and was based in part on evidence discovered in the defendant's loan files that "bank employees were providing assistance to white applicants that they were not providing to African American and Hispanic applicants" such as not helping "minority applicants explain negative information on their credit reports and document all of their income").

against home lenders in the 1990s.[77] These cases tended to involve three distinct issues: (1) "redlining," in which the defendant-lenders were accused of refusing to make loans in minority areas that were comparable to white areas where they did business; (2) "underwriting discrimination," in which defendant-lenders like Decatur Federal were accused of denying loans by applying their credit standards more stringently against minorities than whites; and (3) "pricing discrimination," in which the defendant-lenders were accused of allowing their loan officers and brokers to charge discretionary rates and fees that were higher for minorities than similarly creditworthy whites.[78] All of these Justice Department-initiated cases were resolved before trial through consent decrees.[79]

Much of the increased litigation activity in the 1990s could be traced to data produced by lenders pursuant to 1989 amendments to the Home Mortgage Disclosure Act ("HMDA").[80] The 1989 HMDA amendments required most financial institutions to make yearly reports on the number and dollar amount of their mortgage loans and applications "grouped according to census tract, income level, racial characteristics, and gender."[81] The first year for which such data was produced (1990) showed much higher rejection rates for blacks and Hispanics than for whites,[82] a pattern that continued in the succeeding years.[83] Racial disparities in rejection rates shown by these HMDA data, however, could not by themselves prove illegal discrimination. This is because the HMDA data did not measure many of the characteristics of loan applicants that might legitimately be considered in determining creditworthiness, such as their indebtedness and credit history.[84]

---

[77] See, for instance, cases described in JUSTICE ENFORCEMENT, *supra* note 26, at 2–6.

[78] *Id.*

[79] *See id.* The same is true for the few mortgage cases that Justice has filed in the 2000s. *See* SCHWEMM, *supra* note 67, § 18:2 n.24 and accompanying text (discussing Justice's lending litigation during the recent Bush Administration).

[80] 12 U.S.C. §§ 2801–2810 (2006). HMDA was originally enacted in 1975. *See* Pub. L. No. 94-200, 89 Stat. 1125 (1975). HMDA data collection is administered by the Federal Reserve Board. The Fed's HMDA regulations, *see* 12 C.F.R. § 203 (2009), have been amended over the years to require a broad range of information regarding home-loan originations. *See* Press Release, Fed. Reserve Bd. et al., Frequently Asked Questions About the New HMDA Data (Mar. 31, 2005), *available at* http://www.federalreserve.gov/boarddocs/press/bcreg/2005; *infra* notes 130-132 and accompanying text. As of 2008,

> [t]he HMDA data consist of information reported by about 8,600 home lenders, including all of the nation's largest mortgage originators. The loans reported are estimated to represent about 80 percent of all home lending nationwide; thus, they likely provide a broadly representative picture of home lending in the United States.

*Fed 2008 HMDA Report*, *supra* note 49, at 2.

[81] 12 U.S.C. § 2803(b)(4).

[82] *See* Glenn B. Canner & Dolores S. Smith, *Home Mortgage Disclosure Act: Expanded Data on Residential Lending*, 77 FED. RES. BULL. 859, 868–69 (1991) (reporting nationwide rejection rates for conventional home-purchase loans of 33.9% for black applicants, 21.4% for Hispanics, and 14.4% for whites).

[83] *See* SCHWEMM, *supra* note 67, § 18:2 n.13.

[84] *See* Canner & Smith, *supra* note 82, at 875–76; *infra* notes 136-138 and accompanying text.

001613

Nevertheless, HMDA data did provide a way for enforcement agencies and private litigants to focus on lending institutions whose high disparate denial rates suggested the need for more inquiry.[85] As the Justice Department noted with respect to the defendants in its underwriting cases: "Our attention was focused on these institutions by [HMDA] statistics showing that African-American and Hispanic applicants were rejected for mortgage loans at significantly higher rates than were white applicants."[86]

Furthermore, in 1992, an influential study published by the Boston Federal Reserve Bank showed that, even when all of these other legitimate factors were held constant, the rejection rates for blacks and Hispanics were significantly higher than for whites.[87] In 1999, the Urban Institute undertook a comprehensive review of the existing studies to determine whether the fact that minorities were denied mortgages and obtained them on less favorable terms than whites resulted from discrimination or minorities' lower creditworthiness. This lengthy review concluded that "minority homebuyers in the United States do face discrimination from mortgage lending institutions."[88] The Urban Institute report noted that mortgage lending is a multistage process, which includes advertising and outreach; pre-application inquiries; loan approval or denial; terms and conditions; and loan administration.[89] "Discrimination may occur at any of these stages and may take

---

[85] Among the privately initiated FHA cases that relied on HMDA data to accuse a particular mortgage lender of racial discrimination during the 1990s was *Buycks-Robertson v. Citibank Federal Savings Bank*, 162 F.R.D. 322 (N.D. Ill. 1995). In that case, the plaintiffs' "pivotal allegation [wa]s that Citibank gives its loan originators considerable discretion when making loan decisions" and that such "subjective decisionmaking" resulted in the discriminatory denial of "home loans to over 780 African-Americans between 1992 and 1993." *Id.* at 329-30. The HMDA data provided to the court showed that in these two years, "the percentage of loan applications approved by Citibank was far lower in areas where the racial composition of the neighborhood was predominantly African-American than it was in areas where the composition of the neighborhood was predominantly White." *Id.* at 327. "Plaintiffs' theory [wa]s that the HMDA data show that 'as the percentage of minorities in an area increases, the percentage of loans approved decreases, regardless of income.'" *Id.* at 327 n.8. Based on these allegations, the court decided to certify the case as a class action. *Id.* at 328-38. The plaintiffs' lawyers included Barack Obama. *See id.* at 325.

[86] JUSTICE ENFORCEMENT, *supra* note 26, at 3.

[87] *See* Alicia H. Munnell et al., *Mortgage Lending in Boston: Interpreting HMDA Data* (Fed. Reserve Bank of Boston Working Paper No. 92-7, 1992) (finding that the home-loan rejections rates for blacks and Hispanics were 56% higher than for whites in the Boston area, even when all significant nonracial variables were held constant). This study has been severely criticized, but its key findings about the statistical significance of minority status in producing higher home-loan denial rates have been supported by subsequent research. *See, e.g.*, Stephen L. Ross & John Yinger, *Does Discrimination in Mortgage Lending Exist? The Boston Fed Study and Its Critics*, in MORTGAGE LENDING DISCRIMINATION: A REVIEW OF EXISTING EVIDENCE 43-83 (Margery Austin Turner & Felicity Skidmore eds., 1999), *available at* http://www.urban.org/UploadedPDF/mortgage_lending.pdf.

[88] Margery Austin Turner & Felicity Skidmore, *Introduction, Summary, and Recommendations*, in MORTGAGE LENDING DISCRIMINATION: A REVIEW OF EXISTING EVIDENCE 2 (Margery Austin Turner & Felicity Skidmore eds., 1999), *available at* http://www.urban.org/UploadedPDF/mortgage_lending.pdf.

[89] *Id.* at 5-7; *see also* TURNER ET AL., *supra* note 70, at i.

different forms at different stages."[90]  In subsequent years, additional government and private HMDA-based studies continued to find evidence that minorities and minority communities were much more likely to receive subprime loans, ever after controlling for borrowers' income and other risk-related factors.[91]

### 2. Changing Focus:  Credit Scoring, Reverse Redlining, and Other Pricing Issues

As noted above, the home-loan industry underwent numerous changes in the 1990s and the early years of the 21st century, including significant growth in subprime loans and other types of products offered, in the number of independent mortgage brokers, and in the securitization of mortgage loans.[92]  Another major change was the growing use of automated credit scoring systems to evaluate would-be borrowers and, with it, the rise of "risk-based pricing," in which lenders would vary rates and fees for individual loans based on the particular risks that a borrower presented.[93]  Credit scoring—and the resulting individualized pricing system—contrasted with the earlier era, in which:

> lenders offered consumers a relatively limited array of products at prices that varied according to the characteristics of the loan and property but not according to the creditworthiness of the borrower. Effectively, borrowers either did or did not meet the underwriting criteria for a particular product, and those who met the criteria paid about the same price.[94]

---

[90] Turner et al., *supra* note 70, at i; *see also* Turner & Skidmore, *supra* note 88, at 5 ("Home mortgage lending is a complex process, composed of many different decision points and institutional policies.  The potential for discrimination exists at any one or more points along the way. . . .  [A] finding of little or no discrimination at one stage in the process does not necessarily prove the absence of discrimination in the process as a whole."); *id.* at 7–15 (summarizing what then was known about discrimination at each of these stages of the mortgage process).

[91] *See* Debbie Gruenstein Bocian et al., Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages 7 (2006), *available at* http://www.responsiblelending.org/mortgage-lending/research (describing, inter alia, U.S. Dep't of Hous. and Urban Dev. & U.S. Dep't of the Treasury, Curbing Predatory Home Mortgage Lending (2000); Paul Calem et al., *The Neighborhood Distribution of Subprime Mortgage Lending*, 29 J. of Real Estate Finance and Economics 4 (2004)).

[92] *See supra* notes 18–35 and accompanying text.

[93] "Perhaps the most important of these changes [in modern credit markets] is the shift from a credit rationing to a risk-based pricing system.  Prior to 1990, the lending industry rationed credit to prime borrowers using tight underwriting guidelines to assess and control risk.  Today, far fewer applicants are denied credit.  Instead, they are offered credit at higher prices intended to reflect the greater risk posed by these loans. . . .  With these new risk pricing and management tools, subprime lending in the mortgage industry skyrocketed after 2003." Belsky & Essene, *supra* note 31, at 16-17.  For more on the evolution of risk-based pricing in home loans, see Temkin et al., *supra* note 23, at 27-32.

[94] *Fed's New HMDA Report*, *supra* note 3, at 349; *see also* Belsky & Essene, *supra* note 31, at 19 (noting the "increasing reliance on statistical credit scores" in modern credit markets

001615

Among other things, risk-based pricing meant that borrowers whose credit flaws might well have disqualified them under traditional underwriting standards could often obtain mortgages, albeit at higher prices than borrowers with better credit scores.[95]

These changes, in turn, shifted the focus of discrimination problems within the industry. Whereas earlier discrimination had generally taken the form of denying credit to minorities and their communities,[96] the new system had the potential of greatly expanding credit availability, and with less discrimination. As the Justice Department noted in 2001, "[c]redit scoring systems hold out the promise of promoting fairer lending practices because they purport to use objective, mathematical models for identifying and measuring those factors that demonstrably predict credit performance in place of discretionary decision-making that can be infected by bias and discrimination."[97]

This new system, however, could be misused. For one thing, the automated credit models themselves might be based on factors that unfairly impacted minorities.[98] Even if the objective systems were nondiscriminatory, they generally allowed loan officers to "override" their conclusions. While such overrides might be justified in certain situations,[99] the Justice Department in 2000 sued a large southern bank for violating the FHA by allowing its "individual branch loan officers to 'override' automated underwriting decisions [with the result that] African-American applicants were more than three times as likely to be rejected as similarly situated white applicants."[100]

---

and the fact that the "use of credit scores traces back to the 1970s in the case of credit cards, the mid-1990s in the case of auto loans, and the 1990s in the case of mortgage loans, with each taking a number of years before the majority of loan origination decisions involved these scores").

[95] *See, e.g.*, JUSTICE ENFORCEMENT, *supra* note 26, at 6 ("responsible subprime lending serves an important role in the economy by providing access to credit at higher prices to borrowers whose past credit performance or current debt and income status make them higher risks for lenders").

[96] *See supra* notes 62–79 and accompanying text.

[97] JUSTICE ENFORCEMENT, *supra* note 26, at 4.

[98] *See id.* ("Those who develop and use credit scoring models should take care to determine whether individual credit scoring factors or the overall systems have a disparate adverse impact on minority and other borrowers in protected classes and, if they do, whether other factors or formulations with lesser impact can be used with similar capability to predict creditworthiness."); *see also infra* note 278.

[99] *See, e.g.*, JUSTICE ENFORCEMENT, *supra* note 26 (providing the denial of a second loan "to a borrower who previously defaulted on a loan with the bank, even though a passing credit score indicates that the borrower does not currently pose a greater risk of default than other borrowers to whom the bank is lending" as an example of a legitimate reason for an override).

[100] *Id.* (discussing the Justice Department's lawsuit of Deposit Guaranty National Bank, which resulted in a $3 million settlement); *see also* Settlement Agreement, United States v. Deposit Guar. Nat'l Bank, No. 3:99CV670 (S.D. Miss. 1999), *available at* http://www.justice.gov/crt/housing/documents/dgnbsettle.php. Based on this type of case, the Justice Department concluded that:

> lenders must be careful in allowing overrides. Where disproportionate numbers of white applicants are approved for credit despite a failing credit score or disproportionate numbers of minorities are denied credit even with a passing credit score,

Another "modern" type of mortgage discrimination involved targeting minorities and minority neighborhoods for predatory loans. This practice, which came to be known as "reverse redlining," was first the subject of FHA litigation in private suits. For example, in *Hargraves v. Capital City Mortgage Corp.*,[101] the minority plaintiffs alleged that the home loans they received from the defendant not only included predatory terms, but that the defendant focused these loans on African Americans and made a much greater portion of its predatory loans in heavily black areas.[102] In an amicus brief, the Justice Department supported the plaintiffs' view that this behavior violated the FHA,[103] and the district court agreed in a 2000 opinion.[104] The case was then settled,[105] but its conclusion that "reverse redlining" violates the FHA was ultimately endorsed in a number of other decisions, which upheld FHA claims based on lenders' directing their predatory loans to racial minorities, their neighborhoods, or both.[106]

As the *Hargraves* opinion held, predatory lending does not violate the FHA unless it is targeted at a class of persons protected by the statute. Thus, as the Justice Department has noted: "Predatory lending practices sometimes violate the fair lending laws, sometimes violate state and federal con-

---

there is a concern that discrimination may be at work. The concern is heightened when a lender is not documenting the reasons for the overrides or has a large number where no specific rationale is given for an override decision.

*Id.* For a description of other Justice cases alleging FHA violations based on discriminatory overrides, see *infra* notes 110–115 and accompanying text.

[101] 140 F. Supp. 2d 7 (D.D.C. 2000), *motion for reconsideration granted in part and denied in part*, 147 F. Supp. 2d 1 (D.D.C. 2001).

[102] *See id.* at 20–21. Based on many of the same facts alleged in *Hargraves*, the defendant there was also sued by the Federal Trade Commission in 1998 for a variety of unfair trade practices. *See* JUSTICE ENFORCEMENT, *supra* note 26.

[103] *See id.*; *Hargraves*, 140 F. Supp. at 22.

[104] *See id.* at 20–22.

[105] Interview with John P. Relman, Plaintiffs' Counsel in *Hargraves* (Jan. 10, 2010).

[106] *See, e.g.*, Jackson v. Novastar Mortgage, Inc., 645 F. Supp. 2d 636, 646 (W.D. Tenn. 2007) (upholding FHA claim based on defendants' alleged targeting of minority borrowers for predatory mortgage loans); Martinez v. Freedom Mortgage Team, Inc., 527 F. Supp. 2d 827, 833–35 (N.D. Ill. 2007) (upholding FHA and ECOA claims based on defendants' alleged targeting of Hispanics for predatory home loans); Johnson v. Equity Title & Escrow Co. of Memphis, 476 F. Supp. 2d 873, 881 (W.D. Tenn. 2007) (upholding FHA claim based on defendants' alleged targeting of blacks and black neighborhoods for predatory home-improvement loans); Beard v. Worldwide Mortgage Corp., 354 F. Supp. 2d 789, 808–09 (W.D. Tenn. 2005) (upholding FHA claim based on allegation that defendants targeted blacks and black neighborhoods with fraudulent loan practices designed to take away their homes); *see also* M & T Mortgage Corp. v. Miller, 323 F. Supp. 2d 405, 411 (E.D.N.Y. 2004) (upholding, as affirmative defense in mortgage foreclosure case, black borrowers' allegations that their predatory loan violated the FHA); Eva v. Midwest Nat'l Mortgage Banc, Inc., 143 F. Supp. 2d 862, 886–90 (N.D. Ohio 2001) (upholding FHA claim based on allegations that defendants targeted women for predatory home loans); Honorable v. Easy Life Real Estate System, 100 F. Supp. 2d 885, 892 (N.D. Ill. 2000) (holding, in pre-*Hargraves* decision, that "reverse redlining" violates the FHA); McGlawn v. Pa. Human Relations Comm'n, 891 A.2d 757 (Pa. Commw. Ct. 2006) (upholding "reverse redlining" claim under state fair housing law); cases described *infra* note 107 and accompanying text.

sumer protection laws, and sometimes violate both."[107]  An example of both
was a 2001 suit by the Justice Department, HUD, and the Federal Trade
Commission against subprime-lender Delta Funding Corporation, where the
defendant was accused of violating the FHA, ECOA, and consumer protec-
tion laws by "underwriting and funding home mortgage loans with higher
mortgage broker fees for African-American females than for similarly situ-
ated white males, paying kickbacks to brokers to induce them to refer loan
applicants to Delta, and approving loans without regard to the borrower's
ability to repay."[108]

Unlike earlier forms of discrimination, "reverse redlining" does not in-
volve the denial of credit to minorities, but involves "*too much easy access
to high-cost credit*."[109]  The practice of lenders making loans to minorities at
higher prices than to whites was also at issue in three other FHA cases
brought by the Justice Department in the mid-1990s.  All three involved the
discriminatory application of "overages," a pricing system in which a lender
gives discretion to its "employees or brokers to charge rates higher than the
lender's set rates, for which the employees receive additional compensa-
tion."[110]  In two of these cases, the Justice Department alleged that the de-
fendants' "loan officers were charging African-American and/or Hispanic
borrowers higher up-front fees for home mortgage loans than they were
charging to similarly situated white borrowers."[111]  The third case, which
continues to have significance for current lending litigation,[112] alleged that
California's Long Beach Mortgage Company:

> allowed both its employee loan officers and its independent loan
> brokers the discretion to charge borrowers up to 12% of the loan
> amount above the lender's base price. . . .  Younger white male

---

[107] JUSTICE ENFORCEMENT, *supra* note 26.  For a description of predatory lending cases
prosecuted by the Federal Trade Commission and other federal regulatory agencies from 1998
through 2005, see Engel & McCoy, *supra* note 28, at 125–27 n.121.

[108] JUSTICE ENFORCEMENT, *supra* note 26 (describing the Justice Department's lawsuit
against Delta Funding Corporation).  For the settlement in this case, see Settlement Agreement
and Order, United States v. Delta Funding Corp., No. CV 00 1872 (E.D.N.Y. 2000), *available
at* http://www.justice.gov/crt/housing/documents/deltasettle.php.

[109] JUSTICE ENFORCEMENT, *supra* note 26 (emphasis in original).

[110] *Id.*; *see also supra* note 101 and accompanying text.

[111] *Id.* (discussing Department of Justice lawsuits against The Huntington Mortgage Co.
and Fleet Mortgage Corp.).  The Huntington Mortgage Co. and the Fleet Mortgage Corp.
reached settlements with the Justice Department of $420,000 and $4 million, respectively.  *See*
Settlement Agreement, United States v. The Huntington Mortgage Co., No. 1:95 CV 2211
(N.D. Ohio 1995), *available at* http://www.justice.gov/crt/housing/documents/huntingtonset-
tle.php; Settlement Agreement, United States v. Fleet Mortgage Corp., No. CV 96 2279
(E.D.N.Y. 1996), *available at* http://www.justice.gov/crt/housing/documents/fleetsettle.php.

Most mortgage lenders pay their loan officers commissions based upon both the volume of
loans and the net dollar amount of "overages" that the loan officer generates.  Certain cost
adjustments (e.g., those associated with extending a lock-in period or converting a product to a
stated income or no-document loan, *see supra* note 21, or increases in the loan amount and
interest rate to cover closing costs) produce additional income to the lender that may then be
split between the loan officer (as a commission) and her branch office.

[112] *See infra* notes 180–187 and accompanying text.

borrowers got the lowest rates, and older, African-American, sin-
gle women fared the worst. White females, African-American
males and Hispanics fell somewhere in between. The discrimina-
tion was evident with loans made by Long Beach's own officials,
but was even more marked with loans that came through some of
its mortgage brokers. Because Long Beach ultimately was respon-
sible for underwriting all of the loans and allowed the brokers to
charge the discriminatory prices, we asserted that Long Beach was
liable, not only for the alleged discrimination of its own employ-
ees, but also for that of the brokers.[113]

Also during this period, the Justice Department made similar claims of dis-
criminatory pricing in consumer loan cases based on the ECOA.[114]

These pricing cases demonstrated the growing importance of the issue
of whether minorities were receiving loans on equal terms with their white
counterparts. As the Justice Department commented in 2001 with respect to
the "overages" problem: "The use of an employee or broker incentive pro-
gram such as an overage system is not unlawful per se, but it becomes un-
lawful if applied in a manner to extract higher prices from minorities or
women because of their race, national origin or gender."[115]

More generally, the focus of mortgage discrimination cases was shift-
ing from access issues to pricing issues.[116] As one commentator recently put
it: "In the contemporary United States mortgage loan market, the predomi-

---

[113] JUSTICE ENFORCEMENT, *supra* note 26 (discussing Department of Justice lawsuit
against Long Beach Mortgage Co. in the Central District of California in 1960, which resulted
in a settlement requiring the defendant to change its pricing policies and to pay $3 million to
1,200 borrowers who had been given higher-priced loans). *See also* Settlement Agreement
and Order Thereon, United States v. Long Beach Mortgage Co., No. CV-96-159DT (CWx)
(C.D. Cal. 1996), *available at* http://www.justice.gov/crt/housing/documents/longbeachsettle.
php.

Long Beach Mortgage was later taken over by Washington Mutual, one of the nation's big-
gest subprime lenders, which in turn was eventually put into receivership by the FDIC and
taken over by JPMorgan Chase Bank. *See* PAYING MORE, *supra* note 51, at 5–6; Eric Dash &
Andrew Ross Sorkin, *Government Seizes WaMu and Sells Some Assets*, N.Y. TIMES, Sept. 25,
2008, at A1.

[114] *See* JUSTICE ENFORCEMENT, *supra* note 26 (discussing three such cases). In addition,
the Justice Department addressed the "overages" issue in an amicus brief filed in a private,
ECOA-based suit against Nissan Motor Acceptance Corporation, where the plaintiffs alleged
that defendant's "practice of permitting auto dealers, at their discretion, to set finance charges
independent of risk has resulted in African Americans paying higher finance charges." *Id.*
Justice's amicus brief argued that "a lender has a non-delegable duty to comply with ECOA,
and, thus, is liable under ECOA for discriminatory pricing in loans that it approves and funds."
*Id.* (describing Brief of the United States in Support of Plaintiffs' Opposition to Defendant's
Motion for Summary Judgment as Amicus Curiae, Cason v. Nissan Motor Acceptance Corp.,
No. 3-98-0223 (M.D. Tenn. Aug. 1, 2000)). The *Cason* case is further discussed *infra* notes
193 and 247.

[115] JUSTICE ENFORCEMENT, *supra* note 26.

[116] *See, e.g.*, BELSKY & ESSENE, *supra* note 31, at 26 (noting that, while in the past, "dis-
crimination and unfair treatment took the almost exclusive form of discouraging or denying
loan applicants[, n]ow consumers can be victims of discrimination or unfair treatment without
ever having been denied a loan").

nant fair lending issue is no longer denial of loan applications; it is instead the fact that minority homeowners pay much more in interest rates and are much more likely to get risky subprime mortgages that lead to foreclosure."[117]  The next section focuses exclusively on pricing issues and on the principal industry technique—discretionary pricing—that became a primary facilitator of discriminatory mortgage rates.

### 3.  The Role of Discretionary Pricing in Modern Home-Loan Discrimination

Much of the recent discrimination in the home-loan industry can be traced to a technique called "discretionary pricing."  As discussed in the previous section, the Justice Department as early as 1996 charged a California mortgage lender with FHA violations that allegedly resulted from the lender's discretionary pricing system in which it allowed loan officers and brokers to add charges above the defendant's base price.[118]  Despite the obvious dangers of such a system, discretionary pricing became a common practice in which many large mortgage lenders engaged.  In a 2005 report, the Federal Reserve described this practice as follows:

> *Discretionary pricing*.  Many creditors provide their loan officers and agents working on their behalf (for example, mortgage brokers) with rate sheets that indicate the creditors' minimum prices by product (for example, for conventional loans of various types or with various types of government backing), loan characteristics (for example, term to maturity and LTV ratio), and borrower creditworthiness (for example, credit history score and debt-to-income ratio). . . . A loan officer may quote a prospective borrower a price above the rate sheet (sometimes referred to as an "overage"), and if the consumer accepts the price without demanding cash back to offset loan fees or other closing costs, the contract interest rate or loan fees on such "overaged loans" will be higher than they might otherwise have been.[119]

The following steps are involved in this process:  First, a mortgage lender provides its loan officers and affiliated brokers with the training and forms necessary to complete a loan; these include the lender's rate sheets, which list the available prices for specific loan products and for borrowers with particular credit attributes.[120]  Next, the lender evaluates a prospective

---

[117] White, *supra* note 46, at 678; *see also* PAYING MORE, *supra* note 51, at 1 ("In the past, the concern was whether all borrowers were able to obtain loans, and analysis focused on the fact that loan applicants of color were more likely to be denied home loans.  Today, with credit more widely available, the concern is whether certain groups pay more for their loans.").

[118] *See supra* note 113 and accompanying text.

[119] *Fed's New HMDA Report*, *supra* note 3, at 369–70.

[120] For examples of rate sheets, see ERNST ET AL., *supra* note 24, at 37–38 (providing a Countrywide rate sheet from September 2007); SUSAN WOODWARD, A STUDY OF CLOSING

borrower's risk of default based on objective information in the loan-application file (e.g., the borrower's credit score) and determines that the borrower qualifies for a certain risk-based interest rate; this is known as the "par rate," which is the rate at which the lender is willing to make the loan with no additional payment from the borrower.[121]   Finally, the lender authorizes its loan officers and brokers to impose additional charges to this objectively determined par rate.[122]   A 2008 decision upholding a FHA challenge to Countrywide's version of this system described the defendant's pricing policy as follows:

> Countrywide obtains customers' credit information through its loan officers, brokers, or correspondent lenders. Based on these objective criteria, Countrywide computes a "par rate." Agents, brokers, or correspondent lenders at the point of sale, however, are allowed to impose additional charges, fees, and rates that are unrelated to objective risk factors. Countrywide communicates not only the applicable par rates, but also the additional authorized

---

Costs for FHA Mortgages 6 (2008), *available at* http://www.urban.org/publications/411682.html (providing a typical rate sheet from 2000).

   [121] *See supra* text accompanying notes 95–97. The par rate may differ depending on whether the loan is generated by the lender's own loan officers or by outside brokers; in the latter situation, the par rate may be lower, reflecting the lender's lower costs in not having to use its own employees and facilities, but the borrower in a broker-generated loan will have to pay a fee to the broker, either up-front or through a "yield spread premium" that is built into the amount financed.

   A yield spread premium:

   is a payment by a lender to a broker based on the extent to which the interest rate on the loan exceeds a base or 'par' rate. The lender's payment of a yield spread premium to the broker, and the broker's imposition of a higher interest rate, are unrelated to the borrower's creditworthiness.

Steele v. GE Money Bank, No. 08 C 1880, 2009 WL 393860, at *1 n.2 (N.D. Ill. Feb. 27, 2009) (quoting Ware v. Indymac Bank, FSB, 534 F. Supp. 2d 835, 839 (N.D. Ill. 2008)); *see also* Ernst et al., *supra* note 24, at 8 (describing a yield spread premium as "an extra payment that brokers receive from lenders for delivering a mortgage with a higher interest rate than that for which the borrower qualifies"); Mortgage Bankers/Brokers, *supra* note 32, at 16 (describing yield spread premiums as "payments made from the mortgage banker to the broker for origination services . . . based on the rate of the loan and/or other loan pricing features . . . , [which] consumers pay . . . through higher interest rates and higher monthly payments"). For an example of how a yield spread premium works, see Ernst et al., *supra* note 24, at 37–38, app. 1.

   " 'Yield spread premium' is a term usually reserved for brokered transactions. In loans wholly originated by a lender, the same type of premium is usually referred to as an 'overage.'" Gruenstein Bocian et al., *supra* note 91, at 45 n.40. For more on overages, see *supra* notes 100, 110–113 and accompanying text.

   [122] Lenders that use discretionary pricing carry out this policy by, inter alia: (1) providing training, marketing support, loan-related forms, and instructions to help their employees and brokers implement the policy; (2) evaluating and monitoring the brokers' compliance and rewarding them financially for successfully steering clients into loans with higher interest rates; (3) pricing all loans according to this policy; and (4) assuming part or all of the risk on these above-par loans. *See, e.g., Steele,* 2009 WL 393860, at *6.

discretionary charges to its loan officers, brokers, and correspondent lenders through regularly published "rate sheets."[123]

Allowing discretionary add-ons to the par rate results in a pricing system that elevates lender profit and broker compensation above what is justified by economic risk, as loan officers and brokers are incentivized to increase unsuspecting borrowers' costs above par rates.[124]  Both lenders and brokers profit when borrowers pay inflated discretionary rates and fees:  the lenders lock borrowers into higher-than-par interest rates (which, inter alia, may raise their commission-paid loan officers' compensation and increase the value of the loans on the secondary market); and brokers get paid higher fees, up to the maximum amount authorized by the lender.  The extra, unjustifiable charges lead not only to financial hardship for the borrowers, but also to a substantially increased risk of default and foreclosure.  And it is the rare borrower who has the time or sophistication necessary to comparison shop for lower costs after having once gone through the difficult process of applying for a residential loan.

---

[123] Miller v. Countrywide Bank, N.A., 571 F. Supp. 2d 251, 254 (D. Mass. 2008).  As this quote indicates, a lender's mortgages may be originated through "correspondent lenders" as well as through in-house loan officers and independent brokers.  With respect to the former:

> Correspondent lenders typically are smaller financial institutions that operate much like retail lenders in that they take applications and underwrite and fund mortgages. Although loans are funded in the name of the correspondent, they are later sold to a wholesale lender under prearranged pricing and loan delivery terms and in compliance with established underwriting standards.  Brokers, by contrast, do not fund loans; they simply identify potential customers, process the paperwork, and submit the loan application to a wholesale lender, which underwrites and funds the mortgage.

Apgar & Calder, *supra* note 32, at 105.  In the *Miller* case, the named defendants included one of Countrywide's correspondent lenders, Summit Mortgage LLC.  *See infra* note 160.

[124] Discretionary pricing not only allows loan officers and brokers to mark-up the interest rate but also to tack on other discretionary fees and terms such as prepayment penalties.  *See, e.g., Steele*, 2009 WL 393860, at *8 (describing a minority borrower that paid "a $4,900 origination fee and a $995 processing fee to her broker . . . and a $950 administrative fee" to her lender). These additional fees and costs are often folded into the principal being borrowed, so they do not seem as if they are being paid "out-of-pocket" by the borrower.  *See, e.g.*, U.S. DEP'T OF HOUS. & URBAN DEV. & U.S. DEP'T OF THE TREASURY, CURBING PREDATORY HOME MORTGAGE LENDING 9 (2000), *available at* http://www.huduser.org/portal/publications/hsgfin/ curbing.html) [hereinafter HUD-TREASURY REPORT]  ("Financing points and fees may disguise the true cost of credit to the borrower, especially for high interest rate loans.").

This is an inherently unfair system,[125] and one that is designed to steer borrowers with prime credentials into worse-than-prime loans.[126] Furthermore, discretionary pricing predictably leads to racial minorities being charged higher rates and fees for mortgages than similarly-creditworthy whites, as shown by numerous studies dating back to at least 2000.[127] What is more, similar discretionary pricing practices by the car-finance industry were challenged as being racially discriminatory in a series of ECOA-based class actions earlier in this decade.[128]

For its part, the Federal Reserve commented on the risk of such discrimination in a 2005 report:

> Discretionary pricing can be a legitimate business practice and can help ensure that markets allocate resources in the most efficient

---

[125] *See, e.g.*, BELSKY & ESSENE, *supra* note 31, at 4, 27–28, 41–43 (noting ways in which the mortgage market, due to consumers' relative lack of information, falls short of the competitive ideal, resulting in borrowers often paying more than they would in a fairly competitive market); ERNST ET AL., *supra* note 24, at 7 (same); Apgar & Calder, *supra* note 32, at 118–21 (same). One reason underlying the basic unfairness of this market is, as the Federal Reserve Board recently noted in commenting on proposed changes to its consumer protection rules, that borrowers "generally lack expertise in complex mortgage transactions because they engage in such mortgage transactions infrequently." Truth in Lending, 74 Fed. Reg. 43282 (proposed Aug. 26, 2009) (to be codified at 12 C.F.R. § 226). Racial minorities as a group are particularly susceptible to this source of unfairness, because they tend to have less consumer knowledge and experience than whites. *See, e.g.*, Robert B. Avery et al., *Higher-Priced Home Lending and the 2005 HMDA Data*, 84 FED. RESERVE BULL. A123, A127 (2006), *available at* http://www.federalreserve.gov/pubs/bulletin/2006/hmda [hereinafter *Fed 2005 HMDA Report*] (noting that discretionary pricing has a greater impact on "borrowers with less experience in the mortgage market, such as first-time homebuyers, . . . [which] may be correlated with race . . . [because] minorities are disproportionately first-time homebuyers").

[126] As early as 1996, a Freddie Mac study found that 10 to 35% of borrowers who received subprime mortgages may have actually qualified for a prime-rate loan. *See* HUD-TREASURY REPORT, *supra* note 124, at 23 n.6. *See generally* Peterson, *supra* note 33, at 2214–15 n.176 (describing sources showing that a significant percentage of recent subprime borrowers actually qualified for prime loans). According to the Justice Department, the figures in the Freddie Mac study "suggest that conventional lenders are either not fairly serving minority communities and are engaged in redlining or marketing discrimination, or that they are not fairly underwriting loan applications from minorities." JUSTICE ENFORCEMENT, *supra* note 26, at 7.

[127] *See* HUD-TREASURY REPORT, *supra* note 124, at 23–24 (concluding, in a 2000 report, that many people of color could qualify for more affordable loans than they were allowed to receive); *see also* MICHAEL S. BARR ET AL., HARVARD UNIV. JOINT CTR. FOR HOUS. STUDIES, BEHAVIORALLY INFORMED HOME MORTGAGE CREDIT REGULATION 31 (2008), *available at* http://www.jchs.harvard.edu/publications/finance/understanding_consumer_credit/papers/ucc 08-12_barr_mullainathan_shafir.pdf (describing a 2001 study showing that "within the group of borrowers paying yield spread premiums, African Americans paid $474 more for their loans, and Hispanics $590 more, than white borrowers"); *infra* notes 133–135 and accompanying text (describing studies showing that mortgage lenders gave high-cost loans to minorities at a significantly higher rate than they did to comparable white borrowers).

[128] *See, e.g.*, Coleman v. General Motors Acceptance Corp., 220 F.R.D. 64 (M.D. Tenn. 2004); Smith v. Chrysler Fin. Co., No. Civ. A. 00-6003 (DMC), 2003 WL 328719 (D.N.J. Jan. 15, 2003); Cason v. Nissan Motor Acceptance Corp., 212 F.R.D. 518 (M.D. Tenn. 2002); Jones v. Ford Motor Credit Co., No. 00 CIV. 8330 (LMM), 2002 WL 88431 (S.D.N.Y. Jan. 22, 2002); *see also* Kerwin Kofi Charles et al., *Rates for Vehicle Loans: Race and Loan Source*, 98 AM. ECON. REV. 315 (2008) (finding that blacks pay higher rates for new-car financing compared with whites having similar risk profiles).

way.  However, when loan officers are permitted latitude in estab-
lishing prices, the lender runs the risk that differential treatment on
a basis prohibited by law may arise.  Obtaining overages more
often, or in higher amounts, from minority borrowers or targeting
only minorities for overaging may constitute a fair lending viola-
tion unless some legitimate, nondiscriminatory reason exists for
the result.[129]

When the Fed published this report in 2005, it had good reason to be
concerned about pricing discrimination in the home-loan industry.  Three
years earlier, the Fed had amended its HMDA regulations to require that,
beginning in 2004, mortgage lenders report certain information about their
loan prices.[130]  These amendments required reporting of certain "rate-
spread" information regarding a specified set of loans, i.e., first-lien loans
where the difference between the loan's APR and the return on Treasury
certificates of comparable maturity exceeded 3% and second-lien loans
where this spread exceeded 5%.[131]  In covering only these "higher-priced"
loans, the Fed's regulation was designed not to require reporting of the great
majority of prime loans but "would require reporting for about 98 percent of
the subprime loans."[132]

The data produced pursuant to this new requirement have been ana-
lyzed by the Fed staff in yearly reports covering 2004–2008.  For each of
these years, the Fed studies show that black and Hispanic borrowers were far
more likely than whites to receive high-cost loans.[133]  This was true even
after controlling for the borrowers' income and a variety of other non-racial
factors.[134]  Numerous private studies have confirmed that these minorities,

---

[129] *Fed's New HMDA Report, supra* note 3, at 369–70; *see also Fed 2005 HMDA Report,
supra* note 125, at A128–29 (noting that, due to its potential for differential treatment of mi-
norities, discretionary pricing has been identified as a "risk factor" by federal regulators
charged with determining whether lenders are engaging in illegal price discrimination).

[130] *See* Home Mortgage Disclosure, 67 Fed. Reg. 43218 (June 27, 2002) (to be codified at
12 C.F.R. § 203.4) (requires lenders to report the lien status of a loan or application and re-
quires lenders to ask applicants their ethnicity, race, and sex in applications taken by tele-
phone); Home Mortgage Disclosure, 67 Fed. Reg. 30771 (May 8, 2002) (to be codified at 12
C.F.R. § 203.4) (postponing implementation date to ensure faithful industry compliance and
requiring reporters to use 2000 census data instead of 1990 census data to ensure report accu-
racy and usefulness); Home Mortgage Disclosure, 67 Fed. Reg. 7222 (Feb. 15, 2002) (to be
codified at 12 C.F.R. § 203.4) (requires lenders to report the difference between the APR and
the Treasury yield, whether a loan is covered by the Home Ownership and Equity Protection
Act ("HOEPA"), and whether an application or loan involves a manufactured home).

[131] *See* 12 C.F.R. § 203.4(a)(12)(i) (2010).

[132] *Fed's New HMDA Report, supra* note 3, at 349–50.  Effective October 1, 2009, the Fed
made some changes to the definition of the "higher priced" loans required to be reported,
based on the agency's view that this adjusted definition was needed to more effectively capture
the subprime market.  *See* Home Mortgage Disclosure, 73 Fed. Reg. 63329 (Oct. 24, 2008) (to
be codified at 12 C.F.R. § 203.4).

[133] *See Fed 2008 HMDA Report, supra* note 49, at 31–34.

[134] For the years 2004–2007, see *Fed 2007 HMDA Report, supra* note 50, at A139 (con-
cluding that, for conventional home-purchase loans in the second half of 2007, "the gross
mean incidence of higher-priced lending was 29.5 percent for blacks and 9.2 percent for non-

compared to similarly situated white borrowers, were more likely to receive higher-priced loans and mortgages with subprime characteristics, such as prepayment penalties and balloon payments.[135]

---

Hispanic whites" and the results for Hispanics "are similar," though when controlling for borrower-related factors (income, loan amount, location of the property or metropolitan statistical area, presence of a co-applicant, and sex), these differences are reduced by less than 50%); Robert B. Avery et al., *The 2006 HMDA Data*, 93 FED. RES. BULL. A73, A95 (2007) (reporting that, on conventional home-purchase loans, the gross mean incidence of higher-priced lending was 36.0 percentage points higher for African-Americans (53.7%) than for whites (17.7%) and the difference between these two racial groups for refinancing was 27.1 percentage points, with these differences being reduced by less than one-fifth when certain borrower-related factors other than race and lender characteristics were controlled for); *Fed 2005 HMDA Report*, *supra* note 125, at A159 (concluding that, on conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7% for blacks versus 17.2% for whites, with the difference being reduced by only about one-fifth when certain borrower-related factors other than race were controlled for, and reporting similar race-based differences for refinancing loans); *Fed's New HMDA Report*, *supra* note 3, at 376–84, 393 (concluding that, for conventional first-lien home-purchase loans, "the mean unadjusted incidence of higher-priced lending was 32.4 percent for blacks and 8.7 for non-Hispanic whites" and that one-fourth of this difference could not be explained by differences in these groups' economic characteristics).

The methodology used by the Fed to analyze this issue changed somewhat in its study of the 2008 data, but the basic result was the same. *See Fed 2008 HMDA Report*, *supra* note 49, at 62–63 (reporting that, on conventional home-purchase loans, the gross adjusted mean incidence of higher-priced lending was 6.8% higher for African Americans (10.5%) than for whites (3.7%), and the difference between these two racial groups for refinance loans was 15.6%, with these differences being reduced by only about 2% when certain borrower-related factors other than race were controlled).

[135] *See, e.g.*, Debbie Gruenstein Bocian et al., *Race, Ethnicity and Subprime Home Loan Pricing*, 60 J. ECON. & BUS. 110 (2008); *see also* GAO FAIR LENDING REPORT, *supra* note 35, at 3 (noting that various HMDA-based research reports "indicate that on average, African-American and Hispanic mortgage borrowers may pay substantially higher interest rates and fees than similarly situated non-Hispanic white borrowers"). Other recent private studies that support these conclusions include:

- A 2009 study of fourteen major lenders based on the 2006 HMDA data showed that, among high-income borrowers, "African Americans were three times as likely as whites to pay higher prices for mortgages – 32.1 percent compared to 10.5 percent. Hispanics were nearly as likely as African Americans to pay higher prices for their mortgages at 29.1 percent." ANDREW JAKABOVICS & JEFF CHAPMAN, UNEQUAL OPPORTUNITY LENDERS? ANALYZING RACIAL DISPARITIES IN BIG BANKS' HIGHER-PRICED LENDING 1 (2009), *available at* http://www.americanprogress.org/issues/2009/09/pdf/tarp_report.pdf.
- A 2008 study based on the 2006 HMDA found that middle- and upper-income African Americans were at least twice as likely as comparable whites to receive high cost loans in 71.4% of the metropolitan areas examined, and this was also true among low- and moderate-income borrowers in 47.3% of the areas examined. NATIONAL COMMUNITY REINVESTMENT COALITION, INCOME IS NO SHIELD AGAINST RACIAL DIFFERENCES IN LENDING II: A COMPARISON OF HIGH-COST LENDING IN AMERICA'S METROPOLITAN AND RURAL AREAS 3 (2008), *available at* http://www.ncrc.org/images/stories/pdf/research/income%20is%20no%20shield%20ii.pdf.
- A 2007 study of the nation's top residential mortgage lenders by the Association of Community Organizations for Reform Now found that, nationally, African American home purchasers were 2.7 times more likely and Latinos were 2.3 times more likely than white borrowers to be issued a subprime loan. *See* ASS'N OF COMMUNITY ORGANIZATIONS FOR REFORM NOW FAIR HOUSING, FORECLOSURE EXPOSURE: A STUDY OF RACIAL AND INCOME DISPARITIES IN HOME MORTGAGE LENDING IN 172 AMERICAN CITIES 3 (2007), *available at* http://www.acorn.org/fileadmin/

However, as with the earlier HMDA data, the price-related HMDA data cannot, standing alone, show unlawful discrimination. This is because, as the Fed staff regularly points out, many of the factors that affect an individual's creditworthiness and a loan's price (e.g., the borrower's credit score) are not captured or reported in the HMDA data.[136] Because the HMDA data "are not sufficient by themselves for drawing conclusions about . . . the activities of any individual lender,"[137] the Fed has insisted that reliance on the "raw data . . . can lead to inaccurate conclusions, which in turn may be unfair to particular institutions."[138]

Nevertheless, as with earlier HMDA studies, the recent HMDA-based studies dealing with price disparities, while not by themselves establishing unlawful discrimination, might well suggest that certain lenders' pricing behavior warrants further investigation.[139] Indeed, in the wake of its analysis of the 2004 HMDA data, the Fed asked about 200 individual mortgage lenders for explanations of their pricing disparities, and the Justice Department followed up with letters to a number of these lenders seeking further information,[140] although no government-initiated lawsuits ever resulted from these inquiries.[141]

In addition, one private study combined the 2004 HMDA data with another data set that did take into account borrowers' credit scores and other relevant underwriting factors and found that, for many types of loans, blacks and Latinos "were more than 30 percent more likely to receive a higher rate loan than white borrowers, even after accounting for differences in risk."[142]

---

HMDA/2007/HMDAreport2007.pdf. For refinance loans, this study found that, nationally, African Americans were 1.8 times more likely and Latinos were 1.4 times more likely than white borrowers to be issued a subprime loan. *Id.* These racial disparities were found to persist even among borrowers of the same income level. *Id.*

[136] *See, e.g., Fed 2008 HMDA Report, supra* note 49, at 31, 36; *Fed's New HMDA Report, supra* note 3, at 345, 393.

[137] *Fed's New HMDA Report, supra* note 3, at 345.

[138] *Id.* at 393.

[139] *See Fed 2008 HMDA Report, supra* note 49, at 31 (noting that, while it is impossible "to determine from HMDA data alone whether racial and ethnic pricing disparities reflect illegal discrimination . . . [,]analysis using the HMDA data can account for some factors that are likely related to the lending process . . . [and can] be viewed as suggestive"); *see also id.* at 36 (noting that, because differences in loan prices may "be due to discriminatory treatment of minorities or other actions by lenders, . . . [t]he HMDA data are regularly used to facilitate the fair lending examination and enforcement processes" and that federal banking agencies' examiners "analyze HMDA price data in conjunction with other information and risk factors" in evaluating whether financial institutions have fair lending problems).

[140] *See* SCHWEMM, *supra* note 67, § 18:2 text accompanying nn.18-19.

[141] *See* SCHWEMM, *supra* note 67, § 18:2 n.23; *see also Community and Consumer Advocates' Perspective on the Obama Administration's Financial Regulatory Reform Proposals: Hearing Before the H. Financial Servs. Comm.*, 111th Cong. 15 (2009) (testimony of John Taylor, President and CEO of the Nat'l Cmty. Reinvestment Coal.), *available at* http://financialservices.house.gov/hearings_all.shtml [hereinafter *Taylor Testimony*] ("Shockingly, not a single case of discrimination or civil rights violations have arisen from the roughly 470 Federal Reserve referrals.").

[142] GRUENSTEIN BOCIAN ET AL., *supra* note 91, at 3.

The racial disparities found were "large and statistically significant."[143] This study posited several possible causes for these disparities, one of which was "the considerable leeway mortgage originators have to impose charges beyond those justified by risk-based pricing."[144]

Other private studies also focused on specific lenders' HMDA data. According to one of these, the 2005 HMDA data of seven large national lenders that originated a substantial volume of both prime and subprime loans—Citigroup, Countrywide, GMAC, HSBC, JP Morgan Chase, Washington Mutual, and Wells Fargo—showed that these lenders, both individually and as a group, provided blacks and Latinos with higher-cost loans far more often than they provided such loans to whites.[145] Such large lenders have accounted for a huge share of the overall subprime mortgage market.[146] As we shall see, many of these same lenders ultimately became the principal defendants in privately initiated class actions challenging their discriminatory pricing.[147]

### III.   The Legal Response to Discriminatory Pricing

#### A.   Overview

As mortgage defaults and home foreclosures accelerated in recent years, a variety of legal theories were used to try to protect borrowers from losing their homes. These included state consumer protection and fraud laws to challenge predatory loans[148] and federal statutes designed to protect borrowers against unfair lending practices.[149] Some complaints alleged race or national origin discrimination in violation of the FHA, ECOA, and their

---

[143] *Id.*

[144] *Id.* at 5.

[145] *See* Paying More, *supra* note 51, at i (reporting that, for these seven lenders in the six metropolitan areas studied, "the percentage of total home purchase loans to African Americans that were higher-cost was 6 times greater than the percentage of higher cost home purchase loans to whites in the same cities (41.1 percent vs. 6.9 percent). The percentage of total home purchase loans to Latinos that were higher-cost was 4.8 times greater than the percentage of higher cost home purchase loans to whites (32.8 percent vs. 6.9 percent). In each of the cities examined, the seven lenders combined showed larger African American/white and Latino/white disparities than those exhibited for the overall lending market.").

[146] *See, e.g.*, *Fed 2005 HMDA Report*, *supra* note 125, at A146 (reporting that, in 2005, "the ten lenders with the largest volume of higher-priced loans extended 59 percent of all such loans, a share that had increased from 38 percent in 2004").

[147] *See infra* notes 159–166 and accompanying text.

[148] *See, e.g.*, cases cited in Schwemm, *supra* note 67, § 18:1 n.34; *see also* Commonwealth v. Fremont Inv. & Loan, 897 N.E.2d 548 (Mass. 2008) (enjoining lender's foreclosure proceeding based on state unfair trade law, Massachusetts Predatory Home Loan Practices Act, in case involving an alleged predatory loan); Engel & McCoy, *supra* note 28, at 2090–93 (describing state and local anti-predatory lending statutes and ordinances).

[149] *See, e.g.*, Schwemm, *supra* note 67, § 18:1 n.35 (describing cases that included claims under the Truth in Lending Act ("TILA"), the Real Estate Settlement Procedures Act, the Home Ownership and Equity Act ("HOEPA"), the Credit Repair Organizations Act, and the Racketeer Influenced and Corrupt Organizations Act).

state-law counterparts.[150]  Often a borrower would include multiple claims, some involving civil rights laws and others not requiring a showing of discrimination.[151]

For the most part, these cases pitted individual borrowers against their lenders, with the litigation seeking to block a foreclosure, rescission or reformation of the loan, and/or other individualized relief.  A few cases alleged that predatory lenders engaged in "reverse redlining" by targeting minority neighborhoods, but even these cases generally sought only relief from the particular loans involved and prohibitory injunctions against the specific lenders that had made them.[152]

Civil rights litigation seeking institutional relief in this area has been rare.  Apart from the class actions discussed below, only a handful of major private suits have been filed; these include two directed at race-based predatory lending[153] and one accusing two major lenders of forcing blacks into subprime mortgages while giving lower rates to similarly situated whites.[154]  For its part, the Justice Department brought far fewer FHA mortgage cases during the recent Bush Administration than in the 1990s.[155]  Thus, the class

---

[150] *See, e.g.*, McGlawn v. Pennsylvania Human Relations Comm'n, 891 A.2d 757 (Pa. Commw. Ct. 2006) (described *supra* note 106); Schwemm, *supra* note 67, § 18:3 n.13; Press Release, Illinois Attorney General, Madigan Sues Wells Fargo for Discriminatory and Deceptive Mortgage Lending Practices (July 31, 2009), *available at* http://www.ag.state.il.us/pressroom/2009_07/20090731.html (describing state-court case alleging violations of, inter alia, Illinois civil rights law based on a mortgage lender providing African Americans and Hispanics with higher priced loans than comparable white borrowers).

[151] *See, e.g.*, Whitley v. Taylor Bean & Whitacker Mortgage Corp., 607 F. Supp. 2d 885 (N.D. Ill. 2009) (upholding most of black homeowners' claims of predatory lending under a variety of federal statutes and state-law theories).

[152] *See, e.g.*, "reverse redlining" cases described in Schwemm, *supra* note 67, § 18:3 n.13.

[153] *See* Mayor of Baltimore v. Wells Fargo Bank, 677 F. Supp. 2d 847 (D. Md. 2010) (granting sole defendant's motion to dismiss FHA claim based on its alleged predatory lending within Baltimore, but allowing plaintiffs to amend their complaint to cure perceived deficiencies); NAACP v. Ameriquest Mortgage Co., 635 F. Supp. 2d 1096 (C.D. Cal. 2009) (denying defendants' motion to dismiss nationwide class action brought by the NAACP against numerous mortgage lenders accused of predatory lending in violation of the FHA and other laws); *see also* City of Cleveland v. Ameriquest Mortgage Sec., Inc., 621 F. Supp. 2d 513 (N.D. Ohio 2009) (dismissing city's claim that defendants' predatory lending activities violated state nuisance law); Michael Powell, *Memphis Accuses Wells Fargo of Discriminating Against Blacks*, N.Y. Times, Dec. 31, 2009, at A15 (describing Baltimore-like suit brought in late 2009 by Memphis officials against a single lender).

For a description of the Baltimore case by one of the plaintiff's lawyers, see John P. Relman, *Foreclosures, Integration, and the Future of the Fair Housing Act*, 41 Ind. L. Rev. 629, 632-43 (2008).

[154] *See* Class Action Complaint, NAACP v. Wells Fargo Bank, N.A., No. CV09-01758 DDP (JCx) (C.D. Cal. Mar. 13, 2009), *available at* http://www.naacp.org/news/press/2009-03-13/Original.complaint.against.Wells.Fargo.Bank.Wells.Fargo.Home.Mortgage.pdf.

[155] *See* Schwemm, *supra* note 67, § 18:2 nn.21–24 and accompanying text; *see also* GAO Fair Lending Report, *supra* note 35, at 53–58 (surveying Justice Department and Federal Trade Commission ("FTC") suits in the 2005–2009 period and finding only one race-based pricing case brought by Justice and two by the FTC). *See generally* Charlie Savage, *Report Examines Civil Rights Enforcement During Bush Years*, N.Y. Times, Dec. 3, 2009, at A26 (describing GAO report finding a significant drop in the enforcement of major anti-discrimination laws during the Bush Administration).

actions appear to be the principal effort designed to bring about nationwide systemic change in the modern home-finance industry, at least apart from non-litigation efforts such as legislative reform relating to this industry.[156] These class-action lawsuits are examined in detail in the remainder of Part III, while non-litigation efforts are discussed in Part IV.

## B.  *Class Action Cases Challenging Discretionary Pricing*

### 1.  *The Basic Claim*

Beginning in 2007, a series of lawsuits challenging the discretionary pricing policies of many of the largest mortgage lenders were brought in various federal courts throughout the country.[157]  All of the suits are putative nationwide class actions brought on behalf of African American and Hispanic homeowners that allege the defendants engaged in race and national origin discrimination in originating, funding, acquiring, and servicing residential mortgage loans in violation of the FHA and ECOA.[158]  The basic allegations are similar in all of the cases, but each was brought against only a single lender (sometimes along with its affiliated corporate partners).  The lenders sued include Accredited Home Lenders;[159] Countrywide;[160] GE

---

[156] For examples of such legislative activity, see *infra* notes 281–282 and accompanying text.

[157] *See* cases cited *infra* notes 159–166.  The earliest of these suits was filed on July 12, 2007.  *See* Miller v. Countrywide Bank, N.A., 571 F. Supp. 2d 251, 261 (D. Mass. 2008). Most of the rest were filed later in 2007 or in early 2008, but at least one was filed as late as April of 2009.  *See* Watson v. Homecomings Financial, LLC, No. 09-859 (DWF/JJG), 2009 WL 3517837, at *2 (D. Minn. Oct. 23, 2009).

[158] For a representative complaint, see Class Action Complaint, Guerra v. GMAC LLC, No. 208CV01297 (E.D. Pa. July 22, 2008) [hereinafter Guerra Complaint].  The specific provisions in the FHA and ECOA that ban mortgage discrimination are described *supra* note 67.

[159] *See* Taylor v. Accredited Home Lenders, Inc., 580 F. Supp. 2d 1062 (S.D. Cal. 2008). The defendants named in this case are Accredited Home Lenders, Inc. ("AHL") and Accredited Home Lenders Holding Company, id. at 1064, both of which filed for bankruptcy in 2009. *Accredited Home Lenders Holding Co.*, Hoovers Company Basic Records, July 8, 2009, *available at* 2009 WLNR 12984795.  Founded in 1990, AHL enjoyed spectacular growth for many years as an originator of subprime mortgages, providing some $2 billion of such loans annually at the height of the real estate bubble.  *See* Jason Cornell, *Accredited Home Lender Files for Bankruptcy and Lists Repurchaser Claims as its Largest Creditors*, Delaware Bankruptcy Litigation, May 10, 2009, http://delawarebankruptcy.foxrothschild.com (search for "AHL").

[160] *See Miller*, 571 F. Supp. 2d at 251; Garcia v. Countrywide Fin. Corp., No. EDCV 07-1161-VAP (JCRx), 2008 U.S. Dist. LEXIS 106675 (C.D. Cal. Jan. 17, 2008).  In the former case, the named defendants are Countrywide Bank, N.A., Countrywide Home Loans, Inc., two of their wholly owned subsidiaries (Countrywide Correspondent Lending and Full Spectrum Lending, Inc.), a correspondent lender (Summit Mortgage LLC), and a mortgage broker (Loans for Residential Homes Mortgage Corp.).  *See Miller*, 571 F. Supp. 2d at 251; Class Action Complaint ¶¶ 10–16, Miller v. Countrywide Bank, N.A., No. 07CV11275 (D. Mass. July 12, 2007).  In the *Garcia* case, the two named defendants are Countrywide Financial Corporation and Countrywide Home Loans, Inc.  *Garcia*, 2008 U.S. Dist. LEXIS 106675 at *2.  Countrywide went bankrupt in 2007 and was taken over by Bank of America in 2008.  *See supra* note 54.

Money Bank;[161] GMAC;[162] GreenPoint Mortgage Funding;[163] HSBC North American Holdings and its lending subsidiaries;[164] H & R Block's two mortgage subsidiaries, H & R Block Mortgage Corp. and Option One Mortgage Corp.;[165] and Wells Fargo.[166]

These cases allege FHA and ECOA violations based solely on a disparate impact theory. Plaintiffs allege that the policy of all of these defendant-lenders in allowing discretionary pricing, although facially neutral, has an adverse effect on minority borrowers compared to similarly situated whites. In short, they claim that minority borrowers pay more discretionary charges, both in frequency and amount, than whites with similar credit backgrounds.

Most of the defendant-lenders in these cases responded to the complaints by filing motions to dismiss. In each such case, the trial court upheld

---

[161] *See* Steele v. GE Money Bank, No. 08 C 1880, 2009 WL 393860 (N.D. Ill. Feb. 17, 2009). The principal defendant in this case, GE Money Bank, "is a wholly owned subsidiary of GE Consumer Finance, Inc., a consumer lending unit of General Electric Company." *Id.* at *1. A second defendant, WMC Mortgage, LLC, "is a successor in interest to WMC Mortgage Corporation . . . [which, along with] its parent company, WMC Finance Co., were acquired by . . . GE Consumer Finance[ ] in 2004." *Id.*

[162] *See* Guerra v. GMAC LLC, No. 2:08-cv-01297-LDD, 2009 WL 449153 (E.D. Pa. Feb. 20, 2009). The principal defendants in this case are GMAC LLC and certain of its subsidiaries, including GMAC Mortgage, LLC, GMAC Bank, and Homecomings Financial, LLC. *See* Guerra Complaint, *supra* note 158, ¶¶ 1, 58–62. A separate suit against Homecomings Financial was filed in 2009. *See* Watson v. Homecomings Fin., LCC, No. 09-859 (DWF/JJG), 2009 U.S. Dist. LEXIS 99260, at *1 (D. Minn. Oct. 23, 2009).

[163] *See* Ramirez v. GreenPoint Mortgage Funding, Inc., 633 F. Supp. 2d 922 (N.D. Cal. 2008). There is only one defendant named in this case. *See id.* at 922. GreenPoint, which was once one of the nation's largest originators of Alt-A mortgages, was shut down in 2007 less than a year after being taken over by Capital One Financial Corp. *See* E. Scott Reckard, *Subprime Chaos Claims 500 Jobs at Countrywide*, L.A. TIMES, Aug. 21, 2007, at C4.

[164] *See* Court Documents, Allen v. Decision One Mortgage Co., C.A. No. 1:07-cv-11669-GAO (D. Mass. Nov. 27, 2009) (on file with author). This case, which is further described *infra* notes 241 and 262, names as defendants HSBC North America Holdings, Inc. and five of its lending subsidiaries (Decision One Mortgage Company, LLC; HSBC Finance Corporation; HSBC North America Holding Inc.; HSBC Mortgage Corporation (USA); and HSBC Mortgage Services, Inc.). *See* Class Action Complaint ¶¶ 19–20, Allen v. Decision One Mortgage Co., C.A. No. 1:07-cv-11669-GAO (D. Mass. Nov. 27, 2009) (on file with author). HSBC Finance Corporation is the former Household International, which included Household Finance Company and Beneficial Finance Company and which purchased Decision One in 1999. *Id.*

[165] *See* Barrett v. H & R Block, Inc., 652 F. Supp. 2d 104 (D. Mass. 2009); Hoffman v. Option One Mortgage Corp., 589 F. Supp. 2d 1009 (N.D. Ill. 2008). In the former case, the principal defendants are H & R Block Mortgage Corporation and Option One Mortgage Corporation, which are described as wholly owned subsidiaries of H & R Block, Inc. *Barrett*, 652 F. Supp. 2d at 107. H & R Block, Inc. was also named as a defendant, but the court dismissed it for lack of personal jurisdiction. *Id.* at 113–16. In the *Hoffman* case, H & R Block Mortgage Corp. was also described as "Option One Mortgage Services, Inc." *Hoffman*, 589 F. Supp. 2d at 1009.

[166] *See* In re Wells Fargo Residential Mortgage Lending Discrimination Litigation, No. M:08-CV-1930 MMC, 2009 WL 2473684 (N.D. Cal. Aug. 11, 2009). Wells Fargo has also been sued in a number of other discriminatory pricing cases. *See supra* notes 149, 153, and 154 and *infra* note 255.

the plaintiffs' basic claims.[167]  As a result, all of these cases are now in the pre-trial discovery stage.

### 2.  *Three Strategic Issues*

These class action lawsuits raise three major strategic questions for plaintiffs.  The first is whether to employ an intentional discrimination theory of liability, as opposed to a disparate impact theory.  The second is whether to base the claims on the individual plaintiff-borrower's race or national origin or on that of the borrower's neighborhood as a whole.  Finally, the third is whether to add the mortgage brokers, rather than simply the mortgage lenders, as defendants.  This section examines each of these issues in turn.

First, plaintiffs face a strategic choice whether to adopt an intentional discrimination theory of liability.  In other mortgage lending cases based on similar facts, minority plaintiffs have accused their lenders of intentional discrimination.[168]  This raises the question of why the class action cases do not include an intent-based count, along with their disparate impact claim.  After all, assuming that the lender-defendants' discretionary pricing policies do negatively impact minorities and that these lenders knew or should have known of this disparate impact,[169] such a scenario would present strong evidence of intentional discrimination.[170]

The answer seems to be a matter of litigation strategy.  While it is true that evidence of intentional discrimination is lurking in these cases,[171] prov-

---

[167] *See* cases cited *supra* notes 159-166.  Some decisions dismissed particular defendants or otherwise granted parts of the defendants' motions to dismiss.  *See, e.g., supra* note 165 and *infra* notes 185–187 and accompanying text.

[168] *See, e.g.,* Mayor of Baltimore v. Wells Fargo Bank, 631 F. Supp. 2d 702, 704 (D. Md. 2009), *complaint dismissed*, 677 F. Supp. 2d 847 (D. Md. 2010); Ware v. Indymac Bank, 534 F. Supp. 2d 835, 840 (N.D. Ill. 2008); Newman v. Apex Financial Group, Inc., No. 07 C 4475, 2008 WL 130924, at *3–5 (N.D. Ill. Jan. 11, 2008); Martinez v. Freedom Mortgage Team, Inc., 527 F. Supp. 2d 827, 834–35 (N.D. Ill. 2007).

[169] *See supra* notes 110–114 and 126–135 and accompanying texts, *infra* notes 171–173 and accompanying text.

[170] "Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor." Washington v. Davis, 426 U.S. 229, 253 (1976) (Stevens, J., concurring); *see also* Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987 (1988) ("the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination").

[171] The cases actually present a "hybrid" impact/intent claim, because the defendant-lenders' "neutral" policies that produced racially disparate impacts (i.e., granting discretion to their loan officers and brokers to increase charges above levels necessary to account for credit risk) *allowed* these agents to intentionally discriminate even if the lenders did not specifically intend for such discrimination to occur.  *Cf.* Ho v. Donovan, 569 F.3d 677, 680 (7th Cir. 2009) (ruling against a FHA defendant who was described as having "behaved like an ostrich," and commenting that "[c]onscious avoidance of information is a form of knowledge"); Mathews v. Gov't Emp. Ins. Co., 23 F. Supp. 2d 1160, 1164 (S.D. Cal. 1998) (holding that for purposes of determining whether a Fair Credit Reporting Act ("FCRA") violation is sufficiently willful to justify punitive damages, it is enough to show that defendants recklessly disregarded any of their FCRA responsibilities and that they cannot evade such liability "by sticking their heads in the sand and pleading ignorance").

ing it might be a daunting and distracting task. It would require producing evidence—in addition to the HMDA-based studies showing racial and national origin disparities—that some policy-maker for each defendant-lender directed that minority borrowers be targeted for higher cost loans.[172] This type of evidence has surfaced occasionally, for example from whistle-blowers who once worked for a lender,[173] but it is not easy to find such witnesses and convince them to testify. Furthermore, a disparate impact case poses fewer hurdles. For example, once statistically significant disparities are proven in a disparate impact case, the focus turns to the issues of the defendant's business justifications and the existence of less discriminatory alternatives, issues for which the defendants may have the burden of proof.[174] Finally, as a matter of equity as well as legal theory, the plaintiffs believe the defendant-lenders should be held responsible for the discriminatory *results* of their policies, whether or not they can be shown to have intended those results.[175]

The second strategic choice made by plaintiffs in these lawsuits is to base their claims entirely on the plaintiff-borrowers' race and national origin, as opposed to the race or national origin of the borrowers' neighborhoods, as would be the case in "redlining," "reverse redlining," and other types of area-focused claims of mortgage discrimination.[176] In individual cases, evidence may be produced that a particular lender-defendant has a record of other types of financial discrimination, including neighborhood-based discrimination, but this is not the specific focus of these cases. Rather, the focus is the negative impact of the defendants' discretionary pricing policy on minority borrowers, regardless of where they live.

The third strategic choice made by plaintiffs in these lawsuits is generally not to add as defendants the mortgage brokers who, presumably, were the initial cause of the higher rates and fees to which plaintiffs were sub-

---

[172] It is worth noting that, in one of the few cases where both impact and intent claims were alleged, the trial court upheld the impact claim, but dismissed as "speculative" allegations based on discriminatory intent. *See* Garcia v. Countrywide Fin. Corp., No. EDCV 07-1161-VAP (JCRx), 2008 U.S. Dist. LEXIS 106675, at *40–42 (C.D. Cal. Jan. 17, 2008).

[173] *See, e.g.*, *Mayor of Baltimore*, 631 F. Supp. 2d at 704 (referring to plaintiffs' having submitted affidavits of two of defendant's former employees in support of plaintiffs' FHA claims of discriminatory lending). For a further description of the whistle-blower testimony in this case, see Michael Powell, *Suit Accuses Wells Fargo of Steering Blacks to Subprime Mortgages in Baltimore*, N.Y. TIMES, June 7, 2009, at A15.

[174] *See infra* notes 237–238 and accompanying text.

[175] Intent-based claims might also add to the difficulties of class-action certification. *See infra* notes 192–193 and accompanying text. Because these cases involve hundreds of thousands of loans, defendants might argue that the Rule 23 requirements of commonality and typicality are lacking (e.g., because the class members dealt with different brokers, different loan officers, or purchased different loan packages from a given lender than did the representative plaintiffs). Some courts have, in fact, opined that the Rule 23 requirements are more easily satisfied in a disparate impact case than an intent case. *See, e.g.*, Stastny v. Southern Bell Tel. & Tel. Co., 628 F.2d 267, 274 n.10 (4th Cir. 1980).

[176] For discussions of redlining and reverse redlining, see, respectively, *supra* note 64 and accompanying text and *supra* notes 101–106 and accompanying text.

jected, at least for the loans they originated. The issue of whether a lender should be liable for the discriminatory acts of the mortgage brokers with whom it deals is a difficult one. In 2003, the Supreme Court held in *Meyer v. Holley*[177] that "traditional vicarious liability rules" govern FHA claims and that these rules "ordinarily make principals and employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."[178] In *Meyer*, this meant that the discrimination of a real estate salesman could be attributed to his employer-corporation, "but not the owner or officer [of the corporation]," because only the corporation was the salesman's "principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents."[179]

Under *Meyer*, it is clear that lenders are vicariously liable for the discriminatory acts of their own loan officers and other employees. As for a lender's liability for its brokers' FHA violations, however, *Meyer* may require that a principal-agent relationship exist between the lender and these brokers. The defendant-lenders maintain that brokers act only on behalf of borrowers, not the lender who ultimately makes the loan.[180] Thus, argue the lenders, if a broker discriminates unlawfully against its customers, *Meyer* instructs the victims to sue the broker, but it does not authorize lender liability for such FHA violations.

The plaintiffs respond that a lender should be held responsible for all of its discriminatory loans, regardless of who originally generated them.[181] It is each lender's pricing policies—and its failure to adequately monitor the consequences of those policies—that have led to the racial disparities challenged by these cases.[182] Furthermore, even if *Meyer* is a problem with

---

[177] 537 U.S. 280 (2003).

[178] *Id.* at 285.

[179] *Id.* at 286.

[180] Indeed, laws in some states establish a fiduciary relationship between a broker and its borrowers. *See, e.g.*, KY. REV. STAT. ANN. § 286.8–270 (2009) (imposing, in Kentucky statute passed in 2008, fiduciary duties on mortgage loan brokers in favor of borrowers); *see also* MORTGAGE BANKERS/BROKERS, *supra* note 32, at 25 ("Some state laws hold that a broker must act as an agent of the borrower. In other states, courts have ruled that agency relationships exist based on the broker's conduct. Other states have concluded there is no agency relationship implied."). For more on the issue of whether brokers represent borrowers, see *infra* note 289 and accompanying text.

[181] Plaintiffs point to the large degree of control that the defendant-lenders exerted over their affiliated brokers as showing that the lenders' policies caused the discriminatory impact at issue. Each lender screened and approved individual brokers before allowing them to offer the lender's loan products. A lender's chosen brokers were given internet and intranet access to the lender's proprietary underwriting databases and were required to adhere to wholesale-lending manuals prepared and administered by the lender. Because lenders were required to keep HMDA data for all broker-initiated loans, each instructed its brokers on how to report that data to the lender. Each lender issued daily rate sheets for all of its products to its brokers, and most capped the fees that their brokers could charge (e.g., between 3% and 5% of the loan). Finally, each lender had the ability to monitor broker activities and to suspend or bar particular brokers from carrying its products. *See also supra* text accompanying notes 120–123.

[182] *Cf.* Dunn v. Washington County Hosp., 429 F.3d 689, 691 (7th Cir. 2005) (holding employer liable under Title VII even though the discriminatory terms and conditions complained of were initiated by a third party, on the ground that, because "liability is direct rather

001633

respect to FHA liability, it does not govern claims under the ECOA, which does authorize lender liability for broker-initiated loans.[183]

The plaintiffs also have a strategic rationale for suing only the lenders. The plaintiffs view mortgage brokers—who are often small operations and notoriously elusive, going into and out of business very quickly[184]—as simply a distraction in the overall problem of discretionary loan prices. The fact that such brokers exist at all, much less that they have engaged in this type of pricing discrimination, is ultimately due to the lenders, which set up and maintained this system. A major goal of this litigation is to end the overall system of discretionary pricing in mortgage loans, and this can be accomplished by suing only the lenders. To also name the individual brokers would involve a colossal effort, with very little reward.

To date, one trial court in these cases has agreed in part with the defendant-lenders' position in ruling on a preliminary motion.[185] This court held that the plaintiffs' allegations

> do not support an inference that the defendant lenders had the ability to control the manner and method in which the brokers carried out their work . . . . Because the existence of an actual or apparent agency relationship is based entirely on speculation, the portions of the complaint which rest on an agency theory between the defendants and the brokers are dismissed.[186]

However, the court noted that this ruling does not affect the plaintiffs' claim

> against the lender defendants based on their own actions. . . . An agency relationship between a lender and a broker need not exist for a lender to direct a broker to take a specified action in order for

---

than derivative, it makes no difference whether the person whose acts are complained of is an employee [or] an independent contractor . . . . Ability to 'control' the actor plays no role. . . . This is, by the way, the norm of direct liability in private law as well: a person 'can be subject to liability for harm resulting from his conduct if he is negligent or reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.' RESTATEMENT (SECOND) OF AGENCY § 213(d).").

[183] Under the ECOA, a lender is responsible for the entire loan price, including elements of the price that are set by third parties. *See* Coleman v. General Motors Acceptance Corp., 220 F.R.D. 64, 93 (M.D. Tenn. 2004) (noting, in ECOA case challenging discretionary pricing by a car finance company, that plaintiffs "make a much stronger case for GMAC's liability under ECOA's definition of creditor or assignee than under the agency theory"); 15 U.S.C. § 1691a(e) (2009); *see also* 12 C.F.R. § 202.2(l) (2009) (defining a "creditor" for purposes of ECOA liability as anyone who "participate[d] in a credit decision"); *see also supra* text accompanying note 113 (setting forth Justice Department's position that, because a lender is ultimately responsible under ECOA for all of its loans, a lender should be liable "not only for the alleged discrimination of its own employees, but also for that of the brokers").

[184] *See supra* notes 32–35 and accompanying text; *infra* note 28 and accompanying text.

[185] Steele v. GE Money Bank, No. 08 C 1880, 2009 WL 393860, at *5–7 (N.D. Ill. Feb. 27, 2009).

[186] *Id.* at *6.

that broker to do business with that lender. [Given the plaintiffs'
allegations that this] second kind of relationship existed, . . . the
court's dismissal of any claims based on an agency theory does not
require dismissal of claims based merely on alleged directions to
brokers provided by the defendant lenders.[187]

### 3. Other Issues: Relief Requested; Class Certification; Timeliness

Plaintiffs in these cases seek both equitable and monetary relief. As for
the former, the complaints pray for an equitable decree that, inter alia,
would: enjoin the defendant-lenders' from engaging in subjective decision-
making in the pricing of future home loans; bar defendants from continuing
to collect any non-risk charges resulting from unlawful discrimination; dis-
gorge and provide restitution regarding all such charges; and reform the
above-par loans currently held by defendants to the risk-related rates that the
plaintiff-borrowers should have had on the dates their loans closed.[188]  Plain-
tiffs also seek damages as authorized by the FHA and ECOA.[189]

These cases have been brought as class actions,[190] in part to provide
some equalizing of the litigation resources on the plaintiffs' side against the
huge national finance companies that are the defendants. In addition, class
actions are the only cost-effective way of prosecuting the borrowers' tens of
thousands of claims, the individual prosecution of which "would not only
unnecessarily burden the judiciary, but would prove uneconomic for poten-
tial plaintiffs."[191]

---

[187] Id. at *7; see also Anderson v. Wells Fargo Home Mortgage, Inc., 259 F. Supp. 2d
1143, 1148 (W.D. Wash. 2003) (noting, in similar circumstances, that agency relationship may
not be required "to sustain an FHA claim" to the extent plaintiff "can maintain such a claim
directly against Wells Fargo").

The Steele court went on to conclude that the absent brokers with whom the plaintiffs had
dealt were necessary parties under FED. R. CIV. P. 19(a)(1), and therefore that "the plaintiffs
must join the brokers if they wish to proceed with this action." Steele, 2009 WL 393860, at
*9. For contrary rulings in similar cases, see In re Wells Fargo Residential Mortgage Lending
Discrimination Litig., No. M:08-CV-1930 MMC, 2009 WL 2473684 (N.D. Cal. Aug. 11,
2009); Jackson v. Novastar Mortgage, Inc., 645 F. Supp. 2d 636, 642–43 (W.D. Tenn. 2007).

[188] See, e.g., Guerra Complaint, supra note 158, at "Prayer" after ¶ 162.

[189] See id.; FHA, supra note 1, § 3613(c); ECOA, supra note 66, § 1691(a)–(b).

[190] A typical class is defined as including:

[a]ll minority persons in the United States who obtained a residential mortgage loan
from [Defendants] between January 1, 2001 and the present and were harmed by
Defendants' racially discriminatory policies and/or practices. . . . By "minority,"
Plaintiffs refer to "any and all non-Caucasian/White racial groups protected under
the [ECOA] and the [FHA], including, without limitation, African-Americans and
Latinos."

Guerra v. GMAC LLC, No. 2:08-cv-01297-LDD, 2009 WL 449153, *1 n.1 (E.D. Pa. Feb. 20,
2009); see also Steele, 2009 WL 393860, at *10-11 (describing a similar class).

[191] Hanlon v. Chrysler Corp., 150 F.3d 1011, 1023 (9th Cir. 1998). See generally General
Tel. Co. v. Falcon, 457 U.S. 147, 155, 159 (1982) (describing the principal purpose of class
actions as achieving efficiency and economy of litigation for the parties and the courts).

None of the trial judges in these cases has yet decided whether a class action should be certified. While class certification is essential to the success of these cases, it is a procedural matter that is tangential to the substantive issues we are discussing in this Article. However, it is worth noting that cases alleging race discrimination generally lend themselves to class action treatment[192] and these particular cases seem to be appropriate candidates for class certification.[193]

As for timeliness, the relevant statute-of-limitations period for both the FHA and ECOA is two years,[194] and some members of the plaintiff-classes were exposed to the defendants' illegal policies and given discriminatory loans more than two years before the cases were filed. Plaintiffs assert, however, that these claims, as well as those of the named plaintiffs and other class members whose loans *were* issued within the limitations period, are

---

[192] *See, e.g.*, E. Tex. Motor Freight Sys. v. Rodriguez, 431 U.S. 395, 405–06 (1977).

[193] A class action in federal court must meet all four of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *See* Fed. R. Civ. P. 23(a)–(b). It seems fairly obvious that these cases meet 23(a)'s first two requirements (numerosity and common questions). *See, e.g.*, Cason v. Nissan Motor Acceptance Corp., 212 F.R.D. 518, 520 (M.D. Tenn. 2002); Rodriguez v. Ford Motor Credit Co., No. 01 C 8526, 2002 WL 655679, at *2–3 (N.D. Ill. Apr. 19, 2002). The requirements of typicality and adequate representation are generally fact-based determinations, but the complaints have presumably identified lead plaintiffs and claims in such a way that these elements are also likely to be satisfied. *Cf. Cason*, 212 F.R.D. at 520; *Rodriguez*, 2002 WL 655679, at *3.

Certification under 23(b)(2) is likely to be appropriate since these claims allege that the defendants discriminated against a class of people and the primary relief sought is injunctive. *See, e.g.*, Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1174 (9th Cir. 2007); *see also* Buycks-Robertson v. Citibank Fed. Sav. Bank, 162 F.R.D. 322, 325 (N.D. Ill. 1995) (certifying a (b)(2) class action in a mortgage discrimination case that is further described *supra* note 85). Courts have routinely certified (b)(2) classes alleging disparate impact claims. *See, e.g.*, Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147 (2d Cir. 2001); Rich v. Martin Marietta Corp., 522 F.2d 333 (10th Cir. 1975). *See generally* Amchen Products, Inc. v. Windsor, 521 U.S. 591, 614 (1997) ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples [of (b)(2) class actions]."). The major issue regarding (b)(2) certification is likely to be whether such certification is jeopardized by the fact that the plaintiffs are also seeking monetary damages. *See, e.g.*, Coleman v. General Motors Acceptance Corp., 296 F.3d 443, 447 (6th Cir. 2002) (holding (b)(2) certification inappropriate in ECOA-based challenge to discretionary pricing in car loans, because the injunctive relief requested "does not predominate over the monetary damages"). Note, however, that after the Sixth Circuit's decision in *Coleman*, the trial court on remand and a different court in *Cason* both certified (b)(2) classes after the plaintiffs abandoned their claims for monetary damages. *See* Coleman v. General Motors Acceptance Corp., 220 F.R.D. 64, 100 (M.D. Tenn. 2004); *Cason*, 212 F.R.D. at 523.

A (b)(3) certification may also be appropriate for these cases, because common questions "predominate" and a class action is the "superior" way to adjudicate this controversy. In particular, superiority is demonstrated where "class-wide litigation of common issues will reduce litigation costs and promote greater efficiency." Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996); *see also supra* note 191 and accompanying text. *But see Rodriguez*, 2002 WL 655679, at *4–5 (holding that trial of plaintiffs' claims of car-loan price discrimination "would require an individualized inquiry into the reason for thousands of credit decisions," thereby making (b)(3) certification improper).

[194] *See* FHA, *supra* note 1, § 3613(a)(1)(A); ECOA, *supra* note 66, § 1691e(f).

timely under the "continuing violation theory."[195]  This theory was endorsed for purposes of the FHA by the Supreme Court in 1982 in *Havens Realty Corp. v. Coleman*,[196] and it has also regularly been applied in ECOA cases.[197]

Post-*Havens* decisions make clear that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred."[198]  The class action complaints allege a practice of lending discrimination that was the defendants' standard operating procedure, which means that the continuing violation theory should make the claims of all class members timely."[199]  Thus far, all of the trial courts that have reviewed this issue at the pleading stage have agreed.[200]  The application of the continuing violation theory is also likely to be an on-going point of dispute among the parties.  With these issues in mind, we will move on to a discussion of the merits of these cases.

## C.  *Analyzing the Prototypical Impact Case Against a Single Lender*

### 1.  *Impact Theory under the FHA/ECOA:  Overview and Elements*

A preliminary issue is whether the FHA and ECOA even include an impact standard.  Throughout the history of these statutes, the lower courts

---

[195] *See, e.g.*, cases cited *infra* notes 197–198, 200.  In addition to the continuing violation theory, plaintiffs have asserted other theories that would justify including class members whose loans were obtained beyond the limitations period.  *See, e.g.*, Taylor v. Accredited Home Lenders, Inc., 580 F. Supp. 2d 1062, 1066 (S.D. Cal. 2008) (noting, but avoiding decision on, plaintiffs' discovery and fraudulent concealment theories); Miller v. Countrywide Bank, N.A., 571 F. Supp. 2d 251, 262–63 (D. Mass. 2008) (discussing, but avoiding decision on, plaintiffs' discovery theory).

[196] 455 U.S. 363, 380–81 (1982).

[197] *See, e.g.*, ECOA cases cited *infra* note 200; Davis v. General Motors Acceptance Corp., 406 F. Supp. 2d 698, 705–06 (N.D. Miss. 2005) (applying the continuing violation doctrine to ECOA claims alleging racially discriminatory mark-ups on auto loans).

[198] Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001); *accord* Equal Rights Center v. AvalonBay Communities, Inc., No. AW-05-2626, 2009 WL 1153397, at *9–10 (D. Md. Mar. 23, 2009); Wallace v. Chi. Hous. Auth., 321 F. Supp. 2d 968, 972–75 (N.D. Ill. 2004); Hargraves v. Capital City Mortgage Corp., 140 F. Supp. 2d 7, 17–19 (D.D.C. 2000), *motion for reconsideration granted in part on other grounds*, 147 F. Supp. 2d 1 (D.D.C. 2001).

[199] There is a contrary view, based on the fact that the continuing violation theory generally requires that continuing unlawful acts—and not merely the continuing consequences of these acts—occur within the limitations period.  *See, e.g.*, Paschal v. Flagstar Bank, 295 F.3d 565, 572–74 (6th Cir. 2002) (applying this distinction to hold a FHA mortgage discrimination claim untimely); Robinson v. Argent Mortgage Co., No. C.-09-2075 MMC, 2009 U.S. Dist. LEXIS 69962 (N.D. Cal. Aug. 11, 2009) (same).  *See generally* Delaware State College v. Ricks, 449 U.S. 250, 258 (1980).

[200] *See* Barrett v. H & R Block, Inc., 652 F. Supp. 2d 104, 110–12 (D. Mass. 2009); Taylor v. Accredited Home Lenders, Inc., 580 F. Supp. 2d 1062, 1065–66 (S.D. Cal. 2008); Miller v. Countrywide Bank, N.A., 571 F. Supp. 2d 251, 261–63 (D. Mass. 2008); Ramirez v. GreenPoint Mortgage Funding, Inc., 633 F. Supp. 2d 922, 929–30 (C.D. Cal. 2008); Garcia v. Countrywide Fin. Corp., No. EDCV 07-1161-VAP (JCRx), 2008 U.S. Dist. LEXIS 106675, at *43–44 (C.D. Cal. Jan. 17, 2008).

have consistently upheld impact claims under both laws.[201]  Furthermore, in 1994, the Justice Department, HUD, and eight other federal regulatory agencies took the position that lending practices that produced disparate impacts could result in FHA/ECOA liability.[202]  Still, the Supreme Court has never endorsed this standard in a FHA or ECOA case, and defendants in modern lending cases invariably raise this issue in their motions to dismiss, arguing that the Court's 2005 decision in an employment-age discrimination case suggests that it would not allow impact-based liability under either the FHA or ECOA.[203]  Thus far, this defense has been unanimously rejected by the trial courts, including those in the discretionary pricing cases discussed here.[204]

---

[201] For the FHA, see, e.g., cases cited in SCHWEMM, *supra* note 67, § 10:4, nn.18–35, 41; for the ECOA, see, e.g., Haynes v. Bank of Wedowee, 634 F.2d 266, 269 n.5 (11th Cir. 1981); Smith v. Chrysler Fin. Co., LLC, No. Civ.A. 00-6003(DMC), 2003 WL 328719, at *5–6 (D. N.J. Jan. 15, 2003); cases cited *infra* note 204.  *See also* 12 C.F.R. § 202.6(a) n.2 (2010) (commenting, in the Fed's ECOA regulations, that the ECOA "may prohibit a creditor practice that is discriminatory in effect because it has a disproportionately negative impact on a prohibited basis," based, inter alia, on the fact that the "effects test" doctrine, as developed in Title VII cases, was intended by Congress to "apply to the credit area"); *infra* note 202.

[202] *See* Interagency Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18266, 18268–69 (Apr. 15, 1994) [hereinafter U.S. Policy Statement] (noting that a recognized method of proving lending discrimination under the FHA and ECOA is evidence of disparate impact, which was defined as "when a lender applies a practice uniformly to all applicants but the practice has a discriminatory effect on a prohibited basis and is not justified by business necessity"); *accord* OFFICE OF THE COMPTROLLER OF THE CURRENCY ET AL., INTERAGENCY FAIR LENDING EXAMINATION PROCEDURES ii, iv (2009), *available at* http://www.ffiec.gov/ PDF/FairLend.pdf.  The 1994 U.S. Policy Statement has been cited by the Justice Department in subsequent litigation in support of the proposition that "a plaintiff may establish a violation of ECOA under a disparate impact theory."  *See* Brief for the United States as Amicus Curiae Supporting Plaintiffs at 9, Cason v. Nissan Motor Acceptance Corp., 28 Fed. Appx. 392 (6th Cir. 2002) (No. 3-98-0223), *available at* http://www.justice.gov/crt/housing/documents/ nissan1.php.

For a list of the ten agencies that joined the U.S. Policy Statement above, see 59 Fed. Reg. 18266 (Apr. 15, 1994).  The fact that HUD and Justice joined is particularly significant for purposes of the FHA, because these agencies have FHA enforcement responsibilities, and their interpretations of the statute are therefore entitled to deference by the courts.  *See* SCHWEMM, *supra* note 67, § 7:5.

[203] The argument, based on *Smith v. City of Jackson*, 544 U.S. 228 (2005), is set forth in detail in various defendant-lenders' briefs.  *See, e.g.*, Brief in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint at *6-8, Guerra v. GMAC, LLC, 208 WL 5343096 (E.D. Pa. Aug. 25, 2008) (No. 2:08-cv-01297-LDD).

In *Smith*, the Supreme Court held that an impact theory—albeit one less favorable to plaintiffs than Title VII's—is available in cases under the 1967 Age Discrimination in Employment Act, 544 U.S. at 233–41, 43–47, and then went on to rule against the particular claim in this case both because the plaintiffs had failed to identify a specific employment practice that produced a disparate impact and because the defendant had sufficiently justified its challenged behavior under the relevant standard.  *Id.* at 241–43.

[204] *See* Steele v. GE Money Bank, No. 08 C 1880, 2009 WL 393860, at *3 (N.D. Ill. Feb. 27, 2009); Guerra v. GMAC, LLC, No. 2:08-cv-01297-LDD, 2009 WL 449153, at *2-3 (E.D. Pa. Feb. 20, 2009); *Barrett*, 652 F. Supp. 2d at 108–09; Hoffman v. Option One Mortgage Corp., 589 F. Supp. 2d 1009, 1010–11 (N.D. Ill. 2008); *Taylor*, 580 F. Supp. 2d at 1066-67; *Miller*, 571 F. Supp. 2d at 255–58; *Ramirez*, 633 F. Supp. 2d at 926–29; *Garcia*, 2008 U.S. Dist. LEXIS 106675, at *39-40.

The issue of whether the FHA includes an impact standard goes well beyond the scope of our discussion here because it would apply to a variety of housing discrimination cases in addition to those alleging mortgage discrimination. As a result, we will move on to *how* that impact standard should be applied to the cases alleging discrimination as a result of discretionary pricing in home financing. We will also assume that, whatever the proper liability standards are under the FHA, those same standards would also govern ECOA claims, although we recognize that a particular court might decide to give a broader interpretation to one statute or the other,[205] which is presumably why the plaintiffs in the discretionary pricing class actions have made claims under both statutes.[206]

In consistently interpreting the FHA to include an impact standard, the lower courts have generally agreed that three elements must be considered in analyzing an impact case under the FHA.[207] First, the plaintiff must identify a policy or practice of the defendant that is neutral on its face but is shown to have caused a substantially greater negative impact on a protected class than on others. If this is done, then the defendant has the burden of showing that its policy or practice is justified by legitimate business considerations. Finally, whether the defendant can satisfy this burden of justification depends somewhat on whether there exists a less discriminatory alternative that

---

Other recent decisions involving mortgage discrimination have reached the same conclusion. *See, e.g.*, NAACP v. Ameriquest Mortgage Co., 635 F. Supp. 2d 1096, 1104–05 (C.D. Cal. 2009); Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lender Holding Co., 573 F. Supp. 2d 70, 76–78 (D.D.C. 2008), *discretionary appeal denied*, 597 F. Supp. 2d 120 (D.D.C. 2008); Zamudio v. HSBC N. Am. Holdings, Inc., No. 07 C 4315, 2008 WL 517138, at *2 (N.D. Ill. Feb. 20, 2008); *see also* Payares v. JP Morgan Chase & Co., No. CV 07-5540 ABC (SHx), 2008 WL 2485592 (C.D. Cal. June 17, 2008) (denying defendants' motion to pursue an interlocutory appeal from ruling that, inter alia, upheld plaintiffs' impact-based claims under the FHA and ECOA).

[205] For example, the ECOA regulations explicitly recognize that liability may be based on a disparate impact theory. *See supra* note 201 (describing 12 C.F.R. § 202.6(a)(2)). Under the FHA, the impact theory has been uniformly endorsed by the courts, but without the benefit thus far of a regulation from HUD. The presence of such a regulation might be helpful, should this issue ever reach the Supreme Court. *See, e.g.*, Smith v. City of Jackson, 544 U.S. at 243–45 (Scalia, J., concurring) (relying on an EEOC regulation to hold, based on *Chevron* deference, that an impact standard is appropriate under the Age Discrimination in Employment Act).

Another potential difference between these two statutes arises from the fact that the ECOA and its implementing regulations seem clear that lenders are liable for their brokers' discrimination, whereas such derivative liability is more of an open question under the FHA. *See supra* notes 177–187 and accompanying text.

[206] The ECOA has a provision that bars recovery for conduct that violates both the ECOA and the FHA "based on the same transaction," *see* 15 U.S.C. § 1691(i) (2009), but this only bars double recovery, not the right of plaintiffs to bring suit under both statutes. *See, e.g.*, *Ameriquest Mortgage Co.*, 635 F. Supp. 2d at 1105; *Taylor*, 580 F. Supp. 2d at 1069; Ware v. Indymac Bank, 534 F. Supp. 2d 835, 840 (N.D. Ill. 2008).

[207] *See, e.g.*, Budnick v. Town of Carefree, 518 F.3d 1109, 1118 (9th Cir. 2008); Graoch Associates # 33 v. Louisville/Jefferson County, 508 F.3d 366, 374 (6th Cir. 2007); Reinhart v. Lincoln County, 482 F.3d 1225, 1229 (10th Cir. 2007); Oti Kaga, Inc. v. S.D. Hous. Dev. Auth., 342 F.3d 871, 883 (8th Cir. 2003); Lapid-Laurel, LLC v. Zoning Bd. of Adjustment of Twp. of Scotch Plains, 284 F.3d 442, 466–67 (3d Cir. 2002).

would serve the defendant's needs as well as the challenged policy or prac-
tice does.[208]  The same three elements were also identified in the 1994 policy
statement issued by HUD, Justice, and eight other federal agencies that regu-
late mortgage lenders.[209]  The next section analyzes how these three elements
apply to the discretionary pricing class actions.

### 2. *Three Elements of an Impact-Based Challenge to Discretionary Pricing*

In addressing the three elements of an impact-based challenge to a
mortgage lender's discretionary pricing, we first consider, in section 2.a,
whether this is the type of policy that may be challenged under the disparate
impact theory and whether statistical proof exists to show that this policy has
caused a negative impact on minorities.  Section 2.b then deals with justifi-
cations for this policy and whether less discriminatory alternatives are
available.

### a. *Discriminatory Impact of the Policy*

### i. *Identifying the Policy*

The first step in a disparate impact case is for the plaintiff to identify a
defendant's policy or practice that, although neutral on its face, has a more
negative impact on minorities than whites.  The specific policy being chal-
lenged here is discretionary pricing by mortgage lenders, a policy that was

---

[208] With respect to the last two elements, some differences exist in how the appellate
decisions have articulated the parties' respective burdens.  This matter is further discussed *infra*
notes 234–238 and accompanying text.

[209] *See* U.S. Policy Statement, *supra* note 202.  The three elements are described in this
U.S. Policy Statement as follows:

> [P]roof of lending discrimination using a disparate impact analysis encompasses
> several steps. . . .  The existence of a disparate impact must be established by facts.
> Frequently this is done through a quantitative or statistical analysis.  Sometimes the
> operation of the practice is reviewed by analyzing its effect on an applicant pool;
> sometimes it consists of an analysis of the practice's effect on possible applicants, or
> on the population in general.  Not every member of the group must be adversely
> affected for the practice to have a disparate impact.  Evidence of discriminatory in-
> tent is not necessary to establish that a policy or practice adopted or implemented by
> a lender that has a disparate impact is in violation of the FH Act or ECOA. . . .

> [W]hen a lender's policy or practice has a disparate impact, the next step is to seek
> to determine whether the policy or practice is justified by "business necessity."  The
> justification must be manifest and may not be hypothetical or speculative.  Factors
> that may be relevant to the justification could include cost and profitability.

> Even if a policy or practice that has a disparate impact on a prohibited basis can be
> justified by business necessity, it still may be found to be discriminatory if an alter-
> native policy or practice could serve the same purpose with less discriminatory
> effect.

*Id.* at 18269.

described earlier.[210]  To repeat the salient points, this is a practice through which mortgage lenders provide financial incentives to their loan officers and brokers to mark up interest rates and add on other charges to home loans, resulting in borrowers paying rates substantially more than they should based on objective credit standards.  As Judge Gertner put it in upholding the plaintiffs' claim in the *Countrywide* case:

> The "specific and actionable policy" that plaintiffs challenge is Countrywide's discretionary pricing policy, which allows Countrywide's retail salesmen, independent brokers, and correspondent lenders to add various charges and fees based on subjective non-risk factors, and which, in turn, has a racially discriminatory impact on African-American borrowers. . . .  Plaintiffs have identified the practice at issue:  establishing a par rate keyed to objective indicators of creditworthiness while simultaneously authorizing additional charges keyed to factors unrelated to those criteria.[211]

Over two decades ago in *Watson v. Fort Worth Bank and Trust*,[212] the Supreme Court made clear in the employment discrimination context that subjective or discretionary practices, akin to the defendant-lenders' pricing policies here, are impermissible if they have a disparate impact.  According to the *Watson* opinion:

> [D]isparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests.  In either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices . . . .  If an employer's undisciplined system of subjective decision-making has precisely the same effects as a system pervaded by impermissible and intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply . . . .  We conclude, accordingly, that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases.[213]

Under *Watson*, disparate impact analysis is applicable to an employer's facially neutral policy that is applied subjectively by those to whom the employer gives authority under the policy.  Any other conclusion, the Court reasoned, would permit an entity required to comply with anti-discrimination laws to "insulate" itself from legal responsibility by "refrain[ing] from

---

[210] *See supra* notes 119–123 and accompanying text.
[211] Miller v. Countrywide Bank, N.A., 571 F. Supp. 2d 251, 255–57 (D. Mass. 2008).
[212] 487 U.S. 977, 990–91 (1988).
[213] *Id.*

making standardized criteria absolutely determinative."[214]  This theory has been accepted in financing cases under the ECOA.[215]

The plaintiffs' theory in the mortgage cases is that the defendant-lenders' discretionary pricing policies allowed racial bias to infect their loans. As noted above, numerous studies have demonstrated the adverse impact of discretionary pricing on black and Latino borrowers,[216] resulting in countless minority families paying thousands of dollars more for their home loans than comparable whites.  As Judge Gertner wrote in upholding the plaintiffs' claim against Countrywide, this is "a classic case of disparate impact," because "[w]hite homeowners with identical or similar credit scores pay different rates and charges than African-American homeowners, because of a policy that allows racial bias to play a part in the pricing scheme."[217]

The defendants counter that their discretionary pricing systems do not amount to a sufficiently specific policy or practice for purposes of disparate-impact analysis.  They point out that the Supreme Court in *Watson* required that when a defendant "combines subjective criteria with the use of more rigid standardized rules or tests," the plaintiff must "isolat[e] and identify[ ] the specific . . . practices that are allegedly responsible for any statistical disparities."[218]  Thus, according to the defendants, while the Court has allowed disparate-impact challenges to certain subjective employment standards, its decisions do not authorize the plaintiffs' generalized attack on discretionary pricing in mortgage loans here.[219]

The plaintiffs respond that the defendant-lenders—by designing, disseminating, controlling, implementing, and profiting from the discretionary pricing policies—are indeed being charged with a sufficiently specific pattern of behavior.[220]  The lenders created and maintained these pricing systems, thereby allowing and encouraging their loan officers and brokers to carry out a policy that the lenders must have known would result in disproportionately higher charges to minorities.[221]  Thus far, all of the trial judges

---

[214] *Id.* at 990.

[215] *See, e.g.,* Smith v. Chrysler Fin. Co., No. Civ.A. 00-6003(DMC), 2003 WL 328719, at *5–7 (D. N.J. Jan. 15, 2003); Jones v. Ford Motor Credit Co., No. 00 CIV. 8330(LMM), 2002 WL 88431, at *3–4 (S.D.N.Y. Jan. 22, 2002).  As the *Smith* opinion stated:  "Subjective applications of neutral underwriting criteria is standardized conduct because the loan originators have the opportunity to use their discretion with respect to each loan application."  *Smith*, 2003 WL 328719, at *7 (quoting Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 322, 332 (N.D. Ill. 1995) (FHA case)).

[216] *See supra* notes 133–135 and 142–144 and accompanying texts.

[217] Miller v. Countrywide Bank, N.A., 571 F. Supp. 2d 251, 254 (D. Mass. 2008).

[218] *Watson*, 487 U.S. at 994.

[219] *See id.* at 990; *see also* Smith v. City of Jackson, 544 U.S. 228, 241 (2005) ("it is not enough to simply . . . point to a generalized policy that leads to such an impact.  Rather, the [plaintiff] is 'responsible for isolating and identifying the *specific* . . . practices that are allegedly responsible for any observed statistical disparities.'") (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656 (1989)).

[220] For a description of some of the acts that the defendant-lenders employ to carry out their discretionary pricing policies, see *supra* note 122 and accompanying text and note 181.

[221] Once again, Judge Gertner's opinion in the *Countrywide* case is instructive:

in these cases, in responding to defendants' motions to dismiss, have upheld the claims with respect to the required element of identifying a sufficiently specific policy.[222]

### ii.   Proof of the Policy's Discriminatory Impact

Assuming that a sufficiently specific practice has been identified, the next step in the disparate impact analysis is for plaintiffs to prove that a defendant's discretionary pricing policy has a more negative impact on minorities than whites. The HMDA data and other reports described earlier show loan-price disparities between minorities and whites for the industry as a whole and for each of the defendant-lenders.[223]  The defendants claim, however, that these reports fail to prove any race-based impact, because, as pointed out earlier, HMDA-based studies cannot, by themselves, prove discrimination; factors other than race or national origin (e.g., credit scores) might account for the disparities.[224]

The plaintiffs respond that the HMDA-based studies often *do* control for many objective risk-based differences, and significant racial price disparities still remain.[225]  Furthermore, the HMDA data are the best information available to the public; in other words, if the lenders claim that other factors justify their record of giving higher-priced loans to minorities, it is only fair that they be required to produce the evidence supporting this claim. Plaintiffs also note that the discovery phase will provide them with access to each of the defendant's loan files, where additional evidence of the defendants' records of disparate pricing may be revealed.[226]  Historically, lenders have claimed that this is proprietary information and have kept it secret from the

---

> Where the allocation of subjective decision-making authority is at issue, the "practice" Countrywide has enacted effectively amounts to the *absence* of a policy, an approach that allows racial bias to seep into the process.  Allowing this "practice" to escape scrutiny would enable companies responsible for complying with anti-discrimination laws to "insulate" themselves by "refrain[ing] from making standardized criteria absolutely determinative."

Miller v. Countrywide Bank, N.A., 571 F. Supp. 2d 251, 258 (D. Mass. 2008) (quoting *Watson*, 487 U.S. at 990).

[222] *See* Steele v. GE Money Bank, No. 08 C 1880, 2009 WL 393860, at *3–5 (N.D. Ill. Feb. 27, 2009); Guerra v. GMAC LLC, No. 2:08-cv-01297-LDD, 2009 WL 449153, at *4–6 (E.D. Pa. Feb. 20, 2009); Barrett v. H & R Block, Inc., 652 F. Supp. 2d 104, 110 (D. Mass. 2009); Hoffman v. Option One Mortgage Corp., 589 F. Supp. 2d 1009, 1011–12 (N.D. Ill. 2008); Taylor v. Accredited Home Lenders, Inc., 580 F. Supp. 2d 1062, 1067–69 (S.D. Cal. 2008); *Miller*, 571 F. Supp. 2d at 255–61 (D. Mass. 2008); Ramirez v. GreenPoint Mortgage Funding, Inc., 633 F. Supp. 2d 922, 927–28 (N.D. Cal. 2008); Garcia v. Country Wide Financial Corp., No. EDCV 07-1161-VAP (JCRx), 2008 U.S. Dist. LEXIS 106675, at *40–42 (C.D. Cal. Jan. 17, 2008).

[223] *See supra* notes 133–135 and 139–145 and accompanying texts.

[224] *See supra* notes 136–138 and accompanying text.

[225] *See supra* notes 134–135 and 142–144 and accompanying texts.

[226] *Cf.* Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657–58 (1989) (noting, in response to a perceived objection that the Court was unduly burdening Title VII plaintiffs asserting impact claims, that "liberal civil discovery rules give plaintiffs broad access to employers' records in an effort to document their claims . . . . Plaintiffs as a general matter will have the

public. Now that these lawsuits have moved beyond the motion-to-dismiss stage and into discovery, plaintiffs expect to be able to gather further data that will advance their showing of disparate impact (e.g., based on a statistical analysis of each defendant's loan portfolio that will determine whether that lender has indeed charged minority borrowers higher discretionary rates and fees than comparable white borrowers).[227]

Defendants point out that, in addition to showing the existence of a specific policy and evidence that minorities received more expensive loans, plaintiffs must prove that this policy *caused* the discriminatory result. Otherwise, as the Supreme Court has noted, the disparate impact theory could "result in [defendants] being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances.'"[228] Here, the lenders argue that the required causal link between their discretionary pricing policy and whatever racial disparities exist cannot be shown.[229]

Plaintiffs respond that the racial disparities in the defendants' loans did not happen by chance. Rather, they are the direct result of each defendant's adopting and maintaining a discretionary pricing policy that was readily amenable to racial bias, thereby causing minorities to pay more for home loans than comparable whites.[230] Simply put, discretionary pricing inevitably leads to minority borrowers being charged higher rates and fees. Furthermore, the fact that discretionary pricing has a substantial adverse impact on minority borrowers has long been known in the mortgage industry.[231] Thus, the defendant-lenders knew, or certainly should have known, that the

---

benefit of these tools to meet their burden of showing a causal link between challenged employment practices and racial imbalances in the work force . . . .").

[227] For more on such statistical analyses, see *infra* notes 254–256 and accompanying text. For examples of mortgage discrimination cases in which discovery was ordered of the defendant's loan files, see Hurt v. Dime Sav. Bank, 151 F.R.D. 30 (S.D.N.Y. 1993); Laufman v. Oakley Bldg. & Loan Co., 72 F.R.D. 116 (S.D. Ohio 1976). *See also* Noland v. Commerce Mortgage Corp., 122 F.3d 551, 553 (8th Cir. 1997) (suggesting that plaintiff was entitled to properly focused discovery of defendant's loan files).

[228] Smith v. City of Jackson, 544 U.S. 228, 241 (2005) (quoting *Wards Cove*, 490 U.S. at 657).

[229] *See, e.g.*, Carpenter v. Boeing Co., 456 F.3d 1183, 1198–1204 (10th Cir. 2006) (rejecting Title VII impact claim challenging defendant's supervisors' exercise of discretion on the ground that plaintiffs' evidence failed to establish the required causation because it did not take into account all relevant variables that might explain the admittedly large gender disparities involved in the case).

[230] In addition, as Judge Gertner pointed out in the case against Countrywide, minority borrowers "are more likely than white borrowers to apply for credit from Countrywide through its sub-prime subsidiary, Full Spectrum, or from an authorized broker or correspondent lender, which are on average more expensive than loans obtained directly from Countrywide." Miller v. Countrywide Bank, N.A., 571 F. Supp. 2d 251, 254 (D. Mass. 2008).

[231] *See, e.g.*, studies described *supra* notes 133 and 142–144 and accompanying texts. Knowledge concerning the significant discriminatory impact of commission-driven, discretionary credit-pricing systems has been available to the lending industry for many years, at least since the mid-1990s, as a result of numerous high profile cases brought by the Justice Department. *See* "Pricing Discrimination" cases discussed in JUSTICE ENFORCEMENT, *supra* note 26, at 5–6; *supra* notes 110–114 and accompanying text.

financial incentives they were offering their loan officers and brokers would result in their steering minorities to loans involving higher rates and fees.[232]

Plaintiffs' allegations concerning the necessary causal element have thus far been upheld. Thus, all of the trial judges in these cases, in responding to defendants' motions to dismiss, have held that the complaints adequately allege that the defendants' discretionary pricing policies have caused a sufficiently negative impact on minorities to satisfy the disparate impact theory.[233]

### b.  Justifications for the Policy and Less Discriminatory Alternatives

The parties differ as to which side in an impact case has the burden of persuasion on the issue of the defendant's justification and what exactly that justification standard is. The defendant-lenders argue that the parties' respective burdens and the appropriate standard should be governed by the Supreme Court's Title VII decision in *Wards Cove Packing Co. v. Atonio*,[234] under which a defendant "bears only the burden of production, not the burden of persuasion" and an impact-producing practice is "permissible so long as it 'serve[d], in a significant way, the legitimate employment goals of the employer.'"[235] For their part, the plaintiffs can point to FHA precedents, both before and after *Wards Cove*, holding that, once disparate impact is shown, a defendant may prevail only if it proves that its challenged practice

---

[232] On the other hand, such knowledge has generally been hidden from the borrowing public. Thus, the plaintiffs in these cases allege that they did not know and reasonably could not have discovered that the defendant-lenders were charging them higher rates or fees than similarly creditworthy whites. *See, e.g.*, Guerra Complaint, *supra* note 158, ¶¶ 83–88. According to the plaintiffs, the defendants actively concealed the fact that their rates and fees were discretionary and that plaintiffs were being assessed higher costs than comparable whites. *Id.* This is another reason why the defendants' efforts to block some of the plaintiff-class members' claims on statute of limitations grounds should fail. *See supra* note 195 and accompanying text. "[T]here is a difference between being aware that you got a bad deal and being aware that you were discriminated against in a systemic fashion." Barkley v. Olympia Mortgage Co., No. 04 CV 875(RJD)(KAM), 2007 WL 2437810, at *17 (E.D.N.Y. Aug. 22, 2007) (quoting Phillips v. Better Homes Depot, Inc., No. 02-CV-1168, 2003 U.S. Dist. LEXIS 27299, at *76–77 (E.D.N.Y. Nov. 12, 2003)).

[233] *See* Steele v. GE Money Bank, No. 08 C 1880, 2009 WL 393860, at *3–5 (N.D. Ill. Feb. 27, 2009); Guerra v. GMAC, LLC, No. 2:08-cv-01297-LDD, 2009 WL 449153, at *4–6 (E.D. Pa. Feb. 20, 2009); Barrett v. H & R Block, Inc., 652 F. Supp. 2d 104, 109–10 (D. Mass. 2009); Hoffman v. Option One Mortgage Corp., 589 F. Supp. 2d 1009, 1011–12 (N.D. Ill. 2008); Taylor v. Accredited Home Lenders, Inc., 580 F. Supp. 2d 1062, 1067–69 (S.D. Cal. 2008); *Miller*, 571 F. Supp. 2d at 255–61; Ramirez v. GreenPoint Mortgage Funding, Inc., 633 F. Supp. 2d 922, 927–28 (N.D. Cal. 2008); Garcia v. Countrywide Fin. Corp., No. EDCV 07-1161-VAP (JCRx), 2008 U.S. Dist. LEXIS 106675, at *40–42 (C.D. Cal. Jan. 17, 2008).

[234] 490 U.S. 642, 657 (1989). Congress changed the *Wards Cove* standards for purposes of Title VII in the Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071 (1991), but that statute "did not amend [other civil rights laws] or speak to the subject of [lending discrimination]." Smith v. City of Jackson, 544 U.S. 228, 240 (2005). Thus, the lenders argue, *Wards Cove* remains the controlling precedent in FHA/ECOA impact litigation.

[235] Ricci v. DeStefano, 129 S.Ct. 2658, 2698 (2009) (Ginsburg, J., dissenting) (quoting *Wards Cove*, 490 U.S. at 659).

is justified by "business necessity."[236]  In fact, the FHA appellate decisions, while generally eschewing the *Wards Cove* standards, have often used different phrases in dealing with these points from circuit to circuit.[237]  Therefore, it seems likely that the individual trial courts in the various mortgage class actions will simply follow whatever position has been adopted in prior FHA cases by their respective courts of appeals.[238]

As for the substance of these matters, the defendant-lenders have not yet been called upon to articulate a rationale for why they use discretionary pricing, but we presume that, once this happens, their reasons will all relate to competition of one form or another.  First, an individual lender would claim to be at a competitive disadvantage if it were forced to abandon discretionary pricing on its own, because it could not compete for potential borrowers who are offered more attractive terms from a competing lender.[239]  All such business would presumably be lost, a result that would not only harm the lender, but also would mean that borrowers would be deprived of the opportunity to secure more favorable loans through price competition among lenders.  Another type of competitive disadvantage for a lender forced to give up discretionary pricing unilaterally would be its inability to retain loan officers, who would be tempted to move to other companies that continue to use this practice and thus might offer them better compensation.

Plaintiffs respond that the history of civil rights enforcement is replete with claims by companies using discriminatory practices that they would suffer a competitive disadvantage if they were required to stop discriminating.[240]  This claim has generally been highly exaggerated, and, in any event, it cannot be allowed to justify ongoing discrimination.

---

[236] *See, e.g.*, Pfaff v. HUD, 88 F.3d 739, 747 (9th Cir. 1996); Mountain Side Mobile Estates P'ship v. HUD, 56 F.3d 1243, 1254 (10th Cir. 1995); Betsey v. Turtle Creek Ass'ns., 736 F.2d 983, 988 (4th Cir. 1984); *see also supra* note 202.

[237] *See* SCHWEMM, *supra* note 67, § 10:6 nn.15–19 and accompanying text; *infra* note 238.

[238] The class action cases are pending in the First, Third, Seventh, and Ninth Circuits.  *See supra* notes 159–166.  The governing FHA precedents in these circuits are provided, respectively, by: *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 51 (1st Cir. 2000) ("a demonstrated disparate impact in housing [must] be justified by a legitimate and substantial goal of the measure in question"); *Betsey*, 736 F.2d at 988 (adopting "business necessity" standard); Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights, 558 F.2d 1283, 1290 (7th Cir. 1977) (adopting multi-factor approach to FHA impact cases); and *Pfaff*, 88 F.3d at 747 (adopting "business necessity" standard for most FHA cases).  To the extent that these courts have ruled on the issue of which party has the burden of persuasion on this issue, they have put this burden on the defendant.  *See, e.g.*, *Betsey*, 736 F.2d at 988; Salute v. Stratford Greens Garden Apts., 136 F.3d 293, 302 (2d Cir. 1998).

[239] Similarly, with respect to broker-initiated loans, individual lenders claim they cannot require their affiliated brokers to abandon discretionary pricing, because these brokers would simply take their customers to other lenders.

[240] *See, e.g.*, Vill. of Bellwood v. Dwivedi, 895 F.2d 1521, 1530–31 (7th Cir. 1990) (noting, in an opinion by Judge Posner, that a merchant who refuses to hire blacks not out of personal prejudice but in response to others' threatened action (e.g., customers' threats to take their business elsewhere if blacks are hired) is nevertheless engaged in intentional discrimination in violation of Title VII and applying this principle to FHA cases involving racial steering).

There is good reason to believe that this fear is not well-founded in the mortgage industry. The fact is that some lenders have now eliminated discretionary pricing.[241] If they can do it without suffering severe economic consequences, then the individual defendants in the class action cases can too. Because the system of discretionary pricing is inherently discriminatory against minority borrowers, it should be eliminated entirely. If this cannot be done industry-wide, then it should be done lender-by-lender. Thus, according to the plaintiffs, while the defendants in these cases may be able to "articulate" some reasons for continuing to employ discretionary pricing, there are ready alternatives that would produce significantly less discrimination. This means under traditional disparate impact analysis, the defendants have violated the FHA and ECOA.[242]

### D.  Summary and Anticipated Results

The class action cases challenging discretionary pricing are exploring new ground. As far as we can tell, no discriminatory lending case based on the disparate impact theory has ever gone to trial. Indeed, even with respect to intent-based lending cases under the FHA, only a small number have been tried, and few of these have been successful.[243] As noted earlier, for plaintiffs to prevail in a FHA lending case, they generally must show that the defendant has given more favorable loans to "comparable" white borrowers than to the minority plaintiffs.[244] Defendants in these cases invariably offer

---

[241] *See, e.g.*, Stipulation and Agreement of Settlement ¶ 3.6.b–.c, Allen v. Decision One Mortgage, No.1:07-cv-11669-GAO (D. Mass. Nov. 27, 2009) [hereinafter Decision One Settlement] (on file with author) (stipulating that HSBC and its mortgage subsidiaries have not allowed discretionary pricing in their in-house loans since January 1, 2004).

[242] *See supra* notes 208–209 and accompanying text.

[243] *See supra* notes 69–74 and accompanying text; cases cited *infra* note 244.

[244] *See supra* notes 72–74 and accompanying text. Most intent-based lending cases under the FHA have been analyzed under the prima facie case approach, in which a key first step is for the minority plaintiff to show that the defendant-lender treated similarly situated white borrowers more favorably than the plaintiff. *See, e.g.*, Boykin v. Bank of Am. Corp., 162 Fed. Appx. 837, 839–40 (11th Cir. 2005); Hood v. Midwest Sav. Bank, 95 Fed. Appx. 768, 778–79 (6th Cir. 2004); Rowe v. Union Planters Bank of Se. Mo., 289 F.3d 533, 535 (8th Cir. 2002); Noland v. Commerce Mortgage Corp., 122 F.3d 551, 553 (8th Cir. 1997). This step usually requires an analysis of the defendant's loan files showing that whatever racial disparities exist are not readily explainable by legitimate factors. *Id.* If a prima facie case is thus established, the burden shifts to the defendant to articulate a legitimate reason for the race-based disparities. *See, e.g.*, *Boykin*, 162 Fed. Appx. at 839. Legitimate reasons may exist, *see, e.g.*, *id.* at 840, although a lender will be hard pressed to provide them if it has not kept good records that justify the reasons for its loan-pricing decisions. *See, e.g.*, Simms v. First Gibralter Bank, 83 F.3d 1546, 1551 (5th Cir. 1996) (observing that the defendant's lack of a "contemporaneous written record of its handling of [plaintiffs' refinancing] proposal or its reasons for the rejection" meant that it had to rely exclusively on its loan officer's memory and credibility). This justification stage essentially gives the defendant a second opportunity to offer legitimate explanations for its racial price disparities. If the defendant fails to produce a legitimate justification or if the justification offered is shown to be pretextual, then intentional discrimination may be found. *See, e.g.*, *Boykin*, 162 Fed. Appx. at 839.

001647

non-racial reasons why the selected white borrowers' credit profiles were different enough to justify better treatment.[245]

Thus, while the impact theory of the class action plaintiffs in the current mortgage cases appears sound—as demonstrated by the fact that all trial courts to consider this claim have denied the defendant-lenders' motions to dismiss[246]—difficult issues of proof remain.[247] The pre-trial stage will require substantial discovery, some of which is likely to be contentious.[248] When discovery finally ends, each defendant-lender is likely to move for summary judgment. Given the trial courts' prior rulings at the motion-to-dismiss stage and pursuant to the law-of-the-case doctrine,[249] the defendants will not be able to challenge the plaintiffs' use of the impact theory nor the fact that the defendants' discretionary pricing policies are an appropriate target for this theory.[250] Each will, however, claim that the plaintiffs' evidence is insufficient to establish that illegal race or national origin discrimination has occurred in its loans as a result of this policy.[251]

An examination of some earlier mortgage and car-finance cases suggests how this argument will unfold. The starting point for evaluating evi-

---

[245] *See, e.g., Boykin*, 162 Fed. Appx. at 840; *Rowe*, 289 F.3d at 535; *Noland*, 122 F.3d at 553; case described *supra* notes 72–74.

[246] *See supra* notes 222, 233 and accompanying texts.

[247] In addition, as noted *supra* Part III.B.3, the cases also present difficult procedural issues, particularly those involving class-action certification. The defendant-lenders will surely oppose class certification, *see, e.g.*, Decision One Settlement, *supra* note 241, ¶ 3.1, and the trial courts are required to decide this issue at "an early practicable time." *See* FED. R. CIV. P. 23(c)(1)(A). Indeed, in earlier ECOA-based challenges to discretionary pricing in car loans—which in some ways have served as a model for the current mortgage cases—the class certification issue was not only hotly contested, but resulted in two interlocutory appeals. See *Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443 (6th Cir. 2002) (described *supra* note 193) and *Cason v. Nissan Motor Acceptance Corp.*, 28 Fed. Appx. 392 (6th Cir. 2002) (decision on remand described *supra* note 193), both of which had to be litigated before these cases were ultimately settled. *See infra* note 261 and accompanying text.

[248] *See, e.g., In re* Wells Fargo Residential Mortgage Lending Discrimination Litig., No. C 08-1930 MMC (JL), 2009 WL 1578920, at *1 (N.D. Cal. June 4, 2009) (ruling on defendant's claims that various types of privilege justify its refusal to allow discovery of thousands of pages of documents relating to its loan files and methodologies); *In re* Wells Fargo Residential Mortgage Lending Discrimination Litig., No. M:08-CV-1930 MMC, 2009 WL 1858022, at *1 (N.D. Cal. June 29, 2009) (denying defendant's motion to compel discovery regarding plaintiffs' credit history and "real estate sophistication"); Joint Discovery Report Pursuant to FED. R. CIV. P. 26(f) at *2-5, No. 1:07 CV-11275-RGS, 2008 WL 792075 (D. Mass. Mar. 14, 2008) (describing various disputed points regarding discovery).

[249] The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." Arizona v. California, 460 U.S. 605, 618 (1983). The subsequent stages of litigation covered by this doctrine include when "[a] trial court [rules] on a matter of law and then the same legal question [is] raised a second time in the same trial court." Allan D. Vestal, *Law of the Case: Single-Suit Preclusion*, 11 UTAH L. REV. 1, 4 (1967). Thus, under this doctrine, "a district court's discretion to reconsider its own decisions is limited, at least absent an intervening change of law, to circumstances in which new evidence is available, an error must be corrected, or manifest injustice would otherwise ensue." Stichting Ter Behartiging Van De Belangen v. Schreiber, 407 F.3d 34, 44 (2d Cir. 2005).

[250] *See*, respectively, *supra* notes 204, 222 and accompanying texts.

[251] *See supra* notes 136–138, 228–229 and accompanying texts.

dence of discrimination in virtually all prior lending cases has been a statistical analysis of the particular defendant's loan files.[252] Based on HMDA data and related studies, the plaintiffs in the current class actions will probably be able to show that each of the defendant-lenders has charged minorities more for their mortgages than it has whites.[253] The defendants will counter that these disparities are explainable by non-racial factors, such as differences in the borrowers' credit scores.

Each side will no doubt hire experts to do regression analyses on the defendants' loan files to support their respective positions. This type of loan-file analysis has been used in FHA lending cases since at least the mid-1990s.[254] A modern example of this technique occurred in a recent case against Wells Fargo that is described in a 2009 article by the plaintiffs' lawyer.[255] Similar expert testimony was presented in the car-finance cases.[256]

---

[252] *See supra* notes 73–75, 248 and accompanying texts.

[253] *See supra* notes 133–135, 139–145 and accompanying texts.

[254] *See, e.g., Proposals to Enhance the Community Reinvestment Act: Hearing Before the H. Financial Servs. Comm.*, 111th Cong. 28 (2009) (testimony of John Taylor, President and CEO of the Nat'l Cmty. Reinvestment Coal.), *available at* http://financialservices.house.gov/hearings_all.shtml) (noting that "the Federal Reserve Bank of Richmond conducted matched file reviews of more than 300 loan applications in a CRA exam dated January 1996 of Signet Bank").

For a critique of the use of regression analysis in civil rights cases as being inferior to more recently developed statistical techniques, see D. James Greiner, *Causal Inference in Civil Rights Litigation*, 122 Harv. L. Rev. 534 (2008).

[255] *See* White, *supra* note 46, at 694–98. Here, the author, now a law professor, describes in detail the conflicting expert reports submitted in the case, *Walker v. Wells Fargo Bank, N.A.*, No. 05-cv-666 (E.D. Pa. dismissed pursuant to settlement Feb. 29, 2008), which involved allegations of both intent- and impact-based discrimination in the defendant's pricing of mortgage loans. Professor White notes that the defendant's expert used regression analysis to evaluate "whether legitimate business factors could adequately explain the disparities in pricing between all black and all white borrowers in Wells Fargo's portfolio," with the expert finding, unsurprisingly, that "credit scores and debt-to-income ratios were the major drivers of interest rates, and race was not a statistically significant factor." *Id.* at 696. This expert initially limited her analysis to a subset of Wells Fargo loans that the defendant had identified "as belonging to a channel, i.e., its wholesale lending division, and within that division, to a product category known as Home Credit Solutions." *Id.* at 696–97. In response to the plaintiff's expert's criticisms of this narrow focus, the defendant's expert submitted a second report dealing with a wider set of the defendant's loans, which, again, concluded that the race-based price disparities could be explained almost entirely on the basis of the borrowers' credit scores and other legitimate variables. *Id.* at 697.

This case was settled before the court could evaluate these conflicting expert reports. *Id.* at 695. Still, Professor White concludes the discovery was revealing in that it showed "that within a large financial institution such as Wells Fargo, mortgage prices for borrowers with similar credit scores and qualifications vary widely according to channels and products." *Id.* at 698. He notes that lenders like Wells Fargo could conceivably "offer cost-driven business justifications for charging different prices for loans made through different channels," *id.*, but concludes that it would be difficult for such a lender to justify "selling the same product . . . at different prices [just by] using different names." *Id.*

[256] *See, e.g.*, Reports of Dr. Mark A. Cohen (for plaintiffs) and Dr. Laurentius Marais (for defendants), referred to in Brief of Defendants Regarding Proposed Remedy, Borlay v. Primus Auto. Fin. Serv., Inc., No. 3-02-0382, 2005 WL 4132590 (M.D. Tenn. 2005); Report of Dr. Calvin P. Bradford (for plaintiffs) in Borlay v. Primus Auto. Fin. Serv., Inc. (on file with author).

At the summary judgment stage, therefore, each side will have presented expert reports contending, respectively, that legitimate factors do or do not explain the defendants' race-based price disparities. The existence of conflicting expert testimony suggests that the defendants will have a hard time convincing the courts that summary judgment is appropriate,[257] even though the plaintiffs bear the ultimate burden of persuasion on the issue of whether illegal discrimination has been shown.[258]

We cannot predict how the various trial judges will rule on the defendants' summary judgment motions. Given that the evidence will differ somewhat in each defendant-lender's case,[259] it is certainly possible that some courts will deny summary judgment, while others may grant it. A denial is a non-appealable order, which means these cases would then be ready for trial. Conversely, a ruling in favor of summary judgment would end the case in the defendant's favor at the trial court level, and would presumably result in the plaintiffs filing an appeal. This would provide the appellate court with an opportunity to rule, in a case of first impression, on the nature of the evidence required to support an impact-based lending case under the FHA. As a result, a potential Supreme Court case might well be in the making.

Regardless of how the summary judgment motions are decided, the most likely result for all of these cases is that, like most civil litigation in federal court,[260] they will be settled. Although these class actions are certainly not run-of-the-mill cases, it is instructive that their close cousins in the car-finance field were all settled before trial.[261] If, indeed, this is also the

---

[257] Summary judgment in federal court is appropriate only when the discovery and other materials on file in the case "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]he substantive law will identify which facts are material," and "a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, summary judgment should be denied if the key factual issues "may reasonably be resolved in favor of either party"; that is, if "reasonable minds could differ as to the import of the evidence." *Id.* at 250.

[258] *See, e.g.*, Budnick v. Town of Carefree, 518 F.3d 1109, 1118–19 (9th Cir. 2008); Reinhart v. Lincoln County, 482 F.3d 1225, 1229–32 (10th Cir. 2007); Simms v. First Gibraltar Bank, 83 F.3d 1546, 1555–56 (5th Cir. 1996).

[259] Presumably, despite the similarities in their discretionary pricing policies, the defendant-lenders did not all behave the same way towards blacks and Latinos in pricing their loans. *See, e.g.*, JAKABOVICS & CHAPMAN, *supra* note 135, at 2 (identifying, for each of fourteen major mortgage lenders, substantially different rates of providing higher-priced loans among various racial groups); PAYING MORE, *supra* note 51, at 3 (identifying Wells Fargo as having the highest black/white disparity ratio among seven major lenders studies and HSBC as having the largest Latino/white disparity ratio).

[260] *See* ADMIN. OFFICE OF THE U.S. COURTS, FEDERAL JUDICIAL CASELOAD STATISTICS: MARCH 31, 2008 Table C-4 (2008), http://www.uscourts.gov/caseload2008/tables/C04Mar08.pdf (noting that, of all civil cases terminated in the U.S. District Courts in the year ending March 31, 2008, only 4.1% reached the trial stage, with the figure being even smaller (1.3%) for civil rights cases of the kind involved here).

[261] *See, e.g.*, Claybrooks v. Primus Auto. Fin. Services, Inc., 363 F. Supp. 2d 969, 972 (M.D. Tenn. 2005) (referring to the settlement in *Cason v. Nissan Motor Acceptance Corp.* (case described *infra* notes 193 and 247)); Memorandum of Plaintiff in Support of Final Ap-

ultimate fate for the mortgage cases,[262] then the plaintiffs will presumably achieve some, but not all, of their litigation goals.[263]  Furthermore, the opportunity for judicial guidance beyond that provided by the trial courts' decisions will be lost.

These class action cases have already accomplished much of what they originally sought in terms of injunctive relief, in that some of the defendant-lenders have now abandoned their discretionary pricing policies and others may soon be forced to do so by regulatory changes.[264]  Whether the individual minority plaintiffs who have been victimized by the defendants' alleged discrimination will ultimately be compensated through these cases is harder to predict.  Apart from the possibility of settlement, the plaintiffs could only achieve this result by prevailing on a long and daunting list of procedural and substantive issues.  Given the defendant-lenders' vast litigation resources, and thus the likelihood of their seeking full appellate review on all key issues resolved against them at the trial-court level, it would seem that the plaintiffs would need many years and a few breaks along the way to achieve ultimate success on the merits.

Still, continuing prosecution of this litigation seems eminently worthwhile.  One reason is that it is likely to produce a wealth of heretofore non-public data concerning how the individual defendant-lenders priced their loans.[265]  In addition, the guidance that would result from judicial decisions in these cases might be helpful in clarifying the law and/or in indicating the need for corrective amendments to the FHA and other civil rights statutes.

## IV.  Other Ideas for Reform Beyond Litigation

In this part, we provide some broader thoughts on the class action cases discussed in Part III and look beyond this particular litigation to consider non-litigation reforms necessary to ensure that discrimination in the home-finance industry can be reduced in the future.  The class actions are challenging mortgage practices whose discriminatory results have continued to block our Nation's promise, implicit in the Thirteenth Amendment and explicit in our civil rights laws, that "a dollar in the hands of a Negro will purchase the

---

proval of Settlement, Smith v. Chrysler Fin. Co., Civil Action No. 00-CV-6003 (DMC), 2005 WL 3172009 (D. N.J. Sept. 29, 2005).

[262] At least one of these cases has already resulted in a settlement agreement, approval of which is currently pending before the court.  *See* Decision One Settlement, *supra* note 241.

[263] For a description of the relief originally sought by the plaintiffs, see *supra* notes 188–189 and accompanying text.

[264] *See infra* notes 270–272 and accompanying text.

[265] *See supra* notes 226–227, 254–256 and accompanying texts.  This is not guaranteed, however, in light of the fact that much of modern discovery in large civil rights cases is subject to protective orders that prohibit public disclosure of what thereby becomes viewed as confidential information.  *See generally* Bond v. Utreras, 585 F.3d 1061 (7th Cir. 2009) (rejecting efforts by a journalist and public officials to gain access to such information in a settled § 1983 action alleging police misconduct).

same thing as a dollar in the hands of a white man."[266]  With credit policies vastly under-regulated in the past decade, mortgage lenders exploited the American dream of homeownership by charging a premium to minority borrowers because they could get away with it.  This exploitation is just as wrong—and should be just as illegal—as redlining and other blatant forms of mortgage discrimination.[267]

The financial exploitation of minority consumers is nothing new in our society.  When government fails to act to remedy this exploitation, private litigation has often paved the way for reform.[268]  This is the tradition in which the lending discrimination cases fit.  The fact that some large mortgage lenders have now eliminated discretionary pricing shows that this litigation effort is succeeding.

As noted above, lenders claim they would face competitive problems in eliminating the practice of discretionary pricing on an individual basis,[269] which suggests that a solution should be industry-wide.  Indeed, on August 26, 2009, the Federal Reserve Board published a proposed set of regulations that will have the effect of banning most forms of discretionary pricing.[270]  This new rule would prohibit mortgage lenders from compensating brokers

---

[266] Over forty years ago, in the same year that the FHA was passed, the Supreme Court, in upholding the constitutionality of another federal statute that also guarantees equal property rights, stated:

> Negro citizens, North and South, who saw in the Thirteenth Amendment a promise of freedom—freedom to "go and come at pleasure" and to "buy and sell when they please"—would be left with "a mere paper guarantee" if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man.  At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white may can buy, the right to live wherever a white man can live.  If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep.

Jones v. Alfred H. Mayer Co., 392 U.S. 409, 443 (1968) (quoting legislative history of that part of the 1866 Civil Rights Act that is now codified at 42 U.S.C. § 1982).

[267] For a discussion of redlining and other such blatantly discriminatory practices, see *supra* Part II.C.1.

[268] Private enforcement of the FHA has resulted, over time, in curbing such discriminatory tactics as restrictive covenants, blockbusting, and discriminatory zoning regulations.  *See* private cases cited in SCHWEMM, *supra* note 67, at, respectively, § 3:3 nn.4, 9, 17 (restrictive covenants), § 17:2 nn.6, 8, 14 (blockbusting), and § 13:9 nn.14 and § 13:10 nn.2–5 (discriminatory zoning); *cf.* cases cited *supra* notes 128, 261 (private ECOA litigation challenging discriminatory markups charged by car-finance companies).  For a recent example of how private litigation can—and was needed to—prompt federal agencies to take steps to prevent systematic violations of the FHA, see Sam Roberts, *Westchester County Agrees to Desegregate Housing in Mostly White Towns*, N.Y. TIMES, Aug. 11, 2009, at A14 (describing the settlement in the case of *United States ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County*, 668 F. Supp. 2d 548 (S.D.N.Y. 2009)).

[269] *See supra* note 239 and accompanying text.

[270] *See* Truth in Lending, Regulation Z Amendment Proposal, 74 Fed. Reg. 43232 (proposed Aug. 26, 2009).  The comment period for these new rules closed December 24, 2009.  *Id.* at 43232.

and loan officers based on a loan's terms or conditions,[271] thereby eliminating both "yield spread premiums" on broker-initiated loans and "overages" on in-house loans.[272] The Fed proposal would not eliminate all pricing discretion,[273] but it would remove some of the incentives for loan-originators to impose higher prices.

Eliminating the practice of discretionary pricing on an industry-wide, rather than an individual, basis would be the preferred solution. Statutory and regulatory changes, such as the Fed's proposal, may help eliminate the temptation of some lenders to extract larger profits from the more vulnerable segments of our society. Regulatory reform, however, is not a substitute for—but rather should go hand in hand with—private enforcement of existing civil rights laws.

One clear lesson from the recent housing crisis is that self-regulation by the mortgage lending industry is not sufficient. The temptation to make quick and large profits off an unsuspecting public in the multi-trillion-dollar home-finance market can be too great for many to resist. Some subprime lenders and their predatory practices may have disappeared, but they—or others like them—will soon return if the threat of effective litigation, as well as regulation, does not exist.[274]

Now that the Nation has entered a period of restrictive credit, mortgage lenders may find it easy to eschew discretionary pricing, but the class actions are intended to make an impression that will also last through times of plenty. Hopefully, verdicts and/or consent orders in these cases, coupled with regulatory reforms, will help ensure that future innovative credit practices are applied equally to consumers of all races and national origins.[275]

---

[271] *See id.* at 43233, 43279–85, 43331–32 (proposing new 12 C.F.R. § 226.36(d)(1)). As used here, a loan's "terms or conditions" include "the interest rate, annual percentage rate, or the existence of a prepayment penalty." *Id.* at 43283. Compensation for loan originators could, however, be based on "the originator's loan volume, the performance of loans delivered by the originator, or hourly wages." *Id.*

   The new regulations would also prohibit mortgage brokers and loan officers from steering consumers "to transactions that are not in their interest in order to increase the mortgage broker's or loan officer's compensation." *Id.* at 43233; *see also id.* at 43285–86, 43332–33 (proposing new 12 C.F.R. § 226.36(d)(1) or (e)(1)).

[272] For descriptions of "yield spread premiums" and "overages," see, respectively, *supra* note 121 and notes 110–113 and accompanying text.

[273] For example, the Fed proposal recognizes "that loan originators may need to expend more time and resources in originating loans for consumers with limited or blemished credit histories" and thus paying "an originator based on the time expended would be permissible under the proposed rule." Truth in Lending, *supra* note 270, at 43283.

[274] There is evidence that such predatory lenders may already be returning, with some now claiming to be helpful "advisors" to homeowners in need of mortgage work-outs, foreclosure rescues, or other types of credit counseling. *See, e.g.*, Peter S. Goodman, *Cashing In, Again, on Risky Mortgages: Subprime Brokers Resurface as Dubious Loan Fixers*, N.Y. TIMES, July 20, 2009, at A1; Carrick Mollenkamp, *Subprime Resurfaces As Housing-Market Woe*, WALL ST. J., July 9, 2009, at C1.

[275] Responsible innovations in home financing should be encouraged in order to provide opportunities for borrowers with blemished credit. This must be done, however, with a strong emphasis on equality and transparency. Neutral policies employed by lenders must be validated to ensure that they are related to credit risk and have no unreasonable discriminatory

Attacking the discrimination problems posed by discretionary pricing can be difficult,[276] but we must remember that these problems are only one part of the complex mosaic of discrimination that blacks and Latinos face in the home-finance process. Just as lenders have often steered individual minority borrowers to worse loans than their credit records justify, so too have they regularly targeted minority neighborhoods for predatory loans. Moreover, as credit becomes tighter, a new era of discriminatory loan refusals, not merely price discrimination, may re-emerge. These types of intent-based discriminatory practices are clearly illegal,[277] but it remains an open question whether private litigation challenging them is able to achieve anything more than sporadic and individualized relief.[278]

---

impact. *See, e.g.*, TEMKIN ET AL., *supra* note 23, at 48; *cf.* 29 C.F.R. § 1607 (2009) (EEOC's employment discrimination guidelines). When a discriminatory impact is found, less discriminatory alternatives must be explored. And all of this should be done *before* the practice is imposed on an unsuspecting public.

[276] It was easier to detect discrimination when a common set of underwriting rules was embraced with small deviations by all lenders. It is far more difficult to do so when lenders underwrite using very different rules, at a wide range of prices based on the experience of their own loan portfolios, and on the basis of particular loan conditions and terms. Detecting patterns of unfair or discriminatory treatment on the basis of price, fees, terms, and conditions occurs in the complicated context of an industry that has yet to agree on common practices and prices. It also raises the important question of whether a geographically segmented and differentiated strategy for originating and servicing loans in underserved markets may constitute unfair treatment in and of itself. BELSKY & ESSENE, *supra* note 31, at 26.

[277] *See, e.g.*, Jackson v. Novastar Mortg. Inc., 645 F. Supp. 2d 636, 646–47 (W.D. Tenn. 2007) (upholding FHA and ECOA claims based on intentional discrimination in targeting minorities and minority neighborhoods for high priced loans); Simms v. First Gibralter Bank, 83 F.3d 1546 (5th Cir. 1996) (discussed *supra* notes 72–73 and accompanying text); underwriting cases described *supra* notes 77–78 and accompanying text.

[278] Another issue we have not addressed is whether the credit models used to implement "risk-based" pricing, *see supra* text notes 121, 123 and accompanying text, are fair to minority borrowers. These models rely on computer programs written by human beings who inevitably have their own biases, and the controlling factors written into these programs are generally kept secret from the public. Under these circumstances, there is no guarantee that risk-based pricing—which the class action cases challenging discretionary pricing have assumed are "objective" and therefore non-discriminatory—does, in fact, treat racial and ethnic minorities as well as whites. *See, e.g.*, Zamudio v. HSBC North Am. Holdings Inc., No. 07 C 4315, 2008 WL 517138, at *1–2 (N.D. Ill. Feb. 20, 2008) (upholding FHA/ECOA-based complaint alleging that mortgage lender's "automated underwriting and credit scoring systems . . . have a discriminatory impact on minority mortgage applicants" due to "discriminatory assumptions . . . embedded in the statistical formulas used to analyze credit information and ultimately form underwriting decisions"); TEMKIN ET AL., *supra* note 23, at 47–48 (advising HUD to monitor automated underwriting systems to determine if they have a disproportionate adverse effect on protected classes of borrowers); White, *supra* note 46, at 698, 702–05 (concluding that one of the "potential culprits in racial mortgage price disparities" —in addition to lenders' price-discretion policies—is "the fundamental question of the validity of the risk-based pricing models themselves" and describing flaws in some of these models); *cf.* Ojo v. Farmers Group, Inc., 600 F.3d 1205 (9th Cir. 2010) (en banc) (per curiam) (upholding, subject to possible McCarran-Ferguson Act preemption, FHA-based complaint alleging that defendant-insurance companies used a number of undisclosed factors in their credit-scoring system that disparately impact minorities); Lumpkin v. Farmers Group, Inc., No. 05-2868 Ma/V, 2007 WL 6996584, at *4 (W.D. Tenn. Apr. 26, 2007) (upholding class action complaint alleging that credit scoring system used by defendant to set its home-insurance rates had a disparate impact on minorities in violation of the FHA).

As for non-litigation ideas for reform, we would start by criticizing the federal agencies that are charged with regulating mortgage lenders. From a civil rights perspective, their performance over the past decade has been appalling. In particular, the Federal Reserve, which knew from its own studies as early as 2005 of large-scale discrimination in home-loan pricing,[279] did virtually nothing to effectively challenge this discrimination. The Fed may simply be incapable of enforcing its civil rights mandate because it is primarily concerned with monetary policy and lenders' financial soundness.[280] We therefore support pending legislation that would create a new federal Consumer Financial Protection Agency and provide it with a strong civil rights mandate.[281] Additional legislative changes being considered by the current Congress might also help improve federal oversight of the mortgage industry.[282] Regardless of which agencies are involved, there is no reason why federal regulators should continue to allow mortgage lenders to keep secret their data concerning race and national origin disparities in their loan prices.[283] The failure to make such information public seems to be at the

---

[279] *See supra* note 134 and accompanying text.

[280] According to a former member of the Fed's Consumer Advisory Council: "I would hear Federal Reserve staff talk about serving their 'clients.' I initially thought clients meant the taxpayers but then I was shocked to learn that clients meant banks that were 'members' of the Federal Reserve System." *Taylor Testimony, supra* note 141, at 2; *see also id.* at 16 (quoting two former Federal Reserve governors as doubting that a central bank designed to regulate financial institutions can also effectively perform consumer-protection duties); *Community and Consumer Advocates' Perspective on the Obama Administration's Financial Regulatory Reform Proposals: Hearing Before the H. Financial Servs. Comm.*, 111th Cong. 2 n.2 (2009), (testimony of Nancy Zirkin, Executive Vice President of the Leadership Conference on Civil Rights), *available at* http://financialservices.house.gov/hearings_all.shtml (describing how then-Fed Chairman Alan Greenspan rebuffed efforts by fellow-governor Edward Gramlick to have the Fed take action against the growing danger of risky mortgages, as an example of the refusal of the Fed and other bank regulators to listen to concerns of civil rights and consumer advocates).

[281] On December 11, 2009, the House passed the Wall Street and Consumer Protection Act (H.R. 4173). *See* Press Release, House Financial Services Committee, House Approves Historic New Rules to Govern America's Financial System (Dec. 11, 2009), *available at* http://financialservices.house.gov/. This bill would, inter alia, create a new Consumer Financial Protection Agency ("CFPA") that is responsible for writing consumer protection and civil rights rules dealing with the financial services industry, including previously unregulated mortgage originators. *See id.* On March 15, 2010, Chairman Dodd of the Senate Banking, Housing, and Urban Affairs Committee introduced S. 3217, the Restoring American Financial Stability Act of 2010, which would create a Bureau of Consumer Financial Protection similar to the CFPA approved by the House. The bill is available at http://banking.senate.gov/public.

[282] Bills that were the subject of committee hearings by the 111th Congress in 2000, but were not enacted by the close of 2009, include: the Mortgage Reform and Anti-Predatory Lending Act of 2009 (H.R. 1728 and S. 2452), which would ban or limit a number of problematic mortgage practices (e.g., prepayment penalties for subprime loans); the Community Reinvestment Modernization Act (H.R. 1479), which would expand the CRA's coverage in various ways (e.g., by requiring inclusion of mortgage company affiliates of banks in CRA exams); the Foreclosure Rescue Fraud Act of 2009 (H.R. 1231 and S. 117); the Fairness for Homeowners Act of 2009 (H.R. 1782); and the Housing Fairness Act (H.R. 476).

[283] *See, e.g.*, GAO Fair Lending Report, *supra* note 35, at 4, 19–22, 61–62; Jakabovics & Chapman, *supra* note 135, at 2.
  In addition, federal regulators should update HMDA requirements to mandate reporting of certain crucial information that lenders now claim might legitimately "explain" their race-

heart of the dispute in the class action cases over whether legitimate factors can explain such disparities.[284] It is unseemly for lenders to guard this as proprietary information and then criticize FHA-enforcement efforts for relying on the "limited" data that is made available to the public,[285] particularly when many of these lenders now owe their very existence to huge infusions of public money.[286]

We would also suggest that mortgage brokers be subjected to similar licensing and regulatory restrictions as mortgage lenders.[287] The large role that brokers seem to have played in discriminatory loan pricing, combined with the defendant-lenders' claim that brokers' discrimination is beyond the lenders' control or legal responsibility,[288] makes for an unacceptable situation. *Someone* must be held accountable when brokers discriminate. The claim that brokers "represent" their customers is belied by economic theory as well as actual experience; the fact is, they represent themselves.[289] Addi-

---

based price disparities. *See, e.g.*, GRUENSTEIN BOCIAN ET AL., *supra* note 91, at 26 (recommending that "HMDA should be modified to include the disclosure of factors such as loan-to-value ratios and credit scores of borrowers" along with certain other information); PAYING MORE, *supra* note 51, at 13 (calling for the Fed to "add data fields to those currently in use under HMDA [that would, inter alia,] include information on whether or not a loan was originated through a broker; . . . borrower credit score; . . . debt to income ratios; and loan to value ratios"); *see also* H.R. 3126, 111th Cong. (2009) (a bill that would create a new Consumer Financial Protection Agency, described *supra* note 281, and mandate a number of enhancements to the HMDA data).

[284] *See supra* notes 223–227 and accompanying text.

[285] At the very least, it would seem appropriate for every mortgage lender to have to certify that it is in compliance with the anti-discrimination mandates of the FHA and ECOA and to spell out the basis for its making this certification. Currently borrowers are required to swear on penalty of perjury that the information they are supplying to mortgage lenders is truthful, *see supra* note 71 and accompanying text, and requiring similar truthfulness from the lenders seems only fair. If such a lender's oath were required, enforcement thereof might be accomplished, inter alia, by privately initiated qui tam actions under the False Claims Act. *Cf.* United States *ex rel.* Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester County, No. 06 Civ. 2860 (DLC), 2009 WL 455269 (S.D.N.Y. 2009) (described *supra* note 248).

[286] *See, e.g.*, *supra* note 54 (noting that Bank of America, which took over Countrywide in 2008, received some $45 billion in TARP funds); *supra* note 55 (describing TARP funds received by GMAC, WellsFargo, and Citigroup).

[287] *See, e.g.*, ERNST ET AL., *supra* note 24, at 35–36 (calling for regulation that would significantly increase the bonding requirements for mortgage brokers and place on them a duty to recommend only products that are appropriate for their customers or at least a duty of good faith and fair dealing); MORTGAGE BANKERS/BROKERS, *supra* note 32, at 32 (advocating "rigorous and appropriate licensing standards" for all loan originators, including brokers); PAYING MORE, *supra* note 51, at 12 (calling for legislation that would "adequately regulate mortgage brokers"); Peterson, *supra* note 33, at 2280–81 (suggesting that Congress amend the consumer-protection mortgage laws "to explicitly govern the behavior of mortgage brokers, even where those brokers are not the party to whom a note is initially payable").

[288] *See supra* notes 177–182 and accompanying text.

[289] "The mortgage broker is not the borrower's agent. . . . Their goal as profit maximizers is to find the cheapest wholesale terms and charge what the market will bear." Woodward, *supra* note 120, at 4; *see also* BARR ET AL., *supra* note 127, at 31 (noting that mortgage brokers "are compensated for getting borrowers to pay higher rates than those for which the borrower would qualify"); ERNST ET AL., *supra* note 24, at 9 (noting that their "compensation structure encourages brokers to originate as many loans as possible at the highest prices possible"); Apgar & Calder, *supra* note 32, at 6 (concluding that, given how they are compensated, brokers "do not work on behalf of the borrower" or anyone else and that, as a result, "borrowers

tionally, because there are few barriers to entry, mortgage brokers can go into and out of business at a moment's notice without the slightest proven awareness of applicable civil rights or consumer-protection laws.[290] Given the serious harm that brokers can inflict on would-be borrowers, they must be made more accountable.

Finally, we would advocate that lenders, brokers, and everyone else who deals with mortgage applicants be required to offer, among other options, a "standard" mortgage product (e.g., a thirty-year fixed-rate loan).[291] A new HUD regulation, which became effective on January 1, 2010, and is designed to eliminate "unfair junk fees" that often surprise borrowers at closing, requires loan-originators to use forms that, for the first time, allow customers to "easily compare their estimated loan offer with the one to which they actually agree."[292] If this type of comparison can be required, it should be possible—and even more effective—to mandate that borrowers be given the opportunity to choose, at the outset, a loan product that their lender or broker is currently making available to similarly creditworthy customers and that does not have *any* "unfair junk fees" or other added costs.

Determining which of these legislative and regulatory reforms will be most effective in reducing racial disparities in mortgage lending is not an easy task, but we offer these observations. So long as our home-finance system relies primarily on profit-seeking lenders, it is naïve to believe that these firms will voluntarily put a high value on conforming with civil rights laws if discrimination appears to offer the prospect of more profits. This suggests that substantially more governmental oversight is the answer, but experience has shown that such oversight is only helpful if regulators have the interest, will, and resources to enforce their anti-discrimination and con-

---

who receive funding through the broker channel are charged a premium over apparently similar borrowers who receive their loans through retail channels").

Because mortgage brokers act merely as intermediaries between a lender and a prospective borrower and represent their own financial interests, their role is different from, say, a real estate broker who typically acts as an agent for a seller or buyer and thus is subject to fiduciary and ethical duties to represent the interests of its principal. This distinction is often not apparent to would-be borrowers, who may reasonably, but erroneously, assume that mortgage brokers are obligated to find them the best deal available. Because state regulations often require little, if any, education or experience for mortgage brokers, *see supra* note 35, borrowers who rely on brokers to be knowledgeable about civil rights and consumer-protection laws governing loan products may be misled.

[290] *See supra* note 32; Mortgage Bankers/Brokers, *supra* note 32, at 23 ("Entering the mortgage brokerage business requires fewer resources and less operational capacity [than mortgage lending]. . . . Mortgage brokers generally are not required to have funding sources or net worth except in nominal amounts."); Engel & McCoy, *supra* note 28, at 2077 n.187 (noting that very little capital is required to become a mortgage broker).

[291] *See, e.g.*, U.S. Dep't of the Treasury, Financial Regulatory Reform: A New Foundation: Rebuilding Financial Supervision and Regulation 66-67 (2009), *available at* http://www.financialstability.gov/docs/regs/FinalReport_web.pdf (proposing that federal regulators be authorized to define and require mortgage providers to offer such a "plain vanilla" product).

[292] *See* Press Release, U.S. Department of Housing and Urban Development, HUD Announces Posting of Frequently Asked Question on New RESPA Rule (Aug. 13, 2009), *available at* http://www.hud.gov/news/index.cfm.

sumer-protection powers. Thus, we favor those reforms that provide the greatest degree of public information and transparency in the mortgage process. Private litigation will always be a necessary supplement to governmental regulation in this area, and neither can succeed without making much of what the mortgage industry has heretofore regarded as proprietary information available to the public. An additional value of heightened disclosure and transparency is that, in a market economy, one must ultimately rely on informed consumers to make choices that will not allow lenders to engage in the types of predatory and discriminatory behavior that have too often resulted from discretionary mortgage pricing.

## V. Conclusion

We have examined the principal litigation response to the racial and ethnic discrimination that has characterized the home mortgage industry in recent years: a series of nationwide class actions based primarily on the Fair Housing Act alleging that the discretionary pricing policies of individual defendant-lenders resulted in unjustifiably higher rates and fees for minority borrowers. These discretionary pricing policies have been at the heart of the key fair-lending issue in the past decade: that is, how home-loans are priced, particularly in the boom times when the easy securitization of such loans encouraged lenders to reduce credit standards.

By focusing attention on this industry-wide pricing system, the pending class actions have already gone a long way toward ending this particular practice, but whether they can also secure relief for the tens of thousands of minority families placed in less-than-prime mortgages as a result of this practice remains to be seen. This litigation involves some of today's most challenging FHA issues, along with many difficult procedural questions. Indeed, one unmistakable insight demonstrated by our detailed discussion of these cases is that litigation is a chancy, albeit often necessary, technique for achieving fair-lending reform.

Whether this particular litigation response to recent discrimination problems in the mortgage industry ultimately proves successful or not, it must be seen as just one part of a much broader effort designed to eliminate unlawful discrimination from the home-finance system. This ongoing effort includes other private litigation based on both anti-discrimination and consumer-protection laws, government enforcement through litigation and regulation, and perhaps new legislation.

Mortgage lending has always been the gateway to the American Dream of homeownership, and, historically, it has also been characterized by widespread discrimination against racial and ethnic minorities and their communities. As the nation becomes increasingly more diverse and as better economic times return, there is no more important civil rights issue than making the process of buying and financing a home more open, fair, transparent, and available to all.

the wheel from service within 15 CIS after the effective date of this AD.

(2) Thereafter, remove HPT stage 2 wheels, P/N 23084520, before exceeding the new, reduced engine cycle life limit (ECLL) of 23,000 CSN.

(k) For HPT stage 2 wheels, P/N 23075345 and 23074644, do the following:

(1) For wheels that have 19,985 CSN or more on the effective date of this AD, remove

the wheel from service within 15 CIS after the effective date of this AD unless paragraph (k)(3) of this AD applies.

(2) Thereafter, remove HPT stage 2 wheels, P/N 23075345 and 23074644, before exceeding the new, reduced ECLL of 20,000 CSN.

(3) For HPT stage 2 wheels, P/N 23075345, that have a S/N listed in Table 5 of this AD and that have 22,985 CSN or more on the

effective date of this AD, remove the wheel from service within 15 CIS after the effective date of this AD.

(4) Thereafter, for HPT stage 2 wheels, P/N 23075345, that have a S/N listed in Table 5 of this AD, remove the wheel from service before exceeding the new, reduced ECLL of 23,000 CSN.

TABLE 5—S/Ns OF HPT STAGE 2 WHEEL, P/N 23075345, ELIGIBLE TO REMAIN IN SERVICE UNTIL 23,000 CSN

| | | | |
|---|---|---|---|
| MM507646 | MM508205 | MM508251 | MM508322 |
| MM508144 | MM508208 | MM508264 | MM508337 |
| MM508153 | MM508211 | MM508305 | MM508338 |
| MM508176 | MM508221 | MM508311 | MM508382 |
| MM508186 | MM508241 | MM508319 | MM508387 |
| MM508188 | MM508248 | MM508320 | |

(l) For wheels, P/N 23069438, in engines that have not complied with RRC SB AE 3007A–72–176, Revision 5, dated September 2, 2008, or SB AE 3007A–72–215, Revision 2, dated September 28, 2009, remove the wheel before exceeding the new, reduced ECLL of 10,000 CSN.

(m) For wheels, P/N 23069438, in engines that have complied with RRC SB AE 3007A–72–176, Revision 5, dated September 2, 2008 or SB AE 3007A–72–215, Revision 2, dated September 28, 2009, do the following:

(1) For wheels that have 19,985 CSN or more on the effective date of this AD, remove the wheel from service within 15 CIS after the effective date of this AD.

(2) Thereafter, remove the wheel from service before exceeding the new, reduced ECLL of 20,000 CSN.

**Alternative Methods of Compliance**

(n) The Manager, Chicago Aircraft Certification Office, has the authority to approve alternative methods of compliance for this AD if requested using the procedures found in 14 CFR 39.19.

**Special Flight Permits**

(o) Under 14 CFR 39.23, we are limiting the special flight permits for this AD by restricting the flight to essential flight crew only.

**Related Information**

(p) Contact Kyri Zaroyiannis, Aerospace Engineer, Chicago Aircraft Certification Office, Small Airplane Directorate, FAA, 2300 E. Devon Ave., Des Plaines, IL 60018; e-mail: *kyri.zaroyiannis@faa.gov*; telephone (847) 294–7836; fax (847) 294–7834, for more information about this AD.

Issued in Burlington, Massachusetts, on February 11, 2010.

**Francis A. Favara,**

*Manager, Engine and Propeller Directorate, Aircraft Certification Service.*

[FR Doc. 2010–3145 Filed 2–17–10; 8:45 am]

**BILLING CODE 4910–13–P**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**29 CFR Part 1625**

**RIN 3046–AA87**

**Definition of "Reasonable Factors Other Than Age" Under the Age Discrimination in Employment Act**

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Equal Employment Opportunity Commission ("EEOC" or "Commission") is issuing this notice of proposed rulemaking ("NPRM") to address the meaning of "reasonable factors other than age" (RFOA) under the Age Discrimination in Employment Act ("ADEA").

**DATES:** Comments must be received on or before April 19, 2010. The Commission will consider any comments received on or before the closing date and thereafter adopt final regulations. Comments received after the closing date will be considered to the extent practicable.

**ADDRESSES:** You may submit comments by any of the following methods:

• By mail to Stephen Llewellyn, Executive Officer, Executive Secretariat, Equal Employment Opportunity Commission, U.S. Equal Employment Opportunity Commission, 131 "M" Street, NE., Washington, DC 20507.

• By facsimile ("FAX") machine to (202) 663–4114. (There is no toll free FAX number). Only comments of six or fewer pages will be accepted via FAX transmittal, in order to assure access to the equipment. Receipt of FAX transmittals will not be acknowledged, except that the sender may request confirmation of receipt by calling the Executive Secretariat staff at (202) 663–

4070 (voice) or (202) 663–4074 (TTY). (These are not toll free numbers).

• By the Federal eRulemaking Portal: *http://www.regulations.gov*. After accessing this Web site, follow its instructions for submitting comments.

*Instructions:* All comment submissions must include the agency name and docket number or the Regulatory Information Number (RIN) for this rulemaking. Comments need be submitted in only one of the above-listed formats, not all three. All comments received will be posted without change to *http://www.regulations.gov*, including any personal information you provide. Copies of the received comments also will be available for inspection in the EEOC Library, FOIA Reading Room, by advanced appointment only, from 9 a.m. to 5 p.m., Monday through Friday except legal holidays, from April 19, 2010 until the Commission publishes the rule in final form. Persons who schedule an appointment in the EEOC Library, FOIA Reading Room, and need assistance to view the comments will be provided with appropriate aids upon request, such as readers or print magnifiers. To schedule an appointment to inspect the comments at the EEOC Library, FOIA Reading Room, contact the EEOC Library by calling (202) 663–4630 (voice) or (202) 663–4641 (TTY). (These are not toll free numbers).

**FOR FURTHER INFORMATION CONTACT:** Dianna B. Johnston, Assistant Legal Counsel, or Lyn J. McDermott, Senior Attorney-Advisor, at (202) 663–4638 (voice) or (202) 663–7026 (TTY). (These are not toll free numbers). This notice also is available in the following formats: Large print, Braille, audio tape and electronic file on computer disk. Requests for this notice in an alternative format should be made to the Publications Information Center at

1–800–669–3362 (voice) or 1–800–800–3302 (TTY).

**SUPPLEMENTARY INFORMATION:** On March 31, 2008, the EEOC published a Notice of Proposed Rulemaking ("NPRM") proposing to amend its regulations to reflect the Supreme Court's decision in *Smith* v. *City of Jackson*.[1] 73 FR 16807, Mar. 31, 2008. The NPRM proposed to revise 29 CFR 1625.7(d) to state that an employment practice that has an adverse impact on individuals within the protected age group on the basis of older age is discriminatory unless the practice is justified by a "reasonable factor other than age." The proposed revision also stated that the individual challenging the allegedly unlawful employment practice bears the burden of isolating and identifying the specific employment practice responsible for the adverse impact. The Commission also proposed to revise 29 CFR 1625.7(e) to state that, when the RFOA exception is raised, the employer has the burden of showing that a reasonable factor other than age exists factually.

In addition to requesting public comment on the proposed rule, the Commission asked whether regulations should provide more information on the meaning of "reasonable factors other than age" and, if so, what the regulations should say. Eight commenters supported efforts to provide more information on the issue, one commenter thought the EEOC should not provide additional information, and one commenter did not address the question. After consideration of the public comments, and in light of recent Supreme Court decisions, the Commission believes it appropriate to issue a new NPRM to address the scope of the RFOA defense. Accordingly, before finalizing its regulations concerning disparate impact under the ADEA, the Commission is publishing this new NPRM proposing to amend its regulations to define "reasonable factors other than age."

**Recent Supreme Court Decisions**

In *Smith* v. *City of Jackson*,[2] the United States Supreme Court held that the ADEA authorizes recovery for disparate impact claims of discrimination and that the "reasonable factors other than age" test, rather than the business-necessity test, is the appropriate standard for determining the lawfulness of a practice that disproportionately affects older individuals.

The *Smith* plaintiffs, senior police and public safety officers, alleged that

the defendant City's pay plan had a disparate impact on older workers because it gave proportionately larger pay increases to newer officers than to more senior officers. Older officers, who tended to hold senior positions, on average received raises that represented a smaller percentage of their salaries than did the raises given to younger officers. The City explained that, after a survey of salaries in comparable communities, it raised the junior officers' salaries to make them competitive with those for comparable positions in the region.[3]

The Supreme Court ruled that plaintiffs may challenge facially neutral employment practices under the ADEA but that the "scope of disparate-impact liability under the ADEA is narrower than under Title VII" of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*[4] The Court relied in large part on the parallel prohibitory language and the common purposes of the ADEA and Title VII.[5] The Court noted that, in passing the ADEA, Congress was concerned that application of facially neutral employment standards, such as a high school diploma requirement, may "unfairly" limit the employment opportunities of older individuals.[6] The Court observed that there is a "remarkable similarity between the congressional goals" of Title VII and "those present in the Wirtz Report."[7]

At the same time, however, the Court identified two key textual differences that affect the relative scope of disparate impact liability under the two statutes. First, the ADEA contains the RFOA provision, which has no parallel in Title VII and precludes liability for actions "otherwise prohibited" by the statute "where the differentiation is based on

reasonable factors other than age."[8] The RFOA provision "plays its principal role" in disparate impact cases, where it "preclud[es] liability if the adverse impact was attributable to a nonage factor that was 'reasonable'."[9] Comparing the RFOA provision with the Equal Pay Act provision that precludes recovery when a pay differential is based on "any other factor other than sex,"[10] the Court found it "instructive" that "Congress provided that employers could use only *reasonable* factors in defending a suit under the ADEA."[11]

Second, in reaction to the decision in *Wards Cove Packing Co.* v. *Atonio*,[12] which "narrowly construed the employer's exposure to liability on a disparate-impact theory," Congress amended Title VII but not the ADEA.[13] Accordingly, "*Wards Cove's* pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA."[14]

Applying its analysis, the Court rejected the *Smith* plaintiffs' disparate impact claims on the merits. Focusing on the plan's purpose, design, and implementation, the Court found that the City's pay plan was based on

---

[3] *Id.* at 241–42.

[4] *Id.* at 233–40. Title VII prohibits employment discrimination based on race, color, religion, sex, and national origin. In *Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971), the Supreme Court first recognized the disparate impact theory of discrimination under Title VII. The Court held that Title VII prohibits not only intentional discrimination but also employment practices that, because they have a disparate impact on a group protected by Title VII, are "fair in form but discriminatory in operation." 401 U.S. at 431.

[5] 544 U.S. at 233–40.

[6] *Id.* at 235 n.5 (quoting Report of the Sec'y of Labor, The Older American Worker: Age Discrimination in Employment 3 (1965), *reprinted in* U.S. EEOC, Leg. History of the ADEA 21 (1981) ("Wirtz Report")). Section 715 of the Civil Rights Act of 1964 directed the Secretary of Labor "to make a full and complete study of the factors which might tend to result in discrimination in employment because of age and of the consequences of such discrimination on the economy and individuals affected." 78 Stat. 265. Secretary W. Willard Wirtz presented his findings and recommendations in the Wirtz Report.

[7] 544 U.S. at 235 n.5.

---

[8] *Id.* at 240. The Court found that the presence of the RFOA provision supported its conclusion that disparate impact claims are cognizable under the ADEA. *Id.* at 238–40.

[9] *Id.* at 239.

[10] 29 U.S.C. 206(d)(1).

[11] 544 U.S. at 239 n.11 (emphasis in the original).

[12] 490 U.S. 642 (1989). The *Wards Cove* Court ruled that, in a Title VII disparate-impact case, the plaintiff must isolate and identify the specific employment practice that has a disparate impact. Although the defendant had the burden of articulating a business justification for the challenged practice, the burden of persuasion remained at all times with the plaintiff. According to the Court, "at the justification stage, * * * the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Id.* at 659. If the challenged practice was justified by business necessity, the plaintiff could still prevail by showing that the employer refused to adopt an equally effective, less discriminatory alternative. *Id.* at 660–61.

[13] 544 U.S. at 240 (citing the Civil Rights Act of 1991, sec. 2, 105 Stat. 1071).

[14] *Id.* at 240. The "identical" language is in section 703(a)(2) of Title VII (42 U.S.C. 2000e–2(a)(2)) and section 4(a)(2) of the ADEA (29 U.S.C. 623(a)(2)), which make it unlawful for employers "to limit, segregate, or classify" individuals in a manner that would "deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's [protected status]."

The language of the two statutes significantly differs, however, with regard to the applicable defense. Unlike the ADEA, which provides a defense when the practice is based on a reasonable factor other than age (29 U.S.C. 623(f)(1)), Title VII provides a defense only when the practice is job related and consistent with business necessity (42 U.S.C. 2000e–2(k)(1)(A)).

---

[1] 544 U.S. 228 (2005).

[2] 544 U.S. 228 (2005).

**7214**   **Federal Register**/Vol. 75, No. 32/Thursday, February 18, 2010/Proposed Rules

reasonable factors other than age.[15] The Court noted that the City grouped officers by seniority in five ranks and set wage ranges based on salaries in comparable communities. Most of the officers were in the three lowest ranks, where age did not affect officers' pay. In the two highest ranks, where all of the officers were over 40, raises were higher in terms of dollar amounts; they were lower only in terms of percentage of salary. The Court concluded that the plan, as designed and administered, "was a decision based on a 'reasonable factor other than age' that responded to the City's legitimate goal of retaining police officers." [16]

Finally, the Court noted that, although "there may have been other reasonable ways for the City to achieve its goals, the one selected was not unreasonable." "Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement." [17]

*Smith* did not specify which party bore the burden of persuasion on the RFOA defense, and most of the lower courts that addressed the issue after *Smith* held that the plaintiff bore the burden of proving that the employer's action was unreasonable.[18] Subsequently, in *Meacham* v. *Knolls Atomic Power Lab.,*[19] the Supreme Court held that an employer defending an ADEA disparate-impact claim bears both the burden of production and the burden of persuasion on the reasonable factors other than age defense.

Knolls Atomic Power Laboratories ("KAPL"), the employer in *Meacham,* instituted an involuntary reduction in force ("IRIF") in 1996 to reduce its workforce by 31 employees. To identify employees for the IRIF, KAPL asked managers to rate their employees on three factors—performance, flexibility, and the criticality of their skills—and to add points for years of service. Managers then ranked employees according to their scores and identified the lowest ranked employees for layoff. Thirty of the 31 employees selected for layoff were older than 40, even though

only approximately 58% of the workforce was older than 40. The plaintiffs' statistical expert testified that the manner in which managers subjectively scored employees for flexibility and criticality accounted for the statistically significant disparities.[20]

Relying on the text and structure of the ADEA, the Supreme Court ruled that the RFOA provision creates an affirmative defense. The provision is in section 623(f)(1), which lists exemptions for employer practices "otherwise prohibited" by sections 623(a), (b), (c), or (e). As the court observed, it is a "longstanding convention" that the party claiming the benefits of an exemption bears the burden of proof.[21]

The Court noted that the bona fide occupational qualification provision, which also is in section 623(f)(1), creates an affirmative defense. The Court also noted that it has interpreted the Equal Pay Act exemption for pay differentials based on "any other factor other than sex" as an affirmative defense. In addition, in the Older Workers Benefit Protection Act, Congress added the phrase "otherwise prohibited" to section 623(f)(2) of the ADEA to clarify that the section establishes an affirmative defense. This confirms that the phrase "refers to an excuse or justification" and signals an affirmative defense on which the employer bears the burden of proof.[22]

The Court rejected KAPL's argument that, to prove that an adverse action occurred because of age, plaintiffs must show that the challenged employment practice was not based on a reasonable factor other than age.[23] The Court also rejected the Second Circuit's conclusion that plaintiffs have the RFOA burden of persuasion because plaintiffs bore the business necessity burden of persuasion under *Wards Cove* and the RFOA defense "replaces" the business necessity test. That "the business necessity test should have no place in ADEA disparate-impact cases" does not preclude a finding "that the RFOA exemption is an affirmative defense." [24]

Finally, the Court noted that, "the more plainly reasonable" the non-age factor, the smaller the difference between the burdens of production and persuasion. "It will be mainly in cases where the reasonableness of the non-age factor is obscure for some reason, that the employer will have more evidence to reveal and more convincing to do in going from production to persuasion." [25]

**Revisions to Agency Regulations**

The Commission proposes to revise current paragraph 1625.7(b) to clarify the scope of the RFOA defense. Consistent with *Smith* and *Meacham,* the proposed revision explains that whether a particular employment practice is based on reasonable factors other than age turns on the facts and circumstances of each particular situation and whether the employer acted prudently in light of those facts. This standard is lower than Title VII's business-necessity test [26] but higher than the Equal Pay Act's "any other factor" test.[27] It represents a balanced approach that preserves an employer's right to make reasonable business decisions while protecting older workers from facially neutral employment criteria that arbitrarily limit their employment opportunities.

Proposed paragraph 1625.7(b) notes that whether a differentiation is based on reasonable factors other than age must be decided on the basis of all the particular facts and circumstances surrounding each individual situation.

*Reasonable*

In General

The statutory requirement that the non-age factor be reasonable is a key element of the RFOA defense.[28] In *Smith,* the Court found it "instructive" that the ADEA provides a defense only when the factor is reasonable, unlike the Equal Pay Act, which the Court said permits an employer to justify a pay differential by proving that it is based on any factor other than sex.[29] The test

---

[15] The Court also ruled that the plaintiffs failed to satisfy *Wards Cove's* requirement that they identify a "specific test, requirement, or practice within the pay plan that has an adverse impact on older workers." 544 U.S. at 241.

[16] *Id.* at 242.

[17] *Id.* at 243.

[18] *See, e.g., Pippin* v. *Burlington Res. Oil & Gas Co.,* 440 F.3d 1186, 1200 (10th Cir. 2006); *Meacham* v. *Knolls Atomic Power Lab.,* 461 F.3d 134, 141–43 (2d Cir. 2006), *vacated and remanded,* 128 S. Ct. 2395 (2008).

[19] 128 S. Ct. 2395 (2008).

[20] *Id.* at 2398–99. The Second Circuit initially affirmed a jury verdict for the plaintiffs on their disparate impact claim. *Id.* at 2399 (citing *Meacham* v. *Knolls Atomic Power Lab.,* 381 F.3d 56, 74–47 (2d Cir. 2004)). Following the *Smith* decision, the Supreme Court vacated the judgment and remanded the case to the appellate court. On remand, a divided panel of the Second Circuit ruled that plaintiffs bear the burden of persuasion on the RFOA defense and held that the plaintiffs had not met that burden. *Id.* (citing *Meacham* v. *Knolls Atomic Power Lab.,* 461 F.3d 134, 140–41, 144 (2d Cir. 2006)).

[21] *Id.* at 2400.

[22] *Id.* at 2402.

[23] *Id.* at 2403.

[24] *Id.* at 2404.

[25] *Id.* at 2406.

[26] 42 U.S.C. 2000e–2(k)(1)(A)(i) (noting that a particular employment practice that has a disparate impact based on race, color, religion, sex, or national origin is unlawful unless the employer "demonstrate[s] that the challenged practice is job related for the position in question and consistent with business necessity").

[27] 29 U.S.C. 206(d)(1)(iv) (noting that a sex-based wage differential is not unlawful when payment is made pursuant to "a differential based on any other factor than sex").

[28] *See Meacham,* 128 S. Ct. at 2403 ("The focus of the defense is that the factor relied upon was a 'reasonable' one for the employer to be using.").

[29] *Smith,* 544 U.S. at 239 n.11 (citing 29 U.S.C. 206(d)(1) (Equal Pay Act recovery barred where pay differential is "based on any other factor other than

for whether an age-based employment practice is lawful is not "rational basis"; instead, the statute requires that the practice be "reasonable." In defining what factors are reasonable, we look to tort law,[30] which contains the most extensive legal definition of reasonableness.

Proposed paragraph 1625.7(b)(1) explains that a reasonable factor is one that is objectively reasonable when viewed from the position of a reasonable employer under like circumstances.[31] It is one that would be used in a like manner by a prudent [32] employer mindful of its responsibilities under the ADEA. In light of *Smith* and *Meacham*, a prudent employer knows or should know that the ADEA was designed in part to avoid the application of neutral employment standards that disproportionately affect the employment opportunities of older

individuals.[33] Accordingly, a reasonable factor is one that an employer exercising reasonable care to avoid limiting the employment opportunities of older persons would use.[34]

Consistent with *Smith*, proposed paragraph 1625.7(b)(1) provides that the RFOA defense requires evidence that the challenged practice was reasonably designed to further or achieve a legitimate business purpose and was reasonably administered to achieve that purpose.[35] In *Smith*, for example, the method chosen by the employer to compete for new personnel was one used by most employers in like circumstances—raising the salaries of the least senior employees to attract new applicants. That an employer uses a common business practice is not dispositive of reasonableness, but it weighs in the employer's favor.[36]

In addition to the employment practice's design, the way in which it is administered affects its reasonableness. For example, for purposes of the RFOA defense, it may be reasonable to consider factors such as job performance and skill sets when deciding whom to discharge during a reduction in force.[37] It also may be reasonable to consider the extent to which an employee possesses a critical skill (*i.e.*, one that is key to the employer's operations), or is flexible (i.e., has skills that can be used in various assignments or has the ability to acquire new skills).[38] Use of such

factors is reasonable under the ADEA if the employer has made reasonable efforts to administer its employment practice accurately and fairly and has assessed the age-based impact of the practice and taken steps to ameliorate unnecessary and avoidable harm. Steps such as training its managers to avoid age-based stereotyping, identifying specific knowledge or skills the employer wants to retain (*e.g.*, familiarity with the company's filing system or ability to integrate different computer networks), and providing guidance on how to measure flexibility (*e.g.*, whether an employee performs a variety of tasks or willingly accepts new assignments) are evidence of reasonableness.

The determination of reasonableness also requires consideration of what the employer knew or should have known about the practice's impact when it took the challenged action.[39] If the employer had no reason to know that its actions would have an age-based adverse impact, then it cannot be expected to take any action to ameliorate such impact. An employer, however, cannot hide behind lack of knowledge. A reasonable employer implementing practices that harm significant numbers of employees will evaluate the process to determine whether its practice has a disproportionate impact based on age. If the practice has a substantial adverse age-based impact, the employer's failure to have measured the impact will not protect it from a finding that it should have known of the impact.

### Relevant Factors

To aid in assessing whether an employment practice is based on a reasonable factor other than age, proposed paragraph 1625.7(b)(1) sets forth a nonexhaustive list of factors that may be relevant to the RFOA defense. As noted above, relevant considerations include whether the practice and its implementation are common business practices and the extent to which the employer took steps to assess and ameliorate the adverse impact on older workers. The extent to which the factor is related to the employer's stated business goals also is relevant to whether it is a reasonable one. For example, in *Smith*, the city's decision to grant a larger raise to lower echelon

---

sex")); *compare id. with* 29 U.S.C. 623(f)(1) (ADEA's RFOA provision, which bars recovery only when based on a reasonable factor other than age). *Cf. Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 660 (1989) ("A mere insubstantial justification * * * will not suffice, because such a low standard of review would permit discrimination to be practiced through the use of spurious, seemingly neutral employment practices.").

[30] *See* W. Page Keeton et al., "Prosser and Keeton on Torts" 1, at 4–6 (5th ed. 1984) (torts "consist of the breach of duties fixed * * * by law," provide "compensation of individuals, rather than the public, for losses which they have suffered within the scope of their legally recognized interests," and impose liability "upon conduct which is socially unreasonable").

The Supreme Court has turned to tort law for useful guidance in resolving employment discrimination cases. *See, e.g., Kolstad v. American Dental Assn.*, 527 U.S. 526, 538 (1999) (employer's state of mind relevant to award of punitive damages); *Faragher v. City of Boca Raton*, 524 U.S. 775, 799–802 (1998) (because lower courts have applied a negligence standard to coworker harassment, it is not appropriate to treat supervisory harassment as being within the scope of employment; however, agency principles weighed in favor of holding an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority). So, too, have lower courts. *See Brissette v. Culligan International Company*, 50 F.3d 428, 432 (7th Cir. 1995) (Posner, J.) (in determining when an employer has taken reasonable steps to discover and rectify acts of sexual harassment at its employees, the court observed that "what is reasonable depends on the gravity of the harassment[; j]ust as in conventional tort law a potential injurer is required to take more care, other things being equal, to prevent catastrophic accidents than to prevent minor ones, [citing, inter alia]; W. Page Keeton et al., "Prosser and Keeton on the Law of Torts" 34, at 208 (5th ed. 1984)"; *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (noting that age discrimination constitutes a tort and therefore doctrine of respondeat superior applies).

[31] *Cf.* Restatement (Second) of Torts 283 (1965) (standard of conduct to avoid liability for negligence "is that of a reasonable man under like circumstances").

[32] *Cf.* Restatement (Second) of Torts cmt. c (1965) ("reasonable man" standard refers to a person of "ordinary prudence").

[33] *See Smith*, 544 U.S. at 235, n.5 (quoting Wirtz Report).

[34] *Cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 808–09 (1998) (rejecting employer's argument that it should not be held liable for negligently failing to promulgate anti-harassment policy where EEOC regulations advised employers to take all steps necessary to prevent harassment and holding as a matter of law that employer did not exercise reasonable care to prevent sexual harassment).

[35] *See Smith*, 544 U.S. at 235 n.5 (quoting Wirtz Report's discussion of employment standards that unfairly limit employment opportunities of older individuals).

[36] *See id.* at 241 ("it is not surprising that certain employment criteria that are routinely used may be reasonable despite their adverse impact on older workers as a group").

[37] *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1200–01 (10th Cir. 2006) (finding that reliance on performance ratings and employee skill sets when choosing workers for layoff was reasonable as a matter of law but placing RFOA burden of persuasion on plaintiff).

[38] *See, e.g., Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 144 (2d Cir. 2006) (noting that employer's expert testified that "'criticality' and 'flexibility' were ubiquitous components of 'systems for making personnel decisions'"), *vacated and remanded*, 128 S. Ct. 2395 (2008). However, selecting employees for retention based on their work schedule "flexibility" might expose an employer to allegations of disparate treatment or failure to accommodate under Title VII or the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.* For example, ranking employees according to their ability to work flexible schedules might affect an employee who has been assigned to a regular, set schedule as a reasonable accommodation.

[39] *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 759 (1998) (applying agency principles, the Court noted that an employer may be liable for a supervisor's sexual harassment when the employer's "own negligence is a cause of the harassment" and that "[a]n employer is negligent if it knew or should have known about the conduct and failed to stop it").

employees for the purpose of bringing salaries in line with that of surrounding police forces * * * responded to the City's legitimate goal of retaining police officers."[40]

The extent to which the employer took steps to define the factor accurately also is relevant to reasonableness. For example, an employee's flexibility may be assessed through concrete examples of behavior such as accepting or resisting new assignments, seeking or refusing training, and being open or opposed to new ways of doing things. Similarly, the steps the employer took to apply the factor fairly and accurately affect the determination of whether the factor was reasonable. For example, the extent to which the employer provided decision makers with training or other guidance on how to implement the practice may be relevant to whether the practice was administered in a reasonable way.

In addition, the list includes the severity of the practice's impact on individuals within the protected age group. Severity is measured both in terms of the degree of injury to affected employees and the scope of the impact, i.e., the number of persons harmed.[41] *Smith* is perhaps the quintessential example of negligible impact because the impact was slight in both degree and scope. Although the raises given to older workers were smaller in percentage terms, they were higher in actual dollar terms. Thus, to the extent that any older workers suffered any harm, it was minor.[42] In addition, to the extent workers could be said to have been disadvantaged, the numbers of those so affected were small.

The other end of the severity spectrum is one in which the harm to affected individuals is significant and falls primarily on older individuals. The more severe the harm, the greater the

care that ought to be exercised.[43] This end of the spectrum is exemplified by the facts in *Meacham,* where the affected employees lost their jobs and the age-based effect was "startlingly skewed."[44] This is not to say that a reasonable employer must entirely eliminate the impact but, rather, that a reasonable employer would investigate the reason for the result and attempt to reduce the impact to the extent appropriate to the given facts.

The extent to which the employer took preventive or corrective steps to minimize the severity of the harm, in light of the burden of undertaking such steps, also is relevant to the issue of reasonableness. As noted in the Restatement, the reasonableness of the employer's actions also includes consideration of the relationship between the severity of the harm and the availability of measures that would reduce or eliminate the risk of harm.[45] If, as in *Smith,* the harm is negligible both in terms of the numbers affected and the degree of harm to those affected, it is not necessary to consider whether there are measures that would further reduce or eliminate the harm.

On the other hand, if the harm is severe, the determination of reasonableness includes consideration of whether the employer knew or should have known of measures that would reduce or eliminate the harm and the extent of the burden that implementing such measures would place on the employer.[46] For example, a reduction-in-force designed to cut costs by terminating sales people with the highest salaries might severely affect older workers. The employer could mitigate the harm by also considering the sales revenues that the affected individuals generated. By considering revenue as well as salary, the process would reasonably achieve the employer's important goal of cutting costs without unfairly limiting the employment opportunities of older individuals.

Finally, the determination of reasonableness includes consideration of whether other options were available and the reasons the employer selected the option it did. As the proposed regulation notes, this does not require

an employer to adopt a practice that has the least impact on members of the protected group. Unlike Title VII's business necessity defense, which requires an employer to use the least discriminatory alternative,[47] "the reasonableness inquiry includes no such requirement."[48] Thus, the availability of a less discriminatory practice does not by itself make a challenged practice unreasonable.

That the reasonableness inquiry does not require an employer to use the least discriminatory alternative, however, does not mean that the existence of alternatives is irrelevant. An employer's knowledge of and failure to use equally effective, but less discriminatory, alternatives is relevant to whether the employer's chosen practice is reasonable. This is especially true if the chosen practice significantly affects the employment opportunities of older individuals but only marginally advances a minor goal of the employer. "If the actor can advance or protect his interest as adequately by other conduct which involves less risk of harm to others, the risk contained in his conduct is clearly unreasonable."[49]

On the other hand, the dearth of equally effective options also is relevant to whether the employer's chosen practice is reasonable. The fewer options available, the more reasonable the employer's action appears. Thus, for example, a practice that appears unreasonable in the abstract because it severely affected a high percentage of older workers might in fact be reasonable because there were no other options or the available options were more burdensome than the one chosen.

### Factors Other Than Age

Proposed paragraph 1625.7(b)(2) makes clear that, for the RFOA defense to apply, the challenged practice must be based on a non-age factor.[50] As the proposed paragraph notes, disparate impact challenges typically involve

---

[40] *Smith,* 544 U.S. at 242.

[41] Restatement (Second) of Torts 293 (1965) (in determining the magnitude of the risk for the purpose of determining whether the actor is negligent, factors that must be considered include the extent of the likely harm and the number of persons whose interests are likely to be harmed).

[42] The city's pay plan divided five police ranks into a series of steps and set the wages for the ranks based on a survey of wages in surrounding communities. Most of the officers were in the three lowest ranks, where age did not affect compensation. Compensation was affected only in the two highest ranks, police lieutenant and deputy police chief, where all of the officers were over 40. Although the raises given to the more senior older workers were smaller in percentage terms than the raises given to the less senior younger workers, they were larger in dollar terms. Overall, approximately 66% of the officers under 40 received raises of more than 10% while approximately 45% of those over 40 did. *Smith,* 544 U.S. at 241–42.

[43] *Cf.* Restatement (Second) of Torts 298 cmt. b (1965) ("The greater the danger, the greater the care which must be exercised.").

[44] *Meacham* v. *Knolls Atomic Power Lab.,* 461 F.3d 134, 145 (2d Cir. 2006), *vacated,* 128 S. Ct. 2395 (2008).

[45] *Cf.* Restatement (Second) of Torts 292 cmt. c (1965) ("if the actor can advance or protect his interest as adequately by other conduct which involves less risk of harm to others, the risk contained in his conduct is clearly unreasonable.").

[46] *Id.*

[47] Title VII requires an employer to adopt the least discriminatory alternative. *See* 42 U.S.C. 2000e–2(k)(1)(A). In contrast, factors listed in the proposed paragraph refer to what the employer "knew or should have known" at the time of the challenged action. These factors recognize that the RFOA test is less stringent than the business necessity test and that "the scope of disparate-impact liability under ADEA is narrower than under Title VII." *Smith,* 544 U.S. at 240.

[48] *Smith,* 544 U.S. at 243.

[49] Restatement (Second) of Torts 292, cmt. c (1965).

[50] *See* 29 CFR 1625.7(c) ("When an employment practice uses age as a limiting criterion, the defense that the practice is justified by a reasonable factor other than age is unavailable."); *Smith,* 544 U.S. at 239 (RFOA "preclud[es] liability if the adverse impact was attributable to a nonage factor that was 'reasonable.'").

practices that are based on objective, non-age factors.[51] Objectively measurable factors such as salary and seniority are non-age factors. Although they may sometimes correlate with age, they are analytically and factually distinct from age.[52]

On the other hand, the unchecked use of subjective criteria that are subject to age-based stereotypes may not be distinct from age.[53] The Supreme Court has recognized that the problem of discrimination by lower-level managers given unchecked discretion to engage in subjective decision making needs to be addressed and that disparate impact analysis is sometimes the only way to do so.[54] Like Title VII, the ADEA was directed at "the *consequences* of employment practices, not simply the motivation" and "good faith 'does not redeem employment procedures * * * that operate as 'built-in headwinds' for [protected] groups and are unrelated to measuring job capability.'"[55]

For example, an employer that is downsizing may want to retain individuals with the ability to learn new computer skills. If the employer makes no effort to assess that ability objectively but instead gives managers unchecked discretion to determine whom to retain, the decision makers may act on the basis of stereotypes about older workers' willingness or ability to learn computer skills. As a consequence, the downsizing may result in a significantly younger but not necessarily more technologically capable workforce. In that situation, where age-based stereotypes infected an undisciplined

decision-making process, the employer did not rely on a factor other than age.

An employer that gives unchecked discretion to supervisors to engage in subjective decision making should know that doing so may well cause an age-based disparate impact. Thus, employers that give their supervisors unchecked discretion to make subjective decisions expose themselves to liability on this basis. They should particularly avoid giving such discretion to rate employees on criteria known to be susceptible to age-based stereotyping, such as flexibility, willingness to learn, or technological skills. Instead, evaluation criteria should be objectified to the extent feasible. For example, instead of asking supervisors in the abstract to rate employees' willingness to take on new tasks, employers should instruct supervisors to identify times that an employee was asked to perform new tasks and to describe the employee's reaction to such assignments. In addition, supervisors should be trained to become aware of and avoid age-based stereotyping. If the employer does give supervisors unchecked discretion to engage in subjective decision making, it should determine whether doing so had a disparate impact and, if so, should take reasonable steps to determine whether that impact might be attributable to supervisors' conscious or unconscious age bias and to mitigate the problem.[56]

To aid in assessing whether an employment practice is based on a non-age factor, proposed paragraph 1625.7(b)(2) sets forth a nonexhaustive list of factors that are relevant to the RFOA defense. Relevant factors include the extent to which the employer gave supervisors unchecked discretion to assess employees subjectively, the extent to which supervisors were asked to evaluate employees based on factors known to be subject to age-based stereotypes, and the extent to which supervisors were given guidance or training about how to apply the factors and avoid discrimination.

The Commission invites comments on the proposed changes from all interested parties.

## Regulatory Procedures

### Executive Order 12866

Pursuant to Executive Order 12866, EEOC has coordinated this proposed rule with the Office of Management and Budget. Under section 3(f)(1) of Executive Order 12866, EEOC has determined that the regulation will not have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State or local tribal governments or communities. Therefore, a detailed cost-benefit assessment of the regulation is not required.

### Paperwork Reduction Act

This proposal contains no new information collection requirements subject to review by the Office of Management and Budget under the Paperwork Reduction Act (44 U.S.C. chapter 35).

### Regulatory Flexibility Act

The Commission certifies under 5 U.S.C. 605(b) that this proposed rule will not have a significant economic impact on a substantial number of small entities because it imposes no economic or reporting burdens on such firms and makes no change to employers' compliance obligations under the Act. Instead, the proposed rule brings the Commission's regulations into compliance with recent Supreme Court interpretations of the Act. For this reason, a regulatory flexibility analysis is not required.

### Unfunded Mandates Reform Act of 1995

This proposed rule will not result in the expenditure by State, local, or tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## List of Subjects in 29 CFR Part 1625

Advertising, Age, Employee benefit plans, Equal employment opportunity, Retirement.

Dated: February 12, 2010.

For the Commission.

**Stuart J. Ishimaru,**

*Acting Chairman.*

For the reasons set forth in the preamble, the Equal Employment Opportunity Commission proposes to

---

[51] *See Meacham*, 128 S. Ct. at 2403 ("in the typical disparate-impact case, the employer's practice is 'without respect to age' and its adverse impact (though 'because of age') is 'attributable to a nonage factor' * * *").

[52] *See Hazen Paper Co.* v. *Biggins*, 507 U.S. 604, 611 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'"); *Anderson* v. *Baxter Healthcare Corp.*, 13 F.3d 1120, 1125–26 (7th Cir. 1994) (age and compensation levels are analytically distinct).

[53] *See Durante* v. *Qualcomm*, 144 Fed. Appx. 603, 606 (9th Cir. 2005) (unpublished) (although "'[p]laintiffs generally cannot attack an overall decisionmaking process in the disparate impact context, [and] must instead identify the particular element or practice within the process that causes an adverse impact[.]' * * * an overall decision-making process may be subject to a disparate impact challenge if the employer utilizes an 'undisciplined system of subjective decision-making'") (quoting *Stout* v. *Potter*, 276 F.3d 118, 1124 (9th Cir. 2002) and *Watson* v. *Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988)).

[54] *Watson* v. *Fort Worth Bank and Trust*, 487 U.S. 977, 990 (1988).

[55] *Smith*, 544 U.S. 228, 234–35 (emphasis in original) (citing *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 432 (1971)).

[56] An employer that gives supervisors unchecked discretion to engage in subject decisionmaking should also determine whether doing so resulted in age-based disparate treatment. Cases challenging subjective decisionmaking may involve allegations of disparate treatment as well as disparate impact. *See, e.g., Meacham*, 128 S. Ct. at 2398 (noting that plaintiffs raised both disparate-treatment and disparate-impact claims).

amend 29 CFR chapter XIV part 1625 as follows:

## PART 1625—AGE DISCRIMINATION IN EMPLOYMENT ACT

1. The authority citation for part 1625 continues to read as follows:

**Authority:** 81 Stat. 602; 29 U.S.C. 621; 5 U.S.C. 301; Secretary's Order No. 10–68; Secretary's Order No. 11–68; Sec. 9, 81 Stat. 605; 29 U.S.C. 628; sec. 12, 29 U.S.C. 631, Pub. L. 99–592, 100 Stat. 3342; sec. 2, Reorg. Plan No. 1 of 1978, 43 FR 19807.

### Subpart A—Interpretations

2. Revise paragraph (b) of § 1625.7 to read as follows:

#### § 1625.7   Differentiations based on reasonable factors other than age.

\*   \*   \*   \*   \*

(b) Whether a differentiation is based on reasonable factors other than age ("RFOA") must be decided on the basis of all the particular facts and circumstances surrounding each individual situation.

(1) *Reasonable.* A reasonable factor is one that is objectively reasonable when viewed from the position of a reasonable employer (i.e., a prudent employer mindful of its responsibilities under the ADEA) under like circumstances. To establish the RFOA defense, an employer must show that the employment practice was both reasonably designed to further or achieve a legitimate business purpose and administered in a way that reasonably achieves that purpose in light of the particular facts and circumstances that were known, or should have been known, to the employer. Factors relevant to determining whether an employment practice is reasonable include but are not limited to, the following:

(i) Whether the employment practice and the manner of its implementation are common business practices;

(ii) The extent to which the factor is related to the employer's stated business goal;

(iii) The extent to which the employer took steps to define the factor accurately and to apply the factor fairly and accurately (*e.g.,* training, guidance, instruction of managers);

(iv) The extent to which the employer took steps to assess the adverse impact of its employment practice on older workers;

(v) The severity of the harm to individuals within the protected age group, in terms of both the degree of injury and the numbers of persons adversely affected, and the extent to which the employer took preventive or corrective steps to minimize the severity of the harm, in light of the burden of undertaking such steps; and

(vi) Whether other options were available and the reasons the employer selected the option it did.[1]

(2) *Factors Other Than Age.* When an employment practice has a significant disparate impact on older individuals, the RFOA defense applies only if the practice is not based on age. In the typical disparate impact case, the practice is based on an objective non-age factor and the only question is whether the practice is reasonable. When disparate impact results from giving supervisors unchecked discretion to engage in subjective decision making, however, the impact may, in fact, be based on age because the supervisors to whom decision making was delegated may have acted on the bases of conscious or unconscious age-based stereotypes. Factors relevant to determining whether a factor is "other than age" include, but are not limited to, the following:

(i) The extent to which the employer gave supervisors unchecked discretion to assess employees subjectively;

(ii) The extent to which supervisors were asked to evaluate employees based on factors known to be subject to age-based stereotypes; and

(iii) The extent to which supervisors were given guidance or training about how to apply the factors and avoid discrimination.

\*   \*   \*   \*   \*

[FR Doc. 2010–3126 Filed 2–17–10; 8:45 am]

**BILLING CODE 6570–01–P**

---

[1] This does not mean that an employer must adopt an employment practice that has the least severe impact on members of the protected age group. "Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement." *Smith* v. *City of Jackson,* 544 U.S. 228, 243 (2005). Instead, this simply means that the availability of other options is one of the factors relevant to whether the practice was a reasonable one. "If the actor can advance or protect his interest as adequately by other conduct which involves less risk of harm to others, the risk contained in his conduct is clearly unreasonable." Restatement (Second) of Torts 292, cmt. c (1965).

## DEPARTMENT OF VETERANS AFFAIRS

### 38 CFR Part 17

**RIN 2900–AN37**

### Payment for Inpatient and Outpatient Health Care Professional Services at Non-Departmental Facilities and Other Medical Charges Associated With Non-VA Outpatient Care

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Proposed rule.

**SUMMARY:** This document proposes to update the Department of Veterans Affairs (VA) medical regulations concerning the payment methodology used to calculate VA payments for inpatient and outpatient health care professional services and other medical services associated with non-VA outpatient care.

**DATES:** Comments must be received on or before April 19, 2010.

**ADDRESSES:** Written comments may be submitted by email through *http://www.regulations.gov*; by mail or hand-delivery to Director, Regulations Management (00REG1), Department of Veterans Affairs, 810 Vermont Ave., NW., Room 1068, Washington, DC 20420; or by fax to (202) 273–9026. Comments should indicate that they are submitted in response to "RIN 2900–AN37—Payment for Inpatient and Outpatient Health Care Professional Services at Non-Departmental Facilities and Other Medical Charges Associated with Non-VA Outpatient Care." Copies of comments received will be available for public inspection in the Office of Regulation Policy and Management, Room 1063B, between the hours of 8 a.m. and 4:30 p.m. Monday through Friday (except holidays). Please call (202) 461–4902 for an appointment. In addition, during the comment period, comments may be viewed online through the Federal Docket Management System (FDMS) at *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Joseph C. Enderle, Jr., National Fee Program Manager, Department of Veterans Affairs, P.O. Box 469066, Denver, CO 80246–9066, telephone (303) 370–5088. (This is not a toll-free number.)

**SUPPLEMENTARY INFORMATION:** Under 38 U.S.C. 1703(a), "[w]hen [VA] facilities are not capable of furnishing economical hospital care or medical services because of geographical inaccessibility or are not capable of furnishing the care or services required, the Secretary, as authorized in [38



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-2000

February 9, 2011

OFFICE OF FAIR HOUSING
AND EQUAL OPPORTUNITY

MEMORANDUM FOR:     FHEO Office Directors
                    FHEO Regional Directors

FROM:               Sara K. Pratt, Deputy Assistant Secretary for Enforcement and
                    Programs

SUBJECT:            Assessing Claims of Housing Discrimination against Victims of
                    Domestic Violence under the Fair Housing Act (FHAct) and the
                    Violence Against Women Act (VAWA)

---

I.     Purpose

This memorandum provides guidance to FHEO headquarters and field staff on assessing claims by domestic violence victims of housing discrimination under the Fair Housing Act (FHAct). Such claims are generally based on sex, but may also involve other protected classes, in particular race or national origin. This memorandum discusses the legal theories behind such claims and provides examples of recent cases involving allegations of housing discrimination against domestic violence victims. This memorandum also explains how the Violence Against Women Act (VAWA)[1] protects some domestic violence victims from eviction, denial of housing, or termination of assistance on the basis of the violence perpetrated by their abusers.

II.    Background

Survivors of domestic violence often face housing discrimination because of their history or the acts of their abusers. Congress has acknowledged that "[w]omen and families across the country are being discriminated against, denied access to, and even evicted from public and subsidized housing because of their status as victims of domestic violence."[2] Housing authorities and landlords evict victims under zero-tolerance crime policies, citing the violence of a household member, guest, or other person under the victim's "control."[3] Victims are often evicted after repeated calls to the police for domestic violence incidents because of allegations of disturbance to other tenants. Victims are also evicted because of property damage caused by their abusers. In

---

[1] This guidance refers to the Violence Against Women and Department of Justice Reauthorization Act of 2005 (VAWA 2005), which included provisions in Title VI ("Housing Opportunities and Safety for Battered Women and Children") that are applicable to HUD programs. The original version of VAWA, enacted in 1994, did not apply to HUD programs. Note also that HUD recently published its VAWA Final Rule. *See* HUD Programs: Violence Against Women Act Conforming Amendments; Final Rule, 75 Fed. Reg. 66246 (October 27, 2010).

[2] 42 U.S.C. § 14043e(3) (findings published in the Violence Against Women Act). Note that VAWA also protects male victims of domestic violence. *See* HUD Programs: Violence Against Women Act Conforming Amendments; Final Rule, 75 Fed. Reg. 66246, 66251 ("VAWA 2005 does protect men. Although the name of the statute references only women, the substance of the statute makes it clear that its protections are not exclusively applicable to women.").

[3] *See* 24 CFR § 5.100.

many of these cases, adverse housing action punishes victims for the violence inflicted upon them. This "double victimization"[4] is unfair and, as explained in this guidance, may be illegal.

Statistics show that women are overwhelmingly the victims of domestic violence.[5] An estimated 1.3 million women are the victims of assault by an intimate partner each year, and about 1 in 4 women will experience intimate partner violence in their lifetimes.[6] The U.S. Bureau of Justice Statistics found that 85% of victims of domestic violence are women.[7] In 2009, women were about five times as likely as men to experience domestic violence.[8] These statistics show that discrimination against victims of domestic violence is almost always discrimination against women. Thus, domestic violence survivors who are denied housing, evicted, or deprived of assistance based on the violence in their homes may have a cause of action for sex discrimination under the Fair Housing Act.[9]

In addition, certain other protected classes experience disproportionately high rates of domestic violence. For example, African-American and Native American women experience higher rates of domestic violence than white women. Black women experience intimate partner violence at a rate 35% higher than that of white females, and about 2.5 times the rate of women of other races.[10] Native American women are victims of violent crime, including rape and sexual assault, at more than double the rate of other racial groups.[11] Women of certain national origins and immigrant women also experience domestic violence at disproportionate rates.[12] This means that victims of domestic violence may also have a cause of action for race or national origin discrimination under the Fair Housing Act.

III.    HUD's "One Strike" Rule and The Violence Against Women Act (VAWA)

In 2001, the Department issued a rule allowing housing authorities and landlords to evict tenants for criminal activity committed by any household member or guest, commonly known as the "one strike" rule.[13] The rule allows owners of public and Section 8 assisted housing to terminate a tenant's lease because of criminal activity by "a tenant, any member of the tenant's household, a

---

[4] *See* Lenora M. Lapidus, *Doubly Victimized: Housing Discrimination Against Victims of Domestic Violence*, 11 J. GENDER, SOC. POL'Y & L. 377 (2003).

[5] We recognize that men also experience domestic violence. However, because of the wide disparity in victimization, and because many FHAct claims will be based on the disparate impact of domestic violence on women, we use feminine pronouns throughout this guidance.

[6] Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, *Costs of Intimate Partner Violence Against Women in the United States* (2003).

[7] U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics Crime Data Brief, *Intimate Partner Violence, 1993-2001* (2003).

[8] Jennifer R. Truman & Michael R. Rand, U.S. Department of Justice, *Criminal Victimization, 2009* (2010).

[9] Domestic violence by same-sex partners would be analyzed in the same manner and would be based on sex and any other applicable protected classes.

[10] *Id.*

[11] Steven W. Perry, U.S. Dep't of Justice, NCJ 203097, *A Bureau of Justice Statistics Statistical Profile, 1992-2002: American Indians and Crime* (2004).

[12] For statistics on specific groups, *see* American Bar Association Commission on Domestic Violence, Survey of Recent Statistics, http://new.abanet.org/domesticviolence/Pages/Statistics.aspx.

[13] Screening and Eviction for Drug Abuse and Other Criminal Activity, 66 Fed. Reg. 28776 (May 24, 2001) (amending 24 CFR pts. 5, 200, 247, 880, 884, 891, 960, 966, and 982) (often referred to as the "one strike" rule).

2

guest or another person under the tenant's control"[14] that "threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises); or… threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises."[15]  This policy would seem to allow evictions of women for the violent acts of their spouses, cohabiting partners, or visitors.  However, the Violence Against Women and Department of Justice Reauthorization Act of 2005 (VAWA)[16] prohibits such evictions in public housing, voucher, and Section 8 project-based programs.  VAWA protects victims of domestic violence, dating violence, sexual assault, and stalking.[17]

VAWA provides that being a victim of domestic violence, dating violence, or stalking is not a basis for denial of assistance or admission to public or Section 8 tenant-based and project-based assisted housing.  Further, incidents or threats of abuse will not be construed as serious or repeated violations of the lease or as other "good cause" for termination of the assistance, tenancy, or occupancy rights of a victim of abuse.  Moreover, VAWA prohibits the termination of assistance, tenancy, or occupancy rights based on criminal activity directly relating to domestic violence, dating violence, or stalking, engaged in by a member of a tenant's household or any guest or other person under the tenant's control if the tenant or immediate member of the tenant's family is a victim of that domestic violence, dating violence, or stalking.[18]

VAWA also allows owners and management agents to request certification from a tenant that she is a victim of domestic violence, dating violence, or stalking and that the incidence(s) of threatened or actual abuse are bona fide in determining whether the protections afforded under VAWA are applicable.[19]  The Department has issued forms for housing authorities and landlords to use for such certification requests,[20] but tenants may also present third-party documentation of the

---

[14] 24 CFR § 5.100.

[15] 24 CFR § 5.859.

[16] Pub. L. 109-162, 119 Stat. 2960 (2006).  For the Department's final rule on VAWA, see HUD Programs: Violence Against Women Act Conforming Amendments; Final Rule, 75 Fed. Reg. 66246 (Oct. 27, 2010) (amending 24 CFR pts. 5, 91, 880, 882, 883, 884, 886, 891, 903, 960, 966, 982, and 983).

[17] Each of these terms is defined in VAWA and HUD's corresponding regulations.  See HUD Programs: Violence Against Women Act Conforming Amendments; Final Rule, 75 Fed. Reg. 66246, 66258.

[18] Note the exception to these provisions at 24 C.F.R. § 5.2005(d)(2), which states that VAWA does not limit the authority of a PHA, owner, or management agent to evict or terminate a tenant's assistance if they can demonstrate an actual and imminent threat to other tenants or those employed or providing services at the property if that tenant is not terminated.  However, this exception is limited by §5.2005(d)(3), which states that a PHA, owner, or management agent can terminate assistance only when there are no other actions that could reduce or eliminate the threat. Other actions include transferring the victim to different unit, barring the perpetrator from the property, contacting law enforcement to increase police presence or developing other plans to keep the property safe, or seeking other legal remedies to prevent the perpetrator from acting on a threat.

[19] 42 U.S.C. §1437d(u)(1)(A) (public housing program), 42 U.S.C. §1437f(ee)(1) (voucher programs).

[20] HUD Housing Notice 09-15 transmits Form HUD-91066, Certification of Domestic Violence, Dating Violence or Stalking for use by owners and management agents administering one of Multifamily Housing's project-based Section 8 programs and Form HUD-91067, the HUD-approved Lease Addendum, for use with the applicable HUD model lease for the covered project-based Section 8 program.  HUD Public and Indian Housing Notice 2006-42 transmits form HUD-50066, Certification of Domestic Violence, Dating Violence or Stalking, for use in the Public Housing Program, Housing Choice Voucher Program (including project-based vouchers), Section 8 Project-Based Certification Program, and Section 8 Moderate Rehabilitation Program.  See also PIH Notice 2006-23, Implementation of the Violence Against Women and Justice Department Reauthorization Act of 2005.

3

abuse, including court records, police reports, or documentation signed by an employee, agent, or volunteer of a victim service provider, an attorney, or a medical professional from whom the victim has sought assistance in addressing the abuse or the effects of the abuse.[21] Finally, VAWA allows housing authorities and landlords to bifurcate a lease in a domestic violence situation in order to evict the abuser and allow the victim to keep her housing.[22]

While VAWA provides important protections for victims of domestic violence, it is limited in scope. For example, it does not provide for damages.[23] In addition, VAWA does not provide an explicit private cause of action to women who are illegally evicted. Moreover, VAWA only protects women in public housing, voucher, and Section 8 project-based programs, so domestic violence victims in private housing have no similar protection from actions taken against them based on that violence. VAWA also may not protect a woman who does not provide the requisite documentation of violence,[24] while a claim of discrimination under the Fair Housing Act is not dependent on compliance with the VAWA requirements. In short, when a victim is denied housing, evicted, or has her assistance terminated because she has been a victim of domestic violence, the FHAct might be implicated and we may need to investigate whether that denial is based on, for example, race or sex.

IV.    Legal Theories under the Fair Housing Act: Direct Evidence, Unequal Treatment, and Disparate Impact

*Direct evidence.* In some cases, landlords enforce facially discriminatory policies. These policies explicitly treat women differently from men. Such policies are often based on gender stereotypes about abused women. For example, if a landlord tells a female domestic violence victim that he does not accept women with a history of domestic violence as tenants because they always go back to the men who abuse them, his statement is direct evidence of discrimination based on sex. Investigations in direct evidence cases should focus on finding evidence about whether or not the discriminatory statement was made, whether the statement was applied to others to identify other potential victims, and whether it reflects a policy or practice by the landlord. The usual questions that address jurisdiction also apply.

*Unequal treatment.* In some cases, a landlord engages in unequal treatment of victims of domestic violence in comparison to victims of other crimes. Or a landlord's seemingly gender-neutral policy may be unequally applied, resulting in different treatment based on sex. For example, a policy of evicting households for criminal activity may be applied selectively against women who have been abused by their partners and not against the male perpetrators of the domestic violence. If there is evidence that women are being treated differently because of their status as victims of domestic violence, an unequal treatment theory applies. If an investigator finds evidence of unequal treatment, the investigation shifts to discovering the respondent's reasons for the differences and

---

[21] 42 U.S.C. §1437d(u)(1)(C); 42 U.S.C. § 1437f(ee)(1)(c).

[22] 42 U.S.C. §1437d(l)(6)(B); 42 U.S.C. § 1437f(c)(9)(C) .

[23] Remedies available under VAWA include, for example, the traditional PIH grievance process. *See* HUD Programs: Violence Against Women Act Conforming Amendments; Final Rule, 75 Fed. Reg. 66246, 66255.

[24] While VAWA 2005 allows owners and PHAs to request certification of domestic violence from victims, the law also provides that owners and PHAs "[a]t their discretion . . . may provide benefits to an individual based solely on the individual's statement or other corroborating evidence." 42 U.S.C.A. § 1437d(u)(1)(D); 42 U.S.C.A. § 1437(f)(ee)(1)(D).

4

investigating each reason to determine whether the evidence supports or refutes each reason. If a nondiscriminatory reason(s) is articulated, the investigation shifts again to examining the evidence to determine whether or not the reason(s) given is supported by the evidence or is a pretext for discrimination.[25]

*Disparate impact.* In some cases, there is no direct evidence of unequal treatment, but a facially neutral housing policy, procedure, or practice disproportionately affects domestic violence victims. In these cases, a disparate impact analysis is appropriate. Disparate impact cases often arise in the context of "zero-tolerance" policies, under which the entire household is evicted for the criminal activity of one household member. The theory is that, even when consistently applied, women may be disproportionately affected by these policies because, as the overwhelming majority of domestic violence victims, women are often evicted as a result of the violence of their abusers.

There are four steps to a disparate impact analysis. First, the investigator must identify the specific policy, procedure, or practice of the landlord's that is allegedly discriminatory. This process means both the identification of the policy, procedure, or practice and the examination of what types of crimes trigger the application of the policy. Second, the investigator must determine whether or not that policy, procedure, or practice was consistently applied. This step is important because it reveals the correct framework for the investigation. If the policy is applied unequally, then the proper analysis is unequal treatment, not disparate impact. If, however, the policy was applied consistently to all tenants, then a disparate impact analysis applies, and the investigation proceeds to the next step.

Third, the investigation must determine whether or not the particular policy, procedure, or practice has a significant adverse impact on domestic violence victims and if so, how many of those victims were women (or members of a certain race or national origin). Statistical evidence is generally used to identify the scope of the impact on a group protected against discrimination. These statistics should be as particularized as possible; they could demonstrate the impact of the policy as to applicants for a specific building or property, or the impact on applicants or residents for all of the landlord's operations. For example, in a sex discrimination case, the investigation may uncover evidence that women in one apartment complex were evicted more often than men under a zero-tolerance crime policy. It would not matter that the landlord did not intend to discriminate against women, or that the policy was applied consistently. Proof of disparate impact claims is not an exact science. Courts have not agreed on any precise percentage or ratio that conclusively establishes a prima facie case. Rather, what constitutes a sufficiently disparate impact will depend on the particular facts and circumstances of each case.

If the investigation reveals a disparate impact based on sex, race, or national origin, the investigation then shifts to eliciting the respondent's reasons for enforcing the policy. It is critical to thoroughly investigate these reasons. Why was the policy enacted? What specific outcome was it meant to achieve or prevent? Were there any triggering events? Were any alternatives considered, and if so, why were they rejected? Is there any evidence that the policy has been effective? What constitutes a sufficient justification will vary according to the circumstances. In general, the investigation will examine whether or not the offered justification is real and supported by a substantial business justification. For the purposes of this memorandum, it is important to

---

[25] See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for an explanation of the burden-shifting formula.

understand that an investigation must identify and evaluate the evidence supporting and refuting the justification.

Even if there is sufficient justification for the policy, there may be a less discriminatory alternative available to the respondent. A disparate impact investigation must consider possible alternative policies and analyze whether each policy would achieve the same objective with less discriminatory impact. For example, in a case of discriminatory eviction under a zero-tolerance policy, a landlord could adopt a policy of evicting only the wrongdoer and not innocent victims. This policy would protect tenants without unfairly penalizing victims of violence.

In summary, an investigation of a disparate impact case must seek evidence that a specific policy of the landlord's caused a substantial, disproportionate, adverse impact on a protected class of persons. Proving a disparate impact claim will generally depend on statistical data demonstrating the disparity and a causal link between the policy and the disparity; discriminatory intent is irrelevant.

V.    Fair Housing Cases Involving Domestic Violence

*Eviction Cases*. Victims are often served with eviction notices following domestic violence incidents. Landlords cite the danger posed to other tenants by the abuser, property damage caused by the abuser, or other reasons for eviction. Several cases have challenged these evictions as violations of VAWA or the Fair Housing Act.

*Alvera v. CBM Group*, Case No. 01-857 (D. Or. 2001). [26] The victim was assaulted by her husband in their apartment. She obtained a restraining order against her husband, and he was subsequently arrested and jailed for the assault. She provided a copy of the restraining order to the property manager. The property manager then served her with a 24-hour eviction notice based on the incident of domestic violence. The notice specified: "You, someone in your control, or your pet, has seriously threatened to immediately inflict personal injury, or has inflicted personal injury upon the landlord or other tenants." The victim then submitted an application for a one-bedroom apartment in the same building. Management denied the application and refused to accept her rent. After a second application, management finally approved her for a one-bedroom apartment, but warned her that "any type of recurrence" of domestic violence would lead to her eviction.

The victim filed a complaint with HUD, which investigated her case and issued a charge of discrimination against the apartment management group. She elected to pursue the case in federal court. The parties later agreed to settle the lawsuit. The consent decree, approved by the Oregon district court in 2001, requires that the management group agree not to "evict, or otherwise discriminate against tenants because they have been victims of violence, including domestic violence" and change its policies accordingly. Employees of the management group must participate in education about discrimination and fair housing law. The management group also agreed to pay compensatory damages to the victim.

*Warren v. Ypsilanti Housing Authority*, Case No. 4:02-cv-40034 (E.D. Mich. 2003). The victim's ex-boyfriend broke into her house and physically abused her. She called the police to

---

[26] A copy of the determination is attached to this memo.

6

report the attack. When the Ypsilanti Housing Authority (YHA) learned of the attack, it attempted to evict the victim and her son under its zero-tolerance crime policy. The ACLU sued the YHA for discrimination, arguing that because victims of domestic violence are almost always women, the policy of evicting domestic violence victims based on the violence perpetrated against them had a disparate impact based on sex in violation of the federal Fair Housing Act and state law. The parties reached a settlement, under which the YHA agreed to cease evicting domestic violence victims under its "one-strike" policy and pay money damages to the victim.

*Bouley v. Young-Sabourin* 394 F. Supp. 2d 675 (D. Vt. 2005). The victim called the police after her husband attacked her in their home. She obtained a restraining order against her husband and informed her landlord. The landlord spoke to the victim about the incident, encouraging her to resolve the dispute and seek help through religion. The victim told her landlord that she would not let her husband return to the apartment and was not interested in religious help. The landlord then served her with a notice of eviction, stating that it was "clear that the violence would continue." In a ruling on the parties' cross-motions for summary judgment, the court held that the victim had presented a prima facie case of sex discrimination under the Fair Housing Act. The case later settled.

*T.J. v. St. Louis Housing Authority* (2005). The victim endured ongoing threats and harassment after ending her relationship with her abusive boyfriend. He repeatedly broke the windows of her apartment when she refused to let him enter. She obtained a restraining order and notified her landlord, who issued her a notice of lease violation for the property damage caused by the ex-boyfriend and required her to pay for the damage, saying she was responsible for her domestic situation. Her boyfriend finally broke into her apartment and, after she escaped, vandalized it. The housing authority attempted to evict her based on this incident. The victim filed a complaint with HUD, which conciliated the case. The conciliation agreement requires the housing authority to relocate her to another apartment, refund the money she paid for the broken windows, ban her ex-boyfriend from the property where she lived, and send its employees to domestic violence awareness training.

*Lewis v. North End Village*, Case No. 2:07-cv-10757 (E.D.Mich. 2007). The victim obtained a personal protection order against her abusive ex-boyfriend. Months later, the ex-boyfriend attempted to break into the apartment, breaking the windows and front door. The management company that owned her apartment evicted the victim and her children based on the property damage caused by the ex-boyfriend. With the help of the ACLU of Michigan, she filed a complaint against the management company in federal court, alleging sex discrimination under the FHAct. The case ultimately settled, with the management company agreeing to new, nondiscriminatory domestic violence policies and money damages for the victim.

*Brooklyn Landlord v. R.F.* (Civil Court of Kings County 2007). The victim's ex-boyfriend continued to harass, stalk, and threaten her after she ended their relationship. In late April 2006, he came to her apartment in the middle of the night, banging on the door and yelling. The building security guard called by the victim was unable to reason with her abuser, who left before the police arrived. One week later, the abuser came back to the building, confronted the same security guard, and shot at him. The victim was served an eviction notice from her Section 8 landlord based on this incident. The victim filed a motion for summary judgment which asserted defenses to eviction

7

under VAWA and argued that the eviction constituted sex discrimination prohibited by the FHAct. The parties reached a settlement under which the landlord agreed to take measures to prevent the ex-boyfriend from entering the property.

*Jones v. Housing Authority of Salt Lake County* (D. Utah, filed 2007). The victim applied for and received a Section 8 voucher in 2006. She and her children moved into a house in Kearns, Utah later that year. She allowed her ex-husband, who had previously been abusive, to move into the house. Shortly after he moved in, the victim discovered that he had begun drinking again. After he punched a hole in the wall, the victim asked him to move out. When he refused, she told the Housing Authority that she planned to leave the home with her children to escape the abuse. The Housing Authority required her to sign a notice of termination of her housing assistance. The victim requested a hearing to protest the termination, and the Housing Authority decided that termination of her assistance was appropriate, noting that she had never called the police to report her husband's violent behavior. With the help of Utah Legal Services, she filed a complaint in federal court against the Housing Authority, alleging that the termination of her benefits violated VAWA and the FHAct.

*Cleaves-Milan v. AIMCO Elm Creek LP*, 1:09-cv-06143 (N.D. Ill., filed October 1, 2009). In 2007, the victim moved into an Elmhurst, Illinois apartment complex with her fiancé and her daughter. Her fiancé soon became abusive, and she ended the relationship. He became upset, produced a gun, and threatened to shoot himself and her. She called police to remove him, obtained an order of protection, and removed him from the lease with the consent of building management. When she attempted to pay her rent, however, building management told her that she was being evicted because "anytime there is a crime in an apartment the household must be evicted." With the help of the Sargent Shriver National Center on Poverty Law, she filed a complaint against the management company for sex discrimination under the Fair Housing Act.

*Transfer Cases.* Victims will also sometimes request transfers within a housing authority in order to escape an abuser. Two recent cases have challenged the denial of these transfers as sex discrimination under the Fair Housing Act, with mixed results.

*Blackwell v. H.A. Housing LP*, Civil Action No. 05-cv-01225-LTB-CBS (D. Colo. 2005). The victim's ex-boyfriend broke into her apartment and, over the course of several hours, raped, beat, and stabbed her. She requested a transfer to another complex. Building management refused to grant her the transfer, forcing her and her children into hiding while police pursued her ex-boyfriend. With the help of Colorado Legal Services, the victim filed a complaint in federal court, alleging that the failure to grant her transfer request constituted impermissible discrimination on the basis of sex based on a disparate impact theory. The case eventually settled. The landlord agreed to institute a new domestic violence policy, prohibiting discrimination against domestic violence victims and allowing victims who are in imminent physical danger to request an emergency transfer to another Section 8 property.

*Robinson v. Cincinnati Metropolitan Housing Authority*, Case No. 1:08-CV-238 (S.D. Ohio 2008). The victim moved into a Cincinnati public housing unit with her children in 2006. She began dating a neighbor, who physically abused her repeatedly. When she tried to end the relationship, he beat her severely and threatened to kill her if she ever returned to the apartment.

8

She obtained a protection order and applied to the Cincinnati Metropolitan Housing Authority (CMHA) for an emergency transfer, but was denied. The victim was paying rent on the apartment but lived with friends and family for safety reasons. With the help of the Legal Aid Society of Southwest Ohio, the victim filed a complaint against CMHA in federal court, alleging that by refusing to grant her occupancy rights granted to other tenants based on the acts of her abuser, CMHA intentionally discriminated against her on the basis of sex. The court denied her motion for a temporary restraining order and preliminary injunction, finding that CMHA policy allows emergency transfers only for victims of federal hate crimes, not for victims of domestic violence. The court also distinguished cases of domestic violence-based eviction from the victim's case,[27] saying that CMHA did not violate her rights under the FHAct by denying her a transfer.

VI.    Practical Considerations When Working with a Victim of Domestic Violence

When working with a victim of domestic violence, an investigator must be sensitive to the victim's unique circumstances. She is not only a potential victim of housing discrimination, she is also a victim of abuse. Often, a victim who is facing eviction or other adverse action based on domestic violence also faces urgent safety concerns. She may fear that the abuser will return to harm her or her children. An investigator should be aware of resources available to domestic violence victims and may refer a victim to an advocacy organization or to the police.[28] Investigators should also understand that a victim may be hesitant to discuss her history. Victims are often distrustful of "the system" after negative experiences with housing authorities, police, or courts. In order to conduct an effective investigation, investigators should be patient and understanding with victims and try not to appear judgmental or defensive.[29]

VII.    Conclusion

The Violence Against Women Act provides protection to some victims of domestic violence who experience housing discrimination but it does not protect them from discrimination based on sex or another protected class. Thus, when a victim is denied housing, evicted, or has her assistance terminated because she has experienced domestic violence, we should investigate whether that denial or other activity violates the Fair Housing Act. Victims may allege sex discrimination, but may also allege discrimination based on other protected classes, such as race or national origin.

Questions regarding this memorandum should be directed to Allison Beach, Office of the Deputy Assistant Secretary for Enforcement and Programs, at (202) 619-8046, extension 5830.

---

[27] In its order denying Robinson's request for a temporary restraining order and a preliminary injunction, the court cites *Bouley*, *Lewis*, *Warren*, and *Alvera* as cases that "recognized that to evict the women in these situations had the effect of victimizing them twice: first they are subject to abuse and then they are evicted." Order at 6.
[28] Nationwide resources include the National Domestic Violence Hotline, at 1-800-799-SAFE(7233) or www.thehotline.org, and www.womenslaw.org. Either resource can refer victims to local advocates and shelters and provide safety planning advice.
[29] For more advice on working with domestic violence survivors, see Loretta M. Frederick, *Effective Advocacy on Behalf of Battered Women*, The Battered Women's Justice Project, available at http://www.bwjp.org/files/bwjp/articles/Effective_Advocacy_Battered_Women.pdf.

9

P. 40

6-27-201 4:25PM    FROM LEGAL AID SERVICES  6480513

## DETERMINATION OF REASONABLE CAUSE

CASE NAME: Alvera v Creekside Village Apartments
CASE NUMBER: 10-99-0538-8

## I. JURISDICTION

A complaint was filed with the Department on October 22, 1999, alleging that Ms. Tiffani Ann Alvera, the complainant, was injured by a discriminatory act by the respondents, Creekside Village Apartments, a California Limited Partnership; General Partners Edward and Dorian Mackay; The CBM Group, Inc.; and CBM Group employees Karen Mock, Resident Manager of Creekside Village Apartments, and Inez Corenevsky, Supervising Property Manager. It is alleged that the respondents were responsible for a discriminatory refusal to rent and discriminatory terms, conditions, privileges, or services and facilities, in violation of Sections 804 (a) and (b) of the Fair Housing Act. The most recent discriminatory act was alleged to have occurred on September 7, 1999. The property is Creekside Village Apartments, 1953 Spruce Drive, Seaside, Oregon. The property is not exempt under the Act.

The respondents receive federal financial assistance from the United States Department of Agriculture, Rural Development.

## II. COMPLAINANT'S ALLEGATIONS

Ms. Alvera alleged that on August 2, 1999, her husband physically assaulted her in their home, apartment 21 in Creekside Village Apartments. Her husband was jailed and Ms. Alvera obtained a temporary restraining order against him. On August 4, 1999, Ms. Alvera alleged, she received a 24 hour notice to vacate from management that stated that, pursuant to Oregon law: "You, someone in your control, or your pet, has seriously threatened immediately to inflict personal injury, or has inflicted substantial personal injury upon the landlord or other tenants." The notice specified that the incident was the assault on Ms. Alvera by her husband. Ms. Alvera alleged further that after issuing the notice, the managers refused to accept her rent for September. The managers also refused to move her to a one bedroom apartment; since her husband was not to live with her any more, she believed that she no longer qualified for a two bedroom apartment in this USDA subsidized complex. Ms. Alvera alleged that management discriminated against her because of her sex because the way they interpret and enforce Oregon state law toward domestic violence victims has a greater negative impact on women. She also alleged that management would not have treated men the same way as she was treated.

## III. RESPONDENTS' DEFENSES

The respondents defended that they gave Ms. Alvera a 24 hour notice to vacate because it is their policy to evict tenants who pose a threat to the safety and well-being of other tenants in the complex. When one person in the household poses a threat, the entire household is evicted.

## IV. FINDINGS AND CONCLUSIONS

The investigation revealed that the subject property consists of forty units and is funded by the USDA Rural Development program. The property is intended to serve lower income residents.

The investigation found that Ms. Alvera and her former husband, Mr. Humberto Mota, signed a lease and moved into a two bedroom unit at the complex in November, 1998. Until the incident from which this complaint arises, Ms. Alvera received no warnings or admonitions concerning her tenancy from the respondents. During this period Mr. Mota assaulted Ms. Alvera, who called the police. However, the respondents apparently were not aware of this incident and no action was taken with respect to their tenancy. In March, 1999, respondent Karen Mock became the resident manager of Creekside Village Apartments.

The evidence shows that on August 2, 1999, at approximately 5:30 am, Mr. Mota physically assaulted Ms. Alvera, causing Ms. Alvera to go to the hospital. Her mother, Tamie Alvera, who resided in unit 30 in the complex, at approximately 6:00 am, went to Ms. Mock in order to get a key to her daughter's apartment so that she could see whether Mr. Mota was still in the apartment. At the time, Tamie Alvera told Ms. Mock that Ms. Alvera had been beaten by Mr. Mota. Ms. Mock wrote up an incident report and sent it to respondent Corenevsky The investigation revealed that immediately after she was released from the hospital, Ms. Alvera obtained a restraining order against her husband, which she showed to Ms. Mock. The restraining order stated that Mr. Mota could not contact Ms. Alvera at her residence, place of business, or within 100 feet of Ms. Alvera and could not contact her by phone or mail. The order also stated that Mr. Mota would move from and not return to their residence. Ms. Alvera discussed with Ms. Mock removing Mr. Mota from the lease.

The investigation revealed further that Ms. Mock was instructed by Ms. Corenevsky to terminate Ms. Alvera's tenancy and issue a 24 hour for cause eviction notice. On August 4, 1999, CBM Group issued a 24 hour notice to Ms. Alvera and Mr. Mota. The notice stated: "You, someone in your control, or your pet, has seriously threatened immediately to inflict personal injury, or has inflicted substantial personal injury upon the landlord or other tenants." The notices specified: "On August 2, 1999 at approximately 6 am. Humberto Mota reportedly physically attacked Tiffani Alvera in their apartment. Subsequently, Police were called in."

2

001678

The investigation established that on August 4, 1999, Ms. Alvera made an application for a one bedroom unit at the complex because there was then only one member of the household. The evidence shows that this application was rejected by the respondents because of the incident of domestic violence for which Ms. Alvera received the 24 hour notice. The evidence showed that unit 18, a one bedroom apartment into which Ms. Alvera eventually moved, was available as of August 4, 1999. On October 8, 1999, Ms. Alvera submitted a second application for a one bedroom apartment. On November 2, Ms. Alvera signed a lease for a one bedroom apartment, where she resided until she was later evicted for reasons not directly related to the allegations of this complaint.

The evidence further revealed that on August 6, 1999, Ms. Mock refused to accept Ms. Alvera's rent for the month of August. The respondents communicated to Ms. Alvera up through early September, 1999 that they intended to pursue an FED action against her. On October 26, 1999, an attorney representing the respondents wrote Ms. Alvera "concerning your Rental Agreement of [unit 21]." The letter stated:

> "As you know, there was a recent incident of violence that took place between you and another member of your household. It is our understanding that you have taken steps to ensure that such an incident will not occur again.

> This letter is to advise that Creekside is very concerned about the effect of such conduct on other tenants of the premises. Your conduct and the conduct of the other tenant would probably have been grounds for termination of your tenancy. Obviously, Creekside would not desire to take this action.

> This letter is to advise that if there is any type of reoccurrence of the past events described above, that Creekside would have not other alternative but to cause an eviction to take place. We solicit your cooperation in continuing to maintain a restraining order or for you to take whatever action is necessary to make certain that the rules of your tenancy are followed."

There is no dispute that the sole reason for the 24 hour notice was respondents' response to this incident of domestic violence. The evidence shows that none of the other tenants complained to the respondents that their tenancy had been disrupted or that they had been injured or feared injury because of the incident. Ms. Mock stated that after Ms. Alvera vacated the apartment a hole in the wall, which might have been caused by an assault by Mr. Mota, was discovered, but that she learned of this damage long after the 24 hour notice had been issued and that she did not report the hole to her superiors.

The investigation did not establish that Ms. Alvera was treated differently than similarly situated male tenants. There were no similarly situated male tenants. The evidence also

revealed that there were at least three incidents of domestic violence at Creekside Village Apartments, all involving female victims, but respondents knew only about the August, 1999 incident involving Ms. Alvera. The evidence showed that the respondents issued three other 24 hour notices. One notice was for criminal activity, one was because the INS took the entire family away, and one was because a tenant threatened other tenants with a baseball bat. The evidence also showed that the resident manager filed six incident reports with upper management during the period June 1, 1999 to January 31, 2000. The only incident report involving violence, domestic or otherwise, was that involving Ms. Alvera.

It is the respondents' policy, expressed by respondent Corenevsky, that where there is any threat or act of violence by a tenant or their guest, the household is terminated. She stated that the subject property has a "zero tolerance" for violence or threats of violence, and this policy was affirmed by the ADA/504 Coordinator for CBM Group. Ms. Corenevsky stated: "As is often the case in a domestic violence situation the victim does not take steps to prevent a reoccurrence of violent acts, subjecting other tenants to witness the scene play out time and time again. The reasons we take such a hard stance on the issue of violence is to maintain a peaceful living environment for all tenants."

Nationally, each year from 1992 to 1996 about 8 in 1,000 women and 1 in 1,000 men experienced a violent victimization by an intimate—a current or former spouse, girlfriend or boyfriend. National statistics also showed that, although less likely than males to experience violent crime overall, females are 5 to 8 times more likely than males to be victimized by an intimate. Other national studies have found that women are as much as ten times more likely than men to be victimized by an intimate.

National statistics show that 90% to 95% of victims of domestic violence are women. National estimates are that at least one million women a year are victims of domestic violence. A 1998 Oregon Domestic Violence Needs Assessment stated that more than one in eight (13.3 %) women in the state were the victims of physical abuse by an intimate in the prior year. Evidence obtained during the investigation showed that 93% of the victims of domestic violence reported to Clatsop County in 1999 were women. The 1998 Oregon Domestic Violence Needs Assessment compared the Oregon statistics to national statistics on the prevalence of domestic violence and found them to be comparable. National studies using a similar methodology reported that 1 out of every 9 to 1 out of every 12 women had been victims of physical assault by an intimate partner within the previous year. This compares to the Oregon study's finding that 1 of every 10 Oregon women have been victims of physical assault.

These statistics demonstrate that the respondents' policy of evicting all members of a household because of an incident of domestic violence, regardless of whether the household member is a victim or a perpetrator of the domestic violence, has an adverse impact based on sex, because of the disproportionate number of women victims of domestic violence.

4

The respondents have raised several reasons for their policy. One rationale advanced by the respondents is the need to protect other tenants both from threats of violence or violence and from being disturbed in their tenancy. However, the evidence fails to support this rationale. In the case of Ms. Alvera, no other tenants complained about the incident in question and the evidence shows that the only tenant who was aware of the incident was Ms. Alvera's mother. There were no other records of tenant complaints or incident reports involving domestic violence though the evidence shows that incidents of domestic violence were occurring at the complex. Further, there was no evidence in the investigation to support an assumption that there is a greater probability that persons living in the immediate vicinity of a household that has incidents of domestic violence will themselves become victims of that violence.

The respondents also argued that their policy is consistent with and mandated by rules of Rural Development concerning properties funded by that agency. Rural Development has implemented regulations and procedures providing that: "Action or conduct of the tenant or member which disrupts the livability of the project by being a direct threat to the health or safety of any person, or the right of any tenant or member to the quiet enjoyment of the premises..." is grounds for termination of tenancy. However, Rural Development's rules and policies also provide: "It is not the intent that this provision of material lease violation apply to innocent members of the tenant's household who are not engaged in the illegal activity, nor are responsible for control of another household member or guest." The Rural Development representative responsible for monitoring Creekside Village Apartments stated that the rule protects innocent parties.

Respondent Corenevsky also stated that a reason that the respondents evict the entire household is because a TRO doesn't stop violence, and many men are not afraid of TROs. The results of national studies on the effectiveness of restraining orders in preventing future incidents of domestic violence are mixed. One study showed that in the six months after a restraining order is issued, 65% of the women who obtained the order reported no further domestic violence problems. Another study showed that future incidents of violence did occur even after a restraining order was obtained. However, the respondents' rationale is based on overbroad generalizations that do not take into account either the individual circumstances of the female victim tenant or all of the actions that she may have taken to prevent a recurrence of the violence. For example, in the case of Ms. Alvera, Mr. Mota was jailed, apparently subsequently left the country, and has had no further contact with Ms. Alvera.

In issuing a 24 hour notice, the respondents apparently also were relying on an Oregon State law, ORS 90.400(3), which permits landlords to issue a notice for a tenant to vacate the property within 24 hours if there is substantial personal injury to the landlord or other tenants. However, that law, and the legislative history behind it, were not intended to apply to innocent victims of violence. During the legislative process witnesses testified that: "There are special concerns about battered women who might be evicted under this provision because of the outrageous conduct of an abusive boyfriend; they would be punished twice; beaten by the boyfriend, then evicted because of the boyfriend's abuse."

6-27-201 4:28PM     FROM LEGAL AID SERVICES   6480513                    P. 45

The evidence taken as a whole establishes that a policy of evicting innocent victims of domestic violence because of that violence has a disproportionate adverse impact on women and is not supported by a valid business or health or safety reason by the respondents.

V. CONCLUSION

For the foregoing reasons, the Department finds reasonable cause to believe that the complainant has been discriminated against because of her sex in violation of the Fair Housing Act. A copy of the Final Investigative Report is available by requesting the Report in writing addressed to the Fair Housing Hub, Northwest/Alaska Area, U.S. Department of Housing and Urban Development, 909 First Avenue, Suite 205, Seattle, Washington 98104.

_4 / 13 / 01_
Date

Judith A. Keeler
Director, Seattle Fair Housing Hub

6

No. 11-1159

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

MT. HOLLY GARDENS CITIZENS IN ACTION, INC., *et al.*,

Plaintiffs-Appellants

v.

TOWNSHIP OF MOUNT HOLLY, *et al.*,

Defendants-Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
IN SUPPORT OF NEITHER PARTY

_____

THOMAS E. PEREZ
 Assistant Attorney General

DENNIS J. DIMSEY
APRIL J. ANDERSON
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, DC 20044-4403
 (202) 616-9405

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................................1

STATEMENT OF THE ISSUE................................................................2

STATEMENT OF THE CASE................................................................2

STATEMENT OF THE FACTS ................................................................4

    *1.*    *Facts And Procedural History* ................................................4

    *2.*    *The District Court's Decision* ................................................7

SUMMARY OF ARGUMENT ................................................................10

ARGUMENT

    THE DISTRICT COURT ERRED IN CONCLUDING
    THAT THE PLAINTIFFS DID NOT PRESENT A
    PRIMA FACIE CASE OF DISPARATE IMPACT
    DISCRIMINATION ................................................................11

    *A.*    *Standard Of Review*................................................................11

    *B.*    *Disparate Impact Analysis Under The Fair Housing Act*................12

    *C.*    *The District Court Erred In Holding That*
        *Plaintiffs Failed To Show A Prima Facie*
        *Case Of Disparate Impact Discrimination*
        *Under The Fair Housing Act Because They*
        *Did Not Show That The New Housing Would*
        *Be Unaffordable To All Or Most Minority Households*......................15

    *D.*    *The District Court Erred In Holding That*
        *Plaintiffs Failed To Establish A Prima Facie*
        *Case Of Disparate Impact Because There Were*
        *Enough Minority Households In Burlington County*
        *To Occupy All Of The Proposed New Units*........................................19

**TABLE OF CONTENTS (continued):**                                    **PAGE**

CONCLUSION ........................................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                                     **PAGE**

*Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977)......................................................................13

*Artisan/American Corp.* v. *City of Alvin*,
    588 F.3d 291 (5th Cir. 2009) ........................................................14

*Betsey* v. *Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984) ................................17

*Committee Concerning Cmty. Improvement* v. *City of Modesto*,
    583 F.3d 690 (9th Cir. 2009) ................................................. 16-17

*Community Servs., Inc.* v. *Wind Gap Mun. Auth.*,
    421 F.3d 170 (3d Cir. 2005) ........................................................12

*Doe* v. *Butler*, 892 F.2d 315 (3d Cir. 1989)............................................................14

*EBC, Inc.* v. *Clark Bldg. Sys.*, 618 F.3d 253 (3d Cir. 2010)....................................21

*EEOC* v. *Metal Serv. Co.*, 892 F.2d 341 (3d Cir. 1990)...........................................11

*Greater New Orleans Fair Housing Action Ctr.* v. *HUD*,
    Nos. 10-5257 & 10-5269,
    2011 WL 1327713 (D.C. Cir. Apr. 8, 2011) ...........................................13, 20

*Hallmark Developers, Inc.* v. *Fulton Cnty.*,
    466 F.3d 1276 (11th Cir. 2006) ....................................................... 12-13, 20

*Huntington Branch, NAACP* v. *Town of Huntington*,
    668 F. Supp. 762 (E.D.N.Y. 1987)..................................................20

*Huntington Branch, NAACP* v. *Town of Huntington*,
    844 F.2d 926 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) .......................*passim*

*Lapid-Laurel* v. *Zoning Bd. of Adjustment of Twp. of South Plains*,
    284 F.3d 442 (3d Cir. 2002) ........................................................12

**CASES (continued):**                                                                    **PAGE**

*LeBlanc-Sternberg* v. *Fletcher*, 67 F.3d 412 (2d Cir. 1995),
    cert. denied, 518 U.S. 1017 (1998)...............................................................21

*Lincoln* v. *Case*, 340 F.3d 283 (5th Cir. 2003) .......................................................21

*Mountain Side Mobile Estates P'ship* v. *Secretary of Hous. & Urban Dev.*,
    56 F.3d 1243 (10th Cir. 1995) .........................................................................1

*Resident Advisory Bd.* v. *Rizzo*, 564 F.2d 126 (3d Cir. 1977),
    cert. denied, 435 U.S. 908 (1978)....................................................... 13-14, 16

*Smith* v. *Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982)....................................14

*Tsombanidis* v. *West Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003)....................15

*United States* v. *City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974),
    cert. denied, 422 U.S. 1042 (1975)............................................................2, 12

*United States* v. *Hays*, 515 U.S. 737 (1995) ...........................................................21

**STATUTES:**

42 U.S.C. 1982 .........................................................................................................3

42 U.S.C. 1983 .........................................................................................................3

42 U.S.C. 3602(i) ...................................................................................................21

42 U.S.C. 3604(a) ..................................................................................................12

42 U.S.C. 3612(a) ....................................................................................................1

42 U.S.C. 3613 .......................................................................................................21

42 U.S.C. 3614(d) ....................................................................................................1

001688

**STATUTES (continued):**                                          **PAGE**

42 U.S.C. 3614(o) ..................................................................................................1

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
————————————

No. 11-1159

MT. HOLLY GARDENS CITIZENS IN ACTION, INC., *et al.*,

Plaintiffs-Appellants

v.

TOWNSHIP OF MOUNT HOLLY, *et al.*,

Defendants-Appellees

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
————————————

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
IN SUPPORT OF NEITHER PARTY
————————————

**INTEREST OF THE UNITED STATES**

The United States Department of Justice and the United States Department
of Housing and Urban Development (HUD) share enforcement authority under the
Fair Housing Act (FHA).  42 U.S.C. 3614(d), 3612(a) & (o).  The Department of
Justice and HUD frequently bring cases alleging disparate impact claims.  See,
*e.g.*, *United States* v. *AIG Fed. Sav. Bank*, No. 10-178 (D. Del.) (order granting
unopposed motion for entry of consent order entered on March 19, 2010);
*Mountain Side Mobile Estates P'ship* v. *Secretary of Hous. & Urban Dev.*, 56 F.3d

- 2 -

1243, 1251 (10th Cir. 1995); *United States* v. *City of Black Jack*, 508 F.2d 1179, 1186 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975).  This Court's resolution of the question presented regarding the standards for establishing a prima facie case of disparate impact will likely affect the Justice Department's and HUD's enforcement responsibilities under the FHA.

## STATEMENT OF THE ISSUE

Whether the district court erred in concluding, on summary judgment, that plaintiffs failed to state a prima facie case of disparate impact discrimination because they did not show that the challenged redevelopment would be unaffordable for "all or most" of the township's minority households, and because there were enough middle-income minority households in the county to theoretically occupy all of the proposed higher-priced housing.[1]

## STATEMENT OF THE CASE

Plaintiffs, residents of the Mount Holly Gardens neighborhood in Mount Holly, New Jersey, sued to stop the township's redevelopment of their neighborhood.  R. 73 (Second Amended Complaint); R. 114 at 2, App. 5 (Jan. 3,

---

[1]  The United States takes no position on the other issues presented in this appeal.

- 3 -

2011 Opinion).[2]  They alleged that the redevelopment, which would replace their homes with higher-priced housing, would have a disparate impact on the mostly-minority residents and violate the Fair Housing Act.  Plaintiffs also brought claims under 42 U.S.C. 1982, 42 U.S.C. 1983, and state law.  R. 114 at 3, App. 6 (Jan. 3, 2011 Opinion).  They sought injunctive relief and compensatory and punitive damages.  R. 73 at 52 (Second Amended Complaint).  In addition to the federal case, there were several years of litigation in state courts.  R. 73 at 3 (Second Amended Complaint); R. 114 at 6-7, App. 9-10 (Jan. 3, 2011 Opinion).  The state courts upheld the township's designation of the Gardens neighborhood as blighted and "in need of redevelopment," but those courts did not address the plaintiffs' Fair Housing Act claims.  See R. 73 at 3 (Second Amended Complaint).

The district court conducted several hearings over two years, denied a temporary restraining order and preliminary injunction, and issued several opinions.  R. 114 at 2. n.1, App. 5 (Jan. 3, 2011 Opinion).  Parties were not allowed formal discovery.  R. 114 at 6, App. 9 (Jan. 3, 2011 Opinion).  Finally, the district court converted defendants' motion to dismiss to a motion for summary

---

[2] "R. __" refers to documents filed in the district court, identified by docket number.  "App. __" refers to pages in the Appellants' appendix, volume 1, attached to their opening brief.  Subsequent volumes of the appendix were not available to amicus.

- 4 -

judgment, took supplemental briefing, and granted the motion.  R. 114 at 2-3, App. 5-6 (Jan. 3, 2011 Opinion).

## STATEMENT OF THE FACTS

*1.    Facts And Procedural History*

There were roughly 330 homes in the 30-acre Mount Holly Gardens neighborhood.  R. 17-3 at 8 (Beveridge Decl.); R. 73 at 2, 11 (Second Amended Complaint); R. 106-1 at 2 (Responding Statement of Facts).  About half the neighborhood's residents were homeowners in 2000.  R. 73 at 13 (Second Amended Complaint); R. 106-1 at 6 (Responding Statement of Facts).  Almost all residents have very low or extremely low incomes, defined as less than 50% or 30% of the area median income, respectively.  R. 17-3 at 9 (Beveridge Decl.). Defendants began purchasing homes as early as 2002, and by 2008 had already purchased, vacated, and boarded up more than 200 homes.  R. 73 at. 3, 24 (Second Amended Complaint).  They had demolished more than 70.  R. 17-3 at 8 (Beveridge Decl.); R. 73 at 25 (Second Amended Complaint).

Redevelopment would substantially increase housing costs in the neighborhood.  See R. 73 at 14, 34 (Second Amended Complaint).  Indeed, nearly all Gardens residents could not afford to purchase or rent market-rate homes in the redeveloped area.  R. 73 at 14 (Second Amended Complaint); R. 94 at 11 n.4 (Feb. 13, 2009 Opinion); R. 106-1 at 42 (Responding Statement of Facts); R. 112 at 38-

- 5 -

40 (Def. Summ. J. Br.).  The township pays between $32,000 and $49,000 for each

home it buys in the Gardens.  R. 73 at 24 (Second Amended Complaint); R. 106-1

at 34 (Responding Statement of Facts).  Redevelopment plans call for 464 homes

selling for between $200,000 and $275,000.  R. 73 at 34 (Second Amended

Complaint); R. 106-1 at 41-42 (Responding Statement of Facts).  A one-bedroom

apartment will rent for more than $1200 per month.  R. 73 at 34 (Second Amended

Complaint); R. 106-1 at 41-42 (Responding Statement of Facts).  There will also

be 56 deed-restricted, affordable units, but these will not be affordable for very low

income residents.  R. 73 at 34 (Second Amended Complaint); R. 114 at 12 n.7,

App. 15 (Jan. 3, 2011 Opinion).

Plaintiffs presented expert evidence that the redevelopment in the Gardens

would greatly impact the minority population of Mount Holly.  R. 17-3 at 16

(Beveridge Decl.).  Mount Holly is 66% white, 21% African-American, and 9%

Hispanic.  R. 17-3 at 13 (Beveridge Decl.); R. 73 at 12 (Second Amended

Complaint); R. 106-1 at 4 (Responding Statement of Facts).  It has a population of

more than 10,700.  R. 17-3 at 13 (Beveridge Decl.).  Burlington County is, overall,

76% white, 15% African-American, and 4% Hispanic.  R. 17-3 at 13 (Beveridge

Decl.); R. 73 at 12-13 (Second Amended Complaint); R. 106-1 at 3 (Responding

Statement of Facts).  The population is very different, however, within the census

blocks containing the Gardens neighborhood.  The population is 20% white, 46%

- 6 -

African-American, and 29% Hispanic.  R. 17-3 at 14 (Beveridge Decl.); R. 73 at

12 (Second Amended Complaint); R. 106-1 at 4 (Responding Statement of Facts).

The neighborhood accounts for 32% of Mount Holly's entire Hispanic population

and 21% of the township's entire African-American population.  But only 3% of

the township's white residents live there.  R. 106-1 at 5 (Responding Statement of

Facts).  It contains the highest percentage of African-American and Hispanic

residents of any neighborhood in the township.  R. 73 at 12 (Second Amended

Complaint); R. 106-1 at 5 (Responding Statement of Facts).  Seventy-five percent

of the neighborhood's residents are minorities.  R. 17-3 at 17 (Beveridge Decl.); R.

102 at 8 (Oct. 23, 2009 Opinion).

Accordingly, plaintiffs argued that redevelopment that forces residents to

leave the Gardens will disproportionately affect minority households.  R. 73 at 37

(Second Amended Complaint); R. 114 at 12 n.8, App. 15 (Jan. 3, 2011 Opinion).

Residents are not only displaced from their neighborhood, but also will likely leave

the township – and perhaps Burlington County – altogether.  Plaintiffs showed that

there is a shortage of low-income housing in the township and its immediate

surroundings, suggesting they would likely not be able to find replacement housing

there.  R. 17-3 at 18-19 (Beveridge Decl.); R. 73 at 36 (Second Amended

Complaint).  It appears residents who have left the Gardens most often move

outside Mount Holly.  R. 17-32 at 9, 27-31 (Redevelopment Report).  There is also

a shortage of low-income housing in the county as a whole.  The plaintiffs' expert stated that in 2000 there were roughly 5300 units affordable for families making 50% or less of area median income, while more than 22,000 households needed such affordable housing.  R. 17-3 at 12 (Beveridge Decl.).  Affordable units decreased between 2000 and 2006 in part, plaintiffs' expert stated, "due to the vacant and now demolished units in the Gardens being removed from the housing stock."  R. 17-3 at 12 (Beveridge Decl.).  Destruction of the Gardens will eliminate some 5% of the county-wide stock of housing affordable for very low or extremely low income residents.  R. 17-3 at 12 (Beveridge Decl.).

Indeed, relatively few minorities in the county will be able to buy the new homes.  Plaintiffs presented evidence that only 21% of African-American and Hispanic households in the county would likely be able to afford the new market-rate homes, compared to 79% of white households.  R. 106-2 at 8 (Beveridge Summ. J. Decl.); R. 114 at 12-13 n.9, App. 15-16 (Jan. 3, 2011 Opinion).

## 2.    *The District Court's Decision*

The district court granted summary judgment for the defendants.  Among other things, the court held that the plaintiffs had not presented a prima facie case under their disparate impact theory.  It acknowledged that the project had "an effect on low-income families, and, correspondingly, minority families."  R. 114 at 3, App. 6 (Jan. 3, 2011 Opinion).  But "under plaintiffs' logic," the court

- 8 -

concluded, "any action by the Township to do anything with regard to the Gardens would result in a disparate impact, simply because of the racial composition of the Gardens." R. 114 at 13, App. 16 (Jan. 3, 2011 Opinion).

In particular, the court rejected plaintiffs' statistical analysis. According to the district court, the analysis improperly included the whole of Burlington County (rather than only Mount Holly township), did not account for minorities who might move in from outside the county, and did not consider how many displaced residents would move elsewhere in the township. R. 114 at 12-13 n.9, App. 15-16 (Jan. 3, 2011 Opinion). Furthermore, the district court concluded, plaintiffs had not accounted for how many minorities will move into the new development by buying one of the 56 planned affordable units or renting from a white purchaser. R. 114 at 11-13 & n.9, App. 14-16 (Jan. 3, 2011 Opinion). The court concluded that plaintiffs' analysis was insufficient because it did not show that "the new homes created by the redevelopment will be financially out-of-reach for all or most minorities." R. 114 at 12, App. 15 (Jan. 3, 2011 Opinion).

Turning to statistics on the *absolute* numbers of African-American and Hispanic households who could likely afford the homes, the court concluded that there were 16,744 such families in Burlington County. R. 114 at 12 n.9, App. 15 (Jan. 3, 2011 Opinion). This population had the "ability to occupy all 464 market rate homes." R. 114 at 12 n.9, App. 15 (Jan. 3, 2011 Opinion). Furthermore, the

court stated the plan did not "apply differently to minorities than non-minorities," because many residents – including some plaintiffs – were white and would nevertheless lose their housing.  R. 114 at 11, App. 14 (Jan. 3, 2011 Opinion).

The court further decided that plaintiffs had failed to establish a prima facie case of disparate impact on the ground that no one has "been forced out of their homes by the Township without the offer of relocation services."  R. 114 at 14, App. 17 (Jan. 3, 2011 Opinion).  In so holding, the court noted that all plaintiffs, except one removed by her landlord, still reside in the neighborhood.  R. 114 at 14, App. 17 (Jan. 3, 2011 Opinion).

The court found that, in any event, defendants met their burden to show a legitimate government interest.  R. 114 at 10 & n.6, App. 13 (Jan. 3, 2011 Opinion).  Plaintiffs, the court concluded, had not rebutted this conclusion with any showing that less discriminatory actions were available.  R. 114 at 10 & n.6, App. 13 (Jan. 3, 2011 Opinion).

The court further concluded that the plaintiffs had not shown intentional discrimination.  R. 114 at 20-21, App. 23-24 (Jan. 3, 2011 Opinion); see also R. 94 at 7 (Feb. 13, 2009 Opinion).  Accordingly, the court granted summary judgment for defendants on plaintiffs' 42 U.S.C. 1982 and 42 U.S.C. 1983 claims, as well as their intentional discrimination claims brought under New Jersey law.  R. 114 at 18-26, App. 21-29 (Jan. 3, 2011 Opinion).

## SUMMARY OF ARGUMENT

The district court applied the wrong legal standard in evaluating plaintiffs' disparate impact claim, and consequently erred in ruling that they had not presented a prima facie case.  The district court held that plaintiffs had failed to establish a prima facie case of disparate impact under the FHA because they had not shown that the new homes created by the redevelopment would be financially unavailable for most or all minorities.  In so ruling, the district court failed to properly resolve the determinative question:  whether the proposed redevelopment would have a *disproportionate* effect on a protected group.  Because plaintiffs presented sufficient evidence that the redevelopment would have a disproportionate adverse effect upon minorities in Mount Holly Township, as well as Burlington County, the district court erred in granting summary judgment to defendants on the ground that plaintiffs had failed to present a prima facie case of disparate impact under the FHA.

The district court similarly erred in rejecting plaintiffs' disparate impact claim on the ground that there were, in absolute terms, enough higher-income minority households in Burlington County to purchase all of the houses in the planned redevelopment.  While there is no one statistical method to demonstrate disparate impact, the analysis should be based on relative numbers of minority and nonminority households adversely affected by the proposed redevelopment, rather

- 11 -

than on the absolute number of minority households who the court finds earn enough income to be able to afford the new housing to be created by redevelopment.

In this case, the district court did not fulfill its proper role in resolving defendants' summary judgment motion. The court plainly did not view the facts on the disproportionate racial effect of the redevelopment in the light most favorable to plaintiffs, instead rejecting plaintiffs' evidence – including expert reports – that the proposed redevelopment will effectively and significantly affect the minority population in Mount Holly. Because of this, and the erroneous legal standards it applied, the district court's determination that plaintiffs failed to establish a prima facie case of disparate impact should be reversed.

## ARGUMENT

### THE DISTRICT COURT ERRED IN CONCLUDING THAT THE PLAINTIFFS DID NOT PRESENT A PRIMA FACIE CASE OF DISPARATE IMPACT DISCRIMINATION

A.    *Standard Of Review*

The issue of whether plaintiffs presented a prima facie case of disparate impact is a matter of law, reviewed *de novo*. *EEOC* v. *Metal Serv. Co.*, 892 F.2d 341, 345 (3d Cir. 1990) ("[A] district court's analysis of whether the evidence presented is sufficient to establish a prima facie case" of discrimination, as

- 12 -

opposed to liability, "is plenary because it necessarily implicates the application of a legal standard to historical facts").

This Court reviews a district court's grant of summary judgment *de novo*. *Lapid-Laurel* v. *Zoning Bd. of Adjustment of Twp. of South Plains*, 284 F.3d 442, 449 & n.4 (3d Cir. 2002). A court should grant summary judgment only where, "viewing the facts in the light most favorable to the non-moving party," there is "no genuine issue of material fact." *Id.* at 449 n.4. "The judge's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter." *Ibid*.

B.    *Disparate Impact Analysis Under The Fair Housing Act*

The Fair Housing Act makes it unlawful to "refuse to sell or rent * * * or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. 3604(a). This Court – and indeed every Circuit to consider the issue – has concluded that the Act encompasses disparate impact claims.[3] *Community Servs., Inc.* v. *Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005); *Lapid-Laurel*, 284 F.3d at 466-467;

---

[3]   Under the Fair Housing Act a prima facie showing of discriminatory effect may also be established by evidence that a facially neutral housing practice perpetuates segregated housing patterns. See, *e.g.*, *Hallmark Developers, Inc.* v. *Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006); *Huntington Branch, NAACP* v. *Town of Huntington*, 844 F. 2d 926, 937 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curium); *United States* v. *City of Black Jack*, 508 F.2d 1179, 1184-1186 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975).

- 13 -

*Resident Advisory Bd.* v. *Rizzo*, 564 F.2d 126, 148 (3d Cir. 1977), cert. denied, 435 U.S. 908 (1978); *Greater New Orleans Fair Hous. Action Ctr.* v. *HUD*, Nos. 10-5257 & 10-5269, 2011 WL 1327713, at *6 (D.C. Cir. Apr. 8, 2011) ("Each of the eleven circuits that have resolved the matter has found the disparate impact theory applicable under the Fair Housing Act.").

To establish a disparate impact case of racial discrimination, the plaintiff must show that the defendant's action will have a disproportionate effect on a racial group. *Rizzo*, 564 F.2d at 143 (noting disparate impact claim where city's action "had the undeniable effect of 'bear[ing] more heavily on one race than another'") (quoting *Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977)). Although other factors may go to the ultimate merits, this Court has held that "discriminatory effect alone will, if proved, establish a * * * prima facie case." *Id.* at 148 & n.32. If the plaintiff succeeds, the burden shifts to the defendant to show "a legitimate, bona fide interest" in taking the challenged action. *Id.* at 149. If the defendant meets its burden, plaintiff then has the burden to show that less discriminatory practices are available. *Id.* at 149 n.37.

There is no clear rule for the statistical showing needed in a prima facie case; plaintiffs must offer "proof of disproportionate impact, measured in some plausible way." *Greater New Orleans*, 2011 WL 1327713, at *6. See also *Hallmark Developers, Inc.* v. *Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006)

- 14 -

("no single test controls in measuring disparate impact") (quotation marks and citation omitted). This Court has stated that plaintiffs must show that a challenged housing practice "has fallen more harshly" on a protected group. *Doe* v. *Butler*, 892 F.2d 315, 323 (3d Cir. 1989). In *Rizzo*, the Court found prima facie evidence of a disparate impact where "the impact of the governmental defendants' termination of the [housing] project was felt primarily by blacks." *Rizzo*, 564 F.2d at 149.

Courts have accepted a variety of statistical showings as establishing a prima facie disparate impact case, including analyses based on a statistical connection between income and race. This can be shown where the plaintiff establishes that there is a shortage of housing accessible to a protected group, and that the shortage is causally linked to the challenged policy. In *Huntington Branch, NAACP* v. *Town of Huntington*, 844 F. 2d 926, 929 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curium), for example, plaintiffs stated a prima facie case by showing a shortage of low- and moderate-income housing, and that the impact of the shortage was three times greater on African Americans than on the overall population. See also *Smith* v. *Town of Clarkton*, 682 F.2d 1055, 1062-1064 (4th Cir. 1982); cf. *Artisan/American Corp.* v. *City of Alvin*, 588 F.3d 291, 298-299 (5th Cir. 2009) (plaintiffs' claim failed where they did not make a showing typical in a disparate

impact case, such as a waiting list for affordable housing, a shortage of affordable

housing, or individuals affected by the challenged action).

C.   *The District Court Erred In Holding That Plaintiffs Failed To Show A Prima*
     *Facie Case Of Disparate Impact Discrimination Under The Fair Housing*
     *Act Because They Did Not Show That The New Housing Would Be*
     *Unaffordable To All Or Most Minority Households*

In this case, the district court applied the wrong standard to plaintiffs'

statistical evidence, concluding that plaintiffs failed because they did not show that

"the new homes created by the redevelopment will be financially out-of-reach for

all or most minorities."  R. 114 at 12, App. 15 (Jan. 3, 2011 Opinion).  This

standard is much more restrictive than the proper rule applied in a disparate impact

case.

The proper analysis requires a *disproportionate* adverse effect on a protected

group, rather than an adverse effect on "all or most" minority families.[4]  R. 114 at

12, App. 15 (Jan. 3, 2011 Opinion).  In order to make out a disparate impact claim,

a plaintiff must "establish[] that a challenged practice has a significantly adverse or

disproportionate impact on a protected group."  See *Tsombanidis* v. *West Haven*

*Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003).

---

[4]  Even if the court's standard were correct, the plaintiffs established that
only 21% of African-American and Hispanic households in Burlington County
could afford to live in the new development, whereas 79% of white households
could afford the new homes.  R. 106-2 at 8 (Beveridge Summ. J. Decl.); R. 114 at
12-13 n.9, App. 15-16 (Jan. 3, 2011 Opinion).  Thus "most" minority households
in the county could not afford the new housing.

- 16 -

In *Rizzo*, for example, this Court found a prima facie case where the city opposed a low-income housing development, and African Americans made up "a substantial proportion of those who would be eligible" to live in the challenged development. *Rizzo*, 564 F.2d at 142, 149. Waiting lists for low-income housing were 85% African-American, and this showed that African-American families would be disproportionately affected. *Ibid.* But the Court did not require plaintiffs to show that all or most African-American families in the city needed low-income housing. And in *Huntington Branch*, 844 F.2d at 929, plaintiffs stated a prima facie case where there was a shortage of low-income housing, and 24% of African-American families required such housing. Twenty-four percent was certainly not all or most African-American families, but the impact of the shortage was disproportionate; only seven percent of all families in the city needed low-income housing. *Ibid.* In this case, plaintiffs' expert opined that – at least by some measures – African-American and Hispanic families are respectively 8 and 11 times more likely than white families to be negatively affected by the redevelopment. R. 106-2 at 5 (Beveridge Summ. J. Decl.).

Indeed, a plaintiff may state a prima facie case even if substantial numbers of minority families clearly are *not* affected by the challenged practice. In *Committee Concerning Community Improvement* v. *City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009), for example, the plaintiffs argued their neighborhoods, which

- 17 -

were 71% Hispanic, were improperly denied certain city services.  Other
neighborhoods, which did receive services, also had substantial Hispanic
populations of 48%.  *Ibid.*  Nevertheless, the Ninth Circuit concluded that plaintiffs
had made a prima facie showing of disparate impact.  *Id.* at 704-705.

According to plaintiffs' evidence, the proposed redevelopment in this case
not only affects the availability of affordable housing in the township and county,
but also directly affects a discrete group – Gardens residents.  In measuring the
adverse effect of the proposed redevelopment, the racial composition of potentially
displaced residents is also a relevant consideration.  *Betsey* v. *Turtle Creek Assocs.*,
736 F.2d 983, 987 (4th Cir. 1984).  Here, it is undisputed that displaced residents
are disproportionately minority when compared to the population of Mount Holly
Township or Burlington County as a whole.  Mount Holly Township is 66% white,
21% African-American, and 9% Hispanic; Burlington County has roughly similar
demographics (76% white, 15% African-American, and 4% Hispanic).  R. 17-3 at
13 (Beveridge Decl.); R. 73 at 12-13 (Second Amended Complaint); R. 106-1 at 3-
4 (Responding Statement of Facts).  The census blocks containing the Gardens
neighborhood are 20% white, 46% African-American, and 29% Hispanic.  R. 17-3
at 14 (Beveridge Decl.); R. 73 at 12 (Second Amended Complaint); R. 106-1 at 4
(Responding Statement of Facts).

- 18 -

Indeed, relatively few minorities in the county will be able to buy the new homes. Plaintiffs' expert stated that only 21% of African-American and Hispanic households in the county would likely be able to afford the new market-rate homes, compared to 79% of white households. R. 106-2 at 8 (Beveridge Summ. J. Decl.); R. 114 at 12-13 n.9, App. 15-16 (Jan. 3, 2011 Opinion). Moreover, it is undeniable that nearly all Gardens residents have low incomes and could not afford to purchase or rent market-rate homes in the redeveloped area. R. 73 at 14 (Second Amended Complaint); R. 106-1 at 42 (Responding Statement of Facts); Doc. 112 at 38-40 (Def. Summ. J. Br.).

On this record, then, plaintiffs have plainly made a plausible statistical showing of disparate impact sufficient to state a prima facie case. The district court's conclusion that plaintiffs failed to prove that most or all minorities would be unable to afford the new housing does nothing to undermine this conclusion.[5]

---

[5] Given the flexible standards for establishing a prima facie statistical showing, the district court also erred in concluding plaintiffs' analysis was too narrow because it did not "account for minorities who will move into Mt. Holly Township from outside Burlington County." R. 114 at 12-13 n.9, App. 15-16 (Jan. 3, 2011 Opinion). Where there is a sufficient impact in a smaller region, broader analysis may not be necessary. See *Huntington Branch*, 844 F.2d at 938 n.8. Going to the opposite extreme, the court erred in rejecting plaintiff's analysis because it was too broad, including "the entire population of Burlington County, rather than only Mt. Holly Township." R. 114 at 12-13 n.9, App. 15-16 (Jan. 3, 2011 Opinion). Plaintiffs in fact *did* include statistics about the township, adjacent areas, and the Gardens neighborhood. R. 17-3 at 5, 9-11 (Beveridge Decl.). Plaintiffs' expert stated that nearly all Gardens residents would be unable to afford

(continued...)

- 19 -

D.    *The District Court Erred In Holding That Plaintiffs Failed To Establish A*
      *Prima Facie Case Of Disparate Impact Because There Were Enough*
      *Minority Households In Burlington County To Occupy All Of The Proposed*
      *New Units*

The court also erred in rejecting plaintiffs' prima facie showing on the

ground that there were, in absolute terms, enough middle-income minority families

in Burlington County to occupy all of the proposed new units.  R. 114 at 12-13 n.9,

App. 15-16 (Jan. 3, 2011 Opinion).  The district court found that there were some

16,744 African-American and Hispanic families in Burlington County who could

likely afford houses in the new development.  R. 114 at 13 n.9, App. 16 (Jan. 3,

2011 Opinion); see also R. 112 at 39 (Def. Summ. J. Br.).  The court concluded

that this showed "the minority population's ability to occupy all 464 market rate

homes."  R. 114 at 13 n.9, App. 16 (Jan. 3, 2011 Opinion).  While there is no

specific rule about the form of statistical analysis required to show disparate

impact, the analysis should be based, by definition, on a *disproportionate* impact

on a protected group, rather than on *absolute* numbers.

Other appellate courts have specifically considered and rejected analyses of

absolute rather than proportional statistics.  In *Huntington Branch*, the Second

_____

(...continued)

the new homes, and that the development project would have a disparate impact on
the township *and* the county.  R. 17-3 at 5, 9-11, 51 (Beveridge Decl.); R. 17-4
(Beveridge Decl. Exh.).  The county-wide impact does not negate plaintiffs'
showing; rather it underscores the scope of the disparate impact.

Circuit reversed the district court in part because of its improper reliance on absolute figures.  In that case, the district court compared "the larger absolute number of white poor (22,160) with minority poor (3,671)," and noted that large numbers of white residents might benefit from the proposed project.  *Huntington Branch*, 844 F.2d at 933 (quoting *Huntington Branch, NAACP* v. *Town of Huntington*, 668 F. Supp. 762, 786 (E.D.N.Y. 1987)).  The Second Circuit held that "[b]y relying on absolute numbers rather than on proportional statistics, the district court significantly underestimated the disproportionate impact of the Town's policy," and "perceived facts through a misapprehension of the applicable law."  *Id*. at 938.  The Eleventh Circuit has similarly rejected reliance on absolute numbers, noting that "[t]ypically, a disparate impact is demonstrated by statistics," and "it may be inappropriate to rely on absolute numbers rather than on proportional statistics."  *Hallmark Developers, Inc*., 466 F.3d at 1286 (internal quotation marks and citations omitted).[6]

Given the relatively flexible standard for establishing a statistical prima facie showing, see *Greater New Orleans*, 2011 WL 1327713, at *6, it is clear that the

---

[6]  The district court made a similar analytical error in rejecting plaintiffs' analysis on the ground that white residents of the Gardens were affected *in the same way* as minority residents.  R. 114, App. 14 (Jan. 3, 2011 Opinion).  The court should have considered the *disproportionate impact* on minority families, instead of the fact that some number of white families would also lose their homes.

district court applied impermissibly restrictive legal standards in granting

defendants' summary judgment motion on the ground that plaintiffs failed to

present a prima facie case of disparate impact.  It is equally clear that the court

failed to consider the plaintiffs' evidence "in the light most favorable to the

nonmoving party," and to "draw all reasonable inferences in that party's favor."

*EBC, Inc.* v. *Clark Bldg. Sys.*, 618 F.3d 253, 262 (3d Cir. 2010).  Here, "a rational

person could conclude" that plaintiffs are correct on the disputed issue of disparate

impact.  *Ibid.* (internal quotation marks and citation omitted).[7]

---

[7]  In addition, the district court erred in ruling that plaintiffs failed to establish their disparate impact claim because they have not yet been evicted, and no one has "been forced out of their homes by the Township without the offer of relocation services."  R. 114 at 14, App. 17 (Jan. 3, 2011 Opinion).  The Fair Housing Act states that "[a]n aggrieved person" may seek redress, and defines an aggrieved person as "any person who * * * claims to have been injured by a discriminatory housing practice" or "believes that such person will be injured by a discriminatory housing practice that is *about to occur*."  42 U.S.C. 3602(i); 42 U.S.C. 3613 (emphasis added).  The Act reaches "imminent" harm, provided it is "not conjectural or hypothetical."  *Lincoln* v. *Case*, 340 F.3d 283, 289 (5th Cir. 2003) (quoting *United States* v. *Hays*, 515 U.S. 737, 743 (1995)).  "[A] person who is likely to suffer such an injury need not wait until a discriminatory effect has been felt before bringing suit."  *LeBlanc-Sternberg* v. *Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995), cert. denied, 518 U.S. 1017 (1998).  Moreover, relocation assistance does not cure a potential Fair Housing Act violation.  If this were so, an offer of assistance would essentially immunize a municipality against Fair Housing Act claims, even where the displacement is discriminatory.

- 22 -

# CONCLUSION

The Court should hold that the district court erred in granting summary judgment to the defendants on the ground that plaintiffs had failed to establish a prima facie case of disparate impact.

Respectfully submitted,

THOMAS E. PEREZ
  Assistant Attorney General


s/April J. Anderson
DENNIS J. DIMSEY
APRIL J. ANDERSON
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, DC 20044-4403
  (202) 616-9405

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type volume limitation imposed by Federal Rule of Appellate Procedure 32(a)(7)(B) and 29(d). The brief was prepared using Microsoft Word 2007 and contains no more than 5200 words of proportionally spaced text. The type face is Times New Roman, 14-point font.

I further certify that the electronic version of this brief, prepared for submission via ECF, has been scanned with the most recent version of Trend Micro Office Scan (version 8.0) and is virus-free.

s/April J. Anderson
APRIL J. ANDERSON
 Attorney

Date: June 3, 2011

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rules 28.3(d) and 46.1(a), I hereby certify that I am

exempt from the Third Circuit's bar admission requirement as counsel to the

United States.

s/Dennis J. Dimsey
DENNIS J. DIMSEY
 Attorney

s/April J. Anderson
APRIL J. ANDERSON
 Attorney

Date:  June 3, 2011

# CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2011, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

I further certify that on June 3, 2011, ten (10) paper copies, identical to the brief filed electronically, were sent to the Clerk of the Court by U.S. mail.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system

s/April J. Anderson
APRIL J. ANDERSON
 Attorney

No. 10-1032

# In the Supreme Court of the United States

STEVE MAGNER, ET AL., PETITIONERS

*v.*

THOMAS J. GALLAGHER, ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT*

**BRIEF FOR THE UNITED STATES AS
AMICUS CURIAE IN SUPPORT OF NEITHER PARTY**

DONALD B. VERRILLI, JR.
  *Solicitor General*
    *Counsel of Record*
THOMAS E. PEREZ
  *Assistant Attorney General*

SRI SRINIVASAN
  *Deputy Solicitor General*

SARAH E. HARRINGTON
  *Assistant to the Solicitor
    General*

DIANA K. FLYNN
SASHA SAMBERG-CHAMPION
  *Attorneys*

*Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217*

HELEN R. KANOVSKY
  *General Counsel
  Department of Housing &
    Urban Development
  Washington, DC 20507*

**QUESTIONS PRESENTED**

    1.  Whether disparate-impact claims are cognizable under Section 804(a) of the Fair Housing Act, 42 U.S.C. 3604(a).

    2.  Whether the court of appeals correctly applied a burden-shifting framework in analyzing respondents' disparate-impact claims.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statutory provisions involved . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   I.  Disparate-impact claims are cognizable under
       Section 804(a) of the FHA . . . . . . . . . . . . . . . . . . . . . . 10
       A.  The text, structure, and history of the statute
            support the recognition of disparate-impact
            claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
       B.  The court should defer to HUD's authorita-
            tive interpretation of Section 804(a) of the
            FHA as encompassing disparate-impact lia-
            bility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
  II.  The court of appeals correctly held that a
       burden-shifting framework governs the resolu-
       tion of disparate-impact claims under Section
       804(a), but the court erred in its application of
       that framework to this case . . . . . . . . . . . . . . . . . . . . . . 25
       A.  This court should adopt the burden-shifting
            framework applied by a majority of the
            courts of appeals and set forth in HUD's
            NPRM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
       B.  The court of appeals' application of disparate-
            impact standards to this case was flawed . . . . . . . 29
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**TABLE OF AUTHORITIES**

Cases:

   *Alexander* v. *Choate*, 469 U.S. 287 (1985) . . . . . . . . . . . . . 17
   *Arthur* v. *City of Toledo*, 782 F.2d 565 (6th Cir. 1986) . . . 18

(III)

IV

Cases—Continued:                                                    Page

*Betsey* v. *Turtle Creek Assocs.*, 736 F.2d 983
    (4th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chevron U.S.A. Inc.* v. *NRDC*, 467 U.S. 837 (1984) . . . . . 21

*City of Edmonds* v. *Oxford House, Inc.*, 514 U.S. 725
    (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Fair Hous. in Huntington Comm. Inc.* v. *Town of
    Huntington*, 316 F.3d 357 (2d Cir. 2003) . . . . . . . . . . . 25

*Forest Grove Sch. Dist.* v. *T.A.*, 129 S. Ct. 2484 (2009) . . . 19

*Graoch Assocs. # 33, L.P.* v. *Louisville/Jefferson
    County Metro Human Relations Comm'n*,
    508 F.3d 366 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 25, 26

*Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971) . . . . . . . . 12

*Halet* v. *Wend Inv. Co.*, 672 F.2d 1305 (9th Cir. 1982) . . . 18

*Hanson* v. *Veterans Admin.*, 800 F.2d 1381
    (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982) . . 11

*Hispanics United of DuPage County* v. *Village of
    Addison*, 988 F. Supp. 1130 (N.D. Ill. 1997) . . . . . . . . 26

*Huntington Branch, NAACP* v. *Town of Huntington*,
    844 F.2d 926 (2d Cir.), aff'd,
    488 U.S. 15 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 25

*HUD* v. *Carter*, No. 03-90-0058-1, 1992 WL 406520
    (HUD ALJ May 1, 1992) . . . . . . . . . . . . . . . . . . . . . . . 21, 27

*HUD* v. *Mountain Side Mobile Estates P'ship*,
    No. 08-92-0010-1, 1993 WL 307069 (HUD
    ALJ July 19, 1993), aff'd in relevant part,
    56 F.3d 1243 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . 21, 28

V

Cases—Continued:                                                    Page

*HUD* v. *Pfaff*, No. 10-93-0084-8, 1994 WL 592199
    (HUD ALJ Oct. 27, 1994), rev'd on other grounds,
    88 F.3d 739 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 21, 27

*HUD* v. *Ross*, No. 01-92-0466-8, 1994 WL 326437
    (HUD ALJ July 7, 1994) . . . . . . . . . . . . . . . . . . . . . . . . 21

*HUD* v. *Twinbrook Vill. Apartments*,
    No. 02-00-0256-8, 2001 WL 1632533
    (HUD ALJ Nov. 9, 2001) . . . . . . . . . . . . . . . . . . . . . . 21, 27

*INS* v. *Aguirre-Aguirre*, 526 U.S. 415 (1999) . . . . . . . . . . 21

*Langlois* v. *Abington Hous. Auth.*, 207 F.3d 43
    (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

*Lapid-Laurel, L.L.C.* v. *Zoning Bd. of Adjustment*,
    284 F.3d 442 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 25

*Lorillard* v. *Pons*, 434 U.S. 575 (1978) . . . . . . . . . . . . . . . 19

*Meacham* v. *Knolls Atomic Power Lab.*, 554 U.S. 84
    (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 28, 29

*Metropolitan Hous. Dev. Corp.* v. *Village of
    Arlington Heights*, 558 F.2d 1283
    (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978) . . . . 18

*Meyer* v. *Holley*, 537 U.S. 280 (2003) . . . . . . . . . . . . . . . . . 20

*Mountain Side Mobile Estates P'ship* v. *HUD*,
    56 F.3d 1243 (10th Cir. 1995) . . . . . . . . . . . . . . . . 1, 18, 25

*Mt. Holly Gardens Citizens in Action, Inc.* v. *Town-
    ship of Mount Holly*, 658 F.3d 375
    (3d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ojo* v. *Farmers Group, Inc.*, 600 F.3d 1205, 1207 (9th
    Cir.), amended by 2010 WL 1729742
    (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Resident Advisory Bd.* v. *Rizzo*, 564 F.2d 126
    (3d Cir. 1977), cert. denied, 435 U.S. 908 (1978) . . . 17, 18

VI

Cases—Continued:                                                    Page

*Smith* v. *City of Jackson*, 544 U.S. 228
(2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 16, 22, 28

*Smith* v. *Town of Clarkton*, 682 F.2d 1055
(4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

*2922 Sherman Ave. Tenants' Ass'n* v. *District
of Columbia*, 444 F.3d 673 (D.C. Cir. 2006) . . . . . . . . . 18

*United States* v. *City of Black Jack*, 508 F.2d 1179
(8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975) . . 2, 18

*United States* v. *Marengo County Comm'n*,
731 F.2d 1546 (11th Cir.), cert. denied, 469 U.S.
976 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Mead Corp.*, 533 U.S. 218 (2001) . . . . . . . 21

*Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642
(1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Watson* v. *Forth Worth Bank & Trust*, 487 U.S. 977
(1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Statutes and regulations:

Age Discrimination in Employment Act of 1967,
29 U.S.C. 621 *et seq.* . . . . . . . . . . . . . . . . . . . . . . 13, 14, 28

29 U.S.C. 623(a)(2) (§ 4(a)(2)) . . . . . . . . . . . 7, 12, 14, 22

29 U.S.C. 623(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Equal Credit Opportunity Act, 15 U.S.C. 1619 *et seq.* . . . 22

Civil Rights Act of 1964, Tit. VII, 42 U.S.C.
2000e *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13, 26, 28

42 U.S.C. 2000e-2(a)(2) (§703(a)(2)) . . . . . . 7, 12, 13, 14

42 U.S.C. 2000e-2(k) . . . . . . . . . . . . . . . . . . . . . 13, 15, 25

42 U.S.C. 2000e-2(k)(1)(A)(i) . . . . . . . . . . . . . . . . . . . 27

42 U.S.C. 2000e-2(k)(3) . . . . . . . . . . . . . . . . . . . . . . . . 15

VII

Statutes and regulations:                                    Page

Fair Housing Act, 42 U.S.C. 3601 *et seq.* . . . . . . . . . *passim*

42 U.S.C. 3601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. 3604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. 3604(a) (§ 804(a)) . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. 3604(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. 3604(b)-(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. 3605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. 3605(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. 3605(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C. 3607(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. 3607(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. 3608(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. 3610 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. 3612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

42 U.S.C. 3612(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. 3612(*o*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. 3614 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

42 U.S.C. 3614a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. 3614(a)-(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fair Housing Amendments Act of 1988,
Pub. L. No. 100-430, 102 Stat. 1619 . . . . . . . . . . . . . . . 17

§§ 1-15, 102 Stat. 1619-1636 . . . . . . . . . . . . . . . . . . . . 18

24 C.F.R. 180.675 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Miscellaneous:

114 Cong. Rec. (1968):

p. 2277 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

p. 3421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VIII

Miscellaneous—Continued:                                          Page

134 Cong. Rec. 23,711 (1988) ........................ 18

*Fair Housing Amendments Act of 1987: Hearings
    Before the Subcomm. on the Constitution of the S.
    Comm. on the Judiciary*, 100th Cong., 1st Sess.
    (1987) ......................................... 18, 19

H.R. Rep. No. 711, 100th Cong., 2d Sess. (1988) ..... 18, 19

HUD, No. 8024.01, *Title VIII Complaint Intake, In-
    vestigation & Conciliation Handbook* (1995) ........ 22

HUD, Office of Fair Hous. & Equal Opportunity, *As-
    sessing Claims of Hous. Discrimination Against
    Victims of Domestic Violence Under the Fair
    Hous. Act & the Violence Against Women Act*
    (Feb. 9, 2011) .................................... 22

54 Fed. Reg. 3235 (Jan. 23, 1989) ..................... 20

59 Fed. Reg. 18,269-18,270 (Apr. 15, 1994) ............ 22

76 Fed. Reg. (Nov. 16, 2011):

    p. 70,921 ....................................... 23

    pp. 70,921-70,927 ............................... 2

    p. 70,925 ..................................... 17, 28

    p. 70,927 ....................................... 28

24 Weekly Comp. Pres. Doc. 1140 (Sept. 13, 1988) ...... 19

# In the Supreme Court of the United States

---

No. 10-1032

STEVE MAGNER, ET AL., PETITIONERS

*v.*

THOMAS J. GALLAGHER, ET AL.

---

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE EIGHTH CIRCUIT*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF NEITHER PARTY**

---

### INTEREST OF THE UNITED STATES

This case presents important questions concerning the existence of, and standards for resolving, disparate-impact claims under Section 804(a) of the Fair Housing Act (FHA or Act), 42 U.S.C. 3604(a). The FHA prohibits discrimination on various bases in the sale or rental of housing and in related services. See 42 U.S.C. 3604, 3605. The Act gives the Secretary of the Department of Housing and Urban Development (HUD) "authority and responsibility for administering [the FHA]." 42 U.S.C. 3608(a). In exercising its adjudicatory authority under the statute, HUD has long interpreted the Act to permit disparate-impact claims, *e.g.*, *Mountain Side Mobile Estates P'ship* v. *HUD*, 56 F.3d 1243, 1251 (10th Cir. 1995), and it recently issued a proposed rule reinforcing

(1)

2

its recognition of disparate-impact liability and prescribing standards for addressing disparate-impact claims, 76 Fed. Reg. 70,921-70,927 (Nov. 16, 2011). In addition, the Department of Justice has authority to enforce the FHA, see 42 U.S.C. 3612(*o*), 3614(a)-(d), and has brought disparate-impact claims in its enforcement actions. See, *e.g.*, *United States* v. *City of Black Jack*, 508 F.2d 1179, 1186 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975).

### STATUTORY PROVISIONS INVOLVED

The pertinent provisions of the FHA, 42 U.S.C. 3601 *et seq.*, and select other statutory provisions are set forth in an appendix to this brief. App., *infra*.

### STATEMENT

1. a. Beginning in 2003, the city of St. Paul, Minnesota (City), established a new executive agency to administer the City's housing code. Pet. App. 52a. One priority was to remedy "problem properties," including by performing proactive inspection sweeps in addition to conducting inspections in response to citizen complaints, and by citing every identified violation of the code rather than only those violations reported in a complaint. *Id.* at 6a-7a, 52a-53a. The City employed various practices to compel owners of renter-occupied dwellings to take more responsibility for their properties or to force a change in ownership. Such practices included issuing orders to correct violations of the housing code, condemning buildings, evicting tenants, seizing real estate, and revoking rental registrations. *Id.* at 7a. Correction of noncomplying conditions sometimes required expensive renovations. *Id.* at 8a.

b. Respondents are current and former owners of rental properties subject to the City's housing-code en-

3

forcement practices. Pet. App. 5a, 8a. Respondents
rented their units primarily to low-income households.
*Id.* at 8a. The parties agree that, at the relevant time,
African-Americans made up a disproportionate share of
low-income tenants in the City's private housing. Re-
spondents contend that African-Americans were 60% to
70% of their tenant base. *Id.* at 8a, 57a.

The City issued a number of housing-code enforce-
ment orders to respondents for conditions such as ro-
dent infestation, missing dead-bolt locks, inoperable
smoke detectors, poor sanitation, and inadequate heat.
Pet. App. 8a. As a result of having to comply with such
orders, respondents contend that they experienced in-
creased maintenance costs, fees, and condemnations,
and that they were compelled to sell certain properties.
*Ibid.*

2. Respondents sued the City and various municipal
officials (collectively petitioners), asserting a variety of
challenges to the City's enforcement measures. Pet.
App. 9a; see Pet. ii-iv. Of particular salience, respon-
dents alleged violations of the FHA, including claims of
disparate impact, disparate treatment, and retaliation.
*Id.* at 10a-28a.

The district court granted petitioners' motion for
summary judgment on all claims. Pet. App. 48a-115a.
The court applied a three-step framework to evaluate
respondents' FHA disparate-impact claim. First, re-
spondents must establish a prima facie case by showing
"that a facially neutral policy results in * * * a dispa-
rate impact on protected classes." *Id.* at 61a. Second,
petitioners must demonstrate that the challenged policy
has a manifest relationship to legitimate, nondiscrimina-
tory objectives and is necessary to attaining those objec-
tives. *Ibid.* Finally, respondents must identify viable

4

alternative means of achieving the legitimate objectives without discriminatory effects. *Ibid.*

The district court concluded that respondents had failed to establish a prima facie case. Pet. App. 61a-67a. The court noted that respondents had identified the neutral policy they challenged as the City's decision to enforce its own housing code rather than the less stringent federal Housing Quality Standards (HQS) applicable to federally subsidized rental properties. See *id.* at 56a, 61a-62a. The City's enforcement of its stricter housing code, respondents claimed, produced a disparate impact on African-Americans by increasing the costs of low-income housing, the tenants of which were disproportionately African-American. *Id.* at 62a-63a. The court found that allegation to be insufficient because respondents had offered no evidence establishing the difference in rents from enforcement of HQS instead of the City's code, or that any such difference disparately affected the ability of African-Americans to afford rents. *Id.* at 63a. The court also found that respondents failed to produce evidence of a causal connection between petitioners' enforcement of the City's housing code and the City's shortage of affordable housing. *Id.* at 64a-65a.

The district court further held that, even if respondents had made out a prima facie case of disparate-impact discrimination, petitioners were still entitled to summary judgment because their enforcement policy "has a manifest relationship to legitimate, nondiscriminatory policy objectives and is necessary to attain those objectives." Pet. App. 65a. The court observed that petitioners' objectives included "providing minimum property maintenance standards, keeping the City clean and housing habitable, and making the City's neighborhoods the safest and most livable of any in Minnesota." *Ibid.*

5

Because respondents did not dispute that petitioners satisfied their burden at the second step, respondents could survive summary judgment only by producing evidence that petitioners could achieve their legitimate goals through alternative, less discriminatory means. *Id.* at 65a-66a. The court rejected HQS as a viable alternative, concluding that respondents had produced no evidence that reliance on the less-stringent HQS either would enable petitioners to achieve their objectives or would lower rents or ameliorate the shortage of affordable housing. *Ibid.*

3. The court of appeals affirmed the grant of summary judgment to petitioners on all counts except respondents' disparate-impact FHA claim. Pet. App. 1a-47a. With respect to that claim, the court of appeals first concluded that the district court erred in finding that respondents had failed to establish a prima facie case. *Id.* at 17a-24a. The court believed that the district court had "too narrow[ly]" characterized the challenged neutral practice as the City's enforcement of its own housing code rather than HQS. *Id.* at 17a. In the court of appeals' view, respondents generally challenged petitioners' "aggressive Housing Code enforcement practices," including the issuance of false citations and the imposition of sanctions without proper notification, invitations to cooperate, or adequate time to remedy violations. *Ibid.*

The court concluded that respondents had proffered sufficient evidence "that the City's aggressive enforcement of the Housing Code resulted in a disproportionate adverse effect on racial minorities, particularly African-Americans." Pet. App. 19a. In the court's view, respondents adequately showed "that the City's Housing Code enforcement temporarily, if not permanently, burdened

6

[their] businesses, which indirectly burdened their tenants." *Id.* at 17a-20a. The court further reasoned that, "[g]iven the existing shortage of affordable housing in the City, it is reasonable to infer that the overall amount of affordable housing decreased as a result," and that, "taking into account the demographic evidence in the record, * * * racial minorities, particularly African-Americans, were disproportionately affected by these events." *Id.* at 20a.

Turning to the second step of the analysis, the court noted that respondents had conceded that petitioners' enforcement of the City's housing code "has a manifest relationship to legitimate, non-discriminatory objectives." Pet. App. 24a. As to the third step, the court believed that respondents "identif[ied] as a viable alternative the City's former program for Housing Code enforcement called 'Problem Properties 2000'" (PP2000), which respondents contended "embodied a flexible and cooperative approach to code enforcement, [and] which achieved the goals of code enforcement while maintaining a consistent supply of affordable housing." *Id.* at 24a-25a. The court concluded that "there is a genuine dispute of fact regarding whether PP2000 was a viable alternative." *Id.* at 26a. The court thus reversed the district court's grant of summary judgment to petitioners on respondents' disparate-impact claim. *Ibid.*

### SUMMARY OF ARGUMENT

Respondents allege that the City's aggressive practices in enforcing its housing code had a disparate and adverse impact on African-American residents in violation of Section 804(a) of the FHA. The courts of appeals for decades have uniformly and correctly concluded that the statute supports liability on a disparate-impact theory. Here, the court of appeals articulated the proper

7

framework for addressing disparate-impact claims under Section 804(a), but erred in its application of that framework to respondents' claim.

I. The terms of Section 804(a), when considered in light of the structure and history of the FHA, support the recognition of disparate-impact claims. Even if there were any ambiguity on the matter, the agency charged with responsibility for administering and enforcing the statute has authoritatively construed it to encompass disparate-impact liability.

A. Section 804(a) makes it unlawful to "refuse to sell or rent" or "otherwise make unavailable or deny" housing to a person "because of" a protected characteristic, including race. That language supports liability based on the disparate effects caused by a challenged action because it focuses on the consequences of the action rather than the motivation of the actor. This Court, for the same reason, has held that Section 703(a)(2) of Title VII, 42 U.S.C. 2000e-2(a)(2), and Section 4(a)(2) of the ADEA, 29 U.S.C. 623(a)(2), encompass disparate-impact claims. Those provisions make it unlawful to "deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of," *inter alia*, race or age, and Section 804(a) similarly makes it unlawful to "make unavailable or deny" housing "because of," *inter alia*, race.

The FHA also contains particularized exemptions from liability under Section 804(a) that presuppose the existence of disparate-impact liability. Those exemptions insulate from liability actions that deny housing based on: a person's conviction for drug offenses; a reasonable rule limiting the number of occupants; or an appraiser's taking into consideration factors other than race, gender, family status, or other protected charac-

8

teristics.   Each of those statutory exemptions is
grounded in concerns that, in the absence of the exemp-
tion, the statute would bar actions within the scope of
the exemption on a disparate-impact theory.  Without
the exemptions, for instance, a claim could be made that
a policy denying housing to persons with drug convic-
tions has a disparate impact based on race or another
protected characteristic.

The history of the statute further supports the con-
clusion that Section 804(a) encompasses disparate-
impact claims.  When Congress in 1988 comprehensively
amended the FHA, including Section 804(a), Congress
was aware of the uniform body of court of appeals prece-
dent supporting disparate-impact claims, but made no
relevant change to the statute.  To the contrary, Con-
gress rejected an amendment that would have required
proof of discriminatory intent in a category of cases in
response to certain courts of appeals decisions support-
ing disparate-impact liability.

B.  To the extent there is any doubt about the exis-
tence of disparate-impact liability under Section 804(a),
the authoritative interpretation of the agency charged
with administering the statute should resolve the issue.
The FHA grants HUD broad authority to administer
and enforce the statute, including by conducting formal
adjudications of FHA complaints and by promulgating
rules implementing the statute.  In exercising its author-
ity to conduct formal adjudications, the agency—
including in a decision by the Secretary himself—has
consistently recognized and endorsed the viability of
disparate-impact claims.  This Court's decisions make
clear that agency pronouncements of that variety com-
mand the full measure of deference under *Chevron*.

9

Here, moreover, HUD has reinforced its support of disparate-impact liability through additional means. Of particular note, HUD recently issued a proposed rule for notice and comment in which it reiterates its view that disparate-impact claims are cognizable under the statute. The agency's longstanding interpretation in its adjudication decisions and in the proposed rule is fully entitled to deference as a reasonable interpretation—indeed, the best reading—of Section 804(a).

II. The court of appeals correctly invoked a three-step burden-shifting framework for resolving disparate-impact claims under Section 804(a) that parallels the framework governing disparate-impact claims under Title VII. That framework fairly allocates the burdens of proof at each stage between the parties, and is consistent with the approach HUD has followed in its adjudications and its proposed rule.

While the court of appeals articulated appropriate standards for resolving disparate-impact claims, its application of those standards to respondents' claim was flawed. The court understood respondents to allege that the City's "aggressive" enforcement of its housing code had a disparate impact on African-American residents by operating disproportionately to deny them affordable housing in violation of Section 804(a). Because aggressive enforcement of a housing code can enhance the availability of affordable and safe housing to affected populations—indeed, insufficiently aggressive enforcement of a housing code could itself give rise to a disparate-impact claim—it is important to assess with care the evidentiary support for allegations that enforcement practices had an adverse and disparate effect. The court of appeals failed to do so here.

10

The court reasoned that the aggressive enforcement measures imposed financial burdens on respondents in a manner that reduced the stock of low-income housing, and that any such reduction necessarily had a disparate impact based on race because African-Americans make up a disproportionate share of tenants in low-income housing. The court, however, did not identify evidence that aggressive enforcement measures in fact reduced the stock of affordable housing. For instance, the court cited a report pointing to a decline in affordable housing, but the report attributed the decline to factors other than housing-code enforcement. And the court's reliance on affidavits by three individuals whose residences were condemned failed to raise a genuine issue about the impact on African-Americans as a class. Finally, the court held that respondents produced sufficient evidence that there were alternative means of achieving the City's legitimate goals with a less discriminatory effect; but the court identified no evidence suggesting that the alternative program could feasibly be operated on a broad scale, or indicating the comparative efficacy of the alternative program and the challenged practices.

## ARGUMENT

### I.  DISPARATE-IMPACT CLAIMS ARE COGNIZABLE UNDER SECTION 804(a) OF THE FHA

Respondents allege that petitioners' enforcement of the City's housing code resulted in a disparate impact on African-American residents in violation of Section 804(a) of the FHA, 42 U.S.C. 3604(a). As the eleven courts of appeals to have considered the question have uniformly concluded, see pp. 17-18, *infra*, disparate-impact claims are cognizable under the statute. That conclusion follows from the statute's text, structure, and history. Ad-

ditionally, the federal agency principally responsible for administering the statute has consistently and authoritatively interpreted it to authorize disparate-impact claims.

### A. The Text, Structure, And History Of The Statute Support The Recognition Of Disparate-Impact Claims

1. The FHA aims "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. 3601; *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 380 (1982) (recognizing Congress's "broad remedial intent" in passing the Act). Respondents ground their disparate-impact claim in Section 804(a) of the FHA, 42 U.S.C. 3604(a). See Br. in Opp. 14; see also Pet. Br. 1-2, 20. Section 804(a) makes it unlawful:

> To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. 3604(a). That language is best read to encompass disparate-impact claims.

By banning actions that "make unavailable or deny" housing on one of the specified bases, Section 804(a) focuses on the result of challenged actions—the unavailability or denial of a dwelling—rather than on the intent of the actor. Such a prohibition on specified outcomes that adversely affect a racial group is the essence of a prohibition on actions having a disparate impact, and is most naturally read to support a disparate-impact claim. This Court has reached that conclusion when construing other anti-discrimination statutes whose terms similarly place principal focus on the discriminatory con-

12

sequences of the challenged actions rather than the ac-
tor's motive. In particular, both Section 703(a)(2) of
Title VII of the Civil Rights Act of 1964 (Title VII), 42
U.S.C. 2000e-2(a)(2), and Section 4(a)(2) of the Age Dis-
crimination in Employment Act of 1967 (ADEA),
29 U.S.C. 623(a)(2), make it unlawful for an employer "to
limit, segregate, or classify his employees in any way"
that would "deprive any individual of employment op-
portunities or otherwise adversely affect his status as an
employee, because of" a specified characteristic (race,
color, religion, sex, or national origin for Title VII; age
for the ADEA).

In *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 431
(1971), this Court held that Section 703(a)(2) of Title VII
prohibits employers from taking actions that have the
effect of discriminating on the basis of race, regardless
of whether the actions are motivated by discriminatory
intent. The Court explained that "Congress directed the
thrust of the Act to the *consequences* of employment
practices, not simply the motivation." *Id.* at 432. See
*Watson* v. *Forth Worth Bank & Trust*, 487 U.S. 977, 990-
991 (1988) (if employer's practice "has precisely the
same effects as a system pervaded by impermissible
intentional discrimination, it is difficult to see why Title
VII's proscription against discriminatory actions should
not apply"); see also *Smith* v. *City of Jackson*, 544 U.S.
228, 235 (2005) (plurality) (noting Court's recognition
that its "holding [in *Griggs*] represented the better
reading of the statutory text").

The same is true with respect to the parallel terms of
Section 4(a)(2) of the ADEA, which this Court, in *Smith,
supra*, likewise held encompass disparate-impact claims.
The Court explained that, in prohibiting actions that
"deprive any individual of employment opportunities or

13

otherwise adversely affect his [employment] status, because of" his age, 29 U.S.C. 623(a)(2), "the text" of the statute—like Section 703(a)(2) of Title VII—"focuses on the *effects* of the action on the employee rather than the motivation for the action of the employer." *Smith*, 544 U.S. at 235-236 (plurality); see *id.* at 243 (Scalia, J., concurring in part and in the judgment) ("agree[ing] with all of the Court's reasoning"). That focus, the Court explained, "strongly suggests that a disparate-impact theory should be cognizable." *Id.* at 236 (plurality).

There is no reason to reach a different conclusion with regard to Section 804(a) of the FHA. The language of that provision likewise "focuses on the *effects* of the [challenged] action * * * rather than the motivation for the action." *Smith*, 544 U.S. at 236. Whereas Title VII and the ADEA prohibit actions that "deprive any individual of employment opportunities or otherwise adversely affect" his "status as an employee, because of," *inter alia*, race or age, the FHA analogously prohibits actions that "refuse to sell or rent" or "otherwise make unavailable or deny" housing to an individual "because of," *inter alia*, race. 42 U.S.C. 3604(a). Especially when read against the backdrop of Title VII, which was enacted before the FHA, Section 804(a) of the FHA is best read to include a prohibition on actions having the effect of disproportionately denying housing based on a protected characteristic, without regard to the actor's motivation.[1]

---

[1] In 1991, Congress amended Title VII to add a provision expressly recognizing the existence of "disparate impact cases" under the statute, 42 U.S.C. 2000e-2(k), but Title VII contained no such provision when this Court in *Griggs* construed Section 703(a)(2) to encompass disparate-impact liability.

14

   In contending otherwise, petitioners emphasize (Br. 15-16, 20-22, 26) that the text of Section 804(a) addresses actions having the effect of making housing unavailable "because of" race and other characteristics. According to petitioners (Br. 22), "the 'because of' language forecloses disparate-impact liability." The short answer to that contention is that it is foreclosed by this Court's decisions. Both Section 4(a)(2) of the ADEA and Section 703(a)(2) of Title VII likewise speak to the effect of a challenged action on an individual "because of" a protected characteristic, 29 U.S.C. 623(a)(2); 42 U.S.C. 2000e-2(a)(2), yet this Court construed both provisions to encompass a disparate-impact cause of action. See *Meacham* v. *Knolls Atomic Power Lab.*, 554 U.S. 84, 96 (2008) (explaining that, "in the typical disparate-impact case" under the ADEA, "the employer's practice is 'without respect to age' and its adverse impact (*though 'because of age'*) is 'attributable to a nonage factor'") (emphasis added). The same conclusion should obtain here.[2]

---

   [2] Contrary to petitioners' argument (Br. 27-29), the relevant similarity between Section 804(a) of the FHA, on one hand, and Sections 4(a)(2) of the ADEA and 703(a)(2) of Title VII, on the other hand, is not that each provision contains corresponding "catch-all" language. Instead, the relevant similarity is that the text of each provision "focuses on the *effects* of the [challenged] action on the [plaintiff] rather than the motivation for the action of the [defendant]." *Smith*, 544 U.S. at 236 (plurality). To be sure, in light of the distinct subject matters addressed by the provisions, the FHA naturally focuses on a different consequence (denying a person housing or otherwise making it unavailable) than do Title VII and the ADEA (depriving a person of employment opportunities or otherwise adversely affecting his employment status). But each of the provisions focuses on the effects of a challenged action in their respective subject areas rather than on the motives of the actor, and each thus supports disparate-impact liability.

15

2.  The existence of disparate-impact liability under Section 804(a) of the FHA is reinforced by the Act's structure, in that it contains three exemptions from liability that presuppose the availability of a disparate-impact claim.  First, Congress specified that "[n]othing in [the FHA] prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance."  42 U.S.C. 3607(b)(4). Because the Act contains no direct prohibition on discriminating against individuals with drug convictions, the inclusion of that exemption makes sense only if actions denying housing to individuals with drug convictions would otherwise be subject to challenge on the ground that they have a disparate impact based on race or another protected characteristic.  That the exemption necessarily presupposes disparate-impact liability is made clear by a similar exemption in Title VII.  See 42 U.S.C. 2000e-2(k)(3).  Congress enacted the Title VII exemption for drug users as part of a provision expressly addressed to "disparate impact cases," 42 U.S.C. 2000e-2(k), and the language of the exemption specifies that it applies solely to disparate-impact claims, see 42 U.S.C. 2000e-2(k)(3) (allowing employers to prohibit employment of individuals who use or possess drugs unless "such a rule is adopted or applied with an intent to discriminate because of race").

Second, Congress specified that "[n]othing in [the FHA] limits the applicability of any reasonable * * * restrictions regarding the maximum number of occupants permitted to occupy a dwelling."  42 U.S.C. 3607(b)(1).  Because the Act contains no direct bar against discrimination based on number of occupants, the purpose of the exemption necessarily was to pre-

16

clude suits contending that otherwise reasonable occupancy limits have a disparate impact based on a protected characteristic such as familial status or race. See *City of Edmonds* v. *Oxford House, Inc.*, 514 U.S. 725, 735 n.9 (1995). The reasonable-occupancy-limit exemption resembles an affirmative defense in the ADEA for actions "based on reasonable factors other than age." 29 U.S.C. 623(f)(1). The latter provision, as the plurality observed in *Smith*, "is simply unnecessary" as a defense to a claim of intentional age discrimination: an action based on reasonable factors other than age cannot support a claim of disparate treatment based on age. 544 U.S. at 238.

Finally, the FHA includes a targeted exemption specifying that "[n]othing in [the Act] prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status." 42 U.S.C. 3605(c). There would be no reason to enact an exemption for appraisers' actions based on factors *other than* protected characteristics unless the statute would otherwise bar such actions on a disparate-impact theory. See *Meacham*, 554 U.S. at 96 ("action based on a 'factor other than age' is the very premise for disparate-impact liability").

Those statutory exemptions thus strongly support the conclusion that Section 804(a) of the Act encompasses disparate-impact claims.[3]

---

[3] While the exemptions by terms apply generally to all of the prohibitions in the FHA, not just Section 804(a), their applicability to Section 804(a) reinforces the conclusion that its terms encompass disparate-impact liability. Because respondents' disparate-impact claim is premised solely on Section 804(a), this case affords no occasion for the Court to consider the availability of disparate-impact liability under

17

   3.  The FHA's history also supports the existence of disparate-impact liability under Section 804(a).[4]  Between the enactment of the FHA in 1968 and its substantial amendment in 1988, see Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619, all nine courts of appeals to consider the issue concluded that the Act authorizes suits based on disparate-impact claims.  See, *e.g.*, *Huntington Branch, NAACP* v. *Town*

---

other prohibitions in the FHA.  *E.g.*, 42 U.S.C. 3604(b)-(f), 3605(a). Additionally, as discussed *infra*, pp. 23-24, HUD has recently issued proposed regulations in which the agency clarifies the existence of disparate-impact claims under a number of provisions of the FHA (including Section 804(a)).  See 76 Fed. Reg. at 70,925 (explaining that "[v]iolations of various provisions of the Act may be established by proof of discriminatory effects," and discussing several FHA provisions).  Unlike Section 804(a), certain of the FHA's other prohibitions make it unlawful "[t]o discriminate against any person" in specified, housing-related actions, *e.g.*, 42 U.S.C. 3604(b), 3605(a), and the term "discriminate" readily accommodates an interpretation encompassing disparate-impact liability.  See, *e.g.*, *Alexander* v. *Choate*, 469 U.S. 287, 292 (1985) (addressing "whether federal law also reaches action * * * that discriminates * * * by effect").  HUD's final rule may speak directly to the availability of disparate-impact claims under those provisions, and it has been the position of the United States that disparate-impact liability is available under them.  The pending rulemaking further counsels against this Court's consideration of those other provisions in this case.

   [4]  Petitioners err in contending (Br. 30-31) that floor statements at the time of the FHA's enactment suggest that the statute was intended only to cover actions with an intent to discriminate.  Senator Mondale—the lead sponsor of the original Act—stated that the Act was intended to address segregation perpetuated not only by overt racial animus, but also by "frozen rules" and "[o]ld habits."  114 Cong. Rec. 3421 (1968).  Senator Mondale also pointed to one practice the Act was intended to target that is facially neutral as to race—the "refusal by suburbs and other communities to accept low-income housing."  *Id.* at 2277.

18

*of Huntington*, 844 F.2d 926, 935-936 (2d Cir.), aff'd, 488 U.S. 15 (1988); *Resident Advisory Bd.* v. *Rizzo*, 564 F.2d 126, 146 (3d Cir. 1977), cert. denied, 435 U.S. 908 (1978); *Smith* v. *Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Hanson* v. *Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur* v. *City of Toledo*, 782 F.2d 565, 574-575 (6th Cir. 1986); *Metropolitan Hous. Dev. Corp.* v. *Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978); *United States* v. *City of Black Jack*, 508 F.2d 1179, 1184-1185 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975); *Halet* v. *Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982)*; United States* v. *Marengo County Comm'n*, 731 F.2d 1546, 1559 n.20 (11th Cir.), cert. denied, 469 U.S. 976 (1984).[5]

Against that background, Congress substantially amended the Act in 1988, including by adding new provisions barring discrimination based on familial status and disability, establishing the discussed statutory exemptions that presume the availability of disparate-impact actions, and enhancing HUD's authority to interpret and implement the Act.  See §§ 1-15, 102 Stat. 1619-1636. Congress was aware that the FHA, including Section 804(a), had uniformly been interpreted to encompass disparate-impact claims.[6]  Significantly, however, Con-

---

[5]  The First and Tenth Circuits directly confronted the question for the first time after the 1988 amendments and agreed with their sister circuits, see *Langlois* v. *Abington Hous. Auth.*, 207 F.3d 43, 49 (1st Cir. 2000); *Mountain Side Mobile Estates P'ship* v. *HUD*, 56 F.3d 1243, 1251 (10th Cir. 1995), while the D.C. Circuit has yet to resolve it, see *2922 Sherman Ave. Tenants' Ass'n* v. *District of Columbia*, 444 F.3d 673, 681 (2006).

[6]  See, *e.g.*, H.R. Rep. No. 711, 100th Cong., 2d Sess. 21 (1988) (citing courts of appeals decisions in discussing a policy that could have a "discriminatory effect" on minority households); 134 Cong. Rec. 23,711

19

gress chose, when amending the Act—including an amendment of Section 804(a) to add familial status as a protected characteristic—to leave that provision's operative language unchanged. See *Forest Grove Sch. Dist.* v. *T.A.*, 129 S. Ct. 2484, 2494 n.11 (2009) ("When Congress amended [the Act] without altering the text of [the relevant provision], it implicitly adopted [this Court's] construction" of that provision.); cf. *Lorillard* v. *Pons*, 434 U.S. 575, 580 (1978) (noting that "every court to consider the issue" had agreed on the statute's interpretation, and explaining that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change"). Notably, moreover, Congress specifically rejected an amendment that would have countered decisions recognizing disparate-impact challenges to zoning decisions and would have required proof of intentional discrimination in such challenges. See H.R. Rep. No. 711, 100th Cong., 2d Sess. 89-91 (1988) (dissenting views of Rep. Swindall).

Petitioners note (Br. 34) that President Reagan, when signing the 1988 amendments, disavowed the notion that they "represent[ed] any congressional or executive branch endorsement of the notion, expressed in some judicial opinions," of disparate-impact liability under the FHA. *Remarks on Signing the Fair Hous. Amendments Act of 1988*, 24 Weekly Comp. Pres. Doc.

---

(1988) (Statement of Sen. Kennedy) (noting unanimity of courts of appeals as to the disparate-impact test); *Fair Hous. Amendments Act of 1987: Hearings Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 100th Cong., 1st Sess. 529-557 (1987) (testimony of Prof. Robert Schwemm, Univ. of Ky. Law Sch.) (extensively describing prevailing view in the courts of appeals that the FHA prohibited disparate-impact discrimination).

20

1140, 1141 (Sept. 13, 1988). And HUD regulations issued soon thereafter declined to "resolve the question of whether intent is or is not required to show a violation." 54 Fed. Reg. 3235 (Jan. 23, 1989). But neither of those statements casts doubt on Congress's awareness of courts' unanimous construction of the FHA as encompassing disparate-impact claims when it amended the statute without changing the operative language. In any event, once directly confronted with the question in administrative adjudications and other contexts when exercising the authority granted to it in the 1988 amendments, HUD, as explained next, has consistently determined that the FHA provides for disparate-impact claims.

### B. The Court Should Defer To HUD'S Authoritative Interpretation Of Section 804(a) Of The FHA As Encompassing Disparate-Impact Liability

Consistent with the text, structure, and history of the statute, the agency principally charged with responsibility for interpreting and enforcing the FHA has long interpreted Section 804(a) to support disparate-impact liability. Insofar as the provision were thought to be ambiguous, HUD's longstanding interpretation should be dispositive. See *Meyer* v. *Holley*, 537 U.S. 280, 287-289 (2003).

1. a. The FHA grants HUD broad authority to conduct formal adjudication of FHA complaints, 42 U.S.C. 3610 and 3612, as well as to promulgate rules implementing and construing the statute, 42 U.S.C. 3614a. HUD, through formal adjudications that become final agency decisions after an opportunity for all parties to petition the Secretary for review, see 42 U.S.C. 3612(g); 24 C.F.R. 180.675, has interpreted the FHA—including Section 804(a)—to encompass disparate-impact claims

21

in every adjudication to address the issue.[7]  In addition, the Secretary, in a formal adjudication raising the question whether a disparate-impact claim is cognizable in an action under Section 804(a), issued a decision "find[ing] that * * * a disparate impact, if proven, would establish a violation," and further finding that a prima facie case of disparate-impact liability had been established in the case.  *HUD* v. *Mountain Side Mobile Estates P'ship*, No. 08-92-0010-1, 1993 WL 307069, at *5 (July 19, 1993), aff'd in relevant part, 56 F.3d 1243 (10th Cir. 1995).

When, as here, Congress expressly affords an agency authority to issue formal adjudications carrying the force of law, see 42 U.S.C. 3612, the agency's reasonable interpretation of the statute in such adjudications is entitled to the full measure of deference under *Chevron U.S.A. Inc.* v. *NRDC*, 467 U.S. 837 (1984).  See *United States* v. *Mead Corp.*, 533 U.S. 218, 230 & n.12 (2001) (explaining that *Chevron* deference is warranted for "the fruits of notice-and-comment rulemaking or formal adjudication," and listing "adjudication cases"); see also, *e.g.*, *INS* v. *Aguirre-Aguirre*, 526 U.S. 415, 424-425 (1999).   That understanding controls this case.   In exercising its formal adjudication authority, HUD— including the Secretary himself—has consistently and reasonably determined that the FHA, and Section 804(a) in particular, encompasses disparate-impact liability. The agency's interpretation commands deference.  See

---

[7]  See, *e.g.*, *HUD* v. *Twinbrook Vill. Apartments*, No. 02-00-0256-8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *HUD* v. *Pfaff*, No. 10-93-0084-8, 1994 WL 592199, at *7-*9 (HUD ALJ Oct. 27, 1994), rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996); *HUD* v. *Ross*, No. 01-92-0466-8, 1994 WL 326437, at *5, *7 (HUD ALJ July 7, 1994); *HUD* v. *Carter*, No. 03-90-0058-1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992).

22

*Smith*, 544 U.S. at 243-247 (Scalia, J., concurring in part and in the judgment) (deferring to EEOC's interpretation that disparate-impact claims are cognizable under Section 4(a)(2) of the ADEA).

b. HUD has also reinforced its endorsement of disparate-impact liability through other means. For example, it joined with other federal enforcement agencies in providing guidance concerning fair-lending standards under the FHA and the Equal Credit Opportunity Act (ECOA), 15 U.S.C. 1691 *et seq.*, and that guidance explicitly notes the availability of a disparate-impact theory. See 59 Fed. Reg. 18,269-18,270 (Apr. 15, 1994). Moreover, the original HUD enforcement handbook, published in 1995, instructed its enforcement staff that disparate-impact claims are available under the FHA. See HUD, No. 8024.01, *Title VIII Complaint Intake, Investigation & Conciliation Handbook*, Pt. 7-12 (1995). That view has also been expressed in appellate briefs filed on behalf of HUD. See, *e.g.*, Brief for HUD Secretary as respondent in *Pfaff* v. *HUD*, No. 94-70898 (9th Cir.), 1995 WL 17017239; Brief for HUD Secretary as respondent in *Mountain Side Mobile Estates P'ship* v. *HUD*, No. 94-9509 (10th Cir. 1994). And HUD recently reiterated the availability of a disparate-impact theory for sex-discrimination claims under the FHA. See HUD, Office of Fair Hous. & Equal Opportunity, *Assessing Claims of Hous. Discrimination Against Victims of Domestic Violence Under the Fair Hous. Act & the Violence Against Women Act* 5-6 (Feb. 9, 2011).

c. The FHA also grants the Department of Justice authority to enforce the statute by filing actions in federal court. See 42 U.S.C. 3614. The Department has filed numerous briefs explaining that the FHA supports disparate-impact liability. See, *e.g.*, Brief for the United

23

States as Amicus Curiae in *Mt. Holly Gardens Citizens in Action* v. *Township of Mt. Holly*, No. 11-1159 (3d Cir.), http://www.justice.gov/crt/about/app/briefs/mthollybrief.pdf; Brief for the United States as Amicus Curiae in *Veles* v. *Lindow*, No. 99-15795 (9th Cir. 1999), http://www.justice.gov/crt/about/app/briefs/veles.pdf; Brief for the United States in *United States* v. *Glisan*, Nos. 81-1746 and 81-2205, at 15-20 (10th Cir.).

Petitioner observes (Br. 33-34) that, in 1988, the government filed an amicus brief in this Court arguing that the FHA proscribes only intentional discrimination. See Brief for the United States as Amicus Curiae in *Town of Huntington* v. *Huntington Branch, NAACP*, No. 87-1961 (S. Ct. 1988) at 13-18. But that brief was filed before the enactment of the 1988 statutory amendments giving HUD its full authority to administer and enforce the Act, and thus before the agency's formal adjudications and other administrative pronouncements endorsing the existence of disparate-impact liability under the statute. The brief thus also predated the enactment of the statutory exemptions that presuppose the viability of disparate-impact claims (see pp. 15-16, *supra*). As explained, moreover, the United States has repeatedly filed briefs since the 1988 amendments espousing the position that the amended Act encompasses disparate-impact claims.

2. On November 16, 2011, HUD issued a Notice of Proposed Rule-Making (NPRM) that invites comment on a proposed rule reiterating the agency's consistent view that the FHA encompasses disparate-impact liability and establishing standards for resolving disparate-impact claims.[8] See 76 Fed. Reg. at 70,921. The NPRM

_____

[8] Petitioner observes (Br. 36) that HUD formally issued the NPRM within days of the Court's grant of certiorari in this case. The process

24

explains that HUD "has long interpreted the Act to pro-hibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Ibid.* The NPRM requests comments by January 17, 2012. *Ibid.* Although the NPRM has yet to yield a final rule, the proposed rule fortifies HUD's longstanding support of disparate-impact liability under the FHA. And while HUD's interpretation of the FHA in formal adjudica-tions commands deference wholly aside from the pro-posed rule, HUD's confirmation of its position in its pro-posed rule affords added reason to defer to its long-standing interpretation.

Petitioners argue (Br. 36) that there is no basis for deferring to the proposed regulations because they have yet to be adopted in a final rule. Petitioners, however, entirely disregard the need for deference to HUD's for-mal adjudications. The longstanding existence of those adjudications also disposes of petitioners' (incorrect) argument (Br. 37) that any final rule by HUD would not apply "retroactively" to this case. Nor is there merit to petitioners' assertion (Br. 36) that HUD's interpretation is unreasonable because it is foreclosed by the statute's plain language: that conclusion is highly difficult to square with the uniformity of the contrary view of the 11 courts of appeals to consider the issue. In any event, HUD's interpretation, as explained (see pp. 11-20, *su-pra*), is the best—and, at the very least, a permissible—reading of the statute.

---

of promulgating the proposed rule, however, had long been underway. See  http://www.reginfo.gov/public/do/eoDetails?rrid=120471 (noting that proposed rule was submitted to the Office of Management and Budget for review in early June 2011).

25

## II. THE COURT OF APPEALS CORRECTLY HELD THAT A BURDEN-SHIFTING FRAMEWORK GOVERNS THE RESOLUTION OF DISPARATE-IMPACT CLAIMS UNDER SECTION 804(a), BUT THE COURT ERRED IN ITS APPLICATION OF THAT FRAMEWORK TO THIS CASE

### A. This Court Should Adopt The Burden-Shifting Framework Applied By A Majority Of The Courts Of Appeals And Set Forth In HUD's NPRM

1.  In considering disparate-impact claims under the FHA, a majority of the courts of appeals have employed a burden-shifting framework akin to that applied in disparate-impact cases under Title VII.[9]  See 42 U.S.C. 2000e-2(k).  Under that framework, a plaintiff first must establish a prima facie case by showing that a specific challenged practice actually or predictably has a disparate impact on the basis of a protected characteristic. *E.g.*, *Fair Hous. in Huntington Comm., Inc.* v. *Town of Huntington*, 316 F.3d 357, 366 (2d Cir. 2003).  The burden then shifts to the defendant to establish that the challenged practice has a necessary and manifest relationship to the defendant's legitimate and nondiscrimi-

---

[9]  In addition to the Eighth Circuit, Pet. App. 16a-17a, see *Langlois*, 207 F.3d at 49-50 (1st Cir.); *Huntington Branch, NAACP*, 844 F.2d at 939 (2d Cir.); *Lapid-Laurel, L.L.C.* v. *Zoning Bd. of Adjustment*, 284 F.3d 442, 466-467 (3d Cir. 2002); *Graoch Assocs. # 33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 374 (6th Cir. 2007); *Ojo* v. *Farmers Group, Inc.*, 600 F.3d 1205, 1207 (9th Cir. 2010) (en banc) (per curiam), amended by 2010 WL 1729742 (9th Cir. 2010); *Mountain Side Mobile Estates P'ship*, 56 F.3d at 1254 (10th Cir.).  The Fourth Circuit has employed a balancing test in challenges to municipal actions, see *Town of Clarkton*, 682 F.2d at 1065, but has found burden-shifting appropriate in cases against private defendants, see *Betsey* v. *Turtle Creek Assocs.*, 736 F.2d 983, 988-989 (1984).

26

natory interests. *E.g.*, *Mt. Holly Gardens Citizens in Action, Inc.* v. *Township of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011). If the defendant makes that showing, the burden reverts to the plaintiff to prove that the defendant's legitimate interests can be served by an alternative policy yielding a less discriminatory effect. *E.g.*, *Graoch Assocs. # 33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 374 (6th Cir. 2007).

That burden-shifting framework—which the court of appeals invoked below, see Pet. App. 16a-17a—is sound. Because it parallels the standards applied in Title VII disparate-impact cases, courts considering FHA disparate-impact claims can draw on the considerable body of law developed under Title VII. Additionally, the framework sensibly allocates the burdens of proof. Plaintiffs are generally best situated to demonstrate the discriminatory effects of a challenged practice. Defendants are similarly best situated to offer a legitimate, nondiscriminatory reason for engaging in the challenged practice. And it is fair to assign to plaintiffs the burden of demonstrating the existence of alternative means that would have a less discriminatory effect on them and that would achieve the defendant's legitimate objectives. "Under this formulation, neither party is saddled with having to prove a negative (the nonexistence of bona fide reasons or the absence of less discriminatory alternatives), and the plaintiffs do not have to guess at and eliminate the [defendant's] reasons for proceeding in the manner it chose." *Hispanics United of DuPage County* v. *Village of Addison*, 988 F. Supp. 1130, 1162 (N.D. Ill. 1997).

2. In their petition for a writ of certiorari, petitioners argued (Pet. 15-21) that there is a disagreement

27

among courts of appeals about whether to apply the burden-shifting framework invoked below or instead to apply a multi-factor balancing approach. At that stage, petitioners favored the balancing approach. Pet. 24-26. Petitioners now shift course (Br. 38-41) and urge adoption of the burden-shifting approach, but with one modification: relying on *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 659-660 (1989), petitioners would place the burden of proof at the second stage of the inquiry—concerning whether the challenged practice is legitimate and nondiscriminatory—on the plaintiffs. The allocation of the burden of proof at the second step would make no difference in this case because respondents concede that petitioners' enforcement of the City's housing code bears a manifest relationship to legitimate and nondiscriminatory objectives. See Br. in Opp. 4. At any rate, the sounder approach is to allocate the burden on that issue to defendants, who are better positioned to speak to the legitimacy and nondiscriminatory nature of their own practices. That approach is consistent with the framework that now governs Title VII cases after Congress in 1991 amended the statute to alter the approach prescribed by *Wards Cove*. See 42 U.S.C. 2000e-2(k)(1)(A)(i).

Moreover, in formal adjudications, HUD has consistently assigned to defendants the burden of proof at the second stage of the inquiry. See, *e.g.*, *Twinbrook Vill. Apartments*, 2001 WL 1632533, at *17; *Pfaff*, 1994 WL 592199, at *8; *Carter*, 1992 WL 406520, at *6. Indeed, the Secretary considered and rejected the argument that *Wards Cove* should generally govern the second-

28

step inquiry.  See *Mountain Side Mobile Estates P'ship*, 1993 WL 307069, at *6-*7.[10]

3.  HUD's proposed rulemaking adheres to the burden-shifting framework applied by the agency in its formal adjudications, including by allocating the burden of proof to defendants at the second step of the analysis. See 76 Fed. Reg. at 70,925, 70,927.  The agency, however, expressly solicited comments on "whether a burden-shifting approach should be used to determine when a housing practice with a discriminatory effect violates the Fair Housing Act."  *Id.* at 70,925.  The agency also sought comments on the allocation of the burden of proof at the third stage of the inquiry, concerning "the existence or nonexistence of a less discriminatory alternative to the challenged practice."  *Ibid.*  It therefore is conceivable that HUD's final rule would depart from the NPRM in certain respects with regard to the precise standards for resolving disparate-impact claims under the FHA.  Accordingly, if this Court concludes that Section 804(a) of the FHA encompasses disparate-impact claims, it may wish to defer decision on the precise standards governing resolution of those

---

[10]  Petitioners emphasize (Br. 38, 41) that this Court in *Smith* applied certain aspects of *Wards Cove* to ADEA disparate-impact claims after it observed that the 1991 amendments to Title VII, while modifying *Wards Cove* for purposes of Title VII, did not amend the ADEA.  See *Smith*, 544 U.S. at 240.  Petitioners conclude that *Wards Cove* thus should govern the second stage of the burden-shifting inquiry under the FHA.  That is incorrect.  This Court clarified in *Meacham* that *Smith*'s comments about *Wards Cove* pertained only to two aspects of *Wards Cove*:  "the existence of disparate-impact liability," and the assignment to the plaintiff of the "burden of identifying which particular practices allegedly cause an observed disparate impact."  *Meacham*, 554 U.S. at 98.  Moreover, in *Smith*, unlike here, there were no agency decisions addressing the allocation of the burden.

29

claims until HUD's final rule—to which *Chevron* deference would be owed—is issued.

### B. The Court Of Appeals' Application Of Disparate-Impact Standards To This Case Was Flawed

Although the court of appeals correctly recognized that disparate-impact claims are cognizable under Section 804(a) of the FHA, and correctly articulated the burden-shifting framework that governs consideration of disparate-impact claims, see Pet. App. 16a-17a, the court erred in applying that framework to the claim in this case.

1. Respondents allege that petitioners' approach to enforcing the City's housing code had a disparate impact on the ability of African-Americans to obtain housing, in violation of Section 804(a) of the FHA. To establish a prima facie case here, respondents were required to identify a "specific practice" that caused the alleged disparate impact on African-American residents. See *Meacham*, 554 U.S. at 100-101. Respondents do not contend that mere enactment of a housing code, or mere evenhanded enforcement of a housing code, could support a disparate-impact claim. Instead, the court of appeals understood respondents to challenge "the City's aggressive Housing Code enforcement practices," including the issuance of false citations and the imposition of sanctions without adequate opportunity to reach a cooperative resolution or remedy the violation. Pet. App. 17a. Insofar as the City's "aggressive" enforcement practices constitute a "specific practice" subject to challenge on a disparate-impact theory, respondents were required to demonstrate a genuine issue on whether that specific practice had a disparate and adverse effect on African-American residents.

30

In concluding that respondents made that showing, the court of appeals reasoned that the City's aggressive housing-code enforcement practices imposed financial burdens on respondents, that those increased burdens reduced the stock of affordable housing, and that the reduction in affordable housing necessarily produced a disparate impact on African-American residents because they represent a disproportionate share of low-income housing tenants. Pet. App. 18a-20a. The court's approach is flawed.

As an initial matter, the court failed to identify evidence adequately supporting a finding that the challenged enforcement practices in fact caused any reduction in available affordable housing. The court referenced a city report on vacant buildings that showed an increase in vacant homes during the relevant period, Pet. App. 19a, but that report, as the district court explained, *id.* at 65a, attributes the increase to a number of factors having nothing to do with housing-code enforcement, which the report does not mention. The court also stated that respondents had produced evidence that the aggressive enforcement practices "temporarily, if not permanently, burdened [respondents'] rental businesses," *id.* at 20a; but a "temporary" financial burden on landlords would not necessarily deny housing or make it unavailable, as is required by Section 804(a). Finally, although the court referenced the affidavits of three tenants whose homes had been condemned, *id.* at 19a, that small sample sheds little light on the overall impact of the City's enforcement practices on the stock of low-income housing, and the court identified no evidence addressing whether the challenged practices were applied to (or the impact on) any housing

31

beyond respondents' own properties, which constitute a minuscule fraction of the market.

The court also failed to identify evidence that the challenged aggressive enforcement practices had a disproportionately adverse effect on African-Americans as a class. The court acknowledged that "merely showing that there is a shortage of housing accessible to a protected group is insufficient to establish a prima facie case for a disparate impact claim," and that there is instead a need to "show that such a shortage is causally linked to a neutral policy, resulting in a disproportionate adverse effect on the protected population." Pet. App. 22a n.4. But in finding that requirement satisfied, the court simply asserted that "the evidence demonstrates that there is a shortage of affordable housing and that the City's aggressive code enforcement exacerbated that shortage," *id.* at 22a, presumably in reliance on the aforementioned city report on vacant buildings and the three tenant affidavits. Because those materials fail to establish that the challenged enforcement practices "exacerbated" any shortage of affordable housing, they necessarily fail to show that the challenged practices caused a shortage that disproportionately affected African-Americans as a group.

The deficiencies in the court's approach are notable because aggressive enforcement of a housing code can lead to an *increase* in the availability of low-income housing that meets minimal safety standards, thus potentially benefitting groups who are disproportionately represented in low-income housing. For that reason, merely compelling landlords to bring their rental properties up to code—indeed, doing so aggressively—cannot suffice in itself to prove a disproportionately adverse effect on a racial group, even if the affected ten-

32

ants primarily belong to the group.  In certain situations, the *failure* to aggressively enforce a housing code could give rise to a disparate-impact claim under Section 804(a) if it had the effect of disproportionately denying housing on the basis of a protected characteristic.  Consequently, it is especially important to assess with care the evidentiary support for allegations that aggressive enforcement of a housing code causes a disparate and adverse effect based on race.  The court of appeals failed to do so here.

2.  The court of appeals further erred in concluding that respondents met their burden at the third step of the burden-shifting inquiry.  Respondents, having conceded the legitimacy and nondiscriminatory nature of petitioners' objectives in aggressively enforcing the housing code, were required to produce evidence of alternative means by which petitioners could serve their legitimate objectives with a less discriminatory effect.  The court held that respondents satisfied their burden by pointing to PP2000, a short-term, resource-intensive program employed by the City in 2000, which focused on a small group of landlords with a history of repeated violations and attempted to encourage code compliance through a cooperative and less punitive approach.  See Pet. App. 24a-26a, 66a-67a n.9; C.A. App. 429-431.

The court failed to identify evidence showing that PP2000 would adequately serve the City's legitimate objectives with a less discriminatory effect.  The court identified no evidence that it would be feasible to apply that targeted program on a far broader scale as an overall approach for enforcing the housing code.  Additionally, the district court had found that respondents "offered no evidence showing that the PP2000 program would achieve [petitioners'] objectives without discrimi-

33

natory effect." Pet. App. 67a n.9. The court of appeals
pointed to no such evidence, instead relying on evidence
indicating that PP2000 achieved some success in terms
of code compliance and promoting a cooperative rela-
tionship with landlords, *id.* at 26a—none of which speaks
to the comparative efficacy of PP2000 relative to the
challenged aggressive enforcement practices, or to the
degree to which either program's imposition of costs on
landlords would disproportionately adversely effect
African-American tenants. The court of appeals thus
erred in concluding that respondents had raised a genu-
ine issue concerning the viability of PP2000 as an alter-
native to the challenged enforcement practices.[11]

---

[11] Because the court of appeals applied a flawed analysis in conclud-
ing that respondents presented adequate evidence to survive summary
judgment, this case presents no occasion to entertain petitioners'
contention (Br. 53-56) that the Court should categorically exempt
housing-code enforcement practices from disparate-impact scrutiny to
avoid equal-protection concerns.

34

## CONCLUSION

The judgment of the court of appeals should be reversed.

Respectfully submitted.

DONALD B. VERRILLI, JR.
*Solicitor General*

THOMAS E. PEREZ
*Assistant Attorney General*

SRI SRINIVASAN
*Deputy Solicitor General*

SARAH E. HARRINGTON
*Assistant to the Solicitor
General*

HELEN R. KANOVSKY
*General Counsel
Department of Housing &
Urban Development*

DIANA K. FLYNN
SASHA SAMBERG-CHAMPION
*Attorneys*

DECEMBER 2011

## APPENDIX

**Relevant Provisions of the Fair Housing Act**

1.  42 U.S.C. 3604 provides in relevant part:

**Discrimination in the sale or rental of housing and other prohibited practices**

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a)  To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

2.  42 U.S.C. 3605 provides in relevant part:

**Discrimination in residential real estate-related transactions**

\* \* \* \* \*

**(c) Appraisal exemption**

Nothing in this subchapter prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

(1a)

2a

3.  42 U.S.C. 3607 provides in relevant part:

**Religious organization or private club exemption**

\* \* \* \* \*

(b)(1) Nothing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.  Nor does any provision in this subchapter regarding familial status apply with respect to housing for older persons.

\* \* \* \* \*

[b](4) Nothing in this subchapter prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance as defined in section 802 of title 21.

4.  42 U.S.C. 3608 provides in relevant part:

**Administration**

(a)  **Authority and responsibility**

The authority and responsibility for administering this Act shall be in the Secretary of Housing and Urban Development.

3a

**Relevant Provisions of Title VII of the Civil Rights Act of 1964**

42 U.S.C. 2000e-2 provides in relevant part:

**Unlawful employment practices**

**(a)  Employer practices**

It shall be an unlawful employment practice for an employer—

\* \* \* \* \*

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

\* \* \* \* \*

**(k)  Burden of proof in disparate impact cases**

(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if–

(i)  a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

4a

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

(B)(i) With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

(ii)  If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

(C)  The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

(2)  A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this subchapter.

(3)  Notwithstanding any other provision of this subchapter, a rule barring the employment of an individual who currently and knowingly uses or possesses a con-

5a

trolled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act [21 U.S.C. 801 et seq.] or any other provision of Federal law, shall be considered an unlawful employment practice under this subchapter only if such rule is adopted or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

6a

**Relevant Provision of the Age Discrimination in Employment Act**

29 U.S.C. 623 provides in relevant part:

**Prohibition of age discrimination**

**(a)  Employer practices**

It shall be unlawful for an employer–

\* \* \* \* \*

(2)  to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

No. 10-1032

## In The
# Supreme Court of the United States

———————— ◆ ————————

STEVE MAGNER, et al.,

*Petitioners,*

v.

THOMAS J. GALLAGHER, et al.,

*Respondents.*

———————— ◆ ————————

**On Writ Of Certiorari To The United States
Court Of Appeals For The Eighth Circuit**

———————— ◆ ————————

**BRIEF OF *AMICI CURIAE* HENRY G. CISNEROS,
former Secretary of the United States Department
of Housing and Urban Development; ANTONIO
MONROIG, JUDITH Y. BRACHMAN, ROBERTA
ACHTENBERG, ELIZABETH K. JULIAN, EVA
PLAZA, and KIM KENDRICK, former Assistant
Secretaries for the Office of Fair Housing and
Equal Opportunity, Department of Housing and
Urban Development; J. MICHAEL DORSEY and
JUDGE NELSON A. DIAZ, former General Counsel,
Department of Housing and Urban Development;
HARRY L. CAREY, former Associate General
Counsel for Fair Housing; and LAURENCE PEARL,
former Acting Deputy Assistant Secretary for
Program Operations and Compliance
IN SUPPORT OF RESPONDENTS**

———————— ◆ ————————

DIANE L. HOUK
*Counsel of Record*
EISHA JAIN
EMERY CELLI BRINCKERHOFF & ABADY LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000
dhouk@ecbalaw.com

*Attorneys for Amici Curiae
Henry G. Cisneros, et al.*

January 30, 2012

COCKLE LAW BRIEF PRINTING CO. (800) 225-6964
OR CALL COLLECT (402) 342-2831

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................. iii

INTEREST OF *AMICI* ......................................... 1

SUMMARY OF ARGUMENT ............................. 2

ARGUMENT ...................................................... 4

  I.  HUD'S LONG-STANDING AND AUTHORI-
TATIVE INTERPRETATION OF THE
FHA AS ENCOMPASSING DISPARATE
IMPACT LIABILITY IS ENTITLED TO
DEFERENCE............................................... 4

  II.  WHEN CARRYING OUT ITS FORMAL
ADJUDICATION AUTHORITY UNDER
THE FHA, HUD HAS CONSISTENTLY
APPLIED A DISPARATE IMPACT
THEORY OF LIABILITY ............................ 6

    A.  HUD Administrative Law Judge Orders,
After A Thirty-Day Statutory Review
Period, Are Final Agency Decisions
Entitled To *Chevron* Deference............... 6

    B.  HUD Final Agency Decisions Have
Applied An Effects Test To A Variety Of
Discrimination Claims ........................... 7

    C.  Secretary-Initiated Complaints Have
Recognized An Effects Test ................... 10

  III.  HUD'S APPLICATION OF A DISPARATE
IMPACT ANALYSIS TO GOVERNMENT
SPONSORED ENTERPRISES AS CODIFIED
BY REGULATION IS ENTITLED TO
*CHEVRON* DEFERENCE........................... 11

ii

TABLE OF CONTENTS – Continued

Page

IV.   GUIDANCE FROM HUD ASSISTANT
      SECRETARY FOR FHEO AND/OR HUD
      GENERAL COUNSEL IS ENTITLED TO
      DEFERENCE ............................................   13

V.    HUD FAIR HOUSING ACT INVESTIGA-
      TIVE HANDBOOKS HAVE CONSISTENTLY
      INCORPORATED A DISPARATE IMPACT
      THEORY ...................................................   17

VI.   HUD'S CURRENT PROPOSED RULE-
      MAKING CODIFIES NEARLY TWO
      DECADES OF HUD PRACTICE, GUIDANCE,
      AND FORMAL ADJUDICATIONS IN
      RECOGNIZING LIABILITY BASED ON
      AN EFFECTS THEORY ...........................   19

CONCLUSION.....................................................   20

APPENDIX INDEX

HUD, Office of General Counsel, *Fair Housing
   Enforcement Policy: Occupancy Cases* (Mar.
   20, 1991) ...........................................................App. 1

HUD, Office of General Counsel and Office of
   Fair Housing & Equal Opportunity,
   *Occupancy Fees and Familial Status
   Discrimination Under the Fair Housing Act*
   (Mar. 29, 1994) ................................................App. 9

HUD, Office of Fair Housing & Equal
   Opportunity, *Discretionary Preferences for
   Admission to Multifamily Housing Projects*
   (Oct. 28, 1996) ...............................................App. 34

iii

## TABLE OF AUTHORITIES

Page

FEDERAL CASES:

*Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837 (1984)..................................................................4, 5

*Dada v. Mukasey,* 554 U.S. 1 (2008) ...........................5

*HUD v. Cornerstone Residential Mgmt.*, FHEO No. 04-08-1085-8 (June 9, 2008)...........................10

*Meacham v. Knolls Atomic Power Lab.,* 554 U.S. 84 (2008)..........................................................5

*Meyer v. Holley,* 537 U.S. 280 (2003)....................4, 13

*Skidmore v. Swift & Co.,* 323 U.S. 134 (1944).............5

*Smith v. City of Jackson,* 544 U.S. 228 (2005) ...........5

*United States v. Mead Corp.,* 533 U.S. 218 (2001)........................................................................4

*Wisconsin Dep't of Health & Fam. Servs. v. Blumer,* 534 U.S. 473 (2002) .....................................5


STATUTES & REGULATIONS:

24 C.F.R. 81.42 ..........................................................11

24 C.F.R. 103.400(a) ....................................................4

24 C.F.R. 104.930..........................................................4

24 C.F.R. 982.207(b)(1)(i)..........................................16

42 U.S.C. 3604 ............................................................17

42 U.S.C. 3608 ........................................................4, 17

42 U.S.C. 3610 ..........................................4, 5, 10, 17

iv

TABLE OF AUTHORITIES – Continued

Page

42 U.S.C. 3612 ................................................4, 6, 7, 17

42 U.S.C. 3614a ...........................................................4


HUD AGENCY DECISIONS:

*HUD v. Carlson,* No. 08-91-0077, 1995 WL
    365009 (HUD ALJ June 12, 1995).............................8

*HUD v. Carter,* No. 03-90-0058-1, 1992 WL
    406520 (HUD ALJ May 1, 1992) .............................8

*HUD v. Mountain Side Mobile Estates P'ship,*
    No. 08-92-0010, 1993 WL 307069 (HUD Sec'y
    July 19, 1993), aff'd in relevant part, 56
    F. 3d 1243 (10th Cir. 1995) ............................7, 8, 14

*HUD v. Pfaff,* No. 10-93-0084-8, 1994 WL
    592199 (HUD ALJ Oct. 27, 1994), rev'd on
    other grounds, 88 F. 3d 739 (9th Cir. 1996) .............8

*HUD v. Ross,* No. 01-92-0466-1, 1994 WL
    326437 (HUD ALJ July 7, 1994) .............................9

*HUD v. Twinbrook Vill. Apts.,* No. 02-00-0256-
    8, 2001 WL 1632533 (HUD ALJ Nov. 9, 2001).........9


HUD DOCUMENTS:

HUD, Office of Fair Housing & Equal
    Opportunity, *Assessing Claims of Housing*
    *Discrimination Against Victims of Domestic*
    *Violence Under the Fair Housing Act & the*
    *Violence Against Women Act* 5-6 (Feb. 9,
    2011) ................................................................16, 17

v

TABLE OF AUTHORITIES – Continued

Page

HUD, Office of Fair Housing & Equal Opportunity, *Discretionary Preferences for Admission to Multifamily Housing Projects* (Oct. 28, 1996) ...................................................15, 16

HUD, Office of Fair Housing & Equal Opportunity, *The Applicability of Disparate Impact Analysis to Fair Housing Cases* (Dec. 17, 1993) ...................................................14

HUD, Office of General Counsel, *Fair Housing Enforcement Policy: Occupancy Cases* 2-3 (Mar. 20, 1991) ...................................................13, 14

HUD, Office of General Counsel and Office of Fair Housing & Equal Opportunity, *Occupancy Fees & Familial Status Discrimination under the Fair Housing Act* (Mar. 29, 1994) ...................................................15

HUD, *FY 2006 Annual Report to Congress on Fair Housing* 38 (Mar. 29, 2007) ...........................10

HUD, *FY 2007 Annual Report to Congress on Fair Housing* 39 (Mar. 21, 2008) ...........................10

HUD, No. 002. REV-2, *HUD Directives System* (Apr. 18, 2001) ...................................................17

HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* (1995) ...................................................17, 18

vi

TABLE OF AUTHORITIES – Continued

Page

MISCELLANEOUS:

126 Cong. Rec. 31166 (1980) .......................................3

59 Fed. Reg. 18266 (Apr. 15, 1994) ......................11, 12

60 Fed. Reg. 61846, 61867 (December 1, 1995).........13

64 Fed. Reg. 56894 (Oct. 21, 1999) ...........................16

76 Fed. Reg. 70921 (Nov. 16, 2011) ...........................19

1

## INTEREST OF *AMICI*[1]

The *Amici* are former Presidential appointees and career employees of the United States Department of Housing and Urban Development ("HUD"). During their tenure at HUD, each was responsible for various aspects of the administration and enforcement of the Fair Housing Act ("FHA") from as early as 1981 through 2009. These officials file this *amicus* brief to indicate that in the exercise of their responsibilities in connection with the investigation and adjudication of housing discrimination complaints they consistently used a disparate impact analysis, as well as a disparate treatment analysis, in determining whether a violation of the FHA had occurred or was about to occur.

The Presidential appointees are as follows, by title and dates of tenure: *Secretary of the Department of Housing and Urban Development*, Henry G. Cisneros (1993-1997); *Assistant Secretary for the Office of Fair Housing and Equal Opportunity, Department of Housing and Urban Development*, Antonio Monroig (1981-1987), Judith Y. Brachman (1987-1989), Roberta Achtenberg (1993-1995), Elizabeth K. Julian (1995-1997), Eva Plaza (1997-2001), and Kim Kendrick

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the undersigned counsel contributed financially to its preparation or submission. The parties have consented to the filing of this brief.

(2005-2009); *General Counsel of the Department of Housing and Urban Development*, J. Michael Dorsey (1987-1989) and Judge Nelson A. Diaz (1993-1997).

The additional *Amici* are Harry L. Carey, who retired as Associate General Counsel for Fair Housing in 2007 after more than thirty-five years at HUD, and Laurence Pearl, who retired as Acting Deputy Assistant Secretary for Program Operations and Compliance in 1998 after thirty years in the HUD Office of Fair Housing and Equal Opportunity.

———————◆———————

## SUMMARY OF ARGUMENT

As the chief administrative agency charged with enforcing the FHA, HUD has a broad legislative mandate. Since the original enactment of the FHA in 1968, HUD has been vested by Congress with the statutory authority to administer and enforce the FHA, including by investigating discrimination complaints. With the 1988 Amendments to the FHA, HUD became charged with the responsibility of conducting formal adjudications and making final agency decisions in administering and enforcing the FHA. HUD has consistently recognized a discriminatory effects theory of liability when carrying out its statutory authority. In final agency decisions, such as final orders issued after hearings before administrative law judges, for instance, HUD has repeatedly made findings of discrimination based on evidence of discriminatory effects. HUD has also recognized the

3

disparate impact theory in regulations issued, in part, based on its authority under the FHA; in joint statements of policy with other administrative agencies; in internal guidance memoranda issued by the Assistant Secretary for the Office of Fair Housing and Equal Opportunity ("FHEO") and/or the HUD Office of General Counsel; in internal training materials for HUD investigators; and most recently in the Notice of Proposed Rule-Making that reiterates and codifies the agency's long-standing recognition that the FHA reaches the effects of discrimination. As early as 1980, the HUD Secretary expressly recognized the agency's efforts to address the effects of discrimination. *See, e.g.,* 126 Cong. Rec. 31166-67 (1980) (statement of Sen. Charles Matthias) (reading into the record a letter from the Secretary of Housing and Urban Development describing the "so-called 'effects test'" as a "rational, thoughtful mode of analyzing evidence [that] is imperative to the success of civil rights law enforcement.") For over thirty years, HUD has unambiguously made the disparate impact theory a central part of its administration and enforcement of the FHA. HUD's long-standing and well-reasoned pronouncements are entitled to deference.

———————◆———————

## ARGUMENT

I.  **HUD'S LONG-STANDING AND AUTHORI-
    TATIVE INTERPRETATION OF THE
    FHA AS ENCOMPASSING DISPARATE
    IMPACT LIABILITY IS ENTITLED TO
    DEFERENCE**

HUD's long-standing and authoritative pronouncements regarding the disparate impact theory of liability are entitled to deference. In 1968, Congress expressly gave HUD broad authority to administer and enforce the FHA. 42 U.S.C. 3608, 3610. The Fair Housing Act, as amended in 1988, provides the Secretary of HUD ("the Secretary") with the authority to accept and investigate housing discrimination complaints; to issue determinations of reasonable cause and charges of discrimination; to conduct formal adjudications; and to make final agency decisions. 42 U.S.C. 3610(g)(1), 3610(g)(2)(A), 3612(h)(1); 24 C.F.R. 103.400(a), 104.930. The 1988 Amendments also expressly vested the Secretary with the statutory authority to promulgate rules necessary for carrying out the FHA. 42 U.S.C. 3614a.

Given its broad legislative mandate, HUD's well-reasoned interpretation of the FHA as encompassing disparate impact claims is entitled to deference. HUD's formal adjudications and regulations are entitled to the full measure of deference pursuant to *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837 (1984); *see also Meyer v. Holley,* 537 U.S. 280, 287-89 (2003) (observing that this Court ordinarily defers to HUD's reasonable interpretation of the FHA); *United States*

5

*v. Mead Corp.,* 533 U.S. 218, 230 & n. 12 (2001) (*Chevron* deference is applied to formal adjudications); *Smith v. City of Jackson,* 544 U.S. 228, 243-47 (2005) (Scalia, J., concurring in part and in the judgment) (deferring to an agency's reasonable views). HUD's exercise of its authority to initiate complaints pursuant to 42 U.S.C. 3610 based on a disparate impact theory of liability is also entitled to deference. *Dada v. Mukasey,* 554 U.S. 1, 20-21 (2008) ("Although not binding in the present case, the [Department of Justice's] proposed interpretation of the statutory and regulatory scheme . . . warrants respectful consideration.") (citations omitted); *Wisconsin Dep't of Health & Family Servs. v. Blumer,* 534 U.S. 473, 496 (2002) (stating that the position of the Secretary of Health and Human Services "who possess the authority to proscribe standards relevant to the issue here . . . warrants respectful consideration.") HUD's numerous other pronouncements, including over two decades of guidance in the form of departmental directives, notices, General Counsel memoranda, handbooks, and other training materials that have recognized and applied a disparate impact theory, are also entitled to deference as persuasive and informed agency pronouncements. *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944); *see also Meacham v. Knolls Atomic Power Lab.,* 554 U.S. 84, 102-03 (2008) (Scalia, J., concurring in the judgment) (noting that deference to the views of the Equal Employment Opportunity Commission ("EEOC") is warranted "[b]ecause administration of the ADEA has been placed in the hands of the Commission, and because the agency's positions

on the questions before us are unquestionably rea-
sonable" and deferring to a brief submitted by the
Solicitor General of the United States and signed by
the EEOC's General Counsel).

## II. WHEN CARRYING OUT ITS FORMAL ADJUDICATION AUTHORITY UNDER THE FHA, HUD HAS CONSISTENTLY APPLIED A DISPARATE IMPACT THEORY OF LIABILITY

### A. HUD Administrative Law Judge Orders, After A Thirty-Day Statutory Review Period, Are Final Agency Decisions Entitled To *Chevron* Deference

As part of its enforcement mandate, the FHA, as
amended in 1988, provides HUD with the statutory
authority to make final agency decisions through
administrative law judge ("ALJ") determinations that
the Secretary has the opportunity to review. 42
U.S.C. 3612(h). The FHA mandates that HUD ad-
ministrative law judges commence hearings, "make
findings of fact and conclusions of law," and "promptly
issue" orders of relief. 42 U.S.C. 3612(g). The Secre-
tary may review any ALJ finding, conclusion, or order
within thirty days of its issuance; "otherwise, the
finding conclusion, or order becomes final." *Id.*
3612(h). Any party aggrieved by a final order may
appeal directly to the judicial circuit in which the
discriminatory housing practice is alleged to have
occurred. *Id.* The FHA provides the Secretary with
the right to petition the relevant judicial circuit for

7

the enforcement of an ALJ order. *Id.* 3612(j). Given HUD's legislative mandate to make final agency decisions and enforce them through U.S. courts of appeals, HUD ALJ decisions that become final are entitled to the full measure of *Chevron* deference.

### B. HUD Final Agency Decisions Have Applied An Effects Test To A Variety Of Discrimination Claims

Final orders issued by HUD have repeatedly interpreted the FHA's prohibition on discriminatory housing practices to encompass claims challenging the effects of otherwise neutral housing policies. In *HUD v. Mountain Side Mobile Estates P'ship,* No. 08-92-0010, 1993 WL 307069, at *3-7 (HUD Sec'y July 19, 1993) aff'd in relevant part, 56 F.3d 1243 (10th Cir. 1995), for instance, the HUD Secretary, upon review of an initial ALJ decision, applied a disparate impact analysis to a complaint alleging familial status discrimination. Using this framework, the Secretary determined that a three-person-per-dwelling maximum occupancy policy in a mobile home community had a discriminatory effect on families with children. When the final agency decision was appealed to the Tenth Circuit, the HUD Secretary, as the respondent, submitted a brief in support of this position, and cited statistics that the policy would exclude families with children at more than four times the rate of households without minor children. Brief for HUD Secretary as Respondent in *Mountain*

*Side Mobile Estates P'ship v. HUD,* No. 94-9509 (10th Cir. 1994).

*Mountainside* is also consistent with HUD's position in *HUD v. Pfaff,* No. 10-93-0084-8, 1994 WL 592199, at *17 (HUD ALJ Oct. 27, 1994), rev'd on other grounds, 88 F. 3d 739 (9th Cir. 1996), where a HUD ALJ determined, based in part on statistical evidence regarding household size, that a four-person maximum occupancy policy for a three-bedroom dwelling had a disparate impact on families with children. Upon appeal to the circuit court, the Secretary filed a brief discussing the legislative history and text of the FHA, as well as prior HUD pronouncements that a showing of discriminatory intent is not required to establish liability under the FHA. Brief for HUD Secretary as Respondent in *Pfaff v. HUD,* No. 94-70898 (9th Cir. 1996) 1995 WL 17017239.

In addition to *Mountainside* and *Pfaff,* HUD has issued other final agency decisions under the FHA based on disparate impact theory, including in familial status, sex, and disability cases. *See, e.g., HUD v. Carter,* No. 03-90-0058-1, 1992 WL 406520, at *5, (HUD ALJ May 1, 1992) (HUD ALJ final order noting that "the application of the discriminatory effects standard in cases under the Fair Housing Act is well established"); *HUD v. Carlson,* No. 08-91-0077, 1995 WL 365009 (HUD ALJ June 12, 1995) (HUD ALJ final order holding that a facially neutral four-occupant rule has a disparate impact on families with children).

9

In adjudicating sex discrimination claims, HUD has found that policies such as a landlord's refusal to accept tenants receiving public assistance violate the FHA. For instance, in *HUD v. Ross,* No. 01-92-0466-1, 1994 WL 326437, at *5, *7 (HUD ALJ July 7, 1994), a HUD ALJ issued a final order holding that a landlord's "no welfare" policy had a disparate impact on women, based in part on statistics showing that the overwhelming percentage of public assistance recipients in the landlord's county were women. In keeping with other HUD ALJ adjudications of housing discrimination complaints, the decision noted that "[a]bsent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act." *Id.*

Likewise, HUD ALJ orders have recognized the disparate impact theory in the disability discrimination context. For instance, HUD utilized the disparate impact theory of liability to analyze whether a policy that required tenants to purchase renters' liability insurance before the landlord would permit physical modifications to an apartment complex, such as the installation of ramps, violated the FHA and concluded that such a policy constituted discrimination based on disability. *See, e.g., HUD v. Twinbrook Vill. Apts.,* No. 02-00-0256-8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001).

10

### C. Secretary-Initiated Complaints Have Recognized An Effects Test

The FHA provides the Secretary with the authority to investigate and file complaints alleging discriminatory housing practices on the Secretary's own initiative, even in the absence of an aggrieved person filing a complaint with HUD. 42 U.S.C. 3610(a) ("The Secretary, on the Secretary's own initiative, may also file such a complaint"). HUD has used this authority to commence investigations, and if there is sufficient evidence, to file complaints based on discriminatory effects. For instance, in 2008, HUD filed a Secretary-initiated complaint against a rental management company alleging that its three-person occupancy limit for two-bedroom apartments discriminated against families with children. Complaint, *HUD v. Cornerstone Residential Mgmt.*, FHEO No. 04-08-1085-8 (June 9, 2008). The Complaint alleged that the policy either denied housing to families with children or caused them to incur higher housing costs by requiring families to rent larger apartments. *Id*; *see also* HUD, *FY 2006 Annual Report to Congress on Fair Housing* 38 (Mar. 29, 2007) (Secretary-initiated complaint against the City of Manassas, Virginia alleging that a local ordinance limiting the number of unrelated people who could live together in a dwelling unlawfully discriminated against Hispanic households and families with children); HUD, *FY 2007 Annual Report to Congress on Fair Housing* 39 (Mar. 21, 2008) (Secretary-initiated complaint against Iberville Parish, Louisiana alleging that a facially

neutral resolution adopted after Hurricane Katrina that restricted the placement of FEMA trailer parks in the Parish was racially discriminatory). HUD's Secretary-initiated complaints further demonstrate the agency's use of the effects standard in enforcing the FHA.

## III. HUD'S APPLICATION OF A DISPARATE IMPACT ANALYSIS TO GOVERNMENT SPONSORED ENTERPRISES AS CODIFIED BY REGULATION IS ENTITLED TO *CHEVRON* DEFERENCE

In issuing regulations based, in part, on its authority under the FHA to exercise administrative oversight over two Government Sponsored Enterprises ("GSEs") – the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) – HUD has expressly recognized the applicability of an effects test. *See* Prohibitions Against Discrimination, 24 C.F.R. 81.42 (prohibiting the GSEs from discrimination in "any manner that has a discriminatory effect"). In pronouncements leading to the issuance of 24 C.F.R. 81.42, HUD stressed the importance of the disparate impact theory. For instance, HUD cited to a joint statement it issued with nine other federal agencies that recognized disparate impact as one of the methods of proof of a violation of the FHA in lending discrimination cases. Policy Statement on Discrimination in Lending, 59 Fed. Reg. at 18266 (Apr. 15, 1994) ("the Policy Statement").

The Policy Statement was issued with the intent of being consistent with "the Fair Housing Act for purposes of administrative enforcement." *Id*. The agencies, including HUD, which issued the Policy Statement were concerned with discrimination faced by prospective home buyers in obtaining loans, and discussed how "[p]olicies and practices that are neutral on their face and that are applied equally may still, on a prohibited basis, disproportionately and adversely affect a person's access to credit." *Id.* The Policy Statement recognized that activities, such as a lender's facially neutral policy of refusing to extend loans for home purchases below a minimum loan amount, could be "shown to disproportionately exclude potential minority applicants from consideration because of their income levels or the value of the houses in the areas in which they live." *Id.* In which case, according to the Policy Statement, the lenders would be required to justify the "business necessity" for the policy. *Id.*

In issuing the GSE regulation applying the effects test, HUD explained the importance of the Policy Statement, stating that "[a]ll the Federal financial regulatory and enforcement agencies recognize the role that disparate impact analysis plays in scrutiny of mortgage lending" and have "jointly recognized the disparate impact standard as a means of proving lending discrimination under the Fair Housing Act." HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie

Mac) 60 Fed. Reg. at 61846, 61867 (Dec. 1, 1995). HUD's stated intent in issuing a regulation that addresses the effects of discrimination in lending is entitled to deference. *Meyer,* 537 U.S. at 288 (analyzing HUD's intent in passing another regulation pursuant to the FHA).

## IV. GUIDANCE FROM HUD ASSISTANT SECRETARY FOR FHEO AND/OR HUD GENERAL COUNSEL IS ENTITLED TO DEFERENCE

As part of its authority to implement the FHA, HUD has issued a variety of guidance to ensure that its personnel are uniformly applying the FHA. In this guidance, HUD has consistently recognized an effects test. For instance, in a memorandum from General Counsel providing guidance to all HUD Regional Counsel in 1991, HUD made clear that enforcement of the FHA encompassed facially neutral policies that had a discriminatory effect, such as occupancy standards that operate to disproportionately exclude families with children. HUD, Office of General Counsel, *Fair Housing Enforcement Policy: Occupancy Cases* 2-3 (Mar. 20, 1991), HUD *Amici* App. 1-9. The General Counsel stated his expectations that all Regional Counsel "continue their vigilant efforts to proceed to formal enforcement in all cases in which there is reasonable cause to believe that a discriminatory housing practice under the Act has occurred or is about to occur." *Id.*, HUD *Amici* App. 2. The memorandum was circulated expressly because it was

14

"imperative to articulate more fully the Department's position on reasonable occupancy policies and to describe the approach that the Department takes in its review of occupancy cases." *Id.,* HUD *Amici* App. 3. The General Counsel stated that vigilant enforcement of the FHA was "particularly important in cases where occupancy restrictions are used to exclude families with children or to unreasonably limit the ability of families with children to obtain housing." *Id.,* HUD *Amici* App. 2-3. The memorandum provided hypothetical examples of how a "two person per bedroom" policy could have a disparate impact on families with children. *Id.,* HUD *Amici* App. 4-8.

In 1993, the HUD Assistant Secretary for FHEO issued a memorandum titled "The Applicability of Disparate Impact Analysis to Fair Housing Cases," which stated that housing discrimination complaints should be analyzed by FHEO investigators under a disparate impact theory of liability. HUD, Office of Fair Housing & Equal Opportunity, *The Applicability of Disparate Impact Analysis to Fair Housing Cases* (Dec. 17, 1993). The memorandum outlined the reasoning in HUD's final administrative decision in *Mountain Side Mobile Estates*, *see supra* Section II. B, and instructed HUD Regional Directors to investigate all justifications proffered by respondents for facially neutral policies that may operate to disproportionately disadvantage persons in violation of the FHA.

In 1994, HUD's General Counsel and Assistant Secretary for FHEO issued a memorandum regarding the issue of whether the facially neutral policy of

15

imposing a fee based on the number of occupants in a dwelling constituted unlawful familial status discrimination. HUD, Office of General Counsel and Office of Fair Housing & Equal Opportunity, *Occupancy Fees & Familial Status Discrimination Under the Fair Housing Act* (Mar. 29, 1994), HUD *Amici* App. 9-33. The memorandum stated that "[o]ccupancy fees which are structured to apply equally to all households with a certain number of occupants, regardless of the familial status of the occupants, may violate the Act, even if the fees are enforced in an even handed manner against all households of a certain size." *Id.,* HUD *Amici* App. 16-17. The memorandum discussed, for instance, how a policy of imposing fees based on the number of occupants in a unit would be expected to have a disparate impact on families with children, given that larger households are more likely to contain children, and cited to several decisions discussing HUD litigation involving facially neutral occupancy standards. *Id*., HUD *Amici* App. 26-31.

In 1996, in a notice circulated to all FHEO Directors, Multifamily Housing Directors, and Owners/Managers in HUD-Assisted Housing, HUD stated that the FHA applies to all programs receiving federal financial assistance and prohibits "disparate impact in provision of housing based on certain prohibited bases." HUD, Office of Fair Housing & Equal Opportunity, *Discretionary Preferences for Admission to Multifamily Housing Projects* (Oct. 28, 1996), HUD *Amici* App. 34. The notice stated that "FHEO is concerned that a preference which appears

16

neutral on its face could result in violations of various Civil Rights requirements," including those contained in the Fair Housing Act. *Id.,* HUD *Amici* App. 35.[2]

And recently, in a memorandum from the FHEO Deputy Assistant Secretary for Enforcement and Programs to FHEO Offices and Regional Directors, HUD discussed how facially neutral "zero-tolerance" rental policies regarding domestic violence could have a disparate impact on women. HUD, Office of Fair Housing & Equal Opportunity, *Assessing Claims of Housing Discrimination Against Victims of Domestic Violence Under the Fair Housing Act & the Violence Against Women Act* 5-6 (Feb. 9, 2011). HUD noted that "[d]isparate impact cases often arise in the context of 'zero-tolerance' policies, under which the entire household is evicted for the criminal activity of one household member. The theory is that, even when

---

[2] Three years later, HUD promulgated a final rule regarding the use of local preferences in admissions to Section 8 Housing Choice Voucher Programs administered by public housing authorities ("PHAs"). *Section 8 Tenant Based Assistance; Statutory Merger of Section 8 Certificate and Voucher Programs,* 64 Fed. Reg. 56894 (Oct. 21, 1999). Pursuant to the regulation, PHAs may only use local residency preferences in accordance with the FHA and other federal anti-discrimination statutes. 24 C.F.R. 982.207(b)(1)(i) (citing to 24 C.F.R. 5.105(a)). HUD specifically incorporated a disparate impact standard into the regulation by requiring that local residency preferences "will not have the purpose or *effect* of delaying or otherwise denying admissions to the program based on race, color, ethnic origin, gender, religion, disability, or age of any member of the applicant family." *Id*. at 982.207(b)(1)(iii) (emphasis supplied).

consistently applied, women may be disproportion-
ately affected by these policies" because they are the
overwhelming victims of domestic violence. *Id.* As
examples, the memorandum discussed cases where a
"zero-tolerance" crime policy resulted in women being
evicted after presenting landlords with temporary
restraining orders or contacting the police during a
domestic violence incident. *Id.* at 6-9 (discussing cases
arising under, *inter alia,* 42 U.S.C. 3604(b)).

## V.  HUD FAIR HOUSING ACT INVESTIGATIVE HANDBOOKS HAVE CONSISTENTLY INCORPORATED A DISPARATE IMPACT THEORY

In carrying out its statutory responsibility to
investigate complaints, 42 U.S.C. 3610, conduct for-
mal adjudications, 42 U.S.C. 3612, and administer
the FHA, 42 U.S.C. 3608, HUD published a Title VIII
Complaint, Investigation, and Conciliation Handbook
("the Handbook") that provides instructions for HUD
personnel on how to investigate and evaluate housing
discrimination complaints. HUD, No. 8024.1, *Title
VIII Complaint Intake, Investigation & Conciliation
Handbook* (1995). As per HUD's policy, the Handbook
was subjected to departmental review and clearance
prior to being issued. HUD, No. 002. REV-2, *HUD
Directives System* (Apr. 18, 2001) (describing hand-
books as designed to "communicate information of a
permanent nature (including clarification of policies,
instructions, guidance, procedures, forms and reports)
for HUD staff and/or program participants").

The original edition of the Handbook, issued in 1995, set forth HUD's guidelines for investigating and resolving FHA complaints. The Handbook specifically recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in appropriate cases. The Handbook states that the FHA is violated by an "action or policy [that] has a disproportionately negative effect upon persons of a particular race, color, religion, sex, familial status, national origin or handicap status." HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 3-25.

In 1998, the Handbook was modified and expanded to include a chapter titled "Theories of Discrimination" that incorporates disparate impact as one theory of discrimination under the FHA. *Id.* at 2-27 ("a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations"); *Id.* at 2-27 to 2-45 (HUD guidelines for investigating a disparate impact claim and establishing its elements). The Handbook, which has provided definitive guidance to HUD investigators for over fifteen years, is another example of HUD's application of the disparate impact theory in carrying out its statutory responsibility to enforce the FHA.[3]

---

[3] In 2004, HUD established the Patricia Roberts Harris National Fair Housing Training Academy that provides a five-week fair housing enforcement program for investigators, attorneys, and others from agencies that administer state and

(Continued on following page)

## VI. HUD'S CURRENT PROPOSED RULE-MAKING CODIFIES NEARLY TWO DECADES OF HUD PRACTICE, GUIDANCE, AND FORMAL ADJUDICATIONS IN RECOGNIZING LIABILITY BASED ON AN EFFECTS THEORY

HUD's current Notice of Proposed Rule-Making (NPRM) reiterates HUD's consistent view that the FHA encompasses a disparate impact theory, and establishes a uniform standard for determining when a housing practice with a discriminatory effect violates the FHA. The NPRM cites to the text of the FHA, its legislative history, as well as HUD's prior policy statements and ALJ decisions, to demonstrate HUD's long-standing view that its legislative mandate includes enforcing the FHA against housing-related policies with discriminatory effects. The NPRM explains that HUD "has long interpreted the Act to prohibit housing practices with a discriminatory effect." 76 Fed. Reg. at 70921. Although a final rule has not yet been issued, HUD's NPRM should be recognized as a codification of long-existing policy and accorded deference.

————————◆————————

_____

local fair housing laws that have been certified as substantially equivalent by HUD under Section 3610(f)(3) of the FHA. National Fair Housing Training Academy, *About NFHTA*, http://www.nfhta.org/about.htm (last visited Jan. 22, 2012). As with the Handbook, the training curriculum includes both the disparate treatment and effects theories of liability. *Id.*

## CONCLUSION

For the foregoing reasons, this Court should hold that disparate impact claims are cognizable under Section 804(a) of the FHA.

Respectfully submitted,

DIANE L. HOUK
   *Counsel of Record*
EISHA JAIN
EMERY CELLI BRINCKERHOFF
   & ABADY LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
dhouk@ecbalaw.com

*Attorneys for Amici Curiae*
   *Henry G. Cisneros, et al.*

January 30, 2012

**19080**    **Federal Register**/Vol. 77, No. 62/Friday, March 30, 2012/Rules and Regulations

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 20**

**Estate Tax; Estates of Decedents Dying After August 16, 1954**

*CFR Correction*

■ In Title 26 of the Code of Federal Regulations, Parts 2 to 29, revised as of April 1, 2011, on page 392, in § 20.2053–4, at the end of paragraph (c)(3), Examples 1–3 are added to read as follows:

**§ 20.2053–4   Deduction for claims against the estate.**

\*    \*    \*    \*    \*

(c) \* \* \*

(3) \* \* \*

*Example 1.* There are three claims against the estate of the decedent (D) that are not paid and are not deductible under § 20.2053–1(d)(4) or paragraph (b) of this section: $25,000 of Claimant A, $35,000 of Claimant B, and $1,000,000 of Claimant C. The executor of D's estate (E) may not claim a deduction under this paragraph with respect to any portion of the claim of Claimant C because the value of that claim exceeds $500,000. E may claim a deduction under this paragraph for the total amount of the claims filed by Claimant A and Claimant B ($60,000) because the aggregate value of the full amount of those claims does not exceed $500,000.

*Example 2.* There are three claims against the estate of the decedent (D) that are not paid and are not deductible under § 20.2053–1(d)(4) or paragraph (b) of this section; specifically, a separate $200,000 claim of each of three claimants, A, B and C. The executor of D's estate (E) may claim a deduction under this paragraph for any two of these three claims because the aggregate value of the full amount of any two of the claims does not exceed $500,000. E may not deduct any part of the value of the remaining claim under this paragraph because the aggregate value of the full amount of all three claims would exceed $500,000.

*Example 3.* As a result of an automobile accident involving the decedent (D) and A, D's gross estate includes a claim against A that is valued at $750,000. In the same matter, A files a counterclaim against D's estate that is valued at $1,000,000. A's claim against D's estate is not paid and is not deductible under § 20.2053–1(d)(4). All other section 2053 claims and expenses of D's estate have been paid and are deductible. The executor of D's estate (E) deducts $750,000 of A's claim against the estate under § 20.2053–4(b). E may claim a deduction under this paragraph (c) for the total value of A's claim not deducted under § 20.2053–4(b), or $250,000. If, instead, the value of A's claim against D's estate is $1,500,000, so that the amount not deductible under § 20.2053–4(b)

exceeds $500,000, no deduction is available under this paragraph (c).

\*    \*    \*    \*    \*

[FR Doc. 2012–7819 Filed 3–29–12; 8:45 am]

**BILLING CODE 1505–01–D**

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**29 CFR Part 1625**

**RIN 3046–AA76**

**Disparate Impact and Reasonable Factors Other Than Age Under the Age Discrimination in Employment Act**

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Final rule.

**SUMMARY:** The Equal Employment Opportunity Commission ("EEOC" or "Commission") is issuing this final rule to amend its Age Discrimination in Employment Act ("ADEA" or "Act") regulations concerning disparate-impact claims and the reasonable factors other than age defense ("RFOA"). The Commission published proposed rules in the **Federal Register** on March 31, 2008, and February 18, 2010, for sixty-day notice-and-comment periods. After consideration of the public comments, the Commission has revised portions of the proposed rules and is now issuing a final rule covering both proposals.

**DATES:** Effective April 30, 2012.

**FOR FURTHER INFORMATION CONTACT:** Dianna B. Johnston, Senior Attorney-Advisor, Aaron Konopasky, Attorney-Advisor, or Davis L. Kim, Attorney-Advisor, at (202) 663–4640 (voice) or (202) 663–7026 (TTY). (These are not toll free numbers). This final rule also is available in the following formats: Large print, Braille, audio tape and electronic file on computer disk. Requests for this notice in an alternative format should be made to the Publications Information Center at 1–800–669–3362 (voice) or 1–800–800–3302 (TTY).

**SUPPLEMENTARY INFORMATION:**

### Background

On March 31, 2008, EEOC published in the **Federal Register** a Notice of Proposed Rulemaking ("NPRM") to address issues related to the United States Supreme Court's decision in *Smith* v. *City of Jackson.*[1] 73 FR 16807, Mar. 31, 2008. The Court ruled that disparate-impact claims are cognizable under the Age Discrimination in Employment Act ("ADEA")[2] but that

liability is precluded when the impact is attributable to a reasonable factor other than age. The NPRM proposed to revise 29 CFR 1625.7(d) to state that an employment practice that has an adverse impact on individuals within the protected age group on the basis of older age is discriminatory unless the practice is justified by a "reasonable factor other than age" and that the individual challenging the allegedly unlawful employment practice bears the burden of isolating and identifying the specific employment practice responsible for the adverse impact. The Commission also proposed to revise 29 CFR 1625.7(e) to state that, when the RFOA exception is raised, the employer has the burden of showing that a reasonable factor other than age exists factually.

The NPRM sought public comments on the proposed rule and also invited comments on whether the Commission should provide more information on the meaning of "reasonable factors other than age." Seven of the ten commenters clearly supported efforts to provide more information. One of the seven suggested that reasonable factors should be related to job requirements or job performance. One commenter who preferred that the EEOC not address the matter argued that, if the RFOA definition is subject to regulation, then EEOC should consult case law for a definition and should draft factors relevant to the RFOA determination. One commenter opposed efforts to provide more information on the meaning of RFOA.

As noted below, all commenters who addressed the proposed revision to 29 CFR 1625(d) supported it. Four commenters endorsed the proposal as written and two generally supported the section but suggested changes to the first sentence. For the reasons explained below, the final rule, which has been redesignated 1625.7(c), retains the proposal's substantive language.

Five commenters supported the proposed revision to 29 CFR 1625(e) and four opposed it. The commenters who opposed it argued that plaintiffs, not employers, should bear the RFOA burden of persuasion. As noted below, the final rule, which has been redesignated 1625.7(d), continues to place the burden of persuasion on the employer because the Supreme Court agreed that the employer has the RFOA burden of persuasion.[3]

Subsequently, on February 18, 2010, EEOC published in the **Federal Register** a second NPRM to address the meaning

---

[1] 544 U.S. 228 (2005).

[2] 29 U.S.C. 621–34.

[3] *Meacham* v. *Knolls Atomic Power Lab.,* 554 U.S. 84, 91–92 (2008).

**Federal Register** / Vol. 77, No. 62 / Friday, March 30, 2012 / Rules and Regulations    **19081**

of "reasonable factors other than age." 75 FR 7212, Feb. 18, 2010. The Commission noted that, given public comments and the Supreme Court decisions in *Smith* and *Meacham,* it was issuing the NPRM "before finalizing its regulations concerning disparate impact under the ADEA." The NPRM proposed to revise 29 CFR 1625.7(b) to state that the RFOA determination depends on the facts and circumstances of each specific situation. It defined a reasonable factor as one that is objectively reasonable when viewed from the position of a reasonable employer under like circumstances. It provided that the RFOA defense applies only if the challenged practice is not based on age. In addition, the NPRM provided non-exhaustive lists of factors relevant to whether an employment practice is reasonable and whether a factor is "other than age."

In response to the February 2010 NPRM, EEOC received 27 comments from groups and individuals and more than 2,300 facsimiles that were similar in form and content. Two commenters on the February 2010 NPRM suggested that the Commission issue a new NPRM if it made any changes to the material contained in the March 2008 NPRM. One of the two also suggested the publication of a new NPRM if the EEOC offered new justifications for the material contained in the February 2010 NPRM. The other commenter suggested that a new NPRM clarify whether the 2008 and 2010 documents should be read in conjunction.

The Commission does not believe that publication of a new NPRM is necessary. The Commission has considered all comments received in response to both notices of proposed rulemaking and has made appropriate changes to the proposed rules in response to those comments. This document sets out the revised paragraphs of §§ 1625.7(b) through (e). Because §§ 1625.7(a) and (f) remain unchanged, they are not reprinted herein.

Some commenters on the February 2010 NPRM, including those who submitted form facsimiles, expressed concern that the EEOC's approach to RFOA would place significant burdens on employers. They argued that the rule would lead to unwarranted scrutiny of business decisions, permit second-guessing of routine decisions, and make it harder for employers to defend against frivolous litigation. Other commenters thought that the rule presented a fair, workable approach to RFOA.

The ADEA and disparate-impact analysis by definition require some scrutiny of employer practices that disproportionately harm older workers. As the Supreme Court held, employers must prove that such practices are based on reasonable factors other than age once plaintiffs have identified a specific employment practice that has a significant disparate impact.[4] In holding that the RFOA is an affirmative defense, the Supreme Court recognized that scrutiny of employer decisions that cause an adverse impact is warranted, as employers must persuade "factfinders that their choices are reasonable" and that "this will sometimes affect the way employers do business with their employees."[5]

The EEOC's proposed rule was designed to conform existing regulations to recent Supreme Court decisions and to provide guidance about the application of the RFOA affirmative defense. It was not intended to impose unwarranted burdens on employers. Nonetheless, the Commission recognizes that some commenters interpreted the proposed rule as imposing significant burdens by requiring employers to meet all of the factors relevant to the RFOA determination. As explained below, the Commission has revised the rule to clarify that the factors are not required elements or duties, but considerations that are manifestly relevant to determining whether an employer demonstrates the RFOA defense.

Some commenters argued that the proposed rule improperly imported Title VII standards into ADEA disparate-impact analysis and conflicted with the Supreme Court decisions in *Smith, Meacham,* and *Hazen Paper Co.* v. *Biggins.*[6] Other commenters believed that the proposed rule was consistent with the statute and relevant case law. The Commission, which disagrees with some commenters' interpretations of the statute and Supreme Court decisions, has addressed their comments in the context of specific sections of the rule. For the reasons explained below, the Commission believes that the rule is consistent with the ADEA and case law interpreting the statute. Where appropriate, the Commission has revised the rule to make this clearer.

**Section-by-Section Analysis**

*Section 1625.7(b)*

Former section 1625.7(c) has been redesignated 1625.7(b). The text of the paragraph remains unchanged.

*Section 1625.7(c)*

Section 1625.7(c) revises current section 1625.7(d). The 2008 proposed rule stated that any employment practice that has an age-based adverse impact on individuals within the protected age group is discriminatory unless the practice is justified by a reasonable factor other than age. It also stated that the individual challenging the practice is responsible for isolating and identifying the specific employment practice responsible for the adverse impact.

All of the commenters who addressed this section supported it. Four of them endorsed the section as written. Two of them generally supported the section but suggested changes to the first sentence. One commenter argued that the first sentence of the proposed rule inappropriately implied that the RFOA defense is the only defense applicable to disparate-impact claims under the ADEA. The commenter asserted that, although the *Smith* decision held that RFOA is an appropriate test for determining the lawfulness of an employment practice that has an age-based disparate impact, it did not hold that it was the only test. According to the commenter, section 4(f)[7] of the ADEA permits other practices that might have a disparate impact on members of the protected age group. The commenter did not offer examples of such practices or otherwise explain how other defenses might apply in the disparate-impact context.

The final rule, which has been redesignated 1625.7(c), retains the proposed language. The Supreme Court relied on the RFOA provision to conclude that the ADEA prohibits disparate-impact discrimination.[8] The Court's determination that ADEA disparate-impact claims are cognizable because of the RFOA provision logically leads to the conclusion that RFOA is the defense to such claims. As the Court explained in *Meacham,* the RFOA defense fits[9] as the appropriate defense

---

[4] *Id.* at 96.
[5] *Id.* at 101.
[6] 507 U.S. 604 (1993).

[7] 29 U.S.C. 623(f).
[8] *Smith,* 544 U.S. at 239.
[9] The applicability of a statutory defense to a claim depends on whether the defense appropriately responds to the facts raised. For example, the "bona fide occupational qualification" ("BFOQ") defense in section 4(f)(1) applies to facially discriminatory policies, not to neutral practices. *See Meacham,* 554 U.S. at 92. The NPRMs proposed to revise section 1625.7 only, which is confined to the applicability of the RFOA defense and did not propose changes to other regulatory sections that apply to the ADEA's other affirmative defenses. *See, e.g.,* 29 CFR 1625.6 (BFOQ), 1625.8 (seniority systems), 1625.10 (employee benefit plans). The regulations do not preclude an employer from asserting any statutory defense that responds to a particular claim. It
Continued

to a disparate-impact claim because the age-neutral employment practice causing the unlawful impact is "other than age" and "otherwise prohibited." [10]

Another comment objected to the use of the term "justified." The commenter asserted that the term is closely associated with Title VII's business-necessity test and that its use could cause confusion between the concepts of business necessity and RFOA. The final rule retains the term "justified." Use of this term is consistent with the *Meacham* decision, which noted that the language of section 4(f)(1) "refers to an excuse or justification for behavior that, standing alone, violates the statute's prohibition." [11] It is also consistent with 29 CFR 1625.7(b), the text of which has not been changed. The term "justified" designates the party who bears the burden of proof, not the content of the defense. There is no question that the RFOA standard is lower than the business-necessity standard, as the rule makes clear.

The Commission has simplified the language in the second sentence of paragraph 1625.7(c). The sentence now refers to the employment practice "that allegedly causes" statistical disparities rather than the employment practice "that is allegedly responsible for" the disparities.

Paragraph 1625.7(c) reflects the Supreme Court's conclusions that disparate-impact claims are cognizable under the ADEA, that the individual alleging disparate impact bears the burden of identifying the specific employment practice causing the alleged impact, and that the RFOA defense is the appropriate standard for determining the lawfulness of a practice that disproportionately affects older workers. [12]

### Section 1625.7(d)

Section 1625.7(d) revises current section 1625.7(e). The proposed rule stated that, when the RFOA exception is raised, the employer has the burden of showing that a reasonable factor other

than age exists factually. Five commenters supported the proposal, and four objected to placing the burden of proof on the employer. One commenter noted that the term "exists factually" was ambiguous and likely to lead to confusion.

Subsequently, in *Meacham* v. *Knolls Atomic Power Laboratory,* the Supreme Court confirmed that the employer defending an ADEA claim of disparate impact has the RFOA burden of proof, i.e., the burden of persuasion as well as production. [13] The Commission has revised the paragraph, which has been redesignated 1625.7(d), to reflect the Supreme Court's holding that the RFOA provision is an affirmative defense in disparate-impact cases for which the employer bears the burdens of production and persuasion. To avoid confusion, the Commission has deleted the phrase "exists factually."

The Commission also has revised the rule to clarify that the RFOA affirmative defense is unavailable in disparate-treatment cases. In *Smith,* the Court rejected the argument that the RFOA exemption acted simply as a "safe harbor" in disparate-treatment cases. [14] As the Supreme Court explained in *Smith,* [15] the "other than age" element of the RFOA provision makes the defense inapplicable to a claim conditioned on an age-based intent to discriminate.

### Section 1625.7(e)

Section 1625.7(e) revises current section 1625.7(b). The proposed rule noted that whether a differentiation is based on reasonable factors other than age must be decided on the basis of all the particular facts and circumstances surrounding each individual situation. The final rule retains this language, which emphasizes that the RFOA determination involves a fact-intensive inquiry. [16] For organizational purposes,

the Commission has changed the order of the sentences in the paragraph.

The proposed rule divided the discussion of "reasonable factors other than age" into two paragraphs, "reasonable" and "factors other than age," and listed factors relevant to each paragraph. The "reasonable" paragraph noted that a reasonable factor is one that is objectively reasonable when viewed from the position of a reasonable employer (i.e., a prudent employer mindful of its responsibilities under the ADEA) under like circumstances. It stated that an employer must show that an employment practice was reasonably designed to achieve a legitimate business purpose and was administered in a way that reasonably achieves that purpose in light of the facts that were known or should have been known to the employer. It included a non-exhaustive list of factors relevant to whether an employment practice is reasonable.

The "factors other than age" paragraph noted that the RFOA defense applies only if the practice was not based on age. It stated that, in the typical disparate-impact case, the practice is based on an objective non-age factor and the only question is whether the practice is reasonable. The paragraph noted, however, that a disparate impact may be based on age when decision makers are given unchecked discretion to engage in subjective decision making and, as a result, act on the basis of conscious or unconscious age-based stereotypes. It included a non-exhaustive list of factors relevant to whether a factor is other than age.

### Factors Other Than Age

Some commenters argued that the "other than age" paragraph conflated disparate treatment and disparate impact and improperly shifted the burden of proof by requiring the employer to prove that the challenged employment action was not based on age. They also argued that the paragraph conflicted with *Meacham's* statement that the RFOA defense assumes that a non-age factor is at work.

In response to comments, and to ensure that the rule is not misconstrued as placing a disparate-treatment burden of proof on employers, the Commission has revised the discussion into a subsection, which has been redesignated 1625.7(e)(1)–(3), addressing the term "reasonable factors other than age." The Commission also has revised the lists into a single, non-exhaustive description of considerations relevant to the RFOA defense.

should be noted that the ADEA's affirmative defenses in section 4(f)(1) (BFOQ and foreign workplace) and section 4(f)(2) (seniority system and bona fide employee benefit plan) structurally and historically apply to intent-based claims. *See, e.g.,* 29 U.S.C. 623(f)(1), (2). *See Trans World Airlines, Inc.* v. *Thurston,* 469 U.S. 111, 121 (1985) (BFOQ and seniority system defenses raised to age-based denial of transfers); *Mahoney* v. *Radio Free Europe/Radio Liberty, Inc.,* 47 F.3d 447 (DC Cir. 1995) (holding that foreign workplace defense applied to age-based mandatory retirement provision).

[10] *Meacham,* 554 U.S. at 93.
[11] *Id.* at 95.
[12] *See Smith* v. *City of Jackson,* 544 U.S. 228 (2005).

[13] 554 U.S. 84, 97 (2008).
[14] 544 U.S. at 238–39. Although the majority opinion specifically rejected Justice O'Connor's view of the RFOA as a "safe harbor analogous to the legitimate nondiscriminatory reason (LNR) justification," it did not respond to her contention that the "RFOA provision also plays a distinct (and clearly nonredundant) role in 'mixed-motive' cases." 544 U.S. at 253. Thus, the majority's phrasing that the RFOA provision "plays its principal role" in disparate-impact cases seems to refer to the notion that it would have a role in mixed-motives cases. Any such role has been obviated, however, by the Court's subsequent holding that the ADEA does not permit "mixed-motives" claims. *Gross* v. *FBL Financial Servs. Inc.,* 557 U.S. 167 (2009).
[15] 544 U.S. at 238.
[16] The determination of whether an employer establishes a "reasonable factors other than age" defense is a jury question. *See EEOC* v. *Allstate Ins. Co.,* 458 F. Supp.2d 980, *aff'd,* 528 F.3d 1042 (8th Cir.), *reh'g en banc granted and opinion vacated on other grounds* (Sept. 8, 2008).

**Federal Register** / Vol. 77, No. 62 / Friday, March 30, 2012 / Rules and Regulations    **19083**

The final rule states that a reasonable factor other than age is a non-age factor that is objectively reasonable when viewed from the position of a prudent employer mindful of its responsibilities under the ADEA under like circumstances. The reference to "non-age factor" recognizes that "other than age" is an express part of the statutory RFOA defense.[17]

Prudent Employer

The preamble to the proposed rule stated that, in light of *Smith* and *Meacham*, a prudent employer would know that the ADEA was designed in part to avoid the application of neutral standards that disproportionately affect older workers. One commenter, noting that more than thirty years had passed between the enactment of the ADEA and the Supreme Court's determination that the law covered disparate-impact claims, questioned the Commission's statement. Another commenter agreed with the Commission and pointed out that the Court had decided *Smith* nearly five years, and *Meacham* nearly two years, before publication of the NPRM.

The Supreme Court's decisions in *Smith* and *Meacham* confirmed EEOC's longstanding position[18] that disparate-impact claims are cognizable under the ADEA and that employers have the burden of establishing the RFOA defense. The decisions also validated the 1965 Wirtz Report's concern about "institutional arrangements" that unintentionally limit the opportunities of older workers.[19] Courts had applied disparate-impact analysis to ADEA claims for many years,[20] and it was only after the Court's 1993 *Hazen Paper* decision[21] that some courts held that disparate-impact claims were not

cognizable under the ADEA.[22] Therefore, the Commission continues to believe that a prudent employer mindful of its ADEA responsibilities should know that the law prohibits the use of neutral practices that disproportionately affect older workers and are not based on reasonable factors other than age. A reasonable factor other than age is one that an employer exercising reasonable care would use to avoid limiting the opportunities of older workers, in light of all the surrounding facts and circumstances.[23]

Reference to Tort Law

The proposed rule relied on tort principles when discussing what constitutes a "reasonable" factor other than age. Some commenters thought that the reference to tort law was practical and sensible. Others, however, objected to the use of tort law. They argued that employment discrimination law provides sufficient guidance for determining whether a practice is based on reasonable, nondiscriminatory factors and that the rule inappropriately imports the concept of "reasonable employer" into the RFOA analysis. One commenter asserted that, whereas tort law and sexual-harassment theory assess reasonableness in terms of an individual's efforts to avoid harm, the RFOA analysis assumes and permits disparate impact. Another commenter asserted that it is unfair to rely on some tort principles without including the concepts of contributory negligence and assumption of the risk.

The final rule continues to refer to tort principles. Employment discrimination law includes little discussion of reasonableness whereas tort law extensively analyzes the concept. Indeed, the Supreme Court recently made clear that federal nondiscrimination laws are torts and that "when Congress creates a federal tort [we presume that] it adopts the

background of general tort law."[24] Prior to *Staub*, the Supreme Court noted in *Faragher* v. *City of Boca Raton*[25] that lower courts have unanimously applied tort negligence standards to determine employer liability for co-worker harassment. Similarly, the Court turned to tort principles to determine what mental state warrants punitive damages.[26] Lower courts also have turned to tort law for guidance in resolving employment discrimination cases.[27]

The fundamental objective of employment discrimination statutes, "like that of any statute meant to influence primary conduct, is * * * to avoid harm."[28] Tort law, too, focuses on the duty to avoid harm and provides guiding principles to help understand reasonableness in this context. Under the ADEA, employers are required to avoid the harm of using facially neutral practices that impair employment opportunities for older workers and are not reasonable.[29] Whether a factor is reasonable can be determined only in light of all the surrounding facts and circumstances, including the employer's duty to be cognizant of the consequences of its choices.

The assertion that the rule should not refer to tort law without importing the concepts of contributory negligence and assumption of the risk into the RFOA analysis misapprehends the rule's reference to tort law. The rule does not import tort principles wholesale; rather, it merely refers to tort law for guidance. Like the defense to harassment, the RFOA defense considers what the employer knew about the harm and what it did to correct it. Negligence principles as applied to co-worker harassment do not address the concepts of contributory negligence and assumption of the risk, and there is no

---

[17] 29 U.S.C. 623(f)(1); *see also Smith*, 544 U.S. at 239 (noting that the RFOA defense "preclud[es] liability if the adverse impact was attributable to a nonage factor that was 'reasonable'"). When an employer asserts purportedly neutral criteria, the RFOA defense is not available if age is a component of the employer's practice or policy. *See, e.g., City of Los Angeles, Dept. of Water & Manpower* v. *Manhart*, 435 U.S. 702 (1978) (rejecting employer's assertion of neutral criterion of "longevity" where sex determined longevity).

[18] *See* 29 CFR 1625.7.

[19] Report of the Sec'y of Labor, The Older American Worker: Age Discrimination in Employment 15–17 (1965), *reprinted in* U.S. EEOC, Leg. History of the ADEA 32–34 (1981) (discussing "[a] broad range of personnel programs and practices [that] affect the employment of the older worker, although they were not developed for this purpose") (hereinafter "Wirtz Report").

[20] *See, e.g., Maresco* v. *Evans Chemetics*, 964 F.2d 106, 115 (2d Cir. 1992); *Abbott* v. *Fed. Forge, Inc.*, 912 F.2d 867, 872–77 (6th Cir. 1990); *Leftwich* v. *Harris-Stowe State Coll.*, 702 F.2d 686 (8th Cir.1983); *Geller* v. *Markham*, 635 F.2d 1027 (2d Cir.1980).

[21] 507 U.S. 604 (1993).

[22] *See, e.g., Mullin* v. *Raytheon Co.*, 164 F.3d 696 (1st Cir. 1999); *Ellis* v. *United Airlines, Inc.*, 73 F.3d 999, 1006–10 (10th Cir. 1996); *EEOC* v. *Francis W. Parker Sch.*, 41 F.3d 1073, 1077–78 (7th Cir. 1994). *But see Frank* v. *United Airlines, Inc.*, 216 F.3d 845, 856 (9th Cir. 2000) (disparate-impact claims cognizable under ADEA); *Criley* v. *Delta Air Lines Inc.*, 119 F.3d 102, 105 (2d Cir. 1997) (same); *Smith* v. *City of Des Moines*, 99 F.3d 1466, 1470 (8th Cir. 1996) (same).

[23] *See Smith*, 544 U.S. at 235 n.5 (quoting Wirtz Report's discussion of employment standards that unfairly disadvantage older workers); *cf. Faragher* v. *City of Boca Raton*, 524 U.S. 775, 808–09 (1998) (rejecting employer's argument that it should not be held liable for negligently failing to promulgate anti-harassment policy where EEOC regulations advised employers to take all steps necessary to prevent harassment and holding as a matter of law that employer did not exercise reasonable care to prevent sexual harassment).

[24] *Staub* v. *Proctor Hosp.*, 131 S. Ct. 1186, 1191 (2011) (citing, among other decisions, *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 764 (1998)).

[25] 524 U.S. 775, 799 (1998). In *Faragher* and *Ellerth*, the Court crafted a duty-of-care defense in hostile-environment cases without any statutory language directing it to do so.

[26] *Kolstad* v. *Am. Dental Ass'n*, 527 U.S. 526, 538 (1999).

[27] *E.g., Baskerville* v. *Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995) (reasonableness of employer's steps to discover and correct sexual harassment "depends on the gravity of the harassment"); *see also Erickson* v. *Wis. Dep't of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006) ("The greater the potential injury to the employee, the greater care the employer must take.") (citing *Baskerville*); *Shager* v. *Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (noting, in an age case, that discrimination constitutes a tort).

[28] *Faragher*, 524 U.S. at 806 (citing *Albemarle Paper Co.* v. *Moody*, 422 U.S. 405, 417 (1975)).

[29] *See Meacham* v. *Knolls Atomic Power Lab.*, 554 U.S. 84, 101 (2008); *Smith* v. *City of Jackson*, 544 U.S. 228, 234–5 & n.5 (2005).

need to address those concepts in the RFOA context. Moreover, employees do not "contribute" (negligently or otherwise) to an employer's use of an employment practice that has an age-based disparate impact. In addition, it would be contrary to the purposes of the anti-discrimination laws to assert that any employee voluntarily assumes the risk of being subject to discrimination.[30]

Design and Administration of Employment Practice

The proposed rule looked at "reasonable" from the position of a prudent employer and considered how the challenged employment practice is designed and administered. Some commenters agreed that the rule should look at how the practice is applied as well as at how it is designed. Other commenters, however, argued that this approach inappropriately focuses on the employer's decision-making process rather than on the factor upon which the decision was based. In their view, the RFOA inquiry should focus on the factor underlying the employment practice, not on whether the employer acted reasonably in selecting the factor.

The final rule continues to focus on how the employment practice is designed and administered. The RFOA defense arises after an employment practice has been shown to have an age-based disparate impact. In that context, the concept of "reasonable factor" necessarily includes consideration of the reasonableness of the factor's application. Thus, the *Smith* Court considered not just the City of Jackson's goal of retaining police officers, but also the design and administration of the pay plan used to achieve that goal.[31]

The way in which an employer applies the factor is probative of whether it is reasonable; a practice that seems reasonable in the abstract might not be reasonable in its application. For example, an employer might require candidates for jobs in its meat-processing plant to pass a physical strength test. It would be reasonable for the employer to design a test that accurately measures the ability to perform the job successfully. It would be manifestly unreasonable, however, for the employer to administer the test inconsistently, evaluate results unevenly, or judge test takers unreliably. Similarly, although it might well be reasonable for an employer to conduct a reduction-in-force (RIF) to save money, if an identified employment practice caused older workers to be disparately impacted, the cost-cutting goal alone would not be sufficient to establish the RFOA defense. The employer would have to show that the practice was both reasonably designed to further or achieve a legitimate business purpose and administered in a way that reasonably achieves that purpose in light of the particular facts and circumstances that were known, or should have been known, to the employer.

"Reasonable" and "Rational Basis"

The preamble to the proposed rule noted that the RFOA defense requires that a practice be reasonable, which is different from requiring only that it be rational. Some commenters argued that the RFOA standard should be a rational-basis standard and that "reasonable" means not irrational or not arbitrary. Other commenters commended the EEOC for clarifying that the reasonableness test is not a rational-basis test.

The Commission continues to believe that the RFOA defense is more stringent than a rational-basis or non-arbitrary standard for several reasons. First, the Supreme Court has held that the RFOA provision "confirms that Congress, through the ADEA, has effectively elevated the standard for analyzing age discrimination to heightened scrutiny."[32] In other words, the

Supreme Court has previously recognized that the RFOA reflects a standard of proof higher than a rational-basis standard.

Second, proof that an action was rational or non-arbitrary focuses on whether an articulated reason is a pretext for *intentional* discrimination.[33] Thus, equating the RFOA defense with a rational-basis standard would improperly conflate ADEA disparate-treatment and disparate-impact standards of proof. If an employer attempting to establish the RFOA defense were only required to show that it had acted rationally, then the employer would merely be required to show that it had not engaged in intentional age discrimination. In *Smith*, the Supreme Court bluntly held that the RFOA provision is not a statutory safe harbor from liability for disparate treatment when the employer merely had a rational justification for its actions.[34]

Thus, the Supreme Court concluded that the ADEA prohibits more than intentional discrimination; it also prohibits employers from adopting facially neutral practices that disproportionately exclude older workers unless the employer can prove that its actions were based on reasonable factors other than age. In holding that the RFOA provision is the defense to disparate-impact claims, the Supreme Court recognized that the RFOA defense is distinguishable in form and substance from the "legitimate, nondiscriminatory reason" evidence that the employer must produce in individual disparate-treatment cases.[35] The RFOA defense necessarily requires more than merely a showing that the employer's action was not irrational or not arbitrary.[36] To adopt commenters' assertions would be to nullify the *Smith* and *Meacham* holdings and undermine the intent of Congress to address "the

---

[30] *McKennon* v. *Nashville Banner Pub. Co.*, 513 U.S. 352 (1995) (the ADEA is part of a wider statutory scheme to protect employees in the workplace nationwide). Allowing an assumption-of-risk defense would defeat the ADEA's deterrent purpose; it would allow employers to avoid liability simply by advertising the fact that they will discriminate. *See Smith* v. *Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) (dismissing the idea that discriminatory actions can be excused by a prevailing workplace culture that has included exclusionary practices and bigotry and stating, "There is no assumption-of-risk defense to charges of workplace discrimination."); *Jenson* v. *Eveleth Taconite Co.*, 130 F.3d 1287, 1292 (8th Cir. 1997) (holding that an employer's liability for sex discrimination is not mitigated by the fact that the work environment was known to have an egregiously discriminatory culture); *Williams* v. *Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999) ('women working in the [male-dominated] trades do not deserve less protection from the law than women working in a courthouse').'"

[31] *See Smith*, 544 U.S. at 242. ("Reliance on seniority and rank is unquestionably reasonable given the City's goal of raising employees' salaries to match those in surrounding communities. * * * [T]he City's decision to grant a larger raise to lower echelon employees for the purpose of bringing

salaries in line with that of surrounding police forces was a decision based on a 'reasonable facto[r] other than age' that responded to the City's legitimate goal of retaining police officers.").

[32] *Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62, 88 (2000). The *Kimel* Court held that the ADEA did not validly abrogate states' Eleventh Amendment immunity from suit by private individuals because it "prohibits substantially more * * * than would likely be held unconstitutional under the * * * rational basis standard." *Id.* at 86. The Court concluded that "[the RFOA] exception confirms,

* * * rather than disproves, the conclusion that the ADEA's protection extends beyond the requirements of the Equal Protection Clause." *Id.* at 88.

[33] *Smith*, 544 U.S. at 253.

[34] *Id.* at 238–39 (rejecting Justice O'Connor's argument that "the RFOA provision's reference to 'reasonable' factors serves only to prevent the employer from gaining the benefit of the statutory safe harbor by offering an irrational justification." *Id.* at 253).

[35] *Id.* at 238–39 (rejecting Justice O'Connor's contention that RFOA is safe harbor from liability, because employer can defeat liability in disparate-treatment case by showing that employee was rejected for legitimate, nondiscriminatory reason) (citing *Texas Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 254 (1981)); *see also Meacham*, 554 U.S. at 96, n.12.

[36] *Smith*, 544 U.S. at 238–39.

**Federal Register** / Vol. 77, No. 62 / Friday, March 30, 2012 / Rules and Regulations **19085**

consequences of employment practices, not simply the motivation.'' [37]

Third, a rational basis standard would also undercut the Court's recognition of the RFOA as an affirmative defense. Under a rational-basis standard, an action ''may be based on rational speculation unsupported by evidence or empirical data.'' [38] The decision maker is not required ''to articulate at any time the purpose or rationale supporting its classification,'' [39] and an action will be upheld ''if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'' [40] By that measure, the ''reasonable'' requirement would afford no protection against practices that have an age-based disparate impact. [41]

Finally, equating the RFOA reasonableness requirement with a rational-basis standard would contradict the *Smith* Court's holding that the ''reasonable'' requirement shows that the RFOA provision is more stringent than the Equal Pay Act's (''EPA'') ''any other factor'' defense. [42] Indeed, applying the rational-basis test to the RFOA defense would actually make it less stringent than the EPA's ''any other factor'' defense as the latter has been construed by the EEOC and some courts, which have taken the position that, even under the Equal Pay Act, an employer asserting an ''any other factor other than

sex'' defense must show that the factor is related to job requirements or otherwise is beneficial to the employer's business. [43]

''Reasonable'' and ''Business Necessity''

The February 2010 Notice of Proposed Rulemaking emphasized that the proposed RFOA standard was lower than the business-necessity test of Title VII of the Civil Rights Act of 1964, [44] but higher than the Equal Pay Act's ''any other factor'' test. [45] It also stated that the factors relevant to the reasonableness inquiry recognize that the RFOA standard is less stringent than the business-necessity standard and that disparate-impact liability is narrower under the ADEA than under Title VII.

Several commenters expressed the view that the proposed rule impermissibly imposed Title VII's business-necessity test on ADEA defendants. One of the commenters suggested that EEOC revise the language to state that the factors ''may'' be relevant to the RFOA determination. The commenters' arguments generally centered on the mistaken view that the factors were requirements, and that the factors concerning employers' efforts to assess impact, minimize harm, and weigh options amounted to a business-necessity requirement.

In response, the Commission has made several changes. To address the commenters' view that the factors were required elements or duties, the rule now refers to ''considerations'' relevant to demonstrating the defense. The rule sets forth a non-exhaustive description of relevant considerations, rather than a list of duties to be met. Because the RFOA determination involves a fact-intensive inquiry, the importance of a consideration depends on the facts of the particular situation. Based on the specific facts raised, one or two considerations may be sufficient to establish the RFOA defense.

In addition, the rule expressly states that no specific consideration or combination of considerations need be present for a differentiation to be based on reasonable factors other than age and that the presence of one consideration does not automatically establish the defense. Just as the absence of a consideration does not automatically defeat the RFOA defense, so too the presence of one consideration does not necessarily prove that a differentiation is based on reasonable factors other than age. Rather, as the rule makes clear, the RFOA determination depends on all of the facts and circumstances in each particular situation.

The Commission disagrees that consideration of efforts to assess impact, reduce harm, and weigh options suggests a Title VII business-necessity analysis. However, the Commission has deleted the factor concerning the availability of options because some commenters misconstrued the factor as imposing the Title VII standard that the employer must search for and select the least discriminatory alternative. [46] Removal of the factor does not mean that the availability of measures to reduce harm is irrelevant to

---

[37] *Id.* at 234–35 and n.5 (''just as *Griggs* recognized that the high school diploma requirement, which was unrelated to job performance, had an unfair impact on African-Americans * * * the Wirtz Report identified the identical obstacle to the employment of older workers'').

[38] *FCC* v. *Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993) (Cable Communications Policy Act's distinction between cable television facilities that serve separately owned buildings and those that serve buildings under common ownership, 47 U.S.C. 522(7)(B), is rationally related to a legitimate government purpose under the Fifth Amendment's Due Process Clause).

[39] *Nordlinger* v. *Hahn,* 505 U.S. 1, 15 (1992) (taxation system focusing on acquisition value of real property rationally furthers legitimate state interests for purposes of the Equal Protection Clause of the Fourteenth Amendment).

[40] *FCC* v. *Beach Commc'ns, Inc.,* 508 U.S. at 313.

[41] *See id.* at 323 n.3 (''Judicial review under the 'conceivable set of facts' test is tantamount to no review at all.'') (Stevens, J., concurring); *see also W. Air Lines, Inc.* v. *Criswell,* 472 U.S. 400, 422 n. 36 (1985) (rejecting rational-basis standard for ''bona fide occupational qualification'' defense where, ''under a 'rational basis' standard a jury might well consider that its 'inquiry is at an end' with an expert witness' articulation of any 'plausible reaso[n]' for the employer's decision'') (quoting *United States R.R. Ret. Bd.* v. *Fritz,* 449 U.S. 166, 179 (1980)).

[42] *See Smith,* 544 U.S. at 239 n.11 (2005) (finding it '' instructive'' that, in contrast to providing an ''any other factor'' defense under the Equal Pay Act, 29 U.S.C. 206(d)(1), ''Congress provided that employers could use only *reasonable* factors in defending a suit under the ADEA'') (emphasis in the original).

[43] EEOC Compliance Manual, Compensation Discrimination 10–IV.F.2 (2000) (''An employer asserting a 'factor other than sex' defense also must show that the factor is related to job requirements or otherwise is beneficial to the employer's business.''); *see also Aldrich* v. *Randolf Cent. Sch. Dist.,* 963 F.2d 520, 525–26 (2d Cir. 1992) (factor other than sex must be grounded in legitimate business-related concerns); *EEOC* v. *J.C. Penney Co.,* 843 F.2d 249, 253 (6th Cir. 1988) (factor-other-than-sex defense requires a legitimate business reason); *Glenn* v. *Gen. Motors Corp.,* 841 F.2d 1567, 1571 (11th Cir. 1988) (defense ''applies when the disparity results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business''); *Kouba* v. *Allstate Ins. Co.,* 691 F.2d 873, 876–77 (9th Cir. 1982) (employer must have an acceptable business reason and ''must use the factor reasonably in light of the employer's stated purpose as well as its other practices''). *But see Behm* v. *United States,* 68 Fed. Cl. 395, 400–01 (Fed. Cir. 2005) (text of EPA does not suggest that factor other than sex must be business related; applying ''deferential'' rational-basis standard to any-other-factor defense of federal government employer ''whose business is not business, but government''); *Taylor* v. *White,* 321 F.3d 710, 720 (8th Cir. 2003) (any-other-factor defense does not involve a reasonableness inquiry); *Fallon* v. *State of Ill.,* 882 F.2d 1206, 1211 (7th Cir. 1989) (business-related reason need not be shown).

[44] 42 U.S.C. 2000e–2(k)(1)(A)(i) (a particular employment practice that has a disparate impact based on race, color, religion, sex, or national origin is unlawful unless the employer ''demonstrate[s] that the challenged practice is job related for the position in question and consistent with business necessity'').

[45] 29 U.S.C. 206(d)(1)(iv) (permitting sex discrimination in wages pursuant to a ''differential based on any factor other than sex.'')

[46] Three commenters disagreed with the Commission's statement, in the preamble to the proposed rule, that Title VII requires an employer to adopt the least discriminatory alternative. Under Title VII, once the employer establishes that the challenged practice is job related and consistent with business necessity, the burden shifts to the plaintiff to demonstrate that there is an alternative employment practice that the employer refuses to adopt. 42 U.S.C. 2000e–2(k)(1)(A)(ii), 2000e–2(k)(1)(C) (adopting pre-*Wards Cove* approach to ''alternative employment practice''). The alternative must be less discriminatory and must serve the employer's legitimate business needs. *See Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 425 (1975); *Dothard* v. *Rawlinson,* 433 U.S. 321, 329 (1977); *see also Ricci* v. *DeStefano,* 129 S. Ct. 2658, 2673 (2009). As a practical matter, an employer that does not adopt the least discriminatory effective alternative proposed by the plaintiff will not prevail in a Title VII disparate-impact case because the plaintiff will be able to establish the existence of a less discriminatory alternative. That is not the case under the ADEA, whose RFOA standard is less stringent than Title VII's business-necessity standard. *Smith,* 544 U.S. at 243.

**19086**    **Federal Register** / Vol. 77, No. 62 / Friday, March 30, 2012 / Rules and Regulations

reasonableness. There may be circumstances in which the availability of a measure that would noticeably reduce harm was or should have been so readily apparent that it would be manifestly unreasonable for the employer to fail to use it. The removal of the factor does, however, make clear that an employer need not search for alternatives and use the one that is least discriminatory. These changes, along with the clarification that none of the considerations is a required element of the RFOA defense, make clear the distinction between the ADEA RFOA standard and Title VII's business-necessity standard.

Under Title VII, if a particular employment practice has a disparate impact based on race, color, religion, sex, or national origin, then the employer must "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."[47] An employer could meet the Title VII standard by proving, for example, that a test has been validated to show that it is "predictive of * * * important elements of work behavior which comprise * * * the job."[48] In contrast, the RFOA defense involves the less demanding standard of reasonableness.

Application of the rule's considerations to a physical fitness test[49] illustrates the difference between the RFOA and business-necessity standards. For example, suppose a security company mandated that all applicants for security guard positions must be able to run a half mile in three minutes and do 35 push ups in a row. The company's stated purpose is to ensure that guards are physically able to pursue and apprehend suspects (consideration (i)). The test defines and

measures the factors of speed and strength and provides clear guidance on how the test is to be applied accurately and fairly (consideration (ii)). The employer performs a disparate-impact analysis and finds that large percentages of older workers and women cannot pass the test. (consideration (iv)). The employer changes the test so that performance standards vary based on age and gender, when it learns that a successful competitor firm uses such standards and is attracting a large pool of qualified candidates. Although the test continues to disproportionately exclude older and female applicants, it excludes fewer of them and still produces qualified hires (consideration (v)).

The security company would not need to perform a validation study to establish the RFOA defense. In contrast, to establish a Title VII business-necessity defense, the employer would need to validate the test to show that it accurately measured safe and efficient performance. In addition, even if the employer could show that the test was validated, proof by female applicants that there were less discriminatory alternatives that the employer refused to adopt would impose liability under Title VII. This is just one example of how the RFOA standard is less stringent than Title VII's business-necessity standard.

Relevant Considerations

The proposed rule set forth non-exhaustive lists of factors relevant to whether an employment practice is reasonable and is based on factors other than age. Although, as discussed above, some commenters objected to some of the factors, other commenters found the lists useful and generally supported them. One commenter suggested that EEOC provide guidance on the types of evidence relevant to the factors and argued that the evidence should be objective, in existence before litigation, and more than mere self-serving statements. Another commenter stated that no single factor should be dispositive of whether an employment practice is reasonable.

Given the context-specific nature of the RFOA inquiry, it is not possible to specify every type of relevant evidence. All relevant evidence should be considered, and such evidence necessarily will vary according to the facts of each particular situation. Depending on the circumstances, relevant evidence might include documents describing the business purpose underlying the challenged practice, copies of any written guidance that the employer provided to decision

makers, explanations of how the employer implemented the practice, and impact-related studies that the employer may have conducted. Objective evidence that was in existence prior to litigation will carry more weight than mere self-serving statements or after-the-fact rationales.

The first "reasonable" factor listed in the proposed rule concerned whether the employment practice and its implementation were common business practices. One commenter supported this factor because, as a factor rather than a required element, it would allow employers to defend their actions while ensuring that discriminatory practices that may be common in an industry are not given weight. Other commenters opposed the factor. Some commenters argued, for example, that the factor could stifle employer creativity and was not relevant to whether a particular employer's practice was reasonable under particular circumstances. Others argued that the commonality of a practice has no bearing on whether it is discriminatory and expressed concern that the factor could allow an employer to defend a practice when there is industry-wide discrimination. One commenter suggested that the factor should refer to common practices in comparable settings rather than to common business practices.

In light of the variety of concerns about this factor, the Commission has deleted it from the relevant considerations.

Section 1625.7(e)(2)(i)

The second item in the proposed rule's list of factors relevant to "reasonableness" concerned the extent to which the factor is related to the employer's stated business goal. One commenter thought that the factor encompassed the essence of the RFOA defense but suggested that the term "stated" be deleted. Another commenter thought that the term "stated" was vague and wondered whether it meant that an employer must state its goal in advance.

The Commission has revised the provision, which has been redesignated 1625.7(e)(2)(i), to refer to an employer's "stated business purpose," which is the legitimate business purpose that the employer had at the time of the challenged employment practice. This approach is consistent with *Smith,* which expressly noted that the City's "stated purpose * * * was to 'attract and retain qualified people, provide incentive for performance, maintain competitiveness with other public sector agencies and ensure equitable compensation to all employees

---

[47] 42 U.S.C. 2000e–2(k)(1)(A)(i).

[48] *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 431, 434 (1975). The business-necessity standard has been articulated in other ways. *See, e.g., Dothard* v. *Rawlinson,* 433 U.S. 321, 331 n.14 (1977) ("necessary to safe and efficient job performance"); *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 432 (1971) (employment practice must bear a "manifest relationship to the employment in question"); *El* v. *Se. Pa. Trans. Auth.,* 479 F.3d 232, 242, 245 (3d Cir. 2007) (practice at issue must "accurately—not perfectly—ascertain[] an applicant's ability to perform successfully the job in question").

[49] It is important to emphasize that physical-fitness requirements must be relevant to successful performance of the particular job, so as to avoid the use of such tests to restrict the hiring of older workers when there is no basis for such requirements, as the 1965 Wirtz Report documented. *See* Wirtz Report at 4. Subjecting only older workers to a particular test would be facially discriminatory and the RFOA defense would not apply. *See, e.g., EEOC* v. *Massachusetts,* 987 F.2d 64, 73 (1st Cir. 1993) (rejecting RFOA defense to practice requiring employees to pass physical fitness exam at age 70).

regardless of age, sex, race and/or disability.' " [50] The City reasonably achieved this purpose by raising the salaries of junior officers to make them competitive with those of comparable positions in the region.[51] Similarly, an employer whose stated purpose is to hire qualified candidates could reasonably achieve this purpose by ensuring that its hiring criteria accurately reflect job requirements.

Section 1625.7(e)(2)(ii)

The proposed rule said that the extent to which the employer took steps to define and apply the factor accurately and provided training, guidance, and instruction to managers was relevant to reasonableness. Three commenters supported this factor. One of them noted that training and guidance are sound business practices that are not burdensome. Two commenters objected to this factor. One argued that this factor is not necessary because it is subsumed under the factor concerning the employment practice's relation to the employer's stated business goals. The other commenter argued that, although providing guidance and training to managers may be good business practice and may enhance an employer's RFOA defense, the ADEA does not require employers to take such steps.

The proposed rule also included consideration of the extent to which supervisors were given guidance or training in the "other than age" section. Two commenters supported this factor as written, one commenter asked for guidance on the type of training that will help supervisors to make decisions based on objective rather than subjective criteria, and one commenter argued that an employer should lose its affirmative defense if the employer does not train its managers on subjective decision making. One commenter opposed this factor and suggested that EEOC work with stakeholders to determine whether an employer's preventive training measures should be a *Faragher*-type defense [52] to ADEA disparate-treatment claims. Another commenter asked how often training should be conducted and suggested that training should be required for all protected bases if it is required for age discrimination.

As discussed, the Commission has eliminated the "other than age" section

and has combined the factors relating to guidance and instruction of managers into a single consideration, which has been designated 1625.7(e)(2)(ii). The Commission has deleted the reference to "took steps" to make clear that the consideration focuses on how the employer actually defined and applied its criteria. Through this consideration, the final rule recognizes the importance of defining an employment criterion carefully and educating managers and supervisors on how to apply it fairly.

As commenters noted, it is in the employer's interest to define and apply accurately the criteria on which it relies. Ensuring that decision makers understand and know how to apply the employer's standard will help to ensure that the employer has the work force it wants. For example, research demonstrates that older workers are commonly perceived to be less productive than younger workers but that such stereotypes are inaccurate.[53] In fact, studies show a nonexistent or slightly positive relationship between job performance and older age.[54] The output of older workers is equal to that of younger workers;[55] older workers are better in terms of accuracy and steadiness of work output and output level;[56] and they outperform younger workers in the area of sales.[57] Thus, educating decision makers to be aware of, and avoid, age-based stereotypes can help to ensure that they apply the employer's standard accurately and do

not unfairly limit the opportunities of older workers.

For example, an employer seeking to hire individuals with technological skills could instruct decision makers on the particular skills (e.g., experience using specific software or developing certain types of programs) that it needs. Similarly, rather than simply asking managers to assess an employee's training potential, an employer could instruct managers to identify the times the employee has received or sought training. Using objective criteria as much as possible and providing decision makers with specific job-related information can help to overcome age-based stereotypes.[58]

The rule does not require employers to train their managers. First, by referring not just to training but to "guidance or training," it recognizes that employers use a wide range of measures to convey their expectations to managers, depending on the circumstances. For example, a small employer might reasonably rely entirely on brief, informal, verbal instruction. Second, as with all of the considerations in section 1625.7(e), this consideration is a not a required duty. Instead, its importance depends on the particular facts raised. Thus, an employer's RFOA defense will not necessarily fail because, for example, the employer did not train managers on how to apply its standard. On the other hand, steps such as carefully defining a standard and instructing managers on how to apply it are evidence that the employer's actions were based on reasonable factors other than age and will support the employer's defense.

The Commission does not agree with the commenter's suggestion that preventive training measures should be a *Faragher*-type defense. Employers have a *Faragher*-type defense to harassment based on age.[59] An employer's training measures do not constitute a defense to disparate treatment or disparate impact, but they should go a long way toward preventing conscious or unconscious bias from infecting decision making in the first

[50] *Smith*, 544 U.S. at 231.

[51] *Id.* at 242.

[52] *Faragher* v. *City of Boca Raton*, 524 U.S. 775 (1998) (employer not liable for supervisor harassment that did not result in tangible employment action if employer exercised reasonable care to prevent and promptly correct any harassment and employee unreasonably failed to complain to management or to avoid harm otherwise).

[53] Robert McCann & Howard Giles, *Ageism in the Workplace: A Communication Perspective*, in Ageism: Stereotyping and Prejudice Against Older Persons 163, 172 (Todd D. Nelson ed. 2002) (citing J.O. Britton & K.R. Thomas, *Age and Sex as Employment Variables: Views of Employment Service Interviewers*, 10 J. Emp. Counseling 180 (1973); S. Cole, *Age and Scientific Performance*, 84 a.m. J. Sociology 958 (1979); A. Roe, *Changes in Scientific Activities with Age*, 150 Sci. 313 (1965); P. E. Panek et al., *Age Differences in Perceptual Style, Selective Attention, and Perceptual-Motor Reaction Time*, 4 Experimental Aging Res. 377 (1978); N. Munk, *Finished at 40*, 139 Fortune 50 (1999)).

[54] *See generally* McCann & Giles, *supra* note 53, at 172 (citing J. A. Forteza & J. M Prieto, *Aging and Work Behavior*, in Handbook of Industrial and Organizational Psychology 447 (H. C. Triandis et al. eds., 2d ed. vol. 4, 1994); D. C. Park, *Aging, Cognition, and Work*, 7 Hum. Performance 181 (1994); P. Warr, *Age and Employment, in* Handbook of Industrial and Organizational Psychology, *supra*, at 485).

[55] McCann & Giles, *supra* note 53, at 173 (citing Commonwealth Fund, The Untapped Resource: Americans Over 55 at Work (1993)).

[56] McCann & Giles, *supra* note 53, at 173 (citing J. Eisenberg, *Relationship Between Age and Effects Upon Work: A Study of Older Workers in the Garment Industry*, Dissertation Abstracts Int'l 41 (4A) (1980)).

[57] McCann & Giles, *supra* note 53, at 173 (citing W. H. Holley et al., *Age and Reactions to Jobs: An Empirical study of Paraprofessional Workers*, 1 Aging & Work 33 (1978)).

[58] *See* Richard A. Posthuma & Michael A. Campion, *Age Stereotypes in the Workplace: Common Stereotypes, Moderators, and Future Research Directions*, 35 J. Mgmt. 158, 172 (2009) (availability and use of job-related information reduces the effects of age-based stereotypes).

[59] *See, e.g., Weyers* v. *Lear Operations Corp.*, 359 F.3d 1049, 1056 n.6 (8th Cir. 2004) (same analysis applies to hostile-environment claims under ADEA and Title VII); *Terry* v. *Ashcroft*, 336 F.3d 128, 148–50 (2d Cir. 2003) (same); EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors II (June 18, 1999) (*Faragher* vicarious-liability rule applies to unlawful harassment on all covered bases, including age).

place. Although training is not a required element of the RFOA defense, it is a key component of efforts to provide a workplace free from discrimination. The Commission urges employers to educate all employees on their rights and responsibilities under all anti-discrimination laws.

### Section 1625.7(e)(2)(iii)

Paragraph 1625.7(b)(2) of the proposed rule noted that, in the typical disparate-impact case, an employer has used an objective, non-age factor and the inquiry focuses on reasonableness. Relying on *Watson* v. *Fort Worth Bank and Trust,*[60] however, it also said that employers are subject to liability under disparate-impact analysis for granting supervisors unchecked discretion to engage in subjective decision making because the unchecked discretion allows conscious or unconscious age-based stereotypes to infect the decision-making process and, as such, is not "other than age." It listed three factors relevant to whether an employment practice was "other than age": the extent to which the employer gave supervisors unchecked discretion to assess employees subjectively, the extent to which supervisors evaluated employees based on factors known to be subject to age-based stereotypes, and the extent to which supervisors were given guidance or training.

Three commenters supported the proposed rule's approach to subjective decision making. They noted that subjective decision making frequently disadvantages older workers and raises the risk of age-based disparate impact. Other commenters who addressed this issue opposed the approach and argued that subjective decision making is not inherently based on age. They asserted that the proposed rule conflicted with *Meacham's* statement that the RFOA defense assumes that a non-age factor is at work, misconstrued *Watson,* and conflated disparate impact and disparate treatment. Some commenters asked for more guidance on the meaning of "unchecked discretion."

The preamble to the proposed rule noted that criteria such as flexibility, willingness to learn, and technological skills are particularly susceptible to age-based stereotyping. One commenter argued that it is appropriate for an employer to consider these qualities, which are relevant to today's workplace. Another commenter asserted that the factor was too broad and could encompass such criteria as " 'energy,' 'flexibility,' 'adaptability,' 'long-term commitment to company,' 'success

driven,' 'tolerance,' [and] 'creativity.' " The commenter argued that the factor would cause parties to focus on whether a criterion was subject to stereotypes rather than on whether an employer evaluated employees negatively because of age.

The rule continues to recognize that giving supervisors unchecked discretion to engage in subjective decision making may result in disparate impact and that employers should take reasonable steps to ensure supervisors exercise their discretion in a manner that does not violate the ADEA. To prevent the misunderstanding reflected in the comments, however, the Commission has revised the rule. First, as noted above, the rule no longer addresses "reasonable" and "other than age" in separate paragraphs, but discusses "reasonable factor other than age" in a single paragraph. Second, the factors listed under "other than age" in the NPRM have been integrated into 1625.7(e)(2)(ii) and (e)(2)(iii). Section 1625.7(e)(2)(ii) addresses the extent to which the employer defined the employment criterion—such as a subjective factor—and provided supervisors with guidance on how to apply it. The Commission also has combined two "other than age" factors into a single consideration addressing subjective decision making and the use of criteria susceptible to age-based stereotypes. Section 1625.7(e)(2)(iii) makes clear that the extent to which the employer attempts to minimize subjectivity and avoid age-based stereotyping is relevant to whether or not it acted reasonably, particularly where the criteria are known to be subject to age-based stereotypes.

The Commission disagrees with commenters' assertions that the proposed rule was inconsistent with the Supreme Court's decisions in *Meacham* and *Watson* and believes that the rule is consistent with those decisions. First, *Meacham* did not say that a practice is "without respect to age" in every impact case, but only that such is the case in the typical disparate-impact case.[61] Second, although "[i]t is true * * * that an employer's policy of leaving * * * decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct,"[62] this does not mean "that the particular supervisors to whom this discretion is delegated always act without discriminatory intent."[63] As the Supreme Court recognized in *Watson,* disparate-impact analysis may

be the only way to combat "the problem of subconscious stereotypes and prejudices" that may affect subjective decision making.[64] Thus, although employers may sometimes deem it necessary to use subjective criteria to assess employees, it is not reasonable to leave the supervisors' discretion unconstrained.

Contrary to some commenters' assertions, the rule does not improperly conflate disparate-treatment and disparate-impact claims. It is not surprising, however, that disparate-treatment and disparate-impact claims may overlap in the context of subjective decision making. As the Supreme Court has noted, "the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination."[65] As noted above, the final rule's reference to a "non-age factor" reflects the language of the statutory RFOA defense and the *Smith* decision.[66] It also reflects the *Watson* decision's endorsement of disparate-impact analysis to address the problem of stereotypes and prejudices that impede the elimination of employment discrimination.

The proposed rule used the term "unchecked" discretion, which was also used by the Court in *Watson.* Nevertheless, to address commenters' confusion about the term, we have eliminated it. The rule now refers to whether the employer "limited supervisors' discretion."

One commenter, noting that the identification of a specific employment practice is part of a plaintiff's prima facie case, argued that the issue of subjective decision making is not relevant to the RFOA defense. As noted above, the final rule expressly states that the individual challenging the practice is responsible for isolating and identifying the specific employment practice causing the adverse impact. As courts have recognized, however, plaintiffs may challenge an overall decision-making process "if the employer utilizes an 'undisciplined system of subjective decision making.' "[67] If an individual establishes

---

[60] 487 U.S. 977 (1988).

[61] 554 U.S. at 96.

[62] *Watson,* 487 U.S. at 990.

[63] *Id.*

[64] *Id.*

[65] *Id.* at 987; *see also id.* at 998 (factors such as cost of alternative relevant to "whether the challenged practice has operated as the functional equivalent of a pretext for discriminatory treatment"); *accord Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642, 660 (1989); *Albemarle Paper Co.,* 422 U.S. at 425.

[66] *See* 29 U.S.C. 623(f)(1); *Smith,* 544 U.S. at 239.

[67] *Durante* v. *Qualcomm, Inc.,* 144 Fed. Appx. 603, 606 (9th Cir. 2005) (unpublished) (quoting

that an employer's use of subjective decision making had an age-based disparate impact, then the burden shifts to the employer to prove that the practice is a reasonable factor other than age. The extent to which the employer limited supervisors' discretion in a manner that minimized the likelihood that age-based stereotypes would infect the process is one of a number of factors relevant to whether the employer's practice is a reasonable, non-age factor.

Sections 1625.7(e)(2)(iv) and (v)

The proposed rule listed three factors that some commenters interpreted as imposing Title VII's business-necessity test on ADEA disparate-impact claims. One factor addressed the extent to which an employer assessed the impact of its practice on older workers, and another factor concerned the severity of harm to individuals in the protected age group and the extent to which the employer took steps to minimize the harm. The remaining factor looked at whether other options were available and the reasons the employer chose the option it did. Quoting the *Smith* statement that the RFOA inquiry does not require employers to adopt a less discriminatory alternative,[68] a footnote explained that the factor did not mean that an employer must adopt a practice that has the least severe age-based impact. The footnote also quoted a Restatement of Torts (Second) comment concerning unreasonable risk.

Some commenters argued that the factors conflate the concepts of impact and reasonableness, which are analytically distinct. They asserted that the factors improperly impose an affirmative duty to monitor selection procedures for adverse impact, that employers will not have data to conduct mandated impact analyses because they do not collect and report statistics on the ages of employees and applicants, that conducting impact analyses would be too costly for small employers, and that the factors penalize employers that do not conduct analyses. In addition, noting that plaintiffs have the burden of establishing that an employment practice has a disparate impact, some commenters argued that the factors inappropriately place the burden of disproving impact on employers. They also argued that the factor concerning consideration of other options conflicts

with the *Smith* statement. Some commenters noted that, under Title VII, plaintiffs, not employers, have the burden of identifying less discriminatory alternatives. One commenter who opposed the factor argued that, if the Commission retains the factor, it should refer to "other known options" because employers should not be expected to know all potential employment practices. The commenter also argued that the *Smith* and Restatement quotes in the footnote were contradictory. Another commenter expressed concern that an alternative designed to minimize a practice's age-based impact might have an adverse impact on another protected group.

Two commenters supported the factor concerning consideration of other options. They noted that, as the Supreme Court stated in *Watson,* evidence that the employer ignored equally effective less discriminatory alternatives suggests that the challenged practice was the "functional equivalent of a pretext for discriminatory treatment." [69]

In response to comments, and to emphasize that the rule reflects a standard that is less stringent than Title VII's business-necessity test, the Commission has revised the rule to make clear that none of the considerations is a required element of the RFOA defense. As noted above, the rule now refers to a non-exhaustive description of "relevant considerations" and expressly states that no specific consideration need be present for a differentiation to be based on reasonable factors other than age. The importance of each consideration will necessarily vary according to the facts of each particular situation.

The final rule retains the impact-assessment and harm considerations, which have been redesignated 1625.7(e)(2)(iv) and 1625.7(e)(2)(v). The Commission has deleted the reference to "took steps" from 1625.7(e)(2)(iv) to make clear that the consideration focuses on the extent to which the employer actually assessed the impact rather than on the steps the employer took to do so. What an employer reasonably should do to assess impact depends on the facts of the particular situation. For example, an employer that assesses the race- and sex-based impact of an employment practice would appear to act unreasonably if it does not similarly assess the age-based impact. A small employer that does not generally conduct impact analyses on any basis, however, may well be able to show that its RIF decisions were reasonable even

if it did not conduct a formal disparate-impact analysis during the RIF. Similarly, evidence that a policy was not the type normally subject to disparate-impact analysis would support an employer's argument that it should not reasonably be expected to conduct such analysis. Whether or not a formal disparate-impact analysis is done, if the impact is sufficiently large that the employer was or should have been aware of it, a failure to have taken reasonable steps to avoid or mitigate the impact is relevant to whether the employer's actions were based on reasonable factors other than age.

For purposes of clarity, section 1625.7(e)(2)(v) now refers to the "degree" rather than "severity" of the harm and the "extent" of injury. The final rule also changes the term "minimize" to "reduce" with respect to the assessment of the harm caused by different options to make clear that the rule does not require the adoption of the least discriminatory alternative.

Consideration of the degree of harm on individuals is measured both in terms of the scope of the injury to the individual and the scope of the impact, i.e., the number of persons affected. *Smith* exemplifies negligible harm in terms of injury and impact. In *Smith,* the injury was relatively minor as the raises affecting older workers were actually higher in dollar terms, although lower in percentage terms.[70] The number of older workers affected was also relatively small.

In contrast, the more severe the harm, the greater the care that ought to be exercised.[71] The *Meacham* case exemplifies significant injury and impact from the loss of jobs affecting a "startlingly skewed" group of older workers.[72] In light of such significant injury and impact, it would be reasonable for an employer to investigate the reasons for such results and attempt to reduce the impact as appropriate.

The extent to which the employer took steps to reduce the harm to older workers in light of the burden of undertaking such steps is relevant to reasonableness. Whether an employer knew or reasonably should have known of measures that would reduce harm informs the reasonableness of the

---

*Watson,* 487 U.S. at 990); *see also Meacham* v. *Knolls Atomic Power Lab.,* 461 F.3d 134, 139 (2d Cir. 2006) (unaudited reliance on supervisors' subjective judgment of employees' flexibility and criticality constituted a specific employment practice), *vacated on other grounds,* 554 U.S. 84 (2008).

[68] *Smith,* 544 U.S. at 243.

[69] 487 U.S. at 998.

[70] *Smith,* 544 U.S. at 241–42.

[71] *Cf.* Restatement (Second) of Torts, 298 cmt. b (1965) ("The greater the danger, the greater the care which must be exercised.").

[72] *Meacham* v. *Knolls Atomic Power Lab.,* 461 F.3d 134, 145 (2d Cir. 2006), *vacated,* 544 U.S. 84 (2008).

employer's choices.[73] Thus, the RFOA includes consideration of the availability of measures to reduce harm, and the extent to which the employer weighed the harm to older workers against both the costs and efficiencies of using other measures that will achieve the employer's stated business purpose.

Given the relevance of the availability of measures to reduce harm contemplated by this consideration, the Commission has deleted the last factor concerning the availability of options. In addition, commenters misconstrued the consideration of options as requiring employers to search out every possible alternative and use the least discriminatory alternative, comparable to the Title VII's requirement, which the Supreme Court in *Smith* reasoned is not mandated by the RFOA defense.[74]

The Commission disagrees with commenters' views that *Smith* means that the consideration of alternative or equally effective practices is irrelevant. *Smith* stated that the RFOA does not impose Title VII's "requirement" that the employer must adopt a less discriminatory alternative.[75] This statement does not mean that options or alternatives are irrelevant to the determination of reasonableness. As previously explained, the availability of options is manifestly relevant to the issue of reasonableness.[76] A chosen practice might not be reasonable if an employer knew of and ignored an equally effective option that would have had a significantly less severe impact on older workers. Whereas Title VII requires an employer to adopt an equally effective, even marginally less discriminatory alternative, an employer's choice not to use an alternative that only marginally reduces the impact might be reasonable under the ADEA.

The changes to 1625.7(e) clarify that the RFOA standard is lower than Title VII's "business necessity" standard.[77] They also clarify that the considerations

relevant to the RFOA determination are not required elements of the RFOA defense. These changes ensure that employers may continue to make reasonable business decisions that do not arbitrarily limit the employment opportunities of older workers.

## Regulatory Procedures

### Executive Orders 13563 and 12866

This final rule has been drafted and reviewed in accordance with Executive Order ("E.O.") 13563 and E.O. 12866. Executive Order 13563 directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its cost (recognizing that some benefits and costs are difficult to quantify); tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives; and select, in choosing among alternative regulatory approaches, those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). Executive Order 12866 directs agencies to submit a regulatory impact analysis for those regulatory actions that are "economically significant" within the meaning of section 3(f)(1)."[78] A regulatory action is economically significant under section 3(f)(1) if it is anticipated (1) to "[h]ave an annual effect on the economy of $100 million or more," or (2) to "adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities."[79] Executive Order 13563 reaffirms the principles established by E.O. 12866, and further emphasizes the need to reduce regulatory burden to the extent feasible and permitted by law.[80]

As reported in the February 2010 NPRM, the Commission determined that the rule is not economically significant under this standard, and therefore that a full regulatory impact analysis was not required. However, some comments received during the notice and comment

period suggested, without specifically mentioning the Commission's determination under E.O. 12866, that the rule would impose greater costs on regulated entities than the Commission anticipated. To ensure that regulatory burdens are minimized, the Commission reexamined its basis for determining that the rule is not economically significant in light of the comments. It concluded that the determination did not need to be changed, and that the commenters' stated concerns about costs reflected a misunderstanding of the rule. The final rule has been revised to obviate such misunderstanding. For the record, the Commission presents its analysis of the impact of the rule on regulated entities and responds to the public comments below.

### Analysis

The purpose of the rule is to help explain the implications of the Supreme Court's decisions in *Smith*[81] and *Meacham*[82] and the type of conduct that would support an RFOA defense in court. It therefore does not require any action on the part of covered entities.[83] Rather, it provides assistance to covered entities regarding what they can do to ensure that their practices are based on reasonable factors other than age. The rule does not expand the coverage of the ADEA to additional employers or employees. It also does not include reporting, recordkeeping, or other requirements for compliance. Accordingly, the Commission concluded that efforts to comply with the rule will not have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State or local tribal governments or communities.

However, the Commission recognizes that some covered entities may choose to modify their business practices in light of the recent Supreme Court decisions reflected in the rule, and the provisions in the rule itself, to avoid disparate-impact liability. Therefore, in

---

[73] *Cf.* Restatement (Second) of Torts 292 cmt. c (1965) ("If the actor can advance or protect his interest as adequately by other conduct which involves less risk of harm to others, the risk contained in his conduct is clearly unreasonable.").

[74] 544 U.S. at 243.

[75] 42 U.S.C. 2000e–2(k)(1)(A)(ii), 2000e–2(k)(1)(C) (adopting pre-*Wards Cove* approach to "alternative employment practice"). The RFOA standard does not require the employer to select the least discriminatory option. *Smith*, 544 U. S. at 243.

[76] In addition, the failure to adopt a less discriminatory alternative may be evidence of pretext under certain circumstances. *Watson*, 487 U.S. at 998; *see also Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 660–61 (1989) (refusal to adopt less discriminatory alternative "would belie a claim [that challenged] practices are being employed for nondiscriminatory reasons").

[77] 42 U.S.C. 2000e–2(k)(1)(A)(i).

[78] Executive Order 12866 refers to "those matters identified as, or determined by the Administrator of OIRA to be, a significant regulatory action within the scope of section 3(f)(1)." *Id.* The Office of Management & Budget states that "Executive Order 12866 requires agencies to conduct a regulatory analysis for economically significant regulatory actions as defined by Section 3(f)(1)." Circular A–4 (Sept. 17, 2003), *available at http:// www.whitehouse.gov/omb/circulars_a004_a-4.*

[79] Exec. Order No. 12866, 58 FR 51735 (Oct. 4, 1993), *available at http://www.whitehouse.gov/ sites/default/files/omb/inforeg/eo12866.pdf.*

[80] Exec. Order No. 13563, 76 FR 3821 (Jan. 21, 2011).

[81] 544 U.S. 228 (2005).

[82] 554 U.S. 84 (2008).

[83] The ADEA applies to employers with 20 or more employees, labor organizations, employment agencies, and government entities. There are approximately 639,288 businesses with 20 or more employees. United States Small Bus. Ass'n, *Employer Firms, Establishments, Employment, and Annual Payroll Small Firm Class Sizes, 2007,* Table in Firm Data, *http://archive.sba.gov/advo/research/ us_07ss.pdf* (last visited Feb. 15, 2012). There are approximately 17,000 employment agencies. Am. Staffing Ass'n., *Staffing FAQs, http:// www.americanstaffing.net/statistics/faqs.cfm* (last visited Feb. 15, 2012).

**Federal Register** / Vol. 77, No. 62 / Friday, March 30, 2012 / Rules and Regulations **19091**

addition to determining that the rule imposes no requirements that have an economic impact, the Commission investigated whether this type of voluntary, precautionary behavior would have a significant impact on the economy.

Cost of Disparate-Impact Analyses

Because paragraph 1625.7(e)(2)(iv) of the rule states that "[t]he extent to which the employer assessed the adverse impact of its employment practice on older workers" is relevant to the RFOA defense, some covered entities may perform additional disparate-impact analyses in response to the rule. The first step of the Commission's inquiry was therefore to determine the economic consequences of performing additional analyses.

The Commission does not anticipate that this final rule will motivate large numbers of employers to perform additional disparate-impact analyses for the following reasons. First, the current regulation assumed that employers would routinely analyze job actions susceptible to disparate-impact claims for potential adverse effects on older workers, and many employers, especially larger ones, already do so. Some do so to reduce potential liability for ADEA claims; others simply wish to avoid disproportionately negative treatment of older workers.

Second, few job actions would be subject to disparate-impact analysis.[84] For example, voluntary terminations and individual terminations for cause generally will not be subject to disparate-impact analysis. Third, even actions that involve practices amenable to disparate-impact analysis do not always require such analysis to ensure that a practice is reasonable. The rule states that, to demonstrate the RFOA defense, a covered entity needs to show only that it acted as would a prudent employer mindful of the requirements of the ADEA. In many cases, a prudent employer may reasonably decide that a formal disparate-impact analysis is unnecessary, for example because—

—The number of affected employees is relatively small, making impact readily ascertainable without formal analysis; or

—The employer has reason to believe that the practice will not negatively impact older workers, and no employees or applicants have alleged that it would have such impact.

Further, where the covered entity determines that a disparate-impact analysis is warranted, the associated costs will generally be minimal. Larger businesses already routinely employ sophisticated methods of detecting disparate impact on the basis of race, ethnicity, or gender, and therefore already possess the expertise and resources required to analyze age data for impact. Because performing an additional analysis using these pre-existing resources takes little time, the associated costs will be minimal.

Although smaller entities may be less familiar with disparate-impact analysis, such entities are even less likely to incur costs for performing formal analyses, for two reasons. First, the average small entity's involuntary termination or other selection decisions will most often involve such a small number of employees that impact will be readily ascertainable without formal analysis. Second, where the numbers are large enough to warrant a more formal analysis, the RFOA defense only requires an entity to take steps that are reasonable under the circumstances to uncover potential impact. A small entity without many resources will likely be able to show that it acted reasonably by using the same methods it uses to detect disparate impact on the basis of race, ethnicity, or gender, which can often be carried out using free, readily available Internet tools. By conducting a Web search for the term "online disparate-impact analysis calculator," a small entity may find and use an online calculator that can be easily used by lay people. This tool would enable the entity to test for adverse impact in less than 10 minutes. Additional steps to evaluate adverse impact would be reasonable only if, in light of the circumstances and available resources, a prudent employer mindful of ADEA requirements would take such steps.

Moreover, if a small entity determines that it requires assistance to perform these or other efforts to prevent age discrimination in employment, it may rely on free outreach materials from the Commission. The Commission expects to issue free small-business-oriented guidance materials discussing this rule, including technical assistance specifically designed to instruct small entities how to perform disparate-impact analyses and interpret the results.

Cost of Taking Steps To Reduce Harm

Paragraph 1625.7(e)(2)(v) states that "[t]he degree of the harm [to older workers], in terms of both the extent of injury and the numbers of persons adversely affected, and the extent to which the employer took steps to reduce the harm, in light of the burden of undertaking such steps" is relevant to the RFOA determination.

Steps to reduce harm to older individuals only become relevant to the RFOA defense where the employer knew or reasonably should have known of measures to reduce such harm while effectively achieving its stated business purpose. Again, the Commission's analysis is limited by the paucity of data that currently exist. However, because so few job actions involve neutral employment practices that disproportionately harm older workers,[85] only a small percentage of employer decisions will even present the opportunity for employers to consider steps to reduce harm to older individuals. Of these cases, only a subset will be ones in which the employer knew or reasonably should have known of measures to reduce such harm while effectively achieving its stated business purpose. Thus, such considerations will be relevant only in a very small percentage of cases. Further, as stated expressly in the consideration, the determination whether steps are relevant to the RFOA defense is made in light of the burdens associated with such steps. Therefore, a business would not be required to take steps that were overly burdensome.

Cost of Instruction and Guidance

Paragraph 1625.7(e)(2)(ii) states that "[t]he extent to which the employer defined the factor accurately and applied the factor fairly and accurately, including the extent to which managers and supervisors were given guidance or training about how to apply the factor and avoid discrimination" is relevant to the RFOA determination. Paragraph 1625.7(e)(2)(iii) states that "[t]he extent to which the employer limited supervisors' discretion to assess

---

[84] While the Commission is not aware of data on the number of job actions performed per year that may give rise to a disparate-impact claim, there is research on the number of disparate-impact cases filed in federal court under all of the employment discrimination laws. An analysis of 1,788 randomly selected employment discrimination cases filed in federal court, and reported between 1987–2003, showed that only 4% raised disparate-impact claims. Laura Beth Nielsen et al., *Contesting Workplace Discrimination in Court: Characteristics and Outcomes of Federal Employment Discrimination Litigation 1987–2003* 11 (2008), *http://www.americanbarfoundation.org/uploads/cms/documents/nielsen_abf_edl_report_08_final.pdf*. ADEA disparate-impact claims are only a subset of this 4%, as ADEA cases only comprised 20% of the total number of cases studied. *Id.* at 9.

[85] As previously noted, the percentage of federal employment discrimination cases raising disparate-impact claims is approximately 4%. *Id.* at 11. A review of the ADEA disparate-impact cases available on Westlaw reveals that approximately 70% failed to reach the RFOA issue altogether, because the Plaintiff could not establish impact, leaving only 1.2% of cases.

**19092** **Federal Register** / Vol. 77, No. 62 / Friday, March 30, 2012 / Rules and Regulations

employees subjectively, particularly where the criteria that the supervisors were asked to evaluate are known to be subject to negative age-based stereotypes'' is relevant. Therefore, the rule may motivate some employers to provide additional instruction, guidance, and training to their supervisors.

In many cases, no instruction will be required to avoid age discrimination. As noted, voluntary resignations do not raise a question of disparate impact. Even where the employment action involves application of selection or termination criteria, instruction will not always be needed. For example, instruction to avoid age-based stereotyping will be unnecessary if the selection criteria are objective.

Where instruction is needed, the associated costs will generally be de minimis. Larger employers will not incur significant costs because they already provide regular training for supervisors, including regular EEO training. Any instructions necessary to avoid age-biased applications of selection or termination criteria may easily be incorporated into this regular training.

Smaller businesses are even less likely to incur additional training costs. Because of the small number of people involved, many layoff decisions made by small entities are relatively straightforward, making instruction unnecessary to avoid age-based applications of employment criteria. Further, even where some instruction is appropriate, entities small in size can typically provide such instruction informally, thereby avoiding costs associated with formal training. In addition, a small business wanting help with its training, or with other efforts to reduce adverse impact on older workers, may rely on the Commission's assistance. Each year, the Commission performs a very large number of free outreach presentations for employers, human resource managers, and their counsel, as well as fee-based training sessions offered at approximately $350. In fiscal year 2009 alone, the Commission offered 1,889 no-cost outreach events that addressed ADEA compliance, reaching more than 127,000 people, many of whom were from small businesses, and offered approximately 300 fee-based private-sector trainings that reached more than 13,000 people. In addition, the Commission expects to issue small-business-oriented guidance

materials discussing the rule, as it has done in other contexts.[86]

## Benefits of the Rule

Under E.O. 13563, the Commission must assess not only the rule's negative effects on the economy but also its positive effects. Here again, the Commission's assessment was necessarily limited by the data that currently exist. Indeed, doing this assessment highlights the need for more focused research on the economic costs and benefits of ensuring equal employment opportunity. Nevertheless, on the basis of the general considerations below, the Commission determined that the rule will have modest positive effects on the economy.

—Providing additional instruction about how to implement employment practices in a manner that is free from age bias carries the benefit of obtaining more accurate employee evaluations. As stated in the section-by section analysis above, research demonstrates that negative age-based stereotypes are not only harmful to older individuals but also inaccurate—a large number of empirical studies and research reviews indicate that there is a nonexistent or slightly positive relationship between job performance and older age.[87] These data suggest that taking measures to eliminate age bias in selection and termination can actually improve the employer's bottom line.

—Data show that older individuals who become unemployed have more difficulty finding a new position and tend to stay unemployed longer than younger individuals.[88] To the extent that the difficulty in finding new work is attributable to neutral practices that act as barriers to the employment of older workers, the regulation should help to reduce the rate of their unemployment and, thus, help to reduce these unique burdens on society. This effort is likely to become increasingly important as the Baby Boom Generation grows older,

raising the number of older individuals in the workforce.[89]

—Encouraging employers to avoid practices that adversely affect older workers will reduce employers' litigation costs. In a disparate-impact case, the plaintiff has the initial burden of demonstrating that the challenged practice has a disproportionately negative effect on the protected group. If an employer less frequently uses practices that have a disproportionately negative effect on older workers, older individuals will less frequently have reason to allege discrimination.

—The rule will also reduce employers' litigation costs by eliminating the considerable uncertainty left after the Supreme Court's decisions in *Smith*[90] and *Meacham*.[91] Although the Court clearly held that employers asserting the RFOA defense do not need to demonstrate that the practice is a business necessity, as required by the current regulations,[92] it did not provide guidance on the application of the RFOA standard. Because employers bear the burden of proving that their actions were based on reasonable factors other than age, they will benefit from a greater ability to assess their own liability as a result of the rule, and therefore to avoid litigation.

The Commission also concludes that a wide range of qualitative, dignitary, and related intrinsic benefits must be considered. These benefits include the values identified in E.O. 13563, such as equity, human dignity, and fairness. Specifically, the qualitative benefits attributable to the final rule include but are not limited to the following:

—Reducing discrimination against older individuals promotes human dignity and self-respect, and diminishes feelings of exclusion and humiliation.

—Reducing discrimination against older individuals also yields third-party benefits such as a reduction in the prevalence of age-based stereotypes and associated stigma.

---

[86] See, e.g., Equal Employment Opportunity Comm'n, The ADA: A Primer for Small Business, *http://www.eeoc.gov/ada/adahandbook.html*.

[87] See supra notes 53–57.

[88] See *Impact of Economy on Older Workers: Meeting of the Equal Employment Opportunity Comm'n* (2010) (written testimony of William E. Spriggs, Ph.D.), *available at http://www.eeoc.gov/eeoc/meetings/11–17–10/spriggs.cfm* (citing Bureau of Lab. Statistics, Unemployed Persons by Age, Sex, Race, Hispanic or Latino Ethnicity, Marital Status, and Duration of Unemployment, *http://www.bls.gov/web/empsit/cpseea36.pdf* (last visited Mar. 12, 2011); Bureau of Lab. Statistics, *Displaced Workers Summary* (Aug. 26, 2010, 10 a.m.), *http://www.bls.gov/news.release/disp.nr0.htm*).

[89] *Id.* (citing Bureau of Lab. Statistics, *Employment Projections* (Dec. 10, 2009, 10 a.m.), *http://www.bls.gov/news.release/ecopro.nr0.htm* (reporting that the number of persons in the labor force age 55 years and older is expected to increase by 43 percent by 2018).

[90] 544 U.S. 228 (2005).

[91] 554 U.S. 84 (2008).

[92] See 29 CFR 1625.7(d), 46 FR 47724 (Sept. 29, 1981) (amended herein) ("When an employment practice, including a test, is claimed as a basis for different treatment of employees or applicants for employment on the grounds that it is a 'factor other than' age, and such practice has an adverse impact on individuals within the protected age group, it can only be justified as a business necessity.").

—Increased participation in the workforce by older individuals benefits both employers and coworkers in ways that may not be subject to monetary quantification, including increasing diversity, understanding, and fairness in the workplace.

—Reducing discrimination against older individuals benefits workers in general and society at large by creating less discriminatory work environments.

Public Comments

The comments suggesting that the rule will impose economic burdens were as follows:

—Six commenters stated that the rule would require employers to monitor or analyze employment decisions for adverse impact on older workers. One of these commenters stated more specifically that the rule would require employers to compare the impact of each practice on employees of every age with its impact on employees of every other age. Another commenter thought that disparate-impact analysis would require employers to collect age information about its applicants and employees.

—Four commenters asserted that the rule would require employers to search for and evaluate alternative means of achieving their business goals. One stated more specifically that the number of alternatives that employers must evaluate under the rule is "potentially infinite."

—One commenter asserted that the rule imposed a duty on employers to provide training, instruction, or guidance to its supervisors. Other commenters asserted that the rule required employers to provide training to supervisors in order to limit the discretion that they exercise when assessing employees subjectively, particularly with respect to factors known to be susceptible to age-based stereotypes.[93]

[93] Some commenters interpreted the February 2010 NPRM as asserting that employers should not assess employee qualities such as flexibility, willingness to learn, and technological skills (qualities that are often assessed subjectively). These commenters objected that the rule would deprive employers of their ability to seek out employees with these qualities, which are valuable in the workplace. The Commission does not assert that employers should not seek out employees with these qualities, or that they are not valuable. It does maintain, however, that if employers assess qualities such as flexibility, willingness to learn, and technological skills, they should take reasonable steps to ensure that the assessments are accurate and not influenced by common age-based stereotypes. Such steps may include providing an objective means of assessing the desired quality and instructing managers how to be fair in their evaluations.

—One commenter stated that the rule would require employers to hire consultants to determine whether their practices are "common business practices."

—One commenter asserted that the rule would make it much harder for employers to win even the most frivolous of age discrimination claims at the summary judgment stage. The same commenter asserted that the rule would require litigants to engage in extensive discovery to determine whether each of the listed factors had been met, including whether the employer considered alternatives and whether it took steps to minimize harm to older workers.

Commission Response

The comments do not alter the Commission's conclusion that the rule will not impose unacceptable or unreasonable costs on society. As previously noted, the comments were based on a misunderstanding of the proposed rule, and the final rule was revised to obviate such misapprehension. As shown above, any costs associated with the rule will be minimal.

Response to Comments Regarding the Cost of Disparate-Impact Analyses

The comments overstate the number of disparate-impact analyses that will be performed by employers as a result of the rule. As explained above, a disparate-impact analysis is appropriate in only a small proportion of job actions, is already done by many employers pursuant to existing regulations and case law, and, even where the practice is amenable to disparate-impact analysis, such analysis is not always required to ensure that a practice is reasonable. If an impact analyses is done, neither existing law nor this regulation would require it to compare the practice's impact on individuals of every age with its impact on individuals of every other age. The RFOA defense requires only such steps as would be taken by a prudent employer mindful of the requirements of the ADEA.

The Commission disagrees with the assertion of one commenter that obtaining the required age data would be burdensome. Generally, employees' birth dates are available to employers because they are recorded in personnel files.

Response to Comments Regarding the Cost of Evaluating Alternatives

As explained above, the Commission has deleted the factor discussing the availability of other ways for the employer to achieve its stated business purpose, because commenters misunderstood the factor to mean that employers must search out every possible alternative (or, in the words of one commenter, a "potentially infinite" number of alternatives) and use the one that is least discriminatory. Of course, as also explained above, the deletion of the factor does not mean that the availability of other measures to achieve the employer's purposes is irrelevant to the defense. Whether an employer knew or reasonably should have known of measures that would reduce harm informs the reasonableness of the employer's choices.

Because so few job actions involve neutral employment practices that disproportionately harm older workers, only a small percentage of employer decisions will even present the opportunity for employers to consider the relative harm of various options.[94] Only a subset of these actions will be ones in which the employer knew or reasonably should have known of measures that would reduce harm to older individuals. Further, when an employer does decide to evaluate whether another option would reduce harm to older individuals, it may do so using the same low-cost methods that were described above in the discussion of the cost of disparate-impact analyses. Overall costs are therefore likely to be extremely low.

Response to Comments Regarding the Cost of Instruction and Guidance

The comments assert generally that the additional training will be burdensome. As explained in the analysis above, training costs associated with the rule will be minimal.

Response to Comments Regarding the Cost of Determining Whether a Business Practice Is Common

The Commission has deleted the factor concerning whether a business practice is common from the considerations. Therefore, the Commission need not discuss the commenter's assertion that this factor requires businesses to hire consultants to determine whether their practices are common.

Response to Comments Regarding the Cost of Frivolous Litigation

The Commission disagrees with one commenter's assertion that the rule would increase employers' vulnerability to frivolous litigation or make it more difficult for employers to win against frivolous claims at the summary

[94] *See supra* note 87.

**19094** **Federal Register** / Vol. 77, No. 62 / Friday, March 30, 2012 / Rules and Regulations

judgment stage. Of course, individuals may file frivolous litigation regardless of the underlying law. Further, even without the rule, determining whether a practice is a based on reasonable factors other than age is a fact-specific inquiry; the commenter provided no reason to conclude that the considerations in the final rule are any more complicated than other facts relevant to the RFOA analysis. Indeed, as noted, the Commission concludes the rule is likely to reduce employers' litigation costs.

Conclusion

For the foregoing reasons, the Commission has determined that the final rule will not have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State or local tribal governments or communities.

*Regulatory Flexibility Act*

The purpose of the Regulatory Flexibility Act (RFA), 5 U.S.C. 601–612, is to ensure that statutory goals are achieved without imposing unnecessary and unjustifiable regulatory burdens on small businesses and other small entities, which may have few resources to devote to regulatory compliance. To achieve this purpose, the RFA requires federal agencies to conduct a series of analyses on proposed rules. The analyses are designed to ensure that the agency considers ways of minimizing any significant regulatory burdens imposed on small entities by the rules.

The goal of the analysis is to determine whether the proposed rule will have a significant economic impact on a substantial number of small entities. If it will, the agency must consider alternative regulatory approaches that may minimize the impact. If the rule will not have a significant impact on a substantial number of small entities, it may so certify under 5 U.S.C. 605(b).

In the February 2010 NPRM, the Commission certified under 5 U.S.C. 605(b) that the proposed rule would not have a significant economic impact on a substantial number of small entities, and therefore did not include an initial regulatory flexibility analysis. Although the final rule covers a substantial number of small entities,[95] the

Commission's threshold analysis indicated that, for the reasons discussed in detail in the section on Executive Order 12866 above, the costs imposed by the rule generally are de minimis and therefore would not significantly impact small business.

Public Comments

Two commenters disagreed with the Commission's decision to certify the rule, and therefore requested further analysis under the RFA. One of these commenters asserted that the rule would economically impact small entities by suggesting that they keep track of alternative employment practices and the reasons for their choices, and that they give supervisors additional guidance and training. In light of these comments and the comments discussed above regarding E.O. 12866, the Commission reexamined the factual basis for its certification.

Commission Response

The comments provide no reason to alter the Commission's initial conclusion that the rule will not impose unnecessary or unjustifiable regulatory burdens on small entities. The comments did not include any factual basis for their assertions and, for reasons specifically discussed in the E.O. 12866 analysis above, the Commission has determined that small entities are unlikely to incur costs as a result of this rule.

As explained above, the rule will seldom be implicated in actions by small employers because issues of age-based disparate impact are most likely to arise in the context of mass terminations, hiring based on tests, or other practices involving significant numbers of individuals. Although there are no data available that speak specifically to this issue, the Commission estimates that the average small entity is unlikely to be involved in even one such practice. If a small employer were to engage in such a practice, moreover, the number of individuals affected is likely to be so small that impact can be ascertained without resort to formal disparate-impact analysis. If the employer wants to do such analysis, free and easy to use tools are available on the Internet. Therefore, the Commission disagrees with the commenter that small entities will be significantly burdened by additional impact analyses performed as a result of the rule.

The Commission also disagrees that small entities will be significantly burdened by the need to keep track of alternative employment practices and the reasons for their choices. As explained above, consideration of alternative employment practices would be relevant only in a very small percentage of cases.[96] Further, if a small employer undertook a neutral practice that disproportionately harmed older workers, the determination of the reasonableness of the factor it used would be made in light of its resources. The entity's resources also inform the determination of whether it would be reasonable for it to take, or not to take, further steps to reduce harm. Therefore, small employers will not be disproportionately burdened by this aspect of the rule.

For the reasons explained above, the Commission disagrees with the commenter's assertion that small entities will be significantly burdened by additional guidance and training performed as a result of the rule. Indeed, the rule is likely to have little impact on small employers.

Conclusion

For the foregoing reasons, the Commission certifies pursuant to section 605(b) of the Regulatory Flexibility Act, 5 U.S.C. 605(b), that this rule will not have a significant economic impact on a substantial number of small entities.

*Paperwork Reduction Act*

This final rule contains no new or revised information collection requirements subject to review by the Office of Management and Budget under the Paperwork Reduction Act (44 U.S.C. chapter 35).

*Unfunded Mandates Reform Act of 1995*

This final rule will not result in the expenditure by state, local, or tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Congressional Review Act*

To the extent that this rule is subject to the Congressional Review Act, the Commission has complied with its requirements by submitting this final rule to Congress prior to publication in the **Federal Register**.

---

[95] The rule covers all employers with at least 20 employees, labor organizations, employment agencies, and state and local governments. According to 2007-based statistics from the Small Business Administration, there were 620,977 businesses with 20 or more employees and fewer than 500 employees. United States Small Bus.

Ass'n, *Employer Firms, Establishments, Employment, and Annual Payroll Small Firm Class Sizes, 2007,* Table in *Firm Data, http:// archive.sba.gov/advo/research/us_07ss.pdf* (last visited Jan. 22, 2011).

[96] *See supra* note 94, and the accompanying text.

**List of Subjects in 29 CFR Part 1625**

Advertising, Age, Employee benefit plans, Equal employment opportunity, Retirement.

Dated: March 7, 2012.

For the Commission.

**Jacqueline A. Berrien,**

*Chair.*

For the reasons set forth in the preamble, the Equal Employment Opportunity Commission 29 CFR chapter XIV part 1625 is amended as follows:

## PART 1625—AGE DISCRIMINATION IN EMPLOYMENT ACT

■ 1. The authority citation for part 1625 continues to read as follows:

**Authority:** 81 Stat. 602; 29 U.S.C. 621; 5 U.S.C. 301; Secretary's Order No. 10–68; Secretary's Order No. 11–68; Sec. 9, 81 Stat. 605; 29 U.S.C. 628; sec. 12, 29 U.S.C. 631, Pub. L. 99–592, 100 Stat. 3342; sec. 2, Reorg. Plan No. 1 of 1978, 43 FR 19807.

### Subpart A—Interpretations

■ 2. In § 1625.7, revise paragraphs (b) through (e) to read as follows:

#### § 1625.7 Differentiations based on reasonable factors other than age (RFOA).

\* \* \* \* \*

(b) When an employment practice uses age as a limiting criterion, the defense that the practice is justified by a reasonable factor other than age is unavailable.

(c) Any employment practice that adversely affects individuals within the protected age group on the basis of older age is discriminatory unless the practice is justified by a "reasonable factor other than age." An individual challenging the allegedly unlawful practice is responsible for isolating and identifying the specific employment practice that allegedly causes any observed statistical disparities.

(d) Whenever the "reasonable factors other than age" defense is raised, the employer bears the burdens of production and persuasion to demonstrate the defense. The "reasonable factors other than age" provision is not available as a defense to a claim of disparate treatment.

(e)(1) A reasonable factor other than age is a non-age factor that is objectively reasonable when viewed from the position of a prudent employer mindful of its responsibilities under the ADEA under like circumstances. Whether a differentiation is based on reasonable factors other than age must be decided on the basis of all the particular facts and circumstances surrounding each individual situation. To establish the RFOA defense, an employer must show that the employment practice was both reasonably designed to further or achieve a legitimate business purpose and administered in a way that reasonably achieves that purpose in light of the particular facts and circumstances that were known, or should have been known, to the employer.

(2) Considerations that are relevant to whether a practice is based on a reasonable factor other than age include, but are not limited to:

(i) The extent to which the factor is related to the employer's stated business purpose;

(ii) The extent to which the employer defined the factor accurately and applied the factor fairly and accurately, including the extent to which managers and supervisors were given guidance or training about how to apply the factor and avoid discrimination;

(iii) The extent to which the employer limited supervisors' discretion to assess employees subjectively, particularly where the criteria that the supervisors were asked to evaluate are known to be subject to negative age-based stereotypes;

(iv) The extent to which the employer assessed the adverse impact of its employment practice on older workers; and

(v) The degree of the harm to individuals within the protected age group, in terms of both the extent of injury and the numbers of persons adversely affected, and the extent to which the employer took steps to reduce the harm, in light of the burden of undertaking such steps.

(3) No specific consideration or combination of considerations need be present for a differentiation to be based on reasonable factors other than age. Nor does the presence of one of these considerations automatically establish the defense.

\* \* \* \* \*

[FR Doc. 2012–5896 Filed 3–29–12; 8:45 am]

**BILLING CODE 6570–01–P**

## DEPARTMENT OF DEFENSE

**Office of the Secretary**

**[Docket ID: DOD–2012–OS–0031]**

**32 CFR Part 322**

**Privacy Act; Implementation; Correction**

**AGENCY:** Office of the Secretary, DoD.

**ACTION:** Direct final rule with request for comments; correction.

**SUMMARY:** On March 16, 2012 (77 FR 15595–15596), Department of Defense published a direct final rule titled Privacy Act; Implementation. This rule corrects the paragraph identification in the added text.

**DATES:** This rule is effective on May 25, 2012.

**FOR FURTHER INFORMATION CONTACT:** Patricia Toppings, (571) 372–0485.

**SUPPLEMENTARY INFORMATION:** On March 16, 2012, Department of Defense published a direct final rule titled Privacy Act; Implementation. Subsequent to the publication of that direct final rule, Department of Defense discovered that paragraphs (l)(2) through (l)(5) in § 322.7 should have read paragraphs (l)(1) through (l)(4).

**Correction**

In the direct final rule (FR Doc. 2012–6170) published on March 16, 2012 (77 FR 15595–15596), make the following corrections:

**§ 322.7  [Corrected]**

On page 15596, in § 322.7, in the second column, paragraphs (l)(2) through (l)(5) are corrected to read paragraphs (l)(1) through (l)(4).

Dated: March 26, 2012.

**Aaron Siegel,**

*Alternate OSD Federal Register Liaison Officer, Department of Defense.*

[FR Doc. 2012–7596 Filed 3–29–12; 8:45 am]

**BILLING CODE 5001–06–P**

## DEPARTMENT OF HOMELAND SECURITY

**Coast Guard**

**33 CFR Part 165**

**[Docket No. USCG–2012–0121]**

**RIN 1625–AA87**

**Security Zone; USCGC STRATTON Commissioning Ceremony, Alameda, CA**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Temporary final rule.

**SUMMARY:** The Coast Guard is establishing a temporary security zone in the navigable waters of the San Francisco Bay, Alameda, CA within the San Francisco Captain of the Port (COTP) Zone. The security zone is necessary to ensure the safety of the USCGC STRATTON commissioning ceremony.

**DATES:** This rule is effective from 12 p.m. on March 30, 2012 to 4 p.m. on March 31, 2012.



1700 G Street NW, Washington, DC 20552

CFPB Bulletin 2012-04 (Fair Lending)

Date:                April 18, 2012

Subject:            Lending Discrimination

In response to recent inquiries, the Consumer Financial Protection Bureau
("CFPB" or "Bureau") issues this bulletin to provide guidance about compliance
with the fair lending requirements of the Equal Credit Opportunity Act
("ECOA"),[1] and its implementing regulation, Regulation B.[2] The Dodd-Frank
Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act" or
"Act") granted CFPB authority to supervise and enforce compliance with the
ECOA for entities within CFPB's jurisdiction and to issue regulations and
guidance to interpret the ECOA.[3]

The ECOA makes it illegal for a creditor to discriminate in any credit transaction
against any applicant because of race, color, religion, national origin, sex, marital
status, age (if the applicant is old enough to enter into a contract), receipt of
income from any public assistance program; or the exercise in good faith of a
right under the Consumer Credit Protection Act.[4] As the legislative history of the
ECOA emphasizes, "[t]he availability of credit often determines an individual's
effective range of social choice and influences such basic life matters as selection
of occupation and housing."[5] Without nondiscriminatory access to credit,
consumers face obstacles in obtaining equal access to housing.

In response to recent inquiries, the CFPB states that it will continue to adhere to
the fair lending principles outlined in Regulation B. Consistent with other federal
supervisory and law enforcement agencies, the CFPB reaffirms that the legal
doctrine of disparate impact remains applicable as the Bureau exercises its
supervision and enforcement authority to enforce compliance with the ECOA
and Regulation B.

---

[1] 15 U.S.C. § 1691 *et seq.*
[2] 12 C.F.R. pt. 1002 *et seq.*
[3] Sections 1022, 1024 -1026, 1053, 1054, 1061, and 1085 of the Dodd-Frank Act.
[4] 15 U.S.C. § 1691(a)(1).
[5] House Report that accompanied H.R. 6516, No. 94-210, p. 3.

1

In 1994, the Interagency Task Force on Fair Lending – which was composed of ten federal agencies, including the Department of Justice, each of the federal prudential agencies with regulatory authority over financial institutions, and the Federal Trade Commission – released the Policy Statement on Discrimination in Lending ("Policy Statement").[6] The Policy Statement notes that the courts have recognized the following methods of proving lending discrimination under the ECOA:

- Overt evidence of discrimination;
- Evidence of disparate treatment; and
- Evidence of disparate impact.

The CFPB, which did not yet exist at that time, concurs with the Policy Statement. In addition, the Bureau's ECOA Examination Procedures, Mortgage Origination Examination Procedures, and Mortgage Servicing Examination Procedures also adopt and reference the Interagency Fair Lending Examination Procedures, including those designed to identify evidence of disparate impact.[7]

The applicability of disparate impact doctrine, also known as the "effects test," to credit transactions is reflected in the legislative history of the ECOA. Regulation B, which the Federal Reserve Board adopted to implement the ECOA, provides that:

> The legislative history of the Act indicates that the Congress intended an "effects test" concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971), and *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness.[8]

---

[6] Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending,* 59 Fed. Reg. 18,266 (Apr. 15, 1994) (online at www.occ.treas.gov/news-issuances/federal-register/94fr9214.pdf).

[7] CFPB, *Supervision and Examination Manual* (Oct. 2011) (online at www.consumerfinance.gov/wp-content/themes/cfpb_theme/images/supervision_examination_manual_11211.pdf).

[8] 12 C.F.R. § 1002.6.

2

The Commentary explicating Regulation B further elaborates:

> The act and regulation may prohibit a creditor practice that is discriminatory in effect because it has a disproportionately negative impact on a prohibited basis, even though the creditor has no intent to discriminate and the practice appears neutral on its face, unless the creditor practice meets a legitimate business need that cannot reasonably be achieved as well by means that are less disparate in their impact.[9]

In accordance with the foregoing authorities, as the CFPB exercises its supervisory and enforcement authority, it will consider evidence of the disparate impact doctrine as one method of proving lending discrimination under the ECOA and Regulation B.

---

[9] 12 C.F.R. pt. 1002, Supp. I, § 1002.6, ¶ 6(a)-2.