Case: 1:13-cv-08966-RJL Document #: 41-03 Filed: 10/14/14 Page 1 of 52

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 13 C 8564 |
| SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

In 2013, the United States Department of Housing and Urban Development ("HUD")

issued a final rule formalizing its recognition that liability under the Fair Housing Act ("FHA")

may arise from a facially neutral practice that has discriminatory effects on certain groups of

people, regardless of whether discriminatory intent exists (the "Disparate Impact Rule"). *See*

Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460

(Feb. 15, 2013) (to be codified at 24 C.F.R. pt. 100). In addition to recognizing the availability

of discriminatory effects (*i.e.,* "disparate impact") liability under the FHA, the Disparate Impact

Rule also establishes a three-step burden-shifting approach to deciding disparate impact claims.

Plaintiff Property Casualty Insurers Association of America ("PCI") argues that HUD's refusal

to build exclusions or safe harbors for homeowners insurance into the Disparate Impact Rule

violates the McCarran-Ferguson Act and is arbitrary and capricious. PCI asks the Court to

invalidate the Rule as it relates to homeowners insurance under the Administrative Procedure

Act and to enjoin HUD from applying the Rule to the homeowners insurance industry.

Before the Court are PCI's motion for summary judgment (R. 20) and Defendants'

motion to dismiss or for summary judgment (R. 30). For the following reasons, the Court grants

in part and denies in part PCI's motion, and grants in part and denies in part Defendants' motion.

## BACKGROUND

This Administrative Procedure Act case involves the intersection between two important

federal policies, the policy of ensuring that regulation of the insurance industry rests primarily

with the states and the policy of providing for fair housing throughout the United States, which

are reflected in the McCarran-Ferguson Act, 59 Stat. 33 (1945) (codified as amended at 15

U.S.C. §§ 1011, *et seq.*), and the Fair Housing Act ("FHA"), Pub. L. No. 90-284, 82 Stat. 81

(1968) (codified as amended at 42 U.S.C. §§ 3601-19), respectively. The Court, therefore,

provides a brief overview of these two federal statutes before turning to HUD's Disparate Impact

Rule.

## I.     The McCarran-Ferguson Act

Congress enacted the McCarran-Ferguson Act in response to the Supreme Court's

decision in *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S. Ct. 1162, 88

L. Ed. 1440 (1944), in which the Court held that insurance transactions were subject to federal

regulation under the Commerce Clause. *See United States Dep't of Treasury v. Fabe,* 508 U.S.

491, 499, 113 S. Ct. 2202, 124 L. Ed. 2d 449 (1993); *SEC v. Nat'l Secs. Inc.,* 393 U.S. 453, 458,

89 S. Ct. 564, 21 L. Ed. 2d 668 (1969). Prior to *South-Eastern Underwriters,* "it had been

assumed . . . that [i]ssuing a policy of insurance is not a transaction of commerce" and,

consequently, "the States enjoyed a virtually exclusive domain over the insurance industry."

*Fabe,* 508 U.S. at 499 (internal quotation marks and citations omitted).  Congress reacted quickly to *South-Eastern Underwriters*, passing the McCarran-Ferguson Act within a year of the decision to allay fears that the decision threatened the states' power to tax and regulate the insurance industry.  *See id.* at 499-500.

> Congress expressed the purpose of the McCarran-Ferguson Act in Section 1 of the Act:
>
> Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1101; *see also Autry v. Northwest Premium Servs., Inc.,* 144 F.3d 1037, 1040 (7th Cir. 1998).  To accomplish this purpose, Congress "transformed the legal landscape by overturning the normal rules of pre-emption" and "creating a clear-statement rule . . . that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise.  *Fabe,* 508 U.S. at 507. Specifically, the McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically related to the business of insurance[.]"  15 U.S.C. § 1012(b).

> Over the years, courts have developed a three-part inquiry for determining whether the McCarran-Ferguson Act preempts application of a particular federal statute.  First, courts inquire whether the federal statute at issue "specifically relate[s] to the business of insurance."  *Autry,* 144 F.3d at 1040-41 (quoting *Fabe,* 508 U.S. at 501).  Second, courts ask whether the state statute was enacted "for the purpose of regulating the business of insurance."  *Id.*  Finally, courts determine whether application of the federal statute will "invalidate, impair or supersede" the

state law. *Id.* If the court answers all three inquiries in the affirmative, the federal statute must

give way to state law. *Id.*

In *Humana Inc. v. Forsyth,* 525 U.S. 299, 119 S. Ct. 710, 142 L. Ed. 2d 753 (1999), the

Supreme Court rejected the view that the McCarran-Ferguson Act created "any sort of field

preemption" as well as the "polar opposite view . . . that Congress intended a green light for

federal regulation whenever the federal law does not collide head on with state regulation." *Id.*

at 309. The Court, instead, construed the Act as adopting a middle-ground, holding that "[w]hen

federal law does not directly conflict with state regulation, and when application of the federal

law would not frustrate any declared state policy or interfere with a State's administrative

regime, the McCarran-Ferguson Act does not preclude its application." *Id.* at 310. Accordingly,

if a federal statute complements or duplicates a state's regulation of the insurance industry and

does not interfere with a state's policies or administrative regime, McCarran-Ferguson preclusion

does not apply. *See id.* at 313 (finding that the McCarran-Ferguson Act did not preclude the

plaintiff's RICO claims because "RICO's private right of action and treble damages provision

appears to complement Nevada's statutory and common-law claims for relief"); *NAACP v.*

*American Family Mut. Ins. Co.,* 978 F.2d 287, 295 (7th Cir. 1992) ("Duplication is not

conflict."); *Ojo v. Farmers Grp., Inc.,* 600 F.3d 1205, 1209-10 (9th Cir. 2010) (recognizing that

the McCarran-Ferguson Act would not reverse-preempt the FHA where the FHA

"complement[s]—rather than displace[s] and impair[s]" state law).

## II.    The Fair Housing Act

Congress enacted the FHA in 1968 "to provide, within constitutional limits, for fair

housing throughout the United States." *See* 42 U.S.C. § 3601. The FHA makes it unlawful to,

among other things, refuse to sell, rent, or "otherwise make unavailable or deny" housing to any

4

person "because of race, color, religion, sex, familial status, . . . national origin[,]" or handicap. 42 U.S.C. § 3604(a), (f)(1).  The FHA also makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" because of the person's race, color, religion, sex, familial status, national origin, or handicap.  *See id.* § 3604(b), (f)(2).  The FHA empowers HUD to enforce the Act and to issue regulations implementing the Act.  *See id.* §§ 2612, 3614a.

## A.    Disparate Impact Claims Under the FHA

HUD has long interpreted the FHA as prohibiting not only intentional discrimination on the basis of a person's protected characteristics, but also practices that have unwarranted discriminatory effects on minorities or other persons protected by the Act, regardless of whether there was an intent to discriminate.  *See* 78 Fed. Reg. 11460-62 nn.12-27 (Feb. 15, 2013) (collecting examples).  Put differently, HUD interprets the FHA as providing for both discriminatory intent and disparate impact liability.  *See id.*  All eleven circuit courts to have addressed this issue, including the Seventh Circuit, have agreed that the FHA provides for disparate impact liability at least in some cases.  *See, e.g., Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977) ("We therefore hold that at least under some circumstances a violation of section 3604(a) can be established by showing a discriminatory effect without a showing of discriminatory intent.").[1]  Neither the Supreme Court

---

[1] *See also Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49 (1st Cir. 2000); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935-36 (2d Cir. 1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146 (3d Cir. 1977); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur v. City of Toledo*, 782 F.2d 565, 574-75 (6th Cir. 1986); *United States v. City of Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir. 1974); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311-12 (9th Cir. 1982); *Mountain Side Mobile Estates P'ship v. Secretary of Hous. & Urban Dev.*, 56 F.3d 1243, 1251 (10th Cir. 1995); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1559 n.20 (11th Cir. 1984).

nor the Circuit Court for the District of Columbia, however, has weighed in on whether the FHA allows for disparate impact liability.

### B.     Liability of Insurers Under the FHA

HUD also has long interpreted the FHA as prohibiting discrimination in the provision of homeowners insurance.  In 1989, HUD issued a regulation expressly stating that prohibited acts under the FHA include "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin."  *See Implementation of the Fair Housing Amendments Act of 1988,* 54 Fed. Reg. 3232, 3285 (codified at 24 C.F.R. § 100.70(d)(4)).  Several circuit courts, deferring to HUD's interpretation, have similarly interpreted the FHA as prohibiting intentionally discriminatory practices related to the provision and pricing of homeowners insurance.  *See, e.g., NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 301 (7th Cir. 1992), *cert. denied,* 508 U.S. 907 (1993) ("Section 3604 applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant."); *Ojo v. Farmers Grp. Inc.,* 600 F.3d 1205, 1208 (9th Cir. 2010) (*en banc*) (deferring to HUD's interpretation of the FHA as prohibiting discrimination in the provision of homeowner's insurance); *Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1359-60 (6th Cir. 1995) (same).  *But see Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419, 423-25 (4th Cir. 1984), *cert. denied* 516 U.S. 1140 (1996) (concluding that claims against the hazard insurance industry do not fall within the scope of the FHA).

As the Seventh Circuit explained in *American* Family, discrimination against minorities or other protected groups in the provision of homeowners insurance can make housing unavailable to those groups.  *American Family*, 978 F.2d at 300.  Put succinctly, "[l]enders

require their borrowers to secure property insurance.  No insurance, no loan; no loan, no house;
lack of insurance thus makes housing unavailable."  *See id.* at 297.  Discrimination in the
provision of homeowners insurance can also raise the cost of housing to minorities and other
protected groups and frustrate their ability to live in integrated neighborhoods so that "[e]ven if
they achieve their goal, they pay extra."  *See id.* at 290.  For these reasons, the Seventh Circuit
recognized in *American Family* that the FHA allows for claims against homeowners insurers
who intentionally discriminate against individuals based on protected characteristics.

C.     **Disparate Impact Liability of Insurers Under the FHA**

Although almost all circuit courts have recognized that the FHA allows for disparate
impact liability and several circuit courts have separately recognized that the FHA allows for
claims against homeowners insurers, few courts have addressed whether the FHA allows for
disparate impact claims—as opposed to disparate treatment claims—against homeowners
insurers.  In the same case in which the Seventh Circuit recognized that the FHA allows for
claims against insurers who intentionally discriminate against individuals on the basis of a
protected characteristic, the Seventh Circuit questioned whether the FHA would also allow for
disparate impact liability against insurers.  *See id.*  The Seventh Circuit explained the issue as
follows:

> Insurance works best when the risks in the pool have similar characteristics.  For
> example, term life insurance costs substantially more per dollar of death benefit
> for someone 65 years old than for one 25 years old, although the expected return
> per dollar of premium is the same to both groups because the older person, who
> pays more, also has a higher probability of dying during the term.  Auto insurance
> is more expensive in a city than in the countryside, because congestion in cities
> means more collisions.  Putting young and old, or city and country, into the same
> pool would lead to adverse selection: people knowing that the risks they face are
> less than the average of the pool would drop out.  A single price for term life
> insurance would dissuade younger persons from insuring, because the price would
> be too steep for the coverage offered; the remaining older persons would pay a
> price appropriate to their age, but younger persons would lose the benefits of

> insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables.
>
> Risk discrimination is not race discrimination. Yet efforts to differentiate more fully among risks may produce classifications that could be generated by discrimination. . . . No insurer openly uses race as a ground of ratemaking, but is a higher rate per $1,000 of coverage for fire insurance in an inner city neighborhood attributable to risks of arson or to racial animus?

*Id.* at 290-91. Because of the difficulties that imposing disparate impact liability on insurers may create, the Seventh Circuit made clear in *American Family* that its interpretation of the FHA as applying to insurers extended only to disparate treatment liability, and it made no comment on whether the FHA also allows for disparate impact liability against insurers. *See id.* at 291 ("All we decide is whether the complaint states claims on which the plaintiff may prevail if they establish that the insurer has drawn lines according to race rather than actuarial calculations.").

The Seventh Circuit's decision in *Doe v. Mutual of Omaha,* 179 F.3d 557 (7th Cir. 1999), also calls into question the viability of disparate impact claims against insurers, albeit in a different context and for different reasons than those at issue in *American Family*. In *Mutual of Omaha,* the Seventh Circuit considered whether an insurer violated the Americans with Disabilities Act by including lower lifetime benefits limits for AIDS and AIDS-related conditions than for other conditions. *See id.* at 558. The Seventh Circuit ultimately concluded that the insurer-defendant had not violated the Americans with Disabilities Act because the Act did not require the insurer to alter its policies to make them equally valuable to the disabled and nondisabled. *See id.* at 563. The court also held that even if its interpretation of the Americans with Disabilities Act was wrong, the plaintiff's claim against the insurer "must fail anyway, because it is barred by the McCarran-Ferguson Act." *Id.* According to the Seventh Circuit, interpreting the Americans with Disabilities Act as the plaintiff desired—*i.e.,* as regulating the

content of insurance policies—would "interfere with a State's administrative regime" regulating insurance and, therefore, violate the McCarran-Ferguson Act. *See id.* at 563.

As the Seventh Circuit explained, "[s]tate regulation of insurance is comprehensive and includes rate and conversion issues, . . . so if federal courts are now to determine whether caps on disabling conditions (by no means limited to AIDS) are actuarially sound and consistent with principles of state law they will be stepping on the toes of state insurance commissioners." *Id.* In finding that the McCarran-Ferguson Act barred the plaintiffs' claim, the Seventh Circuit drew a distinction between discriminatory intent claims and disparate impact claims against insurers:

> It is one thing to say that an insurance company may not refuse to deal with disabled persons; the prohibition of such refusals can probably be administered with relatively little interference with state insurance regulation . . . . It is another thing to require federal courts to determine whether limitations on coverage are actuarially sound and consistent with state law. Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of the state law. The states are not indifferent to who enforces their laws.

*Id.* at 564 (emphasis in original).

In addition to the Seventh Circuit, the Eighth Circuit also has questioned the viability of disparate impact claims against insurers, noting that "at least with respect to insurers, the question [of whether the FHA provides for disparate impact liability] is not free from doubt." *See Saunders v. Farmers Ins. Exch.,* 537 F.3d 961, 964 (8th Cir. 2008). Other courts, however, have recognized—either implicitly or explicitly—that the FHA allows for disparate impact claims against insurers. *See Ojo,* 600 F.3d at 1208-10; *Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 60 (D.D.C. 2002) (rejecting the defendants' argument that disparate impact liability does not apply to the insurance industry because of the availability of the "business justification" defense and because the defendants pointed to nothing in the FHA that would justify carving out an exception for a particular type of organization).

The Ninth Circuit's decision in *Ojo* is particularly relevant to the present case. In *Ojo,* the plaintiff, an African-American resident of Texas, claimed that a homeowners insurance company and its affiliates based their rates on a number of credit-score factors that disparately impacted minorities in violation of the FHA. *See Ojo,* 600 F.3d at 1207. The Ninth Circuit, sitting *en banc,* held as a matter of first impression that the FHA prohibits racial discrimination in the denial and pricing of homeowners insurance. *See id.* at 1208. In doing so, the Ninth Circuit made no distinction between disparate treatment claims and disparate impact claims. Because the plaintiff based his claim entirely on the discriminatory effects of the defendants' policies and did not claim that the defendants intentionally discriminated against him, however, the Ninth Circuit implicitly held that disparate impact claims against insurers are cognizable under the FHA.

The Ninth Circuit then went on to address whether the McCarran-Ferguson Act nonetheless precluded the plaintiff's claim. The Ninth Circuit identified the issue as

> whether application of the FHA to [the plaintiff's] case might invalidate, impair, or supersede the provisions of the Texas Insurance Code that authorize insurance companies to use credit scoring in setting insurance rates. If Texas law permits insurance companies to use credit scores even if the factors used to compute scores may have a racially disparate impact, then allowing [the plaintiff] to sue [d]efendants under the FHA for this practice would impair Texas law. On the other hand, if Texas law prohibits the use of credit-score factors that would violate the FHA on the basis of a disparate-impact theory, then the FHA would complement—rather than displace and impair—Texas law, and [the plaintiff's] FHA disparate-impact suit would not be reverse-preempted by the [McCarran-Ferguson Act].

*See id.* at 1209-10. Because the Ninth Circuit determined that this question of Texas law was unsettled, it certified the question to the Supreme Court of Texas. The Supreme Court of Texas, after performing an extensive review of the relevant provisions of the Texas Insurance Code, their legislative history, and similar provisions in other areas of Texas law, determined that Texas law permits race-neutral credit scoring even if it has a racially disparate impact. *See Ojo*

10

*v. Farmers Grp., Inc.,* 356 S.W.3d 421, 422-34 (Tex. 2011). Accordingly, the Texas Supreme

Court concluded that allowing a claim against Texas insurers for using completely race-neutral

factors in credit scoring would frustrate Texas's regulatory policies.[2] *See id.*

## III. HUD's Disparate Impact Rule

### A. The Proposed Rule

The above discussion provides the backdrop for the parties' dispute regarding HUD's

Disparate Impact Rule. HUD issued a Notice of Proposed Rulemaking regarding the Disparate

Impact Rule on November 16, 2011. *See Implementation of the Fair Housing Act's*

*Discriminatory Effects Standard,* 76 Fed. Reg. 70921 (Nov. 16, 2011). In the Notice of

Proposed Rulemaking, HUD traced the development of discriminatory effects liability under the

FHA, noting that Congress intended the FHA's prohibition of housing discrimination to be

"broad and inclusive" and that HUD and all eleven circuits to have addressed the issue had

determined that the FHA allows for liability based on discriminatory effects without the need for

a finding of intentional discrimination. *Id.* at 70922-23. HUD recognized, however, that

"[w]hile the discriminatory effects theory of liability under the [FHA] is well established, there is

minor variation in how HUD and the courts have applied that theory." *See* 76 Fed. Reg. at

70922-23. According to the Notice, the purpose of the Disparate Impact Rule was to "establish[]

a uniform standard of liability for facially neutral housing practices that have a discriminatory

effect." *Id.* at 70921.

To that end, the proposed rule set forth a three-step burden-shifting framework for

evaluating disparate impact claims. In the first step, the plaintiff bears the burden of proving that

---

[2] The parties settled their remaining disputes and dismissed the pending appeal shortly after the Texas Supreme Court issued its opinion. *See Ojo v. Farmers Grp., Inc.,* No. CV-05-05818-JFW (9th Cir.), at R. 69, Order Granting the Parties' Stipulated Motion to Dismiss with Prejudice (June 24, 2011).

a housing practice either has a disparate impact on individuals with a protected characteristic or perpetuates segregation in the housing market. *See id.* at 70923-24. In the second step, the burden shifts to the defendant to prove that the challenged practice "has a necessary and manifest relationship to one or more of the defendant's . . . legitimate, nondiscriminatory interests." *See id.* at 70924. If the defendant satisfies this burden, the plaintiff may still establish liability in the third step by proving a less discriminatory method of serving the same interests. *See id.* HUD explained in the Notice of Proposed Rulemaking that it had adopted this framework because it is consistent with the discriminatory effects standard Congress adopted for Title VII cases and it prevents either party from having to prove a negative. *See id.*

The proposed rule defined discriminatory effects liability as applying "where a facially neutral housing practice actually or predictably results in a discriminatory effect on a group of persons (that is, a disparate impact), or on the community as a whole (perpetuation of segregation)." *Id.* at 70924. HUD specified that "[a]ny facially neutral action, e.g. laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the [FHA] and [the Disparate Impact Rule]." *Id.* HUD then provided examples of housing policies or practices that may have a disparate impact on protected groups. *See id.* Among the examples HUD provided was "the provision and pricing of homeowner's insurance." *Id.* HUD cited the Ninth Circuit's opinion in *Ojo*, 600 F.3d at 1207-08, in support of this example.

### B. Comments from the Insurance Industry

HUD received nearly 100 public comments from various individuals and entities about the proposed rule. Three trade associations representing the homeowner's insurance industry, including PCI, were among those that submitted comments to HUD. (*See* Pl. L.R. 56.1 Stmt.

¶ 21; *see also* Admin. R. 372, 455, 553.)  The insurance industry's concerns regarding the proposed rule fell into four categories.

First, the insurance industry disputed that § 3604 of the FHA allows for disparate impact liability in any context.  The commenters noted that § 3604 proscribes conduct relating to the sale or rental of dwellings that is undertaken "because of" an individual's membership in a class protected under the statute.  According to the commenters, this language prohibits only *intentional* discrimination against protected individuals.  (*See* Admin. R. 374, 457-58, 554.)

Second, the insurance industry contended that application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act.  (*See id.* at 379-80, 456-57, 554.)  According to the commenters, suits challenging the disparate impact of industry-wide classifications would frustrate state policies or interfere with core rate-making functions of states' administrative regimes regulating the insurance industry.  (*See id.*)  One commenter argued that application of the Disparate Impact Rule to the homeowners insurance would similarly violate the common-law "filed rate" doctrine (*see id.* at 378), which bars private claims against insurers that rest on the alleged unreasonableness of a rate that the insurer filed with the state regulatory agency.  *See generally* 44 C.J.S. *Insurance* § 117 (West 2014).

Third, the insurance industry expressed concern that applying disparate impact liability to homeowners insurance is fundamentally incompatible with the use of actuarially sound insurance principles essential to risk-based pricing.  As one commenter put it, "[c]lassifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance."  (*See* Admin. R. at 377; *see also id.* at 554 ("[R]isk discrimination is the foundation of insurance underwriting . . . .").)  Furthermore, the commenters argued that the Disparate Impact Rule

would require insurers to disregard the predictive value of valid risk factors, which, in turn, would put insurers in the untenable position of risking violation of state regulations prohibiting price discrimination among individuals with similar risk profiles. (*Id.* at 377-78.) The commenters also claimed that the Disparate Impact Rule may actually harm consumers by increasing adverse selection and, consequently, causing coverage to suffer. (*Id.*)

Fourth, the insurance industry commented that the three-step burden-shifting approach HUD adopted in the Rule was inappropriate. Two commenters argued that the burden-shifting framework the Supreme Court adopted in *Wards Cove Packing Co. v. Antonio,* 490 U.S. 642 (1989), should apply rather than the framework set forth in the proposed rule. (*See* Admin. R. at 381, 458-59.) One commenter also noted the difficulties that shifting the burden of proof to insurers would impose because insurers do not collect data on the race and ethnicity of insureds and, thus, could not assess whether facially neutral underwriting and rating factors would have a disparate impact on protected classes. (*See id.* at 383.)

For these reasons, the insurance industry requested that HUD either exempt insurance underwriting and pricing from the Disparate Impact Rule altogether or build safe harbors into the Rule for long-recognized actuarial risk factors, such as the age and condition of the property.[3] (*See id.* at 380, 383, 459, 554-55.)

### C.    The Final Rule

HUD issued its final Disparate Impact Rule on February 15, 2013. *See* Final Rule, 78 Fed. Reg. at 11460 (Feb. 15, 2013). HUD acknowledged and responded to the insurance

---

[3] The insurance industry also urged HUD to withdraw the proposed rule pending the Supreme Court's decision in *Magner v. Gallagher,* 619 F.3d 823 (8th Cir. 2010), *cert. granted,* No. 10-1032 (2011), regarding whether disparate impact claims are cognizable under the FHA. The Supreme Court scheduled oral argument in *Magner* to take place shortly after the notice-and-comment period for the proposed rule. The case, however, settled before the Supreme Court issued a decision.

industry's comments in the preamble to the Final Rule. HUD did not, however, make any changes to the Final Rule in response to their comments. Instead, HUD determined that the framework it had adopted was flexible enough to accommodate the insurance industry's concerns on a case-by-case basis.

To begin with, HUD dismissed as contrary to well-established law the insurance industry's and others commenters' argument that the FHA does not provide for disparate impact liability. HUD reiterated that both HUD and all eleven circuit courts to have addressed the issue had long interpreted the FHA to allow for discriminatory effects as well as discriminatory intent liability. *See id.* at 11465-67. HUD also noted that courts regularly borrow from Title VII standards in interpreting the FHA, and it is well-established that Title VII allows for discriminatory effects liability. *See id.* at 11466. Finally, HUD contended that the legislative history of the FHA supported its interpretation of the Act as providing for discriminatory effects liability. *See id.* at 11467.

Next, HUD determined that the insurance industry's concerns that application of the Disparate Impact Rule to the insurance industry would violate the McCarran-Ferguson Act or the filed-rate doctrine were unfounded because the Rule did not alter the analysis courts already employed in evaluating FHA claims against homeowners insurers. *See id.* at 11474-75. Specifically, HUD provided the following, brief response to the industry's concerns that the Disparate Impact Rule would violate the McCarran-Ferguson Act and the filed-rate doctrine:

> HUD has long interpreted the [FHA] to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD, including in *Ojo v. Farmers Group*. Moreover, as discussed above, HUD has consistently interpreted the Act to permit violations to be established by proof of discriminatory effect. By formalizing the discriminatory effects standard, the rule will not, as one commenter suggested, "undermine the states' regulation of insurance." The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State

for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo v. Farmers Group,* it will not interfere with any State regulation of the insurance industry.

*Id.* at 11475 (footnotes omitted).[4]

In a similar vein, HUD also determined that the industry's concerns that the nature of insurance made the Disparate Impact Rule's application to the insurance industry inappropriate were "misplaced" because of the ability of an insurer to establish that the practice at issue has a legally sufficient justification. *See id.* HUD explained:

HUD believes that these concerns are misplaced. First, they presume that once a discriminatory effect is shown, the policy at issue is per se illegal. This is incorrect. Rather as § 100.500 makes clear, the respondent or defendant has a full opportunity to defend the business justifications for its policies. This "burden-shifting framework" distinguishes "unnecessary barriers proscribed by the [FHA] from valid policies and practices crafted to advance legitimate interests." Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.

*Id.* at 11475 (footnote omitted) (citing *Groach Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374-75 (6th Cir. 2007)). HUD went on to deny the insurance industry's request for exemptions or safe harbors related to insurance as unnecessary because "insurance practices with a legally sufficient justification will not violate the [FHA]." *Id.* Moreover, HUD explained, "creating exemptions beyond those found in the [FHA] would run contrary to Congressional intent." *Id.* (footnote omitted).

---

[4] HUD cited *Ojo,* 600 F.3d at 1208, *American Family,* 978 F.2d at 297-301, and *Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1355-60 (6th Cir. 1995), in support of its assertion that courts have agreed that the FHA prohibits discriminatory practices in connection with homeowners insurance. *See id.* at 11475 n.139. HUD noted that the Fourth Circuit found in *Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419, 423-25 (4th Cir. 1984), that the FHA does not cover insurance. *See id.*

Finally, HUD rejected the commenters' argument that the burden-shifting framework adopted in the Disparate Impact Rule is unfair for insurers because they do not collect data on race and ethnicity. *See id.* In response to this concern, HUD stated:

> The burden of proof is not more difficult for insurers than for a charging party or plaintiff alleging that an insurance practice creates a discriminatory effect. The charging party or plaintiff must initially show the discriminatory effect of the challenged practice using appropriate evidence that demonstrates the effect. If the charging party or plaintiff makes that showing, the burden shifts to the insurer to show that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests.

*Id.* HUD also rejected the commenters' request for HUD to adopt the burden-shifting framework used in *Wards Cove* for proving disparate impact claims. *See id.* at 11469-73. HUD found that the framework it adopted, which it borrowed from Title VII cases, is appropriate and fairly balances the interests of all parties. *See id.*

## IV.    Procedural History

On November 27, 2013, PCI filed the present suit seeking to invalidate the Disparate Impact Rule as it applies to the provision and pricing of homeowners insurance. (*See* Compl. at 39.) PCI claims that the Disparate Impact Rule is invalid under the Administrative Procedure Act for a number of reasons. First, PCI argues that application of the Disparate Impact Rule to the insurance industry would violate the McCarran-Ferguson Act. (*See id.* at Count I.) Second, PCI argues that HUD's issuance of the Disparate Impact Rule was arbitrary and capricious because HUD failed to adequately consider the Rule's conflict with the McCarran-Ferguson Act, the filed rate doctrine, and the nature of insurance. (*See id.* at Counts II-IV.) Finally, PCI challenges the three-step burden-shifting framework HUD adopted in the Disparate Impact Rule as arbitrary, capricious, and not in accordance with law. (*See id.* at Counts V-VI.)

PCI moved for summary judgment on its claims (*see* R. 20, PCI Mot.), and HUD filed a cross-motion seeking dismissal of PCI's claims for lack of subject matter jurisdiction or, in the

alternative, summary judgment in HUD's favor on all claims.  (*See* R. 30, HUD Mot.)  The Court

heard oral argument on the parties' motions on August 19, 2014.[5]

## LEGAL STANDARD

The Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.,* sets forth the extent

of judicial authority to review federal agency actions.  *See F.C.C. v. Fox Tele. Stations, Inc.,* 556

U.S. 502, 513-14, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009); *J.N. Moser Trucking, Inc. v. U.S.

Dep't of Labor,* 306 F. Supp. 2d 774, 781 (N.D. Ill. 2004).  Section 10(e) of the APA instructs

that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions

found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  *See* 5 U.S.C. § 706(2); *Little Co. of Mary Hosp. v. Sebelius,* 587 F.3d 849, 856 (7th Cir.

2009).  Judicial review of agency action under the APA is "narrow," and courts must limit their

review of the agency's action to the administrative record before the agency.  *See Judulang v.

Holder,* --- U.S. ---, 132 S. Ct. 476, 483, 181 L. Ed. 2d 449 (2011); *Association of Private Sector

Colls. & Univs. v. Duncan,* 681 F.3d 427, 441 (D.C. Cir. 2012).  A reviewing court "is not to

substitute its judgment for that of the agency."  *Judulang,* 132 S. Ct. at 483.

---

[5] The Court acknowledges and appreciates the *amicus curiae* who submitted briefs in this action.  The American Civil Liberties Union, American Civil Liberties Union of Illinois, Chicago Area Fair Housing Alliance, Chicago Lawyers' Committee for Civil Rights Under Law, Inc., LatinoJustice PRLDEF, Lawyers' Committee for Civil Rights Under Law, National Association for the Advancement of Colored People, NAACP Milwaukee Branch, NAACP Legal Defense & Educational Fund, Inc., National Community Reinvestment Coalition, National Consumer Law Center, National Fair Housing Alliance, National Housing Law Project, Poverty & Race Research Action Council, and Sherman Park Community Association submitted a joint brief in support of HUD's motion.  (*See* R. 33.)  The State of Illinois also submitted an *amicus curiae* brief in support of HUD's motion.  (*See* R. 80.)  The State of Oklahoma, through its Insurance Commissioner, submitted an *amicus curiae* brief in support of PCI's motion (*see* R. 48), and the insurance commissioners of the States of Alabama, Louisiana, Mississippi, and Nevada joined Oklahoma's brief.  (*See* R. 64.)  The American Financial Services Association, the Consumer Mortgage Coalition, the Independent Community Bankers of American, and the Mortgage Bankers Association also submitted a joint *amicus curiae* brief in support of PCI's motion.  (*See* R. 59-1.)

# ANALYSIS

## I.    Subject Matter Jurisdiction

Before the Court can address the merits of PCI's claims, it must assure itself that it has subject matter jurisdiction over those claims.  *See Aljabri v. Holder,* 745 F.3d 816, 818-19 (7th Cir. 2014) (federal courts must "consider subject-matter jurisdiction as the first question in every case, . . . and must dismiss [a] suit if such jurisdiction is lacking").  Of particular relevance here, the Court must determine whether PCI has standing to assert its claims and whether PCI's claim that the Disparate Impact Rule violates the McCarran-Ferguson Act is ripe.  The Court turns to the ripeness issue first.

### A.    Ripeness

"Ripeness is a justiciability doctrine designed 'to prevent the courts through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 807-08, 123 S. Ct. 2026, 155 L. Ed. 2d 1017 (2003) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967)).  The ripeness doctrine stems "both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hospitality Ass'n,* 538 U.S. at 808 (quoting *Reno v. Catholic Social Servs., Inc.,* 509 U.S. 43, 57 n.18, 113 S. Cr. 2485, 125 L. Ed. 2d 38 (1993)).  In *Abbott Laboratories*, the Supreme Court announced a two-factor test for evaluating the prudential aspects of whether agency action is ripe for judicial review.  *See Abbott Labs.,* 387 U.S. at 149.  Under the *Abbott Laboratories* test, courts evaluate "(1) the fitness of the issues for judicial

decision and (2) the hardship to the parties of withholding court consideration" in assessing the ripeness of the issue for judicial review. *Nat'l Park Hospitality Ass'n,* 538 U.S. at 808 (citing *Abbott Labs. v. Gardner,* 387 U.S. at 149).

### 1.    The Nature of PCI's McCarran-Ferguson Claim

Before turning to the ripeness factors, the Court must address the parties' disagreements regarding the nature of PCI's McCarran-Ferguson claim.  PCI argues that its McCarran-Ferguson claim presents an as-applied challenge to the Disparate Impact Rule because PCI challenges the Rule only as it applies to a subset of conduct (*i.e.,* the provision and pricing of homeowners insurance), not as a whole.  HUD, on the other hand, contends that PCI's claim presents a facial challenge to the Disparate Impact Rule because the claim does not turn on particular facts or require the Court to consider a specific application of the Rule to insurers.  The parties also disagree on the standard the Court should apply if it finds that PCI's McCarran-Ferguson claim presents a facial challenge to the Rule.  HUD argues that to succeed on a facial challenge, PCI must show that "no set of circumstances exists under which the regulation would be valid," (*see* Defs. Reply Br. at 7 (quoting *Reno v. Flores,* 507 U.S. 292, 301, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)); *see also* R. 97, Defs. Supp. Br. at 5-8), whereas PCI contends that the appropriate standard is whether the regulation has a "plainly legitimate sweep."  (*See* R. 96, Pl. Supp. Br. at 3-7.)

The Court agrees with HUD that PCI's McCarran-Ferguson claim presents a facial challenge to the Disparate Impact Rule.  PCI does not challenge a particular, concrete application of the Rule to any of its members.  Rather, it categorically challenges a broad range of potential applications of the Rule without relying on the facts of any particular application.  Although PCI does not seek to invalidate the Rule outside the homeowners insurance context, its challenge is

more akin to a facial challenge than to an as-applied challenge, especially considering that the McCarran-Ferguson Act itself only applies to the business of insurance. *See Peick v. Pension Ben. Guar. Corp.,* 724 F.2d 1247, 1261 n.16 (7th Cir. 1983) ("The parties have argued vigorously as to whether this is an 'as applied' or 'facial' challenge to the Act. Given the minimal or nonexistent record with respect to the actual operation of the MPPAA in the situation presented in this case, we do not think that the case can properly be considered an 'as applied' challenge."); *Alliance of Auto Mfrs., Inc. v. Currey,* 984 F. Supp. 2d 32, 46-47 (D. Conn. 2013) (finding that the plaintiff presented a facial challenge because the plaintiff had not alleged "any unconstitutional application of the law apart from the general applicability of the law to all manufacturers who transact business with in-state dealers").

The precise standard that applies to facial challenges remains a matter of dispute. *See United States v. Stevens,* 559 U.S. 460, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010); *A Woman's Choice-E. Side Women's Clinic v. Newman,* 305 F.3d 684, 687 (7th Cir. 2002). The Supreme Court first announced the "no set of circumstances" standard in *United States v. Salerno,* 481 U.S. 739, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987), stating that a law will be held unconstitutional in a facial challenge only when "no set of circumstances exists under which the Act would be valid." *See id.* at 745. The "no set of circumstances" standard was not the decisive factor in *Salerno*, however, and the Supreme Court has not always applied this standard in evaluating facial challenges to the constitutionality of statutes or regulations. *See Newman,* 305 F.3d at 687. Faced with "irreconcilable directives" from the Supreme Court, the Seventh Circuit determined in *Newman* that the language of *Salerno*—which a subsequent Supreme Court decision referred to as a "suggestion," *see Troxel v. Ganville,* 530 U.S. 57, 85 n.6, 120 S. Ct.

2054, 147 L. Ed. 2d 49 (2000)—must give way to the Supreme Court's later holdings in which the Court did not apply the *Salerno* standard. *See Newman,* 305 F.3d at 687.

Since *Newman,* the Seventh Circuit has applied the "no set of circumstances" standard to a facial challenge to an interagency coordination agreement. *See Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs,* 335 F.3d 607, 619 (7th Cir. 2003) ("[T]o prevail on a facial challenge, [the plaintiff] 'must establish that no set of circumstances exists under which the [regulation] would be valid.'" (quoting *Reno,* 507 U.S. at 301)); *see also Fields v. Smith,* 653 F.3d 550, 557 (7th Cir. 2011) (applying the "no set of circumstances" standard to a facial challenge to the constitutionality of a statute). More recently, the Court of Appeals for the District of Columbia also applied the "no set of circumstances" standard in evaluating facial challenges to agency regulations, noting that this standard applied to "both the constitutional challenges and the statutory challenge[s]." *Association of Private Sector Colls. & Univs. v. Duncan,* 681 F.3d 427, 442 (D.C. Cir. 2012) (alteration in original) (quoting *Reno,* 507 U.S. at 301); *see also Sherley v. Sebelius,* 644 F.3d 388, 397 (D.C. Cir. 2011) (applying the "no set of circumstances" standard to the plaintiff's claim that the National Institutes of Health's guidelines for stem cell research were facially invalid under the Dickey-Wicker Amendment barring funding for research in which a human embryo is destroyed). HUD argues that the takeaway from these cases is that the "no set of circumstances" standard continues to govern facial, non-constitutional challenges to a regulation. (*See* Defs. Supp. Br. at 5-6.)

The Court finds that the "no set of circumstances" standard is the appropriate standard for evaluating PCI's claim that the McCarran-Ferguson Act precludes disparate impact claims based on the provision and pricing of homeowners insurance. *See Wisconsin Cent., Ltd. v. Shannon,* 539 F.3d 751, 761 (7th Cir. 2008). In *Wisconsin Central,* the plaintiff, an interstate railroad

22

company, argued that the federal Railway Labor Act and, more generally, Congress's vast regulation of the railways preempted the overtime provisions in Illinois's Minimum Wage Law. *See id.* at 755. The Seventh Circuit held that the plaintiff's preemption challenge under the Railway Labor Act was not ripe because the Act only precludes claims that depend on an interpretation of a collective bargaining agreement's terms and, although it was clear that the court would need to consult the collective bargaining agreements to decide the plaintiff's claim, it was not yet clear whether the court would need to *interpret* the terms of the agreement. *See id.* at 759-61.

In reaching this conclusion, the Seventh Circuit stated that "if it is evident that the result of a process must lead to . . . preemption, it would defy logic to hold that the process itself cannot be preempted and that a complaint seeking that result would not raise a ripe issue." *Id.* at 761 (quoting *NE Hub Partners, L.P. v. CNG Transmission Corp.,* 239 F.3d 333, 348 (3d Cir. 2001)). The Seventh Circuit further explained that where the circumstances at issue "would not invariably lead to a finding of preemption," the plaintiff's claim was not ripe for consideration. *See id.* at 761. Accordingly, the Seventh Circuit held that because "scenarios exist where it would be unnecessary for the [collective bargaining agreements] to be interpreted in order to resolve the claim . . . the district court lacked jurisdiction to rule on [the plaintiff's] counts concerning preemption under the [Railway Labor Act]." *Id.* The Seventh Circuit found that the plaintiff's field preemption claim, on the other hand, was ripe for review because it presented a purely legal issue and, if the court found that field preemption applied, it would completely bar all enforcement of Illinois's overtime regulations against the plaintiff. *See id.* at 761-62.

Under this reasoning, the Court finds that the appropriate standard under which to evaluate PCI's McCarran-Ferguson Act claim is essentially identical to the "no set of

circumstances" standard applied in *Home Builders Association of Greater Chicago v. U.S. Army Corps of Engineers* and *Association of Private Sector Colleges and Universities v. Duncan*. PCI can succeed on its facial challenge only if the McCarran-Ferguson Act would invariably preempt application of the Disparate Impact Rule to the provision and pricing of homeowners insurance. In other words, it can succeed only if no set of circumstances exists under which the regulation would be valid. *Cf. Wisconsin Cent.*, 539 F.3d at 761. With this standard in mind, the Court now turns to consideration of *Abbott Laboratories*' two-factor test for ripeness.

### 2. Ripeness Test

#### a. Fitness of the Issue for Judicial Decision

Where judicial review of an agency's action "involves purely legal claims in the context of a facial challenge to a final rule, a petition is 'presumptively reviewable.'" *Owner-Operator Ind. Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*, 656 F.3d at 586 (quoting *Sabre, Inc. v. Department of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005)). Despite this presumption, however, an issue is not fit for judicial decision where it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300, 118 S. Ct. 1257, 140 L. Ed. 2d 406 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985)). Nor is an issue fit for judicial decision if "further factual development would 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Nat'l Park Hospitality Ass'n*, 538 U.S. at 812 (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 82, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978)). Under these standards, the issue of whether the McCarran-Ferguson Act precludes application of the Disparate Impact Rule to the provision and pricing of homeowners insurance is not yet fit for judicial review. Although this question is a "purely legal one," the

contours of the purported controversy are not sufficiently fleshed out to allow for judicial resolution of the issues at this time. *See Nat'l Park Hospitality Ass'n,* 538 U.S. at 808.

To begin with, the Supreme Court expressly rejected an interpretation of the McCarran-Ferguson Act as creating "any sort of field preemption" in *Humana. See Humana,* 525 U.S. at 309. Under *Humana,* McCarran-Ferguson preclusion applies only when (1) a federal law directly conflicts with state regulation, (2) application of a federal law would frustrate a declared state policy, or (3) application of a federal law would interfere with a State's administrative regime. *See id.* at 310. Courts that have considered McCarran-Ferguson challenges to housing discrimination claims since *Humana* have looked to the particular, allegedly discriminatory practices at issue and the particular insurance regulations and administrative regime of the state in which those practices occurred. *See, e.g., Ojo,* 600 F.3d at 1203-05 (certifying to the Supreme Court of Texas the question of whether Texas law permits an insurance company to price insurance using a credit-score factor that has a racially disparate impact); *Saunders v. Farmers Ins. Exch.,* 537 F.3d 961, 965-68 (8th Cir. 2008) (analyzing Missouri's regulatory regime and the "precise federal claims asserted"—*i.e.,* that insurance companies charged higher premiums to homeowners in minority communities—in determining whether McCarran-Ferguson preclusion applied); *cf. AmSouth Bank v. Dale.* 386 F.3d 763, 781 (6th Cir. 2004) ("[W]hen assessing whether a general federal statute that creates a cause of action 'impairs' the operation of state law, the proper inquiry is whether the particular suit being brought would impair state law."). As these cases demonstrate, the McCarran-Ferguson analysis is more akin to the case-by-case analysis required for finding preemption under the Railway Labor Act than to the categorical analysis that applies in cases of field preemption. *Cf. Wisconsin Cent.,* 539 F.3d at 755-60.

PCI argues, however, that even though the McCarran-Ferguson Act does not establish field preemption, the Act does preclude all disparate impact claims based on the provision and pricing of homeowners insurance because federal adjudication of those claims would necessarily interfere with states' administrative regimes for regulating insurance. PCI relies heavily on *Doe v. Mutual of Omaha Ins. Co.,* 179 F.3d 557 (7th Cir. 1999), in support of this argument. In *Mutual of Omaha,* the Seventh Circuit found that permitting federal courts to determine whether caps on coverage in a health insurance policy are actuarially sound and consistent with principles of state law would result in them "stepping on the toes of state insurance commissioners." *See id.* at 564. Accordingly, the Seventh Circuit stated that even if the formal criteria for determining whether limitations on coverage are actuarially sound and consistent with state law, "displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of state law. The states are not indifferent to who enforces their laws." *Id.* (emphasis in original.)

According to PCI, it follows from *Mutual of Omaha* that the McCarran-Ferguson Act bars all claims brought under the Disparate Impact Rule because the second step of the Rule's burden-shifting approach requires courts to evaluate whether the challenged practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the defendant and whether those interests could be served by another practice with a less discriminatory effect. *See* 24 C.F.R. § 100.500. PCI argues that, in the insurance context, this analysis will necessarily require courts to determine whether the challenged practices are actuarially sound and consistent with state law—something that *Mutual of Omaha* prohibits federal courts from doing.

Although *Mutual of Omaha* supports PCI's argument that the McCarran-Ferguson Act

bars any claims that require courts to determine whether an insurer's practices are actuarially

sound and consistent with state law,[6] it does not necessarily establish that PCI's broad facial

challenge is fit for judicial decision.  A myriad of insurance practices may affect the provision

and pricing of homeowners insurance, and some of those practices may have a disparate impact

on protected groups under the FHA.  In the absence of an actual, concrete application of

disparate impact liability to the homeowners insurance industry, the Court can only speculate

about what types of disparate impact claims HUD or private plaintiffs may assert against insurers

and whether the McCarran-Ferguson Act will preclude those claims.  Variations among state

regulatory regimes, moreover, provide an additional variable that may complicate any

hypothetical McCarran-Ferguson analysis.  While some states require insurers to use risk-based

pricing, other states merely permit risk-based pricing, but do not require it.  Accordingly, some

insurance practices in some states may rest on business justifications rather than actuarially

sound principles or state law requirements.  Under *Mutual of Omaha*, the McCarran-Ferguson

Act would not necessarily preclude claims based on these practices because it is not clear that

such claims would raise the question of whether the insurer's practices are actuarially sound and

---

[6] During oral argument, HUD argued that the language at issue in *Mutual of Omaha* is dicta because the Court's holding turned on a statutory interpretation issue with respect to the Americans with Disabilities Act, not on the application of McCarran-Ferguson preclusion.  The Court disagrees.  The Seventh Circuit's decision in *Mutual of Omaha* rested *both* on its interpretation of the Americans with Disabilities Act *and* its determination that interpreting the Americans with Disabilities Act "as regulating the content of insurance policies is barred by the McCarran-Ferguson Act."  *See Mutual of Omaha,* 179 F.3d at 564. HUD also argued that reading *Mutual of Omaha* as holding that McCarran-Ferguson preclusion bars any claim that would require the court to evaluate whether an insurer's practices are actuarially sound and consistent with state law—rather than just the specific claim at issue in that case—would conflict with *Humana*.  The Seventh Circuit's opinion, however, plainly establishes that the court intended its holding to bar more than just the specific claim at issue.  Indeed, the actual claims at issue in *Mutual of Omaha* did not require the Seventh Circuit to determine whether the defendant's practices were actuarially sound and in accordance with state law because the defendant stipulated that they were not.  *Id.* at 564.  *Mutual of Omaha* is binding on this Court.

consistent with state law. As matters now stand, there are simply "too many imponderables" to allow the Court to determine whether the McCarran-Ferguson Act categorically applies to all disparate impact claims that may fall within the scope of PCI's McCarran-Ferguson challenge. *See Clean Air Implementation Project v. EPA,* 150 F.3d 1200, 1205 (D.C. Cir. 1998).

Under the circumstances, "further factual development would 'significantly advance [the Court's] ability to deal with the legal issues presented'" in PCI's McCarran-Ferguson claim. *See Nat'l Park Hospitality,* 538 U.S. at 812. Similar to the situation in *National Park Hospitality,* both parties here rely on examples of challenges to specific insurance practices to which McCarran-Ferguson preclusion applies and point to specific state insurance laws to support their respective arguments. *See id.* Accordingly, the Court finds that judicial resolution of whether McCarran-Ferguson preclusion applies to disparate impact claims should await a concrete dispute regarding a particular insurance practice. *See id.* (finding that an APA claim asserting that the National Park Service's regulations regarding the concession management program for national parks violated the Contract Disputes Act of 1978 was not ripe because the parties' arguments depended in part on the characteristics of certain types of concession contracts and the respondents acknowledged that some (but not all) types of the contracts might fall within the scope of Contract Disputes Act); *see also Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 163-64, 87 S. Ct. 1520, 18 L. Ed. 2d 697 (1967) (holding that the petitioner's challenge to the regulations promulgated by the Commissioner of Food and Drugs exceeded his statutory authority where the regulation served notice only that the Commissioner may under certain circumstances order inspection of certain facilities and data and "[a]t this junction we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order"); *Texas v. United States,* 523 U.S. 296, 301, 118 S. Ct. 1257, 140 L.

28

Ed. 2d 406 (1998) ("Determination of the scope . . . of legislation in advance of its immediate

adverse effect in the context of a concrete case [often] involves too remote and abstract an

inquiry for the proper exercise of the judicial function." (quoting *Longshoremen v. Boyd,* 347

U.S. 222, 224, 74 S. Ct. 447, 98 L. Ed. 650 (1954))); *Wisconsin Cent.,* 539 F.3d at 760 (finding

that the question of whether the RLA and the Labor Management Relations Act preempted a

state law was not fit for judicial decision because it required a "case-by-case factual analysis to

determine the extent to which a state law claim will require interpretation of a [collective

bargaining agreement]."); *Clean Air Implementation Project,* 150 F.3d at 1205 ("Given the

universe of all possible evidence that might be considered 'credible,' it is impossible for us to

decide now what impact the [EPA's rule permitting the use of 'credible evidence' to prove or

disprove violations of the Clean Air Act] will have.").[7]

---

[7] In addition to *Mutual of Omaha,* PCI also cites several out-of-circuit cases in which courts decided as a purely legal question that McCarran-Ferguson preclusion applied in support of its ripeness argument. In each of those cases, however, the court considered a challenge to particular conduct in a particular state (or states), and, as a result, the court was able to evaluate whether resolution of the plaintiff's particular claim would invalidate, impair, or supersede the state's insurance regulations. *See American Bankers Ins. Co. of Fla. v. Inman,* 436 F.3d 490 (5th Cir. 2006) (holding that McCarran-Ferguson preclusion applied where application of the Federal Arbitration Act would invalidate a Mississippi statute prohibiting the arbitration of disputes regarding uninsured motorist coverage); *La Barre v. Credit Acceptance Corp.,* 175 F.3d 640 (8th Cir. 1999) (finding that the McCarran-Ferguson Act precluded application of RICO to the activities of two defendants but not to the activities of a third defendant); *Datacor, Inc. v. Heritage Warranty Ins. Risk Retention Grp., Inc.,* No. 4:09-CV-1123 (CEJ), 2009 WL 5062137 (E.D. Mo. Dec. 16, 2009) (concluding that a Nebraska statute exempting arbitration provisions found in insurance contracts from the rule favoring enforcement of agreements to arbitrate precluded application of the Federal Arbitration Act to compel arbitration of plaintiff's insurance-related claim); *In re Managed Care Litig.,* 185 F. Supp. 2d 1310 (S.D. Fla. 2002) (holding that the McCarran-Ferguson Act barred the RICO claims of the plaintiffs residing in California, Florida, New Jersey, and Virginia because those states did not allow for private causes of action by victims of insurance fraud). These cases do not support a finding that PCI's McCarran-Ferguson claim, which is divorced from any concrete application of the Disparate Impact Rule, is ripe for review. *See Wisconsin Cent.,* 539 F.3d at 759 ("[C]ases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." (quoting *Lehn v. Holmes,* 364 F.3d 862, 867 (7th Cir. 2004))).

### b.      Hardship to the Parties of Withholding Court Consideration

Turning to the second ripeness factor under *Abbott Labs.*, PCI also fails to establish that withholding judicial determination of its McCarran-Ferguson claim will cause its members hardship. *Abbott Labs.,* 387 U.S. at 149; *Nat'l Park Hosp.*, 538 U.S. at 808. There is no dispute that the McCarran-Ferguson Act, where it applies, trumps any claims brought under the Disparate Impact Rule—just as it trumped any disparate impact claims brought against insurers before HUD issued the Rule. Accordingly, even though the Disparate Impact Rule may expand the exposure of PCI's members to disparate impact liability generally, it does nothing to prevent PCI's members from challenging disparate impact claims as preempted by the McCarran-Ferguson Act. Nor does it change the analysis that courts apply in deciding whether the McCarran-Ferguson Act precludes a specific claim.

Accordingly, the only hardship that PCI's members might suffer from the Court withholding a decision on the merits here is the burden of having to challenge disparate impact claims under the McCarran-Ferguson Act on a case-by-case basis rather than in one fell swoop. As a general rule, the additional burden to a litigant of case-by-case adjudication is not a sufficient hardship to justify judicial review of an otherwise unripe claim. *See Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 734-35, 118 S. Ct. 1665, 140 L. Ed. 2d 921 (1998) (although it would be "easier, and certainly cheaper," for the respondent to mount one legal challenge to an agency's plan rather than several challenges to specific decisions made pursuant to that plan, "the Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe"); *Clean Air Implementation Project,* 150 F.3d at 1205 ("If the [EPA's] credible evidence rule has in fact altered [emission standards], petitioners can raise that as a defense in an enforcement action. The burden of participating in

future proceedings does not 'constitute sufficient hardship for the purposes of ripeness.'"

(quoting *Florida Power & Light Co. v. EPA,* 145 F.3d 1414, 1421 (D.C. Cir. 1998))).  To the

contrary, the ripeness doctrine already "reflects a judgment that the disadvantages of a premature

review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of—

even repetitive—post-implementation litigation."  *Ohio Forestry Ass'n,* 523 U.S. at 735

(collecting cases).[8]

In *Wisconsin Central,* the Seventh Circuit recognized that, in the preemption context, the

plaintiff may satisfy the hardship requirement by establishing a "possibility that it will need to

defend itself in an enforcement action ultimately preempted."  *See* 539 F.3d at 761.  The Seventh

Circuit also explained that this type of hardship makes a preemption claim ripe only when the

circumstances at issue "would invariably lead to a finding of preemption."  *Id.*  As discussed

above, the Court is not in a position to determine whether the McCarran-Ferguson Act will

necessarily preempt all disparate impact claims based on the provision or pricing of homeowners

insurance.  PCI, therefore, has not established that withholding consideration of its McCarran-

Ferguson claim will cause its members hardship under the analysis in *Wisconsin Central.*

In sum, the Court finds that judicial determination of whether McCarran-Ferguson

preclusion applies to the broad range of potential claims that may fall within PCI's McCarran-

Ferguson challenge is best left for a concrete dispute challenging a particular insurance practice,

---

[8] PCI claims that, unlike in the *Ohio Forestry Association* and *Clean Air Implementation Project* cases, its members face the additional hardship of having to "either cease engaging in the core insurance practices of state-regulated risk-based pricing and underwriting or risk substantial liability under the Disparate Impact Rule."  (*See* Pl. Resp. Br. at 18.)  This argument, however, has no merit with respect to PCI's McCarran-Ferguson claim because the Disparate Impact Rule does not alter the application or effect of McCarran-Ferguson preclusion.  *Cf. Toilet Goods Ass'n,* 387 U.S. at 164-65 (finding no hardship where the petitioners already had a statutory duty to permit inspections of their factories and "no irremediable adverse consequences flow from requiring a later challenge to [the] regulation by a manufacturer who refuses to allow this type of inspection).

31

and withholding judicial decision until that time will not impose a hardship on PCI's members. Accordingly, PCI's claim that the Disparate Impact Rule violates the McCarran-Ferguson is not ripe, and the Court lacks jurisdiction to decide it.

### B. Standing

Next, the Court considers whether PCI has standing to assert its remaining claims.[9]  The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Bennett v. Spear,* 520 U.S. 154, 162, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997).  To establish constitutional standing, a plaintiff must show (1) an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) a causal connection between the plaintiff's injury and the complained-of conduct, and (3) a likelihood that a favorable decision will redress the plaintiff's injury.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *Clapper v. Amnesty Int'l USA,* --- U.S. ----, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013).  Apart from the constitutional limitations on standing, federal courts have also created self-imposed prudential limits on their exercise of federal jurisdiction.  *See, e.g., G&S Hldgs. LLC v. Continental Cas. Co.,* 697 F.3d 534, 541 (7th Cir. 2012).  Unlike constitutional standing requirements, however, "prudential limitations on standing can be waived."  *Korte v. Sebelius,* 735 F.3d 654, 668 (7th Cir. 2013).  Here, HUD has raised objections only to PCI's constitutional standing, not its prudential standing.  The Court, therefore, limits its discussion to the constitutional requirements for standing.[10]

---

[9] Because the Court has determined that PCI's McCarran-Ferguson claim is not ripe, the Court need not determine whether PCI has standing to assert that claim.

[10] Although the Court has discretion to overlook HUD's waiver, the Court sees no reason to do so in this case.

An organization such as PCI has standing to sue on behalf of its members even if the organization itself has not suffered an injury if it can show that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000). Only the first requirement of associational standing—that PCI's members have standing to sue in their own right—is at issue here. To meet this requirement, PCI must show that at least one of its members has standing to assert the claims PCI has brought. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); *see also Consumer Fed'n of Am. v. Federal Commc'ns Comm'n,* 348 F.3d 1009, 1012 (D.C. Cir. 2003) ("It is enough [for associational standing] if just one member of the groups has standing.").

As an initial matter, when the plaintiff is "an object of the action (or forgone action) at issue . . . there is ordinarily little question that the action or inaction has caused him injury." *See Owner-Operator Ind. Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.,* 656 F.3d 580, 586 (7th Cir. 2011) (quoting *Lujan,* 504 U.S. at 561-62); *Fund for Animals, Inc. v. Norton,* 322 F.3d 728, 733-34 (D.C. Cir. 2003) (a party's standing to seek judicial review of administrative action is generally "self-evident" when the party is an object of the action at issue). This case is no exception. PCI's member companies, which provide homeowners insurance across the United States (*see* Pl. L.R. 56.1 Stmt. ¶ 2), are among the "objects" of the Disparate Impact Rule, and, as explained below, they satisfy the requirements for constitutional standing.

### 1.    Injury in Fact

First, PCI's members have suffered an "injury in fact" because the Disparate Impact Rule increases their exposure to disparate impact liability under the FHA.  Although the Disparate Impact Rule simply confirmed preexisting legal standards in some circuits, it went beyond established law in others.  The Seventh and Eighth Circuits, for example, had expressly declined to decide whether disparate impact liability applies to the insurance industry under the FHA, *see American Family,* 978 F.2d at 290; *Saunders,* 537 F.3d at 964, and neither the Supreme Court nor the Court of Appeals for the District of Columbia has decided whether the FHA allows for disparate impact claims before HUD issued the Disparate Impact Rule.  The increased exposure of PCI's members to disparate impact claims under the Rule satisfies the "injury in fact" requirement of Article III standing.  *Cf. Johnson v. Allsteel, Inc.,* 259 F.3d 885, 888 (7th Cir. 2001) (granting increased discretion to an ERISA plan administrator increased the plan participant's risk of having his claim for benefits denied, and "[t]he increased risk the participant faces as a result is an injury-in-fact").

Additionally, officers of several of PCI's member companies submitted declarations averring that, as a practical matter, the Disparate Impact Rule will require the company to begin collecting and reviewing information regarding applicants' race, color, ethnicity, national origin, religion, and disability status to monitor their compliance with the Rule.  The declarants represented that doing so will cause their companies to incur costs related to determining what additional data they need and how to obtain it, collecting the data in accord with federal and state laws, and monitoring the data to ensure compliance with the Rule.  (*See* R. 44-2, Cracas Decl. ¶¶ 6-12; R. 44-3, Dawdy Decl. ¶¶ 11-14; R. 44-4, Zaleski Decl. ¶¶ 10-13, 18-20; R. 44-5, Drogan Decl. ¶¶ 7, 10-12.)  HUD has put forward no evidence rebutting the declarations PCI submitted,

so the Court accepts the declarants' representations as true. The compliance costs reported by PCI's members alone are sufficient to satisfy the "injury in fact" requirement of Article III standing. *See Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 392, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988) (holding that the plaintiffs had suffered an injury in fact where "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution"); *Association of Private Sector Colls. & Univs. v. Duncan,* 681 F.3d 427 (D.C. Cir. 2012) ("If states bend to the Department's will, [Appellant's] members are harmed because they will face even greater compliance costs." (alteration in original)); *Keller v. City of Fremont,* 719 F.3d 931, 947 (8th Cir. 2013) (recognizing that a party has standing to challenge a law that "imposes compliance burdens on those it regulates or controls, and compliance is coerced by the threat of enforcement" (internal quotations omitted)).

### 2. Causation

Second, the injuries PCI's members have suffered are fairly traceable to the Disparate Impact Rule. PCI and others in the insurance industry urged HUD to exempt insurers from the Disparate Impact Rule or at least build safe harbors into the Rule for insurers' consideration of long-recognized actuarial risk factors. HUD refused to do so, and as a result, PCI's members now face exposure to disparate impact liability in jurisdictions that had not previously recognized disparate impact claims against insurers. Furthermore, as the declarations PCI submitted establish, its members' increased exposure to disparate impact liability will cause them to incur additional costs collecting, analyzing, and monitoring data to ensure their compliance with the Disparate Impact Rule. (*See* Cracas Decl. ¶¶ 6-12; Dawdy Decl. ¶¶ 11-14; Zaleski Decl. ¶¶ 10-13, 18-20; Drogan Decl. ¶¶ 7, 10-12.)

HUD argues that any injuries PCI's members suffered "are the result of the longstanding administrative and judicial recognition of disparate impact liability under the FHA and the coverage of insurers under the FHA," not HUD's issuance of the Disparate Impact Rule. (*See* Def. Resp. Br. at 13-15.) As explained above, however, the Disparate Impact Rule did more than merely confirm preexisting legal requirements; it exposed PCI's members to disparate impact claims in some jurisdictions where the circuit court had not yet recognized the viability of such claims. Accordingly, the present case is distinguishable from *National Association of Home Builders v. U.S. Army Corps of Engineers,* 663 F.3d 470 (D.C. Cir. 2011), upon which HUD relies, where the "only alteration of the baseline circumstances was in favor of [the plaintiffs]." *See id.* at 474. Here, the Disparate Impact Rule works *against* PCI's members by increasing their exposure to disparate impact liability, not in their favor.

Additionally, as the Court of Appeals for the District of Columbia recognized in *National Association of Home Builders,* "the historical baseline is not the only possible measure of injury." *See id.* at 475. The D.C. Circuit recently confirmed that plaintiffs "need not show that [an agency directive] rendered them worse off than the status quo ante" to establish Article III standing; "[t]hey may alternatively show that, had the [agency] taken the course of action that they claim the law required, they would have been better off." *See Nat'l Envtl. Dev. Ass'n Clean Air Project v. EPA,* 752 F.3d 999, 1006 (D.C. Cir. 2014). Under this approach, "[t]he consequences of the agency's action must, for causation purposes, be assessed not by reference to the status quo ante but instead to other actions [the agency] could have taken." *Id.* Because PCI's members would have been better off if HUD had exempted homeowners insurers from the Disparate Impact Rule, created safe harbors in the Rule for long-recognized actuarial risk factors, and/or adopted the insurance industry's proposed burden-shifting framework for proving

disparate impact claims—as PCI claims HUD should have done—PCI has satisfied the causation requirement of Article III standing. *See id.*

### 3. Redressability

Third, PCI's members satisfy the redressability requirement of Article III standing. In its remaining claims, PCI argues (1) that HUD's decision that the Disparate Impact Rule applies to homeowners insurance was arbitrary and capricious because HUD did not give adequate consideration to comments from PCI and other insurance industry members regarding the inappropriateness of applying disparate impact liability to insurers, and (2) the burden-shifting framework HUD adopted is contrary to law. The first argument presents a procedural challenge to the Disparate Impact Rule. In the context of procedural challenges, the plaintiff does not need to show that the agency would alter its rules upon following the proper procedures in order to establish redressability. *See Iowa League of Cities v. EPA,* 711 F.3d 844, 871 (8th Cir. 2013) (collecting cases); *see also Lujan,* 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."). The plaintiff need only demonstrate "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *See Iowa League of Cities,* 711 F.3d at 871 (quoting *Massachusetts v. EPA,* 549 U.S. 497, 518, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007)). Because there is "some possibility" that granting PCI's requested relief—namely remanding the case to HUD to explain its decision or adopt changes to the Disparate Impact Rule—will prompt HUD to reconsider its decision that the Rule applies to homeowners insurers, PCI has satisfied the redressability requirement of Article III standing with respect to its procedural claim. *See id.*; *Massachusetts v. EPA,* 549 U.S. at 518; *see also Sugar Cane Growers Co-op. of Fla. v.*

*Veneman,* 289 F.3d 89, 94-95 (D.C. Cir. 2002) ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result.").

PCI also satisfies the redressability requirement with respect to its challenge to HUD's burden-shifting framework. PCI argues that HUD should have adopted the burden-shifting framework applied in *Wards Cove.* A ruling in PCI's favor on this issue will result in a more favorable burden of proof to PCI's members, thereby decreasing their exposure to disparate impact liability. This potential is sufficient to demonstrate redressability.

## II.  Merits of PCI's Remaining Claims

Having found that PCI has standing to assert its remaining claims, the Court now turns to the merits of those claims. First, PCI challenges HUD's determination that the Disparate Impact Rule applies to homeowners insurance as arbitrary and capricious because HUD did not give adequate consideration to various substantive comments from the insurance industry. Second, PCI argues that the burden-shifting framework HUD adopted is contrary to law. The Court addresses PCI's argument that application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious first.

### A.  Was HUD's Application of the Disparate Impact Rule to Homeowners Insurers Arbitrary and Capricious?

#### 1.  Standard of Review

Review of an agency's action under the arbitrary and capricious standard is narrow and highly deferential. *See Indiana Forest Alliance, Inc. v. U.S. Forest Serv.,* 325 F.3d 851, 858-59 (7th Cir. 2003); *Cassell v. Napolitano,* No. 12-cv-9786, 2014 WL 1303497, at *6 (N.D. Ill. Mar. 31, 2014). To determine whether an agency action is arbitrary or capricious, a reviewing court

must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *See Indiana Forest Alliance,* 325 F.3d at 858-59 (quoting *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989)). Courts will not vacate an agency's decision unless the agency

> has relied on factors which Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the agency, or is so
> implausibly that it could not be ascribed to a difference in view of the product of
> agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658, 127 S. Ct. 2518, 168 L. Ed. 2d 467 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

A reviewing court must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S.,* 463 U.S. at 43; *see also F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 513, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009). The court, however, may not substitute its judgment for the judgment of the agency. *See Fox Television Stations,* 556 U.S. at 513; *see also Environmental Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n,* 470 F.3d 676, 682 (7th Cir. 2006). With these standards in mind, the Court turns to PCI's specific challenges to HUD's actions as arbitrary and capricious.

### 2.    HUD's Consideration of the McCarran-Ferguson Act

First, PCI argues that HUD failed to adequately consider the insurance industry's comments that application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act. (*See* Admin. R. 372-83, 553-56.) HUD provided the following response to the insurance industry's comments regarding the McCarran-Ferguson Act:

> HUD has long interpreted the [FHA] to prohibit discriminatory practices in
> connection with homeowner's insurance, and courts have agreed with HUD,
> including in *Ojo v. Farmers Group*. Moreover, as discussed above, HUD has
> consistently interpreted the Act to permit violations to be established by proof of
> discriminatory effect. By formalizing the discriminatory effects standard, the rule
> will not, as one commenter suggested, "undermine the states' regulation of
> insurance." The McCarran-Ferguson Act provides that "[n]o Act of Congress
> shall be construed to invalidate, impair, or supersede any law enacted by the State
> for the purpose of regulating the business of insurance . . . unless such Act
> specifically relates to the business of insurance." McCarran-Ferguson does not
> preclude HUD from issuing regulations that may apply to insurance policies.
> Rather, McCarran-Ferguson instructs courts on how to construe federal statutes,
> including the Act. How the Act should be construed in light of McCarran-
> Ferguson depends on the facts at issue and the language of the relevant State law
> "relat[ing] to the business of insurance." Because this final rule does not alter the
> instruction of McCarran-Ferguson or its application as described in *Ojo v.
> Farmers Group*, it will not interfere with any State regulation of the insurance
> industry.

Final Rule, 78 Fed. Reg. at 11475. In short, HUD determined that the question of whether

McCarran-Ferguson preclusion applies should be left to a case-by-case basis determination based

on the facts at issue and the relevant state laws.

As an initial matter, the Court notes that its determination that PCI's McCarran-Ferguson

claim is not ripe for judicial review does not necessarily mean that HUD's decision to leave

application of McCarran-Ferguson preclusion for a case-by-case determination was not arbitrary

and capricious. Federal agencies, unlike federal courts, have rule-making authority, and they can

address issues through rule-making that federal courts cannot because of constitutional or

prudential limitations on their jurisdiction. *See SEC v. Chenery Corp.,* 332 U.S. 194, 202, 67 S.

Ct. 1575, 91 L. Ed. 1995 (1947) ("Since the [SEC], unlike a court, does have the ability to make

new law prospectively through the exercise of its rule-making powers, it has less reason to rely

upon ad hoc adjudication to formulate new standards of conduct . . . ."). Indeed, "[r]ule-making

is an essential component of the administrative process and . . . is often the preferred procedure

for the evolution of agency policies." *Trans-Pac. Freight Conference of Japan/Korea v. Fed.*

*Mar. Comm'n,* 650 F.2d 1235, 1244-45 (D.C. Cir. 1980); *see also Chenery,* 332 U.S. at 202

("The function of filling in the interstices of [a statute] should be performed, as much as possible,

through this quasi-legislative promulgation of rules to be applied in the future.").

> Rule-making has several advantages over piecemeal adjudication:
>
> Rule-making permits more precise definition of statute standards than would
> otherwise arise through protracted, piecemeal litigation of particular issues. It
> allows all those who may be affected by a rule an opportunity to participate in the
> deliberative process, while adjudicatory proceedings normally afford no such
> protection to nonparties. And because rule-making is prospective in operation
> and general in scope, rather than retroactive and condemnatory in effect,
> interested parties are given advance notice of the standards to which they will be
> expected to conform in the future, and uniformity of result is achieved.

*See Trans-Pac. Freight Conference of Japan/Korea,* 650 F.2d at 1244-45. Rule-making,

however, is not always the best method for creating standards. *See Chenery,* 332 U.S. at 202.

When a problem arises that that agency could not have reasonably foreseen, for example, or

when the agency does not have "sufficient experience with a particular problem to warrant

rigidifying its tentative judgment into a hard and fast rule," case-by-case determinations may be

more beneficial than rule-making. *See id.* at 202-03. The same is true when a problem is "so

specialized and varying in nature as to be impossible of capture within the boundaries of a

general rule." *See id.* at 203.

The decision of whether to address an issue through general rule-making or case-by-by

determinations lies largely within the agency's discretion. *See Shays v. Federal Election

Comm'n,* 424 F. Supp. 2d 100, 113 (D.D.C. 2006) (citing *Chenery,* 332 U.S. at 203). An

agency's reliance on case-by-case adjudication, however, can amount to an abuse of discretion in

some cases. *See id.* Furthermore, an agency's failure to provide a reasoned explanation for

relying on case-by-case adjudication may render its decision arbitrary and capricious. *See id.* at

116; *see also Williams Natural Gas Co. v. F.E.R.C.,* 872 F.2d 438, 450 (D.C. Cir. 1989)

("Issuance of the [Notice of Proposed Rulemaking] . . . oblige[d] the agency to consider the comments it received and to articulate a reasoned explanation for its decision.").

HUD's one-paragraph response to the insurance industry's detailed concerns that applying the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act fails to provide a reasoned explanation to prefer case-by-case application of McCarran-Ferguson preclusion over rule-making. To begin with, the fact that the McCarran-Ferguson Act does not preclude HUD from issuing regulations that may apply to insurance policies does not mean that HUD can simply disregard the likelihood that McCarran-Ferguson preclusion will apply in promulgating its regulations. *Cf. Shays,* 424 F. Supp. 2d at 116 ("The question . . . is not whether the Commission has statutory authority to bring enforcement actions, but whether it acted rationally here by refusing to promulgate a rule in favor of its purported preference for piecemeal adjudications . . . .").

Furthermore, although HUD recognized that application of McCarran-Ferguson preclusion depends on the facts at issue and the relevant State laws, it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers. In other words, HUD made no attempt to determine whether the benefits of proceeding by case-by-case adjudications outweighed the benefits of including an exemption or safe harbors for insurers in the Disparate Impact Rule. HUD's lack of analysis is particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha,* 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders,* 537 F.3d at 967, that "a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime." Based on the record, HUD has failed to consider this important aspect of the issue.

Finally, HUD's statement that the Disparate Impact Rule would not alter the McCarran-Ferguson analysis performed in *Ojo v. Farmers Group* does not explain why case-by-case adjudication is more appropriate than rule-making. Courts do not have rule-making authority; unlike agencies, they can only decide issues through case-by-case adjudications. Moreover, while HUD cited *Ojo* to support its position that case-by-case adjudication is appropriate, it failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate impact claims against insurers in light of the McCarran-Ferguson Act.

Although HUD had discretion to decide whether to proceed by case-by-case adjudication or rule-making, it needs to provide a reasoned explanation for preferring case-by-case adjudication over rule-making. HUD's failure to do so was arbitrary and capricious. *See Shays,* 424 F. Supp. 2d at 116 (the Federal Election Committee's lack of explanation for its conclusion that adjudication is preferable to rulemaking for specific groups rendered its purported preference for piecemeal adjudications an abuse of discretion); *see also Chamber of Commerce of U.S. v. Federal Election Comm'n,* 69 F.3d 600, 606 (D.C. Cir. 1995) (holding that the agency's regulation was arbitrary and capricious because the agency failed to provide a reasoned explanation for including certain exemptions). The Court, therefore, remands this case to HUD for further explanation.

### 3.     HUD's Consideration of the Filed-Rate Doctrine

Second, PCI claims that HUD failed to adequately consider whether the Disparate Impact Rule violated the filed-rate doctrine. The filed-rate doctrine "forbids courts from invalidating or modifying rates that have been filed with regulatory agencies." *See Schilke v. Wachovia Mortgage, FSB,* 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011) (citing *Goldwasser v. Ameritech*

*Corp.,* 222 F.3d 390, 402 (7th Cir. 2000); *Arsberry v. Illinois,* 244 F.3d 558, 562 (7th Cir. 2001)).  Put differently, the doctrine "bars courts from altering filed rates, and, by extension, prohibits a court from awarding a plaintiff damages based on the difference between a filed rate and an allegedly lawful rate."  *Id.*

During the notice-and-comment period, National Association of Mutual Insurance Companies ("NAMIC") expressed concern that applying the Disparate Impact Rule to homeowners insurance would violate the filed-rate doctrine.  (*See* Admin. R. at 378.)  In its Final Rule, HUD grouped NAMIC's comment regarding the filed-rate doctrine with the insurance industry's comments regarding the McCarran-Ferguson Act.  *See* Final Rule, 78 Fed. Reg. at 11474 ("Some commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act . . . or the common law 'filed rate doctrine.'").  In its response to those questions, however, HUD referenced only the McCarran-Ferguson Act; it did not mention the filed-rate doctrine.

HUD's failure to separately discuss the filed-rate doctrine, on its own, does not render the Disparate Impact Rule's application to homeowners insurers arbitrary and capricious.  The purpose of the filed-rate doctrine is very similar to the purpose of the McCarran-Ferguson Act—preventing courts from interfering with state's regulatory regimes, and where the filed-rate doctrine applies, the McCarran-Ferguson Act almost certainly applies too.  Accordingly, HUD's response (or lack thereof) to NAMIC's filed-rate doctrine argument alone does not make its actions arbitrary and capricious.  *See Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461, 497, 124 S. Ct. 983, 15 L. Ed. 2d 967 (2004) ("Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" (quoting *Bowman Trasp., Inc. v. Arkansas-Best*

*Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974))).  In failing to give

adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson

Act, however, HUD also failed to give adequate consideration to NAMIC's comments regarding

the filed-rate doctrine.  Accordingly, on remand, HUD must explain its decision regarding the

filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-

Ferguson comments.

### 4.  HUD's Consideration of the Nature of Insurance

Third, PCI claims that HUD did not adequately address the effect the Disparate Impact

Rule would have on the insurance industry due to the nature of insurance.  During the notice-

and-comment period, members of the insurance industry raised several concerns about the

inappropriateness of applying disparate impact liability to insurers based on the fundamental

nature of insurance.  The commenters noted that "[t]he foundation of the business of insurance,

and in particular underwriting and rate-making, is classifying insurance applicants and

policyholders by risk.  Insurers make decisions based on actuarial and business principles that

group policyholders for the purpose of treating those with similar risk profiles similarly."  (*See*

Admin. R. at 376); *see also American Family,* 978 F.2d at 290 ("Insurance works best when the

risks in the pool have similar characteristics.").  The very essence of risk-based pricing involves

"identify[ing] relationships between factors and risk of loss and allocate[ing] costs accordingly."

(*See* Admin. R. at 376.)  The insurance industry argued that applying disparate impact liability to

insurers could jeopardize their use of actuarially sound underwriting factors that are "at the very

heart of the business of insurance."[11]  (*See id.* at 376-77.)  Additionally, the insurance industry

---

[11] Factors commonly used in pricing homeowners insurance include "claim history of the applicant, construction material(s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of

argued that preventing insurers from classifying people and properties by the risks they present and treating similar risk profiles in a similar way—regardless of the disparate impact this may have on certain groups—would increase adverse selection and decrease the availability of coverage. (*See id.* at 377-78.)

> HUD provided the following response to these comments:
>
> HUD believes that these concerns are misplaced. First, they presume that once a discriminatory effect is shown, the policy at issue is per se illegal. This is incorrect. Rather, as § 100.500 [of the Disparate Impact Rule] makes clear, the respondent or defendant has an opportunity to defend the business justifications for its policies. This "burden-shifting framework" distinguishes "unnecessary barriers proscribed by the Act from valid policies and practices crafted to advance legitimate interests." Thus if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.

Final Rule, 78 Fed. Reg. at 11475. HUD went on to state that "[c]reating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act. Moreover, creating exemptions beyond those found in the Act would run contrary to Congressional intent." *Id.* (citing *Groach Associates #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374-75 (6th Cir. 2007)).

HUD's response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance was arbitrary and capricious. HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework. The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation

---

property, roofing material, trampoline use, slab versus basement and the present of an operational security system." (*See* Admin. R. at 376.)

to consider the substance of the insurance industry's concerns raised during the notice-and-comment period.  *See State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43 (an agency rule is arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem").

HUD relies on *Groach* to justify its decision not to create categorical exemptions to disparate impact liability.  *See* Final Rule, 78 Fed. Reg. at 11475 nn.140-41.  In *Groach,* however, the Sixth Circuit expressly found that "if *no* disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate-impact challenges to that practice."  *See* 508 F.3d at 375 (emphasis in original). Indeed, the Sixth Circuit saw "no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success . . . ."  *Id.* at 376.  *Groach,* therefore, supports the insurance industry's argument that HUD should include exemptions from the Disparate Impact Rule or create safe harbors in the Rule for insurance practices that plaintiffs would have no chance of successfully challenging under the burden-shifting framework.  *See id.*

The insurance industry properly raised its concerns about the application of disparate liability to insurers during the notice-and-comment period, and HUD had an obligation to respond to the substance of those concerns or, alternatively, provide a reasoned explanation why case-by-case determinations of the insurers' arguments are preferable to rule-making.  *See Shays,* 424 F. Supp. 2d at 116; *Williams Natural Gas Co.,* 872 F.2d at 450.  HUD's failure to do so makes the Disparate Impact Rule's application to homeowners insurance arbitrary and capricious.  *See Shays,* 424 F. Supp. 2d at 116.  Accordingly, the Court remands this case to HUD for further explanation.

### B.    Is HUD's Burden-Shifting Approach Contrary to Law?

Finally, PCI contests HUD's adoption of the three-step burden-shifting approach outlined in the Disparate Impact Rule as contrary to law.  Specifically, PCI argues that HUD's burden-shifting approach is contrary to the approach the Supreme Court adopted for disparate impact claims in *Wards Cove Packing Co. v. Antonio,* 490 U.S. 642, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989).[12]

HUD's burden-shifting approach, like the *Wards Cove* approach, consists of three steps: the first step centers on whether a practice has a disparate impact on protected groups; the second step concerns whether the defendant has a legitimate business reasons for engaging in the practice; and the third step evaluates whether a less discriminatory alternative would also serve the defendant's legitimate business interests.  Several differences, however, exist between the two approaches.  First, the *Wards Cove* approach requires the plaintiff to challenge a *particular* practice, whereas HUD has indicated that a plaintiff may be able "to challenge the decision-making process as a whole."  *See* 78 Fed. Reg. at 11469.  Second, *Wards Cove* requires the plaintiff to show that the challenged practice creates a "significant" disparate impact, whereas HUD's framework does not require a showing that the alleged disparate impact is "significant." Third, under the *Wards Cove* approach, the burden of proof always remains with the plaintiff, and only the burden of production shifts to the defendant.  In HUD's framework, on the other hand, the defendant bears the burden of proof—not just the burden of production—in the second step.  Fourth, *Wards Cove* does not require the defendant's legitimate business interest to be

---

[12] In 1991, Congress established a statutory framework for proving disparate impact claims in the Title VII context that was less burdensome on plaintiffs than the *Wards Cove* standard.  *See* 42 U.S.C. § 2000e-2(k); *see also Smith v. City of Jackson, Miss.,* 544 U.S. 228, 240, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005).  The Supreme Court, however, has continued to apply the *Wards Cove* framework outside the Title VII context.  In *Smith,* for example, the Supreme Court held that the *Wards Cove* standard continues to govern age discrimination claims brought under the Age Discrimination in Employment Act ("ADEA").  *See* 544 U.S. at 240-41.

"essential" or "indispensable" for it to pass muster in the second step, but HUD's framework requires the defendant to prove that its business interest was "necessary." Fifth, in *Wards Cove,* the Supreme Court held that any alternative practice the plaintiff offered in the third step must be "equally effective" as the challenged practice. HUD, on the other hand, has determined that an "equally effective" standard is inappropriate.

Pursuant to *Chevron v. U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), courts must defer to agency interpretation of a statute where Congressional intent is unclear, and a statute affords an agency authority under the statute.[13] A two-step analysis applies for determining whether *Chevron* deference applies. In the first step of the *Chevron* analysis, the court must determine whether "the intent of Congress is clear" regarding the precise question at issue. *See Barnhart v. Walton,* 535 U.S. 212, 218, 122 S. Ct. 1265, 152 L. Ed. 2d 330 (2002) (citing *Chevron,* 467 U.S. at 842-43). If "the statue speaks clearly 'to the precise question at issue,' [a court] 'must give effect to the unambiguously expressed intent of Congress.'" *Id.* If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to the second step of the *Chevron* analysis, in which the Court defers to any reasonable agency interpretation of the statute. *See Castro v. Chicago Hous. Auth.,* 360 F.3d 721, 727 (7th Cir. 2004). With respect to the first step of the *Chevron* analysis, the FHA is silent regarding how the FHA or a private plaintiff should prove a housing discrimination claim. Accordingly, resolution of this issue rests on the second step of the *Chevron* analysis, and the Court must uphold HUD's adoption of the three-step burden-shifting framework as long as it is a reasonable interpretation of the FHA.

---

[13] There is no dispute here that Congress authorized HUD to implement and administer the FHA. *See* 42 U.S.C. § 3614a.

The burden-shifting framework HUD adopted in the Disparate Impact Rule reflects HUD's reasonable accommodation of the competing interests at stake—*i.e.,* the public's interest in eliminating discriminatory housing practices and defendants' (including insurer-defendants') interest in avoiding costly or frivolous litigation based on unintentional discriminatory effects of their facially neutral practices. HUD's framework is largely consistent with the framework courts have developed on their own for analyzing disparate impact claims. Although the approaches adopted in each circuit varied before the Disparate Impact Rule, the most recent decisions applied the same approach adopted by HUD. *See Inclusive Communities Project, Inc. v. Texas Dept. of Hous. & Comm'ty Affairs,* 747 F.3d 275, 281-82 (5th Cir. 2014) (collecting cases). Additionally, the approach HUD adopted is similar to the statutory approach Congress adopted for Title VII disparate impact cases. *See* 42 U.S.C. § 2000e-2(k). Courts have repeatedly turned to Title VII precedent for guidance evaluating disparate impact liability under the FHA (Title VIII) and vice versa. *See, e.g., Kyles v. J.K. Guardian Sec. Servs., Inc.,* 222 F.3d 289, 295 (7th Cir. 2000) ("Courts have recognized that Title VIII is the functional equivalent of Title VII, . . . and so the provisions of these two statutes are given like construction and application." (citations omitted)); *Inclusive Communities Project,* 747 F.3d at 282. Under these circumstances, HUD's adoption of the three-step burden-shifting approach outlined in the Disparate Impact Rule was reasonable and the Court defers to it. *See, e.g., Castro,* 360 F.3d at 727; *see also United States v. Boyle,* 469 U.S. 241, 246 n.4, 105 S. Ct. 687, 83 L. Ed. 2d 622 (1985) (finding that an agency's interpretation that is "consistent with Congress' intent, and over 40 years of case law" merits deference); *Inclusive Communities Project,* 747 F.3d at 282.

Additionally, although PCI raises challenges to specific aspects of HUD's framework, HUD considered and responded to those challenges during the notice-and-comment period.

Unlike HUD's responses to several of the insurance industry's other concerns, HUD provided reasoned explanations for rejecting the commenters' challenges to HUD's burden-shifting approach. *See* Final Rule, 78 Fed. Reg. at 11469, 11471-74. In sum, PCI has provided no basis for the Court to invalidate HUD's burden-shifting approach.[14]

---

[14] PCI argues in its briefs that HUD's burden-shifting approach violates the APA's requirement that the proponent of a proposed "order"—*i.e.,* a proposed finding of a violation of the FHA—must bear the burden of proof. *See* 5 U.S.C. § 556(c). Neither PCI nor the other members of the insurance industry that commented on the proposed Disparate Impact Rule, however, raised this issue during the notice-and-comment period. PCI contends that, although insurance industry commenters did not cite 5 U.S.C. § 556(d), their argument that the burden of persuasion must remain with the plaintiff at each step of the disparate impact analysis was sufficient to preserve the § 556(d) issue. The Court disagrees. The insurance industry's comments regarding HUD's burden-shifting framework dealt exclusively with its appropriateness in light of *Wards Cove*. Those comments failed to put HUD on notice of PCI's argument under § 556(d) and give HUD an opportunity to pass on it. The issue is therefore waived. *See Koretoff v. Vilsack,* 707 F.3d 394, 398 (D.C. Cir. 2013) ("We require 'the argument [petitioner] advances here' to be raised before the agency, not merely the same general legal issue.'" (quoting *Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1291 (D.C. Cir. 2004) (per curiam)).

## CONCLUSION

For the reasons explained above, the Court grants in part and denies in part PCI's motion for summary judgment, and grants in part and denies in part HUD's motion to dismiss or for summary judgment. The Court dismisses PCI's McCarran-Ferguson claim for lack of subject matter jurisdiction. With respect to PCI's remaining claims, the Court grants summary judgment to PCI on its claims that HUD's application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious, and grants summary judgment to HUD on PCI's challenge to HUD's burden-shifting framework. The Court remands this case to HUD for further proceedings consistent with this Memorandum, Opinion and Order.

**DATED:  September 3, 2014**                    **ENTERED**

AMY J. STEEVE
United States District Court