APPEAL,CLOSED,TYPE–E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:13–cv–00966–RJL
### *Internal Use Only*

AMERICAN INSURANCE ASSOCIATION et al v. UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al
Assigned to: Judge Richard J. Leon
Cause: 05:702 Administrative Procedure Act

Date Filed: 06/26/2013
Date Terminated: 11/07/2014
Jury Demand: None
Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **AMERICAN INSURANCE ASSOCIATION** | represented by | **Adam Joshua Podoll** |

**AMERICAN INSURANCE ASSOCIATION**    represented by    **Adam Joshua Podoll**
WILLIAM &CONNOLLY, LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434–5092
Fax: (202) 434–5029
Email: apodoll@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allison B. Jones**
WILLIAMS &CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434–5478
Fax: (202) 434–5029
Email: ajones@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kannon K. Shanmugam**
WILLIAMS &CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434–5050
Fax: (202) 434–5029
Email: kshanmugam@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES**    represented by    **Adam Joshua Podoll**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allison B. Jones**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kannon K. Shanmugam**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

represented by **Daniel Paul Mosteller**
U.S. DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530–0001
(202) 514–4713
Fax: (202) 514–1116
Email: daniel.mosteller@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Renee Freeny**
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 514–5108
Fax: (202) 616–8470
Email: kyle.freeny@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SHAUN DONOVAN**
*in his official capacity as Secretary of Housing and Urban Development*

represented by **Daniel Paul Mosteller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Renee Freeny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JUDICIAL WATCH, INC.**

represented by **Chris Fedeli**
JUDICIAL WATCH, INC.

425 Third Street, SW
Suite 800
Washington, DC 20024
(202) 646–5172
Fax: (202) 646–5185
Email: cfedeli@judicialwatch.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**ALLIED EDUCATIONAL
FOUNDATION**                   represented by  **Chris Fedeli**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

Amicus

**NATIONAL FAIR HOUSING
ALLIANCE**                     represented by  **Glenn Schlactus**
                                               RELMAN, DANE &COLFAX PLLC
                                               1225 19th Street, NW
                                               Suite 600
                                               Washington, DC 20036
                                               (202) 728–1888
                                               Fax: 202) 728–0848
                                               Email: gschlactus@relmanlaw.com
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

Amicus

**LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW**       represented by  **Glenn Schlactus**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

Amicus

**NATIONAL LOW INCOME
HOUSING COALITION**            represented by  **Glenn Schlactus**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

Amicus

**POVERTY &RACE RESEARCH
ACTION COUNCIL**               represented by  **Glenn Schlactus**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

Amicus

**NATIONAL HOUSING LAW
PROJECT**                      represented by  **Glenn Schlactus**
                                               (See above for address)
                                               *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Amicus**

**LATINOJUSTICE PRLDEF**                represented by   **Glenn Schlactus**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Amicus**

**NAACP LEGAL DEFENSE AND**             represented by   **Ryan P. Haygood**
**EDUCATIONAL FUND, INC.**                               NAACP LEGAL DEFENSE
                                                         &EDUCATIONAL FUND, INC.
                                                         99 Hudson Street
                                                         Suite 1600
                                                         New York, NY 10013
                                                         (212) 965–2200
                                                         Email: rhaygood@naacpldf.org
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES**            represented by   **Ryan P. Haygood**
**UNION**                                                (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Amicus**

**NATIONAL CONSUMER LAW**               represented by   **Ryan P. Haygood**
**CENTER**                                               (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Amicus**

**NATIONAL COMMUNITY**                  represented by   **Ryan P. Haygood**
**REINVESTMENT COALITION**                               (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Amicus**

**CHAMBER OF COMMERCE OF**              represented by   **Brian P. Morrissey , Jr.**
**THE UNITED STATES OF**                                 SIDLEY AUSTIN LLP
**AMERICA**                                              1501 K Street, NW
                                                         Washington, DC 20005
                                                         (202) 736–8798
                                                         Email: bmorrissey@sidley.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Carter G. Phillips**

SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202)736–8270
Fax: (202) 736–8711
Email: cphillips@sidley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN FINANCIAL SERVICES**          represented by   **John Longstreth**
**ASSOCIATION**                                           K &L GATES LLP
                                                          1601 K Street, NW
                                                          Washington, DC 20006
                                                          (202) 661–6271
                                                          Fax: (202) 778–9100
                                                          Email: john.longstreth@klgates.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Paul F. Hancock**
                                                          KLGATES LLP
                                                          200 South Biscayne Boulevard
                                                          Suite 3900
                                                          Miami, FL 33131–2399
                                                          (305) 539–3300
                                                          Email: paul.hancock@klgates.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**CONSUMER MORTGAGE**                      represented by   **John Longstreth**
**COALITION**                                             (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Paul F. Hancock**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**INDEPENDENT COMMUNITY**                  represented by   **John Longstreth**
**BANKERS OF AMERICA**                                    (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Paul F. Hancock**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **MORTGAGE BANKERS ASSOCIATION** | represented by | **John Longstreth** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Paul F. Hancock** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 06/26/2013 | 1 | | COMPLAINT against SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ( Filing fee $ 400 receipt number 0090–3376984) filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 2 | | Corporate Disclosure Statement by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 3 | | NOTICE of Appearance by Allison B. Jones on behalf of AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Jones, Allison) (Entered: 06/26/2013) |
| 06/26/2013 | | | Case Assigned to Judge Richard J. Leon. (kb) (Entered: 06/26/2013) |
| 06/26/2013 | | | SUMMONS Not Issued as to SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (kb) (Entered: 06/26/2013) |
| 06/26/2013 | 4 | | NOTICE *(Corrected Summons)* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 5 | | NOTICE *(Corrected Summons)* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 6 | | NOTICE *(Corrected Summons)* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 7 | | NOTICE *(Corrected Summons)* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/27/2013 | 8 | | ELECTRONIC SUMMONS (4) ssued as to SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Consent to Magistrate)(znmw, ) (Entered: 06/27/2013) |

| 07/10/2013 | 9 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SHAUN DONOVAN served on 7/1/2013; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT served on 7/1/2013, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 07/01/13., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 7/1/2013. ( Answer due for ALL FEDERAL DEFENDANTS by 8/30/2013.) (Jones, Allison) (Entered: 07/10/2013) |
|---|---|---|---|
| 08/07/2013 | 10 | | NOTICE of Appearance by Kyle Renee Freeny on behalf of All Defendants (Freeny, Kyle) (Entered: 08/07/2013) |
| 08/07/2013 | 11 | | NOTICE of Appearance by Daniel Paul Mosteller on behalf of All Defendants (Mosteller, Daniel) (Entered: 08/07/2013) |
| 08/15/2013 | 12 | | Unopposed MOTION to Stay *Proceedings* by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 08/15/2013) |
| 08/29/2013 | | | MINUTE ORDER granting 12 Motion to Stay. It is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that the proceedings in the above–captioned case are stayed until further order, pending the conclusion of proceedings before the Supreme Court in Township of Mount Holly v. Mount Holly Gardens Citizens in Action, Inc., No. 11–1507. It is further ORDERED that, within 30 days after the Supreme Court's disposition of Mount Holly, the parties to this action shall submit a status report to the Court addressing the need for any further proceedings in this action. Signed by Judge Richard J. Leon on 8/29/13. (lcrjl2) (Entered: 08/29/2013) |
| 12/16/2013 | 13 | | JOINT STATUS REPORT by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (jf, ) (Entered: 12/17/2013) |
| 12/16/2013 | 14 | | JOINT MOTION to Lift Stay by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(jf, ) (Entered: 12/17/2013) |
| 12/20/2013 | 15 | | ORDER: Upon consideration of the Parties' 14 Motion to Lift Stay and Status Report; it is hereby ordered that the motion is GRANTED. Signed by Judge Richard J. Leon on 12/20/13. SEE ORDER FOR FULL DETAILS. (tb, ) (Entered: 12/20/2013) |
| 12/20/2013 | 16 | | MOTION for Summary Judgment by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Text of Proposed Order)(Shanmugam, Kannon) (Entered: 12/20/2013) |
| 01/11/2014 | 17 | | NOTICE of Appearance by Adam Joshua Podoll on behalf of AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Podoll, Adam) (Entered: 01/11/2014) |
| 01/28/2014 | 18 | | NOTICE *of Consent to Amicus Briefs* by AMERICAN INSURANCE |

| | | |
|---|---|---|
| | | ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 01/28/2014) |
| 01/30/2014 | 19 | MOTION for Leave to File *Amicus Brief* by JUDICIAL WATCH, INC., ALLIED EDUCATIONAL FOUNDATION. (Attachments: # 1 Exhibit Amicus Brief in Support of Plaintiffs)(Fedeli, Christopher) Modified to add filer on 1/31/2014 (znmw, ). (Entered: 01/30/2014) |
| 02/03/2014 | | MINUTE ORDER granting 19 Motion for Leave to File an Amicus Curiae Brief and Corporate Disclosure Certification. It is hereby ORDERED that the motion is GRANTED and Judicial Watch and AEF may each file an amicus curiae brief in this case. Signed by Judge Richard J. Leon on 2/3/14. (lcrjl2, ) (Entered: 02/03/2014) |
| 02/03/2014 | 20 | MOTION to Dismiss *or, in the Alternative, for Summary Judgment* by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Exhibit A, # 2 Administrative Record – Certified List of Contents, # 3 Text of Proposed Order)(Freeny, Kyle). Added MOTION for Summary Judgment on 2/4/2014 (znmw, ). (Entered: 02/03/2014) |
| 02/03/2014 | 21 | Memorandum in opposition to re 16 MOTION for Summary Judgment filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Exhibit A)(Freeny, Kyle) (Entered: 02/03/2014) |
| 02/03/2014 | 22 | AMICUS BRIEF by ALLIED EDUCATIONAL FOUNDATION, JUDICIAL WATCH, INC.. (znmw, ) (Entered: 02/04/2014) |
| 02/10/2014 | 23 | Unopposed MOTION for Leave to File *a Brief Amicus Curiae* by NATIONAL FAIR HOUSING ALLIANCE, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL LOW INCOME HOUSING COALITION, POVERTY &RACE RESEARCH ACTION COUNCIL, NATIONAL HOUSING LAW PROJECT, LATINOJUSTICE PRLDEF (Attachments: # 1 Brief of Amici Curiae, # 2 Exhibit A, # 3 Exhibit B)(Schlactus, Glenn) (Entered: 02/10/2014) |
| 02/11/2014 | | MINUTE ORDER granting 23 Motion for Leave to File a Brief Amicus Curiae. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 2/11/14. (lcrjl2, ) (Entered: 02/11/2014) |
| 02/12/2014 | 24 | AMICUS BRIEF by LATINOJUSTICE PRLDEF, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL FAIR HOUSING ALLIANCE, NATIONAL HOUSING LAW PROJECT, NATIONAL LOW INCOME HOUSING COALITION, POVERTY &RACE RESEARCH ACTION COUNCIL. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(znmw, ) (Entered: 02/12/2014) |
| 02/20/2014 | 25 | MOTION for Leave to File *a Brief Amicus Curiae* by NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., AMERICAN CIVIL LIBERTIES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL COMMUNITY REINVESTMENT COALITION (Attachments: # 1 Brief of Amici Curiae)(Haygood, Ryan) (Entered: 02/20/2014) |
| 02/24/2014 | | MINUTE ORDER granting 25 Motion for Leave to File a Brief Amicus |

| | | Curiae. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 2/24/14. (lcrjl2, ) (Entered: 02/24/2014) |
|---|---|---|
| 02/24/2014 | 26 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Attachments: # 1 Amicus Brief)(Morrissey, Brian) (Entered: 02/24/2014) |
| 02/24/2014 | 27 | Memorandum in opposition to re 20 MOTION to Dismiss *or, in the Alternative, for Summary Judgment* MOTION for Summary Judgment *and Reply in Support of 16 Motion for Summary Judgment* filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Attachments: # 1 Declaration 1, # 2 Affidavit 2, # 3 Affidavit 3, # 4 Affidavit 4, # 5 Affidavit 5, # 6 Affidavit 6)(Shanmugam, Kannon) (Entered: 02/24/2014) |
| 02/24/2014 | 28 | REPLY to opposition to motion re 16 MOTION for Summary Judgment filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (See Docket Entry 27 to view document). (znmw, ) (Entered: 02/25/2014) |
| 02/24/2014 | 29 | AMICUS BRIEF by AMERICAN CIVIL LIBERTIES UNION, NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., NATIONAL COMMUNITY REINVESTMENT COALITION, NATIONAL CONSUMER LAW CENTER. (znmw, ) (Entered: 02/25/2014) |
| 03/03/2014 | | MINUTE ORDER granting 26 Motion for Leave to File Amicus Curiae Brief. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 3/3/14. (lcrjl2, ) (Entered: 03/03/2014) |
| 03/03/2014 | 30 | AMICUS BRIEF by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (znmw, ) (Entered: 03/04/2014) |
| 03/18/2014 | 31 | REPLY to opposition to motion re 20 MOTION to Dismiss *or, in the Alternative, for Summary Judgment* MOTION for Summary Judgment filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Freeny, Kyle) (Entered: 03/18/2014) |
| 03/18/2014 | 32 | MOTION for Leave to File *amici curiae brief* by AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER MORTGAGE COALITION, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MORTGAGE BANKERS ASSOCIATION (Attachments: # 1 Exhibit Amici curiae brief of AFSA et al)(Longstreth, John) (Entered: 03/18/2014) |
| 03/19/2014 | 33 | NOTICE of Appearance by Paul F. Hancock on behalf of AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER MORTGAGE COALITION, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MORTGAGE BANKERS ASSOCIATION (Hancock, Paul) (Entered: 03/19/2014) |
| 03/25/2014 | | MINUTE ORDER granting 32 Motion for Leave to File Amici Curiae Brief in Support of Plaintiffs' Motion fur Summary Judgement. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 3/25/14. (lcrjl2, ) (Entered: 03/25/2014) |
| 03/25/2014 | 34 | |

| | | | |
|---|---|---|---|
| | | | AMICUS BRIEF by AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER MORTGAGE COALITION, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MORTGAGE BANKERS ASSOCIATION. (znmw, ) (Entered: 03/26/2014) |
| 03/27/2014 | 35 | | NOTICE OF SUPPLEMENTAL AUTHORITY by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Supplemental Authority)(Freeny, Kyle) (Entered: 03/27/2014) |
| 04/01/2014 | 36 | | NOTICE of *Joint Appendix of Administrative Record Materials* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES re 16 MOTION for Summary Judgment (Shanmugam, Kannon) (Entered: 04/01/2014) |
| 06/13/2014 | | | NOTICE of Hearing on Motions: 20 MOTION to Dismiss *or, in the Alternative, for Summary Judgment* MOTION for Summary Judgment; and 16 MOTION for Summary Judgment Motion Hearing set for 7/10/2014 @ 3:00 PM in Courtroom 18 before Judge Richard J. Leon. (tj ) (Entered: 06/13/2014) |
| 06/17/2014 | 37 | | Unopposed MOTION for Order *Rescheduling Hearing* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/17/2014) |
| 06/17/2014 | | | MINUTE ORDER granting 37 Unopposed Motion to Reschedule Hearing. It is hereby ORDERED that the motion is GRANTED and oral argument will be held on 7/16/2014 at 3:00 pm. Signed by Judge Richard J. Leon on 7/16/14. (lcrjl2, ) (Entered: 06/17/2014) |
| 06/18/2014 | | | Set/Reset Hearings: Motions Hearing reset for 7/16/2014 at 3:00 PM in Courtroom 18 before Judge Richard J. Leon. (jth) (Entered: 06/18/2014) |
| 07/11/2014 | | | Set/Reset Hearings: The Motions Hearing that is presently scheduled for Wednesday, July 16, 2014, at 3:00 PM is rescheduled to Tuesday, July 22, 2014, at 3:00 PM in Courtroom 18 before Judge Richard J. Leon. (jth) (Entered: 07/11/2014) |
| 07/22/2014 | | | Minute Entry: Motions Hearing held on 7/22/2014 before Judge Richard J. Leon re 20 MOTION to Dismiss or, in the Alternative, for Summary Judgment filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, and 16 MOTION for Summary Judgment filed by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES, AMERICAN INSURANCE ASSOCIATION; Motions heard and taken under advisement. Parties may file supplemental briefs by not later than 8/5/2014. (Court Reporter Scott Wallace) (tb, ) (Entered: 07/23/2014) |
| 08/05/2014 | 38 | | SUPPLEMENTAL MEMORANDUM to re 16 MOTION for Summary Judgment filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 08/05/2014) |
| 08/05/2014 | 39 | | SUPPLEMENTAL MEMORANDUM to re 20 MOTION to Dismiss *or, in the Alternative, for Summary Judgment* MOTION for Summary Judgment |

| | | | |
|---|---|---|---|
| | | | filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Freeny, Kyle) (Entered: 08/05/2014) |
| 08/08/2014 | 40 | | ADMINISTRATIVE RECORD by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Pages 1–209, # 2 Pages 210–378, # 3 Pages 379–516, # 4 Pages 517–645, # 5 Pages 646–804, # 6 Pages 805–881, # 7 Pages 882–1032, # 8 Pages 1033–1132, # 9 Pages 1133–1206, # 10 Pages 1207–1360, # 11 Pages 1361–1593, # 12 Pages 1594–1812)(Mosteller, Daniel) (Entered: 08/08/2014) |
| 10/14/2014 | 41 | | NOTICE OF SUPPLEMENTAL AUTHORITY by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Exhibit A)(Freeny, Kyle) (Entered: 10/14/2014) |
| 10/16/2014 | 42 | | RESPONSE re 41 NOTICE OF SUPPLEMENTAL AUTHORITY filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 10/16/2014) |
| 10/22/2014 | 43 | | MOTION to Stay *Proceedings* by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 10/22/2014) |
| 10/24/2014 | 44 | | RESPONSE re 43 MOTION to Stay *Proceedings* filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 10/24/2014) |
| 10/24/2014 | | | MINUTE ORDER denying 43 Motion to Stay. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 10/24/14. (lcrjl2, ) (Entered: 10/24/2014) |
| 11/03/2014 | 45 | 15 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 11/03/14. (tb, ) (Entered: 11/03/2014) |
| 11/03/2014 | 46 | 47 | ORDER: For reasons set forth in the Memorandum Opinion accompanying this Order; it is hereby ordered that plaintiff's 16 Motion for Summary Judgment is GRANTED and defendant's 20 Motion to Dismiss is DENIED, and it is further ordered that the Department of Housing and Urban Development's Disparate Impact Rule, promulgated in 78 Fed. Reg. 11,460–11,482, and codified at 24 C.F.R. Section 100.500, is hereby VACATED. Signed by Judge Richard J. Leon on 11/03/14. (tb, ) (Entered: 11/03/2014) |
| 11/07/2014 | 47 | 48 | AMENDED MEMORANDUM OPINION. This Amended Memorandum Opinion replaces the Memorandum Opinion dated 11/3/2014 (Dkt. #45). Signed by Judge Richard J. Leon on 11/07/2014. (jth) (Entered: 11/07/2014) |
| 12/18/2014 | 48 | 13 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 46 Order on Motion for Summary Judgment, Order on Motion to Dismiss,, 45 Memorandum &Opinion, 47 Memorandum &Opinion by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, SHAUN |

| | | | DONOVAN. Fee Status: No Fee Paid. Parties have been notified. (Freeny, Kyle) (Entered: 12/18/2014) |
| --- | --- | --- | --- |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
AMERICAN INSURANCE            )
ASSOCIATION, *et al.*              )
                                          )
          Plaintiffs,                 )
                                          )        No. 1:13-cv-00966 (RJL)
          v.                            )
                                          )
UNITED STATES DEPARTMENT   )
OF HOUSING AND URBAN        )
DEVELOPMENT, *et al.*            )
                                          )
          Defendants.              )
_____)

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that defendants United States Department of Housing

and Urban Development (HUD) and Julián Castro, in his official capacity as Secretary of

Housing and Urban Development,[1] appeal to the United States Court of Appeals for the

District of Columbia Circuit from the Opinion and Order granting Plaintiffs' Motion for

Summary Judgment and denying Defendants' Cross-Motion to Dismiss and/or for

Summary Judgment, entered on November 3, 2014, and from the amended Opinion

entered on November 7, 2014.

Dated: December 18, 2014                   Respectfully submitted,


                                          JOYCE R. BRANDA
                                          Acting Assistant Attorney General

                                          GREGORY B. FRIEL
                                          Deputy Assistant Attorney General

_____

[1] Mr. Castro is substituted for his predecessor, Shaun Donovan, as defendant in this
action pursuant to Fed. R. Civ. Proc. 25(d)(1).

RONALD C. MACHEN JR.
United States Attorney

HELEN R. KANOVSKY
General Counsel
MICHELLE ARONOWITZ
Deputy General Counsel for
  Enforcement and Fair Housing
JEANINE M. WORDEN
Associate General Counsel
  for Fair Housing
KATHLEEN M. PENNINGTON
Assistant General Counsel
  for Fair Housing Enforcement
M. CASEY WEISSMAN-VERMEULEN
AYELET R. WEISS
Attorneys
*Of counsel*

RACHEL J. HINES
Assistant Branch Director
Federal Programs Branch


 */s/ Kyle R. Freeny*
KYLE R. FREENY (Cal. Bar No. 247857)
DANIEL P. MOSTELLER (DC Bar No. 980802)
Attorneys
U.S. Department of Justice
20 Massachusetts Ave., N.W.
Washington, DC 20001
Tel: (202) 514-5108/Fax: (202) 616-8470
Email:  Kyle.Freeny@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN INSURANCE ASSOCIATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Case No. 13-00966 (RJL) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*, | ) ) ) ) | **FILED** |
| Defendants. | ) ) ) | NOV 0 3 2014 |

vd

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**MEMORANDUM OPINION**

(November **3**, 2014) [Dkt. ##16, 20]

Plaintiffs American Insurance Association ("AIA") and National Association of

Mutual Insurance Companies ("NAMIC") (together "plaintiffs")[1] brought this action

against the United States Department of Housing and Urban Development ("HUD") and

Julian Castro[2]—in his official capacity as Secretary of the United States Department

Housing and Urban Development—("Secretary") (together "defendants") on June 26,

2013, *see* Complaint ("Compl.") [Dkt. #1], challenging defendants' promulgation of a

---

[1] Plaintiffs are two non-profit trade associations whose members sell homeowner's insurance in every state and territory of the United States. *See* Compl. ¶¶ 7-8.

[2] Plaintiffs originally named Shaun Donovan—in his official capacity as Secretary of HUD—as a defendant in this case. *See* Compl. ¶ 10. However, on July 28, 2014, Julian Castro assumed office as the 16th United States Secretary of Housing and Urban Development, replacing Secretary Donovan. Accordingly, pursuant to Federal Rule of Civil Procedure 25(d), Secretary Castro shall be, and hereby is, substituted for Shaun Donovan as a named defendant in this action. *See* Fed. R. Civ. P. 25(d).

1

final rule, *see* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500) ("Disparate-Impact Rule" or "Rule"), providing for liability based on disparate impact under the Fair Housing Act ("FHA" or the "Act"), Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified at 42 U.S.C. § 3601 *et seq.*).   Plaintiffs claim that defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, by exceeding its statutory authority when it expanded the scope of the FHA to recognize not only disparate-treatment claims (*i.e.* intentional discrimination) but also disparate-impact claims (*i.e.* facially neutral practices with discriminatory effects).   *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Pls.' Mem.") [Dkt. 16-1] at 8-9.   Now before the Court are plaintiffs' Motion for Summary Judgment ("Pls.' Mot.") [Dkt. #16] and defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mot.") [Dkt. #20].   After due consideration of the parties' pleadings, the arguments of counsel, the relevant law, and the entire record in this case, the Court agrees with plaintiffs that the FHA prohibits disparate treatment *only*, and that the defendants, therefore, exceeded their authority under the APA.   Accordingly the plaintiffs' Motion for Summary Judgment is GRANTED, the defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment is DENIED, and the Disparate-Impact Rule is VACATED.

2

## BACKGROUND

### I.    Statutory Background

Congress enacted Title VIII of the Civil Rights Act of 1968—commonly known as the Fair Housing Act—"following urban unrest of the mid 1960s and in the aftermath of the assassination of the Rev. Dr. Martin Luther King, Jr."   H.R. Rep. No. 711, 100th Cong., 2d Sess. 15 (1988).   Congress's goal in enacting the Fair Housing Act was to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.   To accomplish this purpose, the FHA made it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin."   *Id.* § 3604(a).   Moreover, the FHA made it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," because of those same protected characteristics.   *Id.* § 3604(b).

Twenty years later, Congress amended the FHA, *see* Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 ("1988 Amendments"), to include sex, familial status, and handicap as protected characteristics.   *See* 42 U.S.C. §§ 3604(a) (sex and familial status), (f)(1) (handicap); *see also id.* §§ 3604(f)(2), 3605, 3606.   The 1988 Amendments further vested HUD with the authority to engage in formal adjudications of housing discrimination claims, *see id.* § 3612, as well as the authority to issue

3

rules—following a notice and comment period—to effectuate the goals of the FHA, *see id.* § 3614a.   The 1988 Amendments did *not*, however, make any changes to the operative language of § 3604(a) & (b) or § 3606.   *See* Pub. L. No. 100-430, 102 Stat. 1619.

## II.    Promulgation of the Disparate-Impact Rule

In the absence of explicit language providing for disparate-impact liability when it was enacted in 1968, it is not surprising that there has been a difference of opinion along ideological/political lines—since at least the Supreme Court's decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)—as to whether or not such claims were cognizable under the FHA.[3]   To date, the Supreme Court has not had the opportunity to answer this particular question.[4]   And, while eleven Circuit Courts of Appeals have found that

---

[3] *Compare, e.g.*, Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988) (President Reagan stating that 1988 FHA amendments did "not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that [T]itle 8 violations may be established by a showing of disparate impact . . . without discriminatory intent . . . . Title 8 speaks only to intentional discrimination"), *and Brown v. Artery Org., Inc.*, 654 F. Supp. 1106, 1115 (HHG) (D.D.C. 1987) (discriminatory impact does not establish FHA violation by a private actors), *with* 134 Cong. Reg. 23,711 (Sen. Kennedy) (describing President Reagan's statement as "flatly inconsistent with Congress's understanding of the law").

[4] Since 2011, the Supreme Court has granted certiorari *three times* on the issue of whether disparate-impact liability is cognizable under the FHA, most recently last month *Texas Department of Housing and Community Affairs v. Inclusive Communities Project.   See* No. 13-1371, 2014 WL 4916193 (U.S. Oct. 2, 2014) (*Texas Department of Housing*); *Twp. of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.* (*Mount Holly*), 133 S. Ct. 2824 (2013); *Magner v. Gallagher*, 132 S. Ct. 548 (2011).   While *Texas Department of Housing* is currently before the Court, and likely to be decided this term, both *Mount Holly* and *Magner* were settled before the Court could decide the issue.   The circumstances behind the *Magner* settlement, however, are particularly troubling.   Indeed, a Congressional Joint Staff Report found that—in negotiating a *quid pro quo* deal that facilitated *Magner's* settlement—then-Assistant Attorney

4

disparate-impact claims are cognizable under the FHA,[5] the overwhelming majority of these opinions *preceded* the Supreme Court's decision in *Smith v. City of Jackson*, 544 U.S. 228 (2005), which set forth the appropriate analytical framework when a court is attempting to discern whether disparate-impact liability arises in a particular statutory context.  As for our Circuit, to date it too has never addressed this issue.  *See, e.g.*, *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. and Urban Dev.*, 639 F.3d 1078, 1085 (D.C. Cir. 2011) ("We have not decided whether [the FHA] permits disparate impact claims."); *2922 Sherman Avenue Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006).   However, on November 16, 2011—just nine days after the Supreme Court granted certiorari in *Magner v. Gallagher* to address this very issue, *see Magner*, 132 S. Ct. 548 (2011)—HUD, calculatingly, proposed a rule that would specifically provide for disparate-impact liability under the FHA.  *See*

---

General Thomas Perez "exert[ed] arbitrary authority" to settle the case and "placed ideology over objectivity and politics over the rule of law . . . . Rather than allowing the Supreme Court to freely and impartially adjudicate an appeal that the Court had affirmatively chosen to hear, [Perez] openly worked to get the appeal off of the Court's docket."   Staff of H. Comm. On Oversight and Gov't Reform et al., 113th Cong., *DOJ's "Quid Pro Quo" with St. Paul: How Assistant Attorney General Thomas Perez Manipulated Justice and Ignored the Rule of Law* 64 (Comm. Rep. 2013).

[5] *See, e.g.*, *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49-50 (1st Cir. 2000); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935-36 (2d Cir. 1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146-47 (3d Cir. 1977); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur v. City of Toledo*, 782 F.2d 565, 574-75 (6th Cir. 1986); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *United States v. City of Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir. 1974); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982); *Mountain Side Mobile Estates P'ship v. U.S. Dep't of Hous. and Urban Dev.*, 56 F.3d 1243, 1250-51 (10th Cir. 1995); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1559

5

Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70,921, 70,921 (Nov. 16, 2011) (HUD proposed "to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate").

Following HUD's notice of the proposed rule, plaintiffs submitted comments explaining their numerous concerns about the harmful effects the Rule was likely to cause.[6]  *See* JA at 372-383, 455-59.  Despite these concerns—and those raised by many others—HUD promulgated the final Rule without substantial changes on February 15, 2013.[7]  *See* 78 Fed. Reg. 11,460.  Not surprisingly, the preamble to the Disparate-Impact Rule *expressly* extended the availability of disparate-impact liability to the provision and pricing of homeowner's insurance for the first time.  *See id.* at 11,475.  So much for any

---

n.20 (11th Cir. 1984).

[6] Plaintiffs' concerns included, *inter alia*, (1) the statutory language of the FHA did not provide a cause of action for disparate-impact liability; (2) in many states, the application of the rule would result in reverse-preemption of the FHA pursuant to the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*; (3) the rule was premature given the fact that the Supreme Court had recently granted certiorari in *Magner*, and was poised to determine this very issue; (4) the analytic framework for determining the validity of a disparate-impact claim was at variance with the burden-of-proof framework laid out in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), for disparate-impact claims in non-Title VII cases; and (5) the application of disparate-impact liability to the provision and pricing of homeowner's insurance would require a disastrous departure from long-established risk-based underwriting practices.  *See* Plaintiffs' Joint Appendix of Administrative Record Materials ("JA") [Dkt. #36] at 372-383, Comments from the National Association of Mutual Insurance Companies on the Proposed Rule (January 17, 2012); *see id.* at 455-59, Comments from the American Insurance Association on the Proposed Rule (January 17, 2012).

[7] Notably, in a recent decision from the United States District Court for the Northern District of Illinois, Judge Amy St. Eve ruled that "HUD's response to the insurance industry's concerns [regarding the Disparate Impact Rule] was arbitrary and capricious," and remanded the case to HUD "for further explanation."  *Property Cas. Insurers Ass'n of Am. v. Donovan*, No. 13 C 8564, at 46-47 (N.D. Ill. Sept. 3, 2014).  Judge St. Eve found that HUD failed to adequately address the insurance industry's concerns or explain its decisions regarding application of the

contention that the FHA unambiguously provided for such liability!

The Disparate-Impact Rule itself states that "[l]iability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent." 24 C.F.R. § 100.500. The Rule defines a practice as having a "discriminatory effect" where "it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." *Id.* § 100.500(a). A practice shown to have a discriminatory effect may still be legal if it is supported by a legally sufficient justification. *See id.* § 100.500. "A legally sufficient justification exists where the challenged practice . . . [i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests . . . [and] [t]hose interests could not be served by another practice that has a less discriminatory effect." *Id.* § 100.500(b)(1)(i)-(ii).

The Disparate-Impact Rule employs a burden-shifting framework for assessing disparate-impact liability under the FHA. *See id.* § 100.500(c)(1)-(3). Initially, "the charging party . . . has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Id.* § 100.500(c)(1). If the plaintiff or charging party meets this burden, "the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of their] substantial,

---

Disparate-Impact Rule to the provision and pricing of homeowner's insurance. *See id.*

legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Finally, if the respondent or defendant satisfies its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3).

Importantly here, the Rule expressly applies to entities that provide homeowner's insurance, such as plaintiffs' members. *See* 78 Fed. Reg. 11,460, 11,475. Indeed, the proposed notice of rule-making explicitly listed the "provision and pricing of homeowner's insurance" as an example of a "housing policy or practice" that may have a disparate impact on a class of persons, 76 Fed. Reg. 70,921, 70,924, and in the final rule-making, HUD directly considered some of the very concerns that were raised by insurers during the notice-and-comment period, but did not meaningfully alter the substance of the Rule in response to those concerns, *see* 78 Fed. Reg. 11,460, 11,475.

## III.   Procedural History

Plaintiffs commenced this action on June 26, 2013. On August 15, 2013, however, defendants filed an Unopposed Motion to Stay Proceedings ("Motion to Stay") [Dkt. #12] because the Supreme Court had recently granted certiorari in *Mount Holly*[8]

---

[8] Petitioners in *Mount Holly* filed their Petition for a Writ of Certiorari on June 11, 2012. *See* Petition for a Writ of Certiorari, *Mount Holly*, No. 11-1507 (June 11, 2012), *available at* http://sblog.s3.amazonaws.com/wp-content/uploads/2012/07/11-1507-Mount-Holly-v.-Mount-H olly-Gardens-Citizens-in-Action-Petition.pdf. The Supreme Court granted certiorari on June 17, 2013, solely on the issue of whether "disparate impact claims [are] cognizable under the Fair

8

(June 17, 2013) to resolve the precise statutory question at issue in this case, and a stay of proceedings—pending the Supreme Court's decision—would "at a minimum streamline the proceedings in this case, if not eliminate the need for litigation entirely." *See* Mot. to Stay at 1. I granted the motion by minute order on August 29, 2013.

On November 15, 2013 the Supreme Court dismissed the writ of certiorari in *Mount Holly* because the parties had reached a settlement. On December 16, 2013, the parties filed a joint status report and motion, informing me of the *Mount Holly* dismissal, and seeking a lift of the stay in this case. *See* Joint Mot. to Lift the Stay and Status Report [Dkt. #14]. I granted the parties' motion on December 20, 2013, and set a briefing schedule for dispositive motions. *See* Order (Dec. 20, 2013) [Dkt. #15]. That same day, plaintiffs filed their Motion for Summary Judgment. *See* Pls.' Mot. Defendants then filed their Motion to Dismiss or, in the Alternative, for Summary Judgment on February 3, 2014. *See* Defs.' Mot. Following full briefing of the issues,[9] I heard oral argument on the parties' motions on July 22, 2014.[10]

---

Housing Act." *See Mount Holly*, 133 S. Ct. 2824 (2013); *see also supra* note 4.

[9] *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss or for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Reply") (Feb. 24, 2014) [Dkt. #27]; Defendants' Reply Memorandum in Support of Their Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Reply") (Mar. 18, 2014) [Dkt. #31].

[10] At the conclusion of oral argument, I invited the parties to submit supplemental briefs on any issues raised during the arguments. *See* Transcript of Oral Argument at 49:3-24, *American Insurance Ass'n v. U.S. Dep't of Hous. and Urban Dev.*, No. 1:13-cv-00966 (D.D.C. July 22, 2014). The parties submitted their supplemental briefs on August 5, 2014. *See* Supplemental Memorandum to Plaintiffs' Motion for Summary Judgment ("Pls.' Supp'l Mem.") (Aug. 5, 2014) [Dkt. #38]; Supplemental Memorandum to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Supp'l Mem.") (Aug. 5, 2014) [Dkt. #39].

9

## STANDARD OF REVIEW

### I.    Rule 12(b) Dismissal

The court may dismiss a complaint or any portion of it for lack of subject-matter jurisdiction or for failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(1), (6).  In considering a motion to dismiss, the court may only consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  To survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On a motion to dismiss for lack of standing, a trial court may allow the plaintiff to supplement the complaint with affidavits to demonstrate standing.  *See Warth v. Seldin*, 422 U.S. 490, 501-02 (1975); *see also Rainbow/PUSH Coal. v. FCC*, 396 F.3d 1235, 1239 (D.C. Cir. 2005) (permitting affidavits in response to a motion to dismiss for want of standing).

In considering a motion under Rule 12(b), the court must construe the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged."  *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks and citation omitted).  However, factual allegations—even though assumed to be true—must still "be enough to raise a right to

10   .

relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545

(2007). Moreover, the court need not "accept legal conclusions cast in the form of

factual allegations," nor "inferences drawn by plaintiffs if such inferences are

unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16

F.3d 1271, 1276 (D.C. Cir. 1994).

## II.    Rule 56(a) Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate

when the evidence in the record demonstrates that "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When evaluating

cross motions for summary judgment, "the court shall grant summary judgment only if

one of the moving parties is entitled to judgment as a matter of law upon material facts

that are not genuinely disputed." *Select Specialty Hosp.-Bloomington, Inc. v. Sebelius*,

774 F. Supp. 2d 332, 338 (D.D.C. 2011) (internal quotation marks and citation omitted).

The court must accept as true the evidence of, and draw "all justifiable inferences" in

favor of, the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986) (citation omitted). A genuine issue exists only where "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The nonmoving party may not rely solely on unsubstantiated allegations or conclusory

statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

11

## ANALYSIS

### I.    Standing

A plaintiff establishes Article III standing by demonstrating that he or she has suffered an injury-in-fact, traceable to the defendant's actions, that a favorable judgment would redress.   *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As trade associations proceeding on their members' behalf, plaintiffs have standing as long as one of their members has standing, the suit is germane to the plaintiffs' purpose, and the suit does not require the participation of the plaintiffs' individual members.   *See, e.g., Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). The Government does not challenge that the plaintiffs satisfy the last two requirements of associational standing.   The issue, then, is whether any of plaintiffs' members have standing under Article III.   Unfortunately for the defendants, they do.

### A.    Plaintiffs' Standing is Self-Evident

When, as here, the plaintiffs are "an object of the action (or foregone action) at issue," the Supreme Court has explained that "*there is ordinarily little question* that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."   *Lujan*, 504 U.S. at 561-62 (emphasis added).   Indeed, our Court of Appeals has stated that when "the complainant is 'an object of the [agency] action . . . at issue,'" such as a rulemaking, the complainant's "standing to seek review of administrative action is self-evident."   *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C.

12

Cir. 2002) (quoting *Lujan*, 504 U.S. at 561-62).    In such a case, there "should be 'little

question that the action or inaction has caused [the plaintiff] injury, and that a judgment

preventing or requiring the action will redress it.'"    *Id.* at 900 (quoting *Lujan*, 504 U.S. at

561-62).

Our Circuit Court has affirmed this principle of self-evident standing on numerous

occasions in a wide variety of circumstances, and various members of our Court have so

ruled.   *See, e.g., Affum v. United States*, 566 F.3d 1150, 1158 (D.C. Cir. 2009) (store

owner challenging regulations implementing penalties for trafficking in food stamp

benefits); *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895-96 (D.C. Cir.

2006) (association of petrochemical refiners challenging a pollution regulation scheme);

*Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733-34 (D.C. Cir. 2003) (environmental

group challenging endangered species designation); *Int'l Fabricare Inst. v. EPA*, 972 F.2d

384, 390 (D.C. Cir. 1992) (public water systems operators challenging water standards);

*Fla. Bankers Ass'n v. U.S. Dep't of Treasury*, ___ F. Supp. 2d ___, Civ. No. 13-529

(JEB), 2014 WL 114519, at *5-*6 (D.D.C. Jan. 13, 2014) (bank association challenging

bank regulations); *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 107-08 (CKK) (D.D.C.

2011) (hospitals challenging Medicare reimbursement regulations); *Russell-Murray*

*Hospice v. Sebelius*, 724 F. Supp. 2d 43, 53 (RMU) (D.D.C. 2010) (hospice care provider

challenging Medicare reimbursement regulations); *Am. Petroleum Inst. v. Johnson*, 541 F.

Supp. 2d 165, 176-77 (PLF) (D.D.C. 2008) (companies engaged in natural gas industry

13

challenging definition of navigable waters); *Nat'l Ass'n of Mfrs. v. Taylor*, 549 F. Supp. 2d 33, 48 n.8 (CKK) (D.D.C. 2008) (manufacturers challenging statutory lobbying restrictions).

As described above, the Disparate-Impact Rule was clearly intended to apply to the "provision and pricing of homeowner's insurance," which is precisely the business engaged in by plaintiffs' members. *See supra* pp. 6-8.[11]  As such, I easily find that the plaintiffs' standing to challenge the Rule is self-evident and that the plaintiffs are *not required* to submit any additional evidence. *See Sierra Club*, 292 F.3d at 900 (explaining that when standing is self-evident, the plaintiff or its members need not bring forward additional evidence).

However, even assuming, *arguendo*, that standing was not self-evident, the plaintiffs have already submitted additional evidence[12] demonstrating injury-in-fact to their members that further cements their standing to bring this case.[13]  And, with respect

---

[11] The notion that insurers are an object of the Rule is made even more obvious by the fact that certain disparate-impact complaints against plaintiffs' members, including the complaint initiated by HUD itself, were filed only *after* HUD issued the Rule. *See infra* n.13.

[12] Plaintiffs include with their Reply affidavits and a declaration of six insurance industry professionals, each of whom details the unreasonably harmful effects the Disparate-Impact Rule will have on the business of homeowner's insurance. *See* Pls.' Reply, Ex. 1 (Declaration of Peter Schwartz) ("Schwartz Decl.") [Dkt. #27-1]; Pls.' Reply, Ex. 2 (Affidavit of Bill Essman) ("Essman Affidavit") [Dkt. #27-2]; Pls.' Reply, Ex. 3 (Affidavit of Kathleen Rudolph) ("Rudolph Affidavit") [Dkt. #27-3]; Pls.' Reply, Ex. 4 (Affidavit of Kevin J. Christy) ("Christy Affidavit") [Dkt. #27-4]; Pls.' Reply, Ex. 5 (Affidavit of Martin M. Doto) ("Doto Affidavit") [Dkt. #27-5]; Pls.' Reply, Ex. 6 (Affidavit of Victoria L. McCarthy) ("McCarthy Affidavit") [Dkt. #27-6]; *see also Rainbow/PUSH Coal.*, 396 F.3d at 1239 (explaining that the evidence to establish standing may take the form of affidavits submitted in response to a motion to dismiss).

[13] At least one of plaintiffs' members has *already* been subject to *three* HUD complaints since

14

to traceability and redressability, plaintiffs have additionally, and easily, satisfied those requirements as well.[14]  Finally, with regard to whether this agency action is ripe for review, the question presented here—whether disparate-impact claims are cognizable under the FHA—is a purely legal question of statutory interpretation that does not depend

---

promulgation of the Rule, including one initiated *by HUD itself.  See* Schwartz Decl. ¶¶ 4-12. In light of these pending complaints, it is beyond dispute that plaintiffs' members face a significant threat of litigation and agency enforcement actions as a result of the Rule, which is sufficient injury.  *See, e.g., Chamber of Commerce v. Fed. Election Comm'n*, 69 F.3d 600, 603 (D.C. Cir. 1995).  Furthermore, plaintiffs have averred significant compliance costs as a result of the Rule.  *See* Compl. ¶ 26; Essman Affidavit ¶ 4; Rudolph Affidavit ¶¶ 9, 13; Christy Affidavit ¶ 5; Doto Affidavit ¶ 5; McCarthy Affidavit ¶ 6.  Where an agency rule "influences [plaintiffs'] business decisions such that they have incurred and likely will incur substantial costs as a result of the new [rule], those declarations are sufficient to establish that plaintiffs have been 'injured' for purposes of the standing analysis."  *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d at 176-77.

[14]  The pre-Rule question of disparate-impact liability under the statutory language of the FHA has *never* been resolved conclusively in our Circuit, *see Greater New Orleans Fair Hous. Action Ctr.*, 639 F.3d at 1085 (assuming, without deciding, that disparate-impact liability is available), and judges in this District have reached differing results.  *Compare Nat'l Cmt.y Reinvestment Coal. v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 77-79 (EGS) (D.D.C. 2008) (holding, without explanation, that the FHA permits disparate-impact claims), *with Brown*, 654 F. Supp. at 1115-16 (HHG) (holding that it does not, at least against private defendants).  More importantly, the question of disparate-impact liability for *insurers* under the Fair Housing Act was a much more uncertain question prior to the Rule, and the Rule purports to resolve the question in favor of insurer liability.  *See Saunders v. Farmers Ins. Exchange*, 537 F.3d 961, 964 (8th Cir. 2008) (stating that "we have recognized a disparate impact Fair Housing Act claim against *private* actors in another context," but acknowledging that, "at least with respect to insurers, the question is not free from doubt") (emphasis in original); *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 423-25 (4th Cir. 1984) (holding that the FHA does not apply to insurance); *but see Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) (applying FHA prohibition on racial discrimination to denial and pricing of homeowner's insurance); *Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 59-60 (EGS) (D.D.C. 2002).  At a minimum, the Rule resolves whatever uncertainty existed as to the availability of disparate-impact liability.  Because the Rule changed the law, it is traceable to plaintiffs' alleged injuries, and an order enjoining enforcement of the Rule would redress those injuries.

15

on the application of the Rule to any particular facts.    As such, I find that plaintiffs'

claims are *over* ripe for judicial review!

## II.    Administrative Procedure Act

Because the issue before me is whether disparate-impact claims are cognizable

under the Fair Housing Act, I must, in the final analysis, determine whether the text of the

FHA *unambiguously* evidences Congress's intent for such claims to be cognizable under

the Act.    Plaintiffs argue, in essence, that *only* disparate-treatment (intentional

discrimination) claims are unambiguously cognizable under the plain text of the FHA.

*See* Pls.' Mem. at 10.    Unfortunately for the defendants, I agree.

Pursuant to the APA, courts must set aside any agency action that is in excess of

that agency's "statutory jurisdiction, authority, or limitations."    5 U.S.C. § 706(2)(C).

Courts must also set aside agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."    *Id.* at § 706(2)(A).    Judicial

review of an agency's interpretation of a statute that it administers[15] is governed by the

framework laid out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources

Def. Council, Inc.*, 467 U.S. 837 (1984).    In *Chevron*, the Court held that "[i]f the intent

of Congress is clear [as to a specific issue], that is the end of the matter; for the court, as

well as the agency, must give effect to the unambiguously expressed intent of

---

[15] Congress has vested the Secretary of HUD with "[t]he authority and responsibility for
administering [the FHA]."    42 U.S.C. § 3608(a).

16

Congress."[16]  *Id.* at 842-43; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54

(1992) (noting that "courts must presume that a legislature says in a statute what it means

and means in a statute what it says there").   If the court determines, however, that "the

statute is silent or ambiguous with respect to the specific issue," the court must advance to

step-two of the *Chevron* analysis and determine "whether the agency's answer is based on

a permissible construction of the statute."[17]   *Chevron*, 467 U.S. at 843.

Here, however, an analysis under *Chevron* step-two is unnecessary.   For the

following reasons, I agree with the plaintiffs that the FHA unambiguously prohibits *only*

intentional discrimination.   Accordingly, the Disparate-Impact Rule exceeds HUD's

"statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and thereby

violates the APA.

### A.    Statutory Language

The Supreme Court has made clear that statutes will only prohibit practices

resulting in a disparate impact—in the absence of any discriminatory intent—when they

contain *clear* language to that effect.   *See Smith v. City of Jackson*, 544 U.S. 228, 235-36

---

[16] In attempting to ascertain the intent of Congress, the court is not limited to analysis of an
enabling statute's text alone.   Indeed, the court may consider "the text, structure, purpose, and
history of an agency's authorizing statute to determine whether a statutory provision admits of
congressional intent on the precise question at issue."   *Hearth, Patio & Barbecue Ass'n v. Dep't
of Energy*, 706 F.3d 499, 503 (D.C. Cir. 2013).

[17] To uphold an agency's interpretation of an enabling statute, the court need not find that the
interpretation is "the best interpretation of the statute," *United States v. Haggar Apparel Co.*, 526
U.S. 380, 394 (1999) (citation omitted), or that it is the "most natural one by grammatical or
other standards," *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991) (citing *EEOC v.
Commercial Office Products Co.*, 486 U.S. 107, 115 (1988)).

(2005) (plurality opinion); *Bd. of Educ. of the City Sch. Dist. of the City of New York v. Harris*, 444 U.S. 130, 138-39 (1979) (*Harris*); *see also Washington v. Davis*, 426 U.S. 229, 239 (1976).    Defendants contend, nevertheless, that Congress's intent to recognize claims based on disparate impact under the FHA can somehow be found in the language of three particular sections of the Act.    *See* Defs.' Mem. at 23-24; *see also* 42 U.S.C. § 3604 (prohibiting refusal to sell or rent property "because of" a protected characteristic); *id.* § 3605 (prohibiting discrimination in real estate-related transactions "because of" a protected characteristic; *id.* § 3606 (prohibiting discrimination in the provision of brokerage services "on account of" a protected characteristic).[18]    An analysis of the ordinary meaning of the words used by Congress in those sections, however, compels me to disagree.    How so?

The operative verbs in § 3604 are "refuse," "make," "deny," and—of course—"discriminate."    42 U.S.C. § 3604(a).    The ordinary meaning of "refuse" is "to show or express a positive unwillingness to do or comply with."    *Webster's Third New International Dictionary* 1910 (1966) ("*Webster's Third*").    The ordinary meaning of

---

[18] Defendants further argue that similarities between the language contained in § 3604(a) and the language contained in two provisions of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA")—both of which provide for claims based on disparate impact—indicate that disparate-impact claims should also be cognizable under the FHA.    *See* Defs.' Mem. at 22-23; *see also* 42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2).    Because the FHA fails to include definitions of the operative terms in §§ 3604, 3505, and 3606, the analysis must begin with the words' ordinary meanings.    *See Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011) (citing *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language

18

"make"—as used in the phrase "make unavailable"—is "to produce as a result of action, effort, or behavior" or "to cause to happen to or be experienced by someone." *Webster's Third* 1363. The plain meaning of "deny" is "to refuse to grant" or "to turn down or give a negative answer to." *Webster's Third* 603. Finally, the plain meaning of "discriminate"[19] is "to make a difference in *treatment* or favor on a class or categorical basis in disregard of individual merit." *Webster's Third* 648 (emphasis added).

The use of these particular verbs is telling, and indicates that the statute is meant to prohibit intentional discrimination only. When Congress intends to expand liability to claims of discrimination based on disparate impact, it uses language focused on the result or effect of particular conduct, rather than the conduct itself. *See, e.g.*, 42 U.S.C. § 2000e-2(a)(2) (employer shall not "limit, segregate, or classify his employees . . . in any way which *would deprive or tend to deprive* any individual of employment opportunities" or "*otherwise adversely affect* his status as an employee" (emphasis added)); 29 U.S.C.

---

accurately expresses the legislative purpose." (internal quotation marks and citation omitted))).
[19] HUD contends that the term "discriminate"—as it is used in the FHA—"may encompass actions that have a discriminatory effect but not a discriminatory intent." 78 Fed. Reg. 11,460, 11,466. Please! HUD bases this position on the Supreme Court's interpretation of the now repealed Emergency School Aid Act ("ESAA"). *See id.* n.49. Under the ESAA, schools were ineligible to receive further federal funding if they employed any practice "which results in the disproportionate demotion or dismissal of . . . personnel from minority groups" or "otherwise engage[s] in discrimination . . . in the hiring, promotion, or assignment of employees." *Harris*, 444 U.S. at 138 (quoting § 706(d)(1)(B) of the ESAA). In *Harris*, the Supreme Court held—despite its acknowledgment that "discriminate," standing alone suggests intentional discrimination—that a discriminatory-impact test should apply to § 706(d)(1)(B). *See id.* at 139, 141. In reaching its conclusion, however, the Court relied heavily on the fact that the discrimination clause was closely linked with the clause containing clear effects-based language. *See id.* at 143. Here, because there is no such linkage to any effects-based language, *Harris* is

19

§ 623(a)(2) (same); *see also Smith*, 544 U.S. at 235-36.    Indeed, Congress drafted the

disparate-impact provision of the ADEA with "key textual differences" from the

provision prohibiting disparate-treatment.    *See Smith*, 544 U.S. at 236 n.6; *compare* 29

U.S.C. § 623(a)(1), *with* 29 U.S.C. § 623(a)(2).

In the FHA, Congress has included *no* such effects-based language.    Each of the

FHA's operative terms' definitions describe intentional acts, which are—more often than

not—motivated by specific factors.    The FHA lists its prohibited motivations for these

intentional acts following the "because of"[20] and "on account of" clauses in §§ 3604,

3605, and 3606.[21]    However, the FHA contains no prohibitions on conduct that "tends to"

cause a particular result.    The focus of these sections is clearly not the effect of conduct,

but rather the motivation for the conduct itself.

Defendants, nevertheless, contend that § 3604(a)'s prohibition on discrimination is

analogous to the language contained in the sections of Title VII and the ADEA that

provide for claims based on disparate impact.    *See* Defs.' Mem. at 22-23; *see also* 42

U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2); *Griggs*, 401 U.S. at 432; *Smith*, 544 U.S.

---

inapposite, and the term "discriminate" retains its plain meaning as an intentional act.
[20] The plain meaning of the term "because"—as used in the preposition "because of"—is "for the reason that" or "on account of the cause that."    *Webster's Third* 194.    Thus, the terms following the "because of" clauses in the FHA supply the prohibited motivations for the intentional acts—*i.e.* to refuse to sell rent or otherwise make unavailable or deny—that the Act makes unlawful.    *See* 42 U.S.C. §§ 3604, 3605.
[21] The FHA prohibits discrimination motivated by the following protected characteristics: race, color, religion, sex, handicap, familial status, and national origin.    *See* 42 U.S.C. §§ 3604, 3605, 3606.

at 235-36.  Plaintiffs, not surprisingly, argue that § 3604(a)'s language is far more analogous to the sections of Title VII and the ADEA that provide for claims based on disparate treatment only.  *See* Pls.' Mem. at 14-16; *see also* 42 U.S.C. § 2000e-2(a)(1) (Title VII prohibition on disparate treatment); 29 U.S.C. § 623(a)(1) (ADEA prohibition on disparate treatment); *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (noting that 42 U.S.C. § 2000e-2(a)(1) provides for disparate treatment only); *Smith*, 544 U.S. at 236 n.6 (stating that 29 U.S.C. § 623(a)(1) "does not encompass disparate-impact liability") .  I believe the plaintiffs' analysis is far superior.

The statutory language in § 3604(a) is materially *identical* to the statutory language used in the disparate-treatment prohibitions in Title VII and the ADEA. *Compare* 42 U.S.C. § 3604(a), *with* 42 U.S.C. § 2000e-2(a)(1), *and* 29 U.S.C. § 623(a)(1).  Indeed, just as Title VII and the ADEA make it unlawful to "*refuse to hire or to discharge* any individual, or *otherwise to discriminate* against any individual . . . because of such individual's" protected characteristic, 42 U.S.C. § 2000e-2(a)(1) (emphasis added); 29 U.S.C. § 623(a)(1), so too does the FHA make it unlawful to "*refuse to sell or rent* . . . or to *refuse to negotiate* . . . or *otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, familial status, or national origin," 42 U.S.C. § 3604(a) (emphasis added).  It takes hutzpah (bordering on desperation) for defendants to argue that § 3604(a) more closely resembles the statutory

21

language in the disparate-impact provisions of Title VII and the ADEA,[22] both of which contain explicit effects-focused language that is conspicuously lacking in § 3604(a).

In addition to the clear meaning of the FHA's plain text, the striking similarities between the statutory language of § 3604(a) and the disparate-treatment provisions of Title VII and the ADEA leave this Court with no doubt that Congress intended the FHA to prohibit intentional discrimination only.   Put simply, Congress knows full well how to provide for disparate-impact liability, *c.f. Conn. Nat'l Bank*, 503 U.S. at 253-54, and has made its intent to do so known in the past by including clear effects-based language when it so chooses, *see Smith*, 544 U.S. at 235-36.   The fact that this type of effects-based language appears *nowhere* in the text of the FHA is, to say the least, an insurmountable obstacle to the defendants' position regarding the plain meaning of the Fair Housing Act.

**B.    Congressional Intent**

Even assuming, *arguendo*, that the plain text of the Fair Housing Act did not unambiguously provide for disparate-treatment claims only, Congress's intent to so limit the FHA would still be readily discernable.   How so?

**1.    Statutory Scheme**

When Congress amended the FHA in 1988, it did not make any changes to the

---

[22] Specifically, Title VII and the ADEA's prohibitions on disparate impact state that it is unlawful for an employer "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's" protected characteristics.   42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2).

22

operative language of §§ 3604 and 3606. *See generally* Pub. L. No. 100-430, 102 Stat.

1619 (1988 Amendments). Soon thereafter, however, Congress enacted two other

anti-discrimination statutes that explicitly provide for disparate-impact claims by using

clear effects-based language. In 1990, Congress enacted the Americans with Disabilities

Act ("ADA"), which authorizes claims of disparate impact upon a showing that a

particular practice "adversely affects" a disabled employee. *See* 42 U.S.C. § 12112(b);

*see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (noting disparate-impact

claims are cognizable under the ADA). Indeed, the ADA contains numerous examples

of explicit effects-based language, clearly indicating Congress's intent to provide for

liability, even in the absence of discriminatory intent. *See, e.g.*, 42 U.S.C. § 12112(b)(1)

("in a way that adversely affects"); *id.* at § 12112(b)(2) ("that has the effect of

subjecting"); *id.* at § 12112(b)(3)(A) ("that have the effect of discrimination").

The same is true of Title VII. In order to codify the Supreme Court's holding in

*Griggs*, Congress amended Title VII in 1991 to include language expressly authorizing

claims based on disparate impact. *See* Civil Rights Act of 1991, Pub. L. No. 102-166,

105 Stat. 1071 (1991) (codified at 42 U.S.C. § 2000e-2(k)(1)(A) ("[a]n unlawful

employment practice based on disparate impact is established under this subchapter only

if . . . .")); *see also Griggs*, 401 U.S. at 431. These two statutes powerfully demonstrate

that Congress knows how to craft statutory language providing for disparate-impact

liability when it intends to do so. *C.f. Conn. Nat'l Bank*, 503 U.S. at 253-54. As such,

23

the fact that Congress chose *not* to amend the FHA in 1988 to include clear effects-based language—while doing so at the same time for two similar anti-discrimination statutes—clearly illustrates that it never intended for claims of disparate impact to be cognizable under the FHA.

Defendants further contend that three "exemptions from liability"[23] added to the FHA in the 1988 Amendments—like the "reasonable factor other than age" ("RFOA")[24] exemption in the ADEA, *see* 29 U.S.C. § 623(f)(1)—"presuppose the availability of disparate impact claims" under the FHA.  *See* Defs.' Mem. at 29; *see also Smith*, 544 U.S. at 238-39 (discussing RFOA exemption in ADEA).  I disagree.  The RFOA exemption specifically authorizes conduct that is "otherwise prohibited [by the ADEA]," when that conduct is based on a reasonable factor other than age.  *See* 29 U.S.C. § 623(f)(1).  Unfortunately for defendants, however, the three provisions they cite in the

---

[23] *See* 42 U.S.C § 3605(c) ("Nothing in this subchapter prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than [protected characteristics]."); *id.* § 3607(b)(1) ("Nothing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling."); *id.* § 3607(b)(4) ("Nothing in this subchapter prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance.").

[24] The RFOA exemption in the ADEA states—in pertinent part—that
> It shall not be unlawful for an employer, employment agency, or labor organization . . . to take *any action otherwise prohibited* under [this act] where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age.

29 U.S.C. § 623(f)(1) (emphasis added).

24

FHA *merely* provide safe-harbors, clarifying that *nothing* in the FHA prohibits the specific conduct discussed. These provisions make no mention of conduct "otherwise prohibited" under the FHA. *See* 42 U.S.C § 3605(c); *id.* § 3607(b)(1); *id.* § 3607(b)(4). Rather, they describe conduct that Congress intended to protect with a "complete exemption from FHA scrutiny." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 (1995). Moreover, under the burden-shifting framework applied to claims of disparate-treatment by many jurisdictions, *see, e.g.*, *2922 Sherman Avenue Tenants' Ass'n*, 444 F.3d at 682, these safe-harbor provisions provide *per se* legitimate bases as defenses to claims of disparate treatment. Considering the unambiguous meaning of the FHA's plain text, and the lack of any language referencing conduct otherwise prohibited under the FHA, defendants' contention that the cited provisions *presuppose* the presence of disparate-impact liability appears to be nothing more than wishful thinking on steroids!

## 2. The McCarran-Ferguson Act

Congressional intent to provide only for FHA claims based on intentional discrimination is evident for yet another reason: the expansion of the FHA to include disparate-impact liability against insurers would run afoul of previously enacted federal legislation.[25] Congress enacted the McCarran-Ferguson Act ("McCarran-Ferguson"), 59

---

[25] It would simply defy logic for Congress to intentionally draft legislation in such a way as to contradict previously enacted federal statutes. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 137-39 (2000) (observing that Congress could not have intended to grant the FDA authority to regulate tobacco products, where doing so would run afoul of previously established congressional policy); *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 70 (RJL) (D.D.C. 2010) ("Because this result would effectively dismantle the existing regulatory wall Congress

25

Stat. 33 (1945) (codified at 15 U.S.C. §§ 1011 *et seq.*), to ensure the primacy of state law

in the realm of insurance regulation.   *See id.* § 1012(a) ("The business of insurance, and

every person engaged therein, shall be subject to the laws of the several States which

relate to the regulation or taxation of such business."); *see also Ambrose v. Blue Cross &*

*Blue Shield of Va., Inc.*, 891 F. Supp. 1153, 1167 (E.D. Va. 1995) ("Congress declared

the primacy of state law in the regulation of the business of insurance.").

McCarran-Ferguson states that "[n]o Act of Congress shall be construed to invalidate,

impair, or supersede any law enacted by any State for the purpose of regulating the

business of insurance, or which imposes a fee or tax upon such business, unless such Act

specifically relates to the business of insurance."   15 U.S.C. § 1012(b);[26] *see also*

*Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1360-61 (6th Cir. 1995) ("[B]ecause

the [FHA] does not mention insurance, it is covered by the McCarran-Ferguson Act and

cannot be construed in such a way as to invalidate, impair, or supersede any state law

enacted to regulate the business of insurance.").

  The expansion of the FHA to include disparate-impact liability would not only

have a wide-ranging disruptive effect on the pricing and provision of homeowner's

insurance, but would also require insurers to collect and analyze certain types of

---

erected between tobacco products and drug-device combinations, I can easily infer that Congress *did not* intend tobacco products to be drugs merely because they deliver nicotine." (emphasis in original)).

[26] *Cf. Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson

race-based data on their clients and prospective clients.[27]   *See* Essman Affidavit ¶¶ 5-9

(describing steps required before one of plaintiffs' members will be able to collect and

analyze data on its customers' protected characteristics in order to ensure compliance

with Disparate-Impact Rule).   These practices—expressly prohibited in many

states[28]—will regularly result in the FHA being "reverse-preempted" McCarran-Ferguson.

 *See Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1209 (9th Cir. 2010) (en banc) (stating

that application of the FHA may be reverse-preempted if it "invalidate[s], impair[s], or

supersede[s] the provisions of the Texas Insurance Code").   Indeed, recognition of

disparate-impact liability under the FHA additionally raises serious concerns regarding

widespread federal encroachment upon state insurance regulation.   *See Saunders v.*

*Farmers Ins. Exchange*, 537 F.3d 961, 967 (8th Cir. 2008) (noting that suits "challenging

the racially disparate impact of industry-wide rate classifications may usurp core

rate-making functions of the State's administrative regime").[29]

---

Act does not preclude its application.").

[27] Insurers would, of course, also be required to collect and analyze data on their clients' and prospective clients' other protected characteristics, including color, religion, sex, familial status, national origin, and handicap as well.

[28] State insurance regulations ordinarily prohibit the consideration of protected characteristics in the evaluation and pooling of risk, and at least one state prohibits even the collection of such data.   *See* Md. Code Ann. Ins. § 27-501(c)(1) ("[A]n insurer or insurance producer may not make an inquiry about race, creed, color, or national origin in an insurance form, questionnaire, or other manner of requesting general information that relates to an application for insurance."); *see also, e.g.*, 215 Ill. Comp. Stat. 5/424(3); Alaska Stat. § 21.36.090; Ky. Rev. Stat. Ann. § 304.12-085; Mass Gen. Laws Ann. ch. 175 § 4C; Me. Rev. Stat. tit. 24-A, § 2303(1)(G); Okla. Stat. Ann. tit. 36, § 985; S.C. Code Ann. § 38-75-1210(B)(1); Tenn. Code Ann. § 56-5-303(a)(2)(d); Tex. Ins. Code Ann. § 544.002.

[29] *See also NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290-91 (7th Cir. 1992) ("Risk

Moreover, in order to ensure that their facially neutral underwriting practices do not result in any disparate outcomes amongst protected groups, insurers would be required to turn a blind eye to established actuarial principles in favor of race-based insurance decisions. *See* Rudolph Affidavit ¶¶ 11-15; *see also* Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 277 (2009) (describing risk-based pricing decisions as being in "inevitable and irreconcilable conflict" with disparate-impact liability).[30]   Indeed, insurers "would have to use the newly-acquired data to adjust outcomes for individual insureds based solely on this data—*i.e.* adjusting (upward or downward) the premium charged to achieve parity of 'impact.'"   Rudolph Affidavit ¶15; *see also* Christy Affidavit ¶¶ 5-6; Doto Affidavit ¶¶ 5-6; McCarthy Affidavit ¶¶ 6-7.   No reasonable interpretation of Congress's intent would conclude that it intended for the FHA to act in

---

discrimination is not race discrimination . . . . No insurer openly uses race as a ground of ratemaking, but is a higher rate per $1,000 of coverage for fire insurance in an inner city neighborhood attributable to risks of arson or to racial animus?").

[30] Kathleen Rudolph, a Vice President of Business Compliance at one of plaintiffs' member organizations clarifies that—if the FHA provides for disparate-impact liability against providers of homeowner's insurance—her employer will be forced to

> undertake three steps to assure effective compliance with the HUD rule, and each of those steps would mark departures from [the company's] current business practices.   The three-step process would comprise: (1) collecting data on characteristics of [the company's] insureds of interest to HUD (including race, religion, gender and national origin); (2) cross-referencing this newly-collected data against the pricing determined by the current risk assessment and differentiation model . . . ; and (3) making corrective underwriting, rating and pricing adjustments to recalibrate away from risk and towards parity of 'impact.' Each of these steps would create fundamental conflicts with [the company's] existing State regulatory obligations.

28

such a way as to "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b); *c.f. Ricci*, 557 U.S. at 581 ("Allowing employers to violate the disparate-treatment prohibition [of Title VII] based on a mere good-faith fear of disparate-impact liability would encourage race-based action at the slightest hint of disparate impact."); *id.* at 594 (Scalia, J., concurring) ("[I]t is clear that Title VII not only permits but affirmatively *requires* [remedial race-based actions] when a disparate-impact violation *would* otherwise result." (emphasis in original)).    To the contrary, it is utterly incomprehensible that Congress would *intentionally* provide for disparate-impact liability against insurers in the FHA, where doing so would *require* those same insurers to collect and evaluate race-based data, thereby engaging in conduct expressly proscribed by state law. *See supra* note 28.

## C.    Judicial Treatment

Finally, defendants contend that previous holdings of other Federal Circuit Courts that recognized disparate-impact liability under the FHA, *preclude* this Court from finding that the FHA unambiguously prohibits disparate treatment only. *See* Defs.' Mem. at 20-21. Please!   The Supreme Court itself has made clear that a statute is not ambiguous simply because there is a lack of judicial consensus as to its proper meaning, *see Reno v. Koray*, 515 U.S. 50, 64-65 (1995),[31] and "judges cannot cause a clear text to

---

Rudolph Affidavit ¶ 12.

[31] *See also Hoffman v. Blaski*, 363 U.S. 335, 358 (1960) (Frankfurter, J., dissenting) (noting that the Court's interpretation of the statute at issue was "contrary to the rulings of every Court of

29

become ambiguous by ignoring it," *Deal v. United States*, 508 U.S. 129, 136 (1993).

And as I noted previously, our own Circuit Court has never ruled on the specific question of whether disparate-impact liability is cognizable under the FHA.[32]   While eleven Circuit Courts of Appeals to date have addressed this question in the affirmative,[33] those decisions are not only not binding upon this Court, but more importantly were—for the most part—decided *before* the Supreme Court's decision in *Smith v. City of Jackson*, where the Supreme Court made it clear that an inquiry into the availability of disparate-impact liability turns on the presence, or absence, of effects-based language. *See Smith*, 544 U.S. at 235-36; *see also supra* note 5.

Moreover, it is remarkable that none of the Circuit Courts that have recognized claims of disparate impact *subsequent* to the Supreme Court's decision in *Smith* have either discussed *Smith* in any detail, or reconsidered their Circuit precedent in light of its holding.   *See, e.g., Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. and Cmty.*

---

Appeals but one which has considered the problem, and is contrary to the view of more than half the District Courts as well").

[32] One district judge in this Circuit, however, did rule on this very issue in the aftermath of the Supreme Court's decision in *Smith*.   *See Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70 (EGS) (D.D.C. 2008).   After referencing the parties' arguments—both for and against recognition of disparate-impact liability under the FHA—the judge ruled that "*Smith* does not preclude disparate impact claims pursuant to the FHA."   *Id.* at 79.   Unfortunately, however, he did not choose to explain in his opinion the reasoning behind his conclusion.   Accordingly, it was of no assistance to this Court in resolving this case.

[33] Interestingly, the Second Circuit reached its conclusion in *Huntington Branch, NAACP v. Town of Huntington* only to have the Solicitor General argue to the contrary in its amicus brief before the Supreme Court.   *See Huntington Branch, NAACP*, 844 F.2d at 935-36; Brief for United States as Amicus Curiae at 10, 14, 16, *Town of Huntington v. Huntington Branch, NAACP*, 109 S. Ct. 276 (1989) (No. 87-1961).

*Affairs*, 747 F.3d 275, 280 (5th Cir. 2014), *cert. granted*, No. 13-1371, 2014 WL 4916193

(U.S. Oct. 2, 2014); *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182,

1194-95 (9th Cir. 2006); *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417

F.3d 898, 902 (8th Cir. 2005).   Indeed, Circuit Judge Steven Colloton of the Eighth

Circuit appropriately, but unsuccessfully, cautioned his colleagues that "there has been

little consideration . . . and virtually no discussion of [the textual basis for

disparate-impact liability under the FHA] since the Court in *Smith* explained how the text

of Title VII justified the decision in *Griggs*," and "recent developments in the law suggest

that the issue is appropriate for careful review."   *See Gallagher v. Magner*, 636 F.3d 380,

383 (8th Cir. 2010) (Colloton, J., dissenting from denial of rehearing en banc).

        In short, *Smith* represents a sea change in approach to the analysis of statutory

provisions with respect to disparate-impact liability, *compare Smith*, 544 U.S. at 235-36,

*with Griggs*, 401 U.S. at 432-35, and thus, defendants' reliance on pre-*Smith* case law as

supporting their position is, to say the least, unavailing.

## CONCLUSION

        This is, yet another example of an Administrative Agency trying desperately to

write into law that which Congress never intended to sanction.[34]   While doing so might

have been more understandable—and less troubling—prior to the Supreme Court's

---

[34] *See, e.g., Brown & Williamson Tobacco Corp.*, 529 U.S. at 137-39 (attempted FDA regulation
of tobacco products); *Avenal Power Center v. EPA*, 787 F. Supp. 2d 1, 4 (RJL) (D.D.C. 2011)
(self-serving EPA misinterpretation of Clean Air Act time requirements); *Smoking Everywhere*,

31

decision in *Smith*, in its aftermath it is nothing less than an artful misinterpretation of Congress's intent that is, frankly, too clever by half.    Defendants, of course, were somehow hoping that a favorable *Chevron* analysis would muster the judicial deference necessary to salvage their much desired Rule.    But alas, it did not.    Fortunately for us all, however, the Supreme Court is now perfectly positioned in *Texas Department of Housing* to finally address this issue in the not-too-distant future.    In the meantime, for all of the foregoing reasons, the Court GRANTS plaintiffs' Motion for Summary Judgment and DENIES defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. Accordingly, the United States Departments of Housing and Urban Development's Disparate Impact Rule, promulgated in 78 Fed. Reg. 11,460-11,482, and codified at 24 C.F.R. § 100.500, is hereby VACATED.    An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

*Inc.*, 680 F. Supp. 2d at 70 (RJL) (attempted FDA regulation of e-cigarettes).

32

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN INSURANCE**<br>**ASSOCIATION**, *et al.*,<br><br>**Plaintiffs**,<br><br>v.<br><br>**UNITED STATES DEPARTMENT**<br>**OF HOUSING AND URBAN**<br>**DEVELOPMENT**, *et al.*,<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Case No. 13-00966 (RJL)

**FILED**

NOV 03 2014

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## ORDER
(November **3**, 2014) [Dkt. ##16, 20]

For the reasons set forth in the Memorandum Opinion accompanying this Order, it

is hereby

**ORDERED** that plaintiffs' Motion for Summary Judgment [Dkt. #16] is

**GRANTED** and defendants' Motion to Dismiss or, in the Alternative, for Summary

Judgment [Dkt. #20] is **DENIED**, and it is further

**ORDERED** that the Department of Housing and Urban Development's Disparate

Impact Rule, promulgated in 78 Fed. Reg. 11,460-11,482, and codified at 24 C.F.R.

§ 100.500, is hereby **VACATED**.

**SO ORDERED.**

_____
RICHARD J. LEON
United States District Judge

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN INSURANCE ASSOCIATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Case No. 13-00966 (RJL) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**FILED**

NOV – 7 2014

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## AMENDED MEMORANDUM OPINION

(November **7**, 2014) [Dkt. ##16, 20]

Plaintiffs American Insurance Association ("AIA") and National Association of

Mutual Insurance Companies ("NAMIC") (together "plaintiffs")[1] brought this action

against the United States Department of Housing and Urban Development ("HUD") and

Julian Castro[2]—in his official capacity as Secretary of the United States Department

Housing and Urban Development—("Secretary") (together "defendants") on June 26,

2013, *see* Complaint ("Compl.") [Dkt. #1], challenging defendants' promulgation of a

---

[1] Plaintiffs are two non-profit trade associations whose members sell homeowner's insurance in every state and territory of the United States. *See* Compl. ¶¶ 7-8.

[2] Plaintiffs originally named Shaun Donovan—in his official capacity as Secretary of HUD—as a defendant in this case. *See* Compl. ¶ 10. However, on July 28, 2014, Julian Castro assumed office as the 16th United States Secretary of Housing and Urban Development, replacing Secretary Donovan. Accordingly, pursuant to Federal Rule of Civil Procedure 25(d), Secretary Castro shall be, and hereby is, substituted for Shaun Donovan as a named defendant in this action. *See* Fed. R. Civ. P. 25(d).

1

final rule, *see* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500) ("Disparate-Impact Rule" or "Rule"), providing for liability based on disparate impact under the Fair Housing Act ("FHA" or the "Act"), Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified at 42 U.S.C. § 3601 *et seq.*).   Plaintiffs claim that defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, by exceeding its statutory authority when it expanded the scope of the FHA to recognize not only disparate-treatment claims (*i.e.* intentional discrimination) but also disparate-impact claims (*i.e.* facially neutral practices with discriminatory effects).   *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Pls.' Mem.") [Dkt. 16-1] at 8-9.   Now before the Court are plaintiffs' Motion for Summary Judgment ("Pls.' Mot.") [Dkt. #16] and defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mot.") [Dkt. #20].   After due consideration of the parties' pleadings, the arguments of counsel, the relevant law, and the entire record in this case, the Court agrees with plaintiffs that the FHA prohibits disparate treatment *only*, and that the defendants, therefore, exceeded their authority under the APA.   Accordingly the plaintiffs' Motion for Summary Judgment is GRANTED, the defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment is DENIED, and the Disparate-Impact Rule is VACATED.

# BACKGROUND

## I.    Statutory Background

Congress enacted Title VIII of the Civil Rights Act of 1968—commonly known as the Fair Housing Act—"following urban unrest of the mid 1960s and in the aftermath of the assassination of the Rev. Dr. Martin Luther King, Jr."   H.R. Rep. No. 711, 100th Cong., 2d Sess. 15 (1988).   Congress's goal in enacting the Fair Housing Act was to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.   To accomplish this purpose, the FHA made it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin."   *Id.* § 3604(a).   Moreover, the FHA made it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," because of those same protected characteristics.   *Id.* § 3604(b).

Twenty years later, Congress amended the FHA, *see* Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 ("1988 Amendments"), to include sex, familial status, and handicap as protected characteristics.   *See* 42 U.S.C. §§ 3604(a) (sex and familial status), (f)(1) (handicap); *see also id.* §§ 3604(f)(2), 3605, 3606.   The 1988 Amendments further vested HUD with the authority to engage in formal adjudications of housing discrimination claims, *see id.* § 3612, as well as the authority to issue

3

rules—following a notice and comment period—to effectuate the goals of the FHA, *see id.* § 3614a.    The 1988 Amendments did *not*, however, make any changes to the operative language of § 3604(a) & (b) or § 3606.    *See* Pub. L. No. 100-430, 102 Stat. 1619.

## II.    Promulgation of the Disparate-Impact Rule

In the absence of explicit language providing for disparate-impact liability when it was enacted in 1968, it is not surprising that there has been a difference of opinion along ideological/political lines—since at least the Supreme Court's decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)—as to whether or not such claims were cognizable under the FHA.[3]    To date, the Supreme Court has not had the opportunity to answer this particular question.[4]    And, while eleven Circuit Courts of Appeals have found that

---

[3] *Compare, e.g.*, Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988) (President Reagan stating that 1988 FHA amendments did "not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that [T]itle 8 violations may be established by a showing of disparate impact . . . without discriminatory intent . . . . Title 8 speaks only to intentional discrimination"), *with* 134 Cong. Reg. 23,711 (Sen. Kennedy) (describing President Reagan's statement as "flatly inconsistent with Congress's understanding of the law").

[4] Since 2011, the Supreme Court has granted certiorari *three times* on the issue of whether disparate-impact liability is cognizable under the FHA, most recently last month in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project.    See* No. 13-1371, 2014 WL 4916193 (U.S. Oct. 2, 2014) (*Texas Department of Housing*); *Twp. of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.* (*Mount Holly*), 133 S. Ct. 2824 (2013); *Magner v. Gallagher*, 132 S. Ct. 548 (2011).    While *Texas Department of Housing* is currently before the Court, and likely to be decided this term, both *Mount Holly* and *Magner* were settled before the Court could decide the issue.    The circumstances behind the *Magner* settlement, however, are particularly troubling.    Indeed, a Congressional Joint Staff Report found that—in negotiating a *quid pro quo* deal that facilitated *Magner*'s settlement—then-Assistant Attorney General Thomas Perez "exert[ed] arbitrary authority" to settle the case and "placed ideology over objectivity and politics over the rule of law . . . . Rather than allowing the Supreme Court to

4

disparate-impact claims are cognizable under the FHA,[5] the overwhelming majority of these opinions *preceded* the Supreme Court's decision in *Smith v. City of Jackson*, 544 U.S. 228 (2005), which set forth the appropriate analytical framework when a court is attempting to discern whether disparate-impact liability arises in a particular statutory context.    As for our Circuit, to date it too has never addressed this issue.    *See, e.g.,* *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. and Urban Dev.*, 639 F.3d 1078, 1085 (D.C. Cir. 2011) ("We have not decided whether [the FHA] permits disparate impact claims."); *2922 Sherman Avenue Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006).    However, on November 16, 2011—just nine days after the Supreme Court granted certiorari in *Magner v. Gallagher* to address this very issue, *see Magner*, 132 S. Ct. 548 (2011)—HUD, calculatingly, proposed a rule that would specifically provide for disparate-impact liability under the FHA.    *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg.

---

freely and impartially adjudicate an appeal that the Court had affirmatively chosen to hear, [Perez] openly worked to get the appeal off of the Court's docket."    Staff of H. Comm. On Oversight and Gov't Reform et al., 113th Cong., *DOJ's "Quid Pro Quo" with St. Paul: How Assistant Attorney General Thomas Perez Manipulated Justice and Ignored the Rule of Law* 64 (Comm. Rep. 2013).

[5] *See, e.g., Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49-50 (1st Cir. 2000); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935-36 (2d Cir. 1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146-47 (3d Cir. 1977); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur v. City of Toledo*, 782 F.2d 565, 574-75 (6th Cir. 1986); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *United States v. City of Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir. 1974); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982); *Mountain Side Mobile Estates P'ship v. U.S. Dep't of Hous. and Urban Dev.*, 56 F.3d 1243, 1250-51 (10th Cir. 1995); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1559

5

70,921, 70,921 (Nov. 16, 2011) (HUD proposed "to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate").

Following HUD's notice of the proposed rule, plaintiffs submitted comments explaining their numerous concerns about the harmful effects the Rule was likely to cause.[6]  *See* JA at 372-383, 455-59.   Despite these concerns—and those raised by many others—HUD promulgated the final Rule without substantial changes on February 15, 2013.[7]  *See* 78 Fed. Reg. 11,460.   Not surprisingly, the preamble to the Disparate-Impact Rule *expressly* extended the availability of disparate-impact liability to the provision and pricing of homeowner's insurance for the first time.   *See id.* at 11,475.   So much for any contention that the FHA unambiguously provided for such liability!

---

n.20 (11th Cir. 1984).

[6] Plaintiffs' concerns included, *inter alia*, (1) the statutory language of the FHA did not provide a cause of action for disparate-impact liability; (2) in many states, the application of the rule would result in reverse-preemption of the FHA pursuant to the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*; (3) the rule was premature given the fact that the Supreme Court had recently granted certiorari in *Magner*, and was poised to determine this very issue; (4) the analytic framework for determining the validity of a disparate-impact claim was at variance with the burden-of-proof framework laid out in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), for disparate-impact claims in non-Title VII cases; and (5) the application of disparate-impact liability to the provision and pricing of homeowner's insurance would require a disastrous departure from long-established risk-based underwriting practices.   *See* Plaintiffs' Joint Appendix of Administrative Record Materials ("JA") [Dkt. #36] at 372-383, Comments from the National Association of Mutual Insurance Companies on the Proposed Rule (January 17, 2012); *see id.* at 455-59, Comments from the American Insurance Association on the Proposed Rule (January 17, 2012).

[7] Notably, in a recent decision from the United States District Court for the Northern District of Illinois, Judge Amy St. Eve ruled that "HUD's response to the insurance industry's concerns [regarding the Disparate Impact Rule] was arbitrary and capricious," and remanded the case to HUD "for further explanation."   *Property Cas. Insurers Ass'n of Am. v. Donovan*, No. 13 C 8564, at 46-47 (N.D. Ill. Sept. 3, 2014).   Judge St. Eve found that HUD failed to adequately address the insurance industry's concerns or explain its decisions regarding application of the

6

The Disparate-Impact Rule itself states that "[l]iability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent." 24 C.F.R. § 100.500. The Rule defines a practice as having a "discriminatory effect" where "it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." *Id.* § 100.500(a). A practice shown to have a discriminatory effect may still be legal if it is supported by a legally sufficient justification. *See id.* § 100.500.

"A legally sufficient justification exists where the challenged practice . . . [i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests . . . [and] [t]hose interests could not be served by another practice that has a less discriminatory effect." *Id.* § 100.500(b)(1)(i)-(ii).

The Disparate-Impact Rule employs a burden-shifting framework for assessing disparate-impact liability under the FHA. *See id.* § 100.500(c)(1)-(3). Initially, "the charging party . . . has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Id.* § 100.500(c)(1). If the plaintiff or charging party meets this burden, "the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of their] substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Finally, if the respondent

---

Disparate-Impact Rule to the provision and pricing of homeowner's insurance. *See id.*

7

or defendant satisfies its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."  *Id.* § 100.500(c)(3).

Importantly here, the Rule expressly applies to entities that provide homeowner's insurance, such as plaintiffs' members.  *See* 78 Fed. Reg. 11,460, 11,475.   Indeed, the proposed notice of rule-making explicitly listed the "provision and pricing of homeowner's insurance" as an example of a "housing policy or practice" that may have a disparate impact on a class of persons, 76 Fed. Reg. 70,921, 70,924, and in the final rule-making, HUD directly considered some of the very concerns that were raised by insurers during the notice-and-comment period, but did not meaningfully alter the substance of the Rule in response to those concerns, *see* 78 Fed. Reg. 11,460, 11,475.

## III.    Procedural History

Plaintiffs commenced this action on June 26, 2013.   On August 15, 2013, however, defendants filed an Unopposed Motion to Stay Proceedings ("Motion to Stay") [Dkt. #12] because the Supreme Court had recently granted certiorari in *Mount Holly*[8] (June 17, 2013) to resolve the precise statutory question at issue in this case, and a stay of

---

[8] Petitioners in *Mount Holly* filed their Petition for a Writ of Certiorari on June 11, 2012.  *See* Petition for a Writ of Certiorari, *Mount Holly*, No. 11-1507 (June 11, 2012), *available at* http://sblog.s3.amazonaws.com/wp-content/uploads/2012/07/11-1507-Mount-Holly-v.-Mount-Holly-Gardens-Citizens-in-Action-Petition.pdf.   The Supreme Court granted certiorari on June 17, 2013, solely on the issue of whether "disparate impact claims [are] cognizable under the Fair

8

proceedings—pending the Supreme Court's decision—would "at a minimum streamline the proceedings in this case, if not eliminate the need for litigation entirely." *See* Mot. to Stay at 1. I granted the motion by minute order on August 29, 2013.

On November 15, 2013 the Supreme Court dismissed the writ of certiorari in *Mount Holly* because the parties had reached a settlement. On December 16, 2013, the parties filed a joint status report and motion, informing me of the *Mount Holly* dismissal, and seeking a lift of the stay in this case. *See* Joint Mot. to Lift the Stay and Status Report [Dkt. #14]. I granted the parties' motion on December 20, 2013, and set a briefing schedule for dispositive motions. *See* Order (Dec. 20, 2013) [Dkt. #15]. That same day, plaintiffs filed their Motion for Summary Judgment. *See* Pls.' Mot. Defendants then filed their Motion to Dismiss or, in the Alternative, for Summary Judgment on February 3, 2014. *See* Defs.' Mot. Following full briefing of the issues,[9] I heard oral argument on the parties' motions on July 22, 2014.[10]

---

Housing Act." *See Mount Holly*, 133 S. Ct. 2824 (2013); *see also supra* note 4.

[9] *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss or for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Reply") (Feb. 24, 2014) [Dkt. #27]; Defendants' Reply Memorandum in Support of Their Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Reply") (Mar. 18, 2014) [Dkt. #31].

[10] At the conclusion of oral argument, I invited the parties to submit supplemental briefs on any issues raised during the arguments. *See* Transcript of Oral Argument at 49:3-24, *American Insurance Ass'n v. U.S. Dep't of Hous. and Urban Dev.*, No. 1:13-cv-00966 (D.D.C. July 22, 2014). The parties submitted their supplemental briefs on August 5, 2014. *See* Supplemental Memorandum to Plaintiffs' Motion for Summary Judgment ("Pls.' Supp'l Mem.") (Aug. 5, 2014) [Dkt. #38]; Supplemental Memorandum to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Supp'l Mem.") (Aug. 5, 2014) [Dkt. #39].

9

## STANDARD OF REVIEW

### I.     Rule 12(b) Dismissal

The court may dismiss a complaint or any portion of it for lack of subject-matter jurisdiction or for failure to state a claim upon which relief may be granted.   *See* Fed. R. Civ. P. 12(b)(1), (6).   In considering a motion to dismiss, the court may only consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."   *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).   To survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   On a motion to dismiss for lack of standing, a trial court may allow the plaintiff to supplement the complaint with affidavits to demonstrate standing.   *See Warth v. Seldin*, 422 U.S. 490, 501-02 (1975); *see also Rainbow/PUSH Coal. v. FCC*, 396 F.3d 1235, 1239 (D.C. Cir. 2005) (permitting affidavits in response to a motion to dismiss for want of standing).

In considering a motion under Rule 12(b), the court must construe the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged."   *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks and citation omitted).   However, factual allegations—even though assumed to be true—must still "be enough to raise a right to

relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545

(2007).   Moreover, the court need not "accept legal conclusions cast in the form of

factual allegations," nor "inferences drawn by plaintiffs if such inferences are

unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16

F.3d 1271, 1276 (D.C. Cir. 1994).

## II.   Rule 56(a) Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate

when the evidence in the record demonstrates that "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P.

56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   When evaluating

cross motions for summary judgment, "the court shall grant summary judgment only if

one of the moving parties is entitled to judgment as a matter of law upon material facts

that are not genuinely disputed." *Select Specialty Hosp.-Bloomington, Inc. v. Sebelius*,

774 F. Supp. 2d 332, 338 (D.D.C. 2011) (internal quotation marks and citation omitted).

The court must accept as true the evidence of, and draw "all justifiable inferences" in

favor of, the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986) (citation omitted).   A genuine issue exists only where "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The nonmoving party may not rely solely on unsubstantiated allegations or conclusory

statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

11

## ANALYSIS

### I.    Standing

A plaintiff establishes Article III standing by demonstrating that he or she has suffered an injury-in-fact, traceable to the defendant's actions, that a favorable judgment would redress.   *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As trade associations proceeding on their members' behalf, plaintiffs have standing as long as one of their members has standing, the suit is germane to the plaintiffs' purpose, and the suit does not require the participation of the plaintiffs' individual members.   *See, e.g., Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). The Government does not challenge that the plaintiffs satisfy the last two requirements of associational standing.   The issue, then, is whether any of plaintiffs' members have standing under Article III.   Unfortunately for the defendants, they do.

### A.    Plaintiffs' Standing is Self-Evident

When, as here, the plaintiffs are "an object of the action (or foregone action) at issue," the Supreme Court has explained that "*there is ordinarily little question* that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."   *Lujan*, 504 U.S. at 561-62 (emphasis added).   Indeed, our Court of Appeals has stated that when "the complainant is 'an object of the [agency] action . . . at issue,'" such as a rulemaking, the complainant's "standing to seek review of administrative action is self-evident."   *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C.

Cir. 2002) (quoting *Lujan*, 504 U.S. at 561-62).    In such a case, there "should be 'little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it.'"    *Id.* at 900 (quoting *Lujan*, 504 U.S. at 561-62).

Our Circuit Court has affirmed this principle of self-evident standing on numerous occasions in a wide variety of circumstances, and various members of our Court have so ruled.    *See, e.g., Affum v. United States*, 566 F.3d 1150, 1158 (D.C. Cir. 2009) (store owner challenging regulations implementing penalties for trafficking in food stamp benefits); *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895-96 (D.C. Cir. 2006) (association of petrochemical refiners challenging a pollution regulation scheme); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733-34 (D.C. Cir. 2003) (environmental group challenging endangered species designation); *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 390 (D.C. Cir. 1992) (public water systems operators challenging water standards); *Fla. Bankers Ass'n v. U.S. Dep't of Treasury*, ___ F. Supp. 2d ___, Civ. No. 13-529 (JEB), 2014 WL 114519, at *5-*6 (D.D.C. Jan. 13, 2014) (bank association challenging bank regulations); *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 107-08 (CKK) (D.D.C. 2011) (hospitals challenging Medicare reimbursement regulations); *Russell-Murray Hospice v. Sebelius*, 724 F. Supp. 2d 43, 53 (RMU) (D.D.C. 2010) (hospice care provider challenging Medicare reimbursement regulations); *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176-77 (PLF) (D.D.C. 2008) (companies engaged in natural gas industry

13

challenging definition of navigable waters); *Nat'l Ass'n of Mfrs. v. Taylor*, 549 F. Supp.

2d 33, 48 n.8 (CKK) (D.D.C. 2008) (manufacturers challenging statutory lobbying

restrictions).

   As described above, the Disparate-Impact Rule was clearly intended to apply to the

"provision and pricing of homeowner's insurance," which is precisely the business

engaged in by plaintiffs' members.  *See supra* pp. 6-8.[11]  As such, I easily find that the

plaintiffs' standing to challenge the Rule is self-evident and that the plaintiffs are *not*

*required* to submit any additional evidence.  *See Sierra Club*, 292 F.3d at 900

(explaining that when standing is self-evident, the plaintiff or its members need not bring

forward additional evidence).

   However, even assuming, *arguendo*, that standing was not self-evident, the

plaintiffs have already submitted additional evidence[12] demonstrating injury-in-fact to

their members that further cements their standing to bring this case.[13]  And, with respect

---

[11] The notion that insurers are an object of the Rule is made even more obvious by the fact that certain disparate-impact complaints against plaintiffs' members, including the complaint initiated by HUD itself, were filed only *after* HUD issued the Rule.  *See infra* n.13.

[12] Plaintiffs include with their Reply affidavits and a declaration of six insurance industry professionals, each of whom details the unreasonably harmful effects the Disparate-Impact Rule will have on the business of homeowner's insurance.  *See* Pls.' Reply, Ex. 1 (Declaration of Peter Schwartz) ("Schwartz Decl.") [Dkt. #27-1]; Pls.' Reply, Ex. 2 (Affidavit of Bill Essman) ("Essman Affidavit") [Dkt. #27-2]; Pls.' Reply, Ex. 3 (Affidavit of Kathleen Rudolph) ("Rudolph Affidavit") [Dkt. #27-3]; Pls.' Reply, Ex. 4 (Affidavit of Kevin J. Christy) ("Christy Affidavit") [Dkt. #27-4]; Pls.' Reply, Ex. 5 (Affidavit of Martin M. Doto) ("Doto Affidavit") [Dkt. #27-5]; Pls.' Reply, Ex. 6 (Affidavit of Victoria L. McCarthy) ("McCarthy Affidavit") [Dkt. #27-6]; *see also Rainbow/PUSH Coal.*, 396 F.3d at 1239 (explaining that the evidence to establish standing may take the form of affidavits submitted in response to a motion to dismiss).

[13] At least one of plaintiffs' members has *already* been subject to *three* HUD complaints since

14

to traceability and redressability, plaintiffs have additionally, and easily, satisfied those

requirements as well.[14]    Finally, with regard to whether this agency action is ripe for

review, the question presented here—whether disparate-impact claims are cognizable

under the FHA—is a purely legal question of statutory interpretation that does not depend

---

promulgation of the Rule, including one initiated *by HUD itself.  See* Schwartz Decl. ¶¶ 4-12. In light of these pending complaints, it is beyond dispute that plaintiffs' members face a significant threat of litigation and agency enforcement actions as a result of the Rule, which is sufficient injury.  *See, e.g., Chamber of Commerce v. Fed. Election Comm'n,* 69 F.3d 600, 603 (D.C. Cir. 1995).    Furthermore, plaintiffs have averred significant compliance costs as a result of the Rule.  *See* Compl. ¶ 26; Essman Affidavit ¶ 4; Rudolph Affidavit ¶¶ 9, 13; Christy Affidavit ¶ 5; Doto Affidavit ¶ 5; McCarthy Affidavit ¶ 6.  Where an agency rule "influences [plaintiffs'] business decisions such that they have incurred and likely will incur substantial costs as a result of the new [rule], those declarations are sufficient to establish that plaintiffs have been 'injured' for purposes of the standing analysis."  *Am. Petroleum Inst. v. Johnson,* 541 F. Supp. 2d at 176-77.

[14]  The pre-Rule question of disparate-impact liability under the statutory language of the FHA has *never* been resolved conclusively in our Circuit, *see Greater New Orleans Fair Hous. Action Ctr.,* 639 F.3d at 1085 (assuming, without deciding, that disparate-impact liability is available), and judges in this District have reached differing results.  *Compare Nat'l Cmt.y Reinvestment Coal. v. Accredited Home Lenders Holding Co.,* 573 F. Supp. 2d 70, 77-79 (EGS) (D.D.C. 2008) (holding, without explanation, that the FHA permits disparate-impact claims), *with Brown v. Artery Org., Inc.,* 654 F. Supp. 1106, 1115-16 (HHG) (D.D.C. 1987) (holding that it does not, at least against private defendants).    More importantly, the question of disparate-impact liability for *insurers* under the Fair Housing Act was a much more uncertain question prior to the Rule, and the Rule purports to resolve the question in favor of insurer liability.  *See Saunders v. Farmers Ins. Exchange,* 537 F.3d 961, 964 (8th Cir. 2008) (stating that "we have recognized a disparate impact Fair Housing Act claim against *private* actors in another context," but acknowledging that, "at least with respect to insurers, the question is not free from doubt") (emphasis in original); *Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419, 423-25 (4th Cir. 1984) (holding that the FHA does not apply to insurance); *but see Ojo v. Farmers Group, Inc.,* 600 F.3d 1205, 1208 (9th Cir. 2010) (applying FHA prohibition on racial discrimination to denial and pricing of homeowner's insurance); *Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 59-60 (EGS) (D.D.C. 2002).    At a minimum, the Rule resolves whatever uncertainty existed as to the availability of disparate-impact liability.    Because the Rule changed the law, it is traceable to plaintiffs' alleged injuries, and an order enjoining enforcement of the Rule would redress those injuries.

15

on the application of the Rule to any particular facts.    As such, I find that plaintiffs'

claims are *over* ripe for judicial review!

## II.    Administrative Procedure Act

Because the issue before me is whether disparate-impact claims are cognizable

under the Fair Housing Act, I must, in the final analysis, determine whether the text of the

FHA *unambiguously* evidences Congress's intent for such claims to be cognizable under

the Act.    Plaintiffs argue, in essence, that *only* disparate-treatment (intentional

discrimination) claims are unambiguously cognizable under the plain text of the FHA.

*See* Pls.' Mem. at 10.    Unfortunately for the defendants, I agree.

Pursuant to the APA, courts must set aside any agency action that is in excess of

that agency's "statutory jurisdiction, authority, or limitations."    5 U.S.C. § 706(2)(C).

Courts must also set aside agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."    *Id.* at § 706(2)(A).    Judicial

review of an agency's interpretation of a statute that it administers[15] is governed by the

framework laid out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources*

*Def. Council, Inc.*, 467 U.S. 837 (1984).    In *Chevron*, the Court held that "[i]f the intent

of Congress is clear [as to a specific issue], that is the end of the matter; for the court, as

well as the agency, must give effect to the unambiguously expressed intent of

---

[15] Congress has vested the Secretary of HUD with "[t]he authority and responsibility for
administering [the FHA]."    42 U.S.C. § 3608(a).

16

Congress."[16]  *Id.* at 842-43; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54

(1992) (noting that "courts must presume that a legislature says in a statute what it means

and means in a statute what it says there").   If the court determines, however, that "the

statute is silent or ambiguous with respect to the specific issue," the court must advance to

step-two of the *Chevron* analysis and determine "whether the agency's answer is based on

a permissible construction of the statute."[17]  *Chevron*, 467 U.S. at 843.

Here, however, an analysis under *Chevron* step-two is unnecessary.   For the

following reasons, I agree with the plaintiffs that the FHA unambiguously prohibits *only*

intentional discrimination.   Accordingly, the Disparate-Impact Rule exceeds HUD's

"statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and thereby

violates the APA.

## A.   Statutory Language

The Supreme Court has made clear that statutes will only prohibit practices

resulting in a disparate impact—in the absence of any discriminatory intent—when they

contain *clear* language to that effect.   *See Smith v. City of Jackson*, 544 U.S. 228, 235-36

---

[16] In attempting to ascertain the intent of Congress, the court is not limited to analysis of an
enabling statute's text alone.   Indeed, the court may consider "the text, structure, purpose, and
history of an agency's authorizing statute to determine whether a statutory provision admits of
congressional intent on the precise question at issue."   *Hearth, Patio & Barbecue Ass'n v. Dep't
of Energy*, 706 F.3d 499, 503 (D.C. Cir. 2013).

[17] To uphold an agency's interpretation of an enabling statute, the court need not find that the
interpretation is "the best interpretation of the statute," *United States v. Haggar Apparel Co.*, 526
U.S. 380, 394 (1999) (citation omitted), or that it is the "most natural one by grammatical or
other standards," *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991) (citing *EEOC v.
Commercial Office Products Co.*, 486 U.S. 107, 115 (1988)).

17

(2005) (plurality opinion); *Bd. of Educ. of the City Sch. Dist. of the City of New York v. Harris*, 444 U.S. 130, 138-39 (1979) (*Harris*); *see also Washington v. Davis*, 426 U.S. 229, 239 (1976).    Defendants contend, nevertheless, that Congress's intent to recognize claims based on disparate impact under the FHA can somehow be found in the language of three particular sections of the Act.    *See* Defs.' Mem. at 23-24; *see also* 42 U.S.C. § 3604 (prohibiting refusal to sell or rent property "because of" a protected characteristic); *id.* § 3605 (prohibiting discrimination in real estate-related transactions "because of" a protected characteristic; *id.* § 3606 (prohibiting discrimination in the provision of brokerage services "on account of" a protected characteristic).[18]    An analysis of the ordinary meaning of the words used by Congress in those sections, however, compels me to disagree.    How so?

The operative verbs in § 3604 are "refuse," "make," "deny," and—of course—"discriminate."    42 U.S.C. § 3604(a).    The ordinary meaning of "refuse" is "to show or express a positive unwillingness to do or comply with."    *Webster's Third New International Dictionary* 1910 (1966) ("*Webster's Third*").    The ordinary meaning of

---

[18] Defendants further argue that similarities between the language contained in § 3604(a) and the language contained in two provisions of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA")—both of which provide for claims based on disparate impact—indicate that disparate-impact claims should also be cognizable under the FHA.    *See* Defs.' Mem. at 22-23; *see also* 42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2).    Because the FHA fails to include definitions of the operative terms in §§ 3604, 3505, and 3606, the analysis must begin with the words' ordinary meanings.    *See Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011) (citing *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language

18

"make"—as used in the phrase "make unavailable"—is "to produce as a result of action, effort, or behavior" or "to cause to happen to or be experienced by someone." *Webster's Third* 1363.   The plain meaning of "deny" is "to refuse to grant" or "to turn down or give a negative answer to." *Webster's Third* 603.   Finally, the plain meaning of "discriminate"[19] is "to make a difference in *treatment* or favor on a class or categorical basis in disregard of individual merit." *Webster's Third* 648 (emphasis added).

The use of these particular verbs is telling, and indicates that the statute is meant to prohibit intentional discrimination only.   When Congress intends to expand liability to claims of discrimination based on disparate impact, it uses language focused on the result or effect of particular conduct, rather than the conduct itself. *See, e.g.*, 42 U.S.C. § 2000e-2(a)(2) (employer shall not "limit, segregate, or classify his employees . . . in any way which *would deprive or tend to deprive* any individual of employment opportunities" or "*otherwise adversely affect* his status as an employee" (emphasis added)); 29 U.S.C.

---

accurately expresses the legislative purpose." (internal quotation marks and citation omitted))).
[19] HUD contends that the term "discriminate"—as it is used in the FHA—"may encompass actions that have a discriminatory effect but not a discriminatory intent." 78 Fed. Reg. 11,460, 11,466.   Please!   HUD bases this position on the Supreme Court's interpretation of the now repealed Emergency School Aid Act ("ESAA"). *See id.* n.49.   Under the ESAA, schools were ineligible to receive further federal funding if they employed any practice "which results in the disproportionate demotion or dismissal of . . . personnel from minority groups" or "otherwise engage[s] in discrimination . . . in the hiring, promotion, or assignment of employees." *Harris*, 444 U.S. at 138 (quoting § 706(d)(1)(B) of the ESAA).   In *Harris*, the Supreme Court held—despite its acknowledgment that "discriminate," standing alone suggests intentional discrimination—that a discriminatory-impact test should apply to § 706(d)(1)(B). *See id.* at 139, 141.   In reaching its conclusion, however, the Court relied heavily on the fact that the discrimination clause was closely linked with the clause containing clear effects-based language. *See id.* at 143.   Here, because there is no such linkage to any effects-based language, *Harris* is

§ 623(a)(2) (same); *see also Smith*, 544 U.S. at 235-36.    Indeed, Congress drafted the

disparate-impact provision of the ADEA with "key textual differences" from the

provision prohibiting disparate-treatment.    *See Smith*, 544 U.S. at 236 n.6; *compare* 29

U.S.C. § 623(a)(1), *with* 29 U.S.C. § 623(a)(2).

In the FHA, Congress has included *no* such effects-based language.    Each of the

FHA's operative terms' definitions describe intentional acts, which are—more often than

not—motivated by specific factors.    The FHA lists its prohibited motivations for these

intentional acts following the "because of"[20] and "on account of" clauses in §§ 3604,

3605, and 3606.[21]    However, the FHA contains no prohibitions on conduct that "tends to"

cause a particular result.    The focus of these sections is clearly not the effect of conduct,

but rather the motivation for the conduct itself.

Defendants, nevertheless, contend that § 3604(a)'s prohibition on discrimination is

analogous to the language contained in the sections of Title VII and the ADEA that

provide for claims based on disparate impact.    *See* Defs.' Mem. at 22-23; *see also* 42

U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2); *Griggs*, 401 U.S. at 432; *Smith*, 544 U.S.

---

inapposite, and the term "discriminate" retains its plain meaning as an intentional act.

[20] The plain meaning of the term "because"—as used in the preposition "because of"—is "for the reason that" or "on account of the cause that."    *Webster's Third* 194.    Thus, the terms following the "because of" clauses in the FHA supply the prohibited motivations for the intentional acts—*i.e.* to refuse to sell rent or otherwise make unavailable or deny—that the Act makes unlawful.    *See* 42 U.S.C. §§ 3604, 3605.

[21] The FHA prohibits discrimination motivated by the following protected characteristics: race, color, religion, sex, handicap, familial status, and national origin.    *See* 42 U.S.C. §§ 3604, 3605, 3606.

20

at 235-36.   Plaintiffs, not surprisingly, argue that § 3604(a)'s language is far more

analogous to the sections of Title VII and the ADEA that provide for claims based on

disparate treatment only.   *See* Pls.' Mem. at 14-16; *see also* 42 U.S.C. § 2000e-2(a)(1)

(Title VII prohibition on disparate treatment); 29 U.S.C. § 623(a)(1) (ADEA prohibition

on disparate treatment); *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (noting that 42

U.S.C. § 2000e-2(a)(1) provides for disparate treatment only); *Smith*, 544 U.S. at 236 n.6

(stating that 29 U.S.C. § 623(a)(1) "does not encompass disparate-impact liability") .   I

believe the plaintiffs' analysis is far superior.

 The statutory language in § 3604(a) is materially *identical* to the statutory

language used in the disparate-treatment prohibitions in Title VII and the ADEA.

*Compare* 42 U.S.C. § 3604(a), *with* 42 U.S.C. § 2000e-2(a)(1), *and* 29 U.S.C.

§ 623(a)(1).   Indeed, just as Title VII and the ADEA make it unlawful to "*refuse to hire*

*or to discharge* any individual, or *otherwise to discriminate* against any individual . . .

because of such individual's" protected characteristic, 42 U.S.C. § 2000e-2(a)(1)

(emphasis added); 29 U.S.C. § 623(a)(1), so too does the FHA make it unlawful to

"*refuse to sell or rent* . . . or to *refuse to negotiate* . . . or *otherwise make unavailable or*

*deny*, a dwelling to any person because of race, color, religion, sex, familial status, or

national origin," 42 U.S.C. § 3604(a) (emphasis added).   It takes hutzpah (bordering on

desperation) for defendants to argue that § 3604(a) more closely resembles the statutory

language in the disparate-impact provisions of Title VII and the ADEA,[22] both of which contain explicit effects-focused language that is conspicuously lacking in § 3604(a).

In addition to the clear meaning of the FHA's plain text, the striking similarities between the statutory language of § 3604(a) and the disparate-treatment provisions of Title VII and the ADEA leave this Court with no doubt that Congress intended the FHA to prohibit intentional discrimination only. Put simply, Congress knows full well how to provide for disparate-impact liability, *c.f. Conn. Nat'l Bank*, 503 U.S. at 253-54, and has made its intent to do so known in the past by including clear effects-based language when it so chooses, *see Smith*, 544 U.S. at 235-36. The fact that this type of effects-based language appears *nowhere* in the text of the FHA is, to say the least, an insurmountable obstacle to the defendants' position regarding the plain meaning of the Fair Housing Act.

## B.    Congressional Intent

Even assuming, *arguendo*, that the plain text of the Fair Housing Act did not unambiguously provide for disparate-treatment claims only, Congress's intent to so limit the FHA would still be readily discernable. How so?

### 1.    Statutory Scheme

When Congress amended the FHA in 1988, it did not make any changes to the

---

[22] Specifically, Title VII and the ADEA's prohibitions on disparate impact state that it is unlawful for an employer "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's" protected characteristics. 42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2).

operative language of §§ 3604 and 3606.   *See generally* Pub. L. No. 100-430, 102 Stat.

1619 (1988 Amendments).   Soon thereafter, however, Congress enacted two other

anti-discrimination statutes that explicitly provide for disparate-impact claims by using

clear effects-based language.   In 1990, Congress enacted the Americans with Disabilities

Act ("ADA"), which authorizes claims of disparate impact upon a showing that a

particular practice "adversely affects" a disabled employee.   *See* 42 U.S.C. § 12112(b);

*see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (noting disparate-impact

claims are cognizable under the ADA).   Indeed, the ADA contains numerous examples

of explicit effects-based language, clearly indicating Congress's intent to provide for

liability, even in the absence of discriminatory intent.   *See, e.g.*, 42 U.S.C. § 12112(b)(1)

("in a way that adversely affects"); *id.* at § 12112(b)(2) ("that has the effect of

subjecting"); *id.* at § 12112(b)(3)(A) ("that have the effect of discrimination").

    The same is true of Title VII.   In order to codify the Supreme Court's holding in

*Griggs*, Congress amended Title VII in 1991 to include language expressly authorizing

claims based on disparate impact.   *See* Civil Rights Act of 1991, Pub. L. No. 102-166,

105 Stat. 1071 (1991) (codified at 42 U.S.C. § 2000e-2(k)(1)(A) ("[a]n unlawful

employment practice based on disparate impact is established under this subchapter only

if . . . .")); *see also Griggs*, 401 U.S. at 431.   These two statutes powerfully demonstrate

that Congress knows how to craft statutory language providing for disparate-impact

liability when it intends to do so.   *C.f. Conn. Nat'l Bank*, 503 U.S. at 253-54.   As such,

23

the fact that Congress chose *not* to amend the FHA in 1988 to include clear effects-based language—while doing so at the same time for two similar anti-discrimination statutes—clearly illustrates that it never intended for claims of disparate impact to be cognizable under the FHA.

Defendants further contend that three "exemptions from liability"[23] added to the FHA in the 1988 Amendments—like the "reasonable factor other than age" ("RFOA")[24] exemption in the ADEA, *see* 29 U.S.C. § 623(f)(1)—"presuppose the availability of disparate impact claims" under the FHA.   *See* Defs.' Mem. at 29; *see also Smith*, 544 U.S. at 238-39 (discussing RFOA exemption in ADEA).   I disagree.   The RFOA exemption specifically authorizes conduct that is "otherwise prohibited [by the ADEA]," when that conduct is based on a reasonable factor other than age.   *See* 29 U.S.C. § 623(f)(1).   Unfortunately for defendants, however, the three provisions they cite in the

---

[23] *See* 42 U.S.C § 3605(c) ("Nothing in this subchapter prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than [protected characteristics]."); *id.* § 3607(b)(1) ("Nothing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling."); *id.* § 3607(b)(4) ("Nothing in this subchapter prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance.").

[24] The RFOA exemption in the ADEA states—in pertinent part—that
> It shall not be unlawful for an employer, employment agency, or labor organization . . . to take *any action otherwise prohibited* under [this act] where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age.

29 U.S.C. § 623(f)(1) (emphasis added).

FHA *merely* provide safe-harbors, clarifying that *nothing* in the FHA prohibits the specific conduct discussed.    These provisions make no mention of conduct "otherwise prohibited" under the FHA.    *See* 42 U.S.C § 3605(c); *id.* § 3607(b)(1); *id.* § 3607(b)(4). Rather, they describe conduct that Congress intended to protect with a "complete exemption from FHA scrutiny."    *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 (1995).    Moreover, under the burden-shifting framework applied to claims of disparate-treatment by many jurisdictions, *see, e.g.*, *2922 Sherman Avenue Tenants' Ass'n*, 444 F.3d at 682, these safe-harbor provisions provide *per se* legitimate bases as defenses to claims of disparate treatment.    Considering the unambiguous meaning of the FHA's plain text, and the lack of any language referencing conduct otherwise prohibited under the FHA, defendants' contention that the cited provisions *presuppose* the presence of disparate-impact liability appears to be nothing more than wishful thinking on steroids!

## 2.    The McCarran-Ferguson Act

Congressional intent to provide only for FHA claims based on intentional discrimination is evident for yet another reason: the expansion of the FHA to include disparate-impact liability against insurers would run afoul of previously enacted federal legislation.[25]    Congress enacted the McCarran-Ferguson Act ("McCarran-Ferguson"), 59

---

[25] It would simply defy logic for Congress to intentionally draft legislation in such a way as to contradict previously enacted federal statutes.    *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 137-39 (2000) (observing that Congress could not have intended to grant the FDA authority to regulate tobacco products, where doing so would run afoul of previously established congressional policy); *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 70 (RJL) (D.D.C. 2010) ("Because this result would effectively dismantle the existing regulatory wall Congress

25

Stat. 33 (1945) (codified at 15 U.S.C. §§ 1011 *et seq.*), to ensure the primacy of state law

in the realm of insurance regulation.   *See id.* § 1012(a) ("The business of insurance, and

every person engaged therein, shall be subject to the laws of the several States which

relate to the regulation or taxation of such business."); *see also Ambrose v. Blue Cross &*

*Blue Shield of Va., Inc.*, 891 F. Supp. 1153, 1167 (E.D. Va. 1995) ("Congress declared

the primacy of state law in the regulation of the business of insurance.").

McCarran-Ferguson states that "[n]o Act of Congress shall be construed to invalidate,

impair, or supersede any law enacted by any State for the purpose of regulating the

business of insurance, or which imposes a fee or tax upon such business, unless such Act

specifically relates to the business of insurance."   15 U.S.C. § 1012(b);[26] *see also*

*Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1360-61 (6th Cir. 1995) ("[B]ecause

the [FHA] does not mention insurance, it is covered by the McCarran-Ferguson Act and

cannot be construed in such a way as to invalidate, impair, or supersede any state law

enacted to regulate the business of insurance.").

     The expansion of the FHA to include disparate-impact liability would not only

have a wide-ranging disruptive effect on the pricing and provision of homeowner's

insurance, but would also require insurers to collect and analyze certain types of

---

erected between tobacco products and drug-device combinations, I can easily infer that Congress
*did not* intend tobacco products to be drugs merely because they deliver nicotine." (emphasis in
original)).
[26] *Cf. Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999) ("When federal law does not directly
conflict with state regulation, and when application of the federal law would not frustrate any
declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson

race-based data on their clients and prospective clients.[27]  *See* Essman Affidavit ¶¶ 5-9

(describing steps required before one of plaintiffs' members will be able to collect and

analyze data on its customers' protected characteristics in order to ensure compliance

with Disparate-Impact Rule).   These practices—expressly prohibited in many

states[28]—will regularly result in the FHA being "reverse-preempted" McCarran-Ferguson.

*See Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1209 (9th Cir. 2010) (en banc) (stating

that application of the FHA may be reverse-preempted if it "invalidate[s], impair[s], or

supersede[s] the provisions of the Texas Insurance Code").   Indeed, recognition of

disparate-impact liability under the FHA additionally raises serious concerns regarding

widespread federal encroachment upon state insurance regulation.   *See Saunders v.*

*Farmers Ins. Exchange*, 537 F.3d 961, 967 (8th Cir. 2008) (noting that suits "challenging

the racially disparate impact of industry-wide rate classifications may usurp core

rate-making functions of the State's administrative regime").[29]

---

Act does not preclude its application.").

[27] Insurers would, of course, also be required to collect and analyze data on their clients' and prospective clients' other protected characteristics, including color, religion, sex, familial status, national origin, and handicap as well.

[28] State insurance regulations ordinarily prohibit the consideration of protected characteristics in the evaluation and pooling of risk, and at least one state prohibits even the collection of such data.  *See* Md. Code Ann. Ins. § 27-501(c)(1) ("[A]n insurer or insurance producer may not make an inquiry about race, creed, color, or national origin in an insurance form, questionnaire, or other manner of requesting general information that relates to an application for insurance."); *see also, e.g.*, 215 Ill. Comp. Stat. 5/424(3); Alaska Stat. § 21.36.090; Ky. Rev. Stat. Ann. § 304.12-085; Mass Gen. Laws Ann. ch. 175 § 4C; Me. Rev. Stat. tit. 24-A, § 2303(1)(G); Okla. Stat. Ann. tit. 36, § 985; S.C. Code Ann. § 38-75-1210(B)(1); Tenn. Code Ann. § 56-5-303(a)(2)(d); Tex. Ins. Code Ann. § 544.002.

[29] *See also NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290-91 (7th Cir. 1992) ("Risk

27

Moreover, in order to ensure that their facially neutral underwriting practices do not result in any disparate outcomes amongst protected groups, insurers would be required to turn a blind eye to established actuarial principles in favor of race-based insurance decisions.  *See* Rudolph Affidavit ¶¶ 11-15; *see also* Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 277 (2009) (describing risk-based pricing decisions as being in "inevitable and irreconcilable conflict" with disparate-impact liability).[30]  Indeed, insurers "would have to use the newly-acquired data to adjust outcomes for individual insureds based solely on this data—*i.e.* adjusting (upward or downward) the premium charged to achieve parity of 'impact.'"  Rudolph Affidavit ¶15; *see also* Christy Affidavit ¶¶ 5-6; Doto Affidavit ¶¶ 5-6; McCarthy Affidavit ¶¶ 6-7.  No reasonable interpretation of Congress's intent would conclude that it intended for the FHA to act in

---

discrimination is not race discrimination . . . . No insurer openly uses race as a ground of ratemaking, but is a higher rate per $1,000 of coverage for fire insurance in an inner city neighborhood attributable to risks of arson or to racial animus?").

[30] Kathleen Rudolph, a Vice President of Business Compliance at one of plaintiffs' member organizations clarifies that—if the FHA provides for disparate-impact liability against providers of homeowner's insurance—her employer will be forced to

> undertake three steps to assure effective compliance with the HUD rule, and each of those steps would mark departures from [the company's] current business practices.  The three-step process would comprise: (1) collecting data on characteristics of [the company's] insureds of interest to HUD (including race, religion, gender and national origin); (2) cross-referencing this newly-collected data against the pricing determined by the current risk assessment and differentiation model . . . ; and (3) making corrective underwriting, rating and pricing adjustments to recalibrate away from risk and towards parity of 'impact.'  Each of these steps would create fundamental conflicts with [the company's] existing State regulatory obligations.

28

such a way as to "invalidate, impair, or supersede any law enacted by any State for the

purpose of regulating the business of insurance."    15 U.S.C. § 1012(b); *c.f. Ricci*, 557

U.S. at 581 ("Allowing employers to violate the disparate-treatment prohibition [of Title

VII] based on a mere good-faith fear of disparate-impact liability would encourage

race-based action at the slightest hint of disparate impact."); *id.* at 594 (Scalia, J.,

concurring) ("[I]t is clear that Title VII not only permits but affirmatively *requires*

[remedial race-based actions] when a disparate-impact violation *would* otherwise result."

(emphasis in original)).    To the contrary, it is utterly incomprehensible that Congress

would *intentionally* provide for disparate-impact liability against insurers in the FHA,

where doing so would *require* those same insurers to collect and evaluate race-based data,

thereby engaging in conduct expressly proscribed by state law.    *See supra* note 28.

## C.    Judicial Treatment

Finally, defendants contend that previous holdings of other Federal Circuit Courts

that recognized disparate-impact liability under the FHA, *preclude* this Court from

finding that the FHA unambiguously prohibits disparate treatment only.    *See* Defs.'

Mem. at 20-21.    Please!    The Supreme Court itself has made clear that a statute is not

ambiguous simply because there is a lack of judicial consensus as to its proper meaning,

*see Reno v. Koray*, 515 U.S. 50, 64-65 (1995),[31] and "judges cannot cause a clear text to

---

Rudolph Affidavit ¶ 12.

[31] *See also Hoffman v. Blaski*, 363 U.S. 335, 358 (1960) (Frankfurter, J., dissenting) (noting that
the Court's interpretation of the statute at issue was "contrary to the rulings of every Court of

29

become ambiguous by ignoring it," *Deal v. United States*, 508 U.S. 129, 136 (1993).

And as I noted previously, our own Circuit Court has never ruled on the specific question of whether disparate-impact liability is cognizable under the FHA.[32]   While eleven Circuit Courts of Appeals to date have addressed this question in the affirmative,[33] those decisions are not only not binding upon this Court, but more importantly were—for the most part—decided *before* the Supreme Court's decision in *Smith v. City of Jackson*, where the Supreme Court made it clear that an inquiry into the availability of disparate-impact liability turns on the presence, or absence, of effects-based language. *See Smith*, 544 U.S. at 235-36; *see also supra* note 5.

Moreover, it is remarkable that none of the Circuit Courts that have recognized claims of disparate impact *subsequent* to the Supreme Court's decision in *Smith* have either discussed *Smith* in any detail, or reconsidered their Circuit precedent in light of its holding.   *See, e.g., Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. and Cmty.*

---

Appeals but one which has considered the problem, and is contrary to the view of more than half the District Courts as well").

[32] One district judge in this Circuit, however, did rule on this very issue in the aftermath of the Supreme Court's decision in *Smith*.  *See Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70 (EGS) (D.D.C. 2008).   After referencing the parties' arguments—both for and against recognition of disparate-impact liability under the FHA—the judge ruled that "*Smith* does not preclude disparate impact claims pursuant to the FHA."  *Id.* at 79.  Unfortunately, however, he did not choose to explain in his opinion the reasoning behind his conclusion.   Accordingly, it was of no assistance to this Court in resolving this case.

[33] Interestingly, the Second Circuit reached its conclusion in *Huntington Branch, NAACP v. Town of Huntington* only to have the Solicitor General argue to the contrary in its amicus brief before the Supreme Court.   *See Huntington Branch, NAACP*, 844 F.2d at 935-36; Brief for United States as Amicus Curiae at 10, 14, 16, *Town of Huntington v. Huntington Branch, NAACP*, 109 S. Ct. 276 (1989) (No. 87-1961).

30

*Affairs*, 747 F.3d 275, 280 (5th Cir. 2014), *cert. granted*, No. 13-1371, 2014 WL 4916193 (U.S. Oct. 2, 2014); *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194-95 (9th Cir. 2006); *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 902 (8th Cir. 2005).   Indeed, Circuit Judge Steven Colloton of the Eighth Circuit appropriately, but unsuccessfully, cautioned his colleagues that "there has been little consideration . . . and virtually no discussion of [the textual basis for disparate-impact liability under the FHA] since the Court in *Smith* explained how the text of Title VII justified the decision in *Griggs*," and "recent developments in the law suggest that the issue is appropriate for careful review."   *See Gallagher v. Magner*, 636 F.3d 380, 383 (8th Cir. 2010) (Colloton, J., dissenting from denial of rehearing en banc).

In short, *Smith* represents a sea change in approach to the analysis of statutory provisions with respect to disparate-impact liability, *compare Smith*, 544 U.S. at 235-36, *with Griggs*, 401 U.S. at 432-35, and thus, defendants' reliance on pre-*Smith* case law as supporting their position is, to say the least, unavailing.

## CONCLUSION

This is, yet another example of an Administrative Agency trying desperately to write into law that which Congress never intended to sanction.[34]   While doing so might have been more understandable—and less troubling—prior to the Supreme Court's

---

[34] *See, e.g., Brown & Williamson Tobacco Corp.*, 529 U.S. at 137-39 (attempted FDA regulation of tobacco products); *Avenal Power Center v. EPA*, 787 F. Supp. 2d 1, 4 (RJL) (D.D.C. 2011) (self-serving EPA misinterpretation of Clean Air Act time requirements); *Smoking Everywhere,*

31

decision in *Smith*, in its aftermath it is nothing less than an artful misinterpretation of Congress's intent that is, frankly, too clever by half.   Defendants, of course, were somehow hoping that a favorable *Chevron* analysis would muster the judicial deference necessary to salvage their much desired Rule.   But alas, it did not.   Fortunately for us all, however, the Supreme Court is now perfectly positioned in *Texas Department of Housing* to finally address this issue in the not-too-distant future.   In the meantime, for all of the foregoing reasons, the Court GRANTS plaintiffs' Motion for Summary Judgment and DENIES defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. Accordingly, the United States Departments of Housing and Urban Development's Disparate Impact Rule, promulgated in 78 Fed. Reg. 11,460-11,482, and codified at 24 C.F.R. § 100.500, is hereby VACATED.   An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

*Inc.*, 680 F. Supp. 2d at 70 (RJL) (attempted FDA regulation of e-cigarettes).

32