# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN INSURANCE ASSOCIATION,<br>  2101 L Street, N.W.,<br>  Suite 400,<br>  Washington, DC 20037,<br><br>and<br><br>NATIONAL ASSOCIATION OF MUTUAL IN-<br>SURANCE COMPANIES,<br>  122 C Street, N.W.,<br>  Suite 450,<br>  Washington, DC 20001,<br><br>      Plaintiffs,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF HOUS-<br>ING AND URBAN DEVELOPMENT,<br>  451 Seventh Street, S.W.,<br>  Washington, DC 20410,<br><br>and<br><br>JULIAN CASTRO, in his official capacity as<br>Secretary of Housing and Urban Development,<br>  Office of the Secretary,<br>  451 Seventh Street, S.W.,<br>  Washington, DC 20410,<br><br>      Defendants. | Civil Action No. 13-cv-966 (RJL)<br><br><br><br>**AMENDED COMPLAINT<br>FOR DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## <u>INTRODUCTION</u>

1.     Plaintiffs American Insurance Association and National Association of Mutual

Insurance Companies seek declaratory and injunctive relief against Defendants Department of

Housing and Urban Development ("HUD") and Julian Castro, in his official capacity as Secre-

tary of Housing and Urban Development ("Secretary"), for violations of the Administrative Pro-

cedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA"), and the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA").

2.      On February 15, 2013, HUD promulgated a final rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard," 78 Fed. Reg. 11,460 ("Disparate-Impact Rule" or "Rule"). The Disparate-Impact Rule purports to interpret the FHA to prohibit housing-related activities that, although not motivated by intent to discriminate, result in a disparate impact on certain protected groups. The Disparate-Impact Rule creates a three-part burden-shifting framework for assigning liability in private lawsuits and HUD enforcement actions premised on the existence of a disparate impact.

3.      In the preamble to the Disparate-Impact Rule, HUD formally extended disparate-impact liability to the provision and pricing of homeowner's insurance for the first time. 78 Fed. Reg. 11,460, 11,475.

4.      On June 25, 2015, the Supreme Court issued its decision in *Texas Department of Housing and Community Affairs* v. *The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). The Court held that disparate-impact claims are cognizable under the FHA but cautioned that disparate-impact liability under the FHA is "limited in key respects." *Id.* at 2522. For example, "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers." *Id.* at 2524 (internal quotation marks omitted). "The FHA is not an instrument to force [housing-related entities] to reorder their priorities" or to "displace valid governmental and private priorities." *Id.* at 2522, 2524. "[A] disparate-impact claim that relies on a statistical disparity," moreover, "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* at 2523. The causal connection is severed where "federal law substantially limits the [defendant's] discretion."

*Id.* at 2524.  In addition, the disparate-impact requirement must not be applied in a manner that would "cause race to be used and considered in a pervasive way."  *Id.* at 2523.

5.      In light of *Inclusive Communities*, applying disparate-impact liability to the provision and pricing of homeowner's insurance is contrary to law.  In order to satisfy the disparate-impact requirement, insurers would be required pervasively to use and consider race and ethnicity in their insurance decisions and to discount or disregard legitimate risk-related factors.  The disparate-impact theory also runs headlong into state insurance law, which substantially limits insurers' discretion in the underwriting and ratemaking processes.

6.      The Disparate-Impact Rule also runs afoul of other limits announced in *Inclusive Communities*.  For example, the Rule contemplates that a plaintiff may state a prima facie claim based on a statistical disparity alone, without showing that a policy or practice of the defendant actually caused the alleged disparity.  *See, e.g.*, 78 Fed. Reg. 11,460, 11,469.  The Rule also purports to allow a disparate-impact plaintiff to prevail by showing simply that the defendant's stated interest in the policy or practice at issue could be served by another practice that has a less discriminatory effect, even if the policy or practice is valid and does not present an artificial, arbitrary, and unnecessary barrier.  *See id.* at 11,482 (24 C.F.R. § 100.500(c)(3)).

7.      During the rulemaking process, Plaintiffs pointed out the problems with extending disparate-impact liability to the provision of homeowner's insurance, but HUD promulgated the Disparate-Impact Rule in spite of them.

8.      The Disparate-Impact Rule reaches beyond HUD's statutory authority under the Fair Housing Act, as interpreted by the Supreme Court in *Inclusive Communities*.  For the reasons set forth below, this Court should declare that the Disparate-Impact Rule is unlawful.

## PARTIES

9.    The American Insurance Association ("AIA") is a non-profit trade organization with its headquarters in Washington, D.C.  AIA's members sell homeowner's insurance, subject to state insurance regulations, in every State and territory of the United States.  The Disparate-Impact Rule purports to regulate AIA's members.  In bringing this lawsuit, AIA seeks to vindicate the interests of its members.

10.    The National Association of Mutual Insurance Companies ("NAMIC") is a non-profit trade organization with its headquarters in Indianapolis, Indiana.  NAMIC's members sell homeowner's insurance, subject to state insurance regulations, in every State and territory of the United States.  The Disparate-Impact Rule purports to regulate NAMIC's members.  In bringing this lawsuit, NAMIC seeks to vindicate the interests of its members.

11.    Defendant HUD is an executive agency of the federal government, 5 U.S.C. §§ 101, 105, and is subject to the APA, 5 U.S.C. § 551(1).  HUD was established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. §§ 3531 *et seq*.  HUD is headquartered in Washington, D.C.

12.     Defendant Julian Castro is the Secretary of Housing and Urban Development.  His official address is in Washington, D.C.  He is being sued in his official capacity.  In that capacity, Secretary Castro has responsibility for the operation and management of HUD.  As such, Secretary Castro is responsible for HUD's promulgation of the challenged regulation.

## JURISDICTION, VENUE, AND TIMELINESS

13.     This action arises under the APA and the FHA.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and is authorized to review the final rule and grant relief pursuant to 5 U.S.C. §§ 702, 704, and 706.

14.    Venue is proper in this district under 28 U.S.C. § 1391(b) and (e)(1) because Defendant HUD resides in this judicial district; Defendant Castro performs his official duties in this judicial district; and a substantial part of the events giving rise to this action occurred in this judicial district.

15.    This Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201 and 2202.

16.    This Complaint is timely under 28 U.S.C. § 2401(a).

**BACKGROUND**

**A.    The Business of Insurance**

17.    Plaintiffs' members insure property, including private homes, against the risk of damage or loss.  They sell their homeowner's insurance to private individuals.

18.    When providing insurance coverage, insurers make underwriting and rating decisions.  They calculate the probability of a potential loss by considering aggregated loss data related to the characteristics of the insured property and the risk being assumed.  They are required to consider costs associated with the transfer of risk in developing their rating plans.  For homeowner's coverage, relevant characteristics may include, for example, construction type, location of the property (such as in a region with a heightened risk of natural catastrophes), and the presence of smoke detectors.

19.    By properly classifying the risk associated with insured properties, insurers can then pool similar risks together to reduce the amount of variance in the insurer's expected losses.  That process turns many individually risky transactions into a set that produces predictable outcomes.  Insurers then establish rates, taking into account the expected loss, the magnitude of loss, overhead costs, and a reasonable profit.

20.    Insurance markets function efficiently and fairly when insurers underwrite according to actuarially significant risk factors and set rates that accurately reflect the likelihood of the risk of loss and expenses.  If insurers are not able to do so, the system cannot operate efficiently.  Some consumers would overpay, others would underpay, and insurers would be unable to set premiums that accurately reflect the risks they assume.

21.    Differentiation among risks, then, is one of the foundational elements of insurance.  A regime that does not allow an insurer to make risk-based distinctions would be antithetical to basic insurance practice.  Accurate risk allocation and pooling benefits insured and insurer alike.

22.    To promote accurate risk allocation, every State has enacted laws that regulate the business of insurance.  Those regulatory schemes typically cover virtually all aspects of the business of insurance, including the licensing and operation of insurers in the State, and they are overseen by insurance administrators responsible for consistent, fair enforcement.

23.    Among other things, state laws dictate that insurers' risk-classification standards may be based upon the "differences among risks that can be demonstrated to have a probable effect upon losses or expenses."  W. Va. Code § 33-20-3; *see also* Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(c); Wis. Stat. Ann. § 626.12(2).

24.    So, for example, risk classification may be "based upon size, expense, management, individual experience, purpose of insurance, location or dispersion of hazard, or any other reasonable considerations, provided such classifications and modifications apply to all risks under the same or substantially similar circumstances or conditions."  Me. Rev. Stat. tit. 24-A, § 2303(2).

25.     The differentiation among risks that present different probabilities of loss is permissible and appropriate under state laws. *See*, *e.g.*, Va. Code Ann. § 38.2-1904(A)(3) (providing that "[n]o rate shall be unfairly discriminatory if a different rate is charged for the same coverage and the rate differential (i) is based on sound actuarial principles or (ii) is related to actual or reasonably anticipated experience"). In some instances, such differentiation is required by the State.

26.     By contrast, treating similar risks differently for reasons unrelated to actuarial justification is impermissible. Under state insurance codes, that principle is typically referred to as a prohibition against "unfair discrimination."

27.     For example, insurers may not differentiate among "individuals or risks of the same class or of essentially the same hazard and expense element because of the race, color, religion, or national origin of such insurance risks or applicants." 215 Ill. Comp. Stat. 5/424(3); *see also* Alaska Stat. § 21.36.090; Tenn. Code Ann. § 56-5-303(a)(2)(d). Nor may risk classifications "be based upon race, creed, national origin or the religion of the insured." Me. Rev. Stat. tit. 24-A, § 2303(1)(G).

28.     Because state law prohibits considering characteristics such as the race and national origin of the insured in the risk-classification process, property insurers do not collect data regarding those characteristics.

29.     In order to preserve the primacy of the States in regulating the business of insurance and protect these comprehensive and detailed state regulatory schemes from federal intrusion, Congress enacted the McCarran-Ferguson Act in 1945. *See* 15 U.S.C. §§ 1011-1015.

30.     The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulat-

ing the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). A state law is "impaired" under the McCarran-Ferguson Act if application of the federal law in question would frustrate declared state policy or interfere with a State's administrative regime. *See Humana, Inc.* v. *Forsyth*, 525 U.S. 299 (1999).

31.    The McCarran-Ferguson Act secured the supremacy of state law in the realm of insurance regulation, absent specific legislation from Congress to the contrary.

### B.    HUD's Disparate-Impact Rule

32.    On November 7, 2011, the Supreme Court granted certiorari in *Magner* v. *Gallagher*, No. 10-1032, to decide whether disparate-impact claims are cognizable under the FHA and, if so, what approach courts should use to resolve them.

33.    As of that time, HUD had not proposed any rule concerning disparate-impact liability under the FHA. Nine days after the Supreme Court granted certiorari in *Magner*, HUD proposed a regulation creating disparate-impact liability under the FHA. 76 Fed. Reg. 70,921 (Nov. 16, 2011). That proposed regulation became the final rule at issue in this case.

34.    HUD did not formally consult with state insurance commissioners or the Federal Insurance Office before launching the rulemaking process.

35.    The City of St. Paul, Minnesota, which was the petitioner in *Magner*, voluntarily dismissed its case before the Supreme Court on February 14, 2012. The Department of Justice's role in that dismissal was the subject of an ensuing congressional investigation. *See* Staff of H. Comm. on Oversight and Government Reform et al., 113th Cong., *DOJ's* Quid Pro Quo *with St. Paul: How Assistant Attorney General Thomas Perez Manipulated Justice and Ignored the Rule of Law* (Comm. Rep. 2013).

36.    On February 15, 2013, after notice-and-comment rulemaking, HUD promulgated this final rule interpreting the FHA to prohibit practices that, although devoid of discriminatory intent, result in a disparate impact.  78 Fed. Reg. 11,460.

37.    The Disparate-Impact Rule, codified at 24 C.F.R. §§ 100.5 *et seq.*, provides as follows:  "Liability may be established under the Fair Housing Act based on a practice's discriminatory effect  .  .  .  even if the practice was not motivated by a discriminatory intent."  *Id.* § 100.500.  "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."  *Id.* § 100.500(a).

38.    Under the Disparate-Impact Rule, a practice that results in a discriminatory effect is permissible only if it is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests  .  .  .  [and] [t]hose interests could not be served by another practice that has a less discriminatory effect."  24 C.F.R. § 100.500(b)(1).

39.    The Disparate-Impact Rule creates a burden-shifting framework for assessing disparate-impact liability under the FHA.  It provides that the plaintiff or charging party has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect."  24 C.F.R. § 100.500(c)(1).  If the plaintiff or charging party meets that burden, "the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests."  *Id.* § 100.500(c)(2).  If the defendant or respondent meets its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests sup-

porting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3).

40.    In the preamble to the Disparate-Impact Rule, HUD formally extended disparate-impact liability to the provision and pricing of homeowner's insurance for the first time.  78 Fed. Reg. 11,460, 11,475.

### C.    The Supreme Court's Decision In *Inclusive Communities Project*

41.    In 2008, the Inclusive Communities Project, a non-profit organization, filed suit against the Texas Department of Housing and Community Affairs and its officers, alleging that the Department's criteria for allocating tax credits associated with low-income housing developments violated the FHA.  That was so, the Inclusive Communities Project said, because the criteria had a disparate impact—namely, by virtue of granting "too many credits for housing in predominantly black inner-city areas and too few in predominantly white suburban neighborhoods." *Inclusive Communities*, 135 S. Ct. at 2514.

42.    The district court ruled in the Inclusive Communities Project's favor.  135 S. Ct. at 2514.  While the Department's appeal was pending, HUD promulgated the Disparate-Impact Rule. *Id.*  The Fifth Circuit held, based on circuit precedent, that the Inclusive Communities Project's disparate-impact claim was cognizable under the FHA.  The Fifth Circuit reversed on the merits, however, because the district court applied a burden-shifting test that was inconsistent with the Disparate-Impact Rule. *Id.* at 2515.

43.    The Supreme Court granted review to decide whether the FHA permits disparate-impact claims.  The Court answered in the affirmative.  135 S. Ct. at 2516-2522.

44.    At the same time, however, the Court cautioned that disparate-impact liability under the FHA is "limited in key respects."  135 S. Ct. at 2522.  It "is not an instrument to force [institutions]  .  .  .  to reorder their priorities," or a license "to inject racial considerations into

every housing decision." *Id.* at 2522, 2524. As the Court explained, "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers." *Id.* at 2524 (internal quotation marks omitted).

45.    The Court insisted on a "robust causality requirement" to "protect[] defendants from being held liable for racial disparities they did not create." 135 S. Ct. at 2523. Applying that consideration, the Court noted that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* Likewise, legal obligations that "substantially limit[]" a defendant's discretion break the causal chain between a policy and its effect, with the result that a disparate-impact claim cannot lie. *Id.* at 2524.

46.    The Court emphasized that "disparate-impact liability under the FHA" should not be construed in such a way as to "cause[] race to be used and considered" in a pervasive manner. 135 S. Ct. at 2524. The Court cautioned that, without "adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas," giving rise to "serious constitutional questions." *Id.* at 2523.

### D.    The Disparate-Impact Rule Is Contrary To Law

47.    The Disparate-Impact Rule is not authorized under the FHA to the extent that it imposes a disparate-impact requirement on insurers' underwriting and rating practices.

48.    Plaintiffs' members make race-blind underwriting and rating decisions for property insurance. Those decisions are risk-based, often relying on statistics and probabilities. Indeed, Plaintiffs' members do not even collect data regarding the race and ethnicity of their insureds for underwriting or rating purposes.

11

49.    Under the Disparate-Impact Rule, however, Plaintiffs' members could not main-tain their current race-neutral practices.  In order to ensure that their policies and practices did not cause or perpetuate a disparate impact, insurers would be compelled to collect data on pro-tected characteristics such as race, consider that data, and make classification and rating deci-sions that take into account membership in protected groups.

50.    Imposing a disparate-impact requirement on insurers will thus necessarily "cause race to be used and considered in a pervasive way."  *Inclusive Communities*, 135 S. Ct. at 2523.

51.    In addition, Plaintiffs' members are heavily regulated under state law.  State in-surance codes substantially limit insurers' discretion to make underwriting and ratemaking deci-sions, dictating what criteria insurers may use to classify risks, *see*, *e.g.*, W. Va. Code § 33-20-3; Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(c); Wis. Stat. Ann. § 626.12(2); Me. Rev. Stat. tit. 24-A, § 2303(2), and defining what constitutes prohibited "unfair discrimination," *see*, *e.g.*, 215 Ill. Comp. Stat. 5/424(3); Alaska Stat. § 21.36.090; Tenn. Code Ann. § 56-5-303(a)(2)(d); Me. Rev. Stat. tit. 24-A, § 2303(1)(G).

52.    Because state law "substantially limits [Plaintiffs' members'] discretion," dispar-ate-impact claims against insurers based on underwriting and rating decisions cannot lie under the FHA. *Inclusive Communities*, 135 S. Ct. at 2524.

53.    The McCarran-Ferguson Act buttresses that conclusion.  The FHA does not spe-cifically indicate an intention to override the States' authority to regulate the business of insur-ance within the meaning of the McCarran-Ferguson Act.  Congress therefore did not intend that the FHA be construed in a way that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance."  15 U.S.C. § 1012(b).

54.     Imposing a disparate-impact requirement on insurers' ratemaking and underwriting decisions, however, would have precisely that effect.

55.     Among other things, the Disparate-Impact Rule would impair state laws that prohibit discrimination between risks of the same class or of essentially the same hazard.

56.     The Disparate-Impact Rule would also impair state laws that prohibit consideration of race in the underwriting or rating process.  It would do so by giving rise to disparate treatment among risks of the same class or of essentially the same hazard in order to avoid a disparate impact on protected groups, and by imposing on insurers a need to collect data about characteristics such as the race or national origin of the insured in order to avoid unintentionally perpetuating a disparate effect.

57.     In addition, the Disparate-Impact Rule is not authorized under the FHA to the extent that it is inconsistent with the limitations on disparate-impact liability that the Supreme Court identified in *Inclusive Communities*.

58.     *Inclusive Communities* made clear that a plaintiff cannot make a prima facie disparate-impact claim solely by identifying a statistical disparity, without also identifying a particular policy or set of policies that actually caused the disparate effect.  *Inclusive Communities*, 135 S. Ct. at 2523.  Indeed, "if such liability were imposed based solely on statistical disparity," "serious constitutional questions  .   .   .  might arise."  *Id.* at 2522.

59.     Under the Disparate-Impact Rule, however, "analysis of  .   .   .  data" alone may suffice to state a prima facie claim.  78 Fed. Reg. 11,460, 11,478; *see also id.* at 11,469.  HUD expressly declined to impose a requirement that plaintiffs identify "a specific practice and show that the alleged discriminatory effect is caused by that specific practice."  *Id.* at 11,469.  HUD

also expressly declined to limit disparate-impact liability to practices and policies that create dis-

parate effects, as opposed to merely continuing pre-existing patterns of segregation.  *Id.*

60.     In *Inclusive Communities*, the Supreme Court also explained that disparate-impact

liability under the FHA should not be used to "second-guess which of two reasonable approach-

es" an entity should follow.  *Inclusive Communities*, 135 S. Ct. at 2522.  Nor is it "an instrument

to force  .  .  .  [defendants] to reorder their priorities."  *Id.*  Instead, disparate-impact liability is

properly used only to "remov[e] artificial, arbitrary, and unnecessary barriers."  *Id.* at 2524 (in-

ternal quotation marks omitted).

61.     The Disparate-Impact Rule, however, requires defendants to prove that the chal-

lenged practice or policy is necessary to achieve a substantial, legitimate, nondiscriminatory in-

terest.  24 C.F.R. § 100.500(c)(2).  Even if the defendant makes that showing, the plaintiff may

prevail by demonstrating that the defendant's stated interest could be served by some other prac-

tice or policy that has a less discriminatory effect.  *Id.* § 100.500(c)(3).  Moreover, HUD specifi-

cally rejected a requirement that the plaintiff's alternative be "equally effective" or "at least as

effective" as the challenged policy in advancing the defendant's proffered interest.  78 Fed. Reg.

11,473.

### E.      Plaintiffs' Members Are Harmed By The Disparate-Impact Rule

62.     Although the text of the Disparate-Impact Rule does not specifically address in-

surance, HUD's proposed rule cited "the provision and pricing of homeowner's insurance" as an

"[e]xample[] of a housing policy or practice that may have a disparate impact on a class of per-

sons delineated by characteristics protected by the Act."  76 Fed. Reg. 70,921, 70,924.

63.     In response to the proposed rule, Plaintiffs filed comments that identified a variety

of problems with the proposed rule.  Regarding insurers, Plaintiffs argued, among other things,

that:

A.    Disparate-impact liability for insurance practices is inappropriate because insurance is risk-based and insurers rely on numerous legitimate factors when providing coverage;

B.    Insurers would be forced to violate state laws that require insurance rates to accurately estimate risk and not be excessive, inadequate, or unfairly discriminatory under state law; and

C.    Insurers would face special hardship on burden-of-proof issues because they do not collect race and ethnicity data. Indeed, considering race or ethnicity data in the course of searching for a less discriminatory alternative would be a violation of state laws prohibiting the consideration of those factors.

64.    Instead of directly addressing those arguments, HUD dodged them at every turn.

A.    HUD responded to concerns about risk-based ratemaking and compliance with state law by suggesting that an insurer could always "defend the business justifications for its policies" if it showed that the premiums it charged were supported by "a legally sufficient justification." 78 Fed. Reg. 11,460, 11,475. It did not address the fact that the Disparate-Impact Rule would force insurers, in many cases, to violate state law; bear the costs and risks of proving the necessity of well-established ratemaking practices; and still face the prospect of liability if there were a less accurate alternative to risk-based rating practices that would allegedly result in less of a disparate impact.

B.    HUD essentially ignored the burden-of-proof argument, merely stating that the burden of proof would be no more of an issue for insurers than it would be for plaintiffs. HUD did not address the burden that the Disparate-Impact Rule would impose on insurers, which would have to create new data-collection processes specifically for the purpose of consid-

ering factors such as race, when they previously had not done so, in order to defend against disparate-impact claims. Worse still, HUD completely ignored the fact that, at least in ratemaking, insurers would have to violate state laws prohibiting the consideration of race or ethnicity or other protected characteristics in order to determine whether a less discriminatory alternative practice is available.

65.    After giving those plainly inadequate responses that left Plaintiffs' concerns unaddressed, HUD promulgated the Disparate-Impact Rule.

66.    As a result, Plaintiffs and their members have expended money and resources analyzing the applicability of the Disparate-Impact Rule to the business of insurance.

67.    Plaintiffs have spent money and resources explaining the Disparate-Impact Rule to their members.

68.    Plaintiffs have spent money and resources evaluating the effect of the Disparate-Impact Rule on their members and helping to ensure that their members are in a position to comply with the Disparate-Impact Rule.

69.    In addition, the Disparate-Impact Rule will create, and has already created, significant burdens on Plaintiffs' members.

70.    In order to comply with the Disparate-Impact Rule, Plaintiffs' members have spent and will continue to have to spend money on, and have devoted and will continue to have to devote resources to, re-examining and, if necessary, modifying their existing practices. Plaintiffs' members are and will be harmed by the Disparate-Impact Rule.

71.    The Disparate-Impact Rule will inevitably have an ongoing effect on Plaintiffs and their members.

72.     The Disparate-Impact Rule subjects Plaintiffs' members to different and conflicting obligations under state and federal law.

73.     Plaintiffs' members also face a significant threat of continuous and recurring litigation and agency-enforcement actions under the Disparate-Impact Rule.

74.     The Disparate-Impact Rule injures insurers, including Plaintiffs' members, by imposing significant costs related to identifying and altering or removing the risk distinctions that were acceptable until the rule was issued.   A court decision invalidating the Disparate-Impact Rule would redress that injury.

75.     Ultimately, the Disparate-Impact Rule harms the public, as consumers of insurance, because increased costs to the insurance industry will result in increased costs to insurance policyholders; because consideration of potential disparate impacts will make rating less efficient, causing some policyholders to overpay; and because the Rule, for the first time, makes the policyholder's protected personal characteristics such as race relevant to the insurance decision.

### CLAIMS FOR RELIEF

### COUNT I
**The Disparate-Impact Rule Is In Excess Of Defendants' Statutory Jurisdiction, Authority, Or Limitations Or Is Otherwise Not In Accordance With Law To The Extent It Applies To Insurers' Ratemaking And Underwriting Decisions**

76.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

77.     Congress delegated to the Secretary of HUD the authority to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out" the FHA. 42 U.S.C. § 3614a.

78.     The Disparate-Impact Rule constitutes final agency action.

79.     The Disparate-Impact Rule does not "carry out" the FHA and is not authorized under the FHA.

80.     The Rule imposes a disparate-impact requirement on insurers regarding ratemak-ing and underwriting practices.  The FHA does not authorize that expansion of disparate-impact liability because it will inevitably "cause race to be used and considered in a pervasive way," contrary to the purpose of the FHA.  *Inclusive Communities*, 135 S. Ct. at 2523.

81.     Accordingly, Defendants did not have authority under the FHA to promulgate the Disparate-Impact Rule, and the Disparate-Impact Rule is not in accordance with the FHA.

82.     By promulgating the Disparate-Impact Rule, Defendants acted in excess of their statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C), and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT II
**The Disparate-Impact Rule Is In Excess Of Defendants' Statutory Jurisdiction, Authority, Or Limitations Or Is Otherwise Not In Accordance With Law To The Extent It Applies To Insurers' Ratemaking And Underwriting Decisions**

83.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

84.     Congress delegated to the Secretary of HUD the authority to "make rules (includ-ing rules for the collection, maintenance, and analysis of appropriate data) to carry out" the FHA. 42 U.S.C. § 3614a.

85.     The Disparate-Impact Rule constitutes final agency action.

86.     The Disparate-Impact Rule does not "carry out" the FHA and is not authorized under the FHA.

87.     The Rule allows disparate-impact claims against insurers based on ratemaking and underwriting practices.  State regulation, however, "substantially limits" insurers' discretion and breaks the causal connection between underwriting and rating decisions and any disparate impact.  *Inclusive Communities*, 135 S. Ct. at 2524.  Disparate-impact claims based on insurers' underwriting and rating are thus contrary to the FHA.  *See id.*

88.    Accordingly, Defendants did not have authority under the FHA to promulgate the Disparate-Impact Rule, and the Disparate-Impact Rule is not in accordance with the FHA.

89.    By promulgating the Disparate-Impact Rule, Defendants acted in excess of their statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C), and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

<u>COUNT III</u>
**The Disparate-Impact Rule Is In Excess Of Defendants' Statutory Jurisdiction, Authority, Or Limitations Or Is Otherwise Not In Accordance With Law To The Extent It Applies To Insurers' Ratemaking And Underwriting Decisions**

90.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

91.    Congress delegated to the Secretary of HUD the authority to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out" the FHA. 42 U.S.C. § 3614a.

92.    The Disparate-Impact Rule constitutes final agency action.

93.    The Disparate-Impact Rule does not "carry out" the FHA and is not authorized under the FHA.

94.    HUD has indicated that, under the Rule, a plaintiff may make a prima facie showing of disparate-impact liability based on statistics alone, need not identify a specific practice causing the disparity, and may rest on the mere continuation of pre-existing patterns.  78 Fed. Reg. 11,460, 11,469, 11,478.

95.    But a disparate-impact claim under the FHA based on a statistical disparity cannot lie "if the plaintiff cannot point to a defendant's policy or policies causing that disparity," and defendants may not be "held liable for racial disparities they did not create." *Inclusive Communities*, 135 S. Ct. at 2523.

96.    Disparate-impact claims based on statistics alone are particularly disruptive to the business of insurance and harmful to insurers.  Insurance ratemaking, in particular, relies on statistics and probabilities, and disparate-impact liability based on statistical disparities alone would impose liability based on disparities that insurers did not create.

97.    Because the Rule does not require a plaintiff to identify a specific policy that caused the alleged disparate impact, the Rule is not in accordance with the FHA.

98.    By promulgating the Disparate-Impact Rule, Defendants acted in excess of their statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C), and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

<u>COUNT IV</u>
**The Disparate-Impact Rule Is In Excess Of Defendants' Statutory Jurisdiction, Authority, Or Limitations Or Is Otherwise Not In Accordance With Law To The Extent It Applies To Insurers' Ratemaking And Underwriting Decisions**

99.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

100.    Congress delegated to the Secretary of HUD the authority to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out" the FHA. 42 U.S.C. § 3614a.

101.    The Disparate-Impact Rule constitutes final agency action.

102.    The Disparate-Impact Rule does not "carry out" the FHA and is not authorized under the FHA.

103.    Under HUD's burden-shifting framework, a plaintiff may prevail on a disparate-impact claim—even after a defendant proves that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest—by showing that the defendant's stated interest "could be served by another practice that has a less discriminatory effect."  24 C.F.R. § 100.500(c)(2), (3).  HUD specifically rejected an interpretation of the Rule requiring that the

plaintiff's alternative be "equally effective" or "at least as effective" as the challenged policy in advancing the defendant's proffered interest. 78 Fed. Reg. 11,473.

104.   But the disparate-impact requirement of the FHA only "mandates the removal of artificial, arbitrary, and unnecessary barriers, not the displacement of valid . . . policies." *Inclusive Communities*, 135 S. Ct. at 2522 (internal quotation marks omitted). It "is not an instrument to force . . . [entities] to reorder their priorities." *Id.*

105.   Because the Rule allows plaintiffs to "second guess which of two reasonable approaches a [defendant] should follow," without requiring a showing that the defendant has imposed an "artificial, arbitrary, *and* unnecessary barrier[]," 135 S. Ct. at 2522 (internal quotation marks omitted) (emphasis added), the Rule is not in accordance with the FHA.

106.   The Rule would particularly harm Plaintiffs' members, because insurers' ratemaking and underwriting decisions are dictated by valid policies and priorities, including state law and actuarial standards.

107.   By promulgating the Disparate-Impact Rule, Defendants acted in excess of their statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C), and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1.   Declare that Defendants have violated the APA;

2.   Declare that the Disparate-Impact Rule is not in accordance with the FHA and is beyond Defendant's authority under the FHA to the extent it applies to insurers' ratemaking and underwriting decisions;

3.       Grant an order and judgment vacating the Disparate-Impact Rule as unlawful to the extent it applies to insurers' ratemaking and underwriting decisions;

4.       Grant an order and judgment enjoining HUD and its officers from carrying out any of the powers delegated to them by the Disparate-Impact Rule to the extent it applies to insurers' ratemaking and underwriting decisions;

5.       Award Plaintiffs their costs and reasonable attorneys' fees as appropriate; and

6.       Grant any such other relief that this Court deems just and appropriate.

Respectfully submitted,

By: /s/ Kannon K. Shanmugam
    Kannon K. Shanmugam (#474304)
    Allison B. Jones (#991503)
    A. Joshua Podoll (#1011743)
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, DC  20005
    Telephone:  (202) 434-5000
    Facsimile:  (202) 434-5029

    *Counsel for Plaintiffs*

Dated:  December 8, 2015