## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

      Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and JULIAN CASTRO, in his official
capacity as Secretary of Housing and Urban
Development,

      Defendants.

Civil Action No. 13-cv-966 (RJL)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs American Insurance Association and National Association of Mutual Insurance Companies move for summary judgment on all four of their claims that the Department of Housing and Urban Development's rule purporting to authorize disparate-impact claims against homeowner's insurers is in excess of Defendants' statutory jurisdiction, authority, or limitations, or is otherwise not in accordance with law. In support of this motion, Plaintiffs attach a memorandum of law with exhibits and affidavits. Plaintiffs request an oral hearing under Local Civil Rule 7(f).

/s/Kannon K. Shanmugam
Kannon K. Shanmugam (#474304)
Allison B. Jones (#991503)
A. Joshua Podoll (#1011743)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

June 30, 2016

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

      Plaintiffs,

           v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and JULIAN CASTRO, in his official
capacity as Secretary of Housing and Urban
Development,

      Defendants.

Civil Action No. 13-cv-966 (RJL)

# MEMORANDUM IN SUPPORT OF
# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Kannon K. Shanmugam (#474304)
Allison B. Jones (#991503)
A. Joshua Podoll (#1011743)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................2

    A.    The Business of Insurance ...............................................................2

    B.    Statutory And Regulatory Background.............................................7

    C.    Procedural History ...........................................................................11

ARGUMENT ..................................................................................................................13

    A.    The Disparate-Impact Rule Is Unlawful As Applied To Insurers'
           Ratemaking And Underwriting Decisions Because Disparate-Impact
           Liability Will Cause Pervasive Consideration Of Race And Other
           Protected Characteristics .................................................................15

    B.    The Disparate-Impact Rule Is Unlawful As Applied To Insurers'
           Ratemaking And Underwriting Decisions Because State Law Limits
           Insurers' Discretion Over Those Decisions .....................................21

    C.    The Disparate-Impact Rule Is Unlawful Because It Allows Claims To
           Proceed Based Entirely On Statistics...............................................24

    D.    The Disparate-Impact Rule Is Unlawful Because It Allows Plaintiffs To
           Displace Valid Policies ....................................................................26

CONCLUSION ..............................................................................................................29

# TABLE OF AUTHORITIES

Page

## CASES

*AFL-CIO* v. *FEC*, 333 F.3d 168 (D.C. Cir. 2003) ................................................................14, 20

*Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837 (1984) .............13, 14

*Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) ....................................................23

*EchoStar Satellite L.L.C.* v. *FCC*, 704 F.3d 992 (D.C. Cir. 2013) ........................................14

*Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades
   Council*, 485 U.S. 568 (1988) .....................................................................................19, 20

*Fisher* v. *University of Texas at Austin*, 133 S. Ct. 2411 (2013) ..............................................20

*Freeman* v. *Quicken Loans, Inc.*, 132 S. Ct. 2034 (2012) ...................................................13

*Group Life & Health Insurance Co.* v. *Royal Drug Co.*, 440 U.S. 205, 211 (1979) ......................2

*Insurance Commissioner* v. *Engelman*, 692 A.2d 474 (Md. 1997) ...........................................5

*Magner* v. *Gallagher*, 132 S. Ct. 548 (2011) .......................................................................7, 10

*Massachusetts* v. *U.S. Department of Transportation*, 93 F.3d 890 (D.C. Cir. 1996) .................14

*MCI Telecommunications Corp.* v. *AT&T Co.*, 512 U.S. 218 (1994) ...........................................13

*Miller* v. *Johnson*, 515 U.S. 900 (1995) .............................................................................19, 20

*NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287 (7th Cir. 1992)...................4, 23

*Nationwide Mutual Insurance Co.* v. *Cisneros*, 52 F.3d 1351 (6th Cir. 1995).............................23

*Natural Resources Defense Council* v. *Daley*, 209 F.3d 747 (D.C. Cir. 2000)............................14

*Property Casualty Insurers Association of America* v. *Donovan*, 66 F. Supp. 3d 1018
   (N.D. Ill. 2014)...........................................................................................................13

*Regents of University of California* v. *Bakke*, 438 U.S. 265 (1978)............................................19

*Ricci* v. *DeStefano*, 557 U.S. 557 (2009) ..........................................................................19

*Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961 (8th Cir. 2008) ..................................23

*Shays* v. *FEC*, 528 F.3d 914 (D.C. Cir. 2008) ....................................................................14, 20

Page

Cases—continued:

*Texas Department of Housing and Community Affairs v.
  Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015) ........................................ passim

Texas Department of Housing and Community Affairs v.
  Inclusive Communities Project, Inc., 135 S. Ct. 46 (2014) ................................................10

Township of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.,
  133 S. Ct. 2824 (2013) ......................................................................................................10

Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989)..............................................................24

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. Amend XIV ...................................................................................................20

Administrative Procedure Act, 5 U.S.C. §§ 550 et seq....................................................................1
  5 U.S.C. § 706(2)(A).........................................................................................................13
  5 U.S.C. § 706(2)(C).........................................................................................................13

McCarran-Ferguson Act, 15 U.S.C. §§ 1011 et seq. ...............................................................8, 10

*Fair Housing Act, 42 U.S.C. §§ 3601 et seq.......................................................................... passim
  42 U.S.C. § 3601 ................................................................................................................7
  42 U.S.C. § 3604(a) (1968)................................................................................................7
  42 U.S.C. § 3604(a) (1974)................................................................................................7
  42 U.S.C. § 3604(a) (1988)................................................................................................7
  42 U.S.C. § 3604(b) (1968)................................................................................................7
  42 U.S.C. § 3604(b) (1974)................................................................................................7
  42 U.S.C. § 3604(b) (1988)................................................................................................7
  42 U.S.C. § 3604(f)(1) (1988)............................................................................................7
  42 U.S.C. § 3604(f)(2) (1988)............................................................................................7

24 C.F.R. §§ 100.5 et seq................................................................................................................9

24 C.F.R. § 100.500 .......................................................................................................................9

24 C.F.R. § 100.500(a).............................................................................................................9, 19

24 C.F.R. § 100.500(c)(1)....................................................................................................9, 24, 27

24 C.F.R. § 100.500(c)(2)....................................................................................................9, 27, 28

24 C.F.R. § 100.500(c)(3)........................................................................................................9, 27

Final Rule, Implementation of the Fair Housing Act's Discriminatory Effects Standard,
  78 Fed. Reg. 11,460 (Feb. 15, 2013) ......................................................................... passim

Page

Constitution, statutes, and regulations—continued:

Proposed Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 7021 (Nov. 16, 2011) ........................................8

Ala. Admin. Code r. § 482-1-074-03 ........................................22

Ala. Code § 27-13-27 ........................................22

Alaska Stat. § 21.36.460(d)(4) ........................................21

Alaska Stat. § 21.39.030 ........................................6, 22

Ariz. Rev. Stat. Ann. § 20-384 ........................................21, 22

Ark. Code Ann. § 23-67-209 ........................................22

Ark. Code Ann. § 23-67-209(b) ........................................6, 21

Cal. Ins. Code § 679.71 ........................................21

Cal. Ins. Code § 10225 ........................................5

Colo. Rev. Stat. § 10-3-1104 ........................................21

Colo. Rev. Stat. § 10-4-403(1) ........................................5

Colo. Rev. Stat. § 10-4-403(1)(c) ........................................6, 22

Conn. Gen. Stat. § 38a-686 ........................................22

Conn. Gen. Stat. § 38a-816(12)-(13) ........................................22

D.C. Code § 31-2231.11 ........................................5

D.C. Code § 31-2231.13(d) ........................................22

Del. Code Ann. tit. 18, § 2304(22) ........................................21

Fla. Stat. § 626.9541 ........................................22

Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(I) ........................................21

Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(II) ........................................18

Haw. Rev. Stat. § 431:14-103 ........................................21, 22

Idaho Admin. Code r. 18.01.51.011 ........................................22

Page

Constitution, statutes, and regulations—continued:

Idaho Code § 41-1405 ...................................................................................22

Ill. Comp. Stat. 5/424(3) ...............................................................................21

Ind. Code § 27-7-12-7 ...................................................................................22

Iowa Code § 515F.4 .......................................................................................22

Iowa Code § 515F.4(3) ...................................................................................21

Kan. Stat. Ann. § 40-954 ...............................................................................22

Kan. Stat. Ann. § 40-954(c) ...........................................................................21

Ky. Rev. Stat. Ann. § 304.12-085 ..................................................................22

Ky. Rev. Stat. Ann. § 304.13-031 ..................................................................22

La. Stat. Ann. § 22:1964(7)(f) .......................................................................22

Mass. Gen. Laws Ann. ch. 175, § 4C ...........................................................22

Md. Code Ann. Ins. § 27-501 ........................................................................21

Md. Code Ann. Ins. § 27-501(c)(1) ...........................................................6, 15

Me. Rev. Stat. tit. 24-A, § 2303(1)(G) .......................................................6, 21

Me. Rev. Stat. tit. 24-A, § 2303(2) .............................................................7, 22

Mich. Comp. Laws § 500.2027 ......................................................................22

Minn. Stat. Ann. § 70A.5(2) .....................................................................21, 22

Miss. Code Ann. § 83-2-3 .........................................................................21, 23

Mo. Rev. Stat. § 375.936(11)(g) ....................................................................22

Mo. Rev. Stat. § 379.318(2) ...........................................................................23

Mont. Code Ann. § 33-18-210(5) ...................................................................21

N.C. Gen. Stat. Ann. § 58-3-25(c) .................................................................22

N.D. Cent. Code § 26.1-25-03 ...................................................................22, 23

N.H. Rev. Stat. Ann. § 412:15(II)(b) ..........................................................21, 23

Page

Constitution, statutes, and regulations—continued:

N.J. Stat. Ann. § 17:29B-4(7)(c)-(d) ........................................................21

N.M. Stat. Ann. § 59A-17-7 ...............................................................21, 23

N.Y. Ins. Law § 2606 .............................................................................21

N.Y. Ins. Law § 3201 ...............................................................................5

Neb. Rev. Stat. § 44-7510(3) ...................................................................21

Nev. Rev. Stat. § 686B.060 ................................................................21, 23

Ohio Rev. Code Ann. § 3935.03 .........................................................22, 23

Ohio Rev. Code. Ann. § 4112.02 ..............................................................22

Okla. Stat. Ann. tit. 36, § 985 ...............................................................6, 22

Or. Admin. Rules 836-081-0010 ...............................................................22

Or. Rev. Stat § 737.310 ...........................................................................22

40 Pa. Cons. Stat. Ann. § 1171.5(7) ..........................................................22

R.I. Gen. Laws § 27-44-5 .........................................................................22

S.C. Code Ann. § 38-75-1210(B)(1) ......................................................6, 22

S.D. Codified Laws § 58-11-55 .............................................................18, 22

Tenn. Code Ann. § 56-8-104(7)(F) ............................................................22

Tex. Ins. Code Ann. § 544.002 .................................................................22

Utah Code Ann. § 31A-19a-202(3) .......................................................22, 23

Va. Code Ann. § 38.2-1904(A) ..................................................................22

Va. Code Ann. § 38.2-1904(A)(3) ..........................................................6, 23

Vt. Stat. Ann. tit. 8, § 4724(7)(B) ........................................................22, 23

W. Va. Code § 33-17A-6 ..........................................................................22

W. Va. Code § 33-20-3(c)(2) ................................................................6, 22

Wash. Rev. Code § 48.30.300 ...................................................................22

Page

Constitution, statutes, and regulations—continued:

Wis. Stat. Ann. § 626.12(2) ...............................................................................6, 22, 23

Wis. Stat. § 625.12 .....................................................................................................22

Wyo. Stat. Ann. § 26-14-105(b) ..........................................................................22, 23

## MISCELLANEOUS

Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*,
    71 Va. L. Rev. 403 (1985) ....................................................................................3, 5

Kenneth S. Abraham, *Insurance Law and Regulation: Cases and Materials*
    (5th ed. 2010) .......................................................................................................3, 4

Actuarial Standards Board, Task Force to Revise ASOP No. 12, *Actuarial Standard of
    Practice: Risk Classification (for All Practice Areas)*
    (Dec. 2005) <tinyurl.com/asop12> ..........................................................................4

Ronen Avraham, *The Economics of Insurance Law—A Primer*,
    19 Conn. Ins. L.J. 29 (2012) ................................................................................3, 4

Tom Baker, *Containing the Promise of Insurance: Adverse Selection and Risk
    Classification*, 9 Conn. Ins. L.J. 371 (2003) ............................................................4

Casualty Actuarial Society, Board of Directors, *Statement of Principles Regarding
    Property and Casualty Insurance Ratemaking*
    (May 1988) <tinyurl.com/casstatement> ...................................................................5

Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*,
    Casualty Actuarial Society E-Forum (2009)............................................................18

National Association of Insurance Commissioners, Property & Casualty Model Rating
    Law (File & Use Version), NAIC 1775 (Jan. 2010)..................................................5

National Association of Insurance Commissioners, Property & Casualty Model Rating
    Law (Prior Approval Version), NAIC 1780 (July 2009)............................................5

Steven Plitt et al., *Couch on Insurance*  (3d rev. ed. 2009) ........................................3, 4

Plaintiffs American Insurance Association (AIA) and the National Association of Mutual Insurance Companies (NAMIC) respectfully submit this Memorandum in Support of their Motion for Summary Judgment.

## INTRODUCTION

As the Court is aware, this case concerns a final rule promulgated by the United States Department of Housing and Urban Development (HUD) that interprets the Fair Housing Act (FHA) to prohibit housing-related activities which, although not motivated by intent to discriminate, result in a disparate impact on certain protected groups. *See* Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (Disparate-Impact Rule or Rule), attached as Ex. A. Among other things, the Rule extends disparate-impact liability to the provision and pricing of homeowner's insurance and creates a burden-shifting framework for assigning liability in private lawsuits and government enforcement actions premised on the existence of a disparate impact. On June 25, 2015, the Supreme Court issued its decision in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). While the Court held that disparate-impact claims are cognizable under the FHA, it cautioned that disparate-impact liability under the FHA is "limited in key respects" and elaborated on those "necessary" limitations. *Id.* at 2522, 2524.

Plaintiffs are two of the Nation's largest trade associations representing homeowner's insurers. In their amended complaint, Plaintiffs seek declaratory and injunctive relief against HUD and its Secretary on the ground that Defendants violated the Administrative Procedure Act (APA) by promulgating the Disparate-Impact Rule. In particular, Plaintiffs allege that the Rule contravenes four limitations on disparate-impact liability under the FHA as articulated by the

Supreme Court in *Inclusive Communities*. Plaintiffs are entitled to summary judgment on all of their claims.

*First*, as applied to insurers, the Rule exceeds the bounds of disparate-impact liability under the FHA because it pervasively injects consideration of race (and other protected characteristics) into a previously race-blind process. *See Inclusive Communities*, 135 S. Ct. at 2523-2524. *Second*, as applied to insurers, the Rule is inconsistent with the FHA because the insurance laws of every State restrict insurers' discretion to take membership in protected classes into account when making rating and underwriting decisions, thereby breaking the causal chain required for disparate-impact claims under the FHA. *See id.* at 2524. *Third*, the Rule contravenes the FHA because it allows a plaintiff to make a prima facie disparate-impact claim based on statistical disparity alone, without requiring that a plaintiff identify the particular policy of the defendant that caused the alleged disparity; in so doing, the Rule impermissibly allows defendants to be held liable for disparities they did not create. *See id.* at 2523. *Fourth*, the Rule is not in accord with the FHA because it does more than root out "artificial, arbitrary, and unnecessary barriers"; it allows a plaintiff to displace a defendant's valid policy choice without demonstrating that the proffered alternative is at least as effective. *See id.* at 2524.

In short, HUD's rule flouts the limitations on disparate-impact liability that the Supreme Court articulated in *Inclusive Communities*. Plaintiffs' motion for summary judgment should therefore be granted.

## BACKGROUND

### A.    The Business of Insurance

1.    At its core, insurance is a means of shifting and distributing risk. *See*, *e.g.*, *Group Life & Health Insurance Co.* v. *Royal Drug Co.*, 440 U.S. 205, 211 (1979). An insurer accepts the risk of a large but uncertain future loss; in exchange, the insured pays a small but certain

premium.  *See* Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 38 (2012) (Avraham); 1 Steven Plitt et al., *Couch on Insurance* § 1:6, at 1-16 to 1-18 (3d rev. ed. 2009) (*Couch on Insurance*).  Insurers are able to accept that bargain because of the "law of large numbers"—a statistical phenomenon where "the sample mean for a probabilistic set nears the expected mean for an occurrence or process in the population as the sample size increases." Avraham 37-38.  To put it in non-mathematical terms, a large enough group of individually risky transactions that share similar characteristics (but are uncorrelated) will produce reasonably pre-dictable outcomes.  *Id.*  Based on those outcomes, insurers can determine how to distribute the risks they accept among insureds in the form of insurance premiums.

"The heart of any insurance system is its method of classifying risks and setting prices." Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 403 (1985) (*Efficiency and Fairness*).  In order to take advantage of the law of large num-bers, insurers must identify risk characteristics, sort applicants into groups corresponding to dif-ferences in expected loss, and then allocate the grouped risks by establishing rates.  Insurance markets function properly when risks are classified and grouped appropriately and rates corres-pond to the expected costs of those risks.  *See* Kenneth S. Abraham, *Insurance Law and Regula-tion: Cases and Materials* 3-4 (5th ed. 2010) (*Insurance Law and Regulation*).

The first step of the process—risk classification—requires an insurer to determine the ex-pected losses associated with specific risk characteristics so that the insurer can group insureds accordingly.  The goal is to devise groups of insureds with comparable risk profiles:  in other words, to ensure that the insureds in each group are similarly likely to suffer the loss the insurer has agreed to cover.  An essential prerequisite for effective risk classification is data collection; indeed, "all other functions of the insurer rely on its ability to gather data about the risks it in-

tends to insure."  Avraham 39.  For homeowner's insurance, underwriting professionals and act-uaries will take into account characteristics such as construction type, the location of the property (such as in a region with a heightened risk of natural catastrophes), and the presence of smoke detectors.  Actuaries use that data to create classes, or groupings, of "risk characteristics that are related to expected outcomes."  Actuarial Standards Board, Task Force to Revise ASOP No. 12, *Actuarial Standard of Practice: Risk Classification (for All Practice Areas)* § 3.2.1, at 3 (Dec. 2005) <tinyurl.com/asop12>.

The second step of the process—risk grouping—involves examining the risk characteris-tics of individual applicants and then "sorting insurance applicants into categories believed to correspond to differences in expected risk."  Tom Baker, *Containing the Promise of Insurance: Adverse Selection and Risk Classification*, 9 Conn. Ins. L.J. 371, 376 (2003).  That step is neces-sary because, without accurate grouping, "high-risk insureds would adversely select into [less risky] risk pool[s]," causing low-risk individuals either to subsidize higher-risk customers or, to the extent they are permitted to do so, to opt out and self-insure instead.  *Insurance Law and Regulation* 144; *see NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287, 290 (7th Cir. 1992).  When low-risk individuals choose to self-insure because the cost of subsidizing riskier customers exceeds the value of having insurance, a vicious cycle results:  the insurer bears a higher net risk, which requires the insurer to increase premiums.  That, in turn, causes more customers to opt out.  And because only the highest-risk customers remain, it becomes effective-ly impossible for the insurer to continue providing insurance.  *See* Avraham 44; 1 *Couch on In-surance* § 1:3, at 1-8.

The third and final step of the process—rating—is the allocation of grouped risks through rates.  Three general principles guide that process.  *First*, the rate charged must be an accurate

estimate of the expected value of future costs:  that is, "the predicted probability that an insured will suffer a loss multiplied by the predicted severity of the loss." *Efficiency and Fairness* 408; *see* Casualty Actuarial Society, Board of Directors, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* 2 (May 1988) <tinyurl.com/casstatement> (*Statement of Principles*).  *Second*, the rate must provide for the insurer's costs of doing business, including the costs associated with the transfer of risk.  *See Statement of Principles* 2; *Efficiency and Fairness* 407; Avraham 38.  *Third*, the rate should allow for a reasonable profit, but the rate should not be excessive, inadequate, or unfairly discriminatory.  *See Efficiency and Fairness* 407; *Statement of Principles* 2; National Association of Insurance Commissioners, Property & Casualty Model Rating Law (File & Use Version), NAIC 1775, § 5 (Jan. 2010); National Association of Insurance Commissioners, Property & Casualty Model Rating Law (Prior Approval Version), NAIC 1780, § 4 (July 2009).

2.	State law pervasively regulates the business of insurance.  Every State has enacted a comprehensive insurance code covering the insurance business, from the licensing of insurers and the regulation of their operations, *see*, *e.g.*, N.Y. Ins. Law § 3201; Cal. Ins. Code § 10225, to the prohibition of unfair and deceptive insurance practices, *see*, *e.g.*, D.C. Code § 31-2231.11, to the regulation of rates, *see*, *e.g.*, Colo. Rev. Stat. § 10-4-403(1).

Consistent with the actuarial principles discussed above, States uniformly forbid insurers from engaging in unfair discrimination:  that is, from differentiating among insureds in the classification and rating process based on factors that are not legitimately related to the risks presented by their properties.  *See*, *e.g.*, *Insurance Commissioner* v. *Engelman*, 692 A.2d 474, 480 (Md. 1997) (defining "unfair discrimination," as employed by the Maryland Insurance Code, as "discrimination among insureds of the same class based upon something other than actuarial

5

risk"). Many States specify that "no risks may be grouped by classifications based in whole or in part on race, color, creed, or national origin of the risk." Ark. Code Ann. § 23-67-209(b); *see also*, *e.g.*, Me. Rev. Stat. tit. 24-A, § 2303(1)(G); Okla. Stat. Ann. tit. 36, § 985; S.C. Code Ann. § 38-75-1210(B)(1). Maryland affirmatively prohibits insurers even from collecting data about race or other protected characteristics from their insureds or prospective insureds. *See* Md. Code Ann. Ins. § 27-501(c)(1) (providing that "an insurer or insurance producer may not make an inquiry about race, creed, color, or national origin in an insurance form, questionnaire, or other manner of requesting general information that relates to an application for insurance," except in certain narrow instances related to health insurance). Because of those prohibitions on differentiating between similar risks on the basis of protected characteristics such as race, homeowner's insurers generally do not collect data regarding those characteristics. *See* Aff. of Greg Hayward ¶¶ 5-7; Aff. of Nikki L. Meek ¶ 9; Aff. of Dianne L. Priest ¶ 4; Aff. of Geneau M. Thames ¶ 8; Aff. of Kevin J. Christy ¶ 4; Aff. of Larry M. Shaw ¶ 5; Joint Aff. of North Dakota Association of Farm Mutual Insurance Companies ¶ 6; Decl. of William G. Hirschfeld ¶ 3; Aff. of David R. Benseler ¶ 5; Aff. of Andrew P. Forstenzer ¶ 5; Decl. of Ronald Joseph Zaleski, Sr. ¶ 11; Aff. of Dalith Wells ¶ 6; Aff. of Scott St. Angel ¶ 9; Aff. of Salvatore T. Laduca ¶ 9.

By contrast, States authorize insurers, often expressly, to consider the "differences among risks that can be demonstrated to have a probable effect upon losses or expenses." W. Va. Code § 33-20-3(c)(2); *see*, *e.g.*, Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(c); Wis. Stat. Ann. § 626.12(2). For example, Virginia provides that "[n]o rate shall be unfairly discriminatory if a different rate is charged for the same coverage and the rate differential (i) is based on sound actuarial principles or (ii) is related to actual or reasonably anticipated experience." Va. Code Ann. § 38.2-1904(A)(3). Similarly, Maine provides that a risk classification "based upon size,

expense, management, individual experience, purpose of insurance, location or dispersion of hazard, or any other reasonable considerations" is not unfairly discriminatory, as long as the classification "appl[ies] to all risks under the same or substantially similar circumstances or conditions." Me. Rev. Stat. tit. 24-A, § 2303(2). These laws, and the similar laws of other States, not only tolerate but affirmatively sanction "fair discrimination": that is, grouping and rating practices that are race-neutral and based on shared characteristics of underwriting and actuarial significance. *See id.*

**B.    Statutory And Regulatory Background**

1.    Congress enacted the Fair Housing Act in 1968 to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. In its original form, Section 804(a) of the FHA made it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin." 42 U.S.C. § 3604(a) (1968). Section 804(b) of the FHA, in turn, made it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith because of" the same characteristics. 42 U.S.C. § 3604(b). Congress subsequently amended those provisions and added sex, familial status, and handicap to the list of protected characteristics. *See* 42 U.S.C. § 3604(a), (b) (1974); 42 U.S.C. § 3604(a), (b), (f)(1), (f)(2) (1988). The statute did not specify whether it authorized disparate-impact claims.

2.    On November 7, 2011, the Supreme Court granted review in *Magner* v. *Gallagher*, 132 S. Ct. 548 (2011), which presented the question whether disparate-impact claims are cognizable under the FHA. Just nine days later, in response to the Supreme Court's decision to grant review, HUD proposed a rule authorizing disparate-impact claims under the FHA. *See*

Proposed Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 70,921 (Nov. 16, 2011).

HUD's proposed rule took specific aim at homeowner's insurers. It identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." 76 Fed. Reg. 70,924. The proposed rule marked the first time that HUD had taken the position that insurers were subject to disparate-impact liability in connection with the provision and pricing of homeowner's insurance in a formal rule.

In response to HUD's proposal, both Plaintiffs submitted comments on behalf of their members. *See* Ex. B (AIA Comments, filed Jan. 17, 2012); Ex. C (NAMIC Comments, filed Jan. 17, 2012). In addition to arguing that the FHA did not permit disparate-impact claims at all, *see* Ex. B, at 3-4; Ex. C, at 3-4, Plaintiffs made a number of arguments concerning the impermissibility of extending disparate-impact liability to homeowner's insurers. Plaintiff NAMIC explained that disparate-impact liability would be fundamentally inconsistent with risk-based pricing, one of the cornerstones of the insurance business. *See* Ex. C, at 4-6. It further explained that insurers would have special difficulties with burdens of proof because "insurers do not collect data on race and ethnicity" and in some instances cannot do so because of state law. *See id.* at 12. Both Plaintiffs also argued that applying disparate-impact analysis to the insurance industry would contravene state law and thus violate the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*, which commits insurance regulation to the States. *See* Ex. B, at 2-3; Ex. C, at 7-9.

3.    While HUD's proposed rule was pending, *Magner* settled. Soon after, another challenge to disparate-impact liability was filed in the Supreme Court. *See Township of Mount Holly* v. *Mt. Holly Gardens Citizens in Action, Inc.*, No. 11-1507 (pet. for cert. filed June 11,

2012).  On February 15, 2013, while the petition for review in *Mount Holly* was still pending,
HUD promulgated its final rule.  *See* 78 Fed. Reg. 11,460.

The Disparate-Impact Rule, codified at 24 C.F.R. §§ 100.5 *et seq.*, provides that
"[l]iability may be established under the Fair Housing Act based on a practice's discriminatory
effect . . . even if the practice was not motivated by a discriminatory intent."  24 C.F.R.
§ 100.500.  A practice has a discriminatory effect, according to the Rule, "where it actually or
predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or
perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial
status, or national origin."  24 C.F.R. § 100.500(a).  In addition, the Disparate-Impact Rule estab-
lishes a burden-shifting framework for disparate-impact claims.  Under that framework, the
plaintiff first must show "that a challenged practice caused or predictably will cause a discrimi-
natory effect."  24 C.F.R. § 100.500(c)(1).  If the plaintiff meets that burden, the defendant must
show that "the challenged practice is necessary to achieve one or more substantial, legitimate,
nondiscriminatory interests."  24 C.F.R. § 100.500(c)(2).  If the defendant makes that showing,
the plaintiff "may still prevail upon proving that the substantial, legitimate, nondiscriminatory
interests supporting the challenged practice could be served by another practice that has a less
discriminatory effect."  24 C.F.R. § 100.500(c)(3).  HUD emphasized that a plaintiff may make a
prima facie showing of disparate-impact liability under the Rule based on statistics alone—and
without identifying the specific practice that caused the disparity.  78 Fed. Reg. 11,460, 11,469,
11,478.

In the face of Plaintiffs' comments, HUD offered only cursory responses.  HUD dis-
missed Plaintiffs' concern that the business of insurance was incompatible with disparate-impact
liability, claiming that, under its proposed burden-shifting framework, insurers had the opportu-

nity to show that their premiums were supported by "legally sufficient justification." 78 Fed. Reg. 11,475. HUD summarily rejected Plaintiffs' concern about insurers' inability to collect the data necessary to defend themselves because of state insurance laws and industry practice, asserting that "[t]he burden of proof is not more difficult for insurers than for a charging party or plaintiff alleging that an insurance practice creates a discriminatory effect." *Id.* Most remarkable of all, HUD claimed that it was not bound by the McCarran-Ferguson Act because that law merely "instructs courts on how to construe federal statutes." *Id.*

4.     The Disparate-Impact Rule took effect on March 18, 2013. On May 17, 2013, the Solicitor General filed a brief recommending that the Supreme Court deny review in *Mount Holly* on the ground that "[n]o court of appeals has considered the final rule[] and it would be appropriate for this Court to allow courts to implement HUD's recent guidance." U.S. Br. at 6, *Mount Holly, supra*. Notwithstanding the Solicitor General's recommendation, the Supreme Court granted review in *Mount Holly* on June 17, 2013. *Township of Mount Holly* v. *Mt. Holly Gardens Citizens in Action, Inc.*, 133 S. Ct. 2824 (2013). Like *Magner*, however, *Mount Holly* settled before oral argument.

On October 2, 2014, the Supreme Court yet again granted review to decide whether disparate-impact claims are cognizable under the FHA. *See Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*, 135 S. Ct. 46 (2014). That case did not settle and, on June 25, 2015, the Supreme Court held that disparate-impact claims are cognizable under the Act. *Inclusive Communities*, 135 S. Ct. at 2525.

Of particular relevance here, however, the Court stressed that disparate-impact liability under the FHA is "limited in key respects." *Inclusive Communities*, 135 S. Ct. at 2522. To begin with, the Court emphasized that "[t]he FHA is not an instrument to force [housing-related

entities] to reorder their priorities." *Id.* "Governmental or private policies are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers." *Id.* at 2524 (internal quotation marks omitted). The Court explained that standards for disparate-impact suits under the FHA must "incorporate . . . safeguards" to ensure that disparate-impact liability does not "displace valid governmental and private priorities, rather than solely removing . . . artificial, arbitrary, and unnecessary barriers." *Id.* (internal quotation marks omitted).

Similarly, the Court noted that "racial imbalance does not, without more, establish a prima facie case of disparate impact." *Inclusive Communities*, 135 S. Ct. at 2523 (alterations and internal quotation marks omitted). "A robust causality requirement" is necessary, the Court continued, to "protect[] defendants from being held liable for racial disparities they did not create." *Id.* For that reason, "a disparate-impact claim that relies on a statistical disparity must fail" unless the plaintiff "point[s] to a defendant's policy or policies causing that disparity." *Id.* Similarly, the Court noted that a disparate-impact claim cannot lie when another source of law "substantially limits the [defendant's] discretion," breaking the required "causal connection." *Id.* at 2524. Finally, the Court emphasized that "serious constitutional questions" could arise if disparate-impact liability under the FHA "caus[ed] race to be used and considered in a pervasive way" that "tend[ed] to perpetuate race-based considerations rather than move beyond them." *Id.* at 2523, 2524. The Court therefore cautioned that "adequate safeguards" must be implemented to prevent the FHA's disparate-impact requirement from resulting in "pervasive injection of race into . . . private transactions" covered by the statute. *Id.* at 2523, 2525.

C.    **Procedural History**

Plaintiffs filed their original complaint in this action on June 26, 2013. Dkt. 1. That complaint alleged a single cause of action: that disparate-impact claims are not cognizable under

the FHA.  This Court stayed the case pending the Supreme Court's decision in *Mount Holly*.  After *Mount Holly* settled, this Court lifted the stay, and Plaintiffs moved for summary judgment.  Dkt. 16.  Defendants cross-moved to dismiss or for summary judgment, arguing that Plaintiffs lacked standing and that the Disparate-Impact Rule constituted a valid interpretation of the FHA.  Dkt. 20.

This Court granted summary judgment in favor of Plaintiffs.  *See* Dkt. 46.  At the threshold, the Court rejected Defendants' standing argument, reasoning that Plaintiffs' standing to challenge the Rule was "self-evident" because they are "an object of the agency action at issue" and that Plaintiffs had adequately shown that the Disparate-Impact Rule caused them harm.  Dkt. 47, at 12-14 (alterations and internal quotation marks omitted).  On the merits, the Court held that HUD's rule was invalid because the FHA did not authorize disparate-impact claims.  *Id.* at 31-32.

Defendants appealed.  Before briefing began in the court of appeals, however, the Supreme Court released its decision in *Inclusive Communities*.  Because of the Court's interpretation of the FHA, Plaintiffs asked that the court of appeals vacate the order granting summary judgment and remand to this Court for further proceedings.  *See* Mot. by Appellees to Vacate and Remand, No. 14-5321 (D.C. Cir. July 15, 2015).  Plaintiffs advised the court of appeals that they intended, on remand, to seek leave to amend their complaint and argue that the Disparate-Impact Rule is invalid in light of *Inclusive Communities*.  *See id.* at 2.  The government opposed the motion, arguing that the court of appeals should reverse outright and prevent Plaintiffs from seeking leave to amend in this Court.  *See* Mot. to Govern Future Proceedings and Resp. to Pls.' Mot. to Vacate and Remand, No. 14-5321 (D.C. Cir. July 24, 2015).  The court of appeals granted Plaintiffs' motion, vacating the summary-judgment order and remanding the case to this Court for fur-

ther consideration in light of *Inclusive Communities*. *See* Order, No. 14-5321 (D.C. Cir. Sept. 23, 2015).

On remand, Plaintiffs moved to amend their complaint to add claims that the Disparate-Impact Rule is inconsistent with *Inclusive Communities*, both as it applies to the business of insurance and as a general matter. *See* Dkt. 52. Defendants opposed the motion. *See* Dkt. 54. This Court granted Plaintiffs' motion on April 14, 2016, *see* Minute Order, No. 13-966 (D.D.C. Apr. 14, 2016), and this motion follows.[1]

## ARGUMENT

Under the Administrative Procedure Act, a court must set aside agency action that exceeds the agency's "statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). In applying that standard, the Court follows the familiar two-step framework from *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837, 842-843 (1984).

The Disparate-Impact Rule fails at the first step of the analysis because it "goes beyond the meaning that the statute can bear." *Freeman* v. *Quicken Loans, Inc.*, 132 S. Ct. 2034, 2040 (2012) (quoting *MCI Telecommunications Corp.* v. *AT&T Co.*, 512 U.S. 218, 229 (1994)). "The FHA is not an instrument to force [housing-related entities] to reorder their priorities," and "private policies are not contrary to the disparate-impact requirement unless they are artificial, arbi-

---

[1] Another trade association, the Property Casualty Insurers Association of America, challenged the Disparate-Impact Rule in a separate lawsuit filed in the Northern District of Illinois. On September 3, 2014, that court determined that "HUD's application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious" and "remand[ed] [the] case to HUD for further proceedings." *Property Casualty Insurers Association of America* v. *Donovan*, 66 F. Supp. 3d 1018, 1054 (N.D. Ill. 2014). In the twenty-two months since that decision, HUD has taken no action with respect to the application of the Disparate-Impact Rule to homeowner's insurers, nor has it provided Plaintiffs any notice of its intention to do so.

trary, and unnecessary barriers." *Inclusive Communities*, 135 S. Ct. at 2522, 2524 (internal quotation marks omitted). A theory of disparate-impact liability without a "robust causality requirement" is not cognizable under the statute. *Id.* at 2523. And Congress could not have intended to authorize disparate-impact liability under the FHA to operate in a manner that would "cause race to be used and considered in a pervasive way," which would raise serious constitutional questions. *Id.* As described below, the Disparate-Impact Rule exceeds those statutory limitations, as articulated by the Supreme Court in *Inclusive Communities*.

The Disparate-Impact Rule also fails at the second step of the *Chevron* analysis. When Congress leaves a gap for an agency to fill in a statute, courts must defer to reasonable agency action, but deference is not a "rubber stamp." *Natural Resources Defense Council* v. *Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000). Courts still must "determine whether the agency's interpretation is a reasonable resolution of whatever ambiguity precluded a clear declaration of congressional intent in the first step." *Massachusetts* v. *U.S. Department of Transportation*, 93 F.3d 890, 893 (D.C. Cir. 1996). That "judicial function is neither rote nor meaningless," *Daley*, 209 F.3d at 752, but requires close analysis of the agency's action. *See EchoStar Satellite L.L.C.* v. *FCC*, 704 F.3d 992, 997 (D.C. Cir. 2013); *Shays* v. *FEC*, 528 F.3d 914, 925 (D.C. Cir. 2008); *Daley*, 209 F.3d at 752. In particular, an agency is not entitled to deference when "its regulations create serious constitutional difficulties," *AFL-CIO* v. *FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (internal quotation marks omitted), and courts "must reject administrative constructions . . . that frustrate the policy that Congress sought to implement" in the statute, *Shays*, 528 F.3d at 925 (internal quotation marks omitted). For the reasons explained below, the Disparate-Impact Rule is at a minimum an unreasonable construction of the FHA.

**A.    The Disparate-Impact Rule Is Unlawful As Applied To Insurers' Ratemaking And Underwriting Decisions Because Disparate-Impact Liability Will Cause Pervasive Consideration Of Race And Other Protected Characteristics**

The disparate-impact requirement of the FHA cannot be construed to "cause race to be used and considered in a pervasive way." *Inclusive Communities*, 135 S. Ct. at 2523.  Such a construction would violate the FHA, raise serious constitutional questions, undermine the purposes of the Act, and "set our Nation back in its quest to reduce the salience of race in our social and economic system." *Id.* at 2524.  Applying the Disparate-Impact Rule in the unique context of the insurance business would do precisely that.  The Rule is therefore unlawful as applied to insurers.

1.    In the insurance context, the Disparate-Impact Rule violates the FHA because it causes race and other protected characteristics to be used and considered in a pervasive way, when insurers would not otherwise use or consider those characteristics at all.  *See Inclusive Communities*, 135 S. Ct. at 2523.  Before HUD promulgated the Disparate-Impact Rule, insurers did not collect data concerning race or membership in other protected classes for the purpose of making underwriting or rating decisions.  *See* Hayward Aff. ¶¶ 5-7; Meek Aff. ¶ 9; Priest Aff. ¶ 4; Thames Aff. ¶ 8; Christy Aff. ¶ 4; Shaw Aff. ¶ 5; North Dakota Joint Aff. ¶ 6; Hirschfeld Decl. ¶ 3; Forstenzer Aff. ¶ 5; Zaleski Decl. ¶ 11; Wells Aff. ¶¶ 6, 10; St. Angel Aff. ¶ 9; Benseler Aff. ¶ 5; Laduca Aff. ¶ 9; Aff. of Stephanie Lloyd ¶ 4.  Indeed, at least one State explicitly prohibits them from collecting such data at all.  *See* Md. Code Ann. Ins. § 27-501(c)(1); Meek Aff. ¶ 9; Thames Aff. ¶ 10; Zaleski Decl. ¶ 12.  Insurers do not consider race or other protected characteristics when making underwriting and rating decisions.  *See* Hayward Aff. ¶¶ 5, 10; Lloyd Aff. ¶ 3; Hirschfeld Decl. ¶ 4; Priest Aff. ¶ 5; Shaw Aff. ¶ 5; Wells Aff. ¶ 5; Laduca Aff. ¶ 9.  Instead, insurers identify and analyze risk factors related to individual properties, such as the age of a home, its location, its replacement or repair cost, and various aspects of its construc-

tion.  *See* Meek Aff. ¶ 6; Hirschfeld Decl. ¶ 6; Priest Aff. ¶ 5; Thames Aff. ¶ 7; Zaleski Decl. ¶ 13; St. Angel Aff. ¶ 8; Laduca Aff. ¶ 6.  Insurers next group the risks they have identified in a way that allows them to establish fair rates, consistent with the obligations imposed by state law.  *See* Meek Aff. ¶ 6; Hirschfeld Decl. ¶¶ 4-6.  The viability of insurers' products depends on their accurate and impartial evaluation of risk.  *See* Hirschfeld Decl. ¶ 6; Hayward Aff. ¶ 9.  Membership in a protected class is not an actuarially significant factor within the meaning of state law or actuarial practice, and it plays no role in insurers' underwriting and rating decisions.  *See* Meek Aff. ¶ 9; Hayward Aff. ¶ 9; Hirschfeld Decl. ¶ 6; North Dakota Joint Aff. ¶ 7; Priest Aff. ¶ 6; Shaw Aff. ¶ 5; Zaleski Decl. ¶ 11.

The Disparate-Impact Rule fundamentally alters that system.  As this Court has already recognized, in order to determine whether their practices are resulting in or perpetuating a disparate impact, insurers would need to "collect and analyze certain types of race-based data on their clients and prospective clients"—a practice that is "expressly prohibited in many [S]tates."  Amended Mem. Op., Dkt. 47, at 26-27 & nn.27 & 28 (Nov. 7, 2014); *see also* Hayward Aff. ¶¶ 16-17; Lloyd Aff. ¶¶ 6, 8.  Insurers would first need to analyze whether state law allows them to collect data on protected characteristics.  *See* Meek Aff. ¶ 13; Priest Aff. ¶ 12; Shaw Aff. ¶ 6; Thames Aff. ¶ 9; Laduca Aff. ¶ 10; *see also* Hayward Aff. ¶ 19.  If it did, they would need to decide how to collect the data from existing and prospective policyholders.  *See* Christy Aff. ¶ 5; Hirschfeld Decl. ¶ 7; North Dakota Joint Aff. ¶ 10; Priest Aff. ¶ 9; Shaw Aff. ¶ 7; Wells Aff. ¶¶ 8-10, 13.  Insurers would then need to determine how to store the data they collected, and, if necessary, how to build new data-retention and management systems.  *See* Shaw Aff. ¶ 8; Priest

Aff. ¶ 10.[2]  Insurers would next need to analyze what, if anything, state law allows them to do with the data about protected characteristics that they collect.  *See* Hirschfeld Decl. ¶ 11; North Dakota Joint Aff. ¶ 11; Priest Aff. ¶¶ 12-13; Thames Aff. ¶ 12.  Assuming that insurers could lawfully use data about the race and other protected characteristics of their insureds, they would need to use those data to identify any disparities between the various protected groups.  Then, assuming that insurers could lawfully take data about protected characteristics into account in their decisionmaking, they would need to devise new underwriting and rating models that some-how took protected characteristics into account and eliminated any statistical disparities the data revealed.  *See* Hirschfeld Decl. ¶¶ 11, 13; Benseler Aff. ¶ 7; Forstenzer Aff. ¶¶ 9-10; Zaleski Decl. ¶¶ 18-20; Meek Aff. ¶¶ 14-15; St. Angel Aff. ¶ 13.

It is not hard to see how the Disparate-Impact Rule necessarily injects consideration of race into the currently race-blind underwriting and ratemaking processes.  And it puts insurers in an obvious bind.  Any risk factor that disproportionately affects a protected group could trigger a disparate-impact claim under the Rule.  At the same time, changing risk factors or rates because of the impact on protected groups could make the insurer's rates unfairly discriminatory, thereby violating sound insurance practice and state law.  Of course, explicit consideration of race could violate state and federal laws prohibiting differential treatment based on race or membership in a

---

[2] To take those steps, insurers would have to expend substantial resources.  *See* Christy Aff. ¶¶ 6-10; Hirschfeld Decl. ¶¶ 8-9; North Dakota Joint Aff. ¶ 10; Priest Aff. ¶¶ 9-10; Shaw Aff. ¶ 8; Benseler Aff. ¶¶ 7-9; Forstenzer Aff. ¶¶ 7-11; Wells Aff. ¶¶ 13-15; Hayward Aff. ¶ 12; St. Angel Aff. ¶ 10; Laduca Aff. ¶ 10.  Compliance departments, for example, would need to dedi-cate attorney time to determine whether and how insurers may collect data on race and other pro-tected characteristics under state law.  *See* Christy Aff. ¶¶ 6-7; Priest Aff. ¶ 12; Thames Aff. ¶ 9.  Information-technology personnel would need to design and build any necessary systems to house the newly collected data—and insurers would have to buy any related materials, including computer hardware and software.  *See* Hirschfeld Decl. ¶ 8; Priest Aff. ¶ 10; Shaw Aff. ¶ 8; Thames Aff. ¶ 11; Hayward Aff. ¶ 12; St. Angel Aff. ¶ 10.  And, of course, insurers would have to design and conduct surveys to collect the data.  *See* Christy Aff. ¶ 8; Hirschfeld Decl. ¶ 9; Shaw Aff. ¶ 7; Hayward Aff. ¶ 12; St. Angel Aff. ¶ 10.

protected class (*i.e.*, disparate treatment); intentionally using race in ratemaking could even expose insurers to punitive damages, *see* Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(II), and criminal liability, *see* S.D. Codified Laws § 58-11-55.   In States that require prior approval of rates, moreover, an insurer could be put in the odd and untenable position of telling the State that it considered race explicitly in the ratemaking process.  *See, e.g.*, Hirschfeld Decl. ¶ 5 (describing New Jersey prior approval requirement); Zaleski Decl. ¶¶ 16-17 (describing States' prior approval process).

In short, disparate-impact claims are in "inevitable and irreconcilable conflict" with core insurance principles because they require insurers to consider race, not risk, in their rating and underwriting decisions.  Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 277 (2009); *see* Amended Mem. Op., Dkt. 47, at 28 (noting that, "to ensure that their facially neutral underwriting practices do not result in any disparate outcomes amongst protected groups, insurers would be required to turn a blind eye to established actuarial principles in favor of race-based insurance decisions"); Hayward Aff. ¶¶ 15, 17.  Disparate-impact liability would force insurers to take into account factors not correlated to risk in order to avoid causing or perpetuating a disparate impact on insureds who are members of protected classes.  That, in turn, would cause rates to be based on factors other than an insured's risk profile—namely, membership in a protected class.  Not only would that outcome threaten the viability of the insurance system, and be unfairly discriminatory under established actuarial standards and state law, but it would "cause race to be used and considered in a pervasive way," in violation of the FHA.  *Inclusive Communities*, 135 S. Ct. at 2523.

2.     Because it would require the consideration of race, construing the FHA to permit disparate-impact liability against insurers also would raise serious constitutional concerns.  When

a law or rule "compels race-based [decisions], it by definition raises a serious constitutional question." *Miller* v. *Johnson*, 515 U.S. 900, 923 (1995) (citing *Regents of University of California* v. *Bakke*, 438 U.S. 265, 291 (1978) (opinion of Powell, J.)).  And it is a "cardinal principle" of statutory construction that, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."  *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988). Similarly, courts "reject[] agency interpretations to which [they] would otherwise defer" when the interpretations "raise serious constitutional questions."  *Miller*, 515 U.S. at 923.

Applying the Disparate-Impact Rule to insurers raises serious constitutional concerns because—as explained above—the Rule compels insurers to "use[] and consider[] [race] in a pervasive way." *Inclusive Communities*, 135 S. Ct. at 2523.[3]  By "plac[ing] a racial thumb on the scales[,]  .  .  .  [the Disparate-Impact Rule] require[s] [insurers] to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes." *Ricci* v. *DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring).  That type of racial decisionmaking is indisputably discriminatory, *see id.* at 579-580 (majority opinion), and the Supreme Court has expressly reserved the question whether such discriminatory treatment, even if motivated by "a legitimate fear of disparate impact," could survive constitutional scrutiny, *id.* at 584.  More broadly, the Disparate-Impact Rule, as it applies to insurers, violates the command "[a]t the heart of the Constitution's guarantee of equal protection" that "the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class."  *Miller*,

---

[3] The constitutional implications of the Disparate-Impact Rule are not limited to the context of race; by its terms, the Rule also implicates other constitutionally protected characteristics such as sex and religion.  *See* 24 C.F.R. § 100.500(a)

515 U.S. at 911 (internal quotation marks and citation omitted).  Because the Disparate-Impact Rule requires insurers to take race and other protected classes into account when making rating and underwriting decisions, it "demand[s] the very racial stereotyping the Fourteenth Amendment forbids." *Id.* at 928.

By requiring insurers to take race and other protected characteristics into account in their decisionmaking when they otherwise would not, the Disparate-Impact Rule perversely *causes* insurers to adopt "race-based considerations rather than mov[ing] beyond them." *Inclusive Communities*, 135 S. Ct. at 2524.  In so doing, the Rule undermines the very purpose of the Fair Housing Act by increasing, rather than reducing, the salience of race and other protected characteristics in housing decisions. *Cf. Shays*, 528 F.3d at 925 (holding that courts must reject administrative constructions that "frustrate the policy that Congress sought to implement" in a statute (internal quotation marks omitted)).

As a result, applying the Disparate-Impact Rule to insurers "by definition raises a serious constitutional question and should not receive deference." *Miller*, 515 U.S. at 923.  Racial classifications "are contrary to our traditions and hence constitutionally suspect." *Fisher* v. *University of Texas at Austin*, 133 S. Ct. 2411, 2418 (2013) (internal quotation marks and citation omitted).  For that reason, laws making racial classifications must "be subjected to the most rigid scrutiny." *Id.* at 2419 (internal quotation marks and citation omitted).  Defendants have not attempted to tailor the Rule to avoid that serious constitutional concern; the FHA cannot validly be construed to impose disparate-impact liability on insurers. *See AFL-CIO*, 333 F.3d at 179.  Courts should "not lightly assume that Congress intended to infringe constitutionally protected liberties" or to authorize executive agencies to do so. *Edward J. DeBartolo Corp.*, 485 U.S. at

20

575.  Because it would mandate the consideration of race and other protected characteristics, the Disparate-Impact Rule cannot lawfully apply to insurers' ratemaking and underwriting practices.

**B.    The Disparate-Impact Rule Is Unlawful As Applied To Insurers' Ratemaking And Underwriting Decisions Because State Law Limits Insurers' Discretion Over Those Decisions**

Disparate-impact liability under the FHA incorporates "[a] robust causality requirement" to prevent defendants from "being held liable for racial disparities they did not create." *Inclusive Communities*, 135 S. Ct. at 2523.  A disparate-impact claim under the statute thus cannot lie when a "law substantially limits the [defendant's] discretion," because the law breaks the "causal connection" between the challenged policy and the allegedly disparate impact. *Id.* at 2524.  That limitation forecloses disparate-impact claims based on insurers' rating and underwriting decisions.  The insurance laws of every State circumscribe insurers' ability to consider protected characteristics such as race when making rating and underwriting decisions.  As a result, any disparate-impact claim based on underwriting and rating practices necessarily fails.

1.    In every State, the law restricts insurers' discretion to consider factors such as race, religion, and national origin.  Most States' insurance laws address ratemaking and underwriting directly, specifying that "no risks may be grouped by classifications based in whole or in part on race, color, creed, or national origin of the risk."  Ark. Code Ann. § 23-67-209(b); *see also* Alaska Stat. § 21.36.460(d)(4); Ariz. Rev. Stat. Ann. § 20-384; Cal. Ins. Code § 679.71; Colo. Rev. Stat. § 10-3-1104; Del. Code Ann. tit. 18, § 2304(22); Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(I); Haw. Rev. Stat. § 431:14-103; 215 Ill. Comp. Stat. 5/424(3); Iowa Code § 515F.4(3); Kan. Stat. Ann. § 40-954(c); Me. Rev. Stat. tit. 24-A, § 2303(1)(G); Md. Code Ann. Ins. § 27-501; Minn. Stat. Ann. § 70A.5(2); Miss. Code Ann. § 83-2-3; Mont. Code Ann. § 33-18-210(5); Neb. Rev. Stat. § 44-7510(3); Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. Ann. § 412:15(II)(b); N.J. Stat. Ann. § 17:29B-4(7)(c)-(d); N.M. Stat. Ann. § 59A-17-7; N.Y. Ins.

Law § 2606; N.C. Gen. Stat. Ann. § 58-3-25(c); N.D. Cent. Code § 26.1-25-03; Okla. Stat. Ann. tit. 36, § 985; 40 Pa. Cons. Stat. Ann. § 1171.5(7); R.I. Gen. Laws § 27-44-5; S.C. Code Ann. § 38-75-1210(B)(1); Tex. Ins. Code Ann. § 544.002; Utah Code Ann. § 31A-19a-202(3); Vt. Stat. Ann. tit. 8, § 4724(7)(B); Wash. Rev. Code § 48.30.300; Wis. Stat. § 625.12; Wyo. Stat. Ann. § 26-14-105(b); D.C. Code § 31-2231.13(d).  Other States' insurance laws prohibit insurers from considering membership in a protected class "when deciding whether to provide, renew, or cancel homeowners insurance."  Mass. Gen. Laws Ann. ch. 175, § 4C; *see also* Conn. Gen. Stat. § 38a-816(12)-(13); Fla. Stat. § 626.9541; Ind. Code § 27-7-12-7; Ky. Rev. Stat. Ann. § 304.12-085; La. Stat. Ann. § 22:1964(7)(f); Mich. Comp. Laws § 500.2027; Mo. Rev. Stat. § 375.936(11)(g); S.D. Codified Laws § 58-11-55; Tenn. Code Ann. § 56-8-104(7)(F); Va. Code Ann. § 38.2-1904(A); W. Va. Code § 33-17A-6.  And a third group of States has adopted insurance laws that generally prohibit "unfairly discriminatory" rates.  *E.g.*, Idaho Code § 41-1405; *see also* Ala. Code § 27-13-27; Ohio Rev. Code Ann. § 3935.03; Or. Rev. Stat § 737.310.  In each of those States, administrative interpretations or other sources of law make clear that insurers may not differentiate among their insureds on the basis of membership in a protected class. *See*, *e.g.*, Ala. Admin. Code r. 482-1-074-03; Idaho Admin. Code r. 18.01.51.011; Ohio Rev. Code. Ann. § 4112.02; Or. Admin. Rules 836-081-0010.

In addition, many States have overlapping laws that expressly allow insurers to make distinctions based on "differences among risks that can be demonstrated to have a probable effect upon losses or expenses."  W. Va. Code § 33-20-3(c)(2); *see also*, *e.g.*, Alaska Stat. § 21.39.030; Ariz. Rev. Stat. Ann. § 20-384; Ark. Code Ann. § 23-67-209; Colo. Rev. Stat. § 10-4-403(1)(c); Conn. Gen. Stat. § 38a-686; Haw. Rev. Stat. § 431:14-103; Iowa Code § 515F.4; Kan. Stat. Ann. § 40-954; Ky. Rev. Stat. Ann. § 304.13-031; Me. Rev. Stat. tit. 24-A, § 2303(2); Minn. Stat.

Ann. § 70A.5(2); Miss. Code Ann. § 83-2-3; Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. Ann. § 412:15(II)(b); N.M. Stat. Ann. § 59A-17-7; N.D. Cent. Code § 26.1-25-03; Ohio Rev. Code Ann. § 3935.03; Utah Code Ann. § 31A-19a-202(3); Vt. Stat. Ann. tit. 8, § 4724(7)(B); Va. Code Ann. § 38.2-1904(A)(3); Wis. Stat. Ann. § 626.12(2); Wyo. Stat. Ann. § 26-14-105(b).

2.      Courts interpreting the foregoing state laws routinely recognize that it would be at cross-purposes with state insurance regulation to permit disparate-impact claims. *See Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961, 967 (8th Cir. 2008); *Nationwide Mutual Insurance Co.* v. *Cisneros*, 52 F.3d 1351, 1361 (6th Cir. 1995); *NAACP*, 978 F.2d at 290-291; *see also Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 300 (5th Cir. 2003) (Jones, J., concurring in part and dissenting in part). In *Saunders*, for example, the Eighth Circuit affirmed the dismissal of a claim alleging a disparate impact in the pricing of homeowner's insurance because disparate-impact liability would interfere with Missouri's comprehensive regulatory regime. 537 F.3d at 967-968. The court noted that Missouri law required insurers to establish rates based on economic factors essential to insurer solvency, such as loss experience, and further permitted insurers to classify risks based on standards that "measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses." *Id.* at 967 (quoting Mo. Rev. Stat. § 379.318(2)). The court reasoned that allowing a federal court to "determine that the [i]nsurers' filed rates are unlawful using [the] different federal standard [of] disparate racial impact" would improperly interfere with state law and, in particular, with the ratemaking authority of the state insurance commissioner. *Id.* at 968.

3.      Because state law "substantially limits" insurers' discretion when it comes to ratemaking and underwriting, it severs the causal connection between insurers' ratemaking and underwriting decisions and any resulting disparate impact. *Inclusive Communities*, 135 S. Ct. at

2524.  As explained above, state law prohibits insurers from making classification and rating deci-sions that take into account membership in protected groups.  *See* pp. 5-7, 21-23, *supra*.  Those state-law limitations on insurers' ratemaking and underwriting practices sever the causal connec-tion between those practices and allegedly disparate impacts.  Disparate-impact claims based on those practices are therefore not cognizable.  *Inclusive Communities*, 135 S. Ct. at 2524.  For that additional reason, the Disparate-Impact Rule is unlawful as applied to insurers' underwriting and ratemaking practices.

## C.    The Disparate-Impact Rule Is Unlawful Because It Allows Claims To Proceed Based Entirely On Statistics

1.    As noted above, the disparate-impact requirement of the FHA incorporates a "ro-bust causality requirement [that] ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact."  *Inclusive Communities*, 135 S. Ct. at 2523 (internal quota-tion marks omitted).  Another consequence of that causality requirement is that defendants may not be "held liable for racial disparities they did not create."  *Id.*  As a result, a disparate-impact claim under the FHA that "relies on a statistical disparity" cannot proceed "if the plaintiff cannot point to a defendant's policy or policies causing that disparity."  *Id.*  That limitation is crucial.  If racial disparity alone established a prima facie case of disparate impact, potential defendants would almost inexorably rely on "racial quotas"—"a result that Congress and [the Supreme] Court have rejected repeatedly in the past."  *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 652-653 (1989); *accord Inclusive Communities*, 135 S. Ct. at 2523.

2.    The Disparate-Impact Rule flouts that statutory limitation.  In order to make a prima facie showing of disparate impact under the Rule, a plaintiff need only demonstrate that "a challenged practice caused or predictably will cause a discriminatory effect."  24 C.F.R. § 100.500(c)(1).  In the final version of the Rule, HUD made clear its view that a plaintiff need

*not* identify a specific policy that is alleged to cause the disparity. HUD received two comments "stat[ing] that, in order to establish a prima facie case of discriminatory effect liability, a charging party should have to identify a specific practice and show the alleged discriminatory effect is caused by that specific practice." 78 Fed. Reg. 11,469. But HUD disagreed. "Under this rule," it wrote, whether a party must "identify[] the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis." *Id.*

HUD also made clear its view that a plaintiff may establish a prima facie case of disparate impact under the Rule using only statistical evidence showing the existence of a disparity. Before HUD issued the Rule, "[a] commenter expressed concern that the language in [the proposed rule] would allow for lawsuits based only on statistical data." 78 Fed. Reg. 11,478. But HUD confirmed that interpretation, replying that a plaintiff could make its prima facie case based on statistical data alone. *Id.*

3.      The difference between disparate-impact claims authorized by the FHA and the disparate-impact claims envisioned by HUD's Rule is substantial. The Disparate-Impact Rule envisions prima facie liability based entirely on a showing of statistical disparity, even if there is no evidence of causation. The FHA forecloses that approach. *Inclusive Communities*, 135 S. Ct. at 2523. This difference is significant, and it has an especially harsh effect on insurers.

Rating and underwriting decisions illustrate the point. Suppose that Asian-American residents predominantly inhabit the coastal part of a city, while black residents primarily inhabit the inland section. The former part of town has unusually high rates of wind damage from hurricanes, while the latter part of town does not; properties in the two areas are otherwise similar.

Statistics reveal that insurers charge individuals living in the predominantly Asian-American area higher insurance rates.

If a group of Asian-American plaintiffs brought a claim under the Disparate-Impact Rule, they could succeed at the prima facie stage simply by pointing to the statistical disparity in insurers' rates, without any showing of causation.  The insurer, then, would face the burden of analyzing its rating and underwriting models and data to determine which actuarially significant risk factor caused the statistical deviation.  The insurer then would have to collect evidence explaining why its rating classifications were necessary to achieve a substantial, legitimate, nondiscriminatory interest and explaining why another practice could not also serve that interest.  That process is expensive and time-consuming, even when the answer is relatively simple (as in this hypothetical).  Under the more limited scope of disparate-impact liability under the FHA, however, such a claim would fail at the outset unless the plaintiffs could "point to a defendant's policy or policies causing that disparity."  *Inclusive Communities*, 135 S. Ct. at 2523.  And even if the plaintiffs specifically challenged the insurer's decision to take wind damage from hurricanes into account, the insurer would face substantially fewer burdens in defending against that more targeted suit.  Such a standard, unlike the much lower standard of the Disparate-Impact Rule, "protect[s] potential defendants against abusive disparate-impact claims."  *Id.* at 2524.

Because the Disparate-Impact Rule is inconsistent with the crucial causality requirement for disparate-impact liability under the FHA, it is unlawful and should be vacated.

### D.    The Disparate-Impact Rule Is Unlawful Because It Allows Plaintiffs To Displace Valid Policies

1.    Finally, "[g]overnmental or private policies are not contrary to the disparate-impact requirement [of the FHA] unless they are artificial, arbitrary, and unnecessary barriers." *Inclusive Communities*, 135 S. Ct. at 2524 (internal quotation marks omitted).  The Supreme

Court has explained that disparate-impact liability under the FHA is not a tool for plaintiffs to force defendants to "reorder their priorities" or to "displace valid governmental and private priorities." *Id.* at 2522, 2524. Instead, the disparate-impact requirement is intended "solely" to remove artificial, arbitrary, and unnecessary barriers; claims that are no more than "an attempt to second-guess which of two reasonable approaches" a defendant should follow are not cognizable. *Id.* at 2522.

2.    The Disparate-Impact Rule ignores that limitation on disparate-impact liability by imposing a flawed burden-shifting test. Under the Rule, a plaintiff first has the burden to make a prima facie case of disparate-impact liability by demonstrating "that a challenged practice caused or predictably will cause a discriminatory effect," 24 C.F.R. § 100.500(c)(1), as that factor is interpreted by HUD, *see* pp. 24-25, *supra*. If the plaintiff meets that burden, the defendant must show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 24 C.F.R. § 100.500(c)(2). Once the defendant makes that showing, the plaintiff "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice *could be served* by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3) (emphasis added).

Crucially, the Disparate-Impact Rule does not require that the plaintiffs' preferred alternative practice achieve the defendant's concededly valid interest as effectively as the challenged practice. In fact, HUD expressly rejected such a requirement. A commenter suggested that, "in order for [disparate-impact] liability to attach," HUD should require that "the alternative practice . . . be equally effective as the challenged practice, or at least as effective as the challenged practice." 78 Fed. Reg. 11,473. But HUD brushed that suggestion aside, stating that it did "not believe the rule's language need[ed] to be" revised. *Id.*

27

3.    The Supreme Court's decision in *Inclusive Communities* shows that HUD was wrong.  As written, the Disparate-Impact Rule allows private plaintiffs to "second-guess which of two reasonable approaches" a defendant should follow.  *Inclusive Communities*, 135 S. Ct. at 2522.  The Rule thus allows plaintiffs to displace all manner of valid policy choices rather than solely removing "artificial, arbitrary, and unnecessary barriers."  *Id.* at 2524 (internal quotation marks omitted).

Again, a hypothetical from the insurance context illustrates the problem.  Consider a claim that an insurer's rates for customers of a particular religion in a certain city were disproportionately high.  The plaintiff could make out its prima facie case simply by showing a statistical disparity.  *See* p. 24-26, *supra*.  The insurer might respond that adherents of the particular religion are concentrated in a certain part of the city: for example, around their place of worship.  The homes in the relevant part of the city rely on wood-burning stoves for heat.  That, in turn, raises a substantial risk of fire and thus leads the insurer to charge higher rates.  By pointing to the risk of loss through fire, the insurer has shown that its "challenged practice"—charging a higher rate—"is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests"—fairly reflecting the risk insured.  24 C.F.R. § 100.500(c)(2).  Even after the insurer made that showing, however, the plaintiff still might prevail under the Rule by pointing out that there are several fire stations near the insured properties, and insisting that the insurer charge rates based on the proximity of fire stations, not the condition of the insured property.  To be sure, the proximity of fire stations is relevant; it mitigates the severity of loss through fire and therefore lowers the insurer's expected loss.  But it is nowhere near as effective in furthering the insurer's legitimate goal of setting a rate that reflects the insured risk.

Under the Disparate-Impact Rule, the plaintiff's claim would succeed.  But under the disparate-impact requirement of the FHA, it should fail, because the choice to set a rate based on the condition of the property is not an "artificial, arbitrary, and unnecessary barrier[]."  *Inclusive Communities*, 135 S. Ct. at 2524 (internal quotation marks omitted).  As such, the choice between two valid factors for setting rates is properly left to the insurers and cannot be displaced by a plaintiff on disparate-impact grounds.  The Disparate-Impact Rule, however, ignores that limitation and improperly authorizes disparate-impact claims that stretch far beyond the bounds of the statute.  For that reason, as well, the Rule is unlawful and should be vacated.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted and the Disparate-Impact Rule vacated.

Respectfully submitted,

By:  /s/Kannon K. Shanmugam
     Kannon K. Shanmugam (#474304)
     Allison B. Jones (#991503)
     A. Joshua Podoll (#1011743)
     WILLIAMS & CONNOLLY LLP
     725 Twelfth Street, N.W.
     Washington, DC 20005
     Telephone:  (202) 434-5000
     Facsimile:  (202) 434-5029

     *Counsel for Plaintiffs*

June 30, 2016