## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN INSURANCE ASSOCIATION and NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and JULIAN CASTRO, in his official capacity as Secretary of Housing and Urban Development,<br><br>Defendants. | Civil Action No. 13-cv-966 (RJL) |

**AMICI CURIAE BRIEF OF AMERICAN BANKERS ASSOCIATION, AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER BANKERS ASSOCIATION, CONSUMER MORTGAGE COALITION, FINANCIAL SERVICES ROUNDTABLE, INDEPENDENT COMMUNITY BANKERS OF AMERICA®, AND MORTGAGE BANKERS ASSOCIATION IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Paul F. Hancock (D.C. Bar No. 159327)
K&L GATES LLP
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
(305) 539-3300
paul.hancock@klgates.com

John Longstreth (D.C. Bar No. 367047)
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
(202) 778-9000
john.longstreth@klgates.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ...................................................................................1

SUMMARY OF ARGUMENT ...............……….................................................................3

ARGUMENT ..............................................................................................................4

      THE RULE MUST BE VACATED BECAUSE HUD EXCEEDED ITS
      AUTHORITY AND ACTED CONTRARY TO LAW WHEN IT REJECTED
      THE DISPARATE-IMPACT STANDARD IMPOSED BY THE SUPREME
      COURT. .....................................................................................................4

          A.    HUD Is Bound by Supreme Court Precedent Defining the Standard for
                Disparate-Impact Claims under the Fair Housing Act.............................................4

          B.    HUD Impermissibly Rejected the *Wards Cove* Standard for Disparate-
                Impact Liability under the Fair Housing Act. ...........................................................9

          C.    HUD's Decision to Announce the 1991 Amendments to Title VII as the
                Standard for Disparate Impact under the Fair Housing Act Amounts to an
                Unauthorized and Unlawful Agency Action.........................................................11

          D.    The Disparate-Impact Rule (i.e., the Standard of the 1991 Amendments to
                Title VII) Is a Substantial Departure from *Wards Cove*. ......................................13

          E.    HUD Lacks Authority to Cherry-Pick Portions of the Disparate-Impact
                Standard Congress Enacted to Supersede *Wards Cove* in Title VII Claims..........15

CONCLUSION................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Pharmaceutical Association v. Mathews*,
530 F.2d 1054 (D.C. Cir. 1976) .............................................................5, 12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ...............................................................................5, 6, 9

*Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*,
333 U.S. 103 (1948) .................................................................................5, 12

*Encino Motorcars, LLC v. Navarro*,
579 U.S. ---, 2016 WL 3369424 (2016) ....................................................3, 10

*Gross v. FBL Financial Services, Inc.*,
557 U.S. 167 (2009) ............................................................................8, 9, 11

*Lakeland Bus Lines, Inc. v. N.L.R.B.*,
347 F.3d 955 (D.C. Cir. 2003) ........................................................................17

*Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*,
497 U.S.116 (1990) ............................................................................................5

*Neal v. United States*,
516 U.S. 284 (1996) ...........................................................................................5

*Northcross v. Board of Education of Memphis City Schools*,
412 U.S. 427 (1973) (per curiam) ...................................................................6

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999) ......................................................................................7, 12

*Smith v. City of Jackson, Mississippi*,
544 U.S. 228 (2005) ..........................................................................6, 7, 8, 11

*Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*,
135 S. Ct. 2507 (2015) ............................................................................. passim

*University of Great Falls v. N.L.R.B.*,
278 F.3d 1335 (D.C. Cir. 2002) ........................................................................6

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989) ................................................................................. passim

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................3, 17

5 U.S.C. § 706(2)(C) ............................................................................................3

29 U.S.C. § 628 ..................................................................................................12

42 U.S.C. § 1981a(1) ..........................................................................................16

42 U.S.C. § 1981a(2) ..........................................................................................16

42 U.S.C. § 2000e-2(k)(1)(A) ..............................................................................7

42 U.S.C. § 2000e-2(k)(1)(B) ..............................................................................7

42 U.S.C. § 3605 ..................................................................................................2

42 U.S.C. § 3614a ................................................................................................4

**Other Authorities**

137 Cong. Rec. S15219 ......................................................................................17

*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78
    Fed. Reg. 11,460 (Feb. 15, 2013) ...................................................... *passim*

*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76
    Fed. Reg. 70,921 (Nov. 16, 2011) .....................................................9, 11

## INTEREST OF *AMICI CURIAE*

The American Bankers Association ("ABA"), the American Financial Services Association ("AFSA"), the Consumer Bankers Association ("CBA"), the Consumer Mortgage Coalition ("CMC"), the Financial Services Roundtable ("FSR"), the Independent Community Bankers of America® ("ICBA"), and the Mortgage Bankers Association ("MBA") (collectively, "*amici*") respectfully submit this *amici curiae* brief in support of summary judgment for Plaintiffs.[1]

- The ABA is the principal national trade association of the financial services industry in the United States. Founded in 1875, the ABA is the voice for the nation's $13 trillion banking industry and its million employees. ABA members are located in each of the fifty States and the District of Columbia, and include financial institutions of all sizes and types, both large and small. ABA members hold a substantial majority of domestic assets of the banking industry of the United States and are leaders in all forms of consumer financial services.

- AFSA is the national trade association for the consumer credit industry protecting access to credit and consumer choice. Its members include traditional installment lenders, vehicle finance/leasing companies, consumer and commercial finance companies, mortgage lenders, credit card issuers, industrial banks, and industry suppliers.

- CBA is the trade association for today's leaders in retail banking—banking services geared toward consumers and small businesses. CBA's Corporate Members (the nation's largest financial institutions, as well as many regional banks) collectively hold two-thirds of the industry's total assets. CBA's Associate Members represent the premier providers of goods and services to banks. CBA preserves and promotes the retail banking industry as it strives to fulfill the financial needs of the American consumer and small business.

- The CMC is a trade association of national residential mortgage lenders, servicers, and service providers. CMC was formed in 1995, and its members participate in every stage of the home financing process.

- As *advocates for a strong financial future*™, FSR represents 100 integrated financial services companies providing banking, insurance, and investment products and services to the American consumer. Member companies participate through the Chief Executive

---

[1] No counsel for any party authored this brief in whole or in part, and no counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. No person or entity other than *amici curiae*, their respective members, and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

Officer and other senior executives nominated by the CEO. FSR member companies provide fuel for America's economic engine, accounting directly for $98.4 trillion in managed assets, $1.1 trillion in revenue, and 2.4 million jobs.

- ICBA, a national trade association, is the voice for more than 6,000 community banks of all sizes and charter types and is dedicated exclusively to representing the interests of the community banking industry and its membership. ICBA member community banks seek to improve cities and towns by using local dollars to help families purchase homes and are actively engaged in the business of residential mortgage lending in the communities that they serve.

- The MBA is the national association representing the real estate finance industry, an industry that employs more than 280,000 people in virtually every community in the country. Headquartered in Washington, D.C., the association works to ensure the continued strength of the nation's residential and commercial real estate markets, to expand homeownership, and to extend access to affordable housing to all Americans. Its membership of over 2,200 companies includes all elements of real estate finance, including mortgage companies, mortgage brokers, commercial banks, thrifts, Wall Street conduits, and life insurance companies.

*Amici*'s members are subject to Section 805 of the Fair Housing Act, which prohibits discrimination in residential real estate-related transactions. 42 U.S.C. § 3605. *Amici* and their members vigorously support the Fair Housing Act and strongly oppose discrimination in any aspect of housing or lending. And *amici* have serious concerns that in promulgating the Rule at issue, the U.S. Department of Housing and Urban Development ("HUD" or "Agency") adopted an incorrect and improper standard for disparate-impact liability under the Fair Housing Act—a standard that is inconsistent with *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989),[2] and that ignores the limitations on the application of disparate-impact claims required by *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) ("Inclusive Communities"). *Amici* and their members have an interest in the disposition of this case, as Plaintiffs' challenge to the Disparate-Impact Rule raises many issues

---

[2] *Amici* describe at § D, *infra,* the many and substantial ways in which the standard adopted by HUD in the Rule varies from the governing disparate-impact standard articulated by the Supreme Court in *Wards Cove*.

that *amici*'s members face in complying with the Fair Housing Act and the Rule.  In particular,

the Rule substantially increases both the risk and cost of litigation well beyond that which

*amici*'s members would face in complying with governing Supreme Court precedent.

## SUMMARY OF ARGUMENT

Plaintiffs have demonstrated convincingly that HUD violated the Administrative

Procedure Act in promulgating the Rule addressing the standard for disparate-impact liability

under the Fair Housing Act.  *See* Final Rule, *Implementation of the Fair Housing Act's*

*Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) ("Disparate-Impact Rule"

or "Rule").  The Rule exceeds the Agency's "statutory jurisdiction, authority, or limitations," 5

U.S.C. § 706(2)(C)), and is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in

accordance with law," 5 U.S.C. § 706(2)(A).

*Amici* support, without repeating, the arguments that Plaintiffs present and seek to

amplify and expand the arguments regarding the fundamental legal flaws of the Rule as applied

to all businesses in the United States engaged in the housing industry.

From the outset, in promulgating the Rule, HUD disregarded binding Supreme Court

precedent guiding the application of disparate-impact liability in discrimination lawsuits,

including, in particular, the standard established by the Court in *Wards Cove*.  Although

commenters to the Proposed Rule carefully outlined the proper legal standard for disparate-

impact claims under the Fair Housing Act, HUD unlawfully rejected those comments out-of-

hand and without explanation.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. ---, 2016 WL

3369424, at *7 (2016) ("One of the basic procedural requirements of administrative rulemaking

is that an agency must give adequate reasons for its decisions;" "where the agency has failed to

provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot

carry the force of law.").  Rather than implement the standard the Supreme Court requires, HUD

improperly grafted the standard Congress enacted only for disparate-impact claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII") onto disparate-impact claims brought under the Fair Housing Act.

HUD erred, and exceeded its authority, in multiple respects.  In particular, the Agency exceeded its authority in rejecting the standard that under Supreme Court precedent applies to Fair Housing Act discrimination claims based on a disparate-impact theory.  HUD, an executive-branch agency, lacks the authority to legislate and thus could not adopt a disparate-impact standard that required an act of Congress when implemented for Title VII claims.

Even if HUD somehow had the authority (which it did not) to adopt the standard enacted by Congress for Title VII, HUD abused its authority by cherry-picking only those portions of the standard that HUD desired while omitting a crucial limitation imposed by Congress, namely that the standard would apply only to disparate-impact claims that did not seek monetary damages. Congress required a plaintiff to show discriminatory *intent* to recover money damages under Title VII, but the Rule does not; it purportedly allows disparate-impact claims under the Fair Housing Act even if they focus solely on money damages.

These errors, individually and in combination, require that the Rule be vacated.

## ARGUMENT

**THE RULE MUST BE VACATED BECAUSE HUD EXCEEDED ITS AUTHORITY AND ACTED CONTRARY TO LAW WHEN IT REJECTED THE DISPARATE-IMPACT STANDARD IMPOSED BY THE SUPREME COURT.**

### A.    HUD Is Bound by Supreme Court Precedent Defining the Standard for Disparate-Impact Claims under the Fair Housing Act.

Section 815 of the Fair Housing Act authorizes HUD to "make rules … to carry out this subchapter" after "giv[ing] public notice and opportunity for comment."  42 U.S.C. § 3614a.  As with any rule promulgated by an executive agency, HUD's authority is limited to defining the

application of the Fair Housing Act in a manner consistent with judicial precedent. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 865 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").  It is beyond question that the Agency has no authority to alter the judicial interpretation of a statute as Congress might choose to do. *See, e.g., Neal v. United States,* 516 U.S. 284, 290, 295 (1996) ("Petitioner concedes, as he must, that the Commission does not have the authority to amend the statute we construed in [a prior case];" court gave no deference to an agency rule that "cannot be squared with" with the court's prior interpretation of the statute and overturned it); *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S.116, 131, 134-35 (1990) ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis,* and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning. … Although the Commission has both the authority and expertise generally to adopt new policies when faced with new developments in the industry, it does not have the power to adopt a policy that directly conflicts with its governing statute." (citation omitted)); *Chicago & So. Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 113-14 (1948) ("It has also been the firm and unvarying practice of Constitutional Courts to render no judgments not binding and conclusive on the parties and none that are subject to later review or alteration by administrative action.").

Nor is it of any moment that HUD may believe its Rule to be good policy if the Agency lacks authority under the statute to prescribe it, as only Congress can provide that authority. *See Am. Pharm. Ass'n v. Mathews,* 530 F.2d 1054, 1056 (D.C. Cir. 1976) ("[T]he FDA undoubtedly has genuine cause to believe that … effective regulation in the public interest necessitates [the asserted] authority on its part ….  Under the present statutory framework, however, I believe that

argument must be addressed to Congress.") (McGowan, J., concurring).  And HUD likewise is owed no deference in its interpretation of Supreme Court precedent, which is a matter for courts, not agencies.  *See Univ. of Great Falls v. N.L.R.B.,* 278 F.3d 1335, 1341 (D.C. Cir. 2002) ("We are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle." (internal quotation omitted)).

In this regard, HUD was not operating on a clean slate in articulating the application of disparate impact under the Fair Housing Act when it promulgated the Rule.  Indeed, significant Supreme Court precedent existed to both direct HUD and limit the reach of its rulemaking, precedent arising largely from the *Wards Cove* Court's interpretation of Title VII disparate-impact claims.[3]

The basic prohibitory language of Title VII, before its amendment by Congress in 1991, is similar to that of the Fair Housing Act.  The Supreme Court recognized the "similarity in text and structure" between the two statutes in *Inclusive Communities*.  135 S. Ct. at 2519.  The Court also observed that this similarity "is all the more compelling given that Congress passed the FHA in 1968—only four years after passing Title VII" in 1964.  *Id.*  And the two statutes serve similar purposes, with Title VII designed to eradicate discrimination in employment and the Fair Housing Act designed to eradicate discrimination in housing.  *See id.* at 2521.

In such circumstances, courts have recognized "a strong indication that the two statutes should be interpreted pari passu"—i.e., in the same way.  *Northcross v. Board of Educ. of Memphis City Schs.*, 412 U.S. 427, 428 (1973) (per curiam); *see also Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233-34 (2005).  The *Inclusive Communities* Court concluded that "cases

---

[3] Prior to its 2015 decision in *Inclusive Communities*, the Supreme Court had not decided whether the Fair Housing Act recognized a disparate-impact theory.

interpreting Title VII … provide essential background and instruction" for construing the Fair Housing Act.  135 S. Ct. at 2518.

HUD itself recognized this concept in devising the Disparate-Impact Rule, agreeing that "courts have drawn the analogy between Title VII and the Fair Housing Act in interpreting the Act."  Disparate-Impact Rule, 78 Fed. Reg. at 11,466.  And HUD cited federal circuit court decisions standing for the proposition that "[c]laims under Title VII and the [Fair Housing Act] generally should receive similar treatment."  *Id.* at 11,462 n.35.

There is a break-point, however, at which Title VII jurisprudence can no longer guide interpretation of the applicable standard for disparate-impact liability under the Fair Housing Act.  The break-point occurred when Congress passed the Civil Rights Act of 1991, which, in pertinent part, displaced the *Wards Cove* disparate-impact standard for future disparate-impact claims brought under Title VII.  *See* 42 U.S.C. §§ 2000e-2(k)(1)(A)-(B).  Some had perceived the *Wards Cove* disparate-impact standard as too rigorous for plaintiffs, so Congress amended Title VII in 1991 to create a less rigorous standard for disparate-impact claims brought under that statute.  *See Smith*, 544 U.S. at 240 ("One of the purposes of th[e] amendment [to Title VII] was to modify the Court's holding in *Wards Cove* …, a case in which we narrowly construed the employer's exposure to liability on a disparate-impact theory.").

Because Congress chose to amend Title VII in response to *Wards Cove* but significantly did not choose to amend the Fair Housing Act, *Wards Cove* continues to describe the proper application of disparate impact under the Fair Housing Act.  Indeed, the Supreme Court itself has stated that the 1991 amendments to Title VII "highlight[] the principle that a departure from the traditional understanding of discrimination requires congressional action."  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 624 n.3 (1999).  With respect to the Fair Housing Act, Congress has

never taken action authorizing "a departure from the traditional understanding of discrimination" as described in *Wards Cove*. Thus, prior to 1991, it certainly was both appropriate and common to look to interpretations of Title VII to guide the standard of proof for disparate-impact claims under the Fair Housing Act, but after Congress's 1991 amendments to Title VII, it constitutes an error to do so. Title VII is now governed by a congressionally-enacted disparate-impact standard that is not applicable to other laws prohibiting discrimination.

The Supreme Court has squarely addressed this issue in evaluating the continued application of the *Wards Cove* standard to disparate-impact claims under the Age Discrimination in Employment Act ("ADEA"). In ruling that interpretation of the ADEA is not guided by post-1991 Title VII jurisprudence, the Court stated: "We cannot ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to the ADEA. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009). "Congress neglected to add such a provision to the ADEA when it amended Title VII," and "[a]s a result, the Court's interpretation of the ADEA is not governed by Title VII decisions" which post-date the Title VII amendments. *Id.* at 174-75.

Indeed, the Supreme Court has unambiguously concluded that the *Wards Cove* standard continues to apply in disparate-impact cases arising under civil rights statutes other than Title VII, such as the ADEA:

> While the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination. Hence, *Wards Cove's* pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA.

*Smith*, 544 U.S. at 240. Because the Supreme Court held that the 1991 amendments to Title VII had no application to the ADEA—another anti-discrimination-in-employment statute—it

requires no leap to conclude that the 1991 amendments to Title VII did not alter the continued application of *Wards Cove* to the Fair Housing Act.

In the absence of a congressional action similar to the 1991 amendments to Title VII, it must be presumed that Congress intended *Wards Cove* would continue to supply the disparate-impact standard under the Fair Housing Act. *See Gross*, 557 U.S. at 174; *Chevron,* 467 U.S. at 865 n.9. And the Supreme Court continued to rely on *Wards Cove* in the Fair Housing Act context in its *Inclusive Communities* decision, noting only that *Wards Cove* was "superseded by statute on other grounds"—i.e., superseded in Title VII claims by the 1991 amendments. *Inclusive Communities*, 135 S. Ct. at 2523. Thus, HUD was bound by *Wards Cove* when promulgating the Disparate-Impact Rule, and it constituted error for HUD to apply the 1991 Title VII amendments to disparate-impact claims under the Fair Housing Act.

## B.    HUD Impermissibly Rejected the *Wards Cove* Standard for Disparate-Impact Liability under the Fair Housing Act.

As noted above, in November 2011, HUD proposed a "standard of liability" for disparate-impact claims brought under the Fair Housing Act. *See* Proposed Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 70,921, 70,923 (Nov. 16, 2011) ("Proposed Rule"). When it finalized the Rule, HUD explicitly—and wrongly—rejected the concept that *Wards Cove* governs Fair Housing Act disparate-impact claims: "HUD does not agree … that *Wards Cove* even governs Fair Housing Act claims." Disparate-Impact Rule, 78 Fed. Reg. at 11,473. HUD provided no explanation for this action and cited no authority permitting a departure from binding Supreme Court precedent through administrative rulemaking. The only conclusion possible is that Agency officials did not like the *Wards Cove* standard and preferred a standard that would be more rigorous for potential defendants. The Supreme Court has been clear, however, that "where the agency has failed to

9

provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars*, 579 U.S. ---, 2016 WL 3369424, at *7.

HUD's decision to reject binding Supreme Court precedent is both unexplained and inexplicable. When HUD published the Proposed Rule for comment, the Agency described the long history of federal circuit court decisions applying the disparate-impact theory under the Fair Housing Act, which decisions trace back to Supreme Court precedent addressing disparate impact in the Title VII context. Yet, astonishingly, HUD failed to even mention *Wards Cove* in the Proposed Rule.

The significance, and binding nature, of *Wards Cove* was brought to the attention of HUD by many commenters—including *amici* on behalf of their lending-industry members—who urged HUD to adopt the disparate-impact "standard set out in the Supreme Court's opinion in *Wards Cove*." Disparate-Impact Rule, 78 Fed. Reg. at 11,471. Indeed, the Disparate-Impact Rule indicates that commenters referenced *Wards Cove* as the applicable standard in addressing no less than five separate issues. *See id.* at 11,469 ("commenter referring to *Wards Cove*" in support of position that "plaintiff should have to identify a specific practice and show that the alleged discriminatory effect is caused by that specific practice"); *id.* at 11,471 ("commenters suggested that HUD remove the word 'necessary' to make the standard … consistent with the Title VII standard set out in the Supreme Court's opinion in *Wards Cove*"); *id.* at 11,472 ("commenter requested that HUD replace 'cannot be served' with 'would not be served' because, under the Supreme Court's analysis in *Wards Cove*, a plaintiff cannot prevail by showing that a less discriminatory alternative could in theory serve the defendant's business interest"); *id.* at 11,473 ("commenters pointing to *Wards Cove* in support of [] position" that "the alternative practice must be equally effective as the challenged practice"); *id.* ("[s]ome commenters stated

that the plaintiff or charging party should bear the burden of proof at all stages of the

proceedings … citing *Wards Cove*”).

HUD refused to acknowledge the applicability of the Supreme Court's decision, simply

referencing the "*Wards Cove* case" as "superseded" and providing no other justification.  *Id.*

HUD's simplistic conclusion warrants repetition:  "HUD does not agree … that *Wards Cove*

even governs Fair Housing Act claims."  *Id.*  Quite obviously, the Supreme Court's decisions in

*Smith* and *Gross*—coupled with its decision in *Inclusive Communities*—confirm that HUD's

position, and not the commenters', was wrong as a matter of law.

     **C.**     **HUD's Decision to Announce the 1991 Amendments to Title VII as the Standard for Disparate Impact under the Fair Housing Act Amounts to an Unauthorized and Unlawful Agency Action.**

From the outset, HUD showed its disdain for the *Wards Cove* standard and its preference

for the standard that Congress enacted after the *Wards Cove* decision to govern Title VII claims

but not Fair Housing Act claims.  When the Proposed Rule was published for comment, HUD

stated that it intended to adopt "the discriminatory effects standard confirmed by Congress in the

1991 amendments to Title VII."  Proposed Rule, 76 Fed. Reg. at 70,924.  HUD was not swayed

by any of the comments describing the legal error of HUD's position, *see* § B, *supra*, and in the

Rule as promulgated, HUD chose the "Title VII discriminatory effects standard codified by

Congress in 1991" as the standard to govern disparate-impact claims under the Fair Housing Act.

*See* Disparate-Impact Rule, 78 Fed. Reg. at 11,474.

As noted previously, HUD provided no explanation for its rejection of the *Wards Cove*

standard, even in the context of the continued binding nature of *Wards Cove* in non-Title VII

disparate-impact litigation.  *See Gross*, 557 U.S. at 174 ("We cannot ignore Congress' decision

to amend Title VII's relevant provisions but not make similar changes to the ADEA.  When

Congress amends one statutory provision but not another, it is presumed to have acted

11

intentionally."). **Nor did the agency attempt to articulate any authority for its adoption of the congressionally-enacted 1991 Title VII amendments in the Fair Housing Act context.**

It is not necessary to say that HUD has no power to emulate Congress and overrule Supreme Court statutory interpretations with which it may disagree. As noted earlier, the Supreme Court has stated that the 1991 amendments to Title VII "highlight[] the principle that a departure from the traditional understanding of discrimination requires congressional action." *Olmstead*, 527 U.S. at 624 n.3. And yet HUD sought to exercise the powers of Congress in promulgating the Rule. Indeed, HUD's action here would be comparable to a hypothetical proposal from the Equal Employment Opportunity Commission ("EEOC") to promulgate a rule to supersede the *Wards Cove* decision for future ADEA claims.[4] Obviously that would not be permissible, because an agency rule could not overturn Supreme Court precedent. Federal agencies must promulgate rules that comply with decisions of the Supreme Court. *See Waterman,* 333 U.S. at 113-14 (court decisions are not "subject to later review or alteration by administrative action.").

Neither the EEOC nor HUD has the authority to supersede an otherwise binding decision of the Supreme Court. Agencies can seek relief from Congress if they believe that new standards should govern law enforcement, but they simply cannot achieve their objective through administrative rule making. *See Mathews*, 530 F.2d at 1056 ("Under the present statutory framework, however, I believe that argument must be addressed to Congress.") (McGowan, J., concurring). HUD's preference for the legislative Title VII-specific standard over the otherwise-governing precedent of the Supreme Court is transparent. But, notwithstanding its preference,

---

[4] Congress has authorized the EEOC to issue "such rules and regulations as it may consider necessary or appropriate for carrying out" the ADEA. 29 U.S.C. § 628.

HUD is bound by the limits of its own authority. And it lacked authority to adopt a standard for

the Fair Housing Act that required an act of Congress to achieve in the context of Title VII.

> **D.    The Disparate-Impact Rule (i.e., the Standard of the 1991 Amendments to Title VII) Is a Substantial Departure from *Wards Cove*.**

Congress designed the 1991 Title VII amendments to alter the *Wards Cove* disparate-

impact standard as applied to that statute, *see* § A, *supra*, so it comes as no surprise that, in

improperly adopting the 1991 Title VII amendments, the Disparate-Impact Rule also diverges

widely from *Wards Cove*. The Disparate-Impact Rule departs from *Wards Cove* in at least five

significant ways:

- **First**, *Wards Cove* requires a plaintiff to "demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack," 490 U.S. at 657, but HUD permits a plaintiff "to challenge the decision-making process as a whole," Disparate-Impact Rule, 78 Fed. Reg. at 11,469.

- **Second**, *Wards Cove* requires that "each challenged practice has a significantly disparate impact," 490 U.S. at 657, but HUD made a "decision not to codify a significance requirement," Disparate-Impact Rule, 78 Fed. Reg. at 11,468.

- **Third**, *Wards Cove* requires that the "ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times," 490 U.S. at 659, but HUD "formalizes a burden-shifting test," Disparate-Impact Rule, 78 Fed. Reg. at 11,460.

- **Fourth**, *Wards Cove* specifies "there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster," 490 U.S. at 659, but HUD requires the "defendant to prove that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests," Disparate-Impact Rule, 78 Fed. Reg. at 11,460.

- **Fifth**, *Wards Cove* requires that "any alternative practices … must be equally effective … in achieving [] legitimate [] goals," 490 U.S. at 661, but "HUD does not believe … the less discriminatory alternative must be 'equally effective,' or 'at least as effective,' in serving the respondent's or defendant's interests," Disparate-Impact Rule, 78 Fed. Reg. at 11,473.

Although the Rule predates the *Inclusive Communities* decision, that decision confirms

HUD's errors. The Supreme Court noted that "disparate-impact liability has always been

properly limited in key respects" and described the limits in detail.  *Inclusive Communities*, 135 S. Ct. at 2522.  In particular, the Court described the harmful and unconstitutional consequences flowing from an overbroad application of disparate impact—including the possible invidious consideration of race or national origin in decision-making through racial quotas.  *See id.* at 2523 (quoting *Wards Cove*, 490 U.S. at 653).  Emphasizing the *Wards Cove* standard, *Inclusive Communities* held that a "disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity" and that the application of a "robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact" under the Fair Housing Act.  *Id.* (alterations and quotation marks omitted) (quoting *Wards Cove*, 490 U.S. at 653).  Yet, the Rule describes no meaningful limits on the use of disparate impact and certainly not the type of limits that the Supreme Court has mandated.

The distinctions between Supreme Court precedent and the Rule have an important and harmful impact on *amici* and their members.  For instance, it is well recognized that credit decisions with respect to residential mortgage applications do not align neatly with the realities of racial distribution within the population.  Differences that might be correlated with factors such as race or national origin are to be expected even with the application of fair and prudent underwriting standards, simply as a result of societal differences in wealth, income, employment, and credit scores.  Yet, when a "commenter expressed concern that the language in [the] proposed [Rule] would allow for lawsuits based only on statistical data produced under HMDA," the Agency responded that "HUD and Courts have recognized that analysis of loan level data identified through HMDA may indicate a disparate impact."  Disparate-Impact Rule, 78 Fed. Reg. at 11,478.  In other words, according to HUD, a disparate-impact challenge could proceed

14

beyond the pleading stage by a mere description of statistical disparities.  By contrast, *Wards Cove* and *Inclusive Communities* impose a significantly greater burden on a plaintiff by requiring the plaintiff to identify the specific and uniformly applied business practice that is challenged and to demonstrate "robust" causality between the challenged practice and the statistical imbalance.

Moreover, *Inclusive Communities* limits disparate-impact claims to the "removal of artificial, arbitrary and unnecessary barriers" to housing.  135 S. Ct. at 2524.  And *Wards Cove* specifies that there is no requirement of "necessity" in justifying a challenged practice and mandates that the burden of proof remains with the plaintiff at all stages of the lawsuit.  490 U.S. at 659.  To the contrary, the Rule impermissibly places the burden on the "***defendant*** to prove that the challenged practice is ***necessary*** to achieve one or more of its substantial, legitimate, nondiscriminatory interests."  Disparate-Impact Rule, 78 Fed. Reg. at 11,460 (emphasis added).

In sum, the Rule substantially increases both the likelihood and cost of litigation, as well as ensuing risk of reputational injuries, over that which would be present if HUD had followed Supreme Court precedent.

### E.    HUD Lacks Authority to Cherry-Pick Portions of the Disparate-Impact Standard Congress Enacted to Supersede *Wards Cove* in Title VII Claims.

Even assuming, solely for the sake of argument, that HUD had the authority to reject the *Wards Cove* standard and to promulgate in the housing-discrimination realm what it took an act of Congress to achieve in the employment-discrimination realm, the Disparate-Impact Rule exceeds HUD's authority for a separate but interrelated reason.  Although HUD purports to adopt the "Title VII discriminatory effects standard codified by Congress in 1991," HUD did not adopt the entirety of the standard Congress enacted for Title VII.  Disparate-Impact Rule, 78 Fed. Reg. at 11,474.  Instead, by adopting the statute's burdens on defendants while ignoring the

statute's limitations on disparate impact, HUD formulated a standard for the Fair Housing Act quite different from that which Congress enacted for Title VII.

For instance, under the 1991 Title VII standard, employment-discrimination plaintiffs must establish intent—not merely discriminatory effect—to state a claim for money damages. *See* 42 U.S.C. §§ 1981a(1), 1981a(2) (prohibiting compensatory and punitive damages in Title VII disparate-impact cases). This is the type of limitation on disparate-impact liability envisioned by *Inclusive Communities* when the Supreme Court observed that "[r]emedial orders in disparate-impact cases should concentrate on the elimination of the offending practice that arbitrarily operates to discriminate on the basis of race." 135 S. Ct. at 2524 (internal quotations omitted). Indeed, Congress has never enacted, and the Supreme Court has never recognized, a disparate-impact standard that both *rejects* the limitations of *Wards Cove* and, at the same time, *allows* a claim for money damages.

Yet, in promulgating the Rule, HUD did so. The Agency rejected the provisions of the 1991 standard precluding disparate-impact plaintiffs from obtaining money damages under Title VII (either compensatory or punitive) and set no limits on the use of disparate impact to obtain money damages under the Fair Housing Act. Significantly, HUD noted that a commenter suggested that "the most appropriate remedy for a violation of the Fair Housing Act under an effects theory is declaratory or injunctive relief" because "the use of penalties or punitive damages generally does not serve the underlying purpose of the Fair Housing Act to remedy housing discrimination." Disparate-Impact Rule, 78 Fed. Reg. at 11,474. But HUD responded that it "disagrees with the commenter. The Fair Housing Act specifically provides for the award of damages—both actual and punitive—and penalties." *Id.*

16

The Rule provides no explanation of HUD's rationale for adopting certain provisions of the 1991 Title VII amendments (those which might be viewed as plaintiff-friendly) while rejecting other provisions of the same statute (those which establish limitations on the use of disparate impact). The 1991 amendments reflect Congress's comprehensive statutory framework for the application of disparate impact under Title VII. Indeed, the legislative history of the 1991 amendments confirms the delicate balance Congress envisioned: "*The bill does not give victims an unlimited entitlement to damages. Compensatory and punitive damages are available only in cases of intentional discrimination*." 137 Cong. Rec. S15219, S15234 (Oct. 25, 1991) (emphasis added). It is, of course, markedly different to provide a "no requirement of intent" standard for lawsuits that seek to eliminate offending business practices than it is to provide such a standard in lawsuits that seek compensatory and punitive damages. And HUD has not identified any reasoned basis for adopting only a portion of Congress's 1991 Title VII amendments. Thus, under the Administrative Procedure Act, HUD's cherry-picking is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *cf. Lakeland Bus Lines, Inc. v. N.L.R.B.*, 347 F.3d 955, 962 (D.C. Cir. 2003) (agency cannot find substantial evidence solely on the basis of evidence that supports the result "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn").

## CONCLUSION

HUD exceeded its authority, and acted arbitrarily and capriciously, by promulgating the Disparate-Impact Rule in a manner that (1) conflicts with the Supreme Court's limitations on disparate impact as articulated in *Wards Cove* and reemphasized in *Inclusive Communities*, and (2) seeks to perform the role of Congress by enacting the disparate-impact standard of the 1991 Title VII amendments for Fair Housing Act claims. For these reasons, and those discussed above, *amici* join Plaintiffs the American Insurance Association and the National Association of

Mutual Insurance Companies in requesting that the Court enter an order vacating the HUD Disparate-Impact Rule.

Respectfully submitted,

*/s/ John Longstreth*

Paul F. Hancock (D.C. Bar No. 159327)
K&L GATES LLP
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
(305) 539-3300
paul.hancock@klgates.com

John Longstreth (D.C. Bar No. 367047)
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
(202) 778-9000
john.longstreth@klgates.com

*Counsel for Amici Curiae*

Dated: July 15, 2016