## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————
)
AMERICAN INSURANCE )
ASSOCIATION, *et al.* )
)
      Plaintiffs, )
)    No. 1:13-cv-00966 (RJL)
     v. )
)
UNITED STATES DEPARTMENT )
OF HOUSING AND URBAN )
DEVELOPMENT, *et al.* )
)
      Defendants. )
—————————————————————)

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

                    BENJAMIN C. MIZER
                    Principal Deputy Assistant Attorney General

                    GREGORY B. FRIEL
                    Deputy Assistant Attorney General

                    CHANNING D. PHILLIPS
HELEN R. KANOVSKY          United States Attorney
General Counsel
MICHELLE ARONOWITZ
Deputy General Counsel for       LESLEY FARBY
  Enforcement and Fair Housing    Assistant Branch Director
JEANINE M. WORDEN           Federal Programs Branch
Associate General Counsel
  for Fair Housing            BRIAN G. KENNEDY (DC Bar No. 228726)
KATHLEEN M. PENNINGTON    DANIEL P. MOSTELLER (DC Bar No. 980802)
Assistant General Counsel       Attorneys
  for Fair Housing Enforcement   U.S. Department of Justice
M. CASEY WEISSMAN-VERMEULEN  20 Massachusetts Ave., N.W.
AYELET R. WEISS           Washington, DC 20001
Attorneys               Tel: (202) 514-3357
*Of counsel*               Fax: (202) 616-8187
                    Email: Brian.Kennedy@usdoj.gov
                    *Counsel for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

STATUTORY AND REGULATORY BACKGROUND .................................................2

PROCEDURAL BACKGROUND...................................................................................11

STANDARD OF REVIEW ............................................................................................13

    A.     Summary Judgment Standard ...................................................................13

    B.     Standard of Judicial Review Under *Chevron*..........................................13

ARGUMENT....................................................................................................................14

   I.    PLAINTIFFS BEAR THE BURDEN TO SHOW THAT IN NO SET OF
       CIRCUMSTANCES CAN THE RULE BE VALIDLY APPLIED TO
       INSURERS OR TO INSURERS' UNDERWRITING AND RATEMAKING
       ACTIVITIES...............................................................................................14

  II.    THE DISCRIMINATORY EFFECTS LIABILITY STANDARD OF THE
       RULE MAY BE VALIDLY APPLIED TO HOMEOWNERS INSURANCE
       CONSISTENT WITH *INCLUSIVE COMMUNITIES* .................................16

       A.     The Rule Does Not Require That Race or Other Protected
             Characteristics Be Used and Considered in a Pervasive Way Not
             Permitted by *Inclusive Communities* ...............................................16

       B.     The Rule Does Not Require Insurers to Collect Data Concerning
             Membership in Protected Classes Inconsistent with
             *Inclusive Communities* .....................................................................20

       C.     *Inclusive Communities* Does Not Require HUD to Provide Insurers'
             Business of Evaluating Risk an Industry-Specific Safe Harbor from
             Discriminatory Effects Liability .......................................................24

       D.     State Insurance Law Does Not Break the Causal Chain Between
             Insurers' Actions and Those Actions' Discriminatory Effects .......28

 III.    HUD LAWFULLY BASED THE RULE'S BURDEN-SHIFTING
       FRAMEWORK ON FHA CASE LAW AND TITLE VII IN CONFORMITY
       WITH *INCLUSIVE COMMUNITIES* ..........................................................33

       A.     The Rule, Consistent with *Inclusive Communities*, Requires
             Identification of a Policy of Policies Causing a Disparity..............35

i

B.    The Rule, Consistent with *Inclusive Communities*, Allows Covered
Entities to Maintain Policies that Are Not Artificial, Arbitrary, and
Unnecessary Barriers .....................................................................................39

CONCLUSION.................................................................................................................43

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*,
   444 F.3d 673 (D.C. Cir. 2006) ................................................................5

*Abril-Rivera v. Johnson*,
   806 F.3d 599 (1st Cir. 2015) ..............................................................40

*Am. Ins. Ass'n v. HUD*,
   74 F. Supp. 3d 30 (D.D.C. 2014) ..................................................12, 13

*Ave. 6E Invs., LLC v. City of Yuma*,
   818 F.3d 493 (9th Cir. 2016) ...................................................11, 34, 41

*Azam v. City of Columbia Heights*,
   2016 WL 424966 (D. Minn. Feb. 3, 2016) .........................................11

*Betsey v. Turtle Creek Assocs.*,
   736 F.2d 983 (4th Cir. 1984) ................................................................5

*Bd. of Educ. v. Harris*,
   444 U.S. 130 (1979) .............................................................................9

*Boykin v. Fenty*,
   __ F. App'x ___, 2016 WL 3544284 (D.C. Cir. June 14, 2016) ..........34

*Burbank Apartments Tenant Ass'n v. Kargman*,
   48 N.E.3d 394 (Mass. 2016) ..............................................................29

*Burrell v. State Farm & Cas. Co.*,
   226 F. Supp. 2d 427 (S.D.N.Y. 2002) ...............................................25

*Chamber of Commerce v. NLRB*,
   118 F. Supp. 3d 171 (D.D.C. 2015) ...................................................14

*Charleston Hous. Auth. v. U.S. Dep't of Agric.*,
   419 F.3d 729 (8th Cir. 2005) ................................................................5

*Chase Bank USA, N.A. v. McCoy*,
   562 U.S. 195 (2011) ...........................................................................37

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) .....................................................................*passim*

*Dehoyos v. Allstate Corp.*,
  345 F.3d 290 (5th Cir. 2003) ...................................................................................... 4, 31

*Franklin v. Allstate Corp.*,
  2007 WL 1991516 (N.D. Cal. July 3, 2007) .......................................................................... 26

*Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*,
  508 F.3d 366 (6th Cir. 2007) ........................................................................................... 5

*\*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971) ...........................................................................................*passim*

*\*Hodge v. Talkin*,
  799 F.3d 1145 (D.C. Cir. 2015) .................................................................................. 14, 15

*HUD v. Mountain Side Mobile Estates P'ship*,
  1993 WL 307069 (HUD, Office of the Sec'y, July 19, 1993) ......................................................... 5

*HUD v. Pfaff*,
  1994 WL 592199 (HUD ALJ Oct. 27, 1994) ................................................................................ 5

*HUD v. Twinbrook Vill. Apartments*,
  2001 WL 1632533 (HUD ALJ Nov. 9, 2001) .............................................................................. 5

*Huntington Branch, NAACP v. Town of Huntington*,
  844 F.2d 926 (2d Cir. 1988) ............................................................................................ 5

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*,
  747 F.3d 275 (5th Cir. 2014) .............................................................................. 6, 11, 34, 42

*Johnson v. City of Memphis*,
  770 F.3d 464 (6th Cir. 2014) .......................................................................................... 40

*Jones v. Travelers Cas. Ins. Co. of Am.*,
  2015 WL 5091908 (N.D. Cal. May 7, 2015) .......................................................................... 18, 31, 32

*Langlois v. Abington Hous. Auth.*,
  207 F.3d 43 (1st Cir. 2000) ............................................................................................ 5

*Lumpkin v. Farmers Grp., Inc.*,
  2007 WL 6996777 (W.D. Tenn. July 6, 2007) ....................................................................... 32

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
  558 F.2d 1283 (7th Cir. 1977) ......................................................................................... 5

iv

*Meyer v. Holley,*
    537 U.S. 280 (2003) ...................................................................................... 35

*MHANY Mgmt., Inc. v. Cty. of Nassau,*
    819 F.3d 581 (2d Cir. 2016) ................................................ 11, 34, 42

*Miller v. Countrywide Bank, N.A.,*
    571 F. Supp. 2d 251 (D. Mass. 2008) .................................................. 38

*Mountain Side Mobile Estates v. HUD,*
    56 F.3d 1243 (10th Cir. 1995) .................................................... 5, 35

*NAACP v. Am. Family Mut. Ins. Co.,*
    978 F.2d 287 (7th Cir. 1992) ...................................................*passim*

*Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.,*
    208 F. Supp. 2d 46 (D.D.C. 2002) ...........................................*passim*

*Nationwide Mut. Ins. Co. v. Cisneros,*
    52 F.3d 1351 (6th Cir. 1995) ...........................................................3

*NRA v. Reno,*
    216 F.3d 122 (D.C. Cir. 2000) ....................................................... 13

*Ojo v. Farmers Grp. Inc.,*
    600 F.3d 1205 (9th Cir. 2010) (en banc) ..................................... 3, 4

*Ojo v. Farmers Grp. Inc.,*
    356 S.W.3d 421 (Tex. 2011) ........................................................... 32

*\*Prop. Cas. Insurers Ass'n of Am. v. Donovan,*
    66 F. Supp. 3d. 1018 (N.D. Ill. 2014) ......................................*passim*

*Regions Hosp. v. Shalala,*
    522 U.S. 448 (1998) ...................................................................... 35

*Reno v. Flores,*
    507 U.S. 292 (1993) ...................................................................... 14

*Resident Advisory Bd. v. Rizzo,*
    564 F.2d 126 (3d Cir. 1977) ............................................................5

*Saunders v. Farmers Ins. Exch.,*
    537 F.3d 961 (8th Cir. 2008) ......................................................... 32

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................................................. 14

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ............................................................................. 9

*Steele v. GE Money Bank*,
    2009 WL 393860 (N.D. Ill. Feb. 17, 2009) ........................................... 39

*Tennessee v. Lane*,
    541 U.S. 509 (2004) ............................................................................ 17

*\*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
    135 S. Ct. 2507 (2015) ................................................................*passim*

*Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*,
    704 N.E.2d 667 (Ohio Com. Pl. 1997) ................................................. 32

*Trafficante v. Metro. Life Ins. Co.*,
    409 U.S. 205 (1972) ............................................................................. 2

*United Space All., LLC v. Solis*,
    824 F. Supp. 2d 68 (D.D.C. 2011) ...................................................... 37

*United States v. Boyle*,
    469 U.S. 241 (1985) ..................................................................... 33, 41

*United States v. City of Black Jack*,
    508 F.2d 1179 (8th Cir. 1974) ........................................................... 23

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
    113 F. Supp. 3d 555 (D. Conn. 2015) ............................................ 18, 32

*Wai v. Allstate Ins. Co.*,
    75 F. Supp. 2d 1 (D.D.C. 1999) .......................................................... 3

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989) ..................................................................... 36, 42

## STATUTES AND REGULATIONS

12 U.S.C. § 2803 ............................................................................... 24, 38
15 U.S.C. § 1012 ................................................................................. 7, 32
42 U.S.C. § 2000e-2 ............................................................................... 36
42 U.S.C. § 3601 ..................................................................................... 2
42 U.S.C. § 3604 ............................................................................. 2, 3, 9

42 U.S.C. § 3605.......................................................................................................... 2, 9

42 U.S.C. § 3614a........................................................................................................ 2, 33

42 U.S.C. § 3614-1 ........................................................................................................... 23

24 C.F.R. § 100.120 .......................................................................................................... 38

24 C.F.R. § 100.500 ....................................................................................................*passim*

29 C.F.R. part 1607........................................................................................................... 25

Md. Code Ann. Ins. § 27-501(c)(1) .................................................................................. 20

## LEGISLATIVE AND REGULATORY MATERIALS

*Homeowners Insurance Discrimination: Hearing Before the S. Comm. on*
    *Banking, Housing, and Urban Affairs*,
    103d Cong. (1994) ............................................................................................. 4, 19

*Implementation of the Fair Housing Act's Discriminatory Effects Standard*,
    78 Fed. Reg. 11,460 (Feb. 15, 2013) ....................................................................*passim*

*Implementation of the Fair Housing Act's Discriminatory Effects Standard*,
    76 Fed. Reg. 70,921 (Nov. 16, 2011)........................................................ 6, 9, 36, 37

*Implementation of the Fair Housing Amendments Act of 1988*,
    54 Fed. Reg. 3232 (Jan. 23, 1989) ........................................................................... 3

## OTHER AUTHORITIES

Ronen Avraham et al., *Understanding Insurance Antidiscrimination Laws*,
    87 S. Cal. L. Rev. 195 (2014) .......................................................................... 25, 29

Nat'l Ass'n Ins. Comm'rs, Cas. Actuarial & Statistical (C) Task Force, *Price Optimization
White Paper* (Nov. 19, 2015), *available at* http://naic.org/documents/committees_c_
    catf_related_price_optimization_white_paper.pdf ................................................. 26

Robert W. Klein, *A Regulator's Introduction to the Insurance Industry* (2d ed. 2005),
    *available at* http://www.naic.org/documents/prod_serv_marketreg_rii_zb.pdf..................... 30

**INTRODUCTION**

Plaintiffs, two trade associations representing sellers of homeowner's insurance, filed this lawsuit in 2013 raising a facial, pre-enforcement challenge to a regulation ("Discriminatory Effects Rule" or "Rule"), 78 Fed. Reg. 11,460 (Feb. 15, 2013), promulgated by the Department of Housing and Urban Development ("HUD") that confirmed the longstanding interpretation of the Fair Housing Act ("FHA" or "Act") to prohibit discriminatory effects discrimination in housing-related practices.  Although plaintiffs initially prevailed, the United States Supreme Court's June 2015 ruling in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.* ("*Inclusive Communities*"), 135 S. Ct. 2507 (2015), rejected the very arguments they made to support their original Complaint.

Unwilling to accept that the Supreme Court vindicated HUD's position, plaintiffs now allege that the Rule violates the very decision that definitively upheld the availability of disparate impact liability under the FHA.  Plaintiffs are wrong, and their arguments rely either on reading into *Inclusive Communities* new limitations on discriminatory effects liability that the Supreme Court did not suggest, let alone mandate, or on misconstruing the Rule's requirements.  Contrary to plaintiffs' claims, nothing in *Inclusive Communities* explicitly or implicitly exempted insurance providers from discriminatory effects liability.  Additionally, the Rule's burden-shifting standard does not allow a claim against insurers, or any other covered entity, to proceed based entirely on statistics, and it gives all covered entities, including insurers, the opportunity discussed in *Inclusive Communities* to demonstrate the validity of their policies, even ones that cause a disparate impact or that perpetuate segregation.  The Rule is valid, and the Amended Complaint lacks merit.

## STATUTORY AND REGULATORY BACKGROUND

The Fair Housing Act, Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified as amended at 42

U.S.C. §§ 3601-3619), was enacted "to provide, within constitutional limitations, for fair housing

throughout the United States."  42 U.S.C. § 3601; *see also Inclusive Cmtys.*, 135 S. Ct. at 2521

(recognizing the Act is intended to "eradicate" discriminatory practices related to housing);

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (recognizing the "broad and

inclusive" language of the Act).  To that end, the FHA makes it unlawful, among other things:

> [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to
> negotiate for the sale or rental of, or otherwise make unavailable or deny, a
> dwelling to any person because of race, color, religion, sex, familial status, or
> national origin.

42 U.S.C. § 3604(a); *see also id.* § 3604(f)(1) (prohibiting actions that "otherwise make

unavailable or deny[] a dwelling . . . because of a handicap").  The FHA also makes it unlawful,

"because of" one of the seven prohibited bases, to "discriminate against any person . . . in the

provision of services or facilities in connection" with the sale or rental of a dwelling.  *Id.*

§ 3604(b), (f)(2).  And the FHA makes it unlawful "because of" the same bases "to discriminate

against any person in making available . . . , or in the terms or conditions of . . . providing other

financial assistance" related to "purchasing, constructing, improving, repairing, or maintaining a

dwelling."  *Id.* § 3605.  Congress expressly granted HUD the authority to issue regulations

interpreting the FHA.  *Id.* § 3614a.

It is well established that the FHA prohibits discrimination in the provision of

homeowner's insurance (hereinafter, also referred to simply as "insurance").  In 1978, HUD's

General Counsel explained that, because the inability to obtain homeowner's insurance would

prevent an individual from qualifying for a mortgage, it thereby makes housing "unavailable" as

that term is used in Section 3604.  As such, HUD concluded that the FHA prohibited

2

discrimination in the provision of insurance.  Mem. of Ruth T. Prokop, Gen. Counsel of HUD to

Chester C. McGuire, Assistant Sec'y for Equal Opportunity (Aug. 25, 1978), *quoted in NAACP*

*v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 300 (7th Cir. 1992), *cert. denied*, 508 U.S. 907

(1993); *accord Am. Family*, 978 F.2d at 297 ("No insurance, no loan; no loan, no house; lack of

insurance thus makes housing unavailable.").  In 1989, HUD issued a regulation formalizing its

interpretation of the FHA to prohibit insurance discrimination.  *See* 54 Fed. Reg. 3232, 3285

(Jan. 23, 1989) (codified at 24 C.F.R. § 100.70(d)(4)).  Since 1992, all three circuit courts of

appeals to address the issue have upheld this regulation as a valid exercise of HUD's authority

under the FHA.  *See Ojo v. Farmers Grp. Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) (en banc)

(holding that "HUD's construction of the FHA is reasonable" in "prohibit[ing] racial

discrimination in both the denial and pricing of homeowner's insurance"); *Nationwide Mut. Ins.*

*Co. v. Cisneros*, 52 F.3d 1351, 1360 (6th Cir. 1995) (deferring to HUD's regulation in holding

that "insurance underwriting practices are governed by the Fair Housing Act"), *cert. denied*, 516

U.S. 1140 (1996); *Am. Family*, 978 F.2d at 300-01 ("[T]he question today is whether the

Secretary's regulations are tenable.  They are.  Section 3604 applies to discriminatory denials of

insurance, and discriminatory pricing, that effectively preclude ownership of housing because of

the race of the applicant.").  Courts in this district have also relied on HUD's regulation to hold

that insurance is covered by the FHA.  *See Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.*,

208 F. Supp. 2d 46, 55-58 (D.D.C. 2002) (Sullivan, J.); *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d

1, 5-8 (D.D.C. 1999) (Kennedy, J.).

By 2013, it was also well established that the FHA encompasses a discriminatory effects

theory of discrimination.  *See* 78 Fed. Reg. at 11,461-62 & nn.12-28 (cataloging pre-2013 circuit

court and administrative precedent).  Accordingly, HUD prior to 2013 had specifically

recognized that the FHA prohibits disparate impact discrimination in the provision of insurance.

In 1994, HUD's Assistant Secretary for Fair Housing and Equal Opportunity, in testimony to

Congress, confirmed the applicability of disparate impact liability to insurance: "[insurance

company] practices that are neutral on their face [and] have a disproportionate racial impact . . .

may violate the [Act] where they cannot meet the established test of business necessity and the

showing that there is no less discriminatory alternative." *Homeowners Insurance*

*Discrimination: Hearing Before the S. Comm. on Banking, Hous., and Urban Affairs*, 103d

Cong. 50 (1994) (stmt. of Roberta Achtenberg, Ass't Sec'y for Fair Hous. & Equal Opportunity).

HUD had expressed longstanding concern about practices such as refusing to offer policies in

urban neighborhoods or imposing minimum value or age requirements for the property, which –

even if based on "seemingly neutral policies" – impair equal access to housing and may violate

the Act when not tied to the risk of loss.  *See id.* at 49, 51.[1]

Courts had developed minor variations by 2013 in how they evaluated evidence to assess

liability for disparate impact claims brought under the FHA.  The majority of courts of appeals

addressing the question, and all HUD administrative adjudications, had adopted a three-step

---

[1] The United States had also pursued FHA disparate impact claims against the insurance industry
in federal court prior to 2013.  *See, e.g.*, *United States v. Nationwide Mut. Ins. Co.*, No. 97-291
(S.D. Ohio Mar. 10, 1997) (alleging in paragraph 12 of the Complaint that an insurer's policies
"are not necessitated by considerations of risk, profit, or any other legitimate race-neutral
business consideration" and that "[a]lternative methods are available which would accomplish
the business objectives forming the ostensible rationale for these practices without the substantial
and disproportionate burden on residents of minority neighborhoods"), *available at*
http://www.justice.gov/crt/about/hce/documents/nationcomp.php.  So, too, had private litigants.
*See, e.g.*, *Ojo*, 600 F.3d at 1207; *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 293 (5th Cir. 2003);
*Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 50.

burden-shifting approach.[2]  But the Seventh Circuit applied a four-factor balancing test,[3] the

Sixth and Tenth Circuits employed a hybrid form of the burden-shifting and balancing

approaches,[4] and the Fourth Circuit applied burden-shifting for private defendants and balancing

for public defendants.[5]  The D.C. Circuit had not addressed which approach to take.[6]

Additionally, most circuits with a burden-shifting approach assigned the burden of proof at the

final step to the party bringing the claim,[7] but the Second Circuit placed it on the defending

party.[8]  In adopting these various approaches toward proving an FHA disparate impact claim,

courts borrowed heavily from the proof standards used for disparate impact claims under Title

VII of the Civil Rights Act of 1964.  *See, e.g.*, *Graoch,* 508 F.3d at 371-74; *see also Nat'l Fair*

*Hous. All.*, 208 F. Supp. 2d at 60.

It is against this backdrop that HUD promulgated the regulation that plaintiffs challenge.

In its Notice of Proposed Rulemaking, HUD proposed codifying that the FHA "may be violated

---

[2] *See Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49-50 (1st Cir. 2000); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir. 1988), *aff'd in part*, 488 U.S. 15 (1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148-49 (3d Cir. 1977); *Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 740-42 (8th Cir. 2005); *HUD v. Twinbrook Vill. Apartments*, Nos. 02-00-0256-8, 02-00-0257-8, 02-00-0258-8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *HUD v. Pfaff*, No. 10-93-0084-8, 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994), *rev'd on other grounds*, 88 F.3d 739 (9th Cir. 1996); *HUD v. Mountain Side Mobile Estates P'ship*, Nos. 08-92-0010, 08-92-0011, 1993 WL 307069, at *6 (HUD, Office of the Sec'y, July 19, 1993), *aff'd in relevant part*, 56 F.3d 1243 (10th Cir. 1995).

[3] *See Metro. Hous. Dev. Corp. v. Vill. of Arlington Height*s, 558 F.2d 1283, 1290 (7th Cir. 1977).

[4] *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 373 (6th Cir. 2007); *Mountain Side*, 56 F.3d at 1252, 1254.

[5] *See Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 989 n.5 (4th Cir. 1984).

[6] *See 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia,* 444 F.3d 673, 680 (D.C. Cir. 2006).

[7] *See Rizzo*, 564 F.2d at 149 n.37; *Graoch*, 508 F.3d at 373-74; *Mountain Side*, 56 F.3d at 1254.

[8] *See Huntington Branch*, 844 F.2d at 939.

by a housing practice that has a discriminatory effect."  76 Fed. Reg. 70,921, 70,924 (Nov. 16,

2011).  Consistent with the FHA's applicability to the provision of homeowner's insurance,

HUD specifically acknowledged that the Rule would cover insurance.  *See id*. (listing "the

provision and pricing of homeowner's insurance" as one of a number of "[e]xamples of a

housing policy or practice that may have a disparate impact").  Additionally, HUD proposed

"establish[ing] a uniform standard of liability for facially neutral housing practices that have a

discriminatory effect" whereby "liability is determined by a burden-shifting approach."  *Id*. at

70,923.  HUD explained that its proposed burden-shifting framework was based on existing FHA

case law and administrative practice, and was modeled on the well-established framework

applicable to disparate impact claims brought under other antidiscrimination laws such as Title

VII.  *See id*. at 70,924; *see also Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty.

Affairs*, 747 F.3d 275, 282-83 (5th Cir. 2014) (holding the Rule's burden-shifting standard is "in

accordance with disparate impact principles and precedent" under the FHA and Title VII), *aff'd*

135 S. Ct. 2507 (2015).

   HUD received nearly 100 public comments in response to its proposal from entities

representing a wide variety of interests, including plaintiffs, as well as another trade association

representing the homeowner's insurance industry.  A.R. 372-83 (Cmt. of Nat'l Ass'n of Mut. Ins.

Cos.); 455-59 (Cmt. of Am. Ins. Ass'n); 553-56 (Cmt. of Prop. Cas. Insurers Ass'n of Am.).

HUD made several changes to the wording of its proposed rule in response to comments

suggesting a need for greater clarity, but HUD retained the basic substance of the proposal when

the agency promulgated its Final Rule on February 15, 2013.  *See* 78 Fed. Reg. at 11,463-64.

   In reviewing the public comments submitted during the rulemaking, HUD identified

several broad groups of objections raised by the insurance industry, including that: (i) the

availability of discriminatory effect claims against the insurance industry would interfere with state regulation of insurance, in violation of the McCarran-Ferguson Act ("McCarran-Ferguson"), 15 U.S.C. §§ 1011-1015, or the "filed rate" doctrine; (ii) that the Rule was incompatible with actuarially sound insurance principles; and (iii) that special exemptions or safe harbors should be created for insurance practices. *See* 78 Fed. Reg. at 11,474-75. HUD explained that these comments were misguided because an insurance practice with a discriminatory effect would not be *per se* illegal simply by virtue of its differential effect on a protected class. *See id.* at 11,475 (noting that a policy or practice with discriminatory effect "may still be legal if supported by a legally sufficient justification"). In this way, the Rule provides a mechanism for distinguishing between "unnecessary barriers proscribed by" the FHA and "valid policies and practices crafted to advance legitimate interests." *Id.* (internal quotation marks and citation omitted).

HUD also rejected the insurance industry's objection that application of the Rule to insurance would impair state insurance regulation in violation of McCarran-Ferguson or the "filed rate" doctrine. *Id.* at 11,474. As HUD recognized, McCarran-Ferguson precludes application of a federal statute where such application would "invalidate, impair, or supersede" any state law "enacted . . . for the purpose of regulating the business of insurance," unless the federal measure itself "specifically relates to the business of insurance." *Id.* at 11,475 (quoting 15 U.S.C. § 1012(b)). HUD clarified in response to the comments that the "[R]ule does not alter the instruction of McCarran-Ferguson or its application as described in" case law, noting that the applicability of McCarran-Ferguson "depends on the facts at issue and the language of the

relevant State law 'relat[ing] to the business of insurance.'" *Id*.  Accordingly, HUD concluded

that the Rule "will not interfere with any State regulation of the insurance industry." *Id*.[9]

       After considering alternatives proposed by numerous comments, HUD concluded that its

proposed burden-shifting framework was "the fairest and most reasonable approach to resolving"

FHA disparate impact claims.  *Id*. at 11,473-74.  Therefore, the Rule sets out a three-step burden-

shifting framework to prove a claim of discrimination based on a practice's unjustified

discriminatory effect.  At the first step, the party bringing the claim bears the burden of proving

the challenged practice caused or predictably will cause a discriminatory effect on a protected

class.  24 C.F.R. § 100.500(c)(1).  If this first step is proven, the Rule specifies that the practice

may still be lawful if there is a "legally sufficient justification" for the challenged practice.  *Id*.

§ 100.500.  A legally sufficient justification can be established if, at step two, the defending party

proves that the "challenged practice is necessary to achieve one or more [of its] substantial,

legitimate, nondiscriminatory interests," *id*. § 100.500(c)(2), and the party bringing the claim of

discrimination fails to prove, at step three, that the interest(s) "could be served by another

practice that has a less discriminatory effect," *id*. § 100.500(c)(3).  The legally sufficient

justification "must be supported by evidence and may not be hypothetical or speculative." *Id*.

§ 100.500(b)(2).  In adopting this three-part framework, which applies to both administrative and

---

[9] The United States District Court for the Northern District of Illinois has remanded the Rule to
HUD for further consideration of comments submitted during the rulemaking about aspects of
the Rule's specific application to the provision of insurance.  *See Prop. Cas. Insurers Ass'n of
Am. v. Donovan* ("*PCI*"), 66 F. Supp. 3d. 1018, 1054 (N.D. Ill. 2014).  That court did not vacate
the Rule, and HUD is currently finalizing its response to the remand.  Plaintiffs' Amended
Complaint in the instant case does not raise a similar procedural challenge to HUD's response to
public comments from representatives of the insurance industry.  Additionally, the district court
in *PCI* also dismissed a substantive challenge to the Rule's facial applicability to the insurance
industry, brought on the basis of McCarran-Ferguson, as unripe and "best left for a concrete
dispute challenging a particular insurance practice."  *Id*. at 1042.  Plaintiffs' Amended Complaint
in the instant case does not challenge the Rule under McCarran-Ferguson.

judicial proceedings under the FHA, HUD sought to ensure that "neither party is saddled with

having to prove a negative."  76 Fed. Reg. at 70,924 (quoting *Hispanics United of DuPage Cty.*

*v. Vill. of Addison*, 988 F. Supp. 1130, 1162 (N.D. Ill. 1997)) (internal quotation marks omitted).

The Rule's three-step burden-shifting framework was upheld against an Administrative

Procedure Act ("APA") challenge by a trade association representing the homeowner's insurance

industry.  *See PCI*, 66 F. Supp. 3d at 1051-53.

       Consistent with the Rule, the Supreme Court in *Inclusive Communities* conclusively

construed the text of Sections 3604(a) and 3605(a) of the FHA to provide for discriminatory

effects liability.  The Supreme Court found that Congress's use of the phrase "otherwise make

unavailable" in Section 3604(a), and the term "discriminate" in Section 3605(a), paralleled

language the Supreme Court had previously held to provide for discriminatory effects liability

under other civil rights statutes.  *See Inclusive Cmtys.*, 135 S. Ct. at 2518-19 (citing *Griggs v.*

*Duke Power Co.*, 401 U.S. 424 (1971); *Bd. of Educ. v. Harris*, 444 U.S. 130 (1979); and *Smith v.*

*City of Jackson*, 544 U.S. 228 (2005)).  Moreover, the Court held that Congress's amendment of

the FHA in 1988 without altering the relevant text of Sections 3604(a) or 3605(a) indicates that it

"accepted and ratified the unanimous [pre-1988] holdings of the Courts of Appeals finding

disparate-impact liability."  *Id.* at 2519-20.  The Court further held that Congress's addition of

provisions that presuppose disparate impact liability as part of the 1988 amendments provided

"convincing confirmation of Congress' understanding that disparate-impact liability exists under

the FHA."  *Id.* at 2520-21.  Finally, the Court observed that disparate impact claims are

"consistent with the FHA's central purpose" of "eradicat[ing] discriminatory practices within a

sector of our Nation's economy."  *Id.* at 2521 (citing 42 U.S.C. § 3601).  The Court recognized

that "vestiges remain today, intertwined with the country's economic and social life," of

9

unconstitutional de jure residential segregation by race, and concluded that disparate impact liability helps to "counteract unconscious prejudices and disguised animus."  *Id*. at 2515, 2522.

The Supreme Court explained that from its first decision to recognize disparate impact liability in *Griggs v. Duke Power Co.*, "[t]he Court put important limits" on disparate impact liability.  *Inclusive Cmtys.*, 135 S. Ct. at 2517.  As *Inclusive Communities* detailed, *Griggs* articulated these limits as a "business necessity" defense that "does not prohibit hiring criteria with a 'manifest relationship' to job performance."  *Id.* (quoting *Griggs*, 401 U.S. at 431-32).  Similarly, after holding that the FHA's language provided for disparate impact liability, the Court noted that under the FHA "disparate-impact liability *has always been* properly limited in key respects."  *Id*. at 2522 (emphasis added).  *Inclusive Communities* relied on the language of *Griggs* to explain that under the FHA "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies."  *Id.* (quoting *Griggs*, 401 U.S. at 431).

The Supreme Court then sketched out several such limitations, including: providing "housing authorities and private developers leeway to state and explain the valid interest served by their policies . . . analogous to the business necessity standard under Title VII," *id*.; requiring that a "claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity," *id*. at 2523; and "striv[ing] to design [remedies] to eliminate racial disparities through race-neutral means," *id*. at 2524.  In this portion of the opinion discussing the limits of disparate impact liability, the Supreme Court twice cited the Rule in support of its analysis.  *Id*. at 2522-23 (citing 78 Fed. Reg. at 11,470, 11,476).

Both before and after the Supreme Court's ruling, the circuit courts of appeals have deferred to the Rule.  The decision of the Fifth Circuit that was affirmed by the Supreme Court

had adopted the Rule's burden-shifting framework to evaluate FHA disparate impact claims.
*See Inclusive Cmtys.*, 747 F.3d at 282.  After the Supreme Court's decision, in March 2016, two
more circuits expressly adopted the Rule.  In so holding, the Second Circuit observed that the
Supreme Court in *Inclusive Communities* had "implicitly adopted HUD's approach" to burden-
shifting expressed in the Rule, and determined it was obligated to defer to HUD's "reasonable
interpretation."  *MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016) (citing
*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).[10]  Two
days later, the Ninth Circuit joined in determining that FHA discriminatory effects claims should
be evaluated pursuant to the Rule and indicated that the Rule effectuated the safeguards
mandated by the Supreme Court in *Inclusive Communities*.  *See Ave. 6E Invs., LLC v. City of
Yuma*, 818 F.3d 493, 512-13 (9th Cir. 2016), *petition for cert. filed* (U.S. June 27, 2016) (No. 15-
1545); *see also Azam v. City of Columbia Heights*, No. 14-1044, 2016 WL 424966, at *10 (D.
Minn. Feb. 3, 2016) (explaining the consistency between the three burden-shifting steps of the
Rule and the limitations to disparate impact liability specified in *Inclusive Communities*).

## PROCEDURAL BACKGROUND

On June 26, 2013, plaintiffs American Insurance Association ("AIA") and National
Association of Mutual Insurance Companies ("NAMIC"), two insurance trade groups, filed a
facial challenge to the Final Rule under the APA.  Plaintiffs sought vacatur of the Rule solely on
the ground that the FHA does not encompass disparate impact claims.  Although in their
comments to the agency, plaintiffs had also challenged aspects of the burden-shifting framework
as contrary to law and had argued that applying a disparate impact standard to the provision and

---

[10] The Second Circuit further held that it would defer to the Rule's decision to overrule prior
Second Circuit precedent that had adopted a more plaintiff-friendly burden-shifting standard.
*See MHANY Mgmt.*, 819 F.3d at 618-19 (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X
Internet Servs.*, 545 U.S. 967, 986-88 (2005)).

pricing of insurance would exceed HUD's authority, *see* A.R. 376-83 (NAMIC Cmts.); A.R. 455-59 (AIA Cmts.), plaintiffs elected not to pursue these legal theories in their original Complaint.  In their summary judgment papers, plaintiffs specifically disavowed any effort to proceed on other potentially available claims, including any claim that the Rule unlawfully interfered with state regulation of insurance, *see, e.g.*, Pls.' Opp. (ECF # 27) at 38, even though another insurance trade group was litigating similar claims in *PCI* around the same time.

In a November 3, 2014, opinion, as amended on November 7, 2014, this Court granted plaintiffs' motion for summary judgment and vacated the Final Rule, holding that disparate impact claims are not cognizable under the FHA.  *See Am. Ins. Ass'n v. HUD*, 74 F. Supp. 3d 30, 39-47 (D.D.C. 2014).  HUD appealed, and that appeal was stayed pending the Supreme Court's disposition of *Inclusive Communities*, which presented the same question of statutory construction.  On September 23, 2015, the D.C. Circuit vacated this Court's judgment and remanded for proceedings in light of *Inclusive Communities*.  ECF # 51.

On April 14, 2016, this Court granted plaintiffs' motion for leave to amend their Complaint to substitute four new causes of action contending that the Rule is contrary to law to the extent that it applies to insurers' ratemaking and underwriting decisions.  Two of plaintiffs' causes of action (Counts I and II) are based on the contention that any challenge to insurance underwriting and pricing practices that might be brought under the Rule would exceed the permissible contours of disparate impact claims; the other two causes of action (Counts III and IV) challenge aspects of the Rule's proof framework as contrary to law in the insurance and ratemaking context.  Plaintiffs contend that all of the causes of action in their Amended Complaint arose only as a consequence of the Supreme Court's decision in *Inclusive Communities*.  *See* Pls.' Reply (ECF # 55) at 3.

12

## STANDARD OF REVIEW

### A.      Summary Judgment Standard

As this Court explained in its prior decision in this case:

[S]ummary judgment is appropriate when the evidence in the record demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  When evaluating cross motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  The court must accept as true the evidence of, and draw all justifiable inferences in favor of, the party opposing summary judgment.  A genuine issue exists only where the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  The nonmoving party may not rely solely on unsubstantiated allegations or conclusory statements.

74 F. Supp. 3d at 36 (internal quotations and citations omitted).

### B.      Standard of Judicial Review Under *Chevron*

As this Court also explained in its prior decision:

Judicial review of an agency's interpretation of a statute that it administers is governed by the framework laid out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc*., 467 U.S. 837 (1984).  In *Chevron*, the Court held that "[i]f the intent of Congress is clear [as to a specific issue], that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (noting that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there").  If the court determines, however, that "the statute is silent or ambiguous with respect to the specific issue," the court must advance to step-two of the *Chevron* analysis and determine "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

74 F. Supp. 3d at 39 (footnotes omitted) (alterations in original).  An agency's interpretation is entitled to controlling weight at the second step of *Chevron* so long it is reasonable, a standard that is "highly deferential" to the views of the agency.  *NRA v. Reno*, 216 F.3d 122, 137 (D.C. Cir. 2000).[11]

---

[11] Amicus National Association of Home Builders argues that HUD lacks authority to issue a regulation at least insofar as the regulation addresses judicial as well as administrative proceedings.  ECF # 61.  That argument is incorrect.  *See Am. Family*, 978 F.2d at 300-01.

**ARGUMENT**

**I.   PLAINTIFFS BEAR THE BURDEN TO SHOW THAT IN NO SET OF CIRCUMSTANCES CAN THE RULE BE VALIDLY APPLIED TO INSURERS OR TO INSURERS' UNDERWRITING AND RATEMAKING ACTIVITIES**

To prevail on a facial challenge to a regulation, plaintiffs "must establish that no set of circumstances exists under which the [regulation] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (alteration in original); *see also Sherley v. Sebelius*, 644 F.3d 388, 397 & n.** (D.C. Cir. 2011); *Chamber of Commerce v. NLRB*, 118 F. Supp. 3d 171, 184 & n.7 (D.D.C. 2015).  All four of the plaintiffs' Counts in this case fall far short of that demanding standard, and so their challenge fails.

Plaintiffs' descriptions of their challenge to the regulation contain the words "as applied." Sometimes they seem to argue that the "Rule is . . . unlawful as applied to insurers."  Pls.' Mot. for Summ. J. ("Pls.' Mem.") at 15 (ECF No.  60).  At other times, they make a somewhat more limited claim that it is only "unlawful as applied to insurers' ratemaking and underwriting decisions."  *Id.* (capitalization altered).  But merely using the words "as applied" does not make theirs an as-applied rather than a facial challenge.  The key marker of an "as applied" challenge is that it "asks a court to assess a [regulation's validity] with respect to the particular set of facts before it."  *Hodge v. Talkin*, 799 F.3d 1145, 1156 (D.C. Cir. 2015).  There is no such particular set of facts before the Court here.  Plaintiffs invoke hypothetical hurricane damage to coastal homes, Pls.' Mem. at 25-26, and defendants may also suggest hypotheticals for purposes of explanation.  But no particular set of *non-hypothetical* facts to which the regulation applies is before the Court in this case.

It is thus no matter that plaintiffs challenge the rule only insofar as it pertains to insurance, a subset of the regulation's total sweep.  *See PCI*, 66 F. Supp. 3d at 1036 ("Although

14

[plaintiff] does not seek to invalidate the Rule outside the homeowners insurance context, its challenge is more akin to a facial challenge than to an as-applied challenge . . . .").  *Hodge* illustrates the point.  Hodge brought a challenge to 40 U.S.C. § 6135, which makes it "unlawful to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement."  799 F.3d at 1150.  Because Hodge "raise[d] no meaningful challenge to the statute's application anywhere other than the plaza (within the Supreme Court building, for instance)," the Court of Appeals observed that "Hodge's claim thus might be conceived of as 'as-applied' in the sense that he confines his challenge to the statute's application to a particular site, but 'facial' in the sense that he asks us to examine circumstances beyond his individual case."  *Id*. at 1156.  The Court of Appeals characterized the resulting question before it as "asking us to declare § 6135 unconstitutional in all its applications in the Supreme Court plaza."  *Id.* at 1157.  Here too, though the regulation has applications outside the insurance context, much as the statute in *Hodge* applies in places other than the plaza, the question is whether the regulation is invalid with respect to all its applications to insurers or (as plaintiffs sometimes limit the description of their claim) to all its applications to insurers' underwriting and ratemaking activities.

## II.     THE DISCRIMINATORY EFFECTS LIABILITY STANDARD OF THE RULE MAY BE VALIDLY APPLIED TO HOMEOWNERS INSURANCE CONSISTENT WITH *INCLUSIVE COMMUNITIES*

*Inclusive Communities* says nothing about exempting insurance, or any other entire category of housing-related industry, from disparate impact liability.[12]  Yet plaintiffs claim (Counts I and II) that the Court's decision means that HUD's denial of such a categorical exemption for insurers is not even a reasonable interpretation of the FHA under the applicable highly deferential standard of review under *Chevron*.  *See* Pls.' Mem. at 13-14.  That claim lacks merit.

### A.     The Rule Does Not Require That Race or Other Protected Characteristics Be Used and Considered in a Pervasive Way Not Permitted by *Inclusive Communities*

In Count I, plaintiffs argue that the Rule is invalid "in the unique context of the insurance business" because it will cause race to be used and considered in a "pervasive way."  Pls.' Mem. at 15.  That is incorrect.

The discriminatory effects liability standard set forth in the Rule does not require the pervasive use of race or any other protected characteristic in the context of insurance – or any other context.  To the contrary, the discriminatory effects liability standard precludes the use of "facially neutral practices that have an *unjustified* discriminatory effect on the basis of a protected characteristic."  78 Fed. Reg. at 11,461 (emphasis added).  This matches the Supreme Court's recognition of disparate impact liability under the FHA that does not cause race to be

---

[12] The Supreme Court's failure to reference insurance is all the more significant because plaintiffs, represented by their present counsel, filed an amicus brief in *Inclusive Communities* arguing that disparate impact claims should not be recognized under the FHA because "[p]ermitting liability to be imposed on the basis of a disparate impact, as opposed to disparate treatment, would strike at core principles of sound insurance practice and would impair state law, which is controlling in the unique realm of insurance regulation."  2014 WL 6660912, at *3 (U.S. Nov. 24, 2014).  Additionally, the principal dissenting opinion makes clear that the Supreme Court was aware of plaintiffs' litigation of this very case.  *See Inclusive Cmtys.*, 135 S. Ct. at 2534, 2536, 2541 n.7 (Alito, J., dissenting) (citing *Am. Ins. Ass'n*, 74 F. Supp. 3d at 43).

16

used in an impermissible way.  *See, e.g.*, *Inclusive Cmtys.*, 135 S. Ct. at 2521-22 (endorsing

disparate impact liability, which the Court describes as making unlawful facially neutral

practices that disproportionately affect minorities "without any sufficient justification"); *see also*

*Tennessee v. Lane*, 541 U.S. 509, 520 (2004) (recognizing that the Constitution authorizes

"prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to

carry out the basic objectives of the Equal Protection Clause").  Moreover, as the Court

explained, a remedy "to eliminate racial disparities" of a discriminatory effects violation under

the FHA need not require the use of race.  *See Inclusive Cmtys.*, 135 S. Ct. at 2524.  Instead,

when a practice does have an unjustified discriminatory effect, a remedy can "concentrate on the

elimination of the offending practice," or use other race-neutral devices.  *Id*.  Such remedies

avoid constitutional questions.  *See id*. (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S.

469, 510 (1989) (plurality opinion)).

      Insurance is not some unique instance in which race-neutral remedies are unavailable.  If

anything, race-neutral remedies – typically the elimination of the discriminatory practices – are

almost always likely to be available in the property insurance context.  Particularized examples

help illustrate the point, notwithstanding the facial nature of plaintiffs' challenge.  Under

plaintiffs' own hypothetical, a town's coastal areas, inhabited primarily by Asian Americans, are

charged higher rates than inland areas with a predominately black population because of the

insurer's view that the coastal areas are subject to a higher risk of wind damage.  Pls.' Mem. at

25-26.  *If* a court found the higher charges were in fact *unjustified* by higher risks, it would not

need to order the insurer to make race-conscious changes to its policies like decreasing rates for

all Asian Americans in the town.  The court could instead order the elimination of the practice of

17

charging higher rates unjustified by higher risk or the adoption of a better race-neutral measure of risk with a less discriminatory effect.

Or consider an actual, non-hypothetical case in this district involving a challenge to one insurer's alleged practice of not insuring landlords who accept tenants receiving government "Section 8" housing vouchers, which the plaintiff claims has an unlawful disparate impact based on race and sex. *See Nat'l Fair Hous. All. v. Travelers Indem. Co.*, No. 1:16-cv-00928-JDB (D.D.C. filed May 17, 2016) ("*NFHA*"). The defendant in that case has argued in a motion to dismiss that, effective January 1, 2016, it discontinued, on a nationwide basis, any underwriting criteria that precluded issuing property insurance to landlords with Section 8 tenants. Defs.' Mot. to Dismiss at 2, *NFHA* (ECF No. 10-2). Travelers' alleged decision to respond by eliminating the alleged former policy does not use race or gender or any other protected characteristic at all, let alone in a pervasive manner. As we understand Travelers' description of its current policy, it is willing to underwrite such insurance without regard to whether tenants receive Section 8 assistance and *without* regard to the race, gender, or other protected characteristics of the tenants. If so, Travelers has found the unicorn plaintiffs here say cannot exist: a race-neutral remedy to correct an alleged instance of discriminatory effects liability.[13]

Relatedly, plaintiffs suppose that the discriminatory effects liability standard requires that their members "devise new underwriting and rating models that *somehow* t[ake] protected

---

[13] Two recent decisions in other districts address similar claims. *See Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555 (D. Conn. 2015) (denying insurer's motion to dismiss); *Jones v. Travelers Cas. Ins. Co. of Am.*, No. C-13-02390 LHK, 2015 WL 5091908 (N.D. Cal. May 7, 2015) (denying insurer's motion for summary judgment). In *Viens*, the defendant insurer similarly agreed to eliminate the practice of taking into consideration a tenant's lawful source of income – including Section 8 rental assistance – in connection with its underwriting, pricing, and eligibility criteria for new and existing insurance policies. *See* Consent Decree at ¶ 5, *Viens v. Am. Empire Surplus Lines Ins. Co.*, No. 3:14-cv-000952-JBA (D. Conn. Aug. 31, 2015), ECF No. 96 .

characteristics into account and eliminate[ ] any statistical disparities the data revealed."  Pls.'
Mem. at 17 (emphasis supplied).  This is absurd.  The discriminatory effects liability standard
does not make every statistical disparity in housing outcomes unlawful.  As HUD explained,
responding to similar comments during the rulemaking, plaintiffs' argument incorrectly
"presume[s] that once a discriminatory effect is shown, the policy at issue is *per se* illegal."  *See*
78 Fed. Reg. at 11,475.  Instead, even where a statistical disparate effect is shown, an "insurer
has a full opportunity to defend the business justifications for its policies."  *Id.*[14]  *Inclusive
Communities* makes the same point: a policy that "is necessary to achieve a valid interest" is
lawful even if the statistics show that it does cause a disparity.  135 S. Ct. at 2523.  Therefore, if
insurance companies are, as plaintiffs assert, considering only those factors that relate to
"accurate and impartial evaluation of risk," Pls.' Mem. at 16, and consideration of these factors
is necessary for "sound insurance practice," *id*. at 17, there is no reason to presume insurers'
underwriting or rating models must take protected characteristics into account to avoid liability
under the Rule.

    Liability attaches *only* where an underwriting or rating policy has an *unjustified*
discriminatory effect on a protected class.  *See* 78 Fed. Reg. at 11,461; *Inclusive Cmtys.*, 135 S.
Ct. at 2521-22.  Insurers are under no obligation to abandon efforts to make *justified* distinctions
between genuinely different risks merely because there is not a perfectly even distribution of

---

[14] This is not the first time HUD has attempted to dispel such misconceptions regarding
application of the discriminatory effects standard to insurance practices.  More than two decades
ago, HUD's Assistant Secretary for Fair Housing and Equal Opportunity explained in testimony
to Congress that even when the disparate "racial effect [of an insurance practice] is clear . . .
these types of statistics do not, in themselves, prove a violation of the Fair Housing Act.  Where
there is a business necessity for such a practice and no less discriminatory alternative is
available, no violation would exist." *Homeowners Insurance Discrimination: Hearing Before the
S. Comm. on Banking, Hous., and Urban Affairs*, 103d Cong. 19 (1994) (stmt. of Roberta
Achtenberg, Ass't Sec'y for Fair Hous. & Equal Opportunity).

protected class members between the different risk pools.  To return to plaintiffs' coastal property hypothetical, if indeed the hurricane-related higher price for coastal property is justified, an insurer would be under no obligation to tweak rates to equalize the results for Asian Americans and blacks.  The discriminatory effects liability standard offers ample opportunity for insurers to show that their risk-based and other underwriting and pricing practices are justified, s*ee* 78 Fed. Reg. at 11,470, 11,474, even if differences of results for different protected classes remain.

**B.     The Rule Does Not Require Insurers to Collect Data Concerning Membership in Protected Classes Inconsistent with *Inclusive Communities***

Plaintiffs also support Count I by saying that the Rule will require insurers to gather data concerning the race and other protected characteristics of policyholders and applicants.  *E.g.*, Decl. of William G. Hirschfeld ¶ 7 (ECF No. 60-7); Aff. of Stephanie Lloyd ¶ 8 (ECF No. 60-9); Aff. of Nikki L. Meek ¶12 (ECF No. 60-10); Aff. of Greg Hayward ¶ 19 (ECF No. 60-6); *see* Pls.' Mem. at 15-17.  This is a problem, they continue, because "at least one State explicitly prohibits them from collecting such data at all," Pls.' Mem. at 15,[15] and because the insurers would need to "decide how to collect the data" and "determine how to store the data," *id*, at 16. We have already rebutted plaintiffs' argument that the Rule will require insurers to *use* and consider race or other protected characteristics in a pervasive way.  Plaintiffs also charge that the

---

[15] A provision in one state's law is inadequate to sustain plaintiffs' facial challenge to the Rule's applicability to insurers in all fifty states.  And even in Maryland, the cited statute prohibits inquiries regarding only a subset of the protected characteristics covered by the FHA.  *See* Md. Code Ann. Ins. § 27-501(c)(1) (excluding sex, familial status, and disability).  And it only applies to inquiries related to "application[s] for insurance."  *Id.*  Thus, the cited provision does not prohibit insurers operating in Maryland from collecting certain protected characteristic information from applicants, nor does it prohibit insurers from collecting data regarding any protected characteristic from existing policyholders should they voluntarily choose to do so for purposes of evaluating any potential discriminatory effect of their rating and underwriting practices.

standard will impermissibly require insurers to at least *collect* data on protected characteristics of their policyholders, even if they never rely on it.  That is wrong for the same reason and for additional reasons as well.

First, plaintiffs' claim is built on a faulty premise that the Rule somehow requires insurers to collect demographic data about its members.  Plaintiffs cite absolutely no provision of the Rule, or statement in HUD's explanatory preface, for this proposition.  To the contrary, as HUD explained in addressing a comment about this very concern during the rulemaking, it is the charging party or plaintiff, not the insurer, who has the burden to show that there is a discriminatory effect.  78 Fed. Reg. at 11,475; *see also* 24 C.F.R. § 100.500(c)(1).  If the data on that point are difficult or impossible to come by, it is not the insurer's problem and not its burden to collect that data in the first place.

Moreover, plaintiffs' professed fear that the Rule will require insurers to *begin* collecting data on race and other protected classes is belied by the current fact that insurers are not *already* collecting that data.[16]  As noted earlier, *supra* pp. 3-4, HUD prior to 2013 had specifically recognized that the FHA prohibits disparate impact discrimination in the provision of insurance,

---

[16] Aff. of David R. Benseler ¶ 5 (ECF No. 60-3) ("At no time has Motorists collected data regarding the race, color, religion, national origin, handicap or other protected classes of its policyholders"); Aff. of Salvatore T. LaDuca ¶ 9 (ECF No. 60-8) ("Merchants does not currently collect, retain, or use data regarding the race, color, religion, national origin, sex, familial status, or handicap of its policyholders or prospective policyholders"); Aff. of Andrew P. Forstenzer ¶ 5(ECF No. 60-5) ("Preferred Mutual does not currently collect . . ."); Hayward Aff. ¶ 5 ("State Farm does not collect . . ."); Hirschfeld Decl. ¶ 7 ("Franklin Mutual would need to start collecting data . . ."); Lloyd Aff. ¶ 7 ("Farmers Insurance does not collect, maintain or use data on race . . ."); Meek Aff. ¶ 13 ("Hartford does not currently collect or use data regarding race . . ."); Aff. of Dianne L. Priest ¶ 4 (ECF No. 60-12) ("Cameron Mutual does not request, collect or store information or records relating to race . . ."); Decl. of Ronald Joseph Zaleski ¶ 11 (ECF No. 60-17) ("does not collect and compile data . . ."); Aff. of Kevin J. Christy ¶¶ 4-5 (ECF No. 60-4); Aff. of North Dakota Farm Mutual Cos. ¶ 6 (ECF No. 60-11); Aff. of Larry M. Shaw ¶ 5 (ECF No. 60-13); Aff. of Scott St. Angel ¶ 9 (ECF No. 60-14); Aff. of Geneau M. Thames ¶ 8 (ECF No. 60-15); Aff. of Dalith Wells ¶ 6 (ECF No. 60-16).

and the Department of Justice and private litigants had brought disparate impact claims against insurers.[17]  As the insurers' actual behavior to date reveals, the availability of discriminatory effects liability with respect to insurance has not compelled insurers to gather racial data about their policyholders during the last twenty years.  The continued availability of the discriminatory effects standard set forth in the Rule and *Inclusive Communities* will not require such data gathering in the next twenty years either.

Even if the Rule could be read to require insurers to self-test their policies for disparate impact – which it does not – gathering data about policyholders and applicants will often not be necessary to discerning whether there is a disparate impact.  Take the hypothetical example in plaintiffs' brief, the charging of higher rates in a town's coastal areas that the insurer estimates are at heightened risk for hurricane damage.  The insurer does not need to collect data regarding the races of its policyholders and applicants to find out that Asian Americans are more likely than blacks to live in those higher-rate coastal areas.  Census data would already be available to insurers to provide the demographic breakdown in that hypothetical instance and in the many other likely instances in which it is the insurer's practice to charge a higher rate in one geographical area than another.  *See Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 60 (recognizing the use of census data to support plaintiffs' prima facie case in an FHA claim against an insurer).

More fundamentally, it is unclear how the data collection that plaintiffs allege is required by the Rule would violate *Inclusive Communities*' caution against "caus[ing] race to be used and considered in a pervasive way" – the basis of Count I in their Amended Complaint.  The only

---

[17] Indeed, plaintiffs represented to the Supreme Court in 1996 that they were subject to disparate impact claims under the FHA.  *See* Amicus Brief of NAMIC and AIA, *Nationwide Mut. Ins. Co. v. Cisneros*, (No. 95-714), 1996 WL 33467765, at *14 (U.S. Jan. 3, 1996) (warning, as amici supporting a petition for certiorari that was denied, that "[t]he practical effect of the Sixth Circuit's decision is that property insurers will be forced to fend off FHA disparate impact challenges to underwriting and rating standards and rules").

way to determine whether a policy or policies disproportionately affect members of protected

classes – the foundational requirement of all disparate impact claims – is to take note of who the

policy or policies affect.  Such consideration of race obviously cannot be impermissibly

pervasive, because the Supreme Court has rejected the argument that the mere existence of

disparate impact liability is unconstitutional.  *See Inclusive Cmtys.*, 135 S. Ct. at 2522

("disparate-impact liability has always been properly limited in key respects" to avoid

constitutional difficulties).  Indeed, as *Inclusive Communities* itself recognized, "race may be

considered in certain circumstances and in a proper fashion" in both "public and private

transactions covered by the FHA."  *Id.* at 2525.  Insurers are in no different position with respect

to this issue than any other entity covered by the FHA, including entities involved in practices

that the Supreme Court labeled as "at the heartland of disparate-impact liability."  *See id.* at

2522.

For example, a municipality wanting to determine whether its zoning laws preventing

construction of multifamily rental housing created a disparate impact would need to consider

racial data about its residents and the population of who might want to live in the new housing.

*See United States v. City of Black Jack*, 508 F.2d 1179, 1183, 1186 (8th Cir. 1974) (detailing

data on the racial composition of a municipality and its surrounding metropolitan area and using

that data to conclude there was a disproportionate effect on protected classes seeking housing in

the municipality), *cited in Inclusive Cmtys.*, 135 S. Ct. at 2522.  Indeed, the FHA itself

incentivizes certain covered entities to engage in self-testing designed to identify and remedy any

possible violations of the Act.  *See* 42 U.S.C. § 3614-1.  Such self-testing inherently requires

taking note of the protected characteristics of the applicants or customers involved in the housing

transactions being tested.  Moreover, federal law explicitly provides for some entities subject to

disparate impact liability under the FHA or Title VII to collect data on their applicants' race and

other protected characteristics.  *See, e.g.*, 12 U.S.C. § 2803(b)(4) (requiring lenders to publicly

disclose information about mortgage applicants grouped by characteristics including the race and

sex of borrowers).  Such laws have not been held unconstitutional, nor do they by themselves

create pervasive uses of race.

**C.**      ***Inclusive Communities* Does Not Require HUD to Provide Insurers' Business of Evaluating Risk an Industry-Specific Safe Harbor from Discriminatory Effects Liability**

Plaintiffs also claim as part of Count I that *Inclusive Communities* requires HUD to carve

out an absolute safe harbor from any possibility of discriminatory effects liability for the "unique

context of the insurance business," Pls.' Mem. at 15,  because, at its heart, the insurance business

involves the "accurate and impartial evaluation of risk," with "risk," "risk factors," and "risk

profiles" being the fundamental metrics of underwriting and pricing insurance.  *Id*. at 15, 16, 17,

18, 21, 22-23.  Such a "sweeping" exemption based on that "purportedly unique nature of the

insurance industry" is unjustified.  *Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 60.

Insurers are in the legitimate business of evaluating differences in risks and charging

different rates (or declining to insure some risks altogether) based on genuinely different risks.

*See* Pls.' Mem. at 22-23.  This importance of legitimate risk differentiation to the insurance

industry does not entitle insurers to a unique safe harbor from discriminatory effects scrutiny for

at least four reasons.

First, having to evaluate risks does not fundamentally distinguish insurance from other

contexts in which discriminatory effects analysis is routinely employed.  Lenders have valid

reasons for evaluating who is or is not a good risk to repay and to differentiate between those

who are more versus less risky.  *See* 78 Fed. Reg. at 11,476 (explaining that the Rule continues

to allow lenders to deny the application of "a member of a minority group who did not meet legitimate nondiscriminatory credit qualifications").  Employers have valid reasons for evaluating who is or is not likely to be or to continue to be a good employee and to treat differently those who are unlikely to be able to perform the job.  *See, e.g.*, 29 C.F.R. part 1607 (EEOC guidelines providing framework for nondiscriminatory employment tests and selection procedures); *see also* Ronen Avraham et al., *Understanding Insurance Antidiscrimination Laws*, 87 S. Cal. L. Rev. 195, 197-98 (2014) ("Individuals, corporations, and governments draw distinctions all the time, and in ways that are widely considered unobjectionable . . . . and there are whole fields of law, such as employment discrimination law, that are devoted to the question of when discrimination should be deemed illegal and when not.").  In all such instances, as with insurance, the risk evaluation may involve differences in degree of risk or in certainty of risk.  If discriminatory effects analysis can be deployed in those circumstances – and it can be – where defendants can have valid reasons for differentiating among applicants with demonstrably different risk profiles, it can likewise be deployed here.  As an industry with a legitimate interest in validly differentiating among persons with genuinely different risk profiles, insurance is not a context "unique[ly]" entitled to an absolute safe harbor.

Second, while risk evaluation may be used in some of what insurers do (underwriting and pricing), evaluation of risk is not central to all of what insurers do.  In particular, risk evaluation does not play as central a role in insurers' marketing efforts or claims adjusting activities.  If an insurer's marketing practice or claims adjusting practice has discriminatory effects, there may be a valid reason for the practice that the insurer can invoke, but the reason is not likely to be that the marketing or claims-adjustment practice is justified by a differential evaluation of risks.  *Cf. Burrell v. State Farm & Cas. Co.,* 226 F. Supp. 2d 427, 442 (S.D.N.Y. 2002) (FHA claim related

to the processing of insurance claims); *Franklin v. Allstate Corp.*, No. C-06-1909, 2007 WL 1991516, at *6 (N.D. Cal. July 3, 2007) (FHA claim related to the payment of insurance claims). Plaintiffs sometimes seem to recognize this limitation on the reach of their argument with headings making the (relatively) limited claim that the disparate-effects-liability standard is invalid with respect to "insurers' ratemaking and underwriting decisions."  Pls.' Mem. at 15, 21 (capitalization altered).  But the text of plaintiffs' brief seems to expand the claim to be that the standard is invalid "as applied to insurers" or "[i]n the insurance context."  *Id.* at 15.  To whatever extent Plaintiffs seek a safe harbor for their activities other than underwriting and ratemaking, their arguments are unsupported by their risk rationale.

Third, in making pricing and underwriting decisions, insurers may consider factors beyond those based solely on risk evaluation.  One example is the bundling discount for combining home and auto insurance with the same company.  Perhaps the willingness to bundle is some indication of a lower risk that actuaries could measure, but there is a more obvious and probably larger reason why a lower, bundled rate would be offered, namely, that some of the marketing, billing, customer service, and other administrative costs can be spread over two policies.  A second non-risk factor insurers use in setting their rates is "price optimization."[18] Although there are some variations in how "price optimization" is defined and carried out, as a general matter insurers using price optimization do not consider risk alone in setting prices but add in a consideration of different customers' different price elasticities of demand.  *See* White Paper ¶ 7.  For example, price optimization considers factors such as "marketing goals" and "policyholder retention" as an "additional component of the pricing process" beyond the risk-

---

[18] *See* Nat'l Ass'n Ins. Comm'rs, Cas. Actuarial & Statistical (C) Task Force, *Price Optimization White Paper* (Nov. 19, 2015) ("White Paper"), *available at* http://naic.org/documents/committees_c_catf_related_price_optimization_white_paper.pdf.

based rates to set final prices.  *Id.*  ¶¶ 14(a), 16(b).  The point of this paragraph is a limited one: the choices insurers make in offering discounts for bundled policies or in pursuing price optimization serve purposes other than evaluating and differentiating among different risks.[19] Even if plaintiffs were right – and they are not – that risk evaluation is an inherent feature "unique" to insurance that justifies a safe harbor, there is no basis for exempting insurers from scrutiny under the discriminatory effects liability standard for practices not based on such risk differentiation.  As with practices allegedly justified by risk differentiation, if such non-risk based practices are justified, they would be upheld.  But where such practices do have discriminatory effects, there is no reason why the insurer should be exempted from liability without any scrutiny whatsoever as to whether a given practice is adequately justified.

Fourth, even to the extent that what insurers *should* be doing is making decisions based on "accurate and impartial evaluation of risk," Pls.' Mem. at 16, it does not necessarily follow that that is what they *are* doing or that their evaluations are always accurate and always impartial.  Agencies like defendant HUD have subject-matter experts who consider the meaning of statutes that they specialize in administering and who strive to craft rules based on their expertise and their accurate and impartial evaluation of evidence and public comments.  Yet they occasionally get it wrong, and that is why we have judicial review.  Insurers are also organizations in which decision makers are fallible human beings.  Like agencies, if and when insurers do not do what they argue (and admit) they should be doing – making *justified* evaluations of risk – their decisions should likewise at least be subject to review.  If, for example, an insurer incorporates in its attempt at risk evaluation an outdated or stereotypical factor that differentiates between risks (if at all) badly compared to other available measures and has a

---

[19] This brief takes no position on the different question whether these non-risk-evaluation purposes are valid and justified purposes.

discriminatory effect on a protected class, that decision should be open to scrutiny.  On the other hand, it will also often and (one hopes) usually be the case that insurers will appropriately evaluate risk.  Under the discriminatory effects liability standard, they will have the opportunity to make that very point in the event their practices are alleged to have an unjustified discriminatory effect.  Thus, plaintiffs' "sweeping argument" that "the purportedly unique nature of the insurance industry" as a risk-evaluating enterprise justifies an exemption from scrutiny under a discriminatory effects standard "is unavailing in light of the availability of the 'business justification' defense."  *Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 60.

**D.**     **State Insurance Law Does Not Break the Causal Chain Between Insurers' Actions and Those Actions' Discriminatory Effects**

Plaintiffs contend in Count II that the discriminatory effects standard may not be applied to insurers' ratemaking and underwriting decisions because state laws limit insurers' discretion in making those decisions.  *See* Pls.' Mem. at 21-23.  They then argue that *Inclusive Communities* dictates that these state law limitations conclusively break the causal chain between those decisions and the disparate impact.  *See* Pls.' Mem. at 21, 23-24.  This attempt to offload the insurers' responsibility for the discriminatory effects of their own practices onto the States misreads *Inclusive Communities*.

Plaintiffs' argument is fundamentally flawed because they misconstrue one observation in *Inclusive Communities* about the underlying claim in that case.  Respondents had alleged that a state agency discriminated in its own exercise of discretion in awarding federal low-income tax credits.  *See Inclusive Cmtys.*, 135 S. Ct. at 2513-14.  Federal tax law establishes certain priorities for distributing those credits, delegates responsibility for distributing the credits to the States, and allows States to implement additional criteria.  *See id*. at 2513 (citing 26 U.S.C. § 42).  The district court had ruled for respondents, finding a disparate impact proved by disparities in

28

the approval rate of projects and the percentage of completed projects in low-minority compared to high-minority areas. *See id*. at 2514. In suggesting that respondents' claims might fail when reevaluated on remand, the Supreme Court stated that it might "be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units." *Id*. at 2523-24. One such difficulty, in the context of the claim against the state agency about its own implementation of a federal tax statute that mandates certain considerations and provides the agency with discretion to add others, was that the "federal law substantially limits the Department's discretion." *Id.* at 2524. Contrary to plaintiffs' suggestion, *see* Pls.' Mem. at 21, nothing in that observation establishes a categorical prohibition of FHA disparate impact claims when other laws are implicated. *See Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394, 408 (Mass. 2016) (rejecting a "per se rule precluding disparate impact liability under the [FHA] where a property owner has acted in accord with statute, regulation, and contract" after *Inclusive Communities*). The Court's observation merely underscores that a plaintiff must link alleged disparities in a disparate impact lawsuit to the defendant it is suing and not to another party, consistent with standard principles of causation.

Plaintiffs identify two types of state regulations that, they allege, limit their discretion sufficiently to break the causal chain between their actions and any disparate impact: (i) state laws forbidding grouping risks by classifications based on race, national origin, or other prohibited characteristics, Pls.' Mem. at 21-22 (collecting statutes and regulations),[20] and (ii)

---

[20] *But see* Avraham et al, *supra*, 87 S. Cal. L. Rev. at 196 ("Among our findings is that, contrary to the conventional wisdom, state insurance antidiscrimination laws vary a great deal: in substance and in the intensity of regulation, across lines of insurance, across policyholder characteristics, and across states. The Article also finds that, contrary to our own predictions, a surprising number of jurisdictions do not have any laws restricting insurers' ability to discriminate on the basis of race, national origin, or religion.").

state laws that "*allow* insurers to make distinctions based on 'differences among risks that can be demonstrated to have a probable effect upon losses or expenses,'" Pls.' Mem. at 22 (quoting W. Va. Code § 33-20-3(c)(2)) (emphasis added).  However, plaintiffs do not allege that either category of state law *requires* them to set rates in a particular way.   Insurers, of course, have strong incentives to make risk-based distinctions between categories of customers in their rate setting; as acknowledged above, making *justifiable* distinctions of that sort is essential to the business of insurance.  But the incentives for doing so would generally be the insurers' own business reasons, not mandates of state laws.  *See Am. Family*, 978 F.2d at 295.

Moreover, state law generally leaves insurers with substantial discretion to decide which distinctions to make and how to weigh them.  Consider plaintiffs' hypothetical example of taking into account the "proximity of fire stations."  Pls.' Mem. at 28.  Plaintiffs' brief implies that state law is generally neutral – neither requiring nor forbidding consideration of that particular factor. Plaintiffs have not claimed – let alone met their burden in a facial challenge in establishing – that state law gets into the weeds of *how* insurers consider proximity, such as whether to measure distance from a fire station by crow-flies distance, road miles, or response time; what distance or time cutoffs to use; whether to give a bigger discount for proximity to a truck company than for proximity to an engine company; or of how big a discount to give.[21]  If an insurer chose to adopt a *particular* practice on how to discount for fire coverage that could not survive scrutiny under

---

[21] *See also* Robert W. Klein, *A Regulator's Introduction to the Insurance Industry* 180 (2d ed. 2005) ("A few jurisdictions have . . . stringent price regulation but, as a practical matter, the majority of states rely heavily on competition to regulate insurance prices – even those states with prior-approval systems.") *available at* http://www.naic.org/documents/prod_serv_marketreg_rii_zb.pdf.

the discriminatory effects standard, it is not because state law mandated that particular practice as opposed to one of the more justifiable options.[22]

     An actual case would assist in explaining this point, so we look again at *National Fair Housing Alliance v. Travelers Indemnity Co.*  As noted above, Travelers has stated in a motion to dismiss that, effective January 1, 2016, it discontinued, on a nationwide basis, any underwriting criteria that precluded issuing property insurance to landlords with Section 8 tenants.  *NFHA* ECF No. 10-2 at 2.  If state laws in 2015 actually had *required* Travelers not to underwrite insurance for landlords who accept Section 8 tenants, then Travelers could not have adopted a nationwide practice of underwriting such policies on January 1.  Of course, it seems unlikely that underwriting insurance for Section 8 landlords has *ever* been forbidden in any State, as the Section 8 program could not operate if any landlord who accepted Section 8 tenants would lose her insurance as a result.  *See Jones*, 2015 WL 5091908, at *5 (court "not persuaded" that California law would even allow Travelers' alleged former practice).  If Travelers' former practice was to refuse to underwrite insurance for Section 8 landlords, that practice was adopted for its own business reasons rather than by any compulsion of state law.

     It is no wonder then that courts have generally rejected insurers' claims that practices that have discriminatory effects that the insurers adopted for their own reasons are immune from scrutiny because of state regulation.[23]  *E.g.*, *Dehoyos*, 345 F.3d at 299; *Jones*, 2015 WL

---

[22] The text is limited to the particular point being made, which is that an insurer's choice of particular measures of risk is often not mandated with any level of specificity by state law; the brief does not take a position on whether any particular (or any) consideration of fire station coverage would or would not have a discriminatory effect or on whether, if so, it would nevertheless be justifiable.

[23] Courts have addressed this question in the context of claims that McCarran-Ferguson exempts insurers from coverage under the FHA.  The causation issue raised by Count II provides an even weaker ground for insurers' immunity from state regulation than McCarran-Ferguson.  *See* 15

5091908, at *5; *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868 MA/V, 2007 WL 6996777, at *7

(W.D. Tenn. July 6, 2007); *Viens*, 113 F. Supp. 3d at 573; *Toledo Fair Hous. Ctr. v. Nationwide*

*Mut. Ins. Co.*, 704 N.E.2d 667, 671 (Ohio Com. Pl. 1997); *see Am. Family*, 978 F.2d at 297

("American Family has not drawn to our attention . . . any law, regulation, or decision in

Wisconsin requiring redlining, condoning that practice, committing to insurers all decisions

about redlining, or holding that redlining with discriminatory intent (or disparate impact) does

not violate state law"); *but see Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008);

*Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421 (Tex. 2011).

In any event, it is not enough for plaintiffs to hypothesize that there might be *some*

instances in which application of the discriminatory effects standard of the HUD Rule and

*Inclusive Communities* would conflict with a state law even after flexible application of the

standard's legally sufficient justification prong that would take the state mandate into account.

Outliers like *American Family*'s hypothetical about what the result might be "[i]f Wisconsin

wants to authorize redlining," 978 F.2d at 297, need not be decided unless and until Wisconsin

actually does decide that it wants to authorize redlining.  For present purposes, given the across-

the-board facial nature of plaintiffs' challenge in Count II, it is enough to say that there are some

circumstances in which the discriminatory effects standard of the Rule is entirely compatible

with the causation required by *Inclusive Communities* notwithstanding the state regulation of

insurance.

---

U.S.C. § 1012(b) ("No Act of Congress shall be construed to invalidate, impair, or supersede any
law enacted by any State for the purpose of regulating the business of insurance, or which
imposes a fee or tax upon such business, unless such Act specifically relates to the business of
insurance. . . .").

**III.    HUD LAWFULLY BASED THE RULE'S BURDEN-SHIFTING FRAMEWORK ON FHA CASE LAW AND TITLE VII IN CONFORMITY WITH *INCLUSIVE COMMUNITIES***

Plaintiffs' final two challenges, to the Rule's framework for proving a disparate impact claim (Counts III and IV), also fail as a matter of law.  Congress has charged HUD with administering the FHA, *see* 42 U.S.C. § 3614a, and HUD has construed the Act to provide for disparate impact liability if proven through a three-part burden-shifting framework.  Because the FHA is silent on the proof framework, it was eminently reasonable for HUD to look to existing law under the FHA and Title VII in filling this gap.  *See PCI*, 66 F. Supp. 3d at 1053 (rejecting APA challenge to the Rule's burden-shifting framework because it is "reasonable"); *see also United States v. Boyle*, 469 U.S. 241, 246 n.4 (1985) (holding that an agency "interpretation merits deference" pursuant to *Chevron* when it "is consistent with Congress' intent, and over 40 years of case law").

*Inclusive Communities* is fully consistent with the standard that HUD promulgated relying on these preexisting sources of law.  The Supreme Court explicitly analogized to Title VII in discussing the standards applicable to an FHA disparate impact claim.  *See Inclusive Cmtys.*, 135 S. Ct. at 2522 (giving covered entities "leeway to state and explain the valid interest served by their policies . . . analogous to the business necessity standard under Title VII").  The Court heavily relied on *Griggs*, which is the foundation of Title VII disparate impact proof standards, to articulate the limits of FHA disparate impact.  *See supra* pp. 9-10.  Moreover, the Court's observation that "disparate-impact liability *has always been* properly limited in key respects," *Inclusive Cmtys.*, 135 S. Ct. at 2522 (emphasis added), further evidences that it was not calling for a significant departure from preexisting FHA and Title VII precedents.  Indeed, in the portion of the *Inclusive Communities* opinion discussing the standards of proving a disparate

impact claim, the Supreme Court cited the Rule twice in support of its analysis.  *See id.* at 2522-23.[24]  Accordingly, as noted earlier, two courts of appeals have held after *Inclusive Communities* that the Rule is consistent with – in the words of one, "implicitly adopted by" – the Supreme Court's decision.  *MHANY Mgmt.*, 819 F.3d at 618;[25] *see also Ave. 6E Invs.*, 818 F.3d at 512-13.  Plaintiffs' omission of that case law from their brief is telling, and they cite no court (and defendants are aware of none) that has held that the Rule is inconsistent with *Inclusive Communities* in the more than one year since the Supreme Court ruled.

This Court should join the consensus and reject plaintiffs' argument that *Inclusive Communities* forecloses the burden-shifting framework established by the Rule.  While *Inclusive Communities* elucidated the broad principles governing disparate impact liability, it did not resolve the question left open by the statute of how to evaluate specific cases with specific facts.[26]  *See Inclusive Cmtys.*, 135 S. Ct. at 2549 (Alito, J., dissenting) (highlighting that the majority's opinion leaves many specific questions unanswered about how to prove, and defend against, an FHA disparate impact claim); *see also PCI*, 66 F. Supp. 3d at 1052-53 ("With respect to the first step of the *Chevron* analysis, the FHA is silent regarding how the FHA or a private

---

[24] Consistent with its favorable citations to the Rule, the result of the Supreme Court's decision was to affirm the ruling of the Fifth Circuit that had reversed and remanded the decision of the district court to reevaluate the case based on the Rule's burden-shifting framework.  *See Inclusive Cmtys.*, 747 F.3d at 283.

[25] The D.C. Circuit Court of Appeals has favorably cited *MHANY Management* in a recent unpublished disposition of an FHA disparate impact claim.  *See Boykin v. Fenty*, __ F. App'x __, 2016 WL 3544284, at *2 (D.C. Cir. June 14, 2016).

[26] Indeed, the Supreme Court declined the opportunity to review the standards that the courts of appeals had developed to evaluate FHA disparate impact claims.  The *Inclusive Communities* petition for certiorari had sought review of divisions in circuit case law for "the standards and burdens of proof that should apply" to disparate impact claims under the FHA.  *See* 2014 WL 1989121, at *i, *21-23 (U.S. May 13, 2014).  The Supreme Court declined to grant certiorari on that question.  *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 46 (2014).

plaintiff should prove a housing discrimination claim.").  HUD has the authority to fill this statutory gap.  *See Chevron*, 467 U.S. at 843 (permitting an agency to construe a statute it administers unless the statute is clear on the precise question at issue); *see also Meyer v. Holley*, 537 U.S. 280, 287-88 (2003) (applying *Chevron* to a HUD regulation interpreting the FHA). Because HUD did not contravene any of the limiting principles that *Inclusive Communities* explained were part of the FHA, the agency's decisions on how to fill those gaps are reasonable, and thus lawful.  *See Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998) ("If the agency's reading fills a gap . . . in a reasonable way in light of the Legislature's design, [a court] give[s] that reading controlling weight.").

## A. The Rule, Consistent with *Inclusive Communities*, Requires Identification of a Policy or Policies Causing a Disparity

The Rule is consistent with the causality requirement specified in *Inclusive Communities*. Plaintiffs' Count III to the contrary is meritless.  Drawing on Title VII law, the Supreme Court stated that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."  *Inclusive Cmtys.*, 135 S. Ct. at 2523 (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)).  Preexisting FHA disparate impact case law had similarly held that disparate impact claims must be linked to a "specific policy [that] caused [the] significant disparate effect."  *E.g.*, *Mountain Side*, 56 F.3d at 1251.

The Rule specifies that a charging party or plaintiff must prove that "a challenged practice caused or predictably will cause a discriminatory effect."  24 C.F.R. § 100.500(c)(1).  In the preface to the Rule, HUD recognized that the charging party or plaintiff will need to "identify[] the specific practice that caused the alleged discriminatory effect."  78 Fed. Reg. at 11,469.  HUD did not attempt to create any categorical rules for how to do so, stating that it "will

depend on the facts of a particular situation and therefore must be determined on a case-by-case basis." *Id.*;[27] *see also id.* at 11,468 ("Whether a *particular practice* results in a discriminatory effect is a fact-specific inquiry.") (emphasis added).  HUD also clearly stated that the Rule does not address any questions concerning how to prove disparate impact claims through statistical evidence: "[T]his [R]ule concerns the formalization of a long-recognized legal interpretation and burden-shifting framework, *rather than a codification of how data and statistics may be used in the application of the standard.*"  *Id.* at 11,468 (emphasis added).  In proposing the Rule, HUD specified that its standard of liability "is consistent with the discriminatory effects standard confirmed by Congress in the 1991 amendments to Title VII."  76 Fed. Reg. at 70,924 (citing 42 U.S.C. § 2000e-2(k)).  Among these provisions is a causation requirement.  *See* 42 U.S.C. § 2000e-2(k)(1)(B).[28]

   If there were ambiguity whether the Rule includes a causality requirement consistent with *Inclusive Communities*, which there is not, it is dispelled by the amicus brief of the United States filed in the Supreme Court in that case.  Citing Section 100.500(c)(1) of the Rule, the brief stated that "a plaintiff cannot establish a prima facie case of disparate-impact discrimination without

---

[27] Drawing on Title VII, HUD specified that because "the elements of a decision-making process may not be capable of separation for analysis, . . . it may be appropriate to challenge the decision-making process as a whole."  78 Fed. Reg. at 11,469 (citing 42 U.S.C. § 2000e-2(k)(1)(B)(i)).  Even in those circumstances, the challenge is still "point[ing] to a defendant's policy or policies."  *See Inclusive Cmtys.*, 135 S. Ct. at 2523.

[28] *Inclusive Communities* cited *Wards Cove* for a causation standard consistent with the 1991 amendments requiring a plaintiff to identify the policy or policies causing a disparate impact, and hence it specified that the cited passage was not superseded by those amendments.  *See* 135 S. Ct. at 2523 ("A robust causality requirement ensures that '[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989), superseded by statute *on other grounds*, 42 U.S.C. § 2000e-2(k).") (emphasis added).  The American Bankers Association and its fellow amici defy logic in arguing that this "superseded . . . on other grounds" citation specifies that *Wards Cove* controls every aspect of proving disparate impact liability under the FHA.  *See* Amici Curiae Brief at 9 (ECF No. 63).

identifying the specific or aggregate practice that causes a disproportionately adverse effect of a particular group."  2014 WL 7336683, at *33 (U.S. Dec. 23, 2014).  It further specified that "[t]o do that, a plaintiff *must do more than simply identify a statistical disparity*."  *Id*. (emphasis added).  That interpretation of the Rule, to which this Court should defer, is fully consistent with the Supreme Court's subsequent opinion.  *See Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 210-11 (2011) (deferring to interpretations of federal agency regulation expressed in an amicus brief filed by the Solicitor General).

Plaintiffs' claim that the Rule unlawfully "allows claims to proceed based entirely on statistics," Pls.' Mem. at 24 (capitalization altered), fails in light of the above contrary interpretation of the Rule by HUD.  *See, e.g.*, *United Space All., LLC v. Solis*, 824 F. Supp. 2d 68, 81-82 (D.D.C. 2011) (deferring to a defendant-agency's own interpretation of its regulations that is not "plainly erroneous" over a contrary reading offered by a plaintiff).  Moreover, plaintiffs' claim is based on mischaracterizing two of HUD's responses to comments included in the preface to the Rule.  First, plaintiffs err in claiming that "HUD disagreed" with comments "stating that, in order to establish a prima facie case of discriminatory effect liability, a charging party should have to identify a specific practice and show the alleged discriminatory effect is caused by that specific practice."  Pls.' Mem. at 25 (quoting 78 Fed. Reg. at 11,469).  Instead HUD's response reflects that requirement was already included in the proposed rule, which adopted the causation requirement recognized in FHA case law and codified in Title VII.  *See* 78 Fed. Reg. at 11,469 ("HUD addressed this issue at the proposed rule stage, and its analysis is not changed in this final rule."); 76 Fed. Reg. at 70,924 ("HUD's proposal is consistent with the discriminatory effects standard confirmed by Congress in the 1991 amendments to Title VII.").

37

Plaintiffs' second mischaracterization borders on frivolous.  Plaintiffs incorrectly assert in the Rule that HUD "confirmed" the concern one commenter expressed that the Rule "would allow for lawsuits based only on statistical data."  Pls.' Mem. at 25 (quoting 78 Fed. Reg. at 11,478).  But plaintiffs' argument requires it to truncate the summarized comment it is quoting, and to wrongly imply that HUD's answer was addressing the issue of causation or was applicable to the insurance industry.  In fact, HUD was addressing whether a list of non-exclusive examples of lending discrimination that HUD proposed to codify at 24 C.F.R. § 100.120(b)(2) – not the disparate impact standards proposed to be codified at 24 C.F.R. § 100.500 – would allow plaintiffs in lending discrimination lawsuits to rely "only on statistical data produced *under HMDA*."[29]  78 Fed. Reg. at 11,478 (emphasis added); *see also* A.R. 530-31 & n.13 (Am. Bankers Ass'n et al. Cmts. summarized in this passage).  HUD's response refused to endorse the commenter's proposition that HMDA was an inadequate source of data for a lending discrimination claim because "HUD and courts have recognized that analysis of loan level data identified through HMDA may indicate a disparate impact."  78 Fed. Reg. at 11,478 (citing cases).  This response did not address the separate question of whether a lending discrimination claim needs to link the disparities (whether obtained through HMDA data or some other source) to a defendant's policy or policies.[30]  And this response did not address the use of

---

[29] The Home Mortgage Disclosure Act ("HMDA") requires mortgage lenders to collect information including the race and sex of borrowers and make it available to the public.  *See* 12 U.S.C. § 2803(b)(4).  Lenders commonly argue that the data they must publicly disclose pursuant to the HMDA provides too little information on borrowers' legitimate credit qualification to conduct a disparity analysis that will support the plaintiff's initial burden in a disparate impact case.  *See, e.g., Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251, 258 & n.15 (D. Mass. 2008) (describing, and rejecting, this argument).

[30] Nonetheless, HUD's response expressly stated that such lending discrimination claims would involve a "challenged practice."  78 Fed. Reg. at 11,478.  Moreover, the very cases that HUD cited in rejecting the comment involve plaintiffs who *did* point to a policy or policies of a lender

data with respect to any entity covered by the FHA other than lenders.  It therefore offers absolutely no support to plaintiffs' Count III, which is limited "to the extent [the Rule] applies to insurers' ratemaking and underwriting decisions."  Am. Compl. at 19 (capitalization altered).

**B.     The Rule, Consistent with *Inclusive Communities*, Allows Covered Entities to Maintain Policies that Are Not Artificial, Arbitrary, and Unnecessary Barriers**

HUD's reliance on Title VII law, and the FHA case law that has borrowed from it, effectuates the safeguards identified in *Inclusive Communities*.  *See* 135 S. Ct. at 2522 ("An important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the valid interest served by their policies.  This step of the analysis is analogous to the business necessity standard under Title VII. . . .").  Plaintiffs' arguments that the Rule runs afoul of *Inclusive Communities* – their Count IV – fail scrutiny.

Quoting from its foundational decision in *Griggs* that first recognized the disparate impact theory of liability, the Supreme Court in *Inclusive Communities* observed that "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies."  *Id*. (quoting *Griggs*, 401 U.S. at 431); *see also id*. at 2524 (cautioning against proof standards that "displace valid governmental and private priorities, rather than solely 'remov[ing] . . . artificial, arbitrary, and unnecessary barriers'") (quoting *Griggs*, 401 U.S. at 431) (alterations in original).  The Supreme Court specified that this means disparate impact liability will not be found when a claim is "simply . . .

---

that caused the disparity observed through an analysis of HMDA data.  *See, e.g.*, *Steele v. GE Money Bank*, No. 08 C 1880, 2009 WL 393860, at *4 (N.D. Ill. Feb. 17, 2009) ("The court, however, need not delve into the degree that statistics by themselves can support a claim of disparate impact because the plaintiffs do not rely exclusively on statistics.  Instead, they allege that they were harmed by specific policies put in place by the defendants, and that this caused them to pay more than similarly situated non-minority borrowers."), *cited in* 78 Fed. Reg. at 11,478 n.150.

an attempt to second-guess which of two reasonable approaches" a covered entity should follow. *Id*. at 2522.  Burden-shifting standards have been developed and refined as part of Title VII over the past forty-five years to effectuate these limits articulated by *Griggs*, which *Inclusive Communities* repeated.  *See Abril-Rivera v. Johnson*, 806 F.3d 599, 606-07 (1st Cir. 2015) (treating the burden-shifting standards applied to a Title VII claim to be consistent with the limitations explained in *Inclusive Communities*).

The second and third steps of the Rule's burden-shifting standard protect a covered entity from liability based on "second-guess[ing]" of a policy choice between "reasonable approaches." *See Johnson v. City of Memphis*, 770 F.3d 464, 472 (6th Cir. 2014) (noting under the Title VII burden-shifting standard analogous to the Rule that "the purpose of step three is not to second guess the employer's business decisions") (brackets omitted).  At the second step, a defendant or respondent has the opportunity to prove that the policy or policies at issue "is necessary to achieve one or more substantial, legitimate nondiscriminatory interest."  24 C.F.R. § 100.500(c)(2).  In the third step, a plaintiff or charging party prevails if it proves that interest could be served by a less discriminatory alternative to the challenged practice.  *See id.* § 100.500(c)(3).  In proving the less discriminatory alternative, the plaintiff or charging party must show it "serve[s] the respondent's or defendant's substantial, legitimate nondiscriminatory interest."  78 Fed. Reg. at 11,473.  Moreover, the alternative "must be supported by evidence, and may not be hypothetical or speculative."  *Id*.; *see also* 24 C.F.R. § 100.500(b)(2).

The only discrepancy that plaintiffs concretely assert between the Rule's burden-shifting standard and the safeguards noted in *Inclusive Communities* is the fact that HUD did not use the term "equally effective" in Section 100.500(c)(3).  *See* Pls.' Mem. at 27; *see also* Am. Compl. ¶103 (limiting Count IV to the failure to "requir[e] that the plaintiff's alternative be 'equally

40

effective' or 'at least as effective'").  As HUD explained in the Rule's preface, it made a

considered decision to reject using the term "equally effective" in Section 100.500(c)(3) for two

reasons: 1) it is a standard that Congress disapproved in the Civil Rights Act of 1991; and 2) it

"is even less appropriate in the housing context than in the employment area," to which it briefly

applied, "in light of the wider range and variety of practices covered by the [FHA] that are not

readily quantifiable."[31]  78 Fed. Reg. at 11,473.  The district court in *PCI* specifically held that

HUD acted lawfully in choosing not to include "equally effective" language.  *See* 66 F. Supp. 3d

at 1052-53 (deferring to HUD determination that "an 'equally effective' standard is

inappropriate").  Nothing in *Inclusive Communities*, which never used the phrase "equally

effective," renders unlawful HUD's reasoned decision to reject that language.  *See Ave. 6E Inv.*,

818 F.3d at 512-13 (recognizing the Rule's burden-shifting standard as providing the limits to

liability specified in *Inclusive Communities* and that Section 100.500(c)(3) means that "an

adjustment or accommodation can still be made that will allow both interests to be satisfied").

Instead, citing the Rule, the Supreme Court noted that Title VII "business necessity" defenses are

analogous to the safeguards it identified as part of FHA disparate impact claims.  *See Inclusive

Cmtys.*, 135 S. Ct. at 2522 (citing 78 Fed. Reg. at 11,470).

      The approach adopted in the Rule is far more reasonable than the approach that plaintiffs

now demand: adopting an untested requirement unfamiliar to entities subject to the FHA or

benefitting from its protections.  Agency interpretations that borrow from prevailing judicial case

law generally are reasonable under *Chevron*'s Step Two.  *See Boyle*, 469 U.S. at 246 n.4

(holding that an agency "interpretation merits deference" pursuant to *Chevron* when it "is

consistent with Congress' intent, and over 40 years of case law"); *see also supra* p. 5 & nn.2-8

---

[31] The latter observation accords with the statement in *Inclusive Communities* that "the Title VII
framework may not transfer exactly to the fair-housing context."  135 S. Ct. at 2523.

(cataloging FHA burden-shifting case law from which HUD borrowed).  By borrowing from the

burden-shifting framework applicable to Title VII disparate impact claims, the Rule accords with

the longstanding principle that the FHA should be interpreted in a similar manner to Title VII.

*See Inclusive Cmtys.*, 747 F.3d at 283 ("Many courts interpreting the FHA recognize the similar

purpose and language of the statutes and borrow from Title VII precedent to interpret the

FHA.").  The Rule is also a reasonable interpretation of the FHA because it seeks to fairly

allocate the burdens of proof among the parties and the showing the parties must make at each

stage.  *See* 78 Fed. Reg. at 11,472 (noting the definition of "legally sufficient justification"

"fairly balances the interests of all parties"); *id.* at 11,473-74 ("HUD believes that the burden of

proof allocation in § 100.500(c) is the fairest and most reasonable approach to resolving the

claims. . . . [T]his framework makes the most sense because it does not require either party to

prove a negative.").  Indeed, in some circuits, the Rule's framework provides greater defenses to

covered entities than had existed previously.  *See MHANY Mgmt.*, 819 F.3d at 617 (holding that

the Rule requires a plaintiff to prove the less discriminatory alternative, in contrast to prior

circuit precedent requiring a defendant to prove its absence, and reversing judgment for a

plaintiff who won under the prior standard).  If anything, the Rule provides greater assurance that

discriminatory effects liability will be limited to "artificial, arbitrary, and unnecessary barriers."[32]

---

[32] The American Bankers Association and its fellow amici recycle a set of arguments, which *PCI* rejected, for why HUD's decision not to adopt *Wards Cove*'s burden-shifting framework was unreasonable even before *Inclusive Communities*.  *Compare* ECF No. 63 *with* 66 F. Supp. 3d at 1051-52 (rejecting APA challenge based on argument "that HUD's burden-shifting approach is contrary to the approach the Supreme Court adopted for disparate impact claims in *Wards Cove*").  Those arguments, which are outside the scope of plaintiffs' Amended Complaint, are meritless in light of HUD's reasoned decision for the standard it chose.  *See Chevron*, 467 U.S. at 865 (affording deference to an agency's "accommodation of manifestly competing interests" and "reconciling [of] conflicting policies").  They are also belied by 25 years of case law in which no circuit court of appeals has applied the *Wards Cove* burden-shifting framework to the FHA.

Contrary to plaintiffs' claim, there is no basis in the context of a facial challenge to the Rule to believe the lack of a reference to "equally effective" less discriminatory alternatives will expand discriminatory effects liability against insurers beyond "artificial, arbitrary and unnecessary barriers."  Plaintiffs do not satisfy this burden by sketching a hypothetical with scant details about adherents of a particular religion who all rely on wood-burning stoves and live near a fire station.  *See* Pls.' Mem. at 28-29.  This hypothetical provides no way to know whether the effectiveness of the imagined plaintiffs' alternative would meet the Rule's requirement to be "supported by evidence" that is "not . . . hypothetical or speculative," 24 C.F.R. § 100.500(b)(2).[33]  Consequently, plaintiffs' facial challenge to the Rule as it affects insurers fails.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of defendants on all four Counts in the Amended Complaint.[34]

---

[33] For that matter, it is unclear whether the hypothetical plaintiffs would even be able to prove that their alternative of pricing insurance based on proximity to fire stations, rather than source of heat, is less discriminatory.  For instance, perhaps the town in the hypothetical has a large population of houses owned by non-adherents of plaintiffs' faith that rely on fire-prone indoor kerosene heaters for warmth.  These non-adherents thereby produce a disproportionate percentage of the insurer's losses in the town.  Abandoning the source-of-heat underwriting criteria would then generally raise plaintiffs' rates, perhaps outweighing the benefit they get by factoring in fire station proximity.

[34] Defendants oppose each and every form of relief requested by plaintiffs.  In any event, the Court should not grant any relief that extends beyond the Rule's application to insurers' ratemaking and underwriting decisions.  Plaintiffs' Amended Complaint limits its requested relief to that category of entities and decisions.  *See* Am. Compl. at 21-22.

Dated: August 30, 2016

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

GREGORY B. FRIEL
Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

HELEN R. KANOVSKY
General Counsel
MICHELLE ARONOWITZ
Deputy General Counsel for
   Enforcement and Fair Housing
JEANINE M. WORDEN
Associate General Counsel
   for Fair Housing
KATHLEEN M. PENNINGTON
Assistant General Counsel
   for Fair Housing Enforcement
M. CASEY WEISSMAN-VERMEULEN
AYELET R. WEISS
Attorneys
*Of counsel*

LESLEY FARBY
Assistant Branch Director
Federal Programs Branch

/s/ *Brian G. Kennedy*
BRIAN G. KENNEDY (DC Bar No. 228726)
DANIEL P. MOSTELLER (DC Bar No. 980802)
Attorneys
U.S. Department of Justice
20 Massachusetts Ave., N.W.
Washington, DC 20001
Tel: (202) 514-3357
Fax: (202) 616-8187
Email: Brian.Kennedy@usdoj.gov
*Counsel for Defendants*