# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION,

   et al.,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,

   et al.,

      Defendants.

Case No. 1:13-cv-00966-RJL

**BRIEF OF
THE AMERICAN CIVIL LIBERTIES UNION, THE NATIONAL FAIR HOUSING
ALLIANCE, THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW,
THE POVERTY & RACE RESEARCH ACTION COUNCIL,
THE NATIONAL CONSUMER LAW CENTER, THE NATIONAL COMMUNITY
REINVESTMENT COALITION, LATINOJUSTICE PRLDEF,
THE NATIONAL HOUSING LAW PROJECT,  AND AARP
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Joseph D. Rich
Thomas Silverstein
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1401 New York Avenue, N.W., Suite 400
Washington, DC 20005
(202) 662-8600

Morgan Williams
NATIONAL FAIR HOUSING ALLIANCE
1101 Vermont Ave. N.W., Suite 710
Washington, D.C. 20005
(202) 898-1661

Dennis D. Parker
Rachel E. Goodman
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500

Stephen M. Dane
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, DC 20036
(202) 728-1888

## CORPORATE DISCLOSURE STATEMENT

*Amici* are nonprofit corporations.  They have no parent corporations, nor does any corporation own 10% or more of their stock.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTERESTS OF AMICI ................................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

I.  PLAINTIFFS' ARGUMENT MISCHARACTERIZES THE RELATIONSHIP
    BETWEEN THE HUD RULE AND HOMEOWNER'S INSURANCE .......................... 3

   A.  Insurance ratemaking and underwriting are not the products of purely objective
       risk-sorting ..................................................................................................... 4

   B.  The HUD Rule distinguishes between those aspects of the insurance business that
       are based on legitimate actuarial considerations and those that are not ...................... 8

   C.  Plaintiffs' hypotheticals ignore the realities of the insurance business and the
       HUD Rule ....................................................................................................... 12

II.  ELIMINATING PRIVATE BUSINESS PRACTICES THAT CAUSE
     UNJUSTIFIED RACIAL DISPARITIES DOES NOT RAISE CONSTITUTIONAL
     QUESTIONS OR VIOLATE INCLUSIVE COMMUNITIES ........................................... 14

   A.  Recent Supreme Court jurisprudence makes clear that even governments can
       enact race-neutral policies designed to close racial gaps without raising
       constitutional questions ................................................................................... 15

   B.  Inclusive Communities did not alter equal protection jurisprudence to prohibit
       consideration of race in policy design ................................................................ 18

   C.  The HUD Rule may cause insurers to take race-neutral actions that remove
       unjustified racial disparities, but those actions raise no constitutional concerns ........ 20

III.  THE ARGUMENT THAT HUD MUST APPLY THE WARDS COVE
      DISPARATE IMPACT STANDARD FOR TITLE VII TO THE FAIR HOUSING
      ACT IS FORECLOSED BY ADMINISTRATIVE LAW ............................................... 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Board of Trustees of Univ. of Alabama v. Garrett*,
    531 U.S. 356 (2001) ............................................................................................................ 15

*Chevron v. Natural Resources Defense Council*,
    467 U.S. 837 (1984) ............................................................................................... 23, 24, 25

*DeHoyos v. Allstate Corp.*,
    345 F.3d 290 (5th Cir. 2003) ............................................................................................ 9, 10

*Federal Express Corp. v. Holowecki*,
    552 U.S. 389 (2008) ............................................................................................................ 25

*Fisher v. Univ. of Texas at Austin*,
    133 S. Ct. 2411 (2013) ................................................................................................. passim

*Fisher v. Univ. of Texas at Austin*,
    136 S. Ct. 2198 (2016) ........................................................................................... 17, 18, 22

*Graoch Assoc. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*,
    508 F.3d 366 (6th Cir. 2007) ............................................................................................. 11

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009) ............................................................................................................ 24

*Johnson v. California*,
    543 U.S. 499 (2005) ............................................................................................................ 16

*Mhany Management, Inc. v. County of Nassau*,
    819 F.3d 581 (2d Cir. 2016) .............................................................................................. 25

*Miller v. Johnson*,
    515 U.S. 900 (1995) ..................................................................................................... 15, 23

*Moore v. Liberty Nat'l Life Ins. Co.*,
    267 F.3d 1209 (11th Cir. 2001) ......................................................................................... 10

*NAACP v. Am. Family Mut. Ins. Co.*,
    978 F.2d 287 (7th Cir. 1992) .......................................................................................... 4, 10

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ...................................................................................... 3, 23, 24, 25

*Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*,
    208 F. Supp. 2d 46 (D.D.C. 2002) ................................................................................. 9, 12

*Parents Involved in Community Schools v. Seattle School District No. 1*,
    551 U.S. 701 (2007) .................................................................................. passim

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) ....................................................................................... 22

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ........................................................................... 17, 18, 20

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ....................................................................................... 16

*Smith v. City of Jackson, Miss.*,
    544 U.S. 228 (2005) ....................................................................................... 24

*Texas Department of Housing and Community Affairs v. Inclusive Communities Project*,
    135 S. Ct. 2507 (2015) ............................................................................. passim

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989) ................................................................................ passim

**Statutes**
12 U.S.C. § 2803 ................................................................................................ 10

42 U.S.C. § 3604 ............................................................................................... 15

42 U.S.C. §§ 2000e-2(k)(1) .............................................................................. 24

Pub. Law No. 102–166, 105 Stat. 1071 (1991) ............................................... 24

**Rules & Regulations**
HUD, Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*,
    78 Fed. Reg. 11,460 (Feb. 15, 2013) .....................................................passim

**Other Authorities**
Acord Dwelling Fire Application,
    Sea Coast Underwriters, Inc., (2012) ............................................................ 13

A. Arnold, *Did You Know: Fire Station Proximity Affects Home Insurance Rates*,
    KSN.COM (Nov. 6, 2014) ............................................................................... 13

Board of Directors of the Casualty Actuarial Society,
    Statement of Principles Regarding Property and Casualty Insurance Ratemaking (May
    1988) ............................................................................................................... 6

Casualty Actuarial and Statistical Task Force of the National Association of Insurance
    Commissioners, Price Optimization White Paper (Nov. 19, 2015) ................ 7

D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*, *in* Insurance
Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions
(Gregory D. Squires ed., 1997) .................................................................................. 5

Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through
the Use of Geographic Rating Territories*,
24 J. Ins. Reg. 21 (2006) ........................................................................................... 7

Florida Office of Insurance Regulation,
Use of Price Optimization in Premium Determination, Informational Memorandum OIR-
15-04M (May 14, 2015) ............................................................................................. 8

Meryl Golden & Mike Miller, *Introduction to Price Optimization*,
Earnix (2014) ............................................................................................................. 7

Gov't of the Dist. of Columbia,
Dept. of Ins. Sec. and Banking, Property & Casualty Rate/Rule Filing Requirements
(2008) ....................................................................................................................... 13

Dana L. Kaersvang, *The Fair Housing Act and Disparate Impact in Homeowners Insurance*,
104 Mich. L. Rev. 1993 (2006) ................................................................................ 10

Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners Insurance
Markets*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of
Financial Institutions (Gregory D. Squires ed., 1997) ......................................... 8, 11

Donald Light, *Transforming Underwriting: From Risk Selection to Portfolio Management*,
Celent (March 2004) .................................................................................................. 6

President's National Advisory Panel on Insurance in Riot Affected Areas, Meeting the
Insurance Crisis of Our Cities (U.S. Government Printing Office 1968) ..................... 4

*S. Comm. on Banking, Hous., and Urban Affairs*, 103rd Cong. (1994) (statement of J. Robert
Hunter, former Texas Insurance Commissioner) ....................................................... 5

S. Schallau, *Coastal Property Insurance: The Carolinas*,
AM. ASS'N. OF MANAGING GEN. AGENTS (2013) ..................................................... 12

S. Stiles & S. Hulst, *Homeowners Insurance Changes in Coastal Virginia*,
WETLANDS WATCH (July 2013) ............................................................................... 12

J. Stromberg, *How the Insurance Industry is Dealing With Climate Change*,
SMITHSONIAN MAGAZINE, (Sept. 24, 2013) ............................................................ 12

Virginia Bureau of Insurance,
Compliance with Statutory Rate Standards in File-and-Use Lines of Insurance, Virginia
Administrative Letter 2016-03 (April 15, 2016) ......................................................... 8

**Court Filings**

Conciliation Agmt., *HUD v. Allstate Ins. Co.*,
    No. 03-94-0529-8 (Feb. 1997) ................................................................. 21

Conciliation Agmt., *HUD v. State Farm Fire & Cas. Co.*,
    Nos. 05-94-1351-8, 05-94-1352-8 (July 1996) ....................................... 21

Consent Decree, *NAACP v. Am. Family Mut. Ins. Co*,
    978 F.2d 287 (7th Cir. 1992) .................................................................. 21

Consent Decree, *United States v. Erie Ins. Co. of N.Y.*,
    No. 08-0945 (W.D.N.Y. Dec. 23, 2008) .................................................. 21

Consent Decree, *United States v. Nationwide Mut. Ins. Co.*,
    No. C2-97-291 (S.D. Ohio Mar. 10, 1997) .............................................. 21

## INTERESTS OF AMICI

*Amici* are the American Civil Liberties Union, The National Fair Housing Alliance, the Lawyers' Committee for Civil Rights Under Law, the Poverty & Race Research Action Council, the National Consumer Law Center, the National Community Reinvestment Coalition, LatinoJustice PRLDEF, the National Housing Law Project, and AARP. Each is a non-profit organization that has long sought to eliminate the vestiges of our nation's history of housing segregation and promote equal housing opportunity for all.[1]

No party's counsel authored this brief in any part, and no party, party's counsel, or other person contributed money that was intended to fund it.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court affirmed last year that disparate impact discrimination violates the Fair Housing Act. *Texas Department of Housing and Community Affairs v. Inclusive Communities Project*. 135 S. Ct. 2507 (2015). In so doing, it "acknowledge[d] the Fair Housing Act's continuing role in moving the Nation toward a more integrated society" and in preventing a racially divided "separate and unequal" society. *Id.* at 2525-26. Plaintiffs American Insurance Association and National Association of Mutual Insurance Companies (hereinafter "Plaintiffs") remain unwilling to similarly acknowledge that role, at least with respect to providers of homeowner's insurance employing policies that have unjustified and discriminatory effects on members of protected classes.

Previous to the *Inclusive Communities* decision, Plaintiffs brought this case

---

[1] More detailed statements of interest are contained in the accompanying unopposed motion seeking the Court's leave to file this amicus brief.

seeking to invalidate a rule promulgated by the U.S. Department of Housing and Urban Development (HUD) which codified its longstanding interpretation of the disparate impact standard. *See* ECF No. 16-1, at 1; HUD, Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) [hereinafter "HUD Rule" or "Rule"]. Although Plaintiffs' sole argument was originally that the Fair Housing Act (FHA) does not prohibit disparate impact discrimination, they changed tactics after *Inclusive Communities*. They now argue that *Inclusive Communities* itself makes the HUD Rule unlawful, both as applied to providers of homeowner's insurance and, it seems, more broadly. *Amici* agree with the arguments presented by HUD in support of the Rule and its importance in securing housing opportunities for all people, *see* HUD Br., ECF No. 65, but write separately to emphasize two reasons that *Inclusive Communities* does not preclude the application of the HUD Rule to homeowner's insurance, and to respond to a specious argument raised by Plaintiffs' *amici*.

*First*, contrary to Plaintiffs' characterization, insurance underwriting and ratemaking are not the result exclusively of objective, scientific risk-grouping and risk-rating practices; these processes include many factors that have nothing to do with risk. Although Plaintiffs trumpet the supposed tension between the HUD Rule and the risk-sorting function of the insurance industry, using bizarre hypotheticals, the Rule's burden-shifting framework ensures that practices which are, in fact, justified by risk calculations are unaffected, while practices that unnecessarily limit opportunities for homeownership warrant closer examination. The HUD Rule mandates no sea change in ratemaking.

*Second*, and relatedly, compliance with the HUD Rule does not somehow force

insurers to engage in discrimination prohibited by the Constitution or the *Inclusive Communities* decision. Plaintiffs' brief reflects confusion about the distinction between race-neutral policies designed with an awareness of their racial consequences—which the Supreme Court has repeatedly reaffirmed are fully constitutional, both in *Inclusive Communities* and elsewhere—and government policies that label and sort individuals by race and treat them differently on that basis, which the Supreme Court has indicated can raise equal protection concerns. In order to comply with the Rule, insurers need not adopt racial quotas or charge different rates to insureds of different races. They need only change any policies not justified by actuarial considerations that disadvantage members of protected classes. Revised policies would be applied identically to each insured or applicant for insurance. Therefore, the HUD Rule does not constitute a racial classification creating constitutional issues.

*Finally*, although *amici* supporting Plaintiffs contend that the HUD Rule is unlawful because it does not apply the disparate impact standard articulated in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), that argument is entirely foreclosed by *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). *Brand X* held that a prior court decision binds an agency only where that prior decision follows from the unambiguous terms of the statute at issue, and *Wards Cove* does not so much as mention the FHA.

## I.     PLAINTIFFS' ARGUMENT MISCHARACTERIZES THE RELATIONSHIP BETWEEN THE HUD RULE AND HOMEOWNER'S INSURANCE.

Homeowner's insurance is crucial to the real estate and home-finance industries as a whole, as well as to neighborhoods and to individual homeowners. As observed by a presidential commission the year the FHA was passed, "[i]nsurance is essential to

3

revitalize our cities. . . . Without insurance, buildings are left to deteriorate; services, goods and jobs diminish. Efforts to rebuild our nation's inner cities cannot move forward. Communities without insurance are communities without hope." President's National Advisory Panel on Insurance in Riot Affected Areas, Meeting the Insurance Crisis of Our Cities 1 (U.S. Government Printing Office 1968). And, as the Seventh Circuit put it in recognizing that the FHA reaches discrimination in homeowner's insurance, "No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 297 (7th Cir. 1992).

Nonetheless, Plaintiffs argue that HUD's disparate impact Rule cannot apply to the underwriting and ratemaking of homeowner's insurance. In order to make this argument, Plaintiffs seek to depict those processes as foreordained by objective scientific calculations. In reality, though, as in any other industry, human judgment and business strategy are crucial parts of the insurance business. Insurers establish pricing strategies by taking into account both actuarial determinations and non-actuarial factors, such as profitability levels, competitor prices, rating territory boundaries, and trending assumptions. Any of these practices may result in unjustified race disparities. Plaintiffs' argument that *Inclusive Communities* precludes application of the HUD Rule in "the unique context of the insurance business," Plaintiffs' Br., ECF No. 60, at 15 (hereinafter "Pls. Br."), is therefore misguided both because the insurance business is not unique in any salient way and because, to the extent underwriting and ratemaking do result from the risk-sorting process that Plaintiffs describe, they are unaffected by the HUD Rule.

A. Insurance ratemaking and underwriting are not the products of purely objective risk-sorting.

4

Plaintiffs claim that the HUD Rule would force them to set rates based on "factors other than an insured's risk profile," an outcome that would "threaten the viability of the insurance system." Pls. Br. 18. To tee up this doomsday scenario, Plaintiffs ignore crucial facts about underwriting and ratemaking, namely that insurers do not, and never did, make only those decisions dictated by pure actuarial science.

To begin with, insurance "underwriting guidelines," the rules that determine whether an applicant is eligible to purchase homeowner's insurance, may not be scientific. *See* D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions 119 (Gregory D. Squires ed., 1997) [hereinafter "Insurance Redlining"] ("Today, we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk." (quoting *S. Comm. on Banking, Hous., and Urban Affairs*, 103rd Cong. (1994) (statement of J. Robert Hunter, former Texas Insurance Commissioner)). "Underwriting guidelines are typically not the result of careful, statistical studies. Rather, they are often based on hunches and subjective stereotypes about classes of consumers and types and geographic location of property." *Id.* at 137. "Historically, underwriters have relied on experience, market knowledge, intuition and oral history more than statistical insights when evaluating risk." *See* Gail McGiffin, *Are Underwriters Smarter Than Predictive Models?* 3, Ernst & Young LLP (2013).[2]

---

[2] http://www.ey.com/Publication/vwLUAssets/EY_-
_Insurance_underwriters_vs_predictive_models/$File/EY-Insurance-underwriters-vs-predictive-models.pdf

During the underwriting process, insurers allow human judgments to modify actuarial calculations. As a starting point, an underwriting score may be calculated based on actuarial criteria. *See* Donald Light, *Transforming Underwriting: From Risk Selection to Portfolio Management* 6-7, 12, Celent (March 2004).[3] The score is then reviewed to determine whether the application is accepted, rejected, or in need of additional review. *See id*. at 7. There is significant variation among insurers in how this process is actually implemented and varying levels of quality control. *See id.* Even after the calculation of underwriting scores, "half or more of the underwriting decisions may be ultimately made . . . by human underwriters." *Id*. at 7; *See also* McGiffin at 7 ("Few, if any, underwriting decisions are truly binary. That's why insurers still need teams of people who know how to balance the nuances of risk quality, emerging exposures, market contexts and competitive strategies as they make critical underwriting decisions.").

Insurance rates, even though originally based on actuarial calculations, may be modified or ignored for reasons unrelated to risk. This is because state law generally permits insurance companies to modify their rates based on business judgment and competition. Indeed, the Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking—which Plaintiffs themselves cite, Pls. Br. at 5—acknowledges that, although the actuary's role is to derive an estimation of future costs resulting from the transfer of risk, "[o]ther business considerations are also a part of ratemaking"; those considerations may include marketing, underwriting, and finance. *See* Board of Directors of the Casualty Actuarial Society, Statement of Principles Regarding Property and Casualty Insurance Ratemaking 4:143-44 (May 1988); *see also*

---

[3] http://www.edmblog.com/weblog/files/insurance_transformingunderwriting_celent_wp.pdf

Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Reg. 21, 24-272 (2006) (discussing aspects of the homeowner's insurance ratemaking function that allow for subjective and non-actuarial judgments).[4]

For example, despite what a company's actuaries may determine is a fair and reasonable rate for a specific insurance product in a specific geographic rating territory based on expected loss costs, company executives may reject that determination for competitive reasons, *i.e.*, in order to beat a competitor's price and sell more policies. *See, e.g.*, Meryl Golden & Mike Miller, *Introduction to Price Optimization* 7, 10, Earnix (2014) (listing certain competitive adjustments that are often made to indicated loss costs during the rate setting process). Actuarially-determined rates can be rejected or modified by business executives in order to penetrate (or withdraw from) a specific market. *See id*. at 7. Or they might be adjusted in response to agent input or customer responses. *Id.*

In recent years, insurers have begun to engage in ever more sophisticated forms of "price optimization," in which they engage in "data mining of insurance and non-insurance databases of personal consumer information [, . . .] advanced statistical modeling or both to select prices that differ from indicated rates at a very detailed or granular level." Casualty Actuarial and Statistical Task Force of the National Association of Insurance Commissioners, Price Optimization White Paper 1 (Nov. 19, 2015)[5]; *see also* HUD Br. 26-27. These techniques allow insurers to "'optimize' prices to charge the greatest price without causing the consumer to switch to another insurer." *Id.* at 2. The

---

[4] *Amici* note that the author of the cited article is counsel on this brief.

[5] http://www.naic.org/documents/committees_c_catf_related_price_optimization_white_paper.pdf.

scope of the problem has led nineteen states to issue bulletins making clear that price

optimization constitutes unfair discrimination under state law. *See, e.g.*, Virginia Bureau

of Insurance, Compliance with Statutory Rate Standards in File-and-Use Lines of

Insurance, Virginia Administrative Letter 2016-03 (April 15, 2016)[6]; Florida Office of

Insurance Regulation, Use of Price Optimization in Premium Determination,

Informational Memorandum OIR-15-04M (May 14, 2015).[7]

  Plaintiffs' description of the underwriting and ratemaking process omits any

mention of these various non-risk-related factors, creating the impression that the HUD

Rule will force insurers to deviate from the unadulterated risk-based pricing in which

they previously engaged. *But see, e.g.,* Hayward Aff. ¶ 19 (insurer makes "underwriting

and rating decisions based *primarily* on insurance risk") (emphasis added); Meek Aff. ¶ 8

(regulations require that risk assessment be the "*primary* engine" in underwriting, rating

and pricing) (emphasis added). However, insurers regularly adjust their rates to account

for a variety of judgments and business-related factors, and where those rates are risk-

justified, the HUD Rule will not require any additional adjustment.

  B. <u>The HUD Rule distinguishes between those aspects of the insurance</u>
    <u>business that are based on legitimate actuarial considerations and those</u>
    <u>that are not.</u>

  There is no question that insurance companies do make pricing and underwriting

decisions involving considerations other than risk, nor that the incorporation of these

considerations leads to racial disparities that cannot be explained by risk of loss. *See e.g.*,

Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners*

---

[6] http://www.scc.virginia.gov/boi/adminlets/16-03.pdf

[7] http://www.floir.com/siteDocuments/OIR-15-04M.pdf

*Insurance Markets*, in Insurance Redlining at 72-73 (concluding that the "relationship between race and the availability of insurance persists, even imperfectly controlling for the risk of loss.").  The insurance industry has employed numerous policies and practices that unnecessarily limit risk and act as an unfair barrier to homeownership, which may be so longstanding that insurers have come to believe they are necessary.  The purpose and effect of the Rule's burden-shifting framework is to ensure that those practices that are, in fact, justified by risk calculations will remain unaffected, while those that are mere custom will drop away.  The Rule thus roots out those practices that cause unjustified racial disparities.  With respect to insurance, of course, practices that are driven by risk of loss are justified by definition.  *See* HUD Br. 19-20.

Indeed, measured against the reality of the insurance business, it is not surprising that the core claim advanced by Plaintiffs here has been rejected by courts as overly "sweeping," *Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 60 (D.D.C. 2002), and even "fanciful," *DeHoyos v. Allstate Corp.*, 345 F.3d 290, 297 n.5 (5th Cir. 2003).  The court in *Prudential* elaborated:

> Essentially, [Prudential's] argument turns on the purportedly unique nature of the insurance industry, which must "discriminate" based on an assessment of risk. However, this argument is unavailing in light of the availability of the "business justification" defense. Plaintiffs do not challenge Prudential's right to evaluate homeowners insurance risks fairly and objectively. Rather, plaintiffs allege that the underwriting policies and practices employed by Prudential are *not* purely risk-based. Furthermore, defendants cannot point to anything in the FHA itself that would justify this Court in carving out an exception for a particular type of organization.

208 F. Supp. 2d at 60.  The Fifth Circuit similarly observed that the insurance industry's "ominous" description of how disparate impact will force federal courts to act as "super

actuar[ies,] . . . although colorful, is incorrect." *DeHoyos*, 345 F.3d at 297 n.5.  Courts

are regularly called upon to evaluate whether a practice with a disparate impact is

nevertheless justified by a business necessity, and the "attempt to distinguish the business

of insurance from other businesses is unpersuasive."  *Id.*[8]

        The Seventh Circuit similarly observed, in *NAACP v. American Family Mutual*

*Insurance Company*, that insurers are no different from lenders when it comes to risk

assessment.  Like insurers, lenders must evaluate risks, such as whether to extend credit

in the first instance and what rate of interest to charge.  *Am. Family Mut. Ins. Co.*, 978

F.2d at 298-99.  Yet, the FHA indisputably applies to lenders, so "it is difficult to see risk

classification as a principled ground to exclude insurers" from disparate impact analysis.

*Id.* at 299; *see also* Dana L. Kaersvang, *The Fair Housing Act and Disparate Impact in*

*Homeowners Insurance*, 104 Mich. L. Rev. 1993, 2010-11 (2006) (discussing how

empirical evidence undermines the argument that risk assessment by insurers differs from

risk assessment by lenders and others).[9]

        And, of course, the careful phrasing of Plaintiffs' brief—which asks this Court to

find the HUD Rule unlawful only as applied to "insurers' ratemaking and underwriting

---

[8] The court also noted that the supposed conflicts between disparate impact enforcement and state insurance laws "are entirely conjectural."  *Id.* at 299 n.7; *see also Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, (11th Cir. 2001) (noting that "Liberty National argues that racial discrimination is acceptable in the Alabama . . . insurance context so long as those racial distinctions have an actuarial basis," and holding that "[a]bsent more convincing evidence that racial discrimination in the insurance context is an integral part of Alabama's regulatory scheme, Liberty National's argument must fail.").

[9] In its earlier opinion in this case, this Court held that insurers would need to "collect and analyze certain types of race-based data on their clients and prospective clients."  Amended Mem. Op., ECF No. 47, at 26-27.  In this regard, though, homeowner's insurers are no differently situated from other businesses that are subject to disparate impact liability under the FHA.  Apartment managers do not record the race of housing applicants or tenants. Real estate sales agents do not record the race of their buyers.  Although some lenders are required by federal law to collect and report racial and gender demographic data of loan applicants, 12 U.S.C. § 2803, they are not required to collect or report data about the other protected class characteristics (such as religion, disability, or familial status).  In other words, a regulated entity's preexisting collection of demographic data is not a precondition for application of the disparate impact standard or the HUD Rule.

decisions," Pls. Br. 15, concedes that there is no reason the HUD Rule ought not apply to the numerous other practices in which insurers engage. *See* HUD Br. 26. These ordinary business practices—including marketing and advertising campaigns, sales techniques, agent office placements, insurance product design and benefits, and processes for settling claims and renewing policies—are no different for insurers than for other businesses subject to the Fair Housing Act. Yet such business practices may have significantly different impacts on different populations, with no business justification for that disparity. *See, e.g.*, Klein, at 47-48 (identifying several nonrisk related barriers that can influence the availability and affordability of homeowners insurance in urban markets, including agent bias, prejudicial views of decision-making personnel, adverse selection, agent commission structures, etc.).

As Plaintiffs well know, "not every housing practice that has a disparate impact is illegal. We use [the disparate impact framework]…to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests." *Graoch Assoc. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n,* 508 F.3d 366, 374-5 (6th Cir. 2007); *see also Inclusive Communities*, 135 S. Ct. at 2512 (2015) ("Policies, whether governmental or private, are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers.") (citation and internal marks omitted). Where underwriting decisions and rates are risk-justified, they are not artificial, arbitrary, or unnecessary, and disparate impact liability will not lie. Accordingly, while the HUD Rule does not affect such practices, it helps eradicate those extant practices in the homeowner's insurance industry which have an unjustified disparate impact on members of protected classes.

C.  Plaintiffs' hypotheticals ignore the realities of the insurance business and the HUD Rule.

To support their argument that HUD's Rule is unlawful, Plaintiffs pose two hypotheticals concerning challenges to an insurer's decision to charge different prices to different homeowners.  Pls. Br. at 25-26, 28-29.  Tellingly, neither scenario bears any resemblance to actual litigation brought to challenge insurance policies that have a disparate impact.  Plaintiffs' hypotheticals do not even concern the availability of insurance, the primary focus of prior disparate impact claims.  *See, e.g., National Fair Housing Alliance, Inc., v. Prudential Ins. Co.,* 208 F. Supp. 2d 46 (D.D.C. 2002).

Plaintiffs' first hypothetical, which involves pricing affected by geographically based, weather-related risks, merely illustrates how overwrought are the insurers' contentions that the disparate impact rule imposes on them significant additional burdens.[10]  Pls. Br. at 25-26.  If homeowners living in a coastal area ("predominantly inhabit[ed]" by Asian-Americans) were to show that they pay higher insurance rates than those in inland areas ("primarily inhabit[ed]" by black residents), Plaintiffs suggest that the HUD Rule would force the insurer to analyze "its rating and underwriting models and data to determine which actuarially significant risk caused the statistical deviation." *Id.*

---

[10] As a threshold matter, weather exposures in the homeowner's insurance context are generally underwritten very differently from property-specific risks.  These geographic rating decisions typically take into account not just past actual claims, but weather patterns predicted to occur in the future. *See e.g.*, J. Stromberg, *How the Insurance Industry is Dealing With Climate Change*, SMITHSONIAN MAGAZINE, (Sept. 24, 2013), http://www.smithsonianmag.com/science-nature/how-the-insurance-industry-is-dealing-with-climate-change-52218/?no-ist (noting a shift from historic to predictive weather risk assessment models); S. Stiles & S. Hulst, *Homeowners Insurance Changes in Coastal Virginia*, WETLANDS WATCH 15 (July 2013), http://www.floods.org/ace-files/documentlibrary/committees/Insurance/WetlandsWatch_Insurance-study.pdf (most insurance companies use future weather modeling in their underwriting).  Many coastal states have enacted special legislation governing insurer practices in coastal areas. *See, e.g.,* S. Schallau, *Coastal Property Insurance: The Carolinas*, AM. ASS'N. OF MANAGING GEN. AGENTS 3, 9-10 (2013), http://www.aamga.org/files/whitepapers/2013wp/SchallauSteven_AppState_CoastalPropertyCarolinas.pdf.  The use of a weather-based hypothetical in this context, therefore, is especially unhelpful.

But this "burden" is completely fictional, because state law requires that the insurer provide an empirical, actuarial basis for specific geographic rating differences *before* those rates are implemented.  *See, e.g.*, Gov't of the Dist. of Columbia, Dept. of Ins. Sec. and Banking, Property & Casualty Rate/Rule Filing Requirements (2008).[11]  In reality, an insurer facing such a disparate impact claim would not need to *retrospectively* look for and justify the basis for its differences in pricing, but would merely produce its *pre-existing* justification for establishing those geographic rating differences. This hardly seems burdensome, and any burden it does create is smaller than that facing non-insurers subject to disparate impact liability.

Plaintiffs' second hypothetical, meanwhile, actually demonstrates the elegance and value of HUD's Rule.  Pls. Br. at 28-29.  Plaintiffs imagine that an insurer's rates for "customers of a particular religion in a certain city" are statistically higher than some unspecified comparative population.  *Id.* at 28.  In Plaintiffs' hypothetical, that disparity is because customers of that religion tend more frequently to live in homes that "rely on wood-burning stoves for heat," and the insurer charges higher rates for such homes to reflect greater risk of fire.  *Id.*  Plaintiffs complain that they could face liability under the HUD Rule if the impacted customers show that a less discriminatory alternative—making pricing decisions turn on proximity to fire stations[12]— adequately protects the insurer

---

[11]http://disb.dc.gov/sites/default/files/dc/sites/disb/publication/attachments/property_and_casualty_requirements_52008.pdf

[12] To once again return to real-world underwriting, insurers already underwrite for both the existence of wood-burning heating systems *and* proximity to fire stations.  See A. Arnold, *Did You Know: Fire Station Proximity Affects Home Insurance Rates*, KSN.COM (Nov. 6, 2014), http://ksn.com/2014/11/06/did-you-know-fire-station-proximity-affects-home-insurance-rates/; Acord Dwelling Fire Application, Sea Coast Underwriters, Inc., (2012) http://www.seacoastunderwriters.com/uploads/Acord%2084%20Dwelling%20Fire.PDF (asking if wood stove insert is present).  To *amici*'s knowledge, no group protected by the FHA, religious or otherwise, has challenged either factor.

against risk of fire without correlating so closely to membership in a protected class. It is puzzling that Plaintiffs think it would be bad for an insurer to achieve its legitimate business purpose with a practice that does not have a statistically greater impact on one religion than any other. On the other hand, if the alternative policy does not adequately achieve the legitimate business purpose, as Plaintiffs' hypothetical appears to suggest, then the insurer would face no liability at all under the HUD Rule.

In sum, neither hypothetical provides support for Plaintiffs' argument that the HUD Rule exists in fundamental tension with the operation of the insurance industry.

## II.     ELIMINATING PRIVATE BUSINESS PRACTICES THAT CAUSE UNJUSTIFIED RACIAL DISPARITIES DOES NOT RAISE CONSTITUTIONAL QUESTIONS OR VIOLATE *INCLUSIVE COMMUNITIES*.

The HUD Rule requires providers of homeowner's insurance to ensure that their policies are not causing unjustified disparities for members of protected classes. In arguing that this very act of examination is prohibited by the Constitution, Plaintiffs confuse race-consciousness with racial classification and pretend that the equal protection clause applies in the same way to private and government actors. The Supreme Court has repeatedly made clear that facially race-neutral policies, like those insurers might enact to comply with the HUD Rule, do not trigger heightened scrutiny merely because they are intentionally crafted to remedy segregation and racial gaps.

It is worth noting at the outset that Plaintiffs effectively concede that any purported constitutional concerns, or related arguments arising from the *Inclusive Communities* decision, are not raised by the application of the HUD Rule to members of other protected classes, such as sex or religion, in the same way. Pls. Br. 19 n.3. They consign this point to a one-sentence footnote without engaging in the distinct

14

constitutional analysis dictated by those contexts.  Moreover, they entirely ignore that the
FHA also applies to discrimination based on familial status and disability, 42 U.S.C. §
3604, which do not trigger heightened constitutional scrutiny.  *See Bd. of Trustees of
Univ. of Alabama v. Garrett*, 531 U.S. 356, 365-67 (2001).

> A.  Recent Supreme Court jurisprudence makes clear that even governments
>      can enact race-neutral policies designed to close racial gaps without
>      raising constitutional questions.

Plaintiffs argue that application of the HUD Rule to insurers would raise "serious
constitutional questions," because it "compels race-based decisions.'"  Pls. Br. 19
(citation and internal marks omitted).  This vague and speculative argument ignores the
fact that the Constitution binds government actors; it does not bind private actors
performing private functions.  Plaintiffs rely on caselaw discussing the application of the
equal protection clause to government classifications based on race, but they cite none
applying the equal protection clause to private action—not even where private action is
motivated by the desire to comply with law.  Pls. Br. 18-20 (citing, *inter alia*, *Miller v.
Johnson*, 515 U.S. 900 (1995) (voting districts drawn by legislature); *Fisher v. Univ. of
Texas at Austin*, 133 S. Ct. 2411 (2013) (state university admissions)).

Even more importantly, Plaintiffs' constitutional argument ignores the careful
distinction that the Supreme Court has repeatedly drawn between race-neutral
government policies and practices designed to end unjustified racial disparities and those
that allocate benefits and burdens to particular individuals based upon race.  Only policies
in the latter category are subject to heightened scrutiny.  Those in the former category, far
from raising the kinds of "grave" constitutional concerns warranting constitutional
avoidance, *Rust v. Sullivan*, 500 U.S. 173, 191 (1991), are instead encouraged by the
Supreme Court as appropriate means of dealing with troubling racial gaps.

15

Recent Supreme Court jurisprudence makes the point clear.  In *Parents Involved in Community Schools v. Seattle School District No. 1*, the Court held that the school districts' voluntary consideration of individual students' race in assigning them to schools violated equal protection.  551 U.S. 701, 748 (2007).  The Court held, not for the first time, that "all racial classifications imposed by government must be analyzed by a reviewing court under strict scrutiny."  *Id.* at 741 (quoting *Johnson v. California*, 543 U.S. 499, 505 (2005)) (internal marks omitted).  However, Justice Kennedy's pivotal concurrence affirms that "a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races."  *Id.* at 789.  School districts can make "race conscious" decisions to foster diversity by, for example, drawing attendance zones influenced by neighborhood demographics and keeping statistics on enrollment and performance by race.  *Id.* Because such decisions "do not lead to different treatment based on a classification that tells each student he or she is to be defined by race," they are unlikely to trigger heightened scrutiny.  *Id.*

The Court's very different treatment of two University of Texas admissions policies in *Fisher v. University of Texas at Austin* again emphasizes that strict scrutiny applies not to every policy designed with racial impact in mind, but only to those that allocate benefits or burdens to particular individuals based upon race.  In that case, the plaintiff challenged an undergraduate admissions policy in which the race of an applicant was explicitly considered as part of a holistic review process.  133 S. Ct. 2411 (2013) ("*Fisher I*").  Justice Kennedy's opinion reiterated that "racial classifications" must be subject to strict scrutiny, *id.* at 2418-19, and when the case returned to the Court a second

16

time, the policy was found to meet strict scrutiny.  *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2214 (2016) ("*Fisher II*").  At neither point did any justice express any doubt about the constitutionality of another admissions policy that aimed to ensure the admission of Black and Latino students by admitting all Texas students who graduated in the top ten percent of their class.  In *Fisher II*, the Court specifically noted that "the Top Ten Percent Plan, though facially neutral, cannot be understood apart from its basic purpose, which is to boost minority enrollment."  136 S. Ct. at 2213 (2016).  Because such plans are "'adopted with racially segregated neighborhoods and schools front and center stage,'" they are very much race-conscious.  *Id.*  (quoting *Fisher I*, 133 S.Ct., at 2433 (Ginsburg, J., dissenting)).  Nonetheless, they are not subject to heightened scrutiny.

*Ricci v. DeStefano* once again echoes the idea that designing policies with an eye to their racial consequences is legally and conceptually distinct from taking a particular individual's race into account in making a decision that affects that individual.  557 U.S. 557 (2009).  There, Justice Kennedy's majority opinion held that, while Title VII prohibited the City of New Haven from throwing out the results of a promotional exam after it had been administered because Black and Latino firefighters had not performed as well as white firefighters, Title VII "does not prohibit an employer from considering, before administering a test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of their race."  557 U.S. at 585.  Nor is the Court skeptical of "an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the process by which promotions will be made."  *Id.*  While *Ricci* was decided on statutory and not constitutional grounds, *id.* at 584, it underscores that considering racial effects when

creating policies does not give the Court pause.[13]

Race-neutral policies like these, designed to ameliorate racial gaps without treating individuals differently based upon race, do not raise any constitutional issues at all, let alone "serious" constitutional problems, Pls. Br. 19. Accordingly, that the HUD Rule could cause providers of homeowner's insurance to make race-neutral changes to their ratemaking and underwriting practices ought not affect this Court's construction of the Fair Housing Act or its deference to HUD. And, as described further below, any changes made by insurers would inevitably be race-neutral and thus well within the bounds of disparate impact liability as described by *Inclusive Communities*.

B.    *Inclusive Communities* did not alter equal protection jurisprudence to prohibit consideration of race in policy design.

The doctrinal background above is crucial to understanding Justice Kennedy's majority opinion in *Inclusive Communities*. The opinion breaks no new ground in stating that policies that sort individuals by race raise constitutional questions whereas race-neutral policies do not. Rather, it builds upon *Parents Involved, Fisher I & II*, and *Ricci*.

*Inclusive Communities* holds that disparate impact discrimination is indeed prohibited under the Fair Housing Act. It notes that without safeguards at the prima facie stage, "disparate-impact liability might cause race to be used and considered in a pervasive way and 'would almost inexorably lead' governmental or private entities to use 'numerical quotas,' and serious constitutional questions then could arise." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523

---

[13] Plaintiffs cite language from Justice Scalia's concurrence to suggest that evaluating the racial impact of policies is discriminatory. Pls' Br. 19 (citing *Ricci v. DeStefano*, 557 U.S., at 594 (Scalia, J., concurring)). But even if that language could be read to assert that race-neutral policies violate the Constitution, it is directly contradicted by holdings of the Court in *Inclusive Communities* and the *Fisher* cases. Not a single other justice joined Justice Scalia's opinion in *Ricci*.

(2015) (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)).  Plaintiffs' brief attempts to divorce the first clause of this sentence—about using and considering race—from the second—explaining why such practices would raise constitutional concerns.[14]  In context, though, it is clear that the Court's constitutional concern in *Inclusive Communities* mirrors its concern in the earlier jurisprudence: disparate impact liability under the Fair Housing Act cannot be interpreted to demand "quotas"—that is, that individual seekers of housing or housing-related services be treated differently depending upon their race.  *See id.* at 2524 ("Remedial orders that impose racial targets or quotas might raise more difficult constitutional questions.").

Consistent with the Supreme Court's contemporary equal protection jurisprudence, *Inclusive Communities* emphasizes that, in the context of race-neutral policies designed to remedy racial disparities, consideration of race is not problematic.[15] "While the automatic or pervasive injection of race" into FHA-covered transaction is not desirable, housing authorities' attempts "to foster diversity and combat racial isolation with race-neutral tools" are different.  *Id.* at 2525.  Moreover, "mere awareness of race in attempting to solve the problems facing inner cities does not doom that endeavor at the outset."  *Id.*  In making this point, the opinion explicitly cites to Justice Kennedy's discussion of race-neutral school integration tools in his *Parents Involved* concurrence and the *Ricci* language approving of employers' "affirmative efforts to ensure that all groups have a fair opportunity" to secure promotions.  *Id.* (citing *Ricci*, 557 U.S., at 585).

[14] Plaintiffs' brief artfully divorces the "serious constitutional questions" language from the concern about quotas.  Pls. Br. 11.

[15] Indeed, as HUD aptly notes, if consideration of race were always impermissible, the mere existence of disparate impact liability would be unconstitutional.  HUD Br. 22-23.

Finally, while *Inclusive Communities* seeks to ensure that disparate impact liability is applied in a manner that reduces the "salience of race," *id.* at 2524, it also notes that vestiges of de jure housing segregation "remain today, intertwined with the country's economic and social life," *id.* at 2515, and "acknowledges the Fair Housing Act's continuing role in moving the Nation toward a more integrated society," *id.* at 2525-26. Nonetheless, Plaintiffs read the decision to foreclose application of the disparate impact standard to the underwriting and ratemaking of homeowner's insurance. In light of the Court's repeated approval of race-neutral policies designed to remedy racial disparities, that interpretation is untenable.

C. <u>The HUD Rule may cause insurers to take race-neutral actions that remove unjustified racial disparities, but those actions raise no constitutional concerns.</u>

In order to comply with the HUD Rule, providers of homeowner's insurance may indeed need to change certain underwriting and ratemaking policies—but only those policies that disproportionately impact members of protected groups and are simultaneously not justified by actuarial considerations (or for which the actuarial need could be met in a less discriminatory fashion). *See supra* Section I.B. Even in instances where such changes were necessary, though, that process would not result in a single insured or applicant for insurance being treated differently from any other on the basis of race. Accordingly, these policies are race-neutral and, consistent with *Inclusive Communities* and the equal protection jurisprudence described above, applying the HUD Rule to insurers does not raise any constitutional concerns.

Policy changes that providers of homeowner's insurance have implemented in response to past disparate impact claims illustrate the point. Insurers have eliminated underwriting criteria that do not correlate with actuarial risk, benefitting homeowners of

all races who would have been screened out or charged a higher premium under the old underwriting standards.[16]  They have made all types of insurance policies widely available across census tracts, a facially race-neutral move that increases access for all consumers to desirable forms of insurance, such as replacement cost policies.[17]  And they have increased the accessibility and availability of insurance in targeted urban areas, moves that improve the vitality and stability of neighborhoods, not simply the lot of minority residents.[18]  Each of these policy changes ameliorates a disparate impact, but none results in any individual being treated differently based upon a racial classification. *Cf. Fisher I*, 133 S. Ct. 2411, 2417 (an individual subject to a racial classification "'is entitled to a judicial determination that the burden he is asked to bear on that basis is

---

[16] *See, e.g.*, Conciliation Agmt. at ¶ 8(A)-(C), *HUD v. Allstate Ins. Co.*, No. 03-94-0529-8 (Feb. 1997) (eliminating maximum-age-of-property and minimum-value-of-property requirements, limiting use of credit scoring, and agreeing to adopt objective property-inspection criteria); Conciliation Agmt. at ¶ 11(a)-(f), *HUD v. State Farm Fire & Cas. Co.*, Nos. 05-94-1351-8, 05-94-1352-8 (July 1996) (modifying underwriting criteria to, *inter alia*, eliminate maximum-age and minimum-value requirements, limit use of credit reports, and reduce subjective criteria, and agreeing not to decline coverage solely because another insurer did so); Consent Decree at § III.A, *United States v. Nationwide Mut. Ins. Co.*, No. C2-97-291 (S.D. Ohio Mar. 10, 1997).

[17] *See, e.g.*, Consent Decree at ¶ 19, *United States v. Erie Ins. Co. of N.Y.*, No. 08-0945 (W.D.N.Y. Dec. 23, 2008); Consent Decree at §§ II.c.3, III, *NAACP v. Am. Family Mut. Ins. Co* (increasing access to replacement cost policies by, *inter alia*, eliminating requirement that home must have a market value of 80% or more of the estimated replacement cost); Conciliation Agmt. at ¶ 11(h), *State Farm Fire & Cas. Co.* (agreeing to encourage customers to insure to full replacement cost).

[18] *See, e.g.*, Conciliation Agmt. at ¶ 6, *Allstate Ins. Co.* (expanding comprehensive neighborhood partnership program and adding sales and service centers in targeted urban areas); Conciliation Agmt. at ¶ 13(h), *State Farm Fire & Cas. Co.* (adding sales and service centers in targeted urban neighborhoods with a substantial minority population and agreeing to make $1 million in loans available for mortgage financing in neighborhoods with substantial African-American populations); Consent Decree at § III.A.3-III.A.4, *Nationwide Mut. Ins. Co.* (agreeing to affirmative efforts to increase company's presence in predominantly minority neighborhoods, including community outreach); *id*. at § VI (providing $2.2 million per year in financial assistance for homebuyers in certain predominantly minority neighborhoods); Consent Decree at § VI , *NAACP v. Am. Family Mut. Ins. Co.* (providing $9.5 million in community-based programs including interest rate subsidies for home mortgage and repair loans to encourage the purchase and rehabilitation of dilapidated homes in predominantly African-American communities).  *See also* HUD Br. 18 (discussing Travelers' decision to discontinue underwriting criteria that preclude issuing insurance to landlords with Section 8 tenants).

precisely tailored to serve a compelling governmental interest'") (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 299 (1978)).

These changes—like others that might be required by the HUD Rule—are no doubt race-conscious, in the sense that they are enacted as a result of considering the racial impact of current policies.  Similarly, to use the Plaintiffs' hypothetical, an insurer might well determine that exposure to coastal winds is not, in fact, correlated with risk of loss, and thus opt to remove that factor from its ratemaking calculus given the disproportionate impact on Asian-Americans.  *See* Pls. Br. 25-26.  That decision would be race-conscious, in the sense that it "cannot be understood apart from its basic purpose, which is to [remedy a racial disparity]."  *Fisher II*, 136 S. Ct., at 2213.  But the fact that the policy is designed with racial impacts in mind—and by assessing demographics in order to do that—does not change its facial neutrality or render it a racial classification triggering serious constitutional questions.  The Top Ten Percent plan approved by all justices in *Fisher* was designed in that fashion.  *Id.* (noting that such plans are "'adopted with racially segregated neighborhoods and schools front and center stage'" and are therefore not "blind[ ] to race.").  So are the facially neutral school diversity tools encouraged by Justice Kennedy's *Parents Involved* concurrence, including both drawing attendance zones with neighborhood demographics in mind and "tracking enrollments, performance, and other statistics by race."  551 U.S., at 789 (Kennedy, J., concurring).

Plaintiffs note that equal protection requires that people be treated as individuals, not "as simply components of a racial, religious, sexual or national class." Pls. Br. 19-20 (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).  But they fail to demonstrate that the HUD Rule would require or even encourage any action tantamount to such an

"individual racial classification" through which "burdens or benefits" are distributed.

*Parents Involved*, 551 U.S., at 720.  Instead, the HUD Rule asks providers of homeowner's insurance to examine their policies for unjustified racial disparities and to make facially neutral policy changes to remedy any such disparities.  No constitutional issues arise as a result.

### III.    THE ARGUMENT THAT HUD MUST APPLY THE *WARDS COVE* DISPARATE IMPACT STANDARD FOR TITLE VII TO THE FAIR HOUSING ACT IS FORECLOSED BY ADMINISTRATIVE LAW.

The brief of the American Bankers Association and other banking and financial services industry groups, writing as *amici* for Plaintiffs, contends that the HUD Rule is contrary to law because it does not apply to the Fair Housing Act the standard for disparate impact in the Title VII context articulated in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).  Br. of American Bankers Ass'n. et al. (hereinafter "ABA Br."), at 3-4.  But that argument is entirely foreclosed by *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, which held that a prior court decision binds an agency only where that prior decision follows from the unambiguous terms of the statute at issue.  545 U.S. 967, 982 (2005).  Here, because *Wards Cove* does not mention the FHA and no subsequent decision of the Supreme Court applies the *Wards Cove* standard to the FHA, that requirement is clearly not satisfied.  The HUD Rule is therefore entitled to deference under *Chevron v. Natural Resources Defense Council,* 467 U.S. 837 (1984).  *See* HUD Br. 13 (describing *Chevron* standard).

In *Brand X,* the Supreme Court addressed a Ninth Circuit decision that had declined to grant *Chevron* deference to the agency's interpretation of a statute based on an earlier Ninth Circuit decision that had interpreted the statute differently.  The Supreme

Court reversed, holding that an agency's interpretation otherwise entitled to *Chevron* deference trumps unless "the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S., at 982. Because the previous Ninth Circuit decision had held only that a particular definition of a term was the "*best* reading" of the statute, and "not that it was the *only permissible* reading of the statute," it did not foreclose the agency's different interpretation. *Id.* at 984 (emphasis in original).

After *Brand X*, it cannot be seriously argued that *Wards Cove*, a decision that *does not even mention* the Fair Housing Act, would disrupt the *Chevron* deference to which HUD is entitled in promulgating its Rule under the Fair Housing Act.[19] *Wards Cove* certainly did not hold that any particular construction of the FHA "follows from the unambiguous terms of th[at] statute," *Brand X*, 545 U.S., at 982, and neither did either of the Supreme Court decisions concerning the Age Discrimination in Employment Act cited by Plaintiffs' *amici*. ABA Br., at 7-8 (citing, *inter alia*, *Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)). Once again, neither of those decisions mentions the FHA, and one specifically notes that courts "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination." *Gross*, 557 U.S., at 174 (quoting *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008)). Finally, while *Inclusive*

---

[19] As the *Wards Cove* Court put it, that decision addressed the "the proper application of Title VII's disparate-impact theory of liability." 490 U.S., at 650. In so doing, it relied upon the intent of Congress in drafting Title VII. *Id.* at 652-53. With the Civil Rights Act of 1991, Congress rejected significant aspects of the *Wards Cove* view of Title VII, such that *Wards Cove* has not represented the proper disparate impact framework for Title VII claims for the last twenty-five years. *See* Pub. Law No. 102–166, 105 Stat. 1071 (1991); 42 U.S.C. §§ 2000e-2(k)(1)(A)-(C).

*Communities* does cite *Wards Cove* once, 135 S. Ct. at 2523,  not even Plaintiffs' *amici*

argue that the narrow context of that citation constitutes a holding that the Fair Housing

Act unambiguously imports the *Wards Cove* standard.  *See* ABA Br., at 9.[20]

      Plaintiffs' *amici* complain repeatedly that the HUD Rule rejects "binding

Supreme Court precedent," ABA Br., at 3, 9-10, but they ignore that the agency remains

completely free to "construe th[e] statute differently from a court" except where the court

has specifically held that its interpretation is the only permissible reading of the statute.

*Brand X*, 545 U.S., at 983.  As *amici* note, HUD considered the suggestion that *Wards*

*Cove* ought to govern the FHA disparate impact framework, and HUD rejected that

suggestion.  78 Fed. Reg. 11,460, 11,473 ("HUD does not agree. . .that Wards Cove even

governs Fair Housing Act claims.")  HUD was entitled to make that decision, because

there is no ruling of the Supreme Court, or any other court, holding that the terms of the

Fair Housing Act unambiguously incorporate the *Wards Cove* standard.  *See* HUD Br. 42

n.32.  Accordingly, per *Brand X*, the HUD Rule is entitled to *Chevron* deference.

## CONCLUSION

      For the foregoing reasons, the Court should grant summary judgment to HUD.


                    Respectfully submitted,

                    Rachel E. Goodman
                    Dennis D. Parker
                    AMERICAN CIVIL LIBERTIES
                    UNION FOUNDATION
                    125 Broad St., 18th Floor
                    New York, NY 10004

---

[20] In fact, after *Inclusive Communities*, the Second Circuit held that *Brand X* requires deference to the HUD Rule.  *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 617-19 (2d Cir. 2016) (holding, based on *Brand X*, that prior Second Circuit precedent regarding FHA impact analysis must be abrogated in light of HUD's impact regulation to the contrary).

(212) 549-2500

Joseph D. Rich
Thomas Silverstein
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1401 New York Avenue, N.W.,
Suite 400
Washington, DC 20005
Telephone: (202) 662-8600
Fax: (202) 783-5113

Morgan Williams
NATIONAL FAIR HOUSING
ALLIANCE
1101 Vermont Ave. N.W., Suite 710
Washington, D.C. 20005
Telephone: (202) 898-1661

*/s/ Stephen M. Dane*
Stephen M. Dane
D.D.C. Bar #982046
RELMAN, DANE & COLFAX
PLLC
1225 19th Street, N.W., Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
Fax: (202) 728-0848

Attorneys for *Amici Curiae*

Dated: September 13, 2016