**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

      Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and JULIAN CASTRO, in his official
capacity as Secretary of Housing and Urban
Development,

      Defendants.

Case No. 13-cv-966 (RJL)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Kannon K. Shanmugam (#474304)
Allison B. Jones (#991503)
A. Joshua Podoll (#1011743)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

    A.   The Disparate-Impact Rule Is Unlawful As Applied To Insurers' Ratemaking
        And Underwriting Decisions Because It Will Cause Pervasive Consideration
        Of Race And Other Protected Characteristics ...........................................................2

    B.   The Disparate-Impact Rule Is Unlawful As Applied to Insurers' Ratemaking
        And Underwriting Decisions Because State Law Limits Insurers' Discretion
        Over Those Decisions .................................................................................13

    C.   The Disparate-Impact Rule Is Unlawful Because It Allows Claims To
        Proceed Based Entirely On Statistics, Without Identifying The Specific
        Policy Causing The Alleged Disparity .......................................................17

    D.   The Disparate-Impact Rule Is Unlawful Because It Allows Plaintiffs To
        Displace Valid Policies ..............................................................................20

CONCLUSION ...........................................................................................................22

# TABLE OF AUTHORITIES

Page

## CASES

*Avenue 6E Investments, LLC* v. *City of Yuma*, 818 F.3d 493 (9th Cir. 2016) ...........................1, 21

*Burrell* v. *State Farm & Casualty Co.*, 226 F. Supp. 2d 427 (S.D.N.Y. 2002) ...........................11

*Franklin* v. *Allstate Corp.*, Civ. No. 06-1909, 2007 WL 1991516
     (N.D. Cal. July 3, 2007) ........................................................................................11

*Hodge* v. *Talkin*, 799 F.3d 1145 (D.C. Cir. 2015) ..........................................................2

*Inclusive Communities Project, Inc.* v. *Texas Department of Housing & Community
     Affairs*, Civ. No. 08-546, 2016 WL 4494322 (N.D. Tex. Aug. 26, 2016)...................... *passim*

*McReynolds* v. *Sodexho Marriott Services, Inc.*, 349 F. Supp. 2d 1 (D.D.C. 2004) ....................19

*MHANY Management, Inc.* v. *County of Nassau*, 819 F.3d 581 (2d Cir. 2016)...........................1

*Ojo* v. *Farmers Group, Inc.*, 356 S.W.3d 421 (Tex. 2011) ...........................................14

*Ricci* v. *DeStefano*, 557 U.S. 557 (2009).................................................................6, 7

*Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961 (8th Cir. 2008)............................13, 14

*Texas Department of Housing and Community Affairs* v. *Inclusive Communities
     Project, Inc.*, 135 S. Ct. 2507 (2015) ................................................................. *passim*

*Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642 (1989).......................................18, 19

## STATUTES

Fair Housing Act, 42 U.S.C. §§ 3601-3631....................................................... *passim*

McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 .........................................11, 12, 14

42 U.S.C. § 2000e-2(k)(1)(B)(i) ....................................................................19

Alaska Stat. § 21.39.030 ...............................................................................12

Cal. Ins. Code § 679.74 (2016).....................................................................7, 16

Colo. Rev. Stat. § 10-4-403(1)(c) ....................................................................12

W. Va. Code § 33-20-3(c)(2)...........................................................................12

Wis. Stat. Ann. § 626.12(2) ............................................................................12

Page

**MISCELLANEOUS**

Casualty Actuarial Society, Board of Directors, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* (May 1988) <tinyurl.com/casstatement> ...................................................................................12

Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403 (1985) ....................................................................................12

Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (2013) .......................................................................... *passim*

Proposed Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 70,921 (2011) ...................................................................18

## INTRODUCTION

The Disparate-Impact Rule, as applied to homeowners' insurers' ratemaking and under-writing practices, exceeds the statutory limitations of the Fair Housing Act (FHA) as articulated by the Supreme Court in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015).  The Rule is therefore contrary to law; at a minimum, it is an unreasonable construction of the FHA.

Contrary to the government's repeated suggestions, the Supreme Court did not approve the Disparate-Impact Rule in *Inclusive Communities*, and it certainly did not consider whether the Rule could legitimately be applied to insurers' ratemaking and underwriting practices.  *See*, *e.g.*, Defs.' Mem. 10, 33-34.  Nor have lower courts considered similar challenges to the Rule after *Inclusive Communities*.  The government cites two court of appeals decisions that purport-edly hold the Rule comports with the limitations of the FHA as explained in *Inclusive Communi-ties*.  *See* Defs.' Mem. 34.  But neither is on point here.  In *Avenue 6E Investments, LLC* v. *City of Yuma*, 818 F.3d 493, 512-513 (2016), *petition for cert. filed*, No. 15-1545 (June 23, 2016), the Ninth Circuit merely cited the Rule in passing and noted that it sets forth a burden-shifting framework for disparate-impact claims under the FHA.  And in *MHANY Management, Inc.* v. *County of Nassau*, 819 F.3d 581, 618 (2016), the Second Circuit noted that both HUD and the Supreme Court have placed the burden on the plaintiff at the third step of the burden-shifting process.  Neither court considered a challenge to the legality of the Rule, much less a challenge based on any of the four limitations on disparate-impact liability under the FHA that are at issue here.

This Court should reject the government's plea for deference.  Put simply, the Disparate-Impact Rule cannot be squared with the limitations of the FHA.  It should be vacated.

**ARGUMENT**

As explained in Plaintiffs' opening brief, after the Supreme Court's decision in *Inclusive Communities*, the Disparate-Impact Rule is unlawful on four independent and alternative grounds. As to each of those grounds, Plaintiffs have alleged that the Rule is unlawful "to the extent it applies to insurers' ratemaking and underwriting decisions." Am. Compl., Dkt. 57, at 17, 18, 19, 20 (Apr. 14, 2016) (capitalization altered). In this suit, Plaintiffs have not challenged the Rule as applied to other industries or to practices other than insurance ratemaking and underwriting. *Cf.* Defs.' Mem. 14-15; *cf. also Hodge* v. *Talkin*, 799 F.3d 1145, 1156-1157 (D.C. Cir. 2015) (addressing a challenge that was facial in one sense and as applied in another). Because the Disparate-Impact Rule cannot lawfully be applied to insurers' ratemaking and underwriting decisions for any of the reasons discussed below, summary judgment in plaintiffs' favor is warranted.

**A.    The Disparate-Impact Rule Is Unlawful As Applied To Insurers' Ratemaking And Underwriting Decisions Because It Will Cause Pervasive Consideration Of Race And Other Protected Characteristics**

The Disparate-Impact Rule is unlawful as applied to insurers' ratemaking and underwriting decisions because it would necessarily "cause race to be used and considered in a pervasive way," in contravention of the limits on disparate-impact liability under the FHA. *Inclusive Communities*, 135 S. Ct. at 2523. Insurers currently do not and cannot consider race or membership in other protected classes in the ratemaking and underwriting processes. *See* Pls.' Mem. 15-16. But the Disparate-Impact Rule turns that race-blind system on its head. As this Court recognized in its earlier opinion, in order to assess their compliance with the disparate-impact requirement and to eliminate any violations, insurers will be required to "collect and analyze certain types of race-based data [and data on other protected characteristics] on their clients and prospective clients," conduct that is "expressly prohibited in many [S]tates." Am. Mem. Op.,

Dkt. 47, at 26-27 & n.27 (Nov. 7, 2014).  "Moreover, in order to ensure that their facially neutral underwriting practices do not result in any disparate outcomes amongst protected groups, insurers would be required to turn a blind eye to established actuarial principles in favor of race-based insurance decisions." *Id.* at 28.  In addition to contravening the FHA, such a result raises serious constitutional concerns.  *See* Pls.' Mem. 17-21; *Inclusive Communities Project, Inc.* v. *Texas Department of Housing & Community Affairs*, Civ. No. 08-546, 2016 WL 4494322, at *11 (N.D. Tex. Aug. 26, 2016) (holding that proposed remedy that would require the court to take race into account was not "constitutionally[ ]sound").

The government disputes that applying the Disparate-Impact Rule to insurers' ratemaking and underwriting decisions will cause pervasive consideration of race and other protected characteristics.  Each of its arguments lacks merit.

1.    The government initially dismisses as "absurd" Plaintiffs' concern that, under the Disparate-Impact Rule, they will have to account for race and other protected characteristics in ratemaking and underwriting decisions.  *See* Defs.' Mem. 19.  The government argues that the Disparate-Impact Rule imposes liability "only where an underwriting or rating policy has an unjustified discriminatory effect on a protected class." *Id.* (emphasis omitted).  Because insurers can offer a business justification for their underwriting practices, the government continues, "[i]nsurers are under no obligation to abandon efforts to make justified distinctions between genuinely different risks merely because there is not a perfectly even distribution of protected class members between the different risk pools." *Id.* at 19-20 (emphasis omitted).

The government is incorrect.  To be sure, the Disparate-Impact Rule allows defendants to show that a "challenged practice is necessary to achieve one or more substantial, legitimate, non-discriminatory interests." *Implementation of the Fair Housing Act's Discriminatory Effects*

3

*Standard*, 78 Fed. Reg. 11,460, 11,482 (2013).  But that is not a defense to liability.  Once a defendant justifies its practice, "the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."  *Id.*

That final step of the burden-shifting analysis—which the government ignores in its business-justification discussion—has significant ramifications for insurers.  Insurance rates reflect a number of different risk characteristics.  *See*, *e.g.*, Aff. of Nikki L. Meek ¶ 6; Decl. of William G. Hirschfeld ¶ 6; Aff. of Dianne L. Priest ¶ 5; Decl. of Ronald Joseph Zaleski, Sr. ¶ 13; Aff. of Scott St. Angel ¶ 8.  Each of those characteristics is related to insurers' legitimate goal of charging a rate commensurate with the risks they insure.  *See* Meek Aff. ¶ 6; Hirschfeld Decl. ¶¶ 4-6.  Any risk characteristic an insurer considers in setting a particular rate could thus potentially qualify as "another practice that has a less discriminatory effect."  78 Fed. Reg. 11,482.  As a result, insurers can protect themselves from disparate-impact claims in the ratemaking and underwriting context only by setting rates that do not affect protected groups disproportionately.  But they must consider race and other protected characteristics in order to do so.  *See* Am. Mem. Op., Dkt. 47, at 26-28 & n.27.  Far from "absurd," Defs.' Mem. 19, it is inevitable that the Disparate-Impact Rule will force insurers to consider race in their ratemaking and underwriting decisions despite the "business justification" analysis at the second step of the burden-shifting framework.  Such pervasive consideration of race is antithetical to the FHA and the Constitution because it "tend[s] to perpetuate race-based considerations rather than move beyond them."  *Inclusive Communities*, 135 S. Ct. at 2524; *see also Inclusive Communities*, 2016 WL 4494322, at *12 (explaining that requiring the approval of low-income tax credits in predominantly white areas is not a "constitutionally-permissible remedy").

4

2.     The government alternatively contends that "the standard set forth in the Rule does not require the pervasive use of race or any other protected characteristic in the context of insurance—or any other context" because "race-neutral remedies . . . are almost always likely to be available." Defs.' Mem. 16, 17. In so arguing, the government unsuccessfully attempts to sidestep the core of Plaintiffs' claim. Insurers' ratemaking and underwriting practices are already race-neutral. *See* Aff. of Greg Hayward ¶¶ 5, 10; Hirschfeld Decl. ¶ 4; Priest Aff. ¶ 5; Aff. of Larry M. Shaw ¶ 5; Aff. of Dalith Wells ¶ 5; Aff. of Salvatore T. Laduca ¶ 9. Recalibrating those practices to prevent otherwise race-neutral criteria from having a disparate impact would require taking protected characteristics into account in a pervasive manner and at the expense of race-neutral risk analysis. Hirschfeld Decl. ¶¶ 11, 13; Meek Aff. ¶¶ 12-15; Zaleski Decl. ¶¶ 18-20; *see Inclusive Communities*, 2016 WL 4494322, at *11 (stating that, "[t]o the extent [the plaintiff] asks the court to require that [the defendant] implement a new set-aside for applications for family units in Caucasian areas, such a remedy is not constitutionally sound"). That is not a "race-neutral" consequence.

The government's examples illustrate the point. Consider first the hypothetical taken from Plaintiffs' motion. In that scenario, Asian-American plaintiffs who live in coastal areas of a town with high rates of wind damage bring a disparate-impact claim because they pay higher rates than African-Americans who live inland. Pls.' Mem. 25-26; Defs.' Mem. 17-18. The government asserts that, if those plaintiffs prevailed under the Disparate-Impact Rule's standards, the court could "order the elimination of the practice of charging higher rates" or require that the insurer "adopt[] a better race-neutral measure of risk with a less discriminatory effect." Defs.' Mem. 17-18.

Neither remedy is lawful, and both implicate Plaintiffs' concern about pervasive use and consideration of race in ratemaking and underwriting. *See Inclusive Communities*, 135 S. Ct. at 2523; *Inclusive Communities*, 2016 WL 4494322, at *7, *11, *12. To begin with, the insurer's rates reflect the risks they have agreed to insure. *See* Meek Aff. ¶ 6; Zaleski Decl. ¶ 13; Hirschfeld Decl. ¶¶ 4-6. Resetting those rates is no simple task. And doing so in a way designed to "eliminat[e] the practice of charging higher rates" to a particular group, Defs.' Mem. 17-18—*i.e.*, "plac[ing] a racial thumb on the scales," *Ricci* v. *DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring)—would violate sound actuarial practice and state insurance law, and could violate federal and state anti-discrimination laws prohibiting disparate treatment. The same problems would arise if insurers discounted the plaintiffs' rates without regard to risk. In either instance, the insurer would be subject to further legal action from all corners—including disparate-treatment claims from the African-American residents living inland, who would effectively be subsidizing the Asian-American plaintiffs' now-discounted insurance rates.

The government's blithe suggestion that the hypothetical insurer could "adopt[] a better race-neutral measure of risk with a less discriminatory effect" is no better. Defs.' Mem. 18. State insurance law requires that all measures of risk be race-neutral. *See*, *e.g.*, Pls.' Mem. 21-23; Hayward Aff. ¶¶ 5-10; Hirschfeld Decl. ¶ 4; Priest Aff. ¶ 5; Shaw Aff. ¶ 5. The question, therefore, is how much of a "discriminatory effect" the insurer's race-neutral risk factors have. But because ratemaking and underwriting involve evaluating *and grouping* risk factors, a change to one factor affects the whole rate. *See* Meek Aff. ¶ 6; Zaleski Decl. ¶ 13; Hirschfeld Decl. ¶¶ 4-6. Thus, the "race-neutral" step of eliminating one risk characteristic would require insurers to consider *every* risk characteristic in racial terms and to group those characteristics in a way that avoided disparate-impact liability. In other words, the insurer would need to "evaluate the

racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes." *Ricci*, 557 U.S. at 594 (Scalia, J., concurring).  Even if the ultimate step of eliminating one measure of risk were facially race-neutral, the process of reaching that result requires explicit and pervasive consideration of race, not to mention other protected characteristics.  *See* Hirschfeld Decl. ¶¶ 11, 13; Aff. of David R. Benseler ¶ 7; Aff. of Andrew P. Forstenzer ¶¶ 9-10.

The government's second example, *National Fair Housing Alliance* v. *Travelers Indemnity Company*, Civ. No. 16-928 (D.D.C.), is similarly unhelpful.  The plaintiff in that case alleged that an insurer's underwriting criteria prevented it from selling commercial property and casualty insurance to landlords who rent apartments to recipients of Section 8 housing-choice vouchers in the District of Columbia.  *See id.*, Dkt. 10-2, at 1.  Those criteria, according to the plaintiff, had a disproportionate effect on women and minorities.  *Id.* at 2.  Moving to dismiss the complaint, the insurer explained that it had stopped considering the criteria the plaintiff identified in January 2016 and that there was no causal nexus between the disparities complained of and the prior criteria.  *Id.* at 2-3.  Contrary to the government's suggestion here, the insurer never suggested that it changed its policy because of a concern for disparate-impact liability or to alter the composition of its customer base.  Rather, state insurance legislation that became effective in January 2016 prohibited insurers from considering source of income as a factor in underwriting. *See* Cal. Ins. Code § 679.74 (2016).  What effect (if any) that change will have on the demographics of the insurer's policyholders is unknown, and unknowable given that insurers do not collect information regarding the race of their policyholders (or, in the case of commercial property insurance, their tenants).  The insurer's decision to stop considering source of income is not a "remedy" in any relevant sense.  *Cf.* Defs.' Mem. 18.  And it certainly does not prove that

race-neutral remedies for disparate-impact claims are readily available in the insurance ratemak-ing and underwriting context.

3.    The government next builds and then tears down a straw man.  Plaintiffs, it says, "charge that the [Disparate-Impact Rule] will impermissibly require insurers to at least collect data on protected characteristics of their policyholders, even if they never rely on it."  Defs.' Mem. 20-21 (emphasis omitted).  That characterization of Plaintiffs' argument is incomplete.  It is true that complying with the Disparate-Impact Rule would require insurers to change their data collection and retention practices, imposing substantial financial burdens and practical difficul-ties on insurers.  *See* Pls.' Mem. 16-17.  But that is not the gravamen of Plaintiffs' claim.  The problem, instead, is what the Disparate-Impact Rule would force insurers to do with the data they collect:  namely, to reconfigure their ratemaking and underwriting processes to account for membership in protected classes.  *See*, *e.g.*, Am. Compl., Dkt. 57, at 17-21.  The government's arguments about data collection are inapposite.

Even on their own terms, moreover, the government's arguments are unpersuasive.  To begin with, the Disparate-Impact Rule effectively requires insurers to collect data in order to en-sure that they are complying with the Rule.  This Court has already acknowledged that result of imposing disparate-impact liability on insurers.  *See* Am. Mem. Op., Dkt. 47, at 26-27 & n.27 (explaining that extending disparate-impact liability to homeowners' insurance "would also re-quire insurers to collect and analyze certain types of race-based data [and data about other pro-tected characteristics] on their clients and prospective clients").  The Court has also already ob-served that "the question of disparate-impact liability for *insurers* under the Fair Housing Act was a much more uncertain question prior to the Rule."  *Id.* at 15 n.14; *cf.* Defs.' Mem. 21-22. After the Rule, however, insurers must prospectively comply in all jurisdictions.  To do so, they

must determine whether any of their underwriting or ratemaking practices result in or perpetuate a disparate impact on members of a protected class and determine how to consider the protected characteristics of their insureds to eliminate or lessen statistical disparities. *See* Pls.' Mem. 16-17. That analysis requires data on customers' protected characteristics. *See id.* at 17. As a result, the Disparate-Impact Rule requires insurers to collect data as a practical matter, even if not as a textual command.

The government's argument that census data are sufficient for insurers' purposes is similarly flawed. The census takes place only once every decade, and it does not give insurers information about the particular individuals they insure. At the very most, census data would allow insurers to understand, as a general matter, where particular groups are most concentrated geographically. But that does not answer whether a particular insurer's customers conform to the generalities of the census reports, nor does it shed light on the impact of numerous factors unrelated to geography. As the evidence in this case uniformly shows, to determine whether there is a disparate effect among their particular customers, insurers would need to rely on data they collected themselves (assuming state law allowed them to do so). *See* Aff. of Kevin J. Christy ¶ 5; Hirschfeld Decl. ¶ 7; Joint Aff. of North Dakota Association of Farm Mutual Insurance Companies ¶ 10; *see also* Pls.' Mem. 16 (citing affidavits explaining that insurers would need to collect data from their policyholders).

The government's final argument on data collection fares no better. The government suggests that requiring insurers to collect data cannot be unlawful because "[t]he only way to determine whether a policy or policies disproportionately affect members of protected classes . . . is to take note of who the policy or policies affect." Defs.' Mem. 22-23. Again, the government misses the core of Plaintiffs' argument. The trouble with the Disparate-Impact Rule is

that it requires insurers to use and consider race pervasively not only in *detecting*, but also in *resolving*, racial disparities.  That is a far cry from "engag[ing] in self-testing" to detect potential disparate impacts, Defs.' Mem. 23, particularly because insurers' ratemaking and underwriting practices currently are race-blind.  *See* Meek Aff. ¶ 9; Hayward Aff. ¶¶ 6, 9; Priest Aff. ¶ 6; Shaw Aff. ¶ 5.  The government's argument that data collection must be permissible because a party must consider race to identify a disparate impact misses the point.

4.      Finally on this point, the government urges that the "importance of legitimate risk differentiation to the insurance industry" does not insulate insurers from an obligation to comply with the Disparate-Impact Rule.  Defs.' Mem. 24.  Yet again, the government misses the point.  Plaintiffs have not argued that mere consideration of risk in any decision "entitle[s]" a regulated entity to a "safe harbor."  *Id.* at 25.  Instead, the very nature of the business of homeowners' insurance, with its actuarial foundation and requirements at every step of the process (risk classification, risk grouping, and rating), not to mention state regulation, makes homeowners' insurance uniquely incompatible with disparate-impact liability, which would require insurers to consider factors (protected characteristics) that are forbidden under sound actuarial analysis and state law.

The government argues that "evaluation of risk is not central to all of what insurers do," Defs.' Mem. 25, and that the prices insurers ultimately charge customers involve consideration of "factors beyond those based solely on risk evaluation," *id.* at 26.  Rates naturally must provide for the cost of doing business, including the costs associated with the transfer of risk, and must not be excessive, inadequate, or unfairly discriminatory.  *See* Pls.' Mem. 5.  The risk-based rates insurers file with their state regulators take into account those factors, including associated discounts such as bundling (which is related to both loss costs and expense risk).  But that does not alter the incompatibility of disparate-impact liability with the very core of homeowners' insur-

ance.  Moreover, Plaintiffs' complaint is by its terms limited to ratemaking and underwriting practices.  *See*, *e.g.*, Am. Compl., Dkt. 57, at 17-21.  The government's discussion of other practices such as "marketing efforts or claims adjusting activities" are thus inapposite, because they are not the subject of Plaintiffs' complaint.  Defs.' Mem. 25-26.[1]  Likewise, Plaintiffs have never argued, and do not argue, that insurers should be immune from liability for *intentional* discrimination, *i.e.*, disparate *treatment*.  The cases the government cites, *see id.*, did not address disparate-impact liability (let alone the Disparate-Impact Rule), but rather involved allegations of intentional discrimination in the handling of an insurance claim.  *See Burrell* v. *State Farm & Casualty Co.*, 226 F. Supp. 2d 427, 442 (S.D.N.Y. 2002) (describing complaint as alleging that defendant refused to pay insurance claims because of the plaintiff's race); *Franklin* v. *Allstate Corp.*, Civ. No. 06-1909, 2007 WL 1991516, at *6 (N.D. Cal. July 3, 2007) (describing allegation that "race was the motivating factor" behind alleged conspiracy to deny homeowner's claim).

The government also suggests that disparate-impact liability for ratemaking and underwriting practices is necessary because "decision makers are fallible human beings," and an insurer may "incorporate[] in its attempt at risk evaluation an outdated or stereotypical factor that differentiates between risks (if at all) badly compared to other available measures."  Defs.' Mem. 27.  That argument fails for numerous reasons.

To begin with, the government's argument runs headlong into settled principles of insurance law.  The McCarran-Ferguson Act provides that state law governing the business of insur-

---

[1] By limiting their complaint to ratemaking and underwriting, however, Plaintiffs have not conceded that other insurance practices may legitimately be subject to the Disparate-Impact Rule, or even the FHA.  As for "price optimization," the government concedes it lacks a uniform definition.  *See* Defs.' Mem. 26-27.  To the extent state regulators have allowed some form of "price optimization," they have determined it does not result in rates that are excessive, inadequate, or unfairly discriminatory.

ance supersedes federal law, unless Congress explicitly says otherwise. *See* 15 U.S.C. §§ 1011 *et seq.* Every State regulates insurance, including by determining which characteristics insurers may or may not consider. *See* Pls.' Mem. 21-23 (collecting state statutes concerning permissible rating factors). The determination of which risk factors are permitted or not permitted to be used in rating and underwriting is thus firmly within the purview of the States—not the federal courts.

Similarly, actuarial standards require insurers to set rates that accurately reflect "the predicted probability that an insured will suffer a loss multiplied by the predicted severity of the loss." Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 408 (1985) (*Efficiency and Fairness*); Casualty Actuarial Society, Board of Directors, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* 2 (May 1988) <tinyurl.com/casstatement>. And state law requires that insurers' rates reflect the "differences among risks that can be demonstrated to have a probable effect upon losses or expenses." W. Va. Code § 33-20-3(c)(2); *see* Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(c); Wis. Stat. Ann. § 626.12(2). Rates that are outdated or ineffective do not accurately reflect risk and, as such, violate sound actuarial practice and state law. Moreover, insurers have a powerful, market-based incentive not to rely on such risk factors. Setting rates that accurately reflect risk is "[t]he heart of any insurance system." *Efficiency and Fairness* 403. If insurers' rates did not in fact reflect the risks they insure, their businesses would be in serious danger, either from competitors whose risk assessment was better or, in the case of rates that are too low in relation to the insured risk, from liquidity and regulatory-capital difficulties. Finally on this score, in the event a hypothetical insurer were to rely on stereotypes based on race or other protected characteristics (contrary to state law and sound actuarial principles), the insurer would face liability for *inten-*

*tional* discrimination.  This litigation will have no impact on the availability of claims for intentional discrimination under the FHA.

**B.    The Disparate-Impact Rule Is Unlawful As Applied to Insurers' Ratemaking And Underwriting Decisions Because State Law Limits Insurers' Discretion Over Those Decisions**

The Supreme Court has explained that, when a "law substantially limits the [defendant's] discretion," the law breaks the "causal connection" between the challenged policy and the allegedly disparate impact.  *Inclusive Communities*, 135 S. Ct. at 2524.  In such circumstances, a disparate-impact claim cannot lie under the FHA.  *See id.*  That is precisely what state insurance law does with respect to insurers' ratemaking and underwriting decisions.  Every State exercises substantial control over which risk factors insurers may and may not consider in the ratemaking and underwriting processes, and all States circumscribe insurers' ability to consider protected characteristics such as race when making ratemaking and underwriting decisions.  *See* Pls.' Mem. 21-23 (collecting and describing state statutes).  Those laws, *Inclusive Communities* makes clear, break the necessary "causal connection" between insurers' ratemaking and underwriting practices and disparate-impact claims under the FHA.  *See Inclusive Communities*, 2016 WL 4494322, at *9 (applying the Supreme Court's decision on remand).

The government does not dispute that state law—across all 50 States and the District of Columbia—pervasively regulates insurers' ratemaking and underwriting decisions.  And the government has no answer for *Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961 (8th Cir. 2008), and other cases recognizing that disparate-impact liability is fundamentally inconsistent with state insurance law.  *See* Pls.' Mem. 23.  The government nevertheless insists that state law does not break the causal connection between insurers' ratemaking and underwriting decisions and disparate-impact claims under the FHA.  Its arguments are unpersuasive.

13

1.     As before, the government's first tack is to misstate Plaintiffs' argument.  *Inclusive Communities*, the government says, does not "establish[] a categorical prohibition of FHA disparate impact claims when other laws are implicated."  Defs.' Mem. 29.  True enough.  But that is not what Plaintiffs have argued.  Rather, Plaintiffs argue that, when another law "substantially limits the [defendant's] discretion"—as state insurance law does for Plaintiffs' members in the ratemaking and underwriting contexts—a disparate-impact plaintiff cannot establish a "causal connection."  *Inclusive Communities*, 135 S. Ct. at 2524.  *Inclusive Communities* directly supports that proposition; the government cannot and does not seriously argue otherwise.  *See* Defs.' Mem. 29.

The government also relies on a series of cases considering whether insurers should be subject to FHA claims in light of the reverse-preemption principle of the McCarran-Ferguson Act.  *See* Defs.' Mem. 31-32.  Those cases, the government asserts, show that insurers are not "immune from scrutiny because of state regulation."  *Id.* at 31.  But the government again misses the point.  The relevant question is whether state insurance law imposes substantial limitations on insurers' ratemaking and underwriting activities that break the causal link between ratemaking and underwriting, on the one hand, and disparate effects, on the other.  *See Inclusive Communities*, 135 S. Ct. at 2524; *Inclusive Communities*, 2016 WL 4494322, at *9; Pls.' Mem. 21-24.  Whether the application of the FHA to insurers is reverse-preempted by the McCarran-Ferguson Act is a completely different matter.  As the government acknowledges, that issue is unsettled but is ultimately irrelevant to this case, because Plaintiffs have not alleged a claim based on the McCarran-Ferguson Act.  *See* Defs.' Mem. 8 n.9; *id.* at 31-32 (citing *Saunders*, *supra*; and *Ojo* v. *Farmers Group, Inc.*, 356 S.W.3d 421 (Tex. 2011)).  The government's authori-

ties are therefore inapt; they simply do not address the proposition that disparate-impact plaintiffs can establish causation despite the restrictions imposed by state insurance law.

2.    The government's central argument concerning state law relies on a misconception of the principle articulated in *Inclusive Communities*.  Specifically, the government argues that state insurance law cannot break the chain of causation because it does not "*require*[] [insurers] to set rates in a particular way."  Defs.' Mem. 30; *see id.* at 31 (demanding "compulsion of state law").  But the Supreme Court did not require compulsion by another law to break the causal chain; to the contrary, the Court explained that a law that "substantially limits the [defendant's] discretion" would be sufficient to prevent a disparate-impact plaintiff from showing the required causal connection.  *Inclusive Communities*, 135 S. Ct. at 2524.  Of course, an explicit requirement could provide the requisite interference.  But a command to refrain from certain conduct, or a law that substantially circumscribed conduct, could impose just as much of a burden.

The disposition of the *Inclusive Communities* case on remand is instructive.  After the Supreme Court issued its decision, the district court considered whether the plaintiff had established a prima facie case of disparate impact based on the defendant agency's policy of allowing discretion in allocating tax credits.  Applying the robust causation standard articulated by the Supreme Court, the district court held, *inter alia*, that the plaintiff had failed to prove that the defendant's policy, and not something else, caused the alleged disparity.  *See Inclusive Communities*, 2016 WL 4494322, at *8.  The court observed that the plaintiff had not accounted for other potential causes of the statistical disparity, including the effect of various applicable federal and state law preferences.  *See id.* at *8-*9.  Because the plaintiff could not show that those preferences, local zoning rules, and other factors did not contribute to the disparity, the court conclud-

ed that the plaintiff "cannot show a causal connection between [the defendant's] policy and a disparate impact." *Id.* at *9 (quoting *Inclusive Communities*, 135 S. Ct. at 2524).

Similar analysis applies here. State law need not mandate a particular outcome in order to "substantially limit[] [a defendant's] discretion" in a way that breaks the causal chain. *Inclusive Communities*, 135 S. Ct. at 2524. As with the federal law at issue in *Inclusive Communities*, state insurance law imposes substantial limitations over which risk factors insurers may and may not consider in the ratemaking and underwriting processes and, importantly, prohibits insurers from making classification and rating decisions that take into account membership in protected groups. These state-law limitations sever the causal connection between those decisions and allegedly disparate impacts.

Because the government's premise is faulty, the two examples it offers are unilluminating. The government first points to Plaintiffs' hypothetical involving disparate-impact plaintiffs who force an insurer to set rates based on the proximity of fire stations, rather than the presence or absence of wood-burning stoves, even though the latter better reflects the risk of loss through fire. *See* Pls.' Mem. 28; Defs.' Mem. 30-31. The government claims that, to succeed here, Plaintiffs would have to show that "state law mandated" the insurer's practice (as opposed to another option). Defs.' Mem. 31. As Plaintiffs have explained, however, restrictions far short of compulsion can sever the causal chain. The government's second example, *National Fair Housing Alliance*, is similarly unhelpful to its cause. The government suggests that the insurer in that case "adopted [the practices at issue] for its own business reasons rather than by compulsion of state law." Defs.' Mem. 31. Again, the government invokes the wrong standard. For purposes of Plaintiff's claim here, the question is not what state law compels, but whether state law "substantially limits" insurers' ratemaking and underwriting discretion. *Inclusive Communities*, 135

16

S. Ct. at 2524.  The law unquestionably does impose substantial limitations—particularly, prohibiting consideration of race and other protected characteristics.  *See* Pls.' Mem. 21-24.  The government does not seriously grapple with the standard articulated in *Inclusive Communities* or with its application to Plaintiffs' claim.

### C.    The Disparate-Impact Rule Is Unlawful Because It Allows Claims To Proceed Based Entirely On Statistics, Without Identifying The Specific Policy Causing The Alleged Disparity

The Disparate-Impact Rule explicitly contravenes one of the "limiting principles that *Inclusive Communities* explained were part of the FHA*," Defs.' Mem. 35:  namely, that a disparate-impact claim under the FHA that "relies on a statistical disparity" cannot proceed "if the plaintiff cannot point to a defendant's policy or policies causing that disparity," *Inclusive Communities*, 135 S. Ct. at 2523.  The government's attempts to sidestep that problem are unavailing.

1.    The government first argues that plaintiffs' concerns are unfounded because the Disparate-Impact Rule already requires a plaintiff or charging party to "identify[] the specific practice that caused the alleged discriminatory effect," in order to establish a prima facie case of disparate impact.  Defs.' Mem. 35 (quoting 78 Fed. Reg. 11,469); *see also id.* at 37.  That explanation does not withstand scrutiny.  In denying a request from commenters to include such a requirement in the Rule, HUD explained that a plaintiff or charging party can satisfy the Rule's causation requirement by "challeng[ing] the decision-making process as a whole."  78 Fed. Reg. 11,469.  The government relegates that fact to a footnote—and for good reason.  *See* Defs.' Mem. 36 n.27.  Pointing to a statistical disparity and an entire decisionmaking process without further specificity falls far short of the FHA's requirement that a plaintiff must "point to a defendant's *policy or policies* causing that disparity."  *Inclusive Communities*, 135 S. Ct. at 2523 (emphasis added).

17

The difference between the FHA standard and the standard in the Disparate-Impact Rule is significant—especially for ratemaking and underwriting decisions, which involve a complex matrix of policies and factors. *See* Pls.' Mem. 25-26. *Inclusive Communities* itself again illustrates the point. On remand in *Inclusive Communities*, the district court dismissed one of the plaintiff's disparate-impact claims because it merely "pointed to the 'cumulative effects' of [the defendant's] decision-making process over a multi-year period" and failed to "isolate[] and identif[y] the specific practice that caused the disparity." 2016 WL 4494322, at *6. "[W]ithout knowing the offending policy with precision," the court explained, it could not "evaluate whether the offending policy caused" the statistical disparity, as the FHA demands. *Id.* Thus, the court concluded, the plaintiff's allegations regarding the decisionmaking process as a whole did not satisfy the causation requirement identified by the Supreme Court. *See id.*

The government repeats HUD's argument that the causation requirement in the Rule "is consistent with the discriminatory effects standard confirmed by Congress in the 1991 amendments to Title VII." Defs.' Mem. 36 (quoting Proposed Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 76 Fed. Reg. 70,921, 70,924 (2011)). But that lower standard cannot be squared with the causation requirement of the FHA as the Court articulated it in *Inclusive Communities*. In *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642 (1989), the Supreme Court held that, to establish a prima facie case of disparate impact under Title VII, an employee must "demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." *Id.* at 657; *see id.* (explaining that plaintiffs must show that "the disparity they complain of is the result of one or more of the employment practices that they are attacking"). In response, Congress modified Title VII to provide that "the decisionmaking process may be analyzed as one employment practice," if a plaintiff demon-

strates "that the elements of [the] decisionmaking process are not capable of separation for analysis." 42 U.S.C. § 2000e-2(k)(1)(B)(i); *see McReynolds* v. *Sodexho Marriott Services, Inc.*, 349 F. Supp. 2d 1, 28-29 (D.D.C. 2004). Crucially, Congress has not amended the FHA to add a similar provision. To the contrary, the Supreme Court has instructed that the FHA requires a plaintiff to "point to a defendant's policy or policies causing th[e] disparity," in order to "protect[] defendants from being held liable for racial disparities they did not create." *Inclusive Communities*, 135 S. Ct. at 2523 (citing *Wards Cove*, 490 U.S. at 653). The causation standard in the Disparate-Impact Rule contravenes the "robust causality requirement" of the FHA, *id.*, and is therefore unlawful.

2. The government also contends that the Disparate-Impact Rule does not contemplate that a plaintiff or charging party may establish a prima facie case using only statistical evidence showing the existence of a disparity. *See* Defs.' Mem. 36-37. As an initial matter, in response to a commenter's concern that the Rule "would allow for lawsuits based only on statistical data produced under HMDA," HUD embraced the idea that such data, standing alone, "may indicate a disparate impact" sufficient to establish a prima facie case. *See* 78 Fed. Reg. 11,478. To the extent that HUD now seeks to clarify its stance on the use of statistical evidence and embrace the Solicitor General's position that a plaintiff "must do more than simply identify a statistical disparity" to establish a prima facie case, that clarification should be codified in the Rule itself. Defs.' Mem. 37 (quoting U.S. Br. at 33, *Inclusive Communities*, *supra*).

More importantly, as long as the Disparate-Impact Rule fails to include a requirement that the plaintiff or charging party identify the particular practice or policy causing the alleged disparity—as opposed to pointing to the decisionmaking process as a whole—it is out of step with the limitations of the FHA. Under the Disparate-Impact Rule, a plaintiff could establish a

prima facie case by identifying a statistical disparity and alleging that the defendant's "decision-making process as a whole" resulted in the disparity.  78 Fed. Reg. 11,469.  In many cases, that would be tantamount to identifying a statistical disparity and then pointing the finger at the defendant, with nothing more.  Such an approach is inconsistent with the crucial causation requirement for disparate-impact liability under the FHA.  *See Inclusive Communities*, 135 S. Ct. at 2523.

**D.    The Disparate-Impact Rule Is Unlawful Because It Allows Plaintiffs To Displace Valid Policies**

Finally, the Disparate-Impact Rule ignores the FHA's limitation on disparate-impact liability by imposing a flawed burden-shifting standard.  That standard renders cognizable claims that are no more than "an attempt to second-guess which of two reasonable approaches" a defendant should follow, rather than solely displacing artificial, arbitrary, and unnecessary barriers.  *Inclusive Communities*, 135 S. Ct. at 2522.

The government asserts that the Rule already "protect[s] a covered entity from liability based on 'second-guess[ing]' of a policy choice between 'reasonable approaches.'"  Defs.' Mem. 40.  But the government does not explain how the Rule could possibly do so without requiring, at the third step of the burden-shifting process, that the plaintiff's preferred alternative practice achieve the defendant's concededly valid interest as effectively as the challenged practice.  Without such a requirement, a plaintiff could use disparate-impact liability under the FHA as a tool to force a defendant to reorder its valid priorities; the plaintiff would simply have to show that its preferred alternative results in less of a disparate impact than the defendant's preferred approach, even though the plaintiff's alternative is also a less effective means of achieving the defendant's valid interest.  A practice or policy that is necessary to achieve a substantial, legitimate, nondiscriminatory interest and is also more effective in serving that interest than an alter-

native practice or policy (that results in less of a disparate impact) is not an "artificial, arbitrary, and unnecessary barrier[]," and so is "not contrary to the disparate-impact requirement" of the FHA. *Inclusive Communities*, 135 S. Ct. at 2524 (internal quotation marks omitted).

The government raises two arguments in support of HUD's rejection of a requirement that the plaintiff's proffered alternative be as effective as the defendant's existing policy or practice in achieving the defendant's legitimate interest. First, the government contends that Congress rejected an "equally effective" requirement in Title VII when it enacted the Civil Rights Act of 1991 and that HUD has the authority to adopt a similar standard for the FHA. *See* Defs.' Mem. 41. Tellingly, however, the government does not identify any corresponding congressional amendment applicable to the FHA. It points to the district court decision in *PCI* deferring to the Rule, but that 2014 decision was issued "without the cautionary standards announced in" *Inclusive Communities*. 135 S. Ct. at 2524.[2] Second, the government asserts that the FHA covers a variety of practices that "are not readily quantifiable" and so are not amenable to an effectiveness requirement. Defs.' Mem. 41 (quoting 78 Fed. Reg. 11,473). But HUD is not at liberty to ignore the requirements of the FHA, much less to do so based on nothing more than unsupported speculation about the difficulty of assessing the effectiveness of housing-related practices and policies. Because the Disparate-Impact Rule permits plaintiffs to displace valid policies that are not "artificial, arbitrary, and unnecessary barriers," *Inclusive Communities*, 135 S. Ct. at 2524 (internal quotation marks omitted), it improperly authorizes disparate-impact claims that stretch far beyond the bounds of the FHA.

---

[2] The government also relies on *Avenue 6E Investments*, but as previously explained, the court in that case merely cited the Rule and noted that it sets forth a burden-shifting framework for disparate-impact claims under the FHA; it did not decide whether the Rule complied with the limits announced in *Inclusive Communities*, much less address the challenges Plaintiffs raise here. See p. 1, *supra*.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted, Defendants' motion denied, and the Disparate-Impact Rule vacated.

Respectfully submitted,

By: /s/Kannon K. Shanmugam
    Kannon K. Shanmugam (#474304)
    Allison B. Jones (#991503)
    A. Joshua Podoll (#1011743)
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, DC 20005
    Telephone:  (202) 434-5000
    Facsimile:  (202) 434-5029

*Counsel for Plaintiffs*

September 30, 2016