**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

AMERICAN INSURANCE                    )
ASSOCIATION, *et al.*                 )
                                      )
        Plaintiffs,                   )
                                      )      No. 1:13-cv-00966 (RJL)
    v.                                )
                                      )
UNITED STATES DEPARTMENT              )
OF HOUSING AND URBAN                  )
DEVELOPMENT, *et al.*                 )
                                      )
        Defendants.                   )
_____)

**DEFENDANTS' REPLY MEMORANDUM
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

GREGORY B. FRIEL
Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

TONYA T. ROBINSON
Acting General Counsel
MICHELLE ARONOWITZ                    LESLEY FARBY
Deputy General Counsel for           Assistant Branch Director
    Enforcement and Fair Housing      Federal Programs Branch
JEANINE M. WORDEN
Associate General Counsel            BRIAN G. KENNEDY (DC Bar No. 228726)
    for Fair Housing                 DANIEL P. MOSTELLER (DC Bar No. 980802)
KATHLEEN M. PENNINGTON               Attorneys
Assistant General Counsel            U.S. Department of Justice
    for Fair Housing Enforcement      20 Massachusetts Ave., N.W.
M. CASEY WEISSMAN-VERMEULEN          Washington, DC 20001
AYELET R. WEISS                      Tel: (202) 514-3357
Attorneys                            Fax: (202) 616-8187
*Of counsel*                         Email: Brian.Kennedy@usdoj.gov
                                     *Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 1

I.    PLAINTIFFS HAVE NOT SHOWN THAT INSURERS' RATEMAKING AND
      UNDERWRITING PRACTICES SHOULD ENJOY A BLANKET EXEMPTION
      FROM DISCRIMINATORY EFFECTS LIABILITY .............................................................2

      A.    HUD's Regulation Does Not Require Pervasive or Improper Consideration of
            Race ..................................................................................................................2

      B.    That Insurers Deal with Risk Does Not Exempt Ratemaking and
            Underwriting Activities of Insurers from Discriminatory Effects Liability...................10

      C.    A Blanket Exemption for Insurers' Ratemaking and Underwriting Functions
            Is Not Justified by State-Law Regulation of Those Functions ........................................12

II.   THE RULE'S BURDEN-SHIFTING FRAMEWORK IS CONSISTENT WITH
      *INCLUSIVE COMMUNITIES* ..............................................................................................16

      A.    The Rule, Consistent with *Inclusive Communities*, Requires Identification of
            a Policy or Policies Causing a Disparity .........................................................................16

      B.    The Rule Need Not Include the Phrase "As Effectively As" to Allow Covered
            Entities to Maintain Policies that Are Not Artificial, Arbitrary, and
            Unnecessary Barriers........................................................................................................21

CONCLUSION.....................................................................................................................24

i

## TABLE OF AUTHORITIES

### Cases

*Ave. 6E Invs., LLC v. City of Yuma*,
   818 F.3d 493 (9th Cir. 2016) ............................................................................ 22, 23

*Azam v. City of Columbia Heights*,
   2016 WL 424966 (D. Minn. Feb. 3, 2016) ............................................................ 17

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971) ................................................................................ 3, 21, 22

*Hodge v. Talkin*,
   799 F.3d 1145 (D.C. Cir. 2015) ............................................................................ 2

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*,
   2015 WL 5916220 (N.D. Tex. Oct. 8, 2015) .......................................................... 23

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*,
   2016 WL 4494322 (N.D. Tex. Aug. 26, 2016) ................................................ 3, 4, 17

*Johnson v. City of Memphis*,
   770 F.3d 464 (6th Cir. 2014) .............................................................................. 22

*Jones v. Travelers Cas. Ins. Co. of Am.*,
   2015 WL 5091908 (N.D. Cal. May 7, 2015) .......................................................... 14

*McReynolds v. Sodexho Marriott Servs., Inc.*,
   349 F. Supp. 2d 1 (D.D.C. 2004) ........................................................................ 20

*MHANY Mgmt., Inc. v. Cty. of Nassau*,
   819 F.3d 581 (2d Cir. 2016) ...................................................................... 16, 22, 23

*Mobil Oil Exploration & Producing Se. Inc. v. United Distribution Cos.*,
   498 U.S. 211 (1991) .......................................................................................... 21

*NAACP v. Am. Family Mut. Ins. Co.*,
   978 F.2d 287 (7th Cir. 1992) .............................................................................. 11

*Nationwide Mut. Ins. Co. v. Cisneros*,
   516 U.S. 1140 (1996) .......................................................................................... 9

*Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.*,
   208 F. Supp. 2d 46 (D.D.C. 2002) ...................................................................... 10

*Norton v. S. Utah Wilderness All.,*
 542 U.S. 55 (2004) ................................................................................................ 21

*Ojo v. Farmers Grp. Inc.,*
 600 F.3d 1205 (9th Cir. 2010) (en banc) ............................................................. 19

*Prop. Cas. Insurers Ass'n of Am. v. Donovan,*
 66 F. Supp. 3d 1018 (N.D. Ill. 2014) ....................................................... 2, 13, 23

*Reno v. Flores,*
 507 U.S. 292 (1993) ................................................................................................ 2

*Ricci v. DeStefano,*
 557 U.S. 557 (2009) ................................................................................................ 4

*Texas Dep't of Hous. & Cmty Affairs v. Inclusive Cmty Projects, Inc.,*
 135 S. Ct. 2507 (2015) ……………………………………………………...*passim*

*Viens v. Am. Empire Surplus Lines Ins. Co.,*
 113 F. Supp. 3d 555 (D. Conn. 2015) .................................................................. 19

*Wards Cove Packing Co. v. Atonio,*
 490 U.S. 642 (1989) .............................................................................................. 20

**<u>Statutes</u>**

15 U.S.C. § 1012 .......................................................................................................... 15

42 U.S.C. § 2000e-2(k)(1)(B)(i) ............................................................................. 19, 20

Alaska Stat. § 21.39.010 .............................................................................................. 13

Alaska Stat. § 21.39.030 ........................................................................................ 12, 13

Ariz. Rev. Stat. Ann. § 20-384 .................................................................................... 13

Colo. Rev. Stat. § 10-4-403 ......................................................................................... 12

Idaho Code § 41-1437 .................................................................................................. 13

Ky. Rev. Stat. Ann. § 304.13-031 ............................................................................... 14

Nev. Rev. Stat. § 686B.060 ......................................................................................... 13

N.J. Stat. Ann. § 17:29A-4 .......................................................................................... 13

W. Va. Code § 33-20-1 ................................................................................................ 13

W. Va. Code § 33-20-3 ........................................................................................... 12, 13

Wis. Stat. Ann. § 625.11 ................................................................................................ 12

Wis. Stat. Ann. § 625.12 ................................................................................................ 12

Wis. Stat. Ann. § 626.03 ................................................................................................ 12

Wis. Stat. Ann. § 626.12 ................................................................................................ 12

## **Regulations**

24 C.F.R. § 100.500 ............................................................................................... *passim*

## **Regulatory Materials**

Implementation of the Fair Housing Act's Discriminatory Effects Standard,
78 Fed. Reg. 11,460 (Feb. 15, 2013) ..................................................................... *passim*

Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance,
81 Fed. Reg. 69,012 (Oct. 5, 2016) ................................................................................ 2

# INTRODUCTION

*Texas Department of Housing & Community Affairs v. Inclusive Community Projects, Inc.* ("*Inclusive Communities*"), 135 S. Ct. 2507 (2015), confirmed that discriminatory effects liability can play a vital – and constitutional – role in the Fair Housing Act's ("FHA" or "Act") "central purpose . . . to eradicate discriminatory practices within a sector of our Nation's economy." *Id*. at 2521.

Plaintiffs fail convincingly to explain why – based on *Inclusive Communities* or otherwise – the ratemaking and underwriting activities of the insurance industry should enjoy a unique across-the-board exemption from potential scrutiny for unjustified discriminatory effects. And, while *Inclusive Communities* specified that safeguards applying to disparate impact litigation under Title VII of the Civil Rights Act of 1964 also apply to the FHA, *see id*. at 2522-24, the challenged regulation ("Discriminatory Effects Rule" or "Rule"), *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500) is consistent with those principles. In applying discriminatory effects analysis to *specific* insurance practices, close questions may be presented. But that is not this case. Here, plaintiffs' facial challenge, their claim that *any* practice an insurer can claim involves ratemaking or underwriting is immune from discriminatory effects liability, fails.

# ARGUMENT

Plaintiffs do not dispute that each of the four Counts in their Complaint must be evaluated as a facial challenge, although they have clarified that they are only challenging the Rule's effect on insurance ratemaking and underwriting. *See* Pls.' Opp. to Defs.' Mot. for Summ. J. ("Pls.' Opp.") at 2 (ECF No. 68). As explained in defendants' opening brief, to prevail on a facial challenge to a regulation, plaintiffs "must establish that no set of circumstances exists

1

under which the [regulation] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (alteration in original). Although the Rule has applications outside the insurance ratemaking and underwriting context, the question that the court must address is whether the regulation is invalid with respect to *all its applications* to insurers' ratemaking and underwriting activities. *See Hodge v. Talkin*, 799 F.3d 1145, 1156-57 (D.C. Cir. 2015); *see also Prop. Cas. Insurers Ass'n of Am. v. Donovan* ("*PCI*"), 66 F. Supp. 3d 1018, 1036 (N.D. Ill. 2014) ("Although [plaintiff] does not seek to invalidate the Rule outside the homeowners insurance context, its challenge is more akin to a facial challenge than to an as-applied challenge . . . .").[1] All four of plaintiffs' Counts in this case fall far short of that demanding standard, and so summary judgment should be granted in favor of defendants.

# I. PLAINTIFFS HAVE NOT SHOWN THAT INSURERS' RATEMAKING AND UNDERWRITING PRACTICES SHOULD ENJOY A BLANKET EXEMPTION FROM DISCRIMINATORY EFFECTS LIABILITY

## A. HUD's Regulation Does Not Require Pervasive or Improper Consideration of Race

Plaintiffs now largely build their argument that insurers would have to resort to "pervasive use of race" if discriminatory effects liability were countenanced (Count I) on the premise that their "ratemaking and underwriting practices are already race neutral." Pls.' Opp. at 5. But the same can be said of many lender or landlord practices or local governmental practices,

---

[1] As noted in defendants' opening brief, in *PCI* the Rule was remanded to the Department of Housing and Urban Development ("HUD"), without being vacated, for further consideration of comments submitted during the rulemaking about aspects of the Rule's application to insurance. *See* 66 F. Supp. 3d at 1054. HUD's response to the remand was published on October 5, 2016. *Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance*, 81 Fed. Reg. 69,012. The response provided revised and expanded responses to the comments that had been submitted by the insurance industry and did not alter the Rule's application to insurance. *Id.* at 69,013. The response has no effect on the instant case because plaintiffs' Amended Complaint does not raise a procedural challenge to HUD's response to public comments and the Rule remains substantively unchanged.

all of which can be subject to scrutiny for unjustified discriminatory effects. Indeed, almost by definition, discriminatory effects analysis applies in *any* context *only* to practices that are on their face race-neutral, that is, to practices "that are fair in form, but discriminatory in operation," *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). That some insurers' practices may be race-neutral in form is not an argument that insurers cannot be liable for unjustified discriminatory effects; it is instead a descriptor of the very domain of issues to which that doctrine always has been applied.

Based on their premise that a challenged insurer's practice would be "race-neutral," plaintiffs contend that any remedy that could be devised if that practice was not justified would not be race neutral. Pls.' Opp. at 5-6. That conclusion does not follow. For example, "Charge 5% more for even-numbered street addresses in City X" would be a race-neutral practice.[2] But, if it turned out that such an additional charge both had a disparate impact and was unjustified, some obvious potential remedies, such as "Don't charge extra for even-numbered street addresses" or "Only charge the 2% extra that can actually be justified" are equally race neutral. Or, to take another – indeed, actual – example: If a practice of refusing to insure landlords who accept government "Section 8" housing vouchers is race neutral, then so too is a practice of not refusing to insure them.

The district court decision on remand in *Inclusive Communities* does not help plaintiffs on this point. *See Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 3:08-CV-0546-D, 2016 WL 4494322 (N.D. Tex. Aug. 26, 2016). Plaintiffs rely on the district court's refusal to endorse a remedy proposed by the plaintiff in that case that was *not* race neutral. Pls.'

---

[2] Perhaps an insurer concludes that City X is laid out so that the sides of streets that have odd numbers are more likely to be the sides on higher ground away from a floodplain or the sides with the street lights.

Opp. at 3, 15-16. But in doing so the district court drew a pointed contrast with a kind of remedy that permissibly can be imposed on insurers found liable under the Rule's discriminatory effects standard, a remedy "to *remove* a specific barrier to fair housing." *Inclusive Cmtys.*, 2016 WL 4494322, at *11; *see also* Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 17 (ECF No. 64), ("[A] remedy can 'concentrate on the elimination of the offending practice' . . . .") (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2524).

Additionally, plaintiffs' continued claim that requiring insurers to be aware of racial consequences of its decisions is an invalid "pervasive consideration of race" cannot withstand scrutiny after *Inclusive Communities*. Plaintiffs treat as legally binding the language of Justice's Scalia's concurring opinion in *Ricci v. DeStefano*, 557 U.S. 557 (2009), suggesting that the disparate impact standard "'places a racial thumb on the scale'" and violates disparate treatment principles because it often requires "'decisions based on . . . racial outcomes.'" Pls.' Opp. at 6-7 (quoting *Ricci*, 557 U.S. at 594 (Scalia, J., concurring)) (alteration omitted). But that language is irreconcilable with the holding of *Inclusive Communities* that "[w]hile the automatic or pervasive injection of race into public and private transactions covered by the FHA has special dangers, it is also true that race may be considered in certain circumstances and in a proper fashion." 135 S. Ct. at 2525; *see also* Amicus Br. of ACLU et al. at 18 n.13 (ECF No. 67). Plaintiffs' argument based on the *Ricci* concurrence also would not distinguish insurers seeking to avoid discriminatory effects liability from other entities covered by the FHA. *See* Defs.' Mem. at 24-25. Consequently, plaintiffs' argument that such consideration is the "pervasive consideration of race antithetical to the FHA and the Constitution" simply refuses to accept the majority's holding

in *Inclusive Communities* that the FHA provides for discriminatory effects liability, *see* Pls.'
Opp. at 4.[3]

Plaintiffs also cite affidavits that they say support the notion that any "recalibrat[ion]" of
challenged practices will necessarily require "taking protected characteristics into account in a
pervasive manner and at the expense of race-neutral risk analysis." *Id*. at 5. Those affidavits are
premised on a legal misunderstanding of what the Rule and the FHA require. Plaintiffs' affiant
Meek, for example, bases her assertions on the assumption that the "logical conclusion" of the
regulation is to require absolute "parity of 'impact'" for the outcome of all the insurers' practices
taken as a whole with respect to every protected class, and she then proceeds to explain the
difficulties with that hypothesized approach. Aff. of Nikki L. Meek ¶ 15 (ECF No. 60-10). In the
Rule, HUD addressed head on this misunderstanding of what the Rule requires, explaining that it
does *not* require insurers "'to charge everyone the same rate regardless of risk.'" 78 Fed. Reg. at
11,475 (quoting a commenter). HUD went on to explain that even where a practice does have a
disparate impact, if the practice is supported by a legally sufficient justification, it will stand, and
HUD further explained that the Rule does not require the outcome-driven leveling of rates
without any regard to risk that plaintiffs' affidavits assume. *Id*.; *accord Inclusive Cmtys.*, 135 S.
Ct. at 2522 (allowing defendants "leeway to state and explain the valid interest served by their
policies"); *see* 24 C.F.R. § 100.500 ("The practice may still be lawful if supported by a legally
sufficient justification . . . .").

---

[3] Plaintiffs suggest that their argument is consistent with language this Court used in its now-vacated November 2014 opinion granting summary judgment to plaintiffs. *See, e.g.*, Pls.' Opp. at 3 (quoting *Am. Ins. Ass'n v. HUD*, 74 F. Supp. 3d 30, 45 (D.D.C. 2014)). Plaintiffs' interpretation of this Court's prior language, which the Court wrote without the benefit of the Supreme Court's opinion in *Inclusive Communities*, is similarly irreconcilable with the Supreme Court's holding that discriminatory effects liability generally applies to entities covered by the FHA.

Plaintiffs go further astray in resurrecting their opening brief's hypothetical of a higher rate for coastal properties disproportionately affecting Asian Americans.[4] According to plaintiffs, eliminating the hypothetically higher rate for coastal properties would cause "disparate treatment claims from African-American residents living inland, who would effectively be subsidizing the Asian-Americans plaintiffs' now-discounted insurance rates." Pls.' Opp. at 6. In the first place, unless the remedy were to lower rates just for Asian Americans or raise them just for African Americans (as opposed to removing the higher rates for coastal properties regardless of the owners' race), the remedy would result in no disparate *treatment* based on *race*. Not charging a higher rate for coastal property is just as race neutral as charging one. Plaintiffs are fighting their own hypothetical by characterizing the *post*-remedy situation as one where inland property owners are paying "subsidies" to provide "discounts" to coastal property owners. Remedying a discriminatory effect, through steps like eliminating the higher charge for coastal properties, would only be required under the standard set forth in the Rule if that higher charge did not have a legally sufficient justification in the first place. Plaintiffs' subsidy-discount rhetoric assumes that the original higher charge was justified; but in that case, under the Rule, no relief would have been ordered to remedy discriminatory effects liability under the FHA because there would be no discriminatory effects liability.

The Supreme Court recognized that "if additional measures [beyond eliminating the offending practice] are adopted, courts should strive to design them to eliminate racial disparities through race neutral means." *Inclusive Cmtys.*, 135 S. Ct. at 2524. One such race-neutral

---

[4] As explained in the brief of amici supporting defendants, the hypotheticals presented in plaintiffs' opening brief and repeated in its latest brief "ignore the realities of the insurance business," including how ratemaking and underwriting decisions are actually made. *See* Amicus Br. of ACLU et al. at 12-14.

alternative to *eliminating* the challenged practice altogether might be *replacing* one race-neutral measure of a particular kind of risk with a *better* measure that is also race-neutral and less discriminatory. Plaintiffs characterize this point as a "blithe suggestion." Pls.' Opp. at 6. Plaintiffs' criticism of defendants' point as lacking specificity, however, is a function of the facial nature of plaintiffs' challenge that presents no concrete factual context to provide such specificity. In actual cases, there may well be instances where a different or modified (and still race-neutral) practice would provide *both* a better measure of the same type of risk (the insurer's legitimate goal) *and* a less discriminatory impact. Or there may be instances where a different or modified race-neutral practice is also a good measure of the same type of risk and is significantly less discriminatory. Either possibility is enough to preclude a *facial* challenge to the Rule like this one. And, to be sure, there may also be more difficult cases where the available tradeoffs between lessening disparate impact and measuring differences in risk are more closely balanced. Resolution of those cases can be left until when (if ever) they actually arise.

Plaintiffs' contention that the Rule will not allow them to pursue even their legitimately justifiable practices rests on an implausible reading of the "final step" of the process. Pls.' Opp. at 4. The argument that plaintiffs advance is as follows: "Insurance rates reflect a number of different risk considerations." *Id*. For example, insurers might consider the 1) "applicant's actual loss experience," 2) the "amount of coverage," 3) the "location of premises," 4) the "construction" of the building, 5) the "age of the dwelling," 6) whether "burglar . . . alarms are installed," 7) whether "fire alarms are installed," 8) the dwelling's proximity to fire hydrants and fire stations, and 9) the catastrophe history of the region. Decl. of Ronald Joseph Zaleski ¶ 13 (ECF No. 60-17) (quotations for considerations 1-8); Meek Aff. ¶ 6 (final consideration). "*Each* of these considerations," plaintiffs argue "is related to insurers' legitimate goals of charging a

rate commensurate with the risks they insure." Pls.' Opp. at 4 (emphasis added). Yet, plaintiffs

continue, "[*a*]*ny* risk characteristic an insurer considers in setting a particular rate could thus

potentially qualify as 'another practice that has a less discriminatory effect.'" *Id.* (quoting 78

Fed. Reg. at 11,482) (emphasis added). So if considering burglar alarms has a discriminatory

effect of 45%, considering the construction of the building has a discriminatory effect of 38%,

considering fire station proximity has a discriminatory effect of 22%, and considering

catastrophe history has a discriminatory effect of only 5%, the insurers' fear is that persons

challenging their practices will be able to point to whichever one risk characteristic by itself has

the least discriminatory effect – catastrophe history of the region in this hypothetical – and

invalidate *all* of the other considerations even though those other practices may also, if properly

implemented, measure risks the insurer may justifiably take into account. "As a result," plaintiffs

say that "insurers can protect themselves . . . only by setting rates that do not affect protected

groups disproportionately," and that to do so "they must consider race and other protected

characteristics." Pls.' Opp. at 4.

   Plaintiffs' argument is based on an entirely unreasonable reading of the Rule. The Rule

actually requires the challenger, not the defendant, to prove that another practice that serves the

insurer's "interests supporting the challenged practice" has a less discriminatory effect than the

challenged practice. 24 C.F.R. § 100.500(c)(3). A "less discriminatory alternative" to achieving

an insurer's valid interest in assessing the risk of a fire is not a practice to assess the risk of a

burglary or a practice to assess the risk of a hurricane even if turns out that one of those other

practices has a less discriminatory effect. *See also* Amicus Br. of ACLU et al. at 13 n.12

("insurers already underwrite for both the existence of wood-burning heating systems *and*

proximity to fire stations" and "[t]o *amici*'s knowledge, no group protected by the FHA,

religious or otherwise, has challenged either factor"); *cf.* 78 Fed. Reg. at 11,473 ("[I]f [a] lender's interest in imposing the challenged practice relates to credit risk, the alternative would also need to effectively address the lender's concerns about credit risk.").

In defendants' view, insurers nationwide have been subject to discriminatory effects liability under the FHA for decades. Plaintiffs dispute that, but it is beyond dispute that discriminatory effects liability for insurers has applied *at least* in the Sixth Circuit for the two decades since the Supreme Court denied *certiorari* in *Nationwide Mutual Insurance Co. v. Cisneros*, 516 U.S. 1140 (1996), notwithstanding warnings by plaintiffs of the dire effects of letting that decision stand.[5] If plaintiffs were correct now in *predicting* that a regime of discriminatory effects liability will "inevitabl[y]" have baleful effects, Pls.' Opp. at 4, then a property insurance dystopia where risks cannot be considered and appropriately priced would *already* extend from Michigan to Tennessee. Yet plaintiffs' affidavits and briefs are silent on that point. Plaintiffs do not claim that insurers *are* considering race in a pervasive way in the Sixth Circuit, that they *are* no longer ratemaking and underwriting based on risk in the Sixth Circuit, or that they *have* reset their rates so that they do not affect protected groups disproportionately in the Sixth Circuit. To the contrary, even plaintiffs' members that do business in Sixth Circuit states claim not even to know, or to have calculated, how their rates affect protected groups. For example, the Benseler Affidavit, submitted on behalf of an insurer that does business in six states, including Michigan, Ohio, and Kentucky, makes only the same exclusively forward-looking dire predictions as the Forstenzer Affidavit does for a company that does business only in four northeastern states. Both affidavits claim that "[b]ut for" the "Disparate Impact Rule" the

---

[5] *See* Amicus Brief of NAMIC and AIA, *Nationwide Mut. Ins. Co. v. Cisneros*, No. 95-714, 1996 WL 33467765 (U.S. Jan. 3, 1996).

companies "would" not "incur" the costs those affiants predict *if* the rule is upheld. Aff. of David R. Benseler ¶ 9 (ECF No. 60-3); Aff. of Andrew P. Forstenzer ¶ 11(ECF No. 60-5); *see also* Meek Aff. ¶¶ 5, 10-15 (affidavit on behalf of insurer doing business in all 50 states).

Notwithstanding plaintiffs' unsupported predictions, the Rule strikes a fair balance that allows insurers to retain legitimate measures of risk that have a legally sufficient justification regardless of any discriminatory effect and does not require insurers or anyone else to consider race or any other protected characteristic in a way that *Inclusive Communities* deemed impermissible.

 **B. That Insurers Deal with Risk Does Not Exempt Ratemaking and Underwriting Activities of Insurers from Discriminatory Effects Liability**

Plaintiffs also continue to argue that the "actuarial foundation" of insurance supposedly makes it "uniquely incompatible with disparate-impact liability." Pls.' Opp. at 10. This argument, however, no longer is linked to *Inclusive Communities*. *See id*. at 10-13 (no reference to *Inclusive Communities* in the subsection addressing this argument). For that reason alone, it fails to provide any support to any of the causes of action in the Amended Complaint, which plaintiffs have acknowledged arose only as a consequence of the Supreme Court's decision in *Inclusive Communities*. *See* Pls.' Reply at 3 (ECF No. 55).

In any event, the argument would fail even if it did not need to relate to *Inclusive Communities*. Assessing risks is important to insurance ratemaking and underwriting. Insurers will often be able to point to those interests to justify practices that might be challenged *under* the Rule's discriminatory effects standard. But that insurers are in the business of dealing with risks does not justify a blanket exemption from those practices even being potentially subject to examination under that standard. *See Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 60 (D.D.C. 2002).

First, plaintiffs offer no convincing distinction in kind between insurance ratemaking and underwriting and the practices in other industries that *also* predict, limit, and price risk, whether it be the risk that a loan might not perform or that a tenant might damage the landlord's property. A legitimate need to assess risk is no more a reason to exempt the insurance industry from discriminatory effects liability than it is to exempt the lending industry or the rental community. *See NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 299 (7th Cir. 1992) (observing that "it is difficult to see risk classification as a principled ground to exclude insurers" from FHA provisions that cover lenders); *see also* Defs.' Mem. at 24-25.

Second, even with respect to ratemaking and underwriting, some of the factors – including some potentially legitimate ones – that insurers may consider are simply not "risk" as that term is commonly understood. *See id.* at 26-28; *see also* Amicus Br. of ACLU et al. at 5-8. Taking into account the administrative costs saved when policies are bundled is not taking risk into account; plaintiffs' relabeling these cost savings as "expense risk" is a semantic rather than substantive response that stretches and devalues the meaning of "risk." *See* Pls.' Opp. at 10. And plaintiffs' rejoinders on insurers' widespread use of price optimization techniques are unavailing. That "'price optimization' . . . lacks a uniform definition," *id.* at 11 n.1, is not the issue; what the somewhat varying definitions have in common is that price optimization results in rate differentials that are not based on risk. That (some) state regulators have not disallowed some price optimization practices likewise is not responsive. *See id.* Defendants' brief was agnostic on whether price optimization does or does not violate state law. Defs.' Mem. at 27 & n.19. The point is that – whether or not consistent with state law – an insurer who uses price optimization in setting rates is using considerations other than risk to price its products.

In short, that insurers consider risk in ratemaking and underwriting does not justify an across-the-board exemption for those activities from even being scrutinized under the discriminatory effects standard.

**C.    A Blanket Exemption for Insurers' Ratemaking and Underwriting Functions Is Not Justified by State-Law Regulation of Those Functions**

Plaintiffs continue to argue that *Inclusive Communities* dictates that state insurance law limitations conclusively break the causal chain between their ratemaking and underwriting practices and the disparate impact. But plaintiffs do not show – as they must in this facial challenge (Count II) – that insurers' practices that may be challenged as having a disparate impact will invariably (or even commonly) be adopted as a result of substantial limits on their discretion imposed by state insurance law.

Plaintiffs cite statutes from Alaska and West Virginia for the proposition that state law "*requires* that insurers' rates reflect the 'differences among risks that can be demonstrated to have a probable effect upon losses or expenses.'" Pls.' Opp. at 12 (quoting W. Va. Code § 33-20-3(c)(2)) (emphasis added). This overstates the coercive nature of state law even in those states. What these state statutes provide is that standards insurers use in setting rates "*may* measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses." Alaska Stat. § 21.39.030(a)(4) (emphasis added); W. Va. Code § 33-20-3(c)(2) (emphasis added).[6] It is fair to say that these statutes recognize that insurers may have a business interest in measuring differences among risks and *allow* insurers to pursue that interest. *See PCI*,

---

[6] The Wisconsin statute cited by plaintiffs, Wis. Stat. Ann. § 626.12(2), has the same language as the West Virginia and Alaska statutes but appears to be limited in scope to workers' compensation insurance, *see* Wis. Stat. Ann. § 626.03. (The more general provisions regarding insurance ratemaking appear to be Wis. Stat. Ann. §§ 625.11 and 625.12, which do not contain the cited language.)  A Colorado statute also cited by plaintiffs, Colo. Rev. Stat. § 10-4-403(1)(c), uses different language but also does not support plaintiffs' arguments.

66 F. Supp. 3d at 1039-40 ("[O]ther states merely permit risk-based pricing, but do not require it."). But, to the extent insurers choose to do so, they are pursuing an interest of their own that state insurance law permits them to pursue, not an interest of the state insurance law that directs the insurers on *how*, and the extent to which, they will choose to measure potentially demonstrable differences among risks. Those statutes also underscore insurers' discretion to decide for themselves how to pursue their interest in measuring risks by explicitly acknowledging that different insurers may have different rates. Alaska Stat. §§ 21.39.010(2), 21.39.030(a)(3); W. Va. Code §§ 33-20-1(2), 33-20-3(c)(2), (f). Thus, if one insurer has adopted a practice that has a disparate impact while another insurer has adopted a practice that pursues the same legitimate insurer interest without that disparate impact, the first insurer's practice cannot have been a choice resulting from significant constraints on discretion imposed by state insurance law.

Moreover, plaintiffs mischaracterize state insurance laws when they represent that such laws "impose[] substantial limitations over which risk factors insurers may and may not consider." Pls.' Opp. at 16. Although a few states have laws mandating that insurers consider certain specific factors, such as the presence of smoke detectors, *see*, *e.g.*, N.J. Stat. Ann. § 17:29A-4(d), such laws are the exception rather than the norm. Even in listing criteria that insurers "shall" or "must" consider, state insurance laws tend to speak in broad terms, such as "past and prospective loss experience," and "all other relevant factors, including judgment factors." *See*, *e.g.*, Idaho Code § 41-1437. Many state insurance laws also provide that "risks may be classified in any reasonable way." *See*, *e.g.*, Ariz. Rev. Stat. Ann. § 20-384(B); Nev. Rev. Stat. § 686B.060(2). These provisions leave abundant discretion to individual insurers to determine what criteria they will use and how they will use them. Some states provide insurers

with even more discretion by omitting such provisions entirely or imposing them only for certain markets. *See*, *e.g.*, Ky. Rev. Stat. Ann. § 304.13-031 ("noncompetitive" markets).

Plaintiffs also err in addressing *National Fair Housing Alliance v. Travelers Indemnity Co.*, No. 1:16-cv-00928-JDB (D.D.C.) ("*NFHA*"), an actual case in this district. According to plaintiffs, Travelers' (alleged) decision to drop an (alleged) former practice of refusing to underwrite insurance for landlords who accept tenants with government "Section 8" housing vouchers is due to a new California law effective January 2016 that forbids the (alleged) former practice. Pls.' Opp. at 7, 16. In the first place, *NFHA* is pending in the District of Columbia, not California. If plaintiffs' theory is that state law has compelled Travelers' actions, it is hard to see how a change in one state's insurance law necessarily constrains insurers' options in other jurisdictions. Second, it is not clear that California's new statute represents a change even in California's law: the California federal judge who had considered this issue in 2015 was "not convinced" that then-governing California law allowed Travelers' (alleged) former practice of not insuring voucher-accepting landlords. *Jones v. Travelers Cas. Ins. Co. of Am.*, No. C-13-02390 LHK, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015). Third, and most importantly, while California and other states' insurance laws may well (*at least* now) limit Travelers' discretion so that it may not refuse to underwrite voucher-accepting properties, the relevant question is not whether Travelers' (alleged) *current* practice is so constrained. The practice the *NFHA* plaintiffs challenged as having a disparate impact was the (alleged) *former* practice of refusing to underwrite insurance for voucher-accepting landlords. Plaintiffs have pointed to no law in California, the District of Columbia, or anywhere else that so significantly limited Travelers' discretion that it made Travelers' adoption of its (alleged) former practice anything other than Travelers' own unconstrained choice.

*Inclusive Communities* does not provide support for plaintiffs' arguments. In that case, a nonprofit organization claimed that a state agency had a practice of continuing segregated housing patterns by approving too great a proportion of federal low-income housing tax credits in "predominantly black inner-city areas" and too low a proportion in "predominantly white suburban neighborhoods." *Inclusive Cmtys.*, 135 S. Ct. at 2513-14 (citing 26 U.S.C. § 42). Operation of the tax credit program is governed by federal law, and the Supreme Court left open that on remand that it might be concluded that the state agency's discretion to distribute the tax credits in that case was substantially limited by that federal law. *Id.* at 2524. Plaintiffs have not shown that constraints of state insurance law typically or (as must be shown in this facial challenge) always impose similar limitations on insurer discretion in a way that severs a causal connection between an insurer's choices of ratemaking and underwriting practices and any discriminatory effects that insurer's practices may create.[7]

---

[7] Instead, plaintiffs rely on the minority position taken by courts addressing whether the McCarran-Ferguson Act exempts insurers from discriminatory effects liability under the FHA. *See* Pls.' Opp. at 13 (citing *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008)). But plaintiffs admit that they "have not alleged a claim based on the McCarran-Ferguson Act." *Id.* at 14. The causation issue actually raised by Count II of the Amended Complaint provides an even weaker ground for insurers' immunity from discriminatory effects liability than does the McCarran-Ferguson Act, in which Congress codified a rule of statutory interpretation that federal law cannot "be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b).

## II.    THE RULE'S BURDEN-SHIFTING FRAMEWORK IS CONSISTENT WITH *INCLUSIVE COMMUNITIES*

After finishing their arguments about the supposedly unique nature of insurance, plaintiffs proceed to quoting broad statements from *Inclusive Communities* to fault the Rule's burden-shifting framework. As previously explained by defendants, these arguments (Counts III and IV) fail because the Rule's burden-shifting framework is consistent with *Inclusive Communities*. Indeed, the portion of the *Inclusive Communities* opinion discussing the standards of proving a discriminatory effects claim cited the Rule twice *in support* of its analysis, *see* 135 S. Ct. at 2522-23, and the Second Circuit has held that *Inclusive Communities* "implicitly adopted HUD's approach," *MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016). Plaintiffs' failure to engage with the language of the opinion, even after defendants explained how plaintiffs' arguments are not supported by a meaningful analysis of it, indicates the meritless nature of their claims.

### A.    The Rule, Consistent with *Inclusive Communities*, Requires Identification of a Policy or Policies Causing a Disparity

Plaintiffs continue to claim that the Rule allows for a discriminatory effects claim to proceed even "if the plaintiff cannot point to a defendant's policy or policies causing that disparity." Pls.' Opp. at 17 (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2523). But the Rule does not allow for a claim to proceed under such circumstances. Instead, the Rule explicitly requires that a plaintiff prove that a defendant's "*challenged practice caused or predictably will cause* a discriminatory effect." 24 C.F.R. § 100.500(c)(1) (emphasis added). Moreover, as the brief filed by the Solicitor General in *Inclusive Communities* explained, under the Rule, "a plaintiff cannot establish a prima facie case of disparate-impact discrimination without identifying the specific or aggregate practice that causes a disproportionately adverse effect of a particular group." 2014

16

WL 7336683, at *33 (U.S. Dec. 23, 2014). It further specified that "[t]o do that, a plaintiff *must do more than simply identify a statistical disparity*." *Id.* (emphasis added). Defendants explained in their opening brief how plaintiffs misconstrued the Rule and HUD's responses to comments submitted during the rulemaking process in order to claim otherwise in Count III of their Complaint. *See* Defs.' Br. 37-39.

The courts that have analyzed FHA discriminatory effects claims since *Inclusive Communities* have had no difficulty squaring the Rule with the Supreme Court's requirement that a plaintiff identify a policy or policies causing the disparity. *See, e.g.*, *Azam v. City of Columbia Heights*, 2016 WL 424966, at *10 (D. Minn. Feb. 3, 2016) ("First, the plaintiff must establish a prima facie case by showing that a 'challenged practice caused or predictably will cause a discriminatory effect.' 24 C.F.R. § 100.500(c)(1). At this stage, the plaintiff must satisfy a 'robust causality requirement' by showing facts or statistical evidence establishing a 'causal connection' between the policy and the disparate impact. [*Inclusive Cmtys.*], 135 S. Ct. at 2523-24."). Indeed, the recent district-court resolution of the *Inclusive Communities* litigation itself simultaneously held that the Rule governed the case – as the Supreme Court had affirmed the Fifth Circuit's holding that the Rule applied – and that the plaintiff "must 'point to [defendant's] policy or policies causing that [statistical] disparity." 2016 WL 4494322, at *4; *see also id.* at *8 ("The plaintiff must demonstrate that the statistical disparity is caused by the defendant's policy or policies, rather than by other factors. [*Inclusive Cmtys.*, 135 S. Ct. at 2523] (citing CFR § 100.500(c)(1) (2014))."). Accordingly, plaintiffs are wrong to cite the district court's resolution as supporting their claim. *See* Pls.' Opp. at 18. To the contrary, the *Inclusive Communities* remand demonstrates that a court can simultaneously and consistently apply the Rule and the Supreme Court's requirement to identify a policy or policies causing the disparity.

17

Instead of rebutting defendants' explanation of how plaintiffs' opening brief misconstrued the Rule and HUD's responses to comments, plaintiffs' latest brief largely abandons the arguments made in their opening brief to support Count III. Citing a response by HUD that was not once mentioned in their opening brief, plaintiffs now focus on the narrow situation noted by HUD in promulgating the Rule where it "may be appropriate to challenge the decision-making process as a whole."[8] 78 Fed. Reg. at 11,469. But, plaintiffs fail to acknowledge that HUD explicitly specified when this situation arises, that is when "the elements of a decision-making process [are] not . . . capable of separation for analysis." *Id.* (citing 42 U.S.C. § 2000e-2(k)(1)(B)(i)).

Plaintiffs' retooled argument is a red herring under the standard of review applicable to a facial challenge and in light of plaintiffs' choice to limit their claims to the Rule's treatment of insurers' ratemaking and underwriting decisions. Plaintiffs have not claimed – let alone provided any evidence – that the narrow circumstances allowing a challenge to a decision-making process as a whole will regularly, or ever, apply to discriminatory effects challenges to insurance ratemaking and underwriting processes.[9] Indeed, the hypothetical challenges that plaintiffs themselves posed in their opening brief clearly identified separable aspects of the ratemaking and underwriting process. *See* Pls.' Mot. for Summ. J. at 25-26 (ECF No. 60) (challenge to

---

[8] Ironically, plaintiffs fault defendants for "relegat[ing] . . . to a footnote" the discussion of this passage when plaintiffs did not once cite this passage in their opening brief. *See* Pls. Opp. at 17.

[9] In the Rule, HUD did not suggest that the narrow circumstances allowing a challenge to a decision-making process as a whole will regularly apply to insurers. The only example HUD provided of when it might apply is a challenge to reverse redlining by a mortgage lender. *See* 78 Fed. Reg. at 11,469 (citing *Hargraves v. Capital City Mortg. Corp*, 140 F. Supp. 2d 7, 20-22 (D.D.C. 2000)). Indeed, regardless of industry or practice, it appears these circumstances will only infrequently occur: defendants are not aware of a single FHA case since the Rule's promulgation that has addressed this provision.

discriminatory effect of rates based on risk of wind damage); *id*. at 28 (challenge to discriminatory effect of rates based on risk of heating source); *see also* Amicus Br. of ACLU et al. at 12 (observing that neither of plaintiffs' hypotheticals "bears any resemblance to actual litigation brought to challenge insurance policies that have a disparate impact"). The only evidence that does bear on this question – lawsuits that have actually been brought recent years – demonstrate that discriminatory effects challenges to insurers' ratemaking and underwriting focus on specific elements of insurers' ratemaking and underwriting process. *See e.g.*, *Ojo v. Farmers Grp. Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) (en banc) (challenging use of credit scores in insurance rates); *Viens v. Am. Empire Surplus Lines Ins. Co*., 113 F. Supp. 3d 555 (D. Conn. 2015) (challenging consideration of whether a landlord rents to tenants receiving government housing assistance in insurance rates and underwriting).

But even if plaintiffs had established that the narrow circumstances allowing a challenge to a decision-making process as a whole were regularly encountered by insurers, plaintiffs' challenge is meritless. As part of the Civil Rights Act of 1991, Congress specified that under Title VII "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). *Inclusive Communities* held that FHA discriminatory effects claims should generally be governed by the framework developed to determine liability in Title VII disparate impact cases. *See* 135 S. Ct. at 2522 (giving covered entities "leeway to state and explain the valid interest served by their policies . . . analogous to the business necessity standard under Title VII"). Consistent with that direction, it was certainly reasonable – if not required – for the Rule

to incorporate the codified portions of the Title VII framework into the FHA.[10] Moreover, even in these narrow circumstances, the identification of the "decisionmaking process" is still "point[ing] to a defendant's policy *or policies*" rather than relying on a statistical "racial imbalance . . . without more." *See id.* at 2523 (emphasis added) (alterations omitted); *see also McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 1, 30 (D.D.C. 2004) (requiring a Title VII plaintiff to prove "the causal link between [employer's] allegedly subjective practices and the race disparity" even after holding that 42 U.S.C. § 2000e-2(k)(1)(B)(i) allowed the plaintiff to challenge the employer's overall decision-making process).

Finally, the one argument from their opening brief that plaintiffs continue to make supporting Count III is also wrong. As in their opening brief, plaintiffs cite HUD's statement concerning "statistical data produced under HMDA." *See* Pls. Opp. at 19 (quoting 78 Fed. Reg. at 11,478). Although recognizing that defendants have explained why that statement does not support their claim, plaintiffs now suggest, without citing any legal authority, that HUD is obligated to "codif[y] in the Rule itself" that explanation. *Id*. But HUD was under no obligation to clarify something that was not actually suggested by the Rule. Moreover, as noted in defendants' opening brief, HUD chose not to attempt to create any categorical rules for how to

---

[10] Plaintiffs' observation that "Congress has not amended the FHA to add a similar provision" is irrelevant. *See* Pls.' Opp. at 19. With respect to Title VII, this amendment was necessary to address the Supreme Court's contrary holding in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989). But the Supreme Court has never held that this portion of *Wards Cove* applies to the FHA. (Plaintiffs acknowledge that the holding in *Wards Cove* relevant to a decision-making process not capable of separation appears on page 657 of the U.S. Reports. *See* Pls.' Opp. at 18 (citing 490 U.S. at 657). *Inclusive Communities* favorably cites only page 653 of *Wards Cove*. *See* 135 S. Ct. at 2523.) Therefore, Congress did not need to reverse the Supreme Court in the Civil Rights Act of 1991 with respect to the FHA. HUD's decision to adopt Congress's resolution to this question under Title VII, rather than the Supreme Court's initial answer under Title VII, was a perfectly reasonable way to address an issue for which neither Congress nor the Supreme Court had provided a binding answer.

"identify[] the specific practice that caused the alleged discriminatory effect," based on its experience that such identification "will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis." 78 Fed. Reg. at 11,469. HUD's decision is consistent with blackletter administrative law that allows an agency not to resolve every potentially related issue when engaging in rulemaking. *See Mobil Oil Exploration & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211, 231 (1991); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004) (noting limited circumstances when an agency's failure to act is subject to an APA challenge).

### B. The Rule Need Not Include the Phrase "As Effectively As" to Allow Covered Entities to Maintain Policies that Are Not Artificial, Arbitrary, and Unnecessary Barriers

Plaintiffs also continue to claim that the Rule's burden shifting standard is unreasonable because it lacks the phrase "as effectively as" in the third step. Pls.' Opp. at 20. As defendants explained in their opening brief, the Rule's burden-shifting standards effectuate the observation in *Inclusive Communities* – repeating what the Supreme Court had said in *Griggs* – that "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." 135 S. Ct. at 2522 (quoting *Griggs*, 401 U.S. at 431); *see also id*. at 2524 (cautioning against proof standards that "displace valid governmental and private priorities, rather than solely 'remov[ing] . . . artificial, arbitrary, and unnecessary barriers'") (quoting *Griggs*, 401 U.S. at 431) (alterations in original). Burden-shifting standards have been developed and refined as part of Title VII over the past forty-five years to effectuate the limits articulated by *Griggs*, which *Inclusive Communities* made clear are also part of the FHA.

Plaintiffs fail to acknowledge that this language in *Inclusive Communities*, which is the basis of Count IV of their Complaint, is taken from *Griggs*. Moreover, plaintiffs do not dispute that the burden-shifting framework that the Rule adopted matches Title VII's burden-shifting framework, and implements *Griggs'* command. Instead, plaintiffs continue to argue that this language from *Inclusive Communities* requires HUD to use the precise phrase "as effectively as" in the third step of the framework – even though the Supreme Court never used that phrase in the opinion and the Title VII framework does not use it either – in order to ensure the Rule "protect[s] a covered entity from liability based on 'second-guess[ing]' of a policy choice between 'reasonable approaches." Pls.' Opp. at 20 (brackets in original). But, as explained in defendants' opening brief, under the Title VII framework that HUD adopted, "the purpose of step three is not to second guess the employer's business decisions." *Johnson v. City of Memphis*, 770 F.3d 464, 472 (6th Cir. 2014). It is quite reasonable for HUD to implement a requirement of *Griggs* by mirroring Title VII law rather than accepting an alternate standard suggested by a handful of commenters during the rulemaking process.

The validity of the Rule's articulation of step three is further bolstered by the courts that have applied *Inclusive Communities* to FHA discriminatory effects challenges in the past year and a half. Not one of those courts – including two Courts of Appeals – have required the plaintiff to prove its less discriminatory alternative is "as effective as" the defendant's current practice. *See Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 513 (9th Cir. 2016), *cert. denied*, 2016 WL 3486062 (U.S. Oct. 11, 2016); *MHANY Mgmt.*, 819 F.3d at 619.[11] To the contrary, the

---

[11] Although plaintiffs dismiss *MHANY Management* as not "on point" to this case, Pls.' Opp. at 1, that is belied by the Second Circuit's explicit statement that"[t]he Supreme Court implicitly adopted HUD's approach." 819 F.3d at 618. Moreover, notwithstanding plaintiffs' description of *MHANY Management* as merely a decision that "noted that both HUD and the Supreme Court have placed the burden on the plaintiff at the third step of the burden-shifting process," Pls.'

Ninth Circuit after *Inclusive Communities* described the third step of the burden-shifting analysis as allowing the plaintiff to propose "an adjustment or accommodation" to a defendant's current practices in an effort to "allow both [parties'] interests to be satisfied" rather than limiting the alternative to only those practices that are absolutely equivalent to the defendant's challenged practice. *See Ave. 6E*, 818 F.3d at 513 (citing 24 C.F.R. § 100.500(c)(3)). Indeed, the district court on remand in *Inclusive Communities* understood the Supreme Court's decision to mean it would have allowed the plaintiff to prove "that the defendants' interests could be served by another practice that has a less discriminatory effect" – without any "as effective as" requirement – had the plaintiff proved a *prima facie* case of discrimination. *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 3:08-CV-0546-D, 2015 WL 5916220, at *5 (N.D. Tex. Oct. 8, 2015) (citing 24 C.F.R. § 100.500(c)(3)).

Plaintiffs also wrongfully dismiss in one breezy sentence the careful analysis by the district court that rejected another insurance trade group's APA challenge to the burden-shifting framework of the Rule in *PCI. See* Pls.' Opp. at 21. As explained in defendants' opening brief, and nowhere disputed by plaintiffs, the Supreme Court made it clear that the "cautionary standards" it was discussing in *Inclusive Communities* "ha[ve] always been" a part of FHA discriminatory effects analysis and were drawn from preexisting Title VII law. *See* Defs.' Br. at 9-10, 33-34 (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2522). Applying just such law, the court in *PCI* specifically rejected a challenge to the Rule's failure to include "equally effective"

---

Opp. at 1, the Second Circuit engaged in an extensive analysis of the burden-shifting framework after *Inclusive Communities* that concluded with the holding that the district court on remand should "consider[] . . . whether Plaintiffs satisfied their burden of proving an available alternative practice that has less disparate impact and serves Defendants' legitimate nondiscriminatory interest," *MHANY Mgmt.*, 819 F.3d at 619. Nowhere in its instructions to the district court was a requirement to find that the alternative was "as effective as" the challenged decision.

language. *See* 66 F. Supp. 3d at 1052-53 (deferring to HUD determination that "an 'equally effective' standard is inappropriate"). Plaintiffs have pointed to no concrete changes that *Inclusive Communities* made to the law that warrant a different outcome.

While *Inclusive Communities* elucidated the broad principles governing discriminatory effects liability, it did not mandate any specific articulation of the burden-shifting framework different from that applied to Title VII disparate impact cases. Consequently, contrary to plaintiffs' argument supporting Count IV, HUD did not "ignore the requirements of the FHA" by failing to include the specific phrase "as effective as" in the Rule's articulation of the third step. Pls.' Opp. at 21.

## CONCLUSION

For all these reasons and the reasons set forth in defendants' opening brief, their Motion for Summary Judgment should be granted.

Dated: October 28, 2016                    Respectfully submitted,

                                           BENJAMIN C. MIZER
                                           Principal Deputy Assistant Attorney General

                                           GREGORY B. FRIEL
                                           Deputy Assistant Attorney General

                                           CHANNING D. PHILLIPS
TONYA T. ROBINSON                          United States Attorney
Acting General Counsel
MICHELLE ARONOWITZ                         LESLEY FARBY
Deputy General Counsel for                 Assistant Branch Director
   Enforcement and Fair Housing            Federal Programs Branch
JEANINE M. WORDEN
Associate General Counsel                  /s/ *Brian G. Kennedy*
   for Fair Housing                        BRIAN G. KENNEDY (DC Bar No. 228726)
KATHLEEN M. PENNINGTON                     DANIEL P. MOSTELLER (DC Bar No. 980802)
Assistant General Counsel                  Attorneys
   for Fair Housing Enforcement            U.S. Department of Justice
M. CASEY WEISSMAN-VERMEULEN                20 Massachusetts Ave., N.W.

AYELET R. WEISS                     Washington, DC 20001
Attorneys                          Tel: (202) 514-3357
*Of counsel*                       Fax: (202) 616-8187
                                   Email: Brian.Kennedy@usdoj.gov
                                   *Counsel for Defendants*