<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2    _____

 3    National Association of      )  Civil Action
      Mutual Insurance Companies,  )  No. 1:13-cv-00966-RJL
 4                                 )
                        Plaintiff, )
 5                                 )
      vs.                          )  **Oral Argument**
 6                                 )
      United States Department of  )
 7    Housing and Urban            )
      Development, et al.          )  Washington, D.C.
 8                                 )  July 19, 2021
                        Defendants.)  Time:  3:00 p.m.
 9    _____

10              Transcript of **Oral Argument**
                      Held Before
11              The Honorable Richard J. Leon
                Senior United States District Judge
12    _____

13               A P P E A R A N C E S

14    For the Plaintiff:      **Kannon K. Shanmugam**
                              **William T. Marks**
15                            PAUL, WEISS, RIFKIND, WHARTON &
                              GARRISON LLP
16                            2001 K Street, Northwest
                              Washington, D.C. 20006
17
      For the Defendants:     **James D. Todd, Jr.**
18                            U.S. DEPARTMENT OF JUSTICE
                              Civil Division, Federal Programs Branch
19                            P.O. Box 883 Ben Franklin Station
                              Washington, D.C. 20044
20
      Also Present:           Lesley Farby
21    _____

22    Stenographic Official Court Reporter:
                              Nancy J. Meyer
23                            Registered Diplomate Reporter
                              Certified Realtime Reporter
24                            United States Courthouse, Room 6509
                              333 Constitution Avenue, Northwest
25                            Washington, D.C. 20001
                              202-354-3118
</pre>

<u>P R O C E E D I N G S</u>

1

2     THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

3     This afternoon we have Civil Case No. 13-966, National

4  Association of Mutual Insurance Companies v. the United States

5  Department of Housing and Urban Development, et al.

6     Will counsel for the parties please approach the lectern

7  and identify yourself for the record.

8     MR. SHANMUGAM:  Good afternoon, Your Honor.  Kannon

9  Shanmugam with Paul Weiss for NAMIC, and with me at my counsel

10  table, my colleague Will Marks.

11     THE COURT:  If you've been vaccinated, you can remove

12  those things.  That applies to both sides.  It's easier for the

13  court reporter to hear you too.

14     MR. TODD:  Thank you, Your Honor.

15     Good afternoon.  James Todd, U.S. Department of Justice

16  for the defendants in this action, and with me at counsel table

17  is Leslie Farber, my supervisor.

18     THE COURT:  Thank you.

19     MR. TODD:  Thank you, Your Honor.

20     THE COURT:  All right, Counsel.  We're here for oral

21  argument on the summary judgment motion.  Each side can have

22  20 minutes.  The moving party can reserve up to 5 minutes of

23  its 20 minutes for rebuttal.  So that's your choice.

24     MR. SHANMUGAM:  Thank you, Your Honor.  And I will

25  reserve the five minutes for rebuttal.

1              THE COURT:  Okay.

2              MR. SHANMUGAM:  May it please the Court, Kannon

3    Shanmugam for the National Association of Mutual Insurance

4    Companies or NAMIC.

5              NAMIC does not dispute that disparate impact claims are

6    cognizable under the Fair Housing Act.  The Supreme Court

7    recognizes as much in *Inclusive Communities*, but at the same

8    time, the Court cautioned that disparate impact viability under

9    the FHA is limited in important respects; in part, because of

10   the constitutional concerns with the government's compelling

11   the consideration of race and other protected characteristics.

12             As applied to insurers' rate-making and underwriting

13   decisions, HUD's 2013 rule, which is now once again in effect,

14   contravenes the Supreme Court's limitations on disparate impact

15   liability in numerous respects.  It would necessarily cause

16   race to be considered and used in a pervasive way.  It would

17   transgress the requirement that there be a close, causal

18   connection between a challenged policy and any alleged

19   disparate impact in light of the limitations that state law

20   imposes on insurers' discretion.

21             It would permit a plaintiff, even without identifying a

22   specific practice that gives rise to the asserted disparate

23   impact, to disrupt an insurers' racially neutral rate-making

24   and underwriting practices.  And, finally, it would enable a

25   plaintiff to prevail simply by identifying an alternative

1    practice even where that alternative practice is not as

2    effective as the challenged practice in achieving the insurers'

3    objective.

4         Now, the current administration has really blown off

5    those concerns.  It has allowed the 2020 rule to be enjoined,

6    even though that rule at least contained provisions addressing

7    some of the concerns that we have raised in this litigation.

8    And it has proposed to repeal the 2020 rule without so much as

9    a tweak of the 2013 rule in the wake of the Supreme Court's

10   decision in *Inclusive Communities*.

11        Enough is enough here.  Because the 2013 rule is

12   inconsistent with the Fair Housing Act as interpreted by the

13   Supreme Court in *Inclusive Communities*, this Court should grant

14   NAMIC's motion for summary judgment and vacate the rule insofar

15   as it applies to insurers' rate-making and underwriting

16   practices.

17        Now, because my time is short, Judge Leon, I want to

18   focus primarily on the first and fourth counts in the

19   complaint.  I'll just very briefly address the second and third

20   counts, which I think are really adequately covered in the

21   briefing.

22        Now, as I mentioned, the first count focuses on the

23   pervasive use and consideration of race, and the 2013 rule

24   really mandates that in contravention of the limits on

25   disparate impact liability under the FHA.  Now, as this Court

1    has already recognized in its earlier opinion in this case, the

2    rule would effectively require insurers not just to collect

3    data about protected characteristics in order to detect racial

4    disparities; it would also require insurers to analyze that

5    data in making rate-making and underwriting decisions in order

6    to resolve those disparities.

7         And that is true even if the alternatives for a

8    challenged risk factor are themselves facially race neutral

9    because insurers would have to take race into account in making

10   those rate-making and underwriting decisions and choosing

11   between alternatives, again, even if one alternative is not as

12   effective as the challenged practice in achieving an insurers'

13   actuarial objectives.  In fact, insurers would really have to

14   reconfigure their rate-making and underwriting processes to

15   account for membership in protected classes, not only with

16   regard to particular risk factors, but also with regard to

17   their risk grouping and pricing decisions.

18        And I think the affidavits in this case amply lay out

19   why that is so.  Homeowners insurance, in our view, is really

20   uniquely incompatible with disparate impact liability, and

21   that's really for two reasons.  First, because it would require

22   insurers to consider factors that are forbidden under sound

23   actuarial analysis as part of this incredibly complex

24   rate-making process.  And that it would also require insurers

25   to do things that are inconsistent with state law.

1      Now, I want very briefly to address some of the

2 arguments that the government makes in its reply brief.  I've

3 been waiting five years to have that opportunity, and I want to

4 address just a few of the points that they make in the reply

5 brief we haven't yet addressed in the briefing.

6      So, first, the government argues repeatedly that, well,

7 what's the big deal here because insurers' practices are okay

8 as long as insurers have a valid justification.  But that

9 really terminates the inquiry at the second step of the rules

10 burden-shifting process.  And insurers, in order to have

11 comfort that their practices are going to be okay, have to have

12 comfort that those practices will survive the third step as

13 well.

14      And at the third step, if a plaintiff can show that the

15 interest supporting the challenged practice could be served by

16 another practice that has a less discriminatory effect,

17 insurers will be liable.  And, particularly, if that practice

18 need not be equally effective, that is going to be a very

19 difficult thing for insurers to do ex ante.

20      Now, second, we focus on the fact that this would

21 require insurers to collect data, data that in some

22 jurisdictions they're not allowed to collect and in essentially

23 all jurisdictions they're not allowed affirmatively to use.

24 Well, the government says, rather flippantly, well, you can

25 just use census data.  You don't need to collect your own data.

1    Now, of course, that data can be up to ten years old, but that

2    data isn't really going to tell you whether particular risk

3    factors, aside from geographic ones, have a disparate impact.

4    I just think that there is no way that an insurer is going to

5    be able to modify their systems in order to account for

6    disparate impact liability without having information, not just

7    about race, but also about the other protected characteristics.

8         THE COURT:  Well, the practical impact of not

9    collecting data is to, in essence, let the government or those

10    who, I should say, are acting on behalf of the government to

11    make a prima facie case right away.

12         MR. SHANMUGAM:  Yes, that's exactly correct.  I mean,

13    it really would put insurers at the mercy of the government and

14    of private parties and -- and in a way that I think is -- is

15    much more difficult to anticipate than for other parties that

16    might be subject to disparate impact liability, again, because

17    of the complexity of the rate-making factor, which obviously

18    involves multiple factors, the grouping of those factors and so

19    forth.

20         So the government next disparages our reliance on this

21    Court's earlier decision which simply stood for, I would have

22    thought, the uncontestable proposition that insurers will be

23    required, quote, to collect and analyze certain types of

24    race-based data, dot, dot, dot, on their clients and

25    prospective clients, conduct that is, quote, expressly

1    prohibited in many states.

2          In footnote 3 the government says, well, that opinion

3    predates the Supreme Court's opinion in *Inclusive Communities*,

4    but obviously *Inclusive Communities* didn't address the specific

5    application of disparate impact liability on the insurance

6    industry.  And, again, I don't think that the government can

7    point to any evidence in the record to contravene that fairly

8    fundamental principle.

9          Now, the government next says, well, the remedies in

10   these cases will often themselves be facially race neutral and

11   that race-conscious decision-making is okay.  They cite

12   Justice Kennedy's plurality opinion in *Parents Involved* for

13   that proposition, but the Supreme Court at the same time in an

14   opinion written by Justice Kennedy in *Inclusive Communities*

15   expressed concern about the use of race and the consideration

16   of race in a pervasive way, suggesting that disparate impact

17   liability would be improper in those circumstances.

18         I think anything that the Court may have said in other

19   context involving so-called benign discrimination, such as in

20   the educational context, has to be reconciled with what the

21   Supreme Court said in this context.  And to say that the

22   remedies are going to be facially race neutral, I think, really

23   misapprehends with respect the thrust of our challenge, which

24   is that regardless of the nature of the remedies in this case,

25   the problem is the pervasive consideration of race and other

 1    protected characteristics, not just in detecting racial

 2    disparities -- this is not data collection -- but also in

 3    resolving those disparities as well.

 4        The government says, well, insurers have been subject to

 5    disparate impact liability for many years here.  Of course, the

 6    great irony is that over the last few years we've been in this

 7    sort of Kafkaesque state of animation while the last

 8    administration figured out what to do and now the next -- the

 9    current administration is reversing course.  But, regardless, I

10    think up until this point, we've really been living in a world

11    of uncertainty for my client and for its members about what the

12    state of law actually is.

13        For quite some time there was doubt about whether even

14    if there was disparate impact liability under the FHA that

15    would extend to insurers.  Obviously in the 2013 rule the

16    government made clear that that was true, but then we had the

17    period of time until *Inclusive Communities* and then this period

18    of many years when, again, we've been in a state of suspension

19    awaiting the government's determination about what to do with

20    regard to the rule.

21        THE COURT:  Well, the practical reality is that

22    regardless of what -- how this Court rules or the D.C. Circuit

23    rules, it will go back to the Supreme Court.  Until the

24    Supreme Court rules again in this case, we -- we'll be in a

25    state of uncertainty.

1          MR. SHANMUGAM:  Well, I think that's absolutely

2     right.  And I think the one thing that we can know is that at

3     this point, I think that the current administration has made it

4     quite clear that it intends to revert to the 2013 rule and not

5     to make any of the various accommodations that the previous

6     administration made in the 2020 rule, again, in order to

7     address some of the more egregious concerns with the scope of

8     the preexisting rule.

9          And the only other thing I would say with regard to this

10    claim, Judge Leon, is that, you know, the government makes the

11    argument that our position sweeps too broadly because it would

12    cover other context; that it would cover the lending context

13    and it might cover certain other practices by insurers outside

14    the rate-making and the underwriting context.

15         Perhaps that's true, but I do think that this context is

16    different for the two reasons that I mentioned.  First, because

17    it does involve rate-making and underwriting and the

18    application of actuarial principles, which I think does raise

19    distinct concerns from, say, the lending context, but also

20    because of the role of state law here.

21         And that really brings me, I think, nicely to the second

22    claim, which, again, I'll address very briefly because I think

23    it's well laid out in the briefing on both sides.  So our

24    second count here is that state law substantially limits

25    insurers' discretion and, therefore, breaks the causal chain

1    between any challenged policy and the alleged disparate impact,

2    and I think that there's really no disagreement here about what

3    state law actually does.  And it really does two things that

4    are relevant to this claim.

5        First, the states exercise substantial control over

6    which risk factors insurers may or may not consider in their

7    rate-making and underwriting processes.  And second, the

8    state's circumscribe insurers' ability to consider protected

9    characteristics, such as race, when making rate-making and

10   underwriting decisions.

11       Now, the government says, well, the states don't require

12   insurers to set rates in any particular way; but for purposes

13   of this argument, all that is required is that the states

14   substantially constrain insurers' discretion in the language of

15   *Inclusive Communities*.  And where that is true, the required

16   causal connection between challenged practice and alleged

17   disparate impact is broken.

18       And, again, the government does not dispute that every

19   state pervasively regulates rate-making and underwriting

20   decisions even if the states don't mandate a particular

21   formula.

22       THE COURT:  In the few minutes you have left --

23   before you do rebuttal later, of course -- address the -- the

24   government's arguments against the position that you take that

25   under the -- under the existing rule a statistical basis alone

 1    will be enough to make a prima facie case.

 2              MR. SHANMUGAM:  Sure.  So that brings me to the third

 3    claim, and I think on this claim there's -- there's not a lot

 4    of disagreement, but what there is is sort of a strange

 5    unwillingness on the part of the government to accommodate our

 6    concern.

 7              So this is the argument that you can make a prima facie

 8    case merely by pointing to statistical evidence showing the

 9    existence of a disparity.  We argue that you have to identify a

10    specific practice causing the alleged disparity as well, and we

11    point to comments in the proposed rule on page 11469 of

12    Volume 78 of the *Federal Register* where the government, I

13    think, pretty clearly says that you don't have to identify

14    specific practices in every case and, indeed, goes further and

15    suggests that a plaintiff can simply challenge a defendant's

16    decision-making process as a whole.

17              THE COURT:  The government writing those comments is

18    HUD; right, Counsel?  HUD in the general counsel's office, I

19    assume.

20              MR. SHANMUGAM:  Yes.  Correct.  And -- and --

21              THE COURT:  It's not the Department of Justice's

22    position?

23              MR. SHANMUGAM:  Well, it doesn't seem to be the

24    Department of Justice's position because, as the government

25    rightly points out in its brief in *Inclusive Communities*, the

1    government seemed to suggest that the identification of a

2    specific policy was required.

3          And I guess I just have two points on this claim before

4    getting to the last claim.  My first point is to the extent

5    that HUD in its comments suggests that you can merely come in

6    and say, well, I'm challenging the decision-making process as a

7    whole, they point to the Title VII context.  But in the

8    Title VII context, there is an actual statute, 42 U.S.C.

9    2000e-2(k)(1)(B)(i), which codifies that really as a departure

10   from the Supreme Court's decision in *Wards Cove*, which required

11   the identification of a specific policy.  And there's obviously

12   no such language in the Fair Housing Act.

13         So I think, just as a matter of statutory construction,

14   it makes more sense to look at *Wards Cove* which established the

15   baseline for disparate impact liability than a specific

16   statutory provision that's simply not found in the Fair Housing

17   Act.

18         And second, I would just make the common-sense point

19   that you would think that if the government thinks that it is

20   already made clear that a specific policy is required, that HUD

21   could just say that now that it has the chance of a do-over in

22   the 2021 proposed rule.  And yet HUD, once again, blowing off

23   our concerns, simply proposes to recodify the 2013 rule on the

24   ground that the statement in the SG's brief is somehow

25   sufficient.

1          So that brings me to the last count, and I think that

2     this in many ways is, you know, one of the most practically

3     significant problems with disparate impact liability under the

4     2013 rule.  And this is the point that I averred to in my

5     opening, that the rule permits a plaintiff to prevail simply by

6     identifying an alternative practice even where that practice is

7     not as effective as the challenged practice in achieving the

8     defendant's conceivably valid interest.

9          Now, HUD in rejecting that requirement said that

10     Congress eliminated a similar requirement when it amended

11     Title VII in the Civil Rights Act of 1991, but there was no

12     comparable amendment, once again, to the Fair Housing Act.  And

13     a practice that is more effective in achieving a conceivably

14     valid interest can't be said to erect an artificial, arbitrary,

15     or unnecessary barrier that can give rise to disparate impact

16     liability under the Fair Housing Act.  And while the 2020 rule

17     fixed this problem by requiring that an alternative practice be

18     equally effective to the challenged practice in achieving the

19     insurers' objective, the 2021 proposed rule reverts to the

20     previous formation.

21          Now, I do want to point the Court to the amicus brief of

22     the American Bankers Association which gets into this argument

23     in more detail and lays out the relevant history, but suffice

24     it to say that prior to the Civil Rights Act of 1991, which

25     codified and broadened disparate impact liability under

1    Title VII in various important reports, the Supreme Court in

2    *Wards Cove* and, indeed, in earlier decisions, had made clear

3    that equal effectiveness of the alternative was really a key

4    part of the burden-shifting framework for disparate impact

5    liability.

6          Now, there's a raging debate about whether Congress

7    actually abrogated that requirement in the Civil Rights Act of

8    1991.  Congress was very polite in its effort to overturn

9    *Wards Cove*, and it basically said we're just going to go back

10   to the law the day before *Wards Cove* was actually decided.  In

11   fact, they even codified the date in the Civil Rights Act of

12   1991.  But the problem was that the equal effectiveness

13   requirement really does seem to have predated *Wards Cove.*  And

14   even post the Civil Rights Act, courts applying Title VII have

15   applied that equal effectiveness requirement.

16         And, again, I just think that our submission here is

17   pretty straightforward.  It is that in *Wards Cove* and earlier

18   decisions like *Watson*, I think what the Supreme Court was

19   really doing is saying this is how disparate impact liability

20   works.  And, of course, Congress is free to depart from that if

21   it so chooses, and maybe arguably it did in the Civil Rights

22   Act of 1991, but it certainly hasn't done that under the FHA.

23         And as a practical matter, if, in fact, all a plaintiff

24   needs to do is to say, well, this achieves your goal -- say

25   your goal of reducing fires, even if it doesn't do it as

1     effectively, imagination is going to be the only limit for

2     these types of claims.  You know, suppose we have a case like

3     the hypothetical in our brief that involves a particular

4     religious group whose members tend to live near a church and

5     the houses in that area have wood-burning stoves and an

6     insurance company says, well, you've got wood-burning stoves,

7     we're going to increase your rates because you have a greater

8     risk of fire.

9          Suppose that has a disparate impact on adherence on that

10    particular religion.  Could a plaintiff come forward and say,

11    you know, for instance, if your house has, you know, a six or a

12    nine in the number, fire departments tend to get confused when

13    they report to that house; and, therefore, your fires are less

14    likely to be put out and that should be the factor that you

15    take into account, even if an insurer says that's not going to

16    be nearly as effective as looking to whether you have a

17    wood-burning stove, seemingly that's still good enough.  And

18    when you look at the *Federal Register* on this point, you know,

19    the government conspicuously doesn't impose any sort of limit

20    on how effective an alternative actually has to be.

21         So, again, this is just another example of something

22    that is addressed in the 2020 rule but that is not obviously

23    addressed in the 2013 rule and that the government doesn't

24    propose to address in the 2021 rule.

25         So since this is my first time in court in a while, I'm

1     totally out of shape when it comes to time limits.

2              THE COURT:  You're all right.  I let you run a little

3     extra, but I'll give the government a little extra time.

4              MR. SHANMUGAM:  Great.  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              MR. TODD:  Good afternoon, Your Honor.

7              THE COURT:  Good afternoon.

8              MR. TODD:  May it please the Court, James Todd,

9     again, for the defendants.

10         Before we go too much farther, I think that before now,

11    today, or this week, reaching the merits of plaintiff's claim

12    that are set in their amended complaint, this Court needs or

13    should ensure that plaintiff's claims are, in fact, ripe for

14    judicial resolution at this time; that plaintiffs still have

15    standing to maintain their claims.

16         On ripeness, I'd like to direct this Court's attention

17    to the D.C. Circuit's 2016 opinion in the *Electronic Privacy*

18    *Information Center v. FAA* at 821 F.3d 39; in its 2012 opinion

19    in *American Petroleum Institute v. EPA* at 683 F.3d 382.

20         Given as counsel said in his excellent argument that

21    there is now a pending notice of proposed rulemaking concerning

22    the very rule that plaintiffs are challenging here today, it is

23    the government's position that *EPIC* and *American Petroleum*

24    *Institute* control the resolution and disposition of plaintiff's

25    claim on ripeness grounds.

1          Like the plaintiff in *American Petroleum Institute*,

2     plaintiffs here presently have the opportunity to, quote,

3     convince the agency to alter a tentative position, unquote.

4     And as the D.C. Circuit cautioned in finding that the *American*

5     *Petroleum Institute* plaintiff claims were unripe, quote,

6     ripeness ensures that Article III courts make decisions only

7     when they have to and then only once, unquote.

8          Again, given that there is currently a pending

9     rulemaking process, ruling now on the merits of plaintiff's

10    challenge to the 2013 rule -- which, again, is not the

11    current -- their amended complaint does not address the notice

12    of proposed rulemaking, nor could it possibly address --

13    because it doesn't exist yet -- the final rule that might

14    emerge from that rulemaking, it seems highly unlikely that it

15    is necessary for this Court to resolve plaintiff's claims on

16    the merits today or that such a ruling would be the final word

17    on the matter.

18              THE COURT:  What's the -- what's the status of that

19    situation?

20              MR. TODD:  Well, Your Honor, it's my understanding

21    that the government issued its proposed -- notice of proposed

22    rulemaking on June 25th and that --

23              THE COURT:  Of this year?

24              MR. TODD:  -- commenters have --

25              THE COURT:  Of this year?

1          MR. TODD:  Yes, of this year.  I'm sorry.  Yes,

2     Your Honor.  Thank you for that clarification.  June 25th,

3     2021.

4          And that commenters have until August 24th -- and I hope

5     I'm correct on that.  I will submit something correcting that

6     statement if I'm wrong, but I believe it's August 24th, 2021,

7     that commenters have to submit comments; after which time, of

8     course, HUD will then review the comments.  And if it's

9     anything like the 2013 rule or the 2020 rule, the comments will

10    be significant, probably in the tens of thousands, and it may

11    take some time.  And, of course, I'm sure if the plaintiff

12    hasn't already submitted comments, they're planning to.  And

13    the agency will consider those as it does in any rulemaking,

14    and -- and then -- of course, may, in fact, alter its tentative

15    position.

16         I think there's actually a fair amount of evidence both

17    in the 2013 rulemaking process and in the 2020 rulemaking

18    process that HUD, in fact, did make what I think is fair to

19    characterize as significant alterations to both rules, to both

20    the 2013 rule and the 2020 rule.  And I think this Court is

21    well aware that it is appropriate, indeed, I think as a matter

22    of law, you know, to wait and see what the agency, in fact,

23    does.

24         So I do think that while there might have been a

25    different possible resolution on ripeness grounds to

1    plaintiff's challenge for different reasons before we had an

2    open record of rulemaking before us, I think we now find

3    ourselves in a different situation at this moment.

4        With the Court's indulgence, I'd also like to raise,

5    again, the issue that I think there remain serious questions as

6    to whether plaintiff's alleged injuries are, in fact, concrete

7    or have ever come to pass or are properly traceable to the 2013

8    rule rather than the Fair Housing Act itself, judicial

9    precedent interpreting the act, and prior HUD rules and

10   interpretations making clear that the Fair Housing Act applies

11   to insurers, as well as the numerous judicial precedence

12   concerning the burden-shifting framework that the 2013 rule

13   codified.

14       I don't think plaintiffs have ever shown that an order

15   of this Court setting aside the 2013 rule would, in fact,

16   likely remedy any of the harms claimed by plaintiffs.  And in

17   light of the D.C. Circuit's 2011 opinion in *National*

18   *Association of Home Builders v. U.S. Army Corps of Engineers* at

19   663 F.3d 470, it's not sufficient that plaintiff's members are

20   the direct object of the 2013 rule.

21       When a regulation, as the government argues here,

22   essentially duplicates preexisting legal duties, plaintiffs

23   must still establish the traceability and redressability

24   requirements.  Plaintiffs, however, in this case, entirely

25   fail, for example, to demonstrate how, in light of the

1  Supreme Court's *Inclusive Communities* opinion, vacating the

2  2013 rule would in any way remedy the harms of supposed --

3  being subject to disparate impact liability.  Private litigants

4  and probably also HUD, based on HUD's prior practice, could

5  still pursue disparate impact claims against insurers even in

6  the absence of a rule.

7       Putting aside these just -- just disability issues, I

8  think plaintiffs face even greater problems with the merits of

9  their claims.  I hope we can agree that this is, in fact, or

10  should be evaluated as a facial challenge given the complete

11  absence of a concrete factual record against which plaintiff's

12  challenges can be evaluated.  Plaintiffs in this case fail to

13  show that there are no set of circumstances under which HUD's

14  2013 rule can pass muster.

15       As the D.C. Circuit made clear in its 2015 opinion in

16  *Hodge v. Talkin* at 799 F.3d 1145, claims like those of

17  plaintiffs here do not qualify as an as-applied challenge no

18  matter how plaintiffs so style their claim.  Rather, as the

19  D.C. Circuit explained, an as-applied challenge is one that

20  asks, quote, a Court to assess -- excuse my eyesight -- asks

21  the Court to assess a regulation's validity -- and that's in

22  brackets, regulation's validity -- with respect to the

23  particular set of facts before it.

24       As this Court and plaintiff is well aware, there are no

25  particular set of facts before us today.  Instead, plaintiffs

1    merely pose a series of vague hypotheticals which, to be

2    honest, sounds to me a lot like seeking an advisory opinion on

3    the applicability of the rule.  In any event, we have shown in

4    our briefs that none of the hypotheticals -- in none of the

5    hypotheticals would application of the rule actually be

6    improper, and more importantly -- and for purposes of resolving

7    plaintiff's facial challenge here today -- none come anywhere

8    close to showing that the 2013 rule would, in fact, be improper

9    in all of its applications.

10         With the Court's indulgence, I'd like to respond to some

11    of the points plaintiffs made about *Inclusive Communities*.

12    First, nothing in the language of the Fair Housing Act or the

13    *Inclusive Communities*' opinion requires that insurers be exempt

14    from disparate impact liability, and nothing in the text of the

15    2013 rule, in fact, requires the insurance industry to use race

16    in a, quote, pervasive way or collect data.

17         To the contrary, the discriminatory effects liability

18    standard precludes the use of facially neutral practices that

19    have an unjustified discriminatory effect on the basis of the

20    protected characteristic.  Now that particular phrasing comes

21    from the 2013 -- the preamble to the 2013 rule, but it's almost

22    identical to the language used by the Supreme Court in

23    *Inclusive Communities*.

24         I'd also like to note that plaintiffs suggest that they

25    are somehow uniquely and categorically unable to devise race

1    neutral remedies to unjustified practices that have a

2    discriminatory effect on a protected class, and that their

3    inability to address these problems entitles them to a special

4    exemption.

5         I think there's a lot of problems with this argument.

6    First, as I'm sure this Court is familiar, the *Inclusive*

7    *Communities*' opinion emphasized that remedies can, quote,

8    concentrate on the elimination of the offending practice,

9    unquote, or use other race neutral devices to avoid

10    constitutional questions.  But the Court also recognized,

11    quote, that race may be used -- I'm sorry, race be considered

12    in certain circumstances and in a proper fashion, unquote, in

13    both, quote, public and private transactions covered by the

14    Fair Housing Act.

15         So I think counsel's -- the insurers' position that

16    there would necessarily be problems is, again, not something

17    that we can resolve here today in the context of a facial

18    challenge but would be better addressed in piecemeal litigation

19    with a concrete factual record.

20         In any event, I think the resolution of *National Fair*

21    *Housing Alliance v. Travelers Indemnity Company* here in D.C.,

22    which, of course, we cite in our papers, shows that the 2013

23    rule can be applied to insurers in a way that accords with the

24    *Inclusive Communities*' opinion and its suggestion that courts

25    need not require the use of race to remedy unjustified

1    discriminatory effects but could concentrate on the elimination

2    of the offending practice.  In that case, as I'm sure this

3    Court is aware, the challenge concerned Travelers' decision not

4    to insure landlords that rented their apartments to -- or made

5    their apartments also available to Housing Choice Voucher

6    Holders, commonly known as the Section 8 program.  But, in

7    fact, Travelers after losing a motion to dismiss was able to

8    resolve the matter by agreeing to provide insurance to those

9    landlords.  And in no way does that require them to collect the

10    data that they allege they had to collect nor did it require

11    them to use race in a way that raised constitutional issues.

12            And I think the fact that -- given that this is a facial

13    challenge again, and in the absence of a concrete factual

14    record, the fact that the government can point to even one

15    example of the insurer being able to comply with the disparate

16    impact standard defeats their claim.

17            THE COURT:  How would they defend themselves against

18    the disparate impact claim if they didn't have statistical

19    information?

20            MR. TODD:  Well, Your Honor, first of all, I'd like

21    to point out that the HUD regulation requires the complainant

22    or the plaintiff alleging a disparate impact -- well, it

23    requires a couple things.  And if you'll give me a moment, I'll

24    pull up my piece of paper to make sure.

25            THE COURT:  All right.

1          MR. TODD:  First, contrary to plaintiff's suggestion,

2     it does, in fact, require in the text of the rule that they --

3     that they identify and allege that a challenged practice caused

4     or predictably will cause a discriminatory effect.  So right

5     off the bat that puts the burden on the plaintiff and not on

6     insurers to come forward with such evidence, and the evidence

7     is most often supported with data and statistics.

8          And then, of course, they also have to make a showing

9     that that alleged disparate impact can, in fact, be credibly

10     tied to the challenged practice and is not just a coincidence

11     or intervening cause or a whole bunch of other things.

12          THE COURT:  Wouldn't you anticipate -- wouldn't it be

13     reasonable to anticipate that the parties that would bring

14     these kinds of actions would have their own statistics at -- at

15     their disposal that they have collected somehow or another?  I

16     don't know enough about the world of statistics to tell you how

17     they do it, but they would have a way -- a mechanism to gather

18     statistical data and use the statistical data as the basis to

19     make a prima facie case, and then under the burden-shifting

20     scheme, the burden would fall on the insurance companies.  If

21     the insurance companies didn't have their own statistical data,

22     they wouldn't be able to counter it.

23          MR. TODD:  Well, I'm not sure that's always true in

24     every case, Your Honor.  First of all, the insurers might be

25     able to hire experts that could just take apart the statistical

1    case of the plaintiff and say that this particular statistical

2    analysis is invalid or these are invalid conclusions that you

3    can't draw from this; or, again, they might be able to defeat

4    the claim by saying, okay, you've shown a disparity, but you

5    can't tie that disparity causally to the practice that you

6    claim has given rise to that disparity.  So I'm not sure that

7    they're going to have to go out and affirmatively in advance,

8    in anticipation of a potential suit, and collect this data that

9    they -- that they're concerned about collecting.

10        I also think that the -- if you look at the cases that

11   have come out since the *Inclusive Communities* ruling in 2015,

12   you will see that by and large, for better or for worse, the

13   majority of cases are dismissed because the courts find that

14   the plaintiff has failed to show a prima facie case, either

15   because they failed to allege a discriminatory -- a disparate

16   impact based on a statistical showing or that they have failed

17   to sufficiently tie that disparate impact to the challenged

18   practice or practices or, in fact, in many cases -- I'm sorry,

19   Your Honor.

20        THE COURT:  And were those rulings granting the

21   motions to dismiss?

22        MR. TODD:  They were both --

23        THE COURT:  Did they survive appeal or --

24        MR. TODD:  That's a great question, Your Honor.

25        THE COURT:  -- are they still on appeal?

1          MR. TODD:  So some rulings have been resolved by the

2     D.C. Circuit courts.  There are three or four circuit court

3     rulings.

4          THE COURT:  Upholding the motions to dismiss?

5          MR. TODD:  So in two of those cases, they upheld the

6     dismissal.  And -- and in one of those cases they reversed the

7     district court's dismissal and remanded for further proceedings

8     because they felt that the --

9          THE COURT:  What circuit was that?

10         MR. TODD:  That was the Fourth Circuit in which

11    they -- but I think the Second Circuit case is perhaps the most

12    interesting case, because in that case -- and that's the *Mhany*

13    *Management v. County of Nassau,* and that's 819 F.3d at 581.

14    And, again, it's a Second Circuit ruling in 2016, so shortly

15    after *Inclusive Communities*.

16         And what's most interesting about that case is that the

17    Second Circuit acknowledged that under its own precedent before

18    the 2013 rule, the plaintiffs actually would have had a claim

19    that survived, but -- but under the 2013 rule, plaintiffs

20    claim -- and -- and after -- in light of *Inclusive Communities*,

21    plaintiff's claim no longer survived.  So I think that's an

22    interesting example basically of where the -- it's -- and a

23    reminder that the 2013 rule is, in fact, not the most liberal

24    interpretation of disparate impact liability.  It is actually a

25    more restrictive interpretation that had been adopted by the

1    Second Circuit previously.

2          And, again, it -- as we all know, because this is an

3    APA challenge, if this Court were to vacate and set aside the

4    rule, presumably the Second Circuit ruling would, you know, be

5    in effect again, obviously as modified by the Supreme Court's

6    test, but -- I mean, the Supreme Court's analysis.

7          But I also think it's -- to back up for a moment, Your

8    Honor, it's important to think about what the rule did and what

9    the Supreme Court did.  The rule did not purport to define the

10   absolute limits and set out every single aspect of what it

11   takes to prove disparate impact discrimination or

12   discriminatory effects liability.  It really only sought to

13   settle what at the time was a dispute among the circuits about

14   the burden-shifting analysis.  It did not purport to address

15   what statistics would be sufficient, and it didn't purport to

16   really get into an analysis of what it really takes to make the

17   causal showing.  It deferred to the prior judicial

18   interpretations of that.

19         And the Supreme Court, again, you know, was cognizant of

20   HUD's rule, cited it, of course, a couple times in its opinion,

21   but it really focused more on the evidentiary element of what

22   is required to demonstrate discriminatory effects liability.

23   And, of course, as this Court is well aware, it didn't invent a

24   new test.  It said that disparate impact liability has always

25   been limited in important respects, and it really reached back

1    to the *Griggs* decision from 1973, which, of course, is only a

2    few years after both Title VII and Title VIII were passed in

3    1968 to discuss basically the elements of -- of what the

4    plaintiff's showing would be and what the -- the -- in this

5    case insurers' burdens would be.

6        So I think all we really have before us today basically

7    is a question of whether, in fact, the -- the -- the analysis

8    that HUD selected in the third part of its rule is, in fact, a

9    reasonable construction of the rulemaking authority that was

10    granted to it by Congress.

11        I'm -- again, like plaintiff's counsel, I'm a little

12    unsure of the balance of my time.

13            THE COURT:  You've got a few more minutes.

14            MR. TODD:  Okay.  Well, thank you, Your Honor.

15        I do want to address the equally effective statement in

16    plaintiff's ruling.

17            THE COURT:  Go right ahead.  I'll let you run over a

18    little bit.

19            MR. TODD:  That's very kind of Your Honor.  Thank

20    you.

21        First, I want to point out that nothing in the *Inclusive*

22    *Communities*' ruling ever employed the phrase equally effective,

23    and nothing in *Inclusive Communities*' ruling renders unlawful

24    HUD's recent decision to reject the use of equally effective in

25    its 2013 rulemaking.  The equally effective language is not

1    part of Title VII.  It's -- and it's also never been part of

2    any ruling on the Fair Housing Act before or after *Inclusive*

3    *Communities*'.  It's just the plaintiff's own preferred

4    standard.  Indeed, the only court to consider a challenge of

5    whether HUD's 2013 rule needed to include the term equally

6    effective rejected it, and that was, of course, the *PCI* ruling

7    in Illinois.

8         Now, I want to emphasize that plaintiffs can't prevail

9    here today just by showing that equally effective would be

10   better for them.  They have to show that HUD's selection of the

11   language it did choose is, in fact, a reasonable construction

12   of the statute.  And I do think it is informative to look at

13   what Congress chose to do in 1991 because Congress itself

14   rejected in the Title VII context the use of equally effective

15   in the third element of burden-shifting under Title VII.  And I

16   think it was reasonable of HUD to look at Congress' rejection

17   of that and to not see its use in any other Fair Housing Act

18   cases in the -- stretching back in the years before its

19   rulemaking -- and determine that it was reasonable to instead

20   select -- and I want to -- make sure we get this right.

21        The standard that if a respondent or defendant satisfies

22   the burden of proof set forth in paragraph (c)(2) of the

23   section, the charging party or plaintiff may still prevail

24   upon -- and I want to emphasize this -- proving -- proving --

25   that the substantial legitimate nondiscriminatory interest

1    supporting the challenged practice could be served by another

2    practice that has a less discriminatory effect.  And I think

3    the word prove here is an important one.  I think that it,

4    first of all, shows -- and HUD clarifies this in its rule --

5    this is not a hypothetical argument about we think this might

6    be better.

7         It would be the plaintiff's burden to prove at trial, if

8    necessary -- certainly at summary judgment, if not -- that

9    their -- another practice would have a less discriminatory

10   effect, and yet it says right here serve -- serve -- the

11   legitimate interest.  So I think the fact that Congress -- I

12   mean, I'm sorry, that HUD didn't use the term equally effective

13   has a little less import when one actually looks at the

14   language of the rule that HUD did, in fact, select.

15        But, again, what we're here to do today is to determine

16   this Court's role, of course is -- we're now in *Chevron 2* land

17   to determine whether, in fact, it was appropriate for HUD given

18   the rulemaking authority that was delegated to it expressly by

19   Congress to engage and select this option, and only if this

20   Court were to find that their particular choice completely

21   unreasonable or beyond the bounds of the statute would this

22   Court -- would it be appropriate for this Court to set it

23   aside.

24        I don't think that -- given that there is no judicial

25   precedent ever requiring its use and given that Congress chose

1    not to use it in Title VII, I think HUD's construction is

2    entirely reasonable.

3         And with the Court's indulgence, there's one other point

4    I'd like to make.

5              THE COURT:  Go ahead.

6              MR. TODD:  I would also like to note that I think

7    that plaintiff's claims about the McCarran-Ferguson Act are

8    particularly ill-suited for resolution in the context of a

9    facial challenge.  I think it's fairly well settled -- or at

10   least it's the strong majority view -- that the only way to

11   determine whether there is, in fact, a McCarran-Ferguson Act

12   reverse preemption issue is to look at the particular

13   application of a federal statute, such as the Fair Housing Act,

14   and the particular -- of the particular state statute that it

15   would, in fact, impair or conflict with.

16        And, again, here in a facial context, I don't think that

17   we can show -- or -- and certainly plaintiffs have failed to

18   come up with any concrete examples of where the Fair Housing

19   Act requires them to do one thing in a particular -- in a

20   real-world factual setting and the state law regulation

21   prohibits or requires them -- prohibits them from doing that

22   thing or requires them to do the opposite.

23        And I guess the final point I'd like to make is is that

24   contrary to a lot of the statements plaintiffs have made, you

25   know, there's been a regulation in effect since 1989 saying

1   that the FHA applies to the insurance industry.  In a 1996

2   amicus brief filed by the plaintiffs supporting a cert

3   petition, the plaintiffs themselves admitted that they are

4   subject to disparate impact liability.  And yet in the almost

5   25 years since that amicus brief, they have pointed to no

6   real-world problems from being subject to the disparate impact

7   rule, nor have they come forward with any real-world evidence

8   since the 2013 rule went into effect in 2013.  That's eight

9   years ago.

10          Thank you, Your Honor.  I'd like to reserve the balance

11   of my time.

12          THE COURT:  Thank you.

13          MR. SHANMUGAM:  Your Honor, I'd like to start with

14   the justiciability arguments since those are largely new.

15   First, let me start with --

16          THE COURT:  Well, I'm going to -- as a result of

17   those being thrown into the mix, I'm going to give each side a

18   chance to supplement their briefing on those issues.  So don't

19   feel you have to use your entire five minutes on that point.

20   Make whatever point you'd like.

21          MR. SHANMUGAM:  Great.  I'll spend a couple minutes

22   on that point.  I don't know that we're going to have a lot to

23   say in the supplemental briefing because I think these

24   arguments are really quite straightforward.

25          Let me start with ripeness.  What makes this situation

1    unusual and indeed extraordinary is that the 2013 rule that

2    we're challenging is now once again the status quo.  And so it

3    affects our members right now, imminently, because that is now

4    the law.  And the reason it's the law, of course, ironically

5    enough, is because the government abandoned its defense of the

6    2020 rule.

7        Indeed, in the case where Mr. Todd was lead counsel, the

8    government after a district court entered a preliminary

9    injunction against the 2020 rule withdrew its appeal to the

10   First Circuit from that decision, which allowed the government

11   to put the 2013 rule effectively back in place.

12       Yes, there's a rulemaking.  What the government, I

13   think, has made clear beyond any doubt, that the government's

14   intention is to simply go through the formal step of repealing

15   the 2020 rule, which, again, is not in effect right now.  And

16   so I think under those circumstances, it's a bit rich for the

17   government to come in and say, well, there's an ongoing

18   rulemaking proceeding here and you have to wait and to put us

19   back into the Kafkaesque morass waiting, you know, another few

20   years for the government to issue a new rule.

21       And so this Court certainly could wait if it wants to,

22   but I think our submission is it really shouldn't because at

23   this point the 2013 rule is in effect and there's really no

24   doubt that it's going to remain in effect; but, of course, if

25   the government decides to modify the 2013 rule, then

1    potentially our claims will no longer have force.  But I'm not

2    holding my breath waiting for the government to do that.

3         And on the issue of standing, this is even more

4    extraordinary.  The government did raise a standing objection

5    at the beginning of this litigation, and this Court rejected

6    the government's standing argument on the ground that -- to

7    quote from the header on page 12 on its last opinion,

8    Plaintiff's Standing is Self-Evident.

9         And I guess I would just submit that that reasoning

10   applies with equal force here.  We amended our complaint in the

11   wake of *Inclusive Communities* in April of 2016, and never until

12   today did the government have the temerity to renew its

13   standing objection.  So, again, we're happy to provide

14   supplemental briefing, but I don't think that either of those

15   issues is that complicated.

16        On the merits, just a couple of points.  First, the

17   government is positively obsessed with characterizing what

18   we're arguing here as a facial challenge.  And it certainly is

19   true that we are challenging the application of the 2013 rule

20   to a certain set of cases; namely, to insurers' rate-making and

21   underwriting practices.  Now, I think that that is probably

22   accurately described as a preenforcement challenge, and I'm not

23   disputing that our burden is, therefore, to show that all of

24   those applications are invalid.  But I think that the

25   government can get traction only by wildly mischaracterizing

 1    our claims.

 2         And I want to go right to Count 2, which Mr. Todd

 3    addressed today, and Mr. Todd characterizes that claim as a

 4    McCarran-Ferguson claim; namely, as a claim that the

 5    application of the FHA to insurers is reverse preempted by the

 6    McCarran-Ferguson Act.  If that were what we were arguing, then

 7    it certainly would be true that we would have to show a

 8    conflict between federal law and state law and all of its

 9    applications.

10         But we make quite clear that that is not what we're

11    arguing, and I would point you to page 14 of our reply brief,

12    if there's any doubt.  What we are arguing here is something

13    different.  It is that state law here breaks the causal chain,

14    and it breaks the causal chain specifically because state law,

15    in the words of the Supreme Court, substantially limits

16    insurers' discretion.  And that is true in any case.  That is

17    true across the board regardless of whether the result gives

18    rise to a conflict between the rule and a specific provision of

19    state law.

20         And the same is true with regard to Count 1 because the

21    FHA requires the use and consideration of race -- or the rule

22    requires the use and consideration of race in a pervasive way.

23    It is of no moment what happens with regard to the remedy.  Our

24    submission here is that because insurers in all instances have

25    to take race and other protected characteristics into account

1    in detecting and resolving disparities, that there is a problem

2    in all of these applications.

3         And then the final thing I would say is with regard to

4    the equally effective claim.  Counsel spends a fair amount of

5    time talking about these lower court cases, like the *Mhany* case

6    from the Second Circuit.  And none of those cases involved a

7    challenge to the validity of the 2013 rule.  And to the extent

8    that the Supreme Court in *Inclusive Communities* cited the rule,

9    it was for the bare fact that the rule was in effect.  The

10   Supreme Court certainly was not blessing any of the particular

11   terms of the rule.

12        The only challenge of which I'm aware to the validity of

13   the rule on similar terms was in the *PCI* case in the Northern

14   District of Illinois, and it is true that that case did reject

15   a similar challenge to the absence of a requirement that an

16   alternative be equally effective.  With all due respect to the

17   district court in that case, its reasoning was pretty spare on

18   that point and unpersuasive.  And I don't think that this Court

19   should follow it.

20        And at the end of the day, it's really *Inclusive*

21   *Communities* that explains why the alternative has to be equally

22   effective.  It's not just because the Court reiterated the

23   fundamental principle -- the disparate impact liability is

24   designed to remove artificial, arbitrary, and unnecessary

25   barriers, a standard that goes all the way back to *Griggs* --

1    it's that the Court also said on pages 2522 and 2524 of the

2    Supreme Court Reporter, the disparate impact liability is not a

3    tool to force defendants to, quote, reorder their priorities or

4    to, quote, displace valid governmental and private priorities,

5    and the claims that are no more than, quote, an attempt to

6    second guess which of two reasonable approaches a defendant

7    should follow are not cognizable.

8         And this principle that the alternative has to be

9    equally effective is a venerable one in the Court's cases, and

10   I would point the Court in particular to the Supreme Court's

11   decision in *Wards Cove* where there is at the end of the

12   majority opinion an extensive discussion of that requirement.

13   And, again, it's a requirement that even predates *Wards Cove*,

14   but I think *Wards Cove* is perhaps the best evidence of that

15   principle, as a general principle of disparate impact

16   liability.

17        Unless the Court has any further questions, again, we

18   would ask that the Court grant our motion for summary judgment

19   and vacate the rule and relevant part.

20        THE COURT:  Thank you.

21        Well, let me take this opportunity to give a tip of the

22   cap to both sides for really outstanding briefs and oral

23   arguments today.  To say the least, we don't get briefs of this

24   quality and arguments of this quality on a daily basis.  I wish

25   we did, but we don't.  And I want to compliment both sides.

1    I certainly -- even though it's been quite a few years

2    since I've been in the private sector, I certainly recall the

3    experience of making arguments to courts, and then when I was

4    out celebrating with my colleagues having a beer or whatever

5    afterwards saying I wish I'd said this, I wish I'd said this, I

6    wish I'd said this.  Fine.

7        It's my practice in those cases of this type that are

8    above average in complexity and raise issues that are -- have

9    consequences that are greater even than the parties themselves

10   in this particular case -- in -- in this case to give each side

11   a chance upon reflection to file a supplemental pleading

12   limited to points that were made in the argument.  Limited.

13       So you're going to need to have a copy of the

14   transcript.  I'm sure you'll get the transcript relatively

15   quickly, but the clock won't start until you get the

16   transcript.  And once you get the transcript, you'll have two

17   weeks to file a supplemental pleading, 20 pages or less -- I

18   don't want -- I don't want some 50-page opus, you know -- and

19   limited to points that were raised during the oral argument

20   that you would like to counter or just respond to one way or

21   the other upon reflection.

22       So I -- I take the point that there's -- you know, we

23   have a little time.  So let's get it done, done right, and --

24   and -- but I don't want these -- the briefs to be responsive

25   briefs.  It's just both sides will have the same two-week

1   deadline.  File your pleading and -- if you want to.  I'm not

2   requiring you to do it, but if you'd like -- if you'd like to

3   file some kind of a supplemental pleading, you're welcome to do

4   that.

5          And I know this is a good example of a case where the

6   Court benefits from having above-average counsel doing

7   outstanding work, and -- and people who have been much more

8   immersed in these -- these rules and statutes and case law than

9   the Court.  So I can learn a lot from you, and it'll be

10  definitely to my advantage to have the benefit of your

11  thoughts.

12         So I want to thank you for your hard work, Counsel, and

13  we'll stand in recess.

14                    (The proceedings concluded at 4:06 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3         I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9              Dated this 27th day of July, 2021.

10

11             /s/ Nancy J. Meyer
               Nancy J. Meyer
12             Official Court Reporter
               Registered Diplomate Reporter
13             Certified Realtime Reporter
               333 Constitution Avenue Northwest, Room 6509
14             Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25