## SMALL BUSINESS ADMINISTRATION

### 13 CFR Part 107

### Small Business Investment Companies—Early Stage SBICs; Public Webinar

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Proposed rule; notice of public webinar.

**SUMMARY:** The U.S. Small Business Administration (SBA) announces that it is holding a public webinar regarding its Early Stage Small Business Investment Companies proposed rule, which was published on September 19, 2016. The webinar will describe the changes proposed in the rulemaking and answer questions regarding the proposed rule.

**DATES:** The webinar will be held on October 12, 2016, at 1 p.m. EST. Attendees must pre-register by October 10, 2016, at 11:59 p.m. EST.

**ADDRESSES:** Parties interested in attending the webinar must pre-register by sending an email request to SBA's Office of Investment and Innovation at *applySBIC@sba.gov,* as further described in section III of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Scott Schaefer, SBA Office of Investment and Innovation at (202) 205–6514 or *applySBIC@sba.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Background Information

The Early Stage SBIC program was launched in 2012 as a 5-year effort as part of President Obama's Startup America Initiative. The intent of the Early Stage SBIC program was to license and provide SBA-guaranteed leverage to Early Stage SBICs that would focus on making investments in early stage small businesses. Although 62 investment funds applied to the program, few satisfied SBA's licensing criteria. To date, SBA has only licensed five Early Stage SBICs.

On September 19, 2016, SBA published a proposed rule regarding the Early Stage Small Business Investment Company (SBIC) program (81 FR 64075), which proposes to make the Early Stage SBIC program a permanent part of the SBIC program. In addition, the rule proposes changes to the Early Stage SBIC Program with respect to licensing, non-SBA borrowing, and leverage eligibility.

The proposed Early Stage SBIC rule may be viewed at *https://www.regulations.gov/document?D=SBA-2015-0002-0009.* The comment period for the proposed rule closes on October 19, 2016. In order to familiarize the public with the content of the Early Stage SBIC proposed rule, SBA will host a webinar on the proposed rule before the closing date. The webinar will be transcribed and become part of the administrative record for SBA's consideration when the Agency deliberates on the final Early Stage SBIC regulations.

### II. Webinar Schedule

| Webinar date and time | Registration closing date |
|---|---|
| October 12, 2016, 1 p.m. EST. | October 10, 2016, 11:59 p.m. EST. |

The session is expected to last no more than 1 hour.

### III. Registration

If you are interested in attending the webinar, you must pre-register by the registration closing date. To pre-register, send an email to *applySBIC@sba.gov.* In the body of the email, please provide the following: Participant's Name, Title, Organization Affiliation, Address, Telephone Number, and Email Address. You must submit your email by the applicable registration closing date listed in this notice.

Due to technological limitations, attendance is limited to 120 participants per session. If demand exceeds capacity for the webinar, SBA will hold another one. SBA will announce any additional sessions through a **Federal Register** document and on its Web site, *www.sba.gov/inv/earlystage.*

SBA will confirm the registration via email along with instructions for participating. SBA will post any presentation materials associated with the webinar on the day of the webinar by 10 a.m. EST at *www.sba.gov/inv/earlystage.*

If there are specific questions you would like SBA to address in the webinar, SBA must receive them no later than October 9, 2016. Since the Early Stage SBIC regulations are in the proposed rulemaking stage, SBA will not be able to answer questions that are outside of clarification of the proposed rule.

**Mark L. Walsh,**
*Associate Administrator for Investment and Innovation.*

[FR Doc. 2016–24031 Filed 10–4–16; 8:45 am]

**BILLING CODE 8025–01–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### 24 CFR Part 100

[Docket No. FR–5508–N–03]

### Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Reconsideration of public comments; implementation of the Fair Housing Act's Discriminatory Effects Standard.

**SUMMARY:** HUD is issuing this document to supplement its responses to certain insurance industry comments to HUD's proposed rule implementing the Fair Housing Act's ("Act") discriminatory effects standard. These commenters requested, *inter alia,* total or partial exemptions or safe harbors from liability under the Act's discriminatory effects standard. After careful reconsideration of the insurance industry comments in accordance with the court's decision in *Property Casualty Insurers Association of America* (*PCIAA*) v. *Donovan,* HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act. HUD continues to believe that the commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis.

**DATES:** Supplemental Responses issued on October 5, 2016.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–0500; (202) 402–5188 (this is not a toll-free number). Persons with hearing or speech impairments may contact this number via TTY by calling the toll-free Federal Relay Service at 800–877–8399.

**SUPPLEMENTARY INFORMATION:**

### Background

Title VIII of the Civil Rights Act of 1968, as amended ("Fair Housing Act" or "Act"), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] On November 16,

---

[1] 42 U.S.C. 3601–3619.

2011, HUD issued a proposed rule seeking to formalize, through notice-and-comment rulemaking, HUD's longstanding interpretation of the Act as prohibiting practices with an unjustified discriminatory effect and to standardize the analytical framework for evaluating such cases.[2] In response to the proposed rule, HUD received nearly one hundred comments from a range of interested parties, including from three insurance trade associations requesting exemptions or safe harbors. The National Association of Mutual Insurance Companies ("NAMIC") and the American Insurance Association ("AIA") requested an exemption from discriminatory effects liability for all insurance practices. NAMIC also requested, in the alternative, exemptions for insurance pricing, for Fair Access to Insurance Requirements ("FAIR") plans, and/or safe harbors for recognized risk factors. The Property Casualty Insurers Association of America ("PCIAA") requested an exemption for all insurance underwriting practices.

On February 15, 2013, HUD published its final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("Rule").[3] In the Rule, HUD declined to grant the requested exemptions or safe harbors for any insurance practices, explaining that the commenters' concerns could be addressed on a case-by-case basis. On November 27, 2013, PCIAA filed an action in the U.S. District Court for the Northern District of Illinois ("the court") alleging that HUD's Rule violated the McCarran-Ferguson Act[4] ("McCarran-Ferguson") and the Administrative Procedure Act.[5]

On September 3, 2014, the court issued a decision in PCIAA v. Donovan.[6] The court upheld the Rule's burden-shifting framework for analyzing discriminatory effects claims as a reasonable interpretation of the Fair Housing Act.[7] The court also held that a violation of McCarran-Ferguson can be adjudicated by a court only in the context of a concrete dispute challenging the application of the Rule to a particular insurance practice, and not in the abstract.[8] Distinguishing between adjudication and agency rulemaking, the court concluded that HUD had not adequately explained why case-by-case adjudication was preferable to using its rulemaking authority to provide exemptions or safe harbors related to homeowners insurance.[9] The court remanded the matter to HUD for further proceedings consistent with its ruling.[10]

After careful reconsideration of the comments from insurance industry representatives and the court's opinion, HUD continues to believe that case-by-case adjudication is preferable to creating the requested exemptions or safe harbors for insurance practices. The Fair Housing Act's broad prohibitions on discrimination in housing are intended to eliminate segregated living patterns while moving the nation toward a more integrated society. When Congress enacted the Fair Housing Act in 1968 and amended it in 1988, it established exemptions for certain practices[11] but not for insurance. Rather, Congress stated that the Act is intended to provide for fair housing throughout the United States.[12] The Supreme Court has recognized the Act's broad remedial purpose.[13] Among other things, the Act requires HUD to affirmatively further fair housing in all of its housing-related programs and activities,[14] one of which is the administration and enforcement of the Act.[15] McCarran-Ferguson, enacted in 1945, restricts only those applications of federal law that directly conflict with state insurance laws, frustrate a declared state policy, or interfere with a State's administrative regime.[16] For HUD to create the requested exemptions or safe harbors would allow to go uncorrected at least some discriminatory insurance practices that can be subject to disparate impact challenges consistent with McCarran-Ferguson and the filed rate doctrine. Thus, to create such exemptions or safe harbors would undermine the efficacy of the Act and run counter to the Act's purpose and HUD's statutory responsibilities. The concerns raised by the insurance industry commenters do not outweigh this loss of efficacy in the administration and enforcement of the Act. Rather, the case-by-case approach appropriately balances these concerns against HUD's obligation to give maximum force to the Act by taking into account the diversity of potential discriminatory effects claims, as well as the variety of insurer business practices and differing insurance laws of the states, as they currently exist or may exist in the future. Moreover, in light of the variety of practices and relevant state laws, as well as the substantial range of possible discriminatory effects claims, it is practically impossible for HUD to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application.

Accordingly, HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with HUD's statutory mandate. The discriminatory effects standard imposes liability only for those insurance practices that actually or predictably result in a discriminatory effect and that lack a legally sufficient justification.[17] It takes into account an insurer's interest in the challenged practice and, for the reasons explained below, any conflict with a specific state insurance law can and should be addressed on a case-by-case basis in the context of that state law. HUD provides the following supplemental responses to the public comments submitted by the three insurance trade associations that sought exemptions or safe harbors.

### Revised Responses to Insurance Industry Comments

*Issue:* Two commenters requested exemptions from the Rule for all

---

[2] 76 FR 70921 (Nov. 16, 2011).
[3] 78 FR 11460 (Feb. 15, 2013).
[4] 15 U.S.C. 1011–1015.
[5] 5 U.S.C. 551–559.
[6] *Prop. Cas. Insurers Ass'n of Am.* v. *Donovan* (*PCIAA*), 66 F. Supp. 3d 1018 (N.D. Ill. 2014).
[7] *Id.* at 1051–53.
[8] *Id.* at 1037–42.

[9] *Id.* at 1049.
[10] *Id.* at 1054.
[11] *See, e.g.,* 42 U.S.C. 3605(c) (exempting appraisal practices from disparate impact liability), 3607(b)(1) (exempting reasonable governmental occupancy limits from disparate impact liability), 3607(b)(4) (exempting practices related to certain controlled substance convictions from disparate impact liability); *see also Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2520–21 (2015) (discussing these "exemptions from liability").
[12] *See* 42 U.S.C. 3601.
[13] *See Havens Realty Corp.* v. *Coleman,* 455 U.S. 363, 380 (1982) (recognizing Congress's "broad remedial intent" in passing the Act); *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972) (recognizing the "broad and inclusive" language of the Act); *see also Inclusive Cmtys.,* 135 S. Ct. at 2521 (describing the "central purpose" of the Act as "to eradicate discriminatory practices within a sector of our Nation's economy").
[14] *See* 42 U.S.C. 3608(e)(5).
[15] *See, e.g.,* 42 U.S.C. 3608 (the Secretary's administrative responsibilities under the Act), 3609 (education, conciliation, conferences, and reporting obligations to further the purposes of the Act), 3610 (investigative authority), 3611 (subpoena power), 3612 (administrative enforcement authority), 3614a (rulemaking authority), 3616 (authority to cooperate with state and local agencies in carrying out the Secretary's responsibilities under the Act), 3616a (authority to fund state and local agencies and private fair housing groups to eliminate discriminatory housing practices prohibited by the Act).

[16] *Humana Inc.* v. *Forsyth,* 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").
[17] *See* 24 CFR 100.500(b).

insurance practices, and a third commenter requested an exemption for insurance underwriting practices. All three of these insurance industry commenters raised McCarran-Ferguson in support of their requests for an exemption. One of these three commenters urged HUD to delete the insurance example from the Rule, stating that McCarran-Ferguson dictates that "state insurance law trumps the application of any federal law to state regulated insurance, except under very narrow circumstances, which are not met here." [18] Another questioned "whether non-racially motivated and sound actuarial underwriting principles recognized by state insurance regulators that permit accurate risk-based pricing for consumers can be prohibited by federal regulators who find them to have a 'disparate impact.'" [19]

The third commenter was concerned that "the disparate impact standards would impair state unfair discrimination standards," which have "historically been a cost based concept" prohibiting "underwriting and rating distinctions 'between individuals or risks of the same class and essentially the same hazard.'" [20] The commenter expressed concern that if the Rule is applied to homeowners insurance, "accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer." [21] This commenter also sought, in the alternative, "safe harbors for long-recognized risk-related factors," stating that "[f]ailure to provide safe harbor protection for the use of factors historically allowed by state insurance regulators would subject insurers to baseless litigation and threaten the sound actuarial standards underpinning the insurance market." [22]

*HUD Response:* HUD does not agree that it is necessary or appropriate to create an exemption from discriminatory effects liability for all insurance practices or for all underwriting practices in order to accommodate the insurance industry's concerns. McCarran-Ferguson does not require HUD to do so, and categorical exemptions would undermine the Act's broad remedial purpose and contravene HUD's own statutory obligation to affirmatively further fair housing. HUD also declines to create safe harbors from discriminatory effects liability for the use of particular risk factors. HUD disagrees with the commenter's assertions about the consequences that would befall the insurance industry if HUD does not grant the requested safe harbors for "long-recognized risk-related factors" or "historically allowed" factors. Establishing safe harbors for specific risk-related criteria would be overbroad, arbitrary, and quickly outdated.

The Act's broad remedial purpose is "to provide . . . for fair housing throughout the United States." [23] Thus, the Act plays a "continuing role in moving the Nation toward a more integrated society." [24] Ensuring that members of all protected classes can access insurance free from discrimination is necessary to achieve the Act's objective because obtaining a mortgage for housing typically requires obtaining insurance, too.[25] Likewise, obtaining insurance may be a precondition to securing a home in the rental market.[26] Insurance is also critical to maintaining housing because fire, storms, theft, and other perils frequently result in property damage or loss that would be too costly to repair or replace without insurance coverage.

Yet the history of discrimination in the homeowners insurance industry is long and well documented,[27] beginning with insurers overtly relying on race to deny insurance to minorities and evolving into more covert forms of discrimination.[28] At times, agents were given plainly discriminatory instructions, such as "'get away from blacks' and sell to 'good, solid premium-paying white people,'" or they simply were told, "We don't write Blacks or Hispanics." [29] Underwriting guidelines contained discriminatory statements, such as listing "population and racial changes" among "red flags for agents." [30] Minorities were offered inferior products, such as coverage for repairs rather than replacement, or were subject to additional hurdles during the quote and underwriting process.[31] Additionally, discrimination took the form of insurers redlining predominantly minority neighborhoods and disproportionately placing agents and offices in predominately white neighborhoods.[32] Minorities also were denied access to insurance through property-location and property-age restrictions, even when data had demonstrated that such restrictions are not justified by risk of loss.[33] This history of discrimination led to

---

[18] American Insurance Association, Comment Letter on Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard (Jan. 17, 2012).

[19] Property Casualty Insurers Association of America, Comment Letter on Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard (Jan. 17, 2012).

[20] National Association of Mutual Insurance Companies, Comment Letter on Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard (Jan. 17, 2012).

[21] *Id.*

[22] *Id.*

[23] 42 U.S.C. 3601; *see also* cases cited *supra* note 13.

[24] *Inclusive Cmtys.,* 135 S. Ct. at 2526.

[25] *NAACP* v. *Am. Family Mut. Ins. Co.,* 978 F.2d 287, 297 (7th Cir. 1992) ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable.").

[26] *See, e.g.,* Or. Rev. Stat. 90.222(1) ("A landlord may require a tenant to obtain and maintain renter's liability insurance in a written rental agreement."); Va. Code Ann. 55–248.7:2(B) ("A landlord may require as a condition of tenancy that a tenant have renter's insurance. . . .").

[27] Although the discussion that follows focuses on race and national origin discrimination because of their historic prevalence, examples of discrimination in insurance against other protected classes exist as well. *See e.g., Nevels* v. *W. World Ins. Co.,* 359 F. Supp. 2d 1110, 1120–21 (W.D. Wash. 2004) (disability).

[28] *See generally, Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs,* 103d Cong. (1994) [hereinafter *1994 Hearings*]; *Insurance Redlining Practices: Hearings before the Subcom. on Commerce, Consumer Protection & Competitiveness of the H. Comm. on Energy and Commerce,* 103d Cong. (1993) [hereinafter *Mar. 1993 Hearings*]; *Insurance Redlining: Fact or Fiction: Hearing before the Subcom. On Consumer Credit and Insurance of the H. Comm. on Banking, Finance & Urban Affairs,* 103d Cong. (1993) [hereinafter *Feb. 1993 Hearing*]; Insurance Redlining: Fact Not Fiction (Feb. 1979) [hereinafter Comm'n on Civil Rights] (report of the Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin Advisory Committees to the U.S. Commission on Civil Rights); President's National Advisory Panel on Insurance in Riot-Affected Areas, Meeting the Insurance Crisis of Our Cities (1968) [hereinafter Nat'l Advisory Panel].

[29] *See* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II); *see also, e.g.,* Nat'l Advisory Panel, *supra* note 28, at 116 (quoting an insurance broker as explaining, "No matter how good [a customer] is, they [the insurers] take that into consideration, the fact he is a Negro.").

[30] *Feb. 1993 Hearing, supra* note 28 at 19, 27 (statement of Gregory Squires, Prof. U. Wis. Milwaukee).

[31] *1994 Hearings, supra* note 28, at 15, 47–48 (statements of Deval Patrick, DOJ Ass't Attorney Gen. for Civil Rights); *id.* at 18–19, 51 (statements of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity).

[32] *Feb. 1993 Hearing, supra* note 28, at 7 (statement of John Garamendi, Cal. Ins. Comm'r) ("There may be some people that deny that redlining exists. They are not telling you the truth, or they just don't know what they are talking about. It is real, it does exist, and it is a very serious socioeconomic problem."); Comm'n on Civil Rights, *supra* note 28, at 5 (listing "[p]lacing agents selectively in order to reduce the opportunity to secure business in certain areas" among the types of documented redlining practices).

[33] *See, e.g.,* Comm'n on Civil Rights, *supra* note 28, at 34–39 ("The greater the minority concentration of an area and the older the housing, independent of fire and theft, the less voluntary insurance is currently being written."); *1994 Hearings, supra* note 28, at 18 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (noting the "disparate impact on minority communities" of property age and value requirements, and explaining that "47 percent of black households, but just 23 percent of white households, live in homes valued at less than $50,000" and that "40 percent of black households compared to 29 percent of white households live in homes build before 1950.").

minorities being unjustifiably denied insurance policies or paying higher premiums.[34]

HUD's long experience in administering the Act counsels that discriminatory effects liability does not threaten the fundamental nature of the insurance industry. HUD's position that discriminatory effects liability applies to insurance dates back more than three decades,[35] as does the industry's concern that such liability makes it "near impossible for an insurer to successfully defend himself."[36] HUD has maintained for decades that remedying discrimination in insurance, including discriminatory effects claims, requires examination of each allegedly discriminatory insurance practice on a case-by-case basis,[37] and HUD sees no reason to deviate now from this longstanding approach.

HUD recognizes that risk-based decision making is an important aspect of sound insurance practice, and nothing in the Rule prohibits insurers from making decisions that are in fact risk-based. Under the standard established by the Rule, practices that an insurer can prove are risk-based, and for which no less discriminatory alternative exists, will not give rise to discriminatory effects liability.[38] All the Rule requires is that if an insurer's practices are having a discriminatory effect on its insureds and "an adjustment . . . can still be made that will allow both [parties'] interests to be satisfied," the insurer must make that change.[39] Risk-based decision making is not unique to insurance, and discriminatory effects liability has proven workable in other contexts involving risk-based decisions, such as mortgage lending, without the need for exemptions or safe harbors.[40] Moreover, some states provide for discriminatory effects liability against insurers under state laws, further undermining the industry's claim that providing for such liability as a matter of federal law threatens the fundamental nature of the industry.[41]

Consistent with the Act's broad scope and purpose, as well as HUD's own obligation to affirmatively further fair housing, HUD declines to foreclose viable discrimination claims by creating an overbroad exemption. For the reasons detailed below, wholesale exemptions for all insurance practices or all insurance underwriting practices would necessarily be overbroad, allowing some practices with unjustified discriminatory effects to go uncorrected. Wholesale exemptions also would invariably sweep within their scope potential intentional discrimination in the insurance market as well because "disparate-impact liability under the [Fair Housing Act] also plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment."[42]

Some discriminatory effects claims against insurers will survive a McCarran-Ferguson defense depending on a host of case-specific variables, and therefore wholesale exemptions would be overbroad. McCarran-Ferguson specifically provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."[43] As interpreted by the Supreme Court in *Humana* v. *Forsyth*, McCarran-Ferguson applies only when a particular application of a federal law directly conflicts with a specific state insurance regulation, frustrates a declared state policy, or interferes with a State's administrative regime.[44] Accordingly, the mere fact that a state has the authority to regulate insurance or has adopted ratemaking regulations does not suffice on its own to create the kind of conflict, frustration of purpose, or interference that triggers McCarran-Ferguson.[45] Rather, the inquiry required by *Humana* depends on the relevant state law and other case-specific variables.[46]

For example, in *Dehoyos* v. *Allstate*,[47] the Fifth Circuit rejected a McCarran-Ferguson defense to a disparate impact claim where the insurer did not identify a specific state law that was impaired. In so ruling, the Fifth Circuit reasoned that the Seventh Circuit's holding in *Doe* v. *Mutual of Omaha*[48] does not foreclose all discriminatory effects claims against insurers as barred by McCarran-Ferguson. Instead, the Fifth Circuit distinguished *Doe*, where McCarran-Ferguson was held to bar a claim of discrimination under the Americans with Disabilities Act[49] ("ADA"), by explaining that "[i]n *Doe*, there was an actual *state insurance law* which purportedly conflicted with the application of the [ADA] to the particular question at issue."[50] Thus,

---

[34] *See, e.g.* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II) ("[S]hocking anecdotal evidence was supported by 12 years of data submitted by Missouri State Insurance Commissioner Jay Angoff. . . . It shows that, in the cities of St. Louis and Kansas City, low-income minorities had to pay more money for less coverage than their white counterparts, despite the fact that losses in minority areas were actually less than those in white areas. This evidence directly challenges industry assertions that minorities are too risky to insure.").

[35] *Fair Housing Amendments Act of 1979: Hearings before the Subcom. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 96th Cong. 79 (1979) (statement of Patricia Roberts Harris, Sec'y of HUD).

[36] *Fair Housing Act: Hearings before the Subcom. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 20, 616 (1978) (statement of the Am. Ins. Ass'n.).

[37] *1994 Hearings, supra* note 28, at 19 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (discussing insurers' property age and value requirements and stating that "when practices with such racial impacts are not legally or otherwise justified, a case-by-case, Fair Housing Act analysis is warranted"); *id* at 50 (stating that "it is important to stress that the finding of a [Fair Housing Act] violation occurs on a case by case basis" for insurance practices that are "neutral on their face [but] have a disproportionate racial impact" and "cannot meet the established test of business necessity and . . . less discriminatory alternative").

[38] 24 CFR 100.500(b); *see also Toledo Fair Hous. Ctr.* v. *Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (Ohio Ct. Com. Pl. 1997) ("[T]he disparate-impact approach does not unduly undermine the business of selling insurance. Assuming . . . that the insurance industry is based on 'fair' risk discrimination, the disparate-impact approach will not impede such fair discrimination if the insurer can show a business necessity.").

[39] *Ave. 6E Invs., LLC* v. *City of Yuma*, 818 F.3d 493, 513 (9th Cir. 2016).

[40] *See, e.g.,* Policy Statement on Discrimination in Lending, 59 FR 18266 (Apr. 15, 1994); *Interagency Fair Lending Examination Procedures* (Aug. 2009); *see also 1994 Hearings, supra* note 28, at 20 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) ("As in other areas of fair housing law enforcement, standards to determine [insurance] discrimination will . . . [include] disparate impact. . . . The investigative techniques we will utilize will include those that have grown from our fair housing investigative experience across the board . . . the kinds of tactics that we currently utilize . . . in lending discrimination investigations.").

[41] *See infra* notes 61 thru 64 and accompanying text.

[42] *Inclusive Cmtys.*, 135 S. Ct. at 2522.

[43] 15 U.S.C. 1012(b).

[44] *Humana*, 525 U.S. at 310 ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[45] *Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 295 (5th Cir. 2003) (disparate impact under the Act); *Nationwide Mut. Ins. Co.* v. *Cisneros*, 52 F.3d 1351, 1363 (6th Cir. 1995) (disparate treatment under the Act); *Moore* v. *Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1221 (11th Cir. 2001) (disparate treatment in life insurance).

[46] *See PCIAA*, 66 F. Supp. 3d at 1038 ("McCarran-Ferguson challenges to housing discrimination claims [depend on] the particular, allegedly discriminatory practices at issue and the particular insurance regulations and administrative regime of the state in which those practices occurred.").

[47] *Dehoyos*, 345 F.3d 290.

[48] 179 F.3d 557 (7th Cir. 1999).

[49] 42 U.S.C. 12101–12213.

[50] *Dehoyos*, 345 F.3d at 298 n.6. Although in HUD's view the Fifth Circuit persuasively distinguished the Seventh Circuit's holding in *Doe*, Continued

where no state law is impaired, McCarran-Ferguson will not bar a discriminatory effects claim against an insurer.

Past cases demonstrate also that discriminatory effects claims brought under the Fair Housing Act against insurers survive McCarran-Ferguson defenses even when an insurer points to a specific state law and alleges that it is impaired. Although the commenters provided examples of cases in which state laws were found to be impaired by a particular discriminatory effects challenge, other cases provide examples of state laws that were not. For instance, in *Lumpkin* v. *Farmers Group*, the court rejected a McCarran-Ferguson defense to a disparate impact challenge to credit scoring in insurance pricing, holding that disparate impact liability in that context did not impair the state's law mandating that ''insurance rates cannot be 'unfairly discriminatory.' ''[51] In so ruling, the court held it erroneous to read a state law prohibiting ''unfairly discriminatory'' rates ''too broadly'' and rejected the insurer's argument that such state laws require that practices with an unjustified discriminatory effect must be permitted ''as long as the rates are actuarially sound.''[52] The court then cited other provision of the state's insurance code specifically dealing with credit scoring, concluding that they too were not impaired.[53]

McCarran-Ferguson requires a fact-intensive inquiry that will vary state by state and claim by claim. Thus, even those cases in which impairment was found support the case-by-case approach herein adopted by HUD because, in such cases, the finding of impairment was made only after considering the particularities of the challenged practices and the state law at hand. In *Saunders* v. *Farmers Insurance Exchange*, for example, prior to ruling that McCarran-Ferguson barred a discriminatory effects claim under the Act,[54] the Eighth Circuit first remanded the case for further inquiry into several unknowns about the facts and Missouri law.[55]

The many ways in which one state's insurance laws can differ from another's, as well as the ways in which a single state's insurance laws can change over time, mean that even an exemption for specific insurance practices would be overbroad and quickly outdated. For example, variations in state insurance laws have resulted in discriminatory effects challenges to similar insurance practices surviving a McCarran-Ferguson defense in regard to some state laws but not others.[56] Past cases also demonstrate that the insurance laws of each state can change over time in significant ways,[57] and state insurance regulators respond to new practices as they become common and their effects become clear.[58] Given the variation in state insurance laws across more than fifty jurisdictions and over time, HUD declines to fashion a one-size-fits-all exemption that would inevitably insulate insurers engaged in otherwise unlawful discriminatory practices from Fair Housing Act liability.

A one-size-fits-all exemption is also inappropriate in light of the fact that insurance practices are not governed solely by ''hermetically sealed'' state insurance codes,[59] but are also governed by a range of other state laws, including state fair housing laws. Many state fair housing laws track the Act's applicability to insurance and provision of effects liability, indicating that those states do not consider disparate impact liability to conflict with the nature of insurance. Categorical exemptions or safe harbors of the types requested by the commenters would deprive all states of federal support in addressing discriminatory insurance practices— even those states that welcome or depend on such support. This outcome would be at odds with the purpose of McCarran-Ferguson to support the autonomy and sovereignty of each individual state in the field of insurance.[60] Connecticut's Discriminatory Housing Practices Act, for example, ''provides similar (albeit broader) protection against housing discrimination as the [Fair Housing Act], which is strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary with Connecticut's overall regulatory scheme.''[61] Similarly, a state court found that ''the disparate-impact approach does not conflict with Ohio Insurance law'' and thus allowed a disparate impact claim against an insurer to proceed under the state's fair housing law.[62] In another case where the court rejected a McCarran-Ferguson defense to a discriminatory effects claim against an insurer, the court explained that it was ''not persuaded that California law would allow [the challenged] practice'' and therefore ''the Fair Housing Act complements California law in this regard.''[63] Furthermore, the allocation of authority to enforce a state's protections against discrimination in insurance can impact whether McCarran-Ferguson is a viable defense to a discriminatory effects claim in a given state.[64] The case-by-case approach thus affirms state autonomy

---

the case-by-case approach appropriately accommodates any variations among the circuits that may exist, now or in the future, as to how McCarran-Ferguson should be applied. This includes the Second Circuit's skepticism over whether McCarran-Ferguson applies at all to ''subsequently enacted civil rights legislation.'' *Viens* v. *Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 572 (D. Conn. 2015) (quoting *Spirt* v. *Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1065 (2d Cir. 1982)).

[51] *Lumpkin* v. *Farmers Grp.* (*Lumpkin II*), No. 05–2868 Ma/V, 2007 U.S. Dist. LEXIS 98949, at *19 (W.D. Tenn. July 6, 2007).

[52] *Id.*

[53] *Id.* at *19–20.

[54] *Saunders* v. *Farmers Ins. Exch.* (*Saunders II*), 537 F.3d 961 (8th Cir. 2008).

[55] *Saunders* v. *Farmers Ins. Exch.* (*Saunders I*), 440 F.3d 940 (8th Cir. 2006). These variables included whether Missouri insurance law provided a private right of action to challenge the conduct at issue, and whether determinations by the state insurance agency were subject to judicial review. The court explained that ''the mere fact of overlapping complementary remedies under federal and state law does not constitute impairment for McCarran-Ferguson purposes.'' *Id.* at 945.

[56] For example, in cases challenging the discriminatory effect of insurers' reliance on credit scores, the McCarran-Ferguson defense has failed in some states but succeeded in others. Compare *Dehoyos*, 345 F.3d 290 (McCarran-Ferguson defense fails) *and Lumpkin II*, 2007 U.S. Dist. LEXIS 98949 (same) *with Saunders II*, 537 F.3d 961 (McCarran-Ferguson defense succeeds) *and McKenzie* v. *S. Farm Bureau Cas. Ins. Co.*, No. 3:06CV013–B–A, 2007 U.S. Dist. LEXIS 49133 (N.D. Miss. July 5, 2007) (same). *See also PCIAA*, 66 F. Supp. 3d at 1039 (''Variations among state regulatory regimes . . . provide an additional variable that may complicate any hypothetical McCarran-Ferguson analysis.'').

[57] Compare *Ojo* v. *Farmers Grp., Inc.*, 356 SW.3d 421 (Tex. 2011) (recognizing a McCarran-Ferguson defense to a credit scoring disparate impact claim based on the state legislature ''expressly authoriz[ing] the use of credit scoring in setting insurance rates in 2003'') *with Dehoyos*, 345 F.3d 290 (rejecting a McCarran-Ferguson defense to the same type of claim based on Texas law in effect before 2003).

[58] *See, e.g.,* Nat'l Ass'n of Ins. Comm'rs, *Price Optimization White Paper* (Nov. 19, 2015) http://www.naic.org/documents/committees_c_catf_related_price_optimization_white_paper.pdf [hereinafter *NAIC White Paper*] (discussing the responses of state regulators to the rising increase in use of price optimization practices by insurance providers).

[59] *Humana*, 525 U.S. at 312.

[60] *See* 15 U.S.C. 1011 (explaining the purpose of McCarran-Ferguson as ''the continued regulation . . . by the several States of the business of insurance is in the public interest'').

[61] *Viens*, 113 F. Supp. 3d at 573 n.20 (finding that McCarran-Ferguson does not bar an FHA disparate impact claim against an insurer related to a property located in Connecticut).

[62] *Toledo*, 94 Ohio Misc. 2d at 157.

[63] *Jones* v. *Travelers Cas. Ins. Co. of Am.*, Tr. of Proceedings Before the Honorable Lucy H. Koh U.S. District Judge, No. C–13–02390 LHK (N.D. Cal. May 7, 2015), ECF No. 269–1.

[64] *Toledo*, 94 Ohio Misc. 2d at 157 (recognizing discriminatory effects liability in homeowners insurance under state law in part because the Superintendent of Insurance lacks ''primary jurisdiction'' over such claims).

and furthers the Act's broad remedial goals by ensuring that HUD is not hindered in fulfilling its statutory charge to support and encourage state efforts to protect fair housing rights.[65]

The commenters' concerns about the incompatibility between HUD's Rule and the fundamental nature of insurance do not warrant the requested exemptions. Although the commenters assert that a broad exemption for *all* insurance practices or *all* underwriting decisions is necessary to preserve "sound actuarial underwriting" and the "risk-based insurance 'unfair discrimination' standard," HUD declines to create a broad exemption of that sort because doing so would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations. Insurers regularly engage in practices, such as marketing and claims processing and payment, that do not involve risk-based decision making and to which the Act applies in equal force.[66] In addition, a discriminatory effects claim also can challenge an insurer's underwriting policies as "*not* purely risk-based" without infringing on the insurer's "right to evaluate homeowners insurance risks fairly and objectively." [67] Even practices such as ratemaking that are largely actuarially-based can incorporate an element of non-actuarially-based subjective judgment or discretion under state law. Indeed, many of the state statutes referenced by commenters mandating that rates be reasonable, not excessive, inadequate, or unfairly discriminatory permit insurers, via the very same section of the insurance code, to rely on "judgment factors" in ratemaking.[68] The example of price optimization practices,[69] which a minority of states have started regulating, illustrates how non-actuarial factors, such as price elasticity of market demand,[70] can impact insurance pricing in a manner similar to how such considerations affect pricing of products in non-actuarial industries.[71]

HUD likewise declines to craft a safe harbor for any risk-based factor or for the specific "long-recognized" factors suggested by one commenter because it would be arbitrary and overbroad. Creating a safe harbor for the use of any factor that an insurer could prove is in fact risk-based would be overbroad because it would foreclose claims where the plaintiff could prove the existence of a less discriminatory alternative, such as an alternative risk-based practice. Moreover, if HUD were to provide a safe harbor for the use of any factor that an insurer could prove is purely risk-based, entitlement to the safe harbor would inevitably necessitate a determination of whether the use of the factor is, in fact, risk-based. As stated above, if an insurance practice is provably risk-based, and no less discriminatory alternative exists, the insurer will have a legally sufficient justification under the Rule as is. The arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification. Thus, an exemption for all provably risk-based factors would offer little added value for insurers not already provided by the Rule itself while foreclosing potentially meritorious claims in contravention of the Act's broad remedial goals and HUD's obligation to affirmatively further fair housing.

Selecting a few factors for exemption, such as those suggested by the commenter, based on bare assertions about their actuarial relevance, without data and without a full survey of all factors utilized by the homeowners insurance industry, would also be arbitrary. Even if such data were available and a full survey performed, safe harbors for specific factors would still be overbroad because the actuarial relevance of a given factor can vary by context.[72] Also, while use of a particular risk factor may be generally correlated with probability of loss, the ways in which an insurer uses that factor may not be. Furthermore, the actuarial relevance of any given factor may change over time as societal behaviors evolve, new technologies develop, and analytical capabilities improve.

In light of the long, documented history of discrimination in the homeowners' insurance industry, including the use of "risk factors" by insurers and regulators that were subsequently banned as discriminatory, as well as the fact-specific nature of McCarran-Ferguson analysis and the non-actuarial or hybrid nature of many insurance practices, HUD considers it inappropriate to craft any exemptions or safe harbors for insurance practices. HUD's longstanding case-by-case approach can adequately address any McCarran-Ferguson concerns and better serves the Act's broad remedial purpose and HUD's statutory obligation to affirmatively further fair housing, including by supporting fair housing efforts undertaken by states.[73]

*Issue:* One commenter requested that HUD "exempt insurance pricing from the discriminatory effects standards." The commenter argued that pricing is not covered by the Act because the Act only covers insurance practices that "make[ ] homeowners insurance unavailable" and pricing does not do so. The commenter also asserted that pricing is "subject to the filed rate doctrine" and should therefore be exempted because the filed rate doctrine precludes "private claims for damages based on challenges to filed rates."

*HUD Response:* HUD disagrees with the commenter's characterization of the Act as only covering insurance practices that make insurance unavailable, as well as with the commenter's premise that pricing does not do so. HUD also declines to craft an exemption for insurance pricing based on the filed rate doctrine because HUD does not anticipate that the filed rate doctrine will bar discriminatory effects claims involving insurance pricing. In light of the broad remedial goals of the Act and HUD's obligation to affirmatively further fair housing, HUD continues to prefer

---

[65] *See, e.g.*, 42 U.S.C. 3610(f); 24 CFR pt. 115 (HUD's Fair Housing Assistance Program); 42 U.S.C. 3608(d); 80 FR 42272 (July 16, 2015) (HUD's rule on Affirmatively Furthering Fair Housing).

[66] *See, e.g., Franklin* v. *Allstate Corp.*, No. C–06–1909 MMC, 2007 U.S. Dist. LEXIS 51333 (N.D. Cal. July 3, 2007) (applying the Act to claims processing); *Burrell* v. *State Farm & Cas. Co.*, 226 F. Supp. 2d 427 (S.D.N.Y. 2002) (same).

[67] *Nat'l Fair Hous. Alliance* v. *Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 60 (D.D.C. 2002).

[68] *See e.g.*, Ga. Code Ann. 33–9–4; Mont. Code Ann. 33–16–201; *see also* NAIC White Paper, *supra* note 58, at 1 ¶ 5 ("Making adjustments to actuarially indicated rates is not a new concept; it has often been described as 'judgment.' ").

[69] The term "price optimization" can refer to "the process of maximizing or minimizing a business metric using sophisticated tools and models to quantify business considerations," such as "marketing goals, profitability and policyholder retention." NAIC White Paper, *supra* note 58, at 4 ¶ 14(a).

[70] The term "price elasticity of demand" refers to "the rate of response of quantity demanded due to a price change. Price elasticity is used to see how sensitive the demand for a good is to a price change." *Id.* at 4 ¶ 14(f) (internal quotations omitted).

[71] *Id.* at 9 ¶ 30 ("Price optimization has been used for years in other industries, including retail and travel. However, the use of model-driven price optimization in the U.S. insurance industry is relatively new.").

[72] For example, in some high-crime neighborhoods the higher-than-average risk of loss from theft could be offset by a lower-than-average risk of other losses, such as those caused by weather. Therefore, the legitimacy of declining to issue insurance policies in all locations with high crime rates would depend on other features of those locations.

[73] *Cf. CROSSRDS* v. *MSP Crossroads Apts., LLC*, No. 16–233 ADM/KMM, 2016 U.S. Dist. LEXIS 86965 at *32 n.6 (D. Minn. July 5, 2016) (declining to adopt a per se rule that a certain category of disparate impact claims could not be brought in part because "HUD has indicated a preference for case-by-case review of practices alleged to cause a disparate impact").

case-by-case adjudication over the requested exemption.

In addition to Section 804(a),[74] which prohibits discrimination that "make[s] unavailable" a dwelling, there are several other provisions of the Act that can prohibit discriminatory insurance practices, including pricing.[75] One of those is Section 805(a),[76] which prohibits discrimination in the "terms or conditions" of "residential real estate-related transactions." Another is Section 804(b),[77] which prohibits discrimination in the "provision of services . . . in connection" with a dwelling. Indeed, HUD's fair housing regulations since 1989 have specifically stated that the Act prohibits "[r]efusing to provide . . . property or hazard insurance for dwellings *or providing such . . . insurance differently*" because of a protected characteristic.[78] Courts have applied the Act to insurance pricing,[79] as well as to other practices such as marketing and claims processing,[80] irrespective of whether the discriminatory conduct occurred in conjunction with or subsequent to the acquisition of a dwelling.

HUD is not aware of any case, and no commenter cited one, in which a court has applied the filed rate doctrine to defeat any sort of claim under the Act, although several courts have rejected such attempts.[81] "The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable."[82] The doctrine primarily serves two purposes: First, preventing litigants from securing more favorable rates than their non-litigant competitors, and second, preserving for agencies rather than courts the role of ratemaking.[83]

The fit between the filed rate doctrine and discriminatory effects claims is attenuated, at best, because discriminatory effects claims "do not challenge the reasonableness of the insurance rates" but rather their discriminatory effects.[84] To the extent there is any conflict between the directives of the federal Fair Housing Act and those of state ratemaking regulations, "the Supremacy Clause tips any legislative competition in favor of the federal antidiscrimination statutes."[85] Unlike filed rate doctrine cases involving a conflict between *federal* ratemaking and a federal statute, applying the filed rate doctrine to prioritize *state* ratemaking over a federal statute "would seem to stand the Supremacy Clause on its head."[86] Moreover, the filed rate doctrine "does not preclude injunctive relief or prohibit the Government from seeking civil or criminal redress,"[87] which are types of relief often obtained for violations of the Act.[88]

Because "the law on the filed rate doctrine is extremely creaky,"[89] abundant variations exist among the courts as to how the doctrine applies. Even where it does apply, a filed rate doctrine defense "must be examined specifically in the context of the laws and regulatory structures at issue."[90] This would be a "fact-intensive issue"[91] that would include consideration of the particular state's ratemaking structures.[92] The case-by-case approach best accommodates these variations.

For all the foregoing reasons, HUD does not agree that the filed rate doctrine, nor the commenter's assertions about the Act's scope, warrant an exemption for insurance pricing.

*Issue:* One commenter sought an exemption from discriminatory effects liability for FAIR plans because "the operation of FAIR plans facilitates private conduct that otherwise would not have occurred."

*HUD Response:* FAIR plans were first enacted by many states in response to the federal Urban Property Protection and Reinsurance Act of 1968,[93] which was passed by Congress to address the problem of inadequate property insurance availability in the nation's urban areas due to insurance redlining. FAIR plans operate as insurance pools that sell property insurance to

---

[74] 42 U.S.C. 3604(a).

[75] Depending on the circumstances, discriminatory insurance practices can violate 42 U.S.C. 3604(a), (b), (c), (f)(1), (f)(2), 3605, and 3617. *See, e.g., Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d at 1360 (holding that section 3604 of the Act prohibits discriminatory insurance underwriting); *Nevels,* 359 F. Supp. 2d at 1120–21 (recognizing that sections 3604(f)(1), 3604(f)(2), 3605 and 3617 of the Act cover insurance practices); *Nat'l Fair Hous. Alliance,* 208 F. Supp. 2d at 55–58 (holding that sections 3604(a), 3604(b), and 3605 of the Act prohibit discriminatory insurance underwriting practices); *Owens* v. *Nationwide Mut. Ins. Co.,* No. 3:03–CV–1184–H, 2005 U.S. Dist. LEXIS 15701, at *16–17 (N.D. Tex. Aug. 2, 2005) (holding that section 3604(b) of the Act prohibits discriminatory insurance practices); *Francia* v. *Mount Vernon Fire Ins. Co.,* No. CV084032039S, 2012 Conn. Super. LEXIS 665 (Conn. Super. Ct. Mar. 6, 2012) (relying on section 3604(c) to interpret an analogous state law as prohibiting a discriminatory statement in an insurance quote).

[76] 42 U.S.C. 3605(a).

[77] 42 U.S.C. 3604(b).

[78] 24 CFR 100.70(d)(4) (emphasis added). As used in this regulation, the phrase "property or hazard insurance for dwellings" includes insurance purchased by an owner, renter, or anyone else seeking to insure a dwelling. *See* 42 U.S.C. 3602(b) (defining "dwelling" without reference to whether the residence is owner- or renter-occupied).

[79] *See, e.g., NAACP,* 978 F.2d at 301 ("Section 3604 of the Fair Housing Act applies to discriminatory denials of insurance, and *discriminatory pricing,* that effectively preclude ownership of housing because of the race of the applicant.") (emphasis added); *Dehoyos,* 345 F.3d at 293 (holding that a claim alleging discriminatory insurance pricing was not barred by McCarran-Ferguson).

[80] *See* sources cited *supra* note 66; *see also Owens,* 2005 U.S. Dist. LEXIS 15701, at *17 (Insurance practices are covered by the Act "whether the insurance is sought in connection with the maintenance of a previously purchased home or with an application to purchase a home."); *Lindsey* v. *Allstate Ins. Co.,* 34 F. Supp. 2d 636, 643 (W.D. Tenn. 1999) ("It would seem odd to construe a statute purporting to promote fair housing as prohibiting discrimination in providing property insurance to those seeking a home, but allowing that same discrimination so long as it takes place in the context of renewing those very same insurance policies.").

[81] *See Saunders I,* 440 F.3d at 944–46 ("The district court erred in invoking the judicially created filed rate doctrine to restrict Congress's broad grant of standing to seek judicial redress for race discrimination."); *Dehoyos,* 345 F.3d at 297 n.5 (finding "unpersuasive" the argument that the filed rate doctrine barred a Fair Housing Act disparate impact claim); *Lumpkin* v. *Farmers Grp., Inc.* (*Lumpkin I*), No. 05–2868 Ma/V, 2007 U.S. Dist. LEXIS 98994, at *20–22 (W.D. Tenn. Apr. 26, 2007) (ruling that "the filed rate doctrine does not apply" to a Fair Housing Act disparate impact claim).

[82] *Wegoland Ltd.* v. *NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir. 1994).

[83] *Id.*

[84] *Lumpkin I,* 2007 U.S. Dist. LEXIS 98994, at *21; *see also Dehoyos,* 345 F.3d at 297 n.5 ("[T]he application of anti-discrimination laws cannot be reasonably construed to supplant the specific insurance rate controls of [states].").

[85] *Saunders I,* 440 F.3d at 944.

[86] *Perryman* v. *Litton Loan Servicing, LP,* No. 14–cv–02261–JST, 2014 U.S. Dist. LEXIS 140479, at *20–22 (N.D. Cal. Oct. 1, 2014).

[87] *In re Title Ins. Antitrust Cases,* 702 F. Supp. 2d 840, 849 (N.D. Ohio 2010); *see also Marcus* v. *AT&T Corp.,* 138 F.3d 46, 62 (2d Cir. 1998).

[88] *See* 42 U.S.C. 3612(g)(3), 3613(c), 3614(d).

[89] *Town of Norwood* v. *New England Power Co.,* 202 F.3d 408, 420 (1st Cir. 2000). The filed rate doctrine has also been described as a "weak and forcefully criticized doctrine." *Cost Mgmt. Servs.* v. *Wash. Natural Gas Co.,* 99 F.3d 937, 946 (9th Cir. 1996).

[90] *Munoz* v. *PHH Corp.,* 659 F. Supp. 2d 1094, 1099 (E.D. Cal. 2009).

[91] *Saunders I,* 440 F.3d at 945.

[92] For example, the Seventh Circuit has questioned the applicability of the filed rate doctrine to any claims involving property insurance in Illinois because "[a]lthough [a property insurance provider] is required to file its insurance rates with the Illinois Department of Insurance, it is not at all clear that the Department has the authority to approve or disapprove property-insurance rates." *Cohen* v. *Am. Sec. Ins. Co.,* 735 F.3d 601, 607 (7th Cir. 2013). States vary considerably in the degree to which they regulate rate-setting, with six different types of rate regulatory systems in use across the country: Prior approval; file and use; use and file; flex rating; modified prior approval; and no file. *See* NAIC, 2 Compendium of State Laws on Insurance Topics, Health/Life/Property/Casualty II–PA–10–21 (2011). As the classifications indicate, these rate regulatory systems vary with respect to whether or when an insurance company is required to file its rates with a state insurance agency before those rates can be used.

[93] Public Law 90–448, 82 Stat. 555 (1968).

individuals who are unable to purchase insurance in the voluntary market.

HUD declines to categorically exempt FAIR plans from discriminatory effects liability under the Act. To do so, without any consideration of the particular insurance practice or state requirements at issue, would be inconsistent with the broad remedial purpose of the Act and HUD's obligation to affirmatively further fair housing. Like state regulation of voluntary market insurance practices, state laws governing the provision and pricing of FAIR plans vary across jurisdictions. Variations in state regulation of FAIR plans include the types of coverage provided by such plans,[94] the amount of coverage allowed under such plans,[95] and the conditions under which an individual or property will qualify for such plans.[96] Additionally, even within a given state, FAIR plan regulations are subject to revision over time.

Given such variation and changeability, exempting all FAIR plans from application of the discriminatory effects standard would be overbroad and would deprive individuals of the protections afforded by the Fair Housing Act. Indeed, one state court has held "the disparate impact approach does not interfere with the Ohio FAIR Plan."[97] In light of this demonstrated compatibility, and because insurers retain some discretion in the operation of FAIR plans,[98] HUD determines that case-by-case adjudication is preferable to the requested exemption of FAIR plans.

---

[94] Compare, e.g., Conn. Agencies Regs. 38a–328–3(c) (defining "basic insurance" for purposes of the Connecticut FAIR plan to include liability coverage for any dwelling of up to three families) with Mass. Gen. Laws ch. 175c, § 1 (defining "basic property insurance" for purposes of the Massachusetts FAIR plan to include liability coverage for only non-owner occupied dwellings of up to four families) and 98–08 Wash. Reg. 4 (April 15, 1998) (excluding liability coverage from the definition of "essential property insurance" for purposes of the Washington FAIR plan).

[95] Compare, e.g., Mo. Rev. Stat. 379.825 (limiting maximum insurance coverage for a dwelling under the Missouri FAIR plan to $200,000) with 98–08 Wash. Reg. 5 (April 15, 1998) (limiting maximum insurance coverage for a dwelling under the Washington FAIR plan to $1.5 million).

[96] Compare, e.g., Ohio Rev. Cod. Ann. 3929.44(D) (requiring applicant to certify that two insurance companies declined to provide coverage for purposes of FAIR plan eligibility) with 215 Ill. Comp. Stat. 5/524(1) (restricting FAIR plan eligibility to applicants who have been declined insurance coverage by three companies).

[97] Toledo, 94 Ohio Misc. 2d at 157.

[98] See, e.g., Cal. Ins. Code 10094 (leaving discretion to governing committee of participating insurers to establish "reasonable underwriting standards" for determining whether a property for which FAIR plan coverage is sought is insurable); 215 Ill. Comp. Stat. 5/524(1) (same); Ohio Rev. Code. Ann. 3929.43(C) (same).

Dated: September 23, 2016.

**Gustavo Velasquez,**
*Assistant Secretary for Fair Housing and Equal Opportunity.*
[FR Doc. 2016–23858 Filed 10–4–16; 8:45 am]
**BILLING CODE 4210–67–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 52**

[EPA–R04–OAR–2016–0489; FRL–9953–63–Region 4]

## Air Plan Approval; Georgia: Volatile Organic Compounds

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve portions of two revisions to the Georgia State Implementation Plan submitted by the Georgia Department of Environmental Protection on July 25, 2014, and November 1, 2015. These revisions modify the definition of "volatile organic compounds" (VOC). Specifically, these revisions add two compounds to the list of those excluded from the VOC definition on the basis that these compounds make a negligible contribution to tropospheric ozone formation. This action is being taken pursuant to the Clean Air Act.

**DATES:** Written comments must be received on or before November 4, 2016.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R04–OAR–2016–0489 at *http://www.regulations.gov*. Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov*. EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *http://www2.epa.gov/dockets/commenting-epa-dockets*.

**FOR FURTHER INFORMATION CONTACT:** Sean Lakeman, Air Regulatory Management Section, Air Planning and Implementation Branch, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW., Atlanta, Georgia 30303–8960. Mr. Lakeman can be reached by phone at (404) 562–9043 or via electronic mail at *lakeman.sean@epa.gov*.

**SUPPLEMENTARY INFORMATION:** In the Final Rules Section of this **Federal Register**, EPA is approving the State's implementation plan revision as a direct final rule without prior proposal because the Agency views this as a noncontroversial submittal and anticipates no adverse comments. A detailed rationale for the approval is set forth in the direct final rule. If no adverse comments are received in response to this rule, no further activity is contemplated. If EPA receives adverse comments, the direct final rule will be withdrawn and all public comments received will be addressed in a subsequent final rule based on this proposed rule. EPA will not institute a second comment period on this document. Any parties interested in commenting on this document should do so at this time.

Dated: September 23, 2016.

**V. Anne Heard,**
*Acting Regional Administrator, Region 4.*
[FR Doc. 2016–23971 Filed 10–4–16; 8:45 am]
**BILLING CODE 6560–50–P**

---

# DEPARTMENT OF THE INTERIOR

**Bureau of Land Management**

**43 CFR Part 8360**

[LLCO913000.L16300000.NU0000.16X]

## Notice of Proposed Supplementary Rules for Public Lands in Colorado

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Proposed supplementary rules.

**SUMMARY:** The Bureau of Land Management (BLM) is proposing supplementary rules to protect natural resources and provide for public health and safety. The proposed supplementary rules would apply to all public lands and BLM facilities in Colorado.

**DATES:** You should submit your comments by December 5, 2016.

**ADDRESSES:** You may submit comments by the following methods: Mail or hand