information on those standards, the means by which compliance with the standards is achieved, the impact of the standards on the cost of equipment, including the maintenance costs, and the effectiveness of the standards at achieving their intended purpose;

• Any available information on the distribution of CO emissions of natural or LP gas furnaces in use, or in other words, the number of gas furnaces that are not in compliance with the 400 ppm air-free standard at any given time and the degree to which they might be producing CO in excess of that standard. We also request information on the causes of equipment producing excessive CO and their frequency of occurrence, such as improper installation, changes in installation, poor maintenance of the equipment, and so forth; and

• Any available information on the relationship between excessive CO production and fuel consumption and complete/incomplete combustion in residential furnaces and boilers that are producing excessive CO emissions may also be consuming excessive fuel or not burning fuel completely.

• Any available information on methods of alerting consumers to the need to replace sensors or combination controls that have stopped working on their furnaces or boilers (such as an alphanumeric LED trouble or error code, a flashing light, or short-cycling of the appliance).

In addition, the Commission invites interested parties to submit any existing standards, or portions of them, for consideration as a consumer product safety standard. The Commission also invites interested persons to submit a statement of intention to modify or develop a voluntary consumer product safety standard addressing the risk of injury associated with CO poisoning from residential gas furnaces and boilers, including a description of the plan to develop or modify such a standard.

Please submit comments in accordance with the instructions in the **ADDRESSES** section at the beginning of this ANPR.

Alberta E. Mills,

*Secretary, U.S. Consumer Product Safety Commission.*

[FR Doc. 2019–17512 Filed 8–16–19; 8:45 am]

**BILLING CODE 6355–01–P**

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

**[Docket No. FR–6111–P–02]**

**RIN 2529–AA98**

## HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Proposed rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin. HUD has long interpreted the Act to create liability for practices with an unjustified discriminatory effect, even if those practices were not motivated by discriminatory intent. This rule proposes to amend HUD's interpretation of the Fair Housing Act's disparate impact standard to better reflect the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.,* and to provide clarification regarding the application of the standard to State laws governing the business of insurance. This rule follows a June 20, 2018, advance notice of proposed rulemaking, in which HUD solicited comments on the disparate impact standard set forth in HUD's 2013 final rule, including the disparate impact rule's burden-shifting approach, definitions, and causation standard, and whether it required amendment to align with the decision of the Supreme Court in *Inclusive Communities Project, Inc.*

**DATES:** *Comment Due Date:* October 18, 2019.

**ADDRESSES:** Interested persons are invited to submit comments to the Office of the General Counsel, Rules Docket Clerk, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0001. Communications should refer to the above docket number and title and should contain the information specified in the "Request for Comments" section. There are two methods for submitting public comments.

1. *Submission of Comments by Mail.* Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0500. Due to security measures at all Federal agencies, however, submission of comments by mail often results in delayed delivery. To ensure timely receipt of comments, HUD recommends that comments submitted by mail be submitted at least two weeks in advance of the public comment deadline.

2. *Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *https://www.regulations.gov/*. HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make comments immediately available to the public. Comments submitted electronically through the *https://www.regulations.gov/* website can be viewed by other commenters and interested members of the public. Commenters should follow instructions provided on that site to submit comments electronically.

*Note:* To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the document.

*No Facsimile Comments.* Facsimile (fax) comments are not acceptable.

*Public Inspection of Comments.* All comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m., weekdays, at the above address. Due to security measures at the HUD Headquarters building, an advance appointment to review the public comments must be scheduled by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Copies of all comments submitted are available for inspection and downloading at *https://www.regulations.gov/*.

**FOR FURTHER INFORMATION CONTACT:** David H. Enzel, Deputy Assistant Secretary for Enforcement Programs, Office of Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 7th Street SW, Room 5204, Washington, DC 20410, telephone number 202–402–5557 (this is not a toll-free number). Individuals with hearing or speech impediments may access this number via TTY by calling the Federal Relay during working hours at 800–877–8339 (this is a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] Congress gave the authority and responsibility for administering the Fair Housing Act and the power to make rules to carry out the Act to HUD.[2] While the Supreme Court has held that the language of the Fair Housing Act prohibiting discrimination in housing is "broad and inclusive,"[3] it has also cautioned that the language should not be construed to force defendants to "resort to the use of racial quotas"[4] or require courts to "second-guess" reasonable choices.[5] HUD has implemented prohibitions on discriminatory conduct under the Fair Housing Act at 24 CFR part 100, most recently to include the disparate impact standard in 2013. However, as the Supreme Court cautioned, there must be adequate safeguards around application of disparate impact analysis to avoid setting "our Nation back in its quest to reduce the salience of race in our social and economic system."[6]

On February 15, 2013, pursuant to its authority to administer the Fair Housing Act, HUD published a final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard"[7] (final disparate impact rule). The final disparate impact rule codified HUD's interpretation that the Fair Housing Act creates liability for practices with an unjustified discriminatory effect and responded to public comments on the proposed rule.[8] Relying in part on case law under the Fair Housing Act and title VII of the Civil Rights Act of 1964 (prohibiting employment discrimination) and HUD's longstanding view that discriminatory effects liability is available under the Fair Housing Act, HUD's final disparate impact rule established a burden-shifting framework for analyzing claims of disparate impact under the Fair Housing Act.[9] Specifically, the final rule provides that liability may be established under the Fair Housing Act when a challenged practice actually or predictably results in a disparate impact on a protected class of persons, even if the practice was not motivated by a discriminatory intent. The rule states that a practice that has a discriminatory effect may still be lawful if supported by a legally sufficient justification. Such a justification exists under the rule where the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant and those interests could not be served by another practice that has a less discriminatory effect. The rule also requires that the legally sufficient justification be supported by evidence and may not be hypothetical or speculative.

An unjustified discriminatory effect is established according to the following burdens of proof: (1) The charging party or the plaintiff has the burden of proving that a challenged practice caused, or predictably will cause, a discriminatory effect; (2) the respondent or defendant then has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant; and (3) if the respondent or defendant satisfies the burden of proof, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect. Lastly, the rule provides that a demonstration that a practice is supported by a legally sufficient justification may not be used as a defense against a claim of intentional discrimination.

In 2016, HUD published a **Federal Register** document supplementing HUD's previous response to insurance industry comments HUD provided in its final disparate impact rule.[10] The comments HUD received were on its 2011 Fair Housing Act's discriminatory effects standard proposed rule. After reconsideration of the insurance industry comments, in accordance with the court's decision in *Property Casualty Insurers Association of America (PCIAA)* v. *Donovan,*[11] HUD explained that the agency "continues to believe that case-by-case adjudication is preferable to creating the requested exemptions or safe harbors for insurance practices." HUD noted in support of its case-by-case adjudication preference that, given the diversity of State laws and potential discriminatory effect claims, "it is practically impossible for HUD to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application."[12] This proposed rule uses the term "Disparate Impact Rule" to refer collectively to the final disparate impact rule and 2016 supplement.

In 2015, in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.,*[13] (*Inclusive Communities*), the Supreme Court held that disparate impact claims are cognizable under the Fair Housing Act. The Court's opinion referenced HUD's Disparate Impact Rule,[14] but the Court did not rely on it for its holding. Rather, the Court undertook its own analysis of the Fair Housing Act and discussed the standards for, and constitutional questions and necessary limitations regarding, disparate impact claims.[15]

In discussing disparate impact liability, the Court noted that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system."[16]

The Court placed special emphasis on the importance of the plaintiff's prima facie burden, warning that, "[w]ithout adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas, and serious constitutional questions then could arise."[17] The Court held that, to allege a prima facie case, a plaintiff must specify a policy (or policies) as the cause of the disparity, to meet a "robust causality" requirement that "protects defendants from being held liable for

---

[1] This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap."

[2] *See* 42 U.S.C. 3608(a) and 42 U.S.C. 3614a.

[3] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972); *City of Edmonds* v. *Oxford House, Inc.,* 514 U.S. 725, 731 (1995).

[4] *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.,* 135 S. Ct. 2507, 2512 (2015).

[5] *Id.* at 2512 ("Here, the underlying dispute involves a novel theory of liability that may, on remand, be seen simply as an attempt to second-guess which of two reasonable approaches a housing authority should follow in allocating tax credits for low-income housing.").

[6] *Id.* at 2524.

[7] 78 FR 11460.

[8] *See* 24 CFR 100.5(b), 100.70(d)(5), 100.120(b), 100.130(b), and 100.500.

[9] *See* 24 CFR 100.500(c).

[10] *See* "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 FR 69012 (Oct. 5, 2016); 81 FR 69013.

[11] 66 F. Supp. 3d 1018 (N.D. Ill. 2014).

[12] *See* "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 FR 69012 (Oct. 5, 2016) for HUD's additional justification.

[13] 135 S. Ct. 2507 (2015).

[14] *See* 135 S. Ct. at 2514–2515, 2522.

[15] *See Id.* at 2519–2524.

[16] *Id.*

[17] *Id.* at 2523 (internal quotations removed).

racial disparities they did not create." [18] A one-time decision may not be a policy at all, and multiple factors leading to a decision may make it difficult to establish causation.[19]

The Court also prohibited disparate impact suits that would displace "valid governmental and private priorities[.]" [20] "Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" [21] or "to second-guess" between "two reasonable approaches[.]" [22] If, for instance, a private developer is prevented from investing in housing for low-income individuals, or a government is prevented from ensuring compliance with health and safety codes, the purpose of the Fair Housing Act would be undermined.[23] The policy identified, therefore, must be an "artificial, arbitrary, and unnecessary barrier" to fair housing.[24]

Finally, the Court urged courts to ensure that their remedial orders "concentrate on the elimination of the offending practice" and "eliminate racial disparities through race-neutral means." [25] "Remedial orders that impose racial targets or quotas might raise more difficult constitutional questions." [26]

Following the *Inclusive Communities* decision, on May 15, 2017, HUD published a **Federal Register** notice pursuant to Executive Orders 13771, "Reducing Regulation and Controlling Regulatory Costs," and 13777, "Enforcing the Regulatory Reform Agenda," inviting public comments to assist HUD in identifying existing regulations that may be outdated, ineffective, or excessively burdensome.[27] In response, HUD received numerous comments concerning the Disparate Impact Rule and *Inclusive Communities*. Some commenters wrote that the case supported HUD's rule as currently drafted while others felt HUD should revisit its rule considering the analysis provided in the case. Commenters in support of the rule noted that the *Inclusive Communities* case supported HUD's position that disparate impact claims are cognizable under the Fair Housing Act and that it did not require changes to HUD's framework, which standardized the "burden-shifting" approach used by HUD and 11 U.S. Courts of Appeals. Some commenters specifically thought the burden-shifting framework, the causality requirement, and the less discriminatory alternative step should be amended to better align with the case law. Some commenters also felt that HUD should revisit the application of disparate impact to the insurance industries. Additionally, in October 2017, the Secretary of the Treasury issued a report in response to Executive Order 13772, "Core Principles for Regulating the United States Finance System," issued on February 3, 2017.[28] The Treasury report identified Federal regulations, among other items, that promote or inhibit the U.S. financial system. The report explicitly recommended that HUD reconsider applications of the Disparate Impact Rule, especially in the context of the insurance industry.[29]

In light of *Inclusive Communities,* public comments submitted in response to HUD's May 15, 2017, **Federal Register** notice, and the recommendation from the Secretary of the Treasury, on June 20, 2018, HUD published in the **Federal Register** an advance notice of proposed rulemaking (ANPR) inviting comments on possible amendments to HUD's Disparate Impact Rule. HUD received 1,923 comments on the ANPR, and the comments have been considered during the drafting of this new rule. Some commenters wrote in support of disparate impact liability more broadly, citing the important part it has played in monitoring exclusionary housing practices for at least 30 years, while others described the disparate impact standard as inconsistent with the constitutional presumption against race-based decision-making. Similarly, some comments supported HUD's disparate impact rule and others opposed the rule and felt that HUD's rule undermined the Fair Housing Act. Other commenters felt that the rule was plainly redundant or unnecessary given existing case law.

Commenters that supported HUD's current rule approved of HUD's burden-shifting framework requiring the defendant to prove that the practice is necessary. In addition, those commenters generally supported the rule's language that provided that a plaintiff could prevail by proving that an alternative practice could be used that has a less discriminatory effect. Commenters also referenced the importance of the HUD rule when it comes to the use of eminent domain and redevelopment.[30] Some commenters stated that *Inclusive Communities* was consistent with HUD's rule and that the Supreme Court did not state that any changes to the HUD rule were necessary or that HUD's rule created new obligations. Additionally, some comments noted that post-*Inclusive Communities* courts simultaneously have relied upon both the rule and *Inclusive Communities* as authorities for analyzing disparate impact claims, demonstrating there is no fundamental conflict between the two. Commenters that opposed HUD's current disparate impact rule requested that HUD revise the rule to be more consistent with *Inclusive Communities.* Many of those commenters specifically cited to the inconsistent effects of HUD's standards, the low level of proof and production, the limited causality requirement, the impact on the use of statistical disparities, and the consequences of allowing plaintiffs to show any alternative practice.

Commenters also provided feedback on the use of disparate impact for enforcement and the economic burden of the standard. Commenters wrote that providers should not be liable for disparities they did not create or intend. There were requests from the real estate, credit, property casualty insurer, and other industries for exemptions from the rule for insurance, risk-based pricing, and underwriting. The commenters cited concern with the rule's impact on costs and shifts of burden onto renters and insurance consumers. The commenters also noted increased litigation risks for providers and the possibility that the availability of insurance products and credit could be reduced. The commenters supported their position by pointing to the fact that underwriting is unrelated to protected characteristics and that compliance with

---

[18] *Id.* at 2523.
[19] *Id.*
[20] *Id.* at 2524.
[21] *Id.*
[22] *Id.* at 2512 ("Here, the underlying dispute involves a novel theory of liability that may, on remand, be seen simply as an attempt to second-guess which of two reasonable approaches a housing authority should follow in allocating tax credits for low-income housing.").
[23] *Id.*
[24] *Id.* at 2522, 2524 (internal quotation marks and citation omitted) *Id.* at 2522 (quoting *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431, 91 S. Ct. 849 (1971)). *Id.* at 2522. *Id.* at 2522.
[25] *Id.* at 2525.
[26] *Id.*
[27] 82 FR 22344.

[28] *See* U.S. Department of the Treasury Report: "A Financial System That Creates Economic Opportunities, Asset Management and Insurance (Oct. 26, 2017), available at: *https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.*
[29] *See* U.S. Department of the Treasury Report: "A Financial System That Creates Economic Opportunities, Asset Management and Insurance" (Oct. 26, 2017), available at: *https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.*

[30] Citing *Mount Holly Gardens Citizens in Action* v. *Twp. of Mount Holly,* 658 F.3d 375 (3d Cir. 2011).

the rule distorts market/risk-based pricing.

Lastly, some commenters stated that the States are better equipped to regulate certain industries and that the existing rule conflicts with State laws and violates the McCarran-Ferguson Act.[31] In contrast, other commenters stated that other Federal statutes should be read to be consistent with Federal civil rights laws and that Congress has the power to make exceptions and create "safe harbors" to the Fair Housing Act (as it did previously by excepting certain specific tenant selection practices from disparate impact liability) but Federal administrative agencies cannot. Those commenters generally noted no safe harbor should be provided and that HUD's case-by-case analysis should be retained to ensure consistency with HUD's statutory responsibility to enforce the Fair Housing Act.

All public comments can be viewed at the *www.regulations.gov website,* under docket number HUD–2018–0047. (See *https://www.regulations.gov/docket?D=HUD-2018-0047*).

**II. This Proposed Rule**

In response to comments received on HUD's May 15, 2017, notice and June 20, 2018, ANPR, this rule proposes to replace HUD's current discriminatory effects standard at § 100.500 with a new standard and incorporate minor amendments to §§ 100.5, 100.7, 100.70, and 100.120. These amendments are intended to bring HUD's disparate impact rule into closer alignment with the analysis and guidance provided in *Inclusive Communities* as understood by HUD and to codify HUD's position that its rule is not intended to infringe upon any State law for the purpose of regulating the business of insurance. HUD intends these regulations as an update to HUD's existing framework for evaluating administrative actions alleging a claim of disparate impact and to provide guidance to members of the public seeking to comply with the Fair Housing Act or in bringing a claim for disparate impact that meets the prima facie requirements outlined in *Inclusive Communities.*

*§ 100.5   Scope*

This rule proposes to amend § 100.5 to clarify that the new § 100.500 includes available defenses and rebuttals to allegations of discriminatory effect. The proposed rule would also clarify, in accordance with the language in *Inclusive Communities* warning against the use of racial quotas,[32] that neither the discriminatory effect standard, nor any other item in HUD's part 100 regulations, requires or encourages the collection of data with respect to protected classes and that the absence of such collection will not result in any adverse inference against a party.

*§ 100.7   Liability for Discriminatory Housing Practices*

The proposed amendment to § 100.7 clarifies, consistent with the Supreme Court's decision in *Meyer* v. *Holley,* 537 U.S. 280 (2003), that there must be a principal-agent relationship under common law for there to be vicarious liability on the part of a person for a discriminatory housing policy or practice by that person's agent or employee. In addition, the proposed rule would add a new paragraph (c) to provide the scope of remedies available in administrative proceedings for discriminatory effect cases. New paragraph (c) states, to conform with the language of *Inclusive Communities,*[33] that the remedy should concentrate on eliminating or reforming the discriminatory practice and that, therefore, a remedy in administrative proceedings may include equitable remedies and, when proved, pecuniary damage, but clarifies, consistent with the Fair Housing Act, that punitive and exemplary damages are unavailable in administrative proceedings.[34]

HUD is specifically seeking feedback on the question of whether, and under what circumstances, punitive or exemplary damages may be appropriate in disparate impact litigation in Federal court.

*§ 100.70   Other Prohibited Sale And Rental Conduct*

Section 100.70 provides that it is unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying, or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood, or development. The section provides examples of such practices in paragraph (c). This rule proposes to amend the final example of a violation of the Fair Housing Act in paragraph (c)(5) to add that enactment or implementation of building codes, permitting rules, and requirements should also be considered as other prohibited sale and rental conduct that could be considered as restricting or denying housing opportunities or otherwise making unavailable or denying dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin. HUD is adding these additional types of examples for clarity in connection with the changes HUD is making in § 100.500.

*§ 100.120   Discrimination in the Making of Loans and in the Provision of Other Financial Assistance*

Section 100.120 provides that it shall be unlawful for any person or entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available loans or other financial assistance for a dwelling, or which is or is to be secured by a dwelling, because of race, color, religion, sex, handicap, familial status, or national origin. The section provides examples of such practices in paragraph (b). This rule proposes to amend the first example in paragraph (b)(1), which provides that providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin violates the Fair Housing Act, by amending "inaccurate or different from that provided others" to requiring the information be "materially inaccurate or materially different from that provided others" to clarify, in accordance with the guidance in *Inclusive Communities,*[35] that informational disparities that are inconsequential do not violate the Fair Housing Act. The proposed change would also add a clause to paragraph (b)(1) clarifying that the Fair Housing Act is not violated when a person or entity provides accurate responses to requests for information related to an individual's particular circumstances.

*§ 100.500   Discriminatory Effect Prohibited*

Section 100.500 continues to provide that liability under the Fair Housing Act may be established based on a specific practice's discriminatory effect on members of a protected class, even if the specific practice was not motivated by a discriminatory intent. HUD seeks to amend this regulation to provide additional guidance in light of *Inclusive Communities;* this proposed revision represents HUD's interpretation of

---

[31] 15 U.S.C. 1011–1015.

[32] 135 S. Ct. at 2512.
[33] *Id.* at 2524.
[34] 42 U.S.C. 3612(g)(3).

[35] 135 S. Ct. at 2524.

disparate impact law under the Fair Housing Act. Paragraph (a) would be slightly amended to reflect the removal of a definition for discriminatory effect and the changes to the burden-shifting framework. The previous definition simply reiterated the elements of a disparate impact claim, which HUD believes is now adequately defined in more detail in the later sections, thus, making the definition unnecessary. New paragraphs (b) through (d) would provide a new burden-shifting framework and new paragraph (e) would address the application of the section to the business of insurance.

New Burden-Shifting Framework

The proposed new burden-shifting framework provides, in paragraph (b), that a plaintiff's allegations that a specific, identifiable, policy or practice has a discriminatory effect must plead facts supporting five elements. HUD notes that since *Inclusive Communities* many parties have failed to identify a "specific, identifiable practice."[36] It is insufficient to identify a program as a whole without explaining how the program itself causes the disparate impact as opposed to a particular element of the program. Plaintiffs must identify the particular policy or practice that causes the disparate impact. Plaintiffs will likely not meet the standard, and HUD will not bring a disparate impact claim, alleging that a single event—such as a local government's zoning decision or a developer's decision to construct a new building in one location instead of another—is the cause of a disparate impact, unless the plaintiff can show that the single decision is the equivalent of a policy or practice.[37] In unusual cases, a plaintiff may still be able to succeed at identifying a one-time decision, if the plaintiff can establish that the one-time decision is in fact a policy or practice.[38]

The first proposed element would require a plaintiff to plead that the challenged policy or practice is *arbitrary, artificial, and unnecessary* to achieve a valid interest or legitimate objective. *Inclusive Communities* requires plaintiffs to allege facts at the pleading stage supporting a prima facie claim of disparate impact and requires courts to analyze these claims "with care" to ensure that "the specter of disparate-impact litigation" does not prevent parties "from achieving legitimate objectives."[39] In accordance with this standard, this proposed rule would require plaintiffs to allege facts plausibly showing that the challenged practice is arbitrary, artificial, and unnecessary. This requirement is supported by *Ellis* v. *City of Minneapolis,* which dismissed the plaintiffs' disparate impact claim against the city's housing code for failure to plead facts showing how the housing code was arbitrary, artificial, and unnecessary.[40] In *Ellis,* the challenged housing code was, on its face, intended to require sanitary housing, and the plaintiffs made no attempt to explain how the housing code was arbitrary, artificial, and unnecessary to advance this goal.[41] HUD recognizes that plaintiffs will not always know what legitimate objective the defendant will assert in response to the plaintiff's claim or how the policy advances that interest, and, in such cases, will not be able to plead specific facts showing why the policy or practice is arbitrary, artificial, and unnecessary. In such cases, a pleading plausibly alleging that a policy or practice advances no obvious legitimate objective would be sufficient to meet this pleading requirement. However, in cases where a policy or practice has a facially legitimate objective, the plaintiff must allege facts at the pleading stage sufficient to support a plausible allegation that the policy is arbitrary, artificial, and unnecessary.[42]

If a plaintiff adequately alleges facts to support the assertion that the practice or policy is arbitrary, artificial, and unnecessary, only then does the defendant have the burden to identify a valid interest or interests that the challenged policy or practice serves, which may then be rebutted by the plaintiff, as described below.[43]

The second proposed element would require a plaintiff to allege a *robust causal link* between the challenged policy or practice and a disparate impact on members of a protected class. Claims relying on statistical disparities must articulate how the statistical analysis used supports a claim of disparate impact by providing an appropriate comparison that shows that the policy is the actual cause of the disparity.[44]

The third proposed element would require a plaintiff to allege that the challenged policy or practice has an adverse effect *on members of a protected class.* This element would require a plaintiff to explain how the policy or practice identified has a harmful impact on members of a particular "race, color, religion, sex, familial status, or national origin."[45] Consistent with *Inclusive Communities,* it would be insufficient to allege only that the plaintiff is a member of a protected class and would be adversely affected or that members of a protected class are impacted as are all individuals. This element would require the plaintiff to show that the policy or practice has the "effect of discriminating against a protected class" as a group.[46]

The fourth proposed element would require a plaintiff to allege that the disparity caused by the policy or practice is *significant.* Where a disparity exists but is not material, a plaintiff will not have stated a plausible disparate impact claim. If a defendant were subject to liability for policies that have a negligible disparity, the defendant could be forced to "resort to the use of racial quotas"[47] to ensure that no subset of its data appears to present a disparate impact. *Inclusive Communities* specifically noted that courts must "examine with care whether a plaintiff has made out a prima facie showing of disparate impact, and prompt resolution is important . . ." to avoid injecting "racial considerations into every housing decision."[48] Therefore, a

---

[36] *See, e.g., Frederick* v. *Wells Fargo Home Mortg.,* 649 F. App'x 29, 30 (2d Cir. 2016) (Plaintiff challenging lender's denial of a mortgage application failed to identify the specific policy or practice that caused the disparate impact).

[37] *See, e.g., Barrow* v. *Barrow,* Civil Action No. 16–11493–FDS, 2017 U.S. Dist. LEXIS 103495, at *8 (D. Mass. July 5, 2017) (citing *Inclusive Communities,* 135 S. Ct. at 2523) ("[A] plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all.").

[38] *See* 135 S. Ct. at 2523–24 ("For instance, a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all. It may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units.").

[39] 135 S. Ct. at 2523–24.

[40] *See Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1112–14 (8th Cir. 2017) (citing *Inclusive Communities,* 135 S. Ct. at 2524).

[41] *Id.*

[42] *See id.* at 1114 ("a plaintiff must, at the very least, point to an 'artificial, arbitrary, and unnecessary" policy causing the problematic disparity.).

[43] *See Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989) (holding that the defendant has the burden of producing evidence of the justification for the alleged policy or practice but making clear that the burden of persuasion to prove their case ultimately remains with the plaintiff).

[44] *See id.* (holding that a disparate impact claim is not adequately pled where the alleged disparity is the result of factors outside the defendant's control and does not support the assertion that the defendant's policy itself is the cause of the disparity).

[45] 42 U.S.C. 3604(a).

[46] *Anderson* v. *City of Blue Ash,* 798 F.3d 338, 364 (6th Cir. 2015).

[47] 135 S. Ct. at 2512.

[48] *Id.*

plaintiff would be required to show that the statistical disparity identified is material and caused by the challenged policy or practice, rather than attributable to chance.

The fifth proposed element would require a plaintiff to allege that the *complaining party's alleged injury* is directly caused by the challenge policy or practice. This element seeks to codify the proximate cause requirement under the Fair Housing Act that there be "some direct relation between the injury asserted and the injurious conduct alleged." [49]

If a party brings a claim under paragraph (b), HUD proposes that the defending party may rebut a claim at the pleading stage by asserting that a plaintiff has not alleged facts to support their prima facie claim as explained in paragraph (c).[50] Paragraph (c) also provides defendants with three methods through which to establish that plaintiffs have not alleged a disparate impact claim. HUD proposes to provide that the defendants may raise any of these defenses in paragraph (c) through a variety of procedural motions. For example, in a rule 12(b)(6) motion to dismiss, the defendant can make an argument under the paragraph (c) defense that the facts alleged in the complaint fail to allege sufficient facts to support a claim under paragraph (b). Another example is a rule 56 motion for summary judgment where the defendant could assert facts outside of the complaint to substantiate a defense under paragraph (c). For instance, on a rule 56 motion for summary judgment, the defendant may succeed where the defendant "shows that there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law."

Paragraph (c)(1) provides that the defendant may show its discretion is materially limited by a third party— such as through a Federal law or a State or local law—or a binding or controlling court, arbitral, regulatory, administrative order, or administrative requirement. In cases where a State actor or municipality is the defendant, a State or local law, respectively, may not be considered materially limiting for purposes of this defense.[51] This defense would allow a defendant to show that the complaining party has not shown a robust causality as required in *Inclusive Communities* and codified in paragraph (b)(2), by failing to show that the defendant's policy is the actual cause of the alleged disparate impact.[52] This defense partially overlaps with proposed paragraph (e) of this section, which clarifies that nothing in § 100.500 is intended to conflict with State insurance law. This defense applies to any Federal, State, or local law that limits the defendant's discretion. As discussed further in the Business of Insurance section below, § 100.500(e) applies only to State insurance law.

Paragraph (c)(2) provides that, where a plaintiff identifies an offending policy or practice that relies on an algorithmic model, a defending party may defeat the claim by: (i) Identifying the inputs used in the model and showing that these inputs are not substitutes for a protected characteristic and that the model is predictive of risk or other valid objective; (ii) showing that a recognized third party, not the defendant, is responsible for creating or maintaining the model; or (iii) showing that a neutral third party has analyzed the model in question and determined it was empirically derived, its inputs are not substitutes for a protected characteristic, the model is predictive of risk or other valid objective, and is a demonstrably and statistically sound algorithm.

HUD received comments expressing concern that complicated, yet increasingly commonly used, algorithmic models to assess factors such as risk or creditworthiness, should be provided a safe harbor. While disparate impact provides an important tool to root out factors that may cause these models to produce discriminatory outputs, these models can also be an invaluable tool in extending access to credit and other services to otherwise underserved communities. Therefore, HUD proposes these defenses to provide parties with three methods of defending their models where they can show their models achieve "legitimate objectives[.]" [53] They are intended to ensure that disparate impact liability is "limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." [54] This section is not intended to provide a special exemption for parties who use algorithmic models, but merely to recognize that additional guidance is necessary in response to the complexity of disparate impact cases challenging these models. HUD proposes that a successful defense under this section would demonstrate the lack of a robust causal link between the defendant's use of the model and the alleged disparate impact, as described below.

The first defense allows a defendant to provide analysis showing that the model is not the actual cause of the disparate impact alleged by the plaintiff. It allows the defendant to break down the model piece-by-piece and demonstrate how each factor considered could not be the cause of the disparate impact and to show how each factor advances a valid objective. This defense simply lays out the steps that a defendant would take in defending its actions. A defendant will succeed under this defense where the plaintiff is unable to then show that the defendant's analysis is somehow flawed, such as by showing that a factor used in the model is correlated with a protected class despite the defendant's assertion.

The second defense provides that a defendant can show that use of the model is standard in the industry, it is being used for the intended purpose of the third party, and that the model is the responsibility of a third party. It is similar to the defense that the defendant's actions are materially limited by law, as discussed above, in that it recognizes that there are situations in which standard practice is so clearly established that the proper party responsible for the challenged conduct is not the defendant, but the party who establishes the industry standard. In these situations, the defendant may not have access to the reasons these factors are used or may not even have access to the factors themselves, and, therefore, may not be able to defend the model itself, even where a perfectly rational reason exists for its use. Further, if the plaintiff prevails, the plaintiff would only remove the model from use by one party, whereas suing the party that is actually responsible for the creation and design of the model would remove the disparate impact from the industry as a whole. A plaintiff may rebut this allegation by showing that the plaintiff is not challenging the standard model alone, but the defendant's unique use or misuse of the model, as the cause of the disparate impact.

The third defense is similar to the first and provides defendants with another method of showing that the model is not

---

[49] *Bank of Am. Corp.* v. *City of Miami,* 137 S. Ct. 1296, 1306 (2017).

[50] For example, the Supreme Court in *Wards Cove Packing Co.* dismissed a disparate impact claim against a firm that denied job applicants from a protected class at a higher rate than non-protected class members. Despite the statistical disparity, the plaintiffs had not identified an injury because a disproportionate number of *qualified* minorities were not denied employment. 490 U.S. at 650, 653.

[51] *See Mount Holly,* 658 F.3d 375 (3d Cir. 2011).

[52] 135 S. Ct. at 2524 ("[I]f [the plaintiff] cannot show a causal connection between the Department's policy and a disparate impact—for instance, because Federal law substantially limits the Department's discretion—that should result in dismissal of this case.").

[53] *Id.* at 2524.

[54] *Id.* at 2518.

the actual cause of the disparate impact. This defense allows defendants to prove through the use of a qualified expert that the model is not the cause of a disparate impact. A plaintiff may rebut this defense by showing that the third party is not neutral, that the analysis is incomplete, or that there is some other reason why the third party's analysis is insufficient evidence that the defendant's use of the model is justified.

Given the complicated nature of this issue, HUD is specifically soliciting comments on the nature, propriety, and use of algorithmic models as related to the defenses in (c)(2).

Paragraph (c)(3) provides that a defendant may make any additional claims that the plaintiff has failed to allege sufficient facts to support a prima facie case under paragraph (b).

If a party alleges facts sufficient to show a prima facie case under paragraph (b), a case proceeds beyond the pleading stage. Under paragraph (d)(1), HUD's proposed rule provides that the plaintiff has the burden of proving by a preponderance of the evidence each of the elements of the prima facie case, established not by statistical imbalances or disparities alone, but through evidence that is not remote or speculative. A plaintiff may now have access to discovery to establish facts supporting each allegation, including the allegation that the identified policy or practice is "arbitrary, artificial, and unnecessary." In addition, a defendant may show that the policy or procedure advances a valid interest. The plaintiff must counter this by proving by a preponderance of the evidence that a less discriminatory policy or practice would serve the interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant, consistent with existing disparate impact case law.[55]

Under paragraph (d)(2), the proposed rule provides that the defendant may rebut a plaintiff's case by proving any element identified under paragraph (c)(1) or (2). The defendant may also rebut a plaintiff's case by demonstrating that the plaintiff has not met the burden of proof laid out in paragraph (d)(1), either by failing to prove the elements of a prima facie case or by failing to identify an alternative practice that advances the valid interest identified by the defendant without creating materially greater costs or other material burdens for the defendant, and, therefore, has not in fact "made out a prima facie case of disparate impact."[56] HUD is also particularly seeking input on whether it would be consistent with *Inclusive Communities* to provide a defense for housing authorities who can show that the policy being challenged is a reasonable approach and in the housing authority's sound discretion.

HUD specifically seeks comments on the terms used in this section of the rule and whether HUD should define those terms. Examples of terms that HUD would consider providing definitions to are "robust causal link," "evidence that is not remote or speculative," "algorithmic model," and "material part."

Business of Insurance

In response to comments requesting HUD consider its position on the application of disparate impact to insurance, HUD proposes adding new paragraph (e), which would provide that nothing in § 100.500 is intended to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance. This codifies the general applicability of the "reverse preemption" provisions of the McCarran-Ferguson Act as it applies to the Fair Housing Act.[57] The McCarran-Ferguson Act provides that provisions of Federal law in conflict with state insurance laws are preempted by state laws "unless such Act specifically relates to the business of insurance[.]" [58] This proposed language clarifies that the Fair Housing Act does not "specifically relate to the business of insurance" and affirms in regulation HUD's past position, as stated above, that case-by-case adjudication is the proper way to resolve cases to determine whether the Fair Housing Act conflicts with the State insurance law at issue in each case. The Fair Housing Act, and, therefore, this regulation, will only be preempted where application of the Fair Housing Act would invalidate, impair, or supersede the State insurance law. Under these circumstances, the State insurance law governs.[59]

Proposed paragraph (e) does not provide the safe harbor for insurance, which some commenters requested. However, this proposed section and the complete defense where a defendant's discretion is materially limited by compliance with Federal, State, or local law, would have a similar effect to a safe harbor, in appropriate circumstances, by ensuring that parties are never placed in a "double bind of liability" where they could be subject to suit under disparate impact for actions required for good faith compliance with another law.[60] Both provisions are also consistent with *Inclusive Communities'* robust causality requirement because, where the actual cause of the disparate impact is another law and not the defendant's own independent decisions, a plaintiff has not shown that the defendant is the actual cause of the disparate impact.[61]

This proposed paragraph applies where the defendant can show that imposing disparate impact liability under the Fair Housing Act would invalidate, impair, or supersede State insurance law. The "materially limited" defense is not restricted to State insurance law, but requires the defendant to show that the defendant's discretion is limited to comply with Federal, State, or local law.

III. Additional Questions for Public Comment

In addition to the specific feedback sought elsewhere in the preamble, HUD explicitly requests public comment on the following questions in order to better inform HUD's regulatory impact analysis at the final rule stage.

1. How well do HUD's proposed changes to its disparate impact standard align with the decision and analysis in *Inclusive Communities* with respect to the proposed prima facie burden, including:

i. Each of the five elements in the new burden-shifting framework outlined in paragraph (b) of § 100.500.

ii. The three methods described in paragraph (c) of § 100.500 through which defendants may establish that plaintiffs have failed to allege a prima facie case.

2. What impact, using specific court cases as reference, did *Inclusive Communities* have on the number, type, and likelihood of success of disparate impact claims brought since the 2015 decision? How might this proposed rule further impact the number, type, and likelihood of success of disparate impact claims brought in the future?

3. How, specifically, did *Inclusive Communities,* and the cases brought since *Inclusive Communities,* expand upon, conflict, or align with HUD's 2013

---

[55] *Wards Cove,* 490 U.S. at 661.
[56] 135 S. Ct. at 2523.
[57] 15 U.S.C. 1012(b).
[58] *Id.*
[59] For a discussion of this issue, see *Ojo* v. *Farmers Grp.,* 600 F.3d 1205 (9th Cir. 2010), in which the Appeals Court concluded that the McCarran-Ferguson Act can reverse-preempt the Fair Housing Act, and certified to the Texas Supreme Court the question of whether the Fair Housing Act would conflict with Texas insurance law.
[60] 135 S. Ct. at 2523.
[61] *Id.* at 2524 ("[I]f the ICP cannot show a causal connection between the Department's policy and a disparate impact—for instance, because Federal law substantially limits the Department's discretion—that should result in dismissal of this case.").

final disparate impact rule and with this proposed rule?

4. How might the proposed rule increase or decrease costs and economic burden to relevant parties (*e.g.,* litigants, including private citizens, local governments, banks, lenders, insurance companies, or others in the housing industry) relative to the 2013 final disparate impact rule? How might the proposed rule increase or decrease costs and economic burden to relevant parties relative to *Inclusive Communities*?

5. How might a decision *not* to amend HUD's 2013 final disparate impact rule affect the status quo since *Inclusive Communities*?

6. What impact, if any, does the addition of paragraph (e) of § 100.500 regarding the business of insurance have on the number and type of disparate impact claims? What impact, if any, does the proposed paragraph (e) have on costs (or savings) and economic burden of disparate impact claims?

7. Is there any other data, information, or analysis the public can provide to assist HUD in assessing the impact of the proposed regulation relative to the 2013 disparate impact final rule and the 2015 Supreme Court decision in *Inclusive Communities*?

## IV. Findings and Certifications

*Regulatory Review—Executive Orders 12866 and 13563*

Pursuant to Executive Order 12866 (Regulatory Planning and Review), a determination must be made whether a regulatory action is significant and, therefore, subject to review by the Office of Management and Budget in accordance with the requirements of the order. Executive Order 13563 (Improving Regulations and Regulatory Review) directs executive agencies to analyze regulations that are "outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned." Executive Order 13563 also directs that where relevant, feasible, and consistent with regulatory objectives, and to the extent permitted by law, agencies are to identify and consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public.

The proposed rule has been determined to be a "significant regulatory action," as defined in section 3(f) of the Order, but not economically significant under section 3(f)(1) of the Order. The docket file is available for public inspection in the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–402–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service, toll-free, at 800–877–8339.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule updates HUD's uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. HUD's objective in this proposed rule is to ensure consistency and uniformity, given the Supreme Court decision, and, thereby, provide clarity for the public. HUD's 2013 regulation codified the then prevailing case law for bringing a discriminatory effect claim and the rule provided clarity to all parties involved in a case. Currently, the courts and the public are forced to reconcile how to implement HUD's regulations consistent with *Inclusive Communities.* This rule will provide clarity, thus reducing burdens, for all parties by, consistent with HUD's prior rule, codifying the current framework for bringing a discriminatory effect claim consistent with new case law. Specifically, plaintiffs will have a framework to use for ensuring complaints meet all the requirements identified in *Inclusive Communities* for pleading a claim of discriminatory effect, and defendants will be able to use this framework to rebut such claims. Similarly, defendants will be more proactive in ensuring that their policies and practices comply with the defenses that are provided. It is HUD's intention that plaintiffs will bring claims that are better supported and defendants will be able to resolve unsupported claims of discriminatory effect more quickly; therefore, leading to the "prompt resolution" of disparate impact for all parties.[62] HUD believes all parties, including small entities, will benefit from the changes and clarifications in the rule by reconciling HUD's existing regulatory framework for discriminatory effect claims with *Inclusive Communities* and subsequent case law. Similarly, all entities will especially benefit from this rule as it will allow for a quicker, less costly method of understanding their burden and responsibility under disparate impact law without the need to research and compile case law since *Inclusive Communities.*

Accordingly, the undersigned certifies that the proposed rule will not have a significant economic impact on a substantial number of small entities. Notwithstanding HUD's determination that this rule will not have a significant effect on a substantial number of small entities, HUD specifically invites comments regarding any less burdensome alternatives to this rule that will meet HUD's objectives as described in the preamble to this rule. HUD also requests comments on the potential burden or benefit the proposed regulations may have on potential claimants and the organizations that represent them, some of which are small businesses.

*Environmental Impact*

This proposed rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on State and local governments and is not required by statute, or (ii) preempts State law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This rule does not have federalism implications and does not impose substantial direct compliance costs on State and local governments or preempt State law within the meaning of the Executive order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local, and tribal governments and on the private sector. This rule would not impose any Federal mandates on any State, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

---

[62] 135 S. Ct. at 2523.

**List of Subjects in 24 CFR Part 100**

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD proposes to amend 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

■ 2. In § 100.5, revise the last sentence in paragraph (b) and add paragraph (d) to read as follows:

### § 100.5  Scope.

\* \* \* \* \*

(b) \* \* \* Allegations of unlawful housing discrimination under this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, and defenses and rebuttals to such allegations may be made, consistent with the standards outlined in § 100.500.

\* \* \* \* \*

(d) Nothing in this part requires or encourages the collection of data with respect to race, color, religion, sex, handicap, familial status, or national origin. The absence of any such collection efforts shall not result in any adverse inference against a party.

■ 3. In § 100.7, revise paragraph (b) and add paragraph (c) to read as follows:

### § 100.7  Liability for discriminatory housing practices.

\* \* \* \* \*

(b) *Vicarious liability.* Where a principal-agent relationship exists under common law, a person may be held vicariously liable for a discriminatory housing policy or practice by the person's agent or employee.

(c) *Remedies in administrative proceedings.* The remedy in an administrative discriminatory effect case should concentrate on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons through neutral means, and may include equitable remedies, and, where pecuniary damage is proved, compensatory damages or restitution. Punitive or exemplary damages shall not be available as a remedy.

■ 4. In § 100.70, revise paragraph (d)(5) to read as follows:

### § 100.70  Other prohibited sale and rental conduct.

\* \* \* \* \*

(d) \* \* \*

(5) Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

■ 5. In § 100.120, revise paragraph (b)(1) to read as follows:

### § 100.120  Discrimination in the making of loans and in the provision of other financial assistance.

\* \* \* \* \*

(b) \* \* \*

(1) Failing or refusing to provide to any person information regarding the availability of loans or other financial assistance, application requirements, procedures or standards for the review and approval of loans or financial assistance, or providing information that is materially inaccurate or materially different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin; provided that nothing in this paragraph (b)(1) restricts providing accurate responses to requests for information related to an individual's particular circumstances.

\* \* \* \* \*

■ 6. Revise § 100.500 to read as follows:

### § 100.500  Discriminatory effect prohibited.

(a) *General.* Liability may be established under the Fair Housing Act based on a specific policy's or practice's discriminatory effect on members of a protected class under the Fair Housing Act even if the specific policy or practice was not motivated by a discriminatory intent.

(b) *Prima facie burden.* To allege a prima facie case based on an allegation that a specific, identifiable policy or practice has a discriminatory effect, a plaintiff or the charging party (collectively, "plaintiff") must state facts plausibly alleging each of the following elements:

(1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

(2) That there is a robust causal link between the challenged policy or practice and a disparate impact on members of a protected class that shows the specific practice is the direct cause of the discriminatory effect;

(3) That the alleged disparity caused by the policy or practice has an adverse effect on members of a protected class;

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct link between the disparate impact and the complaining party's alleged injury.

(c) *Failure to allege a prima facie case.* A defendant, or responding party, may establish that a plaintiff's allegations do not support a prima facie case of discriminatory effect under paragraph (b) of this section, if:

(1) The defendant shows that its discretion is materially limited by a third party such as through:

(i) A Federal, state, or local law; or

(ii) A binding or controlling court, arbitral, regulatory, administrative order, or administrative requirement;

(2) Where a plaintiff alleges that the cause of a discriminatory effect is a model used by the defendant, such as a risk assessment algorithm, and the defendant:

(i) Provides the material factors that make up the inputs used in the challenged model and shows that these factors do not rely in any material part on factors that are substitutes or close proxies for protected classes under the Fair Housing Act and that the model is predictive of credit risk or other similar valid objective;

(ii) Shows that the challenged model is produced, maintained, or distributed by a recognized third party that determines industry standards, the inputs and methods within the model are not determined by the defendant, and the defendant is using the model as intended by the third party; or

(iii) Shows that the model has been subjected to critical review and has been validated by an objective and unbiased neutral third party that has analyzed the challenged model and found that the model was empirically derived and is a demonstrably and statistically sound algorithm that accurately predicts risk or other valid objectives, and that none of the factors used in the algorithm rely in any material part on factors that are substitutes or close proxies for protected classes under the Fair Housing Act; or

(3) The defendant demonstrates that the plaintiff has failed to allege sufficient facts under paragraph (b) of this section.

(d) *Burdens of proof for discriminatory effect.* If a case is not resolved at the pleading stage, the burden of proof to establish that a specific, identifiable policy or practice has a discriminatory effect, are as follows:

(1) *Plaintiff's burden.* (i) A plaintiff must prove by the preponderance of the evidence, through evidence that is not remote or speculative, each of the elements in paragraphs (b)(2) through (5) of this section; and

(ii) If the defendant rebuts a plaintiff's assertion that the policy or practice is arbitrary, artificial, and unnecessary under paragraph (b)(1) of this section by producing evidence showing that the challenged policy or practice advances a valid interest (or interests), the plaintiff must prove by the preponderance of the evidence that a less discriminatory policy or practice exists that would serve the defendant's identified interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(2) *Defendant's burden.* The defendant may, as a complete defense:

(i) Prove any element identified under paragraph (c)(1) or (2) of this section;

(ii) Demonstrate that the plaintiff has not proven by the preponderance of the evidence an element identified under paragraph (d)(1)(i) of this section; or

(iii) Demonstrate that the alternative policy or practice identified by the plaintiff under paragraph (d)(1)(ii) of this section would not serve the valid interest identified by the defendant in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(e) *Business of insurance laws.* Nothing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance.

Dated: July 29, 2019.

**Anna Maria Farías,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2019–17542 Filed 8–16–19; 8:45 am]

**BILLING CODE 4210–67–P**

# DEPARTMENT OF THE TREASURY

## Alcohol and Tobacco Tax and Trade Bureau

### 27 CFR Part 9

[Docket No. TTB–2019–0006; Notice No. 184]

RIN 1513–AC42

### Proposed Establishment of the Candy Mountain Viticultural Area and Modification of the Yakima Valley Viticultural Area

**AGENCY:** Alcohol and Tobacco Tax and Trade Bureau, Treasury.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Alcohol and Tobacco Tax and Trade Bureau (TTB) proposes to establish the 815-acre "Candy Mountain" viticultural area in Benton County, Washington. TTB also proposes to expand the boundary of the existing 1,093-acre Yakima Valley viticultural area by approximately 72 acres in order to avoid a partial overlap with the proposed Candy Mountain viticultural area. Both the existing Yakima Valley AVA and the proposed Candy Mountain AVA are located entirely within the existing Columbia Valley AVA. TTB designates viticultural areas to allow vintners to better describe the origin of their wines and to allow consumers to better identify wines they may purchase. TTB invites comments on these proposals.

**DATES:** TTB must receive your comments on or before October 18, 2019.

**ADDRESSES:** You may electronically submit comments to TTB on this proposal, and view copies of this document, its supporting materials, and any comments TTB receives on it within Docket No. TTB–2019–0006 as posted on *Regulations.gov* (*https://www.regulations.gov*), the Federal e-rulemaking portal. Please see the "Public Participation" section of this document below for full details on how to comment on this proposal via *Regulations.gov,* U.S. mail, or hand delivery, and for full details on how to view or obtain copies of this document, its supporting materials, and any comments related to this proposal.

**FOR FURTHER INFORMATION CONTACT:** Karen A. Thornton, Regulations and Rulings Division, Alcohol and Tobacco Tax and Trade Bureau, 1310 G Street NW, Box 12, Washington, DC 20005; phone 202–453–1039, ext. 175.

**SUPPLEMENTARY INFORMATION:**

## Background on Viticultural Areas

### TTB Authority

Section 105(e) of the Federal Alcohol Administration Act (FAA Act), 27 U.S.C. 205(e), authorizes the Secretary of the Treasury to prescribe regulations for the labeling of wine, distilled spirits, and malt beverages. The FAA Act provides that these regulations should, among other things, prohibit consumer deception and the use of misleading statements on labels, and ensure that labels provide the consumer with adequate information as to the identity and quality of the product. The Alcohol and Tobacco Tax and Trade Bureau (TTB) administers the FAA Act pursuant to section 1111(d) of the Homeland Security Act of 2002, codified at 6 U.S.C. 531(d). The Secretary has delegated various authorities through Treasury Department Order 120–01, dated December 10, 2013 (superseding Treasury Order 120–01, dated January 24, 2003), to the TTB Administrator to perform the functions and duties in the administration and enforcement of these provisions.

Part 4 of the TTB regulations (27 CFR part 4) authorizes TTB to establish definitive viticultural areas and regulate the use of their names as appellations of origin on wine labels and in wine advertisements. Part 9 of the TTB regulations (27 CFR part 9) sets forth standards for the preparation and submission of petitions for the establishment or modification of American viticultural areas (AVAs) and lists the approved AVAs.

### Definition

Section 4.25(e)(1)(i) of the TTB regulations (27 CFR 4.25(e)(1)(i)) defines a viticultural area for American wine as a delimited grape-growing region having distinguishing features, as described in part 9 of the regulations, and a name and a delineated boundary, as established in part 9 of the regulations. These designations allow vintners and consumers to attribute a given quality, reputation, or other characteristic of a wine made from grapes grown in an area to its geographic origin. The establishment of AVAs allows vintners to describe more accurately the origin of their wines to consumers and helps consumers to identify wines they may purchase. Establishment of an AVA is neither an approval nor an endorsement by TTB of the wine produced in that area.

### Requirements

Section 4.25(e)(2) of the TTB regulations (27 CFR 4.25(e)(2)) outlines the procedure for proposing an AVA and provides that any interested party may petition TTB to establish a grape-growing region as an AVA. Section 9.12 of the TTB regulations (27 CFR 9.12) prescribes standards for petitions for the establishment or modification of AVAs. Petitions to establish an AVA must include the following:

• Evidence that the area within the proposed AVA boundary is nationally or locally known by the AVA name specified in the petition;

• An explanation of the basis for defining the boundary of the proposed AVA;

• A narrative description of the features of the proposed AVA that affect viticulture, such as climate, geology,