60288 Federal Register / Vol. 85, No. 186 / Thursday, September 24, 2020 / Rules and Regulations

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**24 CFR Part 100**

**[Docket No. FR–6111–F–03]**

**RIN 2529–AA98**

## HUD's Implementation of the Fair Housing Act's Disparate Impact Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** HUD has long interpreted the Fair Housing Act ("the Act") to create liability for practices with an unjustified discriminatory effect, even if those practices were not motivated by discriminatory intent. This rule amends HUD's 2013 disparate impact standard regulation to better reflect the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.* and to provide clarification regarding the application of the standard to State laws governing the business of insurance. This rule revises the burden-shifting test for determining whether a given practice has an unjustified discriminatory effect and adds to illustrations of discriminatory housing practices found in HUD's Fair Housing Act regulations. This Final rule also establishes a uniform standard for determining when a housing policy or practice with a discriminatory effect violates the Fair Housing Act and provides greater clarity of the law for individuals, litigants, regulators, and industry professionals.

**DATES:** *Effective Date:* October 26, 2020.

**FOR FURTHER INFORMATION CONTACT:** David H. Enzel, Deputy Assistant Secretary for Enforcement Programs, Office of Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 7th Street SW, Room 5204, Washington, DC 20410, telephone number 202–402–5557 (this is not a toll-free number). Individuals with hearing or speech impediments may access this number via TTY by calling the Federal Relay during working hours at 800–877–8339 (this is a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Fair Housing Act prohibits discriminatory housing practices on the basis of race, color, religion, sex, disability, familial status, or national origin. HUD has the authority and responsibility for administering and enforcing the Act, including the authority to conduct formal adjudications of Fair Housing Act complaints and the power to promulgate rules to interpret and carry out the Act.[1] Consistent with this responsibility, on February 15, 2013, HUD published a Final Rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("the 2013 Rule").[2] The 2013 Rule formalized HUD's longstanding interpretation that disparate impact liability is available under the Act.[3] The 2013 Rule also codified a burden-shifting framework for analyzing disparate impact claims under the Fair Housing Act, relying in part on existing case law under the Fair Housing Act, decisions by HUD's administrative law judges, and Title VII of the Civil Rights Act of 1964 (prohibiting employment discrimination).[4]

In 2015, the Supreme Court held that disparate impact claims are cognizable under the Fair Housing Act in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*, (*Inclusive Communities*).[5] *Inclusive Communities* recognized the availability of disparate impact claims under the Fair Housing Act independent of the 2013 Rule. The Court's opinion referenced the 2013 Rule, but the Court did not rely on it for its holding. Rather, the Court undertook its own analysis of the Fair Housing Act and engaged in a discussion of standards for disparate impact claims as well as cognizable constitutional limitations to such claims.

Following the *Inclusive Communities* decision, on May 15, 2017, HUD published a **Federal Register** notice that invited public comment to assist HUD in identifying existing regulations that may be outdated, ineffective, or excessively burdensome, pursuant to Executive Orders 13771, "Reducing Regulation and Controlling Regulatory Costs," and 13777, "Enforcing the Regulatory Reform Agenda."[6] In response, HUD received significant feedback concerning the 2013 Rule, with many commenters citing the Court's decision in *Inclusive Communities*. Additionally, in October 2017, the Secretary of the Treasury issued a report which explicitly recommended that HUD reconsider applications of the 2013 Rule, especially in the context of the insurance industry.[7] In response to these suggestions and the Court's decision in *Inclusive Communities*, HUD published an advance notice of proposed rulemaking (ANPR) in the **Federal Register** on June 20, 2018, inviting comments on possible amendments to the 2013 Rule.[8]

## II. The August 19, 2019, Proposed Rule

On August 19, 2019, HUD published a Proposed Rule in the **Federal Register** to replace HUD's disparate impact standard at § 100.500 with a new standard and incorporate minor amendments to §§ 100.5, 100.7, 100.70 and 100.120.[9] The proposed revisions included defenses that a defendant could utilize to rebut the plaintiff's case, by showing that the defendant's discretion was materially limited, that the defendant's use of a risk assessment algorithm was non-discriminatory, or that the plaintiff had failed to plead a prima facie case. Further, the Proposed Rule incorporated the 'artificial, arbitrary, and unnecessary' standard as discussed in *Inclusive Communities*. Specifically, the Proposed Rule explained that defendants may show that a challenged policy or practice advances a valid interest and is therefore not artificial, arbitrary, and unnecessary. Plaintiffs would then rebut this showing by proving that a less discriminatory policy or practice exists that would serve that interest. The proposed revisions also included an interpretation of the Fair Housing Act when in conflict with state laws regulating the business of insurance; clarification of vicarious liability; the provision and clarification of examples of acts that constitute discriminatory practices under disparate impact; and implementation of a burden-shifting framework that more closely aligns with the Court's decision in *Inclusive Communities*. For more information about HUD's Proposed Rule, see 84 FR 42854.

[1] *See* 42 U.S.C. 3608(a) and 42 U.S.C. 3614a.

[2] 78 FR 11460.

[3] *See* 24 CFR 100.5(b), 100.70(d)(5), 100.120(b), 100.130(b), and 100.500.

[4] *See* 24 CFR 100.500(c). In 2016, HUD also published a notice that supplemented its responses to certain comments made by the insurance industry during the rulemaking. *See* "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 FR 69012 (Oct. 5, 2016).

[5] 135 S. Ct. 2507 (2015).

[6] *See* 82 FR 22344.

[7] *See* Steven T. Mnuchin and Craig S. Phillips, *U.S. Department of the Treasury Report: A Financial System That Creates Economic Opportunities, Asset Management and Insurance, Treasury.gov* (Oct. 26, 2017), *https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.*

[8] 83 FR 28560. HUD received and reviewed all 1,923 comments in promulgating HUD's August 19, 2019 Disparate Impact Proposed Rule.

[9] 84 FR 42854.

HUD received 45,758 comments on the Proposed Rule, which were considered and are discussed in Section IV of this preamble.

### III. Changes Made at the Final Rule Stage

In response to public comments, a discussion of which is presented in Section IV, and in further consideration of issues addressed at the proposed rule stage, HUD is publishing this Final Rule. This Final Rule implements the limitations discussed in *Inclusive Communities* and HUD furthers the goal of the Fair Housing Act by exercising its discretion to interpret the Fair Housing Act's disparate impact standard. HUD is therefore adopting the August 19, 2019 Proposed Rule with the following changes:

*A. Section 100.5 Unlawful Housing Discrimination Illustration*

The Final Rule makes minor clarifying changes to proposed paragraph (b) to clarify the language in paragraph (b) regarding illustrations and allegations of unlawful housing discrimination. The Final Rule also adds a sentence at the end of paragraph (b) to align with the requirements in Executive Order 13891 that agency guidance documents and other actions are consistent with law and the agency's regulations.

The Final Rule maintains paragraph (d), which provides that this part does not require or encourage the collection of data, but removes the proposed second sentence of paragraph (d) because HUD determined that the first sentence of paragraph (d) is sufficiently clear. HUD also understands that there may be cases where collecting data may be required by laws outside this rule, and the second sentence created uncertainty and confusion.

*B. Section 100.7 Liability for Discriminatory Housing Practices*

After considering and reviewing public comments, HUD decided not to adopt the proposed changes to § 100.7 and is not adopting as final the proposed clarifying changes to paragraph (b) on vicarious liability or paragraph (c) on remedies in administrative proceedings. However, HUD has moved and amended proposed paragraph (c) into § 100.500 paragraph (f). The new paragraph is discussed below.

*C. Section 100.120 Discrimination in the Making of Loans*

The Final Rule does not include the example proposed in paragraph (b)(1). The Proposed Rule would have amended the first example in paragraph (b)(1) and added a clause to the end of paragraph (b)(1) regarding information related to an individual's particular circumstances. HUD's proposed changes were meant to clarify that, in accordance with the guidance in *Inclusive Communities*, informational disparities must be material in order to violate the Fair Housing Act. HUD believes that the Final Rule's § 100.500 provides for that requirement and therefore the proposed example in paragraph (b)(1) is unnecessary.

*D. Section 100.500 Discriminatory Effect Prohibited Standard*

Paragraph (b)—Pleading Stage

The Final Rule revises paragraph (b) of the Proposed Rule to clarify that the paragraph discusses the pleading stage and not the prima facie burden. The prima facie burden is the burden that the plaintiff must prove before the defendant is obligated to advance a valid interest or provide some other defense. At the pleading stage, the plaintiff must allege facts that state a plausible disparate impact claim.[10] Paragraph (b) of the Final Rule, therefore, lays out the elements that must be sufficiently pled to survive the pleading stage.

Paragraph (b)(1) is changed to make the phrase "artificial, arbitrary, and unnecessary" consistent with the language in *Inclusive Communities*. The order of paragraphs (b)(2) and (b)(3) is reversed because HUD finds it is clearer to state the requirement that an adverse effect must be shown before stating the requirement that the adverse effect be the direct cause. HUD notes that both of these elements require that the plaintiff show that the challenged policy or practice has an adverse effect on a protected class. However, paragraph (b)(2) requires this adverse effect to disproportionately affect protected class members, whereas paragraph (b)(3) requires that the causal link between the challenged policy or practice and the adverse effect be robust. New paragraph (b)(2), formerly paragraph (b)(3), is revised to be consistent with this order, and to add the word "disproportionately," to clarify that the plaintiff must show that protected class members are disproportionately more likely to be affected than individuals outside the protected class. New paragraph (b)(3), formerly paragraph (b)(2), is revised to be consistent with the change in order, and to clarify that HUD intends "robust causal link" to be the same standard as "direct cause." Paragraph (b)(4) remains unchanged from the Proposed Rule. Paragraph (b)(5) is revised to more closely adhere to the language of *Bank of Am. Corp.* v. *City of Miami*,[11] which it is intended to codify.

Paragraph (c)—Burden Shifting

Paragraph (c) of the Proposed Rule provided defendants with affirmative defenses which would necessarily show that the plaintiff had not or could not successfully bring a prima facie case. Paragraph (d) of the Proposed Rule listed the burdens of proof and production throughout a disparate impact case and divided these burdens by plaintiff and defendant. While paragraph (d) included a burden shifting framework, this division did not show the three steps consecutively. For clarity, this Final Rule uses a structure that is more similar to § 100.500(c) of the 2013 Rule and codifies the burden shifting approach in § 100.500 (c) of this Final Rule. This section now flows logically from paragraph (b), which outlines the necessary elements of a pleading, to paragraph (c)(1), which states that the first step after the pleading stage is for the plaintiff to prove the elements provided in paragraph (b), which make up the prima facie case (elements 2–5). Paragraph (c)(2) then provides the defendant with the opportunity to advance any valid interest, and paragraph (c)(3) requires the plaintiff to advance a less discriminatory alternative to address any valid interest raised. Paragraph (c)(2) articulates the same standard for the defendant's valid interest that was implied but not explicitly stated in paragraph (d)(1)(ii) of the Proposed Rule. Paragraph (c)(3) is substantively identical to the burden on plaintiffs in paragraph (d)(1)(ii) of the Proposed Rule.

Paragraph (d)—Defenses

Paragraph (d) of the Final Rule now covers only defenses available to the defendant, and it articulates what defenses are available depending on the stage of litigation. It is largely based on paragraph (c) of the Proposed Rule.

Paragraph (d)(1) identifies defenses that a defendant may raise at the pleading stage by relying on the plaintiff's complaint or on any other material that would ordinarily be admissible at the pleading stage under the applicable rules of procedure. Defendants at this stage may argue that the plaintiff has failed to sufficiently plead one of the elements of the prima

[10] *See, e.g., Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007).

[11] 137 S. Ct. 1296 (2017).

facie case. Defendants may also argue that the policy or practice is reasonably necessary to comply with a third-party requirement which limits the defendant's discretion. HUD believes that this is an appropriate defense at the pleading stage where the defendant can show, as a matter of law, that the plaintiff's case should not proceed beyond the pleading stage when considered in light of a binding authority which limits the defendant's discretion in a manner which shows that the defendant's discretion could not have plausibly been the direct cause of the disparity.

The Final Rule adds paragraph (d)(1)(iii), which was not in the Proposed Rule, to account for binding requirements promulgated by an agency. This may include agency guidance because HUD recognizes, consistent with Executive Order 13891, that a defendant may be obligated to follow agency guidance when it is so binding, or guidance was incorporated into a binding authority, such as a contract. To that end, HUD has also added at this Final Rule stage that the defendant must show that the policy or practice is reasonably necessary to comply with a binding authority. The defendant should not be required to show that its policy is the only possible way to comply with the third party requirement, so long as its policy is reasonably necessary. Similarly, paragraph (d)(1)(iii) of this Final Rule adds that this defense requires the defendant to show that challenged action was reasonably necessary to comply with the restricting law or order, meaning that there may be other reasons the defendant may have chosen the course of action, and there may have been other ways of complying with the restricting law or order, as long as the challenged action was reasonably necessary to comply with the restricting law or order.

Paragraph (d)(2) of the Final Rule provides defenses that are available using evidence appropriate for the stage of litigation. Paragraph (d)(2)(i) supplements paragraph (c)(2) regarding valid interests advanced by the defendant. HUD notes that practices that predict outcomes, such as risk analysis, may lead to a result that appears, without taking into account external factors, to have a disparate impact because, due to factors outside the defendant's control, members of a protected class are disproportionately associated with a particular outcome, such as a higher risk pool. A defendant may show that the predictive analysis accurately assessed risk, which is a valid interest. A defendant may also show that a predictive model is accurate by showing that it is not overly restrictive on members of the protected class. If, for example, a plaintiff alleges that a lender rejects members of a protected class at higher rates than non-members, then the logical conclusion of such claim would be that members of the protected class who were approved, having been required to meet an unnecessarily restrictive standard, would default at a lower rate than individuals outside the protected class. Therefore, if the defendant shows that default risk assessment leads to less loans being made to members of a protected class, but similar members of the protected class who did receive loans actually default more or just as often as similarly situated individuals outside the protected class, then the defendant could show that the predictive model was not overly restrictive.

HUD considers this defense to be an alternative for the algorithm defenses in paragraph (c)(2) of the Proposed Rule. Those algorithm defenses were each intended, in different ways, to provide methods for the defendant to show that an algorithm did not cause a disparate impact. HUD has concluded that these defenses would likely have been unnecessarily broad in their effect, and HUD has determined this alternative would provide some defendants the opportunity to justify predictive models. HUD expects that there will be further development in the law in the emerging technology area of algorithms, artificial intelligence, machine learning and similar concepts. Thus, it is premature at this time to more directly address algorithms.

Paragraph (d)(2)(ii) of the Final Rule provides the defendant the opportunity to show that the plaintiff has failed to prove the prima facie case and replaces paragraph (d)(2)(ii) of the Proposed Rule. Paragraph (d)(2)(iii) mirrors the language in paragraph (d)(1) regarding limited discretion and is repeated here because, while the defendant may bring this defense at the pleading stage, the defendant may also bring this defense with evidence at later stages in the litigation.

Paragraph (f)—Remedies in Discriminatory Effect Cases

Paragraph (f), added in the Final Rule, replaces proposed § 100.7(c) regarding damages. Rather than restricting administrative law judges, paragraph (f) is limited to restricting HUD itself in the types of damages HUD will seek where HUD is the party bringing a discriminatory effects case. The Final Rule also adds an exception that allows HUD to seek civil money penalties in discriminatory effects cases where the defendant has a history of intentional housing discrimination.

Paragraph (g)—Severability

The Final Rule also adds paragraph (g), which reflects HUD's intent that § 100.500 is severable and each part of the section is independently applicable.

## IV. Public Comments

The public comment period for the August 19, 2019, Proposed Rule closed on October 18, 2019. HUD received and reviewed 45,758 comments on the Proposed Rule from a wide variety of interested entities, including individuals, fair housing and legal aid organizations, state and local fair housing agencies, state attorneys general, state housing finance agencies, public housing agencies, insurance companies, insurance trade associations, mortgage lenders, credit unions, banking trade associations, real estate agents, and law firms.[12] This section of the preamble addresses significant issues raised by the public comments and is organized by Proposed Rule section, with summaries of the issues followed by HUD's responses. There were also numerous comments received both in support of and opposition to the Proposed Rule generally, as well as comments that did not specifically address one specific section of the Proposed Rule. Those comments are organized into general categories and responded to accordingly.

Following are the issues raised by the public comments and HUD's responses.

*General Support*

HUD received comments expressing general support for the Proposed Rule. HUD also received comments that supported the Proposed Rule but wrote that HUD could further revise the Proposed Rule to be in line with *Inclusive Communities*. Commenters stated that the Proposed Rule would increase access to fair and affordable housing. One commenter thought that, if implemented, the Proposed Rule would take HUD one step closer to making communities a better place. Commenters also stated the Proposed Rule is effective in uncovering discrimination and ensuring disparate impact cases can be brought forward, while still being consistent with the Act. Commenters stated that the Proposed Rule would specifically incentivize

[12] All public comments on this rule can be found at *www.regulations.gov*, specifically at: *https://www.regulations.gov/docketBrowser?rpp=50&po=0&D=HUD-2019-0067*.

parties to work together and may reduce frivolous and arbitrary claims without creating a material burden on those who have legitimate claims.

Some commenters stated the Proposed Rule would help local governments that face challenges in protecting their citizens and implementing zoning laws, but also ensures that local governments are complying with all applicable state and federal laws; noting that sometimes it is hard to know what is or is not discrimination, especially when an act by government or private individuals appears neutral on its face. One commenter noted that the Proposed Rule appropriately considered changing technology. Other commenters supported the proposition in the Proposed Rule's preamble that neutral decision-making criteria should not lead to regulatory sanction due to disparate impact. Another commenter stated the Proposed Rule promotes the free market system and removes impediments to increased lending in needy communities.

Commenters also noted that the Proposed Rule is consistent with the Supreme Court's *Inclusive Communities* ruling, and that the current regulation is inconsistent with its limitations. Another commenter stated that both *Inclusive Communities* and the Proposed Rule strike a reasonable balance by enforcing fair housing rights without improperly second-guessing otherwise legitimate decisions by public and private entities. One commenter stated that the current regulation is legally inconsistent with case law and congressional intent, and that the 1991 Civil Rights Act amendments superseding *Wards Cove*[13] only applied to Title VII, not the Fair Housing Act; the Proposed Rule corrects this error. Another commenter supporting the Proposed Rule stated that arguably all cases brought since *Inclusive Communities* have been aligned with the Supreme Court's binding precedent in that case, and cases brought that did not meet its standard, or that were based on the 2013 Rule's 3-part test, have been dismissed.

Some commenters stated that courts have erroneously suggested that the 2013 Rule and *Inclusive Communities'* framework are the same, and conforming HUD's rule to *Inclusive Communities* will reduce confusion. Commenters cited differences between the rules, including that the 2013 Rule did not require plaintiffs to prove robust causality, nor did it require that a challenged policy be "arbitrary, artificial, and unnecessary" to achieving a valid objective, which can include practical business and profitability. Commenters also stated that the Proposed Rule would be consistent with the limitations articulated in *Inclusive Communities* on disparate impact claims by including safeguards for defendants to prevent abusive use of disparate impact liability.

Commenters supported the change to the burden shifting framework. One commenter noted that the change is fair to all claimants and will permit and protect practical business choices and profit-related decisions. Commenters also supported HUD's revisions to the burden of proof necessary to prove a prima facie disparate impact case and to the affirmative defenses. Many commenters supported the proposed standard for proving a prima facie case, stating it would ensure that defendants are not sued for disparities that they did not create. Commenters also stated that the current HUD standard creates morally and legally untenable circumstances when seeking to determine actual discriminatory behavior, which the Proposed Rule would address. Some commenters wrote that disparate impact policies are currently used to require the consideration of race and perpetuate the theory that minorities are all poor and in need of housing. The commenters wrote that the 2013 Rule forced landlords, lenders and others involved in the housing industry to incorporate race into their decision-making processes to avoid disparate impact charges.

Other commenters supported the Proposed Rule, stating that without the Proposed Rule, parties would be forced to adopt or pursue policies under very different standards regarding what constitutes actionable discrimination, thus increasing uncertainty and leaving resolution exclusively to the courts. Commenters noted that the Proposed Rule would alleviate burden on industry having to manage two different standards. Other commenters stated the Proposed Rule appears to be an effective way to decrease the costs to affected parties litigating claims. Another commenter stated that the amendments help to safeguard assistance providers, because without additional protections, plaintiffs may claim discrimination effects that are caused by ripple effects too distant to link the injury to the defendant.

Commenters stated that they support provisions in the Proposed Rule that ensure valid disparate impact claims may not be based on statistical disparities alone. One commenter wrote that parties should not be liable for statistical coincidences. Another commenter stated that the Proposed Rule would ensure that plaintiffs asserting claims against lenders must show that the program as a whole causes the disparate impact as opposed to a program's element. Another commenter stated the Proposed Rule would provide cost savings and more options to consumers.

Commenters stated that the Proposed Rule will reduce barriers for community and small banks so they can focus on lending and homebuying, and the Proposed Rule removes barriers generally for banks in the mortgage business. One commenter said the Proposed Rule is essential for smaller banks that do not have the resources to defend costly legal challenges that could drive banks out of the lending market. A commenter said that quantifying costs and benefits is difficult due to differing business plans of banks, but that a growing number of banks are exiting the mortgage business.

Other commenters stated that the proposed changes are a step towards fairness for property owners, and that they protect the rights of landlords and tenants. One commenter expressed that the current regulation creates too much risk for small landlords, making it tempting to exit the real estate business, and clearer standards would make it easier to hire, train, and retain real estate professionals, leading to a better experience for all parties. Some commenters stated that making business choices based on credit and economic factors is not inherently discriminatory and homeowners should be able to make rental decisions without fear of litigation. Another commenter stated that they have seen an increase in the number of threatened or actual claims by tenants or advocacy groups arguing that lease enforcement or business practices could be discriminatory due to a small possible correlation between a protected group and a harmful impact of that practice. Multiple commenters stated the Proposed Rule would provide greater clarity, predictability and certainty to processes and provide some assurance that the screening policies they develop are both fair and compliant with applicable law.

Commenters also supported HUD's changes to §§ 100.5, 100.7 and 100.120. One commenter noted that the change to § 100.5 would provide much needed balance and serve an important gate keeping function. Commenters also supported the changes to remedies in § 100.7, stating that the Proposed Rule properly focuses on eliminating the

[13] *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642 (1989).

offending practice, rather than money damages or penalties. As for § 100.120, one commenter stated that the proposed change would allow lenders to focus their compliance efforts on avoiding and preventing substantive inaccuracies rather than scrutinizing communications for complete uniformity across potential borrowers. The commenter also supported the clarification added to § 100.120(b)(1), which would allow lenders to provide accurate information to customer inquiries related to their individual situations without fear of triggering a regulatory violation.

Lastly, commenters supported the new language addressing insurance. Some commenters, while supporting the change, requested HUD provide further protections for the insurance industry, homeowners insurance, and commercial habitational insurance. Commenters supported the Proposed Rule's preservation of the state-led insurance regulation system. Commenters wrote that allowing plaintiffs to bring disparate impact claims against insurers serves to undermine the functioning state regulatory system, thereby leading to uncertainty in the marketplace, unnecessary litigation, and increases in premiums nationwide.

Commenters stated that the robust causal link element is consistent with Supreme Court disparate impact precedence and *Inclusive Communities*, and the Proposed Rule corrects the exclusion of this language from the 2013 Rule; it also protects defendants from liability when disparities exist that they didn't create, and disallows statistical disparities alone, that are not connected to the defendant's policy, to support a claim. Other commenters said the robust causality element rectifies conflict between the 2013 Rule and cases brought since *Inclusive Communities*.

*HUD Response:* HUD appreciates the comments in support of the Proposed Rule changes. HUD agrees that adopting the proposed changes as final will bring clarity to litigants and further the Fair Housing Act's purpose. HUD also agrees that it will benefit banks and landlords, while ensuring that disparate impact cases can continue consistent with Supreme Court precedent. HUD especially appreciates and agrees that clarity given existing case law is needed to assist both plaintiffs and defendants. Lastly, HUD agrees with the comments that supported the change to § 100.5 and § 100.500(e) dealing with insurance.

*General Opposition*

*Comment: HUD's Proposed Rule weakens the 2013 Rule, which protects vulnerable communities, sets a balanced standard, and should not be changed.*

Many commenters stated they believed the Proposed Rule would increase discrimination or segregation by removing the 2013 Rule, which commenters stated has been a valuable tool in fighting housing discrimination and is a sufficient and clear causation standard. Some commenters stated that HUD's Proposed Rule creates unwarranted loopholes to the Fair Housing Act that are likely to undermine, rather than advance, access to fair housing and the basic rights of all Americans. Several commenters suggested that the 2013 Rule should not be changed, with one commenter specifically stating that the 2013 Rule's flexibility allowed continued improvement and would allow communities to build on common understandings. Commenters stated further that choosing not to amend the 2013 Rule would have no impact on the status quo because *Inclusive Communities* did not disrupt the current regulation. Another commenter noted that the very nature of case law jurisprudence is that it is constantly growing and changing, to meet altered conditions on the ground and the nuances of impacted parties, entities and stakeholders, and not amending the 2013 Rule allows the law since *Inclusive Communities* to continue to develop in real world conditions, without HUD's interference and negative impact. One commenter stated that not enough time has passed since the Supreme Court's decision and the Proposed Rule. A commenter stated that the Proposed Rule would nearly obliterate disparate impact liability by shifting the burden to plaintiffs, limiting defendants' liability, and removing the "discriminatory effects" definition. Some commenters noted that all but one post-*Inclusive Communities* circuit court decision has recognized that the "robust causality requirement" was simply the long-standing requirement codified in the 2013 Rule. Commenters stated that given the absence of any directive from the Supreme Court to modify the burden-shifting test, several lower courts have interpreted *Inclusive Communities* as, at most, emphasizing the need to robustly evaluate plaintiffs' existing prima facie burden. One federal district court has disapprovingly characterized defendants as "strain[ing] to turn the Court's decision to their advantage, insisting that although it affirmed that such claims are cognizable, [the Supreme Court] established 'rigorous, pleading-stage requirements.' "[14]

Commenters also cited cases showing that the defendant does not need to be responsible for the underlying disparity to be responsible for a disparate impact based on that disparity. Commenters noted that the standards used by *Inclusive Communities* were the same as those in *Wards Cove*, cited by *Inclusive Communities*, and are generally accepted standards.[15] Commenters stated that the existing doctrine is that a plaintiff who is able to identify a policy or practice and marshal a showing of causation has identified a robust cause of their alleged harm. Commenters stated the robust causality requirement refers only to the existence of a causal connection between the defendant's policy and a statistical disparity. Commenters stated that the Court's use of the word "robust" in "robust causal link" was a modification of the word "requirement." Commenters cited *Cty. of Cook* v. *Bank of Am. Corp.*, which found that *Inclusive Communities* was consistent with the circuit court's past causality analysis.[16]

Commenters stated that the Proposed Rule amounted to cutting off statistics-based claims altogether, by requiring the dispositive statistical analysis be performed before the relevant data can be gathered. Commenters also stated that requiring a robust causal link would create an additional, onerous obstacle for plaintiffs. Commenters stated that *National Fair Housing Alliance* v. *Travelers Indemnity Co.* concluded that plaintiffs continue to meet well-established pleading standards by pleading the existence of statistical evidence demonstrating a causal connection between the challenged policy and the disparities.[17] Commenters also noted the court in *Cty. Of Cook* v. *Bank of Am. Corp.* found a cognizable disparate impact claim where the complainants articulate both a statistical race-based disparity and a specific, multifaceted policy with a robust causal connection to that disparity and stated that the defendants have not shown that *Inclusive Communities* required more.[18]

Many commenters recommended that HUD, rather than implement the Proposed Rule, focus its efforts on enforcing the 2013 Rule, prohibiting housing discrimination, enforcing the ADA, expanding access to affordable

[14] *City of Cook* v. *Bank of Am. Corp.*, 2018 U.S. Dist. LEXIS 55138, at *25 (N.D. Ill. Mar. 30, 2018).

[15] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015).

[16] 2018 U.S. Dist. LEXIS 55138.

[17] 261 F. Supp. 3d. 20, 31–34 (D.D.C. 2017).

[18] *Id.* at *29.

housing, and more robust fair housing education. Another commenter mentioned that HUD has a direct responsibility to ensure equal opportunity and freedom from discrimination, even if that discrimination is subtle or covert. Several commenters contended that disparate impact liability under the Fair Housing Act is critical for this end, and the 2013 Rule provides clear standards for assessing this responsibility in the market. Commenters stated that the current regulation strikes an appropriate balance or has been effective while other commenters mentioned the effects of policies, rather than intent, in supporting the current regulation. Commenters also suggested that HUD and DOJ amend its November 2016 Joint Statement to include the other types of discriminatory actions that restrict manufactured housing.

Commenters stated that disparate impact liability was vital for handling housing cases after natural disasters such as Hurricanes Katrina and Rita and led to more affordable rental housing in Louisiana and families receiving relief from discriminatory recovery policies. Commenters provided the following examples of the types of alleged discrimination or societal problems which would be harder to challenge or solve under the Proposed Rule: Landlords imposing unfair requirements in their properties; gentrification leading to demolition of properties and eviction of low income families of color; neighborhoods having unaddressed high crime rates and underfunded schools; unfair distribution of city services, parks, and maintenance; zoning rules that keep lower income families out of better funded neighborhoods and communities; facially neutral policies by banks and lending institutions which limit the availability of home mortgage products based on the value of the home being purchased, which disproportionately exclude minorities from access to mortgages; landlords who refuse to rent to those who use housing choice vouchers or who receive disability benefits; financial and real estate institutions adopting policies that result in the blight and deterioration of foreclosed homes in communities of color; segregation of protected classes; the growing wealth gap; decreasing home-ownership rates for minority populations; redlining; and unreasonable lease restrictions imposed by landlords. Another commenter suggested that the Proposed Rule would negatively impact federal, state, and local government budgets by increasing housing instability.

A commenter stated the Proposed Rule would impact public schools, which are dependent on community funding, creating disparities among schools. Some commenters opposed the Proposed Rule because they believe it could negatively impact the health and safety of people reliant on affordable housing, increase housing instability, harm the overall economy, and reduce access to better neighborhoods and schools.

One commenter stated that the proposed changes will bring uncertainty to the credit industry and put innovation at risk. Another commenter stated that the Proposed Rule threatened challenges to discriminatory zoning and land use planning decisions involving manufactured housing. The commenter stated that the 2013 Rule served a vital role in educating communities, including public officials, about the unintended consequences of local zoning and land use decisions, which can prohibit the availability of affordable housing, and was concerned that the Proposed Rule would deny the educational aspects that the 2013 Rule provides.

Some commenters provided statistical evidence of their claims, including data relating to housing displacement. One commenter stated that research has shown that housing interventions for low-income individuals improve health outcomes and reduce health care costs while families and children experiencing housing instability, including homelessness, have a greater risk of suffering detrimental physical and mental health effects, which increases with the frequency of instability. Commenters further stated that the Proposed Rule might specifically harm Housing Choice Voucher participants by limiting where they can live, which would increase reliance on public welfare and place an undue burden on states/localities to meet federal child welfare requirements. Other commenters believed that the Proposed Rule could allow landlords to exclude all veterans, exclude veterans who do not hold full-time jobs, or charge veterans fees not charged to other residents.

Commenters remarked that the Proposed Rule would only serve to make more people homeless when the administration is constantly speaking about the homeless epidemic. One commenter noted that the Proposed Rule would result in individuals losing their housing, which could in turn lead to increased homelessness and that excluding them from their original safety nets will not benefit society.

Commenters expressed concern for the ability of specific populations to maintain affordable housing, such as seniors, people living in low vacancy areas, individuals without access to stable housing, and individuals living in rural areas. One commenter wrote the Proposed Rule could allow landlords to exclude seniors who don't hold full-time jobs. Another commenter cited a study showing that 76% of adults age 50+ prefer to stay in their current homes and noted the aging population faces discrimination often closely related to the likelihood of their acquiring disabilities. Another commenter mentioned that it would be too burdensome for the elderly to prove they need basic accommodations, such as a grab bar in the bathroom. Another commenter pointed out that senior homelessness in their city has risen in the past year and policies basing occupancy on employment status can exacerbate this trend, which the Proposed Rule will not be effective to fight.

Some commenters expressed concern about the Proposed Rule's impact on housing opportunities for LGBTQ individuals and queer people of color because without disparate impact it would be extremely difficult to prove sexual orientation discrimination and that LGBTQ people are disproportionately likely to experience housing discrimination. One commenter cited HUD's research regarding discrimination against LGBTQ individuals. One commenter expressed concern that religious exemptions would allow federal insurance contractors to discriminate against LGBTQ people who are not protected by the Civil Rights Act.

Commenters also objected to the Proposed Rule because religious discrimination in housing provisions often come through facially neutral policies. One commenter remarked that the Proposed Rule undermines the path for legal redress for those in the Jewish community. Another commenter cited an example where an apartment management company required pool dress code compliance based on practices of the Orthodox Jewish community and a complaint against a homeowner's association that normally prohibited outdoor lights and decorations but allowed winter holiday decorations.

Commenters remarked that the Proposed Rule will also make it harder for individuals to avoid falling victim to discrimination based on sex. Commenters worry that communities composed largely of low-income people of color will experience more inequities,

such as less well-maintained roads and litter cleanup, as a result of the Proposed Rule. Another commenter remarked that low-income Americans receiving government benefits do not often receive their checks on the first of the month, which makes them late in paying their rents and vulnerable to evictions in cases where Landlords use neutral policies that all rent be paid on the first of the month.

Commenters stated that the Proposed Rule would increase harms to domestic violence survivors, and HUD fails to address the Proposed Rule's consequences regarding policies such as emergency transfer requirements, crime-free policies, nuisance ordinances, unjust tenant-screening policies, and source-of-income discrimination.

Commenters highlighted that HUD has recognized the 2013 Rule's applicability to discrimination against survivors of domestic violence, dating violence, sexual assault, and stalking face in "HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions, April 4, 2016", and "HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police or Emergency Services, September 13, 2016." [19]

A commenter stated that the 2013 Rule has been used to protect non-English speakers' equal access to housing. Commenters stated that the Proposed Rule would harm people from a different national origin. One commenter noted that they have used the 2013 Rule to stop policies that blocked legal refugees from renting homes. Other commenters used the 2013 Rule to force cities to reconsider development policies that displaced immigrants. A commenter remarked that the Proposed Rule has unintended negative effects on persons like foreign university students and persons on fellowships, even fellows funded by the U.S. government, who end up making risky housing decisions to afford their stay.

Some commenters expressed concern that the Proposed Rule would make it more difficult for people with disabilities to request reasonable accommodations in order to use and enjoy housing and that it would make policy challenges, such as against a homeowner's association, more difficult to bring for people with disabilities. A commenter stated that the 2013 Rule has provided people with disabilities with recourse in the face of pervasive discrimination and barriers to accessible, equitable housing. According to a commenter, HUD has failed to analyze and disclose the consequences of curtailing disparate impact liability on people with disabilities that would arise under the Proposed Rule.

A commenter stated that the effect of the Proposed Rule would be to further isolate people with disabilities from family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment and stigmatize them as incapable or unworthy of participating in community life. One commenter remarked that people with disabilities, including people with mobility impairments, blindness, and deafness, already face barriers finding housing that is accessible and that the Proposed Rule would be yet another barrier. One commenter suggested that the Proposed Rule would allow lenders to discriminate based on borrowers' Social Security Disability Income. Another commenter stated housing providers hide behind insurance policies that have animal or breed restrictions to deny access to people with emotional support animals. Several commenters suggested that the Proposed Rule could allow landlords to exclude people with disabilities who do not hold full-time jobs. Commenters observed that the Proposed Rule would undermine the integration mandate in the Supreme Court's decision in *Olmstead* and implementation of the Americans with Disabilities Act (ADA).[20]

Commenters remarked that people in recovery from drug addiction and alcoholism are protected as people with disabilities under the Fair Housing Act. Some commenters remarked that in many cases, local governments use facially neutral but discriminatory zoning and land use tactics that prevent people with substance abuse disorders from being able to live in the supportive environment of a recovery home. Commenters believed the Proposed Rule would make it significantly harder to prove discrimination in housing for policies that seem neutral, but in practice unfairly exclude certain groups of people or segregate certain communities and further limit access to a critical recovery support.

Commenters stated that the intersection of protected classes compounds the negative impacts of the Proposed Rule, as often a person in one protected class belongs to another protected class, such as women who are victims of domestic violence. One commenter remarked that the intersection of race and gender is the most reliable factor in predicting eviction in Philadelphia (out of the Philadelphians that have evictions, 70% are women of color). Commenters believe that the Proposed Rule would exacerbate existing discriminatory outcomes for women of color since it would allow housing providers to evade awareness of the impact of their own discriminatory practices.

One commenter stated that the Proposed Rule could protect banks with tiered interest rate policies even though such policies may have a disparate impact on homebuyers in predominately minority neighborhoods with lower home values. Some commenters argued that the Proposed Rule would be financially burdensome or make compliance more difficult for small businesses. One commenter said the Proposed Rule undermines fair market competition because smaller companies or new entrants to the marketplace that cannot assert that they also establish industry standards will face a steep, potentially insurmountable barrier to compete in this space.

Commenters remarked that the Proposed Rule would make it more difficult for individuals with criminal records to obtain housing, because housing providers could have admissions policies such as blanket bans on people with criminal records, or with arrests and convictions that arise from the criminalization of homelessness and do not pose a safety concern. One commenter provided an example of how someone with a minor charge or misdemeanor that they had from 20+ years ago can impact their housing access. Another commenter cited statistics regarding the number of minorities incarcerated in Illinois and recidivism rates in support of the argument that stable housing is necessary for former offenders. A commenter noted that Cook County recently passed the Just Housing

[19] U.S. Department of Housing and Urban Development, *HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police or Emergency Services, HUD.gov* (Sept. 13, 2016), *https://www.hud.gov/sites/documents/FINALNUISANCEORDGDNCE.PDF; HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions, HUD.gov* (April 4, 2016), *https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.*

[20] 42 U.S.C. 12101 *et seq.; Olmstead* v. *L.C. by Zimring,* 527 U.S. 581 (1999).

Ordinance,[21] which acknowledges that background check policies have a discriminatory and disparate impact on Black and Latinx communities, as well as people with disabilities. The commenter believed this ordinance is an example of a local government dedicating its resources to the principles of the 2013 Rule and proposes HUD keep the 2013 Rule since it strengthens communities by allowing victims of all types of systemic discrimination to seek recourse and change policies. A commenter remarked that the Proposed Rule would limit the ability of advocates to negotiate with landlords to adopt more inclusive background policies. A commenter remarked that barriers to housing based on an individual's criminal record can also arise from children with criminal records, a disproportionate number of whom are children of color, which similarly affects families' ability to stay united in adequate housing. Another commenter observed that men of color are incarcerated at a higher rate, they disproportionately face more obstacles to housing than their white counterparts, and thus disparate impact is what currently protects them from the effect of institutionalized racism.

One commenter noted that the 2013 Rule and HUD guidance was instrumental in adopting a fair housing ordinance related to the use of criminal records in housing decisions. One commenter wrote that disparate impact theory is extremely important in small cities and rural areas as a viable means of enforcing fair housing rights, especially for protected classes. Another commenter specifically addressed the impact of the Proposed Rule on manufactured housing, related to disparate impacts from state actions on property used for manufactured housing. The comment cited HUD's role in the White House Council on Eliminating Barriers to Affordable Housing, and HUD's recent housing finance reform proposal,[22] which includes a section on eliminating such barriers to the use of manufactured housing as affordable housing. The commenter argued that HUD has broad preemption authority with respect to zoning and land use planning, which negatively impacts the availability of affordable housing that goes together with preemption authority over disparate impact. The commenter encourages HUD to revise the Proposed Rule as it relates to discriminatory zoning and land use requirements, to preserve the ability of plaintiffs to pursue legitimate disparate impact cases in these instances, including where it affects the availability of manufactured housing.

Commenters wrote that the 2013 Rule's disparate impact analysis helps defend protected classes and those who are being discriminated against, ensuring equality in society and fair housing policy by using data-driven approaches to modify facially neutral yet discriminatory policies that impose unnecessary barriers to housing. Commenters noted that the 2013 Rule has been a valuable tool for victims, communities, fair housing practitioners, and the housing industry, to challenge structural inequalities, in holding potential defendants accountable for unintentional and intentional discrimination, as well as combating implicit bias, and has been instrumental in helping to remedy or alleviate discriminatory practices, including historical patterns of segregation. Some commenters provided examples of cases where the 2013 Rule protected tenants from discriminatory housing practices, specifically shielding tenants who receive housing subsidies from being subjected to rental increases or denied insurance. Other commenters used personal and historic examples to highlight the effectiveness of the 2013 Rule in combatting discrimination.

One commenter stated that HUD is allowing public money to fund discrimination in violation of law and another commenter stated that the Proposed Rule constitutes a human rights violation. Another commenter stated the Proposed Rule would result in fewer investigations by HUD's Office of Fair Housing and Equal Opportunity (FHEO). Commenters stated that HUD should not adopt the Proposed Rule because the 2013 Rule is consistent with HUD's mission, including the statutory requirement to affirmatively further fair housing under the Fair Housing Act, the U.S. Constitution, and historic precedent interpreting disparate impact under the Fair Housing Act.

Some commenters cited the societal benefits of the 2013 Rule, including health equity, healthy families, a healthy environment, educational achievements, long-term earnings, and community integration of individuals with disabilities. In spite of the Fair Housing Act's passage and this national policy, one commenter stated that there are over 4 million instances per year of discrimination impeding people's ability to secure affordable insurance products, access quality credit, rent affordable and safe housing, and obtain accessible housing units, which many commenters argued were able to be combated by the uniform standard of the 2013 Rule. These commenters also stated that the 2013 Rule is supported by the *Inclusive Communities* decision and furthers fair housing and fair lending. Several commenters highlighted the positive impact the 2013 Rule had on families with children, such as challenging restrictions on the number of occupants in a unit, as well as restrictions on the use of amenities, where discriminatory intent may not be shown. Another commenter cited data showing that there were 2,675 familial status discrimination complaints filed in 2017, the majority pertaining to rental market discrimination. Other commenters feel that without the 2013 Rule's legal remedies, the country is in danger of returning to the pre-1988 conditions in which one-quarter of rental housing was restricted against families with children. Commenters also stated that by making disparate impact cases harder to bring, the Proposed Rule would have an adverse effect on those impacted by historic patterns of segregation, which are still present today.

One commenter also noted that under the Act, HUD is currently tasked with determining the reasonableness of an occupancy standard considering factors such as size of bedroom and age of children, and that with the Proposed Rule, municipalities would not be required to explain how restrictions on bedroom occupancy related to a legitimate government objective. Another commenter supported the 2013 Rule because it allowed civil rights "watchdogs" to hold housing providers and others accountable, including a 2018 federal lawsuit that challenged a property management company's policy that was having a disparate impact on African Americans in Chicago. Other commenters stated that the 2013 Rule is balanced by providing a well-tailored pleading standard, a defense to disparate impact claims, and a three-step, burden-shifting process which addresses discrimination while preventing frivolous lawsuits. Another commenter stated that the 2013 Rule is critical in negotiations with housing providers even before any official complaint is filed.

Commenters stated that there is no need for the Proposed Rule to shift the balance of interest for parties to make cases more difficult to bring, as the

[21] Cook County Government, *Just Housing Amendment to the Human Rights Ordinance*, *cookcountyil.gov*, *https://www.cookcountyil.gov/content/just-housing-amendment-human-rights-ordinance*.

[22] Exec. Order No. 13,878, 84 FR 30853 (June 25, 2019); U.S. Department of Housing and Urban Development, *Housing Finance Reform Plan*, *HUD.gov* (Sept. 2019), *https://www.hud.gov/sites/dfiles/Main/documents/Housing-Finance-Reform-Plan0919.pdf*.

current regulations have not led to an increase in unwarranted Fair Housing Act litigation or compliance costs. With the exception of a lawsuit filed by insurance trade groups, commenters stated that none of the wide array of entities regulated by the 2013 Rule challenged its legality.

Some commenters believed that the Proposed Rule sought to legalize housing discrimination and segregation or seek to reframe disparate impact as classic disparate treatment. Another commenter stated that HUD has failed to ask how the Proposed Rule might increase or decrease housing inequality or segregation. In this world of rapid societal change, the standards for proving disparate impact under the Fair Housing Act should stay the same so that the Act's remedial purpose can be effectuated, and the 2013 Rule should not be changed. A commenter added that there has been less litigation because of *Inclusive Communities* and the 2013 Rule. The commenter stated that the 2013 Rule's clarity allows parties to make informed decisions about how policies or practices are impacting protected classes and cases are resolved quicker and more efficiently.

Commenters noted that the current and Proposed Rules are both too complicated and proposed HUD make Fair Housing Act regulations simpler so that individuals might have a chance to bring a successful claim. Examples suggested included simplified and clearer guidelines with examples for evidence required.

One commenter suggested that HUD's questions were soliciting positive responses from banks, landlords, or other similar defendants who welcome a rule drafted heavily in their favor, whereas the Proposed Rule would have a significant negative economic impact on protected class households as they will incur greater costs when seeking housing, loans and insurance, and such households will be unable to surmount the barriers created by the Proposed Rule. One commenter said both *Inclusive Communities* and the Proposed Rule make disparate impact claims more difficult and complicated, and therefore more expensive, and may discourage such claims because they appear to increase burdens and costs for complainants, shifting those costs from respondents. Another commenter asserted plaintiffs may review the Proposed Rule and not bring cases due to the conclusion that their claim against an insurance company will not be successful, which will greatly decrease litigation costs and risk of litigation cost to insurance companies; however, it will do nothing to solve the real-world discrimination wrought by unfair and potentially discriminatory policies insurance companies use to perpetuate housing segregation.

*HUD Response:* HUD appreciates the insights provided. HUD disagrees that the Proposed Rule deviates from the agency's mission or the Fair Housing Act's purpose, or that it allows discrimination. HUD thoughtfully considered these comments and made several changes to provisions of the Proposed Rule in response, as discussed in more detail elsewhere. Further, HUD will continue its efforts to enforce the Fair Housing Act and other civil rights statutes within its purview. As discussed in HUD's Proposed Rule, the Supreme Court did not rule specifically on the validity of the 2013 Rule when it decided *Inclusive Communities,* but only on the issue of whether disparate impact theory is cognizable under the Fair Housing Act. As discussed further below, the Court's reference to HUD's 2013 Rule was only in passing. The changes being made by the Proposed and Final Rules are within HUD's discretion to interpret the Fair Housing Act, and are consistent with the direction of *Inclusive Communities* to ensure that the constitutional concerns raised by the Court are fully addressed. The Final Rule will afford the use of data-driven approaches to modify facially neutral yet discriminatory policies, while at the same time providing clarity to members of the public seeking to comply with the Fair Housing Act or bring a claim for disparate impact that meets the constitutional requirements outlined in *Inclusive Communities*. The changes made will also ensure a balanced approach to disparate impact litigation by providing a roadmap for plaintiffs and protecting against frivolous lawsuits while still allowing disparate impact liability to be used to hold violators accountable. The changes also provide guidance for litigants to assist in navigating the limitations that courts have placed on such claims.

HUD acknowledges commenters' concerns regarding changes being made to the 2013 Rule but notes that the Final Rule still recognizes disparate impact as a viable theory of discrimination, which can be used to hold violators accountable for discriminatory policies and practices. The Final Rule also allows municipalities and local governments to implement ordinances and laws that reflect the needs of their distinct communities while providing a tool to challenge policies that have a disparate impact on protected classes. HUD believes that the Final Rule will better serve the 2013 Rule's purposes, including educating the public regarding the purpose and scope of disparate impact law, as it builds upon it by clarifying provisions in light of *Inclusive Communities*. It is important to note that with regard to commenters' statements surrounding the importance of disparate impact as a theory, the Final Rule does not remove the availability of disparate impact claims to address Fair Housing Act violations, and does not change the societal benefits of HUD's implementation of the Fair Housing Act. Rather, the Final Rule provides greater clarity on the use of disparate impact to address alleged violations in a manner that increases the rule's effectiveness so as to best eliminate discriminatory practices.

HUD's interpretation is consistent with *Inclusive Communities'* clarification that *Gallagher* v. *Magner* was "decided without the cautionary standards announced in this opinion[.]" [23] *Gallagher* argued that a Fair Housing Act violation can "arise from a statistical link between income and race[.]" [24] This standard is clearly inconsistent with the robust causality standard articulated in *Inclusive Communities*. In HUD's view, the 2013 Rule presents only a brief explanation of the requirements for prevailing on a disparate impact claim, and therefore invites speculation and does not provide sufficient clarity about the standard used by the courts.

This Final Rule, however, is clear and consistent with the language used in *Inclusive Communities*. It does not set a higher standard than the one currently used by most courts. The Final Rule aligns with *Inclusive Communities,* which stated that liability in disparate impact cases cannot be "imposed based solely on a showing of a statistical disparity." [25] The suggestion that "robust" was intended to modify the word "requirement" does not change HUD's conclusion that plaintiffs are required to show a robust causal link; for the causal link to serve as a robust requirement, it must itself be robust.

Further, as several commenters stated in support of the Proposed Rule, the clarification provided by the Final Rule provides a balanced approach to protect small banks, businesses and landlords while still providing a mechanism for addressing inequality and discrimination, including zoning and land use issues. HUD does not believe the Final Rule will have the suggested

[23] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2524 (2015).

[24] 619 F. 3d 823, 836 (8th Cir. 2010).

[25] *Inclusive Communities*, at 2512.

negative effects on the various constituencies and institutions cited in the comments because, as discussed throughout this preamble, HUD believes that this Final Rule still allows disparate impact claims to be brought when appropriate under law, and, therefore, these constituencies and institutions will still have disparate impact claims as a basis for relief under the disparate impact doctrine.

As to the comment regarding soliciting positive comments, HUD has submitted this Proposed Rule for public comments in good faith, has welcomed all comments and given all comments serious consideration. HUD made significant changes in this Final Rule in light of comments, such as removing the defense based on the existence of a model or algorithm.

HUD believes this Final Rule provides greater clarity, in the wake of *Inclusive Communities*, regarding the requirements for bringing and defending against disparate impact claims. This Final Rule is designed to clarify what evidence is needed in order to successfully challenge a policy or practice, which HUD believes will lead to a greater percentage of successful disparate impact claims while reducing the number of claims that are not appropriate under the disparate impact theory.

Further, as noted above, nothing in this Final Rule alters the myriad other mechanisms for protecting individuals against intentional housing discrimination.

This Rule does not alter the rights and protections available under the Fair Housing Act. For example, housing providers must make reasonable accommodations to policies or practices that interfere with the ability of a persons with a disability to have an equal opportunity for the full enjoyment of housing under that Act. This Rule does not change those protections. Further, a policy with widespread effect could still be successfully challenged under this Rule.

With regard to issues of sexual orientation and domestic violence, this Final Rule leaves unchanged HUD's regulatory protections, which are separate from the Fair Housing Act.[26]

With regard to lending and insurance practices, this Final Rule removes the proposed defense solely based on the defendant following a risk-assessment model or algorithm that had acceptable characteristics, thereby leaving such cases to be examined under the general framework, with the same defenses available in other types of disparate impact cases.

With regard to age, legal protections under the Age Discrimination Act of 1975, for example, remain unaffected. The civil rights laws and authorities that apply to HUD programs are listed here: *https://www.hud.gov/program_offices/fair_housing_equal_opp/fair_housing_and_related_law*.

As to the complexity of the Proposed Rule, disparate impact claims often require the resolution of inherently complex matters. HUD's Final Rule clarifies the legal standards and procedures and aligns them with *Inclusive Communities*, the seminal Supreme Court ruling in this area.

HUD also notes that statistics-based claims, like all other claims, would be required to meet pleading standards under the FRCP. HUD recognizes that plaintiffs may not have access to statistical data needed to prove a claim. However, plaintiffs who are relying on statistical data to make a claim must be able to sufficiently plead the existence of statistics sufficient to meet pleading standards.

*Comment: The Proposed Rule contradicts HUD's prior findings and other relevant authorities.*

Some commenters stated that the Proposed Rule contradicted HUD's previous statements, including previous guidance regarding cognizable disparate impact claims related to criminal record screening and HUD's determination that exemptions and safe harbors undermine the Fair Housing Act's remedial purpose. One commenter specifically noted that in 2013, HUD found that regulated entities have successfully followed the existing rules since at least 1994, and the existing rules have permitted them to "conduct consistent self-testing and compliance reviews, document their substantial, legitimate nondiscriminatory interests, and resolve potential issues so as to prevent future litigation."

One commenter noted that the Proposed Rule did not account for existing case law or HUD's own prior positions, and HUD, therefore, did not rely on the administrative knowledge and experience which largely account for the presumption that Congress delegates interpretive lawmaking power to the agency. The commenters wrote that HUD is, therefore, not within the scope of HUD's delegated authority. Additionally, several commenters stated that, through the Proposed Rule, HUD is improperly substituting its judgment for that of Congress and the judiciary. Some commenters stated that HUD lacked the authority to make many of the changes in the Proposed Rule because Congress ratified the Act in 1988 without disturbing disparate impact precedent and the current 3-step burden shifting framework. Commenters stated further that this rules out use of *Chevron* deference. Commenters noted that as HUD acknowledged in the 2013 Rule, HUD does not have the power to create disparate impact law.

Some commenters opposed the Proposed Rule because they stated that it ignores and is inconsistent with existing agency guidance dating back to 1993, such as the 1994 Joint Policy Statement on Discrimination in Lending, signed by HUD, the Department of Justice, and nine other federal regulatory and enforcement agencies.[27] That Statement applies to lending discrimination under both the Act and Equal Credit Opportunity Act ("ECOA")[28] and describes general principles that these agencies would consider in identifying lending discrimination. Moreover, commenters stated the Proposed Rule deviates from the Statement in various ways—for example, by imposing a requirement to plead that a policy is artificial, arbitrary, and unnecessary; by deleting the requirement that a justification cannot be hypothetical or speculative; and by creating exemptions for the use of models. Commenters suggested that lending institutions subject both to ECOA and the Act would be left to reconcile two conflicting regimes and inconsistent agency positions, while the 2013 Rule was drafted explicitly to acknowledge and avoid this unnecessary burden. Another commenter stated that the Proposed Rule conflicts with the Consumer Financial Protection Bureau and federal regulators' guidance on disparate impact claims under ECOA, as well as with Title VII precedent (regarding the prohibition of employment discrimination).

*HUD Response:* HUD appreciates the comments regarding the interplay of the Proposed Rule and other HUD guidance, jurisprudence and findings, but generally believes that the changes from the 2013 Rule are in line with binding authorities and otherwise within HUD's discretion to make for the reasons set forth herein. We note that sub-regulatory guidance is generally not binding. As discussed by commenters supporting the changes, this Final Rule provides greater clarity to all parties

[26] *See, e.g.*, Violence Against Women Reauthorization Act of 2013: Implementation in HUD Housing Programs, 81 FR 80724.

[27] *Policy Statement on Discrimination in Lending*, 59 FR 18266 (April 15, 1994), available at: *https://www.govinfo.gov/content/pkg/FR-1994-04-15/html/94-9214.htm*.

[28] 15 U.S.C. 1691 *et seq.*

involved in housing transactions regarding disparate impact liability. Further, HUD, as the agency charged with administering the Fair Housing Act,[29] has extensive experience administering the Fair Housing Act and in investigating and adjudicating claims arising under the Act, which provides it with the expertise to modify and create rules interpreting it. In addition, HUD has specific legal authority to issue rules and regulations to carry out the Fair Housing Act.[30] HUD disagrees that the Proposed Rule was designed to restrict the scope of judicial review on Fair Housing Act claims; HUD sought to clarify for all parties the burdens involved in bringing or defending against a disparate impact claim under the Act.

Where HUD departs from past authoritative positions, it does so consistent with the Supreme Court's opinion in *Inclusive Communities*, as discussed further elsewhere in these responses, and consistent with the position that disparate impact claims are cognizable under the Act. As to guidance for disparate impact claims under ECOA and Title VII, while those were relevant models at the time of the 2013 Rule, further consideration as well as the issuance of the Supreme Court's opinion in *Inclusive Communities* has led HUD to determine that it should use its discretion in interpreting Title VIII disparate impact law to change its regulations in a way that HUD believes will best advance the purpose of the Fair Housing Act.

*Comment: The Proposed Rule is not compliant with Inclusive Communities.*

Several commenters provided arguments regarding the scope and breadth of the Supreme Court's decision in *Inclusive Communities*. A commenter suggested that HUD contradicted itself when stating that the Proposed Rule will enable parties to understand their responsibilities without the need to research and compile case law since *Inclusive Communities*, while also admitting that the 2013 Rule codified then-prevailing case law for bringing a discriminatory effect claim and the 2013 Rule provided clarity to all parties involved in a case. Another commenter opposed the Proposed Rule because the Supreme Court held that the Fair Housing Act recognized disparate-impact liability and approved the framework for establishing that liability in HUD's 2013 Rule. Longstanding judicial and agency interpretation—and Congress's reaffirmation of that interpretation in the 1988 amendments to the Fair Housing Act—were a central reason for the Supreme Court's recognition of disparate impact liability in *Inclusive Communities*.[31] The Court emphasized the continued importance to "residents and policymakers [who] have come to rely on the availability of disparate-impact claims" and quoted a brief filed by a number of states arguing that "[w]ithout disparate impact claims, States and others will be left with fewer crucial tools to combat the kinds of systemic discrimination that the Fair Housing Act was intended to address."[32]

One commenter stated that the 2013 Rule, *Inclusive Communities*, and subsequent case law align in that they all recognize the validity of disparate impact claims, but the Proposed Rule does not because it requires more burdensome standards for valid disparate impact claims than those imposed by the Supreme Court. The commenter recommended that HUD use the standards announced by the Court and be neither more nor less restrictive. One commenter wrote further that *Inclusive Communities* adopted the construction of the 2013 Rule, based on statutory interpretation and four decades of Federal jurisprudence. Commenters cited a brief filed by HUD in 2016 to note that *Inclusive Communities* was consistent with the 2013 Rule. Commenters stated that most circuit courts who have considered disparate impact in fair housing or other types of cases have relied on *Inclusive Communities*, and the 2nd and 10th Circuits have relied on HUD's interpretation or applied their own standards. A commenter continued by arguing that there are no recent cases that are inconsistent with either *Inclusive Communities* or the 2013 Rule.

Commenters stated further that the Supreme Court in *Inclusive Communities* discussed the 2013 Rule—including its requirements for making out a prima facie case and burden-shifting—without suggesting that the 2013 Rule required revision.[33] A commenter stated that the petitioner in *Inclusive Communities* was only granted certiorari on the question of whether the Fair Housing Act permits disparate-impact claims, and not what the standards and burdens are for adjudicating such claims. Thus, the Court specifically declined to assert jurisdiction over questions regarding the appropriate standards and burdens.[34] Therefore, parties and the many amici who briefed the case spent little time contesting what the burdens and standards are in disparate-impact litigation.

A commenter also noted that *Inclusive Communities* referred to Title VII as an interpretive touchstone, but Title VII is not referenced in HUD's Proposed Rule. Later courts generally agree that *Inclusive Communities* dictates continuing reliance on preexisting Fair Housing Act and Title VII law in resolving granular questions about disparate impact liability.[35] Commenters provided examples in support of the contention that district courts have encountered no problems in continuing to apply the 2013 Rule and long-standing doctrine post-*Inclusive Communities*, including citations to 36 district court cases that have cited the 2013 Rule since *Inclusive Communities*.

Another commenter suggested that any agency guidance deviating from *Inclusive Communities* is not entitled to deference because the Supreme Court did not rely on the current regulation for its holding in *Inclusive Communities;* the Court undertook its own analysis of the Fair Housing Act and HUD has only limited authority to deviate from circuit precedent when ambiguous statutory provisions are at issue. Commenters suggested that the Proposed Rule goes beyond that authority and would raise constitutional concerns if followed, while the 2013 Rule is a cognizable theory under the Fair Housing Act and constitutional under the Fourteenth Amendment.

*HUD Response:* HUD notes and agrees with commenters who contend that *Inclusive Communities* primarily discussed whether disparate impact is cognizable under the Fair Housing Act; however, given the Court's fulsome explication of the constitutional limitations on disparate impact liability, HUD believes the 2013 Rule should be modified to provide further clarity in light of the explanation provided in *Inclusive Communities*, and to better reflect HUD's interpretation of the Fair Housing Act. HUD agrees with comments that the Final Rule

[29] *See* 42 U.S.C. 3608(a).

[30] *See* 42 U.S.C. 3614a.

[31] *Inclusive Communities*, at 2525.

[32] *Id.*

[33] *See, e.g., id.* at 2514–15 (describing prima facie case and burden-shifting in the 2013 Rule); *id.* at 2522–23 (describing defendants' burden "to state and explain the valid interest served by their policies" and HUD's decision in 2013 Rule not to use term "business necessity" in formulating defendant's burden); *id.* at 2523 (after describing concerns raised by specific claim at issue in case, observing with approval that HUD's 2013 Rule "does not mandate that affordable housing be located in neighborhoods with any particular characteristic") (quoting 78 FR 11476)

[34] See Sup. Ct. Rule 14(1)(a).

[35] *See de Reyes* v. *Waples Mobile Home Park L.P.*, 903 F.3d 415 (4th Cir. 2018); *Wetzel* v. *Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856 (7th Cir. 2018); and *Nat'l Fair Hous. Alliance* v. *Travelers Indem. Co.*, 261 F. Supp. 3d 20 (D.D.C. 2017).

implements standards consistent with those articulated by the Court. HUD also agrees with commenters, as discussed elsewhere, that Title VII continues to aid in understanding disparate impact liability under the Fair Housing Act but notes that the different subject matter necessarily requires distinctions between the areas of law, as recognized in *Inclusive Communities* itself. HUD notes that while courts may continue to cite to the 2013 Rule as guidance or to provide a framework for disparate impact law, that does not necessarily mean that the 2013 Rule is the only permissible interpretation of disparate impact liability under the FHA. As noted, one court of appeals has concluded that the 2013 Rule is in fact inconsistent with *Inclusive Communities,* because *Inclusive Communities* "announce[d] a more demanding test than that set forth in the [2013] rule." [36]

HUD's past positions in litigation briefs are not binding on HUD in rulemaking. HUD issued an ANPR soliciting comments on whether HUD's 2013 Rule is inconsistent with *Inclusive Communities.*[37] HUD received numerous comments in response concerning the 2013 Rule and *Inclusive Communities.* Additionally, in October 2017, the Secretary of the Treasury issued a report that explicitly recommended that HUD reconsider applications of the 2013 Rule, especially in the context of the insurance industry.[38] Based on these comments, HUD concluded that the 2013 Rule did not adequately align with *Inclusive Communities* and did not properly reflect HUD's interpretation of Title VIII disparate impact law. Therefore, HUD issued the proposed disparate impact rule.

This conclusion is borne out by *Inclusive Communities'* three references to HUD's 2013 Rule. First, the Court summarized the burden-shifting test in HUD's 2013 Rule as part of its statement of the case's history and the basis of the Fifth Circuit's decision. Next, the Court referred to the "leeway to state and explain the valid interest served by their policies," referring to this phase as analogous to the business necessity defense under Title VII of the Civil Rights Act and noted that HUD did not use the term "business necessity" because that phrase would not be understood to cover the full scope of activities covered by the Fair Housing Act. The Court's third reference to the 2013 Rule notes that "HUD itself recognized [that] disparate-impact liability does not mandate that affordable housing be located in neighborhoods with any particular characteristic," referring to the preamble of the 2013 Final Rule.[39] Outside of these references, *Inclusive Communities* nowhere mentions the 2013 Rule in connection with discussing the necessary limitations to disparate impact liability. In support of their argument that HUD's 2013 Rule contained the necessary limitations to disparate impact liability, some commenters pointed out that *Inclusive Communities* argued that "disparate-impact liability has always been properly limited in key respects that avoid serious constitutional questions. . ." [40] For these commenters, the phrase "always" implies that *Inclusive Communities* did not need to invent new limitations to disparate impact, but instead recognized limitations that were always there. HUD disagrees. *Inclusive Communities* recognized that limitations to disparate impact liability already existed, but elaborated on these restrictions, showing that such limitations are still subject to further development. Further, HUD, as the agency responsible for interpreting and enforcing fair housing law, has significant discretion to interpret ambiguities in Title VIII disparate impact liability. HUD has taken into consideration the factors discussed in *Inclusive Communities,* as well as other factors HUD has observed using its expertise in fair housing law, and has determined that disparate impact liability is properly considered through the lens of the restrictions articulated in this Final Rule.

Regardless, the fact that disparate impact liability has always been limited does not answer whether, in HUD's view and discretion, the 2013 Rule's scope of disparate impact liability was appropriate. HUD believes that a better way to evaluate the meaning of this phrase is to view it in terms of the broader context of the limitations outlined by *Inclusive Communities,* compared to the limitations contained in HUD's 2013 Rule. For example, *Inclusive Communities* elaborates that "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies" [41] and that "[a]n important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the valid interest served by their policies." [42] HUD believes that neither the "artificial, arbitrary, and unnecessary" protections nor the "valid interest" protections are included in HUD's 2013 Rule.

In response to the suggestion that HUD should not rely on dicta in *Inclusive Communities,* HUD believes that the Court's discussion in *Inclusive Communities* of the limitations to disparate impact is an inherent part of the opinion and thus is not dicta. Dicta is generally "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding." [43] In *Inclusive Communities,* a discussion of the limitations to disparate impact formed the analytical foundations of the Court's holding. The Supreme Court cited *Griggs* v. *Duke Power Co.*[44] and *Smith* v. *City of Jackson,*[45] which, respectively, ruled that disparate impact liability was authorized under Title VII of the Civil Rights Act of 1964 and under the Age Discrimination in Employment Act. The Supreme Court included these citations both to support the existence of disparate impact liability under the Fair Housing Act and to discuss necessary limitations on disparate impact liability, stating that "these cases provide essential knowledge and instruction in the case at issue." [46] The Court stated in *Inclusive Communities* both that disparate impact liability is important in uncovering discrimination and that disparate impact liability is properly limited in key respects so as to avoid constitutional questions that might arise, "*e.g.,* if such liability were imposed based solely on a showing of a statistical disparity." [47]

The discussion of limits to disparate impact liability is essential to discussing whether a statute authorizes such liability for at least two reasons. First, inherent to defining a cause of action is

[36] *Inclusive Cmtys. Project* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019); *see also Fair Housing Act—Segregative-Effect Claims,* 133 Harv. L. Rev. 1476, 1483 (2020).

[37] 83 FR 28560 (June 20, 2018).

[38] *See* Steven T. Mnuchin and Craig S. Phillips, *U.S. Department of the Treasury Report: A Financial System That Creates Economic Opportunities, Asset Management and Insurance, Treasury.gov* (Oct. 26, 2017), *https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.*

[39] 78 FR 11476 (Feb. 15, 2013).

[40] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2522 (2015).

[41] *Id.* at 2522 (quoting *Griggs* at 431).

[42] *Id.* at 2522.

[43] *Coleman* v. *Greene,* 845 F.3d 73, 76 (3d Cir. 2017) (citing *United States* v. *Mallory,* 765 F.3d 373, 381 (3d Cir. 2014).

[44] 401 U.S. 424 (1971).

[45] 544 U.S. 228 (2005).

[46] *Inclusive Communities,* at 2511.

[47] *Inclusive Communities,* at 2511–2512.

defining the general contours of what a cause of action should look like. Second, the Fair Housing Act itself explains that its purpose is to provide for fair housing "within constitutional limitations" [48] and the Court in *Inclusive Communities* noted that constitutional issues could arise if disparate impact liability were not properly limited. Thus, HUD believes that the question of limitations to disparate impact is "fairly included" in the question at issue in *Inclusive Communities*. Further, it seems unlikely that the disparate impact protections were mere dicta when the Court characterized this opinion as having "announced" "cautionary [disparate impact] standards." [49] Indeed, it appears that the Court predicated its narrow decision in *Inclusive Communities* upon the assumption of "adequate safeguards." Further, even if the applicable language *were* dicta, HUD believes it is appropriate to seriously consider statements made by the Court when exercising its discretion in interpreting Title VIII disparate impact law, instead of "idly ignor[ing] considered statements the Supreme Court makes in dicta." [50]

*Comment: A change under these circumstances without better explanation is arbitrary and capricious and will lead to increased costs.*

Commenters stated that the Proposed Rule would be arbitrary and capricious under the Administrative Procedure Act [51] (APA) because HUD offers no explanation for why the changes in the Proposed Rule are desirable, fails to acknowledge that it is changing long-standing practice at all, fails to identify any real-world problems or policy outcomes addressed by the changes, fails to consider adverse consequences and evidence of discrimination, and does not recognize that the Proposed Rule would have implications or costs for federal programs and the entities that administer them. *Inclusive Communities* does not mandate a new policy.

A commenter noted that Supreme Court precedent holds that while agencies may change existing rules, there must be a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy, as well as that this is especially difficult when a rule reflects longstanding practice of the agency and the courts. According to the commenter, the 2013 Rule has been found to meet the objectives of Congress and thus the proposed abandonment of the agency's prior position results in a rule that cannot carry the force of law under *Encino Motors*.[52]

Commenters wrote the Proposed Rule would infringe on core judicial functions, including courts' discretion to consider the unique facts of each case, especially with regard to land use, lending and insurance claims. One commenter noted that in *Inclusive Communities*, the court said "no dire consequences have resulted from several decades of disparate impact cases," while another commenter stated that HUD's argument that entities may resort to racial quotas to avoid disparate impact liability under the 2013 Rule is not supported by any evidence. Other commenters opposed the Proposed Rule, asserting that because the 2013 Rule considered and rejected many of the very changes that the Proposed Rule now would make and, unlike the Proposed Rule, explained its reasoning in doing so. Commenters provided numerous examples, such as HUD's rejection of a suggestion that HUD delete "perpetuation of segregation" as a recognized discriminatory effect, reasoning that "the elimination of segregation is central to why the Fair Housing Act was enacted" and that "every federal court of appeals to have addressed the issue has agreed." [53] The commenters said that the Proposed Rule failed to explain, acknowledge, or identify these prior determinations. These commenters wrote that the Proposed Rule makes no attempt to justify any of its changes as good policy or as better interpretations of the law as it existed in 2013.

*HUD Response:* HUD acknowledges and appreciates these commenters' perspectives but disagrees and believes that in *Inclusive Communities*, the Supreme Court outlined its view of disparate impact litigation under the Fair Housing Act, and the Final Rule appropriately updates and clarifies all parties' burdens during disparate impact litigation consistent with *Inclusive Communities*. HUD provided detailed and reasoned responses in the Proposed Rule's preamble and has provided further details in this Final Rule. HUD is issuing this rule not because of the results of disparate impact cases over the prior decades or racial quotas but, because it believes clarification is appropriate following the Supreme Court's decision. Where HUD is making changes to the 2013 Rule, HUD is doing so in light of developments since 2013 and upon further review of disparate impact case law under the Fair Housing Act. HUD analyzed the cost of this Final Rule and determined that the Final Rule would provide decreased costs through clarity and detailed explanation of a prima facie case, and that any costs or increased difficulty in bringing litigation are the result of the tightened standard in *Inclusive Communities*, and not due to HUD's rule. See HUD's Regulatory Impact analysis discussion of costs and benefits.

*Comment: HUD should eliminate the concept of disparate impact entirely.*

One commenter urged HUD to do away with the disparate impact theory altogether. Another commenter stated that disparate impact is a specious and unsupportable theory that relies on false logic because coincidence does not equal causation and discrimination does not occur every time outcomes are not equal.

*HUD Response:* HUD finds these positions to be inconsistent with *Inclusive Communities* and inconsistent with HUD's interpretation of the Fair Housing Act.

*Section 100.5 Scope*

*Comment: Change to language in § 100.5(b).*

One commenter stated that HUD's use of the language "defenses and rebuttals to such allegations may be made" in the Proposed Rule demonstrates that HUD is proposing to support defendants against disparate impact claims by tying the safe harbor provision to the scope of the entire rule. Several commenters discussed how the proposed changes in § 100.5 might protect defendants and burden plaintiffs. Similarly, another commenter stated that when read alongside § 100.5(d), § 100.500(b)(2) imposes a legally impermissible undue burden on the plaintiff. Another commenter contended that if § 100.5(b) were adopted, it would extend HUD's proposed defenses for discriminatory effects cases to cases alleging discriminatory intent as well. Methods of proving discriminatory intent were well established in cases such as *McDonnell Douglas* and *Arlington Heights*. HUD cannot create a new method to prove intent cases. Another commenter stated that HUD should refrain from adding language that is redundant, confusing, or unnecessary.

Commenters suggested revising § 100.5(b) to read: "Liability for unlawful housing discrimination under this part may be established by a

[48] 42 U.S.C. 3601.

[49] *Id.* at 2524.

[50] *Coleman* v. *Greene*, 845 F.3d 73, 77 (3d Cir. 2017) (citing *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000)).

[51] *See* 5 U.S.C. 706.

[52] *Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117, 2125, 2137 (2016) (quoting *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)).

[53] 78 FR 11469 (Feb. 15, 2013).

practice's discriminatory effect, even if not motivated by discriminatory intent, and defenses and rebuttals to such allegations may be made, consistent with the standards outlined in § 100.500."

*HUD Response:* HUD has revised the language of § 100.500(b) to make clear that it only applies to discriminatory effects. As discussed in HUD's Proposed Rule, HUD is not creating a safe harbor by its reference in § 100.5, but was pointing the public to the rule section that establishes the framework for litigating disparate impact claims consistent with *Inclusive Communities.* See the explanation of changes in Section III above.

*Comment: Support for proposed change to § 100.5(d).*

Several commenters supported the proposed change to § 100.5(d) and noted that collecting demographic data on all customers may indirectly lead to more civil rights violations and also alienate customers. Commenters also stated that collecting demographic information would be overly burdensome, increase liability for privacy risk and information theft, be unnecessary, and have a negative impact on business. Some commenters also noted that data collection may increase costs due to a greater need for new systems to manage and safeguard personal information as well as increased time and staff required to gather and store data. One commenter argued that the increased burden posed by greater information-gathering may increase underwriting costs and impact premiums paid by consumers.

Commenters argued more specifically that if insurance companies were required to collect demographic information it would be invasive to consumers. Commenters related personal experiences explaining that when clients are asked for personal information there is often a negative customer response, including customers becoming upset at the request and refusal by customers to provide information, which increases costs and liability for businesses. Some commenters argued that demographic information is irrelevant and unnecessary to obtaining home insurance, unrelated to risk, and has never affected a claim. Other commenters argued that overly burdensome data maintenance requirements can stifle a healthy real estate market. One commenter supported the Proposed Rule, noting that State agencies have systems in place to regulate the local insurance industry without additional Federally mandated data collection.

*HUD Response:* HUD appreciates the support from commenters and agrees that business and other requirements by state agencies are already in place to require information collection when relevant to businesses. HUD's Final Rule does not change or require information collection.

*Comment: HUD provides no reason for change in § 100.5(d).*

A commenter stated that HUD provides no explanation for § 100.5(d), which appears to have no purpose other than to assist corporate entities in obscuring the discriminatory impacts of their practices.

*HUD Response:* HUD's request for comments in the 2018 NPRM on its reduction of regulatory barriers indicated that the public sought clarification as to whether the new disparate impact standard in § 100.500 required data collection.[54] In addition, this change is consistent with *Inclusive Communities,* to make clear that disparate impact theory itself does not require data collection.

*Comment: Proposed Rule disincentivizes potential defendants from collecting information.*

Commenters contended that the Proposed Rule has the effect of discouraging data collection, which will inhibit the ability of housing providers, lenders, and local governments to demonstrate that their programs, policies and practices do not have a disparate impact or a discriminatory effect, and it disincentivizes them from voluntarily improving practices that may otherwise leave them vulnerable to litigation and greater liability. One commenter wrote that statistical evidence that shows the outputs of a decision-making process that disproportionately exclude a race or gender should be enough to shift the burden of explanation on the decision-maker. Some commenters also noted that the proposed language would generate confusion and hinder enforcement efforts due to the broad assertion regarding adverse inferences. A commenter stated that HUD needs to explain why discouraging demographic data collection would prevent the use of remedial orders that impose racial targets or quotas.

Commenters stated further that the Proposed Rule, by disincentivizing demographic data collection by housing providers and lenders, hampers Fair Housing Act enforcement by allowing the loss of access to critical evidence of discrimination and undermining its 'discriminatory effect' provisions. Commenters also noted that data is a critical tool to demonstrate the impact of housing practices on protected groups, and failure to gather this data will obscure discriminatory impacts of housing practices, especially with the increased use of algorithms by housing providers or lenders and lack of access to algorithm data by monitors and concerned parties.

Commenters also noted that *Inclusive Communities* only discusses racial quotas, but this proposed section extends the data collection to include all protected classes, which disincentivizes data collection. Other commenters similarly stated that while the Supreme Court's decision discouraged collection of protected class information for fear that it would lead to quotas, it also acknowledged that awareness of race can help local housing authorities foster diversity and combat racial isolation with race-neutral tools and help entities design policies to ensure all groups have a fair opportunity to participate in programs. A commenter also stated that in *Wards Cove,*[55] the Supreme Court upheld data collection and noted that some employers maintain records disclosing the impact of selection procedures on opportunities by race, sex, or ethnic group, and the Court approved the use of such records by plaintiffs in litigation. This commenter further noted that while quotas are mentioned by the Court, neither *Inclusive Communities* nor *Wards Cove* include concerns that the collection of protected class information was relevant to the establishment of such quotas. One commenter noted that the Proposed Rule does not explain why data collection is equated with the establishment of racial quotas, since Federal data collection has been in place for decades and has not led to such quotas.[56]

*HUD Response:* The Final Rule does not contain a provision that discourages or prohibits covered parties from collecting data. The language retained from the Proposed Rule makes clear that there is no requirement in HUD's Fair Housing regulations, 24 CFR part 5, that specifically requires data collection. This is not a change from current practice and would not hinder the existing collection of data or the use of such data for either plaintiffs or defendants. In *Inclusive Communities,* the Supreme Court made clear that mere statistical evidence of disparities is not

[54] 84 FR 64549 (Nov. 22, 2019).

[55] *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989).

[56] *See* U.S. Equal Employment Opportunity Commission, Employer Information Report EEO–1, *EEOC.gov, https://www.eeoc.gov/employers/eeo1survey/.*

sufficient to state a prima facie claim. Thus, commenters' statements about data in itself being sufficient to shift a burden to a defendant is misplaced. Finally, the Supreme Court also has clearly indicated that quotas are unconstitutional. Thus, HUD does not believe that adverse consequences should exist merely for failing to collect data. The Final Rule has eliminated language from the Proposed Rule stating that no adverse inference should be drawn if a party does not collect data to ensure that the Final Rule is unambiguously neutral about whether a party collects data.

*Comment: Proposed rule inconsistent with other data collection requirements.*

Commenters stated the Proposed Rule is inconsistent with current HUD requirements regarding the collection and public reporting on data, as well as other Federal requirements, such as the Home Mortgage Disclosure Act's Regulation C, the ECOA's Regulation B, the Fair Housing Act's Incentives for Self-Testing and Self-Correction (42 U.S.C. 3614–1), the Community Development Block Grant (CDBG) program's demographic data collection requirement, and the Housing and Economic Reform Act of 2008, which required state housing finance agencies to collect and report demographic data.

Commenters stated that the Federal Rules of Evidence addresses admissibility of evidence and HUD's proposed § 100.5(d) would infringe upon it. A commenter stated that it raised constitutional concerns regarding the creation of permanent irrebuttable presumptions that conflict with the Due Process Clause of the U.S. Constitution's Fifth and Fourteenth Amendments. A commenter noted that a defendant failing to collect data about a protected class in violation of *some other* law, policy, or practice—apart from HUD's disparate impact rules—could result in an adverse inference. One commenter suggested that HUD should clarify in the Final Rule that nothing in this rule affects other existing legal requirements to collect data.

*HUD Response:* Many commenters interpreted HUD's language broader than drafted. The language in § 100.5(d) is limited to 24 CFR part 100 of the regulations and, as discussed above, clarifies that part 100 itself is not requiring or encouraging data collection. HUD is clarifying in this Final Rule, that neither § 100.500 nor any other provision in part 100 creates such requirement. However, nothing in this rule affects other existing legal requirements to collect data. As for the reference to the Fair Housing Act collection of information, that burden is on HUD, and not the entities regulated by this rule, to collect information to ensure conformity with the Fair Housing Act.

HUD's Final Rule does not impact evidentiary rules, consistent with a "neutral" stance on data collection in the rule. Modification to the Final Rule makes this clear. Separately, data is collected in many other circumstances, as noted in several public comments, and such data could be used in litigation. HUD's Final Rule merely clarifies that the rule itself does not encourage or require collection of such data. Therefore, the regulatory language does not conflict with the Federal Rules of Civil Procedure ("FRCP") or any other law.

*Comment: Opposition to required collection of personal and private demographic information.*

Several commenters opposed the Proposed Rule because they argued it required the collection of personal and private demographic information from home insurance customers that is not currently collected. These commenters argued requiring the collection of demographic information could lead to lawsuits; increase premiums and business costs, which could be detrimental to small businesses; and lead to loss of business from individuals who do not want to provide personal demographic information. Commenters specifically noted asking about an individual's religion was irrelevant to home insurance.

*HUD Response:* These comments misperceived the Proposed Rule. HUD appreciates the comments but, as discussed above, nothing in the Proposed Rule nor this Final Rule requires collection of personal and private demographic data, thus, the inclusion of such language in § 100.5(d).

*Comment: Proposed revisions to § 100.5(d).*

One commenter recommended that HUD revise § 100.5(d) to clarify that while defendants are not required to collect such data, data may be necessary for a plaintiff to prove a prima facie case. Some comments suggest alternatives related to data collection. One such comment suggested the Final Rule should specify that data collection is not required, and the absence of such collection will not result in an adverse inference against a party engaged in housing related business activity.

Other commenters stated that HUD should incentivize, encourage, or require providers to collect demographic data to promote the goals of the Fair Housing Act and for use by organizations ensuring compliance with the Fair Housing Act. Another commenter added that where it is not required but legally permissible, HUD should encourage entities to monitor their practices for discriminatory effects and explore less discriminatory alternatives to mitigate impacts.

*HUD Response:* While HUD understands that requiring potential defendants to maintain data may be helpful for plaintiffs bringing a case, this Final Rule is intended to provide a legal framework for litigation. This rule provides that data collection is not required or encouraged as a result of this rule. However, the Final Rule does not preclude doing so and, as noted above, in some instances is required by other laws. As for the commenters who requested HUD require data collection, requiring data collection is outside the scope of this rulemaking. Neither the Fair Housing Act nor the *Inclusive Communities* decision supports tying a data collection requirement to HUD's discriminatory effects rule. Further, HUD believes that such requirement would be burdensome, especially on small organizations who do not possess the resources to collect such data. Additionally, such data collecting requirements would be duplicative in light of other data gathering requirements.

*Paragraph (b) Vicarious Liability*

*Comment: Change is unnecessary and unlawful.*

Some commenters stated the proposed change to § 100.7(b) would be unnecessary and without justification and would result in inadequate compliance and compensation. Commenters wrote that § 100.7(b) in the 2013 Rule was clear and consistent with long-established law governing vicarious liability under the Act. Some commenters stated that the proposed revision is inconsistent with more than four decades of case law, including Supreme Court case law characterizing Fair Housing Act cases as statutory torts, in *Curtis* v. *Loether*[57] and applying traditional agency principles in determining questions of vicarious liability, in *Meyer* v. *Holley*.[58]

Commenters objected to proposed § 100.7(b)'s omission of the reference to "agency law." Many commenters stated that this change will create confusion, because although vicarious liability most commonly arises out of the "principal-agent relationship," agency law can expand vicarious liability beyond that specific relationship or to certain circumstances where an agent is acting outside the course and scope of

[57] 415 U.S. 189 (1974).

[58] 537 U.S. 280 (2003).

her duties. Commenters also stated that if HUD intends to limit vicarious liability to "principal-agent relationships," rejecting other bases for vicarious liability, then it should explicitly state that purpose so that it may be reviewed by the courts.

Commenters noted that HUD previously stated in its Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act rule preamble that "under traditional principles of agency law, a housing provider may be held vicariously liable for: The discriminatory acts, of an employee or agent regardless of whether the housing provider knew of or intended the discriminatory conduct where the employee was acting within scope of his or her agency, or where the [discrimination] was aided by the agency relationship."[59] Commenters stated that the proposed revisions to § 100.7(b) contradicted its other preamble.

Several commenters expressed concern regarding the principal-agent relationship and liability, as well as potential forum shopping. Commenters stated that HUD amending the vicarious liability provision will create unnecessary confusion on whether its 2016 explanation of vicarious liability principles still applies, as *Meyer* will apply regardless of HUD's regulations and any amendment. Commenters also stated that HUD should explain the purpose of the change in the definition of "vicarious liability" because the definition appears to be identical to a deleted version. Other commenters stated that the vicarious liability should not be addressed in the Proposed Rule because HUD rules already adequately address needed liability issues.

Several commenters objected to the proposed § 100.7(b) omission of text imposing liability regardless of whether a defendant knew or should have known of the conduct that resulted in a discriminatory housing practice. Several commenters stated that this change incentivizes housing providers to remain willfully ignorant of legal requirements and what their employees are doing and to not be involved with the oversight and maintenance of their properties. Commenters also stated that the change seems to repudiate the proposition that, consistent with agency law, vicarious liability may still be imposed.

*HUD Response:* HUD appreciates these comments. The proposed changes were intended only to provide clarification. After reviewing these comments, HUD has determined that the proposed change confused rather than clarified the issue. Therefore, HUD has decided not to make the proposed changes to this section.

*Paragraph (c) Remedies in Administrative Proceedings*

*Comment: Availability of punitive or exemplary damages.*

Commenters objected to prohibiting punitive or exemplary damages as a remedy in disparate impact cases. Commenters stated that both types of damages are appropriate when a defendant drags out litigation, rather than working to solve the problem. Commenters continued by stating that punitive damages should be available when a defendant clearly knows that their actions will harm a protected class and engages in them anyway, or in cases of reckless indifference. Commenters also said that defendants should be subject to punitive damages if the defendant does not make any effort to look for another way to accomplish legitimate business needs, while exemplary damages should be applied when there are unjust profits made in the process of discriminating against protected classes. Other commenters echoed the idea that punitive damages are necessary to deter future conduct and opined that the Proposed Rule eliminates effective tools that are necessary to cure vestiges of discrimination.

Commenters also stated that punitive and exemplary damages should be available in administrative pleadings and that all litigation costs should be covered for plaintiffs in administrative and judicial proceedings so that discrimination challenges are not cost prohibitive. Commenters additionally stated that HUD lacks the authority to bar punitive damages without other authorization.

Some commenters were supportive of the changes regarding punitive damages. Some commenters said that the Final Rule should clearly state that civil penalties are not an available remedy for disparate treatment cases, even when pursued in courts. Commenters stated that punitive damages should only apply to intentional discrimination and agreed with the Proposed Rule's statement that punitive damages are not authorized and are inappropriate in disparate impact cases because it aligns with Supreme Court precedent. Other commenters stated that it is inappropriate to impose punitive damages or award attorney's fees because disparate impact liability is built on the idea of unintentional wrongdoing. Several commenters supported the proposed amendment to § 100.7 because they felt that punitive or exemplary damages have no place in disparate impact litigation, as any remedy for disparate impact claims should focus on eliminating the practice that is having an impermissible discriminatory effect. These commenters said that *Inclusive Communities* answered this question and stated specifically that remedial rather than punitive measures are appropriate due to the absence of intent in discriminatory effect cases.

Some commenters disagreed with the idea of punitive and exemplary damages being awarded in disparate impact cases. These commenters stated that, by definition, disparate impact claims involve unintentional torts, so defendants should not face punitive or exemplary damages in the absence of actual discriminatory intent, but rather that the remedy for a disparate impact violation should be correcting the practice rather than punishment. The application of such damages would undermine *Inclusive Communities,* which advises that businesses must be free to make practical business choices. Commenters suggested that HUD revise the Proposed Rule to bar such damages in administrative proceedings and make it clear that such damages are also unavailable in other litigation under the Act.

*HUD Response:* HUD revised the Final Rule, moving paragraph (c) in § 100.7 to paragraph (f) in § 100.500, and changing the language to explain the circumstances under which HUD, as a matter of policy, may request non-equitable damages, such as civil money penalties. This Final Rule does not, and could not, make changes to the statutory language of the Fair Housing Act with regard to the availability of punitive damages as a potential remedy in civil actions or civil money penalties in administrative proceedings.

This Final Rule also does not address in any manner remedies available in disparate treatment claims, regardless of the forum. Punitive damages are not authorized in administrative proceedings, but an administrative law judge may assess a civil penalty under certain circumstances.[60]

HUD reviewed comments and made changes to this Final Rule regarding damages in order to clarify that HUD is merely restating the Supreme Court's direction in *Inclusive Communities* regarding remedies and is explaining when HUD will itself request non-equitable remedies. These changes

[59] 81 FR 63054, 63065 (Sept. 14, 2016).

[60] *See* 42 U.S.C. 3612(g)(3).

reflect HUD's understanding that relief in disparate impact cases should be focused on equitable remedies, such as eliminating or reforming a discriminatory practice, rather than monetary punishment, unless circumstances out of the ordinary warrant such.

With regard to commenters requesting that the defendant provide litigation costs to plaintiffs, the Fair Housing Act allows attorney's fees and costs to be awarded to the prevailing party in administrative proceedings or civil actions, per the discretion of the Administrative Law Judge (ALJ) or court.[61] This Final Rule does not change this, and HUD defers to the courts for determining if such an award is appropriate. Further, HUD acknowledges commenters' position that punitive and exemplary damages are typically used by courts to deter future violations; however, HUD notes, as other commenters have also pointed out, that a finding of disparate impact liability does not require proof of discriminatory intent. In this context, HUD is clarifying that the goal of disparate impact liability is to eliminate or modify a facially neutral policy or practice because it has a discriminatory effect on members of one or more protected classes. As explained in more detail in response to other comments, HUD may still pursue civil money penalties in administrative proceedings if the particular circumstances warrant it.

In response to commenters who requested that HUD remove the availability of certain types of damages completely, HUD notes that the text of the Fair Housing Act explicitly lists remedies that are available for administrative law judges and courts to order, in their discretion, in cases in front of them. By this Final Rule, HUD is not modifying or challenging that judicial discretion, but merely stating Supreme Court direction and clarifying the types of damages HUD will prioritize in disparate impact cases.

Regarding commenters who argued that punitive damages should be available when a defendant knowingly acts in a manner that discriminates, HUD notes that this type of scenario would involve intentional discrimination rather than disparate impact, which does not involve intent but rather a discriminatory effect without a showing of intentional or targeted discrimination. This Final Rule does not affect how disparate treatment allegations are adjudicated under the Fair Housing Act.

*Comment: Issues with the proposed remedies language in general.*

Several commenters discussed the language used in the remedies section generally, some supporting and some opposing the language. Commenters suggested that HUD should impose more substantial penalties against actors responsible for policies that impact disabled individuals' ability to obtain or maintain housing. Commenters recommended that the Proposed Rule not limit individual liability because it leaves no incentive to comply with the Fair Housing Act.

Commenters stated that the new remedies language added into the Proposed Rule is too confusing and restrictive because it does not allow for addressing disparate impact that affects members of protected classes that are not included in the complaint. They also asserted that the language needs clarification of the difference between "neutral" and "non-neutral" means. Commenters stated that § 100.7(c) substantially narrows remedies available to victims of discrimination by allowing only pecuniary and out-of-pocket expenses, which is inconsistent with the APA and well-established case law.

Commenters stated that remedies should focus on eliminating the disparate impact and not allow for other remedies that simply reform practices.

*HUD Response:* In response to commenters who requested that HUD remove certain types of damages completely, HUD notes that the text of the Fair Housing Act explicitly lists the remedies available for administrative law judges and courts to impose, in their discretion, in cases in front of them. As previously noted, HUD is not modifying or challenging that judicial discretion, but merely stating Supreme Court direction and clarifying the types of damages HUD will prioritize in disparate impact cases. Regarding the comment stating that the Proposed Rule would not allow relief for individuals in protected classes outside those listed in a complaint, HUD acknowledges the commenter's position, but notes that any complaint brought under the Fair Housing Act must contain allegations of discrimination that are sufficient to plead a prima facie case; this requires that the plaintiff specify which protected class(es) are impacted by a challenged policy or practice. HUD notes that the Fair Housing Act allows a complaint to be "reasonably and fairly amended" at any time. This Final Rule does not alter that provision.

Finally, as stated above, because the goal of disparate impact liability is to ameliorate a policy or practice that has a discriminatory effect on members of protected classes; removal of such a policy is a benefit to all individuals who are negatively affected by it regardless of whether they were specifically named in the complaint. HUD appreciates comments that expressed confusion regarding the specification that the remedy must be "neutral" and has concluded that such a distinction is unnecessary. Therefore, HUD has removed the phrase "through neutral means" from the Final Rule stage.

*Comment: Change is unnecessary and confusing.*

A commenter objected to proposed § 100.7(c) because it states unnecessarily that punitive damages are not available as a remedy in an administrative proceeding. Commenters also requested that HUD clarify what is meant when referring to administrative cases.

*HUD Response:* HUD agrees with comments stating that punitive damages are not authorized in administrative proceedings per the language found in the Fair Housing Act;[62] however, this Rule clarifies HUD's position on when it will seek civil penalties in discriminatory effects cases. As for the question on administrative cases, this refers to those cases that are filed with and heard by an administrative law judge, rather than via a civil action in a court of general jurisdiction. Administrative law is the law that governs the organization and powers of government agencies. As an example, these include complaints filed with HUD's Office of Fair Housing and Equal Opportunity under 42 U.S.C. 3610(a)(1)(A)(i) by members of the public, but also can include Secretary Initiated Complaints, which may lead to a hearing with and decision by an administrative law judge.

*Comment: Restricting Punitive Damages Contradicts the Fair Housing Act.*

Commenters objected to proposed § 100.7(c), arguing that it directly contradicts the Fair Housing Act, which provides that if a court finds that a discriminatory housing practice has occurred "the court may award to the plaintiff actual and punitive damages."[63] Commenters noted that although punitive damages will be rarer where the initial actor was a third party, the Act prohibits the agency from making that determination wholesale, rather than leaving it to be decided in individual cases.

*HUD Response:* As stated previously in response to commenters, the changes made by this Final Rule are to clarify

[61] *See* 42 U.S.C. 3612(p).

[62] 42 U.S.C. 3612 and 3613.

[63] 42 U.S.C. 3613(c)(1).

circumstances under which HUD intends to request non-equitable damages, such as civil money penalties. This Final Rule does not, and could not, make changes to the statutory language of the Fair Housing Act with regard to the availability of punitive damages as a potential remedy in civil actions or civil money penalties in administrative proceedings.

*Comment: Proposed Rule would drive more cases to Article III courts and damage tenant-landlord relations.*

Some commenters stated that not having punitive damages available in administrative proceedings would force plaintiffs to file in civil court in egregious cases, which is more time-consuming, expensive, and complicated. Commenters further wrote that problems that typically could be resolved through the administrative process, including conciliation or other settlement discussions, would be rendered less effective without the possibility of punitive damages. Commenters said that this would dissuade low-income individuals from pursuing relief, as well as place a greater burden on lower-income defendants. Because of HUD's relative expertise regarding fair housing, commenters stated that it is beneficial to all parties to go through HUD first instead of through the courts. Commenters also stated that the section would also lead to worse landlord-tenant relations.

*HUD Response:* HUD appreciates these comments but notes that punitive damages are not authorized in administrative proceedings by the Fair Housing Act.[84] This Final Rule does not alter the remedies that may be awarded by administrative law judges in administrative proceedings, including civil money penalties, but merely clarifies that HUD generally will seek equitable remedies in disparate impact cases, in line with the Supreme Court's decision in *Inclusive Communities.*

*Comment: Paragraph (c) is mis-codified.*

A commenter stated that § 100.7(c) is mis-codified: If "administrative discriminatory effect case" applies to proceedings under §§ 3610–3612, then this subsection should be placed in § 180.670, which governs remedies in cases decided by HUD's administrative law judges.

*HUD Response:* HUD agrees that § 100.7(c) could be included in § 180.670 but disagrees that it is miscodified. Paragraph (c) provides for parties reading 24 CFR part 100, Discriminatory Conduct Under the Fair Housing Act, that liabilities in administrative proceedings should concentrate on eliminating or reforming the discriminatory practice. This language does not conflict with the language in § 180.670 and speaks to the scope of liability addressed in § 100.7. However, HUD does agree that some clarification could be helpful and is moving this paragraph into § 100.500(f) of the Final Rule.

*Section 100.120(b)(1) Discrimination in the Making of Loans and in the Provision of Other Financial Assistance*

A commenter stated that the Proposed Rule's amendment to the list of generally applicable examples of prohibited lending discrimination would allow lenders to engage in certain types of intentional discrimination. For example, a lender could admit to intentionally giving a borrower inaccurate information due to the borrower's race, sex, or gender, and face no liability unless the victim could prove the information was material. A commenter stated the current lending discrimination rule does not have a materiality requirement or a safe harbor because it recognizes that conduct that violates the Fair Housing Act can be subtle, and suggested that at the application stage, for example, differential treatment may result as much from a failure to provide information or spend time with or coach a credit applicant as it occurs due to inaccurate information.

A commenter also asserted that persistent lending discrimination occurs in part because of the structural segmentation of the mortgage market, where loan originations are divided within the industry between: A low-cost prime sector serving mainly white borrowers, a sector insured by the Federal Housing Administration and disproportionately serving borrowers of color, and a subprime sector "that facilitated the frequent placement of black and Latino borrowers into higher-cost, higher-risk loans than white borrowers with similar characteristics." A commenter stated that limiting information about available credit types may violate the Fair Housing Act, Privacy Act, or ECOA. One commenter stressed that the protection set forth in the 2013 Rule which prohibits all differing or inaccurate information is necessary because there are numerous situations in which differing information may be dispersed in a manner that has a disparate impact.

Commenters wrote that the Proposed Rule gives defendants too much discretion to decide which information is materially different or inaccurate. Another commenter wrote that there is no source supporting that "immaterially" inaccurate or different requirements are resulting in litigation or costly risk prevention programs that make this change necessary.

Commenters stated that, in contrast to what is stated in the Proposed Rule, *Inclusive Communities* makes no reference to either lending or informational disparities; the Proposed Rule does not explain the purpose of the addition of or its basis in *Inclusive Communities* or any other case law or legal authority; and the revisions are not in keeping with the opinion's guidance. One commenter wrote that the proposed change departs from *Inclusive Communities* and weakened the requirement to provide accurate information as required by the Fair Housing Act.

Commenters wrote that the language was too broad. One commenter noted that a bank providing borrower-specific information to similarly situated borrowers regardless of race does not reflect disparate treatment. In other words, variability is permitted based on relevant factors (of which race is not one). On the other hand, the exemption does not explicitly state variability is permitted based on relevant factors other than race (which is, obviously, part of "an individual's particular circumstances"). Commenters also noted that § 100.120(b)(1) would apply to disparate treatment cases, which *Inclusive Communities* did not address, and where the materiality inquiry is irrelevant and contrary to law, because if a mortgage creditor admitted that it intentionally provided inaccurate information (however relatively minor) to black applicants because of their race, no one would disagree that discrimination in violation of the Fair Housing Act had occurred. A commenter opposed the proposed changes to § 100.120(b)(1) because they would increase, rather than mitigate, confusion. The existing provision makes clear that it is illegal to provide information that is inaccurate or different from that provided others, because of a protected class.

Commenters also wrote that the Proposed Rule needs to clarify "materially" inaccurate or different information and what it means by "accurate" or "related to an individual's particular circumstances." The section would unnecessarily invite debates over the meaning of ambiguous regulatory text, causing confusion and an increase in burdens on litigants, courts, and entities. Another commenter requested examples or guidance regarding "materially inaccurate or materially different", stating that the lack of

[84] *See* 46 U.S.C. 3612.

guidance invites litigation or administrative review, which slows down the overall process. Another commenter stated that such statements would violate the APA and contravene the Act, which prohibits discrimination. One commenter suggested introducing the word "material" in describing disparities in information provided to different potential tenants, buyers, or lenders, and will leave a grey area in defining "material."

*HUD Response:* HUD does not believe that the proposed change would have permitted discrimination. HUD's addition of "materially inaccurate or materially different from that provided others" was meant to clarify, in accordance with the guidance in *Inclusive Communities*,[65] that informational disparities that are inconsequential do not violate the Fair Housing Act. In response to comments that materiality would matter only in discriminatory effect cases and concerns that the addition made things less clear, HUD has decided not to adopt the proposed change in the Final Rule. HUD still believes that disparities that are not material do not violate the Fair Housing Act, but HUD, in response to confusion by the public, agrees that the proposed change in § 100.120(b)(1) is not necessary.

*Section 100.500—Discriminatory Effect Prohibited*

(a) General

*Comment: HUD's proposed removal of references to segregation is not an 'update' and goes against the Fair Housing Act.*

Commenters objected to removing "perpetuation of segregation" from the definition of discriminatory effect in § 100.500(a). Some commenters stated that the removal of "perpetuation of segregation" is counter to the Supreme Court's ruling in *Inclusive Communities* and congressional intent and, without adequate explanation, is in violation of the APA. Commenters stated that its removal is an attempt to limit liability under the perpetuation of segregation theory, would increase burdens on plaintiffs, and marks a retreat from HUD's obligation to meaningfully combat segregation and a return to the "separate but equal" doctrine. Commenters stated that its absence will make it more difficult to combat increasing segregation.

Commenters stated that this change raises the question of whether, going forward, disparate impact analysis would even apply to policies that perpetuate segregation. A commenter wrote that considering the longstanding and undisputed authorities both before and after the decision in *Inclusive Communities*, there can be no legitimate justification for reading the concept of perpetuation of segregation out of the Proposed Rule. The absence of any basis for deleting references to perpetuation of segregation is reason enough to withdraw the Proposed Rule, they contended. Commenters also stated that "practical business" and "profit" should be removed as examples of "valid interest" regarding the Proposed Rule, but references to perpetuation of segregation from § 100.500 should not be removed without explanation or discussion.

Commenters asserted that courts have uniformly recognized that practices leading to the "perpetuation of segregation" violate the Fair Housing Act,[66] including cases since *Inclusive Communities*,[67] and that the Supreme Court itself affirmed that the Second Circuit properly found disparate impact when a town's practices "significantly perpetuated segregation in the Town."[68] A commenter asserted further that the Supreme Court cited these opinions favorably in *Inclusive Communities*, and explicitly recognized "perpetuating segregation" as a basis for liability under the Fair Housing Act.[69]

Commenters also asserted that *Inclusive Communities* made clear that ending the perpetuation of segregation—which harms society as a whole, not just individuals—is a core goal of the Fair Housing Act. They quoted the Supreme Court statement that "the [Fair Housing Act] aims to ensure that those [legitimate] priorities can be achieved without arbitrarily creating discriminatory effects *or* perpetuating segregation."[70] Commenters asserted that HUD provides no justification for removing language regarding segregation from the definition of discriminatory effects.

*HUD Response:* HUD does not agree that removal of the phrase "perpetuates segregated housing patterns" modifies any obligation under the Fair Housing Act. Specifically, HUD's removal of this phrase was part of HUD's streamlining of the regulation and is not meant to imply that perpetuation of segregation could never be a harm prohibited by disparate impact liability. A plaintiff need only prove in a case brought under disparate impact theory that a policy or practice has led to the perpetuation of segregation, which has a discriminatory effect on members of a protected class, in order for that policy or practice to be prohibited under this rule. More generally, HUD views "perpetuation of segregation" as a possible harmful result of unlawful behavior under the disparate impact standard.[71]

*Comment: HUD removes "predictably" without explanation, despite past HUD findings, and case law.*

Commenters noted that the proposed revision in § 100.500(a) deletes the portion of the 2013 Rule stating that a practice has a discriminatory effect "where it actually *or predictably* results" in a disparate impact. Some stated that HUD does not acknowledge this change, despite the fact that in promulgating the 2013 Rule, HUD explicitly found that actions that "predictably" result in discriminatory effects should be covered. Commenters noted that one case concerning a predictable result of perpetuating segregation—*United States* v. *City of Black Jack*—was described in *Inclusive Communities* as a "heartland" case.[72] Some commenters questioned whether the revision would prevent disparate impact cases for future harms.

*HUD Response:* HUD does not feel that any change to the proposed regulatory text is needed here. HUD recognizes that a claim based on a predictable disparate impact may succeed. This Rule's language does not

[65] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2524 (2015).

[66] *See, e.g., United States* v. *City of Black Jack*, 508 F.2d 1179, 1186 (8th Cir. 1974).

[67] *See, e.g, MHANY Management*, 819 F.3d 581, 620 (2d. Cir. 2016) (finding a zoning decision may violate the Fair Housing Act because it perpetuates segregation generally). Other courts have similarly acknowledged perpetuation of segregation as a continued basis for Fair Housing Act liability after *Inclusive Communities. See, e.g., Avenue 6E Invs.* v. *City of Yuma*, 818 F.3d 493, 503 (9th Cir. 2016) ("[A]s the Supreme Court recently reaffirmed [in *ICP*], the [Fair Housing Act] also encompasses a second distinct claim of discrimination, disparate impact, that forbids actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason."); *Nat'l Fair Hous. All.* v. *Bank of America, NA.*, ___ F. Supp. 3d ___, 2019 WL 3241126, at *15 (D. Md. July 18, 2019) (allowing claim to proceed past motion to dismiss where plaintiff pleaded facts sufficient to allege that defendant's policy "forestall housing integration and freeze existing racial segregation patterns"); *Nat'l Fair Hous. Alliance* v. *Travelers Indemnity Co.*, 261 F. Supp. 3d 20, 34 (D.D.C. 2017) (allowing claim to proceed past motion to dismiss where plaintiff pleaded facts sufficient to allege that defendant's policy "will exacerbate racial and sex-based disparities by having a disproportionate impact on African-American residents and members of women-headed households").

[68] *Town of Huntington, N.Y.* v. *Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988) (quoting 844 F.2d 926, 938 (2d Cir. 1988)).

[69] *Inclusive Communities*, at 2522.

[70] *Id.* at 2522 (emphasis added).

[71] *Id.*

[72] *Inclusive Communities*, at 2525 (citing 508 F.2d 1179, 1184 (8th Cir. 1974)).

preclude such a claim, it merely does not recognize this specific type of claim. While *Inclusive Communities* does use the phrase "caused or predictably will cause a discriminatory effect" when discussing the prima facie burden for discriminatory effect plaintiffs, the Court was reciting HUD's 2013 Rule, not a separate authority. Further, the Court stated that disparate impact claims "relying on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement is important in ensuring that defendants do not resort to the use of racial quotas."

*Inclusive Communities'* citation of *Black Jack* as a heartland case does not mean that *Black Jack's* description of disparate impact doctrine is a complete picture of when disparate impact should apply, particularly since *Inclusive Communities* was the first time that the Supreme Court recognized disparate impact liability and articulated constitutional and prudential standards for when it should apply. Further, HUD is not aware of any reason why the scenario outlined under *Black Jack* would not also be subject to disparate impact liability under HUD's new disparate impact regulations. Finally, while *Black Jack* did include a "predictability" standard, the holding in *Black Jack* itself did not depend upon the "predictability" standard. Instead, the court found that it was "established that the ordinance [at issue] had a discriminatory effect."

*Comment: Proposed rule does not allow for underlying pattern of discrimination to support allegation of discriminatory effect.*

Commenters objected to the proposed standing requirements and asserted that a pattern of results that indicates an underlying pattern of discrimination should be a permissible way to show discrimination. Commenters stated that a plaintiff should not have to show a specific, identifiable cause if there is an underlying pattern with a discriminatory effect, but that the burden should be shifted to the defendant, because there may not be an identifiable "arbitrary, artificial, and unnecessary" practice or policy, but a culture with many factors that produce a discriminatory effect.

*HUD Response:* HUD disagrees that a plaintiff should be able to bring a discriminatory effects claim without alleging a specific, identifiable cause of the discrimination. It is not enough to allege a general culture of discrimination; rather, to sufficiently plead the existence of a discriminatory effect, a plaintiff must pinpoint the specific policy or practice that is alleged to lead to a discriminatory effect. As put by the Court in *Inclusive Communities,* requiring a plaintiff to point to a specific policy (or policies) causing disparity protects defendants from being held liable for racial disparities they did not create.[73]

*Comment: HUD uses undefined and unclear terms.*

Commenters stated that HUD's Proposed Rule uses vague language throughout § 100.500, allowing courts and defendants to find fault within the plaintiff's complaint. Commenters specifically questioned HUD's change from the term "specific policy" to the term "a practice." Commenters also opposed the proposed deletion of the definition of "discriminatory effect" from § 100.500(a) because it injects uncertainty into the rule, particularly as to what a plaintiff must show to proceed. Commenters noted that both the 2013 Rule and the Proposed Rule require the plaintiff to demonstrate a causal relationship between the challenged practice and a "discriminatory effect." However, "discriminatory effect" is defined in the 2013 Rule, while the Proposed Rule removes the regulatory definition.

*HUD Response:* HUD made several terminology changes to make the Final Rule more consistent with *Inclusive Communities* and with HUD's interpretation of disparate impact liability under Title VIII more generally. The reference to "specific policy" in § 100.500 is meant to include the practice or policy that forms the basis of a disparate impact claim. As a result, HUD believes that "specific policy" is an appropriate term to describe the breadth of disparate impact claims. However, HUD does not believe that there is a practical effect to adding the term "policy" in addition to the term "practice." Plaintiffs will still have to show that the harm they are alleging is the result of a policy or practice, rather than a one-time action not part of a policy or practice.[74]

HUD does not believe that it is proper to define every term in the regulation, as doing so would result in a rigid regulation that does not leave room for courts to exercise their discretion based on the facts before them. Specifically, when it comes to "discriminatory effect," HUD recognizes that harm can occur in a variety of ways and does not believe it is necessary to impose a definition on a fact-specific finding.

(b) Prima Facie Burden (General)

*Comment: Higher burden for administrative proceedings is unlawful.*

Commenters stated that HUD may not impose stricter standards for pleading the same claim in its administrative process than apply in federal court and must abide by the FRCP in administrative cases or it will violate congressional intent. Further, commenters noted that HUD's proposed pleading standard is inconsistent with HUD's regulations for administrative Fair Housing Act cases, which do not require the plaintiff to make out a *prima facie* case at the pleading stage.[75] Commenters also stated that the Proposed Rule's pleading requirements likely violate due process and equal protection because it places an impossible burden on person deprived of fair housing by requiring one to prove detailed, specific facts at the pleading stage. Commenters stated that HUD does not have the ability to reinterpret the contours of disparate impact liability previously established by the Supreme Court in *Bell Atl. Corp.* v. *Twombly*[76] and other cases. Commenters stated that the Supreme Court has explained that the question of what is required to plead a discrimination claim is controlled by FRCP 8(a)(2) and HUD does not have the authority to reinterpret these regulations. A commenter noted that this raises federalism issues because the Proposed Rule does not limit its reach to questions of pleading or inferences in federal court.

*HUD Response:* HUD is codifying in regulation the necessary requirements to prove a claim of discriminatory effect. This is no different from HUD's decision in the 2013 Rule to codify HUD's interpretation of disparate impact law at that time. It is within HUD's expertise given its role in implementing the Fair Housing Act. This necessarily overlaps with the duties of a plaintiff to bring a case under the FRCP. FRCP 8(a)(2) establishes the general rules of pleading, but the elements that a plaintiff is required to plead in the complaint are governed by the standards established by law, including regarding the proper scope of discriminatory effects liability. HUD's rule is consistent with the FRCP. Further, HUD is mindful of the Supreme Court's admonition that "prompt resolution of those cases is important." [77] HUD also notes that factual allegations are required at the pleading stage and proof at a later stage.

[73] *Id.* at 2507, 2523.

[74] *Id.* at 2523.

[75] See 42 U.S.C. 3610(1)(a)(i); 3610(g)(1); 3610(g)(2)(B)(i); 24 CFR 103.25; 103.400(a); 100.405(a)(1); and 103.400(a).

[76] 550 U.S. 544 (2007).

[77] 135 S. Ct. at 2512.

HUD does not intend to establish a standard which contradicts the FRCP.

*Comment: Prima facie burden will increase the difficulty of bringing a case.*

Several commenters noted that the multiple requirements of a prima facie case would increase the burden of establishing a prima facie case. A commenter claimed HUD ignored the importance of using statistics necessary to provide a prima facie case and stated that the new requirements would not even be met using Home Mortgage Disclosure Act (HMDA) data. Commenters stated that the Proposed Rule would permit banks to have facially neutral policies even if those policies had a clear discriminatory effect.

Commenters stated that the Proposed Rule's heightened burden of proof would make it difficult to challenge policies such as zero tolerance for crime policies, which commenters state disproportionally harm victims of domestic violence and communities of color, low-income households, and people with disabilities. Commenters noted that such a pleading burden is particularly difficult to meet when the defendant generally has in its sole possession the evidence relevant to whether its discriminatory policy is necessary to meet a legitimate purpose while the plaintiff can only speculate as to why the policy is necessary. Commenters cited cases in which only documents and depositions during discovery uncovered the arbitrary, artificial, and unnecessary policy causing the discriminatory effect, or where the defendant was unable to prove that their policy or practice was necessary.

Commenters suggested that HUD and the courts treat the Proposed Rule with flexibility and allow plaintiffs to await discovery to establish some of the elements in the proposed prima facie case. Other commenters suggested the burden should be shifted to the defendant to be more equitable, and that the defendant should have the same evidentiary standards as the plaintiff.

*HUD Response:* HUD appreciates these comments, but notes that the prima facie burden is a requirement of discriminatory effects law generally and HUD's codification of the prima facie burden does not itself result in a higher standard than what is required under *Inclusive Communities*. Please also see Section III above regarding changes to § 100.500(b), which are intended to clarify the requirements at the prima facie stage and further align the language with existing obligations. HUD also notes, as discussed further under (b)(1), that the pleading stage, when a plaintiff does not yet have access to discovery, requires only that the plaintiff "sufficiently plead facts to support the prima facie case, and thus, the requirement to plead facts supporting a prima facie case is lower than some commenters suggested.

*Comment: Courts have incorrectly applied* Inclusive Communities.

Commenters suggested that courts following *Inclusive Communities* have misapplied the "robust causality" requirement, noting that cases have hinged on whether Plaintiffs could show a direct link between the statistical disparity and the Defendants' policy in cases such as *Inclusive Communities*. Commenters noted that the success rate of plaintiffs in disparate impact cases reaching the appellate level has plummeted over the years. One commenter stated that in circuit courts that have applied the 'robust causality' requirement at the pleading stage, plaintiffs' success, at least at the appellate level, generally does not appear to be significantly affected, although the number of cases is too small to draw sweeping conclusions.

*HUD Response: Inclusive Communities'* explanation of discriminatory effects liability expressly provided for a requirement of robust causality. Therefore, HUD believes that cases applying *Inclusive Communities* are correct to require a showing of "robust causality.".

*Comment: Prima facie burden is unnecessary, complicated, and vague.*

Commenters stated that the prima facie burden was unnecessarily complicated and vague. Commenters stated that this ambiguity and complication would cause unnecessary litigation and lead to unfair or unjustified dismissal of cases and would lead to inconsistent results in the courts. Commenters also stated that HUD made no attempt to justify the prima facie requirements but merely suggests that *Inclusive Communities* requires this change.

*HUD Response:* HUD appreciates these comments and notes that HUD has edited § 100.500(b) for clarity. HUD disagrees that this burden is ambiguous, and notes that the prima facie burden must necessarily be explained in general terms because application of the burden is extremely fact-specific and therefore dependent on the circumstances of each case. Alignment with *Inclusive Communities* and other controlling law is sufficient reason for HUD to use its discretion to adopt this regulation. HUD also agrees with other comments that the Supreme Court directs lower courts considering the sufficiency of allegations at the pleading stage to "begin by taking note of the elements a plaintiff must plead to state a claim." [78] Section 100.500(b) provides parties with a list of such requirements.

*Comment: HUD improperly cited* Wards Cove.

Commenters said HUD improperly cites *Wards Cove*, a Title VII disparate impact case, to require an "actual cause" when *Wards Cove* did not use or rely on the phrase, and the Supreme Court noted that Title VII framework may not transfer to the fair housing context. Commenters noted that *Wards Cove* is a thirty-year old case.

*HUD Response:* HUD cited *Wards Cove* for the proposition that a disparate impact claim is not adequately pled where the alleged disparity is the result of factors outside the defendant's control and does not support the assertion that the defendant's policy itself is the cause of the disparity. *Wards Cove* held that the plaintiff is responsible for "isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." [79] HUD equates being "responsible" for observed statistical disparities with being the actual cause of those disparities. HUD also notes that while *Wards Cove* is an old case, it remains persuasive authority, specifically with respect to the Fair Housing Act, which, unlike Title VII, has not had intervening amendments.

*Comment: The Proposed Rule's prima facie elements are consistent with* Inclusive Communities.

Commenters stated the 2013 Rule incorrectly allocates burdens because it uses the 1991 standard set by Congress for Title VII, which is not applicable to the Fair Housing Act. Other commenters expressed support for the "robust causality" requirement, the "legitimate business interest" standard, and "less discriminatory alternative or equally effective manner" element, and commenters stated their support for the proposed burden-shifting framework overall. Another commenter stated defendants should be allowed to provide evidence to support the reasons for their policies, defenses, and rebuttals. Another commenter stated § 100.500(b)(2) and (5) are consistent with proximate cause analysis under the Fair Housing Act and *Bank of America* v. *City of Miami*.[80]

*HUD Response:* HUD appreciates these comments.

---

[78] *Ashcroft* v. *Iqbal*, 556 U.S. 662, 675 (2009).

[79] *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 656, (1989).

[80] 137 S. Ct. 1296 (2017).

*Comment: HUD makes an unsupported claim about failing to identify a "specific, identifiable practice."*

A commenter stated that although HUD claims "many parties" have failed to identify a "specific, identifiable practice," HUD cites only a single, "unpublished, unprecedential" opinion to support this proposition.

*HUD Response:* HUD's Proposed Rule noted the failure of many parties to identify a specific, identifiable practice, only to warn potential plaintiffs of the requirement under *Inclusive Communities.* The following are additional cases in which the court found that the plaintiff failed to identify a specific policy or practice. These cases are provided only to show additional examples of courts finding plaintiffs failed to fulfill this element of the prima facie case. *See also Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1113 (8th Cir. 2017); *Carson* v. *Hernandez,* No. 3:17–CV–1493–L–BK, 2018 U.S. Dist. LEXIS 185782, at *6 (N.D. Tex. July 26, 2018); *Merritt* v. *Countrywide Fin. Corp.,* No. 09–cv–01179–BLF, 2016 U.S. Dist. LEXIS 194613, at *34 (N.D. Cal. June 29, 2016); *City of L.A.* v. *Wells Fargo & Co.,* No. 2:13–cv–09007–ODW(RZx), 2015 U.S. Dist. LEXIS 93451, at *21 (C.D. Cal. July 17, 2015); *Merritt* v. *Countrywide Fin. Corp.,* No. 09–cv–01179–BLF, 2015 U.S. Dist. LEXIS 125284, at *61 (N.D. Cal. Sep. 17, 2015).

*Comment: HUD conflates prima facie standards with pleading standards.*

Commenters stated that HUD's proposal conflates *prima facie* and burden-shifting standards with *pleading* standards, and that numerous courts have rejected this approach, including the Supreme Court in *Swierkiewicz* v. *Sorema N. A.*[81]

*HUD Response:* HUD appreciates these comments and has revised the Final Rule to clarify that HUD intends to establish a prima facie standard. However, HUD notes that *Swierkiewicz's* caution that "the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic," [82] must be read in light of the Court's heightened pleading standards in *Bell Atlantic Corp* v. *Twombly* and *Ashcroft* v. *Iqbal,* both of which the Court decided after *Swierkiewicz.* HUD's treatment of the pleading stage in disparate impact litigation is consistent with the Supreme Court's finding in *Twombly* that plaintiffs cannot survive the pleading stage by relying upon "labels and conclusions," a "formulaic recitation of the elements of a cause of action . . ." or mere speculative factual allegations.[83] There must also be "a reasonable expectation that discovery will reveal evidence of [illegality] . . ." [84]

*Comment: Require some evidence of discriminatory intent.*

Commenters suggested that the Final Rule should require a showing of some evidence of discriminatory intent, though not enough to satisfy the Constitutional standard of *Washington* v. *Davis,* to better align with disparate impact cases from the Third and Seventh Circuits. Commenters also suggested the Proposed Rule should be structured such that the plaintiff must "show or demonstrate" rather than "allege" the prima facie case.

*HUD Response:* On the issue of requiring a showing of discriminatory intent, the *Inclusive Communities* case is clear that a showing of disparate impact does not rely on intent, but is "in contrast to a disparate treatment case," which does rely on intent.[85] On the issue of the prima facie case at the pleading stage, it is, as in any case, the plaintiff's obligation to allege sufficient facts, which is reflected in this Final Rule at § 100.500(b). Of course, in the case in chief plaintiff will have the burden of proof on the allegations.

*Comment: Adding an element on statistical disparity.*

Commenters suggested that HUD add to the description of prima facie burden an "explicit recitation" of *Inclusive Communities'* holding that a disparate impact claim cannot be based solely on a showing of statistical disparity. Other commenters stated that in the 2013 Rule, HUD explicitly declined to include a statistical standard to prove a prima facie case due to the variety of practices covered by the Fair Housing Act.

*HUD Response:* HUD agrees that a disparate impact claim cannot be based solely on a showing of statistical disparity, but does not believe this should be explicitly stated in the rule because the elements already listed necessarily provide a standard which would not be met through a showing of statistical disparity alone. HUD also agrees with commenters that it would be impractical to establish a particular statistical standard to prove a prima facie case due to the numerous and varied practices covered by the Fair Housing Act.

*Comment: Using "specific identifiable policy or practice" is contrary to* Inclusive Communities *and case law.*

Commenters suggested that the Proposed Rule was exempting single decisions. Commenters provided examples of disparate impact claims targeting zoning and land use laws and decisions that unfairly exclude minorities from certain neighborhoods without sufficient justification, arbitrary and discriminatory ordinances barring the construction of certain types of housing units, and unconscious prejudices and disguised animus that escape easy classification as disparate treatment, may all fall under this classification. Commenters cited cases challenging single actions, including *MHANY Management, Inc.* v. *County of Nassau,*[86] and *Huntington Branch, NAACP* v. *Huntington,*[87] which specifically held that a one-time zoning decision can be a policy subject to disparate-impact challenge. Commenters noted that any repeated course of conduct could be traced back to a single decision.

A commenter objected to the preamble section applying *Barrow* v. *Barrow,*[88] which follows *Inclusive Communities,* for the proposition that most "one-time" zoning decisions would not provide a basis for a disparate impact claim or enforcement process, noting that *Barrow* was not a case about zoning.

Commenters noted further that HUD's 2013 Rule preamble also explained that every federal court of appeals to have addressed the issue agreed that the Fair Housing Act prohibits practices with the unjustified effect of perpetuating segregation. The preamble cited numerous cases from various circuits demonstrating that HUD's position was reasonable and firmly grounded in the law and its application by courts since 1968.[89]

Commenters also objected that the "specific, identifiable policy or practice" language was undefined and vague. Commenters stated it was unclear whether the Proposed Rule would prohibit claims against a developer if the rental of affordable units had occurred at one site or for one building as opposed to hundreds of units at multiple buildings. Commenters also stated that it was unclear whether

[81] 534 U.S. 506, 512 (2002).

[82] *Id.* at 512 (citation omitted).

[83] *Bell Atl. Corp.* v. *Twombly* at 555 (citations omitted).

[84] *Twombly* at 556.

[85] *Inclusive Communities,* 135 S.Ct. at 2513.

[86] 819 F.3d 581 (2d Cir. 2016).

[87] 844 F.2d 926 (2d Cir. 1988).

[88] Civil Action No. 16–11493–FDS, 2017 U.S. Dist. LEXIS 103495, at *8 (D. Mass. July 5, 2017).

[89] *See, e.g., Huntington Branch, N.A.A.C.P.,* at 937; *Metropolitan Housing Development Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977); *U.S.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974).

the Proposed Rule would prohibit claims against a county development agency if its policy had only resulted in one instance of applying residency and age preferences to a county-financed rental building. Moreover, commenters stated that the preamble suggests that HUD itself, as opposed to a private plaintiff, will *never* bring a disparate impact claim against a "single event" land-use decision. Other commenters stated the language in the Proposed Rule limits a plaintiff to addressing business practices but is silent on addressing government practices.

Some commenters supported the "specific, identifiable policy or practice" language because it is consistent with Supreme Court precedent, clarifies what plaintiffs must challenge, and furthers the speedy case resolution principle.

*HUD Response:* HUD disagrees with the suggestion that this language will immunize all one-time decisions from disparate impact analysis. Plaintiffs can establish disparate impact liability based upon a single event if it represented a policy; even if, as *Inclusive Communities* clarified, plaintiffs may "not easily" be able to make such a showing.[90] HUD would bring a case against a single event where HUD believed that the single event represented a policy.

As commenters have discussed and HUD agrees, single events can represent a policy or practice. Further, if a jurisdiction implements zoning policy through discretionary decisions, that policy of granting discretion could be subject to a disparate impact suit even if a particular decision may not be. HUD does not believe that this position contradicts its previous position in the 2013 Rule. Further, the 2013 Rule predates *Inclusive Communities,* which prompted the addition of this language.

HUD does not believe that *MHANY Mgmt.* was an example of a post-*Inclusive Communities* court recognizing a one-time decision as a policy. While *MHANY Mgmt.* involved a zoning decision, the court clarified that it took place after "many months of hearings and meetings" and "the change required passage of a local law . . ."[91] HUD believes that these circumstances—particularly the fact of a change in local law—could allow a court to interpret this "one-time decision" as a policy under HUD's formulation. HUD believes courts are capable of determining on a case-by-case basis when a single event may have been the result of a policy, even if that task may be difficult. Further, *MHANY's* reference to the difficulty of distinguishing between a single event and a policy is within the Title VII and ADEA context and so it may have less relevance in the instance of disparate impact under the Fair Housing Act.

HUD also notes that while *Huntington Branch, NAACP* v. *Huntington* did involve a refusal to amend a zoning ordinance, the policy at issue was a zoning regulation "which restricts private multi-family housing projects to a largely minority 'urban renewal area . . .' "[92] Further, repeated application of a policy—the zoning regulation—can hardly be characterized as a one-time decision. A single decision on an ad hoc basis differs from a single policy under which multiple decisions are made.

As to the significance of *Barrow* v. *Barrow,* even though it is not a zoning decision, its ruling that a "single decision relevant to a single piece of property, without more, is not evidence of a policy contributing to a disparate impact"[93] illustrates the difference between such a single decision and a decision that would affect multiple properties and might be considered a policy.

Finally, HUD notes that *Ellis* v. *City of Minneapolis* supports HUD's perspective. *Ellis* repeats *Inclusive Communities'* caution that plaintiffs may lose their disparate impact case at the pleading stage for identifying a "one-time decision" that is not a policy and frames this protection as a "standard" for disparate impact cases.[94] It also repeats the significant reasons why *Inclusive Communities* adopted this standard, namely giving government entities "leeway to apply reasonable housing-code provisions without fear of inviting a costly lawsuit."[95] Further, *Ellis* refused to "bootstrap numerous 'one-time decision[s]' together in order to allege the existence of a City policy to misapply the housing code.[96] While plaintiffs asked the *Ellis* court to read one-time decisions as a policy that invalidated an official city policy, the *Ellis* court's reluctance to create a "policy" out of singular decisions is still instructive. Other courts after *Inclusive Communities* have also recognized this limitation to disparate impact liability.[97]

(b)(1) Arbitrary, Artificial and Unnecessary

*Comment: "arbitrary, artificial, and unnecessary" should be defined.*

Commenters noted that the Proposed Rule does not explain what it means to be "artificial," "arbitrary," or "unnecessary" as a pleading requirement. Commenters asked that HUD define "arbitrary, artificial, and unnecessary." Other commenters suggested that HUD define the phrase "arbitrary, artificial, and unnecessary" as applying to a "policy that is not reasonably calculated to achieve a legitimate goal within the sound discretion of the policy-maker and that imposes an otherwise unexplained burden on housing opportunities for persons in protected classes." Further, commenters suggest HUD provide examples of policies HUD considers "arbitrary, artificial, and unnecessary" and suggests "zoning rules that artificially restrict the ability to develop multifamily housing" as one such example. Commenters also stated that HUD should use the Court's standard in *Inclusive Communities* and should

[90] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2523 (2015).

[91] *MHANY Management, Inc.* v. *County of Nassau,* 819 F.3d 581, 619 (2d Cir. 2016).

[92] *Huntington Branch, NAACP* v. *Huntington,* 844 F.2d 926.

[93] *Barrow* v. *Barrow,* Civil Action No. 16–11493–FDS, 2016 U.S. Dist. LEXIS 164330, at *16 (D. Mass. Nov. 29, 2016).

[94] *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1111 (8th Cir. 2017).

[95] *Id.* at 1114.

[96] *Id.* at 1113 (citing *Inclusive Communities*).

[97] *See City of Joliet* v. *New West, L.P.,* 825 F.3d 827, 830 (7th Cir. 2016); *Hylton* v. *Watt,* 2018 U.S. Dist. LEXIS 156082, *12–13 (D.D.C. Sept. 13, 2018) ("Moreover, to the extent Hylton focuses his claim on the FHFA's one-time, and limited, decision to fill the Ombudsman position with a then-current 'Agency Executive,' he has failed to identify a 'policy' sufficient to sustain a disparate impact claim. "As a general rule, a plaintiff 'cannot attack an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact.' "); *Davis* v. *District of Columbia.,* 246 F. Supp. 3d 367, 394 (D.D.C. 2017) (quoting *Stout* v. *Potter,* 276 F.3d 1118, 1124 (9th Cir. 2002)). In other words, disparate impact ordinarily "looks at the effects of policies, not one-off decisions, which are analyzed for disparate treatment." *City of Joliet* v. *New West, L.P.,* 825 F.3d 827, 830 (7th Cir. 2016). Thus, as the Supreme Court has explained, "a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all." *Inclusive Communities,* 135 S. Ct. at 2523; *see also Breen* v. *Chao,* 253 F. Supp. 3d 244, 265–66 (D.D.C. 2017). Like the plaintiff in that hypothetical, Hylton has failed to identify any "policy" or "practice" that might even arguably have had an adverse effect on a protected group."); *Barrow* v. *Barrow,* 2016 U.S. Dist. LEXIS 164330, at *15–16 ("First, the complaint does not point to any specific policies of any of the defendants that result in racial discrimination. It alleges only that defendants, in various ways, acted to deprive plaintiff of the full value of her inheritance; there is no allegation of an unlawful practice or policy. A single decision relevant to a single piece of property, without more, is not evidence of a policy contributing to a disparate impact. *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2523 (2015).

revise § 100.500(b)(1) to read "create artificial, arbitrary, and unnecessary barriers."

*HUD Response:* HUD declines to define "arbitrary, artificial, and unnecessary" because of the wide variety of possible circumstances in which it may be used. Courts will continue to provide useful examples of this phrase as case law develops. HUD also declines to provide examples of "arbitrary, artificial, and unnecessary" policies because such policies would be too fact-specific to be of general use. HUD believes the addition of "barriers" in § 100.500(b)(1) would not be proper because the discussion of the "barrier" element is a consideration instead under (2), where the plaintiff must show that the policy or practice has a disproportionate adverse effect, *i.e.*, is a barrier.

*Comment: Proposed § 100.500(b)(1) is not supported by caselaw cited in the Proposed Rule.*

Some commenters opposed the Proposed Rule because it conflicts with prior case law by requiring plaintiffs to bear the burden of pleading and proving an "artificial, arbitrary, and unnecessary barrier" to fair housing in the prima facie stage. Commenters argued that this requirement is devoid of context because this language was raised by the Supreme Court as judicial dicta to allow defendants to argue that their policies have a valid interest, but the Court nowhere suggests that the plaintiffs are required to plead and prove it. Commenters also objected that the Proposed Rule would require plaintiffs to prove a negative, which contradicts HUD's determination in promulgating the 2013 Rule and the DOJ's position in litigation, and rebut the defendant's justification before the defendant had even advanced the justification. Commenters noted that this would also increase the cost of pleading a case. A commenter stated that "artificial" essentially means "pretextual." A commenter stated that requiring plaintiffs to show a policy is "arbitrary, artificial, *and* unnecessary" would allow policies that are only one of these three. A commenter stated that the 2013 Rule adequately prevented plaintiffs from bringing arbitrary, artificial, and unnecessary claims. Some commenters argued that *Griggs* [98] did not establish an "artificial, arbitrary, and unnecessary" pleading standard, and so the Supreme Court citing that language could not be interpreted as such. A commenter stated that *Inclusive Communities* requires defendants to state their own valid interest, rather than the plaintiff, because under Title VII's business necessity standard the employer must affirmatively raise the defense. Commenters stated the Proposed Rule inappropriately requires plaintiffs to plead around an affirmative defense. Commenters asserted this approach broke from Congress's intent, affirmed by *Inclusive Communities*, for burden shifting in disparate impact claims, and Title VII case law.

Commenters also objected to the preamble's suggestion that *Ellis* v. *City of Minneapolis* [99] supports the proposed revisions, stating that *Ellis* does nothing more than apply well-established disparate-impact doctrine consistent with the 2013 Rule in holding that the plaintiffs failed to identify a specific policy with a robust causal link to the disparate impact. Commenters cited to a subsequent opinion explaining *Ellis* to support this proposition.[100]

Commenters noted this approach broke from Congress's intent, affirmed by *Inclusive Communities*, for burden shifting in disparate impact claims, and Title VII case law. Other commenters supported the "arbitrary, artificial, and unnecessary" language because it prevents abusive claims and the Proposed Rule asserts that a valid objective can be based on practical business considerations and/or profitability. Other commenters said this language is supported by Supreme Court precedent including *Inclusive Communities* and that it protects defendants' valid interests such as business or profit considerations. Commenters stated that "artificial, arbitrary, and unnecessary barriers" replaced the 2013 Rule's "nondiscriminatory interests" standard.

*HUD Response:* First, HUD notes that plaintiffs do not have to prove alleged facts at the pleading stage. As discussed in the Proposed Rule's preamble, plaintiffs merely have to plead facts supporting this claim sufficient to survive a motion to dismiss. Providing some sort of factual allegation to support the proposition that the policy challenged may plausibly be arbitrary, artificial, and unnecessary, or plausibly alleging that a policy or practice advances no obvious legitimate objective, would be sufficient to meet this pleading requirement.

*Inclusive Communities* made three references to the "arbitrary, artificial, and unnecessary" standard.[101] *Inclusive Communities* never clarifies that the "artificial, arbitrary, and unnecessary" requirement is exempt from the requirement for pleading a prima facie case, and two of these three references were in the context of providing standards for disparate impact suits to avoid constitutional questions that arise with expansive disparate impact liability. *Inclusive Communities* provides that courts should "prompt[ly] resol[ve]" disparate impact cases and examine disparate impact claims "with care." Further, *Inclusive Communities* clarifies that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." [102] Removing this artificial, arbitrary, and unnecessary constraint as a screening mechanism would allow for an untimely resolution of disparate impact cases after expensive litigation and discovery, which is contrary to *Inclusive Communities*. Moreover, HUD believes that the "artificial, arbitrary, and unnecessary" standard gives valuable guidance about the qualitative nature of policies and practices that are suspect because otherwise, there would be a tendency to simply consider how much statistical disparity is too much—something the Supreme Court specifically directed parties to avoid as constitutionally suspect and which would constitute mere second guessing of reasonable approaches.

*Ellis* v. *Minneapolis* [103] supports HUD's interpretation. *Ellis* discussed the elements of a prima facie case, and explained that under *Inclusive Communities*, lower courts must examine "whether a plaintiff has made out a prima facie case of disparate impact." [104] This includes facts about causation between a policy and disparate impact, but *Ellis* does not limit a prima facie case to just that element.

---

[98] 401 U.S. 424 (1971).

[99] 860 F.3d 1106 (8th Cir. 2017).

[100] *Nat'l Fair Hous. Alliance*, 261 F. Supp. 3d at 33 (citing *Ellis* v. *City of Minneapolis, Minn.*, No. 14–CV–3045 (SRN/SER), 2016 WL 1222227, at *6 (D. Minn. Mar. 28, 2016)).

[101] First, in the context of discussing limitations to disparate impact to avoid constitutional questions, the Court says that "Disparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." *Inclusive Communities*, at 2512 (citing *Griggs*, at 43). Second, *Inclusive Communities* states that "Governmental or private policies are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." *Id.* at 2524 (citing *Griggs*, at 431). Third, *Inclusive Communities* states that if "standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities, rather than solely 'remov[ing] . . . artificial, arbitrary, and unnecessary barriers.' " *Id.* at 2524 (citing *Griggs* at 431).

[102] *Inclusive Communities*, at 2518.

[103] 860 F.3d 1106 (8th Cir. 2017).

[104] *Ellis*, at 1111 (quoting *Inclusive Communities* at 2523).

*Ellis* also discusses the "artificial, arbitrary, and unnecessary" constraint as a separate prong from the causality requirement, when it notes that the plaintiff's complaint is insufficient exactly because it lacks "factually supported allegations that [the housing-code provisions, the challenged policies] are arbitrary or unnecessary to health and safety." [105] Two Eighth Circuit cases advance HUD's interpretation of *Ellis*. First, *Khan* v. *City of Minneapolis* described *Ellis* as upholding "the district court's grant of judgment on the pleadings for the city, concluding that the landlords had failed to point to an artificial, arbitrary, and unnecessary policy that a Fair Housing Act disparate-impact claim could remedy." [106] This interprets *Ellis* as imposing an "artificial, arbitrary, and unnecessary" requirement in the pleading stage for disparate impact cases. Second, a district court cites *Ellis* in explaining that "[t]o plead a plausible disparate-impact claim, a plaintiff must plead the existence of an 'artificial, arbitrary, and unnecessary'" policy.[107]

HUD also notes that to the extent *Inclusive Communities* referenced Title VII disparate impact liability, it was "analogous" to disparate impact liability under Title VIII. Such analogies do not limit HUD's significant discretion to impose additional guardrails for Title VIII disparate impact liability that do not exist under Title VII, particularly when *Inclusive Communities* clarified that the opinion "announced" "cautionary standards" for disparate impact liability under the Fair Housing Act.[108]

*Griggs* certainly did not rule that the "artificial, arbitrary, and unnecessary" standard could not be an element of a prima facie case. Even if *Griggs* did not explicitly establish such an element, it explained that Congress provided for "the removal of artificial, arbitrary, and unnecessary barriers to employment. . ." [109] in establishing disparate impact liability. Further, in the context of Title VIII disparate impact liability, for which *Inclusive Communities* enacted more guardrails than Title VII disparate impact liability, it would be reasonable to conclude that the "artificial, arbitrary, and unnecessary" constraint should be an element of a prima facie case, even if it is not for Title VII. For instance, unlike *Griggs, Inclusive Communities* provides, after discussing "constitutional concerns" with expansive disparate impact liability, that "Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important." [110] Further, under a burden shifting approach someone must always plead a negative, consistent with general civil procedure in the United States. That seems more appropriately a burden on the plaintiff. It is also consistent with the Supreme Court's caution about not second-guessing two reasonable alternatives.

Additionally, the requirement for a plaintiff to plead a negative is not unique to HUD's disparate impact rule. For example, the Federal Driver's Privacy Protection Act creates a civil cause of action against a person from "person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted. . ." by the statute.[111] This requirement is "only satisfied if shown that obtainment, disclosure, or use was not for a purpose enumerated under" the statute.[112] It also prohibits State Departments of Motor Vehicles from disclosing personal information except for permissible uses.[113] Plaintiffs suing under this statute plead a negative, specifically that the disclosure at issue lacked a permissible purpose.[114]

HUD is not aware of courts that have responded to the requirement to prove a negative by ignoring that requirement. Courts are capable of tailoring the threshold for an acceptable prima facie showing to match the difficulty of making this type of showing.[115]

(b)(2) Robust Causal Link

*Comment: Meaning of "robust causal link" is unclear.*

Commenters expressed confusion about the meaning of § 100.500(b)(2). A commenter stated that the phrase "robust causal link" is unclear and that pointing to dicta in *Inclusive Communities* does not eliminate the confusion.

Commenters objected to the inconsistent terminology regarding causation in the Proposed Rule and its preamble, noting that HUD uses, interchangeably, four different causation phrases: "robust causality," "robust causal link," "direct causation," and "actual causation." Commenters stated the preamble explanation of § 100.500(b)(2) is unclear as to whether HUD is simply seeking to reflect established case law on proving discriminatory disparities or seeking to establish unprecedented requirements. Commenters stated that it is unclear from the text of proposed § 100.500(b)(2) whether a plaintiff must demonstrate both a 'robust causal link' and 'direct cause,' or whether a showing of 'direct cause' conclusively establishes the 'robust causal link.'

Commenters suggested that HUD should define "robust causal link" but avoid a definition that requires proof of actual or primary causation or that mandates a one-size-fits-all standard of causation. A commenter stated that any new definition of causality or 'robust' risks being overly prescriptive for what is necessarily a case- and context-sensitive question of fact. Commenters suggested that HUD should instead use "substantial causal relationship," meaning the relationship is important, valid, reliable, meaningful, not trivial or tiny. Commenters stated that failing to provide a definition would increase litigation costs and would reduce the ability of potential litigants to analyze the risk of litigation. Other commenters questioned whether HUD intended to adopt in proposed § 100.500(b)(2) "robustness" as defined by George Box, who the commenters stated invented the concept of "robustness" in 1953.

*HUD Response:* HUD appreciates these comments and has clarified in the Final Rule that HUD intends "robust causal" link to mean that the policy or practice is the direct cause of the discriminatory effect. HUD intends these two terms to be synonymous. HUD declines to further define or explain "robust causality" due to the fact-specific nature of the various cases that courts will decide on a case-by-case basis. HUD does not intend to adopt the

[105] *Ellis*, at 1112. While *Ellis* does use the word "or" instead of "and" and omits the word unnecessary here, HUD does not believe this suggests that plaintiffs need only plead that a policy is artificial, arbitrary, *or* unnecessary. Elsewhere *Ellis* discusses a policy being "arbitrary and unnecessary under the [Fair Housing Act]." (*Id.* at 1112). Every other reference (four in total) is to something being "artificial, arbitrary, and unnecessary." This includes the end, where *Ellis* concludes that plaintiffs had not pleaded a prima facie case because they did not meet the requirement in *Inclusive Communities* for a plaintiff to "at the very least point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity."

[106] 922 F.3d 872, 874 (8th Cir. 2019) (citing *Ellis* at 1109, 1114).

[107] *Hoyt* v. *City of St. Anthony Vill.*, 2019 U.S. Dist. LEXIS 85865, *17–18 (May 22, 2019).

[108] *Inclusive Communities*, at 2524.

[109] *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 431 (1971).

[110] *Inclusive Communities* at 2523.

[111] 18 U.S.C. 2724(a).

[112] *Thomas* v. *George, Hartz, Lundeen, Fulmer, Johnstone, King & Stevens, P.A.*, 525 F.3d 1107, 1111 (11th Cir. 2018).

[113] 18 U.S.C. 2721.

[114] *See Welch* v. *Theodorides-Bustle*, 677 F. Supp. 2d 1283, 1287 (N.D. Fla. 2010).

[115] *See, e.g., Gill* v. *Whitford*, 138 S. Ct. 1916 (2018).

definition of "robustness" as defined by George Box.[116]

In addition, throughout the Final Rule and the preamble explaining any changes from the Proposed Rule, HUD has worked to use consistent terms to avoid confusion.

*Comment: Regarding* Lincoln Property.

Commenters objected to the proposed burden-shifting framework, particularly the robust causality pleading requirement, arguing that it is a misapplication of the causality requirements in *Inclusive Communities.* The commenters specifically cited *Inclusive Communities Project, Inc.* v. *Lincoln Property Co.*,[117] (*Lincoln Property*) as the source of that misapplication, stating that the Fifth Circuit created a burden of proof for the plaintiffs beyond what the Supreme Court required in *Inclusive Communities* by finding that it is insufficient to plead and prove that a defendant's challenged policy has a discriminatory impact based on race because of its interaction with pre-existing societal disparities if the defendant is not responsible for the underlying societal disparities. The commenters stated that HUD should specifically refute the higher standard of proof in *Lincoln Property,* otherwise HUD would open the door to more courts using higher burdens of proof for causality, making it even harder for plaintiffs to succeed in their disparate impact claims.

*HUD Response:* The "robust causality" requirement and other changes in the Final Rule are based on *Inclusive Communities* and are also supported by subsequent court of appeals decisions. HUD recognizes the concerns that commenters have with the *Lincoln Property* decision and does not intend to endorse this decision. HUD cites to *Lincoln Property* only as one of several cases which recognize the robust causality requirement articulated in *Inclusive Communities.* HUD agrees with the specific statements made in *Lincoln Property* that "the Supreme Court never explicitly stated that it adopted the HUD regulation's framework" [118] and "the Supreme Court's opinion in [*Inclusive Communities*] undoubtedly announce[s] a more demanding test than that set forth in the HUD regulation." [119] HUD notes that *Ellis* [120] also provides support for the robust causality requirement, which includes it as a part of the "cautionary standards" announced in *Inclusive Communities.*

(b)(3) Adverse Effect on Members of a Protected Class

*Comment: HUD uses different phrases and causes confusion about the interaction of § 100.500 paragraphs (b)(2) and (b)(3).*

Commenters asked whether the concept in (b)(3), that the alleged disparity has "an adverse effect" on a protected class was already satisfied in § 100.500(b)(2), which requires pleading a "disparate impact on members of a protected class." In addition, commenters noted that § 100.500(a) uses the phrase "discriminatory effect on members of a protected class." Commenters stated that it is not apparent that *Inclusive Communities* requires a showing of "adverse effect" in addition to "discriminatory effect," which is required in § 100.500(b)(2).

*HUD Response:* HUD appreciates these comments and has revised the Final Rule to clarify HUD's intent. These elements ((b)(2) and (b)(3)) both require that the plaintiff show that there is a policy or practice with an adverse effect, but differ in that the new element (2) (formerly element (3)) requires a showing that the policy or practice has a *disproportionate* adverse effects on members of the protected class, whereas the new element (3) (formerly element (2)) requires a showing that the policy or practice has a *robust causal link* to such adverse effect. Section 100.500(a) does not set forth the elements of the prima facie case and is therefore not repetitive with elements of paragraph (b).

*Comment: Proposed Rule improperly excludes segregation claims.*

Commenters opposed the revisions in § 100.500(b)(3) because HUD removed language explicitly allowing segregation claims in § 100.500(a) of the 2013 Rule, noting the harm of segregation on individuals and society generally.

*HUD Response:* The Proposed Rule did not intend to, and the Final Rule does not limit claims that result in unlawful segregation. While the reference was removed from explicit mention, it was not excluded from the definition altogether. HUD believes that segregation may be the harmful unlawful result of a policy or practice that violates the disparate impact standard.

*Comment: HUD should clarify or change the "adverse effect" language.*

Commenters stated that the third element has arbitrary meaning for requiring proof of effect of discriminating against a protected class as a group, because it is unclear what proof a plaintiff may have to show that the policy or practice as a whole has the effect of discriminating against a protected class as a group. Commenters asked if it would be enough for a plaintiff to claim that she and two other members of the same protected class constitute a group.

Some commenters suggested that § 100.500(b)(3) should have a heightened standard. Some commenters suggested the plaintiff must show that the alleged disparity has an adverse impact on a *significant* number of individuals of a protected class, so that claims impacting a small number of individuals (regardless of the percentage they constitute) are not actionable.

Alternatively, commenters opposed an elevated degree of harm, which they suggested the language in § 100.500(b)(3) proposed. Commenters stated that distinguishing degrees of harms would likely be unsuccessful, but, if done, should include accepted definitions for terms such as "discriminatory", "adverse", and "prejudicial". Other commenters suggested the Proposed Rule be revised so that a plaintiff may show an adverse effect even where some members of the protected class are not impacted.

Finally, commenters said the Proposed Rule provided necessary guidance on what an adverse impact on a protected group is. Commenters stated it is uncontroversial that a plaintiff must show that the policy or practice has a "disproportionately adverse effect" on members of a protected class in order to bring a disparate impact claim.

*HUD Response:* HUD has revised this language to add the word "disproportionately" to clarify that it is not enough to simply state that some number of members of a protected class are affected, but that a plaintiff must show that the policy or practice disproportionately affects members of protected class compared to similarly situated non-members. The size of the group and the disparity necessary to show that the adverse effect is 'disproportionate' are fact-specific questions which will vary from case to case. This clarifying language also shows HUD is not intending to create an "adverse effect" standard separate from the "discriminatory effect" standard, but is merely codifying the requirement inherent in disparate impact claims. HUD is also not intending to create a

[116] George E.P. Box, *Science and Statistics,* Journal of the American Statistical Association (1976), *https://www.jstor.org/stable/2286841.*

[117] 920 F.3d 890 (5th Cir. 2019).

[118] 920 F.3d at 902.

[119] *Id.*

[120] *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1111 (8th Cir. 2017).

standard that would be inconsistent with *Inclusive Communities.* Therefore, HUD has determined not to implement language that would require the plaintiff to show a minimum number of people are affected. HUD also notes that it is clear that a plaintiff does not have to show that a policy or practice affects the entire group of protected class members, only that the effect is disproportionate on a cognizable portion of the protected class.

*Comment: Does not list Disability.*

Commenters noted that the Proposed Rule's discussion of the third proposed element does not list Disability as a protected class.

*HUD Response:* In an explanation HUD provided in the Proposed Rule's preamble, HUD listed protected classes by quoting 42 U.S.C. 3604(a), which does not include disability because disability is protected in 42 U.S.C. 3604(f).[121] This omission was unintentional. HUD recognizes that disability is a protected class covered under the Fair Housing Act and under § 100.500.

(b)(4) Significant Disparity

*Comment: Regarding the definition of "significant."*

Commenters objected to the section's use of the term "significant." Commenters stated that without a definition, the term "significant" is "too vague to survive review." Commenters stated that failing to define the term would create litigation to define it, increasing litigation costs and reducing the ability of potential litigants to properly analyze the risk of litigating. Commenters stated that the requirement that a plaintiff show a "significant" disparity is a highly subjective and inherently vague standard that will usurp the court's fact-finding role. Commenters noted that imposing a new materiality standard would allow for some undefined quantum of housing discrimination and noted that the Fair Housing Act makes unlawful *all* prohibited practices described by the Act. Commenters stated that HUD is inferring a materiality requirement through the word "significant," which is not supported by *Inclusive Communities.* Commenters also expressed confusion and objected to the fact that the text of Proposed Rule § 100.500(b)(4) required a disparity to be "significant," but the explanation of that subsection stated that the disparity needs to be "material." Commenters noted that materiality is not a concept used in fair housing law and is more commonly applied in the fraud or breach of contract contexts.

Other commenters supported the use of the term "significant." Commenters stated the requirement is consistent with disparate impact precedent, and directions provided by Federal regulators for assessing disparate impact risk. Commenters supported the Proposed Rule, which does not impose a cutoff on what is considered "significant," but clarifies negligible disparities are not enough. Commenters said a plaintiff must be required to show that the disparity caused by the defendant's policy is significant to prevent frivolous, abusive claims, which protects businesses.

Commenters suggested HUD define a "significant" disparity in a functional way, and suggested language defining significant as "qualitatively different." Other commenters suggested that HUD clarify that "significant" only means statistically significant. A commenter wrote that the Final Rule must specify whether it is referring to statistical significance (not product of chance) or practical significance (magnitude of disparity) or just "big or large" in the common, modern use of the term. A commenter noted that "significance" is a concept applied by courts regularly under the Fair Housing Act to refer to statistical significance. A comment suggested that HUD replace the proposed "significance" requirement at § 100.500(b)(4) with a balancing inquiry into the nature of the disparity and strength of the causal connection between the disparity and the challenged practice.

Conversely, some commenters opposed any attempt to define significance or materiality. The commenters stated that the Final Rule should allow these terms to be defined contextually, as they traditionally have been, and not create novel safe harbors for acts of discrimination artificially defined as "insignificant," "immaterial," or "negligible" or otherwise small.

Commenters suggested that courts should determine whether an effect constitutes a "significant disparity" rather than require the plaintiff to prove this as a part of the prima facie burden.

*HUD Response:* HUD agrees with commenters who believe an attempt to define "significant" is not helpful. The meaning of "significant" will vary from case to case and any attempt to define it would necessarily exclude fact-specific situations that HUD does not intended to exclude. HUD therefore declines to define "significant" in exclusively statistical terms, with a balancing inquiry, or in any other way that may limit its application.

HUD believes it is clear that "significant" is a necessary element in Fair Housing Act cases broadly, but especially in disparate impact cases. HUD notes that several courts have, since *Inclusive Communities,* identified a significance requirement.[122] This significance requirement is not exclusively a statistical test or a test of the amount of impact a policy has, but can apply elements of both depending on the situation. HUD does not believe this allows for a "modicum" of discrimination to exist, but recognizes that a numerical disparity is not the same as unlawful discrimination and that some differences may be random and not discriminatory. HUD also believes that it is clear that the requirements of proving a prima facie case rests with the plaintiff, and that this case includes the burden to show that the disparity being challenged is sufficient to be legally cognizable.

Finally, HUD's use of the word "material" in the Proposed Rule's preamble was intended to emphasize that an immaterial difference would not be sufficient. HUD does not intend to import a materiality requirement separate from the significance requirement. HUD also recognizes that many differences are unexplainable. Further, HUD is mindful of the Supreme Court's caution against approaches that might inexorably lead to quotas.

(b)(5) Direct Cause of Plaintiff Injury

*Comment: Intensifies proximate cause.*

Commenters stated that the addition of the proposed element that there be a "direct link" between a disparate impact and an alleged injury intensifies how much proximate cause there must be to prove a disparate impact at the pleading stage of a lawsuit, before parties have access to discovery and would unjustifiably narrow both the kinds of discriminatory policies that can be challenged and the class.

Commenters stated that the direct link requirement is not supported by the Fair Housing Act. Commenters stated the Proposed Rule improperly requires direct causation, rather than "robust causation" as expressed in *Inclusive Communities* or "some direct relation" as expressed in *Bank of Am. Corp.* v.

[121] 84 FR 42858 (Aug. 19, 2019).

[122] *See, e.g., City of Miami Gardens,* 931 F.3d at 1297; *Schaw* v. *Habitat for Humanity of Citrus Cty., Inc.,* 938 F.3d 1259, 1274 (11th Cir. 2019); *Waisome* v. *Port Auth. of New York & New Jersey,* 948 F.2d 1370, 1376 (2d Cir. 1991); *City of Los Angeles* v. *Wells Fargo & Co.,* 2015 WL 4398858 (C.D. Cal. July 17, 2015), aff'd, 2017 WL 2304375 (9th Cir. May 26, 2017).

*City of Miami*,[123] and this can be satisfied by alleging facts or statistical evidence. Commenters also noted that the Eleventh Circuit held that the Fair Housing Act is written in far-reaching terms.[124] Commenters also stated that this element's inclusion was not clearly related to *Inclusive Communities*. Commenters asserted that the Fair Housing Act states that there only needs to be "some direct relation between the injury asserted and the injurious conduct alleged."

Other commenters stated that *Bank of Am. Corp.* v. *City of Miami*, which cites *Holmes* v. *Securities Investor Protection Corporation*, was wrongly decided because *Holmes* was a securities fraud case and did not specifically discuss the Fair Housing Act.[125] Other commenters stated that the plaintiff should be required to show proof of disparity and establish a direct or sole cause between the defendant's actions and the disparity to bring a prima facie case.

*HUD Response:* HUD appreciates these comments. HUD intends to align with Supreme Court precedent in *Bank of Am. Corp.* v. *City of Miami* and has made changes in the Final Rule to mirror the language used in this decision at § 100.500(b)(5), that is, there is a direct relation between the injury asserted and the injurious conduct alleged. HUD is not relying on *Inclusive Communities* for this element. HUD also agrees with commenters that HUD is not authorized to establish standing doctrine, but HUD is only restating language that aligns with Supreme Court precedent. Because *Bank of Am. Corp.* v. *City of Miami* is itself binding precedent, the decision's reliance on *Holmes* does not alter the analysis.

(c) Failure To Allege a Prima Facie Case (General)

*Comment: The structure of HUD's proposed pleading stage rebuttals available for defendants to use to refute the prima facie case will make it difficult for legitimate claims to go forward.*

Commenters objected to the defenses available under the Proposed Rule, stating that the defenses in the Proposed Rule skew the plausibility of a disparate impact claim in the defendants' favor by greatly increasing the difficulty of proving even meritorious claims. These commenters wrote that finalizing a rule with such defenses available would cause HUD to violate its statutory duty to affirmatively further fair housing.

Commenters also said that expanding the available defenses contravenes disparate impact jurisprudence, because exemptions have only been recognized where they are statutorily authorized, and courts have expressly rejected arguments to expand exemptions. Other commenters asserted that the defenses are inconsistent with case law.

*HUD Response:* HUD disagrees that this rulemaking violates HUD's duty to affirmatively further fair housing. Affirmatively furthering fair housing is an independent obligation relating to the manner in which HUD administers its programs, not an independent or heightened enforcement mechanism. HUD has broad discretion in defining that obligation and carries out that statutory duty through various other policies, including through the Proposed Rule published on January 14, 2020, at 85 FR 2041.

In addition, HUD believes that the Proposed Rule, including the defenses, is supported by case law. As recognized by the Supreme Court in *Inclusive Communities*, disparate impact is not set forth explicitly in statutory language. This Final Rule is intended to reflect a constant, logical set of pleading requirements consistent with prevailing case law.

*Comment: Support and opposition for the structure of HUD's process for rebutting the prima facie case.*

Some commenters supported the proposed defenses against a plaintiff's prima facie case, stating that the defenses in the Proposed Rule will discourage abusive disparate impact filings while still preserving cases that are at the core of disparate impact liability. Commenters noted the Proposed Rule was consistent with *Inclusive Communities* and FRCP 12(b)(6) precedent, which allows for dismissal of meritless claims at the pleading stage.

Other commenters objected to the Proposed Rule's framework providing explicit defenses as part of the pleading stage. Commenters stated that the preface cites nothing from *Inclusive Communities*—or any other case law or statute—that provides for this new framework. Commenters cited the three-step, burden-shifting framework included in *Inclusive Communities* and the Fourth Circuit's description of the burden-shifting framework in *de Reyes* v. *Waples Mobile Home Park L.P.*[126] Commenters said that the *de Reyes* court described the burden-shifting framework as requiring plaintiffs to prove a "robust causal connection" in their prima facie case and defendants to prove legitimate nondiscriminatory interests while emphasizing that this causality requirement was not so strict as to obligate plaintiffs to show "any facially neutral rationale to be the primary cause for the disparate impact on the protected class . . ."

*HUD Response:* HUD believes that the proposed framework is consistent with existing case law. The *de Reyes* court explicitly decided the case under *Inclusive Communities*, not HUD's standard, and declined to decide whether the two were different. In *Inclusive Communities*, the Court stated that courts must examine "with care" whether a plaintiff has made a prima facie case of disparate impact. The Court also cited specific elements of a prima facie case, and HUD has codified these prima facie requirements in the Final Rule. Section 100.500(d) then specifies that a defendant can allege in the pleading stage as a defense that the plaintiff has failed to allege all elements of the prima facie requirements.

*Comment: HUD should provide additional clarity to the prima facie defenses.*

Commenters stated that § 100.500(c) should include a clarification that defendants may introduce evidence that the plaintiff has failed to make a prima facie case, and that the defendant is entitled to dismissal upon successful establishment of a listed defense. These commenters wrote that otherwise, some district courts may erroneously deny these defenses in connection with a Rule 12 motion to dismiss the complaint.

Commenters also suggested that HUD specify that judges should decide defenses against a prima facie case as a question of law, rather than a question of fact.

*HUD Response:* HUD has revised the regulatory text for defenses, in § 100.500(d). The revised text clarifies that defendants can, as part of a motion to dismiss, argue that the plaintiff has failed to sufficiently plead facts sufficient to state a prima facie case, which would allow a judge to dismiss the case before discovery. There are also defenses available under paragraph (d)(2) after the motion to dismiss stage that would require discovery and further findings by the court. HUD believes issues of law and fact are best left to the judiciary.

*Comment: Allowing defendants to get cases dismissed at the pleading stage violates the FRCP.*

Commenters stated that the Proposed Rule purports to specify how the burden-shifting framework would apply at the pleading stage of a case and would allow defendants to have a case

[123] 137 S. Ct. 1296 (2017).

[124] Commenters cited *City of Miami* v. *Wells Fargo & Co.*, 923 F.3d 1260, 1278, 1280 (11th Cir. 2019).

[125] *Id.*

[126] 903 F.3d 415 (4th Cir. 2018).

dismissed at the pleading stage by making certain affirmative showings, even when the complaint alleges all necessary elements of the claim. The commenter argues that this squarely contravenes the FRCP regarding motions to dismiss, summary judgment, and Rule 12(d), which HUD has no authority to repeal or modify. Other commenters assert that the Proposed Rule improperly encourages adoption of this prima facie burden by courts.

*HUD Response:* HUD has revised the regulatory text to clarify what elements are necessary to establish a prima facie case and what defenses are available at the pleading stage. The revised text only allows for a defense at the pleading stage if the plaintiff has failed to properly plead a prima facie case. However, a defendant may make this defense by showing, through the plaintiff's complaint or other information admissible at the pleading stage, that the plaintiff has failed to meet one of the elements. HUD especially notes that the defendant may show a failure to plead causation by showing that the defendant's alleged actions are reasonably necessary to comply with a third party requirement, such as a state law.

While the FRCP govern pleading requirements, HUD's disparate impact rule addresses the underlying definition of one specific cause of action under the Fair Housing Act, which HUD has the authority to implement. Specifically, HUD's Final Rule sets forth the standard for establishing a disparate impact claim (§ 100.500(a)), clarifies the prima facie burden for plaintiffs in a disparate impact case (§ 100.500(b)) and how a defendant can demonstrate that a plaintiff has failed to allege a prima facie case (§ 100.500(c)), and clarifies the burdens of proof in disparate impact cases (§ 100.500(d)).

Additionally, this follows the approach that HUD took in its 2013 Rule. HUD's 2013 Rule both established a burden-shifting framework and defined the content of a "prima facie showing of disparate impact" to mean "proving that a challenged practice caused or predictably will cause a discriminatory effect . . ." HUD's Final Rule also allocates the burden of proof and defines when disparate impact can occur. The main difference between HUD's 2013 Rule and the Final Rule is that HUD is now providing more precise guidance for when disparate impact may occur in response to *Inclusive Communities.*

HUD believes that *Inclusive Communities* makes it particularly important for courts to scrutinize whether each element of a prima facie disparate impact claim is sufficiently pled before allowing a claim to proceed, given the constitutional and prudential considerations that *Inclusive Communities* outlined and HUD has articulated. HUD believes allowing a defendant to demonstrate that a plaintiff has not pled the prima facie element of connecting the disparate impact with actions the defendant has taken is appropriate at the pleading stage.

*Comment: HUD does not have authority to create fact-specific safe harbors.*

Commenters stated that courts have declined to adopt exemptions and safe harbors from disparate impact liability as beyond their authority and cited to *Graoch Assoc.* v. *Louisville/Jefferson County Metro Human Relations Commission.*[127] Commenters stated that absent such instruction, HUD lacks the authority to evaluate the pros and cons of allowing disparate-impact claims challenging a particular housing practice and to prohibit claims that we believe to be unwise as a matter of social policy.

*HUD Response:* HUD is not creating a practice-specific exemption or safe harbor, and HUD's defenses are based on HUD's determination that a defendant who can prove the defense has necessarily shown that the defendant cannot be liable in the manner described by the plaintiff. HUD's Final Rule provides no specific action that insulates a party from liability in the manner of a "safe harbor" but instead elucidates the general parameters of the disparate impact theory consistent with Supreme Court precedent.

(c)(1) Prima Facie Case Not Established Because Defendant Discretion Is Materially Limited by a Third Party

*Comment: HUD should define "materially limited".*

Commenters asked for a definition of "materially limited" to clarify the defense's bounds. Commenters stated that it is uncertain whether "materially" refers to information that is germane to the criteria governing loan transactions or the nature of an inaccuracy or difference or the magnitude of the effect of that disparity. Commenters also noted that while the preamble suggests that the defense of "materially limited" discretion applies where a party must take action that would constitute a disparate-impact violation, its plain language sweeps much further. It is arguable that every action in heavily regulated industries such as insurance or lending is taken when the actor's "discretion is materially limited" in some way, thus eliminating the disparate impact argument entirely.

*HUD Response:* HUD has revised the regulatory text to permit this defense only when it is reasonably necessary to comply with a law or court order. HUD believes that this will clarify that the law or court order must lead directly to the defendant's policy or practice.

*Comment: "Materially limited by federal or state law" defense not supported by existing statute or case law.*

Many commenters expressed concern about the Proposed Rule's defense for defendants who can show their actions are materially limited by a third-party such as a law or court decision. Some commenters expressed that there is nothing in the Fair Housing Act or *Inclusive Communities* that would support such a defense. Others stated that allowing such a defense may prevent plaintiffs from being able to bring a claim against a state or local agency for a discriminatory practice. Commenters expressed support for parties being able to implead state or local governments if a state or local law is at issue.

Commenters also stated that this defense is much broader than HUD's previous position that HUD would only recognize defenses based on conflicts with state law in the context of the McCarran-Ferguson Act.[128] Commenters noted section 816 of the Fair Housing Act, which states that laws requiring or permitting discriminatory housing practices are invalid to that extent, and they stated that the statutory provision conflicted with HUD's proposal to create defenses that apply to only certain defendants.

*HUD Response:* In *Inclusive Communities,* the Supreme Court recognized that HUD's 2013 Rule had a 3-step process for disparate impact overall. First, the plaintiff must establish a prima facie showing of disparate impact. The defendant must then have the opportunity to prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests. The plaintiff could still establish liability by showing that those interests can be served by another practice that has a less discriminatory effect. In *Inclusive Communities,* the Court expanded upon those steps, including by favorably citing the lower court's concurring opinion that included as an element of a plaintiff's prima facie case

[127] 508 F.3d 366 (6th Cir. 2007) ("Nothing in the text of the [Fair Housing Act] instructs us to create practice-specific exceptions.").

[128] 15 U.S.C. 1011–1015.

a demonstration that the defendant's policy or practice is not a result of a law that substantially limits the defendant's discretion.[129] If the defendant's discretion is limited in such a way, the Supreme Court identified this as a lack of causal connection between the policy or practice and the disparate impact, and therefore the case should be dismissed.

In addition, HUD does not believe there is a conflict with section 816. The framework of this Final Rule is to require that, where an alleged discriminatory policy or practice is the direct result of state or local legal requirements, entities merely complying with such laws should not be held responsible. Issues of impleaders, joinder, and identifying appropriate defendants are matters of civil procedure outside the scope of this rulemaking.

*Comment: HUD should alter the scope of the "materially limited" defense.*

Several commenters asked that HUD alter the scope of the defense where the defendant is materially limited by a third party. Some commenters suggested that the scope be narrowed by removing the words "such as" to clarify that this defense is available only when a defendant's discretion is materially limited by Federal, state, or local law or a binding court or other similar order, and not when there are limitations from other third parties. Others stated that the defense should only be available where a binding order or regulation rendered a less discriminatory alternative unavailable to the defendant.

Other commenters asked that the defense be expanded. Commenters suggested that defendants be allowed to demonstrate that the defendant acted to comply with applicable laws because the defendant's action is explicitly required or authorized by the statute, or because the action is permitted by the law or reasonably calculated to comply with the other law.

*HUD Response:* HUD believes that this defense should be permitted only when the policy or practice is legally mandated by a third party. However, those third parties can create the mandates through a variety of methods other than statutes or binding court orders. HUD believes that defendants should be able to argue that their actions are required, regardless of the form of mandate the third party uses. HUD is therefore leaving "such as" in the Final Rule.

HUD does not agree that language should be added explicitly discussing when a binding order rendered an alternative unavailable to the defendant. This issue would instead be covered by the defense for a policy or practice that was reasonably required by a law or court order.

HUD also disagrees with expanding the availability of the third-party defense to when actions are merely permitted by the law, as in those instances the policy or practice would not be mandated by the law or court order. In such cases, it would not be reasonably necessary to comply with a third-party requirement. If the defendant's action is not reasonably required to comply with the law or court order, then the defendant has not shown that the cause of the disparate impact is a binding third party.

*Comment: The proposed third-party defense eliminates defendants' liability for discriminatory actions.*

Commenters objected to the proposed defense that a defendant's actions are materially limited by a third party, because they stated that allowing such a defense would eliminate liability for bad actors by allowing them to blame other entities. Commenters pointed out that limited action of the government entity promulgating the requirement would shield the developer or landlord acting upon the governmental policy from liability, and thus no full relief would be available to the plaintiffs. Commenters stated that previous cases have held that where an agent discriminates by following the directions of a principal, both the principal and agent are liable for the discrimination.[130] Some commenters additionally asserted that the third-party defenses are inconsistent with the common law principle that there can be more than one proximate cause of injury.

Commenters expressed that many actions would result in a finding of no liability, such as discriminatory zoning decisions made in conformance with local law or the reliance on crime-free or nuisance ordinances in evictions of victims of domestic violence.

*HUD Response:* In disparate impact cases where liability is found, the Supreme Court has directed that the remedial order should concentrate on rectifying and changing the discriminatory practice.[131] Therefore, in the event that unlawful discriminatory practices are mandated by statute or court order, the most effective way to eliminate the unlawful discrimination is to remove or modify the underlying statute or order that mandated the unlawful discrimination. That also allows for a single legal proceeding to affect multiple actors, rather than requiring many lawsuits for all the entities affected by the statute or court order.

Under the Fair Housing Act, individuals may make complaints about discriminatory policies or practices, including those mandated by statute, to HUD, and HUD has the authority to proceed against various actors, including governments. In addition, under section 813 of the Fair Housing Act, individuals have the ability to bring suit against defendants, including governmental entities, in district court. Principal-agent law is inappropriate to the relationship between the government and the governed. Nothing in the Final Rule suggests that a government can insulate itself by its own laws. Additionally, the third-party defense is not available under the language of the Final Rule in traditional principal-agent relationships.

*Comment: The proposed third-party defense inappropriate at motion-to-dismiss phase.*

Commenters asserted that the proposed defense at § 100.500(c)(1) is impossible to fairly adjudicate as part of the motion-to-dismiss inquiry, noting that HUD does not explain how this defense can fit into the practical realities of litigation. Commenters stated that if the complaint sufficiently alleges that the defendant is responsible for the challenged policy, and the defendant contends otherwise, this question cannot be resolved at the motion-to-dismiss stage and must instead be addressed through summary judgment or trial. Commenters stated that determining whether a defendant's discretion is limited should be deferred to the traditional second step when the burden shifts to the defendant to offer justification, rather than as part of the prima facie stage.

Other commenters noted that the Proposed Rule does not state whether the defenses under § 100.500(c) present questions of fact for resolution by a fact finder or questions of law for resolution by a judge. They stated that the Proposed Rule should make clear that the defenses under § 100.500(c) present questions of law for resolution by a judge and that a judge should make any subsidiary factual determinations bound up within the overall legal analysis.

*HUD Response:* In *Inclusive Communities*, the Supreme Court favorably cited the lower court

[129] *See Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2524 (2015) (citing 747 F.3d, at 283–84).

[130] *See Alexander* v. *Riga*, 208 F.3d 419, 4333 (3d Cir. 2000).

[131] See *Inclusive Communities* at 1224.

concurring opinion[132] that included, as an element of a plaintiff's prima facie case, a demonstration that it was the defendant's policy or practice, is not a result of a law, that substantially limits the defendant's discretion.[133] If the defendant's discretion is limited in such a way, there is no causal connection between the defendant's policy or practice and the disparate impact, and therefore the case should be dismissed. As a result, HUD believes that this defense is properly available to defendants at the pleading stage. However, HUD has also revised § 100.500(d) to clarify that the third-party defense is also available in the fact-finding stage of the litigation. As noted, HUD does not believe it is appropriate for HUD to seek to delineate legal and factual issues.

*Comment: HUD should provide examples.*

Commenters stated it would be helpful for HUD to articulate examples of laws and rules in (c)(1) that materially limit a covered party's discretion. For example, several Federal, State and local statutes, regulations, and guidance substantially limit the discretion of rental housing providers in using credit, rental, and criminal history in their selection of tenants. Housing providers following these mandated criteria may have a complete defense available to them, in some circumstances, where their compliance with mandated processes and practices result in disproportional effect against one or more protected classes.

*HUD Response:* HUD finds it difficult to provide specific examples, as each situation is fact specific. However, it is HUD's intent in this rule to provide protection for defendants with policies or practices that are reasonably required by state law or are within such a narrow range of discretion that there is no practical alternative.

*Comment: Clarification of separate defenses.*

Commenters suggested HUD add the word "or" at the end of § 100.500(c)(1) to clarify each of the defenses are independent and separately available as a complete defense to a disparate impact claim.

*HUD Response:* HUD has refined the "defenses" section of the regulatory text in § 100.500(d) to provide clarity on what defenses are available and at what stage of the litigation.

(c)(2)—Defenses When Disparate Impact Results From Use of System or Risk-Assessment Algorithm

*Comment: HUD should amend the defense for use of algorithms or models created by third parties.*

HUD received many comments regarding the proposed § 100.500(c)(2), which provided certain defenses when the alleged cause of a discriminatory effect is a model used by the defendant. Some commenters objected to the proposed defense, stating that HUD did not have enough information on the nature, propriety, and use of algorithmic models to adequately propose a regulation on the topic. Commenters urged HUD to consult with other agencies to gain insight on the use of artificial intelligence. Other commenters noted that the relationship between algorithms and the laws regulating algorithms may create unpredictable and potentially dangerous outcomes. Some commenters asserted that the Proposed Rule only addressed algorithms in prescribing defenses for their use and failed to address their potential harms or unintended consequence. Commenters also asserted that allowing safe harbors for the use of algorithms would create devastating economic costs and increase discrimination.

Commenters also stated that the premise of the defense was flawed, as it provided a safe harbor for entire industries that rely on algorithms, particularly the insurance industry. Some commenters suggested that HUD lacks the statutory authority to create such safe harbors, and the proposed defense is counter to case law, including *Inclusive Communities.* Commenters stated that HUD should always require a case-by-case analysis of disparate impact claims rather than allowing blanket safe harbors which would hold defendants liable for their choices and allow defendants to demonstrate that the algorithm's use is a for a legitimate and nondiscriminatory purpose. Commenters wrote that the proposed defense defeats the purpose of the Fair Housing Act and effectively imposes an intent requirement in stark opposition of the disparate impact theory.

Commenters stated HUD has not identified the criteria that can be used to confirm whether particular models can be relied upon to produce nondiscriminatory risk assessments, and HUD should undertake additional analysis of models used in the housing industry to confirm whether these models yield useful, nondiscriminatory risk assessments or at a minimum attempt to establish neutral criteria the housing providers and third parties that develop such models can use to assess whether they meet the safe harbor requirements in advance.

Commenters said that allowing a defense for "industry standard" algorithm would still allow for discriminatory impacts. Commenters asserted that none of the authorities that allow for self-testing create safe harbors for algorithms vetted by a third party that determines industry standards. Others stated that allowing safe harbors when algorithms are used will undermine trust in technology.

Commenters stated that allowing a blanket defense for the use of algorithms would be counter to HUD's own actions in recent litigation dealing with targeted advertising. Commenters asserted that insurance companies are free to adopt or modify third-party products or to use their own algorithms, and therefore there should be no defense for using an algorithm.

Commenters stated that the proposed defense language contained many phrases and terms that are unclear and undefined, which would lead to increased litigation costs. Other commenters stated that certain terms, such as "industry standard", should remain undefined to account for rapid business changes that may occur. Commenters asked for further guidance on how to evaluate assertions of the proposed third-party defense.

Others stated that the defense permitted the use of statistically sound algorithms based on biased data, potentially because of a concern that the technology industry is not diverse enough to create products without discriminatory outcomes. Commenters stated that data testing should be mandated to uncover otherwise invisible barriers to fair housing.

Others asserted that it would make disparate impact cases more difficult for plaintiffs to win, even potentially rising to the point of violating the Equal Protection Clause. Some said that it would automatically exempt defendants from having to demonstrate that a policy is necessary to achieve a valid interest and it would increase the burden for plaintiffs to prove there is a less discriminatory alternative. Commenters also stated that defendants may combine the use of algorithms with subjective determinations, where the subjective determination results in a disparate impact, but the proposed defense may not effectively allow plaintiffs to assert such a claim.

Commenters asserted that the Proposed Rule would create an incentive to use third-party algorithms without evaluating and testing the

[132] *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs,* 747 F.3d 275,283–84 (5th Cir. 2014).

[133] *Inclusive Communities,* at 2524.

results and outputs of the algorithms, thus shifting responsibility for disparate impacts to third parties. Commenters pointed to cases such as *Miller* v. *Countrywide Bank, NA.*[134] Commenters asserted that third parties have incentives to secure repeat business rather than eliminating discriminatory effects or giving candid advice about potential impacts, and this defense will allow a wide array of practices facilitated by faulty algorithmic models without liability.

Commenters also questioned whether the proposed defense would afford any relief to plaintiffs. Some commenters asked HUD to clarify that the algorithm developer could be held liable for claims, even if the developer was not directly engaged in making or purchasing loans. Others stated that third-party vendors may try to claim that the discrimination was a result of user misuse, thus potentially leaving plaintiffs without any recourse. Commenters suggested that HUD require vendors to indemnify covered entities for discriminatory compliance issues.

Some commenters expressed concern that developers would attempt to rely on trade secret law to avoid disclosing information about the model, making it difficult or impossible to examine biases inherent in the data being used, particularly in the pleading stage before discovery. Commenters suggested HUD might add confidentiality protections to limit the disclosure of proprietary information to enable examinations. Others stated that HUD should require algorithmic models be published to provide transparency, including factors considered, weights assigned, and all elements that would contribute to a decision. Some commenters stated that plaintiffs with disabilities will not have access to the type of information necessary to challenge an algorithmic model.

Commenters stated that allowing a third-party to certify the algorithm's soundness would further frustrate plaintiffs' ability to evaluate the model, and such third parties are not always reliable. Some commenters suggested that the Proposed Rule contained language explicitly stating that experts cannot be deemed biased based on the fact that the expert has received payment or has prior history with litigation under the Fair Housing Act. Commenters stated that the Proposed Rule does not require the third parties to have fair housing experience, nor does it provide standards for the soundness certification. Commenters expressed concern that an algorithm could still be discriminatory even if it is "statistically sound." Commenters stated that the proposed defense is unclear on whether the algorithm must be validated before or after initial use of the model. Commenters also asserted that HUD cannot mandate that a court accept an expert's testimony as conclusive fact. Commenters stated that it would be expensive for plaintiffs to disprove third-party verifications of models, requiring plaintiffs to gather data and retain expert analysis and testimony.

Commenters also stated that HUD failed to account for the additional burden that small entities would need to undertake to get their own algorithms validated by a third-party, and stated that larger companies, with their increased capacity for getting algorithms validated, would be able to create a higher barrier of entry for small businesses looking to develop algorithms.

Commenters stated that the Proposed Rule should focus more on any algorithm's outputs. Some stated the defense would be problematic without requiring independent audits to determine the accuracy and reliability of algorithmic-based decisions. Commenters stated that the proposed defense did not account for the way data combinations can produce negative impacts, particularly if artificial intelligence is allowed to "learn" to create proxies for otherwise prohibited factors.

Commenters stated that the standard that material factors in the algorithm not be substitutes or proxies for protected classes was inadequate, as close proxies can be used if they are not "material", and sometimes multiple components that are neutral on their face can be an indicator of membership in a protected class when combined. Commenters also stated that what is a close proxy for a protected class may even be mutable over time, and that there are variables that may not be "substitutes of close proxies" but are still influenced by a history of discrimination.

*HUD Response:* HUD appreciates all of the comments and suggestions. As noted in the Proposed Rule, HUD believes that this area was particularly difficult and specifically solicited input on this topic. After considering the comments, HUD has removed this language from the Final Rule. Instead, in § 100.500(d)(2)(i), HUD has included language allowing a defendant to demonstrate that the policy or practice being challenged is intended to predict the occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practice does not or would not have a disparate impact on protected classes compared to similarly situated individuals not part of the protected class. HUD believes this results-based approach is consistent with a number of well-founded comments.

HUD believes that this language achieves many of the goals of the proposed defense while addressing many of the concerns raised by commenters. The defense eliminates the issue of whether the challenged policy or practice is the use of an algorithm and who created or reviewed the algorithm. The defense also does not rely on whether the inputs are proxies for protected classes, eliminating the necessity for examining all the components of the algorithm.

Instead, HUD believes that the Final Rule is improved by focusing the inquiry on whether the defendant has a valid interest in predicting an outcome and whether the ultimate outcome of the challenged policy or practice has a disparate impact on a protected class compared to similarly situated individuals outside of the protected class.

(d) Burdens of Proof for Discriminatory Effect

*Comment: HUD should not have changed the 2013 Rule's burden of proof.*

Commenters stated that the Proposed Rule provided no explanation for changing the burdens of proof set out in the 2013 Rule and that the 2013 Rule's burden shifting framework is consistent with *Inclusive Communities,* which cited the 2013 Rule regarding burdens, and established law. One commenter stated that the proposed burden of proof is a high barrier that would make it virtually impossible to bring the bedrock and heartland housing discrimination cases that Justice Kennedy in *Inclusive Communities* expressly stated should be brought using disparate impact. Commenters noted that a district court expressly rejected the argument that the Supreme Court was changing the three-prong doctrine.[135]

Commenters stated that the 2013 Rule framework was consistent with *United States* v. *City of Black Jack,*[136] which was cited by *Inclusive Communities* and established a three-step test similar to that established for Title VII employment cases in *Griggs* v. *Duke Power.*[137] Commenters noted that when

[134] 571 F. Supp. 2d 251, 260 (D. Mass. 2008).

[135] *Smith* v. *City of Boston, Mass.,* 144 F. Supp. 3d 177, 211 n.43 (D. Mass. 2015).

[136] 508 F.2d 1179, 1186 (8th Cir. 1974).

[137] 401 U.S. 424 (1971).

Congress amended the Fair Housing Act in 1988, nine federal courts of appeals had endorsed *Black Jack's* basic holding that the statute prohibits actions with an unjustified disparate impact. Commenters cited to post-*Inclusive Communities* decisions in which courts have followed long-standing Fair Housing Act disparate impact jurisprudence. Commenters also stated that *Wards Cove's* reasoning suggests that putting such a burden on plaintiffs at the pleading stage is not appropriate, or that *Wards Cove's* reasoning is based largely on careful analysis of the practical realities of Title VII compliance, and not Fair Housing issues. Several commenters asserted that the Proposed Rule's defenses to disparate impact liability are unnecessary because defendants could already raise such defenses as legally sufficient justifications under the 2013 Rule. Commenters expressed preference for the 2013 Rule's analysis of disparate impact claims on a case-by-case basis and noted that the 2013 Rule's "business necessity defense" was already flexible enough to incorporate many of the defenses in the Proposed Rule.

Commenters objected to the requirement that a defendant merely has a burden of production concerning a valid interest and the specification that a plaintiff must prove a less discriminatory alternative. Commenters acknowledged that this requirement is drawn from *Wards Cove*. However, commenters asserted that these burden-shifting standards established by *Wards Cove* were quickly rejected by Congress in the Civil Rights Act of 1991. Commenters stated that nothing in *Inclusive Communities* now renders it more appropriate to import *Wards Cove* into the Fair Housing Act and that although *Inclusive Communities* includes one favorable citation to *Wards Cove*, it is to a portion that was not abrogated by the Civil Rights Act of 1991. Commenters noted HUD specifically rejected giving the defendant only a production burden, but not a persuasion burden, in the 2013 Rule because it is consistent with the burden of proof allocation in settled Fair Housing Act case law and with the standard under Title VII and the ECOA.

Other commenters stated that the plaintiff properly bears the burden of proof at all stages, and the persuasion burden does not shift to the defendant in the pleading stages.

*HUD Response:* HUD has revised the Final Rule's structure to clarify the burden shifting approach. This Final Rule is similar to the 2013 Rule's burden shifting approach, but provides more detail and clarity following the Supreme Court's decision in *Inclusive Communities*. The 2013 Rule inappropriately required the defendant to prove that the challenged practice was necessary to achieve a substantial, legitimate, nondiscriminatory interest.

In *Inclusive Communities*, the Supreme Court stated that the Fair Housing Act is not an instrument to force housing authorities to reorder their priorities, but rather to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects. The Supreme Court analogized to, rather than expressly adopted, the business necessity standard under Title VII.[138]

HUD finds that the analogy to the business necessity standard under Title VII is persuasive. Per *Wards Cove*, if a Title VII plaintiff establishes a prima facie case of discrimination, the burden of producing evidence of a legitimate business justification for those practices will shift to defendant, but the burden of persuasion will remain with the plaintiff at all times.[139] This is consistent with the concept in *Inclusive Communities* of giving housing authorities and developers "leeway to state and explain the valid interest served by their policies." The Proposed Rule would implement this standard in the fair housing context in its section on burden of proof.[140]

*Wards Cove* remains relevant law. Historically, disparate impact standards under Title VII have tracked standards under Title VIII Fair Housing Act liability. Thus, *Wards Cove* has implications for Title VIII Fair Housing Act liability. Congress did not amend Title VIII when it amended Title VII, so *Wards Cove* is still operative in Fair Housing Act cases. Further, while *Inclusive Communities* acknowledges that *Wards Cove* was "superseded," it still cites *Wards Cove* on the importance of a robust causality requirement and cites to the statutory change that only impacted Title VII as the reason for the superseding.[141] Thus, the Supreme Court still believes that *Wards Cove* is controlling for disparate impact fair housing cases even if not now controlling for Title VII cases.

HUD also notes that the burden of production is a more logical burden for the defendant because the defendant may effectuate a defense by challenging other elements of the plaintiff's case, without reaching the issue of a valid interest. If the defendant chooses to raise this particular defense, then the defendant must produce evidence to support such a defense. It is ultimately the plaintiff's burden to prove a case, and the plaintiff must do so by rebutting any evidence produced by the defendant.

As to the comment that *Smith* v. *City of Boston* rejected the reading of *Inclusive Communities* as changing the three-prong burden shifting test, those statements by the District Court in a footnote, which were part of a discussion of the role of the third prong in Title VII analysis (that plaintiffs can rebut a showing of business necessity by identify a less discriminatory alternative that meets the defendant's legitimate needs), were simply dicta, as that part of the burden shifting test was expressly not a factor in the actual holding because the defendant's case failed at an earlier stage.[142]

(d)(1) Not Remote or Speculative

*Comment: "remote or speculative" is vague and unnecessary.*

A commenter asserted that the "remote or speculative" standard is inherently vague and gives litigants no useful marker to evaluate evidence, particularly at the pleading stage. The commenters further agreed that it raises the standard a plaintiff must meet to prove their case at every stage of the proposed burden shifting test. A commenter stated that adding this language is unnecessary as administrative and judicial proceedings would necessarily exclude this type of evidence. Other commenters stated that HUD should define the term as "objective evidence that is measurable, valid, and reliable."

*HUD Response:* HUD has concluded that evidence which is remote or speculative would necessarily not be allowed under administrative and judicial rules of evidence. Thus, HUD has removed the term from the Final Rule, as it is unneeded and confusing.

(d)(1)(i) Plaintiff's Evidentiary Burden

*Comment: Plaintiff should "demonstrate" not "prove".*

Commenters suggested an alternative that plaintiffs should not be required to

[138] *Inclusive Communities*, at 2522.

[139] *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 644 (1989).

[140] *See also* the Proposed Rule, 84 FR 42858, footnote 43 (August 19, 2019).

[141] *See Inclusive Communities*, at 2523 ("A robust causality requirement ensures that "[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create. *Wards Cove* at 653 superseded by statute on other grounds, 42 U.S.C. § 2000e–2(k).").

[142] *Smith* v. *City of Boston*, 144 F. Supp. 3d 177, 211 fn. 43 (D. Mass. 2015)

"prove" elements in paragraphs (b)(2) through (5), but should instead be required to "demonstrate" the elements through preponderance of evidence.

*HUD Response:* The regulation refers to burden of proof by preponderance of the evidence, which is the usual standard of proof for a plaintiff in civil cases.

(d)(1)(ii) Less Discriminatory Policy

*Comment: "Equally effective" alternative not legally justified.*

Commenters noted that at least one post-*Inclusive Communities* case has rejected the argument that a less discriminatory alternative must be an equally effective means for achieving a legitimate interest. Other commenters stated this prong renders the "less discriminatory alternative" ineffective. Commenters also stated that the "legally sufficient justification" standard already existed under the 2013 Rule and HUD correctly implemented it in "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions."[143] Several commenters stated HUD considered and rejected elements of the Proposed Rule when HUD published the 2013 Rule, like the "equally effective manner" element and that the plaintiff must prove a practice lacks a legitimate justification.

*HUD Response:* The 2013 Rule provided that it is a defense to a plaintiff's prima facie case that there is a "legally sufficient justification" for the practice, and that the legitimate, nondiscriminatory interests that constitute the legally sufficient justification could not be served by a less discriminatory alternative practice.

The Proposed Rule would change the burden on the parties such that, if the defendant rebuts the plaintiffs' case by showing that the challenged practice advances a valid interest or interests, the plaintiff must then show that by a preponderance of the evidence that a less discriminatory policy or practice exists that would serve the defendant's identified interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

This approach is consistent with *Inclusive Communities*, which noted, "[I]t would be paradoxical to construe the Fair Housing Act to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable."[144]

The Final Rule, therefore, balances these interests involved by requiring that a less discriminatory alternative, if posed as a basis for discriminatory impact liability, is one that will not unduly harm defendants. HUD notes here that the costs or burdens to be considered and the nature of the less discriminatory alternative both incorporate an assumption of materiality. In order for plaintiffs to fail to meet their burden on this issue, the costs or burdens that would be imposed by the less discriminatory alternative must be material. The "less discriminatory alternative" prong would also have to be material and would be properly balanced against the defendant's legitimate interests.

*Comment: "Less discriminatory alternative" is too generous to plaintiffs.*

Commenters suggested that HUD eliminate the less discriminatory alternative requirement altogether. Commenters stated that allowing a plaintiff to rebut a defendant's showing that the challenged practice advances a valid interest where a defendant insurer can show that it utilized risk-based pricing and underwriting in accordance with state insurance laws, allows the plaintiff to rebut and then require the defendant to prove a material cost or burden is contrary to the holding in *Inclusive Communities*. The commenter asserted this process would force a federal court to weigh the relative merits of insurance rating methods, which is the purview of the states under the McCarran-Ferguson Act[145] and would greatly hinder the insurer's ability to make reasonable decisions inherent in a free economy. Other commenters stated that the Proposed Rule should require the plaintiff to prove the existence of a nondiscriminatory alternative that has actually been implemented in an operation similar to the defendant's.

*HUD Response:* HUD does not believe that these proposals would be consistent with *Inclusive Communities*, or the Fair Housing Act generally, and therefore declines to accept them. Generally, the ability of a plaintiff to raise the existence of a less discriminatory alternative that is equally as effective has been recognized consistently by courts in Title VII and Title VIII disparate impact cases. As far as applicability to insurance specifically, Federal courts have ruled on the applicability of the Fair Housing Act in cases where States regulate insurance, and that case law would apply.[146] HUD itself has also opined on this issue and determined that a general waiver of disparate impact law for the insurance industry would be inappropriate.[147] After further consideration, HUD continues to believe that this determination was correct.

*Comment: Less discriminatory alternatives analysis is flawed.*

Commenters stated that the Proposed Rule's discussion of less discriminatory alternatives does not acknowledge that lowering a requirement like an income requirement may appear to reduce the discriminatory effect when comparing acceptance rates, but may appear to increase the discriminatory effect when comparing denial rates. The commenters stated that the Final Rule should provide guidance on how such a situation would apply in a less discriminatory alternative.

*HUD Response:* HUD declines to opine on fact-specific situations. Whether an alternative is less discriminatory is left to the sound judgment of a court. Parties may generally present arguments and evidence about the impact of a particular policy or practice and the proper perspective for considering it.

*Comment: HUD should provide additional defenses.*

Several commenters suggested that HUD provide an additional defense. Some commenters suggested a complete defense where a defendant shows inaccuracies or unreliability in the data methodology used to prove the existence of a disparity or where the defendant was not the actual cause of the disparate impact.

Commenters proposed an additional or alternative defense for owners that adopt a written policy that is not discriminatory on its face and is reasonably calculated to achieve a legitimate property management objective.

Other commenters proposed a defense where the challenged practice is consistent with any policy or practice that HUD has approved for the operation of Federally insured housing, is related to determining tenant eligibility or selection, and is reasonably calculated to enhance housing opportunities for persons who are

143 U.S. Department of Housing and Urban Development, *HUD Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions*, HUD.gov (April 4, 2016), *https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.*

144 *Inclusive Communities*, at 2512.

145 15 U.S.C. 1011–1015.

146 *E.g., Nationwide Mut. Ins. Co.* v. *Cisneros*, 52 F.3d 1351 (6th Cir. 1995); *Ojo* v. *Farmer's Group*, 600 F.3d 1205 (9th Cir. 2010).

147 *See* "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance," 81 FR 69012 (Oct. 5, 2016).

members of protected classes or other vulnerable classes.

Commenters requested the Final Rule include language allowing reliance on a housing finance agency's analysis of local conditions as proof that a policy or practice is necessary.

*HUD Response:* HUD declines to adopt these proposed defenses. While HUD believes that each of these situations would generally not be situations in which the defendant would be found liable, HUD declines to provide a specific exception because HUD believes that there may be fact-specific situations which HUD cannot foresee but which may lead to liability in these situations. HUD notes that the Final Rule, while not providing these defenses specifically, provides more general defenses which defendants in similar situations could use to rebut a case alleging disparate impact such as reasonable steps to comply with a governmental request.

*Comment: Special defense for Public Housing Agencies (PHAs) exercising discretion.*

Commenters stated there should be no special defense for public housing agencies. Commenters said *Inclusive Communities* does not provide support for adding a separate defense for either PHAs or housing finance agencies and said HUD's current standard is sufficient to ensure that PHAs are afforded "leeway to state and explain the valid interest served by their policies." Commenters stated that such a question is fact specific. Some commenters supported a defense for housing authorities who demonstrate their actions or decisions were reasonable and made with sound discretion.

*HUD Response:* HUD's 2013 Rule did not have such a defense and HUD has determined a defense particularly for PHAs is not appropriate. HUD believes that the protections which are already in the proposed and Final Rule provide sufficient safeguards for PHAs.

(d)(2) Defendant's Burden

*Comment: Regulatory Text is Repetitive.*

A commenter asserted that (d)(2) unnecessarily repeats that the respondent may assert the complainant has failed to support their allegations with a preponderance of the evidence.

*HUD Response:* HUD seeks to avoid unnecessary repetition but believes some repetition aids in ensuring that burdens and duties in disparate impact litigation are clear at all steps. HUD has made edits to the Final Rule to provide clarity and avoid repetition where possible.

*Comment: Suggestions specifically for the defendant's burden at 100.500(d)(2).*

Commenters requested that HUD clarify the Proposed Rule so that it is the plaintiff's burden to demonstrate "equally effective manner," "materially greater costs," and "material burden."

Commenters also stated that HUD should limit the scope of any "individualized assessments," because of the burden it creates for housing providers. Although not explicitly required in the Proposed Rule, the commenters state this should be clarified considering the mitigating evidence required by the courts in prior cases.

*HUD Response:* HUD has made clarifying edits to each party's burdens and believes that these burdens are clear. HUD notes that the less discriminatory alternative is the plaintiff's burden of proof, but the defendant has the burden of rebutting a plaintiff's proposed alternative if the defendant seeks to show that the alternative would impose materially greater costs or burden.

(d)(2)(iii) Valid Business Interest

*Comment: The business interest defense conflicts with law, related agency practice, and places unequal burdens on the plaintiff versus the defendant.*

Commenters asserted that the business interest defense: Conflicts with the 2013 Rule, Title VII, and ECOA because it fails to require the business interest to be substantial, legitimate, or nondiscriminatory; does not require that the challenged policy is necessary to accomplishing the purported interest; and does not require that a defendant's evidence be material and not remote, speculative or hypothetical (while requiring plaintiffs' evidence to be so). Commenters stated that the Proposed Rule does not provide an explanation for altering the business interest defense, noting that *Inclusive Communities* provides no support for this revision, and suggested it would create a dramatic imbalance in the quality of evidence required for plaintiffs as opposed to defendants.

Commenters asserted that case law requires instead an assessment of whatever justifications the defendant advances and carefully weighing them against the degree of adverse effect the plaintiff has shown.[148]

Many commenters expressed concern that the Proposed Rule would contradict established precedent and exempt potential defendants from liability for implementing policies that produce profits because a less discriminatory policy must also be shown to produce substantially similar profits under the Proposed Rule. Commenters asserted that factors 'relevant to the justification' of a practice with a discriminatory impact 'could include cost and profitability,' but a practice cannot be justified simply because of cost or profit. Commenters stated that the alternative policy element is inadequate without a definition explaining "other material burdens" or "materially greater costs."

*HUD Response: Inclusive Communities* stated that defendants must be given leeway to "state and explain the valid interest served by their policies."[149] HUD mirrors this language by requiring defendants to provide a "valid interest." What is considered valid is a fact-specific question, but an interest that is intentionally discriminatory, non-substantial, or otherwise illegitimate would necessarily not be "valid." HUD does not believe this creates a "dramatic imbalance," but merely allows the defendant the opportunity to identify any valid reason for the policy being challenged. Profit is necessarily a valid interest for businesses. It was expressly recognized by the Supreme Court in *Inclusive Communities*. If a defendant produces evidence which is not persuasive, that evidence must be weighed appropriately.

HUD also declines to define "material." What is "material" is a fact-specific question which is heavily dependent on the type of defendant and the type of valid interest being raised. It is not the intent of this Final Rule that a defendant would be insulated from liability simply because a less discriminatory alternative shows an immaterial decrease in profits or burden. As the Proposed Rule states, the costs or burdens imposed must be material, and something more than a mere inconvenience to the business. What is material in a specific case will have to be determined by the court, and this analysis may consider the materiality of the harm which the disparate impact is causing. However, HUD does not find a prescribed balancing test to be consistent with *Inclusive Communities*, which stated "[i]t would be paradoxical to construe

[148] *Inclusive Communities*, 135 S. Ct. at 2522 ("The Act aims to ensure that [local housing] priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation . . . in order to prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping") (citing *Huntington Branch, N.A.A.C.P.* v. *Town of Huntington*, 844 F.2d 926 (2nd. Cir. 1988)).

[149] *Id.* at 2522.

the [Fair Housing Act] to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable." [150]

*Comment: Plaintiffs cannot prove that defendant's asserted interest is illegitimate.*

Commenters stated that the Proposed Rule does not set forth an opportunity for plaintiffs to prove that the defendant's asserted interest is illegitimate because the Proposed Rule immediately shifts to the third step and requires the plaintiff to prove that there is a less discriminatory alternative.

*HUD Response:* The Proposed Rule was drafted under the assumption that the plaintiff would necessarily have the opportunity to prove that the defendant's asserted interest is not valid. The Final Rule has been revised to make this explicit.

100.500(e)—Business of Insurance

*Comment: Proposed rule's interaction with State regulation of insurance.*

Commenters stated that proposed § 100.500(e) would create a safe harbor for insurance claims under the Fair Housing Act, or preempt all such possible claims that the McCarran-Ferguson Act has no reverse-preemptive effect on Federal law at all. A commenter asserted that insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law." This would force Federal courts to second-guess the actuarial soundness of particular state-regulated insurance practices, including whether there is a less discriminatory but equally effective alternative practice that would serve the defendant's identified interest. A commenter stated that this would violate the McCarran-Ferguson Act.[151] A commenter further stated that HUD has provided no evidence to support the need for an insurance industry exemption. Conversely, another commenter stated that the proposed section 100.500(e) does not mention the McCarran-Ferguson Act, but asserted that the proposed regulation uses parallel language and attempts to exempt the insurance industry from disparate impact liability. The commenter stated that there is no reason the insurance industry cannot comply with both the McCarran-Ferguson Act and the Fair Housing Act, because disparate impact liability is not incompatible with the insurance business, as the Final Rule is expressly written to accommodate legitimate business practices, and exempting lenders from disparate impact liability would eliminate an important mechanism for plaintiffs to challenge intentional discrimination. Another commenter stated that HUD in the Proposed Rule declined to exempt homeowner's insurance or meaningfully address whether extending disparate impact liability to homeowner's insurance would interfere with State regulation of insurance in violation of the McCarran-Ferguson Act. Commenters also argued that states were better equipped to regulate the insurance industry.

Finally, some commenters asserted that the Proposed Rule conforms to the McCarran-Ferguson Act and noted court decisions have affirmed the Fair Housing Act does not conflict with state insurance laws, and that the Fair Housing Act necessarily addresses the insurance industry by virtue of addressing the lending industry.

*HUD Response:* Relevant case law indicates that neither of the extreme positions—that all insurers should be shielded from all disparate impact liability, or that McCarran-Ferguson has no preemptive effect at all—is correct. Rather, "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." [152] HUD is neutral as to the application of McCarran-Ferguson in specific cases. A federal law that does not relate specifically to the business of insurance is not to be construed to invalidate, impair, or supersede State law enacted for the purpose of regulating the business of insurance.[153]

The Proposed Rule and Final Rule make clear that HUD is only clarifying that its disparate impact rule is not specifically related to the business of insurance. State laws regulating insurance will supersede the Fair Housing Act in a discriminatory impact case if the application of the Fair Housing Act in that case would invalidate, impair, or supersede State law regulating insurance.[154] In the *Ojo* case, then, the dispositive question was "whether application of the [Fair Housing Act] to Ojo's case might invalidate, impair, or supersede" certain provisions of the Texas insurance code, in which case State law would prevail; or on the other hand, could "complement" that State's law, in which case the Fair Housing Act's provisions would apply and a disparate impact suit would not be prevented. In *Ojo,* the court found that Texas law was unsettled, and certified the issue to the State Supreme Court for resolution.[155]

An example of a case where the Fair Housing Act was found to complement State insurance law, allowing a disparate impact suit to go forward, is *Nationwide Mutual Ins. Co.* v. *Cisneros.*[156] In that case, which was a geographic redlining case involving an allegation that an insurance policy was cancelled due to the insured's race and place of residence, the Ohio law at issue prohibited insurers from "making or permitting any unfair discrimination between individuals of the same class" involving "the same hazard in the amount of premium, policy fees, or rates charged." [157] The Sixth Circuit held that the presence of additional remedies under the Fair Housing Act did not cause the Fair Housing Act to invalidate, impair, or supersede Ohio insurance law, and under McCarran-Ferguson, the Fair Housing Act was not preempted. Similarly, in another redlining case, where the allegation was that the insurer declined to renew a policy based on the neighborhood in which the insured lived, *United Farm Bureau Mut. Ins. Co.* v. *Metropolitan Human Relations Comm'n,*[158] the court found that since the State "does not require or condone redlining, or commit to insurers all decisions about redlining," application of the Fair Housing Act was not precluded.

Examples of cases where a court found that the McCarran-Ferguson Act prevented the application of the Fair Housing Act include *Taylor* v. *Am. Family Ins. Group,*[159] in which the plaintiff alleged that defendant's policy of using an insured's credit score to set prices violated civil rights laws, including the Fair Housing Act. The state law allowed the use of credit information to create insurance scores for the purpose of assessing risk and setting premiums. The court found that allowing the plaintiff to challenge the defendant's credit-based insurance scoring system under federal civil rights statutes, including the Fair Housing Act, would impair the State-specific insurance laws and, therefore, the plaintiff's claims under those federal

[150] *Id.* at 2523.

[151] 15 U.S.C. 1011–1015.

[152] *Humana Inc.* v. *Forsyth,* 525 U.S. 299, 310 (1999).

[153] 15 U.S.C. 1012(b).

[154] *Ojo* v. *Farmers Group, Inc., et al.,* 600 F.3d 1205, 1209 (9th Cir. 2010).

[155] *Id.* at 1209–1210.

[156] 52 F.3d 1351 (6th Cir. 1995).

[157] *Id.* at 1361.

[158] 24 F.3d 1008 (7th Cir. 1994).

[159] 2008 U.S. Dist. LEXIS 61181 (D. Neb., Aug. 11, 2008).

statutes could not proceed under the McCarran-Ferguson Act.[160] In *Saunders* v. *Am. Family Mut. Ins. Co.*,[161] the plaintiffs alleged price discrimination. The court found the claims barred under McCarran-Ferguson based on the fact that the State provided an exclusive administrative remedy for insurance rate complaints, including under the State law that prohibited rates that are "excessive, inadequate, or unfairly discriminatory." The court found that if McCarran-Ferguson did not apply, the court would be forced to determine what a fair and non-discriminatory rate would have been, creating a conflict with the State's administrative regime.[162]

This rulemaking does not establish an insurance industry exemption. As required by Federal law, specifically the McCarran-Ferguson Act, the Final Rule recognizes that Federal law that does not specifically relate to insurance may be barred if it would impair, invalidate, or supersede the State's insurance laws and regulations, and that this result under McCarran-Ferguson is a potential defense to disparate impact liability under the Fair Housing Act. It will be for the courts in individual cases to decide if a particular application of disparate impact liability under the Fair Housing Act would invalidate, impair, or supersede State law.

*Comment: Practice of risk-based pricing and underwriting should be a complete defense to disparate impact claims.*

A commenter asserted that the practice of risk-based pricing and underwriting is an objective practice that is necessary for the insurance industry to function and should provide a complete defense to disparate-impact based claims. A commenter offered that if insurers could not set rates or make underwriting decisions based on objective, predictive, and permitted risk factors, the insurance industry could not function properly.

*HUD Response:* The applicability of Federal law to insurance industry practices is governed by the McCarran-Ferguson Act.[163] McCarran-Ferguson preemption,[164] insofar as it relates to the applicability of disparate impact liability, has to do only with whether Federal law impairs, invalidates, or supersedes State law; it says nothing about risk-based pricing or any specific insurance practice per se. If the State law requires risk-based pricing regardless of other considerations, and the insurance practice involved is in accordance with that requirement, a claim that risk-based pricing results in disparate impact would likely impair, invalidate, or supersede State law and would be preempted. However, in cases where risk-based pricing is not required, the court would have to do a further examination as to whether application of disparate impact liability would impair, invalidate, or supersede State law or the State's administrative regime. If the State law itself prohibits discrimination in pricing or underwriting, application of disparate impact liability may be held not to impair State law because it is complementary.[165] A similar result may occur if the State law is silent on risk-based pricing. Due to the potential variability of State laws, a blanket defense for insurance matters is outside the authority of HUD under the Fair Housing Act.

*Comment: Robust causal link cannot be satisfied by an insurer's reliance on risk-based pricing and underwriting.*

A commenter asserted that insurers' use of risk-based pricing and underwriting results in the practice not being a direct cause of any resulting disparate impact. Thus, the commenter stated that a plaintiff challenging risk-based pricing and underwriting of homeowners and commercial habitational insurance cannot satisfy the "robust causal link" requirement of proposed § 100.500(b)(2) and is the result of factors that are not within the control of insurers. Relatedly, commenters asserted that State laws thus "substantially limit" the discretion of insurers in a manner that would make it impossible to ascribe any disparate effects of underwriting or pricing practices to insurers' independent choices.

*HUD Response:* While HUD does not agree categorically that there can never be a robust causal link between the use of risk-based pricing and an adverse effect on members of a protected class, that could be true in many cases. Further it may be a defense under the Final Rule that the actions of the insurer were a reasonable attempt at compliance with State law. While it may be true that in most cases the risk-based factors will be facially neutral, the basis for liability under a disparate impact claim is that practices that are not obviously discriminatory can nonetheless have an unjustified discriminatory impact on a protected class.

However, while this may be true of a required risk-based pricing regime in general, the specific risk factors chosen, and the weights given them, may be within insurers' control. If the choice of specific risk factors among permissible alternatives is the cause of a disproportionate adverse effect on the protected population as compared to similarly situated members of a non-protected class with respect to the claim being made, then the causal link between the choice of a specific factor or factors and a disparate impact on a protected class conceivably could be shown. This is a case-based decision that is not amenable to a broad regulatory solution. Therefore, HUD declines to adopt a provision that risk-based pricing can never be the cause of a disparate impact under the Fair Housing Act.

*Comment: Proposed rule exempts the insurance industry from disparate impact liability.*

Commenters expressed concern that the Proposed Rule exempts the insurance industry from disparate impact liability, noting that courts interpret the Fair Housing Act and McCarran-Ferguson Act in such a way as to avoid conflict and allow for efficient adjudication of claims.

*HUD Response:* Proposed § 100.500(e) includes the standards of the McCarran-Ferguson Act, 15 U.S.C. 1012(b). Under court decisions, the Fair Housing Act applies to insurance when application of the Fair Housing Act would not invalidate, impair, or supersede State laws enacted for the purpose of regulating the business of insurance. For instance, this could include situations where the State law is silent or where the State law also prohibits racial discrimination. On the other hand, if a State law explicitly permitted an insurance policy or practice and an insurer were following that policy or practice, it would be up to a court to determine whether application of the Fair Housing Act would impair, invalidate, or supersede the State regulatory regime.

*Comment: A safe harbor under the McCarran-Ferguson Act would be inappropriate.*

A commenter asserted that the provision dealing with recognition of state insurance laws would improperly

[160] *McKenzie* v. *S. Farm Bureau Cas. Ins. Co.*, 2007 U.S. Dist. LEXIS 49133 (N.D. Miss. July 6, 2007) has a similar factual situation. In that case, the court held that since the State enacted a regulation authorizing the activity about which plaintiff complained (using credit history to set rates), a Fair Housing Act challenge is untenable because of the McCarran-Ferguson Act (15 U.S.C. 1011–1015).

[161] 2007 U.S. Dist. LEXIS 18804 (W.D. Mo., March 16, 2007).

[162] *Id.* at *27–28.

[163] 15 U.S.C. 1011–1015.

[164] 12 U.S.C. 1012(b).

[165] *Ojo* v. *Farmers Group, Inc., et al.*, 600 F.3d 1205, 1209 (9th Cir. 2010) (If Texas law prohibits the use of credit-score factors that would violate the Fair Housing Act on the basis of a disparate-impact theory, then the Act would complement—rather than displace and impair—Texas law).

shield insurers from disparate impact liability. Commenters stated that the McCarran-Ferguson Act requires a particularized inquiry into the specific details of state insurance law that are affected by a claim under the Fair Housing Act, and the ways in which application of the Fair Housing Act might disrupt state insurance regulation. Commenters asserted that a safe harbor under the McCarran-Ferguson Act would be inappropriate, and that *Ojo* does requires a "particularized inquiry."

*HUD Response:* Section 100.500(e) and McCarran-Ferguson do not create a blanket shield against Fair Housing Act liability for the insurance business.[166] Rather, this rulemaking simply applies long-standing McCarran-Ferguson jurisprudence to the Fair Housing Act, acknowledging neither the Fair Housing Act nor the rule overrides state insurance laws. Beyond that, courts must make a case-by-case determination whether or not a finding of liability under the Fair Housing Act would invalidate, impair, or supersede any State law enacted for the purpose of regulating the business of insurance.

*Comment: Insurance exemption should be located in a different section.*

A commenter stated that because the proposed business of insurance addition would not amend 24 CFR 100.70(d)(4), which stipulates that the provision of property insurance is a covered practice under the Fair Housing Act, but rather amends § 100.500, which defines disparate impact liability itself, this opens the door to arguments that any enforcement of disparate impact liability would have effects on state insurance law and thus be preempted.

*HUD Response:* The issue of the applicability of Federal law to insurance is governed by the McCarran-Ferguson Act and cases interpreting it, regardless of whether the related language is in § 100.70(d)(4) or § 100.500(e). The arguments that the McCarran-Ferguson Act always precludes application of the Fair Housing Act when it implicates State insurance law has been rejected by Federal courts.[167] Likewise, it is clear that in many cases, a Fair Housing Act case will be precluded under the McCarran-Ferguson Act.[168] The issue, which must be decided by courts on a case-by-case basis, is whether allowing a plaintiff to proceed on claims under the Fair Housing Act would impair, invalidate, or supersede State law.[169] Addressing the advisability of § 100.70(d)(4), which also applies to disparate treatment claims, is beyond the scope of this rulemaking.

*Comment:* Inclusive Communities *did not address insurance, so neither should the Proposed Rule.*

Some commenters expressed concern about the Proposed Rule's inclusion of provisions specific to the insurance industry, arguing that the Supreme Court did not specifically address the business of insurance in the *Inclusive Communities* decision. Commenters expressed concern that the Proposed Rule will make recovery from insurance companies based on disparate impact nearly impossible.

*HUD Response: Inclusive Communities* did not deal with insurance, and so, of course, does not address that issue. However, *Inclusive Communities* did address the issue of causality where there are intervening factors; a significant factor is compliance with other laws. Consistent with the McCarran-Ferguson Act, states broadly regulate the insurance industry. This rulemaking does not interpret the McCarran-Ferguson Act or require any particular outcome in a specific case, but does seek to set forth an appropriate framework for analysis in light of existing precedent from case law. As otherwise noted, various courts have held the Fair Housing Act to not be preempted by the McCarran-Ferguson Act.

*Comment: HUD does not have authority to interpret the McCarran-Ferguson Act's applicability to the Fair Housing Act.*

Commenters argued that HUD does not have authority to change the standard for McCarran-Ferguson preemption from conflict preemption to the "material limitation" standard, because HUD's 2013 Rule left McCarran-Ferguson Act questions for courts to decide. Another commenter argued HUD does not have authority to interpret the McCarran-Ferguson Act and noted the interactions of the Fair Housing Act and the McCarran-Ferguson Act is the subject of conflicting court decisions.

*HUD Response:* The Final Rule does not interpret the McCarran-Ferguson Act and HUD is neutral regarding its application in specific cases. HUD acknowledges that different courts have reached differing results on differing facts. However, in accordance with case law, analysis under the McCarran-Ferguson Act is required in cases where insurance practices are alleged to have a disparate impact in violation of the Fair Housing Act, and the Final Rule reflects this fact. The McCarran-Ferguson Act's language itself, as well as the majority of case law interpreting its application to the Fair Housing Act and other civil rights statutes has, consistent with the proposed regulation, held that where the Federal law does not invalidate, impair, or supersede a particular provision of State insurance law permitting an insurance policy or practice or the related State administrative regime, the Federal law may apply, and where the Federal law would have the invalidating effect, it may not be construed to so apply.[170]

*Comment: HUD should clarify that the Final Rule does not prohibit, restrict, or conflict with practices based on state law.*

A commenter stated that § 100.500(e) recognizes the "supremacy of state law in the field of insurance regulation," but HUD should make it clear that the Final Rule will not be construed to prohibit or restrict practices based on, or not inconsistent with, state insurance law. Another commenter stated that, consistent with *Inclusive Communities*, language should be added to note that where the actual cause of a disparate impact is another law rather than the defendant's decision, a plaintiff cannot establish that the defendant is the actual cause of the disparate impact. The commenter suggested a new clause should be added to the end of proposed § 100.500(e), stating that nothing in this section "is intended to impose liability for any action permitted by state law."

*HUD Response:* As has been discussed elsewhere in this preamble, Federal courts have decided issues of the applicability of the Fair Housing Act

---

[166] *See, e.g., Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 298–299 (5th Cir. 2003).

[167] *See, e.g., id.; Ojo* v. *Farmer's Group*, at 1209.

[168] *See, e.g., Saunders* v. *Am. Family Mut. Ins. Co.*, 2007 U.S. Dist. LEXIS 18804 (W.D. Mo., March 16, 2007).

[169] *See, e.g., Taylor* v. *Am. Family Ins. Group*, 2008 U.S. Dist. LEXIS 61181 (D. Neb., August 11, 2008).

[170] See *Ojo* v. *Farmers Group, Inc., et al.*, 600 F.3d 1205 (9th Cir., 2010); *Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 297 (5th Cir. 2003) (because Appellants do not identify a state law or policy that would be impaired by the application of the federal statutes, suit under Fair Housing Act and other civil rights laws not barred); *Moore* v. *Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1221 (11th Cir., 2001) (stating that McCarran-Ferguson does not apply to a civil rights suit because "the federal rule does not contradict directly the terms of the state statute or render it impossible to effect or implement that statute"); *Nationwide Mutual Ins. Co.* v. *Cisneros*, 52 F.3d 1351 (6th Cir., 1995); *NAACP* v. *American Family Mut. Ins. Co.*, 978 F.2d 287, 302 (7th Cir. 1992) (reversing lower court to the extent that it held that Fair Housing Act is inapplicable to property and casualty insurance written or withheld in connection with the purchase of real estate). *But see Taylor* v. *Am. Family Ins. Group*, 2008 U.S. Dist. LEXIS 61181 (D. Neb., August 11, 2008) (involving the setting of rates using credit scores, preempting a disparate impact claim); *Doe* v. *Mutual of Omaha*, 179 F.3d 557 (7th Cir. 1999) (Americans with Disabilities Act case preempted when it would interfere with the State's administrative regime).

to State insurance matters in consideration of the McCarran-Ferguson Act. This rule does not intend to alter that jurisprudence. Therefore, HUD declines to provide addition clarifications or restrictions; HUD believes that this is a job for the courts.

*Comment: Home insurance should only be regulated by the States.*

A commenter stated that State regulation of insurance is comprehensive and includes rate and coverage issues and prohibition of unfairly discriminatory rates. Further, State laws permit, and the majority require, risk-based pricing. The commenter stated that, conversely, State laws make clear that failing to take risk into account results in unfair discrimination. Insurers are typically prohibited from taking protected characteristics into account or collecting such information. Finally, the commenter noted that state insurance commissioners review the rates charged by insurers to protect consumers.

*HUD Response:* HUD acknowledges the general scheme of insurance rating and regulations. HUD does not supplant State regulation of the insurance industry in this rulemaking. Housing laws vary from State to State and different facts present themselves in different cases, as do the conditions under which Federal law may or may not be applicable. The effect on Fair Housing Act claims by State insurance law and regulation is determined by the McCarran-Ferguson Act and related case law. Federal regulation cannot take account of all possible variations of State law, and each case has to be evaluated by a court based on the particulars of the Fair Housing Act claim and the specific State law.

*Comment: Risk based pricing can never be "arbitrary, artificial, and unnecessary" under proposed § 100.500(b)(1).*

A commenter asserted that it is essential for a viable market that insurers make pricing and underwriting decisions based on risk factors, which therefore would be arbitrary, artificial, and unnecessary. Based on this, the commenter stated that risk-based pricing and underwriting should be exempt from disparate impact liability.

*HUD Response:* HUD does not believe it can be stated categorically that no disparate impact plaintiff could ever meet the "arbitrary, artificial, and unnecessary" showing with respect to risk-based pricing and underwriting. This is because there is no uniform or unchanging approach to risk-based pricing and underwriting. For example, the specific risk factors used, in cases where those are within the discretion of the insurer, would have to be considered. Accordingly, HUD declines to adopt a position that risk-based pricing and underwriting for insurance can never be arbitrary, artificial, and unnecessary.

*Comment: The Proposed Rule would overly burden the insurance industry.*

Commenters argued that the application of disparate impact to risk-based pricing would make it more difficult for the insurance industry to accurately price for risk.

*HUD Response:* HUD does not believe that the possibility of disparate impact standards within the prudential safeguards set forth in this Final Rule will unreasonably affect the ability to price risk in the insurance business. It does not appear that this has been the case over a large number of years where disparate impact liability was potentially applicable in a broader way to insurance.

*Comment: Suggestions for Section 100.500(e).*

Some commenters suggested that, if an exemption for the insurance industry is not granted, HUD should explicitly incorporate a complete defense for actuarial risk-based pricing and underwriting in order to better align the Proposed Rule with the *Inclusive Communities* decision, state law, and the McCarran-Ferguson Act. They asserted that case-by-case adjudication in federal court would permit insurers to be held liable for use of sound risk-based practices. Commenters made similar statements regarding the filed-rate doctrine, which bars courts from reexamining the reasonableness of rates that have been filed and accepted by insurance regulators.

*HUD Response:* As discussed above, HUD does not believe that the variety of laws and factual circumstances in the insurance business allow for field preemption of the Fair Housing Act.[171] Similarly, a complete defense for actuarial risk-based price and underwriting, as a business practice is in HUD's view unduly broad. For instance, not all States appear to require risk-based pricing. According to information provided by another commenter, Nebraska, Oklahoma, and Wyoming do not require risk-based pricing.[172] Likewise, not all states require state review and approval of filed rates.[173] Nevertheless, in appropriate circumstances, the McCarran-Ferguson bar or the more general defense under paragraph (d)(1)(i) for following state law may be applicable. The filed-rate requirement, when applicable, is generally aimed at competition issues and in any event does not necessarily answer the variety of issues that could arise under the Fair Housing Act. An exemption for it would be the effective equivalent of a field preemption. HUD declined to accept this approach for the reasons noted above.

*Comment: State laws already prohibit discrimination.*

One commenter stated that variables like race and disability are irrelevant, and home insurance should simply be excluded from the disparate impact standard. The commenter also asserted that application of disparate impact liability would unnecessarily inject racial and other demographic considerations into insurance and State laws that already prohibit use of protected class information. Further, applying disparate impact liability would require insurers to collect sensitive data on protected classes in an effort to ensure that insurers will not be held liable under disparate impact theory.

*HUD Response:* As described elsewhere herein, the Final Rule contains a number of safeguards, as contemplated by *Inclusive Communities,* to avoid injecting race or other protected class status into ordinary governmental and business decision-making processes. The Final Rule expressly provides that it does not create a data collection obligation, and (d)(2)(iii)(A) requires a reasonable relationship between the law and the policy or practice said to flow from it, appropriate to address this issue.

*Comment: Proposed § 100.500(c) defenses for actions permissible under state insurance law.*

Some commenters noted that the limited discretion defense set forth in § 100.500(c)(1)(i) (paragraph (d)(1)(i) in this Final Rule) may apply only where state law requires the challenged insurance practice and therefore, HUD should clarify that the defense also applies where state insurance law permits the challenged practice.

*HUD Response:* HUD believes this Final Rule strikes an appropriate

[171] *Dehoyos* v. *Allstate Corp.*, 345 F.3d 290, 298–299 (5th Cir. 2003) (rejecting a field preemption approach to analyzing the applicability of the McCarran-Ferguson Act); *Property Cas. Insurers Ass'n of Am.* v. *Donovan*, 66 F. Supp. 3d 1018, 1025 (N.D. Ill. 2014) (stating that "In *Humana Inc.* v. *Forsyth*, 525 U.S. 299 . . . [citations omitted], the Supreme Court rejected the view that the McCarran-Ferguson Act created 'any sort of field preemption' ").

[172] *See* Appendix 1; available at *https://www.regulations.gov/document?D=HUD-2019-0067-3436* (last visited February 3, 2020).

[173] *Id.*

balance between what is required and permitted. HUD notes that in many contexts, what is permitted by law is incredibly broad. In other instances, what is permitted is so narrow as to effectively be a requirement. HUD believes the Final Rule language in (d)(1)(i) and (d)(2)(iii)(A), requiring a reasonable relationship between the law and the policy or practice said to flow from it, appropriately addresses the issue.

*Comment: Defendants' burden of proof would interfere with the McCarran-Ferguson Act.*

Commenters stated that requiring a defendant to prove a material cost or burden (under proposed § 100.500(d)(1)(ii)) (paragraph (c)(3) in this Final Rule) would force a Federal court to weigh the relative merits of a different insurance rating method, which is left to the purview of the States under the McCarran-Ferguson Act, and it would hinder the insurer's ability to make reasonable business decisions inherent in a free economy.

*HUD Response:* HUD agrees that the Proposed Rule provides a framework that allows for the McCarran-Ferguson Act to be appropriately raised when relevant. Whether a given Fair Housing Act claim conflicts with State insurance laws such that it can be said to impair, invalidate, or supersede such laws is a case-by-case determination. HUD also agrees that its Fair Housing regulation at 24 CFR 100.70(d)(4) correctly interprets the Fair Housing Act as applicable to property or hazard insurance.

Other General Comments

*Comment: Issues with language used in the section.*

Several commenters expressed concerns about the language used in the Proposed Rule. Commenters pointed out concerns with the terms "building codes" and "permitting rules." One commenter was concerned that adding the terms "building codes" and "permitting rules" to the language would have a detrimental effect on governmental efforts to advance up-to-date building code adoption and enforcement, as well as create new legal risks for communities seeking to improve building codes and strengthen disaster resilience, thereby competing with other regulatory requirements and governmental initiatives. Another commenter stated that there is no legal basis or regulatory precedent supporting the addition of the terms "building codes" and "permitting rules," citing to the *Inclusive Communities* decision, which the commenter asserted did not overrule *Gallagher* v. *Magner*.[174]

One commenter stated that HUD should further explain the addition of local and building ordinances to this section.

*HUD Response:* HUD thanks commenters for their perspectives. HUD notes that the Supreme Court in its decision in *Inclusive Communities* expressly stated that *Gallagher* v. *Magner* was decided without the cautionary standards announced in *Inclusive Communities*.[175] While each case must be decided on its particular facts, under this Final Rule, HUD expects that valid policies will be upheld and ones that are arbitrary, artificial, and unnecessary will be subject to remedy. HUD's identification of particular items is not intended to impact the general analysis under § 100.500. The listing of items is § 100.70(d)(5) is representative only and not exclusive but does not neglect particular areas where HUD has observed problematic policies and practices in Fair Housing Act enforcement.

*Comment: Statute of Limitations.*

Commenters suggest a statute of limitations for disparate impact claims arising from lending decisions. Some suggested that HUD include language clarifying that a lending decision is a "discrete act," which should trigger the running of the statute of limitations. Commenters said HUD should restate verbatim the Fair Housing Act's statute of limitations. Commenters also requested that HUD provide further clarity regarding the tolling period for the statute of limitations on claims.

*HUD Response:* HUD appreciates these comments, but declines to repeat statute of limitations requirements set forth in statutes. This Final Rule does not modify the statute of limitations regarding claims under the Fair Housing Act, which are generally applicable to both disparate treatment and disparate impact cases. Whether a claim is time-barred is a fact-specific question which is dependent on the details of the case and most appropriate for the court or other administrative authority considering the case to determine. Similarly, whether an action constitutes a "discrete act" under the Fair Housing Act, or whether it is a "continuing violation" is also regularly litigated and is a fact-specific question dependent on the details of a case. Therefore, HUD does not choose to establish a regulation regarding the tolling period or issues related thereto for the statute of limitations in this disparate impact rule.

*Comment: Proposed Rule fails to have an adequate cost-benefit analysis.*

Several commenters argued that a more robust discussion of the costs associated with the Proposed Rule should be completed by HUD prior to issuing the Final Rule. Commenters stated that the Proposed Rule did not contain an adequate analysis of the costs and benefits of the Proposed Rule. One commenter stated that HUD did not consider quantitative and qualitative measures of costs and benefits, and did not attempt to tailor its rule to impose the least burden on society, consistent with obtaining regulatory objectives. Another commenter stated that the Proposed Rule fails to consider the benefits created by the availability of disparate-impact claims, which the commenter asserted are threatened by insurmountable litigation burdens and imposes unsupported safe harbors in the Proposed Rule. One commenter also argued that the Proposed Rule did not have crucial sources of data and research that would allow a full assessment of any harms from the Proposed Rule's promulgation, while another commenter argued that entities will now bear the costs of reconciling existing authorities with a seemingly inconsistent HUD rule. Commenters also asked HUD to explain the Proposed Rule's economic impact, including clarifying what HUD meant when it said the Proposed Rule would result in more affordable housing.

*HUD Response:* HUD acknowledges commenters' arguments, but disagrees. HUD's intent in promulgating this Final Rule is to exercise its discretion to further the purpose of the Fair Housing Act and to ensure that HUD's interpretation of disparate impact liability is in line with HUD's understanding of Title VIII disparate impact law and with the Supreme Court's decision in *Inclusive Communities*, as well as Executive Orders 13771 and 13777. Accordingly, this Final Rule does not create any new requirements, but merely provides clarification of how disparate impact liability is effectuated under the Fair Housing Act. HUD has prepared an RIA for this rule which provides a cost-benefit analysis of this rule, but notes here that, in well-pleaded, fully litigated cases, the same result would be reached even in the absence of HUD's discriminatory effects rule. However, this Final Rule should result in greater clarity for litigants, regulators and industry professionals when making and challenging facially neutral policies

[174] 619 F.3d 823 (8th Cir. 2010).

[175] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2524 (2015).

that may have a discriminatory effect on one or more protected classes.

Clarity about the applicable legal requirements increases compliance with the Act and furthers its nondiscrimination purposes. This clarity should also reduce litigation cost and duration by reducing uncertainty. The Final Rule is accordingly expected to encourage more housing development activity in all areas of local communities.

*Comment: Regulatory Flexibility analysis was inadequate.*

A commenter also objected to the Proposed Rule because HUD failed to provide and publish in the **Federal Register** a statement providing the "*factual basis* for its determination" that the Proposed Rule would not have a significant economic impact on a substantial number of small entities. Commenters stated that, among other things, HUD provided no description or estimate of the number of small entities to which the Proposed Rule would apply; it provided no estimate of the economic impacts on those entities; and it provides no disclosure of its assumptions. The commenter asserted that examining both the beneficial and adverse impacts would have resulted in a finding of significant economic impact on a substantial number of small entities. In particular, the commenter stated that small entities that rely on disparate impact litigation to ensure the vindication of their rights will face a higher burden to bring claims and will therefore suffer lost business opportunities, frustration of their missions, and un-remedied violations of their civil rights because of HUD's proposed strict burdens and standards. Similarly, small businesses that have developed tools to help entities comply with existing disparate impact law would suffer the cost of lost revenue due to decreased competitive advantage and the additional cost of developing new software to satisfy HUD's new framework with respect to housing credit, in addition to maintaining software that complies with the existing frameworks applicable to credit generally.

*HUD Response:* HUD notes that a regulatory impact analysis is not required if the rule will not have a significant economic impact on a substantial number of small entities. HUD certified that this Proposed Rule would not have such an impact because it is merely updating HUD's uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. HUD also noted that no such analysis was performed with respect to the 2013 Rule, which was developed in the absence of Supreme Court guidance and at a time when there was substantial questions, as indicated by the dissent in *Inclusive Communities,* over the existence of the disparate impact theory under the Fair Housing Act. It is HUD's position that this Final Rule will reduce burdens on parties by providing clarity regarding the burdens involved in a disparate impact case. Despite this certification, however, HUD also invited commenters to provide less burdensome alternatives to the Proposed Rule that would meet HUD's objectives. HUD has revised this Final Rule in light of comments. HUD has also considered comments submitted in response to the question regarding how the Proposed Rule might increase or decrease costs and economic burden for relevant parties. HUD does not believe the Final Rule will result in an adverse impact on lawyers and consultants because a clear law is easier to follow by ordinary citizens.

*Comment: Impacts on low-income renters.*

A commenter stated that HUD should republish the Proposed Rule with estimates of its impacts on low-income renters and Federal affordable housing programs and solicit public comments on those estimates and their implications. This commenter stated that, as drafted, the Proposed Rule did not sufficiently address or justify all changes and their effects on low-income renters. Other commenters were concerned that the Proposed Rule would weaken disparate impact liability by allowing neutral policies that have a discriminatory effect to remain.

*HUD Response:* HUD's requests for comments elicited feedback on the potential impact of the Proposed Rule on low-income individuals, including voucher holders. HUD appreciates and considered these comments as they raised several issues affecting cities across the nation such as gentrification, increased housing cost burden, and lack of available affordable housing for voucher holders. However, HUD believes it has promulgated an effective Final Rule to challenge discriminatory practices while not having unintended adverse consequences on the creation of decent, safe and affordable housing.

*Comment: The Proposed Rule would make challenges to zoning and land use decisions more difficult, and so it should be withdrawn.*

Commenters asserted that cases involving state action impacting property, such as local zoning and land use decision, should be treated uniquely. Another commenter recommends HUD include a method to identify local efforts to limit housing options earlier in the burden-shifting framework. A comment urged HUD to withdraw the Proposed Rule because the current disparate impact standard is the primary tool used to challenge local zoning and land use planning rules that exclude manufactured housing. Commenters suggested that HUD's approach to such cases conform to relevant and recent court decisions, including the *Knick* v. *Township of Scott, Pennsylvania* decision.[176] One comment recommended a study be conducted for the adverse impacts of actions such as land use and zoning decisions and tax credit policies rather than focusing solely on real estate transactions and lending.

*HUD Response:* HUD disagrees that local zoning and land use decisions should have more unique treatment. Disparate impact liability is available under this Final Rule to challenge facially neutral policies and practices that relate to dwellings, including land use policies. There is no basis under the Fair Housing Act for unique treatment of zoning and land use planning rules, on the one hand, or with respect to manufactured housing on the other hand. The case of *Knick* v. *Township of Scott, Pennsylvania* involves a Fourth Amendment search issue and a Fifth Amendment taking issue and is inapposite to this rulemaking.[177] HUD appreciates commenters' input regarding recommendations for future studies into issues affecting housing; however, such studies are outside the scope of this rulemaking.

*Comment: The Proposed Rule implicates federalism.*

Commenters asserted that HUD failed to consider and evaluate the federalism implications of the Proposed Rule. Because of this alleged failure, according to one commenter, HUD violated the APA and Section 6 of Executive Order 13132.

*HUD Response:* HUD acknowledges the commenter's perspective but disagrees. Executive Order 13132 prohibits an agency from publishing any rule that has federalism implications if the rule imposes substantial direct compliance costs on State and local governments and is not required by statute or preempts State law. As discussed in responses to previous comments, this rulemaking does neither of these. HUD is codifying in regulation statutory requirements to prove or defend a case of discriminatory effect. This is no different from HUD's decision in the 2013 Rule to codify HUD's

176 139 S. Ct. 2162 (2019).

177 *Id.* at 2167.

interpretation of disparate impact law at that time. HUD has specific authority to promulgate regulations under the Fair Housing Act.

*Comment: Fails to consider studies about lending and insurance practices.*

A commenter asserted that HUD's failure to consider both the direct and quantifiable harms as well as indirect and non-quantifiable harms under the Proposed Rule would result in more entrenched residential segregation, exclusion of protected groups from housing, and discrimination in home purchasing and rental markets.

*HUD Response:* HUD notes that, as stated previously, disparate impact liability is a valuable and powerful tool to challenge facially neutral policies that have an unlawful discriminatory effect on one or more protected groups. However, HUD also recognizes that, consistent with *Inclusive Communities,* disparate impact liability must be properly limited to avoid both constitutional infirmities and to avoid second guessing a legitimate governmental and business decision. Both of those issues would also have direct and indirect quantifiable and non-quantifiable harm to housing choice. As such, HUD thoughtfully considered all changes being made to the 2013 Rule to provide a rule consistent with *Inclusive Communities* and the Fair Housing Act, including the remedies to which persons in protected classes are entitled and the important of fairness and certainty in the housing market.

*Comment: HUD should allow expert witnesses.*

Commenters stated that expert witnesses should be allowed for both parties, and that the Proposed Rule should allow for rebuttal of those witnesses.

*HUD Response:* The manner and type of particular evidence is a matter of civil procedure outside of the scope of the Final Rule as revised. In the case of an administrative change, during an investigation into discrimination allegations, both parties are provided the opportunity to provide evidence and witnesses to HUD (or a substantially equivalent State agency). After an investigation, if HUD files a charge of discrimination, the Fair Housing Act allows parties to present evidence, cross-examine witnesses and obtain the issuance of subpoenas by HUD during an administrative hearing.[178] Thus, HUD declines to include expert witness specific provisions in the Final Rule because they are not necessary in light of other more general treatment of expert witnesses.

*Comment: HUD should expand the Proposed Rule to add additional protections for specific groups.*

Commenters stated that HUD should create regulations that apply specifically to discrimination based on disability, since the nature of proof for such cases is distinct. Commenters also proposed that HUD add additional protections for individuals facing discrimination based on source of income and criminal records. Others suggested that HUD add former offenders and convicted felons to the protected class list. Another comment requested that Lesbian, Gay, Bisexual, Transgender, and Queer individuals be added to the list of protected classes.

*HUD Response:* HUD appreciates the perspective provided by commenters who argued that HUD should expand upon the regulations to provide more guidance in disability cases as well as adding protected classes. To the extent that the commenters requested that HUD add protected classes to the Fair Housing Act, HUD lacks the authority to do so. Congress enacted the Fair Housing Act and expressly included race, color, national origin, sex and religion as protected classes, as well as the Fair Housing Amendments Act, which added disability and familial status as protected classes. Disparate impact is a theory of relief under the Fair Housing Act and upheld by the Supreme Court in its decision in *Inclusive Communities.* HUD is therefore not "creating law," but merely providing clarity regarding how the Fair Housing Act is to be interpreted as it relates to disparate impact, in light of the Court's decision in *Inclusive Communities.* Regarding commenters' request for HUD to create regulations that apply specifically to persons with disabilities, HUD notes that it has regulations specifically regarding persons with disabilities in 24 CFR part 8 and part 100, subpart D. Nothing in the Final Rule precludes its use in the context of disability.

*Comment: HUD should, in general, provide definitions throughout the rule.*

Commenters stated that HUD's Proposed Rule used many terms without firm definitions, which would cause confusion and complicate implementation of the rule. Commenters stated that providing definitions now, instead of waiting for courts to create them in case law, would promote compliance and avoid additional litigation. Commenters said unclear definitions created uncertainty about how the rule will function. Commenters pointed to the words "significant," "robust," and "material" as meaning the same thing, but are used interchangeably, which causes confusion about whether the intent is for them to be different. Commenters suggested that HUD instead use "substantial," meaning of important value, rather than "significant," which refers to statistical significance. Using "substantial" would avoid unnecessary legal disputes over the different terms throughout the Proposed Rule.

*HUD Response:* Prior to 2013, disparate impact as a theory of liability was largely developed through the courts and that has continued to a significant extent even after the 2013 Rule. Further, definitions are typically highly litigated since discriminatory effect cases tend to be highly fact specific. HUD has made changes to the regulatory text to distinguish "robust causality" as discussed in *Inclusive Communities,* use "significant" for purposes of pleading that the disparity caused by the policy or practice is significant, and use "material" with regard to the alternative proposed policy or practice burden and costs. This notice elsewhere makes clear that "significant" is not used exclusively in the statistical sense of the term. HUD believes these changes provide clarity and further discusses them above.

*Comment: HUD should provide more guidance for implementing the Proposed Rule.*

Commenters asked HUD for additional guidance on specific practices that would be prohibited or allowed under the Proposed Rule. Commenters stated that sub-regulatory guidance would be able to clarify concepts with examples of safe harbors or asked specific questions about whether particular practices would be considered illegal under the Proposed Rule. Commenters also asked for a sample form or template for pro se plaintiffs regarding the elements.

*HUD Response:* HUD has sought to provide a comprehensive framework for the Final Rule for considering a wide range of potential applications. Issues of disparate impact are particularly fact specific. Accordingly, HUD declines to provide additional examples of any specific situations which may succeed or fail under disparate impact liability, including specific safe harbors, particular practices, or a compliant template for disparate impact. These types of decisions are well within the competency of administrative law judges and courts to evaluate on a case by case basis within the Final Rule's framework. Under Executive Order 13891, sub-regulatory guidance does not generally have the force of law and

[178] *See* 42 U.S.C. 3612(c).

would not in the context of this Final Rule to the extent it added objections have binding effect. Further, with regard to the creation of a sample form or template, HUD provides an online complaint form that allows individuals to provide a brief description of their allegations to HUD to start the process of filing a discrimination complaint.[179] Housing discrimination complaints that are received by HUD are then reviewed by a fair housing specialist, who will assist in the drafting and filing of an official complaint. HUD's process does not require that a party be represented by an attorney and provides individuals the opportunity to speak directly to a fair housing specialist for any questions they have throughout the process.

HUD will review existing guidance for conformity with this Final Rule and other applicable authorities and remove inconsistent items. The issue of whether additional guidance is warranted will be considered as the rule is put into practice.

*Comment: HUD should take a more data-driven approach.*

A commenter recommended looking at the number of Fair Housing Act disparate impact claims filed in Federal court, before and after the 2013 Rule, and after the Supreme Court's decision in *Inclusive Communities*. The commenter specifically noted that nationwide, very few disparate impact claims were filed since 2013, and those that were brought were resolved at an early stage. The commenter also stated that a local survey showed that the overall number of cases since 2013 has not increased, and that the *Inclusive Communities* decision in 2015 has not affected the number of claims brought under a disparate impact theory.

Similarly, several commenters noted that HUD should use a more data driven approach to disparate impact liability and provided a number of suggestions. Another commenter stated that it is appropriate for HUD to look to information or data available to assess the Proposed Rule's impact, including how many discriminatory effect claims were meritorious.

Commenters asserted that they believe HUD's attorneys have been studying the number, type, and likelihood of success of disparate impact claims since 2015, and it would be helpful for HUD to publish its findings based on that research and solicit public feedback concerning the quality of that research and HUD's conclusions.

*HUD Response:* HUD appreciates the suggestions for improving disparate impact regulations in the future, including using a data-driven approach. Data is an important element in many disparate impact claims, and parties are of course free to use data within the framework of this Final Rule in individual cases. HUD has in the past and will continue to review cases as they move through both the administrative and civil court processes in order to ensure the Final Rule is working as intended. As it has always done, HUD will be sure to continuously evaluate claims of discriminatory effect and intentional discrimination in its efforts to uphold the promise of and enforce the Fair Housing Act.

*Comment: Recordkeeping requirements should be added.*

A commenter recommend that Federal financial assistance recipients and all complexes with more than 15 tenants should be required to maintain applications and housing decisions on file for five years, and such information should be made available for review during litigation for use in determining disparate impact of business decisions in order to enforce the Fair Housing Act.

*HUD Response:* This Final Rule does not alter recordkeeping requirements for HUD housing programs, and entities receiving Federal financial assistance are responsible for maintaining records in a manner that is compliant with the relevant guidelines of the programs in which they participate. Further, this Final Rule makes no changes to rules related to civil and administrative procedures relative to records retention, litigation, or the Fair Housing Act's requirement to provide documents and other evidence during an investigation.

*Comment: Social Vulnerability Index should be adopted.*

One commenter suggested HUD adopt the "Social Vulnerability Index" [180] as a tool to ensure fair and just access to housing. The commenter proposed the following three-point inquiry to determine whether the impact of an individual's actions or institution's policy creates an adverse impact: (1) Does it happen more frequently to members of one group than others? (2) Is there a differential impact on members of one group than another? (3) Is it more difficult for members of one group to overcome than another?

*HUD Response:* The Final Rule provides a framework for evaluating whether non-intentional, unlawful discrimination occurs under the Fair Housing Act as interpreted by *Inclusive Communities*. The "social vulnerability index" appears inconsistent with applicable law.

*Comment: 2016 guidance on use of criminal background checks should be withdrawn.*

Multiple commenters stated that HUD's 2016 guidance threatened disparate impact liability for providers who use criminal screening to disqualify prospective residents to protect other residents. Commenters also stated that HUD should limit the scope of any "individualized assessments" regarding criminal records because of the burden it creates for housing providers. Although not explicitly required in the Proposed Rule, the commenters stated that this should be clarified considering the mitigating evidence required by the courts in prior cases.

*HUD Response:* HUD intends to review its existing guidance for consistency with the Final Rule.

*Comment: The Proposed Rule should consider the Takings Clause of the U.S. Constitution when discussing state action.*

A commenter suggested the application of disparate impact regulations in cases involving state action impacting property should differ from other circumstances, especially when such state action violates the Takings Clause. This commenter recommended that the Proposed Rule be withdrawn or revised to ensure an appropriate balance with respect to local zoning ordinances that create barriers to affordable housing.

*HUD Response:* HUD appreciates the commenter's suggestion but declines to carve out a separate portion of the Final Rule for government action. Unlike the situation that led to the Supreme Court's decision in *Knick* v. *Township of Scott, Pennsylvania*,[181] cited by the commenter, the disparate impact rule and the Takings Clause of the U.S. Constitution are not mutually exclusive. An individual may challenge a zoning ordinance as having a discriminatory effect on a protected class group, while the owner of the affected property may challenge the same ordinance under the Takings Clause. It is also HUD's position that the changes being made do not create an imbalance that would prevent an individual's ability to challenge a zoning or land use ordinance as having a discriminatory effect based on protected class status.

*Comment: Exceptions to requirements.*

[179] U.S. Department of Housing and Urban Development, *File a Complaint, HUD.gov, https://www.hud.gov/program_offices/fair_housing_equal_opp/online-complaint.*

[180] U.S. Department of Health and Human Services, *CDC's Social Vulnerability Index (SVI)*, ATSDR Agency for Toxic Substances and Disease Registry (Sept. 12, 2018), *https://svi.cdc.gov/.*

[181] 139 S. Ct. 2162 (2019).

A commenter recommended that landlords renting four or fewer units should not be subject to the Proposed Rule; another suggests HUD add an exemption for private landlords who do not receive funds under any HUD program.

*HUD Response:* HUD does not have the authority to create new exceptions under the Fair Housing Act. Contained within the Fair Housing Act is an exemption for a single-family house sold or rented by an owner if that owner does not own more than three houses.[182] Another exemption applies to rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.[183]

*Comment: HUD should define and provide examples of discriminatory intent.*

Another commenter suggested that HUD should define discriminatory intent and provide examples to clarify when a claim should not be brought under disparate impact but under discriminatory intent. This commenter also suggested that HUD clarify that policies which allow for the exercise of discretion cannot be challenged under disparate impact law because allowing discretion is not the harm, but the intentional discrimination that results from this discretion is the harm.

*HUD Response:* Intentional discrimination is outside the scope of this rulemaking and not included in any way under this Final Rule. Nothing impairs a party's ability to bring a claim that includes both intentional discrimination and disparate impact allegations. As discussed above, a single discretionary action typically is not a policy or practice. As noted by the commenter, this does not mean that such single action may not be unlawful under the Fair Housing Act.

*Comment: Property management companies should not have the ability to impose minimum income amounts on prospective tenants.*

A commenter opposed property management companies' ability to impose minimum income amounts on prospective tenants. The commenter believes that if a tenant can pay rent, then they may be able to use other government assistance, such as SNAP food assistance, and should not be excluded from renting.

*HUD Response:* While there may be some instances where certain policies and practices regarding tenant finances could constitute unlawful disparate impact, such a claim should be considered under this Final Rule's framework. A blanket rule on this issue is inconsistent with *Inclusive Communities.* HUD also notes that socio-economic status is not a protected class under the Fair Housing Act.

**V. Findings and Certifications**

*Regulatory Review—Executive Orders 12866 and 13563*

Executive Order 13563 ("Improving Regulation and Regulatory Review") directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 ("Regulatory Planning and Review"), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (OMB) in accordance with the requirements of the order. This rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

This Final Rule continues to hold to the longstanding interpretation that the Fair Housing Act includes disparate impact liability, and continues to establish uniform, clear standards for determining whether a practice that has a disparate impact is in violation of the Fair Housing Act, regardless of whether the practice was adopted with intent to discriminate.

As stated in the Background section, the need for this updated rule arises in part because *Inclusive Communities,* which held that disparate impact claims are cognizable under the Fair Housing Act, established guidelines and warned of constitutional limitations to the doctrine. These guidelines and warnings were not available to HUD when HUD drafted the 2013 Rule. Further, *Inclusive Communities* used standards with specific phrases such as "robust causal link" and "artificial, arbitrary, and unnecessary" which were not previously part of established discriminatory effect jurisprudence and were not included in the 2013 Rule. The Final Rule is therefore more consistent with the now binding Supreme Court precedent than the 2013 Rule. Further, the 2013 Rule provided a three-step burden shifting framework, but provided few details regarding how these burdens are met, and provided no analysis of how a prima facie disparate impact case would be met or of how a defendant may rebut such a case.

As discussed in the preamble to this Final Rule, HUD is exercising its discretionary rulemaking authority to bring uniformity, clarity, and certainty by updating this rule. This Final Rule aligns with the guidelines and language used in *Inclusive Communities* and provides further detail than the 2013 Rule regarding the elements required to plead a case and the defenses available in responding to a case. This would simplify compliance with the Fair Housing Act's discriminatory effects standard and decrease litigation cost, duration and uncertainty associated with such claims. This Final Rule will reduce the burden associated with litigating discriminatory effect cases under the Fair Housing Act by clearly establishing which party has the burden of proof and how such burdens are to be met.

This Final Rule also provides clarity on how the Fair Housing Act applies in light of the McCarran-Ferguson Act. As discussed in the preamble and in the Proposed Rule, this question has been the subject of controversy and debate. HUD's opinion as reflected by this Final Rule aligns itself with the judicial consensus HUD has observed.

HUD reviewed comments made in response to HUD's questions for public comment in the Proposed Rule, especially to aid HUD in its regulatory impact analysis. These questions and HUD's responses are discussed in the section IV of this Final Rule's preamble. HUD notes that that these comments and HUD's own further deliberation aided HUD in drafting the Final Rule to be consistent with *Inclusive Communities* and HUD's interpretation of the disparate impact standard generally. HUD believes that the Final Rule accurately reflects the standard provided in *Inclusive Communities.* Accordingly, while this Final Rule is a significant regulatory action under Executive Order 12866 in that it establishes uniform standards for determining whether a housing action or policy has a discriminatory effect on a protected group, it is not an economically significant regulatory action. The burden reduction that HUD believes will be achieved through updating these standards will not reach an annual impact on the economy of $100 million or more, because HUD's approach is not a significant departure

[182] 42 U.S.C. 3603(b)(1).

[183] 42 U.S.C. 3603(b)(2).

from, but in fact aligns with, the Supreme Court's holding in *Inclusive Communities.* Although the burden reduction provided by this Final Rule will not result in an economically significant impact on the economy, it nevertheless provides some burden reduction through the uniformity and clarity presented by HUD's standards promulgated through this Final Rule and is therefore consistent with Executive Order 13563.

The docket file is available for public inspection in the Regulations Division, Office of the General Counsel, Room 10276, 451 7th Street SW, Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This Final Rule updates HUD's uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. Given the recent Supreme Court decision, HUD's objective in this rule is to ensure consistency and uniformity, and therefore reduce burden for all who may be involved in a challenged practice.

Accordingly, the undersigned certifies that the rule will not have a significant economic impact on a substantial number of small entities.

*Environmental Impact*

This Final Rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This Final Rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This Final Rule does not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

**List of Subjects in 24 CFR Part 100**

Civil Rights, Fair Housing, Individuals with disabilities, Mortgages, Reporting and Recordkeeping requirements.

For the reasons discussed in the preamble, HUD amends 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

■ 2. In § 100.5, amend paragraph (b) by revising the second sentence, adding a third sentence, and adding paragraph (d) to read as follows:

**§ 100.5 Scope.**

* * * * *

(b) * * * The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, and defenses and rebuttals to allegations of unlawful discriminatory effect may be made, consistent with the standards outlined in § 100.500. Guidance documents and other administrative actions and documents issued by HUD shall be consistent with the standards outlined in § 100.500.

* * * * *

(d) Nothing in this part requires or encourages the collection of data with respect to race, color, religion, sex, handicap, familial status, or national origin.

■ 3. In § 100.70, add a new paragraph (d)(5) to read as follows:

**§ 100.70 Other prohibited sale and rental conduct.**

* * * * *

(d) * * *

(5) Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

■ 4. Revise § 100.500 to read as follows:

**§ 100.500 Discriminatory effect prohibited.**

(a) *General.* Liability may be established under the Fair Housing Act based on a specific policy's or practice's discriminatory effect on members of a protected class under the Fair Housing Act even if the specific practice was not motivated by a discriminatory intent.

(b) *Pleading stage.* At the pleading stage, to state a discriminatory effects claim based on an allegation that a specific, identifiable policy or practice has a discriminatory effect, a plaintiff or charging party (hereinafter, "plaintiff") must sufficiently plead facts to support each of the following elements:

(1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

(2) That the challenged policy or practice has a disproportionately adverse effect on members of a protected class;

(3) That there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect;

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct relation between the injury asserted and the injurious conduct alleged.

(c) *Burdens of proof in discriminatory effect cases.* The burdens of proof to establish that a policy or practice has a discriminatory effect, are as follows:

(1) A plaintiff must prove by the preponderance of the evidence each of the elements in paragraphs (b)(2) through (5) of this section.

(2) A defendant or responding party (hereinafter, "defendant") may rebut a plaintiff's allegation under (b)(1) of this section that the challenged policy or practice is arbitrary, artificial, and unnecessary by producing evidence showing that the challenged policy or practice advances a valid interest (or

interests) and is therefore not arbitrary, artificial, and unnecessary.

(3) If a defendant rebuts a plaintiff's assertion under paragraph (c)(1) of this section, the plaintiff must prove by the preponderance of the evidence either that the interest (or interests) advanced by the defendant are not valid or that a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

(d) *Defenses.* The following defenses are available to a defendant in a discriminatory effect case.

(1) *Pleading stage.* The defendant may establish that a plaintiff has failed to sufficiently plead facts to support an element of a prima facie case under paragraph (b) of this section, including by showing that the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a:

(i) Federal, state, or local law;

(ii) Binding or controlling court, arbitral, administrative order or opinion; or

(iii) Binding or controlling regulatory, administrative or government guidance or requirement.

(2) *After the pleading stage.* The defendant may establish that the plaintiff has failed to meet the burden of proof to establish a discriminatory effects claim under paragraph (c) of this section, by demonstrating any of the following:

(i) The policy or practice is intended to predict an occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practice does not or would not have a disparate impact on protected classes compared to similarly situated individuals not part of the protected class, with respect to the allegations under paragraph (b). This is not an adequate defense, however, if the plaintiff demonstrates that an alternative, less discriminatory policy or practice would result in the same outcome of the policy or practice, without imposing materially greater costs on, or creating other material burdens for the defendant.

(ii) The plaintiff has failed to establish that a policy or practice has a discriminatory effect under paragraph (c) of this section.

(iii) The defendant's policy or practice is reasonably necessary to comply with a third party requirement, such as a:

(A) Federal, state, or local law;

(B) Binding or controlling court, arbitral, administrative order or opinion; or

(C) Binding or controlling regulatory, administrative, or government guidance or requirement.

(e) *Business of insurance laws.* Nothing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance.

(f) *Remedies in discriminatory effect cases.* In cases where liability is based solely on a discriminatory effect theory, remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons. In administrative proceedings under 42 U.S.C. 3612(g) based solely on discriminatory effect theory, HUD will seek only equitable remedies, provided that where pecuniary damage is proved, HUD will seek compensatory damages or restitution; and provided further that HUD may pursue civil money penalties in discriminatory effect cases only where the defendant has previously been adjudged, within the last five years, to have committed unlawful housing discrimination under the Fair Housing Act, other than under this section.

(g) *Severability.* The framework of the burdens and defenses provisions are considered to be severable. If any provision is stayed or determined to be invalid or their applicability to any person or circumstances invalid, the remaining provisions shall be construed as to be given the maximum effect permitted by law.

**Anna Maria Farías,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2020–19887 Filed 9–23–20; 8:45 am]

BILLING CODE 4210–67–P