Procedures'', prior to any FAA final regulatory action.

## Lists of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

## The Proposed Amendment

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### § 71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of Federal Aviation Administration Order 7400.11E, Airspace Designations and Reporting Points, dated July 21, 2020, and effective September 15, 2020, is amended as follows:

*Paragraph 6005   Class E Airspace Areas Extending Upward From 700 Feet or More Above the Surface of the Earth.*

\*   \*   \*   \*   \*

### ASO AL E5   Tuscaloosa, AL [Amend]

Tuscaloosa National Airport, AL
 (Lat. 33°13′14″ N, long. 87°36′41″ W)

That airspace extending upward from 700 feet above the surface within a 9.4-mile radius of Tuscaloosa National Airport and within 4.0 miles each side of the 117° bearing from the airport extending from the 9.4-mile radius to 11.8 miles southeast of the airport and within 2.0 miles each side of the of the 041° bearing extending from the 9.4-mile radius to 11.5 miles northeast of the airport and within 4.0 miles each side of the 296° bearing extending from the 9.4-mile radius to 10.8 miles northwest of the airport and within 2.0 miles each side of the 221° bearing extending from the 9.4-mile radius to 11.8 miles southwest of the airport.

Issued in College Park, Georgia, on June 21, 2021.

**Andreese C. Davis,**

*Manager, Airspace & Procedures Team South, Eastern Service Center, Air Traffic Organization.*

[FR Doc. 2021–13492 Filed 6–24–21; 8:45 am]

**BILLING CODE 4910–13–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### 24 CFR Part 100

[Docket No. FR–6251–P–01]

RIN 2529–AB02

### Reinstatement of HUD's Discriminatory Effects Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Proposed rule.

**SUMMARY:** In 2020, HUD published a rule titled ''HUD's Implementation of the Fair Housing Act's Disparate Impact Standard'' (''2020 Rule''). Prior to the effective date of the 2020 rule, the U.S. District Court for the District of Massachusetts issued a preliminary injunction in *Massachusetts Fair Housing Center* v. *HUD,* staying HUD's implementation and enforcement of the rule. Consequently, the 2020 Rule never took effect. After reconsidering the 2020 Rule, HUD is proposing to recodify its previously promulgated rule titled, ''Implementation of the Fair Housing Act's Discriminatory Effects Standard'' (''2013 Rule''), which, as of the date of publication of this Proposed Rule, remains in effect due to the preliminary injunction. HUD believes the 2013 Rule better states Fair Housing Act jurisprudence and is more consistent with the Fair Housing Act's remedial purposes.

**DATES:** Comment due date: August 24, 2021.

**ADDRESSES:** Interested persons are invited to submit written comments regarding this rule to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410. All communications should refer to the above docket number and title. There are two methods for submitting public comments.

 1. Electronic Submission of Comments. Interested persons may submit comments electronically through the Federal eRulemaking Portal at *www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *www.regulations.gov* website can be viewed by other commenters and interested members of the public. Commenters should follow the instructions provided on that site to submit comments electronically.

 2. Submission of Comments by Mail. Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0500.

 Note: To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule.

 No Facsimile Comments. Facsimile (FAX) comments are not acceptable.

 Public Inspection of Public Comments. All properly submitted comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an appointment to review the public comments must be scheduled in advance by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339. Copies of all comments submitted are available for inspection and downloading at *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Kathleen M. Pennington, Acting Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410–0500, email *HUDDisparateImpact2021@hud.gov* or telephone number 202–402–3330 (this is not a toll-free number). Persons with hearing and speech impairments may contact this phone number via TTY by calling the Federal Relay Service at 800–877–8399 (this is a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background

Title VIII of the Civil Rights Act of 1968, as amended (''Fair Housing Act'' or ''Act''), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities because of race, color, religion, sex, disability, familial status, or national origin.[1] Through the Fair

---

[1] 42 U.S.C. 3601–3619, 3631. This preamble uses the term ''disability'' to refer to what the Act and its implementing regulations term a ''handicap'' because that is the preferred term. *See, e.g., Hunt*

Housing Act, Congress codified its remedial purpose, providing that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [2] The Act's protections are meant to be "broad and inclusive." [3] Congress passed the Act in the wake of the assassination of Dr. Martin Luther King, Jr., recognizing that "residential segregation and unequal housing and economic conditions in the inner cities" were "significant, underlying causes of the social unrest" [4] and that both open and covert race discrimination were preventing integrated communities.[5] As the Supreme Court reiterated more recently, the Act's expansive purpose is to "eradicate discriminatory practices within a sector of the Nation's economy" and to combat and prevent segregation and discrimination in housing.[6] Congress considered the realization of this policy "to be of the highest priority." [7]

The Act gives HUD the authority and responsibility for administering and enforcing the Act, including the authority to conduct formal adjudications of complaints and to promulgate rules to interpret and carry out the Act.[8] Through that authority, HUD proposes this rulemaking.

*Discriminatory Effects Law Under the Fair Housing Act Prior to HUD's 2013 Rule*

HUD's 2013 Rule broke no new ground, but instead largely codified longstanding judicial and agency consensus regarding discriminatory effects law. Courts had long found that discrimination under the Act may be established through evidence of discriminatory effects, *i.e.,* facially neutral practices with an unjustified discriminatory effect. Indeed, all federal courts of appeals to have addressed the question had held that liability under the Act could be established by a showing that a neutral policy or practice either has a disparate impact on a protected group or creates, perpetuates, or increases segregation, even if such a policy or practice was not adopted for a discriminatory purpose.[9] As the Sixth Circuit explained, the Act "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." [10]

HUD had for decades—consistent with this judicial consensus—concluded that facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent, violate the Act.[11] For example, in 1994, HUD, along with nine other agencies and the Department of Justice, issued a joint policy statement that recognized disparate impact liability under the Act.[12]

Although there had been some minor variation in the application of the discriminatory effects framework prior to the 2013 Rule, HUD and the federal appellate courts were largely in agreement. HUD has always used a three-step burden-shifting approach,[13] as did many federal courts of appeals prior to the 2013 Rule.[14] Thus, HUD's 2013 Rule simply codified a familiar standard.

*HUD's 2013 Discriminatory Effects Rule*

In February 2013, after notice and public comment, and taking decades of caselaw into consideration, HUD published the 2013 Rule, which "formalize[d] its long-held recognition of discriminatory effects liability under the Act and, for purposes of providing consistency nationwide, formalize[d] a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act." [15] In promulgating the 2013 Rule, HUD noted the Act's "broad remedial intent;" [16] HUD's prior positions, including that discriminatory effects liability was "imperative to the success of the civil rights law enforcement;" [17] and the consistent application of discriminatory effects liability in the four previous decades (with minor variations) by HUD, the Department of Justice, nine other federal agencies, and federal courts.[18]

Among other things, the 2013 Rule codified a three-part burden-shifting framework consistent with frameworks on which HUD and courts had long relied: (1) The plaintiff or charging party is first required to prove as part of the prima facie showing that a challenged practice caused or predictably will cause a discriminatory effect; (2) if the plaintiff or charging party makes this prima facie showing, the defendant or respondent must then prove that the challenged practice is necessary to achieve one or more substantial,

---

v. *Aimco Props., L.P.,* 814 F.3d 1213, n.1 (11th Cir. 2016) (noting the term disability is generally preferred over handicap).

[2] 42 U.S.C. 3601.

[3] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972).

[4] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 529 (2015) (citing Report of the National Advisory Commission on Civil Disorders 91 (1968) (Kerner Commission Report).

[5] *Id.* at 529 (citing Kerner Commission Report).

[6] *Id.* at 539.

[7] *Trafficante,* 409 U.S. at 211 (1972).

[8] *See* 42 U.S.C. 3608(a), 3612, 3614a.

[9] *See, e.g., Graoch Assocs. # 33, L.P.* v. *Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007) (citing *Arthur* v. *City of* Toledo, 782 F.2d 565, 575 (6th Cir. 1986)); *Hallmark Developers, Inc.* v. *Fulton County, Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006) (citing *Hous. Investors, Inc.* v. *City of Clanton, Ala.,* 68 F. Supp. 2d 1287, 1298 (M.D. Ala. 1999)); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988) (citing *Metro Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), aff'd, 488 U.S. 15 (1988) (per curiam); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987 n.3 (4th Cir. 1984) (citing *Metro Hous. Dev. Corp* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977)); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977) (citing *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U.S. 205, 209–10 (1972)); *United States.* v. *City of Black Jack, Missouri,* 508 F. 2d 1179, 1184–86 (8th Cir. 1974).

[10] *Graoch Assocs. #33, L.P.,* 508 F.3d at 374 (quoting *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431 (1971) (a Title VII case)).

[11] 78 FR, 11460, 11461 (Feb. 15, 2013) (*citing, e.g., HUD* v. *Twinbrook Village Apts.,* No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Carlson,* No. 08–91–0077–1, 1995 WL 365009 (HUD ALJ June 12, 1995) ("A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a prima facie case that the policy or practice has a disparate impact on members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity."); *HUD* v. *Ross,* No. 01–92–0466–18, 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter,* No. 03–90–0058–1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[12] 78 FR 11460, 11461 (citing *Policy Statement on Discrimination in Lending,* 59 FR 18266, 18269 (Apr. 15, 1994)).

[13] *See, e.g., HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994); *HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *see also Policy Statement on Discrimination in Lending,* 59 FR. 18266, 18269 (Apr. 15, 1994) (applying three-step test without specifying where the burden lies at each step).

[14] *See, e.g., Oti Kaga, Inc.* v. *S. Dakota Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003); *Lapid–Laurel, L.L.C.* v. *Zoning Bd. of Adjustment,* 284 F.3d 442, 466–67 (3d Cir. 2002); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Huntington Branch NAACP* v. *Town of Huntington,* 844 F.2d 926, 939 (2d Cir. 1988).

[15] 78 FR 11460.

[16] *See also* 2011 Notice of Proposed Rulemaking, 76 FR 70911, 70922 (Nov. 16, 2011) ("In keeping with the 'broad remedial intent' of Congress in passing the Fair Housing Act, and consequently the Act's entitlement to a 'generous construction' HUD . . . has repeatedly determined that the Fair Housing Act is directed to the consequences of housing practices, not simply their purpose.") (citing *Havens Realty* v. *Coleman,* 455 U.S. 363, 380 (1982); *City of Edmonds* v. *Oxford House, Inc.,* 514 U.S. 725, 731–732 (1995) (internal citations removed)).

[17] 78 FR 11460, 11461 (citing 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias reading into the record letter of HUD Secretary)).

[18] 78 FR 11460, 11461–62.

legitimate, nondiscriminatory interests of the defendant or respondent; and (3) if the defendant or respondent meets its burden at step two, the plaintiff or charging party may still prevail by proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.[19]

*The 2015 Inclusive Communities Supreme Court Decision*

In 2015, the Supreme Court confirmed that the Act provides for discriminatory effects liability in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*[20] The Court was asked to answer two questions: (1) Whether disparate-impact claims are cognizable under the Act, and (2) if they are, what standards and burdens of proof should apply?[21] The Court declined to consider the second question.[22]

The Court found that Congress's use of the phrase "otherwise make unavailable" in § 804(a) and the term "discriminate" in § 805(a) parallel language that the Court had previously held to provide for discriminatory effects liability under other civil rights statutes.[23] Moreover, the Court held that Congress's 1988 amendment of the Act without altering the relevant text of §§ 804(a) or 805(a) indicated that Congress "accepted and ratified the unanimous [pre-1988] holdings of the [c]ourts of [a]ppeals finding disparate-impact liability."[24] The Court further held that Congress's addition of provisions that presuppose disparate impact liability as part of the 1988 amendments further provided "convincing confirmation of Congress' understanding that disparate-impact liability exists under the FHA."[25] The Court further observed that disparate impact claims are "consistent with the FHA's central purpose" of "eradicat[ing] discriminatory practices within a sector of our [n]ation's economy."[26]

As the Court recognized: "Much progress remains to be made in our Nation's continuing struggle against racial isolation. . . . But since the passage of the Fair Housing Act in 1968 and against the backdrop of disparate-impact liability in nearly every jurisdiction, many cities have become more diverse. The FHA must play an important part in avoiding the Kerner Commission's grim prophecy that our Nation is moving toward two societies, one black, one white—separate and unequal. The Court acknowledges the Fair Housing Act's continuing role in moving the Nation toward a more integrated society."[27]

In reaching this holding, the Court explained that from its first decision to recognize disparate impact liability, in *Griggs* v. *Duke Power Co.,* it "put important limits" on the scope of liability.[28] For example, with respect to employment discrimination claims under Title VII of the Civil Rights Act, *Griggs* explained that an employer can justify a practice that has a disparate impact with a "business necessity" defense, such that Title VII "does not prohibit hiring criteria with a 'manifest relationship' to job performance."[29] Similarly, after holding that the Act provided for disparate impact liability, the *Inclusive Communities* Court noted that, under the Act, "disparate-impact liability has always been properly limited in key respects."[30] Quoting *Griggs*, the Court explained that it has always been true that disparate impact liability under the Act "mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies."[31]

The Court then sketched out some of these long-standing limitations on the scope of disparate-impact liability, including: (i) The requirement that "housing authorities and private developers [have] leeway to state and explain the valid interest served by their policies . . . analogous to the business necessity standard under Title VII;" and (ii) the requirement that a "claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."[32]

HUD accounted for these same well-settled limitations in the 2013 Rule, which requires a charging party or plaintiff to challenge a specific practice causing the alleged discriminatory effect and permits a defendant to defend a practice that causes such an impact by demonstrating that it is necessary to achieve a substantial, legitimate, nondiscriminatory interest. The Court did not call into question the 2013 Rule's framework for analyzing discriminatory effects claims, nor did it suggest that HUD should make any modifications to that framework. To the contrary, the Court cited HUD's 2013 Rule multiple times with approval.[33] For instance, the Court noted that the burden-shifting framework of *Griggs* and its progeny, adopted by HUD in the 2013 Rule, adequately balanced the interests of plaintiffs and defendants by giving housing providers the ability "to state and explain the valid interest served by their policies."[34] Multiple courts have since read *Inclusive Communities* as affirming or endorsing the 2013 Rule's burden-shifting test.[35]

---

[19] 78 FR 11460, 11482; *see, e.g., Inclusive Cmtys. Project, Inc.,* 576 U.S. at 527 (overviewing the 2013 Rule's burden shifting framework).

[20] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 519, 532–35.

[21] *See* Petition for a Writ of Certiorari, *in Tex. Dep't of Hous. & Cmty. Affairs et al.,* v. *Inclusive Cmtys. Project, Inc.,* 573 U.S. 991, No. 13–1371, 2014 U.S. S. Ct. Briefs LEXIS 1848, at *9; *See* Questions Presented in, *Tex. Dep't of Hous. & Cmty. Affairs et al.,* v. *Inclusive Cmtys Project, Inc.,* 573 U.S. 991, The United States Supreme Court 1, 1, https://www.supremecourt.gov/qp/13-01371qp.pdf.

[22] *Inclusive Cmtys. Project, Inc.,* 573 U.S. 991 (2014), 2014 U.S. LEXIS 4912 at *1 ("Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit granted limited to Question 1 presented by the petition."); *See also* Questions Presented in, *Inclusive Cmtys Project, Inc.,* 573 U.S. 991, The United States Supreme Court 1, 1, https://www.supremecourt.gov/qp/13-01371qp.pdf.

[23] *Inclusive Cmtys. Project, Inc.,* at 534 (citing *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971); *Bd. of Educ.* v. *Harris,* 444 U.S. 130 (1979); *Smith* v. *City of Jackson,* 544 U.S. 228 (2005)).

[24] *Id.* at 536.

[25] *Id.* at 537.

[26] *Id.* at 539 (citing 42 U.S.C. 3601).

[27] *Id.* at 546–47 (internal citations and quotations omitted).

[28] *Id.* at 531.

[29] *Id.* (quoting *Griggs,* 401 U.S. at 431–32).

[30] *Id.* at 540.

[31] *Id.* (quoting *Griggs,* 401 U.S. at 431).

[32] *Id.* at 541, 542.

[33] *Id.* at 527 (explaining the 2013 Rule, its burden shifting framework, and how the second prong is analogous to Title VII's requirement that a challenged practice be job related), 528 (noting the Court of Appeals for the Fifth Circuit relied on HUD's 2013 Rule), 541 (citing the 2013 Rule in explaining that disparate impact liability is properly limited to give housing authorities and private developers leeway to state and explain the valid interest served by their policies via step two of the burden shifting framework); 542 (approvingly noting that HUD recognized in its 2013 Rule that disparate impact liability "does not mandate that affordable housing be located in neighborhoods with any particular characteristic").

[34] *Id.* at 540–541.

[35] *See, e.g., MHANY Mgmt. Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618 (2d Cir. 2016) ("The Supreme Court implicitly adopted HUD's approach"); *Ave 6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493, 512–513 (9th Cir. 2016) (citing the 2013 Rule in describing the three-prong analytical structure set forth in *Inclusive Communities*); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 28–29 (D.D.C. 2017) (stating that the Supreme Court "carefully explained that disparate-impact liability has always been properly limited" and that "disparate-impact liability under the FHA can be proven under a burden-shifting framework analogous to that used in employment discrimination cases.") (internal citations and quotations omitted); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* No. 13–CV–8564, 2017 U.S. Dist. LEXIS 94502, at *28–*30 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework a reasonable interpretation of the Act, finding that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in

*HUD's 2016 Notice: Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance*

In 2016, HUD published a notice ("2016 Notice") supplementing its response to certain comments concerning homeowners insurance received during rulemaking for the 2013 Rule.[36] The notice responded to an order issued in *Property Casualty Insurers Association of America (PCIAA)* v. *Donovan.* In that case, the U.S. District Court for the Northern District of Illinois had issued a decision upholding the 2013 Rule's burden-shifting framework for analyzing discriminatory effects claims,[37] while remanding for further consideration of certain comments concerning homeowners insurance.[38] In its 2016 Notice, HUD stated, *inter alia,* that "[a]fter careful reconsideration of the insurance industry comments in accordance with the court's decision . . . HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act. HUD continues to believe that the commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis."[39]

*HUD's 2020 Disparate Impact Rule*

On June 20, 2018, HUD published an Advance Notice of Proposed Rulemaking ("ANPRM"), inviting public comment on "what changes, if any" should be made to the 2013 Rule.[40] HUD then published a Notice of Proposed Rulemaking on August 19, 2019 ("2019 Proposed Rule"). In the 2019 Proposed Rule, HUD proposed to "amend HUD's interpretation of the Fair Housing Act's disparate impact standard to better reflect the Supreme Court's 2015 ruling in *Inclusive Communities,* and to provide clarification regarding the application of the standard to State laws governing the business of insurance."[41]

In response to the 2019 Proposed Rule, HUD received approximately 45,000 comments, most of which opposed the proposed changes and many of which raised significant legal and policy concerns with the 2019 Proposed Rule. Commenters objected that the proposed changes did not align with caselaw and made discriminatory effects claims effectively impossible to plead and prove in many instances, thus contravening the core holding of *Inclusive Communities.*[42] HUD's own experience investigating, charging, and litigating discriminatory effects cases aligned with these comments, as will be detailed later.

On September 24, 2020, HUD published the 2020 Rule, which, *inter alia,* removed the definition of discriminatory effect, added pleading elements that made it far more difficult to initiate a case, altered the burden-shifting framework, created new defenses, and limited available remedies in disparate impact claims.[43] Some of these changes are described more fully below, along with HUD's explanation for why it now believes they are unwarranted.

*Massachusetts Fair Housing Ctr. v. HUD Order Staying Implementation of the 2020 Rule.*

Following publication of the 2020 Rule, HUD was sued in three separate federal courts—*Massachusetts Fair Housing Ctr., et al.* v. *HUD,* No. 3:20–cv–11765 (D. Mass.); *National Fair Housing Alliance, et al.* v. *HUD,* No. 3:20-cv-07388 (N.D. Cal.); *Open Communities, et al.* v. *HUD,* No. 3:20–cv–01587 (D. Conn.). The plaintiffs in each case contended that the 2020 Rule was invalid because it was inconsistent with the Act and that its promulgation violated the Administrative Procedure Act ("APA"). Prior to the effective date of the 2020 Rule, the U.S. District Court for the District of Massachusetts in *Massachusetts Fair Housing Ctr.* v. *HUD* issued a preliminary injunction staying the implementation and postponing the effective date of the 2020 Rule. The district court ordered HUD to "preserve the status quo pursuant to the regulations in effect as of the date of this Order."[44]

In its order, the district court preliminarily found that many significant changes made by the 2020 Rule were likely not supported by *Inclusive Communities* or other case law. Similarly, the court concluded that the 2020 Rule did not appear to bring clarity to the discriminatory effects framework, but rather introduced new concepts that had never been part of disparate-impact caselaw without fully explaining their meaning. In support of its conclusions, the court pointed to numerous provisions in the 2020 Rule as problematic, including § 100.500(b) ("requiring at 'the pleadings stage,' among other things, that plaintiffs 'sufficiently plead facts to support' . . . '[t]hat the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law'"); § 100.500(c)(2) (permitting defendants to "'rebut a plaintiff's allegation under (b)(1) . . . that the challenged policy or practice is arbitrary, artificial, and unnecessary by producing evidence showing that the challenged policy or practice' merely '*advances a valid interest*'"); § 100.500(c)(3) (requiring "at the third step of the burden-shifting framework that the plaintiff prove 'a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an *equally effective manner without imposing materially greater costs* on, or creating *other material burdens* for, the defendant'" (emphasis in original)); § 100.500(d)(1) and (d)(2)(iii) ("conflating of a plaintiff's prima facie burden and pleading burden"); and § 100.500(d)(2)(i) (the outcome prediction defense).[45]

The district court stated that the "practical business, profit, policy consideration" language, the "outcome prediction" defense, changes to the third element of the burden-shifting framework, and the conflating of a plaintiff's prima facie burden and pleading burden, ran the risk of "effectively neutering" discriminatory effects liability under the Act, and were all likely unsupported by *Inclusive Communities* or other judicial decisions.[46] The district court also stated that the 2020 Rule's use of "new and undefined terminology, altered burden-shifting framework, and perplexing defenses" accomplished "the opposite of clarity" and was likely "arbitrary and capricious." [47] The court stated that "[t]here can be no doubt that the 2020 Rule weakens, for housing

---

[Inclusive Communities]."); *but see Inclusive Cmtys. Project* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019) (noting that "debate exists regarding whether in *ICP* the Supreme Court adopted the [2013] regulation's approach or modified it" but that it believed that *ICP* "announced a more demanding test" through the announcement of "safeguards" to incorporate into the burden shifting framework, such as a "robust causality" requirement").

[36] 81 FR 69012, 69012.
[37] *Prop. Cas. Insurers Ass'n of Am.* v. *Donovan,* 66 F. Supp. 3d 1018, 1051–53 (N.D. Ill. 2014).
[38] *Id.* at 1049, 1054.
[39] 81 FR 69012, 69012.
[40] 83 FR 28560.

[41] 84 FR 42854.
[42] *See, e.g.,* 85 FR 60317, 60319 (overview of some of the comments making these points).
[43] 85 FR 60288.
[44] *Mass. Fair Hous. Ctr.* v. *HUD,* No. 20–11765–MGM, 2020 U.S. Dist. LEXIS 205633, at *20–21 (D. Mass. Oct. 25, 2020).

[45] *Id.* at *9, *10 n.2, *17–18.
[46] *Id.* at *17–18.
[47] *Id.* at *18-*19.

discrimination victims and fair housing organizations, disparate impact liability under the Fair Housing Act. . . . In addition, the 2020 Rule arms defendants with broad new defenses which appear to make it easier for offending defendants to dodge liability and more difficult for plaintiffs to succeed. In short, these changes constitute a massive overhaul of HUD's disparate impact standards, to the benefit of putative defendants and to the detriment of putative plaintiffs.'' [48] The court stated that the 2020 Rule's ''massive changes . . . pose a real and substantial threat of imminent harm'' to the Massachusetts Fair Housing Center by raising the burdens and costs of pursuing claims under a discriminatory effects theory.[49]

## II. HUD'S Reconsideration of the 2020 Rule

On January 26, 2021, President Biden issued a Memorandum ordering the Department to ''take all steps necessary to examine the effects of the [2020 Rule], including the effect that amending the [2013 Rule] has had on HUD's statutory duty to ensure compliance with the Fair Housing Act'' and ''take any necessary steps . . . to implement the Fair Housing Act's requirements that HUD administer its programs in a manner that . . . furthers . . . HUD's overall duty to administer the Act [] including by preventing practices with an unjustified discriminatory effect.'' [50]

Consistent with the President's Memorandum, HUD has reconsidered the 2020 Rule and proposes that the 2013 Rule be recodified. In so proposing, HUD considered prior public comments on the various rulemakings described above, HUD's responses to those comments, HUD's 2016 supplemental explanation regarding the 2013 Rule's applicability to the insurance industry, legal precedent including *Inclusive Communities*, the *Massachusetts Fair Housing Center* court's order, and HUD's own experience with discriminatory effects cases over 40 years.

In HUD's experience, the 2013 Rule sets a more appropriately balanced standard for pleading, proving, and defending a fair housing case alleging a policy or practice has a discriminatory effect. The 2013 Rule provides greater clarity about what each party must show by relying on concepts that have a long history in judicial and agency precedent. It appropriately balances the need to ensure that frivolous claims do not go forward with a realistic understanding of the practical challenges to litigating these claims. With regard to the 2020 Rule, HUD's experience investigating and prosecuting discriminatory effects cases informs that many of the points made by commenters and the Massachusetts District Court are, in HUD's opinion, correct, including that the changes the 2020 Rule makes, such as amending pleading standards, changing the burden shifting framework, and adding defenses, all favoring respondents, will at the very least introduce unnecessary confusion and will at worst make discriminatory effects liability a practical nullity.

HUD now proposes to recodify the 2013 Rule's discriminatory effects standard and invites comments on this proposal. HUD believes that this standard is more consistent with the Act's purpose, prior caselaw under the Act, including *Inclusive Communities*, other civil rights authorities, including the Equal Credit Opportunity Act and Title VII, and HUD's prior interpretations of the Act. While HUD previously stated that the 2020 Rule was simply intended to implement the Supreme Court's opinion in *Inclusive Communities*, HUD now believes that *Inclusive Communities* maintained the fundamentals of long-established disparate-impact precedent rather than changing them. Moreover, based on HUD's experience investigating and litigating discriminatory effects cases, HUD believes that the practical effect of the 2020 Rule's amendments is to severely limit HUD's and plaintiffs' use of the discriminatory effects framework in ways that substantially diminish that frameworks' effectiveness in accomplishing the purposes that *Inclusive Communities* articulated.

By comparison, in HUD's experience, the 2013 Rule has provided a workable and balanced framework for investigating and litigating discriminatory effects claims that is consistent with the Act, HUD's own guidance, *Inclusive Communities*, and other jurisprudence.

As noted above, the Court in *Inclusive Communities* heavily relied on *Griggs*, which is the foundation of Title VII disparate impact jurisprudence, to illustrate the well-settled principles of disparate impact under the Act, all of which are fully consistent with the 2013 Rule.[51] In *Griggs*, the Court explained that, under Title VII, ''[w]hat is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.'' [52] Quoting from its foundational decision in *Griggs*, the Supreme Court in *Inclusive Communities* observed that ''[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies.'' [53] This quotation from a seminal decision of longstanding disparate impact doctrine is properly read as maintaining existing law, not profoundly changing it. As *Inclusive Communities* explicitly stated, ''disparate-impact liability *has always been* properly limited in key respects'' (emphasis added), making clear that it was not adding additional pleading or proof requirements or calling for a significant departure from pre-existing precedent under the Act and Title VII.[54] Furthermore, reading *Inclusive Communities* to support a heightened pleading standard is contradicted by the fact that the ''heartland'' cases cited by the Court would not have survived a motion to dismiss under that standard because plaintiffs in those cases did not have specific facts to plausibly allege that a policy or practice was arbitrary, artificial, or unnecessary until after discovery.[55] Finally, because *Inclusive Communities* considered a judgment reached after discovery and bench trial, the Court had no occasion or opportunity to consider the proper pleading standards for cases brought under the Act. The parties did not brief or argue such questions to the Court, making it particularly unlikely that the Court intended to reach them.

For these reasons and others, HUD believes that *Inclusive Communities'* quotation of *Griggs'* decades-old ''artificial, arbitrary, and unnecessary'' formulation is best construed as

---

[48] *Id.* at *10.
[49] *Id.* at *19.
[50] *See* 86 FR 7487, 7488.
[51] *See generally Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015).
[52] *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 430–31 (1971).
[53] *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 540 (quoting *Griggs*, 401 U.S. at 431); *see also Inclusive Cmtys. Project, Inc.*, 576 U.S. at 544 (cautioning against proof standards that ''displace valid governmental and private priorities, rather than solely 'remov[ing] . . . artificial, arbitrary, and unnecessary barriers''') (quoting *Griggs*, 401 U.S. at 431) (alterations in original).
[54] *Id.* at 540.
[55] *See, e.g., Town of Huntington, NY* v. *Huntington Branch, NAACP*, 488 U.S. 15 (1988); *United States* v. *City of Black Jack*, 508 F.2d 1179, 1184, 1187–88 (8th Cir. 1974) (specific facts produced during the case supported the court's determination that the policy was one of those ''artificial, arbitrary, and unnecessary'' practices that is properly invalidated under disparate impact doctrine); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Parish*, 641 F. Supp. 2d 563, 567–568 (E.D. La. 2009) (relying on information gathered after the pleadings to find disparate impact).

maintaining continuity with longstanding disparate-impact jurisprudence, as reflected in the 2013 Rule. Accordingly, HUD proposes to recodify the 2013 Rule.

HUD believes other changes the 2020 Rule made create problems that could be cured by a return to the 2013 Rule. For example, the 2020 Rule eliminated the 2013 Rule's definition of "discriminatory effect," stating that the definition was unnecessary because it "simply reiterated the elements of a disparate impact claim." [56] In eliminating this definition, the 2020 Rule erased "perpetuation of segregation" as a recognized type of discriminatory effect distinct from disparate impact, contrary to well established precedent.[57] HUD now proposes to reaffirm that perpetuation of segregation remains, as it always has been, a basis for contending that a policy has an unlawful discriminatory effect. HUD now believes that for clarity, a discriminatory effects rule should explicitly state that perpetuation of segregation is a type of discriminatory effect, distinct from disparate impact.

The 2020 Rule also eliminated from the Act's prohibitions policies or practices that could "predictably result[ ] in a disparate impact on a group of persons," *i.e.*, those for which the disparate impact has not yet manifested but will predictably do so.[58] As HUD stated in 2013, the Act prohibits discrimination that is predictable because it defines an "aggrieved person" as any person who "believes that such person will be injured by a discriminatory housing practice *that is about to occur.*" [59] And consistent with the Act's plain language, courts have found that predictable discriminatory effects may violate the Act: "[t]o establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect." [60] The 2020 Rule did not adequately explain how the Act and caselaw construing it can be read to require waiting until harm is inflicted before an action with predictable discriminatory effects can be challenged, nor does HUD perceive that any such explanation would be availing, given the plain language of the Act and the caselaw interpreting it. Thus, HUD proposes to recodify the 2013 Rule to correct this error.

In addition, the 2020 Rule created new and confusing defenses at both the pleading and post-pleading stage, including that the challenged policy or practice is "reasonably necessary to comply with a third-party requirement." [61] The 2020 Rule's preamble stated that this defense would not require a showing that the challenged policy is the only way to comply with such a requirement, only that the policy serves that purpose.[62] HUD now believes that this defense is inconsistent with the Act, which specifies that state and local laws requiring or permitting discriminatory housing practices are invalid. The defense would preclude many otherwise proper discriminatory effects claims, because, for example, a plaintiff may not have any practical means of knowing whether some other party's policies also contributed to the defendant's practice. Nothing in *Inclusive Communities* suggests this defense is required, let alone reasonable, for HUD to create. Accordingly, HUD proposes to eliminate these provisions by recodifying the 2013 Rule.

The 2020 Rule also created a new "outcome prediction" defense, which would in practice exempt most insurance industry practices (and many other housing-related practices that rely on outcome predictions, such as lending practices) from liability under a disparate impact standard. This is inconsistent with HUD's repeated finding, including in the 2020 Rule, that "a general waiver of disparate impact law for the insurance industry would be inappropriate." [63] Although unclear, it appears that this defense would suggest using comparators that are, in HUD's experience, inappropriate. At the very least, the defense introduces unnecessary confusion into the doctrine.

The 2020 Rule limited remedies in discriminatory effects cases in three respects. It specified that "remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons." [64] It prohibited HUD in administrative proceedings from pursuing anything but "equitable remedies" except that "where pecuniary damage is proved, HUD will seek compensatory damages or restitution." [65] And it restricted HUD from seeking civil penalties in discriminatory effects cases unless the respondent had been adjudged within the last 5 years to have committed intentional unlawful housing discrimination under the Act.[66] HUD believes that these limitations have no basis in law and run contrary to public interest and the purpose of the Act. While the 2020 Rule cited *Inclusive Communities* as supporting these limitations,[67] no part of *Inclusive Communities* suggested such limitations.[68] Moreover, they are in conflict with the plain language of the Act, which provides in all cases for a wide variety of remedies, including injunctive relief, actual damages, punitive damages, and civil penalties.[69]

---

[56] 84 FR 42854; 85 FR 60288, 60306–07, 60332.

[57] *See, e.g., Graoch Assocs. # 33, L.P.*, 508 F.3d at 378 (6th Cir. 2007) (there are "two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups."); *Ave. 6E Invs.* v. *City of Yuma*, 818 F.3d 493, 503 (9th Cir. 2016) ("[A]s the Supreme Court recently reaffirmed [in *ICP*], the FHA also encompasses a second distinct claim of discrimination, disparate impact, that forbids actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason.") (emphasis added); *see also Huntington Branch, NAACP* v. *Huntington*, 844 F.2d 926, 937 (2nd Cir. 1988); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *Nat'l Fair Hous. All.* v. *Bank of Am., NA.*, 401 F. Supp. 3d 619, 641 (D. Md. 2019) (allowing claim to proceed past motion to dismiss where plaintiff pleaded facts sufficient to allege that defendant's policies "forestall housing integration and freeze existing racial segregation patterns"); *Hallmark Devs., Inc.* v. *Fulton Cnty.*, 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005).

[58] 84 FR 42854; 85 FR 60288, 60306–07, 60322.

[59] 42 U.S.C. 3602(1)(2) (emphasis added).

[60] *See Inclusive Cmtys. Project, Inc.*, 576 U.S. at 539–40 (2015) (describing *City of Black Jack*, 508 F.2d at 1184 as "at the heartland of disparate-impact liability").

[61] 85 FR 60288, 60316–17.

[62] 85 FR 60288, 60290.

[63] 85 FR 60321 (citing "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance" 81 FR 69012).

[64] 85 FR 60288, 60333.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *See Inclusive Cmtys. Project*, 576 U.S. at 544–45 (noting considerations for courts on how to properly construct remedial orders (*i.e.*, be consistent with the Constitution, concentrate on the elimination of the offending practice, strive to be race-neutral), but in no way suggesting that remedial orders should be the sole or favored remedy in disparate impact cases, or that civil penalties in administrative proceedings are somehow inappropriate).

[69] *See, e.g.*, 42 U.S.C. 3601 note ("Nothing in the Fair Housing Act as amended by this Act limits any . . . remedy available under the Constitution or any other Act of the Congress not so amended"); 42 U.S.C. 3612(g)(3) ("If the administrative law judge finds that a respondent has engaged . . . in a discriminatory housing practice, such administrative law judge shall promptly issue an order for such relief as may be appropriate, which may include actual damages suffered by the aggrieved person and injunctive or other equitable relief. Such order may, to vindicate the public

Continued

Whereas Congress has chosen to limit the remedies available in disparate-impact cases under Title VII,[70] it has made no such choice with respect to the Act. Thus, HUD proposes to eliminate these provisions by recodifying the 2013 Rule.

In sum, HUD now believes that the 2013 Rule is preferable to the 2020 Rule. It believes the 2013 Rule is more consistent with judicial precedent construing the Fair Housing Act, including *Inclusive Communities,* as well as the Act's broad remedial purpose. Based on its experience interpreting and enforcing the Act, HUD also believes the 2020 Rule, if put into effect, threatens to limit the effectiveness of the Act's discriminatory effects doctrine in ways that are inconsistent with the doctrine continuing to play its critical role in "moving the Nation toward a more integrated society."[71] On the other hand, HUD believes that the 2013 Rule provided clarity, consistency, and a workable, balanced framework, recognized by the Supreme Court, under which to analyze discriminatory effects claims, and under which HUD can better ensure it has the tools to further its "duty to administer the Act [ ] including by preventing practices with an unjustified discriminatory effect."[72]

### III. This Proposed Rule

For the reasons described above, HUD proposes to amend §§ 100.5 and 100.500 to recodify the discriminatory effects regulation specified in the 2013 Rule. As HUD has stated, the 2013 Rule was consistent with *Inclusive Communities.*[73] The vast majority of courts that considered this issue subsequent to *Inclusive Communities* also found that the 2013 Rule was consistent with *Inclusive Communities.*[74] HUD thus proposes this rule because it believes the 2013 Rule accurately reflects the discriminatory effects framework under the Act, whereas the 2020 Rule does not.

HUD does not propose to amend § 100.70. The 2020 Rule made changes unrelated to § 100.500 by simply adding examples to an already non-exhaustive list of prohibited activities under the Act at § 100.70(d)(5).[75] Specifically, it noted that enacting or implementing "building codes," "permitting rules," or "requirements" that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of a protected class is prohibited.

### IV. Findings and Certifications

*Regulatory Review—Executive Orders 13563 and 12866*

Executive Order 13563 ("Improving Regulation and Regulatory Review") directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 ("Regulatory Planning and Review"), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget ("OMB") in accordance with the requirements of the order. This proposed rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

Because the 2020 Rule never took effect, and therefore did not affect the obligations of any regulated entities, this proposed rule is only recodifying the 2013 Rule and will have no impact on regulated entities except to affirm that the 2013 Rule remains in effect. Furthermore, the 2013 Rule itself had little direct effect on regulated entities because it only "formalize[d] the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability" and "[was] not a significant departure from HUD's interpretation to date or that of the majority of federal courts."[76] Therefore, HUD does not believe that deeper analysis is needed on the impact of this rule. However, HUD invites comment on this question.

The docket file is available for public inspection in the Regulations Division, Office of the General Counsel, Room 10276, 451 7th Street SW, Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339 (this is a toll-free number).

*Regulatory Flexibility Act*

The Regulatory Flexibility Act ("RFA") (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule amends the Code of Federal Regulations to accurately reflect HUD's discriminatory effects regulation as it currently exists. As a result, all entities, big and small, have a responsibility to comply with the law.

As discussed above, this Proposed Rule would continue to apply the 2013 Rule, which has been in effect uninterrupted for over seven years. HUD concludes, as it did when it published the 2013 Rule, that the majority of entities, large or small, currently comply and will remain in compliance with the Fair Housing Act. All entities, large and

---

[70] 42 U.S.C. 2000e–5(g)(1).

[71] *Inclusive Cmtys. Project,* 576 U.S. at 547.

[72] 86 FR 7487, 7488.

[73] *See, e.g.,* Defendants' Opposition to Plaintiff's Motion for Leave to Amend Complaint, *Prop. Cas. Ins. Assoc. of Am.* v. *Carson and the U.S. Dep't of Hous. and Urb. Dev.,* No. 1:13–cv–08564 (N.D. Ill. 2017); Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, *Am. Ins. Assoc.* v. *U.S. Dep't of Hous. and Urb. Dev. et al.,* No. 1:13–cv–00966 (RJL) (D.D.C. 2016).

interest, assess a civil penalty against the respondent. . ."); 42 U.S.C. 3612(p) ("[i]n any administrative proceeding brought under this section, or any court proceeding arising therefrom, or any civil action under section 812, the administrative law judge or the court . . . in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fees and costs."); 42 U.S.C. 3613(c)(1) ("in a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred . . . the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order . . . .").

[74] *See, e.g., MHANY Mgmt. Inc.* v. *County of Nassau,* 819 F.3d 581, 618–619 (2d Cir. 2016) (deferring to HUD's [2013] regulation, noting that "the Supreme Court implicitly adopted HUD's [burden shifting] approach [in 24 CFR 100.500(c)]"); *Ave. 6E Invs., LLC,* 818 F.3d at 512–13 (9th Cir. 2016) (citing *Inclusive Communities* and the 2013 Rule at 100.500(c) for the same proposition); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29 (D.D.C. 2017) (citing *Inclusive Communities* and HUD's 2013 Rule at 100.500(c) as standing for the same proposition); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* No. 13–CV–8564, 2017 U.S. Dist. LEXIS 94502, at *29–30 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework was a reasonable interpretation of the Act and that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in [*Inclusive Communities*].").

[75] 85 FR 60326.

[76] 78 FR 11460, 11480.

small, have been subject to the Fair Housing Act for over fifty years and subject to the 2013 Rule for over seven years. For the minority of entities that have failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute and regulation. This proposed rule does not change that substantive obligation; it merely recodifies the regulation that more accurately reflects the law. Any burden on small entities is simply incidental to the pre-existing requirements to comply with this body of law. Furthermore, HUD anticipates that this Proposed Rule would eliminate confusion for all entities, including small Fair Housing Advocacy organizations, by ensuring HUD's regulation accurately reflects the current standards. Accordingly, the undersigned certifies that this Proposed Rule would not have a significant economic impact on a substantial number of small entities. HUD invites comments on this certification. HUD specifically invites comments on the number of small entities which commenters believe may be affected by this regulation.

*Environmental Impact*

This proposed rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This proposed rule would not have federalism implications and would not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) ("UMRA") establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This proposed rule would not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

List of Subjects in 24 CFR Part 100

Aged, Civil rights, Fair housing, Incorporation by reference, Individuals with disabilities, Mortgages, and Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD proposes to amend 24 CFR part 100 as follows:

PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority citation for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

Subpart A—General

■ 2. In § 100.5, revise paragraph (b) and remove paragraph (d) to read as follows:

§ 100.5 Scope.

\* \* \* \* \*

(b) This part provides the Department's interpretation of the coverage of the Fair Housing Act regarding discrimination related to the sale or rental of dwellings, the provision of services in connection therewith, and the availability of residential real estate-related transactions. The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500.

\* \* \* \* \*

Subpart G—Discriminatory Effect

■ 3. Revise § 100.500 to read as follows:

§ 100.500 Discriminatory effect prohibited.

Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

(a) *Discriminatory effect.* A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* (1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

(ii) Those interests could not be served by another practice that has a less discriminatory effect.

(2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (3) of this section.

(c) *Burdens of proof in discriminatory effects cases.* (1) The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

(d) *Relationship to discriminatory intent.* A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

Dated: June 17, 2021.

**Jeanine Worden,**

*Acting Assistant Secretary, Office of Fair Housing and Equal Opportunity.*

[FR Doc. 2021–13240 Filed 6–24–21; 8:45 am]

BILLING CODE 4210–67–P

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** kso-x4ks-kffv
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0200
Comment Submitted by Thomas Karol

## Submitter Information

## General Comment

Please accept the attached comments from the National Association of Mutual Insurance Companies.

## Attachments

HUDComment8_23



317.875.5250 | [f] 317.879.8408
3601 Vincennes Road, Indianapolis, Indiana 46268

202.628.1558 | [f] 202.628.1601
20 F Street N.W., Suite 510 | Washington, D.C. 20001

August 23, 2021

Kathleen M. Pennington
Acting Associate General Counsel for Fair Housing
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street SW
Washington, DC    20410–0500

**Re: Department of Housing and Urban Development, 24 CFR Part 100 [Docket No. FR–6251–P–01] RIN 2529–AB02, Reinstatement of HUD's Discriminatory Effects Standard Proposed Rule ("Proposed Rule")**

Acting Associate General Counsel Pennington:

The National Association of Mutual Insurance Companies (NAMIC) is respectfully submitting comments on the Proposed Rule. NAMIC is the largest property/casualty insurance trade group with a diverse membership of more than 1,400 local, regional, and national member companies, including seven of the top 10 property/casualty insurers in the United States. NAMIC members lead the personal lines sector representing 66 percent of the homeowner's insurance market and 53 percent of the auto market.

NAMIC and NAMIC's members are adamantly opposed to discrimination based on protected classes and unfair discrimination in general, and we support legislative and regulatory policies to prevent these practices. The elimination of racism improves every aspect of our relationships, institutions, and business communities.

**There Remains No Need for The Proposed Rule to Apply to Insurance**

There is no evidence that there were actionable disparate impact cases involving the pricing or provision of housing insurance prior to 2013, and with insurers being subject to the 2013 rule for the last eight years, there have similarly been no allegations or findings of homeowner insurer disparate impact have been made or adjudicated since 2013. As NAMIC has repeatedly made clear to HUD in

comments and in court proceeding challenging this rule, every state has effective and strong civil and criminal insurance anti-discrimination laws, regulations, and enforcement divisions, and there has been not a single allegation that these civil and criminal insurance anti-discrimination laws, regulations and enforcement division have in any way been insufficient.  In fact, the rule undermines or impairs the existing application of the McCarran-Ferguson Act that established the states as the regulators over insurance and in particular the source for the definition of unfair discrimination, linking the definition to equal treatment and cost-based pricing.

### A.  The Proposed Rule Disrupts the Business of Insurance

As NAMIC commented on the original proposed rule in 2012, State insurance laws prohibit insurance rates from being "excessive, inadequate, unreasonable or unfairly discriminatory." Classifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance.  "Unfair discrimination," on the other hand, has specific meaning in the insurance context. The concept of unfairly discriminatory insurance rates has historically been a cost-based concept.  Principal 4 of Casualty Actuarial Society Statement of Ratemaking Principles, formally adopted in 1988, provides that "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."

Also, in comments to HUD on the proposed rule in 2012 and subsequently, NAMIC has continuously tried to help HUD understand that the foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly.  NAMIC has informed HUD that race or other protected class characteristics are not part of the risk assessment process.  HUD understands that state insurance laws proscribe the use of prohibited factors in rating and underwriting practices of insurers, and states prohibit unfair discrimination in insurance.  In the context of insurance, unfair discrimination includes treating similar risks in a dissimilar manner.  Insurance regulation focuses on facially neutral underwriting or rating factors that reflect insurance risk.  Accordingly, state insurance laws largely reflect the principles underpinning property/casualty insurance pricing.

To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly.  This practice is the

very essence of risk-based pricing. Common homeowners insurance factors include claim history of applicant, construction material (s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system among many other facially neutral factors.

Under this Reinstated Discriminatory Effects Standard, these and other common underwriting factors could be jeopardized, even though they do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected.  To achieve a condition in which no statistical disparities would exist that could "actually or predictably results in a disparate impact" in the average rate paid by different demographic groups, many if not most risk- based variables would have to be eliminated from the underwriting process.  In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. But this would be patently unfair since it will result in those receiving more in claim payments paying less while those receiving less in claim payments would pay more.  This will be the case within a protectected class as well as between protected classes since the likelihood of loss is not monolithic by race or ethnicity.  This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

### B. Insurer Compliance with the Reinstated Rule Will be Unworkable

In the Reinstatement, HUD blithely states "this proposed rule…. will have no impact on regulated entities …. Therefore, HUD does not believe that deeper analysis is needed on the impact of this rule." NAMIC respectfully and vigorously disagrees.
§ 100.500 (a) of the proposed reinstated rule provides that "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." To ensure that an insurer does not employ any practice that "actually or predictably results" in disparate impact "because of race, color, religion, sex, handicap, familial status, or national origin", an insurer would <u>by definition</u> need to know and consider the race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant, as well as the undefined "segregated housing patterns."

The primary impediment to any practical compliance by insurers is the fact that insurance companies that price and provide homeowner insurance do not have any data on the race, color, religion, handicap, or national origin of policyholders or applicants. These companies are precluded by at least one state law for asking for such data. To avoid being blindsided and to defend against allegations against insurer practices that may "actually or predictably results in a disparate impact" an insurer would need to somehow obtain, validate, record, and apply data on the race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant. Insurers would be required to ask each existing policyholder and each policy applicant for their self-identified race, color, religion, sex (gender identity?), handicap, familial status, or national origin. Short of denying coverage to all policyholders and applicants who refuse to provide and validate such data, insurers would have no way to ensure that their protected class data sets were accurate and complete. As the proposed disparate impact standard does not consider intent, but rather resulting impact, an incomplete or erroneous data set would likely result in inaccurate evaluations and potential discrimination liability for insurers that employed even the most vigorous compliance efforts.

This need for this perfect data set will also require that an insurer trying to comply must validate and update the data set when a policyholder later self identifies as a different race, color, religion, sex, handicap, familial status, or national origin.

But there's more. The reinstated rule would also subject insurers to liability for insurance practices that – inadvertently and without intent – "actually or predictably" create, increase, reinforce, or perpetuate segregated housing patterns. This would require a compliance oriented insurer to have the same unrealistic protected class data sets defined above, AND to then to understand the undefined "segregated housing patterns" sufficiently to guarantee that the an insurance policy renewed or provided to a policyholder or applicant of a defined race, color, religion, handicap, familial status, or national origin of every policyholder and applicant could not actually or predictably create, increase, reinforce, or perpetuate segregated housing patterns related to race, color, religion, handicap, familial status, or national origin of every policyholder and applicant.

If an insurer can achieve and maintain a perfect data set of policyholder race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant, and understand segregated housing patterns, these dual goals of the reinstated regulation may operate in conflict. Under the proposed rule, an insurer could be liable for discrimination if they have a practice of considering the pricing or provision or a homeowner policy based on race, color, religion, sex,

www.namic.org

handicap, familial status, or national origin of every policyholder and applicant. Under the same rule, an insurer would be liable if they perpetuate segregated housing patterns.

Assuming Insurer X has an application for a homeowner policy from a Protected Group A, it would be discrimination for Insurer X to consider national origin intentionally or operate in any way that resulted in a disparate manner. But at the same time under disparate impact liability under the 2013 Rule, Insurer X could be liable if the home in question was in an area that was perpetuating Protected Group A housing patterns. By requiring the insurer to avoid practices that "actually or predictably creates, increases, reinforces, or perpetuates segregated housing patterns", HUD would require the insurer to make an intentional or disparate practice based upon a prohibited factor.

Insurers would also have great compliance difficulty in continually defining and addressing the requisite statistical discrepancy that would be the basis of possible disparate impact claims under the proposed rule. While there are varying accepted standards of applicable statistical discrepancy that may be permissible and impermissible – i.e. X% variance from statistics is allowed, but X+1% is discriminatory - but the completely undefined factor is the geographic statistical base upon which the insurer's practice must comply. Is the insurer required to track and comply with government, academic or independent protected class statistics of Ward 8, south Baltimore, Baltimore city, metropolitan Baltimore, Maryland, the greater Baltimore Washington Metropolitan area, the Mid-Atlantic states or nationally? Or is the statistical focus on the business of the area in which the insurer operates, or on the business line the insurer offers, or some combination of geographic regions and the insurer's business.

Without some definition of the geographic, business or some other definitive statistical base upon which an insurer could being to establish a compliance program, even the most perfectly accurate and evolving protected class data base and comprehensive analysis of segregated housing by an insurer would not enable compliance with the proposed rule.
These are just some of impractical results of applying the proposed regulation to the pricing and provision of homeowners insurance. Others not detailed here would include the vast expense required of insurers to collect and maintain the protected class data, the liability of insurers for any breach of the confidentiality of that data potential impact of insurers leaving the market as unworkable, too expense and too risky.

### C. The 2013 Rule Does Not Included the 2015 Disparate Impact Requirements Set by the U.S. Supreme Court

HUD's self-congratulatory reinstatement and approval of its own work is a combination of revisionist history and selective memory. HUD proposed the rule in 2012 to try to impose its views on burdens of proof requirements to federal courts that chose to apply the burdens of proof that each court determined most appropriate. There was not a "judicial consensus" as HUD claims in the Reinstatement, which is clear from HUD's 2011 proposed rule statement that "This inconsistency threatens to create uncertainty as to how parties' conduct will be evaluated."
In the Reinstatement, "HUD believes the 2013 Rule is more consistent with judicial precedent construing the Fair Housing Act, including *Inclusive Communities*", which amazingly purports HUD's clairvoyance in proposing a rule in 2011 that would include judicial precedent set out by the Supreme Court in 2015. This continues in the Reinstatement - "As HUD has stated, the 2013 Rule was consistent with Inclusive Communities." HUD also claims that the Supreme Court "cited HUD's 2013 Rule multiple times with approval". While provisions of the Rule were cited in one paragraph by the Court, there is nothing in the reference that can reasonably be interpreted as approval. In fact, HUD's Reinstatement later acknowledges that the "Court had no occasion or opportunity to consider the proper pleading standards."

What the Supreme Court did do in Inclusive Communities is define a number of specific limitation and restrictions that are not included in the 2013 Rule or its Reinstatement. HUD is fully aware that NAMIC has been challenging these deficiencies in the 2013 Rule in federal court since 2015; a case in which HUD has requested and been granted dozens of stays for HUD to examine and reexamine the 2013 rule which has remained in effect and which "HUD does not believe that deeper analysis is needed on the impact of this rule."

The 2013 Rule does not and has not included protections and limitations set down by the U.S. Supreme Court in Inclusive Communities. But disparate-impact liability has always been properly limited in key respects to avoid serious constitutional questions that might arise under the FHA, e.g., if such liability were imposed based solely on a showing of a statistical disparity.

A disparate-impact claim relying on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement is important in ensuring that defendants do not resort to the use of racial quotas.

Policies, whether governmental or private, are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." Griggs, 401 U. S., at 431.
Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and "would almost inexorably lead" governmental or private entities to use "numerical quotas," and serious constitutional questions then could arise. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice, and courts should strive to design race-neutral remedies. Remedial orders that impose racial targets or quotas might raise difficult constitutional questions.
A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact.
The limitations on disparate-impact liability discussed here are also necessary to protect potential defendants against abusive disparate-impact claims.

Were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities, rather than solely "remov[ing] . . . artificial, arbitrary, and unnecessary barriers." Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice that "arbitrar[ily] . . . operate[s] invidiously to discriminate on the basis of rac[e]." Ibid. If additional measures are adopted, courts should strive to design them to eliminate racial disparities through race-neutral means.

### D. **The Proposed Rule Burdens of Proof are Inequitably Tilted to the Charging Party**

As noted, the U.S, Court has made clear that disparate impact requires adequate safeguards at the prima facie stage. The 2013 Rule that purports to address burdens of proof do not include these safeguards and create an unlevel playing field in favor of the charging party.

Section 2(c) of the proposed § 100.500 provides that the charging party has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect. That section does not set any standards for the level of proof or what can or cannot be used. This contrasts with the requirement that the respondent or defendant then has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant, which requires a legally sufficient justification, which must be supported by evidence and may not be hypothetical or speculative.

By inference, the plaintiff proof need not be supported by evidence and may be hypothetical or speculative. This means that a plaintiff may allege that the defendant's practice will "result in a disparate impact" without evidence, but the defendant may not provide a justification to a proposed result that includes speculation but must provide evidence that the result cannot occur. This is clearly in conflict with the Supreme Court ruling that "A plaintiff who fails to allege <u>facts</u> at the pleading stage or produce statistical <u>evidence</u> demonstrating a causal connection cannot make out a prima facie case of disparate impact."

If the respondent or defendant satisfies that burden of proof, the charging party or plaintiff may still prevail upon proving – without evidence and using hypotheticals or speculation - that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect. Note that this standard does not require that the other practice be equally practical or productive or have any economic limitations. There is no requirement that the other practice be reasonable, simply that it has "less discriminatory effect." It also removes the Supreme Court's requirement that the charging party not resort to reverse discrimination.

### E. The Proposed Rule Remedies are Concurrently Overbroad and Inadequate

Therein is another unfair burden imposed upon the defendant. As written, the rule does not exonerate the defendant upon adopting this other practice. As written, the defendant is still found liable for discrimination for an inadvertent practice and then ordered to adopt a less discriminatory practice. And a less discriminatory practice is still a discriminatory practice that subjects the defendant to further liability.

The purpose of such a section is properly to implement the Supreme Courts direction that "Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice". The other practice should not merely reduce the level of the disparate impact – leaving the defendant prejudged for the next allegation – but should be a replacement practice only if it actually or judicially predictably results in the elimination of the discriminatory effect.

In the instance of an insurer, if the insurer has by non-speculative evidence proven that the practice is necessary to achieve one or more of their substantial, legitimate, nondiscriminatory interests – and is therefore not artificial, arbitrary, and unnecessary, then the insurer should be found not liable for disparate impact discrimination if the insurer replaces the practice with a operational and economically reasonable replacement practice that the court judicially determines to actually or

predictably result in the elimination of the proposed discriminatory effect.

**Conclusion**

Insurer liability for any civil or criminal liability is an extremely serious matter, and for the mutual insurance company members of NAMIC, such liability can threaten the ability of the mutual insurance company to continue to provide the requisite protection of its collective policyholders. Discrimination liability includes a particular toxicity in these present times and even an unsupported allegation of such heinous conduct will do permanent and last damage to a mutual insurance company. Mutual insurance companies are often small market companies operating in a single county, with many specializing in niche markets such as churches, pharmacists, jewelers, and lumber dealers. Improperly drafted regulations that encourage baseless allegations of discrimination or that deny a innocent mutual insurance company the ability to comply or defend result in a taint that may immeasurably harm the company and policyholders.

As NAMIC has described above and in its many prior submissions to HUD, the 2013 Rule and the Proposed Rule are not necessary and operate to disrupt the fundamentals of the insurance business. Existing federal, state and local laws and regulations have proven to prevent insurer discrimination and no examples of any deficiencies in these many provisions has been offered by HUD or other proponents of the 2013 Rule. Causing insurers to obtain and use protected class factors that are unrelated to the principles of risk-based pricing is contrary to the business of insurance.  While perhaps well intentioned, the Reinstated Rule will be unworkable for insurers and compliance with the convoluted and conflicting provisions will be complex, expensive, intrusive on policyholder's privacy and unreasonable. It conflicts with impairs and supersedes the congressional authorization of the states to regulate the business of insurance under the McCarran-Ferguson Act and the mandate to the states to define unfair discrimination.

The Reinstated Rule purports to include the protections and limitation set down by the U.S. Supreme Court but it does not. The burdens of proof are tilted to favor the allegations and hamstring any defense. The proposed remedies provide unreasonable latitude to revise the business of insurers without any consideration of practicality or economics, and as written,  and allow remedies that mitigate discrimination, rather than eliminate discrimination as directed by the Supreme Court.  In fact, the proposed remedies enable reverse discrimination by overturning the state statutory prohibition of unfair discrimination as that standard requires insurers to base treatment on expected losses and costs.

I would be most happy to address any questions you may have by contacting me at tkarol@namic.org. Thank you for your time and consideration.

Thomas J. Karol
General Counsel Federal