*April 10, 1968*    CONGRESSIONAL RECORD — HOUSE    **9527**

Willis, Robert E.
Wilson, James M.
Wilt, Albert J., Jr.
Wiltshire, Robert B., II
Winkel, Craig A.
Winston, William A.

Wofford, Kenneth O., Jr.
Woodhouse, Charles
F., II
Woodward, John C., III
Woolshlager, John C.

Wright, Joe Nathan
Yost, James E.
Young, Morton E.

Young, Robert A.
Young, Ronald B.
Zeller, Loren L.

To Be Postmaster General
W. Marvin Watson, of Texas, to be Postmaster General.

CIVIL AERONAUTICS BOARD

John H. Crooker, Jr., of the District of Columbia, to be a member of the Civil Aeronautics Board for the term of 6 years expiring December 31, 1974 (reappointment).

# HOUSE OF REPRESENTATIVES—*Wednesday, April 10, 1968*

The House met at 12 o'clock noon.
Rev. Henry B. Luffberry, D.D., St. Paul's Lutheran Church, Washington, D.C., offered the following prayer:

God of wilderness and promised land, Christ of Calvary and Easter, our journey brings us this day to another intersection of history and destiny.

As we ponder the uncertain way teach us thankfulness for cherished milestones, for glimpses of the horizon which confirm our faith, for those wayside shrines that refresh our souls and renew our resolve.

When we step from yesterday's concrete strip upon today's rugged terrain, when we face again a trackless tomorrow, may we not stumble, Lord, nor tire of the burdens we bear.

In brotherly love light our eyes, to faithful trust tune our hearts—and with the sharp ax of truth blaze our ascending trail. Amen.

## THE JOURNAL

The Journal of the proceedings of yesterday was read and approved.

## EL DORADO NATIONAL FOREST—DESOLATION WILDERNESS AREA

Mr. JOHNSON of California. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from California?

There was no objection.

Mr. JOHNSON of California. Mr. Speaker, today I am introducing legislation to designate approximately 63,500 acres of the El Dorado National Forest in California as the Desolation Wilderness Area. As a member of the House of Representatives Committee on Interior and Insular Affairs and its Subcommittee on National Parks and Recreation, I had a substantial role in the creation of the national wilderness preservation system a few years ago. I am delighted, therefore, that one of the first areas to be designated under this legislation would be an important wilderness region in the Second Congressional District.

The proposed Desolation Wilderness Area which includes most of the Desolation Primitive Area and 22,725 acres of contiguous national forest land is an outstanding example of the rugged beauty of the Sierra Nevada range.

Located in the high mountains far from the hustle and bustle of civilization this is an area of peace and tranquility. Here man can put behind him the cares, toils, and troubles of his everyday life and return to the mountains and to the country, to nature in our land as it was first created by our Maker. Here he can enjoy unmarred by civilization the majestic splendor of the mountains.

It was to set aside such areas as this that the wilderness legislation was initially conceived and enacted by this Congress. It is my feeling that the Desolation Wilderness will serve this purpose excellently.

Furthermore, the Congress established the principal of multiple use of our national forests. This includes all functions, including recreation, mining, grazing, and timber production. The wilderness seeker has a place in this multiple use and it is appropriate that those areas such as this which are most suitable for wilderness designation are set aside.

Mr. Speaker, the U.S. Forest Service, in considering the conversion of the existing Desolation Valley Primitive Area and adjacent national forest lands to the wilderness designation, has reviewed this proposal with State and local agencies and with the public as a whole. A public hearing was held in Placerville, Calif., about a year ago with a general expression of support for the wilderness designation. California's Governor Reagan, the Board of Supervisors of El Dorado County, and all interested Federal Departments and State and local governmental agencies have been consulted.

Accordingly, Mr. Speaker, I hope that Congress will have an opportunity to take early action on the proposal which I introduce here today to establish the Desolation Wilderness. I say this not only on behalf of the people of the Second Congressional District, but for those of all of northern California, for this proposed wilderness is located just west of Lake Tahoe within reach of wilderness seekers from throughout northern areas of our State.

## THE LATE DR. MARTIN LUTHER KING

Mr. RYAN. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. RYAN. Mr. Speaker, I take this time to call to the attention of the House a statement of commitment which 22 Members of the House have joined me in issuing at this time of national tragedy. The statement follows:

APRIL 10, 1968.

We mourn the death of Martin Luther King, Jr.

There is violence in our land, not simply in reaction to the death of a leader, but in the reaction to the oppression of a race. That oppression must end.

Martin Luther King, Jr. represented the hope that full equality could be achieved in America without violence. We, the Congress, must respond to the Poor People's Campaign that he did not live to lead. We must pass the bill which is before us to guarantee open housing and the free exercise of civil rights. But that is a barest beginning. We need also to implement the recommendations of the National Commission on Civil Disorders by acting to provide:

A decent job for every American able to work.

A good education for every child.

Decent homes for the one fifth of a nation who are ill-housed.

Dignified social welfare for the ill, the indigent and the aged.

Full equality before the law, effectively enforced.

This was the promise of America that attracted our immigrant fathers. Our cities are today armed camps because too many black citizens have little reason to believe in that promise. It is within the power of Congress to redeem the promise, if the Congress will only act.

The time for action is now.

WILLIAM F. RYAN, CHARLES C. DIGGS, JR., JOHN CONYERS, JOHN G. DOW, JONATHAN B. BINGHAM, PHILLIP BURTON, DANIEL E. BUTTON, DON EDWARDS, LEONARD FARBSTEIN, JACOB H. GILBERT, WILLIAM D. HATHAWAY, ELMER J. HOLLAND, AUGUSTUS F. HAWKINS, JOSEPH E. KARTH, WILLIAM S. MOORHEAD, ROBERT N. C. NIX, RICHARD L. OTTINGER, THOMAS M. REES, HENRY S. REUSS, JOSEPH Y. RESNICK, BENJAMIN S. ROSENTHAL, EDWARD I. ROYBAL.

## PERSONAL EXPLANATION

Mr. RYAN. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. RYAN. Mr. Speaker, yesterday I attended the funeral services for the Reverend Dr. Martin Luther King, Jr., in Atlanta. I am sure that my constituents wanted me there to bear witness for them.

During yesterday's proceedings of the House there were two record votes and three quorum calls. Had I been present I would have voted "nay" on roll No. 92 and "yea" on roll No. 93.

## LET US WALK TOGETHER—TRIBUTE TO REV. DR. MARTIN LUTHER KING, JR.

Mr. NIX. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to



the request of the gentleman from Pennsylvania?

There was no objection.

Mr. NIX. Mr. Speaker, last week, for the first time in modern history, the world witnessed the extraordinary death of a distinguished American of African descent, Rev. Dr. Martin Luther King, Jr.

As an advocate of one of the basic principles of a society of law and order—nonviolence—he nonetheless died in the advocacy of that creed.

While many may have disagreed with the tenacity of his faith and its uncompromising pursuit, his death did command for 5 full days the undivided attention of one of the most powerful nations in the world. For 1 full day, the smoothly lubricated wheels of government creaked to a halt. The anguish of millions was carried to Atlanta by hundreds of thousands who left a multiplicity of occupations from janitor and sharecropper to Vice President and millionaire to make their pilgrimmage of respect.

All were there—U.S. Senators, U.S. Congressmen, Governors, mayors, foreign dignitaries alongside the unnamed, the lowly and the unemployed. Indeed, the measure of this slightly built blackman's greatness is calibrated by the thousands of messages of condolences and public expressions of grief from heads of state, His Holiness Pope Paul VI and citizens of the world.

And why did they all pay tribute?

In my judgment, this was the first time in this century or any century when an Afro-American, by what he said, by what he lived for touched the conscience of America. By his advocacy of nonviolence and the quality of his life, he even touched the hearts of his enemies who disagreed with his tactic, but respected his sincerity.

As Members of this highest and most respected legislative body, we are to consider today the 1968 civil rights bill.

I ask no one to vote for this piece of legislation or any piece of legislation solely out of the public notice and affectionate esteem accorded Rev. Dr. Martin Luther King, Jr.

Rather, I would ask my distinguished colleagues to examine their consciences. Can they espouse the same principles by which Reverend King lived? The love of all races, the forgiveness of your enemies and the oneness of the family of man?

Or are they prepared to abandon these principles and instead permit the unreasoned laws of the jungle to engulf us all?

This is not a threat, but an invitation to each man to determine himself what steps we shall take or what steps we shall not take to preserve the United States of America.

Whatever steps we do take must be based upon the law of reason.

For we cannot expect reason to triumph in the streets of this Nation unless reason survives in the Halls of this Congress.

And this particular law is an appeal to reason. As that great jurist, Sir Edward Coke, once wrote:

Reason is the life of the law; nay, the common law itself is nothing else but reason . . . The law . . . is perfection of reason.

We who would appeal to all Americans to accept the law of reason and forgo the call of the violent—are we prepared to take that first step?

Reverend King took more than that first step. In heeding the injunction of another man of fellowship that "whosoever compel thee to go a mile, go with him twain," Reverend King walked that last mile to give his last breath of life for a country in which he believed, a country which he loved, and a country in which he never lost faith.

We are asked to walk just 1 mile today in the long journey for democracy's fulfillment and in the enactment of reasonable laws by reasonable men. If we cannot do this, then there is no other place for us to walk together.

## THE CIVIL RIGHTS BILL

Mr. MONTGOMERY. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Mississippi?

There was no objection.

Mr. MONTGOMERY. Mr. Speaker, I hope the Members will not act in haste today, but will open H.R. 2516, the civil rights bill, up for amendments or send it to conference committee for further study.

This bill is so far reaching, covering open housing, riot control, gun control, American Indians, and civil obedience. Even though it originated as a House bill, the Senate added open housing, gun legislation and rights of the American Indian. Congressman BILL COLMER was right when he said this bill is being considered today "under the gun."

The open housing provision in this bill takes away the rights of an individual to dispose of his property in any way that he sees fit. This provision is not going to improve his living conditions; it only hinders the property owner and makes him subject to civil suit.

The gun section of this bill is not clear and certainly should be debated on the floor. Innocent people could be arrested crossing State lines because of the way this gun section of the bill is worded.

Congressman BILL COLMER, chairman of the Rules Committee, should be commended for holding this piece of legislation up for almost a month in his committee.

I urge the Members of the House not to act in haste, but look at the other side of the coin; the private homeowner and the taxpaying American citizens who if you pass this bill will be further penalized by his country for being a good citizen.

## APPEAL FOR HUBERT HUMPHREY TO BE PRESIDENTIAL CANDIDATE

Mr. SISK. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from California?

There was no objection.

Mr. SISK. Mr. Speaker, the events of the past week have placed in perspective the shocking depths of the cleavages which divide this Nation on our domestic policies, just as the events of the previous months had demonstrated the cleavage over our international policies.

As a supporter of President Johnson, I was shocked and dismayed to hear his announcement that he would not be a candidate to succeed himself. Although it was a measure of the President's greatness that he decided not to run, his withdrawal from the field left a void which I do not believe any of the heretofore declared candidates can fill.

I earnestly hope that the Vice President of the United States, HUBERT HUMPHREY, will make himself available as a candidate for this office. I realize that it is late for him to undertake a campaign, but I do not believe there is any other American who can draw the country together and bring unity out of discord.

The Vice President's experience as a legislator and a member of the executive branch are too well known to recount here. His background as a mayor qualifies him exceptionally well to know and understand the problems of the urban areas, which certainly are the focal point of our current domestic crisis.

I know I speak for millions of Americans when I express the hope that the Vice President will not unduly delay his decision on this matter, and for the sake of future generations of Americans and people everywhere, I fervently hope his decision will be in the affirmative.

## SUPPORT FOR MAYOR WASHINGTON DURING CRISIS

Mr. HOLIFIELD. Mr. Speaker, I ask unanimous consent to address the House for 1 minute.

The SPEAKER. Is there objection to the request of the gentleman from California?

There was no objection.

Mr. HOLIFIELD. Mr. Speaker, last year I had the privilege of helping to manage the reorganization plan which established the present mayor-council form of government for the District of Columbia. This plan, which was the President's proposal, has in the last few days been severely tested by events in the District of Columbia. The men whom the President appointed to fill the posts set up under the plan, in particular Mayor Washington and Deputy Mayor Fletcher, have given service to this community without precedent. In our gravest hour, they have given us their finest effort.

I know that I am not alone in commending the Mayor for his courage and leadership during these dark days. I know that I am not alone in commending the hundreds of businessmen, private individuals and members of the police, National Guard, and Army units for their heroic service to the Nation's Capital. What happened here was a breakdown in our ability to think and act as

a community. If we will it, out of this can come a renewed dedication to be a community.

To the President, the Mayor, and Deputy Mayor, to the members of the City Council, I thank you for your efforts through many sleepless nights to give this city the essential continuity of leadership so desperately needed.

## MARTIN LUTHER KING, JR.

Mr. GILBERT. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. GILBERT. Mr. Speaker, yesterday I attended the funeral of Dr. Martin Luther King, Jr. It was an honor I would have preferred to forgo. I would have preferred that Martin Luther King live to continue his great work in behalf of his country. He was a great American and a great patriot. It is amazing that in just 39 brief years he made such a magnificent impact that his name was known and revered around the world, in the capitals of powerful nations and in the mudhuts of impoverished peasants.

Martin Luther King was an inspiration to all of us. He brought honor to America. Even more important, he brought us a message of justice and reason. The American people shall sorely miss him. The Nation grieves at his loss.

## TRIBUTE TO DR. MARTIN LUTHER KING, JR.

Mrs. MINK. Mr. Speaker, I ask unanimous consent to address the House for 1 minute.

The SPEAKER. Is there objection to the request of the gentlewoman from Hawaii?

There was no objection.

Mrs. MINK. Mr. Speaker, tribute to a great man like Dr. Martin Luther King, Jr., is difficult to express in mere words. Yesterday I participated in the funeral procession in Atlanta, Ga., to express my esteem and respect for this great religious and spiritual leader and to underscore my own personal determination to make his life's dream of freedom and equality for our fellow Americans a reality.

Our Nation is not likely to see soon the emergence of such a leader among men who by the sheer strength of his teachings and the magnetism of his words could capture the conscience of all men of good will and dramatize the work that we must do in order to make real the American's creed of freedom from oppression.

His words stung deep into the hearts of Americans, and we must now rise to his challenge to create a society where all men may enjoy the blessings of liberty and opportunity.

An eloquent voice for justice has been silenced. Those who will now count among the living will be those who will be willing to transform their regard for him into actions which will achieve the goals to which this Nation has been since its inception dedicated.

The tragedy is that men must still die to win freedom and equality in America. Dr. King is dead; so long as he lived he bore the cross of our conflict, of our conscience and of our guilt. Sad that he should have died before his dream came true. Sad that his dream had to be only that, when America's pride was in its ideals of liberty and justice for all.

The time has come for America to free its soul of hate and begin to rewrite the chapters of our noble history so that human dignity can be the basis of our mode of life and the creed of our country.

## DR. FREDERICK SEITZ TO BE NEW PRESIDENT OF ROCKEFELLER UNIVERSITY

Mr. DADDARIO. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Connecticut?

There was no objection.

Mr. DADDARIO. Mr. Speaker, on April 4 it was announced by Rockefeller University in New York that Frederick Seitz would become the new president of that institution in the near future. Rockefeller University is to be congratulated upon its choice, but those of us in Washington who have worked with Dr. Seitz for a number of years as president of the National Academy of Sciences will most certainly miss him.

While Dr. Seitz will remain as a part-time president of the Academy until that post is subsequently filled, his principal duties will lie with the university in New York.

I should like to point out, Mr. Speaker, that it was under Dr. Seitz' tenure and with his assistance and vision that the Congress has been able to conclude, for the first time in history, contractual relationships with the Academy. These have been at the instance of the chairman of the Committee on Science and Astronautics, Mr. MILLER, and have resulted in several studies for the committee of the highest utility. Even though that relationship with Dr. Seitz will change, the mechanisms which he helped develop with the Academy will remain. We are grateful for this.

Mr. Speaker, I should like to incorporate the following brief biography of Dr. Seitz at this point:

Frederick Seitz was born in San Francisco, California, on July 4, 1911. After attending San Francisco schools, he entered Stanford University and graduated with an A.B. degree in mathematics in 1932. He earned a Ph. D. in physics at Princeton University in 1934 and remained there for another year as a Proctor Fellow. Since then he has been successively instructor in physics, 1935–36, and assistant professor, 1936–37, University of Rochester; research physicist, General Electric Company, 1937–39; assistant, then associate professor of physics, University of Pennsylvania, 1939–42; and professor and chairman of the physics department, Carnegie Institute of Technology, 1942–49. In 1949, he was appointed research professor of physics at the University of Illinois and in 1957, head of the physics department. He began a four-year term as President of the National Academy of Sciences in 1962, while continuing in his position at the University of Illinois. On September 1, 1964, he became Dean of the Graduate College and Vice President for Research at the University. He resigned the latter position effective June 30, 1965, following his re-election for a six-year term as President of the Academy under revised bylaws that provided for a resident, full-time president.

Dr. Seitz's major professional scientific interest has been in the theory of solids and nuclear physics. In addition to numerous review articles and scientific papers, he wrote *The Modern Theory of Solids* (1940) and *The Physics of Metals* (1943), published by McGraw-Hill. He is co-editor of *Preparations and Characteristics of Solid Luminescent Materials*, published by John Wiley & Sons in 1948; co-editor of *Solid State Physics* series, Academic Press, Inc.; and author of the chapter on "Fundamental Aspects of Diffusion in Solids" in *Phase Transformations in Solids*, John Wiley & Sons, 1951. He is also a member of the editorial boards of *Die Umschau*, *Il Nuovo Cimento*, and *physica status solidi*.

He was a civilian member, National Defense Research Committee, 1941–45; consultant to the Secretary of War, 1945; director of the training program in atomic energy, Oak Ridge National Laboratory, 1946–47; science advisor to the North Atlantic Treaty Organization, 1959–60; member, Statutory Visiting Committee for the National Bureau of Standards, 1962–66; consultant, Education Commission of Country, Government of India, 1964–66. He is now a member of the President's Science Advisory Committee; member, President's Committee on the National Medal of Science (chairman, 1962–63); member, Defense Science Board (chairman, Dec. 1963–March 1968), Department of Defense, member, Naval Research Advisory Committee (chairman, 1960–62), Office of Naval Research; member, Scientific Advisory Group, Office of Aerospace Research; member, Smithsonian Institution Advisory Council; member, National Science Service Scientific Advisory Group; member, Board of Trustees, Pacific Science Center Foundation; member, Midwest Science Advisory Committee (chairman, 1965); member, Science Advisory Council of Illinois (chairman, 1964–66); member, Policy Advisory Board, Argonne National Laboratory; member, Liaison Committee for Science and Technology, Library of Congress; consultant, Organization for Economic Cooperation and Development; member, State Department Liaison Committee on Science; and member of other advisory and liaison groups.

## INTERNATIONAL BIOLOGICAL PROGRAM AND GROWING PROBLEM OF PLANETARY ECOLOGY

Mr. DADDARIO. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Connecticut?

There was no objection.

Mr. DADDARIO. Mr. Speaker, the Washington Post on April 5 carried an editorial based on a report issued by the Subcommittee on Science, Research, and Development of the Committee on Science and Astronautics. That report deals with the international biological program and the growing problem of our planetary ecology.

As the editorial points out, these programs have to date been very poorly supported by the Federal Government, even though the administration has an-

nounced its support and created the administrative machinery to carry the program out. The amount of money necessary to get the program underway is extremely small in relation to the crucial nature of the problems it seeks to attack. Yet, so far we have not been willing to provide the necessary funds.

If we fail in this, our failure could be amongst the most devastating in history, even in comparison to present political, military and social dilemmas.

Mr. Speaker, the editorial is as follows:

BIOLOGICAL MYSTERIES

The International Biological Program has had little of the fanfare that accompanied the International Geophysical Year, perhaps because it is harder to put a finger on what the IBP is all about. But a thoughtful report of a House subcommittee on science, research and development underlies its importance and recommends that the Federal Government provide its programs with more support than they have yet received.

The main goal of the IBP, which was set up by scientists all over the world, is to help us learn more about what we are doing to the planet on which we live. The shortage of knowledge about what modern living and scientific advancement do to the balance of nature is frightening. Dr. David Gates, for example, told the subcommittee, "We do not understand the dynamics of a forest, grassland, ocean, lake, pond or river nor are we proceeding rapidly enough toward this understanding . . . We will go down in history as an elegant technological society struck down by biological disintegration for lack of ecological understanding."

The fact that we do not understand what happens in a lake may not seem of much importance. But in the last 25 years Lake Erie has been turned into a dead lake, nearly devoid of any fresh-water life. That means, obviously, an end to fishing. But it also means an end to the food supply of certain species of birds and, eventually, the end of whatever role those birds play in the rest of nature. And we don't really know what that role is as it affects agriculture and forestry. Similarly, the mass destruction of acres of forests and of grasslands has some effect on the cycle of oxygen and carbon dioxide in the air. But we don't know exactly what that effect is and we don't know whether we are approaching the point at which the air we breathe becomes so different in its composition that the plants we now know can no longer survive.

The list of problems of this type is endless. Is the production of heat by humans and by the machines they devise so great that in time the average temperature of the earth's atmosphere will rise to the danger point? Are we dumping so many pollutants into the atmosphere that the entire weather pattern will be drastically altered? Are we killing off so many species of animals and plants that eventually the world will be populated merely by man and the specific things he has domesticated?

It is questions like these that the IBP is attempting to confront. Its requests to the Government for aid have been small in terms of what it hopes to achieve—it is asking $200 million over five years. The subcommittee has recommended that it get $3 to $5 million next year as a starter. Surely a priority for such an amount can be found somewhere inside a Federal budget that is about 50,000 times more than that.

PRESENT CLIMATE TOO CHARGED WITH EMOTION FOR PRODUCTION OF WELL-REASONED LEGISLATION

Mr. ABBITT. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Virginia?

There was no objection.

Mr. ABBITT. Mr. Speaker, in my opinion, this is no time for the House of Representatives to be taking up a so-called civil rights bill. The present climate is too charged with emotion for the production of well-reasoned, well-thought-out legislation. This measure tends to deprive the people of America of the right to control their own property. The right to own and dispose of real estate is one of the basic fundamental rights of mankind. Never before in a free society has it been contemplated that the Government had a right to tell free people that they cannot sell their homes to whomever they choose. A man's home is supposedly in a free land to be his castle and here we find that the leadership of our Nation is trying to strike down this concept and compel free men and women to give up the right to control their own property and dispose of it as they see fit.

Disorder is rampant in the land—arson, armed robbery, murder, and rioting in the streets. The Nation is faced with armed insurrection and nothing worthwhile is being done by the administration to suppress it—only containment. Here we are today being asked to pass more civil rights legislation to deprive our law-abiding citizens of their rights and privileges. It is shocking to me that we now find ourselves in such a situation. It is shotgun action calculated to intimidate enough of the Members because of the grief throughout our land over the recent killing of a prominent citizen and the armed insurrection on the other hand of a vast lawless element.

What we need is a firm stand by this administration to restore law and order and not pussyfooting around in an apologetic manner to those who are trying to take over by force and might as we would expect in the jungles. Such conduct is expected only of wild beasts and paranoid creatures completely devoid of conscience. The law-abiding citizens of this Nation are entitled to better treatment than this.

I ask the membership of this body to turn down this legislation, to set it aside, to refuse to goosestep to the chant of the rioters and insurrectionists and then to see that law and order are restored to America that once again the average citizen may walk down the streets of America without the fear of being murdered, robbed, or raped or to find his home or business utterly destroyed by arsonists.

LAND OF THE FREE?

Mr. CASEY. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. CASEY. Mr. Speaker, when H.R. 2516 passed the House last year, it had not only my vote, but my wholehearted approval, because it was an act as the title stated "to prescribe penalties for certain acts of violence or intimidation." The bill preserved and guaranteed some of the freedoms which we all enjoy. The freedom to peaceably speak out in behalf of the cause of civil rights.

The United States has been known, since its inception, as the land of the free, and many of the freedoms allotted to our citizens do not meet with the approval of the majority of the people, but nevertheless, the majority of the people feel that every citizen is entitled to his basic freedoms whether we like them or not.

Yes, our citizens have the right and the freedom to criticize their own Government, even to the point of slurring and derogatory remarks against their Congressmen, their Governors, and even the President of the United States.

The black power advocates are free to voice their hatred of the white, and by the same token, the white supremacy advocates may vent their venom on the Negro race.

The Supreme Court has ruled that even those who deny God Almighty may insist that the majority must give in to their freedom to the extent that prayers are denied in school.

Traditionally, the ownership and control of land has been one of the basic rights and freedoms of this Nation of ours. The early immigrants came across the seas because they had the right to own and control their own land and homes. This has been the basic stimulus for the defense of our country.

Today, under consideration, is a proposal to tear down this great basic freedom. I do not deny the high motives of those who advocate this legislation, but do these ends justify the drastic means, and will anything of any magnitude be accomplished, other than this precedent of destruction of this basic freedom, which may come back to haunt us in the years to come?

As I stated in the beginning, the bill which we passed to protect civil rights workers in the peaceful exercise of their pursuit had my support, but now the other body has placed in the bill what is known as the open housing section. If you have read the bill, and I doubt if all the Members have read this bill, and I am sure most of the editorial writers have not, one section is completely unnecessary and meaningless. I refer to that portion dealing with property owned by the Federal Government, or which has been built, in whole or in part, with the aid of loans, advances, grants, or contributions made by the Federal Government. This is basically FHA and VA financed housing, as well as those types of housing for the aged and elderly financed by loans and grants under the Housing and Urban Development Agency. This housing was "open" by Executive order of the late John F. Kennedy, and I think rightly so, since all taxpayers' money was being used in this regard.

The balance of the section is an assault on the freedom of contract; and yes, even thought.

Do you know that this applies, not to just buildings in being, but applies to vacant land as well, because the bill

states that it includes "any vacant land which is offered for sale or lease for the construction or location thereon of any such housing, building, structure, or portion thereof." I think all of you familiar with the recent rulings of the Supreme Court will agree that the Court will consider any vacant land subject to these provisions.

Some of you are under the impression that an owner-occupied, single-family dwelling is exempt. Read the bill, for after December 31, 1969, there will be no exemptions as a matter of practical application.

The other body also placed an amendment to this bill a section in which they endeavor to deal with militants, black and white, who conduct instruction in the making of firearms or explosive or incendiary devices. This section is so worded that it affects every lawful manufacturer of firearms in this country, including those who are making arms for our fighting men in Vietnam. It is so worded that an Attorney General of the United States could stop the shipment of every shotgun or hunting rifle in the United States.

We should not act hastily on accepting the other body's amendments. Did they not spend several months on these amendments? Should we not at least spend more than 1 hour on the consideration of these amendments?

Due to the basic rights of all citizens involved herein, the courageous thing to do is to send the bill to conference where these amendments can be considered with deliberation.

I will have no disrespect for those who see differently than I do in this regard, because that is the very basis of my argument here today, that it is your basic freedom to think as you please, but by the same token, let us preserve it for all the Nation.

---

## WE ARE CALLED UPON TO MAKE A BEGINNING IN STRUGGLE FOR CIVIL RIGHTS

Mr. CORMAN. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from California?

There was no objection.

Mr. CORMAN. Mr. Speaker, the events of the past 4 days have taken a terrible toll of human life and property.

A man who worked for the peaceful attainment of liberty and equality has been murdered. Our city streets have once again been torn by violence, burning, and looting. Seldom, if ever, have we been faced with a domestic problem approaching the critical proportions of the present crisis.

Every man has a choice, Mr. Speaker. A white man can, as one did in Memphis, commit murder for what appears to have been a racist cause. Or a white man can feel sorrow and shame for the inequality and lack of opportunity which besets many Americans and go about doing something constructive to improve the situation.

A black man can join the forces of hatred and racism too. He can "get a gun" and take to the streets. Or a black man can remember the words of Dr. Martin Luther King, who time and again pleaded for nonviolent efforts to attain equality for Negro Americans.

We in the Congress have a similarly profound choice, Mr. Speaker. We can sit and deplore, for whatever reason is most comfortable, the havoc that is shaking this Nation. We have done that often enough.

Or we can stand up and furnish the leadership necessary to end the vicious and deep-rooted causes of racial hatred and fear—causes so recently set out in the report of the President's Commission on Civil Disorders.

We can continue to deplore—but have we not had our fill of that? Are we not at long last ready to take up the hard and costly battle for equal justice and to recognize that this is to be no "limited war"?

In the House of Representatives today there is a bill which would, if written into law, make a beginning on the road to victory in this struggle. It would be nothing more than a beginning—and this should be recognized, because there can be no comfort taken in any false hope that the battle we join will be brief.

But a beginning is what we are called upon to make today. Making the beginning—promptly—will serve at least to show our citizens, black and white, that racism, poverty, and ignorance are being challenged. I urge Members of the House of Representatives to take that first step—now—before any thought is given to an Easter recess—by approving the amended bill H.R. 2516.

---

## WE SHOULD NOT CONSIDER CIVIL RIGHTS LEGISLATION UNDER PRESENT SENSITIVE CIRCUMSTANCES

Mr. BURLESON. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. BURLESON. Mr. Speaker, obviously the House is proceeding today under sensitive circumstances. Frankly, in my opinion we should not be in session at all and specifically, we should not be considering the legislation before us under prevailing conditions.

There is not a Member here who would not assume that I am opposed to the pending bill but let me say to those of you who support it that you would do well for the country to wait for a more sober and a more calm atmosphere to act than is the obvious case at the present time.

I think if I were for this so-called civil rights bill, with its open housing feature, I would not want to cast my vote for it while soldiers and marines are having to stand guard in front of this Capitol. I resent threats of force and duress in anything and if I had to legislate under such conditions I would walk out of this Chamber and not return.

There is a way to honorably and with courage meet this issue, since apparently it is going to be acted on within the next hour or so. That is, to send this measure to conference with the Senate. Let differences between the House and Senate bills be resolved and brought to each body for approval or disapproval under more calm circumstances.

This matter has no deadline except the threats of these groups who look for any excuse to riot and demonstrate. If it is not this, it likely will be something else. When the drums call they will be there and it is high time we challenge the drummer.

It is a sad commentary on this Congress if it yields to the pressures of the moment. I for one had rather yield my seat in this House than to do so.

---

## IT IS IMPOSSIBLE FOR CIVIL RIGHTS LEGISLATION TO RECEIVE RATIONAL CONSIDERATION IN PRESENT CIRCUMSTANCES

Mr. HUNGATE. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Missouri?

There was no objection.

Mr. HUNGATE. Mr. Speaker, we meet in the midst of 13,000 troops called to protect life and property against the threat of imminent destruction. Three blocks from this Chamber shops and stores are boarded up against further pillaging. Three blocks from the White House buildings are looted and burned. This may be the way to move this Congress. It is not the way to move this Congressman. I think it would be appropriate, under the circumstances, if necessary, to consider legislation for the strengthening of the police and the levying of troops or taxes for their support. But it is scarcely otherwise a time or place for calm, deliberate legislative decisions.

If an example is wanted of legislative lightning followed by administrative molasses, see the Gulf of Tonkin resolution. A joint session of Congress is presently inadvisable. The President cannot even go to a funeral in safety. Civil disorder is a national epidemic. It does not spare the 20 States who already possess civil rights legislation with open housing provisions, many of them stronger than that under consideration here. Their effects in New York, California, and New Jersey have been less than overwhelming.

It can be argued that those who would salve consciences with legislation, the benefit of which would be long in coming, if indeed, they ever appear as advertised, do more to disillusion the disadvantaged than those who adamantly oppose such proposed legislation.

I think particularly of those who would support a people's greatest aspirations with everything except money. These are the same people whose concern for economy and detail would lead them to search

for a needle in a haystack, if it was their needle.

This country has real problems that it will take real money and real taxes to solve. But you as Congressmen will get different letters from different people when the time for that action is here.

While the compliment is doubtless well intended, I think it ill behooves the House to dispose of legislation in 1 hour which occupied the Senate for months. I have supported, and urge all of you who support this bill today, to give substance to this bill's promises by supporting model cities, aid to education, and farm legislation to aid those areas where 50 percent of the Americans in poverty live. Can a nation which grants a $20 million tax benefit to one corporation afford $10 million to supplement the rent of those in ghettos so that they may have not only the right to move but the money with which to do it? Can a nation which can afford to lose $12 million on two airplanes in 3 days, can such a nation afford $10 million for better housing for its citizens over a 1-year period?

Under present circumstances, it is impossible for this legislation to receive the rational consideration it deserves. Therefore, I shall vote against the previous question and if the bill is nonetheless to be considered at this time, my vote shall be "present."

## FUNERAL OF MARTIN LUTHER KING

Mr. O'HARA of Illinois. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

Mr. O'HARA of Illinois. Mr. Speaker, on yesterday, the 9th of April in the year 1968, there were two record votes and three quorum calls I, who pride myself on attendance and regularity in answering all quorum calls and record rollcalls, missed them all, and I have no apologies to offer. With some 60 of my colleagues I was in Atlanta, Ga., at the Ebenezer Baptist Church and on the campus at Morehouse College representing the Congress of the United States at the funeral of the Reverend Dr. Martin Luther King. My colleague from Chicago who came with me to the 81st Congress, Mr. YATES, and my colleague from the Springfield district, Mr. FINDLEY, with the junior Senator from Illinois, Mr. PERCY, made up the delegation from this Congress from the State of the martyred Abraham Lincoln to the funeral of the martyred Martin Luther King. Illinois also was represented by its great Governor, Otto Kerner.

I think it was in the minds of all of us, as certainly it came to me several times during the sorrowful services in Atlanta, that the assassination of Lincoln and the assassination of King both were cruel and hideous aftermaths of man's inhumanity to man when slaves were brought to America to do our work.

Lincoln sought to free the slaves, and the price he paid for the chains ham-

mered from their wrists was death from the gun of an assassin.

King sought to free the people of whom he was one from the social chains of prejudice and discrimination, and the price he paid was death from the gun of an assassin.

Mr. Speaker, I hope and pray that the day is dawning when not only in our own beloved country but in all the countries of the world there will be peace and good will and forever will be ended the harsh cruelty of man's inhumanity to man.

I could not conclude these observations on the rarified atmosphere in which your delegation to the funeral of Martin Luther King spent yesterday, when the House was answering to many quorum calls and record votes, without mention of the fine young men from the century-old Morehouse College and the fine young women from the companion woman's college, who labored in the hot sun for many hours directing and aiding in every possible way the many thousand visitors who had come to pay a tribute of love. They constituted a student body of which any school in the land could have been proud. My warmest congratulations also go to the members of the Morehouse College Glee Club, a magnificent organization of accomplished musicians.

Mr. Speaker, had I been here, my vote on rollcall No. 92 would have been "no," and my vote on rollcall No. 93 would have been "aye."

## PROPOSED LEGISLATION DENIES LENDER AUTHORITY TO DETERMINE WHETHER OR NOT TO MAKE LOAN

Mr. WAGGONNER. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Louisiana?

There was no objection.

Mr. WAGGONNER. Mr. Speaker, time is going to be so limited during the debate on the bill this afternoon, that I want to bring in this 1 minute the attention of the House to something that few Members know is in the bill. Before we vote, I want Members to get the bill and read it—which I know some have not done. Turn to page 29, section 805, which is the section entitled "Discrimination in the Financing of Housing." Read it, because, gentlemen, it is so written that it can be interpreted to deny any lender authority in making the determination whether or not he can make a loan.

There are some other factors in which discrimination is involved, but the basic decision of whether or not a loan will be made could be totally denied to any lender.

My colleagues, this bill must at least go to conference for clarification. You are yielding to blackmail if you do less. Even a member of the Rules Committee said he was afraid of what would happen if we did not pass this bill. He made this statement when I was before that body on Monday last. Do not make this House a second-class legislative body. You

should at least have a part in writing this legislation and then vote for it or against it on the basis of merit and not emotion.

## EMERGENCY FAMILY LOAN PROGRAMS FOR VICTIMS OF CURRENT CIVIL DISORDERS

Mr. FARBSTEIN. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. FARBSTEIN. Mr. Speaker, yesterday, I called on the Acting Director of the Office of Economic Opportunity to immediately allocate funds to set up emergency family loan programs for victims of current civil disorders in Washington and other cities who desperately require this assistance.

Experience has shown that one of the most pressing problems faced by low-income families, not on welfare, in a crisis situation, is the need for money to buy such basic staples as food, clothing, medicine, and housing. Time is of the essence. These persons usually have little or no savings. They possess no financial reserves to cushion the blow of a crisis.

In my opinion, the family emergency loan program which I originally sponsored is one of the most useful anti-poverty programs in the Nation. In this time of crisis, I can think of no more responsive or decisive act the Government can take to meet the urgent needs of families than to establish immediately this program in disaster areas. I urge the Office of Economic Opportunity to make funds available at once.

Funds of the Small Business Administration have been made available for business damages resulting from the recent disorders. Surely the Government has a responsibility to people—victims of the disorders. There is authority in the Economic Opportunity Act to do so. Last year, of $8 million set aside for this purpose, loan programs were authorized in only 17 States, $2½ million being allocated therefore; the balance of $5½ million which should have been used for those programs throughout the entire Nation were diverted to other areas of the antipoverty program. I urge an allocation of at least $10 million to be distributed throughout those areas in the Nation where these emergency loans are required.

## PRESERVATION OF THE INTEGRITY OF CONGRESS

Mr. POOL. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. POOL. Mr. Speaker, on the civil rights bill we will have 1 hour of debate. Being more or less a junior Member of the House, I probably will not have

any time allotted to me to talk, so I want to read to the House two paragraphs of a letter I received today. It is in opposition to the civil rights bill.

The integrity of Congress must be preserved, for Congress, it appears, is the only place left for the people of this country to look for the preservation of our American system of due process of law and the recognition of the rights of its citizens as *individuals*. Apparently, many of our national leaders are so ambitious for block votes that they are willing to pour further fuel on the fire in encouragement of these groups which are making destruction and violence so widespread throughout the country.

Congress must not pass legislation out of fear and in response to threats. The advocates of more so-called "Civil Rights Legislation" should be told in no uncertain terms by Congress that the first order of business is a cessation of violence and disregard of the laws of the land.

I agree with my constituent who wrote these words. I pray we have the stamina to stop this unconstitutional bill.

---

## WASHINGTON DAILY NEWS COMMENDS PRESIDENT JOHNSON'S PLEA FOR UNITY

Mr. NEDZI. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. NEDZI. Mr. Speaker, President Johnson—in the words of the Washington Daily News—"made a noble move" to end the divisiveness which threatens the future of America.

By eliminating the Presidency from politics, Lyndon Johnson has made a bid to restore unity where there is now disunity, common purpose where there is now partisan division.

The strength of our country, now as in the past, lies in the unity of our people. This is not the unity of common means, but of shared dreams, not of identical solutions but untied purpose. Only through this unity can America survive the enormous challenges of this decade.

Abroad we seek an honorable solution to a bloody war. At home we seek national reconciliation for a nation rent with division and torn with racial anguish. United we cannot fail, divided we cannot succeed.

President Johnson has set an example for the Nation of devotion to peace and unity which all Americans must emulate.

In the troubled days ahead we must debate, but never delay, we must discuss, but never divide, in our attempt to bring economic stability and social justice to the Nation and a just peace to the world.

As the Washington Daily News puts it, President Johnson "has put it up to the rest of us to do our part." I am certain that the American people will not falter before the challenges of today—and tomorrow.

I include in the RECORD the editorial from the Washington Daily News.

THE PRESIDENT'S STUNNING DECISION

President Johnson always has been a man of surprises—but never before did he, or any President, drop such a spectacular surprise

on the American people as Mr. Johnson delivered Sunday night.

He not only said he would not run for reelection—he would not accept renomination on the Democratic ticket.

His statement was as irrevocable as such a statement can be.

Since becoming President in 1963, indeed throughout his political career, Mr. Johnson has been a consensus man.

His decision not to run again clearly was an extreme bid—the most extreme he could make—to restore unity among the American people. His purpose was to eliminate himself as a divisive factor.

"I have concluded," he said, "that I should not permit the Presidency to become involved in partisan divisions that are developing this year."

He followed that by reiterating a philosophy he often has extolled:

"Whatever the trials and tests ahead, the strength of the country will lie . . . in the unity of the people."

The unity Mr. Johnson seeks obviously is the unity demanded to bring the bloody, frustrating, prolonged war in Vietnam to a just conclusion.

Coupling his withdrawal from the Presidential contest with his new appeal to North Vietnam for peace talks and his decision to stop most of the bombing of North Vietnam, Mr. Johnson was making an unprecedented gesture to prove to the nation his own devotion to peace.

Although he is a man of complex character and his motives have not always been clear, Mr. Johnson's action in this amazing instance hardly can be suspected of anything other than what he said it was: To regain for the next 10 months some of the consensus to which he has been so beholden, especially as applied to the war effort.

But the question is—an enormous question—whether it will work.

It may soften the personal attacks on Mr. Johnson by his anti-war critics. It should erase the suspicions, which inevitably would have arisen if he were a candidate, that his war policies were geared to the election.

But Mr. Johnson has made a lame duck of himself.

Hanoi has not listened to his reasoning or any of his proposals up to now. Is Ho Chi Minh any more likely to listen to a President whom he knows will be out of office within the year?

Of late, Mr. Johnson has had increasing trouble getting action from Congress on any of his proposals. Will his withdrawal from the Presidential race enhance his influence in Congress? It is not likely to.

Nevertheless, Mr. Johnson has made a noble move. The magnanimity in his purpose cannot be disparaged.

The consequences are not at once predictable. But, one way or another, they are apt to be substantial.

We hope, and we think the President's action deserves, the results he intended: That the debate in the coming political campaign be constructive, and not merely petty; that the people and the Government unite as they did in World War II to push more than ever for a just conclusion of the war; and action in Congress to bring economic stability on the homefront—higher taxes and reduced spending.

Mr. Johnson at least has put it up to the rest of us to do our part.

---

## ATTENDANCE AT FUNERALS FOR POLITICAL PURPOSES

Mr. HAYS. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Ohio?

There was no objection.

Mr. HAYS. Mr. Speaker, I despise violence, and I believe the most cowardly form of violence is assassination.

My heart goes out to the family and friends of Dr. Martin Luther King, who was struck down by a cowardly assassin's bullet.

Some people asked me why I did not go to the funeral yesterday, and I replied it would be completely out of character for me had I gone. I have never made a practice of going to funerals in my own constituency except those of extremely close friends. I believe the bereaved family wants only close personal friends near them in time of deep grief.

I just do not believe funerals ought to be used for political purposes by announced presidential candidates. I thought the most poignant thing I heard about the funeral of Dr. King yesterday was of the aged Negro woman who was a member of his parish who wandered around and was unable to find a seat, she said, because of all the rich white people who had come in to be present in front of the television cameras.

---

## ATTENDANCE AT THE FUNERAL OF DR. KING

Mr. CONYERS. Mr. Speaker, I ask unanimous consent to address the House for 1 minute.

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. CONYERS. Mr. Speaker, on behalf of all of those Members who came to Atlanta to participate in the last rites for Dr. King, I want to thank them from the bottom of my heart. I do not know of anybody who was down there to make political mileage out of traveling under those very adverse circumstances. They came to make certain that they at least identified in death with the great principles of what I considered to be one of America's great leaders, not black leaders but great leaders, period. I think it was tremendous; I think it was moving, that so many people came there yesterday, not just from the political sphere but concerned Americans at all levels of our life.

Yes, Mr. Speaker, the church was overflowing. Certainly there were many more present than the several thousand people who were able to get in. Many of the dignitaries, including the Members of Congress, were unable to get in, because we asked that only personal friends of the family be admitted to the church services. Most of the congressional delegation present were not inside the church at all, but, instead, joined some thousands in the march to the Morehouse campus to participate in the last rites conducted there.

Mr. O'HARA of Illinois. Mr. Speaker, will the gentleman yield?

Mr. CONYERS. I am glad to yield to the gentleman from Illinois.

Mr. O'HARA of Illinois. Mr. Speaker, I feel—and I know I speak for many Members of the House in this—that we owe a great debt of gratitude to the distinguished gentleman from Michigan,

Mr. CONYERS, who made it possible for this body to be represented at the funeral of Dr. Martin Luther King yesterday. I estimated there were 60 of us on the plane that left Washington early in the morning and were in attendance at the funeral and at the ceremonies at Morehouse College. I believe the vast majority of the membership of the House were pleased that this historic body was represented at a funeral that in a large sense rededicated this country to its mission under God. It could not have happened had it not been for the pioneering, the planning, and the hard, earnest work of the gentleman from Michigan.

Mr. CONYERS. I thank the gentleman from Illinois.

Mr. BURTON of California. Mr. Speaker, will the gentleman yield?

Mr. CONYERS. I yield to the gentleman from California.

Mr. BURTON of California. Mr. Speaker, I, too, would like to add my word of commendation to our distinguished colleague, my friend, the gentleman from Michigan [Mr. CONYERS]. His efforts made it possible for the congressional delegation, some 70 or so members, to attend the most moving and impressive services for Dr. King in Atlanta yesterday.

I was happy to join with him and my colleagues in this personal expression of sympathy to Dr. King's family and of respect for all that this heroic man stood.

Dr. Martin Luther King, Jr., a man of peace, a man of God, a leader of his people and of this Nation is dead. He was taken from among us cruelly and stealthily by an assassin's bullet. Yesterday, I was in Atlanta, Ga., where he was laid to rest "free at last."

Our Nation mourns him but we do not despair because his words of hope still ring in our ears.

Our Nation is touched again by tragedy and loss but his courage binds us together and leads us on.

Our Nation's sight is blurred with tears and sorrow but his vision is clearly before us, summoning us to the cause for which he gave his life.

Our Nation is sleepless in its grief and shame because his dream is still to be accomplished.

Martin Luther King spoke of that dream on the steps of the Lincoln Memorial in 1963. His words rang out then and the echo of those words can be heard even now.

Let us not wallow in the valley of despair. I say to you today, my friends, even though we face the difficulties of today and tomorrow, I still have a dream. It is a dream deeply rooted in the American dream. I have a dream that one day this nation will rise up and live out the true meaning of its creed: "We hold these truths to be self-evident that all men are created equal."

Martin Luther King would not have us mourn, "as those who have no hope." He would have us carry on the quest for peace, for human dignity, the quest to fulfill his dream. The first step toward fulfillment of that dream must come now with the speedy enactment of the Civil Rights Act of 1968, but more must follow. Jobs, education, training, better housing, expanded public assistance, and health services administered with concern for human dignity must follow.

More than that, the quickened conscience of the Nation must harken to the words of Dr. King and understand the motivation of this heroic figure. He said:

More than ever before, my friends, men of all races and nations are today challenged to be neighborly. The call for a worldwide good-neighbor policy is more than an ephemeral shibboleth; it is a call to a way of life which will transform our imminent cosmic elegy into a psalm of creative fulfillment. No longer can we afford the luxury of passing by on the other side. Such folly was once called moral failure; today it will lead to universal suicide. We cannot long survive spiritually separated in a world that is geographically together. In the final analysis, I must not ignore the wounded man on life's Jericho Road, because he is a part of me and I am a part of him. His agony diminishes me, and his salvation enlarges me.

Dr. Martin Luther King could not ask the Biblical question, "Am I my brother's keeper?" For him, the answer was as obvious as it was forcefully affirmative.

He was involved in mankind. He was concerned and that concern extended from collective bargaining rights for sanitation workers in Memphis where he gave his life to the right of Negro men and women to sit on buses in Montgomery where the cause of human dignity first propelled him into the national spotlight.

His concern for humanity and the dignity of the person made his advocacy of the nonviolent confrontation inevitable. A man of reason, he challenged men to act reasonably. A man of justice, he challenged men to act with justice. A man of God, he saw clearly and challenged others to see the spark of divinity in each man which makes sacred human life and gives dignity to our humanity. This concern caused him to be jailed. It also caused him to be honored with the Nobel Peace Award.

It was natural that this man of peace who sought justice at home should speak out so clearly and eloquently against the injustice and brutality of the war in Vietnam. Dr. King lived the Sermon on the Mount and lived the words, "Blessed are the peacemakers."

Martin Luther King was the apostle of nonviolence and peace, and his life, his words, his deeds and his martyr's death gave witness to his creed. He is no longer with us but in the forefront of every struggle for human dignity, for peace, his spirit will march on.

Men will continue to dream his dreams and in the words of the song of the movement:

    Black and white together,
    We shall overcome!

We shall overcome injustice and enslaving poverty.

We shall overcome bigotry and prejudice.

We shall overcome the vestiges of hatred which have led us to tragedy.

Freedom will ring out—

In Dr. King's words—

from the prodigious hill tops of New Hampshire. Let freedom ring from the mighty mountains of New York. Let freedom ring from the heightening Alleghenies of Pennsylvania. Let freedom ring from the snow-capped Rockies of Colorado. Let freedom ring from the curvaceous slopes of California. But not only that, let freedom ring from Stone Mountain of Georgia.

Let freedom ring from Lookout Mountain of Tennessee.

Let freedom ring from every hill and molehill of Mississippi. From every mountainside, let freedom ring. And when we allow freedom to ring, when we let it ring from every village, from every hamlet, from every state and every city, we will be able to speed up that day when all of God's children, black men and white men, Jews and Gentiles, Protestants and Catholics, will be able to join hands and sing in the words of the old Negro spiritual: "Free at last! Free at last! Thank God Almighty, we are free at last!"

As we consider the civil rights bill today, we have the opportunity to take one more step toward the fulfillment of Dr. King's dream and one more step toward freedom.

## OPPOSITION TO PASSAGE OF CIVIL RIGHTS BILL

Mr. TUCK. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Virginia?

There was no objection.

Mr. TUCK. Mr. Speaker, I rise in opposition to taking up H.R. 2516 at this time and also in opposition to the passage of the bill at any time.

Legislation of an emotional nature should never be acted upon by the Congress at a time when we are faced with tensions such as those which now exist throughout the Nation and particularly here in Washington. Laws should be considered and acted upon only in an atmosphere of careful and thoughtful deliberation.

The so-called civil rights bill now before us, as well as previous ones, is highly objectionable to those who have regard for the principles of liberty embodied in the Constitution. The loss of life and human suffering both have been terrific in recent weeks and in more recent years. In fact, we have had trouble, as I predicted we would, ever since the passage of the first civil rights bill in 1957. Millions of dollars in property loss has been sustained.

The horrendous situation which now exists is accentuated by what appears to be a complete and abject surrender of the executive and legislative departments of our Government to these ruthless racists, looters, thieves, and incendiarists whose real object is to pillage and plunder and also destroy the Government of the United States. Action upon this bill today is an open and written invitation to these despicable groups and characters to multiply and increase the harm and evil which they have already done.

The slaying of Martin Luther King, Jr., was a cruel and wanton act. The perpetrator thereof should be apprehended and given the extreme penalty of the law. It is my fervent hope that this senseless murderer will be brought to justice speedily. I deprecate violence. The killing

056600

of King was indeed unfortunate. The man who committed this crime has done a great disservice to our country, and his act serves to exacerbate the racial tensions and hatreds which were already intolerable throughout the Nation.

I have heartfelt sympathy for the bereaved family of the deceased. However, in expressing sympathy to the members of the bereft family, the Nation should not overlook certain outstanding characteristics of the life and career of Martin Luther King, Jr.

Although it is conceded that he openly advocated nonviolence, he fomented discord and strife between the races. Violence followed in his wake wherever he went, North or South, until he himself fell a victim to violence. He who sows the seed of sin shall reap and harvest a whirlwind of evil. I believe with the Bible that he who takes up the sword shall perish by the sword.

This victim of murder preached compliance only with the laws he approved of and thus was in contempt of statutes not to his liking. Hence, he and his followers, in a most brazen and flagrant manner, flouted the time-honored concepts of this Nation, which is one of laws and not of men.

In one of his last public utterances, he openly stated that he intended to violate a solemn court injunction. At the same time, he was planning to invade Washington with a horde of the hosts of evil, to disrupt and stay the wheels of the Government of the United States. Every sensible person knows, as he himself must have known, that such an act would result in wholesale property destruction, bloodshed, and death to this beleaguered city.

This man trampled upon the laws of our country with impunity, and the Stokely Carmichaels and the Rap Browns were spawned in the waters of hate agitated by his public utterances.

Thus it is discouraging to observe the extent to which the President of the United States and others in high political office have lost perspective in this period of turbulence. The candidates for President in both of the larger political parties joined in this display of maudlin and effusive sentimentality. Dignified and appropriate display of sympathy is always fitting and proper.

I hope that the American people will insist upon a rigid and firm adherence to justice and to a prompt and resolute enforcement of all the laws at every level of government and the swift and certain punishment of law violators irrespective of whether they be white or black.

Mr. Speaker, on April 4, prior to the death of King, I made a statement before the Rules Committee of the House of Representatives in opposition to H.R. 2516, and the same is as follows:

Mr. Chairman, I am grateful to you for allowing me to appear in opposition to H.R. 2516.

On many occasions in the last 11 years I have spoken out in the hope of blocking legislation of this type. That which the Congress already has adopted has done the country tremendous damage. I cannot acquiesce in the reasoning that we should add evil to the already mischievous legislation now on the statute books and thus stir into a maelstrom the seething cauldron of social unrest that already has reached serious proportions and threatens to get worse.

I made the prediction in 1957 that the adoption of the initial so-called Civil Rights bill would be marked by countless future years of irritation and acrimony. I pointed out that, instead of relieving the tensions, it would exacerbate whatever tensions and prejudices were already in existence.

The proponents of the measure contended that the legislation was needed because it would bring peace and tranquility. Where is that peace? Certainly not in the riots which have rocked our cities during recent years and are forecast to be even worse during the summer of 1968. The situation has become infinitely worse and has reached desperate stages. I think longingly and nostalgically of those years of peace, years free of strife, when we had no civil rights legislation.

I cannot see that the legislation of this nature which has successfully passed through the Congress and which I have constantly opposed has done us one iota of good. On the contrary, in my opinion it has done us grave harm by bringing on boundless trouble, misunderstanding, bitterness and hatred where cordiality formerly existed. And now we are considering a proposal designed to deter and punish interference by force or threat of force with activities protected by Federal law.

This bill has been in the Senate since last year. It was almost completely rewritten, making it a more punitive bill than was approved in the House where it was first considered. Now provisions have been added, some not at all germane to the title of the bill, some so drastic and ill-conceived that they constitute the measure's worst features. Despite this, our leadership, with encouragement from the White House, is suggesting that we accept them en toto without further study.

I do not think we need this bill, and I am convinced we will be making a serious mistake to accept even in part the changes which the Senate has made.

My main reason for disapproving of this horrendous measure is my desire to preserve our time-honored American freedom, a goal that has been a guiding light as I have throughout my long years in public life. This bill strikes a serious blow at our liberty. Its proponents say that it is aimed at eliminating discrimination, and yet couched therein are flagrant provisions that abet and condone discrimination. Moreover, they would do grave violence to individual rights, the bedrock upon which the nation was built and for which our forefathers struggled for generations to establish and preserve.

It has always been my understanding that the Constitution and the laws of this nation have as their purpose the protection of the right of its citizens to equal justice. I cite this assumption as typical of America and of her form of government. The bill we now have before us is clearly unconstitutional and out of harmony with our American way of life. It extends rights and protections to a limited group. If it is to operate for any, Federal justice should be extended to all. I need not point out to you the dangers of legislation which serves only a few, as our earlier civil rights bills have sought to serve.

The most objectionable feature of the bill we now have under consideration is involved in Title VIII, the so-called open housing provision. Herein lies the main reason for the controversy which has developed over this legislation. What its open-occupancy clause does in effect is say to every owner of residential property that he cannot sell or rent his residential property to the person to whom he wishes if some other private individual objects and demands that he himself be permitted to buy.

While we are told its purpose is to wipe out discrimination, this bill clearly permits discrimination in certain instances. You will see that it allows the single-family home-owner to discriminate if he owns three or fewer single-family houses, sells no more than one in any two-year period, sells without the service of a broker, and sells without any discriminating advertising. Also exempt are dwellings occupied by no more than four families living independently of one another, if the owner maintains and occupies one of the units involved. Religious institutions and private clubs also are permitted to discriminate in non-commercial operations.

Banks and similar institutions, as well as brokerage services, on the other hand, are forbidden from discriminating.

I have always understood that every man has a right to trade or refuse to trade with anybody on any ground whatsoever. This bill, however, would give one citizen the right to acquire property from another citizen who does not wish to sell it to him. By this process, we would lose a degree of freedom that is deeply rooted in our traditions and in our common law. It would mean that the Federal Government could give one person a certain right even if, in so doing, another person was deprived of a right.

Economic security of private property is the only dependable foundation of personal liberty. Yet this bill would authorize the government to force a homeowner to rent a room or sell his home to a person with whom he does not choose to execute a rental or sales agreement. It seems to me that to require the owner of a home to enter into a contract with one not of his choice is an affront to our traditions of freedom of contract. We have always in the past felt safe in the thought that we need not, without our consent, become involved in a contract with someone else.

The Constitution grants no such powers. The power to enter into a contract willingly is a fundamental right. I know of no justification in forcing a person to enter into a contract with another person for the disposition of private property against his will.

What we would be doing in effect is converting private homes into public utilities. Public utilities must dispense their services without arbitrary discrimination, which is the main difference between public and private business. This bill would impose the obligations of public utilities on the homeowner, which, according to my interpretation of the law, has no constitutional foundation.

The proponents of this bill base its constitutionality on Section 5 of the 14th Amendment, which empowers Congress to enact laws applicable to private discrimination. They also cite the commerce clause as a constitutional basis for forcing homeowners and rental property owners to contract with persons other than those of their choice. It is true that the component parts of a home may at one time have flowed in commerce, but the finished home has stopped its traveling and is a part of the land. To hold that the rental of a room in a home, or the sale of real estate, is part of interstate commerce is fatuous. The only movement of real estate is the movement of the earth, and that was going on long before anybody heard of commerce.

If private homes fall under the commerce clause, nothing falls outside of it, not even household articles.

Under this bill, any offended party may file a complaint with the Secretary of Housing and Urban Development, who is authorized to devise programs of voluntary compliance. If the Secretary is unsuccessful, the offended party may go into a Federal District Court and seek an injunction or other court order. If proof of discrimination is established, the court may award actual and punitive damages, together with court costs and attorney fees. No reputable attorney or title guaranty company would be willing to certify to the title of any real estate conveyed after the passage of this act for fear that both parties would become involved in expensive and endless litigation. Because of the rank

invasion of the field of private rights that this bill involves, the only hope that a sensible person has is that it will not be enforceable. It will serve only, as have its predecessors, to create new sores of unrest and dissatisfaction in a society that is already suffering from nervous prostration and is on the verge of anarchy.

Title I of this bill prescribes punishment for interfering with persons in the enjoyment of certain rights, including voting, enrollment in public schools and colleges, participation in Federal programs, and use of common carriers and facilities. This is clearly aimed at protecting the civil rights workers who go from place to place fomenting strife and discord and stirring up racial violence.

It is obvious that this bill serves to protect agitators and incitors, and I will not offend your ears by calling the names of some of these. If legislation along this line is needed, it should be designed to punish these persons for the heinous misdeeds which they have committed upon society and which have resulted in destruction of property and loss of life.

This bill is a threat to the powers of the states and represents an unwarranted incursion upon the states' authority and responsibility for the enforcement of the law and suppression of public mischief. However, I must commend it for the provision that would impose a fine of $10,000 and a prison sentence of five years upon anyone who travels in interstate or foreign commerce for the purpose of inciting a riot. I introduced similar legislation in both the 88th and 89th Congresses, but failed to get it even before a subcommittee. At that time racial disturbances were confined to Danville, Va. As soon as they spread to New York and Chicago and Detroit and other large cities, the House of Representatives was stirred to pass an anti-riot bill, H.R. 421, by an overwhelming majority.

The focus of any legislation looking toward the stoppage of riots is good, so far as its intentions are concerned. However, I will tell you the best way to stop riots:

The law should be enforced in such a manner that no city should have to cope with mobs gathered on the streets in violation of state and local laws and court injunctions. Those who disturb the peace and break our laws, irrespective of their race, creed, or color, must be dealt with firmly and resolutely and in such fashion as to make them and all others like them know that lawlessness will not be tolerated in any locality in the United States of America. Instead of intimidating, harassing and impeding our police officers, the government at all levels, local, state and national, should let these policemen know that they are expected to use whatever force is necessary to complete an arrest and to subjugate a criminal. At the same time, if help from the state or national government is needed, the local authorities should be assured that it will be promptly forthcoming.

This nation was founded on the principle that observance of the law is the eternal safeguard of liberty. Defiance of the law is the surest way to tyranny. Few laws are generally loved by all citizens, but they are to be respected and not resisted. A man may disagree with the law, but no man may disobey it. We must have a government of laws, not of men.

We must forthwith put an end to the practice of minority group leaders who go about telling the dissatisfied element that they should obey the laws they favor and violate the ones they do not like. These men are a danger to our society. We have too great a country to stand idly by and allow lawless and irresponsible men to encourage lawless and riotous conduct.

The rights of law-abiding citizens should take precedence over the rights of criminals. When a crime is committed, the question in law should be whether or not the accused is guilty and what punishment is merited and not a determination as to whether or not the criminal had a lawyer before he confessed. There are no indications that our law-abiding citizens need further protection from the police, while there is every indication that they need considerably more protection from the lawless.

The claim is made that our troubles can be traced to the ghettoes. I can see little relationship, if any, between impoverished circumstances and criminal behavior. There is overwhelming evidence that poverty does not cause crime and that elimination of poverty will not prevent crime. America has had less poverty in 1967 and 1968 than in any previous years in our history. If the argument of these politicians and sociologists is correct, we would have had a genuine revolution all over the country in the depression years of the 1930's and our present prosperous days would be marked with unprecedented peace and tranquility.

The most effective method the Federal Government could employ to assist in the suppression of crime would be to support the states and localities in their efforts to enforce the law and to desist from the past practices of hindering and impeding them. Law enforcement is a local responsibility. Without exception, I feel that states are capable and desirous of enforcing the law on a local basis. This can be accomplished if they are protected from the vicious outside influences which snub our laws and ignore our community mores, resulting in the chaos which has occurred in some of our larger cities and just a few days ago in Memphis. Our safety and our liberty depend on the excellence of local and state law enforcement. The anti-riot provision of this bill in no way impedes or usurps local law enforcement, but rather would give force and support to it. I hope such legislation will be voted into law.

As for the other provisions of H.R. 2516, I recognize Title X as worthy of consideration, although the matter taken up therein is one that should be handled by the states and not by the Federal Government.

Rather than concentrate on housing, the Congress would be acting much more in the interest of our constituents if it took steps to protect them from the looters and rioters and rowdies who have run so rampantly through the streets of our cities in recent months. Therein lies the real danger to our country, rather than in whether or not a person disposes of his real estate without discrimination.

Surveys have shown that much of the crime which results from these enemies to the welfare of our nation goes unreported simply because people feel the police could do nothing about it. We need laws to offset this sense of public helplessness and to arm our law enforcement officers so that they can stop the wave of crime. H.R. 2516, with the exception of the provisions I have cited as worthy of consideration, would place us further within the power of the demonstrators and looters and make us even more their victims.

Let us help the people and the police, not the lawbreakers.

What has happened to our American statesmanship that we have created such conditions as now exist in this country? In the April 1 issue of Newsweek magazine there appeared an article sponsored by a large American industry containing the following passage which I commend to you for your consideration:

"We pamper criminals and hamper police, when the police are all that save us from anarchy.

"We spend billions to pay people not to work—when we need the workers, and haven't got the billions.

"Devoted men in uniform spend their lives, underpaid and in jeopardy, fighting to keep our nation safe. Then, for political advantage, we sweep aside their gravest advice.

"Companies which provide millions of the best-paying jobs in the world were built out of profits made by ambitious men who plowed those profits back, to make more. Now Government and unions call such men selfish, and tax and destroy the profits vital to tomorrow's jobs.

"We spend billions to get to the moon, for some ridiculous 'prestige', instead of using those billions to reduce our debt and make us safe and solvent again.

"For voters at home we placate our enemies abroad and attack our friends (and how we need those friends!).

"We concentrate more and more power in a central government (too often of little people) and so weaken the local governments—which are the very essence of democracy and freedom.

"We spend billions for foreign aid and let prosperous foreigners who owe us billions spend our money to deprive us of our dangerously-needed gold.

"Common sense used to be the outstanding trait of Americans. In Heaven's name, what has happened to it?"

---

## PROPOSED NATIONAL RESERVE OF GRAIN PRODUCTS

Mr. OLSEN. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Montana?

There was no objection.

Mr. OLSEN. Mr. Speaker, today I am introducing legislation which would provide for the establishment of a national reserve of grain products. This legislation is identical to the McGovern bill which was introduced in the Senate during the last session.

Although there are many things which must be done in the area of legislation to make it possible for our farmers to share more equitably in this Nation's economic abundance, legislation enacted in the last several Congresses has effectively eliminated the burdensome surpluses which plagued our agricultural producers during the 1950's.

The elimination of these surpluses has been beneficial to our farmers, but it has also accentuated the need for our country to maintain a strategic reserve of agricultural products to protect our citizens against drought or natural disasters which are a constant threat to agriculture throughout the world.

The United States has established strategic reserves of nearly every commodity, a shortage of which could threaten the Nation's security and welfare. I share the view of many of my colleagues in the Congress and our leading farm organizations that it is imperative that we include food—the most vital of all commodities—in the national security stockpile.

I do not think it is possible for us to expect our farmers to carry the burden of excess supplies which we need for our national safety. As the record will show, a very slight increase in excess supplies can drive down farm prices by 5 to 10 percent. Therefore, if our farmers would attempt to provide the stockpile which our country needs, without the protection

which this legislation would provide, they would be unfairly penalized.

I submit, Mr. Speaker, that this legislation would work hand in hand with existing farm legislation. If our Government would move to make provisions for a necessary reserve and if these provisions provide the protection for our producers which is absolutely necessary, I feel certain it would result in a better supply stability for both the agricultural industry and consumers and better price stability for our farmers.

My bill would establish an interim, farmer-owned and farmer-controlled emergency reserve of wheat, feed grains, and soybeans. It would direct the Department of Agriculture to provide the Congress with data from which it can determine the proper sized long-term reserves this Nation should maintain of the commodities covered plus rice, cotton, and flaxseed.

In addition, it would authorize the Secretary of the Agriculture to make contracts with producers on a pro rata basis, as practicable, to put 200 million bushels of wheat, 500 million bushels of corn or other feed grains and 75 million bushels of soybeans into storage, under producer control, either on their farms or in elevators.

Mr. Speaker, this Congress must continue to protect the welfare of this Nation and our farmers—particularly our small, family farmers—with improved legislation and imaginative legislation which will help all concerned to cope with the problems which we face. I believe this legislation would give both farmers and consumers the protection which they deserve and must have.

## LET US NOT IMPUGN MOTIVES OF OTHERS

Mr. OLSEN. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Montana?

There was no objection.

Mr. OLSEN. Mr. Speaker, I believe that, particularly here among adults and the trained gentlemen of this body, it is not quite fair to be talking about the motives of other people, the motives of why one votes a certain way, or where you go to a funeral, or the reason why you go. I believe that is pretty unfair.

I believe it is unfair for a Member to get up here and say "I know you did not read the bill." How does anyone know whether I read a bill? We have been studying this legislation for more than 2 years.

How does anyone know what my motives are; whether I am sympathetic about someone's death, or why I go to a funeral? I did not go to Dr. King's funeral. But I presume those who went were sincere mourners.

Mr. Speaker, I did not mean to take the floor today, but I do not like to hear such things as this said in this great body. The questioning of somebody else's motives is, I believe, a particularly unfair thing to do.

I believe everyone knows that this civil rights bill was scheduled a long time ago, was scheduled by the leadership of the House, and agreed to on both sides of the aisle, and they picked a date. Why did they pick a date 2 weeks hence from the time they picked it? They picked it because they wanted to be sure that everyone would have notice to be here, and to do their own will. That is why we will be voting on this bill today. We are voting on it because it was planned to be voted on today. It was planned in advance, so that people could be here, and do whatever is their honest will.

Mr. Speaker, while I am on my feet, I want to remark about the Fourth Estate. I heard on NBC one of the commentators point out every celebrity who was at the funeral, but then, in addition, he went on to impugn their motives, and he said "Where are the poor people?"

But he left it hanging there. Why did he not go and find out? I am sure the poor people were there. I am sure that great Christian leader's friends were there.

Mr. Speaker, the only reason I have taken the floor today is to say for goodness' sake, among adults and honest people, let us not be impugning each other's motives at this place—in this House of Representatives of the United States.

## HOPE FOR A MORE HARMONIOUS TOMORROW

Mr. JOELSON. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from New Jersey?

There was no objection.

Mr. JOELSON. Mr. Speaker, I did not attend the funeral of the Reverend Dr. Martin Luther King, but today or tomorrow I intend to place a rose on his grave by voting for the pending civil rights resolution.

I have not had the opportunity to deliver a funeral oration, but I hope to speak very eloquently in one word, in fact, in one syllable, when I say "aye" for the resolution.

Mr. Speaker, I believe that there can still be good will in this country and hope for a more harmonious tomorrow.

Mr. Speaker, I yield back the balance of my time.

## ARSON, LOOTING, AND DEMOCRACY

Mr. BENNETT. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Florida?

There was no objection.

Mr. BENNETT. Mr. Speaker, no recent editorial in my district has attracted more attention than the following by my constituent, George Wachendorf, business editor of the Florida Times-Union. I think it should be widely read and we

should not pass off lightly the comments he ably makes. I include it herewith:

ARSON, LOOTING, AND DEMOCRACY

(By George Wachendorf)

One of the fascinating things about the free marketplace is the way it reflects the condition of society.

At the moment, for instance, the so-called protection industries—those which manufacture devices to protect the householder against fire and crime—are considered prime growth areas. At the same time, a trend is emerging in real estate development with the growing popularity of suburban apartment and home projects ringed with fences manned by armed guards, which reflect the increasing breakdown of law and order both as far as individual criminal acts and mass civil disorders are concerned. And it certainly is reminiscent of the Middle Ages, when every substantial home was a fortress and every man trained to arms.

The point has been made that what is being attempted in this country is the establishment of something unique in the history of the world—total democracy. Heretofore, in every democratic society there has existed a depressed and suppressed portion of the population with little share in the benefits of the society.

The effort is a worthy one, perhaps, but the course of recent events begins to cast doubt not only on whether it can succeed, but on whether it will not ultimately do our form of government to the death.

In the wake of the most recent riots, there have come increases in insurance rates, more talk about the pressing necessity of establishing government-financed riot insurance, and a curious apathy about a declared riot-control policy which essentially abandons the concept of protecting property.

In Washington we had the spectacle of looting on the part of well-heeled and employed individuals coupled with a goodly amount of self-satisfaction on the part of authorities that they held down the death toll by restricting the use of firearms by police and troops even at the cost of letting arsonists and looters escape.

When Mayor Daley of Chicago advocated a policy of shooting to kill arsonists and shooting to maim looters a storm broke about his head on the grounds he was advocating a policy of indiscriminate shooting.

What is happening is the logical extension of the curious idea that "human rights" and "property rights" are somehow mutually exclusive. As if the right to peaceful possession of one's property is not a human right.

It is the job of any government to protect its citizens in the enjoyment of their property. But ours seems to be moving to the position that the life and well-being of the looter and arsonist are of greater concern than the rights of the men they are unlawfully attacking.

Not only that, but that it is somehow the responsibility of the peaceful majority to pay for the damage wrought by the minority—and no back talk either. Next to the currently developing doctrine "Alice in Wonderland" is a study in rational thought.

What seems to escape most of those involved in assuring a sizable proportion of the citizenry of regular periods of uninterrupted theft is that societies are organized only to regularize the relations of man to man. And that government-blessed anarchy is not civilization.

If there is anything that history teaches, it is that when a government grows too weak to put down disorder—either in terms of available force or in moral resolution—it is too weak to maintain itself.

This may not be the situation in this nation at the moment. But the conclusion seems inescapable that if a majority of the citizens of this country becomes convinced that our vaunted democracy will not or can-

not provide a life free from the fear of violence, democracy will have to give way to a form of government that can.

And who could say that such a majority would be wrong?

## JOHN D. DINGELL, DEDICATED CONSERVATIONIST

Mr. SAYLOR. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. SAYLOR. Mr. Speaker, many people today say that the young people are not as good as their parents. Snide remarks are often made that someone only got ahead because his father or grandfather paved the way for him.

I would like to call your attention to a Member of Congress whom I consider a real friend—one who despite the criticisms of the youth of today is a real leader. Yes, he has even exceeded the excellent record made in the House of Representatives by his illustrious father, the late Honorable John D. Dingell, Sr.

JOHN DINGELL is a dedicated outdoorsman—an avid hunter and fisherman—but one to whom the quest is more important than the bag—one who believes in his country and is striving to make it a better place in which to live, not only for himself and his family, but for all Americans.

JOHN DINGELL's name is known throughout the entire country as a real working conservationist.

Because of my high regard for the gentleman from Michigan and because I am very much aware of his legislative activities in the field of conservation, I am pleased to report to the House of Representatives that Congressman DINGELL has been honored by that largest of all private conservation organizations, the National Wildlife Federation.

I have just learned that at its president's Conservation Achievement Banquet on March 9 in Houston, the Federation presented to Congressman DINGELL its 1967 Distinguished Service to Conservation Award for legislative achievement. The award is in the form of a whooping crane statuette.

In presenting the award to Congressman DINGELL, Herbert F. Smart, vice president of the National Wildlife Federation, stated:

An outstanding Member of the Congress since 1955, here is a man who has authored and steered to enactment a number of major conservation bills. As chairman of the Subcommittee on Fisheries, he has been involved, either as sponsor or staunch supporter, in every major piece of legislation considered in recent sessions of the Congress. They cover an amazingly wide range of important natural resources problems—all the way from protecting the polar bear of our Arctic regions to saving the living versions of our statuette awards, as well as many other endangered species of wildlife.

For his statesmanship in representing the best interests of not only the people of his district but every American as well . . . for his distinguished service to the cause of conservation . . . for his outstanding record of accomplishment, we are proud to introduce a great sportsman, an avid outdoorsman, and

a dedicated conservationist . . . the Honorable John D. Dingell, Member of the United States House of Representatives from Michigan's 16th Congressional District.

I wholeheartedly concur in these comments about the gentleman from Michigan as they are well discerned and truly earned. I join with thousands of other conservationists in the United States to say to JOHN DINGELL, "Thanks for a job well done."

## THE 125TH ANNIVERSARY OF ST. PAUL'S LUTHERAN CHURCH

Mr. SCHWEIKER. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. SCHWEIKER. Mr. Speaker, one of the oldest and best-known churches in Washington, St. Paul's Lutheran Church on Connecticut Avenue, will begin on Easter Sunday the celebration of its 125th anniversary.

Dr. Henry B. Luffberry, who at the invitation of our Chaplain offered the opening prayer for today's session of the House, is the pastor of St. Paul's. Under his outstanding leadership, St. Paul's has been growing spiritually, physically, and in its membership as well. The congregation of St. Paul's is most fortunate to have such a dedicated person as Dr. Luffberry serve their church at this most critical time.

At their Easter services this coming Sunday, Dr. Luffberry will read a proclamation commemorating this historic observance of the 125th year of their founding. I congratulate Dr. Luffberry on his excellent work and extend my best wishes to him and to the entire congregation of St. Paul's Lutheran Church.

I would like to include in the RECORD at this point the proclamation commemorating this important occasion:

A PROCLAMATION

*To the residents of the City and environs of Washington, District of Columbia, and to our brethren in faith throughout the Land:*

We, the members of St. Paul's English Lutheran Church, in gratitude to Almighty God for his constant blessing and unfailing providence, do hereby proclaim the observance of the One Hundred Twenty-fifth Anniversary of our congregation's founding. The celebration thereof shall begin on Easter Sunday in the Year of Our Lord One Thousand Nine Hundred Sixty-eight, and shall culminate in the dedication of an edifice for the religious education of the youth of our congregation and community on the first Sunday after Epiphany of the ensuing year. As we now rejoice in the labors and fruit of our forefather's faithfulness, and as we confront eagerly the mission to which Christ inspires His Church today, we would share with our neighbors and fellow-Christians the Services and other events planned to commemorate this anniversary. We invite them one and all, in glad and thankful heart, to invoke with us the continuing grace and guidance of the Lord upon all religious institutions and endeavors, upon the government and people of these United States, and upon all men of faith and good will wherever they may dwell.

*Published and proclaimed on behalf of St. Paul's English Lutheran Church, witness my hand and the seal of the congregation, April 10, 1968.*

[SEAL]                    HENRY B. LUFFBERRY,
*Pastor and President of the Congregation.*

## THE LATE DR. MARTIN LUTHER KING

Mr. BIESTER. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. BIESTER. Mr. Speaker, our country has witnessed, in recent days, a series of tragic events. The assassination of Dr. Martin Luther King was a shock to the Nation. This criminal act gave rise to a wave of violence. Many of our cities, including Washington, were and are afflicted with arson, looting, and other forms of lawlessness.

The vast majority of our citizens, persons of all races, view these events with profound sadness. The damage has been done. The struggle for equality of opportunity—never an easy one—is now all the more difficult.

But we cannot simply throw up our hands in despair. We must not permit the voices of unreason—the apostles of violence or repression—to prevail.

The problems which beset our Nation are so grave that no single measure can represent more than a modest step toward solution. Still, positive steps can and must be taken.

Now pending in this House is the civil rights bill already passed by the other body.

The differences between the first part of the bill passed by this body and the rights protection portion of the bill adopted by the other body are minor.

The need for a Federal law forbidding racial discrimination in the sale and rental of housing is unmistakable. Prompt action on this measure will hearten all those who put their trust in the rule of law.

We simply cannot justify further delay. We must act immediately and adopt the civil rights bill of 1968. Let us demonstrate that our system of law is responsive to the needs of the country. Let us make clear that the violence of the few will not dissuade us from meeting the just grievances of millions of our people.

## LEVITT & SONS—AMERICAN FREE ENTERPRISE AT ITS FINEST

Mr. CAHILL. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from New Jersey?

There was no objection.

Mr. CAHILL. Mr. Speaker, I am pleased to inform the House of Representatives that today Levitt & Sons, the

most successful builder of dwelling houses in the United States and perhaps in the world, has announced the complete elimination of segregation in its housing policy any place it builds—in the United States and any other country in the world. In the past, Levitt & Sons has abided by local law or custom and, as a result, some Levitt communities have been integrated and others have not.

This new policy announced in full page ads in the daily newspapers of our country today is courageous, truly American and, I believe, an historic step in the realization of the true brotherhood of man. This announcement should do more to encourage and develop open housing in the United States than all the State laws and, hopefully, after today, the Federal laws that have been or will be enacted. This decision of Levitt & Sons sets an example for all builders of homes everywhere—for all Americans everywhere.

The concluding words of the advertisement carried this morning by the daily press should be heeded by all:

We ask our colleagues to adopt a similar policy without delay. The forces of bigotry and prejudice must not be permitted to prevail any longer, and we urge all builders—large and small alike—to do their part in making America once again the ideal of the world.

I congratulate William Levitt, his associates, and the officials of the International Telephone & Telegraph Corp. on this timely, courageous, and farsighted policy of American free enterprise at its finest.

## CIVIL RIGHTS BILL

Mr. HALL. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Missouri?

There was no objection.

Mr. HALL. Mr. Speaker, while the smoke is still rising from the ruins it may be far too early to view the tumultuous events of the past week with any hope for perspective and objectivity. But so many events have been set in motion that are designed to influence the Congress, that Members of this body are not afforded the luxury of waiting for the clearer vision that hindsight always affords. It is already clear that while the President and the extreme black militants may have little, if anything else in common they both believe the House of Representatives should pass immediately the Senate amendments to the previous House-passed civil rights bill. This is a bill which has very little resemblance to the lengthy and highly controversial measure that has been returned to us. The national television networks, or at least those who guide its editorial policies, would now have the very seat of representative government abandon due process, and give unquestioned approval to a measure which the Members of this body have never seen, and whose particulars we would be prohibited from debating.

It may well be that the steamroller will engulf the Congress just as it has, erroneously in my opinion, engulfed the mass media, or at least a significant portion thereof. But, we have a higher duty than to be swept up by the uncertain currents of emotion, currents which might just as easily have carried us in the opposite direction in the wake of mass disorders and riots across the land. Let us therefore review the events that have happened and try to relate them to our duties as we are given the light to see those duties.

On last Thursday, a cowardly act of murder took the life of Martin Luther King. From what we are told by the Attorney General, the slaying was the act of a single deranged individual. I hope he is apprehended and punished to the full extent of the law, But, the reaction to the slaying suggests that many otherwise responsible people have chosen to lose sight of what King was trying to accomplish in Memphis.

He was not there campaigning for an open-housing law. He was leading a campaign to force the city to give in to the demands of the Garbage Collectors' Union. It was essentially a wage dispute, not a civil rights dispute. Furthermore, the main issue dividing the city and the union negotiators was not discrimination in employment, but whether or not the city should agree to a demand for a "checkoff" of union dues. That King lent the support of the Southern Christian Leadership Conference to a labor-management dispute, surely does not automaticaly change the character of the dispute from what it was; an effort to force the city to do something for one group of city employees that it does not do for any other group of city employees, white or black.

Point No. 2 is that in the course of trying to pressure the city of Memphis to give in to the demands, King announced his clear intention to violate a Federal court injunction, prohibiting a mass march on city hall. A former Member of this body was denied access to this body for disobeying the law, so I cannot believe that this House is willing to concede for 1 minute the right of another person to defy the law. Is the Congress to react by passing a law when the prime exponent of nonviolence was planning on demonstrating his contempt for the law and a Federal court injunction? Would Congress, or the courts be as lenient to those who might wish to nonviolently disobey an open housing law?

Have we reached a point in history where it is all right for some persons to defy some laws with which they do not agree? Is it not at least a slight incongruity that the flags are flying at half-mast for one who expressed contempt for the law, and who was leading a march in violation of a Federal injunction? Does the horrible nature of the crime that was committed justify forgetting the methods which the victim was proclaiming? They had another "violent nonviolent" march in Memphis the week before. As someone said afterward, a fellow could get killed amongst all this nonviolence, and indeed a young Negro youth was killed, and stores were looted,

and buildings were burned—"nonviolence," indeed.

Now let us look at the events that occurred with such rapidity immediately after the assassination. The reaction to the violent death of the advocate of nonviolence was violence. If the first and immediate reaction was grief, and I think we would agree it was, what followed was an orgy—an orgy of burning, looting, sniping, mass destruction on a scale that threatened the very seat of government itself. Along with many of you, I watched in disbelief the atmosphere of a "Roman holiday" that was taking place on the streets of Washington. I did not see people crying as they set the torch and carried out their booty. If a wake seemed more appropriate, what happened took more the form of a celebration. Open housing did not seem to be on the minds of thousands of people, as much as free stereo and hi-fi sets, television sets, whisky and Scotch, new suits, and shoes, and other assorted booty.

Suddenly here was an occasion when everybody could take for the asking. And the calls of the moderate leaders of the Negro community, went unheeded and ignored.

Crystal ball gazing is always a hazardous occupation, but I frankly doubt if the open housing bill had been signed into law a month ago, the spectacle that we witnessed would have been appreciably different. After all Congress has adopted numerous civil rights laws in the past few years and the riots have continued unabated. The Civil Rights Act of 1964 was followed 2 years later by Watts, and then Detroit and Newark.

So the theory that passing laws will appease those bent on destruction is a very tenuous theory indeed. And the theory that passing laws without due process, as an automatic response to riots, will prevent riots is an exercise in absurdity. It will only further convey proof to the black militants that the more you riot the more you get, and when an insatiable appetite is to be filled there is no end to the things to be gotten. In fact, television commentators are already telling us that open housing is just the first in a long series of "tributes" that will have to be paid to quell the mobs. I am not convinced that their judgment is any more sound than their colleagues who announced over TV in Washington that looters were being allowed to loot without interference by the police, and thereby probably doubled and tripled the number of looters. It was a sickening and possibly suppressed story that had to be told, but later, not when the very act of telling it compounded the problems of the law enforcement, inadequate as it was.

The other inadequacies of dealing with the Washington riots should, must, and will be investigated and revealed, but that is not my purpose in speaking today. I have lived through curfews, martial law, and looting before, and in other places throughout the world, and I could not believe that authorities could be so inept as they were here in the Nation's Capital. I emphasize the word "authorities," and detract not one whit from the dedication and long hours of police, firemen, and soldiers.

9540                                CONGRESSIONAL RECORD — HOUSE                      *April 10, 1968*

So, Mr. Speaker, if there was serious question and doubt as to the wisdom of the open housing legislation on April 4, not a word and not a comma of this proposed legislation has been changed, and I submit that due process should not now be forever discarded.

Are we, in this body, now to abandon our role as legislators and merely serve a "rubberstamp" role with not the slightest consideration for the merits and means of the bill under consideration? Is it prudent or wise to act, not on the basis of reason but of blind emotion? Are we to not even consider the fact that the Senate amendments create not open housing, but "forced" housing? Are we to not even consider that this bill would, in effect, create two separate and contrary laws; one for the person who sells his home directly, and the other for the person who sells it through his real estate agent? Are we such prisoners of the looters and the burners, that we must grasp for any straw, however weak and unsound that straw may prove to be in actual operation?

Is that tragic and cowardly act of assassination to be the catalyst that caused this representative body to commit its own cowardly act of ignoring due process? Surely not, Mr. Speaker.

The representative process in our Republic is and must remain a two-way street. We must represent those who are informed. Providing information is our responsibility. The people are smart enough to distill information into intelligence. Given information and time, they will do the rest and act with prudent judgment. Thus we can represent properly and wisely, and our system of government will survive.

We are moving through dangerous and perilous times. Let us at least have the wisdom to consider this legislation in the arena of public debate, with adequate interpretation and explanation of its provisions, with prudent recognition of what the bill does, and with recognition of the fact that those who now beseech us to jump on the bandwagon, are themselves uncertain and unknowing of its basic provisions.

There is a great healing task that lies ahead, but let our effort be to bind the wounds, and not reopen them.

### CIVIL RIGHTS BILL

Mr. WATSON. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from South Carolina?

There was no objection.

Mr. WATSON. Mr. Speaker and my colleagues of the House, is it not good to be a Member of the greatest deliberative body in the world—the U.S. House of Representatives?

But today we are being asked to consider and to vote on a matter of such importance and magnitude, affecting the lives and property of every American—but you are only being granted 8 seconds apiece in order to debate this measure. The Senate spent 40 days—and this House of Representatives has 1 hour,

which will average out at 8 seconds per Member.

Can we go back home and tell the American people that this is a great deliberative body?

Mr. Speaker, may I just read two paragraphs from a letter I received from a minister. He said:

All Presbyterian ministers are being asked to write their congressmen urging them to pass the Civil Rights bill and not to recess until this action is taken.

I am writing you to request an opposite action.

This is the part of his letter that I hope you will listen to carefully. He said:

Even if this bill is right and proper, it should not be acted upon in the present state of affairs. I am sure you agree that far-reaching legislation should not be passed as a memorial to a person, nor should it be extracted by torch and gun.

There is an element in our country which snatches every opportunity to forward their program. They have leaped upon the present situation and seem determined to use it for their ends.

If this legislation is good, then it ought not to have the stigma of being passed in an atmosphere of tension. If it is bad, then it ought not to be passed simply because of the crisis through which our nation is passing.

Mr. Speaker, our acts today will neither stop nor start riots. Enforcement of existing criminal laws, rather than enactment of any civil rights law, is always the key to law and order. Despite the many bills which have been passed in this field during recent years, the insatiable appetite of the lawless has not waned, but has actually been whetted.

Today constitutional and representative government are on trial. The only test we face is whether representative government will survive, if indeed whether or not we are deserving of the name representative. It is incomprehensible to believe that the other body deliberated on this matter for 40 days and we have allocated just 1 hour—in fact, about 8 seconds for each Member to determine the property rights of American citizens. That alone should be sufficient grounds to vote against this measure and send it to a committee for further study.

The American people are looking to us to keep our heads when apparently so many all about us are losing theirs. The Nation is looking for calm amid confusion, responsibility amid irresponsibility, lawfulness amid lawlessness and sense amid senselessness. They have a right to expect as much from their representatives and God help us if we fail them.

This measure will not grant rights but deny rights, not restore rights but rob citizens of rights. It will not stop riots but encourage further rioting. Indeed, passage of earlier civil rights measures has not lessened tensions but actually heightened them. If ever this Nation needed a period of calm reflection rather than intemperate action, it is now.

If we err in our finite wisdom, let it be in fairness to all Americans rather than granting special favors for a few. Regardless of how you might attempt to explain

or rationalize our vote, if we pass this bill today, the American people will conclude that we have succumbed to the most insidious and despicable form of blackmail—defiance of law and order. If you vote for it, you will be telling your constituents that 8 seconds for each Member is adequate time for the greatest deliberative body in the world to determine the basic civil rights of all Americans; namely, ownership of property.

In fact, I daresay 90 percent of the American people are unaware that under the terms of this bill a private citizen will be prohibited from advertising his home or placing a "for sale" sign in his yard without coming under the forced provisions of this legislation.

Mr. Speaker, today we stand on trial before the American people. Let us not by precipitous action tell them that anarchy has replaced democracy in America.

### CIVIL RIGHTS BILL

Mr. GROSS. Mr. Speaker, I ask unanimous consent to address the House for 1 minute.

The SPEAKER. Is there objection to the request of the gentleman from Iowa?

There was no objection.

Mr. GROSS. Mr. Speaker, nearly 15,000 troops are quartered in and near the Nation's Capital today.

They are here in an attempt to put an end to the arson, looting, and anarchy that has brought death and hundreds of millions of dollars in damage to Washington and scores of other cities across the Nation.

It is in this climate of lawlessness—of contempt for law and order—that the House of Representatives is being called upon today to approve a bill, many of the provisions of which have never before been considered by the House Members.

To approve this legislation today means setting aside all orderly procedures. It means a capitulation to those who have nothing but contempt for law and order.

It will be a shameful day in the Nation's history if on this day the House of Representatives spinelessly capitulates and if it does I suggest that the U.S. flag be promptly lowered to half staff in mourning for this once great Nation.

### CIVIL RIGHTS BILL SHOULD BE REFERRED TO THE JUDICIARY COMMITTEE OR TO CONFERENCE COMMITTEE

Mr. HARRISON. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Wyoming?

There was no objection.

Mr. HARRISON. Mr. Speaker, the House of Representatives has been directed to vote straight up or straight down on the Senate passed civil rights bill that carries the number: H.R. 2516.

That number is the same as a civil rights bill which passed the House August 16, 1967, with my concurring vote, but the contents of the measure bear no

resemblance to what the House last year wrote, debated and sent to the Senate. It has come back to us now as an entirely different bill.

Now the House is being told, in the frenzy of rioting in a half dozen American cities, to give a blank check endorsement to the Senate passed bill even though the House has not held hearings on a single one of the Senate amendments.

The House has not considered the massive changes in Federal law contained in this measure.

The House has not considered the immediate and long range effects this bill will have on the lives of Americans of all races.

The House has not been consulted on the broader programs of civil rights legislation of which this will be a part.

But the House is expected to buy this weighty and poorly phrased pig in a poke with neither debate nor dissent, neither hearings nor amendments.

In short, the House of Representatives is expected to concur blindly in what the other body has done with out bill, our prerogatives, and our responsibility.

The Senate which expects us to buy this package without debate has the temerity to warn us in its report:

The elected representatives of the people should discharge their sacred obligations by taking time to draft legislation properly and adequately.

Splendid advice.

The first place to start is by sending this bill to the Judiciary Committee or at least a conference committee so the House can study the vital matters on which it is expected to vote.

H.R. 2516 as presented to the House is a single dimension bill. The Senate passed it hastily with perfunctory debate on major amendments that will determine the status of the rights of private property and personal choice for decades to come.

I had the privilege of voting for the original House-initiated version of this civil rights bill. I would endorse it again on the basis of its original rights and protections.

The Senate added to the House provisions—which were also completely rewritten—housing, antiriot, and Indian rights measures.

Two of these additions would appear to be desirable. We have long needed a strong antiriot measure and that need is accentuated by the tragic violence underway at this hour in some of America's proudest cities.

Our American Indians—the Shoshone and Arapahoe of Wyoming and the citizens of more than 280 other tribes in our country—have long needed the protective covenants of the additions to this bill which directly and immediately affect them.

The heart of the House-passed H.R. 2516 was language as law to strengthen the Government's capability to meet the problem of civil rights violence. The bill would have protected any American as he engaged in voting, use of public education facilities, and common carriers, or engaged in a host of other stipulated functions.

The heart of the newly contrived H.R. 2516 is open housing.

This provision vitiates the rights of the seller of a home in deference to the exclusive rights of the buyer. How the constitutional protections and guarantees of those who sell homes got lost en route to the forum, I do not know, but lost they got and lost with them are the rights of an American to dispose of his lawful property as he sees fit.

In its infinite wisdom, the other body has drawn the postulate that wrongdoing is only wrong if done by a real estate agent. On this premise the bill permits the bigoted bargaining away of a home to a non-Negro by the owner. This, says the Senate, is okay. But the bargaining becomes evil under law if a real estate agent happens along and takes part in the transaction. This to my mind is a most curious twist of law and logic.

If it is to be permissible for an American to sell his home with consideration to race, creed, color, or national origin, and the Senate bill says such a deal is okay, how can the entry of a real estate agent into the picture so rupture morality as to completely upend the intent of the law.

The Senate wrote it, but the Senate has failed to enlighten us on its reasoning in so doing.

I have had the privilege of supporting civil rights in my five terms in Congress.

I voted for the original House version of the bill being voted on today.

I fully appreciate that legislation will be required as we search with all Americans for the answer to what is certainly the most critical dilemma facing our Nation since the Civil War: how to bring the 10 percent of our population that is nonwhite into full citizenship and equality of opportunity.

But in seeking and championing this goal we can neither bring justice to the oppressed nor punishment to the oppressor by precipitously passing bad legislation.

This bill foisted off on the House by the other body is a patchwork quilt of legislated morality and contradictory intentions. We will ill-serve the needs of America by foisting it off on the Nation.

Lincoln is reported to have observed that you do not strengthen a man by weakening his adversary. Neither do you guarantee the rights of the Negro by gutting the rights of other Americans.

Let us take this package of ambiguity to our committees and give it the full measure of attention and considered judgment that it deserves. Let us report out a bill that may cover all the points of this one—open housing, civil rights protection, antiriots and Indian rights—but let our bill eliminate the contradictions and the inconsistencies that will throw this measure into a thousand courts for a thousand interpretations when enforcement is attempted.

Let us report out and pass a civil rights bill that is both civil to our citizens and right for our Nation.

## THE MAJORITY VIEW ON CIVIL RIGHTS

Mr. THOMPSON of Georgia. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Georgia?

There was no objection.

Mr. THOMPSON of Georgia. Mr. Speaker, under our traditional republican form of government it is the duty of a Congressman to represent the views of his constituents.

I wish that all Congressmen had taken the time that I have taken to poll their constituents on the question of open housing. I have talked with many, and most have told me that in their opinion their constituents would be opposed to this measure.

I sent out a questionnaire, and out of the thousands and thousands of replies that I have received, over 82 percent of the people in my district, which is Atlanta, Ga., want to reserve for themselves the right to determine to whom they will sell their property. They want to retain the right to sell their property regardless of race, creed or color. This is one of the ancient rights and one of the rights of contract law that is inherent in our form of government.

Mr. Speaker, I am concerned that a minority of the people who have contacted me have said that I should disregard the majority view because the majority does not know what is good for themselves. To them I can only say this: that this is the same rationale used by dictators when we attempt to substitute our will and thoughts for those of the majority of the people.

## CIVIL RIGHTS BILL SHOULD GO TO CONFERENCE

Mr. CEDERBERG. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. CEDERBERG. Mr. Speaker, I take this time because I realize it will not be available when we debate the rule today.

I want to say that in the 16 years that I have been here, I have supported every civil rights bill. However, I believe in the interest of sensible procedure this matter should go to conference. It should have gone to conference long ago.

Let me say further that the House of Representatives passed this legislation last August. It was pending in the other body for 6 months. Now we are asked to adopt it immediately. The blame for delay is the Senate not the House.

I just want to say publicly that I favor civil rights.

I believe that every man, woman, or child in this country, regardless of race, creed, or color, ought to be able to live anywhere that his economic ability will permit him to live. But I think there are important differences in this legislation. The Senate has added riot control, antiriot provisions, and Indian legislation. I do not consider this a civil rights vote at all when I vote to send this bill to conference. If it does not go to conference,

056607

of course, I will vote for the legislation, but I believe that it is wrong to use this particular procedure.

## PROPOSED LEGISLATION WILL RESULT IN CHAOTIC SITUATION IN REAL ESTATE MARKET

Mr. SCOTT. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Virginia?

There was no objection.

Mr. SCOTT. Mr. Speaker, my mail is overwhelmingly in opposition to H.R. 2516 and some of the letters from constituents who support the bill indicate they do not believe in Government discrimination in housing. Certainly, I do not believe in the Government discriminating against any citizen. However, I am not aware of any existing law which does discriminate against any person on the basis of race, color, religion, or national origin. Any person in the country can sell any piece of property he owns to anyone he chooses. If a black man chooses to sell his property to a white man, he has this right. If a Buddhist chooses to sell his property to a Jew, he has this right. If a foreign-born citizen chooses to sell his property to a native-born citizen, he has this right. If there is prejudice existing in this country, and I am sure there is, that prejudice is in the mind of the individual citizen, and I do not believe this Congress has the power to remove prejudice by enacting legislation. The Government should be colorblind in all of its dealings with its citizens, but we have to distinguish between the actions of the Government and the private actions of our citizens.

Referring to a more specific matter, section 810 on page 34 of the bill provides that any person who claims to have been injured by discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur may file a complaint with the Secretary. Now can you imagine the length of time it will take the Secretary of Housing and Urban Development under this bill to process and act upon a petition? Some of the petitions that would be filed if the bill is enacted would be valid ones. Undoubtedly, some would be invalid and without merit.

A property owner would not be able to dispose of his property during this interval for the practical reason that no one would buy a piece of property when there was a cloud upon the title or the right of the owner to dispose of it. In my opinion, Mr. Speaker, this would result in a chaotic situation in the real estate market throughout the country. This bill requires careful consideration by the appropriate committee of this House, and should not be acted upon without thorough consideration by the House committee. If it is adopted without amendment it will come home to haunt each of us. Therefore, I hope this House will vote down the previous question,

and that the House will be permitted to work its will in the matter.

## CIVIL RIGHTS LEGISLATION WAS NOT DELAYED IN HOUSE OF REPRESENTATIVES

Mr. CUNNINGHAM. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Nebraska?

There was no objection.

Mr. CUNNINGHAM. Mr. Speaker, I am not going to comment upon how anybody should vote on this measure. I have made up my mind, and that will be recorded in the RECORD.

However, I am very much alarmed, shocked, disappointed, and angered with the various news commentators, but particularly the Attorney General of the United States, who appeared on several nationally televised programs when they and he not only inferred but came right out and said the delay in this measure is due to the action of the House of Representatives. How irresponsible and untruthful they were.

We passed the original civil rights bill last year, in August. It is not the House of Representatives that is responsible for any delay. The delay occurred in the other body. I wish people who are getting up and saying on radio and TV and writing in newspapers that the House of Representatives is responsible for delay in this legislation would discontinue their unjust criticism of the House, because I think we have acted in a responsible manner. It is not our fault that this legislation comes before us at this late date and in this emotional atmosphere. Where were these commentators and officials in the executive branch when our civil rights bill left the House last August and was buttoned up in the other body?

Mr. Speaker, the conduct of the persons mentioned above is inexcusable.

## STORY OF AMERICA IS CHRONICLE OF EFFORT TO APPLY WITH PERFECTION THE CONCEPT OF EQUALITY

Mr. FINDLEY. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

Mr. FINDLEY. Mr. Speaker, the story of America is essentially the chronicle of our efforts to apply with perfection the concept of equality. None of the steps taken has been in itself perfect, and I daresay what we do today will not be perfect. But I am proud of the fact that the party of Lincoln has played throughout this long period in which we have sought to apply this concept with perfection.

I am proud, also, of my colleague, the gentleman from Illinois [Mr. ANDERSON],

who yesterday played an important role in the action of the Rules Committee. I am confident and hopeful that when this day is done the party of Lincoln will once again have played a major part in progressive legislation in civil rights.

## THE "LITTLE MAN" WINS

Mr. CLEVELAND. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from New Hampshire?

There was no objection.

Mr. CLEVELAND. Mr. Speaker, for a long time I have worried, as our Federal Government has grown in size and scope, that the "little man," the ordinary citizen was becoming lost in the shuffle; that he was becoming a number rather than a person and that it was becoming increasingly difficult for him to gain a sympathetic ear from our vast governmental bureaucracy.

This week I had a heartening experience which renewed my admittedly shaky faith in our governmental functions, and I would like to relate this experience to my colleagues.

A constituent of mine, listening to his radio in a small New Hampshire community some 500 miles from Washington, heard an announcement that was offensive to him. He felt it was derogatory to the American free enterprise system, whose source of strength is the private business community.

"Do you want to spend the next 2 years trying to please a boss who is trying to please his boss" went the announcement. It wound up with a plea for the listener to avoid all of this by joining the Peace Corps.

My constituent resented this as an innuendo against private business. And he resented even more the fact that, as a businessman and taxpayer, he was paying for this message.

He complained to his Congressman and to the Peace Corps. I am sure there were other complaints, that his was not the only one. But the point is that, in this case anyway, the little man apparently won his battle and made his point with the large governmental agency.

Because this week, I received the following letter from Mr. Brent Ashabranner, Acting Director of the Peace Corps, confirming that the offending announcement had indeed been withdrawn:

PEACE CORPS,
*Washington, April 1, 1968.*

Hon. JAMES C. CLEVELAND,
*House of Representatives.*

DEAR CONGRESSMAN CLEVELAND: Mr. Vaughn is presently out of the city and in his absence I am replying to your letter of March 15, in which you request information for a constituent regarding a Peace Corps advertisement.

We have recently reviewed our series of radio announcements, specifically the one to which you refer, and are currently preparing a new series.

We have found that the commercial you mention is subject to misinterpretation, and the Advertising Council, which prepares spot announcements for us as a public service, has

requested radio stations to discontinue its use.

Thank you very much for your interest in this matter and in the Peace Corps.

Sincerely,

BRENT ASHABRANNER,
*Acting Director.*

---

## A TRIBUTE TO DR. MARTIN LUTHER KING, JR.

Mr. HALPERN. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. HALPERN. Mr. Speaker, during the past few days, from one end of this earth to the other, Dr. Martin Luther King has been memorialized in a manner befitting the life he led and the cause for which he strove. The senseless act of murder that stilled his voice cannot kill his words nor dim his dream.

Applying his symbolic philosophy of nonviolence to attain goals of equal justice for all, Martin Luther King was a champion of justice, a revered leader whose vision and indomitable spirit gave profound meaning to the cause of human rights.

From the moment he first led the Montgomery bus boycott in 1956—through the Albany, Ga., demonstrations, the renowned 1964 March on Washington, the march from Selma to Montgomery, the jail terms in Birmingham and Albany—through all this Dr. King counseled peace and justice—and in so doing served not only the cause of equality but the American cause as well.

Out of the intensity of Dr. King's crusade sprang the civil rights bills of 1957, 1960, 1964, and 1965, proclaiming the equality of opportunity as it affected voting rights, public accommodations, employment, and education.

In tribute to his work for justice, coupled with his appeals for peace, in 1964 Dr. King was awarded the Nobel Peace Prize. The tribute was well deserved, for if ever a man had fought for reform, in defiance of those favoring oppression on the one hand, and those favoring revolution on the other, it was Dr. Martin Luther King.

It is ironic, tragically ironic, that the memory of a man who lived and died dedicated to achieving reform by nonviolent means, should be used as a mask for the violence that has swept the country these past 6 days. Let those who have defiled and who would defile the greatness of Dr. King, know that they act in their own name and not in his.

Yesterday, I was among those who journeyed to Atlanta to pay our last respects to Dr. King. It was one of the most moving experiences of my life, one I shall never forget. From every walk of life, every color, every religion, came people to do homage as much to a single principle as to the man who so eloquently gave voice to it—the principle of justice.

Let it be our hope that true brotherhood among all men will be the most lasting memorial to Martin Luther King.

---

## REAPPRAISAL OF RACE RELATIONS

Mr. BETTS. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Ohio?

There was no objection.

Mr. BETTS. Mr. Speaker, the one area in American life which demands immediate reappraisal is that of race relations. The main difficulty, as I see it, is our persistence in refusing to approach the problem, as it should be, on a basis of understanding. The very concept of civil rights implies government domination by government decree. We have legislated extensively in this area and quite properly. We have insured civil rights by law—by providing equality in the right of suffrage, equality in public places, equality in judicial proceedings, and I have supported all of this legislation.

Now we should lay aside the term "civil rights" and in its place use a more appropriate term such as "personal rights" or "individual rights." Civil rights has become associated with controversy, belligerency, demonstrations, and police actions—all negative responses. The need now is for positive means—understanding, reasoning, and education.

In this delicate relationship of individuals to each other it is absurd to think of creating harmony and understanding by means of Federal laws grown out of strife and controversy and enforced by the massive police power of the Federal Government. The tendency is to create more controversy and more strife.

The Federal Government has performed magnificiently in the field of civil rights. It has insured equality of every person as a citizen of the government. The challenge now should be directed to other sources—the churches, civic organizations, educational institutions, and individuals.

I question whether a person can live happily in a neighborhood where his entrance has been supervised and even forced by the Federal Government. It can happen only when he is accepted as an individual whose right to be there is the result of respect and not a Federal law. The President's Commission on Riots acknowledge the basic problem is one of attitude. Until we move positively in that direction, we can never have understanding between the races.

A verbal barrage of statements has appeared in the press recently in support of the proposition that it is time to look to the individual and the community instead of the Federal Government for the solution of this problem.

Vice President HUMMPHREY has said that the Riot Commission report does not address itself to Washington but to the people of the country.

Addressing a group of Southern Baptist leaders, President Johnson said:

The solution to frustrations and discontent will require a change in men's hearts—in the way they treat their brothers.

Wilbur Cohen, the new Secretary of Health, Education, and Welfare commented at a news conference:

I wish some of the energy that has gone into rioting had gone into efforts by the rioters for self-government.

William H. Crook, executive director of VISTA told the Southern Baptist Conference that the churches must react to the Riot Commission report by rooting out bigotry and racism in the churches themselves.

On October 4, 1967, the New York Times reported Swedish Philosopher Gunnar Mydal as saying that America must attend to its poor in terms of both white and black rather than in terms of the Negro population alone, or risk a policy of racism comparable to South Africa.

Bishop John Harris Burt of the Episcopal Diocese of Ohio said:

I hope that at every level of our church life we will see the crucial importance of rooting out the basic social cancers which can well destroy our Nation and our world unless we eradicate them. Chief among these are racism, poverty, and war.

And so, sentiment is building up that more and more the task is ours and not solely the Government's.

Of course, there will be a thousand excuses for not going ahead with community and church programs. But back of all these excuses lies the plain and unvarnished reality that it is much easier to let the Government do it than to tackle the job ourselves.

That it can be done, however, is proven by the work of a group of housewives in Kansas City as related by a recent article which appeared in the Republican Courier of Findlay, Ohio. I submit it as an indication of the positive way to avoid certain danger if we continue to rely on the police state to solve the delicate problems of human relations.

An article follows:

PANEL OF AMERICAN WOMEN REACH PEOPLE CIVIL RIGHTS LEADERS CAN NEVER TOUCH

KANSAS CITY.—In this era of the picket sign and the fire bomb, what can a bunch of housewives do to advance the cause of human rights?

"We can do anything," insists Mrs. Ether Brown, a Kansas City mother of four and founder of the Panel of American Women.

"It isn't what we say but the way we say it."

The approximately 700 panel members scattered around the nation simply tell people what it's like to be a Negro, a Jew, a Catholic or even belong to the white Protestant majority.

Utilizing their image as respectable middle-class matrons to the hilt, they address audiences in churches, colleges, civic clubs and other places where the Rev. Martin Luther King or Stokely Carmichael might not be welcome.

"And the best part is we never go unless we're invited," said Mrs. Brown. "Frankly, we can get by with murder. People look at us and can see we're just ordinary housewives."

Mrs. Brown, wife of an automobile parts supplier, said she founded the first panel 11 years ago "by sheer accident" to provide a program at a Jewish temple meeting.

Today the vivacious brunette heads 30 operating panels and has requests to form more than 300 others. Her groups have more invitations to speak than they can handle.

Each panel consists of a Catholic, a Jew, a Negro, a white Protestant and perhaps someone from another minority group prominent in the area. A moderator completes the team. Each woman reads a typewritten five-minute

talk on her own experiences, and then the audience asks questions. That's all there is to it.

But she noted in many communities the appearance of her panel is the first time issues like racial intermarriage, school segregation or separation of church and state have been discussed in the open.

"It gets people to think about members of minority groups as individuals—not just blank masses," Mrs. Brown explained. "Maybe this is the first time it's happened to them."

A Jewish member of the panel tells how her 6-year-old daughter came home crying because a playmate had taunted her for "killing Christ."

"I never killed anyone," the child sobbed. "What are they talking about?"

A Negro woman recalls her small son gazing at a carnival merry-go-round and asking, "Where's the back? I want to ride."

"People may not agree with what we say," Mrs. Brown contends, "but at least we can open the door."

Occasionally a panelist does lose her temper, Mrs. Brown admitted. She recalled one attractive young Negro matron who was asked about racial intermarriage just once too often.

"Why would we want to marry you after all the things you've done to us?" she demanded of her white questioner.

And there are lighter moments, like the time a Jewish panelist said:

"If you think all Jews are rich and clever, you should meet my husband's relatives."

Most panelists are young and have husbands in business or the professions. This gives them entry into middle-class havens even in the South.

Personality counts more than dedication when it comes to choosing panel members.

"As a matter of fact, we don't appoint women if they are over-committed on civil rights," explained Mrs. Brown. "They become too impatient.

"Oh, I know some of the civil rights people think we don't go far enough. But they admit we're reaching people they could never touch. And that's how we do it—by always remaining polite and not pushing too hard."

## CIVIL RESPONSIBILITIES LEGISLATION

Mr. ASHBROOK. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Ohio?

There was no objection.

Mr. ASHBROOK. Mr. Speaker, yesterday I introduced H.R. 16554, a proposal to amend title 18 of the United States Code to promote civil responsibilities, insure domestic tranquility, and foster the general welfare by making unlawful certain acts which foment domestic disorder. This proposed legislation contains a number of recommendations that deal with various aspects of rioting and civil disorder and which urgently need legislative action to curb this present danger to our national security.

As we all know, all rights presuppose corresponding responsibilities. I have the right to maintain property free from the danger of Molotov cocktails. But I have the responsibility of not using such a weapon on the property of others. It is indeed tragic that today so little is said about our responsibility not to loot, not to snipe, not to burn. If we are to maintain our way of life, it is imperative that

the balance between rights and responsibilities be restored among our citizenry.

The city of Baltimore, Md., is one of the many cities which experienced rioting, firebombing, and looting this week. The Baltimore Sun of April 10 ran an extensive treatment of the disorder which struck that city in the last several days. To emphasize the urgent need for a renewed awareness of our civil responsibilities and to bring wider public attention to the tragic experience which has visited this historic city recently, I place the above-mentioned account in the RECORD at this point:

BACKBONE OF RIOTS BROKEN IN CITY, OFFICIALS SAY—LOOTINGS, FIRES DROP, BUT SOME SNIPING CONTINUES—DEATH TOLL RISES TO 6—50 POLICE AMONG 600 HURT IN 4-DAY UNREST—ARRESTS NEAR 5,000 MARK—BANKS TO OPEN DOORS TODAY—GUARD TROOPS TOLD TO REMOVE BAYONETS FROM RIFLES

Military and governmental officials reported last night that the backbone of the riots that have wracked Baltimore for three days and four nights had been broken. But sporadic lootings and fire bombings continued—and reports of sniping were increasing.

The death toll from the disturbances rose to six with the suffocation of a 74-year-old man who was trapped in his apartment above a store fire lit by an arsonist.

The injury list rose to about 600. It included 50 members of the Baltimore Police Department.

CITY FIRES, 1,150

Since Saturday, firemen have responded to more than 1,150 alarms for blazes that have burned out hundreds of stores and homes throughout the inner city. Lootings jumped over the 1,150 mark last night.

The number of arrests approached 5,000—most of them for violations of the nightly curfew.

Despite all the troubles, strong efforts were made to get the city on as normal a footing as possible under the circumstances.

Public schools reopened. So did downtown department stores and several shopping centers that had been shuttered against the rampagers.

BASEBALL SEASON TO OPEN

The Baltimore Orioles were given the go-ahead to start another American League season this afternoon at Memorial Stadium.

All banks will be open for business today after a one-day holiday.

Authorities relaxed the 7 P.M. to 5 A.M. curfew to allow nightshift workers at factories to report to their jobs.

One sign that the tension was easing—10,987 regular Army and National Guard troops patrolling the city were instructed by Lt. Gen. Robert H. York, their commanding officer, to "bare rifles," tuck away the bayonets that they had affixed to their firearms.

Another sign—some children in a Northeast Baltimore area where children had been in the vanguard of the looters, were flying their kites under a clear blue sky yesterday afternoon.

But authorities took grim notice of the growing restiveness of some white neighborhoods bordering inner city Negro areas.

SHOOTING, BEATING INCIDENT

For example there was a shooting and beating incident sparked by white toughs in West Baltimore yesterday afternoon.

But all-in-all, authorities expressed optimism yesterday in their estimate of the situation as they saw it.

They pointed out, for example, that the 219 lootings logged by 9 P.M. yesterday totaled just one more than those reported

during a single two-hour period Sunday night.

ATTITUDES "SOFTER"

The bitter attitudes of Monday's surging mobs had given way to something "softer," as one high National official put it.

And Negro militants themselves were spreading the word through the ghettos to "cool it."

Rumors, as they always do in times of strife, swept the city. A policeman had been shot. Stokely Carmichael, the black militant, was fomenting strife. The Ku Klux Klan was about to march. They were not founded on fact.

Here are some of the facts that did come out during the day:

1. Under the direction of William Donald Schaefer, president of the City Council, the Small Business Administration is collecting a list of merchants who suffered losses in the time of troubles. Indications were they would be offered quick tide-over loans.

2. There will be at least one more night of curfew, to start at a time designed by Governor Agnew after consultation with General York.

3. Taxpayers who are prevented from compiling their 1967 Federal and State returns because of the riot will be allowed to file after the April 15 deadline without penalty. However, they must be prepared to show, if directed, that the riots—and not their own dilatory tactics—caused their past-deadline filings.

Emergency food supplies—much of it from the Federal Government's surplus—flowed into Baltimore by the ton. In addition, several independent agencies started collecting food and clothing for distribution to inner city residents.

Scarcities of milk and gasoline developed during the day.

And in response to requests from authorities in Delaware, where disturbances are also taking place, Governor Agnew added Cecil county to the list of subdivisions where the sale and on-street possession of alcoholic beverages are banned until further notice.

The other subdivisions are Baltimore city and Baltimore, Howard, Harford and Anne Arundel counties.

RIOT SIDE-EFFECTS

Baltimore hospitals, incidentally, have had to take care of more than 35 victims of riot side-effects—alcoholics who, cut off from their normal supplies, have gone into delirium tremens. They are being treated with massive doses of vitamin B-12 and paraldehyde.

The number of direct casualties of the rioting those hospitals have had to admit have been remarkably low—19.

But talk of what is being done, and what has been done, and what remains to be done before real peace is restored is subordinated to the overriding interest in what happens on the streets from hour to hour.

Everyone hailed the news that not a single piece of fire equipment was away from its station from 9:30 until 10 o'clock last night as another sign that the city was "over the hump."

Lootings dropped to fewer than 10 an hour at that point, and very few arrests were reported.

COURTS WORK OVERTIME

As they have for three days, the courts worked overtime to clear the dockets of the criminal cases arising from the rioting.

More than 80 per cent of those booked since last Saturday had been tried by late last night.

Governor Agnew and his staff stood by in Annapolis, taking frequent reports from Mayor D'Alesandro, General York and others on the hour-by-hour state of affairs in the city.

They are also keeping a close eye on the rest of the State, looking for signs of restlessness that could develop into trouble.

Case 1:13-cv-00966-RJL   Document 153-3   Filed 05/30/23   Page 19 of 111

### BURCH TAKES TOUR

Francis B. Burch, State attorney general who has been acting as an unofficial on-the-scene State liaison with military authorities took another of his frequent tours of the inner city last night.

"It's as quiet as it can be," he said.

Maj. Gen. George M. Gelston, adjutant general of Maryland, who directed National Guard troops until they were Federalized Sunday under General York's command, also took a tour of the stricken ghettos.

He too reported that things were relatively quiet, but that a food shortage was developing.

General Gelston said the "people seemed friendly."

"I think the mood has changed considerably on the street," said the general, who, as a veteran of the Cambridge (Md.) disturbances of past years is an expert on such matters.

He said that, without further investigation, it is "impossible to tell if the riots had organized elements in them," or whether they were completely spontaneous.

Actually, conditions in Baltimore began to improve late Monday night, when there was an abrupt falling-off of disorder.

### FOURTH DAY STARTS QUIET

A temporary peace descended on the city. Looting came to a standstill. The fire alarms stopped. Soldiers and police continued their routine pick-ups of curfew violators.

At 7 A.M. another curfew was lifted. And with it came a renewal of troubles.

Road blocks that had sealed Baltimore off from the outside world were removed, and the city was inundated with traffic from the suburbs.

At the same time, the looting began all over again. There were ten reports of forays on grocers, saloons and dry cleaning shops within an hour. Two stores were set afire.

### FORTY-NINE RAIDS IN 2 HOURS

Looters staged 49 raids between 8 and 10 A.M.

A sniper on Aisquith street sent a bullet crashing into an automobile carrying office workers to their downtown jobs at 9:30 A.M. No one was hurt—and the sniper had disappeared into a maze of back alleys by the time police arrived.

Tear gas was used to disperse disorderly crowds in the 200 block Edmondson avenue and at Dukeland street and Edmondson avenue at about the time children were returning to school for the first time this week.

Downtown stores reopened as the struggle to regain a degree of normal life began—but they attracted few customers. About a quarter of the dress shops, drugstores, furniture stores and other businesses that stretch along Monument street on the extreme edge of the East Baltimore ghetto, were open for business. But their windows were boarded against bricks.

### LAND OFFICE BUSINESS

East Baltimore street merchants came out of hiding—and did a land office business from their horse-drawn vegetable wagons.

Except for a few isolated incidents, East Baltimore seemed to be coming out of its three-day nightmare of fire and violence.

But sporadic looting continued in the crowded west side neighborhoods.

Theodore R. McKeldin, the former Mayor who worked so hard while in office to avoid what finally happened, was a spectator at noon-time fire which burned out a laundromat and a haberdashery in the 1500 block of Pennsylvania avenue.

He drew some cheers and young Negroes crowded around for a pat on the head and a handshake.

"I think this [the riot] is dying out," he said.

Meanwhile Mayor D'Alesandro and other city officials were in conference with General York at the Army's 5th Regiment Armory command post. They were assessing the situation of the moment—and found real room for optimism.

Despite the continued lawlessness, their personal tours and intelligence reports had convinced them that the atmosphere was changing—that the end was in sight.

Emerging from the meeting, Mr. D'Alesandro issued this brief statement: "On the basis of information available to me which clearly shows a drastic decrease in the number and intensity of lawless acts, I am confident that the worst is over."

### FORTY-EIGHT PERSONS ARRESTED

Within the next hour, 48 persons were arrested, 19 new lootings were reported by Police Headquarters and 3 new fires were set.

At 2:10 P.M., a liquor store—its stocks already hauled off by looters—was put to the torch and burned out at Chase and Wolfe streets.

An hour later police reported that there was some sniper activity at a fire at Fayette and Pulaski streets.

### SOLDIERS ORDERED NOT TO FIRE

At 2 P.M. Leonard Logan, 25, of the 1900 block Aisquith street, walked out of a looted saloon at Harford road and Lafayette avenue with a load of wine. He ran right into the arms of three policemen.

Hustled to Central Municipal Court, he was booked, tried and fined $100 within 30 minutes.

But most looters operated in almost complete safety. Acting on the theory that their first duty is to preserve life, soldiers are under orders not to fire except in self-defense or against snipers.

City police have been forced to use their weapons a few times—but not to the degree that policemen in other riot-torn cities have in the last year.

Negroes are not causing all of the trouble in Baltimore. A few whites have taken part in the store-raiding. And on occasion, young white toughs in racial borderline areas of Baltimore have fomented strife.

One of the ugly incidents of yesterday took place at 4 P.M. at Monroe and Pratt streets, an area where whites and Negroes confronted one another Monday.

### WHITE YOUTHS GATHER

A cocky crowd of white teenagers and young white men gathered at the corner, spoiling for a fight.

A 20-year-old white woman, wearing an orange blouse and tight white denims cut off at the knees paraded back and forth with the words "white power" scrawled across the seat of her pants in red crayon.

At about 4:20 P.M., according to eyewitnesses, a Negro family driving by was stoned. The driver, a young Negro man, got out of the car leaving his wife and three young children in the car. A mob of whites attacked him. Others jumped on the car and kicked in the windows and stomped in the hood.

### THREE SHOTS FIRED

A tall white man wearing a white T-shirt and black pants ran past, pulled out a pistol and fired three shots into the car at the chil-

dren. He tossed the pistol into a grocery store and ran south.

About eight policemen arrived to reinforce small clumps of guardsmen on the corners. The police pushed the white crowd back.

The battered Negro car lurched off as the father apparently sought to get to a hospital. The crowd started jeering and then surged against the helmeted policemen. Two white men and the slogan-carrying white woman were arrested.

### THREE WHITES CONVICTED

The three whites arrested were booked at 5 P.M. and convicted of disorderly conduct 25 minutes later by Judge Basil A. Thomas. David R. Shears, 26, of the 1800 block McHenry street, a city sanitation worker, and James Walls, of Mount Airy, a laborer, were both fined $25. The woman, Anna E. Stein, of the 300 block Font Hill Avenue, a mother of two, was ordered held for sentencing on $250 bail until tomorrow.

High officials said in private that their greatest fear was for an increase in the frequency of such white-Negro standoffs. They say that any great increase in the number of those incidents could rekindle the troubles they believe are coming to a foreseeable end.

### TROUBLE SUBSIDES

Troubles subsided (as they have each day) during the 5 P.M. to 6 P.M. dinner break.

Arrests dropped from 62 between 4 P.M. and 5 P.M. to 21 in the next hour; lootings from 30, to 9, and fires from 5, to 1.

Then the mischief-makers took to the streets again—and from 6 to 7 P.M., eighteen stores were raided and nine fires were lit.

With the 7 o'clock curfew, Regular Army troops, National Guardsmen and police set up their checkpoint barricades again and began their sweeps of ghetto streets and alleys for "strays" to be jailed as violators.

### RIGHTS WORKERS TAKE TOUR

Anyone with a valid excuse—hospital workers, late shift employees in factories, newsmen, utility workers, doctors—were allowed to proceed if they could show proper identification.

Sixteen young civil rights workers were taken on after-curfew automobile tours of "sensitive" areas by plain-clothes Negro policemen.

Perhaps better than any sixteen others in the city, they know the potential troublemakers and their haunts—and they were as anxious as anyone else to bring the riots to an end.

Several of the sixteen have police records, and a few of them had donned pseudo-African garments.

They went on the pacifying cruises with the understanding that their actions were not going to lead to any arrests.

### "GONNA MEDIATE"

As one of them put it:

"We're not gonna snatch them—we're gonna mediate with them."

Walter H. Lively, the Negro militant who ran for a Second district seat in the City Council last year and is now director of the Urban Coalition, an organization sponsored by prominent whites and Negroes in an effort to further the cause of racial harmony, showed up and asked to be taken on the cruise.

He was turned away after a heated argument.

Shortly after the curfew hour, Patrolmen Charles George and Albert Warfield subdued a recalcitrant violator with chemical mace—the new weapon which serves as a tear gas and nerve-tingler at the same time.

In the process, they themselves got mace in the face and had to go to Mercy Hospital for a thorough scrubbing.

The violator was hustled to a police sta-

tion, his cheek streaming blood from a push against the sidewalk as he struggled to escape.

As the night wore on, it was evident that the pace was slackening from that of Sunday and Monday.

One veteran of many racial disturbances theorized that the hooligans were running out of steam, getting a little bit bored at what was becoming old-hat, looting and burning.

But there were some still loose (hundreds were in jail) who were up to no good. Early in the night, in the West Baltimore street block between Mount street and Fulton avenue, police heard the crack of a rifle shot, then a shotgun blast. The shots had been fired from one of the red-brick row houses in the block.

Two Negro men were flushed from their hiding nook in a back yard. They were placed under arrest, but no weapons were found.

At about the same time, someone was firing a rifle from the third floor window of a row-house on Longwood street, near North Avenue. The rifleman made his escape before police surrounded the house and searched it from top to bottom.

FEW AMONG RIOTERS BELIEVED OUTSIDERS

Reports of persons from outside of Maryland taking a large role in the four days of Baltimore rioting appear to be exaggerated, although one top State Police official says some outsiders "unquestionably" have been involved.

"Some looters unquestionably have come from out of Maryland," Maj. Thomas Smith, who heads the State Police intelligence unit, said yesterday.

"We've seen a lot of Virginia tags riding around," he said. Other policemen and newsmen have reported an unusually high number of cars with license plates from New Jersey and Washington.

SOME ARRESTED

There have been some out-of-staters arrested, but because of the flood of paperwork in the courts no reliable estimate is available on how many.

One judge, Robert B. Watts, who has been sitting in Central Municipal Court, said he had not noticed any out-of-staters directly involved in the rioting.

"And I've been looking for them," he said. Judge Watts is a Negro. A court clerk at Central Municipal Court said he remembered "a few" out-of-staters, but they all had valid reasons for being in Baltimore.

Two who got caught were young Washington men who drew 60 days in jail and $50 fines for violating the curfew Monday night after police found two empty gasoline cans and an oil can in their car.

Judge William J. O'Donnell, who sentenced them, said that their stories "just test the credulity of the most credulous."

The two were Ervin Davis, Jr., 21, an apprentice pressman, and James Brockman, 22. They said they were going to Philadelphia to visit Brockman's aunt. Their car was having fuel pump trouble, they said, explaining the cans. They were arrested at Lombard street and Central avenue.

LUNCH COUNTER GIVES FREE FOOD TO POLICE

A merchant whose lunch counter was almost burned out early in the rioting has been providing free coffee, stew and sandwiches to all comers at the West side command post ever since.

Samuel Kurland cleaned up the mess left by a fire bomb, then got his lunch counter and grocery store in the 1800 block Pennsylvania avenue into round-the-clock operation.

Besides the police, soldiers and firefighters, he served a 23-year-old mother of two from the 1300 block North Eutaw place yesterday.

Miss Carol Lewis, desperate for milk for her two sons, 3 months and a year old, knew of nowhere else to go, Mr. Kurland gave her a half-dozen cans of evaporated milk and police arranged for an escort to get her home safely after the curfew.

---

SEND THE BILL TO CONFERENCE

Mr. DOLE. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Kansas?

There was no objection.

Mr. DOLE. Mr. Speaker, the key vote today will be whether or not the civil rights bill, H.R. 2516, should go to conference. I shall vote to send it to conference because of the many amendments added by the Senate which have not been fully debated in the House. The Senate added provisions on rights of Indians, fair housing, a civil disorders section which includes provisions dealing with the transportation of explosives and incendiary devices, as well as other provisions.

If the previous question is voted down then I urge my colleagues to support the motion which will be offered by the gentleman from California [Mr. SMITH]. As everyone here knows if the vote on the previous question is in the affirmative then a second vote will be on the question of accepting the Senate amendments. It seems certain, because of recent events, that the House will not today vote to send this highly controversial measure to conference. In that event, and only in that event, will I vote to accept the Senate amendments.

While my mail reflects that the so-called fair housing section is the most controversial it is not, in my opinion, the most important or far-reaching provision in the bill. The riot section, which passed this House by a vote of 347 to 70 on July 19, 1967, is still almost intact. With civil disturbances and unrest at an alltime high in our country the antiriot provision, if properly administered and strictly enforced will put an immediate end to the activities of Stokely Carmichael, Rap Brown, and all other militants, regardless of their race or color. I opposed previous open housing provisions and voted against the bill containing a "fair housing" provision, though it passed the House on August 9, 1966, 259 to 157. I do not now believe the housing section to be the overriding provision in H.R. 2516. On balance I believe that if the House does not send the bill to conference then the Senate amendments should be accepted. I would add there is nothing in this bill preventing a homeowner from selling his property to anyone. I repeat that the antiriot section coupled with the civil disorders section can be helpful in curbing civil strife in the weeks and months ahead.

---

THE CIVIL RIGHTS BILL

Mr. LLOYD. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Utah? There was no objection.

Mr. LLOYD. Mr. Speaker, a decent respect to the opinions of the citizens of the Utah Second Congressional District, and perhaps to my family and friends, requires that I should declare the reasons for the decision which I have made in the matter of the civil rights bill which will come before us today which includes title VIII covering the subject of open housing.

This issue of open housing has divided the people of my district more than any issue of my knowledge in 8 years in the Utah State Senate and more than 3 years in the U.S. House of Representatives. At the same time, it has challenged me to assemble and analyze the individual opinions of my constituents, more than 500 of whom have personally communicated with me on this issue and to further assemble and analyze the hard evidence and statistics which make of this issue a situation approaching a national emergency.

As a Member of the U.S. House of Representatives in 1964, I supported the civil rights bill of that year which was designed to eliminate discrimination in the fields of education, employment, public accommodations, and voting, among others. At that time, and later, I voiced my opinion that to extend this legislation to the field of housing would be an undue infringement upon the property rights of the individual.

Social and economic changes in the United States since that date have brought me to an opposite conclusion.

In the long war in Vietnam, I have voted to draft Negro youths to risk their lives in defense of this country. How can I, therefore, now vote against eliminating a discrimination which faces them when they return home?

In the past week we have had burning, rioting, and looting in the Nation's Capital and in other cities of the Nation in the wake of the assassination of Dr. Martin Luther King. Effective law enforcement has become an emergency need of this country, perhaps more than ever before in our history. How can I, therefore, insist upon, and work for complete, effective and nondiscriminatory law enforcement when the fact of discrimination in housing gives the Negro American an excuse, however false, that he is entitled to violate the law because of the discrimination which exists against him. If the majority of the Members of Congress were to vote flatly against elimination of discrimination in housing, I think it is entirely possible that the black smoke that has enveloped the dome of the Capitol of the United States during the last week might develop into hot flames which would spread across the Nation.

There are more than 22 million Negroes in America. This exceeds the entire population of Canada. This minority group against whom discrimination in the housing field has been accepted in the past cannot be further ignored in America. We can either have a nation divided into hostile camps of black and white, or we can learn to live in harmony together. There seems to be only one realistic, safe and sensible course to me, given the facts of the real world in which we live.

The great volume of correspondence

*April 10, 1968*    CONGRESSIONAL RECORD — HOUSE    9547

which I have received from the people I represent has voiced opposition to this legislation, and I cannot avoid my responsibility to the people whom I represent. Granted that some of this mail has been inspired by organizations who are more interested in inflaming passions than enlightening and urging citizens to reason, there are still hundreds of sincere, thoughtful, and worried citizens who have written me out of their personal convictions that they consider this bill an unwarranted invasion of their property rights, and I must respect their thoughtful judgment.

Today there will be two votes. The first will be a vote on whether or not we should vote on the Senate-passed civil rights measure without chance for amendment or further conference with the Senate. I think there are good reasons why I should vote against this motion. First, out of respect to the majority of those I represent; second, because the legislation as passed by the Senate has never had the opportunity to be exposed to the natural legislative process of committee hearings; and third, because there exists a discrimination against one industry, the real estate industry, which I believe can be reduced by a House-Senate conference. As a matter of fact, this bill before us today was originally a House of Representatives bill which was aimed at increasing the tools we need to punish those who go across State lines for the purpose of inciting riots. Under House rules, the Senate amendment, if it had first been offered on the House floor during our discussion of this antiriot legislation would, in my opinion, have been ruled out of order as not being germane. No such rule exists in the Senate. For these and other reasons, therefore, I think it entirely appropriate that I vote against the motion to consider the Senate bill, and if this motion should fail, we will then have the opportunity to improve the Senate-passed legislation in a climate of peace and calmness rather than in the climate of emergency and ill-will that is apparent throughout the Nation today.

If this motion should prevail, however, and I am called upon either to accept this civil rights legislation as passed by the Senate, or reject it out of hand, I will vote for the legislation for the reasons which I have given.

I recognize that this decision, which is based on my best judgment of many weeks of serious thought and investigation, will not meet with the approval of all my constituents. I can only request that they accord to me the same respect and consideration for my honest views as I do theirs, and in reality this is more than a conscience vote; it is a vote in which consciences are in conflict.

It is our responsibility as Members of Congress to promote domestic tranquility, and to make those judgments which will produce maximum benefits from the potentials of our society, a society which is both black and white and which must be united rather than divided in the interests of ourselves and our posterity and of this Nation which we all love so well.

THE PROGRAM FOR CONSIDERATION OF CIVIL RIGHTS LEGISLATION

Mr. ALBERT. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Oklahoma?

There was no objection.

Mr. ALBERT. Mr. Speaker, in a 1 minute speech a few minutes ago my distinguished friend the gentleman from Iowa [Mr. GROSS], after expressing the same concern which we all share about the rioting and disorders which have been taking place in this city and elsewhere across the Nation, stated that he hoped that the House would not capitulate to such activity.

Now, let us get the record straight. On Thursday afternoon, before the tragic death of Dr. King, before the first tragic act of rioting had taken place in the city of Washington or elsewhere, the program for this week was announced. It was announced at that time, before any of these events, that H.R. 2516, to provide penalties for interference with civil rights, which was subject to action by the Committee on Rules, would be taken up this week. It was stated at the time that we expected to finish this act before the Easter recess.

Who would it be who would be capitulating to the unfortunate events to which the gentleman from Iowa referred if we changed the program at this time?

CLEVELAND PLAIN DEALER PRAISES PRESIDENT JOHNSON'S SACRIFICE

Mr. FEIGHAN. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Ohio?

There was no objection.

Mr. FEIGHAN. Mr. Speaker, the Cleveland Plain Dealer has expressed our Nation's admiration to President Johnson for the "statesmanship with which he coupled his political withdrawal with a new drive for peace" and for his "eloquent appeal for national unity."

During this time of challenge for America we must show the reason and responsibility displayed by President Johnson—not frenzy and emotion. We must have unity and high purpose—not division and partisanship.

Few Presidents in American history have been subjected to the burden of criticism heaped on President Johnson—but none have borne the burden so nobly. The President has not sacrificed prudence for popularity, rationality for ratings.

The President's ultimate sacrifice could set an example of selfless devotion to a country which will end the rancor and division in our land. His renewed attempt at peace could help end the war which has polluted our political discussion.

Together, this Nation under President Johnson carved out legislative milestones which set a standard of creativity and compassion for future generations to emulate.

United we moved to help the aged and the young, the poor and the rich, the farmer and the city dweller enjoy a fuller, more meaningful life.

We must not lose through division all that we have gained through unity. We must continue to debate—but never divide.

The President has given the Nation, in the words of the Cleveland Plain Dealer, "a powerful lesson in devotion to duty." We must all repair to the banner of peace and unity the President has raised.

Together we can meet the difficult tomorrows ahead.

I insert into the RECORD the Cleveland Plain Dealer editorial:

L. B. J.'s CONCEPT OF PRESIDENCY

With the same statesmanship with which he coupled his political withdrawal with a new drive for peace, President Johnson made an eloquent appeal for national unity without which the nation would be in great danger.

His call for reason and responsibility among all the "frenzy and emotion" of an election year is one that public and candidate can take to heart with profit to both.

The respect with which he looks upon the office he holds was apparent in his strong support for great responsibility on the part of presidents.

"For a president to buy public popularity at the sacrifice of his best judgment is too dear a price," he told the National Association of Broadcasters in Chicago. "The nation cannot afford such a price or such a leader."

Depth of his belief in the rightness of his Vietnam decisions was never more accurately measured than in this simple statement of his concept of presidential responsibility.

Criticism of Mr. Johnson has centered on his dogged adherence to the country's commitment made to South Vietnam long before he became President.

By abandoning it or by altering it, he could have put himself on the side of large segments of the public, especially among the young, and enhanced his numerical support.

But he would have found himself on a collision course with his concept of his duties as President.

He has chosen to remain steadfast in that concept rather than make the "pursuit of public tranquility" his first goal.

He has given the nation a powerful lesson in devotion to duty, for which suitable gratitude could be expressed by hearkening to his appeal to let reason prevail over frenzy.

JOHN CARDINAL KROL MAKES ELOQUENT PLEA FOR BROTHERHOOD

Mr. FEIGHAN. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include an address.

The SPEAKER. Is there objection to the request of the gentleman from Ohio?

There was no objection.

Mr. FEIGHAN. Mr. Speaker, perhaps the greatest problem confronting all mankind today is how to translate the word "brotherhood" into reality.

One of the many people who has been working tirelessly to achieve this objec-

tive is John Cardinal Krol, of Philadelphia.

The National Conference of Christians and Jews honored him for these efforts at a recent dinner in my home city of Cleveland. Mr. A. M. Luntz was chairman of the dinner, which was attended by many of our city's leading citizens.

Cardinal Krol spoke of the problem of bringing "unity out of the greatest diversity." He eloquently pointed up the fact that, however different their origins and backgrounds may be, all members of the human race may have much more in common than they have differences.

Because of the great wisdom and importance of his message, I am placing the text of Cardinal Krol's address in the CONGRESSIONAL RECORD for the guidance and inspiration of all who may read it. The Cardinal's address follows:

### ADDRESS BY CARDINAL KROL

Distinguished members, friends and guests of the National Conference of Christians and Jews: It is a pleasure to accept the signal award conferred upon me. I accept with sentiments of deep gratitude and with the conviction that the conferral reflects your benevolence towards me, more than it does my merits.

It is an added pleasure to receive the reward in my native city of Cleveland, and to receive it on the very day of my transfer seven years ago to the See of Philadelphia. The transition was an easy one because the high level of brotherly love practiced in Cleveland easily qualified me for citizenship in Philadelphia—the City of Brotherly Love.

Cleveland has been a microcosm of various nationalities, ethnic groups, creeds, colors and cultures. The people of Cleveland were not a rootless people. They were not receptive to the suggestion of purifying the alleged dross of alienism in a melting pot. They were unwilling to trade their rich cultural heritage, their ancestral identity for an amorphous americanism. They chose to preserve the best elements of their traditions and to integrate them into that great mosaic which is Cleveland, and which is America. They lived according to the motto—"E Pluribus Unum"—"Unity out of the widest diversity."

Living according to this motto, they gave living proof that economic, social, racial, ethnic, religious and other differences were not a necessary cause of strife. They lived in peace and harmony sharing each others joys and sorrows. They maintained their identity and engaged in a healthy rivalry and competition which served as an incentive to greater effort. Raised in such an atmosphere and inspired by the principles of faith, the concept of brotherhood—of the one family of God, became a living reality. Whatever worthwhile efforts I have made in the areas mentioned in the citation are due largely to the influences and experiences that were mine in this city of Cleveland. I take pride in being one of Cleveland's sons, and I acknowledge my debt to the city and to its people.

My acceptance of the award is intended also as a tribute to the National Conference of Christians and Jews for its forty years of effort to promote its objectives. The Conference came into existence shortly after the alarming demonstration of religious prejudice in the 1928 presidential election. The Conference was not intended to be an interfaith movement geared toward religious syncretism or common worship. It was established as a civic organization of religiously motivated people. It was an effort to coordinate the efforts of different religions in order "to promote justice, amity, understanding and cooperation . . . to eliminate intergroup prejudices which disfigure and distort religions, business, social and political relations." All of the efforts of the Conference were conducted "with a view to the establishment of a social order in which the religious ideals of brotherhood and justice shall become the standards of human relationships."

Since my offer to make a two-minute speech of acceptance was graciously smothered under a directive to speak no less than ten minutes, I shall spend the time by directing your attention to those "religious ideals of brotherhood and justice" which must be the standards of human relationships.

We are privileged to live in a very interesting age. The speed of technical and scientific progress in our times defies the imagination. Some of us have witnessed the invention and development of the automobile, the telephone, radio, television, electric light and power, air and space travel. There has been comparable progress in some areas of human relations. We have moved from isolationism to global interest and involvement. We have become the keepers of our brothers in Africa, India, Asia and in other parts of the world. Through governmental and voluntary agencies, we feed and clothe people, and share with them our time, talents and technical know-how.

On the home scene progress in the social, economic, civic and welfare areas is incredible. We have moved from the *laissez-faire* and "dog eat dog" policies to a "tender loving care" policy covering human life from cradle to the grave. Laws were enacted to protect the civil rights of fellow citizens. The disadvantaged, the handicapped command special attention; the aged, the sick, the orphaned receive adequate support. Social Security, Medicare and Medicaid—the War on Poverty and on Illiteracy—all of these are manifestations of our concern for neighbor, and of our practical implementation of the concept of brotherhood of all men. Such progress, truly unprecedented in the history of the world—is most gratifying, and will forever remain a compliment to our age—to our generation.

This gratifying progress instead of diminishing, seems to occasion an epidemic of unrest and dissatisfaction. The order of the day seems to be unfettered criticism, suspicion, cynicism, racial hatred, ideological fanaticism, resentment, violence and riots. Signs of anarchy and repression are increasingly evident. Our national crime rate is increasing seven times faster than our population, and causes a drainage of $27 billion dollars annually from our economy.

Why, in spite of such improvements in the social and economic conditions, is there such a deterioration or demoralization in the area of human relations? Why should there be so much conflict—so much violence? Why have we not found a proper solution to our woes? The problem is complex. The answers are varied. But there is an underlying principle—a premise which must inspire and guide all solutions, and that is that social order cannot be maintained to the exclusion of religious ideals and principles. The world is not an accident, but was created by God, and we are God's creatures. We and the world can operate successfully only by following God's blueprint—His commandments and teachings. There must be in our daily life and activities a return to God.

Four centuries ago natural scientists started a movement by proclaiming their autonomy and rejecting all that could not be sensed, weighed or measured. This movement proved to be the fertile soil for a variety of materialistic philosophies in various disciplines and fields of study. It helped to spawn a variety of strange theories, which when applied to the practical order resulted in a great deal of mischief, disorder and tragedy. A prime example of such theories are those of Karl Marx which developed into the system of Communism.

The movement away from God still enjoys a measure of popularity. The "God is Dead" cliche which recently made profitable copy is now filtering through to the primitive areas, but it is regarded as a sign of subnormal culture. A reverse movement is setting in among the intellectual leaders of the scientific community. As they probe into space and acquire mastery over the tremendous forces of nature, they realize that their calculations are based on predictable patterns of movements in the world and in space. They know that they are not creating but merely discovering what is and has been.

Their reflections cause them to reject the fiction that the world is an accident; the fiction that human life is meaningless; the fiction that man is a prisoner of his own limited resources, and a captive of the boundaries of space and the limits of time. They realize that without God, man would be entering the world without his own prior knowledge or consent, and he would be destined for extinction, leaving but a brief memory, and a faint trace of dust. They realize that faith in God is not an escape from life and its responsibilities, but rather an affirmation of the indestructible meaning and purpose of every man. The trend to return to God by leaders of the scientific community is neither noisy or massive, but it is current and growing.

The Catholic Church, with its two thousand years of experience, has almost a seismographic ability to detect great movements of the human mind. Four centuries ago, at the beginning of the trend toward materialism, the Church recognized the danger. The now famous Council of Trent was convened. The Council Fathers adopted a defensive posture. Ties with outside communities were reduced to a minimum. Fear of contamination and contagion caused a closing of windows and doors. The Church became a fortress committed to preserve not only the purity of faith, but faith in God itself.

Now, four centuries later, seeing a favorable shift in the winds of human thinking, the II Vatican Council was convened by Pope John XXIII. Doors and windows were thrown open. The defense posture was changed into an apostolic—an aggressive posture. Bridges were lowered to establish dialogue with other communities of believers and unbelievers. Initiatives were taken to unify the Christian and the whole human family. Intensive and relentless efforts are being made to restore peace and justice in the human family.

Today, the Church proclaims more vigorously than ever before the basic premise for social order. That premise is that man is a person—a spiritual subject who by nature and hence by God is endowed with inalienable rights to reach his perfection and destiny. These basic rights must co-exist and be exercised harmoniously with the basic rights of other individuals.

This basic premise must penetrate into every phase of human relations. If man does not recognize his responsibility to his Creator—to God his Father, he will have no reason or motive to recognize his responsibility to his neighbor—his brother. Human laws and programs, as necessary as they are, are not sufficient to insure social order and good human relations. These relations must be governed by the religiously inspired virtues of honesty, sincerity, love and reverence for life and a practical acknowledgment that all men are children of the one Father in Heaven.

Spiritual and religious leaders, particularly those who accepted Christ's challenge to cast fire upon the earth, must speak and work to promote religious and spiritual values. It is paradoxical that efforts to introduce such values into the mainstream of daily life are used to discredit religious leaders. They are

regarded by some as purveyors of weak sentimentality which cannot survive in the free-swinging competition of the market place. They are regarded by others as enemies to the policy of Church-State separation, as if there were no room for co-operation of all forces, including religious ones, for the good of mankind and for the common good. Still others will regard all references to the social order, to civil rights, etc., as cause for anxious concern about possible infiltration of communist ideas into religion.

It is well to recall that Communism takes advantage of any weakness, any fault in society, to represent itself as the only possible remedy for such weaknesses. The stated ultimate objectives of Communism are to promote man's betterment, liberation, and to insure justice, equality, peace and plenty for all. These objectives are promised to all who submit in total obedience to the elite corps of social engineers. Communism for all its anti-God and anti-religion protestations, is in fact an involuted religion and as such is a tragic fiction.

Communism inflames man's sense of mission and his ambition for creativity. It involves him in an effort to achieve a transcendent goal beyond and better than the world appears to offer. Such promised opportunities have attracted intellectuals even at the price of treason to their own country. The stated ultimate objectives of Communism are to improve the lot of man, and to establish a social order—not according to religious ideals which respect the dignity of man, but according to materialistic philosophies, which accord all right and power to the State, rather than to men.

The 40 year efforts of the Conference of Christians and Jews to establish a social order in which human relations will be governed by the religious ideal of brotherhood and justice, have been a signal service to God, to man and to Country. No nation can survive without a religious and moral core. No amount of laws, no amount of welfare programs can preserve social order and good human relations. Our love for man, to be universal and all embracing, must derive from the love of God. We cannot claim ties of brotherhood unless we acknowledge a Common Father.

I take occasion to congratulate the Conference on this its 40th anniversary. I pray that in the next forty years your progress in promoting good human relations may exceed that of our scientific and technological development, so that we might all enjoy the rich blessings of God on earth and His presence in heaven.

Again I thank you for the signal award, for your cordial reception and I thank all of you for your kind and patient attention.

Mr. Louis B. Seltzer, retired editor of the Cleveland Press, wrote an article for the dinner program which vividly describes the career of Cardinal Krol. This article follows:

He was the fourth child of Polish immigrant parents who settled on Cleveland's Southeast Side. They named him John J. Krol.

John grew up like any other Cleveland boy—had his fun, had his fights, his parental discipline, learned he must work and sacrifice to reach goals.

He went to Cathedral Latin High School. He studied for the priesthood here. It wasn't really that simple. He and his mother would go out hanging wallpaper to earn that extra money for schooling.

After he became auxiliary bishop in Cleveland, there was a splendid reception one time at the Bratenahl home of the late Archbishop Edward Hoban. An alpine rib roast of beef towered over all dishes at the buffet. Behind it a man named Krol presided, carving knife flashing.

"Why, bishop, you do that like a professional," one of the guests remarked.

"I ought to," he smiled. "I worked my way through school doing this." He had been a meat-cutter, a butcher for one of the major food store chains during those characterformative years.

Today Cleveland's John J. Krol is, of course, John Cardinal Krol, archbishop of Philadelphia—a far cry from a paperhanger, a long shout from a butcher. He wears a Red Hat.

How did he come to the attention of the Vatican?

Somehow, somewhere along the line, when John J. Krol was a young priest, Archbishop Edward F. Hoban, that most astute church leader encountered him and instantly recognized in him a certain spark, a budding administrative genius, a scholarliness about him—and a rich soul.

Cardinal Krol, even when he was a monsignor, had gained a name hereabouts as a foremost authority on canon law. No one knew it better than Archbishop Hoban.

There had been an event in Columbus, Msgr. Krol drove Archbishop Hoban back to Cleveland afterward. Also in the auto was Archbishop Amleto (now Cardinal) Cicognani, apostolic delegate from the Vatican to the United States. Cicognani told Hoban he was confronted by a very ticklish problem in canon law.

Archbishop Hoban pointed to driver Krol and said, "There is an expert. Why don't you have Msgr. Krol brief it for you?" Msgr. Krol did. Archbishop Cicognani was so pleased that from then on he called upon this brilliant priest to do other research for him.

Thus it was inevitable that Cardinal Krol would come to the very favorable attention of the Vatican.

And it might even be that Cardinal Krol's golf prowess—he used to win more than his share of prizes in contests at Parmadale—also won him approval at the Vatican!

These are but a few reminiscences about the man we honor tonight. Perhaps they don't really bear on the subject, except to portray for you something more than an impersonal Red Hat.

John J. Krol, son of Polish immigrants, is as human, as brother-embracing as any man who has walked Cleveland's streets—seeking a better plight for Negroes, for Indians, for anyone downtrodden. Interesting himself in the problems of nationality groups. Bulwarking the ecumenical struggle.

Truly, he is one who lives his belief in the Fatherhood of God and the Brotherhood of Man.

---

## STATEMENT BY LEADING MEMBERS OF THE BAR URGING ENACTMENT OF FAIR HOUSING LEGISLATION

Mr. BINGHAM. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. BINGHAM. Mr. Speaker, there has just come to my attention this morning a statement issued by more than 60 leading members of the bar respectfully urging the House of Representatives to enact fair housing legislation. The signers of this statement include the president-elect of the American Bar Association, the president-elect designate, five past presidents of the American Bar Association, 10 law school deans and officials

of other national, city, and State bar associations throughout the country. The signers also include such distinguished New York bar names as Arthur H. Dean and Roswell Gilpatric, former Deputy Secretary of Defense. I believe that this statement is highly significant and should be drawn to the attention of the Members.

The statement and list of signers follow:

STATEMENT

As lawyers committed to the rule of law, we respectfully urge members of the House of Representatives to vote in favor of fair housing legislation.

If we are to maintain an orderly society ruled by law, the law itself must be just to all people. It must remedy injustice, wherever found. It must be responsive to a deeply felt need for social change.

Ours has always been a land of opportunity. But the door of opportunity is not yet fully open to millions of Americans—to those who are denied the right to rent or buy homes because of their race. The right to bring up a family in decent surroundings, vital to a harmonious society, is widely withheld.

No principle of law can justify this denial of equal opportunity to so many of our citizens. If not soon remedied, it may turn our society into a house divided against itself. For the sake of simple justice, we call upon the Congress to enact a fair housing law. Under such a law, we call upon all citizens to exercise their rights and discharge their responsibilities with due regard for the common obligation to preserve the harmony and tranquility of the Nation.

LIST OF SIGNERS

Frederick A. Ballard, Washington, D.C., member, President's Commission on Crime, District of Columbia; member of the Council, American Law Institute.

Francis Biddle, Washington, D.C., former Attorney General of the United States.

Derek Bok, Cambridge, Mass., dean, Harvard Law School.

Henry Brandis, Jr., Chapel Hill, N.C., dean, University of North Carolina Law School.

John G. Buchanan, Pittsburgh, Pa., former chairman, Standing Committee on Federal Judiciary, ABA.

Clifford N. Carlsen, Portland, Oreg.

Lloyd N. Cutler, Washington, D.C., chairman-elect, ABA Section on Individual Rights and Responsibilities.

James T. Danaher, Palo Alto, Calif.

Arthur H. Dean, New York, N.Y., cochairman, Lawyers' Committee for Civil Rights Under Law.

James C. Dezendorf, Portland, Oreg., former president, National Conference of Commissioners on Uniform State Laws.

Robert F. Drinan, Boston, Mass., dean, Boston College Law School.

John W. Douglas, Washington, D.C., former Assistant Attorney General.

Jefferson B. Fordham, Philadelphia, Pa., dean, University of Pennsylvania Law School; chairman, ABA Section on Individual Rights and Responsibilities.

Herbert A. Friedlich, Chicago, Ill.

Arthur J. Freund, St. Louis, Mo., member, House of Delegates, ABA.

Ralph F. Fuchs, Bloomington, Ind., professor of law, Indiana University Law School.

Lloyd K. Garrison, New York, N.Y., former president, Board of Education, New York City.

Roswell Gilpatric, New York, N.Y., former Deputy Secretary of Defense.

William T. Gossett, Detroit, Mich., president-elect, American Bar Association.

James C. Greene, Los Angeles, Calif.

Albert E. Jenner, Jr., Chicago, Ill., former president, American Judicature Society.

Charles W. Joiner, Ann Arbor, Mich., dean, University of Michigan Law School.

Orrin G. Judd, New York, N.Y., member of the Council, Section on Individual Rights and Responsibilities ABA.

Steven E. Keane, Milwaukee, Wis., president, Milwaukee Bar Association.

David W. Kendall, Detroit, Mich., former Counsel to the President.

Earl W. Kintner, Washington, D.C., former president, Federal Bar Association.

Robert H. Knight, New York, N.Y., former General Counsel, U.S. Treasury.

Stephen B. Lemann, New Orleans, La.

Robert E. Lillard, Nashville, Tenn., former president, National Bar Association.

Cloyd Laporte, New York, N.Y., former president, Association of the Bar of the City of New York.

Ross L. Malone, New York, N.Y., former president, American Bar Association; general counsel, General Motors Corp.

Orison S. Marden, New York, N.Y., former president, American Bar Association; Association of the Bar of the City of New York.

Burke Marshall, Armonk, N.Y., former Assistant Attorney General and former cochairman of Lawyers' Committee for Civil Rights Under Law.

Robert B. McKay, New York, N.Y., dean, New York University Law School.

Vernon X Miller, Washington, D.C., dean, Catholic University Law School.

James E. O'Brien, San Francisco, Calif.

Louis F. Oberdorfer, Washington, D.C., co-chairman, Lawyers' Committee for Civil Rights Under Law.

Wm. H. Orrick, Jr., San Francisco, Calif., Former Assistant Attorney General; chairman, San Francisco Crime Commission.

Louis H. Pollak, New Haven, Conn., dean, Yale Law School.

William Poole, Wilmington, Del., former member, board of governors, American Bar Association.

Paul A. Porter, Washington, D.C., former Chairman, Federal Communications Commission.

John H. Pratt, Washington, D.C., former president, District Bar Association.

William P. Rogers, Washington, D.C., former Attorney General of the United States.

Samuel I. Roseman, New York, N.Y., former president, Association of the Bar of the City of New York.

Charles S. Rhyne, Washington, D.C., former president, American Bar Association.

Barnabas F. Sears, Chicago, Ill., former president, Illinois Bar Association.

Bernard G. Segal, Philadelphia, Pa., former president, American College of Trial Lawyers; president-designate, American Bar Association.

Whitney N. Seymour, New York, N.Y., former president, American Bar Association.

Jerome J. Shestack, Philadelphia, Pa., member of the Council, Section of Individual Rights and Responsibilities ABA.

Sylvester C. Smith, Newark, N.J., former president, American Bar Association.

Davidson Sommers, New York, N.Y., general counsel, Equitable Life Assurance Society.

David Stahl, Pittsburgh, Pa., deputy mayor, Pittsburgh.

Charles P. Taft, Cincinnati, Ohio, former president, Federal Council of Churches of Christ in America.

James F. Thacher, San Francisco, Calif., trustee, California State Colleges.

Gray Thoron, Ithaca, N.Y., dean, Cornell Law School.

Wright Tisdale, Dearborn, Mich., general counsel, Ford Motor Co.

Harrison Tweed, New York, N.Y., former president, American Law Institute; Association of the Bar of the City of New York.

Cyrus Vance, New York, N.Y., former Deputy Secretary of Defense.

John W. Wade, Nashville, Tenn., dean, Vanderbilt University Law School.

William F. Walsh, Houston, Tex., chairman, Section on Criminal Law, ABA.

Bethuel M. Webster, New York, N.Y., former president, Association of the Bar of the City of New York.

Wilson W. Wyatt, Louisville, Ky., former mayor of Louisville.

Mr. GERALD R. FORD. Mr. Speaker, will the gentleman yield?

Mr. BINGHAM. I will be glad to yield to the gentleman from Michigan.

Mr. GERALD R. FORD. I received the same communication to which the gentleman refers, and as I looked over the memorandum from the group, they endorsed fair housing.

Mr. BINGHAM. That is what I said.

Mr. GERALD R. FORD. They did not endorse the acceptance of the Senate bill as a whole. They specifically indicated that they favored a government of law, not of men.

Yesterday before I left the office I sat down and wrote a letter to, I think, seven of these eminent legal technicians, individuals who are personal friends of mine, and I took the care to send to them a 24-page digest of the differences between the House version of the bill and the Senate version of the bill. I respectfully suggested that these technicians of the law, these men who believe in laws being well written, ought to take a look to see what they by inference if not by direction are urging the House of Representatives to approve here today. I will be interested in their responses, because the members of the legal profession who occupy the positions that these men occupy, including the deans of several of our law schools, are supposed to be the leaders in urging the Congress of the United States to pass responsible, constructive statutes. This group should be last to urge legislative action that would result in poorly written legislation.

Mr. BINGHAM. Mr. Speaker, since I have yielded to the gentleman from Michigan, would he ask for some time so I can respond?

The SPEAKER. The time of the gentleman from New York has expired.

## ANNOUNCEMENT OF HOUSING SUBCOMMITTEE MEETING ON URBAN INSURANCE BILL

Mr. BARRETT. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. BARRETT. Mr. Speaker, the Subcommittee on Housing of the Committee on Banking and Currency has just completed 4 weeks of hearings on housing legislation, including the vital bill to provide necessary Federal support for hazard insurance in inner city areas where it is not now readily available. The destruction which has hit so many cities, small and large, throughout the country in recent weeks has focused attention on the need to build a better America. An essential ingredient of this rebuilding is something which most Americans take for granted—the ability to obtain insurance against fire and other hazards. For all too many people, such insurance is either not available or can

be obtained only at a prohibitive cost. As we found in our hearings, prudent lenders simply will not make credit available without the necessary protection of casualty insurance. The key to this in today's setting is the fear of private insurance companies that they might suffer catastrophic losses due to riots. These outbreaks are a matter of national concern and quite appropriately, an object of Federal commitment. We have before us several bills proposed by the administration and by individual Members to live up to that Federal commitment by the provision of Federal reinsurance by which we can make private insurance for normal risks available to all. Because of the urgency of this matter, the Subcommittee on Housing will give the urban insurance legislation, including the administration bill, H.R. 15625, the bill introduced by the gentleman from Pennsylvania, Congressman MOORHEAD, H.R. 14263, and other pending bills their first attention.

Mr. Speaker, the Subcommittee on Housing will go into executive session on Thursday, April 25. These bills provide that Federal reinsurance could go into effect the day the bill is signed into law. It is our hope that action on this legislation can be expedited and I am sure that when it is brought to the floor, it will receive the overwhelming support of the House.

## SUPPORTING H.R. 2516

Mr. KARTH. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Minnesota?

There was no objection.

Mr. KARTH. Mr. Speaker, I rise to support, with enthusiasm and conviction, H.R. 2516 and its objectives.

I have for a long time supported and attempted to implement by legislation the rights and privileges all Americans are inherently entitled to under the Constitution of the United States.

While a member of the Minnesota State Legislature I, 13 years ago, was the sole author of an open housing bill. Since then our State has passed such legislation; legislation of a character similar to what is before us today. Yes, there are some differences, but in each area that those differences appear the Minnesota law is of greater force and effect. I am proud of that.

I am hopeful that this body, the greatest deliberative body in the world, will speedily pass H.R. 2516.

## RESPONSE TO THE MINORITY LEADER

Mr. MONAGAN. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Connecticut?

There was no objection.

Mr. MONAGAN. Mr. Speaker, I yield to the gentleman from New York [Mr. BINGHAM].

Mr. BINGHAM. I thank the gentleman from Connecticut very much for yielding to me.

I just want to say briefly in response to what was said just now by the distinguished minority leader that a member of this group, a distinguished Washington lawyer, called me this morning and asked me to call this statement to the attention of the House today. Certainly it is a fair inference from that request that the group knows exactly what is before the House today and is asking the House to pass the bill that is before it today. I hope it will do so and thus take a historic step toward the realization of our national ideals.

Mr. MONAGAN. Mr. Speaker, I yield back the balance of my time.

## LYNDON JOHNSON AS PRESIDENT

Mr. ANNUNZIO. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

Mr. ANNUNZIO. Mr. Speaker, on April 3, four letters appeared on the editorial pages of the Chicago Tribune under the heading: "L. B. J.: 'Won't Run'." I should like to read one sentence from each of the four letters. R. M. P. writes:

He will undoubtedly be recognized as the greatest President that ever lived.

E. K. said:

President Johnson is a man of firm convictions, for which he has been vilified.

From L. H., a prediction that:

He may endear himself to get tossed right back into office.

Finally, W. R. K. writes:

Regardless of all the criticism thrown at him, our present President, I firmly believe, is the best qualified man to lead this country for the next four years.

These spontaneous expressions of opinion by average citizens reflect, in my opinion, a very broad-based mood in the country following President Johnson's historic announcement. I insert these letters to the editor in the RECORD at this point:

L. B. J.: "WON'T RUN"

PALATINE, April 1.—With accuracy, our adversaries in the world have in the past been able to predict American policy during election years. Unpopular measures would not be initiated by a President hoping for reelection. But now President Johnson has a free hand. Instead of twisting arms to get support, he may and probably will face his opponents openly. Being freed from many hampering considerations, Johnson will probably emerge as a man of action, capable of doing more than can the ordinarily hamstrung President. He may endear himself enough to get tossed right back into office.

LOTHAR HUSSMAN.

GLEN ELLYN, April 1.—Last January my 11-year-old son asked me, "Mom, is President Johnson a great President?"

I said, "Yes, he is. He may not be so ac-

claimed today, but he will undoubtedly be recognized as the greatest President that ever lived."

Now I thank our beloved President for proving to the world that a truly great American is among us, one so endowed with love of his people and country that he sacrificially chose not to run. Let us honor this great man by uniting as one.

ROSE M. PALMA.

CHICAGO, April 1.—President Johnson is a man of firm convictions, for which he has been vilified. Now may God and the parties help us elect a President with the diplomacy and charm of Disraeli, the wisdom of Solomon, and the humanity of Lincoln to lead us out of this divisive Viet Nam war. We should not have too much trouble finding such a man. Every candidate claims to have all these qualifications.

MRS. ELISE KLANG.

CHICAGO, April 1.—Regardless of all the criticism thrown at him, our present President, I firmly believe, is the best qualified man to lead this country for the next four years. The job is tough and I, J. B. isn't perfect, but could any of us have done as well in his position?

W. R. KECK.

## PASSAGE OF CIVIL RIGHTS BILL WILL NOT STOP RIOTING

Mr. JOHNSON of Pennsylvania. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. JOHNSON of Pennsylvania. Mr. Speaker, my office, as well as the offices of many of the other Members, is being inundated with telegrams and letters stating that "you must pass this civil rights bill today."

Mr. Speaker, I have made a study of the open housing laws that are now in effect in the States of Pennsylvania and New York, and they each have a much tougher law today than this proposed Federal law. Neither in the State of New York nor the State of Pennsylvania can a real estate broker or an owner discriminate in the sale of real estate. An individual can just discriminate in the rental of two-family houses.

The bill that will be before us permits an owner to discriminate in the sale of his home. But the people in this country have been sold a bill of goods that, if this bill passes, then everything will be fine, and that you can withdraw the troops from participation with the policemen in handling the civil disorders for those districts where riots are occurring today.

As I say, Mr. Speaker, we have a much stronger fair housing law in the States of New York and Pennsylvania than this bill before us. I do not believe the passage of this bill will make one iota of difference in this Nation one way or the other as far as riots are concerned. As I say, the people misunderstand this bill. This is not the great, great civil rights bill that the people have been led to believe. And I hope the people of this Nation realize that this bill does not do as much as everybody thinks it will do.

As I say, the passage of this bill will not stop riots. To stop the rioting you

must have a return to the Christian principles of honor, good will, integrity, things like that. That is what will stop the rioting.

## CONSIDERATION OF THE CIVIL RIGHTS BILL

Mr. ANDERSON of Illinois. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

Mr. ANDERSON of Illinois. Mr. Speaker, I have just been informed that no time will be available to me today under the rule to present my viewpoint on the legislation we will shortly be considering. I merely want to say this: that I recognize, as well as anyone, that it is certainly a tragic sequence or juxtaposition of events that brings us to the consideration of this matter today following the funeral of Dr. Martin Luther King, Jr.

This happens to be one of those ironic, almost macabre twists of fate, but because of that fact it is being unfairly alleged in many quarters that this House today is acting in some undue haste, is acting under duress, or under the stress of some overwhelming emotion.

I would merely make the record abundantly clear on that point. The Committee on Rules met on the 19th of March and at that time decided to conduct hearings on this resolution and vote on the 9th of April. The decision was made on that day and not following the death of Dr. King.

It was well known on the 19th of March that the leadership of this House fully intended to schedule this matter for debate and consideration on the 10th of April.

So let no one be under any illusion that we are operating today in any miasma of fear or unreasoning duress. We are acting in the normal course of legislative events.

Mr. Speaker, let no one say that we are doing what we are doing today because we wish to reward rioters—because those who plundered and pillaged the great cities of our land in the last 5 days could not care less about this legislation.

We certainly do not want to reward them. I am seeking to reward the Negro schoolteacher in my district who not long ago answered some 100 ads in vain seeking a home or an apartment and who in each and every case was turned away.

I am seeking to afford an advantage to and to benefit the young engineer who finally found a position commensurate with his educational abilities and then sadly confessed to me, "I am going to have to leave the community because I cannot find a place suitable for my family in which to live."

That is why I am going to vote for this resolution today—and not under duress and not because I want to reward any of the rioters in our country.

## THE CIVIL RIGHTS ACT OF 1968

Mr. TAFT. Mr. Speaker, I ask unanimous consent to address the House for

9552

CONGRESSIONAL RECORD — HOUSE

*April 10, 1968*

1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Ohio? There was no objection.

Mr. TAFT. Mr. Speaker, I urge support of H.R. 2516, as reported to the House, because I believe that it is right.

It is right because there should be no privilege in America allowing any person to discriminate on account of race, color, religion, or national origin, against another's equality of opportunity. Racial discrimination in housing has had and still has that effect. To fail to speak out against it could be construed to countenance such a result and to relegate to hopelessness any solution of America's most serious problem in any way consistent with our traditions and the spirit of our people.

The waves of today's stormy seas of controversy and disorder must not turn us from our course. But the course cannot be held without recognizing the tides and currents moving all of us. To reject this measure today will be to undermine those who are seeking solutions through the powers of reason and justice. Responsible Negro leaders are on the spot here in this House today, whether we like it or not. Our action can help them build attitudes and progress with order and justice.

Or it can relegate such leadership to a rear guard action from which it may not recover. This would leave us all to the unpleasant but almost certain alternative of violence and repression. I cannot and will not believe that such an alternative can prevail. But the road back to reason and reality would be one filled with misery for all Americans. It can and must be avoided. Passage of this measure will be a step in the right direction.

## CAPITULATION ON CIVIL RIGHTS

Mr. SNYDER. Mr. Speaker, I ask unanimous consent to address the House for 1 minute.

The SPEAKER. Is there objection to the request of the gentleman from Kentucky?

There was no objection.

Mr. SNYDER. Mr. Speaker, I yield to the gentleman from Iowa [Mr. GROSS].

Mr. GROSS. Mr. Speaker, in response to the gentleman from Oklahoma [Mr. ALBERT] and his comments a few moments ago, let me say to him that the record will be written here today by his vote and by the vote of others, as to whether there is capitulation to coercion.

## CIVIL RIGHTS LEGISLATION

Mr. MYERS. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Indiana?

There was no objection.

Mr. MYERS. Mr. Speaker, I came here today like many others, with an open mind, to hear the discussion and then vote. I had no intention of speaking,

knowing that under the rule granted, we only had 8 seconds each for debate, and you cannot say much in 8 seconds, but after listening to some of the discussion here today, it became necessary to speak. About the timing in bringing this bill up today and talking about how the bill is written—I am not a lawyer—after reading this bill and considering its questionable drafting, I find comfort that I am not. I can read. We have heard talk about the wisdom in bringing the bill to the floor today. Some who have spoken today have discussed whether it should come up today or not. I do not think the question is whether it is being brought to the floor because of the tragic events of last week or because the date was set last week. I think it is the question of timing, and whether it should now come to the floor in view of what happened last week. The question today is, Should we still consider this legislation with national emotions and the tension in this House being what it is?

I am a farmer. I remember once I decided early in the season I would plant corn on the 10th of May. You know, when that date appeared on the calendar, the river bottom was flooded with water. I did not plant on that day. Is our country not flooded today?

## CIVIL RIGHTS MEASURE MUST PASS

Mr. REIFEL. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from South Dakota?

There was no objection.

Mr. REIFEL. Mr. Speaker, I did not intend to come to the well of the House today at this time. This bill that has been referred to as having some provisions affecting Indians will be brought before us. Interestingly enough, there are hardly any Indians in my district, and very few Negroes. I have asked to include with my remarks some statements on that matter as having reference to Indians. I think it would have been better had this been considered through the regular Interior and Insular Affairs Committee.

However, the bill to which it is attached is too important to take a chance on having it defeated in the other body if it should go to a conference.

I remember as a child 7 or 8 years of age going to a nearby town with my father and mother, who was a full-blooded Indian, and as my father sat by a pot-bellied stove talking to the owner of the hotel where my mother and her children were bedded down for the night, I heard the hotel operator say to my father, "Do not worry about the man at the other hotel. He may want to leave you out. But as long as I am here, it doesn't make any difference if your wife is a full-blooded Indian, with long braids; as long as she is clean and decent, she and her children can stay in my hotel."

That is the kind of hurt that can come to millions of boys and girls in this country, and I am sure that most of the Mem-

bers of this body who have never had such a hurt down in their hearts for their children or their grandchildren may not understand this. That is why I appeal to you today that when this bill comes to a vote, vote "aye" on the previous question, because we shall then be taking away at least one hurt from the hearts, the minds, and the souls of little children all across this land of ours, which I think is one of the greatest in the world.

Mr. Speaker, I would like to take a few minutes to comment on titles II to VII of the bill which relate to rights of the American Indians. I do so because I have a special interest in this area, both because so many of the tribes with whom I have worked over a period of 20 years in the Bureau of Indian Affairs would be affected by these provisions, and also because I am myself a fully enrolled member of the Rosebud Sioux Tribe of South Dakota. I was born and raised on the reservation, and know from long personal experience what the effects of these titles would be on our Indian citizens.

Basically, these titles would accomplish two major objectives: First, they would create a bill of rights for the protection of Indians tried by tribal courts, and would improve the quality of justice administered by those courts; and second, they would provide for the assumption of civil and criminal jurisdiction by States over Indian country within their borders only with the consent of the tribes affected. Both of these objectives are important to our Indian citizens; the accomplishment of each of these objectives is long overdue.

Mr. Speaker, at the present time when an Indian citizen appears before State or Federal courts he is accorded the constitutional rights of all Americans. But when that same Indian citizen is brought to book before a tribal court, which has power to punish him usually for as long as 6 months in jail, he has only those rights which the tribe is willing to recognize. Many tribes have behaved responsibly in the administration of justice on the reservations. Too often, however, tribal courts have not acted judiciously.

And more important, Mr. Speaker, under present procedures we have no way of telling whether a tribal court has abused its powers because it is usually not possible for a defendant to ever raise a question in an appeal or in a habeas corpus proceeding.

The enactment of this bill would clearly set forth certain fundamental limitations on the power of tribal courts in dealing with tribal members:

It would prohibit double jeopardy;

It would provide for the privilege against self-incrimination;

It would require a speedy and public trial;

It would require that the accused be informed of the nature of the offense charged, that he be confronted by witnesses against him, and that he have compulsory process for obtaining witnesses in his own favor;

It would prohibit excessive bail, and would provide by statute for a maximum punishment by a tribal court of 6 months in jail or $500 fine; and

It would provide for imprisonment

*April 10, 1968*  CONGRESSIONAL RECORD — HOUSE  9553

only after a jury trial is requested by the defendant.

In addition, Mr. Speaker, by providing for a writ of habeas corpus from the Federal court, the bill would assure effective enforcement of these fundamental rights.

The second most important provision of this bill is the revision of Public Law 280 passed by the 83d Congress. That law permits States to assume jurisdiction over Indian tribes without in any way consulting with the tribes affected. Three States have exercised this power over the objection of affected tribes. A fourth, my own State of South Dakota, attempted such an exercise but was prevented from completing the takeover by a vigorous referendum effort in 1964.

Mr. Speaker, I know of no Indian tribe in this country which has not bitterly resented the arbitrary authority invested in States under Public Law 280, and which does not now support the provision of tribal consent prior to such assumptions of jurisdiction by States.

Therefore, Mr. Speaker, I strongly urge Members to vote "aye" on the previous question and on the question of passage of the bill.

### INDIANS WOULD LIKE TO BE HEARD ON CIVIL RIGHTS MEASURE

Mr. ASPINALL. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Colorado?

There was no objection.

Mr. ASPINALL. Mr. Speaker, I had no intention of coming to the well of the House at this time to speak on the matter that is scheduled to come before us later this afternoon. However, the bill has to do, in sections 2 to 7 inclusive thereof, with Indian rights matters before my committee. We have already had a day's hearings on the matter. May I say that I have no greater respect for any Member of this body than I do for the man who just preceded me in the well of the Chamber of this House. But I wish to advise my friend, the gentleman from South Dakota [Mr. REIFEL] that there are Indians in the United States of America who are not presently in favor of this legislation. There are not merely a few of them. There are a lot of them. They, too, have the right to be heard in accordance with the legislative procedures of the House of Representatives.

### CIVIL RIGHTS BILL

Mr. BEVILL. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Alabama?

There was no objection.

Mr. BEVILL. Mr. Speaker, I rise to voice my strong opposition to the civil rights bill, H.R. 2516.

I am particularly disturbed over the Senate-passed open-housing provision, or so-called fair-housing section of the bill.

The open-housing provision of this bill would, in my opinion, violate the rights of U.S. citizens as guaranteed by the 14th amendment of our Constitution.

It would mean, in effect, that the homes of our people, the very foundation of our freedom, would no longer belong exclusively to them. It would mean that no man would be the sole owner of his property; That the Government would have the right to dictate to him the terms of its disposal.

The notion that one man has the right to purchase any property he pleases is a completely false notion. For this would also mean that the property owner has a "duty" to sell his home to the buyer, whether he wants to or not.

Mr. Speaker, the U.S. Constitution clearly provides safeguards which protect the property of every U.S. citizen.

I am convinced that any open-housing provision would only lead to further Government intervention in the private affairs of our citizens. The tendency for the Federal Government to interfere with private individuals is frighteningly apparent in this movement for open-housing legislation. The provisions of this section of the bill are so weighted in favor of the buyer that just about the only right the homeowner retains is the right to defend himself in court, at his own expense, while the Government picks up the tab for his accuser.

In addition, Mr. Speaker, the obvious question of political expediency continues to surround this bill. Thrusting through the recent rhetoric surrounding this provision of the bill is a thinly veiled attempt to appease certain minority groups in this country.

It is time we stopped trying to placate these minority groups at the expense of the majority of people of this country.

This bill really stems from the recent tide of protest and agitation started by the so-called militant civil rights leaders.

Mr. Speaker, appeasement is not the answer. Appeasement will never solve our problems.

We all agree that every citizen in this great Nation of ours should have—yes, must have—an equal opportunity to pursue the rights promised him by the framers of our Constitution. But this further intrusion on one of our most basic rights is not the answer.

One need only to read his daily newspaper to realize this.

The record speaks for itself. The more so-called civil rights legislation Congress passes, the more militant the civil rights groups have become. More and more appropriations by Congress to minority groups are met with more and more threats and destructive riots—riots started by these same minority groups we are trying to help.

The argument for open housing totally ignores the real needs of these minority groups. An open-housing law will not substantially affect the large majority of the very people it proposes to aid.

In this case, the results of this open-housing provision would most likely have the reverse effect, increasing dissatisfac-

tion and bitterness from those who expect promises to magically remove them from the crowded living quarters of the cities to the comfort of suburban living.

In this country, Mr. Speaker, government among men has always been based on the general consent of the majority. This bill would be a distressing departure from this long-held course.

It has been said—and wisely so—that where there are no property rights there are no human rights.

If the property rights of the citizens of this country are to be protected, this bill must be defeated.

### REREFERRAL OF H.R. 16358, NATIONAL GALLERY OF ART, TO COMMITTEE ON PUBLIC WORKS

Mr. BURLESON. Mr. Speaker, H.R. 16358, a bill introduced by the distinguished chairman of the Public Works Committee, the gentleman from Maryland [Mr. FALLON], and the gentleman from Illinois [Mr. GRAY], introduced on April 1, was referred to the Committee on House Administration. I ask unanimous consent that the bill be rereferred to the Committee on Public Works.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

### PROVIDING FOR AGREEING TO SENATE AMENDMENT TO H.R. 2516, PENALTIES FOR INTERFERENCE WITH CIVIL RIGHTS

Mr. MADDEN. Mr. Speaker, by direction of the Committee on Rules, I call up House Resolution 1100 and ask for its immediate consideration.

### CALL OF THE HOUSE

Mr. WAGGONNER. Mr. Speaker, I make the point of order that a quorum is not present.

The SPEAKER. Evidently a quorum is not present.

Mr. ALBERT. Mr. Speaker, I move a call of the House.

A call of the House was ordered.

The Clerk called the roll, and the following Members failed to answer to their names:

[Roll No. 94]

| | | |
|---|---|---|
| Ashley | Jones, Mo. | Poage |
| Ashmore | Karsten | Resnick |
| Fino | Kastenmeier | Roth |
| Foley | King, Calif. | Teague, Tex. |
| Hathaway | King, N.Y. | |
| Irwin | Passman | |

The SPEAKER. On this rollcall, 416 Members have answered to their names, a quorum.

By unanimous consent, further proceedings under the call were dispensed with.

### PROVIDING FOR AGREEING TO SENATE AMENDMENT TO H.R. 2516, PENALTIES FOR INTERFERENCE WITH CIVIL RIGHTS

The SPEAKER. The Clerk will report the resolution.

The Clerk read the resolution, as follows:

H. RES. 1100

*Resolved,* That, immediately upon the adoption of this resolution, the bill (H.R. 2516) to prescribe penalties for certain acts of violence or intimidation, and for other purposes, with the Senate amendment thereto, be, and the same hereby is, taken from the Speaker's table, to the end that the Senate amendment be, and the same is hereby, agreed to.

The SPEAKER. The Chair desires to state, and this is not to be considered as admonishing anyone in the gallery, that any manifestation of approval or disapproval of any remarks or speech made by a Member on the floor of the House is contrary to the rules of the House.

The Chair knows that the guests of the House in the galleries will respect the rules of the House of Representatives.

Mr. MADDEN. Mr. Speaker, I yield 30 minutes to the gentleman from California [Mr. SMITH], pending which I yield myself 6 minutes.

GENERAL LEAVE

Mr. Speaker, I ask unanimous consent that all Members may revise and extend their remarks during the debate on the resolution.

The SPEAKER. Without objection, it is so ordered.

There was no objection.

Mr. MADDEN. Mr. Speaker, I wish to commend the gentleman from New York, Chairman CELLER; the gentleman from Ohio, Minority Leader McCULLOCH; and members of the Judiciary Committee for their outstanding work on this legislation. Their committee reported civil rights legislation on June 29, 1967, and the antiriot legislation was passed by our body on July 19, 1967. The legislation has been over in the other body and after delay and extended debate passed the Senate by a vote of 71 to 20 a few weeks ago.

This resolution provides for 1 hour debate. Under the procedure of the "previous question" our Members can vote to accept or reject the Senate bill H.R. 2516.

If the previous question is voted down, this legislation is almost certain to be sent back to the other body for probably certain delay, filibustering, and stagnation. This procedure no doubt will mean no civil rights, housing, or antiriot bill in the 90th Congress.

The highly financed real estate lobby during the last few weeks has, through telegrams, letters, and telephone, been bombarding many Members to vote against this legislation.

Twenty-two States have fair housing laws.

Two hundred and twenty-five Members represent districts entirely covered by State fair housing laws.

Two hundred and ninety-three of our colleagues are representing congressional districts covered by either local or State fair housing laws.

What is needed to end housing discrimination is a universal Federal law with uniform coverage so there will be a *single set* of rules everywhere for everyone—buyers, sellers, and real estate brokers.

Many witnesses before the Senate committee, including real estate brokers, said the insult of housing discrimination contributes to social unrest and riots. In terms of education, personal habits, income—large or small—Negro families would still be compelled to live in the ghetto or some other racially segregated neighborhood. These families have no place to dwell but the slum or ghetto under the present conditions.

Last August many prominent State and nationally known realtors testified that the enactment of a Federal fair housing law would eliminate the pressure on them to discriminate against groups of our citizens by reason of race. W. Evans Buchanan, Washington, D.C., former president of the National Association of Home Builders, said:

The fair housing principles are needed by the real estate industry as a means of eliminating unsound competitive practices in protecting those who choose to do business on a non-discriminatory basis.

Participants in PHA and VA programs are now pledged to the policies and practice of nondiscrimination under the provisions of the Executive Order 11063. Enactment of this bill will provide the uniform standards of conduct so greatly needed in today's real estate market.

Many business firms and organizations would long since have discontinued practices of discrimination except for their fear of adverse economic consequences stemming from *competitors who choose* to capitalize on racial and religious prejudices.

With a national law commanding the acceptance of all, the entire industry will sell or rent without discrimination and without fear of economic reprisal.

Elliott N. Couden, Seattle, Wash., real estate broker; president of Couden Agency, Inc.; member of the Seattle Real Estate Board, the Washington Association of Realtors and the National Association of Real Estate Boards, said:

A universal law would remove many of the shackles and impasses we in the real estate business are subjected to . . . Many real estate salesmen and brokers who would voluntarily provide equal service to all clients suffer a reasonably well-grounded apprehension that their efforts will result in intimidation from other realtors and economic attrition from potential clients. This legislation frees all parties from coercion, probably the greatest single element in the minority housing syndrome.

Fred Kramer, Chicago, Ill., president of Draper & Kramer, Inc.; real estate and mortgage banking business, which manages some 15,000 residential units, said:

I think it is to the interest of all of us in the real estate business to be put on an equal basis when it comes to accepting minority groups as buyers, borrowers, or tenants.

Edward Durchslag, Chicago, Ill., in the real estate business on city's South Side for three decades, said:

The real estate industry, our various communities, as well as the country as a whole would benefit from the enactment of fair housing legislation.

Ken Rothchild, St. Paul, Minn., president of H. Val Rothchild, Inc., and president of the Minnesota Mortgage Bankers Association, said:

Minnesota open housing laws have not hurt the real estate business. It has been good. . . . There was . . . a great fear among the real estate people and none of their fears have been justified. . . . Realtors and apartment owners and builders have experienced greater demand for their products. The entire community has benefited from rapidly improving housing and housing conditions and from reduced racial tensions.

Among other realtors who testified in support of a national open housing law was Philip M. Klutznick, Chicago, Ill., senior partner, Klutznick Enterprises; managing partner, KLC Venture, Ltd.; president of Old Orchard, Oakbrook, and River Oaks regional shopping centers; and president of Oak Brook Utility Co., all of metropolitan Chicago; chairman of the board of the American Bank and Trust Co., of New York City—page 394.

U.S. Attorney General Ramsey Clark said he had "no doubt whatsoever" about the constitutionality of the proposal—Senate hearings, page 7. Also testifying to the constitutionality of open housing legislation were the deans of three major law schools: Rev. Robert F. Drinan, S.J., of Boston College Law School; Jefferson B. Fordham, of the University of Pennsylvania Law School; and Louis H. Pollak, of Yale Law School—Senate hearings, page 127.

Finally, the constitutional authority of Congress to enact fair housing legislation was confirmed by a committee consisting of some 30 constitutional experts and legal scholars headed by Mr. Sol Rabkin, of the Anti-Defamation League of B'nai B'rith—Senate hearings, pages 253–254.

In last night's Evening Star, a news account stated:

Sixty leading lawyers, including seven who have headed the American Bar Association, are urging the House to approve Senate-passed open housing legislation.

In a statement released yesterday, the lawyers said that maintenance of an orderly society ruled by law requires that the law itself must be just to all people.

Mr. Speaker, on Sunday, March 3, of this year, the television program "Meet the Press" had as guests six mayors from large metropolitan cities—cities which were victims of major race riots in 1967.

Last year 40 or more other cities suffered great destruction by riots and the mayors of those cities would no doubt have the same thoughts as the city officials which appeared on the television program.

I think it is well for the Members to have a few quotations from mayors who participated in the "Meet the Press" program.

Mayor Ivan Allen, Jr., Atlanta, Ga.:

I think it is a universal problem or a national problem. I feel that racial discrimination and segregation plus the immigration of millions of Negro citizens into the urban centers of America have created the most serious domestic problem that the nation has ever been confronted with. Basically it gets down to an opportunity for good housing, reasonable housing, job opportunity, and adequate education. No matter how far we go away from the basics of the problem, we always get back to the fact that both the poverty areas, white and Negro—principally Negro—in this country have been deprived of the full opportunity to be a full American citizen.

Unfortunately, I would have to say to you that in the last eight or ten months the gap between white and Negro has vastly increased all over the country. This is indeed unfortunate. It behooves leadership at all levels to try to close that gap, to try to make the necessary steps to make a Negro citizen a full American citizen so that he can be accepted. It is a responsibility of leadership to provide sufficient funds—in this instance both at a local—and I hope it will be recognized—at a

056620

Case 1:13-cv-00966-RJL    Document 153-3    Filed 05/30/23    Page 29 of 111

state level and certainly at a federal level, to implement this type of program, these types of programs that are recommended in this report.

**Mayor Sam Yorty, Los Angeles, Calif.:**

There were a lot of people who didn't recognize the plight of the Negro and the discrimination, were suddenly panicked and wanted to find somebody to blame for what had happened when they hadn't been cognizant of the problem at all. Even a great newspaper in my community didn't even have a Negro reporter to go and report the facts. Then suddenly they started blaming me, ignoring the fact that I had completely integrated the Los Angeles City Government in 1961.

We have a City Human Relations Commission which I never could have gotten authorized before the riots, but I think that the best things that are happening are happening as a result of a merging Negro leadership, with the help of some of the President's programs. I think the President deserves more credit than he gets for seeing this problem and trying to get some finance, but the Industrial Union Department of the AFL–CIO has a program going in the Watts Department area, south-central Los Angeles, that I think is truly effective and may be a model for the nation.

**Mayor Carl B. Stokes, Cleveland, Ohio:**

The burden has been placed on the Negro continuously to, "Pull yourself up by your bootstraps." The very people who do not have any boots. This is the first time now that there has been a report which placed the focus, the burden on the primary party that is responsible. I can show you volumes of things that are written all year long about "Why don't you do for yourself?" while at the same time the institution precludes you from doing for yourself. You have to take a look at those who have prepared themselves and then tried to break into the white corporate ranks or into the white university structures or into the other areas of business.

I reject the position that in order to meet these problems you have to resolve the Viet Nam question. I don't believe it. I believe that this country has the resources, has the potentials, to have both a "guns and butter" economy, and I say that anyone who permits either the Administration or the Members of Congress to fall back on an excuse of not meeting domestic problems because of defending our national interests, is doing nothing but to help a failure on the part of those who have the responsibility of fighting the domestic war.

When we take the vast body of the Negroes, there is no question about it that they are still confined, both by way of their living conditions and areas, by way of employment, by way of having visited upon them all of the unmet environmental needs. All of these things continue to perpetuate that which has been a feature of our country, namely, a separation between the races. Unless funds and corrective remedies are applied, then I would have to agree that we are headed for almost an irrevocable separation of the two races in this country.

**Mayor Hugh J. Addonizio, Newark, N.J.:**

To every action there is a reaction. But you will never be able to compare racism on the part of the Negro with the racism to which he is reacting.

First of all, I think I would need about $300 million just to take care of the area of education in Newark. We need school construction generally, because all of our schools are antiquated.

We did not have a new school built for almost 30 years, before I became Mayor of the City of Newark, so I am sure that this indication will show you what the needs are as far as school construction is concerned in my community.

I have practically spent our city bankrupt trying to meet the problems in our community. We have reached our bonded capacity, the limit. We are spending twice as much money in education as we were before I became Mayor.

We have the highest tax rate of any city our size in the country, and unless the Federal Government and State Government step in and help our community, I doubt very much whether there is any kind of a future for the city of Newark.

I don't think you can blame this mess on these mayors throughout the country who unfortunately have had riots. I think that this is something that has come about over a long period of time in this history of the United States, and I might point out to you that for six years I have been Mayor of Newark, and I have been crying out for help from all levels of government. I have gone to the county, I have gone to the State; I have gone to the Federal Government. Everyone is sympathetic but no one does anything.

**Mayor Henry W. Maier, Milwaukee, Wis.:**

The white power structure has not done enough to alleviate the conditions of the ghetto. I think that it can be said, certainly, that in this sense alone I do not think that the influentials and wealthy of our community have done in years past what they ought to be doing to alleviate the conditions of the ghetto.

Nationally we should take money from the space program, from agriculture, if possible from the military, and devote these resources to the problems of our cities. I have also introduced a program designed—called—"The War on Prejudice," and designed to bring resources of the metropolitan area, including the suburbs, to bear on many of our basic problems.

The report strikes at the very heart of what I was talking about earlier in supporting the resolution in the National League of Cities and what I have been trying to do in our locality and in our state. The report says that you cannot finance the central cities off the property tax. I think that the report outlines very clearly that we have got to have state action, we have got to have national action, we have got to have incisive metropolitan action if we are going to move against city problems.

**Mayor Jerome P. Cavanagh, Detroit, Mich.:**

The Council authorized a $7 million emergency bond issue, most of which by the way went in payment for city employees' overtime during the course of the riot.

Much of it is going for new fire equipment, which either was needed or destroyed during the course of the riot. There is less than a million dollars going toward police equipment. . . .

I think one of the very damaging things happening in this country today is this whole question of fear and rumors that are spreading throughout every community in America. We need a degree of sanity to be restored in this nation, and, unfortunately, the fears and the stories about standing armies, and so on, just don't help at all.

I hope it has the effect upon our national government of creating something we don't have in America, and that is a national urban policy.

Numerous complaints have been made by some Members of Congress that the executive department is gradually usurping the powers of the legislative branch.

Could it be possible that the executive leadership keeps pace with the modern progress, changing conditions, and mid-20th-century demands of our expanding population of 200 million people?

I hope the Congress can keep pace with the America of the 1970 period.

As recent as 5 or 10 years ago America could not visualize our Vice President, representing the President of the United States, and major presidential candidates of both political parties, former Vice President Richard Nixon, Governor Rockefeller, Governor Romney, Senator KENNEDY, Senator McCARTHY, and many other Governors, Congressmen, mayors, Cabinet members, ambassadors, and other dignitaries, attending the funeral of a private citizen, grandson of a slave, in the city of Atlanta, Ga., on yesterday.

This great representative of the downtrodden of all races, Rev. Dr. Martin Luther King, Jr., fought for and supported legislation similar to the bill which we are debating today.

I hope this legislation is enacted and sent to the President for signature without further delay and postponement.

Mr. Speaker, I reserve the balance of my time.

The SPEAKER. The gentleman from Indiana consumed 8½ minutes.

The Chair recognizes the gentleman from California [Mr. SMITH].

Mr. SMITH of California. Mr. Speaker, I yield myself 9 minutes.

Mr. Speaker, may I explain the parliamentary situation as I understand it here today.

House Resolution 1100 has been approved by the Rules Committee and is now before us. There will be 1 hour of debate, one-half controlled by the gentleman from Indiana [Mr. MADDEN] and one-half controlled by me. I am sorry we did not have more time for debate, with the result that there are a number of Members I could not yield time to.

House Resolution 1100 calls for taking H.R. 2516 from the Speaker's desk and if approved, will accept the bill as amended by the other body—approve of the same—and thus send it to the White House for signature. No changes whatsoever will be possible.

I will ask that the previous question be voted down. That is, I will ask for a "no" vote on the previous question. Should that request prevail—that is, should the previous question be voted down—then I assume that I will be recognized for 1 hour to present an alternative proposal.

My substitute proposal will be precisely as follows:

Strike out all after the resolving clause of House Resolution 1100 and insert in lieu thereof the following:

"That immediately upon the adoption of this resolution the bill (H.R. 2516) to prescribe penalties for certain acts of violence or intimidation, and for other purposes, with the Senate amendment thereto, be, and the same hereby is, taken from the Speaker's table, to the end that the Senate amendment be, and the same is hereby, disagreed to and a conference is requested with the Senate upon the disagreeing votes of the two Houses."

This means only that H.R. 2516 will go to conference.

I would not anticipate that the additional hour would be used on the amendment. I am certain that everyone knows

the situation, so that debate at that time would not be necessary. I would anticipate that the previous question on the amendment and the resolution could be moved in rather short order. However, if anyone insists on time, I will be as accommodating as possible.

Now, Mr. Speaker, may I review the history on this situation. H.R. 421, the so-called antiriot legislation, was introduced in the House on the opening day of this 90th Congress, to-wit: January 10, 1967—last year. No hearings were held or scheduled by the Judiciary Committee, and indications were that no hearings were contemplated to be scheduled. Accordingly, on June 14, 1967, last year, the distinguished chairman of the House Rules Committee, the gentleman from Mississippi [Mr. COLMER], served notice to the House that hearings would be held in the Rules Committee on H.R. 421 commencing at 10:30 a.m., Tuesday, June 27, 1967.

The Judiciary Committee immediately held hearings and reported H.R. 421 along with civil rights language. It was politely suggested that it would be preferable for the two subject matters to be separated. That if so, and if the antiriot legislation proceeded in accordance with the regular procedure, the civil rights legislation, if in a separate bill, would proceed in accordance with the regular procedure. The Judiciary Committee followed the suggestion and H.R. 421 passed 347 to 70 and subsequently H.R. 2516 passed 326 to 93. Both bills then went to the other body.

Mr. Speaker, as you know, the other body spent most of their time on these measures this year, combined them, changed considerable language, added new matter, and on March 11, passed H.R. 2516. It contains two provisions on civil rights similar to those passed by the House. The first prescribes penalties for interfering with the rights of another person to vote, to secure employment, to attend school or college, to use the facilities of interstate commerce, or to enjoy what we generally call a citizen's civil rights. Both versions contain penalties—fines and imprisonment—for violation of this provision.

The bill of the other body contains a section somewhat similar, but not identical, to H.R. 421 which makes it a Federal criminal offense to go from one State to another with the intention of inciting a riot or attempting to organize or encourage any act of violence in furtherance of a riot.

However, the other body added to the House bill a controversial open housing provision. It prohibits discrimination on the basis of race, religion, color, or national origin in the sale or rental of a dwelling. This, supposedly, would not apply where the owner does not use a real estate broker or agent, and does not advertise in any manner to indicate a preference based on race, color, religion, or national origin.

Opponents contend that if a homeowner posts a notice that he wants to sublet his home for the summer, he may reject for any or no reason the first person who approaches him unless such person is of a different race, religion, color, or na-

tional origin. They base this view on the assumption that even an oral statement indicating racial or religious preferences would subject a family to the penalties of the law. Real estate brokers contend that this provision "discriminates" against them.

Also exempt from the provisions of the bill are owners who rent not more than three single-family houses, and owners of one-to-four family apartments, one of which is owner-occupied. But any owner of a single-family home or a small apartment could lose his exemption by employing a broker, by advertising so as to indicate racial preferences, or by selling more than one house within any 24-month period.

The enforcement provisions are: Any offended party may file a complaint with the Secretary of Housing and Urban Development who has authority to work out programs of voluntary compliance. If unsuccessful, the alleged offended party may go into a Federal district court to seek an injunction or other court order. The court may award to the plaintiff actual damages and $1,000 punitive damages together with court costs and reasonable attorney's fees.

The other body added an amendment designed to assure Indians that the Bill of Rights applies to them in their relationship with tribal courts. It directs the Interior Secretary to draft a model code of Indian offenses and provides that no State can assume criminal or civil jurisdiction over an Indian tribe without its consent. This amendment has nothing whatsoever to do with the purposes of the bill. It could well cause problems so far as Indian rights are concerned. It should be stricken, and the only way to strike it is to send the bill to conference.

The normal procedure when the House and Senate versions differ is for the chairman of the particular committee handling the bill, in this instance the Judiciary Committee, to move that the House disagree in the Senate amendments and agree to a conference. But in this instance, the leadership does not want to follow the customary procedure. They desire to simply accept the Senate amendments without giving the House an opportunity to consider any changes in language whatsoever.

Accordingly, House Resolution 1100 was introduced on March 14, which, if adopted, would agree to the bill as passed by the Senate. No changes of any kind could be made. The bill as passed by the Senate would then go to the President for signature. This resolution was referred to the Rules Committee. It was set down for hearing on March 19. The leadership wanted it approved, and to be voted on in the House on Wednesday, March 27. A motion was made in executive session of the Rules Committee to approve the resolution. A substitute motion was made to have hearings, and vote on the resolution on April 9. It carried and hearings were held which I wish every Member could read.

This bill should go to conference. It is the only reasonable approach.

Mr. Speaker, I am certain that civil rights legislation will pass this year. It is unfortunate that it has to follow so closely to the terrible assassination of

Dr. King. It seems to me that we should have legislation which is real and enduring and not legislation which may merely be a symbol.

During the hearings and at other times, some Members have expressed concern that if this measure goes to conference, the other body will not cooperate and approve of a conference report. I have talked with several Members of the other body during the past 2 days and as late as last evening. Most of them will undoubtedly be conferees. Not only have they assured me that civil rights legislation will be passed but that there will be no efforts made to obstruct its passage. They have further assured me that the other body in conference will assist in attempting to improve H.R. 2516 and that if the conferees of the House will cooperate, and I am certain that they will, an agreement will be reached which should receive the blessing of the conference committee and both the other body and the House.

I believe in this way the results will bring about better legislation. The other body, in passing legislation under cloture, was handicapped from the standpoint that only amendments on file could be considered. This presented somewhat of an artificial situation. The results under the circumstances were, in my opinion, not as good as they should be.

It seems to me that we should let the interplay of the other body and the House, through a conference, work out the legislation so that it will really mean something. If this is done, it may be that Congress can help to solve the serious problems. But to hurriedly accept this bill here today could, in my opinion, cause more harm than good in attempting to solve the problems.

By going to conference, I sincerely believe that a much more reasonable, practical bill will be arrived at in the conference report. It should be a better bill. But to simply accept the bill, as is, might cause additional serious trouble in the future.

I repeat, Mr. Speaker, that after the 1-hour debate on the resolution pending before us is completed, the vote will be on the previous question. If that is agreed to, H.R. 2516 as it presently stands will become law. If the previous question is voted down, I will offer a substitute amendment which will take the bill from the Speaker's table, disagree in the Senate amendment and request a conference. I request that the Members vote "no" on the previous question so that the measure can go to conference. I reserve the balance of my time.

Mr. MADDEN. Mr. Speaker, I yield 2 minutes to the gentleman from Louisiana [Mr. WAGGONNER].

Mr. WAGGONNER. Mr. Speaker, I do not believe it would do any good for me to try to discuss this bill with you on its merits, because obviously it is not going to be considered on that basis, as it should be. This bill is going to be considered on the basis of emotion, and emotion alone, today. And such a situation is deplorable.

I am sure the Members know that I know something about the Negro man—a good bit more about the Negro man than most of the Members do here—and

*April 10, 1968*     CONGRESSIONAL RECORD — HOUSE     9557

I am looking straight at some of the Members now when I say that.

I have lived with them all my life, and I have more Negro friends than all of you put together, and the truth is the vast majority of the Negroes in this country, at least 90 percent of them, are decent, law-abiding citizens, as is the case with the white people in this country. But what is happening here today? We are ignoring that 90 percent of the white people and the Negro people who are decent, law-abiding citizens, and we of this Congress, you and I, are being blackmailed by that minority of 10 percent.

So do not talk to me about the democratic process when we are being blackmailed as we are, and it is perfectly clear why: because these anarchists, these blackmailers, have been following the process of violence, blackmail, and threats, and believe that this Congress, day in and day out, will yield to their threats.

Every previous bill we have had since I have been here, beginning with the 87th Congress, having to do with civil rights had the claim made about it that it would do away with divisiveness, it would do away with discrimination, it would put everybody on an equal footing, and that we would not have to worry about these things any more.

Let me tell the Members truthfully that you cannot get rid of second-class citizenship with a civil rights bill because no man in this country is a second-class citizen who does not think he is one, and who does not act like one.

Let me tell you something else: This bill is just going to add another burning ember to the fire. Here is a reproduction of an item which appeared in this morning's Washington Post that proves to me and should prove to you that this is not the end, because they will just be asking for more.

Here is the article:

NEGRO RULE IN GHETTO REJECTED IN BOSTON

BOSTON, April 9.—Mayor Kevin H. White today rejected demands by a Negro group for black ownership of community businesses and black control of schools and social and public agencies.

In a list of 21 "demands" made public Monday, the United Front, a coalition of community groups in the Boston Negro area, asked that race relations organizations and the white community at large immediately make $100 million available to the black community.

In addition the Front also demanded that "all white-owned and white-controlled businesses in the Negro community be closed until further notice while the transfer of the ownership of these businesses to the black community is being negotiated through the United Front."

In a statement today, the Mayor said of this proposal: "I will not by one word or one act add to the delusion that it is rational, workable or dignified either for black or white."

"Racism is obscene by whomever it is proposed, black or white; and social reform rarely benefits from expropriation," White said.

The statement did not mention the United Front by name, but an aide in the Mayor's office said it was that group's proposal White was talking about.

It is crystal clear, gentlemen. There is no end to these demands. The next one will surely be a guaranteed annual wage and, if we give in to this system of legislating by blackmail, what are you gentlemen going to do when the proposal is accompanied by more rioting, looting, and bloodshed? Give in again? Come back into this Chamber and say we have to rush this guaranteed annual wage bill through without even sending it to committee or to conference because the cities will be burned down if we do not? Is that what we are to reduce the legislative process to?

Well, not me. I want no part of it. We cannot react to blackmail in this manner.

Send this bill to conference and give conferees a chance to work out the bad parts, the unconstitutional parts, and let it come back for consideration when there is less tension in the air and without blackmail hanging over your heads.

The SPEAKER. The time of the gentleman has expired.

Mr. SMITH of California. Mr. Speaker, I yield 5 minutes to the gentleman from Ohio [Mr. McCULLOCH].

Mr. ANDERSON of Illinois. Mr. Speaker, will the gentleman yield?

Mr. McCULLOCH. I yield to the gentleman.

Mr. ANDERSON of Illinois. Mr. Speaker, first let me thank the gentleman from Ohio for yielding. I want to pay him this tribute. I think his wisdom and his counsel in the matter of the splendid statement he made to the Committee on Rules on the constitutionality of this legislation was a very important factor so far as my own personal judgment on this matter is concerned.

I want to say that I think the violence that has stirred the soul and conscience of America during this past week has not blinded us to our responsibility here today. Rather I would dare to hope that it has illumined that responsibility and has helped us to see more clearly and more vividly than we otherwise would see, the responsibilities that we have to try to translate into living reality the idea of equality of opportunity in housing.

I think it would surprise you perhaps if I said that I do not see, personally, this particular piece of legislation as any memorial to the dead. I see it rather as that cloud and that pillar that will guide the way of the living.

I would respond to the gentleman from Louisiana by saying that those who have desecrated our Capital City during these past few days do not mourn the spirit of Martin Luther King. They are the excrescence of conditions that for all too long have been left untended in our society.

In voting for this bill today, we do not vote to reward them—we vote rather to reward that 90 percent, of whom he spoke—the decent, honest and law-abiding citizens who would, if they could, relieve themselves of the bondage and escape the prison of the ghettos.

It is unfortunate that the idea has gained currency that in acting today on civil rights the House is doing so in a miasma of fear and unreasoning hate. Indeed, I have received literally hundreds of letters and wires from all over the country imploring me not to legislate under the emotional distress of Dr. King's assassination. A mere recitation of the chronology of events leading up today can quickly dispel this wholly false illusion that we are acting upon. The Senate passed H.R. 2516 with certain amendments thereto on March 11, 1968. Thereafter on March 19 a motion was made during an executive session of the Committee on Rules to begin hearings the next day on H.R. 1100, a resolution to accept the Senate amendments, and to schedule a final vote in the committee on March 26. I resisted that motion because I felt a longer period of time should be permitted for such hearings in view of the extensive amount of new material inserted in the House bill by the Senate amendments. A majority of the Rules Committee sustained that position, and a substitute resolution which provided that the Rules Committee would vote on H.R. 1100 on April 9 was adopted. It was clearly understood on that day that it was the desire and intention of the House leadership to schedule the matter immediately thereafter for a vote on the floor of the House. Thus on March 19 it was clearly understood that this matter would be voted on in the House on April 10 or prior to the planned Easter recess. This was, therefore, more than 2 weeks prior to the tragic event which occurred on April 4 when Dr. King was slain.

It will be argued that because of the riots of the past 5 days we will by our approval of this bill convey the impression that we are rewarding rioters.

Mr. Speaker, the arsonists, looters, and vandals who have sacked and burned sections of Washington, Baltimore, and other cities do not mourn the departed spirit of Dr. King. Nor do they seek by their actions to protest inadequate housing or other slum conditions. They are the excrescence of conditions too long left untended in our society. The Presidential Commission on Civil Disorders has provided us with a profile of a typical rioter. He is an unmarried male between 15 and 24 with feelings of extreme hostility toward the white community and distrustful of our political system and its leaders. The reorientation and reclamation of these teenagers and young adults will be enormously difficult. We will do little or nothing by this measure before the House today to reach this segment of the black community.

In voting for this bill I seek rather to reward and encourage the millions of decent, hardworking, loyal, black Americans who do not riot and burn. I seek to give them the hope that the dream of owning a home in the suburbs or a decent apartment in the city will not be denied the man who was born black. I would encourage the young Negro schoolteacher in my own home community who answered more than 100 advertisements for a house or apartment only to be turned away each time because of the color of his skin. I seek to encourage the young engineer who found a position commensurate with his education, but sadly concluded that there was no room for his family in a suitable neighborhood and left the community.

Yes, I seek to reward those Negroes who can become the responsible leaders of our society and diminish the influence of black racists and preachers of violence like Rap Brown and Stokely Car-

michael. If we would put out the fires of Negro revolution and defuse the social dynamite which has exploded in city after city across our land we cannot separate the sane and sensible Negroes from the mainstream of American society. To do so, is to encourage the eventual development of a garrison state where unbridled fear and suspicion rend us into two separate and unequal societies.

I do not condone the rioting. Rather I say punish the violators of our laws. Let all men, black or white, understand that the religion of liberty is based on a reverence and respect for the law. But let us not be blind to the necessity of also rendering justice to the patient and the long suffering who do not riot but who will be brought to the brink of despair if like the priest and the Levite we simply turn aside.

I would respectfully suggest to this House that we are not simply knuckling under to pressure or listening to the voices of unreasoning fear and hysteria if we seek to do that which we believe in our hearts is right and just. I legislate today not out of fear, but out of deep concern for the America I love. We do stand at a crossroad. We can continue the Gadarene slide into an endless cycle of riot and disorder, or we can begin the slow and painful ascent toward that yet distant goal of equality of opportunity for all Americans regardless of race or color. Then perhaps we can dare hope as John Addington Symonds wrote:

These things shall be—a loftier race
Than ere the world hath known shall rise,
With flame of freedom in their souls
And light of knowledge in their eyes.

Paul tells us in his letter to the Hebrews that it was by faith that Abraham went forth to receive this inheritance not knowing whither he went. That faith was the substance of things hoped for, the evidence of things not seen.

God grant us that faith in our destiny as a great nation—for Abraham Lincoln once described Americans as "God's almost chosen people." We cannot know how long the journey will take or even precisely where it will take us, but with patience, perseverance, and nobility of purpose we can advance toward our goal of reconciliation and racial understanding.

Mr. McCULLOCH. I thank the gentleman from Illinois for his masterful contribution.

Mr. CONYERS. Mr. Speaker, will the gentleman yield?

Mr. McCULLOCH. I yield to the gentleman.

Mr. CONYERS. Mr. Speaker, I cannot help but rise at this moment during this debate to state how deeply the words have sunk into my heart as just expressed by the distinguished Member of this body, the gentleman from Illinois [Mr. ANDERSON].

I think he expressed most eloquently what I have been turning around in my mind in the last few days since I have been in Atlanta.

We are not doing anything here in memory of this great dead American.

We are just beginning to do what we should have done, Mr. Speaker, for so long.

I thank the distinguished gentleman for yielding.

Mr. McCULLOCH. Mr. Speaker, I rise in support of House Resolution 1100. The adoption of this resolution would enact into law H.R. 2516 as written by the other body.

I think we should recall that the landmark civil rights bills in 1960 and in 1964 were enacted by means of similar resolutions, by House concurrence in the amendments of the other body. I hope that the landmark legislation of this year follows the same process.

Open housing, a most important part of the bill, is once again before the Congress. In 1966, the House approved open housing legislation, but the other body did not act thereon. Now the other body has acted and the burden is upon us.

The people are watching, the people are waiting.

The large problem of civil rights and civil disorders which this bill embraces is one of the most difficult and troublesome of our time.

Last summer, the President appointed a National Advisory Commission on Civil Disorders. What the report of the Commission said is pertinent here:

This is our basic conclusion: Our nation is moving toward two societies, one black, one white—separate and unequal.

Focusing on the question of open housing, the report observed:

Discrimination prevents access to many non-slum areas, particularly the suburbs, where good housing exists. In addition, by creating a "back pressure" in the racial ghettos, it makes it possible for landlords to break up apartments for denser occupancy, and keeps prices and rents of deteriorated ghetto housing higher than they would be in a truly free market.

Men can be imprisoned outside of jails. The ghetto dweller knows that. The Negro knows that he is caged, that society really gives him nowhere else to go.

Of course, the bill would not buy, for the prisoner, a fine home in the suburbs. But it would offer the prisoner the hope that if he tried to climb the economic ladder, society would not forever be stamping on his hands.

If that could be done, it would eliminate the posts and crossbeams of despair on which the ghetto prison is built.

If the prisoner were given access to a better home, he would then have access to a better education for his children. Then his better educated children would have access to better jobs. And then, like all other minority groups, the Negro would have won his equality through economic power. The great American dream would, for him, in part, come true.

I supported such a bill in the last Congress, and I now support the recommendation of the Commission on Civil Disorders for such legislation.

I have listened to testimony for a long, long time on the plight of those in the ghetto, and I am convinced of the necessity for open housing legislation, without delay.

Arguments are made that this legislation should be accepted as a tribute to Dr. Martin Luther King, Jr., or that this legislation should be rejected because of our recent riots.

As for me, I view my duty as something other than bestowing rewards or laying punishments. I must do what I believe is right. Nothing that has occurred during this past weekend, as tragic as it was, has altered my course.

As I said, in 1964, when a similar argument was being made: "Not force or fear, then, but belief in the inherent equality of man induces me to support this legislation."

The additional argument is made that H.R. 2516 is not perfect. Having served a long time in the Congress, I would not expect a bill of 50 pages in length to be perfect.

If the entire matter were in my control, I would amend the legislation where needed and enact the bill. But, of course, that is not the situation. There are many in both Houses who are opposed to the substance of this legislation.

I am fearful that if this legislation is sent back to the other body for any reason, the bill's fragile chances of becoming law will be seriously impaired.

Thus our real choice may not be between imperfect legislation and perfect legislation, but between imperfect legislation and no legislation at all.

If that is the choice we must make, then we must decide whether the defects outweigh the good that may flow from passing this legislation without further amendment.

I do not believe that the defects outweigh the good.

I have carefully reviewed the bill. The drafting could have been better. But I do not find any difficulty so grave that it would obstruct the intended operation of the provisions.

On balance, I do not find that the prospective gain in draftsmanship is worth the risk of sending the bill to a conference or back to the other body in a modified form, there to possibly be lost for this session of Congress.

This is good legislation. It is constitutional legislation. I have analyzed the Supreme Court cases interpreting the scope of Federal power under the commerce clause and the 14th amendment and am convinced that each and every title of the bill will pass constitutional muster.

Thus, I urge the adoption of House Resolution 1100 so that H.R. 2516 can be sent today to the President for his signature.

Mr. MADDEN. Mr. Speaker, I yield 4 minutes to the gentleman from New York [Mr. CELLER], the chairman of the Committee on the Judiciary.

The SPEAKER. The gentleman from New York is recognized for 4 minutes.

Mr. CELLER. Mr. Speaker, I rise today as I have risen many times before to urge adoption of the civil rights bill before us. I make no impassioned plea. This is no time for oratory. There is the need to accord to all those rights—rights of protection and rights of housing—which we in the majority take for granted for ourselves and yet which are arbitrarily denied to a minority of our citizens. Where there is a wrong let the law right it. I firmly believe there is a majority in this House of Representatives who do

not want to see the perpetuation of ghettos in this land of ours. If I am wrong then there can be no more tragic commentary on the nature of our freedom.

A great and good man was buried yesterday. He was shot out of hate and cowardice. I say this not because his untimely and unnatural death gives us a reason for passage of this legislation, the reason existed long, long before the martyrdom of Martin Luther King. I note the tragedy because he spoke so eloquently for the right. And we, the Representatives of this country, can do no less on the floor today.

Title VIII of the bill, entitled "Fair Housing," is designed to assure all persons an equal opportunity to buy or rent housing without discrimination because of race, color, religion, or national origin. The goal of "a decent home and a suitable living environment for every American family" proclaimed in the National Housing Act of 1949 has not been achieved. The late President Kennedy, in November 1962, issued Executive Order 11063, which established a Committee on Equal Housing Opportunity, and forbade discrimination in recent FHA or VA insured housing. Today, some 22 States, the District of Columbia, Puerto Rico, the Virgin Islands, and a large number of municipalities have enacted fair housing laws prohibiting discrimination in private housing transactions, but nevertheless, it is plain that the combined efforts of State and local laws, Executive orders, as well as actions by private volunteer groups is just not enough. Court decisions are not enough. Federal legislation to eliminate the blight of segregated housing and the pale of the ghetto is demanded.

While discrimination in housing is a fact which needs no proof, the consequences for both the individual and his community are not always so apparent. Segregated housing isolates racial minorities from the public life of the community. It means inferior public education, recreation, health, sanitation, and transportation services and facilities, and often means denial of access to training and employment and business opportunities. Too often it prevents the ghetto inhabitants of liberating themselves. It is deeply corrosive both for the individual and for his community. Much of the urban crises that we witness today is a product of Negro segregation in the city ghettos and the flight of whites from the Negro and from these ghettos. To the extent that residential segregation prevents States and municipalities from carrying out their obligations to promote equal access and equal opportunity in all public aspects of community life, the 14th amendment authorizes the removal of this blight.

As I have said, residential segregation of Negroes is a fact which needs no proof. The objective dimensions of urban American ghettos include overcrowded and deteriorated housing, crime, disease, and alarmingly high infant mortality. The subjective dimensions are no less alarming. They include resentment, hostility, despair, apathy, and self-depreciation.

We cannot open the gates of the ghettos unless the minorities can find homes and domiciles outside the medinas and the mellahs. They will remain shut up in slum quarters if they cannot, because of racial discrimination and ostracism, change their abode. Shut up in unspeakable, crowded, rat-infested tenements, they vegetate and breed racism.

The voice of Leviticus says:

Proclaim liberty throughout the land to all the inhabitants thereof.

That voice did not say liberty to some and not to others. It said to all the inhabitants. It did not say liberty to those outside of Harlem, Watts, and Bedford-Stuyvesant, but not to those inside. He said:

Proclaim liberty throughout the land to all inhabitants of the land.

The President's Advisory Commission on Civil Disorders said:

What white Americans have never fully understood—but what the Negro can never forget—is that white society is deeply implicated in the ghetto. White institutions created it. White institutions maintain it, and white society condones it.

I say now white institutions must level the ghetto off. It is time to adopt strategies for action that will produce quick and visible progress. We need fair housing. It is a small key that will open a large door. There is indeed greatness and generosity of spirit which is inherent in this land of ours, and I make a plea for justice and brotherhood and an enduring credo. Let us help hasten the day for this country's redemption of a promise—the promise of freedom of opportunity for all.

We passed a fair housing bill before, only to be blocked in the other body. Let there be no further delay. Years ago Cervantes said:

By the street of by and by you come to the House of Never.

Now is the time for action, and let us act.

Mr. Speaker. It is my fervent hope, that today this House will unite to achieve the purposes of justice and equality.

I will now turn to a brief description of the major provisions of the bill.

TITLE I

In the first place, in general terms, the provisions of sections 101 through 103 of title I parallel the coverage of H.R. 2516, as passed by the House. The Senate amendment sets forth provisions designed to protect against violent interference with the exercise of a variety of benefits and activities. Each area of protected activity is specifically described. They include: voting, public accommodations, public education, public services and facilities, employment, jury service, use of common carriers and travel in interstate commerce, and participation in federally assisted programs. The proposed statute would also protect citizens who lawfully aid or encourage participation in these activities as well as those who engage in speech or peaceful assembly opposing denial of the opportunity to participate in such activities. Persons who have duties to perform with respect to the protected activities—such as pub-

lic school officials, restaurant owners and employers—would also be covered. The bill prescribes penalties graduated in accordance with the seriousness of those results of violations, ranging from misdemeanor penalties to life imprisonment.

The bill, as amended by the Senate, does differ, however, in the following three respects: First, to assure that dual State-Federal jurisdiction is carefully exercised by the Federal Government, the bill requires advance certification of prosecutorial authority by the Attorney General or the Deputy Attorney General; Second, the Senate bill exempts proprietors of "Mrs. Murphy" public accommodations from the prohibitions of the act; and, third, the bill expressly states that police shall not be considered in violation of the new law for lawfully carrying out the duties of their office or for enforcing Federal or State law.

Title I also establishes penalties for incitement to riot. These provisions penalize interstate travel or the use of interstate facilities, including the mail, to incite, organize, or promote a riot. Violations of the act are punishable by a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. To commit a punishable offense under this section, one must not only use interstate facilities with the intent to incite a riot but must also commit an overt act in furtherance of that intent.

"Riot" is defined as acts or threats of violence by one or more persons in an assembly of three or more resulting in or damage to or greatly endangering the person or property of others. Actions which are the mere expression of ideas or beliefs are specifically exempted from the definition of riot. The statute makes clear that State and local law enforcement is not to be preempted by the new Federal law. A judgment of conviction or acquittal on the merits under the law of any State would operate as a bar to any Federal prosecution for the same act or acts.

These provisions closely parallel the provisions of H.R. 421, the so-called antiriot bill, which was favorably reported by the Committee on the Judiciary and adopted by the House on July 19, 1967.

TITLES II TO VII

Mr. Speaker, titles II through VII of the Senate amendment to H.R. 2516 concern protecting the rights of American Indians. In general terms, these titles establish a bill of rights for American Indians and provide for assumption by States of civil and criminal jurisdiction over Indian country with the consent of the Indian tribes affected.

Title II creates a "bill of rights" for Indians in relation to their tribes similar to the Bill of Rights in the Constitution that applies to other citizens' relation to their Government. The provisions of title II would go into effect 1 year following the date of enactment in order to facilitate compliance with its terms by Indian tribes.

Title III authorizes and directs the Secretary of the Interior to draft a model code to govern the courts of Indian offenses, to assure due process in the ad-

ministration of justice by such courts and to implement the rights specified in title II. It is anticipated that this model code would supplement the present code of offenses and procedures regulating the administration of justice now contained in title 25, Code of Federal Regulations, which was established more than 30 years ago. In preparing this code, the Secretary of the Interior is directed to consult with Indians, Indian tribes, and interested agencies of the United States.

Title IV amends Public Law 83–280—67 Stat. 588—which conferred to certain States civil and criminal jurisdiction over Indian country. Title IV provides for U.S. consent to the assumption by any State of criminal and civil jurisdiction over Indian tribes, with the consent of the tribes affected. Thus, Public Law 280 is modified by requiring tribal consent as a precondition to a State's assumption of jurisdiction.

Title V amends the Major Crimes Act—18 U.S.C. 1153—by adding "assault resulting in serious bodily injury" to the list of Federal offenses.

Title VI establishes a new rule governing approval by the Secretary of the Interior or the Commissioner of Indian Affairs for the employment of legal counsel for Indian tribes and other Indian groups. It provides that applications relating to the employment of legal counsel made by Indian tribes or Indian groups shall be deemed approved if neither approved nor denied within 90 days from the date of filing such application with the Secretary or the Commissioner.

Title VII authorizes and directs the Secretary of the Interior to revise, compile, and republish materials relating to Indian constitutional rights and Indian laws and treaties.

TITLE VIII

Title VIII, entitled, "Fair Housing," bans discrimination on grounds of race, color, religion, or national origin in the rental, sale, or financing of residential housing subject to certain specific limited exceptions. I shall briefly outline the coverage of these provisions:

First. Upon enactment, the bill would cover by statute the types of housing now subject to prohibition on discrimination under Executive Order No. 11063. This includes housing owned or operated by the Federal Government; provided in whole or in part with the aid of loans, advances, grants, or contributions made by the Federal Government; provided in whole or in part by loans insured or guaranteed by the Federal Government; and urban renewal redevelopment housing receiving Federal financial assistance. Among other types of housing these provisions cover housing provided with FHA or VA mortgage insurance or guarantees, housing in urban renewal areas, senior citizens' housing, and low-rent public housing.

Second. After December 31, 1968, the bill would cover other housing, subject, however, to three exemptions:

Single-family house sold by owner: Any single-family house sold or rented by a private owner who owns no more than three such single-family houses. In the case of the sale of a single-family house by an owner who is not the resi-

dent nor the most recent resident therein, this exemption applies only with respect to one such sale within a 24-month period.

Mrs. Murphy exemption: Rooms or units in dwellings of four of fewer family units where the owner actually occupies one of the units as his living quarters;

Religious and private club exemption: Housing, operated for other than commercial purposes, furnished to members of religious organizations, associations, or societies or members of private clubs.

Third. After December 31, 1989, the single-family house sale or rental exemption would continue only if the sale or rental is made without the use of the facilities of a real estate broker or other person in the business of selling or renting dwellings, and, without the publication or posting of any notice or advertisement indicating an intention to discriminate. Thus, the bill prohibits the use of a professional real estate dealer or similar person to help accomplish the owner's discriminatory purpose. The bill assumes that when an individual uses the public mechanisms of the real estate industry to effect a sale he should not be permitted to require that industry to carry out his discriminatory purpose. Such sales are to be regarded as public offerings.

Mr. Speaker, the bill H.R. 14765, the Civil Rights Act of 1966, which passed the House on August 9, 1966, prohibited almost the exact same type of conduct with respect to housing discrimination as would be prohibited by H.R. 2516, as amended by the Senate. One difference is that the 1966 bill permitted real estate brokers, agents, or salesmen to discriminate with respect to the sale, rental, or lease of a dwelling whenever instructions in writing were received from the owner of such a dwelling specifying that the broker, agent, or salesman do so.

In contrast, the present bill expressly exempts single-family houses sold or rented by a private owner, if such person is the owner of three or fewer dwellings. In 1970, the single-family home exemption remains effective only where the home is sold or rented without the assistance of a broker or a person in the business of selling or renting dwellings.

I believe the proposed statute will be more easily enforced since the lines between exempt housing and covered housing are made more clear. In our 1966 bill, discrimination might or might not be authorized by a seller, so that even in the case of sales by real estate agents a potential buyer or lessee could not know whether or not a refusal to deal with him was covered by the statute.

H.R. 2516 authorizes no discrimination; all it does is exempt certain types of dwellings. In this respect it resembles State fair housing statutes far more than did the 1966 bill. This bill prohibits discrimination by real estate dealers in 1970 in virtually all cases because it is believed that when an individual uses the real estate industry to effect a sale, the transaction has assumed a public character.

The 1966 bill might also have had the effect of encouraging real estate dealers to continue discriminating and to seek "authorization" to discriminate from

their clients. Although the 1966 bill did prohibit soliciting such written authorizations, there can be no doubt that covert communication, for example, a "raised eyebrow" and other indirect means, would be encouraged by such a provision. In other words, the 1966 bill created a loophole.

Enforcement: H.R. 2516 provides three methods of obtaining compliance: administration conciliation, private suits, and suits by the Attorney General for a pattern or practice of discrimination.

Administrative conciliation: The Department of Housing and Urban Development would have conciliation authority to resolve complaints alleging discriminatory housing practices. A person aggrieved files his complaint within 180 days after the alleged acts of discrimination. The Secretary of Housing and Urban Development would have 30 days after filing of the complaint to investigate the matter and give notice to the person aggrieved whether he intended to resolve it. If the Secretary decides to resolve a complaint, he would engage in informal conference and conciliation with the person alleged to have committed the discriminatory housing practice, and attempt to bring an end to such practice by that means. If conciliation failed, or if the Secretary declined to resolve the charge or otherwise did not act within the 30-day period, the aggrieved person would have 30 days in which to file a civil action in either a State or Federal court.

If the complaint alleges acts constituting a violation of State or local law, and that law provides rights and remedies substantially equivalent to the rights and remedies provided in the bill, the Secretary would be required to refer the matter to the appropriate State or local agency, who would have at least 30 days to act on the matter before the Secretary could begin conciliation proceedings. In States with substantially equivalent rights and remedies any suit filed following failure of conciliation efforts would have to be brought in the State or local court.

Both the Secretary and the party charged have power to subpena records, documents, individuals and other evidence or possible sources of evidence.

In addition to his conciliation function, the Secretary would be required to make studies and to publish reports with respect to the nature and extent of discriminatory housing practices in the United States. He would also be directed to cooperate with and to render technical assistance to Federal, State, local, and private agencies which were carrying on programs to prevent or eliminate discriminatory housing practices, and to administer HUD programs and activities in a matter affirmatively to further the policies of the bill.

Private civil actions: In addition to administrative remedies, the bill authorizes immediate civil suits by private persons within 180 days after the alleged discriminatory housing practice occurred in any appropriate U.S. district court or appropriate State or local court of general jurisdiction. The bill further provides that any sale, encumbrance, or rental consummated prior to a court or-

der issued under this act and involving a bona fide purchaser, encumbrancer, or tenant, shall not be affected. In such circumstances as the court deems just, the bill authorizes the appointment of an attorney for the plaintiff and the commencement of a civil action without the payment of fees, costs, or security. The court is authorized to issue a permanent or temporary injunction, or other appropriate orders and may award actual damages and not more than $1,000 in punitive damages, together with court costs and reasonable attorney fees.

Suits by the Attorney General: The third enforcement method under H.R. 2516 authorizes the Attorney General to institute civil actions for preventive relief whenever he has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this bill, or whenever he has reasonable cause to believe that any group of persons has been denied such rights in a case of general public importance.

Finally, title VIII specifically provides that is shall not be construed to invalidate or limit any State or local law that grants or protects the same rights. The Secretary of Housing and Urban Development is authorized to cooperate with State and local fair housing agencies and, with their consent, can utilize the services of such agencies.

TITLE IX

Title IX, prevention of intimidation in fair housing cases: Title IX, using language similar to that found in title I of the bill, protects persons from forcible interference or injury because of race, color, religion, or national origin, and because they were seeking to sell or acquire housing, to finance or occupy a dwelling, or to exercise other rights connected with housing. The title also prohibits forcible interference with those who would aid or encourage others to exercise their rights or lawfully speak or assemble to protest denials of these rights. The criminal offenses described and the graduated penalties provided in title IX are similar to those stated in title I of the bill.

TITLE X

Title X establishes three new Federal offenses and provides a penalty of a fine of $10,000, imprisonment up to 5 years, or both. These three new offenses are:

First, teaching or demonstrating the use or making of any firearm or explosive or incendiary device, knowing or having reason to know, or intending that it will be unlawfully employed for use in or in furtherance of a civil disorder which may in any way or degree obstruct, delay, or adversely affect commerce, or the conduct or performance of any federally protected function;

Second, transporting or manufacturing for transportation in commerce a firearm or explosive or incendiary device, knowing or having reason to know, or intending that it will be used unlawfully in furtherance of a civil disorder; and

Third, committing or attempting to commit any act to obstruct, impede, or interfere with any fireman or law en-

forcement officer lawfully engaged in the lawful performance of his duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce for the conduct or performance of any federally protected function.

"Civil disorder" is defined as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."

Mr. Speaker, President Johnson 2 years ago described the challenge which we confront in these words:

The task is to give 20 million Negroes the same chance as every other American to learn and grow, to work and share in society, to develop their abilities—physical, mental and spiritual—and to pursue their individual happiness.

The bill which we debate today embodies essential and fundamental principles basic to the human rights and dignity of every American.

Mr. Speaker, I include at the end of my remarks a memorandum describing the constitutionality of the fair housing provisions of this legislation under the 14th amendment and the commerce clause of the Constitution:

CONSTITUTIONALITY OF FEDERAL FAIR HOUSING LEGISLATION UNDER THE 14TH AND THE COMMERCE CLAUSE

The proposed Fair Housing title of H.R. 2516, as amended by the Senate, would prohibit discrimination on account of race, color, religion or national origin in the sale, rental or financing of housing. It would, when its provisions became fully effective, apply to all housing, both public and privately owned.

I. DO FAIR HOUSING LAWS UNCONSTITUTIONALLY INFRINGE PRIVATE RIGHTS?

The first question is whether fair housing legislation which applies to private housing, whether enacted by the Federal Government or by a State or local government, is unconstitutional because it impairs the obligation of contract,[1] deprives persons of liberty or property without due process of law,[2] takes property without just compensation[3] or otherwise infringes private rights. The answer to one aspect of that question has been clear since 1953, when the Supreme Court held that no person has a right to have a court enforce a racially restrictive covenant in a deed, whether the covenant has been inserted by the person himself or a previous owner of the property.[4] And since 1966, State and Local laws barring discrimination in the sale, rental or financing of private housing have become commonplace, and State courts have unhesitatingly upheld them.[5] Any re-

maining aspects of the question were settled by the Supreme Court decision of *Heart of Atlanta Motel* v. *United States* (379 U.S. 241, 259–61) sustaining the provisions of the Civil Rights Act of 1964 forbidding discrimination by restaurants, hotels, theaters and other businesses of similar character. It is now clear that forbidding discrimination on account of race, religion, color or national origin in commercial transactions, including housing transactions, does not unconstitutionally infringe private rights.

II. DOES CONGRESS POSSESS THE CONSTITUTIONAL POWER TO ENACT A FAIR HOUSING LAW?

The remaining question is whether the power to deal with discrimination in housing rests exclusively with the States or whether Congress, too, can legislate on the subject. The answer is that the Constitution provides at least two independent sources of authority for congressional enactment of fair housing legislation: the Fourteenth Amendment and the Commerce Clause.

A. The 14th amendment

The clause of the Fourteenth Amendment which is of principal interest here is the Equal Protection Clause:

"No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." [6]

Every student of the law is familiar with the court's use of the Equal Protection Clause to prevent state action which would violate its terms. Courts have invoked it to prevent States from segregating their schools,[7] from denying jury service to Negroes,[8] individuals of Mexican ancestry,[9] or women,[10] and from denying Negroes a right to vote in primary elections,[11] among other examples.

The power of Congress to enforce the Equal Protection Clause, however, is probably less familiar. It derives from Section 5 of the Fourteenth Amendment, which provides that:

"The Congress shall have power to enforce by appropriate legislation, the provisions of this article" [i.e., of this Amendment].

Perhaps the best known examples of legislation enacted (in part) to enforce the Equal Protection Clause are the Civil Rights Statutes enacted during Reconstruction days, imposing criminal penalties for violations of constitutional rights.[12] A more recent example is Section 4(e) of the Voting Rights Act of 1965, conferring voting rights on certain citizens unable to read or understand English.[13] The Supreme Court took the occasion of its upholding Section 4(e) to define two kinds of legislation which Congress may

---

[1] The Constitution, Article I, Section 10 Clause 1.

[2] The Constitution, Fifth Amendment; Fourteenth Amendment.

[3] The Constitution, Fifth Amendment.

[4] *Barrows* v. *Jackson*, 346 U.S. 249, 260 (1953); *Shelley* v. *Kraemer*, 334 U.S. 1, 22 (1948); *Hurd* v. *Hodge*, 334 U.S. 24, 30–36 (1948).

[5] Twenty-two states, the District of Columbia, Puerto Rico and the Virgin Islands have fair housing laws applicable to private housing transactions. *Fair Housing Laws, Summaries and Text of State Laws*, The Library of Congress Legislative Reference Service, Doc. No. 360/38, A–145 (1966). Almost all of them have been tested in court cases and upheld. See cases listed, Housing and Home Finance Agency, *Fair Housing Laws, Sum-*

*maries and Text of State and Municipal Laws*, pp. 363–66 (Sept. 1964). Washington is the only state whose highest court has ever invalidated a state fair housing statute, and its court acted by a 5 to 4 majority, 3 of the 5 judges ruling on grounds other than that the law infringed private rights. See *O'Meara* v. *Washington State Bd. Against Discrimination*, 58 Wash. 2d 793, 365 P. 2d 1 (1961), cert. denied, 360 U.S. 839 (1962).

[6] *The Constitution*, Fourteenth Amendment, Section 1, second sentence, third clause.

[7] *Brown* v. *Board of Education*, 347 U.S. 483 (1954).

[8] *Strauder* v. *West Virginia*, 100 U.S. 303 (1880).

[9] *Hernandez* v. *Texas*, 347 U.S. 475 (1954).

[10] *White* v. *Crook*, (M.D. Alabama 1966), 251 F. Supp. 401.

[11] *Nixon* v. *Herndon*, 273 U.S. 536 (1927).

[12] The statutes appear in their present form in 18 U.S.C. 241, 242 and 243. Their initial enactment and subsequent history are traced in the appendix of Justice Frankfurter's opinion in Williams I, 241 U.S. 70 at 83 (1951). See also *Ex Parte Virginia*, 100 U.S. 339 (1879), upholding the constitutionality of the forerunner of 18 U.S.C. 243.

[13] 79 Stat. 439 (42 U.S.C. 1973b (e)).

validly enact to enforce the Equal Protection Clause, one of which is of interest here.[14]

1. *Federal legislation under the Equal Protection Clause may be based on Congress' determination to remove obstacles in the way of persons securing the equal benefits of government.*

Section 4(e) of the Voting Rights Act of 1965 provides that no person educated in an accredited school in the United States, its territories, the District of Columbia or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English shall be denied the right to vote because of his inability to read or understand English.[16] The principal intended beneficiaries of the provision were the Spanish-speaking Puerto Rican citizens of New York, many of whom were prohibited from voting by State law.[16] The Supreme Court held that Section 4(e) was a valid act of Congress because the Fourteenth Amendment empowers Congress to remove obstacles in the way of persons' securing the equal benefits of government, and under the circumstances contemplated by this legislation—in particular, the situation of the Spanish-speaking Puerto Rican population of New York—a State's denial of the right to vote is such an obstacle. It hinders the disenfranchised from securing the equal benefits of government such as schools, public housing and law enforcement.[17]

Legislation prohibiting discrimination in housing on account of race, color, religion or national origin would also be sustainable on this basis, because such discrimination forces its victims to live in segregated areas, or "ghettoes," and the benefits of government are less available in ghettoes. That fact can be amply documented. Children raised in ghettoes are more likely to go to inferior public schools.[18] Their parents are more likely to lack adequate public transportation facilities to commute to and from places of work, and so will miss employment opportunities.[19] Local building and housing codes are not effectively enforced in ghettoes.[20] Federal subsidies for private housing bypass ghettoes and go instead to the predominantly white suburbs.[21] Freeways are typically routed through ghettoes, disrupting neighborhoods and displacing families, because land there is cheaper and the inhabitants less able to organize politically to oppose them.[22] Hospital facilities are less available in ghettoes.[23] Most significantly of all, law enforcement is least effective in the ghetto, although it is there that it is needed most.[24]

2. *Federal legislation under the Equal Protection Clause may also be based on a desire to correct the evil effects of past unconstitutionally discriminatory government action.*

There is a second basis under the Fourteenth Amendment to support fair housing legislation, which the Court did not need to consider in its decision upholding the Voting Rights Act of 1965. Section 5 of the Amendment authorizes Congress to enforce its provisions, one of which is the Equal Protection Clause. Enforcement, in the legal sense, traditionally includes both the prevention of violations and the punishment[25] of past violations. It follows that if the States in the past denied to persons within their jurisdictions the equal protection of the laws, and if the effects of their denials are still present, Congress possesses the power to correct those effects. By similar reasoning, the Fifth Amendment, which imposes equal-protection obligations on the Federal Government similar to those which the Fourteenth Amendment imposes on the States,[27] grants Congress the power to correct the enduring effects of any past denials of equal protection by the Federal Government.

Such denials of equal protection by the States, and by the Federal Government, were in fact numerous, and their effects in housing are still with us. The States and their local subdivisions enacted zoning laws denying Negroes and other minority groups the right to live in white neighborhoods until the Supreme Court put a stop to the practice in 1917.[28] Local ordinances with the same effect, although operating more deviously in an attempt to avoid the Supreme Court's prohibition, were still being enacted and struck down by the courts as late as 1930.[29] During these years there also came into use privately drawn racially restrictive covenants in deeds, which "ran with the land" and bound successive owners irrespective of their personal inclinations. Such covenants quickly became the major weapon for keeping minorities out of good housing,[30] and they were fully honored by State and lower Federal courts[31] until the Supreme Court ruled in 1948 that they could not constitutionally be enforced by injunction[32] and in 1953 that they could not be enforced by awards of damages either.[33]

Throughout this period, and even somewhat after the Supreme Court's 1948 ruling, the Federal Housing Administration actively encouraged the use of racially restrictive covenants, in most cases flatly refusing to grant its mortgage insurance or guarantees unless the covenants were included in the deeds concerned.[34] This Federal discriminatory action had a substantial impact:

"FHA's espousal of the racial restrictive covenant helped spread it throughout the country. The private builder who had never thought of using it was obliged to adopt it as a condition for obtaining FHA insurance. * * *

"FHA succeeded in modifying legal practice so that the common form of deed included the racial covenant. Builders everywhere became the conduits of bigotry.

"The evil that FHA did was of peculiarly enduring character. Thousands of racially segregated neighborhoods were built, millions of people re-assorted on the basis of race, color, or class, the differences built in, in neighborhoods from coast to coast."[35]

At the same time, the Federal and State governments were cooperating to enforce segregation in public housing. Lower federal courts approved such efforts as late as 1941,[36] and although thereafter the courts, when they had the opportunity, invalidated them, efforts to keep public housing segregated were continuing in the North until at least 1955[37] and in Kentucky, Missouri and Tennessee until at least 1961.[38]

These efforts to place Negroes in separate neighborhoods were especially successful because they occurred during the period of the greatest Negro migration out of the South into Northern cities. Whereas only 10 per cent of the Nation's Negroes lived outside the South in 1910, 32 percent did so by 1950 and 40 percent by 1960.[39]

Throughout these years the Federal and State governments were also active in promoting segregation in areas other than housing, such as schools and the armed forces. That activity, too, contributed to housing segregation, because it educated the white public to the myth that any kind of close association with Negroes was debasing and to be avoided.[40]

In May of 1967, the Supreme Court affirmed a finding of California's highest court[41] that a recent amendment to the State constitution known as Proposition 14 had "involved the State in private racial discrimination to an unconstitutional degree." The "right" to discriminate, the Supreme Court found, had been "embodied in the States basic

---

[14] The other kind is Federal legislation to nullify or forbid State action which Congress considers invidiously discriminatory. See *Katzenbach v. Morgan*, 384 U.S. 641, 652–56. Since State action resulting in discrimination in housing on account of race, color, religion or national origin would directly contravene the Fourteenth Amendment and so be invalid, Federal fair housing legislation to nullify or forbid it is not necessary. See *Buchanan v. Warley*, 245 U.S. 60.

[15] 79 Stat. 439 (42 U.S.C. 1973b (e)).

[16] See, *e.g.*, CONGRESSIONAL RECORD, vol. 111, pt. 8, pp. 11061–11062, 11065–11066; vol. 111, pt. 12; p. 16240; Literacy Tests and Voter Requirements in Federal and State Elections, Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary on S. 480, S. 2750 and S. 2979, 87th Cong., 2d Sess. 507–08 (1962).

[17] *Katzenbach v. Morgan*, 384 U.S. 641, 652–56 (1966). See also Cox, *Constitutional Adjudication and the Promotion of Human Rights*, 80 Harv. L. Rev. 91, 118–123 (1966).

[18] *Racial Isolation in the Public Schools*, Vol. 1 and 2, Report of the U.S. Commission on Civil Rights, Washington, D.C., 1967.

[19] "White House Aiding Urban Transit Programs to Make it Easier for Poor to Get to Jobs" by Robert B. Semple, Jr., *New York Times*, March 20, 1967, p. 17.

[20] *Law and Poverty 1965* by Patricia M. Wald, National Conference on Law and Poverty, Washington, D.C., June, 1965, pp. 12–20.

[21] *Housing*, Report by the U.S. Commission on Civil Rights, Vol. 4, Washington, D.C. 1961.

*Racial Isolation in the Public Schools*, Vol. 1, Report by the U.S. Commission on Civil Rights, Washington, D.C., 1967, pp. 20–25.

[22] *Dark Ghetto* by Kenneth B. Clark, Harper and Roe, New York, 1965, pp. 154–162.

[23] *Violence in the City—An End or a Beginning*, Report by the Governor's Commission on the Los Angeles Riots, 1965, pp. 73–74.

[24] *The Challenge of Crime in a Free Society*, Report by the Commission on Law Enforcement and Administration of Justice, U.S. Government Printing Office, Washington, D.C., 1967, pp. 60–63.

*Dark Ghetto* by Kenneth B. Clark, Harper and Roe, New York, 1967, pp. 81–97.

*Manchild in the Promised Land* by Claude Brown, McMillian co., New York, 1965, pp. 30–32, 160–180.

[25] See, *e.g.*, 18 U.S.C. 241–43.

[26] See *e.g.*, 42 U.S.C. 1983–85.

[27] *Bolling v. Sharpe*, 347 U.S. 497 (1954).

[28] *Buchanan v. Warley*, 245 U.S. 60 (1917).

[29] See *Harmon v. Tyler*, 273 U.S. 668 (1927), reversing 158 La. 439, 104 So. 200; *City of Richmond v. Deans*, 281 U.S. 704 (1930), affirming 34 F. 2d 712 (4th Cir.).

[30] Gunnar Myrdal, *An American Dilemma*, 349–50, 662–27 (1944).

[31] The courts of 19 states expressly upheld the validity of such covenants. The only state court recorded as denying their validity was a district court in Pennsylvania. See 3 A.L.R. 2d 466, 474–77 (1949).

[32] *Shelley v. Kraemer*, 334 U.S. 1; *Hurd v. Hodge*, 334 U.S. 24.

[33] *Barrows v. Jackson*, 346 U.S. 249.

[34] See U.S.F.H.A., Underwriting Manual (1938), paragraphs 980(3)g, 935, 937 and 951. These provisions stayed in effect until 1947, see U.S.F.H.A., Underwriting Manual (1947), Preface, p. VI. Even thereafter FHA continued to deny mortgage insurance or guarantees if the neighborhood was or threatened to become integrated, see Abrams, *Forbidden Neighbors* 233 (1955), and Weaver, *The Negro Ghetto* 71–73 (1948).

[35] Abrams, *Forbidden Neighbors* 234–36 (1955).

[36] See *Favors v. Randall*, 40 F. Supp. 743 (E.D. Pa. 1941).

[37] See *Detroit Housing Commission v. Lewis*, 226 F. 2d 180.

[38] The United States Commission on Civil Rights, *The Fifty States Report* 173, 329, 591 (1961).

[39] McEntire, *Residence and Race* 9–11 (1960); *Statistical Abstract of the United States*, 1966, Table 26, p. 27.

[40] McEntire, *Residence and Race* 87 (1960).

[41] *Mulkey v. Reitman*, 64 Cal. 2d 529, 413 P. 2d 825 (1966).

Case 1:13-cv-00966-RJL     Document 153-3     Filed 05/30/23     Page 36 of 111

charter." [42] Although the kind of prohibited State action exemplified by the California constitution amendment has been invalidated by the courts, the case illustrates that State-supported efforts to further segregated housing patterns are not entirely a problem of the distant past.

*3. Federal legislation to enforce the Equal Protection Clause may deal with private conduct as well as State action.*

It is no objection of its validity that the Federal Fair Housing Act would prohibit private acts of discrimination in housing as well as discrimination by State or local governments. The supposed objection arises from a false analogy between judicial enforcement and congressional enforcement of the Equal Protection Clause. The power of a court to enforce the Clause arises directly from the Clause itself, which speaks only of what states are forbidden to do ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws"). [43] Hence, courts enforcing the Clause can only forbid action by States or their local subdivisions. [44] But the power of Congress to enforce the Clause arises from another section of the Fourteenth Amendment, Section 5, which reads:

"The Congress shall have power to enforce, by appropriate legislation, the provisions of this article" [i.e., of this Amendment].

Section 5 grants a legislative power, and legislative powers are exercisable in accordance with the Necessary and Proper Clause, [45] which by its terms grants Congress the power: "To make all laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States, . . ." [46]

The scope of the Necessary and Proper Clause has been settled at least since Chief Justice Marshall formulated it in 1819 in the landmark case of *McCulloch* v. *Maryland*:

"Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." [47]

The purpose, or "end," of the Federal Fair Housing Act is to remove the walls of discrimination which enclose minority groups in ghettoes, so that they may live wherever their means permit and be better able to secure the equal benefits of government and the other rewards of life. [48] Prohibiting private as well as government acts of discrimination in housing is undoubtedly a "means which are appropriate" and "plainly adapted to that end." Indeed, it is difficult to conceive of any legislative approach to the desired end which would not include as one of its means the prohibition of private discrimination in housing. And that prohibiting private acts of discrimination is not "prohibited, but consist[s] with the letter and spirit of the Constitution," has already been demonstrated. The courts have held that it does no unconstitutionally impair rights of contract, deprive persons of liberty or property without due process of law, take property without just compensation or otherwise infringe constitutional rights.

Even if individual acts of discrimination, taken alone, would not have the effect of deterring Negroes from acquiring property where they choose, Congress could well conclude that numerous individual refusals to sell or rent to Negroes have combined effectively to bar them from whole communities. Congress has the power to regulate individual instances of discrimination which lack significance when taken in isolation, if, cumulatively, their regulation is appropriate to effectuate a constitutional objective. [49]

It is acknowledged that a few early decisions of the Supreme Court, notably the *Civil Rights Cases*, 109 U.S. 3 (1883), have narrowly interpreted the power of Congress under Section 5 of the Fourteenth Amendment. Under these decisions, Congress' lawmaking authority is confined to the adoption of "appropriate legislation for correcting the effects of . . . prohibited State laws and State acts. . . ." Congress' Fourteenth Amendment power, under this view, is reduced to the same scope as that of the judiciary—the power to redress the effect of unconstitutional State action through "corrective legislation." [50]

The Civil Rights Cases have never been expressly overruled, but the Court's reasoning in that decision has been repeatedly questioned, [51] and recent decisions have virtually destroyed the force of the rule laid down in the 1883 decision. [52]

Discussing the *Civil Rights Cases* in his partial dissent in *United States* v. *Guest*, [53] Justice Brennan, after stating the old rule regarding the scope of Congressional power, said:

"I do not accept—and a majority of the Court today rejects—this interpretation of Section 5."

Justice Brennan pointed to the recent decision of the Court in *South Carolina* v. *Katzenbach*, [54] involving congressional power under Section 2 of the Fifteenth Amendment, where the Court held that "the basic test" of the validity of an exercise of congressional power was that formulated in *McCulloch* v. *Maryland*. [55] Noting that Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth employ "virtually the same" language, Justice Brennan felt that the reach of congressional authority under both enabling clauses should be the same:

"Viewed in its proper perspective, Section 5 of the Fourteenth Amendment appears as a positive grant of legislative power, authorizing Congress to exercise its discretion in fashioning remedies to achieve civil and political equality for all citizens." [56]

In similar language, the Court has since broadly defined the scope of Section 5 in upholding congressional action finding and declaring the existence of a denial of equal protection, and legislating against that denial. [56]

Although the opinion of the Court in the *Guest* case did not deal directly with the question, six of the Justices, three in each of two separate opinions, stated their belief that Section 5 of the Fourteenth Amendment empowered Congress to pass laws to prevent interference with Fourteenth Amendment rights—even when the interference is accomplished wholly without state action. Justice Clark, in a concurring opinion, said:

"There now can be no doubt that the specific language of Sec. 5 empowers the Congress to enact laws punishing all conspiracies—with or without state action—that interference with Fourteenth Amendment rights." [57]

And Justice Brennan wrote:

"Section 5 authorizes Congress to make laws that it concludes are reasonably necessary to protect a right created by and arising under the Amendment; and Congress is thus fully empowered to determine that punishment of private conspiracies interfering with the exercise of such a right is necessary to its full protection." [58]

By the same reasoning, Congress has the power, under Section 5, to pass laws prohibiting private discrimination in the housing market, if it concludes that such laws would provide a "remedy to achieve civil and political equality for all citizens." [58]

*B. The commerce clause*

Housing is one of America's principal industries. In 1965, it contributed $27.6 billion to the economy, [59] considerably more, for example, than the $19.9 billion contributed that same year by all American agriculture, forestry and fisheries combined. [60] The largest single investment most Americans have is their home.

A large portion of housing materials is shipped in interstate commerce. Forty-one-million tons of lumber and finished wood stock were shipped in the United States in 1963. [61] Forty-three per cent of this material was shipped 500 miles or more. [62] Nine million tons of millwork and wood products were shipped in 1963 and 51 percent of it traveled 500 miles or more. [62] Seven per cent of all the brick that was shipped traveled 500 miles or more. [63] In *NLRB* v. *Denver Building and Construction Trades Council*, [64] the Supreme Court held that the NLRB had jurisdiction under the Commerce Clause over a dispute in the building trades because the disagreement might have prevented building materials from crossing state lines.

Much of the financing of housing crosses state lines. In 1960, 2.4 million out of a total of 14.5 million one-family occupant-owned dwellings subject to mortgages were located in a State other than that of the mortgage company. [65] The proportion was only slightly less for multiple dwellings. [65] More than half of the residential mortgages held by insurance companies in 1960 were on property in a State other than that in which the company was domiciled. [66] Almost 40 percent of

[42] *Reitman* v. *Mulkey*, 387 U.S. 369, 377 (1967).

[43] *The Constitution*, Fourteenth Amendment, Section 1, second sentence, third clause.

[44] See cases cited in notes 7 to 11, *supra*.

[45] *Katzenbach* v. *Morgan*, 384 U.S. 641, 648–51 (1966); *United States* v. *Guest*, 383 U.S. 745, 762, 782–84 (1966).

[46] The Constitution, Article I, Section 8, Clause 18.

[47] 4 Wheat. 1, (1819).

[48] See text at notes 18 to 25, *supra*.

[48a] *Wickard* v. *Filburn*, 317 U.S. 111, 127–28 (1942); *NLRB* v. *Fainblatt*, 306 U.S. 601, 606–07 (1939).

[49] 109 U.S. 3, at 11.

[50] See, *e.g.*, Frantz, *Congressional Power to Enforce the Fourteenth Amendment Against Private Acts*, 73 Yale L. J. 1353 (1964); Harris, The Quest for Equality (1960); *Cf. United States* v. *Price*, 383 U.S. 787, 807 (appendix); *Bell* v. *Maryland*, 378 U.S. 226, 289–305 (1964) (concurring opinion of Mr. Justice Goldberg.)

[51] *Katzenbach* v. *Morgan*, 384 U.S. 641 (1966); *South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966); *United States* v. *Guest*, 383 U.S. 745, 762, 782–86 (1966) (concurring opinion of Mr. Justice Clark, and partial dissent of Mr. Justice Brennan).

[52] 383 U.S. 745, 782 (1966).

[53] 383 U.S. 301 (1966).

[54] 17 U.S. (4 Wheat.) 316 (1819). See pp. 16–17 *supra*.

[55] 383 U.S. at 784.

[56] *Katzenbach* v. *Morgan*, 384 U.S. 641 (1966). See pp. 6–7, 16–17, *supra*.

[57] 383 U.S. 745, 762.

[58] *Id.*, at 782.

[58a] *Id.*, at 784.

[59] *Statistical Abstract of the United States*, 1966 Table 454, p. 322.

[60] *Id.*, Table 451, p. 320.

[61] *1963 Census of Transportation, Commodity Transportation Survey, Shipper Series, Lumber and Wood Products, Except Furniture* (Group II). Preliminary Report, Table 5, p. 7.

[62] *Ibid.*

[63] *Ibid.*

[64] *Id. Clay and Glass Products* (Group 13), Preliminary Report, Table 5, p. 8.

[65] 341 U.S. 675, 684 (1951).

[66] *1960 Census of Housing*, Volume V. Part I, Residential Finance-Homeowner Properties.

[66a] *1960 Housing Census, supra*, Part II, Residential Finance-Rental Properties.

[66b] *Ibid.*

9564 CONGRESSIONAL RECORD — HOUSE *April 10, 1968*

all the nonfarm mortgages on property located in California were given to secure loans the funds for which came from outside the State.[10]

Each year one family out of every thirty in the population moves its place of residence to a different State.[11]

The meaning of these statistics was illustrated by the testimony last year of Mr. William J. Levitt to Subcommittee No. 5 of the House Judiciary Committee. Mr. Levitt is the President of Levitt & Sons, Inc, a major builder of homes, and is a supporter of fair housing legislation. He testified:[12]

"Perhaps 80 percent of the materials that go into our houses come from across state lines."

"With the possible exception of the New York Community that we are building now, every other community in which we build receives its financing from a state other than the one in which it is located."

"75 to 80 percent" of Levitt & Sons' advertising is interstate.

"Out-of-State purchasers [of our housing] run from about 35 to 40 percent, on the low side, to some 70 percent, on the high side."

Discrimination in housing affects this interstate commerce in several ways. The confinement of Negroes and other minority groups to older homes [13] in ghettoes restricts the number of new homes which are built and consequently reduces the amount of building materials and financial financing which moves across state lines. Negroes, especially those in the professions or in business, are less likely to change their place of residence to another state when housing discrimination would force them to move their families into ghettos,[14] the result is both to reduce the interstate movement of individuals and to hinder the efficient allocation of labor among the interstate components of the economy.

The Commerce Clause [15] grants Congress plenary power to protect interstate commerce from adverse effects such as these.[16] The power is not restricted to goods or persons in transit. It extends to all activities which affect interstate commerce, even if the goods or persons engaged in the activities are not then, or may never be, traveling in commerce.[17] The power exists even when the effects upon which it is based are minor, or when taken individually, they would be insignificant. It is sufficient if the effects, taken as a whole, are present in measurable

amounts.[18] And it does not matter that when Congress exercises its power under the Commerce Clause, its motives are not solely to protect commerce. It can as validly act for moral reasons.[19]

Mr. SMITH of California. Mr. Speaker, I yield 2 minutes to the gentleman from New York [Mr. GOODELL].

Mr. MacGREGOR. Mr. Speaker, will the gentleman yield?

Mr. GOODELL. Mr. Speaker, I yield to the gentleman from Minnesota.

Mr. MacGREGOR. Mr. Speaker, I rise in support of this resolution and this bill not because it represents the last answer to the problems of discrimination nor because it is the perfect response to the inequities it seeks to correct. I harbor no such illusions. I will vote for this legislation before us today because, despite its several imperfections, it will make a law both sound and just—and an extremely important and worthy addition to the body of civil rights legislation adopted by the Congress in 1957, 1960, 1964, and 1965.

Clearly title VIII, dealing with fair housing, is the most controversial portion of this legislation, yet it is a subject which was thoroughly debated by this body in the recent past. In 1966 a fair housing compromise provision passed the House, but died quietly in the Senate. During that debate many of you supported my efforts to substitute, for the weaker amendment which was eventually adopted, more comprehensive language which would have outlawed discrimination in all sales, including owner-occupied, single-family dwellings.

At this time I stated that a man's home is indeed his castle, but when he leaves it and offers it for sale, it cannot be contended that in his absence it continues to be his castle. I have heard or read nothing since that would lead me to believe otherwise. With regard to rental property, my 1966 amendment would have provided only three exceptions: charitable, fraternal, or religious homes, the so-called Mrs. Murphy's boarding house, and multiunit dwellings of up to four units where the owner occupies one of those four units. My purpose in reciting this history is to point out that if given a similar opportunity today many Members here would again support the substitution of stronger language for the open housing provision now pending before us.

Yet I am convinced from a careful reading of the debate in the other body on this legislation that the Senate at the present time would oppose any effort on our part to strengthen this provision. So many of us find ourselves faced with the imperfect choice of accepting this provision or no provision at all during this session of Congress. While I would prefer a ban on discrimination in the sale of all housing, I will vote today for the more limited coverage which excludes single-family house sales and rentals by

an owner who acts without the assistance of any real estate broker, agent, or salesman.

Fourteen States and the District of Columbia already have laws more comprehensive in their coverage than title VIII currently before us. Twenty-two States have coverage approximately equal to what is called for in this legislation. In addition, many municipalities have acted on their own to adopt open occupancy ordinances where the States have to date failed to adopt fair housing laws.

Now it is our turn to respond—not to any criminal act or to the civil disorder of the moment, although this legislation has something to say about this problem—but rather to the continuing trauma of discrimination which affronts the dignity of man. How bitter it must be to find that although your bank balance is ample, your credit rating is good, your character above reproach, you may not improve your family's housing because your skin is not white. For this reason it is urgent for our Nation that effective open housing legislation such as this becomes the law of the land without further delay. In so doing we will have taken another important step toward the promised land of freedom and social justice for not just some but for all our citizens.

Mr. GOODELL. Mr. Speaker, this is a time of painful divisions within our ranks, and they are not partisan divisions but they are divisions between sincere men of conviction. We are told that we should reject the Senate bill because it is not perfectly drafted. Admittedly it could be improved. We are told it contains things it should not. Admittedly it does.

We are told legislative procedure requires us to send this bill to conference. I say to the Members the Senate bill, after careful study of our best experts and my study, is acceptable to me. It is a sound piece of legislation and essential. Our legislative procedure is to serve us, not inexorably to shackle us to failure and ineffectuality.

We must not today be swept by the emotional tides of the hour. Martin Luther King in one of his last writings said:

Violence is not only immoral and repugnant, it is pragmatically barren.

Some would be guided to vote for bad legislation because of the cruel pathos of the assassination. That is wrong. Others would be guided to vote against good legislation because of the senseless rioting in our streets. That is equally wrong.

In my considered judgment, if this bill goes to conference, it will be jeopardized. That is enough. Open housing legislation should be passed. In fairness, it is long overdue. I implore my colleagues to resist the temptation to react to the passion of the moment. Our solemn responsibility impels us to rise above the passions of the hour, and that means we must accept the Senate bill without sending it to conference. We must do so not because of riots or assassinations or threatened upheavals, but simply because it is right.

[10] Leo Grebler, "California's Dependence on Capital Imports for Mortgage Investment," California Management Review, Spring 1963, Vol. V, No. 3, page 47, at 48–49.

[11] United States Department of Commerce, Bureau of the Census, Americans at Mid-Decade, Series P23, No. 16, January 1966, pp. 4–7, 17–18.

[12] Hearings before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 89th Cong., 2d Sess. 1535–38 (May 4 through May 25, 1966).

[13] See Gunnar Myrdal, *An American Dilemma* 349–50.

[14] See *Katzenbach* v. *McClung*, 379 U.S. 294, 300 (1964). The armed forces also encounter difficulties from off-base segregation in transferring servicemen from one state to another. President's Committee on Equal Opportunity in the Armed Forces, Initial Report, Equality of Treatment and Opportunity of Negro Military Personnel Stationed within the United States.

[15] *The Constitution*, Article I, Section 8, Clause 3.

[16] *Katzenbach* v. *McClung*, 379 U.S. 294 (1964); *Gibbons* v. *Ogden*, 9 Wheat 1, 189–92 (1824).

[17] *Katzenbach* v. *McClung, supra*, 379 U.S. at 302, *Labor Board* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 34–36.

[18] *Wickard* v. *Filburn*, 317 U.S. 111, 125 (1942); *Mabee* v. *White Plains Publishing Co.*, 327 U.S. 178 (1946); *United States* v. *Wrightwood Dairy Company*, 315 U.S. 110 (1942).

[19] *Heart of Atlanta Motel* v *United States*, 379 U.S. 241 (1964).

056630

OPEN HOUSING: THE HOUR OF DECISION

Americans, as a nation and a people, are just now awakening to the terrifying impact of a nation in crisis. Confronted by internal dissension at home and external threats abroad, we—the most powerful nation and people in history—toss and turn with the tides of social discontent, seethe with the injustice of hope denied, and grope with the burden of a war unwon. In the year just passed, we saw added to the conflict abroad a deep and distressing scar at home as our cities—one after another—erupted in the turmoil of crisis.

For America, this is the hour of decision.

We look inwardly during this hour, deep into the recesses of our conscience—

Searching to face squarely an issue which has gnawed at the vitals of our Nation for over a century:

Wondering how best to extend to all Americans the rights of liberty and equality envisioned in the "American dream"; and

Hoping in the end to perpetuate and better our democracy which has been a beacon of inspiration to the world for almost 200 years.

To perpetuate and better our democracy, some would close a lid tightly on a simmering cauldron of racial problems and call that law and order while others would fan the flames of racial strife and thereby destroy the hope and vision in the "American dream." We cannot do either. Our hope and vision are broader.

We must search to create a new America which continues to build the hope of the past into the reality of the future. We must assure all people everywhere that our heritage and tradition are not hitching posts to the past, but steppingstones to the future. We must resolve the issue before us and call that justice.

Some earnestly anticipate this hour of decision; others do not. In any event, for most Members of the House of Representatives, there will be a burden lifted when this hour and this decision pass from us. Whether for or against the proposition of the hour, the time has come and now is when each Member of the House of Representatives must face his own hour of decision on this issue.

The issue is "open housing"—

An issue surrounded by conflicting convictions and differing principles; and

An issue which causes reasonable men to differ honestly.

In countless communities throughout our country, marchers and picketers and sit-in demonstrators have fought for "open housing." And countless city councils, county boards and State legislatures have grappled with "open housing." And countless citizens in all walks of life—housewives and farmers, businessmen and teachers, laborers and lawyers—have discussed the merits of "open housing." The issue itself was on another occasion before the House of Representatives. And now, after all this, the issue once again comes before us, for resolution.

It comes in the same way it came before city councils and county boards and State legislatures, dividing reasonable

men on basic convictions and fundamental principles. With turbulent crosscurrents of opinion on this issue, Members rightfully hesitate to express their views without first examining the full scope and broadest ramifications of the issue. Our consciences and the integrity of the House of Representatives demand such an examination before determining our course of action. I speak out with the full awareness that other Members whom I often agree will not agree with my position on this issue. I find it imperative to support the Senate version of the civil rights bill of 1968.

The situation confronting us poses only two realistic alternatives. We may either accept the Senate version of the civil rights bill or send the bill to conference committee for resolution of House and Senate differences on the bill. I must candidly admit that there are good and considered reasons for pursuing either of these two courses.

Some would send the bill to conference because of a firm desire to fulfill legislative precedent through resolving House and Senate differences on a bill which passed the two Houses in considerably different forms. Others would send the bill to conference to perfect weaknesses in the legislation. And obviously others would send the bill to conference to bury it in a parliamentary jungle from which it could not be resurrected. In discussing the merits of this legislation, I wish to respond to those who want to fulfill legislative precedent and also to perfect weaknesses in the legislation.

For those who believe that legislative precedent demands sending this bill to conference, I would remind them that on two previous occasions, in 1960 and 1964, the House of Representatives accepted, without further consideration, Senate versions of civil rights bills.

For those who believe this legislation needs to be perfected, few would disagree. The bill is not perfect in every detail, but neither is any piece of legislation.

Objections are raised because title I of the Senate version covers the legislation in H.R. 2516 and H.R. 421 as approved by the House in 1967. There is considerable feeling, however, that H.R. 2516 and H.R. 421 should be combined. In fact Republican members of the Judiciary Committee expressed this view in committee reports on each of these bills. I personally commend the other body for combining these two ideas in the same piece of legislation.

Objections are raised because the bill has a declaration of rights for American Indians. I personally wonder how there can be opposition to a declaration of rights for American Indians when our own colleague, the gentleman from South Dakota, BEN REIFEL, the only American Indian now serving in Congress—openly and enthusiastically supports the Indian bill of rights.

Objections are raised about the portions of the bill pertaining to firearms control. I am here constrained to support the view of Senator ROMAN HRUSKA, of Nebraska, who as author of this portion of the bill advises that major sportsmen's groups endorse the firearms provisions.

Objections come from those who believe that previous civil rights bills have not really been constructive contributions to the extension of liberty and equality for all and that we now experience more civil rights difficulties than before. May I simply say in response that thousands of Negro Americans are now voting because of the Voting Rights Act of 1965, and, because of other civil rights acts, millions of Negro Americans are now enjoying pleasures previously denied them.

We are at a critical juncture in our Nation's history which does not allow us the luxury of additional and painstaking consideration of this legislation. On other issues and at other times in our history, we could vote to send legislation to conference committee to satisfy legislative precedent and to perfect the legislation. But at this time and on this day and in this place we do not have this luxury of choice.

Certainly the issue can be avoided or it can be postponed. Should we decide to avoid or postpone, however, the issue will only return to face us again. The reason it will come again is very simple: More and more Americans are demanding open housing legislation.

Indeed the total number of persons now living in State or local government jurisdictions with open housing laws is in excess of 118.2 million. Percentagewise this means that roughly 60 percent of all Americans live within governmental jurisdictions possessing open housing laws. My own State of New York, and most other industrialized States, have stronger open housing laws than the Senate version of this bill. It is time for us to recognize the mood of the American public and to support this long-awaited extension of liberty and equality in the field of open housing.

I am personally satisfied that this legislation meets minimum requirements of technical craftsmanship, though far from perfect. And I know that there is sound and wise precedent for not sending it to conference committee. I have long been on record in support of open housing. I will join my Republican colleagues who have announced they will vote to accept the Senate version of the civil rights bill of 1968.

This is April 1968. Less than a year has passed since the long, hot summer of 1967. Less than one-fourth of a year remains before the summer of 1968.

In the South and in the North, a century's torrential undercurrent of tension between black and white continues to erupt in a vicious violence which threatens to destroy our commitment to the "American dream" of extending liberty and equality to all Americans regardless of race, color, or creed. The perilous paradox of greater equality for some and lesser equality for others, more liberty for some and lesser liberty for others causes expedient shifts from the ballot to the bullet. No democracy can long tolerate shifts from the ballot to the bullet without soon ripping the seams of democracy's strength. The key to democracy's strength is the ballot, and when that fails, democracy fails. The undercurrent of tension can only be resolved, and the key to democracy's strength pre-

served, when every American feels, senses, and knows that he has the same stake in the "American dream" as every other American.

How we vote in this body on this issue—whether we accept the Senate version of the bill or send the bill to conference—will be interpreted—rightly or wrongly—as a vote for or against the extension of liberty and equality. "Open housing" is a key symbol in the civil rights movement. The demonstrated desire for equal access to housing requires that our decision on this issue be responsible to both the substance and the symbol of the legislation. Substantively, this is a reasonably good bill. Symbolically, this is an overwhelmingly important bill. For, on this bill—whether we vote to accept the Senate version of the bill or to send the bill to conference—we will be voting for or against a key symbol in the civil rights movement.

Many impressive documents chart the history of man's groping for liberty and equality. Common to each of them is a similar substance and a common symbol. Whether the Magna Carta or the Declaration of Independence or the Constitution or the Emancipation Proclamation, the outstanding features of each are the substance and symbol of human freedom. The gradual and evolutionary movement in history towards liberty and equality has been slow but sure, almost like a glacial movement passing over a continent. But as a glacial movement is not stopped in its slow sweep across a continent, so has the movement towards liberty and equality never been reversed, when considered in the ageless sweep of history.

On June 15, 1215, at Runnymeade on the Thames, King John reluctantly granted to rebellious barons a charter which read in part that "we will not deny to any man, either justice or right." This, the Magna Carta, became the substantive and symbolic cornerstone of our legal heritage, claiming as its direct descendants the Constitution and the Bill of Rights.

On July 4, 1776, in Philadelphia, the second Continental Congress declared that "all men are created equal." This, the Declaration of Independence, became the substantive and symbolic hallmark of our American commitment to human freedom.

On September 17, 1787, in Philadelphia, Benjamin Franklin fittingly remarked that he had "the happiness to know that it is a rising and not a setting sun" which he saw embellished in the Constitution. The Founding Fathers at the Constitutional Convention wrote the best substantive and symbolic political process ever devised for extending liberty and equality to all. From that day to this very moment, the rights embodied in the "American dream" have gradually been extended and enlarged through the ever "rising sun" of our Constitution.

On January 1, 1863, in Washington Abraham Lincoln wrote in the Emancipation Proclamation that all persons held as slaves "shall be then thenceforward, and forever free." For Negro Americans, this proclamation became the substantive and symbolic turning point in achieving freedom from human bondage.

So reads the history of man's continual striving for liberty and equality. A history stained by blood, sweat and tears, but a history which has not been stopped in its gradual, substantive and symbolic progression toward liberty and equality for all men.

In more recent years we have seen a rapid acceleration of the pace toward liberty and equality as the U.S. Congress has approved four further extensions of human freedom in the Civil Rights Acts of 1957, 1960, 1964, and the Voting Rights Act of 1965. On these pieces of legislation, as indeed on the one before us now, the House of Representatives seriously sought to produce meaningful legislation which would be in keeping with the great history of extending the rights of liberty and equality to all men.

During those legislative battles, disturbed as they were by conflicting convictions on principle, I am proud of my party's record—the party of Lincoln—which recorded overwhelming support for these landmark legislative acts. The Civil Rights Acts of 1957, 1960, and 1964 received the support of 90 percent, 91 percent, and 80 percent of House Republicans. And 82 percent supported the Voting Rights Act of 1965, giving Republicans in the House of Representatives an overall support average of 85 percent for our four most recent Civil Rights Acts, a much higher percentage of support than that given by the other party.

I believe the civil rights legislation before us now merits the same high degree of support from my Republican colleagues which we gave to four previous Civil Rights Acts.

The history of the racial problem in America is long, calling forth memorable leaders and places and events.

Leaders like Abraham Lincoln, a founding father of the Republican Party, who called our Nation forth to lead the fight for human freedom.

Places like Bull Run, Vicksburg, Atlanta, Appomattox, and Gettysburg which record the history of a nation stripped of her unity because of racial conflict.

Events like the signing of the Emancipation Proclamation and the passage of the 13th, 14th, and 15th amendments which put our Nation officially on record in support of liberty and equality for all Americans.

While the history of the problem is long, the heart of the problem is simple. What these leaders, places and events stood for a century ago remain the hallmark of new leaders, new places, and new events today. That hallmark is the extension of liberty and equality to all Americans that this Nation might experience a new surge of freedom which will mend our Nation's racial wounds.

Unless and until our Nation resolves the racial conflict, and the urban crisis, the historical momentum which has propelled us to a pinnacle of self-esteem and leadership in the world will be retarded. Neither the conflict nor the crisis can be resolved without a vigorous commitment to extending liberty and equality for all. Such a commitment will require a broad vision of a new America—

A new America which continues to build the hope of the past into the reality of the future;

A new America which continues to make our heritage and tradition stepping stones to the future.

This is our hour of decision.

Mr. SMITH of California. Mr. Speaker, I yield 2 minutes to the gentleman from Ohio (Mr. LATTA).

Mr. LATTA. Mr. Speaker, this is a sad day in the history of our young Republic. We are being forced to act in haste and without regard to regular and ordinary procedures on important and far-reaching legislation and to do so in such a tense, emotional atmosphere that it is necessary to station troops throughout and around this Capitol Building. Not only are troops stationed around this Capitol Building, but thousands are still on duty on the streets of this city. Fires are still smouldering in this and in most of the other 115 cities where violence has erupted and arson, murder, and looting occurred. Curfews are still in effect. Many people fear for their lives, and Members have been threatened. And the entire Nation still mourns the death of Dr. King.

Yet, Mr. Speaker, we are asked to legislate in a sane and reasonable manner on this bill today. The press has already reported that some of our grief-stricken Members will be voting their emotions today rather than their reason. Heaven help our people if this is true—if our emotions are to replace our reasoning.

My voting record reveals that I have supported many civil rights bills since coming to this Congress. I have voted for legislation to guarantee that the civil rights of all would be protected in voting, in the Armed Forces, in public facilities, in public accommodations, in restaurants, in barbershops, in travel, in education, in training programs, in securing employment, and in all Government programs. I voted for the Civil Rights Commission, the Community Relations Service, the Equal Employment Opportunity Commission, and, yes, I voted to outlaw the almost-forgotten poll tax. Certainly with this voting record, no reasonable person can say that I am or have been anti civil rights. In all of these actions, I have supported legislation to guarantee that all of our citizens enjoy the same benefits which flow from actions by the Federal and State Governments and from the guarantees of the Constitution of the United States and the constitutions of our various States.

Today, however, we are asked to take property rights of private citizens—without compensation—and bestow them upon every other individual citizen. These are property rights which do not flow from the Federal or State Governments but are rights which have been purchased and paid for by private citizens. The right of an individual to dispose of his real property in any manner in which he sees fit has been an inherent right of property in this country and should not be taken or infringed upon by actions of this Congress.

Some of our colleagues feebly point to the 14th amendment as the basis for this legislation. Without going into a lengthy discussion of the 14th amend-

ment, I need only to say that the "provisions" of the 14th amendment prohibit State discrimination, not private discrimination, and the only right which exists under the 14th amendment is to be treated equally by the State. It does not address itself to the property rights of private citizens.

Mr. Speaker, as I pointed out before the Rules Committee, if the nebulous, fuzzy reasoning being put forth by the advocates of this legislation can be applied to real property, why can it not be applied to personal property?

Many people have argued that Congress should pass this legislation because of the moral issue which may be involved. These individuals are caught short in their moral argument. If there really is a moral issue involved, you would think they would be advocating that this bill cover 100 percent of the real property in America rather than only 80 percent. In addition, they should be arguing that the exemption provided in section 807 for religious organizations and associations should be stricken from the bill.

There are those among us who would urge that this bill—which was written on the Senate floor—not go to conference for further study and for reconciling the differences between the bill which the House passed last year—with my support—and the drastically amended Senate-passed measure. The Members will recall, the very able chairman of the House Judiciary Committee, a committee which usually considers civil rights bills in the House, freely admitted on the floor when this matter was referred from the Senate that he was not familiar with all the "intricacies" which were contained in the bill.

Certainly we cannot overlook the fact that two additional non-civil-rights titles were added to this bill in the Senate, and that the contents of these titles were then under consideration by appropriate committees of this House. I refer to title II concerning the rights of Indians and title X, chapter 12, concerning firearms legislation.

We were privileged to hear testimony in the Rules Committee from the chairman of the Interior committee wherein he pointed out that the title dealing with rights of Indians could very well affect some of the treaties which our Government has with the Indians, and that some of the tribes were very much opposed to the legislation affecting them. Indians have rights, too, Mr. Speaker.

With reference to title X, I am sorry to announce that not one witness appearing before the Rules Committee could explain the meaning and ramifications of some of the language contained in its section 231. I invite the Members to turn to page 46 of this bill, line 12, and read the language which says:

Whoever teaches or demonstrates to any other person the use, application, or making of any firearm or explosive or incendiary device or *technique capable of causing injury* or death to persons, knowing or having reason to know or intending that the same will be unlawfully used or in furtherance of a civil disorder.

Can anyone explain what a "technique capable of causing injury" might be? Certainly under this language a person

instructing another in archery or boxing could be held liable, if the person receiving the instruction is subsequently involved in a "civil disorder" defined in chapter 232 as being an assemblage of three or more persons. This means if you instruct your son in the art of self-defense and he subsequently becomes engaged in some fisticuffs on the street corner with two other persons, you could be held liable if injury results.

There are many people among us who say we must do something and do it now, or greater violence will erupt in our cities. Let me simply remind those individuals making this argument that fair housing legislation did not stop or prevent the outbreaks of violence in our Nation's Capital, which has a fair housing statute, nor did it stop the outbreak of violence in the States now having open housing statutes. Twenty-five States have open housing laws. I would caution these individuals not to make any rash political promises that this legislation or any future legislation will solve all the problems facing our Nation. On the contrary, I believe very deeply that the many unfulfilled promises which have been made in the past and the false hopes which they have raised have had more to do with the unrest and destruction in this country than any other single factor, with the possible exception of our failure to enforce existing laws. Let us not repeat these same mistakes forever.

Mr. CRAMER. Mr. Speaker, I refuse to be stampeded into legislating hastily and unwisely as if under the gun. The rights of all people are involved in this bill, and legislation affecting their rights, if conceived in haste, can do violence where good is intended.

I intend to vote against the previous question in order that this House may adopt a rule to permit amendment and needed consideration of this bill or can send the bill to conference for necessary deliberation.

Who with any logic can say that the House should approve without examination or chance to amend this bill? The House sent the Senate one bill, H.R. 2516, containing 3½ pages on nonviolence and nonintimidation against those exercising their federally protected rights and H.R. 421, containing 2 full pages, the antiriot bill, or a total of 5½ pages. The Senate combined the two, amended them with over 25 substantive changes. The Senate also added on the Senate floor amendments dealing with new subjects, Indian rights, open housing, teaching, demonstrating, transporting or manufacturing of firearms or weapons, intimidation in fair housing cases, and ends up with 50 pages, a bill nearly 10 times as lengthy. Who with any logic can argue that the House by this procedure should rubber stamp, without adequate chance for debate or change, the Senate floor amendments making 26 changes in the House-approved bill and adding 39½ pages of additional material?

The Senate has done violence to the nonviolence sections of the bill. As the author of the antiriot bill, H.R. 421, that overwhelmingly passed this House last year and that passed as amendment to the 1966 civil rights bill that died in the Senate, I can say that that section, added

on the floor of the Senate, needs to go to conference. Two major reasons are that the Senate exempted labor unions from the antiriot section, an amendment that was resoundly defeated on the floor of the House, and that a rule of evidence as to travel or use of interstate facilities added to my antiriot bill, as section 2101(b) is senseless, unclear, and could be the basis for challenging its constitutionality.

As the drafter of the substitute for H.R. 2516 the bill protecting against acts of violence which was adopted in the Judiciary Subcommittee and passed the House, I say that the Senate did violence to that bill, now title I, sections 101–104.

"Lawfully" was stricken from this bill, with the result that those exercising their rights need not be doing so lawfully before they are entitled to protection. Thus, those who are unlawfully—perhaps even rioting—could claim the protection of this bill. This was heatedly debated in the Judiciary Committee and on the floor of the House in 1966 and again in 1967 and in all instances it was rightly maintained that any act must be lawful before it is entitled to be protected under the bill.

Racial motivation was stricken out as an element of certain crimes created by the bill under title I.

These three examples alone should mandate a conference or House deliberation under orderly procedure.

We recently sent the excise tax bill to conference because of the numerous amendments added by the Senate, calling the Senate bill the Easter basket bill, but when equally substantive changes and additions to the acts of violence bills are made by the Senate the Rules Committee urges this House not to send it to conference. It is still the Easter season. We have two Easter baskets full, needing careful examination and containing many hurriedly considered "goodies." When one is labeled "civil rights" we are asked to accept it without fully examining or considering what is in it. When it is labeled "taxes" we are asked to send it to conference for consideration. This does not make sense to me. Consistency appears no longer to have any virtue. I refuse to be stampeded in this fashion.

A list of some 12 major changes made in the House bills, H.R. 2516 and H.R. 421 that alone clearly mandate that they be sent to conference or be subject to an open rule, amendment, and debate in the House follows:

REASONS FOR FURTHER "OPEN RULE" OR CONFERENCE CONSIDERATION OF THE CIVIL RIGHTS BILL OF 1968, H.R. 2516, AND THE ANTIRIOT BILL, H.R. 421, AS AMENDED BY THE SENATE

(1) In House passed H.R. 2516, a person who was protected from "interference with federally protected activities" had to be acting "*lawfully*." Section 245(a) of Title I of the Senate bill provides this protection whether acting lawfully or not, by striking the word "lawfully." (This was heatedly debated in Committee and it was resolved to include it in 1966 and 1967.) Thus one acting unlawfully, with violence and intimidation on his part, or drunk and disorderly, still would be protected—yes, even if his action was as a participant in a riot, perhaps.

(2) The necessary criminal element of *racial motivation* or intent to discriminate

("because of race, color or national origin") was included in the House bill but removed in Senate bill, 245(a) of Title I. Thus proof of racial motivation is not regarded in cases involving, under 245:

  A—Voting.

  B—U.S. services or facilities.

  C—U.S. employment.

  D—U.S. jury service.

  E—U.S. financial programs or activity.

(3) The Senate bill added the Anti-riot bill to the Celler bill, H.R. 2516, as Chapter 102 of Title I and specifically *eliminated organized labor* activities from the anti-riot section by excluding 2101(c), despite turn down of this amendment by House vote.

(4) The Senate Anti-riot, Section 2101(b) provided a rule of evidence on the travel in or use of interstate facilities which is senseless and could be the *basis for unconstitutional ruling*.

(5) Anti-riot enforcement is weakened by 2101(g) by loose language *barring* in State Courts *U.S. action* where judgment of acquittal or conviction "on the merits" where the same "act or acts" are involved.

(6) Titles II and VII on *Indian rights* comprise eleven pages as added on the Senate floor. This has not been subject to hearings. It is opposed by many Indians themselves and by the Department of the Interior, having jurisdiction over Indian affairs.

(7) Open Housing, Title VII, was added on the Senate floor, after mutual agreement on all sides in the House that all open housing was removed from the House bill. At that time the feeling was that antiviolence legislation was too essential to get bogged down in open housing which had proved controversial.

(8) Open Housing, Title VIII, in addition to violating constitutional property rights also discriminates against real estate brokers who must act as the enforcers to carry out the law and regulations.

(9) Open Housing as drafted in the Senate is unworkable in that it is implemented on the Federal level only through HUD with powers only to persuade, conciliate and regulate. The only other remedy is through civil action in U.S. or State courts with right to attorney's fees only to the plaintiff and maximum damages of $1 thousand. The court can award such damages without trial by jury.

(10) Title IX of Open Housing provides criminal penalties for intimidation, even for "threats" to "attempt" to "injure, intimidate or interfere with" a person because of race, color or national origin, relating to housing, with penalties of $1 thousand if no injury, $10 thousand with injury, or life, if death occurs. No exemption for individual sales is made under this title so all sales are covered.

(11) Open Housing finance Section 805, is too broad in coverage, dealing with "loans or financial assistance" in that it includes the acts of any "insurance companies, or other corporations, associations, firm or enterprise" that makes real estate loans whether there is any Federal guarantee or involvement in any such business.

(12) In Open Housing, despite the limits of HUD's enforcement power, the Secretary is given the rights of search, seizure, and subpoena, and if there is wilful refusal to appear or produce, there is a fine of $1 thousand, a year in jail, or both, enforced through the U.S. District Courts. The Secretary acts as the hearing officer on complaints and the party aggrieved has the right to enforce the Secretary's decision in the U.S. Court but the defendant has no right of appeal other than that which might be applicable under the Administrative Procedures Act (not spelled out in the bill).

Mr. DICKINSON. Mr. Speaker, a generation ago much was said of the "forgotten man" in the United States. Political slogans were coined in his behalf, legislation was passed to make his life more abundant, jobs were created for his benefit, and so it went, although no one was exactly sure of the identity of the "forgotten man." He was merely a symbol.

There is a new "forgotten man" on the scene today. He is the law-abiding, respectable, hard-working individual. Whether in management or labor, he is the man who watches his earnings siphoned away to support global aid programs of the most frivolous type. He is the man who is allowed a $600 annual tax deduction to raise and educate his child while the unwed mother on relief gets many times that amount in welfare checks to support her burgeoning brood.

It is the same "forgotten man" or his son who volunteers for military service or answers his draft summons without complaint and dies bravely in a war his country will not let him win. He is the man who spends hours filling out forms, questionnaires, and invasions of his privacy in the form of governmental inquiries. He is the same "forgotten man" who contributes to his community in time, effort, and money.

He is the man who takes pride in his home, his environment, his friends and his neighbors. The man who has achieved the dream of owning his own home, of leaving it to whom he wishes, or of selling it to whom he pleases. Rights which are fundamental under our Constitution. Suddenly he finds that these rights are being sacrificed on the altar of political expediency in a whim of frenzy. The "forgotten man" is suddenly branded a "bigot," a "racist," and a veritable beast if he has any preference as to the buyer of his dwelling.

It is this "forgotten man" who has been eclipsed and crowded from the political spectrum by appeals to the packaged vote of organized pressure groups, the disadvantaged, the impoverished, and the indolent, and the indigent who prefer indolence.

It is the basic rights of the "forgotten man" that are being struck down today in a steamroller fashion. Under the terms of the fair housing provisions of the legislation before the House today, the majority of our citizens will lose their right to sell or rent their property to the person they choose and the real estate business will come under the supervision of the Federal Government. To force a citizen to sell his property to a person of the Federal Government's choosing is the most flagrant violation of basic human rights and dignity as can be found in the worst totalitarian system ever devised. The final result will be to reduce fundamental human rights to the level of academic norms which can be changed at each passing fad or fancy in social engineering by self-appointed planners for the lives of others. Beware of our growing number of social planners in government.

Mr. Speaker, this is not the American dream come true. It is instead, in fact, and indeed another step of the American nightmare.

A census has not been taken to establish the number of today's forgotten majority, but I submit, Mr. Speaker, that a census will be taken in November of this year which will reflect itself in the absent faces of many of my colleagues who see fit to strike this blow to the liberty and freedom of the "forgotten man" in America.

Mr. CLEVELAND. Mr. Speaker, I rise in support of passing now this civil rights bill, H.R. 2516. This legislation represents another step by Congress to eliminate barriers which are dividing our Nation. It represents another legislative effort of Congress toward the realization of the American dream—not just of equality, but of equality of opportunity.

H.R. 2516 originated in the House last year. It was designed to protect civil rights workers, such as Jonathan Daniels, of Keene, N.H., who was murdered in Hayneville, Ala., in August 1965. On August 16 of last year, H.R. 2516 passed the House with my support by a 326 to 93 vote. Seven months later on March 11, 1968, it passed the Senate and came back to the House. It is a sad commentary that it languished in the Senate so long. Many of the voices we hear today—lamenting the brief delays in the House were strangely silent while this bill slumbered in the Senate for 7 long months.

It is quite true the Senate changed the bill. It added antiriot provisions, but these reflect H.R. 421 which also passed the House with my support by a vote of 347 to 70, July 19, 1967.

It is also true that the Senate has added an Indian bill of rights. However, the only American Indian presently serving in the House of Representatives, our distinguished colleague, the gentleman from South Dakota [Mr. REIFEL], enthusiastically supports these provisions, and indeed the whole bill, and considers them, as do I, long overdue.

It is also true that the Senate added gun-control provisions. I support these because they recognize the fact that it is not the gun that needs to be controlled, as much as the person who is using it and for what purpose. This provision stiffens the penalties for those who unlawfully use firearms during civil disorders and for those who teach or demonstrate how to use firearms, explosives, and incendiaries, knowing that these devices will be used during a civil disorder.

It is also true the Senate added open housing provisions to this bill. But 2 years ago the House passed an open housing bill substantially similar to the open housing provisions in this bill. The 1966 bill was not hastily considered. It underwent 12 days of hard and heated debate before it was passed with my support by a 259-to-157 vote—August 9, 1966.

The debate on this legislation here and throughout the country has become clouded. There are some who maintain this bill should go to a conference committee. There is of course some merit in this proposal. Surely this bill, indeed any bill, can be improved. But would a Senate-House conference improve it? Mindful of the fact the Senate let the House-passed open housing and civil rights protection bill of 1966 die, and mindful of the fact they embraced the present bill for 7 long months, one must think carefully before again letting that august body entwine this measure. There

is no assurance that a Senate-House conference committee would act promptly and constructively.

It should also be noted that the Civil Rights Act of 1964 which originated in the House, despite significant Senate changes was not sent to conference.

Many aspects of the debate on this measure also invite attention. But I have spoken and reported at length on previous occasions on the three major civil rights bills I have previously supported. During my 6 years in Congress my record and my reasons for my record have been made abundantly clear.

I do, however, want to address myself to one more aspect of this matter.

In voting now to approve this bill are we yielding to pressure? Are we merely decorating the grave of a departed and greatly respected leader, Martin Luther King, Jr.? Are we rewarding rioters?

My answer is no. My answer echoes the remarks of my distinguished colleague, the gentleman from Illinois [Mr. ANDERSON], whose remarks I commend and whose reasoning I applaud. Mr. ANDERSON told us this afternoon that the arsonists, looters, and vandals who have sacked and burned sections of Washington, Baltimore, and other cities do not mourn for Dr. King. Nor do they seek by their actions to protest inadequate housing or other slum conditions. They are indeed but the excrescence of conditions too long left untended. Their reorientation and reclamation will be enormously difficult and we will do little or nothing by this measure before the House today to improve this.

In voting for this bill we seek rather to reward and encourage the decent, hardworking, loyal black Americans who do not riot and burn, and give them the hope that the dream of owning a home in the suburbs, if they wish to do so, or a decent apartment in the city, will not be denied those who are born black.

Finally, Mr. Speaker, there is one more thing I wish to make abundantly clear. Not only are we not rewarding rioters—let us not deceive ourselves that by this measure—indeed any legislative measure—we can solve all of the problems we face as a nation.

I am reminded of what I said here in the CONGRESSIONAL RECORD, volume 110, part 2, page 1644:

Too many people in this country are under the impression that all you have to do with a complex problem is to get Congress to pass a law. This dangerous illusion is fostered by the demagog and pleader for special interests. It is aided and abetted by wishful thinking and laziness of mind and spirit.

Mere passage of this law or any law cannot definitely settle the tortured problems of discrimination and second-class citizenship. The very fact that in a great democracy such as ours, with its vaunted freedoms and equality of opportunity, we need such a law is a poignant commentary.

The battle for freedom and for equality of opportunity is not going to be won in the Halls of Congress. It will have to be won in the minds and the hearts of men.

Mr. RUMSFELD. Mr. Speaker, I support the Civil Rights Act of 1968.

We have heard statements today urging support for this legislation as a memorial to the slain civil rights leader, Dr. Martin Luther King, Jr. We have heard suggestions that this bill should be passed to prevent further riots and civil disorders. Conversely, we have heard that the legislation should be opposed lest it be considered appeasement to rioters or a reward for lawbreakers. It also has been said that the bill should be defeated today and considered at some point in the future when the troops have left this city and the fires of this week's riots have been put out. Personally, I find none of these arguments persuasive. It is not for the House of Representatives today to bestow rewards or to dispense punishment, however much deserved.

My vote today will be cast not because of the pressures of the moment, but in spite of them. It will be cast not out of fear, but from conviction and concern. It is based very simply on my conviction that every person in this Nation regardless of race, color, or creed should have the right and opportunity to live whereever his economic circumstances will permit.

I recognize that this legislation is not perfect—few bills are. Possibly, under different circumstances, perfection could be sought. Further, I reject the argument that the parliamentary procedure being used is improper. On two previous occasions, in 1960 and again in 1964, the House, without requesting a conference, adopted significantly altered versions of previously House-approved civil rights bills. It is well known that the difficulty of achieving cloture in the other body makes this a necessary procedure for civil rights legislation. It is my view that this legislation is the best that can be achieved.

Let me say further, that I recognize that this legislation will not end discrimination or drastically change housing patterns. This can readily be seen in the 22 States and dozens of additional local jurisdictions where fair housing laws already exist. It can, however, reduce the present difficulties which result from the growing patchwork of State and local laws on this subject—each with different application.

More importantly, as in the case referred to by the gentleman from Illinois, [Mr. ANDERSON], it will help the Negro schoolteacher, who, after answering more than 100 ads could not find a place to live; the Negro engineer who had to turn down a job because housing was not available; and returning Negro Vietnam veteran who might be told housing is not available to him. And, it will help their children, children who would otherwise feel the sting of hearing their parents told "Negroes are not allowed."

I concede that there are good arguments on both sides. It is a close question. Goodness cannot be legislated. I support this open housing legislation as I supported the House-passed open housing legislation in 1966, only after taking into account the persuasive arguments offered both in the House and by constituents whose motives are the highest and whose sincerity cannot be questioned. I do so because I believe the legislation is in complete harmony with the spirit and broad purposes of this country since its inception. While this bill will not solve all problems, it might spark a conscience or at least drive from sight agreements to discriminate on the basis of race or religion. This legislation passed the U.S. Senate by a vote of 71 to 20, with Republican Members of the Senate voting 29 to 3 in favor of the bill. Further, the bill has the public support of both former Vice President Richard Nixon and Gov. Nelson Rockefeller—the two principal contenders for the Republican nomination for the Presidency.

There can be no question but that there today remains discrimination in housing. Within a matter of years, most, if not all, of our largest cities will be inhabited by a majority of Negroes. We could continue to permit the opportunity to move out of the ghetto to be closed off. However, one hope to halt the progression of future problems is to today refuse to restrict, simply because of race, what all aspire to—an opportunity to live where one can afford to live. Certainly this should be one of the fruits of the American society.

I have a deep conviction that the real strength of our Nation and the source of its growth, its stability, and, in fact, its genius, is the people—their hopes, their aspirations, their initiative, and their motivations. Is there any way to measure the loss to our society in past decades which has resulted from the dulling of those hopes, of those aspirations, and of the initiative of many Negro Americans who could see no possibility of getting out of the ghetto?

Admittedly, this legislation, as has been said, will not open up a broad highway from the ghetto to the suburbs. It will still be a difficult and tortuous path at best. However, the most compelling argument for me is my belief that ours will be a stronger and healthier nation for having said to all of our citizens that their futures are in their hands, that by their energy and their initiative they can reasonably raise their hopes, their aspirations, and their dreams for themselves and their families and have the assurance of, at least, a chance of attaining what so many can take for granted.

Today, we do not say there is the sky, it is yours, but we can say there is a path and it can be yours. I know of no better hope for the future of this Nation than for its people, all of its people, to be able to reasonably aspire to fulfill their best hopes for the future. The dignity of each man requires it. No man should ask for more; no man deserves less.

Mr. HANLEY. Mr. Speaker, I rise in support of the resolution before us. There are those in our midst who would contend that the action we propose today on the floor of the House is a new departure from the historical role which the Federal Government has played in preserving the individual rights of American citizens. There are those on the other hand who would deny that the Congress has indeed even played the type role it should have. I say to both of those contentions that they are wrong.

The Congress has been in the forefront on the civil rights movement for years. We have gradually broken down the barriers of discrimination which for too long have made us a divided society. Only 2 weeks ago, President Johnson told us of

Case 1:13-cv-00966-RJL    Document 153-3    Filed 05/30/23    Page 43 of 111

the forces of divisiveness at work within America. We know they are at work. And we know that unless we face up to our responsibilities as legislators these forces will remain at work.

I have supported every civil rights bill to come before this body since I have been a Member of Congress, and I say that what we are considering today is not a departure from our traditional role, it is rather a natural extension of the duty of Congress to blaze a trail toward harmony and justice for all citizens. And so I will support the passage of the civil rights bill before us.

My own State of New York has had language similar to that contained in the instant bill on the books for 20 years. What we are asking the Congress today to do is to guarantee to the citizens of every State the same rights as those guaranteed in my own home State. Nothing more, nothing less.

I ask my colleagues to consider this measure on the basis of its own merits, not on the basis of the emotional orgy through which we are now going.

I am going to vote for this measure because I believe that every American citizen has the right, given by God and guaranteed by our Constitution, to move freely within this land and to find for himself and his family a place to live which he can afford and which will permit him the type of security now enjoyed by the overwhelming majority of Americans.

Mr. Speaker, we have a great country. Not the least of its greatness stems from our willingness to permit all Americans to share in that greatness.

Mr. GROVER. Mr. Speaker, last year the House of Representatives passed and sent to the Senate a bill making it a Federal crime to interfere with the legitimate and peaceful exercise of one's civil rights.

The bill also contained severe penalties for certain activities and travel with intent to provoke riots and civil disorder.

The Senate added to the House-passed legislation a section barring discrimination in housing and a section establishing a bill of rights for the American Indian.

The misunderstandings and emotion associated with this open housing section have made it one of the most difficult votes in my 6 years in Congress.

I could dismiss it by saying it will not affect my constituents since it is not as broad as the New York State open housing law now in effect.

I could justify it by pointing out that a man's home is his castle—and this bill does not take away from him his right to sell his home to whom he chooses and on his own terms.

But the balance between the age-old rights inherent in real property ownership and equal protection under the law is one delicate and intricate and not easily dismissed or lightly justified.

My studies indicate to me that the section is constitutional, but that extension or amendment in the future to further restrict the rights of the individual homeowner would be of doubtful constitutionality.

My thoughts on this open housing provision have been formulated over the last several weeks and are in no way re-

lated to the tragedy of Memphis, since for some time I have been troubled with the fact and prospect of voting on this bill which, while it restricts the customer selectivity of the realtor, the builder, and mortgage broker, will give freedom of choice to some 100,000 soldiers of ethnic minorities who have been fighting for me and my country's freedom in Vietnam.

Mr. ROSENTHAL. Mr. Speaker, this has been a week of deep tragedy for our Nation. A great man of peace and courage was murdered, and our cities reacted in anguished violence. Some fear that Dr. Martin Luther King's dream of a day when all Americans would be joined in brotherhood has been shattered.

But we who shared Dr. King's dream share it yet today—with reawakened commitment to working toward its reality. In the shadow of this past week's events, we cannot overestimate the size or complexity of the task ahead of us, nor the importance of beginning our work immediately.

The New York Times editorial spoke for us all today when it said:

Martin Luther King, the man of peace, evoked the very best in Americans of every race and creed; and the tremendous outpouring of silent and spoken grief that centered yesterday in Atlanta gave expression to the overwhelming sentiment of a stunned and united nation. United? It must be united.

This is the legacy of Martin Luther King, as it was his vision. The people of this country cannot fail him now. The concept of racial inferiority and racial discrimination is intolerable if the United States is to survive. It is the fundamental question, and Dr. King, apostle of brotherhood, understood it as such. In all its power and all its majesty these United States must move to make his vision a reality.

Even in the midst of this crisis, private citizens have demonstrated their determination to honor the memory of Dr. King with rededication to the fight against poverty and racial discrimination. We in Congress cannot do less. We cannot wait a month or even a week to begin once more the fight against the symptoms of misery and poverty, but also against their causes as well.

This House has an immediate opportunity to prove its rededication to that goal. We must, without further delay, pass the civil rights bill not as a final tribute to Dr. King but as the first step in a campaign, renewed and refreshed by his memory, to end racism in America.

This bill is no panacea. Many other legislative routes remain to be pursued. But the immediate enactment of the civil rights bill will reaffirm the commitment of the Federal Government to remedy at least two areas of injustice:

This bill will protect men of all races who seek to exercise and to afford others the federal rights which Congress has affirmed during the past decade—men who would follow the road of dignity and peace on which Dr. Martin Luther King marched.

The fair housing provisions of this bill will assure that race will cease to be a barrier to a man's living and raising his children in a home of his choosing. One more right of citizenship will be finally available to those persons who have suf-

fered under the indignities of racial discrimination.

I, therefore, urge the immediate enactment of the Senate version of the civil rights bill, and the reaffirmation by this Congress to pursue in every way possible the cause for which Dr. Martin Luther King gave his life.

Mr. McCLORY. Mr. Speaker, in voting today in favor of the previous question and to concur in the Senate amendments to H.R. 2516, described as the Civil Rights Act of 1968, I am aware fully of the consequences of this decision.

I am impressed that enactment of this comprehensive measure has been delayed too long.

No part of this measure could possibly be more essential or more urgent than the antiriot provisions. Certainly, this Congress should not delay in outlawing activities of one who travels across State lines or who uses the facilities of interstate commerce with the intent to organize, promote, encourage, or participate in carrying on a riot, or to commit any act of violence in furtherance of a riot, or to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot.

Mr. Speaker, offenses such as those included in the antiriot provisions of this bill are well known to us here in Washington today. We deplore the death and destruction that has been wrought in this Capital City. H.R. 2516 will outlaw many activities contributing to the recent riots and will provide just punishment of those guilty of such reprehensible conduct.

The provisions against riots were contained in H.R. 421, which I supported some months ago on the floor of this House. It is a vital part of the measure now before us—a part which it appears we cannot separate from other provisions of the bill under the rule recommended by the Rules Committee. I cannot jeopardize enactment of these provisions by refusing today to permit a concurrence in the Senate amendments.

Another vital part of this measure, which indeed has provided the framework upon which the other body has added amendments, is title I, providing for the protection of those assisting in the exercise of civil rights. This part of the bill prohibits interference with those who assist in the registration of voters and in voting, or assisting in the enjoyment of other rights such as public accommodations, education, employment, jury service, and many other privileges and opportunities. This measure received overwhelming support in the House in the first session of the 90th Congress. It deserves the concurrence of this House today.

Mr. Speaker, it is high time that this body provide by Federal law for the protection of law enforcement officials, firemen, and others engaged in protecting our communities and the lives of our citizens against the lawless conduct of rioters, arsonists, and looters who have been rampant in our Capital City and elsewhere across the Nation. It is important to act immediately on this measure in order to provide for the protection of these firemen and law enforcement offi-

cers, as well as the members of the military, such as those who are serving in Washington today.

Mr. Speaker, a new section added by the other body also makes it a Federal offense to teach or demonstrate to others the use or application or making of any firearm or explosive or incendiary device which he knows or has reason to know might be used in a civil disorder. It also imposes penalties on those who transport or manufacture firearms or explosives, having knowledge that the same will be used unlawfully in the furtherance of a civil disorder.

The provisions of this part of the bill are much more comprehensive than this brief statement can indicate. Nevertheless, my statement serves to establish the essential character of this part of the bill and its urgency in this period of strife in our land.

Mr. Speaker, there are comprehensive provisions regarding the rights of the Indians, which will be discussed and explained much more thoroughly by others who are taking part in this debate. Suffice it to say, the intention of these provisions is to insure basic constitutional rights to Indian citizens who reside on reservations. While the language may be imperfect, the objective of equal constitutional rights for these citizens should equal the objective of securing such rights for Negroes and other disadvantaged citizens among our population.

Mr. Speaker, I am well aware that the controversial part of this bill relates to the so-called subject of open housing. It would probably be preferable if a committee on conference could review these provisions. On the other hand, any enactment today is susceptible to amendment at any time in this or subsequent sessions of the Congress.

I am in wholehearted agreement with the objectives of this part of the bill, and I am substantially satisfied with the language that the other body has adopted and presented now for our concurrence.

Mr. Speaker, the bill seeks to satisfy the great need for housing units denied today to millions of our citizens because of race or color. Multiple housing units as in the typical apartment building and in new residential developments could not be sold or rented on a discriminatory basis under the language inserted by the other body, and in which we are now called upon to concur.

In most respects the broad provisions are very similar to the so-called Mathias amendment to the Civil Rights Act of 1966, which this House adopted, and which I supported. There are significant exemptions from the open housing provisions. Excluded are owner-occupied dwellings. Also, there appears to be adequate language respecting the so-called Mrs. Murphy section applicable to rooming houses and apartments of four units or less where the owner occupies the premises.

Mr. Speaker, the enforcement provisions contained in the Senate version are far weaker than those authorized by the House in the 1966 bill. The Secretary of Housing and Urban Development is charged with working out programs of voluntary compliance, and to seek the elimination or correction of alleged dis-

crimination by informal methods of conferences, conciliation and persuasion. In the event the Secretary's efforts are unsuccessful, an aggrieved party has no choice but to commence a civil action in a U.S. district court.

The earlier House version established an administrative agency, with broad powers not found in the language of the present bill. It can truly be said that while the coverage in the Senate version is broader than that contained in the 1966 House bill, the enforcement sections are much more limited.

Mr. Speaker, I am not unaware of the tense and emotional atmosphere prevailing in this House today, which reflects in large measure the atmosphere of strife and dissent existing throughout the Nation.

In reaching my decision to vote for the previous answer, I have endeavored not to be influenced by emotional appeals. At the same time, I have refused to accept the suggestion that I should vote against the previous question as retribution for the violent and destructive events that followed the slaying of Dr. King. My judgment is based on the equities of the measure now before the House, and an earnest consideration of the rights sought to be advanced by this landmark bill.

Mr. Speaker, I should add that I have no illusions about the inadequacies of this legislation to attain the objectives of equality and justice for all citizens—goals which are supported by all who favor this measure and by many who choose for one reason or another to oppose it.

Legislation is but a part of the answer, indeed, a small part when it comes to such a subject as open housing. It is my understanding that open housing legislation enacted by some of our States has had a very minor effect in reducing segregation. The principal advantage to be gained through enactment of this bill is the psychological, persuasive, and educational aspects which may result.

It is truly said that we cannot legislate brotherly love. However, we can, through legislation, express our attitude attitudes of compassion, understanding, and equity. A great public awakening is needed to encourage respect for our fellow man based on character and other qualities, disassociated from questions of race or color. If enactment of this measure encourages and promotes such a change in individual attitudes, it will have served its greatest purpose.

Mr. Speaker, let me add that I recognize many imperfections in the legislation now before us and it is my fervent hope that the House Judiciary Committee and other appropriate committees will consider needed changes at an early date. I am convinced that immediate action on the pending bill (with a view toward possible amendment at a later time) is far preferable to one which would recommit the entire bill to the committees of this House.

I am prepared to withstand the abuses which may follow the votes which I shall cast today, with the conviction that my decision is based on reason and motivated by a desire for human justice.

Mr. BOLAND. Mr. Speaker, I strongly urge my colleagues to vote favorably on the package of civil rights legislation before the House today.

This bill would answer a need that grows more pressing every day. Its fair housing provisions, for example, would help tear down the barriers now trapping Negroes in rotting slums and dingy segregated neighborhoods throughout the United States. Housing discrimination, a mockery of the concepts of equal opportunity and equal rights, is one of the principal causes behind the racial tumult that has rocked many of our cities. Most Negroes, especially those living in major cities, realize they cannot hope to buy a house in a presentable middle-class neighborhood even if they achieve the other goals of middle class life—a good education, a good job, a good income. This knowledge contributes heavily to the black man's feelings of impotent rage against the white community. It feeds the passions that have made smoking rubble out of widespread sections of Detroit, Los Angeles, Newark, and scores of other cities.

Fair housing legislation, of course, is far more than a nostrum hastily concocted to cure racial strife.

It is an integral part of the congressional attempt to help the Negro enter the mainstream of American life. Black people must have an opportunity to leave the ghetto behind them. All this Nation's past civil rights legislation, all its manpower training projects, all its antipoverty programs will accomplish little for the black man if he cannot escape the slums that are at once the chief symptom and the chief symbol of his oppression. Genuine racial equality in the United States demands the passage of fair housing legislation.

To many Negroes housing discrimination makes meaningless any attempt to finish school, to get a good job, to adopt the standards and attitudes associated with responsible citizenship.

"Why should I?" a Negro brought up in a ghetto would ask. "Will it get me out of here?"

To other Negroes—to those who have struggled to achieve middle-class status—housing discrimination shatters the dream they have worked to fulfill.

One Negro couple, residents of a small Midwest city, cited in a sociological study sought fruitlessly for 3 years to buy a house in the kind of neighborhood they wanted. Both are bright, educated, and articulate. The man is an industrial foreman in a position of genuine responsibility, the woman a schoolteacher celebrated among her colleagues for her knowledge and skill. Yet doors closed on them everywhere they went in search of a home. Discouraged and embittered after 3 years of effort, they finally had to settle for an apartment in a low rent housing project.

The bill we have before us today, Mr. Speaker, would help redress thousands of injustices like the one I have just outlined.

I take pride in the fact that my home State of Massachusetts has pioneered in the enactment of fair housing laws—laws far more rigorous than the one proposed in H.R. 2516. Applauded throughout

Massachusetts by black and white people alike, these laws have proved groundless the conventional fears people express about fair housing legislation—fears that it would erode property values, fears that it would exacerbate racial tensions, fears that it would bring a tide of impoverished Negroes into the suburbs. The Massachusetts laws provide ample evidence that fair housing legislation works and works well.

The fair housing laws proposed in H.R. 2516, like the Massachusetts laws, would go far toward eliminating racial prejudice in the real estate market.

W. Evans Buchanan, former president of the National Association of Builders, in testimony before the Congress said:

Many business firms and organizations would long since have discontinued practices of discrimination except for their fear of adverse economic consequences stemming from competitors who choose to capitalize on racial and religious prejudices. With a national law commanding the acceptance of all, the entire industry will sell or rent without discrimination and without fear of economic reprisal.

And Elliott N. Couden, a member of the National Association of Real Estate Boards, testified:

A universal law would remove many of the shackles and impasses we in the real estate business are subjected to . . . Many real estate salesmen and brokers who would voluntarily provide equal service to all clients suffer a reasonably well-grounded apprehension that their efforts will result in intimidation from other realtors and economic attrition from potential clients. This legislation would free all parties from coercion, probably the greatest single element in the minority housing syndrome.

A national fair housing law, it seems clear, would be as welcome in many real estate firms as it would be in the black ghettos.

The other provisions of H.R. 2516—one to strengthen Federal protection for civil rights workers, another to safeguard the constitutional rights of Indians, still another to combat riots—would be equally welcome to any citizen concerned about the health of his Nation.

I urge swift and favorable action on this bill.

Mr. LEGGETT. Mr. Speaker, Dr. Martin Luther King, Jr., is dead—long live the fundamental rights of people.

Certainly if Martin King stood for anything it was that all people of whatever skin tone have fundamental rights. As I have said on occasion for the past 10 years—people who are taxed as people should have the fundamental rights of people.

One hundred Members of the House and Senate have a sunburned complexion this morning after baking on the streets in Atlanta for 3 hours yesterday in symbolic recognition of the work of a great southern leader. A sea of black and white assembled in a show of affection, remorse and unity for a cause in which he died—freedom.

It is fitting that Levitt & Sons of New York should today print the following modification of their longstanding policy restricting freedom:

LEVITT PAYS TRIBUTE TO DR. KING IN DEED—NOT EMPTY PHRASES

For many years our housing policy has been to abide by local law or custom. Accordingly there have been Levitt communities that have been integrated and others that were not.

During those years, however, we have constantly urged both the Executive and Legislative areas of government to take action making desegregation the law of the land. Our policy has been a matter of record in testimony before Congressional committees and White House meetings.

So far there is no law or executive order eliminating segregation in the United States and we shall not wait any longer for such action to occur.

As a tribute to Dr. King this Company has adopted a new policy—effective at once—eliminating segregation any place it builds—whether it be the United States, or any other country in the world.

We ask all our colleagues to adopt a similar policy without delay. The forces of bigotry and prejudice must not be permitted to prevail any longer, and we urge all builders—large and small alike—to do their part in making America once again the ideal of the world.

It is fitting that this great international corporation should on the day following Dr. King's funeral eulogize not only Dr. King but call out to its brethren in the construction and home sales industry throughout the country to lay down their restrictive covenants and forsake the Ku Klux Klan cross of bigotry.

Twenty percent of the House and Senate went to Georgia yesterday for the purpose of holding out hope to 10 to 12 million Negroes and millions of others in the American melting pot that there is promise for a better world in these United States—through law.

Carmichael sounded his black power revolution to destroy capitalism last August, and it was no surprise to see him try to jump to the forefront immediately on King's demise. Carmichael cannot survive in an atmosphere of "hope" while progress toward equality is being made. Rabble rousers can appeal only to the lunatic fringes of the right and left.

We have the opportunity in this House today to give racial minorities further hope on a national scale. We should forthwith enact the omnibus civil rights bill of 1968 with fair housing provisions. The most fundamental right an individual can have while providing his services in an interstate commerce labor pool is to be able to buy, rent or lease a house or apartment other than in a terminal ghetto like Oakland or Watts in California.

Two hundred and ninety-three Members of Congress already represent States or cities that have a type of fair housing law in force. Heaven and earth will hardly come tumbling down because of the enactment of a Federal uniform law.

What does it gain this Nation as an alternative to bottle up in congested, seething ghettos 10 million dark-skinned people—only letting them out to work in a suburban factory or household.

This Nation has a heritage of freedom and equality of opportunity. This heritage is now being tested as never before.

Some conservatives on the right cling to that heritage of yesteryear believing that it has application only to the sons and daughters of the American Revolution.

The "right" preaches respect for the flag. Their respect is for the flag and government of yesterday, being generally oblivious to the changes in employment,

industry, and politics demanded by a population explosion and imply that the flag of today is socialistic.

Our young people in our ghettos are not well educated as to the flag of yesterday and they are sullen and despondent that the flag of today is little more than a constitutional myth of unachievable rights and opportunity.

I think that this bill before us today can turn on again a light of hope—its effect, however, will be primarily symbolism.

Hundreds of cities, States, and counties have similar laws in effect. In California we enacted our first "fair housing" law in 1959; our Rumford Act followed in 1963. We have enjoyed fair accommodations in our State since 1952 and fair employment practices since 1958.

The mere enactment of laws setting forth in a practical way the meaning of the term "freedom" in the Constitution has not been the total answer to minority problems. Contrary to popular belief, civil rights legislation once enacted is not widely utilized. In California with 20 million people and over 1 million Negroes—more than in the State of Mississippi—there are only a few hundred complaints filed before administrative boards every year and only a handful of these ever get into the courts.

Perhaps if we could stimulate the oppressed to use legislation which legislators enact, they would "self-help" themselves under law into better living accommodations.

There is no doubt that this Nation has problems—housing in the cities and abject poverty in parts of rural America. We have tried "survival of the fittest." The problem is that the poor and handicapped do not die.

It may well be that OEO, HEW, HUD, and the Department of Labor do not currently have all the solutions.

For those who say fair housing is not a partial answer, you tell me what steps this Nation should take over a 5-, 10-, or 50-year time frame. You tell me how this Nation will achieve our constitutional objectives without some assist from the Congress and legislative bodies throughout the land.

We bask in America reading of the revolutionary problems Red China is experiencing with her Red guards. Some hope and expect China's imminent collapse.

Would not we thrill to have 10 percent of the Russian population fomenting a revolution from Moscow to Vladivostok.

The Soviets, no doubt, clap their hands seeing the manifestation of rights disunity in this capitalistic democracy.

No, the death of King or Kennedy or men like them will not put to sleep this movement of self-expression of peoples' rights and aspirations. Those who fear amortization to all Americans, the right of the vote, the right to a decent night's lodging or a fair meal in a restaurant or the right to a job with a fair day's pay, are the ones whose constitutional commitment is currently being tested.

As I walked in Atlanta yesterday and sang the "Battle Hymn of the Republic" with mostly black Americans, I felt clos-

er to my American heritage than ever I did before that time.

We were marching through Georgia yesterday 100 years after Sherman—to provide all Americans a measure of equal protection under the law.

Mr. STEIGER of Wisconsin. Mr. Speaker, I rise in support of H.R. 2516 as passed by the Senate and urge that this bill be accepted by the House without amendment.

The events of the past few days have thrown a shadow over this Congress and this country. How ironic that in a land which stands for freedom, especially the freedom to express oneself openly, a life based on nonviolence should be snuffed out in a violent way by a hidden sniper. The aftermath of that event in Memphis—events in major cities throughout this country marked by civil insurrection and violence—does disservice to that for which Dr. Martin Luther King stood. I reject those extremists, both black and white, from the man who pulled the trigger in Memphis to Stokely Carmichael here in Washington, who is quoted as saying:

Black people have to survive, and the only way they will survive is by getting guns.

There is no excuse for violence, lawlessness, or insurrection in a nation founded on laws and not men. The law must be upheld if our Republic is to survive and prosper. In the past few days the law and perhaps the very fabric of our society have been in jeopardy, and I am reminded of the words of Prime Minister Nehru after the assassination of Mahatma Gandhi:

The first thing to remember is that none of us misbehave because he is angry. We have to behave like strong and determined people, determined to face all the perils that surround us, determined to carry out the mandate that our great leader has given us, remembering always that if, as I believe, his spirit looks upon us and sees us, nothing would displease his soul so much as to see that we have indulged in any small behavior or any violence.

Our task here today, Mr. Speaker, is to debate and decide upon a course of action relating to a law for this country. It is not, in my judgment, appropriate to decide the merits of legislation either as a tribute to an individual or as a reaction to the actions of groups throughout this country. The bill that is before us must be judged on its own merits, within the context of how best to meet the needs of this country, but also within the context of the constitutional heritage we enjoy in our land. Woodrow Wilson said:

This is not America because it is rich. This is not America because it has set up for a great population great opportunities for material prosperity. America is a name which sounds in the ears of men everywhere as a synonym with individual opportunity because it is a synonym of individual liberty.

The foundation of our Constitution provides for the greatest degree of individual liberty and opportunity, and that is what, in my judgment, must be considered today.

The bill we are considering has a number of provisions. Title I, the antiriot section, embraces areas covered in H.R.

421 and H.R. 2516, both of which passed the House in 1967. The inflammatory statements of men like Rap Brown and Stokely Carmichael would, I believe, be covered by the title I provisions. The right of free speech, a right guaranteed by the Constitution, has limits. To paraphrase Justice Holmes:

The right does not extend to those who would shout "fire" in a crowded theater.

And in my opinion, parts of America today are "crowded theaters" in which the Browns and Carmichaels are shouting "fire." This cannot be tolerated.

Titles II through VII deal with rights of American Indians and are provisions which I support. Title X provides some regulation of the use of firearms in connection with civil disorders. Titles VIII and IX are the provisions adopted by the other body, under the leadership of Senator DIRKSEN, of Illinois, which relates to open housing.

In Wisconsin, during the 1965 legislature, I was an author and cosponsor of assembly bill No. 852 which became chapter 439 of the laws of 1965. This legislation established Wisconsin's open housing law and was designed to insure "that all persons shall have an equal opportunity for housing, regardless of race, color, religion, national origin, or ancestry." In addition to the State open housing law, which relates primarily to the business of housing, a number of local municipalities have adopted fair housing ordinances. Among them are Brown Deer, Fox Point, Madison, Menominee Falls, Milwaukee, Whitefish Bay, Shorewood, Bayside, Beloit, and Mequon, which is in the Sixth District and whose ordinance covers the sale of single-family units.

Those who oppose the open housing sections of H.R. 2516 refer to it often as "forced housing." I disagree. This provision in no way forces an individual homeowner to sell to any person. What it does say is that you must treat equally all persons who are in the market for housing. That is, you cannot, because of one reason—race—refuse to sell or rent property. All of the legitimate criteria which a homeowner uses to judge the prospective buyer remain unimpaired. The policy established by this legislation does not mean that one lowers the terms of sale or rent, standards of social behavior or conditions related to family size, the keeping of family pets, and the like. It does mean, however, that these terms, standards, and conditions must be applied equally to all people. In addition, under the provisions of this legislation the burden of proof rests with the person alleging discrimination, who must in any court case which arises under this law, prove discrimination. Under our system of individual freedom, this bill seeks to protect certain fundamental individual rights and assure equality of opportunity for all our citizens. In a statement issued on April 5, I joined with other Members of the House in saying:

It is an affront to human dignity for any American to find that even though his bank balance is ample, his credit rating is good, and the character of his family is above reproach, he still cannot buy or rent better housing because his skin is not white.

Another of the objections that has been raised against this legislation is that as one citizen stated:

The particular measure in question excludes from the law family owned and occupied homes *only* when sold *without* the aid of a real estate broker.

He went on to state:

Obviously, this measure will discourage home owners from using the services of a real estate broker. The consensus of this board is that this measure not only discriminates against the real estate brokers of this nation but in effect, also abridges the home owner's traditional right of contract as to how he shall sell his home to best advantage.

The Wisconsin law which I shall discuss in a moment, basically covers the business of housing. The realtor is a professional—an expert—whose knowledge and judgment has been relied on for years by those wishing to determine and obtain the fair market value for their homestead. The argument that the provisions of this bill will place an undue burden upon the realtor is without foundation. Surely, the realtor will continue to provide a needed service and will continue to merit the support of all citizens who wish to sell their property with the benefit of the realtor's expert counsel. Many brokers would, I believe, welcome the freedom to sell property without discrimination to those who wish to buy and need housing. This legislation would support them. We learned in Wisconsin during our consideration of our law that pressures within a community many times prevented a builder or realtor from providing a service to minorities because of the fear of business losses. Under this legislation (H.R. 2516), all who are in the business of housing will be treated equally. And each will, as they have in the past, merit the support of those with whom they deal on the basis of the service they provide.

In the Wisconsin open-housing law, heavy stress was placed on conciliation. The administrative remedies, through the State department of industry, labor, and human relations, were constructed in such a way as to safeguard both parties. In H.R. 2516, the Secretary of Housing and Urban Development is authorized to educate, persuade, and conciliate in order to eliminate discriminatory housing practices. If the Secretary is unsuccessful, the sole recourse is to the court—State or Federal. This concept is one I support wholeheartedly since it guarantees, in my opinion, the full remedy of the law and of a fair trial. In addition, H.R. 2516 provides that the full weight of State and local fair-housing laws is applicable, and the Secretary is required, under section 810(c) to notify the appropriate State or local agency of a complaint filed with him. Furthermore, section 808(c) provides that conciliation shall be held in the locality where the alleged discriminatory act took place. The safeguards provided by the bill we are considering today are important and effective, as are those provisions which require persuasion, education, and conciliation.

As this bill (H.R. 2516) passed the other body, men such as Senators

DIRKSEN, CURTIS, MURPHY, HRUSKA, MILLER, BROOKE, and PERCY all cast their votes on behalf of passage. It is the purpose of this bill to make the promise of America more of a reality for all of her citizens. It is not a partisan matter. Men and women of both parties will today support this bill. As the Madison Board of Realtors stated in its pamphlet, "Equal Opportunity in Madison and You":

The quest of equal opportunity for all has stirred the conscience of every thinking American. It is one of the most important issues on the national as well as the local level—it is part of the very fabric of our free society. It cannot be ignored. It will not go away. The question merits the deepest concern of every American today.

I concur and therefore urge the adoption of H.R. 2516 by the House today.

Mr. BROTZMAN. Mr. Speaker, I considered this bill carefully and objectively. Like all complex legislation, the measure is not perfect in all details. However, on balance, I felt the national interest demanded action now and further delay with the possibility of inaction if the measure had gone back to the Senate would have been unacceptable.

Features of the bill that are particularly needed as demonstrated by recent events, include:

First. It establishes Federal penalties against crossing State lines, or using the instrumentalities of interstate commerce, to incite riots; it also makes it unlawful to interfere with the lives or safety of those who engage in bona fide, nonviolent civil rights efforts.

Second. It establishes a Federal law extending the right of equal opportunity of property ownership to all our citizens—a right that has been long and fully recognized by the laws of the State of Colorado.

Mr. FISHER. Mr. Speaker, I am opposed to the pending bill, and I shall vote to send it to conference. As I see it the right of a citizen to choose the person to whom he sells or rents his private property is one of our most sacred and cherished of all civil rights. Yet, by a Senate amendment which is in this legislation, that right of freedom of choice would be virtually wiped out.

There are other objectionable features of the legislation, including one provision which could very well hamper law enforcement in controlling violence that stems from civil rights activities.

It has been said that this legislation will ease racial tensions, that it will vindicate the cause served by the late Martin Luther King. How ridiculous can people get? This is the sort of legislation which will aggravate and promote discord, even as prior civil rights legislation enacted by the Congress has triggered more and more racial violence, arson, vandalism, and riots.

It will be recalled that the late Martin Luther King summoned key officials to his Southern Christian Leadership Conference for a week-long strategy session at Frogmore, S.C. Meeting behind closed doors, they drafted plans to give what they described as a "sick and asinine Congress" the "electric shock" necessary, in their view, to save the Nation.

It was there that the pending march on Washington was planned.

Yet, we are now told that out of deference to the memory of the late Mr. King, the Congress should enact this civil rights bill.

It goes without saying that any such reasoning to support a legislative action is utterly absurd. Surely this Congress is not so weak and spineless as to capitulate to this form of emotionalism and hysteria. The Congress does not operate that way, even though the planners at Frogmore seems to have thought so.

Mr. Speaker, there has been much said here about the late Martin Luther King. His record and his philosophy are quite well known. He preached nonviolence, yet in scores of instances he led marches and demonstrations which triggered violence and bloodshed. Indeed exactly 1 week before King was killed he promoted and led a march in Memphis—not in any way related to racial issues—which caused one young Negro to be shot and killed and 63 injured.

That very day, at a press conference in Memphis he was quoted as saying:

Riots are part of the ugly atmosphere of our society now.

King became notorious for advocating civil disobedience—that is, the right of one to violate any law with which he disagreed. Although a court injunction had been issued to prohibit another Memphis march by King, he openly declared if the order remained intact he would willfully defy and violate it. He served many jail terms for such violations of laws and decrees.

It will be recalled that King was a very discontented person. At a New York demonstration he openly assailed the United States—our own Government—as "the greatest purveyor of violence in the world today."

To head the pending April 22 march on Washington, King chose Rev. Bernard Lafayette, an anti-Vietnam and civil rights activist; and Rev. Andrew Young, a long-time King lieutenant who said the United States is dying of "racism, materialism, and economic exploitation."

In a Reader's Digest article, William Schulz reports that King recently conferred privately with the Nation's most notorious black power-ites: H. Rap Brown, the demagogic chairman of the Student Nonviolent Coordinating Committee, now under indictment for inciting a riot in Cambridge, Md.; and Stokely Carmichael, the self-professed revolutionary who globetrotted across the Communist world from Havana to Hanoi last year declaring his intention to overthrow the "imperialist, capitalist, racist structure of the United States."

What took place at these meetings with the two anarchists, reports Schulz, is not known. According to Andrew Young, King hoped to convince Carmichael and Brown: "If you can't adopt nonviolence and join us, let us try our way until the first of August. And if we fail, then you can take over with another approach."

Thus, according to Andrew Young, one of King's chosen leaders for the Washington march, King in effect told the extremists that he wanted to first try to avoid violence, but if his mission was not a success without violence, then Carmichael and Brown could take over and use their own techniques—which means violence and more violence.

If this Congress is to use the memory of the late Martin Luther King as an inspiration for the enactment of this legislation, it is well that the Members ponder King's record and his long association with activities which resulted in massive violence and crime.

Mr. MACHEN. Mr. Speaker, I rise today to present to my colleagues the basis for my vote in opposition to the rule and to H.R. 2516. As we are well aware, H.R. 2516 passed this body by an overwhelming margin last year. When the other body completed its consideration of this bill a short time ago, many different amendments had been added, rendering the bill barely recognizable as the bill we have passed. Yet today, we are asked to vote "yes" or "no" as to whether we will accept these amendments without benefit of a conference committee or other meaningful exchange of views between members of each body so that the bill would represent the will of both houses rather than that of just one. I personally object to such a procedure.

As I have stated repeatedly, I believe that the answer to the problem of providing fair housing is not to impose it by Federal legislative fiat but instead for community organizations and other groups to join together to take an affirmative step toward solving the problem such as has occurred in Prince Georges County, Md.

A Federal legislative fiat on this issue can do little more than fan the flames of racial prejudice which already are burning so hotly. The issue of fair housing is, I believe, bound inextricably to the local community and should be settled through affirmative action at that level. I would be the last person to deny any man the right to purchase the home of his choice provided he has the means. However, I am unable to see the wisdom of ruling by legislative decree that a person may not sell his home to whomever he wishes.

Because I have supported so many measures considered by this body to protect the civil rights of each and every American citizen, I feel compelled to comment on the various titles of H.R. 2516 and explain my position on each of them. I do not want my vote in opposition to H.R. 2516 to be interpreted as an anti-civil-rights vote. However, it is a vote against titles VIII and IX of the bill.

Title I of the bill, providing for the protection of persons engaged in federally protected activities from interference, threat of injury or intimidation receives my wholehearted support now just as it did when it passed the House last August. In addition, this title also has a section dealing with riots. I believe that this section of title I would give us the means to deal with persons who travel in interstate or foreign commerce with the intent of inciting to riot, committing any act in furtherance of a riot, promoting a riot, and aiding and abet-

ting any person in inciting to riot. I believe that the definition of riot which is contained in this bill will go a long way toward giving us the enforcement tools that we need to prevent such outlawry as that which occurred in the District of Columbia and other cities throughout the country during the past week. I am acutely aware of the crisis of lawlessness which struck many of our large cities last summer as well and I believe firmly that lawlessness such as this cannot be tolerated. We cannot be permissive about violence or accept excuses for looting and killing. There is no justification for such activities. These criminal actions are an outrage to civilized life, an affront to democracy, and an insult to law and order. They are born of contempt for the law; they thrive on chaos; and they must be stopped. I strongly support this section of title I of H.R. 2516.

Titles II through VII of this bill deal with the rights of Indians as regards tribal self-government and certain rights guaranteeing the rights promulgated and guaranteed by the Constitution. They would promulgate a model code governing courts of Indian offenses and achieve many other aims. While I must confess that I am not completely familiar with all the problems faced by American Indians, and I would prefer that our committee dealing with those problems be permitted to complete their hearings and make a report on the problems of the Indians together with a bill for the House to consider.

Titles VIII and IX deal with fair housing and, as I stated at the outset of my statement, I strongly oppose them and because of the adamacy of my position on this matter, I will vote against the whole bill.

Title X of H.R. 2516 receives my full support. This title provides penalties of $10,000 fine or imprisonment or 5 years or both for anyone who teaches, or demonstrates to any person the use and application of any firearm or explosive for the purpose of creating a civil disorder.

In the final analysis, public support is the only way that social or economic reform can be achieved. It cannot be forced by the threat of violence or anarchy. This is demonstrated by the other side of the coin, the fact that the biggest strides in the civil rights movement have been made by lawful and legal means.

The average American is a moderate. He will shy away from the left as well as from the right and as one observer has said, "between choosing one extreme or another there is an alternative—think!"

This is what we must do—as citizens and as leaders whose responsibility is to help our fellow Americans. We know that slogans and negative criticisms do not constitute a policy—either foreign or domestic.

Neither "Quit Vietnam" nor "black power" provide any answers. What is needed is discussion of the issues, give and take on both sides and open-mindedness.

This Nation has to cease tearing itself apart. I have in the past 3 years constantly supported programs that are imaginative, creative and provide equal opportunities for all. I mention some of

these items merely to point out that my deep convictions against the open occupancy is not anti-anybody such as:

The amendments to the Economic Opportunity Act, the Elementary and Secondary Education Act amendments, and the Higher Education Act have set up and implemented programs to motivate, train, and educate the less fortunate of our people.

The demonstration cities legislation has established the machinery for abolishing slums in our cities.

We have passed a minimum wage bill to strike at the heart of the problem of the working poor.

The Voting Rights Act of 1965 has made it possible for the number of Negro voters in Southern States to be doubled since the time of the law's enactment.

Medicare and the accompanying social security amendments have raised the quality of life for our older people—many of them poor and hopeless.

All of these constructive and exciting programs have been made possible by the support of the American people who believed in the constitutional guarantees of equality, justice and freedom for all.

I do not want to see the impetus of this great effort lost by the irresponsible acts of a few. I hope that history will not show that those who claimed the right of dissent were truly claiming for themselves the right to destroy.

Thus, the first priority for this Nation is law and order. The extremists can challenge violently our society's laws and its law enforcement in the guise of civil rights—but they will be repelled and even repressed, if necessary. Because no man is above our law. And when our laws are challenged by rioting, looting, arson and violence, our society must marshall its forces and move immediately—not just quickly—to contain the challenge, to prevent its spreading, to arrest the violators and prosecute them to the fullest extent of the laws that we in Congress have given society to enforce. We must not shirk this duty.

And I close by saying, as in the past, I will not now nor will I in the future consider legislation under the threat of a blackjack or blackmail.

Mr. FASCELL. Mr. Speaker, I am today joining a majority of Democrats and Republicans in bipartisan support of H.R. 2516 as amended by the Senate.

In 1966 when I first voted for open housing legislation, I was convinced then as I am now that ending racial discrimination in housing through enactment of a fair housing law is a key and indispensable part of any solution of the interracial problems of our country.

I cast these votes today as I did in 1966 not in fear nor in anger. Neither have I been coerced by individuals or events of the last few days.

I vote out of a deep conviction after careful evaluation of the needs and desires of my constituents and the best interests of our country.

The bill under consideration today is consistent with the desires of my constituents as reflected in responses received from a poll which I conducted in late 1967. In that poll 65.01 percent of the people responding indicated that they were opposed to the passage of "fair

housing legislation making discrimination illegal in the rental or sale of individual homes."

The bill now under consideration provides important protection for the individual's right to dispose of his property as he wishes. Under the bill, the individual homeowner, even after 1969, will still be able to sell or rent in a discriminatory fashion if he so desires but only if he does so without the use of real estate agents or firms. In other words, the individual homeowner can discriminate only if he acts completely alone in selling or renting. These rules also cover a person owning up to three individual single-family homes. Also exempt are small apartment houses and boarding houses.

Beginning in 1969 brokers involved in any real estate transaction could not practice discrimination and this is the heart of this legislation.

The bill is not perfect in every detail, very few bills are. It does, however, seek to assure equality of opportunity for all our citizens. There is no doubt in my mind, and I am confident the majority of our people agree, that it is an affront to human dignity and simple justice for any American to find that even though his bank balance is ample, his credit rating is good, and the character of his family above reproach, he still cannot buy or rent better housing because his skin is not white.

I have no illusions that the passage of this bill will in some way stop the riots, nor is it the sole answer to the interracial misunderstanding which exists today in the United States.

The report and findings of the President's Advisory Commission on Civil Disorders has made it clear that the problem of discrimination is much more complex and difficult than many of us had fully realized.

The rejection and humiliation which result from housing discrimination produce deep rooted and intense feelings. This brooding hostility can be eased with the knowledge that the Negro is able to better himself and can do better for himself. It is this hope of the ability to do better which will reduce in time some of the frustrations which now exist. This civil rights legislation is an important step toward assuring all our citizens the opportunity to fully participate in the life of our country.

Neither do I have any illusions that this bill will magically solve all the housing problems of Negroes. The truth of the matter is, as we all well know, only a few Negro families—those who have adequate financial resources—will be able to escape to the clean cool air of the suburbs. We have had enough experience in the 22 States with 60 percent of our total population which already have fair housing laws to know that the dangers and fears so often expressed with regard to this legislation just have not materialized.

This bill may be not much more than the symbolic knocking down of a barrier and the assertion of simple justice and reaffirmation of human dignity too long denied. But it has powerful meaning for all citizens.

We have been for some years now, and more so today than ever, in a period of

056641

great moral crisis in this country. A great segment of our population have grievances for which they seek redress. Their efforts for advancement have ranged from apathy to violence. Today there can be little doubt in anyone's mind that our country, our democracy, our way of life is perhaps at the most important crossroad in its history.

Shall we, the majority, react in fear and frustration? Will we allow the riots to drive the United States to a police state? Must we turn to the politics of repression? I hope and pray not; to me this course is unthinkable for our country.

Of course, we cannot supinely succumb to threats of violence or actual violence by individuals or groups. We must have efficient and firm law enforcement at the local level supported when requested by the State and Federal Governments. Indeed this civil rights bill contains important anti-riot provisions similar to those in my bill H.R. 4228, which would provide a new tool to Federal law enforcement officials in preventing future riots.

But stringent law enforcement must be helped by individual community and Federal actions by making law abiding citizens out of the majority of those who have serious, meaningful grievances in our society. Only thus can we isolate the intentional and the unscrupulous destroyer of our society.

The passage of this bill today represents at best a compromise between those who wanted stronger legislation and those who wanted none at all, but it is an important compromise. The decision we make today will be historical because it will mark the beginning of a course which this country will take. We must decide today to live up to the commitment to equality of opportunity made in our Declaration of Independence and echoed each day in our Pledge of Allegiance to the Flag. I support this compromise in 1968 even more fully than I did in 1966 because I know that this country can no longer wait for a decision.

Mr. MINSHALL. Mr. Speaker, I have devoted my entire public life to protecting the civil rights and freedom of all American citizens. In 1957 I voted for passage of the first civil rights bill to be enacted by Congress in nearly a century; I have voted for every subsequent civil rights bill to come before the House—six in all.

Last August I voted for the civil rights bill which we in the House passed and then sent to the Senate. That body considered the legislation for 8 months, including 41 days of floor debate. The Senate completely changed the original House bill.

Today the House is asked to rubberstamp the Senate's action. We are given just 1 hour to debate this completely new bill and with no opportunity to amend it in any way. It is "take it or leave it"—under the emotional impact of a national tragedy.

I have always done everything I could to bring peace to our cities and equal justice to all citizens. I shall continue to do so. But this legislation unfortunately is not the answer to the problems which are tearing our Nation apart.

After very careful study it is my firm conviction—and that of many legal experts—that the open housing provision of this bill is not constitutional. Accordingly, I have no choice but to vote against it.

Mr. LONG of Maryland. Mr. Speaker, I rise in support of this resolution (H.R. 1100). I intend to vote for this legislation but I am most concerned over one provision of the open housing section of the civil rights bill. This provision—what I call the "real estate broker bypass"—would deal unfairly with real estate brokers and their associates, and could threaten the very existence of thousands of brokers throughout the country.

Under section 803(b)(1) of the bill, an individual who owns up to three homes is exempt from restrictions—he may discriminate in renting or selling his property—if he does not use the services of a real estate agent. This would encourage persons who are apprehensive about being brought under the provisions of the bill to dispense with the services of realtors, and would shut real estate agents out of transactions that the owner may make acting alone.

Allowing a homeowner to discriminate if he does not use a broker amounts to discrimination against the broker. Real estate brokers should not have to bear the burden for a hastily amended bill.

Mr. FOUNTAIN. Mr. Speaker, this legislation in its present form is bad in so many respects that I cannot support it, but, Mr. Speaker, I rise not to address myself to its merits at this time but to the atmosphere prevailing as we consider it.

First, let me say that I am well aware of the argument that this bill was scheduled for consideration before the tragic, senseless, and useless events of the past week.

But let me say also that when this timetable was decided upon, Dr. Martin Luther King had not been struck down by a cowardly assassin's bullet, more than 100 American cities had not just days before suffered losses of life and property because of mob action, and the National Capital of the United States had not become an armed camp in which a semblance of order is being maintained only through the use of Federal troops.

We cannot possibly act on this legislation today in the prevailing atmosphere of violence—with helmeted troops and machineguns guarding the Capitol Building—with the rational debate and reasoned judgment that is essential to the processes of a democracy.

Proponents of this bill cry "urgency." But this is not the time for hasty and emotional action. We should act on this bill only after order has been clearly and unmistakably restored.

Any action by this House today will bear the impression—which no words of ours can refute—that we are acting on the basis of emotion instead of logic and that we are responding to threats rather than the will of the people we represent.

If we act on this bill today—no matter what the result—we will be unable to dispel charges that our action does not represent the best judgment of the Congress. If the bill is approved, there will be widespread charges that it was done under the threat of violence. And there will be some truth in such charges.

If the bill is defeated, it will be alleged that it was due to "backlash." And there will be some truth in these charges, too.

I have personal knowledge of private businesses that were closed yesterday because of threats of firebombing or worse. I am sure most of us here know of similar incidents.

While it is deplorable that anonymous threats can force a man to close his business for fear of its destruction or worse, it is not difficult to understand how those individuals feel they are helpless to do other than obey the criminal order to close.

Any such arrogant action and a private citizen's acquiescence to it is to be deplored. But we are talking about individuals dealing with secret, faceless criminals.

The U.S. Congress should have no such fear and should succumb to no such blackmail. We represent all the people of the United States—people of all races and creeds and colors—not just a vociferous few who prefer the bomb to rationality.

If we succumb and act at all on this legislation under present circumstances, in my opinion we are not truly representing the people who elected us or our country or its Constitution which we have sworn to defend and uphold. We will simply be victims of fear, emotionalism, and a sense of expediency which serves no one and discredits all.

I will, therefore, vote against the previous question in the hope that this legislation will be sent to conference where conferees of the House and Senate can properly deliberate and consider all of the Senate amendments, the deletions made by the Senate from the House-passed bill and their report as agreed upon will be brought back to House for final action.

Mr. HENDERSON. Mr. Speaker, once again the Members of this body are called upon to vote on a so-called civil rights bill, and again I will vote in opposition to its enactment. Like those before it, this bill will not accomplish what its proponents say it will, but rather, in my opinion, will do more harm than good.

Last Friday morning—the morning after the senseless murder of Dr. Martin Luther King, Jr.—I appeared on a television program in eastern North Carolina and when asked about Dr. King's death, I responded that above all, it was a time for all of our people to remain calm. I reminded the audience of President Johnson's timely pleas for national unity, and as we debate this issue, I urge this House to act calmly and to demonstrate, as best we can, the real unity of the American people.

If every Member of this body will judge the bill now before us on its merits—will weigh the value of any concrete benefits its provides against is serious infringements of property rights—he cannot conclude that it is worthwhile. As a practical matter, how many Negroes can afford to buy homes in Spring Valley here in Washington or in Montgomery County, whether they have that right or not?

Case 1:13-cv-00966-RJL    Document 153-3    Filed 05/30/23    Page 51 of 111

This bill is so like its predecessors, the Civil Rights Act of 1964 and the Voting Rights Act of 1965. It promises much; it raises expectations; but in the end it provides no real solutions to our racial problems which are matters of economics. Those Negroes throughout this land who are restless and volatile feel that they are outside the economic mainstream of American life.

I believe there are two things that must be done before we can hope to reach a lasting solution to our racial problems.

First, we can and we must be concerned with maintaining law and order and preserving an orderly society. We cannot and we must not continue to condone violence and pretend that "demonstrations" do not breed violence.

Second, we must seek long-range solutions to the economic plight of all of the poor people of our land. Not just stopgap, handout, make-work programs, which are self-defeating in that they make no provision for instilling motivation, but instead stifle the pride and self-respect of those who are their recipients.

We must create a coalition of government and the private sector, at all levels, to make a new and concerted effort to bring our poverty-level citizens into the economic mainstream of our Nation by encouraging them to seek education and training; by making more effort to hire them in jobs which they are qualified to do; and to insure the promotion of those worthy of promotion.

The bill before us does nothing to achieve either of these basic goals and offers little more than a false hope and a pretense.

Mr. COHELAN. Mr. Speaker, I had planned today to address the House on the merits and the urgency of passing the open housing and civil rights protection measure. I will proceed with those remarks today, but first I must share with you the deep disappointment and regret I have felt over the last 6 unhappy days.

I have just returned from the funeral of Dr. Martin Luther King, Jr. I cannot describe to you the emotions I felt there as I contemplated the man and the events of his life and death. Suffice it to say that the sadness of the whole Nation bespeaks the massive loss which we have suffered with the passing of this extraordinary man.

These last 6 days have brought an abject shame on this country.

First the coldblooded murder of Dr. King.

The shame and the tragedy could not have been greater, as an apostle of a peaceful America, equally open to all its citizens, a man who believed his country could and would meet its challenges and provide for its people, was violently struck down.

That violence begot more violence.

In scores of cities, in the Nation's Capital, men have been killed, homes and businesses destroyed, thousands of families have been disrupted. Helmeted and armed troops patrol our major cities.

As the Palm Sunday weekend of murder, pillage, and destruction unfolded, I could not help asking myself, "What will it take to awake this great country to

the anger, frustration, and despair that afflict it?"

Many of us, but not a majority, have long recognized the smoldering violence, discrimination, and deprivation which exist everyday, but erupt only now and then.

But today I am a little heartened. My mail, which has been running strongly in opposition to the open housing bill, is suddenly filled with letters and telegrams urging prompt constructive action and passage of the civil rights bill. It is my fervent hope that this outpouring marks an awakening, not only in my district, but in the whole Nation.

Certainly it is time.

For generations we have neglected a massive segment of our population.

We have let our schools fail to educate. At a time when the fruits of formal schooling are increasingly more important we have failed to adequately teach even the rudiments to many of our people.

In a time of increasing mechanization and advancing technology we have allowed many of our people to be passed by—neither educated nor trained and consequently jobless or underemployed.

We have permitted minority Americans to be thrust under into the innards of our cities and forced out to the farthest backwaters of America.

We have dosed out palliatives, we have experimented and we have helped a little.

But the cancer of neglect pervades deep and far through our social fabric.

We have not yet determined as a nation to put our shoulders to the wheel—to make this country for all of us what it is for most of us.

The events of the last few days have set us reeling. It will take some time to sort things out and to get about the business of rebuilding and constructively preventing a recurrence.

But we must not let the opiate of time allow us to forget or diminish the urgency of the task which faces us. What I am most fearful of is that in a week, or a month, or a year, we will again settle back to our past indifference to the lives of many of our citizens. And then, we can only expect more tumult, more fire, more tearing asunder.

Let us not forget the lessons of the Commission on Civil Disorders. The typical rioting ghetto resident is not the unemployed or the worst educated. On the contrary, he has completed 11 years of public school and has a job. These people are caught in the abyss between rising expectations—a rebirth of hope and higher aspirations—and the reality—discrimination, relative poverty, deprecated dignity.

These are people who have listened to the promises of better jobs, better housing, better schools. Their frustration, their alienation from the mainstream, is at the root of their behavior. Our job is to bridge the abyss to bring the reality to the promise.

There are no short answers. There are not even any sure steps. But several matters now pending before the Congress deserve renewed consideration and support.

The civil rights bill, the strengthened

equal employment opportunity measures, the summer supplemental appropriation, the OEO appropriation, police training assistance, and gun control are all matters now pending. Affirmative and prompt action on them should be taken.

The Senate-passed civil rights bill which will be before us tomorrow is not perfect legislation. It has a riot suppression provision, similar to one I previously voted against, which is vague, overbroad, and perhaps unenforceable. But there is considerably more good than bad in this bill.

Open housing is, of course, the most pervasive and controversial part of the measure. Simply passing an open housing law will not bring an end of the ghetto—but it will mean that those who have the means and the desire to leave the ghetto will not be deprived of the chance to do so because of their race, religion, or national ancestry. And it will mean that minority citizens will no longer legally have their dignity affronted by the denial of housing for discriminatory reasons.

Federal open housing is not as some have called it, "forced housing." No one is forced to rent or sell to any one. The law simply forbids the color or religion of the prospective buyer or renter from being a factor in the sale or rental.

Real property rights have never been absolute. From the old English common law to the modern zoning ordinances, sale and use of land has always been regulated to meet social goals. Similarly 22 States and 96 localities have enacted open housing laws in the effort to attain the social goal of equal access to housing.

Now the Federal Government can act to implement the national policy of racial equality, and at the same time make the laws uniform nationwide. Discrimination, and the lack of opportunity and depreciated dignity attendant to it, are national problems demanding not only Federal money but Federal legislation. If discrimination were to be tolerated, all the Federal poverty effort could not succeed. The availability of housing determines where one lives and in turn, the jobs one can take and the school one's children can attend.

Conscience and pragmatism demand the passage of this provision

The civil rights protection provisions in this bill are similar to those passed earlier by the House. They would make it a Federal crime to interfere with the exercise of federally protected rights or the dispensation of Federal benefits. Obstructionist and dilatory tactics in some States have severely handicapped our progress toward equal liberty for all. This provision will allow Federal action to assure Federal rights and privileges.

The civil rights measure also contains a "bill of rights" for Indians. I cannot imagine a more overdue measure for a deprived, neglected and abused group of Americans.

In short, the Senate passed civil rights bill is a significant piece of legislation which will move us one step closer to Dr. King's and the American dream.

Mr. EDWARDS of Alabama. Mr. Speaker, 1 hour to debate monumental legislation such as the civil rights bill is unbelievable; 1 hour to consider amend-

ments adopted by the other body is inconceivable; 1 hour to understand the intricate details of such a far-reaching piece of legislation cannot be justified; 1 hour to be controlled, not by the committee with some expertise in the civil rights field, but rather by the Rules Committee, is not conducive to intelligent consideration of this issue; 1 hour to literally rewrite the real property laws of this Nation is unthinkable; 1 hour, divided 30 minutes for the Democrats and 30 minutes for the Republicans, does not give the Members of this august body time to stand up and be recognized, much less time to say anything worthwhile.

Mr. Speaker, this is no way to legislate. This procedure destroys the integrity of the people's branch of the Government. It takes away from the people's representatives the opportunity to fully explore the multitude of issues involved in this very complex piece of legislation.

Everyone in this Chamber knows why this legislation is being rushed through today. But I warn my colleagues, you cannot buy off the rioters with the passage of a bill. And if you do in this instance, what will you offer them after the next riot? Where does this process end? And perhaps the worst aspect of this appeasement process is that the Negroes of this Nation are being sold another bill of goods. This bill is not going to solve their problems; it is not even going to come close. And one day when this becomes painfully evident the repercussions will be tremendous.

Mr. Speaker, because of the way this bill has been brought to the floor and because I am not wise enough to understand it without thorough debate, I will vote against the previous question in the hope that the bill will go to conference and then come back here for further consideration, when there is less emotion, a better understanding of the bill, and when the Judiciary Committee will be in a better position to explain all of the details.

In the meantime, all I can say is, this is a heck of a way to run a railroad.

Mr. MILLER of Ohio. Mr. Speaker, we in Congress are faced with a most difficult decision, a decision which will directly affect the lives of millions of Americans. Should we or should we not today take action on the civil rights bill of 1968, H.R. 2516.

Much can be said in support of the need for positive legislation to better the plight of our Nation's more unfortunate citizens. Action should, and must be taken to correct many of the present inequities which exist. But I ask you, should not legislation of the importance of that presently before us be subjected to a thorough, comprehensive, and deliberate review by Members of the U.S. House of Representatives. Must we act in haste to legislate a bill, the ramifications of which will materially affect and alter the rights of all Americans?

The situation as I see it is one of reflex. We have read the papers, we have watched the happenings of the past week on television, and we have heard many eloquent and moving pleas for immediate and responsive action. Action now,

not tomorrow, not a week or a month from now, but now. No democratic body should be asked to legislate on a basis of "act now, amend later." The incidents of the past week should not preempt the normal workings of our legislative process.

There are many sections of this bill which most of us actively support, yet there are some areas with which we are concerned. Would it not be best at this point in time, to refer this bill to conference, whereby this legislation can be fully reviewed as it no doubt would have been had it not been for the tragic circumstances of the week preceding.

Mr. GRIFFIN. Mr. Speaker, I oppose House Resolution 1100 which adopts, without proper time for debate, the amendments to H.R. 2516 added by the other body.

The manifestation of civil disobedience visited upon our cities in the last few days is shocking testimony to the futility of achieving racial harmony by passing civil rights laws. Despite the efforts of millions of Americans—in both public and private sectors—to improve the lot of Negroes, there is still loose on society a lawless element which rejects self-discipline and orderly government. Unfortunately, Negro leaders have inflamed the minds of their own race by preaching hatred of the white race in a most subtle but effective way.

A vigorous advocate of civil disobedience was recently slain. While murder is the most heinous of all crimes of violence, it can never be the excuse for rioting, looting, burning, and more murders. Criminals of all types must be brought before the bar of justice and dealt with in accord with the law; otherwise, our system breaks down and anarchy results.

As a responsible legislative body we have the duty to preserve our system as one of laws and not of men, and we have the further duty of demanding the enforcement of laws against looting as well as murder.

The bill before the House will not benefit the American people. It will only cause further grief. Mischief will be the total result of the open housing section, because the cards are stacked against the property owner and in favor of the agitator. Other sections of the bill are equally repugnant to our Constitution and our historic tradition of local self-government.

Here, once again, the Congress seeks to impose on the American people a course of human conduct alien to their nature and their instincts. Such a gesture will cause further conflict, divisiveness and agony.

Mr. Speaker, I believe the greatest contribution we could make would be to call a moratorium on civil rights and other racially oriented legislation. We should stop, think and ponder the question: Where are we and where are we going? If we proceed in our present direction, we are headed for race war. I hope and pray that is not America's destiny; but it will be unless sanity returns to our native land.

Mr. MATSUNAGA. Mr. Speaker, while I am more than willing that the Civil Rights Act of 1968 shall be enacted into

law as a memorial to the late Dr. Martin Luther King, Jr., I am today supporting the measure because it is the right thing to do.

By enacting this legislation today, we will have proven to the world, but more so to the citizens of our own country, that the policy of this Government is firmly and unashamedly based on the principles laid down by our Founding Fathers—that all men, regardless of race, color, religion or national origin are created equal and shall be granted equal opportunities to develop to their optimum capacities.

By the passage of this bill, we will have proven to the world, but more so to the citizens of our own country that not only by policy, but also by the very laws of the land, ours is a republic designed to be "one Nation under God, indivisible, with liberty and justice for all."

Mr. FRELINGHUYSEN. Mr. Speaker, some have suggested that we vote for the civil rights bill under consideration today as a memorial to Dr. Martin Luther King, Jr. Although I had planned to vote for the bill as it passed the Senate before the tragic death of Dr. King, it is my hope that there will be those in this body who will be moved by the events of the past week to support this bill.

Last night in the evening paper I read of the death of an 18-year-old marine in Vietnam. This boy was a typical American soldier in almost every respect; he attended local District of Columbia schools, he was a churchgoer, a Boy Scout, holder of several medals and citations. Only his picture told you that he was a Negro. Can we not also make this bill a memorial to this young lad who gave his most precious possession, his life, for us? How many millions of his fellow black citizens are there who have served country without question, who have obeyed the law, and carried their full share of the responsibilities of citizenship, to whom we can dedicate this bill?

These black Americans have faith in us and in our system, and they are waiting for us to reaffirm that faith by our vote today. I do not think we will fail to reach out our hand and say to them: "Come on, we can work things out."

Mr. COWGER. Mr. Speaker, I intend to support and to vote for the Senate-passed civil rights bill of 1968. This legislation seeks to protect certain fundamental individual rights and assure equality of opportunity for all of our citizens. I am convinced that the controversial housing section is absolutely necessary at this time. Any American should have the right to buy or to rent housing suitable for his family.

I have had considerable experience in drafting civil rights legislation on the local level. During the 4 years that I served as mayor of one of our largest cities, we assumed the leadership in passing local ordinances guaranteeing equal opportunity for all our citizens. In Louisville, Ky., in 1963, we passed the first public accommodations ordinance in the South. This was followed by a fair employment ordinance, also the first in the South. Then, in 1965, we proclaimed by ordinance a statement of principle that every individual have the

right to buy or rent housing of his choice. Last year our board of aldermen passed an even stronger ordinance in this field of open housing. To date we have been unable to find even one case of discrimination in housing, public accommodations, or employment, in order to test our ordinances in court. I think, by and large, that you will find that the controversy over housing is almost exclusively an emotional issue. Yes, I agree that a man's home is his castle, but when he offers it for sale or rent to the public, that means everyone, regardless of their race or religion.

During the years from 1961 through 1965 every major city in the United States was going through great social change. I think that because we were willing to squarely face our problems in Louisville, our city enjoyed for those 4 years unprecedented good race relations. There were no marches, sit-ins, or stand-ins. Not one brick or bottle was thrown, nor was there one bloody head in Louisville, Ky.

Today Congress has an opportunity—and yes, even the responsibility—of voting for the passage of a good civil rights bill, if my colleagues could have lived my experiences in city hall they would have an insight for real action on the firing line. I have always attempted to represent all the citizens in Louisville—Republicans, Democrats, whites, and Negroes, not just those who, for the moment, might constitute the majority.

Mr. BOB WILSON. Mr. Speaker, as one who has enthusiastically supported civil rights legislation in the past, I find myself in the unhappy position of having to oppose the unorthodox parliamentary procedure in the case of the resolution before us today.

I endorse the provisions of this bill which by law would prohibit discrimination in all housing owned by the Federal Government or provided in whole or part by loans or grants from the Government or even on loans insured by the Government.

I do not endorse the provisions of this bill which would open up the possibility of criminal action against an individual homeowner who might have his own ideas on how best to dispose of his own private property.

I do not like the impression being created here today that individual homeowners are exempt from civil action, because the moment they put their home up for sale through a real estate broker or agent, this exemption is nullified.

Less than one-half of 1 percent of homes are sold in this country by individuals, and I submit that this bill clearly does not give individual homeowners any exemption worth mentioning.

It seems to me that individual property rights which are basic tenets of law and order are threatened by this legislation as written. I oppose the adoption of this resolution and will cast my vote against it for that reason.

Mr. MURPHY of New York. Mr. Speaker, I rise in support of the bill.

We are asked today to consider a civil rights bill. In a way, the very fact we have to consider such a bill is a contradiction of our own birthright, for we founded this Nation with the expressed purpose of establishing a community based on the principles of equality among men and individual freedom for all; the fact that more than 180 years after our birth we are still striving to realize this original purpose should have a sobering effect on us all.

The reality rarely fits the dream, and while we all profess to believe in equality of opportunity and equal justice under law, we must realize that these basic rights have been denied to a large segment of our people, and having realized this painful truth we must act without delay to right these terrible wrongs.

The civil rights bill before us today will be a significant step in this direction.

We deliberate on this legislation at a time of great racial strife in our land—strife which has brought flames to our cities in the past few days, but strife which has existed long before the cities erupted into violence. It is also a time of mourning, for the Nation has lost one of its great leaders—a black man who fought for the rights of black people, but more important, an American who fought for the life of his country.

The violence that took Dr. King's life, and the violence that erupted because of his death, are examples of both black and white racism, neither of which Dr. King believed in, and both of which are contrary to the principles for which he lived and died.

There are those on one extreme who now say that Congress should not pay blackmail and reward violence by passing this bill. On the other extreme are those who demand that Congress pass this bill in expiation for the murder of Dr. King. Neither argument should be the basis for our deliberations here today.

This bill should be passed for the simple reason that it is right. It will not reward any group; it is merely a long overdue attempt to provide all citizens the equal protection of the law as promised in the 14th amendment. Those who oppose it now as blackmail for violence opposed it before the violence; the fires in our cities merely provided additional support for a position they held long before.

The need for this bill existed long before the violence in our cities, and long before the tragic death of Dr. King; the need has existed from the day we declared to the world that we were to be a nation dedicated to the proposition that all men are created equal.

This civil rights bill has three basic parts. The first provides protection against interference with certain federally protected activities, such as voting, serving on a Federal jury, or working for the Federal Government. I cannot imagine any one of my colleagues, or any one of my constituents, not wanting to be protected against interference with his right to vote, serve on a jury, or work for the Federal Government. And yet today many Americans, specifically our Negro Americans, are denied this basic protection. There can be no reasonable justification for opposing this part of the bill.

The second part deals with the rights of Indians. Racial discrimination in general has placed a black mark on America's conscience, but no part of that discrimination has been worse than our treatment of the first American—the Indian. This group has suffered more than any other, and continues to suffer today. The second part of the bill provides Indians with basic civil rights which are now guaranteed most other Americans, and there can be no reasonable objection to extending this coverage, these rights, to the Indian.

The third part of the bill deals with open housing, and has received the most attention—and the least rational consideration from the public—of any other part.

To begin with, many States already have open-housing laws. My own State of New York has an open-housing law which is broader in its application than this proposed Federal law, and yet there are those in New York who still fear the effects of this proposed Federal law which would have no impact on their lives.

Many white people fear that their property values will decrease as a result of integration, but studies have proven this to be untrue, and in fact have found that in a large percentage of cases property values have increased after integration.

Another argument advanced in opposition to this section of the bill is that it forces homeowners to sell their property to Negroes, and thus violates the right of the individual to dispose of his property as he sees fit.

This is totally erroneous. This bill would not force homeowners to sell to Negroes or anyone else. It would merely prohibit them from using a real estate agent or some other person to discriminate against prospective buyers on racial grounds. It would make the buyer's financial capability the dominant consideration, not the color of his skin.

The most important aspect of the open housing section is that it would remove the psychological barrier now faced by Negroes when they are looking, or thinking of looking, for a new home. It would say to them that if they have the financial resources to buy a house, racial considerations will not enter into the picture. It is, in effect, a symbolic gesture as much as it is a means of acquiring better housing.

Mr. Speaker, as I said before, this bill need not be considered in the passionate heat of racial violence, and it need not be considered in the sad memory of the death of Dr. King; it stands on its own merits and should be passed because it is right.

Certainly Dr. King fought for the civil rights contained in this bill, and he more than any man, has led this Nation toward its goal of equality for all men. But we should not pass it because of his death; rather, we should pass it as a tribute to his life.

I urge my colleagues to support this bill.

Mr. BUSH. Mr. Speaker, I want to commend the Rules Committee for bringing this bill to the floor. I do not consider this legislating under the gun—rather I think it best that we not change our

Case 1:13-cv-00966-RJL    Document 153-3    Filed 05/30/23    Page 53 of 111

normal legislative schedule in view of the recent rioting.

I would like to see this bill sent to conference. I am particularly concerned about some of the inequities in the open housing section. Although the individual home owner is exempt, he ought to have the right to sell or rent through a real estate agent. The way the bill is now written, it is discriminatory toward the real estate agent. Why pick out one business and discriminate against it?

If the bill goes to conference as I hope it will, I hope we will see speedy action and I hope an amendment similar to the Senate proposed Baker amendment can be adopted by both Houses.

Should the previous question carry and we are not able to amend the bill, I have decided to vote for the bill. I will do this because I believe the pluses outweigh the minuses.

I hope all of the controversy over badly drawn sections has not made any of us forget the good sections of this bill. This legislation makes it an offense to interfere with the rights of another person to vote, to secure employment, to attend school or college, to use the facilities of interstate commerce, or to enjoy what we generally call a citizen's civil rights. It also prohibits teaching people to use firearms or make incendiaries for use in civil disorders, shipping explosives or firearms knowing they will be used in civil disorders, or obstructing law enforcement officers or firemen who are trying to quell riots.

I do not believe we can condone rioting—for any reason. Some time ago I introduced a strong bill making it a Federal crime to cross interstate lines with the willful intent to incite a riot. This is now an integral part of this bill.

Lastly, I do not want it on my conscience that I have voted against legislation that would permit a Negro, say a Negro serviceman returning from Vietnam, where he has been fighting for the ideals of his country, to buy or rent a home of his choosing if he has the money. As I said before I would like to have the chance to amend this bill and remedy some of the inequities in the open-housing section, but if this fails, it is impossible to amend the bill, I will vote for it. I recognize and have fought against its imperfections, but we must have strong law enforcement and we must, while protecting individual property rights, offer hope and fairplay to all Americans regardless of their color.

Mr. O'NEILL of Massachusetts. Mr. Speaker, with shock, sorrow, and despair comes silence, as each man searches his own soul and conscience. This silence is often followed by a great deal of talk—the outpouring of grief and shame.

I take the floor to pay tribute to one of America's greatest leaders. Our Nation has been privileged and fortunate to have had men of courage and conviction who rose to lead us to victories of freedom and justice. Among them have been three martyrs: Abraham Lincoln, John F. Kennedy, and Martin Luther King. Each of these men is distinctive because both in life and in death he has stirred our emotions and our convictions.

Few men have the capability and the dedication to devote their lives to bettering the lives of all people; of few men can it be said that they changed the world. The Reverend Dr. Martin Luther King, Jr., was one of these men.

He never faltered in his faith in man; never doubted his conviction that America could be truly free; and never lost the courage it took to lead that movement toward freedom and equality for all Americans.

He never lost faith that men could and would learn to live as brothers. I, too, see and believe in his dream. I vote aye on the civil rights bill of 1968.

Mr. COLLIER. Mr. Speaker, it is regrettable that this legislation comes before us at a time when the atmosphere is charged with emotionalism ranging from fear to hate to tragedy. It is equally regrettable that this bill comes before us with provisions of far-ranging importance which were not even considered by the Judiciary Committee as part of this measure—amendments which were tacked on H.R. 2516, for which I voted last year. The combination of these circumstances does not represent the proper or normal process of legislation.

In 1964 Congress passed the Civil Rights Act which provided the most sweeping changes in history in the guarantee of nondiscrimination in our social, political, and economic life. I supported that legislation, which passed by a vote of 290 to 130. It provided for the guarantee of voting rights of all citizens, the elimination of practices which had previously deprived many citizens of their right to vote. It conferred jurisdiction upon the district courts of the United States to provide injunctions against practices of discrimination in public accommodations. It authorized the Attorney General to institute lawsuits to protect constitutional rights in public facilities and public education. It extended authority of the Commission on Civil Rights to preventing discrimination in federally assisted programs and established the Commission on Equal Employment Opportunities. It provided for technical assistance to implement plans for desegregation of public schools, establish training institutes, and provided grants to assist teachers, and employ specialists to assist in problems incident to desegregation.

I yield to no Member of this body in my convictions in the protection of the constitutional rights of my fellow man, regardless of race, color, creed, or national origin. My personal feelings, attitude, and conduct have been such that this statement cannot be held up to doubt.

It would be nothing less than ridiculous to suggest that every effort or program devised by the administration, a legislative committee or any civil rights establishment has been meaningful, though we might not have any reason to question the good intention of such actions. The obvious failure of certain programs directed to the host of problems in the Negro community is evidence of this conclusion.

I want to make it eminently clear, as one who supported the recommittal motion to bring the 1966 civil rights bill back to the House without title IV, that

my support of all other provisions of the act should not be subject to question and this in addition to my support of the 1964 act.

Under this bill, a potential buyer can secure a preliminary injunction simply on the basis of his petition and without even any ex parte proceedings. Under this bill the real property owner or his agent has only the right to defend himself, if he can afford to do so, and at the same time he is deprived of the right to protect his equity in his home even though he may have moved to a distant city and needs the cash to buy new property.

Aside from the legal aspects of this provision of the proposed law, I am sure there are many people in the communities I represent who will sell their homes to any qualified buyer, regardless of race, color, creed or national origin, without being forced to do so by questionable Federal law. Certainly the normal turnover in the sale of private property is as applicable to those who assume this attitude as those who might not. Hence, the very economics of the situation would dictate that there would be as many homes available for purchase by any citizen even without passage of the present proposal. And certainly the vast majority of people of all races may be limited by his economic ability to buy in certain areas.

I am just as sincere in my conviction on this issue as those who differ with my views, and I am personally as racially tolerant and understanding as any member of this legislative body. Those who choose to construe my position on this legislation to the contrary have as much right to question my sincerity and motivation as I theirs.

I can appreciate the anxiety of many good citizens to accept the Senate amendments to the 1967 bill, as I am prepared to do except for the open occupancy provisions. Yet I do not believe that most of those who have expressed their support of the open occupancy provisions have sought to consider the fact that you do not accomplish equal protection of the law by a provision that flaunts equal protection of the law.

Under the proposed bill a person seeking to buy property can allege discrimination at any time within 6 months after his offer to buy is claimed to have been turned down. After he gets to court his attorney's fees and court costs are paid for him. Yet the seller, even if it is ultimately decided that he was not guilty of discrimination, must not only pay his own court costs and fees but, indeed, would be faced with having been deprived of his right to have converted his own investment for whatever period of time it might take for the court decision.

In the case of the sale of any home, would a lawyer be safe in certifying a title is clear without having first advertised in a newspaper or without going through the community to make inquiry in an effort to determine whether or not a charge of discrimination is likely to occur?

Mr. BELL. Mr. Speaker, I rise to urge acceptance of the amendments of the

Case 1:13-cv-00966-RJL Document 153-3 Filed 05/30/23 Page 55 of 111

other body in order that the pending civil rights legislation may become law. Perhaps today we can summon the discipline necessary to discuss aspects of this legislation in a context apart from the life and death of Dr. Martin Luther King. We deal at this moment with a parliamentary question. But it is a parliamentary question not without substantive importance; thus there is temptation for both opponents and advocates to address themselves to the ages.

It is a temptation I hope we resist. Relevant and unemotional argumentation is surely needed on this subject in these times. Reduced to fundamentals the decisions we make are simple: shall we pass this legislation, and, shall we pass it now.

The bill is not flawless now.

It will not be flawless later.

Since my first election in 1960 I believe I have supported every civil rights bill to come before Congress. Never have I voted with absolute satisfaction. Always there has been questionable language, imprecise phrases, and general belief that given more time a better law could be written.

I have felt this when debate has been fast paced; I have felt this when debate droned interminably on issues which had been carved over, session after session. But always the time has come when we have had to relinquish new laws to the test of experience. Our job has been to make "yes" or "no" decisions on balance, in full recognition that neither the status quo nor the remedies before us were beyond question.

When these times have come we obtain a measure of strength from the knowledge that the system recognizes the possibility of legislative oversight. If mistakes are made, we have both the right and the responsibility to correct them. Were this not so, it is doubtful we would have courage enough to permit any new law to escape our Chamber.

Opponents may argue that shocking events and massive civil disturbances, such as we have known in Washington in recent days, should not influence our deliberations. They would be right if the legislative proposals before us today had not been passed by the Senate well in advance of the momentous happenings of the last 6 days.

Opponents may argue that it is unwise to practice legislation by placation; that the pending bill is, in a sense, a device to purchase domestic tranquillity. These spokesmen would be wrong. Most landmark decisions made on Capitol Hill have come from us in times of great public tension and unrest, and have been designed by us to relieve that pressure. Moreover, it is hard to imagine that any serious observer of life in the United States today could truly believe that passage of this bill will stop rioting and protest, or significantly reduce the dissatisfaction now rampant in the land.

Far, far more will be asked of us in this cause than mere endorsement of another civil rights bill. We will be asked for a great deal more. We will be asked for a great deal more than we can deliver. And when the time of real testing comes to us it will be important that at the very least

we have given evidence of awareness of need and awareness of urgency.

Racial bias runs deep; fear about open housing is substantial in some areas of our land; constituent reaction at home could be significant. We who have lived in Washington in recent days, however, might say with justification that we have a better knowledge of the danger of polarized society than many whom we represent.

From this one might argue that we should not reward those who have caused such havoc in our capital city. This position is sound. But so, also, is the position that we should not punish the overwhelming majority of those who would benefit from civil rights legislation who adhered to and respected the law in the recent troubled days.

It is not our business to reward or to punish.

It most certainly is, however, our responsibility to make way for an idea whose time has clearly come.

We could delay this vote and justify our decision with the defense that we were following normal parliamentary procedures. The difference is this.

If we vote to accept the amendments today we have law. If we delay we run the risk that we will not have law. Often in the past pressing events have required us to abandon business-as-usual procedures. I believe they do so today.

Later, as we must review new poverty proposals, we will surely have to search for balance between the cost of effective improvement programs and the restraint of sound monetary policy. How much easier it will be to make this point if we are on record as being fully aware and sensitive to the fact that a great deal in our Nation has been found wanting and needs to be changed.

The change is coming. It is inevitable. My hope is that we have the strength and the will to encourage its arrival within a framework of order.

We do not owe it to others to do this.

We owe it to ourselves.

Mr. ANNUNZIO. Mr. Speaker, we are now considering a bill dealing with the most important subject in America; the protection of the rights of all Americans. The list of activities that this civil rights bill seeks to protect sounds like an honor roll of the most vital features of the American way of life: voting, or qualifying to vote; serving as a juror; working at or applying for a job; attending public school or college; being able to travel freely throughout the length and breadth of our Nation; having the opportunity to live where you choose. Not one of these rights is unimportant; not one could be deleted without seriously jeopardizing the rights of all our citizens. But I feel one provision, the fair housing guarantee, is worthy of special mention. It is the most important and significant title of this bill.

One of the most basic responsibilities of a man is to provide decent, safe, and adequate housing for his family. Congress recognized this in the Housing Act of 1949, where we went on record in support of "a decent home and a suitable living environment for every American family." Housing is a commodity that no family can do without. Regrettably, it

is the only commodity which is not available on the open market according to one's ability to pay. There is no person in this Chamber today who does not know that a sizable proportion of the people in this country cannot get housing of their choice because of their race or religion; because of their ancestry or their color; factors unrelated to financial status or individual worth.

This is an intolerable condition. It is intolerable because it denies the basic spirit which has led this country to greatness. For almost two centuries people have come to these shores convinced that this was the land of opportunity. The economic opportunities were, and still are, boundless. The spirit of Horatio Alger is still honored here. But the real significance of America is not to be found in the cashbox but in the catalog of rights and privileges of citizenship. The most fundamental of all rights is the right to life and liberty. This in the most real sense is what the fair housing provisions are all about. They give substantive meaning to life, liberty, and, yes, property.

Think what a home means to a family. It means much more than just a roof over its head. A home dictates the quality of education a child receives. A home determines whether a child plays in the streets, or in a pleasant area where grass and trees are the rule. A home can decide where a family shops, and how it spends its time. The list can be stretched indefinitely.

At present 25 States have enacted open-housing legislation. Some of these laws are more comprehensive than the bill before us, some less. But every one of these enactments carries the same message; the opportunity for decent housing should be available to everyone. Consequently, State action is not enough. As long as just one State remains outside the open-housing fold, some Americans will be denied equal treatment. Why should an individual's state of residence determine whether he can procure the home he wants? Should total enjoyment of the fruits of citizenship in the most advanced nation in the world today be tied to sectional considerations? Our answer must be no.

Equal opportunity in housing should be made nationwide. H.R. 2516 will make equal opportunity in housing a living reality, by obviating all questions of color save the color of one's money.

Mr. Speaker, H.R. 2516 is the most important legislation before the Congress. It attempts in the ways I have described, to protect and strengthen rights that are essential to the preservation of the greatness of this country. Therefore I urge the prompt passage of this bill.

Mr. TENZER. Mr. Speaker, I rise in support of House Resolution 1100 to adopt the Senate passed version of the civil rights bill, H.R. 2516.

The legislation before the House this afternoon presents a basic framework for protecting the human rights of all citizens guaranteed by the U.S. Constitution. There is nothing in H.R. 2516 which should be repugnant to any American who believes in the principles upon which this Nation was founded.

The tragic and senseless assassination

056647

of Dr. Martin Luther King, who lived and guided the civil rights movement by the principle of nonviolence, has brought home to all Americans the fact that when the rights of any one American are threatened, the rights of all Americans are in jeopardy.

I attended the funeral services in Atlanta yesterday not for political reasons as was suggested on the floor—because I am not a candidate for any office—but because I am an American who is committed to keeping America great.

The legislation before the House today provides criminal sanctions for interfering with the rights of any person exercising his civil rights—title I; protection of the rights of Indians—titles II–VII; prohibits discrimination in the sale or rental of housing under certain circumstances—titles VIII–IX; and provides criminal sanctions against those who incite riots or obstruct law enforcement officials or firemen during civil disorders—titles I and X.

Much of the debate today centers on the open housing provisions of the bill.

The provisions of this bill which prohibits discrimination in residential housing transactions have little impact on my own State of New York.

The statistics are interesting and revealing and my colleagues will find them helpful in formulating a position with respect to voting on this bill.

The State of New York has a more comprehensive law against discrimination than the bill before the House this afternoon. The New York State law prohibits discrimination in the sale, leasing or rental of all housing except owner-occupied two family dwellings and the rental of a room in an owner-occupied house. Of particular significance is the fact that real estate brokers and lending institutions are specifically covered by the New York State law.

Twenty-two States, the District of Columbia, Puerto Rico, and the Virgin Islands have fair housing laws and in 21 of the 22 States, these laws go further than the proposed Civil Rights Act of 1968. These 21 States represent more than 50 percent of the population of the United States.

The 22 States are: Alaska, California, Colorado, Connecticut, Hawaii, Indiana, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Vermont and Wisconsin.

Two years ago, in joint testimony before the House Judiciary Committee, representatives of the Catholic Welfare Conference, National Council of Churches, and the Synogogue Council of America gave full support to the open housing provisions of the bill before us today.

This joint statement stressed the importance of open housing from a moral point of view. I quote from that statement:

We therefore come before you with the simple conviction that legislation such as that before this committee is morally right. It is an act of justice, aiming more fully to implement our democratic ideal that all men are equal before the law and our religious conviction that we are the children of one Eternal Father.

More than half the citizens of the United States live under State or local laws which go much further than the proposed sections of H.R. 2516 in barring discrimination in the sale or rental of housing.

No matter how much we talk about property rights, we cannot deny the fact that freedom and democracy can make no distinction with respect to providing equal treatment to all citizens. This must be the principle which guides our action this afternoon and I urge my colleagues to support and accept the Senate passed version of the civil rights bill.

The civil disorders of the past week must be met with firmness and with a speedy restoration of law and order but with understanding and with a new commitment to provide a better life for every American.

No one condones the actions of those who participated in the burning, looting and sniping which occurred throughout the Nation. However, we must not use this illegal action on the part of a minority of irresponsible persons as an excuse for turning our back on our fellow Americans who have not had equal opportunity to live as other Americans live—to work as other Americans work—to improve their educational, social and economic status as other Americans have had.

Now is the time for the Congress and for the Nation to undertake a new commitment—a commitment to mobilize our resources at every level to meet the challenge of the ghetto. The United States has kept other commitments and has mobilized its resources to meet other challenges—this challenge too calls for mobilization of men of good will in and out of government. The challenge must be met.

Whether or not the Vietnam war is brought to a conclusion through successful peace negotiations, and we pray that our efforts will succeed, we must provide the resources and fortify our will to meet our commitments at home.

Let the Congress take the first step—a very small step indeed—by passing the civil rights bill and thus call upon all our citizens to support a new commitment starting immediately, to guarantee to every American the opportunity to achieve a better life for himself and for his family.

The events of this past week are now facts of history. Let us take the steps which will write additional pages of history to record that this week also marked the beginning of a new era in America—an era in which our Nation, united in purpose and resolve, began the battle to free the captives of our own ghettos, by helping them to free themselves.

Now is the time for this new commitment and I urge my colleagues to join in announcing the determination of Congress to keep that commitment.

I support the Civil Rights Act of 1968 as another answer to the cry for justice for our 20 million Negro citizens. I support this legislation because I believe it is right—I believe it is in the best tradition of our democracy to do so—and I urge my colleagues to join in support of House Resolution 1100.

Mr. SIKES. Mr. Speaker, a few days

ago the House had before it a bill which had been amended by the Senate to strengthen America's fiscal stature. It combines a tax raise with budget cuts and other features to offer as much as the Congress can hope to achieve in this field during the entire session, and more than the Congress was able to achieve, despite a yearlong effort, in the last session. That bill was sent to conference. There was no fight to have it approved in toto. I find it difficult to comprehend the difference in the significance of that measure and the one now before us. Surely the administration and the leadership should be as concerned with protecting the savings and the earnings and the financial security of 200 million people and the recovery of the dollar worldwide as they are with H.R. 2516 which rewards 20 million people and is punitive to 180 million.

Why is it that this measure cannot be considered under normal, sound legislative processes? Why is it necessary that the Congress surrender to pressure and the threat of violence? The fact that mobs burned and looted their way across a dozen of the Nation's cities is no reason for this great deliberative body to haul down its flag. There is no requirement that we, too, accept mob rule.

Why cannot the Congress face up to the truth about what is going on? The ugly display in the past week which we have seen is wanton destructiveness—not a search for a better life. The Federal Government has done more for its people than has been done for the citizens of any other land under heaven. Now we have seen these great efforts and these huge expenditures rewarded by burning and stealing and mob violence. And if it had not been stopped here by force, the mob would have moved from the Capital City of the United States and very probably its Capitol building. This is the spirit the Congress is asked to approve and encourage and reward today.

I saw nothing last week to indicate the rioters were carrying on the work of Martin Luther King or venerating the principles credited to him. They were out to loot and destroy, and they were not stopped by appeals to reason by their President or their leaders. It took 12,000 troops in addition to a harassed Capitol Police force to stop the destruction. It is a stern application of force and not appeals—not promises of more money on top of huge amounts already poured out—that is respected. I hope that important lesson is not lost on the administration, and I hope it will not be wasted on the Congress today.

This is a time for men to show courage, a time for men to see this Nation's peril and who will seek to save our land—not help to destroy it by gutting its constitutional processes. Passage of this bill in the irresponsible way which is sought there is legislation by hysteria. I plead with you. Send this bill to conference. Let reasonable men attempt to bring us a sounder measure. There is a tomorrow—there is no requirement that this bill be passed today.

All of the people have a right to be heard and a right to justice in the halls of Congress. Before we enact new laws,

let us determine who they are to benefit. Are they for all the people, or just for targets of the troublemakers? Would Stokely Carmichael be required to observe the laws which are now proposed? Apparently he is above the laws other Americans must observe. He has preached riot and insurrection throughout the world. He violated curfew in Washington last week and no one dared touch him. He is in violation of the antiriot section of the District's new crime bill. This, I am told, the Department of Justice is "considering," and that is the Department's way of saying they are looking the other way and hoping the problem will disappear.

This legislation for the few will help to bring a revolution in November much more far-reaching than the protest movements which influence the House today. Again I plead with you. Do not be driven to legislative chaos. Give the Congress time to know what it is doing. Give the conferees a chance to bring us and the Nation a better bill.

Mr. KORNEGAY. Mr. Speaker, the pulse of the Nation's body politic has quickened in recent days. The atmosphere is tense throughout the land.

We are here today being asked to legislate while troops in full battle gear, carrying rifles, guard this Chamber and the Capitol Building. Federal troops are augmented by police officers, also heavily armed. There is fear and apprehension that the Capitol may be attacked.

We are all supercharged with emotion, and fear and hysteria is rampant throughout the Nation.

This, I contend, is not the proper climate in which to legislate on any issue let alone one that is as highly controversial and that arouses emotions as does the one under consideration. The issue before us, I submit, is one that serves to further divide the Nation as well as those of us in this Chamber.

Sound reason is being abandoned in the call for hasty action on a legislative proposal that has not been considered by any legislative committee of this body. We are pressed into urgency by those who would have us adopt, almost sight unseen, a bill which contains provisions adopted by the other body.

This is not a time for ill-considered action on a measure of the magnitude of the civil rights bill. It is more a time for reasoned debate and searching judgment in an atmosphere of calm.

I urge that this body exercise restraint and reasoned judgment in this perilous time.

Until inflamed passions subside, we should not be forced into voting on this highly controversial and far-reaching measure. With this in mind, I will vote to send the bill to conference where it will be given at least some consideration by the Representatives of the House before being called up for final vote.

Mr. ERLENBORN. Mr. Speaker, how many times have you been appalled by stories telling how a citizen was beaten, even as fellow citizens watched and none gave a helping hand?

How many times have you wondered how Americans can idly watch a fellow citizen suffer, never lifting a finger to help, never even sending for help, and sometimes even feigning ignorance of the need?

Certainly all Members of the House have shared my bewilderment at the callous indifference of men to the needs of other men.

These, too, have been the emotions of some Americans concerning another subject, open housing—the right of any American to enjoy the fruit of his labor, the opportunity to buy a house in any community, anywhere in these United States. And it has been the Congress that has been ineffective and unresponsive to the needs of these Americans. Congress has been seemingly indifferent while some communities, communities like Wheaton and Joliet in my district, have responded and have adopted local open housing ordinances, laws whose effect ends at the municipal boundary.

Two years ago, the House approved an open housing bill, and it died in the other body. This year the other body has approved an open housing bill, and there are some here who would like this bill to die.

Mr. Speaker, the bill before us, H.R. 2516, is not wholly to my liking. On open housing, I prefer the provisions which the House of Representatives passed in 1966 and for which I voted willingly.

When the present bill was returned by the other body, carrying, as it does, its load of amendments, the majority leadership sent it to the Rules Committee with a request that it come to the floor promptly, and that it not be sent to conference.

I resented the argument that the House of Representatives must accept the other body's version; and I resented hearing the President criticize this House because the measure has been held by the Rules Committee for 3 weeks. The implication has been that the House of Representatives ought to do as it is told, without stopping to ask questions.

I have been thinking this over, however. I have listened to the people in my district. I have discussed the issue with a number of my colleagues; and my attitude has changed.

Right here, let me set the sequence of events straight. The senseless and brutal killing of Dr. Martin Luther King was not a consideration in my decision. He was murdered on the evening of April 4. I had made up my mind prior to that time, and I found that a number of my fellow Republicans had come to a similar point of view.

We met—20 of us—on Wednesday, April 3, and again on Thursday morning, the 4th; and we framed a letter to our colleagues. The letter was reproduced that afternoon in order to be ready for distribution Friday, the 5th.

We had decided that the bill's faults are minor in relation to its importance; and had decided that our resentments are of less consequence, in the long run, than the enunciation of the rights of our fellow men.

In buying a house, this bill says that a man's bankroll and his credit rating—not the color of his skin—will be major factors in his choice. Some of my constituents argue that this would deprive them of the right to sell to a person of their choosing. I find no such right enunciated in our Constitution or our laws, but I must concede it is a right which is implied in the ownership of property.

In a free society, however, all of us have many rights; and one man's rights do occasionally collide with another's. When that occurs, the one right must yield and the other right must take precedence. It is a function of government to decide which right shall prevail.

In a real estate transaction, it seems to me that the seller's principal interest is financial—that he gets the best market price. The buyer's interest, however, is human. Will this property give his family an opportunity to grow? Are there good schools nearby? Is it convenient to work?

If the seller has a right to the best price the market will allow him, and the buyer has a right to purchase the best house he can afford, then it seems to me that everybody's real interests are taken care of.

Let me make another point about the nature of real property. A century ago, when we were a rural Nation, there were few restrictions on it. As we have become more an urban Nation, however, we have found it necessary to place many limitations on the owners of property—setbacks, for example, and the height of buildings, and the number and kind of buildings. A few years ago, it was seriously argued that zoning laws were an unconstitutional infringement on the rights of property ownership.

If one owned a lot, these people said, he could build a house on it, or a blacksmith shop, or a factory. But that opinion has few proponents today.

It seems to me that these restrictions on the ways a man may use his property are a much greater invasion of his rights than a law which says he must sell to whoever will pay his price.

I do not anticipate that passage of this bill will be a cure-all. It seems unlikely that either the fears of its foes or the hopes of its proponents will be realized. I remember the scare stories which circulated when Congress was considering the public accommodations law; but all that really happened was that Lester Maddox closed his restaurant and ran for Governor of Georgia.

The experience of the several States and the communities in my district which have open housing laws persuades me that any changes resulting from this law will be gradual. I have not seen any abrupt changes in housing patterns in any of these States and communities.

I believe we should pass this bill because of the needs of the decent, hardworking, clean-living Negro families. They are the vast majority of colored people. This law will afford better housing to a few of them, and will give reassurances to others—reassurances that a great Nation's concern, and reassurances that they and their children can have a better life, one worth striving for.

I have nothing but scorn for the rioters and thieves and arsonists who have scarred so many of our cities in recent days; but I have great admiration for the Negroes who have resisted the impulse to violence, who have resisted the temptation to steal and to burn, and who

056649

have stayed calm in the face of great provocation.

Passage of this bill will not end the strife. I wish it were so. But passage of this bill is a step forward. It puts America one step closer to the promise of the republic that all men are equal and have equal rights to the pursuit of happiness. Let us take that step for all Americans, in all communities, in all States.

Mr. BROYHILL of Virginia. Mr. Speaker, the legislation this House has under consideration today is either right or wrong, good law or bad law. There should be no other consideration in passing or defeating it.

I reject that it is morally necessary that we pass it. I reject the plea that we must pass it as a memorial to the late Martin Luther King, however one may view his life and efforts.

If we are obliged to act in memory of Dr. King, then I submit that the next time a policeman or fireman, or an innocent citizen, is slain in a riot caused by agitators, this House is obligated to pass legislation, as another memorial to the dead, making it mandatory that all police, National Guardsmen and militiamen shoot to kill each and every looter or rioter henceforth.

I propose nothing of the sort, Mr. Speaker. But I do point out that what is justice in life or death for one, if America means what I think it means, is justice in life and death for any other citizen of this land.

To reduce this legislation to its simplest form and to reduce the pressures forcing its passage to the simplest common denominator, what we are talking about is compulsion. Compulsion lathered in a moral issue, which I assert, Mr. Speaker, is more hypocracy than morality.

Anyone who wishes to sell his home or his property on the free market to the buyer of his choice may do so at this moment, Mr. Speaker.

When and if he does, he takes his stand as a free citizen, willing to risk in selling, just as he risked in buying, taking his chances with the mores and customs of his city, State, and Nation—taking his chances with the changing balance of those customs as neighborhoods flourish or decline.

The pressure for us to pass this legislation has accumulated under the rallying cry of "open housing." It is not open, or fair, or moral housing—it is integrated housing, pure and simple, precisely as I labeled it in my annual district poll, a questionnaire which prompted a return of 24.5 percent and an overwhelming rejection of forced integration.

If you indict my district residents for their views, Mr. Speaker, then you are indicting the mainstream of America, for my district contains citizens proud of one of the highest educational levels in the Nation and one of the highest per capita incomes in the Nation.

These obviously are not ignorant people. Nor are they southern bigots, the frequent whipping dogs of civil rights legislation. They are from the heartlands and the mountains of America, just as you and me, who happen to live in a Southern border State.

No, Mr. Speaker, I laid it on the line and I will do so now.

If morality is involved in this legislation, where were the moralists during the past 11 years of civil rights legislation—from the day of the famous Supreme Court decision of 1954?

If morality is involved, where were the advocates during the past 100 years, for that matter?

If morality is involved, why not substitute the Ten Commandments and the Golden Rule for the Congress of the United States, the Constitution of the United States, and the many governments large and small which guide us?

The answer is obvious. People are involved, not morality. People of different races, different ethnic backgrounds, different educational levels, different economic status—people as diverse and as radically different as the trees which grow on our streets or the fish that swim in our seas.

People with different likes, dislikes, prejudices, hates, loves, and yearnings. And neither legislation nor religion will alter them an iota except by the slow seasoning of humanity as it carries them and this Nation to its ultimate destiny.

We had a great experiment with the Volstead Act. We can have another with federally legislated integrated housing, by whatever label we disguise it, or however finely we parse the verbiage to disguise it.

For instance, Mr. Speaker, why half integrated housing, partial integrated housing, class integrated housing? Why not all the way integrated housing?

Why should owner-occupied, multi-family housing be excluded and a non-owner-occupied multi-family building be included? Why should one group be permitted to arbitrarily discriminate when another cannot?

Why should an owner of a single home be permitted to discriminate as an individual but not if he uses the services of a professional expert in the field in order to sell his home?

I raise the question, too, Mr. Speaker, of who runs America? The majority of our citizens, or the minority? Or the minority within the minority which shouts the loudest, threatens the most, riots the best, shoots the straightest, and burns the most briskly?

This is the question before us. Do not forget it, whatever action is taken here today. If it is the wrong one we will all suffer, but mostly the minority will suffer. And the minority within the minority will be granted a license to burn, to loot, to destroy, and to murder, because this minority within the minority is never going to be satisfied, whatever we do.

I urge, Mr. Speaker, that neither this Congress nor the American people ever reach the point where the blackjack replaces the mace, the chicken the valiant and soaring eagle, the mouldering fear of retaliation at the polls the courage we need to display now more than ever before in our times.

Mr. BRAY. Mr. Speaker, before the U.S. Congress or any legislative body can hope to honestly carry out its duty in considering the measures before it, these same measures must be placed into their proper perspective.

It is not the role of a lawmaking body to legislate under threats; it is not the responsibility of this Congress, of this House of Representatives, to succumb to the passions, fears, and sorrows of the moment and rush approval of a bill that in other times, under other circumstances not clouded by a rifle shot in the night, would receive the careful and section-by-section scrutiny all bills must have.

We are all, each of us, less because of the senseless and brutal murder of Martin Luther King last week. But were we not also less—was not all humanity also deprived—when a girl was murdered in New York City a few years ago, while over 30 persons looked on and did not heed her screams for help? Are we not also diminished by the death in Chicago, during the recent riots, of the 10-month-old infant burned to death in his crib as his parents home was destroyed by the fires set by rioters? How about the teenage soldier or marine who, less than 18 months ago, was a star forward for his high school basketball team and now, today, returns to his hometown from Vietnam in a flag-draped casket?

The great English poet and clergyman John Donne put it so eloquently, 300 years ago:

No man is an Island, entire of itself; every man is a piece of the Continent, a part of the maine; if a Clod be washed away by the Sea, Europe is the less, as well as if a Promontory were, as well as if a Manor of thy friends or of thine own were; any man's death diminishes me, because I am involved in Mankind; And therefore never send to know for whom the bell tolls; it tolls for thee.

Every Member of the House of Representatives has felt in some measure the towering wave of pressure now brought upon us for immediate and speedy approval of the civil rights bill, H.R. 2516, in the form as it was passed by the Senate. What is in this bill? Do we really know?

The House last year passed a civil rights bill—a good bill—that was as strong as could be desired by some, and not as strong as desired by others. The Senate last year did not act. Now, after months of debate, at almost the last moment, the Senate has almost totally rewritten the House bill, leaving very little of what the House originally passed.

There is a cloudy and vague section on firearms control, difficult to understand and written by the Senate in language that is open to various interpretations.

A major section of the bill, dealing with American Indians—something else added in the Senate—takes away certain rights and privileges that the Indians have enjoyed for over a century. The question has been raised, too, as to whether or not this entire section even belongs in the bill or is one that should have been considered in this context.

The Senate has also added a provision to the bill to the effect that if a homeowner acts through an agent in selling his house—and how many homeowners are knowledgeable enough about the real estate markets, values, and laws to dare attempt to handle the sale without an agent—the homeowner may not sell to whom he pleases. If the owner is questioned on the sale, although he may be

innocent, he faces the possibility of having the Federal Government bring its immense legal resources to bear against him and he may even have to bear the expenses of his own defense actions. This could be as damaging to the Negro as to the white homeowner.

The appropriate committee of the House of Representatives has had no chance to study or write a report on this bill for submission to the other Members of the House. The only explanation of the differences—the only information given to me to aid me in my consideration of this measure—has been a memo from the minority staff of the Committee on the Judiciary. This same memo, 23 pages long on legal size paper, raises questions on practically every page.

There is, as matters now stand, without referral of this bill to the appropriate committee, or to a conference committee, no chance whatsoever that the feelings and will of the House may become a part of this legislation. We must consider it today under the "gag rule" with but 1 hour's debate and no amendments permitted.

The arguments for passage of this bill—now, as it is presented to us, in its Senate version, all objections notwithstanding—have come to me by phone call and personal contact, by letter and telegram, and I am certain all of my colleagues are familiar with them.

First, it is said, passage of the bill will not only calm down present violence in our cities, but it will also serve to head off violence that is sure to come if we do not pass the bill. The second argument says the bill must be passed as a memorial to one man because it is something he and the people he led wanted to see delivered. Note, there is nothing in either argument about the legislative merits or provisions of the bill itself, about its far-reaching implications, or the changes made in the Senate from the House version. We are presented, by these arguments, with a brandnew rationale for legislative action; because our cities are in flames, and because a man has been foully and brutally murdered.

The fallacy of the first argument is obvious. To pass the bill because of riots—past, present, and future—is nothing less than legislative blackmail. It means making law not on the merits of the bill itself, not out of hope of something better, but out of fear of something worse.

This fear is well-taken when we consider some of the highly inflammatory statements made since Dr. King was murdered. A story in the Chicago Tribune of April 8, 1968, noted that Rev. Ralph Abernathy, identified in the story as the new leader of the Southern Christian Leadership Conference, and Dr. King's successor, called for congressional action "fully, promptly, and unconditionally." Reverend Abernathy called the present violence "a thundering demand for racial justice and economic security."

Warming to his topic, he continued:

Our prescription for ending the current violence and to avoid future violence is for the Congress to enact legislation at once that guarantees a job to all and for those unable to work a guaranteed annual income to insure a decent life.

Speaking of the planned poor people's march on Washington, Reverend Abernathy said:

If the Congress recognizes that the assassination of Dr. King has created a crisis, and will enact these measures, the healing of the Nations' wounds can begin immediately.

Only the most naive and blind would think for a moment that passage of this bill would assuage this man, or Stokely Carmichael, or H. Rap Brown, or others like them.

Not even the administration in its wildest proposals to the Congress has made a request or suggestion for a guaranteed job, a guaranteed income. The idea that the Government of the United States can be "forced" into a weird conglomeration of actions that no one can accurately catalog, predict their effects even if they were enacted or decreed, or place a price tag upon, betrays an appalling ignorance of not only the democratic process but also of the facts of mid-20th century life.

All of these things are demanded "now!" It would take a dictatorship to put them on the statute books, it would take a magician to make them work. There is absolutely nothing in the structure of our Government—executive, legislative, or judicial—that could do this and it is the cruelest of delusions to even infer it is within the realm of possibility in the time element allowed.

We cannot and must not legislate other than carefully, soundly, and wisely. We make laws not only for the needs of the moment, but for the hopes of the future. We pass bills not for those who threaten cities with chaos if we do not, but for those who really understand what the constitutional guarantee of the right of peaceful petition and assembly mean. We legislate not alone for those cruelly and brutally slain, but for those who still live. We write laws not alone for those in the slum and the ghetto, the uneducated, the untrained, the jobless, those without hope. We also write laws for those who do share in the productive part of American life, and who have attained a level of relative affluence in our society. We do not put laws on the books that bear solely on the rights of one group, but must consider the implications of the laws that might infringe on the rights all of us should enjoy.

Let us look, now, at the second argument that says the bill must be passed as a living memorial to a man who wanted it.

There is not a single piece of legislation that comes before the U.S. Congress that can, in the final and most searching analysis, be wholly right and acceptable for every citizen of our country. There is no such thing as a 100-percent noncontroversial bill. The most minor and innocuous measure that passes the Congress and feels the presidential pen has somehow, somewhere, in some way, adversely affected the beliefs or prejudices of another American. Irrational though these beliefs and prejudices may be, the individual may still hold them as long as they are not a threat to the stability of our society. If we ever forget this, then we have turned our backs forever on that which sets our country above all others.

The three branches of Government can do things only up to a certain point. As I have stated, the Congress is not composed of magicians; the courts can adjudicate only so far and cure just so many ills by decrees from the bench; the executive is limited as to what may be done by fiat.

There are no delimiting marks for us, there are no boundaries to tell us, "Thus far and no farther." There is no one rule good for all bills, all court decisions, all orders. Each and every situation has its own individual merits.

Much, probably most, of the blame does lie with the Federal Government, and some of our most prominent public and private citizens and officials. They have allowed development of a cult that rendered nervous, half-smiling, self-conscious, tacit approval to the theory that determination of the "rightness" of a law was something that now lay within each individual. You may, the theory went, not only determine which laws you should obey, but, even more ominous, you were also given a great deal of latitude in determining how you should break them if they did not like them.

There are many avenues open to redress and correct social ills and wrongs that afflict our country. We are not perfect, we make no pretense of being. But a bad law or a bad social order may be changed without shredding the law itself and, worse yet, what should be an inherent respect for it. There are many ways to remedial legislation that will alleviate age-old ills that may be taken without tearing down the structure of law and order and the stability of society that mankind has so carefully built up over the centuries. You may secure redress of grievances and wrongs without compounding these same grievances and wrongs. But your own efforts to correct them must not be far worse than that which you set out to correct. You sweep a dirty floor—you do not burn the house down.

But those in elected or appointed authority, or those who in one way or another are acknowledged, known, and recognized as national spokesmen of one sort or another, gave this no heed. It is a sad commentary on our age to say it became almost fashionable to be able to say you had been jailed for breaking a law.

The method, to be sure, is much more glamorous than the process of change through legal means. In the short run, it was probably quicker. But in the long run, it is most certainly bloodier and more destructive, and shot through with the poisonous seeds of the ultimate destruction of a society and its laws.

Is passage of a measure surrounded with such things a fitting memorial to any man? Is passage of a measure under threat of violence a thing of which any legislative body could be proud? Are we to legislate with one ear cocked for the cries of a mob, with our eyes constantly looking over our shoulders in nervous anticipation of more carnage and destruction? I think not; we are derelict in our duty if we do such things.

I have cast my vote in favor of the Civil Rights Acts of 1956, 1957, 1960, and 1964, and for the civil rights legislation

the House passed in 1967. I voted for the Voting Rights Act of 1966. I have supported fair-employment legislation. I voted for the Civil Rights Commission when first originated, and I voted for its extension in 1967.

I did oppose the 1966 Civil Rights Act—which died in the Senate—because I felt its housing provisions, written in an attempt to secure rights for some, could only eventually lead to a massive infringement on the rights of all homeowners, white and Negro alike. I oppose this bill for these and the other reasons given. I will vote for the opportunity to send this bill to a conference committee or to the House Judiciary Committee, so a good bill can be worked out. I feel I would be violating my oath of office and the wishes of the people who sent me to the House of Representatives if I acted otherwise.

Mr. ASHBROOK. Mr. Speaker, I rise in opposition to H.R. 2516, the bill which is being taken up in this atmosphere of haste and tension. There are many reasons for opposing this legislation, not the least of which is the Reichstag-type rubberstamp process which is being evidenced here today. I oppose the bill for procedural reasons and I also oppose sections of the bill in principle. Thus, my vote will be nay.

I have received a great deal of correspondence on this proposal. It has been my opportunity to discuss it with many constituents. As a representative of the people, I am certain that the open housing provision is not supported by most of my constituents.

Many of those who have written in support of this measure have felt that it should be passed as a tribute to or because of the untimely death of Rev. Martin Luther King. I cannot agree with this contention. While I regret as much as anyone else the criminal act which struck him down I cannot make out of the man's death something that he was not in life. His advocacy of civil disobedience and lawlessness was a hindrance, not a blessing, to this country and its quest for racial peace. On the very eve of his death he had announced he would again violate the law on the next day. The U.S. Supreme Court had already in a previous case upheld his jail sentence for violation of court orders and, in its decision, stated:

This Court cannot hold that the petitioners were constitutionally free to ignore all the procedures of the law and carry their battle to the streets. One may sympathize with the petitioners' impatient commitment to their cause. But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.

Lawlessness is violence—not nonviolence—to America. Thus I could not be emotionally swayed by this traumatic experience even though I deplore the lawlessness which struck him down just as vehemently as I deplored the lawlessness that he advocated and practiced.

As a Congressman who reads his mail very closely, I was struck by another common denominator. A great number of those who wrote favoring open housing—largely those of the academic community and the clergy—are the same people who have been writing urging the Congress to not abdicate its responsibilities by allowing the President to go on what they felt to be his irresponsible way in the Vietnam war. They are now those who urge that we do just that in the so-called civil rights bill. Many of these same people were now urging that we summarily adopt the Senate amendments without crossing "t" or dotting an "i" or making one change.

I take some pride in being a legislator. Emotionalism has its place but not in the Halls of Congress. Here reason should prevail. I voted for the civil rights bill which was sent to the Senate last August. It contained six and one-half pages. The bill returned to us has 50 pages and many provisions that even the proponents admit to be wrong but under the urgencies of the moment they now indicate we should swallow the whole package and not do our legislative duty. This I could not do nor will I ever do as long as I am privileged to represent the 17th District of Ohio.

Procedurally, therefore, it is my judgment that the bill should go to conference where the weight of reason can produce something which is worthy of support. To abandon the time-tested procedures of this legislative body is to do violence to our system. We should not rubberstamp the Senate any more than the Executive, and to adopt parliamentary expediency under the exigency of the moment is to travel down a dangerous road. The road to Vietnam was paved with the same expedients and failures to do our duty. Even the Tonkin resolution received more time and attention than we are afforded under this restrictive rule. Few people who write and ask me to support this measure would in conscience advocate that only 1 hour be allowed to deliberate this matter on the floor and, even worse, no amendment, repeat no amendment, be allowed.

LEGISLATIVE DEFECTS OF H.R. 2516

I fully realize that it is a mistake to discuss the merits or lack of merits of the legislation when the majority is willing to act regardless, but I want to point out some of these defects. We pass too much bad legislation here and H.R. 2516 will be added to the undistinguished efforts of this body if it is not changed.

First, H.R. 2516 provided in the House version that a person who was protected from "interference with federally protected activities" had to be acting "lawfully." Section 245(a) of title I of the Senate bill provides this protection whether acting lawfully or not by striking the word "lawfully." Now consider the plight of the police officer who is required to protect civil rights workers who are committing unlawful acts. It is not clear whether or not he can even arrest a civil rights worker who is acting unlawfully as this might be interfering with him. More important, however, is the capitulation this represents to the lawless element in our society. We need stricter, not weaker, enforcement of the law. This Senate amendment cannot be justified under any stretch of the imagination.

Second, the necessary criminal element of racial motivation or intent to discriminate "because of race, color, or national origin" was included in the House bill but removed in the Senate bill which we are now asked to rubberstamp. Proof of racial motivation is not regarded in cases involving voting, U.S. services or facilities, U.S. employment, U.S. jury service, or U.S financial programs or activity under section 245 of title I. Now if you do not think that will be an opening wedge for bureaucratic encroachment you have not followed Mr. Weaver as closely as I have.

Third, the Senate bill added the antiriot bill to H.R. 2516 as chapter 102 of title I. I supported this bill when it passed the House as it was identical to my own bill. Guess what the Senate did? It created a privileged class by eliminating organized labor activities from the antiriot section. This particular effort was also made in the House but was voted down decisively. Now we are asked to yield in this vital area where we have already worked our will.

Fourth, titles II and VII on Indian rights comprise 11 pages as added on the Senate floor. This has not been the subject of meaningful House hearings and is opposed by many Indians themselves who fear it might abrogate treaty rights. It is also opposed by the U.S. Department of the Interior which has jurisdiction over Indian affairs.

These are but a few important defects which should not be swept under the rug in this mad rush for passage. However, the most important section, so-called open housing or forced housing, depending on your point of view, presents yet another valid reason to reject this bill under these arbitrary procedures.

OPEN HOUSING OR CLOSED HOUSING

Mr. Speaker, in principle I oppose the section which is termed "open housing." It is hard to conceive of many constitutional rights which remain if we move the Federal Government into transactions which concern the owner's residence property. I have listened to the arguments on both sides. Somehow, the liberal always find the same answer to every problem—take away free choice of our people. I cannot subscribe to the theory that this section is either constitutionally proper or necessary.

First of all, there are many advocates of open housing. I have never seen any statistics that indicate that the only people who are selling homes are those who might want to sell on their own terms to persons of their own choosing. It should be patently clear that there are just as many people selling homes who profess belief in open occupancy as those who might not. What is wrong with letting those who want to sell their homes to anyone do so and those who might not want to do so, have the same privilege? I suppose this sounds like a radical suggestion but it is clear to me that most people who want to purchase a home and have the money can do so.

To take away from those who might want to discriminate their right to do so makes no more sense than to take away from all Negroes the right to free speech because a Stokely Carmichael or Rap Brown uses this freedom of speech to advocate violence and anarchy. I suggest that freedom of property is as basic as

any freedom as I will later develop in these remarks. No, it does not make sense and this is one more way of eroding basic freedoms.

The argument that we have some State open occupancy laws so why not have Federal laws is a specious one. States do not have the vast machinery for harassment and intimidation that the omnipotent Federal Government has. Secretary Weaver has already made it clear that he would use such a law as a club.

No matter what valid reason a person has for refusing to sell to a Negro he would be subject to harassment. Say you know that the man who wants to buy your house is one of the rioters and looters and you do not care to sell to him. You would be hard pressed to get by with this valid criterion even though you applied the same standard to white and Negro alike.

I well recall that the 1964 civil rights bill specifically had a legislative history in Congress which indicated that the fair employment section was not to have a quota system. The education section was not to include bureaucratic definitions of de facto segregation. We now see both of these implemented by the bureaucratic officials despite explicit congressional intent. We must legislate with this background and not on pious hopes. Contractors in Ohio and through the Nation have found, for example, that it is not sufficient to comply with the letter of the law and not discriminate in employment. Even though they may never have discriminated they are now forced to go out and hire Negroes if they do not have a sufficient quota. This is the way these laws become enforced and I will not add one more losely drafted bill to be implemented by Mr. Weaver if my vote makes the difference.

These are but a few of the many valid reasons that I could not in good conscience capitulate to this legislative blackmail. The whole concept of freedom and private property are at stake here and I freely cast my vote on the side of freedom. Those who say that so-called human rights transcend property rights are hard pressed to tell us what human rights are without property rights. Communism proudly proclaims that it has human rights and not property rights and we find that this pretty generally means alms from the government which also tells you what you can and cannot do. A detailed look at the whole concept of property rights is in order.

PROPERTY RIGHTS IN AMERICA

In 1964, I predicted that open housing would be the next step of the Federal Government. In a detailed speech, I outlined the process by which private property rights were being eroded and predicted:

Let us honestly look at the next logical step. If this "public interest" or "utility" approach is adopted here, as I fear it will be, it is only a matter of time until the same concept will be developed regarding the private use and enjoyment of your own home. It will be said that you can use it yourself but when you want to sell it, you are divesting yourself of control over it and placing it in a free and open market. At this point, anyone can buy it and you have no right

to pick and choose. What is more fundamental than your right to sell your property to whomever you want, whenever you want, and on the terms you choose? When we reach this point we will have little more than the old common law tenancy by sufferance. It will also be suggested seriously—that the next logical step to achieve this thing called civil rights will be a Federal law which makes it a Federal offense to move out of an integrated neighborhood. How else can we achieve integration it will be said.

The supreme right is still the right of the individual, Government tyranny has been the traditional enemy of the individual and that is why constitutional protections are so important and Reichstag type rubberstamping is so dangerous. As the late Justice George Sutherland said:

Freedom is not a mere intellectual abstraction; and it is not merely a word to adorn an oration upon occasions of patriotic rejoicing. It is an intensely practical reality, capable of concrete enjoyment in a multitude of ways day by day.

Our great Americans have echoed the same plea. Take just a few statements to recognize the importance of constitutional limitations on big government:

Thomas Jefferson: "In questions of power then let no more be heard of confidence in man, but bind him down from mischief by the chains of the Constitution."

Thomas Hobbes: "Freedom is political power divided into small fragments."

James Madison: "The accumulation of all powers legislative, executive, and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny."

Woodrow Wilson: "Liberty has never come from the government. Liberty has always come from the subjects of it. The history of liberty is a history of the limitation of governmental power, not the increase of it. When we resist therefore the concentration of power, we are resisting the processes of death, because concentration of power is what always precedes the destruction of human liberties."

John Locke: "Freedom of men under government is to have a standing rule to live by, common to every one of that society, and made by the legislative power vested in it; a liberty to follow my own will in all things, when the rule prescribes not, and not to be subject to the inconstant, uncertain, unknown arbitrary, will of another man."

John Adams: "Property must be secured, or liberty cannot exist."

I suppose it is fair to say that few people seem to care about these principles any more. I for one do and will as long as I live. It is difficult to be proud of this body today. We have taken one more giant stride down the path of irresponsibility.

Mr. GILBERT. Mr. Speaker, I support the omnibus civil rights bill before us today and I implore my fellow Congressmen to support it, too. I make this request not out of respect to the late Dr. Martin Luther King, Jr., much as I respect that great departed leader. I do not maintain that legislation should be passed for reasons of sentiment. But the death of Martin Luther King brings into sharp relief how vitally important the passage of this legislation is. Martin Luther King lived and died to convey the message to the American people—white and black alike—that racial justice could

be achieved in this country by nonviolent means. We in Congress have it in our power to serve the cause of justice. I implore you to vote for this legislation, to prove the truth of the contention that we can create a just society in a peaceful fashion.

I support wholeheartedly the provision for open housing, Mr. Speaker. We can no longer sanction a system that excludes Americans from decent homes of their choice because of their color. Such a system violates our values—our values of liberty and individual dignity and even our belief in a free marketplace. Passage of this provision will infringe no one's rights, nor will it cost anyone but the exploiters a penny of their earnings. It will, however, contribute to social harmony in this Nation and, in so doing, will preserve what is important to all of us.

But the bill goes farther to become a balanced package. If, on the one hand, we approve a provision to create a more just society, on the other we enact provisions discouraging irresponsible attempts to disrupt the society we are seeking to ennoble. I speak of the antiriot provisions, which in no way impede the rights of orderly protest but do prevent troublemakers from traveling about stirring up death and disorder. For those who fear that this provision is directed only against Negroes, let me remind you that we have had a history of white troublemakers, too. Do not forget the disturbers of peace in Little Rock and Clinton, Tenn., and elsewhere. This, in my view, is a fair provision, Mr. Speaker, and one which liberals should not hesitate to support.

I remind you also that this bill, for the first time, extends Federal protection to those seeking to exercise their civil rights. This provision has been badly needed. By itself it would make this bill a landmark. But it is not by itself. This omnibus legislation is in every one of its provisions an important asset to the rule of just law in our country. I announce also my approval of the provision to guarantee the rights of American Indians. I strongly urge my colleagues to give their support to the measure before us.

Mr. MORTON. Mr. Speaker, during the 6 years I have served in the Congress, I have actively opposed discrimination and segregation wherever it has appeared. I have supported all meaningful civil rights legislation designed to provide equal opportunity, as well as eradicate discrimination among our people. But today, when the so-called civil rights bill of 1968 was brought before the House of Representatives with no opportunity for discussion or debate, and with no previous deliberation and recommendations from the appropriate committees of the House, in good conscience it is impossible for me to support it.

In the first place, the atmosphere surrounding the Capitol, when Federal troops were still on guard following riots and civil disturbance, provided a poor climate indeed to consider this legislation.

Objectively, and based on careful analysis, at best the bill is a hodgepodge and is almost unenforceable. It is an at-

Case 1:13-cv-00966-RJL     Document 153-3     Filed 05/30/23     Page 62 of 111

tempt to satisfy disturbed elements of our society with wild promises; but, like so many programs of the day, it offers little hope of delivering the goods.

The provisions dealing with gun control are incomplete, and inconsistent with gun legislation under consideration by appropriate committees in both Houses.

The titles dealing with the rights of Indians were not even discussed with Members of the House who are knowledgeable in this area. Many Indians themselves have raised objections and are concerned.

The title on open housing is confusing, and creates a double standard—one for the individual homeowner and another for the real estate broker. It will not, in my opinion, solve the housing problems faced by minority groups or lead to a better understanding among our people.

This bill may be considered a psychological attempt to placate a small militant element of our society. We see in this action a Congress influenced by a new lobby—violence and civil disobedience. This was a shabby tribute, indeed, to a great champion of human rights, who gave his life for his cause less than a week ago. Let us hope and pray that in this action a pattern is not being established for the formulation of law in this great country.

No amount of legislation will create equality among men. The opportunity for equality is inherent in democracy. When it fails to become a reality, it is not because there is a lack of law to support it. Those elements in the evolution of our society which have brought about a degree of inequality among men are not subject to legislation. They can be eliminated only through the development and perfection of the human being himself.

Let us increase the opportunity for individual rights by directing ourselves and our communities toward the development of vocational training, toward improvement of education across the board. Let us seek the ways and means to increase manyfold the opportunities for improved housing and homeownership. Here Government, in cooperation with private enterprise, can lead the way and provide the tools with which an energetic society will build for itself a structure in which equality is inherent.

Mr. DERWINSKI. Mr. Speaker, I believe the fundamental issue facing us is whether or not the House should depart from established legislative procedure and pass H.R. 2516 this afternoon with Members restricted from offering amendments or even discussing the details of the bill.

There is no doubt in my mind that if this bill is sent to a House-Senate conference, helpful technical adjustments and language clarifications would be produced and a civil rights law in a much better form would be approved by Congress within a month.

In my opinion, House passage of this bill at this time will be interpreted by many individuals as a capitulation to pressure. The precedent that this interpretation will create will then arise again

and again to interfere with sound legislative procedures.

In the past I have voted for the section of this bill which prohibits travel or use of any facility in interstate or foreign commerce with an intent to incite a riot or other violent disturbance; the section to make it a crime for anyone, by force or threat of force, to injure, intimidate, or interfere with any person because he is or has been participating in specified federally protected civil rights activities; and, the 1966 civil rights bill which contained an open housing provision. Like all Americans, I wish to see the plight of our Indians alleviated and do not have fundamental objections to the sections of the bill dealing with them.

By immediate passage of this complex bill the Congress fails to take into account the numerous State and local housing acts which have or are now being processed. There is legitimate doubt as to whether this bill, as drawn, can be properly implemented dealing as it does with a very basic question of property rights. The many examples of successful racial housing adjustments show that local cooperation and understanding, and not force, produces the desired results within a community.

However, this "package" is such a distortion of legislative procedure and the precedent I refer to is so obvious that I do not believe that this legislation should be passed under the present circumstances at this time.

Mr. BRINKLEY. Mr. Speaker, in the landmark decision of *Shelley* v. *Kraemer*, 334 U.S. 1 (1948), the U.S. Supreme Court established the criteria that racially restrictive covenants on land are not enforceable if there is a willing buyer and a willing seller. The question then became one of exercising the right established. The issue before the House today on H.R. 2516 is whether this principle will be abandoned, thereby jeopardizing the basic common law concept of property rights. The decision should emphatically be in the negative.

Mr. RIEGLE. Mr. Speaker, the senseless murder of Dr. Martin Luther King has shocked and saddened all Americans. The loss of this young man—only 39 years old—is a national loss that this Nation can ill-afford.

Let justice move swiftly and with a sure hand to find and bring to justice his killer.

But let justice also move with new urgency and conviction to advance the goals that Dr. King represented—the goal of an America where each and every citizen is accorded human dignity, equal justice, and equal opportunity. For the American dream says one thing above all other things—and that is human dignity, that a man is to be judged on his character, not his color, his race, or any other factor.

Dr. King fought for this national goal—this realization of the American dream—with man's greatest weapon. That weapon was the strength of his conviction—the quiet strength and determination nourished and sustained by the knowledge that he was right. That the truth was on his side—and the truth would ultimately make all men free.

So he rejected violence—he confronted

it with reason, with unyielding faith, with granite determination. And he was right. He was victorious in life, and he continues victorious in death for death cannot destroy an idea. What is right cannot be murdered—cannot be long suppressed—it will always reassert itself and it will ultimately prevail over any adversity. Those who stand in its way will ultimately be swept aside.

But to those who understand, there passes a responsibility. And that is to take on a share of Dr. King's work—to take back our share of this universal struggle that he has carried for us. To understand in the hour of his death what we may never have realized while he lived—that he was fighting for us, not against us. He worked to carry our share of the load as well as his own. His patience and effort gave us time and with his death we must pick up that portion of the work which is and always has been ours to do.

The America of our ideals is ours to build, and working together "we shall overcome." We will overcome—or be overcome. We will either fulfill our destiny or always stand in the shadow of its unfilled promise.

To young Negro Americans who return from Vietnam having lost arms and legs, but never their dignity, let us be honored to drink together from the cup of full citizenship, full respect, full and equal partnership in America. And let us offer that same cup to their brothers and sisters, to all our neighbors, to each and every person across our land.

That was Dr. King's dream. That is my dream. That is America's dream. Let us now act to realize it before it is too late.

Mr. HALPERN. Mr. Speaker, we have before us legislation of great significance—a bill to provide all citizens of this Nation with rights fundamental to human dignity.

It is unfortunate that this bill comes up at a time of national stress and emotion. On the surface it might appear that Congress is reacting rather than acting. And that should not be a factor in our deliberations today. The basic principle of this legislation should not be measured by the legislative time table. If anything, it is late—not in terms of days or weeks, but in terms of years and decades.

This measure, H.R. 2516, is long overdue. It will go a long way toward protecting the Federal rights of Negroes and the first amendment rights of civil rights workers from violent interference. It will take a requisite step toward establishing by Federal law the right of every person to equal opportunity in the housing market regardless of that person's race or color—a right already given by some States and localities, especially by my own city of New York and the State of New York, both of which have broader laws than contained in H.R. 2516.

The U.S. Government has guaranteed the Negro many essential rights of citizenship—the right to vote under the 15th amendment, for example; the right to attend a nonsegregated school under the 14th amendment; the right to service in places of public accommodation by title II of the 1964 Civil Rights Act; the right not to be discriminated against in federally assisted programs by title VI; the

*April 10, 1968*  CONGRESSIONAL RECORD — HOUSE  9589

right to equal employment opportunity by title VII, and other rights.

Violent reaction against the exercise of equal rights in recent years has been shocking. Even more shocking in too many cases has been the failure of State and local authorities to prosecute racists guilty of murder, of beating, and of intimidation.

The Federal Government must back up the rights which it guarantees by criminal laws providing adequate penalties for forcible interference with Federal rights. H.R. 2516 establishes graduated penalties up to life imprisonment for civil rights crimes. And it applies to any individual perpetrator, not only to public officials or to individuals acting in conspiracy.

Mr. Speaker, the Negro will understandably feel himself rejected by American society until he is free to live where he wishes in this country and where he can afford to live. Negroes must certainly feel excluded from American society when racial discrimination closes them into the ghetto areas of cities in overcrowded and deteriorated housing. Moreover, we will never achieve desegregation of public schools—we will never bring it about that Negro pupils and white pupils go to school together—until we make it possible for Negroes to obtain housing outside the ghetto areas of our cities. We must enact Federal fair housing legislation so that Negro children will not be deprived of equal opportunity in education.

Yet I would caution against a beclouding of the issue. This bill is not just an open housing bill, nor is it solely an act to benefit Negroes. What we have before us is a commendable extension beyond the bill originally passed by the House during the first session of this 90th Congress.

While some of the added provisions have no direct connection as such with civil rights legislation, they are nonetheless sorely needed. And while indirectly related, they are welcome additions to an act designed to protect human rights under our Constitution and to provide the legal tools for their realization.

There is an important section dealing with the rights of America's almost forgotten—but very first—citizens: the American Indians.

There are antiriot provisions that impose severe penalties on those who turn to violence and lawlessness to achieve their ends.

There is a section combatting the unlawful use of firearms in civil disturbances.

Let me clearly emphasize that this bill is not a response to the recklessness of those who would try to hold the Nation hostage for the passage of civil rights legislation. This bill contains provisions valuable enough to enable it to stand on its own, and be passed on its merits, and that is how Congress should consider it.

As a member of the party of Abraham Lincoln, I am proud of the legacy of equality, equal justice, and human dignity he left. I would urge my Republican colleagues to fulfill the Lincoln tradition by registering a resounding vote for this bill and all it represents.

Mr. HAGAN. Mr. Speaker, like the

vast majority of decent Americans of all races, I abhor murder or any lawless means of attempting to settle differences.

In good conscience, I cannot—and will not—be stampeded into voting for this civil rights bill, which I believe infringes upon the constitutional rights of all citizens.

It is shameful that Congress must endure such pressure. It is shameful that fear can dominate commonsense. It is shameful that the criminal acts in our Nation are clouding legislative process.

It is time for all citizens to do some serious soul searching and take stock of themselves.

Therefore, I urge that this measure be tabled until the turmoil in our land is resolved and Congress can act under logical and peaceful circumstances.

Mr. RYAN. Mr. Speaker, it is impossible to consider the resolution before us without having one's mind turn to the murder of Martin Luther King, Jr. His death has provoked a wave of shock and disbelief; it has touched the depths of the national conscience as his life's work never fully did. His martyrdom must not fade into the history books, or his dream for America—and ours—will also fade away. This tragic event must spark a recognition by white America that the full equality for which he lived and died must be achieved.

It is the heavy responsibility of the Congress to formulate the legal framework within which there will finally be full legal equality and equal economic opportunity.

We cannot say that the legislation before us would have spared the Reverend Dr. King. Nor can we assume that its passage will stem the tide of violence that has occurred in the aftermath of his death. It is only the first step in what must be a vast national effort of racial reconciliation. But without this legislation—both for the guarantees it provides and as a declaration that white America cares—no reconciliation can be possible.

In 1967 this House passed a bill—H.R. 2516—to guarantee the free exercise of civil rights. In 1966 the House passed fair housing legislation which was blocked in the Senate. The Senate has now passed H.R. 2516 with provisions similar to those in the bill which the House passed last August—namely, to establish adequate Federal penalties for the forcible interference with the exercise of civil rights.

After 2 months of debate from January 15 to March 11 of this year, the Senate amended H.R. 2516 to prohibit racial discrimination in the sale or rental of most housing. Fair housing legislation is essential if the urban crisis is to be resolved.

Although I have strong reservations about section 104, which I expressed when the so-called antiriot measure was before the House last year, I recognize the realities of the parliamentary situation which require the approval of the Senate amendment today. If the bill were sent to conference, there is no way to predict when or in what form it would emerge.

Today, in our cities American citizens are armed against each other. Whether

it be the legal armament of the national guardsman or the illegal rifle of the sniper, one is no less fearful for America.

The assassination of Martin Luther King, Jr., has given us a tragic reminder of the urgency for Federal protection of the exercise of civil rights. The reaction that followed likewise reminds us that black and white America remain two separate societies. A national fair housing act will signify the willingness of Americans to live together as a community. It is required unless the explosive concentration of Negroes in urban ghettoes is to continue.

The hour is late. If Congress delays, it may be writing the death warrant of racial reconciliation.

Let me comment upon H.R. 2516 as it passed the Senate.

Title I would make it a Federal crime to interfere with federally protected activities. Passage of such a statute is long overdue. For years intimidation, violence, beatings, and murder have been the means used to counteract the civil rights movement which has opened the way for Negroes to participate in the political process in the South, as well as to have equal access under the law to public accommodations and education and employment opportunities.

The Reverend Dr. Martin Luther King gave his life as other civil rights martyrs before him for this cause. This list of martyrs is long and honored and should convince the House of the necessity of Federal legislation to guarantee the free exercise of civil rights.

Let our grief for the death of Martin Luther King not blind our eyes to other civil rights murders.

No man has ever been convicted in a State court for murdering Medgar Evers, the Mississippi chairman of the National Association for the Advancement of Colored People, who was shot from an ambush in Jackson, Miss., almost 5 years ago.

No man has ever been convicted in a State court for murdering James Chaney, Andrew Goodman, and Michael Schwerner, the three courageous civil rights workers who were killed in Neshoba County, Miss., in June of 1964.

No man has ever been convicted in a State court for the murder of James Reeb, a Boston clergyman and civil rights advocate, who died in the hospital after being attacked in Selma, Ala., in March of 1965.

No man has ever been convicted in a State court for the murder of Mrs. Viola Liuzzo, Detroit mother and housewife and civil rights worker who was shot on the highway between Selma and Montgomery, Ala., only a few days after James Reeb died, at the time of the voting rights march.

No one has ever been convicted in a State court for the murder of Jonathan Daniels, a divinity student and civil rights worker, who was shot to death in Hayneville, Ala., in September 1965.

These are only some of the murders that have been committed in order to deny equal rights to black Americans. Time does not permit even a partial recitation of the beatings and acts of intimidation that have been reported in recent years.

Protection of persons and property is primarily the responsibility of State and local governments. However, we are dealing with rights guaranteed by the U.S. Constitution and by Federal law, and we are dealing with the failure of State and local governments in many instances to protect these rights from violent interference.

Attacks upon American citizens to deprive them of Federal rights is an attack upon Congress itself, which has made the obligations corresponding to these rights the law of the land.

And it is intolerable that the U.S. Government should establish certain civil rights and yet lack sufficient authority to protect those rights from violent interference.

The existing statutory authority under which the Justice Department can prosecute for civil rights crimes—sections 241 and 242 of the Federal Criminal Code, title 18—is inadequate. It is inadequate for at least three reasons. First, while its effect is to authorize prosecution of local authorities who commit violence while misusing the power of their office—under color of law—it remains in question whether the Justice Department can seek convictions of private individuals who violate rights secured by the 14th amendment and who do so without the cooperation of public officials. And in any case, section 241 applies only to two or more persons acting in concert or in a conspiracy. Thomas Coleman, of Hayneville, Ala., admitted killing Jonathan Daniels and pleaded self-defense. Coleman was acquitted by a Lowndes County jury. The Federal Government could not seek an indictment because Coleman was not acting under color of law and because he acted alone and not in a conspiracy with others.

Existing Federal law is inadequate also because sections 241 and 242 do not enumerate the specific rights to be protected. This vagueness makes prosecution more difficult, and at the same time it means that men of violence are not given clearcut warning of the Federal rights which they cannot violate with impunity.

A third serious defect in present law is that the penalties are inadequate to deter violence. Maximum penalties under section 241 are a $5,000 fine and 10 years in prison.

Last October, seven men—one of them the deputy sheriff of Neshoba County, Miss., and another one of them an imperial wizard of the White Knights of the Ku Klux Klan—were convicted in a Federal court under section 241 of conspiracy to violate the civil rights of James Chaney, Andrew Goodman, and Michael Schwerner. These seven had violated their civil rights by means of murdering them. The seven killers were sentenced a few weeks later. Two of them got the maximum—10 years in prison; two of them got 6 years; and three of them got 3 years.

Three men—William Eaton, Eugene Thomas, and Collie Wilkins—were convicted of conspiracy in a Federal court in December 1965, in the shooting of Viola Liuzzo. Each of these three received the maximum sentence—10 years.

Both the House and Senate versions of H.R. 2516 make up for the defects in the present law.

Both versions apply the penalties of the law to anyone, whether or not acting under color of law and whether acting alone or in concert with others.

Both versions spell out the specific rights to be protected.

Both versions provide graduated penalties adequate to deter violence, with a maximum sentence of life imprisonment if death results.

The Senate version of this legislation differs from the House version in that the former distinguishes between kinds of rights. Most of the rights enumerated in subparagraphs (1) (A) through (1) (E) of the Senate version are rights binding on the U.S. Government itself. Such is the right to equal opportunity in the Federal service, for example, or the right to serve on Federal juries. Here the obligation to treat citizens in an equal manner falls upon the Federal Government directly, and the Federal Government has unlimited authority to prohibit interference on the part of private individuals whether or not such interference is racially motivated.

The rights enumerated in subparagraphs (2) (A) through (2) (F) of the Senate version are rights binding on someone other than the Federal Government. The right to attend a public school is to be recognized by the States, as is the right to serve on State juries. The Federal Government has the obligation under the equal protection clause of the 14th amendment to protect persons from being deprived of these rights because of racial discrimination. Included in this second category of rights is the right to service in privately owned places of public accommodation without racial discrimination. This right was established by title II of the 1964 Civil Rights Act. Also included is the right to equal opportunity in private employment without racial discrimination. This right was established by title VII of the 1964 Civil Rights Act. Hence, the Senate version protects the second category of rights against interference when such interference is racially motivated.

Mr. Speaker, I should like to make two observations about this distinction between rights in the Senate version. First, the distinction should not weaken the protection of rights provided in the House version of the bill. Second, there must be no question but that the rights enumerated in the second category—those which are to be protected only against racially motivated interference—are definitely Federal rights. They are rights which are guaranteed by the Federal Constitution or by Federal statute and they are to be safeguarded by the Federal Government against violation. We have already delayed too long in enacting the measures necessary to safeguard these Federal rights.

The Senate version has a provision—subparagraph (5)—similar to the provision in the House version prohibiting forcible interference with the exercise of the first amendment rights of speech and assembly on the part of civil rights advocates. Civil rights activities like those of James Chaney, Andrew Goodman, and Michael Schwerner, of James Reeb and Viola Liuzzo and Jonathan Daniels would be protected by this provision.

Section 104 of the Senate version is a cause for concern, and I regret that it will not be presented for a separate vote.

First of all, it is unnecessary. In chapter 3 of its report, the National Advisory Commission on Civil Disorders stated:

On the basis of all the information collected the Commission concludes that the urban disorders of the summer of 1967 were not caused by, nor were they the consequence of, any organized plan or "conspiracy." Specifically, the Commission has found no evidence that all or any of the disorders or the incidents that led to them were planned or directed by any organization or group, international, national or local.

Second. Protection of persons and property against local disorder is primarily the responsibility of State and local government. Except in extraordinary circumstances, it is not the responsibility of the Federal Government. Every one of the States has an antiriot law, and every State that has been disturbed by riots has demonstrated its determination to restore order and to prosecute those responsible, and the Federal Government has given its cooperation.

Third. It threatens the first amendment right of free speech. Although the bill attempts to distinguish between instigating to riot and advocating ideas, nevertheless, the kind of speech for which one may be prosecuted remains uncertain. Moreover, such speech must be judged in the light of what happens—or what could have happened—afterward. I am afraid it will have the consequence of discouraging free speech, and this at a period of social change which must be guided by means of the freest and most open discussion.

The American Civil Liberties Union, in its criticism of the antiriot bill, H.R. 421, which the House passed last summer, pointed out two ways in which such legislation violates the due process clause of the fifth amendment. First of all, under either H.R. 421, or section 104 of the Senate version of H.R. 2516, a man may be prosecuted for traveling interstate or for using the facilities of interstate commerce with a certain intent if he thereafter commits an overt act apparently to carry out his intent. The ACLU said:

Such a provision violates a basic requirement of criminal law that the intent and the criminal act must be contemporaneous.

Mr. Speaker, I would like to turn now to the fair housing law which the Senate has added as title VIII to H.R. 2516.

In chapter 4 of its report, the National Advisory Commission on Civil Disorders said that the factors behind the riots are "complex and interacting." But the Commission went on to say this:

Despite these complexities, certain fundamental matters are clear. Of these, the most fundamental is the racial attitude and behavior of white Americans toward black Americans. Race prejudice has shaped our history decisively in the past; it now threatens to do so again. White racism is essentially responsible for the explosive mixture which

has been accumulating in our cities since the end of World War II.

Open housing is essential if the urban ghetto—and the despair which pervades it—are to be overcome.

National fair housing legislation should signify the willingness of white Americans to welcome black Americans as members of the community. This bill means more than the opportunity for Negroes to acquire decent housing. It should mean a fundamental change in attitude which must underlie and support everything else we do to achieve the aim of an integrated society.

The Federal Government declared its commitment to the goal of fair housing when President Kennedy signed Executive Order No. 11063, "Equal Opportunity in Housing," on November 20, 1962. But this order covers only federally owned, federally financed, or federally insured housing. We need legislation covering all housing. Moreover, we need fair housing legislation which is enacted by Congress—by the representatives of the people—as an expression of a national moral consensus. Passage of this legislation by Congress should have significant meaning. The genuine integration of communities could weave black and white Americans into the fabric of one society.

The increasing concentration of Negroes in the inner cities and the movement of white people into the suburbs bear serious consequences with respect to schools and jobs.

This de facto separation of races between city and suburb perpetuates de facto segregation of schools. The educational consequences of such segregation are grave. In its 1966 report entitled "Equality of Educational Opportunity," the Office of Education verified the fact of school segregation, and reported that at the sixth-grade level the average Negro student is more than a year behind the average white student in verbal attainment, and that at the 12th-grade level the average white student has attained the 12th-grade level of education, or close to it, while the average Negro student is below the ninth-grade level. Ghetto schools are inferior schools, and de facto segregation in schools will hardly be eliminated until housing segregation is eliminated.

Exclusion of Negroes from the housing market has the effect also of denying Negroes equal job opportunities. A recent study of five cities by the National Committee Against Discrimination in Housing reveals that industry is relocating from cities to suburbs and taking job opportunities out to the suburbs along with it—Washington Star, March 10, 1968, page A13. To take one city as an example: The Chicago Association of Commerce and Industry reported in 1966 that during that year 61 corporations relocated outside the city limits and that 34 other corporations established new branches outside the city—Washington Post, September 5, 1967, page A4. So we should not be surprised to learn from a recent study of 20 cities by the Bureau of Labor Statistics that something like one-third of nonwhite young people in these urban areas are unemployed—

Washington Star, February 27, 1968, page A1. To shut Negroes into the inner city is to shut too many of them off from jobs. And laws and programs to achieve equal opportunity will be frustrated until there is open housing.

Both title IV of H.R. 14765, the fair housing law which the House passed on August 9, 1966, and title VIII of the Senate version of H.R. 2516 regulate persons in the housing business. The two bills define persons in the housing business in somewhat different ways. H.R. 14765 defined persons in the housing business as those who are involved in three or more sale, rental, or lease transactions in a year. H.R. 2516 defines persons in the housing business primarily in terms of ownership—a private individual owner is one who does not own more than three single-family houses at a time.

H.R. 2516 is a more effective bill than H.R. 14765 inasmuch as the present legislation grants no exemption to real estate brokers. Under the 1966 bill, real estate brokers would have been exempted from the prohibitions against racial discrimination if they acted on the instructions of private homeowners who wished to sell or rent only to white persons. Under the present legislation, if a private homeowner wants to put his house on the public market for sale or lease through the services of a broker, he must be prepared to do business in a nondiscriminatory manner because the broker who lists his property must do so.

The two bills are alike in forbidding discrimination by institutions in the business of financing real estate transactions, and in prohibiting "block busting" by persons in the real estate business.

I regret that the present bill does not grant to the Secretary of the Department of Housing and Urban Development authority to issue cease-and-desist orders to put a stop to discriminatory treatment by persons in the real estate business. H.R. 14765 gave such authority to the Fair Housing Board which that bill would have established. The experience of State fair employment practices commissions, for example, reveals that those who practice discrimination are usually more willing to seek resolution of complaints through negotiation if the commission has authority to issue orders enforceable through the courts.

I think that we will find that real estate brokers and those who finance real estate transactions will generally comply with the requirements of this fair housing legislation in much the same way as restaurant owners and hotel managers and others in the business of providing public accommodations complied with title II of the 1964 Civil Rights Act. I think that we will find that persons in the real estate business will welcome this legislation because it will make it possible for them to treat everyone with fairness and personal respect without fear of being put out of business by competitors who discriminate.

Both bills establish the same graduated Federal penalties for interference by force or intimidation with the exercise of the right to equal opportunity in housing. H.R. 14765 included this right

among the several rights protected by title V, which dealt with interference. H.R. 2516 provides penalties for intimidation in fair housing cases in title IX. And both bills likewise grant protection to civil rights advocates who exercise the first amendment rights of speech and assembly to support the right to equal treatment in the housing market.

H.R. 2516, as amended by the Senate, has some shortcomings, which I have tried to point out. It will not in and of itself bring racial peace and racial justice to America. But without it, it is difficult to conceive of either.

So, for the sake of equality for all, and for the sake of America, let us act.

Mr. CURTIS. Mr. Speaker, when Goneril and Regan have spoken, what is Cordelia to say?

There is no question that our Negro citizens are seriously disadvantaged in obtaining adequate housing. There is also an important correlation between housing and obtaining and holding jobs with the combined movement of people out of rural areas and the disintegration of the high-rise city. Our Negro citizen is caught up in this great economic upheaval which is further aggravated by a marked shift of job creation away from manufacturing and production into distribution and servicing of which education, health, and recreation are increasing factors. These matters require the deepest study and probably more wisdom than we as a society collectively possess after we have done our fullest work to provide better equity and opportunity for all of our citizens.

Congress in the past few years has had a flurry of activity in passing one law after another with fine labels and great intentions but with little study and debate. The net result has been great promises and little results, with an overall serious resultant that many Negroes believe the promises were insincere in the first place.

I do not believe the promising has been insincere. I believe the trouble lies in Congress, the executive branch of the Government and others failing to do their homework before they have acted. Dogmas have been promoted to combat theories. This irrational approach has been excused on the ground that the current situation is an emergency.

With a limited lifespan it is quite easy for human beings and any particular generation to look upon the problems of its times as emergencies. In many respects they are emergencies. However, I think the better course of action to meet both emergencies and long-range problems is to take the time to do the necessary studying before taking action. Haste does make waste. Pushing the panic button makes matters worse, not better.

I have been digging out my old speeches opposing public housing. In these speeches I said I thought that public housing as it was conceived would produce high-rise slums and would not provide cheap adequate housing for our lower income groups. I also suggested that other social ills could possibly result from taking this approach to the housing problem. Instead of answering these ar-

guments those who were promoting public housing attacked the motives, by saying anyone who opposed public housing was opposed to having our people obtain cheap adequate housing. It was alleged that the opponents to public housing were calloused to or ignorant of the problems of housing for our lower income groups. This debate goes back to 1951. How much time, human suffering and money we could have saved by taking the time to examine into these theories and the theories of the advocates of public housing to protect our minds to better solutions.

Today we are being asked to bypass the orderly legislative process, the study and deliberative process, because of an emergency situation in integrated housing. Is it any more an emergency in 1968 than it was in 1951? The word is abroad that by passing a new law we are going to correct or more markedly toward correcting the problems in housing for the Negro citizen. And anyone who dares speak up against either the proposed law—inadequately studied as it has been—or the sad procedures being followed to bring about prompt enactment of the proposal is racially motivated, is lacking in concern for the problems in housing or is under the influence of the "real estate lobby."

Rioting, looting, and disobedience are given as reasons for acting hastily. The tragic death of Martin Luther King is given as a compelling emotion for acting in haste.

The legislative situation is this. The Senate has placed many amendments on a limited civil rights bill passed by the House last year. One of these amendments relates to open housing. There is a lengthy amendment dealing with the American Indian which the House of Representatives has never had a chance to study through its committee process or through the process of floor debate. There is a poorly drafted amendment which relates to interstate traffic in guns unstudied by either Senate or House committees. There are provisions which seek to establish new crimes relating to civil rights demonstrations. Criminal laws should be carefully drafted, studied and debated before final passage and even when this orderly procedure has been followed we frequently find we have permitted serious errors to occur.

The issue before the House today is whether it will suspend its orderly procedures for considering and enacting legislation. The open housing provision needs considerable more study and discussion to perfect; however, I have stated publicly that I would support an open housing provision even if imperfectly drafted in order to dispel some of the damage that otherwise would be caused by the overpromising which has been made in behalf of this provision. There is not much that can be done to correct the imbalances and problems that exist in housing for the Negro citizens through this kind of legislation.

Its failure of passage could be used as a whipping boy to explain why problems in housing have not been alleviated. By its passage it will be necessary to explain why the housing problem of the Negro has not been alleviated and at least we can then continue searching for effective solutions.

However, we do not have an opportunity to vote for the open housing provision without accepting the provisions relating to Indians, gun trafficking and new crimes in civil rights demonstrations. By sending the matter to conference we could gain this opportunity.

The only argument against sending the matter to conference is that the Senate conferees might delay the matter unfairly. We have had assurances that this would not be done, but if it is attempted the House still retains the remedy of calling the bill back from conference and proceeding as it is here proposed we do.

In the long run civil rights are set back, not advanced, by undermining the orderly procedures for study, deliberation and debate. The ends do not justify the means; expediency damages the cause of equity and justice.

Mr. SCHWENGEL. Mr. Speaker, today we are again dealing with human rights. We call it the civil rights bill, but it is more a human rights bill because it deals with personal liberty, the philosophy of equality under law and opportunity that concerns individual people who do not have the liberties, rights, and opportunities that other people in our society have. We are dealing also with moral principles and with a problem that has too long been a problem for people because their skin is of different color. Because this is basically a moral question we should give priority to its consideration. Also, Mr. Speaker, we need to be realistic and the reality of the situation tells me clearly that unless we act favorably on this bill, this provision of this bill can be indefinitely postponed.

In answer to those who say this is not the same bill and that there are provisions that we have never written and parts that are poorly written I say, no doubt this is true, but there is nothing to prevent us from acting with another bill to correct this shortcoming and eliminating that criticism.

For those who say we are responding to riots, to the actions of extremists, to the looting and burning, I should like to say, I am responding to the nonviolent philosophy of the large majority of population of the Negro community. Mr. Speaker, today I will vote to accept the Senate-passed civil rights bill mainly because it includes a fair housing provision. This is my position for several reasons.

First and foremost, I believe in fair housing. I believe a vast majority of Americans believe that everyone in this country, regardless of his race, color, or creed should be able to live in the neighborhood he can afford and should be able to purchase the home or rent the apartment of his choice.

Many States and municipalities have already passed fair housing legislation or ordinances. I am proud that Iowa has already passed a fair housing law. Its coverage is far broader than legislation under consideration here today. It prohibits anyone from selling his home whether through a broker or not on a discriminatory basis. The city of Davenport, my hometown, has passed a fair housing ordinance modeled after the Iowa law.

The fair housing provisions of the Senate-passed bill make clear that State law takes precedent when it is substantially equivalent to the Federal law. Therefore, the Iowa law is in no jeopardy. It is broader and more inclusive than the Federal legislation. It is illegal today under Iowa law to discriminate in the sale and rental of housing. So as far as Iowans are concerned the legislation before us today will make no difference to realtors, or anyone else selling or renting housing.

Frankly, I first questioned the advisability of accepting the Senate bill. There is no doubt that it could be improved. But after studying it in depth, after having my staff and the Legislative Reference Service of the Library of Congress do the same, I have come to the conclusion that despite its defects it is workable and is worthy of support.

I want to make clear that my vote today is not based on anything else than the reasons I have outlined. My decision on this bill was reached last week before the awful tragedy in Memphis. There will be those who will characterize the passage of this bill as a memorial to Dr. Martin Luther King, Jr. That would be a disservice. This legislation deserves support because it is right, because it is needed.

A more fitting memorial to Dr. King would be never having to use this legislation or any other to insure equal rights. A more fitting memorial would be for all people, all races to erase all vestiges of prejudice and discrimination—for true brotherhood to come peacefully, and without violence. That is a task to which all of us must dedicate ourselves.

Mr. Speaker, to close, I must pay tribute to the leadership of this House and especially the leadership of the Judiciary Committee on both sides of the aisle. Already great and deserved tribute has been spoken of and given to the chairman, EMANUEL CELLER. Little can I add to what has been already said in this regard except to say "Amen", but I must add, too, because I believe it needs further consideration, the magnificent record of the minority leadership, Mr. WILLIAM M. McCULLOCH.

In checking the history of Congress and the contributions made to civil rights, it has been the leadership in the Judiciary Committee that made the difference. All of this began in 1865, On the recommendation of Lincoln the 13th amendment and, after his assassination, on the recommendation of the leadership of Congress—the 14th and 15th amendments were passed. The leadership of Chairman James F. Wilson, First Congressional District of Iowa, the same district I have the honor of representing in this House was influential. Like that early pioneer, I believe in and fought for every bit of civil rights legislation coming to the House floor, but I know without leadership, its enabling legislation is not always the result.

Mr. Speaker, we are fortunate in having as a minority leader of the Judiciary Committee, WILLIAM M. McCULLOCH of Ohio, who not only is a great lawyer

with a perceptive mind, but a man with forthright, deep understanding and devotion to law and order and with a keen appreciation of both the importance of law and importance of well-written law. I am sure that in every move made by the committee on both sides, the judgments and counsel of WILLIAM McCULLOCH has been sought and given. He has also been and I am sure will remain an effective legislator. I honor him, I thank him, and I am sure that all Members of the House, whether or not they agree on this question or not, that we have in Congressman WILLIAM McCULLOCH one of the greatest legislators of all time. We in the Congress owe him much and the people, especially those who have not always had their rights under law owe him much more.

Often marble monuments are built to our great men and books are written about them but the most important monument as stated so well by Sandburg when he spoke of Lincoln "are built in the hearts and minds of Americans who are the beneficiaries of human rights legislation and from this legislation we will again learn as we have so often in history that whenever you give rights, opportunities and advantages to people that are not enjoyed by all the people, not only do the disadvantaged people benefit, but the Nation benefits and the great ideals that we espouse become even greater."

Mr. MATHIAS of Maryland. Mr. Speaker, this House is not a court of law to adjudge guilt and mete out punishment. Nor is the House a court of honor to make awards and lay wreaths.

We are the National Legislature. Our task is to discern truth and our aspiration is to guide the footsteps of a great nation. No pettifogging quibbles and no passing passions should divert us from our work or deflect us from our goal.

Today we must determine whether there is a need for legislation and whether H.R. 2516 meets the need. On the question of need I have been convinced for several years that something must be done on this subject, and this conviction was reinforced only an hour ago when I met with the following individuals:

Mr. Joseph Meyerhoff, Joseph Meyerhoff, Inc.—home sales.

Mr. Henry A. Knott, Henry A Knott, Inc.

Mrs. Isaac Hamburger, Isaac Hamburger & Sons.

Mr. Charles H. Buck, chairman of the board, the Title Guarantee Co.

Mr. John Lotz, Western Electric Co., Inc.

Mr. Harrison Garrett, chairman of the board, Robert Garrett & Sons.

Mr. William B. Guy, Jr., president, W. Burton Guy & Co.

Mr. Jerold C. Hoffberger, president, the National Brewing Co.

Mr. Guy T. O. Hollyday.

Mr. Albert D. Hutzler, Jr., president, Hutzler Bros. Co.

Mr. Donald V. Kane, partner, Arthur Andersen Co.

Mr. I. E. Killian, regional manager, Humble Oil & Refining Co.

Mr. Louis B. Kohn II, president, Hochschild, Kohn & Co.

Mr. Bernard Manekin, president, Manekin & Co.

Mr. James O'Neil, American Sugar Refining Co.

Mr. Henry G. Parks, Jr., president, Parks Sausage Co.

Mr. D. C. Lee, vice president, Westinghouse Corp.

Mr. Charles Lamb, partner, Rogers, Taliaferro, Kostritsky, Lamb.

Mr. James W. Rouse, president, the Rouse Co.

Mr. Walter Sondheim, Jr., first vice president and treasurer, Hochschild, Kohn & Co.,

Mr. G. Cheston Carey, Jr., president, Carey Machinery & Supply Co.

Mr. Douglas Buttmer, Weaver Bros., Inc.

Mr. Michael Quinn, Weaver Bros., Inc.

Mr. Gilbert Rosenthal, president, Baltimore Junior Association of Commerce.

Mr. Robert E. Dalger, chairman of the board, VanSant Dugdale & Co.

Mr. W. G. Smith, general manager, Bethlehem Steel Corp.

Mr. R. W. McAlpin, Armco Steel Corp.

Mr. William Boucher III, executive director, Greater Baltimore Committee.

Because of the sudden change in time, the following were unable to be present:

Mr. Alexander S. Cochran, partner, Cochran, Stephenson & Donkervoet.

Mr. Robert H. Levi, chairman of the executive committee, Mercantile-Safe Deposit & Trust Co.

Mr. John E. Motz, president, Mercantile-Safe Deposit & Trust Co.

Mr. Henry E. Niles, chairman of the board, Baltimore Life Insurance Co.

Mr. L. Mercer Smith, vice president, the C. & P. Telephone Co.

These Maryland community leaders made it abundantly clear that in their judgment, that conditions in Maryland and throughout the United States demand national legislation.

On the question of whether H.R. 2516 meets the need there may be less unanimity of opinion. I might not have used the same words and phrases in drafting the bill had the matter been in my sole charge, but the essence of the question is whether it will do what is necessary without unnecessary friction and controversy. No fundamental amendment of existing law is required, since the Congress settled the right of all citizens to own real estate in 1866, and the 13th amendment guarantees the legal equality of citizens. All that is required is a contemporary method of enforcement. Nothing new or innovative is included or contemplated. The language before us should suffice, and I support its immediate enactment.

Mr. DOWDY. Mr. Speaker, this bill is before us today, because of demands from mobs of rioting looters and arsonists, and as evidenced by executive messages and remarks made in this body, this House is being asked to enact it out of fear, and to appease these vicious mobs. They will not be appeased, and this is evidenced by the fact that the riots and destruction have become progressively worse following the enactment of laws in 1965 and 1966, which were also passed out of cowardly fear, to appease the mobs of those years. I cannot accept the argument that we should abridge the God-

given rights of millions of Americans, in a vain attempt to placate a group of criminals.

The majority of all Americans want to do right, and regardless of their color, are peaceful and law abiding. They want our laws enforced; they want law and order above all material things; they want rioting and looting prevented by whatever force may be necessary. The people are demanding this action. They condemn the orders of officials like the District of Columbia Director of Public Safety, Murphy, who, as the rioting and looting began in Washington the evening of April 4, ordered the municipal police not to arrest anyone engaged in looting and rioting. Such action denotes a man who is unworthy of official position of any kind. Officials of similar authority have made the same orders in other cities, during this period of riots, as they have done in prior years under the same circumstances. All of them should be peremptorily fired from their positions.

Here we have another great fear campaign, to coerce this House of Representatives to take a reprehensible, cowardly action, alien to America and all it stands for. Why cannot the Members recall the great fear campaign that brought confusion, looting, bloodshed, arson to France in July 1789, and resulted in the downfall of the government of that nation? America is confronted with a like situation today, nearly 200 years later.

Surely this body realizes the result to be expected, if it yields to threats, succumbs to blackmail, and surrenders to the mob. America cannot survive by either obeisance to the mob, or by such sacrificial offering to the rioters and looters.

I have toured the areas of destruction here in Washington—more than 60 blocks of wanton arson, destruction and looting; whole blocks of business buildings gutted and destroyed by fire—yet we have heard emotional pleas made here today, demanding that these mobs be rewarded.

Where are we headed? It may be the full intention to bring about the destruction of the United States of America and its Constitution, under which we have become the greatest nation on earth, with the highest standard of living God has ever favored any people. I hope not, but the way things are going, that might well be the end result.

The blame for the rioting, looting, arson, and destruction has been, again, here today, laid on the shoulders of the law-abiding citizen, rather than placed on the rioters, looters, arsonists and other criminals, and on those, like Murphy, whose duty it is to enforce the laws, maintain law and order, and protect law-abiding citizens in their lives and property.

Why do we have government among men? The only real purpose of government is to protect its citizens in their lives and property. Any government which cannot do this, or fails to do it, is not worthy of the name.

The looters and rioters are encouraged to believe they are exercising their rights by indulging in their criminal action. They are encouraged in their lawlessness by statements of Government officials,

Case 1:13-cv-00966-RJL  Document 153-3  Filed 05/30/23  Page 68 of 111

and by orations by voteseeking politicians both in and out of Government. They are encouraged by the pitiful Kerner Panel report on riots, recently made public. That report, instead of helping to solve the problem, encourages the rioters to believe they are entitled to all they claim they should have, and that the sentiment of our Nation's leadership is to give it to them regardless of the cost either in human lives or in billions of dollars. Those of us who prefer the freedoms given to us by a loving God are involved in a conflict with socialist revolutionaries leading the mobs who have resorted to terror and bloodshed, and we are today being asked to surrender to this threat by enacting this bill.

The rioters are further greatly encouraged in that they are agitated and led, right here in the Nation's Capital City, by men who are on the Government payroll, their salaries paid by tax money extracted from the American taxpayer. The people are tired of this; they are entitled to better protection by a Government for which they are paying so dearly. I agree with the people who are demanding law and order, and preservation of the peace in our cities and the countryside.

The people want to know why so few rioters and looters are arrested; and they also want to know why the courts of America free without trial or punishment 99 percent of those who are arrested. The mobs are encouraged in their licentiousness by this, in that they are confident, even if arrested, they will be freed without punishment, just as other criminals are freed by the Federal courts. So the mob participants have great encouragement in their lawlessness because of the existence of the U.S. Supreme Court, which leads the rioters, looters, and arsonists to believe they are only exercising their "rights." What else can be expected, so long as law enforcement officers are handcuffed and restricted in the performance of their duties by orders from on high, and promulgations of the U.S. Supreme Court?

When the District of Columbia Director of Public Safety Murphy was called before the House District of Columbia Committee a few weeks ago to be asked what plans he had to handle the planned riots, and what he planned to do to protect citizens and their property, he said he was prepared to handle it. And how did he handle it? He ordered the police to make no arrests. You saw it on television. The looters grabbed whatever they wanted, even took hand dollies, and hauled heavy merchandise out the front doors of businesshouses, waving at the television cameras, as police directed them to keep the traffic in stolen merchandise moving along. What are we coming to? You answer it. Lawlessness and chaos. We see our Capital City patrolled by military troops with road blocks at street intersections. Curfew has removed people from the streets. It has the appearance of an occupied, war-torn community, solid blocks of buildings destroyed as though bombed; debris of destroyed property littering the streets, and the House of Representatives is here asked to reward such action. Is it our intention to say to the American people that the U.S. Congress is no longer an illustrious body, but is a crawling, groveling body of cowards? Do we mean to say that the way to get a law enacted is to riot, loot, and burn until it is passed? That will be the result, if this bill receives favorable action today.

As evidenced by my statements already uttered, I am disturbed and greatly concerned about the conditions currently existing in the administration of this country's affairs. For Congress to enact this legislation would be a great tragedy for our country. To pass it following in the wake of the unparalleled violence and destruction of property and lives would be a signal to pressure groups of every ilk that Congress is now conducting legislative matters in response to mob violence and the fear of massive rioting and political pressure from such groups. The integrity of Congress must be preserved.

The only place the citizens of America can look for the preservation of our American system and the recognition of their rights as individuals is to Congress. It seems that many of our national leaders of both parties are so ambitious for block votes that they are willing to pour more gas on the fire to encourage those groups which are causing so much destruction and violence across our land.

Congress should never act out of fear and in response to threats. We should state in no uncertain terms that the first order of business is a cessation of violence and disregard of the laws of the land. Congressional investigating committees should call before them all officials responsible for law enforcement and demand of them that they seriously undertake their duty to preserve law and order, and remove those who are unable or unwilling to do so.

The people were shocked that it is necessary to place machineguns and troops in position to protect the White House and the Nation's Capitol, and that there was hesitation and uneasiness on the part of the executive branch of the Federal Government to protect the storeowners, property owners, shopkeepers, and the law-abiding majority in a forceful manner. Congress ought to make it clear that local law enforcement officers will be backed up by Congress, even if they are handicapped by other branches of the Federal Government and by those national politicians who refer to riot and insurrection as "freedom of assembly" and "freedom of speech." Riot and insurrection must be treated as riot and insurrection, and those guilty should be punished regardless of their political affiliation or how they vote. The people want to hear about "civil responsibility," and they are entitled to hear it. They will not hear it if this bill is enacted. It should be defeated.

Mr. BUCHANAN. Mr. Speaker, it is regrettable that issues of the magnitude of those involved in H.R. 2516 should be debated within the present context. Neither sentiment nor fear should becloud debate on such far-reaching legislation.

The only reason this House should approve any legislative proposal is on the basis of its merits. Such should be the case this day. Honest men may differ, but it is my firm conviction that H.R. 2516 cannot pass the test of the thorough and sober consideration which it should have, but has not received from this body, on its merits, and, hence, should not become law.

I regret the existence of hypocrisy or bigotry wherever these may exist in our country. I believe in equality of opportunity and in equal and exact justice under the law. It is my personal desire that every American be not only permitted but encouraged to grow to his full stature and to become whatever in the providence of God he can become. Nor should an American's freedom be limited by anything more than the honest rights of his fellow citizens.

We have witnessed, however, in recent days the most massive and the most violent abrogation of the property rights of Americans this Nation has ever known, in the riots and civil disturbances which have racked our Nation. That criminal and subversive minority which is responsible has acted against the civil, human, and moral rights of every citizen whose life or property has been endangered.

In a quieter, more subtle, yet very serious way this legislation may constitute an ever more massive attack upon the property rights of American citizens. In an honest attempt to secure the rights and protect the interests of a minority group, this House stands in grave danger of abrogating basic rights of the majority.

Two of the Ten Commandments: "Thou shalt not steal," and "Thou shalt not covet * * *" deal with property rights. They have been recognized as legal rights in every succeeding legal system, including our own.

Property rights are human rights and are civil rights of American citizens. They are basic enough to deserve protection from the lawless, and from ill-framed and hastily enacted legislation, as well.

Mr. Speaker, on behalf of the law-abiding, taxpaying, property-holding American citizens who constitute the overwhelming majority of this Republic, I urge the defeat of the previous question. They, too, have rights, which in my judgment are threatened here.

Mr. PEPPER. Mr. Speaker, I presented my views on civil rights and open housing on August 8, 1966, when H.R. 14765, the proposed Civil Rights Act of 1966, was before the House for consideration. What I said then are my views today upon H.R. 2516. Therefore, I repeat today in support of H.R. 2516, with only a change in the number of the title of the bill, what I said in 1966, because my sentiments upon this subject are the same as they were when I spoke to the House then.

The dark spot upon the glorious history of America is the tardiness with which we have removed onerous discriminations from many millions of our fellow citizens. Rather than lamenting the past, however, it behooves us to see how far we have come and to dedicate our efforts to speeding the day when every American shall enjoy that equality of right and pro-

056660

tection which Thomas Jefferson envisaged in the Declaration of Independence.

When Thomas Jefferson wrote into the Declaration of Independence the words "that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these rights are life, liberty and the pursuit of happiness," none knew better than Jefferson that those words did not describe conditions as they then existed in the American Colonies. Jefferson knew that all men's rights were not equally protected in the American colonies; Jefferson knew that what John Adams called the abominable institution of slavery existed in many of the Colonies and some of the Members of the Continental Congress owned slaves; and Jefferson knew that the path to the pursuit of happiness was not equally open to all Americans.

Jefferson knew also that these principles would not become the policies and practices of an America which should burst full grown, like Minerva from the brow of Jove, from the Declaration of Independence. But Jefferson believed that those words would become the principles of the America which was to be; the America which should emerge from ensuing generations of Americans through bloody struggles, unremitting toils and dedicated sacrifices. But those words of equality were not idle or meaningless words. On the contrary they embodied in Jefferson's own immortal eloquence the promise and the challenge of the American dream.

And those words in that Declaration, "that to secure these rights governments are instituted among men," did not mean that Jefferson intended that the government aborning from this Declaration should have for its duty and function only the protection of the rights of citizens which existed at the time that government was formed. On the contrary, he contemplated that it should be the duty and the high purpose of that government to obtain additional rights to secure for the citizen ever a more perfect enjoyment of those rights which as a human being, a child of God, and an American, he was entitled to inherit and enjoy.

And so it has been for almost two centuries that that government which arose from Jefferson's Declaration, always tardily, sometimes faltering, but never failing, has continually stricken down laws, practices, and policies of discrimination against any American and approached nearer and nearer to Jefferson's goal of equality of rights and the enjoyment of such rights by all Americans.

The tragedy has been in the slowness of pace, at least until late years, which has characterized this struggle. It was nearly a hundred years and after a bloody war before the bonds of slavery were stricken from Negro Americans. It was nearly 150 years before women were emancipated to the full status of citizenship. It was nearly 175 years before Negro children were accorded equality of access to the public schools.

But, beginning with the administration of Franklin D. Roosevelt, the drive of the American Government for equal

rights and equal opportunity for all Americans became more determined and the pace of progress toward this ancient aspiration rapidly accelerated. President Roosevelt set up a Fair Employment Practices Commission by Executive order to help win the war and to enable all men and women regardless of race, creed, or color to help gain the final victory.

President Truman sent to the Congress recommendations for the removal of many of the discriminations against our citizens on account of race, color, religion, or national origin. The fight for civil rights, for equal rights for all our people grew in momentum and in intensity in the Congress and throughout the country. America was awakening to the challenge and the necessity that every American be treated like an American.

The really exciting beginning of the dynamic program of the American Government and the American people to secure equality of rights for all Americans began with a decision of the U.S. Supreme Court in Brown against the Board of Education in 1954. Since 1954 the U.S. Supreme Court has decided in one way or another some 60 cases striking down discrimination against Americans on account of race, color, religion, or national origin in respect to voting, the enjoyment of public accommodations and facilities, access to educational institutions at all levels, housing, employment, the payment of a poll tax as a condition of voting, and other areas of activity.

Beginning with the administration of President Eisenhower, at least 12 Executive orders have been issued by Presidents removing discriminations against some Americans in respect to employment and housing. Beginning with 1957, the Congress has enacted four civil rights acts and the House has now by a great majority enacted a fifth and most meaningful one.

The bill we have been considering and have now enacted extends the protection of the fair and nondiscriminatory administration of justice to those who have previously been denied membership on grand juries and petit juries in many parts of America.

But the crowning glory of all civil rights legislation which the Congress has enacted is to be found, in my opinion, in title 4 of the act which we have just passed—in title 8 of the act before us today. This title provides that when a man goes into the marketplace to acquire a home—with all that a home means—the seat of the family altar, the sacred area where the family, the little unit blessed of God, stands together apart from the world to share its joys and sorrows, large and small—that man's offer shall not be spurned nor fail upon deaf ears because of his race, color, religion, or national origin.

This is the American way—to establish the rights of men through law rather than through riots and violence. In this latest civil rights bill we have made this doubly clear by imposing severe penalties for those who would rob and pillage and assault under the cover of the struggle for human rights for all Americans.

However many challenges may lie

ahead, how thrilling it is to see how far we have come, in spite of the long journey which has been involved, toward the realization of Jefferson's dream.

On July 4, 1826, John Adams lay upon his deathbed. He aroused himself to inquire if Thomas Jefferson were still alive. When informed that he was, this grand old patriot uttered his last words "Thank God, Jefferson still lives."

When we contemplate what the Government of our country has done in late years to insure equality of rights for every American and especially when we note the stirring significance of the measure the House has just passed, we too, can say with a fervor comparable to that of old John Adams, "Thank God, Jefferson still lives."

Mr. RHODES of Arizona. H.R. 2516, to provide penalties for interference with civil rights, is, in my opinion, an imperfect piece of legislation. Much of it was adopted as amendments on the floor of the Senate, with little or no consideration by a committee of either of the Houses of Congress. Adopting such a bill without sending it to conference for correction is certainly a strange way to legislate.

I recognize as well as anyone the necessity for people who live in ghettoes to have the opportunity to move into areas where jobs are more plentiful. I will support well considered legislation which will have this effect. However, the open housing provisions of this bill are defective in several ways. Just two of them are: First, a person could sell his house and discriminate, but he could not allow a real estate broker to do so, and second, enforcement provisions are almost totally lacking.

In my opinion, these housing provisions will be a great disappointment to the ghetto inhabitant, who expects them to improve his habitation. They will just not have this effect.

The provisions dealing with Indians would practically guarantee the separation of the American Indian from the rest of the country in perpetuity. It is particularly ironical that in this bill which is supposed to promote integration of the Negro race, American Indians are further segregated from the mainstream of society. Provisions for allowing States to assume jurisdiction of law and order on Indian lands would be modified to the extent that no State will find it desirable to take on this job.

While I am in favor of legislation to control illicit traffic in firearms and to keep them out of the hands of known criminals, rioters, and the like, the provisions of this bill are so inaccurately drawn as to make its enforcement very difficult.

Therefore, I must reluctantly oppose this bill.

Mr. MEEDS. Mr. Speaker, I would like to emphasize briefly the importance of titles II–VII of this bill which are the titles affecting our Indian citizens. I do so both because I have a number of constituents who will be affected by these titles, and also because I am a member of the Interior and Insular Affairs Committee and of the Indian Subcommittee which has been considering similar legis-

lation. With that background, I want to state to the Members that far from apologizing for these provisions, I strongly endorse them. I consider them some of the most important provisions contained in the entire legislation. Moreover, I think it is entirely appropriate that these provisions affecting our Indian citizens be included in a civil rights bill. For too long, we as a nation and as a government have looked upon our Indian citizens as both legally and socially separated. To the extent they wish to remain so, perhaps this separation is appropriate. But surely these citizens, no less than other citizens, are entitled to the dignity of choice, and to the dignity of being accorded fundamental rights—and it is to these principles that this legislation is addressed.

Perhaps the most significant change to be accomplished by this legislation would be to amend Public Law 280, which for 15 years has hung like the sword of Damocles over Indian tribes who have had no voice in the acquisition by States of civil and criminal jurisdiction over them. Although this power has been exercised infrequently, its very existence has been a symbol to the reservation Indians that assertions of Federal power profoundly affecting their daily lives might be made through decisions over which they would have no control, and in the making of which they might not even be invited to participate.

Not only would title IV of the pending legislation assure the tribes of a voice in the determination of whether they would be regulated by State law or Federal law, but also, as provided in the bill, any movement toward increased State jurisdiction would be done in an orderly and gradual fashion. Many States are well prepared to handle some aspects of this responsibility, but unwilling or unable to handle all responsibilities properly. Under the provisions of Public Law 280; our experience over the last 15 years has shown instances where States failed to give adequate protection or services to members of tribes because the States were unwilling to commit the resources necessary to properly enforce their laws. One of the attractive features of the bill is that those States which previously acquired jurisdiction under Public Law 280, but which are not now able to properly handle that responsibility, may now retrocede that jurisdiction back to the Federal Government. Moreover, in States where some tribes are more suited for State regulation than others, this bill would permit the State to assume jurisdiction over some Indian territory without having to assume jurisdiction over all Indian territory. Similarly, if a State is particularly well equipped in a particular field, such as mental health or facilities for juvenile delinquency, the State could assume jurisdiction in these areas without having to assume jurisdiction for all fields.

Just as the power of choice in matters of jurisdiction will accord dignity to the tribes, so will the rights and privileges of the Indian bill of rights contained in title II of this legislation accord self-respect and dignity to the individual who may be tried by tribal courts.

Mr. Speaker, in the course of the hearings on the parallel legislation, I was appalled at the several instances of abuse of tribal power that were brought to our attention. This is not to say that many tribes have not handled this responsibility wisely, and it is not to say that there should be no differences between tribal court systems and other American court systems in the Anglo-American tradition. But the time has long since come and gone when we can permit persons who are American citizens—and all of these reservation Indians are American citizens—to be subjected to deprivation of liberty with no protection of due process.

One final point with respect to this legislation, Mr. Speaker, and that is that this bill accomplishes both the requirement of tribal consent to State assumption of jurisdiction and the establishment of an Indian bill of rights with the maximum possible flexibility to accommodate legitimate tribal customs and processes. For example, section 402(c) specifically states that any tribal ordinance heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to that section. Similarly, the provisions of the bill of rights are not identical to the Federal Constitution's Bill of Rights, and the differences are largely in order to accommodate tribal customs. Thus, for example, there is no prohibition on an establishment of religion—recognizing that many tribes combine religion and government; but there is a prohibition on interference with freedom of religion by individual members of the tribe. Similarly, although the Federal Constitution requires that counsel be provided for all defendants who cannot afford to pay for their own counsel, the Indian bill of rights would require the court to permit counsel, but at the defendants own expense.

By this legislation a constructive step will be taken toward bringing our Indian citizens into the mainstream of American life.

Mr. Speaker, I strongly urge the Members to vote affirmatively on the previous question and on the question of adoption of this legislation.

Mr. WYMAN. Mr. Speaker, I voted for the civil rights bill that we passed in the first session of this Congress. We sent this bill, 10 pages long, over to the other body and it is back here today 50 pages long, with several major new titles on which this body has never held a single hearing. Such a materially changed bill should go to conference.

Much of the language in H.R. 2516 as it has come to us from the other body is loose, poorly drawn, confusing and of dubious enforceability. It should be carefully redrafted. It should go to conference.

Yet what we are faced with here today in this vote is a flat refusal by the majority party leadership in this House to permit the Members of this House to provide sound legislation. They force us to vote up or down a civil rights bill that the House has never acted on. They refuse to send the bill to conference. They decline to send it to the Judiciary Committee for hearings on the new titles.

And they do all this literally at the point of a gun—a double-barreled gun. First, the presence of thousands of troops; and second, the threat of stepped-up violence in the cities of America—unless.

Mr. Speaker, we ought not to pervert the legislative process of this great body by lending ourselves to poor law under duress. Yet, this is precisely what the majority party in control of this House 3 to 2 is forcing upon us at this hour.

I shall vote to send this bill to conference. If this means that it must go over the Easter recess, so be it. If it means that the Easter recess must be given up and we must stay in session, so much the better. By sending it to conference it will mean that we have not enacted legislation the greater part of which was written on the floor of the other body by haphazard scatter-shot amendments comprising what is now a very poorly written bill in many respects.

If the previous question is ordered, I shall vote in favor of this bill because of the breadth of its sweep. Its first section is the original bill that we passed in the House, setting penalties for interfering with the exercise of constitutionally guaranteed civil rights. This is desirable. Another section imposes penalties on persons who travel across State lines to incite riots, the subject matter of a bill that I myself have introduced earlier in this Congress, H.R. 1464. Still another section establishes penalties for teaching the construction or use in interstate commerce of firearms or explosives, intending them to help a riot. These are all important matters, matters which I support. There remains only the controversial additional title inserted by the Senate, title VIII, called fair housing. Much of this title, as presently written, is unenforceable, a great deal of it is meaningless, and in all probability not an insubstantial part of it is unconstitutional because it attempts to impose restraints upon the sale of individually owned homes that have nothing whatever to do with interstate commerce and are beyond the power of the Federal Government to control, even if it wanted to, without a constitutional amendment. I hope that at an appropriate future time the High Court will confirm by subsequent decision that a man's private home in America is still his own free castle both in its use and its disposition. I believe that more is to be accomplished by voting for the bill on final passage, however, than would be accomplished by leaving all of these important other subjects of needed legislation unattended to.

My vote in favor of this civil rights bill on final passage in no sense constitutes a response to the recent unfortunate murder of a civil rights leader. I would not vote for any legislation which I felt on balance to be contrary to the best interests of the American people. Of significance in connection with the fair housing section of this bill is the fact that its most questionable section and the one of least likely constitutionality by its own terms does not take effect until Decem-

ber 31, 1969. This section would make unlawful discrimination in the sale or rental of any private home with the use of a real estate broker, agent or salesman and with the publication of an advertisement or written public notice of sale. Remedial legislation will undoubtedly be offered in the next Congress to correct the infirmities of this and other sections. I shall offer corrective amendments at an appropriate future date when hopefully there is a Congress of the United States at long last in the hands of a leadership that will not foist upon the American people poorly drafted legislation without allowing hearings, and under the pressure of a virtual ultimatum from rabble-rousers in America.

Mr. Speaker, I am confident that this November the people of this Nation, looking after their own interests and aware of the vital importance of maintaining integrity and respectability in the Congress, will elect a Republican House of Representatives and a Republican President to bring to an end the policies of this Democrat administration and this Democrat-controlled Congress that have brought for them war, debt, insolvency, inflation, the threat of devaluation of our dollars, disrespect for law and order, widespread rioting, and pathetically inadequate response to America's needs of the hour, both in the administration of law enforcement and in the legislative process.

Mr. EDWARDS of California. Mr. Speaker, the Easter recess is approaching. Soon many of us will go back to our homes to share with family and friends the glorious meaning of this holiday to the Christian world.

Before that day, however, there remains a sobering task before us. A task that offers an unparaled opportunity to act responsibly at a time when the forces of responsibility have been dealt a telling blow.

Mr. Speaker, H.R. 2516, the civil rights measure awaiting action by this body, presents an opportunity to illustrate our continuing faith in the redress of social injustice through legal means.

But of equal significance is the meaning of this bill in strictly human terms. This bill will tell the people of America that their Congress believes in and is working toward the ideal of equality for all Americans. This bill will tell the American Negro that there is room for him in this country outside the ghetto. It will tell him that his Government has committed itself to giving him meaningful protection in the lawful exercise and advocacy of his rights.

This bill has other purposes, Mr. Speaker, all of them worthy. It would add the Federal Government's law-enforcement machinery to the nationwide effort to end the rioting in our cities; it would furnish for the first time a bill of rights for the American Indian. But primarily, this is a bill to reaffirm our faith in the central ideal of this Nation—equality before the law—equal opportunity for all men to work toward the attainment of a decent home in a good neighborhood; to exercise, without violent interference, the right to attend school, to vote, to travel, and to earn a living.

It is a time for action, Mr. Speaker. We have already waited for too long.

Mr. MINISH. Mr. Speaker, this is no time for speeches or debate. We have had more than enough of both. This is a time for action—action to bind up the Nation's wounds of racial injustice and enmity and to give finally and unreservedly to every American his inalienable birthright of life, liberty, and the pursuit of happiness. These United States must join together to heal the ugliness and hatred that do violence to the vision of our Founding Fathers, a vision exemplified in the life and works of Dr. Martin Luther King, Jr.

It was my honor to preside over this august body on February 10, 1964, during the vote on the landmark Civil Rights Act of 1964. The following year it was my privilege to support the Voting Rights Act of 1965; then the Civil Rights Act of 1966 passed by the House on August 9, 1966; and, again, the present civil rights bill, H.R. 2516, passed by the House on August 16, 1967. I am proud to vote now for House Resolution 1100, providing concurrence with the Senate amendments to H.R. 2516, and I urge that this legislation be enacted as expeditiously as possible.

With his deep attachment to our constitutional principles, Dr. King, I am sure, would ask that support for this legislative effort to carry out the promise of the 14th amendment be motivated by a sense of justice, not by sentiments springing from his martyrdom. The 14th amendment of our Constitution must have full and equal meaning for all Americans; otherwise, we betray the Constitution that we have sworn to uphold. Like our Founding Fathers, Dr. King could say:

I refuse to accept the view that mankind is so tragically bound to the starless midnight of racism and war that the bright daybreak of peace and brotherhood can never become a reality.

We who are privileged to hold membership in this body must do our part to make this no longer a dream but a reality in our time. I urge prompt and favorable action on the pending resolution.

Mr. BROWN of Michigan. Mr. Speaker, my vote on the Civil Rights Act of 1968 is without question the most difficult one I have had to cast in my relatively short tenure in the House of Representatives. No doubt there will be more reason-packing legislation in the future, but I can foresee none that puts my concept of a Representative's proper function more to the test.

Ninety percent of the language of this bill causes me, my constituents, or our national populace, for that matter, little consternation. Sure, each title of the bill could be improved, but that is true of most of the legislation considered and passed by Congress. But, the "guts" of this legislation, insofar as the opposition to it is concerned, are its open housing provisions; whereas, its sense, insofar as its proponents are concerned, is a rather nebulous support of civil rights and opposition to the last vestige of white supremacy or exclusivity as it has been exercised in housing.

As is true with much legislation, each adversary looks to his own little cause celebre and ignores the rest. Neither then, nor now, can such an approach be defended and any constituent acting as the Congressman who attempted to do that which his fellow constituents now advocate—regardless of how he votes on this issue would not only die by his own sword but would be unrepresentative of the people—and the latter is the more important consideration.

For those who may be reading the RECORD of this debate but who have not familiarized themselves with its issue, let me briefly describe the position in which the House finds itself at this moment.

This civil rights bill, H.R. 2516, was first passed by the House of Representatives on August 16, 1967. Much of the bill before us now was considered and approved at that time. But, this same bill is again subject to approval by the House as amended by the Senate to include the very controversial subject of "open housing" and the less controversial subject of gun control legislation.

Normally, such significant amendments tacked on by the Senate would automatically relegate the bill to a fate decided by a joint conference committee, where the "differences" between the House and Senate versions would be "worked out" or compromised. However, we are being asked today to bypass the normal procedure and pass the Senate version without benefit of the joint conference committee consideration.

Without even engaging in a consideration of the merits of the legislation, any reasonably intelligent individual would immediately ask, "Why?"

There's a rather simple answer. Proponents and even nonopponents of the changes added by the Senate know that body spent 7 weeks in the consideration of the very amendments which are now so controversial in the House and only after filibuster upon filibuster and cloture vote upon cloture vote, did these amendments and the bill receive approval. Any action by the House other than acceptance of these Senate amendments would require further action by the Senate. And, "action" in the context used here, means the "inaction" of previous Senate consideration. Why? Because Members of the Senate, even though not constituting a majority, may withhold final action on a bill under the rules of the Senate, and certain Members of the Senate—as in the House—are unequivocally opposed to the controversial portions of this legislation. But before one calls them bigots, or some other unseemly term, he should remember each such dissenter is effectively and responsively representing a constituency, or a majority of it, which objects to, and opposes, these provisions. So, as usual, it is the represented—not the representative—who are at fault, if fault is to be found. Nevertheless, I must agree procedurally, we are being asked to do the unusual; to at least bend the basic tenets of the legislative process as I understand them.

But what about the substance of this legislation? What does it do and why is it needed, if in fact it is needed? We only need to talk about the differences be-

tween the House and Senate versions since all that was included in the bill when it was approved by the House is obviously not in contest today. Likewise, we can forget all differences in the Senate version except for the open housing provision inasmuch as the niceties of language variations and the watered-down gun control legislation included, provide no more reason for opposition to this legislation than is applicable to most legislation passed by the Congress. The real substantive issue is open housing.

What is the open housing provision and what is its effect? Briefly stated and perhaps oversimplified—the bill provides that there shall be no discrimination because of race, color, religion, or national origin in the sale or rental of housing—land and its improvements—except by an individual not in the business of selling or renting housing; that is, the single-family homeowner who:

First, owns three or fewer single-family houses;

Second, sells no more than one non-residence in any 24-month period;

Third, sells without the services of a broker; and,

Fourth, sells without any discriminatory advertising.

It should be noted that the bill, in effect, authorizes such a single-family homeowner under the stated conditions to discriminate. The bill apparently does not even deny to such an owner the right to use a broker and reserve the right to approve all sales, their terms, and so forth, so long as the rejection of a sale is not based solely on race, color, religion, or national origin.

Those who write in opposition, generally protest to me that "regardless of whom or what it does cover, or does not cover, such legislation takes from me my basic constitutional right to own my home and property and to sell or rent or to not sell or not rent it to whomever I wish—and that's un-American." It is appropriate, therefore, to examine with as much objectivity as possible, this constitutional right.

The Constitution of the United States not only does not grant a property owner such an unbridled right, the Constitution in fact, actually authorizes a denial of it. The right of governments under the power of eminent domain authorizes the taking of private property for a public purpose without the owner's consent. The owner cannot sell to whom he wishes in this instance.

Interpretations of the Constitution and laws passed pursuant to it in the field of zoning, planning, and so forth, effectively deny a sale of property to a whole group of purchasers to which one might otherwise like to sell; and, at the same time, such laws deny to a property owner not only his right to sell to whom he chooses but even deny such owner the right to use the property as he chooses. And, let us not forget, you probably cannot build a house upon your own property if you have more children and need more bedrooms than you have money to build the necessary square footage—and heaven forbid if you are trying to build a little house next door for your mother or mother-in-law—if you contemplate do-

ing it on your own residential lot zoned for a single dwelling.

No; our property rights are not half as absolute as we oftentimes think they are or would like to have them. Strangely enough, though, many who today are concerned about depreciation of property values because of open housing are the same people who are pleased that the next door neighbor who wanted to operate a used car lot, a tool shop, or a pig sty has had his property rights abridged by zoning laws.

Needless to say, many, if not most, should do some pretty deep soul searching, as I have, on the efficacy and desirability of unqualified property rights.

Let us assume then, that this legislation is not so contrary to our principles and rights as to preclude consideration and passage. Just because legislation is not violative of our fundamental rights should never mean that, therefore, it should be enacted. I have consistently argued that each piece of legislation must first bear the burden of proof of its need. Is this legislation necessary?

I have come to the conclusion it is necessary—

Because it will alleviate the housing problem of the ghetto and slum resident? Of course not. The impact of this legislation upon the housing needs of the ghettoite will be minuscule at most. He needs decent housing and an economic opportunity not a chance to live in a "lily white" suburb. And, even to suggest this legislation will improve the lot of the ghetto dweller is to be as demagogic as were those who held out the bait of hope to our poverty stricken who expected panaceas from the empty production promises those of the war on poverty program.

Because there have been flagrant discriminatory practices by bigoted whites which makes this a national disgrace comparable to the enslavement that was ended with the Emancipation Proclamation and the 13th and 14th amendments? Not if the complaints which have come to my attention are reflective at all of these discriminatory tactics.

Because Dr. Martin Luther King died as the result of an assassin's bullet and failure to pass this legislation will place Negroes in the hands of black militants and America will become an Armageddon of black against white? This may be a justification to some, but I reject it out of hand. Martin Luther King and the law have nothing in common with violent civil disobedience, civil disorders, looting, and burning. And frankly, without hesitation I aline myself here and now with those to whom lawlessness, arson, and looting are just as illegal and subject to the same enforcement and punitive measures when prompted or occasioned by a claimed legitimate cause as when committed by a member of the regular hoodlum element in our society with no cause to blame or express except his own personal benefit.

No, my support of this legislation is based upon none of these. I am neither voting with a gun at my head nor do I expect the implementation and effectuation of this legislation will create all the evils some portend for it or do the good others optimistically forecast.

Rather, members of the white community, politicians, and with greater justification, members of the minorities, have made this issue the symbol of our unequal society, especially as this inequality is related to race, color, and national origin. Although we can spend our last dollar on education, job training, housing, and what-have-you, we will never achieve economic equality for all men—and I question if it is even a desirable aim—but we may be able to achieve equality of economic opportunity. But no amount of dollars and programs will change the color of one's skin. We have recognized this in education, in employment, in public accommodations—in fact, everywhere except in non-Government-related housing.

I believe it is time that we remove the last impediment—or crutch, depending upon one's viewpoint—to an equal opportunity for all—not just to those of us who are giving but to those who should benefit. With the passage of this legislation a member of the minority stands on equal footing with a member of the majority. Removal of this last but probably most significant symbol of inequality likewise removes the last excuse for less than equal responsibility under the law.

Mr. CORMAN. Mr. Speaker, when all of us have passed from the scene and history chronicles the progress of this Nation toward racial justice, two giants will stand out—the gentleman from New York, EMANUEL CELLER, and the gentleman from Ohio, WILLIAM McCULLOCH. Each of the 432 of us in this House is privileged to serve with these two great Americans.

In a very short while the Members of this House will be given an opportunity to vote and register their approval of the Senate amendments to H.R. 2516, the pending civil rights bill. As many know, House Resolution 1100 would permit the Members of this House to concur in the Senate amendments and thereby enact into Federal law a historic Federal open housing statute. Along with the chairman of the Judiciary Committee and my committee colleague from Colorado [Mr. ROGERS], I have attended hearings of the Rules Committee and testified in support of H.R. 2516, as amended by the other body. We are pleased that the Committee on Rules has given its approval to House Resolution 1100.

H.R. 2516, as amended by the Senate, contains 10 titles. Of course, the interest throughout the country focuses on title VIII, the fair housing title of the bill.

Mr. Speaker, the past 20 years has witnessed a vast expansion of new housing and homebuilding. The millions upon millions of new dwelling units have vastly changed the character of our urban residential areas. As our cities have grown, racial segregation has grown within them. Suburbia has come into being and continues its rapid expansion around our cities. With the growth of the suburbs has come a tremendous increase in homeownership.

Except for our Negro citizen, virtually all Americans have been afforded an opportunity to share in these housing developments. Negroes are largely barred from this opportunity. Their choice in

056664

housing, unlike that of whites, is not limited merely by means, it is limited by color. Desirable housing in our cities and suburbs is too often foreclosed to the individual Negro and ironically, because of its scarcity, what housing is available to him frequently costs more than comparable housing open to whites.

In January of this year, the President reminded us of the moral principle which fair housing legislation poses. He said:

When we speak of overcoming discrimination we speak in terms of groups—Indians, Mexican-Americans, Negroes, Puerto Ricans and other minorities. We refer to statistics, percentages, and trends.

Now is the time to remind ourselves that these are problems of individual human beings—of individual Americans.

Housing discrimination means the Negro veteran of Vietnam cannot live in an apartment which advertises vacancies.

Mr. Speaker, housing discrimination means many things to many Negro Americans throughout this Nation:

To Leonard Simmons of Shaker Heights, Ohio, it almost meant the end of his graduate studies. Simmons, a graduate student and instructor at the School of Applied Social Sciences, Western Reserve University, described his frustrating experiences trying to find housing before the U.S. Commission on Civil Rights:

I encountered extreme difficulties. In the fall of 1963, I was accepted in the advanced program at the School of Applied Social Sciences at Western Reserve University. At that time, I was employed as a social service director at Massillon State Hospital. Each weekend beginning in July, I would come to Cleveland to try to find a place to live. I looked in the area of the University because I would be attending school there. Also, I was going to be a graduate student and naturally my income would be rather limited. So between the two, I wanted to stay near the University and find something that would not be too expensive. I encountered so much difficulty in finding a place to live that I was considering writing the school and notifying them that I would not be able to attend.

But Simmons, married, and a father, persisted in his search for decent housing for his family and his expectant wife:

Initially, we were thinking in terms of finding an apartment to rent. Many of the people told us that they were unwilling to accept children. I think that this was a factor in many cases. In other instances, I think this was used as a subterfuge because we were nonwhites. Others would tell me that the place was not available; it had just been rented or they would have to consult with somebody else about renting the apartment to me.

Nor, Mr. Speaker, were the Simmons' any more successful in buying a house, unless they would be willing to live in an all-Negro neighborhood. Asked how his experiences in seeking housing affected him, Simmons replied:

It has had a devastating effect on me. In order to answer this question adequately, I suppose it is necessary to tell something about my background. I was born in Baltimore, Maryland. In Baltimore, at that time, *de jure* segregation and discrimination was a way of life. There was no aspect of my life that was not touched by *de jure* segregation. I was born at Johns Hopkins Hospital which at that time was rigidly segregated. When I left the hospital, my parents took me to

my home which was in a Negro neighborhood. I attended a Negro school, worshipped in Negro churches, and when I became ill, I was attended by Negro doctors. When family members or friends died, they were buried in Negro cemeteries. My brothers served in a Negro army unit during World War II. I attended a Negro college. Despite all of that, I continued to believe that one day this Nation would keep its promise of equal opportunities for all citizens. I continued to believe that the forces of hate and ignorance would be overcome some day. Now, I am not nearly as sure as I used to be. I have worked very hard to make myself acceptable. I have worked very hard to be upwardly mobile and educated. Now that I am neither unwashed nor unlettered nor are my friends and family members, I was under the impression that I would gain great acceptance in the White community. I found that to a large extent nothing has changed. I have a responsible job but I am still denied the basic need of housing.

For Mrs. Violet Tyson of Philadelphia, Pa., housing discrimination meant that her family's new home was a second choice; because of matters beyond her control, she and her family had to take a house which was not up to her expectations and hopes. When she, her husband and children sought a home by going to white real estate brokers in the Kensington and Olney sections, two brokers stated simply that they could not help her; two said explicitly that "the people in that area didn't want to sell to colored." After 2 years of house-hunting, Mrs. Tyson said:

I have just become very disgusted and I just didn't understand why we are not able to buy a house, just because we are colored, in a white neighborhood. . . . I just want to find a decent place to live and a larger house.

For Mrs. Mary Burke of Philadelphia, a white American, housing discrimination means threats on her life. After she had advertised her house for sale in the Philadelphia Tribune, she received six anonymous phone calls, one of which was a bomb threat, and one morning found written on her door, "You won't live until settlement if you sell to Negroes."

For thousands of others, housing discrimination means the indignities of not so subtle subterfuge in refusing rental to Negroes. If a nonwhite "gets by" the first telephone call and is invited to inspect the apartment, he may be told that he has, like Mr. Simmons, "too many children." Or he may be classified as a poor financial risk and asked to undergo "a rigid screening test" or "to pay several months' rent in advance."

There is the humiliation of being kept waiting outside the premises while the owner drives past to discover if the applicant is nonwhite. There is the owner who conveniently "forgets" about the Negro applicant's appointment. There are the cases in Springfield and Holyoke, Mass., where janitors have been instructed to rent to whites only, but when nonwhite prospects appear they deny any authority to rent apartments and refer the applicants to the landlords—who, "unfortunately" live in Florida.

There are the landlords, who once they learn that a prospective tenant is Negro, suddenly discover that the once available apartment has "been rented in the last few minutes" or that "some mistake was made" when the apartment seeker ap-

pears to inspect premises that were available earlier during a telephone conversation.

There are the cases where Negroes driving about the city looking for apartments have seen "for rent" signs in apartment house windows only to find upon inquiry that the apartment has been rented and that the landlord forgot to remove the sign. Yet, the sign remained in the window for weeks or even months after inquiry.

And finally, Mr. Speaker, there are the "rent raisers." Those owners who on seeing a nonwhite applicant for an apartment fake records to show that the apartment rents for twice its advertised rate.

Mr. Speaker, housing discrimination is an affront to what America stands for. One of the traditional rights of an American is that of freely selecting a place to live, subject to his means. The decision of a member of a particular racial or religious or national origins group to join a neighborhood made up largely of his fellows is a manifestation of that right, but in a free nation such residence should be a matter of choice. No citizen should be forced to live only in such neighborhoods.

Individual personal bias plays only a part in maintaining patterns of racial segregation. Concern over possible financial loss is a motivating factor. Developers, real estate brokers, property managers, lenders, and apartment lessors share a typical concern if they break the "color line," they will suffer economic loss. But, in fact, studies of the subject have shown such fears to be largely groundless. Property values in desegregated neighborhoods usually equal, and sometimes exceed, those in segregated neighborhoods. See Laurenti, "Property Values and Race—Studies in Seven Cities," University of California Press, Berkeley and Los Angeles 1960; "Race and Property University Extension Service on Public Issues," John H. Denton, Editor, Diablo Press, Berkeley, Calif., 1964.

The last two decades have witnessed a variety of Government actions dealing with racial discrimination in housing. In *Shelley* v. *Kramer*, 334 U.S. 1, decided in 1948, the Supreme Court held that the fifth and 14th amendments prohibited courts from issuing injunctions to enforce racially restrictive covenants in real property deeds, even though the deeds had been privately drawn and operated only between private parties. The decision was followed 5 years later by another, *Barrows* v. *Jackson*, 346 U.S. 249, barring the enforcement of such covenants by judicial awards of damages in case of breach. After the Court's holdings came a series of State and local laws prohibiting discrimination in housing, and today 22 States, the District of Columbia, Puerto Rico, the Virgin Islands, and a large number of municipalities have such laws. In November 1962 President Kennedy issued Executive Order No. 11063 prohibiting racial and religious discrimination in housing financed or insured by the Housing and Home Finance Agency or other executive departments and agencies; the order established the President's Commit-

9600

**CONGRESSIONAL RECORD — HOUSE**

*April 10, 1968*

tee on Equal Opportunity in Housing to oversee and coordinate the implementation of the directive and to engage in other activities to encourage nondiscrimination in housing. Title VI of the 1964 Civil Rights Act outlawed discrimination on grounds of race and national origins in programs and activities receiving Federal financial assistance, other than by way of insurance or guarantee; it prohibits such discrimination in public housing, urban renewal projects and other housing receiving Federal financial assistance.

These actions, and the activities of many private, voluntary groups have been beneficial. Today's announcement by Levitt & Sons to adopt a new policy, eliminating segregation any place it builds—in tribute to Martin Luther King, Jr.—is indeed praiseworthy. But commendable as this tribute is, it is not in itself adequate to meet the broad dimensions of the problem. Although racial barriers have fallen or have been eased in a number of communities and neighborhoods, it is clear that a comprehensive and effective national law is needed if there is to be meaningful progress.

Moreover, it is readily apparent that racial discrimination in the sale of homes reduces the number of new houses built and otherwise impedes the movement of building supplies across State lines. It also discourages the interstate movement of individuals. In short, racial discrimination in the sale or rental of residential housing adversely affects commerce.

Mr. Speaker, title VIII of H.R. 2516, as amended by the Senate, bans discrimination on grounds of race, color, religion, or national origins in the rental, sale, or financing of residential housing subject to certain limited exemptions. Like the bill passed by the House in 1966, H.R. 2516, as amended, exempts religious and charitable institutions and bona fide private groups. Like the bill passed by the House in 1966, H.R. 2516 exempts "Mrs. Murphy's boarding house" and rooms or units in an owner-occupied dwelling where the dwelling is occupied by no more than four families, and finally, H.R. 2516, as amended, exempts single-family houses sold or rented by a private owner.

Mr. Speaker, I believe the proposed statute will be more easily enforced than the bill which the House passed in 1966. This bill "authorizes" no discrimination—all it does is exempt certain types of dwellings. In this respect, it resembles State fair housing statutes more than did the 1966 bill.

I believe that this bill will promote, not contract, expansion in the housing industry. I believe it will stabilize housing values and not artificially inflate or depress them. I believe the compliance with the public accommodations antidiscrimination provisions of the 1964 Civil Rights Act offers a sound precedent here. A Federal declaration of open housing will protect those in the housing business, builders and real estate brokers alike, when they do what is right. The individual homeowner who wants to do

right will also be protected and encouraged.

Mr. Speaker, the 13th amendment to the Constitution forever barred slavery and involuntary servitude in the United States. It was viewed by those who had approved it as abolishing not just enforced service of one person for another but as a guarantee to all citizens, of the outlawing of all the badges and incidents of slavery. One hundred and three years after its adoption the Congress has yet to remove all the disabilities of that servitude.

Critics of fair housing legislation charge it would invade the privacy of home. But title VIII is aimed not at privacy but at commercial transactions. It would prohibit no one from selling or renting to a relative or to a friend. The bill simply assures that houses put up for sale or rent to the public are in fact for sale or rent to the public. It would assure that anyone who answered an advertisement for housing not be turned away on the basis of his race. It would free the housing market of a barrier which often handicaps not only the Negro buyer but also the white seller. It is not forced housing. It is the opposite—open housing, unrestricted housing.

Mr. Speaker, I earnestly hope that the Members of this House overwhelmingly approve and enact into law this historic legislation.

Mr. DONOHUE. Mr. Speaker, as we begin our consideration of this Senate-amended Civil Rights Protection Measure, H.R. 2516, previously approved by this body last August 16, I think it may be well to emphasize that this is a fateful hour in the destiny of our country and that the House is faced with one of the greatest legislative challenges in its existence. It is indeed more a time for prompt action than extended eloquence. In view of the most tragic events that have occurred in this Nation in recent days, there is vital need for us, here, to exercise restrained emotion, subdued prejudices, heightened conscience, and supreme patriotism for the welfare and preservation of America and the free world.

The encouraging eyes of the vast majority of American citizens are focused upon this House today; the questioning eyes of allied and hesitating peoples abroad are centered upon us during this debate; the cynical eyes of the Communist powers are fastened on the legislative capital of the world, waiting, with propaganda machines "at the ready," to see if we can and if we will grant full opportunity to each of our citizens to exercise, and full protection in such exercise, the rights and privileges we claim to espouse for all peoples everywhere. That is the basic challenge to which we must now respond; that is the historical question to which we must now give legislative answer.

Beyond its antiriot and Indian rights provisions, this measure is substantially designed to expand and protect, for all of our citizens everywhere in the country, basic rights and privileges already guaranteed to them under our National Constitution and, indeed, a great many of our State constitutions including my

own great Commonwealth of Massachusetts.

It would be rash, indeed, for anyone to pretend that in complete application and every technicality this bill, or any other law or legislative proposal, is perfect. Nevertheless, our duty is to judge it on its basic merit and we must not be diverted from that responsibility by any emotionalism of the moment. In great part we have already, last year, considered this bill and we have all had the opportunity to observe the other body work their will over several long weeks of painstaking debate.

Under existing circumstances we all have a special obligation to be patient with each other and to be tolerant of one another's sincere convictions but, finally, our highest obligation is to legislate. I most earnestly hope that legislative obligation will result in resounding approval of this measure, now, so that it may be signed into law by the President at the earliest date.

I hope and urge that our action here this afternoon will result in the enactment of another legislative milestone, for all the world to see, in advancement of the traditions upon which this noble Nation was founded and upon which, God willing, it will move ahead, in domestic tranquility, as the free world's leader for the peaceful progress of all mankind, now and forever.

Mr. DORN. Mr. Speaker, this bill before us today is an infringement upon the property rights of the American people. Our property rights are guaranteed in the Constitution. We hear a lot about the fifth amendment to the Constitution. We think in terms of pleading the fifth, but the most important part of the fifth amendment is "or be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."

Any American citizen, since the formation of our country, has had the right to sell or rent his property or make loans to the person of his choice. This is a basic elemental right along with peaceful assembly, trial by jury, and the right to bear arms.

The right to own property is the basis of our great private enterpise system. Our private or free enterprise system has made it possible for the United States to enjoy the highest standard of living in world history. Our system of private enterprise has made it possible for our country to become the arsenal of democracy.

I do not believe human rights in this world can be preserved without property rights. At this moment the U.S. Army and marines with combat troops are quartered in the Capitol Building itself and on the grounds of the palladium of liberty under armed guard. This is no way to legislate. We should not legislate under pressure. We should not legislate in a state of emotionalism. We should not be influenced by mobs, violence, and destruction of property.

We should reject even consideration of this bill until we can operate in a calm, cool, deliberative manner as envisioned by the Founding Fathers. I plead and

Case 1:13-cv-00966-RJL     Document 153-3     Filed 05/30/23     Page 75 of 111

urge my colleagues to vote down the previous question. Such a vote would encourage and reassure the people of this Nation during these critical times.

Mr. FARBSTEIN. Mr. Speaker, on August 16, 1967, the House passed by a wide margin, a civil rights bill aimed at protecting individual citizens against unlawful injury and intimidation because of race, color, or religion. The House moved with commendable speed in passing this measure because most of us saw an urgent need therefor.

As we all know, the Senate recently passed a civil rights bill after much debate. The Senate bill is similar to the House version, but it does add an important provision covering open housing. I hasten to add that in the 89th Congress—2 years ago—the House, by a 259-to-157 vote, sent to the Senate a civil rights measure which contained a fair housing provision. The Senate never passed it. Now, we who provided the early leadership can see our support for open housing legislation redeemed. In my judgment, this provision is one all of us should support. I urge my colleagues in the House to do so.

Mr. Speaker, we have all read with interest the recent report of the President's National Advisory Commission on Civil Disorders. This report clearly documents the danger of two Americas—one white and one black. We cannot tolerate this possibility. We must vigorously strive to break down racial barriers wherever they exist. The civil rights legislation we passed last year was aimed particularly at protecting civil rights workers against intimidation and protecting Negro rights in such areas as schooling, housing, voting, jury duty, and the use of public facilities. Now the Senate has come forth with legislation providing additionally for open housing for all citizens. The House bill of last year did not include this provision. We now have an opportunity to do so.

It has been estimated that this fair housing provision will open approximately 80 percent of all dwellings in the nation to all citizens by 1970. This means that about 54 million housing units, including millions of single-unit dwellings, will be open to Negroes and other minority groups. This is a major step toward equality. Based as it is upon the dignity of the individual, regardless of race, color, or religion, it is one that will ultimately benefit all citizens.

Mr. Speaker, in a way it is appropriate to look upon this legislation as a testimonial to the late Dr. Martin Luther King, a martyr to the cause of human rights. But I do not look upon passage of this bill as a sentimental act, however grieved we are by Dr. King's death. I look upon it as a necessary and appropriate act by Congress, one which is long overdue. Whether or not Martin Luther King died, we in this body would have been under moral obligation to approve this measure. I am proud to support this bill and dedicate it to the memory of a great American, Dr. King. But I am even more proud that this bill will be passed because our country needs it.

Mr. SCHADEBERG. Mr. Speaker, I rise in support of civil rights for all

Americans. To me the term "American" is not and cannot be tainted by the insertion of color, race, creed or ethnic background—only men, women and children. I have supported all civil rights legislation before this House upon which I as a Member was committed to vote. I know no color line since my judgment of my fellow man is not based on his religion or the color of his skin. I have had Negro guests in my home not because they were Negro but because they were my friends whom I loved as decent upright citizens. I served a unit of 1,400 Negro men during World War II. I found that there were good and bad among them as I found good and bad among those with white skin. I take second place to no one in my service to and concern for the welfare of the citizens of this Nation whose color of skin happens to be dark. For 10 months in 1943 and 1944 I spent 4 hours a night, 5 nights a week, of my own time teaching 80 Negro servicemen to read and to write. I seek no applause for this since I felt it was my obligation and privilege, but I relate this to make it abundantly clear that I lived with these men day in and day out sharing their problems; living their fears; and experiencing their hopes. I could not even, if I tried, have today any vestige of discrimination against them because of the color of their skin. In fact the most humbling tribute given to me in my long years in public service, first as a clergyman and then as a Member of Congress, was in the simple remark of a seaman to my wife upon my receiving orders to another place of duty. "Mrs. Schadeberg," he said, "we are sorry to have the chaplain leave. He was the only one who treated us like people."

I stand here in support of civil rights for the American people.

I express my opposition to this legislation, not because it contains an open housing section, but because we are asked to rubberstamp the work of the Senate with but an hour's debate on legislation that includes far-reaching changes in Indian legislation, riot legislation, and gun legislation tied up into one package in a take it or leave it fashion. My fondest hope is that this House will pass legislation that will produce results, not vain hopes; will provide rights to minorities without denying constitutional rights to the majority; that this House will pass legislation that solves problems without creating more and greater problems than those it would seek to solve. Our Nation must not be further divided and suspicions heightened. Our unity is strained to the point of serious proportions.

We must accept our responsibility to look beyond the emotions of today and view this legislation in terms of the effect it will have on our Nation as a whole over the long pull. It would be tragic indeed if in seeking to provide the rights of a minority at the expense of constitutional rights of the majority we create the instability in the communities throughout this Nation that would make the rights of all meaningless and empty.

It is my measured and sincere conviction that the passage of this legislation:

First, will not stop future burning and pillage of our cities;

Second, will create divisions and suspicions and ill feelings that will set civil rights efforts back instead of forward;

Third, will create greater disappointment and discouragement by the mere fact that by holding out hope for millions living in the ghettos, it does not and will not provide the economic base that will allow them to move from the ghetto into other areas.

Only time will tell.

Mrs. KELLY. Mr. Speaker, the din of clashing arms fills the air. Violence and anger are having their day. Logic, reason, and understanding seem to have lost their appeal.

The fiber of our people—the fabric of our society—the power and the resolve of our Nation, are being severely tested both at home and abroad.

These times place heavy demands on all of us.

At home, we have lived with violence or under its dreadful shadow for nearly 2 weeks.

Sparked by the tragic and senseless murder of Dr. Martin Luther King, this violence found its vent in the equally senseless and tragic destruction of human lives and material resources in a score or more of our cities.

At a time when we were beginning to grope our way out of the woods—when our elective governments, on all levels, were beginning to address themselves to long-neglected problems; when our community organizations, ignoring color and religious barriers, were joining together in a common effort to help the disadvantaged and the dispossessed; when individuals, young and old, black and white, rich and poor, were laying the predicate for a viable, cooperating, healthy society—just at that very moment, the assassin's bullet found its mark, violence flared, and lawlessness reigned.

Before long, the reaction began to set in and to undo the progress of the past 10 years.

And this Nation hesitated on the verge of taking a giant step into the darkness, and ignorance, and prejudice of the past.

I am not an alarmist by nature.

Neither am I the permissive type who insists that a child, or an adolescent, will be permanently repressed unless you allow him to beat your brains out.

I stand some place in the middle—believing that we must move with the times—having faith in the goodwill and the intelligence of each succeeding generation, admitting to the wrongs of the past, yet insisting, and insisting with every ounce of our conviction in my bones, that you cannot have progress without some semblance of order; you cannot have freedom without responsibility; you cannot achieve a better society by destroying society itself and the law which is the foundation of our freedom.

I sorrowed with the millions who wept at Dr. Martin Luther King's death.

I hoped with the millions who shared his dream of a new America, an America reformed without bloodshed and violence, and I bowed my head in shame that my own Nation would kill two leaders of our time in a single, brief period of 5 years.

But I have never condoned, and I shall never attempt to excuse or justify, those

056667

who, with mindless anger, tear at the very sinews of our society, attempt to set us against each other, defy the law which is their ultimate personal protection, and try to lead us down the path of violence and hate to the denial of everything that has been worthwhile in our country's past.

The time has come to set aright many things in this country and each one of us must play his or her part in this historic process.

An historic part was played in Congress in 1866, when a law was enacted which is now section 1982 of title 42 of the United States Code. This law provides that "Every citizen of the United States shall have the same right to acquire real property as is enjoyed by white citizens." A case, Jones against Mayer, was argued by the Attorney General the week of April 1, 1968, which involved the question of whether a developer who is building homes can refuse to sell lots and houses in such a development to Negroes purely on account of race. There were two arguments advanced why he could not—because the Constitution itself would prevent him; and because, even if the Constitution did not prevent him, the statute of 1866 would.

When the Attorney General was asked in court about the effect of the old law as compared with the pending legislation which is being considered on the House floor today, he said that the scope was somewhat different, the remedies and procedures were different, and that the new law was still quite necessary. There is serious doubt as to whether the court would rely on the 1866 statute as much as it would on the stronger measure before us today.

Now, I am called upon to play my part by supporting the legislation before us, to provide penalties for interference with civil rights.

Mr. Speaker, as you know, on August 16, 1967, the House passed H.R. 2516, a bill to establish Federal penalties for forcible interference with enumerated civil rights and for traveling interstate to incite a riot. I sponsored similar legislation and voted for H.R. 2516.

Nobody should think that because of the passage of this legislation, which includes fair housing, antiriots, and Indian rights provisions, the problem is going to be solved overnight. Therefore, while I support the bill on the floor today, consistent with my personal belief and my record of support of past civil rights legislation, I hasten to point out that enactment of this law will not, in and of itself, cure the social ills at which it is directed. With reference to one of the most controversial sections of this bill New York is one of the States which already has on its statute books laws prohibiting discrimination in all housing other than one- and two-family homes which are owner-occupied. There are still enormous economic and social barriers which must be overcome to accomplish fully the purposes of this legislation. However, the achievement of man's recognizing and accepting the inherent rights of all is the ultimate answer.

Mr. ROYBAL. Mr. Speaker, I rise to offer my strong support for H.R. 2516.

I believe this measure will help advance the rights and opportunities of all our citizens.

And I believe it is the kind of legislation that America urgently needs—and that the great majority of Americans want—at this critical hour in the Nation's history.

The tragic events of recent days make it imperative that we put aside all thought of partisanship and act in the best interest of our beloved country, to try to heal the divisions and conflicts that afflict us, and build for ourselves and for our children a better America where each person is judged as an individual, and not according to his race, or religion, or color, or creed.

Mr. Speaker, I believe the provisions of H.R. 2516 will help achieve this goal by attempting to end the pain and suffering that has been caused by the too-slow movement of Negroes, Mexican Americans, and members of other minority groups toward full equality.

It is the painful promise of a better day that has brought frustration to many of these citizens. Freedom just out of reach is far more distressing than freedom that is clearly unattainable.

In many ways, then, we are victims of the growing pains of progress in the struggle for equality. But the only rational answer to this critical dilemma is to bring about more quickly the full realization of social and economic equality for all Americans.

This is no an easy task, and it is an expensive one. But there is no other means at hand to restore America except the awful alternative of repression. If we do not act, Mr. Speaker, we shall have accepted the alternative by default.

Let us begin with this measure—H.R. 2516—to affirm the right of equal protection of the laws and equal access to decent housing.

It is little enough, but it shall be recognized as a significant movement, in the direction of freedom and equality. We must do more, Mr. Speaker, and we cannot do less.

Mr. RANDALL. Mr. Speaker, I cannot support the previous question as provided for in House Resolution 1100. The House should not be denied a chance to consider the Senate amendments to H.R. 2156. There is no substance to either argument we should hurriedly legislate today as a memorial to Dr. King or completely reject all the provisions of this bill because of the violence of the last few days. We should never let ourselves legislate as an honor or reward to anyone, on one hand, or as a penalty or punishment, upon the other hand.

Today we are put in a personal situation of "take it or leave it." In other words, like it or not, if we support the previous question that is the end of the line.

As it were we are being asked to rubber stamp in 1 short hour the work that the other body took 40 days to debate. In the lengthy document that comes to us today there are 10 pages of Indian legislation which denied our Committee on Interior and Insular Affairs the right to consider such provisions. Those who are knowledgeable say if we approve this Indian legislation, we may be destroying

rights granted under Indian treaties. If that is true, we would be bestowing rights upon the Negro at the expense of Indian rights.

One of the worst things about the present procedural situation is to deny the House its status as a coequal to the other body. For a long while we have suffered through a process of erosion. If we act today by accepting the long document that was sent to us without debate then we have further eroded ourselves into the status of an inferior body. We hear considerable conversation today about second-class citizens. If we accept without debate the Senate version of this bill, we thus become second-class legislators.

In 1966 I opposed a similar provision for open housing because I felt it amounted to forced housing. It was a deprivation of property rights in that it stripped the owners of dwellings of all their freedom of choice over the disposition of their property. In 1966 I pointed out, that the House provision which was predicated on the interstate commerce clause must be invalid because I could not then and I cannot now see how a house already built and thereby immovable could be an item in interstate commerce and thereby subject to the interstate commerce clause. The exemption of a residence certainly does not improve the constitutionality of the proposal. The 1968 bill remains a frightening abridgment of the rights of owners of private property. Even though the gag rule is working against the House today and we are denied the right to debate title VIII, or the fact we have placed ourselves in a straight jacket should not preclude or foreclose all thoughtful consideration of title VIII. We should at least have the remaining right to vote against the previous question and if passed, against the resolution. Title VIII discriminates against every homeowner in America and every real estate agent, salesman or broker who by the provision of this bill are denied the right to protect the interest of their clients and adequately represent them in the sale of their property.

It has been suggested the purpose of title VIII is to stamp out discrimination in housing. Every single day every one of us in the Congress meets and associates with members of other races and of other ethnic backgrounds whom we would be proud and happy to have as our neighbors. But we should have the freedom of choice to choose the purchaser from whatever race he may come. We should have the right to protect ourselves and our neighbors from intrusion in the neighborhood of undesirables of whatever race or religion, who will never mow a lawn, repair a single, paint a house, trim the shrubbery or clean the yard of trash and debris. Yes, as I observed, I do have concern for the real estate broker or agent who are denied the right to exercise fully the perfect legitimate instructions of his client. One hears so much about justice in the bill. The same persons should consider the injustices of the bill's requirement that an agent cannot show a home or negotiate or implement a sale without being charged with violation of title VIII.

*April 10, 1968*          CONGRESSIONAL RECORD — HOUSE          9603

Mr. Speaker, within title VIII, there is another objectionable aspect of forced housing. There is imposed a very heavy burden on another segment of the business community, our financial institutions. Section 805 makes it unlawful to deny a loan because of race, religion, and color. Consider what will happen if a bank or savings and loan refuses to lend to an applicant with marginal credit. Bad credit risks can then charge the bank with discrimination and the burden of proof is on the lending agency to defend itself. The case may be heard in the U.S. District Court without regard to the amount in controversy. The plaintiff can sue as a poor person which means no court costs have to be paid prior to commencing the suit. There is a provision of $1,000 punitive damages but worst of all the plaintiff may be awarded his attorney fees. Thus, the lending institutions can be subjected to continuous harassment and must continuously defend themselves for refusing to make a loan even to those who are bad credit risks. But the bill is so inconsistent that while it puts the burden on banks and savings and loans, an insurance company can refuse title insurance or fire, casualty and other insurance without discriminating or without subjecting themselves to lawsuits.

The matter of housing is not one of legislation. It is a problem of economics. Those who believe this housing section will relieve racial tensions are basing their conclusions on faulty reasoning. For those who believe more civil rights legislation will insure us freedom from racial tensions, rioting, looting, burning and property destruction in the future, should look at the record which demonstrates otherwise. Just after the Civil Rights Act of 1964 was passed, which had the most extensive applicability to all the problems of minorities, there were riots in Harlem and Brooklyn. Damage ran into millions of dollars; hundreds of people were injured. Remember too this was just 11 days after the President signed the 1964 civil rights bill into law. Now look back at the Voting Rights Act of 1965, another landmark in civil rights legislation. This was signed into law on August 5, 1965, and in just 5 short days, on August 10, came Watts, 34 died, 85 were injured with $2 million in damages. Chicago flared up a week later. Then take the Civil Rights Act of 1966. While this was being debated by the House, riots broke out in Chicago, South Bend and Baltimore. This very bill, H.R. 2156, was under consideration by the House Judiciary Committee in the summer of 1967 when we experienced the carnage in Detroit, Newark, and Cambridge, Md. It was then that Rap Brown traveled from Philadelphia to Cambridge with the threat to "burn the town down." The most convincing argument of all that there is no correlation between the passage of civil rights legislation and elimination of riots or fires, is the fact that just 16 days after this present bill was passed by the Senate, on March 18 came the rioting and looting and death in Memphis.

Our burden is heavy today not only because of the sadness of what happened in Memphis but also because of the bewilderment of what has happened here in Washington and over the country. This allegedly is an aftermath of Memphis. The death last Thursday of Dr. King is deplorable. I cannot believe the rioting, looting and arson was a manifestation of grief over his death. Instead, this disgraceful incident is a product of irresponsibility of a very small minority and had nothing to do with his death. The death provided a smoke screen—and I intend no "pun"—behind which burglary, larceny, looting and arson could go on to such an extent as to require trucks to carry away the personal property under the eyes of the police officers who made no effort to stop the offenders. Civil rights legislation such as we are considering today, in my opinion, will not stop incidents of this kind that have occurred in our cities within the past 5 days. Who can say there is any correlation between open occupancy housing and the man who last week put the torch to business establishments in a dozen areas of Washington?

I am not a racist. I have supported five of the six major civil rights bills considered by the Congress since coming here in 1959. My credentials as a matter of record. Instead of inflicting forced housing provisions upon thousands of American homeowners and placing financial institutions in a compromising position when they deny a loan because of a marginal applicant, and to prevent real estate people the right to fully represent the interest of their clients, we should recognize that the answer is not more legislation of so-called civil rights provisions but recognize that the real need is for jobs, low cost housing and better educational programs and facilities. No additional rights legislation is needed. Instead there should be adequate appropriations for low cost housing which the minority groups can afford. There should be adequate appropriations for manpower retraining, and vocational programs which will enable minority groups to qualify themselves for job opportunities that are available. Finally there must be adequate appropriations for improved educational facilities in the inner city. I have supported these authorizations and appropriations for these purposes in the past and I shall continue to support funding for these purposes consistent and commensurate with the fiscal and budgetary situation facing us in our country today.

Mr. PUCINSKI. Mr. Speaker, the inclusion of an open housing title in the Civil Rights Act of 1968 has provoked one of the most widespread debates on an issue that I recall in many years.

I am opposed to the Senate enforcement provisions of this open housing proposal, because in my judgment it will bring an unprecedented degree of Federal involvement and control into every local community of America.

More importantly, it will expose every homeowner in this country to the prospect of unprecedented harassment by both the Federal Government and those who seek to continue the turmoil in this country.

We in this House shall have no opportunity to offer amendments to this bill or participate in any questions to establish legislative intent. I am amazed that this legislation which will ultimately effect every household in America is being rushed through Congress with no public hearings or substantive debate in the House.

I believe the havoc wreaked in this Nation during the past weekend clearly indicates that if America is to survive, we need a period of calm reconstruction instead of adding to the fires of emotion legislation which will create more problems than it will solve.

May I remind you that this open occupancy amendment has not seen a single minute of public hearings either in the House or the Senate.

The tragedy of our time is that whenever a person dares raise his voice in honest warning about bad legislation involving civil rights, he is immediately tagged as a racist or bigot.

Nothing could be further from the truth in my own opposition to the enforcement of this legislation. I shall include at the conclusion of my remarks the entire text of the enforcement section of this proposed open housing legislation, and I am certain that any reasonable American who reads the enforcement provisions will agree with me that this legislation cannot be supported in good conscience in its present form.

Mr. Speaker, my record in support of human dignity for all Americans is crystal clear, and I need never apologize for my contribution toward better understanding and opportunity for all Americans.

Even on so important a measure as fair housing, I believe that any fair-minded American would strongly uphold an equal right of every other American to purchase, lease or occupy a home for his family commensurate with his ability to afford such housing.

As a matter of fact, the most recent survey which I conducted in my district shows that an overwhelming 62.1 percent of the residents in my district are willing to accept limited integration as long as all property owners properly maintain their homes and have comparable educational and economic backgrounds.

But that same survey clearly shows that 56.2 percent of my constituents are opposed to open housing legislation because they believe integration can be accomplished more effectively through voluntary procedures than by the force of law.

I, myself, Mr. Speaker, would certainly subscribe to the principle that every citizen in this country has a right to purchase a home in any community if such a person can afford to purchase the home and wishes to maintain it in a manner similar to the general standards of the community. Such a right is the basic philosophy of our whole Republic and I might add, that equality in housing has been a creature of Federal statute for nearly 100 years.

On April 9, 1866, Congress enacted a law which now appears as 42 U.S.C. 1982, entitled "Property Rights of Citizens," which provided that—

All citizens of the United States shall have the same right, in every State or territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

9604    CONGRESSIONAL RECORD — HOUSE    *April 10, 1968*

In the National Housing Act of 1949, the Congress reiterated this commitment under the heading "Congressional Declaration of National Housing Policy," in the following terms:

The Congress declares that the general welfare and security of the Nation * * * require * * * the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family.

In 1962, President John F. Kennedy promulgated Executive Order No. 11063, which was aimed at the elimination of discrimination in federally assisted housing.

Thus, the fact that the Federal Government is undertaking to act in this area should not, of itself, be the source of deep concern. What is the source of deep concern is that the enforcement provision of the open occupancy act before us sets up such a vast network of Federal bureaucracy to enforce these rights that no citizens can be secure in the knowledge that whatever he does with his property, no matter how well-meaning or innocent, he will still be subject to Federal harassment.

This is no exaggeration.

Just look at the first sentence of section 810(a) of the enforcement section of the bill before us, which states as follows:

Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter "person aggrieved") may file a complaint with the Secretary.

Mr. Speaker, what is proposed here by sponsors of this legislation is that they not only permit a course of action for those who are actually aggrieved, but they also give a broad basis for action against a homeowner to those persons who "believe" that they will be injured by an action of a homeowner "that is about to occur." No other law provides such a broad basis for action even before a discriminatory act actually occurs.

Furthermore, not only is a homeowner subject to this kind of harassment, but this bill, unlike any other legislation, subjects a homeowner to a fine of $1,000 and/or a sentence in jail for 1 year if he refuses to cooperate or carry out an order of the Secretary of Housing and Urban Development.

This is the heart of the issue. No other law in this country gives a Federal official such broad powers as this provision which would make every homeowner subject to the dictates of the Secretary and expose the homeowner to a jail sentence if he doesn't comply.

One of the most objectionable features of this whole enforcement provision is that the Government would pay for the entire legal costs of a complainant if he cannot afford such legal costs himself, but there is no similar provision in this act that if a defendant—a homeowner—is subsequently found not guilty of an offense, the legal costs he or she has incurred in defending himself would also be borne by either the complainant or the Government.

In other words, Mr. Speaker, with the kind of harassment that is provided in this legislation, homeowners throughout this country would be subject to substantial legal costs in defending themselves with no provision that if they prove themselves innocent of such charges, the cost of the defense would be borne by someone other than themselves.

In the 1966 Civil Rights Act, the House specifically excluded the single family homeowner up to and including a four flat, and further provided that a real estate agent would also be excluded if he was acting on specific and express instructions from an owner selling his home.

Furthermore, one finds very little consolation in the provision of this act which states that a single family homeowner shall be excluded from coverage if he sells his home without the help of a real estate agent. Eighty percent of the homes in this country are sold through the services of a real estate agent because the average homeowner does not have the facilities or the ability to sell his own home and receive full value.

Under the provision of this act, after December 31, 1969, the moment a potential home seller retains the services of a real estate agent, he would be subject to the full coverage of this act, including all of the enforcement procedures and harassment by disgruntled potential home buyers.

Now, even under our injunctive laws, some overt act must first occur before you can seek relief through injunction, but here under the broad language of this act, we give a home seeker the right to move against a homeowner merely because he "believes" that an act will occur which will deny him a fair opportunity at decent housing.

As we read through this whole enforcement section, we find example after example of how the bureaucracy has carefully constructed a network of provisions in this law which, in my honest judgment, will subject every homeowner to a degree of harassment unprecedented in the history of this Nation.

As one who strongly believes in human dignity because my own people, for a thousand years have been the victims of discrimination and persecution, I tell you Mr. Speaker, that it is with a heavy heart that I must vote against this legislation today. But when I took my oath, I assumed a responsibility to conduct myself in a manner that will provide maximum protection and representation for the people whom I represent here in Congress.

I am mindful of those who feel a great deal of compassion for the minority groups of America, and I would yield to no one in my own concern for their plight.

But I have seen the erosion of personal liberties in this country, not through legislation that the Congress has enacted, but through rules and regulations adopted by the Federal bureaucracy to implement the intent of Congress.

Having seen what can happen through administrative fiat in the administration of bills passed in good faith by the Congress, I do not intend to subject the property owners in my congressional district to the same kind of harassment

through the bill now before us dealing with open occupancy.

I invite those who have urged support of this legislation to carefully read the full provisions of the enforcement section and judge for themselves the degree of harassment which the Federal Government can engage in if this act is enacted by Congress.

This is undoubtedly the most difficult decision that I have had to make since coming to Congress, but I want to underscore that in voting against this provision I am reflecting the overwhelming majority of views of my constituents.

More important, in my own honest judgment, enactment of this provision in the Civil Right Act of 1968 will create more turmoil in this country at a time when America needs a pause to restructure its communities.

I call my colleagues' attention to an article which appeared in the Washington Star by the very distinguished columnist, James Kilpatrick, dealing with this subject.

Mr. Kilpatrick is no racist. His long record as a distinguished columnist fighting for the rights of minority groups is well known. Neither am I a racist or a bigot, but I must agree with the conclusions reached by Mr. Kilpatrick in his analysis of this bill.

Mr. Kilpatrick, in his article, quite correctly points out that this entire open housing amendment has received relatively little attention in the press as to its basic details.

The press has merely centered on whether or not Members of Congress appear to be for open housing or against it on principle alone. There has been little disposition to get down to specific provisions on a line-to-line basis.

But I believe that when the American people study this proviso line by line and see, as Mr. Kilpatrick has stated, that unlike establishing a Fair Housing Board—as was proposed in the 1966 legislation—named by the President and confirmed by the Senate to administer a Federal Fair Housing Act, the proposal before us today gives vast powers to a single individual; namely, the Secretary of Housing and Urban Development. He would be vested with breathtaking powers of administration and enforcement.

More important, the bill before us today does not merely make the Secretary the administrator, it further permits the Secretary to delegate any of his functions, duties and powers to employees of the Department or to boards of such employees.

Here is what Mr. Kilpatrick said about this particular provision of the civil rights bill before us today:

What are these powers that any designated employee could exercise in the secretary's name? They include the power to receive complaints of discrimination, to investigate complaints, and to resolve complaints. The Secretary could issue "cease and desist orders." He could require the persons who sells or rents property "to take such affirmative action as will effectuate the policies of this act."

The secretary is judge, jury, policeman and prosecuting attorney, all wrapped into one. The Secretary may administer oaths.

He "may issue subpoenas" to compel the attendance of persons before him. Failure to obey the secretary's order would carry a fine of not more than $1,000 or imprisonment of not more than one year, or both.

Mr. Kilpatrick stated further:

How in the name of a free country could any such federal act as this be seriously considered? The answer lies in the hysteria that has been fomented by the hair-trigger cause of "civil rights." Ordinarily rational men, acting from honest emotion, or threat of riot, or from hope of political gain, have lost their sense of perspective. In their eagerness to "do what is right for the Negro," or to appease the extremists, these gentlemen would toss old concepts of property rights to the winds.

Mr. Speaker, I believe it is time to stop and see where this Nation is going and to see how far we have come before we pile any further restrictions on free American citizens.

Less and less attention is being given to the basic rights of all Americans because some Americans have become so thoroughly obsessed with the struggle now going on in this country.

As I watch the Federal Government reach out further and further into the rights of the American citizen, I cannot help but feel that we here in Congress have a responsibility to carefully study this particular bill before it becomes law.

I am mindful that many States and many local communities have passed fair housing legislation. We in Chicago have a fair housing ordinance which has been on the books for the last 5 years or more.

But when you have local laws and State statutes there is a greater degree of protection for the individual citizen against abuses of these ordinances and statutes because the citizen himself is closer to local government.

We must constantly guard against the burgeoning Federal bureaucracy which is protected by civil service laws and which, time after time, is oblivious of any direction from either the executive branch of Government or the legislative branch of Government.

Once the President affixes his signature to this bill and this bill becomes law, the Federal bureaucracy takes over and with its broad powers then starts moving into community after community with no regard for either the President or the Congress.

I have tried to persuade the House to send the bill to conference so we can correct some of its weaknesses but the House insists on final action even though the open occupancy provision has not had 1 day of public hearings and there has been absolutely no debate on this issue in the House.

I know of no legislation that has come before the Congress which can affect the lives of every American citizen more than the open housing bill pending before us today, and for that reason, Mr. Speaker, in good conscience I cannot support this bill in its present form.

Mr. Speaker, the text of the Senate open housing amendment to the Civil Rights Act follows:

### TITLE VIII—FAIR HOUSING

#### POLICY

Sec. 801. It is the policy of the United States to provide within constitutional limitations, for fair housing throughout the United States.

#### DEFINITIONS

* * *

#### EFFECTIVE DATES OF CERTAIN PROHIBITIONS

Sec. 803. (a) Subject to the provisions of subsection (b) and section 807, the prohibitions against discrimination in the sale or rental of housing set forth in section 804 shall apply:

(1) Upon enactment of this title, to—

(A) dwellings owned or operated by the Federal Government;

(B) dwellings provided in whole or in part with the aid of loans, advances, grants, or contributions made by the Federal Government, under agreements entered into after November 20, 1962, unless payment due thereon has been made in full prior to the date of enactment of this title;

(C) dwellings provided in whole or in part by loans insured, guaranteed, or otherwise secured by the credit of the Federal Government, under agreements entered into after November 20, 1962, unless payment thereon has been made in full prior to the date of enactment of this title: *Provided,* That nothing contained in subparagraphs (B) and (C) of this subsection shall be applicable to dwellings solely by virtue of the fact that they are subject to mortgages held by an FDIC or FSLIC institution; and

(D) dwellings provided by the development or the redevelopment of real property purchased, rented, or otherwise obtained from a State or local public agency receiving Federal financial assistance for slum clearance or urban renewal with respect to such real property under loan or grant contracts entered into after November 20, 1962.

(2) After December 31, 1968, to all dwellings covered by paragraph (1) and to all other dwellings except as exempted by subsection (b).

(b) Nothing in section 804 (other than subsection (c)) shall apply to—

(1) any single-family house sold or rented by an owner *Provided,* That such private individual owner does not own more than three such single-family houses at any one time: *Provided further,* That in the case of the sale of any such single-family house by a private individual owner not residing in such house at the time of such sale or who was not the most recent resident of such house prior to such sale, the exemption granted by this subsection shall apply only with respect to one such sale within any twenty-four month period: *Provided further,* That such bona fide private individual owner does not own any interest in, nor is there owned or reserved on his behalf, under any express or voluntary agreement, title to or any right to all or a portion of the proceeds from the sale or rental of, more than three such single-family houses at any time: *Provided further,* That after December 31, 1969, the sale or rental of any such single family house shall be excepted from the application of this title only if such house is sold or rented (A) without the use in any manner of the sales rental or any such single-family house shall or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings, or of any employee or agent of any such broker, agent, salesman, or person and (B) without the publication, posting or mailing, after notice, of any advertisement or written notice in violation of section 804 (c) of this title; but nothing in this proviso shall prohibit the use of attorneys, escrow agents, abstractors, title companies, and other such professional assistance as necessary to perfect or tranfer the title, or

(2) rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.

(c) For the purposes of subsection (b), a person shall be deemed to be in the business of selling or renting dwellings if—

(1) he has, within the preceding twelve months, participated as principal in three or more transactions involving the sale or rental of any dwelling or any interest therein, or

(2) he has, within the preceding twelve months, participated as agent, other than in the sale of his own personal residence in providing sales or rental facilities or sales or rental services in two or more transactions involving the sale or rental of any dwelling or any interest therein, or

(3) he is the owner of any dwelling designed or intended for occupancy by, or occupied by, five or more families.

#### DISCRIMINATION IN THE SALE OR RENTAL OF HOUSING

Sec. 804. As made applicable by section 803 and except as exempted by sections 803(b) and 807, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, or national origin.

#### DISCRIMINATION IN THE FINANCING OF HOUSING

Sec. 805. After December 31, 1968, it shall be unlawful for any bank, building and loan association, insurance company or other corporation, association, firm or enterprise whose business consists in whole or in part in the making of commercial real estate loans, to deny a loan or other financial assistance to a person applying therefor for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, or national origin of such person or of any person associated with him in connection with such loan or other financial assistance or the purposes of such loan or other financial assistance, or of the present or prospective owners, lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan or other financial assistance is to be made or given: *Provided,* That nothing contained in this section shall impair the scope or effectiveness of the exception contained in section 803(b).

#### DISCRIMINATION IN THE PROVISION OF BROKERAGE SERVICES

Sec. 806. After December 31, 1968, it shall be unlawful to deny any person access to or membership or participation in any mul-

tiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, or national origin.

### EXEMPTION

SEC. 807. Nothing in this title shall prohibit a religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted on account of race, color, or national origin. Nor shall anything in this title prohibit a private club not in fact open to the public, which as an incident to its primary purpose or purposes provides lodgings which it owns or operates for other than a commercial purpose, from limiting the rental or occupancy of such lodgings to its members or from giving preference to its members.

### ADMINISTRATION

SEC. 808. (a) The authority and responsibility for administering this Act shall be in the Secretary of Housing and Urban Development.

(b) The Department of Housing and Urban Development shall be provided an additional Assistant Secretary. The Department of Housing and Urban Development Act (Public Law 89–174, 79 Stat. 667) is hereby amended by—

(1) striking the word "four," in section 4(a) of said Act (79 Stat. 668; 5 U.S.C. 624b (a)) and substituting therefor "five,"; and

(2) striking the word "six," in section 7 of said Act (79 Stat. 669; 5 U.S.C. 624(c)) and substituting therefor "seven."

(c) The Secretary may delegate any of his functions, duties, and powers to employees of the Department of Housing and Urban Development or to boards of such employees, including functions, duties, and powers with respect to investigating, conciliating, hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter under this title. The persons to whom such delegations are made with respect to hearing functions, duties, and powers shall be appointed and shall serve in the Department of Housing and Urban Development in compliance with sections 3105, 3344, 5362, and 7521 of title 5 of the United States Code. Insofar as possible, conciliation meetings shall be held in the cities or other localities where the discriminatory housing practices allegedly occurred. The Secretary shall by rule prescribe such rights of appeal from the decisions of his hearing examiners to other hearing examiners or to other officers in the Department, to boards of officers or to himself, as shall be appropriate and in accordance with law.

(d) All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this title and shall cooperate with the Secretary to further such purposes.

(e) The Secretary of Housing and Urban Development shall—

(1) make studies with respect to the nature and extent of discriminatory housing practices in representative communities, urban, suburban, and rural, throughout the United States;

(2) publish and disseminate reports, recommendations, and information derived from such studies;

(3) cooperate with and render technical assistance to Federal, State, local, and other public or private agencies, organizations, and institutions which are formulating or carrying on programs to prevent or eliminate discriminatory housing practices;

(4) cooperate with and render such technical and other assistance to the Community Relations Service as may be appropriate to further its activities in preventing or eliminating discriminatory housing practices; and

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title.

### EDUCATION AND CONCILIATION

SEC. 809. Immediately after the enactment of this title the Secretary shall commence such educational and conciliatory activities as in his judgment will further the purposes of this title. He shall call conferences of persons in the housing industry and other interested parties to acquaint them with the provisions of this title and his suggested means of implementing it, and shall endeavor with their advice to work out programs of voluntary compliance and of enforcement. He may pay per diem, travel, and transportation expenses for persons attending such conferences as provided in section 5703 of title 5 of the United States Code. He shall consult with State and local officials and other interested parties to learn the extent, if any, to which housing discrimination exists in their State or locality, and whether and how State or local enforcement programs might be utilized to combat such discrimination in connection with or in place of, the Secretary's enforcement of this title. The Secretary shall issue reports on such conferences and consultations as he deems appropriate.

### ENFORCEMENT

SEC. 810. (a) Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter "person aggrieved") may file a complaint with the Secretary. Complaints shall be in writing and shall contain such information and be in such form as the Secretary requires. Upon receipt of such a complaint the Secretary shall furnish a copy of the same to the person or persons who allegedly committed or are about to commit the alleged discriminatory housing practice. Within thirty days after receiving a complaint, or within thirty days after the expiration of any period of reference under subsection (c), the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint, he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. Nothing said or done in the course of such informal endeavors may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Secretary who shall make public any information in violation of this provision shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or imprisoned not more than one year.

(b) A complaint under subsection (a) shall be filed within one hundred and eighty days after the alleged discriminatory housing practice occurred. Complaints shall be in writing and shall state the facts upon which the allegations of a discriminatory housing practice are based. Complaints may be reasonably and fairly amended at any time. A respondent may file an answer to the complaint against him and with the leave of the Secretary, which shall be granted whenever it would be reasonable and fair to do so, may amend his answer at any time. Both complaints and answers shall be verified.

(c) Wherever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title, the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law, and the Secretary shall take no further action with respect to such complaint if the appropriate State or local law enforcement official has, within thirty days from the date the alleged offense has been brought to his attention, commenced proceedings in the matter, or, having done so, carries forward such proceedings with reasonable promptness. In no event shall the Secretary take further action unless he certifies that in his judgment, under the circumstances of the particular case, the protection of the rights of the parties or the interests of justice require such action.

(d) If within thirty days after a complaint is filed with the Secretary or within thirty days after expiration of any period of reference under subsection (c), the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this title, insofar as such rights relate to the subject of the complaint: *Provided,* That no such civil action may be brought in any United States district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title. Such actions may be brought without regard to the amount in controversy in any United States district court for the district in which the discriminatory housing practice is alleged to have occurred or be about to occur or in which the respondent resides or transacts business. If the court finds that a discriminatory housing practice has occurred or is about to occur, the court may, subject to the provisions of section 812, enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate.

(e) In any proceeding brought pursuant to this section, the burden of proof shall be on the complainant.

(f) Whenever an action filed by an individual, in either Federal or State court, pursuant to this section or section 812, shall come to trial the Secretary shall immediately terminate all efforts to obtain voluntary compliance.

### INVESTIGATIONS; SUBPENAS; GIVING OF EVIDENCE

SEC. 811. (a) In conducting an investigation the Secretary shall have access at all reasonable times to premises, records, documents, individuals, and other evidence or possible sources of evidence and may examine, record, and copy such materials and take and record the testimony or statements of such persons as are reasonably necessary for the furtherance of the investigation: *Provided, however,* That the Secretary first complies with the provisions of the Fourth Amendment relating to unreasonable searches and seizures. The Secretary may issue subpenas to compel his access to or the production of such materials, or the appearance of such persons, and may issue interrogatories to a respondent, to the same extent and subject to the same limitations as would apply if the subpenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is

taking place. The Secretary may administer oaths.

(b) Upon written application to the Secretary, a respondent shall be entitled to the issuance of a reasonable number of subpenas by and in the name of the Secretary to the same extent and subject to the same limitations as subpenas issued by the Secretary himself. Subpenas issued at the request of a respondent shall show on their face the name and address of such respondent and shall state that they were issued at his request.

(c) Witnesses summoned by subpena of the Secretary shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts. Fees payable to a witness summoned by a subpena issued at the request of a respondent shall be paid by him.

(d) Within five days after service of a subpena upon any person, such person may petition the Secretary to revoke or modify the subpena. The Secretary shall grant the petition if he finds that the subpena requires appearance or attendance at an unreasonable time or place, that it requires production of evidence which does not relate to any matter under investigation, that it does not describe with sufficient particularity the evidence to be produced, that compliance would be unduly onerous, or for other good reason.

(e) In case of contumacy or refusal to obey a subpena, the Secretary or other person at whose request it was issued may petition for its enforcement in the United States district court for the district in which the person to whom the subpena was addressed resides, was served, or transacts business.

(f) Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence, if in his power to do so, in obedience to the subpena or lawful order of the Secretary, shall be fined not more than $1,000 or imprisoned not more than one year, or both. Any person who, with intent thereby to mislead the Secretary, shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document submitted to the Secretary pursuant to his subpena or other order, or shall willfully neglect or fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(g) The Attorney General shall conduct all litigation in which the Secretary participates as a party or as amicus pursuant to this Act.

ENFORCEMENT BY PRIVATE PERSONS

SEC. 812. (a) The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. *A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred; Providing, however,* That the court shall continue such civil case brought pursuant to this section or section 810(d) from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in the complaint made to the Secretary or to the local or State agency and which practice forms the basis for the action in court: *And provided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving *a bona fide purchaser,* encumbrancer, or tenant *without actual notice* of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected.

(b) Upon application by the plaintiff and in such circumstances as the court may deem just, a court of the United States in which a civil action under this section has been brought may appoint an attorney for the plaintiff and may authorize the commencement of a civil action upon proper showing without the payment of fees, costs, or security. A court of a State or subdivision thereof may do likewise to the extent not inconsistent with the law or procedures of the State or subdivision.

(c) The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff *actual damages* and not more than *$1,000 punitive damages,* together with court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees.

ENFORCEMENT BY THE ATTORNEY GENERAL

SEC. 813. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been, denied any of the rights granted by this title and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this title.

EXPEDITION OF PROCEEDINGS

SEC. 814. Any court in which a proceeding is instituted under section 812 or 813 of this title shall assign the case for hearing at the earliest practicable date and cause the case to be in every way expedited.

EFFECT OF STATE LAWS

SEC. 815. Nothing in this title shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any jurisdiction in which this title shall be effective, that grants, guarantees, or protects the same rights as are granted by this title; but any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this title shall to that extent be invalid.

COOPERATION WITH STATE AND LOCAL AGENCIES ADMINISTERING FAIR HOUSING LAWS

SEC. 816. The Secretary may cooperate with State and local agencies charged with the administration of State and local fair housing laws and, with the consent of such agencies, utilize the services of such agencies and their employees and, notwithstanding any other provision of law, may reimburse such agencies and their employees for services rendered to assist him in carrying out this title. In furtherance of such cooperative efforts, the Secretary may enter into written agreements with such State or local agencies. All agreements and terminations thereof shall be published in the Federal Register.

INTERFERENCE, COERCION, OR INTIMIDATION

SEC. 817. It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806. This section may be enforced by appropriate civil action.

APPROPRIATIONS

SEC. 818. There are hereby authorized to be appropriated such sums as are necessary to carry out the purposes of this title.

SEPARABILITY OF PROVISIONS

SEC. 819. If any provision of this title or the application thereof to any person or circumstances is held invalid, the remainder of the title and the application of the provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

TITLE IX

PREVENTION OF INTIMIDATION IN FAIR HOUSING CASES

SEC. 901. Whoever, whether or not acting under color of law, by force or threat of force willfully, injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(a) any person because of his race, color, religion or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling, or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings; or

(b) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

(1) participating, without discrimination on account of race, color, religion or national origin, in any of the activities, services, organizations or facilities described in subsection 901(a); or

(2) affording another person or class of persons opportunity or protection so to participate; or

(c) any citizen because he is or has been or in order to discourage such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the activities, services, organizations or facilities described in subsection 901(a), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate—

shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

Mr. HORTON. Mr. Speaker, I first would like to commend my colleagues on the high quality of discussion and debate that we have conducted on this bill. I know that all of my colleagues realize that the eyes of the Nation are on the House today as we decide the fate of H.R. 2516 as it was passed by the Senate.

Many Americans think this bill is a test for the Congress—testing whether or not we can be responsive to pressing problems which face America. Others, also in great numbers, feel that such important and serious legislation should not be voted upon in an atmosphere of crisis or hysteria, when the Nation is reacting to the shock of an assassination and the wanton riots and destruction which ensued.

My view is that such events outside the sphere of Government should not be permitted to disrupt or postpone action which has already been scheduled by the Congress on such important legislation. All of us knew long before the events of

056673

Case 1:13-cv-00966-RJL     Document 153-3     Filed 05/30/23     Page 82 of 111

last weekend that H.R. 2516 was slated for a crucial decision this week. We have all been studying this measure for many, many weeks, and we have all thoroughly read and considered the opinions of our constituents—the people of America. Irresponsible rioters should not be permitted to stall the workings of Congress, any more than they should be permitted to disrupt the lives of peaceful citizens in our cities.

Mr. Speaker, I believe that the provisions of this bill are very much in tune with the landmark legislation in the field of individual rights which Congress has enacted earlier in this decade. H.R. 2516 takes several important steps toward underscoring the determination of Congress and the Federal Government to make good the promise and the philosophy which is bound up in the 13th, 14th, and 15th amendments to the Constitution.

I support this legislation, and I am proud to be among a great many of our colleagues who share my support for its enactment today. This bill protects the individual rights of every American, not just those of one class or economic strata. We cannot fail to provide this protection.

Mr. BROWN of Ohio. Mr. Speaker, as is so frequently the case with legislation, H.R. 2516, the so-called civil rights bill of 1968, is not perfect. But it contains a number of features which are needed now.

I have examined this complex bill carefully and objectively. I have concluded that the bill should be passed as promptly as possible in the best interest of all our Nation's citizens.

While it is true that several parts of this legislation have not undergone the usual House procedure of careful reexamination by committee since passage by the Senate, it is also true that the vast national attention focused on this legislation has resulted in more careful scrutiny by every individual Member of this body than may be usual.

Title VIII, the open housing section, is generally considered the most controversial feature of this bill. The way this title is drawn hones very close to the bone of two fundamental principles: the individual right to reside wherever you can afford without discrimination on account of race, creed, or color; and the individual right to do with the property you own as you see fit. Nothing in this legislation can be construed to force an individual to sell his property to another unwillingly.

But I must point out that I am unhappy with the provisions in this legislation which I feel discriminate against the use of real estate brokers in the handling of homes and I feel the legislation should be corrected in this regard. Whether one can or cannot discriminate regarding his own home should not be dependent upon the use of an agent, but rather on whether or not one is in the business of selling or renting property.

I voted for the House-passed open housing legislation in 1966 which was rejected by the Senate. Events since then have not dissuaded me from that position. All Americans with the ambition and ability to improve their station in life should have the opportunity to do

so without discrimination. This need is addressed in title VIII of this bill.

The pattern of minority groups throughout our Nation's brief history has been to move into the ghetto and then out of it. After the events of last week, I am sure many Negro Americans will have even more motivation to achieve in order to be able to escape to a place of greater safety and opportunity for themselves and their children. So, while I do not agree with all of the details of this bill, certain features are needed now.

Events of last week attest to the need for legislation to prohibit rioting and violence for whatever purpose. We need legislation to prevent interference with those pursuing their own civil rights or attempting to educate others about their rights. But we also need legislation to prevent inciting of violence in the name of civil rights or under whatever pretext. Such an urgent need cannot await delay nor tolerate inaction. These needs are addressed in title I of this bill.

Related to the above necessity to protect the bona fide civil rights movement, while restricting the riots and violence which unfortunately have been promulgated falsely in the name of that legitimate movement, is the need for legislation to limit the manufacturing or transporting of firearms, explosives, and incendiaries, along with advocating or instructing in their use in civil disorders. This need is addressed in title X of this bill.

This is also an appropriate time to improve the situation of the American Indian who has been denied many rights for too long. This need is addressed in titles II through VII of this bill.

Further delay in passage of this legislation could be dangerous. The legislation is legitimate and warranted. Last week made the need urgent. To delay would strengthen the hand and voice of the extremists, who are only sometimes racists. Some are extremists for personal or political advantage. To allow these extremists, regardless of which variety, to continue to exploit the genuine problems confronting the Negro would further polarize our Nation and threaten much greater civil disorder and riot in the future.

To delay would threaten the life and property of many more law-abiding citizens, whatever their economic circumstance or whatever their commitment to the cause of civil rights. Delay could mean further disorder and destruction with the inevitable loss of places to work or live.

And, finally, to delay would apparently deprive the Attorney General the authority he seems to feel he needs to move against national advocates of civil riot. For 2 years I have repeatedly urged the prosecution of such individuals. But the administration apparently felt it lacked the authority to prosecute. During this time the situation has grown increasingly worse. Passage of this act should remove that cloud by which the administration has avoided what I deem to be its duty.

Under no circumstances should legislation be considered as a memorial to an individual, because this is a nation of

laws, not of individuals. But it may be appropriate to pass legislation and to do so promptly in the interests of preserving the orderly processes of our American system.

Those who would capitalize most upon our failure to pass this legislation are the same as those who would profit most from the disorders which followed the assassination of Martin Luther King, the Communists and the advocates of racial separatism.

And perhaps this is an appropriate point at which to ask whether the administration, the Congress, the news media, or the American people have given adequate consideration to this fact in connection with the recent tragic assassination.

Mrs. DWYER. Mr. Speaker, both simple justice and the equity of the Constitution compel us today to approve both the preferential resolution (H. Res. 1100) and the bill (H.R. 2516) as amended by the Senate including its open housing provisions.

There has been a great deal of misunderstanding, I fear, about what this bill would do in regard to open housing and about the manner in which the House is considering the legislation. After considerable study, both of the legislation itself and of the objections which have been raised against it, I am personally convinced that the weight of the evidence clearly comes down in favor of the bill and of the preferential resolution which will enable us to vote on the merits.

First, Mr. Speaker, by passing this long-overdue legislation, the House will not—repeat not—be acting hurriedly or emotionally. It will be voting belatedly and I hope soundly on matters of fundamental justice which have been under active consideration in Congress for several years.

As I am sure our colleagues will recall, a majority of the House, of which I was one, voted in favor of open housing legislation in the 89th Congress. Subsequent filibusters in the other body have accounted for the ensuing delay.

Contrary to the assumptions of many people, therefore, today's scheduled vote on civil rights has nothing directly to do with the tragic assassination of Dr. Martin Luther King, Jr., or with the disorders which followed. The Senate had finally passed the legislation in March and the House had, prior to Dr. King's death, assigned the bill for consideration today.

By any test, however, approval of this bill is right. Morally, discrimination based on race is wrong.

Constitutionally, the law cannot be—as it is today in many parts of the country—exploited for the purpose of enforcing housing segregation.

Politically, we shall irreparably damage and divide our country unless we honestly strive for equal opportunity and equal rights.

And practically, several States—including the State of New Jersey—already have in force open housing statutes even more comprehensive than the bill before the House. Consequently, passage of this legislation will not change the situation

in these States—again including New Jersey—in any respect.

Finally, Mr. Speaker, it is useful to remind ourselves that the pending bill is a better balanced piece of legislation than most people seem to realize. In addition to its civil rights provisions, it contains important antiriot sections which will be effective in preventing and controlling any further disorders.

For all these reasons—but with emphasis on the continuing need to do justice, to discourage racial discrimination, to bring new hope and opportunity to all our people—I urge our colleagues to approve the resolution and to pass the bill. In the final analysis, the obligation to act rightly and responsibly belongs to us. We must not avoid it.

Mr. SMITH of California. Mr. Speaker, I yield 5 minutes to the distinguished minority leader, the gentleman from Michigan [Mr. GERALD R. FORD].

Mr. GERALD R. FORD. Mr. Speaker, I speak only for myself. In this emotional atmosphere I would hesitate to claim that I speak for others.

I must say that I speak with deep conviction and with a troubled heart.

As I said several weeks ago, I favor the enactment of fair housing legislation and will vote for such legislation regardless of the parliamentary procedure determined by a majority of the Members of this body. But in all sincerity I strongly urge that the Senate bill be sent to conference.

Mr. Speaker, over the years the Congress, but more particularly the House of Representatives, has been a bulwark of strength reflecting the good judgment of the American people. This is so because we—each of us—go back to put our records on the line for approval or disapproval every 2 years.

Over the years the House with courage and wisdom has rejected the excessive and unwise demands of the executive branch of the Government.

Over the years the House with forthrightness and sagacity has maintained its right as a copartner with the Senate in working our combined will on legislative matters.

Over the years the House with dedication and good judgment has refused to be stampeded by one group or one segment of our society.

We have followed the time-tested procedures, and America has been the better for it. The net result: the Congress, and specifically the House of Representatives, has contributed constructively to America today and despite its problems, it is a great country.

I am saddened—and I sincerely mean it—by what we may do here today, not on the issue of open housing but because I feel we may abandon those procedures whereby a collective judgment of the Members of the other body and of ourselves will be the determining factor in what we finally approve.

I am saddened by the possibility that we may be rubberstamping some far-reaching legislation that came from the other body, not for ourselves in part.

Today we are considering this bill of some 50 pages, and we are considering it in 1 hour on an up or down basis.

It all began last August in this body when the House, by a vote of 326 to 93, passed a six-and-a-half-page bill which went to the other body and was referred to their Committee on the Judiciary. After 3 months of consideration their Committee on the Judiciary sent to the Senate a four-and-a-half-page document which was significantly different from the bill that we passed.

Then in January of this year this bill, as amended by the Senate Committee on the Judiciary, came to the Senate floor, and in 40 days of debate that body considered the House bill as amended and added one amendment after another, including H.R. 421, which in July of last year we passed in the House by a vote of 347 to 70.

But they did not pass the same bill in substance that the House had approved. The amendment the Senate added is not the bill that we passed. As a matter of fact, they deleted a most important provision which this House in working its will insisted be retained in the legislation by a vote of 2 to 1.

There are other substantive differences in this bill between what we passed and what the Senate approved. The Senate in its 40 days of deliberations added S. 1843 relating to Indian rights, approved by the Senate Committee on Interior and Insular Affairs. This was a 10-page-plus bill of considerable importance and some little controversy. This is legislation which is in the House Committee on Interior and Insular Affairs with no action on it thus far. If we approve this 50-page bill today, we will take from the 34 Members on both sides of the aisle in that committee the right to work their will and to make their recommendations to us.

Then the other body added a 23-page open housing provision, a provision which is quite different from the one passed here 2 years ago in the House of Representatives. The fair housing legislation passed in 1966 was more narrow in its coverage but more stringent in its enforcement provisions.

The SPEAKER pro tempore (Mr. ALBERT.) The time of the gentleman from Michigan has expired.

Mr. SMITH of California. Mr. Speaker, I yield the gentleman 1½ additional minutes.

Mr. GERALD R. FORD. I pass no judgment on the two fair housing versions—the House version called the Mathias amendment on the Senate version—but since the House in the 90th Congress has not previously considered such legislation. I believe we should now do so through our House conferees.

Of course the Senate added other legislation concerning so-called gun control.

It will be said there is no significant difference between what the Senate did and what the House approved in August 1967. I respectfully urge each and every one of you to examine carefully this 24-page memorandum that came from the House Committee on the Judiciary staff. No good lawyer could allege there are no significant or material differences between the House version and the Senate proposal. The memorandum points—

MEMORANDUM ON H.R. 2516

This memorandum contains a more complete analysis of H.R. 2516 (as passed by the Senate on March 11, 1968) than that provided by minority staff in the first memorandum of March 13, 1968. As in the first memorandum, the Senate substitute is compared to relevant House-passed bills, H.R. 2516 and H.R. 421 of the 90th Congress and H.R. 14765 of the 89th Congress. However, unlike the first memorandum, this provides an analysis of Titles II through VII of the Senate substitute which treat with Indian rights.

TITLE I—INTERFERENCE WITH FEDERALLY PROTECTED ACTIVITIES

Title I of the Senate version embraces the areas covered both in H.R. 2516 and H.R. 421, as they passed the House in 1967. It should be noted that Republican members of the Judiciary Committee expressed the view in the Committee reports on both of these House bills that the two bills actually reflected two sides of one problem, and that they therefore should be joined together. The Senate has taken the suggested approach.

The first half of Title I is similar to the House version of H.R. 2516. However, there are several differences. Both the House version and the Senate version make it a crime for anyone, whether or not acting under the color of law, by force or threat of force, to injure, intimidate or interfere with any person because he is or has been participating in specified federally protected activities. However, the Senate version requires that such injury be done "willfully," whereas the House version requires that it be done only "knowingly."

The Senate version divides the enumerated activities into two categories: the first might be called that of greater federal interest; and the second, that of lesser federal interest. But only as to the second category of activities does the Senate version purportedly require that racial motivation (a shorthand term for "because of his race, color, religion or national origin") be proved as an element of the offense. The House version does not divide the enumerated activities into two categories, and requires that racial motivation be proved as to all cases. The Senate version does not mimic the House version in describing the substance of the protected activities. There are thus subtle differences in the two versions.

After considerable debate in the House, it was agreed that "attempts to interfere" with a person's federally protected rights were simply too tenuous a basis for prosecution. The Senate version does not agree. However, neither did the House version consistently take that position throughout the entire bill. Compare Sec. 245(a) with Sec. 245 (b), 245(c) and 245(d).

The House version forbids discrimination on the basis of "political affiliation" in the enumerated areas, whereas the Senate version does not.

After some discussion, the House, in the Committee of the Whole, narrowly defeated (90-90) an amendment to protect businessmen during riots. However, such protection is extended to such people by Sec. 245(b)(3) of the Senate version.

Sec. 245(b)(4)(A) of the Senate version, which forbids interference with "participating without discrimination on account of race, color, religion or national origin in any of the benefits or activities" enumerated, presents a serious problem. If the section is designed to proscribe acts of terrorism against minority groups, it may be superfluous (and certainly confusing) in view of the intimidation clause that was added by the Senate at subsection 1 of the Sec. 245(b). The House bill requires a separate acts-of-terror section, 245(b) (on page 3 of the House version), because it does not have an intimidation clause comparable to that in Sec. 245(b)(1) of the Senate version. If, on the other hand, it is not designed to proscribe acts of terrorism, but applies rather

to civil rights workers (see Cong. Rec., March 7, 1968, page 5636), it is likewise superfluous and confusing.

It should be noted that the language of the House version is far more clear. The principal sections were not rewritten on the floor. Thus the House version avoids awkward phraseology like that in proposed section 245(b)(1): "whoever, whether or not acting under color of law, by force or threat of force willfully . . . intimidates . . . any person . . . in order to intimidate such person or any other person or any class of persons from" participating in the activities described. Proposed section 245(b)(4)(A) repeats this language verbatim except that it adds the qualification that the victim must be participating "without discrimination on account of race," etc. Is that a distinction without a difference? Probably so.

Proposed section 245(b)(2) requires racial motivation as an element of the offenses concerning activities of lesser federal interest. This is the only place in Title I of the Senate version where racial motivation is made an element of an offense. But that requirement in proposed section 245(b)(2) is made meaningless by (b)(4) of such section which makes it a crime to do what (b)(2) forbids even if racial motivation is lacking.

Thus the element of racial motivation drops out of the Senate version—an effect which was probably not intended by the other body. Thus, for example, if a fist fight breaks out in a labor dispute because one party was "enjoying employment . . . by any private employer" as, say, a scab laborer, then a federal crime may have been committed. The same might be true if two employees fought over the fact that one received a bonus (a "perquisite") while the other did not. These results are not in harmony with the probable legislative intent of the other body, let alone that of the House.

One should recall that one of the earlier stalemates in the other body was caused by the question whether racial motivation should be made an element of the crime. Though subsections (b)(1) and (b)(2) give the appearance of compromise on that question, subsection (b)(4) indicates that the so-called liberal bloc lost the bargain.

The other example of a disparity in Title I between what was intended and what was legislated grows out of the Mrs. Murphy amendment [compare section 201(b)(1) of the Civil Rights Act of 1964] proposed by Senator Cooper (Cong. Rec., p. 5636, March 7, 1968). The amendment reads:

"Nothing in subparagraph (2)(F) or (4)(A) of this subsection shall apply to the proprietor of any establishment which provides lodging to transient guests, or to any employee acting on behalf of such proprietor, with respect to the enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of such establishment if such establishment is located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor as his residence."

Thus if Mrs. Murphy wishes to intimidate a prospective Negro tenant she may do so without violating Title I of the Senate version. But suppose the Ku Klux Klan intimidates Mrs. Murphy because she has a Negro tenant. Does Title I of the Senate version protect her? No. The relevant language is found in proposed section 245(b)(4)(B): no one may intimidate Mrs. Murphy for "affording another person . . . opportunity . . . to so participate."

The language refers back to (4)(A) whose coverage was truncated by the Cooper amendment. Thus, since Mrs. Murphy was affording opportunities beyond those delimited in (4)(A) she is not protected by (4)(B).

The House version of H.R. 2516 probably produces a different result in both cases: Mrs. Murphy could not intimidate (by force or threat of force) the prospective Negro tenant nor could the KKK intimidate Mrs. Murphy for affording a room to such a tenant.

Thus it should be noted that these last two major differences (racial motivation, protection of Mrs. Murphy) between Title I of the Senate version and H.R. 2516 as passed by the House are somewhat accidental. It is probable that the Senate did not intend to be different on those two issues.

The question of protection from and protection of Mrs. Murphy is not laid to rest by the Cooper Amendment to Title I. Since Title VIII does not regulate Mrs. Murphy [section 803(b)(2)] and since the purpose of Title IX is only to enforce Title VIII with criminal sanctions, it would seem that none of the criminal sanctions in the Senate Amendment apply to the Mrs. Murphy situation. That was probably the intent of section 101(b) of the Senate version which states: "Nothing contained in this section shall apply to or affect activities under title VIII of this Act."

The argument would be valid if Title IX had been written to do no more than enforce Title VIII. But Title IX, mirroring the approach of Title I, makes it a crime to intimidate "any person because of his race . . . and because he is . . . renting . . . occupying . . . or negotiating for the . . . rental . . . or occupation of *any* dwelling . . ."

Thus Mrs. Murphy may not intimidate the prospective Negro tenant. And since Title IX also forbids intimidating anyone because he is "affording another person . . . opportunity . . . so to participate," the KKK cannot intimidate Mrs. Murphy for renting to a Negro without subjecting itself to criminal penalties.

Thus the results under Title IX, unlike those under Title I, appear to square with the House version.

Both the Senate and House versions provide for the protection of Civil Rights workers. While the House version protects Civil Rights workers who are "persons," the Senate version protects only those who are "citizens." See proposed section 245(b)(5) in Title IX of the Senate version.

Both the Senate and House versions provide for an identical tier of penalties for violations of the Act based upon the seriousness of the offense.

Two Senate amendments attempt to make the protection provisions inapplicable to law enforcement officers. The first, proposed by Senator Talmadge, insulates officers who are "lawfully" carrying out the duties of their office, Sec. 245(c). The second amendment, proposed by Senator Ervin, provides that the operative sections shall not apply to "acts or omissions on the part of law enforcement officers . . . who are engaged in suppressing a riot or civil disturbance or restoring law and order during a riot or civil disturbance." Under the latter amendment, Sec. 101(c), protection of the law may be wanting when it is needed most." Although neither the term "riot" nor the term "civil disturbance" is defined for the purposes of the chapter in question, it is clear that the Ervin Amendment would seriously decrease the number of people ("whoever, whether or not acting under color of law") whose conduct would be regulated by the proposed legislation.

The amendments to Sec. 241 and 242 of Title 18 concerning penalties are the same in the House and Senate versions.

The pre-emption Section of the House version says that no state law is pre-empted unless it is "inconsistent" with the Federal law, whereas the Senate version makes clear that it is pre-emptive whatsoever. Since it is unlikely that a State would seek to enforce a statute conflicting with the federal policy stated herein, it is probable that the different approaches would produce the same result.

Finally, Sec. 245(a)(1) of the Senate version states that no prosecution shall be undertaken unless the Attorney General certifies in advance that it is "in the public interest and necessary to secure substantial justice." The House version contains no such provision.

H.R. 421 and the Thurmond-Lausche amendment contain almost identical operative sections. However, the Senate version makes clear that the overt act which is required may occur either during the travel or use of the interstate facility or after the travel or use of such facility, whereas the House version seemed to say that the overt act could occur only after the travel or use of the interstate facility.

Sec. 2101 (b) of the Senate version provides for a rule of evidence. It is senseless. The House version has no such provision.

Sec. 2101(c) of the Senate version provides that conviction or acquittal on the merits under the laws of any state shall be a bar to any federal prosecution "for the same act or acts." What is the scope of the quoted phrase? The House version has no such provision.

Sec. 2101(d) of the Senate version requires that the Department of Justice quickly prosecute interstate rioters or report to Congress in writing. The House version has no such provision.

Sec. 2101(e) of the Senate version insulates labor unions from the anti-riot provisions, so long as they are "pursuing the legitimate objectives of organized labor." The House, in the Committee of the Whole, twice handily rejected (120–66 on a division, CONGRESSIONAL RECORD, vol. 113, pt. 15, p. 19418, and 110–76 on a division, CONGRESSIONAL RECORD, vol. 173, pt. 15, p. 19423) similar exemptions for labor unions.

Sec. 2101(f) of the Senate version is the anti-pre-emption section. It makes clear that the federal remedy is in addition to the state remedies. The House version says that the federal remedy does not pre-empt the state remedies unless they are "inconsistent." Since it is unlikely that a State would seek to enforce a statute conflicting with the federal policy stated herein, it is probable that the different approaches would produce the same result.

Sec. 2102 of the Senate version defines the terms "riot" and "to incite a riot," as does the House version. Both the House and the Senate versions make the mistake of applying the "clear and present danger" doctrine to the definition of a riot, rather than the definition of "to incite a riot." For the doctrine sets down a rule by which freedom of speech is limited. See *Schenck* v. *United States*, 249 U.S. 47, 52 (1919). The Congress may limit "speech" where it presents a clear and present danger of a riot. The doctrine does not address itself to the issue of whether a riot, in order to be defined as a riot, must present a clear and present danger of harm to the community.

The Senate definition of "riot" includes not only acts of violence, but also threats of acts of violence. The House version embraced only the former. The Senate version, like the House version, of the definition of the term "to incite a riot" states that such term does not mean the mere advocacy of ideas or expression of belief. However, the Senate version makes clear that "expression of belief" does not involve "advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit any such act or acts," whereas the House version is silent on that particular aspect.

These six titles were added to H.R. 2516 in the Senate by Senator Ervin. They constitute the exact provisions of S. 1843, a bill which passed the Senate without debate on December 6, 1967 and is presently pending before the House Committee on Interior and Insular Affairs. The bill has never before had the benefit of hearings in the House, although the Interior Committee has scheduled hearings beginning March 29, 1968, for has such legislation been considered in any previous Congress.

A comprehensive analysis of these six titles concerning the Rights of Indians is found

in Senate Report No. 841, 90th Congress, 1st Session (accompanying S. 1843).

### TITLE II—RIGHTS OF INDIANS

This title creates a "bill of rights" for Indians in relationship to their tribal government similar to the guarantees of our Federal Constitution. It embodies portions of the First, Fourth, Fifth, Sixth, Seventh and Fourteenth Amendments and Article 1, Sec. 3 of the Constitution and applies them to Indians who are not now so protected. Indian tribal courts are not now subject to Constitutional sanctions.

In addition to the specific portions of the Constitution made applicable to Indians, this title provides additionally that: (1) tribal courts may not impose criminal penalties in excess of $500 and six months imprisonment, or both; (2) jurors may not be fewer than six; (3) assistance of counsel shall be at the accused's own expense (present interpretations of Constitutional minimum requirements of the Sixth Amendment applicable to non-Indian citizens require lawyers to be appointed at no cost to the non-Indian accused, if he is indigent and the Criminal Justice Act of 1964 provides payment for such lawyers in the Federal Courts); (4) habeas corpus application for release from tribal detention shall be made in the Federal courts (under present Constitutional practice, non-Indian citizens, if imprisoned under state law, must first seek habeas corpus by exhausting available state court remedies before applying to Federal courts.)

### TITLE III—MODEL CODE GOVERNING COURTS OF INDIAN AFFAIRS

This title authorizes the Secretary of the Interior to draft for Congressional consideration a model code to govern the administration of justice by Indian courts which would supplant the present code now reposing in Title 25 of the Code of Federal Regulations and which is more than thirty years old. Curiously, this title requires that such code shall assure that any accused shall have the "same rights, privileges and immunities" as non-Indian citizens have under the Constitution. This blanket extension of protection under the Constitution seems to make the *Partial* enumeration of "rights" under Title II unnecessary or confusing.

### TITLE IV—JURISDICTION OVER CRIMINAL AND CIVIL ACTIONS

This title authorizes states *not* having jurisdiction over civil and criminal actions in Indian country within their boundaries to assume such jurisdiction only with the consent of the Indians (majority vote of adult Indians required). To accomplish that, title IV amends Public Law 83–280 (67 Stat. 588) which now permits States to assume such jurisdiction by legislative action and without Indian consent.

Some States presently exercise jurisdiction over Indians by authority of their own legislative enaction (PL 83–280) and some by Federal mandate (18 USC 1162, 28 USC 1360).

To implement the purposes of the bill—to govern Indians only with their consent—title IV repeals that part of PL 83–280 (Sec. 7) which permits States to assume Indian jurisdiction without Indian consent. The bill does not amend, however, those States which formerly had specifically require certain States to assume jurisdiction. Instead title IV allows those States, along with the others now exercising jurisdiction, to retrocede such presently exercised jurisdiction back to the United States. Retrocession presumably, would then permit those States to extend jurisdiction back to Indians only upon the Indians' consent. But careful analysis of the bill and Senate report No. 841 reveals a contrary result.

The Senate report says that title IV authority for States to assume Indian jurisdiction—with Indian consent—extends only to those States where no such jurisdiction "now exists." Thus, States *now* exercising jurisdiction are not granted authority to extend such jurisdiction to Indians even in the event they should retrocede that jurisdiction to the U.S. This anomalous situation occurs because retrocession necessarily would be a future event. The State retroceding jurisdiction would, at the time of retrocession, and only then, become a State "not having jurisdiction." The bill, as explained by the Senate report gives authority *only* to States were no jurisdiction "now exists." Therefore, those retroceding States would not be authorized by this or any other provision to regain jurisdiction for subsequent extension to Indians once it is given up.

The apparent gap between the bill's purpose and effect is due to the interpretation given the authority grant language, namely to those States where no jurisdiction "now exists." Although this interpretation frustrates the purpose of the bill, it is supported by the general rule that Congress does not give its consent to acts that may occur in the future. That doctrine is best demonstrated in the analogous situation where Congressional consent to interstate compacts is required. In such cases, the consent given is for only those acts presently occurring and not for acts that may happen *in the future*.

### TITLE V—OFFENSES WITHIN INDIAN COUNTRY

This title amends the "Major Crimes Act" (18 USC 1153) to include an additional offense of "assault resulting in serious bodily injury." This offense, along with other serious crimes, will be prosecuted in Federal courts, since Indian courts may punish only up to $500 and six months, or both. Senator Ervin, who sponsored this amendment, thus sought to have serious assaults punished by more substantial penalties than imposed by Indian courts (Senate Report No. 841, p. 13.) But that may not be the result. Section 1153, to which this crime is added, provides no specific penalty, but instead provides such punishment as the offense would merit under other Federal jurisdiction. But the crime this amendment specifically defines does not appear in Title 18 U.S. Code. Therefore, no Federal penalty is provided. The Federal assault statute most nearly similar in definition (18 USC 113d) provides no greater penalty than the Indian court may impose. It could be argued, however, that 18 USC 13 would apply to effect the purpose of this amendment. 18 USC 13 provides that offenses occurring in Federal jurisdictions that are not defined by Federal statute are punishable under applicable State law. However, that application not only raises questions of State jurisdiction over Indians which other parts of this bill would extend only with Indian consent, but it also raises questions of whether similar State laws even exist or, if they do, whether they provide greater penalties.

### TITLE VI—EMPLOYMENT OF LEGAL COUNSEL

This title provides that when approval of agreements between Indians and their legal counsel is required by the Secretary of the Interior or the Commissioner of Indian Affairs and takes longer than ninety days in forthcoming, such approval shall be deemed granted.

### TITLE VII—MATERIALS RELATING TO CONSTITUTIONAL RIGHTS OF INDIANS

This title authorizes and directs the Secretary of the Interior to revise, compile and publish certain documents and materials relating to Indian rights, laws, treaties and other affairs.

### TITLE VIII—OPEN HOUSING

This analysis will compare Title IV of the 1966 Civil Rights bill, H.R. 14765, which passed the House on August 9, 1966, with Title VIII of H.R. 2516, as passed by the Senate on March 11, 1968. The analysis will

attempt primarily to note the differences in the two approaches.

The House version was more narrow in its scope and more stringent in its enforcement. The House version sought to regulate only real estate brokers, their employees, salesmen and people "in the business" of building developing, selling, and so forth. The Senate version, rather than treat the commerce of building, selling, and renting houses, embraces every dwelling in the nation except for certain cases where the conduct of the owner qualifies for an exemption from the law.

The House version established strict enforcement procedures. It established a Fair Housing Board as a new government agency with broad powers, similar to that of the National Labor Relations Board. Thus, the complainant would seek the vindication of his fair-housing rights before the Board, rather than going to court, as he would under the Senate version. Under the House version, the Secretary of HUD served in an ancillary enforcement capacity, but his powers were limited to investigating, publishing reports and studies, and co-operating with other agencies in eliminating discriminatory housing practices.

Under the Senate version, the Secretary of HUD is authorized to educate, persuade and conciliate in order to eliminate discriminatory housing practices. But, if the Secretary of HUD is unsuccessful, the sole recourse under the Senate version is to the court, State or federal, and not any administrative agency, such as a Fair Housing Board.

The two versions differ in more particular ways. Under the Senate version, the discriminatory basis is that of race, color, religion or national origin. The House version covered those four bases but also, at times referred to the factors of economic status and of children, both in their number and their age, as discriminatory bases upon which the bill was predicated.

The House version forbade real estate brokers and the like to refuse to use their "best efforts" to consummate any sale or rental because of race, color, etc., whereas the Senate version is silent.

Moreover, the House version forbade brokers and the like from engaging in any practice to restrict the availability of housing on the basis of race, color, etc., whereas the Senate version is silent.

The House version made clear that nothing in the Act would affect the right of the broker to his commission, whereas the Senate version is silent. On the question of the breadth of coverage, Sections 403(e) and 402 were at the heart of the House approach in that they emphasized the freedom of the typical homeowner in selling or renting. Sec. 403 said:

"(e) Nothing in this section shall prohibit, or be construed to prohibit, a real estate broker, agent, or salesman from complying with the express written instructions of any person not in the business of building, developing, selling, renting, or leasing dwellings, or otherwise not subject to the prohibitions of this section pursuant to subsection (b) or (c) hereof, with respect to the sale, rental, or lease of a dwelling owned by such person, if such instruction was not encouraged, solicited, or induced by such broker, agent, or salesman, or any employee or agent thereof,".

The last sentence of Sec. 402 reads:

"But nothing contained in this title shall be construed to prohibit or affect the right of any person, or his authorized agent, to rent or refuse to rent, a room or rooms in his home for any reason, or for no reason; or to change his tenants as often as he may desire."

Since the House version regulated only those in the business of selling, renting, or developing, those who were not in such business were implicitly exempt although they were not expressly exempt. The only express exemption (the last sentence of section 402, quoted above) applied to homeowners

renting rooms in the town "homes" (whatever that means) even though they might otherwise be "deemed to be in the business" of renting under section 402(d).

However, the Senate version covers all classes of dwellings in all transactions except three. They are as follows:

A. A *single-family "house"* (whatever that means) sold or rented by an owner but only if the following four conditions are true:

(1) he owns three or fewer single-family houses,

(2) he sells no more than one non-residence in any two year period,

(3) he sells without the services of a broker or the like, and

(4) he sells without any discriminating advertising.

These conditions present some problems. The first condition is modified by an attribution clause resembling in purpose those found in the Internal Revenue Code. That is, the ownership of an item by one spouse or relative is attributed to the other spouse or relative lest some rule be circumvented. The attribution clause here is very loose in comparison to IRC attribution sections.

The second condition is phrased in troublesome language: "The exemption . . . shall apply only with respect to one such sale within any twenty-four month period." What if two non-residences are sold in such time? Which sale gets the exemption? The first? Or is it the seller's choice?

The fourth condition requires that, "after notice," there be no discriminatory advertising. What "notice"? By whom? there is no intimation in the entire Title of what is meant by "after notice."

However, it is clear that regardless of circumstances, no one can "make . . . any notice, statement, or advertisement" that discriminates, section 804(c). That applies to *all* dwellings except religious and fraternal organizations exempted by section 807. Thus the fourth condition, which is stated in more narrow terms (it requires less of the seller) apparently contradicts the broader requirement of section 804(c) stated above.

The fourth condition would seem to require only the avoidance of written discriminatory advertising whereas section 804(c) would arguably require the avoidance of both written and spoken (a "statement" can be oral) "indications of preference."

So, does the fourth condition mean that less is required? Or is it simply a nullity?

Furthermore, don't these prohibitions violate "free speech" under the First Amendment? Does not a citizen have the right to indicate his preference by the spoken or written word? Those questions are not easy to answer.

B. *Mrs. Murphy's boardinghouse.* It appears under section 803(b)(2), there is an exemption for "rooms or units in dwellings" holding no more than four families [" 'family' includes a single individual"—section 802(c)] living independently of each other, if the owner resides therein. The exemption applies to both the sale and rental of rooms and units, not merely to rental as would be true if this were purely a Mrs. Murphy exemption. (Note in comparison that private clubs are exempt only for rental purposes under section 807.) Is it then possible for Mrs. Murphy to sell all her units (i.e., her house) to one buyer and still be exempt?

If Mrs. Murphy is not exempt by section 803(b)(2) in selling her dwelling, is she exempt under section 803(b)(1)? Is Mrs. Murphy's house a "single-family" dwelling? From the use of language in Title VII, especially in sections 802(b), 802(e) and 803 (b)(2), it would seem that a "single-family" house is one which is "occupied as, or *designed* or intended for occupancy as, a residence by one" family.

Thus if Mrs. Murphy has a boarder or if her house is *designed* to hold both the Murphy family and others as well (i.e, it has an extra room), then her house is not exempt

for sale purposes under section 803(b)(1). Of course, there are many homes that fit that definition. If the definition is correct, then many dwellings considered exempt will not prove so.

However, the sections delimiting the exemptions are not so clear as they should be in view of their central importance.

It is interesting to note that a four-apartment condominium would be exempt under section 803(b)(2) whereas a co-operative would not, because in the former, each family owns a unit, whereas in the latter each family owns an undivided quarter which may not be considered by a court to be a "room" or "unit." The policy for making such a distinction is not clear.

However, the House version contained a provision, section 403(b), which was substantially similar to section 803(b)(2).

C. 1. A *dwelling maintained by a religious group for a non-commercial purpose*, exempt as to both sale and rental.

2. A *dwelling maintained as a bona fide private club for a non-commercial purpose*, exempt as to rental only so that preference can be given to members of such club.

In the House version, section 403(c) exempted the same two groups as to both the sale and rental to their own members.

Section 805 of the Senate version forbids banks and similar institutions from discrimination on the basis of race, color, etc. in the financing of housing. So did section 404 of the House version.

Section 806 of the Senate version forbids discrimination in the provision of brokerage services. So did section 404(a)(6) of the House version.

As for the enforcement of the open housing provision, it was noted earlier that the House version provided for an administrative remedy before the Fair Housing Board.

In contrast, section 810 of the Senate version permits any aggrieved person to file a complaint with the Secretary of HUD within 180 days after the alleged discriminatory housing practice occurred. Within thirty days after receiving a complaint, the Secretary must notify the aggrieved person whether he intends to resolve the complaint. The Secretary, if he intends to do so, then proceeds to correct the alleged discriminatory housing practice by informal methods of conciliation and persuasion.

The functions of the Secretary are delegable within the Department. However, HUD has only six regional offices and one area office within the United States. The bill does not make clear how or where a complaint will be filed. However, section 808(c) does state that conciliation meetings shall be held in the locality where the alleged discrimination occurred.

Under section 810(c), where there is a State or local fair-housing law applicable, the Secretary is required to notify the appropriate State or local agency of any complaint filed with him. If, within thirty days after such notice has been given to the appropriate State or local official, such official commences proceedings in the matter, then the Secretary must refrain from further action unless he certifies (why? to whom?) that such action is necessary.

However, section 310(d) interrupts this conciliation process by permitting the aggrieved person within thirty days after the filing of a complaint (that is, within the same period that the Secretary has to judge the substantiality of the complaint) to file an action in the appropriate U.S. district court against the respondent named in the complaint—unless State or local law provides "substantially equivalent" relief, whereupon such relief must be sought.

However, the Secretary may continue to seek voluntary compliance up until the beginning of the trial (as distinguished from the commencement of the law suit).

In the course of the investigation, the Sec-

retary is permitted to make whatever searches and seizures are necessary "provided, however, that the Secretary first complies with . . . the Fourth Amendment." The Secretary may issue subpenas to compel production of such materials and may issue interrogatories and may administer oaths. Any person who is found in contempt of the Secretary by "willfully" neglecting to attend and testify or to answer any lawful inquiry or to produce records shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Thus, in summary, the Secretary's powers are limited to education, conciliation, and investigation. He apparently cannot enforce the title; only a court can.

However, section 808(c) yields a contradictory implication. It empowers the Secretary to prescribe the "rights of appeal from the decisions of his hearing examiners." That implies *administrative enforcement* of the prohibitions of the title. It might be the source of an unintended enlargement of administrative power. Caution would require its elimination.

Section 812 states what is apparently an alternative to the conciliation-then-litigation approach above stated: an aggrieved person within 180 days after the alleged discriminatory practice occurred, may, without complaining to HUD, file an action in the appropriate U.S. district court. At this point, two commands come into play: Section 812 commands the court to wait to determine if the Secretary can achieve voluntary conciliation, while section 814 requires that the court "assign the case for hearing to the earliest practicable date and cause the case to be in every way expedited." Note further that the command of section 814 to expedite applies only in the situation where the aggrieved party has not sought the assistance of the Secretary of HUD, but has instead filed a civil action without the prior aid of the Secretary. If the aggrieved party has first sought the assistance of the Secretary and then files an action within thirty days of his filing the complaint with the Secretary, then the civil action arises under section 810(d), a section to which the expedition requirement of section 814 does not apply.

Section 812(a) also changes the law concerning the bona fide purchaser and the doctrine of lis pendens. Under section 812(a), it appears that a person who purchases a house that is involved in a law suit is termed a bona fide purchaser if he does not actually know of the law suit, even though he has constructive knowledge that such a law suit was pending.

Section 812(b) permits the court to appoint an attorney for the plaintiff where justice requires it. However, the court has that power only where the action is brought under section 812 and not where the action is brought under section 810 (that is, after the assistance of the Secretary has been sought.) Note that under section 812(c), the court may award up to $1,000 in punitive damages. The House version contained no such provision.

Both the Senate version, section 115, and the House version, section 407(a), stated that the provisions of the federal law do not preempt State and local open housing laws, but do pre-empt State and local laws which required or permitted discriminatory housing practices.

Section 817 of the Senate version establishes a civil cause of action in tort for the interference by coercion or threats with any person in the enjoyment of his right to fair housing. Section 407 of the House version is comparable.

Section 819 of the Senate bill is a separability clause. The House version contained no such clause. However, whereas the 1966 House bill fell within the Congressional power over interstate commerce, the more far-reaching Senate bill probably does not and must look to section 5 of the Fourteenth Amendment as

its constitutional basis. Since section 1 of the Fourteenth Amendment focuses only on "State" action, it has long been doubted that Congress could reach private discriminatory action through legislation to "enforce" section 1 of the Fourteenth Amendment, See *Civil Rights Cases*, 109 U.S. 3 (1883). However, six Justices of the Supreme Court of the United States, in the case of *United States* v. *Herbert Guest*, 383 U.S. 745 (1966), stated in *dictum* that section 5 of the Fourteenth Amendment empowers Congress to enact laws which reach private discrimination.

The following is a list of the comparable sections in the House and the Senate versions:

| House version, 1966 | Senate version, 1968 |
| --- | --- |
| 401 | 801 |
| 403(a)(1) | 804(a) |
| 403(a)(2) | 804(b) |
| 403(a)(3) | 804(c) |
| 403(a)(5) | 804(d) |
| 403(a)(6) | 806 |
| 403(a)(8) | 804(e) |
| 403(b) | 803(b)(2) |
| 403(c) | 807 |
| 404 | 805 |
| 405 | 817 |
| 406(a) | 812(a) |
| 406(b) | 812(b) |
| 406(c) | 812(c) |
| 407(a) | 813 |
| 410 | 815 |

TITLE IX—PREVENTION OF INTIMIDATION IN FAIR HOUSING CASES

Title IX of the Senate version provides criminal sanctions in the fair-housing area, just as Title I provided criminal sanctions in the areas enumerated in that Title. The Senate version apparently classifies the open-housing area as one of lesser federal interest and thus, as in Title I, requires racial motivation as an element of the crime in one section, but not another. Compare section 901(a) with section 901(b)(1). Since the treatment of open housing in Title IX is identical with Title I's treatment of the areas of lesser federal interest, there is no readily apparent reason why Title IX could not have been incorporated into Title I.

Title V, section 501(a)(5) of the 1966 bill, passed by the House, also provided criminal sanctions for the interference with any person because of his race, color, religion or national origin while he is seeking to engage in the purchase, rental, or occupancy of any dwelling.

Note that both of these protection provisions with criminal sanctions are broader in scope than the open-housing rights recognized for the civil-law purposes. In both versions, the criminal sanctions apply with reference to "any dwelling" without exception.

Note also that because both versions protect the right to occupy any dwelling, that they are both public-accommodation and open-housing provisions.

TITLE X—CIVIL OBEDIENCE

Three new Federal crimes punishable by $10,000 or five years, or both:

1. Teaching or demonstrating the use of making of firearms or explosives or incendiaries or techniques capable of causing injury, knowing or *having reason to know* such devices will be used unlawfully in a civil disorder adversely affecting commerce or the performance of a federally protected function.

2. Transporting or manufacturing for transportation in commerce a firearm or explosive or incendiary knowing or *having reason to know* that such device will be used unlawfully in furthering a civil disorder.

3. Commission of an act to obstruct a law enforcement officer or fireman lawfully engaged in performing his duties incident to and during a civil disorder which adversely

affects commerce or the performance of a federally protected function.

Section 232 defines "civil disorder" as a "public disturbance involving acts of violence by assemblages of three or more persons . . ." This definition of civil disorder is different from the Title I definition of "riot" (pages 7–8 of this memo). Civil disturbances for gun control and fireman and policemen protection purposes require acts of violence (but not threats) by assemblages, whereas riots require acts of violence (or threats of violence) by only *one* person as part of an assemblage. There seems no apparent reason for this confusing difference except that the "riot" amendment was offered by Senators Thurmond and Lausche and "civil disturbances" amendment was offered by Senator Long (D–La.). From the debate record, it appears that both sections were meant to treat with the same kind of "disturbance" or riot.

Section 231(a)(1), listed as number 1 under Title X above, raises questions as to the scope of "teaching" and "demonstrating" either use of weapons or "techniques capable of causing injury . . ." when coupled with criminal liability for those acts by "having reason to know" that such weapons or techniques will be used unlawfully in furtherance of a civil disorder. What does that prohibition include? Also, what is the meaning of the requirement that the disorder adversely affect commerce? Does *scienter* also include knowledge of the affect on commerce?

The prohibition against transportation or manufacture for commerce of firearms and incendiaries, unlike the teaching and demonstrating prohibition, does not require that the disorder affect commerce. Does that difference make the disorder any more or less serious. Should teaching about firearms, incendiaries or "techniques" that cause injury become criminal only in disorders that affect commerce and should shipping firearms and incendiaries become criminal in disorders that do not affect commerce?

The firearms sections differ substantially from the proposals now being considered in the House and Senate Judiciary Committees (Dodd, Celler, Hruska and Blester-Rallsback bills) in that these Title X sections prohibit the demonstration and transfer and manufacture of firearms and explosives with respect to their subsequent *use*. The bills in Judiciary Committees would simply regulate commerce of such devices and would not rely on subsequent use. Use of firearms and similar devices has been a matter for local control by states and political subdivisions.

Law enforcement officials, lawfully performing their duties, are excluded from the prohibitions of Title X.

Neither the 1966 nor the 1967 House-passed Civil Rights bills contained provisions affecting firearms.

Yes, Mr. Speaker, expediency may be the House decision today. I think it is wrong. We should not condone it.

In 1957 one of the great liberal Senators in the other body said in the consideration of equally important civil rights legislation then, and I quote:

Oh, Mr. President, I say to the liberals, parliamentary expediency is not the road to travel.

Those words by that individual in 1957 are applicable to us today. If we take the oath of expediency, we will live to regret it. I say to you in my best judgment we should follow the time-tested principles of parliamentary procedure, because they are primarily in the best interests of our minority groups, and also in the best interests of all our citizens.

Mr. MADDEN. Mr. Speaker, I yield 2 minutes to the gentleman from Colorado [Mr. ASPINALL].

Mr. CLARK. Mr. Speaker, will the gentleman yield?

Mr. ASPINALL. I yield to the gentleman from Pennsylvania.

Mr. CLARK. Mr. Speaker, we cannot overestimate the seriousness of the action this House is being asked to take today. As most of my colleagues know, I have been speaking out frequently on the subject of law enforcement for several years now, most recently within the past few weeks.

An examination of the CONGRESSIONAL RECORD will clearly indicate that, unfortunately, my predictions of disaster have come true this past weekend. I have the feeling, however, that my voice is still not being heard when I repeat once again that we cannot make any progress in the field of civil rights when we are in a state of anarchy. And we will remain in that state just as long as we continue the policy of nonsupport for our law-enforcement agencies.

Mr. Speaker, if there is an underprivileged, downtrodden minority in this country today—and this past weekend—it is the police officers of the Nation. They were required to accept unspeakable insults, flagrant injuries, were shot at, thrown at, spit at, cursed at—and then asked to accept it quietly and at the same time be held responsible for the maintenance of law and order.

I say to my colleagues that this intolerable condition must be corrected first—now, before any other action is taken by this House. I, for one, will not be stampeded or threatened into precipitous legislative action that will in effect reward looters and arsonists.

Mr. Speaker, we are supposedly considering a civil rights bill. As I have said before, what we have been dealing with here has been neither civil, nor right. I say to the Members in this Chamber that before they vote today they should walk out that door and onto buses and ride through the destroyed areas and streets of our Nation's Capital. I ask how many of the Members about to vote here have been through the ravaged region of this city? I ask how many have talked to the police officers and National Guardsmen and Federal troops who braved the war on Washington? And that is exactly what it has been—a war on Washington.

Total and utter destruction of blocks of the city creating havoc and spreading fear through this city such as has never been done before. And now we are being asked to forge our usual calm, deliberative, legislative process, in an atmosphere of fear to pass legislation that may well have beneficial effects, but how do we know until our proper committee has examined the contents of this legislation?

Mr. Speaker, I rise today not in opposition to this bill in itself, I rise and speak with all of the earnestness of my heart to speak for the police of this Nation. And I ask my fellow Members to consider that we are adding still another indignity to their already overwhelming ones by precipitous passing of a bill that will make it clear to them that their job cannot be done.

Recently, I read a document of the District of Columbia National Guard entitled: "Riot Control Training, FBI,

056679

and Prevention and Control of Mobs and Riots," dated April 3, 1967. This document contains the most incredibly inept, unbelievably poor and incomprehensible instruction to the troops who have been defending our city in the past 72 hours. I will take a few moments to cite some of the instructions contained therein but I point out, Mr. Speaker, that this document is a black mark indeed in our annals of protection of people and property. I submit that this House would better be considering an order for a full investigation of the origin of this document and if necessary an investigation of the National Guard and the Federal Bureau of Investigation.

Consider some of these orders that were issued a year ago to the men facing the insurrection and civil rebellion of the past few days: "You will fire only when ordered to do so." Thus, no provision for firing in self-defense. "When you fire, you will fire to disable, rather than to kill." Note there is no distinction of category between a casual looter and outright assault with a deadly weapon. And perhaps the most incredible order of them all; "You do not fire solely to protect property." It would seem that the traditional function of the Army and law enforcement agencies to protect life and property has been changed by some mysterious bureaucratic edict. Go out that door and go down to the ravaged area and see the results of that order.

Talk to the police of the city and hear their stories of retreat under fire, because they were ordered. Hear their stories of allowing looters to walk away unchallenged because they were ordered to. Hear their stories of failure to return fire from deadly snipers because those are what the orders said. To be exact, this document of which I speak says: "You simply don't fire at looters. This goes back to the principle which says you will not fire solely to protect property."

Mr. Speaker, this is unbelievable in this day and age of civil disobedience. It is beyond my wildest imagination that within the past 72 hours the people of this Nation saw television and newspaper pictures of a tripod and machinegun right outside these doors on the very steps of the Capitol Building and we still refuse to face the fundamental issue of this moment—the total restoration of law and order first—a job that cannot be done until our police are properly equipped and trained and paid to do their job. When it comes to the conduct of the war in Vietnam we do not stand around and second-guess General Westmoreland. We do not allow the Secretary of Defense to draw strategy maps in detail or issue instructions to the forward observer of a combat team. We assume that our military leaders have the capacity to make military decisions. If they do not then we remove them. But we allow, apparently, a civilian commissioner of police—or someone—to tell the Police Chief here, and perhaps all over the country, how to conduct police business in detail.

Mr. Speaker, this city, this Nation, has caused men in uniform to be out in the streets defending us and we have left them totally defenseless. We have made a mockery out of law enforcement. We

have created an underprivileged, undefended, trampled-on minority and have put them into blue uniforms and sent them out on the streets to be shot at like dogs. Why, if any Member suggested such similar treatment for our Negro citizens, or Indians, or Mexican Americans, they would be hooted out of this Hall as a madman. And yet we not only tolerate such treatment for this miniscule minority in blue, we are now being asked to further emasculate them by passage of legislation in an atmosphere of fear and to demonstrate to the entire Nation that we do not even have the guts ourselves that we demand of them.

Mr. Speaker, let us put to rest once and for all that we are about to make a pro-Negro or an anti-Negro vote here today. In recent hours more than 92 percent of our Negro citizens responded to a great tragedy with calmness and dignity. They did not make a mockery of the mourning for Dr. King by dancing in the streets and laughing while they burned and looted. The violence and destruction has been caused by less than 8 percent of the black population and about 5 percent of the white population who have joined the army of destruction flaunting the laws of this Nation. An overwhelming majority of all of our citizens, of whatever color, have remained calm, if frightened. But this small minority of destroyers that we have permitted to run amuck have caused millions of millions of dollars in damage and right now our Ways and Means Committee is being asked to pick up the bill. Pick up the bill when our law-enforcement people are being ordered to stand by and watch destruction? I am truly saddened, and if I shake my head in wonderment it is because we still refuse to see what is right in front of us.

Mr. Speaker, the police of this Nation must be given the tools to protect the vast majority of our citizens. They must know when we send them out into the streets that they are to deal with persons willfully doing vandalism and looting and burning that they are to deal with them for what they are—criminals, insurrectionists, irresponsible, irrational people who must be restrained.

Mr. Speaker, I intend to vote against the previous question and do so without any reluctance. Until this House is willing to face and assume some of the responsibility for the protection of the police of this Nation and in turn permit them to protect our law-abiding citizens, then I shall continue to oppose legislation in such an atmosphere of fear that will give aid and comfort to the enemies of the policeman on the beat. I propose to demonstrate as much courage as we have asked of them in recent hours.

Mr. ASPINALL. Mr. Speaker, I oppose the House approval of the Senate amendments to H.R. 2516 and request that the matters in controversy in this legislation be sent to a conference committee of the two bodies.

Mr. Speaker, there is a grave danger that by giving our approval to H.R. 2516, as it comes to us from the other body, we may, in fact, be destroying Indian treaty rights in the name of so-called civil rights—in trying to aid one minority we are destroying rights of another

minority. I am sure there are none among us who desire this.

H.R. 2516, which includes titles II, III, IV, V, VI, and VII, relate to Indian affairs, and the language of these six titles is identical to the language of S. 1843 which has passed the other body and is now pending before the House Committee on Interior and Insular Affairs.

The inclusion of these titles in the civil rights bill would thwart the orderly legislative process. They were adopted on the floor of the Senate without hearings by any committee of the 90th Congress. The explanation was that these titles are the same as S. 1843, which had been considered and reported by the Judiciary Committee of the other body, and which had passed the other body on December 7, 1967, during the closing days of the last session. S. 1843, however, has been reported by the committee of the other body without any public hearings in the 90th Congress. Although predecessor bills have been the subjects of hearings in the 89th Congress, S. 1843 is a revised bill and it has not been the subject of any hearings either in the 89th Congress or the 90th Congress.

S. 1843 is now pending before the Interior and Insular Affairs Committee. Hearings on the bill have been scheduled for sometime to be held by the Subcommittee on Indian Affairs under the able leadership of the gentleman from Florida [Mr. HALEY]. The first of these hearings were held on March 29, 1968. It would be a travesty on the legislative process to allow the substance of S. 1843 to be included in the civil rights bill and enacted without any consideration by the committee that has jurisdiction.

I do not want to be misunderstood as raising a jurisdictional issue. I am not. I am raising a question of orderly legislative process. While this is not the time to discuss the merits or defects of titles II through VII of H.R. 2516, I have satisfied myself that they contain provisions that merit careful evaluation before they are accepted by the Members of this House. The Interior and Insular Affairs Committee has received from some Indian tribes expressions of alarm and requests for amendments. Those Indian groups are entitled to be heard. Without in any way expressing an opinion regarding the merits of the objections because I believe the formulation of an opinion would be premature, I can mention a few of them as illustrative:

First. One provision of title II provides that in an Indian tribal court a defendant in a criminal case shall be entitled to the assistance of counsel. In an ordinary court of law this would, of course, be a highly desirable provision. A tribal court, however, is not an ordinary court. Neither the judges nor the prosecutors are attorneys. They function in a most informal manner. The fear expressed, which I believe should be evaluated, is that a defense lawyer in that kind of court would so confuse the lay judges with formalistic demands that the system might collapse. That fear may or may not be well founded. We should find out.

Second. Another provision of title II fixes a maximum penalty that can be

imposed by a tribal court at $500 and 6 months imprisonment. The split of jurisdiction between tribal courts, State courts, and Federal courts is technical and confusing. Some tribes have indicated that the maximum penalty provided by title II may be too low in some cases, and might result in serious offenders escaping reasonable punishment.

Third. Trial by jury, although embedded in our common law, is foreign to the customs of many tribes. Before imposing this requirement in tribal courts, the probable results should be considered.

Other provisions of these Indian titles are completely unrelated to civil liberties, and they do not belong in a civil rights bill. They relate entirely to sound Federal administration of the Indian affairs program. For example, no question of civil rights is involved in the question of whether Indian laws should be collected and published by the Secretary of the Interior, whether a book entitled "Federal Indian Law" should be updated and republished, or whether secretarial regulations affecting Indians should be published separately from the publication in the Federal Register.

One other provision needs to be noted. Title IV would substantially amend Public Law 280 of the 83d Congress by permitting States to assume partial jurisdiction over an Indian reservation. The Department of Justice has expressed serious doubt about the wisdom of this action.

Another change would require tribal consent before a State may assume any jurisdiction. Public Law 280 originated in the Interior and Insular Affairs Committee, and it is our intention to consider these two changes when S. 1843 is scheduled for hearing.

Mr. Speaker, it is my personal feeling that too many Members of the Federal Congress, and too many of the political spokesmen of the major political parties of our country, are trying to solve the problems attendant to the civil rights of our people purely from a political, partisan, or personal ambitious viewpoint. As long as this procedure continues, we shall never solve such problems. Just the reverse will be true. We shall continue to magnify and intensify them.

The strong feelings of pro-racism today and the growing fear among our people in their attitudes toward each other is no mere happenstance of the moment. I believe that it is a direct consequence of trying to go too far, too fast. Statutes, and statutes alone—no matter how nobly inspired—are not the sole, or even the main, answer to what is troubling us. We need, first of all, as a nation, to understand each other better—to come to know our ambitions, our goals, and our shortcomings—and, yes, above all, to know our possibilities and potentials, as a nation, of reaching worthwhile objectives. We talk and write too much of things which we are going to do, and then we actually do too little after we have run out of breath and paper.

I am convinced that the great majorities of all races in this Nation of ours wish to grow, to prosper, and to live together. I am also convinced that they

wish to do this in an orderly, sane, and peaceful way. They do not want the shyster leader. They do not want the self-serving politician. They want the evolutionary leader, rather than the revolutionary one. They want leaders who are dedicated to the end goals of equal opportunities and freedom for all.

The great majorities of our people fully realize and understand how our festering sores of discrimination and inequities have developed. They understand the seriousness of the malady that affects us. They understand also that a nation does not cure these illnesses or maladies overnight. In my opinion, the overwhelming numbers of our people, regardless of race and national origin, know when they are being preyed upon by their fellow man, regardless of who the self-acclaimed leaders may be. Accordingly, let us be done with overnight cures, with hasty and ill-advised panaceas such as continued statutory verbiage. Rather, let us proceed to furnish within our limitations, frankly admitting what those limitations may be, to all and all alike the blessings which this great Nation possesses, realizing that with the acceptance of those blessings or any part of them goes corresponding responsibilities.

I repeat—this is not, and should not be, a partisan political controversy. I resent the implication which I sometimes find in the remarks of my colleagues.

Personally, I resent a statement from my fellow public servants which is publicized by the news media as follows:

Any one voting against open housing or any part of this legislation in this election year must take the responsibility.

Rather, let us legislate from respect and understanding of each other than from the motivation of fear. I shall answer to my own conscience and to my constituents for my action, and not because of fears or reprisals.

Mr. SMITH of California. Mr. Speaker, I yield 3 minutes to the gentleman from Illinois [Mr. ARENDS].

Mr. ARENDS. Mr. Speaker, I most emphatically believe that we should take a firm, united stand in opposition to the proposed rule to collectively adopt the Senate amendments.

The procedure that is proposed makes a travesty of the whole legislative process. It is tantamount to the House abdicating its legislative prerogatives. It is tantamount to our delegating to the Senate, by a rubber stamp process, our duties and responsibilities to the people we represent.

It is not a question as to whether one is for or against open housing. Nor is it a question as to whether one is for or against gun control legislation, antiriot legislation, Indian rights, or any of the provisions which the Senate added to the civil rights bill we passed.

Whatever our position on any of these questions raised by the Senate amendments, the House should at least have opportunity to explore in detail just what the Senate proposes in its amendments to the bill we passed and for which I voted.

It is my understanding that the firearms section of the Senate amend-

ment differs substantially from the bills now before our Committee on Judiciary, and even differs from the proposals being considered by the Senate Judiciary Committee itself.

By following the procedure now proposed, we would be denying members of our own Judiciary Committee opportunity to pass upon the adequacy or inadequacy of the firearms amendment to the civil rights bill.

The Senate open housing version differs in many and very material ways from the House version. There are differences not only as to scope, but also as to manner of enforcement.

Open housing can mean many things. Open housing is a matter of very real concern and delicacy to the people we represent. And the manner of enforcement can be as important as the scope of the law. Surely, we recognize that property rights are involved in this issue.

I have here a memorandum prepared by the minority staff of our Judiciary Committee analyzing the differences between the House-passed bill and the Senate-amended bill. It took 24 double-spaced, typewritten pages to outline the many and far-reaching differences between the House version and the Senate version of the civil rights bill. Yet we are called upon to accept the Senate version, yes or no, without a second thought, even without discussion and much less of any perfecting change.

But as I said at the outset, the question before us is not so much a matter of substance. We do not know except by label what the substance is.

The question before us is a matter of procedure. We owe it to ourselves, as well as to our constituents—we owe it to the House, as an equal arm with the Senate in the legislative process—we owe it to the orderly legislative processes—not to approve this extraordinary procedure.

We have many times complained against the practice of the Senate, which has no rule of germaneness, of adding entirely new matter to House-passed bills. We have many times fought against the Senate ignoring the will of the House, and jockeying us into an impossible position. Even now some of our Members are complaining that we do not have as large a voice as we should in foreign affairs.

To adopt this rule is to gag ourselves and to gag the people for whom all are supposed to speak. We of the minority have consistently railed against "rubber stamping procedure."

The rights of this House, which is more representative of the people than the Senate can possibly be, are at stake. And this is reason enough that the adoption of any rule to accept the Senate bill should be defeated.

This measure should be sent to conference that the members of our committee most familiar with the subject could have opportunity to examine in depth all that is involved. That is what we did with the tax bill last week. We rightfully refused to accept the many Senate amendments and sent the bill to conference. There is no reason whatever to assume that the conferees cannot come to an agreement. There is no basis for the assumption that the bill will die in

conference or that the conference report will not be adopted by the Senate.

I certainly do not believe any Member of this House, particularly those on our side of the aisle, wishes to abdicate both his rights and his duties by voting for a rule that precludes the House from having any voice whatever in such a far-reaching matter and of such great consequence as this.

Whatever our views of any of the Senate amendments, there is no reason whatever why the House should abdicate. The issue here is one of procedure and nothing more.

Mr. MADDEN. Mr. Speaker, I yield 2½ minutes to the distinguished Speaker of the House of Representatives, the gentleman from Massachusetts [Mr. McCORMACK].

Mr. McCORMACK. Mr. Speaker, one of the finest statements for supporting the action to concur in the Senate amendments was made by the gentleman from Illinois [Mr. ANDERSON] when he said:

I have come to this judgment because I believe that as a nation we must turn our face away from a course of segregation and separation. We must reaffirm this essential human right to justice and human dignity.

That statement is based on truth and principle. It is based on the constitutional right of all persons to equal rights and opportunity and respect, and more so, it is based on the moral law.

I am going to make brief reference to some of the contributions made by American Negroes during our constitutional history.

How many of you know that in the American Revolution some 5,000 Negroes served under Gen. George Washington?

May I refresh your memory by recalling that the first victim of the War for Independence in 1770 at the Boston Massacre was Crispus Attucks, a runaway slave.

At Bunker Hill, Peter Salem became the hero of the battle of Bunker Hill, killing Major Pitcairn who was the commander of the British forces at Bunker Hill.

In the War of 1812, American Negroes served and made up a large percentage of all our sailors and soldiers in the great victory on Lake Erie.

They served in the Mexican war.

In the Civil War, there were nearly a quarter of a million American Negro soldiers and sailors and they served in the Union forces. There were also Negroes in the Confederacy.

In the Indian wars the American Negro served with great distinction.

The Spanish-American War—they were there—they were at San Juan Hill and elsewhere.

In World War I there were about 342,-000 Negro soldiers and in World War II there were 1,175,000 American Negroes who served.

So we are talking about human dignity. We are talking about human rights. We are talking about the right of a person to be respected.

Mr. Speaker, I include at this point a military history of the American Negro:

1. *The American Revolution:* Crispus Attucks, a runaway slave, was the first to fall in the Boston Massacre in 1770. Shot dead while leading a mob protesting the presence of British troops, he was the first American to die in the cause of freedom. A Negro Minuteman, Prince Estabrook, was among the 70 who faced the British at Lexington on the first day of the Revolution. Another Negro, Peter Salem, became the hero of the battle of Bunker Hill, killing Major Pitcairn, whose Redcoats had fired on the patriots at Lexington. Another Negro soldier, Salem Poor, was cited by General George Washington for his bravery at Bunker Hill. Negro regiments were raised in Massachusetts and Rhode Island. It is estimated that there were approximately 5,000 Negroes in the Continental Army during the American Revolution. Negro slaves who volunteered were given their freedom after three years of military service.

2. *The War of 1812:* Negroes made up a large percentage of Oliver Hazard Perry's sailors in the great victory on Lake Erie and a significant part of Andrew Jackson's soldiers in the triumph over the British at New Orleans.

3. *Mexican War:* A very small number served in the Mexican war.

4. *The Civil War:* Nearly a quarter of a million Negro soldiers and sailors served in the Union forces during the Civil War. Forty thousand died and twenty won Congressional Medals of Honor. From the moment Ft. Sumter was fired upon, the Negroes made efforts to participate directly in the conflict. In many Northern cities during April and May of 1861, Negro leaders initiated movements to raise Negro volunteers for the Army. It was not until after the issuance of the Emancipation Proclamation in 1863, however, that the Federal Government became amenable to the idea of enlisting free Northern Negroes as troops. In the meantime, General Butler had recruited a regiment of free Negroes in Louisiana in September 1862. This unit, the First Regiment of New Orleans native guards represented the first Negro soldiers mustered into the United States Army as a unit in the Civil War. Subsequent to the Emancipation Proclamation, the Secretary of War did authorize the enlistment of free Negro volunteers in the North. The first such Northern Negro regiment was recruited by Governor John A. Andrews of Massachusetts as the 54th Massachusetts Regiment. Other Negro regiments were recruited in most of the Northern States, including Rhode Island, Pennsylvania, and New York.

Negroes in the Confederacy: During the winter of 1864–1865, when it became impossible to keep the Confederate Army filled with white soldiers, the Confederacy finally enacted a Negro soldier bill which promised freedom to slaves after military service. This measure came so late that even though some Negro soldiers were enlisted, there is no evidence that any actually participated in any military campaigns.

5. *The Indian Wars:* After the Civil War, the Goverment organized the 9th and 10th Cavalry and the 24th and 25th Infantry Regiments made up of Negroes. These outfits helped guard the Western frontier against Indian attacks during the 1870's and 1880's.

6. *Spanish-American War:* These four regular Army Regiments, together with six volunteer State regiments, and four additional regiments raised by the War Department, gained distinction during the Spanish-American War. Four Negro units of the regular army served at San Juan Hill with the Rough Riders and at the battle of El Carney.

7. *World War I:* About 342,000 Negro soldiers served during World War I, approximately 100,000 overseas. Two Infantry Divisions, the 92nd and the 93rd, fought in several important battles, especially the Champagne and the Argonne sectors. The 369th Regiment of the 93rd Division was on the front line longer than any other American regiment. Privates Henry Johnson and Needham Roberts of this Regiment became heroes. Each won the French Croix de Guerre for fighting off a good-sized German raiding party in hand-to-hand combat.

8. *World War II:* During World War II, 1,175,000 Negroes served in the Armed Forces. Approximately 500,000 fought in most of the theatres of the war, from Pearl Harbor to the surrender of Germany and Japan. Dorrie Miller of the U.S.S. Arizona, won the Navy Cross for heroically manning a gun though he was only a mess attendant. The 761st Tank Battalion saw distinguished service in the Battle of the Bulge; the 92nd Division received many citations and decorations for valor for its part in the African and Italian campaigns; the 49th Pursuit Squadron, activated as the first all-Negro air unit, served in the Mediterranean theatre. In the Pacific theatre, Negro troops of the 96th Engineer Regiment fought in New Guinea, and the 93rd Division, a combat unit, served in the Solomons.

9. *Vietnam Conflict:* During the years 1961–1966, Negroes accounted for 11 percent of the total fighting force in Vietnam, while the enlisted death rate for those years was 18.6 percent. For the first eleven months of 1966, Negroes accounted for about 11 percent of the enlisted personnel in Vietnam, and for 17.8 percent of the combat deaths.

Mr. MADDEN. Mr. Speaker, I yield 11 minutes to the gentleman from Mississippi [Mr. COLMER].

Mr. SELDEN. Mr. Speaker, will the gentleman yield?

Mr. COLMER. I yield to the gentleman from Alabama briefly.

Mr. SELDEN. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Alabama?

There was no objection.

Mr. SELDEN. Mr. Speaker, I thank the distinguished gentleman from Mississippi [Mr. COLMER] for yielding to me so that I might express my opposition to House Resolution 1100 and urge its defeat.

It will be recalled that when the Civil Rights Act of 1964 was passed, it was said here on the floor of the House that the passage of that legislation would take the civil rights movement off the street.

Today, however, the House is being asked to consider yet another civil rights bill in a National Capital that in recent days has been under a virtual state of siege by looters and burners.

The House is being asked—if not in effect ordered and directed by extraordinary parliamentary procedures—to pass another civil rights bill while troops guard the Capital and patrol the streets protecting the Capitol Building itself.

I submit that no legislation should be considered under such conditions in a free and democratic society.

The spurious notion has been advanced in recent days that somehow property rights are separable from, and not as important as, other rights under our system. But the fact is that the foundations of the American system rest on the concept of the individual's right to hold property. The bill we are considering today is one of the most serious infringements on that right ever to be put before an American Congress. This is not a civil rights bill. It is a totalitarian bill which would sacrifice individual freedoms on an altar of election-year expediency.

I therefore ask that the House reject

this highhanded effort to stampede the U.S. Congress into enacting unwise legislation under conditions of siege.

Mr. COLMER. Mr. Speaker, first, I would like to thank my colleague, the gentleman from Indiana, the author of this resolution, for graciously permitting me this time. I must confess that I feel a bit selfish in taking this much time when only a brief 60 minutes is permitted under the straitjacket in which we find ourselves here today to discuss one of the most momentous questions involving the rights, the privileges, and the liberties of our people. But we find ourselves in that situation because we will not permit ourselves to act as an equal, coordinate body of the Congress.

There was a time, as envisioned by the Founding Fathers, when this body was set up to be the important body of Congress, fashioned after the House of Commons. But through a process of erosion, this body has permitted itself to become a second-rate body. We hear a great deal about second-class citizens. Are we not putting ourselves in the position of second-class legislators by accepting the Senate bill with all of these substantial changes and amendments in toto under this rule?

It might be well, in order to get the matter in its proper perspective, to briefly recite the history of the bill, even though others, including the gentleman from Michigan [Mr. GERALD FORD], have made reference to it. Permit me to remind you that this bill started out last year in this House as an antiriot bill. You will probably recall that, sometime around July, I arose in this House and notified the distinguished chairman of the Judiciary Committee, the gentleman from New York [Mr. CELLER], that if his committee did not proceed forthwith to take some action on one of a number of antiriot bills that were languishing in his committee, my Rules Committee would exercise a rare power that it has of taking a bill from a legislative committee and reporting it to the floor of the House. Immediately following this action the Committee on the Judiciary did report the so-called Cramer antiriot bill, but it reported it with what I regarded and still regard as an antidote for the riot bill, a so-called civil rights bill. I insisted at that time that the bills be reported separately. The Judiciary Committee proceeded to do that. In due course both of these bills were passed and sent over to the other body in August of last year. After much consideration in the Senate Judiciary Committee, the two bills were reported as a package deal, but in a considerably modified form.

Finally, after weeks of debate on the floor of the Senate, the bill now before us was passed and sent to the House. But, that is not all of the story. During that debate on the floor of the Senate, three entirely new and extraneous matters were added—the so-called gun control chapter, the so-called Indian rights chapter, and the most far-reaching so-called open housing chapter. None of these last-mentioned chapters have been considered by the appropriate committees and upon the floor of the House

during this, the 90th Congress. As a matter of fact, the so-called gun control provision of the bill is so controversial that no committee of this House has been able to report a bill, although it has been considered by at least two committees in the past several years. The Indian affairs provisions are now undergoing hearings in the committee of the distinguished gentleman from Colorado [Mr. ASPINALL], the Committee on Interior and Insular Affairs.

Possibly the most controversial, the most dangerous, and undoubtedly the worst provision of this bill is the one written on the floor of the Senate, the so-called open housing provision. To my mind, this is the greatest assault that has yet been made upon the Constitution and the heritage of free men which has been handed down to us by the Founding Fathers. Even as late as 10 years ago if some bureaucrat or politician had suggested that the Federal Government could tell a citizen how and under what conditions he could dispose of his property, he would have been scoffed at. What has become of the slogan we have heard so many times only a few years ago about. "A man's home is his castle." The right of a citizen to acquire, enjoy, and dispose of his property is one of our most sacred heritage as free men in a democratic Republic.

If we pass this bill today, I ask you in all seriousness what the next step will be. Will it be to require the Federal Government to move members of one race, minority or majority, into various sections of our communities to bring about a balance and thus hasten full integration? If you think this is far fetched, then I need only remind you that when we passed the Federal aid to education bill, even though the Congress refused to write a provision into that bill requiring the bussing of students from one school to another in order to remove a racial imbalance, the fact remains that it is being done today in many cities of our land. Is it fantastic, in view of what the Congress and the courts have done in the past, to suggest that even another step to be taken would be to subsidize people of minority groups by payment of a certain percentage, if not all, of the purchase price of a home in order to further the forced integration of the races, regardless of whether they wanted to or not?

Mr. Speaker, I realize that the wheel that squeaks the loudest gets attention, but remember that this proposed legislation affects not one section but all sections of our common country. And further realizing that a man's family, his dog, and his home are his most cherished possessions, I doubt seriously that this proposed revolutionary legislation is as popular as some politicians think. I think this is another case of where the politicians have failed to properly evaluate the public mind.

Mr. WHITENER. Mr. Speaker, will the gentleman yield?

Mr. COLMER. I yield briefly to my friend, the gentleman from North Carolina [Mr. WHITENER].

Mr. WHITENER. Mr. Speaker, I thank the distinguished gentleman from Mississippi for yielding to me. At this point,

I think it is only proper that the gentleman be applauded for his valiant effort to preserve orderly procedure in the consideration of this legislation. The gentleman from Mississippi has been a consistent supporter of the concept that such broad-based legislation as we have before us should be thoroughly considered in committee before forced down the throats of the Members of this body.

We have heard it said here today that the level of debate is in keeping with the traditions of the House. That contention is not impressive to me since I observe that the entire debate has been a discussion of parliamentary procedures and personal philosophies of individual Members. At no time have we heard any discussion of the language of the legislation or of the great legal and constitutional questions involved.

The bill now before us has never been adequately studied by the membership of this House. We should defeat the resolution now before us so that the bill might be sent to conference where attention can be given to many important issues which it raises.

Mr. Speaker, it was my privilege to testify before the Committee on Rules on April 2, 1968. I make that testimony a part of my remarks at this point in the RECORD:

STATEMENT OF HON. BASIL L. WHITENER, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NORTH CAROLINA

Mr. WHITENER. Mr. Chairman and members of the Committee on Rules: I have not heard all of the statement of my distinguished chairman, Mr. Celler. I was privileged to hear the first day of his testimony.

I note that in his statement on the first day of hearings he said that the Senate bill contained "many provisions not in the House bill." Of course, in this day and time, it is hard to pick out the understatement of the year. But that statement by Mr. Celler would be in the contest.

I have here a study made by the Library of Congress, Legislative Reference Service, which is a comparison of the open housing provisions of H.R. 14765, as passed by the House in August 1966, and H.R. 2516 as passed in the Senate on March 11, 1968.

A casual reference to that study will indicate that there is much in the so-called open housing provisions of H.R. 2516 which did not appear in the House bill which we had before us in the 89th Congress.

In view of Mr. Young's question of a few moments ago to Chairman Celler, I think it might be significant to point out that in the bill passed in the 89th Congress which, as Mr. Latta has so well said, was a Congress composed of different personnel to a major degree, the House very specifically wrote into that bill, section 403(e). That section provided:

"Nothing herein is to be construed to prohibit a real estate broker, agent, or salesman, or employee or agent of any real estate broker, agent, or salesman, from complying with the expressed written instructions of any person not in the business or not otherwise subject to the prohibition of subsection (b) or (e) with respect to the sale, rental, or lease of a dwelling owned by such person so long as the broker, agent, or salesman does not encourage, solicit, or induce the restricted instructions."

So it seems to me that the House, if we want to talk about what another Congress did, that the House in the 89th Congress met head on the problem which the gentleman from Texas—Mr. Young—and the gentleman from Florida—Mr. Pepper—have pointed out here.

I certainly concur with the gentleman from Florida that one of the elementary principles that we lawyers have always accepted was that a man could do through an agent what he could do himself.

I think that the attack in this bill upon an almost immutable principle of the law of agency is not justified and that we in this body should not embark upon a program of establishing bad law and bad precedents just because someone thinks that the other body might act differently.

Our responsibility to legislate wisely on any measure cannot be escaped by apprehension as to what the other body will do.

The first title of this bill, entitled "Interference With Federally Protected Activities," is a total misnomer. If we look at the language of the title, it provides that whoever, whether or not acting under color of law, does certain things is in violation of title I of this legislation.

Some of those things are voting or qualifying to vote, qualifying or campaigning as a candidate for elective office or qualifying or acting as a poll watcher or any legally authorized election official in any primary, special or general election.

So, really, what this is saying in this subsection is that the Federal Government is now going to preempt the body of statutory law in every State in this Union which relates to the subject matter.

It further provides against persons interfering with, whether under color of law or not, serving or attending upon any court in connection with possible service as a grand or petit juror in any court of the United States.

I take it that that means any local court as well as any Federal Court. I certainly don't recommend that we preempt the right of the States to control interference with serving as grand or petit jurors attending any court in connection with such service.

It goes further. It says whether a person is acting under color of law or not, that he has committed a Federal offense if he interferes with anyone participating in, or enjoying any benefits, service, privilege, program or facility, or activity, provided or administered by any State or any subdivision thereof.

You may say that this is not too important, but then you go on down to page 4 of the bill and it says that whether under color of law or not, if you interfere with anyone serving or attending upon any court of any State in connection with the possible service as a grand or petit juror, you are guilty of a Federal offense. Significantly, title I does not carry with it the usual nonpreemption provision which we refer to around here as the H.R. 2 provision.

So, it seems to me that in that title we may be getting ourselves into the doctrine of the *Steve Nelson* case and having our Federal courts say that no longer can a State protect a proposed juror or a potential voter, an election official, or these other categories that I have mentioned.

I could talk at great length but you gentlemen have heard our contentions on this for many, many years now. It seems to me that the constitutional law that we learned in the 1930's in law school, that the 14th amendment applies to State action and not the action of a citizen who might be walking down the street doing something without sanction or color of authority from the State, is still good law. It should be adhered to.

That being true, as I understand it, title I is alleged to be based upon the authority granted by the Congress by the 14th amendment. I don't see how the 14th amendment could be stretched to include the case of some criminal who might be charged with a crime in a local court, grabbing a prospective juror in the collar as he starts up the courthouse steps. I can't see that such conduct by an individual brings the 14th amendment into play in such a way as to give the

Federal Government jurisdiction to punish the offender.

There has been a great deal written by the courts on that. I won't bore the committee with extensive references, except one comment made by Mr. Justice Douglas in *Garner v. Louisiana*, 368 U.S. 175. I use Justice Douglas for reasons which I am sure everyone on the committee understands. He said:

It is, of course, state action that is prohibited by the Fourteenth Amendment, not the actions of individuals. So far as the Fourteenth Amendment is concerned, individuals can be as prejudiced and intolerant as they like. They may as a consequence subject themselves to suit for assault, battery, or trespass, but those actions have no footing in the Federal Constitution. The line of forbidden conduct marked by the equal protection clause of the Fourteenth Amendment is crossed only when a State makes prejudice or intolerance its policy and enforces it as held in the Civil Rights Cases, 109 U.S. 3.

"Mr. Justice Bradley speaking for the Court, said: 'Civil rights such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful act of individuals, unsupported by State authority in the shape of laws, customs, or judicial or executive proceedings.'"

That is what Justice Douglas said about the application of the 14th amendment to situations such as title I would relate to in part. Those particular parts being the ones that I have referred to.

Mr. LATTA. The gentleman makes a very important point, as far as the 14th amendment is concerned, in pointing out that it applies to State action rather than to individual citizen action. I am wondering whether or not the Supreme Court had ruled on this question of open occupancy as far as the individual homeowner is concerned.

Mr. WHITENER. My reference is to title I, not to open housing.

I might give you another outstanding authority which I see here before me. In *Peterson v. The City of Greenville*, 373 U.S. 244, a case decided in 1963, the Chief Justice had this to say, and I quote:

"I cannot be disputed that under our decisions private conduct abridging individual rights does no violence to the equal protection clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it."

That is what Chief Justice Warren says about it. In the light of that, I am wondering how we as Members of the legislative body can contend that for some strange reason that we should create exclusively a Federal offense if one interferes with, because of color, religion, or national origin, persons serving or attending upon any court in any State in connection with the possible service as a grand or petit juror. Nor do I see how we find authority to say that in a water district election in North Carolina or any other State, that if some individual walks in from the bar, the corner bar, and interfered with the right or the privilege of one to vote, or qualifying to vote, or if he walked in where I was making a campaign speech and said that I was a honky, that I ought to sit down, and that he is going to take some violent action. I just don't believe that the 14th amendment gives the Federal Congress the right to vest exclusive jurisdiction in the Federal courts of that type of offense.

I won't comment about the Indian titles because, frankly, I am not too familiar with those titles. My distinguished senior Senator from North Carolina is the father of these sections of the bill. While I am not disinterested in the Cherokee Indians, Lumbees, Croatans or the others that are in North Carolina, I have not had occasion to know about the problems which Senator Ervin seeks to eliminate by the Indian legislation.

I do understand that some of the members

of the House committee which has jurisdiction over the Indian affairs, have expressed some dissatisfaction with this legislation dealing with the Indian, and feel that it is a matter that should be studied by that committee.

The fair housing titles, you have heard a great deal about. I will not try to pose as an expert on them. But basically, I think it is offensive to all Americans to have anyone interfere with their right to own and dispose of property. I think this is offensive equally to persons of different color, religion, and national origin. I don't believe any of us would argue that there is any difference in our feeling about property we own.

In my own community where we have not been as concerned, apparently, about where people live as they have been in some other areas, we recently had an occurrence which pointed out to me members of other races are proud of their property and feel that they should be protected in it. In the past few days the local housing authority has proposed to build some low-cost housing near a subdivision which was developed immediately after World War II by some of our Negro friends. They built very attractive and expensive homes. They are now contending very strongly against the action of the housing authority to bring low-cost housing into their area where they have large investments.

I don't condemn or approve their attitude, but I merely point it out as a specific bit of evidence that people do like to protect their own property.

In an area of the city in which I formerly lived my neighbors were members of the Negro race. A colored church was within a hundred yards of my house. For as long as I can remember, people of both races have lived in this neighborhood in harmony. It was not a slum neighborhood. They live there now without friction.

But I dare say that if you went to my former neighbor who was a member of another race up the street and told him that under a Federal law he had to sell his house to a member of my race, and he had a son who was willing to pay him just a little bit less or a good friend of his own race, that he would loudly proclaim that any such law as that was a foolish law.

This I think is something that we must remember. There are people other than white southerners and Negroes in this country. There are members of religious groups. I know when I went to Brooklyn in World War II where the Navy had sent me, I was amazed that the social life, residential decisions, and everything else in the community where I went revolved around a Methodist Church.

When I wanted an apartment, living with fine fellow Methodists in their home, and we were looking for an apartment, they helped us find an apartment which they knew another Methodist was about to vacate. It was purely on the basis of my religious affiliation and in that time of great housing shortage we found the place to live. But under this bill, as I understand it, I cannot say if I put my house on the market, I cannot say to you, "Well, I will tell you one thing, I am not going to sell it to a Baptist, I am going to sell it to a Methodist because I think I owe is to my church to look after the Methodists."

If I were an Italian living in an Italian neighborhood, I couldn't say, and I couldn't have my broker go out and say, "We don't want any Polish people here, we want to sell this place only to Italians."

So this bill is a little more than just black and white. I certainly would not be understood here as saying that I favor prejudicial conduct on the basis of race, color, or national origin. But I do think that we are entitled as individuals to discriminate, as the Supreme Court has said we are entitled to, as individuals we are entitled to have our prejudices whether they be commended by the community or not.

If you start applying Federal law to every

individual that you know that had prejudice about many, many different matters, the Federal judiciary would be totally inadequate in number to undertake to handle the cases.

The antiriot provision we are all familiar with. I would like to point out a rather interesting thing. I don't know that Mr. Celler has dealt with this, but you have a title X in this bill called Civil Obedience. You have another title, the title on riots. You will note that in the chapter 102 on page 9, it is in title I, I guess, it was rather interesting to me to note that in that title, that section on riots, the other body was very anxious to write into that title at the bottom of page 10, line 25, subsection (e), "nothing contained in this section shall be construed to make it unlawful for any person to travel in or use any facility interstate or foreign commerce for the purpose of pursuing the legitimate objectives of organized labor through orderly and lawful means."

A riot as the bill defines it is a public disturbance involving, one, an act or acts of violence by one or more persons, part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of or shall result in damage or injury to the property of any other person or to the person of any other individual, or, two, a threat or threats of the commission of an act or acts of violence by one or more persons, part of assemblage of three or more persons having individually or collectively the ability of immediate execution of such threat, or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger or would result in damage or injury to the property of any other person or to the person of any other individual.

This protective provision for labor organizations in connection with labor disputes is written into this provision with reference to riots.

Now when you get to title X, and you tell with civil disorders which are disturbances of a lesser degree than a riot, you don't find this provision. While I don't advocate civil disorders or any conduct that disturbs the public peace in connection with labor disputes or otherwise, I do think that it is rather significant that title X of the bill would be so restrictive upon people and might subject them to criminal penalty in some rather remarkable ways.

What is a civil disorder, according to this bill? It means any public disturbance involving acts of violence by assemblages of three or more persons which causes an immediate danger of and results in the damage or injury to the property or person of any other individual. Three men walk out of a bar. One of them calls the other a name, a fighting name, and a fist fight ensues and personal injury results to one of these persons.

As I view this definition, that is a civil disorder. Suppose that in connection with a labor dispute this same event occurred among three of the people who were involved in it or maybe two who were involved in the labor dispute and one who was not involved but was friendly to management.

If someone could show under title X that either one of these men the week before had gone downtown to one of these karate training outfits and told them that a labor dispute was coming up next week and he didn't know what may happen but he wasn't very well able to take care of himself, and he needed a little bit of karate training. I say that under this provision the man who ran that training school, who knew that this individual was about to become embroiled in a labor dispute and taught him—and line 14 of page 46—"a technique capable of causing injury or death to persons" could be imprisoned. The same thing could happen if someone had taught another person to use a firearm and had reason to

believe that this man was about to go into a labor dispute, because certainly the language on lines 18 through 21 where they use the words delay or obstruct, delay or adversely affect commerce, or the movement of any article or commodity in the commerce, or the conduct of the performance of any federally protected function could very well be extended to include knowledge that a strike was going to impede the flow of commerce.

It is not only true of labor disputes but if some individual instructed another in the use of firearms or other devices, or a technique capable of causing death or injury if he knew this individual was going to attend some meeting on a public highway. It might and very well could affect some of the very people that the first title of the bill seems to want to protect. It might do the opposite to them. That is, your civil rights workers who are going to an assembled group of more than three people.

I think that this legislation should not be swallowed by the Congress without adequate consideration.

I don't believe that sending it to conference will necessarily accomplish the type of study that I would like to see. I would rather see the bill referred back to the Judiciary Committee where we could look over the legislation and come up with some changes.

We have heard a lot about the history of civil rights legislation. In the 11 years that I have served on the Judiciary Committee, we have had numerous civil rights bills sent to us by the Justice Department. I can tell you, gentlemen, that I don't remember one of them that was not almost completely rewritten when the Judiciary Committee studied it.

I remember many of these bills that have come out of the subcommittee, Subcommittee No. 5 of the Judiciary Committee, I believe it is. In the full committee we have virtually rewritten them. I believe the gentleman from California, Mr. Smith, served with us on the Judiciary Committee during the considerations of some of those.

The committee refined and improved the legislation. I don't believe that it is good legislative practice for us to approve the language of this so-called compromise that somebody wrote one night in the Senate Office Building without subjecting it to the type of study that it should have.

I remember one occasion, Mr. Pepper, when our subcommittee charged with the primary responsibility in civil rights legislation came out with a proposal, reported it to the full committee and then attorney general, the present Senator from New York, Mr. Kennedy, contacted the chairman and asked to be heard in executive session on that legislation.

He said in effect to the committee that he just couldn't conceive of us going as far as the subcommittee had gone in that legislation, that it would create a police state, and he urged that we amend it. We did.

So while there may be some hue and cry for legislation in this field—there will be more, I am sure, at a later date—I don't believe we should place on the statute books without adequate study legislation which all of us will regret in the future.

Thank you.

The CHAIRMAN. Thank you, Mr. Whitener, for your very splendid analysis of this bill as a member of the Judiciary Committee, and a man who enjoys the respect and confidence of his colleagues.

Mr. Whitener, there are so many questions that arise here that I would really like to go into. But time will not permit. I am going to mention just one thing.

When the bill was before the House in the previous Congress, the House on the floor deleted the provision applying to organized labor by a vote on the floor. The Senate has changed that and just reversed the situation. It has taken the labor union out.

Mr. WHITENER. Out of title I?

The CHAIRMAN. Yes.

Mr. WHITENER. They didn't take them out of title X.

The CHAIRMAN. They took them out of title I.

Mr. WHITENER. Only where they are lawfully engaged. I really don't find any argument with that. I don't see why you need to write that into the law just as I don't see the necessity of one of the other provisions here, and I didn't refer to it in my testimony. They said no law enforcement officer—shall be indicted for doing his duty in a lawful way. How silly can you get?

The CHAIRMAN. Very well, but there was a change made there and, yet, your committee, and the House under the proposal here of sending this thing to the floor and concurring in the Senate amendment, would obviate any opportunity for even an amendment on that to reinstate the House version.

The gentleman made, also, some reference to the burden that would be put upon the Federal courts. There has been a tendency all through the years, and especially for the past several years, to preempt the State laws and concentrate power in the Federal Government and in the Federal courts.

If this is enacted into law as it is now written, you are going to have to have many additional Federal judges, more Federal police power to enforce this, and at a time when we are talking about retrenching, economizing, trying to stabilize the dollar.

But many, many questions could be raised. We are going to have to go to the floor.

The question here before this committee is whether we are going to adopt the version advocated by the advocates of this bill, take it as it is with no opportunity for amendment in a very limited discussion. Of course the discussion amounts to nothing if you can't amend it.

Mr. WHITENER. Certainly 1 hour discussing would not be adequate.

The CHAIRMAN. Even if you had 6 hours, your discussion would be really worthless if you had no opportunity to amend it. So it gets down to the question of what this committee is going to do. That is really the problem that is before us, and the question to be resolved.

Are we going to take it that way, or are we going to send it back to your committee, which you say you prefer and which I think would be the proper procedure?

Mr. WHITENER. Mr. Chairman, if this bill went back to the Judiciary Committee, I can assure you that there are members of that committee who have a record of strong support of civil rights legislation who would be offering key amendments to this language and who would be trying to improve it.

The CHAIRMAN. Since there seems to be no willingness on the part of the advocates of this bill to send it back to the committee, then the least we could do would be to send it to conference, would it not?

Mr. WHITENER. Yes, second to going back.

The CHAIRMAN. For orderly procedure.

Mr. WHITENER. I think in fairness—I am not trying to argue both sides of the case—but in fairness to those gentlemen, and I reiterate what I said before, that if this bill went back to the Judiciary Committee I would not be at all surprised to see our distinguished chairman of the Judiciary Committee and Mr. McCulloch and others offering key amendments to the bill.

Their contention on the procedural step—and I think we ought to be fair with them—is their apprehension that if the bill goes back through the Senate through the conference route, that there will never be anything except a roadblock created. I don't agree with them on that in the light, as Mr. Anderson pointed out, of the fact that the Senate voted cloture I believe twice in 2 weeks.

I think that bit of history gives more support for the position that we take. This bill should go to the Judiciary Committee for

9620 CONGRESSIONAL RECORD — HOUSE *April 10, 1968*

further study and in any event it should go to the conference committee.

The CHAIRMAN. Very well.

Are there any questions?

Thank you very much, Mr. Whitener.

Mr. WHITENER. I appreciate the opportunity to come here. I am sorry I had not prepared a formal statement.

Mr. Speaker, I again commend the gentleman from Mississippi [Mr. COLMER] for the effort that he is making to preserve the dignity of the House of Representatives. I am happy to join him in undertaking to defeat this undesirable legislation.

Mr. COLMER. Mr. Speaker, I thank the gentleman for his contribution.

Now, if I may get back to these few remaining minutes, I have about 3 minutes. Think of that—3 brief minutes. And yet, under this gag rule that is 1,800 times more than the average Member of this House has to get up on this floor and even discuss this matter.

Now let me just say this, and I hate to say this but I am going to say it, because I have an unusual fault, I think, of saying what I think.

I pleaded with the powers that be in this House. I humbled myself to try to get an opportunity for all the Members of this House to have a direct vote upon the question of whether the bill should be sent to conference. This was, as I thought, a reasonable request and purely a procedural matter. The Committee on Rules turned down the proposition by a vote of 8 to 7 that the rule be granted on the Madden resolution, House Resolution 1100, and carry with it the right to also consider House Resolution 1118 on the floor which would send the bill to conference. That rule would not have delayed a single day the vote in the House. Whatever rule we passed would be considered here today on the floor.

Well, what is wrong with that?

The other day the other body put through a tax bill, a big tax bill, as an amendment which the President wanted, I understand, on our simple bill we passed in this House extending the excise taxes. When it came back to the House was there any motion to take that up and agree to the Senate amendment and adopt it and let it become law? That is what we are asked to do here because of the emotionalism that prevails.

Yes, I agree in this matter we are put in this straitjacket about voting. In the Rules Committee yesterday it was the best we could get, and Martin Luther King had nothing to do with that vote. But I also say, as one who has observed the workings of this House and who knows something about its personnel and membership, that on Thursday evening when I went home, in my humble judgment as well as that of many others, we had the votes to send the bill to conference.

But now the situation is changed. Here we are legislating in an atmosphere of hysteria, of threat, of arm twisting—an unsavory climate to legislate in.

Your U.S. Capitol today is surrounded by marines and soldiers. I ask you to follow the orderly procedure, to maintain the dignity of this House, to vote down the previous question and to send this bill to conference.

Mr. SMITH of California. Mr. Speaker, I yield myself my remaining 30 seconds to refresh the minds of the Members that the gentleman from Indiana [Mr. MADDEN] will move the previous question. I will request a yea and nay vote. A "yea" vote for the previous question will send this bill to the White House. A "nay" vote, if carried, will vote down the previous question. I will offer an amendment to send the bill to conference if a "nay" vote prevails.

The SPEAKER. The time of the gentleman from California has expired.

All time has expired.

Mr. MADDEN. Mr. Speaker, I move the previous question on the resolution.

The SPEAKER. The question is on ordering the previous question.

Mr. SMITH of California. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The question was taken; and there were—yeas 229, nays 195, not voting 9, as follows:

[Roll No. 95]

YEAS—229

Adams
Addabbo
Albert
Anderson, Ill.
Andrews,
  N. Dak.
Annunzio
Ashley
Ayres
Barrett
Bates
Bell
Betts
Biester
Bingham
Blatnik
Boggs
Boland
Bolling
Brademas
Brasco
Brooks
Broomfield
Brotzman
Brown, Calif.
Brown, Mich.
Brown, Ohio
Burke, Mass.
Burton, Calif.
Button
Byrne, Pa.
Cahill
Carey
Celler
Cohelan
Conable
Conte
Conyers
Corbett
Corman
Cowger
Culver
Cunningham
Daddario
Daniels
Dawson
Dellenback
Dent
Diggs
Donohue
Dow
Dulski
Dwyer
Eckhardt
Edwards, Calif.
Eilberg
Erlenborn
Esch
Eshleman
Evans, Colo.
Fallon
Farbstein
Fascell
Feighan
Findley
Flood
Foley

Ford,
  William D.
Fraser
Frelinghuysen
Friedel
Fulton, Pa.
Fulton, Tenn.
Gallagher
Garmatz
Giaimo
Gilbert
Gonzalez
Goodell
Gray
Green, Oreg.
Green, Pa.
Griffiths
Grover
Gude
Halpern
Hamilton
Hanley
Hanna
Hansen, Wash.
Harvey
Hathaway
Hawkins
Hays
Hechler, W. Va.
Heckler, Mass.
Helstoski
Hicks
Holifield
Holland
Horton
Howard
Irwin
Jacobs
Joelson
Johnson, Calif.
Karth
Kastenmeier
Kazen
Kee
Keith
Kelly
Kirwan
Kleppe
Kluczynski
Kupferman
Kyros
Leggett
Long, Md.
McCarthy
McClory
McCloskey
McCulloch
McDade
McDonald,
  Mich.
McFall
Macdonald,
  Mass.
MacGregor
Madden
Mailliard
Mathias, Md.
Matsunaga

Meeds
Meskill
Michel
Miller, Calif.
Minish
Mink
Mize
Monagan
Moore
Moorhead
Morgan
Morris, N. Mex.
Morse, Mass.
Mosher
Moss
Murphy, Ill.
Murphy, N.Y.
Nedzi
Nelsen
Nix
O'Hara, Ill.
O'Hara, Mich.
O'Konski
Olsen
O'Neill, Mass.
Ottinger
Patten
Pelly
Pepper
Perkins
Philbin
Pickle
Pike
Pirnie
Podell
Price, Ill.
Quie
Railsback
Rees
Reid, N.Y.
Reifel
Resnick
Reuss
Rhodes, Pa.
Riegle
Robison
Rodino
Rogers, Colo.
Roman
Rooney, N.Y.
Rooney, Pa.
Rosenthal
Rostenkowski
Roush
Roybal
Rumsfeld
Ruppe
Ryan
St Germain
St. Onge
Sandman
Scheuer
Schneebeli
Schweiker
Schwengel
Shipley
Sisk
Slack

Smith, Iowa
Smith, N.Y.
Stafford
Staggers
Stanton
Steiger, Wis.
Stratton
Sullivan
Taft
Tenzer

Thompson, N.J.
Tiernan
Tunney
Udall
Ullman
Van Deerlin
Vanik
Vigorito
Waldie
Whalen

Widnall
Wilson,
  Charles H.
Wolff
Wyatt
Wydler
Yates
Young
Zablocki
Zwach

NAYS—195

Abbitt
Abernethy
Adair
Anderson,
  Tenn.
Andrews, Ala.
Arends
Ashbrook
Aspinall
Baring
Battin
Belcher
Bennett
Berry
Bevill
Blackburn
Blanton
Bolton
Bow
Bray
Brinkley
Brock
Broyhill, N.C.
Broyhill, Va.
Buchanan
Burke, Fla.
Burleson
Burton, Utah
Bush
Byrnes, Wis.
Cabell
Carter
Casey
Cederberg
Chamberlain
Clancy
Clark
Clausen,
  Don H.
Clawson, Del
Collier
Colmer
Cramer
Curtis
Davis, Ga.
Davis, Wis.
de la Garza
Delaney
Denney
Derwinski
Devine
Dickinson
Dingell
Dole
Dorn
Dowdy
Downing
Duncan
Edmondson
Edwards, Ala.
Edwards, La.
Everett
Evins, Tenn.
Fisher
Flynt
Ford, Gerald R.

Fountain
Fuqua
Galifianakis
Gardner
Gathings
Gettys
Gibbons
Goodling
Griffin
Gross
Gubser
Gurney
Hagan
Haley
Hall
Halleck
Hammer-
  schmidt
Hansen, Idaho
Hardy
Harrison
Harsha
Hébert
Henderson
Herlong
Hosmer
Hull
Hungate
Hunt
Hutchinson
Ichord
Jarman
Johnson, Pa.
Jonas
Jones, Ala.
Jones, N.C.
Kornegay
Kuykendall
Kyl
Laird
Landrum
Langen
Latta
Lennon
Lipscomb
Lloyd
Long, La.
Lukens
McClure
McMillan
Machen
Mahon
Marsh
Martin
Mathias, Calif.
May
Mayne
Miller, Ohio
Mills
Minshall
Montgomery
Morton
Myers
Natcher
Nichols
O'Neal, Ga.

Passman
Patman
Pettis
Poff
Pollock
Pool
Price, Tex.
Pryor
Pucinski
Purcell
Quillen
Randall
Rarick
Reid, Ill.
Reinecke
Rhodes, Ariz.
Rivers
Roberts
Rogers, Fla.
Roudebush
Satterfield
Saylor
Schadeberg
Scherle
Scott
Selden
Shriver
Sikes
Skubitz
Smith, Calif.
Smith, Okla.
Snyder
Springer
Steed
Steiger, Ariz.
Stephens
Stubblefield
Stuckey
Talcott
Taylor
Teague, Calif.
Teague, Tex.
Thompson, Ga.
Thomson, Wis.
Tuck
Utt
Vander Jagt
Waggonner
Walker
Wampler
Watkins
Watson
Whalley
White
Whitener
Whitten
Wiggins
Williams, Pa.
Willis
Wilson, Bob
Winn
Wright
Wylie
Wyman
Zion

NOT VOTING—9

Ashmore
Fino
Jones, Mo.

Karsten
King, Calif.
King, N.Y.

McEwen
Poage
Roth

So the previous question was ordered.

The Clerk announced the following pairs:

On this vote:

Mr. King of California for, with Mr. Ashmore against.

The result of the vote was announced as above recorded.

The SPEAKER. The question is on the resolution.

Mr. GERALD R. FORD. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The question was taken; and there were—yeas 250, nays 172, answered "present" 1, not voting 10, as follows:

*April 10, 1968*  CONGRESSIONAL RECORD — HOUSE  **9621**

[Roll No. 96]

YEAS—250

| | | |
|---|---|---|
| Adams | Gallagher | Nelsen |
| Addabbo | Giaimo | Nix |
| Albert | Gilbert | O'Hara, Ill. |
| Anderson, Ill. | Gonzalez | O'Hara, Mich. |
| Andrews, | Goodell | O'Konski |
| N. Dak. | Green, Oreg. | Olsen |
| Annunzio | Green, Pa. | O'Neill, Mass. |
| Ashley | Griffiths | Ottinger |
| Ayres | Grover | Patten |
| Barrett | Gude | Pelly |
| Bates | Halpern | Pepper |
| Bell | Hamilton | Perkins |
| Berry | Hanley | Philbin |
| Betts | Hanna | Pike |
| Biester | Hansen, Wash. | Pirnie |
| Bingham | Harvey | Podell |
| Blatnik | Hathaway | Pollock |
| Boggs | Hawkins | Price, Ill. |
| Boland | Hays | Quie |
| Bolling | Hechler, W. Va. | Railsback |
| Brademas | Heckler, Mass. | Rees |
| Brasco | Helstoski | Reid, N.Y. |
| Brooks | Hicks | Reifel |
| Broomfield | Holifield | Reuss |
| Brotzman | Holland | Rhodes, Pa. |
| Brown, Calif. | Horton | Riegle |
| Brown, Mich. | Howard | Robison |
| Brown, Ohio | Hunt | Rodino |
| Burke, Mass. | Hutchinson | Rogers, Colo. |
| Burton, Calif. | Irwin | Ronan |
| Bush | Jacobs | Rooney, N.Y. |
| Button | Joelson | Rooney, Pa. |
| Byrne, Pa. | Johnson, Calif. | Rosenthal |
| Byrnes, Wis. | Karth | Rostenkowski |
| Cahill | Kastenmeier | Roush |
| Carey | Kazen | Roybal |
| Cederberg | Kee | Rumsfeld |
| Celler | Keith | Ruppe |
| Chamberlain | Kelly | Ryan |
| Clark | Kirwan | St Germain |
| Cleveland | Kleppe | St. Onge |
| Cohelan | Kupferman | Sandman |
| Conable | Kyros | Scheuer |
| Conte | Laird | Schneebeli |
| Conyers | Langen | Schweiker |
| Corbett | Leggett | Schwengel |
| Corman | Lloyd | Shipley |
| Cowger | Long, Md. | Sisk |
| Culver | Lukens | Slack |
| Cunningham | McCarthy | Smith, Iowa |
| Daddario | McClory | Smith, N.Y. |
| Daniels | McCloskey | Springer |
| Dawson | McCulloch | Stafford |
| de la Garza | McDade | Staggers |
| Dellenback | McDonald, | Stanton |
| Denney | Mich. | Steiger, Wis. |
| Dent | McEwen | Stratton |
| Diggs | McFall | Sullivan |
| Dingell | Macdonald, | Taft |
| Dole | Mass. | Tenzer |
| Donohue | MacGregor | Thompson, N.J. |
| Dow | Madden | Thomson, Wis. |
| Dulski | Mailliard | Tiernan |
| Dwyer | Mathias, Md. | Tunney |
| Eckhardt | Matsunaga | Udall |
| Edwards, Calif. | May | Ullman |
| Eilberg | Mayne | Van Deerlin |
| Erlenborn | Meeds | Vander Jagt |
| Esch | Meskill | Vanik |
| Eshleman | Michel | Vigorito |
| Evans, Colo. | Miller, Calif. | Waldie |
| Farbstein | Minish | Whalen |
| Fascell | Mink | Widnall |
| Feighan | Mize | Wilson, |
| Findley | Monagan | Charles H. |
| Flood | Moore | Winn |
| Foley | Moorhead | Wolff |
| Ford, Gerald R. | Morgan | Wright |
| Ford, | Morris, N. Mex. | Wyatt |
| William D. | Morse, Mass. | Wydler |
| Fraser | Mosher | Wyman |
| Frelinghuysen | Moss | Yates |
| Friedel | Murphy, Ill. | Young |
| Fulton, Pa. | Murphy, N.Y. | Zablocki |
| Fulton, Tenn. | Nedzi | Zwach |

NAYS—172

| | | |
|---|---|---|
| Abbitt | Blanton | Clancy |
| Abernethy | Bolton | Clausen, |
| Adair | Bow | Don H. |
| Anderson, | Bray | Clawson, Del |
| Tenn. | Brinkley | Collier |
| Andrews, Ala. | Brock | Colmer |
| Arends | Broyhill, N.C. | Cramer |
| Ashbrook | Broyhill, Va. | Curtis |
| Aspinall | Buchanan | Davis, Ga. |
| Baring | Burke, Fla. | Davis, Wis. |
| Battin | Burleson | Delaney |
| Belcher | Burton, Utah | Derwinski |
| Bennett | Cabell | Devine |
| Bevill | Carter | Dickinson |
| Blackburn | Casey | Dorn |

| | | |
|---|---|---|
| Dowdy | Jones, N.C. | Rogers, Fla. |
| Downing | Kluczynski | Roudebush |
| Duncan | Kornegay | Satterfield |
| Edmondson | Kuykendall | Saylor |
| Edwards, Ala. | Kyl | Schadeberg |
| Edwards, La. | Landrum | Scherle |
| Everett | Latta | Scott |
| Evins, Tenn. | Lennon | Selden |
| Fallon | Lipscomb | Shriver |
| Fisher | Long, La. | Sikes |
| Flynt | McClure | Skubitz |
| Fountain | McMillan | Smith, Calif. |
| Fuqua | Machen | Smith, Okla. |
| Galifianakis | Mahon | Snyder |
| Gardner | Marsh | Steed |
| Garmatz | Martin | Steiger, Ariz. |
| Gathings | Mathias, Calif. | Stephens |
| Gettys | Miller, Ohio | Stubblefield |
| Gibbons | Mills | Stuckey |
| Goodling | Minshall | Talcott |
| Gray | Montgomery | Taylor |
| Griffin | Morton | Teague, Calif. |
| Gross | Myers | Teague, Tex. |
| Gubser | Natcher | Thompson, Ga. |
| Gurney | Nichols | Tuck |
| Hagan | O'Neal, Ga. | Utt |
| Haley | Passman | Waggonner |
| Hall | Patman | Walker |
| Halleck | Pettis | Wampler |
| Hammer- | Pickle | Watkins |
| schmidt | Poff | Watson |
| Hansen, Idaho | Pool | Watts |
| Hardy | Price, Tex. | Whalley |
| Harrison | Pryor | White |
| Harsha | Pucinski | Whitener |
| Hébert | Purcell | Whitten |
| Henderson | Quillen | Wiggins |
| Hosmer | Randall | Williams, Pa. |
| Hull | Rarick | Willis |
| Ichord | Reid, Ill. | Wilson, Bob |
| Jarman | Reinecke | Wylie |
| Johnson, Pa. | Rhodes, Ariz. | Zion |
| Jonas | Rivers | |
| Jones, Ala. | Roberts | |

ANSWERED "PRESENT"—1

Hungate

NOT VOTING—10

| | | |
|---|---|---|
| Ashmore | Karsten | Resnick |
| Fino | King, Calif. | Roth |
| Herlong | King, N.Y. | |
| Jones, Mo. | Poage | |

So the resolution was agreed to.

The Clerk announced the following pairs:

On this vote:

Mr. King of California for, with Mr. Ashmore against.

Until further notice:

Mr. Karsten with Mr. Roth.
Mr. Dulski with Mr. Fino.
Mr. Resnick with Mr. Herlong.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

## GENERAL LEAVE

Mr. ALBERT. Mr. Speaker, I ask unanimous consent that all Members may be permitted to revise and extend their remarks on House Resolution 1100 and to include therewith extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Oklahoma?

There was no objection.

## LEGISLATIVE PROGRAM FOR TODAY

Mr. GERALD R. FORD. Mr. Speaker, I ask unanimous consent to address the House for 1 minute.

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. GERALD R. FORD. Mr. Speaker,

I take this time to inquire of the gentleman from Oklahoma the program for the remainder of today.

Is it the intention that we take up the excise tax extension proposal and the maritime authorization bill?

Mr. ALBERT. The gentleman is correct. If the Chair will recognize me at this time, I will offer a concurrent resolution for the adjournment.

## ADJOURNMENT OF THE HOUSE FROM APRIL 11, 1968, TO APRIL 22, 1968

Mr. ALBERT. Mr. Speaker, I offer a concurrent resolution (H. Con. Res. 761) and ask for its immediate consideration.

The Clerk read the resolution, as follows:

H. CON. RES. 761

*Resolved by the House of Representatives (the Senate concurring),* That when the House adjourns on Thursday, April 11, 1968, it stand adjourned until Monday, April 22, 1968.

The concurrent resolution was agreed to.

A motion to reconsider was laid on the table.

## AUTHORIZATION FOR CLERK TO RECEIVE MESSAGES FROM THE SENATE AND THE SPEAKER TO SIGN ENROLLED BILLS AND JOINT RESOLUTIONS

Mr. ALBERT. Mr. Speaker, I ask unanimous consent that notwithstanding the adjournment of the House from April 11 to April 22, 1968, the Clerk be authorized to receive messages from the Senate and that the Speaker be authorized to sign any enrolled bills and joint resolutions duly passed by the two Houses and found truly enrolled.

The SPEAKER. Is there objection to the request of the gentleman from Oklahoma?

There was no objection.

## PRIVILEGE OF EXTENDING AND REVISING REMARKS IN THE CONGRESSIONAL RECORD NOTWITHSTANDING THE ADJOURNMENT UNTIL APRIL 22, 1968

Mr. ALBERT. Mr. Speaker, I ask unanimous consent that notwithstanding the adjournment of the House until April 22, 1968, all Members of the House shall have the privilege to extend and revise their own remarks in the CONGRESSIONAL RECORD on more than one subject, if they so desire, and may also include therein such short quotations as may be necessary to explain or complete such extension of remarks; but this order shall not apply to any subject matter which may have occurred or to any speech delivered subsequent to the said adjournment.

The SPEAKER. Is there objection to the request of the gentleman from Oklahoma?

There was no objection.

## LEGISLATIVE PROGRAM

Mr. GERALD R. FORD. Mr. Speaker, I ask unanimous consent to address the House for 1 minute.

CONGRESSIONAL RECORD — HOUSE *April 10, 1968*

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. GERALD R. FORD. Mr. Speaker, will the distinguished majority leader indicate if it is true that once we finish the legislative schedule that he has indicated previously for today, although we would meet tomorrow, there will be no legislation on Thursday?

Mr. ALBERT. Mr. Speaker, will the gentleman yield?

Mr. GERALD R. FORD. I yield to the gentleman from Oklahoma.

Mr. ALBERT. In response to the gentleman, if we finish the matter which the distinguished chairman of the Committee on Ways and Means intends to bring before the House and the maritime authorization bill, we will have finished our legislative program for the week.

Tomorrow is Pan American Day and, of course, we will announce the program for the week after the recess.

Mr. GERALD R. FORD. But there will be no unanimous-consent requests for the consideration of legislation?

Mr. ALBERT. There is no legislative program scheduled for tomorrow.

Mr. GERALD R. FORD. I thank the gentleman.

## TEMPORARY EXTENSION OF EXCISE TAX RATES ON AUTOMOBILES AND COMMUNICATION SERVICES

Mr. MILLS. Mr. Speaker, I call up House Joint Resolution 1223 and ask unanimous consent that it be considered in the House as in the Committee of the Whole.

The Clerk read the title of the joint resolution.

The Speaker. Is there objection to the request of the gentleman from Arkansas?

There was no objection.

The Clerk read the joint resolution, as follows:

H.J. RES. 1223

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) the following provisions of the Internal Revenue Code of 1954 are each amended by striking out "March 31, 1968" and inserting in lieu thereof "April 30, 1968", and by striking out "April 1, 1968" and inserting in lieu thereof "May 1, 1968,":

(1) Section 4061(a)(2) (relating to tax on passenger automobiles);

(2) Section 6412(a)(1) (relating to floor stocks refunds on passenger automobiles); and

(3) Subsections (a)(2) and (c) of section 4251 (relating to tax on certain communications services).

Subsection (c) of such section 4251 is amended by striking out "February 1, 1968" and inserting in lieu thereof "March 1, 1968,", and by striking out "January 31, 1968" and inserting in lieu thereof "February 29, 1968,".

(b) The amendments made by subsection (a) shall take effect as of March 31, 1968.

Mr. MILLS. Mr. Speaker, I move to strike out the last word.

The SPEAKER. The gentleman from Arkansas is recognized.

Mr. MILLS. Mr. Speaker, this resolution continues the 7-percent rate of the manufacturers excise tax on automobiles and the 10-percent rate of the tax on telephone service from April 1 of this year to May 1. The conference committee which is presently meeting to resolve the differences between the House and Senate versions of the Tax Adjustment Act of 1968, realizes it cannot develop a conference report before Easter and feels this action should be taken.

The conferees have met a number of times and have made progress. Nevertheless, we are far from the end of our work and it appears unlikely that we can complete action before the Easter recess begins.

The series of amendments which the Senate added to the House version of the bill raised a number of major issues. These issues require careful consideration which necessarily prolongs the length of the conference.

The necessary length of the conference presents a problem, however, in connection with the excise taxes on automobiles and telephone service. The 7- and 10-percent rates of these excise taxes expired on April 1. At the suggestion of the Treasury, the manufacturers involved have continued to collect the excises at these rates. The Treasury issued this suggestion on the strength of the fact that both the House and Senate have approved legislation to continue these rates in effect from April 1 to the end of 1969. In fact this matter is not even in conference. The Treasury instruction is a temporary expedient, however, and legislative action is needed to clear up any uncertainty in the minds of the public. That is the purpose of this resolution.

Let me emphasize that the resolution deals with a provision of the bill which has been approved in identical form by both Houses of Congress. It is, therefore, clear that when this bill is enacted, the 7- and 10-percent rates will be imposed from April 1 until the end of the next calendar year.

Approval of this resolution will make it plain that the excise tax rates will not fall between April 1 and the date of enactment of the bill. It will also indicate that there will be no basis for claiming floor stock refunds with respect to items in inventories on April 1.

The 1-month extension of the excise tax rates provided by the resolution gives the conference committee additional time to arrive at a rational, reasoned answer to the many fundamental issues raised by the Senate amendments. In view of the complexity of these issues, the additional time provided is not excessive.

I urge the adoption of this resolution.

Mr. Speaker, are there further requests for debate?

Mr. BYRNES of Wisconsin. Mr. Speaker, will the gentleman yield?

Mr. MILLS. I yield to the gentleman from Wisconsin.

Mr. BYRNES of Wisconsin. Mr. Speaker, rather than take time, I just join the gentleman and also advise that I joined him in the introduction of the resolution. I think it is desirable and important that we do provide this 30-day extension.

Mr. MILLS. Mr. Speaker, I move the previous question on the joint resolution.

The previous question was ordered.

The SPEAKER. The question is on the engrossment and third reading of the joint resolution.

The joint resolution was ordered to be engrossed and read a third time, and was read the third time.

The SPEAKER. The question is on the passage of the joint resolution.

The joint resolution was passed.

A motion to reconsider was laid on the table.

## MARITIME AUTHORIZATION

Mr. PEPPER. Mr. Speaker, by direction of the Committee on Rules, and on behalf of the gentleman from New York [Mr. DELANEY], I call up House Resolution 1122 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

H. RES. 1122

*Resolved,* That upon the adoption of this resolution it shall be in order to move that the House resolve itself into the Committee of the Whole House on the State of the Union for the consideration of the bill (H.R. 15189) to authorize appropriations for certain maritime programs of the Department of Commerce. After general debate, which shall be confined to the bill and shall continue not to exceed two hours, to be equally divided and controlled by the chairman and ranking minority member of the Committee on Merchant Marine and Fisheries, the bill shall be read for amendment under the five-minute rule. At the conclusion of the consideration of the bill for amendment, the Committee shall rise and report the bill to the House with such amendments as may have been adopted, and any Member may demand a separate vote in the House on any amendment adopted in the Committee of the Whole to the bill or committee amendment in the nature of a substitute printed in the bill. The previous question shall be considered as ordered on the bill and amendments thereto to final passage without intervening motion except one motion to recommit with or without instructions.

The SPEAKER. The gentleman from Florida [Mr. PEPPER] is recognized for 1 hour.

Mr. PEPPER. Mr. Speaker, I yield 30 minutes to the able gentleman from Tennessee [Mr. QUILLEN], pending which I yield myself such time as I may consume.

Mr. Speaker, House Resolution 1122 provides an open rule with 2 hours of general debate for consideration of H.R. 15189 to authorize appropriations for certain maritime programs of the Department of Commerce.

H.R. 15189, as amended, would authorize appropriations for the use of the Department of Commerce for fiscal year 1969, as follows:

First, acquisition, construction, or reconstruction of vessels and construction-differential subsidy and cost of national defense features incident to the construction, reconstruction, or reconditioning of ships—$237,470,000;

Second, payment of obligations incurred for operating-differential subsidy, $206,000,000;

Third, expenses necessary for research and development activities, $11,000,000;

Fourth, reserve fleet expenses, $5,-279,000;

Fifth, maritime training at the Merchant Marine Academy at Kings Point, N.Y., $5,177,000; and

Sixth, financial assistance to State marine schools, $2,035,000.

Mr. Speaker, this is a very meritorious measure the rule would permit the House to consider, vital to the strength and perpetuation and building up of our important merchant marine. Therefore, I hope House Resolution 1122 will be adopted by the House, in order that H.R. 15189 may be considered.

Mr. QUILLEN. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, as the gentleman from Florida [Mr. PEPPER] has stated, the purpose of the bill is to authorize appropriations for fiscal 1969 for the maritime programs of the Department of Commerce.

This is the first such authorization bill since Public Law 90–81 was passed. It provides that the maritime programs are to be specifically authorized rather than, as before, being lumped in with Commerce authorizations.

The bill as introduced and recommended by the administration called for authorizations totaling $344,856,000. The reported bill contains an increase of $122,105,000, bringing the total to $466,961,000. The increase is almost totally allocated for ship construction.

The committee believed the increase was necessary to permit the Maritime Administration to contract for the construction of some 27 new ships as compared with the 10 provided in the administration's request.

The committee notes that unobligated funds totaling $103,300,000 remains from fiscal 1968. It recommends that these funds be made available for ship construction as suggested above. Twenty-seven ships ranging from general cargo ships and container carriers to dry bulk carriers, the exact number of each to be determined according to needs.

The committee notes that even if all unobligated funds are used and the full increase is approved and used, our merchant fleet will still not begin to approach our needs. It notes that 5 years from now, if our present construction rate is maintained, we will have only 244 merchant ships less than 25 years old compared to today's total of 663.

The various agencies support the bill as introduced. There are no minority views.

Mr. Speaker, I have no further requests for time, but I reserve the remainder of my time.

Mr. PEPPER. Mr. Speaker, I have no further requests for time.

I move the previous question on the resolution.

The previous question was ordered.

The resolution was agreed to.

A motion to reconsider was laid on the table.

Mr. GARMATZ. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the consideration of the bill (H.R. 15189) to authorize appropriations for certain maritime programs of the Department of Commerce.

The SPEAKER. The question is on the motion offered by the gentleman from Maryland.

The motion was agreed to.

IN THE COMMITTEE OF THE WHOLE

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the consideration of the bill H.R. 15189, with Mr. GILBERT in the chair.

The Clerk read the title of the bill.

By unanimous consent, the first reading of the bill was dispensed with.

The CHAIRMAN. Under the rule, the gentleman from Maryland [Mr. GARMATZ] will be recognized for 1 hour and the gentleman from California [Mr. MAILLIARD] will be recognized for 1 hour.

The Chair recognizes the gentleman from Maryland [Mr. GARMATZ].

Mr. GARMATZ. Mr. Chairman, I yield myself as much time as I may consume.

Mr. Chairman, the purpose of this bill is to authorize appropriations for certain maritime programs of the Department of Commerce. To put it in more familiar terms, this bill would authorize for fiscal year 1969 appropriations for the principal activities of the Maritime Administration in carrying out our national maritime policies.

You will recall that on September 5, 1967, the bill numbered H.R. 158, which would require authorization of funds for certain programs of the Maritime Administration in the Department of Commerce to precede the making of appropriations therefor was signed by the President and became Public Law 90–81.

That bill required that after December 31, 1967, only such sums as the Congress might specifically authorize by law might be appropriated for several specified purposes—including such matters as vessel construction, vessel operations, reserve fleet expenses, research and development, maritime training at the Merchant Marine Academy and the State marine schools, and the vessel operations revolving fund.

The bill before you today is our first exercise of authority under Public Law 90–81. It was introduced in response to Executive Communication No. 1434, dated January 31, 1968, from the Acting Secretary of Commerce, recommending legislation to authorize appropriations without fiscal year limitation for maritime programs for the fiscal year 1969.

This bill, as introduced, would authorize funds for fiscal year 1969 for all purposes required under Public Law 90–81 except the vessel operations revolving fund. No authorization in the latter case was either sought by the Department of Commerce or added by your committee because activities under the fund are being reimbursed by the Military Sea Transportation Service with respect to the operation of general agency ships and are, therefore, not subject to the Department of Commerce appropriation bill.

The bill as introduced would have authorized a total of $344,856,000 for the several categories of activity.

Nine days of hearings were held by our committee, between February 27 and March 27, during which time testimony was heard from representatives of the Secretary of Commerce, the Federal Maritime Administration, the Bureau of the Budget, and all major segments of the maritime industry.

The bill, as reported, recommends an authorized total of $466,961,000. This is a total recommended increase of $122,105,000. More than the budget request.

Our committee approves and recommends authorization of the sums contained in the budget request for the following items:

First, operating-differential subsidy—$206,000,000.

Second, reserve fleet expenses—$5,279,000.

Third, maritime training at the Merchant Marine Academy at Kings Points, N.Y.—$5,177,000.

However, increases are recommended on the other items.

On the vital subject of ship construction and related matters, the committee recommends an increase in the authorized total from $119,800,000 to $237,470,000.

This is $107,670,000 more than budget requested.

And $150,675,000 less than the Maritime Administration requested.

This amount—together with the use of $103,300,000 heretofore appropriated, but carried over from 1968—would enable the Maritime Administration to enter into contracts in 1969 for about 27 new modern ships—as contrasted to the 10 ships contemplated by the budget request.

It would include ships originally planned to be contracted for in fiscal 1968.

In addition, it would allow the conversion and upgrading of as many as 30 existing ships—which would thereby be made more productive.

While this item is substantially more than the budget request, it is substantially less—$150,675,000—than the Maritime Administration recommendation to the Department of Commerce for fiscal 1969.

The committee also recommends an authorization for research and development which would exceed the budget request by $4,300,000—to a total of $11,000,000.

This is the amount originally requested by the Maritime Administration.

It is an exceedingly modest amount, especially in the light of ultimate cost savings which can accrue to the Government's benefit by reduction of the level of Government subsidy through increased efficiency of ship operations.

Finally, the committee increased the item of financial assistance to State marine schools—from $1,900,000 to $2,035,000—which was the amount originally proposed by the Maritime Administration and approved by the Secretary of Commerce.

We understand that the reduction in this case was based on a belief that the probable attrition rates in the State schools would not make the originally requested amount necessary.

Present needs for qualified officers in the current situation are very great.

Graduates of the service schools are heavily employed—and it is our belief that the Maritime Administration is in the better position to evaluate the probable requirements.

Our committee is fully cognizant and

sensitive to the present overall fiscal pressures which are requiring constraints on wide areas of Federal activities and programs.

The unanimous action taken on this bill was with complete awareness of these constraints.

However, when it is appreciated that within the next 5 years the privately owned, U.S.-flag, dry cargo fleet will fall from a present level of 663 ships of less than 25 years of age, to only 244, the problem is placed in a most disturbing perspective.

The national security and the national economy demand that this precipitously dangerous declining trend be reversed.

The neglect of the merchant marine in recent years has brought about this condition—a condition which finds us some 90 to 100 major ships behind in the replacement of the subsidized dry cargo fleet.

And there are no replacement prospects at the moment for the presently nonsubsidized liner fleet or the bulk carrier fleet.

This neglect has brought us to the condition of where we are capable of carrying only about 7 percent of our total waterborne foreign commerce.

We simply cannot afford to continue at the present rate of new construction.

As I stated, this bill was reported unanimously by the committee—and on the basis of the record of the hearings—is conservative in the light of our known needs, requirements of operators, and capability of the American shipyards.

I strongly urge favorable action on this legislation.

Mr. MAILLIARD. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, under my unanimous-consent request, I have a statement that I will put in the RECORD, but our distinguished chairman [Mr. GARMATZ] has stated the fact situation in this bill, and stated the supporting reasons for our bringing in a bill even under these circumstances where our recommendation is substantially above the budget request.

Mr. Chairman, I wish to express my wholehearted support for the passage of the bill, H.R. 15189, with the amendment made by our Committee on Merchant Marine and Fisheries.

This bill represents a milestone in continuing congressional efforts to revitalize the American maritime industry. For the first time, your Committee on Merchant Marine has exercised jurisdiction over the authorization of appropriations for certain maritime programs pursuant to Public Law 90–81 approved on September 5, 1967.

H.R. 15189 with the committee amendment is the product of several weeks of extensive hearings and executive deliberation. All interested parties—both Government and private industry—were afforded every opportunity to present their respective views on the President's proposed maritime budget for fiscal year 1969.

While fully cognizant of the current fiscal restraints under which we now labor, your Committee on Merchant Marine unanimously agreed that the mounting needs of our maritime industry dictated increases in certain programs, and accordingly amended the legislation submitted by Executive Communication No. 1434. The committee amendment increases the administration's request for the several maritime programs by slightly more than $122 million in the following manner:

First, Ship construction-differential subsidy and related activities has been increased by $117,670,000, that is, from $119,800,000 to $237,470,000;

Second, Maritime research and development has been increased by $4.3 million, that is, from $6.7 million to $11 million; and

Third, Financial assistance to State marine schools has been increased by $135,000, that is, from $1,900,000 to $2,035,000.

By far the most important increase made by the committee amendment was the increase in the amount authorized to be appropriated for new merchant ship construction. At first blush, this increase may appear to be substantial. However, the demonstrated needs of the industry refute this initial reaction and render the increase both realistic and wholly justifiable.

Several years of cumulative neglect combined with executive deferral of the expenditure of funds appropriated by the Congress for new merchant ship construction have resulted in extraordinary vessel replacement needs. This situation has been further aggravated by the debilitating effect upon investor confidence in the industry resulting from the failure of the President to submit the "new" maritime policy which he promised more than 3 years ago in his state of the Union message of January 1965. Several of the subsidized American ship operators have requested and have been granted deferrals in their vessel replacement obligations in view of this air of uncertainty surrounding the future fate of the industry. As a result, the merchant ship replacement program, commenced in 1958, is 81 vessels behind schedule, and continuation of the low level of administration funding of this program will only serve to further deteriorate our maritime posture.

It has been estimated that the continuation of the ship replacement program at the current low level of funding will result in reducing the number of U.S.-flag dry cargo vessels 25 years of age or less by almost two-thirds. Acceptance of the amount requested by the administration for this program coupled with executive deferral of expenditures would further aggravate the situation and result in the loss of 1 year in meeting programed needs.

Mr. Chairman, I would venture to say that the American merchant marine has been allowed to deteriorate to such a low level that today our current sealift capability—comprised of privately owned shipping, the Military Sea Transportation Service, and the National Defense Reserve Fleet—could not meet minimum defense and civilian emergency requirements during a limited war contingency such as Korea. I feel we have become too complacent and have placed unwarranted reliance upon the National Defense Reserve Fleet to furnish the necessary surge capability to meet our contingency requirements. We would do well to bear in mind that these reserve fleet vessels were constructed during World War II and within the next 5 to 7 years will be completely phased out after an economic life of 30 years.

Perhaps even more telling concerning our ship replacement needs is the distinct probability that during a limited war contingency we would not have sufficient bulk shipping capability to transport the raw materials so vital to sustaining our manufacturing complex. Dramatic shifts in our trade patterns have resulted in more than 55 percent of the volume of our total ocean-borne foreign trade. Between 1950 and 1966, for example, our dry bulk foreign ocean-borne commerce has increased nearly sevenfold. Unfortunately, owing to limited funds and a concentration on meeting our dry cargo vessel needs, there has not been a corresponding growth in U.S. sealift capability to meet this national need.

It is significant, therefore, that in its initial consideration of this authorization legislation, your Committee on Merchant Marine did take cognizance of this dramatic shift in our trading patterns and the need to address attention to our dry bulk shipping capability. Although it is not reflected in the legislation now before you, what your Committee on Merchant Marine did was to take into consideration the initial ship construction request submitted by the Maritime Administration to the Department of Commerce for a 30-ship program in fiscal year 1969. Included in that initial request was provision for funds to construct five dry bulk cargo ships. The committee amendment includes the necessary funds for these vessels, and I, for one, hope that a long overdue effort in this area will result.

The request of the Maritime Administration to the Department of Commerce also included funding for 10 full containerships and 12 general cargo ships. The committee amendment provides the necessary funding for these vessels which, when combined with the 5 dry bulk cargo ships, could result in a 27-ship program for this coming fiscal year, and thereby begin a realistic replacement program approaching national needs.

The committee amendment, however, deleted three combination passenger-cargo ships originally requested by the Maritime Administration, since it was learned that the operator for whom the funds were budgeted was not prepared to proceed at this time.

The committee amendment also reduced the original Maritime Administration request for funds to retrofit and upgrade existing vessels by slightly more than $7 million.

The authorization for maritime research and development was increased $4.3 million by your committee's amendment—from $6.7 million to $11 million. This comports with the request of the Maritime Administration to the Department of Commerce and the latter's request to the Bureau of Budget. It was done in recognition of the fact that slightly more than one-half of the $6.7

million requested by the administration would be required to fund the N.S. *Savannah* program. This would result in only $3.3 million being available for actual research and development—an exceedingly low level in the very area which holds forth the most promise of improving our maritime posture. I, for one, would hope that the level of funding authorized would be appropriated and would be applied to those projects which show the greatest near-term benefit to improving the competitive posture of the American merchant marine.

The third and final increase made by the committee amendment was concerning financial assistance to State marine schools. The administration's request was increased by $135,000—from $1,-900,000 to $2,035,000. This increase results in a funding level which is the same as that requested by the Maritime Administration of the Department of Commerce and the latter of the Bureau of the Budget. This minimal increase is necessary to cover the statutory allowance for an additional number of cadets, plus makeup payments to the various State marine schools. It recognizes in a small way that our ship needs are complemented by personnel needs.

Finally, your Committee on Merchant Marine took into account the estimated carryover into fiscal year 1969 of unobligated funds in the amount of $103.3 million. The deduction of this amount coupled with decreases made by your committee in the original Maritime Administration request to the Department of Commerce results in a funding level slightly more than $150 million less than the agency's original request.

Mr. Chairman, the ultimate product embodied in H.R. 15189 represents a meaningful attempt to get on with the task of meeting our maritime needs. Some will say that the increases provided by the committee amendment are too great; some few, that they are not enough. I personally feel that the increases are necessary and totally justified, if we in the Congress intend to transpose our words of support for the American maritime industry into deeds. I therefore most earnestly urge that all my colleagues in the House support the passage of the bill, H.R. 15189, and assist in setting the course of the American Merchant Marine toward much-needed and long overdue revitalization.

Mr. CLARK. Mr. Chairman, will the gentleman yield?

Mr. MAILLIARD. I am glad to yield to the gentleman from Pennsylvania, a member of the committee.

Mr. CLARK. Mr. Chairman, I believe our chairman of the Merchant Marine and Fisheries Committee and Mr. MAILLIARD have adequately described the need for favorable consideration of H.R. 15189. I wish to join my chairman and associate myself with his remarks, but I wish to amplify, if I may, on the posture of our merchant fleet as compared to that of Soviet Russia.

By 1970, the Russian merchant marine will carry more than 50 percent of its foreign commerce. In striking comparison, the U.S. merchant marine now carries 7 percent of our foreign commerce,

and as time marches on, by 1970 we will be carrying less than that figure.

Russia emerged from World War II with a nondescript fleet of 432 merchant vessels, totaling less than 3 million tons. By 1970, she is programed to attain a fleet totaling 15 million tons. Last year, 471 merchant vessels totaling slightly less than 4 million tons were under construction or on order. At the same time, only 48 merchant ships totaling a little more than 1 million tons are under construction or on order for the U.S. merchant marine.

Deliveries for our U.S. merchant fleet for the past several years averaged only 15 ships per year, while the Soviets have taken delivery of at least 100 ships per year.

Today, the Russian fleet exceeds the American fleet in numbers, and it is only a matter of time when she will surpass us in tonnage.

Mr. Chairman, I could cite additional statistics pointing out the ambitious shipbuilding program of the Soviets and what I consider the lethargic attitude of our U.S. shipbuilding program, but I believe the motive of the Soviet buildup is obvious. Supremacy on the high sea.

Unless we in this country do not embark on a strong ship construction program now, the glory of our merchant fleet, which dates back to the famous clipper ships, will cease to exist except in memory.

I strongly urge favorable consideration of H.R. 15189.

Mr. MAILLIARD. Mr. Chairman, I yield 5 minutes to the gentleman from Washington [Mr. PELLY].

Mr. PELLY. Mr. Chairman, I urge support of H.R. 15189, the first maritime authorization bill to come before this House under legislation passed by Congress last year, providing that annual maritime appropriations bills shall not be reported or in order unless such expenditures are previously authorized by law.

H.R. 15189 exceeds the President's budget request. For example, the increase in funds for new ship construction would be from $119,800,000, requested by the administration, to $237,470,000. Our House Committee on Merchant Marine and Fisheries felt that this latter amount if coupled with carryover funds from fiscal year 1968 of $103,300,000 would provide for 27 new ships to be built instead of the 10 new ships requested by the President.

Also, the research and development authorization was increased from $6.7 million to $11 million.

The United States, Mr. Chairman, is 100 ships behind in its program to meet the block obsolescence in its merchant fleet, which was mostly built during World War II. We should be authorizing funds to build 50 ships a year to accomplish this objective, but the committee took a conservative position as a first step looking toward such a program. The committee report states my view that the national security and the economy require that the quality and composition of the American merchant marine must be improved.

The committee, in arriving at its recommendation, took as a starting point, the request for $388,000,000 of the Mari-

time Administrator, James Gulick, of the Department of Commerce, in order to provide the needed 5-day bulk carriers, 10 container ships, three combination passenger and cargo ships and 12 general cargo vessels.

Since there are no present applications pending for combination ships, the committe adjusted its authorization total accordingly and likewise reduced the figure for trade-in and conversion of the reserve fleet.

Mr. Chairman, I share the sentiment of my House Committee on Merchant Marine and Fisheries that its recommendation is conservative and that the Nation can no longer afford to neglect its merchant fleet in an attempt to curtail budget outlays. Let me point out that the Military Sea Transport Service has had to depend on foreign-flag vessels to provide for the needs of Vietnam, and our commitments throughout the world. For example in ship charter, it has paid out $30,079,626 for foreign ship charter last year alone. And, amounts paid to foreign lines for freight, and so forth, in 1 year alone—1965—was estimated at $1,322 million, and since then, the amounts would be much larger. I do not have these latter figures.

But, it is apparent the dollar drain and strain on our economy, because we do not have sufficient ships, is very heavy. And, besides, the necessary construction subsidy costs of constructing new vessels should properly be cut down by the amount we pay out each year to foreign shipowners.

So, I strongly urge passage of H.R. 15189 as reported by the House Committee on Merchant Marine.

Mr. GROVER. Mr. Chairman, will the gentleman yield?

Mr. MAILLIARD. I yield to the gentleman.

Mr. GROVER. Mr. Chairman, I think we should point out something that is not too well known here. The very base of our strategic reserve merchant fleet is to take ships from the existing fleet, the turnover from the presently used fleets, and to put them into the reserve.

We have taken some 120 ships from the moth ball fleet for the sea lift to Vietnam.

We have now, including those, some 1,200 ships in our strategic reserve. Some 455 of those, I believe are consigned for demolition to be scrapped.

The rest of these ships in the strategic reserve fleet, because we are not replacing them, will be by 1972 obsolete.

We will have no strategic reserve fleet by the 1970's.

So if we do not get on with rebuilding the merchant marine not only will we be off the seas in our import and export trade, but we simply will not have a bottom to go if we have a serious international situation; is that not so?

Mr. PELLY. The gentleman is absolutely correct. The situation is that we must start replacing our block obsolescence and supply added vessels. As the gentleman has pointed out, we must do so for national defense, if not for our economy. It is for both. Both are vital.

Mr. GROVER. For the past 6 years we have been presiding, as someone has said, at the last rites of our merchant

marine. It is a very, very serious thing. It does not get enough recognition from this Congress or the people of the country. If we do not get with it, we will be in extreme circumstances. If we were phasing-out the U.S. Marine Corps, which is another part of our defense security, we would hear a hoot and a howl from all over the country. Now we are phasing-out the fourth arm of our defense, and we are doing so very passively.

Mr. PELLY. I agree with the gentleman.

Mr. GARMATZ. Mr. Chairman, I yield to the gentleman from Virginia.

Mr. DOWNING. Mr. Chairman, there can be no question of the need of our country for an adequate merchant marine. We may differ as to what constitutes adequacy, but there can be no difference of opinion with respect to the fact that the relative handful of vessels presently in operation is totally inadequate.

We are carrying less than 8 percent of our own commerce. We had to dig 25-year-old vessels out of the reserve fleet in order to maintain our supply line to Vietnam, and we have virtually no ore carriers under our flag. Our tramp fleet is virtually obsolete and considerably more than half of our liners are overdue at the shipbreakers.

I am conscious of the needs of our Government for expenditures in other fields, but my experience in connection with merchant marine matters convinces me that the welfare of our country urgently demands the beginning of a constructive program to protect us in the future. Every year, more and more of our vessels are reaching the point where they are unable to fulfill their tasks, and unless they are replaced we will be totally at the mercy of foreign shipowners.

Shipbuilding is not something we can turn on and off like an electric light—we must set up a program beginning right now for a reasonably long period in the future to replace aging vessels and to augment our fleet. It takes years to build a merchant ship.

All we have to do is think back to the length of time it took us to turn out the first Liberty ship during World War II. That ship by today's standards lacked so many improvements that it would be virtually unusable under today's conditions. The development of engineroom automation, sophisticated cargo handling gear, vastly improved engines, and hull designs have substantially increased the length of time required to construct a vessel.

Therefore, our action on today's bill will not produce any vessels for as long as 3 years, and during that time our competitive position in world commerce will continue to worsen.

We must start now to rebuild our fleet and this bill represents a first step on the long road to regaining our rightful place as a maritime nation.

Mr. MAILLIARD. Mr. Chairman, I yield to the gentleman from Alabama [Mr. Edwards].

Mr. EDWARDS of Alabama. Mr. Chairman, I think this is a great day for the country, for the merchant marine, and for this body, because this is the first authorization bill that our committee has brought in under the most recently passed law. To me it is a great step in starting toward the rebuilding of our merchant marine. In the next few weeks we will be holding extensive hearings looking to a real national policy insofar as the merchant marine is concerned, and who knows what will come out of those hearings? In the meantime, we are starting on the right track. We are increasing the number of ships to be built. We are saying to the merchant marine and to the people of this country that Congress is going to do something about the sad state of our affairs in the merchant marine field.

We have watched the number of ships in this country dwindle. We have watched the amount of cargo that is hauled in our own ships, our own cargo, fall off to almost nothing. We have watched the Russian seapower increase daily. And we have seen the American merchant marine fall in almost every category from its once proud heritage.

I like to think this bill is the first step, the beginning in bringing our merchant marine back to that status in the world that it should have.

Mr. GARMATZ. Mr. Chairman, I yield to the gentleman from Maryland [Mr. Fallon] the chairman of the Committee on Public Works.

Mr. FALLON. Mr. Chairman, I rise in support of this long overdue legislation.

Mr. Chairman, the need to update our merchant marine is urgent, and the reasons are many. I do not think it necessary to repeat many of the very valid arguments already presented on many occasions for a viable merchant fleet. But I would like to present a few cold, hard facts that deserve repeating.

Almost everyone acknowledges that we cannot depend upon foreign maritime powers to transport the goods so vital to our Nation—especially in times of emergency. We are, at this moment in time, becoming increasingly dependent upon foreign ores to maintain our industrial complex. Iron ore, for example, is brought from Labrador, Peru, Brazil, and many other areas in the world to feed the blast furnaces in our country. America's national security would be imperiled if these ores were denied to us. Yet, there are practically no American ships engaged in this traffic, and we have no assurance that foreigners will continue to supply us these vital needs.

Although our maritime problems are complex and massive, they can be summed up with the statement that we must have more ships. And the only way to get them is by appropriating more funds for immediate construction.

As another illustration of our ship shortage, I might note that sufficient American vessels are not even available to carry the needed freight between America's east and west coast and Puerto Rico is an island totally dependent upon ocean transportation; it depends upon the United States for most of its vital materials, and we do not have sufficient American ships to service its needs properly. Such examples, I think, help drive home the significance of what we mean

when we warn that the United States is only transporting about 7.4 percent of its own foreign commerce on American-flag vessels. In other words, foreign ships are carrying better than 92 percent of America's foreign commerce.

We are all aware of the great service rendered by our merchant marine in carrying 98 percent of all supplies to Vietnam. But do we stop to think that a large proportion of the fleet engaged in that service consists of World War II ships? Do we realize it is extremely unlikely that they will be available for the next emergency? They served us well in Korea, they served us well in Vietnam, but they have passed their useful life and if another emergency arises, we will be almost totally dependent upon foreign ships.

I call the attention of the House to the fact that ships cannot be built overnight. In World War I we embarked on a crash shipbuilding program at fantastic expenses, and the first vessel did not come over the ways until after the armistice. We cannot tolerate such a situation. If trouble should break out in the future any place in the world, we must have the means available to immediately transport our supplies. Over a quarter of our fleet is already overdue at the scrap yard. We must start building now to prepare for future emergencies.

The bill being considered by us today represents a bare minimum toward a start on the long road to an adequate merchant marine. The amount of money involved is relatively small compared to some of our other undertakings. We can and must have a proper fleet for our own welfare, both commercial and defense, and we cannot have it unless we build ships now. To say that we will build them when this emergency is over, or next year, or any other time, is no answer, because we know from experience that there are always demands on our budget. Unless we take care of the most immediate requirements first, we will never take care of them at all.

I submit to you, gentlemen, that this is a requirement that demands immediate action.

Mr. GARMATZ. Mr. Chairman, I yield to the gentleman from Maryland [Mr. Friedel].

Mr. FRIEDEL. Mr. Chairman, I heartily endorse H.R. 15189. I heard the chairman, Mr. Garmatz, and Mr. Mailliard speak so eloquently in bringing out the real reasons why we should have a strong merchant marine.

Mr. Chairman, I am completely convinced of the necessity for the enactment of this legislation as reported by the Merchant Marine Committee.

Despite our rising world commerce, and rapidly increasing demands upon our defense establishments overseas, our merchant fleet continues to diminish at an alarming rate.

Over the centuries, the preeminence of Great Britain was based primarily upon its possession of a large merchant fleet. Its ships were capable of carrying its products to all the corners of the world, and of returning with vital raw materials. Today, we are in a position similar to that which Britain formerly occupied. We have assumed obligations

to less fortunate nations throughout the world, we have obligations to our allies, and we must do our part in improving conditions of peoples throughout the world by aiding their development. This can best be done, not by gifts of money, but by encouraging them to produce products that can enter into the stream of world commerce. We must do our part by providing adequate transportation for such countries.

Ironically, at the moment, we are in the unhappy position of not being able to even assume our own commerce or defense responsibilities. Before we can undertake our share of the burdens of other countries, we must help ourselves. This can only be done by building up our fleet to the point where it is at least adequate for our own needs. These needs are essential, not only for our commerce, but—as Vietnam has demonstrated—for our defense.

We must embark upon the long, hard road toward an adequate merchant marine and this involves money. How can we justify not spending a few million dollars on such an important, pressing and obvious need, when we are willing to spend billions to put a man on the moon?

I submit that, if we do not provide the funds called for in this legislation, we are shirking our responsibility, not just to our Nation, but to the entire free world.

Mr. GARMATZ. Mr. Chairman, I have no further requests for time.

Mr. MAILLIARD. Mr. Chairman, I yield to the gentleman from Iowa [Mr. GROSS].

Mr. GROSS. Mr. Chairman, I thank the gentleman for yielding me time. I am not quite clear as to how many ships will be provided by this bill.

Mr. MAILLIARD. Mr. Chairman, will the gentleman yield?

Mr. GROSS. I yield to the gentleman from California.

Mr. MAILLIARD. Of course, we cannot be absolutely precise, since these ships would be constructed in partnership between private business and Government. So you never can be sure until you know what the contracts call for. Our estimates are that new construction funds, together with the carryover that remains unexpended, ought to allow contracts for 27 new vessels during fiscal 1969.

In addition, there are funds provided for some upgrading and refurbishing of existing ships—perhaps as many as 30 of them, and again we cannot be precise until the contracts are signed.

Mr. GROSS. Why a carryover? The gentleman did say there was a carryover, did he not?

Mr. MAILLIARD. Yes. There was a carryover from 1967, I believe it is, of $103.3 million in the ship construction fund, carried over from prior years at the end of fiscal year 1969, and that together with the new money authorized would permit—it is our best estimate—27 new vessels instead of the 10 that are now programed.

Mr. GROSS. I am for ship construction in this country, but it seems an inopportune time to be compelled to spend money in this direction and in this amount in

view of the financial crisis with which this Nation is faced.

It seems to me this points up the necessity—if we are going to approve a bill of this nature—to slash awfully deep in the foreign aid bill this year; not just a symbolic cut of $200 or $300 million. If we are going to finance projects of this kind, under the circumstances we had better be prepared to cut the foreign handout bill by a billion dollars. I would hope those who are interested in ship construction in this country would lend their best effort in that direction.

Of course, I am no longer a member of the Merchant Marine and Fisheries Committee, but by the time I left that committee I had been given a pretty good indoctrination in the condition of the shipyards of this country. I assume that in the matter of ship construction in American yards it is pretty expensive for the reason, among others, of the obsoleteness of the shipyards of the United States by comparison with those of foreign countries, many of which we bombed into destruction during World War II and then this Government turned right around and provided the money for rebuilding them into modern shipyards.

Meanwhile American shipyards have become obsolete, resulting in higher costs of construction. This means the American taxpayer is soaked both ways—for the money the U.S. Government has taken from him to rebuild up-to-date foreign shipyards and now for the additional subsidies necessary for the building of needed freighters in the shipyards of this country.

Mr. PELLY. Mr. Chairman, will the gentleman yield?

Mr. GROSS. I yield to the gentleman from Washington.

Mr. PELLY. Mr. Chairman, I would like to comment to the gentleman that the way our merchant marine exists today, we have to use foreign ships to carry our cargoes, and we can carry only 7 percent of our own merchant shipping. That is the foreign aid program we should cut down on.

Mr. GROSS. Yes, that, and the granddaddy of them all, the annual multibillion-dollar foreign aid program. We could build a lot of ships with even a fraction of the $152 billion which the handout artists in this Government have peddled around the world in foreign aid since World War II.

Mr. GROVER. Mr. Chairman, will the gentleman yield?

Mr. GROSS. I yield to the gentleman from New York.

Mr. GROVER. Mr. Chairman, I agree with the gentleman. We have $12 billion in the pipeline, and I will go along with him this year.

Mr. GROSS. Mr. Chairman, I thank the gentleman.

Mr. GARMATZ. Mr. Chairman, I have no further requests for time.

Mr. MAILLIARD. Mr. Chairman, I have no further requests for time.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That funds are hereby authorized to be appropriated

without fiscal year limitation as the appropriation Act may provide for the use of the Department of Commerce, for the fiscal year 1969, as follows:

(a) acquisition, construction, or reconstruction of vessels and construction differential subsidy and cost of national defense features incident to the construction, reconstruction, or reconditioning of ships, $119,-800,000;

(b) payment of obligations incurred for operating differential subsidy, $206,000,000;

(c) expenses necessary for research and development activities (including reimbursement of the Vessel Operations Revolving Fund for losses resulting from expenses of experimental ship operations), $6,700,000;

(d) reserve fleet expenses, $5,279,000;

(e) maritime training at the Merchant Marine Academy at Kings Point, New York, $5,177,000; and

(f) financial asistsance to State marine schools, $1,900,000.

Mr. PELLY (during the reading). Mr. Chairman, I ask unanimous consent that the bill be considered as read, printed in the RECORD, and open to amendment at any point.

The CHAIRMAN. Is there objection to the request of the gentleman from Washington?

There was no objection.

COMMITTEE AMENDMENT

The CHAIRMAN. The Clerk will report the committee amendment.

The Clerk read as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

"The funds are hereby authorized to be appropriated without fiscal year limitation as the appropriation Act may provide for the use of the Department of Commerce for the fiscal year 1969, as follows:

"(a) acquisition, construction, or reconstruction of vessels and construction-differential subsidy and cost of national defense features incident to the construction, reconstruction, or reconditioning of ships, $237,-470,000;

"(b) payment of obligations incurred for operating-differential subsidy, $206,000,000;

"(c) expenses necessary for research and development activities (including reimbursement of the Vessel Operations Revolving Fund for losses resulting from expenses of experimental ship operations), $11,000,000;

"(d) reserve fleet expenses, $5,279,000;

"(e) maritime training at the Merchant Marine Academy at Kings Point, New York, $5,177,000; and

"(f) financial assistance to State marine schools, $2,035,000."

AMENDMENT TO COMMITTEE AMENDMENT OFFERED BY MR. PELLY

Mr. PELLY. Mr. Chairman, I offer an amendment to the committee amendment.

The Clerk read as follows:

Amendment to the committee amendment offered by Mr. PELLY: On Page 3 immediately after line 5, insert the following new paragraph:

"None of the construction, reconstruction, or reconditioning of ships authorized in Paragraph (a) shall be procured from other than shipyards and facilites within the United States."

Mr. PELLY. Mr. Chairman, H.R. 15189 authorizes, under paragraph (a), funds for acquisition, construction or reconstruction of vessels and construction-differential subsidy.

Under my amendment, a new paragraph is added to the bill which provides that none of this construction, recon-

CONGRESSIONAL RECORD — HOUSE *April 10, 1968*

struction or reconditioning of ships shall be procured from other than shipyards and facilities within the United States.

This is the same provision which the House, in its wisdom, adopted in connection with the Coast Guard authorization bill on March 19.

Mr. Chairman, no one should think for a moment this amendment is not necessary if Congress wants to follow this policy, because there are powerful individuals in this administration who advocate building some of our ships abroad.

Only last Monday the Maritime Administrator, James Gulick, testified before the House Merchant Marine Committee that his agency favored a policy of permitting the building of midbodies or parts of ships in foreign yards for jumboizing our American ships in our yards.

Secretary of Transportation, Alan Boyd, has for a long time advocated building U.S. ships abroad.

Congress does not agree and the House now has an opportunity to reaffirm its will that where the taxpayers' money is involved it should be kept at home and spent in American yards and for American workers.

I strongly urge my colleagues to adopt this amendment.

Mr. MAILLIARD. Mr. Chairman, will the gentleman yield?

Mr. PELLY. I am glad to yield to the gentleman from California.

Mr. MAILLIARD. I am fully in accord with the gentleman's amendment, but in all honesty I should point out this is contained in very stringent language in the present law. Section 505(a) reads:

All construction in respect of which a construction differential subsidy is allowed under this title shall be performed in a shipyard within the continental limits of the United States as the result of competitive bidding, after due advertisement, with the right reserved in the applicant to reject, and in the Commission to disapprove, any or all bids.

It even goes on to say:

In all such construction the shipbuilder, subcontractors, materialmen, or suppliers shall use, so far as practicable, only articles, materials, and supplies of the growth, production, or manufacture of the United States.

That really is even stronger than the language of the gentleman's amendment. While I certainly agree with the gentleman, I believe this is unnecessary.

Mr. PELLY. I would say to the gentleman that there are now to be authorized under this bill for some reconstruction and reconditioning some 30 vessels for the reserve fleet, and those could well have midbodies, according to the hearing we had the other day.

Mr. MAILLIARD. I would have to disagree with the gentleman. This section is binding as to anything that has construction differential subsidy. The midbodies involve questions of registering under the United States or having certain privileges under Public Law 480, cargo preference, and so forth.

This is ironclad; no construction money can go into foreign purchase.

Mr. PELLY. As I said in my remarks, as the gentleman knows, here is an opportunity to reaffirm our position on the basic law, and Congress can state once

again, as we did on the Coast Guard authorization bill, that we are for building American ships, for reconditioning them and repairing them, in American yards by American workers.

Mr. MAILLIARD. I agree with the gentleman's point.

Mr. EDWARDS of Alabama. Mr. Chairman, I move to strike the requisite number of words.

If I may have the attention of the gentleman from Washington, the gentleman knows we are in the middle of hearings right now on H.R. 163 and similar bills. What effect will the gentleman's amendment have on the construction of midbodies and other aspects as covered by H.R. 163?

Mr. PELLY. Mr. Chairman, I would say to the gentleman that so far as the building of American midbodies, if it was done under the new program, which my colleague from California indicates is not possible, it would meet with the administration's recommendation. They want to save money by building those midbodies in foreign yards and towing them over here and then attaching them in American yards. I think it might have no effect under existing law, as Mr. MAILLIARD pointed out, but at least it would let the administration know the way the Congress feels.

Mr. EDWARDS of Alabama. This would not render useless the hearings we are presently holding, would it?

Mr. PELLY. No, I do not think it would. In fact, to the contrary.

Mr. EDWARDS of Alabama. In other words, if a ship line is doing something today that would be prohibited by H.R. 163, the gentleman's amendment would not change that?

Mr. PELLY. That is correct.

Mr. EDWARDS of Alabama. I thank the gentleman.

Mr. GARMATZ. Mr. Chairman, I have no objection to the amendment. We accept the amendment on this side.

Mr. HALL. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, I take this time to ask a question about the committee amendment. I have served far too long on the Airlift-Sealift Subcommittee of the Committee on Armed Services not to approve this bill in general, although, as the gentleman from Iowa has said, it is difficult to increase over and above the budget request by some $122 million the first authorization bill that this committee has brought out. As Members of this House for years have known it is easy to authorize something in the hopes that Appropriations will hold the line. If we do this too much, we relegate our authority to a subcommittee of the House. The thing that concerns me is that when the distinguished committee was given the privilege of authorizations and made a legislative committee, in fact, it was said, as I recall it, on the floor of the House that we would review by line items these authorizations. Already in the colloquy here today we have had the discussion of the carryover of funds authorized to the Secretary for continued use.

The question naturally arises, why were not those funds used? I thought we on the Committee on Armed Services,

as long as we had Robert Strange McNamara, were the only ones that did not use up to our complete authorization and appropriation, and he has long since been dumped off the stern of the Ship of State. Perhaps the same thing happened in the Maritime Administration or whoever handles the merchant fleet. But we need this block replacement. We need to avoid block obsolescence and need, if necessary, to subsidize shipbuilding to keep the assembly lines going in the United States. We need to be able, without the spending of $1 billion a year in foreign bottoms, to lift our troops and equipment. So how do we come in this committee to do this when it says in the first line "That funds are hereby authorized to be appropriated without fiscal year limitation as the appropriation act may provide."

What use is an authorizing or legislating committee if we are going to pass the buck to the Committee on Appropriations? Why do we have carryover funds instead of reviewing in the committee each year by line item the new construction? These are the questions that I want to know before we accept almost automatically here in the shank of the evening today the committee bill which otherwise I am strongly in favor of.

Mr. MAILLIARD. Mr. Chairman, will the gentleman yield?

Mr. HALL. I yield to the gentleman from California.

Mr. MAILLIARD. I am very sympathetic to the point the gentleman makes, but we have a little unusual situation, if I may explain it. First let me answer the gentleman's earlier question.

The Secretary of Commerce simply withheld these funds even after the Congress appropriated them. It is not an authorization carryover but an appropriation carryover.

Mr. HALL. If I may interpolate, I presume that was a part of the Chief Executive's general economy program in holding back on congressionally approved funds. Is that correct?

Mr. MAILLIARD. It might have been that or it might have been he was peeved because we did not put the Maritime Administration into the Department of Transportation. I cannot read the mind of the executive branch.

Mr. HALL. I appreciate the answer of the gentleman, and I can only say that I am not privy to their high council. But is the gentleman trying to imply, in answer to my question, that this is a one-time authorization bill that will allow carryover funds and without fiscal year limitation?

Mr. MAILLIARD. What I was going on to say, if the gentleman will yield further, is that it is very difficult to pinpoint the fiscal year in a situation where each contract for the construction of a ship has to be worked out between the shipyard, the Government, and the prospective operator, and this sometimes take a long time to actually get from the point of discussion to a firm contract to build.

Sometimes it extends well over a year, so it is a very difficult situation.

Mr. HALL. If I may interpolate again, and I appreciate the answer of the dis-

tinguished gentleman but, after all, we have exactly the same problem in the Committee on Armed Services in contracting for capital ships, and we do it regularly.

Mr. MAILLIARD. The committee does?

Mr. HALL. And there is some carry-over, and there are contingency funds, but I would presume the Commissioner of the Maritime Commission would have the same situation, or the same relief, unless we are just getting ourselves into the position.

Mr. MAILLIARD. That is the point. This is the first time we have done this.

I believe we have a limited experience in this, and we will have to develop our experience, especially, let us say, from the authorization to the appropriation of funds by the Committee on Appropriations to the actual contracts. For example, this last year we had a case where everyone was agreed, the contracts were put out to bid, and the bids turned out to be so much higher than had been anticipated that we had to recall the bids. That is an example of what can happen.

Will the gentleman yield further?

Mr. HALL. I yield further to the gentleman.

Mr. MAILLIARD. As I say, that is exactly what can happen in this situation that it just seems was not possible during that limited period. Now, I think we have several choices in the future. One will be to allow a carryover, but to look at the carryover each year, and take it into consideration when we authorize for the next year. But I do not believe we can strictly confine this three partnership operation to the fiscal year very successfully, because the time factors are just too long.

Mr. HALL. I want to say to the gentleman again that I appreciate his answer, and I appreciate the dilemma, and I appreciate that this is a three-way factor, but again I submit that in the building of capital ships we have capital ships built by private industry, in fact a great majority of them, and only repairs are made by the in-house capability of the various naval shipyards that we have around the country, too many of whom, incidentally, have been decimated.

But here is a way to do this, and with all due respect to the distinguished members of the committee, whom I love and whom I appreciate bringing this bill to the floor—and I believe I appreciate their dilemma—if you do not retain that factor of yearly authorizations and line item review, if experience, insofar as the building of capital ships is any experience, that this thing will get out of hand.

In fact, this Congress passed a law at one time to remove all the carryover appropriations on capital ships and wiped it out and started clean again.

So this language in this committee amendment today, Mr. Chairman, concerns me, and I hope that it will not be repeated in the future, and indeed that I can have assurance that this is a one-time, first-time, without fiscal year limitation inclusion in the authorization bill.

Mr. MAILLIARD. Mr. Chairman, will the gentleman yield again?

Mr. HALL. I am happy to yield again to the gentleman.

Mr. MAILLIARD. I thank the gentleman for yielding.

In a sense we did just what the gentleman is talking about because, when we came up with this total figure as against the program, the approved number of ships, and so forth, we deducted from what we are now authorizing the carryover funds from prior years. So where we may have gone at it a little differently than the gentleman's committee, I believe we have very tight control, as long as we always compute the carryover into the current authorization.

Mr. HALL. That is very reassuring, and I am certainly not trying to fit our hat on the gentleman's committee.

Mr. Chairman, I yield back the balance of my time.

Mr. MURPHY of New York. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, I rise in support of the bill.

H.R. 15189 is a bill authorizing appropriations for certain maritime programs. Because of the fact that the American Merchant Marine has all but been eliminated from the high seas, this bill is vital to both the security and economy of the United States.

More than 80 percent of our American-flag ships are more than 20 years old. In the next 5 years, if we continue at the present rate of ship construction, our U.S.-flag fleet will drop to only 244 ships which are not virtually obsolete because of age.

Only $119,800,000 was requested for construction of new ships; the Merchant Marine Committee increased this amount to $237,470,000, which, taking into account a carryover of unobligated funds totaling $103,300,000, will enable the Maritime Administration to contract for about 27 new, modern ships as contrasted to the 10 ships contemplated by the budget request. With the amount authorized by this bill and the amount carried over, a total of $340,770,000 would be available in fiscal year 1969 for ship construction.

There is no change in the budget request of $206 million for operating-differential subsidy, but the amount requested for research and development has been increased from $6.7 million to $11 million. Almost half of the budget request would be used by the NS Savannah project, and there are many other important projects which would be unfunded without the increase recommended by the committee.

Basically, the rest of the budget requests are the same, with the exception of that applying to financial assistance to State marine schools. The committee raised the authorization to the amount originally requested by the Maritime Administration.

Mr. Chairman, our American merchant marine is facing nearly total block obsolescence within the next 5 to 10 years unless we act now to modernize and revitalize our fleet. This will cost money, but these expenditures must be considered an investment the security and economy of the Nation. Ships carry well over 90 percent of all supplies to Viet-

nam, and the resulting strain on our capacity would make it next to impossible to respond adequately to another crisis in another part of the world.

In addition, by increasing our shipping capacity, we will significantly improve our balance-of-payments deficit, which today threatens the economy of this Nation, if not the world. Today we carry only 7 percent of our foreign commerce on U.S.-flag ships. If this could be raised to 50 percent, there would be no balance-of-payments problem.

The time to act is now. The Soviet Union is one of many countries determined to control the high seas with their merchant vessels. But we have the capacity to regain our dominance of the seas if we only act now. This bill will be an important first step.

I urge my colleagues to support this bill.

Mr. MATHIAS of Maryland. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, I think the gentleman from Missouri is to be congratulated on the flexible attitude that he has taken. I think he raises a very substantive point. But I think the gentleman from California, the ranking minority member of the committee, has pointed out the urgency of this situation.

I personally want to congratulate the members of the committee, particularly my colleague, the gentleman from Maryland, the distinguished chairman of the committee, for the initiative that they have taken in going forward in this authorization bill, in increasing the budgetary request.

I believe that the increase in funds that have been requested in this authorization will prove to be one of the most valuable investments that this country has made.

The merchant marine and the maritime industry generally is so vital to all that this country does and all that this country aspires to do.

I think it is absolutely necessary that we move in the direction in which the committee is pointing today.

Mr. Chairman, I very strongly support the authorization and the increased amounts that have been requested.

Mr. LENNON. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, the distinguished chairman of the Committee on Merchant Marine and Fisheries has clearly and succinctly outlined the basic purpose of this bill, its background, and its effect.

The rules of the House provide that—

No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law—

With appropriate exception in the case of continuation of appropriations for such public works and objects as are already in progress.

This rule has been with us since 1837.

Questions have been raised as to why we are now asking for annual authorization for maritime programs—why they have not been required before—and how long has it been since the annual authorization authority was lost.

056695

**9630**                    CONGRESSIONAL RECORD — HOUSE                    *April 10, 1968*

Modern merchant marine organized promotional development goes back to the Shipping Act of 1916, which was hastily enacted to meet the emergency of World War I, when we suddenly discovered that the foreign-flag shipping which we had let ourselves become dependent upon in the prewar years was no longer available to us.

Prior to that time, there had been for many years no real merchant marine program. In that emergency the Congress authorized vast sums for a tremendous emergency shipbuilding program and set up organizations to administer them. The situation at that time was not comparable to the situation pertaining today. The object was to build and operate as many ships by the Government in the quickest possible time.

Then, and in ensuing years, there were several organizations set up—the Emergency Fleet Corporation, and later, the U.S. Shipping Board—to attempt to carry on a stable merchant marine program in the World War I and postwar years. A broad authority was enacted for the administration of these programs to buy and sell terminals; build, sell, operate and charter ships and other related activities.

There was no need under those authorities for annual authorization of appropriations because the statutes gave continuing authority so long as they were within the broad directives of the enabling statute.

Subsequently, when the Merchant Marine Act of 1936 was enacted, it was provided that—

The appropriations necessary to carry out the provisions and accomplish the purposes of this act are hereby authorized.

And section 209 of the Merchant Marine Act of 1936 again provided for continuing authority for appropriations by the language:

There are hereby authorized to be appropriated such sums as are necessary to carry out the provisions of this Act.

Thus, it can be seen that in the history of merchant marine programs for the past half century there has not been a general requirement for annual authorizations. Of course, whenever new programs not covered by the basic enabling law arose, specific authorization was necessary.

There, of course, have been occasions when new programs have been recommended when specific authorization had to be made as a prelude to appropriation.

I think the following background will be useful in explaining why we are now seeking to change the pattern of the past—and I think it is very pertinent to the background of what we are doing today.

When the Merchant Marine Act of 1936 was originally enacted the administering agency was the U.S. Maritime Commission, an independent agency responsible to the Congress. The programs authorized by that act were set up in a fashion intended to permit their efficient administration under broad enabling authority. The availability of a construction revolving fund minimized the need

for seeking detailed annual authorization for appropriations.

Since shortly after World War II, however, such matters as the transfer of the administration of the maritime functions to the Department of Commerce, the denial of the availability of the construction revolving fund, and other self-imposed limitations have had the practical effect of placing the operations of the agency on a strictly annual basis.

In view of these developments, it has become increasingly clear to your committee that if it is to exercise and maintain its legislative responsibility over our maritime policies and programs, we must review such policies and programs annually and make specific legislative authorization for the use of appropriated funds for such major items of expense as those covered by this bill. Through such annual review and authorization your committee believes a genuine service can be rendered to both the Congress and the Maritime Administration in the evaluating and carrying out of the maritime programs.

The CHAIRMAN. The question is on the amendment to the committee amendment offered by the gentleman from Washington [Mr. PELLY].

The amendment to the committee amendment was agreed to.

The CHAIRMAN. The question is on the committee amendment, as amended.

The committee amendment, as amended, was agreed to.

The CHAIRMAN. Under the rule, the Committee rises.

Accordingly the Committee rose; and the Speaker having resumed the chair, Mr. GILBERT, Chairman of the Committee of the Whole House on the State of the Union, reported that the Committee having had under consideration the bill (H.R. 15189) to authorize appropriations for certain maritime programs of the Department of Commerce, pursuant to House Resolution 1122, he reported the bill back to the House with an amendment adopted by the Committee of the Whole.

The SPEAKER. Under the rule, the previous question is ordered.

Is a separate vote demanded on the amendment to the committee amendment? If not, the question is on the amendment.

The amendment was agreed to.

The SPEAKER. The question is on the engrossment and third reading of the bill.

The bill was ordered to be engrossed and read a third time, and was read the third time.

The SPEAKER. The question is on the passage of the bill.

The bill was passed.

A motion to reconsider was laid on the table.

--------

## AMERICAN MUSEUM OF NATURAL HISTORY CENTENNIAL IN 1969

The SPEAKER pro tempore (Mr. ALBERT). Under previous order of the House, the gentleman from New York [Mr. KUPFERMAN] is recognized for 15 minutes.

Mr. KUPFERMAN. Mr. Speaker, the American Museum of Natural History in New York City will celebrate its centennial in April of 1969. It is an important event for Americans and for the whole world.

Incorporated in 1869 to encourage and develop the study of the natural sciences, advance the general knowledge of kindred subjects, and furnish popular instruction, it has become the finest museum of natural history in the world. It occupies a four-block area of New York City-owned land on Central Park West, south of 81st Street and facing my district. Its 19 buildings contain over 50 exhibition halls, a large library, two auditoriums, and the American Museum-Hayden Planetarium. Its main entrance on 79th Street and Central Park West stands as New York State's memorial to Theodore Roosevelt, a former Governor of New York and the great 26th President of the United States, whose father was one of the founders of the museum.

Ninety-nine years of research and scores of expeditions have filled the museum's 58 halls and 11.5 acres of floor space with exhibitions covering every aspect of natural science, while millions of valuable specimens comprise the study collections used for research and investigation.

The scientific and educational work of the museum is carried on by 13 departments, each headed by a chairman or curator under the leadership of the director. The funds through which specimens are purchased, exhibitions constructed, explorations carried on, and scientific investigation conducted are contributed by the trustees, members, and other friends. The city of New York pays for the maintenance of the building, education, and custodial staffs, amounting to about one-third of the museum's budget. Its research program in part is supported by Federal funds.

During the course of its history the museum has changed and developed with the changing times. The original concept of the museum which limited its scientific investigations to anatomical study and classification of dead forms has undergone a tremendous evolution and growth in recent years. It now embraces the whole field of ecology, the study of living plants and animals in relation to other living species, and to the chemistry and physics of the environment. Today, the American Museum is at the forefront of research in systematic biology and evolution, in studies of fossil and live animals of many varieties, and in investigation about man and his cultures from earliest times to the present. The American Museum-Hayden Planetarium conducts an active growing program of research and education in astronomy.

Very important too is the fact that the museum is part of the effort made by the city of New York, the largest city in the Nation, to create better citizens. The thousands of elementary school, college, and postgraduate students who visit the museum every week emerge inspired to

Case 1:13-cv-00966-RJL     Document 153-3     Filed 05/30/23     Page 105 of 111

play a role in the development of their city, their country, and their world.

The most extensive phase of the museum's centennial planning involves the museum's exhibit halls. Since the beginning of an expanded exhibition program in 1959, the museum has opened 10 permanent halls and some 30 special exhibitions and temporary exhibits. By 1969, six additional halls that are now being developed will have been completed. They range in subject matter from a comprehensive study of life in the oceans to a view of the cultural patterns and social organization of the peoples of Africa and of the Pacific. Specifically these halls are Man in Africa, Ocean Life, Biology of Fishes, Earth History, Mexico and Central America, and Peoples of the Pacific.

The plans for 1969 call for an academic procession, a convocation, and an address by an outstanding American on "The Museum in Modern Society," a symposium on "The American Museum of Natural History in Modern Society," a reception and a dinner with an invitation to inspect the museum, all on April 7; the publication of an anecdotal history of the museum by Geoffrey Hellman; a pictorial history of the museum by Jean LeCorbeiller; a children's book on the behind-the-scenes at the museum by David Levine; a collection of the most outstanding articles that have appeared in the magazine Curator as a special issue of the magazine; meetings at the museum of some 10 to 12 scientific societies; presentation of the museum's medals for outstanding contributions in the field of the natural sciences; floodlighting of the museum; the "Man and Nature" lectures by Dr. Margaret Mead; an exhibit on 100 years of the American Museum of Natural History; and an ambitious exhibit to be placed in the Roosevelt Memorial on the theme "Man and His Future Environment," the exhibit being concerned with man's present future and highlighting population and conservation problems.

The mere existence of an institution like the American Museum of Natural History helps to give a better image to the United States. The museum's contribution to our cultural life is a story that deserves to be told. I am, therefore, giving support to the issuance of a commemorative stamp by the Post Office Department to celebrate the first 100 years of this great museum and on this 99th anniversary, as we prepare for the celebration next year, I am introducing a bill to help accomplish this result.

## MORE VIOLENCE A CERTAINTY IF POVERTY MARCH IS ALLOWED

The SPEAKER pro tempore. Under previous order of the House, the gentleman from Louisiana [Mr. WAGGONNER] is recognized for 15 minutes.

Mr. WAGGONNER. Mr. Speaker, the slaying of Martin Luther King last Thursday was a senseless act and I deplore the idea of anyone taking the law into his own hands, as much as I deplored King's preaching that philosophy. The senseless slaying of King, however, pales into insignificance when compared to the deaths and violence which have followed. Deaths across the Nation are numbered in the thirties, destruction of property in the scores of millions of dollars and the damage done to constructive efforts toward peaceful racial relations is beyond calculation.

But the slaying of King has changed nothing. What was wrong before he died is still wrong; what was right before he died is still right.

I will not belabor this body by recounting in all its horror, the appalling events that have taken place here in Washington in the past week. The press has been full of the details; it has been a constant subject of television coverage. Every day, the people of the Nation's Capital have tensely awaited further outbursts. Citizens have had to move under a curfew, dismiss employees early, and see to the safety of their families. A cloud of tension still hangs over the city. If we are to believe the public statements of the heirs of Martin Luther King, the Capital faces almost certain violence again later this month when the so-called poverty march builds another tinderbox in the streets. This time, who can say where it will end? In the burning of the Capitol? In an attack on the White House?

There are those who would have us believe that only an infinitesimal part of the Capital's Negro population took part in the looting, burning, and rioting, but the cold facts refute it. Over 6,000 were arrested. Even allowing that one out of 10 was caught, which is a highly optimistic figure, this indicates that 60,000 men, women, and children put aside all reason, morals, commonsense and ordinary decency to attack their neighbors in a week of madness.

What we have witnessed this week is only a preview of what will come later this month if thousands of trained demonstrators are permitted to pour into this city, already raw nerved and tense.

If there is any complacent official left in Washington, I ask him to sample these quotations from black power advocates and those who side with it in the hopes of some political gain:

**Stokely Carmichael:**

The rebellions that have been occurring . . . is just light stuff to what is about to happen. We have to retaliate for the deaths of our leaders. The execution for those deaths will not be in the court rooms. They're going to be in the streets of the United States of America.

**Leroi Jones:**

We citizens have the right to rebel.

**Floyd McKissick:**

We are through clapping our hands and marching. From now on, we must be ready to kill.

**A. Phillip Randolph:**

This could escalate into a race war in this nation which could become catastrophic to the Negro and to America.

**Senator ROBERT KENNEDY:**

There is no point in telling Negroes to obey the law. To many Negroes, the law is the enemy.

**Whitney Young:**

The Negro no longer can be appealed to on the basis of love and non-violence and being patient.

**Adam Clayton Powell:**

I'm calling this evening for total revolution of young people, black and white, against the sick society of America. The concept of non-violence is finished.

This is only a sample of what the leaders of the black power revolution are saying. In the face of this evidence, in the aura of tension that hangs over this city, we cannot stand quietly aside and allow the conditions that assure violence to build up again. The poverty march will accomplish nothing. We know it and the leaders of the march know it. The only effect it will have is to set the stage for more of what we have had the past week and frankly, Mr. Speaker, I do not believe the people will stand for it.

I urge the House, before we adjourn for Easter, to express its will to the President and urge him to contact the leaders of the so-called poverty march and tell them that, for the safety of the people in the Capital and in the surrounding area, the march must be canceled.

If rioting breaks out again, and no one can realistically say that it probably will not, the failure of the Congress and the President to forestall it will be your responsibility and mine. Again, Mr. Speaker, I urge that the leadership contact the President and express this view to him.

## PRAISE FOR PRESIDENT JOHNSON

The SPEAKER pro tempore. Under previous order of the House, the gentleman from Texas [Mr. GONZALEZ] is recognized for 5 minutes.

Mr. GONZALEZ. Mr. Speaker, a cross section of letters to the editor in the San Antonio Express demonstrates the respect and admiration Americans feel for President Johnson's decision to put peace and unity above party and politics.

The shock of the President's withdrawal from the presidential campaign has made people recognize—now as never before—his contributions to the welfare of America.

Our Nation now understands clearly—as it had difficulty understanding before—that the Johnson years have been years of great accomplishment.

The President has been the champion of civil rights for the Negro and quality education for the young. He has extended the Nation's hand to help the poor and needy help themselves, and provided security against the costs of major illness for our elderly.

Rich and poor, labor and business have all been enriched by the unparalleled prosperity fostered by the administration's fiscal policies.

History—with its clear vision—will see these 5 years as the outburst of creative legislation aimed at improving the quality as well as increasing the quantity of American life. Water and air pollution control have been launched in earnest and conservation given its proper—and vital—place in American life.

But Lyndon Johnson's Presidency is more than a catalog of achievements—as impressive as the list is. Rather, his tenure in office is distinguished by the devotion to duty, sacrifice of self, and loyalty to country which will stand as shining examples for generations to come.

As one of the writers to the San Antonio Express put it:

I, for one, will mourn the loss of one of the greatest leaders our country has known.

America mourns with him for we will have lost a giant in American history.

Under unanimous consent, I insert in the RECORD these expressions of support in the San Antonio Express:

"DECISION WAS JUSTIFIED"

DEAR SIR: An Open Letter to President Lyndon Baines Johnson:

I was shocked beyond words when I heard you say on television that you would not be a candidate for re-election as President of the United States.

At first I could not understand your decision. After thinking things over, I began to come to the conclusion that your decision was justified.

I know of no one person on the face of this earth who has done so much for so many people as you have. You have done more for the Negro than all the other Presidents before you, and it must have hurt to see them turn on you. You have done more for the young people than anyone; you made it possible for youngsters to go to college who could have never even dreamed of going before, and it must have hurt to see them turn on you. You have done more for the poor and the needy, for labor and business, and for everybody else and the ingratitude they showed was disgusting.

You were right as you could possibly be in your thinking and in your conduct regarding the war in Vietnam, and I think the time will come when Americans will realize it.

You are a better man than I. I would have quit a long time ago rather than put up with the ingratitude that you did. However, for the sake of our country, now and in years to come, I hope you will reconsider and make yourself available again for re-election.

FRED A. SEMAAN.

"WE LET HIM DOWN"

DEAR SIR: President Johnson's statement that he would not seek reelection has really upset me. Then I think—why should he?

Why should he tear himself apart for people who have cursed, abused and belittled him from the start?

He has done more for us than any past president and yet no one gives him credit for the good things. All they can think of is the Vietnam war and that their boys are being killed. What is so different about this war and the Korean War? The young men of yesterday died, too.

Why are the kids now ready to riot or street brawl at the drop of a hat and then consider their lives too valuable to risk for their country?

President Johnson isn't sending our boys over there for the fun of it. He is protecting us in the only way he can. He is lending a helping hand to our neighbors in the hopes of peace for all.

I, for one, will mourn the loss of one of the greatest leaders our country has known. He didn't let us down, we let him down.

MRS. AUDREY GRUNEWALD.

## ANTI-OIL-POLLUTION BILL

The SPEAKER pro tempore. Under previous order of the House, the gentleman from New York [Mr. HALPERN] is recognized for 5 minutes.

Mr. HALPERN. Mr. Speaker, I was pleased to be a sponsor of the original bill offered last January to fight the growing menace of oil pollution of our coastal waters and beaches. That bill, H.R. 14852, would have been the first step toward establishing new authority for the Coast Guard to control and combat oil spillage from tankers.

I was pleased to again join our distinguished and able colleague from Massachusetts, HASTINGS KEITH, last Friday in introducing a new bill to strengthen our earlier measure.

That bill had not yet received a hearing when a major disaster last month demonstrated how totally unprepared we are to act swiftly to avert the miring of our vacation beaches, the killing of our wildlife, and the disruption of our fishing industry by thick, black, stinking sludge. Miles of beautiful beaches in Puerto Rico were fouled by millions of gallons of crude oil from a tanker that foundered in San Juan Harbor.

At this point, the administration belatedly drafted its own bill which is expected to receive quick attention before the Committee on Public Works, whereas our original bill is still awaiting action by the Merchant Marine and Fisheries Committee.

Since it is imperative that something be done—and done immediately—to forestall similar disasters on our shores, that is why I am so pleased to again combine efforts with the gentleman from Massachusetts, this time to go even further than the administration's recommendations. We propose to include stronger language that would, among other things, extend the Government's authority to deal with tanker spillage, not merely within the 12-mile limit, but outside it as well, when our shores are threatened.

We must have an effective antipollution law passed as soon as possible, and I urge the House to give this matter its full support.

## MEMORIAL PROCEEDINGS FOR JUDGE GEORGE C. SWEENEY

The SPEAKER pro tempore. Under previous order of the House, the gentleman from Massachusetts [Mr. PHILBIN] is recognized for 5 minutes.

Mr. PHILBIN. Mr. Speaker, under unanimous consent I revise and extend my remarks in the RECORD and include therein the memorial proceedings for our distinguished, beloved friend, the late Judge George C. Sweeney, which were held December 11, 1967, in the U.S. District Court of Massachusetts.

The proceedings were presided over by the learned, distinguished chief judge, Charles E. Wyzanski, Jr. Sitting were the learned, distinguished judges of the court: Hon. Frank J. W. Ford, district judge; Hon. Anthony Julian, district judge; Hon. Andrew A. Caffrey, district judge; Hon. W. Arthur Garrity, Jr., district judge, and Hon. Frank J. Murray, district judge.

The proceedings were attended by other members of the judiciary, leaders of the bar association, public officials, and Judge Sweeney's bereaved widow and friends.

In opening the exercises, Chief Judge Wyzanski made some very appropriate remarks and introduced the able, distinguished U.S. attorney, Hon. Paul F. Markham, and the able, distinguished attorney, Mr. C. Keefe Hurley, both personal friends and associates of Judge Sweeney, who spoke feelingly of their association with this great jurist of late and lamented memory, and delivered impressive eulogies concerning his long, faithful, memorable service to the court, to the State, and to the Nation.

The remarks made by the chief judge and those who participated in the program eloquently touched upon the personal qualities, public contributions, judicial talents, and effective thrust of Judge Sweeney during his career on the bench and in the public service.

The memorable tribute delivered on the occasion by the scholarly chief judge, Hon. Charles E. Wyzanski, Jr., traced Judge Sweeney's fine contribution on the bench, his constructive, able work with the Department of Justice in Washington, and other phases of his public life.

Judge Wyzanski's very striking recital of Judge Sweeney's background and the scope and quality of his service on the bench graphically illumined the many facets of Judge Sweeney's makeup as a judge and as a human being, which contributed so much to the success he achieved as a recognized, highly esteemed judicial leader.

The learned chief judge brilliantly and cogently summarized various important cases Judge Sweeney conducted, which included some extremely complex legal problems, and made mention of the down-to-earth, sensible, practical, humane approach that the late judge took in presiding over the court, and his fine, humane outlook, and understanding of his fellow men that always prompted Judge Sweeney to show special compassion and sympathy for his afflicted brethren.

As a warm friend and admirer of Judge Sweeney for many years, I am deeply impressed by these memorial proceedings, and am especially grateful to Chief Judge Wyzanski for his kindness in arranging and presiding over them and calling upon Judge Sweeney's close, distinguished friend, Attorney C. Keefe Hurley, an outstanding member of the bar, to present such well-chosen remarks, and especially for the magnificent tribute of esteem, respect and affection which he himself paid, and which very deeply touch all of us who knew and loved Judge Sweeney.

These proceedings were marked by that dignity that so fittingly typifies our great Federal court at Boston, and by the well-expressed words of its great presiding Judge Wyzanski, and those of our highly esteemed friend, Attorney Hurley, who during his lifetime was a neighbor and very close friend of our beloved, departed brother, whom we mourn so sorrowfully.

In reading the proceedings, I was

*April 10, 1968*                    CONGRESSIONAL RECORD — HOUSE                    9633

deeply moved by the fond recollections of Judge Sweeney which these remarks evoked. He came from the historic, very attractive city of Gardner, Mass., in my district, and worked his way up from humble beginnings to become a very successful, prominent lawyer, and at an unusually early age was elected mayor of that beautiful city.

I came to know the judge quite early in his career, and it was my happy providence to have worked with him in many causes which we both deemed very worthy.

Alert, vigorous, and buoyant he was endowed with a superabundance of energy and very deep convictions.

He was forward looking, independent of mind, known for his sincere fellowship of the spirit, and he was totally dedicated and devoted to the very distinguished public service that he rendered throughout his lifetime.

It was very appropriate that these exercises should have been attended by his esteemed, beloved, and illustrious colleagues of the court who stand so high in the annals and achievements of our renowned Federal judiciary, and by members of the bar, who so universally respected and esteemed Judge Sweeney.

The sorrow of his gracious wife and dear ones, encompassing a multitude of friends, has been poignant and deep, yet surely these touching exercises, for them and his wide circle of personal and professional friends, provided the comforting solace of publicly expressed tributes of honor, admiration, and love which will prayerfully serve to lighten the shadows and bring some substantial degree of resignation and peace at a time of sorrowful bereavement and grief.

In the words of the poet:

Sunset and evening star,
And one clear call for me!
And may there be no moaning of the bar,
When I put out to sea.

But such a tide as moving seems asleep,
Too full for sound and foam,
When that which drew from out the boundless deep
Turns again home.

Twilight and even bell,
And after that the dark!
And may there be no sadness of farewell,
When I embark.

May our dearly beloved friend, George, find rest and peace in his heavenly home, and may the Good Lord whom he served so faithfully in life, bless and keep him forever.

The memorial proceedings follow:

MEMORIAL PROCEEDINGS FOR JUDGE GEORGE C. SWEENEY, DECEMBER 11, 1967

Sitting: Charles E. Wyzanski, Jr., Chief Judge; Francis J. W. Ford, D.J.; Anthony Julian, D.J.; Andrew A. Caffrey, D.J.; W. Arthur Garrity, Jr., D.J.; and Frank J. Murray, D.J.

Presiding: Judge Wyzanski.

Chief Judge WYZANSKI. Mrs. Sweeney, and honored guests, the exercises this afternoon will begin with a statement from the United States Attorney, Mr. Markham, and then will be followed by statements by Mr. Hurley and by Mr. Healey, and there will be a reply by the Court.

These exercises are in no sense funeral, and anyone should feel free to leave at any time if he wishes to do so, and there is no restriction on people entering during the course of the proceedings.

Before calling upon anyone to speak, I ought to say that Mr. Justice Fortas, the Supreme Court Justice, assigned to this Circuit, has expressed his regret at not being here. Several of the Circuit and District Judges have also communicated their regrets. In particular, the weather has kept many people from coming, and obviously the fact that the Congress of the United States is still in session explains, as their communications have already indicated, the absence of the members of the Senate and House of Representatives who had hoped to be able to attend, several of whom have asked that their names be incorporated in the record as people who wished to express their very high opinion of our late Chief Judge.

Mr. Markham.

Remarks of Paul F. Markham, Esquire, United States Attorney, at special session of the United States District Court, in honor of the late Chief Judge of the Court, the Honorable George C. Sweeney.

May it please your Honors, it is both indeed a pleasure and a distinct honor for me to participate this afternoon in this special session commemorating the late Judge Sweeney. I have a special debt of gratitude to Judge Sweeney for indeed he was one of the members of this Court who voted for my present position. I have many fond and particular memories of Judge Sweeney.

However, there are two people here today who perhaps knew him at least as well, and probably better, than most. Mr. C. Keefe Hurley, a man who knew Judge Sweeney from their early days in Massachusetts, and then again in college days. They followed the same paths, Their association was very close through the years. Again, another man who will speak about Judge Sweeney, Mr. Joseph P. Healey, who was Judge Sweeney's law clerk, and since those days maintained a very close relationship with the Judge, and who, as we all know, has risen to great heights not only in the law but in the fields of education and business.

I would only move, if your Honors please, that the proceedings here today be recorded and made a permanent part of the records of this Court.

Chief Judge WYZANSKI. Your motion that the proceedings shall be recorded will be followed. In some cases I am aware that the speakers may have manuscripts which they wish to have filed with the records of the Court. The manuscripts will be regarded as being the official entry unless the speaker asks otherwise.

I ought to express to you our gratitude to the United States Attorney's office, and you personally, for your part in arranging these proceedings, and also to Mr. Chase and Mr. Tamburello, the respective Presidents of the Boston Bar Association and the Massachusetts Bar Association, and their various associates from other Bar Associations, who have joined in these arrangements and in the selection of the two speakers, who, as you have correctly pointed out, had special relationships to Judge Sweeney, and will speak with the added authority of many decades of friendship.

First, Mr. C. Keefe Hurley.

REMARKS OF C. KEEFE HURLEY, ESQUIRE

Chief Judge Wyzanski, Chief Judge Aldrich, the family of Judge Sweeney, judges of the Court of Appeals and District Courts for this Circuit, distinguished members of the United States Senate and House of Representatives, members of the Bar and friends:

While I am humbled by the realization that the life and works of Chief Judge George C. Sweeney memorialize him with far more eloquence than any words of mine could ever

achieve, I am deeply grateful for the cherished honor of participating in this tribute to a man who was my close personal friend for more than forty years.

Judge Sweeney was appointed to the United States District Court for the District of Massachusetts on August 24, 1935. At that time he was an assistant to the then Attorney General of the United States, Homer Cummings. He was in charge of the Claims Division of the Department of Justice and I was working with him there in Washington. My vivid memory of that happy occasion conspires with the aging process to convince me that it wasn't so very long ago—and perhaps it wasn't in the chronological sense. But in terms of events, it is ages past. On August 24, 1935, social security was a ten day old infant. The ravings of a diabolical little man in Germany were not yet recognized as the sparks that would ignite the bloodiest conflagration the world has ever known. And the atom was still the smallest particle of indivisible matter. Yet Americans of that generation sensed what their leader was soon to articulate—that they had a rendezvous with destiny.

Judge Sweeney came to the bench unawed by the prospect of that rendezvous, but with a deep sense of the responsibility which goes hand in hand with the cloak of judicial power. He loved the law—not merely because it provided nourishment for his great scholarship—but more importantly because he believed with every fiber of his being that the impartially administered rule of law is the cornerstone of our civilization. Moreover, as a thoughtful pragmatist, he rejoiced in a legal system which he perceived to be a practical and effective servant of the people.

Judge Sweeney was in incisive man. I invite you to contemplate his early decision in the case of *Davis v. Boston & Maine Railroad*, 17 Federal Supplement 97 (December 7, 1936). That case involved a challenge to the constitutionality of Title IX of the Social Security Act of August 14, 1935. In this, the thirty-second year of social security, it is difficult to recapture the drama and importance of that case. However, the title page gives us a clue to the significance which the government attached to the issues involved. The list of lawyers representing the interests of the United States would, a few years later, read like judicial Who's Who, including as it does such names as Charles E. Wyzanski, Jr., Stanley Reed, Robert H. Jackson and Francis J. W. Ford. No judge could fail to be acutely conscious of the great legal and social implications of any decision he might render in such a case. Judge Sweeney was no exception. But, he did not believe that big problems necessarily required lengthy opinions. On the contrary, he disposed of the conflicting contentions in four pages of lucid analysis and, with the incisiveness to which I have alluded, defined his holding in a paragraph which I consider to be symbolic of him in its clarity and simplicity. Let me quote it for you:

"I therefore rule that the tax imposed under Title IX of the Social Security Act is a valid exercise under the taxing powers imposed in Congress, that it does not exceed the limitation of uniformity, that it is to provide for the general welfare of the United States, and is therefore constitutional."

While Judge Sweeney derived much intellectual satisfaction from philosophical and conceptual debate, he was not an abstractionist. He was sensitively aware of the fact that a judge deals with specific human relationships and specific human problems. He was never governed by the desire to do as fancy and humanely within the framework of law.

Judge Sweeney's devotion to fairness and justice often caused him pain, for the paths which lead to these great goals are not always clearly marked. However, he never permitted himself the luxury of indecision. He knew

that just as causes have a beginning, so must they have an end, if our legal system is to function effectively. And so he judged, with courage and without favor. But the loneliness of his task was not eased by a dogmatic belief that he was always right. His solace came from the conviction that a judge does all he should do when a judge does all he can. To my mind this concept becomes a truth when the judge in question possesses the character and capability of a George C. Sweeney.

No tribute to Judge Sweeney would be complete without grateful recognition of his considerate treatment of lawyers. He was ever attentive to our arguments and understanding of our problems. We reciprocated with respect and admiration. We miss his friendly demeanor, his finely honed sense of humor, and his even-handed administration of justice, but our fond memories of him will always endure. In order that future generations might associate the visage of the man with the great record of his reported decisions, we plan to commission the artistic recreation of his likeness for presentation to this Court.

When man first interacted with man, the need for an arbiter was born, and I suspect that debate over the qualifications of judges dates from about the same time. I have listened to and participated in much of it during my years at the bar, and I am satisfied that an impediment to unanimity is our tendency to approach the problem with a view to prescribing the quality of judgment to be visited upon others. I am equally satisfied that all who would contemplate the prospect of being judged themselves would join in this plea:

"Fill the seats of justice
With good men, not so absolute in goodness
As to forget what human frailty is."

Chief Judge George C. Sweeney was such a man. He will not be forgotten.

Chief Judge WYZANSKI. Thank you very much, Mr. Hurley.

Mr. Healey.

Remarks of Joseph P. Healey, Esquire, at special session of the United States District Court in honor of the late Chief Judge of the Court, the Honorable George C. Sweeney.

Chief Judge Wyzanski, Chief Judge Aldrich, honorable Judges of this Court and the Circuit Court of Appeals, Mr. Attorney General, representatives of the Bar Associations, distinguished guests, Mrs. Sweeney and her family:

More than two decades have passed since I served in this Court as law clerk to Chief Judge George C. Sweeney. These have been years of change, unprecedented in scope and impact. There has been searching inquiry, especially by our young people, into traditional concepts of religion and morality, government, business, education—indeed the very fundamentals of our society. Institutional loyalties have been shaken. Voices of disagreement have become voices of dissent. The beginnings of the population explosion has made for more impersonal relationships between man and all aspects of his environment, including government. The age of the computer promises to be one of struggle to preserve essential individual identity and dignity.

Our legal system has not escaped challenge. The structure of the common law, built upon tradition and precedent, has little attraction for the more opportunistic forces in contemporary society. The judicial process itself, with its inherent and often necessary delays, is met with a growing impatience on the part of those who function in our dynamic and complicated economy. Procedures adapted to a simple and more unhurried day must fit the new needs of today and tomorrow.

We cannot expect our democratic society to survive just because of its intrinsic merit and because we will it to survive. We must have answers to the challenges and the criticisms. One of the answers is the continuing assurance of a viable and functional judicial system—a system which will work well only if persons of ability, courage and vision sit in the places of judgment. The appointing authority of any jurisdiction in the nation would do well to use Judge Sweeney as the measure of what a judge should be.

Here indeed, in one man, was integrity, wisdom, dedication and a broad-gauged approach to the problems of his fellow man. He had a deep sense of urgency to get on with the business of the Court, knowing that justice, if not prompt, is not full. He was alert to schedule cases for trial and diligent in the use of pre-trial proceedings to narrow the issues in litigation.

Punctuality with him was almost an article of faith. He often said, "My obligation to counsel, the parties and witnesses is to be on time." Exactly at the appointed hour he would take his place on the bench and woe to the counsel who was not present and ready to proceed.

In the actual conduct of a trial he was a master at cutting through to the heart of complex evidence, and eliminating the superfluous and redundant. In one case counsel for the defendant successfully objected to the admission of certain documentary evidence on the part of the plaintiff. After the ruling of exclusion defendant's lawyer continued to argue that the evidence was inadmissible. The Judge finally leaned over and said, "I have excluded the document, but if you keep talking I'll change my ruling and admit it."

He had a fine rapport with juries and a facility for presenting issues to them in an understandable context. He also had a real feel for the technique of settling litigation. At a fairly early stage in the proceedings he could size up the trend of the case and evaluate the relative strength of the litigants' positions. A frank discussion with counsel in chambers often led to termination of the case by a settlement acceptable to both sides. When settlement was not possible and the matter went to ultimate decision, a concise and timely opinion was written. These opinions seldom dealt with issues extraneous to those directly involved, even where there was clear opportunity for discussion of questions of great but irrelevant interest. Such matters, he felt, were not for a trial judge to explore. One of his favorite expressions was, "I have enough to do to decide what is before me." This was one of the first lessons I learned at his law clerk, fresh out of the Harvard Law School and eager to tackle all the unresolved problems in Anglo-American jurisprudence.

From these comments it should not be inferred that Judge Sweeney was the paragon of all virtues as a trial judge. He was a vital member of the human family with all its inheritances. He was, on occasion, impatient and irritable. Sometimes counsel thought that his pressure for settlement was stronger than it should have been.

But he saw his role as an arbitrator as well as a judge, and in his more than thirty years of service on the Court he moved thousands of cases to conclusion, by decision or settlement, in the full spirit of due process of law.

As Chief Judge of this Court he had both the talent and concern for efficient judicial administration. A generalist, he was equally at home in criminal and civil cases. He had a flair for technical problems, e.g. those involved in patent infringement suits. Once he even attended classes at M.I.T. for background in preparing for a particularly complicated case.

He was a progressive innovator both in his personal approach to the judicial process and in carrying out his administrative responsibilities. These characteristics can be found in his handling over several years of the case involving the Aldred Investment Trust—one of first impression under the Investment Company Act of 1940. Before the matter was concluded he undertook, among other things, to supervise the operation of a horse racing track for a full season, and to direct the ultimate liquidation of the trust. His decisions survived a number of appeals to higher courts. One distinguished observer characterized the Judge's work as "the most nearly perfect handling of a long and complicated case that I have ever seen."

In criminal cases he was a firm and fair, but compassionate, judge, especially with first offenders. Rehabilitation to him was something that called for direct involvement to achieve a critical social objective. I recall one case in which two men and a woman were convicted of embezzlement. After sentencing the two men, both of whom had prior records, he turned to the woman, a first offender, and gave her an extended lecture. Finally he said, "If I put you on probation you won't do this ever again, will you?" The woman answered, "No father. I won't." Afterward the Judge was heard to remark—"That's the closest I ever got to the other side of the confessional."

What then can we say of this man whose vibrant presence once filled these rooms? We can say that he was in every sense a whole man and a whole judge. We will need many more like him in all the courthouses of this land in the years of trial and challenge that lie ahead.

Thank you.

Chief Judge WYZANSKI. Thank you, Mr. Healey.

REMARKS OF CHIEF JUDGE CHARLES E. WYZANSKI, JR.

We are met not in sorrow but in joy reflected from the honor our late Chief Judge, George C. Sweeney, earned for the United States District Court. From 1935 to 1966 Judge Sweeney sat with us. From 1941 he was our leader, first as Senior Judge, and from September 1, 1948 until his seventieth birthday, on July 23, 1965, the first Chief Judge of this District.

He was one of the most widely known Federal District Judges, partly because of the length of his tenure, partly because of his service as one of the two representatives of the First Circuit at the Judicial Conferences in Washington, but mostly because of his trial of cases here and in many other Districts of the United States, even as distant as California, had built a solid reputation for his rare mastery of that quality paradoxically known as *common sense*. Those who as jurors, lawyers, parties, witnesses, or mere spectators watched Judge Sweeney in action observed his practical skill, his shrewd judgment, and his insistence on fair play.

Judge Sweeney came to this Court after surprisingly large experience for a man who at his appointment on June 17, 1935 was not quite 40 years old. Born in Gardner, Massachusetts July 23, 1895, he had been educated in the public schools of his native city, and at Williston Seminary, which later chose him to give the annual address to the Honorary Cum Laude Society. During world War I he had served overseas as a sergeant of infantry attached to the 301st Military Police Battalion with the 76th Division, from which he was honorably discharged on July 17, 1919. Two months later he entered Georgetown University Law School from which he graduated in 1922. Beginning practice in Gardner in 1924, he was three years later elected to the City Council, of which he became president in 1929. From January 1, 1931 to June 15, 1933 he was Mayor of Gardner. His suc-

056700

cesful municipal administration attracted national attention, and brought him into close contact with James Roosevelt and through him with his father Franklin D. Roosevelt.

At the outset of the New Deal George Sweeney was appointed Assistant Attorney General under Homer Cummings. Some friends had wrongly thought that the post would exceed the capacities of a lawyer who had not in his credentials either a college degree or intensive appellate court training. However, those who watched him as head of the Civil Division charged with actions in the Court of Claims and with admiralty causes and who heard him in argument before the Supreme Court of the United States recognized him as a genuine peer of his Department of Justice colleagues.

What he had learned in Gardner and in Washington made him a natural choice as a successor to Judge James Arnold Lowell. The appointment had particular significance because Judge Sweeney was the first Democrat and the first person of Irish antecedents and Catholic faith named a federal judge in Massachusetts. For us who realize that throughout the First Circuit there is not now sitting even one District Judge of Yankee heritage the nomination appears to mark a watershed.

There is a polite tradition that judicial lives should be recited in terms of cases heard and opinions rendered. No sophisticated reader of history regards this convention as the most revealing or accurate measure of wearers of the judicial robe. Many even of the most celebrated names in legal annals have a reputation which reflects less their qualities than the atmosphere of the age in which they lived. On the occasion of the hundredth anniversary of the commissioning of John Marshall, Oliver Wendell Holmes, Jr., perceptively wrote that "A great man represents a great ganglion in the nerves of society . . . a strategic point in the campaign of history, and part of his greatness consists in his being *there*." So much does the Zeitgeist rule in our accounting that a man as considerable a judge as Taney has been buried by the weight of the Dred Scott case, just as Chief Justice Warren was at once catapulted to world renown by the fortunate circumstance that in his first year there was on his docket *Brown* v. *Board of Education.*

History shone favorably on Judge Sweeney. His opening years gave him the opportunity of being the first judge to uphold in 1936 the constitutionality of the Social Security Act. The case was *Davis* v. *Edison Electric Illuminating Co. of Boston,* 18 F. Supp. 1 (D. Mass.) rev'd., 1st Cir., 89 F. (2d) 393, rev'd, 301 U.S. 619, and was argued by the future Justice Robert H. Jackson and Edward F. McClennen, a leader of the Boston bar and former partner of Justice Brandeis. A year later, Judge Sweeney in *U.S. v. H. P. Hood & Sons,* 26 F. Supp. 672 (D. Mass.) aff'd, 1st Cir., 108 F. 2d 342, aff'd 307 U.S. 588, again broke new paths when he sustained the constitutionality of the Marketing Agreement Act of 1937. Thereafter he applied that statute to many milk orders governing this region.

Later calendars brought to Judge Sweeney other noteworthy litigation. In 1956 in *Marks v. Polaroid,* 129 F. Supp. 243 (D. Mass.) aff'd 1st Cir. 237 Fed. 428, he held valid the basic patents of the Land camera upon which the Polaroid industry has been built. The criminal prosecution in *United States v. McGinnis* against officers of the Boston & Maine Railroad, whose convictions were affirmed in *McGinnis v. United States,* 1st Cir. 361 F. 2d 31, marked an advance in standards imposed on corporate officers. Only three years ago in the important suit involving *de facto* segregation in the Springfield schools, Judge Sweeney wrote an opinion,

*Barksdale v. Springfield School Committee,* 237 F. Supp. 543 (D. Mass.), which, though the judgment was reversed in the Court of Appeals, *Springfield v. Barksdale,* 1st Cir. 348 F. 2d 261, may have a more distinguished progeny than that of the opinion of the appellate court.

Corporate reorganizations, receiverships, and liquidations fell in a field wherein Judge Sweeney was an accomplished performer, not least because of his sound judgment as to the members of the bar to whom responsibility could prudently be entrusted. The Amoskeag Mills liquidation in 1936, the Waltham Watch Company reorganization in 1948, and the Boston Post Publishing Company reorganization in 1956 are widely-known examples.

Judge Sweeney would have been the last to claim that his opinions in those or other cases were text-book models or specimens of scholarly elegance. He would not have wanted to write in an academic vein. His ideas were simple, direct, and often indeed phrased by his faithful law clerks pursuing the lines of direction he firmly settled.

In jury work, Judge Sweeney was always the master of the courtroom, avoiding prolixity and delay without ever trenching upon the lawyers' province of needlessly interfering with their presentation. The judge is remembered testimony with scrupulous accuracy, though he took almost no notes and rarely, if ever, wrote his instructions to the jury. While, particularly in later years, he may not have equalled some few extraordinary judges in patience or in care as to details, the main outlines of each litigation never escaped him and the principal points received appropriate attention.

Quite rightly, no aspect of his daily work more concerned Judge Sweeney than the sentences he imposed on criminal defendants. He was never insensitive to human frailty, nor lacking in compassion. He strongly believed that only a man who had children of his own was qualified for criminal sentencing. An example is the discriminatory skill with which he designed successful rehabilitative procedures for the unfortunate singer Ray Charles. Judge Sweeney's moderation in disposition of tax evaders and postal embezzlers (while it may not have pleased those who, sitting in bureaucratic offices in Washington, offer unproven theories as to the deterrent effect of heavy sentences), seems, in retrospect, to have had as sensible social consequences as heavier penalties would have produced.

The role that George Sweeney had as Chief Judge he performed with such tact, insight, and quiet efficiency that only after his death were his colleagues fully appreciative of what his leadership had meant. We all knew that his reins lay light upon us. He never sought to influence a judge in his opinion, though he was available to counsel him. He never checked on any brother's work habits, but he gladly assumed another's load so that he could more easily take a vacation or attend a meeting.

We gratefully sensed the time he unobtrusively devoted to daily administrative tasks and his principle part in recruiting worthy persons as probation officers, clerks, referees, commissioners, court reporters, and other important functionaries. In his footsteps we adopted as he had the Massachusetts state court practice of pre-trials, long before it was standard procedure. We benefitted from the evenhanded assignment of cases by lot, pursuant to a formula he devised.

But of what perhaps even his brethren did not have full awareness was the extent to which he voluntarily did more than his aliquot share of the total burden of the District Court. And this was the more remarkable because, though he never whim-

pered, Judge Sweeney did not uniformly enjoy robust health or extraordinary vigor. If a judge came to the Court with little trial experience, or if he were dilatory, or even in some aspects incompetent, Judge Sweeney gave him relief and help, never admonishing, much less criticizing him, either privately or publicly. His colleague was his brother, in every sense of that word.

Friendliness characterized his treatment of elderly no less than young attaches of the Court. Men and women who had begun to falter were given lighter assignments and patient consideration. Judge Sweeney never forgot their human needs and still existent potentialities as well as their years of devoted service. If he by doing their work or forgiving their lapses could keep them productive and useful citizens he knew that they and the Court and the larger society would all benefit.

His relationships to members of the United States Senate and the House of Representatives were grounded in mutual confidence and affection, as indeed this assembly bears witness, and as did the remarks about Judge Sweeney published at the time of his death in the Congressional Record by his Congressman, the Honorable Philip J. Philbin. With state judges he was on intimate terms. Judges in other Districts and Circuits of the Federal System turned often for assistance and for advice to Judge Sweeney. Both in Massachusetts and in New Hampshire where he had a country place at Wolfboro, his friends were legion. Again the visible evidence is before us, as well as in letters such as Judge Gignoux has sent to make his esteem.

What Judge Sweeney was to his professional associates and neighbors he was in even greater measure to his family. For his beloved and charming wife he had a constant solicitude which made his marriage so successful. His son and daughters were rightful objects of his pride. Though he took care to avoid boring anyone with accounts of their prowess, their happy days were occasions for Judge Sweeney to invite his brethren to be with them.

Many judges are thought to be of special stature because they have earned plaudits from professors, or appellate judges, or the press. For such acclaim Judge Sweeney had no yearning. Perhaps he had indifference even to the verge of disdain.

He was glad to be a friend of his Department of Justice colleague, Dean Erwin N. Griswold of the Harvard Law School, and to have received an honorary degree of Doctor of Jurisprudence in 1964 from Suffolk University, but he knew that academic appreciation coming from men who must largely rely on hearsay, is no reliable index to the quality of a trial judge.

As to appellate courts, he had the attitude of a self-respecting judge of first instance who knows that a court which happens to be superior in the hierarchy is not inevitably superior in judgment or in understanding. Often appellate judges, as he noticed, are more eager to shine as teachers than as appraisers of fairness. If they are bent on discovering flaws, they in the quiet of their libraries can easily fault the performance of lower court judges ruling under fire. He had seen not a few superior court judges more solicitous of commendation from law reviews than from men who have better grounding in the realities of litigation. Writers of their own press releases, appellate judges find it easy to score better than men who necessarily speak extemporaneously and subject to the distortion which almost always accompanies a translation from oral speech to written record. Charles James Fox said a speech that reads well almost never sounded well. And the same might be said of a charge to a jury or many rulings or remarks made during a trial.

9636                    CONGRESSIONAL RECORD — HOUSE                    *April 10, 1968*

With the press Judge Sweeney was cordial, without imitating one of his predecessors who seasonally distributed cigars and other gifts designed to curry favor. The judge was glad, of course, when an editorial commended him as a "no nonsense judge." But he would not have been intimidated or deflected by editorials written in adverse criticism unless, which is too rarely the case, the comment reflected a full appreciation of the facts and circumstances surrounding judicial action. While no judge is entitled to scorn public opinion, the opinion to which he is most likely to defer is that of men who spend the effort, have the learning, and apply the canons of judgment appropriate to make a knowledgeable appraisal of professional work.

We who were Judge Sweeney's colleagues and are subject to the same standards as governed him know how well he did his job to the very moment of his death on November 5, 1966. We found in him the apotheosis of the common man trained by experience for uncommon tasks. No doubt he had superiors in formal education, but none in practical wisdom or high sense of honor.

Now as the judges, the Senators, the Congressmen, the lawyers, the family and friends of Chief Judge Sweeney, and others in this honorable company leave, let us in grateful remembrance stand for one minute in tribute to him as we always stood when he entered or left this courtroom.

## THE KEY TO UNITY

The SPEAKER pro tempore. Under previous order of the House, the gentleman from West Virginia [Mr. STAGGERS], is recognized for 5 minutes.

Mr. STAGGERS. Mr. Speaker, it is not arrogance to remind ourselves that this is a great and mighty Nation. Through the work of our hands and minds, and under the dispensation of a gracious providence, we have piled up power and wealth beyond compare. All the resources of emperors and kings through the ages fade into insignificance when measured against what we have achieved in science and technology, in social advancement, in education, in benevolence.

And yet, with all that we have, and all that we are, we have not been able to set up a reign of peace and happiness in our own land. We are living in dangerous and explosive times. All the progress of the last few decades could be swept away, submerged under waves of discontent, distrust, and disillusionment.

Lust for power and craving for wealth seem to have warped the consciences of great and small alike. Virtue and honor and integrity are almost lost words. The system of morality so painfully constructed by experience and suffering through the long centuries is being thrown into the rubbish heap.

Strange doctrines are abroad throughout the land. Propagated and proclaimed by some 2,000 extreme leftwing organizations and an equal number of extreme rightwing organizations, these doctrines pour out a flood of venom against the Government, and infect our people with the poison of dissension and strife.

Recent events have shown that we cannot keep on the road we are now traveling, for on that way lies disintegration of our democracy in an explosion which will scatter all our greatness into the dust of the air. What is the answer? I do not know, but I always turn to the words of

the Master: "Let us have faith." Faith in ourselves, in our fellowmen, in the original tenets of our democracy; but above all, faith in Almighty God, as the architect of the universe, the ruler of the destinies of men, the strength and the protection of our noblest national aims and purposes.

As he was returning to his own country after a long sojourn in the United States, former President Romulo of the Philippines observed that the strength of this mighty Nation lay in the deep religious faith of its people, and he believed we would maintain that strength as long as we held fast to our faith. Today his statement appears as both a warning and a prophecy.

The remarkable insight of our Founding Fathers shows itself in the structure of a government capable of indefinite expansion and development, and also in the key words which they set up here for our guidance and admonition. In the Chamber of the House of Representatives, on the Speaker's dais where all may see, they engraved five words. They still stand there: "Union; justice; tolerance; liberty; peace."

First comes union, for without that accord in purpose and action which we call unity, we are impotent, we can attain none of the other desired goals, we must soon collapse as a nation.

Second is justice, justice for every individual regardless of his station in life or the condition of his birth or his genetic origin.

Then comes tolerance, which asks us to give equal faith and credit to every man's views, though we do not accept them as our own.

Liberty is a wide-spreading concept, incapable of exact definition, perhaps. Fundamentally it permits every man to make his own decisions, so long as these do not interfere with the equal rights of his fellows.

And to cap this illustrious pentad of ideals, there is peace. It is the reward of the attainment of the previous four. Without these foundation stones, there can be no peace.

May we traverse the course which leads to destruction, and return to the sound and useful principles of our forefathers.

And may the Lord which dwelleth in Heaven watch over this great and mighty Nation and keep it strong, and may His angels watch over each individual citizen and guard and guide him through the perilous days that lie ahead.

## SPECIAL ORDERS GRANTED

By unanimous consent, permission to address the House, following the legislative program and any special orders heretofore entered, was granted to:

Mr. RYAN, for 30 minutes, tomorrow; and to revise and extend his remarks and include extraneous matter.

Mr. WAGGONNER, for 15 minutes, today; to revise and extend his remarks and include extraneous matter.

Mr. GONZALEZ, today, for 10 minutes; to revise and extend his remarks and to include extraneous material.

Mr. PHILBIN, for 5 minutes, today; and

to revise and extend his remarks and include extraneous matter.

(The following Members (at the request of Mr. WIGGINS) to revise and extend his remarks and to include extraneous matter to:)

Mr. HALPERN, for 5 minutes, today.

Mr. HOSMER, for 15 minutes, on Thursday, April 11.

Mr. MICHEL, for 20 minutes, on Thursday, April 11.

Mr. STAGGERS (at the request of Mr. CLARK) to revise and extend his remarks and to include extraneous matter, for 5 minutes, today.

## EXTENSIONS OF REMARKS

By unanimous consent, permission to extend remarks was granted to:

Mr. DADDARIO.

Mr. RUMSFELD to extend his remarks in the body of the RECORD during debate on the civil rights bill.

Mr. DICKINSON to revise and extend his remarks immediately following the remarks of Mr. CRAMER.

Mr. MICHEL and to include an editorial.

Mr. CLEVELAND to extend his remarks during debate today on the civil rights bill.

Mr. CRAMER to have his 1 minute speech included during debate on civil rights legislation today.

Mr. McCORMACK (at the request of Mr. PEPPER) to revise and extend his remarks made today and include a document entitled "Military History of the American Negro."

(The following Members (at the request of Mr. WIGGINS) and to include extraneous matter:)

Mr. BELL.

Mr. ANDERSON of Illinois in two instances.

Mr. HARRISON in two instances.

Mr. BROYHILL of Virginia in two instances.

Mr. REIFEL.

Mr. SCHERLE in three instances.

Mr. MILLER of Ohio.

Mr. HOSMER in two instances.

Mr. CURTIS in two instances.

Mr. ASHBROOK.

Mr. GURNEY.

Mr. GUDE.

Mr. GROVER.

Mr. BURKE of Florida.

Mr. ERLENBORN.

Mr. DERWINSKI in three instances.

Mr. BOB WILSON.

(The following Members (at the request of Mr. CLARK) and to include extraneous material:)

Mr. DINGELL in two instances.

Mr. LONG of Maryland in two instances.

Mr. BRASCO.

Mr. TUNNEY in three instances.

Mr. MACDONALD of Massachusetts.

Mr. GALLAGHER in two instances.

Mr. RESNICK in two instances.

Mr. ROSENTHAL in three instances.

Mr. GIAIMO.

Mr. PODELL.

Mr. THOMPSON of New Jersey.

Mr. EILBERG.

Mr. RYAN in three instances.

Mr. JOELSON.

Mr. CAREY in two instances.

*April 10, 1968* CONGRESSIONAL RECORD — HOUSE 9637

Mr. WHITENER in two instances.
Mr. GONZALEZ in three instances.
Mr. HOWARD.
Mr. HELSTOSKI.
Mr. RARICK in three instances.
Mr. HAMILTON in two instances.
Mr. HATHAWAY in two instances.
Mr. CHARLES H. WILSON.
Mr. DE LA GARZA.
Mr. CORMAN.
Mr. JONES of Alabama.

## ENROLLED BILL SIGNED

Mr. BURLESON, from the Committee on House Administration, reported that that committee had examined and found truly enrolled a bill of the House of the following title, which was thereupon signed by the Speaker:

H.R. 2516. An act to prescribe penalties for certain acts of violence or intimidation, and for other purposes.

## ADJOURNMENT

Mr. CLARK. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 4 o'clock and 38 minutes p.m.), the House adjourned until tomorrow, Thursday, April 11, 1968, at 12 o'clock noon.

## REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of rule XIII, reports of committees were delivered to the Clerk for printing and reference to the proper calendar, as follows:

Mr. THOMPSON of New Jersey: Joint Committee on the Disposition of Executive Papers. House Report No. 1290. Report on the disposition of certain papers of sundry executive departments. Ordered to be printed.

Mr. HENDERSON: Committee on Post Office and Civil Service. H.R. 15890. A bill to amend title 5, United States Code, to provide for additional positions in certain executive agencies, and for other purposes; with amendment (Rept. No. 1291). Referred to the Committee of the Whole House on the State of the Union.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 4 of rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. EVERETT:
H.R. 16580. A bill to provide that Flag Day shall be a legal public holiday; to the Committee on the Judiciary.

By Mr. HALPERN:
H.R. 16581. A bill to prohibit the Administrator of Veterans' Affairs from requiring an annual income statement from certain pensioners who are 72 years of age or older; to the Committee on Veterans' Affairs.

By Mr. JOHNSON of California:
H.R. 16582. A bill to designate the Desolation Wilderness, Eldorado National Forest, in the State of California; to the Committee on Interior and Insular Affairs.

By Mr. MOORHEAD:
H.R. 16583. A bill to amend the Immigration and Nationality Act, and for other purposes; to the Committee on the Judiciary.

By Mr. OLSEN:
H.R. 16584. A bill to establish producer-owned and controlled emergency reserves of wheat, feed grains, soybeans, rice, cotton, and flaxseed; to the Committee on Agriculture.

By Mr. RIVERS:
H.R. 16585. A bill to authorize payment of expenses relating to the transportation of motor vehicles of certain members of the Armed Forces; to the Committee on Armed Services.

By Mr. RYAN:
H.R. 16586. A bill to amend the Communications Act of 1934 to prohibit discrimination in employment practices by broadcast station licensees; to the Committee on Interstate and Foreign Commerce.

By Mr. SCHEUER:
H.R. 16587. A bill to amend the Federal Employees Health Benefits Act of 1959 to provide that the entire cost of health benefits under such act shall be paid by the Government; to the Committee on Post Office and Civil Service.

By Mr. WHALLEY:
H.R. 16588. A bill to provide that the receipts from all Federal gasoline and automotive excise taxes shall be placed in the highway trust fund to be used for road improvement purposes only, to eliminate the State matching requirements in the Federal-aid highway program, and to provide Federal assistance for State and local highway purposes; to the Committee on Ways and Means.

By Mr. FULTON of Pennsylvania:
H.R. 16589. A bill to amend the Civil Service Retirement Act to provide increased annuities; to the Committee on Post Office and Civil Service.

H.R. 16590. A bill to amend the Internal Revenue Code of 1954 to increase the credit against tax for retirement income; to the Committee on Ways and Means.

H.R. 16591. A bill to amend the Internal Revenue Code of 1954 to provide that the full amount of any annuity received under the Civil Service Retirement Act shall be excluded from gross income; to the Committee on Ways and Means.

By Mr. MORGAN:
H.R. 16592. A bill to provide for orderly trade in canned mushrooms; to the Committee on Ways and Means.

By Mr. RYAN (for himself, Mr. CAREY, Mr. TIERNAN, Mr. ANNUNZIO, Mr. BINGHAM, Mr. BOLAND, Mr. BURKE of Massachusetts, Mr. BUTTON, Mr. BYRNE of Pennsylvania, Mr. DANIELS, Mr. DOW, Mr. FRIEDEL, Mr. GALLAGHER, Mr. HALPERN, Mrs. HECKLER of Massachusetts, Mrs. KELLY, Mr. KLUCZYNSKI, Mr. McCARTHY, Mr. O'NEILL of Massachusetts, Mr. PATTEN, Mr. PUCINSKI, Mr. WOLFF, and Mr. WYDLER):
H.R. 16593. A bill to amend the Immigration and Nationality Act to make additional immigrant visas available for immigrants from certain foreign countries, and for other purposes; to the Committee on the Judiciary.

By Mr. ZWACH (for himself, Mr. NELSEN, and Mr. LANGEN):
H.R. 16594. A bill to amend chapter 34 of title 38 of the United States Code to provide certain educational assistance for veterans taking 6 or 9 hours of institutional courses while engaged in agricultural employment; to the Committee on Veterans' Affairs.

By Mr. GURNEY:
H.J. Res. 1225. Joint resolution designating Tax Freedom Day as a national holiday; to the Committee on the Judiciary.

By Mr. JOELSON:
H.J. Res. 1226. Joint resolution to direct the Secretary of the Navy to provide a Marine Corps honor guard at the Marine Corps War Memorial; to the Committee on Armed Services.

By Mr. DE LA GARZA:
H.J. Res. 1227. Joint resolution to authorize the temporary funding of the emergency credit revolving fund; to the Committee on Agriculture.

By Mr. HATHAWAY (for himself, Mr. ANDERSON of Tennessee, Mr. DAVIS of Georgia, Mr. DOW, Mr. GATHINGS, and Mr. SISK):

H.J. Res. 1228. Joint resolution to authorize the temporary funding of the emergency credit revolving fund; to the Committee on Agriculture.

## MEMORIALS

Under clause 4 of rule XXII.

331. The Speaker presented a memorial of the Legislature of the State of New York, relative to declaring the Garibaldi-Meucci Memorial Museum as a national historical landmark, which was referred to the Committee on Interior and Insular Affairs.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. ADDABBO:
H.R. 16595. A bill for the relief of Francesca and Antonio Ardizzone; to the Committee on the Judiciary.
H.R. 16596. A bill for the relief of Lorenzo Ardizzone; to the Committee on the Judiciary.

By Mr. ANNUNZIO:
H.R. 16597. A bill for the relief of Gaetano Lazzaro-Marocco; to the Committee on the Judiciary.

By Mr. BARRETT:
H.R. 16598. A bill for the relief of Flavia Merlino; to the Committee on the Judiciary.

By Mr. BINGHAM:
H.R. 16599. A bill for the relief of Wei Lian Lee; to the Committee on the Judiciary.

By Mr. BRASCO:
H.R. 16600. A bill for the relief of Mrs. Paolo Fontana, and her son, Girolamo Fontana; to the Committee on the Judiciary.

By Mr. DELANEY:
H.R. 16601. A bill for the relief of Gabriella Giacomello and Tiziana Giacomello; to the Committee on the Judiciary.

By Mr. KUPFERMAN:
H.R. 16602. A bill to require the Foreign Claims Settlement Commission to reopen and redetermine the claim of Julius Deutsch against the Government of Poland, and for other purposes; to the Committee on the Judiciary.

By Mr. MACDONALD of Massachusetts:
H.R. 16603. A bill for the relief of Elzo Ninomiya; to the Committee on the Judiciary.

By Mr. MacGREGOR:
H.R. 16604. A bill for the relief of Yoshio Arakawa; to the Committee on the Judiciary.

By Mr. MOSS:
H.R. 16605. A bill for the relief of Wong Kam Foon, his wife, Mah Yuet Mei, and children, Wong Lai Sun, Wong Wai Hang, and Wong Wai Leung; to the Committee on the Judiciary.

By Mr. MURPHY of New York:
H.R. 16606. A bill for the relief of Domenico Di Bellis; to the Committee on the Judiciary.
H.R. 16607. A bill for the relief of Emilia Oliveri; to the Committee on the Judiciary.

By Mr. ROSTENKOWSKI:
H.R. 16608. A bill for the relief of Maria Scire; to the Committee on the Judiciary.

By Mr. ST. ONGE:
H.R. 16609. A bill for the relief of Sea Oil & General Corp., of New York, N.Y.; to the Committee on the Judiciary.

By Mr. STAGGERS:
H.R. 16610. A bill for the relief of Dr. Auelino T. Sales and his wife, Loreto O. Sales; to the Committee on the Judiciary.

By Mr. TUNNEY:
H.R. 16611. A bill for the relief of Pancho O'Mara (also known as Francisco Rube-Cincotta); to the Committee on the Judiciary.

By Mr. WHITE:
H.R. 16612. A bill for the relief of Eugene A. Helterbrand; to the Committee on the Judiciary.