

**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

ROBERT GORDON
SENIOR VICE PRESIDENT
POLICY DEVELOPMENT AND RESEARCH

September 25, 2014

The Honorable Julian Castro, Secretary
The Honorable John Trasviña, Assistant Secretary
U.S. Department of Housing and Urban Development
451 17th Street, S.W.
Washington, DC 20410

Dear Secretary Castro and Assistant Secretary Trasviña:

On September 4, 2014, the United States District Court for the Northern District of Illinois issued the enclosed Memorandum Opinion and Order granting in part the motion for summary judgment filed by Property Casualty Insurers Association of America ("PCI") in *Property Casualty Insurers Association of America v. Donovan*, No. 13-8564. The Court remanded the case to HUD for further proceedings.

In its opinion, the Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in its Disparate Impact Rule (*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. The Court further directed HUD to explain why application of its Rule to homeowners insurance did not violate the filed-rate doctrine, which forbids courts from invalidating or modifying rates that have been filed with regulatory agencies. *Id.* at 43. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It noted that HUD's previous response to comments raising this issue was inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

PCI intends to submit additional comments to HUD to address the issues identified in the Court's order. If there is a deadline for submitting comments, please let me know.

Additionally, PCI requests that HUD re-open the public comment period to inform others that the Agency expects to fully consider the complex issues presented by application of the Disparate Impact Rule to homeowner's insurance. The case-by-case application of disparate impact liability to insurers presents significant legal and compliance uncertainty, subjects insurers to conflicting regulatory requirements, imposes significant expenses on the property and casualty industry, and interferes with State regulation of insurance. We respectfully suggest that HUD should solicit public comments on this important issue.

058156

September 25, 2014
Page 2

Please contact me at (202) 639-0490 or Robert.Gordon@pciaa.net if you have any questions or information.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

cc:      Helen R. Kanovsky
         Jeanine Worden
         Kyle R. Freeny



**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

January 26, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

**Re:    Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's
        Discriminatory Effects Standard**

Dear Sir or Madam:

     On September 4, 2014, Judge St. Eve of the U.S. District Court for the Northern
District of Illinois issued the enclosed Memorandum Opinion and Order in *Property
Casualty Insurers Association of America v. Donovan*, No. 13-8564 (*PCI*), remanding the
case to the Department of Housing and Urban Development (HUD) for further
consideration of whether HUD's Disparate Impact Rule (*Implementation of the Fair
Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) can
be applied to homeowners insurance.

     On September 25, 2014, PCI informed HUD of its intent to submit additional
comments to HUD to address the issues identified in the Court's order and requested
HUD to re-open the public comment period to inform others that the Agency expects to
fully consider the complex issues presented by application of the Disparate Impact Rule
to homeowners' insurance. For the reasons explained below, the Disparate Impact Rule
cannot lawfully be applied to homeowners insurance. Application of the Rule to
homeowners insurance would impair state regulation of insurance in violation of the
McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners
insurance, and would impose needless costs on providers of homeowners
insurance and their customers. HUD should therefore exempt homeowners insurance
from the Rule.[1]

---

[1] HUD has not yet opened a public comment period, and On November 3, 2014, Judge Leon of the
U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the
Disparate Impact Rule in American Insurance Association v. U.S. Department of Housing and Urban
Development, No. 13-cv-00966 (D.D.C.). But PCI is submitting these comments now in an abundance of
caution, given the remand from Judge St. Eve.

444 North Capitol Street NW, Suite 801, Washington, DC 20001   Telephone 202-639-0490   Facsimile 202-639-0494   www.pciaa.net

Regulations Division
January 26, 2015
Page 2


# I.    BACKGROUND

### A.    The Business of Insurance

Insurance is a means by which one party (the insured) transfers risk to another party (the insurer) for an agreed-upon rate.  For example, an insured purchases homeowners insurance so that, in the event that her home is damaged by a fire, the insurer will pay to repair her home.  Insurance rates are based on an insured's risk of future losses, as well as the extent of coverage sought.  The risk of future loss is also central to underwriting decisions, that is, decisions about whether to insure and how to price a particular risk or class of risk.  *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:2; 1:6 (3d ed. 2013).

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and their financial implications.  Actuaries examine numerous factors that correlate with losses.  *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985).  For homeowners insurance, these factors may include, for instance, the types of construction materials used to build a house, any history of previous losses related to that home or similar units, the home's proximity to fire hydrants, and the presence or absence of a trampoline in the yard.  Homeowners insurance actuaries do not consider race, gender, or any other protected characteristic when evaluating these factors. *See* Admin. Rec. 383; Decl. of Teresa C. Cracas ¶ 6 (stating that Cincinnati Insurance Company does not collect information on race or ethnicity); Decl. of Michael Dawdy ¶ 11 (State Auto Insurance Companies does not collect data on policyholders' race or ethnicity); Decl. of Ronald Joseph Zaleski, Sr. ¶ 11 (Selective Insurance Company of America does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); Decl. of Peter Drogan ¶ 7 (Amica Mutual Insurance Company does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that consumer and similarly situated consumers.  *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.  If insurers could not set rates based on neutral risk factors, the insurance industry could not function properly.  Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.

Regulations Division
January 26, 2015
Page 3

*See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty
Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—
A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012). Such a pricing scheme would also greatly
reduce the financial incentive for customers to reduce risks, construct safer houses, and
maintain existing houses. Avraham, *The Economics of Insurance Law*, *supra* pp. 66-67.

### B.  State Regulation Of Insurance and The McCarran-Ferguson Act

The states have traditionally regulated the insurance industry, from the pricing of
insurance to the processing of claims. Indeed, until the mid-twentieth century, insurance
was largely immune from federal regulation because the business of insurance was not
considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75
U.S. (8 Wall.) 168 (1868). Shortly after the Supreme Court determined in *United States
v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of
insurance across state lines constituted interstate commerce susceptible to federal
regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to
ensure that ruling would not undermine the states' long-standing regulation of insurance.
Today, "State regulation of insurance is comprehensive and includes rate and coverage
issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999).

In the McCarran-Ferguson Act, Congress expressly stated that "the continued
regulation and taxation by the several States of the business of insurance is in the public
interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress
shall be construed to invalidate, impair, or supersede any law enacted by any State for the
purpose of regulating the business of insurance … unless such Act specifically relates to
the business of insurance." 15 U.S.C. § 1012(b). Thus, federal law must not be read to
authorize regulations that either "directly conflict with state regulation" of insurance or
whose "application … frustrate any declared state policy or interfere with a State's
administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299,
310 (1999).

### C.  The Fair Housing Act and the Disparate Impact Rule

The Fair Housing Act (FHA) makes it unlawful to "discriminate against any
person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the
provision of services or facilities in connection therewith, because of race, color, religion,
sex, familial status, or national origin." 42 U.S.C. § 3604(b). The Act makes no reference
to either disparate impact or homeowners insurance.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of
the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70921 (Nov.

Regulations Division
January 26, 2015
Page 4

16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* at 70921. The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70924.

Representatives of the insurance industry submitted comments explaining why disparate impact liability cannot lawfully be applied to homeowners insurance. The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes, whether by statute, regulation, or under the "filed rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, the application of disparate impact liability to insurance would cripple the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting.

HUD promulgated its final Disparate Impact Rule on February 15, 2013. 78 Fed. Reg. 11460. The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

### D.    The Litigation Brought by PCI

On November 27, 2013, the Property Casualty Insurers Association of America (PCI) challenged both the Disparate Impact Rule as applied to the provision of homeowners insurance and HUD's process for issuance of the Rule, under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* On September 3, 2014, the Court granted in part PCI's motion for summary judgment.

Regulations Division
January 26, 2015
Page 5

The Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. Those conflicts, the Court explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It held that HUD's response to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

### E.    The Supreme Court's Grant of Certiorari in the *Inclusive Communities* Case and Judge Leon's Vacating of the Disparate Impact Rule

On October 2, 2014, the Supreme Court granted certiorari in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, No. 13-1371, to address the question whether disparate impact claims of any sort are cognizable under the FHA. Oral argument took place on January 21, 2015. PCI, the American Insurance Association, and the National Association of Mutual Insurance Companies submitted a brief amicus curiae supporting petitioners, explaining that the FHA does not recognize disparate impact liability. The brief also explains that interpreting the FHA to permit disparate-impact liability would upend fundamental tenets of the insurance business and contravene the McCarran-Ferguson Act.

On November 3, 2014, Judge Leon of the U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the Disparate Impact Rule in *American Insurance Association v. U.S. Department of Housing and Urban Development*, No. 13-cv-00966 (D.D.C.). Judge Leon held that "the FHA unambiguously prohibits *only* intentional discrimination." Op. at 17. On December 18, 2014, the government filed its notice of appeal.

The Supreme Court is scheduled to decide later this year whether the FHA permits imposition of disparate impact liability altogether. It should hold that the FHA does not. But even if the Court were to interpret the FHA as allowing disparate impact claims in certain circumstances, disparate impact liability must not be extended to homeowners insurance. Reading the FHA to permit disparate impact claims regarding homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of

Regulations Division
January 26, 2015
Page 6

homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers.

## II.    REQUEST FOR RELIEF

For the reasons set forth below, HUD should exempt homeowners insurance from its Disparate Impact Rule.

### A.    Disparate Impact Claims Are Not Cognizable Under The FHA

In *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, the Supreme Court is likely to rule that disparate impact claims are not cognizable under the FHA. As Judge Leon's recent decision in *American Insurance Association v. U.S. Department of Housing and Urban Development* indicates, a necessary consequence of that holding would be the vacating of the Disparate Impact Rule in its entirety. Whatever the Supreme Court ultimately decides, its opinion would be extremely important for HUD to consider before applying its Rule to insurers.

The Supreme Court is likely to hold that the FHA does not authorize disparate impact claims for several reasons. First, the FHA's terms indicate that it is limited to claims of intentional discrimination. The FHA prohibits various acts performed "*because of* race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604 (emphasis added). Accordingly, it only prohibits actions taken against persons because of their race or other protected characteristic. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (interpreting similar wording in Title VI of the Civil Rights Act to reach only intentional discrimination). Actions taken for other reasons that happen to affect different racial, gender, religious, or other groups differently are not prohibited by the FHA because they are not actions performed "because of race" or other protected characteristics. They are, by definition, actions taken "because of" other factors.

An example from the insurance context may help to illustrate this point. An insurer might charge different customers different rates based on whether or not their homes contain a fire extinguisher. This insurance pricing factor may mean that more people of a particular national origin may pay higher or lower insurance rates than others. But insurers would not be charging different rates "because of" national origin. Indeed, they could not do so, because insurers do not currently obtain data about the national origin, race, color, religion, or disability status of their policyholders. PCI Reply Br. at 7; Decl. of Teresa C. Cracas ¶ 6; Decl. of Michael Dawdy ¶ 11; Decl. of Ronald Joseph Zaleski, Sr. ¶ 11; Decl. of Peter Drogan ¶ 7.

Regulations Division
January 26, 2015
Page 7

The FHA's legislative history also indicates that it does not authorize disparate
impact claims. During floor debates, no Representative or Senator suggested that the
FHA could be used to impose disparate impact liability. Instead, the debates show
Congress's intention to prohibit intentional discrimination. *See, e.g.*, 114 Cong. Rec.
5643 (1968) (Mondale: "The bill permits an owner to do . . . everything he could ever do
with property, except refuse to sell it to a person solely on the basis of his color or his
religion. That is all it does. It does not confer any right."); 114 Cong. Rec. 2283
(Brooke: "A person can sell his property to anyone he chooses, as long as it is by
personal choice and not because of motivations of discrimination."); 114 Cong. Rec.
2530 (Tydings: the problem Congress intended to address was "the deliberate exclusion
from residential neighborhoods on grounds of race"); 114 Cong. Rec. 3421 (Mondale:
"[T]he basic purpose of this legislation is to permit people who have the ability to do so
to buy any house offered to the public if they can afford to buy it. It would not overcome
the economic problem of those who could not afford to purchase the house of their
choice."); 114 Cong. Rec. 3129 (Hatfield: the FHA prohibits a person being "denied the
right to buy a home within a community according to his economic ability . . . merely
because his skin is of a different color"); 114 Cong. Rec. 3252 (Scott: the FHA would
ensure that individuals "can rent or buy the dwelling of their choice, if they have the
money or credit to qualify").

B.     **Application of the Disparate Impact Rule to Homeowners Insurance
       Would Impair State Laws Regulating Insurance and Thus Violate the
       McCarran-Ferguson Act**

HUD must provide an exemption for homeowners insurance because application
of the Disparate Impact Rule to homeowners insurance would impair state laws
regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the
district court repeatedly criticized HUD for failing to explain how the Disparate Impact
Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could
not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply"
before promulgating its regulations. Op. at 42. It concluded that HUD had acted
arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-
Ferguson preclusion would apply and whether it would bar entire categories of disparate
impact claims against insurers." *Id.*

Once the evaluation required by the district court is undertaken, it becomes clear
that inclusion of homeowners insurance within the scope of the Disparate Impact Rule
would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state
laws requiring insurers to engage in risk-based pricing; (ii) impairing state laws
permitting insurers to engage in risk-based pricing; (iii) impairing state laws and
regulations providing for state administrative review of insurance rates; (iv) impairing

Regulations Division
January 26, 2015
Page 8

operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

### 1.    State Laws Requiring Insurers To Engage in Risk-Based Pricing

The vast majority of states—40 of 50—require insurers to set rates based on past losses, anticipated future losses, and other neutral actuarial factors. *See* Table I, *infra*. Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, ... [and] to all other relevant factors, including trend factors, within and outside this state ...." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, Ga. Code Ann. § 33-9-4(4); Md. Code Ann., Ins. § 11-205(c); Mass. Gen. Laws Ann. 174A, § 5; N.J. Stat. Ann. § 17:29A-4; N.Y. Ins. Law § 2304(a); Ohio Rev. Code Ann. § 3935.03; S.C. Code Ann. § 38-73-430; Tenn. Code Ann. § 56-5-304; Wash. Rev. Code Ann. § 48.19.030(3); *see generally* Table I, *infra*.

In compliance with these laws, insurers charge different rates to different customers based on the required actuarial risk factors. It is possible that the differences in risk-based rates charged to customers with different risks would affect various demographic groups differently. HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a protected characteristic in 24 C.F.R. § 100.500(a), thus creating a conflict between the Rule and the laws of 40 of the 50 states. Application of the Disparate Impact Rule to insurers would therefore "impair" and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly required by state law. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

Moreover, the burden-shifting framework established by the Rule would result in insurers facing potential liability even for using actuarially justified risk factors. For example, insurers would be liable if their use of an actuarially justified factor was not "*necessary* to achieve a legitimate interest." 24 C.F.R. § 100.500(c) (emphasis added). And even if every risk factor were proved necessary, plaintiffs could still prevail by showing that insurers' interests could be served by another practice with a less discriminatory effect, even if the alternative practice were less effective than the use of actuarial risk factors. *Id.*; Admin. Rec. at 625.

Regulations Division
January 26, 2015
Page 9

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *See id.* at 311; 24 C.F.R. § 100.500. *See Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Subjecting companies to case-by-case adjudication in federal court would strip them of the ability to rely on state law and institutions that McCarran-Ferguson is designed to guarantee.

### 2. State Laws Permitting Insurers To Engage in Risk-Based Pricing and Underwriting

#### a. State Insurance Laws

Every state has permitted insurers to charge different rates to different customers based on the customers' risk profiles. Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). Numerous other states use very similar language to expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, Conn. Gen. Stat. § 38a-803(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); Va. Code Ann. § 38.2-1904(A)(3). Under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

Ind. Code § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of actuarial, risk-based pricing. *See, e.g.*, Ariz. Rev. Stat. Ann. § 20-356(4); Ark. Code Ann. § 23-67-209; Colo. Rev. Stat. § 10-4-403(4); 18 Del.

Regulations Division
January 26, 2015
Page 10

Code § 2503; Me. Rev. Stat. Ann. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.05(2); Nev. Rev. Stat. Ann. § 686B.060(2); S.D. Codified Laws § 58-24-6; Tex. Ins. Code Ann.§ 2251.052(c); *see generally* Table I, *infra*. As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g.*, *Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) (noting that "statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. ... Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g.*, *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal...laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ.A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). Yet that is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to prohibit insurances practices expressly permitted by the laws of 47 states. *See* Table I, *infra*.

**b.    State Fair Housing Laws**

HUD noted during the *PCI* litigation that some states have fair housing laws and that some state courts look to the FHA for guidance in interpreting those laws. HUD Mem. ISO Mot. to Dismiss at 28. HUD suggested that some of these state laws might in theory be interpreted to permit disparate impact claims against insurers. *Id.* Even in

Regulations Division
January 26, 2015
Page 11

states with fair housing laws, if the fair housing law does not specifically displace the
state's insurance laws discussed above, then those insurance laws would remain valid.
HUD did not show—and did not even claim— that any state's fair housing law displaces
its insurance laws. Accordingly, if these valid state insurance laws requiring or
permitting insurers to engage in risk-based pricing and underwriting conflict with the
Disparate Impact Rule, then HUD's Rule is impermissible under the McCarran-Ferguson
Act. PCI submits, based on the statutes described above, below, and in Table I, that state
insurance laws in all 50 states clearly do conflict with the Disparate Impact Rule.

### c.    Limitations on Use of Certain Risk Factors

HUD also noted during the *PCI* litigation that some states have laws restricting
the discriminatory use of some factors in insurance pricing and underwriting, specifically
credit history, geographic location, domestic violence victimization, and property age.
HUD Mem. ISO Mot. to Dismiss at 26. As PCI pointed out in its responsive brief, these
laws do not alleviate the conflict between the Disparate Impact Rule and state laws
requiring or permitting insurers to engage in risk-based pricing and underwriting. Indeed,
these laws prohibiting *discriminatory* use of certain risk factors permit insurers to rely on
those factors so long as they do so in accordance with "sound underwriting and actuarial
principles related to actual or reasonably anticipated loss experience." Colo. Rev. Stat.
§ 10-3-1104(1)(f) (XIV) (permitting insurers to take geographic location into account so
long as it is related to anticipated loss experience); *see also, e.g.*, Ark. Code Ann. § 23-
66-206(14)(C) (permitting insurers to consider geographic location so long as it is not a
mere pretext for discrimination); Ind. Code § 27-2-17-5(b) (same); Wis. Admin. Code
Ins. § 6.68(3)(a) (same); Ala. Admin. Code r. 482-1-127.06 (prohibiting insurers from
making decisions based solely on credit score or using credit history for any unfairly
discriminatory reason); Alaska Stat. § 21.36.460(c) (permitting insurers to use credit
history so long as they use it in combination with other substantive factors); N.Y. Ins.
Law § 2802 (same); W. Va. Code Ann. § 33-17A-6(h) (same); Del. Code Ann. tit 18,
§ 4124 (permitting insurers to base decisions on age of property if decisions are "for a
business purpose which is not a mere pretext for unfair discrimination"); Va. Code Ann.
§ 38.2-508(5) (same). These statutes thus delineate the extent to which insurers can use
certain risk factors and which applications may be unfairly discriminatory. Therefore,
they highlight the conflict between the Disparate Impact Rule's application to insurance
pricing that uses standard actuarial factors and state laws' approval of insurers' reliance
on just those factors.

Regulations Division
January 26, 2015
Page 12

### 3.    State Laws and Regulations Providing for State Administrative Review of Insurance Rates

The overwhelming majority of states—47 of 50, plus the District of Columbia—require insurers to file their rates with state insurance commissioners for review and approval. *See* Table I, *infra*. Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, Conn. Gen. Stat. § 38a-689(a); Fla. Admin. Code Ann. r. 69O-170.013(1)(b); Ga. Code Ann. § 33-9-21(a); Kan. Stat. § 40-955 (a), (l); Ky. Rev. Stat. § 304.13-051(4); 24-A Me. Rev. Stat § 2938-A; Md. Code, Insurance, § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; Mo. Code Regs. Ann. tit. 20, § 500-9.100; N.H. ADC Ins. 3306.01(a); N.J. Stat. Ann. § 17:22-6.14a1; N.M. Stat. Ann. § 59A-17-5.1; 28 Tex. Admin. Code § 5.9342; Utah Admin. Code r. R590-127; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5; Ga. Code Ann. § 33-9-26; Kan. Stat. § 40-955 (a), (l); Md. Code, Ins. § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; N.J. Stat. Ann. § 17:22-6.14a1; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. Cal. Ins. Code § 1861.05.

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair or invalidate these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing and review provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired or interfered with by the application of the Rule. *See, e.g., Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008) ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state administrator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to prove in federal court that every component of their rating and underwriting

Regulations Division
January 26, 2015
Page 13

plans and other business practices was necessary to achieve a substantial legitimate interest. *See* 24 C.F.R. § 100.500. Such interference with the states' insurance administration regimes is unlawful under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

### 4.    The Filed-Rate Doctrine

HUD also must exempt homeowners insurance from the Rule in order to avoid conflict with the states' filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986).

The district court in *PCI* found that HUD had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. Op. at 44-45. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* at 45.

The filed-rate doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g., McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F3d 229, 236-39, 242 (3rd Cir 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011);; *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005); *see also, e.g.*, Cal. Ins. Code § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 118 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates).

Applying the Disparate Impact Rule to insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and government enforcement actions that question the permissibility of a filed rate. *See, e.g., Square D*, 476 U.S. at 417; *Korte*, 27 F.3d at 19; *Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted). Nor does the extent or the vigor of an agency's review of filed rates matter—the filed-rate doctrine applies whenever rates have been filed. *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

Regulations Division
January 26, 2015
Page 14

### 5.    Displacement of the Regulation of Insurance from States to Federal Courts

HUD's basic response to the numerous indisputable conflicts between the Disparate Impact Rule and state laws regulating insurance described in the preceding sections is that the Rule's burden-shifting framework would allow defendant companies to raise these state-law considerations on a case-by-case basis. In response to a plaintiff's *prima facie* case, a company could rely on these state laws to show that its pricing or underwriting practices were "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." Far from alleviating the conflict between the Disparate Impact Rule and state insurance regulation, this response only confirms that the Rule makes the conflict inescapable.

As the Seventh Circuit has explained, the McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999) (McCarran-Ferguson prohibits the federal courts from "regulating the … insurance industry" via litigation). That is just what the Rule's burden-shifting framework would do. In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act (ADA) to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.*

HUD's Disparate Impact Rule would similarly lead to federal courts usurping core functions of the states' administrative regimes, including rate-making and underwriting, as well as all other insurance activities regulated by state law. State insurance commissioners currently regulate and supervise the insurance business, enforce insurance laws, and punish violators. *See, e.g.*, 1 Plitt et al., *Couch on Insurance* §§ 2:7-2:8. Under HUD's Rule, in order to avoid liability insurers would have to prove in federal court that their practices are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and defeat the plaintiff's effort to show that "the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c). That would necessarily involve an examination into whether use of that factor was legitimate, and federal courts would find themselves evaluating questions of actuarial soundness. Thus, in every case under the Rule

Regulations Division
January 26, 2015
Page 15

challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts on the basis of a law that does not mention insurance is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

The *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eight Circuit's similar recognition in *Saunders* that 'a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime." *Id.* That concern should preclude application of the Rule to risk-based pricing and underwriting of homeowners insurance.

### C.    Peripheral Insurance Activities Not Mentioned in HUD's Rulemaking

In the Rule's preamble, HUD addressed the "provision and pricing of homeowner's insurance." 76 Fed. Reg. at 70924. During the course of the *PCI* litigation, however, HUD indicated that the Rule might also apply to other insurance practices, such as claims processing or marketing. HUD Reply Br. at 3. HUD should exempt from the Disparate Impact Rule all homeowners insurance practices, not just pricing and underwriting.

As an initial matter, the relevant provisions of the FHA do not apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership. As the Seventh Circuit has explained, 42 U.S.C. § 3604 only "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992). The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing. Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices. That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." That section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD. Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection." *Southend Neighborhood Improvement Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1210 (7th Cir. 1984). Because homeowners insurers provide no such services, they are not covered by § 3604(b).

Regulations Division
January 26, 2015
Page 16

In any event, regulating broad categories of insurance practices in federal court on the basis of a federal statute that does not specifically relate to insurance would violate the McCarran-Ferguson Act by displacing the regulation of such practices by state regulators and courts. States pervasively regulate such practices. *See, e.g.*, Wis. Stat. Ann. § 628.01-628.98 (regulating marketing); Utah Code Ann. 1953 §§ 31A-23a-101 *et. seq.* (same); R.I. Gen. Laws. § 27-3.2-4 (requirements for salespersons); Ind. Code § 27-4-1-4.5 (regulating claims settlement); N.Y. Ins. Law § 2601 (same); Alaska Stat. § 21.36.125 (same); Ga. Code Ann., §§ 33-6-30 *et. seq.* (same). To move the locus of this regulation from the states into federal courts on the basis of a statute that does not mention insurance would violate the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

PCI respectfully requests that HUD provide an exemption or safe harbor for insurance practices beyond just rate-setting and underwriting. That is the only approach consistent with the FHA and the controlling precedent of *Mutual of Omaha*.[2]

> **D.    Application of the Disparate Impact Rule to Homeowners Insurance Would Undermine the Fundamental Nature of Insurance**

As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using of any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. Admin. R. at 377.

---

[2] Absent creating a wholesale exemption for the provision and pricing of homeowners insurance, HUD should recognize that use of actuarially-sound, risk-based pricing and underwriting practices always constitutes a legitimate business interest. HUD should also require that any alternative proffered by a plaintiff or by HUD be equally effective to the challenged practice or combination of practices.

Regulations Division
January 26, 2015
Page 17

This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of actuarial factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. Op. at 46. "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Thus, it was not enough for HUD to impose *prima facie* liability on core insurance practices and then allow insurers the possibility of justifying their practices during the "Sisyphean" process of burden-shifting litigation. *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 376 (6th Cir. 2007). Rather, HUD should consider the costs to insurers of being subjected to such litigation, especially under a burden-shifting framework that places a difficult burden on defendants (proving that insurance practices are "necessary" to a substantial interest) and allows plaintiffs to win if they can show that an alternative exists that has less disparate impact. Indeed, under the burden-shifting framework adopted by HUD, some actuarially justified practices will not only be burdensome to justify and therefore likely relinquished, but will actually be prohibited. HUD expressly rejected a burden-shifting framework that would require plaintiffs or HUD to show that a proposed alternative approach is "equally effective," Admin. Rec. at 625. As a result, some actuarially justified factors will be prohibited because some other, less predictive factor may be used as a substitute. Federal courts reviewing insurance practices in all 50 states are likely to reach inconsistent judgments about which neutral risk factors violate the Fair Housing Act under this framework. They may also hold insurers liable for using neutral risk factors deemed acceptable by state courts. Moreover, HUD should consider the potential effects—including adverse selection and decreases in coverage—of imposing a rule of law that declares many core insurance practices unlawful (unless proven innocent in unpredictable litigation) and directs insurers to avoid all disparate impacts on protected groups.

Regulations Division
January 26, 2015
Page 18

### E.    HUD Can and Should Exempt Homeowners Insurance from the Rule
for the Reasons Set Forth Above

HUD has previously maintained that it cannot exempt homeowners insurance from the Disparate Impact Rule because "creating exemptions beyond those found in the Act would run contrary to Congressional intent." Admin. Rec. at 627. HUD based this assertion entirely on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the *Groach* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. *Graoch*, 508 F.3d at 376 (emphasis added). Indeed, the *Groach* court went on to point to homeowners insurance as an example of when application of the Disparate Impact Rule is never appropriate. *Id.* at 290-91.

\*    \*    \*

The Supreme Court is expect to decide whether disparate impact claims are not cognizable under the Fair Housing Act. Regardless of the outcome of that case, however, application of the Disparate Impact Rule to homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, interfere with the fair and efficient operation of the market for homeowners insurance, and impose needless costs on providers of homeowners insurance and their customers. HUD should therefore exempt homeowners insurance from the Disparate Impact Rule.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

Enclosures



**Property Casualty Insurers**
**Association of America**

Advocacy. Leadership. Results.

July 29, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

> **Re:    Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's**
> **Discriminatory Effects Standard**
>
> ***Property Casualty Insurers Association of America v. Donovan*, 66 F.**
> **Supp.3d 1018 (N.D. Ill. 2014)**

Dear Sir or Madam:

On September 3, 2014, Judge St. Eve of the U.S. District Court for the Northern
District of Illinois issued a memorandum opinion and order in *Property Casualty Insurers
Association of America v. Donovan*, 66 F. Supp.3d 1018 (N.D. Ill. 2014) (*PCI*), granting
summary judgment to PCI on its claims that the Department of Housing and Urban
Development's (HUD's) "application of the Disparate Impact Rule to homeowners
insurance was arbitrary and capricious." *Id.* at 1030. Judge St. Eve remanded the case to
HUD for further consideration of whether the Disparate Impact Rule (*Implementation of
the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15,
2013)) can lawfully be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional
comments to HUD to address the issues identified in the district court's remand decision
and requested that HUD re-open the public comment period to inform others that HUD
expects to fully consider the complex issues presented by application of the Disparate
Impact Rule (the "Rule") to homeowners insurance. On January 26, 2015, PCI submitted
the promised additional comments to HUD setting forth the following reasons that the
Disparate Impact Rule cannot lawfully be applied to homeowners insurance. PCI noted
that application of the Rule to homeowners insurance would (i) impair state regulation of
insurance in violation of the McCarran-Ferguson Act, (ii) fundamentally interfere with
the provision of homeowners insurance, and (iii) impose needless costs on providers of
homeowners insurance and their customers. Consistent with the relief PCI sought in the
district court and the direction given by that court on remand to HUD, PCI requested that
HUD exempt homeowners insurance from the Rule.

On June 25, 2015, the U.S. Supreme Court handed down its decision in *Texas
Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*,
No. 13-1371. The Supreme Court held that the Fair Housing Act (FHA) permits assertion

Regulations Division
Page 2

of disparate-impact claims, but the Court emphasized that disparate-impact liability must be limited in key respects. The Supreme Court's explanation of those limitations further supports PCI's contention that homeowners insurance should be exempted from the Disparate Impact Rule. PCI thus submits these supplemental comments to take account of the Supreme Court's decision.[1]

## I.   The Supreme Court's Decision

In *Texas Department of Housing and Community Affairs*, the Supreme Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" Slip Op. at 21 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." Slip Op. at 18. In order to ensure that disparate-impact claims are properly limited, the Court held that two key "safeguards" must be put in place. *Id.* at 20, 22.

The first of those safeguards is "[a] robust causality requirement." *Id.* at 20. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989). Referring approvingly to the opinion below of Fifth Circuit Judge Jones, the Court held up as a paradigmatic case of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21.

A second safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policy." *Id.* at 18. Homeowners insurers exemplify the potential defendants the Court had in mind, in that the extensive state regulation of their industry provides a quintessential case of the "valid interest[s]" to which the Court made reference. Businesses, the Court also stated, "must be given latitude to consider market forces." *Id.* at 19. Again, homeowners insurance markets, with their dependence on actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability.

The Supreme Court cautioned that without these two safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id.* at

---

[1] HUD has not yet opened a public comment period. But PCI is submitting these comments now in an abundance of caution, given the remand from Judge St. Eve and HUD's statement in other litigation that it is "currently reviewing its regulation in light of the judgment" in *PCI*. Motion to Govern Future Proceedings and Response to Plaintiffs' Motion to Vacate and Remand, *American Insurance Ass'n v. United States Department of Housing and Urban Development*, No. 14-5321 (D.C. Cir. July 24, 2015).

Regulations Division
Page 3

20. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 21. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* at 21. The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

## II.     The McCarran-Ferguson Act Requires an Exemption from Disparate-Impact Claims for Homeowners Insurance

In her September 3, 2014 decision remanding the *PCI* case to HUD, Judge St. Eve ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. *PCI,* 66 F. Supp.3d at 1027. Those conflicts, Judge St. Eve explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. Judge St. Eve also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 1028. She held that HUD's responses to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 1029.

In our January 26, 2015 comments, PCI discussed three reasons why HUD must provide an exemption for homeowners insurance.

*First,* application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI,* the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *PCI,* 66 F. Supp.3d at 1027. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

The evaluation required by the district court shows that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage

Regulations Division
Page 4

in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

*Second*, application of the Disparate Impact Rule to homeowners insurance would interfere with the provision of homeowners insurance. As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." *PCI*, Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." *PCI*, Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. *PCI*, Admin. R. at 377. This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

*Third*, application of the Disparate Impact Rule to homeowners insurance would impose needless costs on providers of homeowners insurance and their customers.

## III.    The Supreme Court's Reasoning Confirms that an Exemption for Homeowners Insurance Is Required

The two key safeguards the Supreme Court established on disparate-impact claims in *Texas Department of Housing and Community Affairs* provide further support for each of PCI's three arguments.

Most fundamentally, the Supreme Court's determination that FHA disparate-impact claims must satisfy "[a] robust causality requirement" confirms that the Disparate

Regulations Division
Page 5

Impact Rule cannot be applied to homeowners insurance without running afoul of the McCarran-Ferguson Act and interfering in the lawful operation of homeowners insurance markets. Slip Op. at 20. In describing the causality requirement, the Court identified as a quintessential example of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21. That is precisely the circumstance in which companies offering homeowners insurance find themselves. Application of disparate-impact liability under the FHA to homeowners insurers would leave them caught between conflicting federal and state legal regimes and thus place them in just the "double bind of liability" the Court instructed must be avoided. *Id.* at 19.

As PCI described at length in its January 26, 2015 comments, companies offering homeowners insurance are regulated by a panoply of state laws requiring the use of actuarially sound pricing methods for homeowners insurance, expressly delineating and permitting the use of such methods, and requiring the filing of homeowners insurance rates with state administrative bodies for approval. PCI January 26, 2015 Comments at 7-13. Those state laws mandate or expressly permit homeowners insurers to use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates to various risk classifications. They thus "substantially limit" the discretion of homeowners insurance companies in a manner that would make it impossible to ascribe any apparently disparate effects of the companies' underwriting or pricing practices to their independent choices. As the Supreme Court emphasized, when companies' policies are subject to legal constraints of these sorts, it is the companies' obligation to comply with those legal requirements that is the cause of any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the sort of "double bind of liability" the Court warned against. That is just what the McCarran-Ferguson Act prohibits.

The Supreme Court's instruction that disparate-impact claims be defined in a way that gives "latitude to consider market forces" also reinforces PCI's contention that disparate-impact liability should not be permitted against homeowners insurers. Slip Op. at 19. As PCI highlighted in its earlier comments, insurance markets run efficiently when insurance is priced in accord with actuarially sound, risk-based factors. PCI January 26, 2015 Comments at 2-3, 16-17. This sends appropriate and socially beneficial market signals about risk taking and risk mitigation. The extensive state-law framework governing the pricing of homeowners insurance is intended to promote such efficient operation. The "specter of disparate-impact litigation," however, as the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market and in particular actuarially sound, risk-based pricing. Slip Op. at 21. Unless that specter were vanquished, "the FHA would have

Regulations Division
Page 6

undermined its own purpose as well as the free-market system." *Id.* Under the McCarran Ferguson Act regulation of the market for homeowners insurance is reserved to the states. Exempting homeowners insurance from disparate-impact claims is necessary to ensure that the threat of disparate-impact litigation does not impair states' legal regimes governing the pricing of homeowners' insurance or hinder the efficient operation of insurance market in accord with those state-law regimes.

Finally, the Supreme Court's caution that the FHA should not be interpreted to promote the use of racial (or other suspect) classifications supports each of PCI's arguments. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," the Court explained, would perversely "tend to perpetuate race-based considerations rather than move beyond them." Slip Op. at 21. But that is just what extending disparate-impact liability to homeowners insurers would do.

State law ensures that homeowners insurers price their products in accordance with risk-based, actuarially sound factors. State law does not permit reliance on, and homeowners insurers do not rely on, racial (or other suspect) classifications in pricing their products. Yet, the failure to exempt homeowners insurers from disparate-impact liability would effectively require them to compile data on the racial (and other suspect) characteristics of their customers in a defensive effort to ensure that they would not be accused of causing prohibited disparate impacts in insurance provision. Exempting homeowners insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none currently exist, the application of disparate-impact liability to homeowners insurers would, contrary to the McCarran-Ferguson Act, significantly undermine the state regulation of unfair discrimination. It would also interfere with the provision of homeowners insurance by imposing significant and needless costs on providers of homeowners insurance and their customers.

*       *       *       *

Regulations Division
Page 7


The Supreme Court's decision in *Texas Department of Housing and Community Affairs* strongly supports PCI's arguments that HUD should exempt homeowners insurance from the Disparate Impact Rule. For all the reasons given above and in PCI's earlier comments, HUD should act promptly to establish such an exemption.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research