UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF | ) | |
| MUTUAL INSURANCE COMPANIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 13-966 (RJL) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF HOUSING AND URBAN | ) | |
| DEVELOPMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION
(September *19*, 2023) [Dkt. ## 60, 64]

The U.S. Department of Housing and Urban Development has promulgated a Rule

that creates a legal framework for establishing disparate-impact claims under the Fair

Housing Act. That Disparate-Impact Rule first came to be in 2013, after which two

associations whose members sell homeowner's insurance challenged it as exceeding

HUD's authority. As originally conceived, this action posed the question whether

disparate-impact claims are permissible at all under the Fair Housing Act. In 2014, I

answered that question in the negative, *Am. Ins. Ass'n v. HUD*, 74 F. Supp. 3d 30, 32

(D.D.C. 2014), but the Supreme Court in *Texas Department of Housing & Community

Affairs v. Inclusive Communities Project, Inc.* (*Inclusive Communities*), 576 U.S. 519

(2015), several months later answered the same question in the affirmative. Consequently,

this action moved in a different direction after it went on appeal to our Circuit Court.

Undaunted, the associations still argued that the Disparate-Impact Rule is unlawful, but

they advanced a new theory that the Rule expands the Supreme Court's judicially approved disparate-impact liability concept beyond certain parameters laid out in *Inclusive Communities*.

Amazingly that theory has remained untested for seven years, in what is sure to be a case study in government by rulemaking!  In that time—a period covering three Presidential administrations—the Disparate-Impact Rule was substantially overhauled, then stayed, then revived to its original form.  Along the way, one of the two associations dropped out of the action, leaving the National Association of Mutual Insurance Companies ("NAMIC") as the only plaintiff.  The good news for NAMIC is that its challenge is, at long last, ripe for decision.  The bad news for NAMIC is that its post–*Inclusive Communities* arguments for invalidating the Disparate-Impact Rule, creative as they might be, are unconvincing.  Indeed, because I have concluded that the Rule does not conflict with the Fair Housing Act as applied to insurers' underwriting and rating practices, I must DENY NAMIC's motion for summary judgment and GRANT HUD's cross-motion for summary judgment.

## BACKGROUND

### I.     The Fair Housing Act and the 2013 Rule

Enacted in 1968, Title VIII of the Civil Rights Act of 1968—commonly known as the Fair Housing Act ("FHA")—furthers the congressional policy "to provide, within constitutional limitations, for fair housing throughout the United States."  Civil Rights Act of 1968, Pub. L. No. 90-284, § 801, 82 Stat. 73, 81 (codified at 42 U.S.C. § 3601).  The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to

refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of" certain protected characteristics.  42 U.S.C. § 3604(a).  It also makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" the same characteristics.  *Id.* § 3604(b).[1]

Absent from the FHA, however, is explicit language specifying the types of discrimination claims created by those provisions.  While it was undisputed that the FHA prohibits housing policies and practices that intentionally discriminate on the basis of a protected characteristic, *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 682 (D.C. Cir. 2006); *see Inclusive Cmtys.*, 576 U.S. at 558 (Alito, J., dissenting) ("Everyone agrees that the FHA punishes intentional discrimination."), it was much less clear (at least until 2015) whether the FHA also recognizes so-called disparate-impact liability—that is, a housing policy or practice "that [is] not intended to discriminate but in fact ha[s] a disproportionately adverse effect on" individuals with a protected characteristic, *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009); *see Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1085 (D.C. Cir. 2011) ("We have not decided whether [the FHA] permits disparate impact claims.").  In 2011, the Supreme Court granted

---

[1] The characteristics protected by the FHA, as originally enacted, were race, color, religion, and national origin.  Civil Rights Act of 1968 § 804(a)–(b), 82 Stat. at 83.  In 1974 amendments, Congress expanded the list of protected characteristics to include sex, Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 808(b)(1), 88 Stat. 633, 729, and in 1988 amendments, familial status and handicap were added, Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, § 6(a), (b)(2), 102 Stat. 1619, 1620–22 (codified as amended at 42 U.S.C. § 3604(a)–(b), (f)).

certiorari in *Magner v. Gallagher*, 565 U.S. 1013 (2011), to address that very question. *See* Petition for Writ of Certiorari at i, *Magner*, No. 10-1032 (U.S. Feb. 14, 2011).

Just nine days later, HUD, supposedly having "long interpreted" the FHA to allow disparate-impact liability, proposed a rule that would "establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70,921, 70,921 (proposed Nov. 16, 2011) (to be codified at 24 C.F.R. pt. 100).[2]  The parties in *Magner* settled their case, however, before the Supreme Court could address its merits. 565 U.S. 1187 (2012). The rulemaking nevertheless continued. HUD published its final Rule in February 2013 (the "2013 Rule"), "formaliz[ing] its long-held recognition of discriminatory effects liability under the Act" and creating a three-step "burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act." Implementation of the Fair Housing Act's Discriminatory Effects Standard ("2013 Rule"), 78 Fed. Reg. 11,460, 11,460 (Feb. 15, 2013) (to be codified at 24 C.F.R. pt. 100).

Under the first step of the framework, a plaintiff had the burden of proving "that a challenged practice caused or predictably will cause a discriminatory effect," 24 C.F.R. § 100.500(c)(1) (2013), that is, when the practice "actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates

---

[2] The 1988 amendments to the FHA vested the Secretary of HUD with authority to make rules, after notice and comment, to carry out the goals of the FHA. Fair Housing Amendments Act of 1988 § 8, 102 Stat. at 1635 (codified as amended at 42 U.S.C. § 3614a).

segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin," *id.* § 100.500(a). If that burden was met, the defendant bore the burden at the second step of proving that the practice was "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). If that burden was also met, the burden returned at the third step to the plaintiff to prove that "the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). At the last two steps, the burden could *not* be met with hypotheticals or speculation; hard evidence was required. *Id.* § 100.500(b)(2).

The 2013 Rule expressly applied to providers of homeowner's insurance, such as the members of the two original plaintiffs in this action, NAMIC and the American Insurance Association ("AIA"). 2013 Rule, 78 Fed. Reg. at 11,474–75; Compl. [Dkt. #1] ¶¶ 7–8.[3] Indeed, they commenced this action against HUD and its Secretary (hereinafter referred to collectively and in the singular, "HUD") after the 2013 Rule was issued, claiming violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the FHA. Compl. ¶ 1. Their position then was that the FHA prohibited only intentional discrimination and so HUD's promulgation of a Rule recognizing disparate-impact liability exceeded its statutory jurisdiction, authority, and limitations, or was otherwise not in

---

[3] In 2019, AIA merged with a separate organization called the Property Casualty Insurers Association of America, who was pursuing its own challenge to the 2013 Rule in the U.S. District Court for the Northern District of Illinois. The merged organization, called the American Property Casualty Insurance Association, continued pressing its claims in Illinois, and so AIA sought and obtained a dismissal of its claims here pursuant to Federal Rule of Civil Procedure 41(a)(2). Unopposed Mot. to Dismiss [Dkt. #104]; Order (Mar. 25, 2019) [Dkt. #106].

accordance with law. *Id.* ¶¶ 43–50, 66–73; *see* 5 U.S.C. § 706(2)(A), (C). I agreed, granting the associations' motion for summary judgment and vacating the 2013 Rule. *Am. Ins. Ass'n*, 74 F. Supp. 3d at 32.[4]

As I forecasted, however, my decision would not be the final say on disparate-impact liability under the FHA, *id.* at 47, for the Supreme Court had just recently granted certiorari in *Inclusive Communities*, 573 U.S. 991 (2014), its third attempt to resolve whether disparate-impact claims are cognizable under the FHA. *See* Petition for Writ of Certiorari at i, *Inclusive Cmtys.*, 576 U.S. 519 (No. 13-1371). With four Justices in dissent, it answered that question in the affirmative. *Inclusive Cmtys.*, 576 U.S. at 545–46. It did, however, impose certain limitations on disparate-impact liability under the FHA, cautious not to allow "disparate-impact liability [to] displace valid governmental and private priorities." *Id.* at 544. For one, at the prima facie stage of the analysis, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity." *Id.* at 542 (emphasis added). This "causality requirement" is "robust": a mere statistical correlation is insufficient, and external factors that might limit a defendant's discretion can sever the causal connection between a housing practice and any disparate impact. *Id.* at 542–43. If a prima facie case is met, it is a defense to a disparate-impact claim if a housing practice or policy is proven

---

[4] Summary judgment briefing, oral argument, and my decision all occurred after a stay that was ordered when the Supreme Court granted certiorari in *Township of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.*, 570 U.S. 904 (2013), to resolve the statutory question first presented in *Magner*. *See* Petition for Writ of Certiorari at i, *Township of Mount Holly*, No. 11-1507 (U.S. June 11, 2012). Unfortunately, the parties in *Township of Mount Holly*, like those in *Magner*, once again settled before the Supreme Court could issue a decision on the merits. 571 U.S. 1020 (2013).

to be "necessary to achieve a valid interest." *Id.* at 541. In the final calculus, housing

practices or policies "are not contrary to the disparate-impact requirement unless they are

'artificial, arbitrary, and unnecessary barriers.'" *Id.* at 543 (quoting *Griggs v. Duke Power*

*Co.*, 401 U.S. 424, 431 (1971)).

While it goes without saying that *Inclusive Communities* overruled much of this

Court's first opinion, our Circuit Court vacated my order granting summary judgment and

predictably remanded the case for further consideration in light of *Inclusive Communities*.

Order, *Am. Ins. Ass'n v. HUD*, No. 14-5321 (D.C. Cir. Sept. 23, 2015). On remand, the

associations requested and obtained leave to file an amended complaint. Not surprisingly,

they still alleged violations of the APA and the FHA but focused on more specific ways in

which the 2013 Rule ran afoul of the limitations to disparate-impact liability imposed by

the Supreme Court in *Inclusive Communities*. Am. Compl. [Dkt. #57] ¶¶ 1–8, 47–61, 76–

107. New summary judgment briefing followed shortly thereafter. Pls.' Mot. for Summ.

J. ("NAMIC Mot.") [Dkt. #60]; Defs.' Mot. for Summ. J. ("HUD Mot.") [Dkt. #64]; Defs.'

Opp'n [Dkt. #65]; Pls.' Opp'n [Dkt. #68]; Pls.' Reply [Dkt. #69]; Defs.' Reply [Dkt. #70].

Oral argument was scheduled to occur in February 2017, but the recent change of

Presidential administrations had the unfortunate effect of creating an extended delay in this

litigation. For example, the case had to be stayed for over a year to allow for individuals

in certain leadership positions at HUD and the Department of Justice to be nominated,

confirmed, and brought up to speed on this litigation. Min. Order (Feb. 15, 2017); Joint

Status Report (July 12, 2017) [Dkt. #79]; Joint Mot. to Continue Status Conference (Feb.

7, 2018) [Dkt. #88]. Once the dust settled by mid-2018, however, the stay continued

because HUD apparently had second thoughts about maintaining and defending the 2013 Rule. Indeed, the agency issued an Advance Notice of Proposed Rulemaking seeking public comment on possible amendments to the Rule following *Inclusive Communities*. Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 83 Fed. Reg. 28,560 (proposed June 20, 2018) (to be codified at 24 C.F.R. pt. 100); *see also* Joint Status Report (June 25, 2018) [Dkt. #94]. And that fall, it shared its plans to issue a Notice of Proposed Rulemaking, Joint Status Report (Oct. 19, 2018) [Dkt. #95], which it finally published in August 2019. HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 84 Fed. Reg. 42,854 (proposed Aug. 19, 2019) (to be codified at 24 C.F.R. pt. 100).

## II.    The 2020 Rule

Ultimately, it took another year for HUD to publish its new final Rule (the "2020 Rule") replacing the 2013 Rule, after which the case remained stayed. HUD's Implementation of the Fair Housing Act's Disparate Impact Standard ("2020 Rule"), 85 Fed. Reg. 60,288 (Sept. 24, 2020) (to be codified at 24 C.F.R. pt. 100); *see* Joint Status Report (Dec. 14, 2020) [Dkt. #119]. But the new Rule, not surprisingly, invited new litigation elsewhere. Relative to the 2013 Rule, the 2020 Rule made it more difficult for plaintiffs to advance disparate-impact claims and easier for defendants to justify housing practices and policies so as to avoid liability. 2020 Rule, 85 Fed. Reg. at 60,292–97. Unhappy with that development, fair housing organizations challenged the 2020 Rule under the APA, and they were able to obtain a preliminary injunction in a Massachusetts

District Court postponing its effective date. *Mass. Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600, 607, 611–12 (D. Mass. 2020).

That ruling was in late 2020, just before yet another change of Presidential administrations. That new administration unsurprisingly quickly announced its opposition to the 2020 Rule, Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies, 2021 Daily Comp. Pres. Doc. 90 (Jan. 26, 2021), and by June 2021, HUD issued a Notice of Proposed Rulemaking with plans "to recodify its previously promulgated rule," the 2013 Rule. Reinstatement of HUD's Discriminatory Effects Standard, 86 Fed. Reg. 33,590, 33,590 (proposed June 25, 2021) (to be codified at 24 C.F.R. pt. 100). According to HUD, the 2013 Rule "better states Fair Housing Act jurisprudence and is more consistent with the Fair Housing Act's remedial purposes." *Id.* With such strong indications of a reversion back to the 2013 Rule, I finally held oral argument on the parties' cross-motions for summary judgment in July 2021—nearly four and a half years after originally scheduled. Tr. of Oral Arg. (July 19, 2021) [Dkt. #126]. The parties also submitted supplemental briefs after argument. Suppl. Br. in Supp. of Defs.' Mot. for Summ. J. [Dkt. #128]; Suppl. Br. of Pl. [Dkt. #129]. Still, the case remained stayed thereafter and through the publication of HUD's new Rule in March 2023 (the "2023 Rule").

### III. The 2023 Rule

The 2023 Rule comes as advertised, reinstating *verbatim* the disparate-impact standard from the 2013 Rule. Reinstatement of HUD's Discriminatory Effects Standard ("2023 Rule"), 88 Fed. Reg. 19,450, 19,454–55 (Mar. 31, 2023) (to be codified at 24 C.F.R.

pt. 100).[5]  To establish a claim for disparate-impact liability under the FHA, a plaintiff bears the initial burden of proving "that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1) (2023).[6]  A practice has such an effect "where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." *Id.* § 100.500(a).  If the plaintiff meets that initial burden, the defendant must then prove "that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the defendant.  *Id.* § 100.500(c)(2); *see also id.* § 100.500(b)(1)(i).  If the defendant meets that burden, the plaintiff may still prevail if it proves "that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3); *see also id.* § 100.500(b)(1)(ii).  As with the 2013 Rule, the final two burdens in the analysis "must be supported by evidence and may not be hypothetical or speculative." *Id.* § 100.500(b)(2).

---

[5] The only part of the 2020 Rule that the 2023 Rule retains is one example of an activity that would violate the prohibition on "engag[ing] in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons," "because of" a protected characteristic.  24 C.F.R. § 100.70(b) (2023).  The example is as follows: "Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin." *Id.* § 100.70(d)(5); *see* 2023 Rule, 88 Fed. Reg. at 19,455, 19,500.

[6] This opinion cites to the Code of Federal Regulations for the language codified therein and hereafter refers to that language as the "Disparate-Impact Rule."  It cites to the Federal Register for the preambles of the 2013 Rule and the 2023 Rule.

After the 2023 Rule was published, NAMIC[7] obtained leave to amend the complaint again, with minimal changes given that the 2023 Rule simply reinstated the 2013 Rule.  *See* Second Am. Compl. [Dkt. #146] ¶¶ 14–17; *id.* at 22.  The parties then submitted yet another round of supplemental briefs.  Suppl. Br. in Supp. of Defs.' Mot. for Summ. J. ("HUD Second Suppl. Br.") [Dkt. #150]; Suppl. Br. of Pl. [Dkt. #151].  At last their motions are now ripe for review.

## LEGAL STANDARD

On a motion for summary judgment in an action challenging an agency action, the typical standard under Federal Rule 56(a) does not apply.  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001).  Rather, "as an appellate tribunal," *id.*, the district court "must decide as a matter of law 'whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'"  *Cayuga Nation v. United States*, 594 F. Supp. 3d 64, 71 (D.D.C. 2022) (Lamberth, J.) (quoting *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013) (Contreras, J.)).  Under the APA, a reviewing court shall set aside a final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or one found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  A court reviews "an agency's construction of the statute which it administers" under the two-step framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).  At step

---

[7] *See supra* note 3 and accompanying text.

one, the court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, however, "the statutory provision in question is 'silent or ambiguous with respect to the specific issue,'" the court moves to step two and must defer to the agency's interpretation so long as it "is based on a permissible construction of the statute." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 552 (D.C. Cir. 2020) (quoting *Chevron*, 467 U.S. at 843).

With respect to standing and ripeness, "district courts are not limited to the administrative record." *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 187 (D.D.C. 2022) (Moss, J.). As the party invoking federal jurisdiction, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" supporting standing, "which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)). "Similarly, a defendant may move for summary judgment on standing, seeking to demonstrate 'that there is no genuine dispute as to any material fact' and that [a] plaintiff[] cannot establish the required elements of Article III standing based on the record evidence." *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 187 (citations omitted) (quoting Fed. R. Civ. P. 56(c)). Those same standards apply to the question of whether a claim is ripe for adjudication, on constitutional grounds or for prudential reasons. *Garcia v. Acosta*, 393 F. Supp. 3d 93, 103 (D.D.C. 2019) (Moss, J.).

## DISCUSSION

### I.   Constitutional Standing and Ripeness

For similar reasons as in 2014, *see Am. Ins. Ass'n*, 74 F. Supp. 3d at 36–39, NAMIC

has standing to challenge the Disparate-Impact Rule.   As an association, NAMIC has

standing only if (1) at least one of its members has standing to sue in its own right, (2) the

interests that NAMIC seeks to protect by suing are germane to its purpose, and (3) neither

the asserted claim nor the relief requested requires individual members to participate in the

litigation.  *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022).  The latter

two requirements are easily met.   The interests being protected by NAMIC here are its

*raison d'être*, *see* Second Am. Compl. ¶ 18, and the Court "see[s] no reason—nor has any

been identified—that an individual member's participation is required." *Ctr. for Biological

Diversity*, 56 F.4th at 67.

As to the first requirement, no doubt at least one of NAMIC's members has standing

to sue on its own—in fact, every single member likely has standing.   A member would

have standing upon a showing of an "injury in fact that was caused by the conduct of the

defendants and that can be redressed by judicial relief." *Pub. Citizen, Inc. v. Nat'l Highway

Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).  The 2023 Rule, by its own

terms, applies to the insurance practices engaged in by NAMIC's members.  *See* 2023 Rule,

88 Fed. Reg. at 19,463–80 (explaining in detail HUD's decision not to exempt insurance

industry, as requested by commenters in notice-and-comment).  And it sets a legal standard

under which insurance companies may become liable for violating the FHA.  *See id.* at

19,500.   That legal exposure is an injury in fact caused by HUD's rulemaking, and the

liability would be eliminated by a decision in NAMIC's favor. *See Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 43 (D.C. Cir. 2015) ("[R]egulated entities' standing to challenge the rules that govern them is normally not an issue, because regulatory constraints typically qualify as injury in fact." (cleaned up)).

Not so fast, says HUD.  It takes the position that the 2023 Rule "essentially duplicates pre-existing legal duties" imposed by the FHA and therefore does not cause any injury to NAMIC's members that can be redressed with a favorable ruling.  HUD Second Suppl. Br. at 12–15.  It points to cases in which a plaintiff lacks standing because two independent government actions produce the same harm but only one is challenged.  *See, e.g.*, *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015) (per curiam) (no standing to challenge EPA standards when unchallenged NHTSA standards independently caused same harm); *see also Texas v. EPA*, 726 F.3d 180, 198 (D.C. Cir. 2013) (no standing to challenge rule that actually *mitigated* the injury from a self-executing statute).  The same is true here, says HUD: even if the 2023 Rule is vacated, the FHA's disparate-impact liability, as interpreted in *Inclusive Communities* and other opinions, still applies to NAMIC's members.  HUD Second Suppl. Br. at 13–15.  I disagree.

HUD curiously undersells the Disparate-Impact Rule, which does not simply restate preexisting legal duties.  In "providing consistency nationwide," 2013 Rule, 78 Fed. Reg. at 11,460, the Rule "confirmed preexisting legal standards in some circuits, [but] it went beyond established law in others."  *Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1043 (N.D. Ill. 2014); *see* 2013 Rule, 78 Fed. Reg. at 11,462 (discussing divergent standards adopted by various U.S. courts of appeals).  It did even more in our

Circuit, where no judicially crafted standard has ever existed. *See Greater New Orleans Fair Hous. Action Ctr.*, 639 F.3d at 1085. And that calculus has not changed since *Inclusive Communities*. In holding that the FHA allows for disparate-impact claims, the Supreme Court recognized some outer boundaries on disparate-impact liability, 576 U.S. at 540–45, but it did not purport to establish a uniform legal standard or framework for deciding such claims. *Id.* at 586 (Alito, J., dissenting) (observing that majority opinion left unanswered specific questions about proving a disparate-impact claim). The Disparate-Impact Rule may well be "[c]onsistent with [HUD's] own past practice and that of many federal courts." 2013 Rule, 78 Fed. Reg. at 11,463. But the Rule can hardly be said to have zero practical effect in light of preexisting legal duties. If it did, why promulgate it in the first place?

HUD also argues that NAMIC's evidentiary submissions fall short of showing an "actual or imminent" injury. HUD Second Suppl. Br. at 10–12; *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). When NAMIC moved for summary judgment in 2016, it submitted affidavits from fifteen employees at certain of its member companies, and they all explained that they would need to start collecting data about applicants' and insureds' protected characteristics (which they otherwise do not do) in order to ensure compliance with the Disparate-Impact Rule. *E.g.*, Christy Aff. [Dkt. #60-4] ¶¶ 4–10; Hayward Aff. [Dkt. #60-6] ¶¶ 5–7, 12–14. According to HUD, those data-collection burdens are too hypothetical and speculative to count as an injury for purposes of Article III standing. HUD Second Suppl. Br. at 10–11. And, from HUD's perspective, the proof is in the pudding: "In the seven years since summary judgment briefing,

[NAMIC] still has not come forward with any evidence substantiating its claims of present or imminent injury to its members." *Id.* at 11.

But NAMIC's standing is "self-evident," and so it need not rely on evidence outside the administrative record to establish its standing. *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002). When a plaintiff challenges an administrative action and is "an object of th[at] action," usually "no evidence outside the administrative record is necessary for the court to be sure of" the plaintiff's standing. *Id.* Nothing further is required because "'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Defs. of Wildlife*, 504 U.S. at 561–62). And there is little question here. As noted above, the 2023 Rule expressly applies to the insurance practices engaged in by NAMIC's members, and it exposes those insurers to disparate-impact liability beyond what they otherwise would. 2023 Rule, 88 Fed. Reg. at 19,463–80, 19,500. NAMIC therefore has established its standing even without the data-collection burdens its members would purportedly bear under the 2023 Rule.

For much the same reasons, this action is constitutionally ripe for review. *See POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) ("Constitutional ripeness is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is imminent or certainly impending." (internal quotation marks omitted) (quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012))). While I acknowledge this action is a so-called "pre-enforcement suit," in which a regulated

entity is challenging the validity of a law before violating that law, *State Nat'l Bank*, 795 F.3d at 53–54, that sort of posture does *not* make a case premature.  Federal courts "'normally do not require plaintiffs to bet the farm' by violating the law in order to challenge" an administrative action. *Id.* at 54 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010)).  And HUD does not offer any reason to force NAMIC's members to bet their farm before their association can challenge the 2023 Rule here. *See* HUD Second Suppl. Br. at 17.  This case is therefore constitutionally ripe.

## II.     Prudential Ripeness

"Even if a case is 'constitutionally ripe,' though, there may also be 'prudential reasons for refusing to exercise jurisdiction.'" *Am. Petroleum Inst.*, 683 F.3d at 386 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)).  Not so, however, here!  The aim of prudential ripeness, in a nutshell, is to have "Article III courts make decisions only when they have to, and then, only once." *Id.* at 387.  In the administrative context, the doctrine seeks to prevent courts "from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *In re Aiken County*, 645 F.3d 428, 433 (D.C. Cir. 2011) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)).  It also "protect[s] the expenditure of judicial resources [and] comports with [the courts'] theoretical role as the governmental branch of last resort." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996).  Courts are thus tasked with evaluating "two factors in deciding whether to stay their hand: the 'fitness of the issues for

judicial decision' and 'the extent to which withholding a decision will cause hardship to the parties.'" *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 408 (D.C. Cir. 2013) (quoting *Am. Petroleum Inst.*, 683 F.3d at 387).

As to the "fitness" factor, NAMIC's claims are "presumptively suitable for judicial review" because they "raise purely legal questions." *Kaufman v. Nielsen*, 896 F.3d 475, 483 (D.C. Cir. 2018) (quoting *Venetian Casino Resort, L.L.C. v. EEOC*, 409 F.3d 359, 364 (D.C. Cir. 2005)).  NAMIC's position is that the Disparate-Impact Rule runs contrary to the FHA in all applications to insurers' underwriting and rating practices.[8]  Second Am. Compl. at 18–22.  Although, as detailed below, that position places a heavy burden on NAMIC, it nonetheless presents pure legal questions that NAMIC can raise now, before one of its members gets sued for practices that allegedly have a disparate impact.  *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464–65 (D.C. Cir. 2006) (facial challenge to regulation governing discharge permits as exceeding statutory authority was ripe, even though each permitting decision will rest on case-specific findings).  In other words, case-specific factual development would not, as HUD thinks, "significantly advance [the Court's] ability to deal with the legal issues presented nor aid [it] in their resolution." *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 82 (1978); HUD Second Suppl. Br. at 18–19.

---

[8] Underwriting refers to the decisions of whether to accept or decline an application for insurance and how to group an insurance policy with other policies that have similar risk profiles.  1 Steven Plitt et al., Couch on Insurance § 1:2 (3d ed. 2023); Daniel Schwarcz, *Towards a Civil Rights Approach to Insurance Anti-discrimination Law*, 69 DePaul L. Rev. 657, 664 (2020).  Rating refers to the setting of the premium to be paid by a group of policyholders, based on the risk insured. Plitt et al., *supra*, § 1:3; *see also* Schwarcz, *supra*, at 664 ("In practice, the line between rating and underwriting has become increasingly blurred in recent decades.").

And because the Disparate-Impact Rule marks the end of the administrative road, there is no concern that the Court's review would "disrupt" an ongoing "administrative process." *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 674 (D.C. Cir. 1978). With the Disparate-Impact Rule, HUD has "crystalized its position" on the scope of disparate-impact liability under the FHA, *Sprint Corp. v. FCC*, 331 F.3d 952, 957 (D.C. Cir. 2003), and private parties who believe they have been wronged may seek to establish such liability without any further decision-making from HUD. 24 C.F.R. § 100.500 (2023). The Rule is therefore unlike the agency actions challenged in some cases on which HUD relies, which contemplate further agency decisions. HUD Second Suppl. Br. at 18–19. For example, in *Diamond Shamrock*, the challenged regulation governed the measurement of wastewater discharge to be used by regional EPA administrators when issuing permits in the future. 580 F.2d at 672. And in *Office of Communication of United Church of Christ v. FCC*, the challenged policy statement outlined a framework that the FCC might apply in deciding whether to postpone review of a future license-transfer application. 826 F.2d 101, 103 (D.C. Cir. 1987). In those cases, "judicial intervention would inappropriately interfere with further administrative action." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Not so with the Disparate-Impact Rule.

The "hardship" factor weighs heavily in favor of reviewing the claims now. HUD's contention that NAMIC's challenge to the Disparate-Impact Rule would be ripe only after a specific underwriting or rating practice has been challenged as causing a disparate impact under the Rule is practically unworkable. HUD Second Suppl. Br. at 18–19. Indeed, it's no surprise that courts typically do not require parties to flout regulations and risk the

imposition of civil liability, just to obtain judicial review of a regulation. *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021). Speaking out of the other side of its mouth, HUD also claims that NAMIC has not suffered hardship because none of its members have faced a claim under the Disparate-Impact Rule since it was first promulgated in 2013. HUD Second Suppl. Br. at 20–21. Regardless of why that might be, it is enough to say that the Disparate-Impact Rule is "a substantive rule which as a practical matter requires [NAMIC's members] to adjust [their] conduct immediately." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). And perhaps they have done just that in order to avoid a lawsuit. The pressure to comply with the Disparate-Impact Rule or else get sued is a hardship "felt immediately by those subject to it in conducting their day-to-day affairs," *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967), not some "speculative or hypothetical future harm," *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 166 (D.C. Cir. 1988) (per curiam); *see also id.* ("The paradigmatic hardship situation is where a petitioner is put to the choice between incurring substantial costs to comply with allegedly unlawful agency regulations and risking serious penalties for non-compliance."). For all those reasons, NAMIC's claims are ripe for review, and the Court can proceed to the merits.

## III.   Merits

In a case that was initiated on the theory that the FHA does not encompass disparate-impact liability, NAMIC has been forced to change its strategy after the Supreme Court reached the opposite conclusion in *Inclusive Communities*. Under its new strategy, NAMIC still argues that the Disparate-Impact Rule conflicts with the FHA, but in more

nuanced ways.  As explained above, the Supreme Court in *Inclusive Communities* placed certain limitations on disparate-impact liability under the FHA so as to avoid potential constitutional issues and to prevent the Act from forcing housing authorities to reorder their legitimate priorities.  576 U.S. at 540.  NAMIC's theory is that the Disparate-Impact Rule goes beyond those limitations for four reasons.  Unfortunately for NAMIC, all four are unconvincing.  How so?[9]

### A.    Pervasive Consideration of Protected Characteristics

NAMIC first argues that the Disparate-Impact Rule is inconsistent with the FHA because it will cause protected characteristics to be used and considered by insurers in a pervasive way.  NAMIC Mot. at 15–21.  Without the Rule, the argument goes, insurers make underwriting and rating decisions without considering protected characteristics; those decisions are informed only by factors relevant to the risk of future loss, such as a home's age, its location, and repair costs.  *Id.* at 15–16.  Under the Rule, however, insurers must collect, store, and analyze data on insureds' and applicants' protected characteristics to determine if their practices result in or perpetuate a disparate impact.  *Id.* at 16–17.  They

---

[9] Before explaining why, I would simply note that, "[w]ith respect to the first step of the *Chevron* analysis, the FHA is silent regarding how the FHA or a private plaintiff should prove a housing discrimination claim." *Prop. Cas. Insurers*, 66 F. Supp. 3d at 1052–53.  I therefore reach *Chevron*'s second step and must uphold the Disparate-Impact Rule if it amounts to a permissible construction of the FHA. 467 U.S. at 843.

As to NAMIC's four reasons why the Disparate-Impact Rule is unlawful "to the extent it applies to insurers' ratemaking and underwriting decisions," Second Am. Compl. at 18–22 (capitalization altered); *see also* Tr. of Oral Arg. at 35:22–24, I will model my approach on the one taken in *Hodge v. Talkin*: examine the validity of the Disparate-Impact Rule's application to specific housing practices (insurers' underwriting and rating decisions), but ask whether the Rule is invalid in *all* such underwriting and rating decisions, not a particular decision that someone alleges resulted in a disparate impact. *See* 799 F.3d 1145, 1156–57 (D.C. Cir. 2015); *see also Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012) (same principles apply to challenges to both statutes and regulations).

would then have to rewrite their underwriting and rating models to eliminate any statistical disparities the data revealed. *Id.* at 17. But doing so would mean that insurers are, as prohibited by the FHA, considering protected characteristics in a pervasive way. *Id.* at 17–18.

NAMIC is indeed correct that the Supreme Court in *Inclusive Communities* sought to establish "adequate safeguards at the prima facie stage" so as not to allow disparate-impact liability to "cause race to be used and considered in a pervasive way." 576 U.S. at 542. It is also true that the Supreme Court cautioned against "interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." *Id.* at 543.

But it is hard to see how the Disparate-Impact Rule causes the pervasive consideration of protected characteristics that NAMIC fears is inevitable. Nowhere does the Disparate-Impact Rule require those engaging in housing practices to collect or use data on individuals' protected characteristics. *See* 24 C.F.R. § 100.500 (2023). Rather, as HUD points out, the initial burden is on the *plaintiff* to prove—through data or otherwise—that a housing practice actually or predictably results in a disparate impact. *Id.* § 100.500(a), (c)(1); HUD Mot. at 21. The defendant bears no such burden. 2023 Rule, 88 Fed. Reg. at 19,480 ("Defendants need not present their own statistics in response to this step one evidence . . . ."). And although an insurer "may wish to examine whether a facially neutral policy or practice causes an unjustified discriminatory effect," *id.* at 19,469, NAMIC does not explain how the provisions of the Disparate-Impact Rule induce that sort of "self-examination" beyond what the FHA, as interpreted in *Inclusive Communities*,

already induces. *See id.* at 19,465 ("Any obligation to evaluate practices comes from the language of the Act itself, not this final rule.").

Ultimately, NAMIC's argument here is a complaint about any sort of disparate-impact liability that might apply to insurance practices. *See, e.g.*, NAMIC Mot. at 18 ("In short, disparate-impact claims are in 'inevitable and irreconcilable conflict' with core insurance principles because they require insurers to consider race, not risk, in their rating and underwriting decisions."). Although I found that complaint convincing back in 2014, *Am. Ins. Ass'n*, 74 F. Supp. 3d at 44–45, we are now living in a post–*Inclusive Communities* world. And I do not see how the Disparate-Impact Rule causes pervasive consideration of protected characteristics beyond what the FHA, according to the Supreme Court, causes.[10]

### B.    State-Law Limitations on Insurance Practices

NAMIC next argues that the Disparate-Impact Rule is unlawful insofar as it forces insurers to consider the protected characteristics that state laws prohibit from consideration. NAMIC Mot. at 21–24. As NAMIC correctly points out, many states have enacted statutes that generally prohibit "unfairly discriminatory" insurance rates. Ronen Avraham, Kyle D. Logue & Daniel Schwarcz, *Understanding Insurance Antidiscrimination Laws*, 87 S. Cal. L. Rev. 195, 232 nn.124–25 (2014). And many states more specifically prohibit the consideration of certain characteristics in insurers' underwriting and rating decisions. *Id.* at 240, 248, 257, 263, 270–74; *see also id.* at 196 ("[S]tate insurance antidiscrimination

---

[10] The Court reaches that conclusion without according HUD any deference, which NAMIC argues would be inappropriate because HUD's interpretation of the FHA "raise[s] serious constitutional questions." *Miller v. Johnson*, 515 U.S. 900, 923 (1995); NAMIC Mot. at 18–20.

laws vary a great deal: in substance and in the intensity of regulation, across lines of insurance, across policyholder characteristics, and across states."). According to NAMIC, those laws "substantially limit[]" an insurer's "discretion" in its underwriting and rating decisions and thereby eliminate any cognizable disparate-impact claim. NAMIC Mot. at 23–24. And that, says NAMIC, makes the Disparate-Impact Rule unlawful. *Id.* at 24.[11]

NAMIC's argument borrows heavily from a particular passage in *Inclusive Communities*. In its discussion of a "robust causality requirement" necessary to limit the scope of viable disparate-impact claims, the Supreme Court raised some examples of housing practices in which a plaintiff might not be able to establish causation. 576 U.S. at 543. For example, a developer's decision to construct a new building in a particular location is unlikely to be "a policy causing a disparate impact because such a one-time decision may not be a policy at all." *Id.* Similarly, a state agency's policy of distributing tax credits under federal law might not be shown to cause a disparate impact if the "federal law substantially limits the [state agency]'s discretion" in its distribution. *Id.* If a plaintiff cannot show the causal connection between the policy or practice and the disparate impact, the result should be "dismissal of th[e] case." *Id.*

---

[11] NAMIC's theory here is not to be confused with one based on the McCarran-Ferguson Act, which calls for the primacy of state insurance law by prohibiting any federal law from being construed to invalidate, impair, or supersede state insurance law unless the federal law specifically relates to insurance. 15 U.S.C. § 1012(b). In its first opinion in this action, the Court saw the reverse-preemptive effect of the McCarran-Ferguson Act, in conjunction with the state laws discussed above, as a reason to hold that the FHA does not encompass disparate-impact liability. *Am. Ins. Ass'n*, 74 F. Supp. 3d at 43–46. (Again, the Supreme Court saw it differently. *Inclusive Cmtys.*, 576 U.S. at 545–46.) But the inquiry then was whether Congress intended to include disparate-impact liability in the FHA, not, as it is now, whether state law categorically severs the causation requirement in a disparate-impact claim under the FHA.

To be clear, that "robust causality requirement" actually works in favor of NAMIC's members if sued, making NAMIC's argument both counterintuitive and ultimately unconvincing.  Indeed, the causation element is meant to "protect[] defendants from being held liable for racial disparities they did not create." *Id.* at 542.  If an insurer is sued under a disparate-impact theory of liability, it can try to show that a state law prohibits (or requires) certain underwriting or rating decisions in a way that severs the causal connection between the insurer's practices and the disparate impact. *Id.* at 543.  If successful, the insurer should be able to get the case dismissed. *Id.*  But that does not make the Disparate-Impact Rule unlawful or, somehow, categorically inapplicable to insurers. *See Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394, 408 (Mass. 2016) (declining to adopt "a per se rule precluding disparate impact liability under the fair housing statutes where a property owner has acted in accord with statute, regulation, and contract").  It is one thing for a law to have a standard that is difficult (or perhaps even impossible) for a plaintiff to meet, and quite another for the law to be invalid.  NAMIC does not explain why the latter must follow from the former.  NAMIC Mot. at 24.  Accordingly, it cannot succeed on its theory that state antidiscrimination laws invalidate the Disparate-Impact Rule by severing the nexus between a housing practice or policy and a disparate impact.

### C.    Claims Based Solely on Statistical Disparities

NAMIC's next argument is that the Disparate-Impact Rule conflicts with the FHA insofar as the Rule allows a claim to be established solely on statistical disparities.  NAMIC Mot. at 24–26.  As already discussed, the Supreme Court in *Inclusive Communities* outlined certain limitations on disparate-impact claims, like the "robust causality requirement" that

"ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." 576 U.S. at 542 (alterations in original) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)).[12] One corollary of that causation requirement is that disparate-impact liability cannot be established "solely on a showing of a statistical disparity." *Id.* at 540. Simply put, a statistical correlation does not prove causation. *See id.* at 542 ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity." (emphasis added)).

NAMIC contrasts that limitation with the Disparate-Impact Rule, which does not include language specifically addressing how statistical evidence may (or may not) be used to establish causation. NAMIC Mot. at 24–25. The Rule simply requires a plaintiff, at the prima facie stage at least, to demonstrate "that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1) (2023); *see also id.* § 100.500(a) ("A practice has a discriminatory effect where it actually or predictably

---

[12] Back when the 2013 Rule was the operative rule being challenged in this action, American Bankers Association and its fellow amici argued that the Disparate-Impact Rule was unlawful because it did not follow *Wards Cove*'s framework for establishing disparate-impact liability, which, although abrogated in the employment context, was apparently "binding" in the housing context while the 2013 Rule was being promulgated. Amici Curiae Br. of Am. Bankers Ass'n [Dkt. #63] at 9–12. *See generally Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (explaining effect of 1991 amendment on *Wards Cove* framework for Title VII employment claims). Whatever effect *Wards Cove* had on the FHA back then, it can hardly be considered the definitive word on the disparate-impact liability under the FHA after *Inclusive Communities*, which issued well before rulemaking commenced for the 2023 Rule, the operative rule now. *See Inclusive Cmtys.*, 576 U.S. at 533 ("The cases interpreting Title VII and the ADEA provide essential background and instruction in the case now before the Court."). That is why NAMIC's action focuses, appropriately, on the Disparate-Impact Rule vis-à-vis *Inclusive Communities*, not *Wards Cove*. Second Am. Compl. at 18–22.

results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns . . . ."). That more general language allows "prima facie liability based entirely on a showing of statistical disparity, even if there is no evidence of causation," says NAMIC. NAMIC Mot. at 25. But "[t]he FHA forecloses that approach." *Id.*

From my perspective, NAMIC's argument reads too much into *Inclusive Communities* and not enough into the Disparate-Impact Rule. The Supreme Court's specific mention of statistical disparities was part of a broader discussion on the importance of establishing causation at the prima facie stage. *See Inclusive Cmtys.*, 576 U.S. at 542–43. And, contrary to NAMIC's position, proof of causation is exactly what the Disparate-Impact Rule requires of plaintiffs at the prima facie stage. 24 C.F.R. § 100.500(a), (c)(1) (2023). To be sure, the Supreme Court specifically called out statistical disparities as being insufficient *alone* to establish causation at the prima facie stage, *Inclusive Cmtys.*, 576 U.S. at 542, and the Disparate-Impact Rule does not. But the Disparate-Impact Rule's legal standard can still be, and is in fact, consistent with *Inclusive Communities* even if the Rule does not include the same depth of explanation as does the judicial opinion. As HUD explained when it first promulgated the Disparate-Impact Rule, the purpose of the Rule "is to formalize a long-recognized legal interpretation and establish a uniform legal standard, rather than to describe how data and statistics may be used in the application of the standard." 2013 Rule, 78 Fed. Reg. at 11,468. I therefore disagree with the premise of

NAMIC's argument: that the Disparate-Impact Rule allows a prima facie showing with nothing more than evidence of statistical disparities. Simply put: it does not![13]

### D.    Displacement of Valid Priorities

NAMIC's final argument is that the Disparate-Impact Rule violates the FHA insofar as the Rule allows plaintiffs "to force housing authorities to reorder their priorities." *Inclusive Cmtys.*, 576 U.S. at 540.  As the Supreme Court observed, "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." *Id.* (quoting *Griggs*, 401 U.S. at 431).  In the housing context, all sorts of valid factors—market dynamics, costs, traffic patterns, and historic architecture, to name a few—might influence where a private developer chooses to build, how zoning officials choose to draw lines, or how a housing authority chooses to allocate tax credits for low-income housing.  *Id.* at 541–42.  Disparate-impact liability cannot be used to force entities to make different decisions "merely because some other priority might seem preferable."  *Id.* at 541.  In other words, plaintiffs may not "attempt to second-guess which of two reasonable approaches a housing authority should follow in the sound exercise of its discretion."  *Id.*

---

[13] I likewise disagree with NAMIC's reading of HUD's responses to certain comments in notice-and-comment for the 2013 Rule.  NAMIC claims that HUD "disagreed" with comments recommending that the Rule require a party to "identify a specific practice and show the alleged discriminatory effect is caused by that specific practice."  NAMIC Mot. at 25.  But HUD did not quite "disagree[]" with the recommendation.  It explained that some cases might allow for easy identification of a specific practice causing an alleged disparate impact, while others might involve multiple acts that, combined, create a disparate impact.  2013 Rule, 78 Fed. Reg. at 11,469.  Either way, causation is required.  *Id.*

NAMIC also claims that HUD confirmed a commenter's concern that the Rule would allow for lawsuits based only on statistical data.  NAMIC Mot. at 25.  But that comment was in regard to an entirely different section of the 2013 Rule that is not part of the Disparate-Impact Rule's burden-shifting framework, 24 C.F.R. § 100.120(b)(2) (2013), and is not being challenged by NAMIC in this action.  2013 Rule, 78 Fed. Reg. at 11,478.

According to NAMIC, the final step of the Disparate-Impact Rule's burden-shifting framework allows for such second-guessing.  NAMIC Mot. at 27–28.  At that final step— after a plaintiff has proven that a practice causes a discriminatory effect, and after a defendant proves that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest—a plaintiff may prevail upon proving that the interest "could be served by another practice that has a less discriminatory effect."  24 C.F.R. § 100.500(c)(3) (2023).  A plaintiff need not, however, prove that the alternative practice achieves the defendant's interest as effectively as the challenged practice, which NAMIC thinks is crucial.  NAMIC Mot. at 27.  In fact, HUD received comments in notice-and-comment asking it to adopt such an "equally effective" standard at the final step, but it declined to do so.  2023 Rule, 88 Fed. Reg. at 19,490–91.

To the extent that the Disparate-Impact Rule's "could be served" standard could allow for second-guessing of the type prohibited by *Inclusive Communities*, NAMIC's challenge is not the vehicle to decide it.  Recall, NAMIC is challenging the Rule in every application to insurers' underwriting and rating decisions.  Second Am. Compl. at 18–22. It is therefore not enough to "point to a hypothetical case in which the rule might lead to an arbitrary result."  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 667 (D.C. Cir. 2019) (quoting *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991)).

But NAMIC tries just that!  It proposes a hypothetical in which a plaintiff can prove that an insurer's interest in setting risk-accurate rates "could be served" by basing rates on a criterion "that has a less discriminatory effect" than the insurer's preferred criterion, even though the plaintiff's alternative reflects actual risk less accurately than the insurer's

preferred criterion and thus is not "equally effective." NAMIC Mot. at 28–29. In NAMIC's hypothetical, the insurer's preferred criterion is the high risk of fire introduced by wood-burning stoves in a particular area populated disproportionately by families who observe a particular religion; the plaintiff's proposed alternative is the risk-lowering fact that the area has several fire stations nearby. The consideration of fire stations could serve the insurer's interest in setting risk-based rates and would have less discriminatory effect (rates would be lower), but it would not be as effective in capturing risk as would consideration of the risky wood-burning stoves.

In the abstract, this over-simplified hypothetical might make sense. But in the final analysis, the Court has no way of knowing whether the consideration of fire-station proximity would actually serve an insurer's interest in setting risk-accurate rates. In fact, it would probably be rather *in*accurate to base rates solely on that criterion. Nor do I know whether consideration of that criterion actually has a less discriminatory effect. In sum, the Court cannot conclude, based on a single hypothetical in which the Disparate-Impact Rule might allow a plaintiff to second-guess an insurer's priorities, that *every* underwriting and rating decision will be second-guessed in violation of the FHA. This is, after all, a summary judgment motion, not a law school classroom discussion! *See Brennan v. Dickson*, 45 F.4th 48, 61 (D.C. Cir. 2022).

## CONCLUSION

For the foregoing reasons, NAMIC's motion for summary judgment will be DENIED, and HUD's cross-motion for summary judgment will be GRANTED.  An order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge